<pre>
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF ARIZONA

 3                  _____

 4
     In Re:  Bard IVC Filters    ) MD-15-02641-PHX-DGC
 5   Products Liability Litigation )
                                   ) Phoenix, Arizona
 6   _____) May 18, 2018
     Doris Jones, an individual,  ) 8:30 a.m.
 7                                 )
                 Plaintiff,        )
 8                                 ) CV 16-00782-PHX-DGC
            vs.                    )
 9                                 )
     C.R. Bard, Inc., a New        )
10   Jersey corporation; and Bard  )
     Peripheral Vascular, Inc., an )
11   Arizona corporation,          )
                                   )
12               Defendants.       )
     _____)
13

14
            BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE
15
               REPORTER'S TRANSCRIPT OF PROCEEDINGS
16
               (Jury Trial - Day 4 - A.M. Session)
17               (Pages 720 through 861, inclusive.)

18

19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
</pre>

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3            GALLAGHER & KENNEDY PA
                By:  Mark S. O'Connor, Esq.
 4              By:  Paul L. Stoller, Esq.
                By:  Shannon L. Clark, Esq.
 5              By:  C. Lincoln Combs, Esq.
                2575 East Camelback Road, Suite 1100
 6              Phoenix, Arizona 85016

 7            LOPEZ MCHUGH LLP
                BY:  Ramon Rossi Lopez, Esq.
 8              100 Bayview Circle, Suite 5600
                Newport Beach, California 92660
 9
              HEAVISIDE REED ZAIC
10              By:  Julia Reed-Zaic, Esq.
                By:  Laura Elizabeth Smith, Esq.
11              312 Broadway, Suite 203
                Laguna Beach, California 92651
12
      For the Defendants:
13            NELSON MULLINS RILEY & SCARBOROUGH LLP
                By:  Richard B. North, Jr., Esq.
14              By:  Elizabeth C. Helm, Esq.
                By:  Matthew B. Lerner, Esq.
15              201 17th Street NW, Suite 1700
                Atlanta, Georgia 30363

16
                         I N D E X
17
      WITNESS:              DIRECT   CROSS   REDIRECT   RECROSS
18    ROB CARR
      (Resumed)
19    By Mr. Lopez             743

20    DEREK MUEHREKE
      By Mr. Combs             752              806
21    By Mr. North                     786

22              INDEX OF EXHIBITS

23    EXHIBIT                              IDENT    RECEIVED
      571     PowerPoint Presentation entitled
24            BPV Filter Franchise Review dated
              5/6/2008                      822       812
25    589     (No Description Available)              812
```

UNITED STATES DISTRICT COURT

| | EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|---|
| 1 | 590 | (No Description Available) | | 812 |
| 2 | 591 | Bard Idea POA on the Denali Filter, | | |
| | | Project No. 8108 Rev. 0.0, revised | | |
| 3 | | August 2009 by Bret Baird | | 812 |
| | 592 | E-Mail between you and Brian | | |
| 4 | | Reinkensmeyer in April of 2010 | 839 | 812 |
| | 1053 | Document RE. "Product Opportunity | | |
| 5 | | Appraisal for Recovery Filter", | 816 | 812 |
| | 1568 | Post-Market design review marketing | | |
| 6 | | Summary | 847 | 812 |
| | 1621 | (No Description Available) | 844 | 845 |
| 7 | 1740 | 1/18/2010 E-mail from Bret Baird | | |
| | | (Marketing Manager of IVC Filters) | | |
| 8 | | To Sales Team listserve (TPE-PV Sales-DG) | | |
| | | Re. "Important: Eclipse Vena Cava | | |
| 9 | | Filter Launch Details" | | 812 |
| | 1788 | 10/2/2010 E-mail Thread from Jeffrey | | |
| 10 | | Pellicio Re. "Meridian | | |
| | | Commercialization Plan" | | 812 |
| 11 | 1950 | Meeting Summary of the IVC Filter | | |
| | | Focus Group meeting held on 6/1/2006 | | |
| 12 | | In Chicago, IL at Hilton O'Hare | 747 | - |
| | 2453 | Expert Report of Derrek Muehrcke | 793 | - |
| 13 | 4414 | Email from Brian Reinkensmeyer to | | |
| | | Baird cc Pellicio and Randall | | |
| 14 | | Re "Filter study Idea" | | 812 |
| | 4416 | Bill Little email re Eclipse Filter | | |
| 15 | | Naming | 850 | 812 |
| | 4428 | Eclipse Vena Cava Filter Ad | 761 | 761 |
| 16 | 4454 | Eclipse Vena Cava Filter Concept | | |
| | | POA, Revision 2 | 835 | 812 |
| 17 | 4455 | Vail Vena Cava Filter DIS | 837 | 812 |
| | 4456 | Eclipse Vena Cava Filter Product | | |
| 18 | | Performance Specification (PPS) | | 812 |
| | 4457 | Vail Filter System DFMEA | | 812 |
| 19 | 4467 | 8/12/2011 email from Mike Randall to | | |
| | | Joni Creal re Corp approval needed | | |
| 20 | | For Cleveland Clinic Studies w/ | | |
| | | Attached PowerPoint slides | | |
| 21 | | Re Filter Fixation and Migration: | | |
| | | Forces and Design | | 812 |
| 22 | 4468 | 6/10/2011 email from Mike Randall | | |
| | | Re Meridian Presentation for SSM 2011 | | 812 |
| 23 | 4469 | Data Source Evaluation memo from | | |
| | | Natalie Wong to Quality Systems | | |
| 24 | | Coordinator, October 2010 | 855 | 812 |
| | 4499 | Meridian Vena Cava Filter vs. Eclispse | | |
| 25 | | Vena Cava Filter | 856 | 812 |

11:33AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.

1          P R O C E E D I N G S

2          THE COURT:  Good morning, everybody.

3          Counsel, I assume you saw the order I entered last

4    night on the 1006 chart and other documents.  And assuming we

5    have time, I would like to talk about that this morning.  But I          08:30AM

6    want to make sure we address any issues that need to come up

7    for this morning's events.

8          Are there any other issues besides those that

9    plaintiff or defendants wish to raise?

10          MR. O'CONNOR:  Nothing that we can think, of Your          08:30AM

11    Honor.

12          THE COURT:  Okay.

13          MR. NORTH:  Your Honor, we have one concern that we

14    would like to express.  And we believe that yesterday there

15    were a lot of implicit statements made that would suggest other          08:30AM

16    litigation which this Court has previously ruled should not be

17    admitted in front of this jury.  There were a number of

18    questions about what occurred where Mr. Lopez would ask what

19    occurred two months ago with Mr. Carr.  There were questions

20    that were talking about depositions and identifying the names          08:31AM

21    of specific other cases.  And we think this could easily be

22    cured by just referencing, have you told me in the past or on a

23    previous occasion without that specificity.  And we would ask

24    that the Court instruct all the parties to speak in those terms

25    as opposed to specific references that suggest previous          08:31AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.

1    litigation.

2          THE COURT:  Comments from plaintiff's counsel?

3          MR. LOPEZ:  I think he's talking about me.

4          I thought I was pretty careful, actually, Judge.  I

5    don't think I mentioned a case.  I don't think I did.  The          08:31AM

6    difficulty is one of them was a trial transcript.  I mean,

7    should I just call it a deposition?

8          THE COURT:  Well, when you referred to that you said,

9    two months ago, didn't you testify two months ago.  But I don't

10   think you referred to a trial.          08:32AM

11         MR. LOPEZ:  Yeah.

12         THE COURT:  I think you were careful not to refer to a

13   trial.  You did, probably a dozen times, refer to something two

14   months ago.

15         MR. LOPEZ:  Right.          08:32AM

16         THE COURT:  From which the jury, I assume, was

17   thinking it was either a deposition or a trial two months ago.

18   I don't think there was anything said to show it was a trial.

19   What cases are you thinking of he mentioned?

20         MR. NORTH:  He mentioned the Phillips case which was a          08:32AM

21   case tried in Reno in front of Judge Jones.  He mentioned the

22   Tillman case in reference to a deposition, a case in Florida,

23   just when referring to deposition transcripts.  I'm not

24   suggesting there was anything intentional done.  I just think

25   we need to be careful about these references.          08:32AM

1          MR. LOPEZ:  I thought I was, Judge.  If I slipped,

2     it's difficult when you are trying to -- I don't think I said

3     Tillman.  I do remember saying Phillips.  I think I was asking

4     Gay to find the transcript.  That's the only way I could

5     identify it.                                                    08:33AM

6          THE COURT:  I think what we ought to do going forward

7     is let's just refer to previous testimony.  We told the jurors

8     the depositions are testimony.  So say didn't you say in

9     previous testimony and avoid references to cases.  If you think

10    for some reason you need to call attention to a particular bit    08:33AM

11    of testimony that you think will jog the witness's memory you

12    can use a time:  Didn't you in previous testimony two months

13    ago, or a few years ago.  But I do think we -- I mean, I had

14    the same thought as this was going on.

15         MR. LOPEZ:  It's difficult.                                08:33AM

16         THE COURT:  It's dropping clues.  I know you were

17    trying to avoid it.  So let's just refer to it as previous

18    testimony and do our best to stay away from it so we honor the

19    Motion in Limine.

20         MR. LOPEZ:  The only reason I said the two months ago      08:34AM

21    is because I was trying to -- he was not remembering a lot of

22    stuff, Your Honor.  I thought it was important, at least from a

23    credibility standpoint he wasn't remembering things he said two

24    months ago.  Can I still do that?  I'm not doing it this

25    morning because I'm done with that.                             08:34AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.

1    THE COURT:  Let's refer to previous testimony and try

2    to avoid references to time, if we can.

3    MR. LOPEZ:  We do have one issue that I thought of.  I

4    will have -- we don't have to deal with it now, but there was

5    one part of the transcript in his testimony where I asked him          08:34AM

6    about the Recovery Filter, and he really downplayed the

7    problems with the Recovery Filter.  I will find the transcript.

8    We can probably deal with it next week.  But I think that's one

9    more step toward it being unfair that we can't reveal to the

10   jury the significance of the problems with the recovery.  And          08:35AM

11   he almost made it sound like it was an act of valor that they

12   took it down because it only had minor issues.

13   THE COURT:  If we're not going to be addressing it

14   this morning, let's not spend time on it.  Because I will need

15   to look at whatever you are talking about next week.  You can          08:35AM

16   raise it next week but I'd rather spend time on the other

17   issues this morning.

18   Anything else that needs to be raised?

19   MR. NORTH:  Nothing.

20   THE COURT:  In the order I entered last night I raised          08:35AM

21   three issues for folks to address.

22   MR. CLARK:  Your Honor, I'm sorry.  I did have one

23   short matter for one of the witnesses this morning.  We plan to

24   call Mr. Bret Baird.  And one of the exhibits that we do intend

25   to use with him is Exhibit 4416, which is the "break the          08:35AM

1  baggage" memo.  I did want to get some clarification from the

2  Court because I could anticipate this could come up on a

3  opening the door type issue with respect to lawyer advertising

4  and I would rather not take the time at sidebar while the jury

5  is empaneled.                                                    08:36AM

6       THE COURT:  So what's the issue you are asking me to

7  address?

8       MR. CLARK:  I plan to move it into evidence.  And what

9  I want to get some clarification is the Court's order in

10 denying -- I'm sorry -- granting the Motion in Limine Number 7   08:36AM

11 relating to lawyer advertising indicated that it is possible

12 that plaintiffs would be opening the door to evidence

13 concerning the filter law website.  And I just want to address

14 that now so we don't have to deal with it later.

15      We don't think that it is accurate that that is, in        08:36AM

16 fact, what the meaning of baggage was.  Obviously, if the

17 defendants have a different position we would like to know that

18 now so we kind of know which direction to go.

19      MS. HELM:  Your Honor, I told Mr. Clark yesterday when

20 we talked about this that it was our position that if they went  08:36AM

21 into "break the baggage" that the witness's explanation of what

22 that baggage was would open the door to attorney advertising

23 that was taking place back at the time the Eclipse Filter was

24 on the market.  There was a website called filterlaw.com that

25 did not involve these lawyers but that competitors of Bard       08:37AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.

1    found out about and were using it to market and try to sell

2    against Bard.  The sales and marketing teams at Bard spent a

3    tremendous amount of time countering this bad press and what

4    their competitors were using, how they were using what was, in

5    fact, attorney advertising to sell in the marketplace.                08:37AM

6           We have instructed all of our witnesses that they

7    can't -- that we have instructed them very clearly that they

8    can't use -- they can't talk about what was happening at the

9    time.  It actually came up with Mr. Carr yesterday.  Mr. Lopez

10   asked him a question that said:  Did the sales force need to be      08:37AM

11   re-energized?  And he said yes, absolutely, but couldn't

12   explain what was going on in the marketplace.

13          So I do believe that -- I mean, Mr. Baird, if allowed

14   to testify, will explain that the baggage is not complications

15   with the filter.  It's what was going on in the marketplace          08:38AM

16   because of this filterlaw.com which was, in fact, attorney

17   advertising.  So we believe it at least opens the door to that

18   attorney advertising and what was going on in the marketplace

19   at the time so that the witnesses can truthfully and fully

20   explain what the baggage is.  Otherwise, the implication is          08:38AM

21   that it's complications and problems with the filter.

22          THE COURT:  Was Mr. Baird a party to this e-mail, this

23   communication?

24          MS. HELM:  Yes, Your Honor, he was.  He wrote it.

25          THE COURT:  He's the one who said "baggage."              08:38AM

1           MS. HELM:  Yes, Your Honor.

2           THE COURT:  So, Mr. Clark, what is your response to

3    the suggestion that he should be able to explain what he meant

4    by "baggage" even if it includes that website?

5           MR. CLARK:  I think just to be clear, Your Honor, if      08:38AM

6    he is going to testify that baggage -- what he meant by

7    "baggage" was this website, then you are right.  We have opened

8    the door to that narrow issue.  But what I don't want to have

9    happen is this case to turn into an indictment of lawyer

10   advertising, that there were other things.  So I think we need   08:39AM

11   to have some type of structure that it is this website, and it

12   does not involve the lawyers in this courtroom.  Because I feel

13   like that could be misleading.  Particularly, you heard how

14   important this issue was to the members of the panel before we

15   got the jury.                                                    08:39AM

16          So I think if we can just have some clarification he

17   would be referring to that website, it was back at the time

18   this memo was drafted and didn't involve the lawyers in this

19   courtroom, I think that's a fair compromise.

20          THE COURT:  So I understand you to be saying, Mr.        08:39AM

21   Clark, that you still want to introduce it.

22          MR. CLARK:  Yes.

23          THE COURT:  Even if the response from Mr. Baird is the

24   baggage was a reference to this filterlaw website that was

25   causing us problems in the marketing that was lawyer            08:39AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.

1    advertising but somehow clarifying not advertising by these

2    lawyers.  I know that's not ideal for you, but if that's his

3    truthful description of what he meant by "baggage" you are not

4    suggesting I prevent him from doing that as I understand.

5         MR. CLARK:  No, Your Honor.  We questioned that was                08:40AM

6    only thing he meant by that, but I think that's fair game.  But

7    again, just that specific website.

8         THE COURT:  Okay.  Ms. Helm, do you see it any

9    differently in terms of what his specific response would be?

10        MS. HELM:  No, Your Honor.  We believe, and we believe          08:40AM

11   the fair compromise is to limit it to the advertising that was

12   taking place at the time the documents were written.  And that

13   was, indeed, the filterlaw.com website.

14        THE COURT:  And does he have any knowledge as to

15   whether or not these lawyers were involved with that?                     08:40AM

16        MS. HELM:  No, he doesn't have that knowledge.

17        THE COURT:  It seems to me in fairness what we ought

18   to do, subject to your comments, is either during that

19   testimony or afterward, have me tell the parties or you tell

20   the parties that the parties agree that the plaintiff attorneys        08:41AM

21   in this case were not involved with the filter website,

22   filterlaw website.

23        MS. HELM:  Your Honor, I think I can say -- I mean,

24   he's going to say, I don't know who it was.  And we can say

25   well, we know it wasn't the lawyers here in the courtroom but          08:41AM

 1   there was a website or something like that.  I think I that

 2   would be fine.

 3          THE COURT:  You would do it during your questioning?

 4   Is that what you are thinking?

 5          MS. HELM:  Yes, Your Honor.                      08:41AM

 6          THE COURT:  So we will find a way to make clear to the

 7   jury it doesn't involve any plaintiff's attorneys.  And if, Mr.

 8   Clark, after the witness has testified you think additional

 9   clarification is needed, call for a sidebar and we'll talk

10   about that.                                            08:41AM

11          MR. CLARK:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          MS. HELM:  Thank you, Your Honor.

14          THE COURT:  We've only got 17 minutes left.  I'm going

15   to confine each of you to about five or six minutes.  What I   08:41AM

16   want to do is hear your responses on the three issues that I

17   raised plus any others.

18          Let's start with plaintiff.

19          MS. REED-ZAIC:  Your Honor, I read your order last

20   night, and I believe the first question pointed at the        08:42AM

21   plaintiff is the case that was provided, the *Schwartz* case, and

22   if there was contrary authority found, contrary cases.  And I

23   did not find any contrary authority in the Ninth Circuit.  I

24   found other cases, specifically the *In Re: Tylenol* case, 181

25   F. Supp. 3d 278.                                       08:42AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.

1        THE COURT:  I'm sorry.  181 F. Supp. 3d --

2        MS. REED-ZAIC:  278.

3        THE COURT:  Is there a page cite?

4        MS. REED-ZAIC:  It is 287.

5        THE COURT:  Okay.  It's Section 4 under Westlaw.  It's     08:42AM

6    a Section 4 headnote.  It involves notice and describing the

7    fact that the extent to which defendants were on notice of the

8    potentially adverse effects of Tylenol would be relevant to

9    showing how intentional the behavior was and not addressing a

10   potential problem or safety signal and the number of adverse    08:43AM

11   events will not necessarily be limited.  It was a pretrial

12   ruling, however, again, not controlling in the Ninth Circuit.

13   But there are cases that indicate this sort of information.

14        Let me cut to the chase.

15        THE COURT:  *Schwartz* isn't controlling either.          08:43AM

16   *Schwartz* is an unpublished decision.

17        MS. REED-ZAIC:  Understood.  But it's in the Ninth.

18   It's informative.  Let me cut to the chase.  At the end of the

19   order there was a question whether this proposal of providing

20   the number of adverse events, counting them up and then        08:43AM

21   providing a sampling.  We -- I'd like to make a record that I

22   think the *Schwartz* case is absolutely completely different to

23   the nth degree in the sense that the defendant was not selling

24   showers.  They were not selling showers and saying there's a

25   coating and film that's going to prevent falls and it's going   08:43AM

1    to prevent these particular adverse events and injuries.  It

2    was a hotel describing notice of how many times people had

3    fallen.  So it's a completely different set of circumstances.

4          And in this case in particular, the defendant has used

5    the lack of reporting and the lack of the number of adverse          08:44AM

6    events.  So they have brought the cumulative -- alleged

7    cumulative nature of this issue to the forefront themselves,

8    starting from opening statement and stating that 99 percent of

9    Eclipse filters sold had no reported events, fractures,

10   migrations, et cetera.  And we always feel that showing the          08:44AM

11   summary and nature and extent and the characterizing the actual

12   adverse events counterbalances the presentation of numbers and

13   the claimed lack of reporting by a natural phenomenon effect

14   that they are not required to report.  It evens the playing

15   field in the 403 analysis to allow us to present the nature and      08:44AM

16   extent of the actual injuries.

17         We understand the Court's proposal with regard to

18   rather than sending back, you know, a thousand of these,

19   although substantially similar according to the codes and the

20   searches that we have done we're not opposed to the proposal.        08:45AM

21   I guess we would sort of need to understand what that's going

22   to look like if we were to take 10, I'll call them exemplars,

23   examples, of injuries for each particular filter as long as we

24   can provide the number at the end of the day of each particular

25   failure mode.  I think we would be okay with that.                   08:45AM

1    But I think -- and I don't know if Mr. Lopez would

2    like to comment.  We got in a long discussion about this last

3    time about the presentation of it, and we don't know what the

4    defendants' objections would be.  I know we're limited on time.

5    There was an issue asking the defendants if they had actually          08:45AM

6    reviewed the exhibit, and I just wanted to point out it was in

7    our bench brief, that that exact exhibit with the caveat was

8    actually attached to our filing back Docket Number 10068 when

9    we were opposing the initial Motion in Limine with regard to

10   other complications.                                                    08:46AM

11   So they have had a substantial number of these in the

12   exact format.  The only difference being is that there was a

13   later production of adverse events from 2013 to 2015 that we

14   hadn't yet reviewed.  And we reviewed those adverse events

15   produced by the defendants just this within the last month             08:46AM

16   since the last filing.  And we added just the fractures related

17   to this case, of course, to get something in front of the

18   court.

19   So they have had this exhibit, essentially, since the

20   filing a few months back.                                              08:46AM

21   THE COURT:  Thank you.

22   MR. NORTH:  Your Honor, we did look through the

23   exhibit.  And Ms. Reed-Zaic is completely correct.  We have had

24   access to the exhibit.  We acknowledge that the exhibit

25   correctly and accurately reflects the event descriptions from          08:46AM

—5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.—

1    the complaint files.  We do believe there are two or three that

2    really are not in the complication areas that the Court has

3    outlined.  But if the Court were to decide to admit the exhibit

4    in its entirety, that's certainly something we could work out

5    with counsel as far as that's concerned.                          08:47AM

6         Before I get to the meat of the argument, I did want

7    to mention one other small thing.  But if this Court were to

8    decide to admit the three actual complaint files that were

9    mentioned yesterday, I would like to note for the record that

10   Exhibit 3270, one of those complaint files, has my name         08:47AM

11   littered throughout it because it was one of those cases that I

12   mentioned, events that came to the attention of the company

13   through litigation.  And my office was the source of a lot of

14   the information that the company had to analyze and investigate

15   the claim.  And if that were to be admitted, I would           08:47AM

16   respectfully request under 403 that any mention of my name be

17   redacted because I think it injects issues into the proceeding

18   that should not be there.

19        As far as the Rule 403 issue goes, this is a matter of

20   great concern to Bard in this particular litigation.  This      08:48AM

21   case, Ms. Jones' case, like probably 80 to 90 percent of the

22   cases in this MDL involve not a significant long term injury

23   with regard to this filter.  Yes, there has been a

24   complication.  But as far as the sequela of that complication

25   it is not, as the Court has heard and will heard, going to be   08:48AM

1    as significant as what they are trying to portray with many of

2    these events.

3           They have -- and nobody is contesting the fact that

4    they can get in to this Court and in front of this jury the

5    number of adverse events in all of these categories that have          08:49AM

6    occurred.  We have never objected to that.  We have, in fact,

7    touted the low adverse event rate that we compute.  All this

8    issue is about is their desire to get the gory details of every

9    single report of an adverse event.  And it is -- they want to

10   overwhelm the jury with a 450-page document that makes it              08:49AM

11   appear that there are many more events than there are, and they

12   want all these descriptions, many of which have never been

13   verified, in front of the jury to argue that just by the

14   cumulative nature there must be something wrong here.

15          We believe that is not only cumulative but extremely            08:49AM

16   prejudicial for Bard.  If this Court were to decide consistent

17   with what the Court did in *Schwartz* to select or limit the

18   number, we would ask that the plaintiffs not be allowed to

19   unilaterally choose that number.  If the Court were to, for

20   example, as suggested or mentioned in the order last night,            08:50AM

21   limit the number of events to 40, they should be randomly

22   selected or each side should get to choose 20.  Otherwise, they

23   are going to go and find the 40 most severe injury cases

24   reported when the vast majority of the events described in that

25   spreadsheet are asymptomatic events.  They are going to find           08:50AM

1    the handful that did involve a death or very, very serious

2    invasive surgery of some sort.

3           We believe it's going to be difficult, in all candor,

4    for Bard to get a fair trial if the jury has a 450-page

5    document that outlines in gory detail all these unverified          08:51AM

6    facts about patients who had complications.  We are afraid it

7    is going to distract this jury's attention from the fundamental

8    issue here, which is was the Eclipse Filter defectively

9    designed, and was there an adequate warning with regard to the

10   Eclipse Filter.  And how -- we have already acknowledged they       08:51AM

11   can put in how many of these events occurred.  But to overwhelm

12   the jury with that level of minutia on that many events,

13   merely, we believe, creates a prejudice that we cannot

14   overcome.

15          And particularly, the probative value of those details       08:51AM

16   is very marginal given the fact that the occurrence itself is

17   already going to be in front of the jury.  The fact that there

18   were, let's say, 300 fractures, that's going to be in front of

19   the jury.  The fact that there were 200 migrations, that's

20   going to be in front of the jury.                                   08:52AM

21          So the probative value of every minutia detail with

22   regard to each of those events is marginal particularly

23   compared to the prejudice that will be involved.  So that for

24   that reason, we would ask for this Court to significantly limit

25   what can come in to the jury from that spreadsheet under Rule       08:52AM

1    403.

2              THE COURT:  Okay.  Thank you.

3              Any other comments?  Ms. Reed-Zaic.

4              MS. REED-ZAIC:  Mr. Lopez would like to make a

5    comment.  But since I'm more familiar with the actual complaint    08:52AM

6    files I would like to state this for the record.  We're not

7    opposed to redacting Mr. North's name on the one particular

8    complaint.  But I did want to mention that this statement about

9    gory details, the only thing that's in the summary is their

10   event description.  And that does not include a lot of the        08:52AM

11   details in these complaints.  It is filtered through a Bard

12   employee who collects all of the information and all of the,

13   quote, gory details and puts it into an event description

14   filtered through them.  And that is the only thing that is on

15   that chart.  There is a lot of other information when you walk     08:53AM

16   through a complaint detail about things I put in the Court

17   previously, you know patient taken back, pull stopped, detail

18   after detail of communications.  And the only thing on the

19   chart is the summary.

20             MR. LOPEZ:  You know, as the Court knows from the        08:53AM

21   Booker trial and from opening statement, the defense in this

22   case is that there are only a certain percentage of the

23   fractures and migrations and perforations.  That doesn't tell

24   the story.  What tells the story is what the severity -- this

25   is a risk/benefit case.  Their argument is that the risks --       08:53AM

1    the benefits of these outweigh the risk.  Just saying there's a

2    fracture doesn't tell the story.  What tells the story are what

3    happens to individual plaintiffs.  And in the summary sometimes

4    it's a combination of fracture migration and tilt.  So to take

5    out, you know, the details of some of these that are                    08:54AM

6    particularly those that are like Ms. Jones is not allowing us

7    to tell the jury what the true risks are in this case just to

8    count up numbers.

9          THE COURT:  Let me tell you the concern I have about

10   that argument so you can respond to it.                                  08:54AM

11         If it's true that every filter has these

12   complications, some level of migration and tilt and perforation

13   and fracture, and it seems to me you could pick out a filter

14   that everybody agrees is reasonably designed and reasonably

15   marketed.  And in a trial you could zero in on the specific             08:54AM

16   difficult human details of the complications that come with

17   that filter in asking the jury to decide whether it's

18   reasonable.  And if the jury is focusing in on those human

19   details they could conclude it's not reasonable even though

20   that level of complication is accepted by everybody as                  08:55AM

21   appropriate given the risk/benefit.

22         My point is, it seems to me that the details can lead

23   to an inaccurate conclusion out of a motion, and that's one of

24   the things I'm wrestling with, is I understand it's part of the

25   story, but it's a part of the story that evokes human emotion.          08:55AM

1    And even for a reasonably designed filter to cause a jury to

2    say it's not reasonable, look at the suffering these people

3    went through.  Could you address that?

4         MR. LOPEZ:  I can.  For example, in the last trial I

5    think it was Dr. Hurst that said the Simon Nitinol Filter has        08:55AM

6    fractures, but it doesn't do anything to the patient because it

7    stays encased within the body of the filter.  These conical

8    shaped filters, when you have a fracture, the risk level is

9    significantly higher.

10        THE COURT:  I understand that, that point about the              08:55AM

11   fracture.

12        MR. LOPEZ:  So for them to think that this is just a

13   balancing act between whether one device fractures more than

14   the other doesn't tell the story about the risk of fracture

15   with the design of this device.  There are a number of these        08:56AM

16   complaints where, just like Ms. Jones, where a piece of the

17   filter embolized.  Embolization is a different from a migration

18   where the filter just moves up and down within the vein or a

19   fracture that someone finds within the wall of the vena cava.

20   The real risk here to the design of this thing is not only the      08:56AM

21   fact that it has a higher incidence of reported fractures, that

22   higher incidence of reporting fractures puts patients with that

23   filter at an increased risk of death, frankly, of serious

24   consequences.  For this -- they want to turn this into a case

25   of how many fractures, how many migrations, how many                08:56AM

1    perforations because what do they do?  They go to the SIR

2    guidelines and they pigeonhole these things into what was

3    reported in the literature about devices that are no longer on

4    the market or have nothing to do with the Bard filter.  They

5    didn't analyze the Bard filter.  If you were to do this today          08:57AM

6    maybe the SIR would say, here's a category of fractures, of

7    pieces that embolized to the heart, and, you know, our position

8    is that is much more significant design problem than just we

9    have -- we've got fractures that are within the acceptable

10   range of fractures.                                                    08:57AM

11           That is -- talk about misleading.  That's not giving

12   us a fair trial because the risk has to be what the risk is.

13   The risk here, the severity of this risk is much different than

14   just the fact that there's been a history of fractures.  They

15   are going to say we warn of fractures in our IFU.  Ours is            08:57AM

16   that, no, you should be warning of how many times you have had

17   a fracture of these devices where a strut has either gone into

18   the heart or through the heart into the lung like it had with

19   Ms. Jones.  Because that's what she needs to be warned about,

20   not the fact that there are fractures.                                08:58AM

21           THE COURT:  Okay.  I understand that point.  Thank

22   you.

23           MS. REED-ZAIC:  I'm sorry.  Just one more point.  Mr.

24   North's commentary that we would have the default position of

25   pulling the most severe injuries and front load that or try and      08:58AM

1  mislead this jury, you know, this was a questionnaire process.

2  This is a very educated jury.  I don't think it would behoove

3  us to put in deaths and procedures that Ms. Jones did not

4  undergo or injuries that are not substantially similar.  And

5  the fact that two or three complaint files that actually went          08:58AM

6  in front of Mr. Modra were fractures, they were a piece that

7  embolized to the heart or lungs.  They were substantially

8  similar to her injuries.

9          THE COURT:  Do you agree that if we were to do a

10  representative sample it would have to be a representative          08:58AM

11  sample.  It couldn't pick out the 20 or 40 worst instances.  It

12  would have to be indicative of what's in the entire body of the

13  complaints.

14          MS. REED-ZAIC:  True.  And we actually started to do

15  that with Mr. Modra and refined it such that it was even more          08:59AM

16  relevant to this actual case.

17          THE COURT:  All right.  We've got to get the jury in.

18  I will tell you this.  I find this to be a challenging issue.

19  I need to think about it.  I have read three or four of the

20  entries in the big exhibit.  I'm going to read much more of it          08:59AM

21  and look at the case that's been cited.

22          MS. REED-ZAIC:  There's a housekeeping matter.

23          THE COURT:  Do my best to come up with the right

24  decision.  Let's get the jury.

25          MS. SMITH:  One issue plaintiffs would like to          08:59AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.

1    address, if plaintiffs are seeking one-week extension to

2    defendants' Motion to Seal certain trial exhibits, it's Docket

3    11010, we have met with defendants and they agree.  And we're

4    just seeking relief from the Court.

5               THE COURT:  That's fine.                         08:59AM

6               MS. SMITH:  Thank you.

7               (Jury in at 9:00 a.m.)

8               THE COURT:  Good morning, Ladies and Gentlemen.  Thank

9    you all for being here.  We are going to pick up where we left

10   off last night with the testimony of Mr. Carr.              09:00AM

11              MR. LOPEZ:  Thank you, Your Honor.

12                            ROB CARR

13   called as a witness herein, having been previously sworn, was

14   examined and testified as follows:

15                   DIRECT EXAMINATION (Resumed)

16   BY MR. LOPEZ:

17   Q.  Good morning, Mr. Carr.

18   A.  Good morning.

19              MR. LOPEZ:  Could we, Gay, put up Exhibit 770?  I

20   think we were talking about that right near the end of the day. 09:01AM

21              Can I publish it to the jury, Your Honor?  It's

22   admitted.

23              THE COURT:  Yes.

24   BY MR. LOPEZ:

25   Q.  And if we go to Page 5 of this document, again, just can we  09:01AM

1    just remind the jury what is a Concept POA as Bard uses that

2    phrase?

3    A.   It's an initial business document that is put together to

4    frame out a potential project, puts together, in this case, a

5    next filter, lays out the potential market, some of the                09:01AM

6    situations going on in the market, some of the hypotheses for

7    the program.  So it's just a business document.

8    Q.   Multiple people contribute to the content of a document

9    like this?

10   A.   They can, yes.                                                    09:02AM

11   Q.   And they gather up whatever information within the company

12   to put into a document like this so it can be summarized and

13   discussed among other people within the company.  Is that

14   accurate?

15   A.   Yes.                                                              09:02AM

16   Q.   If you look at Page 5, we have -- in your screen, and --

17   A.   I have Page 6.  I'm sorry.

18   Q.   Should be Exhibit 770.005.  At the top it should say

19   description of unmet needs.  Do you see where I am?

20   A.   Yes.  Sorry.  Mine says Page 6.  I'm sorry.  On the top.         09:02AM

21   Q.   Okay.  I see.

22   A.   Sorry.

23   Q.   So what was the situation?  Was that just what's the

24   current situation that the company is aware of?

25   A.   Partially, yes.  So SPIN, situation, problem, implication,       09:02AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    and needs is a way -- it's a popular selling tool, and it's

2    also a way that we try and develop programs.  So we go and try

3    and identify current situations, what problems do those

4    situations have, what are the implications of those problems,

5    and then what are the needs and/or solutions of those.  And so          09:03AM

6    it's a popular selling method.

7    Q.  Gotcha.  So the situation here was physicians are very

8    sensitive to complications with optional IVC filters that make

9    it difficult to retrieve or that increase the risk for

10   patients.  And Number 2, physicians decide to place filters in          09:03AM

11   patients based on the risk/benefit tradeoff.  And Number 3,

12   physicians decide on which filter technology to use based on

13   the risk/benefit tradeoff.

14          Did I read that correctly, sir?

15   A.  Yes.                                                                 09:03AM

16   Q.  And then the problem, there are three problems identified.

17   Number 1, no filter is benign without complications and

18   optional filters get more scrutiny as a result of retrievals;

19   and Number 2, the Bard G2 has a reported rate of 12 percent

20   caudal migration, 18 percent tilt, and 22 percent penetration           09:04AM

21   in the EVEREST trial.  And the third problem is though the

22   reported incidence rate of G2 Filter fracture is low, the

23   severity of fractures can be significant.

24          Did I read those correctly?

25   A.  Yes.                                                                 09:04AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   Q.  And the implications, number one, physicians who experience

2   even one challenging filter case may react strongly and choose

3   to move away from using the product altogether.

4           Did I read that one correctly?

5   A.  Yes.                                                    09:04AM

6   Q.  Complications may drive physicians to become more selective

7   in patient usage of vena cava filter therapy; Number 3, though

8   migration tilt and penetration are not seen as significant

9   issues, they have potential, the potential, to lead to more

10  serious problems; and Number 4, a fractured arm or leg of a     09:05AM

11  filter can result in complications.

12          Did I read those correctly, sir?

13  A.  Yes.

14  Q.  And then the solution, a filter that meets these needs will

15  reduce the number of reported complaints, Number 2, create more  09:05AM

16  confidence in physicians; Number 4, provide patients an

17  improved filter experience.  I may have said Number 4.  Number

18  3 is provide patients an improved filter experience; and Number

19  4, capture more competitive market shares.

20          Did I read that correctly?                          09:05AM

21  A.  Yes.

22  Q.  Sir, would you agree with me that if the solution to some

23  of these complications could be reduced by 78 percent by Bard

24  making design changes to its filter, do you think that Bard

25  should do that?  Yes or no?                                 09:05AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    A.  It depends on what those were.

2    Q.  You can't answer -- well, let me, again, if Bard could

3    reduce the complications that are described here by 78 percent,

4    should Bard do that?  Yes or no?

5    A.  Potentially.                                              09:06AM

6            MR. LOPEZ:  1950, please, Gay.  Exhibit 1950.

7    BY MR. LOPEZ:

8    Q.  You are only going to see this for the time being, Mr.

9    Carr.  Do you recognize this document?

10   A.  Yes.                                                      09:06AM

11   Q.  Were you at this meeting?

12   A.  Yes, I was.

13   Q.  Is this a summary of the meeting?

14   A.  Yes.

15           MR. LOPEZ:  Your Honor, I'd like to offer 1950 into   09:06AM

16   evidence at this time.

17           THE COURTROOM DEPUTY:  I show that in on the 15th.

18           THE COURT:  We show that as admitted.

19           MR. LOPEZ:  Okay.

20           MR. NORTH:  There are some redaction issues but       09:06AM

21   subject to those, no objection.

22           THE COURT:  Actually, I don't show it in evidence,

23   Traci.

24           THE COURTROOM DEPUTY:  I will check.  I show May 15.

25           THE COURT:  I will admit it even if it has already    09:07AM

1   been admitted but subject to redaction.  I assume you are

2   agreeable to working out redaction?

3           MR. LOPEZ:  We'll work that out, Your Honor, yes.

4   BY MR. LOPEZ

5   Q.  Okay, sir.  What's an IVC -- an IVC focus group is where        09:07AM

6   you bring experts to a meeting whose advice you seek about

7   various issues dealing with your products.  Right?

8   A.  Not issues, just a group of physicians we bring to talk

9   about filter usage.  Yes.

10  Q.  Dr. Rogers, do you know who Dr. Rogers is?                      09:07AM

11  A.  I do.

12  Q.  What is Dr. Rogers' specialty?

13  A.  He's a trauma surgeon.

14  Q.  And Dr. Trerotola, is he an interventional radiologist?

15  A.  Yes, he is.  I can't see it anymore.  Sorry.                    09:07AM

16  Q.  Okay.  And there are a number of doctors here who basically

17  you sat in a room with them and got their advice about risks

18  and their tolerance for certain risks about IVC filters?

19  A.  Yes.

20  Q.  That's a fair characterization of this?                        09:08AM

21  A.  Partially, yes.

22  Q.  And one of the doctors thought the fracture rate should be

23  one in 10,000.  True?

24  A.  He would prefer it, yes.

25  Q.  And you were at this meeting?                                   09:08AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    A.   Yes.

2    Q.   And you went to this meeting so you could get good advice

3    from people who were physicians that were potentially -- who

4    could potentially be using or were using Bard IVC filters.

5    True?                                                              09:09AM

6    A.   I don't know if they all were, but yes.

7    Q.   Sir, would you agree that the Asch study does not support

8    that either the Recovery or the G2 was appropriate for a

9    permanent use?

10   A.   No.                                                          09:09AM

11            MR. LOPEZ:   Gay, can I see the deposition, December

12   19, 2013 deposition of Mr. Carr.   Page 154, Lines 8 through 14.

13   BY MR. LOPEZ:

14   Q.   Do you see that, Mr. Carr?

15   A.   Yes.                                                         09:09AM

16   Q.   May I publish this to the jury, Your Honor?

17            THE COURT:   No.   It's not an exhibit.

18            MR. LOPEZ:   Okay.

19   BY MR. LOPEZ:

20   Q.   Sir, on that date, you were asked:   It's your testimony     09:09AM

21   that the Asch study supports the contention by Bard that the

22   Recovery and G2 devices are appropriate for permanent use.

23   True?   Your answer was no.   And as a matter of fact, after Mr.

24   North objected you repeated no.

25            That's what you testified to in 2013.   Correct?         09:10AM

1   A.  It says "partially" in the next paragraph.

2   Q.  Sir, is it your testimony that retrievable filters should

3   be at least as safe and effective as permanent filters?

4   A.  They are safe and effective.

5   Q.  Could I have Mr. Carr's deposition, October 25, 2013, Page       09:10AM

6   165.

7           "QUESTION:  And would you agree that the retrievable

8   filters ought to be at least as safe as the permanent ones?

9           "ANSWER:  Yes."

10          That's testimony you gave under oath in October of          09:10AM

11  2013.  True?

12  A.  Yes.

13  Q.  Thank you.

14          MR. LOPEZ:  Your Honor, no further questions.  Pass

15  the witness.                                                        09:11AM

16          THE COURT:  All right.  Cross-examination?

17          MR. NORTH:  Your Honor, we will reserve our

18  questioning of Mr. Carr until our case in chief.

19          THE COURT:  All right.  You can step down, Mr. Carr.

20          THE WITNESS:  Thank you.                                    09:11AM

21          MR. COMBS:  Your Honor, the plaintiff at this time

22  calls Dr. Derek Muehrcke.

23          THE COURT:  All right.  Do you have a copy of his

24  report?  I didn't mention this this morning, but I think it

25  would be helpful whenever we're calling an expert -- hold on        09:12AM

 1   right here, sir -- to have a copy of the report if issues come

 2   up about disclosure.

 3            MR. COMBS:  We'll get that for you, Your Honor.

 4            THE COURT:  That's fine.

 5            MR. COMBS:  I'd give you mine but you wouldn't want        09:12AM

 6   it.  It's got some notes on it.

 7            THE COURTROOM DEPUTY:  Sir, if you will raise your

 8   right hand.

 9            (The witness was sworn.)

10            THE COURTROOM DEPUTY:  Could you please state and         09:12AM

11   spell your name for the record?

12            THE WITNESS:  Derek Muehrcke.  D-E-R-E-K, Muehrcke,

13   M-U-E-H-R-C-K-E.

14            THE COURT:  Let's have you restate that when you get

15   to the mic so the jury can hear it.                               09:13AM

16            MR. COMBS:  Your Honor, may I introduce myself to the

17   jury?

18            THE COURT:  Sure.

19            MR. COMBS:  Ladies and Gentlemen of the jury, my name

20   is Lincoln Combs.  I'm with the firm of Gallagher & Kennedy.  I   09:13AM

21   represent the plaintiff, Doris Jones, along with the rest of

22   the trial team you have already met.

23            THE COURT:  Dr. Muehrcke, can you spell your name

24   again?

25            THE WITNESS:  Yes.                                       09:13AM

1    My name is spelled M-U-E-H-R-C-K-E.

2                    DEREK MUEHRCKE, M.D.

3    a witness herein, having been first duly sworn by the clerk to

4    speak the truth and nothing but the truth, was examined and

5    testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. COMBS:

8    Q.  Good morning, Dr. Muehrcke.

9    A.  Good morning.

10   Q.  You have already told the jury your name and spelled it for    09:13AM

11   them a couple times.  Why don't you tell them what you do for a

12   living.

13   A.  I am a cardiothoracic and vascular surgeon.  I live in

14   Jacksonville, Florida.  And my practice involves open heart

15   surgery, thoracic surgery, and vascular surgery in equal    09:13AM

16   thirds.

17   Q.  You are a heart surgeon?

18   A.  Yes.

19   Q.  And as part of your work as a cardiothoracic surgeon, do

20   you operate on the main blood vessels in the body?    09:14AM

21   A.  Yes, I do.

22   Q.  Do you hold any board certifications, Dr. Muehrcke?

23   A.  I'm board certified in thoracic surgery.

24   Q.  Explain to the jury, if you could, what that means to be

25   board certified?    09:14AM

1    A.   To be board certified in thoracic surgery is the highest

2    level of certification available for cardiothoracic surgeons.

3    It involves having completed a general surgical training

4    program and then a cardiothoracic fellowship and passing exams

5    along the way.  And I have actually recertified twice for my       09:14AM

6    certification, which is due every 10 years.

7             MR. COMBS:  Your Honor, I have a copy if I may

8    approach.

9             THE COURT:  Yes.  Please.

10   BY MR. COMBS:                                                      09:14AM

11   Q.   And how long have you been board certified, Dr. Muehrcke?

12   A.   24 years.

13   Q.   And if you could kind of briefly explain to the jury your

14   training and background and how you -- your education and your

15   work that you pursued to become a cardiothoracic surgeon.         09:15AM

16   A.   I went to school for 17 years after high school.  I went to

17   a seven-year college medical school program and then

18   matriculated to Harvard where I did my general surgical

19   residency program.  I had an opportunity to spend two years in

20   Great Britain as part of the National Health Care Service.        09:15AM

21            I came back to San Francisco and did a year of

22   research at the -- bench research at the Cardiovascular

23   Research Institute and went back to Boston to finish my fourth

24   and fifth year.  And then I stayed on to do my cardiothoracic

25   surgery training and then I stayed on at Harvard to do my         09:15AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    congenital heart surgery at Boston Children's.

2    Q.  And at some point in that training did you do some clinical

3    research as well?

4    A.  Yes, I did.  I did a year of -- well, I did bench research

5    for a year in San Francisco, but I have also done a lot of          09:16AM

6    clinical research as far as looking at patients.  And I think I

7    have over 40 publications.

8    Q.  But you have done some bench testing in your career?

9    A.  Yes, I have done bench testing.  Yes.

10   Q.  Where do you currently practice, Doctor?                        09:16AM

11   A.  In St. Augustine, Florida, south of Jacksonville.  I'm in

12   group of eight cardiac surgeons and five vascular surgeons.

13   Q.  Do you hold any positions at the hospitals in your area?

14   A.  Yes.  I'm one of the founding members of our group, and I'm

15   the chairman of the Department of Cardiothoracic and Vascular       09:16AM

16   Surgery at Flagler Hospital.

17   Q.  And you are charging the plaintiff a fee to be here today,

18   correct?

19   A.  Yes, I am.

20   Q.  What is your fee?                                               09:16AM

21   A.  Well, my fee for the trial is $7,000.  I charge $650 an

22   hour to review articles.  I do have a staff back in my office

23   that I need to pay and light bills to pay and also lose

24   opportunity to earn income when I'm here.  So I do have to

25   charge to come out here.                                            09:17AM

1   Q.  And how much would you say you have charged the plaintiff,

2   total, in this case not counting your fee to come out here to

3   testify?

4   A.  The total is going to be probably close to 15,000.  I'd

5   have to look at it.  I don't know exactly.  I know Mr. North          09:17AM

6   deposed me along with four other cases at one time, and I think

7   he paid me -- he paid me $4,200.  So I think it would be $950

8   that should go towards that deposition and then probably 12

9   hours of work and then the $7,000 on top.  So probably about

10  $15,000.                                                              09:17AM

11  Q.  I want you to just, if you could, give the jury some

12  background on the venous system and the issues that IVC filters

13  are implanted in patients to prevent.

14  A.  Sure.  So arteries take the blood away from the body and

15  bring it to the organs, and the veins bring it back to the           09:18AM

16  heart.  The major artery off the heart is the aorta, and the

17  first arteries off that are the coronary arteries which supply

18  the heart with the blood supply.  And the aorta comes up and

19  goes off the arms, across the ascending aorta to the left arm,

20  and they go down below the diaphragm and they give a blood           09:18AM

21  supply to the kidneys and then they perfuse the legs.

22          And the matching system which returns the blood to the

23  body is the venous system.  And the venous system kind of

24  mirrors the distribution or the anatomy of the arterial system

25  but it returns blood products back to the heart.  And then the       09:18AM

1    whole system is a kind of in series system where the blood goes

2    into the heart, the right heart beats, puts the blood into the

3    pulmonary circulation.  There the blood gets oxygenated, takes

4    out carbon dioxide, and then goes to the left heart which

5    ejects it under a much higher pressure to the body.                    09:19AM

6    Q.  And I presume as part of your work you are familiar with

7    and probably do procedures on the vena cava?

8    A.  Yes.

9    Q.  Describe the vena cava to the jury and its importance to

10   this circulatory system you have just described.                       09:19AM

11   A.  Well, the vena cava is a dynamic organ.  It's thin-walled,

12   thinner than its adjacent arterial system.  It's the blood

13   supply to the heart and anything which is caught in the venous

14   system, such as a clot in the leg, will go through that system

15   to the heart and to the lungs.                                         09:19AM

16   Q.  Would you describe the vena cava as dynamic?

17   A.  Yes.  It's a very dynamic system.  It has the capacity when

18   people are fluid overloaded to become quite large.  And when

19   people are volume depleted or bleeding or dehydrated, the vena

20   cava will become smaller.  So it has a kind of a capacitance to      09:19AM

21   hold extra fluid if needed.  But it changes shape and is

22   dynamic and can be compressed from organs from the outside or

23   manipulation of the abdomen.  It's very dynamic.

24   Q.  And you told us a minute ago that you conducted what's

25   called bench testing in your career.  There's been some             09:20AM

1    evidence in this case that Bard conducted bench testing of its

2    IVC filters using sausage casing inside of PVC pipe to mimic

3    the environment of the vena cava.  Are they any similarities

4    between sausage casing and the human IVC?

5            MR. NORTH:  Your Honor, objection.  This is outside    09:20AM

6    the scope of his report.

7            THE COURT:  Where is this in the report?

8            MR. COMBS:  It's not in the report, Your Honor, but he

9    has testified to it before.

10           THE COURT:  In a deposition?                            09:20AM

11           MR. COMBS:  No, Your Honor.

12           THE COURT:  Well, let's talk about it at sidebar for

13   just a minute.

14           If you want to stand up, Ladies and Gentlemen.

15           (Discussion was had at sidebar out of the hearing of    09:20AM

16   the jury:)

17           THE COURT:  Was it in trial?

18           MR. COMBS:  It was in trial.  There was never an

19   objection.  I literally copied the transcript into my outline.

20           MR. NORTH:  I just don't recall.                        09:21AM

21           THE COURT:  If it was said in the previous trial

22   without objection, do you have an objection now?

23           MR. NORTH:  No.

24           THE COURT:  All right.  Go ahead.

25           (In open court.)                                        09:21AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1        THE COURT:  Thank you, Ladies and Gentlemen.

2        MR. COMBS:  Should I reask, Your Honor?

3        THE COURT:  Yes.

4   BY MR. COMBS:

5   Q.  The question was about bench testing using the sausage          09:21AM

6   casing in PVC pipe to mimic the dynamics of the vena cava.

7        Are there any similarities between sausage casing in

8   PVC pipe and the human IVC?

9   A.  I would think they would act very differently.

10  Q.  And are you familiar with inferior vena cava blood filters      09:21AM

11  or what we have been calling IVC filters?

12  A.  Yes, sir.

13  Q.  Do you use them in your practice?

14  A.  Yes, I do.

15  Q.  And have you implanted Bard IVC filters in your career?         09:22AM

16  A.  Yes, I have implanted every iteration of the Bard filters.

17  Q.  And describe those the Bard filters that you are familiar

18  with.

19  A.  I have implanted the Simon Nitinol Filter.  The first

20  optional or retrievable filter was the Recovery Filter, which      09:22AM

21  was released nationally in 2004.  The next filter was the G2,

22  or second generation.  And there was another form of that

23  called the G2X, which had a hook on it to make it easier to

24  retrieve the filter.

25        And the next filter was the Eclipse Filter which Ms.          09:22AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    Jones had in her.  The next iteration was the Meridian Filter,

2    and then the final iteration is the Denali Filter.  Six

3    different filters.

4    Q.  And I want to focus on the G2, G2X, and Eclipse.  How were

5    those distinguished, or maybe a better way to ask it is, how          09:23AM

6    was the Eclipse different than the G2X and G2?

7    A.  How is the Eclipse?  The Eclipse has a electropolishing to

8    the surface of the G2X.  It's the same dimensions, same wire

9    width, same -- basically the same filter except it's

10   electropolished.  And that was done in an effort to help            09:23AM

11   prevent fractures.

12   Q.  Is the Eclipse functionally, from your perspective as a

13   surgeon who implants the filters, the same as a G2?

14   A.  Yes, it is.

15   Q.  What filters do you currently use?                              09:23AM

16   A.  I use the Argon Option Filter.

17   Q.  Have you, in the past, used other filters besides Bard

18   filters?

19   A.  Yes, I have used --

20   Q.  And the Argon?                                                  09:24AM

21   A.  I have used the Argon.  I have used the Trapease, OptEase,

22   Cook, Celect Filters.

23   Q.  Do you currently use Bard filters?

24   A.  I do not use Bard filters.

25   Q.  Why not?                                                        09:24AM

1   A.  I do not use Bard filters after I had an opportunity to see

2   the internal documents that Bard had showing that there have

3   been problems with their filters over a long period of time.

4   And those problems were not relayed to physicians in their

5   marketing material or through their representatives so that we        09:24AM

6   could talk to our patients and give them an honest estimate of

7   what their risk factors were when they had these filters

8   placed.

9           I personally felt betrayed by that.  I was a loyal

10  user of Bard at the time.  Our interventional radiologist in my       09:25AM

11  hospital stopped using the Bard device, but I stuck with them.

12  And when I had an opportunity to kind of see the internal

13  documents and see that there were problems known for a long

14  time, and that when these problems were dealt with, they were

15  never studied in humans.  They were just sold.  They were put         09:25AM

16  back into humans to see how they did without any real testing

17  with them.  And I have a moral and ethical issue with that.

18  Q.  And in addition to implanting IVC filters, have you removed

19  them?

20  A.  I have removed them, yes.                                         09:25AM

21  Q.  In private practice, have you been provided with brochures

22  on the Bard IVC filters?

23  A.  Yes, we have.

24  Q.  Have you seen the brochure for the Eclipse permanent

25  filter?                                                               09:26AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    A.  Yes, I have.

2           MR. COMBS:  Gay, if you could please pull up 4428.

3    BY MR. COMBS:

4    Q.  And Dr. Muehrcke, do you recognize this as an Eclipse

5    brochure that was provided to you by Bard?                  09:26AM

6    A.  Yes, I do.

7    Q.  Go to the second page, please.

8           Does this Exhibit 4428 accurately represent the way in

9    which this filter was marketed to you as a physician for

10   implanting the filter?                                      09:26AM

11   A.  Yes, it does.

12          MR. NORTH:  Your Honor, objection.  Outside the scope

13   of his report.

14          THE COURT:  Is this in the report?

15          MR. COMBS:  I think he just testified -- I'm not       09:26AM

16   really asking for an opinion, I don't think.

17          THE COURT:  Is it in the report?

18          MR. COMBS:  I will withdraw the question, Your Honor.

19          THE COURT:  All right.

20          MR. COMBS:  But I would like to move this document      09:26AM

21   into evidence at this time.

22          MR. NORTH:  No objection, Your Honor.

23          THE COURT:  Hold on just a minute.

24          Exhibit 4428 is admitted.

25          MR. COMBS:  May I publish the exhibit to the jury,     09:27AM

1    Your Honor?

2              THE COURT:  Yes.

3    BY MR. COMBS:

4    Q.  And Dr. Muehrcke, as a doctor that implanted the Eclipse

5    Filter did you have certain expectations as to how that filter          09:27AM

6    would perform after it was implanted?

7    A.  Yes, I did.

8    Q.  And what were those expectations when you used the G2 and

9    Eclipse filters?

10   A.  I would expect an inferior vena cava filter to stay in             09:27AM

11   place and catch clots from the legs and prevent them from going

12   to the lungs and to the heart.

13   Q.  Would other physicians like yourself have the same

14   expectations of the G2 and Eclipse Filters?

15   A.  Yes.  That's why they are placed.                                   09:28AM

16   Q.  Why would it be important that the Eclipse Filter not move

17   or fracture, stay in place where it was implanted?

18   A.  Well, it's important because if it moves or migrates or

19   tilts, it will be less effective in catching clots.  And if it

20   were to disintegrate or fall apart or embolize, it can cause           09:28AM

21   danger to the rest of the body and also be noneffectual.

22   Q.  And at some point in your use of Bard IVC filters, did you

23   start to see complications with those filters?

24   A.  I have seen complications with Bard filters, yes.

25   Q.  And what kind of complications have you seen with                   09:28AM

1   particularly the G2 and Eclipse line of filters?

2   A.  Well, I have seen tilting of filters.  I have seen

3   perforations.  I have seen fractures.  I have not seen -- with

4   the G2 filters I have not seen any cranial migration problems

5   or towards the heart but mostly tilting, perforation, fracture,   09:29AM

6   embolization.

7   Q.  And the problems with migration, we have heard a lot of

8   talk in this case about cephalad versus cranial -- cephalad

9   versus caudal.  You are obviously familiar with those terms?

10  A.  Yes.                                                          09:29AM

11  Q.  Which kind of problems with migration did you see with the

12  G2 and Eclipse Filters?

13  A.  The type of problems which the G2 Filter presented, and I'm

14  not so sure I understand exactly why the filter developed this

15  problem, but it developed a problem where it would fall          09:29AM

16  backwards, kind of caudally, towards -- caudal means toward

17  your tail.  And we have a remnant of a tail in human beings,

18  the coccyx.  But it would cause the filter to migrate in an

19  inferior caudal fashion and that sets up an entire cascade of

20  events due to the instability of the filter.                     09:30AM

21  Q.  And you talked about several different types of

22  complications; migration, tilt, fracture.  What's the

23  relationship in your experience between those complications

24  with the G2 and Eclipse Filters?

25  A.  Well, I think that it all starts out with a bit of           09:30AM

 1   instability in the inferior vena cava where the filter falls

 2   back a little bit on one side, or can fall back a lot.  And

 3   that sets up a situation where you can have arms penetrating

 4   the inferior vena cava; you can have the nose cone touching the

 5   side of the vena cava; or you can have abnormal stresses put on   09:30AM

 6   the filter itself as I believe occurred in Mrs. Jones' case.

 7   And it can put abnormal stresses on the filter such that the

 8   wire in these filters are being flexed.  And if you flex a

 9   piece of metal long enough, you will have fatigue and it will

10   break off.  And given the design of the Bard filter being a      09:31AM

11   cone-shaped device, once you have a fracture that fracture is

12   not going to be stable.  It's going to blast off and go

13   someplace.

14         And, I hasten to add that the efficiency of the filter

15   in catching clots is obviously reduced if it's missing arms and  09:31AM

16   legs and is tilted.

17   Q.  So do these complications occur together, or are they more

18   likely to occur separately where a patient will only have one

19   complication at a time?

20   A.  In the Bard filters they seem to occur in clusters.  They    09:31AM

21   seem to occur together.  Once the backward tilting and

22   migration occurs and the tilting, it sets up kind of a domino

23   effect.

24   Q.  What's the significance of this domino effect on the

25   filters for you, as a clinician, in implanting them in           09:32AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1  patients?

2  A.  Well, it represents a setup for filter fracture,

3  inefficiency of the filter.  The benefit is lost of the filter

4  clinically.  And it's also dangerous to the patients.

5  Q.  Fracture can occur as part of the domino effect?          09:32AM

6  A.  Correct.  Fractures can occur.

7  Q.  What's the significance for the patient when a fracture

8  occurs?

9  A.  Well, when a fracture occurs, the filter fractured element

10  can stay locally, or it can go to the heart or it can go to the   09:32AM

11  lungs or it can go to other parts of the body.  And then --

12  that's kind of a new set of problems which we're not used to

13  dealing with before.  And those things are not meant to be in

14  organs like the liver or the lungs or the heart.  And if you

15  get into a dynamic organ which moves, it can be a problem down   09:33AM

16  the line.  It can take years for that problem to occur.

17  Q.  As part of your work as an expert in this case, have you

18  had an opportunity to review internal Bard documents?

19  A.  Yes, I have.

20  Q.  And if you could tell the jury, you know, about how many   09:33AM

21  pages of Bard documents have --

22  A.  I have read hundreds of Bard's documents, and I have read

23  thousands of pages of depositions taken in this litigation.

24  Q.  And before your involvement as an expert witness in this

25  case, when you were just a treating physician, had you ever had   09:33AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    an opportunity to review any of these internal Bard documents?

2    A.   No.   Those documents are not made available to physicians.

3    Q.   And I think you mentioned you have had an opportunity to

4    review the testimony of current and former Bard employees?

5    A.   Yes, I have.                                                      09:34AM

6    Q.   And are those part of the basis for your opinions in this

7    case?

8    A.   Yes, they are.

9    Q.   And you have also had a chance to review Mrs. Jones'

10   medical records, I believe?                                           09:34AM

11   A.   Yes, sir.

12   Q.   And do those records include the records for the

13   implantation of her Eclipse Filter?

14   A.   Yes.

15   Q.   And imaging she's received of the filter?                        09:34AM

16   A.   Yes.

17   Q.   And the records for when her filter was removed as well?

18   A.   Correct.

19   Q.   When did Doris Jones receive her Eclipse Filter?

20   A.   It was in 2010.                                                  09:34AM

21   Q.   And I believe the implanting surgeon was Dr. Avino.  Does

22   that sound right?

23   A.   Yes.

24   Q.   Do you believe that the Eclipse Filter was appropriately

25   placed in Ms. Jones?                                                  09:35AM

1   A.  Yes.  She had a problem with recurrent deep venous

2   thrombosis where her legs would swell and was undergoing -- she

3   had two gastric surgeries.  She had one before and was

4   requiring a second gastric surgery and she could not be

5   anticoagulated.  So the filter was put in place to protect her          09:35AM

6   from a clot going from her legs to her lungs.  I think that's

7   an appropriate use of the filter.

8   Q.  And based on your review of the records of the implant

9   procedure and everything else, was the filter implanted

10  properly?                                                               09:35AM

11  A.  I believe so.

12  Q.  Was Doris Jones indicated for a permanent filter at the

13  time she was implanted with the Eclipse Filter in 2010?

14  A.  Yes.  The indications from the implanting physician was

15  that this filter would be permanent; would not be removed             09:36AM

16  because she had gastrointestinal bleeding every time she was

17  placed on anticoagulants so she could not be anticoagulated

18  and, therefore, she's going to need the filter for the rest of

19  her life.

20  Q.  And what imaging have you reviewed of Mrs. Jones?                  09:36AM

21  A.  I have reviewed her chest CT scans and her chest x-rays of

22  2013, 2015, and 2010.

23  Q.  And what did the 2013 chest X-ray show?

24  A.  It looked normal.

25  Q.  In regards to the filter?                                         09:36AM

1    A.   It looked normal.

2    Q.   Filter was in place in 2013?

3    A.   Yes.

4    Q.   And then what about in April 2015 as far as the filter,

5    what did that imaging show?                                    09:36AM

6    A.   Well, the CT scan showed that there's a fragment of her

7    inferior vena cava filter in her right mid-lung zone.

8    Q.   And if you could explain to the jury what happened with

9    Mrs. Jones' Eclipse Filter in 2015?

10   A.   She developed a complication of the inferior vena cava    09:37AM

11   filter where one of the arms fractured and migrated up the

12   inferior vena cava through the heart, through the pulmonary

13   artery into the right lung and was caught as soon as the vessel

14   narrowed down into an area that could not pass.

15            MR. COMBS:  Gay, if you could please locate Exhibit    09:37AM

16   4568 and show it to Dr. Muehrcke.

17   BY MR. COMBS:

18   Q.   Doctor, this is an animation that depicts the fracture of

19   Doris Jones' IVC filter?

20            MR. NORTH:  Your Honor, I'm going to object.  None of  09:38AM

21   this was in his report.  He did not discuss this then.

22            THE COURT:  What's your response, Mr. Combs?

23            MR. COMBS:  He certainly talked about what happened.

24   He already talked here without objection about what happened

25   with Ms. Jones' IVC filter.                                    09:38AM

1          THE COURT:  Is this animation part of his report?

2          MR. COMBS:  No, Your Honor.  It was created for trial.

3          THE COURT:  Let's talk at sidebar for a minute.

4          Go ahead and stand up, Ladies and Gentlemen.

5          (Discussion was had at sidebar out of the hearing of    09:38AM

6     the jury:)

7          THE COURT:  Rule 26(a)(2)(B) requires disclosure of

8     all exhibits an expert would use during trial.  What is your

9     response that?

10          MR. COMBS:  Two responses to that, Your Honor.  Number   09:38AM

11    one, this is an animation.  It just helps him explain his

12    opinions, explains it to the jury.  Number two, in Booker we

13    did the same thing.  I don't believe there was any objection to

14    any animations that Dr. Muehrcke explained to the jury.

15          THE COURT:  But you agree it was not disclosed as       09:39AM

16    parts of his report?

17          MR. COMBS:  An animation?  No.

18          THE COURT:  What's the basis for your objection?

19          MR. NORTH:  Your Honor, it was not disclosed as part

20    of his report.  It's one thing for them to have shown it in    09:39AM

21    opening where lawyers were not presenting evidence or talking

22    about it.  But then to have this expert witness, I don't know

23    what sort of detail or opinion he's going to give about it.  It

24    should have been disclosed in a report if the expert is going

25    to talk about.                                                 09:39AM

————— 5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct—————

 1            THE COURT:  Show me the report disclosures that you

 2    think cover this, please.

 3            MR. COMBS:  Your Honor, it talks about the CT scans

 4    where they show the filter.

 5            THE COURT:  Where are you?                          09:40AM

 6            MR. COMBS:  On page -- I'm sorry.

 7            MR. ROGERS:  It's not enumerated.

 8            MR. COMBS:  Case specific opinions above that talks

 9    about CT scans that are reviewed, and then he talks about what

10    the CT scans showed.  And he talks about her medical course and  09:40AM

11    this is all part of that.

12            THE COURT:  Is there anything in here that describes

13    how the fragment got from the filter to the lungs?

14            MR. COMBS:  I don't believe it does, Your Honor.

15            THE COURT:  The objection is sustained.             09:41AM

16            MR. COMBS:  While we're here, Your Honor, there's

17    subsequent animation showed in opening as well showing the

18    removal of the filter, not of the fragment.

19            THE COURT:  Is there going to be an objection to that?

20            MR. ROGERS:  This is the removal of her filter?  He's  09:41AM

21    never reviewed that.  That's not disclosed in his report.

22            MR. COMBS:  Well, he certainly has reviewed the

23    reports, the medical records of the removal.

24            THE COURT:  Where is it in his report?

25            MR. COMBS:  That the filter was removed?            09:41AM

————5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct————

1        THE COURT:  Well, The description of how it was

2   removed, which is what I understand the animation will show.

3        MR. COMBS:  More importantly --

4        THE COURT:  Hold on.

5        MR. COMBS:  There's not a detailed description of        09:41AM

6   filter removal procedure.  It's a general filter removal.

7        THE COURT:  The objection is sustained.

8        MR. COMBS:  Okay.

9        (In open court.)

10        THE COURT:  Thank you, Ladies and Gentlemen.        09:42AM

11        MR. COMBS:  Your Honor, may I approach the witness to

12   hand something to draw on?

13        THE COURT:  You mean to create something for the jury

14   to see?

15        MR. COMBS:  Correct.        09:42AM

16        THE COURT:  Yes, you can.

17        THE WITNESS:  Do you have any crayons?

18        MR. O'CONNOR:  Yeah.  Green.

19        THE WITNESS:  Actually, probably show up better.

20        MR. COMBS:  That would be better.        09:43AM

21   BY MR. COMBS:

22   Q.  Dr. Muehrcke, why don't you, if you could, briefly and

23   somewhat, obviously, not to scale or in great detail, but draw

24   for the jury a quick diagram of the vena cava and the heart and

25   the pulmonary system so you can show how the filter is --        09:43AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    filter fragment traveled to where it ultimately landed in Mrs.

2    Jones.

3            MR. NORTH:  Your Honor, I'm going to object again.

4    It's trying to get the same --

5            THE COURT:  Isn't that the issue we just discussed at     09:43AM

6    sidebar?

7            MR. COMBS:  He can't create an exhibit here.

8            THE COURT:  It's not in his report, so the objection

9    is sustained.

10           MR. COMBS:  Fair enough, Your Honor.                       09:44AM

11           I will take my pen back if I may, Your Honor.

12           THE COURT:  Yes.

13   BY MR. COMBS:

14   Q.  Where did the fragment that broke off of the Eclipse

15   Filter, where did it ultimately lodge in Mrs. Jones' body?        09:44AM

16   A.  So the fragment came off of the inferior vena cava filter,

17   which is located below the renal veins and the inferior vena

18   cava.  It broke off and went up the vena cava into the right

19   atrium.  And then it went through the tricuspid valve into the

20   right ventricle.                                                  09:44AM

21           MR. NORTH:  Your Honor, I'm sorry.  Objection.  Same

22   thing.

23           THE COURT:  I think the question was where it came to

24   rest.  Is that right?

25           MR. COMBS:  Correct, Your Honor.                          09:45AM

1          THE COURT:  If you could just address that issue.

2          THE WITNESS:  It came to rest in her right pulmonary

3   artery in the mid-lung zone.

4   BY MR. COMBS:

5   Q.  And why did -- well, how did the imaging and the discovery          09:45AM

6   of this broken filter come about in April 2015?

7   A.  Mrs. Jones presented to the hospital with light headedness

8   and bilateral arm pain.  And one of the first studies they did

9   on her was to do a CT scan of her chest to see if they could

10  find out what was causing her symptoms.          09:45AM

11  Q.  And what symptoms was she suffering at that time that you

12  relate to the broken piece of the IVC filter?

13  A.  Well, I think the bilateral arm pain is a concern to me

14  that it may represent the filter fragment traveling through her

15  heart into the pulmonary artery.          09:46AM

16  Q.  And that's a serious complication?

17  A.  It's a serious complication.  She's lucky, if lucky is the

18  right word, that it didn't stay in her heart which would be

19  very dangerous.  But it managed to negotiate its way out of the

20  heart into the pulmonary arteries and stuck in her right          09:46AM

21  pulmonary artery.

22  Q.  What did Mrs. Jones' doctors that were treating her at the

23  time do to help her with these problems?

24  A.  Well, at the time they went in and they removed the damaged

25  or disintegrated inferior vena cava filter.  They took a look          09:46AM

1    at the fragment in her right pulmonary artery, and the

2    interventional radiologist, given her skill set, without having

3    experience removing fragments from the pulmonary artery thought

4    that the risk/benefit ratio was not in favor of removing that.

5    So they left it in her lung.                              09:47AM

6    Q.   And do you have any criticism or disagreement with any of

7    the decisions that her treating physicians made at the time

8    dealing with this fractured filter and fragment in her

9    pulmonary artery?

10   A.   No.   I think it was appropriate to remove her inferior vena   09:47AM

11   cava.   It brings up the question, though, that is, you know,

12   does she need to have another filter inserted, a permanent

13   filter inserted.

14   Q.   Was the filter that was removed, was it removed through an

15   open procedure?                                           09:47AM

16   A.   No.   It was removed through a percutaneous procedure.

17   Q.   What does percutaneous mean?

18   A.   Percutaneous means it's done through a needlestick with

19   wires and catheters as opposed to opening up her vena cava.

20   Q.   So it's a cut through the skin into the vein?        09:47AM

21   A.   Yes.

22   Q.   Why was it so -- well, you touch on this a little bit.   I

23   want you to tell the jury a little bit further why it was a

24   good idea for the interventional radiologist treating Mrs.

25   Jones at the time not to remove the fragment in her pulmonary   09:48AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    artery?

2    A.  Well, I mean, I think it would be best if that fragment

3    could ultimately be removed, because I think it's a danger to

4    her.  But there are only a few people across the United States

5    or in the world, for that matter, who have the skill set of          09:48AM

6    removing these filter fragments by using special techniques

7    which are not -- they are more advanced techniques which are

8    not commonly used.  And most interventional radiologists do not

9    have a lot of experience with them.

10   Q.  What is your opinion about Mrs. Jones' treatment going          09:48AM

11   forward in regards to this fragment in her pulmonary artery?

12   A.  As far as monitoring or --

13   Q.  Well, what would you recommend that she do?

14   A.  I would recommend that she go to a center like Stanford and

15   have that fragment removed so it's not a danger to her.  And I       09:49AM

16   would -- until that happens, I would monitor her extremely

17   closely to make sure that that spike in her lung doesn't cause

18   a problem.

19   Q.  And there's surgeons around the country, including a center

20   at Stanford, that specializes in these kinds of removals?           09:49AM

21   A.  Yes.  Dr. Kuo.

22   Q.  In the meantime until she can have that type of procedure,

23   what would you recommend for her treatment and care?

24   A.  I would tell her to be careful, to avoid any trauma to her

25   chest.  The problem is that this, you know, spike is in a            09:49AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    dynamic area.  She breathes 16 to 20 times a minute.  And she's

2    a breath away from having a problem, a death.  And that could

3    be very serious.  So I think that that thing should be removed

4    and she should be monitored.  She cannot be anticoagulated.  It

5    would be great if she could because I think that metal object        09:50AM

6    in her lung is clearly at risk for clotting off, because we put

7    wires in arteries and veins to make them clot off.  That

8    abnormal serve surface is very thrombogenic, so to say.  I

9    think she needs to be monitored very closely, and I would think

10   she should have that fragment removed.                               09:50AM

11   Q.  At the time that Mrs. Jones' Eclipse Filter was implanted,

12   what would be the expectations of a reasonable physician in

13   putting that in her as far as how the device would perform over

14   the rest of her life?

15   A.  I think the implanting physician wanted it to be permanent,      09:50AM

16   to stay there forever.  And one would expect it to stay in

17   place and not to fall apart and to catch clots if it need be.

18           MR. COMBS:  Your Honor, I'd like to display Exhibit

19   2248, which I believe is in evidence.

20           THE COURT:  You may.                                         09:51AM

21           MR. COMBS:  Publish that to the jury, please, or put

22   it up, Gay, and Traci will publish.

23           THE COURTROOM DEPUTY:  I did.

24           MR. COMBS:  Thank you.

25   BY MR. COMBS:                                                        09:51AM

1    Q.  Doctor, Exhibit 2248, is that a document that you have

2    reviewed before?

3    A.  Yes.

4    Q.  It's part of the bases for your opinions?

5    A.  Yes.                                                          09:51AM

6    Q.  And I don't know that we have the pages numbered.

7            MR. NORTH:  Your Honor, I'm going to object.  This is

8    in violation of the Court's order of *Daubert*.

9            THE COURT:  All right.  We need to talk about that.

10   Sorry, Ladies and Gentlemen.  You can stand up if you would      09:52AM

11   like.

12           (Discussion was had at sidebar out of the hearing of

13   the jury:)

14           THE COURT:  Are you talking about Docket 9771?

15           MR. NORTH:  Yes, Your Honor.                              09:52AM

16           THE COURT:  What page?

17           MR. NORTH:  Beginning of Page 8.  Well, discussion

18   begins, I'm sorry, on Page 7 at the bottom.

19           THE COURT:  What's the ruling you think it violates?

20           MR. NORTH:  This is the unacceptable analysis document    09:52AM

21   from Natalie Wong, and this Court ruled that he could not give

22   opinions about an unacceptable risk merely repeating

23   conclusions in the Wong report which is exactly what he's

24   doing.

25           THE COURT:  Hold on just a minute.                        09:53AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

| | |
|---|---|
| 1 | Tell me where you are going with that, Mr. Combs. |
| 2 | MR. COMBS:  Your Honor, this came up in Booker and |
| 3 | there was a sidebar.  I don't remember all the back and forth |
| 4 | but I believe you ultimately said he can testify if this was |
| 5 | true, what would your expectations be or how was information -- |
| 6 | THE COURT:  I don't remember Booker.  What is it that |
| 7 | you -- |
| 8 | MR. COMBS:  I think it's what your Motion in Limine -- |
| 9 | if Bard knew there was an unacceptable risk is that information |
| 10 | that physicians would have wanted to know? |
| 11 | THE COURT:  Okay.  Hold on just a minute. |
| 12 | Okay.  I think the key is on Page 9 where I say Dr. |
| 13 | Muehrcke could opine as a treating physician who must make |
| 14 | decisions about IVC filter use; that Bard should have disclosed |
| 15 | any risks it found in its products that would be unacceptable |
| 16 | to doctors and patients.  But he cannot opine that Bard filters |
| 17 | present an unacceptable risk unless he's got a basis for it, |
| 18 | which I don't think he does.  So he can't repeat -- and I went |
| 19 | on to say he can't repeat the conclusions in the Wong report. |
| 20 | So tell me again what you are going to ask. |
| 21 | MR. COMBS:  If Bard's filters demonstrated |
| 22 | unacceptable risk, was that something that physicians like |
| 23 | yourself would have wanted to know? |
| 24 | THE COURT:  That looks to me like it's within my |
| 25 | order. |

09:53AM

09:53AM

09:54AM

09:55AM

09:55AM

1    MR. COMBS:  Your Honor, I'm frustrated the rearguing

2  thing you have already ruled on in Booker.  And I understand

3  you can't remember everything.  I can't remember everything

4  that happened in Booker.  What's the best way if this happens

5  again where they want to raise a new objection?  This is                09:55AM

6  exactly what was shown to the jury, the witness went over in

7  Booker.  Should I bring in a transcript of the sidebar?

8  Because they want to go back to the motion in limine and

9  reargue something you have ruled on.

10    THE COURT:  This was a motion in limine for all of the    09:55AM

11  cases.

12    MR. COMBS:  Exactly.

13    THE COURT:  And I ruled on it.

14    MR. COMBS:  Yeah.

15    THE COURT:  I just decided that.  But I am not going      09:55AM

16  to say that either side is unable to make objections that were

17  made in Booker.  This is a new trial.  I'm ruling on them as

18  they come up.

19    MR. COMBS:  Understood.  Procedurally what's the best

20  way to go Your Honor, look, you ruled -- because I can't go to   09:56AM

21  a docket entry.  Should I bring a transcript?

22    THE COURT:  No, because how I ruled there won't

23  necessarily control how I rule here.  I'm going to do my best

24  to make my judgments in this trial.

25    MR. COMBS:  Even on the exact exhibit, exact same line   09:56AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   of questions?

2           THE COURT:  Yeah.  Otherwise, every objection we're

3   going to be searching for in that transcript to figure out how

4   I ruled.  That's going to be impossible.  And I'm going to use

5   my best judgment in this trial to make the rulings to                    09:56AM

6   objections as --

7           MR. COMBS:  That's fair, Your Honor.  Now that I

8   understand, I understand.

9           THE COURT:  Okay.

10          (In open court.)                                                  09:56AM

11          THE COURT:  Thank you, Ladies and Gentlemen.

12  BY MR. COMBS:

13  Q.  Dr. Muehrcke, in Exhibit 2248, Page 20 here, there's a box

14  and a circle around some figures in a chart that talks about

15  unacceptable risk.  Do you see that?                                      09:57AM

16  A.  Yes, I do.

17  Q.  If Bard's IVC filters, specifically the G2 Filter, had an

18  unacceptable risk, is that something you, as a treating

19  physician using G2 Filters and the filters after them like the

20  Eclipse Filter, that were the same design and performance as a           09:57AM

21  G2 Filter, is that information you would have wanted to know?

22  A.  Absolutely.

23  Q.  Why?

24  A.  Because when I go to put a filter in the patient I have to

25  obtain an informed consent, and I have to tell them what the             09:57AM

1  risk/benefits alternatives are in the procedure, and I try to

2  use the best filter for the patient.  And if I'm not aware of

3  what the best filter is when I talk to the patient then I'm

4  really not giving them the information that they need to know

5  to make a decision about whether to have the filter or not.      09:58AM

6  Q.  And Doctor, what was the subsequent Bard model that came

7  out that replaced the Eclipse?

8  A.  The Meridian Filter came out, I think, in 2011.

9  Q.  What was the difference between the Eclipse Filter and the

10 Meridian Filter?                                                 09:58AM

11 A.  Well, the Meridian Filter had the caudal anchors.

12        MR. NORTH:  Your Honor, I'm sorry.  I hate to object

13 but it's not within the report.

14        THE COURT:  Show me where it is in the report.

15        MR. COMBS:  I will, Your Honor.                           09:58AM

16        THE COURT:  I have got the report.  Just point it out

17 to me.

18        MR. COMBS:  Bottom of case-specific opinions regarding

19 Doris Jones.  It goes on to the next page.

20        THE COURT:  Hold on just a minute, please.               09:58AM

21        The objection is overruled.

22 BY MR. COMBS:

23 Q.  What was the difference between the Eclipse Filter and the

24 Meridian Filter?

25 A.  So the Meridian Filter was the next iteration of the Bard    09:59AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   Filter after the Eclipse, and the caudal anchors were placed in

2   an effort to deal with the caudal migration problem, which was

3   found in the G2 Filter.

4   Q.  Doctor, what is a differential diagnosis?

5   A.  A differential diagnosis is a process that one goes through    09:59AM

6   to try to find out the cause of a problem or a disease state.

7   Q.  And did you as part of your work in this case perform a

8   differential diagnosis to try to determine the cause of the

9   fracture of Mrs. Jones' Eclipse Filter?

10  A.  Yes.                                                           10:00AM

11  Q.  And what was your conclusions?

12  A.  In my conclusion I found no other source of why it should

13  fracture other than a slight tilt and fatigue and, you know,

14  fragment embolization.

15  Q.  And what was the root cause of those failures?                 10:00AM

16  A.  I think it's the filter has an issue with, you know,

17  instability in the inferior vena cava and is prone to a cascade

18  of events with the slight caudal migration tilting and abnormal

19  stresses on the filter, which it doesn't seem to tolerate very

20  well.  Those problems can occur early or they can occur years     10:00AM

21  and years later.

22  Q.  The domino effect?

23  A.  Yes, the domino effect.

24  Q.  Did you identify any other reasonable causes of the

25  fracture of Mrs. Jones' Eclipse Filter?                           10:01AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   A.  I didn't see any other causes.

2   Q.  And as a heart surgeon performing procedures on patients,

3   you presumably do some kind of risk/benefit analysis and go

4   over that with the patient before you perform the procedure?

5   A.  Absolutely.                                                      10:01AM

6   Q.  Did you do a risk benefit analysis of the filter that Mrs.

7   Jones received in this case?

8   A.  Yes, I did.

9   Q.  And what were your conclusions from that risk/benefit

10  analysis?                                                           10:01AM

11  A.  I thought that the filter probably wasn't very beneficial

12  to her overall, and I think that the risk was probably greater

13  than the benefit to that filter.  And that has to do with the

14  fact that the benefit of a filter really is realized if it

15  catches a clot.  She has no evidence that this filter caught a     10:02AM

16  clot.  And once the thing, you know, disintegrated and had a

17  filter fracture fragment go to her lung, that put her at

18  increased risk and also decreased the clot-trapping ability of

19  that filter.  So I thought that in general, the risk of the

20  filter outweighed the benefits.                                    10:02AM

21         And parenthetically, I would also add that there's

22  never been a study to show that inferior vena cava filters save

23  lives.  There's never been a study to show that.

24  Q.  If Bard's filters, including the G2 and Eclipse Filters had

25  an unacceptable risk of failure, should they have ever been        10:02AM

UNITED STATES DISTRICT COURT

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    placed on the market?

2            MR. NORTH:  Objection, Your Honor.  Outside of his

3    expertise and not within the report.

4            THE COURT:  Where is it in the report?

5            MR. COMBS:  It's on the top -- first paragraph on the    10:02AM

6    next page, right below where you just were.

7            THE COURT:  The objection is overruled.

8            THE WITNESS:  I'm sorry, could you please repeat the

9    question?

10   BY MR. COMBS:                                                      10:03AM

11   Q.  If Bard's IVC filters, specifically the G2 and Eclipse, had

12   an unacceptable risk of failure, should they have ever been

13   placed on the market?

14   A.  Well, going back to the Recovery or the G2?

15   Q.  Well, sure.  Go back to the Recovery.                          10:03AM

16   A.  I think that the internal studies from Bard showed that the

17   Recovery Filter was not as good as the predicate device, the

18   Simon Nitinol Filter, even though it was portrayed to the FDA

19   that it was.  And I think that it was adulterated.

20           MR. NORTH:  Objection, Your Honor.  Outside the scope.    10:04AM

21           THE COURT:  I'm going to sustain that objection and

22   instruct the jury to disregard that answer.

23   BY MR. COMBS:

24   Q.  Just focus on the G2 and Eclipse then.

25   A.  And the G2 was a response to problems that the Recovery        10:04AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   Filter had.  And they made changes to that filter and the

2   filter was released without a study, and they started having

3   problems with that filter.  And there were unacceptable caudal

4   migration rates.

5          MR. NORTH:  Objection, Your Honor.  That's in                10:04AM

6   violation of the order.

7          THE COURT:  I think you should re-ask the question and

8   just have a response to the question.

9          MR. COMBS:  I will, Your Honor.

10  BY MR. COMBS:                                                        10:04AM

11  Q.  Dr. Muehrcke, given what you learned in this case, should

12  the G2 and Eclipse Filters been put on the market?

13         THE COURT:  And you are asking his opinion as a

14  physician?

15         MR. COMBS:  As a physician, correct.                         10:05AM

16         THE WITNESS:  No.

17  BY MR. COMBS:

18  Q.  And if the G2 and Eclipse Filters hadn't been placed on the

19  market, Doris Jones would have never received an Eclipse

20  Filter?                                                              10:05AM

21  A.  That's correct.

22         MR. COMBS:  Nothing further at this time, Your Honor.

23         THE COURT:  All right.  Cross-examination.

24         MR. NORTH:  Yes, Your Honor.

25                        ***                                           10:05AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1                          CROSS-EXAMINATION

2    BY MR. NORTH:

3    Q.  Good morning, Dr. Muehrcke.

4    A.  Good morning.

5    Q.  I believe you told us a few minutes ago that you are        10:05AM

6    charging $7,000 a day?

7    A.  $7,000 for the trip out here.

8    Q.  That's total for the entire trip or 7,000 for each day?

9    A.  It's for today.

10   Q.  And did you charge for yesterday?                           10:05AM

11   A.  I'm going to charge for yesterday, yes.

12   Q.  7,000 for yesterday?

13   A.  No.  No.  It's going to be $3,000 for the six-hour trip out

14   here.

15   Q.  And will you be charging for return travel to St.           10:05AM

16   Augustine?

17   A.  Tomorrow, no.  I would not miss work tomorrow.  Saturday.

18           MR. NORTH:  If we could bring up Exhibit 2248 please

19   and go -- I believe it's the second page, the chart.  Keep

20   going.  Yes.                                                    10:06AM

21           Your Honor, this has been admitted if we could publish

22   this, please.

23           THE COURT:  You may.

24   BY MR. NORTH:

25   Q.  Dr. Muehrcke, you were asked some questions about this      10:06AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    particular exhibit.  Are you aware that at the time this

2    analysis was performed at Bard there were only 13 reports of

3    caudal migration?

4    A.   Using the MAUDE data?

5    Q.   Look at this exhibit, if you would.  The total number of          10:06AM

6    complaints.  It lists 13 at the time this analysis was done,

7    correct?

8    A.   That's what the report says.

9    Q.   And you have no idea personally how many thousands of

10   filters had been sold at that time, do you?                           10:07AM

11   A.   I do not know how many filters were sold at that time.

12   Q.   Let's talk a minute if we could, Doctor, about these

13   documents that you reviewed.

14        You claimed that you reviewed hundreds of Bard

15   documents.  Is that correct?                                          10:07AM

16   A.   That is correct.

17   Q.   But at the time you issued your report in this case, you

18   only listed 24 Bard documents.  Correct?

19   A.   24 documents, yes.

20   Q.   So at the time you prepared your report you had only            10:07AM

21   reviewed 24 Bard documents.  Is that correct?

22   A.   That's correct.  That's what I just said.

23   Q.   And so then the hundreds you have read, you read after the

24   report?

25   A.   No, I think those 24 documents have several pages to them.       10:07AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   Q.   So did you ever review any documents beyond those 24?

2   A.   Yes, I have.

3   Q.   Now, every single document you reviewed was presented to

4   you by the plaintiff's attorneys, correct?

5   A.   That's correct.                                          10:08AM

6   Q.   They selected which documents you were going to be given to

7   review?

8   A.   Is that a question?

9   Q.   Yes.

10  A.   Yes.                                                     10:08AM

11  Q.   And you are aware of the fact that in the course of this

12  litigation, Bard has produced millions of documents.  Correct?

13  A.   That's correct.

14  Q.   And yet at the time you -- well, at the time you prepared

15  your report, you gave the same opinions as we have heard that  10:08AM

16  you did in this courtroom today.  Correct?

17  A.   That's correct.

18  Q.   And at the time you prepared that report to give the same

19  opinions you are giving in this courtroom today, you had read

20  24 Bard documents, all selected by the plaintiff's attorneys?  10:08AM

21  A.   That's correct.

22  Q.   Doctor, you told us earlier that you are a cardiothoracic

23  surgeon, correct?

24  A.   That is correct.

25  Q.   So as a part of your practice, you make decisions as to    10:09AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   whether patients should have heart surgery of some sort or

2   should not, correct?

3   A.  That is correct.

4   Q.  And I believe, as you have told us previously, you do not

5   believe that Mrs. Jones should have open heart surgery of any        10:09AM

6   sort to -- I'm sorry, not heart surgery -- any open surgical

7   procedure to remove the strut in her pulmonary artery, correct?

8   A.  What I said is I would not do an open removal unless she

9   had a life-threatening complication.

10  Q.  And, in fact, when you said you recommended she go to          10:09AM

11  Stanford that is a procedure that's performed percutaneously,

12  correct?

13  A.  Exactly.

14  Q.  Now, you still treat patients with inferior vena cava

15  filters, correct?                                                   10:10AM

16  A.  Yes.

17  Q.  And so for those patients where you implant the filters,

18  you obviously believe they provide some sort of benefit,

19  correct?

20  A.  Yes.  I am very limited in the patients I put them in.  I       10:10AM

21  think most implanting physicians are starting to implant a lot

22  less of those.

23  Q.  And you are aware of the fact that all filters have

24  complications.  Correct?

25  A.  All filters can have complications.                            10:10AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   Q.  And all inferior vena cava filters can fracture, correct?

2   A.  They can.

3   Q.  And the medical literature contains dozens of articles

4   indicating fractures with all sorts of filters, correct?

5   A.  That's correct.                                                    10:10AM

6   Q.  And all manufacturers' filters can fracture and have a

7   strut embolize or move to a patient's pulmonary artery,

8   correct?

9   A.  They can.  I think some are less likely to occur than

10  others based on design.                                                10:10AM

11  Q.  But all filters can have that sequence of events occur with

12  them, correct?

13  A.  I think that's possible.

14  Q.  And there are reports in the literature of that happening

15  with all manufacturers' filters?                                       10:11AM

16  A.  Yes.

17  Q.  And all inferior vena cava filters can migrate, correct?

18  A.  They -- yes.  Some are much less likely than others based

19  on design.

20  Q.  But all can migrate?                                               10:11AM

21  A.  They can.

22  Q.  And the literature is full of articles of all manufactures'

23  filters migrating?

24  A.  Filters can migrate.

25  Q.  And all IVC filters can penetrate, correct?                        10:11AM

1    A.   They can.

2    Q.   Now, we have heard a lot about perforation or penetration.

3    But you did not mention that in your report.  There was no

4    penetration seen with Ms. Jones' filter, correct?

5    A.   I did not see any.                                          10:11AM

6    Q.   And the tilt you saw was only 4 percent as you quantified

7    it, correct?

8    A.   Four degrees.

9    Q.   Four degrees?

10   A.   Not percent, yeah.                                          10:11AM

11   Q.   And that is, generally speaking, a very slight tilt.

12   Correct?

13   A.   It's a very slight tilt.

14   Q.   And you saw on the films that the filter had been

15   originally implanted at the level of L1, correct?             10:12AM

16   A.   Correct.

17   Q.   And just for L1, that's the lumbar disc Number 1?

18   A.   Yes.

19   Q.   And at the time the filter was removed, it was located at

20   the level of L1, correct?                                       10:12AM

21   A.   Yes.

22   Q.   Is there any evidence that this filter moved at all?

23   A.   Well, I think to tilt, something has to give.  You can't

24   have a tilt without something moving back or something moving

25   forward.  There's got to be movement.  There's got to be        10:12AM

1    instability.  Yeah.  The four-degree tilt is the evidence that

2    something happened.

3    Q.  So you have seen evidence on the radiographic, or the

4    tests, of a four-degree tilt, but you don't see any evidence on

5    the films themselves that the filter actually moved downward,      10:13AM

6    do you?

7    A.  Well, I think it's a micromovement.  It's beyond the

8    resolution of the radiographic study.

9    Q.  Well, isn't the answer to my question that you have not --

10   you are not able to see any evidence on the films itself that     10:13AM

11   the filter has moved downward?

12   A.  I could not discern it, but something had to have moved for

13   the filter to tilt.  Either one side went down or the other

14   side went up and the filter's associated with caudal migration

15   problems.  So I think one side went back.  It's a small amount.   10:13AM

16   It's not as egregious as some of the other cases we have been

17   involved in.  But, yeah, I can't tell because it's beyond the

18   resolution of the study but it must have occurred for it to

19   have tilted.

20   Q.  Tell us what a cavagram is?                                    10:14AM

21   A.  A vena cavagram?

22   Q.  Yes.

23   A.  It's an injection of contrast into the vena cava to outline

24   the vena cava.

25   Q.  And are those generally performed at the time of implant or   10:14AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    explant retrieval of a filter?

2    A.  They should be.

3    Q.  Did you review the vena cavagram taken at the time of the

4    filter being implanted in Ms. Jones?

5    A.  I don't recall it.  I don't recall it.                    10:14AM

6    Q.  So you have seen no evidence that would allow you to

7    determine whether there was a four-degree tilt of that filter

8    in Ms. Jones at the time it was implanted, have you?

9    A.  I think that the -- well, I think the filter was vertical

10   when it was implanted is my recollection of the implantation   10:14AM

11   films.  And I think that there's a four-degree tilt in 2015.

12   And I think that the filter had to caudally migrate on one

13   side.  There's no other explanation for that.  When I saw her

14   implant films as I recall it looked like her filter was

15   implanted fine.                                               10:15AM

16   Q.  So you have actually looked at films from the implant?

17   A.  I believe I have seen films from her implant that show that

18   the filter was vertical when her implanting physician felt it

19   was implanted.

20        MR. NORTH:  Could we bring up Exhibit 2453, please.      10:15AM

21   BY MR. NORTH:

22   Q.  Do you recognize Exhibit 2453, Doctor?

23   A.  Yes.

24   Q.  Turn to Page 6, if we can.  And this is a copy of the

25   report you prepared in this particular case.  Correct?       10:16AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    A.   Yes.

2    Q.   And as a part of this report, you list all of the medical

3    records and various other materials that you have reviewed as a

4    part of your work in the case, correct?

5    A.   Correct.                                                    10:16AM

6    Q.   And this is the list that contains the 24 Bard documents

7    that you reviewed, correct?

8    A.   Yes, it does.

9    Q.   And beginning on the bottom of Page 6, there is a list of

10   the radiographic films that you reviewed, correct?              10:17AM

11   A.   Yes, sir.

12   Q.   And the only film listed in -- well, first of all, Ms.

13   Jones had her filter implanted in August of 2010, correct?

14   A.   Correct.

15   Q.   The only listing is August 14, 2010 for that year, KUB.    10:17AM

16   What does that stand for?

17   A.   It's abdomen -- flat plate of the abdomen.

18   Q.   I'm sorry?

19   A.   Flat plate of the abdomen.

20   Q.   So that's not a cavagram, correct?                         10:17AM

21   A.   No.  No.

22   Q.   And that's not a chest X-ray or film, correct?

23   A.   It's not.

24   Q.   And that would not show the filter orientation, would it?

25   A.   No.  No.                                                   10:17AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   Q.  You don't have listed here any film that you reviewed in

2   2010 when she had this implanted, do you?

3   A.  I don't have them listed, no.

4   Q.  So as you sit here today, are you certain you ever saw a

5   film of the implant?                                              10:18AM

6   A.  You know, I stand corrected.  I thought I saw the film.

7   Maybe I didn't see the implantation film but my understanding

8   from the implantation physician it was vertical.  It's been a

9   long time since I made this report.

10  Q.  So your only evidence that the filter was completely         10:18AM

11  vertical at the time of implant and did not have what you have

12  already said would be a very slight tilt in the nature of four

13  degrees, your only evidence of that is in the implant report,

14  correct?

15  A.  Implant report.                                               10:18AM

16          MR. COMBS:  Objection, Your Honor.  Can we approach?

17          THE COURT:  Yes.

18          You can stand up, Ladies and Gentlemen.

19          (Discussion was had at sidebar out of the hearing of

20  the jury:)                                                        10:18AM

21          MR. COMBS:  This is a line of questioning implying

22  that the filter was implanted incorrectly, which there's no

23  evidence of.  There's no disclosure.  There's no opinions on

24  this.  He can't then come in and hint, hint that oh, you are

25  not sure that this was implanted properly without tilt.          10:19AM

1          MR. NORTH:  Your Honor, first of all, I'm making no

2    insinuation, nor would I, that a four-degree tilt at the time

3    of implant reflects anything on the part of the doctor.  These

4    things are never perfectly vertical.  What I'm trying to show

5    is that all this cascade of complications that he has alleged          10:19AM

6    did not occur here.  Yes, there was a fracture.  He's seen no

7    perforation.  He can't not, I don't think, establish what's

8    really caudal migration.  And I don't think he can establish

9    that it tilted after the time of implant and I think I'm

10   entitled to show that.                                                  10:19AM

11         MR. COMBS:  I think that's a subtle distinction that

12   would be lost in the jury that, oh, it wasn't below the

13   standard of care to put it in at a tilt.  But that does happen.

14   I think that's unfair.

15         THE COURT:  Well, when I was hearing it, my                       10:19AM

16   understanding of the purpose of the questioning was to rebut

17   the doctor's testimony that at some time after implant it

18   tilted.  That led to stress that caused the fracture.  And I

19   think that's legitimate cross-examination on that point.  I

20   have not heard questioning that suggests Dr. Avino made a               10:20AM

21   mistake.  I think he was questioning this doctor's view that it

22   tilted four degrees after implant, and that's what caused the

23   problems.

24         MR. COMBS:  I would just ask, Your Honor, that the

25   questioning be focused on that it was tilted four degrees or            10:20AM

1    something insignificant, not put in wrong.

2              THE COURT:  I think it has been.

3              MR. COMBS:  Okay.

4              THE COURT:  Yeah.  I don't think he's gone beyond that

5    and I think it's fair cross-examination.                    10:20AM

6              MR. COMBS:  Thank you.

7              (In open court.)

8              THE COURT:  Thank you, Ladies and Gentlemen.

9    BY MR. NORTH:

10   Q.  So let me repeat the question, Dr. Muehrcke.            10:20AM

11             Since you did not see any films performed on Mrs.

12   Jones at the time of the implant, the only basis you have for

13   concluding that the filter was perfectly vertical after

14   placement is the narrative report by the implanting doctor in

15   his record.  Correct?                                       10:21AM

16   A.  After having had a chance to look at my report, I see that

17   there is a KUB of 8-14-10 and another X-ray from 8-04-13.  And

18   I think that that shows the change in the tilt.

19   Q.  What is the 8-14-10?  You told us earlier right before we

20   took the break, I believe, that that would not have shown the  10:21AM

21   filter.

22   A.  Well, the KUB will show the filter, oh, yes.  It won't show

23   the filter next to the -- the orientation of the wall of the

24   inferior vena cava.

25   Q.  Do you know when Ms. Jones' filter was implanted?       10:21AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    A.   It was in 2010.

2    Q.   The KUB reviewed was dated August 14 of 2010, correct?

3    A.   Yes.

4    Q.   Are you aware of the fact that Ms. Jones' filter was

5    implanted after that date in August?                              10:22AM

6    A.   Yes, the 24th.  My recollection is that I saw a change.

7    Perhaps it's on the X-ray of January 2012 but I thought there

8    was a change.

9    Q.   But you saw no films at the time of implant?

10   A.   Correct.  The report is what I have that it was vertical     10:22AM

11   when it was inserted.

12   Q.   There's not a great deal of discernible difference between

13   straight up vertical and four degrees, correct?

14   A.   We said that before, yes.  I agree.

15   Q.   Well, let's think of a clock.  And from on the hour, let's   10:22AM

16   say 10:00 to 10:15, that would be 90 degrees, correct?

17   A.   I'm sorry, from 10:00 to 10:15?

18   Q.   Yes.  That arc of the circle would be 90 degrees?

19   A.   Yes.

20   Q.   So four degrees would be equivalent as opposed to 10:00      10:23AM

21   straight up and down more like 10:02, wouldn't it?

22   A.   I agree.  It's not a major tilt.  I agree.

23   Q.   And you are assuming that that four-degree or 10:02 tilt

24   would have caused caudal migration, but you can't see that on

25   any of the films?                                                 10:23AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   A.  Well, that's the standard way that these things fail.  But

2   there's no doubt that she has a filter fragment in her lung.

3   And that, you know, is pretty well documented.

4   Q.  But I'm -- my question was, you can't see this caudal

5   migration on the films?                                    10:24AM

6   A.  I cannot see the caudal migration.  I have answered that

7   like four times.

8   Q.  You agree that Ms. Jones needed to have a filter at the

9   time she did, correct?

10  A.  Yes, I do.                                             10:24AM

11  Q.  In fact, she was suffering from gastric bleeding while she

12  was hospitalized?

13  A.  She had problems with gastric bleeding.

14  Q.  And she also had suffered a DVT?

15  A.  On multiple occasions.                                 10:24AM

16  Q.  And she had a deep vein thrombosis incident right before, a

17  couple days right before she needed to have gastric surgery,

18  correct?

19  A.  Her redo gastric surgery, yes.

20  Q.  So she medically needed a filter to provide further      10:24AM

21  protection from any additional clotting at that time?

22  A.  I agree.

23  Q.  You have not reviewed any of her medical records from

24  before August of 2010, have you?

25  A.  I don't remember.  I cannot remember her -- I do not recall  10:25AM

1   that I saw her first bypass surgery, just the second one.

2   Q.  And you have not reviewed any of her medical records since

3   the filter was removed in 2015, have you?

4   A.  Correct.

5   Q.  Now, you would agree with me that the radiologist who saw          10:25AM

6   the fractured filter in 2015, she retrieved the filter through

7   a percutaneous procedure as you told us, correct?

8   A.  Yes.

9   Q.  And that procedure only took approximately 34 minutes,

10  correct?                                                               10:25AM

11  A.  Yeah.  I believe that's the time.

12  Q.  And she also concluded that the fragment in the pulmonary

13  artery was, and I quote, "stable; no action required."

14  Correct?

15  A.  That's what she wrote.                                             10:26AM

16  Q.  But my understanding is you disagree with the treatment

17  decision she made to leave that filter in place?

18  A.  No, I don't.

19  Q.  You believe that fragment should be removed, though?

20  A.  I do think the fragment should be removed.  I don't think         10:26AM

21  that she had the skill set to remove it.  And that's not a

22  criticism of her.  There's very few people who specialize in

23  the advanced removal techniques.

24  Q.  Have you told Ms. Jones that you disagree with the decision

25  by her doctor?                                                         10:26AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    A.  I have not told Ms. Jones that, no.

2    Q.  And Ms. Jones --

3    A.  It's not really disagreeing with them, but I think that

4    filter fragment should be removed.

5    Q.  Have you told Ms. Jones that you believe that fragment          10:27AM

6    should be removed?

7    A.  Like I just said, I have not told Mrs. Jones that.

8    Q.  And in fact, you live in northwest Florida, St. Augustine,

9    correct?

10   A.  Yes, I do.                                                      10:27AM

11   Q.  And you know that Ms. Jones lives in southeast Georgia, not

12   that far away, correct?

13   A.  I don't know exactly where she lives but I understand she's

14   in Georgia.

15   Q.  Are you aware that Ms. Jones has been diagnosed over the        10:27AM

16   years with severe anemia?

17   A.  I understand she has had anemia.

18   Q.  That's a condition where the body has lower red blood cells

19   than it should, correct?

20   A.  That's correct.                                                 10:27AM

21   Q.  And one of the principle symptoms of anemia is fatigue, is

22   that correct?

23   A.  It can be.

24   Q.  You testified earlier that there's no evidence that this

25   filter provided a benefit for her?                                  10:28AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1    A.  I don't believe it did.

2    Q.  There would be no way of knowing whether she had any

3    clotting event that was broken up by the filter while it was in

4    place during her surgery, is there?

5    A.  I disagree.                                              10:28AM

6    Q.  You think that -- what would be the outward manifestation

7    that the filter was actually confronting a clot?

8    A.  Well, I think Mrs. Jones has had two bouts of deep vein

9    thrombosis with swollen legs that brought her to the hospital.

10   So she's very aware of the signs, and she has responded by      10:28AM

11   coming to the hospital when she's had deep vein thrombosis

12   before.  And I think if somebody is going to have a pulmonary

13   embolism, many of them are preceded by a deep vein thrombosis,

14   which she's very well aware of the symptoms because she's been

15   admitted twice to the hospital before with them.  And there's    10:28AM

16   no evidence that that occurred.  I would agree with your expert

17   witness, Dr. Hurst, the hematologist who said there's no

18   evidence she had a DVT since 2010.

19   Q.  But you cannot eliminate the possibility that that she

20   could have had a pulmonary embolism that would not have been     10:29AM

21   detected because the filter did its job, can you?

22   A.  There's no evidence that she's had a deep vein thrombosis

23   or a pulmonary embolism.

24   Q.  If she had suffered a pulmonary embolism during her stomach

25   surgery it could have been fatal, correct?                       10:29AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   A.  Yeah, sure it can be fatal.

2   Q.  And over time, in your practice, I think as you have told

3   us before, you have actually had filters catch clots and

4   prevent pulmonary embolism.  Bard filters do so, correct?

5   A.  Bard filters can, yes.                                    10:29AM

6         THE COURT:  We've reached 10:30 at this time.  We're

7   going to break, Ladies and Gentlemen, until 10:45.  We'll

8   excuse the jury.

9         (Recess from 10:29 a.m. until 10:46 a.m.)

10         THE COURT:  Mr. North, anything further?              10:46AM

11         MR. NORTH:  Yes.

12         THE COURT:  All right.

13  BY MR. NORTH:

14  Q.  Dr. Muehrcke, as we talked about before the break, Ms.

15  Jones had her filter implanted in August of 2010, correct?   10:46AM

16  A.  Correct.

17  Q.  And then you have reviewed a chest X-ray taken of Ms. Jones

18  two years later in 2012, correct?

19  A.  Correct.

20  Q.  And there is no evidence visible on that chest X-ray of any  10:47AM

21  strut in her pulmonary artery, correct?

22  A.  In 2012?

23  Q.  Yes.

24  A.  Correct.

25  Q.  And you also looked at a chest X-ray from 2013, correct?  10:47AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   A.   Yes.

2   Q.   And in that chest X-ray, once again, there is no evidence

3   of a strut in the pulmonary artery or any fracture of the

4   filter, correct?

5   A.   Correct.                                                        10:47AM

6   Q.   Now, you reviewed some medical records from the retrieval

7   of the filter in 2015?

8   A.   Yes.

9   Q.   You did not review the cavagram, the inferior vena cavagram

10  that was taken as part of that retrieval procedure, did you?     10:47AM

11  A.   I don't recall seeing it.  I don't remember if I saw it or

12  not.

13  Q.   And you did not review any other films taken after the

14  removal of that filter strut, did you?

15  A.   I have seen her retrieval of her IVC filter.  I have seen    10:47AM

16  that.

17  Q.   Okay.

18  A.   I have seen them use -- they use the cone device to

19  retrieve it from a jugular approach.

20  Q.   You told us you had seen no medical records of her           10:48AM

21  treatment after 2015?

22  A.   Correct.

23  Q.   And therefore, you did not see the chest X-ray that was

24  performed on her in 2016, did you?

25  A.   I don't think I have seen that film.  I don't think I have    10:48AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Carr-Direct

1   seen it.

2   Q.  So you don't know what the film from March of 2016 showed

3   with regard to the positioning of the retained strut in her

4   pulmonary artery, correct?

5   A.  My understanding is her fragment is stable.                    10:48AM

6   Q.  Now, you have told us about a number of risks that you

7   believe may be posed because of that strut --

8   A.  Yes.

9   Q.  -- in Ms. -- if I may finish -- in Ms. Jones' pulmonary

10  artery, correct?                                                   10:48AM

11  A.  Correct.

12  Q.  But as you have already told us in the past, you cannot

13  cite a single case where any of those risks have actually come

14  to pass, have you?

15  A.  Oh, I'm aware of a case where those -- where a person's     10:49AM

16  died of a pulmonary fragment.

17  Q.  One case, correct?

18  A.  One case.  There's literature where it's hard to tease that

19  out of where Des Jardine's article talks about 20 deaths from

20  the Bard filters in the MAUDE data, but you don't know if they   10:49AM

21  are all cardiac or pulmonary fragments.  It's hard to tease

22  that out.  It's not broken down.  So I'm not sure that -- that

23  may be true in that situation, also.

24  Q.  Did not cite a single medical article in your report in

25  this case regarding any risks associated with retained struts   10:49AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Muehrcke-Redirect

1    in the pulmonary artery, did you?

2    A.   That's correct.

3              MR. NORTH:   Thank you, sir.  That's all I have.

4              THE COURT:   Redirect?

5                        REDIRECT EXAMINATION                          10:49AM

6    BY MR. COMBS:

7    Q.   Did Muehrcke, Mr. North asked you questions about the

8    number of documents reviewed and pointed out there were

9    millions of Bard documents you haven't reviewed, right?

10   A.   Yes.                                                         10:50AM

11   Q.   Have you been deposed in this litigation?

12   A.   Several.  Yes, I have been deposed lots.

13   Q.   And the Bard lawyers that deposed you had an opportunity to

14   present you documents in those depositions?

15   A.   That's correct.                                             10:50AM

16   Q.   In any of those opportunities to show you documents, did

17   they ever show you any documents that put their -- your

18   opinions in a different context or made you rethink anything

19   based on new documents you hadn't seen that they showed you?

20   A.   No, they did not.                                           10:50AM

21   Q.   Did they ever take a document, show you a document that put

22   Exhibit 2248 in a different light that changed your opinions?

23   A.   No.

24   Q.   And they had an opportunity to do so, correct?

25   A.   Yes.                                                        10:50AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Muehrcke-Redirect

1    Q.   You were asked about the number of fractures in that

2    Exhibit 2248 in that report that described unacceptable risk?

3    A.   The caudal migration?

4    Q.   Correct.   In general, in your experience as a medical

5    professional, you review lots of studies and you have conducted   10:51AM

6    studies and research, correct?

7    A.   Correct.

8    Q.   If a sample size is too small for a study to reach certain

9    conclusions about it, what's the remedy for that?

10   A.   Do a larger study.                                          10:51AM

11   Q.   Did Bard ever show you in any of your depositions any

12   documentation of a larger clinical study that would make those

13   results and that analysis irrelevant?

14   A.   No.

15   Q.   You were asked about your review of the records and imaging   10:51AM

16   at the time and what you read.   And I think you got a little

17   bit confused about what imaging you reviewed for the 2010

18   implant.

19   A.   Yeah.   I apologize.   It's been a while.

20   Q.   But have you seen anything?   Has Bard shown you anything?   10:52AM

21   Have you ever seen anything that showed that this was put in in

22   a tilted angle?

23   A.   No.

24   Q.   Any of Bard's experts opine it was put in in a tilted

25   angle?                                                           10:52AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Muehrcke-Redirect

1    A.  I haven't seen that.

2    Q.  You briefly mentioned that Mrs. Jones had a couple

3    procedures preexisting the implant.  What kind of medical

4    problems, just generally, what kind of medical problems was she

5    having where she had those kind of procedures?          10:52AM

6    A.  She had peptic ulcer disease and she had procedures to -- a

7    gastric bypass procedure and also she had an afferent loop

8    syndrome which is a complication of the first surgery that had

9    to be fixed.

10   Q.  So these are gastrointestinal issues?           10:53AM

11   A.  Correct.

12   Q.  Nothing to do with her heart or circulatory system, things

13   you would be involved in?

14   A.  Correct.

15   Q.  You were asked some questions by Mr. North, and I guess he   10:53AM

16   was trying to imply that you should have driven up from

17   Jacksonville to Savannah to treat Doris or she should have come

18   down there to treat with you.  You are not Mrs. Jones' treating

19   physician, right?

20   A.  No.                                   10:53AM

21   Q.  And would it be appropriate for an expert witness in a case

22   to take on the plaintiff as a patient?  Is that something you

23   would have ever done?

24   A.  That would be a conflict, I would think.

25   Q.  And would you be the person to take out Mrs. Jones'   10:53AM

1    fragment within her pulmonary artery?  Have you ever done a

2    procedure like that?  Would you do you a procedure like that?

3    A.  I would not be the person to do that.  She would have to go

4    to a center that specializes in that, and there's very few

5    places in the United States that do that.  There's Stanford.          10:54AM

6    There's Northwestern.  There's University of Pennsylvania

7    Hospitals where people see enough of these problems where they

8    have become experts in using advanced different techniques to

9    remove them.  But I certainly wouldn't do that myself.  They

10   have quite a bit of experience at University of Pennsylvania.          10:54AM

11   They have a 71-percent retrieval rate of pulmonary fragments.

12   Q.  You were asked about, and forced to admit because it's

13   true, that all filters have complications.  Do you recall that?

14   A.  Yes, I do.

15   Q.  What's different about the complications with the Bard           10:54AM

16   filters that makes them, in your opinion and in your clinical

17   experience, different than the other complications in other IVC

18   filters?

19   A.  In my experience and my colleagues' experience, the Bard

20   filters have not only more complications but they have a             10:55AM

21   constellation of all the different types of problems together

22   and typically and more than other filters.  And it may be due

23   to a design problem, you know.  That's been my experience with

24   it.

25   Q.  And then Mr. North asked about the explanting physician,         10:55AM

1  Dr. Nelson, and a note in her medical records and her notes for

2  the explant procedure that she thought the fragment was stable.

3  And why don't you tell us your perspective as cardiothoracic

4  surgeon about whether that fragment is stable.

5  A.   Well, the pulmonary artery is a hostile environment.  The          10:55AM

6  right ventricle pumps blood through the pulmonary artery and

7  that's not a situation that that fragment is supposed to be in,

8  especially being the inferior vena cava, which is a low flow

9  area.   The pulmonary artery is a higher pressure, higher

10  dynamic area and also the lungs are going up and down.  We          10:56AM

11  breathe 16 to 20 times per minute, and that spear is in her

12  pulmonary artery, which can be damaged by the lung going up and

13  down.  And I would be concerned about that.

14       I personally would see if it could be removed

15  percutaneously.          10:56AM

16  Q.   Without listing all the articles that you have reviewed,

17  both for this case and just for your practice, but just

18  generally, is there medical literature that supports that

19  opinion?

20  A.   Taking out fragments of the pulmonary artery, yes, there          10:56AM

21  are.

22  Q.   Has there been medical literature on that even since Dr.

23  Nelson performed the explant procedure in 2015?

24  A.   Yes.

25  Q.   Even since you did your expert report in this case?          10:56AM

1    A.  I would have to look at it.  I can't recall.

2    Q.  You have opined in this case and talked at length about

3    that the filter tilted, correct?

4    A.  Correct.

5    Q.  Migrated?                                                    10:57AM

6    A.  Yes.

7    Q.  Maybe to a small degree, but whether it's tilt or

8    migration, are these kind of the same thing?

9    A.  Yeah, it is.  But I think the big problem here is not the

10   tilt or the migration.  She's got a fragment in her pulmonary   10:57AM

11   artery.  That's the problem.

12   Q.  And that's the cascade, right?

13   A.  Yes.  That's the issue here.

14   Q.  And in this case, Mr. North explained about how it's -- he

15   called it a 10:02 or however he wanted to phrase it, it's a     10:57AM

16   very small, very tiny tilt in this case, right?

17   A.  Correct.

18   Q.  And the Bard filter, Eclipse Filter in Mrs. Jones still

19   fractured, went through her heart, into her pulmonary artery?

20   A.  Correct.                                                     10:58AM

21              MR. COMBS:  No further questions, Your Honor.

22              THE COURT:  Thank you, sir.  You can step down.

23              MR. COMBS:  Your Honor, can I ask him one more

24   question?  Sorry.  I had to consult with my lawyers, team of

25   them.                                                           10:58AM

---5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Muehrcke-Redirect---

1    BY MR. COMBS:

2    Q.  Dr. Muehrcke, are all the opinions you gave today to a

3    reasonable degree of medical certainty?

4    A.  Yes.

5    Q.  Thank you very much.                                    10:58AM

6            MR. CLARK:  Your Honor, at this time the plaintiff

7    would call Bret Baird.

8            THE COURTROOM DEPUTY:  Mr. Baird, would you please

9    come forward.  Stand right here and raise your right hand,

10   please.                                                     10:59AM

11           (The witness was sworn.)

12           THE COURTROOM DEPUTY:  Could you please state your

13   name and spell it for the record?

14           THE WITNESS:  Bret Baird.  B-R-E-T, B-A-I-R-D.

15           MR. CLARK:  Your Honor, at this time the plaintiff  11:00AM

16   would move into evidence the following exhibits:  571, 589,

17   590, 591, 592.

18           THE COURT:  Little more slowly.  591.

19           MR. CLARK:  592, 1053, 1568, 1740, 1788, 4414, 4416,

20   4454, 4455, 4456, 4457, 4467, 4468, 4469 and 4499.         11:00AM

21           THE COURT:  What was the last one?

22           MR. CLARK:  4499.

23           MS. HELM:  No objection, Your Honor.

24           THE COURT:  Those are all admitted.

25

1                          BRET BAIRD,

2    called as a witness herein, having been duly sworn, was

3    examined and testified as follows:

4                       DIRECT EXAMINATION

5    BY MR. CLARK:

6    Q.  Pardon the housekeeping.

7            Could you please tell us, sir, when did you -- have

8    you worked for Bard Peripheral Vascular System?

9    A.  Yes.

10   Q.  When did you start working there?                    11:01AM

11   A.  In 2006.  End of 2006, beginning of 2007.

12   Q.  Do you have a month, or is that just a general

13   recollection?

14   A.  I believe it was December 2006.

15   Q.  And my understanding is that during that time you started  11:01AM

16   off as a senior project manager?

17   A.  Senior product manager, correct.

18   Q.  Was that a marketing function?

19   A.  Yes.

20   Q.  And you had that function until April of 2008?        11:01AM

21   A.  Correct.

22   Q.  And then you became the marketing manager, correct?

23   A.  The franchise manager, correct.

24   Q.  And I have seen that you have described your role as

25   franchise manager as having global responsibilities for a $50  11:01AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    million division coordinating full upstream and downstream

2    marketing and development activities.  Is that how you

3    described that role?

4    A.  Correct.

5    Q.  And in your capacity as a franchise manager, did you direct        11:02AM

6    the core creative ideas for marketing for Bard?

7    A.  Did I create -- as a marketing person I created the

8    marketing pieces, correct.

9    Q.  That would include online marketing campaigns?

10   A.  Correct, yes.        11:02AM

11   Q.  Educating the sales force?

12   A.  I was one of the many who did that, correct.

13   Q.  And were you also one of the people who would educate

14   customers?

15   A.  One of the many who would do that.        11:02AM

16   Q.  And my understanding is that you were let go by Bard in

17   October 2011, is that right?

18   A.  Yes.

19   Q.  And you weren't given a specific reason for that

20   termination?        11:02AM

21   A.  Nope.

22   Q.  And you have given a deposition in this case, right?

23   A.  Correct.  Yes.

24   Q.  Pretty long deposition?

25   A.  Yeah.        11:02AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    Q.   And did Bard hire attorneys for you in that deposition?

2    A.   Yes.

3    Q.   And did Bard agree to compensate you for your time in

4    preparing and attending that deposition?

5    A.   Yes.                                                          11:03AM

6    Q.   And that was $150 an hour?

7    A.   I believe so.

8    Q.   And are you being compensated for your time and for

9    preparing and coming here to talk to the jury today?

10   A.   Yes.  I hope so.                                              11:03AM

11   Q.   Is it at that same rate?

12   A.   We haven't even finalized that.  I don't know.

13   Q.   Depends how good you do?

14   A.   What's that?

15   Q.   Depends how good you do?                                      11:03AM

16   A.   No.  Actually, every price every year changes.  I actually

17   do business consulting which my rates have gone up, things like

18   that.  So it depends.

19   Q.   Now, what do you do for a living now?

20   A.   So I am a director for an orthopedic financial services       11:03AM

21   group which does orthopedic surgery on a lien at financial

22   services.

23   Q.   And on a lien, what does that mean?

24   A.   Just means for patients who need -- they don't have health

25   care and they need to be able to do the surgery.  We finance it    11:04AM

1    for them.

2    Q.  What is the lien attached to?

3    A.  A settlement for them.  It's a case for them which is if

4    they were injured in a car accident.

5    Q.  Okay.  So you would be working with lawyers to get          11:04AM

6    compensation from any recovery that the injury victim might

7    get?

8    A.  Yes.

9    Q.  Let's talk about marketing at Bard.  I take it Bard

10   believes in marketing as part of its overall business strategy.  11:04AM

11   Is that fair?

12   A.  That's true.

13   Q.  And they hired you?

14   A.  Yep.

15   Q.  And you are an MBA, correct?                               11:04AM

16   A.  Correct.

17   Q.  You got your MBA from Harvard?

18   A.  Yes.

19   Q.  That's a pretty good school, right?

20   A.  I hope so.                                                 11:04AM

21         MR. CLARK:  Gay, would you please bring up Exhibit

22   1053?

23         Your Honor, may I publish this to the jury?

24         THE COURT:  Yes.

25         MR. CLARK:  Gay, please go to Page 2 of 10.  Next       11:04AM

1    page, please.  There we go.

2    BY MR. CLARK:

3    Q.  If you look at the middle of this paragraph that begins

4    market customer service device, and understanding, this is a

5    document that preceded your time at Bard.  It was an earlier          11:05AM

6    document relating to a different filter.

7            Do you see where it says:  Users can be swayed by ease

8    of use, low profile, and aggressive marketing even in the

9    absence of solid clinical history and in spite of documented

10   negative clinical experiences.                                        11:05AM

11           Did I read that correctly?

12   A.  Okay.

13   Q.  While you were at Bard, in your experience, did they have

14   an aggressive marketing campaign?

15   A.  Did they have aggressive marketing campaign?  I don't know        11:06AM

16   how to answer that.  We're constantly trying to market and --

17   Q.  Is one of the things you might try to do through marketing

18   overcome customer reluctance or concerns about products?

19   A.  The primary role in marketing, especially with what I'm

20   doing is for product launches, introduce new products, to talk       11:06AM

21   about our current product line.

22   Q.  So one of the functions you had would be to introduce new

23   products and get the word out about new products, right?

24   A.  Yeah.

25   Q.  Some of what you did was also dealing with customer               11:06AM

1    complaints about existing products, right?

2    A.   No.   Complaints go through field assurance.

3    Q.   What I mean by "complaints" is concerns that customers were

4    expressing?

5    A.   I'm sorry.   Can you ask that question differently?                    11:06AM

6    Q.   Sure.   You told me one of the things that you did would be

7    to support new projects that were coming on line at Bard,

8    right?   That would be on the offensive side?

9    A.   Right.

10   Q.   Did you do some defense also?                                          11:07AM

11   A.   In regards to helping our sales force answer questions like

12   Q&A and things like this, yes.

13   Q.   So you would also support existing lines of business and

14   products?

15   A.   Correct.                                                              11:07AM

16   Q.   And if there were concerns or problems that came in,

17   marketing would be one of the groups that would address those

18   customer concerns, right?

19   A.   With a whole team of people depending on what those

20   concerns were, correct.                                                    11:07AM

21   Q.   Was one of the functions of marketing to improve the

22   reputation or branding of devices?

23   A.   Absolutely.   That's probably the quintessential marketing

24   role.

25   Q.   And as I understand it, you, in the marketing department,              11:07AM

─5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct─

1    would interact with the sales force.  Right?

2    A.  Correct.

3    Q.  So you would create messaging and communication planning,

4    and that would be disseminated to the boots-on-the-ground sales

5    force?                                                              11:07AM

6    A.  Yes.

7    Q.  As a franchise manager, would you consider that a dynamic

8    position?

9    A.  Absolutely.

10   Q.  You had to interface with a whole bunch of different groups   11:08AM

11   at Bard.  Correct?

12   A.  Correct.  Yeah.

13   Q.  That would include upper management?

14   A.  Yeah.

15   Q.  Other people in the marketing department?                     11:08AM

16   A.  Yes.

17   Q.  Engineering sometimes?

18   A.  Uh-huh.  Yes.

19   Q.  And, of course, sales?

20   A.  Yes.                                                          11:08AM

21   Q.  And the project you worked on would cut across multiple

22   disciplines as well at Bard.  Right?

23   A.  Absolutely.  Yeah.  These types of projects are really team

24   focused.

25   Q.  Now, Bard's ultimate customer with respect to its medical     11:08AM

1  device products are the physicians that use those products.

2  Correct?

3  A.   Correct.  There's multiple layers of customers, but yes.

4  Q.   And you, in your capacity as franchise manager, would, on

5  occasion, meet with doctors to talk about products.  Right?        11:08AM

6  A.   On occasion.  Not that often.

7  Q.   And you might meet them at a conference or perhaps

8  entertain them.  Is that right?

9  A.   Yes.

10  Q.   And Bard also had a sales force that would handle the        11:09AM

11  majority of those types of functions.  Right?

12  A.   Correct.

13  Q.   Now, while you were at Bard, is it fair to say you worked

14  extensively with their IVC filter line of products?

15  A.   When I was a filter franchise manager.                       11:09AM

16  Q.   And that started in 2008?

17  A.   2008.  April.

18  Q.   So the products that were on line at the time you started

19  were the G2, is that right?

20  A.   I think we launched -- we were launching G2X or Express at   11:09AM

21  the time.

22  Q.   So you came in right around the time when the G2 was

23  transitioning to the G2X?

24  A.   I believe so.

25  Q.   And the G2X essentially had a hook on the top of the G2?     11:09AM

1  A.  Yes.  I'm sorry.  This is now history.  I am two jobs past

2  this.  So any reference to these things I have to think about

3  to remember.

4  Q.  No problem.  But you do remember that the G2X came on line

5  early in your tenure as the franchise manager.  Right?              11:09AM

6  A.  Yes.

7  Q.  And that eventually gave way to the Eclipse Filter?

8  A.  Yep.

9  Q.  And were you there when the Meridian came on line?

10  A.  Yes.                                                            11:10AM

11  Q.  Were you there when the Denali came on line?

12  A.  No.

13  Q.  Now, one of the primary things you did was to support those

14  products as they came on line, right?

15  A.  Correct.                                                        11:10AM

16  Q.  As a marketing person you wanted to help the sales force

17  get the product out there and get it to customers?

18  A.  Yes.

19  Q.  And one of the ways that you could do that would be to

20  identify new opportunities for products.  Right?                   11:10AM

21  A.  Absolutely.

22  Q.  And while you were at Bard you participated in multiple

23  filter franchise reviews.  Right?

24  A.  Yeah.  That was a -- yes.

25       MR. CLARK:  Could you bring up, please, Gay, 571.             11:10AM

─5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct─

1          Your Honor, may I publish 571 to the jury?

2          THE COURT:  You may.

3    BY MR. CLARK:

4    Q.  Is this an example of a filter franchise review?

5    A.  Yes.                                                    11:11AM

6    Q.  And this is -- your name is first on the list down there,

7    right?

8    A.  Correct.

9    Q.  You made a contribution to the creation of this document?

10   A.  This is the 2008 one, so I think I was there for a month.  11:11AM

11   So I was one of the team members.

12   Q.  Generally, as I understand, these come out about every six

13   months where Bard sort of takes inventory of what's going on

14   with its products?

15   A.  These happen every six months, the purpose of which is     11:11AM

16   primarily three-year budgeting.  So you are always looking

17   to -- well, if you don't mind I will take a minute to explain

18   it.

19          So a filter or a franchise review just happens in all

20   the different organizations.  It happens all at once meaning   11:11AM

21   stents and balloons, things like that.  So you are put together

22   as a team to prepare documents to the board or the president of

23   the company who might fly in.  And it helps understand where

24   the opportunities are for the future, where the money is going

25   to be spent for the future.                                  11:12AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    Q.  And this document is a collaboration between marketing,

2    sales, and engineering.  Is that fair?

3    A.  Yes.  And there might even be more people.  I don't

4    remember.

5    Q.  And like you said, it gets into -- it gets presented to the    11:12AM

6    president on occasion and the Board of Directors?

7    A.  Say that again.

8    Q.  Does it get presented to Bard leadership including the

9    president?

10   A.  Depending on who is coming in or who is presenting, yes.    11:12AM

11   So it might be just the Bard Peripheral Vascular board or might

12   be the president that comes in.

13          MR. CLARK:  Page 2, Gay.

14   BY MR. CLARK:

15   Q.  This slide is a depiction of the market share by company,    11:12AM

16   is that's right?

17   A.  Yes.

18   Q.  And it looks like Bard had about 28 percent of the overall

19   market share for the filter market.  Right?

20   A.  Yes.    11:12AM

21   Q.  And one of your goals as a filter franchise manager was to

22   move Bard to a position where it was the leader in market share

23   for filters, right?

24   A.  Correct.  Oh, yeah.

25   Q.  Turn to Page 7, please.  Here we have an SWOT.  Can you    11:13AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1   tell the jury what that stands for?

2   A.  Sure.  SWOT, strength, weakness, opportunity, threat.  So

3   SWOT is a very standard business marketing tool, kind of a --

4   well, best way to say it is a tool that you use as a marketing

5   person to assess opportunities and what's happening with your          11:13AM

6   product, what opportunities, what -- well, what are the

7   strengths, weaknesses, opportunity, threats.

8   Q.  That's with respect to the products?

9   A.  And the market, correct.

10  Q.  Now, if you look under weaknesses, one of the identified          11:13AM

11  weaknesses is that the -- I guess the product or the people

12  making the product were a device focused versus disease-state

13  focused.  Do you see that?

14  A.  Sure.

15  Q.  And do I take that to mean there was a concern expressed          11:14AM

16  that the company was more concerned about the product itself as

17  opposed to the condition it was intended to treat?

18  A.  I don't recall.  I don't remember what the purpose of that

19  was.

20  Q.  Did you write that?                                              11:14AM

21  A.  I have no idea.

22  Q.  Another function or expression of weaknesses was reactive

23  slash evolutionary designs.  What did that mean?

24  A.  Reactive evolutionary designs.  I don't recall.

25  Q.  Do you see there at the last bullet point there was a            11:14AM

1   market perception of BPV filter higher complication rates.

2   That's pretty self-explanatory, right?

3   A.   Whatever it says there.

4   Q.   Now, I understand from your deposition that market

5   perception is the perception of the customers who are the        11:14AM

6   doctors.  Is that right?

7   A.   I'm sorry, from what?

8   Q.   From the doctors.  That's the market you are talking about

9   there?

10  A.   I would assume so.  Again, I don't -- this is a document     11:15AM

11  way back when.

12  Q.   If you told us in your deposition that the market

13  perception was based on what doctors were telling Bard, would

14  you have any reason to disagree with that?

15  A.   Yes.  Depending on the time we're talking about, there was   11:15AM

16  all sorts of things going on in the market.  We had customers

17  who were -- sorry -- competitors who were attacking us with

18  MAUDE data that they cooked up.  We also eventually had calling

19  attorneys that were attacking Bard filters on the market, our

20  products alone.                                                   11:15AM

21  Q.   You are referring to a filter law website.  Is that right?

22  A.   Yeah, as well as other attorneys that were getting on

23  board.

24          MR. CLARK:  Your Honor, may we approach?

25          THE COURT:  Yes.                                          11:15AM

1        If you want to stand up, Ladies and Gentlemen.

2        (Discussion was had at sidebar out of the hearing of

3    the jury:)

4        MR. CLARK:  Your Honor, as we mentioned this morning,

5    and as I was assured by counsel we were going to be dealing        11:16AM

6    with the filter law website specifically, I have asked my

7    questions based on that.  This is sort of a gratuitous

8    injection into other things.  I don't think that's fair because

9    we made a deliberate decision about this line of questioning

10   specific to that website.  So for him to inject that             11:16AM

11   gratuitously particularly when we had an e-mail exchange, we

12   agree we're all talking about the website.

13       MS. HELM:  Your Honor, I told him to limit it to

14   filterlaw.com.  I don't know where that statement came from.

15   If asked, is it your understanding that these attorneys were     11:16AM

16   not involved, he's going to say yes, that's my understanding.

17       THE COURT:  What do you propose to do?

18       MR. CLARK:  I think at this juncture what I should be

19   permitted to do is ask him, the attorneys you were referring to

20   had a website called filterlaw and they were in Illinois.  And   11:17AM

21   then a follow-up question that they were not the attorneys in

22   this courtroom.

23       MS. HELM:  I'm fine with that.

24       THE COURT:  I think that's reasonable.

25       MR. CLARK:  As long as he doesn't inject more.          11:17AM

```
 1              MS. HELM:  I think the problem is that -- and I did
 2    instruct him more than once to limit it to filterlaw.com.  I
 3    think what happened is, as happens, other lawyers picked up on
 4    filterlaw, and that's what he's referring to.  So I can't
 5    instruct him but I have already told him to limit it to          11:17AM
 6    filterlaw.com.  He doesn't know who it was.  He doesn't know
 7    who the lawyers were.  He just knows they were dealing with
 8    filterlaw.com.  And he knows if you ask him is it your
 9    understanding that did not involve any of the lawyers in this
10    case, he's going to say yes, that's my understanding.            11:17AM
11              THE COURT:  Okay.  Are you good with that?
12              MR. CLARK:  I feel like it's -- I don't know how to
13    put the toothpaste back in the tube at this point.  That's the
14    problem.  I think what might be a more direct thing would be
15    for the Court to instruct the jury that the filterlaw website   11:18AM
16    involved attorneys from -- that his answer involved the
17    filterlaw website which is attorneys from Illinois who are not
18    part of this case.  That way I don't have to ask him more
19    questions.
20              MS. HELM:  That's fine.                                11:18AM
21              THE COURT:  So what I will tell the jury is I will say
22    something like, you just heard the witness refer to the
23    filterlaw website and other attorneys who might have referred
24    to the website.  The parties have agreed that all of the
25    lawyers who were involved with the filterlaw website have        11:18AM
```

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    nothing to do with this case and the plaintiff's attorneys in

2    this case have no involvement with it.

3          MR. O'CONNOR:  Are we going to hear the baggage issue?

4          MR. CLARK:  Hopefully he will get the message.

5          THE COURT:  Are you going to get to the baggage issue    11:19AM

6    before lunch?

7          MR. CLARK:  I expect I will.

8          THE COURT:  Did you talk to him specifically about

9    that?

10         MS. HELM:  Yes, Your Honor.                               11:19AM

11         THE COURT:  If I need to give another instruction at

12   that time, I will.  Okay.

13         (In open court.)

14         THE COURT:  Ladies and Gentlemen, before we continue

15   with Mr. Baird's testimony, let me share with you a stipulation  11:19AM

16   from the parties.  Mr. Baird made reference a moment ago to

17   something called a filterlaw website and attorneys who were

18   involved with it.  The parties have stipulated that these

19   plaintiff's attorneys in the case have nothing to do with that

20   website or the lawyers who were involved.                       11:19AM

21         All right.  Mr. Baird, you may continue.

22         MR. CLARK:  One moment, sir.

23         Gay, could you pull up Page 74 of his deposition.

24   BY MR. CLARK:

25   Q.  Sir, can I direct your attention to Page 74 of your        11:20AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1   deposition which is displayed there.  You were asked the

2   question:  Market perception of BPV filter has higher

3   complication rates.  That's what it says.  I'm sorry.  That was

4   your answer to a question.

5          And the following question is:  Where the perception   11:20AM

6   comes from is the doctors, meaning the guys that are putting

7   these things in using your products, correct?

8   A.  Correct.

9   Q.  And your answer was:  Correct.  That's market perception.

10  The market is the doctors.                                    11:20AM

11         Does that refresh your recollection?

12  A.  Sure.

13  Q.  Now, in terms of doctors, the sales force at Bard are the

14  ones who primarily interface with the doctors, right?

15  A.  I'm sorry.  Say that again.                               11:21AM

16  Q.  Bard sales are the people who generally interface with the

17  doctors?

18  A.  Correct.

19  Q.  They are sort of the face of Bard in the outside world?

20  A.  Yes.                                                      11:21AM

21  Q.  And the sales people would cultivate relationships with

22  those doctors.  Is that fair?

23  A.  Sure.

24  Q.  And doctors would rely on the sales force to bring them

25  information about new products.  Right?                       11:21AM

1    A.  I can't speak for the doctors, but there's data available

2    on all sorts of avenues for the doctors to get it.

3    Q.  One of the things that you did was to make sure sales force

4    had data to provide to doctors.  Right?

5    A.  True.                                                        11:21AM

6    Q.  Or certain types of data, anyway.

7    A.  Yes.

8    Q.  You would agree the data that the sales force had to

9    provide to the doctors should be accurate.  Right?

10   A.  True.  Correct.                                             11:21AM

11   Q.  So in terms of the flow, the salespeople would look to Bard

12   to get the information and they would, in turn, disseminate

13   that to the doctors?

14   A.  Say that again.  The Bard people what?

15   Q.  So information goes from Bard?                              11:22AM

16   A.  Right.

17   Q.  To sales to the doctors.  Right?

18   A.  That's one vehicle.  There's lots of other vehicles.

19   Q.  There might be some direct communications between Bard and

20   doctors, is that right?                                        11:22AM

21   A.  Correct.

22   Q.  Now, going back to the exhibit, please.  Now this is a

23   confidential internal document, right, if you look at the

24   bottom?

25   A.  Looks like it.  It's confidential.                         11:22AM

1    Q.  This isn't something that gets put on the website that the

2    public can see?

3    A.  No.  Do you know what this is?  I only have one page so I

4    don't know what this document is.

5    Q.  I'm sorry.  This is back to the Exhibit 571.                    11:22AM

6    A.  Oh.  Filter franchise.  Okay.  Thank you.

7              MR. CLARK:  Gay, can you go to Page 8 of this exhibit,

8    please.

9    BY MR. CLARK:

10   Q.  Now, we talked about strengths and weaknesses.  One of the      11:23AM

11   things it also has identified are threats.  Is that right?

12   A.  Correct.  That's the model SWOT.

13   Q.  And one of the threats that's identified is a trend to

14   focus on complications related to optional IVC filters in

15   clinical literature.  Did I read that correctly?                    11:23AM

16   A.  Yep.

17   Q.  And clinical literature is literature created by customers,

18   the doctors?

19   A.  By the doctors, correct.

20   Q.  So you are saying the doctors have a tendency to focus on        11:23AM

21   complications related to optional IVC filters.  Is that right?

22   A.  I'm not saying that, but the team must have put that in a

23   document.

24   Q.  Those may not be your words, but that's something that Bard

25   created?                                                            11:23AM

1   A.   Yeah.

2   Q.   Let me ask you, so part of the purpose of identifying

3   strengths and weaknesses is to evaluate whether there are other

4   opportunities for Bard to get out there with either different

5   products or new lines of business.  Right?                          11:24AM

6   A.   Absolutely.

7   Q.   This is a tool to develop that?

8   A.   Yeah.  This document, franchise review, again, that's a lot

9   of what the purpose is.

10   Q.   So this analysis will be part of the decision making in      11:24AM

11   terms of trying to figure out what types of projects would be

12   useful for the company to go for?

13   A.   Yes.

14          MR. CLARK:  Gay, could you please turn to Page 14.

15   BY MR. CLARK:                                                       11:24AM

16   Q.   If you look at Item Number 2, one of the product line

17   strategies, and the product line we're referring to is the IVC

18   filter line, right?

19   A.   Yes.

20   Q.   And one of the strategies under Number 2 was to implement     11:24AM

21   short-term modifications to enhance the current platform.  And

22   it has in parenthesis G3?

23   A.   Yes.

24   Q.   Am I to take from that that the current platform was a G2

25   Express like you told us, and there were plans to make a          11:25AM

1  further iteration of that that would make modifications to

2  enhance it?

3  A.  Correct.

4  Q.  And then Item Number 3 was to introduce a next gen

5  operational filter that significantly reduces complications.          11:25AM

6  Right?  Is that right?

7  A.  Yeah.

8  Q.  So the plan was to come up with a G3 in the sort-term and

9  have a next generation device in the somewhat longer term?

10 A.  Correct.  Yeah.  That was a fairly -- a next gen is a very   11:25AM

11 large project, takes years and a lot of money to do.  So the

12 implement short-term modifications is a chance to be able to

13 continue and improve your current design to try to enhance it

14 and make it better.

15 Q.  It is also a chance to keep the product on the market while  11:25AM

16 you are working on making the product better.  Right?

17 A.  I don't understand the question.  The product is already

18 there.

19 Q.  It's there.  And this will preserve some market share while

20 you are working on the next generation?                        11:26AM

21 A.  Yeah.  I don't think any medical device company would ever

22 pull a product while they are waiting for the next generation

23 product.

24 Q.  We'll talk about that in a little bit.  But for the touchup

25 or the short-term modifications for the G3, that project       11:26AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    ultimately became the Eclipse Filter.  Right?

2    A.  I don't know.  I remember the name G3.  I know it

3    eventually -- I know Eclipse was the next filter.

4    Q.  So the next generation filter after G2X was the Eclipse?

5    A.  Correct.                                                      11:26AM

6    Q.  And the next generation filter was the one that came on

7    line after the Eclipse, the Meridian.  Right?

8    A.  No.

9    Q.  What was between Eclipse?  What was after Eclipse?

10   A.  Well, that is successfully correct, but when we talk about    11:26AM

11   next generation, that's Denali.

12   Q.  One of the things we ultimately will learn in this case is

13   that the Eclipse Filter was going to have caudal anchors.  Do

14   you remember that?

15   A.  That's more of an R&D discussion.  But I don't recall.         11:27AM

16   Q.  I will see if we can find some documents that help us with

17   that.

18           Could you go to Page 19?

19           On under G3 the objective was to improve the G2

20   platform to address current complications without a clinical      11:27AM

21   trial.

22   A.  Okay.

23   Q.  And like you told us, a clinical trial can take a lot of

24   time, right?

25   A.  Correct.                                                       11:27AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    Q.  And can cost a lot of money?

2    A.  Yes.

3    Q.  So the idea here was to be able to have something that

4    would improve the product without having to go through the

5    expenditure of the resources and time necessary to do a                11:27AM

6    clinical trial?

7    A.  I think a better way to say that is that we're able to get

8    something out as quickly as possible to improve it.

9    Q.  To improve the existing platform but not address the

10   significant complications that you hoped to address with the           11:28AM

11   next generation filter?

12   A.  I think we have to be careful of the semantics we're

13   talking about.  Let's piece that apart.  Say that again.

14   Q.  So this is going to address current complications without a

15   clinical trial?                                                         11:28AM

16   A.  Correct.

17   Q.  And like we saw on the slide before, the next generation

18   filter was going to significantly improve those complication

19   rates?

20   A.  That was the hope.                                                  11:28AM

21   Q.  That was the plan, right?

22   A.  Correct.  And that's Denali.

23          MR. CLARK:  Gay, could you please pull up Exhibit

24   4454.

25          May I publish this to the jury?                                  11:28AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1           THE COURT:  Yes.

2    BY MR. CLARK:

3    Q.  And this is an Eclipse Vena Cava Concept POA.  What's POA

4    stand for?

5    A.  Product opportunity assessment.                           11:28AM

6    Q.  And if we go to Page 3, is this a report that you prepared?

7    A.  Yes.

8    Q.  And Page 4, please.  Now, the goal was to have

9    electropolishing with this Eclipse Filter.  Right?

10   A.  Correct.                                                   11:29AM

11   Q.  And that would bring it up to industry standard.  Right?

12   A.  Again, that's an R&D discussion.

13   Q.  Okay.  So when we see things like what this product is

14   going to do, you are incorporating information provided by

15   other departments at Bard?                                     11:29AM

16   A.  Sorry.  Say that again.

17   Q.  Are the information things like what electropolishing is

18   going to do, that's not something you come up with as marketing

19   manager?

20   A.  Right.                                                     11:29AM

21   Q.  That's something that comes from engineering or other

22   developers?

23   A.  Yeah.

24   Q.  So as I understand it, you come up with a concept, right?

25   A.  We as a team come up with a concept, yeah.                 11:29AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1   Q.  And then it goes to engineering?

2   A.  No.  I think you are making it successive.  And I'm not

3   quite sure what the discussion point is, but it's a team

4   document.

5   Q.  Okay.  So we have a team document.  And at some point the          11:30AM

6   engineers get involved and provide input to the document.

7   Right?

8   A.  Again, I don't think it's successive.  This is a holistic

9   thing.  It, as a team, works on these things all the time.

10           MR. CLARK:  Gay, let's pull up Exhibit 4455.                    11:30AM

11  BY MR. CLARK:

12  Q.  Are you familiar with this DIS approval form?

13  A.  This form, yes.

14  Q.  And, in fact, you were a signatory to this form, right?

15  You had to sign off on it?                                               11:30AM

16  A.  Yes.

17           MR. CLARK:  Can we publish this exhibit to the jury,

18  Your Honor?

19           THE COURT:  Yes.

20  BY MR. CLARK:                                                           11:30AM

21  Q.  Now, this was signed by various people in November 2009,

22  correct?

23  A.  Yes.

24  Q.  And will you recall that that was roughly a month after the

25  product opportunity assessment that we just looked at?                  11:31AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    A.  I'm sorry.  We can go back.  But the dates?

2    Q.  Would it surprise you if this was a document that appeared

3    after the product opportunity assessment?

4    A.  I don't know.  But if we can look at dates, I can tell you.

5           MR. CLARK:  Gay can you pull up the date of the last       11:31AM

6    one please?  I think I have the wrong document here.  In

7    November 2009 -- go back to 4455, please.

8    BY MR. CLARK:

9    Q.  This is a design input study.  Is that right?

10   A.  Correct.  Not study but design input summary.               11:31AM

11   Q.  And if we look on Page 3 under purpose, it says:  This

12   report documents and summarizes the design input information

13   gathered during the concept phase of the Vail project.

14          Was the veil project another name for what would later

15   become the Eclipse?                                             11:32AM

16   A.  Yes.

17   Q.  And this design input information is used to develop the

18   product performance specification, product design, and test

19   plans.  Is that your understanding of how this document works?

20   A.  How it reads, yeah.  I can just confirm what it says.       11:32AM

21   Q.  You are confirming that that's -- at least that's what the

22   document says its purpose is?

23   A.  Yeah.

24   Q.  If we look under Section 5 at the bottom, 5.0, there's a

25   comment about surface finish.  Do you see that?                 11:32AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    A.  Yes.

2    Q.  And it says that electropolishing the current G2X for the

3    current -- electropolishing the current G2X vena cava filter

4    will improve the surface finish and will make the filter

5    consistent with emerging industry standards for implantable          11:32AM

6    Nitinol devices.

7            Did I read that correctly?

8    A.  Yes.

9    Q.  So one of the purposes of having this finished was to bring

10   it up to what were the emerging industry standards?               11:33AM

11   A.  That looks like it.

12   Q.  And this paragraph here doesn't mention anything about

13   fatigue resistance or fracture resistance, correct?

14   A.  Correct.

15           MR. CLARK:  Would you please bring up Exhibit 592.        11:33AM

16           May I publish this to the jury, Your Honor?

17           THE COURT:  Yes.

18   BY MR. CLARK:

19   Q.  Mr. Baird, this looks to be an e-mail between you and Brian

20   Reinkensmeyer in April of 2010.  Do you recall this document?    11:33AM

21   A.  No.

22   Q.  If you look at the first page, there's in about the middle

23   it says:  Bret, please clarify if we can use the statement you

24   use in the field, question mark.  And the statement reads:

25   Bench testing demonstrates an improved resistance to fracture    11:33AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    when compared to the G2X Filter.

2         Did I read that correctly?

3    A.  Yep.

4    Q.  And what he's asking you -- if we can pull it back, Gay, up

5    top if you want to blow that up -- is whether he can use that        11:34AM

6    statement in his communications in the field, right?

7    A.  Correct.  Yeah.

8    Q.  And you tell him that yes, this is now approved and will

9    show up at our next iteration of sales brochures.  But then you

10   go on to say you must use all of the verbiage though.  You         11:34AM

11   can't say now it's just fracture resistant.

12        Did I read that correctly?

13   A.  Yes.

14   Q.  And what is the difference between resistant to fracture

15   and fracture resistant?                                            11:34AM

16   A.  I'm not quite sure I understand the question.

17   Q.  Well, you are telling him to be very careful and to use the

18   verbiage that was provided in that, which is that bench testing

19   demonstrates improved resistance to fracture when compared to

20   the G2X.  But you are saying, don't say fracture resistant.        11:34AM

21   I'm trying to understand what that means.  What's the

22   difference?

23   A.  I'm sorry, I can't recall back then that far what the

24   nuances of it was.  I can say that just stepping back a little

25   bit from the document, that in a sales force you always want to    11:35AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    bake and create and do whatever they want.  And it is very

2    clear on the marketing side internally what things go through

3    review, goes through legal, corporate, goes through regulatory

4    clinical.  So it's very clear what, as a marketing person we

5    need to communicate to the salesperson what can be said, what    11:35AM

6    can't be said.  So whenever you hear language in an e-mail like

7    that it's almost default for a marketing person to say you have

8    got to use the language we provided you.

9    Q.  And specifically, you are telling him you can't say this is

10   fracture resistant?                                              11:35AM

11   A.  Again, all I can do is refer to what this is saying.  I

12   don't know what the nuances of it was.

13   Q.  Earlier we talked about some of the negative -- well, some

14   of the perceptions that positions were focusing on

15   complications with the IVC filters.  Do you remember that when  11:36AM

16   you were talking about under the SWOT assessment?

17   A.  Okay.

18   Q.  Do you remember a study by Dr. Nicholson that came out in

19   August 2009?

20   A.  Yes.                                                         11:36AM

21   Q.  And that was a significant study from Bard's perspective

22   because it was critical of the G2 Filter, right?

23   A.  Sure.

24   Q.  And one of the things -- well, let me pull up the study

25   here.                                                            11:36AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1          Could you pull up 587?

2          Do you remember getting a copy of this study?

3   A.  I don't.

4   Q.  Does that appear to be a copy of Dr. Nicholson's study

5   concerning?                                              11:36AM

6   A.  I can confirm that that's his name on it.

7   Q.  If you look at -- do you remember what -- well, this was

8   not a favorable study to Bard, correct?

9   A.  As far as I recall, no.

10  Q.  It was something that Bard and its marketing department   11:37AM

11  were concerned about, right?

12  A.  Correct.

13  Q.  And one of the things that it talked about was a higher

14  than expected failure rate with G2 Filters, correct?

15  A.  I'm sorry.  I'm not the clinical person.  I can't recall  11:37AM

16  the details of this especially so many years now.

17  Q.  Bard had a reaction to this document.  That's fair to say,

18  right?

19  A.  Correct.

20          MR. CLARK:  Your Honor, I would move to admit this   11:37AM

21  document.

22          MS. HELM:  Your Honor, 802.

23          THE COURT:  What's your response on hearsay?

24          MR. CLARK:  Your Honor, we are not offering it for the

25  truth of the matter asserted.  We would like to talk about what 11:37AM

1    it says and to establish what Bard's reaction was.  And I think

2    that doesn't matter whether it's true or not.

3                THE COURT:  Your response, Ms. Helm?

4                MS. HELM:  I'm sorry, Your Honor.  I'm looking at the

5    code section.                                                    11:37AM

6                THE COURT:  So you are not seeking to use it under

7    803.18.  Is that right?

8                MR. CLARK:  No, Your Honor.  I think it can come in

9    because it's not hearsay.

10               MS. HELM:  Your Honor, it's still -- I don't know how   11:38AM

11   you get around the hearsay.  It's putting in information that

12   has no implications other than it's offered for the truth of

13   the matter.  It's obviously hearsay and serves no other purpose

14   other than to be offered for the truth of what's stated in the

15   article.                                                         11:38AM

16               THE COURT:  This is the dilemma on notice issues.  I

17   think what we ought to do, Mr. Clark, is reserve this for

18   discussion when we're not keeping the jury waiting.  Because I

19   would like to talk to you more about it.  It will take a few

20   minutes.  I'd rather not take their time on it.  Let's come      11:38AM

21   back to that.

22   BY MR. CLARK:

23   Q.  Sir, let me direct your attention to the results column.  I

24   would like you just to read it.

25               THE COURT:  Read it to himself, right?                11:38AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1           MR. CLARK:  Himself.  Thank you for that

2    clarification.

3           THE COURT:  Read it to yourself.

4    BY MR. CLARK:

5    Q.  While you are looking, if you could also look at the          11:39AM

6    conclusion, sir, again, reading it to yourself.

7    A.  Okay.

8    Q.  Now, this was something that got Bard's attention, right?

9    A.  Correct.

10   Q.  And something that Bard reacted to, right?                    11:39AM

11   A.  Yes.

12          MR. CLARK:  Gay, could you please pull up 1621.

13   BY MR. CLARK:

14   Q.  Looking at 1621, do you recognize this document?

15   A.  No.                                                           11:39AM

16   Q.  Would you have had input into creating talking points for

17   how Bard would react to the Nicholson study?

18   A.  Talking points, yes.

19   Q.  So if there were key talking points discussed in this item

20   is that something that you would have provided input into?        11:39AM

21   A.  Could have, yes.  I didn't create this document.  I really

22   can't say.

23   Q.  Well, it's a response to the Nicholson study, correct?

24   A.  Key talking points, correct.

25          MR. CLARK:  Your Honor, I would move to admit Exhibit       11:40AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    1621 as a Bard business record that has been produced as such.

2              MS. HELM:  No objection.

3              THE COURT:  Admitted.

4              MR. CLARK:  Could we publish to the jury, Your Honor?

5              THE COURT:  Yes.                                    11:40AM

6    BY MR. CLARK:

7    Q.  And on Page 2 -- well, actually, before you go to Page 2,

8    one of the things they look at here was that in Dr. Nicholson's

9    presentation, 5 out of 28 patients with the Recovery were

10   symptomatic whereas zero out of 49 patients with G2 were        11:40AM

11   symptomatic.  Right?

12   A.  That's the way it reads.

13   Q.  So one of the talking points that Bard would be emphasizing

14   to potentially concerned physicians who would see the Nicholson

15   study was that many patients had these problems but were not     11:41AM

16   symptomatic.  Is that a fair read?

17   A.  That's how I read it.

18   Q.  And one of the talking points would also be to say that the

19   Recovery was phased out, right?

20   A.  Correct.                                                   11:41AM

21   Q.  And that the Recovery and G2 are different filters?

22   A.  Correct.

23   Q.  And it also talks about other data points from Dr.

24   Nicholson.  Do you see that at the bottom?

25   A.  Okay.                                                      11:41AM

1  Q.  They found that the fracture rate in the study for Recovery

2  Filters was 25 percent.  Is that right?

3  A.  Yes.

4  Q.  And the fracture rate for the G2 Filters was 12 percent?

5  A.  All I can do is read it to you.  Looks like it says five of    11:42AM

6  these fractures were symptomatic, 12 percent.

7  Q.  12 percent?

8  A.  Yes.  That's the way it reads.

9  Q.  Turn to Page 2, please.

10         MR. CLARK:  This is not the right document.  Can you    11:42AM

11  take that off, Gay?  Do we have Exhibit 1621?  Was that Page 2

12  of 1621?

13         I apologize.  We have some technical difficulties

14  here.

15         THE WITNESS:  No worries.    11:43AM

16         MR. CLARK:  Do we have Page 2 of 1621?  There we go.

17  BY MR. CLARK:

18  Q.  This is Page 2 of the communication or presentation we just

19  talked about.  Under affirmative actions, if you look there,

20  one of the issues was Bill'S communication plans.  Do you see    11:43AM

21  that second bullet point under affirmative?

22  A.  Okay.

23  Q.  Who is Bill?

24  A.  Bill Little, I'm assuming that we're referencing to.  So

25  Bill Little is the VP of marketing.    11:43AM

1   Q.  And the other thing, last bullet point there, was to launch

2   Eclipse ASAP.  Right?

3   A.  Okay.

4   Q.  So one of the responses to Nicholson's study was to get the

5   Eclipse on the market as soon as possible, right.                11:43AM

6   A.  It appears that's the language here.  And the more I look

7   at this, I'm almost more positive this isn't my document.

8   Q.  Okay.  That's what the document says?

9   A.  That's all I can do is review the document.

10            MR. CLARK:  Gay, let's pull up Exhibit 1568.           11:44AM

11            May I publish this to the jury, Your Honor?

12            THE COURT:  Yes.

13            MR. CLARK:  Your Honor, we have some proposed

14   redactions to this document.  We would only publish the first

15   page here.                                                      11:44AM

16            THE COURT:  All right.

17   BY MR. CLARK:

18   Q.  This document is a post-market design review marketing

19   summary.  Is that something that you prepared?

20   A.  It appears so.                                              11:44AM

21   Q.  And in the introduction it says that the objective of the

22   Eclipse Filter was to enhance the G2X Filter surface finish

23   through electropolishing to bring it up to emerging industry

24   standards.  That's what we talked about earlier, correct?

25   A.  Correct.                                                    11:45AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    Q.  And also to improve the overall fatigue resistance.

2    Correct?

3    A.  Correct.

4    Q.  Fatigue means fracture, right?

5    A.  No.  Again, that's a question for the R&D team.  Yeah.  You          11:45AM

6    can start getting into nuances that I don't know how to respond

7    to that.

8    Q.  When you wrote this, is that something that was your word

9    or a word you needed to use?

10   A.  I don't recall back then.  I'm influenced when I write          11:45AM

11   these things by what the R&D team is saying, quality team is

12   saying.

13   Q.  Okay.  Now, one of the things it says on the bottom there

14   is that the enhancement was well received.  Right?

15   A.  Correct.          11:45AM

16   Q.  I'm sorry.

17        MR. CLARK:  Gay, go back up to the introduction.

18   BY MR. CLARK:

19   Q.  It says the introduction also provided the opportunity to

20   rebrand the line and move it closer to the new divisional brand          11:45AM

21   standards.  Right?

22   A.  Okay.

23   Q.  And then at the bottom it says that the enhancement to the

24   surface finish was well received but that there were some

25   complaints.  Right?          11:46AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1   A.   Sorry.  Am I looking for something in this document?

2   Q.   Sure.  Does it say there that there were some frustrations

3   that were expressed by sales with respect to having to change

4   the name and the code?

5   A.   Yeah.  It says there were some frustrations with the name          11:46AM

6   change and code change that required going back into each

7   account and switching them all.  Correct.

8   Q.   For what seemed to many sales reps as minor changes to the

9   product.  Right?

10  A.   That's the way it reads.                                            11:46AM

11  Q.   And you wrote that that name change was necessary to

12  maintain G2X and Eclipse product differentiation.  Is that

13  right?

14  A.   Where is that?  Sorry.

15  Q.   So you are trying to distinguish or maintain a separation          11:46AM

16  between the Eclipse Filter and the G2X and its predecessors,

17  right?

18  A.   Are you asking if I wrote that?

19  Q.   Yes.

20  A.   Yeah.  So I mentioned it was necessary to maintain G2X and         11:47AM

21  Eclipse product differentiation.

22  Q.   That's a separation.  It's a distinction --

23  A.   Yes.

24  Q.   Two lines of product, keeping them apart?

25  A.   Yep.                                                                11:47AM

UNITED STATES DISTRICT COURT

1    Q.  And that was true even though there was really only one

2    change between, from the design standpoint, between the G2X and

3    Eclipse, right?

4    A.  There was one design change, correct.

5    Q.  And that was electropolishing?                              11:47AM

6    A.  Yeah.  Yes.

7            MR. CLARK:  Gay, if you could pull up 4416.

8            And may I publish this to the jury?

9            THE COURT:  Yes.

10   BY MR. CLARK:                                                   11:47AM

11   Q.  Sir, this is a document that talks about Eclipse anchors.

12   Do you see that?

13   A.  Could I just do one back to the other one?

14   Q.  Yes.

15   A.  So I think you mentioned -- could we go back to the other   11:48AM

16   document?  I'm sorry.  I don't know who to direct that question

17   to.

18   Q.  Normally I get to ask the questions of you.  We'll make an

19   exception.

20   A.  I just wanted to give some clarifying information for you.  11:48AM

21   So when it says the introduction also provided an opportunity

22   to rebrand the line and move it closer to the new divisional

23   brand standards, Bill Little was the VP of marketing at the

24   time, and he had this big push to create a whole new brand look

25   for Bard, new schemes of colors, things like that.  So that's   11:48AM

1    what he's talking about.

2    Q.  Fair enough.  Going back to 4416.  This is a document you

3    wrote, correct?

4    A.  I don't know.  It says Filter Marketing.

5    Q.  You don't remember whether you authored it?                    11:48AM

6    A.  I don't remember.

7    Q.  There's a section under naming rationale that talks about

8    the Eclipse launch.

9         It's says:  The Eclipse launch introduced a product

10   that addressed a shortcoming with its predecessor G2X and G2     11:49AM

11   through electropolishing.  We have talked about that, right?

12   A.  Okay.

13   Q.  And then it goes on to say:  The change in brand name and

14   codes was to create a break with the baggage associated with

15   the previous versions despite the fact that the new iteration    11:49AM

16   was the same as the G2X in every way but one.

17        Did I read that correctly?

18   A.  Yes.

19   Q.  And it looks like from the last paragraph that there was

20   success with that change, right, from both a brand and a         11:50AM

21   product perspective?

22   A.  It says:  Given the success of Eclipse, I think that's

23   separate, right, the success itself was the Eclipse product,

24   both from the brand and the product perspective.  So we changed

25   the brand and that was successful and the product perspective.   11:50AM

1    I'm sorry.  I don't know what the --

2    Q.  Fair enough.

3    A.  Again, I don't even know if I authored that.

4    Q.  The point of this here is that at this point, the name of

5    the Eclipse would be retained because it was well received,            11:50AM

6    right?

7    A.  Yes.

8    Q.  And going back up, this was a document that was talking

9    about the Eclipse anchor filter which was going to be the

10   Eclipse Filter with caudal anchors added.  Correct?                    11:51AM

11   A.  Correct.

12   Q.  And under value proposition, it says:  The Eclipse anchor

13   filter will retain the advantages of G2, G2X, and Eclipse,

14   including the retrievable indication while improving caudal

15   migration resistance.  This improvement in caudal migration           11:51AM

16   resistance should reduce tilt, fracture, and penetration.  That

17   was the hope of this product, right?

18   A.  Correct.

19   Q.  And at the same time this was happening -- if we could go

20   to Page 2, Gay -- there were also plans to have another filter        11:51AM

21   called the Denali.  Is that right?

22   A.  Correct.

23   Q.  And this was going to have be a best in class filter?

24   A.  Yes.

25          MR. CLARK:  And let's just go to the POA for the               11:52AM

1    Denali, which is 591 Gay.

2    BY MR. CLARK:

3    Q.  And this is a document you prepared, correct?

4    A.  Yes.

5             MR. CLARK:  And may I publish it to the jury, Your          11:52AM

6    Honor?

7             THE COURT:  Yes.

8    BY MR. CLARK:

9    Q.  So this idea for the Denali was underway at least as of

10   August 2009, is that right?  Did I read the date correct?          11:52AM

11   A.  Correct.

12   Q.  And if we go to Page 2, it says under the summary that this

13   creates an opportunity for a new optional filter that offers

14   improved performance and comparison to our current G2X optional

15   filter technology?                                                 11:52AM

16   A.  Yes.

17   Q.  It says:  Bard is the market leader for sales of optional

18   filters in the United States, but only by a slim margin.

19   Right?

20   A.  Correct.                                                       11:52AM

21   Q.  So it sounds like you achieved the goal of taking Bard from

22   the 20th percent to a market leader?

23   A.  Sounds like it.

24   Q.  But only by a slim margin?

25   A.  Yep.                                                           11:53AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1   Q.  And this offering would be to create and improve resistance

2   to movement, fracture, and penetration while maintaining long

3   term retrievability which would help strengthen you position

4   and capture more share.  Right?

5   A.  Correct.                                                          11:53AM

6   Q.  And that's more share of the market?

7   A.  Yes.

8   Q.  The idea, if you look at the next paragraph, is there would

9   be modifications including penetration limiters.  Right?

10  A.  Yes.                                                              11:53AM

11  Q.  Caudal anchors?

12  A.  Yes.

13  Q.  Laser cut one-piece design?

14  A.  Yes.

15  Q.  Electropolish finish?                                            11:53AM

16  A.  Yes.

17  Q.  Enhanced design with broad shoulders for centering.  Right?

18  A.  Correct.  And we're talking about Denali right now.

19  Q.  Okay.  And the reason for these designs, if we change this

20  when you go back up, is that some of the most common inputs we   11:53AM

21  receive, being Bard, from customers in the sales force for the

22  G2 and G2X products pertain to filter complications that

23  compromise retrievability including migration, tilt, and

24  penetration.  Right?

25  A.  That's what the document says.                                   11:54AM

1    Q.  And it also says that filter fractures are not reported as

2    often but tend to have more serious results.  Did I read that

3    correctly?

4    A.  Yes.

5    Q.  So Bard wanted to address those by creating this next          11:54AM

6    generation filter, right?

7    A.  Correct.  Yes.

8    Q.  Now let's go back to caudal anchors for a second.

9            MR. CLARK:  Can you pull up 4469.

10           May I publish 4469, Your Honor?                           11:54AM

11           THE COURT:  Yes.

12   BY MR. CLARK:

13   Q.  Sir, do you recognize this?

14   A.  No.

15   Q.  I think I have the wrong document here.                       11:55AM

16           Well, sir, do you now know that the Meridian ended up

17   being the next generation after the Eclipse Filter.

18   A.  Correct.  Yes.

19   Q.  And that had caudal anchors, right?

20   A.  Yes.                                                          11:55AM

21   Q.  And did the caudal anchors improve the problem of

22   migration?

23   A.  I don't know.  You would have to go get the data for me.

24   Q.  It's not something you remember off the top of your head?

25   A.  No.                                                           11:55AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1    Q.  Let me see if I find it for you.

2           MR. CLARK:  One second.  I apologize to the jury and

3    the Court.

4           Could you pull up 4499, Gay?

5           May I publish this to the jury, Your Honor.                    11:56AM

6           THE COURT:  We don't show that as being in evidence

7    Mr. Clark.

8           MR. CLARK:  I apologize.  I thought I moved this into

9    evidence.  Plaintiff would seek admission of this document.  I

10   believe it was the last one.  I might have misspoke.             11:56AM

11          THE COURT:  This is 4449?

12          MR. CLARK:  4499.

13          THE COURTROOM DEPUTY:  He moved 4498.

14          THE COURT:  I show 4499 as admitted.

15          Yes, you may publish it.                                       11:57AM

16   BY MR. CLARK:

17   Q.  Okay.  Do you see this?

18   A.  Yes.

19   Q.  And this is a Bard document, correct?

20   A.  Correct.                                                          11:57AM

21   Q.  Is that something that you would help prepare for marketing

22   purposes?

23   A.  Yes.

24   Q.  And this shows a 16 to 1 improvement in caudal migration

25   with the Meridian?                                                    11:57AM

1    A.   Okay.

2    Q.   You agree with that?  That's what this shows?

3    A.   That's what this shows.

4    Q.   Now, is it your understanding that improving caudal

5    migration in Bard's view would also improve other conditions          11:57AM

6    such as tilt, puncture, and fracture?

7    A.   It was a hypothesis.  It was definitely a hope.

8    Q.   And that was something that you would put into the product

9    opportunity assessments for the Meridian product, right, that

10   was what was hoped to have happened?                                   11:57AM

11   A.   Let me think if that was with Meridian.  Correct.  Yes.

12   That was something that the team would put in.

13   Q.   Now, Bard understood, or hypothesized, that adding caudal

14   anchors was going to have a dramatic improvement on caudal

15   migration.  Right?                                                     11:58AM

16   A.   I don't know if dramatic or not.  But that was the hope

17   that that would happen.

18   Q.   It did have an improvement on caudal migration according to

19   this document?

20   A.   According to this document, yes.                                  11:58AM

21   Q.   Now while this Meridian was being developed --

22   A.   Sorry.  Can I just look at this document a little bit more?

23   Because I think -- this is talking about bench testing, but you

24   would have to dig into this with R&D.

25   Q.   So bench testing may or may not be reliable.  Is that what       11:58AM

5-18-18-MD 15-2641-Jones v Bard-Jury Trial-Day 4-A.M.-Baird-Direct

1  are you saying?

2  A.  That's a question for R&D.

3  Q.  But this document is at least promoting that the Meridian

4  vena cava demonstrates a significant improvement in caudal

5  migration resistance when compared to Eclipse vena cava filter.    11:58AM

6  Right?

7  A.  Correct.  If you look at the bullet points, bench test

8  results may not necessarily be indicative of clinical

9  performance.

10 Q.  At least what this document is telling us is the data they    11:59AM

11 are analyzing shows a 16 to 1 improvement?

12 A.  Correct.

13 Q.  And did Bard tell physicians before the Meridian was on

14 line that they were in the process of developing something that

15 they thought would have a significant improvement on caudal      11:59AM

16 migration?

17 A.  I have no idea.

18 Q.  Do you know whether at any time while you were with Bard

19 there were any discussions about taking Eclipse off the market

20 until the Meridian could come on line?                           11:59AM

21 A.  I don't recall.

22         THE COURT:  We're going to break at this point, Mr.

23 Clark.

24         Ladies and Gentlemen, we'll plan to resume at 1:00.

25 We'll excuse you now.                                            11:59AM

UNITED STATES DISTRICT COURT

1          (Jury out at 12:00 p.m.)

2          THE COURT:  Mr. Clark, when I said you need to slow

3    down I meant the pace at which you are speaking, especially

4    when you are reading.  The court reporter is having a real hard

5    time keeping up.                                              12:00PM

6          MR. CLARK:  I apologize.

7          THE COURT:  Let me give you your time before we break.

8          Okay.  Counsel, as of now, plaintiff has used 13

9    hours, 26 minutes.  Defendants have used three hours and 21

10   minutes.                                                      12:02PM

11         Mr. Clark, on that issue about notice versus

12   admissibility, it seems you pretty much covered it with the

13   next document that came in.  Do you still want to move that

14   Nicholson report in?

15         MR. CLARK:  Your Honor, I think it's important because  12:02PM

16   of the conclusion, which is what Bard was reacting to.  So I

17   would like to move that into evidence.  And again, I don't

18   think it's offered for the truth of the matter asserted.  It's

19   just an information out there that Bard was reacting to.

20         MS. HELM:  Your Honor, I think having looked at it and  12:02PM

21   discussed it, I believe it's admissible.  But we would ask for

22   a limiting instruction that it's not being offered for the

23   truth of the matter asserted and that it's solely being offered

24   for the purpose that it was out there and available.  It's just

25   like the SIR guidelines as we discussed in the Booker case.   12:02PM

1          THE COURT:  I will give that limiting instruction if

2   you want to move it in again when the jury is back.

3          MR. CLARK:  I will.

4          THE COURT:  Okay.  See you at 1:00.

5          (Proceeding recessed at 12:03 p.m.)                    12:02PM

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                          C E R T I F I C A T E

7

8              I, LAURIE A. ADAMS, do hereby certify that I am duly

9      appointed and qualified to act as Official Court Reporter for

10     the United States District Court for the District of Arizona.

11             I FURTHER CERTIFY that the foregoing pages constitute

12     a full, true, and accurate transcript of all of that portion of

13     the proceedings contained herein, had in the above-entitled

14     cause on the date specified therein, and that said transcript

15     was prepared under my direction and control.

16             DATED at Phoenix, Arizona, this 18th day of May, 2018.

17

18                             s/Laurie A. Adams

19                             _____
                               Laurie A. Adams, RMR, CRR

20

21

22

23

24

25