1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4    In Re: Bard IVC Filters          )   MD-15-02641-PHX-DGC
     Products Liability Litigation    )
5                                     )   Phoenix, Arizona
                                      )   **May 18, 2018**
6    _____)
     **Doris Jones, an individual,**      )
7                                     )
                        Plaintiff,   )
8                                     )   CV-16-00782-PHX-DGC
             v.                       )
9                                     )
     **C.R. Bard, Inc., a New Jersey**    )
10   **corporation; and Bard Peripheral** )
     **Vascular, Inc., an Arizona**       )
11   **corporation,**                     )
                                      )
12                      Defendants.   )
     _____)

13

14

15       BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              TRIAL DAY 4 – P.M. SESSION

18                  (Pages 862 – 934)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2      For Plaintiff:

3                Gallagher & Kennedy
                 By: **MARK S. O'CONNOR**, ESQ.
4                By: **PAUL L. STOLLER**, ESQ.
                 By: **SHANNON L. CLARK**, ESQ.
5                By: **C. LINCOLN COMBS**, ESQ.
                 2575 East Camelback Road, Suite 1100
6                Phoenix, AZ  85016

7                Lopez McHugh, LLP
                 By: **RAMON ROSSI LOPEZ**, ESQ.
8                100 Bayview Circle, Suite 5600
                 Newport Beach, CA  92660
9
                 Lopez McHugh, LLP
10               By: **JOSHUA MANKOFF**, ESQ.
                 214 Flynn Ave.
11               Moorestown, NJ  08057

12               Heaviside Reed Zaic
                 By: **JULIA REED ZAIC**, ESQ.
13               By: **LAURA E. SMITH**, ESQ.
                 312 Broadway, Ste. 203
14               Laguna Beach, CA  92651

15

16     For Defendants:

17               Nelson Mullins Riley & Scarborough
                 By: **RICHARD B. NORTH, JR.** ESQ.
18               By: **ELIZABETH C. HELM**, ESQ.
                 201 17th Street NW, Suite 1700
19               Atlanta, GA  30363

20               Nelson Mullins Riley & Scarborough.
                 BY: **JAMES F. ROGERS**, ESQ.
21               1320 Main St.
                 Columbia, SC  29201

22
                 Snell & Wilmer
23               By: **AMANDA C. SHERIDAN**, ESQ.
                 400 East Van Buren
24               Phoenix, AZ  85004

25

1                              **EXAMINATION**

2      **WITNESS**                                                    **PAGE**

3   BRET BAIRD

4           Direct Examination (Cont'd) By Mr. Clark        868

5           Cross-Examination By Ms. Helm                   874

6           Redirect Examination By Mr. Clark               884

7   MICHAEL RANDALL

8           Direct Examination By Mr. O'Connor              891

9           Cross-Examination By Mr. Rogers                 925

10          Redirect Examination By Mr. O'Connor            927

11

12  Video Testimony of Guillermo Bill Altonaga             888

13  Video Testimony of Dr. David Ciavarella                890

14  Video Testimony of Jason Greer                         930

15  Video Testimony of Janet Hudnall                       931

16

17

18                              **EXHIBITS**

19    **NUMBER**     **DESCRIPTION**                          **PAGE**

20    587         Dr. Nicholson exhibit                     871

21    1742        May 5, 2009, document                     885
                  prepared by Bret Baird
22
      1216        Ciavarella Exh. 21,                        889
23                BPV-17-01-00024667 – 684,
                  Regulatory Affairs Manual,
24                RA-STD-002, 10-12-2000

25

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 925 | Ciavarella Exh. 28, BPV-17-01-00180239, Powerpoint Presentation Entitled "Filters Complaint History Data as of 7/31/2007" By Natalie Wong. | 889 |
| 991 | Cortelezzi, 11/11/2016, Exhibit 586 – 12/23/2005 E-mail from David Ciavarella Re. "G2 Caudal Migrations", Forwarded to Brian Barry on 12/27 | 889 |
| 927 | Ciavarella Exh. 35, BPVE-01-00245379 – 383, Ciavarella Exh. 35, Health Hazard Evaluation 12-17-2004 | 889 |
| 931 | Ciavarella Deposition, 11/12/2013 – Exhibit 39 – Draft of Updated Health Hazard Evaluation Memo from Ciavarella to Uelmen, Re: "Limb Fractures of Recovery | 889 |
| 1221 | Ciavarella Exh. 40, BPVEFILTER-01-00008355 357, 2/15/2006 Health Hazard Evaluation from David Ciavarella to Gin Schulz Re. "G2 Inferior Vena Cava Filter – Migration" | 889 |
| 1222 | Ganser Deposition, 10/11/2016 – Exhibit 534 – PowerPoint Presentation for a meeting to analyze EVEREST and MAUDE data and provide justifications for proposed changes to G2 filter | 891 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1912 | Greer 7, 3/16/2006 E-mail from Jason Greer to Janet Hudnall | 929 |
| 992 | Cortelezzi, 11/11/2016, Exhibit 588 – 7/16/2005 E-mail from Jason Greer to many Re. "Westy's situation…everyone's situation", detailing Bard's need to respond to Cordis' bringing forward the Maude database to physicians and "causing a problem" | 929 |
| 545 | Hudnall 24, 2/26-2/27/2004 E-mail exchange b/w Hudnall and David Rauch of BPV Re. "Case for Caval Centering" | 930 |
| 1053 | Edwards Deposition, 01/20/2014 – Exhibit 02 – 3/28/2003 Document RE. "Product Opportunity Appraisal for Recovery Filter", FM070018, Doc No. POA-7081, Version 000 | 930 |
| 1336 | Hudnall Deposition, 11/01/2013, Exhibit 22 – Recovery G2 Filter System brochure | 930 |
| 1337 | Hudnall Deposition, 11/01/2013, Exhibit 23 – G2 Brochure (permanent) – Patient Questions & Answers and Bard's website page about G2 Filter System, Indicated for removal, 6/10/2010 | 930 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1339 | Hudnall Deposition, 11/01/2013, Exhibit 29 – 7/6/2004 E-mail exchange b/w Hudnall and Bob Cortelezzi Re. "Maude Website Discussion" | 930 |
| 1594 | Hudnall Exh. 34,2/16/2005 E-mail from Charlie Simpson to Hudnall Re. "American Venous Forum – Mary Protocor presented an evaluation of filter related findings from the Maude database" | 930 |

DIRECT EXAMINATION (CONT'D) — BRET BAIRD

### P R O C E E D I N G S

08:30:08  1

2        (Proceedings resumed in open court with the jury

3    present.)

4

13:01:08  5        THE COURT:  Ladies and gentlemen, for your

6    information, we're going to go to 4:15 today.  That's when

7    we'll break.

8            Mr. Clark.

9            MR. CLARK:  May we proceed with the direct

13:01:17 10    examination of Mr. Baird?

11            THE COURT:  You may.

12                        **BRET BAIRD,**

13    recalled as a witness herein, after having been previously

14    sworn or affirmed, was examined and testified as follows:

15            D I R E C T   E X A M I N A T I O N

16    BY MR. CLARK:

17    Q   Welcome back, Mr. Baird.  Hope you had a good lunch.

18    A   Thank you.  Yes.

19            MR. CLARK:  Can you pull up, Gay, 1788, please.

13:01:31 20            And please go to page 4.

21            Your Honor, may I publish this to the jury?

22            THE COURT:  You may.

23            MR. CLARK:  If you could highlight Value Proposition,

24    the first paragraph.

13:01:46 25            That's fine.

DIRECT EXAMINATION (CONT'D) - BRET BAIRD

13:01:47  1  BY MR. CLARK:

2  Q   Sir, we were talking a little bit about the hope that the

3  Meridian with the additional caudal anchors would address the

4  issue of caudal migration.  Do you remember that?

13:01:58  5  A   Correct.

6  Q   And it says here that the theory would be that the

7  addition of caudal anchors should limit the amount of tilt

8  which may in turn reduce the likelihood of penetration and

9  fracture.

13:02:14  10          Was that the hope for this project?

11  A   That's the hope for this project; correct.

12  Q   Now, are you aware of any time while you were at Bard of

13  Bard telling doctors about this cascade of problems that could

14  result from caudal migration?

13:02:26  15  A   I don't recall having a conversation.

16  Q   Are you aware of any time where Bard told physicians that

17  it might want to consider not using the Eclipse because

18  another product was coming on line that would address caudal

19  migration and this other cascade of issues?

13:02:42  20  A   No, I don't recall.

21  Q   Are you aware of Bard telling physicians that it was going

22  to be -- that -- strike that.  Let me withdraw the question.

23          In 2009, there were plans made to have not only the

24  Eclipse, but also segueing into the Meridian and later the

13:03:02  25  Denali; correct?

DIRECT EXAMINATION (CONT'D) – BRET BAIRD

13:03:04  1  A   I don't know which documents and what timing with R&D.

2          MR. CLARK:  Could you please pull up 591, Gay.

3          May I publish this to the jury, Your Honor?

4          THE COURT:  Yes.

13:03:26  5  BY MR. CLARK:

6  Q   Mr. Baird, we've seen this before.  This is the Idea POA

7  for the Denali?

8  A   Yes.

9  Q   And the date on that is?

13:03:34  10  A   August 2009.

11  Q   So as of August 2009, there were already plans in the

12  works to have a filter come on the market that would have

13  design features such as penetration limiters and caudal

14  anchors and other safety features that would help it be

13:03:54  15  self-centering; right?

16  A   That's a potential early on in the project.

17  Q   To your knowledge, did Bard ever tell doctors that they

18  should wait before they consider using the Eclipse until

19  another filter like this came on line?

13:04:07  20  A   Not to my knowledge.

21  Q   Did they ever tell doctors they believed they had a filter

22  prototype that could address these issues?

23  A   I don't know.

24          MR. CLARK:  Your Honor, at this time I move for

13:04:27  25  admissibility of Exhibit 587.

DIRECT EXAMINATION (CONT'D) – BRET BAIRD

13:04:29  1          THE COURT:  Which one is that?

2          MR. CLARK:  This is the Dr. Nicholson exhibit.

3          THE COURT:  All right.

4          MR. CLARK:  I would offer it with the caveat that we

13:04:37  5   are not offering it for the truth of the matter asserted, but

6   merely to show what Bard was reacting to.

7          THE COURT:  All right.

8          MS. HELM:  Your Honor, no objection subject to an

9   instruction from the Court.

13:04:47  10          THE COURT:  All right.

11          Ladies and gentlemen, under the rules of evidence I'm

12   going to admit this document.  It's the article written by

13   Dr. Nicholson.  In considering the document, however, because

14   of the rules of evidence, you should not consider it for the

13:05:02  15   truth of what Dr. Nicholson was saying.  In other words, don't

16   consider it to establish the truth of the facts he's setting

17   forth.

18          The reason it's being admitted is so that you can

19   understand what Bard knew about what Nicholson said.  So it

13:05:17  20   goes to Bard's knowledge that it knew there was this article

21   out there with the contents.  That's the relevancy, not the

22   truth of the matter actually asserted in the article.

23          (Exhibit 587 admitted.)

24          MR. CLARK:  May I publish, Your Honor?

13:05:33  25          THE COURT:  You may.

DIRECT EXAMINATION (CONT'D) – BRET BAIRD

13:05:33    1        MR. CLARK:  Gay, could you please blow up -- thank

2    you; you read my mind.

3    BY MR. CLARK:

4    Q   Mr. Baird, let me direct your attention to the conclusion

13:05:41    5    that the authors of this paper reached.  And can you read

6    that, please.

7    A   "The Bard Recovery and Bard G2 filters had high

8    prevalences of fracture and embolization, with potentially

9    life-threatening sequelae."

13:05:56   10    Q   And fracture means that a portion of the filter broke

11    apart; correct?  Is that your understanding?

12    A   There's technical terms for fracture, but that could be

13    one of the definitions.

14    Q   Do you understand that embolization means that whatever

13:06:08   15    fractured moved?

16    A   Could move; correct.

17    Q   And what these authors are concluding is that could be

18    potentially life-threatening to people; right?

19    A   Correct.

13:06:17   20    Q   And is this what Bard was reacting to when we talked about

21    earlier?

22    A   One of many things.

23    Q   And in terms of this article, did Bard consider, to your

24    knowledge, recalling the G2 line of filters at that point

13:06:30   25    based on the study?

DIRECT EXAMINATION (CONT'D) - BRET BAIRD

13:06:32  1    A   Not that I know of, to my knowledge.

2    Q   Did Bard consider issuing a warning letter to physicians

3    to make sure they had this information out there that

4    Dr. Nicholson --

13:06:40  5    A   At that point I don't know.  That's not my area of

6    expertise.

7    Q   You're not aware of that happening?

8    A   I'm not aware of it.

9    Q   Now, as someone with a background in marketing, would you

13:06:51  10   agree that a product recall can hurt a brand's reputation?

11   A   Sure.

12   Q   And if a brand's reputation is hurt, that could hurt

13   market share; right?

14   A   Sure.

13:07:03  15   Q   Could lead to a loss of confidence for the customer?

16   A   At that point I couldn't conjecture for the customer.

17   Q   Certainly could create an opportunity for competition to

18   come in?

19   A   Again, conjecture at that point, but, yes.

13:07:18  20   Q   You think it's speculative that if reputation is hurting,

21   that customers might go to a different competitor?

22   A   I agree.

23   Q   You agree it's speculative?  Or you agree that it could

24   happen?

13:07:29  25   A   I agree it could happen.  It's all conditional.

CROSS-EXAMINATION - BRET BAIRD

13:07:31   1   Q   Now, certainly having an entryway for competition would

           2   not a good thing for a company that is trying to hang on to

           3   its narrow lead as the market leader in the IVC filter market;

           4   right?

13:07:40   5   A   Correct.

           6           MR. CLARK:  That's all the questions I have.

           7           THE COURT:  Cross-examination?

           8           MS. HELM:  Yes, Your Honor.

           9                C R O S S - E X A M I N A T I O N

13:07:53  10   BY MS. HELM:

          11   Q   Good afternoon, Mr. Baird.

          12   A   Good afternoon.

          13   Q   You were asked in the beginning of your testimony if you

          14   were being paid or had had discussions about being paid for

13:08:11  15   your time to be here today.  Do you recall that?

          16   A   Yes.

          17   Q   Are you missing work today?

          18   A   I am.

          19   Q   Are you missing the opportunity to do what you get paid to

13:08:18  20   do today?

          21   A   Absolutely.

          22   Q   Are you seeking any compensation other than being

          23   reimbursed for the time and money that you're missing by not

          24   being able to be at work today?

13:08:27  25   A   No.

CROSS-EXAMINATION – BRET BAIRD

13:08:32  1    Q    You've been asked about a lot of documents that were

        2    written a long time ago.  And you left Bard in 2011; is that

        3    right?

        4    A    Correct.

13:08:40  5    Q    Have you done your best today to try to remember events

        6    that occurred more than ten years ago?

        7    A    Yes.

        8    Q    One of the documents, one set of documents you were asked

        9    about were documents called Franchise Reviews.  Do you recall

13:08:55 10    those?

       11    A    Yes.

       12    Q    What is a Franchise Review?  What was the purpose of that

       13    when you were at Bard?

       14    A    Sure.  It's a very typical activity, I guess is the best

13:09:05 15    way to say it, and that happens every six months.  It's

       16    something company wide.  It's a very typical thing that one

       17    does.  In fact, it's a planning event that you do.  Look for

       18    opportunities to, as stated before, what's called three-year

       19    budgeting.  What projects you want to do, what improvements

13:09:26 20    you can do, how do you proceed forward as a company.

       21    Q    And did Bard require of that of every product line?

       22    A    Absolutely.

       23    Q    And so it was not unique to filters?

       24    A    Not at all.

13:09:36 25    Q    And this concept of looking at your products and planning

CROSS-EXAMINATION - BRET BAIRD

13:09:39   1   ahead, based on your experience, is that unique to Bard?

2   A   No.  No.  I've worked in other medical device companies,

3   and Medtronic was the one right before.  They're constantly

4   innovating, constantly looking for new opportunities.

13:09:53   5   Q   You were ask about a SWOT analysis.  Do you recall that?

6   A   Yes.

7   Q   Is a SWOT analysis unique to Bard?

8   A   Not at all.

9   Q   Is a SWOT analysis a system to use to evaluate products,

13:10:08  10   processes, companies, any number of things?

11   A   Yes.  SWOT is primarily a marketing tool.  It's something

12   provided as a standard marketing tool.

13   Q   And with that SWOT analysis that you were asked about

14   previously, was that done in reaction to an issue with the

13:10:25  15   Eclipse filter?

16   A   No.

17   Q   Was that something, again, done as part of the company's

18   continuous improvement, continuous attempt to improve their

19   products and their marketing?

13:10:35  20   A   Yes.

21   Q   You were asked earlier or read a document that said the

22   purpose of marketing is to improve the reputation of the

23   product.  Do you recall that?

24   A   Yes.

13:10:48  25   Q   Is that unique to Bard?

CROSS-EXAMINATION - BRET BAIRD

13:10:50   1   A   To improve the reputation?  No.

2   Q   For marketing to have a purpose to improve the reputation

3   of the product.

4   A   No.  That's the role of marketing.

13:10:58   5   Q   In any company anywhere?

6   A   Any company anywhere, any industry.

7   Q   That's what marketing's supposed to do; right?

8   A   That's what we're supposed to do.

9   Q   You were also asked a number of questions about changes to

13:11:12  10   the G2 for the Eclipse and then subsequent filters.  Do you

11   recall that?

12   A   Yes.

13   Q   Okay.  Before a product can go to market, before a filter

14   could go to market, what has to happen?  Just generally what's

13:11:25  15   the big picture of what has to happen?

16   A   It's very complex.  Complex procedure.  Typically you

17   start with an idea.  We talked about idea POAs.  The team

18   comes together and they discuss all sorts of things -- it's a

19   very complex system.  So once you've identified an

13:11:42  20   opportunity, R&D works on it.  There's potentially years of

21   testing.  There's innovations that you can try to implement

22   onto the product or innovate, as we talked about, a brand-new

23   product, but there's a whole slew of activities.  And once you

24   do that, you even have other team members who are involved in

13:12:00  25   it.

CROSS-EXAMINATION - BRET BAIRD

13:12:00  1   Q   And in the progression of the filters at Bard from the G2X

2   or G2 Express to the Eclipse and then subsequent filters, did

3   the team make the decision to go ahead and make the changes

4   from the G2X to the Eclipse rather than waiting the years and

13:12:17  5   years of development of the other concepts that were in

6   process?

7   A   Yes.  That was a continual process of improvement.

8   Q   Does the fact that Bard was continuing to look to ways to

9   improve its filters mean that there was a problem with the

13:12:29  10  existing filter?

11  A   No.

12  Q   Have you been involved in other companies that were --

13  that followed this concept of continuous improvement?

14  A   Absolutely.

13:12:39  15  Q   Do you think that that is what a prudent medical device

16  company should do?

17  A   Yes.

18  Q   Is that what Bard was doing?

19  A   Yes.

13:12:46  20  Q   You were asked a few questions about and the jury just

21  heard about the Nicholson article.  Do you recall that?

22  A   Yes.

23  Q   Are you aware that Dr. Nicholson subsequently published a

24  correction to that article, that it actually had some errors

13:13:03  25  in it?

CROSS-EXAMINATION - BRET BAIRD

13:13:04   1    A    Yes.

       2    Q    In the 2009-2010 time period, you mentioned there were a

       3    lot of external forces going on in the IVC filter market.  Do

       4    you recall that?

13:13:18   5    A    Yes.

       6    Q    And you were specifically asked about a document that

       7    referred to breaking with the baggage of the G2 and the G2X.

       8    Do you recall that?

       9    A    Yes.

13:13:28  10    Q    What was that baggage?

      11    A    Well, there's a lot going on in the market.  We had

      12    filterlaw.com that was attacking our business, we had other

      13    external forces.  We had sales reps who were fabricating

      14    things to try to attack our business.  So there's all sorts of

13:13:41  15    things going on.

      16    Q    And from a marketing perspective and as the franchise

      17    manager, was it your responsibility, from a marketing

      18    perspective, to address those external forces, the

      19    filterlaw.com, the competitors making up information?

13:13:56  20    A    Absolutely.  Our team's and then the marketing role is to

      21    communicate those.

      22    Q    And did that end up taking a good portion of your time?

      23    A    Quite a bit of my time.  Yes.

      24    Q    Did Bard take some action in response to filterlaw.com and

13:14:10  25    the information that the competitors were providing to

CROSS-EXAMINATION - BRET BAIRD

13:14:15  1  doctors?

2  A    Yes.

3  Q    What action did Bard take?

4  A    I believe provided a letter to the customer.

13:14:22  5           MS. HELM:  Can I pull up 8548, please.

6           MR. CLARK:  Your Honor, may we approach?

7           THE COURT:  Pardon?

8           MR. CLARK:  May we approach?

9           THE COURT:  We're going to put a limit on bench

13:14:37  10  conferences.

11           We'll be right with you, ladies and gentlemen.  Go

12  ahead and stand up if you want.

13        (Bench conference as follows:)

14           MR. CLARK:  Your Honor, this talks about legal

13:14:53  15  websites, plural.  Television advertisements.  We been very

16  clear and you've instructed the jury that we're just talking

17  about the filterlaw website, so this is expanding dramatically

18  what we'd be talking about.

19           And I think, as a factual matter, the filterlaw

13:15:07  20  website did not go online until August 2009 so it's not even

21  related to filterlaw.

22           THE COURT:  Therefore what?

23           MR. CLARK:  Therefore, the only door we've opened was

24  the response to the baggage memo.  We talked about filterlaw.

13:15:22  25  The baggage memo is six or seven months from this date, so it

CROSS-EXAMINATION – BRET BAIRD

13:15:27  1    was fair game to talk about filterlaw, that was already

2    online, and that is what your ruling has been.

3            THE COURT:  What do you mean six or seven from this

4    date --

13:15:36  5            MS. HELM:  Filterlaw.com was --

6            THE COURT:  Hold on.

7            MS. HELM:  Sorry.

8            MR. CLARK:  My concern --

9            THE COURT:  What do you mean six or seven months from

13:15:40 10    this date?  Before or after?

11            MR. CLARK:  After.  I'm sorry.

12            My understanding is August 2009 is when filterlaw.com

13    was launched.  The baggage memo is April 2010.  So this

14    precedes the baggage memo and also invites much broader use of

13:15:59 15    lawyer advertising which, again, is not what we agreed to and

16    not the door opened.

17            THE COURT:  So you're suggesting I should not admit

18    it for that reason?

19            MR. CLARK:  Correct.

13:16:07 20            MS. HELM:  Your Honor, I don't have the date on

21    filterlaw.com.  I asked the witness about this and he said

22    this was the reaction that the company -- if it predates

23    filterlaw.com, I stand corrected.  I can't answer that

24    question.

13:16:20 25            THE COURT:  Well, do you agree that the baggage memo

CROSS-EXAMINATION – BRET BAIRD

13:16:22  1  is ten months after this?

2            MS. HELM:  Yes.

3            THE COURT:  So how is this relevant to the baggage --

4            MS. HELM:  Well, because the baggage memo refer- --

13:16:33  5  baggage refers back in time.  The baggage is what occurred

6  prior to the date of that memo, and so these are events that

7  occurred prior to the date of the memo.

8            THE COURT:  What is the relevancy of this document,

9  in your view?

13:16:44  10           MS. HELM:  It goes to the fact that if -- he's talked

11  about marketing, and it goes to the fact of what marketing was

12  doing, what they were having to do.  There's a number of

13  implications that there were problems with the G2 filter and

14  problems with the Eclipse filter that marketing was reacting

13:16:58  15  to when, in fact, they were reacting to these external forces,

16  these websites, and other things.

17           MR. CLARK:  Your Honor --

18           THE COURT:  Hold on.

19           MR. CLARK:  Fine.

13:17:40  20           THE COURT:  My concern, Ms. Helm, is that this memo

21  is about nothing other than lawyer lawsuits and advertisement.

22  That's the only topic addressed.

23           MS. HELM:  Yes, sir.

24           THE COURT:  And it says there are no class action

13:17:53  25  lawsuits against Bard.  It does get directly into the whole

CROSS-EXAMINATION - BRET BAIRD

13:18:03   1   question of activities of plaintiffs' lawyers.

2           It seems to me --

3           MS. HELM:  Your Honor, I'll move on.

4           THE COURT:  Okay.

13:18:17   5       (Bench conference concludes.)

6           THE COURT:  Thank you, ladies and gentlemen.

7   BY MS. HELM:

8   Q   Mr. Baird, during the course of your work in the medical

9   device industry, have you had the opportunity to communicate

13:18:46   10   with physicians on occasion?

11   A   On occasion, yes.

12   Q   Are you -- and as a result of your work in the medical

13   device community, are you familiar with the information that's

14   available to physicians to evaluate a product such as an IVC

13:18:58   15   filter?

16   A   Sure.

17   Q   What information is available to them?

18   A   There's a myriad of sources of information, one of which

19   would be, of course, their own peer to peer.  So that is in

13:19:10   20   journals.  There's others -- when I say peer to peer, doctors

21   to doctors.

22           National conferences where they present to each

23   other.  Also, they've got access to information through

24   instructions for use, we call them IFUs, and there's data and

13:19:26   25   information in there.  There's their own personal training as

REDIRECT EXAMINATION - BRET BAIRD

13:19:31  1   physicians.  And -- that's all that comes to my mind right

2   now.

3   Q   Medical literature?

4   A   Medical literature, absolutely.

13:19:36  5   Q   Based on your experience, marketing is a very small part

6   of the information that goes to doctors on an IVC filter.  Do

7   you agree with that?

8   A   Correct.

9   Q   And despite the fact that you're a marketing person, would

13:19:49  10   you agree that from a physician's perspective, it's probably

11   the lowest part that they consider?

12   A   Yes.

13             MS. HELM:  Thank you.  No further questions.

14             THE COURT:  Any redirect?

13:20:02  15             MR. CLARK:  Yes, Your Honor.  Briefly.

16               R E D I R E C T   E X A M I N A T I O N

17   BY MR. CLARK:

18   Q   Mr. Baird, when we talked about the SWOT analysis, there

19   was no mention of filterlaw website in that analysis; correct?

13:20:18  20   A   Correct.

21   Q   Are you familiar with the G2 Platinum POA?

22   A   Vaguely.  It's an earlier name for -- I believe for -- for

23   Eclipse.

24             MR. CLARK:  Could you please pull up Exhibit 592, I

13:20:40  25   believe.  No, I'm sorry, 1742.

REDIRECT EXAMINATION - BRET BAIRD

13:20:43  1   BY MR. CLARK:

2   Q   And, sir, this is a May 5, 2009, document.

3   A   Correct.

4   Q   And you're the preparer of this document?

13:21:02  5   A   Correct.

6        MR. CLARK:  Your Honor, I would move for admission of

7   this document in evidence.

8        MS. HELM:  No objection, Your Honor.

9        THE COURT:  Admitted.

13:21:12  10      (Exhibit 1742 admitted.)

11        MR. CLARK:  May I publish, Your Honor?

12        THE COURT:  Yes.

13   BY MR. CLARK:

14   Q   And I think you told us that this was the project that

13:21:20  15   would become the Denali; is that right?  Or the Meridian?

16   A   G2 Platinum.  I think that is Eclipse.

17   Q   And here, they were going to -- if you look at page 2.

18   The idea was to create an electropolished filter, which is the

19   Eclipse; right?

13:21:45  20   A   Which is the Eclipse, correct.

21   Q   And in this document, if we go to the next page, at the

22   bottom there, we see Voice of Customer Plan.

23        Do you see that?

24   A   Yes.

13:21:56  25   Q   And it says:  "User input was obtained for this project

REDIRECT EXAMINATION - BRET BAIRD

13:21:59  1   using a variety of means, including filter placement,

2   procedural observations, primary qualitative research, BPV

3   sales team input, BPV complaint history, MAUDE and FDA website

4   searches, Bard and IMS sales, clinical literature and

13:22:17  5   textbooks."

6        Did I read that correctly?

7   A   Yes.

8   Q   That's that sort of multi-disciplinary approach that you

9   talked about in terms of formulating these POAs?

13:22:26 10  A   Correct.

11  Q   And it doesn't say anything anywhere in Exhibit 1742 about

12  the filterlaw website; correct?

13  A   Correct.

14  Q   Sir, you, in your current line of work, work with trial

13:22:47 15  lawyers; right?

16  A   Yes.

17  Q   And you work with physicians who work with them, and you

18  coordinate reimbursement from lawsuits; right?

19  A   Correct.

13:22:57 20  Q   And, in fact, in your -- you have yourself created ads to

21  advertise for that type of work; right?

22  A   Detail that.

23  Q   Do you remember creating an ad where you were advertising

24  for the Arizona Trial Lawyers Association --

13:23:14 25  A   Oh.  Correct.

REDIRECT EXAMINATION - BRET BAIRD

13:23:15  1    Q    -- years ago?

       2    A    Yes.

       3    Q    And that was to develop business from trial lawyers.

       4    A    Correct.

13:23:20  5    Q    In this community.

       6    A    Correct.  In Arizona.

       7    Q    And did you think there was something wrong with that at

       8    the time?

       9    A    No.

13:23:28 10    Q    And one of the things that you, as the franchise manager

      11    at Bard, did was to create a response website to the

      12    filterlaw.com called filterfacts.com; correct?

      13    A    Correct.

      14         MR. CLARK:  That's all the questions I have.  Thank

13:23:47 15    you.

      16         THE COURT:  All right.  Thanks, Mr. Baird.  You can

      17    step down.

      18         MR. CLARK:  For the next witness we call Guillermo

      19    Bill Altonaga.

13:24:21 20         May I be permitted to read the background summary for

      21    this witness?

      22         THE COURT:  This is going to be a video?

      23         MR. CLARK:  Video deposition.

      24         THE COURT:  You may.

13:24:30 25         MR. CLARK:  Guillermo Bill Altonaga practiced as an

REDIRECT EXAMINATION - BRET BAIRD

13:24:34  1   optometrist for 19 years, after which he began work for a

2   medical device company in its field assurance department.  In

3   2008 he began to work with Bard Peripheral Vascular as a

4   consultant, and then in 2010, became full-time employee of BPV

13:24:48  5   working in quality assurance and medical affairs where his

6   responsibility included providing clinical input into failure

7   modes analyses, health hazard evaluation, and promotional

8   materials.  He is not a licensed medical doctor.

9          And, Your Honor, I would add there are no exhibits to

13:25:07  10  this deposition.

11         THE COURT:  Okay.

12      (Video testimony of Guillermo Bill Altonaga was played.)

13         MR. CLARK:  Your Honor, at this time the plaintiff

14  would call Dr. David Ciavarella, who will be presented via

13:43:25  15  video deposition.

16         I have some exhibits to move into evidence first.

17         The plaintiff would move into evidence trial

18  Exhibits 1216, 925, 991, 927, 931, and 1221.

19         MS. HELM:  Your Honor, we have no objection to the

13:43:54  20  admission of those exhibits, but some are subject to the

21  Court's prior order and we'd just have to make sure they're

22  properly addressed.

23         THE COURT:  Meaning redactions?

24         MS. HELM:  Yes, Your Honor.

13:44:06  25         THE COURT:  All right.  Those exhibits are admitted

REDIRECT EXAMINATION - BRET BAIRD

13:44:08  1   subject to redaction by the parties.

2         (Exhibits 1216, 925, 991, 927, 931, and 1221 admitted.)

3         MR. CLARK:  And, Your Honor, we have prepared a cheat

4   sheet to translate the trial exhibit number to the deposition

13:44:17  5   exhibit number.  Would you like me to --

6         THE COURT:  Have you shown that to defense counsel?

7         Any objection to the jury receiving that, Ms. Helm?

8         MS. HELM:  Your Honor, I'm seeing it for the first

9   time.  I don't know if it's accurate, but no, it's fine.

13:44:34  10        THE COURT:  So you're not objecting?

11        MS. HELM:  I don't have a basis to agree to it or

12   object.  I'm -- excuse me.  I don't have a basis to agree or

13   object, so I won't.

14        THE COURT:  You won't agree or object.  Okay.

13:44:44  15        Since there's no objection, you can give them to

16   Traci and she'll distribute them to the jury.

17        MR. CLARK:  Thank you.  May I approach?

18        THE COURT:  Yes.

19        MR. CLARK:  When those are handed out, Your Honor,

13:45:10  20   may I be permitted to read the summary?

21        THE COURT:  Yes.

22        MR. CLARK:  Dr. Ciavarella obtained his medical

23   degree from UCLA, then completed an internship and residency

24   at Roosevelt Hospital in New York City, followed by a

13:45:34  25   fellowship in hematology at the University of Washington.

DIRECT EXAMINATION - MICHAEL RANDALL

13:45:36  1          Dr. Ciavarella joined C.R. Bard in 2004 as vice

2      president of corporate clinical affairs.  In that role

3      Dr. Ciavarella originally had responsibilities over both

4      clinical affairs, which oversees clinical trials, and medical

13:45:50  5      affairs, which provides the medical component to the quality

6      system and informs risk analyses.

7          In 2008, Dr. Ciavarella's role in clinical affairs

8      grew to the point that medical affairs was transitioned to

9      another individual.

13:46:04  10         Since 2004, Dr. Ciavarella's work has included Bard's

11     IVC filters, including the Recovery and the G2 filters.

12         (Video testimony of Dr. Ciavarella played.)

13         MR. O'CONNOR:  Your Honor, our next witness will be

14     Michael Randall.  He is here live.

14:24:58  15         Would you like us to get started?

16         THE COURT:  Yes, let's get him and get started.

17         THE COURTROOM DEPUTY:  Mr. Randall, if you'll please

18     come forward.  Sir, stand right here and raise your right

19     hand.

20                          **MICHAEL RANDALL,**

21     called as a witness herein, after having been sworn or

22     affirmed, was examined and testified as follows:

23         THE COURTROOM DEPUTY:  Could you spell your last name

24     for the record.

14:25:44  25         THE WITNESS:  R-A-N-D-A-L-L.

DIRECT EXAMINATION – MICHAEL RANDALL

14:25:47    1          THE COURTROOM DEPUTY:  Thank you, sir.  Please come

         2    have a seat.

         3          MR. O'CONNOR:  Your Honor, before we get started, I'd

         4    like to offer for admission into evidence Exhibit 1222.

14:26:17    5          MR. ROGERS:  No objection, Your Honor.

         6          THE COURT:  Admitted.

         7          (Exhibit 1222 admitted.)

         8    BY MR. O'CONNOR:

         9    Q   Good afternoon, Mr. Randall.  Would you state your full

14:26:27   10    name, please.

        11    A   Michael Adam Randall.

        12    Q   Mr. Randall, do you work for Bard at this time?

        13    A   Yes, I do.

        14    Q   Here in Arizona?

14:26:35   15    A   Yes.

        16    Q   Are you the director of research and development?

        17    A   Yes.  I'm a director.  One of them.  There's many.

        18    Q   How long has that been your position?

        19    A   I think for about three to four years.

14:26:50   20    Q   How long have you been at Bard?

        21    A   Going on 12 years.

        22    Q   And you have been involved in a number of -- in various

        23    filter projects?

        24    A   Yes.

14:27:00   25    Q   As a matter of fact, you were the lead for a while.  And

DIRECT EXAMINATION - MICHAEL RANDALL

14:27:01  1    was it the Platinum G2 project?

2    A    Initially, yes.

3    Q    And you, in the research and development department, work

4    with engineers and other people throughout Bard; is that

14:27:13  5    correct?

6    A    That's correct.

7    Q    You work with an engineer named Andrzej Chanduszko?

8    A    Yes, I do.

9    Q    And in 2008, you and Mr. Chanduszko conducted a meeting,

14:27:24 10    you developed the agenda for a meeting about -- the objective

11    of the meeting was the EVEREST study and MAUDE data.  Do you

12    recall that?

13    A    Andrzej put together a deck for that meeting; correct.

14         MR. O'CONNOR:  Can we, Gay, please put up

14:27:40 15    Exhibit 1222.

16    BY MR. O'CONNOR:

17    Q    Showing you Exhibit 1222, is this the slide deck that was

18    used at the meeting?

19    A    I believe so.  I'm not sure if it's the final draft.

14:28:04 20         MR. O'CONNOR:  If you scroll through a couple of

21    pages.  It's missing a page up front.

22         Gay, if you could scroll one or two pages.

23         THE WITNESS:  I believe this is a draft.

24    BY MR. O'CONNOR:

14:28:15 25    Q    Let's talk about this document, Mr. Chanduszko.

DIRECT EXAMINATION – MICHAEL RANDALL

14:28:22  1        First of all, you were at Bard during the EVEREST

2  study; correct?

3  A   I believe the EVEREST study was still going on when I was

4  there; correct.

14:28:30  5  Q   And the EVEREST study was -- you knew that the G2 was

6  cleared originally -- the G2 filter was cleared originally as

7  a permanent device; correct?

8  A   Yes.

9  Q   And eventually the G2, Bard sought clearance for it as a

14:28:44  10  retrievable device; correct?

11  A   Correct.

12  Q   And the purpose of the EVEREST study was to study the

13  safety of the retrievability of the G2 correct?

14  A   I believe so.

14:28:57  15        MR. O'CONNOR:  Oh, yeah.  Let's publish this.

16        May I publish, Your Honor?

17        THE COURT:  Yes.

18        MR. O'CONNOR:  Thank you.

19  BY MR. O'CONNOR:

14:29:08  20  Q   And the meeting that you and Mr. Chanduszko were setting

21  up involved both the findings of the EVEREST study as well as

22  the MAUDE data; correct?

23  A   Yes.  It was an analysis of that.

24  Q   And during this time there was discussion about a new

14:29:25  25  filter platform, the G2 Platinum; is that right?

DIRECT EXAMINATION - MICHAEL RANDALL

14:29:29   1    A    Yes.  Platinum.  G2 Platinum.

2    Q    And, according to Exhibit 122, the objective of the G2

3    Platinum was "To improve the G2 platform to address current

4    complications without a clinical trial."

14:29:50   5         Did I read that correctly?

6    A    Yes.  For this project that was the objective.  We had

7    other projects that would have a clinical.

8    Q    This was the project that you were talking about, this is

9    the one that's the subject of this document, and this was a

14:30:05  10   project where the objective was to have a filter without a

11   clinical trial.  True?

12   A    Yes.  For this project.

13   Q    And the discussions were how to overcome or address

14   current complications of the existing line of filters, which

14:30:21  15   were the G2 and the G2 -- well, the G2 at that time.  True?

16   And the G2X?

17   A    That's what the objectives here says.

18   Q    And just so you and I are clear and everybody's on the

19   same page, this meeting occurred around June of 2008.  Does

14:30:45  20   that sound right?

21   A    I believe it's 2008.  I'm not sure what month it is,

22   though.

23   Q    I can show you an e-mail from Andrzej Chanduszko when he

24   forwarded the slides that said June 9, 2008.  Would you like

14:30:58  25   to see that?

DIRECT EXAMINATION – MICHAEL RANDALL

14:30:58  1   A    No, I'll take your word that he sent it to me that day.

2   Q    Thank you.

3        And discussion about how the G2 Platinum would be

4   improved include features including electropolishing; correct?

14:31:18  5        Do you see where I'm reading?

6   A    Yes.  Electropolishing is one of the features we wanted to

7   add.

8   Q    And you were also looking at reducing tilt, penetration,

9   migration.  True?

14:31:31  10  A    Yes.

11  Q    And that's what you were saying this product, at least the

12  plan was, what this product would deliver to your customers.

13  Fair?

14  A    Yeah, that was the objective of the project.

14:31:44  15  Q    And on the same page, page 3 that we're looking at, there

16  were also risks that were considered by the people at your

17  meeting, including you and Mr. Chanduszko, which included

18  "unable to make changes to the filter without a clinical

19  trial."  Correct?

14:31:58  20  A    Correct.

21  Q    And there was also concerns about timeline challenges

22  based on changes; correct?

23  A    Correct.

24  Q    And at this time the G2 was on the market.  True?

14:32:14  25  A    Yes, G2 was on the market.

DIRECT EXAMINATION - MICHAEL RANDALL

14:32:17  1   Q   And the G2 filter was the subject of the EVEREST trial;

2   correct?

3   A   Correct.

4        MR. O'CONNOR:  Gay, would you go to page 6.

14:32:28  5   BY MR. O'CONNOR:

6   Q   Mr. Randall, we're looking at a diagram that talks

7   complications and failures that were found or discovered

8   during the G2 EVEREST trial.

9        Do you see that?

14:32:51  10  A   Yes.

11  Q   And what do you call this, a Venn diagram?

12  A   Correct.

13  Q   And all together that trial involved -- there were at

14  least 100 patients enrolled; correct?

14:33:03  15  A   I believe so.

16  Q   And it was -- actually, the total patients that were

17  followed up, according to this slide, were 83.

18        Do you see that?

19  A   Yes, I do.

14:33:13  20  Q   And the objective of the study was to look at

21  retrievability during a period of time which the mean period

22  was about 140 days.  Does that sound right?

23  A   I don't know the specifics on how that trial was designed.

24  When I was at Bard at this time, I had just got to the

14:33:32  25  company, so I didn't work on this project.

DIRECT EXAMINATION – MICHAEL RANDALL

14:33:36  1   Q   But you understood when you were getting ready for this

2   meeting that the goal of that project was to look at the

3   retrievability of the G2 filter.  Fair?

4   A   We weren't looking at the retrievability of the G2 filter.

14:33:48  5   This meeting here, we were looking at scoping out the G2

6   Platinum filter.

7   Q   And I apologize.  My question was bad.

8         Did you have an understanding that the EVEREST study

9   had looked at the retrievability?

14:33:58 10   A   Yes, I knew.

11   Q   And what is set forth in this slide are results of

12   complications from the EVEREST study; correct?

13   A   Correct.

14         THE COURT:  We're going to break at this point,

14:34:09 15   Mr. O'Connor.

16         MR. O'CONNOR:  Sure.

17         THE COURT:  We'll break for 15 minutes, ladies and

18   gentlemen.  We'll resume at ten minutes to the hour.  Please

19   remember not to discuss the case, and we'll see you then.

14:34:17 20       (The jury exited the courtroom at 2:34.)

21         MR. CLARK:  Your Honor, by way of housekeeping, in

22   the Booker trial you'll recall that there was a problem with

23   the tape for Janet Hudnall.  That's a witness we plan to play

24   this afternoon.  Would we be permitted, or the Court

14:34:55 25   permitted, to give an explanation that there is a little break

DIRECT EXAMINATION - MICHAEL RANDALL

14:34:59  1   in the audio?

2            THE COURT:  A little what?

3            MS. HELM:  There was -- in the Booker trial, when we

4   played the Janet Hudnall tape, which we intend to play this

14:35:11  5   afternoon, there is a part in the video where it drops out and

6   we gave you a heads-up on that last time and you were able to

7   tell the jury if it goes out for a moment, it's just the tape.

8   And we were wondering if we could have the same information

9   provided to them, just so that they're not wondering.

14:35:25  10           THE COURT:  Any objection?

11           MR. NORTH:  No.

12           THE COURT:  Let's do that as part of the

13   introduction.  Just explain that.

14           MS. HELM:  Thank you, Your Honor.

14:35:30  15      (Recess was taken from 2:35 to 2:50.  Proceedings resumed

16   in open court with the jury present.)

17           THE COURT:  Please be seated.

18           You may proceed, Mr. O'Connor.

19           MR. O'CONNOR:  Thank you, Your Honor.

14:52:23  20   BY MR. O'CONNOR:

21   Q   Mr. Randall, thank you for returning.

22           For the jury's benefit, to read this Venn diagram,

23   what this slide shows are the complications that were

24   discovered during the course of the EVEREST study; correct?

14:52:41  25   A   Yes.

DIRECT EXAMINATION - MICHAEL RANDALL

14:52:42  1    Q    And the red circle signifies the total number of filter

2    failures that involved tilt in those study participants;

3    correct?

4    A    Yes, the total amount of tilts.  If you add up all of

14:52:59  5    those numbers inside the red circle, those were the total

6    number of tilts observed.

7    Q    Okay.  Thank you.  And I think there are 15 tilts.

8          And then if you look at the light blue circle, that's

9    the total number of caudal migrations; correct?

14:53:16  10   A    Yes.

11   Q    Yes?

12   A    Yes.

13   Q    And then to the left there, the yellow circle are

14   penetrations.

14:53:29  15   A    Correct.

16   Q    Meaning legs penetrating through the vena cava wall;

17   correct?

18   A    It could be legs or arms, and it's anything more than

19   3 millimeters outside the contrast column --

14:53:45  20   Q    Thank you for the clarification.  You were looking at the

21   study and had specific definitions, but, for the jury's

22   benefit, the point you're making is the G2 had a two-tiered

23   system with arms and then longer legs?

24   A    Correct.

14:53:58  25   Q    And that's how it would seat itself inside the vena cava.

DIRECT EXAMINATION - MICHAEL RANDALL

14:54:01  1    True?

2    A    Yes.   Correct.

3    Q    And those legs and arms would be involved in the

4    clot-catching function of the filter?

14:54:09  5    A    Yes.

6    Q    And when we look at these circles in the Venn diagram,

7    there's overlap.   True?

8    A    Correct.

9    Q    And what the overlap shows are the different events where

14:54:28  10   there were more than one complication; correct?

11   A    Correct.

12   Q    For example, the 2 that's between the red and yellow, do

13   you see where I'm talking about?

14   A    Yes.

14:54:43  15   Q    That means there was a complication that involved both

16   tilt and penetration.   Right?

17   A    That's correct.

18   Q    And then just below that with the intersection of the

19   blue, yellow, and orange, with the 3 with the asterisk, that

14:55:00  20   means there were three that had tilt, penetration, and caudal

21   migration; correct?

22   A    That's correct.

23   Q    And so for the jury's benefit, that's how the jury can

24   look at this when they view this, they can look at it and know

14:55:15  25   that there were total number of patients followed up, 83, and

DIRECT EXAMINATION – MICHAEL RANDALL

14:55:20   1   a specified period of time in a study that studied

2   retrievability, and the complications were recorded and the

3   Venn diagram shows the complications and also shows filters

4   that had more than one complication; correct?

14:55:34   5   A    Correct.

6   Q    Thank you.

7        So, for example, looks like there were a total of 18

8   penetrations.  Some of those overlapped with other failures.

9   Fair?

14:55:51  10   A    Correct.

11   Q    It looks as though there were 15 tilts and some of those

12   tilts overlapped with other complications; correct?

13   A    Correct.

14   Q    And there were caudal migrations.  True?

14:56:16  15   A    True.

16   Q    How many?

17   A    Ten, it looks like here.

18   Q    Pardon me?

19   A    Ten.

14:56:25  20   Q    And those also -- there were, among those ten, filters

21   that suffered more than one complication; right?

22   A    Correct.

23   Q    And also during this, in the slide presentation that was

24   prepared --

14:56:43  25        MR. O'CONNOR:  If you go to page 10, Gay.

DIRECT EXAMINATION - MICHAEL RANDALL

14:56:46  1    BY MR. O'CONNOR:

2    Q   -- there was data collected from the MAUDE database; is

3    that correct?

4    A   That is correct.

14:56:57  5    Q   Regarding the G2 filter.  True?

6    A   Yes.  I believe this is G2.

7    Q   And for the benefit of the jury, MAUDE, M-A-U-D-E, stands

8    for Manufacturers and User Facility Device Experience

9    database; is that right?

14:57:16  10   A   I believe so.

11   Q   And that is where Bard has an obligation to report adverse

12   events to the FDA?

13   A   Bard, hospitals, different facilities, yes.

14   Q   You're not suggesting -- you understand that Bard has a

14:57:33  15   mandatory responsibility to report adverse events.  You

16   understand that.  True?

17   A   Yes.

18   Q   And when you look at this Venn diagram regarding filter

19   complications that were reported to MAUDE concerning the G2,

14:57:52  20   here again we can see that there are filters that had events

21   involving fractures, tilt, and caudal migration.  True?

22   A   True.

23   Q   But then there were other filters who had one or more of

24   the complications in a patient; correct?

14:58:11  25   A   Correct.

DIRECT EXAMINATION – MICHAEL RANDALL

14:58:12  1   Q   So if the jury wants to know, they could look at this and

2   see that 31 patients in the data that were looked at had 31

3   filters that caudally migrated and tilted.   True?

4   A   True.

14:58:28  5   Q   And that there were six that suffered from all three of

6   the failures; correct?

7   A   Correct.

8   Q   And then, of course, there were fractures that were

9   combined with tilts; correct?

14:58:48  10   A   Correct.

11   Q   Thank you.

12       Now, you do know that a deficiency of the MAUDE

13   database is underreporting.   True?   You've heard that?

14   A   I've heard that statement before.

14:59:23  15   Q   We just heard from Dr. David Ciavarella.   Did you know

16   him?

17   A   I know who Dr. Ciavarella is, yes.

18   Q   Dr. Ciavarella just testified that it may be only 1 to 5

19   percent of actual adverse events are reported.   Do you have

14:59:38  20   any reason to dispute that?

21   A   I wouldn't have any idea.

22       MR. O'CONNOR:   Go to Page 12, Gay.

23   BY MR. O'CONNOR:

24   Q   And here in the slide presentation that Bard was showing

14:59:58  25   in its meeting, it was stated that "The greatest number of

DIRECT EXAMINATION – MICHAEL RANDALL

15:00:05   1   complications is associated with tilts and migrations followed

2   by penetrations."

3        Did I follow that -- did I say that correctly?

4   Excuse me.

15:00:16   5   A   Yes, you did.

6   Q   It says "This is contrary to the EVEREST data."

7        Do you see where I'm at?

8   A   Yes.

9   Q   "And one possible explanation is that some asymptomatic

15:00:27  10   penetrations are not reported."

11        Did I read that correctly?

12   A   Yes, you did.

13   Q   And that's something that you were aware of, that there

14   could be patients out there with Bard filters who were unaware

15:00:38  15   of the failures because they were not experiencing symptoms at

16   the time.  You're aware of that, aren't you?

17   A   Most filter complications are asymptomatic.

18   Q   You're aware that with respect to Bard filters, staying

19   with Bard, there are patients out there that may have filter

15:00:56  20   complications who are unaware of those complications.  True?

21   A   Yes.  In terms of what this says here, yes.

22   Q   And a concern that was stated in this presentation is that

23   "MAUDE shows more fractures than EVEREST.  One possible

24   explanation is that some tilts and caudal migrations are not

15:01:25  25   reported."

DIRECT EXAMINATION - MICHAEL RANDALL

15:01:25  1          Now, did I read that correctly?

2     A   You read that correctly.

3     Q   And, again, assuming that what Dr. Ciavarella said, that

4     it may only be 1 to 5 percent, that makes sense that not all

15:01:44  5     failure -- filter failures, Bard filter failures, are reported

6     to the MAUDE database; correct?

7     A   I'm sorry, can you say that question again.

8     Q   Sure.  And assuming what Dr. Ciavarella testified to, this

9     is also suggesting that not all Bard filter complications are

15:02:00  10    reported to MAUDE data; correct?

11    A   Correct.

12    Q   Another issue that was addressed at this meeting is

13    penetrations.  "Penetrations are associated with caudal

14    migrations and tilts."

15:02:16  15         Did I read that correctly?

16    A   Yes, you did.

17    Q   And that's something that we just saw in the Venn

18    diagrams; correct?

19    A   Yes.

15:02:24  20    Q   Relationship between one failure to another.  True?

21    A   Yes.  Shows there was overlap.

22    Q   In other words, what we saw was that there are filters

23    that just don't experience one failure, but experience more

24    than one failure; and the issue here was whether one failure

15:02:43  25    led to other failures; correct?

DIRECT EXAMINATION - MICHAEL RANDALL

15:02:49  1   A   I don't understand that question.  Can you repeat that?

2   Q   Well, "Penetrations are associated with caudal migrations

3   and tilts."

4           Did I say that correctly?

15:02:57  5   A   Yes.  You did.

6   Q   Meaning there was an issue and -- an issue that was being

7   discussed whether there was a relationship between

8   penetrations, caudal migrations, and tilts.  In other words,

9   that one leads to another.  You recall that being a concern;

15:03:17  10  correct?

11  A   I don't know if it was a concern.  We had a hypothesis

12  that we wanted to stop movement, and if we did that we think

13  we could address penetration, help reduce it, help reduce

14  caudal migration, help reduce tilt.

15:03:31  15  Q   Whether it was a concern or hypothesis, it was stated in

16  June of 2008; correct?

17  A   I believe in here there's a hypothesis that states that.

18          MR. O'CONNOR:  Let's go to page 13.

19  BY MR. O'CONNOR:

15:03:53  20  Q   And still staying with the G2, in June of 2008, according

21  to this Bard document, "Caudal migration, tilt, perforation,

22  and fractures are the most commonly occurring complications

23  associated with the filter."

24          Did I read that correctly?

15:04:14  25  A   Yes, you did.

DIRECT EXAMINATION - MICHAEL RANDALL

15:04:15  1    Q    And we saw that in the Venn diagrams.   True?

2    A    Yes.

3    Q    It goes on to say that "Eliminating these failure modes

4    would reduce number of filter complaints from 152 to 34," or,

15:04:35  5    paren, "by 78 percent," close paren, period.

6           Did I read that correctly?

7    A    Yes, you did.

8    Q    Meaning that the concern or hypothesis was this:  That if

9    Bard could eliminate failure modes that it would likely reduce

15:04:56  10   the number of filter complications; correct?

11   A    Absolutely.  We felt if we could eliminate these filter

12   failure modes here, which are the most common filter failure

13   modes, it would reduce complications.  So that's what we were

14   striving to do.

15:05:19  15          MR. O'CONNOR:  Go to page 16.

16   BY MR. O'CONNOR:

17   Q    And in June 2008, preparing the statement, the people at

18   Bard said "It is believed that caudal migration leads to

19   tilts, perforations, and fractures."

15:05:37  20          Did I read that correctly?

21   A    Yes, you did.  I don't know if this is the final

22   hypothesis we put in since this is a draft document, though.

23   Q    It was prepared by people at Bard.  True?

24   A    It was prepared by Andrzej.

15:05:52  25   Q    Andrzej Chanduszko.  And he is an engineer that has been

DIRECT EXAMINATION - MICHAEL RANDALL

15:05:57   1    at Bard quite a while.  True?

2    A    Yeah.  But I don't know if this was the final document.

3    Q    This was prepared by Andrzej Chanduszko, that's all I'm

4    asking.  Yes or no?

15:06:05   5    A    Oh.  Yes.

6    Q    And what's his position, sir?

7    A    Andrzej is a principal engineer right now.

8    Q    And he's been at Bard quite a while, hasn't he?

9    A    Yes.

15:06:15  10    Q    And at Bard, the engineers do look at failure modes and

11    complications, don't they?

12    A    Yes.

13    Q    And the engineers do look at ways to design the filter to

14    prevent or minimize complications.  True?

15:06:36  15    A    Absolutely.

16    Q    And the engineering department is separate from research

17    and development?  Or are they all one?

18    A    Well, there's different engineers.  So there's engineers

19    in research and development, there's engineers in quality,

15:06:50  20    there's engineers in field assurance.

21    Q    So the engineers in research and development are the

22    groundwork of looking at how can we make the filter safer and

23    prevent or reduce the complications we're seeing.  Is that

24    fair?

15:07:06  25    A    Yeah.  The goal of the engineers in R&D is to enhance

DIRECT EXAMINATION - MICHAEL RANDALL

15:07:11 1  performance.

2  Q    And you have that group in Tempe, Arizona; right?

3  A    Correct.

4  Q    But also in Tempe, Arizona, you have another group, you've

15:07:18 5  got marketing people; right?

6  A    Yes, we do.

7  Q    And their job is to assist the sales force in getting the

8  knowledge out there about the devices; correct?

9  A    One of their roles, yes.

15:07:29 10  Q    And you know the people in marketing, don't you?

11  A    Yes, I know who works in marketing.

12  Q    And you've worked with people in marketing and sales;

13  correct?

14  A    Marketing for sure.  Sales is an outside -- they're not in

15:07:43 15  the building.  But I know some sales reps.

16  Q    But you know the sales force at Bard are the persons, the

17  people, that interact with the doctors who are the customers

18  of Bard; correct?

19  A    The sales reps do; correct.

15:07:57 20  Q    And when it comes to Bard and its relationship with its

21  consumers, the doctors, the sales force are the linchpin;

22  right?  They're the connector.

23  A    They deal with the physicians.

24  Q    Essentially the sales force is the face of Bard; correct?

15:08:15 25  For the physicians.  Physicians have more interaction with

DIRECT EXAMINATION – MICHAEL RANDALL

15:08:18  1   sales force at Bard than any others.

2   A    Yeah.

3   Q    That makes sense to you; right?

4   A    Yeah, they deal with the physicians.

15:08:36  5   Q    And back in June 2008 --

6            MR. O'CONNOR:  If we could go to 17, Gay.

7   BY MR. O'CONNOR:

8   Q    -- Bard, through MAUDE data, other sources, including the

9   EVEREST study, knew that the G2 was experiencing failures,

15:08:56  10  including failures with caudal migration; correct?

11  A    Yes.  We knew about these failure modes.

12  Q    And as a matter of fact, back in June of 2008 there were

13  discussions about design changes that could reduce or

14  eliminate those failure modes.  Fair?

15:09:18  15  A    You said back in -- I didn't hear the year.

16  Q    I'm going back to 2008, when this meeting was happening.

17  A    Um-hmm.

18  Q    Yes?

19  A    Yes.

15:09:29  20  Q    And knowing that the G2 and its predecessor had failures

21  that included caudal migration, cephalad migration, tilts,

22  perforations, and fractures, in 2008 your group and the

23  engineers were looking at how to reduce that.  Is that fair?

24  A    You threw me off.  You said cephalad migration.  Were you

15:09:53  25  talking about EVEREST data when you said that?

DIRECT EXAMINATION – MICHAEL RANDALL

15:09:56   1   Q    I'll take cephalad out of the question.

2                   And to your point, EVEREST dealt with G2?

3        A    Correct.

4        Q    The issue with G2 was primarily down migration, caudal

15:10:06   5   migration; correct?

6        A    I wouldn't say issue.  There were reported complications

7        below 1 percent for those.  But that was a known complication;

8        correct.

9                   MR. O'CONNOR:  Well, I move to strike because that's

15:10:16  10   nonresponsive.

11                  THE COURT:  Overruled.

12                  MR. O'CONNOR:  All right.

13       BY MR. O'CONNOR:

14       Q    The point is, is that in 2008, engineering was looking at

15:10:26  15   ways to eliminate or reduce that complication.  True?

16       A    Yes, that was one of the goals.

17       Q    And what you were looking at was how to reduce fractures

18       through electropolishing the surface and using a low inclusion

19       wire.  True?

15:10:44  20   A    True.

21       Q    And you were looking at reducing tilt, penetration, and

22       migration, and you were looking at design changes to reduce

23       those complications; correct?

24       A    Yes, that was the goal of that project.

15:11:00  25   Q    And you were certainly familiar and knew about something

DIRECT EXAMINATION - MICHAEL RANDALL

15:11:05 1  that could be considered to reduce or eliminate caudal

2  migration, and that was caudal anchors; correct?

3  A   At this particular time here, I'm not sure if we had that

4  solution yet.

15:11:20 5  Q   You knew about the solution, though, didn't you?

6  A   What do you mean do you know about the solution?

7  Q   You were aware of the concept of caudal anchors back then.

8  True?

9  A   Caudal anchors, yes, but in itself caudal anchors is

15:11:33 10  not -- you still have to design it for the part, which is very

11  challenging.  So we didn't have a solution for caudal anchors.

12  Q   My question's different.

13  A   I'm sorry.  Go ahead.

14  Q   You knew there was a design feature that was around as

15:11:45 15  early as 2008 and earlier that was being used to address

16  caudal migration.  Fair?

17  A   Not for this design, no.

18  Q   Well, there were caudal anchors that you were aware of;

19  correct?

15:12:00 20  A   Caudal anchors keeping something to move down on a

21  permanent filter we were aware of.  Not for a retrievable

22  filter.

23       MR. O'CONNOR:  Go to page 26, please, Gay.

24  BY MR. O'CONNOR:

15:12:36 25  Q   And this is risks in terms of discussing what to do about

DIRECT EXAMINATION - MICHAEL RANDALL

15:12:41  1    the complications.  Is that a fair reading of this slide?

2    A   I'm sorry, can you repeat your question.

3    Q   Sure.  In looking at this slide, Risks, the concern still

4    is what can be done to improve or reduce the complications

15:13:01  5    that this meeting was about.  Is that a fair reading?

6    A   No, that's not how I interpret this.

7    Q   You talk about existing test methods.

8           See where I'm reading?

9    A   Yes.  What this is saying is that you have to be careful

15:13:17  10   when you design and implement a solution because that solution

11   that you implement can cause a negative effect.  So, for

12   instance, we were talking about caudal anchors.  If you put

13   caudal anchors on the filter, if you don't do it right you may

14   not get the right wall apposition and you might cause

15:13:39  15   migrations.

16   Q   Just hang on, Mr. Randall.  Let me just get this one

17   point.

18          The last sentence says "Existing test methods may not

19   be able to fully assess negative effects."

15:13:50  20          Did I read that correctly?

21   A   Yes, you did.

22   Q   And Bard had tests for various failure modes back when it

23   was developing the Recovery and G2; correct?

24   A   Correct.  But that last sentence is talking to if we made

15:14:08  25   a change, we may not be able to figure out the negative

DIRECT EXAMINATION - MICHAEL RANDALL

15:14:10  1   consequence of that change with the existing test method.

2   Q    All I'm looking at is you had existing test methods and

3   your concern was whether they would be adequate at the time.

4   Is that fair reading?

15:14:23  5   A    For the change.  Correct.

6   Q    For the change to the filter.

7   A    Yes.

8   Q    Meaning if you're going to change the filter, you might

9   have to change the test.

15:14:33  10  A    We -- or may need a new test.

11  Q    Certainly something that engineers are capable of doing;

12  correct?

13  A    Correct.

14  Q    Certainly something that -- Bard has an engineering force.

15:14:46  15  If they need a new test to develop a design feature in a

16  filter, they can and should do it if the filter is failing.

17  True?

18  A    Yeah.  I think you if you can make improvements, you

19  should definitely strive to make improvements.

15:15:02  20  Q    I mean, if the existing tests are not accurately

21  predicting what's going on out there in the field or in the

22  real world, then a company like Bard should reexamine the

23  testing.

24  A    That's not what this is saying.  This is saying as we do

15:15:14  25  the project --

DIRECT EXAMINATION - MICHAEL RANDALL

15:15:15  1   Q   My question is different, sir.

2        THE COURT:  Please don't interrupt.  Let him answer

3   the question.

4        THE WITNESS:  I thought we were talking about -- in

15:15:21  5   this context here, what this is saying is if we made a change,

6   our current existing tests may not be sufficient to handle

7   this change because it was new technology that we're adding

8   and that new technology could lead to a different failure

9   mode.  So it just said, hey, let's recognize that this is a

15:15:40 10   risk.  Let's not overlook it.  So that's what this whole

11   section is about, to make sure that the engineers did not

12   overlook the risk that you could do something thinking you're

13   making a good, positive solution, but it could be bad for the

14   product.  So that's what this slide really represents.

15:15:56 15   BY MR. O'CONNOR:

16   Q   All right.  My question's a little bit different.

17   A   Okay.

18   Q   The purpose of testing at Bard, testing filters, is to

19   help engineers and the people at Bard have some predictability

15:16:09 20   of how filters may act when they're out there in the public;

21   correct?

22   A   Correct.  We have to test it and make sure we do it to the

23   best we can.

24   Q   And if Bard finds that filters are failing more than

15:16:26 25   predicted by their tests, their bench tests and other tests,

DIRECT EXAMINATION – MICHAEL RANDALL

15:16:30  1    then Bard should look at changing the test.  Do you agree with

2    that?

3    A    I think within reason.  It's kind of hard to connect those

4    to the bench testing.

15:16:40  5    Q    But you should always examine, can something be done to

6    improve the testing to help us have better predicability of

7    what will happen once this device is out in the public.  True?

8    A    Yeah, we constantly try to improve.

9    Q    Now, on this idea about caudal anchors --

15:16:59  10         MR. O'CONNOR:  Gay, please go to Exhibit 591.

11   BY MR. O'CONNOR:

12   Q    We just heard --

13         MR. O'CONNOR:  Your Honor, I believe this is in

14   evidence.  May I publish to the jury?

15:17:38  15         THE COURT:  Yes.

16   BY MR. O'CONNOR:

17   Q    This is Exhibit 591, Mr. Randall, and it's an Idea POA,

18   Product Opportunity Appraisal.

19         Do you see that?

15:17:55  20   A    Yes, I do.

21   Q    Have you seen these documents before?

22   A    Yes.

23   Q    And the date of this is August 2009; correct?

24   A    Correct.

15:18:02  25   Q    And, by the way, the Eclipse filter was cleared and

DIRECT EXAMINATION - MICHAEL RANDALL

15:18:06  1   released for market in January of 2010; right?

2   A   I believe so.

3   Q   And so this is before the release of the Eclipse filter

4   and during the period of the G2 and the G2X filter; right?

15:18:20  5   A   I believe so.

6   Q   And you were involved in the G2X.  True?

7   A   Yes.

8   Q   And what you did was you took the G2 and you figured out

9   how to put a hook on top; correct?

15:18:32  10   A   That was one of the changes.

11   Q   A hook that would assist doctors in retrieving the filter;

12   correct?

13   A   For snare retrievability a hook was added, and then there

14   were also some delivery system changes, hemostasis valves

15:18:48  15   added preventing blood loss and improving the product that

16   way.

17   Q   You testified, though, the G2X was essentially the G2 with

18   a hook.

19   A   It is -- there's a hook on it; correct.

15:18:59  20   Q   And in August of 2009 there was an idea product

21   opportunity appraisal entitled Denali Idea POA.

22         Do you see where I'm reading?

23   A   Yes.

24         MR. O'CONNOR:  And if we go to page 2, Gay.

15:19:39  25         And, Gay, if you would, in the first paragraph,

DIRECT EXAMINATION - MICHAEL RANDALL

15:19:42  1    highlight "Bard is the market leader."  It's the second

       2    sentence.

       3            Highlight the whole sentence, I'm sorry.

       4    BY MR. O'CONNOR:

15:20:18  5    Q   In August of 2009 in the Bard product opportunity

       6    appraisal, Mr. Baird wrote that "Bard is the market leader for

       7    sales of optional filters in the United States but only by a

       8    slim margin."

       9            Did I read that correctly?

15:20:31 10    A   Yes, you did.

      11    Q   And the way Bard was using the term "optional filters,"

      12    those were filters that were permanent that also had the

      13    option to be retrieved.  True?

      14    A   That's correct.

15:20:43 15    Q   So, in other words, originally when it first came to the

      16    market, the G2, as you know, was cleared to be a permanent

      17    filter only; right?

      18    A   Yes, that's what I remember.

      19    Q   And it was sometime later where it went and received a

15:20:57 20    clearance to also have retrievability; correct?

      21    A   Correct.

      22    Q   But it was always promoted as a permanent filter that had

      23    the option of being retrieved.  True?

      24    A   I don't know how it was promoted, but it's an optional

15:21:12 25    filter.  The sales guys promote the product for marketing.

DIRECT EXAMINATION - MICHAEL RANDALL

15:21:16   1   Q    All right.  But you understand that the G2 was always a

2   permanent filter and had the option to be retrieved; correct?

3   A    Correct.  That's what option means.

4   Q    You knew from Bard's history that Bard had a permanent

15:21:28   5   filter known as the Simon Nitinol filter; correct?

6   A    Yes.

7   Q    And permanent filter means a filter that is intended to

8   stay in a patient's body, in her vena cava, for the entirety

9   of his or her lifetime.  True?

15:21:42   10   A    Permanent.  Nonretrievable.  Correct.

11   Q    Mr. Baird went on to write:  Offering a new device with

12   improved resistance to movement, fracture, and penetration

13   while maintaining long-term retrievability will help

14   strengthen our position and capture more share.

15:22:09   15        Did I read that correctly?

16   A    Yes, you did.

17   Q    And that was something you were aware of during the entire

18   time you've been at Bard all the way through now, the present

19   time, is that the filter market, like any medical device

15:22:24   20   market, is a competitive market; correct?

21   A    It's a competitive market, correct, and --

22   Q    And Bard -- Bard, according to this document, wanted to

23   make sure -- wanted to take steps to capture its market share.

24   Fair?

15:22:39   25   A    Well, wanted to improve the product too.

DIRECT EXAMINATION - MICHAEL RANDALL

15:22:41  1   Q    Improve the product --

2   A    Wanted to be the leader in filters, so in order to be the

3   leader you've always got to be striving to be the best.

4   Q    Right.  And so in the next paragraph we can see that in

15:22:53  5   trying to figure out how to capture market share, there was a

6   discussion about inputs from customers.

7        MR. O'CONNOR:  Can you put the first sentence in,

8   Gay, of the second paragraph.

9   BY MR. O'CONNOR:

15:23:25 10   Q    Mr. Baird wrote that some of the most common inputs we

11   receive from customers and the sales force -- customers are

12   likely doctors, is that correct, Mr. Randall?

13   A    Yes, I would say so.

14   Q    And the sales force, they're out there every day talking

15:23:41 15   to doctors; right?

16   A    They deal with the physicians.

17   Q    "Some of the most common inputs we receive from customers

18   and the sales force for the G2 and G2X products pertain to

19   filter complications that compromise retrievability, including

15:23:57 20   filter migration, tilt, and penetration."

21        Now, did I read that correctly?

22   A    Yes, you did.

23   Q    And, as a matter of fact, when we just went through the

24   slide presentation that was part of the meeting that you wrote

15:24:10 25   the agenda for in June 2008, we saw the Venn diagrams that

DIRECT EXAMINATION – MICHAEL RANDALL

15:24:16  1   talked about those fractures -- those failure modes; correct?

2   A   Yeah.   Those are --

3   Q   Migration, tilt, and penetration.   Fair?

4   A   Yes.   Those are the failure modes for all filters.

15:24:29  5   Q   Well, here, this document's talking about the G2 and G2X;

6   correct?

7   A   Yes, this is input from the sales force on G2 and G2X.

8   Q   And Mr. Baird wrote on behalf of Bard, "In order to reduce

9   these types of complications, this project will incorporate

15:24:50 10   design modifications that will help limit the movement, keep

11   the filter centered, and minimize fracturing."

12        Did I read that correctly?

13   A   Yes, you did.

14   Q   And back in September of 2009, the modifications to limit

15:25:09 15   movement, keep the filter centered, and minimize fracturing

16   included the following:   Penetration limiters.

17   A   Um-hmm.

18   Q   A feature that would minimize the filter legs and arms

19   from penetrating through the vena cava wall; correct?

15:25:26 20   A   Yeah.

21   Q   That's what a penetration limiter is.

22   A   Yeah.   Trying to dissipate the radial strength, that's

23   what we were trying to do.

24   Q   Caudal anchors.

15:25:35 25   A   Yes.

DIRECT EXAMINATION - MICHAEL RANDALL

15:25:36 1    Q    A design feature that will prevent the filter from moving

2    downward.  True?

3    A    Correct.

4    Q    Talking about Denali, a laser cut one-piece design.

15:25:48 5        Do you see that?

6    A    Yes, I do.

7    Q    An electropolished finish.

8    A    Um-hmm.

9    Q    Enhanced design with broad shoulders for centering.

15:26:02 10        Did I read that correctly?

11    A    Yes, you did.

12    Q    Now, in January of 2010, Bard released the Eclipse filter;

13    correct?

14    A    I believe it was in January.  Well, 2010, for sure.  Not

15:26:31 15    sure what month.

16    Q    Well, assuming that there are documents that said it was

17    released in early 2010, does that make sense to you?

18    A    Yeah.

19    Q    And you agree that the design changes in the Eclipse did

15:26:51 20    not address penetration.

21    A    For Eclipse.  The enhancements did not address those.

22    Q    So that you and I are on the same page, you agree design

23    changes in the Eclipse did not address penetration.  True?

24    A    It -- those design enhancements were not focused on

15:27:12 25    penetration, that is correct.

DIRECT EXAMINATION – MICHAEL RANDALL

15:27:14  1  Q    All right.  The design changes in the Eclipse did not

2  address tilt; correct?

3  A    Correct.

4  Q    The design changes in the Eclipse did not address

15:27:26  5  migration.  True?

6  A    True.  There were no enhancements for that.

7  Q    In fact, the Eclipse was an electropolished version of the

8  G2; correct?

9  A    It was -- we took the G2X and electropolished those

15:27:47 10  components.

11  Q    So you took the G2 with the hook you designed for the G2X,

12  electropolished the legs, and essentially you had the G2X with

13  electropolished legs; correct?

14  A    Legs, arms, and the snare tip.

15:28:04 15  Q    And that's how you released the device in 2010?

16  A    2010 was electropolishing.

17  Q    I can show you in your deposition, if you like, where you

18  testified about the launch in January 2010.  Do you agree with

19  me or do you want me to show you your deposition?

15:28:39 20  A    No, it's in there.  I just don't remember all those dates

21  off the top of my head.

22  Q    Here's what else you testified to:  Safety and

23  effectiveness are the most important job of a medical device

24  company.

15:28:50 25        You agree with that.  True?

DIRECT EXAMINATION - MICHAEL RANDALL

15:28:52  1    A    Safety and effectiveness are definitely important, yeah,

2    for medical device companies.

3    Q    Just let me wrap it up here, Mr. Randall.  I appreciate

4    your time today.

15:29:25  5         So if we look at that meeting that occurred at Bard

6    back in June of 2008 and then we fast-forward to January of

7    2010, year and a half, that meeting addressed -- in 2008

8    addressed the failures that were seen in studies and in the

9    MAUDE database that involved the G2; correct?  We just talked

15:30:00  10   about that.

11   A    You're talking about the PowerPoint for the G2 Platinum?

12   Q    Yes.

13   A    Yes.

14   Q    Then in January of 2010, the Eclipse was released and --

15:30:13  15   true?

16   A    Yeah.  True.

17   Q    And in 2010, a year and a half after that 2008 meeting,

18   Bard released a filter that did not have design changes to

19   address tilt, caudal migration, or perforation; correct?

15:30:33  20   A    Correct.  There were other filter projects still going

21   along at the same time.

22   Q    Filter that was released, that Eclipse, did not address

23   those failure modes; correct?

24   A    It had no enhancements for those.

15:30:54  25   Q    And just so you and I are clear, again, the EVEREST study

CROSS-EXAMINATION - MICHAEL RANDALL

15:31:03  1   was a relatively short-term study; it was not a long-term

2   study; correct?  You understood it was just about six months,

3   true, to look at retrievability?

4   A   I don't remember the contents or the details on EVEREST.

15:31:22  5   I wasn't a part of that.  But I know that data is summarized

6   somewhere.

7   Q   But it was a study for retrievability; right?

8   A   I do know that.

9   Q   And it didn't involve the Eclipse, it was the G2.

15:31:33  10  A   Yes, G2 filter.

11          MR. O'CONNOR:  That's all I have.

12          THE COURT:  Cross-examination?

13          MR. ROGERS:  Yes, Your Honor.  Very briefly.

14              C R O S S - E X A M I N A T I O N

15:31:43  15  BY MR. ROGERS:

16  Q   Good afternoon, Mr. Randall.

17  A   Afternoon.

18          MR. ROGERS:  Could we get Exhibit 1222 back up, the

19  PowerPoint, please.

15:32:01  20          And would you go to page 6, please.

21  BY MR. ROGERS:

22  Q   All right.  Mr. Randall, do you have that on your screen?

23  A   Yes, I do.

24  Q   Do you recall being asked questions about this particular

15:32:16  25  document by plaintiff's counsel?

CROSS-EXAMINATION - MICHAEL RANDALL

15:32:17  1    A    Yes.

2    Q    And I believe this is clear, but this particular document,

3    does it relate to the EVEREST study?

4    A    Yes.  This is gathered from that data.

15:32:29  5    Q    And that was a clinical study that was done by Bard?

6    A    Correct.

7    Q    And if you look at the intersecting circles, were you

8    asked about those by plaintiff's counsel?

9    A    Yes.

15:32:40  10   Q    I don't recollect if you were asked about the one circle

11   that is to the left, the green circle about fractures.  Were

12   you asked about that?

13   A    No.

14   Q    And can you explain for the jury what that means, the

15:32:53  15   green circle, please?

16            THE COURT:  Counsel, do you want this displayed?

17            MR. ROGERS:  Yes, Your Honor.  I apologize.  Yes,

18   would you please publish it.  Thank you.

19            THE COURT:  Yes.

15:33:02  20   BY MR. ROGERS:

21   Q    Let me ask you again, Mr. Randall.  You were asked about

22   the intersecting circles --

23   A    Correct.

24   Q    -- correct?

15:33:10  25            And the one circle that is to the left, the green

REDIRECT EXAMINATION – MICHAEL RANDALL

15:33:14  1    circle, you were not asked about.

        2    A    No.  No.

        3    Q    And can you explain for the jury what that circle

        4    represents.

15:33:22  5    A    Yeah.  That was there was one fracture in the EVEREST

        6    study.  And the asterisk kind of shows it there.  So we

        7    couldn't really put that in the Venn diagram.  So it was just

        8    one fracture.

        9    Q    And does that one fracture, did it have any of those other

15:33:43 10    failure modalities in that filter?

       11    A    Yeah.  It had -- it's in the middle with the 3, so

       12    penetration, caudal migration, tilt.

       13    Q    Okay.  Thank you, Mr. Randall.

       14         MR. ROGERS:  I don't have any further questions,

15:34:00 15    Your Honor.

       16         THE COURT:  Any redirect?

       17         MR. O'CONNOR:  Just quickly.

       18         Go ahead and put that back up, please.

       19         R E D I R E C T   E X A M I N A T I O N

15:34:10 20    BY MR. O'CONNOR:

       21    Q    You understood that the EVEREST study was a limited period

       22    of time, correct, with a patient sampling of 83?

       23    A    100 patients.  There was patients lost to follow-up, so

       24    looks like 83 they got data on.

15:34:40 25    Q    So if this study lasted, let's say, 140 days, this would

REDIRECT EXAMINATION - MICHAEL RANDALL

15:34:44   1    be the collection of fractures seen within that period of

       2    time; correct?  Whatever period the study took, this is a

       3    recording of what failures were discovered during that period

       4    of time.

15:34:55   5    A    Yeah.  For that time span.

       6    Q    But then if you go and you look at -- just one moment.

       7    I'm looking for the MAUDE data.  Excuse me.

       8          MR. O'CONNOR:  Go to page 10, Gay.

       9    BY MR. O'CONNOR:

15:35:30  10    Q    In this collection of events from the MAUDE database,

      11    there's significantly more failures including fractures, you

      12    agree with that, than what we just saw in the EVEREST study?

      13    A    Yeah.  There's more filters being sampled here too.

      14    Q    Right.

15:35:53  15          And as we said before, there are also patients out

      16    there that may have Bard filters who are asymptomatic and do

      17    not know if they have a filter failure.  You agree with that?

      18    A    I believe the majority of complications are asymptomatic.

      19    Q    Meaning if patients don't know about them and don't go to

15:36:11  20    their doctors, there's no chance it will get reported to the

      21    MAUDE database; right?

      22    A    Yeah.  If it's not reported, then, yeah.

      23    Q    And that's a problem with the MAUDE database, it's

      24    underreported.  You know that.

15:36:29  25    A    I've heard that the MAUDE database can be underreported.

15:36:32  1    How much, I'm not sure.

       2    Q   All right.  Thank you.

       3            THE COURT:  All right.  Sir, you can step down.

       4    Thank you.

15:36:51  5            MR. CLARK:  Your Honor, the plaintiff would call

       6    Jason Greer, and the plaintiff would move into evidence trial

       7    Exhibits 1912 and 992.

       8            MS. HELM:  No objection.

       9            THE COURT:  Those are admitted.

15:37:12 10        (Exhibits 1912 and 992 admitted.)

      11            MR. CLARK:  May I give the jury the -- there are only

      12    two, so I'll give the numbers, if that's okay, Your Honor.

      13            THE COURT:  This is video?

      14            MR. CLARK:  This is video deposition; correct.

15:37:22 15            THE COURT:  All right.

      16            MR. CLARK:  Ladies and gentlemen, trial Exhibit 1912

      17    is Deposition Exhibit 7.

      18            Trial Exhibit 992 is Deposition Exhibit 12.

      19            THE COURT:  12?

15:37:35 20            MR. CLARK:  One two.  Yes.  12.

      21            May I read the summary of this witness?

      22            THE COURT:  You may.

      23            MR. CLARK:  Jason Greer graduated from the University

      24    of Mississippi and became a sales representative at Bell South

15:37:48 25    Mobility in 1991 and worked for two other companies doing

15:37:53  1    sales until he joined Bard Peripheral Vascular in 1999 as a

2    sales representative.  In 2005 he became a district manager.

3    Throughout his time at Bard he sold Bard's IVC filters.

4    Mr. Greer left Bard in 2007 and currently works for another

15:38:10  5    medical device manufacturer.

6         (Video testimony of Jason Greer played.)

7              MR. CLARK:  At this point, Your Honor, the plaintiff

8    would call Janet Hudnall, also via video deposition, and would

9    move into evidence the following exhibits:

15:47:17 10              545.  1053.  1336.  1337.  1339, which is subject to

11   redaction.  1594, also subject to redaction.

12              MS. HELM:  No objection, Your Honor, subject to

13   redactions.

14              THE COURT:  Those are admitted.

15:47:41 15         (Exhibits 545, 1053, 1336, 1337, 1339, 1594 admitted.)

16              MR. CLARK:  May I approach to provide the jurors a

17   cheat sheet?

18              THE COURT:  Yeah, go ahead and give it to Traci and

19   she'll hand it out.

15:48:12 20              MR. CLARK:  May I be permitted to read the background

21   summary?

22              THE COURT:  Yes.

23              MR. CLARK:  Janet Hudnall has a degree in industrial

24   engineering from the Georgia Institute of Technology and an

15:48:21 25   MBA from ASU.  She began working for what became Bard

15:48:24  1    Peripheral Vascular in June of 1998 as a product development

2    engineer and was promoted to senior product manager in 2002,

3    and marketing manager in 2004.

4             As marketing manager, Ms. Hudnall managed marketing

15:48:40  5    activities of BPV's IVC product filter line and was involved

6    in the launch of both the Recovery filter the G2 filter.

7             Ms. Hudnall left BPV in 2008 and since then has

8    worked in marking for several medical device manufacturers.

9             And I would note for the jury that there is a portion

15:48:58  10    of this deposition where the audio is somewhat muffled.  That

11    is a problem with the tape and we do apologize for any

12    inconvenience.

13        (Video testimony of Janet Hudnall played.)

14             THE COURT:  Counsel, let's stop the deposition.

16:14:36  15             All right, ladies and gentlemen, we've reached 4:15

16    so we're going to break for the day.

17             Thank you for your attention today.

18             Members of the jury, let me just remind you we are

19    reconvening Tuesday morning at 9 o'clock.  Over the long

16:14:49  20    weekend, please be sure not to do any research or talk to

21    anybody about the case.

22             We'll plan to see you Tuesday morning.  Have a nice

23    weekend.  Thank you all.

24        (The jury exited the courtroom.)

16:15:12  25             THE COURT:  Counsel, do you know how you're

16:15:13 1   allocating deposition video time?

2           MS. HELM:  Yes, Your Honor.  Mr. Clark, and I have

3   conferred.  The total, including Ms. Hudnall, is 66 minutes --

4   you don't want me to include her?

16:15:24 5           THE COURT:  Well, through now or including on Monday?

6           MS. HELM:  There's two minutes left of that video.

7           THE COURT:  Okay.

8           MS. HELM:  66 minutes for the plaintiff, 25 minutes

9   for the defendant.

16:16:22 10           THE COURT:  All right.  Counsel, as of the end of

11   today plaintiff has used 15 hours and 41 minutes.

12           Defense has used four hours and one minute.

13           We will plan to see you Tuesday morning at 8:30.

14           MR. CLARK:  Your Honor, I need to correct one

16:16:39 15   statement I made to the Court at the sidebar relating to the

16   filterlaw discussion we had about the Dear To Whom It May

17   Concern letter.

18           I believe I indicated to the Court as part of my

19   argument that I thought the filterlaw website came online

16:16:56 20   after the date of the June 29, 2009, letter.  I was mistaken

21   about that.  I had reviewed a document and I must have been

22   confused because we were talking about the Denali in August of

23   2009.  I went and re-reviewed the document after Mr. North

24   pointed out he believed it actually came online in December of

16:17:13 25   2008.  The document I reviewed was February 2009, and I do

16:17:18   1    apologize to the Court and the parties about that.

           2            I will note that that was not my principal argument.

           3    I still believe that this document opens a whole can of worms

           4    with respect to class actions, television ads and everything,

16:17:33   5    but I did want to correct that statement, and I thank

           6    Mr. North for bringing it to my attention.

           7            THE COURT:  Okay.  Does that change anything?

           8            MR. NORTH:  No, Your Honor.

           9            MR. ROGERS:  No, Your Honor.

16:17:44  10            THE COURT:  Okay.  We'll see you all Tuesday morning.

          11    Thank you all.

          12            (End of p.m. session transcript.)

          13                          *  *  *  *  *

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 18th day of May,

15   2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25