1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3                  _____

4   In Re: Bard IVC Filters          )   MD-15-02641-PHX-DGC
    Products Liability Litigation    )
5                                     )   Phoenix, Arizona
                                      )   **May 22, 2018**
6   _____)
    **Doris Jones, an individual,**       )
7                                     )
                     Plaintiff,       )
8                                     )   CV-16-00782-PHX-DGC
              v.                      )
9                                     )
    **C.R. Bard, Inc., a New Jersey**     )
10  **corporation; and Bard Peripheral**  )
    **Vascular, Inc., an Arizona**        )
11  **corporation,**                      )
                                      )
12                   Defendants.      )
    _____)
13

14

15     **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17           <u>**TRIAL DAY 5 – A.M. SESSION**</u>

18              (Pages 935 – 1076)

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

```
1                        A P P E A R A N C E S

2    For Plaintiff:

3            Gallagher & Kennedy
             By: MARK S. O'CONNOR, ESQ.
4            By: PAUL L. STOLLER, ESQ.
             By: SHANNON L. CLARK, ESQ.
5            By: C. LINCOLN COMBS, ESQ.
             2575 East Camelback Road, Suite 1100
6            Phoenix, AZ  85016

7            Lopez McHugh, LLP
             By: RAMON ROSSI LOPEZ, ESQ.
8            100 Bayview Circle, Suite 5600
             Newport Beach, CA  92660
9
             Lopez McHugh, LLP
10           By: JOSHUA MANKOFF, ESQ.
             214 Flynn Ave.
11           Moorestown, NJ  08057

12           Heaviside Reed Zaic
             By: JULIA REED ZAIC, ESQ.
13           By: LAURA E. SMITH, ESQ.
             312 Broadway, Ste. 203
14           Laguna Beach, CA  92651

15

16   For Defendants:

17           Nelson Mullins Riley & Scarborough
             By: RICHARD B. NORTH, JR. ESQ.
18           By: ELIZABETH C. HELM, ESQ.
             201 17th Street NW, Suite 1700
19           Atlanta, GA  30363

20           Nelson Mullins Riley & Scarborough.
             BY: JAMES F. ROGERS, ESQ.
21           1320 Main St.
             Columbia, SC  29201
22
             Snell & Wilmer
23           By: AMANDA C. SHERIDAN, ESQ.
             400 East Van Buren
24           Phoenix, AZ  85004

25
```

**EXAMINATION**

**WITNESS**                                                    **PAGE**

Video Testimony of Janet Hudnall was Played          966

DARREN R. HURST, M.D.

        Direct Examination By Mr. Combs              968

        Cross-Examination By Mr. Rogers             1026


**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 4570 | 4-22-15 Coronal MIP 2 with Fragment | 994 |
| 4459 | Eclipse Vena Cava Filter Jugular Vein Approach | 1006 |
| 8325 | Eclipse IFU 02.2010 PK5100600 Rev. 1 | 1008 |
| 932 | Ciavarella Deposition, 11/12/2013 - Exhibit 41 - BPV's 5/6/2008 PowerPoint presentation entitled "Filter Franchise Review", including charts of 2007 U.S. Market Share by $ and U.S. filter sales history | 1017 |
| 8067 | Admission History and Physical | 1056 |
| 7598 | April 14, 2017 Report of Dr. Fasching, Pictures from Figure 125 | 1057 |
| 8068 | Discharge Summary | 1058 |
| 8069 | Emergency Room Visit | 1060 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 8070 | Chest X-ray report | 1061 |
| 7953 | April 14, 2017 Report of Dr. Fasching, Pictures from Figure 120 | 1064 |
| 7951 | April 14, 2017 Report of Dr. Fasching, Pictures from Figure 118 | 1067 |

**P R O C E E D I N G S**

08:30:08  1

2        (Proceedings resumed in open court outside the presence

3     of the jury.)

4

08:30:37  5        THE COURT:  Thank you.  Please be seated.

6        Good morning, everybody.

7        EVERYBODY:  Morning.

8        THE COURT:  As you saw, I issued an order on Saturday

9     dealing with the Rule 1006 chart.  I'll let you all look that

08:30:57 10    over.  And when you have a chance, on the defense side, review

11    it.  If there's issues I need to address, I'll be happy to.

12    Otherwise, you can just apprise me as to when you want to put

13    it in evidence.

14        I looked as well at the FDA warning letter issue,

08:31:17 15    which I think is Exhibit 1680.  I want to wait to rule on the

16    admissibility of that.  In the Booker trial it was on the

17    morning of Day 9 that I ruled, when I had seen enough of the

18    evidence to know its relevancy.

19        I want to hold off and see how the evidence comes in

08:31:35 20    as well, consistent with the ruling I made on a motion in

21    limine before the Booker trial.  So that's what we'll do on

22    the FDA warning letter.

23        But feel free to raise it if you think at a

24    particular point it becomes relevant.  Otherwise I'll just

08:31:50 25    plan to hold it for a few more days and see how the evidence

08:31:53    1   comes in and then rule on whether it's admissible.  Well,

            2   whether Section 3 is admissible.  That's all plaintiff has

            3   moved into evidence.

            4          A couple of other matters I wanted to mention.

08:32:10    5          There was testimony late in the day on Friday where a

            6   witness, and I'm not even remembering who it was, made

            7   reference to other cases against Bard.  I think everybody

            8   should be advising their witnesses not to discuss other cases,

            9   consistent with the ruling that I made before the trial.

08:32:31   10          And when you put an expert witness on, please provide

           11   me with a copy of the report so that we can deal with

           12   objections of nondisclosure quickly.  I'd prefer to even avoid

           13   a sidebar.  If there's a nondisclosure objection, I think I'll

           14   just ask the questioning lawyer tell me where it is in the

08:32:50   15   report.  And if I can't find it, we'll do a sidebar.  But that

           16   way we can move through those issues quickly.

           17          MR. COMBS:  Your Honor, can I make a point on that?

           18          THE COURT:  Yeah.

           19          MR. COMBS:  The plaintiffs are going to call

08:33:01   20   Dr. Hurst after we finish the Hudnall deposition.  What I have

           21   is his report, his -- there were two transcripts from his

           22   deposition because it was continued, and also the transcript

           23   of his Booker testimony.

           24          Can I approach and give these to you now?  And what I

08:33:24   25   would say is that I'd just refer to the Booker -- transcripts

08:33:28   1    1, 2, and 3.

2                   THE COURT:  That's fine.

3                   MR. ROGERS:  One brief on that.  I know that

4    Mr. Combs said he'd refer to them as Booker 1, 2, and 3 --

08:33:46   5                   MR. COMBS:  No, no.

6                   THE COURT:  I think he said transcript 1, 2, and 3.

7                   MR. ROGERS:  I apologize.  I misheard.

8                   MR. COMBS:  Yeah, whatever they are.

9                   And then, we believe, Your Honor, and obviously we

08:33:57  10    had quite a bit of sidebar --

11                   THE COURT:  Is this the same issue?

12                   MR. COMBS:  Yes, correct.

13                   THE COURT:  Okay.

14                   MR. COMBS:  With Dr. Muehrcke, we want to avoid that

08:34:05  15    as well.  We do think the Court was overly restrictive on what

16    he could say or couldn't say as far as not being specifically

17    mentioned in his report.  I have some legal authority.  We

18    pulled -- I don't know if you want me to give it to you now

19    or -- at some point if it becomes an issue, I would like to

08:34:22  20    make a record on it.

21                   THE COURT:  You can make a record.  I'll tell you

22    what I am relying on.  I'm relying on the fact that in my case

23    management order I said that the reports had to include a full

24    and complete disclosure of everything that would be said

08:34:34  25    during trial, and I specifically cited to the advisory

08:34:38   1   committee note to Rule 26(a)(2)(B) which says that a report

2   should set forth everything a witness is going to say on

3   direct testimony.  That's been the standard I've been applying

4   to expert witnesses for 15 years.  And I try to be real clear

08:34:55   5   in my case management order that's what's required.  I know

6   there are other courts that are more liberal.  I don't agree

7   with them.  I don't think that is the intent of 26(a)(2)(B)

8        So that's the basis upon which I'm holding parties to

9   what is actually in the report, and I tried to make that real

08:35:09   10   clear in the case management order in this case.

11        MR. COMBS:  Understood, Your Honor.

12        THE COURT:  But, yeah, absolutely.  If you think I'm

13   getting it wrong and you want to make a record, you can

14   certainly do that at the appropriate time.

08:35:22   15        MR. COMBS:  Thank you, Your Honor.

16        THE COURT:  The other thing I wanted to mention is I

17   have been resisting the temptation to ask a questioning lawyer

18   if he wants to display something to the jury.  And as a result

19   there's been folks coming up and telling the lawyer, which is

08:35:38   20   fine.  I finally couldn't resist the temptation when one of

21   the defense lawyers was up, because the jury was just trying

22   to follow what was going on and they couldn't because it

23   wasn't in front of them.

24        I'm going to try not to prompt you on that.  So

08:35:52   25   please remember to ask the jury -- I mean, to ask me to

08:35:56   1   display it.

2            I think I need to be fair to both sides.  I haven't

3   prompted plaintiff yet, but I just felt I had to with one

4   defense lawyer on Friday because the jury looked lost trying

08:36:07   5   to follow what was being said.  So please remember to do that.

6            All right.  Are there matters that plaintiff's

7   counsel wants to raise before we get started this morning?

8            MR. CLARK:  There are, Your Honor.

9            I think they will be brief.  We have -- we plan to

08:36:30   10  rest tomorrow.  One of the things that concerns us is wanting

11  to make sure that we have adequately made a record that we've

12  offered the 1006 summary, the monthly management reports that

13  we dealt with with Mr. Modra, as well as some of the redacted

14  issues that need to be substituted.

08:36:51   15           So I have spoken with counsel for Bard and we agree

16  that we can rest subject to whatever ruling the Court makes on

17  those and obviously substituting redacted exhibits.  But I

18  just wanted to be comfortable that the Court was okay with

19  that, that we don't waive our right to seek admissibility of

08:37:09   20  those in our case after we've rested.  I think we have

21  actually asked for those to be admitted but we are abiding the

22  Court's ruling with respect to the monthly management reports,

23  and then obviously we need to comply with what you've ordered

24  on Saturday on the 1006 summary.  And that may take some back

08:37:24   25  and forth time.

08:37:29  1      THE COURT:  On Saturday I said, "After considering

2      the parties Rule 403 arguments, the Court will admit the

3      Complaint Record Detail Reports and the monthly management

4      reports identified during the testimony of Mr. Modra."

08:37:45  5      MR. CLARK:  That solves that problem.  Thank you.

6      THE COURT:  Yeah.  Now, with the redactions that

7      Mr. North raised about his name.  But after you work out those

8      redactions, I'm admitting those.  I think we need to do it in

9      front of the jury again.  And I didn't go back on Saturday and

08:37:59 10      try to get those exhibit numbers.  So -- but it's the ones, I

11      think there were two of each, that were covered with

12      Mr. Modra.  My view is those are admissible.

13      MR. CLARK:  Okay.  And to the extent we don't yet

14      have the redactions done, can we do that in the defendants'

08:38:15 15      case without prejudice to having offered it and sought

16      admission of it in our case?

17      THE COURT:  Yeah, that sounds fine to me.

18      Do the defense attorneys have any objection to that?

19      MR. NORTH:  None, Your Honor.

08:38:24 20      THE COURT:  Yeah, that's fine.

21      MR. CLARK:  And the same would be true with respect

22      to the 1006 summary that we need to prepare?

23      THE COURT:  Right.

24      MR. O'CONNOR:  Hey, Shannon.

08:38:33 25      (Counsel confer.)

08:38:35  1          MR. CLARK:  And I apologize, Your Honor.  My

2    attorneys have advised that there is an issue.  I think the

3    Court's -- our understanding was that we could present up to,

4    I think, ten reports, and it may not be that ten of them have

08:38:54  5    been presented with Mr. Modra.  So whatever --

6          THE COURT:  Well, no, I didn't say you could admit

7    ten reports.  What I said was that we would admit the reports

8    that you moved into evidence during Mr. Modra, and then in the

9    Rule 1006 exhibit you can provide ten exemplars from each of

08:39:11 10    the four categories of fillers, which includes the event

11    description from Bard.  My intent was not that the reports

12    underlying all of those would come in.  Nobody had raised that

13    before.

14          MR. O'CONNOR:  I think we're talking about two

08:39:26 15    things.

16          THE COURT:  Okay.

17          MR. O'CONNOR:  Understood your ruling about the

18    complaint files, but there's also those monthly management

19    reports.

08:39:35 20          THE COURT:  You only covered two of those with

21    Mr. Modra; right?

22          MR. O'CONNOR:  For the same reason that I was giving

23    examples, but I think in his actual testimony there were two,

24    that's correct.

08:39:45 25          THE COURT:  So are you saying you want more of those

08:39:47  1   admitted?

2         MR. O'CONNOR:  Well, that was our plan.

3         THE COURT:  Okay.  I didn't know that.  I wasn't

4   aware that that was something you wanted to do.

08:39:57  5         MR. O'CONNOR:  Well, we have the two in.  Can we

6   revisit and show you the ones we wanted based upon the

7   foundation?

8         THE COURT:  Yeah.  I mean, you talk to defendants

9   about that.

08:40:05 10        Here's the issue that I'm not clear on, Mr. O'Connor.

11  My memory is that those monthly management reports have pages

12  at the end of complaints, and if we put ten of those in and

13  there's 15 or 20 complaints at the back of each one, we're

14  putting in 150 or 200 different specific details about

08:40:28 15  complaints.

16        And my thought on the 1006 ruling was we'll give the

17  jury a good exemplar of what's in there, but we're not going

18  to put in scores or hundreds of them.  And it seems to me we

19  do that, in effect, if we put in ten monthly management

08:40:44 20  reports.

21        MR. O'CONNOR:  All right.  I understand your

22  position.

23      (Counsel confer.)

24        MR. STOLLER:  Your Honor, let me address that real

08:40:55 25  quickly.

08:40:56  1        The part of the reason we look at the monthly

2    management reports is, one, there's some content in the body

3    of it before that.  And so in some cases we want to talk about

4    that content, which is the nonreporting of the adverse events.

08:41:09  5        But the other thing about the adverse event part in

6    those monthly management reports is we're focused not on a

7    long stretch of time.  The ones we're looking at are

8    immediately surrounding the implantation of Mrs. Jones, where

9    there's particular importance, we think, in what Bard knew at

08:41:28  10   that time that was happening with respect to these particular

11   filters shortly after the Eclipse has come to market because,

12   if you'll recall, I believe it came to market in June --

13   excuse me, January of 2010, and she's implanted later that

14   year, and shortly after implantation.

08:41:43  15       So it's not an attempt to get around the order you've

16   given on the broader pool of adverse events, but it is

17   specific as to time in what they knew at that time and what

18   warnings were given at that time in light of the events that

19   were happening leading up to and immediately following her

08:42:00  20   implantation.  So it has a specific temporal component to it

21   that is not captured by the ruling you've given on the overall

22   adverse events.

23       THE COURT:  I think this is the first time I've ever

24   heard about this.  I don't think you've moved in ten monthly

08:42:17  25   management reports or --

08:42:20   1          MR. STOLLER:  I don't believe we have, Your Honor.

2          THE COURT:  -- or made this argument about clustering

3     them around Ms. Jones' implant.  So I haven't thought about

4     that.  I haven't looked at them.  I don't know what exhibits

08:42:30   5     you're talking about.  I don't know the defendants' reaction.

6          I think if you want to do that, what you ought to do

7     is identify them, for me and for the defendants.  I'll be

8     happy to hear what the defendants have to say.  Then I can

9     look at them.  But this specific issue I don't think I've

08:42:47  10     heard before.

11          MR. O'CONNOR:  Just one point.  So, Your Honor, I

12     understand what you're saying.  I think we can bring that to

13     your attention, and I think you understood that one purpose

14     that I was serving with Mr. Modra was just to lay foundation

08:43:03  15     for the types of reports.

16          And so based upon that, I think we would like to at

17     least move in these additional temporal reports based upon his

18     foundation that we already laid.

19          THE COURT:  Okay.  Yeah.  Well, let's identify them

08:43:16  20     and I'll be happy to consider them --

21          MR. O'CONNOR:  Thank you.

22          THE COURT:  -- and hear objections from the

23     defendants.

24          MR. O'CONNOR:  All right.  Thank you.

08:43:23  25          THE COURT:  Okay.

08:43:28   1          MR. CLARK:  One issue pertains to a video deposition

2      that we anticipate playing after the first witness, the first

3      live witness, I should say.  We realized a day or two ago that

4      one of the important designations that was initially

08:43:40   5      designated internally and at some point did not make it into

6      the submission to the Court, fell on the cutting room floor or

7      somehow was not placed in there, so we would seek to leave to

8      add that to the deposition testimony of Dr. Avino.

9          And for the record, it is lines 89/14 through 89/22

08:44:00  10      and lines 90 -- page 90, line 20 -- sorry, page 90, line 12

11      through 22.

12          THE COURT:  Have you talked to defense counsel about

13      this?

14          MR. CLARK:  I have.  And there is a 401, 403

08:44:16  15      objection to them.  If I could be permitted to read the

16      testimony to the Court --

17          THE COURT:  When is this likely to come up?

18          MR. CLARK:  With our first deposition witness, after

19      Dr. Hurst, who will be the first live witness.

08:44:27  20          THE COURT:  When is that likely to happen?

21          MR. CLARK:  Depending on how long Dr. Hurst takes, I

22      think it could be around 10:00, 10:15, something like that.

23          THE COURT:  Okay.

24          MR. CLARK:  So the testimony to Dr. Avino is:

08:44:39  25          "Question:  The fracture rates they're reporting

08:44:43  1        here aren't vague.  True?"

          2             "Answer:  Correct.  You're right."

          3             "Question:  And is that information that would

          4        have been important for you in deciding to use Bard

08:44:51  5        IVC filters?"

          6             "Answer:  Yes.  All of the fracture information

          7        rate is something that was important to consider in

          8        this decision."

          9             "Question:  Is that information that would have

08:45:02  10       been important to you to know, that the medical

          11       director for Bard in 2005 was questioning why Bard

          12       was pushing the G2 as a permanent filter when they

          13       already had the SNF one?"

          14            "Answer:  Again, all information is helpful if

08:45:19  15       it's information regarding concern about one filter

          16       being better than the other."

          17            So, Your Honor, I think particularly given the

          18   causation defense that is being challenged in this case, that

          19   is important testimony to talk about the comparative rates and

08:45:34  20   questions about other -- the Simon Nitinol and the G2.  So we

          21   don't think it is prejudicial really at all because it's just

          22   testimony about that.  Somehow or another there was an error

          23   that this did not get submitted.  But I do think that's

          24   harmless error under the circumstances.  But that would be our

08:45:54  25   record on that.  We think it is important testimony for the

08:45:57  1    causation defense.

2             THE COURT:  All right.

3             MS. HELM:  Your Honor, again, this was not submitted

4    to the Court to review when you reviewed the deposition in its

08:46:05  5    full context, and the testimony is about a -- he's being

6    questioned about a line in an e-mail, and he's not given the

7    full context of the e-mail.  And I think the prejudice of him

8    asking a doctor to react on one line in an e-mail rather than

9    in the whole context outweighs any probative value.

08:46:24 10             There are other places in that -- sorry.  There are

11    other places in the deposition where the doctor talks about

12    wanting to know as much information as possible and what

13    information would be important to him.

14             So I think this line taken out of context in this

08:46:39 15    scenario is -- the prejudice of it outweighs any relevance,

16    especially in the context of the whole deposition where they

17    have that information previously as it relates to other Bard

18    documents.

19             THE COURT:  Well, let me ask you a question on that,

08:46:55 20    Ms. Helm.  I assume the line in the e-mail is the one we've

21    seen a number of times that was by -- was it Dr. Ciavarella

22    or -- where he's asking if we've got the SNF that has

23    virtually no complaint history, why are doctors choosing the

24    Recovery filter as a permanent filter when we have this

08:47:23 25    alternative.

08:47:23  1          That's not the wording, but that was the essence --

       2          MS. HELM:  It's actually the G2, Your Honor, and

       3   that's really close.

       4          THE COURT:  Yeah.  I remember the line.  And as I

08:47:33  5   understand the question that was asked to Dr. Avino, it was,

       6   would you have wanted to know that the medical director or a

       7   manager within Bard was asking this question in light of

       8   fracture rates.

       9          What is the unfair prejudice?

08:47:53 10          MS. HELM:  Actually, Your Honor, the question was not

      11   wouldn't you have wanted to know that the medical director was

      12   questioning this, the question is, wouldn't it have been

      13   important to know that the medical director was questioning

      14   why Bard was pushing the G2 as a permanent filter when it

08:48:11 15   already had the SNF one.

      16          So I think the way the question's asked, it raises a

      17   prejudicial effect and it takes the statement out of context.

      18   We don't have the e-mail.  They haven't marked it as an

      19   exhibit.  So I think that that -- just in the context,

08:48:27 20   particularly in light of the entire deposition where they have

      21   other questions of Dr. Avino, would you want to know

      22   questions.

      23          And I may be wrong about the exhibit, I'm sorry, it's

      24   not marked.

08:48:39 25          THE COURT:  I think you're saying in the deposition.

08:48:42  1   But it's already admitted in the trial; right?

2          MS. HELM:  Yes, Your Honor, it has.

3          THE COURT:  It's in evidence.

4          MS. HELM:  Yes, Your Honor.

08:48:47  5          THE COURT:  So is your objection that the question

6   misstates what the e-mail says?

7          MS. HELM:  Yes, Your Honor.

8          THE COURT:  Do you have the e-mail, Mr. Clark?

9          MR. CLARK:  The e-mail is in evidence.  It's

08:49:03 10   Exhibit 991.  I don't have it with me right now.

11          I believe the witness was questioned with the e-mail

12   right?  So we didn't cut the part that talked about that

13   because it is already in evidence.  But --

14          THE COURT:  Do you have the transcript?

08:49:20 15          MR. CLARK:  I do.  I can -- may I approach?

16          THE COURT:  Yeah.

17          Well, what you've given me, Mr. Clark, is not the

18   transcript, it's the excerpts.

19          MR. CLARK:  I apologize.  I do not have the

08:50:26 20   transcript with me.  I can -- the transcript should be up

21   here, if I can grab that.

22          THE COURT:  Yeah.  I think I just need to see the

23   context in which the question is asked.

24          MR. CLARK:  May I approach --

08:50:37 25          THE COURT:  Yeah.

08:50:38   1          While he's looking for that, are there other matters

2     the plaintiff's counsel need to raise this morning?

3          MR. O'CONNOR:  No, I don't think so, Your Honor.

4          THE COURT:  How about from defense counsel?

08:50:48   5          MR. LOPEZ:  Hold it.  We do have one more thing,

6     Your Honor.

7          As you recall, when we played Dr. Altonaga --

8          THE COURT:  I thought you were bringing your phone up

9     to hand it in this morning.

08:50:57  10          MR. LOPEZ:  That's why I have it out.  I'm looking

11    for Nancy.

12          You threw me off, Judge.

13          When Dr. Altonaga's video deposition was played in

14    Booker, there's a part in there and, if you'll recall, I asked

08:51:11  15    you if I could read it.  Because the court reporter reads it

16    to the witness, you cannot hear it.  And I'm wondering if we

17    can -- if I could read that section of Altonaga's dep- -- it

18    is important testimony, and there's no way the jurors heard

19    it.

08:51:28  20          THE COURT:  When is this?

21          MR. LOPEZ:  It already happened.  I mean,

22    Dr. Altonaga's video deposition has already been played and,

23    unfortunately, I was sitting in the back of the room without

24    the run and forgot about the section until it actually played.

08:51:42  25          THE COURT:  What is the section?

08:51:47 1         MR. LOPEZ:  The question is:  "Would it be your

2   expectation when Bard launched the filter for commercial use

3   that Bard would have an awareness about the long-term clinical

4   performance of that device?"

08:51:57 5         The answer was "Yes."

6         But that was a reread by the court reporter that you

7   just -- there's no way could you hear.

8         THE COURT:  Okay.  Read it to me one more time.

9         MR. LOPEZ:  Question:  "Would it be your expectation

08:52:32 10  that when Bard launched a filter for commercial use that Bard

11  would have an awareness about the long-term clinical

12  performance of that device?"

13         "Answer:  Yes."

14         You could hear the yes, but you could not hear the

08:52:46 15  question.

16         THE COURT:  What I have in my notes, having just

17  listened to what he testified to, is that he said it was

18  prudent for a company to understand how its device performs.

19         Isn't that essentially the point?

08:53:01 20         MR. LOPEZ:  Yeah.  But, I mean, it was played,

21  Your Honor.  This testimony was actually played in the video.

22         THE COURT:  I know.  My point is I got that from the

23  video.  I wasn't following along in a transcript.

24         MR. LOPEZ:  Okay.

08:53:09 25         THE COURT:  Do you think the jury missed it?

08:53:11  1          MR. LOPEZ:  Well, I mean, this is a little different.

       2  I mean, I -- not prudent.  It would be his expectation.

       3          THE COURT:  And so what you're proposing to do is

       4  just read the question and answer?

08:53:24  5          MR. LOPEZ:  Yes, sir.

       6          THE COURT:  Mr. North?

       7          MR. NORTH:  Well, on that, I just think it

       8  reemphasizes the testimony.  I think it was clear the first

       9  time.

08:53:33  10          THE COURT:  Do you think it could be heard by the

      11  jury?

      12          MR. NORTH:  I thought it could.

      13          THE COURT:  It was faint.  I remember it being faint.

      14          My only concern, Mr. Lopez, is whether we're

08:53:46  15  reemphasizing any particular evidence.  I don't think that's a

      16  big risk here.  So what I will allow you to do is just I'll

      17  point out there was a point in the transcript that was faint.

      18  We're not trying to emphasize this evidence, but just to make

      19  sure the jury heard it we'll let you read it.

08:54:03  20          MR. LOPEZ:  All right.  Thank you, Your Honor.

      21          THE COURT:  Okay.

      22          MR. CLARK:  May I approach with the iPad version of

      23  the transcript?  I can't find it quickly in boxes.

      24          THE COURT:  Yeah, that's fine.

08:54:25  25          So is 4026 in the deposition -- the exhibit we're

08:54:30  1    talking about, the e-mail?

2          MR. CLARK:  It is, Your Honor.  It's Trial

3    Exhibit 991.

4          And if I could hand that to the clerk?

08:54:37  5          THE COURT:  Yeah, that would be fine.

6          I'm going to overrule the objection.  I think this is

7    relevant and not unduly prejudicial.  Unfairly prejudicial.

8    So I will allow that to be added to the video that's going to

9    be shown.

08:55:55  10          MR. CLARK:  Thank you, Your Honor.

11          We have one more issue with a deposition, but I think

12    that deposition will be an afternoon deposition, so we can --

13          THE COURT:  Let's not talk about it now because we've

14    only got three minutes left.  I want to hear defendants'

08:56:05  15    issues.

16          MR. NORTH:  Your Honor, with all due respect to the

17    plaintiff's counsel, we are concerned about a recurring event

18    in this trial, and that's that they monopolize with all their

19    issues the 30 minutes we have.

08:56:14  20          We have two very important issues.  One doesn't need

21    to be decided right now, but the other one does need to be

22    decided before the plaintiff testifies, and our understanding

23    is they're putting her on this morning.  And Ms. Helm has that

24    issue, but I don't know that we can get it done before 9:00.

08:56:30  25          THE COURT:  What's the issue?

08:56:36  1    MS. HELM:  Your Honor, on the first day of trial you

       2    instructed us not to raise the issue of the plaintiff's

       3    smoking without first approaching the Court.  So I'm

       4    approaching the Court on the issue of her smoking and on her

08:56:49  5    other medical conditions, based on two events that have

       6    occurred since you gave us the instruction.

       7        I don't think I can argue this in three minutes,

       8    Your Honor.  I have testimony, I have case law, I have quite a

       9    bit.  But the issue relates to we believe the door has been

08:57:06  10   opened to her smoking and also to all of her medical

       11   conditions and comorbidities based on the testimony of

       12   Dr. Muehrcke on Friday, and also on based statements by

       13   counsel in the opening statement.

       14       THE COURT:  Well, let me ask plaintiff's counsel,

08:57:25  15   when are you going to put on Ms. Jones?

       16       MR. O'CONNOR:  Prior -- later, probably, in the

       17   morning after the break.

       18       THE COURT:  And how long will your direct of her

       19   take?

08:57:33  20       MR. O'CONNOR:  About 20 minutes.

       21       MS. HELM:  How long?

       22       MR. O'CONNOR:  Her direct?  20 minutes.

       23       THE COURT:  Okay.

       24       MR. O'CONNOR:  I mean, it's -- hopefully.

08:57:44  25       THE COURT:  How long will your cross take?

08:57:46  1          MS. HELM:  Your Honor, it depends on your ruling on

         2    this issue.

         3          THE COURT:  Well, without this, how long will it

         4    take?

08:57:52  5          MS. HELM:  Probably 15 or 20 minutes.

         6          THE COURT:  Okay.  Well --

         7          MS. HELM:  Your Honor, this also frankly impacts the

         8    cross-examination of Dr. Hurst because if you allow this issue

         9    in, it impacts what Mr. Rogers can ask Dr. Hurst on

08:58:10 10    cross-examination.

        11          THE COURT:  All right.  Tell me what it is you think

        12    you should be allowed to do.

        13          Traci, would you tell the jury we're going to be a

        14    few minutes.

08:58:24 15          MS. HELM:  Thank you, Your Honor.

        16          On Friday Dr. Muehrcke testified that the plaintiff

        17    is, quote, a breath away from having a serious problem, a

        18    death.

        19          It's on page 776 --

08:58:32 20          THE COURT:  I remember that testimony.

        21          MS. HELM:  Okay.  We should be able to introduce

        22    evidence that disputes Dr. Muehrcke's opinion as to causation.

        23    This does not go to contributory negligence, but it goes to

        24    whether there are other possible causes for her being a breath

08:58:52 25    away from having a serious problem.  She suffers from a number

08:58:55  1    of serious medical issues that both predated and postdated the

2    retrieval of the filter.

3          The plaintiffs have changed course through the case,

4    throughout the entire case.  There were physical symptoms that

08:59:11  5    they attributed to the filter strut, and as you will recall on

6    the first day of trial, they started withdrawing those.  But

7    those physical symptoms all are preexisting, all relate to a

8    very complicated medical history.

9          She's had four very complicated GI bleed surgeries,

08:59:31  10   including one that postdates the retrieval of the filter and

11   put her in the ICU, was emergent.  She suffers from anemia,

12   chronic hypertension, peptic ulcer disease, repeat GI

13   bleeding, hypothyroidism, and migraine headaches.  All of this

14   history is now clearly relevant to what Dr. Muehrcke said.

08:59:53  15   The jury is entitled to consider whether there are other

16   causes of her being a breath away from a serious problem,

17   including her smoking.

18         Your Honor, in *Wages* -- and I have these cases for

19   the Court to consider -- in *Wages versus S-I-B-R-A-N*, at 171

09:00:14  20   Georgia Appeal 14, the Georgia Court of Appeals held that:  A

21   plaintiff's other injuries or medical conditions are

22   admissible to show that the injuries at issue are not the

23   result of the defendant's negligence and that they can come in

24   through a cross-examination of the plaintiff.

09:00:33  25         Likewise, in *Lindsay versus Turner*, 279 Georgia

09:00:38   1   Appeal 595, the plaintiff argued that the defendant should not

2   have been permitted to testify -- to question him about,

3   quote, wholly unrelated, close quote, conditions allegedly

4   incurred prior to and after the accident.

09:00:55   5       But the Court held that evidence concerning a

6   plaintiff's other medical conditions may be admissible to show

7   that the issue -- the injuries currently at issue are not the

8   result of the defendant's negligence.

9       And I understand that Dr. Muehrcke was testifying as

09:01:10  10   to the retained strut in her pulmonary artery, but what this

11   jury heard is she's a breath away from serious injury or

12   death.  The jury's entitled to know whether there are other

13   causes for her being a breath away from serious injury or

14   death.  And they're entitled to know that this complicated

09:01:31  15   medical history that is continuing into today, that her

16   smoking, which the Court has already found is common knowledge

17   and contributes to her medical condition, it's well-known, the

18   jury's entitled to consider that.

19       And what the plaintiffs are trying to do here is

09:01:50  20   they're trying to paint a picture that Ms. Jones was perfectly

21   healthy after the strut was -- except for the retained strut,

22   and that there were no other comorbidities that could put her

23   in a hospital or cause a serious medical condition.  And that

24   is simply not the case.

09:02:06  25       And under Georgia law, her other comorbidities, her

09:02:09   1   other medical conditions, her other causes of potentially

2   being a breath away, should be heard by the jury and

3   considered by the jury in making the determination of

4   causation.

09:02:23   5        Also, in opening statement, Mr. O'Connor, and I quit

6   counting, but it was more than five times said she has pain

7   and suffering.  He didn't just say mental pain and suffering,

8   he continually said pain and suffering.

9        In the pretrial order, the plaintiff makes a claim

09:02:42  10   for physical pain and suffering past, present, and future.

11        They've asked for a jury charge on physical pain and

12   suffering and mental pain and suffering.

13        To the extent that Ms. Jones and her family members

14   are going to come in here and say anything about pain and

09:03:01  15   suffering, the jury's entitled to know other causes of that

16   pain and suffering.

17        And, frankly, Your Honor, it goes to her worry.

18   She's going to come in and say she's worried about the strut.

19   Dr. Muehrcke went on and on and on about this worry of the

09:03:17  20   strut, she's a breath away.

21        We should be entitled to cross-examine her about

22   whether she's worried about her hypertension, whether she's

23   worried about her anemia, whether she's worried about her

24   hypothyroidism, whether she's worried about the impact that

09:03:31  25   the smoking has on her health.

09:03:33   1      She's going to come in and testify and her daughter's

       2   going to come in and testify that they worry something's going

       3   to happen with her grandchildren.

       4      And, actually, if you look at her medical history,

09:03:43   5   every time she's had an emergent medical situation it has been

       6   unrelated to the filter, except for potentially 2015.  But

       7   since then she's had to go by ambulance to the hospital.  So

       8   this worry and this worry that something could happen when she

       9   has her grandchildren, the jury should also be able to

09:04:02  10   consider that there are other causes for that worry and

      11   that -- and those conditions.

      12      And so, pursuant to your order, we're raising this

      13   issue.  We believe that it's completely prejudicial to the

      14   defendant and unfair and inappropriate under Georgia law to

09:04:17  15   allow the plaintiffs to come in and try this case as she got a

      16   filter, the filter broke, there's a retained strut, and that's

      17   all that matters, because she has a number of comorbidities

      18   that her expert should have been aware of, and that we should

      19   be able to both cross-examine her and the other fact witnesses

09:04:36  20   about.

      21      And I have copies of case law if you'd like it,

      22   Your Honor.

      23      THE COURT:  No.  We don't need it.  Thank you.  We

      24   can find those cases.

09:04:43  25      Plaintiff's response?

09:04:50   1        MR. COMBS:  Your Honor, the Court's been very strict

2    in this case about its rulings on -- not deciding this case on

3    irrelevant things that might be unfairly prejudicial.

4    Obviously, the plaintiffs disagree with a lot of those

09:05:05   5    rulings, and not just the cephalad migration deaths, but the

6    buffet line e-mail, the finger picture.  There's a lot of

7    things in this case that are unfairly prejudicial and

8    irrelevant.

9        Smoking is the same thing.  Plaintiffs just --

09:05:19  10    defense just wants to get this in to say that she's a smoker

11    and she doesn't care about her health, and that is unfairly

12    prejudicial and irrelevant.

13        So you already ruled on this, Your Honor.  So the

14    question is whether the plaintiffs opened the door.

09:05:32  15        All we've talked about is causation relating to the

16    filter.  And that's all that Dr. Muehrcke talked about, and

17    that is all Dr. Hurst is going to talk about as far as what

18    could happen from her respirations could cause the filter

19    piece to move and migrate and cause harm.

09:05:51  20        They don't have any experts disclosed in this case

21    that are going to talk about causation as far as smoking

22    shortening her life, or anemia or hypertension or any of these

23    things.  There's no medical testimony about causation in this

24    case from them.  We haven't opened the door.

09:06:08  25        As far as pain and suffering, that's from the

09:06:10  1   removal.  And our experts have been clear about that and clear

2   about that in their reports.

3       They've already briefed this, Your Honor.  They've

4   already argued it.  I know we've got the jury waiting, so I

09:06:21  5   won't be further, Your Honor, but the Court's already ruled on

6   this, and we believe the Court should reaffirm its rulings

7   because plaintiffs have not opened the door.  And will not.

8       THE COURT:  Okay.  I understand your positions.

9   We'll look at those cases and then we can talk about it later

09:06:35 10   in the morning when the plaintiff testifies.

11      MS. HELM:  Excuse me.  Respectfully, Your Honor, it

12   impacts Dr. Hurst's cross-examination, as I stated.  I know we

13   have the jury and I'm mindful of it, but it does make a

14   difference in Dr. Hurst's cross-examination.

09:06:50 15      THE COURT:  Well, I've got to read the cases.  Right?

16   I don't know what to do about that because I didn't learn

17   about the cases until this morning, and we've got to look at

18   the cases.  So we'll do our best with that.

19      MR. ROGERS:  And, Your Honor, the cross-examination

09:07:00 20   of Dr. Hurst can certainly begin before the morning break.

21   And I don't know if you can look at them on the morning break.

22   If you can't, that's fine.  Then we'll figure out a way --

23      THE COURT:  I don't know if I can either.  I'll do my

24   best.

09:07:10 25      MR. ROGERS:  Understand, Your Honor.

09:07:10  1          THE COURT:  There's usually several things waiting

2    when I walk off the bench.

3          Okay.  We'll bring the jury in.

4       (The jury entered the courtroom at 9:08.)

09:08:30  5          THE COURT:  Please be seated.

6          Good morning, ladies and gentlemen.

7          THE JURORS:  Morning.

8          THE COURT:  Hope you had a nice weekend.  Thank you

9    for being here.  I apologize for starting ten minutes late but

09:08:39 10   we had a number of issues we needed to talk through and

11   hopefully by doing that we save time later in the trial.

12         We are going to continue this morning with the

13   videotaped testimony of Ms. Hudnall.

14         We can proceed.

09:09:13 15      (Video testimony of Janet Hudnall was played.)

16         THE COURTROOM DEPUTY:  The jury has it.  I'll work on

17   the back screen.

18         MR. CLARK:  Your Honor, at this time the plaintiff

19   would move the following exhibits into evidence:  4407, 4403,

09:12:40 20   4404, 4405, 4406, 4536, 4537, 4459, 932, 2238, 4420, subject

21   to redaction, 79, 1006.

22         THE COURT:  79 meaning 79?

23         MR. CLARK:  79.

24         THE COURT:  Okay.  And what was the next one?

09:13:18 25         MR. CLARK:  1006.  1023.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:13:24   1          THE COURT:  I'm sorry, I couldn't hear that.

           2          MR. CLARK:  1023, 1369, 1383, 2059, 2061, 2062, 2063,

           3   2065, 2068, 2069, 1370, 1580, 677, 1133, 5303, 2052, 546

           4   subject to redaction, 854 subject to redaction, 447, 1612,

09:14:19   5   2057 subject to redaction, 926 subject to redaction, 1295,

           6   4412, 2052, 614, 4486, 5296, 5302, 2253.

           7          MS. HELM:  Your Honor, I tried to keep up with

           8   Mr. Clark but my list is in a different order than his, so may

           9   I have an opportunity to review his list before I state

09:15:01  10   whether I have any objections or not?

          11          THE COURT:  Yes.

          12          MS. HELM:  Thank you.

          13          THE COURT:  Mr. Combs, what are we doing next?

          14          MR. COMBS:  Plaintiff calls Dr. Darren Hurst.

09:15:35  15          THE COURT:  Ms. Helm, after you've looked that over,

          16   if you could just, even in the middle of Dr. Hurst, let me

          17   know how you rule so we know if these exhibits are in for

          18   purposes of his testimony.

          19          MS. HELM:  Yes, Your Honor, I'm going to --

09:15:46  20          THE COURT:  Whenever you can get through it.

          21          MS. HELM:  Thank you.

          22          THE COURTROOM DEPUTY:  Dr. Hurst, if you would please

          23   come forward and raise your right hand.

          24

          25

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:16:19   1        **DARREN R. HURST, M.D.,**

       2    called as a witness herein, after having been first duly sworn

       3    or affirmed, was examined and testified as follows:

       4            THE COURTROOM DEPUTY:  Would you please state and

09:16:19   5    spell your name for the record, please.

       6            THE WITNESS:  Darren Robert Hurst.  D-A-R-R-E-N.

       7    R-O-B-E-R-T.  H-U-R-S-T.

       8              D I R E C T   E X A M I N A T I O N

       9    BY MR. COMBS:

09:16:40  10    Q   Good morning, Dr. Hurst.  When you get settled there, if

      11    you could please introduce yourself to the jury.

      12    A   Excellent.  Yes.

      13            Hi.  My name is Darren Hurst.  I'm a physician.  I

      14    work in northern Kentucky in the Greater Cincinnati area.  I'm

09:17:29  15    a vascular and interventional radiologist.

      16    Q   And, Dr. Hurst, could you briefly explain what you do as

      17    an interventional radiologist.

      18    A   Yeah.  So interventional radiologists are physicians who

      19    use image-guided minimally invasive therapies to treat

09:17:45  20    patients, predominantly with vascular disease, but with cancer

      21    as well.  We do vascular access, dialysis access, place

      22    bal- -- use balloons and stents to treat vascular disease and

      23    place IVC filters.

      24    Q   So in your practice you do use IVC filters?

09:18:04  25    A   Yes.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:18:04  1   Q    Have you implanted IVC filters?

2   A    Yes.

3   Q    Have you removed them?

4   A    Yes.

09:18:09  5   Q    And does that include Bard IVC filters?

6   A    Yes.

7   Q    And why don't you tell the jury why you're here today and

8   what your role is in this case.

9   A    So my role in this case is to evaluate the performance of

09:18:24  10  the Bard Eclipse filter in Doris Jones and to evaluate whether

11  the implanting physicians were adequately warned of the

12  potential risks and complications of the device, and also to

13  evaluate the modes of failure of the device.

14  Q    And did you review Mrs. Jones' medical records and

09:18:49  15  imaging?

16  A    Yes.

17  Q    And are you going today to explain that imaging as it

18  relates to Mrs. Jones and her filter?

19  A    Yes.

09:19:00  20  Q    And what did you find when you reviewed the imaging in

21  regards to her filter?

22  A    So Mrs. Jones' filter demonstrated multiple modes of

23  failure, including tilt, migration, fracture, and embolization

24  of one of the fragments of the filter through her heart to her

09:19:17  25  right pulmonary artery.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:19:20  1    Q    And let's talk about your education and background

2    briefly.

3              You're a doctor specializing in vascular and

4    interventional radiology; correct?

09:19:29  5    A    Yes.

6    Q    Where are you licensed to practice vascular and

7    interventional radiology?

8    A    Indiana, Ohio, and north -- I'm sorry, and Kentucky.

9    Q    And where did you go to school to obtain your medical

09:19:40  10   degree?

11   A    The University of Cincinnati.

12   Q    If could you briefly describe your training after medical

13   school.

14   A    So after medical school I went to the University of

09:19:50  15   Michigan and did a diagnostic radiology residency for four

16   years.  And then, following that, a year of training in

17   vascular and interventional radiology as a fellow at

18   University of Michigan.

19   Q    So how long have you been a doctor?

09:20:05  20   A    21 years.

21   Q    And where do you work now?

22   A    I work at St. Elizabeth Health System.  It's a large

23   medical system in northern Kentucky that covers the southern

24   part of Greater Cincinnati.  We have three hospitals with over

09:20:20  25   a thousand beds.  We're a tertiary care medical center.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:20:25  1    Q    And what positions do you hold in your hospital system?

2    A    So I've been the director of vascular interventional

3    radiology for the system for ten years, and then I'm also the

4    chair of the product committee, which evaluates all the

09:20:40  5    products that come through the cardiology cath lab and the

6    interventional vascular labs.

7    Q    Are you board certified?

8    A    Yes, I'm board-certified in both vascular and

9    interventional radiology and diagnostic radiology.

09:20:54  10   Q    How long have you been board certified?

11   A    Since 2001.

12   Q    And could you briefly explain to the jury, I think we're

13   all familiar with the radiologists if you go in for imaging,

14   that would be what's called diagnostic radiology?

09:21:08  15   A    Yes.

16   Q    Can you explain the difference between a diagnostic

17   radiologist and an interventional radiologist?

18   A    So an interventional radiologist is basically like a

19   vascular surgeon, except I don't do open surgery.  I run my

09:21:20  20   own clinics, I see patients with vascular diseases like

21   varicose veins, arterial disease like vascular disease that

22   affects the iliac arteries or the renal arteries or the

23   arteries of the legs.  And we also see cancer patients that

24   have issues with liver tumors that we embolize.  It's a wide

09:21:42  25   variety of diseases that are treated with minimally invasive

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:21:46  1    therapies.

2    Q    Now, you are here as an expert witness.  You never treated

3    Mrs. Jones.

4    A    No.

09:21:54  5    Q    And you talked about you'd spent time reviewing her

6    records and imaging.  How much time overall do you think

7    you've spent working on this case?

8    A    Probably about 30 hours.

9    Q    And have you been paid for that time?

09:22:07  10   A    Yes.

11   Q    What percentage, if you could give it a percentage, of

12   your professional work is doing litigation work, expert

13   witness work like this?

14   A    About 10 percent of my time is spent doing that.

09:22:22  15   Q    And how much do you charge for your litigation work?

16   A    $500 an hour.

17   Q    And about how much do you think you've been paid total by

18   the plaintiff for your work on this case?

19   A    Probably about $25,000.

09:22:41  20   Q    And what did you do to prepare to come here today through

21   this case in preparing opinions?

22   A    So what I did was I reviewed all of Doris Jones' medical

23   records, all of her imaging that was pertinent to the case.  I

24   reviewed the Bard internal corporate documents that were

09:23:00  25   provided to me.  I've reviewed the medical literature that is

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:23:06  1   pertinent to this case.  And I've reviewed the instructions

2   for use for various devices, including the Eclipse filter.

3   Also reviewed the depositions and expert witness reports for

4   both sides.

09:23:22  5   Q   And then you prepared a report in this case, a summary of

6   your opinions?

7   A   Yes.

8   Q   When you were reviewing the imaging for Mrs. Jones, what

9   was important to you to look at in reviewing the imaging?

09:23:38 10   A   So when we look at filters on imaging, what we're looking

11   at is the degree of tilt present in the inferior vena cava

12   from the filter; migration, either towards the head, which is

13   cranially, or towards the feet, which is caudal; the presence

14   of fracture and the presence of fracture fragments or

09:24:05 15   fragments that have embolized or gone through the vascular

16   system.

17   Q   And you talked about you have used Bard filters in the

18   past.  What Bard filters have you used?

19   A   So we used the permanent filter, the Simon Nitinol filter.

09:24:20 20   Then we used the Recovery, the G2, the G2X, the Meridian, the

21   Eclipse, and the Denali.

22   Q   Do you still use those filters today?

23   A   The only filter that is still available today is the

24   Denali.  The rest have been removed from the market.

09:24:41 25   Q   And did you bring a couple filters with you here today?

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:24:44  1    A    I did, yes.

          2    Q    And if you could -- do you have a G2 filter?

          3    A    Yes.

          4         MR. COMBS:  Your Honor, I'd like to -- I'm not sure

09:24:58  5    if I know how to do it, to turn on the Elmo there, if I may

          6    approach?

          7         THE COURT:  Traci can do it.

          8         MR. COMBS:  Okay.

          9         Thank you, Traci.

09:25:13 10         THE WITNESS:  Sorry, these filters tend to like each

         11    other very much.

         12         There we go.

         13         I also have this one.

         14    BY MR. COMBS:

09:25:26 15    Q    Let's just get the G2 out to start.

         16    A    Sure.

         17    Q    And if you could -- and I understand the filter that's at

         18    issue in this case was an Eclipse filter; correct?

         19    A    Yes.

09:25:47 20    Q    Do you have an Eclipse filter up there with you?

         21    A    I do.

         22    Q    Oh, you do.  Okay.  I'm sorry, then let's get the Eclipse

         23    filter out.  I'm the one confusing the jury.

         24    A    There you go.

09:25:58 25    Q    If could you just talk briefly about the Eclipse filter.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:26:02  1   A    So --

2        MR. ROGERS:  Your Honor, I'm sorry to interrupt.  I

3   don't believe this was disclosed in Dr. Hurst's report.  A

4   general description of the filter and how it works, the

09:26:10  5   Eclipse filter.

6        THE COURT:  Where is it in the report?

7        MR. COMBS:  The top of page 10, Your Honor.  I

8   understand the question was a little open-ended.  I can

9   rephrase it, but --

09:26:41 10   And if we're going to deal with objections, I can be

11   more specific in my questions, Your Honor.

12        THE COURT:  Yeah, let's do that, please.

13        MR. COMBS:  Understood.  I'll withdraw that.

14        THE COURT:  Do you want this displayed to the jury?

09:26:53 15        MR. COMBS:  Oh, I'm sorry.  Please.  If I could

16   publish to the jury, Your Honor.

17        THE COURT:  All right.  You may.

18        MS. HELM:  I'm ready when you are, Your Honor, on the

19   exhibits.

09:27:03 20        THE COURT:  On the exhibits?

21        MS. HELM:  Yes.

22        THE COURT:  Are you going to be using any of the

23   exhibits that were listed, Mr. Combs?

24        MR. COMBS:  I'm not 100 percent sure.  I don't think

09:27:12 25   so.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:27:13   1       THE COURT:  Then why don't we -- let's wait and do

         2   those after the direct, if that's all right.

         3       MR. COMBS:  If one comes up, I'd be free to --

         4       THE COURT:  Yeah.  Okay.

09:27:22   5       MR. COMBS:  Okay.

         6   BY MR. COMBS:

         7   Q   Dr. Hurst, I believe you've testified before that the

         8   Eclipse filter has a conical design.  Could you talk about

         9   what that means, explain that to the jury.

09:27:38  10   A   Sure.  So the conical design means that the filter is

        11   shaped like a cone.  Like a teepee, basically, without the

        12   fabric on it.  Some filters are shaped like that.  Other

        13   filters have a less conical design.  But the whole family of

        14   Bard filters all had a -- were based off a conical design or a

09:28:04  15   tent-like design where the arms and legs meet at the top of

        16   the cone.

        17   Q   And what's the difference -- what was the predecessor

        18   device of the Eclipse filter?

        19   A   The G2X.

09:28:23  20   Q   And what was the predecessor device of the G2X?

        21   A   The G2.

        22   Q   And, first, what was the difference between the G2 and

        23   G2X?

        24   A   The G2, which is this device right here, did not have a

09:28:37  25   hook on the top.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:28:39 1        I'm going to rotate this one so that you can see the

2    retrieval hook.  You can barely see it.

3        At the top of the -- this device there is a tiny

4    little hook, and that's to facilitate retrieval of the device

09:28:58 5    from the inferior vena cava.  The original device, the

6    original G2 did not have a hook.

7    Q    And then the G2X was the predicate device for the Eclipse

8    filter; right?

9    A    Correct.

09:29:17 10   Q    And what was the difference between the G2X and the

11   Eclipse?

12   A    So the G2X and the Eclipse are different in that the

13   Eclipse filter is actually what we call electropolished.  And

14   you can see that this filter is shinier.  It reflects the

09:29:38 15   light much better than the predecessor.  The electropolishing

16   was the main difference between the two filters.  That, and

17   the color is different.  It's blue.

18   Q    And you've talked about in your report and testified about

19   the Simon Nitinol filter; correct?

09:30:03 20   A    Yes.

21   Q    And what was the Simon Nitinol filter?

22   A    So the Simon Nitinol filter is this device right here.  It

23   is a permanent filter that has a slightly larger diameter wire

24   than the two retrievable filters.  It does not have a hook.

09:30:26 25   It has a large continuous cone, or they look like petals on a

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:30:33   1   flower.  That is one continuous wire that is woven around to

       2   also -- to -- the idea was to additionally trap a clot.  It

       3   also has larger hooks on its feet.  And it has a wider spread

       4   of its legs than the G2.

09:30:56   5         MR. COMBS:  Your Honor, at this time we would ask if

       6   we could publish those to the jury for them to hold, like we

       7   did with Dr. McMeeking.

       8         THE COURT:  Any objection?

       9         MR. ROGERS:  No, Your Honor.

09:31:05  10         THE COURT:  Yes, that's fine.

      11         Why don't we have Traci do that.

      12         MR. COMBS:  And, Your Honor, if I could continue with

      13   my examination of Dr. Hurst while the jury's examining it?

      14   It's up to you.

09:31:18  15         THE COURT:  Well, then they're going to be having to

      16   split their attention.  If you want them to look at the

      17   filters, I'd rather not have them having to listen to the

      18   witness at the same time.

      19         MR. COMBS:  Understood, Your Honor.

09:35:35  20   BY MR. COMBS:

      21   Q   Dr. Hurst -- oh, I'm sorry, not quite done.

      22         Now we have them all.

      23         Dr. Hurst, could you explain to the jury about the

      24   differences between permanent and retrievable filters.

09:35:57  25   A   So permanent filters were the original devices to be used

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:36:04  1    for what we call caval interruption.  So an inferior vena cava

      2    filter is placed when a patient has a contraindication to the

      3    primary way of treating DVT and PE, which is anticoagulation.

      4    So if you can't give a patient blood thinner to treat their

09:36:27  5    DVT or PE, then the next option is to place a filter.  The

      6    initial devices were permanent devices, and they were placed

      7    in the inferior vena cava.

      8  Q    And, Doctor, make sure they can see it --

      9  A    Yeah, I've got to get it in there.

09:36:51  10       They're placed in the inferior vena cava through a

     11    catheter.  The device is folded up inside a catheter and then

     12    delivered into the inferior vena cava.  Folding them up again

     13    usually is a lot more difficult than it was to initially

     14    deploy them.

09:37:10  15       There we go.

     16       So if you can imagine this as the -- this tube as the

     17    inferior vena cava and the patient's legs are down here, what

     18    the device does is it blocks clot from traveling from the legs

     19    through the inferior vena cava to the lungs up here, where it

09:37:29  20    can have deadly consequences.

     21       What happens is the clot travels through the inferior

     22    vena cava, hits the filter, either breaks up in the filter to

     23    smaller clots which don't affect the lungs and heart as much,

     24    or it's trapped in the filter for a long enough period of time

09:37:49  25    that the body can break down that clot naturally.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:37:55  1      So these devices were made to stay in the patient

2    permanently.  They can be retrieved but it's an extremely

3    difficult procedure and rarely -- it's rarely done.

4          The retrievable filters were a new class of device

09:38:14  5    that could be placed in the inferior vena cava and because of

6    their design, with legs that had hooks that were smaller and

7    were designed to release from the inferior vena cava wall and

8    also the device itself had less radial force or outward force

9    on the inferior vena cava, the device could be retrieved by

09:38:41 10    placing a -- by hooking the device with a snare from above and

11    then running a catheter over the top and collapsing the device

12    into a catheter, and then removing it.

13    Q    And, Dr. Hurst, what are the circumstances when a patient

14    requires an IVC filter?

09:39:01 15    A    So the main circumstance is a contraindication to

16    anticoagulation and a history of DVT and PE.  And

17    contraindications to anticoagulation can include patients

18    with, like, a brain tumor.  You can't put those patients on a

19    blood thinner because they might bleed into their head.  Or

09:39:22 20    maybe a history of recent falls.  You don't want those

21    patients on a blood thinner because they could fall and hurt

22    themselves and bleed out.

23          The other indication is a patient who is at high risk

24    for DVT and PE and who has had a PE or a DVT while on

09:39:37 25    anticoagulation.  And those patients sometimes have issues

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:39:41   1   with diseases involving the blood that cause them to clot more

2   commonly than other patients.

3   Q    And I think we can put those away and turn that off.

4          MR. COMBS:  And then, Gay, if you could please pull

09:39:56   5   up Exhibit 4428.

6          Which I believe is in evidence, Your Honor.

7          THE COURTROOM DEPUTY:  What was the number?

8          MR. COMBS:  4428.

9          THE COURTROOM DEPUTY:  Yes, sir.

09:40:17  10          MR. COMBS:  May I publish it to the jury?

11          THE COURT:  You may.

12   BY MR. COMBS:

13   Q    And, Dr. Hurst, in your practice you receive marketing

14   brochures like this for various products?

09:40:25  15   A    Yes.

16   Q    Including Bard products?

17   A    Yes.

18   Q    Are you familiar with this brochure?

19   A    Yes.  As part of the product committee, we review the

09:40:34  20   marketing materials and the instructions for use for the

21   devices that are being submitted to the committee for purchase

22   by the hospital.

23          MR. COMBS:  And if you could go to the next page,

24   Gay.

09:40:51  25          And --

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:40:55  1          MR. ROGERS:  Your Honor, I'm sorry to interrupt, but

        2   I don't believe that the doctor has disclosed any information

        3   about this particular brochure in his report.

        4          THE COURT:  Mr. Combs?

09:41:20  5          MR. COMBS:  I would direct Your Honor to page 9 of

        6   his report, Roman numeral IV.

        7          THE COURT:  Are you going to ask specifically about

        8   that opinion?

        9          MR. COMBS:  Yes.

09:41:46 10          THE COURT:  Mr. Rogers?

       11          MR. ROGERS:  Your Honor, in that portion of the

       12   report it does not mention this particular document.  So -- I

       13   mean, it's a relatively broad statement.

       14          THE COURT:  I agree, but I'm going to overrule the

09:42:01 15   objection.

       16          But you ought to focus on that opinion in your

       17   questioning.

       18          MR. COMBS:  Understood, Your Honor.

       19   BY MR. COMBS:

09:42:15 20   Q   This brochure here talks about electropolishing,

       21   Dr. Hurst?

       22   A   Yes.

       23   Q   Did the -- could you point to where on this it talks about

       24   electropolishing?

09:42:38 25          MR. ROGERS:  Your Honor, I'm sorry to interject

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:42:40  1    myself again, but the statement that Mr. Combs directed us to

2    does not mention electropolishing.  It doesn't talk about

3    that.  So I think it's beyond his report.

4              THE COURT:  Your response, Mr. Combs?

09:42:54  5              MR. COMBS:  Your Honor, his report discloses -- I

6    need to lay a -- tell him what I can ask him about.  I don't

7    think it needs to describe exactly every marketing material,

8    the problems with it.

9              THE COURT:  Well, this is the difficulty in line

09:43:07 10   drawing that we referred to this morning.  I think you need to

11   stick to the opinions and not go beyond it.  I'll allow you to

12   lay the foundation briefly for his opinion on this brochure

13   that he stated in his report, but you shouldn't be going

14   beyond that opinion.

09:43:23 15             MR. COMBS:  Understood, Your Honor.  That's all I'm

16   trying to do.

17   BY MR. COMBS:

18   Q   Dr. Hurst, can you describe on there where it talks about

19   electropolishing?

09:43:32 20   A   Yes.  The electropolished Eclipse vena cava filter

21   combines proven performance with long-term retrievability and

22   improved surface.

23   Q   And what is your opinion on the Bard marketing materials

24   that you reviewed for this case and the claims they make in

09:43:49 25   their marketing materials?

DIRECT EXAMINATION – DARREN R. HURST, M.D.

09:43:51   1   A   So the claims in the marketing materials don't seem to

2   jibe or correlate with the claims in the instructions for use.

3   The marketing materials often talk about increased stability,

4   increased centering capability, migration resistance, when we

09:44:10   5   know that these devices have issues with all of those

6   particular problems.

7   Q   Let's turn to Mrs. Jones' medical course.

8           And can you just briefly describe her medical course

9   as you -- regards to her filter based on your review of the

09:44:37  10   records and imaging?

11   A   Sure.  Hold on, let me pull up my report here.

12           So Mrs. Jones had gastrointestinal issues related to

13   ulcers and bleeding, and she required surgery for those

14   ulcers.  It's a pretty significant issue.  And because she was

09:44:58  15   having -- I'm sorry -- and during this time where she was

16   having all these issues, she also developed a DVT.  So she

17   needed protection from pulmonary embolism, but at that time,

18   because she was having issues with bleeding, her

19   anticoagulation was contraindicated, so they chose to place an

09:45:22  20   IVC filter.

21           And following that, she developed issues with her IVC

22   filter and developed chest pain and presented to the emergency

23   department with chest and arm pain, and was found to have a

24   fragment of the filter in her right pulmonary artery.

09:45:46  25   Q   And what happened with her filter after that?

09:45:52  1    A    So because of the -- well, her physicians decided that

2    they felt that the filter was unstable and that she didn't

3    need it anymore, so there was very little benefit that she

4    would gain from having the device that had some instability

09:46:09  5    and had already fractured.  So they removed her Eclipse filter

6    from her inferior vena cava.

7    Q    And you reviewed -- how much imaging for Mrs. Jones did

8    you review in this case?

9    A    There's about 20 or 30 studies and 800 or so images.

09:46:29  10   Q    Were those images useful to you in formulating your

11   opinions in this case?

12   A    Yes.

13   Q    And what I'd like to do is have you walk us through some

14   of those images.

09:46:44  15          MR. COMBS:  Gay, if you could pull up 4574.

16          MR. ROGERS:  Your Honor, I apologize.  I object.

17   There is nothing about this particular image in Dr. Hurst's

18   report.

19          THE COURT:  Why don't we talk for a minute at

09:46:58  20   sidebar, Counsel.

21          Ladies and gentlemen, if you want to stand up, feel

22   free to do that.

23       (Bench conference as follows:)

24          THE COURT:  Is this image discussed?

09:47:26  25          MR. COMBS:  It's in his review list.  It's not

09:47:29   1   discussed specifically.  As you know, Your Honor, our position

2   is that requiring a script of trial testimony for an expert is

3   not the proper interpretation of the disclosure requirements.

4   There's case law to the effect that a physician has -- or any

09:47:48   5   expert can talk about things that are reasonably within their

6   expertise and that you don't need a script of testimony.

7         I understand Your Honor takes a different position,

8   so I'm just making that record here.

9         But his report does talk about specific imaging and

09:48:02   10   he talked about specific events in Mrs. Jones' medical

11   history.

12         THE COURT:  Tell me where that is, please.

13         MR. COMBS:  Page 5.

14         And there are other opinions about tilt of the filter

09:48:32   15   or things that are -- obviously elsewhere in his opinion.

16         THE COURT:  Where on page 5?

17         MR. COMBS:  B.

18         THE COURT:  B?

19         MR. COMBS:  Yes.

09:48:53   20         THE COURT:  So Dr. Avino's placement of the filter?

21         MR. COMBS:  Yeah.  These are all --

22         THE COURT:  Is that what you are going to have him

23   describe now from this exhibit?

24         MR. COMBS:  Correct.

09:49:03   25         THE COURT:  And the exhibit that you're presenting to

09:49:08  1    him, is it one of the images reviewed?  And if so, which one?

          2            MR. COMBS:  This one wasn't actually on his imaging

          3    list because we didn't get it to him at the time of his

          4    report, but we did supplement it later and get it to him.

09:49:22  5            THE COURT:  Did you supplement the report later?

          6            MR. COMBS:  I don't believe we did, Your Honor.

          7            THE COURT:  Well, here's -- hold on, please.

          8            Here's the problem that I have.  It seems to me we're

          9    either going to adhere to Rule 26 or we're not.  Rule 26 says

09:49:35 10    that any exhibit the expert is going to use in trial has to be

         11    included with the expert report.  That's right in the text of

         12    Rule 26(a)(2)(B).

         13            I don't believe that the requirement is that an

         14    expert only speak a word or a sentence that's in the report.

09:49:54 15    But I believe the report has to describe the testimony.  In

         16    fact, that's what the committee note to Rule 26(a)(2)(B) says,

         17    it's intended to disclose what the expert will say on direct

         18    testimony.

         19            And it seems to me we either hold all experts to that

09:50:14 20    standard or we hold none.  I will tell you I've never had a

         21    case of trial in 15 years where I have relaxed that standard,

         22    because I think it's the only way fair way to proceed.

         23            So if you're going to put in front of this expert an

         24    exhibit for purposes of trial that was not in the report,

09:50:30 25    that's clearly not allowed by Rule 26(a)(2)(B).

09:50:35   1          But I'm going to hold all experts to the same

2    standard, including the defense experts, as I think I did in

3    the Booker trial.

4          Now, I say that so I can hear your response.

09:50:47   5          MR. COMBS:  No, I understand that, Your Honor.  And I

6    think there's, I think, five images we wanted him to show.  I

7    think that is the only one that's not in this reference list.

8    But I think -- that's my position on that.

9          THE COURT:  Nancy, did you find that yet?

09:51:12  10    So I just want to be real clear since this is going

11    to be on the record.  What I am referring to is the

12    requirement in Rule 26(a)(2)(B)(iii) that the report must

13    contain, quote, any exhibits that will be used to summarize or

14    support them, meaning the opinions that the expert is giving,

09:51:39  15    it has to be in the report.

16          So just so we're complete on the record, Docket 519,

17    which is Case Management Order Number 8 in this case, says

18    that the parties were required to provide, quote, full and

19    complete expert disclosures as required by Rule 26(a)(2)(A)

09:52:15  20    through (C).

21          And then, on page 3 of the report, I said -- this is

22    paragraph 6 on page 3:  As stated in the advisory committee

23    notes to Rule 26, expert reports under Rule 26(a)(2)(B) must

24    set forth, quote, the testimony the expert is expected to

09:52:33  25    present during direct examination together with the reasons

09:52:37   1   therefor, close quote.

2            I went on to say full and complete disclosures of

3   such testimony are required on the dates set forth above.

4            I did that to try to be as clear as I could that I

09:52:49   5   was going to apply Rule 26 literally.  So my conclusion is

6   that an expert cannot use an exhibit that was not disclosed in

7   the report.

8            But I'm not going to say you can only speak a

9   sentence if it appears in the report.  You can give that

09:53:05  10   testimony, but the testimony has to be disclosed in the

11   report, and the exhibits do too.

12            MR. COMBS:  And our argument wasn't that you were

13   saying that, Your Honor.  The argument is that if opinion is

14   disclosed in a report on a topic where he says he reviewed

09:53:21  15   imaging, an expert within his expertise should be allowed to

16   talk about that, especially given factual testimony and

17   like -- like where the filter went -- fragment went

18   afterwards.  That's not even opinion or disputed.  There's

19   certainly no issue with nondisclosure, any surprise to Bard

09:53:38  20   whatever, and our position, these are technical objections

21   that Bard is making, and so experts should be allowed to talk

22   about things within their expertise, especially if they're

23   factual matters and not even opinion.  Like reviewing records

24   and imaging.

09:53:56  25            MR. ROGERS:  Your Honor, regarding this particular

09:53:58  1    exhibit that plaintiff wants to use, Mr. Combs already said

2    this was not in his report.  He had not looked at this film at

3    the time of his report.  It was not mentioned in his report.

4    He does say that Dr. Avino implanted the filter and lists a

09:54:14  5    position.  But, you know, Your Honor, I assume that that was

6    just lifted from the medical record because that is exactly

7    what Dr. Avino says in his document, his implantation record.

8         And so it's clear that this witness had not seen this

9    image at the time of the report.  So I don't think,

09:54:32  10   Your Honor, it is fair for him to be able to talk about it now

11   at trial.

12        THE COURT:  All right.  I understand both parties'

13   positions.  I'm going to sustain the objection and stick with

14   what I tried to clearly state in Case Management Order

09:54:44  15   Number 8 on all experts, including defense experts --

16        MR. ROGERS:  Understand.

17        THE COURT:  -- that are going to be held to the same

18   standard.  So I'm going to sustain the objection to the use of

19   this exhibit.

09:54:52  20        MR. COMBS:  Your Honor, can we go ahead, we're here,

21   and talk about the next image I'm going to show, which is

22   something that's in his reliance list.  Can I ask him opinions

23   about that, or is that going to get another Bard objection?

24        THE COURT:  Well, tell me what it is and where it is.

09:55:05  25   And I don't want to keep the jury waiting too much longer.

09:55:09   1          MR. COMBS:  His reliance list.  It's going to be the

2     8/14/13 chest and rib X-ray on page 4.

3          THE COURT:  Okay.  What do you intend to do?  Where's

4     the testimony or opinion regarding that disclosed in his

09:55:32   5     report?

6          MR. COMBS:  I don't know if that is specifically

7     described in his report either, but it is on part of his

8     reliance list and, like I said, Your Honor, I think someone

9     within their expertise can talk about what that image shows,

09:56:05  10     opinion.

11          THE COURT:  I disagree with that.  I think it needs

12     to be in the report if the expert is going to give it.  So if

13     it's not described then -- in the report or the deposition.  I

14     think I also said in my case management order that if the

09:56:14  15     other side pulls stuff out of the expert at deposition, that

16     becomes fair game.  If it's not discussed in those, then I'm

17     going to sustain the objection.

18          MR. ROGERS:  And, Your Honor, in an effort to move

19     this along I would go ahead and say that it's my position that

09:56:31  20     the doctor does address the CT scan in his report.  So I would

21     have no disclosure objection to the CT scan.

22          As far as any other imaging, he has no specific

23     comment except for just listing out images that he's reviewed.

24     So that's what I'm planning on sticking to.  I'm just trying

09:56:47  25     to let Mr. Combs know.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:56:49  1        THE COURT:  What I'm going to look for is, is the

        2   exhibit mentioned in the report and testimony that will be

        3   given about it.

        4        MR. COMBS:  Thank you, Your Honor.

09:56:57  5        MR. ROGERS:  Thank you, Your Honor.

        6      (Bench conference concludes.)

        7        THE COURT:  Thanks, ladies and gentlemen.

        8        MR. COMBS:  Gay, you can take that one down for now.

        9   BY MR. COMBS:

09:57:16 10   Q   Dr. Hurst, we talked about the filter was implanted in

       11   2015 -- I mean, I'm sorry, 2010 --

       12   A   Yes.

       13   Q   -- correct?

       14        By Dr. Avino?

09:57:26 15   A   Yes.

       16   Q   Was it appropriate to implant a filter in Mrs. Jones at

       17   the time?

       18   A   Yes.

       19   Q   And in your review of this case, did you find anything

09:57:38 20   that Dr. Avino did wrong as far as implanting the filter?

       21   A   No.  When he implanted the filter it was appropriately

       22   positioned with the superior tip at the L2-L3 intervertebral

       23   body level, or disk level.  The filter was centered in the

       24   inferior vena cava and --

09:57:56 25        MR. ROGERS:  I apologize, again, Your Honor.  I don't

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:57:58   1   want to continue to interrupt, but the witness has continued

2   to talk about the image and we just discussed this issue.

3           THE COURT:  Let's ask the next question, please,

4   Mr. Combs.

09:58:08   5           MR. COMBS:  Thank you, Your Honor.

6   BY MR. COMBS:

7   Q   And then you talked about in 2015 the filter was

8   discovered to be fractured; correct?

9   A   Correct.

09:58:26  10   Q   Let's -- what happened to the filter fragment after it

11   broke off from the Eclipse filter?

12   A   So when a fragment embolizes or migrates away from the

13   filter, it -- when it fractures and becomes a free fragment,

14   it travels through the inferior vena cava with the flow of

09:58:51  15   blood back towards the heart, through the right atrium,

16   through the valve, through the right ventricle and into the

17   pulmonary artery, and then out to where it ended up, the right

18   pulmonary artery.

19           MR. COMBS:  And, Gay, if you could pull up 4570.

09:59:09  20   BY MR. COMBS:

21   Q   And, Doctor, what is 4570 on your screen there?

22   A   This is a coronal, so a front view, multiplanar

23   reconstruction of a CT examination, a CAT scan study.

24   Q   And what is the date on that, do you know?

09:59:35  25   A   4/22/15.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

09:59:39  1          MR. COMBS:  Your Honor, I ask to move 4570 into

2   evidence.

3          MR. ROGERS:  No objection, Your Honor.

4          THE COURT:  Admitted.

09:59:46  5      (Exhibit 4570 admitted.)

6          MR. COMBS:  And publish to the jury, Your Honor?

7          THE COURT:  You may.

8          MR. COMBS:  Thank you, Your Honor.

9   BY MR. COMBS:

09:59:54  10  Q   So, Dr. Hurst, if you could describe what the jury is

11  seeing on their screens here --

12  A   Sure.

13  Q   -- for us.

14  A   So this structure right here is the right atrium.

10:00:10  15  Normally that connects up to the right ventricle.  You don't

16  see it very well here, but this is the right ventricle.  There

17  will be a valve right here, and then because of the way this

18  image is done it's like a slice through the chest at a certain

19  level.  What you're act- -- you're actually missing the part

10:00:34  20  of the pulmonary artery which comes off this way and goes up

21  like that to the main pulmonary artery up here.

22          And then this is the right pulmonary artery, and that

23  goes to the right middle of the pulmonary artery where the

24  fragment is situated.

10:01:00  25  Q   And from the imaging you reviewed, specifically this CT

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:01:03  1   scan, and I understand there's different slices you can view?

2   A   Yes.

3   Q   How many slices or images from this CT have you reviewed

4   approximately?

10:01:12  5   A   Oh, there's 3- or 400, at least.

6   Q   From your review of this exhibit, 4570, what can you tell

7   the jury about the current -- or I guess current as of the

8   time of this CT scan, location and status of the fragment in

9   the pulmonary artery?

10:01:32  10   A   So the fragment is located in the right middle lobe

11   pulmonary artery.   It extends down into the peripheral portion

12   of the artery of the segmental branch.   The fragment itself, a

13   portion of it is along the wall of the artery, and then a

14   portion of it is free within the pulmonary artery.

10:01:59  15   Q   And what risk does that create for Mrs. Jones, that

16   fragment in her pulmonary artery?

17   A   There are a few risks.   The first risk is that this

18   pulmonary artery -- or that this fragment could migrate more

19   distal into a smaller pulmonary artery and cause occlusion of

10:02:20  20   the pulmonary artery segment.

21        Another risk would be that this fragment, which has

22   basically two sharp ends, could penetrate through the

23   pulmonary artery and cause hemorrhage into either the lung or

24   into the mediastinum or its structure surrounding the heart

10:02:42  25   into the chest, which could be catastrophic or

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:02:45  1   life-threatening.

2        The final complication that could occur would be that

3   this fragment could migrate distally and puncture the lung

4   itself, the airways of the lung, and result in what is called

10:03:03  5   a pneumothorax, which is when the lung actually collapses.

6   That also can be a catastrophic or very serious event.

7        The final, but most least likely, would be that the

8   fragment itself could serve as a nidus for infection.  So if

9   she was getting her teeth cleaned or having an IV placed or

10:03:26 10   anything that could introduce a small amount of bacteria into

11   her blood, this could serve as a sort of stopping ground for

12   that bacteria and result in an infection.

13   Q   And can you quantify with some kind of number on what kind

14   of risk Mrs. Jones faces from those conditions you just

10:03:44 15   described?

16   A   I don't think we really actually know what the risk is.

17   Because we really don't have a lot of experience with

18   fragments traveling to the pulmonary arteries, there are not a

19   whole lot of studies.  We don't really know exactly what is

10:04:03 20   going to happen with this fragment in her pulmonary artery.

21   Q   What do you think happened to Mrs. Doris Jones' Eclipse

22   filter?

23   A   What do I think happened to Doris Jones' Eclipse filter.

24   Well, in this family of devices we saw a cascade of failures

10:04:34 25   that begins with the caudal migration.  When the filter

DIRECT EXAMINATION – DARREN R. HURST, M.D.

migrates or settles in the inferior vena cava, the legs start
to splay out and become more horizontal.

So if we're looking at the device, the device would
tilt sideways in the inferior vena cava, and as it tilts
sideways these legs start to catch the other, the opposite
wall of the inferior vena cava, and there's new horizontal
pressure put on that leg, kind of like this.  Those legs
aren't used to having that kind of sideways or horizontal
pressure.  They're really only supposed to have pressure that
goes up and down like this.  But when it turns sideways or
even a little sideways, that pressure in the cava or that
movement in the cava starts to wrench at it, kind of like
this.

This particular device, the G2, Recovery –– this
family of devices, I'm sorry, is different than the permanent
filters in that it has the cone of arms that you guys saw,
where there's only one attachment point for this arm.  It's at
the top or the tip of the device.  Whereas the Simon Nitinol,
that is one continuous wire, so if it breaks it has two
attachment points.  Because it has only one attachment point,
if this breaks free, there is a higher risk that it can go
anywhere.

So I think in her particular case, one of these arms
got caught up on the sidewall of the inferior vena cava when
this tilted a small amount, and then fractured and traveled

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:06:28   1    through her inferior vena cava, through her right atrium,

2    through her right ventricle, and into her pulmonary artery.

3    Q    Change topics a little bit here.

4         Dr. Hurst, what is informed consent?  And

10:06:42   5    specifically when you're talking about implanting a permanent

6    medical device in a patient like an IVC filter?

7    A    So when we plant -- implant permanent devices in patients,

8    we're kind of serving as the informant for the patient.  We're

9    making a decision together based on the -- my knowledge of the

10:07:08  10    device and its behavior and its potential benefits and the

11    patient's disease process and the risks of that ongoing

12    disease process.

13         So we do a risk/benefit analysis, and it really

14    depends on the inherent or potential risks of that device.

10:07:29  15    You really need to know what's going to happen with that

16    device before you place it.

17    Q    So when you're assessing the risk/benefit analysis, so you

18    can provide informed consent to a patient, do you have

19    expectations of a medical device company like Bard?

10:07:48  20    A    Yes.

21    Q    What are those expectations?

22    A    We expect the device companies to provide us with

23    information that will instruct us on how to use the device

24    properly, instruct us on or warn us of potential complications

10:08:03  25    that occur both during the placement of the device and in the

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:08:07  1    follow-up of the device.  We expect to be instructed on how to

        2    follow up the device, especially if it's a permanent device.

        3    And we expect to kind of have an idea of what the incidence of

        4    and seriousness of these potential complications of any device

10:08:27  5    would be.

        6    Q   And you just talked about the expectations of a company as

        7    far as of information it would provide to you.

        8          What were your expectations yourself and similar

        9    interventional radiologies as far as the performance of the

10:08:44 10    Bard IVC filters, including the Eclipse?

       11    A   So we expect the device company up front to have done

       12    their due diligence, to have done the research on the device,

       13    to understand how the device will work in a patient.  And

       14    then, once the device is released, we expect communication

10:09:02 15    back and forth on any adverse events that they might be seeing

       16    or any risks that are unexpected that occur with the device.

       17    We expect them to have some sort of surveillance program such

       18    that they'll be able to alert us to issues that are happening

       19    with the device.

10:09:25 20    Q   And as far as the performance of the device, did

       21    Mrs. Jones' Eclipse filter meet those expectations?

       22    A   Mrs. Jones' filter did not.  Unfortunately, it failed.  It

       23    developed a fracture which embolized or migrated to her heart

       24    and then to her right pulmonary artery.

10:09:46 25    Q   Now, the Eclipse was -- could be a permanent device?

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:09:51  1    A    The Eclipse was marketed as both a retrievable and

2    permanent device, yes.

3    Q    Was there a specific expectation of interventional

4    radiologists at the time when Doris Jones' Eclipse filter was

10:10:06  5    implanted in August of 2010 as to how it would performance as

6    a permanent device?

7    A    Well, when we placed permanent filters in the past, like

8    the Simon Nitinol filter and the Greenfield filter, the

9    expectation is that those filters would remain stable in the

10:10:19 10    patient, not move, and provide protection for the patient's

11    lifetime.

12    Q    And if a new version of an IVC filter was put on the

13    market, what would physicians like yourself have reasonably

14    expected the manufacturer to have done before putting a new

10:10:44 15    device out on the market?

16    A    The same things that we would expect with the permanent

17    devices.  I mean, we would expect they would have done the

18    research to evaluate the behavior of the device.  And for a

19    device that was going to be permanent, you want them to

10:10:58 20    evaluate the stability of the device.

21    Q    You talked a little bit about risk/benefit analysis in the

22    context of informed consent.

23         What is your risk/benefit analysis of the Eclipse

24    filter that Mrs. Jones received?

10:11:18 25    A    Well, I think that the filter did not perform like it was

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:11:22  1   supposed to and provided very little benefit to her beyond the

2   initial time of the placement.

3         So as a permanent device, it did not function very

4   well.

10:11:38  5   Q   Did it pass or fail risk/benefit analysis?

6   A   As a permanent device, it failed.

7   Q   Was there another option for -- in 2010 that would have

8   performed better on a risk/benefit analysis?

9   A   The Simon Nitinol filter would have, yeah.

10:11:55  10  Q   Now, there would be an additional benefit from an Eclipse

11  filter in that it could be retrieved, whereas the

12  Simon Nitinol filter, I think you testified, would be

13  difficult to receive -- to retrieve, excuse me.

14        How does that additional benefit affect the

10:12:12  15  risk/benefit analysis you just talked about?

16  A   Well, I think it depends on how long you leave the filter

17  in.  Certainly, if you were going to leave this in a short

18  period time, which is now the current FDA recommendation, the

19  risk/benefit analysis changes.  But over time, as you leave

10:12:29  20  this device in, the incidence or the risk of a complication

21  such as a fracture, migration, penetration and such increases.

22  So that modest benefit of retrievability is outweighed by the

23  long-term risks of the device.

24  Q   You talked about some of the problems that this line of

10:12:56  25  filters has, in your opinion.  But don't all IVC filters have

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:13:04   1   complications?

2   A   So all IVC filters -- actually, any device has risks when

3   it's placed in a patient.  And all IVC filters have

4   demonstrated some complications.  The difference between the

10:13:20   5   permanent filters, which we had a 20-or-so-year history with,

6   and this family of devices is that each one of these devices,

7   and I have a Greenfield filter here and a Simon Nitinol

8   filter, but I have other filters, each one of these devices

9   had maybe one or two issues with it that we knew about that

10:13:42  10   could cause a complication.

11         For example, the Greenfield filter, which is a

12   conical filter, had issues with tilt.  The Simon Nitinol

13   filter had issues with penetration of the inferior vena cava.

14         This family of filters, though, had almost every

10:14:02  15   issue.  It wasn't that they had just one issue, you know,

16   tilt, one issue with penetration.  It had issues with

17   penetration, tilt, migration, and then it had a new issue of

18   these embolized fragments, which was extremely rare but for --

19   before this device.

10:14:25  20   Q   And what level of harm do these new more severe

21   complications create?

22   A   Well, so when we talk about complications and the severity

23   of complications and risks, if a device like the Greenfield

24   filter fractures, it may have very little effect on the

10:14:46  25   patient because that fracture fragment's not going to embolize

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:14:50  1    because it has two attachment points, it has very robust hooks

       2    that hook into the inferior vena cava and rarely release, and

       3    then it has a second attachment point at the cone of the

       4    filter.

10:15:02  5          So when a device like this fractures, the severity of

       6    the complication or the adverse event is very little or has

       7    very little effect on the patient.

       8          When we talk about a fracture and migration of an arm

       9    of a filter such as in the Eclipse, the severity of that

10:15:26 10    complication could be catastrophic.  You can have a puncturing

      11    of the right ventricle, you can have issues with the valves

      12    where the filter fragment gets caught in the valve and then

      13    requires open heart surgery.

      14          So the degree of seriousness of the risk is much

10:15:45 15    higher in this device than the complications that we saw with

      16    the other devices.

      17    Q   And for catastrophic risk like that, what would be an

      18    acceptable rate of risk generally, across all medical devices

      19    you work with?

10:16:04 20    A   Right.  So when you look at devices in the risk/benefit

      21    analysis, like I said, you can have a complication such as a

      22    fracture or tilt of the -- that's inconsequential.  You're

      23    willing to accept a higher rate of occurrence, maybe one out

      24    of 1,000 patients or one out of 10,000 patients.  But when you

10:16:26 25    get to a catastrophic or potentially catastrophic event, your

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:16:31   1    tolerance for risk goes way down to one out of a million.

2              Take, for example, a heart valve.  So if a heart

3    valve fails, the patient will likely die.  Or there'll be

4    extremely serious consequences -- extremely serious

10:16:49   5    consequences.  So, you know, your tolerance for that heart

6    valve failing is one out of a million; right?

7              For a device like a stent that we put in the

8    arteries, sometimes those stents will develop a small

9    fracture, but it is inconsequential.  It doesn't cause any

10:17:15  10    problem to the patient.  So we're willing to put up with a

11    stent fracture in, like, one out of a thousand patients

12    because it really has no clinical significance.

13              MR. COMBS:  Your Honor, may I use the Elmo here

14    briefly?

10:17:27  15              THE COURT:  Yes.

16    BY MR. COMBS:

17    Q   You talked about one in a million, Dr. Hurst.  Would that

18    be a rate of --

19              MR. ROGERS:  Your Honor, again, I apologize for

10:17:48  20    interrupting, but this information has never been disclosed in

21    any report or --

22              MR. COMBS:  Transcript 3, page 847, Your Honor.

23              THE COURT:  I don't see this on that page, Mr. Combs.

24    What you're putting on the Elmo.

10:18:45  25              MR. COMBS:  All I did was convert it to a percentage,

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:18:47  1    Your Honor.

2              THE COURT:  So you're referring to lines 14 through

3    16?

4              MR. COMBS:  Yes, Your Honor.

10:19:02  5              MR. ROGERS:  Your Honor, I apologize if I misheard.

6    I thought he said page 837.  Is that --

7              MR. COMBS:  847.

8              THE COURT:  847, lines 14 through 16.

9              MR. ROGERS:  847, and it's lines 14 through what?

10:19:25 10              MR. COMBS:  16.

11             THE COURT:  16.

12             MR. ROGERS:  I concede the testimony, Your Honor.

13             THE COURT:  Objection is overruled.

14             MR. COMBS:  May I publish this, Your Honor?

10:19:43 15             THE COURT:  Yeah.

16   BY MR. COMBS:

17   Q   So, Dr. Hurst, just so we're clear, one in a million would

18   be .001 percent; correct?

19   A   Yes, that is correct.

10:19:50 20   Q   That would be an acceptable risk for a catastrophic event

21   for any medical device?

22   A   Correct.

23             MR. COMBS:  I'm done with that.

24             If you could pull up, Gay, please, 4459.

10:20:11 25             I'm not sure if this is in evidence or not,

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:20:24  1   Your Honor.  I know there were a bunch moved in.  Or if we

2   need to --

3         THE COURT:  I don't believe it is in evidence.

4         MR. ROGERS:  It is not, Your Honor, but we have no

10:20:33  5   objection to admissibility.

6         MR. COMBS:  If I could, Your Honor, move 4459 into

7   evidence.

8         THE COURT:  Admitted.

9      (Exhibit 4459 admitted.)

10:20:42 10         MR. COMBS:  May I publish to the jury?

11         THE COURT:  Yes.

12   BY MR. COMBS:

13   Q   Dr. Hurst --

14         MR. COMBS:  Gay, if you could go to page 4 first.

10:20:51 15   BY MR. COMBS:

16   Q   And describe what Exhibit 4459 is for the jury, Dr. Hurst.

17   A   This is called the instructions for use document for the

18   Eclipse vena cava filter.  The instructions for use is a

19   document that goes into every package for every medical

10:21:18 20   device, and it provides, number one, general information on

21   how to use the device, the indications, diagrams on how to

22   place the device, and then it also provides precautions and

23   warnings and lists of potential complications that you should

24   look for.

10:21:39 25         And finally, it -- well, it can provide sometimes

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:21:43  1   some clinical information or research information and also

2   provide instructions for follow-up of a permanent device.

3          MR. COMBS:  Gay, if you could please go to, I think

4   it's the next page.

10:21:58  5          And -- I'm sorry, next page, please.

6          Yeah.  And the potential complications there.  I

7   believe it's subsection G, all the way down, Gay.

8          THE WITNESS:  G?  I have a much better copy here.

9   It's a little easier to see.

10:22:24 10          MR. COMBS:  Apologize to everybody.

11          THE WITNESS:  That's okay.  I can read mine.

12          MR. COMBS:  That's the best we have.

13   BY MR. COMBS:

14   Q   Dr. Hurst --

10:22:32 15          MR. ROGERS:  Your Honor, I'm interrupting to be

16   helpful.

17          THE COURT:  I'm sorry?

18          MR. ROGERS:  I'm interrupting to be helpful.  I

19   apologize.  But if you wanted to use the exhibit from our

10:22:41 20   exhibit list, I think it's much clearer.

21          THE COURT:  What is that exhibit?

22          MR. COMBS:  Certainly happy to.  I didn't think you

23   had a clearer one or I would have.

24          MR. ROGERS:  Your Honor, that would be Defense

10:23:00 25   Exhibit 8325.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:23:05    1              THE COURT:  Can you call that up, Mr. Combs?

2              MR. COMBS:  I'm sorry, Your Honor?

3              THE COURT:  Can you call that one up?

4              MR. COMBS:  Yeah.

10:23:11    5              Can you get that?  Thank you.

6              THE COURTROOM DEPUTY:  I have it over here.  Scott

7    pulled it up.

8              MR. COMBS:  Can we move into evidence?

9              THE COURT:  It's up with the defense computer.

10:23:24   10              MR. COMBS:  Oh.  You've got it.  Okay.  Thank you.

11              If we can go to the page we were just looking at with

12    potential complications.  I'm not sure what page it will be on

13    this exhibit.

14              THE COURT:  And this is 8325?

10:23:36   15              MR. COMBS:  Correct, Your Honor.

16              THE COURT:  And that's not in yet, is it, Traci?

17              THE COURTROOM DEPUTY:  No.

18              THE COURT:  So no objection to it being admitted?

19              MR. ROGERS:  No, Your Honor.

10:23:44   20              THE COURT:  Okay.  So we will admit 8325.

21              (Exhibit 8325 admitted.)

22              MR. COMBS:  May I publish, please, Your Honor?

23              THE COURT:  Yes.

24              MR. COMBS:  And if you could get the whole section,

10:23:53   25    please, in one.

DIRECT EXAMINATION — DARREN R. HURST, M.D.

10:23:55  1          All right.

2    BY MR. COMBS:

3    Q    And, Dr. Hurst, explain to the jury what this section is

4    briefly.

10:24:04  5    A    So this is a list of potential complications for the

6    Eclipse filter.

7    Q    And you've talked a lot about the problems the Eclipse

8    filter has caused Mrs. Jones and the risk of harm it's caused.

9          Are those consequences in that risk of harm, is that

10:24:22  10   adequately warned of in this IFU and specifically this

11   section?

12   A    So with this particular IFU, it presents a -- literally a

13   laundry list of complications.  This is basically a list of

14   every single complication that could possibly occur with an

10:24:42  15   inferior vena cava filter.  It sort of dilutes out any

16   potential usable warning.

17        This particular IFU does comment on filter fractures.

18   But the way it describes filter fractures I think grossly

19   understates the severity or potential severity of a

10:25:05  20   catastrophic event.  Basically what it says is filter

21   fractures are a known complication of vena cava filters.

22        Without giving a number, the physician is left to

23   assume the incidence of this particular complication is

24   similar to the prior known devices.  And that simply wasn't

10:25:27  25   true with this device.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:25:34    1   Q    And what would a interventional radiologist like yourself

            2   have reasonably expected Bard to put in its IFU for the

            3   Eclipse?

            4   A    Well, if there was a complication that they were seeing

10:25:49    5   more often than others that had potentially catastrophic

            6   consequences, most device manufacturers would highlight that

            7   and possibly give an incidence of that type of complication or

            8   perhaps have some research in there that demonstrates what the

            9   occurrence is of that particular complication, instead of

10:26:19   10   putting it in a long list of complications.

           11           MR. COMBS:  If you could now just zoom in on the

           12   first two bullet points.

           13           Thank you.

           14   BY MR. COMBS:

10:26:33   15   Q    Do you see the first bullet point does have a warning

           16   about migration; right?

           17   A    Yes, sir.

           18   Q    Is there anything in this warning about migrations causing

           19   fractures?

10:26:48   20   A    No.

           21   Q    Does it say anything about rates of migrations or other

           22   complications?

           23   A    No.

           24           And, in fact, just to clarify.  So when we discussed

10:27:02   25   migrations in the past with inferior vena cava filters,

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:27:08  1   predominantly the permanent devices, because that's what our
        2   experience was, migrations were actually described
        3   predominantly when the device was deployed.  So oftentimes
        4   when these devices were deployed they, because they have
10:27:23  5   radial strength and they're loaded, compacted into a tiny
        6   catheter, like a straw, sometimes when they would come out
        7   they would almost like fire out, and that was called
        8   migration.

        9        The other migrations that we would see were late
10:27:41 10   migrations, and they were very, very rare because -- usually
       11   because the inferior vena cava was larger than the diameter of
       12   the filter, or at least at a borderline size, and then the
       13   filter legs could not engage the inferior vena cava.  And that
       14   oftentimes happened right during deployment as well.

10:28:02 15        The migration that we see with this device is a
       16   delayed migration.  It doesn't happen when you deliver the
       17   device.  The device can look perfect on delivery.  And then
       18   years, months, whenever, later, the device has changed
       19   position.  And in this particular device, it was caudal
10:28:21 20   migration that was the issue.
       21   Q   And you see the second bullet point there discusses filter
       22   fractures.
       23        Do you see that?
       24   A   Yes.
10:28:33 25   Q   And I expect that Mr. Rogers, in a minute when I sit down,

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:28:36   1   is going to talk about this, but it says, "Filter fractures

2   are a known complication of vena cava filters.  There have

3   been some reports of serious pulmonary and cardiac

4   complication with vena cava filters requiring their retrieval

10:28:48   5   of the fragment utilizing endovascular and/or surgical

6   techniques."

7           And my question, Dr. Hurst, is:  Well, why doesn't

8   that adequately warn people like Doris Jones and her

9   physicians of what happened to her and the risk she faced with

10:29:03   10   the Eclipse filter?

11   A   Because filter fractures were known complication of vena

12   cava filters.  In the permanent filters, like I said, when

13   they fractured, though, there was –– it is extremely rare to

14   have any clinical consequence.

10:29:18   15           So to say that it is a known complication is saying

16   that it's the same kind of thing that happened with the

17   permanent filters.  But it's not.  And to say there's been

18   some reports of serious pulmonary and cardiac complication

19   grossly understates the potential risk here of a patient dying

10:29:35   20   from this device.

21           And finally, you know, the way that this is worded

22   saying "requiring the retrieval of the fragment using

23   endovascular surgical techniques," that makes it sound like

24   this is really easy to do, to go get one of these fragments,

10:29:54   25   when it's not.  And it makes it sound like it always happens,

10:29:58   1   like you're always able to retrieve it, it's never a problem.

2   So, you know, I think this just grossly understates

3   the severity of the issue here.

4   THE COURT:  Mr. Combs, we're at 10:30.

10:30:11   5   So we're going to break for 15 minutes, ladies and

6   gentlemen.  We'll excuse you at this time.

7   (The jury exited the courtroom at 10:30.)

8   THE COURT:  All right.  See you in 15 minutes.

9   (Recess taken from 10:30 to 10:42.  Proceedings resumed

10   in open court with the jury present.)

11   THE COURT:  Thank you.  Please be seated.

12   Counsel, let me tell you where I am now on the issue

13   that was raised by you this morning, Ms. Helm.

14   The -- I haven't read the two cases; my law clerk

10:43:39   15   has.  They were both cited in our motion in limine ruling, so

16   we've seen them before.  And I was reacquainted by my law

17   clerk with them, having read them before.

18   We're going to confirm this in the transcript, but

19   plaintiff has withdrawn, I believe, any damages based on life

10:43:59   20   expectancy, shortness of breath, weakness, which addressed

21   smoking and anemia; is that correct?

22   MR. COMBS:  That's correct, Your Honor.  Yes.

23   THE COURT:  What I want to do, not while we're

24   keeping the jury waiting, is tie down exactly the categories

10:44:17   25   of damages plaintiff is seeking.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:44:18  1    There is something I haven't done yet, which is go

2    back and reread the opening and the pain and suffering and the

3    worry references, which I will do.

4    But at this point I'm not persuaded that the

10:44:33  5    plaintiff has opened the door to Ms. Jones' other medical

6    conditions, so for purposes of cross-examination that

7    shouldn't be addressed.

8    I do want to look more closely at the transcript.  I

9    will hear further arguments from the parties.

10:44:46 10    If I decide at some point the door's open, Ms. Jones

11    will certainly be available to recall during the defense case.

12    But at this point I'm not persuaded the door is opened, having

13    been reminded what those cases say and having thought about it

14    while I was up here.

10:45:04 15    So going forward this morning, we shouldn't be going

16    into those areas.  We'll come back to that subject.

17    Okay, let's bring the jury in.

18    (The jury entered the courtroom at 10:45.)

19    THE COURT:  Please be seated.

10:46:48 20    You may continue, Mr. Combs.

21    MR. COMBS:  Thank you, Your Honor.

22  BY MR. COMBS:

23  Q   Dr. Hurst, to wrap up on the IFU, or instructions for use,

24    for the Eclipse filter, if Bard had information that its

10:47:01 25  Eclipse filter had increased rates of failure compared to

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:47:05  1   other filters, including its own Simon Nitinol filter, is that

2   something that you and the medical community would expect to

3   see in the IFU?

4   A   Yes.

10:47:14  5   Q   Is that information in the IFU?

6   A   No.

7   Q   And I apologize, I'm probably going to jump around a

8   little bit here to finish up.

9            According to Dr. Avino's records, where was the

10:47:30  10  filter placed?

11  A   At the -- the tip of the filter was positioned at the

12  L1-L2 disk level.

13  Q   And then exactly what failure modes did it subsequently

14  have?

10:47:47  15  A   So the filter went on to tilt in the inferior vena cava

16  and then it fractured.  I'm sorry.  The filter first caudally

17  migrated, which means it settled, and then it tilted and then

18  it fractured.  And the fracture fragment embolized to the

19  right pulmonary artery.

10:48:07  20  Q   So Mrs. Jones' filter suffered migration, tilt, and

21  fracture?

22  A   Yes, sir.

23  Q   Dr. Hurst, is reviewing medical literature part of your

24  practice?

10:48:25  25  A   Yes.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:48:25   1   Q   Why is that important for a physician like yourself?

2   A   Well, we review medical literature because that's the way

3   we get the information on new procedures, old procedures,

4   devices.  It's just basically part of our practice.

10:48:41   5   Q   And what medical literature did you review for this case?

6   A   I reviewed over 100 articles that were -- that I found on

7   Medline and in our own journals in regards to all types of IVC

8   filters, including the Bard filters.

9   Q   Are there a lot of articles about IVC filters?

10:49:02   10   A   Prior to 2002 there were probably only 70 articles in the

11   literature.  After 2002 there were over 2- or 300.

12   Q   Did some of the medical literature you review focus

13   specifically on Bard Is IVC filters?

14   A   Yes.

10:49:22   15   Q   Did those -- did you review those articles?

16   A   Yes, I did review those articles.

17   Q   And did those articles support the opinions you've given

18   today?

19   A   Yes, they do.

10:49:35   20   Q   Okay.

21        MR. COMBS:  Gay, if you could please pull up

22   Exhibit 932.

23   BY MR. COMBS:

24   Q   And what is Exhibit 932, Dr. Hurst?

10:49:48   25   A   This looks like a Bard corporate document.

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:49:53  1    Q   Is this a document that you reviewed and relied on in

2    creating your report, formulating your opinions in this case?

3    A   Yes, I did review this document.

4            MR. COMBS:  Your Honor, I'm not entirely sure if this

10:50:05  5    is in evidence or not, but I'll move into evidence if it's

6    not.

7            MR. ROGERS:  No objection.

8            THE COURT:  Admitted.

9        (Exhibit 932 admitted.)

10:50:14  10           MR. COMBS:  May I publish to the jury?

11           THE COURT:  Yes.

12           MR. COMBS:  If you could please, Gay, go to page 6.

13   BY MR. COMBS:

14   Q   And, Dr. Hurst, is this a type of document that physicians

10:50:28  15   would ever see?

16   A   No.

17   Q   And do you see there on the right column, the bullet

18   points under "Weaknesses"?

19   A   Yes, I do.

10:50:42  20   Q   And do you see the second bullet point down there?

21   A   Yes.

22   Q   What does that say?  If you could please read it to the

23   jury.

24   A   Yes.  "Lack of thorough understanding of the dynamics of

10:50:52  25   caval anatomy."

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:51:00  1   Q   Would it be a reasonable expectation of interventional

2   radiologists like yourself that a medical device company would

3   have a thorough understanding of the anatomy of the area where

4   a medical device would be permanently implanted?

10:51:14  5   A   This would be part of the due diligence that we discussed

6   before.

7   Q   And why is understanding the dynamics of the caval anatomy

8   particularly important to the manufacturer of an IVC filter?

9   A   Because the IVC -- I'm sorry.  The inferior vena cava is

10:51:29 10   what we call a hostile vascular environment.  It's under

11   constant stress.  It can change rapidly in diameter related to

12   the patient's blood volume.  It can collapse almost

13   completely.  It can expand quite a bit.  It can also stretch,

14   move sideways, with every movement of the body.

10:51:53 15   Q   If a medical device manufacturer lacked an understanding

16   of the anatomy of the area where a medical device is going to

17   be implanted, what would you expect -- reasonably expect it to

18   do before it placed that on the market?

19   A   I would expect it to have a testing method that would

10:52:11 20   allow it to understand the anatomy, understand the dynamics of

21   that IVC.

22   Q   Let me put it a different way.  You would reasonably

23   expect that a medical device manufacturer would understand the

24   dynamics of the anatomy before they would put a medical device

10:52:33 25   out on the market for placement in that anatomy?

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:52:37   1   A    Yes.

2                MR. COMBS:  Gay, move on to 991.

3                And just the top.

4                I'm sorry, Your Honor.  I believe this is in evidence

10:52:51   5   also.

6                THE COURT:  Yes.

7                MR. COMBS:  Can I publish to the jury?

8                THE COURT:  You may.

9    BY MR. COMBS:

10:53:00  10   Q    Dr. Hurst, is this a document that you reviewed and relied

11   on for your report?

12   A    Yes.

13   Q    And this -- this appears to be an e-mail from a David

14   Ciavarella to several people dated 12/27/05.

10:53:22  15             I'll represent to you that David Ciavarella was the

16   medical director for Bard at the time.

17             MR. COMBS:  I want to focus on the last four

18   paragraphs, if you could zoom in on those, Gay.

19   BY MR. COMBS:

10:53:33  20   Q    And do you see there kind of in the middle of the page, it

21   starts with "I would like to look more generally at the G2

22   complaints.  I have seen problems with caudal migration,

23   tilting, perforation, misdeployment, and maybe one or two

24   additional things."

10:53:51  25             Do you see that?

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:53:52  1    A    Yes.

2    Q    If internally Bard was aware of problems with the G2 in

3    2005, would interventional radiologists like yourself have

4    expected -- reasonably expected Bard to share that

10:54:05  5    information?

6    A    If they had information that would be helpful to us, yes.

7    Q    And let's go down to the paragraph there that starts with

8    the G2.

9         It reads:  "The G2 is a permanent filter.  We also

10:54:23  10   have one, the SNF, that has virtually no complaints associated

11   with it.  Why shouldn't doctors be using that one rather than

12   the G2?"

13        Do you see that, Doctor?

14   A    Yes, I do.

10:54:35  15   Q    If Bard believed the SNF was a safer permanent filter than

16   the G2 filter, is that information that would have been

17   important to you as an interventional radiologist implanting

18   the G2 line of filters in your patients?

19   A    Yes.

10:55:01  20        MR. COMBS:  Let's go to the next one, Gay.  It's

21   going to be 2248.

22   BY MR. COMBS:

23   Q    Before I get into this one specifically, you reviewed a

24   lot of Bard documents in this case; right?

10:55:22  25   A    Yes.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:55:23  1   Q    And Bard deposed you in this case; right?

        2   A    Yes.

        3   Q    Has Bard ever shown you any documents that have put any of

        4   these documents you've reviewed in context, in a different

10:55:36  5   context, or challenged you to change or question your

        6   opinions?

        7   A    No.

        8        MR. COMBS:  Let's go to page 20, Gay, please.

        9        And I believe this is in evidence also, Your Honor.

10:55:52 10        THE COURT:  It is.

       11        MR. COMBS:  May I publish to the jury?

       12        THE COURT:  Yes.

       13   BY MR. COMBS:

       14   Q    And, Doctor, this is another document that you reviewed

10:56:04 15   and relied on in formulating your reports; correct?

       16   A    Yes.

       17   Q    And do you see there where it describes where it's been

       18   highlighted that Bard internal analysis determined that the G2

       19   filter had an unacceptable risk of caudal migration?

10:56:22 20   A    Yes.

       21   Q    If Bard determined internally that its G2 line of filters

       22   posed an unacceptable risk of caudal migration, was that

       23   information that you and other interventional radiologists

       24   would have reasonably been expected to have been told?

10:56:37 25   A    Yes.

DIRECT EXAMINATION – DARREN R. HURST, M.D.

10:56:38  1    Q    Was that ever told to you?

       2    A    No.

       3    Q    Was it in the IFU?

       4    A    No.

10:56:46  5    Q    Do you test medical devices?

       6    A    No.

       7    Q    Do you design medical devices?

       8    A    No.

       9    Q    And how do doctors like yourself, how do they learn about

10:56:56 10    medical devices?

      11    A    There's several different ways to learn.  We get

      12    information from the device manufacturer.  There are

      13    training -- sometimes training programs supplied by the device

      14    manufacturer, sometimes the training programs are performed by

10:57:14 15    our own society.  And following release of the device, or even

      16    before release of the device, usually there are studies that

      17    are done that are published in our major journals so that we

      18    can learn about the device.

      19    Q    You're a busy physician; right?

10:57:31 20    A    Yes.

      21    Q    And you have to rely on medical device companies to tell

      22    you things about their devices.

      23    A    It's a back and forth.  Yes.

      24    Q    If a -- if there's important information about a medical

10:57:47 25    device and a manufacturer doesn't tell anyone, how does the

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:57:51   1   medical community ever learn about that issue with the device?

2   A    Well, usually what happens is there will be a series of

3   case reports where physicians who have experienced some sort

4   of adverse event have published a report in a journal.  Then

10:58:08   5   sometimes that will snowball into discussions at local or

6   national meetings.  And then there will be usually some sort

7   of incentive to do a trial of some sort to further evaluate

8   the device if it's having issues.

9           MR. COMBS:  Sorry, I had one more question about

10:58:35  10   2248, if I could publish it again.

11           May I publish?

12           Thank you.

13   BY MR. COMBS:

14   Q    This document and other Bard documents dealt with the G2

10:58:58  15   filter; right?

16   A    Correct.

17   Q    And were there any design changes between the G2 and

18   Eclipse filters to improve caudal migration?

19   A    No.

10:59:13  20   Q    What was the model of Bard IVC retrievable filter after

21   Eclipse?

22   A    The Meridian.

23   Q    And what were the -- what's the difference between the

24   Eclipse and the Meridian?

10:59:26  25   A    So the Meridian put what are called caudal anchors on the

DIRECT EXAMINATION - DARREN R. HURST, M.D.

10:59:31   1   arms of the filter, and these were little feet that were kind

2   of turned upside down on the arms so that when the arms

3   interacted with the wall of the inferior vena cava it sort of

4   held it in place and kept it from migrating towards the feet.

10:59:48   5         MR. COMBS:  And, Gay, if we could pull up now

6   Exhibit 2238, please.

7         I'm not 100 percent sure, Your Honor, but I believe

8   it's been moved into evidence.

9         MR. ROGERS:  Your Honor, I'm standing up to object

11:00:11  10   because I don't believe this document has ever been discussed

11   in any of Dr. Hurst's reports or prior testimony.

12         THE COURT:  It's not in?

13         THE COURTROOM DEPUTY:  It's not in.

14         MR. COMBS:  My response, Your Honor, is I'm positive

11:00:42  15   it's on his reliance list and he's disclosed extensive

16   opinions about the Meridian versus the Eclipse.

17         THE COURT:  Can you show me where it is on the

18   reliance list?

19         MR. COMBS:  Let me find it.

11:01:00  20         It's number 20, which is page 14.  And I can give

21   you --

22         THE COURT:  That is 2238?

23         MR. COMBS:  Yes.

24         THE COURT:  And where is it in the opinion?

11:01:19  25         MR. COMBS:  Page 9 at the bottom it starts, and then

DIRECT EXAMINATION – DARREN R. HURST, M.D.

11:01:21  1   much of the paragraph that goes most of page 10 discusses the

2   Meridian as well.

3         THE COURT:  Is there any discussion in the report of

4   Exhibit 2238?

11:01:51  5         MR. COMBS:  I don't believe specifically, Your Honor,

6   no.

7         THE COURT:  Objection is sustained.

8         MR. COMBS:  Thank you, Your Honor.

9   BY MR. COMBS:

11:02:01 10   Q   If Bard believes, Dr. Hurst, that its IVC filters needed

11   improvements to improve safety, is that information doctors

12   like you would have reasonably expected to know?

13   A   Yes.

14   Q   Does the warning on migrations in the IFU that we reviewed

11:02:33 15   say anything about Bard having unacceptable risk of caudal

16   migration?

17   A   No.

18   Q   Does the warning on filter fractures say anything about

19   migrations causing fracture?

11:02:50 20   A   No.

21   Q   The opinions you told the jury today -- told the jury

22   about today to a reasonable degree of medical probability?

23   A   Yes.

24         MR. COMBS:  Nothing further at this time, Your Honor.

11:03:25 25         THE COURT:  All right.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:03:25  1          Cross-examination?

2          MR. ROGERS:  Yes, Your Honor.

3              C R O S S - E X A M I N A T I O N

4     BY MR. ROGERS:

11:03:47  5     Q    Good morning, Dr. Hurst.

6     A    Good morning.

7     Q    I don't believe you and I have had a chance to meet.

8     A    We have not.

9     Q    Doctor, I want to first ask you some questions about your

11:03:55 10    experience as an expert witness.

11    A    Sure.

12    Q    Am I correct that you first started doing expert witness

13    work in 2014?

14    A    Yes.

11:04:04 15    Q    And, Doctor, am I correct that the majority of the cases

16    in which you have been retained as an expert have been in

17    medical malpractice cases?

18    A    Yes.

19    Q    Am I correct that since 2014 you have been retained as an

11:04:20 20    expert in at least 20 medical malpractice cases?

21    A    Yes.

22    Q    And, Doctor, am I correct that of those 20 or so medical

23    malpractice cases where you have been retained as an expert,

24    that you have been retained as an expert by an attorney

11:04:34 25    representing the plaintiff in all but two of those cases?

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:04:38  1   A    Yes.

2   Q    And, Doctor, am I correct that you have formed a business

3   for your expert witness work?

4   A    Correct.

11:04:47  5   Q    And what is the name of that business?

6   A    Tristate Medical Legal Consulting.

7   Q    Is the Tristate because you're licensed in Indiana,

8   Kentucky, and Ohio?

9   A    Yeah.

11:04:58  10   Q    Am I correct, though, Doctor, that the only state in which

11   you actually perform procedures is in Kentucky?

12   A    That's because our hospitals are in Kentucky, yes.  But I

13   read images from all three states.

14   Q    I see.  But the procedures you perform are just in

11:05:13  15   Kentucky?

16   A    Currently yes.  We'll have a hospital in Indiana where

17   we'll be doing procedures in about six months.

18   Q    Doctor, do you have a LinkedIn page?

19   A    Yes.

11:05:22  20   Q    And is the Tristate Medical Legal Consulting business you

21   have featured on your LinkedIn page?

22   A    I wouldn't say it's featured.  It's on there.  It's

23   listed --

24   Q    It does --

11:05:35  25   A    Yeah, it does appear.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:05:36  1    Q    Thank you, Doctor.

2              And, Doctor, do you list yourself on certain websites

3         that are referral services for expert witnesses for lawyers

4         who are looking for experts?

11:05:46  5    A    That one website, S-E-A-K, yes.  Seak.

6         Q    S-E-A-K.  That's the Seak website?

7         A    (Nods head.)

8         Q    And, Doctor, have you ever looked at a website called the

9         LexVisio website?

11:05:58 10    A    No.

11        Q    And would you be surprised to know you appear on that

12        website as a potential expert?

13        A    Sure.  Yeah.

14        Q    And you didn't do anything to put yourself on that

11:06:07 15    website?

16        A    No, I did not.

17        Q    And the Seak website that you were talking about, am I

18        correct that you pay an annual fee to have a listing on that

19        website?

11:06:14 20    A    I do.

21        Q    And what is that fee, Doctor?

22        A    It's 600 bucks.

23        Q    And does that cover all of your listings that you have on

24        there?

11:06:23 25    A    Yes.  Yeah.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:06:25  1  Q   And, Doctor, the Seak company that has this website, does

2  it also offer classes for individuals who want to be expert

3  witnesses or for expert witnesses who want to become a better

4  expert?

11:06:41  5  A   Yes.

6  Q   And have you ever taken advantage of any of those classes?

7  A   I have not.

8  Q   Does the Seak company also offer books and DVDs so that

9  people can purchase those in order to learn how to be a better

11:06:54  10  expert?

11  A   Yes.

12  Q   Have you ever purchased any of those?

13  A   Yes.

14  Q   Do you recall the name of anything you purchased?

11:07:01  15  A   I think it was how to start an expert witness business.

16  I'm not sure what the title was.

17  Q   Was it a book or video?

18  A   It's a book.

19  Q   Is that the only thing you've ever purchased?

11:07:15  20  A   Yes.

21  Q   And, Doctor, the listing that appears on the Seak website,

22  is that something that you wrote yourself?

23  A   Yes.

24  Q   And did you want to put everything that you felt like was

11:07:25  25  important for lawyers who were looking for experts in that

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:07:29  1    listing?

2    A    Yeah.

3    Q    And, Doctor, am I correct that one of the areas of

4    expertise that you list in the Seak website is expertise in

11:07:39  5    IVC filter product liability cases?

6    A    Yes.

7    Q    And you wrote that?

8    A    Yes.

9    Q    You felt like it was important for the community of

11:07:48  10   lawyers who may be looking for an expert witness to know that

11   is an area of your expertise?

12   A    Sure.

13   Q    Doctor, the case we're here for today is a IVC product

14   liability case; correct?

11:07:58  15   A    Yes.

16   Q    Doctor, let me shift gears and talk to you a little bit

17   about your experience with IVC filters.

18        Am I correct that only about 5 percent of your time

19   is spent with either implanting or retrieving IVC filters?

11:08:16  20   A    5 percent of my time.  I'd say it is probably more like

21   10 percent.

22   Q    Okay.  So if you testified previously that the percentage

23   of your practice of placement and retrieval of IVC filters is

24   only 5 percent, you wouldn't disagree with that, would you?

11:08:34  25   A    Well, I did testify to that, but the number of retrievals

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:08:37   1   has gone up.

2   Q    And, Doctor, you've never published anything in the

3   peer-reviewed medical literature about IVC filters, have you?

4   A    I have not.  I'm a private practice physician, so I don't

11:08:46   5   do that type of research.

6   Q    And I take it you've never published any book chapters

7   about IVC filters?

8   A    I do not.  Have not.

9   Q    And, Doctor, are you a member of an organization called

11:08:56   10   the Society of Interventional Radiologists?

11   A    Yes, I am.

12   Q    And is that the national society for people who are in

13   your profession?

14   A    Yes.

11:09:05   15   Q    And do you ever attend meetings of the Society of

16   Interventional Radiologists?

17   A    I do.

18   Q    Does it have an annual meeting?

19   A    Yes.

11:09:12   20   Q    And have you ever given any presentations at that meeting

21   to other interventional radiologists about IVC filters?

22   A    I have not.

23   Q    And, Doctor, within the Society of Interventional

24   Radiologists, is there something you can become called a

11:09:25   25   fellow?

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:09:27  1    A    Yes.

2    Q    And can you tell the jury, please, what that is.

3    A    So to get -- to become a fellow of the Society of

4    Interventional Radiology you need to publish, usually it's an

11:09:38  5    academic -- you have to be in an academic institution.  You

6    need to have, I think, two supporting references.  I think

7    that's it.

8    Q    And so as I understand it, you say it's limited to just

9    people who are in academic institutions?

11:09:58 10    A    It's not limited to that, but predominantly it is people

11    who are in academics.

12    Q    Am I right that only about 5 percent of those members of

13    that society have been deemed fellows?

14    A    Yeah, they have applied for it.  Yes.

11:10:10 15    Q    Doctor, have you ever been through that vetting process to

16    become a fellow?

17    A    I never felt like it was necessary.

18    Q    Doctor, let me switch gears again and ask you a little bit

19    about your experience with Bard IVC filters.

11:10:23 20          I think you got asked a question during the direct

21    examination about your current use of filters.  And am I right

22    you currently do place a Bard IVC filter called the Denali

23    filter?

24    A    Yes, we do.

11:10:40 25    Q    Doctor, as I understand it, before you got involved in

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:10:42   1    this litigation you routinely used Bard filters.  Is that

2    true?

3    A    Yes.

4    Q    Once you were retained as an expert, am I also correct

11:10:49   5    that based on some of the documents that you reviewed, that

6    you decided that you would stop using Bard filters?

7    A    Except for the Denali, yes.

8    Q    Okay.  So you never completely quit using Bard filters

9    altogether?

11:11:01  10    A    No.  And part of that has to do with the product that we

11    have at certain hospitals.

12    Q    Okay.  And, so, Doctor, am I correct that some of your

13    concern that you had about the use of IVC filters that were

14    manufactured by Bard was because of what you had seen in some

11:11:15  15    of the documents that you -- about -- that had been produced

16    by Bard; correct?

17    A    Yes.

18    Q    And am I right, Doctor, that when you made this decision

19    about whether you would continue to use Bard filters, that you

11:11:30  20    had only seen about 20 documents that had been produced by

21    Bard?

22    A    Well, I don't think it really had to do as much with the

23    documents by Bard.  It had to do with what was happening in

24    our society and in the medical literature and some of the

11:11:45  25    issues that my colleagues would have with devices.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:11:49  1      We had a fracture migration, we had a full filter

2  migration, we had penetrations, things that -- patients where

3  we had to retrieve devices and pieces of devices.  So it was

4  our personal experience as a group.

11:12:03  5      We have seven interventional radiologists.  We have a

6  very busy practice, very busy hospital, and also we're

7  connected to the other practices in town and in our region,

8  and we discuss things like that.  So when it came to the Bard

9  filters, especially the G2, Recovery era of filters, well, the

11:12:25 10  Recovery was actually taken off the market before any of this

11  occurred in my life, but -- and the G2 was probably gone at

12  that point too.  So the only device we stopped using, really,

13  was the Meridian.  And we moved to the Denali because the

14  Meridian was actually discontinued as well, so we were left

11:12:45 15  with the Denali filter.  And we changed our practice.  We no

16  longer leave those filters in permanently.  Every patient is

17  followed and their filter is either removed at three months or

18  we -- if they need a permanent filter, we remove their filter

19  and put in a permanent filter, usually a VenaTech filter.

11:13:07 20  Q   Are you finished, Doctor?

21  A   Yes.  I'm sorry.  I just wanted to qualify that statement.

22  That's why we use the filter right now --

23  Q   I did understand.  But we're clear that you do currently

24  implant a Bard filter called the Denali filter?

11:13:19 25  A   We do, yes.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:13:20  1    Q   And that is a conical filter as you described

2    previously --

3    A   Yes.

4              THE COURT:  Excuse me.

11:13:24  5              Counsel and Doctor, we're talking over each other.

6    It's very hard for her to take down, so let's kind of pause,

7    please, between questions and answers.

8              MR. ROGERS:  Absolutely, Your Honor.

9              THE WITNESS:  We use it as a retrievable-only filter,

11:13:37  10   yes.

11   BY MR. ROGERS:

12   Q   Doctor, to get back to the documents you reviewed, am I

13   correct when you formed your opinions in this case that you

14   had looked at only about 20 Bard documents?

11:13:51  15   A   I'd actually looked at probably more than that, but those

16   are the 20 that are included in there.  I've reviewed a case,

17   separate case, where we reviewed even more Bard documents than

18   that.

19   Q   And when you wrote your opinions in this case and put down

11:14:04  20   all the things you relied on for this case, you only listed

21   about 20 documents; right?

22   A   Yes.

23   Q   And, Doctor, am I correct that after you wrote your

24   opinions in this case that you were provided with an

11:14:17  25   electronic drop box that contained many more Bard documents;

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:14:21   1    is that right?

2    A    That is correct, yes.

3    Q    But you've never gone and looked through anything in that

4    electronic drop box, have you?

11:14:28   5    A    Oh, I certainly have, yes.

6    Q    You have?

7    A    Absolutely.

8    Q    And, Doctor, have you testified previously that you had

9    not looked through that drop box?

11:14:35  10    A    I may have at that point, but certainly -- there's over a

11    million documents in this case, so there are times when I've

12    gone back to that drop box to look for something to answer a

13    question.

14    Q    And when was this review of the materials that was in the

11:14:51  15    drop box?

16    A    I can't say.  I'm sure it was within the last couple of

17    months.

18    Q    Okay.  So it was immediately before this trial; is that

19    correct?

11:15:00  20    A    No.  Actually, it was probably before the Booker trial.  A

21    separate trial.

22        MR. ROGERS:  And, Your Honor -- well, let me

23    continue.

24    BY MR. ROGERS:

11:15:09  25    Q    So just so we understand, so for your opinions in this

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:15:15  1    case, you only looked at about 20 documents; right?

       2    A    20 Bard internal corporate documents?  Probably, yes.

       3    Q    Even though you looked at those 20 documents, you

       4    continued to implant the Bard Denali filter.  True?

11:15:30  5    A    Those documents aren't in regard to the Bard Denali

       6    filter, but yes.

       7    Q    But those documents are about Bard; right?

       8    A    Sure.  Yeah.

       9    Q    And, Doctor, you have implanted Denali filters in calendar

11:15:42 10    year 2018.  True?

      11    A    Yeah, Um-hmm.

      12    Q    Can you tell us when the last time you implanted a Bard

      13    Denali filter was?

      14    A    Probably about four weeks ago, I would say.

11:15:53 15    Q    And do all the facilities where you practice stock Bard

      16    Denali filters?

      17    A    They currently do, yes.

      18    Q    And I believe you testified earlier that you were on

      19    something called a product committee; is that correct?

11:16:05 20    A    Yes.

      21    Q    And so has that Bard filter made it through the product

      22    committee so it's in use at your hospitals?

      23    A    Yeah.  Actually, we evaluated that device in comparison to

      24    the other retrievable filters that are available.  And even

11:16:19 25    though it has weaknesses, as we discussed, the weaknesses that

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:16:25  1    the prior devices had have been somewhat mitigated by the

2    changes that they made over time through the family of

3    filters.

4          So when they started with these filters, they had

11:16:35  5    lots of issues.  And during each iteration of the filter, they

6    addressed the issues one by one by one by one.

7          They're still not perfect and we still have issues

8    with the retrievable filters, but now that we take them out

9    and we don't use them as a permanent filter, we have much less

11:16:55 10    problems because those issues tend to occur over time and the

11    risk tends to increase over time.

12    Q    And, Doctor, am I correct that there is no such thing as a

13    perfect filter?

14    A    There is no such thing as a perfect filter.

11:17:09 15    Q    And just to finish this line of questioning about

16    documents, am I correct that you have never seen any internal

17    documents from any other filter manufacturer besides Bard?

18    A    I have not.

19    Q    So you don't have any idea what's in any internal

11:17:21 20    documents of any other company that manufactures IVC filters.

21    True?

22    A    True.

23    Q    And, Doctor, you also currently use a filter called the

24    Gunther Tulip; is that right?

11:17:31 25    A    Yes.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:17:32  1    Q    And you use a filter called the VenaTech filter?

2    A    Correct.

3    Q    And you've never seen any documents that those companies

4    that make those two filters have produced that are their

11:17:41  5    internal documents; is that right?

6    A    No, we do not receive internal documents.

7    Q    All right.  Let me pick up about no filter being perfect.

8    And, Doctor, would you agree that all IVC filters have risks?

9    A    Yes.  I've already said that.

11:17:54 10    Q    And would you agree all IVC filters can fracture?

11    A    All IVC filters can fracture, but this particular filter

12    fractures and embolizes.

13    Q    So, Doctor, is it your testimony that if another filter

14    fractures, there's no way that it can embolize; is that

11:18:09 15    correct?

16    A    In the permanent filter world there were no fractures that

17    embolized.  So the permanent devices, there are no reports of

18    an embolization of a fracture fragment.

19    Q    Well, Doctor, would you agree that all retrievable filters

11:18:25 20    have the potential for fracture and migration of a piece of

21    the filter that breaks off?

22    A    The current retrievable devices?  Yes, they all have that

23    risk.

24    Q    And would you agree all IVC filters can perforate or

11:18:39 25    penetrate the walls of the IVC?

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:18:41    1    A    Yes.

2    Q    And would you agree that all IVC filters have the

3    potential for migration?

4    A    You would have to tell me what kind of migration you're

11:18:50    5    discussing.

6    Q    Well, do you agree all IVC filters have the potential to

7    caudally migrate?

8    A    Not to the degree that these filters do.

9    Q    Do you agree all retrievable filters have the potential to

11:19:04   10    caudally migrate?

11    A    The OptEase doesn't really caudally migrate, but, yeah,

12    the Gunther Tulip and this filter do because they're conical

13    filters.  It's their design.

14    Q    And would you agree that all retrievable filters have

11:19:18   15    potential to tilt?

16    A    No.  The OptEase filter, because of its design, can't

17    tilt.  The Gunther Tulip definitely tilts, it's a conical

18    filter of similar design to this device.  So the two conical

19    filters, yes, they both have the propensity to tilt.  They

11:19:40   20    both have similar problems.

21    Q    And, Doctor, am I right that many, many models of filters

22    that are on the market today have the potential to tilt?

23    A    Do you mean permanent or retrievable filters?

24    Q    Retrievable filters.

11:19:52   25    A    Well, we've already discussed -- there's only four, I

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:19:54  1   think, retrievable filters on the market.  Five.  So the

2   conical ones, the ALN, the Bard filters, and the Gunther Tulip

3   filters all have the propensity to tilt.  OptEase, which is

4   not a conical style filter, does not.  And the VenaTech, the

11:20:11  5   new VenaTech convertible filter does not.

6   Q   And, Doctor, do you implant these filters in patients that

7   have a potential to fracture even though you know that there's

8   that potential?

9   A   We didn't know that there was such a potential when we

11:20:28  10   were placing the Recovery, the G2, the G2X, and the Eclipse.

11   The Denali, I hope, will not have the issues of fracture

12   because I hope that it's not going to caudally migrate and

13   start the cascade of events that causes fracture.

14   Q   And, Doctor, let me ask you about that term, "cascade of

11:20:50  15   events."  You've used that several times during your

16   testimony; correct?

17   A   Um-hmm.

18   Q   Have you ever seen that term used in the medical

19   literature?

11:20:58  20   A   I'm not sure I've seen the term used, but the cascade has

21   been described in the medical literature, yes.

22   Q   But not in the terms of using "cascade"; is that correct?

23   A   No, I guess -- I'm not sure.  I've never seen it used, but

24   yes.

11:21:14  25   Q   Have you ever been to a medical meeting where another

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:21:17  1  doctor described a cascade of events in regard to IVC filters?

2  A   Not using that terminology.

3  Q   And have you ever heard this term "cascade of events" in

4  regard to IVC filters outside of the context of litigation?

11:21:31  5  A   No.

6  Q   And, Doctor, when you implant an IVC filter, is it because

7  you are doing it to provide a benefit to your patient, or

8  potential benefit?

9  A   Yes.

11:21:44  10  Q   And is that benefit to potentially save the patient's life

11  in case they've got a high risk for a pulmonary embolism?

12  A   Yes.

13  Q   And, Doctor, you talked some in your direct examination

14  about the informed consent process.  Do you remember that?

11:22:00  15  A   I do.

16  Q   And when you are treating your patients, do you go through

17  a standard informed consent process with your patients who are

18  going to receive an IVC filter?

19  A   Yes.

11:22:12  20  Q   And, Doctor, as part of that process, do you tell your

21  patients about the potential risk of fracture, tilt,

22  migration, and perforation?

23  A   We used to.  I'm not sure I really discuss fracture, tilt,

24  migration, and perforation as much anymore because we really

11:22:28  25  don't see it as much with the Denali device.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:22:31  1   Q   So you don't talk to your patients about that currently?

2   A   I tell them there's a small risk of those types of

3   complications occurring, but -- yeah, I guess we still do tell

4   them about those risks.

11:22:43  5   Q   And do you tell your patients there's a risk of serious

6   injury or death in regard to an IVC filter?

7   A   I usually don't, actually.  That scares them.

8            MR. ROGERS:  Can we pull up Dr. Hurst's deposition

9   testimony from his deposition in this case, please.

11:23:16 10           And specifically I'm looking for page 37, line 8.

11   BY MR. ROGERS:

12   Q   And, Doctor, do you see your testimony from this

13   deposition?

14   A   Yes.

11:23:33 15   Q   And, Doctor, am I correct that the question you were

16   asked -- let me back up for a moment.

17            This deposition was taken in 2017; is that right?

18   A   Yeah.

19   Q   And, Doctor, when you were asked these questions, you were

11:23:48 20   under oath, just as you're under oath today.  True?

21   A   Yes.

22   Q   And you wanted to provide the most truthful and accurate

23   testimony you could; correct?

24   A   Yes.

11:23:56 25   Q   And, Doctor, on that date you were asked the question,

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:23:58  1   "When you implant a filter, do you specifically advise the

2   patient that the filter has the potential to fracture?"

3   A   Correct.

4   Q   And your response was, "I advise the patient that there is

11:24:09  5   a risk of fracture, migration, malfunction," it says "cable

6   occlusion.  We basically have a standard consent form."

7          Did I read that correctly?

8   A   You did.

9          MR. ROGERS:  And if we could also, before we move on,

11:24:33  10   go on to page 38, line 18.  Would you pull that back up,

11   please.

12   BY MR. ROGERS:

13   Q   And, Doctor, here the question is -- do you see that?

14   A   Yeah.

11:24:54  15   Q   The question is, "Do you specifically write in

16   'penetration'?"

17          And that's in regard to the specific consent form the

18   patient signs; correct?

19   A   Correct.

11:25:03  20   Q   Your answer is, "Yes, I do write there's a risk of

21   penetration and cable occlusion and death."

22          Did I read that correctly?

23   A   Yeah.  So basically the consent form is a standard consent

24   form that has all of these complications there.  When I said I

11:25:20  25   write in, basically that is already on the consent form.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:25:25  1      With every patient you have to judge what you're

2    going to discuss with them or not.  There are some patients

3    who don't want to know anything and, in fact, they will tell

4    you right up-front, I don't want to know anything, Doc, just

11:25:36  5    put it in, I trust you.

6        There are other patients who want to know every

7    single detail, everything you could possibly tell them.  And

8    so then you sit down and you have a discussion about every

9    single possible complication.

11:25:50  10       So it varies what we tell the patients.  So --

11   Q   And --

12   A   Sorry.  The legal form that is given to the patient has

13   all of these things listed.  It varies what we tell the

14   patients.  So, yes, I said this, and now I'm telling you what

11:26:09  15   we really do.

16   Q   And so you would agree your testimony today is different

17   than what you testified to in your deposition?

18   A   Yeah, it's different.

19   Q   Doctor, would you agree that all medical devices can be

11:26:23  20   made safer?

21   A   Sure.

22   Q   And is that true for IVC filters?

23   A   Yes.  We're continually looking for ways to make them

24   better.

11:26:32  25   Q   And you certainly recognize that there's no such thing as

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:26:35  1    a risk-free medical device; is that right?

2    A    There is no such thing as a risk-free medical device.

3    That is true.

4    Q    Doctor, you testified today about what you consider to be

11:26:49  5    acceptable rates of complications for filters.  Do you recall

6    that?

7    A    I do.

8    Q    And do you recall your testimony that you thought that if

9    it was a particularly serious outcome, you thought that a risk

11:26:59 10    of one out of a million was an acceptable rate.  Do you recall

11    that?

12    A    Catastrophic.  Yes.

13    Q    Catastrophic.  That's the word you used.

14    A    Yes, that's the word I used.

11:27:09 15    Q    Would you agree, Doctor, in order to measure whether or

16    not that standard can be satisfied, there has to be at least a

17    million of the filters that are out there in patients; is that

18    true?

19    A    No.  That's not the way statistics works.

11:27:25 20    Q    Okay.  Doctor, would you agree with me that previously you

21    had testified that you felt like if an IVC filter had a

22    complication rate of less than 1 percent, that that would be

23    an acceptable rate?

24    A    I did testify to that, yes.

11:27:39 25              I'm sorry, you said complication rate?

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:27:43    1    Q    Yes.

2    A    Can you repeat that, that question?

3    Q    Sure, I'm glad to.

4         Have you previously testified that if a IVC filter

11:27:50    5    has a fracture rate of less than 1 percent that would be an

6    acceptable rate?

7    A    That's true.  With the permanent devices, when they

8    fracture, like I said before, because there's two attachment

9    points, it was an event that you could put up with, that you

11:28:06    10   could tolerate.  But if you're talking about fracture with

11   embolization, no.

12   Q    And you never offered any of those kind of qualifications

13   in your prior testimony, is that correct, Doctor?

14   A    I did not.

11:28:20    15   Q    Doctor, would you agree with me also you have previously

16   testified that if an IVC filter has a migration rate of less

17   than 1 percent that that would be an acceptable rate?

18   A    I did.

19   Q    And did you also testify that if there is a tilt rate of

11:28:33    20   less than 1 percent that that would be acceptable?

21   A    I did.

22   Q    Doctor, let's change gears and talk a little bit about

23   your specific opinions about Mrs. Jones.

24        And you testified earlier that Mrs. Jones was an

11:28:50    25   appropriate patient for an IVC filter; correct?

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:28:53  1  A    Yes.

2  Q    And is that because she had very severe bleeding ulcers at

3  the time she got her filter?

4  A    She had contraindication to anticoagulation and had a DVT.

11:29:08  5  Q    Okay.  So at the time she got her filter she had active

6  bleeding but she also had a blood clot in her legs; is that

7  correct?

8  A    That's correct.

9  Q    She could not take an anticoagulant or blood thinner

11:29:18 10  because she had active bleeding and also needed to have

11  surgery to try to treat the bleeding ulcers; correct?

12  A    Yes, sir.

13  Q    So had Ms. Jones been your patient, you would have put an

14  IVC filter in her; is that right?

11:29:32 15  A    Yes.

16  Q    And, Doctor, when you were testifying earlier, do you

17  recall talking about how medical device companies need to do

18  due diligence?

19  A    Yes.

11:29:42 20  Q    And would you agree with me that that applies to medical

21  professionals as well?

22  A    Correct.  Yeah.

23  Q    And do you think it's important for a doctor to engage in

24  due diligence before the doctor makes a diagnosis or treats

11:29:54 25  the patient?

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:29:55   1   A    Absolutely.  You want all the information you can possibly

2   have before you make a decision.

3   Q    And so you think you -- you would agree with me that it's

4   important for a doctor to review all important records about a

11:30:05   5   patient before they engage in the care of that patient?

6   A    Yes.

7   Q    And that's part of the due diligence process for a medical

8   doctor; right?

9   A    Well, I mean, it depends.  Sometimes you're brought in as

11:30:19  10   a consultant and you're only asked to review a specific

11   portion of the patient's medical care.  So obviously I'm not

12   involved in treating a patient's skin condition or things like

13   that.  So I'm not going to review all of the patient's medical

14   records before I place an IVC filter.  I'm going to review the

11:30:38  15   pertinent medical records.

16   Q    As a medical consultant in this case serving as an expert

17   witness, do you think it was important for you to review all

18   the important records that relate to Doris Jones?

19   A    The pertinent medical records, yes.

11:30:50  20   Q    And, Doctor, I don't believe you reviewed any records of

21   Mrs. Jones that existed prior to 2009; is that right?

22   A    Correct.

23   Q    And so, Doctor, if Mrs. Jones had previously been

24   diagnosed with other episodes of gastrointestinal bleeding and

11:31:09  25   that she had a previous DVT, is that information you were

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:31:13   1   aware of?

2   A   No.

3   Q   So none of those medical records were provided to you by

4   plaintiff's counsel.  Is that true?

11:31:19   5   A   No.

6   Q   And you haven't had an opportunity to review those

7   records; correct?

8   A   No.

9   Q   And, Doctor, at the time you issued your report in this

11:31:26   10   case, am I correct that you had not reviewed the images from

11   the implantation of the filter in Mrs. Jones; is that right?

12   A   I requested them, but they did not have them.

13   Q   And is the same true for the explantation films when

14   Mrs. Jones' filter was removed?

11:31:46   15   A   Again, I requested them, but they did not have them.

16   Q   And, Doctor, am I also correct you have reviewed no

17   medical records that relate to Mrs. Jones after her filter was

18   removed in 2015?

19   A   That's correct because it's not pertinent to my testimony.

11:32:07   20   Q   I see.  And so if there's any information in her medical

21   records from a hospitalization in 2016, you have not had a

22   chance to review those records; is that right?

23   A   I actually have reviewed those records because you gave

24   them to us.

11:32:20   25   Q   Okay.  And, Doctor, am I correct, though, that there's

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:32:24  1    imaging from that hospitalization of Mrs. Jones' lung in 2016?

2    A    Correct.  There is.

3    Q    And, Doctor, when you issued your report in this case, you

4    had not reviewed that imaging, which would be the most recent

11:32:38  5    imaging of this strut in Mrs. Jones' lung; correct?

6    A    Correct.

7    Q    Now, Doctor, let's talk a little bit more about Mrs. Jones

8    and some of the opinions that you did give.

9         And you would agree with me that Mrs. Jones got her

11:32:54 10    Eclipse filter in 2010; right?

11    A    Yes.

12    Q    And I also don't believe you reviewed the deposition

13    testimony of Dr. Avino, who put in the IVC filter?

14    A    I did review that.

11:33:05 15    Q    You did.  But that wasn't disclosed in the information in

16    your report; is that correct?

17    A    I guess it wasn't.

18    Q    And so you had a chance to review Dr. Avino's testimony

19    regarding what he was using Mrs. Jones' filter for as to

11:33:21 20    whether or not it was permanent or retrievable; right?

21    A    Correct.

22    Q    And I think you testified in your direct exam that you

23    considered this filter to have failed as a permanent filter;

24    right?

11:33:31 25    A    Yes.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:33:32  1   Q   And if Dr. Avino wanted this filter to be a retrievable

2   filter, would that change your opinion?

3   A   No.  It still failed because the device fractured and

4   deteriorated.

11:33:44  5   Q   So it really doesn't matter to you if it was a retrievable

6   filter or permanent filter; is that right?

7   A   It still failed.

8   Q   And, Doctor, at the time you wrote your report in this

9   case, I also don't believe you were provided any medical

11:33:59 10   records for a hospital admission that Mrs. Jones had in 2009;

11   is that right?

12   A   I'm not sure about that one.

13   Q   Well, if it's not in your report, would you agree with me

14   that you didn't review them?

11:34:12 15   A   I might have reviewed it, but I may not have found it

16   pertinent.  But go ahead.

17   Q   Okay.

18        MR. ROGERS:  Can you put up 8067, please.

19   BY MR. ROGERS:

11:34:20 20   Q   And, Doctor, can you see this exhibit on your screen?

21   A   I can.

22   Q   And can you see there that it a history and physical that

23   was taken of Mrs. Jones in January of 2012?

24   A   Yes.

11:34:38 25        MR. ROGERS:  And, Your Honor, I move for admission of

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:34:39  1    this record into evidence.

2              MR. COMBS:  Objection, Your Honor.  Motion in limine.

3    Relevancy.

4              THE COURT:  I don't know what you mean by motion in

11:34:51  5    limine.  Let's talk for a minute.

6              If you want to stand up, ladies and gentlemen, feel

7    free.

8         (Bench conference as follows:)

9              THE COURT:  What are you referring to, Mr. Combs?

11:35:19 10             MR. COMBS:  Objecting on relevance.  I believe this

11   is part -- you limited in your motion in limine rulings just

12   to talking about anemia as far as past medical --

13             THE COURT:  Other medical conditions.  I agree.  But

14   that's what -- so you think this exhibit touches on that?

11:35:35 15            MR. COMBS:  Correct.

16             THE COURT:  Mr. Rogers?

17             MR. ROGERS:  The reason I want to use that exhibit is

18   Dr. Hurst has testified that when she presented in 2015 she

19   had chest pain, and in this particular admission she also

11:35:45 20   presented with chest pain.  And I think that those admissions

21   where she has the similar complaints to what she had when she

22   presented in 2015 are very relevant and important for us to

23   read here.

24             THE COURT:  Well, is there other material in there

11:36:00 25   about anemia or other medical conditions?

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:36:03  1          MR. ROGERS:  We have redacted, have we not, the other

       2   conditions, Your Honor.

       3          THE COURT:  Have you seen the redacted version?

       4          MR. COMBS:  I believe my colleagues have reviewed the

11:36:14  5   redacted version.  I haven't personally.

       6          THE COURT:  So you're moving in the redacted version?

       7          MR. ROGERS:  Yes, Your Honor.

       8          THE COURT:  And you think your team has reviewed that

       9   and approved it?

11:36:22 10          MR. COMBS:  I do, Your Honor.

      11          THE COURT:  So if the other medical conditions are

      12   redacted, what's your objection?

      13          MR. COMBS:  I think it's still lack of relevance.

      14   They don't have anybody that's going to come in and say this

11:36:31 15   was chest pain -- I mean, they haven't disclosed any opinions

      16   from anybody that's going to link this chest pain to anything

      17   else related to her filter or say it was the same as the pain

      18   she was having in 2015.  So it's really just inviting the jury

      19   to speculate about irrelevant stuff.

11:36:48 20          THE COURT:  Before I hear his response, my

      21   understanding is you are claiming physical pain related to the

      22   filter as a category of damages in the case.

      23          MR. COMBS:  Yeah.  Pain and suffering in that window

      24   of when she came into the ER and had it removed.  That's the

11:37:05 25   pain and suffering --

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:37:06  1        THE COURT:  So you're going to be asserting to the

2    jury that the pain and suffering she was experiencing was

3    caused by the filter?

4        MR. COMBS:  Your Honor --

11:37:15  5        THE COURT:  If that's true, isn't pain that predated

6    filter relevant?

7        MR. COMBS:  -- I'm going to withdraw my objection to

8    that and clarify with Mr. Rogers.

9        THE COURT:  Okay, so we'll be putting in a redacted

11:37:26 10   exhibit?

11        MR. ROGERS:  Yes, Your Honor.

12        MS. HELM:  Your Honor.

13        Lincoln and Mark.

14        On this redaction issue, there are so many redactions

11:37:32 15   that are going back and forth and we have an agreement to only

16   check the exhibits.  We're going to check all the redactions

17   both for the cranial migration and also where we end up on

18   medical records.  But I did want you to know that Mr. Clark

19   and I had a conversation about that and we're passing them

11:37:48 20   back and forth as best we can.

21        THE COURT:  Okay.

22        MR. COMBS:  Everybody's working hard with good faith,

23   Your Honor.

24        (Bench conference concludes.)

11:37:57 25        THE COURT:  Thank you, ladies and gentlemen.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:37:58  1          Exhibit 8067 is admitted.

2        (Exhibit 8067 admitted.)

3    BY MR. ROGERS:

4    Q   Doctor, do you have the exhibit?

11:38:13  5    A   I do.

6          MR. ROGERS:  And, Your Honor, could we display the

7    exhibit, please?

8          THE COURT:  Yes.

9    BY MR. ROGERS:

11:38:23  10   Q   On this particular date, Dr. Hurst, would you agree with

11   me that the chief complaint that is indicated there --

12         MR. ROGERS:  Would you kind of pull that out, please,

13   Scott --

14   BY MR. ROGERS:

11:38:31  15   Q   -- that the chief complaint that Mrs. Jones complained of

16   on that date was chest pain?  Am I correct?

17   A   Yes.  She was short of breath, diaphoresis, chest pain,

18   squeezing sensation in the middle of the chest.  Yes.

19   Q   And did she describe the chest pain as a 10 on a scale of

11:38:53  20   10?

21   A   Yes.

22   Q   Doctor --

23         MR. ROGERS:  You can take that down.

24   BY MR. ROGERS:

11:38:58  25   Q   -- did Mrs. Jones have a chest X-ray as part of that

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:39:02  1    visit?

2    A    Yes.

3              MR. ROGERS:  And can you pull up Exhibit 7598,

4    please.

11:39:07  5              Your Honor, I move for admission of this exhibit.

6              THE COURT:  Any objection?

7              MR. COMBS:  Your Honor --

8              THE COURT:  7598.

9              MR. COMBS:  No objection, Your Honor.

11:39:29 10              THE COURT:  Hold on just a minute.

11              THE COURTROOM DEPUTY:  On my list it shows as a place

12    holder.  Is there another number for that?  7958.

13              THE COURT:  Hold on just a minute.  We want to make

14    sure that's the right exhibit number.

11:39:48 15         (Courtroom deputy and counsel confer.)

16              THE COURTROOM DEPUTY:  It just needs added to the

17    list.

18              THE COURT:  All right. 7598 is admitted.  I think you

19    said no objection, didn't you, Mr. Combs?

11:40:33 20              MR. COMBS:  No objection.

21              THE COURT:  All right.  Admitted.

22         (Exhibit 7598 admitted.)

23              MR. ROGERS:  Your Honor, may we display this to the

24    jury, please?

11:40:38 25              THE COURT:  You may.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:40:39  1   BY MR. ROGERS:

2   Q   Dr. Hurst, do you have the exhibit there in front of you?

3   A   I do.

4          MR. ROGERS:  And, Scott, if you would, could you

11:40:45  5   please pull out the impression down near the lower part.

6          Thank you.

7   BY MR. ROGERS:

8   Q   And, Doctor, would you agree with me that the report of

9   the radiologist that read this film was that this was a normal

11:40:58  10  chest X-ray?

11  A   Correct.

12         MR. ROGERS:  And can we pull up Exhibit 8068, please.

13         Your Honor, I move for admission of Exhibit 8068 into

14  evidence.

11:41:24  15        MR. COMBS:  No objection, Your Honor.

16         THE COURT:  Admitted.

17     (Exhibit 8068 admitted.)

18  BY MR. ROGERS:

19  Q   Would you pull up number 1 under where it says Discharge

11:41:31  20  Diagnosis, about midway through.

21         Thank you.

22  BY MR. ROGERS:

23  Q   And, Doctor, would you agree with me that this is one of

24  the discharge diagnoses that Mrs. Jones received following

11:41:44  25  this hospitalization?

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:41:45  1   A    I agree.

2   Q    Would you agree with me that the diagnosis made by the

3   doctor was chest pain that was noncardiac in origin, likely

4   costochondritis?

11:41:54  5   A    Yes.

6   Q    And can you explain for the jury, please, what

7   costochondritis is.

8   A    Costochondritis is basically an inflammation of the

9   junction between the sternum and the rib.  Where it meets

11:42:05 10   there's what's called the costochondral junction.  It's a

11   tissue that can get inflamed.  Causes point tenderness over

12   the chest.  Can masquerade as a heart attack in some people if

13   it's severe.

14          MR. ROGERS:  And, Your Honor, may I publish this

11:42:22 15   exhibit?

16          THE COURT:  Yes.

17   BY MR. ROGERS:

18   Q    And would you agree with me, Doctor, that costochondritis

19   is typically considered to be muscular in nature?

11:42:31 20   A    Musculoskeletal, yeah.

21   Q    And, Doctor, you didn't review any of these actual medical

22   records relating to this hospital admission; correct?

23   A    No.  This is prior to the filter placement.

24   Q    Doctor, let's move on to an admission that Mrs. Jones had

11:42:44 25   in August of 2013.  And I believe you didn't review any

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:42:47  1   medical records related to that admissions either, did you?

2   A   Let me pull up my report here.

3         What date are you asking for?

4   Q   The date would be August the 14th, 2013.

11:43:14  5   A   No.

6   Q   Okay.

7         MR. ROGERS:  So could we pull up, please,

8   Exhibit 8069.

9         And, Your Honor, I move for admission of Exhibit 8069

11:43:26 10   into evidence.

11        MR. COMBS:  No objection, Your Honor.

12        THE COURT:  Admitted.

13      (Exhibit 8069 admitted.)

14        MR. ROGERS:  May I publish the exhibit?

11:43:57 15        THE COURT:  You may.

16   BY MR. ROGERS:

17   Q   Doctor, on this particular admission in August of 2013, am

18   I right that Ms. Jones' chief complaint was something called

19   syncope?

11:44:08 20   A   Yes.

21   Q   And can you explain to the jury what that is, please.

22   A   So syncope is basically when you get lightheaded and pass

23   out, or near pass out.

24   Q   And did she also complain specifically of lightheadedness

11:44:24 25   in that admission?

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:44:27  1   A    Yes.

2   Q    Doctor, did Ms. Jones receive a chest X-ray as part of

3   that admission?

4   A    Yes.

11:44:32  5            MR. ROGERS:  And could we pull up Exhibit 8070,

6   please.

7            Your Honor, I move for admission of 8070 into

8   evidence.

9            MR. COMBS:  No objection.

11:44:52 10            THE COURT:  Admitted.

11          (Exhibit 8070 admitted.)

12            MR. ROGERS:  May we publish?

13            THE COURT:  Yes.

14   BY MR. ROGERS:

11:44:57 15   Q    And, Dr. Hurst, do you see this Exhibit 8070?

16   A    Yes.

17   Q    And would you agree with me that this is the report from

18   the radiologist who read Ms. Jones' chest X-ray in August of

19   2013?

11:45:10 20   A    Yes.

21   Q    And, Doctor, if you look down there --

22            MR. ROGERS:  Thank you, Scott.  Would you pull up the

23   Impressions section, please.

24   BY MR. ROGERS:

11:45:16 25   Q    And would you agree with me, Doctor, that the

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:45:19  1   radiologist's impression was that this was a normal chest

2   exam?

3   A   Correct.

4         MR. ROGERS:   And could we flip back real quick to

11:45:29  5   Exhibit 8069.

6   BY MR. ROGERS:

7   Q   And, Doctor, down at the bottom of the page there -- well,

8   actually, I don't see.

9         MR. ROGERS:   I'm sorry, would you go to page 7 of

11:45:43 10   that document, please.

11         And down at the bottom of this page, Scott, would you

12   please pull out the primary diagnosis.

13         Thank you.

14   BY MR. ROGERS:

11:45:57 15   Q   And, Doctor, would you agree with me the diagnosis -- or

16   one of the diagnoses that Ms. Jones received on that date was

17   that she was dehydrated?

18   A   Yes.

19   Q   And you didn't look at any of these medical records;

11:46:07 20   correct?

21   A   Not these, no.

22   Q   And in most of the reports from the chest X-rays that we

23   looked at in both 2012 and 2013, would you agree with me that

24   the radiologist did not note anything about a filter in

11:46:23 25   Mrs. Jones' lung?

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:46:25  1   A   Because it wasn't in the lung yet.

       2   Q   Okay.  So you would agree it had not migrated to the lung

       3   at that point?

       4   A   Yeah, I would agree.

11:46:32  5   Q   All right.  Let's move on to April of 2015.

       6          And, Doctor, would you agree with me that in April of

       7   2015 is when Mrs. Jones went to the ER and it was discovered

       8   that she had a fracture of a strut in her lung as an

       9   incidental finding?

11:46:52 10   A   What do you mean by incidental finding?

      11   Q   Well, Doctor, would you agree with me she did not come

      12   into the hospital because she felt like she had a strut in her

      13   lung?  Is that true?

      14   A   Well, I don't think anybody knows they have a strut in

11:47:05 15   their lungs.  Why did she come to the hospital?  She came to

      16   the hospital because she had arm pain and chest pain.

      17   Q   Okay.  And Doctor, were you aware -- and the day she did

      18   come to the hospital was August the -- excuse me, April the

      19   22nd, 2015; right?

11:47:22 20   A   She came in April 21st first, then came in April 22nd.

      21   She came in two days in a row.

      22   Q   Okay.  So you're aware she went to the ER two days in a

      23   row?

      24   A   I am.

11:47:33 25   Q   The first admission to the ER, that was not contained in

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:47:35  1  your report; correct?

2  A   Well, I -- I think it is, but, okay, go ahead.

3  Q   Well, let's take a look at --

4  A   I have those medical records but --

11:47:46  5  Q   Okay, let's take a look at the admission from April 21st,

6  2015.

7  A   Sure.

8         MR. ROGERS:  Can we pull up 7953.

9         Doctor, I move -- excuse me.  Your Honor, I move for

11:47:58 10  admission of 7953 into evidence.

11         MR. COMBS:  No objection, Your Honor.

12         THE COURT:  Admitted.

13      (Exhibit 7953 admitted.)

14         MR. ROGERS:  May we publish?

11:48:17 15         THE COURT:  Yes.

16         MR. ROGERS:  Scott, would you look at the middle

17  section there where it says under Comment -- it says Chief

18  Complaint on the left and it says Comment.

19  BY MR. ROGERS:

11:48:25 20  Q   Do you see that part?

21  A   Right.

22  Q   Doctor, would you agree with me that on the 21st of April,

23  2015, Mrs. Jones came to the ER complaining of being faint and

24  dizzy; is that right?

11:48:38 25  A   Yeah.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:48:38   1          Can we hold on just a second?  I'd like to pull up

2      these medical records for a second so that I have them

3      completely.  You're just showing small portions of the record.

4      Q    Doctor, I'm not going to ask you any more questions about

11:49:19   5      that exhibit, if you want to move on.

6      A    Well, I think you just have the chief complaint here, you

7      don't have the history and physical that was done that day.

8      Q    Well, that was what she reported as her chief complaint;

9      correct?

11:49:31  10      A    Correct, but that's not the history and physical.  So the

11     chief complaint is what the physician synopsizes as her

12     complaint.  It may not include all of her symptoms.

13     Q    Well, and you would agree with me that at some point

14     during this admission she also complained of chest pain;

11:49:48  15      correct?

16     A    She complained of chest and arm pain.  Shoulder pain,

17     actually, radiating to her hands.

18     Q    Okay.  And let's talk for a moment about her feeling faint

19     and dizzy.

11:49:57  20          Do you see that?

21     A    Yes.

22     Q    And, Doctor, you're aware that Mrs. Jones is anemic;

23     correct?

24     A    Correct.

11:50:03  25      Q    And you would agree with me that at this point in time she

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:50:06   1   had had anemia for at least ten years; right?

          2   A    Yes.

          3   Q    And you also agree anemia can cause a patient to feel

          4   faint and dizzy.   True?

11:50:14   5   A    Absolutely.

          6   Q    And, Doctor, as we have discussed, Mrs. Jones returns to

          7   the ER on the following day, on April the 22nd, 2015; correct?

          8   A    Yes.

          9   Q    And when she came back, were her complaints essentially

11:50:29  10   the same as what she had on the prior day?

          11   A    Hold on just a minute.

          12        So from the medical record, she came to the emergency

          13   department yesterday with a similar complaint for reasons

          14   unspecified.   Today she came in with similar complaints that

11:50:55  15   have been ongoing.   Lightheadedness was primarily April 21st

          16   when she was at work cleaning as a janitor.   She states the

          17   lightheadedness was accompanied with some diaphoresis.   She

          18   denies any chest pain, shortness of breath, back pain,

          19   abdominal pain, nausea, vomiting, or focal weakness --

11:51:21  20        THE COURT:   Excuse me, Doctor, are you reading from

          21   the exhibit?

          22        THE WITNESS:   No, I'm not, I'm reading from her

          23   medical record.

          24        THE COURT:   We shouldn't have you reading in

11:51:27  25   something that's not an exhibit in the trial.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:51:30  1          MR. ROGERS:  Thank you, Your Honor.

        2    BY MR. ROGERS:

        3    Q   I'm going to move on, okay, Dr. Hurst?

        4    A   Well --

11:51:34  5    Q   And, Doctor, your counsel will have an opportunity to ask

        6    you any questions he wants to on redirect.

        7    A   Okay.  Fine.

        8    Q   And, Doctor, during this admission in April 22nd, 2015,

        9    this is when it was discovered that there was a strut in

11:51:47 10    Mrs. Jones' lung; correct?

       11    A   Yes.

       12    Q   And you would agree with me that her treating doctors made

       13    the determination to try to remove that filter, the Eclipse

       14    filter; right?

11:51:59 15    A   Yes, because they felt it was deteriorating.

       16          MR. ROGERS:  Can we pull up Exhibit 7951, please.

       17          And I move for admission of Exhibit 7951.

       18          THE COURT:  Mr. Combs?

       19          MR. COMBS:  No objection, Your Honor.

11:52:23 20          THE COURT:  Admitted.

       21        (Exhibit 7951 admitted.)

       22          MR. ROGERS:  May we publish, please, Your Honor?

       23          THE COURT:  Yes.

       24          MR. ROGERS:  If you'd go to page 2, please, of that

11:52:29 25    document.  And, Scott, if you would, can you pull out that

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:52:32  1   part where it says "procedure date" right underneath that.  Do

2   you see that?

3   BY MR. ROGERS:

4   Q    And, Doctor, is this a record that would come from the

11:52:41  5   cath lab --

6   A    Yes.

7   Q    -- where the filter was removed?

8   A    Yes.

9   Q    And when you're doing those type of procedures like

11:52:48 10   implanting a filter or removing a filter, is everything that's

11   being done in the cath lab at that point being recorded as

12   it's happening?

13   A    Absolutely.

14   Q    And, Doctor, this particular document we're looking at

11:52:59 15   here, the procedure start time, would that indicate the time

16   that the procedure began?

17   A    Yes.

18   Q    And that says 11:39.

19   A    Yes.

11:53:08 20   Q    And the procedure end time was 12:13; is that right?

21   A    Looks like it went pretty quick.

22   Q    So would you agree the entire process of removal of

23   Mrs. Jones' filter took a little more than 30 minutes?

24   A    Looks like it was uneventful.

11:53:21 25   Q    All right.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:53:21  1          MR. ROGERS:  Can we go to page 5 of that exhibit,

       2   please.  And, Scott, if you would, you see where it says 11:58

       3   and it says "right internal jugular accessed."  Can you pull

       4   up everything through "filter recovery system out."

11:53:43  5   BY MR. ROGERS:

       6   Q    And, Doctor, what we're seeing here, is this that kind of

       7   moment-by-moment recording of events in the cath lab?

       8   A    This looks like a routine filter removal.

       9   Q    Doctor, would you agree with me that the doctor,

11:53:55 10   Dr. Nelson, who removed this filter gained access to

      11   Mrs. Jones' jugular vein at 11:58; is that right?

      12   A    Yes.

      13   Q    And it looks like the entire filter recovery system was

      14   out by 12:05; is that right?

11:54:08 15   A    Absolutely.

      16   Q    So this entire procedure of at least when the filter was

      17   being removed took a little bit more than five minutes; is

      18   that right?

      19   A    Looks like it was a routine removal.

11:54:21 20   Q    So you would agree with me that the filter was

      21   successfully removed; right?

      22   A    Yes.

      23   Q    That was after it had been in place for about five years;

      24   correct?

11:54:29 25   A    Correct.

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:54:31  1   Q   And would you agree with me that Mrs. Jones never

2   experienced any pulmonary embolism in that five-year period?

3   True?

4   A   Correct.

11:54:39  5   Q   And regarding the strut that was discovered in her lung,

6   you would agree that Mrs. Jones' doctors decided to leave that

7   in place; right?

8   A   Yes.

9   Q   And you don't disagree with that decision, do you?

11:54:53  10  A   No, I don't.

11  Q   And, Doctor, am I correct that you have never had a

12  patient who has had a strut in their lung or pulmonary artery;

13  is that right?

14  A   I have not.

11:55:03  15  Q   So you never managed a patient in that position; correct?

16  A   I have not.  Fortunately.

17  Q   And, Doctor, the CT scan that you showed the jury that

18  showed the strut in her lung, do you recall that?

19  A   I do.

11:55:17  20  Q   And I believe you said there were 300 to 400 images from

21  that CT scan?

22  A   Correct, um-hmm.

23  Q   And the CT scan is showing many different slices of

24  Mrs. Jones' body; correct?

11:55:27  25  A   Yes.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:55:28  1   Q   And of all those images, that is the one that you picked

2   out to bring to the jury today; is that right?

3   A   I had several images picked out.  We didn't have time to

4   show them all.

11:55:38  5   Q   Doctor, let me kind of change gears a little bit.

6           Are you familiar with a medical article that was

7   written by Dr. Scott Trerotola about the management of

8   patients with retained filter fragments?

9   A   Yeah.  Give me a second, I have it right here.

11:55:53  10          Go ahead.

11   Q   Doctor, would you agree with me that that particular

12   article is a reliable article?

13   A   What do you mean by reliable?

14   Q   I'm asking if it's something that is published in the

11:56:06  15   peer-reviewed medical literature?

16   A   This is a retrospective study.

17          So there are differing levels of scientific evidence

18   that you can have, from the best evidence, which is

19   prospective randomized trial all the way to a case report.

11:56:22  20   This is just a little bit above a case report.  What they did

21   is retrospectively evaluate a series of cases that had come

22   through their institution.  So there is significant bias that

23   can be introduced.  And in addition, this report was performed

24   by two radiologists who are -- one radiologist who is involved

11:56:42  25   in this case.

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:56:44   1   Q   Doctor, let me ask you this:  Are you familiar with Scott

2   Trerotola?

3   A   I am.

4   Q   And he's a member of the Society of Interventional

11:56:52   5   Radiologists?

6   A   He is.

7   Q   Is he considered one of the leading thought leaders about

8   IVC filters in this country?

9   A   He is a key opinion leader, yes.

11:57:00  10   Q   Would you also agree with me that his center at the

11   University of Pennsylvania is one of the leading centers in

12   this country for the retrieval of IVC filters or fragments; is

13   that right?

14   A   Yes.

11:57:12  15   Q   And so would you agree with me that the article that

16   Dr. Trerotola published in the journal called Radiology is a

17   reliable article?

18   A   It describes 65 patients and their attempts at retrieving

19   fragments.  Yes.

11:57:29  20   Q   Okay.  So, Doctor, I'm going to ask you specifically about

21   some things that are in that article.

22         MR. ROGERS:  And, Scott, could you pull up

23   Exhibit 8602, please.

24   BY MR. ROGERS:

11:57:41  25   Q   And, Doctor, what is the title of this article?

CROSS-EXAMINATION – DARREN R. HURST, M.D.

11:57:45   1   A   Management of Fractured Inferior Vena Cava Filters,

2   outcomes by Fragment Location.

3   Q   And would you agree with me this is published just last

4   year in 2017?

11:57:56   5   A   Yes.

6           MR. ROGERS:  And, Scott, if you would, can you go to

7   page 9, please.

8           And, Scott, do you see this language that starts like

9   in the first full paragraph?  Can you highlight that, please.

11:58:16  10   BY MR. ROGERS:

11   Q   And, Doctor, I'm going to read a portion of

12   Dr. Trerotola's article to you.

13   A   Sure.

14   Q   And does it read, "Perhaps the least strong argument can

11:58:25  15   be made for retrieving intrapulmonary fragments" -- and that

16   means within the lungs; right?

17   A   That's what it says, yes.

18   Q   It goes on to say, "To our knowledge, no symptomatic

19   intrapulmonary fragment has been reported."  Isn't that

11:58:41  20   correct?

21   A   That's based on how many cases?  Do you know?

22   Q   And, Doctor, would you agree with me this is information

23   that is provided within the medical community and to

24   interventional radiologists such as yourself about how to

11:58:56  25   manage patients who have got fragments in their lung or other

CROSS-EXAMINATION - DARREN R. HURST, M.D.

11:59:00  1   locations?

2   A   This article describes six fragments that were left

3   behind.

4   Q   And, Doctor, in your report you didn't cite any article

11:59:08  5   from the medical literature discussing any symptoms from a

6   filter fragment in the pulmonary artery, did you?

7   A   That's because I don't think there are any except for this

8   one describing six fragments.

9   Q   Okay.

11:59:20 10         MR. ROGERS:  You can take that down, Scott.

11   BY MR. ROGERS:

12   Q   Doctor, as far as that strut that is in Mrs. Jones' lung

13   is concerned, would you agree with me that it has become

14   endothelialized?

11:59:32 15   A   It's partially endothelialized.  It's still -- a portion

16   of it is still within the vessel.

17   Q   And does endothelialization mean that tissue has grown

18   around that strut?

19   A   Yes, it does.

11:59:45 20         THE COURT:  We're going to break at this point,

21   Mr. Rogers.

22         Ladies and gentlemen, we will plan to resume at

23   1 o'clock.  We will excuse you at this time.

24      (The jury exited the courtroom.)

12:00:38 25         THE COURT:  All right, Counsel, as of now plaintiff

12:01:07  1   has used 17 hours and 21 minutes, and defendants have used

2   four hours and 58 minutes.

3            We will plan to see you at 1 o'clock.

4            MR. ROGERS:  Thank you, Your Honor.

5        (End of a.m. session transcript.)

6                          *  *  *  *  *

1                    **C E R T I F I C A T E**

2

3           I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14          DATED at Phoenix, Arizona, this 22nd day of May,

15   2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25