<pre>
 1                  UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF ARIZONA

 3                 _____

 4
     In Re:  Bard IVC Filters    ) MD-15-02641-PHX-DGC
 5   Products Liability Litigation )
                                   ) Phoenix, Arizona
 6   _____) May 22, 2018
     Doris Jones, an individual,  ) 1:00 p.m.
 7                                 )
                  Plaintiff,       )
 8                                 ) CV 16-00782-PHX-DGC
          vs.                      )
 9                                 )
     C.R. Bard, Inc., a New        )
10   Jersey corporation; and Bard )
     Peripheral Vascular, Inc., an )
11   Arizona corporation,          )
                                   )
12                  Defendants.    )
     _____)
13

14        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             (Jury Trial - Day 5 - P.M. Session)
17             (Pages 1077 through 1189, inclusive.)

18

19

20

21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
</pre>

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3           GALLAGHER & KENNEDY PA
                 By:  Mark S. O'Connor, Esq.
 4           By:  Paul L. Stoller, Esq.
                 By:  Shannon L. Clark, Esq.
 5           By:  C. Lincoln Combs, Esq.
                 2575 East Camelback Road, Suite 1100
 6           Phoenix, Arizona 85016

 7           LOPEZ MCHUGH LLP
                 BY:  Ramon Rossi Lopez, Esq.
 8           100 Bayview Circle, Suite 5600
                 Newport Beach, California 92660
 9
             HEAVISIDE REED ZAIC
10           By:  Julia Reed-Zaic, Esq.
                 By:  Laura Elizabeth Smith, Esq.
11           312 Broadway, Suite 203
                 Laguna Beach, California 92651
12
     For the Defendants:
13           NELSON MULLINS RILEY & SCARBOROUGH LLP
                 By:  Richard B. North, Jr., Esq.
14           By:  Elizabeth C. Helm, Esq.
                 By:  James F. Rogers, Esq.
15           201 17th Street NW, Suite 1700
                 Atlanta, Georgia 30363

16
                       I N D E X
17   WITNESS:             DIRECT   CROSS   REDIRECT   RECROSS
     DARREN HURST, M.D.
18   By Mr. Rogers          1083
     By Mr. Combs                           1104
19
     ANTHONY AVINO, M.D.
20   By Video Deposition    1117

21   SHANICE JONES
     By Mr. O'Connor        1118
22
     ALEX TESSMER
23   By Mr. Stoller         1124              1167
     By Mr. Rogers                  1164
24
     DORIS JONES
25   By Mr. O'Connor        1170
```

```
 1                    INDEX OF EXHIBITS
      EXHIBIT                                    RECEIVED
 2    79        Test Protocol TPR-04-02-02         1082
      447       (No description available)         1082
 3    546       Altonaga 04, 4/13-4/15/2004 E-mail
                Exchange b/w Lee Lynch, Lehmann, and others
 4                Re: "Crisis Plan and Supporting Documents
                For Your Review"                   1082
 5    614       (No description available)         1082
      677       Filter - Fracture Analysis August 2010,
 6              Reporting range 7/1/05 - 8/31/10, G2, G2X,
                And Eclipse                        1082
 7    854       12/12/2004 E-mail from Uelmen to Kellee
                Jones, attaching 12/9 /2004 Remedial Action
 8              Plan (Revised) SPA-04-12-01        1082
      932       BPV's 5/6/2008 PowerPoint presentation
 9              Entitled "Filter Franchise Review",
                Including charts of 2007 U.S. Market Share
10              By $ and U.S. filter sales history 1082
      1006      12/9/2003 Meeting Minutes Memo from Brian
11              Hudson to Len DeCant, Mike Casanova,
                Robert Carr, and Alex Tessmer Re:
12              "Special Design Review for Recovery 1082
      1023      Internal Presentation on the G2 Filter
13              System for Permanent Use, detailing the
                Design modifications, features/benefits,
14              And comparison to the Recovery Filter 1082
      1133      Recovery Filter Arm Fracture,
15              Remedial Action Plan September 2, 2004  1116
      1295      3/23/2006 E-mail exchange b/w Mickey
16              Graves and Charlie Simpson, FEA on G2,
                Regarding Historical FEA analysis   1082
17    1369      3/24/2004 E-mail from Alex Tessmer to
                Charlie Benware and Ed Fitzpatrick
18                Re:  "Starguide Filter Migration
                Test Results"                       1082
19    1370      12/11/2003 E-mail exchange b/w Brian
                Hudson and Janet Hudnall, others CC'ed,
20              Re: "Special Design Review for Recovery
                Meeting Minutes"                    1082
21    1383      Hudson Deposition, 01/17/2014,
                Exhibit 13 -  BPV Engineering Test
22              Report - Characterization of Recovery
                Filter Migration Resistance in
23              Comparison to Competitive Product - Phase 1,
                ETR-04-03-02, Rev 0.                1082
24

25
```

## INDEX OF EXHIBITS

| EXHIBIT | | RECEIVED |
|---|---|---|
| 1580 | Kessler Report -July 12, 2004 Email from Bard's VP of Regulatory Sciences Chris Ganser, to Tim Ring And John Weiland, attached "an executive Summary of Recovery Filter adverse events (Migration and fracture | 1082 |
| 1612 | (No Description Available) | 1082 |
| 2052 | (No Description Available) | 1082 |
| 2057 | Recovery Filter Migration Remedial Action Plan SPA-04-12-01 dated 1/4/2005, Including the Lehmann Report and Dr. Ciavarella's 12/17/2004 HHE titled "Recovery Filter - Consultant's report | 1082 |
| 2059 | Project Status Report Form for the Recovery Filter, Project No. 7081, Initiated 7/1/2002 with the goal to "Investigate Migration"; FM0700160, Rev. 1. | 1082 |
| 2061 | 2/4/2004 E-mail from Alex Tessmer to Several Re: "Updated: Filter Migration Flow Loop Test Fixture" | 1082 |
| 2062 | 1/14/2004 Memo from Rob Carr to File Re "Design Review Meeting Minutes Response" | 1082 |
| 2063 | 2/25/2004 E-mail from Alex Tessmer to Robert Carr and Brian Hudson Re: "Filter Migration Test Results | 1082 |
| 2065 | BPV Engineering Test Report - Characterization of Recovery Filter Migration Resistance When Legs are Crossed or Hooks Removed - Phase 2 | 1082 |
| 2068 | E-mail from Tessmer to Carr and others | 1082 |
| 2069 | 8/26/2004 E-mail from Alex Tessmer to Robert Carr and Avijit Mukherjee Re: "Corporate Presentations" | 1082 |
| 2238 | 9/25/2007 E-mail from John Lehmann to John Van Vleet and John Reviere Re:   "EVEREST FSR rev H and Supporting redlines | 1082 |
| 2253 | 5/27/2004 E-mail from Natalie Wong to Doug Uelmen Re. "Recovery Stats" | 1082 |
| 4401 | Implant op report with Avino 8/24/2010 | 1116 |
| 4402 | Product ID/sticker 8/24/2010 (1 page) | 1116 |
| 4403 | Chest x-ray report discovers filter Fragment in pulm artery 4/22/15 (1 page) | 1082 |
| 4404 | CT Angiogram report 4/22/15 (2 pages) | 1082 |
| 4405 | 8/14/13 XR Chest PA/LAT report | 1082 |

1
<u>INDEX OF EXHIBITS</u>

2

| <u>EXHIBIT</u> | | <u>RECEIVED</u> |
|---|---|---|
| 4406 | Retrieval and discharge records 4/22-24/15 (7 pages) | 1082 |
| 4407 | Removal bills | 1082 |
| 4412 | Email from: Gin Schulz to Kevin Shifrin Regarding Recovery Filter Limb Fractures with attachment of RF Limb detach | 1082 |
| 4420 | Meridian Vena Cava Filter and Jugular Delivery System Product Performance Specification PPS, Revision 3 | 1082 |
| 4459 | Eclipse Vena Cava Filter Jugular Vein Approach IFU | 1082 |
| 4486 | G2 Express Project Plan FM0700150 Rev 6 1-30-07 | 1082 |
| 4536 | 4-22-15 XR Chest Pa/LAT of Doris Jones (2 images) | 1082 |
| 4537 | 4-22-15 Topogram of Doris Jones | 1082 |
| 5296 | G2 Filter Product Performance Specification v.2 | 1082 |
| 5302 | G1A Recovery Filter Femoral System Design Verification and Validation Protocol | 1082 |
| 5303 | G2 DV&V Summary Testing | 1082 |

1   P R O C E E D I N G S

2        THE COURT:  Ms. Helm, there was that long list of

3   exhibits that were moved in at the beginning of the day.  I

4   think you have had a chance to review them now.

5        MS. HELM:  I have, Your Honor.  And I spoke with Traci     01:01PM

6   and she suggested I read the list again.

7        THE COURT:  Are you objecting to any of those?

8        MS. HELM:  Some of them are subject to redaction, and

9   I will say that when I get to the number.

10        THE COURT:  But as redacted you are okay with              01:01PM

11   admitting?

12        MS. HELM:  Yes, Your Honor.

13        So we have no objection to 79; 447; 546, subject to

14   redactions; 614; 677; 854, subject to redactions; 926, subject

15   to redactions; 932; 1006; 1023; 1133; 1295; 1369; 1383; 1580,   01:02PM

16   subject to redactions; 1612; 2052; 2057, subject to redactions;

17   2059; 2061; 2062; 2063; 2065; 2068; 2069; 2238; 2253; 4403;

18   4404; 4405; 4406; 4407; 4412; 4420, subject to redactions;

19   4459; 4486; 4536; 4537; 5296; 5302; 5303.

20        THE COURT:  All right.  Those exhibits are admitted.       01:03PM

21        Were there any in Mr. Clark's list that you did not

22   just mention, Ms. Helm?

23        MS. HELM:  I'm sorry.  Apparently -- yes, Your Honor.

24   Apparently I missed one and it's Exhibit 1370.  And we have no

25   objection.                                                      01:04PM

1         THE COURT:  Okay.  That exhibit is admitted as well.

2         Mr. Rogers, you can continue with your

3   cross-examination.

4         MR. ROGERS:  Thank you, Your Honor.

5            CROSS-EXAMINATION (Resumed)                01:04PM

6   BY MR. ROGERS:

7   Q.  Hello, Dr. Hurst.

8   A.  Hi.  How are you.

9   Q.  I'm going to pick up kind of where I left off.  And right

10  before the lunch break, we were discussing whether Mrs. Jones'    01:04PM

11  strut that is in the -- her pulmonary artery had

12  endothelialized.  Do you recall that?

13  A.  Yes.

14  Q.  I believe you will agree with me that means some tissue has

15  grown around that strut, is that correct?                         01:05PM

16  A.  Correct.

17  Q.  And Doctor, would you also agree that you have not seen any

18  evidence that Mrs. Jones's strut in the pulmonary artery has

19  moved since it was first identified in 2015.

20  A.  I have not.                                                   01:05PM

21  Q.  And would you agree with me that the odds of that strut

22  moving are very small?

23  A.  I would agree they are small.

24  Q.  And would you agree that the strut is not occluding the

25  artery or blocking any blood flow in Ms. Jones?                  01:05PM

1  A.  It is not currently.

2  Q.  And Doctor, let me ask you about some of the things that

3  you said were possibilities that could happen in regard to that

4  strut in the future.  Do you recall that testimony?

5  A.  Yes.                                                          01:05PM

6  Q.  And Doctor, I believe you said that you just didn't know

7  how likely any of those things were to occur.  Do you recall

8  that?

9  A.  I don't think anyone knows.

10  Q.  And Doctor, are there a lot of things in medicine that we    01:06PM

11  just don't know?

12  A.  Yes.

13  Q.  And Doctor, would you also agree with me that when you are

14  advising a patient there are really no always in medicine.

15  Would you agree with that?                                       01:06PM

16  A.  That is true.

17  Q.  And Doctor, in regard to the strut, I believe you said that

18  it may be a source of infection, it could potentially migrate,

19  and it could potentially perforate her pulmonary artery into

20  the lung.  Is that right?                                        01:06PM

21  A.  Correct.

22  Q.  And Doctor, would you agree with me that the likelihood of

23  any of those things occurring, even though we don't know for

24  sure, would be around 1 percent?

25  A.  We have no idea.                                             01:06PM

1    Q.  And Doctor, would you disagree with me that you have

2    testified previously in your deposition in this case that the

3    likelihood of those events occurring would be 1 percent or

4    less?

5    A.  I think I did testify to that.       01:06PM

6    Q.  And Doctor, would you also agree that the likelihood of

7    Mrs. Jones experiencing any injury, serious injury or death

8    from that strut is 1 percent or less?

9    A.  It's -- I think it probably is around 1 percent or less.

10    But again, I'm not sure we know.       01:07PM

11    Q.  Okay.  Can we pull up Exhibit 4406, please, which just got

12    moved into evidence.

13       And Doctor, do you have the exhibit there on your

14    screen?

15    A.  I do.       01:07PM

16       MR. ROGERS:  And may we publish the exhibit to the

17    jury, Your Honor?

18       THE COURT:  Yes.

19    BY MR. ROGERS:

20    Q.  And Doctor, would you agree with me that this is -- well,     01:07PM

21    how about turn to Page 3 of that document.

22       And Doctor, would you agree with me that this is a

23    medical record that relates to when Mrs. Jones was discharged

24    from the hospital in April of 2015 after her filter had been

25    removed?       01:08PM

1   A.  This is a discharge summary, yes.

2          MR. ROGERS:  And Scott, if you would, can you pull up

3   that section there under the discharge diagnoses, please.

4   BY MR. ROGER:

5   Q.  And Doctor, are these the discharge diagnoses from that          01:08PM

6   record that were made by her treating doctors at the time?

7   A.  Yes.

8   Q.  And do you see the very first one there is the foreign body

9   embolism, and it says:  Status post-IVC filter removal and IVC

10  filter component remaining in the right pulmonary artery.           01:08PM

11  Correct?

12  A.  I agree.

13  Q.  And we have already discussed that.  And then Number 2, do

14  you see that?

15  A.  Uh-huh.                                                         01:08PM

16         MR. ROGERS:  Scott, if you could highlight that,

17  please.

18  BY MR. ROGERS:

19  Q.  And would you agree with me that that says:  Bilateral arm

20  paresthesias secondary to iron deficiency.  Do you see that?       01:08PM

21  A.  Yes.

22  Q.  And Doctor, would you agree that the term "secondary" means

23  that the doctor who made this diagnosis believed that the cause

24  of the bilateral arm pain that Mrs. Jones experienced was due

25  to iron deficiency?                                                01:09PM

1   A.   Okay.

2   Q.   And you don't dispute that, do you, Doctor?

3   A.   I don't dispute that that was his diagnosis.

4   Q.   Doctor, let's turn to your opinions about the Eclipse IFU.

5            MR. ROGERS:  And Scott, if you would, would you mind          01:09PM

6   pulling up Exhibit 8325.

7            And, Your Honor, do you mind if we display this to the

8   jury, please?

9            THE COURT:  No.  You may.

10  BY MR. ROGERS:                                                          01:09PM

11  Q.   Doctor, as I understand your opinions about this IFU, you

12  are partially critical about it because you say it provides too

13  much information about complications, but yet you also believe

14  it does not provide enough information about the rate and

15  severity of certain complications.  Is that true?                      01:09PM

16  A.   It provides a laundry list of complications but yet doesn't

17  provide any specificity about incidence or seriousness of

18  complications.

19           MR. ROGERS:  Okay.  Scott, go to the next page,

20  please, and next page.                                                  01:10PM

21  BY MR. ROGERS:

22  Q.   Doctor, this page that's up here, I believe you said that

23  the first thing that an IFU needs to do is provide doctor some

24  information about how to use the device.  Is that correct?

25  A.   That is correct.                                                   01:10PM

 1   Q.  And would you agree with me that the Eclipse IFU does that?

 2   A.  Absolutely.

 3          MR. ROGERS:  And so would you please go, Scott, now to

 4   Section E, which is the warning section.

 5   BY MR. ROGERS:                                                    01:10PM

 6   Q.  And Doctor, you previously testified about this portion of

 7   the IFU, correct?

 8   A.  I did.

 9   Q.  And let's pull out the portion about fracture, please,

10   which I believe is Paragraph 11.                                  01:10PM

11          And Doctor, the first sentence says:  Filter fractures

12   are known complication of vena cava filters.  And you agree

13   that's an accurate statement, correct?

14   A.  I agree that is.

15   Q.  And the next sentence says:  There have been some reports    01:11PM

16   of serious pulmonary and cardiac complications with vena cava

17   filters requiring the retrieval of the fragment utilizing

18   endovascular and/or surgical techniques.  And you would agree

19   with that, correct?

20   A.  Yeah.  There have been some reports, actually probably more   01:11PM

21   than some.

22   Q.  And Doctor, I believe that you said that one of the issues

23   you had with this portion of the IFU is you believed it implied

24   that if there is a fragment that it can always be removed via

25   surgical techniques.  Is that right?                             01:11PM

1   A.   Endovascular or surgical techniques, yes.

2   Q.   Doctor, you would agree with me still, though, there are no

3   always in medicine.  Correct?

4   A.   Absolutely.

5   Q.   And Doctor, when you were counseling patients about a          01:12PM

6   procedure that you are going to perform, you don't counsel them

7   that you will always be successful every single time you do

8   that procedure, correct?

9   A.   You don't.

10  Q.   And let's move on down to a section called precautions,       01:12PM

11  which is Section F.  Well, this section is called precautions.

12  Do you agree?

13  A.   Yes.

14  Q.   And the first thing is the section relates to Eclipse

15  Filter implantation, correct?                                     01:12PM

16  A.   Yes.

17  Q.   And does the IFU provide information about certain

18  precautions that an implanting physician such as yourself

19  should take when they implant an IVC filter?

20  A.   Yes, it does.                                                 01:13PM

21         MR. ROGERS:  Let's scroll on down please, Scott.  And

22  keep on going.  We're going to go down to the next section,

23  please.

24  BY MR. ROGERS:

25  Q.   And then we have a section on Eclipse Filter removal.  Do     01:13PM

1   you see that?

2   A.  Yes.

3   Q.  And are these precautions that a doctor such as yourself

4   should take when they are going to remove a filter?

5   A.  Yes.                                                          01:13PM

6            MR. ROGERS:  And Scott, if you would, can you blow up

7   the section entitled "note" in bold.

8   BY MR. ROGERS:

9   Q.  And Doctor, I'm going to read this section and ask you to

10  follow along with me if you would.  But it reads:  Note,        01:13PM

11  standards and guidelines developed by the Society of

12  Interventional Radiologists recommend that patients with

13  filters, either permanent or retrievable, be tracked and

14  receive routine follow-ups subsequent to the placement of the

15  device.                                                         01:13PM

16           Did I read that correctly?

17  A.  You did.

18  Q.  And Doctor, you are a member of the Society of

19  Interventional Radiologists, correct?

20  A.  Yeah.                                                        01:14PM

21  Q.  And you agree with the statement that patients who receive

22  IVC filters, either permanent or retrievable filters, should

23  receive routine follow-up?

24  A.  Depends what you call routine follow-up, but yes.

25  Q.  That has quotes around it, so it came directly from the     01:14PM

1    standards and guidelines of the SIR, correct?

2    A.  It did.  The guidelines were very general.

3    Q.  So are you critical of the guidelines of the organization

4    of which are you a member of?

5    A.  Yes.  Can I finish my sentence here?  Specifically, these          01:14PM

6    guidelines were for permanent filters.  The retrievable

7    filters, they put out new guidelines but the wording didn't

8    change.

9    Q.  I see.  And I'm assuming, Doctor, you were not involved in

10   the drafting of the guidelines.  Is that right?                       01:14PM

11   A.  No.

12   Q.  And you have never served on any committee that relates to

13   those guidelines?

14   A.  No.

15   Q.  And would you defer to doctors who were involved in the           01:14PM

16   process of drafting those guidelines as to what they mean?

17   A.  Sure.

18   Q.  And let's move on, please, to the next section called

19   potential complications, Section G.

20          And if you would pull that out, Scott.  Thank you.            01:15PM

21          And Doctor, briefly, if you follow along with me,

22   under the section there at the very top, it says that first,

23   complications may occur at any time during or after the

24   procedure.  Do you agree with that?

25   A.  Yes.                                                              01:15PM

1   Q.  And the next sentence says:  Possible complications include

2   but are not limited to the following.  And the first bullet

3   point, that is essentially a repeat of the section that I

4   believe you looked at on movement and migration.  Is that

5   right?                                                          01:15PM

6   A.  It is.

7   Q.  And Doctor, you would agree with me, would you not, that

8   the second -- or excuse me -- the third sentence there says:

9   There have also been reports of caudal migration of the filter,

10  is that correct?                                                01:15PM

11  A.  Yeah.  That infers that there's been a few reports of

12  caudal migration.  Doesn't give an incidence.

13  Q.  And the word "few" does not appear in there, does it,

14  Doctor?

15  A.  It just says "reports" so it's very general.               01:16PM

16  Q.  Doctor, have you ever heard of a term called micromovement

17  in regard to caudal migration?

18  A.  No.

19  Q.  Let's look at the second bullet point.  It says:  Filter

20  fractures are a known complication of filters.  And that's     01:16PM

21  something we just covered, correct?

22  A.  Yes.

23  Q.  And then the third bullet point, again -- Scott, if you

24  would highlight that, and Doctor, if you would follow along, it

25  reads:  Perforation or other acute or chronic damage of the IVC 01:16PM

1  wall.  Do you see that?

2  A.  Yes.

3  Q.  You would agree that that warns about potential

4  perforation, correct?

5  A.  Doesn't give an incidence, but it does warn that it is a      01:16PM

6  complication.

7  Q.  And moving on down, if you would, to the -- let's see.

8  Keep going there, Scott.

9  A.  There's a lot of them.

10  Q.  And let's hold up here.  And then on that little point      01:16PM

11  there where your cursor is, would you highlight that, please?

12  That says filter tilt, correct, Doctor?

13  A.  Again, not giving the incidence, but it does say filter

14  tilt.

15  Q.  This is the portion of the warning that you think provides      01:17PM

16  so much information it really is meaningless, is that correct?

17  A.  Yes.

18  Q.  Let's move on down to the next section, please.

19       And Scott, would you mind highlighting that bold

20  section there.      01:17PM

21       And Doctor, if you would follow along with me:  All of

22  the above complications may be associated with serious adverse

23  events such as medical intervention and/or death.  There have

24  been reports of complications, including death, associated with

25  the use of vena cava filters in morbidly obese patients.  The      01:17PM

1  risk/benefit ratio of any of these complications should be

2  weighed against the inherent risk/benefit ratio for a patient

3  who is at risk of pulmonary embolism without intervention.

4          Did I read that correctly?

5  A.  You did read it correctly.                                01:17PM

6  Q.  Doctor, that last statement about risk/benefit ratio, do

7  you agree with that statement?

8  A.  That you have to measure the risk/benefit ratio --

9  Q.  Yes.

10 A.  -- for a device?  You always have to measure the         01:18PM

11 risk/benefit ratio for a device.

12 Q.  And that's something you do patient by patient every time

13 you perform one of these procedures, correct?

14 A.  Absolutely, and device by device.

15 Q.  And Doctor, I think one of the things that you were       01:18PM

16 critical about this morning of is that it does not provide

17 information about rates of complications.  Is that correct?

18 A.  Correct.

19 Q.  I think you specifically said that one problem you had is

20 that the label did not provide any information about rates of 01:18PM

21 the Simon Nitinol filter compared to the Eclipse Filter.  Is

22 that correct?

23 A.  Correct.  I mean, it basically, when it states that there

24 are known complications, it infers that this device behaves the

25 same as the previous devices.                                 01:18PM

1  Q.  Doctor, am I right that you have never seen an IFU, an

2  Instructions For Use, for any IVC filter that provides

3  comparative rate information between that filter and a

4  different filter?

5  A.  No.  But we had a history, robust history with permanent          01:19PM

6  filters and their complications and their rates of

7  complications and what to expect.  So that's what, you know, we

8  needed to go back to compare this IFU to prior IFUs.

9  Q.  So for any retrievable filter that you have ever used or

10  that you are aware of in the market, are you aware of any          01:19PM

11  retrievable filter that has got comparative information in it

12  about the rate of complication versus that retrievable filter

13  to a permanent filter?

14  A.  No, there is not.

15  Q.  And Doctor, in regard to the Simon Nitinol Filter, you          01:19PM

16  would agree that that is a permanent filter, right?

17  A.  Absolutely.

18  Q.  And you have never attempted to remove a Simon Nitinol

19  filter?

20  A.  I haven't removed them.  I have stented around them before          01:19PM

21  when they are occluded.

22  Q.  Are you aware of any instances where a Simon Nitinol filter

23  had to be removed in an open surgical procedure?

24  A.  I'm sure there have been.

25  Q.  And the Simon Nitinol Filter was not designed to be          01:20PM

1  retrieved, correct?

2  A.  No, it was not.

3  Q.  And you would agree with me that the Eclipse Filter is a

4  filter that was designed such that it could be retrieved,

5  right?                                                              01:20PM

6  A.  Yes.  Absolutely.  That's one of its design

7  characteristics.

8  Q.  Would you please pull up Exhibit 7156, please.

9          And Doctor you have in front of you medical article,

10 correct?                                                            01:20PM

11 A.  It's a Ferris article.

12 Q.  You are familiar with this article, right?

13 A.  Yes.

14 Q.  And this particular article was published in the

15 peer-reviewed medical literature, correct?                          01:20PM

16 A.  In 1992, yes.

17 Q.  And it was published in a journal called the Journal of

18 Vascular and Interventional Radiology, right?

19 A.  Yeah.

20 Q.  And that is the journal that is the journal that publishes   01:20PM

21 for the Society of Interventional Radiologists, right?

22 A.  It does, yes.

23 Q.  So you would agree with me that articles that are published

24 in this particular journal are reliable articles.  Correct?

25 A.  Right.  Yes.                                                    01:21PM

1    MR. ROGERS:  And if you would, Scott, let's roll over

2  to Page 405.

3  BY MR. ROGERS:

4  Q.  Doctor, I realize that's a little grainy, and I apologize

5  for that.  Do you see the section there that's referring to                    01:21PM

6  Figure 5?

7  A.  Yeah, I do.

8  Q.  And if you would again follow along with me.

9    Let me back up.  I apologize.  Can you go back to the

10  first page?                                                                    01:21PM

11    And Doctor, do you agree that this particular article

12  was a study regarding the performance of the Simon Nitinol

13  Filter?

14  A.  Yeah.  20 patients, yes.

15  Q.  And where there were originally -- yeah.  That's right.                    01:21PM

16    So in this particular study Simon Nitinol filters were

17  implanted and they were followed and the doctors were analyzing

18  how they performed, correct?

19  A.  Yeah.

20  Q.  So let's go back over to 405, Figure 5.  And I realize that                01:22PM

21  those images are not particularly easy to see.  But I would ask

22  that you follow along with me with that last sentence.  And it

23  reads:  Chest radiograph obtained at one month reveals the

24  filter in the left pulmonary artery.

25    Do you see that?                                                            01:22PM

1  A.  Yep.

2  Q.  Doctor, would you agree with me that this is a report of a

3  migration of an entire Simon Nitinol Filter, not a fragment, to

4  the left pulmonary artery?

5  A.  Yes, it is.                                                    01:22PM

6  Q.  Doctor, I believe you testified on direct that you charge

7  $500 an hour as an expert witness.  Is that right?

8  A.  Yes.  Uh-huh.

9  Q.  And there's some variability in that, correct, in what you

10  charge?                                                           01:22PM

11  A.  $6,000 a day for trial, and $750 for a deposition because I

12  have to be out of my office.

13  Q.  I understand.  And so for your testimony today, you are

14  charging $6,000?

15  A.  I am.                                                         01:23PM

16  Q.  And did you charge for any time yesterday?

17  A.  Yes.  I was here yesterday.

18  Q.  And was that another $6,000?

19  A.  Yes.  It was a full day, yes.

20  Q.  And so were you just charged $6,000 for yesterday and today  01:23PM

21  for this case?

22  A.  Yeah.

23  Q.  And you don't plan on charging any time tomorrow, is that

24  correct?

25  A.  I hope not.                                                   01:23PM

1  Q.  Okay.  Doctor, those are all the questions I have for you.

2       Thank you.

3            THE COURT:  Redirect?

4            MR. COMBS:  Yes, Your Honor.  Could we approach

5  briefly?                                                        01:23PM

6            THE COURT:  Yes.

7            You can stand up, Ladies and Gentlemen, if you would

8  like to.

9            (Discussion was had at sidebar out of the hearing of

10  the jury:)                                                     01:23PM

11           MR. O'CONNOR:  Your Honor, just now, when they were

12  cross-examining Dr. Hurst they talked about the Eclipse IFU.

13  And they made it a big point to talk about how it covers all

14  these complications.  And one thing that they really emphasized

15  was the reports of death associated with filters in morbidly   01:24PM

16  obese patients.  Now, they know that refers to the Recovery and

17  no other filters across the board.  That was unique to the

18  Recovery.

19           So I think they have opened the door, once again, to

20  we should be able to ask this doctor is he a aware of Recovery  01:24PM

21  deaths with the morbidly obese population and any other filters

22  that cause that.

23           THE COURT:  So what is it that you are asking?

24           MR. O'CONNOR:  To clarify with this doctor this

25  statement about morbidly obese.  There's no other filter that   01:24PM

1   did this with morbidly obese patients other than the Recovery,

2   and they know that.

3          MR. ROGERS:  Your Honor, I completely disagree.  The

4   portion of the warning I showed, the sentence was obviously

5   contained in there.  There was no way for me to talk about the          01:24PM

6   risk/benefit portion without -- I didn't want to exclude that

7   sentence when I was drawing attention to that section.  I don't

8   see how the reference to the IFU has done anything to open the

9   door to the Recovery Filter deaths.

10         MR. O'CONNOR:  You read it into the record.          01:25PM

11         THE COURT:  I'm aware of that.

12         Help me understand, Mr. O'Connor, how you think this

13  opened the door to your being able to introduce evidence of

14  cephalad migration deaths which admittedly don't occur after

15  the recovery.          01:25PM

16         MR. O'CONNOR:  Because if you will recall in the last

17  trial, it was happening in morbidly obese patients with the

18  Recovery.  They made it a point to imply to this jury that

19  that's a known complication in the world of filters.  The only

20  filter that was doing that, the only one Bard was aware of when          01:25PM

21  it made that IFU was the Recovery.  That was a problem they had

22  primarily with the cephalad migration.  In the last trial we

23  talked about the whole issue about morbidly obese patients.  It

24  should be brought up with this doctor he is aware of those

25  happening by the Recovery and no other filter just by the          01:25PM

1    notion that this is a problem across the board with all

2    filters.

3              THE COURT:  So you are concerned that the jury has

4    been led to believe that morbidly obese patient deaths occur

5    from all filters?                                              01:26PM

6              MR. O'CONNOR:  Right.

7              THE COURT:  What is your response to that, Mr. Rogers.

8              MR. ROGERS:  Your Honor, I disagree.  I don't think it

9    implies that one bit.  It is part of this label so I think it's

10   relevant, but I don't think it brings in the Recovery Filter   01:26PM

11   one bit.  It is the warning for the Eclipse Filter.  Nothing

12   about it says Recovery Filter.  Nothing about that says

13   cephalad migration deaths.  It's just a simple statement that

14   it has been reported in morbidly obese patients.

15             THE COURT:  Okay.  Hold on just a minute.            01:26PM

16             It seems to me -- let me say what my thought is and

17   let you respond.

18             What the jury's been told is that a risk of filters

19   migrating and causing death exists in morbidly obese patients.

20   You wanted in the trial to get in evidence that filters can    01:27PM

21   cause death to counter the defense argument that filters saves

22   lives.

23             This clearly doesn't.  I mean, their own warning says

24   it can cause death.  So it seems to me it accomplishes that

25   objective for you.  And what you want to do is make the        01:27PM

1   additional point in your favor that the only filter that causes

2   death in morbidly obese patients is a Bard filter, right?  And

3   you want to take it a step further in your favor.

4           MR. O'CONNOR:  I believe that's correct because we had

5   the evidence that it was -- that was the problem with the          01:27PM

6   Recovery with Bard and that was their concern, was morbidly

7   obese population.  There was no other evidence that any other

8   filter has done that to any other patient.  And so it's

9   misleading the jury right now to suggest otherwise.

10          THE COURT:  Well, that's what I'm wrestling with is        01:28PM

11  the misleading point.  The jury has been told that a risk from

12  filters is death in morbidly obese patients.  They understand

13  that.  They understand Bard has effectively admitted that in

14  its own warning.

15          So that fact, the possibility of death, is in front of    01:28PM

16  the jury.  Bard -- I'm struggling with how the jury is being

17  misled.

18          MR. O'CONNOR:  Because the jury -- they are trying to

19  imply they are just like all the other filters, and they know

20  they are not.  They know that when they talk about -- and they     01:28PM

21  want to fight our contention about increased failure rates.

22  And they have kept out this so far that the only one they are

23  aware of that increased the risk of death and the fact happened

24  to be with the morbidly obese population with Recovery filters.

25  There was no other filter.  Right now, their defense is we are     01:29PM

1    just like all the rest, and they are not.

2              THE COURT:  I understand that point.

3              Do you agree, Mr. Rogers, that death in morbidly obese

4    patients was unique to Bard filters?

5              MR. ROGERS:  I don't agree to that, Your Honor.  I                    01:29PM

6    mean, it certainly -- there were certainly reports of that

7    occurring with the Recovery Filter in morbidly obese patients.

8              THE COURT:  Are you aware of reports of that occurring

9    in other filter cases?

10             MR. NORTH:  I have a vague recollection.  That could        01:29PM

11   be wrong.  I certainly could find out in a few minutes' time.

12             THE COURT:  So the question is whether this is

13   misleading.  That turns on whether or not you are right, this

14   is the only instance where morbidly obese deaths occur.  I

15   don't know how to resolve that.  I will give you an opportunity    01:29PM

16   to resolve it.  Do you have other witnesses?

17             MR. O'CONNOR:  No.

18             THE COURT:  I'm assuming you could if I decide that's

19   relevant with a Bard witness like Mr. Carr or one of the

20   others, bring out the fact that Bard filters were known to        01:30PM

21   cause deaths in morbidly obese patients.  Do you disagree with

22   that?  I know you want to do it now.

23             MR. O'CONNOR:  No.  No.  No.  I think you are correct.

24   But you know, whether they go out and find the outlier out

25   there, it's still not going to resolve the problem.  This is in    01:30PM

1    there because they knew about the Recovery risk.

2              THE COURT:  I can't find that the door has been opened

3    now.  I want to have you come forward with whatever evidence

4    there is that this is not a unique Bard problem.  And then I

5    will address your point, Mr. O'Connor, that the jury has been          01:30PM

6    misled.  You can do it through another witness.

7              MR. O'CONNOR:  Fair enough.

8              (In open court.)

9              THE COURT:  Thank you, Ladies and Gentlemen.

10             MR. COMBS:  May I proceed, Your Honor?                       01:30PM

11             THE COURT:  Yes.

12             MR. COMBS:  I will be brief because Dr. Hurst has a

13   flight to catch.  At least as brief as I can.

14                       REDIRECT EXAMINATION

15   BY MR. COMBS:                                                          01:31PM

16   Q.  Dr. Hurst, you were provided a lot of Doris Jones' medical

17   records to review for your work in this case?

18   A.  Correct.

19   Q.  And I think you have already testified you are not an

20   expert who is shy about asking for more records or going and          01:31PM

21   getting additional records if you need them to complete your

22   reports and opinions?

23   A.  Yes.

24   Q.  Was there any other medical records that you wanted but

25   weren't able to access to compile your opinions in this case?         01:31PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Hurst-Redirect

1   A.   No.

2   Q.   Does Doris Jones have health complications that are

3   unrelated to the IVC filter?

4   A.   Absolutely.  She has many illnesses.

5   Q.   And how does she fit in with the general population of          01:31PM

6   people that you implant IVC filters in?

7   A.   Many of the people who get IVC filters already have

8   multiple illnesses.  That's one of the reasons they are getting

9   a filter is because they have DVT and they have a

10  contraindication to anticoagulation.  Most of the time that      01:32PM

11  contraindication is related to some other illness.

12  Q.   Doris Jones' health history isn't abnormal for a recipient

13  of an IVC filter?

14  A.   Absolutely not.

15           MR. COMBS:  Would you pull up 4406.                      01:32PM

16           I believe this is already any evidence, Your Honor.

17           THE COURT:  Yes.

18           MR. COMBS:  May I publish?

19           THE COURT:  You may.

20           MR. COMBS:  Actually, let's go to the second page       01:32PM

21  please.

22  BY MR. COMBS:

23  Q.   You might have to help me, Dr. Hurst.  You were trying to

24  read from a medical record earlier on cross, and I'd like you

25  to be able to complete what you were starting to look at.  But   01:33PM

1  is this -- maybe we need to go back to the first page or maybe

2  you can help me find in this record where that -- where you

3  were reading from.

4  A.  This is -- you need the history and physical from the ER.

5  Isn't that what you are looking for?  This is the report of the    01:33PM

6  IVC filter removal.  It's the wrong -- the one I was reading

7  from was the history and physical from her date of presentation

8  to the emergency department done by the ER physician.

9  Q.  Well, what do you recall from what you were trying to read

10  about Doris Jones' health history in April of 2015?    01:33PM

11  A.  So basically, the history and physical that was done by the

12  emergency room physician described her ailments that she had

13  that brought her to the ER.  And one of them was this dizziness

14  and -- no, that's not it.  That's the discharge summary.

15       The thing that really brought her -- one of the things    01:34PM

16  that brought her in also was some shoulder and arm pain,

17  started out on the left side and then went to the right side.

18  The pulmonary arteries are not innervated per se with pain

19  receptors, and neither is the mediastinum or the chest.  That's

20  why you get what's called referred pain.  There are nerves    01:34PM

21  that --

22       MR. ROGERS:  I'm sorry to interrupt, but this has not

23  been covered in his report.

24       THE COURT:  Overruled.  I think this is fair redirect

25  based on what was covered in cross.    01:34PM

1    THE WITNESS:  So the nerves in the chest are --

2  sensory fibers actually transfer that feeling of pain to the

3  sensory fibers that go out to your arms, your shoulder, the

4  upper portion of your neck and chest.  That's why when you have

5  a heart attack you get left-sided chest pain and pain up into      01:35PM

6  your neck.

7    The pulmonary arteries are very similar.  They are

8  innervated by the vagus nerve.  And the distribution pain for

9  referred pain to the vagus nerve is the shoulder and upper

10  arms.  So it wouldn't be unusual for someone with a problem in     01:35PM

11  their pulmonary artery, like when we used to do pulmonary

12  artery angioplasty, the patients would get tremendous pain in

13  their shoulders from inflating the balloon.

14    So it's not unusual to have pain related to the

15  pulmonary arteries referred to the shoulders and arm.             01:35PM

16  BY MR. COMBS:

17  Q.  Dr. Hurst, you were asked a series of questions about other

18  IVC filters and a whole bunch of different brand names were

19  thrown out.

20  A.  Sure.                                                         01:35PM

21  Q.  Are any of the other IVC filters you are familiar with, do

22  any of them have the problems of the Bard G2 Eclipse line of

23  filters?

24  A.  The Gunther Tulip has problems with penetration, with

25  fractures, and with fragments that can migrate, again, because    01:36PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Hurst-Redirect

1  of its design.  The feet of these filters were made to release

2  from the inferior vena cava once that radial force of the

3  filter was disrupted.  When the fracture happens in the filter,

4  it disrupts that radial force and then the foot just can pull

5  right out of the inferior vena cava wall.                        01:36PM

6  Q.  Let me ask it a little different way.  What's unique about

7  the problems with failures in the Bard Eclipse G2 line of

8  filters?

9  A.  Well, the unique thing is that the Bard filter is the only

10  one that has these free arms that we showed previously.  That   01:36PM

11  upper tier of arms is actually really only attached in one

12  place, and that's it, the cone in the filter.  And if that

13  detachment, if it detaches from the cone then it's free.

14  Q.  You were asked about the Denali Filter that you use from

15  time to time.  Could you explain to the jury what your current  01:37PM

16  practice is with using the Denali Filter?

17  A.  So we use the Denali Filter only as a retrievable filter or

18  a temporary device.  So if a patient has an issue where they

19  can't receive anticoagulation but has a DVT and needs

20  protection from a PE, but we feel like that issue may pass      01:37PM

21  we'll put in a retrievable filter.  And then what we do is we

22  see those patients in follow-up usually within one month and

23  determine whether or not they are going to still need a filter.

24          If they are still going to need a filter we'll

25  actually follow them out to about three months, and at that     01:37PM

1   point, if we feel like they are going to need a permanent

2   filter we'll retrieve the temporary filter, the Denali Filter,

3   and we'll put in a permanent filter.

4   Q.  Did Bard ever tell interventional radiologists such as

5   yourself that the G2 Eclipse line of filters needed to be                   01:38PM

6   followed or monitored after implantation?

7   A.  So the recommendations that were given in the IFU, you saw

8   them.  They actually did make some recommendations.  What they

9   told you to do was refer to the SIR recommendations and they

10  referred also to two additional papers which he didn't cover.              01:38PM

11         All three of those articles made recommendations for

12  clinical follow-up of the filter, and they left it up to the

13  physician to do the follow-up.

14         In the original trial for the Recovery Filter, the

15  person who did the study, his name was Murray Asch, after doing            01:38PM

16  the study and in his deposition both, he recommended that there

17  be imaging follow-up for these filters because he felt that

18  there was -- that because of his study that he did, the

19  original study for these retrievable filters, that there might

20  be some instability with these devices and that they should be            01:39PM

21  followed with imaging.

22         That recommendation was never put into the IFU, and it

23  was sort of left up in the air.

24  Q.  In fact, the IFU specifically describes, we just saw it

25  blown up a minute ago, that the Eclipse was intended for use as           01:39PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Hurst-Redirect

1   a permanent device.  Correct?

2   A.  Correct.

3   Q.  And in the Eclipse IFU, we saw precaution sections for

4   placement.  Do you remember that?

5   A.  Yes.                                                    01:39PM

6   Q.  And a precaution section for removal.  Do you remember

7   that?

8   A.  Yes.

9   Q.  Is there anything in the Eclipse IFU, is there a section

10  for precautions for leaving it in the body?               01:39PM

11  A.  No.  Not -- no.

12  Q.  Do you have opinions about the monitoring and follow-up

13  that Doris Jones should receive because of the filter fragment

14  piece in her?

15        MR. ROGERS:  Your Honor, objection.  This is beyond   01:40PM

16  the scope of the cross or the prior direct.

17        THE COURT:  I think that is beyond the scope.  I'm

18  going to sustain the objection.

19  BY MR. COMBS:

20  Q.  You were asked a lot of questions about the 2012 and 2013  01:40PM

21  hospital visits.  And have you reviewed imaging for those

22  visits?

23  A.  Yes.

24  Q.  And the problems with the filters show up in the imaging

25  for those visits?                                          01:40PM

UNITED STATES DISTRICT COURT

```
 1              MR. ROGERS:  Your Honor, objection.  This is beyond

 2    the scope of the direct or the cross.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  Can you repeat your question?

 5    BY MR. COMBS:                                               01:40PM

 6    Q.  In the 2012 and 2013 imaging of chest X-ray films, I

 7    believe, what did those show for Doris Jones' Eclipse Filter?

 8    A.  The 2000 films didn't show a whole lot.  The filter was in

 9    good position.  You can only really see the top of the filter

10    because it was a chest X-ray.  The 2013, she had what's called  01:41PM

11    a rib series because she was having this costochondritis rib

12    thing again.  And that includes a picture of her abdomen in

13    which you can see the filter.  And in that picture you can see

14    that the filter is tilted just about 8 to 10 degrees and has

15    caudally migrated about a centimeter.  So it's changed        01:41PM

16    position.

17    Q.  I want to pull up the Trerotola article.  I don't know the

18    best way to do that.  It's a defense exhibit, I think.

19              MR. ROGERS:  Exhibit 8602.

20              MR. COMBS:  And if you could go to the, I believe it's  01:42PM

21    the second to last page.

22              MR. ROGERS:  Your Honor, I apologize for interrupting,

23    but this exhibit was not admitted into evidence.  Just certain

24    portions of it were published and it should not be published to

25    the jury.                                                     01:42PM
```

1    THE COURT:  I agree it's not admitted.  It can be used

2    under 803.18.

3         MR. COMBS:  I'm not trying to publish it, Your Honor.

4    I wanted to ask some follow-up on it.

5         THE COURT:  That's fine.                                01:43PM

6    BY MR. COMBS:

7    Q.  Second to last page.  There we go.

8         And do you see down there where it says in the middle

9    of the bottom:  Disclosures of conflict of interest?

10   A.  Yes, I do.  Yes.                                         01:43PM

11   Q.  And it talks about -- you don't have to read it into the

12   record.  I don't think -- that might not be appropriate anyway.

13   But reading it there, what does that say to you reading that

14   disclosures of conflicts of interest?

15        MR. ROGERS:  Objection, Your Honor.  This is hearsay.   01:43PM

16        THE COURT:  Overruled.  He's not asking him to repeat

17   what has been said.  He's asking for your impression, Doctor.

18        THE WITNESS:  So when you do a journal article or you

19   write a -- do a study, you have to disclose as a matter of

20   course any conflicts of interest that you might have, anything  01:44PM

21   that might bias you when you are doing the study.  So in this

22   particular article, SOT on your screen there is Scott

23   Trerotola.  And it basically says he is a paid consultant and

24   he receives honoraria from Bard Peripheral Vascular.  So does

25   SWS.  So --                                                  01:44PM

1   BY MR. COMBS:

2   Q.   That's the other author of this?

3   A.   Yeah.  So basically what that means is they have disclosed

4   that they are both receiving funds from Bard.

5   Q.   And just generally, I don't want to go through the article,     01:44PM

6   but just generally, does this article support your opinion that

7   there is little information on embolized filter fragments in

8   the medical literature?

9   A.   Exactly.  I mean, in this particular article, you know,

10  there are only six fragments with were evaluated in the          01:45PM

11  pulmonary artery.  That's six fragments out of however many

12  fragments are out there.  And they only -- they don't really

13  describe their follow-up.  They give a range of years of

14  follow-up from two months to eight and-a-half years with an

15  average of three and-a-half years.  And the imaging that they     01:45PM

16  use to follow it, they don't describe completely but I think

17  they were using chest X-rays which is a very imprecise way to

18  measure movement of a fragment that's only 1.4 centimeters in

19  length and only a couple million in diameter.

20          So while it's a good start, it certainly is not the       01:45PM

21  complete and last word on what pulmonary artery fragments are

22  going to do.  I just don't think we know.

23  Q.   Basically this article is just a summary of these doctors'

24  work removing filter fragments.  Is that a fair summary of

25  this?                                                            01:46PM

1  A.  Exactly.

2  Q.  How many of the filter fragments discussed in this article

3  were from Bard IVC filters?

4  A.  50 percent of the fractured filters, or fragments, were

5  from Bard devices.                                            01:46PM

6  Q.  And you were asked some questions, I think, based on this

7  article about whether fragments that embolized to the pulmonary

8  artery are symptomatic or asymptomatic.  Do you recall that?

9  A.  Yeah.

10  Q.  And I think there's an implication in this litigation that  01:46PM

11  asymptomatic filter fragments aren't a problem.  Is that right

12  in that asymptomatic filter fragments aren't a problem, or is

13  there a problem even if there's no current symptoms?

14  A.  I mean, when you talk about filter fragments you have to

15  talk about all the fragments not just the ones in the pulmonary  01:46PM

16  arteries.  And we know that these fragments can migrate.  So

17  they may be asymptomatic one year and the next year they have

18  moved to a location that's more critical.

19       So we have seen fragments that have migrated through

20  the IVC, through the tissues of the retroperitoneum into the    01:47PM

21  ureter or the kidney.  We have seen fragments migrate to where

22  they are touching bone and the patient is having back pain.

23       So they may start out asymptomatic, and they may

24  remain asymptomatic, but they also can become symptomatic.

25  Q.  They are asymptomatic until they are not, right?           01:47PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Hurst-Redirect

1    A.   Exactly.

2    Q.   You were shown an article about the Simon Nitinol Filter.

3    I didn't know if you had any other comments on that but I

4    wanted to make sure you had an opportunity if you had any

5    further comments on that article to tell the jury.                   01:47PM

6    A.   I don't think I did.  No.

7    Q.   And then you were asked about some of your deposition

8    testimony about 1 percent rates and 1 percent chance of harm

9    and things like that.  When you testified about that 1 percent

10   chance of something happening when?  Over the next week?  The    01:48PM

11   next month?  In Doris Jones' lifetime?  What temporal -- what

12   time frame did you have in mind when you talked about 1 percent

13   chance of something bad happening?

14   A.   I think I was talking about 1 percent per year.

15           MR. COMBS:  Nothing further, Your Honor.                  01:48PM

16           THE COURT:  Thank you, Doctor.  You can step down.

17           MR. COMBS:  Dr. Hurst.  Sorry, Your Honor, if I may

18   one more question.  Definitely one.

19   BY MR. COMBS:

20   Q.   Are all the opinions you just gave on redirect as well as    01:48PM

21   your opinions on direct examination to a reasonable degree of

22   medical probability?

23   A.   Yes.

24           MR. COMBS:  Thank you.

25           THE COURT:  All right.  Thank you.                        01:48PM

1    MR. LOPEZ:  Your Honor, before we call our next

2  witness, can we deal with the deposition of Dr. Altonaga, the

3  one section the court reporter read?

4    THE COURT:  Yes.  Before you came in this morning,

5  Ladies and Gentlemen, we discussed the fact that there was a          01:49PM

6  question and answer in the video of Dr. Altonaga yesterday that

7  you couldn't really hear.  You couldn't hear the question.  You

8  could hear the answer.  It was being read back by the court

9  reporter.

10    So I decided we should re-read to you that question          01:49PM

11  and answer from his deposition.  By doing that we're not

12  intending to emphasize this testimony over any other.  We just

13  want to make sure it was heard.

14    MR. LOPEZ:  The question was:  Would it be your

15  expectation that when Bard launches a filter for commercial use          01:49PM

16  that Bard would have an awareness about the long term clinical

17  performance of that device?

18    And the answer was yes.

19    THE COURT:  Okay.  Thanks.

20    All right.  Your next witness.          01:49PM

21    MR. CLARK:  Your Honor, the plaintiff would call Dr.

22  Anthony Avino via video deposition and at this time would move

23  into evidence Exhibits 1133, 4401, 4402.

24    THE COURT:  Any objection to those exhibits?

25    MS. HELM:  None, Your Honor.          01:50PM

1    THE COURT:  All right.  Those are admitted.

2    MR. CLARK:  And, Your Honor, there are a couple of

3    other deposition exhibits that are already in evidence, so I

4    have prepared a cheat sheet for the jury if that would be

5    appropriate.                                                    01:50PM

6    THE COURT:  Yes.  That's fine.

7    MR. CLARK:  May I approach?

8    THE COURT:  Yes.  Give it to Traci and she'll handle

9    that.

10   MR. CLARK:  May I be permitted to read the summary?           01:51PM

11   THE COURT:  You may.

12   MR. CLARK:  Dr. Anthony Avino is a board certified

13   surgeon in Savannah, Georgia.  He has been practicing since

14   1999.

15   (Video deposition testimony played in open court.)           01:51PM

16   THE COURT:  Counsel, let's stop at this point, please.

17   Ladies and Gentlemen, we will break until 2:45 and

18   excuse the jury at this time.

19   (Recess from 2:29 p.m. until 2:46 p.m.)

20   THE COURT:  Ladies and gentlemen, for your              02:46PM

21   information, we'll go until 4:20 today.  We have some hearings

22   at 4:30.  We'll have to break.

23   You can continue with the deposition.

24   (Video deposition testimony resumed.)

25   MR. O'CONNOR:  Your Honor, we call at this time        02:46PM

─5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Matthews-Direct─

1   Shanice Matthews.

2          THE COURTROOM DEPUTY:  Ms. Matthews, if you would

3   please come forward.  Stand right here and raise your right

4   hand, please.

5          (The witness was sworn.)                                    02:52PM

6          THE COURTROOM DEPUTY:  Could you please spell your

7   first and last name for the record.

8          THE WITNESS:  Shanice, S-H-A-N-I-C-E, Matthews,

9   M-A-T-T-H-E-W-S.

10          THE COURTROOM DEPUTY:  Thank you so much.  Please come    02:53PM

11   have a seat.

12          MR. O'CONNOR:  May I proceed, Your Honor?

13          THE COURT:  Yes.

14                    SHANICE MATTHEWS,

15   called as a witness herein, having been duly sworn, was

16   examined and testified as follows:

17                    DIRECT EXAMINATION

18   BY MR. O'CONNOR:

19   Q.  Would you introduce yourself to the jury, please?

20   A.  Hi.  My name is Shanice Matthews.                            02:53PM

21   Q.  How do you feel today, Shanice?

22   A.  A little nervous but good.

23   Q.  Are you one of the daughters of Doris Jones?

24   A.  I'm her youngest daughter.

25   Q.  Do you have a sister?                                        02:53PM

1  A.  Yes, sir.

2  Q.  What is her name?

3  A.  Sharese May.

4  Q.  And where are you from?

5  A.  I'm from Savannah, Georgia.                           02:53PM

6  Q.  Did you come here from Savannah to be in this trial?

7  A.  Yes, sir.

8  Q.  Now, tell us a little bit about yourself.  How old are you?

9  A.  I am 26 years old.

10  Q.  And do you have any children?                        02:54PM

11  A.  I have two daughters.

12  Q.  And what are their names and ages?

13  A.  Chastity Matthews.  She's seven.  She's my oldest.  And

14  Zi'Yari Matthews.  She's three.  She's my youngest.

15  Q.  Are you married?                                     02:54PM

16  A.  Yes, sir.

17  Q.  What is your husband's name?

18  A.  His name is DeAndre Matthews.

19  Q.  Back in Savannah, Georgia, do you work?

20  A.  Yes, sir.                                            02:54PM

21  Q.  Would you tell us what you do?

22  A.  I am a housekeeper at Springhill Suites.

23  Q.  How many hours a week do you work?

24  A.  Between eight and nine.

25  Q.  And do you go to school?                             02:54PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Matthews-Direct

1    A.  Yes, sir, I do.

2    Q.  Where are you going to school at?

3    A.  I go to Savannah Technical College.

4    Q.  Would you tell the members of the jury what you are doing

5    in school right now?                                            02:54PM

6    A.  I'm receiving my GED.

7    Q.  So did your mother raise you and your sister?

8    A.  Yes, sir.

9    Q.  Tell us about your mother and your relationship with her,

10   Doris Jones.                                                    02:54PM

11   A.  Well, my mom, she was a single mother, and she raised me

12   and my sister to have a good life.  In school she made sure we

13   got to school every day safely, eat, you know.

14   Q.  How did she make sure you got to school safely every day?

15   A.  She walked us to school every day.                          02:55PM

16   Q.  Elementary school?

17   A.  Yes, sir.

18   Q.  Did she used to come and take you back?

19   A.  Yes, sir.

20   Q.  Now, when you go to work and school every day who takes     02:55PM

21   care of your children?

22   A.  My mother.

23   Q.  Does she do that every day for you?

24   A.  Yes, sir.

25   Q.  How do you feel about that?                                 02:55PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Matthews-Direct

1   A.  I feel like they are in safe hands.

2   Q.  Does that help you out?

3   A.  A lot.  Yes, sir.

4   Q.  How so?

5   A.  Because I don't trust any daycares, and my mom is the best      02:55PM

6   person I know to take care of my kids.  She took care of me.

7   Q.  I'm sorry.  I interrupted you.  I apologize.

8   A.  She took care of me and my sister to the best knowledge she

9   could, and I believe she could do the same with my girls.

10  Q.  Does that give you peace of mind when you go to work and       02:56PM

11  school every day?

12  A.  Yes, sir.

13  Q.  Now, Shanice, are you aware that your mom received an IVC

14  filter in August of 2010?

15  A.  Yes, sir.                                                      02:56PM

16  Q.  And then in April of 2015, are you aware that your mother

17  had problems with the filter?

18  A.  Yes, sir.

19  Q.  Would you tell the members of the jury how you became aware

20  of what problems your mom had with her filter.  What happened?    02:56PM

21  What do you know?

22  A.  Well, from what I know she went to the hospital because she

23  wasn't feeling well, and --

24  Q.  And then did she -- did you learn at some point in time

25  that something happened to her filter?                            02:56PM

1    A.  Yes, sir.

2    Q.  What did you learn?

3    A.  That it broke off and embedded into her lung.

4    Q.  And did you -- were you aware the main part of the filter

5    was removed?                                                    02:57PM

6    A.  Yes, sir.

7    Q.  Now, that was in 2015, correct?

8    A.  Yes, sir.

9    Q.  Does your mom continue to take care of your two little

10   girls?                                                          02:57PM

11   A.  Yes, sir.

12   Q.  And your sister, does she have a child?

13   A.  Yes, sir.  She has a one-year-old daughter.

14   Q.  So what's Sharese's daughter's name?

15   A.  Monae Jones.                                                02:57PM

16   Q.  Does your mother take care of Monae?

17   A.  Yes, sir.

18   Q.  And does she do that every day?

19   A.  Yes, sir.

20   Q.  Tell us, if you would, from your perspective, knowing your  02:57PM

21   mom, Doris, how having that piece of that filter embedded in

22   her lung, how does she deal with that?

23          MS. HELM:  Your Honor, object.  Calls for either

24   hearsay or speculation or both.

25          THE COURT:  I think you need to call for observations    02:57PM

1   in your questioning, Mr. O'Connor.

2   BY MR. O'CONNOR:

3   Q.  You see your mom every day, is that right?

4   A.  Yes, sir.

5   Q.  And you know that she has an embedded filter in her lung?   02:57PM

6   A.  Yes, sir.

7   Q.  Have you observed how she deals with that?

8   A.  It scares her.

9   Q.  Does she talk about it?

10  A.  No, sir.  But I can see in her eyes that it scares -- it   02:58PM

11  hurts her.

12  Q.  But she never talks about it?

13  A.  No, sir.

14  Q.  Why is that?

15  A.  Because she wants to be strong for me, my sister, and her   02:58PM

16  granddaughters.  So she doesn't like us to see her fear.

17  Q.  Does she stay strong despite it all?

18  A.  Yes, as to her best she can.

19  Q.  All right.  Thanks.  That as all I have.

20          THE COURT:  Any cross-examination?   02:58PM

21          MS. HELM:  None, Your Honor.

22          THE COURT:  Thanks, Ms. Matthews.

23          THE WITNESS:  Thanks so much.

24          MR. STOLLER:  Your Honor, plaintiff calls Alex

25  Tessmer.   02:59PM

```
 1            THE COURT:  If you want to stand up, Ladies and
 2   Gentlemen, while the witness is coming up, feel free.
 3            THE COURTROOM DEPUTY:  Sir, if you will please come
 4   forward.  If you will raise your right hand, please.
 5            (The witness was sworn.)                          02:59PM
 6            THE COURTROOM DEPUTY:  Please state your name and
 7   spell it for the record.
 8            THE WITNESS:  Alex Tessmer.  A-L-E-X, T-E-S-S-M-E-R.
 9            THE COURTROOM DEPUTY:  Thank you.  Please come have a
10   seat.                                                      02:59PM
11                        ALEX TESSMER,
12   called as a witness herein, having been duly sworn, was
13   examined and testified as follows:
14                     DIRECT EXAMINATION
15   BY MR. STOLLER:
16   Q.  Good afternoon, Mr. Tessmer.
17   A.  Good afternoon.
18   Q.  My name is Paul Stoller.  We haven't met before.  How are
19   you doing this afternoon?
20   A.  I'm doing well.  How are you?                          03:00PM
21   Q.  Good.  Thank you.
22            I understand that you work for Bard, is that correct?
23   A.  Yes.
24   Q.  Currently you are in a marketing position at Bard?
25   A.  That is correct.                                       03:00PM
```

1   Q.  But back in about 2002 to around 2005, you were a member of

2   the filter franchise team.  Correct?

3   A.  That is correct.

4   Q.  You were -- you held the position as an engineer?

5   A.  That is correct.                                                03:00PM

6   Q.  And you worked on IVC filters, among other things?

7   A.  So my specific role was to work on the jugular delivery

8   system.  And I was pulled from time to time to help out with

9   different aspects of the filter.  But that was not my

10  expertise, the filter itself.                                       03:00PM

11  Q.  Let me -- I will try to be clear and I will try to ask

12  clear questions.  If you don't understand, let me know.  But my

13  question, I think, sir, was:  You worked on IVC filters among

14  other things.  Is that true?

15  A.  I worked on the jugular delivery system.                        03:01PM

16  Q.  As part of the IVC filter franchise team?

17  A.  I was part of the filter franchise team, and they pulled me

18  in to do testing and so forth once in a while on the filter

19  itself.

20  Q.  Sir, I will ask you questions.  But is the answer to my         03:01PM

21  question correct, you were part of the filter franchise team?

22  A.  Yes.

23  Q.  And you worked on IVC filters.  Thank you.

24          And you just mentioned that you worked on some testing

25  at some points in time, is that correct?                            03:01PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1   A.  That is correct.

2   Q.  I'm going to ask you, you were part, in December of 2003,

3   of a special design review for the Recovery Filter, correct?

4   A.  That is correct.

5          MR. STOLLER:  Can we pull up, Gay, Exhibit 1006,          03:01PM

6   please?

7          Your Honor, I believe this is in evidence.  May I show

8   it to the jury?

9          THE COURT:  Yes, you may.

10          MR. STOLLER:  Thank you.                                 03:01PM

11  BY MR. STOLLER:

12  Q.  Mr. Tessmer, you should have on the screen what's Exhibit

13  1006 to this trial, which is an e-mail on the top to, among

14  others, you, dated December 10, 2003.  Do you see that?

15  A.  Yes, I do.                                                   03:02PM

16  Q.  And the subject line is Special Design Review for Recovery

17  Meeting Minutes, correct?

18  A.  Correct.

19  Q.  And if we go to the next page, we have a memorandum that

20  appears to be those meeting minutes.  Correct?                  03:02PM

21  A.  Correct.

22  Q.  And you have seen this document before, haven't you, sir?

23  A.  I have seen it.

24  Q.  And the e-mail -- or sorry -- the memorandum is addressed

25  to you among others, correct?                                   03:02PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    A.  That is correct.

2    Q.  And if we look at the first paragraph just underneath the

3    subject line, it says:  A special design review meeting was

4    held on Friday, December 5th, 2003, to discuss the Recovery

5    Filter and Cone projects.  It has some numbers in the                  03:02PM

6    parenthesis.  The purpose of this special review was to gain

7    further understanding related to the design elements of these

8    products in anticipation of the up-and-coming full market

9    release in January of 2004.  Correct?

10   A.  That is what it says, correct.                                     03:03PM

11   Q.  And you were at that meeting, correct?

12   A.  Yes, as far as I -- according to this document.

13   Recollection is a little fuzzy.  It's been over a decade.  But

14   according to this, yes, I was at that meeting.

15   Q.  And the subject matter discussed at that meeting was to        03:03PM

16   gain a further understanding related to design elements of the

17   Recovery Filter, correct?

18   A.  Design elements of these products in anticipation of

19   up-and-coming FMR, correct.

20   Q.  And the products included the Recovery Filter, correct?        03:03PM

21   A.  Yes.

22   Q.  If we go down a couple of paragraphs it says:  The

23   following items resulted from this meeting.  Do you see that?

24   A.  Yes, I do.

25   Q.  And the first of those talks about deployment force in         03:03PM

1  bold.  Do you see that?

2  A.  Yes.

3  Q.  Second, partial deployment in bold?

4  A.  Yes.

5  Q.  And the third related to the issue of migration.  Do you          03:04PM

6  see that?

7  A.  Yes.

8  Q.  Like to focus, if we can, sir, on the third point which

9  says:  Related to the issue of migration, the review team would

10  like to see objective evidence of the following elements.          03:04PM

11          Do you see that?

12  A.  Yes.

13  Q.  And the first one under A says:  Documentation that

14  explains the establishment of the 50 millimeters mmHd, which is

15  millimeters mercury, correct?          03:04PM

16  A.  Correct.

17  Q.  So it says:  Documentation that explains the establishment

18  of the 50 millimeters mercury acceptance criteria for migration

19  resistance, correct?

20  A.  Yes.          03:04PM

21  Q.  And that was one of the items that the Design Review

22  Committee wanted to see, correct?

23  A.  Yes.

24  Q.  And if we turn to the next page, 3, there are four -- I'm

25  sorry -- five more items, B through F.  Do you see that?          03:04PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1   A.  Yes, I do.

2   Q.  And B says:  A migration resistance study that analyzes the

3   performance of the Recovery Filter in conjunction with tilting

4   and quantity of legs and hooks.  True?

5   A.  True.                                                          03:05PM

6   Q.  And the next one says:  C, a migration resistance study

7   that compares the Recovery Filter to competitive products, then

8   in parenthesis, e.g. Greenfield.

9        Did I read that correctly?

10  A.  Yes.                                                           03:05PM

11  Q.  Do you recall, sir, why they were asking about comparison

12  to the Greenfield Filter?

13  A.  It says example given, Greenfield not exactly -- don't

14  recall exactly why.  They just chose Greenfield on there.

15  Q.  Sitting here today, sir, do you recall that Greenfield was   03:05PM

16  one of the predicate devices for the Recovery Filter?

17  A.  Okay.  So that was -- okay, for the 510(k).  Okay.

18  Q.  Do you recall that?

19  A.  I do not recall that.

20  Q.  Do you recall the SNF, Simon Nitinol, was also the           03:05PM

21  predicate device for the Recovery Filter?

22  A.  I think in my preparation for today, I think I did see

23  that.

24  Q.  Okay.  So at least for the Simon Nitinol you recall that

25  that's a predicate but you are not sure about the Greenfield.     03:06PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1  Is that correct?

2  A.  That's correct.

3  Q.  They ask about a couple other things.  I'll skip ahead to

4  D, they ask about radial force.  Do you see that?

5  A.  Yes, I do see it.                                    03:06PM

6  Q.  In E, they ask about a migration resistance study on the

7  filter that was manufactured at a certain location.  Do you see

8  that?

9  A.  Yes, I do.

10  Q.  Finally, they ask under F, a migration resistance study    03:06PM

11  that analyzes the performance of the Recovery Filter in

12  conjunction with an oval and/or D shaped IVC track.

13          Do you see that?

14  A.  Yes, I do.

15  Q.  And at the time that the special Design Review Committee    03:06PM

16  was asking for, I believe their language on the prior page was

17  objective evidence of these items, you were approximately,

18  what, six weeks before full market release of the product?

19  A.  It appears to be that way if you go back to the top.

20  Q.  Well, you know, sir, sitting here today, that the full     03:07PM

21  market release wasn't until January of 2004, correct?

22  A.  Well, I saw in the document it was anticipated --

23  anticipation of the full market release.  If the full market

24  release had actually occurred, I don't recollect.

25  Q.  You know this question was shortly before it was           03:07PM

1   anticipated that full market release was going to happen,

2   correct?

3   A.  I believe, yes, according to this document.

4   Q.  Is your memory any different than that?

5   A.  I do not.                                                    03:07PM

6   Q.  So at that time, shortly before full market release, the

7   special Design Review Committee who had been tasked to look at

8   this device before it went to market had these six plus

9   questions for which they still wanted objective evidence,

10  correct?                                                         03:07PM

11  A.  It appears from the document we are looking into these

12  questions, correct.

13  Q.  And do you recall that those tests were not completed and

14  provided back to the Design Review Committee until after full

15  market release?                                                  03:08PM

16  A.  That I don't recall, or I am not aware.

17           MR. STOLLER:  Let's look, Gay, if we can, at Exhibit

18  2062.

19           Your Honor, this is also in evidence.  May we display

20  it to the jury?                                                  03:08PM

21           THE COURT:  Yes.

22           MR. STOLLER:  Thank you.

23  BY MR. STOLLER:

24  Q.  Mr. Tessmer, Exhibit 2062 is a memorandum to, it says file,

25  from Mr. Carr.  Who is Mr. Carr?                                 03:08PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    A.  At one point he was my boss.

2    Q.  And at that point in time he was your boss, correct?

3    A.  Correct.  Well, just to be fair, he was my boss and then at

4    some point he appointed another boss that reported up to Rob.

5    Q.  Okay.                                                    03:08PM

6    A.  But he was the director at the time, I believe.

7    Q.  And Mr. Carr was the head of the filter franchise team,

8    correct?

9    A.  Yes.

10   Q.  Of which you were a member, correct?                     03:09PM

11   A.  That is correct.

12   Q.  And this memo, it says in the first paragraph:  This memo

13   is in response to the special design reviews conducted on

14   December 5th for projects 7018 and 8008.  Do you see that?

15   A.  I do.                                                    03:09PM

16   Q.  And do you recall those are the numbers associated with the

17   Recovery Filter and the Recovery Cone?

18   A.  I believe those were the numbers.

19   Q.  If we look down, there are numbers on the left-hand side of

20   this 1, 2, and 3.  Do you see those?                        03:09PM

21   A.  Yes.

22   Q.  And if we look all the way down to Number 3, you see it

23   says:  Related to the issues of migration, the review team

24   would like to see objective evidence of the following elements,

25   correct?                                                    03:09PM

1  A.  Correct.

2  Q.  Same language we just saw in the memorandum and the minutes

3  of the special design review meeting, correct?

4  A.  Yes.  It appears to be similar.

5  Q.  And there appears to be some language in the A and the B on          03:10PM

6  this page that corresponds to what we just saw on those meeting

7  minutes, correct?

8  A.  Yes.

9  Q.  And if we look under A, it says:  The team will investigate

10  the development of the acceptance criteria and provide what          03:10PM

11  information is available by February 6th, 2004.  Correct?

12  A.  That's what it says, yes.

13  Q.  And so you had anticipated full market release in January

14  of 2004 and according to Mr. Carr, anticipated answering the

15  first question by February 6th.  Correct?          03:10PM

16  A.  That's what this says here, yes.

17  Q.  And look at B at the bottom of the page, which is migration

18  resistance study.  Do you see that?

19  A.  Yes.

20  Q.  Let's turn to the next page.  I want you to keep that in          03:10PM

21  mind.  That's Item B.  And it appears that if we look for this

22  item, Mr. Carr says should be done by March 12, 2004.  Correct?

23  A.  Yes.

24  Q.  And under C, that item, which was a migration resistance

25  study that compares the Recovery Filter to competitive products          03:11PM

1    again March 12, correct?

2    A.   That's what it says, yes.

3    Q.   D, radial force study looks to be done by March 12,

4    correct?

5    A.   That is correct.                                          03:11PM

6    Q.   E, migration resistance study on the different

7    manufacturing locations March 12, correct?

8    A.   Yes.

9    Q.   And then F, which is another migration resistance study

10   also March 12, correct?                                        03:11PM

11   A.   That's correct.

12   Q.   So is it your recollection, sir, that these tests were not

13   completed, in fact, until after the product went to full market

14   release?

15   A.   Yeah.  So I'm not aware of when full market release        03:11PM

16   occurred.

17   Q.   But it was your understanding that was going to happen in

18   January of 2004, correct?

19   A.   It was my understanding that that was the anticipated date

20   because that's what I recollect from the prior document.        03:12PM

21   Q.   Well, let's talk about the tests that you actually

22   conducted.

23           MR. STOLLER:  Gay, would you please pull up Exhibit

24   1383.

25           And, Your Honor, this is also in evidence.  May we      03:12PM

1   show it to the jury?

2            THE COURT:  Yes.

3            MR. STOLLER:  Thank you.

4   BY MR. STOLLER:

5   Q.  Sir, this says:  It is a characterization of Recovery          03:12PM

6   Filter migration resistance in comparison to competitive

7   product Phase 1.  Do you see that?

8   A.  Yes, I do.

9   Q.  Do you recall this as the test you conducted for

10  comparative migration resistance?                                  03:12PM

11  A.  So this is a report that I would have written.  My

12  technicians actually conducted the test, but I kind of

13  supervised the technicians and wrote this report.

14  Q.  Fair enough.  So there were people who worked at the

15  company and within your department who were responsible to         03:12PM

16  physically run the tests and give the results to you?

17  A.  That is correct.

18  Q.  And then you would take those results and you put them into

19  this report?

20  A.  That's correct.                                                03:13PM

21  Q.  Let's take a look, if we could, at Page 2, please.  And

22  under Item Number 1, objective and purpose of the test, it

23  says:  The objective of this study was to compare the Recovery

24  Filter, RF, to competitive products in relationship to

25  migration resistance.  Did I read that correctly?                  03:13PM

1  A.  Yes.

2  Q.  So this was the migration -- comparative migration

3  resistance test that the special Design Review Committee had

4  requested in December of 2003.  Correct?

5  A.  Yes.                                                       03:13PM

6  Q.  And just for a moment, I would like to take you to the

7  bottom.  Skip past a number of things but at the bottom of the

8  page under 4.0 it has a heading of test procedure.  Do you see

9  that?

10  A.  I do.                                                     03:13PM

11  Q.  And it talks about test protocol TPR-04-02-02.  Do you see

12  that?

13  A.  Yes.

14  Q.  And that is in reference to the protocol for this

15  particular test, correct?                                     03:14PM

16  A.  Yes.

17  Q.  And a test protocol is essentially the rules that you are

18  supposed to follow in performing and conducting the test.  Is

19  that fair?

20  A.  That's fair.                                              03:14PM

21  Q.  And it's important to follow those rules when you are

22  conducting the test to ensure that the test accurately measures

23  what you're trying to determine by the test.  Would you agree

24  with that?

25  A.  Yes.                                                      03:14PM

1   Q.  Would you agree with me that this test that you were

2   conducting, sir, was a critical test?

3   A.  Yeah.  I mean, this test itself was a characterization so

4   we're trying to characterize compared to the other products.

5   Q.  I understand that, sir, but would you agree that the test        03:14PM

6   is critical in terms of answering the questions about the

7   comparative migration resistance of the Recovery Filter as

8   against other filters as requested by the Design Review

9   Committee in December of 2003?

10  A.  Yes.  That's fair.                                               03:14PM

11  Q.  I want to go to the next page quickly to orient ourselves.

12  If we go to the bottom, under 5.3, it talks about sample

13  identification.  Do you see that?

14  A.  Yes, I do.

15  Q.  It has sample ID numbers and gives us a description,            03:15PM

16  correct?

17  A.  Correct.

18  Q.  So that we know when we look at results if we see something

19  with an RF it's a Recovery Filter, is that correct?

20  A.  That's correct.                                                 03:15PM

21  Q.  And SF means Simon Nitinol Filter, is that correct?

22  A.  Yes.

23  Q.  GT means Greenfield Titanium Filter, correct?

24  A.  Yes.

25  Q.  So if we have any questions about what any of these            03:15PM

1  shorthand sample ID numbers are, we can look at this table and

2  know what the answer is.  Is that true?

3  A.  That's true.

4  Q.  Let's go ahead to the next page, bottom, Item 70.  Test

5  results summary of data.  Do you see that?                    03:15PM

6  A.  Yes, I do.

7  Q.  And if we're looking here, this is a summary of the results

8  of the test.  Is that fair?

9  A.  That's fair.

10 Q.  In other words, what we see here is it says, for example,   03:16PM

11 on the first item, RF which we just saw is a Recovery Filter.

12 Is that correct?

13 A.  That is correct.

14 Q.  We'll see on filter sample size that 11 filters were

15 tested, right?                                                 03:16PM

16 A.  That is correct.

17 Q.  And then we see mean, which is the average result for those

18 filters, right?

19 A.  That's correct.

20 Q.  And then we have minimum and maximum which tell us what     03:16PM

21 was -- what one had the least and which had the highest in the

22 values, correct?

23 A.  That is correct.

24 Q.  But this is not the underlying data.  We don't know what

25 happened for each of these filters based on what we have seen   03:16PM

1   here, correct?

2   A.  It's not -- yeah.  It's not the individual test data.  That

3   is correct.

4   Q.  Let's take a look at some of the individual data.

5           MR. STOLLER:  Could you pull up, Gay, please, Exhibit          03:16PM

6   2063.

7           Your Honor, I believe this is also in evidence.  May

8   we display it to the jury?

9           THE COURT:  Yes.

10          MR. STOLLER:  Thank you.                                        03:16PM

11  BY MR. STOLLER:

12  Q.  Mr. Tessmer, Exhibit 2063 should be in front of you which

13  appears to be an e-mail from you to Mr. Carr and Brian Hudson

14  on February 25th, 2004.  Is that correct?

15  A.  That is correct.                                                    03:17PM

16  Q.  And we can see under attachments there are three --

17  actually I take that back -- four different attachments that

18  are all Excel spreadsheets, right?

19  A.  That is correct.

20  Q.  And in the body of the e-mail you say:  Rob and Brian, I        03:17PM

21  have attached the most current results.  Is that correct?

22  A.  That is correct.

23  Q.  So if we look at -- let's go to Page 2, if we could.

24          MR. STOLLER:  Thank you, Gay.  And can you blow up 1

25  through -- yeah.  Perfect.                                              03:17PM

1    BY MR. STOLLER:

2    Q.  If we look at this, these are individual test results,

3    right?

4    A.  Correct.

5    Q.  So, for example, if we look at the first item sample ID, it     03:17PM

6    says RF1 so we know we're looking at Recovery Filters, correct?

7    A.  That is correct.

8    Q.  And the first set there is 1 through 10 and then we have a

9    second set of 11 through 20.  Right?

10   A.  Correct.                                                         03:18PM

11   Q.  So these have been sorted into two different groups?

12   A.  That is correct.

13   Q.  And, in fact, we'll see under the data summary, the

14   summaries are for the two different groups on the right-hand

15   side, correct?                                                       03:18PM

16   A.  That appears to be correct.  Yep.

17   Q.  So let's take a look at this really quickly.  What we see

18   here on this first set of data, Recovery Filter 1 to 10.

19            MR. STOLLER:  And Gay, could you blow up the status

20   summary there on the side?  In particular, the chart over here      03:18PM

21   all the way to the left starting with "average."

22   BY MR. STOLLER:

23   Q.  So if we look at this data, sir, what we're seeing is that

24   the average pressure -- well, let's start across the top.  So

25   across the top, first column identifies our filter type, right?     03:18PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    A.   The sample ID number, yes.   Correct.

2    Q.   And then we have a lot number and then a run number.   Looks

3    like each of the filters except for Number 2 was run three

4    times, correct?

5    A.   That is correct.                                                    03:19PM

6    Q.   Then there's a column for pressure at filter migration in

7    psi and a column for pressure at filter migration in

8    millimeters mercury, correct?

9    A.   That is correct.

10   Q.   Then there's a column for temperature and column for tube          03:19PM

11   diameter?

12   A.   That is correct.

13   Q.   So what we see here on this chart are a series of Recovery

14   Filters run through a 28-millimeter tube diameter at 37 degrees

15   Celsius plus or minus 2 degrees, correct?                               03:19PM

16   A.   That is correct.

17   Q.   And we'll see the results of those runs in the column under

18   pressure, is that correct?

19   A.   That is correct.

20   Q.   And if we look all the way to the right in the small chart,        03:19PM

21   it says the average of those runs for these filters was 45.2

22   millimeters mercury, correct?

23   A.   That is correct.

24   Q.   And you understood at the time, and we just saw it in the

25   memo from the special Design Review Committee that the minimum        03:20PM

1    acceptance criteria for migration resistance was 50 millimeters

2    mercury, correct?

3    A.  For the characterization.  We had no acceptance criteria.

4    Q.  I'm asking you a different question, sir.  I'm asking --

5    A.  Okay.                                                          03:20PM

6    Q.  -- whether the company had established a minimum migration

7    resistance standard for IVC filters of 50 millimeters mercury.

8    Is that true?

9    A.  They established that.  That is true.  Correct.

10   Q.  And the part of what the questions that the Special Design    03:20PM

11   Review Committee had been asking in December of 2003 is what's

12   the basis for that, right?

13   A.  That is correct.

14   Q.  And when you ran this test, let me ask this:  The test you

15   ran here is run on a device, correct?                             03:20PM

16   A.  Run on what?

17   Q.  A device?

18   A.  Correct.

19   Q.  I think you call them fixtures.  Is that fair?

20   A.  Correct.                                                       03:20PM

21   Q.  And the fixture that was used to run this comparative data

22   test, and I understand you said the technicians ran it, but the

23   fixture or device on which this comparative test was run is the

24   same fixture that's used when Bard was testing its filters for

25   migration resistance all on their own, correct?                   03:21PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    A.  I would think so.

2    Q.  And in this test, the average migration resistance by the

3    Recovery Filter was 45.2 millimeters mercury, correct?

4    A.  That is correct.

5    Q.  And that number is below the minimum acceptance criteria        03:21PM

6    for migration resistance that Bard had for its IVC filters at

7    50 millimeters mercury, correct?

8    A.  So this number is below 50, correct.

9    Q.  And 50 was the minimum acceptance criteria for migration

10   resistance for IVC?                                                 03:21PM

11   A.  Again, for characterization tests we didn't have acceptance

12   criteria.

13   Q.  That's not my question.

14   A.  Okay.

15   Q.  The question is whether that number is below the minimum        03:21PM

16   migration resistance acceptance criteria for Bard IVC filters.

17   A.  That is correct.

18   Q.  Whether this had been run alone without regard to

19   comparison of others, that's a failure as against that

20   acceptance criteria.  True?                                         03:22PM

21   A.  If we were testing against that failure criteria, that is

22   true.

23   Q.  And that is the general criteria of acceptance that Bard

24   imposed for migration resistance for their Recovery Filter.

25   True?                                                               03:22PM

1    A.   Correct, for controlled experiments.

2    Q.   This was a controlled experiment, was it not?

3    A.   So, you know, there's different robust -- some experiences

4    are more robust and we tweak different things.  That's where I

5    want to be careful with that.                                03:22PM

6    Q.   Sir, this was a controlled experiment, was it not?

7    A.   Actually, this data set I'm seeing right here I would have

8    to look at it, the protocol and the report, to tell you

9    exactly.

10   Q.   Well, we just looked at the report.  What in the report   03:22PM

11   would you need to see?

12   A.   So I would want to look at these averages and this data and

13   compare it to the report data.

14   Q.   Okay.  Well, we'll do that in just a minute.

15   A.   Sure.                                                   03:23PM

16   Q.   We'll come back to that.  Let's look at the column of

17   pressure at filter migration millimeters mercury.  Do you see

18   that?

19   A.   Yes.

20   Q.   And we have highlighted every time one of the filters    03:23PM

21   migrated at a pressure less than 50 millimeters mercury.  Would

22   you confirm that's accurate?

23   A.   That's accurate.

24   Q.   And by my count, there would be 30 runs except RF2 only ran

25   once.  So I count 28 total runs.  Would you agree with that?   03:23PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    A.  Yep.

2    Q.  And I'm not going to have you do the counting, but I will

3    tell you there are 21 yellow highlights meaning 21 of the 28

4    runs failed to meet or exceed 50 millimeters mercury.  Does my

5    counting look accurate to you?                                    03:23PM

6    A.  Yes.

7    Q.  And that would be 75 percent were below, is that right?

8    A.  Give or take, yes.

9            MR. STOLLER:  Let's go to the next page, Gay, if we

10   could, please.                                                   03:24PM

11   BY MR. STOLLER:

12   Q.  This is the -- if we see it looks like SF, so Simon

13   Nitinol, correct?

14   A.  That is correct.

15   Q.  And again, we're looking at it at 37 plus or minus 2         03:24PM

16   degrees in 28 millimeter tube, correct?

17   A.  That is correct.

18   Q.  And the average for the Simon Nitinol, which I think you

19   agreed was a predicate device for the Recovery, is 76.3

20   millimeters mercury, correct?                                    03:24PM

21   A.  That is correct.

22           MR. STOLLER:  Let's look at Page 7, if we could, Gay.

23           Thank you.

24   BY MR. STOLLER:

25   Q.  And G2, I think we saw earlier when we looked at the test,   03:24PM

1    is the Greenfield filter.  Do you recall that?

2    A.   Greenfield Titanium, yes.

3    Q.   Again, the first one is 37 degrees plus or minus 2 at 28

4    millimeters.  And we see the average is 110 millimeters

5    mercury, correct?                                              03:25PM

6    A.   That is correct.

7             MR. STOLLER:  Can we go back to Page 2, please, Gay.

8             So we looked previously -- I need you to go, if you

9    could, to the other blank two, if you would.  Can you blow it

10   up a little bit, Gay, so we just see the charts?              03:25PM

11            Yeah.  Get rid of some of the white space.  Thank you.

12   BY MR. STOLLER:

13   Q.   The first category, which are the ones we already looked

14   at, 1 through 10 were at 37 degrees plus or minus 2 degrees and

15   gave us an average of 45.2, is that correct?                  03:25PM

16   A.   Correct.

17   Q.   Now, the second set, 11 through 20, it appears that you ran

18   a second set of Recovery Filters, correct?

19   A.   That is correct.

20   Q.   And this time you did it at 40 degrees, is that correct?  03:25PM

21   A.   That is correct.

22   Q.   Let me ask you a question.  Do you know what 37 degrees

23   Celsius is in Fahrenheit?

24   A.   98.6 degrees Fahrenheit.

25   Q.   I agree.  Normal human body temperature?                 03:26PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    A.  That is correct.

2    Q.  Do you know what 40 degrees Celsius is equivalent to in

3    Fahrenheit?

4    A.  Not exactly.

5    Q.  Would you agree with me if I said it was about 104 degrees?    03:26PM

6    A.  Sounds reasonable.

7    Q.  So if we look at this bottom level --

8           MR. STOLLER:  And Gay, can you blow up 11 through 20,

9    please.

10   BY MR. STOLLER:                                                   03:26PM

11   Q.  We see that when you heat the temperature up to about 104

12   degrees that the average resistance for millimeters mercury

13   goes to 51.5, correct?

14   A.  Correct.

15          MR. STOLLER:  I'm going to ask, Gay, if you could pull    03:26PM

16   up Exhibit 79.

17          And, Your Honor, I believe this is also in evidence.

18   May we display it to the jury?

19          THE COURT:  Yes.

20          MR. STOLLER:  Thank you.                                   03:27PM

21   BY MR. STOLLER:

22   Q.  Sir, this is a test protocol and it's test protocol

23   TPR-04-02-02.  Do you see that?

24   A.  Yes.

25   Q.  Do you recall this is the test protocol we pointed out when   03:27PM

1   we looked at the test report earlier?

2   A.  Yes.

3           MR. STOLLER:  And let's go to move quickly, Gay, if we

4   could, to Page 5.

5   BY MR. STOLLER:                                                 03:27PM

6   Q.  If we look there, it says test procedure Phase I under 9.0,

7   do you see that?

8   A.  Yes, I do.

9   Q.  If we go down to 9.2.1, do you see it says:  Fill the water

10  bath with water; turn on the regulator slash circulator and set  03:27PM

11  to 37 degree Celsius.  Did I read that correctly?

12  A.  You did.

13  Q.  And that was supposed to be the temperature which this test

14  was run, correct?

15  A.  For those 10 samples, yes.                                  03:28PM

16          MR. STOLLER:  If go down to the next page, Gay, look

17  at Page 6.

18  BY MR. STOLLER:

19  Q.  You will see 9.2.7.  Says:  Place the digital thermometer

20  probe through the tubing just above the simulated inferior vena  03:28PM

21  cava and verify the temperature is 37 degrees Celsius, plus or

22  minus 2 degrees Celsius.  Correct?

23  A.  That is correct.

24          MR. STOLLER:  So let's go back if we could, Gay,

25  please, to Exhibit 2063.                                        03:28PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1   BY MR. STOLLER:

2   Q.  So we know the test criteria is 37 degrees Celsius but you

3   turned it up to 40 degrees.  Is that correct?  According to

4   these data --

5            MR. STOLLER:  I'm sorry.  I'm getting ahead of you.  I      03:28PM

6   apologize, Gay.

7   BY MR. STOLLER:

8   Q.  Test criteria was 37 degrees at which we returned a result

9   of 45.2 degrees mercury.  Then when it turned up to 40 degrees,

10  or 104 degrees Fahrenheit, it moved up to 51.5 correct?           03:29PM

11  A.  That is correct.

12  Q.  And what happened -- sir, you held the position of an

13  engineer at the time, correct?  That was your title?

14  A.  That's correct.

15  Q.  My recollection, though, is that your degrees are in          03:29PM

16  biology and business.  True?

17  A.  BS in chemistry with a biochemistry emphasis and business.

18  Correct.

19  Q.  And so do you have any special education or training as a

20  mechanical engineer?                                              03:29PM

21  A.  Only on-job experience.

22  Q.  Fair enough.  But do you have a general understanding based

23  on your job experience what happens when you heat materials?

24  A.  Well, certain materials I have a better understanding than

25  others.                                                           03:29PM

1  Q.  Was it fair to say based on your understanding of chemistry

2  and biology that when you heat materials they have a tendency

3  to expand?

4  A.  That would be true in most cases.

5  Q.  And so when we expanded the Recovery Filter by 3 degrees      03:30PM

6  Celsius it performed better in terms of migration resistance,

7  didn't it?

8  A.  According to this data set, yes, it did.

9  Q.  But if we look at --

10         MR. STOLLER:  Gay, can you highlight, go to Highlight      03:30PM

11  2 for the bottom category of RF 11 to 20.  If we look at the

12  numbers here we see a number of them over 50, but we also see a

13  number of them over 50 on these runs.

14         Can you display the second highlighted one that shows

15  these?  Thank you.  That should make it a little clearer.       03:30PM

16  True?

17  A.  True.

18  BY MR. STOLLER:

19  Q.  So those failed the 50 millimeters mercury standard, didn't

20  they?                                                           03:30PM

21  A.  Those were under the 50 millimeters of mercury.

22  Q.  Let's go back to the filter, I'm sorry, formal report which

23  is Exhibit 1383.

24         MR. STOLLER:  And Gay, can we go to Page 6, please.

25  Actually, let's start at 4 and then we'll get there.            03:31PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    BY MR. STOLLER:

2    Q.  So 4 is where we were before which was the test results and

3    summary of data, correct?

4    A.  That is correct.

5    Q.  And then if we flip ahead, we'll go page by page, the first      03:31PM

6    page has got two diameters, 15 millimeters.  The second page --

7    can we go to the next one Page 5?  Apologies.  Back one more.

8    Thanks.

9             There we also see 15 millimeter tube diameter then 18

10   millimeters tube diameter, 21 and 25, correct?                      03:31PM

11   A.  Correct.

12   Q.  All right.  Let's go to the next page, Page 6.  If we look

13   at the top we see 28 millimeters at 37 degrees Celsius,

14   correct?

15   A.  Correct.                                                        03:32PM

16   Q.  And we see there a mean of 47.5, correct?

17   A.  That is correct.

18   Q.  So again, below the 50 millimeters mercury.  True?

19   A.  Below 50 millimeters of mercury.

20   Q.  And the SNF on the other hand is at 76.3, correct?             03:32PM

21   A.  Correct.

22   Q.  And the minimum there for the SNF is 65 as well.  Do you

23   see that?

24   A.  Yes, I do.

25   Q.  And these are the results of the tests we were just talking     03:32PM

1  about, correct?

2  A.  These are the results for this, but the other data set

3  you -- the other data set I'm not sure if that data matches

4  that.

5  Q.  I think you got to my next question which is if we look at        03:32PM

6  the sample ID we see RF 1 to 10, and 32 to 34, correct?

7  A.  Correct.

8  Q.  And sample size here says 13, right?

9  A.  Correct.

10  Q.  So it looks like we're looking at different data set.        03:33PM

11  Would you agree with that?

12  A.  That this is a different data set from what you previously

13  showed me?

14  Q.  Yes, sir?

15  A.  Yeah.  Could be.        03:33PM

16  Q.  And if we look at the minimum millimeters mercury on this

17  one says 32.1 and the other one, I believe, said 7.9?

18  A.  Okay.  So different study.

19  Q.  It looks like you ran it yet another time and in this case

20  again came below 50.  Is that true?        03:33PM

21  A.  So the mean at 37 plus or minus 2 was 47.5 which is below

22  50.

23  Q.  And if we go down four lines, we have another set of RF, 11

24  to 21, and heated up to 40 degrees, correct?

25  A.  That is correct.        03:33PM

1    Q.  And that time we exceed 50 millimeters mercury, correct?

2    A.  Yes.

3    Q.  Let's look at another migration resistance test that you

4    ran, 2065.  Can you go to the first page?  Oh.  You are still

5    working your way.  Sorry.  2065.                              03:34PM

6         MR. STOLLER:  I'm sorry, Your Honor.  This has been

7    admitted, I believe.  May we show it to the jury?

8         THE COURT:  Yes.

9         MR. STOLLER:  Thank you.

10   BY MR. STOLLER:                                               03:34PM

11   Q.  This is another characterization test for the Recovery

12   Filter that refers to the legs being crossed or hooks removed.

13   Do you see that?

14   A.  Yes, I do.

15   Q.  Were you involved in this testing?                        03:35PM

16   A.  Yes.

17   Q.  And I'm going to skip through this one relatively quickly

18   and go straight to the results.  But if we look at Page 5, and

19   at the very top at the title, Table 2, it says:  Recovery

20   Filter migration resistance, and in parenthesis, 1, 2, 3, 4, 5, 03:35PM

21   or 6, hooks removed.  Do you see that?

22   A.  Yes, I do.

23   Q.  So this was a test of what's the migration resistance if

24   one or more of the hooks are removed from the filter, correct?

25   A.  That is correct.                                          03:35PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    Q.  And if we look down toward the bottom of the chart the last

2    set of data is 28 millimeter tube, correct?

3    A.  That is correct.

4    Q.  And what we see in the left-hand column are 1, 2, 3, 4, 5,

5    6 hooks removed and what the results are.  True?                03:35PM

6    A.  That is true.

7    Q.  And what we see there is that if even one hook is removed

8    the average is only 33 millimeters mercury.  Would you agree

9    with that?

10   A.  That is correct.                                            03:36PM

11   Q.  And if we look over at the maximum for that, it's 41.7.  Do

12   you see that?

13   A.  I do.

14   Q.  So the results of this demonstrated that even if one of the

15   hooks of the filter is not engaged, it will fail the 50         03:36PM

16   millimeters mercury test.  True?

17   A.  So this doesn't have acceptance criteria, but it is below

18   50 if one of the hooks is removed.

19   Q.  Let's go to Page 10, because you are saying it doesn't have

20   acceptance criteria.                                            03:36PM

21   A.  Sure.

22   Q.  Let's look at that and see the conclusion item 10.0.

23   Second bullet point says, -- remember, this test had two

24   separate tests:  One test for crossed legs; one test for hooks

25   being removed.  Correct?                                        03:36PM

1    A.   That's correct.

2    Q.   So the first test was -- we didn't look at it -- was legs

3    crossed and the second test was hooks removed.   True?

4    A.   Correct.

5    Q.   If we look just on the conclusion, second bullet point:      03:37PM

6    All recovery filters that were tested after crossing two

7    adjacent legs met the predefined NMT migration resistance

8    acceptance criteria of a 50 millimeters mercury minimum for all

9    simulated IVC diameters.

10            Did I read that correctly?                              03:37PM

11   A.   You read correctly, but this was an observation, and if you

12   go to the test protocol, which we looked at, it says no

13   acceptance criteria.

14   Q.   Sir, I'm reading the words of a report you drafted under a

15   heading "conclusion" am I not?                                  03:37PM

16   A.   You are.

17   Q.   I read them correctly?

18   A.   You read those words correctly.

19   Q.   And your conclusion with the Recovery Filter with crossed

20   legs met that minimum criteria it was your conclusion that it   03:37PM

21   met it.   True?

22   A.   That is direct.

23   Q.   And it doesn't mention here that when you lose even one

24   foot it does not meet it.   It doesn't say that, does it?

25   A.   It does not.                                               03:38PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1    Q.  I want to talk a bit, sir, about your involvement in the

2    design development testing of the G2 Filter.  You were at Bard

3    when the G2 was under development.  True?

4    A.  Yes, I was.

5    Q.  And you were involved at some level in looking at some of          03:38PM

6    the improvements to the G2 Filter, correct?

7    A.  I had a very limited role, but I had to know those

8    specifications because I was developing a delivery system.

9            MR. STOLLER:  Let's look at 2068, Gay.

10           And, Your Honor, I believe this is in evidence.            03:38PM

11           May we show it to the jury?

12           THE COURT:  Yes.

13           MR. STOLLER:  Thank you.

14   BY MR. STOLLER:

15   Q.  Sir, Exhibit 2068 is an e-mail from Mr. Carr to you at the       03:38PM

16   top.  But if we go down to the third e-mail embedded there's an

17   e-mail from you to Mr. Carr, Mr. Chanduszko and Mr. Hudson

18   dated June 8, 2004.  Do you see that?

19   A.  Yes, I do.

20   Q.  It talks about filter improvement DOE.  True?                   03:39PM

21   A.  That is true.

22   Q.  And this was you doing some testing to determine the effect

23   of the hook diameter and leg span on migration resistance.

24   True?

25   A.  So this e-mail is I did a DOE, so I'm not sure if I             03:39PM

1  actually conducted this testing or if I was just running it,

2  setting up the DOE itself, the design of experiments.

3  Q.  But you were involved and you were looking at -- and this

4  purpose was to look at what's the effect of increasing the leg

5  span among other things on migration resistance.  True?          03:39PM

6  A.  That is correct.

7  Q.  And you know, sir, do you not, sitting here today, that

8  when the Recovery Filter was developed it had a wider leg span

9  than -- I'm sorry.  Let me start over.

10            You know that when the G2 Filter was developed, it had  03:40PM

11  an increased leg span as compared to the Recovery.  True?

12  A.  Based on my preparation, yes.

13  Q.  Let's look at Exhibit 1023.

14            MR. STOLLER:  Can you blow up that picture, Gay,

15  please?  Thank you.                                             03:40PM

16  BY MR. STOLLER:

17  Q.  So we see here, sir, that the G2 modified design increased

18  the leg span, true, as compared to the Recovery?

19  A.  Yes.

20  Q.  By 40 millimeters from -- excuse me -- by 8 millimeters     03:40PM

21  from 32 to 40?

22  A.  I can't read the writing on here, but I think that's

23  accurate.

24  Q.  Let's go to the next page.  Look at the slide there.  If

25  you look at it says:  Summary of features and benefits, true?   03:41PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1   A.  Correct.

2           THE COURT:  Do you want this displayed, counsel?

3           MR. STOLLER:  I'm sorry.  I thought I had asked.  I

4   apologize, please, Your Honor.

5           THE COURT:  Let's display it.                    03:41PM

6           MR. STOLLER:  I apologize.  I'm trying to move quickly

7   get through a lot of ground.

8   BY MR. STOLLER:

9   Q.  So this, sir, is the second page of the document we're

10  looking at which has the title, "Summary of Features and    03:41PM

11  Benefits."  True?

12  A.  It appears to be.

13  Q.  And the first benefit says:  Increased migration

14  resistance, right?

15  A.  Yes, it does.                                        03:41PM

16  Q.  And the feature is wider leg span?

17  A.  That's what it says.

18  Q.  So it was your belief and understanding that increasing the

19  span of the legs would increase migration resistance.  Is that

20  correct?                                                 03:41PM

21  A.  I'd have to go back to that prior e-mail to look at.  I did

22  not, as far as I recall, I did not write this document.

23  Q.  So you don't know one way or another?

24  A.  Correct.

25  Q.  Let's talk about some of the testing that Bard did with  03:42PM

—5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct—

1    regard to migration resistance for G2.

2         MR. STOLLER:  Gay, could you put up 5303.

3         May we display it?

4         THE COURT:  Yes.

5    BY MR. STOLLER:                                          03:42PM

6    Q.  Sir, Exhibit 5303 is a G1A Recovery Filter Femoral System

7    Design Verification and Validation Report.  Do you see that?

8    A.  I see it.

9    Q.  And you are familiar with a Design Verification and

10   Validation Report, aren't you?                          03:43PM

11   A.  Design Verification Validation, yes.

12   Q.  And the G1A Recovery is the G2.  You know that sitting here

13   today, don't you?

14   A.  I don't recall that exactly that it was, but it was or not.

15   Q.  Well, the jury will find out.  I think the jury found out  03:43PM

16   already.

17         Let's turn to Page 15 if we could.  Before we do that

18   can we go to Page 2?

19   BY MR. STOLLER:

20   Q.  This is the approval form.  Do you see that for this -- I'm  03:43PM

21   going to call it DV&D for short.  Will you understand what I

22   mean?

23   A.  Yes.

24   Q.  And DV&V is short for Design Verification and Validation.

25   True?                                                    03:43PM

————5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct————

1   A.  True.

2   Q.  So this is the signoff for the DV&V for the G1A, correct?

3   A.  It appears to be that way, yes.

4   Q.  And number of people signed off on it mostly on or around

5   February 24, 2005.  True?                                   03:44PM

6   A.  That is true.

7   Q.  So let's go then to Page 15.  And can we look --

8        MR. STOLLER:  And can you highlight for us, Gay, Table

9   19 at the bottom?

10       Thank you.                                             03:44PM

11  BY MR. STOLLER:

12  Q.  What we see here, sir, at Table 19, is a 28-millimeter

13  filter migration resistance summary of tests.  Correct?

14  A.  That's what it says, yes.

15  Q.  And the filter type in the first column has three filters:  03:44PM

16  The SNF, G1A, and the RNF.  True?

17  A.  True.

18  Q.  Says:  Each of them was run 30 times and then it gives us

19  some mean results.  Do you see that?

20  A.  Yes, I do.                                              03:44PM

21  Q.  And the SNF mean result was 121.6; G1A 106.3; and the RNF,

22  56.5.  Do you see that?

23  A.  I do.

24  Q.  Let's go to the next page.

25       MR. STOLLER:  And Gay, would you blow up Table 21       03:45PM

1   which is in the middle?  Thank you.

2   BY MR. STOLLER:

3   Q.  Again, this is Table 21.  It says:  28 millimeters filter

4   migration resistance comparison.  Do you see that?

5   A.  Yes, I do.                                                      03:45PM

6   Q.  And towards the right hand there's an acceptance criteria.

7   Do you see that?

8   A.  I do.

9   Q.  Says G1A filter must be statistically equivalent or greater

10  than SNF.  Right?                                                   03:45PM

11  A.  That's what it says.

12  Q.  And then in the -- towards the left-hand column it gives us

13  the mean values calculated on the prior page of SNF at 121.6

14  and G1A at 106.3?

15  A.  That's correct.                                                 03:45PM

16  Q.  And the result there is fail?

17  A.  That's what it says, yes.

18  Q.  And so this test that's DV&V found that Bard had failed the

19  acceptance criteria for migration resistance with the G1A

20  filter.  True?                                                     03:46PM

21  A.  That's what this says, yes.

22  Q.  I'd like to go next, if we could, to 4 -- I'm sorry.  5296.

23          MR. STOLLER:  Your Honor, I believe this is in

24  evidence.  May we show it to the jury?

25          THE COURT:  Yes.                                           03:46PM

————5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct————

1       MR. STOLLER:  Thank you.

2    BY MR. STOLLER:

3    Q.  Page 2 of the document has a document detail.  It says:

4    G1A filter and femoral delivery system PPS.  Do you see that?

5    A.  Yes, I do.                                                    03:46PM

6    Q.  And a PPS is a product performance specification, correct?

7    A.  If I recall correctly, correct.

8    Q.  That sets the standards that the product must meet in order

9    to go to market, correct?

10   A.  As far as I recall, correct.                                  03:47PM

11   Q.  And this one has a release date of 4-8-2005.  Do you see

12   that?

13   A.  Yes, I do.

14   Q.  So it looks like a little more than six weeks after the

15   document we just saw.  True?                                      03:47PM

16   A.  Correct.

17       MR. STOLLER:  Gay, can we go to Page 15, please.  Are

18   you able to turn that?  Thanks.

19   BY MR. STOLLER:

20   Q.  So if we look at this, go two more pages if you would.  I     03:47PM

21   apologize, to Page 15 of 30.

22   BY MR. STOLLER:

23   Q.  At the top, 6.2 says mechanical characteristics.  Do you

24   see that?

25   A.  Yes, I do.                                                    03:48PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Direct

1   Q.  If we look at the left-hand column under 6.2.1.2 IT has a

2   design characteristic of filter migration resistance?

3   A.  Yes, it does.

4   Q.  And if we look under the engineering specification it says

5   migration resistance of G1A and a simulated IVC diameter of 28        03:48PM

6   millimeters must be statistically greater than that of RNF

7   Filter.  Did I read that correctly?

8   A.  Yes.

9   Q.  So the engineering criteria changed from what it had been

10  at the test.  True?                                                   03:48PM

11  A.  So I don't know the complete context of these documents.

12  Is there another protocol?  But if you were saying if I were to

13  look at this comparing to the other one, as far as I recall I

14  was in part of this.  It looks like there's differences.

15  Q.  The bar was lowered?                                              03:49PM

16  A.  What's that?

17  Q.  The bar was lowered.  True?

18  A.  It doesn't say the bar was lowered here.  It says it looks

19  like SNF versus RNF.

20  Q.  We looked at the results before the SNF was at 121?               03:49PM

21  A.  Correct.  Yes.

22  Q.  G1A was at 126, thereabouts?

23  A.  I believe so.

24  Q.  And the Recovery was at 50 something, correct?

25  A.  Correct.                                                          03:49PM

1   Q.  50 something is much lower than 121, isn't it?

2   A.  That is correct.

3          MR. STOLLER:  No further questions.  Thank you.

4          THE COURT:  Cross-examination?

5          MR. ROGERS:  Yes, Your Honor.                    03:49PM

6                     CROSS-EXAMINATION

7   BY MR. STOLLER:

8   Q.  Mr. Tessmer, when did you come work for C.R. Bard?

9   A.  It was 1997, January 1997.

10  Q.  When did you leave Bard?                            03:50PM

11  A.  I believe it was June of 2005.

12  Q.  And at some point did you come back to Bard?

13  A.  Yes, I did.

14  Q.  And since you left in 2005, have you had any work

15  responsibilities for IVC filters?                      03:50PM

16  A.  No.

17  Q.  So it's been around 13 years since you have had any work

18  responsibility for IVC filters?

19  A.  Yeah.  That is correct.

20  Q.  Mr. Tessmer, when you were working for Bard in the early  03:50PM

21  2000s, what was the main thing that you were doing in regard to

22  IVC filters?

23  A.  I was working on the jugular delivery system.

24  Q.  And can you explain what that is?

25  A.  Yeah.  So the jugular delivery system is a system that's  03:50PM

1    used.  So there's a femoral approach where you would access in

2    the groin with a femoral delivery system and this delivery

3    system, because the filter had to be oriented a different way,

4    was coming from a jugular vein approach and delivering the

5    filter.                                                          03:51PM

6    Q.  So that would really be focused on the way the filter comes

7    and goes in the body, is that right?

8    A.  That's correct.

9    Q.  And your boss at the time, I know there was some unclarity

10   about this.  But was it primarily Rob Carr?                     03:51PM

11   A.  That is correct.

12   Q.  And did you get called in from time to time for projects

13   that were related to the Recovery Filter?

14   A.  I did.

15   Q.  And how would you describe the types of projects that you   03:51PM

16   did?

17   A.  So mostly the things I was called in was, you know, to help

18   out with testing that sort of thing.

19   Q.  And when you say you were asked to help out with testing

20   does that mean that you were the person actually running the    03:51PM

21   tests?

22   A.  So the technicians ran the test and I tried to help write

23   the protocol and report.

24   Q.  And when you got called in to do these tests, were you

25   aware of any tests that had been done prior to the ones that    03:52PM

1    you performed?

2    A.  Yes.

3    Q.  And were you involved in any of those tests as far as the

4    migration resistance testing of the Recovery Filter before the

5    ones that you did?                                          03:52PM

6    A.  Not that I recall.

7    Q.  And were all of the tests that you were asked about today

8    tests that were looking at migration in the cranial direction,

9    toward the head?  Is that correct?

10   A.  I believe so, correct.                                 03:52PM

11   Q.  And were any of the tests that you were asked about today,

12   did they have anything to do with caudal migration?

13   A.  No.

14   Q.  And did you have any say-so or input into the specific

15   tests that were going to be run?                           03:52PM

16   A.  No.  I was just pulled in to help out the team.

17   Q.  And once the tests were completed did you write up these

18   reports and send them to others like Rob Carr?

19   A.  That is correct.

20   Q.  And did you have any part in the decision making process as  03:53PM

21   to what happened after the tests were completed?

22   A.  No, I did not.

23   Q.  And when you left C.R. Bard in 2005 did you go to a totally

24   different company?

25   A.  I did.                                                  03:53PM

1   Q.  And what year did you come back to C.R. Bard?

2   A.  I think it was 2012 or something.

3   Q.  Were any of the tests that you were asked about today tests

4   that were on the Eclipse Filter?

5   A.  No.                                                          03:53PM

6           MR. ROGERS:  No further questions.

7           THE COURT:  Any redirect?

8           MR. STOLLER:  Thank you, Your Honor.

9                         REDIRECT EXAMINATION

10  BY MR. STOLLER:                                                  03:53PM

11  Q.  Mr. Tessmer, Mr. Rogers just asked you whether you had any

12  input on the tests or the results of the tests.  Do you recall

13  that?

14  A.  If I had any input on the results of the test, yes,

15  correct.                                                        03:54PM

16  Q.  Did you have, after you conducted those tests, have

17  conversations with Mr. Carr, for example, about the test

18  results?

19  A.  I don't recall exactly, but I would have, of course, I

20  would have shared any results I got from the test to Mr. Carr.  03:54PM

21  Q.  Well, did you have any conversation with him after you

22  conducted the migration resistance testing in which you said

23  I'm concerned we're not meeting the 50 millimeters mercury

24  minimum acceptance criteria for these filters?

25  A.  Not that I recall.                                          03:54PM

1  Q.  Did you have any conversation with them in which you said,

2  I'm concerned that this filter and the comparative analysis

3  does not meet the performance of its predicate devices, either

4  the SNF or Greenfield?

5  A.  Not that I recall.                                      03:54PM

6  Q.  When you were looking at the results of those tests and

7  looking towards redesigning the G2, did you have any

8  conversations with Mr. Carr or anyone on the filter franchise

9  team and say, we need to do things to make sure that this

10  problem is fixed?                                          03:55PM

11  A.  Not that I recall.

12  Q.  Did you have any conversations with any of those folks when

13  the company was going through the process of redesigning the

14  recovery to the G2 and looking a wider base and say, we need to

15  test and make sure that when we make changes to the design of  03:55PM

16  this filter that we don't have other adverse events that result

17  from that design change?

18  A.  Not that I recall.

19  Q.  Did you ask any questions about what's going to happen when

20  we move we take what is a 32 millimeter base in a 28          03:55PM

21  millimeters vena and make it 40 millimeters; hey guys, that

22  might cause some other problems we need to worry about.  Was

23  there ever any conversation like that?

24  A.  Not that I recall.

25  Q.  Was there any conversation as to testing about why that   03:55PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Tessmer-Redirect

1   might cause the filter to tilt?

2   A.  No.  That was not my responsibility.

3   Q.  You were a member of the filter franchise team.  True?

4   A.  I do.

5   Q.  Whether it was your responsibility or not, was there any          03:56PM

6   conversation on that team about whether that would cause the

7   filter to perforate?

8   A.  Not that I recall.

9   Q.  Was there any conversation on that team whether the changes

10  you were making to the Recovery Filter to the design of the G2       03:56PM

11  would cause the filter to fracture?

12  A.  Not that I recall.

13  Q.  Were there any conversations on that team as you were

14  making the change from the Recovery to the G2 that any of those

15  changes may cause the filter to have all of the different           03:56PM

16  problems; the fracture, the tilt, the perforation; and

17  migration?

18  A.  Not to my recollection.

19          MR. STOLLER:  No further questions, Your Honor.

20          THE COURT:  Thank you, sir.  You can step down.            03:56PM

21          THE WITNESS:  Thank you.

22          MR. O'CONNOR:  Our next witness is Doris Jones.

23          THE COURTROOM DEPUTY:  Ms. Jones, if you will please

24  come forward AND raise your right hand.

25          (The witness was sworn.)                                    03:57PM

UNITED STATES DISTRICT COURT

1    MR. O'CONNOR:  May I proceed?

2    THE COURT:  Yes.

3                    DORIS JONES,

4    called as a witness herein, having been duly sworn, was

5    examined and testified as follows:

6                    DIRECT EXAMINATION

7    BY MR. O'CONNOR:

8    Q.  Would you introduce yourself to the jury, please?

9    A.  Hi.  My name is Doris Jones.

10   Q.  And can I call you Doris?                           03:58PM

11   A.  Yes.

12   Q.  I always do.

13            How do you feel right now?

14   A.  Nervous.

15   Q.  That's okay.                                        03:58PM

16            Doris, where are you from?

17   A.  Savannah, Georgia.

18   Q.  And how long have you lived there?

19   A.  Most of my life.

20   Q.  Have there been times where you left Savannah?      03:58PM

21   A.  Yes.

22   Q.  When were you born?

23   A.  When was I born?

24   Q.  Yes?

25   A.  Born February 10, 1965.                             03:58PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Jones-Direct

1   Q.  Now, did you attend school in Savannah?

2   A.  Yes, I have.

3   Q.  Did you go to high school?

4   A.  High school.  Some college.

5   Q.  Did you graduate?                                          03:58PM

6   A.  Yes, I graduated.

7   Q.  And then did you have any school after that?

8   A.  I went to college, it was called South College for nursing.

9   Q.  And did you obtain some type of certificate?

10  A.  Nursing for CNA.                                           03:58PM

11  Q.  What is that, certified nursing assistant?

12  A.  Certified nursing assistant, yes.

13  Q.  Do you have family?

14  A.  Yes, I do.

15  Q.  We met one of your daughters.  What is her name?          03:59PM

16  A.  Her name is Shanice Matthews.  My oldest daughter name is

17  Sharese May.

18  Q.  And they both have children.  Why don't you tell us who

19  your grandchildren are?

20  A.  My grandchildren name, the oldest one who is seven years   03:59PM

21  old name is Chastity Matthews.  My second oldest who is three

22  years old is named Zi'Yari Matthews.  The third one who is

23  about to be turning 1 the first of June is Monae Jones.

24  Q.  Now did you raise Sharese and Shanice in Savannah?

25  A.  Yes, I did.                                                03:59PM

1    Q.  And did you raise them as a single mom for the most part?

2    A.  Yes, I did.

3    Q.  Are you married now?

4    A.  Yes, I am.

5    Q.  What is your husband's name?                                    04:00PM

6    A.  His name is Alfred Jones.

7    Q.  When did you marry Alfred Jones?

8    A.  I married him in 2003.

9    Q.  Did you know him before then?

10   A.  I knew him during middle school.                                04:00PM

11   Q.  Through middle school?

12   A.  Yes.

13   Q.  Did you two have a friendship or go out?

14   A.  No.

15   Q.  Did he ever come over to your house?                           04:00PM

16   A.  He came over to my house to have my father fix his car.

17   And my father somehow knew that he liked me.  And my dad told

18   him, well, if you like her go up to the house.  She's in the

19   house.  Instead of him doing that he ran, got in his car and he

20   left.                                                              04:00PM

21   Q.  What type of impression did he make?

22   A.  I called him a chicken.

23   Q.  Well, now you are married to him.

24   A.  Yeah.

25   Q.  How is he as a husband?                                        04:00PM

5-22-18-MD 15-2641-Jones v Bard-Jury Trial-Day 5-Jones-Direct

1   A.  He's a wonderful husband.

2   Q.  What about as a father?

3   A.  He's great.  He's a great father.

4   Q.  Well, stepfather.  And then how is he to your

5   grandchildren?                                              04:01PM

6   A.  Him and his grandchildren, they get along great.  They love

7   him to death.

8   Q.  How do you feel about your grandchildren?

9   A.  Oh.  Words can't tell how I feel about my grand kids.  They

10  are my world.  I love them to death.                        04:01PM

11  Q.  What do you do in Savannah these days?

12  A.  What do I do in Savannah these days?  I watch my grand

13  kids while their mother goes to work and school so that they

14  can have a better life, better than what I had.  I want

15  something out of life for my girls.  I always told them that.  04:01PM

16  I want something out of life for my grand girls.  If it help

17  for me to stay home be with my grand kids that's the best joy I

18  have.  That's the best feeling a grand mom could have.

19  Q.  Do you watch them every day?

20  A.  I watch them every day.                                 04:01PM

21  Q.  How do Sharese and Shanice feel about having their mom

22  watch their babies?

23  A.  They love it.  They love every minute of it.

24  Q.  How about you?  Do you like what you do?

25  A.  Yes, I do.                                              04:02PM

1  Q.  Now, let's talk about back in August 14 of 2010.  Now,

2  you've had various medical conditions over the years, correct?

3  A.  Yes, I have.

4  Q.  And one of the problems that we heard about is that you had

5  ulcers that would bleed from time to time?                    04:02PM

6  A.  Yes.

7  Q.  Would you tell the jury about when you went to the hospital

8  in August?  I think it was August 24, 2010?

9  A.  I think it was August 14.

10 Q.  That's right.  You are right.                              04:02PM

11 A.  Because I was in there for like August through September.

12 I went to the hospital because I was having a bleeding ulcer.

13 I was real sick with a bleeding ulcer.  I was throwing up

14 blood.  They rushed me to the hospital.  We got to the hospital

15 and I was in so much pain that they gave me some medicine for   04:03PM

16 the pain.

17 Q.  Then how long were you in the hospital for?

18 A.  Well, that time, from August 14 to September the 3rd.

19 Q.  And did anything happen to you while you were in the

20 hospital?                                                       04:03PM

21 A.  While I was in there, I seen that my hand was swelling up.

22 And I figured it was from the needle that they put in my arm.

23 And then all of a sudden my leg my, ankle started swelling up.

24 I called and told my husband.  That ankles also were swollen.

25 And he went out and got a nurse.  So when the nurse came she    04:03PM

1  called for a doctor and they took an ultrasound of my leg and

2  it was like, you have a blood clot in your leg.

3  Q.  All right.  So did you see a doctor about the blood clot

4  while you were in the hospital?

5  A.  Yes, I did.                                              04:04PM

6  Q.  Did the doctor talk to you about what kind of treatment

7  would be given to you for that?

8  A.  Yes.

9  Q.  What did the doctor tell you?

10 A.  From what they told me was a stent.  I didn't knew nothing  04:04PM

11 about no filter.  The only thing I knew was a stent.

12 Q.  You were talking about you later learned what you were

13 receiving was a Bard Eclipse Filter?

14 A.  Yeah.

15 Q.  And did the doctor tell you how long you would have the   04:04PM

16 Eclipse Filter?

17 A.  They say it would be in me for the rest of my life.

18 Q.  How did you feel about that?

19 A.  I felt okay about it.  It was helping me.

20 Q.  And did you understand that they were putting it in there  04:04PM

21 because of your blood clot?

22 A.  Yes.

23 Q.  Now, Doris, why don't you tell the members of the jury just

24 briefly how you recall -- were you sedated?  Did they put you

25 under before they put the filter in?                        04:05PM

1  A.  No.  I seen the whole thing.  Only thing they -- what they

2  did was gave me some medicine so I won't feel nothing.  That

3  was it.  And they put long this long tube and put it right here

4  in my thigh, my groin.  And they asked me while I was doing it

5  does that hurt.  I told them, yes, it does.  So they gave me          04:05PM

6  some more medicine.  And after that I didn't feel anything as

7  they was putting it in my leg.  That's all.

8  Q.  So they put the filter in?

9  A.  Uh-huh.  Yes.

10  Q.  And did you eventually leave the hospital?                       04:05PM

11  A.  After they put the filter in?

12  Q.  Yes.

13  A.  No, I was still in there for the ulcer and stuff.

14  Q.  This was at Memorial Hospital?

15  A.  At Memorial Hospital.                                           04:06PM

16  Q.  Is that in Savannah?

17  A.  This is in Savannah.

18  Q.  Now, at some point in time you were discharged from the

19  hospital?

20  A.  Yes.                                                            04:06PM

21  Q.  And then you went home?

22  A.  Yes, I went home.

23  Q.  Now, at some point in time later, did you find out -- did

24  you have problems that brought you back to the hospital where

25  you learned about your filter?                                      04:06PM

1    A.   Yes.  In 2015, I got -- I was working at the police

2    station.

3    Q.   Why don't you tell everybody what type of work you were

4    doing at that time.

5    A.   I was doing janitorial work at the police station.                04:06PM

6    Q.   For what company?

7    A.   CKC.  That's a janitorial cleaning company.  And all of a

8    sudden, I start feeling pain in my chest and tingling in both

9    of my arms and started feeling lightheaded.  So I went out to

10   the lobby and one of the secretaries told me to sit down.  And    04:07PM

11   I asked could they find my supervisor because he was working

12   with us.

13          So they took my blood pressure.  They said my blood

14   pressure was sky high so they called the ambulance.

15   Q.   Take you to the hospital?                                          04:07PM

16   A.   Take me to the hospital.

17   Q.   Which hospital did they take you to?

18   A.   Memorial Hospital.

19   Q.   When was that?

20   A.   That was on -- I can't remember what day it was on but I       04:07PM

21   knew it was in April of 2015.

22   Q.   April 21, 2015 sound right?

23   A.   Sounds right.

24   Q.   So you went to the emergency room?

25   A.   Yes.                                                               04:07PM

1   Q.  And how long were you there?

2   A.  I was there for a couple of hours.

3   Q.  Did you talk to the doctor eventually?  Did they do any

4   treatment for you?

5   A.  No, they didn't.                                            04:07PM

6   Q.  Okay.  So did you talk to the doctor at some point?

7   A.  I talked to the doctor and I told the doctor, I say I'm

8   tired because how long I have been there.  I have been there

9   for several hours.  I was tired.  I had not eaten anything.  I

10  have been on my foot all day.  So I told him, I say, I'd like   04:08PM

11  to go home and lay down.  They said -- he advised me not to but

12  I said I will come back.  He told me to be back at 5:00 that

13  morning, and that's what I did.

14  Q.  So you returned to Memorial Hospital the next morning.

15  That would get us to April 22?                                  04:08PM

16  A.  Right.

17  Q.  2015?

18  A.  Yes.

19  Q.  And that next morning did you return at 5:00 in the

20  morning?                                                        04:08PM

21  A.  I returned at 5 a.m. in the morning.

22  Q.  And when you got there, can you tell us what happened to

23  you then?

24  A.  I had to start everything over again with the chest pain,

25  taking vital signs, everything.  And they took me in the back   04:08PM

1  and that's when they took an X-ray of my chest to, I guess,

2  when you have the chest pain they want to make sure everything

3  is okay.

4  Q.  Did you have problems with your arms?

5  A.  Yes.  I had tingling in my arms.                          04:09PM

6  Q.  Were you still feeling faint, lightheaded?

7  A.  At that point, no.  I had only felt lightheaded when I was

8  at the job.

9  Q.  So they did some type of imaging study for you?

10 A.  Uh-huh.                                                    04:09PM

11 Q.  Yes?

12 A.  Yes.

13 Q.  And did the doctor talk to you about the what the X-ray or

14 the imaging study showed?

15 A.  He told me that the filter that was in me, the blood clot  04:09PM

16 had broken loose.  I don't know how to say it, but had I guess

17 moved from where it was.  And it was -- I know it had broken

18 loose.

19 Q.  Did he tell you it was near your lung?

20 A.  The clot -- okay.  One clot was in, I guess, another piece 04:10PM

21 fell off and it lodged in my chest, in my lungs.

22 Q.  How did you feel when the doctor told you that the filter

23 had broke?

24 A.  When the doctor told me that, see like everything just went

25 solid.  I probably blanked out.  I didn't want to hear        04:10PM

UNITED STATES DISTRICT COURT

1   anything.  I didn't want to -- it was just everything just went

2   dark for me.

3   Q.  Now, Doris, let me ask you this:  Going back to August of

4   2010, when you had the filter put in, did you have any reason

5   to expect or believe that it would break some day?          04:10PM

6   A.  No.

7   Q.  Did you expect that it would stay in place for the entirety

8   of your life?

9   A.  Yes, I did.

10  Q.  So when you were in the hospital in April 2015 and the     04:11PM

11  doctor came in and told you that the filter, we had known it

12  was an Eclipse Filter made by Bard, broke and that a piece was

13  up in your lung.

14  A.  Right.

15  Q.  Did the doctor tell you what could be done for you for that 04:11PM

16  filter?

17  A.  They told me that it was too dangerous to move.  It is more

18  better safe where it's at.  The other piece they could remove

19  from my neck.  They removed that from my neck.  But the one

20  that is lodged in my lung is more safer there than anything.   04:11PM

21  It's too dangerous for them to move because if that had --

22  because they would have to go through my heart to get to my

23  lungs to remove it.

24  Q.  Now, eventually, a doctor did go in and take out the

25  filter, is that right?                                        04:12PM

```
1   A.  Yes.

2   Q.  But you still --

3   A.  Had that one piece in my lung.

4   Q.  And you have had that piece the entire time?

5   A.  Yes.                                                    04:12PM

6   Q.  How do you feel about that?

7   A.  I'm scared.

8   Q.  Why?

9   A.  For one, I have my grand babies with me all the time.  They

10  are going on one and three years old.  Who is to say I could be  04:12PM

11  sitting down with my grand kids and all of a sudden I fall

12  over?  I don't know what's going on.  My grand kids don't know

13  what's going on.  They can't run out the house.  They can't

14  call on the phone and say oh, my grandmother need help.  The

15  only way somebody going to know that something is wrong unless  04:12PM

16  my daughters come home from work.  And how would that make them

17  feel if their mother on the floor and don't know what's going

18  on and having my grand babies sit there and just look at me and

19  be crying and don't know if it is -- this is a terrible thing.

20  It hurts.  It really hurts my heart for me to have my grand     04:13PM

21  kids like that.

22  Q.  Do you tell anybody in your family that you are scared?

23  A.  No.

24  Q.  Why?

25  A.  For one, I'm supposed to be their mother.  I'm supposed to  04:13PM
```

1    be their supporter.  I'm supposed to be strong in their eyes;

2    not weak, strong so they could be strong for their girls and

3    their family.

4    Q.  Have you seen a doctor about taking out the filter?

5    A.  No, I haven't.                                          04:14PM

6    Q.  Why?

7    A.  I'm scared.

8    Q.  Is that because the other doctor told you that it would be

9    okay then?

10   A.  Yes.                                                    04:14PM

11   Q.  Now, Doris, if there were doctors that are now specializing

12   in taking filters out of places like pulmonary arteries, would

13   you consider going seeing such a doctor?

14   A.  I would consider going seeing one.

15   Q.  And why?                                                04:14PM

16   A.  I would consider going to see them.  I would consider

17   hearing him out.  As far as having it taken out, I can't say

18   yes or no if I would do that because if you tell me it's safer

19   where it's at, why would I risk my life you going into my chest

20   through my heart just to get a filter out.  Either way I'm     04:14PM

21   gone, something is happening to me.

22   Q.  But would you at least go see a doctor.  If you had your

23   choice and it was safe would you want that filter piece out of

24   you?

25   A.  Yes, I would.                                           04:15PM

1    MR. O'CONNOR:  Gay, can you put up Exhibit 4407?

2    Your Honor, may I approach Doris Jones with a paper

3    copy so she can go through and identify this?

4    THE COURT:  Yes.  Don't talk when you are up here.

5    They can't hear you.  Just hand it to her.  We need to have you    04:15PM

6    talk into the mic.

7    MR. O'CONNOR:  Thank you.

8    BY MR. O'CONNOR:

9    Q.  Do you recognize that document?

10   A.  I can't see it.  I don't have my glasses with me.  They    04:16PM

11   are -- I'm sorry -- in the chair.

12   MR. O'CONNOR:  May I approach with glasses?

13   THE COURT:  Yes.

14   BY MR. O'CONNOR:

15   Q.  Take a minute and look at those pages if you would, please.    04:16PM

16   A.  Okay.

17   Q.  Can you tell the members of the jury what you are looking

18   at, Exhibit 4407?

19   A.  The bill from the hospital.

20   Q.  And do those dates correspond with the dates that you were    04:17PM

21   in the hospital to have your filter removed?

22   A.  Yes.  Yes.

23   MR. O'CONNOR:  May I publish -- move to admit Exhibit

24   4407 at this time, Your Honor.

25   THE COURT:  I believe it's already in evidence.    04:17PM

1    MR. O'CONNOR:  All right.  Thank you.

2    BY MR. O'CONNOR:

3    Q.  And Doris, is the amount on the last Page 21,198.45?

4    A.  Yes.

5    Q.  Is that the amount of the bills that were for the          04:17PM

6    hospitalization to get your filter out?

7    A.  Yes.

8    MR. O'CONNOR:  May we publish to the jury?  I'm sorry,

9    Your Honor.

10   THE COURT:  Yes.                                               04:18PM

11   MR. O'CONNOR:  Gay, could you scroll page by page for

12   the jury, please.

13   May I just consult with my lawyers here, Your Honor?

14   THE COURT:  You may.

15   MR. O'CONNOR:  That's all the questions I have, Your           04:18PM

16   Honor.

17   THE COURT:  Okay.  We're going to go ahead and break

18   at this time, Ladies and Gentlemen.  We will plan to resume

19   tomorrow morning.  Please remember not to discuss the case and

20   we'll see you in the morning.                                  04:18PM

21   (Jury out at 4:19 p.m.)

22   THE COURT:  Please be seated.

23   All right.  Counsel, do you have an allocation for the

24   video time this afternoon?

25   MR. STOLLER:  I have 29 minutes for Avino as being            04:19PM

1    designated to plaintiff.

2           MR. CLARK:  Your Honor, for plaintiff on Avino, 14 and

3    29 for the defendant.

4           THE COURT:  29 minutes to the defendant on Avino.

5           Do you agree, Ms. Helm?                              04:19PM

6           MS. HELM:  I do, Your Honor.

7           THE COURT:  Okay.  All right.  Counsel, as of this

8    evening plaintiff has used 19 hours, 27 minutes.  Defense has

9    used five hours and 50 minutes.

10          Let me mention something on the issue that was raised  04:20PM

11   this morning about other health conditions in the plaintiff.  I

12   looked at the cases that were cited.  They, I think, stand for

13   the unremarkable proposition that evidence of a plaintiff's

14   other injuries is admissible to show that the current issue

15   injuries were not caused by the defendants' negligence.       04:21PM

16          The -- one of the arguments you made this morning, Ms.

17   Helm, was that Mr. O'Connor referred to pain and suffering in

18   the opening statement.  We searched the opening statement and

19   couldn't find that.  So we don't know exactly what was referred

20   to.                                                          04:21PM

21          We did go through a discussion about what was out and

22   what was in in terms of the plaintiff's case when we were

23   talking about the slide that the defense was going to use in

24   opening.  Plaintiff stated that the dizziness claim was out of

25   the case but that there would not be an objection to dizziness  04:21PM

1    being a reason for her being admitted to the hospital.

2            Plaintiff also stated that they agreed that fatigue

3    was fair game.  That's part of the claim that's being made;

4    that shortness of breath was out of the case and was not going

5    to be claimed; that there would be no testimony of a shortened          04:22PM

6    life expectancy from any expert but that they did intend to

7    claim damages for the uncertainty created by the presence of

8    the filter.

9            What I'd like to do tomorrow morning, if plaintiff

10   would do it, is be as specific as you can concerning the                04:22PM

11   categories of damages you intend to claim so that I can make

12   sure I'm thinking about that in terms of whether or not any of

13   this evidence is admissible.  And then we'll continue the

14   discussion at that point in time.

15           The other thing I would like to do is plan to talk             04:22PM

16   about the final jury instructions on Friday at 4:30 when we get

17   to the end of the day.  That's the only day between now and the

18   end of trial when I don't have a 4:30 hearing.  So I think

19   we'll need to use that time to talk about jury instructions.

20   So please be prepared to do it by that time.                           04:23PM

21           Is there a question?

22           MR. STOLLER:  I'm sorry, Your Honor.  Did you say

23   Thursday?

24           THE COURT:  Friday.

25           MR. STOLLER:  Friday.                                          04:23PM

1      THE COURT:  Friday at the end of the day at 4:30.

2   Sorry to make it that time, but that's the only time I have got

3   to talk about jury instructions.

4      We've got a sentencing at 4:30 in another hearing, so

5   we will need to break.  Were you going to raise something Mr.    04:23PM

6   North.

7      MR. NORTH:  I would like to respectfully ask the Court

8   to instruct the plaintiff's attorneys one more time to school

9   their witnesses of not mentioning -- making gratuitous mention

10  about the litigation.  After the Court said that this morning   04:23PM

11  the next expert referred to the Booker trial.  I'm afraid that

12  the cumulative effect of these references are nearing us to the

13  point of having to seek relief.

14     THE COURT:  I understand that, Mr. North, but I

15  thought the questioning was the reason the witness gave that     04:24PM

16  answer.  The questioning was intending to tie the witness down

17  on exactly when he was looking at these Bard documents, when

18  exactly was it.  He said it was before the Booker trial.  I

19  don't think it would have come out but for that questioning.

20     I think it's good to remind witnesses, but that wasn't  04:24PM

21  a gratuitous comment.  That was response to a very specific

22  question about when he finally looked at these additional

23  documents.  But we should continue to remind witnesses.

24     MR. COMBS:  On behalf of the plaintiffs, we have been

25  instructing our experts.  But we agree with Your Honor's        04:24PM

1    assessment.

2            THE COURT:  Okay.  We'll see you in the morning at

3    8:30.

4            MR. COMBS:  Thank you, Your Honor.

5            (Proceeding recessed at 4:24 p.m.)                    04:24PM

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                          C E R T I F I C A T E

7

8            I, LAURIE A. ADAMS, do hereby certify that I am duly

9    appointed and qualified to act as Official Court Reporter for

10   the United States District Court for the District of Arizona.

11           I FURTHER CERTIFY that the foregoing pages constitute

12   a full, true, and accurate transcript of all of that portion of

13   the proceedings contained herein, had in the above-entitled

14   cause on the date specified therein, and that said transcript

15   was prepared under my direction and control.

16           DATED at Phoenix, Arizona, this 23rd day of May, 2018.

17

18                              s/Laurie A. Adams
                                _____
19                              Laurie A. Adams, RMR, CRR

20

21

22

23

24

25