1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3              _____

4    In Re: Bard IVC Filters              )   MD-15-02641-PHX-DGC
     Products Liability Litigation         )
5                                          )   Phoenix, Arizona
                                           )   **May 23, 2018**
6    _____)
     **Doris Jones, an individual,**       )
7                                          )
                        Plaintiff,         )
8                                          )   CV-16-00782-PHX-DGC
             v.                            )
9                                          )
     **C.R. Bard, Inc., a New Jersey**     )
10   **corporation; and Bard Peripheral**  )
     **Vascular, Inc., an Arizona**        )
11   **corporation,**                      )
                                           )
12                      Defendants.        )
     _____)

13

14

15       BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16       REPORTER'S TRANSCRIPT OF PROCEEDINGS

17            <u>TRIAL DAY 6 — A.M. SESSION</u>

18              (Pages 1190 — 1276)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                       A P P E A R A N C E S

 2    For Plaintiff:

 3            Gallagher & Kennedy
              By: MARK S. O'CONNOR, ESQ.
 4            By: PAUL L. STOLLER, ESQ.
              By: SHANNON L. CLARK, ESQ.
 5            By: C. LINCOLN COMBS, ESQ.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, AZ  85016

 7            Lopez McHugh, LLP
              By: RAMON ROSSI LOPEZ, ESQ.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 9
              Lopez McHugh, LLP
10            By: JOSHUA MANKOFF, ESQ.
              214 Flynn Ave.
11            Moorestown, NJ  08057

12            Heaviside Reed Zaic
              By: JULIA REED ZAIC, ESQ.
13            By: LAURA E. SMITH, ESQ.
              312 Broadway, Ste. 203
14            Laguna Beach, CA  92651

15

16    For Defendants:

17            Nelson Mullins Riley & Scarborough
              By: RICHARD B. NORTH, JR. ESQ.
18            By: ELIZABETH C. HELM, ESQ.
              201 17th Street NW, Suite 1700
19            Atlanta, GA  30363

20            Nelson Mullins Riley & Scarborough.
              BY: JAMES F. ROGERS, ESQ.
21            1320 Main St.
              Columbia, SC  29201
22
              Snell & Wilmer
23            By: AMANDA C. SHERIDAN, ESQ.
              400 East Van Buren
24            Phoenix, AZ  85004

25
```

**EXAMINATION**

| **WITNESS** | **PAGE** |
| --- | --- |

DORIS JONES

Cross-Examination By Ms. Helm — 1213

Redirect Examination By Mr. O'Connor — 1249

LORA WHITE

Direct Examination By Mr. Combs — 1255

Cross-Examination By Ms. Helm — 1263

Redirect Examination By Mr. Combs — 1267


Video testimony of Kirstin Nelson, M.D. — 1252

Video testimony of David Chodos, M.D. — 1253

Video testimony of Abithal Raji-Kubba — 1271

Video testiony of Natalie Wong — 1272



**EXHIBITS**

| **NUMBER** | **DESCRIPTION** | **PAGE** |
| --- | --- | --- |
| 8048 | Admission History & Physical | 1213 |
| 7958 | Jones Radiology Report 1-9-2012 | 1213 |
| 8054 | Admission History and Physical | 1213 |
| 8057 | History and Physical | 1213 |
| 8066 | Discharge Summary | 1213 |

**(Index of Exhibits Continued)**

<u>**EXHIBITS**</u>

| <u>NUMBER</u> | <u>DESCRIPTION</u> | <u>PAGE</u> |
|---|---|---|
| 7953 | Jones ER Assessment Sheet 4-21-2015 | 1213 |
| 8078 | Admission History and Physical | 1213 |
| 8084 | Office Visit: David Chodas, M.D. | 1213 |
| 8086 | Admission History and Physical | 1213 |
| 4403 | Chest X-ray report discovers filter fragment in pulmonary artery 4/22/15 (1 page) | 1251 |
| 4406 | Retrieval and discharge records 4/22-24/15 (7 pages) | 1251 |
| 8076 | CT Angiogram:  Chest report | 1252 |
| 1817 | Raji-Kubba Deposition, 07/18/2016 - Exhibit 301 - 5/14/2009 E-mail from Bill Edwards to Raji-Kubba and Mike Randall Re. "Tomorrow" | 1270 |
| 1821 | Raji-Kubba Deposition, 07/18/2016 - Exhibit 305 - 11/12/2009 E-mail from Bret Baird to Bill Little, John Van Vleet, and Gin Schulz | 1270 |
| 1823 | Raji-Kubba Deposition, 07/18/2016 - Exhibit 308 - 1/4/2010 E-mail from Gin Schulz to Beasley, Raji-Kubba, Van Vleet, Doherty, and Little Re. "Potential Actions" | 1270 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1822 | Raji-Kubba Deposition, 07/18/2016 – Exhibit 307 – 1/21/2010 Bard Memo from Jeffrey Pellicio to "Reviewers" | 1270 |
| 2243 | Wong Deposition, 10/18/2016 – Exhibit 537 – 4/23/2004 E-mail from John Lehmann to Carr and Uelmen Re. "Draft data set for statistician" | 1272 |
| 2247 | Wong Deposition, 10/18/2016 – Exhibit 542 – 12/2/2009 E-mail exchange b/w Sandy Kerns and Natalie Wong Re. "Filter Fractures" | 1272 |
| 2249 | Wong Deposition, 10/18/2016 – Exhibit 544 – 5/18/2006 Natalie Wong meeting documents, email re "Caudal Investigation" with attachments of G2 Caudal Report 05.18.06 and Caudal Pre-PAT minutes | 1272 |
| 2250 | Wong Deposition, 10/18/2016 – Exhibit 545 – BPV's Failure Investigation Report on the G2 Filter – Caudal Migration, FIR-06-01-01 | 1272 |
| 2251 | Wong Deposition, 10/18/2016 – Exhibit 547 – 4/10/2006 High Importance E-mail from Cindi Walcott to Allen, Schulz, and McDermott Re. "FW: FDA Request for Information" | 1272 |

1

**(Index of Exhibits Continued)**

2

<u>**EXHIBITS**</u>

3

<u>**NUMBER**</u>  <u>**DESCRIPTION**</u>  <u>**PAGE**</u>

4     2254      Wong Deposition, 10/18/2016 –        1272
                Exhibit 552 – 2/17/2006 Memo
5               from Mickey Graves and
                Natalie Wong Re. "Recovery
6               Filter (Generation 1) Product
                Assessment Team Minutes –
7               Fractures"

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

08:30:08  1

2         (Proceedings resumed in open court outside the presence

3     of the jury.)

4

08:30:44  5         THE COURT:  Thank you.  Please be seated.

6               Morning, everybody.

7               EVERYBODY:  Morning, Your Honor.

8               THE COURT:  I'm going to start with defense counsel

9     today in light of the comment you made yesterday, Ms. Helm,

08:31:24 10    that you never have enough time.  We'll let plaintiffs go

11    second.

12              MR. CLARK:  I was going to suggest the same thing.

13              MS. HELM:  Thank you, Your Honor.

14              I need to correct -- the first thing I need to do is

08:31:34 15    correct a statement I made yesterday.  I stated that

16    Mr. O'Connor stated in opening statement that the case was

17    about pain and suffering.  And I had the day right but I had

18    the event wrong.  He actually stated, and I just did a word

19    search, at least 14 times during jury selection that this

08:31:56 20    case was about pain and suffering and asked jurors questions

21    like, And if there are claims of pain and suffering in this

22    case.

23              And so he questioned the entire jury panel,

24    including the jurors that are impaneled and sworn in, about

08:32:13 25    pain and suffering.  And so the panel -- my argument is the

08:32:16  1   same.  The jurors believe this case is about pain and

       2   suffering, and we should be entitled to put in evidence of

       3   other sources of pain and suffering.

       4          And, again, I'm going to reiterate as to worry, we

08:32:29  5   should be able to put in evidence through Ms. Jones of other

       6   sources of worry.  She testified yesterday that she's worried

       7   something's going to happen with her grandchildren, while

       8   she's with her grandchildren.  And we believe that the effect

       9   of smoking particularly and what it could do to her is

08:32:45 10   something that we should be able to cross-examine her about

      11   and ask her whether she worries about the impact of her

      12   smoking on her health and her ability to care for her

      13   grandchildren.

      14          THE COURT:  Okay.  I understand that.

08:32:55 15   Do you have other matters to raise?

      16          MR. NORTH:  No.

      17          MS. HELM:  Other than we would appreciate if the

      18   plaintiffs would tell us what they're actually claiming in the

      19   case.

08:33:08 20          THE COURT:  Right.  We're going to nail that down.

      21   How about other matters besides that?  Does

      22   plaintiff have any matters to raise?

      23          MR. CLARK:  We have a couple of brief matters.

      24          THE COURT:  Go ahead.

08:33:15 25          MR. CLARK:  Would you like me to proceed?

08:33:17   1          THE COURT:  Yes.

        2          MR. CLARK:  Your Honor, one issue relates to the

        3   deposition of Daniel Orms that we will play today.  There

        4   is -- the transcript is agreed to, we resolved your order as

08:33:31   5   far as the objections.  But part of the testimony that is

        6   agreed to deals with Exhibit 4514, which is an October 8,

        7   2010, monthly management report.  We think this is directly

        8   relevant to Mr. Orms' testimony.  He is a contributing author

        9   to the report based upon his testimony.  It also has a number

08:33:54  10   of -- some language in there that he was examined upon as far

       11   as opening doors and the idea what the Eclipse filter would do

       12   for the company.

       13          So we would move, obviously in front of the jury,

       14   for that to be admitted, but would like that to be subject to

08:34:08  15   whatever limitations Your Honor will place on us for the

       16   other monthly management reports.

       17          So that would be issue number one, if you want to

       18   take them one at a time.

       19          THE COURT:  Let's take them one at a time.

08:34:17  20          MR. NORTH:  Your Honor, we just believe they should

       21   be subject to those limitations.  That can be worked out.

       22          I would also note there is a 401, 402 objection,

       23   too.  Many parts of it have to do with other products, sales,

       24   stents, things of that nature, which we think that should be

08:34:34  25   redacted out of that in all of them.

08:34:37  1        THE COURT:  Well, I assume that's part of what you're

2    going to work out, is those relevancy issues.

3        MR. NORTH:  Yeah.

4        THE COURT:  So you have no objection to my admitting

08:34:44  5    it subject to resolving the other relevancy arguments?

6        MR. NORTH:  Right, no objection.

7        THE COURT:  Okay.  So go ahead and move it in.  I'll

8    admit it subject to that understanding.

9        MR. CLARK:  Your Honor, the other housekeeping issue

08:34:55  10   is your order from Saturday indicated that the 1006 summary

11   can be admitted and we have to work out the redactions.  We

12   will propose Exhibit 4565, which was part of your order, be

13   substituted for whatever product we reach agreement with the

14   parties.

08:35:11  15       So I just want the record to be clear that that will

16   be 4565.

17       THE COURT:  That was the big one; right?

18       MR. CLARK:  Yes.

19       THE COURT:  Yeah, we'll come up with a new 4565.

08:35:20  20       MR. CLARK:  Then, Your Honor, I think we have a

21   number of other monthly management reports that we will be

22   offering in our case and, again, it would be subject to

23   whatever limitation.

24       We'll pick a time that's convenient for the jury to

08:35:33  25   make that motion.  And if the Court wants to consider it,

08:35:35  1    perhaps you can defer ruling on it or something like that,

2    but we just want to offer those into evidence before we rest

3    in our case, along with a couple of other documents that I'm

4    consulting Ms. Helm on.

08:35:45  5              THE COURT:  Well, on those exhibits, is there -- what

6    is the defense response to the other monthly management

7    reports?  Are you of the view those can come in subject to the

8    same sort of relevancy redactions?

9              MR. NORTH:  Yes, Your Honor.  Our only two issues are

08:35:58 10    the relevancy and then the adverse event compilations at the

11    back of them being subject to whatever limitations.

12              THE COURT:  Well, so, are you moving, then, in for

13    issues other than the adverse event compilations at the back

14    of them, Mr. Clark?

08:36:15 15              MR. CLARK:  Yes.  There are a couple things I think

16    we can work it out with counsel as far as other things that

17    are -- there's some language in the reports that we would want

18    to highlight.  We may or may not have a disagreement about

19    certain other redactions as it relates to financial

08:36:28 20    information.  We agree that all the other product information

21    should be out of there.  But I think there's been argument

22    about this is a small part of Bard's business and we think it

23    may be that showing the overall portion of the business that

24    relates to filters could be relevant.  We need to evaluate

08:36:43 25    that.  But I think subject to us working that out, that

08:36:46   1   shouldn't be a problem.

2           THE COURT:  It seems, then, that the monthly

3   management reports should come in subject to two caveats:  One

4   is working out the relevancy objections the defendants have,

08:36:55   5   and the second is the question we talked about yesterday, and

6   that is whether the adverse event attachments should come in,

7   in addition to what's going to be in the new 4565.

8           MR. CLARK:  Right.  And then these would be bundled

9   with whatever your decision is on that.

08:37:09   10          THE COURT:  Okay.  So we'll reserve both of those

11  issues to be resolved.  But go ahead and admit the reports for

12  the other purposes.

13          MR. CLARK:  That's correct, Your Honor.

14          THE COURT:  Okay.

08:37:19   15          Let's talk about plaintiff's damage claim, then.  I

16  think I asked last night for you all to specify exactly what

17  you're claiming for damages.

18          Mr. O'Connor?

19          MR. O'CONNOR:  Thank you, Your Honor.

08:37:32   20          So we went back and we looked at this.  And here are

21  our claims:  Pain and suffering damages.  Any claims of pain

22  and suffering relate to the April 21, April 22, 2015,

23  hospitalization.  Dr. Hurst testified that he believes the

24  radiating pain down her arms is related to the filter.  And I

08:37:56   25  don't think there's any question, based upon Hurst and

08:38:00  1    Muehrcke, that the procedure to remove the filter, of course,

2    would be painful and leave a patient with pain and suffering.

3         Our claim for emotional distress suffering is

4    limited to Doris' suffering, mental suffering and emotional

08:38:19  5    suffering, from having a foreign object in her pulmonary

6    artery.

7         Our claim for permanent damages is simply the fact

8    that there is a strut that is in her pulmonary artery.

9         We made a claim for medical expenses.  They were

08:38:33 10    21,000 something, I don't have the exact amount, but that

11    came in yesterday.

12         And then today we are going to put on a claim for a

13    future damage for either a percutaneous procedure in the

14    amount of $130,157 or -- 130,000, excuse me, or an open

08:38:54 15    procedure, $244,961.

16         We are not bringing down our economist since we are

17    not going to make a claim and not have any testimony about

18    the lifelong need for anticoagulation.

19         So we are just talking about a very finite set of

08:39:14 20    medical expenses, past and future, pain and suffering from

21    the date she went into the hospital and then had her filter

22    removed.

23         Emotional suffering from having that piece in her

24    pulmonary artery.

08:39:32 25         And, again, the medical expenses, past and future.

08:39:36   1          THE COURT:  When you said a moment ago pain and

        2    suffering from the date she went into the hospital, you mean

        3    from then on or do you mean just during the April 2015

        4    hospitalization?

08:39:49   5          MR. O'CONNOR:  She -- I believe it will be limited to

        6    the radiating pain and any pain and suffering she had having

        7    the removal of the filter.

        8          THE COURT:  So just during her hospitalization?

        9          MR. O'CONNOR:  For the physical pain and suffering.

08:40:18  10          THE COURT:  The emotional distress damages, you say,

       11    will be limited to suffering from having the strut in her

       12    lung.  Tell me what evidence you'll argue to the jury supports

       13    an award of damages for that kind of suffering.  That is,

       14    filter fragment mental suffering.

08:40:43  15          MR. O'CONNOR:  Well, I think there is an instruction

       16    on mental suffering.

       17          THE COURT:  There's a broader one.  But my question

       18    is, what is in evidence that you are going to say to the jury

       19    shows she suffers mental suffering because of the strut in her

08:41:00  20    lung?

       21          MR. O'CONNOR:  She testified yesterday she worries

       22    what happens if that strut moves or causes any of the problems

       23    that people like Dr. Muehrcke or Dr. Hurst talked about,

       24    perforating, any other damage it could cause.  The fact that

08:41:13  25    it's in there causes her distress each and every day and when

08:41:16  1    she takes care of the grandchildren.

2        THE COURT:  And how is that -- well, let me ask this

3    question differently.  You also said permanent damages for

4    having the strut in her lung.

08:41:35  5        MR. O'CONNOR:  Right.

6        THE COURT:  How is the permanent damage for having

7    the strut in her lung different from the mental suffering for

8    having it in there and the cost of having it removed?

9        MR. O'CONNOR:  I think it just goes to a permanency

08:41:50  10   instruction.  In other words, I don't think there's any

11   question based on the testimony that having a foreign object

12   embedded in an artery that's in a circulatory system is an

13   injury.  I don't think there can be any dispute about that.

14   And it's in there.  And until it's removed it will be in there

08:42:06  15   permanently.  If it's removed --

16       THE COURT:  I thought you were asking them, the jury,

17   to award money to have it removed.

18       MR. O'CONNOR:  Pardon me?

19       THE COURT:  You're asking the jury to give her money

08:42:16  20   to have it removed.

21       MR. O'CONNOR:  There is testimony it can be removed,

22   if it can be removed.  I mean, that's still an issue, I think,

23   that everybody agrees.  I mean, she can go to a doctor to have

24   it removed.

08:42:26  25       But I would agree to you that if she had it removed

08:42:29   1   and that there were no complications from the procedure, and

           2   we don't have testimony about any complications that could

           3   occur from the procedure, then that would end the permanency.

           4          THE COURT:  Okay.  Let me ask the question one more

08:42:41   5   way, then.  Let's assume the jury gives her mental suffering

           6   damages up to the point where they pay for it to be removed,

           7   and then they pay for it to be removed.  What other permanent

           8   damages are there from having a strut in her lung?  She's got

           9   the mental suffering up to the point where it's removed and

08:43:00  10   she's been given money to have it removed.  I'm having trouble

          11   seeing what other category of permanent damages there are.

          12          MR. O'CONNOR:  Well, you know, I think that's the

          13   issue with mental suffering damages.  Nobody can predict.  But

          14   I would agree that if this jury decides that she is entitled

08:43:20  15   to recover for future expense to have it removed, and if they

          16   determine that they believe, based upon the testimony, that

          17   removal would be successful, then they could also determine

          18   that, as they deliberate on what the damages are, that her

          19   mental suffering would end there.

08:43:39  20          But I think it's going to be up to them to evaluate

          21   the testimony.  But certainly there's not going to be an

          22   argument that she will continue to suffer beyond having a

          23   filter removal, if that happened.  I think the bigger issue

          24   is this, is that she is placed in a difficult position.  Does

08:44:00  25   she leave it or does she have it out?  And as we heard

08:44:03  1    yesterday, she's concerned about that, too, because this is

      2    not a simple procedure that we're talking about.  It's a

      3    procedure that goes through a person's heart, and I think

      4    that would cause anybody mental suffering and concern and

08:44:16  5    fear.  And I think that is something that a jury can

      6    certainly consider and evaluate based upon their collective

      7    mind.

      8              THE COURT:  Okay.  All right.  Thanks.

      9              Comments from defense counsel?

08:44:30 10              MS. HELM:  Again, Your Honor, the fact that they're

     11    seeking this emotional -- this worry, and the fact they're

     12    seeking permanent damages should allow us to put in evidence

     13    of other potential sources of worry that she has based on her

     14    lifestyle.

08:44:48 15              I mean, I've got her preexisting medical conditions,

     16    which I believe are fair game and are going to come in.  But

     17    this jury's going to hear that Ms. Jones is worried only

     18    because of her filter.  And they don't know that there are

     19    other lifestyle choices that she's made that should be a

08:45:06 20    source of worry for her, that are commonly known as a source

     21    of worry, and it could impact her ability to take care of her

     22    grandchildren.

     23              So we intend to go into her preexisting conditions

     24    as it relates to worry.  We believe the plaintiffs have made

08:45:22 25    that an issue in the case.  But I also think that we should

08:45:26 1    be allowed to address her smoking as it goes to her worry

2    claim because it's a prominent health hazard that has been --

3    she's been counseled about for many, many, many years and, as

4    you noted in your ruling, it is well-known that it has an

08:45:44 5    impact on people's health.

6            THE COURT:  What preexisting conditions are you

7    referring to?

8            MS. HELM:  Your Honor, she has -- well, her anemia.

9            THE COURT:  Right.

08:45:55 10           MS. HELM:  She has the preexisting GI bleeds, the

11   bleeding ulcers.  She has prior episodes of fainting.  And all

12   events that could impact her ability to take care of her

13   grandchildren.

14           THE COURT:  Well, that's a pretty broad statement at

08:46:10 15   the end.

16           MS. HELM:  Well, I mean --

17           THE COURT:  What beyond fainting?

18           MS. HELM:  Pardon me?

19           THE COURT:  What beyond fainting?

08:46:15 20           MS. HELM:  Her dizziness, her fainting, and her

21   pretty significant GI bleeds are the ones that I plan to

22   address, including a very significant GI bleed that occurred

23   after the filter was removed.

24           THE COURT:  The --

08:46:33 25           MS. HELM:  So that is a post existing condition.

08:46:36  1          THE COURT:  All right.  The only evidence, it sounds

2     to me like you're asking me to permit is smoking.

3          MS. HELM:  Yes, Your Honor.

4          And I believe the other issues, we'll have to

08:46:56  5     address during the charge conference.

6          THE COURT:  I think I want to hold off on the smoking

7     issue until after we settle the jury instructions on Friday.

8     I'm not persuaded at this point that the door has been opened

9     to smoking.  And I want to think about that in the context of

08:47:26 10     how we finalize the damages instruction that will come in.

11          If I decide that you can go into it, I'll permit you

12     to call her during your case next week to bring in the fact

13     of smoking.  So don't go into it today because at this point

14     I'm not persuaded that that door is opened.  And I don't know

08:47:42 15     that I will be, but I want to make that decision after we

16     settle the instructions.

17          But to avoid issues later today, do the plaintiffs

18     have any disagreement with the list of preexisting

19     conditions -- anemia, GI bleeds, fainting/dizziness -- that

08:47:58 20     the defense intends to bring out in cross today?

21          MR. O'CONNOR:  No, Your Honor.  I mean, they can ask

22     her about that.

23          THE COURT:  Okay.

24          MS. HELM:  And, Your Honor -- I apologize,

08:48:13 25     Your Honor, I forgot --

08:48:15   1          THE COURT:  Before you speak, so what we'll do, then,

2     is we'll -- you can cover those preexisting conditions, we're

3     going to leave smoking off the table for now.

4          One of the things we'll need to have -- think about

08:48:24   5     for Friday, and I would encourage you all to give this some

6     thought with respect to instruction number 19, that's the

7     compensatory damages instruction, is how we refine the list

8     of factors that can be considered to match what the plaintiff

9     is limiting damages to.  Because that list of factors now is

08:48:43  10     very broad.  And it seems to me if we're going to limit

11     damages the way we've described today, we need to refine

12     that.

13          So give that some thought, if you would, before

14     Friday, and then I'll make a final decision on the smoking

08:48:57  15     issue after plaintiff has rested and we settle those

16     instructions.

17          Were you going to say something, Mr. O'Connor?

18          MR. O'CONNOR:  Well, I think I understand.  You know,

19     I think there's going to be a fine line from making

08:49:10  20     instructions into comments on the evidence.  I think the jury

21     should be allowed to -- in their delivery, based upon the

22     evidence they've heard, and then apply it and --

23          THE COURT:  Well, but that's --

24          MR. O'CONNOR:  -- so the arguments are made outside

08:49:24  25     of that.

08:49:24  1          THE COURT:  And that's what we'll talk about on

2    Friday.

3          MR. O'CONNOR:  All right.

4          THE COURT:  But, for example, if you're limiting pain

08:49:28  5    and suffering to her hospitalization in April 2015, it seems

6    to me the instructions should say pain and suffering for the

7    hospitalization in April 2015.  Because you're not claiming

8    anything beyond that.  So that's a factor they can consider.

9          So give that some thought.  I won't settle that now,

08:49:47 10    but that is what I'd like to pin down on Friday afternoon.

11          MR. O'CONNOR:  Thank you.

12          THE COURT:  Did you have something else, Ms. Helm?

13          MS. HELM:  Yes, Your Honor.  I forgot a preexisting

14    condition.  In Exhibit 4406, which the plaintiffs admitted

08:49:58 15    into evidence yesterday, there's also indication of Ms. Jones'

16    hypertension or high blood pressure, and I intend to ask her

17    about that.

18          THE COURT:  I think that was in the exhibit, as I

19    recall.

08:50:13 20          Any issue with that from the plaintiff's side?

21          MR. O'CONNOR:  Well, wait a minute.  I thought that

22    hypertension was supposed to be redacted.

23          MR. CLARK:  It was, Your Honor.  In light of the

24    Court's ruling on the motion in limine relating to

08:50:24 25    hypertension, that exhibit should have been redacted.

08:50:27  1          THE COURT:  I don't think it was when it came in.  I

        2    think I saw it on the screen.

        3          MS. HELM:  Correct, Your Honor.

        4          THE COURT:  I think I did in the motion in limine say

08:50:36  5    it was out because defendants hadn't identified a reason it

        6    should be in.

        7          MR. CLARK:  Your Honor, my recollection, and I'm not

        8    representing that this happened, but my recollection is that

        9    is a document that came in that I think we were responding to

08:50:48 10    their cross-examination.  If it was -- came in without

       11    redaction --

       12          THE COURT:  Cross-examination of whom?

       13          MR. O'CONNOR:  I think it was Dr. Hurst.

       14          THE COURT:  What's the exhibit number?

08:50:59 15          MS. HELM:  Your Honor, it's exhibit 4406, and it was

       16    in the long list of exhibits that Mr. Clark tendered at the

       17    beginning of the day yesterday.

       18          THE COURT:  Let me pin that down.  I can tell you

       19    exactly when we addressed it.

08:51:53 20          It was in the long list of documents, Mr. Clark, you

       21    proposed at the beginning of yesterday.

       22          MR. CLARK:  It may very well be, Your Honor.  We have

       23    had a pretty good working relationship of exhibits that need

       24    redacting can be redacted, and if that was not mentioned as

08:52:10 25    one of them, I apologize, but we would like to redact

08:52:12   1   hypertension in light of the Court's motion in limine.  That

2   should have been identified as something that needed redacted.

3              THE COURT:  My memory, Ms. Helm, is that there was no

4   mention of it in the testimony.

08:52:27   5              Is that your understanding as well?

6              MR. ROGERS:  Your Honor, I believe, and I may be

7   mistaken, that when I did introduce it into evidence and

8   displayed it, that Dr. Hurst commented on it when I was asking

9   about what she had presented for.  I did not ask a question

08:52:43  10   about that, but I think he brought it up himself.

11              THE COURT:  Well, what I show in my notes, and

12   they're certainly not as complete as the transcript, is that

13   you presented it as the discharge summary and you had the

14   doctor look at the diagnosis, which was a foreign body

08:53:16  15   embolism, and you brought out the fact that the cause of the

16   bilateral arm pain in the diagnosis was iron deficiency.  And

17   then you moved on to the IFU.

18              I did, in my pretrial ruling --

19              Confirm this, Jeff --

08:53:36  20              -- say hypertension was out, so I'm going to allow

21   that to be redacted from document or Exhibit 4406, and we

22   should not include that in the list of preexisting

23   conditions.

24              Okay.  Are there other matters we need to take up

08:53:53  25   before we get started this morning?

08:53:55  1            MR. CLARK:  Not for the plaintiff.

          2            MR. NORTH:  Not for the defendant.

          3            THE COURT:  Did you finish with Ms. Jones yesterday,

          4     Mr. O'Connor?

08:54:01  5            MR. O'CONNOR:  Yes.  We finished.  And I think she's

          6     going to be back down for cross-examination.

          7            THE COURT:  So we start with cross.

          8            Okay.  I'll come in in five minutes when the jury's

          9     in.

08:55:25 10         (Recess taken from 8:55 to 9:00.  Proceedings resumed in

         11     open court with the jury present.)

         12            THE COURT:  Morning, ladies and gentlemen.

         13            JURORS:  Morning, Your Honor.

         14            THE COURT:  Thank you for being with us this morning.

09:01:31 15            We are going to begin this morning with the

         16     cross-examination of Ms -- Mrs. Jones.

         17            Ms. Helm, you may proceed.

         18            MS. HELM:  Thank you, Your Honor.

         19            Your Honor, before I proceed, the parties have

09:01:45 20     reached an agreement to admit Exhibits 8048, 7958, 805- --

         21            THE COURT:  Hold on just a minute, Ms. Helm.  I've

         22     got to get to the right place in my notes.

         23            Could you start over.

         24            MS. HELM:  Yes, Your Honor.  8048, 7958, 8054, 8057,

09:02:14 25     8066, 7953, 8078, 8084, 8086.  All of those exhibits are

CROSS-EXAMINATION - DORIS JONES

09:02:28   1    subject to redactions based on the Court's prior rulings.

2              THE COURT:  Any objection?

3              MR. O'CONNOR:  No objection.

4              THE COURT:  Okay.  Those are admitted subject to

09:02:40   5    redaction.

6         (Exhibits 8048, 7958, 8054, 8057, 8066, 7953, 8078, 8084,

7    8086 admitted.)

8              THE COURT:  You may proceed.

9              MS. HELM:  Thank you, Your Honor.

10                        **DORIS JONES,**

11   recalled as a witness herein, after having been previously

12   sworn or affirmed, was examined and testified as follows:

13                 C R O S S - E X A M I N A T I O N

14   BY MS. HELM:

09:02:47   15   Q    Good morning, Ms. Jones.

16   A    Good morning.

17   Q    My name is Kate Helm, and I don't think we've met before,

18   other than passing each other going in the door.  My job this

19   morning is to ask you a few follow-up questions, and so I'm

09:02:56   20   going to do that.  Okay?

21   A    Okay.

22   Q    And I'm going to ask you some questions about your medical

23   history and some events that occurred both prior to you having

24   the filter implanted and after the filter was implanted.

09:03:09   25   Okay?

CROSS-EXAMINATION - DORIS JONES

09:03:10  1    A    Okay.

2    Q    You have sort of a long history of stomach ulcers and

3    bleeding ulcers, don't you?

4    A    Yes, I do.

09:03:20  5    Q    In fact, it goes as far back as 1993 or 1994?

6    A    Yes.

7    Q    And you've had multiple surgeries for bleeding ulcers,

8    haven't you?

9    A    Yes.

09:03:36  10   Q    Three or four?

11   A    Three or four, yes.

12   Q    And I want to take you to 2006.  Do you remember you were

13   living in Jacksonville at that time?

14   A    Yes, I was.

09:03:47  15   Q    Okay.  And in 2006 you had a problem with a bleeding

16   ulcer, did you not?

17   A    Yes, I did.

18   Q    And you went to the hospital complaining of chest pain and

19   nausea and dizziness, didn't you?

09:04:01  20   A    Yes, I did.

21   Q    And, in fact, you had chest pain and tingling in your

22   arms, didn't you?

23   A    Yes, I did.

24   Q    Okay.  So in 2015, back when you had the filter removed,

09:04:13  25   that wasn't the first time you had had chest pain or tingling

CROSS-EXAMINATION - DORIS JONES

09:04:16   1    in your arms, was it?

           2    A    No.

           3    Q    You had had that before?

           4    A    Yes.

09:04:21   5    Q    And in 2006 when you went to the hospital in Jacksonville,

           6    you had to have a laser surgery for the bleeding ulcer, didn't

           7    you?

           8    A    Yes, I did.

           9    Q    Okay.  And, in fact, you went to the hospital two times,

09:04:36   10   didn't you?

           11   A    I --

           12   Q    Do you remember that?

           13   A    No.

           14   Q    Do you remember passing out one time and having to have

09:04:43   15   the paramedics take you to the hospital in Jacksonville?

           16   A    No.  I don't remember.

           17   Q    Okay.  If that's in your medical records --

           18   A    I don't remember that, though.

           19   Q    Okay.  But if it's in your medical records, it probably

09:04:54   20   happened; right?

           21   A    Probably did.

           22   Q    Okay.  Was a long time ago?

           23   A    Yeah.

           24   Q    Was that the first time you had to have surgery for the

09:05:01   25   bleeding ulcers?

CROSS-EXAMINATION - DORIS JONES

09:05:03  1    A    Surgery?  No.

2    Q    You'd had it before 2006?

3    A    2006, that's the only one I remember about the surgery.

4    Other than that, no surgeries.

09:05:13  5    Q    Okay.  So 2006 was the first surgery?

6    A    Yes.

7    Q    And that was the day that you had arm tingling and chest

8    pain and you ended up having to have what was a laser surgery.

9    Do you remember that?

09:05:27  10   A    Yes.

11   Q    Then in 2009 you were back in Savannah.

12   A    Yes.

13   Q    And you had to have another surgery; is that right?

14   A    Yes.

09:05:35  15   Q    Okay.  And you went to Memorial Hospital that time; right?

16   A    Yes, I did.

17   Q    Okay.  And, again, in 2009 you had passed out at home,

18   right, and had to be taken to the hospital?

19   A    I don't think I passed out.

09:05:50  20   Q    Okay.

21        MS. HELM:  Scott, would you pull up 8084, please.

22        THE WITNESS:  I don't remember.

23        MS. HELM:  I'm sorry, 8054.

24        I'm sorry, 8057.  I had the wrong one.

25

CROSS-EXAMINATION - DORIS JONES

09:06:09    1    BY MS. HELM:

            2    Q    Okay.  You don't remember that you passed out?

            3    A    No, I don't.

            4              I've got the wrong one.

09:06:17    5    Q    Okay.  Did you have to have another surgery in 2009 for

            6    the stomach ulcers?

            7    A    I probably did.  I don't remember.

            8    Q    Unfortunately, there have been many of them; right?

            9    A    Right.

09:06:32   10    Q    Okay.  And then in 2010, that was the time you were having

           11    an ulcer bleed and you had to get the filter; is that right?

           12    A    Yes, it was.

           13    Q    And before that one you were really suffering from some

           14    pretty significant fatigue, weren't you?

09:06:49   15    A    Yes.

           16    Q    And you had to quit your job because you were too tired to

           17    work at Taco Bell at the time?

           18    A    No, that wasn't the reason.

           19    Q    Okay.  Why --

09:06:57   20    A    The reason was that my boss said that he had to get a

           21    doctor's excuse.  I brought the doctor's excuse, but he said

           22    that he didn't want to risk me getting sick or anything

           23    happening to me on the job.

           24    Q    Okay.  Okay.

09:07:12   25              But you were throwing up blood and sick and dizzy and

CROSS-EXAMINATION - DORIS JONES

09:07:16  1    very tired; correct?

       2    A    Yes.

       3    Q    And do you remember in 2010 that you were diagnosed as

       4    having anemia?

09:07:26  5    A    2010.  Yeah.

       6    Q    Was it before that that you were diagnosed with having

       7    anemia?

       8    A    When I was diagnosed with having anemia, I was young.  I

       9    was very young.  So I knew about the anemia.

09:07:37 10    Q    Okay.  So you've been diagnosed with anemia for a very

      11    long time; is that right?

      12    A    Yes.

      13    Q    Okay.  And you understand that the anemia can make you

      14    tired?

09:07:47 15    A    Yes.

      16    Q    And you understand that the anemia can make you dizzy?

      17    A    No.  I didn't.

      18    Q    Okay.  But you've definitely had prior episodes of

      19    dizziness throughout the years that you've ended up in the

09:07:59 20    hospital, right?

      21    A    Yes.

      22    Q    When you had to get the filter in 2010, do you remember

      23    much about the discussions for the filter?

      24    A    Not really.

09:08:16 25    Q    You had a pretty significant stomach ulcer and were going

CROSS-EXAMINATION - DORIS JONES

09:08:19   1   to have to have some pretty significant surgery; right?

2   A   Yes.

3   Q   And you were in the hospital quite a while, weren't you?

4   A   Yes, I was.

09:08:26   5   Q   And that was related to the stomach surgery?

6   A   Ulcer, yes.

7   Q   And I think you said in your deposition you said that was

8   one of the bad ones.

9   A   Yes, it was.

09:08:36   10   Q   Okay.  And was your husband there at the hospital with

11   you?

12   A   Yes, he was.

13   Q   And did he talk to the doctors about the filter?

14   A   Yes.

09:08:44   15   Q   And were you there?  Were you listening?

16   A   I was there but I was medicated, so I don't know what they

17   was talking -- he probably was talking to me but I can't

18   remember anything.  So it was between him and my husband who

19   was talking.

09:09:00   20   Q   So you deferred to your husband's decision about having --

21   about you having a filter?

22   A   Yes.

23   Q   Okay.  Did he talk to you about that?

24   A   About having a filter?

09:09:11   25   Q   Yes, ma'am.

CROSS-EXAMINATION – DORIS JONES

09:09:11  1    A    Yes.

2    Q    Okay.  And you decided, based on your husband's

3    conversations with the doctor, to have the filter; correct?

4    A    Yes.

09:09:25  5    Q    After that surgery in 2010, you didn't go back to work for

6    a while, did you?

7    A    No, I didn't.

8    Q    You stayed home and were sort of recuperating from your

9    ulcer issues; correct?

09:09:36  10   A    Yes, I was.

11   Q    And then in 2012 you had to go back to Memorial Hospital

12   because you had chest pain.  Do you recall that?

13   A    In 2012?

14   Q    Yes, ma'am.

09:09:51  15   A    I really don't.

16        MS. HELM:  Would you pull up 8067, please.

17   BY MS. HELM:

18   Q    Ms. Jones, do you have your glasses?

19        And do you see at the very beginning under history of

09:10:17  20   present illness it says --

21        MS. HELM:  And if you'll just take it up to the first

22   three lines, four lines, Scott.

23        That's good.

24   BY MS. HELM:

09:10:28  25   Q    It says the patient is you, and you were admitted to the

CROSS-EXAMINATION – DORIS JONES

09:10:32   1   emergency room with complaint of substernal chest pain present

           2   since January 8, 2012.

           3        Do you see that?

           4   A   Yes, I do.

09:10:40   5   Q   And it says you described it as a 10 out of 10 in

           6   intensity.  So you were in pretty significant pain; is that

           7   right?

           8   A   Yes, I was.

           9   Q   Do you recall this?

09:10:52  10   A   To be honest with you, I really don't.

          11   Q   So you don't recall how they treated you in the hospital

          12   or anything that occurred?

          13   A   No, I don't.

          14   Q   Okay.  And no one -- and during that hospitalization in

09:11:06  15   2012, when you went in for the chest pain, no one told you

          16   anything about your filter; is that right?

          17   A   No, they didn't.

          18   Q   And you didn't ask any questions about the filter; right?

          19   A   No, I didn't.

09:11:18  20   Q   Okay.  Thank you.

          21        Now, in 2013, you again had to go back to Memorial

          22   Hospital because you were -- I think you were working in the

          23   yard and felt light-headed and dehydrated.  Do you remember

          24   that?

09:11:33  25   A   In the yard?

CROSS-EXAMINATION - DORIS JONES

09:11:34  1    Q    Okay.

2              MS. HELM:  Would you pull up 7596, please.

3         BY MS. HELM:

4         Q    Ms. Jones, do you see that that shows that you went to

09:11:44  5    Memorial Hospital on August --

6              MS. HELM:  I'm sorry, may I publish this, Your Honor?

7              THE COURT:  Yes.

8              MS. HELM:  Thank you.

9              THE COURTROOM DEPUTY:  7956?

09:11:58  10             MS. HELM:  Yes, ma'am.

11             MR. O'CONNOR:  Excuse me, Your Honor, may we

12        approach?  There should be -- may we approach before this is

13        published?

14             THE COURT:  Yes.

09:12:06  15             THE COURTROOM DEPUTY:  I'm sorry, I don't show it --

16             THE COURT:  What is the exhibit number, Ms. Helm?

17             MS. HELM:  7956.  I believe it came in with Dr. Hurst

18        yesterday.  I may have the wrong number, but it definitely

19        came in with Dr. Hurst yesterday.

09:12:18  20             THE COURT:  We don't show that as being admitted.

21             MS. HELM:  I apologize.  I'll check my exhibit

22        number.

23             THE COURT:  So are we taking this down?

24             MS. HELM:  Yeah, you need to take it down.

09:12:28  25             THE COURT:  Does that resolve your issue,

CROSS-EXAMINATION - DORIS JONES

09:12:29  1   Mr. O'Connor?

2           MR. O'CONNOR:  That resolves it.

3           THE COURT:  Okay.

4         (Counsel confer.)

09:12:51  5   BY MS. HELM:

6   Q   Ms. Jones, you don't recall going back to the hospital in

7   2013?

8   A   No, I don't.

9   Q   If there are medical records that show you went to the

09:13:02 10  hospital in 2013, it's just something you don't remember; is

11  that correct?

12  A   It's something I don't remember.

13  Q   Okay.  And you may well have gone; right?

14  A   I may well.

09:13:10 15  Q   And if you're feeling dizzy or dehydrated or fainted at

16  home, that's what would you do, you would go to the hospital;

17  right?

18  A   Sometimes, yes.  Sometimes, no.

19  Q   Okay.  Thank you.

09:13:22 20  A   You're welcome.

21  Q   Now, in 2015 in April you went to the hospital twice, one

22  day and then went home, and went back the next day; is that

23  right?

24  A   Yes, I did.

09:13:33 25  Q   And you had light-headedness, dizziness; is that right?

CROSS-EXAMINATION - DORIS JONES

09:13:36    1   A    Yes, I did.

            2   Q    And you had that arm pain like you had had in 2006; is

            3   that right?

            4   A    Yes.

09:13:42    5   Q    And it was during that hospitalization, during this --

            6   when you went back the second time that they took out your

            7   filter; is that right?

            8   A    When I went back the second time?

            9   Q    Yes, ma'am.

09:13:54   10   A    That's when they took the X-rays of my chest and that's

           11   when they told me that the filter had broken off.  I didn't

           12   have an operation until probably the next day after that.

           13   Q    Okay.  But you stayed in the hospital -- or did you go

           14   home and come back?

09:14:10   15   A    No, I stayed in the hospital.

           16   Q    Okay.  And you talked a little bit yesterday about the

           17   procedure that they did to take the filter out.

           18   A    Yes.

           19   Q    And you said they gave you some medication, you told them

09:14:21   20   you could still feel it, and then they gave you a little

           21   bit -- they gave you some more; is that right?

           22   A    When they took it out of my neck?

           23   Q    Yes, ma'am.

           24   A    No, I said when they was putting it in.

09:14:31   25   Q    Oh, that pain was when they put it in?

CROSS-EXAMINATION – DORIS JONES

09:14:33  1    A    When they put it in.

2    Q    Okay.  So when they put the filter in, you said you could

3    feel it and they gave you more medication; is that right?

4    A    Yes, that's right.

09:14:43  5    Q    When they took -- when they took it out, they had given

6    you medication and you couldn't feel it; correct?

7    A    When they took it out, I was asleep.  I was on medication

8    where they put me to sleep on that one.

9    Q    So you didn't feel anything when they took it out;

09:14:55 10    correct?

11    A    No.

12    Q    Is that right?

13    A    That's right.

14    Q    Okay.  Thank you.

09:14:58 15    A    You're welcome.

16    Q    Now, when you left the hospital in April of 2015, you were

17    told to do a follow-up with a doctor, Dr. Chodos.  Do you

18    remember that?  A young doctor?

19    A    No.

09:15:17 20    Q    Okay.  Well, if your medical records indicate you went

21    back and saw Dr. Chodos in May of 2015, you don't have any

22    reason to disagree with that, do you?

23    A    No, I don't.

24    Q    Okay.  And when you went back to see Dr. Chodos in May of

09:15:34 25    2015, you don't remember that at all?  Going to -- he's a

CROSS-EXAMINATION - DORIS JONES

09:15:39    1    really young doctor.

            2    A    No, I don't.

            3    Q    Okay.

            4         So you don't remember any follow-up at all after you

09:15:46    5    were --

            6    A    Only follow-up I remember they telling me to do is go to

            7    Curtis Cooper.

            8    Q    Okay.  We're going to talk about Dr. Cooper in a minute.

            9         So from when you got the filter removed in April of

09:16:01   10    2015, until today, you've only been to the hospital or the

           11    doctor one time; is that right?

           12    A    Yes.

           13    Q    And that's because you had to go; right?

           14    A    Yes.

09:16:13   15    Q    And that was in 2016 when you went to St. Joseph's

           16    Hospital because of another bleeding ulcer; is that right?

           17    A    Yes, it was.

           18    Q    Okay.  And in 2016 you woke up vomiting blood, didn't you?

           19    A    I wasn't waking up vomiting blood.  I was already up.

09:16:33   20    Q    Okay.  You were up and then you started vomiting blood; is

           21    that right?

           22    A    Yes.

           23    Q    And your husband took you to the hospital; is that right?

           24    A    Yes, he did.

09:16:41   25    Q    Okay.  And that was a bad -- that was another really bad

CROSS-EXAMINATION - DORIS JONES

09:16:44  1   bleed, wasn't it?

2   A   Yes, because that one caught me off guard because I wasn't

3   sick at all.  I was getting ready for work, and when I went to

4   get my purse and stuff, that's when I start throwing up blood.

09:16:59  5   And that's when he rushed me to the hospital.

6   Q   And where were you working in 2016 when that happened?

7   A   I was working at the police station.

8   Q   So you went back to the police station after you had the

9   filter retrieved; is that right?

09:17:13  10  A   Yes.

11  Q   Okay.  And that one caught you off guard and you started

12  vomiting up blood and had to go to the hospital immediately --

13  A   Yes.

14  Q   -- is that right?

09:17:22  15       And, again, you were in the hospital quite a long

16  time, weren't you?

17  A   Yes, I was.

18  Q   Okay.  And they did do two surgeries, didn't they?

19  A   Yes.

09:17:30  20  Q   They did one, they thought it was okay, and then it wasn't

21  and you ended up in the ICU, didn't you?

22  A   Yes.

23  Q   It was pretty scary, wasn't it?

24  A   Yes, it was.

09:17:40  25  Q   Okay.  When you left the hospital in 2016, after you had

CROSS-EXAMINATION - DORIS JONES

09:17:44   1    the two surgeries, they told you to follow-up with Dr. Curtis

2    Cooper, didn't they?

3    A    Yes, they did.

4    Q    And Dr. Cooper is a doctor in Savannah; is that right?

09:17:53   5    A    Yes.  He's a clinic.

6    Q    Like a primary care clinic that you can go to for lots of

7    reasons in Savannah?

8    A    Yes.

9    Q    And when you left in 2016 and they told you to go see

09:18:06   10   Dr. Cooper, you didn't go, did you?

11        MR. O'CONNOR:  Objection.  Irrelevant.

12        THE COURT:  Can we talk about this for a minute,

13   Counsel, please.

14        If you want to stand up, ladies and gentlemen, feel

09:18:17   15   free.

16        (Bench conference as follows:)

17        THE COURT:  What's the relevancy?  Is this your

18   failure to mitigate defense?

19        MS. HELM:  Yes, Your Honor.  She says she's worried

09:18:30   20   and worried and worried and she's told many times to follow up

21   with physicians.  She hasn't done it.  She testified that she

22   was going to go to a doctor and she hasn't gone.

23        I'm clearly entitled to go into -- I mean, if she's

24   worried and won't go to the doctor, we're entitled to know

09:18:42   25   that it's been recommended to her on a number of occasions.

CROSS-EXAMINATION - DORIS JONES

09:18:47  1          MR. O'CONNOR:  We talked about failure to mitigate.

2     I mean, Your Honor --

3          THE COURT:  We said it was in the case.  That was

4     what we said at the final pretrial conference.  I think it

09:18:55  5     was -- that it is part of the defense of the case.

6          MR. O'CONNOR:  But now we're going to start opening

7     the door to finances and all that.

8          THE COURT:  Do you agree they go into the fact that

9     she's financially unable to go to the doctor?

09:19:07  10          MS. HELM:  Your Honor, if they go into that, I'm

11     going to have to be heard on that because there is case law in

12     Georgia that if that becomes a material issue, we're entitled

13     to -- it's a waiver of the collateral source rule.  And, also,

14     if they go into that, I've got evidence that Curtis Cooper is

09:19:24  15     a free clinic.

16          MR. O'CONNOR:  Well, we have no evidence of that.  I

17     don't know how they're going to prove that up.

18          THE COURT:  Well, there is a failure to mitigate

19     defense in this case.  So my question is what is the basis for

09:19:38  20     your relevancy objection if there's a failure to mitigate

21     defense?

22          MR. O'CONNOR:  Well, I suppose because I don't know

23     how they're going to tie it up.  Failure to mitigate.  Did it

24     result in any further damage?  They're not going to be able to

09:19:55  25     prove that.

CROSS-EXAMINATION - DORIS JONES

09:19:55  1        It is just really an attempt to once again inflame

2    the jury here.  And also to put us in a predicament where

3    they're going to open a door and they're going to make this

4    into a collateral issue trial on issues that have no

09:20:06  5    relevancy here.

6        THE COURT:  Ms. Helm, explain to me what damages she

7    failed to mitigate by not going to see Dr. Cooper.

8        MS. HELM:  First, Your Honor, Mr. O'Connor asked her

9    yesterday if she had been to any doctor, and she testified no,

09:20:25 10    that she had not been to the doctor because she was scared.

11        It fails to mitigate her worry claim, her emotional

12    distress claim, because there's testimony in the case that

13    will come in that she was told there was nothing to worry

14    about.  She's had the opportunity to go have the filter

09:20:45 15    checked and she hasn't done it.

16        So the jury's left with this I'm worried, I'm

17    worried, I'm worried, where she hasn't gone.  She testified

18    in her deposition that she was going to go to see Dr. Cooper

19    to determine whether it was in her head or whether she really

09:21:00 20    had something to worry about.

21        So it clearly goes to her failure to mitigate this

22    worry and concern claim because she could get peace of mind

23    by simply going to a doctor and having them evaluate the

24    filter for her.

09:21:15 25        I am not going to ask her why she didn't go.  I'm

CROSS-EXAMINATION - DORIS JONES

09:21:17  1    just going to confirm that there have been many opportunities

2    and many instructions to go and she hasn't gone.

3              THE COURT:  Was the recommendation to follow up with

4    Dr. Cooper after the 2016 bleed?

09:21:28  5              MS. HELM:  Yes, Your Honor.

6              THE COURT:  So how was that a recommendation to go to

7    Dr. Cooper to get the filter fragment checked?

8              MS. HELM:  Well, Your Honor, it's a pattern of

9    showing that she's been recommended to obtain medical care and

09:21:39 10    doesn't do it.

11              THE COURT:  When was she recommended to do a

12    follow-up medical check on the filter fragment?

13              MS. HELM:  There hasn't been one.  She's been told

14    there hasn't been one.  But it goes to her worry claim,

09:21:52 15    Your Honor, because her testimony is, I was going to go see

16    Dr. Cooper to see if I had anything to worry about.  It's in

17    her deposition.  We're getting to it.  I'm just going

18    chronologically.

19              THE COURT:  See if I have anything to worry about

09:22:04 20    with the filter?

21              MS. HELM:  Yes, Your Honor.  Exactly.

22              THE COURT:  Well, that hasn't been brought out at

23    this point.  And if the recommendation was to go to see

24    Dr. Cooper because of the follow-up on the GI bleed, it seems

09:22:13 25    to me there's no reason she would think to go and see him

CROSS-EXAMINATION - DORIS JONES

09:22:19  1   would tell her anything about the filter.  That's the

2   disconnect I'm seeing right now in the evidence.

3            MS. HELM:  Well, Your Honor, I believe it shows a

4   pattern of failing to follow instructions to follow the

09:22:28  5   primary care --

6            THE COURT:  Well, but if there's no instruction that

7   she's received to see a doctor to follow up on the filter,

8   then it seems to me the pattern argument doesn't work because

9   she's never been told to go see somebody as a follow-up on the

09:22:43 10   filter, unless you have evidence that she has.

11           MS. HELM:  No, Your Honor, I don't.

12           THE COURT:  Well, so, all we've got, then, as I

13   understand it, Ms. Helm, is no recommendation from a doctor to

14   see Cooper in order to address the filter, but testimony in

09:22:58 15   her deposition that she thought she could find out from Cooper

16   whether there was anything to worry about with the filter.

17           MS. HELM:  Exactly, Your Honor.

18           THE COURT:  I think that's relevant.  If you can lay

19   the foundation that she thought she could ease her worry on

09:23:14 20   the filter from going to see Dr. Cooper, and she didn't, I

21   think that's relevant on the worry claim, but I don't know

22   where this is going in terms of opening the door to her

23   financial condition, and I am not saying at this point that I

24   am going to conclude this opens up the collateral source rule.

09:23:36 25           So -- but I can't conclude it's irrelevant if she

CROSS-EXAMINATION - DORIS JONES

09:23:39  1    thought she could get relief from her worry from Dr. Cooper

         2    and didn't go.  That clearly goes to her worry.

         3              MR. O'CONNOR:  I think it's a stretch and, you know,

         4    I just think, again, we're getting into a realm of evidence

09:23:52  5    that doesn't really exist.  It was a creation of some type of

         6    fabrication, possibly at the deposition, but I just see this

         7    going --

         8              THE COURT:  Fabrication by your client?

         9              MR. O'CONNOR:  No.  That they're forcing --

09:24:03  10             THE COURT:  Why do you say fabrication?

        11             MR. O'CONNOR:  Well, let --

        12             MS. HELM:  Your Honor, may I go get the transcript?

        13             THE COURT:  No.

        14             MR. O'CONNOR:  They're creating an issue that doesn't

09:24:13  15   exist.

        16             THE COURT:  But she testified to that in her

        17   deposition.

        18             MR. O'CONNOR:  Well, I have to go look at it again.

        19             THE COURT:  Well, then go get the transcript.

09:24:45  20             MS. HELM:  "Do you intend to schedule any visit to

        21   any physician for physical problem?"

        22             "I want to try to go to Curtis."

        23             THE COURT:  This is --

        24             MS. HELM:  Her transcript --

09:24:54  25             THE COURT:  Is this the date of the deposition?

CROSS-EXAMINATION - DORIS JONES

09:24:55  1          MS. HELM:  Yes, Your Honor, February 3rd.

2          THE COURT:  So this is after the 2016 Cooper visit?

3          MS. HELM:  Yes, Your Honor.

4          THE COURT:  Okay.

09:25:01  5          MS. HELM:  And her testimony is --

6          THE COURT:  I'll read it.

7          MS. HELM:  I'm sorry.

8          Your Honor, she's --

9          THE COURT:  Well, so, what she said, as I understand

09:25:23 10  it, Ms. Helm, was in February of 2017, so three months ago.

11          MS. HELM:  Actually 15 months ago, Your Honor.

12          THE COURT:  Isn't this 2017?

13          So February 2017 she said she was going to see

14  Dr. Cooper to find out if this was in her head or not; right?

09:25:46 15          MS. HELM:  Your Honor, she's --

16          THE COURT:  Is that right?

17          MS. HELM:  That's her testimony, Your Honor.  Yes,

18  Your Honor.

19          THE COURT:  Okay.  Well, then, it seems to me that if

09:25:52 20  you want to use this as the basis, then what you can do is ask

21  her whether in fact it was her intention in February of 2017

22  to go to Dr. Cooper to see whether or not this was in her head

23  or whether it was a real problem.  And if she says yes, then

24  you can say did you go, and if she says no, you've established

09:26:14 25  that point.  But I can't conclude at this stage that

CROSS-EXAMINATION - DORIS JONES

09:26:17  1    doesn't -- the -- open the door to her saying why didn't you

2    go and her saying I can't afford it.

3            MS. HELM:  But, Your Honor she's going to testify, I

4    anticipate, and maybe I need to ask this question, when did

09:26:30  5    she start worrying.  I anticipate she's going to say she

6    started worrying in 2015 when she learned about the strut.  So

7    she had the opportunity it in 2016 and was recommended in 2016

8    to go see Dr. Cooper.

9            THE COURT:  But not for the strut; right?

09:26:44 10            MS. HELM:  I'll go back and ask her if she asked

11    anyone in the hospital to check on the strut in 2016 or if she

12    went to Dr. Cooper.

13            THE COURT:  Okay.  Here's my ruling.  Before you can

14    elicit testimony that she did not go see a doctor, you need to

09:26:56 15    lay the foundation either that she was told to follow up on

16    the strut or that she believed she could follow up on the

17    strut.

18            MS. HELM:  I understand, Your Honor.  Thank you.

19            MR. O'CONNOR:  There's still this issue that she's

09:27:08 20    already went down, and this is my point, she's already said

21    she didn't go to a visit that has nothing to do with the

22    filter.  That's already out there.  This is a whole different

23    issue now that -- talking about something after that.  She --

24    counsel has already asked her, you didn't go to that doctor,

09:27:24 25    implying that she could have done something about the filter,

CROSS-EXAMINATION - DORIS JONES

09:27:27  1  where clearly that wasn't the issue.  Clearly, the issue about

2  that visit that was said that she could go to had to do with

3  bleeding ulcers, nothing about the filter.

4          THE COURT:  So therefore what?

09:27:37  5          MR. O'CONNOR:  Therefore, I think you should move

6  to -- I mean, I don't know how to handle it other than she

7  shouldn't go in there again.  I mean, they're drawing --

8  they're putting questions out there that they know they can't

9  tie up.  These are two different issues from two different

09:27:51  10  points in time.

11          THE COURT:  Well, you're talking about the answer

12  that was just given?

13          MR. O'CONNOR:  I didn't go back.

14          THE COURT:  Hold on just a minute.

09:28:35  15          She never answered the question.  So there's been no

16  answer.  The question was asked, you objected, and we started

17  the sidebar.  So she hasn't given any evidence about not

18  going to the doctor.

19          MR. O'CONNOR:  Will my objection be sustained?

09:28:50  20          THE COURT:  Well, I was going to move on to the next

21  question.

22          MS. HELM:  I will move on.

23          THE COURT:  We've instructed the jury questions are

24  not evidence.  I'll sustain the objection just so the jury

09:28:59  25  knows, and then move on to other points we've talked about.

CROSS-EXAMINATION - DORIS JONES

09:29:00   1          MS. HELM:  I understand, Your Honor.  Thank you.

           2       (Bench conference concludes.)

           3          THE COURT:  Thank you, ladies and gentlemen.

           4          The objection to the last question is sustained.

09:29:12   5          Ms. Helm, you may proceed.

           6          MS. HELM:  Yes, Your Honor.  I'll move on.

           7   BY MS. HELM:

           8   Q    Ms. Jones, in 2016 when you had the GI bleed and had to go

           9   to St. Joseph's Hospital, that was after the filter had been

09:29:26  10   removed; right?

          11   A    Yes.

          12   Q    Okay.  And that was after you had learned about the --

          13   that the strut was still in your pulmonary artery; right?

          14   A    Right.

09:29:38  15   Q    So you knew that when you went to the hospital in 2016;

          16   right?

          17   A    Right.

          18   Q    You testified yesterday that you were worried about the

          19   strut in your -- that's still retained in your pulmonary

09:29:50  20   artery.  You remember telling the jury that?

          21   A    Yes, I do.

          22   Q    When did you start worrying about that?

          23   A    The first day they told me about that.

          24   Q    So in 2015 when you learned about it, that's when you

09:30:04  25   started worrying?

CROSS-EXAMINATION - DORIS JONES

09:30:05  1  A   Yes.

2  Q   Okay.  So when you went to the hospital in 2016 for the GI

3  bleed, did you ask anyone at the hospital to check on the

4  strut in your lung?

09:30:20  5  A   No.

6  Q   But you knew it was there; right?

7  A   Yes.  And I also told them that I had it there too.

8  Q   But you didn't ask them to check on it?

9  A   No, I didn't.

09:30:28  10  Q   Even though you were worried about it?

11  A   I was worried about it, and also when the doctor told me

12  it was a safe place where it was at, so.

13  Q   I'm sorry, the doctor told you what?

14  A   At Memorial Hospital, when the doctor said it is more

09:30:39  15  safer there, where it's at.

16  Q   Okay.  So the doctor at Memorial Hospital told you that it

17  was okay where it was and it was safer where it was; right?

18  A   Right.

19  Q   And she told you you didn't need to do anything about it;

09:30:53  20  right?

21  A   Right.

22  Q   When did you start taking care of your grandchildren

23  full-time?

24  A   Well, first full-time I really start taking care of them

09:31:06  25  is when my oldest was about two years old.  Full-time, like, I

CROSS-EXAMINATION - DORIS JONES

09:31:15  1   go to work too, and I come home and take care of them while

2   their parents is at work, because the mother will work in the

3   morning and the dad work at night.  So in between I would take

4   care of her.

09:31:24  5   Q   Okay.  So after you had -- was that after you had the

6   filter removed?

7   A   That's when I got -- she was born in 2010.  December.  So

8   that's when I had this --

9   Q   Okay.  When did you quit the job at the police station and

09:31:42  10  just start taking care of your granddaughters?

11  A   I quit the job after the doctors -- my husband told me the

12  doctor said basically I can't work.

13  Q   Okay.  So you quit the job after you had the filter

14  removed; is that right?

09:31:58  15  A   Yes.

16  Q   So it was after -- I want to make sure you're right.  I

17  know it's hard to remember things.

18      Let me see if I can help you.

19  A   Okay.

09:32:13  20  Q   You take care of three granddaughters; right?

21  A   Yes, I do.

22  Q   And I believe they are seven, three, and one, or seven,

23  four, and one?

24  A   Seven, three, and 11 months.  She'll be one the first of

09:32:30  25  next month.

CROSS-EXAMINATION - DORIS JONES

09:32:31   1    Q    Have you always taken care of the three-year-old?

2    A    Yes, I have.

3    Q    So for at least the last three years you've been taking

4    care of your grandchildren; right?

09:32:39   5    A    Yes.

6    Q    And that's what you've been doing full-time; right?

7    A    Yes.

8    Q    So that takes us back to around 2015?

9    A    Right.

09:32:45  10    Q    Okay.  Okay.  So -- and the seven-year-old and the

11    three-year-old, they live with you?

12    A    Yes, they do.

13    Q    And your daughter that was here yesterday, she lives with

14    you?

09:32:57  15    A    Yes, she does.

16    Q    And her husband; right?

17    A    No, he don't.

18    Q    Oh, he doesn't live with you?

19    A    No.

09:33:01  20    Q    Did he at one point live with you?

21    A    At one point he did.

22    Q    Okay.  So in your house today, it is you, Mr. Jones, your

23    daughter, and your two -- and I apologize, I'm really bad with

24    names, and so rather than mess them up I'm just going to

09:33:15  25    identify them -- and your two granddaughters; is that right?

CROSS-EXAMINATION – DORIS JONES

09:33:17  1    A    Yes.

2    Q    And your other daughter lives real close by?

3    A    Yeah.  She stay right across the street.

4    Q    Okay.  And so since 2000- -- approximately 2015, what

09:33:27  5    you've been doing is taking care of your grandchildren; right?

6    A    Yes.

7    Q    And it was in 2015 that you had the filter removed and

8    found out about the strut that's in your pulmonary artery;

9    right?

09:33:40  10   A    2015.  Yes.

11   Q    Okay.  So the whole time you've been taking care of your

12   two youngest grandchildren, you knew about that; right?

13   A    I knew about that.

14   Q    Okay.

09:33:52  15        Now, do you remember giving your deposition in this

16   case?  Do you remember having to go, I think maybe to a hotel

17   room or an office somewhere, and a man named Mr. Hom talked to

18   you?  Do you recall that?

19   A    Yes, I do.

09:34:11  20   Q    Okay.  And do you remember in your deposition telling

21   us -- and that was in February of 2017; is that right?

22   A    Right.

23   Q    So about a little over a year ago; right?

24   A    Right.  Yes.

09:34:23  25   Q    And you told Mr. Hom that you were going to see a doctor

CROSS-EXAMINATION – DORIS JONES

09:34:31  1    to determine whether you had anything to worry about with your

        2    filter strut.  Do you remember that testimony?

        3    A    No.  I don't.

        4         MS. HELM:  Can you pull up her deposition, page 56,

09:34:43  5    please.

        6    BY MS. HELM:

        7    Q    Ms. Jones, can you see that?

        8    A    Yes, I can see this.

        9    Q    Can you see the numbers down the left side?

09:35:09 10         You see the numbers on the left side of the page?

       11    A    Yes, I do.

       12    Q    Okay.  I'm going to start at number 17.

       13         Do you see where I am?

       14    A    Yes, I do.

09:35:16 15    Q    And the question to you was:  "Do you intend to schedule

       16    any visit to any doctor for your physical problems?"

       17         And your answer was:  "I want to try to go see Curtis

       18    V. Cooper to see if it's just a mental thing or do I really

       19    have anything to worry about because in my mind this is a

09:35:35 20    mental thing to me because it's in my chest."

       21         And the question was:  "And you said you plan to see

       22    Curtis Cooper?"

       23         And your answer was:  "I'm going to see Curtis

       24    Cooper."

09:35:48 25         Did I read that correctly?

CROSS-EXAMINATION - DORIS JONES

09:35:49    1    A    Yes, you did.

2    Q    Okay.  So, Ms. Jones, in February of 2017 you testified

3    that you were going to go see Dr. Cooper to check on the strut

4    and whether you had anything to worry about; correct?

09:36:02    5    A    Correct.

6    Q    Okay.  And you haven't done that, have you?

7    A    No, I haven't.

8    Q    And you haven't been to any doctor to have them check on

9    the strut, have you?

09:36:10   10    A    No, I haven't.

11    Q    You testified yesterday that you worry something's going

12    to happen to you while you're with your grandbabies; right?

13    A    Yes, I do.

14    Q    Do you ever worry that you're going to faint again?

09:36:27   15    A    Yes.

16    Q    Do you worry that you might have another bleeding ulcer

17    and suddenly get ill and throw up blood while you're with your

18    grandbabies?

19    A    Yes, I do.

09:36:38   20    Q    Do you worry that you're going to have dizziness and pass

21    out?

22    A    Yes, I do.

23    Q    And since you've learned about the filter, you've indeed

24    had a very bad physical issue with a stomach bleed, haven't

09:36:52   25    you?  With a bleeding ulcer?

CROSS-EXAMINATION - DORIS JONES

09:36:55  1    A    Yes.

       2    Q    But you haven't had any issues related to the strut, have

       3    you?

       4    A    No.

09:37:03  5    Q    When you came out here for this lawsuit, was that the

       6    first time you heard about a special doctor who might be able

       7    to take the strut out?

       8    A    No.

       9    Q    When did you first learn about there might be a doctor who

09:37:18 10    could take the strut out?  You testified about that yesterday.

      11             MR. O'CONNOR:  Objection, Your Honor.  This may go

      12    into privileged matters.

      13             THE COURT:  I think you need to ask this question in

      14    a way that doesn't address any privileged communications,

09:37:30 15    Ms. Helm.

      16             MS. HELM:  Your Honor, I simply asked when.  I didn't

      17    ask the source.

      18             THE COURT:  Ask in a way that makes clear there is no

      19    privilege being inquired into.

09:37:37 20             MS. HELM:  Sure.

      21    BY MS. HELM:

      22    Q    Ms. Jones, I don't want to know anything your lawyers have

      23    told you.  But when did you learn that there was a specialist

      24    or a doctor that might be able to take the strut out?

09:37:49 25    A    When?

CROSS-EXAMINATION - DORIS JONES

09:37:49   1    Q    Yes, ma'am.

         2    A    We talked about it when I got here.

         3    Q    So since you've been in Phoenix; is that right?

         4    A    Yes.

09:38:00   5    Q    But even if there's a doctor that might be able to take it

         6    out, you're not sure you would have that done, are you?

         7    A    I'm not sure.

         8    Q    Okay.  None of the doctors in Savannah who actually

         9    treated you at Memorial Hospital or at St. Joe's, none of them

09:38:17  10    have told you that you're going to have any future problems

        11    with the strut, have they?

        12    A    No, they haven't.

        13    Q    And none of the doctors who have treated you have told you

        14    that it might move or cause any complications, have they?

09:38:30  15    A    No, they haven't.

        16    Q    Okay.

        17         And, in fact, the only thing they've told you is it's

        18    stable where it is; right?

        19    A    Yes.

09:38:49  20    Q    Did you hear yesterday that one of the consultant doctors

        21    who's been hired by your lawyers testified that you have a

        22    1 percent chance of any problems at all with that strut?

        23    A    No.  I didn't.

        24    Q    That's a pretty small chance, isn't it?

09:39:07  25    A    Yes, it is.

CROSS-EXAMINATION – DORIS JONES

09:39:08  1          MS. HELM:  Thank you, Your Honor.  No further

       2  questions.

       3          THE COURT:  Redirect?

       4          MR. O'CONNOR:  Yes, Your Honor.

09:39:13  5          May we just approach on one point, Your Honor?

       6          THE COURT:  Yes.

       7          If you want to stand up, ladies and gentlemen, feel

       8  free.

       9       (Bench conference as follows:)

09:39:34 10          MR. O'CONNOR:  I just want to draw objection.  I

      11  think they've opened the door to her financial condition, so I

      12  want to go into that with her.

      13          THE COURT:  Tell me what you intend to do.

      14          MR. O'CONNOR:  I'm going to ask her why she hasn't

09:39:43 15  gone to see a doctor.

      16          THE COURT:  What do you think she'll say?

      17          MR. O'CONNOR:  Well, I think there's two reasons.

      18  One is because the doctors have not -- have told her it should

      19  be safe.  Secondly, they put us in a predicament because, you

09:39:57 20  know, we kept her outside of the courtroom --

      21          THE COURT:  What do you think she'll say?  That's my

      22  question.

      23          MR. O'CONNOR:  I think she'll say it was safe and

      24  that she can't afford it.

09:40:07 25          THE COURT:  Okay.  If she says she can't afford to go

CROSS-EXAMINATION - DORIS JONES

09:40:09  1   to the doctor?

2           MS. HELM:  Your Honor, I think it opens the door on

3   collateral source generally.  There's -- I have a long line of

4   case law and a bench brief on that.

09:40:19  5           THE COURT:  What do you mean opens the door?

6           MS. HELM:  It becomes -- if you -- if they're allowed

7   to testify that her financial condition is a material issue in

8   this case, then the issue of collateral source and the ability

9   to --

09:40:35  10          THE COURT:  That's not my question, Ms. Helm.

11          MS. HELM:  I'm sorry, I misunderstood you,

12  Your Honor.

13          THE COURT:  My question is -- well, I probably didn't

14  ask it well.  My question is real specific.  If they elicit

09:40:44  15  testimony that she hasn't gone to the doctor because she can't

16  afford it, what specifically do you think that allows you to

17  do in this case?

18          MS. HELM:  I'm allowed to impeach her with the fact

19  that Curtis Cooper is a free clinic.  I have an impeachment

09:40:58  20  exhibit tendered that shows that it's a free clinic and a pay

21  as --

22          THE COURT:  So that's what you would propose to do?

23          MS. HELM:  Yes, Your Honor.

24          THE COURT:  It seems to me if she says she can't go

09:41:07  25  to Dr. Cooper because she can't afford it, it's relevant to

CROSS-EXAMINATION - DORIS JONES

09:41:10   1   bring out the fact that she wouldn't have to pay.

2        MR. O'CONNOR:  But she opened the door to not just

3   Dr. Cooper, but to doctors.  And that's the problem.  You

4   know, to open a door and then box us in, that's two different

09:41:21   5   issues.  She broadened it beyond Cooper.

6        THE COURT:  Mr. O'Connor, my view is what she asked

7   is relevant, clearly relevant, to the worry issue that the

8   plaintiff has testified about.  So that's in evidence.

9        So it seems to me if you elicit testimony that she

09:41:36  10   hasn't gone to see Dr. Cooper because she can't afford it and

11   if they have evidence that he's free, that evidence ought to

12   be able to come in.

13        Are you suggesting you want to go broader than that

14   and elicit testimony that she hasn't gone to see other

09:41:55  15   doctors besides Cooper because she can't afford it?

16        MR. O'CONNOR:  I think they've opened that door.

17   But, you know, at the same time, I've got to be careful not to

18   make this into a collateral issue that they created.  I think

19   that the relevancy here is so slim to none, what they just

09:42:13  20   did.

21        THE COURT:  Well, I disagree with you on that.  So

22   the question is where do we go from here?

23        MR. O'CONNOR:  Well, I won't ask her, then, but I

24   want to make a record that I think they've improperly opened

09:42:22  25   the door.

REDIRECT EXAMINATION – DORIS JONES

09:42:23  1          THE COURT:  Did you say you want to ask her that?

2          MR. O'CONNOR:  I will not go into it with her.

3          THE COURT:  Okay.  All right.

4      (Bench conference concludes.)

09:42:30  5          THE COURT:  Thank you, ladies and gentlemen.

6              R E D I R E C T   E X A M I N A T I O N

7  BY MR. O'CONNOR:

8  Q   Doris, I have a couple for you.

9  A   Okay.

09:42:49 10  Q   Monae, she's the oldest granddaughter?

11  A   No.  She's the baby.

12  Q   Which one is the oldest, Zi'Yari or Chastity?

13  A   Chastity is the oldest.

14  Q   Have you always, ever since your daughters have had

09:43:01 15  children, made yourself available to them in taking care of

16  them, even while you were working?

17  A   Yes.

18  Q   Is that something you've done since the first baby was

19  born?

09:43:09 20  A   Since the first baby was born, yes.

21  Q   And eventually it became full-time for you?

22  A   Yes.

23  Q   Now, let me ask you a question.  We heard about the

24  problems you've had with GI bleeding and anemia.  And those

09:43:26 25  are problems that you have dealt with over the years; correct?

REDIRECT EXAMINATION – DORIS JONES

09:43:30  1    A    Correct.

2    Q    Have you been able to get those controlled when you go to

3    the hospital and see the doctors?

4    A    Yes.

09:43:36  5    Q    Now, when you went to the hospital in 2010 and you were

6    told that you needed the Bard filter, that's where I want to

7    focus, was there a Bard representative there?

8    A    No.

9    Q    Did anybody tell you that because you've had GI bleeds,

09:43:54  10   because you've had anemia, because you've been sick, that you

11   shouldn't receive a Bard filter?  Did anybody ever tell you

12   that?

13   A    No.

14   Q    Did you receive a filter because you believed -- well,

09:44:10  15   your doctor and your husband believed that it was important

16   for your health?

17   A    Yes.

18   Q    Did you ever expect that the Bard filter would break and

19   go into your lung?

09:44:25  20   A    Oh.  I'm sorry.  No.  No.

21   Q    Doris --

22   A    I'm sorry.

23   Q    That's okay.

24            With your history of GI bleeds, with your history of

09:45:13  25   edema and the other problems you had before the filter, did

REDIRECT EXAMINATION - DORIS JONES

09:45:17  1  you always make it a point to go back to work?

2  A    Yes.

3  Q    Did you always make it a point to be there for your

4  family?

09:45:27  5  A    Yes.

6  Q    And even now with your medical history and now with this

7  filter strut, are you still there to be strong for your

8  family?

9  A    Yes, I am.

09:45:45 10           MR. O'CONNOR:  Thank you.  That's all I have.

11           THE COURT:  All right.  Thanks.

12           Mrs. Jones, you can step down.

13           THE COURT:  Mr. Clark?

14           MR. CLARK:  Your Honor, the plaintiff would call via

09:46:10 15  video deposition Dr. Kirstin Nelson.

16           And at this time we would move into evidence

17  Exhibits 4403, 4406, subject to appropriate redactions.

18           THE COURT:  Any objection?

19           MS. HELM:  Your Honor, I apologize.  I don't have

09:46:31 20  those exhibits as being listed with Dr. Nelson.  May I reserve

21  my objection until the conclusion of the -- are they being

22  published?

23           MR. CLARK:  I don't remember if they're published.  I

24  can tell you that we had agreed on these previously.

09:46:46 25           MS. HELM:  Okay.  No objection, then, Your Honor.

REDIRECT EXAMINATION - DORIS JONES

09:46:48  1        THE COURT:  All right.  Those are admitted.

2        (Exhibits 4403 and 4406 admitted.)

3        THE COURT:  And do you want to read an introduction

4   for Dr. Nelson?

09:46:52  5        MR. CLARK:  I will.

6        And, Your Honor, there are actually four exhibits

7   referenced in that, two of which were already in evidence.

8   So I do have a cheat sheet for the jury, if you'd like.

9        THE COURT:  Okay.  That's fine.

09:47:03 10        MR. CLARK:  May I approach?

11        THE COURT:  Yes.

12        MR. CLARK:  Dr. Kirstin Nelson is an endovascular

13   interventional radiologist in Savannah, Georgia.  She has been

14   in practice for 11 years and is board-certified in diagnostic

09:47:23 15   with a certificate of additional qualification in

16   interventional radiology.

17        (Video testimony of Kirstin Nelson, M.D. was played.)

18        MR. CLARK:  At this time the plaintiff would call

19   David Chodos via video deposition and move into evidence

10:22:26 20   Exhibit 8076.

21        MS. HELM:  No objection, Your Honor.

22        THE COURT:  Admitted.

23        (Exhibit 8076 admitted.)

24        MR. CLARK:  There are two additional exhibits that I

10:22:34 25   would like to provide the cheat sheet for the jury.

REDIRECT EXAMINATION - DORIS JONES

10:22:36  1        THE COURT:  All right.

       2        MR. CLARK:  May I approach?

       3        THE COURT:  Yes.

       4        MR. CLARK:  And may I read the summary to the jury?

10:22:49  5        THE COURT:  You may.

       6        MR. CLARK:  Dr. David Chodos, M.D., is a practicing

       7  physician who worked as an internal medicine resident at

       8  Memorial Health University Medical Center in April 2015.

       9      (Video testimony of David Chodos, M.D. was started.)

10:23:22 10        THE COURT:  Counsel, could we turn up the volume a

      11  little bit.

      12        JUROR:  There's no video.

      13        THE COURT:  Let's pause it for a minute.

      14        Can the volume be any higher?

10:23:39 15        THE COURTROOM DEPUTY:  I've got mine up.

      16        THE COURT:  Why don't we start it over again since

      17  there was a little interruption at the beginning.

      18        That's loud enough.

      19        Okay.  We're going to start over again.

10:24:17 20      (Video testimony of David Chodos, M.D. was played.)

      21        THE COURT:  Counsel, let's stop the video there.

      22        Ladies and gentlemen we will resume at 10:45.

      23      (Recess taken from 10:30 to 10:43.  Proceedings resumed

      24  outside the presence of the jury.)

10:30:02 25        THE COURT:  Counsel, I understand that you had an

REDIRECT EXAMINATION – DORIS JONES

10:43:28    1    issue.

2              MR. CLARK:  Your Honor, with apologies.  You might

3    have heard the reference to high blood pressure in that

4    deposition.  We notice there are a number of other references

10:43:38    5    to things that we have talked about this morning as not being

6    relevant.

7              I will say the parties have been working very

8    diligently to try to catch things like that, but in this

9    particular transcript there are a number of them.  What we

10:43:49   10    would request jointly is that the Court could inform the jury

11    that there are some technical problems with this transcript

12    and that we're going to move on to the next witness and we

13    will revisit this witness at another point in the trial.

14              THE COURT:  So we'll just end the video here?

10:44:05   15              MR. CLARK:  Yeah, we'll postpone it.

16              THE COURT:  And what do you have after that?

17              MR. CLARK:  We will be presenting Lora White live.

18    And then after that we have the depositions of Raji-Kubba,

19    Wong, Alfred Jones, who we will be presenting live.  We have

10:44:25   20    the depositions of Mr. Orms, Smith, and Dr. Rogers.

21              THE COURT:  All right.

22              Any objection to that?

23              MS. HELM:  No, Your Honor.  And as far as time

24    allocations, it's words here and there and we'll still be able

10:44:37   25    to work out the total time allocation.

DIRECT EXAMINATION – LORA WHITE

10:44:39   1                THE COURT:  Okay.  That's fine.

           2                MR. CLARK:  Thank you.  Appreciate it.

           3                THE COURT:  Bring the jury in.

           4           (The jury entered the courtroom.)

10:46:42   5                THE COURT:  Please be seated.

           6           Ladies and gentlemen, during the break an issue

           7      arose about that deposition you were watching of Dr. Chodos.

           8      Rather than try to resolve it now, the parties and I agreed

           9      we're just going to end it there, go on with the evidence,

10:46:54  10      and we'll come back and replay the rest of that deposition

          11      after those issues have been resolved.

          12                MR. COMBS:  Your Honor, at this time plaintiff would

          13      call Lora White.

          14                THE COURTROOM DEPUTY:  Ms. White, if you'll please

10:47:10  15      come forward, raise your right hand.

          16                          **LORA WHITE,**

          17      called as a witness herein, after having been first duly sworn

          18      or affirmed, was examined and testified as follows:

          19                D I R E C T   E X A M I N A T I O N

10:47:40  20      BY MR. COMBS:

          21      Q   Good morning, Ms. White.  Could you please introduce

          22      yourself to the jury once you're settled there.

          23      A   Sorry, I just don't want to choke.  My name is Lora White.

          24      I'm a nurse.

10:48:05  25      Q   And, Ms. White, why don't you tell the jury why you're

DIRECT EXAMINATION – LORA WHITE

10:48:11  1    here today, what your role is in this case.

2    A    So I was hired -- I do life care planning and case

3    management, and I was hired to figure out what future medical

4    care Ms. Jones is going to need and how much that would cost.

10:48:22  5    Q    And, Ms. White, you mentioned you're a nurse.  What other

6    training do you have that you've applied to your work in this

7    case?

8    A    Well, I'm a certified case manager.

9              This is so loud.

10:48:37  10             I'm also a certified life care planner.  So you take

11   a course and then you take a test and then hopefully you pass,

12   and then you get your certification.

13   Q    And do you work up life care plans as a consultant?

14   A    Yes, sir.

10:48:52  15   Q    And is that pretty much your full-time job?

16   A    Yes.  More than.

17   Q    You have a business for doing that?

18   A    I do.  It's called Sims & White.  I'm White.

19   Q    And in your work as a consultant doing life care plans

10:49:11  20   with Sims & White, about how many life care plans have you

21   done over the years?

22   A    Almost a thousand.  Might be a little over a thousand now,

23   actually.  I've not had a chance to count them lately.

24   Q    And did you do a traditional life care plan for this case?

10:49:26  25   A    No, I didn't.  I did -- basically I would call this kind

DIRECT EXAMINATION – LORA WHITE

10:49:28   1    of a cost projection.  So -- because a life care plan, I would

2    interview the client and take everything, equipment,

3    everything.  This was just for the care that was necessary as

4    recommended by the doctors.

10:49:42   5    Q    And what doctors did you refer to?

6    A    Drs. Muehrcke and Hurst.

7    Q    And how did you go about collecting this information?

8    A    I called them and I asked them what their recommendations

9    were.  And then I e-mailed -- I sent them a letter to make

10:50:00  10    sure I didn't hear them wrong.  So they both had their

11    recommendations, and then I always try to get them to sign --

12    whatever doctor I'm working with, because, you know, you're

13    human, you make mistakes, I don't want to mis-hear something.

14    So it gives them a chance to change stuff.

10:50:16  15    Q    And why did you choose to speak with Dr. Hurst and

16    Dr. Muehrcke about Doris' future medical care in this case?

17    A    Because they had already evaluated the patient and the

18    case.  They were familiar with the complications from the

19    strut which broke apart, and they knew, because of their

10:50:36  20    practice, what was going to need to be done.

21    Q    Is that your usual practice, what you do when you create

22    life care plans?

23    A    Yes.  I'll go to the doctors that are treating or

24    evaluating, and I go to each specific specialty and I get

10:50:48  25    their recommendation.  Because I'm a nurse, I'm not a doctor.

DIRECT EXAMINATION — LORA WHITE

10:50:52  1   Q    Is this the process that other life care planners use?

2   A    They're supposed to.

3   Q    And when you talked to the doctors, what specifically did

4   you understand was the medical condition that you were looking

10:51:06  5   to project treatment costs for?

6   A    So the strut that was put in her broke apart and it landed

7   in -- specifically the one I was worried about was the one

8   that was remaining in her pulmonary artery.  So that has to

9   come out.  And there were two ways that the doctors wanted to

10:51:27 10   try to take that piece out, because it can't sit in there, it

11   causes problems.

12        MS. HELM:  Your Honor, excuse me.  I move to strike.

13   This is outside the expertise of this witness.

14        THE COURT:  You're not going to have the witness

10:51:42 15   opining on whether the strut needs to stay in?

16        MR. COMBS:  No, Your Honor.

17        THE COURT:  So the jury shouldn't consider the

18   testimony for that purpose, just for the cost projection she's

19   going to give.

10:51:52 20   BY MR. COMBS:

21   Q    What were the two options Dr. Hurst and Dr. Muehrcke

22   discussed with you as potential options for removing the

23   fragment?

24   A    First option was to try to do it percutaneously.  They

10:52:05 25   already tried once, so they wanted to send her to a specialist

DIRECT EXAMINATION - LORA WHITE

10:52:07  1   at Stanford that has a lot of experience with this kind of

2   complicated issue, and so they wanted to try it that way again

3   because it's less invasive.  That's what the doctors told me.

4         And then the second one, if that fails, which

10:52:21  5   there's -- it could fail again, then they wanted to do an open

6   procedure.  And what that means is they cut her open and take

7   it out physically.

8   Q    Two options:  One is through the skin and through her

9   circulatory system, the percutaneous procedure; right?

10:52:41  10  A    That's correct.

11  Q    And another option would be an open procedure?

12  A    That's right.

13  Q    And why does the -- let's talk about the two different

14  options.

10:52:58  15        What did the doctors recommend -- what were all the

16  things that would go along with the percutaneous procedure, if

17  that was the option?

18  A    Well, she's got to go to Stanford, which is in California,

19  so she'll have to travel there, have to stay there for a

10:53:11  20  while.  Then she'll have the hospitalization, the anesthesia,

21  the postoperative followup, all of the associated charges with

22  surgery.  They have to do some preoperative testing.  That is

23  standard of care to make sure she can undergo anesthesia

24  safely and she won't have a difficult time with that.  So they

10:53:30  25  do X-rays and EKGs and labs for that.

DIRECT EXAMINATION - LORA WHITE

10:53:34  1    Q   So your job, then, was to take all of that that goes along

2    with it and assign it a financial cost; right?

3    A   Correct.

4    Q   And how did you go about doing that?

10:53:44  5    A   I called the providers that were going to be doing the

6    service.  So I called the people at Stanford and talked to

7    their billing office.  I have CPT codes because when you bill

8    for a procedure, a medical procedure, you use codes.  And I

9    worked with the billing office and got their costs.  Not hard.

10:54:05  10   Q   And what was the -- the surgery itself would be the main

11   cost with this; right?

12   A   Yes.

13   Q   There's other costs of the travel and then staying and

14   some consultations and imaging.  But the surgery is the main

10:54:20  15   cost; right?

16   A   Correct.

17   Q   Specifically, how did you get the cost of the surgery?

18   A   I called the surgical -- I called the surgical place, the

19   place that does the surgery, and I called the doctor that does

10:54:33  20   the surgery.  Anesthesia, I went off what is called a fee

21   schedule.  So that's how I got them.

22   Q   And what hospital was that?

23   A   Stanford.

24   Q   And what was the total of all of those figures for a

10:54:48  25   percutaneous procedure?

DIRECT EXAMINATION – LORA WHITE

10:54:49  1   A    $130,000-- $130,157.  I don't know why I can't say that.

2                MR. COMBS:  Your Honor, may I use the Elmo here?

3                THE COURT:  Yes.

4                MR. COMBS:  May I publish this to the jury,

10:55:12  5   Your Honor?

6                THE COURT:  Yes.

7   BY MR. COMBS:

8   Q    Okay.  Did I get that number right?

9   A    Correct.

10:55:31  10               MR. COMBS:  Apologize to everybody for my

11  handwriting.

12  BY MR. COMBS:

13  Q    Let's turn to the second option.

14               What was the second option for removing the fragment?

10:55:45  15  A    For her to undergo the open procedure.  If the

16  percutaneous fails again, they have to go in and take it

17  physically out, open her up.  And that can be done in Atlanta,

18  so that's where I priced it.  At Emory.

19  Q    And why did you pick Atlanta for the procedure when

10:56:06  20  Ms. Jones lives in Savannah?

21  A    It was the closest place that had the appropriate care

22  available for her.

23  Q    And you didn't have all of the travel costs and everything

24  associated like that with it.

10:56:19  25               So how did you find the costs of the medical care

DIRECT EXAMINATION – LORA WHITE

10:56:22  1   associated with an open procedure in Atlanta?

2   A   Again, I called the billing office at Emory and gave them

3   the CPT codes and the DRG, because with in-patient it's a

4   different kind of code, and I asked them.

10:56:37  5   Q   And what was the total figure that you arrived at for an

6   open procedure?

7   A   $244,961.  I did that one better.

8   Q   Did I get that number right?

9   A   Yeah.

10:56:58  10          Can I clarify one thing?  With the in-patient

11   facility, I cleared that with the database that I use, FAIR

12   Health, which you can plug in the DRG and it will spit out the

13   average cost for a specific ZIP code.

14   Q   All of this work was done using the normal methodology of

10:57:16  15   a life care planner?

16   A   Yeah.  You call, you get the information from the billers,

17   and then you compare it to the databases you have to make sure

18   you talked to somebody who knew what they were doing, because

19   sometimes you get people who just make stuff up and so you

10:57:32  20   have to double-check everything.

21   Q   And how do you double-check those figures?

22   A   From the databases.  So I go to the CPT fee book, I go to

23   the FAIR Health database, I go to the American Hospital

24   Directory, and I go to the Medicare website.

10:57:46  25   Q   So you take what they tell you and you also kind of make

CROSS-EXAMINATION - LORA WHITE

10:57:49  1    sure they're reasonable under the databases you have access to

       2    as a life care planner?

       3    A    That's correct.  That's right.

       4    Q    Are all the opinions you've given today in this case to a

10:57:57  5    reasonable degree of life care planner probability?

       6    A    Yes.

       7              MR. COMBS:  Nothing further, Your Honor.

       8              THE COURT:  Cross-examination?

       9              MS. HELM:  Yes, Your Honor.

10:58:09 10              C R O S S - E X A M I N A T I O N

      11    BY MS. HELM:

      12    Q    Morning, Ms. White.  My name is Kate Helm.  We've never

      13    met before, have we?

      14    A    No, ma'am.

10:58:19 15    Q    You spend -- or you derive approximately 90 percent of

      16    your income doing litigation-related work; is that right?

      17    A    At least.  Yes.

      18    Q    And you have done many, many cases with the

      19    Gallagher & Kennedy firm, Mr. Combs' firm; is that right?

10:58:38 20    A    I've done a few cases with him.  I don't know what you

      21    mean by "many, many."  Sounds like hundreds, but I haven't.

      22    Q    But you've definitely been retained by them before?

      23    A    Yes.

      24    Q    On more than one occasion?

10:58:48 25    A    Yes.

CROSS-EXAMINATION - LORA WHITE

10:58:54   1   Q   You testified earlier that what you're here for is to

           2   figure out the future medical care Ms. Jones will need and how

           3   much it will cost; right?

           4   A   Yes.

10:59:01   5   Q   You actually didn't make any determination about what

           6   future medical care she will need, did you?

           7   A   No.  This came straight from the doctors.

           8   Q   Came from the hired consultants hired by

           9   Gallagher & Kennedy; correct?

10:59:11  10   A   Correct.

          11   Q   You did not speak to any of her treating physicians, did

          12   you?

          13   A   No.

          14   Q   You didn't ask to speak to any of her treating physicians,

10:59:19  15   did you?

          16   A   No.

          17   Q   And are you aware that none of Mrs. Jones' treating

          18   physicians have recommended either of the procedures that you

          19   costed out?

10:59:27  20   A   I don't know because I didn't talk to them.

          21   Q   Did you ask to talk to them?

          22   A   No.

          23   Q   You simply relied on conversations with Dr. Hurst and

          24   Dr. Muehrcke; correct?

10:59:35  25   A   That's right.

CROSS-EXAMINATION - LORA WHITE

10:59:37  1   Q   Are you aware that neither Dr. Hurst nor Dr. Muehrcke have

2   ever treated or evaluated Ms. Jones in person?

3   A   Yes.

4   Q   So what you did in this case is you had Dr. Hurst tell you

10:59:58  5   she should go to Stanford, so you chose Stanford based on that

6   and you cost projected it for a percutaneous procedure in

7   Stanford; right?

8   A   Right.

9   Q   You did not look at the possibility that could be done in

11:00:09 10   Savannah, Georgia, did you?

11   A   They already tried it.

12   Q   It's your testimony they already tried to retrieve the

13   strut in Savannah, Georgia?

14   A   Somewhere locally.  They couldn't get it, so --

11:00:22 15   Q   Who told you that?

16   A   I can't remember, I'm sorry.

17   Q   So if you're wrong and they have not tried to

18   percutaneously retrieve the strut, you were given wrong

19   information; correct?

11:00:33 20   A   About that, yes.

21   Q   So you did not look at options to retrieve the strut in

22   Savannah, Georgia, did you?

23   A   No, because Dr. Muehrcke specifically said to try Dr. Kuo

24   because of his experience and expertise.

11:00:46 25   Q   And you didn't look at any options on the east coast at

CROSS-EXAMINATION – LORA WHITE

11:00:49  1    all, did you?

       2    A    No.  I could have gone -- I think I could have gone to the

       3    University of Pennsylvania, but the costs would have been

       4    similar.

11:00:54  5    Q    But you didn't do that?

       6    A    No.

       7    Q    And are you aware, are you not, and in fact you recorded

       8    in your report that Dr. Muehrcke specifically recommends

       9    against an open procedure?

11:01:07 10    A    I'm sorry, I didn't understand your question.

      11    Q    Dr. Muehrcke, who you talked to; right?

      12    A    Right.

      13    Q    He specifically recommends against an open procedure for

      14    Ms. Jones.  Are you aware of that?

11:01:17 15    A    I know he said he wanted to do the percutaneous -- he

      16    thought the percutaneous would be the first option to try, and

      17    if that failed they would have to go to the open procedure.

      18    Q    So it's your testimony that Dr. Muehrcke said they would

      19    have to do an open procedure?

11:01:31 20    A    No, that's not what I said.  What I said was the doctors

      21    said that they would try the percutaneous procedure first, and

      22    then if that failed then they would do the open procedure.

      23    Q    And you costed the open procedure in Emory based on that

      24    understanding; correct?

11:01:46 25    A    That's right.

REDIRECT EXAMINATION - LORA WHITE

11:01:47  1   Q   So if Dr. Muehrcke has testified to this jury this week or

2   last week that he recommends against an open procedure, that

3   cost would not be necessary, would it?

4   A   It depends what Dr. Hurst says.

11:01:58  5   Q   Well, if they both say there's no need -- they recommend

6   against an open procedure, that cost would not be necessary,

7   would it?

8   A   Yes, but I would want to talk to them before I took it out

9   of my report because they told me something --

11:02:12  10  Q   But you did, in fact, include in your report Dr. Muehrcke

11  said an open procedure would be too risky, didn't you?

12  A   Yes.

13          MS. HELM:  Thank you.  No further questions.

14          THE COURT:  Redirect?

11:19:09  15          R E D I R E C T   E X A M I N A T I O N

16  BY MR. COMBS:

17  Q   Ms. White, you were asked about your litigation work.

18  About how much of your work is on the plaintiff side and how

19  much is on the defense side?

11:02:41  20  A   It's 50/50.  I'm hired by defense as much as plaintiff.

21  Q   In fact, you've had defense cases against my firm;

22  correct?

23  A   Yes.

24  Q   Recently?

11:02:50  25  A   Yes.

REDIRECT EXAMINATION – LORA WHITE

11:02:51  1   Q   And you've done work for other law firms in Arizona,

2   including Snell & Wilmer; correct?

3   A   That's correct.

4   Q   And Snell & Wilmer is one of the defense firms involved in

11:03:00  5   this case; right?

6   A   They're national.  Yes.  I've worked with them in other

7   areas too.

8   Q   You haven't reviewed Ms. Jones' medical records in this

9   case?

11:03:13  10   A   No.

11   Q   And for the explant procedure, it was taken out, the

12   filter was removed.

13   A   I'm sorry?

14   Q   You haven't reviewed the medical records, for example, of

11:03:23  15   the filter that was -- the removal of the filter?

16   A   No.

17   Q   Or when the filter -- regarding the filter fragment, you

18   haven't reviewed imaging or anything like that?

19   A   That's right.

11:03:34  20   Q   You just know that there's a filter piece still left in

21   her.

22   A   Yes.

23   Q   That's what the doctors told you?

24   A   That's correct.

11:03:43  25   Q   So as far as whether they tried to take it out or couldn't

REDIRECT EXAMINATION - LORA WHITE

11:03:47  1    or it was left in or they didn't -- they left it alone, you

       2    don't know that?

       3    A    I don't.  I just know what I've been told.

       4    Q    Why don't you -- why don't you -- let me ask it this way:

11:03:59  5    Do you typically call the treating physicians in cases like

       6    this?

       7    A    No.  This wasn't -- like I said, when you do a life care

       8    plan, which you're outlining all of the medical costs, you

       9    want to talk to all of the doctors, you want to read all the

11:04:13 10    medical records.  All I was asked in this case to do -- we

      11    knew there was a filter fragment in her body that needed to

      12    come out, so all I was asked to do was to price how much that

      13    would be.  That's all I did.

      14         So this wasn't a true life care plan, it was just a

11:04:27 15    simple evaluation, talk to the doctors, get their

      16    recommendations, find out how much that's going to be, because

      17    doctors don't know how much they bill.

      18             MR. COMBS:  Nothing further, Your Honor.

      19             THE COURT:  All right.  Thank you.

11:04:40 20             You can step down.

      21             THE WITNESS:  Thank you.

      22             MR. CLARK:  At this time the plaintiff would call

      23    Abithal Raji-Kubba via video deposition, and would move into

      24    evidence the following exhibits:  1817, 1821, 1823.

11:05:11 25             MS. HELM:  Your Honor --

REDIRECT EXAMINATION - LORA WHITE

11:05:11  1          I'll do it later.  I've got it.

        2          -- there's an exhibit the defendants also need to

        3  move in, but I apologize, I can't get my --

        4          MR. CLARK:  I can tell you what that is.  But I will

11:05:24  5  represent that you had agreed those three exhibits --

        6          MS. HELM:  I'm sorry.  Yeah, no objections.

        7          THE COURT:  Okay.  Those are admitted.

        8        (Exhibits 1817, 1821, 1823 admitted.)

        9          MR. CLARK:  And I believe the defendant has a motion

11:05:31 10  to admit Exhibit 1822.

       11          MS. HELM:  Your Honor, we would move to admit 1822.

       12          THE COURT:  That will be admitted as well.

       13          MR. CLARK:  And for the record, we have no objection

       14  to that.

11:05:40 15          THE COURT:  That was my assumption.

       16        (Exhibit 1822 admitted.)

       17          MR. CLARK:  Your Honor, if I could -- because this

       18  got a little tangled up, if I could just read the deposition

       19  exhibit conversion to the jury for this particular one.  And I

11:05:52 20  apologize for not having the handy cheat sheet.

       21          THE COURT:  That's fine.

       22          MR. CLARK:  Exhibit 1817 is deposition Exhibit 301.

       23          Exhibit 1821 is deposition 305.

       24          1823 is deposition 308.

11:06:10 25          And 1822 is deposition 307.

REDIRECT EXAMINATION – LORA WHITE

11:06:15 1    THE COURTROOM DEPUTY:  Could he spell the name for

2    the jury.

3        THE COURT:  Would you spell the name for the jury,

4    please.

11:06:24 5    MR. CLARK:  Yes.  The name of the witness?

6        THE COURT:  Yes.

7        MR. CLARK:  It is Abithal, A-B-T-I-H-A-L, Raji,

8    R-A-J-I, hyphen, Kubba, K-U-B-B-A.

9        May I be permitted to read the summary?

11:06:39 10    THE COURT:  Yes.

11        MR. CLARK:  Ms. Raji-Kubba was the vice president for

12    research and development at Bard Peripheral Vascular from

13    May 2007 until December 2011.  She has a bachelor's degree in

14    engineering and specialized in material science.  She has a

11:06:54 15    background working with semiconductors.  Since 1993 she has

16    been working with medical devices, including implantable

17    devices such as ports, central lines, and IVC filters.

18        (Video testimony of Abithal Raji-Kubba played.)

19        MR. CLARK:  Your Honor, the plaintiff would call

11:25:07 20    Natalie Wong, also via video deposition, and would offer the

21    following exhibits into evidence:  2243, 2247, 2249, 2250,

22    2251, and 2254.

23        And if I could just make a question.  I believe 2248

24    and 2253 are already in evidence; is that correct?

11:25:43 25    THE COURTROOM DEPUTY:  2248 has been admitted.

REDIRECT EXAMINATION – LORA WHITE

11:25:45  1          And 2253?

2          MR. CLARK:  Yes.

3          THE COURTROOM DEPUTY:  Has been admitted.

4          MR. CLARK:  Thank you.

11:25:50  5          THE COURT:  Any objection?

6          MS. HELM:  None, Your Honor.

7          THE COURT:  All right, those exhibits are admitted.

8       (Exhibits 2243, 2247, 2249, 2250, 2251, and 2254

9 admitted.)

11:25:54 10          MR. CLARK:  May I approach with the conversion chart?

11          THE COURT:  You may.

12          MR. CLARK:  And may I be permitted to read the

13 background summary?

14          THE COURT:  Yes.

11:26:09 15          MR. CLARK:  Natalie Wong is currently employed at

16 Bard Peripheral Vascular, and since 2008 has been a quality

17 engineering manager in field assurance.  Ms. Wong earned a

18 bachelor's degree in industrial engineering in 2001 and a

19 master's in business administration in 2007 from Arizona State

11:26:26 20 University.  She began working at BPV in April of 2002 as a

21 quality engineer and has been with the company since, with the

22 exception of a brief stint at Lockheed Martin in Georgia.  At

23 BPV she handles quality assurance issues and conducts trending

24 analyses related to BPV's IVC filters.

11:27:00 25       (Video testimony of Natalie Wong played.)

REDIRECT EXAMINATION - LORA WHITE

11:27:08  1          THE COURT:  Counsel, let's end the deposition there.

2          Ladies and gentlemen, we will resume at 1 o'clock.

3      We'll excuse you at this time.

4          (The jury exited the courtroom at 12:00.)

12:00:10  5          THE COURT:  Please be seated.

6          So, Counsel, do you know how you're allocating time

7      on depositions for this morning?

8          MR. CLARK:  We do, Your Honor.

9          For Dr. Nelson, plaintiff had 20 minutes and

12:00:28  10     defendant had 14 minutes.

11          For the portion of Dr. Chodos played so far, we're

12     splitting it three and three.

13          For Raji-Kubba, it's 13 to plaintiffs and five to

14     defendant.

12:00:43  15          THE COURT:  Okay.  And then there will be some for

16     Wong later.

17          MR. CLARK:  Correct.

18          THE COURT:  Okay.  Give me just a minute here.

19          MR. CLARK:  Your Honor, if you like, I can tell you

12:00:51  20     the remaining depositions so you have it?  Would that be

21     helpful to you, to the Court?

22          THE COURT:  Tell me what?

23          MR. CLARK:  The remainder of the ones to be played.

24          THE COURT:  No.  It only helps after I've got the

12:01:00  25     time recorded.

12:01:04  1             MR. CLARK:  No problem.

        2             THE COURT:  Let me just do this math.

        3             All right.  As of now, Counsel, plaintiff has used

        4    21 hours and four minutes, defense has used six hours and

12:02:26  5    three minutes.

        6             And we will see you at 1 o'clock.

        7         (End of a.m. session transcript.)

        8                         *  *  *  *  *

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 23rd day of May,

15  2018.

16

17

18

19

20                         s/ Patricia Lyons, RMR, CRR
                           Official Court Reporter
21

22

23

24

25