```
 1                    UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ARIZONA
 3
 4                   _____
 5   In Re:  Bard IVC Filters    ) MD-15-02641-PHX-DGC
     Products Liability Litigation)
 6                                ) Phoenix, Arizona
     _____) May 23, 2018
 7   Doris Jones, an individual,  ) 1:00 p.m.
                                  )
 8                Plaintiff,      )
                                  ) CV 16-00782-PHX-DGC
 9          vs.                   )
                                  )
10   C.R. Bard, Inc., a New       )
     Jersey corporation; and Bard )
11   Peripheral Vascular, Inc., an)
     Arizona corporation,         )
12                                )
                 Defendants.      )
13   _____)
14
15       BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE
16             REPORTER'S TRANSCRIPT OF PROCEEDINGS
17              (Jury Trial - Day 6 - P.M. Session)
                (Pages 1277 through 1347, inclusive.)
18
19
20
21   Official Court Reporter:
     Laurie A. Adams, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 43
23   Phoenix, Arizona 85003-2151
     (602) 322-7256
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription
```

```
      ─────5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6─────
```

 1   APPEARANCES:

 2   For the Plaintiff:

 3            GALLAGHER & KENNEDY PA
              By:  Mark S. O'Connor, Esq.
 4            By:  Paul L. Stoller, Esq.
              By:  Shannon L. Clark, Esq.
 5            By:  C. Lincoln Combs, Esq.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, Arizona 85016

 7            LOPEZ MCHUGH LLP
              BY:  Ramon Rossi Lopez, Esq.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, California 92660
 9
     For the Defendants:
10            NELSON MULLINS RILEY & SCARBOROUGH LLP
              By:  Richard B. North, Jr., Esq.
11            By:  Elizabeth C. Helm, Esq.
              By:  James F. Rogers, Esq.
12            201 17th Street NW, Suite 1700
              Atlanta, Georgia 30363
13

14

15

16

17

18

19

20

21

22

23

24

25

```

1

# I N D E X

2

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| NATALIE WONG | | | | |
| By Video Deposition | | | | |
| (Resumed) | 1281 | | | |
| | | | | |
| ALFRED JONES | | | | |
| By Mr. O'Connor | 1282 | | 1295 | |
| By Mr. Rogers | | 1287 | | |
| | | | | |
| DANIEL ORMS | | | | |
| By Video Deposition | 1298 | | | |
| | | | | |
| CHRISTOPHER SMITH | | | | |
| By Video Deposition | 1299 | | | |
| | | | | |
| DONNA-BEA TILLMAN | | | | |
| By Mr. North | 1302 | | | |

3
4
5
6
7
8
9
10
11
12

## INDEX OF EXHIBITS

13
14

| EXHIBIT | | RECEIVED |
|---------|--|----------|
| 677 | Filter - Fracture Analysis August 2010, Reporting range 7/1/05 - 8/31/10, G2, G2X, and Eclipse | 1297 |
| 1009 | 4/6/2004 Memo from Peter Palermo to Doug Uelmen Re:  "Remedial Action Plan - BPV Recovery Nitinol Vena Cava Filter", Including the Remedial Action Plan SPA 04-03-01 on the Recovery Filter, dated 3/26/2004 | 1297 |
| 1014 | 6/11/2004 Memo from Pete Palermo to Doug Uelmen Re. "Remedial Action Plan BPV Recovery Filter - Migration" | 1297 |
| 1018 | 9/27/2004 Memo from Pete Palermo to Doug Uelmen Re: "Remedial Action Plan BPV Recovery Filter - Migration (SPA-04-05-01)" | 1297 |
| 1022 | Failure Investigation Report on the Recovery Filter Migration, FIR-04-12-01 Rev. 00 | 1297 |
| 1140 | Presentation titled Filter-Fracture Analysis | 1297 |

15
16
17
18
19
20
21
22
23
24
25

—5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6—

1                        INDEX OF EXHIBITS

2    EXHIBIT                                          RECEIVED

3    2049      11/17/2004 Updated Health Hazard
               Evaluation Memo from David Ciavarella,
4              M.D. to Doug Uelmen, Re: "Limb
               Fractures of Recovery Filter"              1299
5    1787      11/9/2010 E-mail Thread from Chris
               Smith Re: "Northside(S) Filter Business"   1298
6    4504      Monthly Management Report, dated 4/8/09    1297
     4507      Monthly Management Report, dated 7/9/09    1297
7    4509      Monthly Management Report, dated 10/8/09   1297
     4512      Monthly Management Report, dated 1/1/10    1297
8    4514      Monthly Management Report, dated 3/8/10    1297
     4522      Monthly Management Report, dated 11/8/10   1297
9    4528      Monthly Management Report, dated 5/9/11    1297
     4532      Monthly Management Report, dated 9/9/11    1297
10   4533      Monthly Management Report, dated 10/10/11  1297
     4534      Monthly Management Report, dated 11/8/11   1297
11   4552      Failure Investigation Report,
               Recovery Filter Migration
12             FIR-04-12-02, Rev. 00                      1297
     5126      Guidance for Industry and FDA
13             Reviewers/Staff - Guidance for
               Cardiovascular Intravascular
14             Filter 510(k) Submissions                  1341
     7753      2014 Draft FDA Guidance re
15             Benefit-Risk Factors When Determining
               Substantial Equivalence in Premarket
16             Notifications 510k with Different
               Technological Characteristics              1331
17   8062      Consent: Filter placement                  1290

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT

—5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6—

1           P R O C E E D I N G S

2           THE COURT:  Ladies and Gentlemen, Nancy mentioned to

3   me that one or more of you asked whether it would be

4   permissible for you to stand up or move around during a video

5   to stay wide awake and attentive, and the answer is yes.  If          01:01PM

6   you are having any trouble focusing, just stand up, whatever

7   you need to do to stay focused.  And we'll try to continue to

8   keep videos to a minimum.

9           MR. CLARK:  How about the lawyers?

10          THE COURT:  You guys have to stay seated.                      01:01PM

11          Actually, you don't.

12          All right.  Let's go ahead and continue with the Wong

13  deposition.

14          (Video testimony of Natalie Wong resumed.)

15          MR. CLARK:  Your Honor, I believe we have resolved our         01:11PM

16  difficulties with the Chodos transcript and should be able to

17  continue with that right now.

18          THE COURT:  All right.

19          (Video testimony of David Chodos, M.D. played in open

20  court.)                                                               01:12PM

21          MR. O'CONNOR:  Your Honor, at this time we're going to

22  call Alfred Jones.

23          THE COURT:  If you want to stand up, Ladies and

24  Gentlemen, while he's coming in, feel free.

25          THE COURTROOM DEPUTY:  Mr. Jones, if you will please          01:39PM

 1   come forward and raise your right hand, sir.

 2          (The witness was sworn.)

 3          THE COURTROOM DEPUTY:  Could you state and spell your

 4   name for the record.

 5          THE WITNESS:  Alfred Jones.  A-L-F-R-E-D, J-O-N-E-S.          01:39PM

 6          THE COURTROOM DEPUTY:  Thank you, sir.  Please come

 7   have a seat.

 8          MR. O'CONNOR:  May I proceed, Your Honor?

 9          THE COURT:  You may.

10                    ALFRED JONES,

11   called as a witness herein, having been duly sworn, was

12   examined and testified as follows:

13                 DIRECT EXAMINATION

14   BY MR. O'CONNOR:

15   Q.  Will you introduce yourself to the members of the jury,          01:39PM

16   please?

17   A.  Yes.  My name is Alfred Jones.

18          THE COURT:  Mr. Jones, could you get a little closer

19   to the mic?

20   BY MR. O'CONNOR:                                                      01:40PM

21   Q.  May I call you Alfred?

22   A.  Yes, you may.

23   Q.  Where are you from?

24   A.  Savannah, Georgia.

25   Q.  And have you been there most of your life?                       01:40PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-A. Jones-Direct

1    A.  Yes, sir.  Pretty much.

2    Q.  How old are you today?

3    A.  52.

4    Q.  Are you married to Doris Jones?

5    A.  Yes, I am.                                                    01:40PM

6    Q.  How long have you been married?

7    A.  14 years, but we've been together 17.

8    Q.  We heard that you actually knew Doris years before that.

9    Is that right?

10   A.  Yes, sir.                                                    01:40PM

11   Q.  But it sounds as though she told us that nothing happened

12   then.  Why don't you tell us your side.

13   A.  Well, we grew up in the same area and went to the same

14   schools.  Her father used to work on vehicles and when anyone

15   had an issue with a vehicle it was taken to her father.  So     01:40PM

16   needed some work done and I took it to her father.  And I

17   assume he knew I liked her.  When he told me to go in and talk

18   to her, instead of going in I fixed it myself and left.

19   Q.  And then you ran into her years later?

20   A.  Yes.                                                        01:41PM

21   Q.  Now, Alfred, let's just go right to August 24, 2010.

22        First of all, we have heard testimony that Doris has

23   had various health issues, including issues with ulcers and GI

24   bleeding.  Is that true?

25   A.  Yes, it is.                                                 01:41PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-A. Jones-Direct

1    Q.  Do you recall when she was hospitalized on August 24, 2010?

2    A.  Yes, I do.

3    Q.  And why don't you tell us about that.  She went to the

4    hospital and then eventually was there a clot discovered?

5    A.  Yes.  After she had the surgery for the bleeding ulcers,          01:41PM

6    while she was still under the drugs, she began to get swelling

7    and that's when they discovered there were a clot.

8    Q.  Swelling in her ankle?

9    A.  Right above the ankle, more near the calf area.

10   Q.  Were you present the whole time with Doris?                       01:42PM

11   A.  Yes, I was.

12   Q.  At some point in time was there discussion about placing a

13   Bard Eclipse Filter?

14   A.  Yes, it was.

15   Q.  And how was Doris during that time when there was a              01:42PM

16   discussion about the filter?

17   A.  She was more or less in and out due to the pain medication

18   they were giving her at that time.

19   Q.  Did you have conversations with the doctor?

20   A.  Yes, I did.                                                       01:42PM

21   Q.  And based upon your conversations, did you agree to have

22   Doris undergo implantation of the filter?

23   A.  Yes, I did.

24   Q.  At that time, did you have any reason to know or believe

25   that the filter may migrate, tilt, or fracture?                      01:42PM

—5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-A. Jones-Direct—

1   A.  No, I did not have any idea at all.

2   Q.  Did you have an understanding how long the filter was

3   intended to be in Doris?

4   A.  My understanding was that she would need to have that

5   filter in for basically the remainder of her life.                01:42PM

6   Q.  And how did you feel about that?

7   A.  Well, really, I wasn't too pleased by it but if it was

8   going to save her life or make it prolonged to where she could

9   live longer, then I was with anything that was going to make

10  her stay with us.                                                  01:43PM

11  Q.  Now, at some point in time Doris had problems with that

12  filter.  Is that correct?

13  A.  Yes, she did.

14  Q.  And I want to fast forward to April 21/22 of 2015.  Do you

15  recall that time period?                                           01:43PM

16  A.  Yes.

17  Q.  And why don't you explain to the members of the jury what

18  you recall about that.

19  A.  This particular day she was at work and was having some

20  issues.  And they sent her to the hospital via ambulance.  I      01:43PM

21  was called to meet her there.  When I got there, they examined

22  her.  They found out that the filter had fractured and they was

23  going to need to remove the filter.

24  Q.  And how did Doris -- how was she about that?  Do you

25  recall?                                                            01:44PM

1   A.  Well, she wasn't really too pleased by it because she was

2   under the same impression that I was, that it was going to be

3   there for her life and that it was there to save her.  And then

4   when she found out that it had fractured, and she just was like

5   I guess numb would be the word for it.                          01:44PM

6   Q.  Did you learn that a fragment of that filter had embolized

7   or had moved up through the circulatory system through her

8   heart and into her pulmonary artery?

9   A.  Yes.  That's when they told me that they was going to need

10  to remove.  So once they did the removal of what they could     01:44PM

11  they said they couldn't remove the other.  And I asked, well,

12  why?  And they said that it was better left where it was at

13  because it would have -- the way they would have had to try to

14  remove it would have caused her more damage and even death

15  compared to just leaving it where it was at.                    01:45PM

16  Q.  Now, going back in 2010 when Doris had the Bard Eclipse

17  Filter implanted, did you have any reason to expect that some

18  day you would be back in the hospital because that filter

19  fractured and embolized?

20  A.  No.                                                         01:45PM

21  Q.  How is -- we heard that Doris now is taking care of her

22  three granddaughters.

23  A.  Yes, she is.

24  Q.  And how does she, from your perspective, how is she these

25  days knowing that she has that fragment in her lung?            01:45PM

─────5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-A. Jones-Direct─────

 1   A.  Well, I can't speak medically, but I guess it's most like

 2   any other person.  You have your good days; you have your bad

 3   days.  But for the most part, with that knowledge and her not

 4   really speaking with us about it, you know her, you can see the

 5   difference in how she do things, or how she carry herself as          01:45PM

 6   far as she's not that real out, outgoing person she used to be

 7   but she still has a smile.  She still enjoys being with the

 8   kids.  But you can tell deep down inside that she's really

 9   worried about it.

10   Q.  Do you have any reason to believe she's afraid with the          01:46PM

11   filter fragment in there?

12   A.  Yes.  Of course I do.  And because when she do talk with us

13   about it she breaks down.  She cries.  She wants to be by

14   herself.  She doesn't want to really discuss it but she

15   sometimes just kind of like fall back and try to put the best       01:46PM

16   on the outside, I guess would be the best wording for it.

17   Q.  Let me check one thing.

18          MR. O'CONNOR:  That's all I have.  Thank you, Your

19   Honor.

20          Thank you, Alfred.                                            01:46PM

21          THE COURT:  All right.  Cross-examination?

22          MR. ROGERS:  Yes, Your Honor.

23                      CROSS-EXAMINATION

24   BY MR. ROGERS:

25   Q.  Good afternoon, Mr. Jones.                                       01:47PM

1  A.  How are you?

2  Q.  I am well.  Thank you.  I hope you are.

3  A.  Yes.  For the most part I am, yes.

4  Q.  Mr. Jones, you and I have not had a chance to meet but I

5  need to ask you just a few questions if that's okay with you.    01:47PM

6  A.  Yes, sir.

7  Q.  Mr. Jones, this is kind of a silly question to start with,

8  but you currently live in the same home with your wife, Doris,

9  right?

10 A.  Yes, I do.    01:47PM

11 Q.  And who else is in that home?

12 A.  Our daughter Shanice and her two children.

13 Q.  And when you are there at the house, do you try and help

14 Doris out as much as possible?

15 A.  Of course.  Yes, I do.    01:47PM

16 Q.  And do you help Doris out with watching the grand kids?

17 A.  For the most time, I do.  Sometimes it's more or less I do

18 duties around the house as far as the dishes, help with the

19 clothing, help get them dressed, help her feed them for that

20 part.    01:48PM

21 Q.  But you do try and help out with the grand kids?

22 A.  Yes.  Definitely.

23 Q.  Are you working right now, Mr. Jones?

24 A.  Yes, I am.

25          MR. O'CONNOR:  Objection.    01:48PM

1    I was going to say objection, irrelevant.  But the

2  answer came.

3           MR. ROGERS:  I'm sorry.  Is it withdrawn?

4           MR. O'CONNOR:  Well, no, I mean, I do have an

5  objection that that's not relevant.                          01:48PM

6           THE COURT:  Are you making the objection?  I can't

7  tell.

8           MR. O'CONNOR:  Objection.  Irrelevant.

9           THE COURT:  Sustained.

10           MR. ROGERS:  May I respond, Your Honor?            01:48PM

11           THE COURT:  Yes.

12           MR. ROGERS:  Your Honor, I'm just trying to establish

13  how much time Mr. Jones spends in the home.

14           THE COURT:  You can ask that question.

15           MR. ROGERS:  I will be glad to rephrase.          01:48PM

16  BY MR. ROGERS:

17  Q.  Mr. Jones, can you tell the jury how much time you spend in

18  the home currently?

19  A.  Over a full day, I'm normally home half of the time.

20  Q.  Okay.  Thank you.                                       01:48PM

21           And Mr. Jones, let me turn your attention now to the

22  2010 hospital admission when your wife got the IVC filter.

23  Okay?  And Mr. Jones, you were there for that admission, right?

24  A.  Yes, I was.

25  Q.  And I believe you were the person who actually spoke some  01:49PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-A. Jones-Cross

1  with the doctor who was going to implant the filter, is that

2  correct.

3  A.  Yes, sir.

4  Q.  Could we pull up Exhibit 8062, please?

5          MR. ROGERS:  Your Honor, I'd like to move 8062 into      01:49PM

6  evidence.

7          THE COURT:  Any objection?

8          MR. O'CONNOR:  No objection.

9          THE COURT:  Admitted.

10          MR. ROGERS:  May we display, Your Honor?      01:49PM

11          THE COURT:  You may.

12  BY MR. ROGERS:

13  Q.  Mr. Jones, can you see that document there on the screen?

14  A.  Yes, sir, I can.

15  Q.  And Mr. Jones, do you remember -- well, first of all, let      01:49PM

16  me ask you, there's a signature there on the left-hand side.

17          MR. ROGERS:  And Scott, if you could blow that up I'd

18  appreciate it.

19  BY MR. ROGERS:

20  Q.  But Mr. Jones, is that signature on the left-hand side, is      01:49PM

21  that your signature?

22  A.  Yes, it is.

23  Q.  And is this a document that you signed before your wife

24  underwent the procedure to have the filter implanted?

25  A.  Yes, it was.      01:50PM

—5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-A. Jones-Cross—

1   Q.  And did you have a chance to talk with the doctor, Dr.

2   Avino, who was going to do this procedure?

3   A.  Yes, I did.

4   Q.  And can you tell us what he told you about this procedure

5   and whether or not there were any potential risks with this          01:50PM

6   procedure?

7   A.  Yes, I will.

8         When I signed this particular sheet of paper, the

9   risks that were explained to me was about the procedure or

10  surgery, or however they implanted it.  He told me that it          01:50PM

11  would have been normal risk just like with any other procedure.

12  He had done it before.  It shouldn't be an issue.  And I felt

13  confident that he knew what he was talking about.  He was the

14  physician.  He knew what he was doing so I had no need to worry

15  about anything.                                                      01:50PM

16  Q.  At this point in time did you understand that your wife had

17  a blood clot in her leg?

18  A.  Yes, I did.

19  Q.  Did you also understand that she needed to have this

20  surgery to fix the bleeding ulcers that she had?                     01:51PM

21  A.  Yes.

22  Q.  And did Dr. Avino explain to you that your wife had a risk

23  of something called a pulmonary embolism, a blood clot, going

24  to her lung?

25  A.  Yes.                                                             01:51PM

1  Q.  Did he explain to you that that was potentially something

2  that could be deadly for your wife?

3  A.  Speaking of the blood clot, yes.

4  Q.  And based on that, did you perceive that there was a

5  benefit to your wife to have this filter inserted so that it          01:51PM

6  might catch a blood clot if it was headed to your wife's lungs?

7  A.  Again, according to the doctor, I did believe that was to

8  be the right route to take.

9  Q.  And Mr. Jones, did you have any understanding that this

10  filter was a filter that could be removed at a later date?          01:51PM

11  A.  No, sir, I did not have that understanding.

12  Q.  And that was not explained to you?

13  A.  No, sir.

14  Q.  Did you talk with anybody about this procedure or the

15  device that was going to be implanted in your wife other than       01:52PM

16  Dr. Avino?

17  A.  No, sir, I did not.

18  Q.  Because as I understood your prior testimony, did you trust

19  Dr. Avino to do the right thing by your wife?

20  A.  Yes, I did.                                                     01:52PM

21  Q.  And is that why you signed this consent form?

22  A.  Yes, sir.  And she was in a lot of pain.  I love my wife

23  and I wanted her to be here with me.

24  Q.  Mr. Jones, let's move forward in time, if you would, to

25  2015 when your wife had the procedure to have the filter            01:52PM

1   removed.  Do you remember that?

2   A.  Yes, I do.

3   Q.  And do you remember a doctor named Dr. Kirsten Nelson?

4   A.  I believe that was the doctor that did the removal.

5   Q.  And did you have a chance to meet her and talk with her     01:52PM

6   before she did the removal procedure?

7   A.  Yes, I did.

8   Q.  And based on that conversation, did you understand that

9   your wife did have this metallic strut that was in her left

10  lung?  Is that right?                                          01:53PM

11  A.  Yes.

12  Q.  Did Dr. Nelson explain to you that there were any potential

13  future risks because of that fragment in her lung?

14  A.  Well, not word for word.  There were a risk for it being

15  there but she did say it was a danger to her.  But she,        01:53PM

16  herself, could not perform the surgery and it was best to be

17  left alone.

18  Q.  And Mr. Jones, do you remember getting deposed in this

19  case?  Do you recall that?

20  A.  Getting who?                                               01:53PM

21  Q.  I'm sorry.  Do you remember when you went to a law office

22  or a conference room somewhere in Savannah and people asked you

23  questions about this case?

24  A.  Yes, I do.

25  Q.  And that's typically called a deposition.  And you can     01:53PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-A. Jones-Cross

1    remember giving that?

2    A.  Yes.

3    Q.  And do you remember you were under oath when they asked you

4    questions at that time?

5    A.  Yes.                                                              01:54PM

6            MR. ROGERS:  Scott, if you would, can you pull up Mr.

7    Jones' deposition, Page 36, Lines 23 on to 25.

8    BY MR. ROGERS:

9    Q.  And Mr. Jones, can you see that okay on your screen?

10   A.  Yes.                                                              01:54PM

11   Q.  And Mr. Jones, I'm just going to read this.  If you follow

12   along with me I'd appreciate it.  And the question is:  Did

13   she, and that refers to Dr. Nelson.  If you want to look at

14   more of this to make sure that's right we'll be glad to do

15   that.  But the question said:  Did she discuss at all any        01:54PM

16   future risks related to leaving the strut implanted?

17            And your answer was:  None that I can recall.

18            Did I read that correctly?

19   A.  Yes, you read it correctly.

20   Q.  Mr. Jones, did Dr. Nelson ever tell you your wife would      01:54PM

21   need to have some sort of procedure to have that strut removed

22   later on?

23   A.  No, she didn't.

24   Q.  And Mr. Jones, since you talked with Dr. Nelson about that

25   strut that was in your wife's heart -- excuse me -- in your       01:55PM

1   wife's lung, have you had any conversations with any other

2   doctors yourself about that strut?

3   A.  No, sir.

4   Q.  No further questions, Mr. Jones.  Thank you.

5           THE COURT:  Redirect?                                    01:55PM

6                    REDIRECT EXAMINATION

7   BY MR. O'CONNOR:

8   Q.  We heard testimony from doctors who indicated that this

9   strut was in a dangerous place to be removed.  Was that your

10  understanding, too?                                             01:55PM

11  A.  Yes, sir, it is.

12          MR. O'CONNOR:  No more questions.

13          THE COURT:  Thanks, Mr. Jones.  You can step down.

14          MR. O'CONNOR:  Your Honor, may Mr. Jones be excused

15  but may he remain in the courtroom?                             01:56PM

16          THE COURT:  Any objection?

17          MR. ROGERS:  None, Your Honor.

18          THE COURT:  Yeah.  That's fine.

19          MR. CLARK:  For plaintiff's next witness, we call

20  Christopher Smith.  And all of the exhibits associated with     01:56PM

21  this deposition have been admitted into evidence.

22          May I be permitted to approach with the cheat sheet?

23          THE COURT:  Yes.

24          MR. CLARK:  Your Honor, another one of those technical

25  difficulties has arisen.  Let me proceed with Mr. Daniel Orms   01:57PM

1  if the Court would permit me to.

2      THE COURT:  So are you saying we're going to do Orms

3  before Smith?

4      MR. CLARK:  Yes, Your Honor.  I apologize.  I thought

5  we had that queued up.  One second.  Might have shuffled the      01:57PM

6  deck the wrong way.  Apologize.

7      Your Honor, before we proceed with this deposition,

8  the plaintiff would like to move into evidence the following

9  exhibits, all of which are subject to redaction, in particular,

10  the monthly management reports that we discussed earlier this     01:57PM

11  morning.

12      THE COURT:  Before we do that, Traci, I don't show

13  2049 as being in evidence.  Do you?

14      THE COURTROOM DEPUTY:  I don't show it in.

15      THE COURT:  So 2049 on the Smith sheet has not been      01:58PM

16  admitted.

17      MR. CLARK:  I apologize, Your Honor.  I thought it

18  was.  We would move to admit 2049.  I believe we cleared all

19  the exhibits with the defendant.  We can handle that one before

20  Mr. Smith's deposition.      01:58PM

21      THE COURT:  We'll come back to that when we get to

22  Smith.  So we want to do Orms now?

23      MR. CLARK:  Yes, Your Honor.  Before Mr. Orms'

24  deposition, we would move the following documents into evidence

25  again subject to redaction:  4504, 4507, 4509, 4512, 4514,      01:58PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6

1    4522, 4528, 4532, 4533, 4534, 1009, 1014, 1018, 4552, 1022,

2    667, 1140.

3              MR. NORTH:  Your Honor, first of all, I believe Mr.

4    Clark just said 667.  That should be 677, I believe.

5              MR. CLARK:  I stand corrected.  Thank you, Richard.          01:59PM

6              THE COURT:  Any objection?

7              MR. NORTH:  Your Honor, no objections subject to the

8    redactions we talked about this morning and further subject to

9    redactions consistent with the Court's previous orders on other

10   issues.                                                              01:59PM

11             THE COURT:  That's fine.  All right.  We'll admit

12   these exhibits subject to those redactions.

13             MR. CLARK:  For this deposition there are four

14   exhibits.  I have a cheat sheet.  May I approach?

15             THE COURT:  Yes.                                           02:00PM

16             MR. CLARK:  And may I be permitted to read the

17   background summary?

18             THE COURT:  Yes.

19             MR. CLARK:  In 1988, Daniel Orms received his

20   Bachelor's degree in business with specialization in marketing.     02:00PM

21   Mr. Orms began selling medical devices for the Johnson &

22   Johnson subsidiary Ethicon in 1991.  Mr. Orms worked for number

23   of medical device companies selling their devices before he

24   started working for what is now Bard Peripheral Vascular in

25   1997 as a sales representative.  He became a district sales         02:00PM

1    manager in 2001 and then a regional sales manager in 2008.

2    During his time at Bard, Mr. Orms sold Bard's Simon Nitinol,

3    G2, and Eclipse Filters and oversaw the district and regional

4    sales representative who sold these filters.

5           Mr. Orms was laid off from Bard in December 2012 and    02:01PM

6    is currently employed as a regional manager for Abbott

7    Vascular, another medical device manufacturer.

8           THE COURT:  Mr. Clark, one of the exhibits listed for

9    this deposition is 1787.  That's not in evidence.

10          MR. CLARK:  Your Honor, I apologize.  Our notes are    02:01PM

11   crossed.  I would move into evidence Exhibit 1787, which is

12   Deposition Exhibit 13.

13          MS. HELM:  No objection.

14          THE COURT:  It's admitted.  You may play the

15   deposition.                                                    02:01PM

16          MR. CLARK:  Apologize, Your Honor.  Thank you.

17          THE COURT:  Counsel, is that Russian?

18          MR. LOPEZ:  Can we start over, Your Honor?

19          THE COURT:  Good idea.

20          MR. CLARK:  We thought in the interest of time we      02:02PM

21   would speed it up.

22          THE COURT:  I thought you were playing two at the same

23   time.

24          (Video testimony of Daniel Orms played in open court.)

25          MR. CLARK:  Plaintiff is going to try again with       02:27PM

─5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6─

1   Christopher Smith and would move at this time into evidence

2   Exhibit 2049.

3            MS. HELM:  No objection, Your Honor.

4            THE COURT:  Admitted.

5            MR. CLARK:  May I be permitted to read the background          02:27PM

6   summary?  And I believe the Court already has the cheat sheets.

7            THE COURT:  Yes.  Go ahead.

8            MR. CLARK:  Christopher Smith was a sales

9   representative for Bard Peripheral Vascular from 2006 through

10  2010.  He began as a territory manager and was promoted to          02:27PM

11  southeastern district manager in 2008.  He currently works for

12  Medtronic Neurovascular.

13           (Video testimony of Christopher Smith played in open

14  court.)

15           THE COURT:  Counsel, let's stop it there, please.          02:29PM

16           Ladies and Gentlemen, we will resume at 2:45.

17           (Recess from 2:29 p.m. until 2:47 p.m.)

18           THE COURT:  Thank you.  Please be seated.

19           All right.  Counsel, you may continue.

20           (Video testimony resumed.)          02:47PM

21           MR. CLARK:  Your Honor, plaintiff calls her last

22  witness via video, Dr. Frederick Rogers.  And I'm happy to

23  report that it is a short video.  May I be permitted to read

24  the summary?

25           THE COURT:  Yes.          03:05PM

UNITED STATES DISTRICT COURT

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6

1    MR. CLARK:  By the way there are no exhibits

2  associated with this deposition.

3    Dr. Frederick Rogers specializes in critical care and

4  has over 37 years of experience in the field of medicine.  He

5  is board certified in surgery and surgical critical care.  He      03:05PM

6  graduated from the University of Vermont College of Medicine

7  with his medical degree in 1981.

8    In 2008, Dr. Rogers assumed the trauma medical

9  directorship at Lancaster General Hospital, a Level 2 trauma

10  center, in Southern Pennsylvania.  And in January of 2017 he      03:05PM

11  became director of the Lancaster Hospital Clinical Research

12  Program.  He has conducted clinical research involving IVC

13  filters for more than 20 years.

14    Dr. Rogers is not being presented as an expert witness

15  by either party.                                                  03:06PM

16    (Video testimony of Frederick Rogers, M.D. played in

17  open court.)

18    MR. CLARK:  Your Honor, may I be permitted to read the

19  answer?

20    THE COURT:  I think we all know what it was.  It was      03:16PM

21  the third time the question was asked.  You can read it.

22    MR. CLARK:  The answer was yes.

23    THE COURT:  All right.  Anything else?

24    MR. O'CONNOR:  Plaintiff rests, Your Honor.

25    THE COURT:  All right.                                          03:17PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6

1   MR. NORTH:  Your Honor, at this point could we briefly
2   approach?
3   THE COURT:  Go ahead and stand up, Ladies and
4   Gentlemen.
5   (Discussion was had at sidebar out of the hearing of          03:17PM
6   the jury:)
7   MR. NORTH:  Your Honor, at this time, just as we did
8   in Booker, I just want to be sure the record is clear and I
9   preserve my right to assert a Rule 50 motion.  We certainly can
10  argue it at a later time at the Court's convenience.           03:17PM
11  THE COURT:  All right.  The motion is deemed made.
12  MR. NORTH:  Thank you.
13  (In open court.)
14  MR. NORTH:  Your Honor, at this time the defendants
15  would call Donna-Bea Tillman to the stand.                     03:18PM
16  THE COURTROOM DEPUTY:  Ms. Tillman, come forward and
17  raise your right hand, please.
18  (The witness was sworn.)
19  THE COURTROOM DEPUTY:  Could you please state your
20  name and spell it for the record, ma'am?                       03:18PM
21  THE WITNESS:  Donna-Bea Tillman.  D-O-N-N-A, hyphen
22  B-E-A, Tillman T-I-L-L-M-A-N.
23  THE COURTROOM DEPUTY:  Thank you very much.  If you
24  will please come have a seat.
25  MR. NORTH:  Your Honor, if I may approach I have a             03:19PM

1   copy of Dr. Tillman's report and reliance list for the Court.

2           THE COURT:  That's fine.

3                     DONNA-BEA TILLMAN,

4   called as a witness herein, having been duly sworn, was

5   examined and testified as follows:

6                    DIRECT EXAMINATION

7   BY MR. NORTH:

8   Q.  Good afternoon, Dr. Tillman.

9   A.  Good afternoon.

10  Q.  Could you tell the members of the jury where you reside?     03:19PM

11  A.  I live in Columbia, Maryland.

12  Q.  What is your profession?

13  A.  I am a biomedical engineer.

14  Q.  Do you specialize in any particular area?

15  A.  Yes.  I specialize in FDA regulations of medical devices.     03:19PM

16  Q.  And what is your present employment?

17  A.  So I work for a company called Biologics Consulting Group.

18  Q.  And what sort of consulting company is Biologics Consulting

19  Group?

20  A.  So we help medical device companies, biologics companies,     03:20PM

21  and pharmaceutical companies who have products that they are

22  taking in front of the FDA develop the data and evidence they

23  need to support their marketing applications.

24  Q.  And prior to today, have you ever testified at a trial

25  before?                                                          03:20PM

—5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct—

1    A.   This is my second trial.

2    Q.   Could you tell the members of the jury about your

3    educational background?

4    A.   Sure.  So I have an undergraduate degree in engineering

5    from Tulane University and I have a Ph.D. in biomedical                03:20PM

6    engineering from Johns Hopkins and I have a master's in public

7    administration from The American University.

8    Q.   And when did you obtain your Ph.D.?

9    A.   I was at Hopkins from, let's see, 1985 to 1992, I believe.

10   Q.   After you received your Ph.D. in biomedical engineering,          03:21PM

11   what was your first major employment?

12   A.   So I went to work for the government for the Consumer

13   Products Safety Commission.  That's a federal agency that's

14   responsible for helping to ensure the safety of consumer

15   products.                                                              03:21PM

16   Q.   And what was your position at the Consumer Products Safety

17   Commission?

18   A.   So I was a physiologist in the Health Sciences Directorate.

19   Q.   What did you do as a physiologist in that commission?

20   A.   So I worked on different product spaces trying to help            03:21PM

21   ensure the safety of consumer products.  I worked in the area

22   of swimming pool safety, so trying to find the appropriate

23   warning labels and information to help people understand they

24   shouldn't dive into shallow swimming pools.  I worked on

25   playground equipment.  I worked on the warning labels you may         03:21PM

1   see on five-gallon buckets warning people children can actually

2   drown in five-gallon buckets, a wide range of consumer

3   products.

4   Q.  How long did you stay at the Product Consumer Safety

5   Commission?                                                        03:22PM

6   A.  I think I was there about three years.

7   Q.  Where did you go after you left the Commission?

8   A.  So I then went to work for the FDA.

9   Q.  When did you go to work for the FDA?

10  A.  I believe it was 1994.                                         03:22PM

11  Q.  And what area of the FDA did you first work with?

12  A.  So I started out as a reviewer in the Obstetrics and

13  Gynecology Devices Branch in the part of FDA that does

14  premarket reviews of medical devices.

15  Q.  What sorts of products were you looking at at that point?      03:22PM

16  A.  So obstetric and gynecology devices; women's health

17  products; contraceptive products; products used in

18  gynecological surgery.  Pretty much anything that falls into

19  that category.

20  Q.  And what does a medical reviewer at the FDA do?                 03:22PM

21  A.  So I was a biomedical engineer, and so my job was to take

22  the lead on reviewing different kinds of premarket submissions.

23  When I started it was mostly 510(k) submissions and then other

24  kinds of premarket submissions for different kinds of medical

25  devices.                                                           03:23PM

—5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct—

1    Q.  And how long did you hold that position?

2    A.  So I was a reviewer for approximately three years.

3    Q.  And then would that have taken you through approximately

4    1997?

5    A.  Yes.  I think that's correct.                          03:23PM

6    Q.  And then in 1997, did you move to another area of the FDA?

7    A.  I did.  I moved into my first management position, which

8    was in the group that did pacemakers and neurological devices.

9    So I was the branch chief of that branch.

10   Q.  And how long were you the branch chief for pacing and     03:23PM

11   electrophysiology devices?

12   A.  I think I was a branch chief for approximately three years,

13   I would say.

14   Q.  And how many people at the FDA reported to you at that time

15   or during that period?                                      03:23PM

16   A.  Yeah, it fluctuated a little bit but somewhere between

17   12 -- I had 12 and 14 scientists and medical officers that

18   worked for me during that time.

19   Q.  And as the manager of the group, exactly what was your

20   individual role or responsibility?                          03:24PM

21   A.  So my job was to coordinate the reviews that were performed

22   by my branch.  So to assign work when a new submission would

23   come in I would assign that submission to one of the reviewers.

24   When they finished their review they would make a

25   recommendation to me, and I would review those recommendations   03:24PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1   to make sure there was consistency across the branch.  And then

2   I had basic personnel and management responsibilities as well.

3   Q.  And did the submissions that you would sign off on, did

4   those include device submissions for premarket approval?

5   A.  Yes.  They included premarket approvals or PMAs and 510(k)s    03:24PM

6   and IDEs and a wide range of other kinds of less common

7   submissions.

8   Q.  And did you remain in that position for approximately three

9   years?

10  A.  Yes.  I believe it was approximately three years.            03:25PM

11  Q.  And after that in 2000, where did you move in the FDA?

12  A.  So my next formal position was as the Deputy Director for

13  Cardiovascular Devices.  So it was sort of the next level up

14  the administrative hierarchy.  So in that position I had a

15  number of branch chiefs that reported to me.                     03:25PM

16  Q.  And how long were you in that group?

17  A.  So I was in that position for, once again, roughly two to

18  three years, I would say.

19  Q.  And what exactly were your responsibilities as the Deputy

20  Director of the Division of Cardiovascular?                      03:25PM

21  A.  So my job was sort of similar to the branch chief job but

22  sort of one level up.  So it was to ensure consistency and

23  quality of the reviews that came through the Division to help

24  on allocating resources between the different branches.  I also

25  was responsible, actually had the authority to sign off on      03:25PM

1    510(k) submissions when I was in that position.  So I was

2    actually the person at FDA who was the final signatory on

3    510(k) submissions at that time.

4    Q.  And in that role, what particular types of devices fell

5    under the jurisdiction of the Division of Cardiovascular?          03:26PM

6    A.  So my part of the Division included electrophysiology

7    devices; catheters that are used to do cardiac procedures;

8    cardiac pacemakers; I was responsible for the peripheral

9    vascular devices branch, so it would include intravascular

10   filters; all the monitors when you go to a hospital and get        03:26PM

11   hooked up to ECGs, those kinds of devices as well.

12   Q.  And during those years as the Deputy Director For the

13   Division of Cardiovascular, approximately how many FDA

14   employees reported to you?

15   A.  So the branch chiefs reported directly to me and then under    03:26PM

16   the branch chiefs they had their own employees.  So roughly

17   indirectly, 30 to 40 people reported to me.

18   Q.  And what was your next position within the FDA?

19   A.  So then I moved up to the level of the Office Director.

20   And so I was the Deputy Office Director For Science and             03:27PM

21   Technology, so more of a policy position.

22   Q.  And what sort of role did you play or responsibilities did

23   you have in that position?

24   A.  So in that position it was really trying to develop policy

25   and guidance and overall direction for the Premarket Program.      03:27PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    So I was very much involved with developing guidance documents

2    for 510(k), IDE, PMA programs.  I was involved in a policy

3    around how FDA was going to regulate medical devices software

4    and high level questions about how FDA's Premarket Program sort

5    of functioned at a macro level.                                      03:27PM

6    Q.  And then in April of 2004, were you promoted to a new

7    position?

8    A.  Yes.  So at that point in time, I became the Director of

9    the Office of Device Evaluation.  So I was overseeing the

10   entire Premarket Review Program for medical devices except for   03:28PM

11   the in vitro diagnostic devices which have their own office.

12   Q.  And what was your role as the Director of the Office of

13   Device Evaluation?

14   A.  So my I had overall responsibility for the Premarket Review

15   Program.  So I was responsible for managing resources.  I was    03:28PM

16   responsible for creating overall review policy and direction

17   for the staff.  I was responsible for organizing -- dealing

18   with issues that crossed between my office and the other

19   offices so where there were issues that maybe involved

20   premarket and post-market and compliance issues, I represented  03:28PM

21   my office on those committees.

22   Q.  Dr. Tillman, approximately how many FDA employees reported

23   to you in that position?

24   A.  So there were around 350 scientists and medical officers

25   and administrative folks who worked for me at that time.         03:29PM

1  Q.  Now, how long did you remain in that position?

2  A.  So I was in that position for approximately six years until

3  2010.

4  Q.  And did you leave the FDA in 2010?

5  A.  Yes, I did.  It was a very hard decision for me, but I have        03:29PM

6  always been interested in medical device software.  It's a very

7  interesting area from a regulatory and public health

8  perspective.  And I was approached by Microsoft.  And they were

9  developing a medical device software group.  I had the

10 opportunity to go to work for them and help them figure out how       03:29PM

11 they would integrate their processes and how they would sort of

12 deal with medical device regulations.  So it was a very

13 exciting opportunity for me and so I left FDA to work for

14 Microsoft.

15 Q.  And for approximately how long were you with Microsoft?           03:29PM

16 A.  So I was there for about two and-a-half years.

17 Q.  And why did you decide to leave Microsoft?

18 A.  So at that time, Microsoft decided that they were going to

19 take their health group and form a joint venture with another

20 medical device company.  And they wanted me to move out to           03:30PM

21 Seattle, and that just wasn't going to be a good option for me

22 given some of my family commitments.  So I left Microsoft at

23 that time.

24 Q.  And what did you do after you left Microsoft?

25 A.  That's when I joined my current company, Biologics             03:30PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    Consulting.

2    Q.  How many years total were you employed by the FDA, Dr.

3    Tillman?

4    A.  I was at the FDA for 17 years.

5    Q.  Can you estimate how many premarket submissions for medical    03:30PM

6    devices you may have reviewed during those 17 years?

7    A.  So if you include the submissions I reviewed both as a

8    reviewer and as a branch chief and then as a deputy division

9    director and then the ones I saw as office director, I would

10   estimate anywhere between 1 to 2,000 pre market submissions.    03:30PM

11   Q.  Did those include PMAs and 510(k)s?

12   A.  Yes, they did.

13   Q.  And ultimately, were you the person at the FDA ultimately

14   responsible for all premarket submissions during your last six

15   years there?    03:31PM

16   A.  With the exception of the in vitro diagnostics, yes.  I was

17   ultimately responsible for the final signoff on all premarket

18   submissions.

19   Q.  Now, tell us what you do -- well, have you been with your

20   present company Biologics Consulting Group since 2012?    03:31PM

21   A.  Yes, I have.

22   Q.  And what sort of work do you do with that company?

23   A.  So I work with medical device companies and both very small

24   startup companies where an inventor might have an idea of a

25   novel medical device and they know they have to go to the FDA    03:31PM

1  but they really don't understand that process, so I help them

2  both understand what it means to be a regulated medical device

3  company and how to develop the kinds of data they need to

4  support their products.  And I work with companies also to help

5  them develop quality systems, so how do they develop processes    03:32PM

6  to make sure that they consistently produce quality products.

7          I work with clients who need help if they are having

8  problems in the post-market setting where perhaps they have got

9  a problem with a device and they are trying to figure out how

10  to deal with that.  So pretty much having to do with FDA    03:32PM

11  regulation of medical devices I help companies in that sense.

12  Q.  And in your present role, do you actually meet with the FDA

13  on occasion on behalf of the these clients?

14  A.  Yes.  I regularly meet with FDA on behalf of my clients.

15  Q.  In your present consulting work, do you actually draft    03:32PM

16  labeling or Instructions For Use, proposed Instructions For Use

17  for review or clearance or approval by the FDA?

18  A.  So I work -- I definitely work with my clients to draft

19  labeling.  It is a very important part of any premarket

20  submission, so I usually start with my clients where I give    03:32PM

21  them examples of labeling to look at.  They draft their

22  labeling.  I provide them guidance on what they need to put in

23  that in order to make it consistent with FDA's expectations.

24  Q.  And did you ever become involved in any capacity with

25  inferior vena cava filters while working at the FDA?    03:33PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1  A.  Yes.  When I was at the FDA, I was the branch chief of the

2  branch that was responsible for reviewing inferior vena cava

3  filters.  And, in fact, if you look at some of the letters from

4  FDA relating to the 510(k)s you will see my name on them.

5  Q.  Over the course of the last few years in your consulting        03:33PM

6  business, what sort of medical devices have you been involved

7  with generally?

8  A.  So one of my major areas of focus is medical device

9  software:  When does your phone become a medical device?  What

10  kinds of medical applications, software applications are a        03:33PM

11  medical device?  I work a lot in radiology imaging, so software

12  that's intended to be used to analyze radiological images and

13  identify regions of interest.

14       I work a lot in the combination product space.  So

15  that is where you have a product that might include a drug        03:34PM

16  component and a device component, for example, a stent that has

17  a drug in it and novel kinds of drug delivery systems.  And

18  because of my experience at FDA, I work pretty much in almost

19  any kind of cardiovascular medical device.

20  Q.  As a part of your consulting work, do you also assist        03:34PM

21  parties that are involved in litigation involving medical

22  devices?

23  A.  So that is part of what I do.  I would estimate that it's

24  about 15 percent of what I do.  Most of what I do is the pure

25  regulatory consulting, but I do do some litigation work.        03:34PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    Q.  Do you charge a rate for consulting work in litigation?

2    A.  So I'm an employee of a company so I am paid by my company.

3    My company bills $500 an hour for my time, but that money

4    doesn't come directly to me.

5    Q.  Have you been involved in any other litigation on behalf of    03:35PM

6    Bard?

7    A.  So I also work with Bard on its transvaginal mesh

8    litigation.

9    Q.  And were you paid for that work?

10   A.  Yes, I was.                                                    03:35PM

11   Q.  Doctor, at my request and the request of my team, have you

12   undertaken a review of the regulatory history of Bard's IVC

13   filters?

14   A.  Yes, I have.

15   Q.  And as a result of this review that you have conducted,        03:35PM

16   have you reached opinions as a regulatory technical specialist

17   in this case?

18   A.  Yes.  I have a number of opinions that I have documented in

19   a report I wrote.

20   Q.  Have you reached an opinion concerning the FDA's present       03:35PM

21   classification of filters?

22   A.  Yes, I have.

23   Q.  And tell us what that opinion is, generally.

24   A.  So that opinion is that FDA has classified IVC filters as

25   Class II devices based on an understanding that they know what     03:36PM

1  the risks are and they can establish special controls that

2  enable those risks to be mitigated to an appropriate level;

3  that the benefits of those devices should outweigh the risks.

4  Q.  Do you have an opinion regarding what the FDA has to find

5  to downclassify a device?                                    03:36PM

6  A.  Yes.  I have an opinion about that.

7  Q.  And what is that?

8  A.  So in order to classify a device in Class II, they need to

9  demonstrate that the device does not present an unreasonable

10  risk of illness or injury, and that they can establish these  03:36PM

11  special controls that should ensure that the device benefits

12  outweigh its risks.

13  Q.  As a part of your work and review of materials in this

14  case, did you review Bard's premarket -- or Bard's submissions

15  to the FDA regarding the G2, or the Recovery Filter, the G2   03:37PM

16  Filter and the Eclipse Filter?

17  A.  Yes.  I have received and reviewed copies of all of

18  Bard's -- well, I shouldn't say all, all of the relevant Bard

19  filter 510(k)s.

20  Q.  And did you reach an opinion about the appropriateness or  03:37PM

21  adequacy of those submissions that Bard made to the FDA?

22  A.  Yes.  My opinion is that the information that was provided

23  in the submissions was consistent with what FDA would expect to

24  be in a 510(k) submission for a device of this type, and that

25  it was consistent with FDA's special control guidance document  03:37PM

1    for intravascular filters.

2    Q.  And as a part of your work in this case, did you review

3    Bard's instructions for use and promotional materials regarding

4    the Recovery G2 and Eclipse Filters?

5    A.  Yes, I did.                                                           03:38PM

6    Q.  And did you reach an opinion about the adequacy or

7    appropriateness of those materials?

8    A.  Yes.  My opinion is that those materials are consistent

9    with FDA's expectations with the information that FDA's

10   guidance document suggests should be in filters, and that they     03:38PM

11   are also consistent with what is in the labeling and what is

12   the sort of standard expectation for filters in general.

13   Q.  The jury has heard some testimony about the MAUDE database.

14   Can you tell us what MAUDE stands for?

15   A.  So the MAUDE database is FDA's publicly available database     03:38PM

16   of adverse event reports.

17   Q.  As a part of your work in this case, have you reached any

18   opinions as to whether it would be appropriate for a

19   manufacturer to include complication rate information taken

20   from the MAUDE database in its labeling regarding a device?       03:39PM

21   A.  Yes.  My opinion is that it would be inappropriate for a

22   manufacturer to include comparative information based on the

23   MAUDE database, because the information in that database is

24   fundamentally limited in what you can learn from it.

25   Q.  Dr. Tillman, let's talk just generally, if we could, about   03:39PM

1  the regulatory process or scheme developed by Congress for

2  medical devices.

3         Did you prepare some PowerPoint slides to use as

4  demonstrative evidence to demonstrate the various

5  classifications of products?                                    03:39PM

6  A.  Yes, I did.

7  Q.  First of all, how many classifications have been created

8  for medical devices?

9  A.  So medical devices are broadly classified into one of three

10 categories:  Class I, Class II, and Class III.                  03:40PM

11 Q.  If we could bring up Exhibit 7929-1.  7929.

12         Why don't you tell us about Class I devices.

13 A.  So Class I devices are the lowest risk devices.  They are

14 simple things like manual surgical instruments; tooth brushes

15 are actually Class I medical devices.  Class I devices do not   03:40PM

16 require any kind of premarket submission to FDA, but companies

17 that manufacture Class I devices still usually need to

18 establish a quality system.

19 Q.  What about Class II?  What is involved with a Class II

20 device and how are they differentiated from Class I devices?    03:40PM

21 A.  So Class II devices are devices that are of a slightly

22 higher risk than Class I devices.  They are devices that

23 require -- most of them require a company to submit something

24 called a 510(k) to FDA before they can be marketed.  They are

25 subject to what we have called special controls which are often 03:41PM

1   guidance documents that FDA writes.  Class II devices also have

2   to have a quality system, and the intervascular filters that

3   we're talking about today are Class II devices.

4   Q.  And what is the regulatory standard that the FDA applies to

5   permit a Class II device to be introduced or sold on the        03:41PM

6   market?

7   A.  So a Class II device or a device that needs a 510(k) has to

8   be shown to be substantially equivalent to a predicate device

9   before it can be marketed.

10          MR. NORTH:  If we could bring up Number 2.              03:41PM

11  BY MR. NORTH:

12  Q.  Tell us what class an IVC filter falls in.

13  A.  So IVC filters are Class II devices.  I should say with one

14  exception.

15  Q.  What's that exception?                                      03:42PM

16  A.  There was one IVC filter, the Bird's Nest Filter, which

17  actually was Class III and required a PMA.  The ones we're

18  talking about today and the vast majority of IVC filters are

19  Class II.

20  Q.  Now, do Class II devices such as IVC filters require        03:42PM

21  preclinical testing?

22  A.  Yes.  Most IVC filters and most Class II devices are

23  supported by bench or preclinical testing.  Some of them

24  require animal testing, and only a very small handful of them

25  actually require clinical data.                                 03:42PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    Q.  What about actual clinical tests?  We've heard testimony

2    about some clinical tests performed with the Bard filters.  Are

3    those generally required for Class II devices?

4    A.  So only roughly 5 to 10 percent of Class II devices or

5    510(k) devices require clinical data.  So IVC filters are          03:43PM

6    somewhat unique in the sense that they do require clinical data

7    for certain types of modifications.

8    Q.  So what is the third class of medical devices?

9    A.  So Class III devices are the most novel and the most

10   complex medical devices, and they require a submission called a   03:43PM

11   premarket approval submission.

12   Q.  What is the regulatory standard for approval of a premarket

13   application for a Class III device?

14   A.  So a PMA has to show that the device is -- that there is a

15   reasonable assurance of safety and effectiveness.  That is the    03:44PM

16   regulatory standard for a PMA.

17   Q.  Who makes the determination as to whether to seek FDA

18   clearance or approval for a device as either under the 510(k)

19   process or the PMA process?

20   A.  So devices are put into classes by FDA.  And so if a          03:44PM

21   particular device, for example, IVC filters are Class II, that

22   means that if that product meets the definition of a Class II

23   device, then that company needs to submit a 510(k).  If the

24   device is a type that FDA requires a PMA for then that company

25   has to submit a PMA.                                              03:44PM

1    So companies don't get to choose whether they want to

2    submit a 510(k) or PMA, the regulatory pathway is defined by

3    the particular device and its indications for use.

4    Q.  In this country, are the majority of medical devices

5    brought to the market through the 510(k) process that inferior          03:45PM

6    vena cava filters generally go through or through the PMA

7    process?

8    A.  So the vast majority of devices that go to market go

9    through 510(k).  FDA receives somewhere between 3 to 4,000

10   510(k) submissions each year, and they receive, depending on           03:45PM

11   the year, anywhere between 30 and 50 original PMA submissions.

12   So the vast majority of new devices go to market through the

13   510(k) program.

14   Q.  I believe you mentioned earlier that the standard for

15   clearance of a 510(k) device such as an IVC filter is                  03:45PM

16   substantial equivalence?

17   A.  Yes.  That is correct.

18   Q.  And what exactly does that mean?  Substantially equivalent

19   to what?

20   A.  So a device has to be shown to be substantially equivalent         03:45PM

21   to a predicate device, which is a legally marketed device that

22   has basically gone to market through the 510(k) process.  I

23   mean, that's the most common way.  So you have to show that the

24   device is substantially equivalent to another device that's

25   already out there.                                                     03:46PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1  Q.  Can a new device be found to be substantially equivalent by

2  the FDA to the predicate device even if it has new

3  technological characteristics?

4  A.  Absolutely.  Many 510(k) devices and many of the

5  submissions FDA gets are for incremental or even for fairly          03:46PM

6  significant improvements to devices.  And so it's not at all

7  uncommon for a device to have different technological

8  characteristics compared to its predicate.  The basis of the

9  510(k) program is to allow for innovation.  So you have got

10  devices out there, and as medical device companies innovate and    03:47PM

11  add new features and capabilities to the new devices they make

12  an argument the new devices are substantially equivalent to the

13  older ones.  And over time, we get more sophisticated and we

14  get more innovative medical devices.

15  Q.  If we could bring up 7758, please.                              03:47PM

16          Are you familiar with this document that's being

17  displayed in front of you, 7758?

18  A.  I am very familiar with this document.

19  Q.  And tell us what this document is, if you would.

20  A.  So this is a guidance document.  So this is a document that     03:47PM

21  FDA prepares to help medical device companies understand what

22  its regulations and policies are regarding a particular area.

23  So this guidance is about the 510(k) program.

24  Q.  Are these documents made publicly available by the FDA?

25  A.  Yes.  These documents are all posted on FDA's website.          03:47PM

 1          MR. NORTH:  Your Honor, at this time we would offer

 2   for admission Exhibit 7758.

 3          MR. LOPEZ:  Objection.  Hearsay, Your Honor.  I don't

 4   mind cross-examination with it, but I object to the admission

 5   of the entire document as hearsay.                              03:48PM

 6          THE COURT:  I don't know what you mean by

 7   cross-examination.  You will be doing cross-examination.

 8          MR. LOPEZ:  Directing it -- I don't mind him treating

 9   it like a medical article but I'm going to object to admission

10   of the entire document.                                         03:48PM

11          THE COURT:  What's your response on hearsay?

12          MR. NORTH:  Your Honor, I believe under the exception

13   of 803.8 as a public record.  It reflects the office's

14   activities.

15          MR. LOPEZ:  I think there are probably some 403         03:48PM

16   reasons, too.  It's a pretty dense document.

17          THE COURT:  Well, do you have specific 403 concerns

18   you want to express?

19          MR. LOPEZ:  Just that -- well, we want to do it at

20   sidebar?                                                        03:49PM

21          THE COURT:  If we're going to talk about 403 issues we

22   should probably talk about them at sidebar.

23          If you want to stand up, Ladies and Gentlemen, feel

24   free.

25          (Discussion was had at sidebar out of the hearing of    03:49PM

1   the jury:)

2          MR. LOPEZ:  My only hesitancy with a document like

3   this is we're going to talk about three or four pages of it

4   probably, each.  I'm going to talk about it, too.  But then you

5   let this thing in the jury room and it allows -- just like my      03:49PM

6   medical articles didn't get in.

7          THE COURT:  Tell me what specifically is your 403

8   concern.

9          MR. LOPEZ:  That primarily it could just be -- I just

10  think some of this could be misleading.                            03:50PM

11         THE COURT:  Such as?

12         MR. LOPEZ:  Just, Your Honor, let me do this.  Instead

13  of answering that question, I have got some government

14  documents, too.  As long as we're going to agree these are

15  admissible because they are public record government documents,    03:50PM

16  fine.  Good for the goose is good for the gander.  So I'm

17  willing to allow this to come in.

18         THE COURT:  I don't think you get to allow it.

19         MR. LOPEZ:  What?

20         THE COURT:  I don't think you get to allow it.             03:50PM

21         MR. LOPEZ:  Oh.  I'm sorry.

22         THE COURT:  You said you are going to allow it to come

23  in.

24         MR. LOPEZ:  I mean I'm not going to object.

25         THE COURT:  You are not going to sustain your             03:50PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    objection?

2           No, let's be specific.  Do you have a reason for

3    thinking this doesn't qualify as a government document under

4    803.8?

5           MR. LOPEZ:  No.  It does.                          03:50PM

6           THE COURT:  So that resolves the hearsay issue.  Is

7    there something specific in it that gives you a 403 concern?

8           MR. LOPEZ:  Nothing I can point out to you other than

9    the fact that I think the best way, if I was going to maintain

10   this, this objection, it would be because medical articles you   03:50PM

11   can read.  I don't mind this being admitted.  Just my concern

12   about anything like this, if the jury goes in no one has ever

13   talked about it, no one has ever testified about it, they start

14   thumbing through it and now all of a sudden they get testimony

15   basically.                                                03:51PM

16          THE COURT:  Let me ask you this question:  Is there

17   anything in this document about IVC filters specifically?

18          MR. LOPEZ:  No.

19          THE COURT:  It's just about the 510(k) process?

20          MR. LOPEZ:  It is.                                 03:51PM

21          THE COURT:  Well, okay.  Well, I think it is

22   admissible under 803.8.  I'm not going to exclude it on Rule

23   403 without some specific form of prejudice and I will do my

24   very best to apply the rules consistently but I will need to

25   hear objections to other documents.                       03:51PM

1    MR. NORTH:  Can I ask the Court one thing quickly.

2  What time are you going to quit?

3    THE COURT:  4:20.

4    MR. NORTH:  Thank you.

5    (In open court.)                                   03:51PM

6    THE COURT:  Thanks, Ladies and Gentlemen.  By the way,

7  we're going to go until 4:20 today for your information.

8    MR. NORTH:  Your Honor, if --

9    THE COURT:  Let me first say I'm going to admit

10  Exhibit 7758.                                       03:52PM

11    MR. NORTH:  Thank you.  Could we display it now?

12    THE COURT:  You may.

13  BY MR. NORTH:

14  Q.  If we could turn to Page 9 of this document, please.  And

15  if we could look under the heading A, the 510(k) review      03:52PM

16  standard, that first paragraph, does the FDA announce there the

17  standard that it is applying when examining 510(k)

18  applications?

19  A.  Yes, it does.

20  Q.  And if you could read that first paragraph for us.        03:52PM

21  A.  "The 510(k) review standard substantial equivalence of a

22  new device to a legally marketed predicate device differs from

23  the PMA review standard, reasonable assurance of safety and

24  effectiveness.  The 510(k) review standard is comparative

25  whereas the PMA standard relies on an independent demonstration 03:53PM

1    of safety and effectiveness.

2           Nevertheless, the principles of safety and

3    effectiveness underlie the substantial equivalence

4    determination in every 510(k) review."

5    Q.   Now, when the FDA approves a Class III device as opposed to      03:53PM

6    a Class II device through the PMA process, does the agency make

7    an affirmative finding that that device has a reasonable

8    assurance of safety and efficacy?

9    A.   Yes, it does.

10   Q.   And to be clear, does the FDA make that same pronouncement      03:53PM

11   with regard to 510(k) devices like IVC filters?

12   A.   No.  It instead makes a determination that the new device

13   is as safe and effective as the predicate device, which is a

14   different finding than in a PMA.

15   Q.   But does the FDA recognize that safety and effectiveness      03:54PM

16   plays some role in its review process?

17   A.   Absolutely.  It states that in this guidance document.  And

18   I can tell you from my years at FDA and the many submissions

19   that I have made since leaving them, 510(k)s are fundamentally

20   about data and science and safety and effectiveness.      03:54PM

21   Q.   Does substantial equivalence or demonstrating to the FDA

22   that a device is substantially equivalent, does it mean that

23   the proposed new device must share the exact same design

24   characteristics as the predicate device?

25   A.   No, it does not.  As I mentioned before, it's fairly common      03:54PM

─────5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct─────

1    for a new device to have different technological

2    characteristics compared to the predicate device.

3    Q.  What sort of data do manufacturers generally have to

4    submit, or does the FDA require, to show that a new device is

5    substantially equivalent to a predicate device?                03:55PM

6    A.  So it obviously depends to a certain extent on the device.

7    The data you need for a device that's just software is going to

8    be different than what you need for something like an IVC

9    filter.  But the data often includes biocompatibility testing

10   to show that the materials are appropriate; data looking at if  03:55PM

11   the device is electrical, is it electrically safe; does it

12   interfere, electromagnetic compatibility with other devices;

13   are the mechanical properties of it appropriate; is the tensile

14   and compressive strength appropriate; does it corrode; if

15   there's software, is the software written appropriately and     03:55PM

16   verified and validated; if it's sterile, has the company

17   demonstrated that it can sterilize the device; if it's

18   reusable, has the company demonstrated that somebody could

19   actually clean it and reuse it.

20          So there's a lot of different kinds of data, and it      03:56PM

21   really depends on the type of device.

22   Q.  Now, does substantial equivalence as the FDA applies that

23   standard, does it mean that the new device being proposed must

24   have the exact same safety profile as the predicate device?

25   A.  No.  Different devices can have different risks and          03:56PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1  different benefits.  The FDA just needs to find that the

2  overall risk/benefit profile of the new device is comparable or

3  equivalent to that of the predicate device.

4  Q.  And conversely, does the new device have to have the exact

5  same benefit profile as the predicate device?                    03:56PM

6  A.  No, it does not.

7  Q.  Have you seen -- or let me ask you this.  In making that

8  determination, does the FDA sometimes consider unique factors

9  about a new device such as, let's say, retrievability with an

10  IVC filter to be an important aspect for consideration?          03:57PM

11  A.  Yes.  I think FDA often considers what potential benefits

12  or if there's a new innovation that may be out there, what

13  those characteristics are that may make a new device different

14  from the predicate device.  So it absolutely considers

15  differences between the new device and old device in terms of    03:57PM

16  innovative new features and capabilities.

17  Q.  Have you seen instances where the FDA would clear a new

18  device even though it might have more of a certain type of

19  complication than the predicate device?

20        MR. LOPEZ:  Objection, Your Honor.  Not in the report.     03:57PM

21        THE COURT:  Is that in the report, Mr. North?

22        MR. NORTH:  I think it is, but I'm going to move on

23  because I can't find the cite easily.

24  BY MR. NORTH:

25  Q.  If we could bring up Number 7753.  Can you identify what     03:57PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    this is, Dr. Tillman?

2    A.   This is another FDA guidance document, and this one is

3    about how does the FDA look at risk and benefit when it's

4    determining whether a new device is substantially equivalent to

5    a predicate device.                                              03:58PM

6    Q.   And are you familiar with this document?

7    A.   I am.

8    Q.   It indicates --

9             MR. LOPEZ:  Your Honor, before -- I don't think this

10   is identified on her reliance list or discussed in the report.  03:58PM

11            THE COURT:  Mr. North, could you show me where that

12   is?

13            MR. NORTH:  Yes, Your Honor, on Pages 39 and 40 of the

14   report itself and on Page 40 of the reliance list.

15            MR. LOPEZ:  I withdraw my objection, Your Honor.       03:58PM

16            THE COURT:  All right.

17   BY MR. NORTH:

18   Q.   This indicates that it's a draft guidance.  What does that

19   mean, Dr. Tillman?

20   A.   So the way FDA publishes guidance documents is it develops  03:59PM

21   a draft guidance which reflects its current practices and

22   procedures.  It publishes that and then it gives the industry

23   and other interested parties the opportunity to comment on that

24   draft guidance, and then it takes those comments and publishes

25   a final guidance document.                                      03:59PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    MR. NORTH:  Your Honor, at this time we would offer

2  Exhibit 7753 as an exhibit.

3    MR. LOPEZ:  I'm going to object, Your Honor, because

4  of the date on this is not applicable to any date that's

5  relevant in this case.                                          03:59PM

6    THE COURT:  I think you need to address that, Mr.

7  North.

8    MR. NORTH:  Your Honor --

9    THE COURT:  With testimony.

10   MR. NORTH:  I understand.                                      03:59PM

11   THE COURT:  The foundation does not establish this is

12  a relevant guidance document.

13  BY MR. NORTH:

14  Q.  Does this document, to your knowledge, reflect new thinking

15  on behalf of the agency?                                        04:00PM

16    MR. LOPEZ:  Your Honor, I'm going to object.  That

17  lacks foundation, 402 -- I'm sorry -- 602 whether or not she

18  has personal knowledge of that.

19    THE COURT:  I think you need to lay foundation for

20  that as well.                                                   04:00PM

21  BY MR. NORTH:

22  Q.  Are you familiar with the standards that the FDA applied to

23  submissions during the year that you were in charge of all

24  premarket submissions for the FDA?

25  A.  Yes.  I'm very familiar with FDA's criteria it uses to make 04:00PM

1  risk/benefit decisions based on the 17 years I was at FDA.

2  Q.  And you left the FDA in 2010?

3  A.  That is correct.

4  Q.  And this document is dated 2014?

5  A.  Yes.                                                                04:00PM

6  Q.  Do the general standards that this document lays out in the

7  guidance document, are those consistent with the standards that

8  your department and group applied in the review of medical

9  devices?

10  A.  Yes.  There is really nothing -- when this guidance came      04:00PM

11  out I was not at FDA anymore.  It basically lays out, though,

12  the principles and the approaches FDA takes to making

13  risk/benefit decisions that have been going on for the past, I

14  would say, 10 to 20 years.  So it is -- those FDA's approach is

15  now available in writing for people to understand, but this      04:01PM

16  reflects what FDA was doing before the document was even

17  written.

18          MR. NORTH:  Your Honor, with that foundation I would

19  offer again Exhibit 7753 for admission.

20          MR. LOPEZ:  Still going to object, Your Honor.            04:01PM

21  Guidance document by its nature is the current thinking of FDA

22  with respect to guiding industry.

23          THE COURT:  What's the objection?

24          MR. LOPEZ:  It's not relevant to any issue or any date

25  or any event involved in this case regarding this filter.        04:01PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    THE COURT:  Okay.  Objection is overruled.  Exhibit

2    7753 is admitted based on the testimony just received.

3    MR. NORTH:  If we could display this to the jury,

4    Your Honor?

5    THE COURT:  You may.                                    04:02PM

6    BY MR. NORTH:

7    Q.  If we could turn to Page 7, please.  Page -- under "scope,"

8    does the FDA set forth in this particular guideline, guidance

9    document, the standard that you were talking about earlier as

10   to how the device needs to compare, a new device needs to     04:02PM

11   compare to the predicate device?

12   A.  Yes.  What this section says is that a new device does not

13   have to be identical to the predicate device.  It can have

14   different indications for use, for example, retrievability

15   versus permanent or it can have different technological       04:03PM

16   characteristics and still be found substantially equivalent.

17   Q.  And is that consistent with how your group applied the

18   standards when you were with the FDA overseeing the review of

19   medical devices?

20   A.  Yes.  This is how FDA has applied the standard of         04:03PM

21   substantial equivalence, frankly, since the program began.

22   Q.  If we could turn to the next page.  And under the section

23   benefits and risk factors --

24   MR. NORTH:  I'm sorry.  You're one page too far.

25   BY MR. NORTH:                                                 04:03PM

1   Q.   The second sentence there, does that state anything

2   beginning "FDA may make a determination" anything about whether

3   the risks and benefits of the new device have to be identical

4   to the predicate device as you were discussing earlier?

5   A.   Yes.  So this makes the same point that I mentioned          04:04PM

6   earlier, which is that if a new device has different risks or

7   different benefits FDA can still find it to be substantially

8   equivalent as long as it finds that the overall risk/benefit of

9   the two devices is comparable or equivalent.

10              MR. NORTH:  Can we go to the following page, please?   04:04PM

11   BY MR. NORTH:

12   Q.   Under the section Increased Risk/Increased Benefit, here

13   does the agency say anything about a situation where the new

14   device may have greater risks than the predicate device?

15   A.   Yes.  It says here that if the new device has greater risks  04:04PM

16   than a predicate, FDA can still find it to be substantially

17   equivalent -- SE means substantially equivalent -- if FDA finds

18   that there's increased benefit.  So if you have a device that

19   has increased risks, if it also brings with it increased

20   benefits, FDA may still determine that it is substantially      04:05PM

21   equivalent.

22              MR. LOPEZ:  May we approach, Your Honor, on this

23   document?

24              THE COURT:  Yes.  You can stand up, Ladies and

25   Gentlemen.                                                      04:05PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1       (Discussion was had at sidebar out of the hearing of

2   the jury:)

3           MR. LOPEZ:  Your Honor, if there's any evidence in

4   this case I don't know about where FDA said you can sell the

5   Recovery, G2, the Eclipse, despite the fact that its risks are          04:05PM

6   greater or that there's a determination that the risk/benefit

7   is greater than a risk for a retrievable filter, this is

8   misleading the jury.  This is a 403 issue where it is just

9   misleading the jury so he can argue something that's not going

10  to be in the case.  Unless there's something where the FDA has         04:06PM

11  made a determination consistent with what he's talking about

12  with his expert, it's not relevant to this case, the FDA

13  regulatory issues in this case, and it's not fair that she

14  should be able to testify about something that has nothing to

15  do with these devices.                                                  04:06PM

16          THE COURT:  Okay.  You have made that objection.

17          MR. NORTH:  Your Honor, the plaintiff's argument from

18  the beginning of this litigation throughout this trial is that

19  whatever filter involved, here the Eclipse, is not

20  substantially equivalent because of this chain of predicates           04:06PM

21  tracing back to the Simon Nitinol because none of the later

22  filters have the same safety profile in their view as the

23  predicate Simon Nitinol, which began it all.

24          That's an argument that's been presented in opening.

25  It is an appropriate rebuttal, I believe, and highly relevant          04:07PM

1   to point out that substantial equivalence does not turn

2   necessarily on an identical safety profile.  We're not saying

3   the FDA made that decision here.  We're saying that they are

4   suggesting we misled the FDA because we had data that the

5   profile wasn't the same.  We're entitled to say in response.                04:07PM

6           THE COURT:  I understand your response, and I know you

7   two could argue this for the next hour.  I don't believe that

8   makes this document inadmissible or the questioning

9   inappropriate.  I think you will be entirely within your rights

10  to argue to the jury that there's no evidence the FDA made this             04:07PM

11  determination.  But clearly an issue in this case is whether or

12  not these devices were substantially equivalent or not.  The

13  FDA standard outlining in my view is relevant, and you can

14  argue it wasn't met.

15          But I don't think there's anything misleading about               04:07PM

16  putting the standard in front of the jury.  So I'm going to

17  overrule the objection.

18          MR. LOPEZ:  Just to make another, it's a 2014 standard

19  we're talking about did not apply.

20          THE COURT:  She's testified it's a 20-year-old                    04:08PM

21  standard.  Now, you can argue to the jury they shouldn't

22  believe that, but if they do then the standard in here is

23  relevant.

24          MR. LOPEZ:  When did she render an opinion?  It's not

25  in her report.                                                            04:08PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1    THE COURT:  Well, you didn't make that objection and

2    that's in.

3    (In open court.)

4    THE COURT:  Thank you, Ladies and Gentlemen.

5    BY MR. NORTH:                                                    04:08PM

6    Q.  Do we have highlighted up there the line you were just

7    referencing?

8    A.  Yes, we do.

9    Q.  Is that consistent with your understanding of how the FDA

10   applies the substantially equivalent standard?                  04:08PM

11   A.  It's consistent with my understanding and my experience,

12   yes.

13   MR. NORTH:  If we could turn on the same exhibit

14   7775.014, looking under innovative technology.

15   BY MR. NORTH:                                                    04:09PM

16   Q.  Do technological improvements in a new device factor into

17   the FDA's assessment of clearance or substantial equivalence?

18   A.  Yes, they do, because FDA has sort of two missions, two

19   related missions:  One is to protect the public health, but the

20   second is to promote access to innovative new technologies.  So  04:09PM

21   as part of that sort of tension between making sure the devices

22   are safe but also making innovative technologies available to

23   U.S. patients, FDA recognizes that sometimes when you have a

24   new technology there may be greater risks associated with that.

25   But if that device also potentially offers greater benefits,     04:09PM

1  then FDA may be willing to accept more uncertainty around those

2  devices.

3  Q.  Who ultimately decides whether a predicate device is

4  appropriate for a new device?

5  A.  So FDA ultimately decides if a predicate device is an          04:10PM

6  appropriate predicate device.

7  Q.  Who decides whether a device, a new device raises different

8  types of safety and effectiveness questions?

9  A.  So once again, that is a finding that FDA makes as part of

10 its substantial equivalence determination.                        04:10PM

11 Q.  And who decides whether the data provided or submitted by

12 the manufacturer provides a reasonable assurance that the new

13 device is as safe and effective as the predicate device?

14 A.  So that is the finding that FDA makes in determining if the

15 device is substantially equivalent.                               04:10PM

16 Q.  When does, in this process, does the FDA determine whether

17 a new device is substantially equivalent to a predicate device?

18 A.  So usually the way it works is if a company wants to sell a

19 device or if they have a device and they make a change to it

20 that requires a new 510(k), they submit that to FDA, gets         04:11PM

21 reviewed by a lead reviewer and perhaps some other people, and

22 then at the end of that review process, there is a finding by

23 FDA if the device is substantially equivalent.  And the company

24 gets a letter that basically says we have reviewed your 510(k)

25 submission, and we have determined based on all of the data you   04:11PM

1   have provided that your device is substantially equivalent to a

2   predicate.

3           So it's a determination that's made by FDA and it's

4   made sort of at the end of this process and documented in a

5   letter.                                                                04:11PM

6   Q.   Can a manufacturer sell a new medical device before the FDA

7   makes that determination of substantial equivalence?

8   A.   So if the device is a type that requires FDA to review and

9   clear a 510(k), then the company can't sell the device until

10  after FDA has sent them that 510(k) clearance letter.                  04:12PM

11  Q.   After the FDA has made a finding of substantial equivalence

12  is the agency basically done with the device, or does it play

13  any continuing role with the device?

14  A.   No, it's not done.  I like to tell my clients that it's

15  sort of like having keys to a car, or having keys to a car but        04:12PM

16  if you don't have a driver's license you can't drive it.  So if

17  you get your 510(k), that's one piece of what you need to do.

18  But companies also have to establish quality systems that sort

19  of define the parameters around which they manufacture the

20  device.  We also call those good manufacturing practices.             04:12PM

21  Companies have to report adverse events to FDA.  Companies have

22  to make sure that their labeling meets the labeling

23  requirements.  Companies have to determine if there's problems

24  with their devices.  They may have to do a recall.

25          And FDA is involved with all of that.  FDA inspects           04:13PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct

1   medical device manufacturers.  So 510(k) is, I tell people,

2   sort of just the beginning.

3   Q.  Let's talk about inferior vena cava filters in particular.

4   These devices are Class II, correct?

5   A.  Yes.  They were originally Class III, but FDA          04:13PM

6   downclassified them to Class II.

7   Q.  That seems somewhat of a foreign term, downclassify.  What

8   does that mean in FDA parlance?

9   A.  Yeah.  So I mean, it's downclassification because you

10  started with Class III and now you are Class II.  So that's why  04:13PM

11  we call that -- when FDA changes a classification, we broadly

12  call that reclassification.  And if you go from III to II,

13  that's downclassifying.  If you go from II to III, for example,

14  automatic external defibrillators that are out there in case

15  you have a heart attack to shock you, those were originally   04:14PM

16  510(k) devices.  FDA recently upclassified those to Class III

17  so that's the language.

18  Q.  Generally speaking, what sort of factors play into the

19  agency's decision when it decides to downclassify a device from

20  Class III to Class II?                                       04:14PM

21  A.  So in order to do that, FDA has to have determined that it

22  understands what are the risks that the device presents, so we

23  have to have enough information and we understand the risks,

24  what kind of risks are there, how often do they occur, is it

25  something that the medical community has seen.               04:14PM

————5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct————

1     Then once we know what the risks are how do we

2  mitigate those risks?  What are the types of tests and data,

3  information, labeling, what are the -- we call these special

4  controls that can be put into place to make sure that these

5  risks are appropriately mitigated.  And then if FDA believes          04:15PM

6  that it knows what the risks are, it knows how they can be

7  mitigated and it believes that the device does not present an

8  unreasonable risk of illness or injury, then it can

9  downclassify the device from Class III to Class II.

10 Q.  When were IVC filters downclassified by the FDA from Class        04:15PM

11 III to Class II?

12 A.  I believe it was around 1999-ish.  Sometime in that time

13 frame.

14 Q.  And as a part of your work in this case, have you had

15 access to internal FDA documents regarding the decision to            04:15PM

16 downclassify IVC filters?

17 A.  Yes, I have.

18 Q.  And how is it possible to get those documents?

19 A.  So there's a law called the Sunshine Act or the Freedom of

20 Information Act which says that as American citizens, we should        04:15PM

21 have access to the information that our government uses to make

22 decisions.  And so through this Freedom of Information Act, we

23 call it FOIA, anybody can request documents from federal

24 agencies and federal organizations that aren't classified or

25 where there's not some reason why they can't be produced.             04:16PM

—5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6-Tillman-Direct—

1           And so there was a Freedom of Information request made

2   where we requested, or somebody requested, Bard requested the

3   documents that recorded FDA's decision making process when it

4   decided that it would downclassify IVC filters.

5   Q.  If we could bring up Exhibit 5877, please.                    04:16PM

6           Do you recognize this document, Dr. Tillman?

7   A.  Yes.  This is an FDA --

8           MR. LOPEZ:  Objection, Your Honor.  This is not in the

9   report or on the reliance list.

10          THE COURT:  Mr. North.                                     04:17PM

11          MR. NORTH:  Could we approach, Your Honor.

12          THE COURT:  We've got two minutes left.  Let's cover

13  something else and not keep the jury waiting on this issue.

14          MR. NORTH:  Okay.

15  BY MR. NORTH:                                                      04:17PM

16  Q.  After downclassifying IVC filters, did the FDA issue or as

17  a part of that process issue a guidance document specific to

18  filters?

19  A.  Yes, it did.  It issued a special control guidance document

20  which basically defined what the testing and the labeling        04:17PM

21  information that companies needed to have in order to support

22  an IVC filter 510(k).

23  Q.  If we could bring up Exhibit 5126, please.

24          Are you familiar with this document?

25  A.  Yes, I am.                                                     04:17PM

1  Q.  Is that the guidance documents for IVC filters that you

2  just referenced?

3  A.  Yes, it is.

4      MR. NORTH:  Your Honor, at this time we would offer

5  for admission Exhibit 5126.                              04:18PM

6      MR. LOPEZ:  No objection, Your Honor.

7      THE COURT:  Admitted.

8  BY MR. NORTH:

9  Q.  Now, you have talked about special controls.  Does a

10  guidance document for a specific device such as this constitute   04:18PM

11  a special control?

12  A.  Yes.  This particular device-specific guidance document is

13  a special control because it was part of the basis for the

14  decision to downclassify IVC filters.

15      MR. NORTH:  Your Honor, could we display this to the   04:18PM

16  jury, please?

17      THE COURT:  Yes.

18  BY MR. NORTH:

19  Q.  How does this guidance help a manufacturer such as Bard in

20  the submission of a 510(k) for an IVC filter?           04:18PM

21  A.  So this guidance document describes in detail the

22  information that FDA expects a company to provide in its 510(k)

23  for an IVC filter.

24  Q.  Let's turn to Page --

25      MR. NORTH:  Are we displaying that document?        04:19PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6

1    THE COURT:  We're going to go ahead and break at this

2    point, Mr. North.

3    Ladies and Gentlemen, we will plan to resume at 9:00

4    in the morning.  Have a good night, and we'll excuse you at

5    this time.                                              04:19PM

6    (Jury out at 4:19 p.m.)

7    THE COURT:  Please be seated.

8    Counsel, how are we allocating video deposition time

9    for this afternoon?

10   MR. CLARK:  Your Honor, we are going to be allocating   04:19PM

11   of the Wong deposition, 26 minutes to the plaintiff; 17 to the

12   defendant.  The remainder of the Chodos deposition, six minutes

13   to the plaintiff; 14 to the defendant.  Smith is 16 to

14   plaintiff; three to defendant.  Orms is 19 to plaintiff; five

15   to defendant.  Rogers is eight to plaintiff; three to         04:20PM

16   defendant.

17   And Your Honor, I did kind of check my math against

18   yours from this morning.  I want to make sure I'm understanding

19   how you track that.  I saw about a 20-minute discrepancy.  Did

20   Your Honor assign the Wong time to the plaintiff at that time  04:20PM

21   subject to revision, or did you stop your counting before Wong

22   started?  Because it seemed like --

23   THE COURT:  You gave me a Wong allocation just before

24   lunch, right?

25   MR. CLARK:  I don't believe we did.              04:20PM

5-23-18-MD 15-2641-Jones v Bard-Jury Trial-Day 6

1      THE COURT:  You gave me some allocation.  You gave me

2  some allocation before lunch.

3      MS. HELM:  It was Nelson and the six minutes of

4  Chodos.  And we did not give you the Wong allocations.

5      THE COURT:  I didn't subtract it from -- all of the      04:21PM

6  Wong time this morning was attributed to you then.

7      MR. CLARK:  That would explain it.

8      THE COURT:  So how much time from this morning from

9  Wong goes to defendants?

10      MR. CLARK:  That would be hard to estimate.  It was     04:21PM

11  26:17, so I think that's roughly 60/40, something like that.

12      THE COURT:  So what did you just give me when you gave

13  me 17 minutes to defendant, the first one you gave me?

14      MR. CLARK:  17 and 10, Your Honor, I had -- I don't

15  have a 17 and 10.                                          04:21PM

16      THE COURT:  No.  No.  You gave 17 minutes to defendant

17  on one of the depositions you just discussed.  You gave me -- I

18  was just writing down the amount allocated to defendants

19  because I subtract that from your time.  You gave me 17

20  minutes, 14 minutes, three minutes, five minutes, and three   04:22PM

21  minutes.

22      MS. HELM:  17 was Wong, Your Honor.

23      THE COURT:  So is 17 just Wong in the afternoon?

24      MR. CLARK:  No, Your Honor.  Unfortunately we don't

25  have a way of really tracking whose portion is played when they   04:22PM

1    span the gap.

2         THE COURT:  What's the total from Wong that goes to

3    the defendants?

4         MR. CLARK:  17.

5         THE COURT:  I'm going to subtract that now.  So that          04:22PM

6    will even it up.  It will come out of your afternoon time but

7    it comes out of your time.

8         MR. CLARK:  That makes sense.  I'm sorry for the

9    confusion.

10         THE COURT:  Okay.  Give me just a minute.          04:22PM

11         Okay, Counsel.  I add up a total of 42 minutes this

12    afternoon that is deposition time allocated to defendants,

13    including the Wong time if you want to check my math.  Is that

14    what you get, too, Ms. Helm?

15         MS. HELM:  Yes, Your Honor.          04:23PM

16         THE COURT:  Give me just a minute then.

17         MR. COMBS:  That's correct, Your Honor.

18         THE COURT:  All right, counsel.  As of the end of

19    today, plaintiff has used 22 hours, 11 minutes; defendants have

20    used seven hours, 56 minutes.          04:24PM

21         Let me mention a couple of things.  Mr. Lopez and Mr.

22    O'Connor, when you whisper at counsel table, I can hear what

23    you are saying.  So keep that in mind.  If I can hear it I'm

24    guessing the jury can hear it, too.  I can't always pick out

25    the words but I often can.          04:24PM

1    MR. LOPEZ:  Thank you, Your Honor.

2    THE COURT:  What is it that you wanted to discuss at

3    sidebar on the Exhibit 5277?

4    MR. NORTH:  The Booker trial, Your Honor.  It was

5    admitted without a disclosure objection, only a hearsay          04:25PM

6    objection at the Booker trial.  It was not available and had

7    not been produced by the FDA at the time she rendered her

8    report.  She did give an opinion about that downclassification

9    in her report at Page 27, and this document merely confirmed.

10   But they did not object on a disclosure basis, only on a         04:25PM

11   hearsay basis.  And that was at Page 1387 of the Booker trial

12   transcript.

13   THE COURT:  But it's not listed in her report, right?

14   MR. NORTH:  Right.  It was not available at the time.

15   THE COURT:  So how does the failure to object at           04:25PM

16   Booker on that point somehow waive it for this trial?

17   MR. NORTH:  I could be mistaken, Your Honor.  I

18   thought if things had come out in a deposition or had come out

19   in the Booker trial with opinions or materials such as this

20   without objection.                                               04:25PM

21   THE COURT:  That's testimony.  I mean, I think there's

22   been one time, maybe two, at sidebar where we discussed it and

23   it was testimony in the Booker trial.  But I have said I'm

24   going to hold you to the requirement on Rule 26(a)(2)(B)(iii)

25   which is exhibits used at trial need to be part of the expert    04:26PM

1   report.  And if this isn't part of the expert report it can't

2   be used.  I'm not going to say that the plaintiff waived that

3   because they didn't object in the Booker trial.  If it's not in

4   the report it's not in the report.

5           MR. NORTH:  And, Your Honor, there's no exception when   04:26PM

6   the document was not available to any party at the time of the

7   reports?

8           THE COURT:  Well, it seems to me you could have raised

9   that in an effort to supplement the report.  But there's been

10   no supplementation of the report.  It's been argued in my case   04:26PM

11   management order.  I said only rarely would I permit

12   supplementation.  There was no effort made, so I'm going to

13   sustain the objection to 5277 on that basis.

14           MR. NORTH:  Thank you, Your Honor.

15           THE COURT:  We'll see you at 8:30 in the morning.   04:26PM

16           (Proceeding recessed at 4:26 p.m.)

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E


     I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

     I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

     DATED at Phoenix, Arizona, this 23rd day of May, 2018.


     s/Laurie A. Adams
     _____
     Laurie A. Adams, RMR, CRR