1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                    _____

4  **In Re: Bard IVC Filters**        )   **MD-15-02641-PHX-DGC**
   **Products Liability Litigation**   )

5                                      )   Phoenix, Arizona
                                       )   **May 24, 2018**

6  _____)
   **Doris Jones, an individual,**    )

7                                      )
                        Plaintiff,     )

8                                      )   CV-16-00782-PHX-DGC
              v.                       )

9                                      )
   **C.R. Bard, Inc., a New Jersey**  )

10 **corporation; and Bard Peripheral** )
   **Vascular, Inc., an Arizona**     )

11 **corporation,**                    )
                                       )

12                      Defendants.    )
   _____)

13

14

15      **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16      **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17          **TRIAL DAY 7 – A.M. SESSION**

18              (Pages 1348 – 1483)

19

20

21 Official Court Reporter:
   Patricia Lyons, RMR, CRR

22 Sandra Day O'Connor U.S. Courthouse, Ste. 312
   401 West Washington Street, SPC 41

23 Phoenix, Arizona  85003-2150
   (602) 322-7257

24

25 Proceedings Reported by Stenographic Court Reporter
   Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For Plaintiff:

 3            Gallagher & Kennedy
              By: MARK S. O'CONNOR, ESQ.
 4            By: PAUL L. STOLLER, ESQ.
              By: SHANNON L. CLARK, ESQ.
 5            By: C. LINCOLN COMBS, ESQ.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, AZ  85016

 7            Lopez McHugh, LLP
              By: RAMON ROSSI LOPEZ, ESQ.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 9
              Lopez McHugh, LLP
10            By: JOSHUA MANKOFF, ESQ.
              214 Flynn Ave.
11            Moorestown, NJ  08057

12            Heaviside Reed Zaic
              By: JULIA REED ZAIC, ESQ.
13            By: LAURA E. SMITH, ESQ.
              312 Broadway, Ste. 203
14            Laguna Beach, CA  92651

15

16    For Defendants:

17            Nelson Mullins Riley & Scarborough
              By: RICHARD B. NORTH, JR. ESQ.
18            By: ELIZABETH C. HELM, ESQ.
              201 17th Street NW, Suite 1700
19            Atlanta, GA  30363

20            Nelson Mullins Riley & Scarborough.
              BY: JAMES F. ROGERS, ESQ.
21            1320 Main St.
              Columbia, SC  29201
22
              Snell & Wilmer
23            By: AMANDA C. SHERIDAN, ESQ.
              400 East Van Buren
24            Phoenix, AZ  85004

25
```

**EXAMINATION**

| **WITNESS** | | **PAGE** |
|---|---|---|
| DR. DONNA-BEA TILLMAN | | |
| | Direct Examination (Cont'd) By Mr. North | 23 |
| | Cross-Examination By Mr. Lopez | 93 |

**EXHIBITS**

| **NUMBER** | **DESCRIPTION** | **PAGE** |
|---|---|---|
| 6075 | Nov. 10, 2004 FDA Internal Memo re Dear Doctor Letter | 44 |
| 6064 | July 26, 2005 Internal FDA memo re BPV Responses to FDA AI re Modified Recovery (K050558) | 52 |
| 6061 | Aug. 22, 2005 Internal FDA memo reviewing BPV's Responses to FDA AI re G2 (K050558) | 54 |
| 5343 | Aug. 29, 2005 FDA Clearance Letter re G2 Permanent (K050558) (Substantial Equivalence) | 56 |
| 5324 | July 8, 2005 BPV's original IDE submission re G2 EVEREST Study (G050134) | 58 |
| 5322 | Nov. 2, 2005 FDA Grants Full Approval of G2 EVEREST Study (G051304) | 59 |
| 5340 | Oct. 31, 2007 BPV's G2 Filter Retrievable Traditional 510(k) (K073090) | 61 |
| 5339 | Jan. 15, 2008 FDA Clearance Letter G2 Filter Retrievable (K073090) (Substantial Equivalence) | 64 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 5354 | Sept. 19, 2005 BPV's G2 Filter – Jugular Subclavian Delivery Kit Special 510(k) (K052578) | 65 |
| 5361 | Sept. 25, 2006 BPV's G2 Filter – Femoral Delivery Kit Special 510(k) (K062887) | 66 |
| 5362 | Oct. 26, 2006 FDA Clearance Letter G2 Filter – Femoral Delivery Kit (K062887) | 68 |
| 5353 | Nov. 25, 2005 FDA Clearance Letter G2 Filter – Jugular (K052578) (Substantial Equivalence) | 68 |
| 5373 | Mar. 7, 2008 BPV's G2 Express Filter Special 510(k) (K080668) | 69 |
| 5368 | July 30, 2008 FDA Clearance Letter G2 Express Filter (K080668) (Substantial Equivalence) | 70 |
| 5379 | Aug. 12, 2008 BPV's G2X Filter Special 510(k) (K082305) | 71 |
| 5376 | Oct. 31, 2008 FDA Clearance Letter G2X Filter (K082305) Substantial Equivalence | 71 |
| 5272 | Nov. 23, 2009 BPV's Eclipse Filter System Special 510(k) (K093659) | 74 |
| 5588 | Dec. 15, 2009 Letter FDA to BPV re FDA AI Demand re Eclipse (K093659) | 77 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 5486 | Dec. 17, 2009 Letter from BPV to FDA re Eclipse Filter System Response to FDA Questions (K093659) | 80 |
| 5273 | Jan. 14, 2010 FDA Clearance Letter Eclipse Filter (K093659) (Substantial Equivalence) | 82 |
| 5586 | May 20, 2010 BPV's Eclipse Filter Special 510(k) (K101431) | 84 |
| 5589 | June 22, 2010 -- FDA Clearance Letter for Eclipse Filter (K101431) (Substantial Equivalence) | 84 |
| 7795 | Screenshot from FDA, MAUDE - Manufacturer and User Facility Device Experience, available online at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm | 87 |
| 7787 | Cordis Optease Femoral Jugular Antecubital - 2013 | 90 |
| 7771 | Braun Vena Tech LP Femoral - October 2010 | 91 |

# P R O C E E D I N G S

08:30:08 1

2        (Proceedings resumed in open court outside the presence

3   of the jury.)

4

08:30:22 5              THE COURT:  Please be seated.

6              All right.  Good morning, everybody.

7              EVERYBODY:  Good morning, Your Honor.

8              THE COURT:  I'd like to hear the argument today the

9   defendant made -- for the motion defendants made at sidebar.

08:31:16 10  But before doing that, let's see if there are any matters we

11  need to address before we start trial.

12             Let's start on the defense side.

13             You have none?

14             MR. NORTH:  We have nothing, Your Honor.

08:31:30 15             MR. O'CONNOR:  We have nothing, Your Honor.

16             THE COURT:  You want to make the motion argument --

17             MR. NORTH:  Yes, Your Honor.

18             THE COURT:  -- Mr. North?

19             MR. NORTH:  Your Honor, at this time, pursuant to

08:31:48 20  Federal Rule of Civil Procedure 50, we would like to move for

21  a judgment as a matter of law on all of the plaintiff's

22  claims.

23             First, if I could start with the issue of design

24  defect.  It's my understanding now, according to the pretrial

08:32:04 25  order, the only claims in the case are design and warning

08:32:07   1    defect claims, as well as the associated punitive damage

           2    claim.

           3                With regard to design defect, the plaintiff's only

           4    proof in this case of a design defect is the testimony of

08:32:19   5    Dr. McMeeking and the testimony of Drs. Hurst and Muehrcke.

           6                Drs. Hurst and Muehrcke broadly condemn Bard filters,

           7    but they base that upon what they say are excessive

           8    complications with regard to those filters but they have no

           9    opinions and were not allowed to even give opinions as to

08:32:41  10    rates of complications.  So they have presented no evidence

          11    that the rate of complication with regard to Bard's filters

          12    are greater than those of competitive filters.  And, in fact,

          13    in the *Daubert* orders prior to the beginning of these trials,

          14    this Court precluded both of them from offering any rate

08:33:00  15    opinions because they had not in a reliable fashion reviewed

          16    the literature.

          17                If you disregard their opinions on design defect,

          18    that leaves you with the opinions of Dr. McMeeking.  It's very

          19    clear under Georgia law that to prove a design defect in a

08:33:18  20    case of this sort involving a sophisticated product, you need

          21    expert witness.  Dr. McMeeking's evidence, however, is

          22    inadequate, we believe, as a matter of law.

          23                He admitted that he had tested only the Recovery

          24    filter and the G2.  He had never tested the Eclipse.  He tried

08:33:38  25    to extrapolate his testing of the G2 to the Eclipse on the

08:33:45   1   basis that the configuration of the two were similar.  But yet

2   he testified that the Eclipse had been electropolished and

3   that the electropolish probably did make some difference in

4   the fracture resistance of the device, which is what we have

08:34:02   5   that occurred here.

6          He could not quantify that or he did not measure the

7   effect, but he admitted that the electropolishing likely

8   improved the fracture resistance.  Yet he's never done any

9   testing at all concerning the Eclipse filter.

08:34:19   10          And we believe that as a matter of law under Rule 50

11   and under the applicable risk/benefit test of Georgia law,

12   that that is insufficient evidence to prove the design defect

13   claim.

14          With regard to the warning claim, Your Honor, we will

08:34:37   15   concede that there is sufficient evidence to go to the jury as

16   to whether the warning was adequate.  What we do not believe

17   there's sufficient evidence as to is whether any alleged

18   inadequacy of the warning was a proximate cause of Ms. Jones'

19   alleged injuries.

08:34:55   20          It is plaintiff's burden under Georgia law to show

21   that not only that the warning was inadequate, but also that

22   there was a causal link between the inadequate warning,

23   allegedly, and the injury.  There is simply no evidence here.

24          Dr. Avino testified that he could not recall ever

08:35:14   25   reading the instructions for use.  He did not give any

08:35:17 1    testimony as to any concrete discussions with the sales

2    representative that assisted him or sold products to him.   In

3    fact, the plaintiffs, although having deposed that sales

4    representative, chose not even to submit her testimony and any

08:35:35 5    evidence of her interactions with Dr. Avino as a part of their

6    case.

7        Dr. Avino did testify that he would want to know

8    certain information offered by the plaintiff in their

9    aggressive questioning of him.   However, there was absolutely

08:35:52 10   no testimony from Dr. Avino that anything raised by the

11   plaintiffs in their citation of a litany of internal documents

12   would have changed his position regarding implanting this

13   device.   He testified to the contrary that he has, throughout

14   his career, continued to utilize Bard filters, even after the

08:36:16 15   fracture -- knowing of the fracture that happened here.

16       In other words, we don't believe that the plaintiffs

17   have been able to show that any different warning would have

18   made a difference in Dr. Avino's prescribing and implanting

19   decisions and, as a consequence, they have failed as a matter

08:36:34 20   of law to show any damage.   I mean, to show a causal link.

21       Third, Your Honor, we would like to move as a matter

22   of law on the plaintiff's claim for future damages in this

23   case.   The component of their claim for future pain and

24   suffering.

08:36:51 25       There's no allegation of physical pain, future

08:36:57  1    physical pain.  In fact, the plaintiff's attorneys appeared to

2    have conceded that it's only mental worry that she's seeking

3    as far as future damages.  And, therefore, this mental worry

4    is premised on the fear of future consequences because of this

08:37:13  5    strut.

6          Now, the unrefuted testimony by admission of

7    Dr. Darren Hurst, the plaintiff's expert in this case, is that

8    the risk of any of those complications occurring with regard

9    to that retained strut are roughly 1 percent.

08:37:34 10          We submit, Your Honor, that that does not qualify or

11    pass muster as a matter of law to present that claim to the

12    jury.

13          They have the burden of showing that it is more

14    probable than not that future injuries will occur.  They

08:37:55 15    simply cannot do so when their own expert says the risk of a

16    future injury is 1 percent.

17          And worry about future consequences should not be

18    compensable, and is not under Georgia law unless that worry is

19    reasonable.  And in a situation where the risk is 1 percent,

08:38:16 20    it is not reasonable and they cannot show more probable than

21    not that any such future consequence could occur.

22          We would also draw the Court's attention to a case, a

23    couple of cases, by the Georgia -- one by the Georgia Court of

24    Appeals, one from the Northern District of Georgia.

08:38:36 25          *Boyd versus Orkin*, at 381 Southeast 2d 295.  That's a

08:38:42   1   situation where the court held there must be proof that a

2   condition or an exposure will actually cause future disease,

3   pain, or impairment of some kind.

4   And, here, they simply cannot do that by a

08:39:00   5   preponderance of the evidence.

6   Also in the case of *Parker versus Brush Wellman*, at

7   377 F. Supp. 2d 1290, Federal District Court Judge Rick Story

8   held that subclinical effects of an exposure in that case are

9   not a cognizable injury under Georgia law until an actual

08:39:27  10   complication manifests itself.

11   And while not directly identical to what has occurred

12   here or what the proof is here, we believe it is applicable.

13   And, therefore, we do not believe the plaintiffs have met

14   their burden as a matter of law to show that it's more

08:39:43  15   probable than not that they will -- that Ms. Jones will have

16   future consequences from this retained strut and, therefore,

17   that her fear of future consequences is reasonable and

18   compensable.

19   Lastly, Your Honor, we would move for -- under

08:39:59  20   Rule 50 for judgment as a matter of law on the punitive

21   damages claim.

22   We continue to believe that the clear and convincing

23   evidence standard set forth in Georgia law is a significant

24   hurdle, particularly in this case, based on this evidence.  It

08:40:19  25   was adopted in the 1990s by the Georgia general assembly as a

08:40:22   1   matter of tort reform to make punitive damages more difficult
       2   to obtain and to limit them to cases where there is absolutely
       3   emphatically evidence, clear and convincing evidence, of that
       4   level of egregiousness necessary to support a punitive award.
08:40:42   5        Here, the plaintiff's evidence, we submit, does not
       6   rise to that level.
       7        And the plaintiff's evidence on this record is
       8   fundamentally different from the evidence they presented to
       9   the Court at the summary judgment stage.  They premised then
08:40:55  10   their entire argument for punitive damages on the premise that
      11   the rate of complications with Bard filters exceed those of
      12   competitive filters.  There is no evidence on this record
      13   here.  They utilized at the summary judgment stage,
      14   particularly Dr. Betensky, the statistician from Harvard, who
08:41:20  15   has made no appearance in this case, nor the last one.
      16        Instead, to try to implicate Bard filters and suggest
      17   they're worse than others, they rely principally on, again,
      18   Drs. Hurst, Muehrcke, and McMeeking.  But Dr. McMeeking has
      19   admitted candidly that he has no opinions in this case as to
08:41:41  20   rates.  He offers no opinions that Bard's filters have higher
      21   complication rates than competitive filters.
      22        This Court, in the *Daubert* orders before trial,
      23   specifically barred Drs. Hurst and Muehrcke from testifying
      24   that Bard's filters have complication rates greater than
08:42:03  25   competitors'.

08:42:04  1        So what we're left with is evidence that Bard's

2    filters do have complications in some instances.  Based upon

3    a -- against a background with a concession by all the experts

4    that all filters have complications.  There's simply no

08:42:22  5    evidence on this record at all that Bard's filters have an

6    excessive complication rate or complication rates greater than

7    those recognized by all the experts.

8        We submit that because that premise of the

9    plaintiff's case is not present, they simply have not shown,

08:42:41 10    and certainly not by clear and convincing evidence, any

11    egregious behavior or conduct that would justify an award of

12    punitive damages in this case.

13        And so for those reasons on those four points, we

14    would ask the Court for judgment as a matter of law.

08:42:59 15        THE COURT:  All right.  Thank you.

16        MR. MANKOFF:  Good morning, Your Honor.

17    Josh Mankoff for the plaintiff.

18        I'll try to address the arguments made by Mr. North

19    in the order he gave them.

08:43:21 20        Regarding design defect, we do have Drs. McMeeking

21    and Hurst discussing the conical design which was relatively

22    unique to the Eclipse and the retrievable line of Bard filters

23    in comparison to the SNF filter.  And, of course, they both

24    had the permanent indication and the filter was intended for

08:43:43 25    permanent placement in Ms. Jones.

08:43:46   1          They discussed the fact that the design allowed for

2      this unique injury with the caudal migration leading to the

3      cascade of failures, the tilt, the perforation, and the

4      fracture, and then the fact that these fractured components

08:44:04   5      could migrate through the body and cause severe injury.

6          And that was an aspect of the design.  And it led to

7      this more severe type of injury.

8          Regarding the warnings -- and, of course, the

9      standard here is the same as the motion -- standard under our

08:44:28  10      motion for summary judgment, and Mr. North and Bard made the

11      same argument on the summary judgment motion.  And regarding

12      the warnings, the same evidence was submitted in response to

13      that motion as has been -- has come in at trial.

14          The causal link has been made because the warning

08:44:52  15      evidence -- well, the jury could reasonably infer that had

16      Bard given the warnings and transmitted the information that

17      we heard they had and that Dr. Hurst testified a reasonable

18      doctor would expect to give, that that would have made its way

19      to Dr. Avino.  He did read the IFU from time to time, and if

08:45:19  20      there was new significant information he would have learned of

21      it through his peers and other ways that warnings come out.

22          If the sales representatives had been told of this

23      information, and we heard that they were not, they had a duty

24      to provide that information to Dr. Avino.

08:45:34  25          So the jury could reasonably infer that he would have

08:45:37   1   received those warnings.

2   Further, they can infer that he would have discussed

3   that information with the Joneses and so that risk to benefit

4   decision that occurs in consult with the patient would have

08:45:54   5   been different.  That's a reasonable inference.

6   Regarding future pain, Mr. North misrepresents

7   somewhat the evidence on that aspect.  We did hear that the

8   risk for any individual injury occurring may have been

9   1 percent, but I believe that was 1 percent per year.  In any

08:46:17  10   event, the different occurrences that may happen with the

11   embolized fragment would be additive.  So there may be

12   approximately -- and this was an estimate -- approximately

13   1 percent risk per year of infection occurring, but there's

14   also 1 percent risk that it would cause occlusion or that it

08:46:44  15   would move further, or that it would perforate the arteries in

16   the lung or puncture the lung.  We heard about a whole risk of

17   potential injuries, so those are cumulative.

18   There's also a dispute in the evidence about whether

19   the filter -- whether that fragment should be removed and, of

08:47:02  20   course, if she does undergo surgery, that would involve

21   additional pain.

22   The case Mr. North cited, *Boyd*, has language about --

23   in that case, the injury was whether the -- whether there was

24   any evidence that there was an injury in the case.  It

08:47:23  25   involved, I believe, elevation of a certain blood level or

08:47:30  1    test or something like that.  And the language in that full

2    quote talks about any indication of future injury, and there

3    was none, apparently, in that case.

4         Regarding punitive damages, there's clearly evidence

08:47:44  5    that these filters are all linked.  Obviously they're

6    predicates of each other.  But we heard regarding the design

7    of the filter, they all had the conical design.

8         Starting with the Recovery, Bard became aware of

9    significant risks.  They didn't -- they had a pilot study.

08:48:08 10    They knew that they should do a long-term clinical study.

11    They never did that.  Instead they redesigned and came up with

12    the G2 filter.  They didn't fully test that and they learned

13    and they knew about this new risk.  They determined it was

14    unacceptable, and they continued to market it.

08:48:28 15         We heard that going from the G2 to the Eclipse they

16    made one change.  They didn't intend to address any failure

17    that's relevant in this case.  And while there's some evidence

18    that it may have impacted fracture resistance to a small

19    degree, we heard, it didn't address at all the cascade of

08:48:55 20    events.

21         So there's still this unacceptable risk of caudal

22    migration causing the tilt and the perforation.  And a

23    marginal improvement in fracture resistance without additional

24    testing on that point links these filters together.

08:49:19 25         So the knowledge they had with the G2 carries forward

08:49:27  1    to the Eclipse filter.  And they had -- the only doctor

2    involved in these filters suggested that people should use the

3    SNF instead of the G2 when they thought that a permanent

4    filter was warranted.

08:49:45  5         He suggested monitoring, just like Dr. Asch, who is

6    one of the only other doctors we've heard from involving these

7    filters, and Bard never warned doctors to conduct that

8    monitoring.  Instead we heard that they downplayed the risks.

9    They knew they had a lack of thorough understanding of the

08:50:08  10   caval anatomy.  And that the filters were not being designed

11   or tested in that environment in which the IVC could expand or

12   collapse or twist and cause failures.

13        We heard that they specifically did not give sales

14   representatives this information, so they could not pass it on

08:50:35  15   to the doctors.

16        We heard that starting with the Recovery, when

17   doctors learned of even a migration or a fracture occurred in

18   their hospital, they stopped using Bard filters.  So when

19   they -- this information Bard knew was clearly relevant and

08:50:54  20   putting patients at severe risk of harm.

21        We heard that they -- we saw that when they did the

22   migration testing on the G2 filter that they moved the goal

23   posts.  They consciously adjusted the standards regarding the

24   acceptance criteria and even the temperature at which they ran

08:51:32  25   these tests in order to meet their own internal standards to

08:51:38    1    put these filters on the markets.

            2            At the same time they had new design, two new

            3    designs, in the works that were going to specifically address

            4    the issue introduced with the G2 filter that carried through

08:51:57    5    to the Eclipse:  The caudal anchors on the Meridian filter,

            6    and then a whole host of changes on the Denali.

            7            So they had direct -- it's clear and convincing

            8    evidence of the direct knowledge they had of the issues with

            9    this filter that they were not warning about and not

08:52:15   10    addressing.

           11            There's no evidence that Bard delivered any of these

           12    warnings in any form to Dr. Avino.  And he testified he was

           13    not aware of any of this internal information.

           14            If the Court has no questions, then that concludes --

08:52:47   15            THE COURT:  Okay.  Thank you.

           16            Mr. North, did you want to say anything else?

           17            MR. NORTH:  Your Honor, the only thing I would

           18    respond to specifically is on the punitive damages.  Even if

           19    you accept all of what I would characterize as their Monday

08:53:05   20    morning quarterbacking of Bard's development efforts over the

           21    years, even if you accept all of that evidence as true it

           22    still does not rise, in our view, to the level necessary to

           23    justify punitive damages because a fundamental premise in

           24    their argument is missing, and that is there is no evidence

08:53:22   25    that Bard's filters have these complications more so than

08:53:26   1   competitive filters.

2   And all of their experts admit that there's no such

3   thing as a perfect filter, all these filters out there in the

4   market have these complications.  The FDA knows it, the SIR

08:53:37   5   knows it, everyone knows it.

6   So all they're saying, their evidence is suggesting

7   is we could have done even better, but they have not

8   established that our rate was unacceptable in the first

9   instance or greater than competitors'.  And we believe that

08:53:54   10   does not rise to the level of the clear and convincing

11   evidence necessary.

12   MR. MANKOFF:  If I may respond on that point,

13   Your Honor?

14   THE COURT:  Yes.  Go ahead.

08:54:08   15   MR. MANKOFF:  That evidence comes on -- in on two

16   points.  One is we heard evidence that the SNF was considered

17   very safe and had virtually no failures, and, further, the

18   evidence is that the risk involves both the rate -- or the

19   probability of the harm occurring, as well as the severity.

08:54:33   20   And in this case we heard that the severity of the fracture

21   was greater.

22   THE COURT:  So are you agreeing that in this case

23   there's no evidence that the rate of complications for the G2

24   line exceeded the complications in competitor devices?

08:54:48   25   MR. MANKOFF:  No, I disagree with that proposition.

08:54:51  1    There's -- the rates were higher.  We heard the rates were

2    higher for the SNF filter, and there was also evidence that

3    when they did comparisons with other filters they found a

4    statistically significant difference with several filters.

08:55:10  5         THE COURT:  Of the Recovery; right?

6         MR. MANKOFF:  I believe it involved the Recovery and

7    the G2 filter.

8         THE COURT:  Can you remember the specific evidence

9    on comparing G2 to other competitor devices?

08:55:22 10         MR. MANKOFF:  Yeah, I believe it came in through a

11   health hazard evaluation.

12         And the Wong deposition.

13         THE COURT:  Okay.  Give me just a minute, please.

14         All right.  With respect to the first argument I'm

08:56:35 15   not persuaded that I should grant judgment on the design

16   defect claim.  I do believe that Dr. McMeeking described the

17   design defect in the G2 line of filters that's been described

18   here, the conical design, the propensity to caudally migrate,

19   and the fractures that result.  And there's been a number of

08:57:01 20   different points of evidence that the Eclipse is essentially

21   the same design as the G2.

22         The fact that Dr. McMeeking did not personally test

23   an Eclipse filter, in my view, does not undercut all of the

24   other evidence, and I think it's a jury question as to whether

08:57:17 25   or not his testimony and that of the other doctors establishes

08:57:24  1    a design defect.

2              I'm also going to deny the motion with respect to the

3        failure to warn claim.  It's a causation argument that's been

4        made.

08:57:34  5              Dr. Avino testified that he expects manufacturers

6        will inform doctors of anything in their product that is not

7        safe, that he talked with the Bard sales representative,

8        Melanie Velice, about the IVC filters.  He discussed

9        complications with her, and he also learned more about IVC

08:57:56 10    filters from meetings with colleagues, and he did sometimes

11       read the IFU.

12             There has been evidence that sales representatives

13       were not told of complication rates and that sales

14       representatives, if told of such rates, would be obligated to

08:58:11 15    share them with doctors.

16             Dr. Avino said he would want to know if rates of

17       complications were higher than competitive filters.  He would

18       want to know if rates of migration, performance, and fracture

19       were four times higher than of all other filters, referring to

08:58:33 20    the 2004 HHE.  That fracture rates would be important to him,

21       and similar testimony.

22             Whether or not that is sufficient to establish

23       causation I believe is a jury question.

24             As far as the risk of future damages, I think that

08:58:49 25    also is -- or I should -- the proof of further damages, I

08:58:53   1    think that also is a jury question.  It's true that on

   2    cross-examination Dr. Hurst said 1 percent per year.

   3            Dr. Muehrcke said it was a risk that placed the

   4    plaintiff a breath away from death, and with -- if the jury

08:59:09   5    believes that, it seems to me, the jury could conclude that

   6    the plaintiff has a reasonable basis for worry if that's the

   7    category of punitive -- or, pardon me, of compensatory damages

   8    to be sought.  And I think that is, again, a jury question.

   9            I think all the arguments made by the defendants on

08:59:28  10    this motion are good jury arguments.  But, in my view, they do

  11    not support a judgment in favor of defendants at this point.

  12            And on punitive damages, I think the evidence is

  13    essentially the same as in the Booker case.  That is, there is

  14    evidence that the defendants were aware of complications that

08:59:48  15    were not known to the public, that were unacceptable, that

  16    resulted in adjustments of criteria within the company, none

  17    of which was shared with the public.

  18            It seems to me that it is possible a jury could find

  19    that that evidence shows a callousness that satisfies the

09:00:08  20    Georgia standard for punitive damages, so I'm going to deny

  21    the defendants' motion.

  22            All right.  We'll bring the jury in.

  23        (The Court and the courtroom deputy confer.)

  24            THE COURT:  Counsel, we apparently are missing a

09:00:52  25    juror.  So --

09:00:53   1          No word from the juror?

2          THE COURTROOM DEPUTY:  They called and said they're

3     going to be late.  We didn't know how long.

4          That was like 20 till 8:00.

09:01:05   5          THE COURT:  All right.  Apparently the juror called

6     and said he or she will be late.  We'll wait a few minutes

7     and see if the juror arrives.

8          MR. O'CONNOR:  Your Honor, can we assume there's at

9     least five minutes?

09:01:18  10          Oh.  I'm sorry, I thought we were going to take a

11    recess.  I apologize.

12          THE COURT:  You mean you want to step out of the

13    courtroom for a few minutes?

14          MR. O'CONNOR:  Please.

09:01:28  15          THE COURT:  You can.  That's fine.

16       (The jury entered the courtroom at 9:09.)

17          THE COURTROOM DEPUTY:  Come to order.

18          THE COURT:  Thank you.  Please be seated.

19          Good morning, ladies and gentlemen.

09:09:50  20          JURORS:  Good morning.

21          THE COURT:  We will pick up where we left off

22    yesterday afternoon.

23          So you may proceed, Mr. North.

24          MR. NORTH:  Thank you, Your Honor.  And before I

09:09:57  25    begin, I have copies for the Court of the previous

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

09:10:01  1    transcripts in case they become necessary.

2              THE COURT:  Okay.

3                      **DR. DONNA-BEA TILLMAN,**

4    recalled as a witness herein, after having been previously

5    duly sworn or affirmed, was examined and testified as follows:

6              D I R E C T   E X A M I N A T I O N   (CONTINUED)

7    BY MR. NORTH:

8    Q   Good morning, Dr. Tillman.

9    A   Good morning.

09:10:15  10             MR. NORTH:  If we could bring up Exhibit 5126.

11   BY MR. NORTH:

12   Q   I believe we were looking at this exhibit yesterday when

13   we concluded for the afternoon?

14   A   Yes, we were.

09:10:28  15             MR. NORTH:  And I believe this has been admitted.

16   If we could display it for the jury.

17             THE COURT:  Yes.

18   BY MR. NORTH:

19   Q   And remind us again what the purpose of this document was.

09:10:40  20   A   So this is the special control guidance document that FDA

21   wrote to describe the special controls or the things that have

22   to be done in order to support a premarket submission for an

23   IVC filter.

24   Q   And when was this published?

09:10:55  25   A   So it was published in November of 1999.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:11:00  1   Q   And was this developed as a -- by the FDA as a part of the

2   down-classification process for IVC filters?

3   A   Yes, it was.

4          MR. NORTH:  If we could turn to page 3.

09:11:20  5   BY MR. NORTH:

6   Q   In looking at the first paragraph beginning with -- well,

7   beginning with the first paragraph, what does this guidance

8   document say is the purpose or the importance of the guidance

9   document to manufacturers of filters?

09:11:37 10   A   So this is the guidance document that explains what are

11   the things that a medical device manufacturer who is making a

12   filter needs to do in order to mitigate the risks of filters.

13   And so this guidance describes the testing and the evidence

14   that needs to be provided in order to demonstrate that one of

09:11:58 15   these devices is substantially equivalent to a predicate

16   device.

17          MR. NORTH:  If we could go to page 4.

18   BY MR. NORTH:

19   Q   At the top of the page, does the FDA say anything about

09:12:14 20   the need for filters with certain classification of patients?

21   A   So in this guidance, FDA describes sort of the public

22   health problem of recurrent pulmonary embolism and talks about

23   the rates at which they occur, and it talks about what the

24   purpose of IVC filters are.

09:12:42 25          MR. NORTH:  Now, if we could turn to page 5.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:12:49  1   BY MR. NORTH:

2   Q   Does the FDA here begin to set forth various tests that

3   they -- that the agency recommends for a filter manufacturer?

4   A   Yes, they do.  As we mentioned the other day, there's sort

09:13:01  5   of a standard set and types of tests that are done with

6   medical devices.  And so FDA sort of is going through in this

7   guidance listing the major types of tests, and then details

8   around the device-specific testing that needs to be done for

9   IVC filters.

09:13:16  10         MR. NORTH:  If we could look at the second sentence

11   under subsection B, "It is the submitter's responsibility."

12   BY MR. NORTH:

13   Q   Does the agency place the obligation to perform these

14   tests on the manufacturer?

09:13:33  15   A   Yes, most definitely.

16         MR. NORTH:  If we could turn to the next page,

17   please.

18   BY MR. NORTH:

19   Q   Does the FDA -- what sort of specific test does the FDA

09:13:46  20   prescribe or suggest as a part of this guidance document?

21   A   So this is a set of what I would call bench testing that's

22   specific to IVC filters, and so FDA has considered the

23   potential risks of IVC filters.  And then for each of those

24   different risks, they've identified a set of tests that are

09:14:06  25   done in order to demonstrate that those risks have been

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

1  mitigated.

2       So some of these tests -- for example, there's one

3  about simulated deployment so can the delivery system for the

4  filter be introduced into the patient and the filter be

5  correctly deployed?  And then they go through a bunch of other

6  kinds of tests.

7  Q   Let's look at number 4.

8       Does the FDA specifically prescribe or suggest

9  testing for the risk of filter fracture?

10 A   Yes.  Filter fracture is a known risk of IVC filters.  And

11 in this section FDA describes that companies need to conduct

12 bench testing that reflects worst case respiratory and

13 diaphragmatic movements in order to demonstrate the filter can

14 withstand the mechanical forces it will be subjected to.  And

15 they also say that the filter needs to be tested to make sure

16 that it can resist corrosion.

17 Q   Let's look at Number 5.

18      Does the FDA also suggest specific types of tests to

19 evaluate the risk of caval penetration or filter migration?

20 A   Yes, it does.  The guidance basically says that companies

21 have to develop test methods to ensure that the filter will

22 stay in place under the expected conditions of use and that it

23 will not have a tendency to perforate the caval wall.

24      MR. NORTH:  If you could turn to the next page.

25

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:15:38   1   BY MR. NORTH:

2   Q   Does the FDA also offer some guidance with regard to

3   clinical studies pertaining to IVC filters?

4   A   Yes.  So the guidance basically says that if you're

09:15:51   5   manufacturing a new filter, so if it's a company's first ever

6   filter, that those devices will generally require clinical

7   data.  And also that if a company makes significant

8   modifications to a device, that those modified devices may

9   also require clinical data.

09:16:09  10   Q   Let's look at the paragraph on that page that begins for

11   the indications outlined previously.

12       In that first sentence, what does the FDA

13   specifically say about the risks and benefits of IVC filters?

14   A   So FDA says that for the particular set of indications

09:16:28  15   that the guidance talks about, and that is the set of

16   indications for which FDA has down-classified IVC filters,

17   that the risks and benefits are well documented.  That

18   basically the FDA and the -- FDA understands what the risks

19   are and the benefits.

09:16:47  20   Q   A couple of lines down, beginning with the sentence

21   "Although," does the agency say anything about how these risks

22   are reflected in the medical literature?

23   A   Yes.  So FDA says that the risks are well described in the

24   literature.

09:17:14  25   Q   Beginning at the bottom of that page, does the FDA discuss

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:17:18  1    specific risks that it has seen in the literature and weighed?

        2    A    Yes.  So in this section FDA is describing the known risks

        3    of IVC filters and then discussing how they should be

        4    evaluated in the clinical trial.

09:17:35  5              MR. NORTH:  If we could turn to page 9, please.

        6    BY MR. NORTH:

        7    Q    Does the FDA recognize that death can be a potential

        8    complication with respect to IVC filters?

        9    A    Yes.  Absolutely.  There's a section in here called Death

09:17:55 10    where FDA discusses that there have been deaths reported with

       11    IVC filters and that if deaths occurred during the clinical

       12    study that they need to be documented and provided for FDA's

       13    review.

       14    Q    Look at the next section.  Does the FDA recognize

09:18:14 15    migration is a known risk of IVC filters?

       16    A    Yes.  In fact the first paragraph here says that minor

       17    filter migration in the caudal or cephalic direction is

       18    commonly reported and does not appear to be associated with

       19    clinally significant events.

09:18:32 20              And then the FDA also goes on in this paragraph to

       21    talk about what they call true migration, which is migration

       22    that is more significant.  So they also recognize that that is

       23    a potential -- potential adverse event associated with

       24    filters.

09:18:48 25              MR. NORTH:  If we could go to the next page, please.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:18:57  1    BY MR. NORTH:

        2    Q    Number 5, does the FDA recognize that caval penetration or

        3    perforation is a known risk of these devices?

        4    A    Yes, they do.

09:19:07  5    Q    Number 6, does the FDA recognize that tilting is a known

        6    complication?

        7    A    Yes.  The guidance clearly lists filter tilting and

        8    angulation as a potential complication.

        9    Q    In number 8, does the agency recognize that filter

09:19:29  10   embolization is a known risk?

        11   A    Yes, they do.

        12   Q    And what is filter embolization?

        13   A    So filter embolization usually refers -- usually filter

        14   migration is movement of the entire filter.  Filter

09:19:47  15   embolization often reflects movement of or -- or fracture of

        16   the filter and embolization of a part of the filter.

        17   Q    Does the guide also acknowledge that the FDA recognizes

        18   fracture as a risk of filters?

        19   A    So I think that clearly filter embolization is a byproduct

09:20:17  20   of filter fracture, so I would say that FDA does.  And they

        21   talk about the fact that filter embolization can be -- is a

        22   serious complication, but it may have different kinds of

        23   clinical effects, some of them are asymptomatic and some

        24   patients who have those may have very catastrophic outcomes.

09:20:49  25        MR. NORTH:  Let's look, if we could, back at page 8,

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:20:51   1   the second section, "These complications can result in."

       2   BY MR. NORTH:

       3   Q   And does the FDA here recognize fracture as a potential

       4   risk?

09:21:01   5   A   Yes.  It is explicitly listed here.

       6        MR. NORTH:  Now, if we could turn to page 11.

       7   BY MR. NORTH:

       8   Q   Does the FDA in the guidance document suggest certain

       9   parameters for the labeling or instructions for use to

09:21:24  10   accompany these devices?

      11   A   Yes.  This -- basically FDA reviewed the labeling for

      12   devices that were currently being marketed prior to writing

      13   this guidance document, and then they believe -- they've

      14   recommended here changes that should be made to the labeling

09:21:41  15   in order to make sure that the labeling is consistent among

      16   different medical device manufacturers.

      17   Q   And if we could look at the last sentence on that page,

      18   the attachment.

      19        Does the FDA go so far as to provide a format for the

09:21:56  20   labeling for IVC filters?

      21   A   Yes, they do.  It's provided as an attachment to this

      22   guidance document.

      23        MR. NORTH:  If we could look at the next page,

      24   page 12.

      25

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:22:12   1    BY MR. NORTH:

2    Q    Is this the attachment where the FDA in the guidance

3    document prescribes a certain format and structure for the

4    instructions for use for IVC filters?

09:22:21   5    A    Yes, it is.

6    Q    In your opinion, do these various aspects of the guidance

7    document that the FDA came up with, did it reflect the

8    agency's considerations in down-classifying filters?

9    A    Yes, it did.  This guidance document basically was the

09:22:48   10   documentation of FDA's determination that it understood the

11   potential risks and that it understood what needed to be done

12   to mitigate those risks.  And then by presenting the testing

13   and the labeling information that's recommended in this

14   guidance document, FDA believes that if a company follows

09:23:06   15   this, then the device should be such that the benefits of the

16   device would outweigh the risks.

17   Q    Dr. Tillman, at the request of my law firm, did you review

18   documents regarding the regulatory history of Bard's IVC

19   filters?

09:23:21   20   A    Yes, I did.

21   Q    And did that include the regulatory history of the

22   Recovery filter, the G2 filter, and the other variations of

23   the G2 filter, and the Eclipse filter?

24   A    Yes, I did.

09:23:34   25   Q    Were there certain types of documents or information you

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:23:38  1   wanted to review for your analysis in this case?

2   A   Yes.  So when I started in this case, the first thing I

3   wanted to receive was copies of all of the 510(k) submissions.

4   I also looked at copies of the communications between Bard and

09:23:53  5   FDA during the 510(k) process.

6        Then, when I learned more about what was going on in

7   the postmarket setting, I asked for documents relating to

8   Bard's internal communications.  So when they were looking at

9   how the product was performing, once it was released into the

09:24:09  10  market, they were getting information back about complaints

11  and adverse events, so I asked for information documenting

12  what they did to address that.  I received and reviewed

13  documentation about the testing that Bard did in response to

14  those events.

09:24:24  15       Then, when Bard -- in response to those postmarket

16  events, Bard interacted with FDA and there were meetings

17  between FDA and Bard about how they talked about those events.

18  So I reviewed all of that documentation.

19       I reviewed expert reports from the plaintiffs.  I've

09:24:43  20  reviewed some depositions of Bard employees that are relevant

21  to the FDA process.  And then I reviewed relevant FDA guidance

22  documents like some of the ones we've talked about today.

23       Now, I don't know if that is an exhaustive list but

24  it's much of what I looked at.

09:25:00  25  Q   During your work in this case, if you wanted to review

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:25:02  1  additional documents, did you have the opportunity to do so?

2  A    Absolutely.  If I felt like I needed an additional

3  document, if I saw a reference to a test report, I contacted

4  the attorneys that I work with and asked for the document and

09:25:16  5  it was provided to me.

6  Q    What type of regulatory submissions did Bard submit for

7  the Recovery filter and G2 filters?

8  A    So Bard submitted 510(k) premarket notifications.

9  Q    And what was the predicate device for the Recovery filter?

09:25:34 10  A    So the predicate for the Recovery was the Simon Nitinol

11  filter.

12  Q    And what was the predicate for the G2 filter?

13  A    And the predicate for the G2 was the Recovery filter.

14  Q    At the time that Bard submitted the 510(k) application for

09:25:49 15  the G2, was the Recovery filter legally on the market?

16  A    Yes, it was.

17  Q    To what extent, if at all, was Bard required under the

18  regulations or the FDA's procedures to compare the G2 to any

19  other IVC filter besides the Recovery filter?

09:26:12 20  A    So a company is allowed to select its own predicate

21  device, so there's no requirement that it compare to any

22  particular device.  Given the fact that the whole intent of

23  the G2 program was to develop a device that was the next

24  generation after the Recovery, it makes sense to me that the

09:26:30 25  Recovery would be the appropriate predicate.  If Bard had come

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:26:33  1   to me as a regulatory consultant and asked me to prepare that

       2   510(k), I would have said, well, we should use the Recovery as

       3   a predicate device.

       4   Q    What was the purpose -- what's your understanding of the

09:26:44  5   purpose for changing the Recovery filter to the G2 filter?

       6   A    So when the Recovery filter was cleared and was marketed,

       7   Bard observed that there were some adverse events occurring

       8   relating to filter fracture and migration.  These were known

       9   adverse -- known types of adverse events, but Bard determined

09:27:04 10   that it could improve the performance of the device and make

      11   some changes to it to improve its fracture resistance and its

      12   ability to resist migration.  So the G2 represents sort of the

      13   next generation improved product.

      14   Q    Now, over time had the -- did you see evidence that Bard

09:27:21 15   and the FDA had been in communication about the performance of

      16   the Recovery filter after the time it was initially cleared by

      17   the agency?

      18   A    Yes.  Absolutely.  Bard was definitely in communication

      19   with FDA.  I have seen minutes of phone calls where Bard

09:27:39 20   employees reached out to FDA to inform them about what they

      21   were observing with the Recovery filter and the efforts that

      22   they were taking to communicate this information with health

      23   care providers.

      24   Q    Did you prepare a chronology of the various communications

09:28:07 25   that Bard had with the FDA regarding the Recovery filter?

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

09:28:10  1    A   Yes, I did.  There were a number of interactions, and so

       2    to try to help kind of keep them straight in my own mind I

       3    created a chronology that sort of laid out the different

       4    communications and the dates on which they occurred.

09:28:25  5            MR. NORTH:  Could we bring up Exhibit 7928.

       6    BY MR. NORTH:

       7    Q   Is this the chronology you prepared?

       8    A   Yes, it is.

       9            MR. NORTH:  Your Honor, if we could have permission

09:28:37 10    to display this to the jury.

      11            MR. LOPEZ:  I don't think this is in the report,

      12    Your Honor.

      13            THE COURT:  Is this in the report?

      14            MR. NORTH:  Not as a demonstrative.  The subject

09:28:48 15    matter of all of this is.

      16            THE COURTROOM DEPUTY:  I've reported it.  It's an

      17    alarm in the tech room.

      18            THE COURT:  Do you know what the beeping is?

      19            THE COURTROOM DEPUTY:  Yes.  It's a panel in the

09:29:09 20    tech room.  And they're going to fix it at break.

      21            THE COURT:  Hold on just a minute, Counsel.

      22            If this is not in the report, I'm going to sustain

      23    the objection under Rule 26(a)(2)(B)(iii), which requires

      24    exhibits used to summarize opinions.

09:29:31 25            MR. NORTH:  Thank you, Your Honor.

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

09:29:31    1    BY MR. NORTH:

2    Q   Can you tell us what sorts of communications the FDA had

3    with Bard regarding the performance of the Recovery filter?

4    A   Yes.  So Bard initially approached FDA to talk to them

09:29:46    5    about a letter that they planned to send to physicians

6    informing them about some of what they were seeing with the

7    Recovery filter.  FDA provided some feedback to Bard on the

8    contents of that letter.

9           Bard and FDA also had some conversations around

09:30:01   10    Bard's plans to engage with the physician community and to try

11    to get additional feedback about certain events that were

12    occurring and to hear from the physician community about that

13    as well.

14    Q   During the course of the marketing and sale of the

09:30:19   15    Recovery filter, did Bard produce a Dear Colleague letter sent

16    out to the medical community about complications?

17    A   Yes, they did.

18    Q   And did Bard consult with the FDA regarding the contents

19    of that letter?

09:30:34   20    A   Yes.  They submitted a draft of that letter to FDA and

21    asked FDA to review it and provide feedback on it.  And FDA

22    actually provided some suggestions, and Bard made those

23    changes and then sent the letter out.

24    Q   Did Bard likewise send a second letter, a Dear Doctor

09:30:51   25    letter about complications with the Recovery filter out to

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:30:55  1   physicians who had utilized the device?

2   A   Yes, they did.

3   Q   And did Bard again consult with the FDA regarding that

4   second letter?

09:31:04  5   A   Yes, they did.

6   Q   What sorts of evidence did you see regarding the agency's

7   review of those letters and discussions with Bard?

8   A   So I reviewed --

9        MR. LOPEZ:  Excuse me.  That calls for a lot of

09:31:31 10   hearsay, Your Honor.  Going back and forth, her talking about

11   the conversations going back and forth.

12        THE COURT:  I think he just asked what documents she

13   saw.  That answer won't be hearsay.

14        So, but we should just describe documents before

09:31:45 15   talking about contents.

16        MR. NORTH:  Yes.

17        THE WITNESS:  So I reviewed minutes of meetings

18   that -- of phone calls that Bard had with the agency, and I

19   also reviewed some drafts of the letters that Bard proposed

09:31:58 20   to send.

21        MR. NORTH:  If we could bring up Exhibit 6075.

22   BY MR. NORTH:

23   Q   Have you seen this particular document?

24   A   Yes, I have.

09:32:21 25   Q   And what is this document?

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:32:23  1   A    So this is minutes of a phone call between Bard and FDA to

2   talk about a conversation between an FDA reviewer and a Bard

3   representative regarding the -- Bard's -- what Bard was seeing

4   with the Recovery filter and Bard's plans to provide a Dear

09:32:42  5   Doctor letter to health care providers.

6   Q    Who was the author of these particular minutes?

7   A    So the minutes were written by FDA, by Lisa Kennell, who

8   is a reviewer --

9            MR. LOPEZ:  I'm going to object.  I'm looking on the

09:32:58  10   reliance under the FDA production number that appears on

11   here.  It's not on the list, and I don't think it's discussed

12   in the report.

13            THE COURT:  Could you point out the location on the

14   reliance list, please.

09:33:08  15            MR. NORTH:  Your Honor, on the reliance list it is

16   on page 12.  In the report it's on page 51.

17            MR. LOPEZ:  Page 12.  I'm looking at the FDA

18   production number.

19            THE COURT:  Can you tell me where on page 12.

09:33:28  20            MR. NORTH:  On page 51 of the report, at the

21   paragraph beginning "In reviewing."  It quotes from that

22   memo.

23            THE COURT:  That is Exhibit 6075?

24            MR. NORTH:  Yes, Your Honor.

09:33:48  25            THE COURT:  All right.  Objection is overruled.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:33:52  1   BY MR. NORTH:

      2   Q   Dr. Tillman --

      3            MR. LOPEZ:  Your Honor, I'm sorry, but the FDA

      4   production number that is shown is different than what's in

09:33:57  5   the report.

      6            THE COURT:  Have you compared the language on

      7   page 51 to the document, Mr. Lopez?

      8            MR. LOPEZ:  What's the footnote number?

      9            THE COURT:  It's page 51.

09:34:05  10            MR. LOPEZ:  I see the 51, but it refers -- six

     11   footnotes here.

     12            THE COURT:  It's not in the footnote.  It's in the

     13   paragraph beginning "In reviewing."

     14            MR. LOPEZ:  Okay.

09:34:12  15            THE COURT:  There's a quotation of four, five

     16   sentences.

     17            MR. NORTH:  Your Honor, I believe what he's

     18   referring to, in the reliance list it has the FDA production

     19   and it has a broad range, like from page 1 to page 1,000, and

09:34:25  20   this is within those that is there.

     21            MR. LOPEZ:  I'm sorry.  The FDA production number

     22   here is different than the one that's in the report.  So.

     23            THE COURT:  Well, Counsel, come to sidebar, would

     24   you.

09:34:38  25            You can stand up, ladies and gentlemen.

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

09:34:39   1        (Bench conference as follows:)

2             THE COURT:  Show me what you're talking about,

3     Mr. Lopez.

4             MR. LOPEZ:  Well, the document's up.  Says FDA

09:35:01   5     production 1019.

6             THE COURT:  You said it's not in the reliance list.

7             MR. LOPEZ:  Yeah, I didn't see it in the reliance

8     list.

9             THE COURT:  Where is it in the reliance list?

09:35:11  10             MR. NORTH:  Right here, Your Honor.  It starts from

11     1004 to 1370.  Beginning and end numbers.

12             MR. LOPEZ:  But it's not referenced.  He doesn't

13     cite to it in the report.

14             THE COURT:  Well, but it is clearly in the reliance

09:35:23  15     list.  Do you agree?

16             MR. LOPEZ:  Now that I know it's on list.  But --

17             THE COURT:  Okay.  But do you agree that this is a

18     quote from it?

19             MR. LOPEZ:  I don't know.

09:35:29  20             THE COURT:  Well, it seems to me it's your burden to

21     show that it is if it's quoted and they're representing to me

22     it's in the document.

23             MR. LOPEZ:  But, Your Honor, what I'm saying is that

24     the report does not refer to this -- the document on the

09:35:41  25     screen.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:35:42   1          MR. NORTH:  It refers to 18 and 20.  All right in

        2   there.

        3          MR. LOPEZ:  I know 19 is between 18 and 20, but --

        4          MR. NORTH:  And it's a direct quote from right

09:35:54   5   there.

        6          MR. LOPEZ:  Is this a typo?

        7          MR. NORTH:  Must be.

        8          THE COURT:  Well, you're avowing that this is a

        9   direct quote from the exhibit.

09:36:02  10          MR. NORTH:  I just saw it, Your Honor.

       11          THE COURT:  Okay.  On the basis of that avowal, I

       12   will overrule the objection.

       13       (Bench conference concludes.)

       14          THE COURT:  Thank you, ladies and gentlemen.

09:36:20  15          MR. LOPEZ:  For the record, I have 403 and 802

       16   objections to the same document.

       17          THE COURT:  I don't think there's been a motion to

       18   admit it into evidence yet.

       19          MR. LOPEZ:  Okay.

09:36:34  20   BY MR. NORTH:

       21   Q   Dr. Tillman, how is it that you came to have access to

       22   this internal FDA memorandum discussing the agency's review of

       23   Dear Doctor letters that Bard was intending to send?

       24   A   So this was acquired -- yesterday we talked about the

09:36:55  25   Freedom of Information Act, so this was acquired through a

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

09:36:59  1    Freedom of Information Act request that was submitted to FDA

2    about information relating to this particular 510(k).  And in

3    response to that FDA provided what is called the

4    administrative record, which documents the actions that FDA

09:37:14  5    had during the review of the 510(k) and afterwards.  And

6    that's how this document was received.

7              MR. NORTH:  Your Honor, at this time we tender

8    Exhibit 6075.

9              MR. O'CONNOR:  Objection, Your Honor.  403 and

09:37:27 10    hearsay 802.

11              THE COURT:  Okay.  What is your response on hearsay?

12              MR. NORTH:  Your Honor, 803(8), a public record.

13    The memorandum specifically discusses the office's activities

14    subsection (A)(i) of 803(8).

09:37:51 15              MR. LOPEZ:  It's hearsay within hearsay in this

16    document, Your Honor.

17              THE COURT:  Where is the hearsay within hearsay?

18              MR. LOPEZ:  I need to see the next page.  I think

19    they're quoting from some other people.

09:38:00 20              THE COURT:  Do you have a copy of this exhibit,

21    Mr. North?

22              MR. NORTH:  Yes, Your Honor.  Just a minute.

23              MR. LOPEZ:  Second paragraph, Your Honor, there's

24    hearsay.

09:38:27 25              THE COURT:  Second paragraph of what?

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:38:29   1           MR. LOPEZ:  On the first page.

           2           THE COURT:  Okay.  Hold on.

           3           What's your response, Mr. North?

           4           MR. NORTH:  Are we talking about the second page?

09:39:13   5           THE COURT:  Second paragraph, first page.

           6           MR. NORTH:  First page?

           7           THE COURT:  Yes.  Second sentence.

           8           MR. NORTH:  First of all, Your Honor, I don't think

           9   that particular line within there is being asserted for

09:39:34  10   the -- I mean, being offered for the truth of the matter

          11   asserted.  It is simply to document the discussions between

          12   the agency and Bard.  It does not quote and it also helps to

          13   explain the conduct and the decisions of the agency.

          14           THE COURT:  Well, I don't think we can go so fine as

09:40:01  15   to be giving instructions on sentences within documents.  So

          16   I think we should redact that sentence which is hearsay

          17   within hearsay.  And with that sentence redacted, I'll admit

          18   the document 6075.

          19           MR. NORTH:  Okay.  And I would note there's another

09:40:17  20   redaction that needs to be made in accordance with previous

          21   orders before we display --

          22           THE COURT:  The one already that's on the page, you

          23   mean?

          24           MR. NORTH:  What?

09:40:25  25           THE COURT:  You mean the one that's already on the

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:40:26  1    document?

2                  MR. NORTH:  Yeah.

3                  THE COURT:  So it's admitted subject to redacting

4    the second sentence in the second paragraph.

09:40:34  5                  MR. LOPEZ:  Excuse me, Your Honor.  He's saying he

6    wants further redactions on this.  I'd like him to at sidebar

7    tell us which ones --

8                  THE COURT:  No, we're not going to have another

9    sidebar.  This document is admitted.  You can talk about

09:40:46  10   redactions --

11                  Counsel.  Talk to me.

12                  -- we can talk about redactions if there's an issue

13   later.  We're moving forward with this exhibit.

14                  MR. NORTH:  Thank you, Your Honor.

09:28:06  15       (Exhibit 6075 admitted.)

16                  MR. NORTH:  Could we display just the first

17   paragraph to the jury?

18                  THE COURT:  If you could do that, yeah, without

19   the --

09:41:05  20                  MR. NORTH:  The first paragraph.

21                  THE COURT:  Yeah, that's fine.

22                  Yeah, that may be displayed.

23                  MR. NORTH:  Thank you, Your Honor.

24   BY MR. NORTH:

09:41:13  25   Q   Tell us, if you will, does this explain the purpose of or

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:41:17  1   what the subject of these discussions were?

2   A    Yes.  So what happened was Bard decided, based on the

3   information it had in the postmarket setting that it needed to

4   make some changes to the labeling to add some additional

09:41:31  5   information, cautionary information to the labeling.  And when

6   you make changes to your labeling, sometimes you need to

7   actually submit a new 510(k).

8           And, so, Bard had approached FDA, and that's what

9   this submission was, with these changes to the labeling and

09:41:47 10   the Dear Doctor letter to ask FDA if we make these changes to

11   the labeling, do we need to submit a new 510(k).

12          And if you don't need a new 510(k), then what you

13   submit is what is called an amendment to the 510(k).

14          So if you read this sentence, what FDA is telling

09:42:07 15   Bard, Mary Edwards, is that an amendment to the 510(k), which

16   basically describes the changes to the labeling, would be the

17   appropriate route in order for Bard to make the labeling

18   changes and to get FDA's input on the Dear Doctor letter.

19          MR. NORTH:  Your Honor, could we display the second

09:42:28 20   page of this?

21          THE COURT:  You may.

22          MR. NORTH:  Thank you.

23   BY MR. NORTH:

24   Q    Starting in the paragraph "I shared," does the --

09:42:39 25   Lisa Kennell from the FDA indicated what she had done as far

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:42:46  1   as analyzing what was going on?

2   A   Yes.  So there's a bunch of different offices at FDA.  So

3   the office I worked for and the office that Lisa Kennell

4   worked for is the Office of Device Evaluation.  And those are

09:42:59  5   the people responsible for doing the premarket reviews and

6   reviewing the 510(k)s.

7        There's another office, the Office of Surveillance

8   and Biometrics, which they call OSB, and there is a person

9   there, Jenny Liu, who I knew very well when I was there, who

09:43:18 10   was responsible for looking at postmarket safety data.

11        And so what happened was, when Lisa Kennell became

12   aware of this information as documented in this memo, she

13   reached out to Jenny Liu and asked her if she had comments on

14   the Dear Doctor letter language, and Jenny Liu then went and

09:43:34 15   searched the databases, and this would have been the MAUDE

16   database that we talked about yesterday, which is where the

17   adverse event data lives, and Jenny Liu said that she did a

18   search of the MAUDE database and that she identified some

19   questions about what they were seeing in the MAUDE database.

09:43:51 20   Q   And if we could look at the second sentence that says "we

21   agree that the bolded statement."  Did she make any comment

22   about the IFU as it presently read?

23   A   Yes.  So basically what they're -- what Lisa Kennell is

24   saying in this memo is that the bolded statement that Bard is

09:44:13 25   proposing, which apparently is regarding weighing the risk and

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:44:18  1    benefit of using the filter, that Lisa Kennell believed that

2    this should address the issue, but that Bard needed to

3    continue to monitor the adverse events.

4    Q    Does this memorandum indicate to you that the agency was

09:44:36  5    looking at information that Bard had provided regarding the

6    performance of the Recovery filter?

7    A    Yes.  I mean, this suggests that both the premarket office

8    and the postmarket safety office were aware of the adverse

9    event data regarding the Recovery filter.

09:44:54  10   Q    Does this information indicate to you that the FDA was

11   independently reviewing and tracking complications associated

12   with the Recovery filter?

13          MR. LOPEZ:  Your Honor, speculation.  I think that

14   lacks foundation.

09:45:09  15          THE COURT:  Overruled.

16          THE WITNESS:  So the fact that Jenny Liu went back

17   and did her own analysis of the adverse event data, as we saw

18   documented in that memo, suggests to me that FDA is not just

19   relying on Bard to tell them about the events, but it's

09:45:24  20   actually looking at the adverse event data themselves and

21   doing their own analysis.

22          MR. NORTH:  If we could look at Exhibit 5349,

23   please.

24   BY MR. NORTH:

09:45:38  25   Q    Do you recognize this document?

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:45:43  1   A    Yes.  This is a 510(k) submission for what I believe was

2   the G2 filter.  It's a little confusing because when they

3   originally submitted it they called it the Recovery, and they

4   eventually changed it to G2.

09:46:09  5   Q    And when was this submitted to the FDA?

6   A    In March of 2005.

7            MR. NORTH:  If we could look at Exhibit 5905.

8   BY MR. NORTH:

9   Q    Do you recognize this document?

09:46:24  10  A    Yes, I do.

11  Q    And what is this?

12  A    So this is an agenda of a meeting that Bard held with FDA

13  to discuss what it was observing in terms of the performance

14  of the Recovery filter and the steps that it was taking to

09:46:40  15  address what it was seeing.

16  Q    And did this particular meeting, is it your understanding

17  that it occurred soon after the initial submission of the

18  510(k) for the G2 filter?

19  A    Yes, it did.

09:46:53  20  Q    And in your experience, is it unusual for a manufacturer

21  such as Bard to have a sit-down meeting with the FDA

22  concerning an application?

23  A    Yeah.  It's very unusual to have this kind of meeting.

24  And, in particular, there were a significant number of FDA

09:47:11  25  people that attended this meeting, both from the premarket

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:47:14   1   review side, the people who review the 510(k)s, and from the

          2   postmarket safety side.  So this was somewhat of an unusual

          3   meeting.

          4   Q   What did the -- following this meeting, what did Bard do

09:47:27   5   with regard to its regulatory track with the G2 filter?

          6   A   So originally when Bard submitted the 510(k) for the G2,

          7   they said to FDA we've got a cleared device, the Recovery

          8   filter.  It's cleared for permanent indications and it's

          9   cleared for retrievability and we've made some modifications

09:47:49  10   to it to improve its fracture resistance and its migration

         11   resistance and we're going to submit what is called a

         12   Special 510(k).

         13        And a Special 510(k) is a kind of 510(k) that a

         14   company can submit when they make changes to their own device

09:48:08  15   that don't change the indications for use and that don't

         16   change its fundamental scientific technology.

         17        So the idea is that medical devices are constantly

         18   being modified.  Engineers are constantly tweaking devices,

         19   and when they do that, companies have to submit new 510(k)s.

09:48:25  20   And this Special 510(k) program is sort of an abbreviated

         21   510(k) that allows manufacturers to submit summary of data

         22   rather than the full data, if they only make a minor

         23   modification.

         24   Q   What sort of additional information did Bard submit to the

09:48:46  25   FDA when it submitted a regular 510(k) for the G2 filter?

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:48:51  1   A   So when Bard originally submitted this as a special and

2   FDA came back and said it can't be a special because we're

3   going to need some clinical data, and at that point in time

4   Bard sort of bifurcated the pathway.

09:49:09  5   Q   Did Bard submit a 510(k) for initial clearance of the

6   device as a permanent filter?

7   A   Yes.  So what happened then was FDA said to Bard you're

8   going to need clinical data if you want to indicate this new

9   G2 filter for retrievability.  But if you want to just

09:49:29  10  indicate it as a permanent filter, you don't need clinical

11  data.

12      So Bard then went down two paths.  They submitted --

13  they updated this 510(k) to become a traditional 510(k), they

14  provided all of the test reports, and then FDA will review

09:49:47  15  that 510(k) for permanent indications.  And then, meanwhile,

16  Bard and FDA worked on designing and developing a clinical

17  study that would be used to support another 510(k) later on

18  for the retrievable indications.  So we sort of split the G2

19  into a permanent pathway and a retrievable pathway.

09:50:08  20  Q   Did Bard submit as a part of the G2 application for

21  permanent use of the filter a DV and V protocols?

22  A   Yes.  Bard submitted basically the testing of the new

23  filter that was consistent with what FDA asked for in the

24  guidance document we talked about, and that testing called

09:50:30  25  design verification and validation testing, or DVT.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:50:38  1    Q    And did Bard submit animal studies?

        2    A    Yes.  Bard did submit an animal study as well.

        3    Q    And did Bard submit information concerning its rationale

        4    regarding fatigue testing?

09:50:51  5    A    Yes.  All of that information was provided in the

        6    traditional 510(k) for the permanent indication Recovery -- G2

        7    filter.

        8          MR. NORTH:  If we could bring up Exhibit 6064,

        9    please.

09:51:07 10    BY MR. NORTH:

       11    Q    Have you seen this document before?

       12    A    Yes, I have.

       13    Q    And can you tell us what that is?

       14    A    So this is a review memo.  So when FDA reviews a 510(k),

09:51:30 15    there's a lead reviewer assigned, and there might be other

       16    reviewers on the team as well.  And as I mentioned before,

       17    those reviewers document their findings in a review memo.

       18          So this basically says -- describes what the device

       19    is, what FDA looked at, what questions it asked, and then what

09:51:49 20    evidence was provided by the company to demonstrate

       21    substantial equivalence.

       22          So the lead reviewer on this particular 510(k) was

       23    Angela Smith, and this documents her findings in the review.

       24          MR. NORTH:  Your Honor, at this time we would tender

09:52:07 25    Exhibit 6064 for admission.

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

09:52:10  1          MR. LOPEZ:  No objection, Your Honor.

2          THE COURT:  Admitted.

3      (Exhibit 6064 admitted.)

4          MR. NORTH:  If we could turn to page 3, please.

09:52:46  5          Your Honor, could we display this in front of the

6  jury?

7          THE COURT:  Yes.

8  BY MR. NORTH:

9  Q    Had FDA asked some questions of Bard regarding its

09:52:58  10  submission for the G2?

11  A    Yes, they had.  And FDA calls those questions

12  deficiencies.  So when FDA has a question for a company in a

13  submission, they send them a deficiency letter.

14  Q    And does this particular memo from the FDA's deliberations

09:53:16  15  discuss their analysis of Bard's response to those

16  deficiencies?

17  A    Yes.  In this memo FDA documents the questions that they

18  asked.  So number 1 is the first question FDA asked, and then

19  in bold is FDA's analysis of the response from Bard.  And then

09:53:37  20  number 2 is the second question FDA asked, and in bold after

21  that is FDA's assessment of the response received from Bard.

22          MR. NORTH:  If we could look at page 5, please.

23  BY MR. NORTH:

24  Q    And under number 2 there, did the agency provide some

09:54:15  25  comments regarding the labeling for the G2?

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:54:17  1   A   Yes, they did.  So basically FDA noted that while the

2   indications for use for the G2 reflected the fact that it was

3   only indicated for permanent placement, that the name might

4   suggest that it could be removed.  And so FDA requested that

09:54:37  5   the device name be changed from Recovery to something else.

6   Q   Are these sorts of memos typical for the agency to prepare

7   when reviewing devices?

8   A   Absolutely.  They're actually required.  FDA has to

9   document the basis for any decision that it makes, and every

09:54:58 10   510(k) submission is accompanied by an administrative record

11   which includes all of the review memos and any telephone

12   conversations that FDA has with the sponsor during the review.

13        MR. NORTH:  If we could look at page 2, and just

14   bring out the paragraph that begins "Lisa Kennell."

09:55:37 15        And let's -- can we delete the -- or just show that

16   one paragraph.

17   BY MR. NORTH:

18   Q   Does this indicate that the FDA had reviewed Bard's bench

19   testing on the G2 to assess the changes that had been made to

09:55:56 20   the Recovery filter?

21   A   Yes.  It indicates here that FDA had reviewed the sponsor,

22   which is Bard's bench testing, and that they -- FDA believed

23   that that testing was adequate to support the modifications.

24        MR. NORTH:  If we could bring up 6061, please.

25

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

BY MR. NORTH:

Q   Dr. Tillman, can you tell us what 6061 is?

A   So this is a cover sheet that basically is put on top of the administrative record when FDA gets a submission, and this reflects the next round of questions.  So FDA received the 510(k), they asked Bard some questions, Bard answered those questions, and that's the memo you just saw.  And in reviewing that information, FDA had some additional questions.  In particular about whether the animal study was relevant.  And so FDA went back and asked Bard some additional questions, and then this document reflects FDA's review of Bard's answer to that second round of questions.

            MR. NORTH:  Your Honor, at this time, subject to some redactions that will be need to be made, we would tender Exhibit 6061.

            MR. LOPEZ:  No objection, Your Honor, but also no concessions about any redactions.

            THE COURT:  Well, it's admitted subject to the parties agreeing on redactions.

            MR. NORTH:  Thank you, Your Honor.

         (Exhibit 6061 admitted.)

            MR. NORTH:  If we could turn to page 4.

            Could we display, Your Honor?

            THE COURT:  Yes.  Assuming this isn't information that's going to be redacted?

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

09:57:56   1          MR. NORTH:  No.

          2          THE COURT:  You may.

          3          MR. NORTH:  And if we could look at the

          4   recommendation SE with limitations.

09:58:05   5   BY MR. NORTH:

          6   Q    What does that mean in FDA speak?

          7   A    So what that means.  So SE means substantially equivalent,

          8   so when you submit a 510(k) you -- if you're a company you

          9   want FDA to determine it's substantially equivalent.

09:58:23  10          Substantially equivalent with limitations is a

         11   finding FDA makes in a very small subset of 510(k)s.  And what

         12   that means is that FDA has determined that there is reasonable

         13   likelihood that the device could be used off label and that

         14   such use could cause harm.  So that is what SE with

09:58:44  15   limitations means.

         16          And the off label use that FDA was worried about was,

         17   remember, this G2 was only being cleared for permanent

         18   indications.  And even though the name was being changed from

         19   Recovery to G2, FDA wanted to make sure it was very clear that

09:59:00  20   the device was only being cleared for permanent indications.

         21   And so they found it SE with limitations and required Bard to

         22   put this statement that's on this slide that the safety and

         23   effectiveness of the G2 filter system for use as a retrievable

         24   or temporary filter have not been established on the labeling

09:59:22  25   at this time to reflect the fact that it was only being

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:59:26   1   cleared for permanent indications.

2          MR. NORTH:  Could we bring up Exhibit 5343, please.

3   BY MR. NORTH:

4   Q    Have you seen 5343 before Dr. Tillman?

09:59:42   5   A    Yes, I have.

6   Q    And what is this document?

7   A    So this is the actual letter that FDA sends to the

8   company.  This is the SE with limitations letter, which

9   basically gives Bard the authority to market the device.

09:59:56  10          MR. NORTH:  Your Honor, at this time we would tender

11   5343.

12          MR. LOPEZ:  No objection, Your Honor.

13          THE COURT:  Admitted.

14          (Exhibit 5343 admitted.)

10:00:03  15          MR. NORTH:  Could we display, Your Honor?

16          THE COURT:  You may.

17   BY MR. NORTH:

18   Q    Dr. Tillman, does this letter -- is this letter consistent

19   with the internal FDA memo we just looked at?

10:00:13  20   A    Yes, it is.  This is a standard sort of boilerplate letter

21   that also includes the SE with limitations language that we

22   discussed.

23   Q    After the FDA cleared the G2 filter, did Bard conduct a

24   clinical trial with regard to the G2?

10:00:31  25   A    Yes, they did.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:00:33   1    Q    And what was -- was that clinical trial called the EVEREST

2    study?

3    A    Yes, it was.

4    Q    And what was the purpose of the EVEREST study?

10:00:42   5    A    So the purpose of the EVEREST study was to collect

6    clinical data to support the retrievable indications for the

7    G2 filter.

8    Q    Now, in order to conduct a clinical trial for a use, like

9    retrievability here, that had yet to be cleared by the FDA,

10:01:02   10   did the -- Bard -- was it required to file some sort of

11   application with the agency?

12   A    Yes.  So there's a program called Investigational Devices

13   Exemption, or IDE, and that is a program that FDA administers

14   where if a company wants to do a clinical study of a medical

10:01:21   15   device that is not approved or cleared in the U.S., then they

16   need to submit an application to FDA to ensure that the study

17   is appropriately designed and that human subjects are

18   appropriately protected.

19            MR. NORTH:  If we could look at Exhibit 5324,

10:01:40   20   please.

21   BY MR. NORTH:

22   Q    Have you seen Exhibit 5324 before?

23   A    Yes, I have.

24   Q    And what is that?

10:01:50   25   A    So this is the IDE submission that Bard made to FDA

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:01:56  1    requesting approval to conduct the EVEREST study.

2             MR. NORTH:  Your Honor, at this time we would tender

3    5324.

4             MR. LOPEZ:  No objection, Your Honor.

10:02:04  5             THE COURT:  Admitted.

6         (Exhibit 5324 admitted.)

7             MR. NORTH:  If we could turn to page 42, please.

8             I'm sorry, page 57, the actual page 42.

9    BY MR. NORTH:

10:02:36 10    Q    What is a study end point?

11   A    So when you do a clinical study, clinical studies are done

12   to answer questions.  And so the purpose of this particular

13   clinical study was to answer questions regarding the

14   retrievability of the G2 filter and its safety and adverse

10:02:56 15   event profile.

16        So study end points are the things that the company's

17   going to measure when they do the study in order to answer

18   those questions.

19        So there were three questions basically that this

10:03:09 20   study was designed to look at:  Procedural success, so can I

21   get the filter in there and get it in place; clinical success,

22   that the filter can actually be retrieved after some amount of

23   time; and then adverse events, so what were the adverse events

24   that were observed during the study.

10:03:31 25   Q    What does it mean that Bard included adverse events as a

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

10:03:35  1   study end point?

2   A    So it meant that the study was not just looking at

3   retrievability, but it was also looking at the adverse events

4   that would occur throughout the 30 days post filter retrieval.

10:03:49  5        Almost all clinical studies have both end points

6   looking at effectiveness and end points looking at safety,

7   like this one.

8        MR. NORTH:  If we could bring up Exhibit 5322,

9   please.

10:04:01  10  BY MR. NORTH:

11  Q    Have you seen 5322 before?

12  A    Yes, I have.

13  Q    What is this document?

14  A    So this is the letter from FDA approving the IDE for the

10:04:15  15  EVEREST study.  So giving Bard approval to conduct the EVEREST

16  clinical trial.

17       MR. NORTH:  Your Honor, at this time we would tender

18  Exhibit 5322.

19       MR. LOPEZ:  No objection, Your Honor.

10:04:27  20       THE COURT:  Admitted.

21       (Exhibit 5322 admitted.)

22       MR. NORTH:  Could we display, Your Honor?

23       THE COURT:  Yes.

24  BY MR. NORTH:

10:04:39  25  Q    In this application did the FDA limit the EVEREST study to

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:04:43  1    a specific number of institutions and patients?

2    A    Absolutely.  Every IDE is -- approval is limited to a

3    certain number of institutions and subjects.  So FDA limited

4    the study to 15 institutions and 100 subjects.

10:05:03  5    Q    Did Bard have any obligations to communicate with the FDA

6    during the progress of the EVEREST study?

7    A    Yes.  As part of the IDE program, companies are required

8    to submit -- if they observe any unanticipated adverse events,

9    they have to submit that information to FDA.  To the best of

10:05:25  10   my knowledge, there were no unanticipated adverse events.  But

11   they also have to submit periodic or annual reports to the FDA

12   documenting the progress of the study.  And then when the

13   study's over, they have to submit a final report.

14   Q    After Bard completed the EVEREST study, what did Bard do

10:05:45  15   next with regard to the G2?

16   A    So Bard -- once the study was completed and the study

17   report was finalized, Bard submitted a traditional 510(k)

18   submission to FDA requesting approval to expand the

19   indications from permanent to permanent plus retrievability.

10:06:09  20        MR. NORTH:  If we could bring up Exhibit 5340,

21   please.

22   BY MR. NORTH:

23   Q    Do you recognize 5340?

24   A    Yes.  This is the 510(k) submission for the Recovery G2,

10:06:18  25   or just the G2 with the retrievable indications.

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

10:06:25   1          MR. NORTH:  Your Honor, at this time we would tender

        2   Exhibit 5340.

        3          MR. LOPEZ:  No objection, Your Honor.

        4          THE COURT:  Admitted.

10:06:38   5      (Exhibit 5340 admitted.)

        6          MR. NORTH:  If we could turn to page 406.

        7          Your Honor, could we display?

        8          THE COURT:  You may.

        9   BY MR. NORTH:

10:06:49  10   Q   During the course of the EVEREST study, were there some

       11   complications that had been observed in patients?

       12   A   Yes, there were.

       13   Q   Were those complications reported to the FDA in the 510(k)

       14   submission for the EVEREST study -- I mean, for the

10:07:06  15   retrievability indication.

       16   A   Yes, they were.  There was a very lengthy clinical study

       17   report that was included in the 510(k), I think it was almost

       18   a thousand pages, and it included both summary information

       19   about the adverse events, like the table on the slide, and it

10:07:25  20   also included detailed information about individual adverse

       21   events.

       22          MR. NORTH:  Let's look at page 339 of this exhibit,

       23   please.

       24   BY MR. NORTH:

10:07:42  25   Q   Did Bard actually submit to the FDA the complete final

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:07:47    1    report from the EVEREST study?

2    A    Yes, they did.

3            MR. NORTH:   If we could turn to page 408.

4            And if we could display that chart, please.

10:08:14    5    BY MR. NORTH:

6    Q    Did Bard provide the FDA with evidence or calculations of

7    the complication rates found in the EVEREST study?

8    A    Yes, they did.   That's actually documented in this table.

9    Q    And what did Bard report was the fracture rate in the

10:08:33   10    EVEREST study?

11   A    So the fracture rate was 1.2 percent.

12   Q    And what did Bard report was the migration rate in the

13   EVEREST study?

14   A    12.2 percent.

10:08:46   15   Q    And what did Bard represent was the penetration rate?

16   A    21.7 percent.

17   Q    Did Bard also compare those or provide those to the FDA

18   next to the SIR reported rates?

19   A    Yes, they did.

10:09:04   20   Q    What is your understanding of what the SIR reported rates

21   are?

22   A    So the Society for Interventional Radiology has published

23   a paper that describes the rates of adverse events observed in

24   the clinical literature and the ranges, and so this table

10:09:23   25   shows the ranges of adverse event rates in that SIR document.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:09:29  1    It was published in 2003, and it compares the rates that Bard

2    observed during the EVEREST study with the rates reported in

3    the SIR paper.

4    Q    Have you seen any evidence in your review of the FDA's

10:09:46  5    internal documents and the communications between the FDA and

6    Bard, any evidence that FDA was concerned about the

7    complications reported in the EVEREST study?

8              MR. LOPEZ:  Well, I think that calls for kind of an

9    opinion or a conclusion without a foundation.  Calls for her

10:10:05 10    speculation about somebody else's concerns.

11              THE COURT:  Overruled the way it's phrased.

12              THE WITNESS:  So I believe that if FDA had -- had

13    concerns about these complication rates that Bard was not

14    able to answer, they would not have cleared the G2 for the

10:10:22 15    retrievable indications.  So the fact that FDA eventually

16    cleared the 510(k) demonstrates to me that FDA did not have

17    any significant concerns about these adverse event rates.

18              MR. NORTH:  If we could bring up Exhibit 5339,

19    please.

10:10:42 20    BY MR. NORTH:

21    Q    Do you recognize 5339?

22    A    Yes.  This is the SE letter, the substantial equivalence

23    letter, where FDA is clearing the G2 for the retrievable

24    indications.

10:10:57 25              MR. NORTH:  Your Honor, at this time we would tender

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:10:59   1   Exhibit 5339.

2                MR. LOPEZ:  No objection, Your Honor.

3                THE COURT:  Admitted.

4           (Exhibit 5339 admitted.)

10:11:04   5                MR. NORTH:  Could we display?

6                THE COURT:  You may.

7   BY MR. NORTH:

8   Q   Did the agency -- looking at the first paragraph, did the

9   agency find substantial equivalence to permit Bard to begin

10:11:21  10   selling the G2 filter as a retrievable filter?

11   A   Yes.  It says that FDA has reviewed the 510(k) and

12   determined that the device is substantially equivalent to the

13   predicate device.

14   Q   Did Bard submit any other 510(k) submissions to the FDA

10:11:39  15   regarding the G2 filter?

16   A   Yes.  Bard submitted several additional 510(k)s for the G2

17   filter.

18                MR. NORTH:  If we could bring up Exhibit 5354,

19   please.

10:11:48  20   BY MR. NORTH:

21   Q   What is 5354?

22   A   So this is a Special 510(k) submitted by Bard to add an

23   additional delivery kit for the G2 filter.  So the original

24   510(k) was cleared with a certain kind of delivery kit, and

10:12:07  25   then in this Special 510(k) bard is asking FDA to clear a new

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:12:12  1    route of -- a new way of accessing the patient, basically, to

2    deliver the filter.  There were no changes to the filter, it's

3    just a new way to deliver it.

4    Q    And by you saying new way of -- to deliver it, do you mean

10:12:26  5    through the jugular vein as opposed to the femoral vein?

6    A    Exactly.  So this is for jugular subclavian access,

7    whereas the original 510(k) was cleared for femoral access.

8              MR. NORTH:  Your Honor, I would tender 5354.

9              MR. LOPEZ:  No objection, Your Honor.

10:12:46  10             THE COURT:  Admitted.

11             (Exhibit 5354 admitted.)

12             MR. NORTH:  Now, if we could look at 5353, please.

13   BY MR. NORTH:

14   Q    Could you identify what 5353 is.

10:13:04  15   A    Is this the correct exhibit?

16             This is --

17   Q    No.  Okay.  You are absolutely correct.

18   A    We've already seen this one.

19   Q    Did Bard eventually receive a clearance letter from the

10:13:35  20   FDA?

21   A    Yes, they did.

22   Q    Regarding the jugular approach G2?

23   A    Yes, FDA did clear that 510(k).

24             MR. NORTH:  If we could now look at 5361.

25

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:13:53  1    BY MR. NORTH:

2    Q   Is this another 510(k) submitted regarding the G2?

3    A   Yes.  This is another 510(k) for -- once again, for some

4    minor modifications to the delivery kit.

10:14:03  5    Q   And what sort of modifications were those?

6    A   They were modifications to the delivery kit.  They didn't

7    actually change the filter itself.  So just modifications

8    intended to make it easier to deliver the filter.

9            MR. NORTH:  Your Honor, at this time we would tender

10:14:23  10   Exhibit 5361.

11           MR. LOPEZ:  No objection, Your Honor.

12           THE COURT:  Admitted.

13           (Exhibit 5361 admitted.)

14           MR. NORTH:  And then if we can bring up 5362,

10:14:33  15   please.

16   BY MR. NORTH:

17   Q   Do you recognize 5362?

18   A   Yes.  But this is also for the wrong exhibit again.  This

19   is for the permanent -- the permanent G2 SE letter.  Because

10:15:03  20   you can see the limitation.

21   Q   When is this dated?

22   A   2006.

23   Q   Do you recall that the G2 was cleared for permanent use in

24   2005?

10:15:25  25   A   Yes, it was.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:15:26   1          Oh.  I see.  So I think I'm a little confused with

2     the 510(k) numbers on here.  It's hard to see on my screen.

3          So is this the same 510(k) number -- this is a 510(k)

4     for the permanent G2 filter modification.

10:15:48   5          So let me just clarify this, because I got a little

6     confused for a moment.

7          So if you recall, we had sort of bifurcated the G2.

8     We had clearance for 510(k) for permanent indications, and

9     meanwhile we're doing the clinical study for EVEREST.  And

10:16:03  10   then, in the meantime, Bard submitted two Special 510(k)s to

11    make modifications to those delivery systems for the permanent

12    indications.

13         And the last 510(k) we looked at and this one are

14    both for these minor modifications to the delivery systems

10:16:18  15   that were made while the EVEREST study was being conducted.

16         So I apologize, Richard, I was a little confused

17    there are for a minute.

18         So this is the substantial equivalence letter for the

19    second of those Special 510(k)s that were made to the G2

10:16:34  20   permanent while the EVEREST study was underway.

21         So I got a little confused there for a minute.

22         MR. NORTH:  Your Honor, at this time we would tender

23    5362 into evidence.

24         MR. LOPEZ:  No objection, Your Honor.

10:16:43  25         THE COURT:  Admitted.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

09:28:06  1          (Exhibit 5362 admitted.)

2          MR. NORTH:  And let's go back, if we could, to 5353.

3    I see I think I've seen the source of confusion.

4          THE WITNESS:  Yes.  I think that's what the issue

10:16:53  5    was too.

6    BY MR. NORTH:

7    Q   Now that you see 5353, do you recognize what this is?

8    A   Yes.  So this is -- so this is once again for the

9    permanent G2, this is the first Special 510(k) clearance

10:17:04 10   letter that the FDA issued where they've cleared the jugular

11   subclavian delivery route for the permanent G2.

12         MR. NORTH:  Your Honor, at this time we would tender

13   5353 into evidence.

14         MR. LOPEZ:  No objection, Your Honor.

10:17:19 15         THE COURT:  Admitted.

16         (Exhibit 5353 admitted.)

17         MR. NORTH:  Can we display, Your Honor?

18         THE COURT:  You may.

19         MR. NORTH:  And if we could look at the first

10:17:26 20   sentence of the letter.

21   BY MR. NORTH:

22   Q   Again, did the agency find the device under this

23   Special 510(k) and the introduction of the jugular system a

24   delivery system to be substantially equivalent?

10:17:44 25   A   Yes, they did.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:17:45  1   Q   And did that permit the company to begin selling the

2   jugular delivery system?

3   A   Yes, it did.

4         MR. NORTH:  If we could bring up 5373, please.

10:18:03  5   BY MR. NORTH:

6   Q   Do you recognize 5373?

7   A   So yes.  So this one is in 2008.  So this is the G2

8   Express.  So Bard has now obtained clearance for

9   retrievability.  So we've got the G2 now, it's cleared for

10:18:18  10   permanent and retrievability.  And now Bard is submitting a

11   series of Special 510(k) submissions to make modifications to

12   the delivery kit for the G2 with the retrievable indications.

13   And this is one of those special 510(k)s.

14   Q   And do you know what was different about the G2 Express?

10:18:37  15   A   So this is also some modifications to the delivery kit

16   with no changes actually made to the filter itself.

17         MR. NORTH:  Your Honor, at this time we would tender

18   5373.

19         MR. LOPEZ:  No objection, Your Honor.

10:18:51  20         THE COURT:  Admitted.

21      (Exhibit 5373 admitted.)

22         MR. NORTH:  If we could look at Exhibit 5368,

23   please.

24   BY MR. NORTH:

10:19:02  25   Q   And what is 5368?

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:19:10   1   A   So this is FDA clearance letter for the Special 510(k) we

         2   were just talking about.  When you look at it you'll see that

         3   that language, that limitation language is no longer there

         4   because FDA has approved -- has cleared the G2 for retrievable

10:19:27   5   indications at this point.

         6        MR. NORTH:  Your Honor, at this time we would tender

         7   5368.

         8        MR. LOPEZ:  No objection, Your Honor.

         9        THE COURT:  Admitted.

10:19:35  10      (Exhibit 5368 admitted.)

        11        MR. NORTH:  May we display?

        12        THE COURT:  Yes.

        13   BY MR. NORTH:

        14   Q   Again, looking at the first sentence, did the agency find

10:19:44  15   the application, the device to be substantially equivalent to

        16   the predicate device?

        17   A   Yes, they did.

        18        MR. NORTH:  If we could look 5379, please.

        19   BY MR. NORTH:

10:20:12  20   Q   And is this still another 510(k) regarding the G2 Express?

        21   A   Yes, it is.  This is another modification to the delivery

        22   system for the G2 Express.

        23        MR. NORTH:  Your Honor, at this time we would tender

        24   5379.

10:20:31  25        MR. LOPEZ:  No objection, Your Honor.

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:20:33  1          THE COURT:  Admitted.

2          (Exhibit 5379 admitted.)

3   BY MR. NORTH:

4   Q   Did the FDA again clear this particular 510(k)?

10:20:40  5   A   Yes, they did.

6          MR. NORTH:  If we could look at Exhibit 5376.

7   BY MR. NORTH:

8   Q   Is this the clearance letter for that application from the

9   FDA?

10:20:52 10   A   Yes, it is.

11          MR. NORTH:  Your Honor, at this time we would tender

12   5376.

13          MR. LOPEZ:  No objection, Your Honor.

14          THE COURT:  Admitted.

09:28:06 15          (Exhibit 5376 admitted.)

16          MR. NORTH:  Could we display, Your Honor?

17          THE COURT:  Yes.

18   BY MR. NORTH:

19   Q   And, again, did the agency find that this modification

10:21:09 20   made to the G2 Express was substantially equivalent to a

21   legally marketed predicate device?

22   A   Yes, they did.

23   Q   Now let's turn to the Eclipse filter, finally.

24          Prior to submitting any application to the FDA for

10:21:30 25   the Eclipse filter, did Bard discuss the filter with the

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:21:34  1   agency?

2   A   Yes, they did.

3   Q   Did Bard also discuss other filter projects it was

4   undertaking with the agency?

10:21:43  5   A   Yes, they did.  I reviewed minutes from a meeting between

6   Bard and FDA where Bard described its sort of plans for a

7   family of modifications to the filters that it was working on,

8   including the Eclipse filter.

9            MR. NORTH:  If we could look at Exhibit 5593.

10:22:17 10   BY MR. NORTH:

11   Q   Are these the minutes that you referenced?

12   A   Yes, they are.

13   Q   Did you see evidence that Bard had discussed with the FDA

14   the fact that it was attempting to develop caudal anchors?

10:22:42 15            MR. LOPEZ:  Your Honor, I'm going to object if

16   she's -- this is a document that's clearly hearsay.  I think

17   she's just going to regurgitate what's in the document.

18            THE COURT:  I don't think the question is about the

19   document.

10:22:50 20            Could you ask it again, though, to make clear you're

21   not asking her what's in the document.

22   BY MR. NORTH:

23   Q   Have you seen evidence that Bard communicated with the FDA

24   that it was developing caudal anchors --

10:23:01 25            MR. LOPEZ:  Same objection, Your Honor.  Evidence

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:23:03  1    could be -- calls for her legal conclusion to determine

2    whether or not this is considered evidence or not.  It's

3    hearsay.

4              THE COURT:  What's your response on hearsay?

10:23:20  5              MR. NORTH:  I'm not asking her for the truth of the

6    matter asserted, just whether she's seen evidence of

7    discussions on topics.

8              THE COURT:  Objection is overruled.

9              THE WITNESS:  So I have seen meeting minutes that

10:23:39  10   describe -- that describe communications between Bard and FDA

11   where Bard talked about its plans to develop a filter with

12   caudal anchors.

13   BY MR. NORTH:

14   Q   How would you characterize, as a regulatory specialist,

10:23:56  15   the interactions Bard had with the FDA during this time frame

16   2008, 2009 regarding the various filter projects it had

17   underway?

18   A   I would say that Bard was very interactive with FDA.

19   Usually what companies do is they develop a device, they

10:24:11  20   submit it FDA, and FDA reviews it.  It's not common for a

21   company to come in to FDA with its sort of long-range product

22   plans and describe the different products that it's

23   contemplating and to lay that whole product strategy out in

24   front of FDA.

10:24:30  25   Q   What type of 510(k) did Bard eventually submit after these

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:24:33  1    discussions to the FDA regarding the Eclipse filter?

2    A    So they submitted a Special 510(k).

3    Q    What type of testing data does one typically provide to

4    the FDA in a Special 510(k) application?

10:24:50  5    A    So the testing that underlies a Special 510(k) is the same

6    as a traditional 510(k).  The only difference is that instead

7    of actually providing the actual test reports, in a

8    Special 510(k) companies can provide just a summary of the

9    test reports.

10:25:07 10          MR. NORTH:  Let's look, if we could, at

11   Exhibit 5272.

12   BY MR. NORTH:

13   Q    Do you recognize this document?

14   A    Yes.  This is the Special 510(k) for the Eclipse filter

10:25:20 15   system.

16          MR. NORTH:  Your Honor, at this time we would tender

17   Exhibit 5272, please.

18          MR. LOPEZ:  No objection, Your Honor.

19          THE COURT:  Admitted.

09:28:06 20          (Exhibit 5272 admitted.)

21          MR. NORTH:  Could we display, Your Honor?

22          THE COURT:  Yes.

23          MR. NORTH:  If we could, let's turn to page 2,

24   please.

25

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:25:42   1   BY MR. NORTH:

2   Q    Does this generally indicate what sort of information Bard

3   was providing the FDA regarding the Eclipse filter?

4   A    Yes.  This is a sort of typical table of contents for a

10:25:56   5   Special 510(k) submission.

6   Q    Does it provide labeling?

7   A    Yes.  You can see that the appendices included the

8   labeling for the predicate device, which was the device that

9   was already marketed, the labeling for the subject device, and

10:26:14  10   then engineering drawings for the predicate device and the

11   subject device so that FDA could understand what the

12   differences are.  And then something called DFMEA, which is a

13   Design Failure Modes Effects Analysis.

14        MR. NORTH:  If we could go back to the whole page.

10:26:35  15   BY MR. NORTH:

16   Q    Under the tables, what sort of information was provided to

17   the FDA?

18   A    So what FDA's doing in this -- what Bard is doing in this

19   table is helping FDA to understand what are the changes

10:26:47  20   between the device that's legally marketed and the new

21   Eclipse.

22        So they've got a Table 1, where they're showing the

23   differences between the filter that was previously cleared and

24   the new filter.

10:26:58  25        They've got Table 2, where they're comparing the

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

10:27:03  1   delivery –– the femoral delivery system in the two devices.

2           Table 3, they're comparing the jugular delivery

3   systems.

4           And Table 4, they're doing an overall comparison.

10:27:11  5           And so –– and these are basically comparing what the

6   new device is to what the old device is.

7           And then in Table 7, they summarize the testing that

8   they did in order to verify and validate the Eclipse.

9           MR. NORTH:  If we could turn to page 35, please.

10:27:33  10  BY MR. NORTH:

11  Q   What did Bard provide the FDA in terms of a risk analysis?

12  A   So the fundamental basis of a Special 510(k) is I've got a

13  legally marketed device where there's a presumption that the

14  device –– that there has been demonstrated to be as safe and

10:27:50  15  effective as the predicate, and now I've made changes to it.

16  And so when you make changes, you need to do a risk analysis

17  and say I've made these changes, what new risks or changes to

18  risks could that modification cause.  And so that is

19  documented in this DFMEA.

10:28:09  20          So in this, FDA is looking at the fact that Bard has

21  said it's done a risk analysis, and then Bard's provided a

22  table that summarizes what the major new risks or changes in

23  risks are as a result of this modification.

24          And then Bard actually provided a copy of the actual

10:28:29  25  DFMEA in this submission, which is actually not required.

DIRECT EXAMINATION (CONT'D) – DR. DONNA-BEA TILLMAN

10:28:34  1      MR. NORTH:  If we could turn to page 118 of this

2      exhibit, please.

3      BY MR. NORTH:

4      Q   And is this what you were just referencing?

10:28:44  5      A   Yeah.  This is the actual DFMEA.

6      MR. NORTH:  Okay.  If we could turn to or bring up

7      Exhibit 5588.

8      BY MR. NORTH:

9      Q   And what is this exhibit, Dr. Tillman?

10:29:03 10      A   So this is the substantial equivalence letter where FDA is

11      clearing the Eclipse filter system.

12      MR. NORTH:  Your Honor, at this time we would tender

13      5588.

14      MR. LOPEZ:  No objection, Your Honor.

10:29:14 15      THE COURT:  Admitted.

16      (Exhibit 5588 admitted.)

17      MR. NORTH:  Can we display, Your Honor?

18      THE WITNESS:  You may.

19      BY MR. NORTH:

10:29:19 20      Q   Dr. Tillman, is this the letter that allowed Bard to begin

21      selling the Eclipse filter?

22      A   Yes, it is.

23      Q   And that was dated what?

24      A   December 15th, 2009.

10:29:33 25      THE COURT:  All right.  We're going to break at this

DIRECT EXAMINATION (CONT'D) - DR. DONNA-BEA TILLMAN

10:29:35  1   time.  We will resume, ladies and gentlemen, at 10:45 and

2   excuse the jury.

3         (The jury exited the courtroom at 10:29.)

4         MR. LOPEZ:  Your Honor, I didn't want to call you

10:30:06  5   while the jury -- there's going to be an issue I'm going to

6   need to talk about before I start my cross.  Should we wait

7   until we resume and then do a sidebar?  Do you want us to

8   come back early and --

9         THE COURT:  How much longer do you have, Mr. North?

10:30:17 10        MR. NORTH:  Probably about 20 to 30 minutes,

11  Your Honor.

12        MR. LOPEZ:  I can do it at sidebar, Your Honor,

13  before I start my cross.

14        THE COURT:  Let's just do that.  All right.

15        (Recess taken from 10:30 to 10:49.  Proceedings resumed

16  in open court with the jury present.)

17        THE COURT:  Thank you.  Please be seated.

18        Sorry for the delay, ladies and gentlemen.  We had to

19  turn off the sound system and turn it back on to get rid of

10:50:45 20  that beeping.

21        You may proceed, Mr. North.

22        MR. NORTH:  Thank you, Your Honor.

23        If we could display Exhibit 5588 again.

24        THE COURT:  You may.

25

DIRECT EXAMINATION – DR. DONNA-BEA TILLMAN

10:50:55  1    BY MR. NORTH:

2    Q   Dr. Tillman, before the break I think I was confused as to

3    what this letter is.  Is this the actual clearance letter for

4    the Eclipse?

10:51:05  5    A   No.  Actually, this is a request for additional

6    information.

7    Q   If we could look at the second paragraph there.  What did

8    the agency indicate to Bard regarding its Eclipse 510(k)

9    submission?

10:51:25  10   A   So in the 510(k) submission, Bard had done its failure

11   mode analysis and determined that a certain subset of testing

12   was necessary:  Corrosion resistance, cyclic fatigue, and arm

13   fatigue testing.  However -- and Bard had determined that that

14   was the testing that it needed to.

10:51:45  15        FDA came back and said, well, you haven't done radial

16   force testing, migration/clot trapping testing or tensile

17   strength testing, and that this was information because FDA

18   believed that electropolishing could affect the strength of

19   the legs.

10:52:03  20        So here is FDA sending this letter to Bard asking

21   them to provide the results of additional testing.

22        MR. NORTH:  If we could bring up Exhibit 5486,

23   please.

24   BY MR. NORTH:

10:52:14  25   Q   Did Bard actually provide a supplemental response to the

DIRECT EXAMINATION - DR. DONNA-BEA TILLMAN

10:52:18  1    FDA?

2    A    Yes, they did.

3    Q    And was that in response to the FDA's request for various

4    additional information?

10:52:26  5    A    Yes, it was.

6         MR. NORTH:  Your Honor, at this time we would offer

7    5486.

8         MR. LOPEZ:  No objection, Your Honor.

9         THE COURT:  Admitted.

09:25:03  10       (Exhibit 5486 admitted.)

11        MR. NORTH:  Could we display, Your Honor?

12        THE COURT:  Yes.

13        MR. NORTH:  If we could turn to page 7, please.

14   BY MR. NORTH:

10:52:50  15   Q    If we could look at the first paragraph.

16        How did Bard respond to FDA's inquiry concerning

17   tests that had not been submitted initially?

18   A    So Bard explained that when they made the changes, they

19   performed what's called this design failure modes and effects

10:53:08  20   analysis to understand what the impact of those changes might

21   have been on the risks presented by the device and on the

22   failure modes.  And as a result of that, they determined they

23   needed to do a certain kind of testing.  And they say here

24   that although this analysis did not identify radial force

10:53:28  25   testing, migration/clot trapping or filter tensile strength

DIRECT EXAMINATION - DR. DONNA-BEA TILLMAN

10:53:33  1    testing, that a different analysis they did, which is a

2    process failure modes and effects analysis, which is more

3    about sort of the manufacturing process, did require them to

4    do that testing, and so they had actually done it.

10:53:46  5         And so in this response they're basically providing a

6    summary of the additional testing that they'd done consistent

7    with what FDA was asking for.

8    Q    So had Bard, in fact, done all three tests the FDA had

9    requested information about?

10:54:05 10    A    Yes.  They had done the testing, they simply had not

11    provided it in the original 510(k) submission.

12    Q    If we could look at the bottom of page 7.

13         Did Bard then describe for the FDA the radial force

14    testing that had been previously performed on the Eclipse?

10:54:24 15    A    Yes.  So in this response they basically summarized the

16    testing that they did for each of those areas, including, for

17    example, here, the radial force testing.

18         MR. NORTH:  If we could turn to page 8, please.

19    BY MR. NORTH:

10:54:42 20    Q    Did Bard describe for the FDA the migration/clot trapping

21    testing that had been performed on the Eclipse filter?

22    A    Yes, they did.  They basically described the fact they did

23    migration/clot trapping and that the result of that testing

24    showed that the performance was no different from that of the

10:55:01 25    predicate device.

DIRECT EXAMINATION – DR. DONNA-BEA TILLMAN

10:55:06   1           MR. NORTH:  And then if we could turn to page 9.

2      BY MR. NORTH:

3      Q   Did Bard describe for the FDA and provide the agency with

4      data on the filter tensile strength testing it had already

10:55:17   5      performed on the FDA -- I mean on the Eclipse?

6      A   Yes.  So Bard basically described it had conducted this

7      testing and that the results of this testing showed there was

8      no difference between the performance of this device and the

9      predicate device.

10:55:34  10      Q   After Bard submitted these responses to the FDA's

11     questions, did the FDA ask for any additional testing

12     regarding the Eclipse filter?

13     A   No.  FDA determined that this information was sufficient

14     since they didn't ask for any additional information.

10:55:49  15           MR. NORTH:  If we could bring up Exhibit 5273,

16     please.

17     BY MR. NORTH:

18     Q   Now, could you tell us what 5273 is?

19     A   Yes.  So now this is the actual substantial equivalence

10:56:03  20     letter for the Eclipse filter.

21           MR. NORTH:  Your Honor, we would tender for

22     admission 5273.

23           MR. LOPEZ:  I'm sorry, Your Honor.  No objection.

24           THE COURT:  Admitted.

10:56:14  25        (Exhibit 5273 admitted.)

DIRECT EXAMINATION - DR. DONNA-BEA TILLMAN

10:56:15  1        MR. NORTH:  Could we display, Your Honor?

       2        THE COURT:  Yes.

       3   BY MR. NORTH:

       4   Q    So now that the record's clear, on what date did the FDA

10:56:21  5   clear the Eclipse filter?

       6   A    January 14th, 2010.

       7   Q    And what was the predicate device, again, for the Eclipse?

       8   A    It was the G2 filter.

       9   Q    And did the agency, in that first sentence, find the

10:56:40 10   Eclipse filter to be substantially equivalent to the G2?

       11   A    Yes, they did.

       12   Q    Now, did Bard eventually submit an additional 510(k)

       13   submission to the FDA regarding the Eclipse device?

       14   A    Yes, they did.

10:57:07 15   Q    What was the second 510(k) for?

       16   A    So Bard determined that it wanted to provide a patient

       17   brochure to provide information about the Eclipse filter and

       18   they decided that although it may not have been required to

       19   submit a Special 510(k) to FDA, that they wanted to get FDA's

10:57:28 20   feedback on the patient brochure and so they submitted a

       21   Special 510(k) for that.

       22        MR. NORTH:  Let's look at Exhibit 5586 if we could,

       23   please.

       24   BY MR. NORTH:

10:57:40 25   Q    What is this document, Dr. Tillman?

DIRECT EXAMINATION – DR. DONNA-BEA TILLMAN

10:57:45  1    A    So I –– given the date, I believe this is the

2    Special 510(k) for the –– to add the patient brochure to the

3    Eclipse filter.

4              MR. NORTH:  Your Honor, at this time we would tender

10:57:58  5    5586.

6              MR. LOPEZ:  No objection, Your Honor.

7              THE COURT:  Admitted.

8          (Exhibit 5586 admitted.)

9              MR. NORTH:  Then if we can bring up 5589, please.

10:58:06 10    BY MR. NORTH:

11    Q    What is 5589?

12    A    So this is another substantial equivalence letter from FDA

13    saying that the Eclipse filter with the patient brochure was

14    found substantially equivalent.

10:58:26 15              MR. NORTH:  Your Honor, at this time we would tender

16    5589.

17              THE COURT:  Any objection?

18              MR. LOPEZ:  No objection, Your Honor.

19              THE COURT:  Admitted.

09:25:03 20          (Exhibit 5589 admitted.)

21              MR. NORTH:  Could we display, Your Honor?

22              THE COURT:  Yes.

23    BY MR. NORTH:

24    Q    And what was the date of the clearance of the filter with

10:58:43 25    the patient brochure Bard had prepared?

DIRECT EXAMINATION – DR. DONNA-BEA TILLMAN

10:58:46  1   A   June 25th, 2010.

2   Q   Is this the second time that the agency has cleared as

3   substantially equivalent the Eclipse filter?

4   A   Yes, it is.

10:59:07  5   Q   You told us, I believe yesterday, during the course of

6   your consulting work you assist medical device manufacturers

7   in the preparation of labeling for devices?

8   A   Yes, I do.

9   Q   During your years at the FDA, did you yourself actively

10:59:21  10  review labeling for devices?

11  A   I spent quite a bit of time reviewing labeling.  Yes.

12  Q   And based on the information you have reviewed in this

13  case, how would you characterize the information that Bard

14  provided to doctors in the Eclipse instructions for use?

10:59:40  15  A   So I believe the labeling was consistent with FDA's

16  guidance document.

17      I believe that it was consistent with what FDA

18  expected for IVC filters, based on the communications that FDA

19  had regarding the changes it actually asked FDA to make on the

11:00:00  20  patient brochure.

21      I think it is consistent with the competitor labeling

22  that I have reviewed.  So I have reviewed other companies' IVC

23  filter labeling, and it's my opinion this labeling is

24  consistent with that as well.

11:00:15  25  Q   Over the years in your review -- well, in your review of

DIRECT EXAMINATION – DR. DONNA-BEA TILLMAN

11:00:18  1   the regulatory history for Bard's family of retrievable

2   filters, did you see evidence on occasion that the FDA

3   requested Bard to make changes to the instructions for use?

4   A   Yes.  I believe there were quite a few occasions where FDA

11:00:37  5   asked Bard to make changes to its labeling.

6   Q   Did you see any evidence that the FDA asked Bard to

7   include complication rates as compared to other manufacturers'

8   filters in the --

9          MR. LOPEZ:  Objection, Your Honor.  Sorry.  403,

11:00:52  10   foundation, 602.

11          THE COURT:  Overruled.

12          THE WITNESS:  So I did not see any evidence in the

13   documents that I reviewed that FDA requested that Bard

14   include any kind of comparative rate information in their

11:01:09  15   labeling.

16   BY MR. NORTH:

17   Q   Do you have an opinion, Dr. Tillman, as to whether it

18   would have been appropriate for Bard to include comparative

19   complication rate data in its IFU?

11:01:23  20   A   So in my experience, the only time that information is

21   appropriate is if you -- if the company has done a clinical

22   study, and this is often done for PMA devices where you study

23   a company's device and a competitor device, and then you

24   report the adverse event data that was seen for both devices

11:01:41  25   in your clinical study summary in your labeling.  But that's

DIRECT EXAMINATION - DR. DONNA-BEA TILLMAN

11:01:46  1  only for PMA devices usually, and that's only for devices

2  where you've actually conducted a clinical study where you

3  know what the rates are.

4       I think if you're talking about including comparative

11:01:56  5  rate information based on the MAUDE database, I don't believe

6  it would be appropriate to include that information in the

7  labeling because I don't believe that the MAUDE database

8  provides data of sufficient quality to be able to draw any

9  conclusions about comparative rates.

11:02:13 10       MR. NORTH:  If we could bring up Exhibit 7795,

11  please.

12  BY MR. NORTH:

13  Q   Do you recognize Exhibit 7795?

14  A   Yes.  This is a screen shot of the FDA -- the portal --

11:02:34 15  electronic portal into FDA's MAUDE database.

16       MR. NORTH:  Your Honor, at this time we would tender

17  Exhibit 7795.

18       MR. LOPEZ:  No objection, Your Honor.

19       THE COURT:  Admitted.

11:02:52 20     (Exhibit 7795 admitted.)

21  BY MR. NORTH:

22  Q   So what does the FDA say about the limitations with regard

23  to --

24       MR. NORTH:  I'm sorry.  Could we display,

11:03:06 25  Your Honor?

DIRECT EXAMINATION - DR. DONNA-BEA TILLMAN

11:03:08   1          THE COURT:  Yes, you may.

        2    BY MR. NORTH:

        3    Q    What does the FDA say generally about the limitations?

        4    A    So there's a number of bulleted limitations listed below

11:03:19   5    the search engine, and some of the limitations are about the

        6    fact that it's limited to adverse events reported within the

        7    past ten years.

        8          I think more importantly for this conversation we're

        9    having here is that MDR data alone cannot be used to establish

11:03:35  10    rates of events, evaluate a change in rates of events over

       11    time, or compare event rates between devices.

       12    Q    Based upon those limitations, do you believe it's

       13    appropriate to use the MAUDE database to compare -- provide

       14    data to doctors regarding comparative rates?

11:03:59  15    A    No, I don't believe it would be appropriate to use the

       16    MAUDE data in that way.

       17    Q    Generally speaking, are manufacturers permitted to include

       18    flawed or incomplete data in its warnings?

       19    A    No.  The information that's in manufactures' labeling

11:04:25  20    needs to be based on valid scientific evidence, and I would

       21    not consider MAUDE data to constitute valid scientific

       22    evidence for the purpose of establishing adverse event

       23    profiles.

       24    Q    Dr. Tillman, as a part of your work in this case, have you

11:04:39  25    looked at the instructions for use for some other inferior

DIRECT EXAMINATION - DR. DONNA-BEA TILLMAN

11:04:45  1    vena cava filters manufactured by different companies?

2    A   Yes, I have.

3         MR. NORTH:  If we could bring up Exhibit 7787,

4    please.

11:04:57  5    BY MR. NORTH:

6    Q   Do you recognize --

7         MR. NORTH:  Go to the second page, if we could.

8    BY MR. NORTH:

9    Q   Do you recognize this particular document?

11:05:03 10    A   Yes.  This is the instructions for use for the Cordis

11    OptEase IVC filter.

12         MR. NORTH:  Your Honor, at this time we would tender

13    Exhibit 7787.

14         MR. LOPEZ:  Objection, Your Honor.  Relevance and

11:05:17 15    hearsay.

16         THE COURT:  Overruled on relevance.

17         What's your response on hearsay?

18         MR. NORTH:  Your Honor, it's not being offered for

19    the truth of the matter asserted as to any statement within

11:05:27 20    there.

21         MR. LOPEZ:  I'll add 403 to my objection,

22    Your Honor.

23         THE COURT:  All right.  I'm going to overrule 403.

24         I will admit this exhibit, but with the instruction

11:05:38 25    to the jury similar to one I gave before, which is

DIRECT EXAMINATION – DR. DONNA-BEA TILLMAN

11:05:40   1   Exhibit 7787 is not being admitted to the show the truth of

2   what it is saying.  The facts stated in the document are not

3   being offered as true to you by this document.  Rather, it's

4   simply to show what is in the document for purposes of the

11:05:55   5   witness's testimony.

6           And with that instruction I'll admit 7787.

7       (Exhibit 7787 admitted.)

8           MR. NORTH:  May we display the document?

9           THE COURT:  Yeah.

11:06:06  10           MR. NORTH:  Go to the first page so the jury can see

11   that, Mr. Russell.

12           Then if we could turn to page 8, please.

13   BY MR. NORTH:

14   Q   What does this document generally show on page 8?

11:06:22  15   A   So there's information in here about potential

16   complications that may be experienced with the device.  That's

17   in section 6.

18           And then in section 7 it's a summary of the clinical

19   study that was conducted to support the OptEase filter.

11:06:38  20   Q   And does that discussion continue over onto pages 9 and 10

21   about the clinical experience with the OptEase filter?

22   A   Yes, it does.

23   Q   At any point in this IFU, in those sections or in any

24   other section, is there any mention comparing complication

11:07:00  25   rates between the Cordis filter and other competitive filters?

DIRECT EXAMINATION - DR. DONNA-BEA TILLMAN

11:07:05   1    A    Not to the best of my knowledge, no.

2              MR. NORTH:  Okay, if we could look at Exhibit 7771.

3    BY MR. NORTH:

4    Q    Could you identify for us what 7771 is.

11:07:23   5    A    So this is the instructions for use for another vena cava

6    filter.  This is the B Braun VenaTech.

7    Q    And did you review this particular brochure or IFU as part

8    of your work in this case?

9    A    Yes, I did.

11:07:42  10              MR. NORTH:  Your Honor, at this time, subject to

11   same limitation, we would offer 7771.

12              MR. LOPEZ:  Same objections, Your Honor, as I made

13   to the prior exhibit.

14              THE COURT:  All right.  Those objections are

11:07:50  15   overruled.

16              But 7771 comes in with the same instructions, that

17   you're not to consider it for the truth of what is asserted in

18   the document itself.

19         (Exhibit 7771 admitted.)

11:08:03  20              MR. NORTH:  Could we display, Your Honor?

21              THE COURT:  You may.

22   BY MR. NORTH:

23   Q    So this is the instructions for use for the Braun VenaTech

24   IVC filter?

11:08:14  25   A    Yes, it is.

DIRECT EXAMINATION – DR. DONNA-BEA TILLMAN

11:08:15  1        MR. NORTH:  If we could turn to page 5, under

2    Potential Adverse Effects.

3    BY MR. NORTH:

4    Q    In that section or any other section, did you see any

11:08:33  5    mention of comparative rate -- complication rate information?

6    A    No, I did not.

7    Q    In your experience, Dr. Tillman, have you ever seen a

8    manufacturer of any medical device include comparative rate

9    information based on MAUDE data?

11:08:52 10    A    No, I have never seen medical device labeling include that

11   information.

12   Q    Dr. Tillman, during the course of your work in this case,

13   have you seen any labeling or promotional materials by Bard

14   that, in your opinion, inappropriately reflected risk

11:09:16 15   information?

16   A    No.  None of the Bard labeling materials that I reviewed,

17   in my opinion, inappropriately represent the risk information.

18   Q    Have you seen any evidence during your work in this case

19   that in submitting 510(k) applications to the FDA and in

11:09:36 20   responding to the FDA's questions, did you see any occasion

21   where Bard did not appropriately disclose information to the

22   agency as a part of the 510(k) process?

23   A    To the best of my knowledge, Bard provided complete and

24   appropriate responses to FDA's questions and the information

11:09:57 25   in the 510(k) was consistent with FDA's guidance documents and

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:10:01   1   what I would have expected to see, in my professional opinion,

2   in an IVC filter 510(k) from that period of time.

3   Q   Does the evidence you have reviewed in this case lead you

4   to any opinion as to whether the FDA conducted a risk/benefit

11:10:14   5   analysis regarding IVC filters in general?

6   A   I believe that in reviewing the 510(k)s and in clearing

7   the Bard IVC filters that FDA was making a determination that

8   the benefits of the device outweigh the risks because I think

9   that is a fundamental part of making a substantial equivalence

11:10:35  10   determination.

11   Q   Dr. Tillman, do you hold all of the opinions you have

12   expressed yesterday and today to a reasonable degree of

13   certainty as an expert in the field of regulatory affairs?

14   A   I do.

11:10:48  15           MR. NORTH:  Thank you.  That's all the questions I

16   have.

17           THE COURT:  All right.  Thank you.

18           Mr. Lopez.

19           MR. LOPEZ:  May I proceed, Your Honor?

11:11:11  20           THE COURT:  You may.

21           MR. LOPEZ:  Thank you, Your Honor.

22               C R O S S - E X A M I N A T I O N

23   BY MR. LOPEZ:

24   Q   Dr. Tillman, hi.  Good morning.

11:11:14  25   A   Good morning.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:11:15  1    Q   Now, I'm harking back to yesterday and we were talking

2    about substantial equivalence and how the risk/benefit

3    sometimes doesn't have to be the same between a predicate

4    device and a device that's going through 510(k).  Do you

11:11:32  5    remember that discussion?  I think you used an exhibit to talk

6    about that.  Recall that?

7    A   Yes, I do.

8    Q   Now, have you seen any evidence in this case or any

9    statement by Bard or FDA that the design changes of Bard

11:11:47  10   filters that were going to become retrievable filters

11   increased the risk of complications over permanent filters?

12   A   So are you talking about a particular filter or just --

13   Q   Any evidence where Bard said to the FDA, by the way, we're

14   making this change to the design of our filter but it may not

11:12:11  15   be quite as safe as our predicate device, the Simon Nitinol

16   filter.  Did you see anything like that?

17   A   So, no, I didn't see any evidence that the retrievable

18   filters were less safe and I didn't see any evidence that Bard

19   made that statement to the FDA.

11:12:27  20   Q   Did FDA ever authorize or approve any Bard filters that

21   received a retrievable indication that they did not have to be

22   at least as safe and effective as the Simon Nitinol filter?

23   A   So when FDA cleared the 510(k)s for the Bard filters, they

24   were finding that a particular device was substantially

11:12:54  25   equivalent to whatever the predicate.  So the Simon Nitinol

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:12:58  1   filter was the predicate for the original Recovery, so the FDA

       2   was determining that it was as safe and effective as

       3   Simon Nitinol.

       4   Q   I guess maybe a different way to ask it was did FDA tell

11:13:12  5   Bard in any document that the risk/benefit profile of its

       6   retrievable filters could be different than the Simon Nitinol

       7   filter?  Yes or no?

       8   A   So there wouldn't have been an opportunity for FDA to make

       9   that kind of a statement to Bard.

11:13:30  10  Q   Did Bard ever tell doctors that the risk/benefit profile

       11  of our retrievable devices is going to be different than our

       12  permanent device, the Simon Nitinol filter?

       13  A   So I've not reviewed all of Bard's communications with

       14  doctors.  But I don't believe that Bard ever made that

11:13:48  15  statement to doctors.  But I'm not sure what the basis of that

       16  statement would be.

       17  Q   Is it fair to say that doctors to whom Bard filters were

       18  being sold would have had the expectation that those filters

       19  would have been at least as safe and effective as the

11:14:06  20  Simon Nitinol filter?

       21  A   I don't believe that the doctors necessarily had any

       22  expectations about whether the Eclipse filter was as safe and

       23  effective as the Simon Nitinol filter.

       24  Q   Doctor, do you remember having your deposition taken on

11:14:22  25  August 4 of 2017?

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:14:26  1    A   I certainly do remember that, yes.

2              MR. LOPEZ:  Could you show Dr. Tillman page 335 of

3    that deposition, Gay.

4              MS. MENNUTI:  Apologize.  What deposition?

11:14:43  5              MR. LOPEZ:  I'm sorry.  It was the August 4, 2017,

6    deposition.  Page 335.

7    BY MR. LOPEZ:

8    Q   See line 3, Dr. Tillman, where you state that, "Yes, I

9    think it's fair for doctors to expect that the Recovery filter

11:15:06 10   be as safe and effective as the Simon Nitinol filter."

11   A   And I think that's what I just said.  The Simon Nitinol

12   filter was the predicate device for the Recovery, so there is

13   an expectation it be as safe and effective as the

14   Simon Nitinol filter.  I think for subsequent Bard filters,

11:15:23 15   I'm not sure that that is an appropriate statement to make.

16   Q   Now, the subsequent Bard filters that had permanent -- all

17   had permanent indications as well as eventually got

18   retrievable indications.  True?

19   A   So certainly the G2 and the Eclipse filters have both

11:15:41 20   permanent and retrievable indications, yes.

21   Q   Did FDA ever tell Bard that they did not -- as a

22   retrievable filter that those filters did not need to perform

23   as safely and effectively as the Simon Nitinol filter?

24   A   So, once again, that's not a communication --

11:16:00 25   Q   I know.  I'm just asking if that happened, that's all.

CROSS-EXAMINATION – DR. DONNA-BEA TILLMAN

11:16:02   1   A   Well, no, but there wouldn't have been any reason for FDA

2   to do that.

3   Q   Did Bard tell doctors that if you're going to use any of

4   our filters that have the option to be retrieved as a

11:16:15   5   permanent filter, that that optional filter's not going to be

6   as safe and effective as a Simon Nitinol filter as a permanent

7   device?

8   A   I'm not sure I understand your question.

9   Q   Well, let me ask you this:  Did Bard tell anybody that

11:16:30  10   their safety profile of any their optionally retrievable

11   filters was going to be different than the Simon Nitinol

12   filter?

13   A   As far as I know, Bard did not tell anybody that.  But I'm

14   not aware of any evidence demonstrating that there are

11:16:44  15   significant differences in the performance.

16   Q   Now, at the very end, Mr. North asked you some questions

17   about risk/benefit.  You haven't done your own risk/benefit

18   analysis of any Bard filter, have you?

19   A   No, I have not.

11:16:58  20   Q   And you're not giving an opinion today on what a

21   reasonable doctor could or should expect Bard to share with

22   them about the risk and benefits of their filters.  True?

23   A   That's right.  I can't make any opinions about what a

24   reasonable doctor would expect.

11:17:12  25   Q   And through all of the materials you went through

CROSS-EXAMINATION – DR. DONNA-BEA TILLMAN

11:17:15  1    regarding FDA letters back and forth, companies like Bard

2    cannot suggest -- I'm sorry.  Bard cannot suggest that any of

3    those devices have been approved by FDA as being safe and

4    effective.  True?

11:17:31  5    A    That is correct.  A 510(k) is only cleared and it's only

6    been shown to be as safe and effective as the predicate

7    device.

8    Q    And FDA regulations require that all information contained

9    in a 510(k) application must be truthful, accurate, and that

11:17:46 10    no material fact has been omitted.  True?

11    A    That is correct.

12    Q    In other words, if -- you have to provide both favorable

13    and unfavorable testing that might affect the substantial

14    equivalence profile of a predicate -- I'm sorry, a 510(k)

11:18:04 15    device.  True?

16    A    So you have to provide all material information, whether

17    it's favorable or unfavorable.

18    Q    Now, you did not -- I think you testified at your

19    deposition that your job when you were hired by Bard's lawyers

11:18:17 20    was not to audit the documents in the depositions to see if

21    there was anything that Bard may not have provided to FDA.

22    True?

23    A    Yes.  So when I made that statement, I was differentiating

24    between my role as an expert versus when I'm hired by

11:18:35 25    companies to do mock audits or investigations.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:18:39  1   Q   Now, you also testified you were given access to a lot of

2   documents and depositions; right?

3   A   Yes, I was.

4   Q   First time, you remember, I took your deposition, 2014,

11:18:49  5   all of the materials you received at that time was provided to

6   you by the lawyers; right?

7   A   So all of the material that -- Bard material that I

8   received even to now has been provided to me by the attorneys.

9   I don't have the access to Bard materials other than what's

11:19:07  10   publicly available on my own.

11   Q   Now, you know who Dr. Asch is; right?

12   A   I know who Dr. Asch is, yes.

13   Q   I think you told us at your last deposition that you asked

14   the lawyers for Bard whether or not there was anything in

11:19:19  15   Dr. Asch's deposition of 2016 that you should read for

16   purposes of making your -- rendering an opinion, and they told

17   you you didn't need to see Dr. Asch's deposition.  True?

18   A   I think you're mischaracterizing what I said.

19   Q   Did you say that?  Did you say that -- did the lawyers

11:19:37  20   tell you you did not need to read Dr. Asch's deposition?

21   A   No.  What happened -- as I explained to you before, there

22   are a lot of depositions, and I went through the list of

23   depositions with the attorneys and I had already read one of

24   Dr. Asch's depositions and I asked, is there anything new

11:19:55  25   relevant to FDA regulations in this new deposition that I need

CROSS-EXAMINATION – DR. DONNA-BEA TILLMAN

11:19:59  1   to look at, and they told me they thought that there wasn't

2   anything significantly different.

3                MR. LOPEZ:  Can I have page 62, Gay, please, of

4   Dr. Tillman's 2017 deposition.

11:20:17  5                Line 9.

6   BY MR. LOPEZ:

7   Q   "And the same would hold true for Dr. Murray Asch.  You

8   read Dr. Asch's deposition taken in January of 2011, but you

9   knew there was a deposition taken in 2016; right?"

11:20:32 10                "Answer:  I would have seen it on the

11  list."

12                Next question:  "You had discussion with

13  counsel about the fact that there was a 2016

14  deposition and you asked, is there really any reason

11:20:47 15  for me to read his 2016 deposition?

16                And they said No."

17                "Is that essentially what happened?"

18                "Essentially.  It may not have been those

19  exact words but yes."

11:20:55 20                And how about Dr. David Ciavarella.  Do you know who

21  Dr. David Ciavarella is?

22  A   Yes, I do.

23  Q   And you were not provided with Dr. David Ciavarella's

24  deposition that was taken in 2013.  True?

11:21:09 25  A   So I would say that I -- it's not that I wasn't provided

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:21:13  1   it, it was that I did not ask to see it.

2   Q   Okay.

3            MR. LOPEZ:  Could we have page 61 of that same

4   deposition, Gay, please.

11:21:27  5            Page 61, line 6.

6   BY MR. LOPEZ:

7   Q   "And the process then went to" --

8            MR. LOPEZ:  Your Honor, can I display this to the

9   jury, please?  It's Exhibit --

11:21:39  10           THE COURT:  Is this a deposition transcript?

11           MR. LOPEZ:  Yes, Your Honor.

12           THE COURT:  It's not in evidence.  You can't -- it

13  can't be displayed.  You can use it for impeachment purposes

14  in reading it, but you can't display it to the jury.

11:21:49  15  BY MR. LOPEZ:

16  Q   "Question:  And the process then went to is there anything

17  in Dr. Ciavarella's 2013 deposition that I need to review for

18  purposes of rendering my opinion?"

19           And you were told no.

11:21:58  20           "Answer:  Is there -- there are really -- are there

21  really any significant new or different issues in that that

22  were important for my opinion?"

23           Correct.

24           You asked that and they told you you didn't need to

11:22:13  25  read it; right?

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:22:14   1   A   Yes.  I asked them whether there was -- given that I had
          2   already read one of his depositions, whether there was
          3   anything additional in this new deposition that was relevant
          4   to the types of opinions I was presenting, and I was told no.
11:22:30   5   Q   Do you know what Dr. Asch's opinion is about the manner in
          6   which his study was used and described in the permanent 510(k)
          7   of the Recovery filter?
          8   A   As I sit here today, I can't tell you what Dr. Asch's
          9   opinions are.
11:22:51  10   Q   And if the manner in which that was represented in the
         11   510(k) application was not truthful and accurate, what are
         12   your opinions about that?
         13   A   So I don't -- I think the data stand or their own.
         14   Dr. Asch was the investigator on the clinical study that was
11:23:10  15   used to support the Recovery filter, and those data were
         16   provided to FDA.  So I'm not sure what Dr. Asch's opinions
         17   about the fact that those data could or could not support a
         18   510(k) has to do with anything about FDA's determination.
         19   Q   I'm sorry.  Asked a bad question.
11:23:27  20        My question should have been, wouldn't it have been
         21   in violation of federal regulations had Bard misrepresented
         22   the conclusions and findings of Dr. Asch's retrievability
         23   study?
         24   A   It would depend on what you mean by "misrepresenting."
11:23:45  25   Q   It wasn't truthful and wasn't accurate.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:23:47   1    A    You would have to be more specific.

          2    Q    If it just -- generally, if in fact as it's represented in

          3    the 510(k) application it was not truthful and accurate, that

          4    would be a violation of 510(k) regulations.   True?

11:24:03   5    A    So the material in 510(k) has to be truthful and accurate.

          6    And so if there's information in a 510(k) that's not truthful

          7    and accurate, then that would be a violation.

          8    Q    Now, the bottom line is that Bard doesn't need the FDA to

          9    tell it to do a long-term study, does it?

11:24:24  10    A    Bard certainly needs to be doing what it needs to do

         11    regardless of what FDA tells it.   I would agree.

         12    Q    If internally they have risk analysis, they have done some

         13    of their own analysis of materials they have that they haven't

         14    shared with anybody, and it was appropriate for Bard to do a

11:24:40  15    clinical trial in the interest of patient safety, Bard should

         16    do that trial; right?

         17    A    I certainly think that patient safety should be first and

         18    foremost on the mind of any medical device manufacturer, yes.

         19    Q    Now, let's talk a little bit about you were at the FDA

11:25:04  20    until I think 2010?

         21    A    That's correct.

         22    Q    And then you went to work for Medtronic; right?

         23    A    No, no.   Microsoft.

         24    Q    Microsoft.   I'm sorry.

11:25:12  25             While you were at FDA, you often got approached to

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:25:16  1  work for industry; right?

2  A    Not often.  Occasionally people would approach me about

3  whether I was interested in making a career move.

4  Q    Well, I asked you at your deposition whether companies

11:25:28  5  sought out your employment and you testified there were quite

6  a few of them.  Is that still accurate?

7  A    Well, over 17 years, you know, I would say I was

8  approached on an occasional basis.  So perhaps quite a few.

9  But it wasn't like it was happening every day.

11:25:47  10  Q    Okay.  And you actually were hired by the lawyers that

11  represent Bard; right?  You were hired -- I think you told us

12  your client here is really the lawyers that hired you.

13  A    Right.  Remember, so I'm an employee of a company and so

14  the -- Bard is a client of my company.  Yes.  Bard's lawyers

11:26:07  15  are -- I'm sorry.  Bard's lawyers are a client of my company.

16  Q    And most of your clients, your paying clients, are either

17  pharmaceutical or medical device companies?

18  A    Yeah, the vast majority of the work I do is for

19  pharmaceutical or medical device companies.

11:26:22  20  Q    And you have also been hired by Mr. North's firm to work

21  on the TVM litigation involving Bard; right?

22  A    The?

23  Q    TVM.

24  A    Oh, transvaginal mesh.  Yes, I also do expert witness in

11:26:39  25  that space.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:26:39  1    Q   And can you estimate how much money you've billed for your

2    time and working with the Nelson Mullins firm on both Bard and

3    TVM cases?

4              MR. NORTH:  Objection, Your Honor.  402 as to other

11:26:53  5    litigation.

6              THE COURT:  Overruled.

7              THE WITNESS:  So as I mentioned yesterday, about

8    15 percent of my work is litigation work.  And then I can't

9    answer that directly because, remember, I get paid a salary.

11:27:05 10   So my salary doesn't directly reflect what my company bills

11   for my time.

12   BY MR. LOPEZ:

13   Q   All I'm asking is for an estimate of how much money that

14   you've billed the Nelson Mullins firm since 2000- -- whenever

11:27:18 15   you started working on TVM and Bard.

16   A   How much my company --

17   Q   TVM and IVC cases.

18   A   I'm sorry, do you mean how much my company has billed

19   them?

11:27:28 20   Q   Yes.  Yes.

21   A   I am an engineer; I don't like to give imprecise numbers.

22   But I would say perhaps somewhere around $200,000.  Perhaps.

23   Q   And that's just -- that's just a small part of the money

24   you earn working for or on behalf of either pharmaceutical or

11:27:47 25   medical device companies.  True?

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:27:49  1    A    Once, again, that money does not come to me.   That is the

2    money my company makes.   I'm paid --

3    Q    I understand.

4    A    -- salary --

11:27:55  5    Q    You've explained that.   I just want to know how much you

6    billed.   Through your work, small percentage of what you

7    described that you got paid for working on Bard -- for

8    Mr. North's firm, most of that -- the rest of that comes from

9    working for pharmaceutical and medical device companies;

11:28:13  10   right?   Can you just answer that yes or no?

11   A    I'm sorry, I'm not sure I understand the question.

12         So, yes, I've already said that I work for medical

13   device and pharma companies.   They pay my company for my time

14   and my company pays me a salary.

11:28:28  15   Q    By the way, I can't go through all those document, I just

16   don't have time.   We have limited time.   So I notice some of

17   the names on the interactions that you showed us.   One was

18   Kennell, Ms. Kennell.

19   A    Lisa Kennell, yes.

11:28:44  20   Q    She's not a doctor; right?

21   A    No.   She's a microbiologist.

22   Q    And I think Jenny Liu was another.   I think she's an RN;

23   correct?

24   A    I believe Jenny Liu is a nurse, yes.

11:28:55  25   Q    Would you agree that, for the most part, that people that

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:28:59  1   are reviewing materials with the 510(k) -- that are going

2   through a 510(k) process are what you would call nonclinical

3   people?

4   A    So Jenny Liu is a nurse, so I would consider her a

11:29:14  5   clinical person.  On the premarket side, most of the lead

6   reviewers on 510(k)s are engineers and scientists, like

7   myself.  But if there's clinical data in the submission, there

8   is always a medical officer that reviews the clinical data.

9   Q    You were asked at your deposition, "Would you agree that

11:29:32 10   the primary reviewers of new medical devices that are being

11   submitted under a 510(k) are more often than not nonclinical

12   individuals at FDA?"

13       And your answer was, "Correct."

14       Is that still your answer today?

11:29:44 15   A    Yes.  That's the same answer I believe I just gave.

16   Q    Now, if a new device is cleared through the 510(k) process

17   but does not perform as represented to and cleared by FDA in a

18   510(k) submission, it is considered adulterated.  True?

19   A    So a device is considered adulterated if it's not

11:30:09 20   performing in accordance with its specifications.

21   Q    Thank you.

22       Now, did you do an analysis of Bard's complaint

23   files, complaint records?

24   A    No, I did not do an independent analysis of Bard's

11:30:29 25   complaint files.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:30:30   1   Q   And you talked about the Dear Doctor letter that was --

         2   that Bard had sent regarding the Recovery filter?

         3   A   Yes.

         4   Q   And you're saying that that letter appropriately

11:30:41   5   represented what was going on at Bard at the time?

         6   A   I believe that the information in that letter was

         7   consistent with -- based on the information I reviewed, with

         8   what Bard was observing about the Recovery filter at the time.

         9   Q   Do you have any idea the type of catastrophic injuries

11:31:00  10   that were caused by the Recovery filter when it was on the

        11   market?

        12        MR. NORTH:  Objection, Your Honor.  402 and 403.

        13        THE COURT:  As worded, I don't think it's a

        14   violation of any prior ruling or irrelevant or subject to

11:31:22  15   403, so I'm going to overrule the objection.

        16   BY MR. LOPEZ:

        17   Q   You have no --

        18   A   I'm sorry, I lost the question.

        19   Q   The question is simply this:  You weren't provided with

11:31:32  20   data, actually information, about the type of catastrophic

        21   injuries caused by the Recovery filter before you made your

        22   determination that the information in the Dear Doctor letter

        23   was appropriate.  True?

        24   A   No, I don't agree with that.  I very much reviewed

11:31:46  25   internal Bard documents and health hazard evaluations that

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:31:50  1   talked in detail about the kinds of events that Bard was

       2   seeing with the devices.

       3   Q   So your testimony about the appropriateness of the Dear

       4   Doctor letter had something to do with your review of, like,

11:32:01  5   health hazard evaluations that specifically described the type

       6   of events that were happening as a result of people getting

       7   the Recovery filter?

       8        Can you answer that yes or no?

       9   A   So certainly all of the information that I reviewed bears

11:32:18 10   on my opinion that the Dear Doctor letter was consistent with

      11   Bard -- what Bard was observing.

      12   Q   So you saw everything that you needed to see?

      13   A   I certainly did not see everything and I have never said

      14   I've seen everything.  However --

11:32:35 15   Q   Now, the Dear Doctor letter mentions death, doesn't it?

      16   A   I believe so, although I'd have to see it to be certain.

      17   Q   Okay.  Assuming it says death in the Dear Doctor letter,

      18   were you provided with data or any adverse event data that

      19   relates to death while the Recovery filter was on the market?

11:32:57 20   A   So, once again, I reviewed health hazard evaluations and

      21   other internal Bard documents relating to the events that Bard

      22   was observing about the filter.

      23        MR. LOPEZ:  Your Honor, I'd like a sidebar on this.

      24   I'd like to go into different areas that have been affected

11:33:14 25   by a motion.

CROSS-EXAMINATION – DR. DONNA-BEA TILLMAN

11:33:14  1          THE COURT:  All right, let's have a sidebar.

       2          You can stand, ladies and gentlemen.

       3       (Bench conference as follows:)

       4          MR. LOPEZ:  Your Honor, there's a couple documents.

11:33:33  5   One of the documents referenced death that he offered into

       6   evidence.  I can't remember which one it was.  I think it had

       7   to do with the Dear Doctor letter.

       8          The Dear Doctor letter, she's saying it was

       9   appropriate in telling doctors what happened with respect to

11:33:45 10   the Recovery filter.  It doesn't.  It hardly scratches the

      11   surface about what was really going on with the Recovery

      12   filter.  That's number one.  I can't cross-examine her on

      13   that.  I have not had an opportunity to fairly cross-examine

      14   her on something that he made a big point on.

11:34:06 15          THE COURT:  When you say he made a big point --

      16          MR. LOPEZ:  I'm sorry.  Mr. North.

      17          THE COURT:  Big point of what?

      18          MR. LOPEZ:  The fact that Bard went the extra step

      19   and told doctors what was going on with their Recovery

11:34:16 20   filter, they were actually warning doctors and showing

      21   doctors what was going on in the Dear Doctor letter.  They

      22   didn't.  There's no way, if you look -- I mean, it does not

      23   tell the true story about what was going on with the Recovery

      24   filter.  That's number one.

11:34:31 25          Number two, I haven't asked her this question yet,

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:34:34  1  but there's an issue about whether or not this was

2  inappropriate -- she said it was a very appropriate predicate

3  device.  I've got to be able to ask her whether or not under

4  the circumstances of the Recovery's history, whether or not it

11:34:50  5  was appropriate, if whether FDA regulations allowed them to

6  use that type of predicate device.

7        It says you're supposed to use the most appropriate

8  predicate, and some of the testimony's coming up, she's

9  testified to it already in deposition, that if a device is

11:35:07  10  adulterated, it's not being legally marketed.  I've got to be

11  able to explore that fully.

12        If you've got 16 deaths compared to Simon Nitinol

13  that had none, you're not being legally marketed.  I can't

14  scratch the surface with that.  I mean, it has to be -- I

11:35:25  15  mean, it just has to be a fair cross with respect to whether

16  or not that was an appropriate predicate.

17        If Recovery's not an appropriate predicate, then G2's

18  not on the market.  If G2's not on the market, Eclipse's not

19  on the market.  That's a cascade --

11:35:40  20        THE COURT:  I understand that argument.  We're

21  keeping the jury waiting, so don't repeat arguments you've

22  made before.  You've made that one, so I understand it.

23        MR. LOPEZ:  Okay, but I'm just telling you -- okay.

24  That's it.

11:35:51  25        MR. NORTH:  First of all, Your Honor, I do not

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:35:52  1  believe I asked her for, as I recall, an opinion as to the

2  adequacy of --

3          THE COURT:  I want you to hear this because I want

4  you to respond to it.

11:36:00  5          MR. NORTH:  -- to the adequacy or sufficiency of the

6  Dear Doctor letter.

7          My questions with regard to the Dear Doctor letter

8  had to do with did they show it to the FDA; did the FDA look

9  at it.  Just the fact of the communication --

11:36:17  10          MR. LOPEZ:  Can I get some water real quick?

11          THE COURT:  Do you remember the number of the

12  Recovery filter Dear Doctor letter.

13          MR. NORTH:  I didn't introduce it, Your Honor.

14          THE COURT:  You didn't identify it?

11:36:33  15          MR. NORTH:  No.  Oh, I know.  I got one out.  Let me

16  run and get it.

17          It's in evidence.

18          THE COURT:  Hold on just a minute.

19          I think what was admitted was document 6075 --

11:37:05  20          MR. NORTH:  Which is right here --

21          THE COURT:  -- which are the minutes of a phone call

22  regarding the Dear Doctor letter.

23          Okay.  Go ahead with what you were saying.

24          MR. NORTH:  And here are those minutes if the Court

11:37:29  25  needs them.  But that was the context in which I referenced

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:37:32  1    the Dear Doctor letter, was this phone call.

2            I had at no time tendered or presented the Dear

3    Doctor letter itself, and I don't believe I asked her any

4    opinion as to the adequacy.  Merely the fact there had been

11:37:44  5    communication.

6            That particular document, the Court has ordered the

7    second sentence out, which we will do, of course, and there

8    are also references to death in that that need to be redacted,

9    which is why I didn't display the second page.

11:37:59 10            THE COURT:  Finish your response to what Mr. Lopez

11    said.

12            MR. NORTH:  Well, that's the main thing.  I don't

13    think I opened the door as to the adequacy of the Dear Doctor

14    letter.

11:38:09 15            As far as predicate devices, I think that was

16    essentially --

17            THE COURT:  I'm going to forget where I am.  Let's

18    talk about that second, your second point, Mr. Lopez.

19            On the first one, which is the Dear Doctor letter, my

11:38:26 20    notes, which are pretty thorough, show that this was after you

21    tried to introduce the chronology and I didn't let you bring

22    it in.

23            She testified that Bard approached the FDA to discuss

24    a letter to be provided to doctors, the FDA provided feedback

11:38:48 25    on it.  And also on plans to engage with the physician

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:38:53   1   community.  I assume that meant focus group type events.

2       The Dear Colleague letter was sent by Bard to

3   doctors.  Bard submitted a draft to the FDA.  The FDA provided

4   feedback and Bard made the suggested changes and sent out the

11:39:10   5   letter.

6       Bard sent a second letter to doctors after consulting

7   with the FDA.

8       Then you introduced the minutes of a phone call

9   regarding what Bard was seeing with the Recovery and the plan

11:39:25  10   to provide a Dear Doctor letter.  The minutes were authored by

11   the FDA, obtained through a FOIA request.

12       Bard asked if changes to I think the doctor letter

13   would constitute a change in labeling that required a new

14   510(k).  FDA provided input on the letter.  FDA agreed that

11:39:54  15   the bolded statement would address the issue but that Bard

16   continued -- needed to continue diligently monitoring.

17       I don't know what the bolded statement is.

18       MR. NORTH:  The IFU, Your Honor.  Statement about

19   risk/benefit that we continued to express on the second page.

11:40:14  20       THE COURT:  Okay.

21       But I guess my question for you, Mr. North, is, it

22   seems to me the clear import of all of that testimony is that

23   with respect to complications Bard was seeing in the Recovery

24   filter, it went to the FDA, proposed what it would communicate

11:40:35  25   to the doctors, the FDA reviewed it and made suggestions.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:40:40  1    Bard adopted the suggestions and sent out the letter.

2            The whole implication is the FDA approved what Bard

3    was saying in the Dear Doctor letter about Recovery filter

4    complications.  Isn't that the point?

11:40:56  5            MR. NORTH:  I don't think the point is approved, but

6    they did review it, yes.

7            THE COURT:  But, I mean, what you want --

8            MR. NORTH:  -- distinction --

9            THE COURT:  What you want the jury to come away with

11:41:05  10   is that whatever Bard said in the letters to doctors about

11   Recovery filter complications had been run by the FDA and, if

12   not expressly approved, they hadn't had any objection, and,

13   in fact, you incorporated changes they made.  So they were

14   sort of a party in putting together this communication to

11:41:22  15   doctors.

16           Do you disagree with that?

17           MR. NORTH:  No.  Not at all.

18           My intent was to show the agency's knowledge about

19   what Bard was doing and the fact that there was this dialogue

11:41:34  20   going on.  Not so much that they approved it.  But I

21   understand the Court's implication.

22           THE COURT:  So here's the question:  If the

23   plaintiff believes that Bard was not forthcoming in the

24   letter to the doctors about deaths caused or related to the

11:41:56  25   Recovery filter, why isn't that relevant in light of the fact

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:42:02  1   that Bard has in effect said this filter had the blessing of

2   the FDA and talked about Recovery filter complications to

3   doctors?

4            MR. LOPEZ:  Including death.

11:42:17  5            MR. NORTH:  Your Honor, he's already brought out, as

6   the Court ruled earlier, he can testify -- he can bring out

7   evidence that this device can, as a complication, lead to

8   death.  He has done that.  I mean, these last few questions

9   with that firmly in the record, and many other people have.

11:42:36 10        I don't see how the mention of a Dear Doctor letter

11   or a Dear Colleague letter, without going into the specifics,

12   opens the door to this avalanche of materials as to the

13   details.

14        It's then going to require me to come in and we're

11:42:54 15   going to start litigating the same subsidiary peripheral issue

16   because all the documents are replete, FDA internal documents,

17   with their knowledge of these deaths.  And so then we're going

18   to get into all of this and it's going to be a trial within a

19   trial.

11:43:11 20        It is marginal relevance as to the details.  We were

21   talking about the fact of a letter.  And that evidence is in.

22   The FDA reviewed that letter.  But the details of what the

23   complications were, he's already established that it included

24   death.  To get into each single event, we can show the FDA

11:43:34 25   knew of each single event.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:43:35   1            THE COURT:  Does the Dear Doctor letter say anything

        2    about death?

        3            MR. NORTH:  Yes.

        4            THE COURT:  What does it say about death?

11:43:40   5            MR. NORTH:  I'm going to have to go get it.  I did

        6    not have it to use with her, the Dear Colleague letter.

        7            There were two, a Dear Doctor and Dear Colleague.

        8    The Dear Colleague references death.

        9            THE COURT:  How much longer do you have on cross?

11:44:00  10            MR. LOPEZ:  I just got my five-minute warning, so --

       11    it's going to be longer than that, though.

       12            THE COURT:  And how much redirect are you going to

       13    have?

       14            MR. NORTH:  Depends on the Court's ruling.  Right

11:44:10  15    now I have no --

       16            THE COURT:  We've got 15 minutes before the noon

       17    hour.  I'm just conscious -- I think I need to look at the

       18    Dear Doctor letter and think about this issue further.

       19            The question on my mind is whether -- well, I think

11:44:26  20    the jury has clearly been given the impression that the Dear

       21    Doctor letter provided, in effect, an FDA-approved description

       22    of the Recovery filter risks.  And if the plaintiff has a

       23    basis for saying, no, it didn't, there were risks that weren't

       24    adequately communicated to the doctors, I think that's fair

11:44:46  25    game.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:44:48  1          But I can't assess that -- I mean, I know there

2     hasn't been -- the Dear Doctor letter hasn't been admitted.

3          Are you going to try to put it in?

4          MR. LOPEZ:  No.  I mean probably not.  But I don't

11:44:59  5     know.  Depends where this goes, Judge.

6          THE COURT:  What I'm wrestling with is whether -- I

7     think it's fair for the plaintiff to present evidence that

8     the Dear Doctor letter was not an adequate description of the

9     risks, if the plaintiff can do so.  I can't assess that

11:45:15 10     without having a sense for what's in the letter, whether it

11     does or does not mention deaths.  If so, how it mentions

12     deaths.  So I need to look at it.  And I don't want to keep

13     the jury waiting while we do that.

14          MR. LOPEZ:  Can I make one more -- there's a whole

11:45:29 15     separate layer that's equal to that, which is continuing to

16     tell the jury through this witness how transparent they were

17     with FDA about those deaths and quality of those deaths and

18     internal analysis about those deaths and recommendations

19     Dr. Ciavarella was making about those deaths and the report

11:45:46 20     from the HHE which showed there was an increased risk of

21     almost five times amount of deaths than any other device on

22     the market, and all of those things were consistent with

23     their bench testing.  I mean, we can't -- all of that.

24          THE COURT:  I understand what you're saying,

11:46:01 25     Mr. Lopez.

CROSS-EXAMINATION – DR. DONNA-BEA TILLMAN

11:46:02  1    I continue to be of the view that in an Eclipse case,

2    that stuff happening in 2004 and 2005 is marginally relevant

3    for all of the reasons I stated in my prior orders.  So I'm

4    not persuaded that your inability to go through that in detail

11:46:19  5    is something that over -- that makes my Rule 403 ruling

6    incorrect.

7    What I'm really focused on here is the evidence

8    that's now been presented to this jury about the Dear Doctor

9    letter and the FDA's involvement.  I think that's fair game

11:46:34  10   because that's what the defendants have interjected.  So

11   that's my focus.

12   I don't want to turn this into the trial -- a trial

13   about what was or was not told to the FDA in 2004, 2005

14   because I view that as marginally relevant.

11:46:47  15   I know your hand's up.  We've got to move along, and

16   I'm going to use the one-lawyer rule here.

17   MR. O'CONNOR:  Still have an issue from yesterday

18   that I raised with you that does implicate the Eclipse.

19   That's what I wanted to bring up.

11:47:00  20   THE COURT:  What issue is that?

21   MR. O'CONNOR:  The way they used the Eclipse IFU and

22   made it appear any mention of death in the obese, morbidly

23   obese, patients, they implied that was something --

24   THE COURT:  We've left that for the question they

11:47:15  25   were going to get an answer to of whether there's evidence of

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:47:18  1    morbidly obese deaths from other filters.  So that's a

       2    different issue.

       3              MR. O'CONNOR:  Except I just wanted you to -- I just

       4    wanted to make the point that does apply to the Eclipse.  It

11:47:29  5    was Eclipse.

       6              THE COURT:  Okay.  I understand.

       7         (Bench conference concludes.)

       8              THE COURT:  Ladies and gentlemen, thank you.  Sorry

       9    to stay so long.

11:47:38 10              Let's continue, Mr. Lopez, on your next subject, and

      11    I'll work further on this issue over the lunch hour so we're

      12    not keeping the jury waiting.

      13              MR. LOPEZ:  Thank you, Your Honor.

      14    BY MR. LOPEZ:

11:47:59 15    Q    You would agree that labeling needs to include information

      16    that patients and their doctors need in order to make

      17    decisions about whether or not to use the product; right?

      18    A    I would say in general that's a reasonable statement, yes.

      19    Q    And the warning needs to be specific to the safety profile

11:48:20 20    of the company's device, not just the safety profile of

      21    everyone's device.  If there's something uniquely different

      22    about the risk profile of a Bard filter, the warning needs to

      23    make sure a doctor knows that there's something different

      24    about maybe fractures, for example, in a Bard filter versus

11:48:42 25    maybe fractures in a Simon Nitinol filter.  Don't you agree

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:48:45   1   that doctors should know about those differences?

2   A   So I certainly think if there's a failure mode or

3   complication that's different from -- of a particular

4   company's device that that information should be disclosed in

11:48:58   5   the labeling, so that not all device labeling is the same.

6   Q   Now, what is a company's obligation when it knows it's

7   selling a device that they know would never have gotten

8   cleared through a 510(k) process had FDA had the clinical data

9   that the company now has from marketing it?

11:49:26   10   A   I'm not -- I mean, that's a question that there's so many

11   "it depends" in that I'm not sure I can give you a general

12   answer to it.

13         MR. LOPEZ:  Gay, can I -- this is her June 2014

14   deposition, page 168, beginning line 17.

11:49:50   15   BY MR. LOPEZ:

16   Q   See there?  I'm going to read from line 17.

17         MR. LOPEZ:  Gay, when I'm done, the answer goes on

18   to the next page.

19   BY MR. LOPEZ:

11:50:00   20   Q   I can read it -- oh.  Could you see that okay,

21   Dr. Tillman?

22   A   Yeah, I could see the question.  It was the same one you

23   just asked me.

24   Q   The question is:

11:50:08   25         "Really, what is the company's obligation

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:50:09   1   when it knows that it's selling a device that they

2   knew would never have gotten cleared through a

3   510(k) process had FDA had the clinical data it now

4   has that it's marketing?"

11:50:20   5        "Answer:  Once again, there are certainly

6   postmarket regulatory controls, including

7   corrections and removals, and the fact that, as you

8   mentioned, it's illegal to sell an adulterated

9   device.  So if the company becomes aware -- aware

11:50:38  10   that its device is adulterated for whatever reason,

11   if it's not meeting specifications or performing to

12   meet user needs and intended uses, then the company

13   has an obligation to remove that product from the

14   market."

11:50:51  15        That was your answer in 2014; correct?

16   A    Yeah.  I think that's a good answer.

17   Q    Dr. Tillman, would you expect that a company determines,

18   based on risk analysis, that the product fell into the

19   unacceptable category that they would take some kind of

11:51:22  20   action, including recall?

21   A    So what do you mean by "unacceptable category"?

22        MR. LOPEZ:  Could I have her deposition, Gay.  Same

23   one, August -- I'm sorry, this one's June 12, 2014.  269.

24        Right to there, line 8.

25

CROSS-EXAMINATION – DR. DONNA-BEA TILLMAN

11:51:50  1    BY MR. LOPEZ:

2    Q    Your deposition was taken also in 2017; correct?

3    A    Yes.  I've been deposed twice in this matter, I think.

4    Q    In fact, I gave you a copy of the 2014 deposition that

11:52:02  5    we're reading now at that deposition.  Do you remember that?

6    A    I don't remember if you gave me a copy, but I certainly

7    have copies of both depositions.

8    Q    And you told me you didn't have any changes to make to the

9    2014 deposition when I took your deposition in 2017; correct?

11:52:16  10   A    Yeah.  I looked at these since then and I don't have any

11   changes to make to these.

12   Q    Okay.  At line 8 you stated:

13            "I would expect if a company determines,

14   based on risk analysis, that the product fell into

11:52:28  15   the unacceptable category that they would take some

16   kind of action."

17            Then I asked:  "Including recall?"

18            And you said:  "I think they need to take

19   some kind of action to correct the unacceptable

11:52:43  20   risk.  That could be recall.  It could be a safety

21   communication to providers.  I mean there's a bunch

22   of different things they could do, but I would

23   expect they need to do something."

24            That was your testimony in 2014 that you agreed --

11:52:54  25    that you agreed you were not going to change when I took your

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:52:59   1   deposition in 2017; correct?

2   A    Yes.  So the reason I was a little bit more uncertain --

3            MR. LOPEZ:  Your Honor, there's no question pending.

4            THE WITNESS:  You asked me "Correct?"

11:53:09   5   BY MR. LOPEZ:

6   Q    Whether or not that was your testimony.

7   A    So that -- what you just read was my testimony.

8   Q    Okay.

9            MR. LOPEZ:  And can we look at 271/7, Gay, please.

11:53:19  10   Put that up as well.

11   BY MR. LOPEZ:

12   Q    Page 271, line 7, you stated under oath:

13            "So I believe that if a company becomes

14   aware that a device presents an unreasonable risk,

11:53:33  15   that they need to take appropriate action and

16   communicate appropriately to their stakeholders.  So

17   in general" --

18            MR. NORTH:  I'm sorry.  Objection.  Improper

19    impeachment.

11:53:46  20            THE COURT:  I don't think you asked her a question

21    that this is inconsistent with.

22            MR. LOPEZ:  Well, I don't know, I said something

23    that prompted me to do this and I can't remember what it was.

24    Okay.

25

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:53:55   1   BY MR. LOPEZ:

2   Q   Let me ask you this --

3        THE COURT:  Let's just have you go on with your

4   question along this line and you can use it if it becomes --

11:54:01   5   BY MR. LOPEZ:

6   Q   So, ma'am, do you believe that if a company becomes aware

7   that a device presents an unreasonable risk that they need to

8   take appropriate action and communicate appropriately to their

9   stakeholders?  Yes or no?

11:54:17   10   A   So I can't answer that question yes or no because since

11   the time this deposition was taken I've become aware of a Bard

12   document where there was a formal definition of "unreasonable

13   risk," which I believe may be different than just the common

14   understanding of what that means.

11:54:34   15        So I agree that the statement I made here, if we're

16   just talking about unreasonable risk in the commonly accepted

17   interpretation of the term, I agree, the statements I made,

18   that's what those are based on.

19        So I would agree that if we're talking about

11:54:51   20   unreasonable risk, then, yes, companies need to take action.

21   Q   Dr. Tillman, do you agree that it's important for medical

22   device manufacturers to share relevant postmarket safety

23   information with health care providers and patients, and that

24   they have the primary responsibility, meaning the company that

11:55:12   25   sells and profits from the device, for insuring the safety and

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:55:16   1   effectiveness of the device?

2   A   So I agree the companies have primary responsibility for

3   ensuring the safety and effectiveness of the device.

4   Q   And do you also agree that it's not appropriate for a

11:55:27   5   company to use a device as a predicate device if the device is

6   either misbranded or adulterated?

7   A   So I believe that in general a device that's been found to

8   be misbranded or adulterated should not be used as a predicate

9   device.

11:55:43   10   Q   And isn't it also -- I'm sorry, did I interrupt you?

11   A   No.

12   Q   Is it also true that FDA does not regulate advertising and

13   promotional materials for medical devices the way it does for

14   drugs so you're convinced that this is necessarily a piece --

11:55:59   15   I'm sorry.  Let me start that over.

16        Do you agree that FDA does not regulate advertising

17   and promotional materials for medical devices the way it does

18   for drugs?

19   A   I would say that is true, yes.

11:56:19   20   Q   If a company knows that it has design deficiencies, do you

21   agree that not only do they need to tell doctors, but they

22   need to do something to correct the design deficiency?

23   A   So I think that if a company is aware that a device is not

24   performing the way that they expected it to in the market or

11:56:40   25   that if it's not meeting specifications, then, yes, they need

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:56:44    1    to do something is to address that matter.

         2    Q   If they have design deficiencies, would you agree they

         3    ought to stop selling it until they fix it?

         4    A   So I think it depends what you mean by design

11:56:57    5    deficiencies.

         6    Q   Well, in other words, they've identified that it's having

         7    complications, known complications, but because of the design

         8    of the device it's contributing to or causing those

         9    complications like migration and tilting and perforation and

11:57:14  10    fractures.  They know it's related to a design.  They know

        11    what they need to do to fix it.  Shouldn't they stop selling

        12    it and fix it?

        13    A   So those adverse events you mentioned are known

        14    complications associated with IVC filters.  Just because a

11:57:31  15    device has those complications doesn't mean it has a design

        16    deficiency.

        17    Q   Ma'am, my hypothetical included the company internally

        18    recognizing they need to make the design changes to minimize

        19    or eliminate that complication.  You took that out.

11:57:47  20          So let me just ask it this way.  In fact, why don't

        21    we show you your deposition.  It was taken in August of 2017

        22    at page 189.

        23          MR. NORTH:  Your Honor, again, objection.  I'm not

        24    sure there's a question or answer to be impeached.

11:58:04  25          THE COURT:  Overruled.

CROSS-EXAMINATION - DR. DONNA-BEA TILLMAN

11:58:06  1   BY MR. LOPEZ:

         2   Q    Page 189 line 7:

         3            "Well, I didn't ask you whether you agreed

         4   with me or not.  I want you to -- I'm just asking

11:58:14  5   you if a company knew it had design deficiencies in

         6   their device that was causing or contributing to

         7   migrations of the device with a clot in it to the

         8   heart and causing death, don't you think physicians

         9   would have wanted to know that?"

11:58:29 10            "I can't answer that question because I

        11   think if a company knows it has, quote, design

        12   deficiencies, then not only is that something

        13   physicians ought to know, but the company actually

        14   needs to do something about it."

11:58:44 15            "Question:  They ought to stop selling

        16   it?"

        17            "Answer:  If they have design

        18   deficiencies."

        19            That's what you testified to less than a year ago;

11:58:54 20   right?

        21   A    And I'm not disagreeing with what I said then.  My point

        22   simply is I think you have to be careful about what is a

        23   design deficiency versus what is just a device performing in a

        24   way that it -- where a device is known to have certain adverse

11:59:11 25   events.  If a device has that event, it doesn't mean there's a

11:59:15  1   design deficiency.

2   Q    Would you agree with this simple concept --

3        THE COURT:  Actually, Mr. Lopez, we're at the noon

4   hour so we're going to break at this point.

11:59:21  5        Ladies and gentlemen, we will resume at 1 o'clock.

6   We'll excuse you at this time.

7        (The jury exited the courtroom at 11:59.)

8        THE COURT:  All right.  Counsel, do you have a copy

9   of the Dear Colleague letter that was discussed?

12:00:14 10        MR. NORTH:  That is both of the letters, Your Honor.

11  Dear Colleague and Dear Doctor.

12        MR. O'CONNOR:  Can we see what you've shown him.

13        THE COURT:  Okay.  What you've handed me, it looks

14  like, are Exhibits 5915 and 5001.  Is that right?

12:00:37 15        MR. NORTH:  Yes.

16        THE COURT:  And can you point to me -- point me to

17  where in the letters it talks about death.  And if you can't,

18  I'll read them.  I don't want --

19        MR. NORTH:  May 11, 2005, Exhibit 5915, the third

12:00:56 20  sentence:  "Over the past two years we have received adverse

21  event reports of filter migration, some being associated with

22  medical intervention and/or death."

23        MR. LOPEZ:  Next sentence too, Your Honor.

24        MR. NORTH:  That's the mention of death in that one.

12:01:19 25        Your Honor, the Dear Doctor letter is merely advising

12:01:24  1   about changes to the IFU which actually added that bolded

       2   statement on page 2 of 2.  This is Exhibit 5001.  In advising

       3   of the changes to the IFU it added that "All of the above

       4   complications have been associated with serious adverse events

12:01:46  5   such as medical intervention and/or death."

       6         And that was the bolded language that the FDA was

       7   talking about in that Exhibit 6075.

       8         THE COURT:  Okay.

       9         All right.  What I want to do, Counsel, in light of

12:01:59 10   our sidebar, is read these letters.  I'm going to go back and

      11   look at the transcript again and think about the issues that

      12   have been raised so that I can give you a ruling on the

      13   question.

      14         MR. LOPEZ:  I need 30 seconds too, Judge.

12:02:14 15         THE COURT:  For a new issue?

      16         MR. LOPEZ:  On this issue.

      17         THE COURT:  What were you going to say, Mr. North?

      18         MR. NORTH:  I was going to say, Your Honor, I have

      19   some materials about morbidly obese deaths in other -- with

12:02:24 20   other manufacturers.  I was going to give a copy to the Court

      21   and one to the plaintiffs, I will tell you it's a lot to wade

      22   through, if and when the Court's ready --

      23         THE COURT:  Tell me what's in it.

      24         MR. NORTH:  There are two different --

12:02:36 25         THE COURT:  Have you given the materials to the

12:02:37  1    plaintiff's counsel?

2              MR. NORTH:  Let me.  Here.

3              Two different MAUDE reports involving other

4    manufacturers and death, migration deaths, in morbidly obese

12:02:48  5    people.  There's also a major medical article which is a case

6    report of a migration death with a competitive filter.  And

7    most important, there's an overview article of approximately

8    70 or 80, I think, reports in the medical literature of

9    migrations of filters to the heart, and it notes importantly

12:03:13  10   on page 880 of the article that in eight of the reported cases

11   involving all sorts of manufacturers the cause for filter

12   migration was attributed to a mega cava, which is a huge cava.

13   Implying these are morbidly obese patients because of the very

14   large, greater than 28 millimeter in diameter, cavas.

12:03:39  15             THE COURT:  Okay.  I don't know that I'm going to

16   have time over the lunch hour to look at that, but I

17   understand now what materials you're giving to me.

18             You wanted to say something, Mr. Lopez, for 30

19   seconds.

12:03:49  20             MR. LOPEZ:  Yes.  The next two sentences are

21   important too because --

22             THE COURT:  Of what?

23             MR. LOPEZ:  Of this letter, about it comparing to

24   the SRI guidelines.  I can tell you I've got testimony from

12:03:59  25   her at her deposition where she agrees that is inappropriate

12:04:03  1    comparison because it does not describe --

          2              THE COURT:  That's not the issue.  This letter isn't

          3    in front of the jury and so what's in the letter and whether

          4    you can impeach it isn't the question.

12:04:12  5              The letter I'm going -- the issue I'm going to focus

          6    on is whether or not what's been said to the jury about the

          7    FDA's involvement with this letter has opened the door for you

          8    to bring out some information about death.  To do that I

          9    wanted to understand what the letter is.  But I'm not looking

12:04:29 10    through the letter asking is there something in here the

         11    plaintiff can disagree with, because this isn't in evidence.

         12              MR. LOPEZ:  Well, he certainly opened the door for

         13    me to admit this letter when he talked about it.

         14              THE COURT:  If you decide to admit it, that will be

12:04:40 15    your choice.  That, to me, doesn't open any door if you put

         16    it in.  The question is whether their evidence opened the

         17    door for you.

         18              MR. LOPEZ:  It's kind of a door -- I made it wider,

         19    but he kind of took it -- made it so I --

12:04:54 20              THE COURT:  And you may choose to put it in.  That's

         21    fine.  But if you put it in, I'm not going to say your

         22    putting it in opens a further door for you.

         23              MR. LOPEZ:  No, I understand, but I've got to be

         24    able to show the jury he misrepresented its transparency to

12:05:08 25    FDA, its transparency to doctors like the impression he was

12:05:10  1   leaving the jury.  I've got to be able to tell the jury, no,

2   this was an opportunity for them to come clean about a lot of

3   stuff and they didn't.

4        THE COURT:  Again, what I said at sidebar is I'm not

12:05:21  5   revisiting the whole 403 issue.  I continue to believe that

6   cephalad migration death evidence in the Recovery filter is

7   marginally relevant in this Eclipse case.  So I'm not going

8   to change that ruling.

9        What I am trying to decide is whether what the

12:05:40  10  defendants have presented, in fairness, should allow you to

11  put in something about it.  That's what I'll work on over the

12  lunch hour.

13       MR. LOPEZ:  Thank you, Your Honor.  I just don't

14  want them to take unfair advantage of that ruling.  I think

12:05:49  15  maybe they have.

16       THE COURT:  I understand you don't.  I don't want

17  them to, either.

18       Thank you all.

19       Oh, I'll give you your time.  Do you need your times

12:05:58  20  now or is the end of the day okay?

21       MR. LOPEZ:  I can only deal with that once a day,

22  Judge.

23       THE COURT:  Okay.

24       MR. LOPEZ:  We're probably going to need it.  We're

12:06:06  25  going to need it.

12:06:07  1        THE COURT:  Now?  All right.  Give me just a minute.

2        MR. LOPEZ:  You're not going to count that sidebar

3   against me, are you?

4        THE COURT:  I'm giving seven minutes of that sidebar

12:06:22  5   to defendants.  I split it evenly.  You're keeping the jury

6   waiting, so that's what I do.  If a sidebar is entirely

7   unwarranted, in my view, I leave it on the party who

8   requested it.  If it's a genuine debate, I split it.  That's

9   what I'm doing with this sidebar.

12:07:28  10        All right.  As of the lunch hour plaintiff has used

11   22 hours and 53 minutes.  Defendant has used nine hours and 42

12   minutes.

13        We'll see you at 1 o'clock.

14        MR. LOPEZ:  Thank you, Your Honor.

12:07:40  15     (End of a.m. session transcript.)

16                          *  *  *  *  *

17

18

19

20

21

22

23

24

25

1

**C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true, and accurate transcript of all of that portion

9     of the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control, and to the best

12    of my ability.

13

14         DATED at Phoenix, Arizona, this 24th day of May,

15    2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter

21

22

23

24

25