1  UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF ARIZONA

3  _____

4

In Re:  Bard IVC Filters     ) MD-15-02641-PHX-DGC
5  Products Liability Litigation )
                             ) Phoenix, Arizona
6  _____) May 24, 2018
Doris Jones, an individual,  ) 12:55 p.m.
7                             )
              Plaintiff,     )
8                             ) CV 16-00782-PHX-DGC
         vs.                 )
9                             )
C.R. Bard, Inc., a New       )
10  Jersey corporation; and Bard )
Peripheral Vascular, Inc., an )
11  Arizona corporation,        )
                             )
12              Defendants.    )
_____)

13

14
          BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE
15
           REPORTER'S TRANSCRIPT OF PROCEEDINGS
16
              (Jury Trial - Day 7 - P.M. Session)
17            (*Pages 1484 through 1621, inclusive.*)

18

19

20

21  Official Court Reporter:
Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
(602) 322-7256
24
Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

1    APPEARANCES:

2    For the Plaintiff:

3              GALLAGHER & KENNEDY PA
               By:  Mark S. O'Connor, Esq.
4              By:  Paul L. Stoller, Esq.
               By:  Shannon L. Clark, Esq.
5              By:  C. Lincoln Combs, Esq.
               2575 East Camelback Road, Suite 1100
6              Phoenix, Arizona 85016

7              LOPEZ MCHUGH LLP
               BY:  Ramon Rossi Lopez, Esq.
8              100 Bayview Circle, Suite 5600
               Newport Beach, California 92660

9
     For the Defendants:
10             NELSON MULLINS RILEY & SCARBOROUGH LLP
               By:  Richard B. North, Jr., Esq.
11             By:  Elizabeth C. Helm, Esq.
               By:  James F. Rogers, Esq.
12             201 17th Street NW, Suite 1700
               Atlanta, Georgia 30363

13

14

15

16

17

18

19

20

21

22

23

24

25

1

                            I N D E X

2

WITNESS:                    DIRECT   CROSS   REDIRECT   RECROSS
3    DONNA-BEA TILLMAN
     (Resumed)
4    By Mr. Lopez                      1500

5    CLEMENT GRASSI, M.D.
     By Mr. Rogers           1512                  1567
6    By Mr. Clark                      1546

7    ANDRZEJ CHANDUSZKO
     By Ms. Helm             1568
8    By Mr. Stoller                    1610

9

10                       INDEX OF EXHIBITS

11   EXHIBIT                                            RECEIVED
     696        GAO Dated 6-18-19 Regarding FDA         1507
12   5037       ETR-05-02-02 (Effects of Changes to the
                Recovery Filter & The Femoral Delivery
13              System on Filter Stresses Based on
                FEA Analysis)                           1601
14   5233       RD-SOP-054.00 (Recovery Filter
                EnduraTEC Fatigue Testing SOP NMT)      1582
15   5234       RD-RPT-099 (Recovery Filter EnduraTEC
                Fatigue Testing Report NMT)             1584
16   6842       ACR-SIR-SPR Practice Parameter for the
                Performance of Inferior Vena Cava (IVC)
17              Filter Placement for the Prevention of
                Pulmonary Embolism. Revised 2016.       1558
18   7312       SIR Guidelines for IVC filters          1526

19

20

21

22

23

24

25

1   P R O C E E D I N G S

2        THE COURT:  All right, counsel.  Let me share with you

3   my thoughts after having looked at this issue over the lunch

4   break.  And then I'm going to invite your focused responses.

5   This is a topic we could talk about forever, and we don't have          12:55PM

6   time to do that.  So I'm going to ask you some fairly focused

7   questions.

8        I went back and re-read the transcript on the exchange

9   between Mr. North and the witness about the recovery filter

10  complications and the Dear Doctor letters.  And the following          12:55PM

11  points were made to the jury through that testimony.  These are

12  my words, but I think they quite closely parallel what the

13  evidence was.

14       Bard communicated with the FDA about the performance

15  of the Recovery Filter.  Bard sent letters to doctors about          12:55PM

16  complications with the Recovery Filter.  Minutes of the meeting

17  reflect that Bard told the FDA what it was seeing with the

18  Recovery Filter in its postmarket marketing and that it planned

19  to send a letter.  And this would be based on information it

20  had in the postmarket setting.  The FDA reviewed Bard's          12:56PM

21  Recovery performance information.  The FDA was aware of the

22  adverse event data regarding Recovery Filter.

23       The FDA independently tracked that data through the

24  MAUDE database.  The FDA reviewed the proposed letter to the

25  doctors, made suggestions, the suggestions were accepted by          12:56PM

1    Bard, and the letters were sent to the doctors.

2         I think there are two points to distill this down that

3    were made to the jury.  One is that the FDA knew everything

4    Bard knew about the Recovery Filter complications and approved

5    Bard's communications to doctors about those complications.          12:56PM

6    And the second, I think, is the implication which is Bard told

7    the doctors everything it should have about the Recovery Filter

8    complications.  I believe that's the fair import of the

9    evidence.

10        Those two points, those two summary points, I believe       12:57PM

11   the plaintiffs are entitled to rebut if they have evidence they

12   believe shows that the FDA did not know everything Bard knew

13   about Recovery Filter complications.  They are entitled to

14   bring that out.  And they are entitled, through this same line

15   of evidence, that is, the Dear Doctor letters, to rebut the       12:57PM

16   idea that Bard told the doctors everything it should have told

17   them about the Recovery Filter complications.

18        Now, here's where it gets difficult.  Putting context,

19   this is one point, or collection of points, among many that

20   have been made through this witness and hundreds that have been   12:57PM

21   made during the trial.  But it's a point that the plaintiff

22   fairly should be permitted to rebut.

23        I have been wrestling with the question of what the

24   plaintiffs should be able to do to rebut it.  Clearly, to the

25   extent the plaintiff can present non-death information about      12:58PM

1    complications in the Recovery that the FDA did not know about

2    or that were not accurately described in the Dear Doctor

3    letter, that's fair game.  The question is what should the

4    plaintiffs be permitted to do with death evidence related to

5    the Recovery Filter.  And I'm struggling with that.  My concern    12:58PM

6    is if we step onto that slippery slope, that could take a lot

7    of time.  It could take a lot of evidence.  I know the parties

8    could argue for hours about what evidence was or was not shared

9    with the FDA on death evidence; what it means; how it should be

10   interpreted.  We don't have time in this trial to do that nor    12:58PM

11   would that be proportional in my view to the issue that's been

12   raised.

13       But I believe by interjecting into the trial this

14   point that the FDA knew everything Bard knew and approved the

15   communication to the doctors, the door has been opened to    12:59PM

16   rebutting that.

17       So frankly, I don't know the right answer as to how

18   far into this road we should go with death evidence to permit

19   plaintiff fairly to rebut it.  That's what I want your thoughts

20   on.  I don't want 10-minute arguments from both of you.  I want    12:59PM

21   focused, precise thoughts so I can consider what you have to

22   say and make a decision on this.

23       MR. LOPEZ:  I must say I share the same sentiment,

24   Your Honor, about the time, especially with how little time we

25   have left.  But I also know that it's important that we have an    12:59PM

1   opportunity to fairly rebut all those things that you listed.

2   I was going to go into some of that with her.

3          I can tell you --

4          THE COURT:  Go ahead.

5          MR. LOPEZ:  I can tell you that I don't plan to all of   12:59PM

6   a sudden bring out 20 documents.  I think that we should at

7   least have an opportunity to show the fatality, statistically

8   significant differences in fatalities done by Natalie Wong.

9   She actually did a statistical analysis of the fatalities.  But

10  we ought to at least be able to bring in the HHE, which wasn't   01:00PM

11  a statistical analysis.  I think Josh had -- I think we made a

12  list of about four or five documents.

13         And that we somehow or another should be able to rebut

14  the fact that in the letter it's not mostly bariatric patients.

15  That was a small percentage, really, of the deaths caused by   01:00PM

16  the Recovery Filter.  And I think that might actually be in

17  that HHE.

18         There's also an executive summary sent to the CEO and

19  COO that tracks the differences in the deaths and fractures

20  between the Recovery Filter, the Simon Nitinol Filter, and   01:01PM

21  other filters.

22         THE COURT:  Let me interrupt you, Mr. Lopez.  I

23  understand what are you saying is that there are a few

24  documents you think you should be able to present to this

25  witness.  Give me -- let's say you put the Wong statistic in   01:01PM

1    front of her.  What is it you want to ask her that gets to

2    these issues that I have outlined?

3         MR. LOPEZ:  Whether or not that's the kind of

4    information -- she's going to tell me that the company is

5    responsible for doing the tracking and trending, not FDA.  Once          01:01PM

6    they get to a point when they realize that there's a

7    statistically significant difference between the predicate

8    device and the device that's cleared through 510(k), especially

9    with something as clinically significant as deaths, I'm hoping

10   she would say they need to bring that to the attention of FDA          01:02PM

11   and maybe even stop selling it at that point because it's

12   adulterated.

13        THE COURT:  But see, here's my concern:  What you are

14   allowed to rebut is the suggestion they have made that the FDA

15   knew everything and approved the doctor's communications.          01:02PM

16   Getting into adulterated and things like that is other points

17   you wanted to make through the death evidence.  But I'm focused

18   on how you should be fairly be permitted to rebut what has been

19   presented to the jury.

20        So let me ask this question.  Let's say you put the          01:02PM

21   Wong evidence in front of you.  Are you going to ask her, did

22   you see this?  Do you know if the FDA knew about this?  If she

23   says yes, I saw it, and yes, I believe the FDA knew about it --

24        MR. LOPEZ:  Okay.

25        THE COURT:  -- then where are we?          01:02PM

1    MR. LOPEZ:  Then --

2    THE COURT:  And if she says no, and they should have

3  been told you have made your point.  But if she says yes, I saw

4  this, and yes, the FDA knew about it, then do you want to go

5  into more?  I'm trying to figure out how we cabin this and keep          01:03PM

6  it proportional to the door that's been opened.

7    MR. LOPEZ:  First of all, I hope she doesn't get to

8  say, yeah, the FDA knew about this because I don't know how she

9  would know that unless she has something that was actually

10 shared with them through some document.  So I hope she's not          01:03PM

11 going to be allowed to say, oh, yeah, the FDA knew about this.

12    THE COURT:  What if she says I assume they did?

13    MR. LOPEZ:  I would ask her to show me the evidence

14 that she has that makes her assume that.  I could get into a

15 back and forth with her about that, about why you would assume          01:03PM

16 that because that's what a responsible company would do.  But

17 you don't know that that was shared.  In fact, when she says

18 that the FDA independently tracked this, there's no evidence of

19 that happened.

20    THE COURT:  Let's stay on point here.          01:03PM

21    MR. LOPEZ:  Okay.

22    THE COURT:  So you want to put in a handful of

23 documents that reflect death rates in the Recovery Filter.

24    MR. LOPEZ:  Then we have the hold where the company

25 says, we have a death, and we're going to put it on hold.  If          01:04PM

1   we have one more death, if we have another -- if we have a

2   hospitalization from this happening, we're going to continue

3   the hold.  Well, they have a death and they don't take the hold

4   down, they don't tell the FDA that they have done this.

5            THE COURT:  So you want to go into that, too?                01:04PM

6            MR. LOPEZ:  I do.

7            THE COURT:  Here's my concern:  We start taking steps

8   in and they are going to want to respond to it all.  I could

9   see us spending an hour or two on this issue of what the FDA

10  knew about death evidence.  I don't think we should do that.        01:04PM

11  That's what I'm wrestling with in the back room is you want to

12  make a point, they will want to make a point.  You will want to

13  make a further point and they will.  And we'll lose -- we will

14  present the 403 problem of this taking time it shouldn't be

15  taking.                                                              01:04PM

16           MR. LOPEZ:  At the very least, Your Honor, I think the

17  Natalie Wong data, the December HHE data, and the statistically

18  significant analysis done by their consultant and probably the

19  data that's in the executive summary that's, I think, in August

20  of 2005, which was about two months before the Dear Doctor         01:05PM

21  letter would probably satisfy, you know, us being able to show

22  that the Dear Doctor letter does not really tell doctors what

23  they need to know about Recovery.

24           THE COURT:  Would you intend to put the letter in

25  evidence?                                                           01:05PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7

1    MR. LOPEZ:  Yes.

2    THE COURT:  Traci, will you tell the jury we're taking

3    a few extra minutes?  Will you do that, please?

4    Okay.  Have you covered the points you want to make?

5    MR. LOPEZ:  Yes, Your Honor.                          01:05PM

6    THE COURT:  Mr. North.

7    MR. NORTH:  Your Honor, I think the problem with what

8    the plaintiff is proposing is it really is a slippery slope to

9    that extent.  With the exception of the Natalie Wong report,

10   every other document that he discussed postdates the date of   01:06PM

11   their review of this Dear Doctor letter.  So how can that

12   really rebut the point that we didn't share everything with the

13   FDA when the HHE, for example, was done after these

14   communications took place.  This report to management took

15   place after that communication took place.                     01:06PM

16   We respectfully disagree with the Court's conclusion

17   that we have opened the door, but now that the Court has made

18   that conclusion, we think they should be extremely limited in

19   what they can produce or confront this witness with.  Maybe the

20   Natalie Wong analysis, because that was May of 2004 beforehand.  01:06PM

21   If they do present the Dear Colleague and Dear Doctor letter,

22   in response we're going to go into two different FDA

23   communications that show at this time the FDA knew of between 7

24   and 12 deaths.  So we'll want to get that in in rebuttal to

25   that.                                                           01:07PM

1  So even just putting in the Wong memo is going to open

2  the door for us to need to put in more evidence as to what the

3  FDA knew.

4  THE COURT:  So if they put in the Wong memo, you want

5  to put in exhibits that show the FDA's knowledge of, you said,    01:07PM

6  7 to 12 deaths?

7  MR. NORTH:  Yes.  One of the exhibits is already in,

8  but it was subject to redaction.

9  THE COURT:  Okay.  Did you have other points to make,

10  Mr. North?    01:07PM

11  MR. NORTH:  No.  That's it.

12  THE COURT:  Let me ask this question, counsel.  I

13  mean, I just am concerned about heading down the road.  We

14  could go that far.  I could say these are the one or two or

15  three documents plaintiff can put in, this is what defendants    01:07PM

16  can do, and we're stopping and not going any farther.  That

17  would be one approach.

18  There's another alternative.  And the other

19  alternative would be for me to instruct the jury to disregard

20  all of this witness's evidence about the FDA communicating with    01:08PM

21  them about Recovery Filter complications.

22  Mr. O'Connor, please don't talk to counsel when I'm

23  talking.

24  MR. O'CONNOR:  I apologize.

25  THE COURT:  This is about the sixth time.  He needs to    01:08PM

1    hear what I'm saying so he can respond.

2              MR. O'CONNOR:  I apologize.

3              THE COURT:  Apology accepted.

4              Another alternative is to give a limiting instruction

5    and I would be detailed.  I would say you should disregard the          01:08PM

6    evidence about the communications between Bard and the FDA

7    regarding Recovery Filter complications, regarding the Dear

8    Doctor letter, regarding the FDA proposing language on the Dear

9    Doctor letter, regarding the FDA independently tracking this

10   data.  You should disregard that.  That's another alternative.         01:08PM

11   I'm interested in both sides' thoughts on -- that certainly

12   saves more time, but it's an alternative.

13             MR. LOPEZ:  Can I --

14             THE COURT:  Now have at it.

15             MR. LOPEZ:  I was going to yell at him too, Judge.           01:09PM

16             THE COURT:  I don't think I yelled.

17             MR. LOPEZ:  I didn't mean that.  Reprimand.

18             THE COURT:  I know it sounded like it.

19             (Discussion off the record between plaintiff's

20   counsel.)                                                              01:10PM

21             MR. LOPEZ:  Well, it's like three straws, which one

22   we're going to -- part of me says you can't unring the bell,

23   but a part of me also wants to get the trial, you know, where

24   we don't get all of a sudden, you know, how much is enough.

25   And my preference would be to get -- for you to allow us a             01:10PM

—5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7—

1   limited amount to get the evidence -- some of this evidence in.

2   Because I don't think -- I mean, he spent a lot of time on how

3   wonderful -- I should say the witness -- on all the things FDA

4   did tracking these things, which they didn't do; reviewing them

5   which there's no evidence they did, and I was going to cover      01:11PM

6   that with her.  Of course, I don't have to if you strike it.

7   Of course, I would have to ask you for more time.  I have told

8   them I'm not doing that for this trial.  If someone else wants

9   more time they will have to ask for it.

10        But let's go with a limiting instruction.  I mean,        01:11PM

11  let's go with the striking the evidence, Your Honor.  And

12  however you said it, you probably wrote it down.  But if it's a

13  powerful instruction for them to disregard all of that, we'll

14  move forward.

15        THE COURT:  Mr. North.                                    01:12PM

16        MR. NORTH:  Your Honor, we would object to the

17  instruction.  I believe that it is too broad.  It basically

18  would be asking this jury to disregard 50 percent of her

19  testimony about the communications with the FDA.  If it was

20  very specific to the Dear Doctor and Dear Colleague letter,     01:12PM

21  that might be something else.  But if it's going to be as broad

22  as the Court styled it, we think we were entitled to get that

23  information in.  The evidence is there.  And if the Court

24  really believes the door was opened, I think the best solution

25  is a limited subset of evidence as opposed to a broad          01:12PM

1    instruction that eliminates from the jury's consideration

2    clearly relevant evidence under Georgia law.

3         THE COURT:  All right.  My conclusion is that if we

4    were to go into the road -- down the road of introducing the

5    death evidence it would present two problems:  One would be I        01:14PM

6    think it's a slippery slope and I think we'd have a hard time

7    controlling it.  The second is I think it puts plaintiff at an

8    unfair advantage because the plaintiff has limited time left in

9    the trial.  They have allocated their time to issues that we

10   were going to address which did not include the death evidence.    01:14PM

11   And I think with that limited time it puts them in a box if now

12   we have to spend a half hour on each side talking about death

13   evidence.

14        So my conclusion is that's not the right way to solve

15   the problem.  As a result, I'm going to give a limiting           01:15PM

16   instruction to the jury which will be as follows.  I'm going to

17   tell the jury to disregard the following categories of

18   evidence:  That Bard sent letters to doctors about

19   complications with the Recovery Filter; that Bard told the FDA

20   what it was seeing with the Recovery Filter on the basis of       01:15PM

21   information it gathered in the postmarket setting and told FDA

22   of its plans to send the letter; FDA reviewed the letters, made

23   suggestions, Bard accepted them and sent out the letter.  I'm

24   going to tell the jury to disregard that evidence.

25        I'm not going to explain why, because that would be          01:15PM

1    hazardous in my view and me commenting on the evidence.  I have

2    already told them I'm going to instruct them to disregard

3    evidence.  I'm going to do it.

4         I will tell them when they come back in we have taken

5    17 minutes of their time in an effort to save time in the trial      01:16PM

6    which is the overall objective so they know we have been trying

7    to do that.  And that is the way in which I'm going to solve

8    this problem.

9         Okay.

10        MR. NORTH:  Just so the record is clear, can I just             01:16PM

11   offer an objection to one portion of that limiting instruction?

12        THE COURT:  Yes.

13        MR. NORTH:  And that's the part where you are going to

14   tell them to disregard the fact that Bard was conveying

15   complaint information to the FDA.  I think that's broader than       01:16PM

16   just the Dear Doctor or Dear Colleague letter.

17        THE COURT:  It's going to be specific to Recovery

18   Filter complications in connection with the Dear Doctor letter.

19        MR. NORTH:  If it's limited to the Dear Doctor letter

20   then my objection is moot.                                          01:16PM

21        THE COURT:  All right.  Let's bring them in.

22        Jury in at 1:17 p.m.)

23        THE COURT:  Thanks for your patience, Ladies and

24   Gentlemen.  We have been in here for the last 20-plus minutes

25   resolving an issue that I think will shorten the trial.  Well,      01:18PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7

1    I don't want to suggest we're going to end before we told you

2    but it's not going to run over.  We're trying to keep our arms

3    around this time limit so we can get the trial done in the

4    amount of time we discussed.

5           What I want to do now is give you a limiting                    01:18PM

6    instruction.  You remember that I told you at the beginning of

7    the trial I may instruct you to disregard some evidence.  I'm

8    going to do that now.

9           So this is the evidence that you have heard this

10   morning that I am going to instruct you to disregard.  It's the  01:18PM

11   following categories:  Bard sent letters to doctors about

12   complications with respect to the Recovery Filter.  In

13   connection with those Dear Doctor letters, as they have been

14   referred to, Bard told the FDA what complications it was seeing

15   with the Recovery Filter in the postmarket setting.  The FDA     01:18PM

16   reviewed proposed letters, made suggestions which were accepted

17   and the letters were then sent out.

18          My instruction to you is to disregard that evidence

19   when you are deciding the case.

20          All right.  Let's continue with the cross-examination.    01:19PM

21          MR. LOPEZ:  Thank you, Your Honor.

22                    CROSS-EXAMINATION (Resumed)

23   BY MR. LOPEZ:

24   Q.  Dr. Tillman, hope you had a good lunch.

25   A.  I did.  Thank you.                                           01:19PM

1   Q.  I know we talked about this a little bit, but I just want

2   to make it clear that the documents that you were provided by

3   Bard or had access to, you didn't go through the documents to

4   look for maybe some test results or some information that was

5   different than what Bard provided to FDA so that you could          01:20PM

6   render an opinion as to whether or not Bard actually provided

7   FDA with everything FDA should have had for any of the 510(k)

8   applications.  Is that true?

9   A.  So I would say it's true that I did not deliberately look

10  at the information I had and make sure everything I thought FDA    01:20PM

11  should have was provided to FDA.  I did not actively engage in

12  that activity.

13  Q.  So in your words, you were not acting as an auditor or an

14  investigator where you were going through Bard's records to

15  determine if there was something that should have been            01:20PM

16  submitted to FDA that wasn't, in other words, that wasn't your

17  role or responsibility for purposes of being an expert in this

18  case.  True?

19  A.  That is true.

20  Q.  And did you go look at any of the bench testing or any of     01:20PM

21  the animal testing that Bard had done with respect to any of

22  these filters to determine whether or not there were some test

23  results that show that there were product performance failures

24  that Bard kept to themselves and didn't send to FDA and should

25  have sent to FDA?                                                 01:21PM

1  A.  So I certainly looked at bench tests.  Some of the reports

2  were submitted to FDA.  Some of then weren't.  It was not my

3  intent, once again, to audit those or to determine what should

4  or should not have been sent to FDA.

5  Q.  Were you actually provided with some testing, bench                     01:21PM

6  testing, where any of their filters had failed performance

7  specifications that they kept from FDA and didn't send to FDA?

8  A.  So in my opinion, I did not see any valid scientific

9  evidence that suggested that a Bard filter was not performing

10  according to specifications.                                               01:21PM

11  Q.  Okay.

12  A.  I did see -- sorry -- some individual test deviations or

13  test items that suggested that the performance was -- that some

14  of the data, the information Bard was seeing was not entirely

15  consistent with the specifications, but I think some of that   01:22PM

16  might have been due to problems with the test setup or other

17  testing limitations.

18  Q.  Now, when a device like these filters we have been talking

19  about here are going through a 510(k) process the FDA doesn't

20  actually even get the device, right?  They just get a schematic  01:22PM

21  of the device?

22  A.  So FDA can request a sample of the device if it wants.  It

23  doesn't do that very often.  And it is my understanding that

24  FDA did not actually have a sample of this device.  So that is

25  correct.                                                                   01:22PM

1    Q.  They didn't get to hold like the Simon Nitinol Filter in

2    one hand and the Recovery Filter in the other to inspect it, or

3    any other filters?  They couldn't -- they didn't do any

4    physical inspections of the device, right?

5    A.  I think that that's probably true, yes.                    01:23PM

6    Q.  Of course, they don't test devices themselves.  True?

7    A.  FDA only rarely does device testing and they did not do any

8    testing in this case.

9    Q.  And they didn't tell Bard what tests to run.  Bard chose

10   their own tests to run with respect to these 510(k)           01:23PM

11   applications.  Is that true?

12   A.  Well, there is special control guidance documents.

13   Q.  I understand.  My question is a little different.  I don't

14   mean to interrupt.  I'm talking about choice right now, not

15   whether or not there was a guidance document.                 01:23PM

16       Did FDA choose what tests they were going to run for

17   these 510(k) applications or did Bard choose the tests they

18   were going to run?

19   A.  So Bard certainly chose the tests it would run.

20   Q.  Thank you.  And then the FDA would rely on whatever results 01:23PM

21   happened from these tests to be accurately and honestly

22   summarized for FDA.  True?

23   A.  So in the special 510(k)s, Bard provided a summary of the

24   tests.  In the traditional 510(k)s Bard provided the actual

25   test reports and FDA would have actually reviewed the test    01:24PM

1    reports themselves.

2    Q.  Now, you mentioned that you thought the Recovery was an

3    appropriate predicate for the G2.  Do you remember saying that?

4    A.  Yes, I do.

5    Q.  And you know the G2 first cleared as a permanent-only          01:24PM

6    device, right?

7    A.  That is correct.

8    Q.  And you knew that the Simon Nitinol Filter was a

9    permanent-only device, true?

10   A.  Yes.                                                          01:24PM

11   Q.  And did you see in the material that you reviewed that the

12   safety profile between the Recovery Filter and the Simon

13   Nitinol Filter revealed that the Recovery Filter was

14   dramatically more dangerous and had dramatically more

15   complications than the Simon Nitinol Filter?                      01:25PM

16   A.  So I don't agree with your characterization of the

17   performance of the Recovery Filter.

18   Q.  So if the Simon Nitinol Filter had three fractures in

19   Bard's files in 15 years and the Recovery Filter had 75 or 80

20   fractures, you think that was comparable performance?            01:25PM

21   A.  I don't think you can compare those numbers without

22   understanding what the denominator is in terms of how many

23   devices are out there.

24   Q.  Was there any evidence that you saw where Bard told doctors

25   or patients that receive either the G2, the G2X, or the Eclipse  01:25PM

1  Filter, or were candidates for either, that those filters were

2  under retesting and redesigning at the time that they were

3  using those devices?

4  A.  So I don't -- I did not see any evidence or any information

5  to suggest that Bard told physicians that it was in the process   01:26PM

6  of making modified versions of those devices.

7  Q.  Now, you would agree with me that if you have a design

8  deficiency or a design defect that you have recognized that is

9  probably contributing to an increased complication, increased

10  risk of your device, you don't fix that by just warning about   01:26PM

11  known complications.  Don't you agree with that?

12  A.  So I think if there is a design defect with a device then

13  ideally, you would like to try to redesign the device to

14  correct it.  If you can't redesign to correct it and you can't

15  protect the user, then the appropriate thing is to warn against   01:26PM

16  it.

17  Q.  But you should always look to redesign first, and if you

18  can't redesign then you put out a warning?

19  A.  If it's possible to redesign the device to correct the

20  problem without making something else worse, then yes, that   01:27PM

21  would ideally be --

22  Q.  And if the data that Bard has is that increased risks that

23  we identified in our device is because of a design, some design

24  issues, the warning would be, we have an increased risk of

25  complications with our device because we have identified some   01:27PM

1  design deficiencies.  Wouldn't you agree that's the most

2  appropriate warning?

3  A.  So sounds like there's a hypothetical here, which is that

4  if a company has identified design defects then should it warn

5  people that those defects occur?  If that's the hypothetical        01:27PM

6  then yes, I would say that that would be appropriate.

7  Q.  Okay.

8          MR. LOPEZ:  Can I have trial Exhibit 696, please?

9  BY MR. LOPEZ:

10  Q.  Do you see that, Dr. Tillman?  You recognize this document,   01:28PM

11  correct?

12  A.  Yes, I do.

13  Q.  And this is a document -- tell the jury who is or what is

14  GAO?

15  A.  So GAO is the General Accountability Office which is a --      01:28PM

16  or I guess Government Accountability Office which is a part of

17  the U.S. government that is tasked with going out and doing

18  studies and investigations of parts of the government.  So if

19  Congress wants to know more about what FDA is doing, they can

20  go to the GAO and say, we'd like you to do a report on FDA.       01:28PM

21  Here's the questions we want you to look into.  And then GAO

22  goes off, they do a study, and write a report.  So this is a

23  GAO report.

24  Q.  And you are familiar that the GAO has done a number of

25  reports regarding the FDA's -- some of the shortcomings of       01:28PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Tillman-Cross

1    FDA -- some of the resource issues that they have?  You

2    understand that, right?

3    A.  Oh, yes.  I'm very familiar with GAO has done many reports

4    about FDA.

5    Q.  And this is a copy of a report that you are very familiar        01:29PM

6    with, right?

7    A.  Yes, I was certainly familiar with this report at the time

8    I was at the FDA.

9         MR. LOPEZ:  Your Honor, I would like to offer 696 into

10   evidence at this time.                                              01:29PM

11        MR. NORTH:  No objection, Your Honor.

12        THE COURT:  Admitted.

13        MR. LOPEZ:  And could I show it to the jury, Your

14   Honor?

15        THE COURT:  You may.                                           01:29PM

16   BY MR. LOPEZ:

17   Q.  And this is a document dated June 18, 2009, and it's

18   shortcomings in FDA's premarket review, postmarket

19   surveillance, and inspections of device manufacturing

20   establishments.  Correct?                                          01:29PM

21   A.  Yes.  That is what this report was about.

22   Q.  What was your position at the FDA at this time?

23   A.  So at this time, I was the Director of the Office of Device

24   Evaluation.

25   Q.  And you had an opportunity, when they were preparing this      01:29PM

1  report, to actually review it and make any suggestions or

2  corrections about its content.  True?

3  A.  So when GAO finishes writing a report they give a draft to

4  the organization and give you the opportunity to correct any

5  errors of fact.  You are not allowed to correct their            01:30PM

6  conclusions, but if they've got numbers that are wrong or other

7  errors of fact then you are supposed to point those out.  And I

8  did do that with this report.

9  Q.  I don't have the time, nor would I want to if I did.  But I

10 am going to point out a couple things in this report.          01:30PM

11            MR. LOPEZ:  Could you go to the next page, Gay?

12            And could you highlight the second full paragraph

13 where it says "FDA also faces challenges."  Blow it up for Dr.

14 Tillman.

15 BY MR. LOPEZ:                                                   01:30PM

16 Q.  Dr. Tillman, that reads:  The FDA also faces challenges in

17 postmarket surveillance of medical devices.  In 2008 GAO

18 reported that the number of adverse event reports associated

19 with medical devices increased substantially from 2000 to 2006.

20            Do you see that?                                     01:31PM

21 A.  Yes.  I see that.

22 Q.  Do you see both GAO and FDA have identified shortcomings in

23 FDA's postmarket oversight.  Did I read that correctly?

24 A.  Yes, you did.

25 Q.  For example, in 2006 FDA reported that the agency's ability  01:31PM

1    to understand the risk related to the use of medical devices is

2    limited by the fact that the volume of submitted reports

3    exceeded FDA's ability to consistently enter or review the

4    reports in a routine manner.

5              Did I read that correctly?                                    01:31PM

6    A.   That is what GAO found at the time this report was written,

7    yes.

8              MR. LOPEZ:  Can we go down to the bottom of that page,

9    Gay, please.  Just the last sentence there at the very bottom.

10   BY MR. LOPEZ:                                                           01:31PM

11   Q.   Taken together these shortcomings in both premarket -- and

12   premarket would be 510(k) applications, right?

13   A.   So this report was not about the broad premarket program.

14   It was about a very narrow issue with the premarket program,

15   but just to be clear about that.                                       01:32PM

16   Q.   Taken together these shortcomings of both premarket and

17   postmarket activities raise serious concerns about FDA's

18   regulation of medical devices.  Correct?

19   A.   That is GAO's conclusion, yes.

20             MR. LOPEZ:  Next, the next page, Gay, in the middle          01:32PM

21   there.  Middle paragraph.

22   BY MR. LOPEZ:

23   Q.   FDA reviews submissions for thousands of new devices filed

24   each year to decide whether they should be allowed to be

25   marketed in the United States and is also responsible for             01:32PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Tillman-Cross

1    oversight of thousands of devices already on the market.

2         Correct?  Did I read that right?

3    A.  That is what it says.

4         MR. LOPEZ:  And then the next paragraph down, Gay,

5    please.                                                        01:33PM

6    BY MR. LOPEZ:

7    Q.  Recently concerns have been expressed about FDA's ongoing

8    ability to fulfill its mission of ensuring the safety and

9    efficacy of medical products including drugs, biologics, and

10   devices.                                                       01:33PM

11        Do you see that?

12   A.  I see that.

13   Q.  And then the demands of the agency have soared in recent

14   years.  This investigation revealed that.  Is that what it

15   says?                                                          01:33PM

16   A.  That's what it says, yes.

17        MR. LOPEZ:  And then let's go to Page 14, Gay.  It

18   would be probably Page 17 of the actual exhibit, Page 14 of the

19   document.  Two more pages.  The middle paragraph.

20   BY MR. LOPEZ:                                                  01:33PM

21   Q.  We and FDA have identified shortcomings in FDA's

22   post-market surveillances.  In 2006 FDA reported that the

23   agency's Center of Devices and Radiological Health's ability to

24   understand the risks of adverse events related to the use of

25   medical devices, whether used in the home of a patient, in a   01:34PM

1  hospital, in a laboratory, or in the office of a private

2  practitioner is limited both by lack of informative validated

3  adverse event reports and by lack of quality epidemiologic

4  information.

5        Did I read that right?                           01:34PM

6  A.  Yes.  That's what GAO found in 2006.

7  Q.  Well, there's been other reports since then, right?  I

8  mean, there have been reports in 2008, 2009 that have similar

9  findings.  Are you familiar with that?

10 A.  I don't think the findings are completely the same but I   01:35PM

11 would agree that GAO has continued to express concern about

12 FDA's ability to perform its mission in the time frame that you

13 are talking about.

14 Q.  And you have seen a number of these reports where the FDA,

15 I mean, they are good people, they are scientists, but they're   01:35PM

16 just overwhelmed sometimes and they just can't do the job that

17 we might expect them to do, right?

18 A.  At the time that this report was written, that's true.

19 Since then their resources have increased significantly.

20       MR. LOPEZ:  Okay.  Those are the only questions I have   01:35PM

21 at this time, Your Honor.

22       THE COURT:  Redirect?

23       MR. NORTH:  No further questions, Your Honor.

24       THE COURT:  Thanks, Dr. Tillman.  You can step down.

25       MR. NORTH:  Your Honor, at this time Mr. Rogers is   01:36PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Tillman-Cross

1   going to present Dr. Clement Grassi.

2           MR. ROGERS:  Your Honor, I understand he's in the

3   restroom.

4           THE COURT:  Okay.  If you want to stand up, Ladies and

5   Gentlemen, feel free.                                          01:36PM

6           MR. ROGERS:  Your Honor, in the interim can I hand up

7   his report and some prior testimony of the doctor?

8           THE COURT:  Yep.  We'll trade you.

9           THE COURTROOM DEPUTY:  Please come forward and raise

10  your right hand.                                               01:38PM

11          (The witness was sworn.)

12          THE COURTROOM DEPUTY:  Sir, if you could please state

13  your name and spell it for the record.

14          THE WITNESS:  Yes.  Clement Grassi.  C-L-E-M-E-N-T,

15  G-R-A-S-S-I.                                                   01:38PM

16          THE COURTROOM DEPUTY:  Thank you, sir.  Please come

17  have a seat.

18                      CLEMENT GRASSI, M.D.

19  called as a witness herein, having been duly sworn, was

20  examined and testified as follows:

21                      DIRECT EXAMINATION

22  BY MR. ROGERS:

23  Q.  Good afternoon, Dr. Grassi.

24  A.  Good afternoon.

25  Q.  Can you introduce yourself to the jury, please?           01:38PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1    A.  Yes.  My name is Clement Grassi, and I'm a practicing

2    diagnostic and interventional radiologist.

3    Q.  Doctor, what is going to be the focus of your testimony

4    today?

5    A.  The focus will be for me to speak about and render opinions        01:39PM

6    on the SIR guidelines and the topic of IVC filters.

7    Q.  And when you use the abbreviation SIR, what are you

8    referring to?

9    A.  That refers to the Society of Interventional Radiology.

10   Q.  And would it be okay with you if we called it SIR for short       01:39PM

11   during the course of your testimony?

12   A.  Yes.

13   Q.  Doctor, let me ask you some questions about your background

14   and your education and training.

15           Can you tell the jury where you went to college,             01:39PM

16   please?

17   A.  Yes.  I attended Harvard College.

18   Q.  When did you finish Harvard?

19   A.  That was in -- I graduated in 1976.

20   Q.  And did you go to medical school thereafter?                      01:39PM

21   A.  Yes, at Tufts University School of Medicine.

22   Q.  Is that also in Boston?

23   A.  It is.

24   Q.  And after medical school, did you do a what is something

25   called an internship?                                                01:39PM

1  A.  Correct.  In my internship or first post-graduate year one

2  I was at the Massachusetts General Hospital in Boston.

3  Q.  And what types of things would you have done during that

4  internship that year?

5  A.  The internship is required for certification licensing.  It      01:40PM

6  includes clinical experience, seeing and treating patients.

7  Q.  And is the Massachusetts General Hospital one of the

8  hospitals that is also affiliated with Harvard?

9  A.  Yes, it is.  It is one of the Harvard Medical School

10  teaching hospitals.                                                 01:40PM

11  Q.  Doctor, after that, did you complete a residency in

12  radiology?

13  A.  Yes.  I was in a residency at the Beth Israel Deaconess

14  Hospital also in Boston.

15  Q.  What year did you complete your residency?                      01:40PM

16  A.  That was in 1985.

17  Q.  And Doctor, can you tell us was your residency in

18  diagnostic radiology?

19  A.  Correct.  Radiology training during the residency program

20  for general radiology is in the field of diagnostic radiology.      01:41PM

21  And then graduates may or may not continue with additional

22  subspecialty training.

23  Q.  And can you tell us briefly what you mean by diagnostic

24  radiology?

25  A.  Diagnostic radiology is the practice of imaging                 01:41PM

1  interpretation and integration in terms of reporting for

2  patient care.

3  Q.  So Doctor, if we think of a doctor in the hospital

4  typically holding up an X-ray and looking at it and trying to

5  discern what's in there, is that diagnostic radiology?                01:41PM

6  A.  Yes, overall.

7  Q.  And so after that, did you do a fellowship?

8  A.  I did.  I did a two-year fellowship in interventional and

9  cardiovascular radiology.

10  Q.  Where was that?                                                   01:42PM

11  A.  Brigham and Women's Hospital in Boston.

12  Q.  Is that also affiliated with Harvard?

13  A.  It is.  It is the third major Harvard teaching hospital.

14  Q.  And very briefly, can you tell the jury the difference

15  between diagnostic radiology and interventional radiology?           01:42PM

16  A.  Well, diagnostic radiology involves, as I mentioned, the

17  interpretation of images and the application of those findings

18  to patient care.  Interventional radiology is a subspecialty in

19  which practitioners will use various catheter-based and other

20  image-guided technique to perform procedures, again, for the         01:42PM

21  benefit of patients.

22  Q.  And Doctor, after your fellowship in interventional

23  radiology did you do some teaching?

24  A.  I did.  I was asked to continue as a staff member at

25  Brigham and Women's Hospital.  And the responsibilities there        01:42PM

1   in addition to the clinical practice and research included

2   teaching.

3   Q.  Who were you teaching?

4   A.  I was teaching fellows, residents, and also medical

5   students including Harvard medical students.                      01:43PM

6   Q.  So when you say you were teaching fellows, does that mean

7   were you teaching doctors who were in the process of learning

8   to be an interventional radiologist about how to do that?

9   A.  Yes.  That's right.

10  Q.  Doctor, tell us where you currently work, please.           01:43PM

11  A.  I'm currently with Partners Healthcare, and I also work for

12  Hallmark Health.  And those hospitals are in the greater Boston

13  area just north of Boston.

14  Q.  How long have you been in Boston?

15  A.  I have really been -- grown up in Pennsylvania, but more of  01:43PM

16  my life has been in New England or just outside Boston.

17  Q.  Doctor, are you licensed to practice medicine?

18  A.  Yes, in the state of Massachusetts.

19  Q.  Are you board certified?

20  A.  Yes, I am.                                                   01:44PM

21  Q.  And so Doctor, how long have you been in the practice of

22  medicine currently?

23  A.  I have been practicing now for 38 years.

24  Q.  And have you been the director of vascular and

25  interventional radiology at certain hospitals?                  01:44PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1   A.  Yes.  After I had left Brigham and Women's Hospital I had

2   taken additional positions, promotion positions.  One of those

3   was as director at the Boston VA Health Services in the Boston

4   area, and I directed interventional radiology.

5   Q.  Do you implant inferior vena cava filters?                    01:44PM

6   A.  Yes, I do.

7   Q.  And do you retrieve inferior vena cava filters?

8   A.  Yes.  I also retrieve them.

9   Q.  How long have you been doing that?

10  A.  Well, implantation, as you know, because of permanent         01:44PM

11  devices, would have been performed really since the time of my

12  fellowship.  And more recently, over my several years of

13  practice, it would also include retrievals which has been more

14  recently.

15  Q.  And have you had an interest in inferior vena cava filters    01:45PM

16  throughout the course of your career?

17  A.  It really has been an interest of mine.  It's been one of

18  my career interests in terms of venous thromboembolic disease,

19  prevention of pulmonary embolism, and the use of mechanical

20  protection by vena cava filters.                                  01:45PM

21  Q.  Have you published articles in the peer-reviewed medical

22  literature or inferior vena cava filters?

23  A.  Yes.  I have several published articles.

24  Q.  Have you served as an investigator for clinical trials that

25  were studying inferior vena cava filters?                         01:45PM

1    A.   I have.   I have participated as a co-participant, and I

2    have also been the principal investigator for one of the IVC

3    filter trials while I was a staff member at Brigham and Women's

4    Hospital.

5    Q.   So Doctor, how long, approximately, would you say that --          01:46PM

6    well, let me strike that question.

7            Doctor, when is the last time that you would have

8    implanted an inferior vena cava filter?

9    A.   I would say about two and-a-half weeks ago.

10   Q.   When is the last time you would have retrieved one?              01:46PM

11   A.   Approximately three weeks ago.

12   Q.   And Doctor, let me ask you some more questions about the

13   Society of Interventional Radiologists or the SIR.

14           Can you describe for the jury just generally what that

15   organization is?                                                     01:46PM

16   A.   Yes.   The Society of Interventional Radiology promotes and

17   promulgates information both for educational purposes and for

18   the dissemination of techniques related to interventional

19   radiology.   Although it's based in the United States, it's

20   really an international organization.                                01:47PM

21   Q.   About how many members are there of that organization?

22   A.   As of this date, I would say it probably exceeds the high

23   5,000s.

24   Q.   Doctor, is there something you can become in the SIR called

25   a fellow or a senior fellow?                                         01:47PM

1  A.  Yes, there is.  That's an additional position in addition

2  to standard membership.  And it's not to be confused with the

3  term of fellow that we just talked about for training purposes.

4  It's really an honorary position that's granted to those who

5  apply who are members of the SIR, and who then have either     01:47PM

6  published in the field, created or promoted new advances, or

7  otherwise distinguished themselves in the field of

8  interventional radiology.

9  Q.  Do you also have to receive letters of support from other

10 members of the SIR who are fellows?                            01:48PM

11 A.  That's correct.  There's an application process.

12 Q.  And Doctor, are you a senior fellow in the SIR?

13 A.  Yes, I am.

14 Q.  How long have you been a senior fellow?

15 A.  Since approximately 1993.                                  01:48PM

16 Q.  Let me ask you about some of your other work within the

17 SIR.  Have you been involved in certain committees of the SIR?

18 A.  I have.  Because of my interests I have been very active in

19 several of the committees there.

20 Q.  And can you tell us, have you chaired any of those          01:48PM

21 committees?

22 A.  I have; specifically two of them.  I was a member of the

23 Technology Assessment Committee which looks at new and

24 interesting technologies in the field, and I became a chair

25 there for three years.  And I have also been a member of the    01:48PM

1  Standards of Practice Committee.  And after working in that

2  committee I was a chair of the SIR Standards of Practice

3  Committee also for three years.

4  Q.  And what does that committee do, the Standards of Practice

5  Committee?                                                    01:49PM

6  A.  That committee is created by the SIR in an effort to

7  educate, summarize information for practitioners and for those

8  working in the field, and to create documents, both electronic

9  and in print, that will guide practitioners in the field.

10  Q.  And were you involved in the preparation of some guidelines  01:49PM

11  as part of that committee that relate to the use of inferior

12  vena cava filters?

13  A.  Yes.  I was actually a first author of one such

14  publication.

15  Q.  When were those guidelines published?                    01:49PM

16  A.  They were published in 2001.

17  Q.  And did they go through a peer-review process?

18  A.  Yes, they did, a very strict one.

19  Q.  And were the guidelines, once they were published, were

20  they provided to all members of the SIR?                     01:50PM

21  A.  They were.  They were available after publication on line

22  and also in a print version.  They were published in the

23  official journal of the Society of Interventional Radiology

24  which is the JVIR, or Journal of Vascular Interventional

25  Radiology.                                                   01:50PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1   Q.  So Doctor, is it fair to say that the guidelines you worked

2   on and that were published were widely disseminated within the

3   medical community?

4   A.  They were.  And in answer to your question, there was a

5   period where they were available also prior to their final          01:50PM

6   publication in which members of the Society and those working

7   in the field in general could submit comments in regard to the

8   publication of the document itself.

9   Q.  Okay.  Thank you, Doctor.  I'm going to ask you a little

10  bit more about that in a minute.                                    01:51PM

11          MR. ROGER:  But can we pull up Exhibit 7132, please.

12  BY MR. ROGERS:

13  Q.  Doctor, do you see on your screen there Exhibit 7312?

14  A.  Doesn't seem to be coming up quite yet.  Now it is.

15  Q.  And is this a copy of the published version of the              01:51PM

16  guidelines that you were describing?

17  A.  Yes, it is.

18  Q.  And what is the title of these guidelines?

19  A.  The title is:  Quality Improvement Guidelines for

20  Percutaneous Permanent Inferior Vena Cava Filter Placement for      01:51PM

21  the Prevention of Pulmonary Embolism.

22          MR. ROGERS:  At this time, I would move for admission

23  of 7132.

24          MR. CLARK:  Your Honor, we would object as hearsay.

25          MR. ROGERS:  Your Honor, under Rule 801(c) we don't         01:52PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1    believe this document is hearsay because it is not being

2    offered for the truth of the matter asserted but is being

3    offered instead for the information that was available within

4    the medical community and to Bard in the 2001 time frame.

5              THE COURT:  Mr. Clark.                                      01:52PM

6              MR. CLARK:  Your Honor, we would disagree with that

7    characterization.  It's offering studies and information that

8    is, in fact, offered for the truth of the matter asserted.  We

9    would not object to information from it being published under

10   803.18 as an authoritative text.  I think Mr. Rogers has        01:52PM

11   touched those bases, but we do not think it gets around the

12   other problems.

13             THE COURT:  I want to ask you a couple questions so

14   let's talk briefly at sidebar.

15             You can stand up, Ladies and Gentlemen.                    01:52PM

16             (Discussion was had at sidebar out of the hearing of

17   the jury:)

18             THE COURT:  Mr. Clark, in the Booker trial this was

19   admitted with a limiting instruction that it was not to be

20   considered for the truth of the matter asserted, only for      01:53PM

21   notice and knowledge within the industry.  My question to you

22   is:  If I were to admit it with that limiting instruction in

23   this case, do you think that it is improper under the Rules of

24   Evidence in some way?

25             MR. CLARK:  I do in this particular circumstance.  I       01:53PM

1   do not think there's been foundation laid.  Yes, he said it

2   went out to doctors but as far as the information, how they

3   reacted, we talked about this a little bit with the Nicholson

4   article.  And I think that was the basis of your ruling to

5   allow that was that it produced a specific reaction with Bard.          01:53PM

6   We don't have any foundation that it has done that in the

7   medical community in this particular case.

8            THE COURT:  If that foundation is laid, do you think

9   that admitting it with that limiting instruction would be

10  appropriate?                                                            01:53PM

11           MR. CLARK:  Your Honor, I don't, because I think we're

12  getting into what information the doctors are taking from this

13  which gets into truths.  I don't think that cures the problem

14  so I would maintain my objection.  I understand the Court's

15  prior ruling.                                                          01:54PM

16           THE COURT:  I do think it needs that additional

17  foundation.  If it's going to be admitted for purposes of

18  notice and knowledge there needs to be foundation that that's,

19  in fact, the effect it had.

20           So I am not going to admit it at this point, but if           01:54PM

21  you want to lay that additional foundation I will consider it

22  at that point.

23           MR. ROGERS:  Okay.  We'll do, Your Honor.

24           (In open court.)

25           THE COURT:  Thank you, Ladies and Gentlemen.                  01:54PM

1  BY MR. ROGERS:

2  Q.  Dr. Grassi, are you ready?

3  A.  Yes.

4  Q.  Let me ask you a few more questions about this document.

5          You told us earlier that it was published in 2001 and          01:54PM

6  distributed to the all the members of the SIR.  Is that right?

7  A.  That's right.  Because of the fact that the Journal of

8  Vascular and Interventional Radiology is the official journal

9  and is a benefit of membership, all of the members would have

10  had access to this.                                                  01:55PM

11  Q.  So would it have gone to all 5,000 plus members of the SIR?

12  A.  Correct, as well as being available electronically on the

13  website.

14  Q.  And Doctor, what is your understanding of how members of

15  the medical community, including members of SIR, would have          01:55PM

16  used this document?

17  A.  They would have used it, and its intended purpose was as a

18  summary document.  The goal was to provide, in a summary

19  fashion, comments which would help practitioners in their

20  day-to-day work and all those working with vena cava filters.        01:55PM

21  Since in the literature there were literally hundreds of

22  articles which had been published, but to my knowledge as of

23  that time there was no real summary document, it was the

24  opinion of the SIR executive committee that that was something

25  that was greatly needed.                                             01:56PM

1    Q.  And did the document that you put together summarize

2    information about adverse events that were seen with IVC

3    filters in individual doctors' practices?

4    A.  Yes, it did.

5    Q.  And was that information disseminated to the members of the    01:56PM

6    SIR?

7    A.  Yes.

8    Q.  And so with that kind of information about the adverse

9    consequences that a doctor may see about -- with an inferior

10   vena cava filter, how were the doctors in the medical community    01:56PM

11   supposed to use that information?

12   A.  They would use it in a constructive fashion to look at the

13   data presented, examine the thresholds or rates which we had

14   quoted, and as described in the document, if in their practice

15   they found that some of the complications or adverse events or    01:56PM

16   other parameters met or exceeded what was quoted, then that

17   should prompt for them a quality assurance review in their own

18   department for their own personal use.

19   Q.  Were these guidelines also available to other stakeholders

20   in the IVC filter world such as IVC filter manufacturers?    01:57PM

21   A.  Yes, they were.

22   Q.  And was the data that was contained in your guidelines

23   available for use by IVC manufacturers like C.R. Bard?

24   A.  Because this was available on the website and published, it

25   was available to them and to the public as a whole.    01:57PM

1       MR. ROGERS:  Your Honor, I, again, move Exhibit 7312

2  into evidence.

3       MR. CLARK:  Same objection, Your Honor.

4       THE COURT:  All right.  Ladies and Gentlemen, I'm

5  going to admit Exhibit 7312 but with a limiting instruction        01:57PM

6  that you have heard before, which is this document is not being

7  admitted to prove the truth of what is asserted in the

8  document.  It is instead being admitted to demonstrate

9  knowledge within this medical community and what was known by

10  the community on the basis of these guidelines.                   01:58PM

11       And with that instruction, the document is admitted.

12       MR. ROGERS:  May we publish the document, Your Honor?

13       THE COURT:  Yes.

14  BY MR. ROGERS:

15  Q.  Dr. Grassi, let me first turn your attention, you have       01:58PM

16  given us the title of the article previously.  I do want to

17  point out your name appears with several other names under the

18  title.  Can you tell us what that means, please?

19  A.  Yes.  So that I was the first author and as the first

20  author responsible for the leadership on the document, and the   01:58PM

21  additional dozen or so names here were my co-authors on the

22  document.

23       The committee itself consisted of over 30 people, and

24  these were the individuals who had participated directly in the

25  publication and the review of the document.                      01:59PM

1   Q.  And so since -- with all these doctors whose names are

2   listed, are they all interventional radiologies like yourself?

3   A.  They are, and it includes a number of physicians who I must

4   say are very talented and prominent in the field and many of

5   whom you see here are still active within the SIR.                01:59PM

6   Q.  And as the lead author, what were your responsibilities?

7   A.  I was --

8   Q.  Compared to the other authors?

9   A.  Yes.  I was responsible for being the leader on the

10  document, being the prime author, delegating sections for         01:59PM

11  review, creating subcommittee or working groups in terms of the

12  construction of the document.  And then I was the organizer and

13  coordinator for our personal meetings and also for our

14  conference calls.

15  Q.  And before these guidelines were developed, were there any    02:00PM

16  practice guidelines for interventional radiologists such as

17  yourself about IVC filters?

18  A.  Certainly as I mentioned there were a variety of

19  publications on the subject, but to my knowledge before this

20  there were no specific practice guidelines in a summary fashion   02:00PM

21  that existed.

22  Q.  And Doctor, before we get into the substance of some of the

23  guidelines, let me ask you just a few questions about how this

24  was put together.

25          Can you describe for the jury generally what the          02:00PM

1   process was that you went through in order to kind of bring

2   these guidelines together?

3   A.  It was a multi-step process, because as you can imagine, we

4   felt obliged to be very comprehensive with the information we

5   had.  It started with a review of the literature by the SIR            02:00PM

6   staff and ourselves in collecting all of the known articles by

7   sources like PubMed, MEDLINE, and Google search.  Then of those

8   hundreds of articles the committee looked at them and we

9   boiled those down to the ones which we felt were the most

10  pertinent.                                                            02:01PM

11          From the information in those articles there was text

12  and writing which went on, and that process was extensively

13  reviewed over about a two-year period.  As I mentioned, we

14  conducted personal committee meetings at two different annual

15  meetings; one the annual meeting of the SIR, which usually            02:01PM

16  occurs in the Spring, and also the meeting of the Radiological

17  Society of North America which regularly occurs at the end of

18  November to the beginning of December in Chicago.

19  Q.  Once there was a draft of these guidelines ready, what was

20  the process thereafter?                                               02:01PM

21  A.  After the draft, it was important that the working members

22  of the committee review it and that there be a give and take

23  about the facts within it.  So we conducted conference calls,

24  usually in the evenings, anywhere between Monday and Friday.

25  They might be quite lengthy, lasting for two or three hours.          02:02PM

1  We would go through actually each section of the document, part

2  by part, reviewing the text, the tables, references, and

3  listening really to everyone's opinion on the subject; what

4  they felt was important to exclude and what would not be

5  included.                                                           02:02PM

6  Q.  And did a draft of the document go to the executive

7  committee for the SIR?

8  A.  It did.  After this preliminary process then that was

9  submitted to the executive committee and then there was further

10 action.                                                            02:02PM

11 Q.  And at one point, did the draft document get posted on the

12 SIR website so all interventional radiologists who were members

13 of that organization could comment on the guidelines?

14 A.  It did.  It was available for commentary, and after a

15 period of commentary, those notes and e-mails were collected.     02:03PM

16 And then that was synthesized in the document and then the

17 document was, once again, submitted now to the Journal of

18 Vascular Interventional Radiology to the editor-in-chief for

19 their review.

20 Q.  So once it was submitted to the editor, did it go through     02:03PM

21 an additional peer-review process?

22 A.  Yes, by the editor and the co-editors.

23 Q.  And then thereafter was it published?

24 A.  That's correct.

25 Q.  And Doctor, again, I believe you said it was published in     02:03PM

─────5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct─────

1    2001, is that right?

2    A.  Yes.

3              MR. ROGERS:  And Scott, if you would, can we pull up

4    Table 2 which is on Page 7312, excuse me, third page.

5    BY MR. ROGERS:                                              02:03PM

6    Q.  Doctor, do you see on your screen there Table 2?

7    A.  Yes.

8    Q.  Is this something that was a part of the guidelines that

9    you put together?

10   A.  Yes, it is.                                             02:03PM

11   Q.  And underneath Table 2 it says "other trackable events."

12   Do you see that?

13   A.  Yes.

14   Q.  And can you describe for the jury what that means?  What

15   are other trackable events?                                02:04PM

16   A.  Well, it's important to understand that these are medical

17   parameters that in my opinion and in the opinion of the

18   committee members were important for physicians and those

19   working with interventional devices, IVC filters.  They include

20   IVC penetration, migration, filter fracture, axis site        02:04PM

21   thrombosis, insertion problems, and a category of other.

22             Now, it's important to understand that these may not

23   be adverse events.  In many cases these were patients who had

24   no ill effects whatsoever.  But we felt that for the purpose of

25   medical completeness the practitioners should be aware of these  02:04PM

—————5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct—————

1   events and know about them.

2   Q.  And Doctor, what are these numbers that come after those

3   categories?  For instance, after IVC penetration, we see 7, 17,

4   19.  Can you tell us what those are?

5   A.  Those were the numbered references or citations to the          02:05PM

6   articles that are included under the reference list that we

7   referred to for these categories.

8        MR. ROGERS:  Scott, would you go to the last two

9   pages, please, and let's show the reference list.

10  BY MR. ROGERS:                                                      02:05PM

11  Q.  And Doctor, it looks like the reference lists run through

12  the Number 54.  Is that right?

13  A.  Yes.

14  Q.  And so does that mean -- well, tell us what that means.

15  Are these the 54 medical articles that were cited in your          02:05PM

16  guidelines?

17  A.  They are.  And this does not mean that these are the only

18  articles that dealt with the subject.  But of the hundreds that

19  I had mentioned in our review of the literature, these were the

20  ones which the committee felt were the most significant ones.       02:05PM

21  Q.  And do all of these articles that are cited in the

22  guidelines, do they all deal with permanent IVC filters?

23  A.  They do, because on a time frame it's important to

24  understand that this was written at the time that vena cava

25  filters were available as permanent devices.  The retrievable       02:06PM

1  or option-type filters came later.

2  Q.  And at the time you did this search of the worldwide

3  literature, roughly how many articles are out there?  Do you

4  have any idea, about IVC filters?

5  A.  I would say it would be in the hundreds, perhaps over a          02:06PM

6  thousand.

7  Q.  And did you cull down the articles that you wanted to cite

8  down to these 54?

9  A.  Yes.

10         MR. ROGERS:  Scott, let's go back to Table 2 please.        02:06PM

11  BY MR. ROGERS:

12  Q.  And Doctor, we pulled out Table 2, and on the right-hand

13  side there's something called reporting rates.  Can you explain

14  to the jury what that is?

15  A.  So the reported rates are a range which we provided in the     02:07PM

16  table for the benefit of practitioners.  And they give the

17  range over which we observed these particular parameters

18  occurring.  For example, IVC penetration on the first line, in

19  those articles was cited as occurring with a frequency of

20  anywhere from zero to 41 percent.                                  02:07PM

21  Q.  And how did you come up with that range?

22  A.  It was by looking through the articles, reading them, and

23  seeing what the investigators reported.

24  Q.  So if there's zero, does that mean that there was an

25  article out there that found zero IVC penetrations in the study   02:07PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1    that they did?

2    A.   That's right, whereas one of the other articles may have

3    reported IVC penetration in as high as 41 percent.

4    Q.   Okay, Doctor, I want to talk a look at the line that says

5    filter fracture.  Do you see that, in the third one down?        02:08PM

6    A.   Yes.

7    Q.   So what is the reported rate for IVC filter fracture?

8    A.   The reported rate is between 2 and 10 percent.

9    Q.   And Doctor, let's take a look at one of the citations that

10   you relied on.  Do you see number 17 there?                      02:08PM

11   A.   Yes.

12          MR. ROGERS:  And Scott, if you would, can you pull up

13   7002, please?

14   BY MR. ROGERS:

15   Q.   Doctor, do you have that on your screen?                    02:08PM

16   A.   Yes, I do.

17   Q.   And what is the title of that article?

18   A.   This article is Percutaneous Inferior Vena Cava Filters

19   Follow-Up of Seven Designs in 320 Patients.

20   Q.   Where was this article published?                          02:08PM

21   A.   This is published in the so-called Grey Journal of

22   Radiology.  That is the official journal of the Radiological

23   Society of North America, or we refer to it as the RSNA.

24   Q.   Is that a peer-reviewed medical journal?

25   A.   It definitely is.                                          02:09PM

1    Q.  Would you consider this article to be a reliable article?

2    A.  Yes.  It's one of the preeminent journals.

3         MR. ROGERS:  If you would, please, Scott, let's go to

4    Page 3.

5    BY MR. ROGERS:                                              02:09PM

6    Q.  Well, before we get there, Doctor, let me ask you a general

7    question.  In this particular article what were the authors

8    studying?  What were they looking at?

9    A.  The authors were looking at IVC filters in general and

10   commenting specifically on the complications which they saw      02:09PM

11   associated from a variety of devices.

12        MR. ROGERS:  And let's pull out Table 2, if you

13   would, please.

14   BY MR. ROGERS:

15   Q.  And Doctor, is this a table that appears in that article?    02:09PM

16   A.  Yes, it does.

17   Q.  And running across the top, we see that there are -- it

18   says complications, and then there are several abbreviations.

19   Are all those abbreviations the abbreviation for a particular

20   filter?                                                          02:10PM

21   A.  That's correct.

22   Q.  Are all these filters permanent filters?

23   A.  Yes, they are.

24   Q.  And, for instance, the first two, there's BN1 and BN2 what

25   are those?                                                       02:10PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1    A.  So that stands for bird's necessary or specifically the

2    Gianturco-Roehm Bird's Nest Filter.  The one refers to the

3    first version or the first iteration, and the numeral 2 refers

4    to the second.

5    Q.  And what would the N be that's in the middle there?                02:10PM

6    A.  The N in this article is the abbreviation for the so-called

7    Simon Nitinol Filter with the N representing Nitinol.

8    Q.  How about the one that says VT.  What was that?

9    A.  That would stand for the Vena Tech Filter.

10   Q.  What about TG?                                                      02:10PM

11   A.  That would be the Titanium Greenfield Filter.

12   Q.  And Doctor, let's take a look, I guess, first at the

13   fracture rate that's reported in this article.

14         MR. ROGERS:  Can you pull that line out, please,

15   Scott?  Can you go one more line down?  Thank you.                     02:11PM

16   BY MR. ROGERS:

17   Q.  And so what are the rates here that are being reported for

18   fracture that are seen in these filters?

19   A.  Well, these are the reported rates according to the various

20   filter types that we have talked about.                               02:11PM

21   Q.  So, for instance, with the Bird's Nest 1 and Bird's Nest 2,

22   what was the fracture rate that was being reported according to

23   this article?

24   A.  So the Bird's Nest Type Number 1 showed 1 in 26 or a rate

25   of 4 percent.  The Bird's Nest Filter 2, one fracture in 32, or       02:11PM

1    a rate of 3 percent.

2    Q.   What was the reported fracture rate for the Simon Nitinol

3    Filter?

4    A.   The Simon Nitinol filter under the line N 10 showed 2 of 17

5    or rate of 12 percent.                                      02:11PM

6         MR. ROGERS:  Scott, can you pull out the line on

7    migration, please.

8    BY MR. ROGERS:

9    Q.   Doctor, do you recall how migration was defined in this

10   article?                                                    02:12PM

11   A.   Yes.  It's my understanding that migration that is

12   representing a significant change of the filter position within

13   the vena cava was defined as a change of two centimeters or

14   greater.

15   Q.   Let's take a look just to make sure we're accurate.     02:12PM

16        MR. ROGERS:  Can you go to Page 2, please, Scott, and

17   that top section?  I think we're on Page 4.  Let's go over to

18   Page 2.  And that middle paragraph or middle column, can you

19   pull out the section on migration, please.

20   BY MR. ROGERS:                                               02:12PM

21   Q.   So Doctor, from this portion of the article, what was the

22   definition of migration?  How is that defined?

23   A.   Yes.  So I just want to correct myself.  In this particular

24   article it was a movement, cranial or caudal, cranial meaning

25   superior, or toward the head; caudal meaning inferior, or      02:13PM

1  toward the feet of actually more than one centimeter.

2  Different articles one will find may actually use either the

3  one-centimeter or the two-centimeter parameter.

4  Q.  So any movement within the inferior vena cava up or down by

5  more than one centimeter was considered migration?                    02:13PM

6  A.  Yes.

7          MR. ROGERS:  Scott, can you go back to the table,

8  please.  Pull out the migration line.

9  BY MR. ROGERS:

10 Q.  So Doctor for this particular line of migration for that          02:13PM

11 Bird's Nest 1, what was the percentage of migration that was

12 reported?

13 A.  The percentage of migration on the left is 12 percent.

14 Q.  And how about the rate for the Simon Nitinol Filter?  What

15 was the rate there?                                                   02:13PM

16 A.  The rate for the Simon Nitinol Filter is 12 percent.

17 Q.  And for the Titanium Greenfield, what was the rate reported

18 for migration?

19 A.  Yes.  In this case, three out of six, and with that smaller

20 number the rate is actually 50 percent.                               02:14PM

21 Q.  Doctor, let's look also at the line called IVC penetration.

22          MR. ROGERS:  Can you highlight that line, please,

23 Scott?

24 BY MR. ROGERS:

25 Q.  And so Doctor, again, what are the rates that are reported        02:14PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1  here for IVC penetration?

2  A.  Moving from left to right, for example, with the Bird's

3  Nest Filter, Type 1, 5 percent; with the Bird's Nest 2, 6

4  percent.  With the Nitinol Filter that you had mentioned

5  earlier, or Simon Nitinol Filter, there was a rate of 33        02:14PM

6  percent.

7  Q.  How about for the Titanium Greenfield?

8  A.  And the Titanium Greenfield, a rate of penetration of 50

9  percent.

10         MR. ROGERS:  Would you please take that down and let's  02:15PM

11  go back to the prior exhibit, please.  Can we publish that for

12  the jury, please?

13         THE COURT:  Yes.

14         MR. ROGERS:  Scott, if you would, can you pull back,

15  that table please.                                             02:15PM

16  BY MR. ROGERS:

17  Q.  So Doctor, now that we've got a little bit of an idea how

18  some of these rates were put together, can you tell us what the

19  migration rate was that's published in your article?

20  A.  The migration rate is a reported range of between 0 and 18  02:15PM

21  percent.

22  Q.  So looking then at the first three lines where you have

23  penetration, migration, and fracture, were those rates all well

24  known within the medical community when this was published in

25  2001?                                                          02:16PM

1   A.  Yes, they were.

2   Q.  And were these -- were the information that was published

3   used by practitioners such as yourself and in teaching

4   institutions for fellows who were training in interventional

5   radiology?                                                          02:16PM

6   A.  Yes.  It would have been rates which were available to

7   people in teaching hospitals as well as hospitals as a whole.

8   Q.  And since your guidelines were published, have the

9   guidelines from the Society of Interventional Radiology been

10  updated from time to time?                                          02:16PM

11  A.  Yes, they have, which is a regular process by the SIR.

12  Q.  And what is the most recent edition of those guidelines?

13  A.  There is actually a 2017 updated version, which is

14  available through a publication with the American College of

15  Radiology.                                                          02:17PM

16          MR. ROGERS:  Scott, would you pull up Exhibit 6842,

17  please.

18  BY MR. ROGERS:

19  Q.  And Doctor, do you have on your screen the most recent

20  version of the SIR guidelines?                                      02:17PM

21  A.  Yes, I do.

22  Q.  And were these the ones that were published in 2017?

23  A.  Yes.  And you can see the date about the third of the way

24  down.  Says they were revised in 2016, and it's my

25  understanding they were actually published in calendar 2017.        02:17PM

1    Q.  And were these guidelines also submitted to a peer review

2    process similar to what you described earlier?

3    A.  Yes, they were.

4    Q.  And are these, again, available to all the members of the

5    Society of Interventional Radiology?                          02:17PM

6    A.  They are.  They would be available to members of the

7    Society of Interventional Radiology; the members of American

8    College of Radiology, a separate large society.  And because

9    they are published they are available as knowledge to the

10   public as well.                                              02:18PM

11   Q.  And Doctor, do you consider these guidelines to be a

12   reliable authority?

13   A.  Yes, I do.

14   Q.  And do you use these guidelines in your practice?

15   A.  Yes.  They are widely used.                              02:18PM

16   Q.  And so do these particular guidelines, since they were

17   published in 2017, did they contain data on both permanent and

18   retrievable filters?

19   A.  In this case, because in the time period of 2016 to 2017,

20   retrievable or option filters were available, these included  02:18PM

21   both permanent and retrievable types.

22           MR. ROGERS:  Scott, can you go to Table 2, please, and

23   pull that up for the doctor.  That's on Page 13.  Yeah.  There

24   you go.

25   BY MR. ROGERS:                                               02:18PM

1   Q.  Doctor, is there a Table 2 in the 2017 version similar to

2   the Table 2 that was put together for the set of guidelines

3   that you authored in 2001?

4   A.  Yes, there is, and it's what you are showing now.

5   Q.  And are the categories of potential complications that are        02:19PM

6   listed in Table 2 pretty much the same as the ones that you

7   published in 2001?

8   A.  Yes.  They are very, very similar.

9   Q.  And for the one section called migration of filter, has

10  there been something added on to that?                                02:19PM

11  A.  There is.  The listing now reads migration of filter slash

12  filter components.

13  Q.  And what does that mean, migration of filter components?

14  A.  Well, in thinking about the medical term migration,

15  migration is usually defined as a movement of the filter             02:19PM

16  itself.  The use of filter components connotes that rather than

17  being the filter as a whole, it might include movement of one

18  portion, that is, one piece of metal of the filter rather than

19  the filter in total.

20  Q.  And what is the reported rate that's listed in the 2017          02:20PM

21  guidelines?

22  A.  The rate is between 0 and 25 percent.

23  Q.  And Doctor, roughly how many citations have been given in

24  the 2017 guidelines in support of that reported rate for filter

25  migration?                                                           02:20PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1    A.   These look to be approximately 33 references.

2    Q.   And have you reviewed those references?

3    A.   Yes.   I have seen the titles of all these citations.

4    Q.   And do any of those references report any clinical data

5    that was done on the Eclipse Filter?                                02:20PM

6    A.   Let's see.   No.   These would not include the Eclipse

7    Filter.

8    Q.   And so if they don't include data on the Eclipse Filter,

9    what does that mean?   What can you take away from that?

10            MR. CLARK:   Objection.   Foundation.                      02:21PM

11            THE COURT:   Overruled.

12            THE WITNESS:   Yes.   Well, I can say looking at this

13   subjectively that the rate of my filter migration or filter

14   component migration is based on filter devices other than the

15   Eclipse Filter showing a rate of 0 to 25 percent.                  02:21PM

16   BY MR. ROGERS:

17   Q.   Okay.   And let's take a look at filter fracture.   What is

18   the reported rate for filter fracture in 2017?

19   A.   In this article, the reported rate is between 0 and 50

20   percent.                                                           02:21PM

21   Q.   And again, roughly how many citations are there in support

22   of that rate?

23   A.   Again, approximately 33.

24   Q.   And Doctor, have you had a chance to review those citations

25   that support that rate?                                            02:22PM

1    A.   I have seen the titles of these reference citations.

2    Q.   And do any of the titles that you see, do any of those

3    appear to concern the Eclipse Filter?

4    A.   No.   These would not include the Eclipse.

5    Q.   And then for IVC penetration, what is the rate that's          02:22PM

6    reported there?

7    A.   For penetration the rate is between 0 and 100 percent.

8    Q.   And roughly how many citations are there in support of the

9    penetration rate?

10   A.   Again, just over 30.                                           02:22PM

11   Q.   And have you reviewed those articles?

12   A.   Yes.   I have had a chance to see these article titles.

13   Q.   And do any of those articles appear to concern the Eclipse

14   Filter?

15   A.   No.   These would not include the Eclipse Filter.             02:22PM

16   Q.   And so Doctor, again, does it appear that the complications

17   of penetration, migration, and filter fracture are well known

18   within the medical community today?

19   A.   Yes.   Based on the guidelines that we have talked about,

20   these guidelines and the literature that's available and          02:23PM

21   published, these pieces of information are well known.

22   Q.   Doctor, the jury has heard testimony that filter migration,

23   penetration, tilt, and fracture are interrelated and that

24   specifically, that migration, tilt, and penetration can cause a

25   filter to fracture.   In your opinion, is that theory supported   02:23PM

1   by the medical literature?

2   A.  Well, I can say that from my work on the committee and

3   interaction with the members and in my own personal experience,

4   certainly I have seen, or seen with colleagues, a variety of

5   different complications with all filter devices.  But I have          02:23PM

6   not seen and have not seen proof of any relationship that you

7   have just mentioned.

8   Q.  And in the current version, the 2017 version of the

9   guidelines that are published by the SIR, is there anything in

10  those guidelines that relate to an inter-relatedness between        02:24PM

11  filter complications?

12  A.  Well, certainly the guidelines deal with either one or more

13  than one complication related to a particular filter,

14  particular patient.  But there's no mention of any interrelated

15  sequence of events in them.                                          02:24PM

16  Q.  And Doctor, in all of your review of the medical

17  literature, have you ever seen the term "cascade of events" as

18  applied to IVC filters?

19          MR. CLARK:  Your Honor, I don't think this is in his

20  report.                                                              02:24PM

21          THE COURT:  Where is that in the report, Mr. Rogers?

22          MR. ROGERS:  Your Honor, on Page 10 of his report he

23  discusses that there is no information about interrelatedness

24  amongst the various complication modes with IVC filters.

25          THE COURT:  Where is that, please?                           02:25PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Direct

1          MR. ROGERS:  It's on Page 10 of his report.

2          THE COURT:  Yeah.  Where?  It's a dense page.

3          MR. ROGERS:  Sure.  I'm sorry.  If you look under the

4   section at the very top, first full paragraph, "relationship of

5   IVC adverse events."                                              02:25PM

6          THE COURT:  Let me read that.

7          The objection is overruled.

8   BY MR. ROGERS:

9   Q.  So Doctor, let me ask you again.  In your review of the

10  medical literature, over the course of the years that you have   02:25PM

11  been an interventional radiologist, have you ever seen the term

12  "cascade" as applied to the concept of there being some

13  relationship between various filter modalities -- excuse me --

14  complication modalities with filters and particularly tilt and

15  perforation and migration leading to fracture?                   02:26PM

16  A.  Well, I am aware of comments using either a term similar to

17  cascade, or cascade.  But in my own personal experience, and in

18  the articles that I have had a chance to read, I have not

19  encountered any proof of such a pathophysiology.

20  Q.  Doctor, are you charging for your time today?                02:26PM

21  A.  Yes.

22  Q.  And what is your hourly rate?

23  A.  My hourly rate is $350 per hour.

24  Q.  And have you been retained by my law firm or C.R. Bard to

25  be an expert witness in this litigation?                         02:26PM

1  A.  Yes, via the Nelson Mullins law firm.

2  Q.  Do you charge $350 an hour for all of the activities that

3  you engage in as an expert witness?

4  A.  Yes, I do.

5  Q.  And Doctor, have all the opinions that you have expressed          02:26PM

6  today been to a reasonable degree of medical certainty?

7  A.  Yes.

8  Q.  Thank you, Doctor.  I don't have any further questions.

9          THE COURT:  All right.  Cross-examination?

10          MR. CLARK:  Yes, Your Honor.                                  02:27PM

11                          CROSS-EXAMINATION

12  BY MR. CLARK:

13  Q.  Good afternoon, Doctor.

14  A.  Good afternoon.

15  Q.  I want to make sure I heard that right.  Did you have some        02:27PM

16  connection with Harvard in your professional experience?

17  A.  Yes.  Through my work, through a number of hospitals I have

18  been affiliated with Massachusetts General, Beth Israel

19  Deaconess, and more recently, Brigham and Women's Hospital

20  which, as you know, are Harvard medical school teaching              02:27PM

21  hospitals.

22  Q.  I think I get the opportunity to talk to the people Bard

23  has hired from Harvard in this case, so it's your lucky day.

24          You were asked questions by Mr. Rogers about

25  compensation by the Nelson Mullins firm in this case.  How much     02:27PM

1   have you charged for your work in this matter?

2   A.   The more recent billing for this specific matter, and you

3   are asking me for a total?

4   Q.   Yes.

5   A.   Yes.  So the more recent billing which included imaging                02:28PM

6   review, record review, and, of course, testimony is

7   approximately $6,000.

8   Q.   $6,000.  And you have been working with -- for Bard on a

9   consulting basis since 2010, is that correct?

10  A.   That's correct.                                                         02:28PM

11  Q.   And is it fair to say that over the last eight years that

12  your total billing on all matters you have handled on a

13  consulting basis with Bard would approach six figures?

14  A.   No.  I don't believe it would be that much.  I would have

15  to actually, myself, go back and look at the billing since          02:28PM

16  2010.

17  Q.   Well, if you testified a couple months ago that your

18  billing had been around $37,000, and that did not include all

19  prior work, would that give you some perspective that it might

20  actually be over the course of the last eight years somewhere      02:29PM

21  around six figures?

22  A.   Off the top of my head, I would say, counselor, that it

23  would be less than that because one would have to understand

24  that the work, unlike my medical practice, is not constant, is

25  not every week or every month.  And so I work intermittently in    02:29PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross

1    terms of my time and energies.

2           THE COURT:  Mr. Clark, we're going to take a break at

3    this point.

4           Ladies and gentlemen, we'll resume at 2:45.

5           (Recess from 2:29 until 2:45 p.m.)                    02:29PM

6           THE COURT:  Ladies and Gentlemen, for your

7    information, to make up for a little bit of lost time, we'll go

8    until 4:30 today.

9           You may continue, Mr. Clark.

10          MR. CLARK:  Thank you.                               02:46PM

11   BY MR. CLARK:

12   Q.  Doctor, let's get into the SIR guidelines.  These

13   guidelines were published in 2001, correct?

14   A.  Correct.

15   Q.  And they are a collection of data that had been culled from  02:46PM

16   medical literature, is that right?

17   A.  Yes.

18   Q.  And at the time of 2001, I think you told us that

19   retrievable or optional filters were not yet on the market.  Is

20   that fair?                                                  02:47PM

21   A.  That's fair.  They were not in clinical use.

22   Q.  So at the time in 2001, that study related only to

23   information concerning permanent filters, right?

24   A.  Yes.  As stated in the guidelines, that document dealt with

25   permanent IVC filters.                                     02:47PM

1  Q.  Now, in terms of studies you talked a little bit about the

2  types of studies that went into the SIR guidelines.  You have

3  authored an opinion in this case that there's a certain

4  hierarchy of studies with the first kind of gold standard being

5  double-blinded controlled prospective studies.  Do you remember      02:47PM

6  that?

7  A.  Yes.

8  Q.  And you agree that that's the best level and most reliable

9  level of a study, correct?

10  A.  That would be the ideal in terms of the level of               02:47PM

11  information for its accuracy and unbiased nature, yes.

12  Q.  And as we get down the list in terms of that, then, one of

13  the things that becomes concerning is that different studies

14  can have different biases, either underreporting,

15  over-reporting, selection bias, things like that.  Right?        02:48PM

16  A.  That's fair.

17  Q.  And in terms of the -- you would agree that there are no

18  what we might call Level 1 studies, that double-blind

19  controlled prospective studies relating to the use of IVC

20  filters.  Fair?                                                   02:48PM

21  A.  To the best of my knowledge there are no double-blinded

22  prospective multi-center Level 1 type studies available on IVC

23  filters.  That's right.

24  Q.  And that's true today just like it was back in 2001, to the

25  best of your knowledge?                                           02:48PM

1    A.   Yes.   To the best of my knowledge, that is still correct.

2    Q.   Now, one of the categories you listed in your report is a

3    Level 5 category in terms of strongest to weakest was

4    collection of data including from the FDA's MAUDE database.  Do

5    you remember giving that opinion?                              02:49PM

6    A.   Category 5 that you are mentioning would be reports that

7    might be singular reports, case reports, or other data which

8    certainly could be read and used but is not a Level 1 study.

9    Q.   And what you have rated the FDA's MAUDE database was Number

10   5 in your report, correct?                                     02:49PM

11   A.   Correct.

12   Q.   And for scientific reasons, it's most useful and most

13   reliable to compare studies that are of the same category in

14   terms of the data that's in there, correct?

15   A.   Certainly in answer to your question, trying to compare    02:49PM

16   study to study, it's most useful to look at data from

17   comparable level studies.

18   Q.   Apples to apples, right?

19   A.   More or less.

20   Q.   Now, you talked about the Ferris article which is Exhibit   02:49PM

21   7002.

22            MR. CLARK:  Could you pull that up please, Gay?  If

23   you could go to Page 3,  Table 2.

24   BY MR. CLARK:

25   Q.   Do you remember this document?  Was this the document that  02:50PM

1   you said was very important?

2   A.   Yes.   You are showing the Table 1, I believe, from the

3   Ferris, et al., radiology article.

4   Q.   And this was the table that was used to describe the rate

5   of failure for different types of conditions, including IVC        02:50PM

6   penetration, migration, and fractures.   Correct?

7   A.   Correct, as defined by the authors in this article.

8   Q.   And I understand Mr. Rogers didn't highlight this for you,

9   but the way the authors define the rate here is if you look at

10  the footnote I have highlighted for you that the first number     02:50PM

11  is the number of complications; second number is number of

12  studies performed to evaluate complications.   The number in the

13  parenthesis, which I think was the rates you were discussing

14  with Mr. Rogers, is the percentage of studies that showed

15  complications.   Did I read that more or less accurately?         02:51PM

16  A.   You did.

17  Q.   So what this is looking at, the Ferris article, is the

18  percentage of studies that reported these types of

19  complications, correct?

20  A.   As I understand this article, because they were reviewing    02:51PM

21  multiple filters with multiple data.

22  Q.   But that would be different.   That wouldn't be an apples to

23  apples comparison to a clinical study where they were

24  monitoring patients, for example, and seeing what the results

25  with those particular patients were, right?                       02:51PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross

1    A.   Well, I'm not sure I understand exactly your question.

2    Q.   Let me phrase it in a more intelligible way.

3             This study that you were talking about with Table 2 is

4    looking at the rate of complications reported based on the

5    number of studies that they saw.  It's a function of how many          02:52PM

6    studies there are, right?

7    A.   They use that, as you have highlighted, as their

8    denominator.

9    Q.   Okay.  That's what the authors did?

10   A.   Yes.                                                               02:52PM

11   Q.   Now, in this table, just while we have it up, that doesn't

12   have any category for the phenomenon of migration -- I'm

13   sorry -- the phenomenon of fracture and embolization of a

14   filter component, right?  That's not reported in Table 2?

15   A.   Well, it's my understanding on this article, and we would         02:52PM

16   have to probably look at the methods paragraph at the beginning

17   to be sure, that they were creating categories, in this case

18   they use the category of migration.  And one must understand in

19   fairness for any scientific study the authors make some

20   decisions as to what their methods are, what categories they            02:53PM

21   are going to be looking at and how they are going to list their

22   data.  I know this from having participated in studies myself.

23   Q.   Understand.  But what's not listed in here is the term

24   embolization that we have heard about, right?  That's not on

25   Table 2?                                                                02:53PM

1   A.  You are correct in that they haven't used that particular

2   medical term.

3   Q.  Let's talk about what the SIR guidelines are not.  Now, my

4   understanding is that these guidelines are not intended to

5   imply that the complication or trackable event rates that are          02:53PM

6   set forth in Table 2 of the SIR guidelines are acceptable.

7   That's not making a statement that as long as it's within these

8   ranges that's an acceptable rate.  Is that fair?

9   A.  Certainly, personally, and I think I can speak for many of

10  my colleagues, we would like there to be no complications and         02:53PM

11  no adverse events for patients we treat.  The SIR guidelines

12  are meant to be educational, to summarize what is reported.

13  And in your question with the use of acceptable, certainly we

14  reported ranges of complications.  And our intention was as

15  stated explicitly in the guidelines text that if a particular        02:54PM

16  doctor or someone working with IVC filters saw that they met or

17  exceeded those numbers, then that would prompt their own

18  personal review.

19  Q.  So this is a tool for physicians, correct?

20  A.  Well, it would be a tool for physicians, for practitioners,       02:54PM

21  and for all of those who would work on the subject or with IVC

22  filters.

23  Q.  Well, the design of the study was to be helpful to

24  practitioners who are implanting and removing IVC filters,

25  correct?                                                              02:54PM

1    A.   No.   I would say that the establishment of the guidelines

2    was not limited to doctors or physicians alone in the same way

3    it wasn't limited to interventional radiologists.   Anyone who

4    would be placing an IVC filter, working with patients with IVC

5    filters, in fairness could read and benefit from the                02:55PM

6    information contained in the guidelines.

7    Q.   Let's see if we can agree on something.   You would agree

8    that the guidelines are not meant to establish a standard of

9    care for physicians using IVC filters.   Is that right?

10   A.   They are meant to be educational.                              02:55PM

11   Q.   In other words not the standard of care.   It's educational.

12   It's information?

13   A.   They certainly are guidelines, that's right, and a summary

14   for physicians and those working with filters.

15   Q.   And it's not meant to establish a standard of care for        02:55PM

16   medical device companies who may be working with IVC filters,

17   right?   That's not its design?

18   A.   Well, it's not for me to comment on what a company would or

19   would not use as a standard.   I can only say that as one

20   involved in the guidelines our goal was to be informative,         02:56PM

21   educational, and be helpful with the summary.

22   Q.   But would you agree with the statement that SIR guidelines

23   do not create safety thresholds for filters that relate to

24   perforation, fracture, migration, tilt, or the inability to

25   remove a filter?                                                    02:56PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross

1    A.  Overall, I would.

2    Q.  And that the SIR guidelines are not meant to be an

3    instruction manual for medical device companies like Bard when

4    they are designing a filter?

5    A.  Certainly the guidelines were, as I think I have just          02:56PM

6    described, any instruction manual or directives to the company

7    would, of course, come from engineers and their own staff.

8              MR. CLARK:  Gay, could you pull up Exhibit 6842.

9              Your Honor, in light of the Court's prior ruling

10   concerning the SIR guidelines and their admissibility, I would    02:57PM

11   move to admit 6842 into evidence.

12             THE COURT:  What is it?

13             MR. CLARK:  It is the update to the SIR guidelines.

14             THE COURT:  The 2017?

15             MR. CLARK:  Correct.                                     02:57PM

16             THE COURT:  Any objection to having it admitted on the

17   same basis?

18             MR. ROGERS:  Your Honor, I do object.  We admitted it

19   for the purpose of the knowledge of the medical community in

20   2001 prior to the introduction of the Eclipse Filter.  And as     02:57PM

21   you just pointed out this was published in 2017.

22             THE COURT:  Your response?

23             MR. CLARK:  I was actually listening very carefully.

24   I think Mr. Rogers established the same foundation that he laid

25   for that in that this was published.  It was disseminated to      02:57PM

UNITED STATES DISTRICT COURT

1    physicians and physicians had notice.  I think he used the

2    words knowledge of it.  So I think it's exactly the same

3    analysis, Your Honor.

4              THE COURT:  4-20-17.

5              MR. CLARK:  Correct.                              02:57PM

6              THE COURT:  So why is it relevant in this case?  I

7    think that was the objection.

8              MR. ROGERS:  Correct, Your Honor.

9              MR. CLARK:  Your Honor, I think it's relevant, and I

10   can lay that foundation.  It gets relevant into what has      02:58PM

11   happened between 2001 and 2017.  I would like to ask questions.

12             THE COURT:  I think you need to lay additional

13   foundation.

14             MR. CLARK:  Okay.

15   BY MR. CLARK:                                                02:58PM

16   Q.  In 2017 we had an update to the SIR guidelines, correct?

17   A.  Yes.

18   Q.  And that update also contains Table 2 like we saw in the

19   last exhibit, right?

20   A.  Yes.                                                     02:58PM

21   Q.  And Table 2 has the same type of information in terms of

22   rates of failure that are collected from a category of

23   information, right, of medical literature?

24   A.  The Table 2, that's true, is a very similar table.

25   Q.  And if you could pull up Table 2 in 6842.                02:58PM

1    Do you see the disclaimer in the bottom of Table 2

2   that is highlighted sir, or Doctor?

3   A.  Yes.

4   Q.  It says -- well, and does that indicate that these are

5   reporting outcomes that are collected from data but are not the    02:59PM

6   SIR standards for complications?  Is that fair?

7   A.  It would be fair to say that these, again, as we discussed

8   earlier, are presented as information as a summary.  And it

9   says simply the statement and the sentence that you just read.

10  Q.  And so physicians who have received this would now know, at    02:59PM

11  least as of 2017, that these are not meant to be representative

12  of the SIR standard for complications.  Is that fair?

13  A.  I think you would have to clarify that question for me

14  because I'm not exactly sure of the meaning of your question.

15  Q.  Right.  You said that doctors get this article, right?    03:00PM

16  It's a peer-reviewed publication?

17  A.  Yes.

18  Q.  And when doctors get that information, presumably they read

19  it.  Right?

20  A.  Yes.    03:00PM

21  Q.  And in reading it, they would learn that it would be very

22  clearly expressed that the design of this information is not to

23  be representative of the SIR standard for complications.

24  Right?

25  A.  Well, the SIR, I think, has been very appropriate in    03:00PM

1    calling these guidelines.  The SIR, as you know, is a

2    professional organization.  It is not a regulatory or standards

3    body so in that regard, the charge of the SIR, as an

4    institution, would not be to create some form of regulatory

5    standard.                                                        03:00PM

6          MR. CLARK:  Your Honor, I believe that makes it

7    relevant, particularly to how the SIR guidelines are being used

8    in this particular case in 2018.

9          MR. ROGERS:  No objection, Your Honor.

10         THE COURT:  All right.  I'm going to admit 6842 with      03:01PM

11   the same limiting instruction it's not for the truth of the

12   matter asserted, simply regarding notice and knowledge within

13   the medical community.

14         MR. CLARK:  Gay, if you could back up.

15         May I publish this, Your Honor?                           03:01PM

16         THE COURT:  Yes.

17         MR. CLARK:  Before you back up, Gay, that's the

18   footnote that I was referring to the disclaimer at the bottom

19   of Table 2?

20         THE WITNESS:  Yes.  And could you repeat that, please?    03:01PM

21   BY MR. CLARK:

22   Q.  What is highlighted at the bottom, just for the benefit of

23   the jury, is the disclaimer we were just discussing?

24   A.  That's correct.

25   Q.  If you could go to Page 2, please.  Doctor, I have          03:01PM

1  highlighted some text here.  And it says:  Although retrievable

2  filters are often placed as permanent devices, the long term

3  safety and efficacy of these devices as a class have not been

4  established.

5      Do you agree with that statement?                          03:02PM

6  A.  I would have to give a cautious commentary on that

7  statement, and if you like I can elaborate.

8  Q.  Your Honor -- or Doctor, I have limited time with you so

9  I'm sure Mr. Rogers will bring that out.  But what I'm asking

10  is yes or no, do you agree with that statement from the SIR?   03:02PM

11  A.  Well, and my answer to try to be as fair as I can in answer

12  to your question is I actually can't answer this as a yes or

13  no.  The long term safety and efficacy of these devices as a

14  class is something which is continually looked at in studies.

15  It has been reviewed in the previous two SIR annual meetings   03:02PM

16  with abstracts and publications.  And if you would like I can

17  even comment on some of these which I saw a year ago.

18  Q.  Let me ask this question:  As of 2017, when this SIR

19  guideline update was published, the opinion of the authors was

20  that the long term safety and efficacy of retrievable filters  03:03PM

21  had not yet been established.

22      Is that fair?

23  A.  I would say certainly, this is the considered opinion of

24  the authors in this publication.  Yes.

25  Q.  That's what I was asking.  Thank you.                      03:03PM

1    A.   Correct.

2    Q.   Now, perhaps to speed -- we talked a little bit about the

3    cascade, and that's a term that you are not -- you have not

4    seen literature to support that term.  Is that correct?

5    A.   Correct.                                                    03:03PM

6    Q.   And you haven't seen literature to talk about the kind of

7    constellation of problems that could happen with migration

8    leading to tilt to perforation to fracture.  Is that fair?

9    A.   I have either heard alluded to, or at least I'm aware of

10   individuals who have referred to this.  And again, I can       03:03PM

11   elaborate as to who those are and what types of studies.  But

12   in my opinion, to date there has not been a sequence of events

13   which, in my view, has shown a proof to those statements.

14   Q.   And my question was specific to literature, so I would

15   appreciate if you could just respond to the question I asked.  03:04PM

16   A.   Uh-huh.

17   Q.   As literature you have not seen that.  That's what you told

18   Mr. Rogers, right?

19   A.   That I have not seen what, please?

20   Q.   Literature referring to the cascade of events that we     03:04PM

21   described.

22   A.   As I mentioned, I have heard a sequence of events referred

23   to, not specifically the word "cascade."  And I, in proceedings

24   I have heard this referred to, to answer your question.

25   Q.   In terms of -- let me make sure I understand.  So you     03:04PM

1  haven't received any internal documents from Bard that talk

2  about Bard's understanding of the relationship between

3  migration, tilt, perforation, and fracture.  Is that fair?

4  A.  That's correct.  I haven't received any proprietary or

5  internal company documents.                                    03:05PM

6  Q.  And if Bard understood that there could be that cascade of

7  information as reflected in its internal documents, that's not

8  information you have been given in this case.  Fair?

9  A.  Well, that would be a hypothetical question.  As I

10  mentioned, I haven't received any such documents so it's really  03:05PM

11  not possible for me to comment on that subject.

12  Q.  And in terms of you haven't been given analysis or data or

13  internal information from Bard about fracture rates with the

14  Eclipse Filter.  Is that fair?

15  A.  That's fair.  I have not received any internal documents  03:05PM

16  from Bard on that particular subject.

17  Q.  And the information you told Mr. Rogers was from looking --

18  when you talked about the articles that were referenced in the

19  Ferris article, that those fractures -- I'm sorry, not the

20  Ferris article -- in the Table 2 of the 2007 update, there were  03:06PM

21  no Eclipse fractures represented in that data.  Correct?

22  A.  That's correct.

23  Q.  Your understanding of that was based on reviewing headlines

24  of data, of articles.  That's what you told us?

25  A.  I have seen those articles, over the years have been  03:06PM

1  familiar with them, and have probably read them either in whole

2  or in part in the course of my work.

3  Q.  But what you told us earlier was that you read the

4  headlines.  Did I hear that wrong?

5  A.  No.  That's not accurate.  If I remember the question          03:06PM

6  correctly, what was asked of me is if I have seen the articles

7  and I said that I have seen the titles and am aware of all the

8  articles.  I would not presume to testify that I have read

9  every word of each one of those articles.  But yes, I am

10  largely familiar with them and have reviewed all of those        03:06PM

11  citations that were asked of me a little bit earlier.

12  Q.  In the interest of time I have prepared a sort of

13  side-by-side comparison of the two tables from the 2001 and the

14  2016 study.

15          MR. CLARK:  Your Honor, may we be permitted to put       03:07PM

16  that on the ELMO to display?

17          THE COURT:  Just to the witness?

18          MR. CLARK:  To the witness.  That would be fine.

19          THE COURT:  All right.  Yes.

20  BY MR. CLARK:                                                     03:07PM

21  Q.  Can you see that, Doctor?

22  A.  Yes, I do.

23  Q.  And in 2001, just a to run through this again, IVC

24  penetration reported rates were 0 to 41, right?

25  A.  Yes.                                                          03:07PM

—————5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross—————

1    Q.   Migration was 0 to 18?

2    A.   Yes.

3    Q.   And filter fracture was 2 to 10, right?

4    A.   Yes.

5    Q.   And fast forward to 2016, which is when the data was          03:07PM

6    collected for the 2017 study, we have IVC penetration was 0 to

7    100, right?

8    A.   Yes.

9    Q.   And migration of filter now includes the category like Mr.

10   Rogers said, filter components, right?                            03:08PM

11   A.   Yes.

12   Q.   This introduces this concept of fragment embolization that

13   we talked about earlier?

14   A.   That's fair.

15   Q.   And the reported rates for that were 0 to 25, right?         03:08PM

16   A.   Yes.

17   Q.   And for filter fracture was 0 to 50?

18   A.   As listed on your chart, yes.

19   Q.   So what we know from this comparison is that once

20   retrievable filters are part of the population that is studied,   03:08PM

21   the upward bounds of these ranges goes up considerably.  Is

22   that fair?

23   A.   I will say that as represented by the numbers on your

24   charts, those numbers have increased as we're seeing them in

25   front of us.                                                      03:08PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross

1  Q.  And they increased across each of those three categories,

2  correct?

3  A.  In each of the categories of your chart the numbers have

4  increased.

5  Q.  And we also now have a recognition of the phenomenon of          03:08PM

6  fragment embolization in the 2016 study, correct?

7  A.  Well, no.  Let me comment on that, if I may.

8  Q.  I'm going to ask you a yes or no question.  Is that related

9  in the 2016 study?

10  A.  The question that I believe you just asked me is that it       03:09PM

11  represented -- did it represent a new concept of distal

12  embolization.  That's not a new concept.  In fairness,

13  counselor, embolization of filter fragments have been

14  recognized as far as back as 1972.  And I have had colleagues

15  and I have had my own personal experience where I have seen      03:09PM

16  either fractures or portions of filters that have then gone on

17  to a nontarget organ.

18          MR. CLARK:  Move to strike as nonresponsive, Your

19  Honor.

20          THE COURT:  Granted.  The jury should disregard the       03:09PM

21  last answer.

22  BY MR. CLARK:

23  Q.  Doctor, the definition of filter embolization in the

24  Exhibit 7312, which are your guidelines, is post-deployment

25  movement of the filter to a distant anatomic site completely     03:10PM

———5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross———

1    out of the target zone.  Is that right?

2    A.   That's correct.

3    Q.   And the definition of filter embolization, when we fast

4    forward to Exhibit 6842, is post-deployment movement of the

5    filter or its components to a distant anatomical site                    03:10PM

6    completely out of the target zone.  The only difference between

7    those is we now include "or its components," is that right?

8    A.   No.  I think one must be pretty careful.  It's a matter of

9    medical semantics here whether the particular person in the

10   particular study is talking about movement of the filter as a           03:10PM

11   whole therefore using the word embolization, which is in the

12   interventional radiology community the definition.  And it's

13   important to understand that when a portion that is less than

14   the total filter goes to an area, let's say such as a pulmonary

15   artery or distal pulmonary artery, that that, in the second            03:11PM

16   guidelines, was referred to as an embolization.  I think of

17   that myself as a component embolization, and I can elaborate

18   further if you wish.

19   Q.   I do not wish.  I would move to strike as nonresponsive.

20        THE COURT:  I think that one was responsive.  But            03:11PM

21   let's say this.  If you want him to answer yes or no, then

22   Doctor, either answer yes or no or simply say you can't answer

23   it yes or no.  And if he wants elaboration he'll call for it.

24        THE WITNESS:  Yes.

25   BY MR. CLARK:                                                            03:11PM

———————5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross———————

1   Q.  Doctor, did the definition change for the 2016 for filter

2   embolization?

3   A.  The question you asked I actually can't answer.

4   Q.  You can't say whether there was a difference between the

5   2001 and the 2006 definition of filter embolization?  That's          03:11PM

6   yes or no?

7   A.  I cannot say that because I would have to compare the

8   specific medical semantics.  In fairness, what I can say is

9   what I have told you is my --

10           THE COURT:  That's good, Doctor.  You said you can't       03:12PM

11   answer.

12           MR. CLARK:  Telling me no, right?

13           THE WITNESS:  Thank you.

14   BY MR. CLARK:

15   Q.  In terms of rates, Doctor, if there was a physician who        03:12PM

16   reported to Bard fracture embolization, that he experienced

17   five patients that he examined and wrote an article about all

18   five, each with a different failure mode, the rate would be --

19   let me withdraw that question.  I think -- I don't think I

20   understand the note from my counsel.                                03:12PM

21           Doctor, you are not an engineer, right?

22   A.  No.  I do not have training of an engineer.

23   Q.  And you haven't done a failure modes effect analysis on IVC

24   filters, is that fair?

25   A.  I have worked with various engineering aspects in the          03:13PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Grassi-Cross

1   course of looking at filters as a study, but no, I have not

2   done failure mode engineering analysis on the Bard or other IVC

3   filters.

4   Q.   Thank you, Doctor.

5          THE COURT:  Redirect?                              03:13PM

6          MR. ROGERS:  Very briefly, Your Honor.

7                    REDIRECT EXAMINATION

8   BY MR. ROGERS:

9   Q.   Dr. Grassi, in the course of your career as a medical

10  doctor, have you ever received internal company documents to     03:13PM

11  evaluate for the manufacture of any medical device that you

12  use?

13  A.   No, I have not and have not requested them either in an

14  effort, for example, during the guidelines to remain impartial.

15  Q.   When you were preparing the guidelines that were published  03:13PM

16  in 2001, did your committee consider any internal documents of

17  any company as a source of information for those guidelines?

18  A.   That's a very reasonable question, and that was a question

19  that we considered whether to dig down, so to speak, and look

20  at very specific information from the companies.  We did not do  03:14PM

21  that for a variety of reasons, which included the fact that the

22  majority of the committee members felt it was most fair and

23  most impartial for us not to favor or give the appearance of

24  favoring any one particular company or group, but rather that

25  it would be the most accurate for us to comment on what was in   03:14PM

1    the literature and what was out there in practice in the

2    community.

3    Q.   Thank you.   No further questions.

4            THE COURT:   All right.   Thank you, sir.   You can step

5    down.                                                          03:14PM

6            If you want to stand up, Ladies and Gentlemen, feel

7    free to do that while we're bringing in the next witness.

8            MS. HELM:   Your Honor, at this time we call Andrzej

9    Chanduszko.

10           THE COURTROOM DEPUTY:   Sir, please come forward and    03:15PM

11   raise your right hand, please.

12           (The witness was sworn.)

13           THE COURTROOM DEPUTY:   Could you please state your

14   name and spell it for the record, sir.

15           THE WITNESS:   My name is Andrzej Chanduszko.          03:15PM

16   A-N-D-R-Z-E-J, and the last name is C-H-A-N-D-U-S-Z-K-O.

17                       ANDRZEJ CHANDUSZKO,

18   called as a witness herein, having been duly sworn, was

19   examined and testified as follows:

20                       DIRECT EXAMINATION

21   BY MS. HELM:

22   Q.   Good afternoon, Mr. Chanduszko.

23   A.   Good afternoon.

24   Q.   Would you please tell the ladies and gentlemen of the jury

25   where you work?                                               03:16PM

1   A.  I work at Bard Peripheral Vascular.

2   Q.  How long have you worked at -- I'm going to call it BPV.

3   How long have you worked at BPV?

4   A.  I worked there for 14 years.

5   Q.  What type of products does BPV develop and manufacture?        03:16PM

6   A.  Products, lots of implantable devices such as vena cava

7   filters, stents, skin grafts, angioplasty balloons, biopsy

8   needles.  These are some of them.

9   Q.  Are you an engineer by education and training?

10  A.  Yes, I am.                                                     03:17PM

11  Q.  Mr. Chanduszko, where were you born?

12  A.  I was born in Poland.

13  Q.  And what year did you come to the United States?

14  A.  In 1989.

15  Q.  And I'm not going to ask you your birthday but how old were    03:17PM

16  you in 1989 when you came to the United States?

17  A.  I was 24 years old.

18  Q.  And did you become a U.S. citizen?

19  A.  Yes, I did.

20  Q.  Is English your first language?  You speak with an accent,     03:17PM

21  obviously.

22  A.  No, it is not.  Polish is my first language.

23  Q.  Do you still have to -- do you still struggle with English

24  phrases and terms sometimes?

25  A.  A little bit sometimes, yes.                                   03:17PM

1   Q.  And personally how do you manage that when you are having

2   to translate phrases or terms?

3   A.  So I guess that depends on the environment.  But in a

4   professional environment I typically try to reduce, you know,

5   the terms to something that is more defined, more technical.     03:18PM

6   Q.  And is it sometimes easier for you to speak in technical

7   terms?

8   A.  Yes.  Sometimes it is.

9   Q.  Would you describe your education for the jury, please?

10  A.  So I started four years in Poland, I started environmental    03:18PM

11  protection.  And when I came to the United States, I studied

12  mechanical engineering at Northeastern University in Boston,

13  and I have a Bachelor of Science degree.

14  Q.  Why did you choose to become an engineer?

15  A.  So I always wanted to be an engineer since I was a child.     03:18PM

16  And once I went to school, physics and math were my favorite

17  subjects, and I always liked problem solving.  So it became

18  very natural for me to do engineering things.

19  Q.  After you moved to the United States, did you have a job at

20  Massachusetts General Hospital?                                   03:19PM

21  A.  Yes, I did.

22  Q.  And what were you doing at Massachusetts General Hospital?

23  A.  I was delivering medical equipment and supplies to the

24  whole hospital.  It's a huge hospital and in different

25  buildings.                                                        03:19PM

1   Q.  And in the process of delivering those medical supplies and

2   equipment, were you able to observe different and new medical

3   technologies?

4   A.  Yes, I did.

5   Q.  And how did your work at Mass General in delivering medical          03:19PM

6   supplies and equipment impact your career decisions?

7   A.  So this is the first time in my life I worked in a

8   hospital, and I worked there for a few years.  And, you know,

9   while I was delivering the equipment, not just equipment, bed

10  frames and other things like that, I would set it up for              03:20PM

11  patients.  And I was able to observe a lot of suffering and

12  different diseases.  At the same time, I also saw how modern

13  medicine, modern technology, how it can positively affect these

14  patients.

15  Q.  And did you decide to try to work in the medical device          03:20PM

16  field as a result of that?

17  A.  Yes.  So that really -- I really wanted to help.  And when

18  I went to school, I was studying mechanical engineering, I

19  asked my co-op advisor to get me in touch with a medical

20  company so I can interview with them.                                03:20PM

21  Q.  Have you spent the majority of your professional career

22  since college involved in the medical device industry?

23  A.  Yes.  100 percent.

24  Q.  Mr. Chanduszko, do you own any patents?

25  A.  Yes, I do.                                                       03:21PM

1  Q.  How many patents do you have?

2  A.  I have currently over 70 patents.

3  Q.  Are they for more than one type of product?

4  A.  Yes.  They cover many different products.

5  Q.  We're here today about an IVC filter.  What percentage of          03:21PM

6  your patents relate to IVC filters?

7  A.  So I don't know the exact number, but I think it's going to

8  be about a third.

9  Q.  Now, after you graduated and received your mechanical

10  engineering degree, did you start working for a company called          03:21PM

11  NMT?

12  A.  Yes.  That's correct.

13  Q.  And when did you join NMT?

14  A.  So as a full time employee, that was in 1997.

15  Q.  Did you do a co-op or an internship before you became a          03:21PM

16  full time employee?

17  A.  Yes.  So when I mentioned earlier, I asked my co-op advisor

18  to get me in touch with a medical company, and in fact she did.

19  And I interviewed, and they hired me, so this is a more of a

20  temporary job for students but it's a full time job for six          03:22PM

21  months.  And when I graduated they offered me a job and hired

22  me full time.

23  Q.  When you started at NMT, or during your work at NMT, did

24  you eventually work on what is now known as the Recovery

25  Filter?          03:22PM

1   A.   That's correct.

2   Q.   The design and the development of the Recovery Filter

3   actually started at NMT, right?

4   A.   Yeah.  So because it was my first job after school, I was

5   working under the direction of more senior engineers, and one          03:22PM

6   of the projects was the Recovery Filter.

7   Q.   And since your work at NMT through today, are you familiar

8   with what diseases IVC filters are intended to treat?

9   A.   Yes.  They prevent pulmonary embolism.

10  Q.   And based on your understanding of what you have learned         03:23PM

11  over the past decades working on IVC filters, do you have an

12  understanding that pulmonary embolisms are potentially deadly?

13  A.   Yes.  According to different estimates, it's about 50 to

14  200,000 people die every year in the U.S. alone.

15  Q.   Now, we have heard some testimony about the risks of IVC         03:23PM

16  filters.  Through your experience in working on IVC filters, do

17  you understand that there are inherent risks associated with

18  the use of IVC filters?

19  A.   Yes.  That is correct.

20  Q.   And what is your job as far as attempting to reduce those        03:23PM

21  risks?

22  A.   So there's different parts, but one is trying to understand

23  the environment; two is designing tests and building prototype

24  and testing the filters, making sure they meet all the

25  requirements for the filters.                                          03:24PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Chanduszko-Direct

1    Q.  Is it your goal to reduce the risks and complications as

2    much as possible?

3    A.  Yes.  That's correct.

4    Q.  And when you go to work every day, is that your goal when

5    you are working on IVC filters or any medical device?          03:24PM

6    A.  Yes, it is.

7    Q.  Now, we're here today about an Eclipse Filter, which is the

8    device that was implanted in Ms. Jones.  But over the last

9    several days, this jury has also heard a lot about the Recovery

10   Filter and the G2 Filter.                                       03:24PM

11        What is the relationship between the Recovery Filter

12   and the G2 Filter?

13   A.  So the Recovery Filter was the first generation IVC

14   retrievable filter that was developed at NMT Medical, and then

15   the G2 Filter was the second generation of the Recovery Filter  03:24PM

16   that was developed at Bard.

17   Q.  Okay.  So we started out and we learned a few minutes ago

18   that the Recovery Filter actually started at NMT.  Is that

19   right?

20   A.  That is correct.                                            03:25PM

21   Q.  And NMT eventually sold its rights to the Recovery to Bard,

22   is that correct?

23   A.  Yes.

24   Q.  Did you eventually move from NMT to Bard?

25   A.  Yes.  I did move in 2004.                                   03:25PM

1   Q.  And when you moved to Bard, did you have the opportunity to

2   continue to work on the IVC filter, the Recovery Filter?

3   A.  So it was the G2 Recovery Filter.

4   Q.  Okay.  At NMT, what was your role in the development of the

5   Recovery Filter?                                            03:25PM

6   A.  So my main role was to test the filters.

7   Q.  And did you do more than one test?  Did you run various

8   tests?

9   A.  Yes.  So there were multiple different tests, a whole

10  battery, in fact.  And some of them were already developed and   03:25PM

11  some of them needed to be developed.

12  Q.  And was it part of your role to help develop tests for the

13  Recovery Filter?

14  A.  Yes.  That's correct.  Some earlier versions, but yes.

15  Q.  What is design verification and validation?              03:26PM

16  A.  So during the development of a medical device, typically

17  there's a number of different phases.  We start with the

18  concept, which is more of a prototyping, the feasibility which

19  is a little more formal, and then design verification and

20  validation test is the final formal test that is then submitted   03:26PM

21  to FDA.

22  Q.  So you have a concept or an idea, you do a feasibility

23  analysis, and then you do design verification and validation to

24  see whether the concept and the feasibility are going to work.

25  Is that right?                                             03:26PM

1  A.  So concept typically start with prototypes, and these

2  prototypes are developed further, fine-tuned.  And in

3  feasibility, typically there's one design that is selected that

4  is tested, a large assemble size and then the V&V test, it

5  tests large sample sizes of implants for statistical          03:27PM

6  significance.

7  Q.  That process from concept to design validation and

8  verification -- I said it backwards -- design verification and

9  validation, is that something that happens in a matter of weeks

10  or months?                                                    03:27PM

11  A.  No.  It typically takes some years.

12  Q.  And after a product has gone to market, for example, after

13  the Recovery Filter went to market, does the design evaluation

14  process end?  Is that it?

15  A.  No.  That's not it.                                       03:27PM

16  Q.  Is there continued review and analysis of the design based

17  on information received from the market?

18  A.  Yes.  That's correct.

19  Q.  Are you directly involved in that process?

20  A.  Typically not.                                            03:28PM

21  Q.  So your role is the design verification and validation

22  before the product goes to market.  Is that right?

23  A.  Yes.  So there's a different department that typically

24  attracts the filter performance after the launch, and these

25  results are shared with a team that's working on new devices.  03:28PM

1    But I wouldn't be directly involved, I would be indirectly

2    involved in the matter of this monitoring of filter performance

3    is shared later with engineers so they can work on many

4    improvements.

5    Q.  Once the concept and the feasibility of the Recovery Filter    03:28PM

6    were completed, what types of tests did NMT perform?

7    A.  So there were many different tests.  I can probably break

8    them into three different categories.  So one was what we call

9    bench testing; another one is animal testing; and the final one

10   is clinical trial.    03:29PM

11   Q.  And when you refer to the term "bench testing," what are

12   you talking about?  Is that laboratory testing?

13   A.  Yes.  So that testing is done in a laboratory.

14   Q.  And what's the purpose of bench testing or laboratory

15   testing?    03:29PM

16   A.  So typically, engineers have a little more control and more

17   repeatability when it comes to these tests so they can do --

18   test many more filters and they can do statistical calculations

19   and they can challenge the filters in all kinds of different

20   ways.    03:29PM

21   Q.  In your experience as an engineer who has worked in the

22   medical industry for your entire career, are these bench tests

23   or laboratory tests the types of tests medical companies start

24   with and rely on?

25   A.  Yes.  That is an industry standard.    03:30PM

1    Q.  Was one of those laboratory tests or bench tests that you

2    performed, or one type of them, a fatigue test?

3    A.  That's correct.

4    Q.  Did you also perform bench testing or laboratory testing

5    for migration resistance?                                    03:30PM

6    A.  Yes.

7    Q.  Have you personally designed any bench test methods for IVC

8    filters?

9    A.  Yes.  I design a number of them.

10   Q.  Is that an easy concept to mimic the dynamics of the IVC?  03:30PM

11   A.  So it depends on the test, and some tests are not too bad

12   but some are very difficult to design.

13   Q.  And why is it?  Why is that difficult?

14   A.  So the cava typically behaves in a reasonably predictable

15   manner but at times it can be a very dynamic and very harsh   03:31PM

16   environment.  And one of the difficulties is that it is

17   sometimes extremely difficult or even impossible to observe

18   these rare events.

19   Q.  Does Bard know everything about the dynamics, everything

20   about the inferior vena cava?                                03:31PM

21   A.  No.  It's impossible to know everything.

22   Q.  Does any medical device company manufacturing IVC filters

23   know everything about the inferior vena cava?

24          MR. STOLLER:  Objection, Your Honor.  Foundation.

25          THE COURT:  Hold on just a minute.                    03:31PM

1    MS. HELM:  I will rephrase it, Your Honor.

2    THE COURT:  All right.

3  BY MS.  HELM:

4  Q.  Is it possible for a medical device company such as Bard to

5  know everything about the inferior vena cava?                    03:31PM

6  A.  No.  It's not possible.

7  Q.  Based on your experience in your review of medical

8  literature and your experience in designing IVC filters for

9  your entire career, does the medical community, is it your

10 understanding whether the medical community knows everything     03:32PM

11 about the dynamics of the IVC filter?

12    MR. STOLLER:  Objection, Your Honor.  Foundation.

13    THE COURT:  Overruled.

14 BY MS. HELM:

15 Q.  Go ahead.  You can answer.                                   03:32PM

16 A.  No, they don't.

17 Q.  So even though NMT and then Bard didn't know everything

18 about the dynamics of the IVC when it was designing the

19 Recovery Filter, why put the filter on the market?

20 A.  So one answer to it is that the performance of the filters,  03:32PM

21 the filters, they have been around since 1970s.  And people may

22 not know absolutely everything about the vena cava, but they

23 can typically tell with reasonable accuracy how they are going

24 to perform.  Because typically, the designs, the new designs

25 that are coming are typically tested against proven designs      03:32PM

1    that are already on the market.

2    Q.  Was it important to you when you were working on the

3    Recovery Filter to be able to put a filter on the market that

4    could be retrieved?

5    A.  Yes.  Absolutely.                                            03:33PM

6    Q.  Did you feel like you were bringing a lifesaving device to

7    the market?

8    A.  Yes.

9    Q.  Was that important to you personally and professionally?

10   A.  It is important.  That's why I'm in the medical field, to   03:33PM

11   help people.

12   Q.  Let's go back and talk about the testing.  What types of

13   animal testing did NMT perform on the Recovery Filter?

14   A.  So for this type of filter, which is a retrievable filter,

15   typically, the work involves -- so there are medical doctors    03:33PM

16   who perform these tests, and typically, these tests are done in

17   a larger animal, a sheep, for example, would be one example,

18   because they have vena cava that is similar to human.  And the

19   doctors would typically implant the filters and judge the

20   performance of the filter during implantation.                  03:34PM

21           Then the filters would be implanted for weeks or

22   months.  And during that time, the doctors would also monitor

23   the performance and finally, the filters were retrieved by the

24   doctors and they would then judge how the filter performed and

25   also how easy it was to take it out.  And finally, the vena     03:34PM

1   cava would be sent for analysis to another doctor which would

2   be histopathologist.

3   Q.  Did NMT also conduct a clinical study with Dr. Asch on the

4   Recovery Filter?

5   A.  Yes.  That's correct.                                    03:34PM

6   Q.  Now, I want to talk a little bit more about this testing

7   and the testing that you were involved with on the Recovery

8   Filter.  Were there hundreds of tests run on the Recovery

9   Filter before it went to market?

10  A.  Yes.  Very likely, yes.                                  03:35PM

11  Q.  And out of the interest of time and for the benefit of the

12  jury, we're not going to go through hundreds of tests.  But I

13  do want to talk to you about fatigue testing.  Were you

14  involved in the fatigue testing of the Recovery Filter?

15  A.  Yes.  I was personally involved.                         03:35PM

16  Q.  What is fatigue testing?

17  A.  So fatigue is a consideration for a medical device,

18  particularly an implantable device.  It has to do with a

19  phenomenon that if a metal in this case is deformed many, many

20  times it can weaken to the point where it can break.  So the   03:35PM

21  test is designed to deform the material and make sure that the

22  material does not break over the effectively intended

23  implantation time of the filter.

24          MS. HELM:  Scott, would you pull up 5233, please.

25  BY MS. HELM:                                                 03:36PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Chanduszko-Direct

1   Q.  Mr. Chanduszko, can you see that on your screen?

2   A.  Yes, I can.

3   Q.  Would you please tell the Ladies and Gentlemen of the jury

4   what this document is?

5   A.  So this is a standard operating procedure for the fatigue          03:36PM

6   test that was done on the Recovery Filter.

7   Q.  This is your test method.  This is how to run the test, is

8   that right?

9   A.  Yes.  That's correct.

10          MS. HELM:  Your Honor, at this time I would move for          03:36PM

11   the admission of Exhibit 5233.

12          MR. STOLLER:  No objection.

13          THE COURT:  Admitted.

14          MS. HELM:  Your Honor, may I publish it to the jury?

15          THE COURT:  Yes.                                                03:36PM

16          MS. HELM:  Would you go ahead and turn to Page 2?

17   BY MS. HELM:

18   Q.  Mr. Chanduszko, would you describe the test that is laid

19   out in Exhibit 5233?

20   A.  So the purpose of the test was to accurately evaluate 10          03:37PM

21   years equivalence of corrosion and fatigue endurance of 16

22   Recovery Filters by inducing a cyclic stress state in a

23   simulated physiological environment.  The duration of the

24   experiment was equivalent to 10 years of pulmonary output, or

25   32 million cycles.                                                    03:37PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Chanduszko-Direct

1    Q.  Why 10 years?  Why did you choose 10 years?

2    A.  So we really didn't choose 10 years.  This is, I believe,

3    this is a FDA guidance and this is also an industry standard

4    for most of the implantable devices.

5    Q.  And you said it's 10 years of pulmonary outlook, which is          03:37PM

6    approximately 32 million cycles.  Is that right?

7    A.  Yes.  That's correct.

8              MS. HELM:  If you pull up 5234, please.

9    BY MS. HELM:

10   Q.  Can you see that Mr. Chanduszko?                                    03:38PM

11   A.  Yes, I do.

12   Q.  Would you please tell the Ladies and Gentlemen of the jury

13   what this document is?

14   A.  So this document was created after the completion of the

15   test.                                                                   03:38PM

16   Q.  These are the test results?

17   A.  Yes.  These are the test results.  That's correct.

18   Q.  You had the test procedure, which we previously saw, you

19   ran the test, and these are your results.  Right?

20   A.  Yes.  That's correct.                                              03:38PM

21   Q.  And were you personally involved in compiling these test

22   results?

23   A.  Yes, I was.

24   Q.  And is that your signature on the first page of Exhibit

25   5234?                                                                   03:39PM

1    A.  Yes, it is.

2            MS. HELM:  Your Honor, at this time I would move for

3    the admission of Exhibit 5234.

4            MR. STOLLER:  No objection.

5            THE COURT:  Admitted.                          03:39PM

6            MS. HELM:  May I publish it to the jury, Your Honor?

7            A JUROR:  Your Honor, we already saw it.  It was

8    already up on the screen.

9            THE COURT:  Okay.  It's in front of them now.

10           MS. HELM:  Would you turn to Page 5234.002, please.  03:39PM

11           This report states in the first paragraph -- Scott,

12   can you pull that out?

13   BY MS. HELM:

14   Q.  Pulmonary functions produce a measurable diameter change of

15   about one millimeter.  Is this distension, this measurable IVC  03:39PM

16   diameter change?

17   A.  I'm sorry.  Could you repeat?

18   Q.  Sure.  In the highlighted section it talks about it

19   produces a measurable IVC diameter change of about one

20   millimeters.  Is that the distension of the IVC?           03:40PM

21   A.  Yes.  That is the distension.

22   Q.  What pulmonary functions, what's going on in the body that

23   produces this change or distension of the IVC?

24   A.  So the pulmonary function is effectively breathing in and

25   breathing out.  And this produces a measurable change in the  03:40PM

1    cava diameter, or the cava distends and compresses.

2    Q.  As I stand here today breathing in and breathing out, my

3    IVC is widening and contracting.  Is that right?

4    A.  That is correct.

5    Q.  The document also refers to a corrosive environment.  Why          03:40PM

6    is the IVC a corrosive environment?

7    A.  So it's not very corrosive, but the blood in the vena cava

8    has all kinds of salts and effectively with the salt and metal

9    this is something that you always want to evaluate.

10   Q.  So in your testing you take into consideration the fact          03:41PM

11   that the material flowing through the IVC is blood and it

12   contains with it salts and other materials.  Is that right?

13   A.  That is correct.

14   Q.  Would you please turn to Page 4.  And what is this, Mr.

15   Chanduszko?                                                           03:41PM

16   A.  I'm sorry.  It is the graph or --

17   Q.  I'm sorry.  We need the test results.

18          Are those the results, Mr. Chanduszko?

19   A.  That's correct.  These are results.

20   Q.  And you mentioned previously 36 million cycles.  What does          03:41PM

21   that mean?

22   A.  So the 36 million cycles, so the requirement, the guidance

23   is, as I mentioned, is 10 years equivalency of pulmonary, which

24   is breathing.  So that 10 years need to be converted to a

25   number of cycles.  And the number of cycles that were               03:42PM

1   calculated, it is my recollection that it was 32 million cycles

2   would be the equivalent.  And then I believe we ran the test to

3   36 million cycles just to make sure we passed the 32 million

4   mark.

5   Q.  And after you ran the test to 36 million cycles, did you          03:42PM

6   make a determination of whether the filters, the Recovery

7   Filters that you tested had passed this fatigue test?

8   A.  Yes.  That was the requirement per the protocol and that's

9   what we did.

10  Q.  And did they pass the test?                                       03:42PM

11  A.  Yes, and they passed the test.

12  Q.  And after you performed the test on it did you inspect the

13  filters?

14  A.  Yes.

15  Q.  And did you find any evidence of cracks, deformation,             03:43PM

16  fracture, or any other damage in those filters?

17  A.  No.  There was no sign of any damage.

18  Q.  In your mind as an engineer, was this a reasonable test to

19  perform in order to understand the fatigue performance of the

20  Recovery Filter in an IVC?                                           03:43PM

21  A.  That was a very reasonable test.

22  Q.  Now, after you cycled it, you kept running it, is that, for

23  the 32 million you kept running it.  Is that right?

24  A.  That is correct.

25  Q.  Why did you do that?  If it passed the test, why did you          03:43PM

1    keep running it?

2    A.  So the team wanted to go above and beyond just to make sure

3    that the device was robust.

4    Q.  And as you kept running it, do you recall how far you ran

5    it or how many cycles?                                      03:43PM

6    A.  So my recollection is that we passed 400 million cycles.

7    Q.  So the standard was 32 million cycles but you ran it to 400

8    million cycles, is that right?

9    A.  That's correct.

10   Q.  And it still passed, is that right?                     03:44PM

11   A.  Yes.  That's correct.

12   Q.  Now, you have talked about this test, and I'm assuming this

13   didn't take place over a matter of hours or days.  This took

14   some weeks to run?

15   A.  Yes.  So it was a long time ago but I think it was about  03:44PM

16   six months.

17   Q.  And did you keep track of the test as it was going along

18   and the results that you were receiving?

19   A.  Yes.  So there were measurements frequently taken because

20   we had to measure the simulated vena cavas where the filters   03:44PM

21   were implanted to make sure that we are getting at least one

22   millimeter distension.  So over the six months we were taking

23   the measurements, at least one once a week, probably more

24   frequently than that.

25   Q.  Did you record that information in lab notebooks for the   03:45PM

1  test?

2  A.  Yes.  That's correct.  The results of these were -- all

3  monitoring was recorded in the notebook.

4  Q.  And I'm just going to hold this up.  I'm not going to move

5  to admit it.  Is this a lab notebook for the fatigue test that     03:45PM

6  we are talking about?

7  A.  Judging by the cover, yes, that's what it is.

8  Q.  And in this there are just pages and pages of test results

9  and calculations and information and data that you recorded

10  throughout the course of the test, is that right?     03:45PM

11  A.  That is correct.

12          THE COURT:  Does that have an exhibit number, Ms.

13  Helm?

14          MS. HELM:  Yes, it does, Your Honor.  It's 5022.

15          THE COURT:  All right.     03:45PM

16  BY MS. HELM:

17  Q.  For each test that was run on the Recovery Filter is there

18  a comparable set of compilations and data that was recorded and

19  analyzed throughout the process of the test?

20  A.  So every test that was performed there was data collected.     03:45PM

21  Obviously this test ran over many, many months so it was

22  probably a little more data on this test than the other ones.

23  But typically there's pages and pages of notebook data for

24  every test.

25  Q.  And that's what you analyze and have available to you to     03:46PM

1  determine both whether the test is working and whether the

2  product is passing the test correct?

3  A.  That's correct.

4  Q.  Let's shift gears and talk about the G2.  At some point

5  after the FDA cleared the Recovery you were at Bard and Bard          03:46PM

6  started working on the next generation the, G2.  Is that right?

7  A.  That is correct.

8  Q.  What was the goal or the purpose of designing the G2

9  Filter?

10 A.  So the two major goals as I remember was to improve           03:46PM

11 fracture resistance and migration resistance.

12 Q.  So the Recovery Filter was on the market, and you were

13 receiving information from the market there were some incidence

14 of fracture, is that right?

15 A.  Yes.  What I mentioned before, there's a team that monitors   03:46PM

16 all these events and these events are shared with what we call

17 the filter team.

18 Q.  And you also mentioned movement.  What was the movement or

19 migration of the Recovery Filter that you were trying to

20 address were the G2?                                             03:47PM

21 A.  So that was the movement up.

22 Q.  So up?

23 A.  Yes.

24 Q.  And we have heard that referred to as cranial migration.

25 Is that a term that you used?                                    03:47PM

1    A.   Yes.   Cranial migration.   That's the term.

2    Q.   And why did you want to reduce the fractures or the

3    incidence of fractures from the Recovery to the G2?

4    A.   Because fractures can occasionally lead to complications

5    and therefore, we wanted to eliminate them or at least minimize   03:47PM

6    them.

7    Q.   Same reason for the attempt to reduce cranial migrations?

8    A.   That's correct.

9    Q.   What was your role in the process of developing the G2

10   Filter?   03:47PM

11   A.   So I did many different things as an R&D engineer,

12   including building and manufacturing fixtures to make these

13   filters, making filters, testing filters, designing test

14   methods.   That probably captures most of it.

15   Q.   Did the G2 go through this same design process that we   03:48PM

16   talked about with Recovery from concept to feasibility to

17   verification and validation and then before it could go to the

18   market?

19   A.   Yes.   That's correct.

20   Q.   You mentioned that you used different prototypes for   03:48PM

21   testing of the G2.   Why did you do that?

22   A.   So we used many different prototypes, and effectively you

23   start with the hypothesis.   You want to improve a particular

24   characteristic and you design a prototype for that and then you

25   have to test it.   And typically, we make different changes to   03:48PM

1    different degrees, and based on that we want to see what is the

2    effect so we can fine tune the design to give us the

3    performance that, you know, the best performance that we can

4    achieve.

5    Q.  When you are designing any IVC filter and when you were          03:49PM

6    designing the G2, did you have to balance the different

7    attributes of the filter in order to create the best filter

8    reasonably possible?

9    A.  Yes, because often times the requirements are

10   contradictory, and in the end a lot of it is a balancing act.      03:49PM

11   Q.  So you may be able to address one complication but then you

12   have to worry about whether it's creating or increasing another

13   complication?

14   A.  Yes.  That could be the case.

15   Q.  And that's something you knew when you were designing IVC       03:49PM

16   filters?

17   A.  Yes.  That is true for any medical device.

18   Q.  Okay.  And that's something you take into consideration and

19   you look for in your testing and your test results, correct?

20   A.  Yes.  That's correct.                                           03:49PM

21   Q.  Did you make, as part of the design team, did you make

22   significant changes from the Recovery to the G2 Filter?

23   A.  So, geometry-wise, the filters were very similar.  But

24   performance-wise, we did make very significant changes.

25   Q.  At my request, have you prepared a demonstrative or a           03:50PM

1    picture to show the differences between the Recovery and the

2    G2?

3    A.  I'm sorry?

4    Q.  At my request, did you prepare a demonstrative to show the

5    differences between the Recovery and the G2?                03:50PM

6    A.  Yes.

7    Q.  Would that help you explain those differences to the jury

8    if we were able to put those pictures up?

9    A.  Yes.  Absolutely.

10           MS. HELM:  Would you please pull up 7875?           03:50PM

11           Your Honor, may I display this to the jury as a

12   demonstrative only?

13           MR. STOLLER:  I'm sorry.  May I look at it for a

14   moment, Your Honor?  It hasn't been disclosed to us.

15           Perhaps with a bit more foundation, I'm not sure this  03:51PM

16   accurately depicts what it purports to depict.

17           THE COURT:  Would you lay that foundation, please, Ms.

18   Helm.

19           MS. HELM:  Sure.

20   BY MS. HELM:                                                03:51PM

21   Q.  Mr. Chanduszko, does this document show a diagram of the

22   Recovery Filter and specifically certain aspects of the

23   Recovery Filter that are at the bottom of the longer legs of

24   the filter?

25   A.  So I'm sorry.  I'm not sure.  If you could rephrase.     03:51PM

1    Q.  Does the diagram in front of you depict a Recovery Filter?

2    A.  Yes.  The part on the left is Recovery.

3    Q.  And does the diagram also depict a G2 Filter and show

4    certain changes to the G2 Filter as compared to the Recovery

5    Filter?                                                           03:51PM

6    A.  That's correct.

7    Q.  And would you go ahead and go to the second page, please.

8    And on the second page of the diagram, does it again show

9    differences between the Recovery Filter and the changes you

10   made to create the G2 Filter as far as measurements of those    03:52PM

11   filters?

12   A.  Yes.

13   Q.  And would you go to the next page, please.  And does Page 3

14   of the diagram show additional changes made from the Recovery

15   Filter to what was eventually called the G2 Filter as it        03:52PM

16   relates to certain aspects or components of the filter?

17   A.  That is correct.

18   Q.  And would you go to Page 4, please.  And on Page 4, does

19   the diagram show differences that were made between the

20   Recovery Filter and the G2 Filter at the cap or the top of the  03:52PM

21   filter?

22   A.  Yes.

23   Q.  And would you go to the last page, please.

24       And does the last page also show geometric differences

25   and angle differences between the Recovery Filter and the G2    03:53PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Chanduszko-Direct

1    Filter?

2    A.  Yes, it does.

3    Q.  Would it be helpful for you to be able to describe these

4    pictures, rather than me describing them, for you to describe

5    them to the jury to show the differences between the Recovery        03:53PM

6    and G2?

7    A.  Yes, I believe so.

8    Q.  Your Honor, I would ask to publish this as a demonstrative

9    exhibit.

10           MR. STOLLER:  Now that I have seen it we have no             03:53PM

11   objection, Your Honor.

12           THE COURT:  Okay.  You may.

13           MS. HELM:  Scott, would you go back to the first page,

14   please.

15   BY MS. HELM:                                                        03:53PM

16   Q.  Mr. Chanduszko, would you describe to the jury what is

17   shown here on the first page?  Start with the Recovery and

18   explain the hooks on the bottom and then explain the

19   differences between the Recovery and the G2 as they are

20   depicted on this page.                                              03:53PM

21   A.  So the image on the left shows the Recovery Filter, which

22   is the first generation of retrievable filter.  The image on

23   the right shows G2 Filter, which is the second generation of

24   the Recovery Filter.  So this is the filter that was developed

25   at Bard.                                                            03:54PM

1    And I'm just going to go over maybe kind of a naming

2    scheme.  So the top of the filter, we call it a tip, looks like

3    a rounded cylinder.  Then what you have is the longer parts,

4    the wires, that end with hooks.  We call these legs.  And then

5    the shorter ones that are bent roughly halfway through, we call    03:54PM

6    these arms.  And then the area right under the tip, we call it

7    a neck.

8    So in this image what you see is the G2 Filter had

9    stronger elastic hooks, so the hooks of the Recovery Filter

10   were modified to make them stronger.  Also the arms on the G2    03:54PM

11   Filter are longer and curved on the end.  And finally, the G2

12   Filter last a wider leg span as compared to the Recovery

13   Filter.

14   Q.  Let's talk about that wider leg span.

15   Page 2, please.                                                    03:55PM

16   Does this image reflect the increased leg span between

17   the Recovery and the G2?

18   A.  Yes, it does.

19   Q.  And it shows that the Recovery had a leg span of 32

20   millimeters and you increased that to 40 millimeters which was    03:55PM

21   approximately 25 percent.  Right?

22   A.  That is correct.

23   Q.  Would you go to the next page, please.

24   And this page you talked about the hooks a minute ago.

25   Would you explain the change between the Recovery Filter and    03:55PM

1   the G2 Filter as to the hooks?

2   A.  So the Recovery Filter hooks were 8.5 thousandths of an

3   inch thick, and the thickness was increased to 10.5 thousandths

4   of an inch on the G2 Filter to make them stronger.

5   Q.  Would you go to the next page, please.                      03:55PM

6        This page seems to highlight the top or the apex of

7   the filter.  Would you explain to the jury what this page shows

8   as far as the differences between the Recovery and the G2?

9   A.  So the Recovery Filter in the neck area when you see where

10  the wire exits the tip, and then it takes a turn.  There's a    03:56PM

11  relatively small radius of curvature.  And on the G2 Filter

12  that radius of curvature was significantly increased to better

13  distribute the loads that are put on the filter.

14  Q.  And was the change to the curvature of the arms coming out

15  of the apex intended to improve fracture resistance in that     03:56PM

16  area of the filter?

17  A.  That is correct.

18  Q.  But that style change alone is not overall responsible for

19  the improved fracture resistance, is it?

20  A.  No it is not.  It's just a part of it.                      03:56PM

21  Q.  What other changes between the Recovery and the G2

22  attributed to improved fracture resistance between the Recovery

23  and the G2?

24  A.  So one change was the curved arm and switch would prevent

25  the arms to engage readily into -- sometimes the Recovery       03:57PM

1    Filter arms would engage in, for example, side vessels, so that

2    was done so the arms wouldn't engage as readily.  And the

3    second thing was increased thickness of the hooks which then

4    would provide a more fracture resistance to this part of the

5    filter.                                                          03:57PM

6    Q.  Once you made these design changes -- you can take it

7    down -- between the Recovery and the G2 and you developed the

8    G2 Filter, did you do fatigue testing on it?

9    A.  Yes, we did.

10   Q.  And was that one of hundreds of tests performed on the G2?   03:57PM

11   A.  Yes.

12   Q.  And again, late in the day.  I'm not going to go through

13   hundreds of tests.  But I do want to talk to you briefly about

14   fatigue testing for the G2.

15        MS. HELM:  Would you please pull you up 5303.             03:58PM

16   BY MS. HELM:

17   Q.  Do you recognize this document, Mr. Chanduszko?

18        We've got the wrong number.  We'll go without the

19   document.

20        Did you do fatigue testing on the G2 Filter?             03:58PM

21   A.  So I don't know if I did it personally, but as a team, yes.

22   Q.  I'm sorry?

23   A.  As a team, yes.

24   Q.  Okay.  And you mentioned earlier that improved fracture

25   resistance was one of the goals of the G2 Filter, is that        03:58PM

1   right?

2   A.  Yes.  That was one of the main goals.

3   Q.  And did you personally, you, Mr. Chanduszko, create a test

4   to compare the G2 to the Recovery Filter to see if the fracture

5   resistance was improved?                                            03:58PM

6   A.  Yes.  I was the main contributor.

7   Q.  Tell us briefly about that test.  What were the test

8   parameters based on?

9   A.  So I mentioned earlier the fatigue test on the Recovery

10  Filter that was tested the filter to one millimeter.  This test    03:59PM

11  looked at much more severe deformations, and it was a

12  comparative test, so that the requirement of the project was to

13  make the Recovery Filter more fatigue resistant.

14          So we had to test the G2 Filter to make sure that it

15  is indeed much more resistant to fatigue than the Recovery         03:59PM

16  Filter.

17          So in this test, the filter was set up in a special

18  fixture, and the arms of the filter, there were actually

19  multiple filters, would be performed up and down, I believe,

20  about 10 millimeters and they were cycled to the point of          03:59PM

21  fracture.  And it was the same test done on Recovery Filter,

22  many of them, and it was the same test done on the G2 filters

23  and then the results were compared.

24          MS. HELM:  Would you please pull up 5303.

25  BY MS. HELM:                                                       04:00PM

1   Q.  Is this the test report for that testing you just described

2   to the jury?

3   A.  So I think it is, just looking at the cover.

4          MS. HELM:  Would you, Scott, turn to page -- I'm

5   sorry -- 18.                                                    04:00PM

6   BY MS. HELM:

7   Q.  Mr. Chanduszko, do you see Section 7.11 there?

8   A.  Yes, I do.

9   Q.  And does that refresh your recollection that these are the

10  test results for the test that you just described to the jury?  04:00PM

11  A.  Yes, it does.

12         MS. HELM:  Your Honor at this time I would move for

13  the admission of Exhibit 5303.

14         THE COURTROOM DEPUTY:  I show it in.

15         MS. HELM:  Already in?  May I publish, Your Honor.       04:01PM

16         THE COURT:  Let me confirm that.  Not that I'm

17  doubting you, Traci.  Yeah, it's previously admitted.

18         Yes, you may.

19  BY MS. HELM:

20  Q.  Mr. Chanduszko, there in Section 7.11, are those the test   04:01PM

21  results for the test you just described to the jury?

22  A.  Yes, they are.

23  Q.  And do these test results show that the G2 is more fracture

24  resistant than the Recovery Filter?

25  A.  Yes.  On the loading conditions actually very               04:01PM

1   significantly.

2   Q.  Did Bard also do a finite element analysis on the G2 for

3   fatigue in addition to this testing?

4   A.  Yes, we did.

5   Q.  What is the purpose of finite element analysis?                04:01PM

6   A.  So finite element analysis, or FEA, is a computer

7   simulation.  In that simulation we typically create a model of

8   the filter and then we can subject it to different deformations

9   and then we can measure the strains and stresses that are

10  produced in the filter.                                           04:02PM

11  Q.  So you did testing.  You saw that you did your testing that

12  you described that showed that the fatigue resistance was

13  better than the Recovery Filter.  And then you took the testing

14  information and you did finite element analysis to further

15  analyze it.  Is that right?                                       04:02PM

16          MR. STOLLER:  Objection leading.

17          THE COURT:  Sustained.

18  BY MS. HELM:

19  Q.  What did you do with the test data from the original test

20  as far as using it in the finite element analysis?               04:02PM

21  A.  So the finite element analysis test was to look at a

22  different loading scenario which was the type that I described

23  earlier for the Recovery Filter.

24          MS. HELM:  Would you please pull up 5037.

25  BY MS. HELM:                                                      04:03PM

1    Q.  Mr. Chanduszko, do you recognize this document?

2    A.  Yes, I do.

3    Q.  And what is this?

4    A.  So this is a test to evaluate, so it's a computer

5    simulation to evaluate effects of changes to the Recovery          04:03PM

6    Filter in the femoral delivery system and filter stresses based

7    on the FEA analysis.

8    Q.  This is the report of the FEA analysis, right?

9    A.  That's correct.

10   Q.  Are you the originator of this document?                        04:03PM

11   A.  Yes, I was.

12   Q.  Is this your report?

13   A.  Yes.

14        MS. HELM:  Your Honor, at this time if it's not

15   already in I move to admit 5037.                                    04:03PM

16        MR. STOLLER:  No objection.

17        THE COURT:  Admitted.

18        MS. HELM:  May I publish it to the jury?

19        THE COURT:  You may.

20        MS. HELM:  Scott, would you please turn to Page 5,             04:03PM

21   Section 10.

22   BY MS. HELM:

23   Q.  Mr. Chanduszko, is that the conclusion of the finite

24   element analysis?

25   A.  Yes, it is.                                                     04:04PM

1  Q.  And what did the results of the finite element analysis

2  show about the filter stresses and strengths of the G2 compared

3  to the Recovery Filter?

4  A.  So they show that the modified filter design, which is the

5  G2, showed substantially lower peak stresses compared to the          04:04PM

6  original design which is the Recovery Filter, and it was up to

7  90 percent.  The legs, effect of the results on the legs were

8  similar with 4.6 percent difference in the load configuration,

9  and that was very minimal.

10  Q.  So you did your testing.  You can take it down.                   04:04PM

11          You did your finite element analysis.  Did you go back

12  and do the original testing that you had done on the Recovery

13  Filter on the G2 again?

14  A.  No, I did not.

15  Q.  Why not?                                                          04:04PM

16  A.  So the answer is, there was no need to do it.  And

17  effectively what we had, we had a data from three different

18  tests.  So one was the original test on the Recovery Filter.

19  That was ran way past of what the actual standard is.  To make

20  sure that the G2 was not -- was more fracture resistant we did        04:05PM

21  the computer simulation to see, mainly, look at the parts that

22  were changed.  And the main parts, the main changes that were

23  done were to the neck area and then to the hooks.  And both of

24  these areas showed substantial decrease in stress and strain in

25  both compressed for delivery and then expanded configuration in       04:05PM

─────5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Chanduszko-Direct─────

1    the vena cava.

2         Thirdly, we did an actual fatigue test that I

3    described earlier with a much more severe deformation and that

4    test G2 showed very significant improvement over the Recovery

5    Filter.  So we had enough evidence to conclude that the G2          04:06PM

6    Filter was significantly more fracture resistant than the

7    Recovery Filter.

8    Q.  And we focused our discussion on fatigue and fracture

9    resistance.  Were there also other tests run on the G2, for

10   example, for cranial migration and tensile strength?              04:06PM

11   A.  Yes.  There were many different other tests.

12   Q.  Hundreds, right?

13   A.  So maybe not hundreds times but the tests themselves, yes,

14   they were run many, many times for hundreds and hundreds of

15   filters.                                                          04:06PM

16   Q.  Was there also animal testing done on the G2 Filter?

17   A.  Yes.  That's correct.

18   Q.  After your work on the G2 Filter, after it went to market,

19   did you move to a new project or a different project?

20   A.  Yes, I did.                                                   04:07PM

21   Q.  What did you work on after the G2?  Do you recall?

22   A.  So after the G2 my recollection is that we started working

23   on G3 which was another generation of vena cava filter.

24   Q.  G3, we haven't heard that one today, or in the last couple

25   of weeks.  So before we talk about, and we're going to talk      04:07PM

1  about it briefly, did the G3 ever go to market?

2  A.  Not in the same form that we started with, no.

3  Q.  And what was the purpose of the G3 project?

4  A.  So my recollection is that it was mainly to improve caudal

5  migration resistance.                                                04:07PM

6  Q.  So you had the G2 which you had proven through your testing

7  was an improvement over the Recovery Filter, and now you were

8  looking at this G3 project to address caudal migration.

9  Anything else, or was it predominantly a project to address

10  caudal migration?                                                   04:08PM

11  A.  So the caudal migration was the major goal, but obviously

12  in the process of designing, we aim to improve any filter

13  performance characteristic there is.

14  Q.  And as a part of the project to develop the G3 Filter, did

15  you have to develop new test methods and do additional testing     04:08PM

16  to address caudal migration alone?

17  A.  Yes.  In fact, we were developing many different test

18  methods, not just one.

19  Q.  So as the filters progress and as you move through the

20  generation of filters, did Bard continue to develop its test       04:08PM

21  methods and test procedures along with new filters?

22  A.  That's correct.  There were over time we developed many

23  different test methods that we added to the requirements for

24  testing.

25  Q.  Based on the information you learned through prior testing      04:08PM

1    or test results, right?

2    A.  That's correct, or clinical experience, any of the above.

3    Q.  So you are not staying at your Recovery test methods back

4    from when the Recovery was developed as you are continuing to

5    improve and develop new filters over time, are you?            04:09PM

6    A.  Absolutely not.

7    Q.  Okay.  So in addition to continually looking to improve

8    your filters, you are also continuing to improve your

9    technology and your testing, right?

10         MR. STOLLER:  Objection.  Leading.                        04:09PM

11         THE COURT:  Sustained.

12   BY MS. HELM:

13   Q.  In addition to continuing to improve filters, are you also

14   continuing to improve your technology and your testing?

15   A.  Yes.                                                        04:09PM

16   Q.  Are you also looking to continually improve your knowledge

17   about the filters and how they perform in the inferior vena

18   cava?

19   A.  Absolutely.

20   Q.  Did this G3 -- we talked about the G3 filter.  It did not   04:09PM

21   make it to market, is that right?

22   A.  That is correct.

23   Q.  What happened?  Why didn't it go to market?

24   A.  So like I said, my recollection is that we were looking to

25   ways to stabilize the filter, particularly, have a better      04:10PM

1    improvement over G2 from a caudal migration standpoint.  But

2    this is not the only consideration like I said.  So we went

3    through a number of different prototypes.  Typically with the

4    filters, you -- it's not just the implant but you have to

5    design a delivery system to deliver it without any damage.  We      04:10PM

6    also added number of different test methods that we had to

7    develop effectively from scratch.

8           So in the end we developed three or four different

9    prototypes and these prototypes were tested in animals.

10   Unfortunately we cannot replicate every clinical characteristic     04:10PM

11   on the bench.  So often times the animal is effectively the

12   last test where we pretty much test everything because that's

13   the most similar to the human anatomy.  And what we found is

14   that we had some filters that had significant penetrations and

15   there were others that were marginal.  So at that point we          04:11PM

16   decided that this design is not going to work, and effectively,

17   we scratched it and we went back to the drawing board.

18   Q.  How long did you work on the G3 project before you tabled

19   it and went back to the drawing board?

20   A.  I think about two years.                                        04:11PM

21   Q.  And what was the next project you worked on after the G3?

22   A.  So it was a project that we called Platinum.

23   Q.  And did that project go to market?

24   A.  That project did not go to market either, at least not the

25   way it was started.                                                 04:12PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Chanduszko-Direct

1   Q.  Did you also work on the Denali Filter?

2   A.  Yes, I did.

3   Q.  And the jury's heard briefly about the Denali Filter.  Do

4   you recall what year the Denali Filter went to market?

5   A.  When?                                                          04:12PM

6   Q.  Do you recall what year the Denali Filter went to market?

7   A.  I believe it was 2013.

8   Q.  And how long did you work on the Denali Filter before it

9   went to market?

10  A.  Probably about five years.                                     04:12PM

11  Q.  Okay.

12  A.  Or maybe, I should say, the team.  So the total project

13  length was about that.

14  Q.  And during that five-year time period, the Denali Filter is

15  a different filter.  It's designed differently than the G2 or     04:12PM

16  the Eclipse, is that right?

17       MR. STOLLER:  Objection leading.

18       THE COURT:  Sustained.

19  BY MS. HELM:

20  Q.  Is the Denali designed differently than the G2 or the         04:13PM

21  Eclipse?

22  A.  It's largely different in some respects and similar, but

23  it's largely different, yes.

24  Q.  While you were working on the Denali did you also have the

25  opportunity to do some work on the Eclipse Filter?                04:13PM

1    A.   To -- could you repeat, please?

2    Q.   Sure.  Are you familiar with the Eclipse Filter?

3    A.   Yes, I am.

4    Q.   Did you do any work on the Eclipse Filter?

5    A.   To some minimal degree, but yes, I'm familiar with what the    04:13PM

6    team did on that project.

7    Q.   What is the difference between the Eclipse Filter and the

8    G11 or the G2X Filter?

9    A.   So the difference is that the Eclipse is an electropolished

10   filter and the G2X is not that's the only difference.    04:13PM

11   Q.   What are the possible general risks or problems that could

12   happen with electropolishing a filter made out of Nitinol?

13   A.   So general risks could be hydrogen I'm brittle.  Which

14   would lead to the material being brittle.  It could be

15   dimensional inconsistency, meaning the dimensions may not be    04:14PM

16   controlled to the degree that is needed for this device.  It

17   could be pits, it could be other surface damage.

18   Q.   Did it take Bard some time to perfect the ability to

19   electropolish the filter which became the Eclipse Filter before

20   it put it on the market?    04:14PM

21   A.   So we did not have the expertise in house to do this kind

22   of operation so we worked with external experts that, you know,

23   for example, Nitinol producers, and they worked on the project

24   and it took us several years to effectively get this project to

25   the point where it could be usable for this device.    04:15PM

1  Q.  And did Bard wait until it was comfortable that it had

2  perfected the electropolishing before it put the Eclipse on the

3  market?

4  A.  Yes.  Absolutely.

5  Q.  Do you believe that electropolishing the Eclipse Filter may    04:15PM

6  improve the fatigue or fracture resistance of the filter?

7  A.  So not only I believe, but we have a test data that clearly

8  shows that.

9  Q.  Were the changes, the electropolishing, the changes that

10  were made from the G2 or the G2X to the Eclipse, intended to    04:15PM

11  make it an improvement?

12  A.  Yes.  Of course.

13  Q.  Even though Bard has later developed filters and continued

14  to make changes to filters, do you believe that the Eclipse

15  Filter was a safe filter?    04:16PM

16  A.  Yes.

17  Q.  Mr. Chanduszko when you graduated with a degree in

18  mechanical engineering, aside from the medical device field

19  what other fields could you have worked in?

20  A.  Pretty much everything.  I could be making Ramen noodles or    04:16PM

21  space shuttles.

22  Q.  Cars?  Ladders?

23  A.  Anything.

24  Q.  Why have you chosen to devote your entire professional

25  career to working with medical devices such as IVC filters?    04:16PM

1   A.  So I was, and still am, very passionate about it.  It goes

2   back to my experience at Mass General Hospital.  And I worked

3   there for a number of years and I have seen human suffering.

4   So I really wanted to help.

5   Q.  Do sales or profits of the company drive your decision                04:16PM

6   making process when you are designing an IVC filter?

7   A.  No, they don't.

8   Q.  What drives your decision making process?

9   A.  To make the best product possible to help patients.

10  Q.  Thank you.  No further questions.                                     04:17PM

11          THE COURT:  Cross-examination?

12          MR. STOLLER:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14  BY MR. STOLLER:

15  Q.  Mr. Chanduszko, my name is Paul Stoller.  We have not met            04:17PM

16  before.  Good afternoon.

17  A.  Good afternoon.

18  Q.  I'd like to ask you some questions about the role of an

19  engineer in a medical device company.  And you testified a bit

20  about that earlier this afternoon.                                       04:17PM

21          Would you agree with me that one of your jobs as an

22  engineer is to design and test products to ensure that they are

23  safe in the human body or at least as safe as they can

24  reasonably be?

25  A.  Yes.  That's correct.                                                04:18PM

1  Q.  And would you agree that in doing that you need to consider

2  the worst-case scenario or the reasonable worst-case scenario

3  that those filters or products may experience in the body?

4  A.  Yes.

5  Q.  And I believe when Ms. Helm was asking you questions                04:18PM

6  earlier, she asked you about the purposes of bench testing and

7  I think you said that you have to understand the environment

8  because it may challenge filters in all kinds if different

9  ways.  Did I hear that correctly?

10  A.  Yes.  I believe so.                                                04:18PM

11  Q.  And so one of the things you want to do when you are bench

12  testing is try to simulate the real world as closely as

13  possible so that you can understand the challenges that a

14  filter is going to place while it's in the body.  Is that fair?

15  A.  Generally speaking, yes.                                          04:19PM

16  Q.  And when you were testing filters here, one of the things

17  you needed to keep in mind were those challenges that the

18  filter might face in the body that could cause failures.  True?

19  A.  One of the things, yes.

20  Q.  So let's talk about some of the tests that you ran.              04:19PM

21          And I think that you indicated one of the tests that

22  you ran for -- and I will start chronologically like Ms. Helm

23  did, with the fatigue test report you ran for the Recovery

24  Filter, which I believe was Exhibit 5234.  I'm not going to put

25  it up because I don't want to talk about the specifics of it.        04:19PM

1    But I want to ask you some general questions about that test.

2            I believe your testimony was that in that test, what

3    you did was you took the filter and you squeezed it one

4    millimeter.  Is that correct?

5    A.  So the requirement for the test -- so what the test was                    04:19PM

6    supposed to simulate is the deformations that the filter would

7    experience during breathing.  And the requirement was one

8    millimeters minimal distension.  The test that we ran was

9    actually higher than that, and I believe it was anywhere from

10   one millimeter to about 1.7 millimeters.                                       04:20PM

11   Q.  And I'm going to -- we're short on time so I'm going to try

12   and ask mostly yes or no questions.  If you can't answer yes or

13   no let me know and I will try to clarify.  Is that all right?

14   A.  Yes.

15   Q.  And I'm going to talk a little quickly but apologize to                    04:20PM

16   everybody for that as we go.

17            But the compression you did there was you took a

18   filter and you squeezed it, and you just said somewhere between

19   a millimeter and 1.7 millimeters, correct?

20   A.  Yes.  That's correct.                                                      04:20PM

21   Q.  And the idea of that was to simulate normal human

22   breathing, correct?

23   A.  Yes.

24   Q.  And you ran that test, you said originally set out to 32

25   million cycles and then to 36, correct?                                        04:21PM

1  A.  So the goal was 32 and the test was stopped at 36 is my

2  recollection.

3  Q.  And then you said you even ran it out longer than that for

4  a long period of time.  True?

5  A.  400 million cycles.                                    04:21PM

6  Q.  And your conclusion on that was when it faced normal human

7  breathing, the filter didn't break over the course of how many

8  ever cycles you ran it.  True?

9  A.  Correct.

10 Q.  So, sir, what worst-case condition for breathing testing   04:21PM

11 did you do in the bench to demonstrate that the filter wouldn't

12 break when it faced worst-case conditions?

13 A.  So this one actually I could argue is the worst-case

14 because we're all breathing so this is very common.  I will

15 consider that a worst-case.  That's one way to look at it.  The  04:21PM

16 other also is that the requirement was one millimeter.  That's

17 where we had the clinical input but we ran at it at much higher

18 deformations and then we ran it for a much more extended number

19 of cycles, which was actually equivalent to way over 50 years.

20 Q.  Sir, your testimony was this was to mimic normal breathing. 04:22PM

21 True?

22 A.  That's correct.

23 Q.  And you know that the IVC expands and contracts a lot more

24 in all kinds of situations than it does in normal breathing.

25 True?                                                         04:22PM

UNITED STATES DISTRICT COURT

1    A.  IVC alone it may, yes.  But it would be at a much lower

2    frequency.

3    Q.  Sir, I'm going to ask you yes or no questions.  If you

4    can't answer them yes or no, please tell me and I will ask you

5    a different question.  Is that fair?                              04:22PM

6    A.  I will do my best.

7    Q.  Okay.  So you were trying to simulate normal human

8    breathing.  True?

9    A.  Yes.

10   Q.  And you ran it out for some million number of cycles by     04:22PM

11   squeezing it a millimeter to 1.7 millimeters.  True?

12   A.  Yes.

13   Q.  And you knew and you know now that the IVC twists, turns,

14   we have seen it and the jury's seen it, compresses, expands

15   much more than 1 to 1.7 millimeters.  True?                      04:23PM

16   A.  The IVC without a filter, yes.

17   Q.  You don't know what the effect of the -- I'm not -- the

18   answer to my question is true, isn't it?

19   A.  Yes.

20   Q.  And you did not perform simulations of twisting, turning,    04:23PM

21   compressing, expanding beyond 1.7 millimeters.  True?

22   A.  For the Recovery Filter, yes.  That's true.

23   Q.  So let's talk about -- and that passed that test in your

24   mind.  Correct?

25   A.  Not just in my mind but it did pass.  Yes.                   04:23PM

1  Q.  Then you said you made some pretty significant changes to

2  the -- from the G2 -- I'm sorry -- from the Recovery to the G2,

3  correct?

4  A.  Correct.

5          MR. STOLLER:  And I don't have it, but could we pull          04:24PM

6  up -- I beg your indulgence -- 7875.

7          May we display this to the jury, Your Honor?

8          THE COURT:  This is the demonstrative?

9          MR. STOLLER:  Yes.  This is the defense demonstrative.

10          THE COURT:  You may.          04:24PM

11          MR. STOLLER:  Thank you.

12  BY MR. STOLLER:

13  Q.  Mr. Chanduszko, this is the demonstrative you created with

14  Ms. Helm to show the differences in the Recovery and the G2.

15  Correct?          04:24PM

16  A.  I don't know if I created it but I described it.

17  Q.  Fair enough.  And this shows a number of differences in

18  moving from the Recovery to the G2, does it not?

19  A.  Yes, it does.

20  Q.  You widened the legs pretty substantially, right?          04:24PM

21  A.  Correct.

22  Q.  And when I look at these side by side, that's a very big

23  difference in the leg span.  Would you agree with that?

24  A.  Yes, I would.

25  Q.  You also said that you changed the hooks, made them          04:24PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7-Chanduszko-Direct

1    stronger.  Correct?

2    A.  Correct.

3    Q.  You changed -- you lengthened the arms, correct?

4    A.  Correct.

5    Q.  You changed the angle of the arms, correct?                04:25PM

6    A.  I don't know if the angle is changed, but no, I think the

7    angle is roughly the same.

8    Q.  I meant at the top.  At the top of where it is in the

9    filter, you changed that.  Correct?

10   A.  Yes, the neck.                                              04:25PM

11   Q.  And I think you also testified this response to some things

12   Ms. Helm asked you that when you make one change to try to

13   address a complication in the device sometimes it has an effect

14   of creating other complications.  True?

15   A.  It might, yes.                                              04:25PM

16   Q.  And one of the things that you needed to look at or should

17   have been looking at when you made pretty significant changes

18   from the Recovery to the G2 was to determine whether in trying

19   to address migration and widening the leg span of the filter it

20   created other complications.  Shouldn't you have been doing     04:25PM

21   that?

22   A.  Yes.

23   Q.  So let me ask you, sir, what testing you did for the G2 to

24   ensure that the change in the filter design -- let me change

25   the question.                                                   04:26PM

1    When you changed the filter design from the Recovery

2  to the G2 and you significantly widened the base, you did not

3  test to see what effect that would have on the filter's

4  propensity to tilt, did you?

5  A.  We did, absolutely.                                    04:26PM

6  Q.  You ran bench tests to see that this would not cause

7  further tilt?

8  A.  Yes.  Multiple ones.

9  Q.  And where are those, sir?

10  A.  They will be in lab notebooks.  There will be in reports.   04:26PM

11  Q.  Were they listed in the DV&V you did for the FDA for

12  testing purposes?

13  A.  DV&V will have testing, yes.

14  Q.  I'm asking about this particular test, sir.  Do you know?

15  A.  One of the tests, yes, I'm sure.  There's multiple tests   04:26PM

16  actually that takes that into account.

17  Q.  That's not my question, sir.  My question was:  Did that

18  test that you claimed to have performed to measure the result

19  of the widened base of the G2 Filter, causing its propensity to

20  tilt, is that included in the DV&V report that was provided to   04:27PM

21  the FDA?

22  A.  So I can think of at least of one test that looked at that.

23  But every single test effectively takes that into account.

24  Q.  Your testimony, sir, is every single test looked at whether

25  or not this change caused the filter to tilt?               04:27PM

1   A.   Most of them would look at that particular characteristic,

2   yes.

3   Q.   Let's move on then, sir, and the jury will look at the DV&V

4   when it has the opportunity in the jury room.

5        You testified earlier in response to Ms. Helm's          04:27PM

6   questions that you performed other tests to measure the

7   fracture resistance in the G2 Filter as a result of the changes

8   that were made.

9        Did I understand that correctly?

10  A.   We performed two tests, at least from what I remember.     04:28PM

11  Q.   And you did not -- the tests that you performed on the

12  Recovery you did not perform on the G2, correct?

13       Let me be clear, because that's not fair.  There were

14  a number of tests you performed.

15       The tests we just talked about, the compression tests      04:28PM

16  to simulate breathing, you did not perform that test on the G2,

17  did you?

18  A.   We did not.  That's correct.

19  Q.   And you performed -- you said you developed another test to

20  test, I believe your terms were different loading conditions.    04:28PM

21  Correct?

22  A.   Yes.  There was an FEA analysis and there was another test

23  which looks at the more severe deformations.

24  Q.   Let me talk about the latter which is the bench test you

25  created.  And the jury has heard about this and the jury heard   04:28PM

1   it referred to as the saluting arm test.  Have you referred to

2   that test as the saluting arm test?

3   A.  We typically call it the arm fatigue test, but yes.  That

4   would be another way to describe.

5   Q.  That's a test where you take the filter arms, move them up          04:29PM

6   on up and down and up and down until they break, correct?

7   A.  Yes.

8   Q.  And you performed that test and concluded that the G2 was

9   better at that test than the Recovery had been, correct?

10  A.  That's correct.                                                      04:29PM

11  Q.  Now, sir, one of the issues coming out of that test was you

12  did not conduct an FEA or finite element analysis of that same

13  test to see what the results would be, did you?

14  A.  I don't think we did, and I don't think there was a need

15  for that.                                                               04:29PM

16          THE COURT:  We're going to stop at this point, Mr.

17  Stoller.

18          Ladies and Gentlemen, we'll plan to begin at 9 in the

19  morning and we will excuse you for the evening.  Thank you.

20          MR. STOLLER:  Thank you, Your Honor.                            04:29PM

21          (Jury out at 4:29 p.m.)

22          THE COURT:  I'm going to give you your time, counsel,

23  if you hold on for just a minute.

24          All right, counsel.  As of now, plaintiff has used 23

25  hours, 51 minutes.  Defendants have used 11 hours, 37 minutes.          04:31PM

5-24-18-MD 15-2641-Jones v Bard-Jury Trial-Day 7

1   And we will plan to see you at 8:30.

2           Please remember tomorrow at this time we're going to

3   talk about the jury instructions.

4           See you tomorrow.

5           MR. LOPEZ:  Do we let the jury go at 4?                04:32PM

6           THE COURT:  Let me tell you that in the morning.  I

7   want to see how we're doing on our overall schedule in meeting

8   the time.  If we can let them go at 4 tomorrow, they would

9   probably appreciate it.  That would give us a little more time

10  for jury instructions.  I will see if that works with getting   04:32PM

11  the trial done in time.

12          MS. HELM:  Thank you, Your Honor.

13          (Proceeding recessed at 4:32 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                         <u>C E R T I F I C A T E</u>

7

8          I, LAURIE A. ADAMS, do hereby certify that I am duly

9    appointed and qualified to act as Official Court Reporter for

10   the United States District Court for the District of Arizona.

11         I FURTHER CERTIFY that the foregoing pages constitute

12   a full, true, and accurate transcript of all of that portion of

13   the proceedings contained herein, had in the above-entitled

14   cause on the date specified therein, and that said transcript

15   was prepared under my direction and control.

16         DATED at Phoenix, Arizona, this 25th day of May, 2018.

17

18                              s/Laurie A. Adams
                              _____
19                              Laurie A. Adams, RMR, CRR

20

21

22

23

24

25