1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ARIZONA

3    _____

4

In Re:  Bard IVC Filters      ) MD-15-02641-PHX-DGC
5   Products Liability Litigation )
                                  ) Phoenix, Arizona
6   _____) May 25, 2018
Doris Jones, an individual,   ) 1:00 p.m.
7                                 )
               Plaintiff,        )
8                                 ) CV 16-00782-PHX-DGC
          vs.                     )
9                                 )
C.R. Bard, Inc., a New           )
10  Jersey corporation; and Bard )
Peripheral Vascular, Inc., an )
11  Arizona corporation,          )
                                  )
12            Defendants.         )
_____)

13

14

         BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE
15

             REPORTER'S TRANSCRIPT OF PROCEEDINGS
16

             (Jury Trial - Day 8 - P.M. Session)
17           (*Pages 1755 through 1865, inclusive.*)

18

19

20

21  Official Court Reporter:
Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
23  Phoenix, Arizona 85003-2151
(602) 322-7256
24
Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

```
1    APPEARANCES:

2    For the Plaintiff:

3             GALLAGHER & KENNEDY PA
              By:  Mark S. O'Connor, Esq.
4             By:  Paul L. Stoller, Esq.
              By:  Shannon L. Clark, Esq.
5             By:  C. Lincoln Combs, Esq.
              2575 East Camelback Road, Suite 1100
6             Phoenix, Arizona 85016
     Add Mr. Mankoff**
7             LOPEZ MCHUGH LLP
              BY:  Ramon Rossi Lopez, Esq.
8             100 Bayview Circle, Suite 5600
              Newport Beach, California 92660
9
     For the Defendants:
10            NELSON MULLINS RILEY & SCARBOROUGH LLP
              By:  Richard B. North, Jr., Esq.
11            By:  Elizabeth C. Helm, Esq.
              By:  James F. Rogers, Esq.
12            201 17th Street NW, Suite 1700
              Atlanta, Georgia 30363
13

14
     WITNESS:                DIRECT   CROSS   REDIRECT   RECROSS
15   MONI STEIN, M.D.
     By Mr. Combs                      1757
16   By Mr. Rogers                              1770

17   PAUL BRIANT
     By Mr. North            1773                1834
18   By Mr. Stoller                   1816

19   JOHN DEFORD
     By Video Deposition     1836
20
     MARK WILSON
21   By Video Deposition     1837

22                     INDEX OF EXHIBITS

23   EXHIBIT                             RECEIVED
     1031    DeFord Deposition Exhibit 283    1836
24

25
```

UNITED STATES DISTRICT COURT

———————5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Stein-Cross———————

1           P R O C E E D I N G S

2           THE COURT:  You may continue, Mr. Combs.

3           MR. COMBS:  Thank you, Your Honor.

4                    MONI STEIN,

5   called as a witness herein, having been previously sworn, was          01:01PM

6   examined and testified as follows:

7                    CROSS-EXAMINATION

8   BY MR. COMBS:

9   Q.  Good afternoon, Dr. Stein.  My name is Lincoln Combs.

10  Where do you currently reside?                                         01:01PM

11  A.  Columbus, Ohio.

12  Q.  Columbus is beautiful this time of year, as I know and I

13  know you know.  And what I'd like to do today to get you back

14  there as soon as possible is just answer a series of yes or no

15  questions.  And that way if you could answer them yes or no, or        01:01PM

16  say I can't answer that yes or no, that will move things along.

17  Hopefully that's the last non yes or no question I ask you.

18           Is that okay, Doctor?

19  A.  Not every question can be answered yes or no, so I will

20  try.  But I can't promise.                                             01:02PM

21  Q.  Understood.  And if you can't answer it yes or no, just

22  tell us and I will try to re-ask the question or move on,

23  whatever we need to do.

24           And I want to start, Doctor, with a few simple

25  propositions that I hope we can agree on.  Can you agree with          01:02PM

1   me that when a manufacturer is aware that its product is not

2   performing consistent with its own safety goals and thresholds

3   it should take the product off the market?

4   A.   There's no yes or no.

5   Q.   You can't answer yes or no?                                01:02PM

6   A.   No yes or no.

7           MR. COMBS:   Gay, could you pull up Page 137 of --

8   there we go.   Starting on Line 22, we're going to go into the

9   next page.

10  BY MR. COMBS:                                                   01:02PM

11  Q.   In your deposition you were asked:   Do you agree, sir, that

12  when a manufacturer is aware that a product is not performing

13  consistent with its own safety goals and thresholds it cannot

14  ignore that fact?

15          And your answer there at Line 6, after some             01:02PM

16  objections, was:   They should take the product off the market.

17  Do you see that?   That's how you answered in your July 31st

18  deposition.

19  A.   My answer was longer than that and you just picked out a

20  small portion.                                                  01:03PM

21  Q.   Did I read from your deposition correctly?

22  A.   Yes, you did.

23  Q.   Let me try again with another one.   And you would agree

24  with me, hopefully you can agree with me, that if a company had

25  bad information of bad performance and serious safety concerns,  01:03PM

1  bringing a product to the market would be outrageous.  Did you

2  agree with that statement?

3  A.  The statement was a lot longer, but the way you took it out

4  of there, I said that.

5  Q.  And finally, you would agree with me that any measurable     01:03PM

6  migration of an IVC filter is considered clinically

7  significant, correct?

8  A.  No.

9          MR. COMBS:  Gay, if you could pull up Page 160 of Dr.

10  Stein's deposition.  And we're going to go to Line 17 through    01:03PM

11  22.

12  BY MR. COMBS:

13  Q.  You were asked in your deposition:  As you sit here now can

14  you tell us what is the distance that is utilized to define

15  migration by the SIR and ACR?  You responded:  I can't recall    01:04PM

16  the exact number.  I think any migration is considered

17  significant, any measurable migration.

18          Did I read that from your deposition correctly?

19  A.  You omitted --

20  Q.  Yes or no, please.                                           01:04PM

21  A.  -- clinical.

22  Q.  Yes or no please, Doctor.

23  A.  I can't answer yes or no.

24  Q.  Did I read correctly from your deposition?  That's the

25  question.                                                        01:04PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Stein-Cross

1    A.  But when you asked the question --

2    Q.  Yes or no, please, Doctor.

3    A.  -- the word clinical.

4           MR. COMBS:  Your Honor, I would instruct you to have

5    the witness answer yes or no.                              01:04PM

6           THE COURT:  Hold on just a minute.

7           The attorneys on the other side can ask you to explain

8    if they deem it important.  For now, if you can answer yes or

9    no, do so.  If you can't, just say I can't answer that yes or

10   no.                                                        01:04PM

11          THE WITNESS:  I can't answer that yes or no.

12   BY MR. COMBS:

13   Q.  You can't answer yes or no whether I read from your

14   deposition correctly?

15   A.  Well, you read from the deposition correctly but there was   01:04PM

16   another issue.

17   Q.  That's my question.

18   A.  Okay.  Yes.

19   Q.  And Doctor, you did two reports for this case, correct?

20   A.  Yes.                                                   01:05PM

21   Q.  One on Bard filters generally and one addressing Mrs. Jones

22   and her Eclipse Filter specifically?

23   A.  Yes.

24   Q.  Let's take a look at your general deposition.

25          MR. COMBS:  Exhibit 2465, please, Gay.             01:05PM

1   BY MR. COMBS:

2   Q.  Starting on the first page, this is your general report for

3   this case, correct?

4   A.  Yes.

5   Q.  And you spent a good chunk of this report discussing the          01:05PM

6   medical literature on Bard IVC filters, correct?

7   A.  Yes.

8   Q.  And there are quite a few articles out there on Bard's IVC

9   filters, correct?

10  A.  Yes.                                                              01:05PM

11          MR. COMBS:  Let's go to Page 6, if you could, Gay.

12  BY MR. COMBS:

13  Q.  In the middle section there, middle paragraph, you talked

14  about the Binkert study?

15  A.  Yes.                                                              01:06PM

16  Q.  The Binkert Study is also known as the EVEREST study?

17  A.  Yes.

18  Q.  That was a study funded by Bard?

19  A.  Yes.

20  Q.  And the EVEREST study looked at G2 Filters explanted from        01:06PM

21  patients after an average of 140 days.  Is that correct?

22  A.  Yes.

23  Q.  And it found that -- I'm quoting your report here -- caudal

24  migration was seen in 12 percent of filters.  That's what you

25  said in your report, correct?                                        01:06PM

─────5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Stein-Cross─────

1    A.  Yes.

2           MR. COMBS:  Your Honor, could I use the ELMO as well?

3           THE COURT:  Yes.

4    BY MR. COMBS:

5    Q.  And in your report you continued:  Filter fracture was seen          01:07PM

6    -- was observed in 1 out of 85, 1.2 percent; filter tilt of

7    more than 15 degrees in 15 out of 85, 18 percent.

8           Did I read that correctly?

9    A.  Yeah,

10          MR. COMBS:  May I publish this to the jury, Your          01:07PM

11   Honor?

12          THE COURT:  Publish what?

13          MR. COMBS:  The ELMO.

14          THE COURT:  You mean what you have written?

15          MR. COMBS:  Yes.          01:08PM

16          THE COURT:  Publish that?  Any objection?

17          MR. ROGERS:  None, Your Honor.

18          THE COURT:  You may.

19          MR. COMBS:  Thank you.

20   BY MR. COMBS:          01:08PM

21   Q.  And I next want to turn to the VJ study which you talked

22   about on the bottom of Page 7 and into Page 8 of your report.

23   And you mentioned the VJ article and you said VJ, et al.,

24   reviewed retrospectively the charts of 548 patients who

25   received Recovery G2 or G2 Express Filters between 2004 to 2010          01:08PM

1  who came for filter retrieval.  63 fractures were reported for

2  a fracture rate of 12 percent.  Excluding minimal foot process

3  fractures, the fracture rate dropped to 6 percent.  The average

4  dwell time for fractured filters was 692 days.

5          Did I read correctly from your report?                     01:08PM

6  A.  I'm not seeing the report, but I think you did.

7  Q.  And 692 days is about two years, correct?

8          Is that yes?

9  A.  Yes.

10 Q.  And then I want to go to the section of your report where     01:09PM

11 you talked about the An study, A-N.

12         MR. ROGERS:  Your Honor, may I interrupt for a moment?

13 The witness can't see the report.  He either needs a copy on

14 the screen or in his hand.

15         THE COURT:  I agree.  If you are asking him if you are     01:09PM

16 reading it correctly, he needs to have the report.

17         MR. COMBS:  That's fine, Your Honor.

18         Can we switch back to his report, Gay, please, and

19 Traci?  Thank you.  That's fair.  I apologize.

20 BY MR. COMBS:                                                      01:10PM

21 Q.  Let's go to Page 7.  There we go.  Talk about the An Study.

22 And in your report you discuss the An Study which looked at 684

23 patients who received G2 Filters over a five-year span from

24 2005 to 2010.  And you said the authors found filter fractures

25 in 13 of 684 patients, 1.9 percent.  And again, I'm quoting      01:10PM

1    your report, at five years fracture prevalence was estimated to

2    be 38 percent.

3             Have I correct correctly from your report?

4    A.  Yes.

5             MR. COMBS:  May I publish the ELMO again, Your Honor?      01:10PM

6             THE COURT:  You may.

7    BY MR. COMBS:

8    Q.  And I think your opinion in this case, as expressed in your

9    report is that these studies I have mentioned and other studies

10   you talked about in your report are unfairly biased against      01:11PM

11   Bard.  Is that correct?

12   A.  To a certain degree, yes.

13   Q.  I'm sorry?

14   A.  To a certain degree, yes.

15   Q.  Certain degree.                                              01:11PM

16             MR. COMBS:  Can you go to Page 15 of Dr. Stein's

17   report, Gay?

18   BY MR. COMBS:

19   Q.  Specifically, you said on Page 15 of your report:  Based on

20   my research there has been an unfair bias toward Bard filters    01:11PM

21   with overreaching and unjustified conclusions relying on low

22   quality research and sensationalized case studies.

23             That's what you said in your report, correct?

24   A.  It's written there, yes.

25   Q.  And did that comment include Bard's own study, the Binkert    01:11PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Stein-Cross

1    EVEREST Study?

2    A.   No.

3    Q.   Yes or no?

4    A.   No.

5         MR. COMBS:   You can take that down, Gay.                    01:12PM

6    BY MR. COMBS:

7    Q.   Want to talk about your case-specific opinions addressing

8    Mrs. Jones and what happened to her Eclipse Filter.  Have you

9    ever seen -- well, you reviewed Mrs. Jones' medical records and

10   imaging in this case, correct?                                   01:12PM

11   A.   Yes.

12   Q.   And have you ever seen her -- any reports of her having

13   blood clots or problems with blood clots since the filter was

14   implanted in 2010?

15   A.   No.                                                         01:12PM

16   Q.   And no problems with blood clots after the filter was

17   removed?

18   A.   Not that I could see.

19   Q.   You said in your report, and I can pull it up if you don't

20   recall, but that there is no force to push the strut through     01:12PM

21   the wall of the pulmonary artery.  Do you recall seeing that?

22   I can pull up your report if you need.

23   A.   Please.

24        MR. COMBS:   If you could, Gay, go to Page 4.

25   BY MR. COMBS:                                                    01:13PM

1  Q.  And if you see the last sentence of the paragraph there

2  that Gay is highlighting for you, you said:  There is no force

3  to push the strut through the wall of the pulmonary artery.

4  A.  Yes.

5  Q.  Is that correct?                                          01:13PM

6        And you would agree, though, that the pulmonary artery

7  is the connection in the body between the heart and the lung?

8  A.  Indirectly.

9  Q.  I'm sorry?

10 A.  To a certain degree, yes.                                 01:13PM

11 Q.  To a certain degree?

12 A.  Yeah.

13 Q.  Is it yes or no?  Is the pulmonary artery the connection

14 between the heart and lung?

15 A.  Well, there's the main pulmonary artery.  Where the strut  01:13PM

16 is is a peripheral pulmonary artery.  So it's not the same

17 thing.  You are simplifying it.

18 Q.  Well, you would agree that Mrs. Jones' fracture is located

19 in the space between her heart and her lung in her body?

20 A.  The fracture, you mean the fragment or the filter?        01:14PM

21 Q.  The fragment piece of the filter.

22 A.  The fragment piece is in the pulmonary artery.

23 Q.  That's between the heart and the lung?  Yes or no.

24 A.  What do you refer by lung?  Lung contains a lot of

25 structures.                                                   01:14PM

1   Q.   I think it's a pretty simple question, Doctor, and I have

2   asked you for a yes or no answer, please.

3   A.   I can't answer yes or no.

4   Q.   Thank you.  But you would agree as a medical doctor that

5   you are aware that the heart beats and pushes blood through the    01:14PM

6   circulatory system around 80 times a minutes, which is about 42

7   million times per year?

8   A.   Yes.

9   Q.   And you would agree that the lungs breathe in and out

10  respirating about 16 times per minute, about eight million         01:14PM

11  times per year?

12  A.   Yes.

13  Q.   Let me ask you another simple yes or no question:  Did Mrs.

14  Jones' Eclipse Filter fail?  Yes or no.

15  A.   It did not.                                                    01:14PM

16  Q.   And it is your expert opinion in this case at the time of

17  retrieval it was still functional?

18  A.   Yes.

19  Q.   And you would degree the filter tilted?

20  A.   Slightly.                                                      01:15PM

21  Q.   Do you agree the filter caudally migrated?

22  A.   No.

23  Q.   So you would disagree if there's testimony in this case

24  from plaintiff's experts like Dr. Hurst, you would disagree

25  there was any caudal migration of her filter?                      01:15PM

1    A.  I did not see his testimony, but if you are asking me if I

2    think that it migrated, I strongly disagree with that.  I can

3    elaborate if you want me to.

4    Q.  But you would agree with me that it did fracture?

5    A.  Yes.                                                          01:15PM

6    Q.  And you haven't been shown or looked at any Bard internal

7    documents in your work for this case, have you?

8    A.  No, I did not.

9    Q.  And so are you aware that Bard describes tilt, migration,

10   and fracture as failure modes?                                    01:15PM

11   A.  There's a structural failure or a clinical failure.

12   There's a difference.

13   Q.  But it's your opinion, your opinion regardless of how Bard

14   defines failure, that Mrs. Jones' filter did not fail in this

15   case?                                                             01:16PM

16   A.  Clinically it did not fail.  She did not have pulmonary

17   embolism.

18   Q.  The fragment of Mrs. Jones' Eclipse Filter that broke off,

19   it had to travel through her heart in order to reach the

20   pulmonary vasculature, is that correct?                          01:16PM

21   A.  Correct.

22   Q.  And you mentioned in your questioning with Mr. Rogers that

23   dizziness like she reported in April 2015 in the emergency room

24   could be caused by a cardiac event, correct?

25   A.  Yes.                                                          01:16PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Stein-Cross

1  Q.  And as the filter piece travelled up through her vena cava

2  into her heart through the chambers and valves of her heart

3  into her pulmonary artery it could have gotten stuck or lodged

4  there, is that correct?

5  A.  No.  It traveled through.  It didn't get stuck.                    01:16PM

6  Q.  Could have, though, correct?

7  A.  Unlikely.

8  Q.  Not possible?

9  A.  Very unlikely.

10  Q.  But you would agree, of course, that if that had happened        01:16PM

11  that would be a bad thing, if it had got stuck in her heart?

12  A.  That's a hypothetical question.  It didn't happen.  In

13  reality it didn't happen.  I don't believe it happened.

14  Q.  If it had happened, Doctor, would that have been a serious

15  event?                                                               01:17PM

16  A.  In the unlikely possibility, yes.

17  Q.  That could cause lots of problems?

18  A.  Again it's a very hypothetical if.  It's very unlikely.  So

19  I'm not sure -- you are asking me a lot of unlikely

20  hypothetical questions.  How am I supposed to answer that?           01:17PM

21  Q.  So even if the filter piece -- I'm sorry -- even if Mrs.

22  Jones' Eclipse Filter didn't fail under your standards, the

23  fragment embolizing up through her vena cava into and through

24  her heart could have killed her, couldn't it?

25  A.  It did not.                                                      01:17PM

1    Q.  Could have, couldn't it?

2    A.  I don't think so.  There's no report of fatalities out

3    there.

4            MR. COMBS:  No further questions, Your Honor.

5            THE COURT:  Redirect?                                01:17PM

6            MR. ROGERS:  Very briefly, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MR. ROGERS:

9    Q.  Dr. Stein, you were asked some questions about the An

10   article.  Do you recall that?                                01:18PM

11   A.  Yes.

12   Q.  Is that a piece of medical literature that you are familiar

13   with?

14   A.  Yes, I am.

15   Q.  I'm going to put this back up on the ELMO.               01:18PM

16           MR. ROGERS:  And, Your Honor, can we display that to

17   the jury, please?

18           THE COURT:  Yes.

19   BY MR. ROGERS:

20   Q.  Now, on this piece of paper, that has got an An, it says   01:18PM

21   five years fracture 38 percent.  Do you see that, Doctor?

22   A.  Yes, I do.

23   Q.  And in the An Study, what was the reported fracture rate

24   that the authors reported in the medical literature based on

25   the current data that they had?                              01:18PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Stein-Redirect

1   A.   I think it was more like 1.2 percent.

2   Q.   1.2?

3   A.   Yeah.

4   Q.   Does 1.9 sound about right?

5   A.   Yeah.  Yeah.  Sorry.  1.9.                          01:18PM

6   Q.   So I'm going to strike through this and put 1.9 percent.

7        Now, plaintiff's counsel put on the screen five year

8   fracture, 38 percent.

9   A.   Yes.

10  Q.   Can you explain that to the jury?                   01:19PM

11  A.   Sure.  So they use something that is called a Kaplan-Meier

12  analysis.  So with the way the Kaplan-Meier analysis works is

13  that you basically take the fractures and the sample size at

14  every interval.  So the problem with this analysis is that it

15  tends to exaggerate the rate at the end because the sample size  01:19PM

16  is very small.  So at five years you are not going to have a

17  lot of patients.  So therefore, the percentage is going to be

18  artificially high.  And I think it is misleading.  It creates a

19  false impression.  And I think it very unfortunate that a lot

20  of literature quotes that particular number which I question    01:19PM

21  greatly.  I am more with the 1.9 percent.

22  Q.   I understand.  Let me ask you this:  So this 38 percent as

23  reported, was that a prediction of what would happen in the

24  future or was it something that was based on current data that

25  was available at that time?                             01:20PM

UNITED  STATES  DISTRICT  COURT

—5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Stein-Redirect—

1  A.  I think it's an extrapolation.  I think it's kind of an

2  over-analysis or confusing statistics to manipulate and

3  sensationalize the data is the way I perceive it.

4  Q.  Since this article was published, are you aware of any

5  study that has come along since then that would publish a rate    01:20PM

6  based on actual current data that would be anything close to 38

7  percent?

8          MR. COMBS:  Objection, Your Honor.  Nondisclosure.

9  He's got to specify the article he's talking about.

10         THE COURT:  Overruled.  Fair redirect.    01:20PM

11         THE WITNESS:  No.  I'm not aware of anything that

12  comes even close to that, nowhere close to that.

13         MR. ROGERS:  Thank you.  No further questions.

14         THE COURT:  Thank you, Doctor.  You can step down.

15         MR. NORTH:  Your Honor, at this time we could call Dr.    01:20PM

16  Paul Briant to the stand.

17         THE COURT:  Feel free to stand up, Ladies and

18  Gentlemen, if you want to.

19         MR. NORTH:  May I approach?

20         THE COURT:  Yes.    01:21PM

21         THE COURTROOM DEPUTY:  Please stand right there.

22  Raise your right hand.

23          (The witness was sworn.)

24         THE COURTROOM DEPUTY:  Could you please state your

25  name and spell it for the record?    01:21PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1            THE WITNESS:  Paul Briant.  P-A-U-L, last name

2    B-R-I-A-N-T.

3            THE COURTROOM DEPUTY:  Thank you.  Please come have a

4    seat.

5                           PAUL BRIANT,

6    called as a witness herein, having been duly sworn, was

7    examined and testified as follows:

8                        DIRECT EXAMINATION

9    BY MR. NORTH:

10   Q.  Good afternoon, Dr. Briant.                            01:22PM

11   A.  Good afternoon.

12   Q.  Could you tell the members of the jury what your profession

13   is?

14   A.  Sure.  So I'm a mechanical engineer at Exponent Failure

15   Analysis Associates.                                      01:22PM

16   Q.  Now, can you tell the jury about your educational

17   background which resulted in you becoming a mechanical

18   engineer?

19   A.  Sure.  So I got my Bachelor of Science degree in mechanical

20   engineering from Washington University in St. Louis where I    01:22PM

21   graduated summa cum laude.  I then want went on to Stanford

22   University where I got my Master's and my Ph.D., again, both in

23   mechanical engineering.

24   Q.  What was the topic of your Ph.D. research?

25   A.  So for my Ph.D., I looked at tissue mechanics so         01:22PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1   understanding how tissues within the body will react to

2   mechanical loads and forces you put on them.  The focus on that

3   was looking at cartilage and to understand the causes of

4   osteoarthritis.

5   Q.  Are you a licensed engineer?                                01:22PM

6   A.  Yes.  I'm a professional engineer.

7   Q.  You said that you worked for Exponent Failure Analysis

8   Associates.  Can you tell us what that company does?

9   A.  Sure.  So we're a technical consulting firm, and we focus

10  mostly on failure analysis.                                     01:23PM

11  Q.  And where are your offices located?

12  A.  So I'm in Menlo Park, California.

13  Q.  How long have you been employed with Exponent?

14  A.  I have been there for 10 years.

15  Q.  Did you start there after you completed your doctorate?    01:23PM

16  A.  Yes.  I went there right out of school.

17  Q.  What is your position with Exponent?

18  A.  I'm a principal engineer.

19  Q.  And what type of work do you do with the company?

20  A.  So my work focuses on understanding the stresses and        01:23PM

21  strains inside of a structure.  So I do strain analysis or

22  stress analysis.  And this includes both calculations and

23  analytical finite element analysis and other testing as well as

24  custom laboratory bench testing.

25  Q.  Do you work -- what sort of entities do you perform this    01:23PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1  analysis for?

2  A.  So we, and I, consult over a wide range of industries.  My

3  work focuses largely on medical devices as well as electronic

4  devices.

5  Q.  Are you familiar with a substance called Nitinol?                01:24PM

6  A.  Yes.

7  Q.  Have you had any involvement with Nitinol from a

8  professional standpoint?

9  A.  Yes, I have, a lot.

10  Q.  Have you ever had any experience with cardiovascular            01:24PM

11  Nitinol products?

12  A.  Yes.  So a large part of the medical device work that I do

13  is on implantable medical devices and understanding the

14  stresses and strains in those structures.

15  Q.  Have you given presentations on Nitinol?                        01:24PM

16  A.  Yes.

17  Q.  And have you written in any publications on Nitinol?

18  A.  Yes.  I have published papers on understanding, again, the

19  stresses and strains of Nitinol structures as well as analyzing

20  what we call the fatigue performance of Nitinol.                    01:24PM

21  Q.  Now, do you work with companies sometimes in the medical

22  device industry?

23  A.  Yes.  That's a big part of what I do.

24  Q.  And what sort of projects do you do for companies in the

25  medical device industry?                                           01:25PM

1    A.  Again, it varies, but a lot of the work that I do is on

2    implantable cardiac devices.

3    Q.  And when you say "a lot of the work I do," is that testing

4    and analysis?

5    A.  Yes.  Both.                                                      01:25PM

6    Q.  Have you been retained by my law firm to assist in this

7    litigation?

8    A.  I have.

9    Q.  And have you been consulting with my firm for several

10   years?                                                              01:25PM

11   A.  I have.

12   Q.  What were you specifically asked to do in this case?

13   A.  So I was asked in this case to review the opinions and

14   claims put forth by Dr. McMeeking, who is the mechanical

15   engineering expert put forth by the plaintiffs and to review   01:25PM

16   the basis for those claims and the underlying calculations that

17   went into those bases.

18   Q.  And who determined what your methodology would be in

19   undertaking this analysis?

20   A.  I did.                                                          01:26PM

21   Q.  As a part of your work with Exponent do you also consult

22   with parties involved in litigation?

23   A.  I do.

24   Q.  Can you estimate for us what percentage of your

25   professional time is spent in litigation versus what percentage   01:26PM

1   is spent working directly with clients analyzing failure events

2   of their products?

3   A.   Sure.   So about 40 percent of my time is on litigation

4   related matters, and the remaining 60 percent of my time is on

5   working directly with corporations to understand their          01:26PM

6   products.

7   Q.   Can you just give us a sampling of some of the medical

8   devices you have worked on in conducting failure analyses?

9   A.   Sure.   It ranges, but things like stents, heart valves,

10  catheter-based devices.   So it covers a broad range.           01:26PM

11  Q.   And I believe you mentioned that you have also done work

12  for the consumer electronics industry?

13  A.   That's correct.

14  Q.   And what sort of products have you worked on as far as

15  doing testing and analysis for that industry?                   01:27PM

16  A.   It, again, varies, but the core of it, the focus of it is

17  understanding how the products are going to perform when they

18  are in the field looking at things like broken solder joints,

19  things like that.

20  Q.   Can you estimate how many medical devices you have         01:27PM

21  analyzed, tested, and reviewed as a part of your work at

22  Exponent over the last decade?

23  A.   I don't have an exact number, but well over 100.   Medical

24  device analysis, as I said, is a big part of what I do and

25  analyzing doing complicated analyses of medical devices under   01:27PM

1    real life scenarios is the --

2    Q.  Have any of your analyses of various medical devices been

3    presented to the FDA as part of a device submission in the

4    past?

5    A.  Yes.  My work has been reviewed by the Food and Drug          01:28PM

6    Administration as part of submissions, and I have worked

7    directly with FDA reviewers during their -- if they have any

8    questions.

9    Q.  What documents were you provided to review in this matter?

10   A.  It was a range of materials.  It included Bard files; it      01:28PM

11   included expert reports; it included depositions from other

12   experts, things like that.

13   Q.  Were you provided materials regarding the development of

14   the Recovery, the G,2 the G2X, and Eclipse IVC filters?

15   A.  Yes.  Part of the materials was the 510(k) submissions, the   01:28PM

16   design history files, things like that.

17   Q.  Were you provided testing materials?

18   A.  Testing materials are part of those packages, yes.

19   Q.  And how were the documents you received and reviewed

20   selected?                                                          01:28PM

21   A.  So I received an initial set of documents, and I received

22   documents throughout the course of this project.  And if I

23   needed other documents I would just go ahead and request them.

24   Q.  Did you review any expert reports or depositions in the

25   litigation?                                                        01:29PM

1  A.  Yes.  I reviewed expert reports and depositions.

2  Q.  Did you pay particular attention to the report and

3  depositions of Dr. McMeeking?

4  A.  Yes.  Those are certainly the focus of my role in this

5  case.                                                           01:29PM

6  Q.  And did you attempt to review most of the documents

7  referenced in Dr. McMeekings reports or depositions?

8  A.  Yes.  I don't know if I reviewed all of them, but I

9  certainly reviewed most of them.

10 Q.  Now, Dr. Briant, as a part of your consulting work with me   01:29PM

11 and my firm in this case, have you actually performed testing

12 or analysis of Bard's IVC filters?

13 A.  Yes.  We have done both.

14 Q.  Tell us what sort of testing and analysis you have done

15 over the years.                                                 01:29PM

16 A.  So the analyses have been finite element based strain

17 calculations which we'll be talking about.  And the testing has

18 been experimental bench testing, so testing we do in the lab on

19 actual filters.

20 Q.  Did that testing involve sophisticated equipment?           01:30PM

21 A.  Yeah.  As I said, the technique we use for our strain

22 calculations is called finite element analysis.  And the test

23 equipment is also sophisticated.

24 Q.  Doctor, you keep referencing "we."  Did other professionals

25 at Exponent assist you with this testing and analysis?          01:30PM

1    A.   Yes.  I have a team that helped me with this.

2    Q.   And what sort of professionals does that team consist of?

3    A.   It consists of other engineers as well as technical staff.

4    Q.   Now has your company charged for the testing and finite

5    element analysis and other calculations and work you have done          01:30PM

6    as a part of your work in this case?

7    A.   Yes.

8    Q.   Can you estimate how much Exponent has charged in total for

9    all of the analyses performed by this team of people over the

10   years?                                                                  01:31PM

11   A.   Sure.  So over the five years or so that we have been

12   involved in this project, it's totaled about $650,000.

13   Q.   Are you an employee or owner of Exponent?

14   A.   I'm an employee.

15   Q.   Do the billings that you have given to my law firm over          01:31PM

16   that five-year period reflect only your time?

17   A.   No.  It's myself and the team and also machine charges,

18   unit charges, things like that.

19   Q.   Are you a salaried employee at Exponent?

20   A.   Yes, I am.                                                          01:31PM

21   Q.   Is your compensation contingent in any way on the number of

22   hours you have worked on the filter analyses?

23   A.   No, it's not.  I get a salary whatever it is.

24   Q.   Dr. Briant, as a result of the work and investigation that

25   you have done in this case, have you reached any opinions?              01:31PM

1   A.  Yes, I have.

2   Q.  And are those generally three major opinions?

3   A.  Yes.

4   Q.  Could you tell the members of the jury what your

5   principal -- three principal opinions are?                    01:32PM

6   A.  Sure.  So as you heard from the plaintiff's expert, Dr.

7   McMeeking, he renders a series of criticism and claims about

8   the Bard filters, both in terms of the design of the filters as

9   well as the testing that Bard did during their design process.

10       And so my opinions boil down to three main things.       01:32PM

11  Number one is that the calculations that Dr. McMeeking

12  performed that underlie, or the foundation for his design

13  opinions, that those calculations are unreliable.  And that's

14  due to the simplifications that Dr. McMeeking made when

15  performing those calculations as well as the assumptions that  01:32PM

16  were fed into that analysis which, as I will talk about, were

17  beyond physical limits of what the body can do.  So that's

18  number one.

19       Number two is that Dr. McMeeking criticizes the

20  testing that Bard performed.  However, the testing that Bard    01:33PM

21  did considered all the relevant complications that are known to

22  occur with IVC filters.  And in addition, while Dr. McMeeking

23  criticized the testing, he didn't put forth any analysis or

24  engineering bases for alternative test methods that might be

25  used or any alternative designs, for that matter.               01:33PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    Q.  And what was your third opinion, Dr. Briant?

2    A.  Sure.  So my third opinion was that the Simon Nitinol

3    Filter, the SNF that you have heard about, is not an

4    alternative design from an engineering perspective because it

5    lacks the retrievability of that functionality that Bard          01:33PM

6    filters have.

7            MR. NORTH:  Could we display Exhibit 7944, please.

8    BY MR. NORTH:

9    Q.  Can you identify for us what 7944 is?

10   A.  Sure.  This is a slide I put together that summarizes the     01:33PM

11   opinions that we just discussed.

12           MR. NORTH:  Your Honor, at this time we would seek

13   permission to display 7944.

14           THE COURT:  As a demonstrative exhibit?

15           MR. NORTH:  As a demonstrative, yes.                       01:34PM

16           THE COURT:  Any objection?

17           MR. STOLLER:  No objection.

18           THE COURT:  You may.

19   BY MR. NORTH:

20   Q.  Here, do you list the three opinions that you just            01:34PM

21   explained for us?

22   A.  Yes.  On the left-hand side is a summary of those opinions.

23   Q.  And are those opinions taken from your report in this

24   litigation?

25   A.  Yes, they are.                                                 01:34PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    Q.  And I think we'll talk about these in more detail in a

2    minute.  But tell us briefly what you are trying to show with

3    these pictures or pictographs on the right.

4    A.  Sure.  So on the right-hand side, those images are related

5    largely to opinion number one.  And they sort of highlight the        01:34PM

6    difference in the analyses that were performed.  So Dr.

7    McMeeking, in his calculations, incorporated just a single

8    filter arm explicitly in his analysis, and actually just the

9    upper portion of the arm from the tip to the elbow.

10           And in the calculations that we did, we had the entire        01:35PM

11   filter, and more importantly, we also had the surrounding soft

12   tissues.  So we had the IVC; we had the surrounding abdominal

13   tissues and the vertebrae.  And that's depicted in the images

14   in the center column.

15   Q.  Let me ask you this, Dr. Briant:  As part of your work in        01:35PM

16   this case have you examined actual Bard filters?

17   A.  Yes, I have.

18   Q.  What kinds of Bard filters have you looked at?

19   A.  So I have looked at Recovery, G2, and Eclipse Filters.

20   Q.  And what did you do with the Bard filters that you were          01:35PM

21   provided?

22   A.  We did the mechanical bench testing as I talked about to

23   validate our calculations.

24   Q.  And what was the purpose of that mechanical bench testing?

25   A.  It was to validate the analyses.  So an important part when      01:35PM

1  you do calculations like this to try and understand the strains

2  and structures is to make sure that your calculations are

3  representative, are consistent with real world data.  So that's

4  what that bench testing was for.

5  Q.  Now, have you read any materials in this litigation                      01:36PM

6  specific to Mrs. Jones, the plaintiff in the case?

7  A.  I have read other expert reports specific to her.

8  Q.  Do you know what type of filter Mrs. Jones had implanted?

9  A.  It was an Eclipse Filter.

10 Q.  And do you have an understanding of the type of events or                01:36PM

11 complications that Mrs. Jones has been reported as having with

12 her Eclipse Filter?

13 A.  Yes.  My understanding is she had a tilt of about four

14 degrees and she had a strut fracture.  And the strut moved to

15 her right pulmonary artery.                                                  01:36PM

16 Q.  Dr. Briant, let's talk further about your first opinion

17 regarding the strain analysis performed by Dr. McMeeking.

18       I believe you told us that something about he analyzed

19 only part of an arm.  Is that correct?

20 A.  That's correct.                                                          01:37PM

21 Q.  What about that analysis and only looking at part of the

22 arm do you criticize?

23 A.  So there's several things that I criticize, and we'll go

24 into more detail about them, I'm sure.  But as I said, he only

25 looked at a portion of the arm.  And the biggest thing here is  01:37PM

1    it didn't include the surrounding the issue, so the environment

2    that the arm was in.  So he had to make assumptions on how that

3    arm was going to be loaded by the IVC as opposed to having a

4    more complete picture with the surrounding environment that the

5    filter lives in.                                                    01:37PM

6    Q.  Why did these incorrect assumptions that Dr. McMeeking made

7    in your view, why did those matters?

8    A.  So as you will see, he -- the assumptions that he made were

9    beyond what the human body can do.  So he assumed essentially

10   that the IVC was infinitely stiff; that it would move           01:38PM

11   regardless whether there's a filter there or not by the same

12   amount.  And in addition, he assumed that wherever the filter

13   contacted the IVC, that that point was essentially constrained

14   from rotation so it was kind of locked and the filter just had

15   to go wherever the IVC went.  So this resulted in an           01:38PM

16   overprediction of his strains, or higher strains than what you

17   would get with actually incorporating the environment.

18   Q.  Now, you conducted filter arm strain and stress analysis,

19   correct?

20   A.  That's correct.                                             01:38PM

21   Q.  Can you tell us in general terms what that means or

22   consists of?

23   A.  Sure.  That involves solving fundamental equations to

24   calculate the stresses or the strains inside of a structure.

25   Q.  Did Dr. McMeeking also analyze filter arm strain and        01:38PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1   stress?

2   A.  Yes, he did.

3   Q.  And how did he do his analysis?

4   A.  So he did a series of analytical calculations.  That was

5   the bulk of the work, and then he also did some finite element    01:38PM

6   analysis.

7   Q.  Did you see any evidence that Dr. McMeeking conducted

8   mechanical bench testing to verify his initial calculations?

9   A.  No, he did not.

10  Q.  Did you do that?                                              01:39PM

11  A.  Yes.  We did the bench testing to validate the

12  calculations.

13  Q.  What, in particular, was Dr. McMeeking evaluating about arm

14  strain?

15  A.  He was calculating the strains in the filter arm with a      01:39PM

16  focus near the cap.

17  Q.  Do you have any criticisms of his including only the upper

18  arm in doing those calculations?

19  A.  Well, as I said he has just the upper arm and so therefore,

20  had to, in order to simplify it down to that, had to make a      01:39PM

21  series of assumptions, and the biggest one being that he didn't

22  incorporate the surrounding IVC and tissues and had to make

23  assumptions about how the filter would be loaded.

24  Q.  When you did your computer modeling, did you utilize the

25  entire filter as opposed to just one arm?                        01:40PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    A.   Yes.   We had the entire filter in there.

2    Q.   Did you create a demonstrative exhibit taken from your

3    report to help you explain some of the assumptions?

4    A.   Yes, I did.

5             MR. NORTH:   Could we display 7812?                          01:40PM

6             Your Honor, at this time we would seek leave to

7    display 7812 as a demonstrative.

8             MR. STOLLER:   No objection.

9             THE COURT:   You may.

10   BY MR. NORTH:                                                         01:40PM

11   Q.   And this is essentially the pictures we saw on the summary

12   of your opinions, aren't they?

13   A.   That's correct.

14   Q.   And did you utilize these to show a difference between how

15   you -- the assumptions you made versus the assumptions Dr.           01:40PM

16   McMeeking made?

17   A.   Correct.

18   Q.   And explain that for us, what that difference is.

19   A.   Sure.   Again, as we talked about, so the calculations by

20   Dr. McMeeking had just the single filter arm and, most               01:41PM

21   importantly, did not have the surrounding soft tissues.   He

22   didn't model those as deformable.   He assumed they were

23   essentially infinitely stiff, so they would move regardless of

24   whether the filter was present and didn't allow the filter to

25   really interact with the IVC the way it would naturally.             01:41PM

1    In the calculations that we did, we had the whole

2 filter and then we had the surrounding soft tissues.  The IVC

3 is shown in blue, it's is that blue ring.  So the image in the

4 center there, we're looking down on our analysis.  The filter

5 is in the center.  You can see the struts emanating out.  The      01:41PM

6 IVC is shown in blue and then we have the surrounding soft

7 tissues that are shown in green.  And we also included a

8 vertebrae, because it's nearby.

9    And then we loaded this in different ways in order to

10 try to bound the problem.  So we looked at it from not just a    01:42PM

11 single loading scenario but several loading scenarios to try

12 and understand and capture the entire range of strains that

13 might be present on the filter.

14 Q.  Dr. Briant, what impact on the analysis do you believe that

15 your use of the complete filter as opposed to just a single     01:42PM

16 upper arm like Dr. McMeeking did had on the calculations and

17 analysis?

18 A.  Sure.  So certainly including the environment that the

19 filter lives in allows for both a more accurate set of

20 calculations and strains.  In addition, the assumptions that     01:42PM

21 Dr. McMeeking used in his calculations, as I said, were beyond

22 what the human body can do.  So this would lead to an

23 overprediction or higher strain than you would actually expect

24 to happen.

25    MR. NORTH:  If we could pull up 7183, please.          01:42PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1   BY MR. NORTH:

2   Q.  You have mentioned the importance of the surrounding

3   tissues which you considered in your analysis.  Is 7813 a

4   demonstrative you prepared to explain the importance of the

5   surrounding tissue aspect of the analysis?                    01:43PM

6   A.  Yes.

7          MR. NORTH:  Your Honor, at this time we would seek to

8   display 7813 as a demonstrative exhibit.

9          MR. STOLLER:  No objection.

10          THE COURT:  You may.                                    01:43PM

11          MR. NORTH:  Thank you.

12   BY MR. NORTH:

13   Q.  Now, on the right side, that's the sort of diagram of the

14   entire filter in the IVC that you showed us earlier, correct?

15   A.  That's correct.                                            01:43PM

16   Q.  Tell us what we're looking at on the left side and what the

17   importance of that is.

18   A.  Sure.  So what we're looking at on the left side is a CT

19   scan.  This was taken from medical literature.  But this is put

20   together to explain the motivation and to explain the geometry   01:43PM

21   and why we set up the model the way we did.

22          So what you can see in the center, kind of near the

23   bottom, is a bright region and that's a part of the spine.

24   That's a vertebrae.  A little above and to the left of that

25   where you can see two yellow arrows pointing down is an         01:44PM

1    ellipse, and that's the IVC.  So you can see where the IVC

2    lives in the abdomen surrounded by soft tissues in that region.

3    You have abdominal tissues.  You have the kidneys, things like

4    that.

5            So you can imagine translating this over, and this was    01:44PM

6    the motivation behind the model setup that we did where we have

7    the filter, we have the IVC, and then we have the surrounding

8    soft tissues with the vertebrae.

9    Q.  Did you make a different assumption than Dr. McMeeking did

10   on how the tissue and filter would interact in the human body?    01:44PM

11   A.  Yes, as we talked about.  So we allowed the filter to

12   interact with it, and because we have deformable soft tissue so

13   the filter will push against the IVC and deform it as opposed

14   to assuming the IVC is infinitely stiff and that the IVC will

15   just control wherever the filter goes.    01:45PM

16   Q.  As a part of your work in studying mechanical engineering

17   issues, are you familiar with medical literature that

18   substantiates or supports your assumptions about the impact of

19   the surrounding tissues?

20   A.  Yes.  And this is in two ways.  On the front end there's    01:45PM

21   medical literature where they have gone in and tested the

22   properties of these tissues to understand how stiff they are,

23   and that's what we use as input into our analysis.  And then on

24   the back end there's been studies where they have looked at the

25   motion of the IVC and the people that have filters in them, and    01:45PM

1   they have shown that at the location of filter the IVC moves

2   less than away from the filter.

3   Q.  What is hyperelastic response?  What does that mean?

4   A.  So that's a type of a stress-strain constitutive response

5   that tissues often show.                                         01:45PM

6   Q.  If we could pull up 7945.

7           Is this a demonstrative you prepared in your report to

8   illustrate the hyperelastic response for the IVC?

9   A.  Yes, it is.

10          MR. NORTH:  Your Honor, at this time we would seek       01:46PM

11  permission to display 7945 as a demonstrative exhibit.

12          MR. STOLLER:  No objection.

13          THE COURT:  You may.

14          MR. NORTH:  Thank you.

15  BY MR. NORTH:                                                    01:46PM

16  Q.  Tell us what this graph depicts, if you would, please.

17  A.  Yes.  So we're getting very mathy here.  So what we have is

18  this plot here where on the X axis we have strain.  And I don't

19  know that we have gone through defined stress and strain yet.

20  So strain is a measure of how much an object deforms when you    01:46PM

21  load it.  So you imagine you have an object and you apply

22  weight to it.  The weight is the force and stress is the

23  measure of the force that is applied.  Strain is a measure of

24  how much the object will stretch, so it's a measure of

25  deformation.  Stiffness is the ratio of those two things.  So    01:47PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    an object that is very stiff deforms very little under the same

2    force.  Steel is very stiff and has a high stiffness.  Rubber,

3    on the other hand, is very soft and has a low stiffness.

4           So going back here to the plot, what we're looking at

5    is what we call a stress-strain response of the tissue.  So on       01:47PM

6    the X axis we have the strain, and on the Y axis we have the

7    stress, which is the vertical axis.  So what you can see is

8    initially the tissue is very soft.  It's that low region and

9    then eventually it stiffens up.  And this is due to initially

10   the collagen fibers within the tissue are not particularly           01:47PM

11   organized.  And then you pull on it and the fibers become

12   aligned, and so that's why you can get this change and this

13   increase in the stiffness once you are actually pulling on the

14   fibers themselves.

15   Q.  What is this reference to modified data from Fung?               01:47PM

16   A.  Fung is a textbook that we pull the data from.

17   Q.  And what is this reference to Marlow fit for analysis?

18   A.  So Marlow is a particular type of equation you can use to

19   fit these types of curves.  So that was what was input into the

20   FEA.                                                                 01:48PM

21   Q.  Now, did you take, in doing your stress-strain analysis on

22   the Bard filters, did you take into account the hyperelastic

23   response for the IVC?

24   A.  Correct.  So this is one of the material properties or

25   direct inputs into the analysis.  So again, rather than            01:48PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    assuming the IVC was infinitely stiff or rigid, we incorporated

2    this data which is from the literature about how the tissue

3    responds to load.

4    Q.  Did that make your particular analysis different from the

5    one conducted by Dr. McMeeking?                                    01:48PM

6    A.  Yes.  For what I was just talking about in having a

7    deformable tissue that surrounds it based on this data from the

8    literature as opposed to making an assumption about how the IVC

9    would respond.  And this allows us to, again, calculate the

10   response of the filter and the IVC together and not just have    01:49PM

11   to assume a certain value.

12   Q.  Now, are there certain attributes unique to Nitinol as a

13   substance that you considered in your assumptions that differed

14   from those made by Dr. McMeeking as well?

15   A.  Yes.  So Nitinol is a special material.  It's what we call   01:49PM

16   superelastic so it's kind of very stretchy compared to most

17   other metals.  So in the calculations that we did, we took that

18   into account whereas Dr. McMeeking assumed that the material

19   was linear elastic.

20   Q.  If we could bring up 7677, please.                            01:49PM

21        Is this a demonstrative slide of graphs taken from

22   your report that illustrate the special properties of Nitinol?

23   A.  Yes, it is.

24        MR. NORTH:  Your Honor, at this time, we would seek

25   permission to display Exhibit 7677 as a demonstrative.            01:49PM

1    MR. STOLLER:  No objection, Your Honor.

2    THE COURT:  You may.

3  BY MR. NORTH:

4  Q.  What is a Nitinol constitutive relationship?

5  A.  Yes.  So the Nitinol constitutive relationship is, again,       01:50PM

6  the stress-strain response of the material.  So what we're

7  looking at here, its curves are very similar to what we're

8  looking at.  We have strain on the horizontal axis for both of

9  them and we have stress, which is the force, again, on the Y

10  axis.                                                             01:50PM

11    And so what happens with Nitinol is you start in the

12  bottom left corner at 00 and you load it up.  And it's

13  initially got a stiffness that's rather stiff, and then it goes

14  through this phase transition.  And that's where you get that

15  horizontal portion of the curve where it becomes very soft.       01:50PM

16  And this is a very useful property for cardiovascular medical

17  devices.  The reason these are often used for these devices is

18  because you can crimp it down to something very small and they

19  feed it into the body, and then it will spring back to its

20  original shape as opposed to other metals which won't do that.    01:51PM

21  Q.  In making his calculations, did Dr. McMeeking take into

22  account the unique properties of Nitinol that you have just

23  discussed?

24  A.  In his strain calculations, no, he did not.

25  Q.  Did you consider it important to try to -- when trying to      01:51PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    make an accurate calculation of stress and strain to take into

2    account the unique qualities Nitinol?

3    A.  Yes.  So for IVC filters, the loads that they go under both

4    during crimp when they are loaded onto the catheter as well as

5    during cyclic loading at the extreme levels I calculated and         01:51PM

6    that he calculated, in both of those cases superelasticity

7    would be needed to get an accurate result.

8    Q.  Dr. Briant, is it well known in the mechanical engineering

9    and material sciences communities that Nitinol has these unique

10   superelastic properties?                                            01:52PM

11   A.  Yes, it is.

12   Q.  Do you have any understanding from what you have reviewed

13   as to why if that is well known Dr. McMeeking did not take that

14   into account in his analysis?

15   A.  No, I don't.                                                    01:52PM

16   Q.  How did your analysis differ from Dr. McMeeking's with

17   regard to filter geometry?

18   A.  Sure.  So as we talked about, in terms of the filter

19   geometry, Dr. McMeeking just had the single arm exclusively

20   incorporated into his analysis up to the elbow whereas we had      01:52PM

21   the entire filter.

22   Q.  Were there any different assumptions that you and Dr.

23   McMeeking made with regard to motion of the filter?

24   A.  Sure.  So this is what I was talking about before where Dr.

25   McMeeking, in order to simplify things down and just have the      01:53PM

1   single arm and do things analytically rather than using the

2   finite elements, he had to make these assumptions in order to

3   make these simplifications and assume that the filter would

4   move a certain amount exactly as the IVC was moving beforehand

5   rather than allowing to deploy the filter into the environment        01:53PM

6   and allow the forces to balance out and actually calculate what

7   that motion would be.

8   Q.  Does the filter actually impact the movement or pulsation

9   of the IVC?

10  A.  It depends on the diameter of the IVC that you are looking        01:53PM

11  at, but it certainly can.

12  Q.  And how can it impact it?

13  A.  So when you squeeze the filter down, you really have to

14  squeeze it down in order to get it into the IVC.  The filter

15  naturally wants to be bigger than the IVC.  So you squeeze it         01:53PM

16  down, and that creates a force to do that.  So the filter is

17  then pushing back against the IVC, so when loads come on to the

18  IVC to try and compress it, the filter is creating an external

19  load outwards.  So that resists the motion so it reduces the

20  amount of pulsation you would get than if the filter wasn't           01:54PM

21  there.

22  Q.  Why are these assumptions important in your view to the

23  analysis of strains with regard to these filters?

24  A.  Sure.  In order to be able to accurately calculate the

25  strains we would want to take this into account because it is         01:54PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    very important.  And the assumptions that Dr. McMeeking made

2    are overly conservative and resulted in overprediction of the

3    strains.

4    Q.  Did the different assumptions that you have outlined for us

5    regarding the geometry, regarding the tissues, regarding the          01:54PM

6    superelastic property of the Nitinol and these other

7    assumptions, did those produce different results in your

8    calculations than those obtained by Dr. McMeeking?

9    A.  Yes, they did.

10   Q.  If we could bring up 7816, please.                                 01:54PM

11          Is this a demonstrative exhibit you prepared taken

12   from your report that illustrates the differences in your

13   calculations with those of Dr. McMeeking?

14   A.  Yes, it is.

15          MR. NORTH:  Your Honor, at this time we would seek             01:55PM

16   permission to display 7816 as a demonstrative exhibit.

17          MR. STOLLER:  No objection, Your Honor.

18          THE COURT:  You may.

19          MR. NORTH:  Thank you.

20   BY MR. NORTH:                                                         01:55PM

21   Q.  Explain to us what you are depicting on the left, first of

22   all.

23   A.  Sure.  So on the left is two images from different analyses

24   that we did.  So these are direct outputs from the finite

25   element analysis software.  Again, you put in the geometry, you      01:55PM

1    put in your properties for the tissues, and it calculates out

2    what the response would be.

3            And so what you can see on the left is two cases.  We

4    looked at both a not perforated filter and a perforated filter.

5    And what I will draw your attention to is you can see that                 01:55PM

6    where the arms contact the IVC, where the elbows of the arms

7    contact the IVC, you can see that the IVC has bulged there

8    because the filter arms are pushing outwards.  And this is the

9    response that I was talking about where the filter will push

10   out against the IVC and change the motions when you apply an               01:56PM

11   external load.

12   Q.  So did you perform your calculations in two different ways

13   once assuming, in the first instance, assuming that the filter

14   was not perforating the IVC and second assuming that it was?

15   A.  Yes.  That is correct.                                                 01:56PM

16   Q.  And does the second picture, B, depict the test that would

17   have been analyzed with perforation occurring?

18   A.  Correct.  That's the analysis with perforation.

19   Q.  And how much perforation did you assume in your

20   calculations in that scenario?                                            01:56PM

21   A.  So you can see here we have basically perforated up until

22   about halfway up the upper arm.  We looked at perforation

23   levels from the elbow and upward.  So we look looked at several

24   different scenarios.

25   Q.  Now, tell us what the chart on the right shows.                        01:57PM

1    A.   Sure.   So this is a bar graph.   And the primary thing we're

2    looking at is comparing the calculations using Dr. McMeeking's

3    assumptions versus there was also the calculations under the

4    same conditions when you incorporate the deformable nature of

5    the IVC and the environment that the filter lives in.                01:57PM

6            So what we have are the three different pairs of bars,

7    and those are for three different amounts of pulsation of the

8    IVC.   So you can imagine the IVC pulses every time you breathe.

9    And so we looked at various levels of that.   We looked at one

10   millimeters pulsation and then we looked at 18 and 50 percent.       01:57PM

11   And that refers to -- the percent there is how much it pulses

12   relative to its initial diameter.

13           On the vertical column, on the Y axis, we have the

14   strain amplitude, which is how much strain you are getting

15   every time the IVC pulses.   So the red bars are the results        01:57PM

16   from Dr. McMeeking's evaluations, and blue bars are the results

17   from our calculations when you have the whole filter and

18   surrounding tissue and things like that.

19   Q.   Am I correct that at 50 percent Dr. McMeeking's

20   calculations are almost eight times -- having the stress or         01:58PM

21   strain at eight times greater than Exponent's calculations?

22   A.   It appears to be about that.

23   Q.   Can you estimate approximately how much greater at 18

24   percent Dr. McMeeking's strain calculations were than what

25   Exponent conducted?                                                 01:58PM

1   A.   I don't know the numbers off the top of my head, but it

2   looks like it's about the same ratio.

3   Q.   Was it also significant at one millimeter?

4   A.   Yes.  In all cases you can see that when you assume both

5   that the IVC motion doesn't change and that the IVC is so stiff          01:58PM

6   that it locks the rotation of that filter so it has to -- the

7   filter just has to move where the IVC goes, then you get a big

8   overprediction in the strains.

9   Q.   And what is your opinion as to why Dr. McMeeking's

10  calculations are so much greater than what Exponent determined?         01:59PM

11  A.   Well, again, it's because of the assumptions that were used

12  in order to be able to simplify and do the calculations by hand

13  rather than doing the finite element analysis.

14  Q.   We talked earlier about the fact that Dr. McMeeking in his

15  analysis did not consider the superelastic nature of Nitinol.           01:59PM

16  Did he make any other assumptions about the Nitinol wire that

17  Bard used in its filters?

18  A.   Yes.  So once you do these calculations, you can compare

19  them to what's called the fatigue strength of the material

20  which is how strong the wire is in a fatigue scenario where you         01:59PM

21  are getting lots of cycles.  And he assumed a value for this,

22  for this fatigue strength that was based on literature rather

23  than using fatigue strength data that came from testing that

24  Bard actually performs.

25  Q.   Were Bard's actual test values for the fatigue strength of         02:00PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1  the Nitinol wire actually used in Bard filters, was that

2  available to Dr. McMeeking?

3  A.  Yes, it was.

4  Q.  Are you aware that Dr. McMeeking has testified in this case

5  that he instead consulted a literature review to determine          02:00PM

6  values?

7  A.  Yes, I am.

8  Q.  By using what he found in the literature to determine those

9  strain values rather than the actual data available to him for

10 wires used in Bard filters, did that affect the outcome of Dr.      02:01PM

11 McMeeking's calculations?

12 A.  So what it affects is the implications of his calculations.

13 So as we have been talking about this whole time, he used

14 highly conservative values that are beyond physical limits and

15 got an overprediction of his strains.  He then took a book          02:01PM

16 value for the fatigue strength that was way low.  And rather

17 than using actual, you know, the actual environment of the IVC

18 and not overpredicting the strains and using the testing that

19 Bard did, taking both the overprediction of the strains and the

20 very low book value overstates the implications of his             02:01PM

21 calculations.

22 Q.  I believe you have told us that you then did bench testing

23 on actual Bard filters following your stress and strain

24 calculations?

25 A.  That's correct.                                                 02:01PM

1  Q.  And that Dr. McMeeking did not go that extra step?

2  A.  No, he did not do any bench testing.

3  Q.  Why did you decide to go, even after you had done this very

4  complicated analysis of stress and strain, why did you decide

5  to go further and do actual bench testing?                        02:02PM

6  A.  We did it because we wanted to verify our analyses and make

7  sure that our calculations lined up with actual results from

8  filters.

9  Q.  And did the bench testing you performed actually validate

10  your calculations?                                               02:02PM

11  A.  Yes.  We got very good agreement.

12  Q.  If we could bring up Exhibit 7815, please.

13        Dr. Briant, is 7815, does this contain pictures and

14  graphs from your report that demonstrate the bench testing that

15  you did?                                                         02:02PM

16  A.  Yes, it does.

17        MR. NORTH:  Your Honor, at this time we would seek

18  permission to display Exhibit 7815 as a demonstrative exhibit

19  for the jury.

20        MR. STOLLER:  No objection, Your Honor.                    02:02PM

21        THE COURT:  You may.

22  BY MR. NORTH:

23  Q.  Explain to the members of the jury what this is showing us.

24  A.  Sure.  So this is showing the bench testing that we did,

25  the test setup.  And so what we have on the left is a picture    02:03PM

1  of the setup.  So you can see the actual filter that we have

2  there.  This is a G2.  You can see we're holding it by the cap.

3  And then what we have is a rod that's coming down from the top,

4  and this is attached to what's called an Instron machine, which

5  is a testing machine.  And so that machine brings the rod down          02:03PM

6  into contact with the filter and then pushes on the arm, and we

7  also did legs, and then measures what's called the force

8  displacement response.  So it measured the amount of force it

9  takes to compress the arm a certain amount.

10 Q.  Now, what does this graph on the right side show us?                 02:03PM

11 A.  That's a result from one of the tests.  So similar to what

12 we looked at before, this is showing displacement on the

13 horizontal axis.  So that's how much the rod has moved down as

14 it comes down.  And the vertical axis we have the force, how

15 much force it took to do that.  And the experimental results            02:04PM

16 are shown by the solid lines there and you can see compared to

17 the FEA result, which is the black dash line.  And you can see

18 we got very good agreement.

19 Q.  I want to be sure I understand this.  The FEA line, does

20 that represent the actual finite element analysis strain               02:04PM

21 calculations you made?

22 A.  Correct.  So what we do is we simulate this test on the

23 bench, that we did on the bench, we simulate that with our FEA

24 model.  And then we pull out the same corresponding parameter

25 and do this comparison.                                                 02:04PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1  Q.  When it says "experiment," is that the actual bench

2  testing?

3  A.  Correct.  That's directly from the machine.

4  Q.  Does that demonstrate the results from the two types of

5  tests are virtually identical?                                  02:04PM

6  A.  It demonstrates that the calculations and the way we set up

7  the model is valid and representative of reality.

8  Q.  Did you do anything else to verify the accuracy of your

9  calculations?

10  A.  So again, we compared our results to literature.  And this   02:05PM

11  is what I was talking about before where clinical studies have

12  been done with people that actually have filters in them.  And

13  they have gone in and measured how much motion you get of the

14  IVC during various maneuvers.  And so what they found was that

15  when they measured the pulsation of the IVC both above and       02:05PM

16  below the filter, they got more than when they measured the

17  pulsation right where the filter is.

18        So this demonstrates that the filter is reacting to

19  the tissues in keeping the IVC open compared to above and below

20  where the filter is not.                                         02:05PM

21  Q.  Dr. Briant, did you also review some analysis that Dr.

22  McMeeking did relative to tilt?

23  A.  Yes, I did.

24  Q.  What was it that Dr. McMeeking did?

25  A.  So for tilt, Dr. McMeeking, again, did some analytical       02:05PM

1   calculations as well as some finite element analysis work.

2   Q.  Are those basically just by hand?

3   A.  Yes.  So those are hand calculations.

4   Q.  And did -- what sort of assumptions did he make in making

5   those calculations regarding tilt?                                    02:06PM

6   A.  Sure.  So when performing those tilt analyses, again, he

7   was looking at how much the filter, how easily it is to tilt

8   the filter.  When performing those calculations, he didn't

9   include several things that would resist the tilting motion.

10  Number one, he assumed that the interaction between the IVC and  02:06PM

11  the filter was frictionless so there was no friction at that

12  interaction.  He, again, assumed that the IVC was rigid, so it

13  was perfectly smooth, as opposed to this tenting where you saw

14  where you get bulging where the filter makes contact, and that

15  would resist tilting.                                                  02:06PM

16          And the last one is he didn't look at the effect of

17  how the foot would have to be disengaged from the wall.  So as

18  you may have seen, the filters have little feet on the bottom

19  that engage with the filter wall, and the foot would have to

20  become disengaged in order for it to tilt.                            02:07PM

21  Q.  Are you critical of any of those assumptions made by Dr.

22  McMeeking?

23  A.  Oh, yes.  They would all resist tilting.  And in order to

24  make the claim that the filter would easily tilt, one would

25  want to look at these effects rather than just ignoring them.          02:07PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1   Q.  Did Dr. McMeeking perform any bench testing to try to

2   confirm his hand calculations regarding tilt?

3   A.  No, he did not.

4   Q.  Does his analysis provide any information or data to assist

5   in determining how frequently Bard filters may tilt?          02:07PM

6   A.  No, it wouldn't.

7   Q.  Did you conduct your own analysis of tilt?

8   A.  Yes.  We did tilting analyses also.

9   Q.  Can you explain to us what you did to try to analyze tilt?

10  A.  Sure.  So again, we looked at the -- how much force it took   02:08PM

11  to tilt the filter.  We, again, used the same model setup that

12  we had in the previous calculations, so we had the entire

13  filter in an IVC in surrounding tissues.  We looked at both

14  deformable IVC and surrounding tissues as well as a rigid one.

15  Q.  Did you also do bench testing of a Bard filter to verify   02:08PM

16  your calculations regarding tilt?

17  A.  Yes.  We did bench testing as well, which is why we

18  simulated the rigid IVC in our calculations in order to be able

19  to compare that with the bench testing.

20  Q.  Could we please bring up 7702.                            02:08PM

21          Dr. Briant, does Exhibit 7702 reflect drawings taken

22  from your report to demonstrate the tilt analysis you

23  performed?

24  A.  Yes, it does.

25          MR. NORTH:  Your Honor, at this time we would seek   02:08PM

1    permission to display Exhibit 7702 as a demonstrative exhibit.

2            MR. STOLLER:  No objection, Your Honor.

3            THE COURT:  You may.

4    BY MR. NORTH:

5    Q.  Explain to the members of the jury, Dr. Briant, what this          02:09PM

6    is showing us here.

7    A.  Sure.  So this is, again, looking at a direct output from

8    the finite element software.  What we're looking at is a

9    cross-section of the model where we have -- we have run the

10   whole model then taken for the viewing purposes and cut it in        02:09PM

11   half.  And what we're looking at on the left is the process

12   that we used for doing these tilt calculations.

13           So we deploy the filter in, and you can see on the

14   left side how it's vertical straight up and down.  And we push

15   on the cap of the filter and look at how much force it takes to      02:09PM

16   do that.

17   Q.  What do you mean with your reference to both rigid and

18   deformable IVCs?

19   A.  Sure.  So the deformable one would be using the

20   hyperelastic stress-strain response we saw before and using the     02:09PM

21   model setup we did during our strain calculations.  We also

22   looked at a rigid IVC, and that was in order to be able to

23   compare for our bench testing.  For our bench testing we used a

24   PVC tube for the IVC.

25   Q.  And then you told us you did some bench testing regarding        02:10PM

1  or confirming your tilt calculations?

2  A.  That's correct.

3  Q.  Could we bring up Exhibit 7935, please.

4       Does 7935 reflect some drawings and photographs taken

5  from your report that help to explain the bench testing you did  02:10PM

6  with regard to tilt?

7  A.  Yes, it does.

8       MR. NORTH:  Your Honor, at this time we would seek

9  permission to display Exhibit 7935 as a demonstrative exhibit.

10      MR. STOLLER:  No objection.  02:10PM

11      THE COURT:  You may.

12  BY MR. NORTH:

13  Q.  Dr. Briant, tell us what this photograph on the left is

14  showing.

15  A.  So this is showing that the test setup that we did for our  02:10PM

16  tilt testing.  So what you can see is we're looking down a tube

17  where the filter has been deployed, so you can see we're

18  looking at the cap of the filter and you can see the arms and

19  the legs coming off of that.  This is inside a PVC pipe, as I

20  said.  02:11PM

21      And then what we did is we have a push rod very

22  similar to what we did in the force displacement testing where

23  we come in and push on the cap of the filter and measure the

24  amount of force that it takes to do that.

25  Q.  Did it take more force or less force to tilt the Recovery  02:11PM

1    Filter versus the G2 in the test you performed?

2    A.  As you can see on the right-hand side, it took slightly

3    more force.  What we're looking there at each of those plots

4    is, again, a force displacement response.  So you can see on

5    the X axis for each one we have displacement of the cap, and on    02:11PM

6    the Y axis we have the force.  And then the blue lines are the

7    experimental data from the testing while the black dash lines

8    are the FEA.  As you can see, we got good agreement.

9           The two bottom plots are for G2 at two different tube

10   diameters and the two top plots are for Recovery Filters that    02:12PM

11   we tested, again, at different tube diameters.

12   Q.  Again, did Dr. McMeeking do any bench testing such as this

13   regarding tilt?

14   A.  No, he did not.

15   Q.  What's your understanding of what Dr. McMeeking    02:12PM

16   testified -- or concluded with regard to tilt?

17   A.  So he concluded that the filter could tilt easily.

18   Q.  And are you critical of those opinions?

19   A.  Yes, for the -- because of the basis for those opinions and

20   the analysis he did did not include all the things we talked    02:12PM

21   about in terms of the friction and the disengaging the foot.

22   In addition, Dr. McMeeking made other conclusions with regard

23   to tilt in terms of its role with perforation and the strains

24   on the filters.

25   Q.  Did you reach any conclusion yourself as to how tilt might    02:12PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1   increase or decrease the strain on the filter and whether that

2   could lead to fracture?

3   A.  Yes.  So we did additional calculations beyond what we have

4   already talked about where we went in on our model and actually

5   tilted the filter and then repulsed the IVC and looked at the          02:13PM

6   change in the strains.

7   Q.  Did you see any evidence in his work that was presented by

8   Dr. McMeeking to support his opinion that tilt somehow leads to

9   fracture?

10  A.  So Dr. McMeeking's report made a claim that the strains           02:13PM

11  would increase when the filter gets tilted but he didn't

12  provide any calculations to support that claim.

13  Q.  If we could bring up 7936, please.

14          Dr. McMeeking -- I mean Dr. Briant, can you identify

15  what Exhibit 7936 is showing?                                         02:13PM

16  A.  That's showing a depiction of our tilted filter strain

17  calculations.

18  Q.  Is that taken from your report?

19  A.  It is.

20          MR. NORTH:  Your Honor, at this time we would seek            02:14PM

21  permission to display Exhibit 7936 as a demonstrative exhibit.

22          MR. STOLLER:  No objection, Your Honor.

23          THE COURT:  You may.

24          MR. NORTH:  Thank you.

25  BY MR. NORTH:                                                          02:14PM

1  Q.  Tell us what we're looking at here starting first from the

2  left -- first of all, is this depicting a G2 Filter?

3  A.  Yes.  This is a G2 Filter.

4  Q.  And what are we showing on the left versus the right as to

5  not perforated versus perforated?                              02:14PM

6  A.  So again, we looked at both cases and we looked at both

7  perforated tilted filters as well as not perforated tilted

8  filters.

9  Q.  And tell us what this overall shows as far as your analysis

10 goes.                                                          02:14PM

11 A.  Sure.  So on the left you can see the not perforated case.

12 The filter barely tilts in that condition because the elbow

13 from the arms contact the wall almost right away.  So you get

14 very little tilt.

15         In the perforated case we have a much larger tilt that 02:15PM

16 you can see there, and again, you can see when we -- in the

17 contracted state how the IVC is being resisted by the presence

18 of the filter.  Now, down at the table on the bottom are the

19 results from the calculations, and so again, what we're looking

20 at is the strain amplitude, which is how much strain you get in 02:15PM

21 the filter as it pulses.  And so on the next to last column we

22 have the results from before where it's straight up and down,

23 and you can see the strain amplitudes there.  And in the right

24 most column we have the results from the tilted case, and you

25 can see the strain amplitudes are similar but actually slightly 02:15PM

1   lower in the tilted analysis.

2   Q.  So does this show as according to your calculations and

3   testing the strain on a tilted filter is actually less than on

4   a not tilted filter?

5   A.  It was similar but slightly lower, yes.                    02:15PM

6   Q.  Did you come to a conclusion about why that would occur?

7   A.  So I expect it's due to the orientation of the strut arms.

8   So you can see in particular on the tilted case how the struts

9   are more horizontal, especially the one on the top.  That would

10  reduce the actual stiffing effect and reduce the amount of     02:16PM

11  pulsation you would get for the filter itself.

12  Q.  Did Dr. McMeeking's tilt analysis even look at the issue of

13  strain generated on the filter in tilt?

14  A.  No.  He didn't do any -- well, he mentioned in his report

15  that the strains would increase but didn't provide any         02:16PM

16  calculations.  In addition, as we talked about, he had just a

17  single arm in his calculations.  And in a situation like this,

18  doing -- using a single arm, one would not be able to calculate

19  the results in a tilted filter because you are no longer

20  symmetric, you are tilted.  So a single arm doesn't work        02:16PM

21  anymore.  It's no longer a valid assumption.

22  Q.  Did your tilt analysis include a range that would include a

23  four-degree tilt?

24  A.  Yes.  So we looked at straight up and down, as you can see.

25  The non-perforated case is slightly tilted.  I don't know       02:17PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    exactly what the number is.  But you can see in the perforated

2    case we looked at larger than four degrees.

3    Q.  According to your calculations, would the strains at a

4    four-degree tilt be significant?

5    A.  I think they would be very similar to a vertical filter.          02:17PM

6    Q.  You have talked about your analysis of stress and strain

7    perforation and tilt in Recovery and G2 Filters.  Does that

8    analysis have application to the Eclipse Filter?

9    A.  Yes, it would, because the geometry of the struts in the

10   Eclipse Filter are the same as the geometry in the G2.  The         02:18PM

11   only difference is the electropolishing that is performed for

12   the Eclipse Filter.

13   Q.  How would you describe the stress and strains you

14   calculated that the G2 family of filters will experience?

15   A.  As we talked about, using the -- incorporating the entire       02:18PM

16   environment that the filter lives in would give you much lower

17   strains than what Dr. McMeeking calculated.

18   Q.  Let's move to your second opinion, if we could.  And your

19   criticism, or your discussion of Dr. McMeeking's criticism of

20   Bard's testing and development process, have you developed over     02:18PM

21   the course of your career testing protocols in your work with

22   Exponent?

23   A.  Yes.  Experimental testing is a big part of what I do.

24   Q.  What is your understanding of Dr. McMeeking's criticisms of

25   Bard testing?                                                       02:19PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    A.  He was critical of it.

2    Q.  And do you agree with that criticism?

3    A.  No, I don't.

4    Q.  Did you have any comment about Bard's use or consideration

5    of the unique superelastic nature of Nitinol in its testing?      02:19PM

6    A.  Well, I think that since Nitinol is superelastic you should

7    take it into account.

8    Q.  Do you have responses to Dr. McMeeking's criticism

9    regarding the pulsation rates used by Bard in its testing?

10   A.  No.  Bard looked at a range of pulsation amounts in their    02:19PM

11   testing from one millimeter pulsation to much larger as well.

12   Q.  Did Bard do, from your review of the materials, did Bard do

13   testing that took filters all the way to a failure mode?

14   A.  Yes.  So they did testing where they took their filters all

15   the way to fracture so the legs or the arms actually broke off   02:19PM

16   in their testing.

17   Q.  Is that standard testing to perform?

18   A.  Yes.  Testing of failure is definitely standard.

19   Q.  Did you see any evidence that Dr. McMeeking had offered any

20   suggested alternative test protocols in his analysis?            02:20PM

21   A.  He makes some speculation about some changes but doesn't

22   provide any basis or engineering calculations to demonstrate

23   that what he's suggesting would actually be better.  And in

24   addition, a lot of the suggestions that are made would have a

25   lot of practical issues in terms of actually being able to       02:20PM

1  perform the testing.

2  Q.  Now, your third opinion related to the Simon Nitinol

3  Filter.  Would you tell us what that opinion is again?

4  A.  Sure.  It is simply that the Simon Nitinol Filter from an

5  engineering perspective is not an alternative design to the        02:20PM

6  Bard filters, and that's because it lacks the retrievability

7  functionality and benefit that the Bard filters have.

8  Q.  You have explained to us and the members of the jury what

9  differences in assumptions that you and Dr. McMeeking used in

10  your analysis.  But you would agree that the assumptions Dr.        02:21PM

11  McMeeking made resulted in much higher strains imposed on the

12  filters than what you calculated?

13  A.  He calculated higher strains, yes.

14  Q.  Dr. McMeeking said that the assumptions he used represented

15  worst-case scenario testing.  What does worst-case mean in that     02:21PM

16  context in the engineering world?

17  A.  Sure.  So worst-case analysis talks about understanding the

18  environment of what your product is going to undergo and being

19  able to estimate a foreseeable maximum load, you might say, of

20  what the product is going to see.                                    02:21PM

21  Q.  In your opinion, do Dr. McMeeking's assumptions represent

22  worst-case?

23  A.  No.  He goes beyond worst-case, as we talked about.  He

24  incorporates assumptions and properties for the surrounding

25  tissues in the IVC beyond what the body can actually do.  So        02:21PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Direct

1    calculating under conditions that are beyond what we know isn't

2    going to happen isn't particularly useful.

3    Q.  If Dr. McMeeking were to criticize your assumptions as best

4    case, would you agree with that characterization?

5    A.  No.  Not at all.  We used conservative assumptions all over        02:22PM

6    the place.  We had the whole filter we talked about.  The

7    tissue properties we used were at three standard deviations

8    above the mean, the average value of what's reported for these

9    properties.  So we had conservative assumptions, or

10   conservative inputs, I should say, throughout the analysis.            02:22PM

11   Q.  Dr. Briant, other than his computer modeling and his hand

12   calculations, have you seen any other evidence of testing

13   performed by Dr. McMeeking to support his opinions?

14   A.  No, I haven't.

15   Q.  Thank you.  That's all I have.                                     02:22PM

16           THE COURT:  Cross-examination.

17                   CROSS-EXAMINATION

18   BY MR. STOLLER:

19   Q.  Good afternoon, Dr. Briant.

20   A.  Good afternoon.                                                    02:23PM

21   Q.  We have not met.  My name is Paul Stoller.  How are you

22   this afternoon?

23   A.  Good.  How are you?

24   Q.  Good, thank you.  I represent Doris Jones.  I want to spend

25   some time this afternoon asking you about the testimony you           02:23PM

1    just gave.

2          Let me start with a question about the scope of your

3    assignment.  Is it -- am I correct to say that your role in

4    this litigation has been to review the calculations and

5    opinions that Dr. McMeeking has given?                           02:23PM

6    A.  That has been the majority of my role, yes.

7    Q.  I believe you testified at your deposition that you were

8    not asked by Bard or its lawyers to do anything beyond that.

9    Is that fair?

10   A.  I have one opinion in my report that talks about the        02:24PM

11   testing that Bard did, but everything else has been focused on

12   Dr. McMeeking.

13   Q.  Your opinion with respect to the testing that Bard did was

14   in response to Dr. McMeeking's criticisms.  Is that fair?

15   A.  By and large, yes.                                          02:24PM

16   Q.  And is it also fair to say that you didn't go back and do a

17   full and comprehensive review and look at everything Bard did

18   to test their IVC filters and come up with opinions as to

19   whether or not that was reasonable and comprehensive?

20   A.  That's correct.                                             02:24PM

21   Q.  So let me ask you a couple things.  And the starting point

22   when we talked about your testimony is largely about the

23   disagreements with Dr. McMeeking's assumptions and his

24   methodologies.  Is that fair?

25   A.  That's correct, yes.                                        02:24PM

—————5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Cross—————

1    Q.  But you agree with me that Dr. McMeeking is well qualified

2    to provide opinions in the area of mechanical engineering and

3    solid mechanics?

4    A.  Dr. McMeeking has a long history of solid mechanics work in

5    this respect in the field, yes.                                    02:25PM

6    Q.  I appreciate your answer.  My question was a little bit

7    different.  You would agree with me he is a qualified and

8    competent mechanical engineer?

9    A.  I would think so, yes.

10   Q.  So what we're talking about here is not a difference of you  02:25PM

11   saying he doesn't know what he's talking about, it's a

12   disagreement in terms of the assumptions he applies and the

13   methodologies he uses.  Is that fair?

14   A.  Correct.  My role here was to review the analysis for this

15   case and the calculations and the methodologies that were used   02:25PM

16   for this analysis.

17   Q.  And again, I'm going to -- if I ask a yes or no question,

18   do your best to answer yes or no.  If you don't understand it

19   or you can't answer it yes or no, just tell me and I will try

20   to ask a better question.  Is that fair?                          02:25PM

21   A.  Sure.

22   Q.  So again, the fundamental difference here is one about you

23   disagree with the assumptions he makes and the methodologies he

24   applies.  True?

25   A.  Correct.                                                      02:26PM

1  Q.  And we talked about it's not a matter of qualification,

2  it's also not a matter of you think he made math errors like

3  calculation or computational errors.  Is that true?

4  A.  That's true.

5  Q.  And you have identified for this jury a number of areas  02:26PM

6  that you have disagreement with Dr. McMeeking on his

7  assumptions.  True?

8  A.  That's correct.  There's several areas.

9  Q.  One was you disagree with his focus on a single arm versus

10  the whole filter, correct?  02:26PM

11  A.  Correct.  I think that by incorporating explicitly only a

12  single arm in the analysis it forces you to make a variety of

13  assumptions.

14  Q.  Can I cut you off?  I just needed a yes or no.  We can talk

15  about some of those things, but I want to tick off the list if  02:26PM

16  that's all right.  We're coming up to a break so I want to try

17  to move quickly.  Is that all right?

18  A.  Sure.  I get excited.

19  Q.  Understood.  Happens to me too.  We love our science,

20  right?  02:26PM

21  A.  Who doesn't?

22        THE COURT:  Everybody raise your hand who. . .

23  BY MR. STOLLER:

24  Q.  I just want to move through the list, though.  The first is

25  single arm versus whole filter, correct?  02:27PM

1    A.  Yes.  That's correct.

2    Q.  And these aren't necessarily in the order you have

3    addressed them, but I want to tick them off.

4         The other is you disagree on the stiffness of the

5    surrounding tissues?                                          02:27PM

6    A.  Correct.  Dr. McMeeking assumed those infinitely stiff as

7    opposed to deformable.

8    Q.  Let me stop you again.  Just yes or no for now, okay?

9         You disagree on stiffness of surrounding tissues.

10   True?                                                         02:27PM

11   A.  That's correct.

12   Q.  And you disagree not as much on his assumption but a

13   methodology that he chose to apply a linear elastic methodology

14   versus a superelastic methodology.  True?

15   A.  That is another one.                                      02:27PM

16   Q.  And another one is the -- you disagree about the geometry

17   of the IVC itself and its effect on the filter and vice versa?

18   A.  Correct, that the -- he assumed that the IVC would not

19   respond to the presence of the filter.

20   Q.  Okay.  Again, yes or no if we can.                        02:27PM

21        So those are your fundamental disagreements for the

22   most part when you talk about the areas of the difference in

23   fatigue resistance, is that fair?  Wait.  One more.  Difference

24   in terms of the resistance of Nitinol itself, correct?

25   A.  Yes.                                                      02:28PM

1    Q.  With those -- with that addition, you would agree with me

2    those are the areas of disagreement?

3    A.  Yes.  As I recall, those are the primary ones.

4    Q.  And would you agree with me that in his calculations, and

5    you would -- let me stop for a minute.                                   02:28PM

6         You know that Dr. McMeeking did both hand calculations

7    and, for a number of things, he did finite element analysis,

8    correct?

9    A.  He did both.  The majority of his work was hand

10   calculations.  And especially for strain, he did some finite      02:28PM

11   element analysis.  However, he used the same assumptions in

12   both his FEA as well as his analytical calculations I know.

13   Q.  Doctor, Judge Campbell's got me on a play clock.  My time

14   becomes valuable.  So best you can, yes or no.

15        He did both, though.  He did hand calculations and he       02:28PM

16   did finite element analysis?

17   A.  He did both, yes.

18   Q.  And in both of those situations, in most of them, at any

19   rate, he made the following assumptions about the filter

20   itself; that the filter was tilted, that it was perforated,       02:29PM

21   that it was endothelialized in many instances, and that the IVC

22   surrounding and surrounding organs around the filter were

23   relatively or completely stiff.  Is that fair?

24   A.  Other than tilted I would agree with that.

25        THE COURT:  We're going to break at this point.            02:29PM

————5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Cross————

1   Ladies and Gentlemen, we'll resume at 2:45.

2            (Recess from 2:29 p.m. until 2:45 p.m.)

3            THE COURT:  You may continue, Mr. Stoller.

4            MR. STOLLER:  Thank you, Your Honor.

5   BY MR. STOLLER:                                          02:45PM

6   Q.  Welcome back, Doctor.

7   A.  Thank you.

8   Q.  When we left off, I was asking you about some of the

9   assumptions that Dr. McMeeking had made in forming opinions in

10  this case.                                               02:45PM

11           You believe, as compared to Dr. McMeeking, that the

12  surrounding tissue, the tissue surrounding the IVC would be

13  stiffer than he does, true?

14  A.  I think it would be softer.

15  Q.  Softer.  Thank you for correcting me.  It's Friday      02:46PM

16  afternoon before Memorial Day weekend so I guess I have got

17  that going.

18           All right.  So you think the surrounding -- tissues

19  surrounding the IVC would be softer, correct?

20  A.  Yes, based on the literature.                        02:46PM

21  Q.  And you believe -- and again, sir, yes or no.  If I need an

22  explanation I will ask.  All right?

23  A.  Okay.

24  Q.  Okay.  Thank you.

25           You believe that the Nitinol would be more resistant   02:46PM

1  to fatigue than he does, correct?

2  A.  Based on the Bard testing, yes.

3  Q.  Okay.  And I'm going to ask you again, please answer my

4  question yes or no.  If you think you need further explanation

5  or you can't answer it with yes or no, tell me.  I just need a          02:46PM

6  yes or no answer.  Is that fair?

7  A.  Sure.

8  Q.  Thank you.  All right.  And the other thing that you -- one

9  of the other things you believe is that the endothelialization

10  of the filter arms or legs would be less restrictive on its            02:46PM

11  movement than Dr. McMeeking believes.  Is that fair?

12  A.  I think it could be, yes.

13  Q.  Okay.  You told the jury, I believe I heard you say, that

14  you do not know why Dr. McMeeking did not use the superelastic

15  qualities of the IVC filter in his calculations.  Did I hear          02:47PM

16  that correctly?

17  A.  Yes.

18  Q.  Have you seen Dr. McMeeking's testimony in this case that

19  was given to this jury?

20  A.  Yes, I have.                                                       02:47PM

21  Q.  So you didn't recall see seeing anything in there where

22  Dr. McMeeking explained why he didn't use the superelastic

23  qualities in testing in evaluating the fatigue resistance of

24  the Nitinol -- or these filters?

25  A.  Can I give a non-yes or no answer?                                 02:47PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Cross

1    Q.  Yes or no.  Do you recall one way or the other?

2    A.  I recall seeing it, yes.

3    Q.  Okay.  Thank you.  Let me ask you this:  Your respective

4    calculations and conclusions are based on the differences in

5    those assumptions and the differences in your methodologies.        02:48PM

6    True?

7    A.  That's correct.

8    Q.  And those are based on calculations and formulas and

9    methods that you learned in your schooling all the way through

10   getting your Ph.D. in mechanical engineering.  True?              02:48PM

11   A.  As well as my work at Exponent.

12   Q.  Fair enough, so even more.  A lot of education and

13   experience after that.  True?

14   A.  That's correct.

15   Q.  And the rest of us in the courtroom, unless we have had      02:48PM

16   that sort of experience, probably aren't going to be able to do

17   our own calculations and decide who is right and who is wrong

18   based on the math.  Would you agree with me?

19   A.  That's possible.

20   Q.  Would you agree with me it's probable?                       02:48PM

21   A.  Probable, yes.

22   Q.  So one of the ways that you look at, and you have testified

23   to the jury, assessing are my calculations and assumptions

24   reasonable as you do bench testing, correct?

25   A.  That's one of them, yes.                                     02:48PM

UNITED STATES DISTRICT COURT

1  Q.  That's one of the ways.  Would you agree with me that

2  another one of the ways that you look at whether your

3  assumptions and calculations are reasonable and accurate is you

4  look at how the device performs in the real world?

5  A.  One can do that, yes.                                    02:49PM

6  Q.  Yeah.  And wouldn't you agree with me that it's important

7  clinical data about how devices perform or fail when they are

8  in people is going to give you good information, or some

9  information, that you can use to evaluate about whether your

10  calculations and your assumptions and your methodologies are   02:49PM

11  correct?

12  A.  That's one way that you can look at it, yes.

13  Q.  And if you are finding, for example, that your testing

14  indicates your calculations and your FEA and your bench testing

15  is indicating to you that a filter is not likely to fracture,  02:49PM

16  but you are seeing higher than expected rates of fracture in

17  the population of patients who have it, that that would be

18  something you would want to know and take into account,

19  correct?

20  A.  That would be something you could look at, yes.          02:49PM

21  Q.  And it might suggest to you that your testing and your

22  calculations and your FEA are not accurate.  True?

23  A.  It's something you would want to look at to evaluate, but

24  yes.

25  Q.  So, for example, if you were to run a test to try to     02:50PM

1    understand the fatigue limit or the likeliness of fracture due

2    to fatigue of a device, and you ran it out to 32 or 36 or even

3    100 or 200 million cycles and it didn't fracture and it didn't

4    fail, but then in the field you were experiencing a significant

5    number of fractures, that would suggest to you that maybe your          02:50PM

6    test isn't giving you accurate or adequate information to

7    evaluate the likelihood of fracture in the field, wouldn't it?

8    A.   It would be something you would want to go back and review.

9    Q.   So one of the ways that those of us who don't know the

10   math, don't know the calculations and don't understand the          02:50PM

11   methodologies and haven't had years of schooling, training, and

12   experience can try to assess which of you between Dr. McMeeking

13   and yourself is more accurate is to look at what happens in the

14   field; are these devices more likely to fracture or less likely

15   to fracture.  Would you agree with that?          02:51PM

16   A.   That could be one way in addition to the inputs and the

17   motivation for the inputs that were used.

18   Q.   Again, I'm focusing on the things the folks in this

19   courtroom can do.  We can look at and say is this thing

20   fracturing or tilting or perforating, whatever, more than one          02:51PM

21   or the other you have calculated to help us assess who you

22   think is making more reasonable assumptions.  Would you agree

23   with that?

24   A.   That's something you could do, as I said, in addition to

25   understanding why we use the inputs that we did.          02:51PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Cross

1  Q.  Okay.  Sure.  But again, you both explained we've got to

2  decide so we can look at what's really happening, right?

3  A.  That's one way.

4  Q.  Okay.  And you are aware sitting here that there have been

5  complications in patients with these filters including the          02:51PM

6  Eclipse, correct?

7  A.  I'm aware of that, yes.

8  Q.  You know that the filters, there have been incidence of

9  caudal migration, correct?

10  A.  I'm aware that caudal migration occurs.                         02:52PM

11  Q.  You know that tilt occurs?

12  A.  I know that tilt occurs.

13  Q.  You know that fractures occur?

14  A.  Yes.  I know that fractures occur.

15  Q.  You know that perforations occur?                               02:52PM

16  A.  Yes.  I know that.

17  Q.  And is it true, sir, that you have not attempted to

18  determine how many or how often that is happening for any of

19  those complications?

20  A.  That is correct.                                               02:52PM

21  Q.  And you have done no analysis, for example, of fracture

22  rate for these filters?

23  A.  No.  I haven't looked at fracture rates.

24  Q.  And you didn't look at things like the clinical studies of

25  them that have been done on these devices to determine what        02:52PM

1     rates of failure or fracture exists in those cases.  True?

2     A.  Not in detail.

3     Q.  So, for example, you haven't reviewed in detail the Asch

4     study.  Is that true?

5     A.  Correct.                                                    02:52PM

6     Q.  And you haven't reviewed in detail the EVEREST study.  Is

7     that true?

8     A.  That's correct.

9     Q.  Is it also true that you haven't seen Bard's internal

10    documents in terms of what Bard knew with respect to the       02:53PM

11    frequency or rate of fractures and other failures of its

12    devices?

13    A.  So I have seen tables where it suggests that the fracture

14    rates are less than 1 percent.

15    Q.  You have seen some tables but have you seen the internal    02:53PM

16    Bard documents where they are tracking trending determining how

17    often filters are fracturing in an identified patient

18    population, or whether those rates are exceeding their

19    expectations?

20    A.  No.  I have just seen these summary tables.                02:53PM

21    Q.  And has Bard provided you any of its internal documents

22    analyzing adverse events rates or rate of events and how those

23    are occurring?

24    A.  I don't recall seeing those, no.

25    Q.  Let me see if we can agree on a couple things.             02:53PM

1      Would you agree with me that medical device companies

2  must evaluate and test devices for reasonably foreseeable

3  worst-case scenarios?

4  A.  I think it's important for medical device companies to look

5  at the environment and to test and evaluate under foreseeable      02:54PM

6  worst-case conditions, yes.

7  Q.  So is the answer to my question yes?

8  A.  Yes, it is.

9  Q.  Let's stick with yes or no.  If you can't, let me know and

10  we'll see if we can do an explanation.                             02:54PM

11      Would you agree with me it's important to do that

12  testing and evaluation under reasonably foreseeable worst-case

13  scenario to give predictability as to how the design of the

14  device is going to perform in people?

15  A.  I think you should do that to understand its performance,       02:54PM

16  yes.

17  Q.  So is the answer to my question yes?

18  A.  Yes.

19  Q.  And you want to understand whether and how the device might

20  fail in foreseeable worst-case conditions.  True?                  02:54PM

21  A.  I'm sorry.  Can you repeat the question?

22  Q.  You want to, as an engineer, somebody developing and

23  working on a medical device that's going to be implanted in a

24  person, you want to understand whether and how the device might

25  fail in foreseeable worst-case scenarios in a person.              02:55PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Cross

1    A.  Yes, you would want to look at that.

2    Q.  And that's important to patient safety.  True?

3    A.  Yes.

4    Q.  And you would -- would you agree with me that in the design

5    and development of medical devices, that patient safety is          02:55PM

6    priority number one?

7    A.  Yes.  I think that.

8    Q.  I'd like to talk a little bit about your work as an expert.

9    I think you testified earlier in response to questions by Mr.

10   North that you have worked at Exponent for 10 years since you        02:55PM

11   graduated and had your doctoral degree true?

12   A.  That's correct.

13   Q.  And for five of those years you have done expert litigation

14   work for Bard.  Is that true?

15   A.  Yes.  That's about right.                                        02:55PM

16   Q.  And I think you said 40 percent of your time is currently

17   spent as an expert in litigation.  Is that true?

18   A.  Approximately, yes.

19   Q.  And then I think you also said that over that period of

20   time, approximately five years, that you have done outside work      02:55PM

21   for Bard.  Bard has paid Exponent $650,000 approximately?

22   A.  That's correct.

23   Q.  Is that all time that's been?  Is that billed and unbilled

24   or is that just money that's been paid so far and there are

25   still outstanding bills?                                             02:56PM

1    A.   That's basically all of it.   We bill monthly so it would

2    just be something from this month.

3    Q.   And that $650,000 plus is for your time plus your team's

4    time and other people working on the matter?

5    A.   That's correct.                                            02:56PM

6    Q.   But all of that has been related to the opinions that you

7    have offered in this case.   True?

8    A.   As well as the previous to the MDL work as well.

9    Q.   But it's all with respect to the responses to the opinions

10   of Dr. McMeeking and with respect to the design development and   02:56PM

11   testing of these devices, correct?

12   A.   That's correct.

13   Q.   You haven't offered any opinions, and I think we talked

14   about this earlier, but you haven't, for those services and

15   that money, offered any opinions that the testing and analysis   02:56PM

16   by Bard of its IVC filters was thorough or accurately done.

17   True?

18   A.   I haven't offered that opinion, no.

19   Q.   And you have not offered any opinion or performed any

20   in-depth analysis of Bard's testing and FEA of its filters.      02:57PM

21   True?

22   A.   Other than the last opinion in my report where the opinion

23   notes that Bard considered the relevant complications during

24   their testing and analysis.

25   Q.   My question is a bit different, sir, so if I am not clear    02:57PM

1   let me know.  But I think my question was:  You have not formed

2   an opinion or performed an in-depth analysis for Bard's testing

3   and finite element analysis of its filters.  Is that true?

4   A.  That's correct, yes.

5   Q.  And you have not focused on testing and analysis Bard did          02:57PM

6   in the design process for its IV filters including the Eclipse,

7   true?

8   A.  Correct, other than what I stated before.  Yes.

9   Q.  You have not formed an opinion or an assessment of the

10  general fatigue resistance of Bard's IVC filters including             02:57PM

11  Eclipse.   True?

12  A.  I have reviewed the data as noted in my report where I

13  think that it is appropriate to use the testing that Bard did

14  in evaluating and determining a fatigue strength for the wire.

15  Q.  Sir, isn't it true that you have testified that you have           02:58PM

16  not done sufficient work to be able to form an opinion or an

17  assessment of the general fatigue resistance of Bard's IVC

18  filters?

19  A.  That's correct.  The statement I was making earlier was,

20  again, with respect to Dr. McMeeking's assumption.  Yes.              02:58PM

21  Q.  I want to be very clear.  You have not done sufficient work

22  to be able to form an opinion or an assessment of the general

23  fatigue resistance of Bard's IVC filters.  True?

24  A.  That's correct, yes.

25  Q.  You have not performed a root cause analysis of Bard's            02:58PM

1    failures -- or excuse me -- of the failures of Bard's IVC

2    filters.   True?

3    A.   That's correct, yes.

4    Q.   And you cannot say whether Bard's IVC filters are

5    reasonably designed because you have not done the work that          02:58PM

6    would be required to answer that question.   True?

7    A.   Correct.   I don't have an opinion on that.

8    Q.   So you cannot say whether the Eclipse has a defective

9    design or not.   True?

10   A.   That's correct.                                                 02:59PM

11   Q.   And you do not have any opinions as to whether or not the

12   fracture rates of Bard's IVC filters, including Eclipse, could

13   have been reduced by a different design or good engineering

14   practices.   True?

15   A.   That's correct.                                                 02:59PM

16   Q.   Now, those are all things you could have done, correct?

17   A.   I could have looked into those in more detail.

18   Q.   Well, let me ask this:   The other 60 percent of what you do

19   that's not being an expert in litigation --

20   A.   Uh-huh.                                                         02:59PM

21   Q.   Let me ask you a question before that.   Is it true that

22   when you are an expert in litigation the vast majority of that

23   is for defendants?

24   A.   For my work, yes.

25   Q.   The other 60 percent of the time when you are not a            02:59PM

1    litigation expert you are doing these kind of things.  True?

2    A.  That's correct, yes.

3    Q.  And you are certainly qualified and competent to do it.

4    True?

5    A.  Correct, yes.                                                    02:59PM

6    Q.  But you didn't do it in this case because Bard didn't ask

7    you to?

8    A.  That's correct.  Yes.

9    Q.  I have no further questions.  Thank you, Doctor.

10            THE COURT:  Redirect?                                       03:00PM

11            MR. NORTH:  Yes, Your Honor.

12                     REDIRECT EXAMINATION

13   BY MR. NORTH:

14   Q.  Dr. Briant, you were asked a few moments ago by Mr. Stoller

15   whether you had looked at complication rates for Bard filters.       03:00PM

16   Do you recall that?

17   A.  Yes.

18   Q.  Have you seen any evidence that Dr. McMeeking looked at

19   complication rates for Bard filters?

20   A.  I don't recall anything as I sit here.                           03:00PM

21   Q.  But you have seen some documents in your review in this

22   case that did provide data on Bard fracture rates.  Correct?

23   A.  That's correct.

24            MR. STOLLER:  Leading, Your Honor.

25            THE COURT:  I didn't hear what was said.                    03:00PM

———5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Redirect———

1       MR. STOLLER:  Objection.  Leading.

2       THE COURT:  Sustained.

3   BY MR. NORTH:

4   Q.  Have you seen any data regarding Bard fracture rates?

5   A.  I have seen these summary tables that I was talking about.    03:00PM

6   Q.  What was the general range that those summaries suggested

7   was the Bard fracture rate?

8   A.  They were less than 1 percent.

9   Q.  Thank you, Doctor.  That's all I have.

10      THE COURT:  All right.  Thank you.  You can step down.    03:01PM

11      THE WITNESS:  Thank you.

12      MR. NORTH:  Your Honor, at this time we would like

13  to -- oh.  I think Ms. Helm will handle this.

14      MS. HELM:  Your Honor, at this time we call John

15  DeFord by video.  I think the plaintiff had some exhibits to    03:01PM

16  admit.

17      MR. CLARK:  Yes, Your Honor.  Plaintiff would move to

18  admit Exhibit 1031, subject to redaction.

19      THE COURT:  Is that all?

20      MR. CLARK:  I'm sorry?    03:01PM

21      THE COURT:  Is that all?

22      MR. CLARK:  There are two exhibits associated with

23  this.  Exhibit 1221 is already in evidence.

24      THE COURT:  Any objection to 1023?

25      MS. HELM:  None, Your Honor.    03:01PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8-Briant-Redirect

```
 1              THE COURT:  Admitted.

 2              MR. HELM:  May I approach and read the summary?

 3              MR. CLARK:  And, Your Honor, we have a conversion

 4    chart if it's helpful to the jury.

 5              THE COURT:  You can just read them.              03:02PM

 6              MS. HELM:  Deposition Exhibit 294 is Trial Exhibit

 7    1221, and Deposition Exhibit 283 is Trial Exhibit 1031.

 8              THE COURT:  283?

 9              MS. HELM:  283 is 1031.

10              Dr. John DeFord is a senior vice president for science  03:02PM

11    technology and clinical affairs at Bard.  In this role, Dr.

12    DeFord is responsible for research and development functions at

13    the various divisions of Bard.  Dr. DeFord obtained both

14    Bachelor's and master's degrees in engineering before obtaining

15    his Ph.D. in electrical biomedical engineering in 1990.       03:02PM

16              Prior to joining Bard in 2004, Dr. DeFord held various

17    positions at other medical device manufacturers including

18    serving as the president and chief officer of Cook Medical,

19    Inc.

20              (Video testimony of Dr. John DeFord played in open   03:03PM

21    court.)

22              MS. HELM:  Your Honor, at this time the defendants

23    call Mark Wilson also by videotape.  There are no exhibits that

24    accompany this deposition.

25              And Mr. Wilson discusses his background and employment  03:34PM
```

1    in the deposition, so we'll just let it play.

2         THE COURT:  Okay.  We're going to take 60 seconds and

3    let everybody stand up first.

4         MS. HELM:  Your Honor, may we approach on a very

5    administrative issue, something real simple relating to this          03:34PM

6    video?

7         THE COURT:  Yes.

8         (Discussion was had at sidebar out of the hearing of

9    the jury:)

10        MS. HELM:  I just wanted to let the Court know that          03:35PM

11   this video is 24 minutes long.  So if we can start we can get

12   it in at 4:00 and not have --

13        THE COURT:  We'll go until it's in.

14        MS. HELM:  That was all I wanted.

15        (In open court.)          03:35PM

16        THE COURT:  We're told, Ladies and Gentlemen, this

17   video is 24 minutes long.  We'll watch it to the end but that

18   might run us a few minutes past 4.  Better to get it all done.

19        Please be seated.  Let's go ahead with the video.

20        (Video testimony of Mark Wilson played in open court.)          03:37PM

21        THE COURT:  All right.  Ladies and Gentlemen, we are

22   finished for the week.  I will plan to see you Tuesday morning

23   at 9.  Please remember not to discuss the case or do any

24   research.  We hope you have a good weekend.  We'll see you on

25   Tuesday.          04:02PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8

 1          (Jury out at 4:02 p.m.)

 2          THE COURT:  How are we allocating the video time?

 3          MS. HELM:  For the two videos combined, the plaintiffs

 4   have a total of 10 minutes.

 5          THE COURT:  10 minutes to plaintiffs?                    04:02PM

 6          MS. HELM:  Yes, Your Honor.

 7          MR. CLARK:  Total.

 8          THE COURT:  All right.  Counsel, give me just one more

 9   minute.

10          All right.  As of the end of today, plaintiff has used  04:04PM

11   25 hours, 18 minutes.  And defendant has used 15 hours, 32

12   minutes.

13          So we're going to talk about jury instructions.  Give

14   me just a minute.

15          MS. HELM:  Your Honor, can we take a quick break       04:05PM

16   before we start the jury instructions?

17          THE COURT:  Yeah.  That's fine.

18          MS. HELM:  Thank you.

19          (Discussion off the record.)

20          THE COURT:  Are we ready, folks?                        04:09PM

21          Okay.  So I think what I would like to do is go

22   through the instructions one at a time and get your comments.

23   On what you submitted, you did not make any changes until

24   Instruction Number 14.  And I think what I included in my

25   proposal was the 1 through 14 you had proposed.  So I'm       04:09PM

1    assuming there's no issue there.

2            MR. CLARK:  Your Honor, I apologize.  You are correct

3    that we agreed on 1 through 13.  In reviewing the Instruction

4    13 in preparation for this afternoon, I did notice that the

5    last sentence talks about, "However, if an act or omission of          04:09PM

6    any person not a party to the suit was the sole proximate cause

7    of an occurrence, then no act or omission of any party could

8    have been a proximate cause."

9            I think that could be confusing in this particular

10   case since there is no non-party fault allocation or argument.         04:10PM

11           MS. HELM:  I completely agree, Your Honor.

12           THE COURT:  Okay.  We'll take out the last sentence in

13   Number 13.

14           Instruction Number 14, the proposed change from

15   plaintiff was to delete the second and third paragraphs from          04:10PM

16   the end which would be on Page 17.  I left them in.  I left the

17   third from the end in because that's in the Georgia standard

18   instruction.  I left the second from the end in because I

19   thought it accurately reflected what was in the *Browning* case.

20   But I'm interested in any comments that plaintiff's counsel has       04:11PM

21   on that or anything else in Instruction Number 14.

22           MR. CLARK:  Your Honor, our concern about the second

23   paragraph on what I have as Pages 17 of 34 in Document 11077,

24   is the same one we expressed before.  We think that is

25   highlighting FDA compliance or noncompliance.  We do recognize        04:11PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8

1  the *Browning* case talks about that, but we think this gets away

2  from the focus of the instruction and into a comment on the

3  evidence.  And that would be the third time in this particular

4  instruction that FDA activity or inactivity is mentioned.

5      So while it is accurate, it is a variable highlight on      04:11PM

6  the FDA's role or not having a role in this case.

7      THE COURT:  When you say it's the third time, what are

8  you referring to?

9      MR. CLARK:  Well, Your Honor, on Page 16 we have the

10  manufacturer's compliance with industry standards or government   04:12PM

11  regulations, which could only be FDA in this particular case,

12  and then the two paragraphs on Page 17.

13      THE COURT:  You said this would be the third time.  I

14  see one would be Paragraph 13.  Is there another?

15      MR. CLARK:  Yeah.  I apologize, Your Honor.  The first   04:12PM

16  full paragraph is the one we have been discussing, and then

17  following that is the one you left in based on the Georgia

18  pattern instruction.  So collectively, they would be three

19  references to the FDA.

20      THE COURT:  The one you are talking about is a comment   04:12PM

21  on the evidence is the next to last instruction, or next to

22  last paragraph in the instruction.  Is that right?  The one

23  that starts, "In deciding."

24      MR. CLARK:  Yes, Your Honor.

25      THE COURT:  Okay.  Any comments from defense counsel   04:13PM

———— 5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8 ————

1  on those issues?

2       MR. NORTH:  Your Honor, as the attorney who actually

3  tried the *Browning* case and argued that in the Georgia Court of

4  Appeals, I am particularly devoted to that.  I do think it is a

5  hornbook principle of Georgia law and is not a comment on the        04:13PM

6  evidence but instead is simply identifying that as a factor,

7  not a determinative factor but just a factor that can be

8  considered.  And I don't believe that the other implications

9  about government regulation make that clear like that does.  So

10  I do believe it should be left in.                                   04:14PM

11       THE COURT:  Can I hold you responsible for other

12  things in these Georgia instructions?  I told Dave Nahmias, who

13  is a friend, that they really need to clean up this area of the

14  law.  It is so confusing in so many areas.  So I will put some

15  of the blame on you.                                                 04:14PM

16       MS. HELM:  We share your pain, Your Honor.

17       THE COURT:  Okay.  Anything else on Number 14.

18       MR. CLARK:  Not for the plaintiff, Your Honor.

19       THE COURT:  Number 15 was an instruction on which

20  there were no proposals for change.                                  04:14PM

21       MR. CLARK:  Again, I hate to be maybe overthinking

22  this, but on the paragraph beginning, "There is no single

23  general way," it has language in there that says, "Based on the

24  instruction that I will give you and the evidence received

25  during the trial," I think what's intended there is the             04:15PM

1    instruction that follows on this particular instruction.  But

2    when I read that, it occurred to me that people might consider

3    that there is going to be a further instruction on that.

4         THE COURT:  So how about if we just say based on my

5    instructions and the evidence received during the trial.          04:15PM

6         MR. CLARK:  That would cure the problem.

7         THE COURT:  Any objection?

8         MS. HELM:  None, Your Honor.

9         THE COURT:  Okay.  On Number 16, I added what I think

10   was a defense proposed sentence in the second to last           04:15PM

11   paragraph, the sentence that begins, "In making the

12   determination."

13        I added that after looking not only at the *Ogletree*

14   case that is cited by defendant but also *Banks versus ICI*

15   *Americas* and *Hernandez versus Crown Equipment*.  *Hernandez* is a   04:16PM

16   federal district court case from Georgia, but it specifically

17   says for both strict product liability and negligent design

18   defect claims, a risk utility analysis is applied.  That seemed

19   to me to pretty clearly be the case.

20        Now, that raises -- there's an area of ambiguity that       04:16PM

21   raises a real question as to whether or not there are two

22   causes of action in Georgia, one for negligent failure to

23   design and one strict liability -- or strict liability design

24   defect.  And I have seen some lower court decisions in Georgia

25   that say there aren't two causes of action anymore.  There's     04:17PM

1    only.  And I have seen the Georgia Supreme Court say, no,

2    there's two.  That's all it says.  It doesn't explain why.

3          So I struggle with this as an ambiguous area of the

4    law but it appears clear to me that negligent design defect

5    claims in Georgia are to include the risk/benefit analysis.  So    04:17PM

6    that's why I included it.  I'm interested in what plaintiff has

7    to say about that.

8          MR. CLARK:  Your Honor, I agree that that area is

9    particularly problematic.  It does seem to be somewhat

10   confusing that they were highlighting this particular analysis.    04:17PM

11   But my fear in including this in a negligence issue is that

12   that will hone the jury in on particularly the risk/benefit

13   analysis, which they should do.  But they also need to look at

14   the broader scope of conduct that is at issue.  There's a risk

15   analysis but there's also whether they acted reasonably in    04:17PM

16   terms of the duty of care.

17          So I think that basically says the only inquiry that

18   they need to lock at is the risk/benefit analysis and I don't

19   think that is a correct statement of Georgia law.

20          THE COURT:  So how would you phrase it?    04:18PM

21          MR. CLARK:  I would say among the things you could

22   consider would be a risk/benefit analysis.  Or I would add some

23   language in there to reflect other factors could influence

24   whether a manufacturer acted reasonably.  And I don't have a

25   particular list of those factors right now because we get into    04:18PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8

1    this sort of slippery slope.  But that's the concern is we are

2    highlighting one aspect.

3         THE COURT:  What do we do with the language in

4    *Ogletree* which says, "In a negligent design case the risk

5    utility analysis applies to determine whether the manufacturer    04:18PM

6    is liable"?

7         MR. CLARK:  It makes sense to talk to the jury about

8    risk and benefit.  I mean, that language is there.  And the

9    problem we have is that that's focusing them on exclusively

10   that issue.  At least that's how I read this instruction.  I      04:18PM

11   think that perhaps we could soften it by saying one of the

12   factors you should consider in this would be that.  That way

13   we're telling the jury they should look at that but we're not

14   limiting them to that.

15        THE COURT:  Comments?                                        04:19PM

16        MS. HELM:  Your Honor, respectively, I don't think

17   putting in "one of the factors you should consider" is in

18   compliance with *Ogletree, Banks* or *Hernandez*, because they say

19   it is the factor.  I mean, *Ogletree* as you have quoted and as

20   we have quoted in our statement says in a negligent design case   04:19PM

21   the risk utility analysis applies.

22        MR. NORTH:  Your Honor, if I could add too, my

23   understanding of Georgia law is there is no distinction as far

24   as the claim itself.  And the implications I have always seen

25   in the Georgia court cases are a concern because the defenses     04:19PM

1    can be different.  Comparative fault, for example, is not a

2    defense generally to a strict liability claim traditionally but

3    it is to a negligence claim.

4            Similarly, the statute of repose is an absolute bar to

5    a strict liability claim, but there are exceptions for certain    04:20PM

6    negligent failure to warn claims.  So the defenses are

7    different, but I have never seen any decision since *Banks* and

8    *Ogletree* that makes any distinction between the claim itself.

9            MR. CLARK:  Then we're back to the problem of there

10   are two distinct causes of action.                              04:20PM

11           THE COURT:  Agreed.

12           MR. NORTH:  Welcome to Georgia.

13           THE COURT:  Okay.  I understand that point.  I want to

14   go back and re-read the cases in light of your comments, Mr.

15   Clark.                                                          04:20PM

16           Anything else on 16?

17           MR. CLARK:  Not from the plaintiff, Your Honor.

18           THE COURT:  On 17, I adopted the language you all

19   agreed upon.  I included what is the fourth paragraph from the

20   end, which says the parties agree that Bard had a duty of       04:21PM

21   reasonable care.  The comment from Bard on that was that that

22   repeats what is in Item 1 above, but it doesn't seem to me to

23   repeat it.  Item 1 says this is an element.  This paragraph

24   says it's not contested.

25           So that's why I thought it was relevant, and this part  04:21PM

1    is contesting it had a duty to warn.

2            MS. HELM:  Your Honor, we don't have any exception to

3    that language.

4            THE COURT:  Okay.  So I will leave that in.

5            Bard had also asked in the next paragraph that we add      04:21PM

6    a sentence that says, "In making the determination of whether

7    Bard acted reasonably in warning Dr. Avino, you should consider

8    the same factors for strict liability failure to warn about

9    which I previously instructed you."

10           I didn't put that in for two reasons:  One was I          04:21PM

11   thought that that's not the way to instruct the jury because

12   there is no list of factors in the previous instruction and

13   it's not telling the jury clearly what they should look back to

14   find.  It seems to me if we're going to tell them it's the

15   same, we should make it the same.                                 04:22PM

16           And secondly, I wrestle with the language that the

17   Georgia courts have used where they say that the two causes of

18   action apply the same duty concepts, or they have the same

19   duty-based elements, or it's the same duty-based negligence

20   analysis.  I don't know what that means.  So I don't know if      04:22PM

21   the law is identical for the two claims, although I know there

22   are cases that have said they are essentially the same, that

23   the standard instructions don't give us the negligence and the

24   strict liability failure to warn claims.

25           And in light of that uncertainty, as well as what I       04:23PM

1   thought was a confusing instruction to go back and look at what

2   I told you before, I didn't include it.  But I'm happy to hear

3   what defendants wish to say about that.

4           MS. HELM:  Yes, Your Honor.  There's a recent,

5   actually, federal district court case, *Shelton versus* G-A-L-C-O   04:23PM

6   *International Limited*, and it only has a Westlaw cite which is

7   3597497.  It's a Northern District of Georgia case.

8           THE COURT:  That doesn't sound like a Westlaw cite.

9           MS. HELM:  2017 WL 3597497.

10          THE COURT:  3597497.                                       04:23PM

11          MS. HELM:  Yes, sir.

12          THE COURT:  Okay.

13          MS. HELM:  In that case the court held in a products

14  liability case whether or not grounded in strict liability or

15  negligence, a manufacture's duty to warn depends on the          04:24PM

16  foreseeability of the use in question, the type of the danger

17  involved, and the foreseeability of the user's knowledge of the

18  danger.  And it cites to *Dietz*, *D-I-E-T-Z versus Smithkline*

19  *Beecham,* 598 F.3d 812.  Again, showing that in product

20  liability cases, Georgia law insists that a plaintiff show the   04:24PM

21  duty to warn the defendant breached the duty in proximate

22  cause.  In other words, they treat strict liability and

23  negligence as a separate cause of action but with the same

24  analysis.

25          THE COURT:  Is *Dietz* applying Georgia law?             04:24PM

1           MS. HELM:  Yes, Your Honor.

2           THE COURT:  What circuit is it?

3           MS. HELM:  Eleventh.

4           THE COURT:  And what does it cite as the source of

5      those elements?                                              04:25PM

6           MS. HELM:  I will have to pull the case up, Your

7      Honor.

8           THE COURT:  We'll do that.

9           MS. HELM:  I'm sorry.  I'm reading a summary of it.

10          THE COURT:  That's okay.                                04:25PM

11          MS. HELM:  But again, as the Court has recognized, we

12     have a situation under Georgia law where separate causes of

13     action are recognized but the analysis of those separate causes

14     of action have been co-mingled.  And, in fact, in many state

15     court cases, there's not a separate charge given for           04:25PM

16     negligence.  Only the strict liability charges are given.

17          So we believe that a reference and maybe a more

18     artfully worded reference to the strict liability factors or

19     the strict liability instruction is warranted in the failure to

20     warn.                                                         04:25PM

21          THE COURT:  All right.

22          MR. CLARK:  Your Honor, I would have to read those

23     cases, but what we are relying on is the long established

24     principle that there are indeed separate causes of action, and

25     what they are proposing essentially merges them.  I don't know  04:25PM

1    what the jury does with that other than basically have the same

2    answer for both.  And it seems to me that the negligence count

3    would be broader because you are looking at foreseeability type

4    issues and things and it's a broader scope of conduct.  It's

5    not so focused on what they say the device was at the time it          04:26PM

6    left the manufacturer and those types of things.

7            So again, I think it's appropriate to keep the

8    distinction that we see here.

9            THE COURT:  Well, let me share a couple of thoughts

10   for you all to chew on that are troubling me.                          04:26PM

11           The standard Georgia instruction for strict liability

12   failure to warn, although whoever wrote the instruction they

13   included in the strict liability section but they removed the

14   word "strict liability" from the title of the instruction.  And

15   then they put into the strict liability instruction the                04:26PM

16   sentence that is at the bottom of Page 18 in these

17   instructions, which says, "A manufacturer's duty to warn arises

18   when the manufacturer knows or reasonably should know of the

19   danger presented by the use of the product."

20           That's not strict liability.  But if it is a correct          04:27PM

21   statement of Georgia law that this non-negligent failure to

22   warn claim includes that requirement, then there is a

23   distinction, arguably, between the two claims.  One is the

24   claim that arises when the product is sold if the manufacturer

25   knows or reasonably should know of a danger presented by the           04:27PM

1   product.  When the product is sold, it's unreasonably dangerous

2   because it doesn't include that warning and the manufacturer

3   knows it, and the continuing duty is a continuing duty wherever

4   that product goes to give the warning the manufacturer knew it

5   should have given when it left its hands, whereas the negligent        04:28PM

6   failure to warn can be a claim that arises later, after the

7   product is sold when the manufacturer knows or should know that

8   the product is dangerous.

9           As written in the standard instructions, that

10  distinction would make sense.  I haven't seen that.  I don't         04:28PM

11  think we have seen that anywhere in the cases.  And I don't

12  know what to do with Instruction Number 15, because it's not a

13  true strict liability instruction but it is the instruction in

14  the Georgia standard instructions.

15          So I throw that out for you all to enlighten me on if       04:28PM

16  you have thoughts.

17          MS. HELM:  Your Honor, you are acknowledging what this

18  discrepancy and this, what I call, co-mingling of the causes of

19  action in the Georgia charges.  I actually think that we have

20  addressed it collectively rather well here with the strict         04:29PM

21  liability charge and the negligence charge with my one

22  exception that I just want to note for the record.  And that's

23  the sentence referring to the strict liability standard within

24  the negligence charge.

25          But I recognize the conundrum that our fellow members       04:29PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8

1   of the Georgia Bar have created for us.

2           THE COURT:  Well, in the citation, in the standard

3   instructions to the strict liability instruction for this know

4   or should have known is to a negligent failure to warn case.

5           MS. HELM:  Yes, Your Honor.                            04:29PM

6           MR. NORTH:  But, Your Honor, I do think that *Banks*

7   essentially introduced in the concept or into the doctrine of

8   strict liability design that it really is a reasonableness

9   standard.  So I'm not sure it's entirely consistent to have a

10  reasonableness standard and strict liability failure to warn    04:30PM

11  because that's the way the Georgia courts have gone.

12          THE COURT:  My point is if they go there, there could

13  be a distinction between the claims.  One arises when the

14  product is sold the manufacturer knows or should know that

15  there's a danger about which it is not warning.  The other can  04:30PM

16  arise later when the manufacturer acquires knowledge that a

17  product that's already out there has a danger it hasn't warned

18  about.

19          MR. NORTH:  That's true.  It could be one theory.  But

20  the problem then is the courts recognize this continuing duty    04:30PM

21  to warn and don't differentiate.

22          THE COURT:  Right, but the continuing duty could be a

23  continuing duty to warn people of what you knew when it left

24  your hands.  So it's not a duty that arises with a new set of

25  knowledge, it's the duty that once the product is out of your    04:30PM

1    hands you better warn people or make sure they know of the

2    danger that you knew about when it left your hands.

3           I don't see that in the cases, but that, to me, would

4    seem a logical way to harmonize the negligence instruction and

5    the strict product liability instruction.  Not that we would       04:31PM

6    say anything about that, but under that scenario, a jury could

7    look at the facts and say, well, I don't think Bard knew when

8    the filter left its hands that there was a danger.  So it's not

9    subject to strict liability.  But it learned later and it

10   negligently failed to follow up with a warning.  And you could     04:31PM

11   end up with different verdicts on those two cases of action.

12          Anyway, this is just sort of the puzzling we have been

13   doing.

14          MR. NORTH:  I would agree if one could define the

15   continuing duty to warn as the Court does.  But I'm not sure,       04:31PM

16   like you said, the courts support that.

17          MR. CLARK:  Your Honor, that's the distinction I would

18   make is the one you just offered that there could be evidence

19   that is acquired later that would trigger a responsibility at

20   that point to get out there and warn.  And we see that in the       04:31PM

21   automotive context and things like that.  So it makes some

22   sense.

23          And that's our suggestion is that in the absence of

24   clarity from the case law that we go the direction that the

25   Court has at least preliminarily indicated makes sense.             04:32PM

1    THE COURT:  Well, my intent will be to leave

2  Instruction 15 the way it is because that follows the model

3  instruction from Georgia and that's what everybody seemed to

4  think was okay.  I will give further thought to whether we

5  should say something in Instruction 17 that refers back to or      04:32PM

6  repeats some of the instruction from 15 after I read the

7  *Shelton* case.  And I will get this again to you probably by the

8  end of Tuesday so that we'll have a chance to talk about it

9  before we charge the jury.

10    Anything else on Instruction 17?                                04:32PM

11    MR. CLARK:  There is one issue on 17, and the Court

12  has adopted the language we proposed about the parties agree

13  that Bard does have this duty.  I think a corresponding change

14  would be in the last paragraph, because it could arguably be

15  confusing to say that basically there's an agreement that there   04:33PM

16  is a duty, but then we tell the jury that the plaintiff needs

17  to establish all four of these elements or that she won't win.

18  And I think we need to make some modification.  Perhaps it's

19  just adding a sentence at the end that says you may consider

20  the first element, duty proven, or something to that effect so    04:33PM

21  that there's no confusion about, well, we're not -- they agree

22  about three but we still have to find three or three of the

23  four.  So you must consider the first element proven or you

24  shall consider the first element proven.  I think that would be

25  the cleanest way to avoid confusion there.                        04:33PM

1    THE COURT:  Comments from defense counsel?

2    MS. HELM:  Your Honor, I think it's satisfied by the

3    statement that you have already added where the parties agree

4    that the reasonable -- the duty of reasonable care.

5    THE COURT:  What if we did this.  What did if we took                04:33PM

6    that sentence which is now after the elements, the parties

7    agree, put that at the beginning of the last paragraph and then

8    have the next sentence say:  If Mrs. Jones has failed to prove

9    any other element by a preponderance of the evidence.  Does

10   that do it?                                                          04:34PM

11   MR. CLARK:  That would do it.

12   MS. HELM:  That --

13   THE COURT:  Okay.  On Instruction -- well, there were

14   a couple of related instructions that were proposed.  There was

15   a plaintiff's proposal on the instruction regarding a           04:34PM

16   manufacture's scope of knowledge.  I understand plaintiff's

17   reason for proposing it.  It was proposed in the Booker case.

18   The cases cited, the *Borel* case and the *Mercer* case, are Texas

19   law.  I'm not going to give it for the same reason I didn't

20   give it in Booker.  I don't think it's part of Georgia law,     04:35PM

21   even though I understand why you proposed it.

22   Similarly, on plaintiff's proposed instruction on the

23   scope of the duty to warn, I elected not to give that because

24   it's not part of the Georgia standard instructions, and I think

25   it's fairly encompassed within the instructions that are going  04:35PM

1  to be given.

2          Same thing for plaintiff's proposed instruction

3  regarding risks to be warned about.  Same thing for defendants'

4  request for an instruction on failure to read the warning.  As

5  I concluded in Booker, there's a proximate cause element in          04:36PM

6  both failure to warn claims.  Proximate cause is explained in

7  Instruction Number 13.  I think it's well covered and defendant

8  can make this argument as the plaintiff can make the other

9  arguments.

10          We took out Instruction 18, which was the instruction     04:36PM

11  about Dr. Amer's negligence.  We took out 19 which was about

12  comparative fault.  We took out 20 about Dr. Kang.  The

13  assumption of the risk defense which is Instruction 18 is the

14  same as you all agreed to.

15          MR. CLARK:  Your Honor, may we be heard on that one?      04:36PM

16          THE COURT:  Yeah.

17          MR. CLARK:  Your Honor, I think the evidence in this

18  case at this juncture would not support an assumption of risk

19  instruction.

20          THE COURT:  Key word there is at this juncture.  You      04:37PM

21  would be absolutely free to make that argument when we get to

22  the end of the evidence and I will consider it.

23          I did not include the plaintiff's FDA warning

24  instruction for the same reasons I didn't include it in Booker.

25          MR. CLARK:  Before you move on, could we be heard on      04:37PM

—5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8—

 1   that?

 2            THE COURT:  Yes.

 3            MR. CLARK:  Your Honor, I think it's particularly

 4   important in this case to include that instruction, and we did

 5   propose a different instruction that I think is hopefully less          04:37PM

 6   of a comment on the evidence than what was presented in Booker.

 7   But in this particular case there have been a number of

 8   references, and I don't suggest that they are intentional, but

 9   I think we need to do something about the sort of littered

10   statements about approval in the case.                                  04:37PM

11            And just a couple of examples from yesterday, Ms.

12   Tillman testified that on Page 1418 of the daily transcript we

13   received, that because the FDA has approved and, dash dash, has

14   cleared the G2 for retrievable indications at this point.  Mr.

15   North asked her a question on Page 1442:  Did the FDA ever             04:38PM

16   authorize or approve any Bard filters that received the

17   retrievable indication?  So we had that, and I don't have a

18   transcript but there were a number of references to approval

19   through Ms. Shari O'Quinn, and I acknowledge there was some

20   effort to try and clean that up by Mr. North.  But I don't see         04:38PM

21   this as a comment on the evidence that there's another

22   instruction that will be given talking about the particulars of

23   the FDA that either party can call them as witnesses.

24            So I don't think this would be conspicuous in that

25   way, but it is an explanation and it is a correct statement of         04:38PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8

1   the law.  And I just think having that clarity would avoid any

2   potential confusion on that part.

3            THE COURT:  Defense counsel?

4            MR. NORTH:  Your Honor, I think we have been very

5   careful, obviously just about anybody, I think even some of the      04:39PM

6   plaintiff's experts, have used the word "approval."  It's just

7   a failing that people make.  We have tried to be very

8   scrupulous in being precise.  Dr. Tillman corrected herself

9   yesterday.  I made sure that Ms. Allen corrected herself today

10  because she accidentally used the word "approved" a couple of       04:39PM

11  times.  I certainly have used the word "clearance" I think in

12  all of my questions.  Ms. Allen even explained to the jury why

13  she lapsed and used "approval" because most of her work is with

14  PMA devices.

15           Secondly, I don't think their proposed instruction is      04:39PM

16  an accurate statement of the law.  As this Court has held and

17  recognized, while the FDA's 510(k) process does not make an

18  affirmative finding that a device is safe and effective, it

19  does determine whether the device, new device, is as safe and

20  effective as the predicate device.  It is a comparative            04:40PM

21  analysis.  So for this instruction to say it does not evaluate

22  devices for safety and efficacy is simply not the law.

23           Lastly, I think this is very much a comment on the

24  evidence.  The regulatory process has been accurately

25  portrayed, and I don't think that the Court should specifically    04:40PM

1  wade into comment on this.

2          THE COURT:  I'm sensitive to the issue.  I'm

3  highlighting in my notes as I go through when something is said

4  that helps one side or the other on this argument.  When we get

5  to the end I will consider it again.                          04:40PM

6          MR. CLARK:  Add it to your notes if it's not already

7  there the testimony of Mr. DeFord today.

8          THE COURT:  I noticed that from Mr. DeFord, and I put

9  an asterisk there, too.  I'll tell you I have got three places

10 with asterisks where it's been very clearly explained it's     04:40PM

11 clearance not approval.  There are some ambiguities,

12 particularly with DeFord where he said, yeah, they say that but

13 they really look at safety and effectiveness.  And I will

14 consider all that at the end whether I think there's a risk of

15 confusion for the jury.                                       04:41PM

16          I did not include defendants' request for instruction

17 on jury deliberation on product defect.  I think that's

18 repetitive of what's already in the defective design

19 instructions.

20          On damages, this one I think we need to -- this has   04:41PM

21 general categories of damages.  And we have limited, or

22 plaintiff has limited damages claims that are going to be made

23 in order to eliminate some of the health issues that would

24 otherwise be brought in about Ms. Jones.  So it seems to me we

25 need to refine the list of Items 1 through 8 in some degree to  04:41PM

1  reflect the narrowed claim the plaintiff is making.  Otherwise

2  we're saying to the jury in this anything is fair game that's

3  within these eight.

4        So my thought is what we ought to have you do is

5  confer, see if you can agree on something that's narrowed on          04:42PM

6  what plaintiff has said at the trial.  If you can't, give me

7  your sort of competing proposals about how it should be

8  narrowed.  But it seems to me we should be doing some

9  narrowing because there clearly has been a narrowing of the

10  plaintiff's damages claims.  I think it's not productive to        04:42PM

11  talk through it now and draft it by committee at 15 to 5 on

12  Friday evening.  But why don't you confer about that.  And if

13  you can agree, great.  If not, give me your proposals and that

14  will at least advance the ball some.

15        MS. HELM:  When would you like that, Your Honor?            04:42PM

16  Tuesday?

17        THE COURT:  Yeah, if you could get it to us by the end

18  of Tuesday then we can consider it with what I get back to you.

19        MS. HELM:  Thank you, Your Honor.

20        THE COURT:  I put a question mark after Instruction          04:43PM

21  Number 20, because I didn't know if the evidence would support

22  it.  I think that's an issue we can address.  This is the

23  failure to mitigate unless plaintiff thinks it's okay.  If you

24  think it's not going to be supportive you might want to address

25  that at the end of the evidence.                                    04:43PM

5-25-18-MD 15-2641-Jones v Bard-Jury Trial-Day 8

1      MR. CLARK:  We think it is not yet supported.  We can

2  come back later.

3      THE COURT:  The form, I think, is the pattern

4  instruction.  So I'm assuming form is okay if I conclude it's

5  supported by the evidence.  I won't worry about the language          04:43PM

6  and we'll talk about whether it's supported later.

7      The rest of the instructions up to punitive damages

8  is, or are, deliberation instructions.  On punitive damages,

9  which is Instruction A on Page 33, Item 4 is the profitability

10  of Bard's wrongdoing, and defendants ask that we include in          04:44PM

11  Georgia.  My understanding from reading the cases and Jeff's

12  reading the cases on the same issue, is that the profitability

13  of wrongdoing in a punitive damages award is relevant if the

14  jury is being asked to in effect disgorge profit that the

15  defendant has earned as punishment for their wrongful conduct.       04:45PM

16      If that is the idea behind the profitability of the

17  wrongdoing then it seems to me logically it should be limited

18  to the state of Georgia, although that's not in the standard

19  jury instruction.  The standard instruction does say, however,

20  that this element should only be given if it is supported by         04:45PM

21  the evidence.  And so I guess the question I have for

22  plaintiff's counsel is, if we get to a punitive damages phase,

23  do you intend to try to present evidence about the

24  profitability of the IVC filter business and argue for some

25  kind of a disgorgement measure of punitive damages?                  04:45PM

1       MR. CLARK:  Speaking not necessarily by committee

2   here, I will certainly start the ball rolling on that.  We had

3   focused on it more from a constitutional standpoint under the

4   *State Farm* and *Gore* guidepost analysis and did not feel that

5   that was an appropriate measure under that.  So I have not          04:46PM

6   given consideration to the disgorgement idea.

7       I do think there has been some evidence in the case

8   concerning profitability in the sense that when we talked to

9   Mr. Baird, at that time Bard had a smaller segment of the

10  market and eventually through his tenure there got itself to       04:46PM

11  the number one position in the market.

12      There is some, or will be some discussion potentially

13  in the monthly management reports concerning profitability.

14  Now, do we have evidence about that specific to Georgia, if

15  that's the focus I'm not aware of that.                            04:46PM

16      THE COURT:  Let me make another comment so you can

17  factor this in.  When you look at Item 6, which is the

18  financial circumstances, the financial condition or net worth

19  of Bard, defendants again proposed we say, based on the sale of

20  Eclipse in Georgia, that to me isn't the right consideration.      04:47PM

21  Item 6 is the how much does it take to make it sting kind of

22  analysis.  In fact, some of the case law talks about making it

23  sting.

24      So the notion is how much of an award is necessary to

25  truly be punitive for this entity.  That isn't related to what     04:47PM

1   happens in Georgia.  That has to do with one of the resources

2   of this entity and how much will it take to get their

3   attention.

4            So I didn't think we ought to include Georgia in Item

5   6, but the way it was argued by plaintiffs in Booker was not          04:47PM

6   disgorge the profits, it was get the attention of this big

7   corporation.  If that's going to be your argument again, seems

8   to me 4 comes out; 6 stays in, and it's not limited to Georgia

9   because it's the what does it take to sting kind of question.

10           MR. STOLLER:  Can we put our heads together for just a    04:48PM

11  second?  I think we can address that.

12           THE COURT:  That's fine.

13           (Discussion off the record.)

14           MR. CLARK:  Our recommendation, Your Honor is we

15  strike Item Number 4.                                                  04:48PM

16           THE COURT:  Okay.  What are defendants' thoughts on

17  these issues?

18           MS. HELM:  I think striking Number 4 is appropriate.

19           THE COURT:  Okay.  Did you want to say anything about

20  6 and my thinking on it?                                               04:48PM

21           MS. HELM:  I respectfully disagree, but I understand

22  the Court's position.

23           THE COURT:  Then I will take out 4.  We will make

24  Number 5 Number 4 and Number 6 Number 5 and not include Georgia

25  in Number 6, which will become Number 5.                              04:48PM

1    I did not get you a verdict form with these proposals.
2  We haven't had time to look at that or talk about it.  But you
3  proposed one that I think was pretty similar to what we used
4  last time that took out Dr. Kang and Dr. Amer.
5    MS. HELM:  The defendants proposed one that was very    04:49PM
6  much based on the verdict form you gave in Booker taking out
7  the non-party at fault and the intervening cause.  The
8  plaintiffs propose, I think, a one-line verdict form.
9    MR. CLARK:  For the same reasons we did in Booker,
10  Your Honor.    04:49PM
11    THE COURT:  I don't want to give a one-line for the
12  same reason I didn't in Booker.  I will look back to the
13  defendants' proposal but my anticipation is to give essentially
14  the same verdict form with Kang and Amer taken out.  But we'll
15  get that to you as well by the end of Tuesday.    04:50PM
16    What else do we need to talk about?
17    MR. NORTH:  Your Honor, I just thought I would give
18  the Court a heads up that I think that we are on a very similar
19  schedule from the defense standpoint as last time, probably
20  finishing and concluding our case after lunch on Wednesday.    04:50PM
21    THE COURT:  That's fine.  In terms of overall time, we
22  are 10 minutes behind schedule, which isn't bad.  We can catch
23  up by just going until 4:30 on Tuesday.
24    MR. CLARK:  Plaintiffs would be happy to be only 10
25  minutes behind schedule.    04:50PM

1    THE COURT:  I understand.  My point is I think we're

2  not -- we have been getting five and-a-half hours of trial time

3  a day with the exception of yesterday where we lost a half

4  hour.  So I think we're okay on the schedule.

5    Have a good weekend.  We'll plan to see you on          04:50PM

6  Tuesday.

7    (Proceeding recessed at 4:51 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 26th day of May, 2018.


s/Laurie A. Adams
_____
Laurie A. Adams, RMR, CRR