1               UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3        _____

4   In Re: Bard IVC Filters          )   MD-15-02641-PHX-DGC
    Products Liability Litigation    )
5                                     )   Phoenix, Arizona
                                      )   **May 29, 2018**
6   _____)
    **Doris Jones, an individual,**      )
7                                     )
                      Plaintiff,      )
8                                     )   CV-16-00782-PHX-DGC
            v.                        )
9                                     )
    **C.R. Bard, Inc., a New Jersey**     )
10  **corporation; and Bard Peripheral** )
    **Vascular, Inc., an Arizona**       )
11  **corporation,**                     )
                                      )
12                    Defendants.     )
    _____)

13

14

15      **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16      **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17      <u>**TRIAL DAY 9 — A.M. SESSION**</u>

18           (Pages 1866 – 1992)

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

```
 1                      A P P E A R A N C E S

 2    For Plaintiff:

 3            Gallagher & Kennedy
              By: MARK S. O'CONNOR, ESQ.
 4            By: PAUL L. STOLLER, ESQ.
              By: SHANNON L. CLARK, ESQ.
 5            By: C. LINCOLN COMBS, ESQ.
              2575 East Camelback Road, Suite 1100
 6            Phoenix, AZ  85016

 7            Lopez McHugh, LLP
              By: RAMON ROSSI LOPEZ, ESQ.
 8            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 9
              Lopez McHugh, LLP
10            By: JOSHUA MANKOFF, ESQ.
              214 Flynn Ave.
11            Moorestown, NJ  08057

12            Heaviside Reed Zaic
              By: JULIA REED ZAIC, ESQ.
13            By: LAURA E. SMITH, ESQ.
              312 Broadway, Ste. 203
14            Laguna Beach, CA  92651

15

16    For Defendants:

17            Nelson Mullins Riley & Scarborough
              By: RICHARD B. NORTH, JR. ESQ.
18            By: ELIZABETH C. HELM, ESQ.
              201 17th Street NW, Suite 1700
19            Atlanta, GA  30363

20            Nelson Mullins Riley & Scarborough.
              BY: JAMES F. ROGERS, ESQ.
21            1320 Main St.
              Columbia, SC  29201
22
              Snell & Wilmer
23            By: AMANDA C. SHERIDAN, ESQ.
              400 East Van Buren
24            Phoenix, AZ  85004

25
```

1                              **EXAMINATION**

2       **WITNESS**                                           **PAGE**

3      DAVID W. FEIGAL, JR., M.D.

4              Direct Examination By Ms. Helm              1892

5              Cross-Examination By Mr. Lopez              1912

6              Redirect Examination By Ms. Helm            1931

7      CHRISTOPHER MORRIS, M.D.

8              Direct Examination By Mr. Rogers            1935

9              Cross-Examination By Mr. Combs              1981

10

11     Video testimony of Melanie Sussman played           1988

12

13

14                               **EXHIBITS**

15      **NUMBER**    **DESCRIPTION**                    **PAGE**

16      5333      Feb. 2, 2007 Letter BPV to              1891
17                FDA re G2 EVEREST Study
                  (G051304) Annual Progress
18                Report

        5335      Aug. 23, 2007 Letter BPV to             1891
19                FDA re G2 EVEREST Study
                  (G051304) Annual Progress
20                Report

21      5334      Sept. 21, 2007 Letter FDA to            1891
22                BPV Questions re G2 EVEREST
                  Study (G051304)

23      5336      Oct. 25, 2007 Letter BPV to             1891
24                FDA re Responses to FDA re G2
                  EVEREST Study (G051304)

25

1    **(Index of Exhibits Continued)**

2                **EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 5488 | June 21, 2010 Letter from BPV to FDA re Eclipse Filter System Response to FDA Questions (K101431) | 1891 |
| 5587 | June 18, 2010 Letter FDA to BPV re FDA AI Demand re Eclipse (K101431) | 1891 |
| 5593 | Aug. 14, 2009 Conference FDA and BPV re future Eclipse Filter 510(k) | 1891 |
| 5602 | FDA Contact Report January 7 2010 FINAL | 1891 |
| 5612 | Nov. 17, 2009 (Filters and future submissions) | 1891 |
| 5923 | Dec. 9, 2004 email re Dear Doctor Letter | 1891 |
| 5942 | January 7, 2010 FDA Powerpoint Presentation | 1891 |
| 8358 | TR-09-10-15 – Eclipse Flat Plate Fatigue and Corrosion Examination of the Vail (Eclipse) Filter | 1891 |
| 8368 | TP-09-10-15 Rev. 0 – Eclipse DV&V Flat Plate Fatigue and Corrosion Test Protocol | 1891 |
| 8373 | TP-09-10-16 Rev. 0 – Eclipse Filter DV&V Arm Fatigue Evaluation Test Protocol | 1891 |
| 8575 | TP 09-10-10, Test Protocol Cyclic Fatigue Testing of Electropolished Vail Filter Wire | 1891 |

1                    **(Index of Exhibits Continued)**

2                              **EXHIBITS**

3        <u>**NUMBER**</u>    <u>**DESCRIPTION**</u>                              <u>**PAGE**</u>

4        4415      Email from Mike Randall to             1891
                   Carr and Raji-Kubba re
5                  "Misclassified??"

6        1140      Ferrera Deposition,                    1891
                   04/07/2017, Exhibit 25 –
7                  Presentation titled
                   Filter-Fracture Analysis
8
         588       Asch Deposition, 05/02/2016 –          1891
9                  Exhibit 209 – Article by Dr.
                   Murray Asch, entitled
10                 "Initial Experience in Humans
                   with a New Retrievable IVC
11                 Filter"

12       691       Boyle, 02/02/2017, Exhibit            1891
                   842 – E-mail chain first one
13                 from John Van Vleet to Steve
                   Williamson, dated 11/5/2015,
14                 6 pages

15       1036      Deford Deposition, 06/02/2016         1891
                   – Exhibit 296 –
16                 9/26-9/27/2007 High
                   Importance E-mail exchange
17                 b/w Dennis Salzmann, John Van
                   Vleet, and John Reviere of
18                 BPV, with others CCedd, Re.
                   "Comments on Rev H".
19                 Discussion about concern for
                   over-reporting of the SIR
20                 guidelines re- classification
                   and removal of the
21                 retroperitoneal bleed, and
                   replacing consultant John
22                 Lehmann

23

24

25

1           **(Index of Exhibits Continued)**

2                 **EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1500 | Kessler Report – August 7, 2010, John Van Vleet emailed BPV President Jim Beasley, Marketing Director Bill Little, and V.P. of QA Gin Schulz | 1891 |
| 1926 | Romney, 01/18/2017, Exhibit 2061 – 8/6/2014 E-mail from Schyler Smith, Field Manager for BPV in Washington-Idaho-Montana, to Kim Romney, Subject redacted, relaying that a redacted doctor had placed a Meridian in the past year and discovered at retrieval that an arm fractured, which imaging confirmed had occurred within 1 week of placement, and was now wondering if he should try to remove the filter or leave it in. Van Vleet forwarded to Treratola in a high importance e-mail on 8/7, requesting that he contact the doctor on Bard's behalf | 1891 |
| 2105 | Trerotola, 01/20/2017, Exhibit 692 – 4/30/2015 E-mail from Dr. Trerotola to John Van Vleet, forwarding an article from Forbes Magazine about ALN filters entitled "Effect of a Retrievable IVC Filter Plus Anticoagulation vs. Anticoagulation Alone on Risk of Recurrent PE: A Randomized Clinic Trial". Per Trerotola, "not good for ALN...and maybe not good for the industry". The article was discussed through 5/4, as | 1891 |

1              **(Index of Exhibits Continued)**

2                        **EXHIBITS**

3    <u>**NUMBER**</u>      <u>**DESCRIPTION**</u>                              <u>**PAGE**</u>

4    2105 (cont'd) they were meeting that
             day to review articles before
5            meeting with JVV.

6    2252      Wong Deposition, 10/18/2016 –         1891
              Exhibit 548 – 9/25/2007
7             E-mail from John Lehmann to
              John Van Vleet and John
8             Reviere Re. "EVEREST FSR rev
              H and supporting redlines
9
     5290      TD-00456 (EVEREST Study Final         1891
10             Report)

11   6991      FDA Safety – Inferior Vena           1965
              Cava (IVC) Filters: Initial
12            Communication: Risk of
              Adverse Events with Long Term
13            Use, 08/09/2010

14   6992      FDA Safety Communications,          1970
              Removing Retrievable Inferior
15            Vena Cava Filters.
              05/06/2014.http://wayback.arc
16            hive-it.org/7993/201707222157
              31/https://www.fda.gov/Medica
17            lDevices/Safety/AlertsandNoti
              ces/ucm396377.htm
18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

(Proceedings resumed in open court outside the presence
of the jury.)

THE COURT:  Thank you.  Please be seated.

Morning, everybody.

EVERYBODY:  Morning, Your Honor.

THE COURT:  Counsel, do you have things we need to
talk about before we get started today?

MR. O'CONNOR:  Yes, we do, Your Honor.

MR. CLARK:  We have a couple of things.  I don't know
how many Bard has.

Your Honor, I think, as we foreshadowed last week, we
do have an issue with respect to the complaint detail summary
at the end of certain monthly management reports.  And we
understand the Court's concern about the 403 analysis that was
done with respect to the 1006 summary.

By our count there are or will be 12 monthly
management reports into evidence.  We do think it's important
for the jury to be able to see a few examples of the complaint
detail that was going into these monthly management reports
because that is a direct line to the decision makers in the
company.

We have broached this with Bard.  Their position, or
its position, is that that would run afoul and sort of be too

08:31:28  1     cumulative of other information.  We don't think that's the

       2     case.  We do understand the concern about having too much, but

       3     of the 12 we propose four or five be allowed to include the

       4     complaint detail because this is the only area where we can

08:31:41  5     show the jury that this is what is going to the decision

       6     makers.  We have the complaint summaries, we have the

       7     TrackWise data, and what's going to be in the 1006 summary.

       8     But there's no -- we don't that have link that all of these --

       9     this information is going to the decision makers.  So I think

08:31:57 10     that is an important component there.

      11           So we want to try to find some balance there where we

      12     can at least show the jury this is the type of information

      13     that was going there and then make redactions for the other

      14     eight or nine of those.  But we do think we should be allowed

08:32:12 15     to have a few of those in there, and we want your decision on

      16     that so we can get those redactions going.

      17           THE COURT:  Well, I think to make that decision I

      18     think I need to see both the 1006 summary and the all of the

      19     exhibits you're proposing to put in as monthly management

08:32:25 20     reports so I can look at the exhibits and decide --

      21           MR. CLARK:  Would it be okay with the Court if we

      22     provided that information to you before the lunch hour?

      23           THE COURT:  Yes.

      24           MR. CLARK:  Okay.

08:32:34 25           THE COURT:  But what I'll need to know is exactly

08:32:36   1    what it is you're proposing to put in.  So I think you need to

       2    give me the 12 exhibits with the four or so you think should

       3    have the complaint summaries attached, as well as the 1006

       4    summary.

08:32:47   5         MR. CLARK:  We can do that.

       6         THE COURT:  And I'll hear from Bard now about what

       7    they think should be excluded, but I think I need to lay them

       8    side by side in order to make a decision.

       9         MR. CLARK:  That makes sense.

08:32:57  10         I have one other issue.  I don't know if you want to

      11    take them both --

      12         THE COURT:  Well, let's hear from defense counsel.

      13         Is it your view that none of the complaint summaries

      14    should be included with the monthly management reports?

08:33:07  15         MR. NORTH:  Right, Your Honor.  Our belief is that by

      16    allowing the 40 events in the separate summary, that that

      17    provides the sampling the Court had talked about, and the

      18    management reports in essence sort of circumvent that

      19    limitation by introducing several dozen more.

08:33:24  20         THE COURT:  Okay.  So if you could have those

      21    exhibits for me at the noon hour, I'll look at them.

      22         MR. CLARK:  The other issue, Your Honor, was just to

      23    kind of circle back to the FDA warning letter.  We would like

      24    to use that with certain witnesses, if possible.  I don't know

08:33:36  25    if you've -- if your tally has allowed you to make a decision

08:33:40  1   on that --

2         THE COURT:  When is it that those witnesses are on?

3         MR. CLARK:  It could come up as early as Mr. Carr

4   this afternoon, and certainly with Mr. Modra tomorrow that we

08:33:48  5   would like to use that.

6         THE COURT:  Okay.

7         Is Mr. Carr coming on this afternoon?

8         MR. NORTH:  Mr. Carr is coming this afternoon.

9   Mr. Modra is the person that is most knowledgeable.  He's

08:33:59 10   coming tomorrow.

11         THE COURT:  What time do you expect to get to

12   Mr. Carr?

13         MR. NORTH:  He's our fourth witness today.  So

14   assuming we get to him it probably wouldn't be until 3 o'clock

08:34:10 15   or so.

16         THE COURT:  And how much direct do you expect to have

17   with him?

18         MR. NORTH:  At least an hour to an hour and a half.

19         THE COURT:  Why don't you give me a sense, if you

08:34:21 20   would, when we break at the noon hour as to whether you think

21   you'll finish your direct by the end of the day on Mr. Carr.

22   If so, I'll look back at the FDA warning issue over the lunch

23   hour.

24         MR. NORTH:  Okay.

08:34:34 25         MR. O'CONNOR:  Your Honor, I just wanted to remind

08:34:38 1    you that last week we raised at the sidebar the whole issue

2    about opening the door to the cephalad migration based upon

3    the IFU discussion that defense counsel had with Dr. Hurst,

4    pointing out and bringing attention to the morbidly obese

08:34:58 5    patient statement in that IFU.  You were going to rule on it.

6         Mr. North gave some articles.  We don't think they're

7    applicable or that there's any evidence to show that those

8    were considered.  We believe the evidence has shown that

9    everything Bard has done in this case was response to that

08:35:17 10   serious problem caused by the cephalad migration deaths, and

11   that by pointing half the story out to the jury, we feel that

12   now the ruling that was made that was intended to protect the

13   defendants from prejudice has now been used somewhat as a

14   sword against us and evidence that really should be told a

08:35:40 15   complete story and put in context with why they did things

16   isn't being told, and the inference is that they've done very

17   reasonable things for relatively minor incidents.

18        So I just want to remind you, number one, that you

19   had put that on hold and you were going to rule on that.  But

08:35:59 20   that's our position.

21        THE COURT:  Okay.

22        Counsel, I don't have those articles that you

23   submitted.  If they're up here, they've been lost.  Do you

24   have other copies?

08:36:14 25        MS. HELM:  Mr. North's looking for them, Your Honor.

08:36:20    1          THE COURT:  All right.  While he's looking for those,

            2     are there any other matters that we need to talk about?

            3          MR. O'CONNOR:  Along the same lines, Mr. Lopez was

            4     going to talk about what happened in the DeFord deposition.

08:36:33    5          MR. LOPEZ:  Morning, Your Honor.

            6          THE COURT:  Go ahead, Mr. North, bring those up,

            7     would you.

            8          Go ahead, Mr. Lopez.

            9          MR. LOPEZ:  Yes, Your Honor.  On Friday I think one

08:36:52   10     of the last depositions that was played was Mr. DeFord.  And

           11     I've got the transcript here, part of the transcript that was

           12     played.

           13          And he testified that, and he was talking about the

           14     Recovery filter, that the device was adding value.  It

08:37:08   15     couldn't stop a massive thrombus, just like your seat belt

           16     can't stop, and he went on about the fact that the Recovery

           17     filter was saving lives.

           18          And then he stated that:  I think the risk to

           19     patients was absolutely evaluated but the decision was made

08:37:22   20     that the product continued to add value and shouldn't be

           21     placed on hold.

           22          Then he said that:  The conditions wanted a device

           23     they could retrieve.  It wasn't a company decision.  We're not

           24     going to put it on hold because we're selling a retrievable

08:37:40   25     product.  It was the belief and our continued belief that the

08:37:42  1  product added unique special value and patients lives were

2  being saved.

3  And I can go on and on, but the point is, Your Honor,

4  throughout this testimony he says it again, that the

08:37:52  5  technology was saving many more lives than it was unable to

6  save.  And if we took it off the market and did not have the

7  technology available, then that would further increase the

8  risk to patients versus decrease the risk to patients.

9  Then he says:  We certainly had another vena cava

08:38:13  10  filter on the market, the Simon Nitinol filter, very different

11  technology, certainly known to prevent pulmonary embolism

12  death, but didn't have all the features and benefits of the

13  Recovery.

14  And I've marked -- I can go on and read this,

08:38:27  15  Your Honor, but I've got five or six more places where he

16  basically testified that the reason they left the Recovery

17  device on the market because it was saving more lives and

18  preventing -- than the lives it was putting at risk.

19  And I've got eight or nine places in here where he

08:38:48  20  left that impression with the jury.

21  The real evidence in the case is that there is no

22  evidence.  I asked Ms. Hudnall that at her -- and which we

23  played in trial, that the Recovery filter ever stopped a

24  thrombus that might have taken someone's life.  They don't

08:39:06  25  know.  What we do know is that there --

08:39:08  1          THE COURT:  I think what Ms. Hudnall said is you

        2   can't know.

        3          MR. LOPEZ:  You can't know.

        4          THE COURT:  Not that they don't know, but there's no

08:39:14  5   way to monitor it.

        6          MR. LOPEZ:  Right.  In other words, they have --

        7   there's no data about any patient whose life was saved who had

        8   a Recovery --

        9          THE COURT:  But there can't be any such data.

08:39:26 10          MR. LOPEZ:  That's the point.  But he kept saying

       11   that --

       12          THE COURT:  No, the point isn't that they could have

       13   collected it and didn't; her point was you can't.  It's

       14   impossible to know.  You're trying to prove something that

08:39:36 15   can't be proven because there's no way to detect when a

       16   thrombus gets caught by a clot.

       17          MR. LOPEZ:  Well, there is a way that you could have

       18   known that had you taken appropriate steps to --

       19          THE COURT:  Well, I think her point was only if you

08:39:48 20   have somebody on 24-hour monitoring will you ever know if the

       21   filter catches a clot.

       22          MR. LOPEZ:  Right.  I understand.  But the point is

       23   there is no evidence that it saves lives.  And we do have

       24   evidence in the case, it's not been countered yet, when you

08:40:02 25   look at a retrospective review of patients, Dr. Rogers, a

08:40:08  1    defendant -- a defense expert, wrote an article that says

2    looking at a 30-million-patient population, there has been no

3    change in PE fatalities with or without the use of filters.

4         What we do know is that the Recovery has a history of

08:40:32  5    having been hit with clots, that's the very clots that they're

6    supposed to prevent from causing a fatal PE, that once

7    challenged get -- that migrate to the heart and actually take

8    lives.

9         And I think that the impression this jury has is that

08:40:49  10   the Recovery filter was a lifesaving device when, in fact, the

11   only evidence in the case that -- it doesn't exist now, but

12   you know the evidence exists -- is that it takes a life.  One

13   month -- one per month on average over a very short period of

14   time, that when it does get hit by a PE, a large PE, it

08:41:15  15   doesn't work.  And it results in death.

16        And the jury doesn't know that right now.  I think

17   that is as much as anything that's happened in this case, it's

18   opened the door to allow us to get that evidence in front of

19   the jury.

08:41:27  20        THE COURT:  Well, let me ask this question,

21   Mr. Lopez:  Let's say the jury knew that.

22        MR. LOPEZ:  Okay.

23        THE COURT:  How does that help prove that the Eclipse

24   filter was defectively designed or defectively warned about?

08:41:39  25        MR. LOPEZ:  Your Honor, as you know, our theory has

08:41:41   1   been and will continue to be that the Recovery -- if there's

2   no Recovery filter, there's no Eclipse.  That the Recovery

3   filter was the predicate device for the G2 and the G2 was the

4   predicate device for the Eclipse.

08:41:55   5        Even Dr. Tillman agreed that if you're selling an

6   adulterated product, it is being illegally marketed and cannot

7   be used as a predicate.

8        There's no better evidence that that was an

9   inappropriate predicate than the 19 deaths that the Recovery

08:42:11  10   caused, I think it's 19, prior to the G2 being cleared to be

11   marketed into the U.S. consuming public.

12        And the jury doesn't know that.  They just think that

13   there's something wrong with the design of the Recovery that

14   caused some injury and harms, and that Bard did what a prudent

08:42:33  15   manufacturer would do, and that is redesign it and sell the

16   G2, when, in fact, the evidence is very strongly that there's

17   no way they should have been selling the Recovery or had it

18   around to be the predicate device for the G2.

19        If the G2 had used the Simon Nitinol filter as its

08:42:54  20   predicate, this would be a much different set of circumstances

21   that we should be allowed to argue.  And we can't.

22        THE COURT:  Okay.  I understand that point.

23        MR. LOPEZ:  Thank you, Your Honor.

24        MR. NORTH:  Your Honor, Dr. DeFord was responding, as

08:43:10  25   I recall, to some questions posed by plaintiff's counsel in

08:43:15   1   the deposition clip as to why the Recovery filter was not

2   being taken off the market, and he said it was the company's

3   determination that the risks were outweighed by the benefits.

4   He actually acknowledged quite honestly in that particular

08:43:27   5   testimony that there had been some catastrophic events,

6   without going into detail.

7        He mentioned that there had been instances of clots

8   overcoming and overburdening the filter.  But that they still

9   determined that the risks were outweighed by the benefits.  I

08:43:44  10   don't believe that opens the door to the parade of evidence

11   they now want to put in about all of the details of the

12   cephalad migrations.

13        This Court held from the very beginning prior to this

14   case that they could present evidence that complications with

08:44:01  15   these devices, including the Recovery filter, can lead to

16   death.  And they have done that throughout this case.  And

17   that's also all that Dr. DeFord was acknowledging is that

18   there can be catastrophic adverse events.

19        And then he said we did not -- we canceled the

08:44:21  20   product hold and put the product -- allowed the product to be

21   sold because we determined that the risks were outweighed by

22   the benefits.

23        Ironically, at the time the product hold even came

24   into issue, there were only two migration deaths, as I recall.

08:44:35  25   Two, maybe three.  Not the 19 that Mr. Lopez is talking about.

08:44:39   1          But in any event, we do not believe that opens the

           2   door to this long parade of evidence they wish to put in,

           3   particularly in a case involving an Eclipse filter two

           4   generations removed from the Recovery filter.  It is in the

08:44:55   5   record, they have their evidence, and have long had their

           6   evidence, that these complications can lead to death, and

           7   therefore we don't believe that the door should be opened any

           8   further.

           9          THE COURT:  Okay.  Well, I understand the parties'

08:45:07  10   positions on this issue.  I will think about it further in

          11   light of what's been said this morning.

          12          Is there anything else we need to cover before we get

          13   the jury?

          14          MR. O'CONNOR:  Yes, one more issue Mr. Combs has.

08:45:23  15          MR. COMBS:  Morning, Your Honor.

          16          THE COURT:  Morning.

          17          MR. COMBS:  I'm not sure how much argument you want

          18   to hear, I'm prepared to talk about it.  But the issue is with

          19   the defendants wanting to call five interventional

08:45:36  20   radiologists in their case.  We already heard from Dr. Grassi,

          21   Dr. Stein, and today we'll hear from Dr. Morris.

          22          And they also want to play the videos of

          23   Drs. Trerotola and Stavropoulos, who I think were played in

          24   Booker, so you're familiar with what they were going to say.

08:45:55  25   And we would just argue that those are cumulative testimony,

08:45:58  1    as well as Drs. Stavropoulos and Trerotola, their opinions

2    lack relevance to this case regardless of whatever the

3    relevance was in Booker where they were played.

4        So we would just object that five IRs is well beyond

08:46:15  5    cumulative evidence.

6        THE COURT:  Why do they lack relevance?

7        MR. COMBS:  I'm sorry?

8        THE COURT:  Why do they lack relevance?

9        MR. COMBS:  They don't know anything about this case,

08:46:23 10    they don't know anything about the goings-on between -- they

11    were deposed in this case because plaintiffs were seeking

12    evidence of interactions between them and Bard.

13        That's not what they're being offered for.  They're

14    just being offered for pure expert opinions on their

08:46:36 15    experiences with Bard filters and their beliefs on filters are

16    great and safe and all those kinds of evidence and opinions,

17    which are not only expert opinions from paid Bard consultants,

18    but also entirely duplicative and cumulative of evidence we've

19    already heard or will hear today from Dr. Morris.

08:46:56 20        You know what Dr. Morris is going to testify on today

21    because it's the same report as Booker.

22        THE COURT:  You said twice that I know.  I have -- I

23    will tell you I have zero memory about what any of those three

24    experts will say.

08:47:10 25        MR. COMBS:  Fair enough, Your Honor.

08:47:12    1          THE COURT:  I can go back and look at my notes from

            2    Booker, but as I stand here I don't have even an iota of

            3    memory of what they will say.

            4          MR. COMBS:  Fair enough, Your Honor.

08:47:22    5          Dr. Morris had a general report --

            6          THE COURT:  Let's do this in three minutes because I

            7    still have to take care of a matter before we start.

            8          MR. COMBS:  Understood, Your Honor.

            9          We submit the five interventional radiologists

08:47:32   10    opining about Bard filters and their benefits and their

           11    opinions on them is well beyond cumulative.

           12          THE COURT:  So you think they're being called to say,

           13    I think Bard filters have value, I think they're good filters,

           14    I use them?

08:47:49   15          MR. COMBS:  Yes, that's exactly what they're going to

           16    say.  And then you have additional gratuitous opinions like

           17    Dr. Trerotola preferring the Simon Nitinol filter, Simon

           18    frightenol filter, which I'm sure you're familiar with from

           19    Mr. North's closing in Booker.

08:48:07   20          So these are all expert opinions.  They're nothing

           21    directly relevant to this case.  And, actually,

           22    Dr. Stavropoulos in his deposition, most of his testimony

           23    deals with, like, perforation, grade 3 perforations and things

           24    which aren't relevant to this case.

08:48:20   25          THE COURT:  Okay.

08:48:22    1          MR. NORTH:  Your Honor, we are very mindful of the

            2    Court's general admonition about cumulative experts.

            3    Dr. Grassi spoke to the SIR guidelines.  Dr. Stein had looked

            4    at the specific records of the plaintiff in this case and

08:48:35    5    talked about that.  And Dr. Morris is talking about the

            6    general use of IVC filters.

            7          The two depositions he's complaining about are two

            8    physicians that were deposed by the plaintiffs as fact

            9    witnesses.  They've never been designated by either side as an

08:48:52   10    expert.  They were deposed at length.  And we have like eight-

           11    to ten-minute clips of them that we wish to play.  And they're

           12    not offering expert opinions; they're talking about their

           13    personal experiences with filters in general.

           14          THE COURT:  Well, the problem I have is I'm hearing

08:49:06   15    about this ten minutes to 9:00 on the day the evidence is

           16    going to be presented.  I have no time to go look at the

           17    depositions, look at the reports, and decide if it's

           18    cumulative.  I just can't do that.

           19          And I certainly can't say, well, I think you're more

08:49:19   20    believable this morning, Mr. Combs, than Mr. North.  I mean,

           21    the only way I can make that decision is to actually look at

           22    the evidence, and it is impossible to do it with ten minutes

           23    until the jury comes in.

           24          So I'm afraid I'm not in a position to grant any

08:49:33   25    relief on that.  I'm going to have to assume what the

defendants are saying is correct because I can't look at

anything to refute it before we start trial in ten minutes.

If this comes up in another trial, you need to raise

it far enough in advance so I've got time to look at the

transcripts and make a judgment as to whether there's a

cumulative expert opinion.  And that's where it matters.

That's where I've said you get one expert per side on an

issue.  But on fact witnesses, we've had lots of cumulative

evidence on both sides from fact witnesses.  Not to the point,

in my view, where we've had a 403 problem, but there's been

lots of repetition on questioning by plaintiffs and defendants

of witnesses who are fact witnesses.

MR. COMBS:  Well -- okay.  I guess, Your Honor, my

only response to that is it puts plaintiffs in a little bit of

a dilemma.  If we bring it up too early before the other IRs

have testified, then it's not ripe yet.  We don't know what

they're going to say.  How --

THE COURT:  If you want me to look at it and they

confirm they're going to call, I'll look at the transcript and

I'll look at the report and I'll rule on it.  I'm not going to

say don't bother me about that until ten minutes before we

start trial on the day the witnesses are going to be called.

That just doesn't leave any time to do it.  And I don't have a

way to make a ruling based on what I'm hearing from you with

now eight minutes to go before we get the jury in.  It's just

08:50:54  1   not possible.

2   　　　　MR. COMBS:  Understood, Your Honor.

3   　　　　THE COURT:  I will come in when we get the jury in

4   the courtroom in eight minutes.  Hopefully, folks will be on

08:51:02  5   time.  There was real traffic problems coming into the city

6   this morning from the east side, so hopefully we haven't lost

7   any jurors.

8   　　(Recess was taken from 8:51 to 9:00.  Proceedings resumed

9   in open court with the jury present.)

09:01:12  10  　　　　THE COURT:  Thank you.  Please be seated.

11  　　　　Good morning, ladies and gentlemen.

12  　　　　JURORS:  Good morning.

13  　　　　THE COURT:  Thanks for being here this morning.  Hope

14  you had a good weekend.

09:01:18  15  　　　　We will carry on.  We believe we're on schedule to

16  get the case wrapped up this week, and so we're going to keep

17  forging ahead.

18  　　　　Ms. Helm.

19  　　　　MS. HELM:  Thank you, Your Honor.

09:01:27  20  　　　　Before we call our first witness, both parties have

21  some exhibits to admit.  Defendants move to admit

22  Exhibit 5333, 5335, 5334, 5336, 5488, 5587, 5593 subject to

23  redactions, 5602 subject to redactions, 5612 subject to

24  redactions, 5923, 5942, 8358, 8368, 8373, and 8575.

09:02:27  25  　　　　THE COURT:  Any objection?

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:02:30  1          MR. CLARK:  Plaintiff has none.

       2          We do have a few of our own exhibits to seek

       3   admission of.

       4          THE COURT:  Okay.

09:02:34  5          Those are admitted.

       6          (Exhibits 5333, 5335, 5334, 5336, 5488, 5587, 5593,

       7   5602, 5612, 5923, 5942, 8358, 8368, 8373, 8575 admitted.)

       8          MR. CLARK:  Plaintiff would offer 4415, 1140 subject

       9   to redaction, 588, 691, 1036, 1500, 1926, 2105, 2252, and

09:03:02 10  5290.

      11          MS. HELM:  No objection, Your Honor.

      12          THE COURT:  Okay.  Those are admitted subject to

      13   redaction.

      14          (Exhibits 4415, 1140, 588, 691, 1036, 1500, 1926, 2105,

09:03:10 15  2252, 5290 admitted.)

      16          MS. HELM:  Your Honor, at this time defendants call

      17   Dr. David Feigal.

      18          Your honor, while we get Dr. Feigal, may I move the

      19   flip chart over?

09:03:24 20          THE COURT:  Yes.

      21          THE COURTROOM DEPUTY:  Sir, if you'll stand right

      22   there and raise your right hand.

      23          THE COURTROOM DEPUTY:  Doctor, please state your name

      24   and spell your last name.

09:04:10 25          THE WITNESS:  David William Feigal, Jr.  The last

DIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:04:10   1   name is spelled F-E-I-G-A-L.

2                    **DAVID W. FEIGAL, JR., M.D.,**

3   called as a witness herein, after having been first duly sworn

4   or affirmed, was examined and testified as follows:

09:04:10   5                    D I R E C T   E X A M I N A T I O N

6   BY MS. HELM:

7   Q   Morning, Doctor.

8   A   Good morning.

9   Q   Would you please introduce yourself and tell the ladies

09:04:33   10   and gentlemen of the jury where you live?

11   A   My name is David William Feigal, Junior, and I live just a

12   little bit north of Thousand Oaks, California.

13   Q   And what is your profession?  What is your medical

14   specialty?

09:04:45   15   A   I'm a physician, an internist and a clinical

16   epidemiologist.

17   Q   And what is epidemiology?  What does an epidemiologist do?

18   A   Epidemiology is the study of the patterns of diseases in

19   populations.  The original word came from epidemics.  But it

09:05:02   20   is much broader than that now, and so what epidemiologists do

21   is they look at the patterns of diseases or medical conditions

22   or the effects of medical treatment.

23   Q   And would you explain what education and training you have

24   in the field of clinical epidemiology, please.

09:05:21   25   A   After I finished my internship and residency, I spent a

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:05:27  1    couple of years on the faculty at UC Davis in the department

2    of medicine, and then I went back and did a clinical

3    epidemiology fellowship at University of California,

4    San Francisco and the University of California, Berkeley.  It

09:05:39  5    was a joint program.  Two-year program, included getting a

6    master's in public health, and two years of coursework, and

7    then some practical research.

8    Q   Over the course of your profession, have you continued to

9    receive training in the field of epidemiology, on-the-job

09:05:52  10   training?

11   A   Well, I have.  After I completed the fellowship, I

12   actually became the deputy director of the program that I had

13   been in.  It was the Andrew Mellon Scholars and Clinical

14   Epidemiology.  I was the deputy director for that program.

09:06:08  15   And I was a member of the faculty of the department of

16   epidemiology at the University of California, San Francisco.

17   And throughout my career, I have done epidemiological

18   research, used those skills later in my career when I was at

19   FDA.  Skills that I've used again and again in assessing

09:06:28  20   product effectiveness and product safety.

21   Q   Have you ever consulted with medical device companies as

22   an epidemiologist?

23   A   I have.  I have been asked to help them design studies, to

24   help them design their programs for monitoring the safety of

09:06:46  25   their products in the marketplace.  Design studies that take

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:06:49  1   place before the products are approved for use.  So I've done
        2   quite a bit of that.
        3   Q    Have you actively -- have you practiced medicine as a
        4   clinical practitioner?
09:07:03  5   A    Yes.  My practice was always part of a university
        6   practice.  I was first at UC Davis, and as the faculty there
        7   about a third of my time was seeing patients.  Much of that my
        8   own patients, but also with the students and the interns and
        9   residents.
09:07:19 10        And then, similarly, when I moved to
       11   UC San Francisco, and then eventually my wife was recruited to
       12   UC San Diego, so I followed her there.  And I was on the
       13   department of medicine there, all during those approximately
       14   12 years.  About a third of my time was in direct patient
09:07:37 15   care, both inpatients and outpatients in clinical research.
       16   Q    And do you still hold an active medical license?
       17   A    I do.  I've been continuously licensed in California since
       18   I finished my training.
       19   Q    And are you board-certified in any discipline?
09:07:51 20   A    Yes.  I'm board-certified in internal medicine, and then I
       21   have a master of public health in epidemiology.
       22   Q    You mentioned you worked with the FDA.  That is the Food
       23   and Drug Administration; is that right?
       24   A    That's right.
09:08:01 25   Q    Would you briefly summarize the positions you held with

DIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:08:04  1    the FDA and over what period of time.

2    A    Sure.  Makes sense if I back up just a little.

3         When I was at San Francisco General Hospital, it was

4    1983 and I was doing cardiovascular research, and the AIDS

09:08:18  5    epidemic came along and we had no idea what it was.  And

6    several of my friends who are also epidemiologists began

7    studying it, began finding out what the disease was, and one

8    thing led to another and I actually began doing studies for

9    products that would help people, mostly to treat the

09:08:38  10    infections that they were getting from HIV.

11         And that work actually led to an approval of a

12    product by FDA, old product, and led to my being asked to be

13    on advisory committees for antiviral drugs.

14         And when a position opened in 1991, I applied.  It

09:08:56  15    was a position of being the director of antiviral drugs, which

16    was responsible for all the AIDS products and herpes and

17    influenza and fungal infections and a lot of other things.

18    And they offered me the position and I took that.  And my

19    wife -- I followed my wife to San Diego, she followed me to

09:09:17  20    Washington, went to the National Cancer Institute, and I spent

21    the next 12 years in FDA.  First five years in center for

22    drugs, where probably the drugs that were the cornerstone of

23    HIV therapy were first approved during that -- in that era.

24         So it was a very exciting time.  And then I worked in

09:09:34  25    the Center for Biologics, blood, vaccines, those types of

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:09:38  1    products.

2         And for the last five years I was at FDA, I was the

3    director of the Center for Devices and Radiological Health.

4    So that was a group of about 1200 people, 1200 staff, with

09:09:48  5    research laboratories and product approval responsibilities

6    and monitoring responsibilities.

7         So that was a period from 1992 to 2004.

8    Q    You mentioned the Center for Devices and Radiological

9    Health.  What is the role of the Center for Devices and

09:10:04 10    Radiological Health within the FDA?

11    A    Well, there's three centers that deal with products for

12    human medicine:  Drugs, Biologics, and Devices.  So Devices

13    has -- has the equipment, the implants, the X-ray machines,

14    the MRI machines, the hospital supplies, and a wide, wide

09:10:24 15    range of different types of products.  And then it's also

16    combined with a radiological health program, which is

17    responsible for the safety of not just medical products, but

18    consumer products that emit radiation, like cell phones, which

19    use microwaves, microwave ovens, theft detection devices.  So

09:10:44 20    very broad range of products.

21    Q    In addition to your medical practice and your work at the

22    FDA, have you also lectured or presented lectures to

23    professional organizations on topics involving medical

24    devices?

09:10:56 25    A    I have.  I have done quite a bit of lecturing.  FDA does

DIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:11:00   1   quite a bit of outreach, and so I spoke at universities, trade

        2   associations, before governmental bodies.  I was on

        3   governmental panels and commissions.

        4           And then since leaving FDA, I've continued to speak.

09:11:13   5   And then I teach -- in fact, when we -- when I left FDA, this

        6   time I followed my wife, who got a job at TGen, couple blocks

        7   from here, Translational Genomics Institute, and I started as

        8   a volunteer teacher at Arizona State University.

        9   Q   And are you still a part-time resident of Arizona?

09:11:33  10   A   I am.  We have a house down in Ahwatukee, which nobody

       11   outside of Phoenix knows where that is.  But south side of

       12   town.  We spend about a third of our time here.

       13   Q   And as a physician and epidemiologist, have you conducted

       14   medical research studies yourself?

09:11:52  15   A   Yes, I have.  I've been principal investigator on a large

       16   number of studies, coinvestigator on hundreds.  Have, at FDA,

       17   looked at the design of studies both before approval and after

       18   approval.  And I'm part of a consulting group that works with

       19   small startup companies and help them design their studies.

09:12:15  20   So I've been doing clinical trials and other types of studies

       21   of therapeutic products for 35 years.

       22   Q   Have the results of your research and studies been

       23   published?

       24   A   Yes.  When I went into FDA, I stopped doing original

09:12:31  25   research, but up to that time there were about 50 or 60

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:12:36   1   publications in the peer-review literature.  Many of those --

       2   most of those were epidemiologic studies.  And since that time

       3   I've also had some publications, but they've been more -- they

       4   haven't been related to studies, they've been more

09:12:49   5   commentaries and editorials.

       6   Q   In your professional career, in addition to publishing,

       7   have you had responsibility for evaluating studies of adverse

       8   events associated with drugs or medical devices?

       9   A   Yes.  Actually, the first presentation I ever made at a

09:13:05  10   professional meeting was an FDA organized meeting, it was on

      11   safety of blood pressure medicines in the elderly and whether

      12   or not they had more side effects than younger people.  Turns

      13   out they do, but they take their medicines better than younger

      14   people.

09:13:19  15       But that was -- my involvement with studies of safety

      16   and side effects goes all the way back to the start of my

      17   career.

      18   Q   In this case you were retained by my law firm to consult

      19   and provide an expert opinion; right?

09:13:33  20   A   Yes, that's right.

      21   Q   What were you asked to do?

      22   A   Well, the issue came up, and this started back in late

      23   2010, about what was the state of knowledge in the medical

      24   literature of -- about the known complications and safety

09:13:48  25   issues and the benefits of inferior vena cava filters.

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:13:52  1    Specifically the Bard family of filters.  So they asked me if

2    I would just do a systematic analysis of all of the studies.

3    What do they show, what do physicians and others know from

4    reading the medical literature.

09:14:05  5    Q    So to break that down a little bit, you were asked to go

6    back and review an extensive amount of medical literature?

7    That was step one?

8    A    That's correct.  There's about 2,000 papers on inferior

9    vena cava filters of various kinds, and a small fraction of

09:14:20 10    those are actual studies.  But there's quite a bit published

11    about them.

12    Q    Okay.  And have you formed an expert opinion as an

13    epidemiologist based on your review of medical literature?

14    A    I have.

09:14:36 15    Q    Okay.  And are those opinions that you had formed, formed

16    to a reasonable degree of scientific certainty as a medical

17    doctor and an epidemiologist?

18    A    Yes, they are.

19    Q    Okay.  Before we start talking about your studies, in your

09:14:47 20    medical practice have you ever implanted an IVC filter?

21    A    No, I've not.  Actually, one of my research areas of

22    interest was pulmonary emboli, and I had patients that I

23    referred to others to implant those.  In those days it was the

24    Greenfield filter.  So, but -- so I have experience in

09:15:04 25    considering the risks and benefits and recommending the use in

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:15:08  1   certain patients.  But it was back in the 1990s, so quite a

2   time ago.

3   Q   Does your lack of experience in actually implanting or

4   retrieving a filter inhibit your ability to evaluate the

09:15:21  5   sufficiency of the information in the medical literature you

6   reviewed?

7   A   No, not at all.

8   Q   And the purpose of the review of that medical literature

9   was what?

09:15:32  10   A   Well, one of the questions was whether or not there is --

11   there are the type of studies you can actually be very

12   quantitative about exactly what the risks for certain types of

13   problems that are common to almost all filters, such as

14   migration or fracture.  And there has been quite a good deal

09:15:53  15   written about that.

16         But the devil is in the details in terms of the

17   methodology about whether you can be quantitative about it or

18   whether or not you simply have a collection of studies that

19   describe these things but don't really -- don't really give

09:16:05  20   you a ballpark understanding of how often they occur.

21   Q   We've talked about you were retained by my law firm.  And

22   are you being compensated for the time that you spent

23   evaluating the studies to determine whether a rate could be

24   determined?

09:16:20  25   A   Yes, I am.

DIRECT EXAMINATION — DAVID W. FEIGAL, JR., M.D.

09:16:21  1   Q   And how much do you charge per hour?

2   A   I charge $650 per hour.

3   Q   And does your rate change whether you're researching and

4   reviewing medical literature or whether you're here today

09:16:30  5   testifying?

6   A   No.

7   Q   Okay.  And you talked about that you have been doing this

8   analysis of medical literature for quite a while.  How much

9   have you billed in connection with this long-term study of

09:16:43  10  medical literature of IVC filters?

11  A   I think I first invoiced for work relating to this in

12  2011, and since then, you know, estimating through charges for

13  today, approximately $230,000.

14  Q   Let's talk about some of the types of medical literature

09:17:04  15  that you reviewed in doing your work.  Can you tell us

16  generally what it was and the body of materials you looked at.

17  A   Sure.

18      Well, as you might imagine, some studies are better

19  than others.  And so epidemiologists and even clinicians think

09:17:20  20  of them as a kind of a hierarchy.  There's certain things you

21  look for first.

22      So the first thing you look for is to see did anybody

23  ever do a randomized control trial.  Anybody ever recruit a

24  bunch of patients and say, we can either put in a Bard filter

09:17:34  25  or we could treat you with drugs or we can treat with you

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:17:36  1    nothing.  Did anybody ever do a randomized study like that.

2              So I looked for randomized control trials, and there

3    aren't any.

4              And then, after that, we have observational studies.

09:17:48  5    And some of those are very well organized and they follow

6    patients from the time of an implant and systematically

7    evaluate the implant by doing X-rays and follow-up exams.  And

8    sometimes it's just one implant, sometimes they may be

9    comparing two implants, and those are typically called cohort

09:18:10  10   studies; you're following these two cohorts along and seeing

11   what happens.

12             Then there's case series where you have a bunch of

13   cases but you're not really sure where they relate to.  There

14   are case reports, which are just single one-off reports of

09:18:26  15   someone saying this is what happened.  Those are often the

16   unusual things.

17             And then there are people trying this

18   retrospectively.  They'll say, well, let's take all the

19   patients who came in to have their filters removed and see

09:18:39  20   what's going on with their filters.  And so there's studies

21   like that.

22             So there's different types of studies.  You learn

23   different things from them.  But there are very few studies

24   that actually were designed to actually find out what

09:18:52  25   proportion of patients developed certain complications,

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:18:54  1   because they didn't have the whole population.  Those are best

2   done if you start at the beginning and go forward.  And there

3   aren't very many of those.

4   Q   Okay.  You've talked about a variety of types of studies,

09:19:04  5   and you mentioned a randomized control trial.  Would you --

6   for reliability purposes to determine reliable rates for

7   adverse events, how would you describe the randomized control

8   trial?

9   A   That is the gold standard because you start with a group

09:19:23  10  of people, and then you let a computer do it.  You basically

11  flip a coin, so you don't know who is going to what group.  So

12  by the time you have groups of any size, they're really very

13  similar.

14       And then the only thing that differs is one thing,

09:19:37  15  the intervention.  And then you follow that over time.  So

16  because of that, you can actually very reliably make a direct

17  comparison between those in the patients that are studied.

18  Q   In your review of the medical literature for IVC filters

19  dating back to 2010, when you started your review, but in your

09:19:57  20  review of the medical literature, has there ever been a

21  randomized control trial for any IVC filter?

22  A   No.  There has not been.  And it's in part because usually

23  if someone needs a filter it's because they can't take drugs.

24  So you can't say, well, we're going to give you drugs anyway.

09:20:17  25       MR. LOPEZ:  Objection.  First of all, beyond the

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:20:18  1   scope of the question, and I don't think what he's talking

2   about now is in his report.

3        THE COURT:  Well, you said beyond the scope of the

4   question.  Did you mean --

09:20:26  5        MR. LOPEZ:  It was beyond the scope of the question.

6        THE COURT:  The question?  You don't have that

7   objection.  The questioner does.

8        MR. LOPEZ:  I'm sorry, Your Honor?

9        THE COURT:  You said beyond the scope of the

09:20:35 10   question.

11        MR. LOPEZ:  In other words, she asked a question --

12        THE COURT:  You can't make that objection.  Only the

13   questioner has that objection.  So overruled.

14        MR. LOPEZ:  I'm objecting that his answer went beyond

09:20:48 15   the scope of the question, number one.

16        THE COURT:  Okay.  That's overruled.

17        MR. LOPEZ:  Not in his report that he's about to talk

18   about right now.

19        THE COURT:  All right.  That's a relevant objection.

09:20:57 20        MS. HELM:  Your Honor, I would refer the Court to his

21   prior testimony, page 1951, lines 8 to 15.

22        THE COURT:  I don't have any copy of that.

23        MS. HELM:  Yes, you do -- I'm sorry, Your Honor.

24        THE COURT:  Not at page 1951.  It starts on page 67

09:21:20 25   and goes to page 93.

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:21:23   1          MS. HELM:  Your Honor, it's on page 85, page number

        2   at the bottom, and then midway through the page it says 1951

        3   on the right.

        4          THE COURT:  All right.

09:21:40   5          MR. LOPEZ:  I'm sorry, Counsel, what line?

        6          THE COURT:  Page 85, Mr. Lopez, bottom half.

        7          MR. LOPEZ:  I'm at 1951.

        8          MS. HELM:  Lines 8 through 15.

        9          THE COURT:  Would you show Mr. Lopez where it is,

09:21:56  10   please.

       11          MS. HELM:  Sure.

       12          MR. LOPEZ:  You said 1951; right?

       13          THE COURT:  Mr. Lopez, do you stand on that

       14   objection?

09:22:24  15          MR. LOPEZ:  Again, Your Honor, it wasn't in his

       16   report, so, yes, I do.

       17          THE COURT:  All right.

       18          Where is it in the report, Ms. Helm?

       19          MS. HELM:  Section 2, page 4.  Under the category A,

09:22:42  20   Study Design and Reliability of Evidence, and then Randomized

       21   Control Trials.

       22          THE COURT:  Okay.  Give me just a minute.

       23          I see where he says it hasn't been done, but I don't

       24   see an explanation as to why.  Is that on page 4 somewhere

09:23:18  25   or --

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:23:19  1        MS. HELM:  It carries onto page 5 and carries on in

2    his testimony, in his prior testimony as well, Your Honor.

3        THE COURT:  Right.  But I think the fact that it was

4    in previous testimony, if it's not in the report, isn't

09:23:31  5    sufficient, so I'm going to sustain the objection.

6        MS. HELM:  Okay.

7    BY MS. HELM:

8    Q   Dr. Feigal, you talked about randomized control trials,

9    and then you also talked about different types of trials,

09:23:50 10    prospective cohort studies, case studies, and retrospective

11    studies.  Can you calculate from those types of studies

12    accurate rates of adverse events?

13    A   You would from the prospective cohort studies if you had

14    planned examinations.  You can't tell if something's gone on

09:24:12 15    in this filter unless you get an X-ray of some kind, CT scan

16    or something else.

17        And so most of the studies actually did not have

18    planned follow-up after the implants.  So you don't really

19    have accurate rates.  So if the studies had been done you

09:24:27 20    could do that.

21        And there are a couple of examples of prospective

22    studies with good follow-up with everybody and planned X-rays.

23    But there are very few of those.

24    Q   And are there any of those from which you could calculate

09:24:41 25    accurate rates of adverse events for IVC filters?

DIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:24:46  1   A    No, because typically -- the ones with respect to Bard,

2   they're about a single filter, and they've been relatively

3   short term.  Say, for example, six months.  And there's been

4   very few adverse events during that time period, so you really

09:25:02  5   can't calculate rates from what happens after six months.  You

6   know during six months, not very much happens.

7   Q    What do you need to be able to calculate rates?

8   A    You need to have complete follow-up of everybody.  Because

9   if you start losing people, and there are some studies that

09:25:17 10   have lost as many as 85 or 90 percent of the patients who were

11   implanted, you don't know what happened to those people.  So

12   you need complete follow-up, and you need planned

13   measurements, the same in everybody, that occur so that you

14   can actually look for whether there's been a fracture or a

09:25:34 15   migration.

16   Q    And in the 2,000 articles and the approximately 100

17   relevant studies that you have reviewed, have you been able --

18   have you seen that?  Have you been able to find a controlled

19   group and accurately calculate rates of adverse events of IVC

09:25:52 20   filters?

21   A    No.  There isn't any study that's actually been designed

22   to do that.

23   Q    Okay.  Now, the jury has heard about a published study

24   known as the Nicholson study that discussed adverse events of

09:26:03 25   Bard filters.  Are you familiar with that study?

DIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:26:07  1    A    Yes, I am.

2    Q    And is that one of the studies in the medical literature

3    you examined as a part of your investigation in this matter?

4    A    I did.

09:26:12  5    Q    What was that study about?

6    A    What Dr. Nicholson did was that after he had seen a

7    patient who had an unusual complication, he called back

8    patients who had had implants at a hospital in Pennsylvania,

9    York Hospital.  And then he used fluoroscopy, a type of X-ray

09:26:28 10    that's available in the cardiology suite, to look to see what

11    the status of the filters were.

12    Q    And do you agree that that study can accurately analyze

13    adverse event rates for Bard filters?

14    A    No.  There's -- there's a large number of problems with

09:26:44 15    that study.  And actually we have quite a bit of detail about

16    that study because during discovery he was deposed and study

17    records are available.

18    Q    And what were the problems with the study?

19    A    Well, the first problem is that -- particularly, if you

09:27:00 20    look at the study as published, it isn't what it says it was.

21    He said he had all implantations at York Hospital over about a

22    four-and-a-half-year span.  Well, in fact, he only had maybe a

23    third of those.

24         And to make matters worse, he included patients who

09:27:19 25    were not part of the group he said that should have been

DIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:27:23  1   included, which increased the numbers.

2        He also excluded patients who had had their filters

3   removed who had no fractures or problems.  He should have

4   counted those as part of the group that had no fractures.

09:27:36  5        And he only pursued patients who had their implants

6   done in certain parts of the hospital, and not others.

7        And then in the paper he said, well, the strength of

8   the study was that there's so many different people putting in

9   filters.  But it turned out of the 13 fractures that he

09:27:53 10   reported, fractures and migrations, ten of them were implanted

11   by a single surgeon.  So what he really had was a study that

12   showed that they had a surgeon who probably has the highest

13   rate of complications ever performed.  He said, well, he

14   thought it was not -- he thought the strength of the study was

09:28:15 15   there were so many different people implanting this.  But, in

16   fact, if you take --

17        MR. LOPEZ:  Your Honor, I'm going to object.  This is

18   not in his report, and he's also testifying on hearsay right

19   now.

09:28:31 20        MS. HELM:  Your Honor, he discusses the Nicholson

21   study at length in pages 11 through 16 of his report.  And

22   discusses the -- his criticisms of the report specifically on

23   page 13.  In the paragraphs -- it starts on page 12 about

24   limitations to the fact a single physician was associated with

09:29:00 25   ten of the 13.

DIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:29:01   1            THE COURT:  Right.  I see that.

        2            MR. LOPEZ:  My objection is he's quoting

        3   Dr. Nicholson.  That is hearsay.

        4            THE COURT:  Well, that was your second objection.

09:29:10   5            MR. LOPEZ:  Right.

        6            THE COURT:  The first is overruled because it's in

        7   the report.

        8            What is your response --

        9            MR. LOPEZ:  That was the part -- well, I know the

09:29:15  10   Nicholson study is in the report.  It's the part that he's

       11   talking about Dr. Nicholson said that's not in his report.

       12            THE COURT:  Well, that wording isn't.  But clearly

       13   the same point is in the report, so I'm overruling what was

       14   nondisclosure.

09:29:31  15            What is your response on hearsay?

       16            MS. HELM:  Your Honor, the Nicholson article has been

       17   admitted into evidence, and I believe Dr. Feigal can testify

       18   about what Dr. Nicholson reported in the article, and that's

       19   what he's doing.

09:29:43  20            THE COURT:  Well, he can read from the article under

       21   803(18), but that doesn't allow him to bring in other hearsay

       22   from Dr. Nicholson.

       23            MS. HELM:  We'll move on, Your Honor.

       24            THE COURT:  All right.  The objection is sustained.

       25

DIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:29:54  1    BY MS. HELM:

      2    Q    In your opinion, can the Nicholson study be relied upon

      3    for scientifically reliable data of adverse events in IVC

      4    filters?

09:30:02  5    A    No, it can't.  And Dr. Nicholson published a correction to

      6    his paper where he pointed out that only three of the

      7    fractures had been implanted by a surgeon other than the

      8    single surgeon who had the very high rate of complications.

      9    Q    Is the Nicholson article still being cited today?

09:30:21  10   A    Unfortunately, it is.  Unfortunately, it is.  Not all of

      11   the limitations of the study were actually brought out in

      12   Dr. Nicholson's correction.

      13   Q    Okay.  And you would agree that there are studies that

      14   show there have been adverse events in IVC filters, would you

09:30:39  15   not?

      16   A    Oh, yes.  There's one study that cited migration and

      17   fracture in 17 different models of filters, including one -- I

      18   think, as I recall, nine of which had come from Bard filters.

      19   But of the 100 fractures there were 17 different models

09:30:59  20   involved.

      21   Q    But, again, did you find any studies that met all of the

      22   requirements that are necessary to determine an accurate rate

      23   of adverse events of IVC filters?

      24   A    No.  What the literature establishes is that these are

09:31:11  25   known risks of -- we can tell they're low frequency of events

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:31:17  1   and that they occur across all the models, virtually on models

2   of all of the filters.

3   Q   I want to narrow my question down.  Did you find any

4   studies that met the requirements that are necessary to

09:31:27  5   determine an accurate rate for adverse events for Bard IVC

6   filters?

7   A   No.

8   Q   And let me narrow it down a little further.  Did you find

9   any studies that meet the requirements that are necessary to

09:31:40  10  determine an accurate rate for adverse events in the Bard

11  Eclipse filter?

12  A   No.

13              MS. HELM:  No further questions.

14              THE COURT:  Cross-examination?

09:31:52  15              MR. LOPEZ:  Thank you, Your Honor.

16                  C R O S S - E X A M I N A T I O N

17  BY MR. LOPEZ:

18  Q   Morning, Dr. Feigal.

19  A   Good morning.

09:32:11  20  Q   I just want to make sure this is clear.  In 2010 you said

21  you did a systematic study of the medical literature.  You did

22  that on behalf of lawyers that have hired you to do that;

23  correct?

24  A   Yes.  That's the reason I did it.

09:32:24  25  Q   So it wasn't Bard that came to you and said we have a

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:32:27  1   problem that we're looking into, we'd like to hire you to look

2   at the medical literature for us to more fully understand

3   what's going on with our product?  It was lawyers that hired

4   you to do that; correct?

09:32:37  5   A   That's correct.  That was where I was retained by lawyers

6   for Bard.

7   Q   You said for the past 20 years -- let me ask you, for the

8   past 20 years have you treated patients?

9   A   I stopped seeing patients in 1992.  So that's the last

09:32:56 10   time I saw a patient.

11   Q   All right.  And so have you ever evaluated a patient to

12   determine whether or not a patient was a candidate for an IVC

13   filter?

14   A   Not since 1992.  Before that, yes.

09:33:08 15   Q   Have you ever looked at the MAUDE database or the medical

16   literature to determine whether or not, if you were going to

17   prescribe or recommend a Bard filter, which filter had the

18   safest profile?

19   A   I'm very familiar with the MAUDE database, but that's not

09:33:25 20   a database that would tell you which product is safe.  It

21   tells you which products had reports.  But, no, I wouldn't use

22   the database for that purpose.

23   Q   Do you know that there's evidence in this case that many

24   doctors that were using Bard filters, by looking at data in

09:33:38 25   the MAUDE database, decided not to use the product anymore for

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:33:42  1    concern about safety?

2    A    I don't know one way or the other about that.

3    Q    Do you know that there's evidence in this case where

4    hospitals took Bard filters off their formulary after seeing

09:33:53  5    single reports of complications with Bard filters because of

6    the seriousness of the complaints?

7    A    Again, I have no knowledge about what the hospitals did

8    with the use of which filters.

9    Q    Now, when you left FDA in 2004, did -- your first new

09:34:13  10   venture was doing litigation expert witness work?  Is that

11   true?

12   A    No.  I joined a group called NDA Partners, which I'm still

13   a partner in.  We're a group of 130 consulting experts.  We

14   work with any given time over 100 companies, usually startups

09:34:34  15   developing medical products.

16   Q    Okay.  Now, in 2014, when you testified under oath

17   regarding Bard filters, you said that 40 percent of your

18   income was derived from litigation.  Is that still the

19   percentage?  Is it higher or lower than that now?

09:34:54  20   A    That was correct for 2014, where there was an unusual drug

21   case that had ten trials in one year.  But year in, year out,

22   my average percentage of my income from litigation is

23   25 percent of my income.

24   Q    And as of at least 2014, 95 percent of the time when you

09:35:10  25   were asked to be an expert in a pharmaceutical or drug device

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:35:17 1   case, it was on behalf of a manufacturer.  True?

2   A   It was true at that time.  Actually, I've had more

3   plaintiffs' work since that time and have done depositions for

4   plaintiffs, attorneys representing plaintiffs.

09:35:30 5   Q   In medical device cases?

6   A   Yes, in medical device cases.

7   Q   What other medical device case?

8   A   I've offered testimony in a case involving surgical

9   equipment called a morcellator on behalf of attorneys for the

09:35:42 10  plaintiffs of a patient who died from complications.

11  Q   Now, sir, again, this is going back to 2014, because you

12  and I haven't spoken since then.  True?

13  A   That's correct.

14  Q   And you had 15 to 20 appearances on behalf of medical

09:35:57 15  device companies as of that date where you were an expert

16  witness defending them.  True?

17  A   Well, not actually asked to defend them.  I'm actually

18  asked to provide expert opinions typically about epidemiology

19  or sometimes other topics.  But, as you pointed out, the

09:36:11 20  majority of the people who have asked me to testify have been

21  manufacturers.

22  Q   Okay.  And, again, this is in 2014, you were an expert on

23  behalf of a company called Roche, who manufactured and sold a

24  drug called Accutane that caused birth defects.  True?

09:36:32 25  A   Yes.  But I was not retained for cases for birth defects.

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:36:36  1    Q    And as of 2014 you had made approximately $250,000

2    defending Roche; right?

3    A    Not defending Roche, but offering testimony on the risk,

4    and in this case it was an inflammatory bowel disease

09:36:47  5    associated with Accutane, the acne medication.

6    Q    Can you give us your best estimate, sir, over the last

7    number of years you've been doing expert witness work, that

8    you've made in working for either drug or medical device

9    companies?

09:37:07  10   A    You know, I don't have an exact figure, but I would say

11   approximately 25 percent of my income comes from work relating

12   to litigation.  The majority of that is for manufacturers.

13   And my average income over the last ten, 15 years has been

14   about $600,000 per year.  So about a quarter of that since

09:37:24  15   2004.

16   Q    So I can't do that math, but it sounds like somewhere

17   between 2.5- and $3 million?

18   A    I'm not sure I can do the math either, but that --

19   Q    That sounds about right?

09:37:34  20   A    That sounds about right.

21   Q    Now, do you know Susan Alpert?

22   A    I do.

23   Q    And you know Susan Alpert left FDA and went to work for

24   Bard?

09:37:43  25   A    She did, yes.

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:37:44   1   Q   And she was the medical director of Safety and then the

2   Office of Device Evaluation at FDA?

3   A   She was.  That's the same position that Donna-Bea Tillman

4   held, yes.

09:37:56   5   Q   And when she went to work for Bard, do you know what role

6   she played in assisting Bard to get clearance of their first

7   retrievable IVC filter?

8   A   I don't.  No.

9   Q   Do you know Donna-Bea Tillman?

09:38:07  10   A   Yes.

11   Q   And was she at FDA when you were there?

12   A   Yes.  She reported to me or reported to me through another

13   person.

14   Q   And you know that Donna-Bea Tillman is -- signature

09:38:16  15   appears on one of the clearance letters that we're talking

16   about in this case.

17   A   I haven't seen that letter, but that wouldn't surprise me.

18   Q   Now, if you're going to get data to see if your device is

19   actually performing safely and effectively, instead of just

09:38:31  20   waiting for reports to come in that might or might not come in

21   from the real world, from voluntary reporting, I think you

22   listed a number of things that a company could have done.  For

23   example, you mentioned that there were two trials that the

24   company had done but they -- after a certain period of time

09:38:50  25   they decided they weren't going to follow those patients to

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:38:53  1    see how they did with those devices still in them over time.

2              Do you remember saying that?

3              MS. HELM:  Your Honor, I object.  It exceeds the

4    scope of the direct.

09:39:01  5            THE COURT:  Hold on just a minute.

6              I think you need to reask the question, if you would,

7    please, Mr. Lopez.

8              MR. LOPEZ:  All right.

9    BY MR. LOPEZ:

09:39:27 10    Q   I wrote this down.  You said most studies as they relate

11   to Bard filters did not have planned follow-up with planned

12   X-rays.  Do you recall that?

13   A   Yes.  I mean that's not -- that's true not only of the

14   Bard studies, but it's -- it's -- most of the -- most of the

09:39:42 15   medical literature did not ask patients to come in and get

16   follow-up X-rays.

17   Q   I'm just going to talk about the two Bard studies.  There

18   was the Asch study where they got certain data regarding risks

19   and complications, but Bard did not follow patients beyond a

09:40:00 20   certain time period to see how those patients were going to do

21   from the standpoint of complications after they were released

22   from the study.  True?

23   A   Well, that's --

24   Q   Is that true?

09:40:11 25   A   That is correct.

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:40:11  1    Q   Okay.  And the same with the Eclipse study.  After 180

2    days there were a number of patients who continued to have the

3    device and Bard decided not to do planned follow-up with

4    planned X-rays to see how the device was going to perform

09:40:25  5    after six months.  True?

6            MS. HELM:  Your Honor, I do object and ask Mr. Lopez

7    to correct the record.  He referred to an Eclipse study.

8            MR. LOPEZ:  I'm sorry.  You're right.  I did.  Thank

9    you.  I should have been saying EVEREST study.  I do that all

09:40:40  10   the time, by the way.  I mix those two up.  Let me start over.

11   BY MR. LOPEZ:

12   Q   The EVEREST study then involved the G2 did not have

13   planned follow-up with planned X-rays for patients beyond 180

14   days.  True?

09:40:52  15   A   That's correct.  It was a retrievability study, so they

16   went to the time when they were going to retrieve them and

17   they retrieved a large number of them, and that was what the

18   study was planned to do.

19   Q   Now, unfortunately, based on what you just testified to,

09:41:04  20   the best data that we have regarding the safe performance or

21   the potential risk of this device is the route that Bard

22   shows, and that is let's see what happens in the open

23   marketplace and hope that physicians report complications to

24   us.  True?

09:41:23  25   A   That was part, but not all.  Because there also was an

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:41:26   1    extensive medical literature which is separate and above and

        2    beyond the reports to the company.

        3    Q    Okay.  So in addition to waiting to see if doctors report

        4    to Bard that they may have a complication that they're

09:41:41   5    concerned about, Bard decided let's waited and see if someone

        6    like Dr. Nicholson wakes up five years later, decides to do a

        7    retrospective study to see if there are problems with

        8    fractures and what happens when patients have fractures.

        9    That's the other thing that Bard decided to do?

09:41:57  10    A    I have no information about Bard and what they decided to

       11    do.

       12    Q    Yeah, but you just said that or they can wait for medical

       13    literature, I think, they can see what's in the medical

       14    literature; right?

09:42:06  15    A    They didn't need to wait.  The medical literature has been

       16    developing on inferior vena cavas ever since the Greenfield

       17    filter, so this is on ongoing area.  And you have the

       18    professional societies offering guidance and commentary, so

       19    it's an area where there is very active discussion of the

09:42:22  20    risks and benefits of these products --

       21    Q    But do you understand this is about Bard products.  It's

       22    not about just generically IVC filter products.  We're talking

       23    about the performance of Bard products that are on the market.

       24    You understand that?

09:42:34  25    A    Yes.

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:42:35  1    Q   And the truth is Bard never sponsored someone like

2    Dr. Nicholson or Dr. Vijay, whose article we saw:  Why don't

3    you take a look at your hospital records going back four, five

4    years, and see how much fractures we have.  They didn't do

09:42:48  5    that, did they?

6    A   Um --

7    Q   Did they do that?

8    A   Bard -- I don't know what -- I do not have -- I have not

9    reviewed Bard documents.

09:42:56 10    Q   And, sir, I'd like --

11    A   But Bard did not sponsor those studies.

12    Q   And so I think one thing we can agree you on, you can't

13    use adverse events to determine rates and you can't use

14    medical literature to determine rates.  True?

09:43:07 15    A   You can't use this medical literature and you cannot use

16    adverse events, yes.  I would agree with you.

17    Q   Would you agree with me that it would be false and

18    misleading if a company or anyone speaking on behalf of -- on

19    its behalf were to use AER data to affirmatively state that

09:43:24 20    our failure or complication rates are X?

21    A   I would have to see the specific.  I -- it would depend on

22    what they said and what that's based on.  I can't answer that

23    as a hypothetical.

24    Q   Well, let's just say they said that our failure rate is

09:43:40 25    less than 1 percent, and they based that -- and they want the

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:43:42  1   world to believe that is their failure rate, and that is based

2   on adverse event reporting.  That would be false and

3   misleading to suggest that is their failure rate.  True?

4   A   Not necessarily.

09:43:52  5   Q   Would that be false and misleading?  Yes or no?

6   A   Not necessarily.

7   Q   Okay.  Now, one of the primary reasons companies cannot

8   use adverse events to state this is our failure or

9   complication rate is because you don't know whether there were

09:44:04  10  ten or 100 times that this same event happened in other

11  patients where it was not reported.  True?

12  A   That's correct.

13  Q   And what a response -- what an ethical company should do

14  in the interest of patient safety is assume you might be just

09:44:20  15  seeing the tip of the iceberg when you get these reports;

16  right?

17  A   No, I don't think they should do that either.  They

18  should --

19  Q   Okay.  All right.  Then, in a situation where there is

09:44:28  20  underreporting, we have, number one, where doctors find out

21  there is a problem and they choose not to report it, right,

22  because they don't have to?

23  A   That's correct.

24  Q   And, but, in a situation where you have a number of

09:44:38  25  patients where doctors don't know because the patient doesn't

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:44:41  1    know that they actually have this problem, that's another

2    thing that contributes to underreporting.  True?

3  A    That's correct.

4  Q    In other words, if it's known that these devices could

09:44:54  5    actually break and they actually could embolize to a distant

6    organ, but a patient doesn't know about it, he's not going to

7    report it to his or her doctor; correct?

8  A    That's correct.

9  Q    And that's another reason why there might be significant

09:45:06 10    underreporting of adverse events as they relate to a filter

11    like Bard's.  True?

12  A    That's right.  Because there's no adverse events.

13  Q    Were you aware that Bard's medical director,

14    Dr. Ciavarella, testified that they are likely getting only 1

09:45:24 15    to 5 percent of what is really happening in the open

16    marketplace?

17  A    I haven't seen his testimony.

18  Q    Okay.  Now, again, assuming you have -- listen to this

19    question, please, very carefully.  If you've sold 100 Bard

09:45:32 20    filters -- this is a hypothetical -- and among those 100 you

21    get one report of a serious injury or death, do you follow me

22    so far?

23          Sir?

24  A    Yes.

09:45:41 25  Q    And wouldn't it be misleading for someone to say that the

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:45:44  1    unreported cases are evidence of a 99 percent success rate?

2    Yes or no?

3    A    Well, I can't answer that yes or no.

4    Q    Well, you --

09:45:53  5         MR. LOPEZ:  Can I have his testimony, Gay, please,

6    from 2014, page 80, lines 3 to 17.

7    BY MR. LOPEZ:

8    Q    Sir, you remember you gave sworn testimony in 2014?

9         See that?

09:46:16 10   A    Yes.

11   Q    And the question was that:  "We don't know anything else

12   about the other 99.  Nothing.  We don't know whether the

13   device has ever been challenged by a clot, we don't know

14   whether the doctors put it in for a short time and it's been

09:46:28 15   taken out, we don't know whether it's moved up or down a

16   centimeter or whether there's a fracture.  We know nothing

17   about the other 99.  Do you follow me so far?"

18        "Answer:  Yes."

19        "Do you think it would be a little misleading if

09:46:41 20   someone were to say that the other -- that the data proves

21   that 99 percent of the time our device does not migrate?"

22        "I think if that was the data based on reports I

23   think -- that would be misleading."

24        You testified to that in 2014, sir?

09:46:57 25   A    That's a different question than you asked me, but yes, I

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:47:00  1  stand by that testimony.

2  Q   You have stated in prior sworn testimony that adverse

3  event data is not a data source that predicts rates of success

4  any better than it predicts rates of complications.   True?

09:47:13  5  A   You cannot get rates either for success or failure, with

6  the exception of deaths, where there is mandatory reporting

7  from health facilities.

8  Q   And -- I'm sorry.

9  A   With a death there is mandatory reporting to FDA from

09:47:26 10  health facilities, and they lose their accreditation if they

11  don't report those.  So there is good data on deaths.  But the

12  rest of it, you're quite right, it's voluntary.

13  Q   And isn't the bottom line that there are defects in using

14  MAUDE data and there are defects in reports in the medical

09:47:40 15  literature data?

16  A   I don't know what you mean by defects.

17  Q   In other words, you can't really know what the rate is by

18  looking at either one; right?

19  A   Well, you could -- not from MAUDE, but from literature,

09:47:49 20  you could hear or you can put some bounds on it from what's

21  been reported.  But there haven't been studies done that get

22  the rates.  That's what I testified to.

23  Q   And you should not be making representations about rates

24  of complications comparing AER data with medical literature

09:48:04 25  data.  Do you agree with that?

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:48:06   1   A    Depends on the representation.  I'd have to see what

           2   you're talking about to be able to answer that question.

           3   Q    In other words, Bard says, well, our complication rate is

           4   less than 1 percent, and they're basing that on adverse event

09:48:19   5   data, and then they're taking a piece of medical literature

           6   that says that the rate is 2 percent or -- or also less than

           7   1 percent.  You can't do that; right?  And say that these two

           8   things are comparable because you compared one to the other?

           9   A    Well, I think you've asked me several questions there.

09:48:37  10   Q    I'm running -- I just got a note that I need to hurry.

          11               Question:  The reason you look for a safety signal is

          12   once it's on the market, especially if there's no long-term

          13   clinical trials for safety is to find out whether or not

          14   something unexpected and unintended is happening with your

09:48:55  15   product so you can take steps to protect people from those

          16   risks.  True?

          17   A    Yes.

          18   Q    And AERs give the company the first hint that they may

          19   have a design issue with their product.  True?

09:49:06  20   A    Sometimes, but not always.

          21   Q    Well, sir, I can show you the testimony.  You just gave me

          22   a yes last time.  Is that a true statement?

          23   A    It's often true, yes.  Not always, but yes.

          24   Q    And haven't you made public statements that, quote, there

09:49:17  25   are times a single case can identify a design issue?

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:49:21  1  A    Yes.  If it's something novel that hasn't been seen

        2  before.

        3  Q    Okay.  Now -- so let me ask you, if a single case can do

        4  that, what if you have 13 cases of the same device failure

09:49:31  5  within the first six months of a device being on the market.

        6  Would that be stronger evidence of a design issue than just

        7  one report?

        8          Sir, can you answer that yes or no?

        9  A    No, I can't answer that yes or no.

09:49:44 10  Q    And you were not provided with documentation by Bard or

       11  its lawyers on the adverse events and the company's risk

       12  analysis that concluded the G2 filter posed an unacceptable

       13  risk of serious harm to patients.  True?

       14  A    It's true I did not review the Bard documents.

09:50:01 15          THE COURT:  Excuse me, Mr. Lopez, let him answer.

       16          MR. LOPEZ:  I'm trying, Your Honor.

       17  BY MR. LOPEZ:

       18  Q    Sir, if you could just answer --

       19          THE COURT:  Just let him finish his answer.

09:50:08 20          MR. LOPEZ:  I will.

       21  BY MR. LOPEZ:

       22  Q    And you were not provided with documentation that based on

       23  that analysis that whoever did the analysis -- not whoever did

       24  the analysis but the actual policy of Bard was that they

09:50:19 25  should not launch the product into the open market until they

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:50:22   1   fix the problem.  You weren't given that information; right?

       2   A   I was not asked to review to Bard documents, no.

       3   Q   And you were not advised that that analysis was done based

       4   on the reports they were getting voluntarily from doctors in

09:50:36   5   the first six months the device was in the market.  True?

       6   A   I don't know.

       7   Q   You were not shown Bard internal documents discussing

       8   design deficiencies that explain these early events?

       9   A   No.  It was outside the scope of what I was asked to do.

09:50:51  10   Q   And were you provided with documentation that the medical

      11   director stated that doctors should be using the Simon Nitinol

      12   filter and not the G2 because of the comparative history of

      13   adverse events that were being reported to the company?  Were

      14   you advised of that?

09:51:06  15   A   Again, I didn't review any Bard documents.

      16   Q   Sir, you've written in open medical literature concern

      17   that corporate culture and their financial bottom line

      18   adversely influences companies to not focus on product

      19   performance and patient safety.  True?

09:51:21  20   A   I don't know if that is a direct quote.  That is sometimes

      21   true, but it's generally not true.  It is bad business to not

      22   take care of patient safety.

      23          MR. LOPEZ:  Exhibit 1212 please.

      24   BY MR. LOPEZ:

09:51:30  25   Q   Sir, do you recognize this article?

CROSS-EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:51:34  1  A    Yes.

2  Q    And you wrote this -- you were an author on this article

3  with Dr. Myerburg.   True?

4  A    Yes.

09:51:40  5  Q    2006; correct?

6  A    Yes.

7  Q    And have you written any articles on the subject matter of

8  medical devices or pharmaceuticals since 2006?

9  A    I don't recall.   I may have, but I don't recall.

09:51:56  10  Q    Would you please look at the third page of this exhibit --

11  and, by the way, the title of this is -- and this was

12  published in the New England Journal of Medicine; right?

13  A    That's correct.

14  Q    And it's about the most prestigious journal that exists in

09:52:10  15  maybe the world, but for sure in the United States; right?

16  A    I would think so.   I read five or six publications there.

17  Q    And you wrote this article for other physicians to look at

18  and read and rely upon for purpose of your opinions and your

19  perspective as a former FDA person; right?

09:52:27  20  A    That's correct.   But it was on behalf of a panel that was

21  actually commissioned by Guidant to evaluate a safety problem

22  they had with a pacemaker that occurred one in 25,000

23  patients.

24  Q    And, sir, on page 2311 -- you see where I am?   Middle

09:52:42  25  paragraph, see where it is highlighted?

CROSS-EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:52:46  1        You wrote:  "Voluntary independent review of the

2    level suggested is a notion both foreign and frightening to

3    most corporations, whose perceived need is to protect business

4    interests.  But corporate culture fosters a loyalty to

09:53:05  5    corporate goals that may create unintended bias and distorted

6    perceptions about product performance and patient safety."

7              You wrote that in 2006; right?

8    A   I --

9    Q   Did you write that in 2006?

09:53:19 10    A   I or my co-author.

11    Q   Have you retracted this article since 2006?

12    A   No.

13    Q   And you wrote that after having a perspective of having

14    worked with pharmaceutical and drug companies not only as a

09:53:30 15    officer at FDA, but as a consultant to corporations after you

16    left FDA.  True?

17    A   That's right.  This article was about Guidant Corporation.

18    Q   When a company gets safety signals their focus should be

19    on reducing or eliminating the risk being reported and not on

09:53:48 20    market share or sales goals.  True?

21    A   Yes.  And most companies do that.

22    Q   Dr. Feigal, should the sense of patient safety and public

23    health be different for the American consuming public getting

24    a Bard filter than someone that was in a clinical trial

09:54:03 25    involving the same product?

REDIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:54:06  1   A    No.  I mean, safety's safety.  You're always concerned

2   about that.

3   Q    When a drug or device is new, companies like Bard need to

4   be very cautious once it gets into widespread use.  True?

09:54:17  5   A    Yes, if it's very novel, if it's not related to other

6   products which have experience you can rely on.

7   Q    And when they see things reported they were not expecting,

8   predicting, or representing to FDA and doctors, they need to

9   stop and take whatever steps necessary to avoid future harm to

09:54:32 10   patients.  True?

11   A    Yes, if they saw something that wasn't a feature of the

12   filters, but I don't think that was the case.

13            MR. LOPEZ:  Those are all the questions I have,

14   Your Honor.  Thank you.

09:54:45 15            THE COURT:  All right.  Redirect.

16            MS. HELM:  Yes, Your Honor.

17            R E D I R E C T   E X A M I N A T I O N

18   BY MS. HELM:

19   Q    Dr. Feigal, Mr. Lopez just talked to you a lot about what

09:54:53 20   you were not shown and what did you not know.

21            Would you again tell the ladies and gentlemen of the

22   jury what you were asked to do in this case.

23   A    So what I was asked to do was to assess the state of the

24   medical literature for complications from inferior vena cava

09:55:08 25   filters to assess whether or not things like fracture and

REDIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:55:11  1   migration and embolization were well recognized for all

2   filters, and for Bard filters in particular.  And whether

3   there was any -- any studies of the hundreds or so papers that

4   reported clinical data, direct clinical data, that allowed you

09:55:27  5   to actually calculate a rate so you could be quantitative

6   about that risk, not just know, as has been known about all

7   filters, that they can fracture and that they can embolize and

8   they can migrate.

9   Q   Were you asked to evaluate Bard's internal analysis of

09:55:42  10   adverse events?

11   A   No.  Only in one small part as it related to the MAUDE,

12   since that was in the literature as well.

13   Q   Have you seen Bard's internal analysis of adverse events

14   reported to Bard for any of its filters?

09:55:56  15   A   No, I've not.

16   Q   And you've not been asked to evaluate that because you

17   haven't seen it; right?

18   A   That's -- that's correct.

19   Q   So you were asked a lot of hypothetical questions,

09:56:05  20   shouldn't a company do, shouldn't a company do.  You can't

21   answer those about whether Bard complied with the "shouldn't

22   theys," because you haven't seen their internal analysis or

23   how they reacted to adverse events?

24   A   That's correct.

09:56:19  25   Q   Okay.

REDIRECT EXAMINATION – DAVID W. FEIGAL, JR., M.D.

09:56:22  1      But you would agree that a company should analyze

2  adverse events that are reported to the company?

3  A   Yes, they should.

4  Q   And in this scenario, you just haven't seen appropriate

09:56:36  5  information in the medical literature to calculate rates of

6  adverse events for IVC filters; right?

7  A   That's correct.

8  Q   At the beginning of your testimony, Mr. Lopez asked you

9  about the fact that you serve as a consultant and work in what

09:56:51 10  we call the medical legal field.  Do you remember those

11  questions?

12  A   Yes.

13  Q   Does the fact that you derive part of your income as a

14  consultant in the medicolegal field, did that impact your

09:57:05 15  opinions in this case?

16  A   No.  I mean, I view my role to be an expert that is

17  intended to help the jury understand the technical issues,

18  such as how to evaluate certain different types of studies, in

19  this case, and what you can learn from them and what you

09:57:18 20  can't.

21  Q   Does the fact you serve as a consultant in the medical

22  field, often on behalf of either drug or medical device

23  manufacturers, does that in any way impact your opinion as to

24  whether the medical literature available to doctors, to

09:57:34 25  medical device companies, is sufficient to calculate a rate of

REDIRECT EXAMINATION - DAVID W. FEIGAL, JR., M.D.

09:57:39  1    the risks of adverse events of IVC filters?

2    A    No.

3              MS. HELM:  That's all I have.  Thank you.

4              THE COURT:  All right.

09:57:48  5              Thank you, sir.  You can step down.

6              If you want to stand up, ladies and gentlemen, while

7    we get the next witness in, feel free.

8              We're trying to cool off the courtroom for those of

9    you who feel warm.

09:58:09  10             Sorry, Mr. Rogers.

11             MR. ROGERS:  Your Honor, I was going to inform the

12   Court that we're going to call the next witness for the

13   defense, Dr. Christopher Morris.

14             THE COURT:  All right.

09:58:18  15             THE COURTROOM DEPUTY:  Dr. Morris, if you would

16   please come forward and raise your right hand, sir.

17                       **CHRISTOPHER MORRIS, M.D.,**

18   called as a witness herein, after having been sworn or

19   affirmed, was examined and testified as follows:

20             THE COURTROOM DEPUTY:  Would you please state and

21   spell your name for the record, sir.

22             THE WITNESS:  Christopher Scott Morris.

23             MR. ROGERS:  Your Honor, may I approach with some

24   materials related to Dr. Morris?

09:58:51  25             THE COURT:  Yes.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

09:58:58   1    MR. ROGERS:  Your Honor, would it be okay if I move

2    the easel?

3        D I R E C T   E X A M I N A T I O N

4    BY MR. ROGERS:

09:59:21   5    Q    Good morning, Dr. Morris.

6    A    Good morning.

7    Q    Can you introduce yourself to the jury, please.

8    A    My name is Christopher Scott Morris, and I'm an

9    interventional radiologist.

09:59:31  10    Q    Where do you live and work?

11    A    I live in Vermont and I work at the Lerner College of

12    Medicine at the University of Vermont, also known as

13    University of Vermont Medical Center.

14    Q    What city is that in Vermont?

09:59:45  15    A    Burlington, Vermont.

16    Q    And, Doctor, can you give us a little bit of detail about

17    your educational background, please.

18    A    Yes.  I went to medical school in Cleveland at Case

19    Western Reserve University School of Medicine, and then I did

10:00:00  20    an internship in Cleveland at the same institution.  Then I

21    did my diagnostic radiology residency in Columbus, Ohio, at

22    Ohio State University.  And after that I did a fellowship in

23    interventional radiology at Mass General Hospital in Boston.

24    And ever since then I've been at the University of Vermont.

10:00:21  25    Q    In addition to your degrees in medicine, do you also have

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:00:25  1    a master of science?

2    A    Yes, I do.

3    Q    And tell us about that, please.  What's that in?

4    A    That was also obtained at Ohio State, and that's in

10:00:35  5    radiological sciences and it was mainly focusing on

6    radiobiology and radiation physics.

7    Q    Dr. Morris, about how many years have you been practicing

8    as an interventional radiologist?

9    A    I've been at University of Vermont about 27 years.

10:00:53 10    Q    Are you licensed to practice medicine?

11    A    Yes.

12    Q    In what states, please?

13    A    Vermont, California, and New York.

14    Q    And do you have current licenses in those states?

10:01:03 15    A    Yes.

16    Q    And, Doctor, are you board-certified?

17    A    Yes.

18    Q    Have you done any teaching in the area of interventional

19    radiology?

10:01:11 20    A    Yes.  My whole career I've performed teaching, yes.

21    Q    So tell us about that.

22    A    So we have a residency program at our institution where we

23    train residents in diagnostic radiology.  We also have a

24    fellowship program in interventional radiology, and that is a

10:01:31 25    pretty intensive teaching requirement that I'm involved with.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:01:34  1    So we have two fellows every year that spend every day with me

2    and as well as with my other three colleagues.

3            We also teach residents and medical students that are

4    on other services, for instance surgery residents.  And we

10:01:53  5    have a clerkship from the medical school so that medical

6    students rotate with us on a monthly basis.  So there's lots

7    of teaching activities that occur.

8    Q    Are you a member of any professional societies that relate

9    to interventional radiology?

10:02:08  10    A    Yes.  The main one is Society of Interventional Radiology.

11    Q    And are you a member of other professional societies that

12    relate to radiology?

13    A    Yes.  Radiological Society of North American, American

14    College of Radiology, American Heart Association.  Those are

10:02:24  15    the main ones.

16    Q    Are you a senior fellow in the Society of Interventional

17    Radiology?

18    A    Yes, I am.

19    Q    Have you done anything in your career where you were

10:02:36  20    instructing other interventional radiologists at meetings of

21    the SIRs regarding IVC filters?

22    A    Yes.  For about six years I've participated in the IVC

23    filter workshop series at the annual Society of Interventional

24    Radiology national meeting, and three of those years I was the

10:02:55  25    workshop coordinator, so I ran the workshop series during

DIRECT EXAMINATION — CHRISTOPHER MORRIS, M.D.

10:02:59   1   those meetings.

2   Q   Are you currently involved in a clinical practice?

3   A   Yes.

4   Q   And so tell us about that.  What types of things do you

10:03:07   5   do?

6   A   As interventional radiologists, we perform many different

7   types of procedures.  I think there's over 100 discrete types

8   of procedures that we perform.  It's based on imaged guidance.

9   So we are radiologists, but we're specialized radiologists

10:03:24  10   that do actual therapeutic type procedures.  We don't use

11   radiation to perform the procedure, but we use imaging,

12   ultrasound, fluoroscopy, which is a radiology type of imaging

13   system, CAT scans, to perform procedures such as drainages.

14   If someone has a blocked kidney, we'll put a tube in their

10:03:49  15   blocked kidney to relieve the obstruction, for instance.  We

16   do that in all the organ systems throughout the body.

17        And then the other part of our practice is in

18   vascular, so we do a lot of procedures, diagnostic as well as

19   interventional procedures, in the vascular system, such as

10:04:06  20   angioplasty, stents, and IVC filters.

21   Q   When were you first exposed to IVC filters?

22   A   When I was a resident at Ohio State.

23   Q   And have you been consistently utilizing IVC filters in

24   your medical practice since that time?

10:04:23  25   A   Ever since then, yes.

DIRECT EXAMINATION — CHRISTOPHER MORRIS, M.D.

10:04:26  1   Q    And are you still treating patients today with IVC

2   filters?

3   A    Yes, I am.

4   Q    Doctor, when's the last time you placed an IVC filter in a

10:04:35  5   patient?

6   A    Several weeks ago.

7   Q    And how about when is the last time you would have

8   retrieved a retrievable filter?

9   A    Maybe three or four weeks ago.

10:04:42 10   Q    Have you published any medical literature that relates to

11   IVC filters?

12   A    Yes.

13   Q    And can you tell us about that, please.

14   A    I have -- ever since I've been at University of Vermont,

10:04:54 15   IVC filters has been a big part of our practice, and early on

16   after the first year I was there, we started a project with

17   the trauma surgeons on IVC filters and their use in trauma

18   patients.  So that was one of the first studies that we

19   published relating to trauma patients.  There was a follow-up

10:05:16 20   study on that five years later.

21        And then we published our experience with the first

22   retrievable filters, called the Cook Tulip filter, in the

23   early 2000s.  And most recently we've published our experience

24   using a multidisciplinary clinic to follow-up our IVC filter

10:05:40 25   patients, and we started that in 2006.  And that was

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:05:43  1    published, I think, in 2017, that five-year intervention that

2    we performed on them.

3    Q    Doctor, have you been retained as a expert witness in this

4    case?

10:05:53  5    A    Yes.

6    Q    And are you charging for the time that you spend in your

7    work in this matter?

8    A    Yes.

9    Q    And what is your customary charge?

10:06:01  10   A    It's a flat fee of $500 per hour.

11   Q    And is that for any activities that you engage in?

12   A    Yes.

13   Q    And prior to becoming an expert witness in the area of IVC

14   filters, have you had any sort of relationship with C.R. Bard

10:06:17  15   where were where you were paid for by C.R. Bard?

16   A    For a few years when retrievable filters came out, so this

17   was in the early 2000s to about 2006 or so, I was a paid

18   consultant for Bard, yes.

19   Q    And what types of things would you have done as a

10:06:33  20   consultant at that time?

21   A    There are basically three different activities.  One was I

22   was a monitor, what they call a clinical monitor.  So I went

23   to -- actually, just twice to a regional hospital, University

24   of Albany, to teach the interventional radiologists there how

10:06:52  25   to take out the Bard Recovery filter.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:06:54   1        And I did the same thing at -- in Schenectady,

2    New York, at a hospital called, I believe, St. Peter's.

3        And the other activity was that I delivered a few

4    lectures at regional meetings, what we call angio clubs,

10:07:14   5    around that same time, where I just talked about IVC filters

6    in general.  This was the time frame when the retrievable

7    filters were just coming out and a lot of interventional

8    radiologists had not had an experience with those.

9        And then the third activity I did with Bard was I

10:07:30  10    participated in a series of focus groups where I think I went

11    to Chicago, Tempe, Arizona, and Memphis, Tennessee, to discuss

12    IVC filters in general with other interventional radiologists

13    during those meetings.

14    Q   And has all that work that you just described, has that

10:07:52  15    been more than ten years ago?

16    A   Yes.

17    Q   Doctor, let me turn your attention to your opinions in

18    this case.  Are you prepared to offer the opinions that you've

19    formed regarding Bard IVC filters?

10:08:04  20    A   Yes, I am.

21    Q   And before we get there, let me ask you this:  Are you

22    going to be offering any opinions today that are specific to

23    Mrs. Jones, the plaintiff in the case, or any of her medical

24    care?

10:08:17  25    A    No.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:08:19  1   Q    Have you reviewed any medical records or imaging that

       2   relate to Mrs. Jones?

       3   A    No.

       4   Q    So, Doctor, what are the opinions that you will be

10:08:27  5   offering in this case today?

       6   A    That pulmonary embolism is a common and very often a

       7   lethal disease, and that doctors should strive to decrease the

       8   PE mortality rate.  That IVC filters are effective in

       9   decreasing lethal pulmonary embolism.  But that is restricted,

10:08:55  10  and I want to be very clear about this, in patients that have

       11  documented acute venothromboembolic disease, that is proximal

       12  DVT of their legs or an acute pulmonary embolism, and in those

       13  patients that can't be treated with anticoagulation.

       14       Now, another opinion is that interventional

10:09:15  15  radiologists are very aware of the complications associated

       16  with IVC filters, including tilt, perforation, penetration,

       17  migration, fracture, fracture embolization and thrombosis.

       18       And then finally, the family of Bard retrievable

       19  filters, IVC filters, including the Eclipse filter, are safe

10:09:40  20  and effective.

       21  Q    Thank you, Doctor.

       22       Let's start off with the first one of those opinions

       23  that you said that you would provide regarding the treatment

       24  of PE or the prevention of PE.

10:09:55  25       Over the course of your career, have you treated

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:09:58   1   patients who had got DVTs?

2   A   Yes.

3   Q   And have you also treated patients who have experienced

4   pulmonary embolism?

10:10:05   5   A   Yes.

6   Q   And, Doctor, can you tell us, where do the blood clots

7   typically originate that may develop into a pulmonary

8   embolism?

9   A   They typically begin within the deep veins of the legs or

10:10:20   10   pelvis, and once the clot forms, the advancing edge of the

11   clot becomes -- because the new clot is pretty fragile and

12   very delicate, and that's the part of the clot that's at risk

13   of breaking off and then traveling to the lungs and causing a

14   pulmonary embolism.

10:10:39   15   Q   And over the course of your career, have you had patients

16   who have died from a pulmonary embolism?

17   A   Yes.

18   Q   And have you had patients that you're aware of who have

19   had a IVC filter in place who have died from a pulmonary

10:10:51   20   embolism?

21   A   I have -- I'm not aware of any patient at our medical

22   center that died with an IVC filter in place.

23   Q   And --

24   A   I'm sorry.  From pulmonary embolism.

10:11:03   25   Q   Thank you, Doctor, for that clarification.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:11:06  1    Do you consider pulmonary embolism to be a

2  significant health risk in the American population?

3  A   It's a huge health risk, yes.

4  Q   And do you have some numbers that may give us some context

10:11:17  5  for that?

6  A   Well, it's generally thought that pulmonary embolism

7  occurs about 600,000 times a year in the United States, and it

8  depends on which study we look at and a lot of these are

9  autopsy studies of hospital deaths, but the death rate from

10:11:35  10  pulmonary embolism has be been described to occur anywhere

11  from 50,000 to 200,000 per year.

12  Q   And, Doctor, if a patient has got a risk of pulmonary

13  embolism and that goes untreated, do you know the rate of

14  potential mortality for that patient?

10:11:55  15  A   Studies have shown between 26 and 30 percent.  That means

16  if a patient has an acute pulmonary embolism, whether it's

17  symptomatic or not, the studies have shown by doing pulmonary

18  angiograms that if it's untreated, they will die 26 to

19  30 percent of the time.

10:12:17  20  Q   And what are some of the primary risk factors that would

21  expose a patient to a high risk of pulmonary embolism?

22  A   Well, the risk factors are multifold.  There are types of

23  risk factors that a patient's born with, sort of a genetic

24  predisposition to developing clots.  We call that

10:12:38  25  hypercoagulable state.  And some of the names of these genetic

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:12:42  1    defects cause situations that have names like protein C.

2    Deficiency protein, S deficiency, and Factor Leiden.

3         Then there are the patients that are -- don't have a

4    predisposition genetically, but have other inciting factors

10:13:02  5    that make them prone to developing clots.  So any time a

6    patient is immobilized, which can cause sluggish blood flow.

7    So that can be recovering from surgery, that could be a trauma

8    patient that's paralyzed and just lying in bed for a long

9    time, or it can be someone in a long plane ride.  So, you

10:13:22  10   know, not getting up and exercising the legs.  Their legs.

11        So immobilization is a big risk factor which causes

12   sluggish blood flow.

13        Another one is trauma in general, either penetrating

14   or deep blunt trauma.

10:13:40  15       Others include factors such as hormone replacement

16   therapy, and pregnancy is another potential risk factor.  And

17   then cancer.  Whether diagnosed or undiagnosed, certain

18   cancers have a lot more predisposition to increasing the risks

19   for thrombosis than others, such as anything that interrupts

10:14:05  20   the blood brain barrier, so brain cancers.  And then all of

21   the urologic type cancers also have a real high propensity to

22   increase the risk factors for venous thromboembolism.

23   Q    Doctor, you referred to this a moment ago, but what is

24   typical first line of defense that doctors will pursue if you

10:14:27  25   have a patient who is at high risk of pulmonary embolism?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:14:30   1    A    Anticoagulation.

2    Q    And can you explain to the jury what that is.

3    A    So that's basically thinning the blood with medicines.

4    And the first type of medicine that's used is an injectable

10:14:42   5    medicine called heparin, and that can be either injected

6    straight into the vein through an IV or it can be inserted

7    underneath the skin, a subcutaneous type injection, like an

8    insulin shot.

9         And then once the patient has stabilized on heparin,

10:14:58  10    generally speaking, the doctors then will change that

11    medication to an oral pill that they can take.  Anticoagulants

12    like Warfarin or the newer direct anticoagulants that are

13    available now like Eliquis or Xarelto, those types of pill,

14    pill-type form.

10:15:17  15    Q    And from time to time do you have patients who cannot take

16    an anticoagulant for some reason?

17    A    Yes.

18    Q    And in those patients, are there any alternative

19    treatments to try to prevent PE other than an IVC filter?

10:15:32  20    A    No.

21    Q    Doctor, do you have an opinion to a reasonable degree of

22    medical certainty as to whether IVC filters are effective in

23    stopping clots?

24    A    I believe they are, yes.

10:15:43  25    Q    And can you tell us what your opinion is based on?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:15:46   1   A   Well, it's based on a review of the literature, as well as

2   my own personal experience.

3   Q   Why don't we break those down.  And let's talk about the

4   literature first.

10:15:57   5        The jury's just heard some information about

6   different types of studies.  And in the worldwide medical

7   literature, are there any studies that would be considered

8   randomized clinically controlled prospective trials that

9   relate to IVC filters?

10:16:15   10  A   There's the PREPIC1 and the PREPIC2 studies.

11  Q   And so what do you mean by that?  What is PREPIC1 and

12  PREPIC2?  What does that mean?

13  A   So the PREPIC1 was a randomized controlled trial of

14  permanent filters.  It was published in 1998, so well before

10:16:31   15  the advent of the retrievable filters.  And there were 400

16  patients, all of them had proximal DVT.  Some of them had PE,

17  but all of them had to have proximal DVT, and they put all

18  those patients, they randomized 400 -- all 400 patients that

19  they enrolled in the study all got anticoagulation.  Half of

10:16:53   20  those, around 200, got a filter, and the other half did not.

21  So right away it doesn't really mimic real world conditions

22  where we place filters in patients that cannot be

23  anticoagulated.

24        So they looked at the pulmonary embolism rate at 12

10:17:12   25  days, and then there was an eight-year follow-up study that

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:17:16  1    they also did.  And at that 12 day rate they imaged all the

2    patients, looking for asymptomatic pulmonary embolism.  That

3    is very important because we know that there are a lot more

4    asymptomatic pulmonary embolism cases that occur than

10:17:31  5    symptomatic.  So they found that the patients that received

6    the filter had a lower rate of recurrent pulmonary embolism

7    than the patients that did not receive an IVC filter.

8          However, there was no change in the overall mortality

9    rate between those two groups in the PREPIC1.

10:17:51 10    So now we flash forward to the PREPIC2 studies done

11    by a different set of authors, but also performed in France.

12    They looked at retrievable filters.  It was a little bit

13    different type of a study in that these patients all presented

14    with -- and there were about 400 of them, they presented with

10:18:12 15    symptomatic pulmonary embolism.  Now, they ran -- again, they

16    anticoagulated all the patients.  Again, not mimicking real

17    world situations here.

18          Then they looked at three months and six months at

19    symptomatic pulmonary embolism.  They did not do any imaging

10:18:31 20    unless the patient had a symptom that they thought may be a

21    PE.  So they were missing all the asymptomatic pulmonary

22    embolism that could occur.

23          And in that study, the PREPIC2, with one single

24    retrievable filter, whereas the PREPIC2 had, I think, four or

10:18:47 25    maybe even five different permanent filters that they used.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:18:49  1    In the PREPIC2 study they just used a French single level

2    retrievable filter call the ALN.  They found no significant

3    difference in the recurrent pulmonary embolism rate.  I should

4    say symptomatic pulmonary embolism rate.

10:19:03  5        But my major criticism of that was they didn't look

6    for pulmonary embolism, they just relied on whether the

7    patient had a major symptom to determine whether they had a

8    pulmonary embolism or not.  So I think they missed a lot of

9    the -- well, they missed all the asymptomatic pulmonary emboli

10:19:18  10   that could be occurring.  And they're just as dangerous as

11   symptomatic pulmonary embolism, by the way.

12   Q    So, Doctor, what do the PREPIC1 and PREPIC2 studies mean

13   for you in your practice?

14   A    Well, the PREPIC1, I mean, despite all the criticisms of

10:19:33  15   the study that I have, did show that IVC filters decrease the

16   recurrent pulmonary embolism rate even on top of an already

17   well-known treatment called anticoagulation.

18        PREPIC2, I don't really have a lot to comment on

19   because I don't think it really told us very much at all.

10:19:53  20   Q    Did either the PREPIC1 or the PREPIC2 study involve a

21   Eclipse filter or any other Bard filter?

22   A    No.

23   Q    And, Doctor, let's kind of carry that forward a little

24   bit.  Other than the two PREPIC studies, are there any other

10:20:12  25   randomized clinically controlled prospective studies on IVC

DIRECT EXAMINATION — CHRISTOPHER MORRIS, M.D.

10:20:17  1  filters?

2  A    No.

3  Q    And has a study ever been done where searchers compared a

4  population of patients who were -- who received an IVC filter

10:20:28  5  but took no anticoagulant versus a group of patients who did

6  not receive any treatment at all?

7  A    I've heard of one underway, but I don't know of any study

8  like that that's been published, to my knowledge.

9  Q    And would there be certain issues that researchers may

10:20:52  10  encounter if they try to conduct such a study to compare a

11  group of patients who had received filters who are at risk of

12  pulmonary embolism versus patients who are at risk of

13  pulmonary embolism but received no treatment?

14  A    There would be major ethical problems with a study like

10:21:08  15  that, yes.

16  Q    So, Doctor, if there are no studies that are these kind of

17  Level 1 randomized clinically controlled studies about filters

18  that showed their efficacy, is there other literature that you

19  rely on to support your opinions?

10:21:24  20  A    Yes.   There are lots of what we call observational

21  studies.   These are nonprospective -- they can be prospective,

22  but they're nonrandomized and controlled studies that do show

23  a benefit of IVC filters.

24  Q    And can you give the jury some overview of the types of

10:21:43  25  studies you looked at and what your take away was from those

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:21:46   1   studies?

2   A    Right.  So there's a doctor named Dr. Paul Stein who does

3   a lot of database studies, and he came out with a publication,

4   and I believe it was 2012, where he looked at what's called

10:22:00   5   the national inpatient sample.  This was looking at millions

6   of hospitalized patients with a diagnosis of pulmonary

7   embolism.

8        And he basically looked at those patients that

9   received a filter and those that did not.  And overall he

10:22:22  10   found a case fatality rate in those patients that received the

11   filter to be lower than the patients that did not receive a

12   filter.

13        In particular, he looked at several different groups

14   that were very interesting.  These were unstable pulmonary

10:22:38  15   embolism patients, meaning their blood pressure was low, they

16   were at -- they had what we call a high risk pulmonary

17   embolism.  And in those patients that received thrombolytic

18   therapy, because as interventional radiologists sometimes we

19   try to dissolve the clot emergently to try to save the

10:22:57  20   patient's life in those patients, and these are the types of

21   patients that he's talking about in that case.

22        In that subset of patients, the patients that

23   received a filter had a case fatality rate of 7.6 percent,

24   whereas the patients that did not receive a filter had a case

10:23:17  25   fatality rate of 18 percent.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:23:19   1        In another subgroup with the same type of patients

2    that did not receive thrombolytic therapy, so they were also

3    unstable, that case fatality rate was 33 percent, whereas the

4    patients that did not -- that received the filter, whereas the

10:23:34   5    patients did not receive the filter, their case fatality rate

6    was 51 percent.

7    Q    And are there other articles that you saw --

8    A    I reviewed quite a few of them.  There's another one that

9    came out in 2014 by the same -- and Dr. Decousus, who was the

10:23:55  10    lead author of the PREPIC1 study was an author of this

11    particular study, the lead author was named Dr. Muriel, and

12    they -- this is a multinational, multicenter study.  It was a

13    prospective cohort study.  It wasn't randomized.  But they

14    looked at over 40,000 pulmonary embolism patients in

10:24:17  15    hospitals -- that were hospitalized.

16        And they picked 344 of the patients that had a

17    filter, and they matched those to 344 other patients that did

18    not receive a filter.  They all had pulmonary embolism.  And

19    they found that the risk adjusted pulmonary embolism mortality

10:24:37  20    rate was much lower for the patients that received a filter.

21    They had a mortality rate of 1.7 percent, whereas the patients

22    who did not receive the filter had a mortality rate of

23    4.9 percent.  That is almost a three-fold reduction in the

24    risk adjusted pulmonary embolism mortality rate by having a

10:24:59  25    filter placed.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:25:03  1   Q   Dr. Morris, do these large retrospective studies that you

2   reviewed, do they support your opinion that IVC filters are

3   effective in stopping PE?

4   A   Yes.  But the Muriel study was a prospective study.

10:25:17  5   Q   And do doctors in clinical practice, do you have to make

6   medical decisions every day based on information that lacks

7   these kind of Level 1 randomized clinically controlled

8   prospective trials?

9   A   Yes.

10:25:31 10   Q   Doctor, let's turn our attention to the second thing that

11   you said that you were relying on about the effectiveness of

12   IVC filters and.  I believe you said that that was your

13   personal experience with filters?

14   A   Yes.

10:25:42 15   Q   And can you start off by telling us, just generally, in

16   your group at the University of Vermont, approximately how

17   many filters do you think your group has placed?

18   A   Well, since I've been there since 1991, we've placed

19   around 2,000 IVC filters.  And I've been one of two

10:26:01 20   interventional radiologists and, more recently, one of four

21   interventional radiologists over the last 27 years.  I

22   estimate that I placed around 800 IVC filters, in general.

23   Q   And can you give us a rough estimate of approximately how

24   many retrievable filters you would have removed?

10:26:18 25   A   Somewhere between 1- and 200.  That's a rough estimate.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:26:23  1    Q    And of the filters that you have used during the course of

2    your career, have the majority of those filters been Bard IVC

3    filters?

4    A    Yes.

10:26:32  5    Q    And have they been Bard IVC retrievable filters?

6    A    Yes.

7    Q    And did you also use Bard permanent filters, like the

8    Simon Nitinol filter?

9    A    We did use that, yes.

10:26:44 10    Q    And, Doctor, other than those Bard family of filters, have

11    you used various filters that were made by different

12    manufacturers?

13    A    We have used lots of different filters, yes.

14    Q    Okay.  Let me ask you about some of your experience, just

10:27:00 15    in a sort of historical way.  When you first were in your

16    training, did you have experience with patients who had

17    received a filter called the Mobin-Uddin umbrella filter?

18    A    Yes, we did.

19    Q    And tell us about that.

10:27:13 20    A    Well, Dr. Mobin-Uddin was a professor of surgery at Ohio

21    State when I was a resident, and although he developed the

22    Mobin-Uddin umbrella when he was at University of Florida and

23    introduced in 1967, it was pretty much replaced by the

24    Greenfield filter early on in the early seventies, when the

10:27:33 25    Greenfield filter came out in 1973.  But since he was Ohio

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:27:38  1    State, he still had a cohort of patients that he had placed

2    his umbrella in, and so we would still see those patients

3    occasionally for various reasons.  So I was familiar with the

4    Mobin-Uddin filter from that standpoint.

10:27:51  5  Q    Was the Mobin-Uddin filter one that could be retrieved?

6  A    No.

7  Q    And can you tell the jury how that filter was placed in a

8    patient?

9  A    It was placed by a surgical cut down in the groin vein

10:28:04  10   called the femoral vein.  And back then the only surgeons were

11   replacing these.  I never actually saw the delivery device,

12   but I was told by some of the older surgeons that it was a

13   large cannula that the umbrella was pushed through and

14   delivered, in similar fashion to the filters that we place

10:28:23  15   today.

16  Q    And so you mentioned the Greenfield filter.  And tell us

17    about your experience with that.

18  A    At Ohio State we placed a lot of Greenfield filters, and

19    placed a lot of them at University of Vermont as well.  But

10:28:39  20   that was developed by Dr. Greenfield and introduced in 1973,

21    became the gold standard IVC filter.  It's a permanent IVC

22    filter.  It's conical in shape, it was the first filter that

23    looked like an actual umbrella, and it was unique in that it

24    could collect quite a bit of clot and still keep the IVC, or

10:29:03  25   inferior vena cava open, because the Mobin-Uddin filter, its

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:29:09  1    competitor, had a really high IVC occlusion rate.  It would

       2    trap clots just fine, but all that clot didn't have anywhere

       3    to go and it would block off the IVC, whereas the conical

       4    filter was a unique design.

10:29:20  5           I wish I had a picture to show you, to show you the

       6    difference in the design of those filters, but that was the

       7    filter of choice when I started my residency at Ohio State in

       8    1986.

       9           THE COURT:  We're going to break at this point,

10:29:36 10    Mr. Rogers.

      11           We will resume, ladies and gentlemen, at 10:45.

      12        (Recess taken from 10:29 to 10:45.  Proceedings resumed

      13    in open court with the jury present.)

      14           THE COURT:  Please be seated.

10:46:09 15           You may continue, Mr. Rogers.

      16           MR. ROGERS:  Thank you, Your Honor.

      17    BY MR. ROGERS:

      18    Q   Dr. Morris, before we had our break, you were talking

      19    about some of the permanent filters that you had used earlier

10:46:18 20    in your career.  And you had talked to us about the

      21    Mobin-Uddin filter, as well as the Greenfield filter.  Were

      22    there other permanent filters that were used in the early

      23    portions of your career?

      24    A   Yes.  After the Greenfield filter, at least the first

10:46:35 25    version of the Greenfield filter, because there were three

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:46:37  1    versions:  One was titanium and two of the others were

2    stainless steel, the Greenfield.  Shortly after that the Cook

3    Bird's Nest filter was introduced in, I believe, 1985 or so.

4    And we, of course, used that.  And we still have it in our

10:46:54  5    inventory now at University of Vermont Medical Center.  That

6    was unique in that it was the only filter that could be placed

7    in very large diameter inferior vena cava, the so-called mega

8    cava.

9         Then the Simon Nitinol was introduced in the late

10:47:11  10   1980s, around the same time the LGM VenaTech.  These are all

11   permanent filters, by the way.  The VenaTech filter was

12   similar in design to the Greenfield filter.

13        Then after that we had some experience with the

14   TrapEase filter.  That was also a permanent filter in the

10:47:35  15   1990s.

16        Then the Cook Tulip filter was introduced in the

17   early 2000s, and we pretty much switched over to placing that

18   because we could retrieve it.

19   Q    Let me stop you there for a moment.  Was that the first

10:47:49  20   retrievable filter that you had experience with?

21   A    Yes.

22   Q    And about when was that introduced in the marketplace?

23   A    I don't remember exactly.  Somewhere around 2001, 2002.

24   Q    And what were the limitations as to how the Cook Tulip

10:48:06  25   filter could be used and how long it could remain in a

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:48:09  1  patient?

2  A   So the Cook Tulip filter was what we called an optional

3  filter.  It could stay in place as a permanent filter, but

4  could also be retrieved when there was no longer an indication

10:48:26  5  for IVC filtration.

6          But we believed that it could only be retrieved

7  within the 14 to 21 days.  So it had a limited duration of

8  filtration.  So at that time we were placing it into a lot of

9  younger trauma patients and we wanted to make sure we got the

10:48:45  10  filter out.  So we would have to bring these patients back

11  down to the interventional radiology suite every 14 to 21 days

12  and perform an invasive procedure under sedation by retrieving

13  the filter but not taking it out of the body, just moving it

14  about a centimeter either up or down and redeploying it so it

10:49:09  15  had a new, fresh reattachment site, and we had to continue to

16  doing that for the duration of the life of the filter.

17  Sometimes these patients needed to keep these filters in up to

18  six months.  You can imagine how many times we had to perform

19  that repositioning procedure on the Cook Tulip filter.

10:49:29  20  Q   When was the Recovery filter introduced in the market?

21  A   I believe it was late 2003, but I think we started placing

22  it in 2004.

23  Q   And how long could the Recovery filter remain in a patient

24  prior to potential retrieval?

10:49:45  25  A   Well, at least six months, but soon after we started

DIRECT EXAMINATION — CHRISTOPHER MORRIS, M.D.

10:49:48  1    placing it there were reports coming out that it could be

2    retrieved after a year of duration.

3    Q    And what was the general reaction in the interventional

4    radiology community about this filter that could remain in

10:50:02  5    patients for longer periods of time and still be retrieved?

6    A    We were ecstatic because we no longer had to perform these

7    very cost-inefficient and onerous repositioning procedures on

8    the Cook Tulip filter.  So this new Bard Recovery filter sort

9    of revolutionized the IVC filter world at that time.

10:50:26  10    Q    Have you used the family of Bard retrievable filters since

11    that time?

12    A    Yes.  All of them.

13    Q    And have you implanted and retrieved all of the Bard

14    family of retrievable filters?

10:50:40  15    A    Yes.

16    Q    And would that include the Eclipse filter?

17    A    Yes.

18    Q    And, Doctor, do you have a reasonable degree -- an opinion

19    to a reasonable degree of medical certainty as to whether the

10:50:55  20    Bard family of retrievable filters, including the Eclipse

21    filter, is safe and effective?

22    A    I do, yes.

23    Q    And what is that opinion?

24    A    That they are safe and effective.

10:51:06  25    Q    Doctor, let's talk a little bit about the retrieval of a

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:51:10  1    filter that can be removed.  Can you tell us what a doctor

2    should consider when they're caring for a patient about the

3    potential removal of a filter?

4    A    Well, every patient is different, so we look at the

10:51:23  5    risk/benefit ratio of leaving the filter in versus taking it

6    out on every single patient.  But, in general, if the

7    indication for IVC filtration has expired, and that can happen

8    for several reasons.  One is the patient may be able to

9    anticoagulated at some point.  And another might be the

10:51:47  10   patient is ambulatory and no longer at bedrest.  Or the filter

11   has been in place for up to three months or six months,

12   however long the physicians believe the patient needs to be

13   protected against recurrent pulmonary embolism.  These are

14   some of the reasons why we look at each individual patient and

10:52:11  15   make that determination whether it's best to get that filter

16   out at that time.

17         Other patients may not have a continued indication

18   for IVC filtration but it might be more compassionate to leave

19   it in those cases.  These may be patients that have a limited

10:52:25  20   life expectancy of less than one year.  Patients with

21   metastatic cancer that are not going to do well and why

22   subject them to another invasive procedure.

23         So we look at each individual patient on a

24   case-by-case basis.

10:52:41  25   Q    And do you have in place at your hospital a program that

DIRECT EXAMINATION — CHRISTOPHER MORRIS, M.D.

10:52:45  1  focuses on the retrieval of IVC filters that can be retrieved?

2  A    Yes, we do.

3  Q    And tell us about that, please.

4  A    Well, we -- in 2006 we conceptualized a multidisciplinary

10:52:59  5  clinic that looked just at IVC filters that we placed.  And at

6  that point our trauma surgeons were also placing some filters,

7  so they were part of it as well, but most were placed by

8  interventional radiologists.  And after we placed a filter, we

9  send the patient after -- at three months to our hematology

10:53:19 10  specialists who are just -- are world-renowned experts in

11  venous thromboembolic disease, and they make the determination

12  on a case-by-case basis of whether they recommend the patient

13  be retrieved or not.  And so that's been going on ever

14  since -- I believe we actually started in 2007, and that was

10:53:42 15  the subject of our paper, the five-year experience early on

16  that we published that came out just last year.

17  Q    And so it was a study performed in regard to the program

18  that you have about retrieving filters?

19  A    Yes.  Yes, there was.

10:53:57 20  Q    And I think you mentioned a moment ago that study was

21  ultimately published.

22  A    Yes, it was.

23  Q    Was that subject to the peer-review process?

24  A    Yes.

10:54:04 25  Q    Tell us, what were the general results of that study?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:54:07  1  A   Well, we compared the five-year intervention patients to

2  historical controls.  Meaning it was a program that we, as

3  interventional radiologists, performed on our own.  And we

4  were retrieving filters at a rate of 23 percent historically.

10:54:22  5       And when our hematologists got involved with this

6  multidisciplinary clinic, that rate went up to 45 percent.

7  Now we're somewhere between 70 and 80 percent.  But it was a

8  gradual increase in the IVC filter retrieval rate.

9  Q   Have there been shifts over the course of your career in

10:54:42  10  the way that doctors have approached the potential retrieval

11  of IVC filters that can be retrieved?

12  A   Yes.

13  Q   And describe that for the jury, please.

14  A   Well, early on in the era of the retrievable filters, we

10:55:00  15  were not very diligent in following up our patients and

16  looking at ways to get the filters out.  We relied a lot on

17  the clinicians, the primary care physicians, maybe trauma

18  surgeons, to refer those patients back to us.  And that's one

19  reason why the IVC filter retrieval rate was so low early on.

10:55:22  20       With time, we realized that we have to be a lot more

21  rigorous in evaluating these patients and clinically assessing

22  them and determining whether or not these filters should come

23  out or not.

24       MR. ROGERS:  Can we pull up Exhibit 6991, please.

25

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:55:41  1    BY MR. ROGERS:

2    Q    Dr. Morris, do you see Exhibit 6991 on your screen?

3    A    Yes, I do.

4    Q    Can you tell us generally what this is.

10:55:59  5    A    Well, this is the first of two communications from the FDA

6    regarding the --

7         MR. COMBS:  Objection, Your Honor.  Nondisclosure.

8         THE COURT:  Where is this in the report?

9         MR. ROGERS:  Your Honor, on page 6 of the report,

10:56:15  10   bottom of the page.

11        MR. COMBS:  This was not disclosed as an exhibit to

12   be used with this witness, that I'm aware.

13        THE COURT:  Let's talk at sidebar for a minute,

14   Counsel.

10:56:32  15     (Bench conference as follows:)

16        THE COURT:  Where exactly is the disclosure?

17        MR. COMBS:  Recommendation --

18        MR. ROGERS:  6, if you look at the bottom of the

19   page.  About four lines up from the bottom.  FDA --

10:56:44  20        THE COURT:  I see that.  And where is it disclosed as

21   an exhibit?

22        MR. ROGERS:  For this trial, we sent it to them

23   yesterday and said we plan to use it.

24        MR. COMBS:  What was the number?

10:56:56  25        THE COURT:  What's the number?

DIRECT EXAMINATION - CHRISTOPHER MORRIS, M.D.

10:56:57  1          MR. ROGERS:  6991.

2          MR. COMBS:  I stand corrected, Your Honor.

3          THE COURT:  Okay.  All right.

4       (Bench conference concludes.)

10:57:11  5          THE COURT:  Thank you, ladies and gentlemen.

6    BY MR. ROGERS:

7    Q   Dr. Morris, I believe you were explaining to the jury what

8    this document was.

9    A   Yes.

10:57:27 10    Q   Can you continue, please.

11    A   Okay.

12          So this was written by the FDA and they call it a

13    initial communication, and it was regarding the -- basically

14    the lack of diligent follow-up of these patients that had

10:57:49 15    retrievable IVC filters in place and --

16    Q   Doctor, let me cut you off for just a moment, if you don't

17    mind.

18          MR. ROGERS:  Your Honor, I would like to move

19    Exhibit 6991 into evidence.

10:58:03 20          MR. COMBS:  Objection.  Hearsay grounds, Your Honor.

21          MR. ROGERS:  Your Honor, it falls under exception

22    803(8) as a public record.

23          THE COURT:  What is your response on 803(8),

24    Mr. Combs?

10:58:17 25          MR. COMBS:  I'm not sure they've established any

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:58:20  1   foundation for that exception, Your Honor, and I'm not sure

       2   this witness can establish that foundation.

       3          THE COURT:  Hold on just a minute.

       4          Objection is overruled.  6991 is admitted.

10:58:38  5      (Exhibit 6991 admitted.)

       6          MR. ROGERS:  Thank you, Your Honor.

       7          Your Honor, may we publish this to the jury, please?

       8          THE COURT:  You may.

       9   BY MR. ROGERS:

10:58:47 10   Q   Dr. Morris, now that the jury has this up on their

      11   screens, I want to at least give a little orientation about

      12   this document.

      13          MR. ROGERS:  Scott, would you mind highlighting the

      14   very top where it says "FDA."

10:58:57 15   BY MR. ROGERS:

      16   Q   And so is this what you were describing earlier,

      17   Dr. Morris, as being a communication from the FDA?

      18   A   Yes.

      19   Q   And, briefly, do you mind reading the title of the

10:59:10 20   communication.

      21   A   Yes.  Inferior Vena Cava IVC Filters.  Initial

      22   Communication:  Risk of Adverse Events with Long Term Use.

      23          MR. ROGERS:  And, Scott, if you don't mind, would you

      24   take that down.  And there's a section there that says

10:59:23 25   Audience, can you pull that out, please.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

10:59:25  1   BY MR. ROGERS:

2   Q    And so, Dr. Morris, what was the intended audience for

3   this communication?

4   A    Well, it says here Emergency Medicine and Surgery.  But I

10:59:37  5   think it was really intended for all physicians that had

6   anything to do with IVC filters.  That would include

7   interventional radiologists, surgeons, primary care

8   physicians, hematology specialists.  Everyone.

9   Q    Okay.  So --

10:59:51  10         MR. ROGERS:  Would you take that down, please.

11         And, if you would, let's pull out the section called

12   Issue and Background, both of those two sections.

13         Thanks.

14   BY MR. ROGERS:

11:00:03  15   Q    And so if you don't mind, Dr. Morris, can you give us some

16   more background on this and what was your understanding of

17   what was going on at the time?

18   A    Okay.  So early on with the retrievable filters, we were

19   taking out a good percentage of them, even though it wasn't as

11:00:21  20   high as we thought it would be.  So we were actually imaging

21   all these filters that had never been done before.

22         We were not retrieving permanent filters.  When we

23   placed permanent filters, we put them in and often never saw

24   the patient again and never looked at any of their imaging

11:00:39  25   they might have.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:00:40  1       When these first IVC -- retrievable IVC filters were

2       placed, there were reports of complications with them.  They

3       got very specific imaging looking for some of these

4       complications that we've already talked about.  And so the

11:00:55  5       FDA, through their MAUDE database, got some of these reports

6       of these complications, and then they also noticed at the same

7       time that a lot of these filters were not being removed when

8       there was no more indication for IVC filtration.  And they

9       figured out there's really a failure of communication between

11:01:12  10      the implanting physicians and those physicians taking care of

11      the patients long term.  So it's really an omission of this

12      failure of communication that is being denoted here.

13      Q   In the last sentence before it reaches the Background

14      section --

11:01:28  15          MR. ROGERS:  Can you highlight that, please.

16      BY MR. ROGERS:

17      Q   And, Dr. Morris, would you mind reading that for the jury.

18      A   Sure.  "Known long-term risks associated with IVC filters

19      include but are not limited to lower deep vein thrombosis,

11:01:45  20      DVT, filter fracture, filter migration, filter embolization,

21      and IVC perforation."

22          MR. ROGERS:  And can you take that down, please.

23      BY MR. ROGERS:

24      Q   What is the date of the document when this was released

11:01:58  25      from FDA?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:01:59   1    A    This would have been 2010.  8/9/2010.

2    Q    How does that relate to when the Eclipse filter was on the

3    market?

4    A    I know it came out --

11:02:10   5         MR. COMBS:  Nondisclosure as to Eclipse.

6         THE COURT:  Is that in the report?

7         MR. ROGERS:  I doubt it, Your Honor.  I'll move on.

8         THE COURT:  All right.

9    BY MR. ROGERS:

11:02:22  10    Q    Dr. Morris, was this particular -- first of all, let's

11    look at the Recommendation section, if you would.

12         MR. ROGERS:  Could we pull that out.

13    BY MR. ROGERS:

14    Q    And so, Dr. Morris, if you would, would you mind reading

11:02:33  15    the first sentence under the Recommendations section.

16    A    Yes.  "FDA recommends that implanting physicians and

17    clinicians responsible for the ongoing care of patients with

18    retrievable IVC filters consider removing the filter as soon

19    as protection from PE is no longer needed."

11:02:48  20    Q    And is that consistent with what you were describing to

21    the jury earlier?

22    A    Yes.

23    Q    And does this particular safety communication from FDA,

24    does it mention any specific manufacturer of IVC filters?

11:03:03  25    A    No.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:03:03  1    Q    Does it mention any particular model of IVC filter?

2    A    No.

3    Q    And so, Doctor, with your practice, what sort of impact

4    did this have in the -- in the interventional radiology

11:03:21  5    community?

6    A    Well, I think most interventional radiologists knew about

7    this issue.  This -- but the medical -- general medical

8    community did not know about the issue, and I think this had

9    more of an impact on the general medical community.  But we

11:03:39  10   had already been talking about these issues for many years

11   prior to this.

12   Q    Okay.

13         MR. ROGERS:  Can we take that down, please.

14         And would you mind pulling up Exhibit 6992.

11:03:52  15   BY MR. ROGERS:

16   Q    And, Dr. Morris, would you describe generally what this

17   document is?  This 6992.

18   A    This came out four years later and it's an update of the

19   2010 initial communication.

11:04:09  20        MR. ROGERS:  And, Your Honor, I would at this time

21   move Exhibit 6992 in evidence.

22        THE COURT:  Exhibit 6992?  You said 992.

23        MR. ROGERS:  Excuse me.  Yes, Your Honor, 6992.

24        MR. COMBS:  No objection, Your Honor.

11:04:21  25        THE COURT:  Admitted.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:04:22  1    (Exhibit 6992 admitted.)

2        MR. ROGERS:  May I publish?

3        THE COURT:  You may.

4    BY MR. ROGERS:

11:04:28  5    Q   Dr. Morris, if you don't mind, what's the title of this

6    communication?

7    A   FDA Safety Communication:  Removing Retrievable Inferior

8    Vena Cava Filters.

9    Q   And I think you said this a moment ago, but the date of

11:04:40  10   this is what?

11   A   August 9, 2010.

12       MR. ROGERS:  And if you would go down, please, Scott,

13   a little bit and pull out the section on Audience.

14   BY MR. ROGERS:

11:04:51  15   Q   And, Dr. Morris, according to the FDA, who is this

16   communication directed to?

17   A   "Physicians who implant inferior vena cava, IVC, filters

18   and clinicians responsible for the ongoing care of patients

19   with these devices."

11:05:06  20       MR. ROGERS:  And let's pull out the Recommendations

21   and Action sections.

22   BY MR. ROGERS:

23   Q   And so, Doctor, would you mind describing for the jury

24   what the recommendations of FDA were at this point in time in

11:05:17  25   2014?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:05:17  1    A    "The FDA recommends that implanting physicians and

2    clinicians responsible for the ongoing care of patients with

3    retrievable IVC filters consider removing the filter as soon

4    as protection from pulmonary embolism is no longer needed."

11:05:31  5    Q    And did this communication reference any specific

6    manufacturer or model of IVC filter?

7    A    No.

8    Q    And what impact did this have in your practice as an

9    interventional radiologist?

11:05:42  10   A    Well, it really didn't have any impact on my personal

11   practice because we were already following these

12   recommendations many years before.  It did give us a little

13   more impetus to publish our study that we were completing

14   around this time.  And it did generate, I think, even a little

11:06:02  15   more notoriety in the general medical community.

16   Q    And do you feel like it addressed that disconnect between

17   the interventional radiology community and the community of

18   physicians, like family care doctors and internists who may

19   refer a patient to an interventional radiologist to have a

11:06:22  20   filter placed?

21   A    Yes, I think it spelled it out in black and white.

22   Q    Doctor --

23        MR. ROGERS:  We can remove that, please.

24   BY MR. ROGERS:

11:06:29  25   Q    Let's move on and talk a little bit about potential risks

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:06:33  1   and complications with IVC filters.  You've addressed that a

2   little bit, but I want to talk to you in a little more detail.

3           What are some of the known risks of IVC filters?

4   A   Well, conical filters can tilt.  I can list all of them

11:06:51  5   just in general, but perforation, penetration, migration.

6   Almost basically all filters can fracture.  And then fracture

7   embolization and thrombosis, which includes IVC thrombosis and

8   recurrent deep venous thrombosis at the puncture site, for

9   instance.  Those types of things.

11:07:17  10  Q   You said fracture embolization.  What do you mean by that?

11  A   If a filter fractures and that fracture fragment becomes

12  detached from the filter, it can stay in place or it can

13  migrate away from its original location and can even embolize

14  with the flowing blood towards the heart, and it can go

11:07:39  15  through the heart and into the pulmonary arteries.

16  Q   Did the complications you described occur with both

17  permanent filters and retrievable filters?

18  A   Yes.

19  Q   Doctor, is there anything you're aware of that would be

11:07:53  20  considered a perfect IVC filter?

21  A   No.

22  Q   Is there always room for improvement with IVC filters?

23  A   Yes.

24  Q   Doctor, let's talk a little bit more about permanent

11:08:03  25  filters.  In your experience, did they get as much -- when you

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:08:07   1   have a patient who has a permanent filter, do those patients

2   tend to get as much clinical follow-up regarding their filter

3   and imaging follow-up as a patient who has a retrievable

4   filter?

11:08:18   5   A   In our practice, patients with permanent filters did not

6   get any follow-up per se about their IVC filters at all.

7   Q   What do you think that means as far as the numbers of

8   complications that are seen with permanent filters versus

9   retrievable filters?

11:08:37  10   A   I think some of it is related to the difference between

11   the generalized imaging follow-up that we've applied to

12   retrievable filters, as opposed to permanent filters, so we

13   see more complications partly because of that.

14   Q   Let's shift gears and talk about the Simon Nitinol filter.

11:09:02  15   I believe you told us earlier that is a filter you did implant

16   at some point?

17   A   Yes.

18   Q   When is the last time you would approximate you would have

19   implanted a Simon Nitinol filter?

11:09:12  20   A   Late 1990s, although one of my partners implanted a series

21   of Simon Nitinol filters in maybe mid 2000s.  But I gave up

22   the Simon Nitinol filter in the late 1990s.

23   Q   And what was your personal experience with the

24   Simon Nitinol filter?

11:09:26  25   A   It was not my favorite IVC filter.  It did have an

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:09:30   1   advantage in that it was low profile.  So that means that it

2   could be placed through an arm vein.  It was the only filter

3   that could be placed in that manner.  So sometimes we'd have a

4   patient that had no, what we say, IV access, and that means

11:09:45   5   both of their femoral veins are clotted off, there's no way to

6   get into their venous system that way, and both of their

7   jugular and subclavian veins up in their neck, they were all

8   clotted off, and so it may have been the only access we had

9   was through an arm vein.  So we place them at that time.

11:10:01   10   And sometimes we also placed what's called a PICC

11   line, which is an arm IV access.  And if that patient also

12   needed a filter, we were already in the venous system through

13   the arm, so we would leave a Simon Nitinol filter in place

14   because we already had that access available to us.

11:10:22   15   MR. ROGERS:  Can we bring up Exhibit 7226, please.

16   BY MR. ROGERS:

17   Q   Doctor, do you see Exhibit 7226 on your screen?

18   A   Yes.

19   Q   And can you tell us what the title of this document is.

11:10:39   20   A   This says Long Term Results of the Simon Nitinol Inferior

21   Vena Cava Filter.

22   Q   Is this a medical article that was published in the

23   literature?

24   A   Yes.

11:10:50   25   Q   Doctor, do you know what journal this was published in?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:10:53   1   A   Cardiovascular Radiology.

2   Q   Is that a journal that is a peer-reviewed journal?

3   A   Yes.  It's a European journal.

4   Q   Would you consider articles that are published in that

11:11:05   5   journal to be reliable?

6   A   Yes.

7   Q   And would you consider this particular article to be

8   reliable?

9   A   Can I correct myself one second?  It's actually published

11:11:14  10   in European Radiology and I misread.  Cardiovascular Radiology

11   is the subtitle of European Radiology.

12        But, yes, it is reliable.  Yes.

13   Q   Is this an article you're familiar with?

14   A   Yes.

11:11:28  15   Q   Can you tell the jury, please, when this article was

16   published?

17   A   I believe it came out in 1998.

18   Q   And was what is the general subject matter of this

19   article?

11:11:40  20   A   They looked at the Simon Nitinol filter, which is the

21   permanent filter, and they, I believe, had 114 patients but

22   they were able to subject 38 of those to a pretty intensive

23   radiologic follow-up, which included an ultrasound, duplex

24   ultrasound, looking at whether their inferior vena cava was

11:12:02  25   open or to not; a radiograph, meaning abdominal X-ray; and

DIRECT EXAMINATION - CHRISTOPHER MORRIS, M.D.

11:12:07  1   also a CAT scan.  They were able to do that on 38 patients and

2   then provide the radiographic follow-up at almost, I believe,

3   three years after these filters on average were in place.

4   Q   And, Doctor, did the authors of this study publish

11:12:25  5   information about the complications they saw with the

6   Simon Nitinol filter?

7   A   Yes, they did.

8        MR. ROGERS:  Scott, would you mind going to the third

9   page and pulling up Table 2.

11:12:35 10   BY MR. ROGERS:

11   Q   And, Doctor, can you tell the jury what the complication

12   information was that's reported in this study.

13   A   They found quite a few complications on their follow-up

14   imaging.  The most striking one was 95 percent perforation

11:12:53 15   rate.  That means 95 percent of these filters had perforated

16   the IVC.  And, in addition, 76 percent of the filters have

17   what we call today a grade 3 perforation, meaning one of the

18   struts was interacting with another structure outside of the

19   inferior vena cava.

11:13:15 20        In addition, they had a fracture rate of the struts,

21   not the daisy wheel.  You may have heard how the Simon Nitinol

22   filter had a continuous loop on top and if that fractured it

23   wasn't that big of a deal because it wouldn't become detached

24   and embolize.  But if they just looked at the struts

11:13:32 25   themselves, there was a 16 percent fracture rate of the

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:13:36  1   struts.  And those could become detached and embolize,

2   potentially.

3        And then there was another high percentage of what's

4   called the eccentric positioning, which in the Simon Nitinol

11:13:53  5   basically meant that it deformed.  The daisy wheel would often

6   bend over itself and become deformed within the inferior vena

7   cava and basically, I thought, predispose the inferior vena

8   cava to thrombosis.  And that happened 68 percent of the time.

9   Q   Doctor, you've obviously been talking about complications

11:14:18 10   seen with the Simon Nitinol filter.  But are the complications

11   of tilt, migration, fracture, and embolization complications

12   that are well-known to happen in virtually all IVC filters?

13   A   Yes.

14   Q   And has that been known for a number of years within the

11:14:35 15   interventional radiology community?

16   A   Yes.  There are certain designs that may not be able to

17   tilt, for instance.  The TrapEase and OptEase, because of

18   their design, physically can't tilt.  Although I have seen a

19   horizontal -- somehow a TrapEase filter was horizontal in the

11:14:54 20   IVC, but that is extremely rare.

21   Q   Doctor, let's again shift gears and talk specifically

22   about the Eclipse filter.  Have you had an opportunity to

23   review the instructions for use with --

24        MR. COMBS:  Objection, Your Honor.  Nondisclosure to

11:15:08 25   the Eclipse filter.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:15:10  1        THE COURT:  Where is that, Mr. Rogers?

        2        MR. ROGERS:  Your Honor, may we approach?

        3        THE COURT:  Sure.

        4        If you want to stand up, ladies and gentlemen, feel

11:15:15  5   free.

        6     (Bench conference as follows:)

        7        MR. ROGERS:  Generally on page 10 of the report.

        8   Through page 12.  The doctor discusses the Bard family of IFUs

        9   in general.

11:15:58 10        THE COURT:  Where it talks about the Bard Denali IFU?

       11        MR. ROGERS:  Yes, Your Honor.  Then if you continue

       12   to the bottom of page 11, he says these complications have

       13   been warned of in the various IFUs for the Bard family.

       14        THE COURT:  That's talking about -- okay.  So it says

11:16:31 15   this list of complications was present in the IFU for all Bard

       16   IVCs since the G2.  Is that what you're talking about?

       17        MR. ROGERS:  Yes, Your Honor.  And he does go on to

       18   specifically mention the Eclipse in the third line.

       19        MR. COMBS:  It's not in his reliance list,

11:16:47 20   Your Honor.

       21        THE COURT:  What's not?

       22        MR.COMBS:  The Bard Eclipse IFU.

       23        THE COURT:  So what's the objection?

       24        MR. COMBS:  Nondisclosure.

11:16:57 25        THE COURT:  He's being asked to testify about -- I

DIRECT EXAMINATION - CHRISTOPHER MORRIS, M.D.

11:17:00  1   mean give his opinion about the IFU was disclosed; right?

2           MR. COMBS:  His opinion about Bard IFUs, yes.

3           THE COURT:  And that it's in the Eclipse it says

4   right here.

11:17:14  5           MR. COMBS:  There's nothing saying he reviewed that.

6           THE COURT:  But the opinion is disclosed.  They're

7   asking him for the disclosure.  I mean, you're saying it isn't

8   disclosed.  The opinion is disclosed.

9           MR. COMBS:  He looked at the Bard Denali IFU and made

11:17:28  10  a general statement applying to all of them.

11          THE COURT:  Well, so the opinion is disclosed.

12          MR. COMBS:  Not about the Bard Eclipse IFU.  He can

13  talk about the Bard Denali.

14          THE COURT:  He says it was added to the Bard Eclipse

11:17:41  15  IFU.  That's what I'm not understanding.

16          What is it that you say -- what opinion is not

17  disclosed?

18          MR. COMBS:  I don't even know what he's going to ask

19  him about yet.  But this Eclipse IFU was not part of his

11:17:57  20  reliance list in his report.

21          THE COURT:  So what are you going to ask, Mr. Rogers?

22          MR. ROGERS:  I was going to go through the

23  complication section, which he reports here.

24          THE COURT:  On the basis of the Eclipse IFU?

11:18:08  25          MR. ROGERS:  Yes, Your Honor.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, M.D.

11:18:09  1        THE COURT:  He says this is based on the Denali IFU;

        2   right?

        3        MR. ROGERS:  Yes, Your Honor, and refers generally

        4   all of this information since the G2 has been in the entire

11:18:19  5   family of Bard filters and I think that sentence kind of

        6   carries over from 11 to 12.

        7        THE COURT:  It seems to me if you're going to do it

        8   you need to do it the way it was done in the report.  You need

        9   to do it with the Denali IFU and he says what he can say here,

11:18:37 10   that it was present in the IFU for all Bard IVCs since the G2.

       11   That is an opinion that was disclosed.  But I don't think you

       12   can -- if this is all based on the Denali IFU, I don't think

       13   you can have him do it on the basis of the Eclipse IFU.

       14        MR. ROGERS:  May I raise one other thing?

11:18:56 15        THE COURT:  Yeah.

       16        MR. ROGERS:  This is a notebook that Dr. Morris

       17   brought to his deposition for the MDL, and the notebook was

       18   identified at the deposition.  He was asked a question about

       19   the contents of the notebook, about the IFUs that are in here,

11:19:11 20   and the Eclipse IFU is in the IFUs that he brought with him to

       21   the deposition.

       22        THE COURT:  Was it marked as an exhibit?  Did he

       23   testify about it?

       24        MR. ROGERS:  He testified in the sense they asked him

11:19:22 25   about what did you bring and what is this.

CROSS-EXAMINATION - CHRISTOPHER MORRIS, M.D.

11:19:25  1          THE COURT:  Okay.  Did he give opinions --

       2          MR. ROGERS:  He did not, Your Honor.

       3          THE COURT:  Then I think you need to proceed the way

       4   it is in the report.

11:19:34  5          MR. ROGERS:  I will move on from this.

       6          MR. COMBS:  Thank you, Your Honor.

       7        (Bench conference concludes.)

       8          THE COURT:  Thank you, ladies and gentlemen.

       9   BY MR. ROGERS:

11:20:02 10   Q   Dr. Morris, I'm going to try to wrap up here and ask you a

      11   few concluding questions.

      12   A   Okay.

      13   Q   Have you given all of the opinions today to a reasonable

      14   degree of medical certainty?

11:20:12 15   A   Yes.

      16   Q   And, Doctor, is it your opinion the entire Bard family of

      17   filters are safe and effective?

      18   A   Yes.

      19          MR. ROGERS:  Thank you.  I have no further questions.

11:20:23 20          THE COURT:  Cross-examination?

      21            C R O S S - E X A M I N A T I O N

      22   BY MR. COMBS:

      23   Q   Good morning, Dr. Morris.

      24          You didn't review any medical records of the

11:20:40 25   plaintiff, Doris Jones, for your work in this case, did you?

CROSS-EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:20:43 1  A    No.

2  Q    And you didn't look at any internal documents from Bard in

3  your work in this case?

4  A    No.

11:20:50 5  Q    And so if there's internal documents where the medical

6  director of Bard expresses his opinion internally within Bard

7  about the Simon Nitinol filter, you wouldn't know anything

8  about that?

9  A    No.

11:21:06 10  Q    And if the medical director of Bard stated in an internal

11  document that the Simon Nitinol filter had virtually no

12  complaints, you have no way to address that because you did

13  not see the document or talk to anybody at Bard about it;

14  right?

11:21:20 15  A    I did not see that, no.

16  Q    And the Simon Nitinol filter was the predicate device to

17  the Recovery filter.  True?

18  A    Yes.  And the Greenfield.

19  Q    And from reading the medical literature, you know that the

11:21:38 20  Recovery filter had been associated with some problems with

21  migration and perforation, tilting, injuring patients.  True?

22  A    Can you repeat that again, please.

23  Q    Yeah.  From reading the medical literature, you're aware

24  that the Recovery filter had reports of complications

11:21:56 25  including complications that injured patients?

CROSS-EXAMINATION - CHRISTOPHER MORRIS, M.D.

11:21:59  1  A    Yes.

2  Q    And the Recovery filter's no longer on the market.   True?

3  A    True.

4  Q    And Simon Nitinol filter is still on the market?

11:22:07  5  A    No.  Not true.

6  Q    Not true?

7  A    Not true.

8  Q    You're also aware of literature talking about

9  complications regarding the G2 line of filters; correct?

11:22:24 10  A    Yes.

11  Q    And when you talked about the Poletti article and the

12  Simon Nitinol filter, when they were fractures of the struts

13  that you talked -- you remember talking about fractures of

14  struts in the Simon Nitinol filter as reported in the Poletti

11:22:40 15  article?

16  A    Yes.

17  Q    Those struts would stay below the umbrella of the filter.

18  True?

19  A    They didn't really talk about that.  They said there were

11:22:48 20  no symptoms related to those fractures.

21  Q    And in terms of comparing the Recovery, the G2, or other

22  Bard filters to the Simon Nitinol filter, you're not aware of

23  any medical literature comparing the two; correct?

24  A    No.

11:23:11 25  Q    And you've never seen any Bard internal documents

CROSS-EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:23:14  1    comparing the Simon Nitinol filter to other Bard retrievable

2    filters as far as complications.  True?

3    A    True.

4    Q    And you would agree that the knowledge within the medical

11:23:37  5    community about Bard's retrievable filters, as expressed in

6    the medical literature, shows as time went on there were more

7    and more reports of complications with the Recovery and G2

8    line of filters.  True?

9    A    To a certain extent.  There were some papers later on that

11:23:56  10   showed some high complication rates.  But early on there were

11   not.  So in general that could be a true statement, but it

12   wasn't a linear rise in rates.

13   Q    And you talked about how pulmonary embolism can be

14   asymptomatic; right?

11:24:14  15   A    Yes.

16   Q    And a fractured filter can be asymptomatic.  True?

17   A    Yes.

18   Q    And certainly you would agree that a filter can fracture

19   and be in a location that may be dangerous but still be

11:24:31  20   asymptomatic?

21   A    I can't really answer that yes or no because sometimes

22   filter fragments can embolize to the heart and they can be

23   potentially symptomatic.  But if they embolize all the way

24   through the heart and to the pulmonary arteries, they're

11:24:52  25   usually described as asymptomatic.

CROSS-EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:24:54  1   Q   But they could embolize to places where they could be

2   dangerous and still not yet show a symptom.   True?

3   A   They could go to a place where they could be dangerous,

4   but they can also go to a place where they're not dangerous.

11:25:07  5   Q   Fair enough.

6          And -- well, you would agree that a filter piece

7   fracturing and embolizing, that generally poses a danger and

8   risk to the patient.   True?

9   A   A rare risk.

11:25:27  10   Q   And there haven't been any studies on filter fragments and

11   the length of time that they will remain asymptomatic.   True?

12   A   Not true.

13   Q   And once a filter fragment -- it's discovered that a piece

14   of an IVC filter has broken off, that's something that the

11:25:57  15   doctor -- the patient has to deal with.   True?

16   A   I guess that's a little bit hard to answer just yes or no,

17   but we do evaluate those patients and they may or may not be

18   followed for a period of time.   But sometimes they're not

19   followed either.

11:26:20  20   Q   It's something you would take seriously, though?

21   A   Yeah.   I don't discount anything that's related to a

22   patient, no.

23   Q   And filter fragments breaking off and embolizing is

24   something that a medical device company should take seriously.

11:26:35  25   True?

CROSS-EXAMINATION – CHRISTOPHER MORRIS, M.D.

11:26:36  1    A    Well, like anyone, yes.

2    Q    You talked a lot about the efficacy of IVC filters

3    generally.  And your opinion in this case is that IVC filters

4    are effective in preventing pulmonary embolism.  True?

11:26:51  5    A    I believe so, yes.

6    Q    Are you aware of an article published by Dr. Frederick

7    Rogers in the Journal of the American Medical Association in

8    May of 2017?

9    A    Very much so, yes.

11:27:01  10   Q    Dr. Rogers is a former colleague of yours.  True?

11   A    Yes.

12   Q    And Dr. Rogers' article was a study that looked at

13   30 million trauma patients from 2003 to 2015; correct?

14   A    Yes.

11:27:13  15   Q    And his article and his study found as IVC filter usage

16   declined, there was no change in the rate of pulmonary

17   embolism reported in trauma patients; correct?

18   A    That's what he said, yes.

19   Q    And you would agree this article tends to refute the

11:27:30  20   hypothesis that IVC filters are effective in preventing

21   pulmonary embolism.  True?

22   A    I don't agree with that because Dr. Rogers was looking at

23   patients that did not have documented thromboembolic disease.

24   They were placing them in patients prophylactic- -- trauma

11:27:46  25   patients prophylactically and that's an indication that we

CROSS-EXAMINATION - CHRISTOPHER MORRIS, M.D.

11:27:50  1  gave up, and Dr. Rogers also gave it up, at University of

2  Vermont Medical Center more than ten years ago because we

3  don't believe that is a valid indication of IVC filters.

4  Q   And Dr. Rogers has testified in this case that the

11:28:05  5  hypothesis -- hypothesis of his study was that as IVC filter

6  usage declined, pulmonary embolism rates would go up, and he's

7  testified that this study did not validate his hypothesis.

8          Would you disagree with that?

9  A   I do.  And I know most of those authors on that paper,

11:28:28  10  including the lead author Alan Cook and Steve Shackford, who

11  is also on that paper.  I'm not sure that they really looked

12  at the diagnosis of pulmonary embolism in a manner that an

13  interventional radiologist or radiologist would look like.  So

14  CT angiography, for instance, can detect a lot of asymptomatic

11:28:51  15  pulmonary embolism.  In fact, most pulmonary emboli are

16  asymptomatic and if they're not looking for them, how do they

17  know what happened to the pulmonary embolism rate?

18  Q   You talked about the PREPIC 2 study, Doctor.  And the

19  PREPIC 2 study also found that the use of IVC filters did not

11:29:10  20  decrease rates of pulmonary embolism.  Is that true?

21  A   That's what they found, yes.

22          MR. COMBS:  Nothing further, Your Honor.

23          THE COURT:  Any redirect?

24          MR. ROGERS:  No, Your Honor.

11:29:19  25          THE COURT:  All right.  Thank you, sir.  You can step

11:29:21  1   down.

2           MS. HELM:  Your Honor, at this time defendants call

3   Melanie Sussman by videotaped deposition.  Her education and

4   background are in the video.

11:29:51  5           THE COURT:  All right.

6           (Video testimony of Melanie Sussman played.)

7           THE COURT:  Let's stop the video here, Counsel.

8           We'll break until 1 o'clock, ladies and gentlemen.

9           (The jury exited the courtroom at 12:00.)

12:00:01  10          THE COURT:  Please be seated.  Or if you want to

11  leave, that's fine.  It will take me a minute to calculate the

12  time.

13          Well, do you know how we're allocating the deposition

14  time?

12:00:11  15          MS. HELM:  Yes.  The deposition has about two or

16  three minutes left.  The total time allocated to the plaintiff

17  is four minutes.

18          THE COURT:  Okay.

19          All right, Counsel, as of now plaintiff has used 25

12:02:11  20  hours and 53 minutes.  Defendants have used 17 hours and 39

21  minutes.

22          We've handed you the jury instructions after our

23  conversations on Friday.  We've red-lined the stuff that's

24  changed.  And you'll be able to see the stuff that wasn't

12:02:32  25  changed because it isn't changed.  And we've given you a

12:02:35   1   verdict form that is essentially the Booker form with the

           2   things taken out that had to do with Dr. Cain and others.

           3          I have a criminal sentencing today at 4:30, and so

           4   what I think I'd like to do is get any final comments from you

12:02:56   5   on the jury instructions at 8:30 tomorrow morning, if you

           6   could look at those this evening.

           7          Defendants, where are you in your estimate of whether

           8   you will get through with Mr. Carr today?

           9          MR. NORTH:  I'm sorry?

12:03:10  10          THE COURT:  Mr. Carr.  Where are you -- do you think

          11   you'll get through your direct on him today?

          12          MR. NORTH:  It's going to be a very close call one

          13   way or the other.  He's the second witness.  We've got -- we

          14   do have a deposition that we could play in between to stretch

12:03:27  15   that out.  But I'm just not sure.

          16          THE COURT:  Okay.  And Mr. -- I can't remember which

          17   one of you raised the issue with me.  Is it the FDA warning

          18   letter that you wanted to cover with Mr. Carr?  Is that the

          19   issue --

12:03:42  20          MR. CLARK:  That was the thought.

          21          MR. O'CONNOR:  Yes.

          22          THE COURT:  -- that you raised this morning?

          23          Okay.

          24          I've got to prepare for this criminal sentencing over

12:03:47  25   the lunch hour.  If I have time, I'll look at the FDA warning

12:03:51  1    letter.  I'm not certain I'll have time.  But I'll do my best.

       2    And if I can, I'll let you know when I come back in my

       3    conclusion on that.

       4         MR. NORTH:  Your Honor, I certainly can't tell the

12:03:59  5    plaintiffs how to try their case, but Mr. Carr had no role in

       6    filters by the time the letter was issued.  And Mr. Modra, of

       7    course, was the point person and he will be here tomorrow.

       8         THE COURT:  Okay.

       9         MR. O'CONNOR:  Your Honor, then, if that's the case,

12:04:13 10    then understanding your schedule and based upon his

      11    representation, we can get it through Mr. Modra, Your Honor.

      12         THE COURT:  Okay.  I'll be sure to look at it tonight

      13    so I get you an answer by tomorrow morning.

      14         MR. CLARK:  There is the one matter of the monthly

12:04:29 15    management reports.  I have prepared, and forgive me because

      16    it has my highlighting and things like that, drafts --

      17         THE COURT:  When is it -- when is it that you want to

      18    use those?

      19         MR. CLARK:  With Mr. Modra.

12:04:42 20    THE COURT:  Mr. Modra.  Why don't you go ahead and

      21    bring them up.  I probably won't look at those until this

      22    evening.

      23         MR. CLARK:  That's fine, Your Honor.

      24         For the record, Your Honor, the ones that we would

12:04:50 25    propose not redacting the filter related complaint summaries

12:04:56  1    are 4504, 4522, 4519, and 4528.  That's two before the

2    implantation and two after.

3              And then also I'm going to hand the Court a

4    work-in-progress draft of our 1006 summary with the 40

12:05:14  5    complaint summaries, as well as an exemplar of what the

6    redacted monthly management reports would look like.

7              THE COURT:  Okay.

8              MR. CLARK:  May I approach?

9              THE COURT:  Yeah.

12:05:26 10              So are you just giving me the four that have the

11    attachments plus an example of a redacted version?

12              MR. CLARK:  Plus the 1006 summary and 40 complaints.

13              THE COURT:  Right.  Okay.  Thanks.

14              We'll see you at 1 o'clock.

12:05:39 15              MR. COMBS:  Your Honor, I do have copies of the

16    Stavropoulos and Trerotola runs.  I know you're buried over

17    the lunch hour.  But if you could look at them.  They're

18    short.

19              MR. NORTH:  We're not getting to those until

12:05:50 20    tomorrow.

21              MR. COMBS:  If that's for tomorrow, that's fine.

22    May I approach?

23              THE COURT:  What's the issue?

24              MR. COMBS:  The cumulative testimony --

12:05:59 25              THE COURT:  Oh, that's the one you raised this

12:06:01  1    morning?

2                        MR. COMBS:  Correct.

3                        THE COURT:  Let me ask this question:  These are fact

4    witnesses; right?

12:06:07  5              MR. COMBS:  We believe their testimony that defense

6    wants to use is all expert testimony.  That's our position.

7                        THE COURT:  They're not designated experts; right?

8                        MR. COMBS:  Not by Bard, no.

9                        THE COURT:  So this doesn't fall under my direction

12:06:20  10   that you can't use a designated retained expert on more than

11   one issue.  So, instead, it seems to me, if it isn't covered

12   by that, the objection has to be based on a basic cumulative

13   objection, really 403 objection.

14                       MR. COMBS:  Correct, Your Honor.

12:06:38  15             THE COURT:  Okay.

16                       MR. COMBS:  Thank you, Your Honor.

17            (End of a.m. session transcript.)

18                            *  *  *  *  *

19

20

21

22

23

24

25

1                          **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14             DATED at Phoenix, Arizona, this 29th day of May,

15   2018.

16

17

18

19

20                                 s/ Patricia Lyons, RMR, CRR
                                   Official Court Reporter
21

22

23

24

25