```
1                    UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF ARIZONA

3                    _____

4

   In Re:  Bard IVC Filters      ) MD-15-02641-PHX-DGC
5  Products Liability Litigation )
                                  ) Phoenix, Arizona
6  _____ ) May 29, 2018
   Doris Jones, an individual,   ) 1:00 p.m.
7                                 )
                 Plaintiff,       )
8                                 ) CV 16-00782-PHX-DGC
          vs.                     )
9                                 )
   C.R. Bard, Inc., a New         )
10 Jersey corporation; and Bard   )
   Peripheral Vascular, Inc., an  )
11 Arizona corporation,           )
                                  )
12               Defendants.      )
   _____  )
13

14
        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE
15
            REPORTER'S TRANSCRIPT OF PROCEEDINGS
16
            (Jury Trial - Day 9 - P.M. Session)
17          (Pages 1993 through 2130, inclusive.)

18

19

20
   Official Court Reporter:
21 Laurie A. Adams, RMR, CRR
   Sandra Day O'Connor U.S. Courthouse, Suite 312
22 401 West Washington Street, Spc 43
   Phoenix, Arizona 85003-2151
23 (602) 322-7256

24 Proceedings Reported by Stenographic Court Reporter
   Transcript Prepared by Computer-Aided Transcription
25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3           GALLAGHER & KENNEDY PA
             By:  Mark S. O'Connor, Esq.
 4           By:  Paul L. Stoller, Esq.
             By:  Shannon L. Clark, Esq.
 5           By:  C. Lincoln Combs, Esq.
             2575 East Camelback Road, Suite 1100
 6           Phoenix, Arizona 85016

 7           LOPEZ MCHUGH LLP
             BY:  Ramon Rossi Lopez, Esq.
 8           100 Bayview Circle, Suite 5600
             Newport Beach, California 92660

 9

10   For the Defendants:
             NELSON MULLINS RILEY & SCARBOROUGH LLP
11           By:  Richard B. North, Jr., Esq.
             By:  Elizabeth C. Helm, Esq.
12           By:  James F. Rogers, Esq.
             201 17th Street NW, Suite 1700
13           Atlanta, Georgia 30363

14

15

16                     I N D E X

17
     WITNESS:                  DIRECT   CROSS   REDIRECT   RECROSS
18   MELANIE SUSSMAN
     By Video Deposition
19   (Resumed)                 1996

20   JOHN VAN VLEET
     By Mr. Rogers             1996               2081
21   By Mr. Clark                      2065

22   ROB CARR
     By Mr. North              2083
23

24

25
```

1                          INDEX OF EXHIBITS
       EXHIBIT                                        RECEIVED
2      5169      Apr. 25, 2003 Recovery Retrievable
                 Abbreviated 510(k)                     2105
3      5177      Nov. 27, 2002 FDA Clearance Letter
                 Re Recovery Permanent
4                (Substantial Equivalence)              2104
       5178      Oct. 25, 2002 Letter IMPRA to FDA
5                Re Recovery                            2103
       5179      Oct. 4, 2002 Letter FDA to IMPRA
6                Re Recovery                            2102
       5182      Aug. 30, 2002 Letter IMPRA to FDA
7                Re Recovery                            2100
       5187      Aug. 5, 2002 Letter FDA to IMPRA
8                Re Recovery                            2098
       5197      July 25, 2003 FDA Clearance Letter
9                Re Recovery Retrievable
                 (Substantial Equivalence)              2107
10     5252      ETR-04-03-02 (RNF v. Competitive
                 Product -- migration resistance)       2117
11     5301      ETR-05-01-06 Animal Model Evaluation of
                 Recovery Filter G1A Femoral System Report  2110
12     5304      ETR 05-02-11 G1A Recovery Filter
                 Femoral System Chronic Animal Study Report 2111
13     5315      Phase 2 Design Review G1A Recovery Filter
                 Femoral Delivery System                2123
14     5316      Phase 3 Design Review (Design Review 3 & 4)
                 G1A Recovery Filter Femoral Delivery System 2124
15     5877      1996 Memo from Veronica Price          2053
       5949      ETR-06-05-02 (Test report re G2® Clot
16               Trapping Efficiency)                   2121
       6089      Product Development Cycle PPT           2089
17     7960      Summary of clinical studies conducted
                 In support of FDA application for clearance 2061
18     8362      Eclipse Filter Patient Questions & Answers 2033

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S

 2             THE COURT:  Ladies and Gentlemen, for your

 3   information we will go until 4:20 today as I have a 4:30

 4   hearing.

 5             Counsel, let's go ahead and continue playing the      01:00PM

 6   deposition.

 7             (Video testimony of Melanie Sussman resumed.)

 8             MR. ROGERS:  Your Honor, at this time the defense

 9   calls John Van Vleet.

10             THE COURTROOM DEPUTY:  Mr. Van Vleet, if you will     01:05PM

11   please come forward.  Stand right here and raise your right

12   hand, please.

13             (The witness was sworn.)

14             THE COURTROOM DEPUTY:  Could you state and spell your

15   name for the record, sir?                                       01:05PM

16             THE WITNESS:  Sure.  It's John, J-O-H-N, D. as in

17   David, Van Vleet, V-A-N capital V-L-E-E-T.

18             THE COURTROOM DEPUTY:  Thank you, sir.  Please come

19   have a seat.

20                      JOHN D. VAN VLEET,

21   called as a witness herein, having been duly sworn, was

22   examined and testified as follows:

23                      DIRECT EXAMINATION

24   BY MR. ROGERS:

25   Q.  Mr. Van Vleet, can you introduce yourself to the jury,     01:06PM
```

 1   please?

 2   A.   Sure.  My name is John Van Vleet.

 3   Q.   And let's get one thing out of the way right out of the box

 4   which I'm sure everyone is wondering about.  What's up with

 5   your leg?                                                        01:06PM

 6   A.   I have a repeated injury to my left ACL so I'm in the

 7   middle of a two-stage revision.

 8   Q.   Mr. Van Vleet, have you ever been an employee of C.R. Bard?

 9   A.   Yes, I have.

10   Q.   What years were you employed at C.R. Bard?               01:06PM

11   A.   I began working for Bard in June of 2007.

12   Q.   And what -- well, when did you leave Bard?

13   A.   At the end of the calendar year last year.

14   Q.   So at the end of 2017?

15   A.   Correct.                                                 01:06PM

16   Q.   Can you tell the jury what you are doing now, please?

17   A.   Sure.  My position at Bard was the Vice President of

18   Regulatory and Clinical Affairs and it's exactly the same job

19   I'm doing for a smaller company based in Boston, Corindus

20   Vascular Robotics.                                            01:07PM

21   Q.   Do you currently live in Phoenix?

22   A.   I live in Tempe.

23   Q.   How long have you lived in the Phoenix area?

24   A.   Since 2007.

25   Q.   And with your new job, are you going to remain in the    01:07PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    Phoenix area?

2    A.  I will.

3    Q.  So you are able to work for this Boston company remotely

4    and live in Phoenix?

5    A.  Correct.  I will be in the office a week of the month.          01:07PM

6    Q.  Mr. Van Vleet, do you have family here?

7    A.  I do.

8    Q.  Tell us about your family.

9    A.  Let's see.  I have my 90-almost-3-year-old mother, my wife,

10   and two of our three children live here.  And then I have two     01:07PM

11   adult children that live in Michigan.

12   Q.  Mr. Van Vleet, let's talk a little bit more about your time

13   at Bard.  Were you an employee of the Peripheral Vascular

14   Division?

15   A.  Yes, I was.                                                     01:07PM

16   Q.  And tell us what your -- what you did in your role as the

17   VP of Regulatory Clinical Affairs?

18   A.  So essentially, my responsibilities were to interface with

19   all ministries of health throughout the world in the countries

20   in which we sold our products.  In the U.S. that would be the      01:08PM

21   FDA.  And in the cases where those products required a higher

22   level of data, such as human clinical trials, then our teams

23   would need to design and conduct clinical trials to collect

24   those data.

25   Q.  Did your job entail communications with the FDA?               01:08PM

1    A.   Yes.

2    Q.   And how frequently were you in communication with the FDA?

3    A.   At least once a week.

4    Q.   Mr. Van Vleet, before I ask you some questions about your

5    education, tell us where you were born, please.                    01:08PM

6    A.   Sure.  I was born about 40 miles from the Haitian border in

7    the Dominican Republic.  I was youngest son of four missionary

8    parents.

9    Q.   When did you come to the United States?

10   A.   I came to go to University in 1977.                            01:08PM

11   Q.   What year did you finish?

12   A.   Well, I changed majors a few times and I was working full

13   time.  I graduated in 2003.

14   Q.   What was your degree that you finished with?

15   A.   A Bachelor of Science in biology with a minor in chemistry.   01:09PM

16   Q.   Are you also -- do you have a degree in medical technology?

17   A.   I did a 12-month internship and took the boards and

18   received my license from the American Society of Clinical

19   Pathologists in 1984.

20   Q.   What does a medical technologist do?                          01:09PM

21   A.   So in order to conduct and analyze samples collected from

22   patients, human patients, a team of pathologists are supported

23   by med techs, licensed med techs, who then have been

24   specifically trained to conduct these studies.

25   Q.   Does that involve a lot of work in a laboratory?             01:09PM

1    A.   Yes.

2    Q.   And Mr. Van Vleet, do you have a Master's Degree?

3    A.   I do.

4    Q.   In what?

5    A.   I have a Master's of Science in management with a minor in          01:10PM

6    marketing from Marian College.

7    Q.   Did you start off your work life in the medical device

8    industry?

9    A.   No.

10   Q.   And can you tell us the journey you went through to get to         01:10PM

11   the medical device industry?

12   A.   Sure.  I had the good fortune of finding a job in a

13   hospital system in Fort Wayne, Indiana, where I worked at the

14   time.  And they had tuition reimbursement, which is how I was

15   able to pay for my college.  But after I finished my licensure         01:10PM

16   in medical technology, I was unable to find a position in the

17   field of medicine.  So I focused on analytical laboratory type

18   of work and I worked analyzing fuels and lubricants and coal

19   and different things like this, basically leveraging my lab

20   skills and then also worked briefly as the manager of a               01:10PM

21   hazardous waste testing landfill.

22          And it was at that time that I was finishing my

23   Master's and I met the person that offered me my first job in

24   medical devices 30 years ago at Bristol-Myers Squibb Orthopedic

25   Division-Zimmer.                                                      01:11PM

1    Q.  Have you been in the medical device industry since that

2    time?

3    A.  I have been lucky enough to be there, yes.

4    Q.  That's been for about 30 years?

5    A.  Yes.                                                          01:11PM

6    Q.  Why have you devoted your career to the field of medical

7    devices?

8    A.  For me, it offered me an opportunity to be involved in the

9    delivery of care to patients.  I missed not working in the

10   hospital because I did patient care in the hospital.  But this   01:11PM

11   almost brings both worlds together.  You still have an impact

12   and you are still delivering care to patients, but you have

13   better working hours.

14   Q.  Let's turn our attention, I guess, to your work at C.R.

15   Bard.  And I think you told us that you came to Bard in 2007,    01:11PM

16   is that right?

17   A.  June of 2007.

18   Q.  So at that point in time, what IVC filter was on the

19   market?

20   A.  At that time, the G2 Filter was on the market for permanent  01:11PM

21   indication.

22   Q.  And did you have responsibilities for the G2 Filter?

23   A.  I did.

24   Q.  And what was the first project that you were involved in

25   regarding the G2 Filter?                                         01:12PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1  A.  So the study of -- for the submission to the FDA had been

2  essentially completed.  The data were being scrubbed and they

3  were being analyzed.  So essentially, it was to take those data

4  and oversee or help write the clinical study report that would

5  be submitted to FDA.                                        01:12PM

6  Q.  When you are referring to a clinical study, are you

7  referring to the EVEREST study?

8  A.  I am.

9  Q.  So when you arrived in 2007, had the G2 already been on the

10  market?                                                     01:12PM

11  A.  Yes.

12  Q.  And about how long had it been on the market?

13  A.  Maybe a year or a couple years.  Actually, I think it was

14  two years.  Two years.  Yeah.

15  Q.  And when it was originally cleared and made it into the   01:12PM

16  marketplace, was the G2 indicated for permanent retrieval -- or

17  excuse me -- as a permanent filter?

18  A.  Yes.

19  Q.  And so the purpose of EVEREST was what?

20  A.  To evaluate the safety of being able to retrieve the device  01:13PM

21  when it was no longer clinically necessary.

22  Q.  And Mr. Van Vleet, was it necessary for you to educate

23  yourself as part of the process of getting up to speed to do

24  your job about what had happened historically with the G2

25  Filter?                                                     01:13PM

UNITED STATES DISTRICT COURT

—5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct—

1    A.   Yes.

2    Q.   And once you were involved in the EVEREST study, did you

3    have communications with FDA about that study?

4    A.   Yes.

5            MR. ROGERS:  Can we pull up Exhibit 5333, please.          01:13PM

6            And, Your Honor, this is in evidence since this

7    morning, I believe.  May we publish?

8            THE COURT:  You may.

9    BY MR. ROGERS:

10   Q.   Mr. Van Vleet, can you see on your screen this exhibit?      01:13PM

11   A.   I can.

12   Q.   And can you tell the jury what this is?

13   A.   This is an IDE annual progress report.  IDE stands for

14   Investigational Device Exemption which is the process by which

15   FDA grants manufacturer the permission to conduct trial or a      01:14PM

16   study of a device that's not included in its current approved

17   labeling.  That's a long story.

18   Q.   When you say "approved labeling" do you mean cleared

19   labeling?

20   A.   Cleared labeling.  Yes.  Correct.                            01:14PM

21   Q.   What is the distinction between those two things, cleared

22   and approved?

23   A.   Sure.  So the IVC filter family of products are Class II

24   products.  Those are cleared through an application process

25   called the 510(k) process.  Class III devices are cleared         01:14PM

1    through a usually clinical trial but what's call a PMA process,

2    or premarket approval application and that's generally a longer

3    process as well.

4    Q.  And of all the Bard IVC filter products that are

5    retrievable, have they all been through the 510(k) clearance          01:14PM

6    process?

7    A.  Yes, sir.

8    Q.  Mr. Van Vleet, can you describe for the jury just generally

9    what the purpose of this document is?

10   A.  So there is a requirement on an annual basis to provide a         01:15PM

11   comprehensive summary of mostly the adverse events that are

12   collected in the study, because frequently you don't have all

13   of the data points for all the primarium points.  And so it's

14   kind of a status report of the study.  You actually do two

15   different reports:  One every six months as a listing of            01:15PM

16   investigators or people that are actually doing the study and

17   confirming that they have institutional permission to do that;

18   and then this is the more extensive listing of all the adverse

19   events.

20           MR. ROGERS:  Scott, would you mind going to Page 33.         01:15PM

21   BY MR. ROGERS:

22   Q.  Down at the bottom, Mr. Van Vleet, do you see where it says

23   3.7?

24   A.  Yes.

25   Q.  Can you read for the jury what that is?                          01:15PM

1   A.   Summary of anticipated and unanticipated adverse effects.

2   The study utilizes an independent physician who acts as a

3   medical monitor.  The medical monitor's role is to ensure an

4   unbiased assessment of adverse events and responsible for the

5   review and validation of all reported adverse events that are          01:16PM

6   considered serious, device and/or procedure related and that

7   occur during the course of the study.

8   Q.   And so is this where you are periodically providing to FDA

9   information about adverse events that happened during the

10  EVEREST study?                                                          01:16PM

11  A.   Yes.

12          MR. ROGERS:  Let's go to Page 57, please.  And can you

13  rotate that?  Can you pull that chart out, I guess, so it's a

14  little bigger maybe?

15  BY MR. ROGERS:                                                          01:16PM

16  Q.   Mr. Van Vleet, can you see that okay?

17  A.   I can.

18  Q.   Can you tell the jury what we're looking at here?

19  A.   This is just a detail listing of all complications that

20  would have been reported in the study.  FDA called them adverse        01:17PM

21  events.

22  Q.   And so if an event occurs during the EVEREST study, is Bard

23  obligated to report that?

24  A.   Yes.

25  Q.   And let's go on to Page 70, please.                               01:17PM

─────5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct─────

1        Can you pull that table out?

2        And just so we're oriented, Mr. Van Vleet, I want to

3   ask you what some of these columns are.  On the far left looks

4   like there's a column called "patient number."  What is that?

5   A.  So that's a code that's assigned to the patient to                   01:17PM

6   de-identify them and protect their anonymity.

7   Q.  Then there's a column called "AE number."  What is that?

8   A.  That is a number -- I'm just trying to orient myself.

9   Okay.  So that would be if a patient has an adverse event, they

10  first have their own identifier, and then that adverse event             01:17PM

11  would be Number 1.  If they have more than one, the next is

12  Number 2, 3, 4, et cetera.

13  Q.  How about that next column that says, "preferred term."

14  What is that?

15  A.  Sure.  So FDA prefers, and the clinical community prefers            01:18PM

16  that we use a pre-agreed upon listing of names, in other words,

17  that we're always calling the condition or whatever happens the

18  same thing every single time.  So that's the preferred name

19  that usually is agreed upon before, or there is a glossary that

20  is included.                                                             01:18PM

21  Q.  And moving across the page there is a column that says

22  "event."  Do you see that underneath "investigator assessment"?

23  A.  Yes, sir.

24  Q.  What is that?

25  A.  So that's just basically kind of a more detailed                     01:18PM

1    description of actually what the complication was.

2    Q.  And then following that, there's a column called "SAE."  Do

3    you see that?

4    A.  Yes.

5    Q.  What does that stand for?                                    01:18PM

6    A.  That stands for Serious Advice Effect or Event.

7    Q.  And there are some Ns we see underneath that.  Does that

8    get coded as either N or Y?

9    A.  Yes.

10   Q.  For yes or no?                                              01:19PM

11   A.  Yes.

12   Q.  Then we've got a column that says "filter," and what's

13   going on in that column?

14   A.  Sure.  So on the case report form where these events are

15   reported to the sponsor, there is a question that asks the      01:19PM

16   physician to give his interpretation or her interpretation as

17   to whether or not that event had something to do with the

18   device, in this case the filter.  So it would say "not related"

19   or "related."

20        MR. ROGERS:  Scott, if you don't mind could you pull       01:19PM

21   out the section on Patient 06-14, please.  And how about pull

22   out everything down through Number 9, if you would, all

23   together.

24   BY MR. ROGERS:

25   Q.  Can you see that, Mr. Van Vleet?                            01:20PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    A.  Yes.

2    Q.  And so on that far column, it says 06-14.  Are all these

3    adverse events, do they all relate to one patient?

4    A.  They are.  There are nine of them total.

5    Q.  And how many events -- I'm sorry.  You just said it.  This       01:20PM

6    patient had nine events?

7    A.  Yes.

8    Q.  Let's kind of walk through those if you would.  The first

9    one says "hepatotoxicity."  What is that?

10   A.  That means basically poisoning of the liver, essentially.       01:20PM

11   And it looks here that they were taking Dilantin, which is a

12   medication for seizure purposes, and they may have reached some

13   toxic levels of that.

14   Q.  Was that coded as being related to the filter?

15   A.  It was coded as not related.                                    01:20PM

16   Q.  And the second issue that this patient had is something

17   called atrial flutter.  What is that?

18   A.  That is a quivering or vibration of the heart.  It's very

19   common in people over 65, 70 years of age.

20   Q.  Was that coded as being related to the filter?                  01:21PM

21   A.  It was coded as not related.

22   Q.  And next on the third adverse event is dysphasia.  What is

23   that?

24   A.  It is the -- not inability, but the loss of desire to eat,

25   essentially.                                                        01:21PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1   Q.  And was that coded as being related to the filter?

2   A.  Not related.

3   Q.  And just to kind of move this on, Mr. Van Vleet, looks like

4   we've got sinusitis, esophagitis, hiatal hernia, diarrhea, oral

5   candidiasis -- I'm sure I'm not saying that right -- and rash.    01:21PM

6   Do you see all those?

7   A.  I do.

8   Q.  Were any of those coded as being related to the filter?

9   A.  They were all coded as not related.

10  Q.  And then looking more specifically as the more detailed       01:21PM

11  description of those events, can you provide the jury some

12  additional information about those things?

13  A.  Yeah.  So Number 4, sinusitis, it would be an infection of

14  the sinuses.  Esophagitis is an irritation of your swallowing

15  portion of your throat.  Hiatal hernia is part of your           01:22PM

16  intestine, sometimes can protrude through tears in your

17  abdominal cavity.  Diarrhea is self-explanatory.  Oral

18  candidiasis is a yeast infection of the mouth.  And rash is a

19  fungal rash growing in axillae.  Axillae is your armpit.

20  Q.  Were all of these adverse events reported as being adverse    01:22PM

21  events in the EVEREST study?

22  A.  They were.

23  Q.  Mr. Van Vleet, let's switch over to a different page and go

24  to Page 57, please.

25          MR. ROGERS:  And can you pull out the information for      01:22PM

1    the patient, that very first patient at the top.  Thank you.

2    BY MR. ROGERS:

3    Q.  And Mr. Van Vleet, tell us what's occurring in this

4    particular row.

5    A.  I need to read it for a second.                                    01:23PM

6            Okay.  This was a report of a perforation or other

7    acute or chronic damage of the inferior vena cava, which is the

8    big vessel that the filter is placed in.  So the filter had

9    perforated or damaged the IVC or the inferior vena cava.

10   Q.  Was that an adverse event that was reported as being          01:23PM

11   related to the filter?

12   A.  Yes.  Definitely.

13   Q.  Does it specifically say "definitely" there?

14   A.  It says "definitely."

15   Q.  Mr. Van Vleet, we have seen some examples of the way these    01:23PM

16   adverse events are reported.  And the jury has also heard that

17   the adverse event rate for the EVEREST study was over 50

18   percent.  And would that include all of these adverse events?

19   A.  Yes.

20   Q.  And would it include the adverse events that are not          01:24PM

21   related to the filter or that were coded as not related to the

22   filter?

23   A.  Yes.

24           MR. ROGERS:  We can bring that down.  And Let's call

25   up Exhibit 5335, please.                                          01:24PM

—————5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct—————

1          And, Your Honor, this has been admitted.  May we

2   publish?

3          THE COURT:  Yes.

4   BY MR. ROGERS:

5   Q.  Mr. Van Vleet, can you tell the jury, please, what this is?   01:24PM

6   A.  This is another annual progress report on the clinical

7   trial, the investigational device exemption study.

8   Q.  So let's go to Page 18 of that document.

9          And Mr. Van Vleet, at the bottom of the page there,

10  what did Bard tell FDA about the complications observed during   01:24PM

11  the EVEREST study?

12  A.  Sure.  I will read from the report:  In total, there were

13  10 filter migrations greater than two centimeters reported with

14  a mean follow-up of five months.  These migration were all

15  caudal in direction between 2.0 and 4.1 centimeters and without   01:24PM

16  clinical sequelae, which means any further complication.

17         No subject with filter migration was found to have a

18  subsequent pulmonary embolus and no filter embolized.  PE,

19  pulmonary embolus, is a blood clot to the lungs.  Of these 10

20  migrated filters, five were successfully retrieved; three were   01:25PM

21  left in place without attempted retrieval; and two remained in

22  place after a failed retrieval procedure.  A total of six

23  subjects had expired during the course of the EVEREST study.

24  The following is a summary for two subjects.

25         Do you want me to continue reading?   01:25PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1   Q.  No.  That's okay.  You can take that down.

2           Did Bard have subsequent communications with FDA about

3   caudal migration?

4   A.  Yes, it did.

5           MR. ROGERS:  Can we pull up Exhibit 5334, please.          01:25PM

6           And, Your Honor, may we publish?  This has been

7   admitted.

8           THE COURT:  You may.

9   BY MR. ROGERS:

10  Q.  Mr. Van Vleet, how about tell the jury what this is,          01:26PM

11  please.

12  A.  This is a letter from the FDA to the regulatory

13  correspondent, a Bard employee, asking them questions about the

14  application that they were reviewing, the 510(k).

15  Q.  Let's go to Question 3 on the following page.                 01:26PM

16          MR. ROGERS:  And could you pull that out, please.

17  BY MR. ROGERS:

18  Q.  And so Mr. Van Vleet, what did FDA want to know from Bard

19  about the caudal migration information?

20  A.  Sure.  They said that we have reported that there have been   01:26PM

21  10 migrations in the 100-patient study.  This equates to an

22  incidence of migration of 10 percent.  Please explain why this

23  rate of device migration the clinically acceptable.  In

24  addition, please provide a comparison of the approximate

25  migration rates of the currently marketed Recovery and G2        01:26PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    Filter devices based on your clinical experience as compared to

2    the investigational Recovery Filter studied in the EVEREST

3    trial.

4    Q.  Did Bard respond to this letter?

5    A.  Yes.                                                    01:27PM

6           MR. ROGERS:  Can we pull up Exhibit 5336?

7           And, Your Honor, may we publish?  It's been admitted.

8           THE COURT:  Yes.

9    BY MR. ROGERS:

10   Q.  Mr. Van Vleet, I think we need to probably go to Page 13 of  01:27PM

11   the letter.  And do you see the portion there about question

12   Number 3?

13   A.  Yes.

14   Q.  And what did Bard tell the FDA in regard to caudal

15   migration?                                                 01:27PM

16   A.  Do you want me to read it or paraphrase?

17   Q.  You can paraphrase.

18   A.  Okay.  So they had -- the question originally was 10

19   patients out of the 100-patient study were reported to have

20   some level of migration, which would be 10 percent.  And the  01:27PM

21   FDA said, please help us understand why this is clinically

22   acceptable.  So the first thing that we did in the response is

23   correct that, because while there were 100 patients in the

24   study, I believe there were only images available for 82.  So

25   10 divided by 82 is actually 12.2 percent.                 01:28PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1          So we revised the percentage to show what we knew to

2     be true.  And then it talks about the levels of migration and

3     the distances that it migrated.

4     Q.  During the course of your working with the EVEREST study,

5     to your knowledge, were all the adverse events that occurred          01:28PM

6     during that study reported to the FDA?

7     A.  Yes.

8     Q.  Let's move on to the next document, which is Exhibit 5340.

9          MR. ROGERS:  And, Your Honor, may we publish?  This is

10    already in evidence.                                                   01:28PM

11          THE COURT:  Yes, you may.

12    BY MR. ROGERS:

13    Q.  Mr. Van Vleet, what is this document?

14    A.  This is the application to the FDA for request to clear the

15    G2 Filter system.  It's a traditional 510(k).                         01:28PM

16    Q.  And was this submitted to the FDA after the EVEREST study

17    was completed?

18    A.  Yes.

19    Q.  And about how big is this document, Mr. Van Vleet, if you

20    know?                                                                  01:29PM

21    A.  Well, it would be much larger than a typical 510(k) because

22    it would include the entire clinical study report and patient

23    line listings.  This is probably 1500 pages, perhaps, 1500.

24    Q.  Let's go over to Page 339 of the document.

25          Mr. Van Vleet, tell us what this is, please.                    01:29PM

1    A.   This is actually the title page for the final study report.

2    Q.   So was the final study report provided to FDA in its

3    entirety?

4    A.   Yes.

5         MR. ROGERS:  And can we go over to Page 406?                    01:29PM

6         And pull out the table there.

7    BY MR. ROGERS:

8    Q.   So what is this information?

9    A.   Sure.   This is a listing of filter-related device

10   observations as defined by the American College of Radiology       01:29PM

11   and the Society For Interventional Radiology.  It lists five

12   different types.  And then it has a miscellaneous column.  And

13   it compares the data that were collected in the EVEREST study

14   with the classifications that both ACR and SIR have and divides

15   them into major and minor complications.                           01:30PM

16   Q.   And according to this table, how many patients in the

17   EVEREST study experienced a fracture?

18   A.   One.

19   Q.   Do you know if that patient was symptomatic or

20   asymptomatic?                                                      01:30PM

21   A.   I believe that patient was no symptoms.

22         MR. ROGERS:  Let's go over to Page 408.  And can we

23   pull out this chart, please?

24   BY MR. ROGERS:

25   Q.   So Mr. Van Vleet, can you tell us what this chart is?        01:30PM

1    A.   This is, again, device observations compared to what the

2    Society For Interventional Radiology standards are.   It

3    includes migration greater than two centimeters; embolization

4    which basically means when the filter, or part of the filter,

5    moves with the blood flow; filter fracture; and filter                 01:31PM

6    penetration.

7    Q.   So in regard to filter fracture, how did that rate that was

8    reported in EVEREST compare to the SIR rate?

9    A.   So the one patient presumably divided by the 82 patients

10   that had evaluable images equals 1.2 percent, and SIRs range          01:31PM

11   that they have published that would be expectable in these

12   populations is somewhere between 2 and 10 percent.

13   Q.   Let's go on to Page 797, please.

14           MR. ROGERS:   And would you mind pulling that out, the

15   table?                                                                01:31PM

16   BY MR. ROGERS:

17   Q.   And Mr. Van Vleet, can you describe for the jury, please,

18   what this table represents?

19   A.   Sure.   This is a listing or a summary of all of the

20   recorded movements in the EVEREST study in any patient.              01:32PM

21   Q.   When you say "recorded movements" what does that mean?

22   A.   So there is an independent evaluator that looks at images

23   and makes the determination if the device has moved since its

24   original implantation.

25   Q.   Down at the bottom it says:   Movement greater than two          01:32PM

1    centimeters.  Do you see that?

2    A.  Yes.

3    Q.  So was there a particular definition of what migration was

4    defined at for this study?

5    A.  Yes.  It was based on the SIR recommendation that a        01:32PM

6    movement of greater than two centimeters be considered to be

7    actually significant.

8    Q.  And the other ones that are above movement greater than two

9    centimeters, those are all less than two centimeters of

10   movement?                                                      01:32PM

11   A.  Yes.  Those are all expressed in millimeters.

12   Q.  Was all this information provided to FDA?

13   A.  Yes.

14   Q.  Mr. Van Vleet, were the results of the EVEREST study

15   published in the medical literature?                           01:33PM

16   A.  Yes, they were.

17   Q.  And can we pull up Exhibit 6892.

18        And do you have that exhibit on your screen?

19   A.  I do.

20   Q.  And tell the jury what it is, please.                      01:33PM

21   A.  Sure.  It's -- I will read the title of the paper, which is

22   the Technical Success and Safety of Retrieval of the G2 Filter

23   and a Prospective Multicenter Study.  And this was published in

24   Journal of Vascular and Interventional Radiology which is the

25   journal for the Society of Interventional Radiology in 2009.   01:33PM

1        MR. ROGERS:  Your Honor, at this time I move Exhibit

2   6892 into evidence.

3        MR. CLARK:  Your Honor, I think he's touched the basis

4   for 803.18 but nothing more.

5        THE COURT:  Your response?                              01:33PM

6        MR. ROGERS:  Your Honor, I'm admitting it not for the

7   truth of the matter but notice to the medical community and the

8   information that was provided about the G2 Filter and the

9   results of this study within the greater community for doctors

10  who used these types of devices.                             01:34PM

11       THE COURT:  Counsel, let's talk about that for a

12  minute.

13       If you want to stand up, Ladies and Gentlemen.

14       (Discussion was had at sidebar out of the hearing of

15  the jury:)                                                   01:34PM

16       THE COURT:  Why is notice to the medical community

17  about the G2 relevant?

18       MR. ROGERS:  Well, Your Honor, the jury's heard a lot

19  of evidence how the Eclipse is nothing but the G2 that's been

20  electropolished.  And, of course, the plaintiff's contention in 01:34PM

21  this case is the electropolish really didn't do anything.  So I

22  think that we would like to be able to show, you know, what the

23  information in the medical literature was about the G2.

24       THE COURT:  Well, but that sounds to me like it's for

25  the truth of the matter asserted.  You would like to show what  01:34PM

1    the medical literature said about the complication rates on the

2    G2.

3          MR. ROGERS:  Let me rephrase, Your Honor.  What was

4    the information that was available to the doctors.

5          THE COURT:  My question is:  Why is that relevant?        01:35PM

6    Why is notice to doctors about the G2 independent of the truth

7    of the matter asserted relevant in this case?

8          MR. ROGERS:  Your Honor, I don't have a better answer

9    so if that's where we are, you want me to move on?

10         THE COURT:  No.  My ruling, then, is this really is        01:35PM

11   being offered for the truth of the matter asserted.  So I'm

12   going to sustain the objection to admission but you can use it

13   under 803.18.  I think you didn't have an objection to that.

14         MR. CLARK:  I agree with that.

15         THE COURT:  So you can read portions in but we can't       01:35PM

16   admit the document.

17         MR. ROGERS:  Sure.  Thank you, Your Honor.

18         (In open court.)

19         THE COURT:  Thank you, Ladies and Gentlemen.

20   BY MR. ROGERS:                                                  01:35PM

21   Q.  Mr. Van Vleet, I'm going to get you to provide the jury

22   some information that's contained in this document.

23         Do you see it?

24   A.  Yes.

25   Q.  And the results section that is there in front of you, can  01:35PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1   you tell the jury if that matches the information that was in

2   the clinical study that was provided to FDA?

3   A.  Yes.

4   Q.  And so does this article report information from the

5   EVEREST study about fracture, migration, penetration, and tilt?    01:36PM

6   A.  It does.

7   Q.  So is that information available in the medical literature?

8   A.  Yes.

9           MR. ROGERS:  Let's move on to Exhibit 5339, please.

10          And, Your Honor, may I publish?  It's in evidence.          01:36PM

11          THE COURT:  Is that 539?

12          MR. ROGERS:  5339.

13          THE COURTROOM DEPUTY:  Yes, it's in.

14          THE COURT:  Yes.  You may publish.

15  BY MR. ROGERS:                                                     01:36PM

16  Q.  Mr. Van Vleet, what is this document?

17  A.  This is a letter from the FDA to the regulatory

18  correspondent at Bard informing them that the FDA has

19  considered the device in question to be substantially

20  equivalent, or in other words, they have cleared the device for    01:37PM

21  commercial distribution.

22  Q.  And would that be commercial distribution with a labeled

23  indication as a retrievable filter?

24  A.  Yes.

25  Q.  So let's move forward, Mr. Van Vleet, to some additional       01:37PM

1    documents.

2              MR. ROGERS:  And how about pull up 5354.

3              And, Your Honor, this document is already in evidence.

4    May we publish?

5              THE COURT:  Yes.                                    01:37PM

6    BY MR. ROGERS:

7    Q.  Mr. Van Vleet, can you describe for the jury what this

8    document is?

9    A.  Yeah.  It's the cover page from another application to FDA.

10   This would be a special 510(k).                              01:37PM

11   Q.  And what in this particular 510(k) was FDA asking -- or

12   excuse me -- was Bard asking FDA to clear?

13   A.  I have to -- oh.  Change, I believe, in the delivery

14   system.

15   Q.  And let's go to Exhibit 5353.                            01:37PM

16             Your Honor, may we publish?  This is in evidence.

17             THE COURT:  You may.

18   BY MR. ROGERS:

19   Q.  Mr. Van Vleet, what is this document?

20   A.  This appears to be the clearance letter from FDA clearing  01:38PM

21   the previous application.

22   Q.  And would this be the third time that the FDA has cleared a

23   product that's related to the G2 Filter?

24   A.  I believe so.

25             MR. ROGERS:  How about let's move to Exhibit 5361.   01:38PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1            And, Your Honor, may we publish?  This is in evidence.

2            THE COURT:  You may.

3    BY MR. ROGERS:

4    Q.  Mr. Van Vleet, what's this document?

5    A.  It is another submission to the FDA, a special 510(k)          01:38PM

6    submission for the G2 Filter system and some modification to

7    the delivery kit.

8            MR. ROGERS:  And may we pull up 5362.

9            And, Your Honor, may we publish this which is also in

10   evidence?                                                          01:39PM

11           THE COURT:  Yes.

12   BY MR. ROGERS:

13   Q.  And Mr. Van Vleet, was the application that we saw just a

14   moment ago, was that also cleared by FDA?

15   A.  Yes.  This is the clearance letter clearing that              01:39PM

16   application.

17   Q.  And was that the fourth clearance that the FDA had done on

18   the G2 Filter?

19   A.  I believe so.

20   Q.  All right.  Mr. Van Vleet, how about tell us what the G2      01:39PM

21   Express Filter is.

22   A.  The G2 Express was the inclusion of a hook at the apex of

23   the filter to enable it to be retrieved with a snare.

24   Q.  Did Bard submit a 510(k) application to the FDA for the G2

25   Express for clearance?                                            01:39PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    A.  Yes.

2           MR. ROGERS:  Can we pull up Exhibit 5373.

3           And, Your Honor, may we publish?  That's also

4    admitted.

5           THE COURT:  Yes.                                      01:40PM

6    BY MR. ROGERS:

7    Q.  Mr. Van Vleet, is this the 510(k) application?

8    A.  This is the 510(k) requesting clearance for the addition of

9    a hook onto the apex.

10   Q.  Was this submission ultimately cleared?                  01:40PM

11   A.  Yes.

12          MR. ROGERS:  And can we pull up 5368.  Your Honor, may

13   we publish?

14          THE COURT:  Yes.

15   BY MR. ROGERS:                                               01:40PM

16   Q.  Mr. Van Vleet, was this the letter from FDA clearing that

17   application for the G2 Express?

18   A.  Yes, it is.

19          MR. ROGERS:  How about let's go to 5379.

20          And, Your Honor, may we publish?  This is in evidence. 01:40PM

21          THE COURT:  Yes.

22   BY MR. ROGERS:

23   Q.  Mr. Van Vleet, is this another application for the G2

24   Express?

25   A.  Yes, it is.                                              01:40PM

 1   Q.  And what is this for?

 2   A.  This is, I believe, for a modification of the delivery

 3   system G2 Express.

 4           MR. ROGERS:  And can we go to Exhibit 5376?

 5           Your Honor, may we publish?  It's in evidence.          01:41PM

 6           THE COURT:  Yes.

 7   BY MR. ROGERS:

 8   Q.  Mr. Van Vleet, was this particular application cleared by

 9   the FDA?

10   A.  Yes.  This is the clearance letter from FDA.               01:41PM

11   Q.  Was that the sixth clearance we have seen for the G2 line

12   of filters?

13   A.  Yes.

14   Q.  Okay.  Let's turn our attention to the Eclipse Filter, if

15   you would, Mr. Van Vleet.                                      01:41PM

16           Were you personally involved with the regulatory

17   filings for the Eclipse Filter?

18   A.  I was.

19   Q.  So before Bard ever submitted a clearance application to

20   FDA for the Eclipse, did you have communications with the FDA?  01:41PM

21   A.  Yes.

22   Q.  And did you have communications with FDA about the Eclipse

23   Filter?

24   A.  Yes.

25   Q.  And can we pull up Exhibit 5593, please.                   01:41PM

1          Mr. Van Vleet, do you have that on your screen?

2     A.  Yes.

3     Q.  Can you tell us what this is, please?

4     A.  This is meeting minutes from a meeting held with our

5     reviewer at FDA.  After the meetings are concluded FDA requests    01:42PM

6     that we submit to them a copy of our meeting minutes and then

7     they usually have some editorial comments and change some

8     things.  And once they are agreed upon they are filed.

9     Q.  In the second paragraph there's something referred to there

10    called G2 Platinum.  Do you see that?                             01:42PM

11    A.  Uh-huh.

12    Q.  Can you tell the jury what G2 Platinum is?

13    A.  So I believe G2 Platinum was a project that was being

14    undertaken to terminally electropolish or provide a more

15    consistent surface finish on the G2 family of products.          01:42PM

16    Q.  And did the G2 Platinum project make it anywhere, or did it

17    kind of get scrapped?

18    A.  No.  It ended up being scrapped because it was not feasible

19    to electropolish it given some of the constructs of it.

20    Q.  So if we go to Page 2 of this document, and up at the top    01:42PM

21    there in that paragraph, do you see where it references caudal

22    anchors?

23    A.  Yes.

24    Q.  And so what was being relayed to FDA about caudal anchors?

25    A.  So simply that this would be the next upcoming project that   01:43PM

———5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct———

 1    they would be seeing.  We try always to provide FDA kind of a

 2    sense of the timing and what -- for them to be able to manage

 3    their workload.

 4    Q.  And did the caudal anchors ultimately get added to the Bard

 5    filter?                                                        01:43PM

 6    A.  Yes.

 7    Q.  Was that in a filter called the Meridian Filter?

 8    A.  Yes.

 9    Q.  Let's look down at the bottom of this document, please.

10    Mr. Van Vleet, do you see where it references laser cut filter  01:43PM

11    with caudal anchors?

12    A.  Yes.

13    Q.  And what does that mean, laser cut?

14    A.  So it would be a product that is cut out of a tube, in this

15    case Nitinol, nickel titanium, via laser, basically carved      01:44PM

16    through a laser cut, single construct.  One solid state.

17    Q.  And did Bard ultimately introduce into the marketplace a

18    laser cut filter?

19    A.  Yes.

20    Q.  And which filter is that?                                   01:44PM

21    A.  That's the Denali Filter.

22    Q.  Is that the filter that's on the market currently?

23    A.  Yes, it is.

24    Q.  And so is this information about projects involving caudal

25    anchors and potentially laser cutting a filter, was it all      01:44PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    provided to FDA before the application for the Eclipse Filter

2    was cleared?

3    A.   Yes.

4    Q.   Let's pull up Exhibit 5612, please.

5         Mr. Van Vleet, do you have that on your screen?          01:44PM

6    A.   I do.

7    Q.   Can you tell the jury, please, what this document is?

8    A.   This is, again, meeting minutes.  We called them FDA

9    contact reports.

10   Q.   Does this reflect additional communications between Bard   01:45PM

11   and the FDA regarding the Eclipse project?

12   A.   Yes, it does.

13   Q.   So let's move on to Exhibit 5272.

14        MR. ROGERS:  Your Honor, may we publish?  This is in

15   evidence.                                                      01:45PM

16        THE COURT:  Yes.

17   BY MR. ROGERS:

18   Q.   Mr. Van Vleet, can you tell the jury what this is?

19   A.   Sure.  This is the cover page for a special 510(k)

20   submission requesting FDA to clear the Eclipse Filter system.  01:45PM

21   Q.   And can you go to Page 2 of the document.

22        And can you just describe generally for the jury what

23   types of information was provided about the Eclipse Filter to

24   FDA in this application?

25   A.   So this would include the summary of all of the testing,  01:45PM

1    identification of the materials, any change to a process of

2    manufacturing, just a comprehensive listing of anything that

3    would have changed from the predicate device.

4    Q.  And would this application also include a draft IFU, or

5    Instructions For Use, for the Eclipse?                    01:46PM

6    A.  Yes.

7    Q.  And to your knowledge, did FDA ask for additional or

8    different warnings regarding the Eclipse IFU?

9    A.  I don't believe they did.

10   Q.  Can you pull up Exhibit 5273, please.                 01:46PM

11          MR. ROGERS:  Your Honor, may we publish?  This is in

12   evidence.

13          THE COURT:  Yes.

14   BY MR. ROGERS:

15   Q.  Mr. Van Vleet, what is this?                          01:46PM

16   A.  This is the letter from the FDA clearing the Eclipse 510(k)

17   submission.

18   Q.  And once Bard received this letter from FDA clearing the

19   Eclipse Filter, was that sort of the green light where Bard

20   could start to market the device?                         01:46PM

21   A.  Yes.

22   Q.  And let's move on to -- let's see.  Well, let me ask you a

23   couple questions first.

24          Did Bard submit an additional 510(k) to FDA regarding

25   the Eclipse Filter?                                       01:46PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1  A.  Yes.  I believe there was a follow-up submission including

2  a patient brochure and an implant card.

3  Q.  Would you pull up Exhibit 5586.

4          MR. ROGERS:  And, Your Honor, may we publish?  This is

5  in evidence.                                                      01:47PM

6          THE COURT:  Yes.

7  BY MR. ROGERS:

8  Q.  And Mr. Van Vleet, is this the second application that

9  relates to the Eclipse Filter?

10  A.  Yes.                                                         01:47PM

11  Q.  And tell us, if you would, what was the purpose of this

12  second submission?

13  A.  I would have to take a look at it, but I think that was

14  adding the patient brochure and the implant card.

15  Q.  Let's go to Page 78 of the document.                        01:47PM

16  A.  Yes.

17  Q.  And if you look through 78, and -- well, yeah.

18          MR. ROGERS:  Are you going to make that bigger there

19  Scott?

20          Thank you.                                              01:48PM

21  BY MR. ROGERS:

22  Q.  So Mr. Van Vleet, tell the jury what this is.

23  A.  This is an informational card for patients receiving the

24  Eclipse Filter.

25  Q.  And can you go to the next page?                            01:48PM

1          Was this also part of that same card?

2    A.  Yeah.  It's a tri-fold or quad-fold brochure.  It's about

3    this shape and it all folds up against itself.

4    Q.  And how was this card and other information supposed to be

5    delivered with the Eclipse Filter?                                01:48PM

6    A.  It was kangaroo pouched on the outside of the package as an

7    added piece of information.

8    Q.  And what do you mean be by kangaroo pouched?

9    A.  So it was included in a pouch, or an envelope, a clear

10   plastic envelope stuck to the outside of the package so the      01:48PM

11   physician and the staff would know that it needs to be

12   associated with that package.

13   Q.  So it's literally on the external part of the box that the

14   delivery system comes in?

15   A.  Correct.                                                      01:49PM

16   Q.  Can we go to Exhibit 5587.

17          MR. ROGERS:  And, Your Honor, this is in evidence.

18   May we publish?

19          THE COURT:  Yes.

20   BY MR. ROGERS:                                                    01:49PM

21   Q.  And Mr. Van Vleet, can you tell us what this letter is?

22   A.  This was a response to the 510(k) for the inclusion of the

23   patient brochure and implant card.  And it's what we call an

24   additional inquiry letter so FDA had questions about the

25   submission.                                                       01:49PM

1   Q.  So what was the question that FDA was raising?

2   A.  Number one talks about in the patient brochure, the

3   question is:  When can the filter be removed?  And the

4   statement that was proposed initially was:  The Eclipse Vena

5   Cava Filter does not have a time in which it must be removed.    01:50PM

6   So FDA was questioning that because they felt that Bard had not

7   provided clinical data to support the statement.  And then it

8   pulled out the data that was submitted from the EVEREST study

9   on 58 patients with a mean retrieval time of 140 days.  And

10  that was observational data.  I'm trying to read their mind at   01:50PM

11  this point in time.

12          But they felt that that was not sufficient to

13  substantiate the statement that the filter does not have a time

14  limit for retrieval.

15  Q.  And did Bard respond to this letter?                         01:50PM

16  A.  Yes.

17          MR. ROGERS:  Could be pull up Exhibit 5488?

18          Your Honor, may we publish?

19          THE COURT:  Yes.

20  BY MR. ROGERS:                                                   01:50PM

21  Q.  And Mr. Van Vleet, is this Bard's response to FDA?

22  A.  Yes.

23  Q.  Can we go to Page 6 of that document.

24          MR. ROGERS:  And can we pull out the section about the

25  patient brochure up at the top?  Thank you.                      01:51PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    BY MR. ROGERS:

2    Q.  And so Mr. Van Vleet, what was -- well, this is the actual

3    question from FDA, correct?

4    A.  Correct.

5    Q.  And so let's look down below that, please.  And so what did          01:51PM

6    Bard respond to as far as this question is concerned?

7    A.  So the patient brochure was revised, and the section on

8    when can the filter be removed was actually taken out of the

9    patient brochure.

10   Q.  And was the patient brochure application cleared by FDA?            01:51PM

11   A.  Yes.

12   Q.  And can we pull up Exhibit 5589.

13          MR. ROGERS:  Your Honor, may we publish?  This is in

14   evidence.

15          THE COURT:  Yes.                                                 01:52PM

16   BY MR. ROGERS:

17   Q.  Mr. Van Vleet, is this the letter from FDA clearing the

18   510(k) application for the patient brochure?

19   A.  Yes.

20   Q.  Can we pull up now Exhibit 8362.                                    01:52PM

21          And Mr. Van Vleet, can you tell us what this is,

22   please?

23   A.  That is a copy of the patient brochure for the Eclipse Vena

24   Cava Filter.

25   Q.  And is this the version that FDA cleared?                           01:52PM

1   A.  I believe so.  There's usually a little code number at the

2   bottom that tells us it's the final version.

3   Q.  And Mr. Van Vleet, we can flip to the back page if you want

4   to see it.  I'm not sure if it's there.

5           MR. ROGERS:  Is there a second page there, Scott?          01:52PM

6           THE WITNESS:  Yes.  I believe this is the final.

7           MR. ROGERS:  And Your Honor, at this time I move

8   Exhibit 8362 into evidence.

9           MR. CLARK:  Objection, relevance.  No evidence that

10  Mrs. Jones received this brochure.                                 01:53PM

11          THE COURT:  Overruled.  8362 is admitted.

12          MR. ROGERS:  Can we go back to the first page,

13  please.

14  BY MR. ROGERS:

15  Q.  And before we actually get into the actual language of this   01:53PM

16  brochure, Mr. Van Vleet, why did Bard decide to create this

17  patient brochure for the Eclipse Filter?

18  A.  So upon conversations with FDA we were asked to create this

19  for informing the patients.  And the requirement, generally

20  speaking, for many if not most implantable devices is that        01:53PM

21  there is a specific brochure that's targeted toward the patient

22  that provides information about the case, the device, any

23  potential risks with the device, and it has to be written at a

24  level that a non-medical person can understand.

25  Q.  And was there any intention with this brochure to do          01:54PM

1   something in order to -- that would change the relationship

2   between the patient and the doctor who may implant one of these

3   devices?

4   A.   No.

5   Q.   Okay.  So let's take a look at, I guess this generally.  So       01:54PM

6   on this first page is there some general information about

7   pulmonary embolism?

8   A.   Yes.

9   Q.   Are there also information about alternative treatments for

10  pulmonary embolism besides an IVC filter?                               01:54PM

11  A.   Yes.

12  Q.   In the middle there, where there's a question, what is a

13  vena cava filter?  Do you see that?

14  A.   Yes.

15  Q.   Does that provide the patient some information and a              01:54PM

16  picture of a vena cava filter?

17  A.   Yes, it does.

18  Q.   And then over on the right-hand side, is there information

19  about the implant procedure itself?

20  A.   There is.                                                         01:54PM

21  Q.   And can we go to the next page, please.

22          And in this portion, starting, I guess, over on the

23  left-hand side, that first column of writing where it says

24  "after the procedure," do you see that?

25  A.   Yes.                                                              01:55PM

1    Q.  And does this provide some information about what the

2    patient may expect?

3    A.  Yes, it does.

4    Q.  And then it looks like in the middle column there is a

5    column there that says, "What are the risks associated with        01:55PM

6    implantable filters."  Do you see that?

7    A.  Yes.

8            MR. ROGERS:  And let's go down to the section -- just

9    pull the whole thing out, if you would, please, Scott.  Thank

10   you.                                                               01:55PM

11           Looking at the bullet point that's the next to the

12   last one on the page, can you pull that out, please?

13   BY MR. ROGERS:

14   Q.  Mr. Van Vleet, what does that paragraph state?

15   A.  Sure.  I will just read it:  The entire filter or pieces of    01:55PM

16   the filter may break loose and travel to the heart or lungs

17   causing injury or death.  You may need to have additional

18   surgery to retrieve the filter or pieces if they break loose.

19   Q.  And what was the reason to include that information in the

20   brochure for the patient?                                          01:56PM

21   A.  Well, it's, number one, fair balance.  You can't simply say

22   anything that's just good about a device.  You have to also be

23   very transparent about any risks the device had.  And these

24   complications are events that have been known either from the

25   literature to occur in cases where people use IVC filters or if    01:56PM

UNITED STATES DISTRICT COURT

1  there were specific studies on the filter they would be derived

2  from the studies, adverse event listing of the studies.

3  MR. ROGERS:  Scott, would you take that down.  Pull

4  out the section that's on the top right, "Does the filter have

5  to be removed."                                                    01:57PM

6  BY MR. ROGERS:

7  Q.  And Mr. Van Vleet, is this the section we were discussing

8  earlier where there was a back-and-forth with FDA about what

9  sort of information should be provided in regard to the answer

10  to this question?                                                 01:57PM

11  A.  Yes.

12  Q.  And does this reflect the change that FDA wanted to make?

13  A.  Yes.

14  Q.  So what's the information that was ultimately provided to

15  the patient in this brochure about does the filter have to be    01:57PM

16  removed?

17  A.  The answer that is provided is:  No, the Eclipse Vena Cava

18  Filter is designed to be a permanent implant and does not have

19  to be removed, repositioned, or replaced.  However, in the

20  cases where the risk for pulmonary embolism is temporary, your   01:57PM

21  physician may choose to remove the filter.  You should discuss

22  filter removal with your physician.  There's a typo.

23  Q.  Thank you, Mr. Van Vleet.

24  MR. ROGERS:  You can take that down.  You can take the

25  whole thing down.                                                 01:57PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1   BY MR. ROGERS:

2   Q.  Let's talk for a little bit about the IFU that was provided

3   with the Eclipse Filter.  And how does the IFU differ from what

4   we just looked at, which was the patient brochure?

5   A.  The IFU is targeted toward the physician.  So the way the          01:58PM

6   description is written would be more at a higher technical

7   medical level.  It also is much more comprehensive.  And there

8   are specific sections to the Instructions For Use that are

9   required by FDA.  So it's essentially a negotiation or a

10  conversation with FDA, and FDA has the ultimate authority on         01:58PM

11  what must be included in an IFU.

12  Q.  What was your role in the preparation of the IFU that

13  accompanied the Eclipse Filter?

14  A.  I would have to review and approve anything going to the

15  FDA.                                                                  01:58PM

16          MR. ROGERS:  And can we pull up Exhibit 8235?

17          And, Your Honor, may we publish this?  It's in

18  evidence.

19          THE COURT:  Yes.

20  BY MR. ROGERS:                                                        01:59PM

21  Q.  Mr. Van Vleet, is this a copy of the IFU, at least a cover

22  page for the IFU?

23  A.  For the Eclipse Vena Cava Filter, yes.

24          MR. ROGERS:  Let's go to Page 4, please.  Scott, would

25  you pull out the section there that -- Yeah.  Part E.  Do you         01:59PM

1    see that?

2    BY MR. ROGERS:

3    Q.  Mr. Van Vleet, what is this section?

4    A.  This is the warning section which is a required section in

5    any IFU.  And it includes a listing of any relevant event or          01:59PM

6    any relevant knowledge about the performance of the device that

7    the physician should know.

8    Q.  And can we pull out Number 11, please.

9           And Mr. Van Vleet, was this -- what's up on the screen

10   now, is that in the warnings portion of the IFU?                      01:59PM

11   A.  It is.

12   Q.  Would you read that for the jury, please?

13   A.  Filter fractures are a known complication of vena cava

14   filters.  There have been some reports of serious pulmonary and

15   cardiac complications with vena cava filters requiring the            02:00PM

16   retrieval of the fragment utilizing endovascular and/or

17   surgical techniques.

18   Q.  What was the purpose of including this information in the

19   IFU?

20   A.  It was one of the known complications of IVC filters.  And        02:00PM

21   part of the requirements for the Instructions For Use is that

22   all known risks surrounding the use of a device be included.

23          MR. ROGERS:  And Scott, would you take that down and

24   pull out the next section, Number 12, please.

25   BY MR. ROGERS:                                                        02:00PM

1  Q.  Mr. Van Vleet, would you read Number 12 for the jury?

2  A.  Movement migration or tilt of the filter are known

3  complications of vena cava filters.  Migration of the filters

4  to the heart or lungs has been reported.  There have also been

5  reports of caudal migration of the filter.  Migration may be          02:01PM

6  caused by placement in IVCs with diameter exceeding the

7  appropriate labeled dimension specified in this IFU.  Migration

8  may also be caused by proper deployment, deployment into clots,

9  and/or dislodgement due to the large clot burdens.

10 Q.  What was the purpose of including this information in the          02:01PM

11 warning section of the IFU?

12 A.  Again, just a continuing need to make sure that any known

13 complications for these types of devices are being

14 appropriately represented to the physicians using them.

15         MR. ROGERS:  Scott, can you take that down and go to          02:01PM

16 the next page.  And up at the top, can you pull out the Part G?

17 Section G?  Thank you.

18 BY MR. ROGERS:

19 Q.  Mr. Van Vleet, do you see up at the top where it says

20 "potential complications"?                                             02:01PM

21 A.  Yes.

22 Q.  How does this section in an IFU about complications differ

23 than a section about warnings?

24 A.  It's more detailed, I think, and it also would include any

25 observed complication, again, combed from the literature but          02:02PM

 1   it's just kind of a listing of each individual complication.

 2   Q.  And do the first bullets --

 3         MR. ROGERS:  Can you pull those out, please, Scott.

 4   BY MR. ROGERS:

 5   Q.  Do those first two bullets that are there, do they match          02:02PM

 6   what had been provided in the warning section?

 7   A.  Yes.  I believe it's the same warning.

 8   Q.  Okay.  So let's go down to the next bullet below those two.

 9         And Mr. Van Vleet, can you read that for the jury,

10   please?                                                               02:02PM

11   A.  Perforation or other acute or chronic damage of the IVC

12   wall.

13         MR. ROGERS:  And how about scroll on down a little

14   ways below, little more.  And down right, it's just coming up

15   there.  And can you highlight that bullet?                           02:03PM

16   BY MR. ROGERS:

17   Q.  And Mr. Van Vleet, what does that say?

18   A.  Filter tilt.

19   Q.  And so were perforation and tilt also provided as potential

20   complications in the information in the IFU about the Eclipse       02:03PM

21   Filter?

22   A.  Yes, they were.

23         MR. ROGERS:  And let's go on down to Figure 6.  You

24   pull that down.  This is the clinical studies section.

25         Next page.  Here we go.                                        02:03PM

1    BY MR. ROGERS:

2    Q.  Do you see that there where it says "clinical experience"?

3          Mr. Van Vleet, describe for us, if you would, what is

4    this portion of the IFU?

5    A.  So in the case that devices have had clinical data          02:03PM

6    submitted as part of the application, there's a required

7    summary of the overall results of whatever study was performed.

8    And this is a summary of the clinical data.

9    Q.  And was this the clinical data for the EVEREST study?

10   A.  Yes.                                                        02:04PM

11          MR. ROGERS:  And can you scroll down a little bit,

12   please, Scott.  And so in this section here that starts right

13   above the bolded language, can you pull that out, that

14   sentence, where it begins, "asymptomatic complications."

15   BY MR. ROGERS:                                                  02:04PM

16   Q.  And Mr. Van Vleet, what is this?

17   A.  This is a summary of complications that didn't have any

18   symptoms.

19   Q.  And was this information provided in every IFU that

20   accompanied the Eclipse Filter?                                 02:04PM

21   A.  Yes.

22          MR. ROGERS:  All right.  You can pull that down.

23   BY MR. ROGERS:

24   Q.  Mr. Van Vleet, I want to kind of change our attention and

25   talk some more about sort of any additional communications you  02:04PM

1    had with the FDA.

2              MR. ROGERS:  And can we pull up Exhibit 5602.

3              And, Your Honor, this is, I believe, was one of the

4    documents that we agreed would be admitted in evidence but

5    there's a redaction issue so I'm not going to publish this.          02:05PM

6    BY MR. ROGERS:

7    Q.  And Mr. Van Vleet, can you describe for the jury what this

8    is, please?

9    A.  This is another FDA contact report, basically meeting

10   minutes or a description of a meeting with Bard personnel and        02:05PM

11   FDA personnel.

12   Q.  Can you tell from this who requested the meeting?

13   A.  I can't tell from this specific page, but I do know that I

14   requested the meeting.

15   Q.  Well, let me, I guess, orient the jury a little bit more.         02:05PM

16   So what's the date of this document?

17   A.  January 7th, 2010.

18   Q.  And so would this have been before or after the Eclipse

19   Filter had been cleared?

20   A.  This would be after.  I would have to go back to the dates,       02:05PM

21   I'm sorry.  I think it's --

22   Q.  Okay.

23   A.  Actually it's before.  It was a short period of time

24   before, maybe 15 days before.

25   Q.  Okay.  And can you describe generally what the purpose of         02:06PM

1    this meeting was?

2    A.   Sure.  So I will read from the subject here.  It says:

3    Recovery G2, G2X fractures and Nicholson publication slash

4    presentation.  So Bard had become aware of a meeting at which a

5    cardiologist had presented the results of a study that he          02:06PM

6    conducted at his institution that had a variety of

7    complications at rates that were very different than had been

8    previously observed in Bard's or anybody else's filters.  And

9    we had experienced a challenge in collecting the detail behind

10   this.  You have to make a reasonable effort to report            02:06PM

11   everything.  And I believe there were 15 different attempts at

12   collecting the data on these reported or alleged complications

13   and we had not been successful.

14          So part of it, I think, was hoping the FDA might reach

15   out directly to the physician and ask him to please provide the   02:07PM

16   requested information.

17   Q.   When you were describing the 15 separate attempts to try

18   and contact Dr. Nicholson, what types of things did Bard do to

19   try and get additional information from Dr. Nicholson?

20   A.   Sure.  Technically, attempt could be something as simply as  02:07PM

21   an e-mail or a telephone call.  But I do know in this case that

22   at least six of the attempts were made directly in person at

23   the hospital.

24   Q.   And so if you look up at the top of this document, did the

25   meeting take place in January of 2010?                            02:07PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    A.   Yes.   January 7th.

2    Q.   And was this before the Nicholson study had actually been

3    published?

4    A.   This was before the Nicholson study had been published.

5    Q.   And how many folks from the FDA attended this meeting?          02:07PM

6    A.   About 10, a dozen, maybe.

7    Q.   And how many people from Bard attended the meeting?

8    A.   10.

9    Q.   And from looking at the list of names of the FDA

10   participants, are several of those individuals medical doctors?   02:08PM

11   A.   Yes.

12   Q.   And at this particular meeting, was the focus exclusively

13   the Nicholson study?

14   A.   That was the reason, the stated reason for meeting.  But it

15   was just to discuss just in general the -- yeah.  I think that     02:08PM

16   was the main reason for the meeting, but there was a lot of

17   data, additional data, that was presented to the FDA.

18   Q.   Was a PowerPoint presentation given to FDA?

19   A.   Yes.

20          MR. ROGERS:  And can we pull up Exhibit 5942.               02:08PM

21          And, Your Honor, may we publish?  This has been

22   admitted.

23          THE COURT:  You may.

24   BY MR. ROGERS:

25   Q.   Mr. Van Vleet, is this the entire PowerPoint presentation     02:09PM

1    that was given to the FDA in January of 2010?

2    A.  Yes.

3    Q.  If we go over, I guess, to Page 6, please.  And was this

4    some information that was presented to FDA?

5    A.  Yes.                                                        02:09PM

6    Q.  So why did you discuss risks of pulmonary embolism with

7    FDA?

8    A.  So while several, probably half of the reviewers were

9    medical doctors, many of the reviewers and the other personnel

10   present would be engineers.  And it's really important that    02:09PM

11   everybody kind of understands the medical purpose for the use

12   of the device.  So this is more of a background slide.

13   Q.  Let's go over to Page 9.  And Mr. Van Vleet, what type of

14   information is this, and why was it presented to FDA?

15   A.  So with any decision FDA makes, they look at things in     02:09PM

16   terms of risk and benefit.  And so this had some of the

17   benefits associated with it.  Presumably there's another one

18   with the risks.

19          MR. ROGERS:  Let's move over to Page 19, please.  And

20   pull that out.                                                  02:10PM

21   BY MR. ROGERS:

22   Q.  And what is this?

23   A.  This is our summary of what we had learned from the

24   presentation by a cardiologist at York Hospital.

25   Q.  You say a presentation.  Do you know what the context of   02:10PM

1   the presentation was?

2   A.  Sure.  This is a meeting that's hosted, I believe, on a

3   monthly basis by a cardiologist in Washington, D.C.  It's kind

4   of like a grand rounds meeting where people will come present

5   interesting information or different information to their          02:10PM

6   medical peers.

7           MR. ROGERS:  Let's go to Page 21.  And pull that out,

8   please.

9   BY MR. ROGERS:

10  Q.  And Mr. Van Vleet, what is this information?                   02:10PM

11  A.  So this is kind of a walk-through to the FDA of the steps

12  that we took as soon as we became aware of this information

13  from Dr. Nicholson.

14  Q.  And with that last bullet it says:  13 additional attempts

15  to gather details.  Do you see that?                              02:11PM

16  A.  Yes.

17  Q.  Why were you telling FDA that information?

18  A.  Well, number one, to make sure that they understood that we

19  had followed through and tried to get the information that they

20  request us to submit on that.  But also hopefully they would      02:11PM

21  maybe reach out on our behalf and try to help us obtain this

22  information.

23  Q.  And can we go to Page 28 -- or excuse me -- 26 of the

24  document.

25          MR. ROGERS:  Would you pull that out?                     02:11PM

1    BY MR. ROGERS:

2    Q.  Mr. Van Vleet, was this information presented to FDA?

3    A.  Yes.

4    Q.  And describe for the jury, please, what this information

5    is.                                                              02:11PM

6    A.  This is a listing of all the fractures for the Bard filters

7    that were known to the company or reported by anybody to the

8    company.

9    Q.  And how about let's move on to Page 28.  And pull that out.

10   And Mr. Van Vleet, can you describe for us what this             02:12PM

11   information is?

12   A.  So this is a summarization of the studies that have been

13   conducted by other IVC filter manufacturers in support of their

14   applications to FDA.

15   Q.  And was this information reviewed with FDA as part of this   02:12PM

16   meeting?

17   A.  Yes.

18           MR. ROGERS:  Let's move on to Page 34.  And pull that

19   out.

20   BY MR. ROGERS:                                                   02:12PM

21   Q.  And what is this information?

22   A.  This was a summary of all of the migrations for Bard

23   filters from 2005 forward that were known to the company or

24   reported to the company.

25           MR. ROGERS:  You can take that down, Scott.  Thank       02:12PM

1    you.

2    BY MR. ROGERS:

3    Q.  Mr. Van Vleet, following this meeting, what was the result?

4    Did it lead to some sort of path or something of that nature?

5    A.  I think the discussions continued, but I think our attempt    02:13PM

6    or our desire in having this meeting is, are we doing something

7    that -- or are we not doing something that you think we should

8    be doing?  Is there another step that you think is appropriate

9    for Bard to take given the things that had been said?  And we

10   felt that there was resolution at that meeting.    02:13PM

11   Q.  Let me change gears on you, Mr. Van Vleet.  Are you

12   familiar with something called FDA down-classification?

13   A.  Yes.

14   Q.  And can you tell the jury what that is, please?

15   A.  So FDA has, at times, moved to change the classification of    02:13PM

16   a device.  Essentially there are three types of device

17   classification:  Type I, Type II, and Type III in the United

18   States classification system.  Type I is something maybe as

19   simple as a cane or perhaps a Band-aid.  Type II in this case

20   would be a filter, certain types of stents, balloon    02:14PM

21   angioplasty.  Type III are generally implantable devices that

22   require a more comprehensive level of data to be provided.  So

23   a down-classification by definition is when FDA lowers the

24   classification of a device.

25   Q.  When you were working at C.R. Bard on IVC filters, did you    02:14PM

1    come to learn that the FDA had down-classified IVC filters?

2    A.   Yes.

3    Q.   And can you tell us what the change in class was?

4    A.   Sure.  I believe this happened in 1996, and the panel of

5    physicians that review these types of applications requested          02:14PM

6    that this be down-classified from a Class III to Class II.

7    Q.   And since that time, have you learned that there was an FDA

8    memo from 1996 regarding the down-classification of IVC

9    filters?

10   A.   Yes.                                                              02:15PM

11   Q.   Can I pull up Exhibit 5877, please.

12            Mr. Van Vleet, you have on your screen Exhibit 5877.

13   Is that the memo that you were referring to?

14   A.   Yes.

15            MR. ROGERS:  Your Honor, at this time I would move           02:15PM

16   5877 into evidence.

17            MR. CLARK:  Objection, Your Honor.  Cumulative.  Also

18   if you look on Pages 8 and 9 it appears to be a draft of some

19   sort.  This is not a Bard document.

20            THE COURT:  Let's address this for a minute at              02:15PM

21   sidebar, counsel.

22            Feel free to stand up.

23            (Discussion was had at sidebar out of the hearing of

24   the jury:)

25            THE COURT:  What are you talking about?                     02:15PM

 1          MR. CLARK:  For one thing, Your Honor, this appears to

 2    be a draft of some sort.  There are handwritten edits,

 3    highlights, things like that.  We also don't have -- this is

 4    not a Bard document.  So again, not knowing that this is a

 5    final publication.                                              02:16PM

 6          THE COURT:  Your objection besides cumulative is what?

 7          MR. CLARK:  It's not the authentic, final version of

 8    what went out to the public.  It's also hearsay, Your Honor.  I

 9    don't think it can be established as a business record.

10          THE COURT:  As a what?                                    02:16PM

11          MR. CLARK:  As a business record or regularly

12    conducted activity.

13          MR. ROGERS:  Your Honor, this is a certification we

14    have gotten from the FDA via FOIA service which contains the

15    memorandum here that certifies that this document did come from  02:16PM

16    FDA.

17          THE COURT:  Hold on just a second.

18          So my question is under Rule 902.1, is this a seal of

19    the United States?  That's what you are asserting?

20          MR. ROGERS:  902.1.                                       02:17PM

21          THE COURT:  I'm just trying to understand how you are

22    wanting to use this certificate at the beginning.

23          MR. ROGERS:  Yes, Your Honor.  I would say this is a

24    seal under 902.1 and that should address any issues about the

25    authentication document.                                        02:18PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1          THE COURT:  Is there a signature?

2          MR. ROGERS:  There is a signature here.  I can't read

3     it upside down.

4          THE COURT:  Let me look at it.  So this is a custodian

5     of records certificate.  So in other words, what this is is a     02:18PM

6     certificate confirming that this is a -- here's the affidavit.

7     So it looks to me as though the affidavit of Katherine Uhl,

8     which is certified with a certificate on the front and

9     notarized states that it is a certified authentic copy of the

10    records from the Food and Drug Administration.                    02:19PM

11         So my question to you, Mr. Clark, is why is not that

12    affidavit and the certificate sufficient to authenticate this

13    as an FDA document?

14         MR. CLARK:  I think that that affidavit and

15    certificate is sufficient for authentication.  I don't think it  02:19PM

16    cures the hearsay problem.

17         THE COURT:  Well, if it's authenticated.

18         MR. CLARK:  We didn't have that seal, by the way.

19    Apologize.

20         THE COURT:  If it's authenticated as a government          02:19PM

21    document, then why doesn't 803.8 then apply?  It's a record of

22    a public office.  It would seem to set out the office's

23    activities.

24         MR. CLARK:  I think it's Part 2 from information

25    observed during their legal duty to report.  This is an          02:19PM

1    internal thing.

2          THE COURT:  It can be any of those.  Part A elements

3    are disjunctive.  It could can be 1, 2, or 3.

4          MR. CLARK:  I think we're down to cumulative.  You

5    persuaded me.  Again, I didn't have the seal.                    02:20PM

6          THE COURT:  That's fine.  Why do you think it's

7    cumulative?  What it cumulative of?

8          MR. CLARK:  We have had number of witnesses talk about

9    down-classification.  We heard that from Tillman.  We heard

10   from his own testimony.  So this document doesn't do anything   02:20PM

11   but pile on.

12         THE COURT:  What's your response?

13         MR. ROGERS:  Well, Your Honor, we attempted to put

14   this document in with Dr. Tillman when she testified.  They

15   objected.  So the jury has not seen this document so I don't    02:20PM

16   think that this is cumulative.  It is some new information

17   about the down-classification process that the jury has not

18   seen.  And so I think it's just additional information that is

19   new.

20         THE COURT:  Just so we have a clear record, my           02:20PM

21   understanding, Mr. Clark, from our discussion, cumulative is

22   the only objection you are making to the document now?

23         MR. CLARK:  In reviewing it, I think there's a

24   relevance issue, too, Judge, because we're talking about this

25   is undisputed this is a Class II device the whole time.  The    02:21PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    implication that they are trying to draw is these things have

2    been recognized by FDA that it's safer.  I don't think that's

3    an important part of the inquiry that's in front of this jury.

4              THE COURT:  Okay.  I'm going to overrule the relevancy

5    and cumulative objections.  So I will admit the document.                02:21PM

6              (In open court.)

7              THE COURT:  Thank you Ladies and Gentlemen.

8              The objection is overruled, and Exhibit 5877 is

9    admitted.

10   BY MR. ROGERS:                                                           02:21PM

11   Q.  Mr. Van Vleet, do you have the document in front of you?

12   A.  Yes.

13   Q.  Have you had a chance to review this document?

14   A.  Yes.

15   Q.  If you would, let's turn to Page 4 of the document, please.          02:21PM

16   And is this a section of the document that relates to known

17   risks of IVC filters?

18   A.  Yes.

19   Q.  And if we move down to Section E, do you see Section E?

20   Mr. Van Vleet, if you would, what did this memo that FDA                 02:22PM

21   prepared about the down-classification of IVC filters, what

22   information did it provide about the occurrence of filter

23   migration?

24   A.  I will read directly from the document:  The design of the

25   filter must be such that it is stable within the vena cava.             02:22PM

1    The filter release mechanism that is part of the delivery

2    system must be simple and controlled such that the filter is

3    deployed in the desired location and it is completely opened.

4    If it is not it can ultimately propagate into the right heart

5    or it may tilt such that its filtering efficiency is                 02:22PM

6    compromised.

7    Q.   Let me interrupt you, Mr. Van Vleet.

8         MR. ROGERS:  Your Honor, may we publish?  I don't

9    believe the jury has it on the screen.

10        THE COURT:  Yes, you may.                                       02:23PM

11   BY MR. ROGERS:

12   Q.   I'm sorry, Mr. Van Vleet.  Can you just pick up where you

13   were?

14   A.   Sure.  If it is not, it can ultimately propagate into the

15   right heart or it may tilt such that its filtering efficiency       02:23PM

16   is compromised.  The occurrence of filter migration in the

17   literature varies from 6 percent to 53 percent.  And there's

18   references cited.

19   Q.   And this information, or the memo is written in 1996, is

20   that right?                                                         02:23PM

21   A.   Yes, sir.

22   Q.   If you would, what is the next sentence about filter

23   migration?

24   A.   Minor filter migration in the caudal or cephalic direction

25   is commonly reported and does not appear to be associated with     02:23PM

1    clinically significant events.

2    Q.  And was that information that the FDA was considering in

3    1996?

4    A.  Yes, sir.

5            MR. ROGERS:  And let's move on to Section F.                02:23PM

6            Would you pull that out, please?

7    BY MR. ROGERS:

8    Q.  Mr. Van Vleet, what did the FDA say in regard to caval

9    penetration in this memo?

10   A.  The filter must be designed such that it is secure within    02:24PM

11   the vena cava without penetrating the wall of this vessel and

12   potentially penetrating nearby organs.  Slight penetration of

13   the caval wall by filter struts is usually asymptomatic and

14   clinically insignificant, perhaps because penetration occurs

15   gradually allowing time for the vessel wall to fibrose.           02:24PM

16   Q.  And did it report a rate?

17   A.  A caval penetration rate of 9 percent has been reported.

18   Q.  And let's move on to Section J.  Well, before we move on to

19   J, I'm sorry, underneath F there's G.  And what does that

20   section address?                                                  02:24PM

21   A.  Filter tilting and angulation.

22   Q.  And so what did the FDA include in this memo regarding

23   filter tilting?

24   A.  The significance of tilting and angulation of caval filter

25   after placement is controversial.  There is a theoretical loss   02:25PM

1  of filtering efficacy of any filter when tilted or angulated

2  significantly.  However, there is no good clinical data to

3  support a definite increased incidence in PE or failure to trap

4  thrombi.  A properly designed device should minimize the

5  possibility for tilting upon deployment or angulating after          02:25PM

6  implantation.  This risk can be controlled by special controls.

7  Q.  Thank you.

8          MR. ROGERS:  You can pull that down.  Can we move to

9  the next, Page 7?  And under the Section J, can you pull that

10  out, please?                                                        02:25PM

11  BY MR. ROGERS:

12  Q.  And what did this section regarding fracture of filter have

13  in it regarding these filters at that time?

14  A.  Filters may fracture as a result of direct trauma to the

15  abdomen or from a metal fatigue phenomenon when perforation         02:26PM

16  exists and the tip of the leg becomes locked into a vertebral

17  body or adjacent and mobile tissues whereby the respiratory

18  motion may then cause repeated unanticipated flexion of the

19  filter leg, or it may fracture due to metal corrosion and weld.

20  The fracture fragments may migrate locally or distally.  This       02:26PM

21  complication --

22  Q.  Continue.  I'm sorry.

23  A.  This complication usually is asymptomatic and requires no

24  treatment.  The incidence of occurrence has been reported at 2

25  percent.  Filter fracture is a function of design and delivery      02:26PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    into the IVC.  The risk can be controlled by special controls.

2    Q.  Was all of this information information that FDA considered

3    in 1996 in making a determination whether IVC filters should be

4    down-classified?

5    A.  Yes.                                                            02:26PM

6    Q.  And I believe you told us earlier that the FDA ultimately

7    did decide to down-classify IVC filters from Class III to Class

8    II.

9    A.  Yes.

10            MR. ROGERS:  You can take that down, please.             02:27PM

11   BY MR. ROGERS:

12   Q.  Mr. Van Vleet, let's kind of move forward chronologically.

13   We were just looking at a document from 1996, and I want to

14   bring us back to the year 2010.

15            And were you familiar with an FDA safety communication  02:27PM

16   that was issued by FDA in 2010 regarding IVC filters?

17   A.  Yes.

18            MR. ROGERS:  And can we pull up Exhibit 6911?

19            Excuse me.  I misspoke.  It's 6991.

20            Your Honor, may we publish?  This as in evidence.        02:27PM

21            THE COURT:  Yes, you may.

22   BY MR. ROGERS:

23   Q.  Mr. Van Vleet, is this the safety communication?

24   A.  Yes.

25   Q.  And were you the regulatory affairs vice president when       02:27PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Direct

1    this safety communication was issued?

2    A.  Yes, I was.

3    Q.  And did Bard undertake some effort in order to send

4    information out regarding this safety communication?

5    A.  Yes.                                                        02:28PM

6           MR. ROGERS:  And if we could, could we pull up Exhibit

7    5923.

8           And, Your Honor, this -- I'm not going to publish this

9    again because -- well, I take it back.  Your Honor, I believe

10   this has been moved into evidence, although I'm not sure if    02:28PM

11   there was any issues about it.

12          THE COURT:  Is this 5923?

13          MR. ROGERS:  It is 5923.

14          MR. CLARK:  No objection.

15          THE COURT:  We show it in evidence.                      02:28PM

16   BY MR. ROGERS:

17   Q.  So Mr. Van Vleet, can you tell us please what this letter

18   is?

19   A.  It's a letter to -- it's addressed to:  Clinical Caregiver.

20   Q.  And are you the person that signed the letter?             02:28PM

21   A.  Yes.

22   Q.  And so what was the purpose of this?

23   A.  It was to respond to what I felt were numerous questions

24   that we had received or I had received personally from

25   physicians and other customers and reflecting maybe some       02:29PM

1    concerns or confusion about the initial communication, the

2    safety communication.

3    Q.  And in the third paragraph there, that first sentence, can

4    you read that for the jury, please?

5    A.  All vena cava filters have the potential for complications.   02:29PM

6    Dr. Bram Zuckerman, the director of FDA Center for Devices and

7    Radiological Health Division of Cardiovascular Devices was

8    quoted recently in an interview with the Associated Press

9    wherein he indicated that problems had been seen with all

10   retrievable filters and that FDA is in the process of   02:29PM

11   completing an analysis of data on filter problems generally.

12          MR. ROGERS:  Your Honor, may we publish?

13          THE COURT:  After the break.  We're going to break

14   until 2:45, Ladies and Gentlemen.

15          (Recess from 2:29 p.m. until 2:46 p.m.)   02:29PM

16          THE COURT:  You may continue, Mr. Rogers.

17          MR. ROGERS:  Thank you, Your Honor.

18          THE COURT:  Go ahead.

19          MR. ROGERS:  Your Honor, before the break I had asked

20   if we could publish Exhibit 5923 which has been admitted.   02:46PM

21          THE COURT:  Yes, you may.

22   BY MR. ROGERS:

23   Q.  And Mr. Van Vleet, on your screen, is this the letter that

24   you had authored and sent out in September of 2010?

25   A.  Yes.   02:46PM

1   Q.  And up at the top, it says:  Dear Clinical Caregiver.  Do

2   you see that?

3   A.  Yes.

4   Q.  And how did you decide who would receive a copy of this

5   letter?                                                          02:46PM

6   A.  So it would have been a combination of anybody that's

7   involved in the receipt of IVC filters, whether it was a

8   purchasing person, a hospital employee, or physicians that we

9   knew had used the device.

10  Q.  And there in the second paragraph, that last sentence.      02:46PM

11          MR. ROGERS:  Would you pull that out, please, Scott?

12          Thank you.

13  BY MR. ROGERS:

14  Q.  And what in this sentence did you encourage doctors to do?

15  A.  So we encouraged physicians to review the FDA initial        02:47PM

16  communication and to consider the risks and benefits of filter

17  removal for each patient.

18          MR. ROGERS:  You can take that down.  Thank you.

19          And can we pull up Exhibit 7960.

20  BY MR. ROGERS:                                                  02:47PM

21  Q.  And Mr. Van Vleet, can you see the exhibit?

22  A.  Yes.

23  Q.  And can you tell the jury just generally what this is

24  without going into a description of it?

25  A.  Sure.  It's a summary of all of the clinical studies that    02:47PM

1   have been conducted, I believe, in support of FDA application

2   for clearance.

3   Q.  And were you personally involved in the creation of this

4   handout?

5   A.  Yes.                                                          02:47PM

6   Q.  What was your involvement?

7   A.  As regulatory head, it's my responsibility to approve and

8   make sure that all of the information is accurate and it's also

9   appropriately contexted and that it's fair and balanced.

10  Q.  And from time to time, did Bard prepare handouts to provide  02:48PM

11  to physicians and other health care providers?

12  A.  Yes.

13          MR. ROGERS:  Your Honor, at this time I move this

14  document into evidence.

15          MR. CLARK:  No objection.                                 02:48PM

16          THE COURT:  Admitted.

17          MR. ROGERS:  May we publish?

18          THE COURT:  You may.

19  BY MR. ROGERS:

20  Q.  Mr. Van Vleet, now that the jury has seen the document, can  02:48PM

21  you describe just physically how this would be used?  Well,

22  strike that question.

23          I'm really trying to -- was this something that would

24  be laminated?

25  A.  It would have been something that could be left with a       02:48PM

1   customer.

2   Q.  And would it be something that would be left behind for the

3   customer at their office?

4   A.  Yes.  That would have been the intention.

5   Q.  And can you tell the jury what your thought process was in          02:48PM

6   assembling this information?

7   A.  The purpose for pulling this together was to context the

8   clinical performance of the Bard filters with the clinical

9   performance of other filters on the market.

10  Q.  And the first column that we see there is the EVEREST              02:49PM

11  study.  Do you see that?

12  A.  Yes.

13  Q.  And that study is the study you previously discussed that

14  relates to the G2?

15  A.  Yes.                                                               02:49PM

16  Q.  How about these other studies that we may not recognize?

17  We see Olivia, Charles, Lynch, Cantwell, Lynch.  Do you see

18  those?

19  A.  Yes.

20  Q.  What are those studies?                                           02:49PM

21  A.  So if you look at the second list down where it says

22  "filter," that identifies the actual product that the studies

23  were evaluating.  So the first one, two, three, four five, six

24  studies are Bard products and then the last four would be other

25  competitive products, probably the more recent products cleared      02:49PM

1    on the market.

2    Q.  It looks like you also included a column for the Nicholson

3    study, is that right?

4    A.  Yes.

5    Q.  What was your thinking in including information about that          02:49PM

6    study?

7    A.  The data that was summarized by Dr. Nicholson was so

8    completely different than anything we had seen in the

9    literature about either Bard filters or any other filter, and

10   we had some specific concerns about the data.                          02:50PM

11   Q.  And the last four columns, you have got four separate

12   studies there.  And do those studies involve Bard filters?

13   A.  No.

14   Q.  And what was the purpose of including the information about

15   those studies?                                                         02:50PM

16   A.  I think those were -- well, for sure, option -- those were

17   other major filters being used by the interventional radiology

18   community.

19   Q.  And are all the studies that are contained in this handout

20   studies that a doctor could go look up in the published                02:50PM

21   literature?

22   A.  Yes.

23   Q.  Can we go to the second page of the handout?

24           And on this particular page there is some complication

25   rates down there.  Do you see that?                                    02:51PM

1    A.  Yes.

2    Q.  And there's a column there for G2.  Do you see that?

3    A.  Yes.

4    Q.  And where does that information come from?

5    A.  That comes from, I believe that comes from the IFU, the          02:51PM

6    Instructions For Use and the data initially -- or originated in

7    the EVEREST clinical trial.

8    Q.  And I'm sorry, did you say the EVEREST clinical trial?

9    A.  Yes.

10   Q.  Okay.  And as far as the rates of fracture are concerned,       02:51PM

11   what are the rates that are reported there for Bard and the

12   other filters?

13   A.  Bard had a rate of 1.2 percent.  That was the one patient

14   with the, I think, 82 patient denominator.  Celect had no

15   reported fractures.  And the Tulip study, Gunther Tulip study       02:51PM

16   they were not recorded or reported in the study, so we

17   attempted to context it the way it was known to us.  And then

18   Option and OptEase had no fractures.

19   Q.  Do each of these columns represent information from one

20   clinical study?                                                     02:52PM

21   A.  Yes.

22   Q.  Mr. Van Vleet, just to wrap up, you were at Bard for a

23   little bit more than 11 years, is that right?

24   A.  10 and-a-half years.

25   Q.  10 and a half.  Excuse me.  Were you familiar with the          02:52PM

1    internal processes at Bard regarding corrective actions?

2    A.  Yes.

3    Q.  And throughout the course of your time at Bard, did it ever

4    become to a point where Bard felt like there was any corrective

5    action that needed to be done regarding its IVC filters based          02:52PM

6    on the internal data that the company had?

7    A.  No.

8    Q.  And has Bard ever made a decision that any of its -- the

9    IVC filters on the market while you were there, starting with

10   the G2, that any of those filters should be recalled?                   02:53PM

11   A.  No.

12   Q.  Thank you, Mr. Van Vleet.  I have no further questions.

13              THE COURT:  Cross-examination.

14              MR. CLARK:  Yes, Your Honor.

15          Your Honor, may I be permitted to approach the witness          02:53PM

16   and provide him a copy of his transcript from testimony a few

17   months ago?

18              THE COURT:  Sure.  Why don't you just give it to

19   Traci.  She'll hand it to him.

20                      CROSS-EXAMINATION                                     02:53PM

21   BY MR. CLARK:

22   Q.  Afternoon, Mr. Van Vleet.  I'm going to go through a couple

23   things in a sort of scattered fashion just to pick up on a few

24   points Mr. Rogers raised with you.

25          With respect to the letter that you designed to go to          02:53PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross

1    customers and people who used IVC filters, do you remember that

2    testimony?

3    A.   Yes.

4    Q.   It was Exhibit 5923?  Take my word for it?

5    A.   I will take your word for it.                                    02:54PM

6    Q.   Now, that letter did not contain any warning rates or

7    anything about fractures, tilt, migration, with respect to

8    Bard's G2 family of filters.  Is that correct?

9    A.   Yeah.  The text of that letter did not contain any specific

10   rates.                                                               02:54PM

11   Q.   Okay.  And in terms of the document you were shown from

12   1996 that was the down-classification memo?

13   A.   Yes.

14   Q.   The solution that the authors concluded there was that

15   fracture is something that would be a function of the filter's     02:54PM

16   design and implantation.  Do you remember that?

17   A.   I know that those words were there.  I'd have to see the

18   actual text to see.

19   Q.   Well, you read those words to the jury today.  Right?

20   A.   Uh-huh.                                                        02:54PM

21   Q.   That's a yes?

22   A.   Yes, I read those words.

23   Q.   You were asked some questions about Dr. Nicholson's study.

24   Just to be clear, Dr. Nicholson has never been a consultant or

25   a thought leader or anybody compensated by Bard.  Is that          02:55PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross

1   right?

2   A.   Not to my knowledge.

3   Q.   And the FDA was concerned after receiving information about

4   that study, and that's what prompted the meeting where you

5   assembled a team of 9 or 10 people to meet with the FDA, right?   02:55PM

6   A.   Bard was concerned, and we -- actually I personally called

7   the meeting.

8   Q.   You illustrated some statistics at the bottom of Exhibit

9   7960.   Do you remember that, where we talked about filter

10  migration rates, fracture rates, tilt rates, things like that?   02:55PM

11  You just gave that testimony to Mr. Rogers.   Do you remember

12  that?

13  A.   I would have to look at and see.   Was that the clinical

14  study report or --

15  Q.   Let me see if I can put this up.   Will that show on his   02:55PM

16  screen?

17          THE COURT:   You want it shown to the witness?

18          MR. CLARK:   Yes, please.

19          THE COURT:   What is this?

20          MR. CLARK:   This is Exhibit 7690.   02:56PM

21          THE COURT:   Do you want it displayed to the jury?

22          MR. CLARK:   Sure.

23          THE COURT:   Okay.

24          MR. CLARK:   Thank you.

25  BY MR. ROGERS:   02:56PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross

1    Q.  Now, this what we're looking at here with my finger, those

2    are the rates that came from the EVEREST trial, right?

3    A.  Correct.

4    Q.  And the fracture rate was higher than any of the other

5    filters recorded, correct?                                    02:56PM

6    A.  It is numerically higher than any of the other filters.

7    Q.  And the caudal migration rate was higher than any of the

8    other filters, right?

9    A.  Yes.  It also was numerically higher than others.

10   Q.  And the filter tilt of greater than 15 degrees was          02:56PM

11   numerically higher than any of the other filters, correct?

12   A.  It would be hard to say, because I don't believe the filter

13   tilt was reported in those studies.

14   Q.  The penetration rate was higher than the other recorded

15   filters, correct?                                             02:56PM

16   A.  In three of them, correct.

17   Q.  And one of the ones just didn't have the information?

18   A.  Didn't have that information included.

19   Q.  And that's all information that was also in the Binkert

20   article that you talked about with Mr. Rogers, correct?        02:56PM

21   A.  The EVEREST information was.  I'm not sure if the other

22   competitive filters were.

23   Q.  What I'd like to do in the interest of time, is to ask you

24   a series of questions.  And I think they are all capable of you

25   can tell me if it's true or false, and if it's not true or     02:57PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross

1  false I have got a little category here where you can tell me I

2  can't answer true or false.  Is that fair?

3  A.  Sure.  Yes.

4  Q.  And could I show the witness these questions one at a time?

5          THE COURT:  Show the questions to the witness?          02:57PM

6          MR. CLARK:  Yes.

7          THE COURT:  Yes.  You can show the questions to the

8  witness.

9          MR. CLARK:  Sure.

10  BY MR. CLARK:                                                  02:57PM

11  Q.  Can you see that, sir?

12  A.  Yes.

13  Q.  Got a little controlled question here.  First one is:  Your

14  name is John Van Vleet.  Is that true or false or I can't

15  answer true or false?                                          02:57PM

16  A.  That is true.

17  Q.  Now, second statement:  The FDA relies on medical device

18  manufacturers to provide truthful, accurate, and reliable

19  information about medical devices.  True, false or I can't

20  answer true or false?                                          02:58PM

21  A.  That is true.

22  Q.  Dr. Scott Trerotola was a paid consultant for Bard during

23  your tenure with Bard?

24  A.  That is true.

25  Q.  During your tenure with Bard, Dr. Jay Nicholson published a  02:58PM

1    study raising concerns about the number of recovery and G2

2    Filter fractures doctors at his hospital found in a study.

3    A.   True.

4    Q.   Bard lost filter sales as a result of Dr. Nicholson's

5    study.                                                              02:58PM

6    A.   I can't answer true or false.

7    Q.   Fair enough.

8         One of Bard's responses to the Nicholson study was to

9    try to launch the Eclipse Filter ASAP.  Do you remember that?

10   A.   I don't believe that's true.  I believe that's false.       02:58PM

11   Q.   That's false.

12        The only design difference between the Eclipse Filter

13   and the G2 is that the Eclipse is electropolished?

14   A.   The base wire for the Eclipse is electropolished, correct.

15   Electropolishing is the change.  True.                            02:59PM

16   Q.   Put that in the true category?

17   A.   Yes.

18   Q.   The Eclipse Filter does not contain caudal anchors?

19   A.   True.

20   Q.   Caudal anchors reduce caudal migration?                      02:59PM

21   A.   Caudal anchors are designed to reduce caudal migration.

22   Q.   True?

23   A.   I believe that's true.

24   Q.   And these are just based on your belief.  I understand if

25   you have a question you can tell me you can't answer true or      02:59PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross

1    false.

2            Bard understood as early as 2006 caudal anchors can

3    reduce caudal migration.

4    A.  I can't answer true or false.

5    Q.  Bard understood from the EVEREST trial that we have heard          02:59PM

6    about that migration can lead to tilt, perforation, and

7    fracture.

8    A.  I probably have to say I can't answer true or false on

9    that.

10   Q.  Fair enough.  At the time Bard was seeking FDA clearance          03:00PM

11   for the Eclipse Filter, it had plans to create a filter with

12   caudal anchors.

13   A.  I'm a little rusty on my chronology, so I don't know

14   exactly when the filter with caudal anchors was begun to be

15   designed.  But it sounds reasonable.  But I would have to look        03:00PM

16   at the dates because the projects start at different times.

17   Q.  We'll put that as can't answer true or false to be fair.

18   A.  That's fine.

19   Q.  The filter with caudal anchors became the Meridian?

20   A.  Correct.                                                           03:00PM

21   Q.  Now, caudal anchors made the Meridian 16 times for

22   resistant to caudal migration than the Eclipse?

23   A.  I can't answer.  It sounds like a good number but I would

24   have to look at the report.

25   Q.  Do you have independent recollection that the addition of         03:00PM

1    caudal anchors did make that filter more resistant to caudal

2    migration?

3    A.   It stands to reason.  I just don't know what the numbers

4    were for sure.

5    Q.   The FDA did not do any independent testing of the G2 or          03:01PM

6    Eclipse filters, right?

7    A.   So I do know that we tested the Eclipse Filter because we

8    didn't have the capability to do some of the testing.  So there

9    was other external labs involved in the testing.

10   Q.   FDA labs?                                                        03:01PM

11   A.   I'm sorry?

12   Q.   FDA labs?

13   A.   FDA did have a lab, and we agreed on the way the testing

14   should be conducted, but it was an independent test house, like

15   Manasi or somebody.                                                   03:01PM

16   Q.   To your knowledge, the FDA itself never independently

17   tested either of these filters?

18   A.   I don't know if they did or not.  I know they have an

19   Office of Science and Laboratories.

20   Q.   We'll put you down for can't answer true or false.  Fair?        03:02PM

21   A.   Okay.

22   Q.   Controlled question:  Your name is still John Van Vleet?

23   A.   Yes, that's true.

24   Q.   Dr. John Lehmann was an independent consultant for Bard

25   during some of your tenure at Bard, correct?                         03:02PM

1    A.   I believe so.   I have never met him.

2    Q.   Dr. Lehmann was originally going to be the person who

3    signed Bard's submission to the FDA reporting on the EVEREST

4    trial.   True?

5    A.   I don't know.   I wasn't there.   I didn't -- I didn't hire          03:02PM

6    him so I -- it sounds reasonable, but I don't know what his

7    role was or who was giving him direction.

8    Q.   Can't answer true or false for that one?

9    A.   Yeah.   I think that's probably good.

10   Q.   Do you remember that Dr. Lehmann did not want to include          03:02PM

11   SIR guideline information in Bard's EVEREST trial submission?

12   A.   I do remember e-mail discussions of that.

13   Q.   That would be true?

14   A.   Yes.

15   Q.   Now, Dr. Lehmann didn't want to include the SIR guideline          03:02PM

16   information because they are not intended for anyone other than

17   physicians, right?

18   A.   I believe that that may have been one of the reasons.   I

19   really didn't understand his rationale.

20   Q.   I will put that as a true with asterisk by it.   Fair          03:03PM

21   enough?

22   A.   Sure.

23   Q.   Dr. Lehmann did not believe it would be truthful and

24   accurate for Bard to represent that the EVEREST trial

25   demonstrated that the G2 was substantially equivalent to          03:03PM

1    similar devices.

2    A.  I can't answer true or false.  I'm not sure what was in his

3    head.

4    Q.  In his proposed draft of the EVEREST trial submission, Dr.

5    Lehmann deleted the representation that the EVEREST trial          03:03PM

6    demonstrated substantial equivalence to similar devices?

7    A.  I can't answer true or false to that.

8    Q.  After getting this report back from Dr. Lehmann, you

9    requested that he be removed as the submitting author for the

10   EVEREST trial report?                                             03:04PM

11   A.  I believe he was removed or I don't know.  I actually saw

12   his name as one of the authors.  But I can't remember true or

13   false.

14   Q.  Well do you remember the part of that submission that Mr.

15   Rogers blew up for you and it was signed by Dr. Ciavarella and    03:04PM

16   not Dr. Lehmann?

17   A.  I didn't look at that part, but yeah, if that's the way it

18   was.

19   Q.  More to the point, did you ask that he be removed from this

20   project, Dr. Lehmann?                                             03:04PM

21   A.  I can't recall if I specifically asked that he be removed

22   from the project.  I know we had differences of opinions for

23   sure.

24   Q.  I will skip the next one.  I think you have already

25   answered it.                                                      03:04PM

———5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross———

1           The final report that was ultimately sent to the FDA

2    includes comparison data from the SIR guidelines.  Is that

3    right?

4    A.  I believe that's true.

5    Q.  And we saw some of that today?                          03:04PM

6    A.  Uh-huh.

7    Q.  Yes?

8    A.  Yes.  Uh-huh.

9    Q.  The final report sent to the FDA indicates, quote, "The

10   overall study results constitute valid scientific evidence   03:05PM

11   regarding the overall performance of Bard Recovery G2 Filter

12   system as an IVC filter and serves as a valid basis for

13   comparison in determining that the Recovery G2 Filter is

14   substantial equivalent to similarly marketed devices.

15   A.  That seems reasonable.  I would have to look at the report  03:05PM

16   make sure.

17   Q.  True with an asterisk?

18   A.  Sure.

19   Q.  To your knowledge, Bard never told, at least during your

20   tenure there, the FDA about Dr. Lehmann's concerns about      03:05PM

21   including the SIR guidelines in its EVEREST submission?

22   A.  To my knowledge, no.  True.

23   Q.  To your knowledge, Bard never told the FDA about Dr.

24   Lehmann's concerns about the truthfulness of a statement that

25   the EVEREST trial data showed that the G2 Filter was          03:05PM

1    substantially equivalent to other devices?

2    A.   I can't answer true or false.

3    Q.   To your knowledge that never happened, though, correct?

4    A.   Yeah.  To my knowledge, correct.

5    Q.   As late as October 28, 2015 Bard employee Josh Smale was          03:06PM

6    representing to the medical community that the Simon Nitinol

7    Filter had a, quote, "safe track record of use for over 20

8    years," close quote?

9    A.   It sounds reasonable.

10   Q.   True with an asterisk?                                            03:06PM

11   A.   I guess the part I don't understand is representing to the

12   medical community.

13   Q.   Are you aware of him making that representation to others

14   involved in filter use?

15   A.   I can't -- I guess I can't answer true or false on that          03:06PM

16   one.

17   Q.   Would it surprise you if he did make that representation?

18   A.   It wouldn't be surprising, no.

19   Q.   If I could direct your attention, sir, to the transcript in

20   front of you from testimony you provided about two months ago,        03:06PM

21   I have tagged a few --

22          MR. ROGERS:  Objection, Your Honor.  I don't believe

23   there's been any question that's been asked that would make

24   impeachment proper.

25          MR. CLARK:  I'm getting to that.  I'm just trying to           03:07PM

1    get him oriented.

2              THE COURT:  I'm going to overrule at this point.  Go

3    ahead.

4    BY MR. CLARK:

5    Q.  Sir, I asked you some questions earlier about your              03:07PM

6    recollection of -- hang on one second here.  Let me go to a

7    better document.

8              MR. CLARK:  Gay, could you please pull up Exhibit

9    1036?

10             While she's pulling it up let me go back to that          03:07PM

11   transcript real quick.

12   BY MR. CLARK:

13   Q.  I think you told me earlier, sir, that you did not recall

14   whether Mr. Dr. Lehmann had a concern about including a

15   statement that the EVEREST trial demonstrated substantial          03:08PM

16   equivalence between the G2 and similar devices.  Do you

17   remember that testimony?

18   A.  I'm sorry.  Can you repeat the question?  I was reading.

19   Q.  Sure.  Do you remember giving testimony earlier to me that

20   you did not recall Dr. Lehmann having a concern about including    03:08PM

21   a statement in the FDA submission on the EVEREST trial that the

22   G2 -- that the study demonstrated that the G2 was substantially

23   equivalent to other devices?

24   A.  Can you say the very beginning part again?

25   Q.  Yeah.  Earlier when we were talking, you told me you          03:08PM

1    couldn't say true false or --

2    A.   Right.

3    Q.   -- regarding that statement.  Do you remember that?

4    A.   Correct.

5    Q.   So you don't have any recollection of Dr. Lehmann          03:08PM

6    expressing concern about including a statement to the FDA that

7    the EVEREST trial showed that the G2 was substantially

8    equivalent to other similar devices?

9    A.   I don't have a specific recollection.

10   Q.   Can I direct your attention to page 4547.63, which is, I   03:09PM

11   think, the third tab in the transcript I have laid before you?

12   A.   .63?

13   Q.   063?

14   A.   Yes.

15   Q.   The question on Line 5 says, "On re-reading the document, I  03:09PM

16   realize that we have an unsupported regulatory statement that

17   needs modification relating to the EVEREST trial demonstrating

18   substantial equivalence to similar devices which it obviously

19   didn't do.  So I have deleted that sentence."

20         And the question is, do you see that?  You said you      03:09PM

21   did see that?

22   A.   Uh-huh.

23   Q.   Does that refresh your recollection that Dr. Lehmann had

24   some concerns about including that language?

25   A.   It does.  I would have to see what I was reading at the    03:09PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross

1    time to respond to that, but yes.

2              MR. CLARK:  Let's go back to 1036, please, Gay.

3    BY MR. CLARK:

4    Q.  Mr. Van Vleet, this is an e-mail that you authored,

5    correct?                                                03:10PM

6    A.  Correct.

7              MR. CLARK:  And if you could pull to the last

8    paragraph before the signature.

9    BY MR. CLARK:

10   Q.  This e-mail is discussing some frustration that you were   03:10PM

11   encountering with Dr. Lehmann's proposed revisions to the

12   EVEREST trial submission to the FDA, correct?

13   A.  Correct.

14   Q.  And you had asked that Dr. Lehmann be reassigned from

15   authorship of this report, correct?                     03:10PM

16   A.  Correct.  When this report was developed there was not a

17   director of clinical research or affairs at Bard Peripheral

18   Vascular.  So now that there was, I felt it was appropriate

19   that we reassign the signature to John Reviere.

20   Q.  You didn't like what Dr. Lehmann was proposing with his   03:10PM

21   revisions, correct?

22   A.  I didn't understand what he was proposing, to be quite

23   honest with you, and he was 2500 miles away.

24   Q.  And Dr. Lehmann was, in fact, reassigned from authorship of

25   that study, correct?                                    03:11PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Cross

1  A.  It wouldn't surprise me that he was.  But we certainly did

2  have John Reviere's signature on that.

3  Q.  Lastly, you were asked some questions about the patient

4  brochure for the Eclipse?

5  A.  Yes.                                                          03:11PM

6  Q.  And I didn't see anything in there about any relative

7  increase of risk of those complications associated with the

8  Eclipse Filter.

9        Is that fair?  Those are not in there.

10  A.  Increase in risk relative to what?                           03:11PM

11  Q.  Use of the Eclipse Filter.

12  A.  Okay.

13  Q.  Let me give you some context.

14        There's a number of complications that are listed in

15  that brochure, correct.                                          03:11PM

16  A.  Correct.

17  Q.  And but it doesn't say anything about whether this filter

18  makes those complications more or less likely than other

19  filters.  Fair?

20  A.  I don't believe that there was anything that made a          03:11PM

21  comparison one way or the other.

22  Q.  Thank you, sir.  No further questions.

23        THE COURT:  Redirect?

24        MR. ROGERS:  Very briefly, Your Honor.

25        Can we pull Exhibit 7960 back up?  That is not what I      03:12PM

1    was looking for.  The last exhibit we used.

2            THE COURT:  1036.  Oh, that you used?

3            MR. ROGERS:  I'm sorry.  The last exhibit I used, the

4    handout.  I may have written down the wrong number.  Yes.

5    Thank you.  Can we go to the second page, please?                03:12PM

6                    REDIRECT EXAMINATION

7    BY MR. ROGERS:

8    Q.  And Mr. Van Vleet, you were just asked some questions about

9    this bottom left portion there?

10           MR. ROGERS:  Scott, would you mind blowing that up?      03:12PM

11   BY MR. ROGERS:

12   Q.  You were asked some questions by plaintiff's counsel about

13   this.  Do you recall that?

14   A.  Yes.

15   Q.  And was this chart, was that contained in this handout that  03:12PM

16   was to be provided to doctors about the Bard's IVC filters?

17   A.  Yes.

18   Q.  And Mr. Van Vleet, do you believe that this information was

19   fair and balanced about what these particular studies showed?

20   A.  I do believe it was.                                         03:13PM

21   Q.  And Mr. Van Vleet, has it been a while since you have taken

22   a true/false test?

23   A.  Probably.

24   Q.  And I expect you have never taken a true/false test in

25   court before, have you?                                          03:13PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Van Vleet-Redirect

1    A.  I certainly have not.

2            MR. ROGERS:  And if you would, can we go to the last

3    exhibit that was used, which was 1036?

4    BY MR. ROGERS:

5    Q.  Mr. Van Vleet, were you asked some questions about this       03:13PM

6    particular e-mail?

7    A.  Yes.

8    Q.  And what's the date of that e-mail?

9    A.  September 27th, 2007.

10   Q.  So it's been more than 10 years ago since you wrote this      03:13PM

11   e-mail?

12   A.  Yes.

13   Q.  And Mr. Van Vleet, is it true or false that you can't

14   recall everything that you wrote in an e-mail 10 years ago?

15   A.  That's very true.                                             03:13PM

16   Q.  Thank you.  No further questions.

17           THE COURT:  All right, sir.  You can step down.

18           MR. NORTH:  Your Honor, at this time we would recall

19   Mr. Rob Carr to the stand.

20           THE COURT:  If you want to stand up, Ladies and          03:14PM

21   Gentlemen, while he's coming in, feel free.

22           Mr. Carr, you are still under oath for purposes of the

23   trial, so you can come back to the witness chair.

24                           ***

25                           ***

1          ROB CARR,

2   called as a witness herein, having been previously sworn, was

3   examined and testified as follows:

4                    DIRECT EXAMINATION

5   BY MR. NORTH:

6   Q.   Good afternoon Mr. Carr.

7   A.   Good afternoon.

8   Q.   I believe the jury has met you a couple weeks ago, but now

9   I'd like to ask you a few questions myself.

10          Could you briefly describe for the jury your          03:15PM

11   educational background?

12   A.   I have a Bachelor of Science in Biomedical Engineering from

13   the Catholic University of America in Washington, D.C.

14   Q.   And what is biomedical engineering?

15   A.   It's a discipline that marries the biological classes with,   03:15PM

16   in my case, mechanical engineering classes.  Sometimes it's

17   electrical engineering.  In my case it was mechanical.

18   Q.   Do you live here in Phoenix?

19   A.   I do.

20   Q.   And are you married?                                     03:15PM

21   A.   I am.

22   Q.   And are you part of a medical sort of family?

23   A.   Yes.

24   Q.   Why did you become an engineer?

25   A.   I was always interested in either becoming a veterinarian   03:15PM

1    or a physician, and engineering seemed like a nice entree into

2    either of those at the time.

3    Q.  Has most of your professional career since college been

4    involved with medical devices?

5    A.  All of it.                                                    03:16PM

6    Q.  What was your first job after graduating from college at

7    Catholic University?

8    A.  In Boston, I worked for a startup biotech firm called

9    Organogenesis.

10   Q.  And can you tell us what Organogenesis does, or did?         03:16PM

11   A.  Still does.  We worked on collagen-based material, so it's

12   a natural protein in your body and we tried to create different

13   structural things out of it, blood vessels, urinary patches,

14   things like that.

15   Q.  And for how many years did you work at Organogenesis?        03:16PM

16   A.  About seven.

17   Q.  And what was your position generally at that company?

18   A.  I held different engineering positions.  When I left I was

19   the director of R&D, research and development.

20   Q.  And was NMT or Nitinol Medical Technologies your next job    03:17PM

21   after you left that company?

22   A.  Yes, it was.

23   Q.  And when did you join NMT?

24   A.  September of 1996.

25   Q.  What positions did you hold at NMT during your years there?  03:17PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1    A.   Again, different levels of R&D positions.

2    Q.   What was your position at the time you left?

3    A.   I think program director of R&D.

4    Q.   And you left NMT to come to Bard?

5    A.   I did.                                                    03:17PM

6    Q.   And what year was that?

7    A.   July 1st, 2002.

8    Q.   So you were with NMT approximately six years?

9    A.   Yes.

10   Q.   What product did you -- or products did you spend most of  03:17PM

11   your time working with while at NMT?

12   A.   Vena cava filters as well as a device used to seal a hole

13   in your heart called a PFO.

14   Q.   When you started working with IVC filters in the 1990s,

15   what type of filters were available?                          03:18PM

16   A.   Just permanent filters.

17   Q.   What material are Bard's or NMT's filters made of?

18   A.   Nitinol.

19   Q.   Describe for us briefly what Nitinol is.  How was it

20   originated?                                                   03:18PM

21   A.   So it's a material that was developed by the Navy, and it

22   is a shape memory, it's called, material that at one

23   temperature can be in one shape and then at a different

24   temperature can form into a different shape.

25   Q.   While working at NMT, did you work with a physician by the  03:18PM

1    name of Dr. Morris Simon?

2    A.   Yes.

3    Q.   Who was Dr. Simon?

4    A.   He was a world renowned interventional radiologist at Beth

5    Israel Hospital in Boston.  And he had developed what is the    03:19PM

6    Simon Nitinol Filter and was one of the founders of NMT

7    Medical.

8    Q.   Was he considered a pioneer in the development of IVC

9    filters?

10   A.   Absolutely.    03:19PM

11   Q.   Did you work with Dr. Simon in the development of a new

12   filter after the introduction of the Simon Nitinol?

13   A.   Yes.  It became the Recovery Filter.

14   Q.   Why were you and Dr. Simon working on the development of a

15   retrievable filter when you already had the Simon Nitinol    03:19PM

16   Filter on the market?

17   A.   Dr. Simon and others that we worked with felt that there

18   were many patients who were getting permanent filters that

19   didn't necessarily need a permanent filter forever, that the

20   reason why they were getting a filter was temporary.  And so    03:19PM

21   while unknown what that length would be, it was temporary.

22          And so he wanted to work to develop a filter, if we

23   could, that could be implanted, remain in forever, or be

24   removed at any time when it was no longer needed.

25   Q.   From your work with Dr. Simon, did it appear that he was    03:20PM

1  passionate about this project?

2  A.  We were all very passionate about it.

3  Q.  Besides Dr. Simon, were there other medical professionals

4  who assisted in the development of IVC filters at NMT?

5  A.  Yes.  There were several.  The main ones was John Kaufman          03:20PM

6  who was an interventional radiologist at Mass General at the

7  time and Tony Venbrux, who was an in interventional radiologist

8  at Johns Hopkins in Baltimore at the time.

9  Q.  Did you begin working on the development of what became the

10  Recovery Filter when you first started in 1996?                      03:20PM

11  A.  It was shortly after I started on the septal occluder

12  device first, but yes, certainly shortly after.

13  Q.  What was the work environment or the atmosphere at NMT

14  surrounding these products to develop a retrievable filter?

15  A.  It was a great place to work.  He had very smart people          03:21PM

16  doing something nobody else had ever done, literally, and

17  trying to create a device that could save a lot of people's

18  lives and very collegiate, very academic, but very driven at

19  the same time.

20  Q.  Now, at some point NMT sold its rights to the Recovery           03:21PM

21  Filter to C.R. Bard, correct?

22  A.  Yes.  I believe October of 2001.

23  Q.  And did NMT also sell the rights to the Simon Nitinol

24  Filter at that time?

25  A.  Yes.                                                             03:21PM

1  Q.  And then how soon after that sale did you move to Bard?

2  A.  I started July 1st, so about nine months.

3  Q.  Why did you decide to move to Bard in July of 2002?

4  A.  It was a great opportunity, both for my family -- my oldest

5  children were just about to start kindergarten.  My wife had          03:22PM

6  graduated from school and the opportunity to continue to

7  develop filters and work for a larger, more stable medical

8  device company.

9  Q.  And so when you moved to Bard, did you receive the

10  opportunity to continue to work with IVC filters?                    03:22PM

11  A.  I did, yes.

12  Q.  And what was your position when you moved to Bard?

13  A.  It was program director.

14  Q.  And did any of your other colleagues at NMT eventually join

15  you at Bard?                                                         03:22PM

16  A.  Yes.  Ultimately, I brought Andrzej Chanduszko from NMT to

17  Bard.

18  Q.  Had you worked with Mr. Chanduszko while at NMT in filter

19  development projects?

20  A.  Yes.  In fact, we started the same day.                         03:23PM

21  Q.  When you came over to Bard did you continue to work with

22  Dr. Kaufman and Dr. Venbrux as consultants on the projects?

23  A.  Yes, we did.

24  Q.  Mr. Carr, let's talk a little bit about your experience as

25  a biomedical engineer in the development of new medical             03:23PM

1    devices.

2              Could we bring up slide 6089 -- Exhibit 6089.

3              Are you familiar with this document?

4    A.  Yes.  I created it.

5    Q.  And what is this document?                                03:23PM

6    A.  It's an outline that walks through our new product

7    development system, or the way we develop products.

8    Q.  Have you used this particular presentation on the job at

9    Bard?

10   A.  Yes.                                                      03:23PM

11   Q.  In what kind of context?

12   A.  To outline the way we do things and what we focus on, our

13   steps through the development cycle.

14             MR. NORTH:  Your Honor, at this time we would offer

15   for admission Exhibit 6089.                                   03:24PM

16             MR. O'CONNOR:  No objection, Your Honor.

17             THE COURT:  Admitted.

18             MR. NORTH:  Could we display, Your Honor?

19             THE COURT:  Yes.

20             MR. NORTH:  Could we turn to Page 3.                03:24PM

21   BY MR. NORTH:

22   Q.  If you would, Mr. Carr, walk through for the jury what you

23   are attempting to depict here regarding the new product

24   development process.

25   A.  So what this slide says, if you work from left to right,  03:24PM

1    yeah, my left to right, you start with ideas.  And so, you

2    know, our business is based on creating needs out of unmet

3    needs so there are ideas of those solutions.  As those ideas

4    percolate we put together a business case to hopefully either

5    pursue those ideas or not.  And that's where you see your          03:24PM

6    approved idea, POA, which is product opportunity assessment.

7          If successfully passing through that gate, we enter

8    what's called the concept phase where we take some of those

9    ideas and hopefully make them more real; so potential

10   solutions, some prototypes, if you will.  We do some testing.     03:25PM

11   And the goal of concept phase is really to eliminate all of the

12   show stoppers or unmet questions.

13         We then go through a design review where that's

14   reviewed by independent people off of the project.  Feasibility

15   is a continuation of that process where those ideas and          03:25PM

16   prototypes are further refined.  We develop all the design

17   inputs, all the specifications.  We hold another design review

18   to say that, yes, those are what we want the product to be.

19   Then through development, we actually build samples for testing

20   through all of our, what's called, verification and validation   03:26PM

21   testing.  Go through yet another design review to make sure

22   those outputs have met the inputs that were created before and

23   then get another approval to launch the product obviously

24   assuming that we had regulatory approval before that.

25         And then once the product is on the market for some         03:26PM

1    period of time we do a post-launch design review where we take

2    in all of the data that we have had from complaints, from

3    sales, from operational efficiencies, things like that and hold

4    yet another design review.

5    Q.  If we could turn to Page 13 on that very topic.                03:26PM

6            Why do you conduct a post-launch review and an

7    additional design review even though the product is already out

8    on the market?

9    A.  To double check that things are going well; to assess where

10   that product is, and again, from both externally looking out      03:27PM

11   into the field as well as internally looking from a production

12   and cost and operations point of view.

13   Q.  When the G2 and the Eclipse filters were being designed and

14   developed, was this general product development cycle followed?

15   A.  Yes.                                                           03:27PM

16   Q.  Mr. Carr, over the course of your years, have you been

17   actively involved with engineering issues at Bard Peripheral

18   Vascular?

19   A.  Sure.

20   Q.  And for a lot of that time, have you been involved with       03:27PM

21   filters specifically?

22   A.  Yes.

23   Q.  Are you familiar generally with how much money the Division

24   has invested in the research and development of its filters?

25   A.  Yes.  Over $18 million.                                        03:27PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1    Q.  And would that stretch from 2003 to 2017?

2    A.  Yes.

3    Q.  Did they spend anywhere close to that amount of money that

4    they spent in research and development in marketing filters?

5    A.  No, about one-third of that.                          03:28PM

6    Q.  Let's talk briefly about the Recovery Filter and its

7    development first.

8            Is it fair to say based on what you told us earlier

9    that the development of the Recovery Filter began in 1996 or

10   thereabouts?                                              03:28PM

11   A.  Yes.

12   Q.  Did NMT, you and your fellow team members at NMT have to

13   develop a number of prototypes for the Recovery Filter before

14   you settled on the ultimate design?

15   A.  Yes, very many.                                       03:28PM

16   Q.  And why were some prototypes rejected or not used?

17   A.  For one reason or another, they failed our testing or were

18   maybe too difficult to make or were just not practical

19   solutions at the end of the day.

20   Q.  When was the initial design of the Recovery Filter as it   03:29PM

21   ultimately came to be marketed, created, or invented?

22   A.  Probably 1998-ish.

23   Q.  So did it take you and your team approximately two years in

24   testing various prototypes to come up with the ultimate design?

25   A.  Yes.                                                  03:29PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1   Q.  Once you arrived at what would be the ultimate design among

2   those various prototypes, what was the next step?

3   A.  We would do benchtop testing.

4   Q.  What type of tests did you perform on the proposed design

5   while at NMT?                                                        03:29PM

6   A.  They would be tests that ranged from testing the strength

7   of the device, tensile strength, to migration testing, to clot

8   trapping, to some animal tests where we looked at the filters

9   implanted, could they be removed without damaging the vena

10  cava.  A whole battery of tests.                                     03:30PM

11  Q.  In your 25-plus years in the medical device industry, have

12  bench tests been fairly typical in the product development

13  cycle?

14  A.  Mandatory.

15  Q.  And in developing and testing what became the Recovery          03:30PM

16  Filter, did NMT also conduct some animal tests?

17  A.  Yes, we did.

18  Q.  And what physicians assisted you with the animal tests?

19  A.  Dr. Simon, but primarily Doctors Venbrux and Kaufman.

20  Q.  And in the development of the Recovery Filter, did you also     03:30PM

21  ultimately conduct, or did NMT conduct a clinical study?

22  A.  Yes.  We did a special access study in Toronto with Dr.

23  Asch.

24  Q.  In your experience, are clinical studies common for these

25  types of medical devices?                                           03:31PM

1   A.  Yes.

2   Q.  Are they typical or common for devices that go through the

3   510(k) process as opposed to the PMA or approval process?

4   A.  No.  Not routinely.

5   Q.  If we could bring up Exhibit 5189.  Do you recognize what        03:31PM

6   this is, Mr. Carr?

7   A.  Yes.

8   Q.  And what is it?

9   A.  It is the special 510(k) submission filed in November of

10  2002.                                                               03:31PM

11  Q.  Was this the submission to the FDA for a permanent

12  indication for the Recovery Filter?

13  A.  Yes.

14  Q.  Was this submitted after you had already joined Bard?

15  A.  Yes.                                                            03:31PM

16  Q.  And were you personally involved in preparing this

17  submission, Mr. Carr?

18  A.  Yes.

19          MR. NORTH:  Your Honor, at this time we would tender

20  5189.                                                               03:32PM

21          THE COURT:  I show it in evidence.

22          MR. NORTH:  I'm sorry, Your Honor.  Could we display

23  it, please?

24          THE COURT:  You may.

25  BY MR. NORTH:                                                       03:32PM

1    Q.  Could we turn to Page 18, please.

2           What does this portion of the 510(k) generally depict?

3    A.  It's the summary of the design control activities, so it

4    outlines on the left part of the table the changes or

5    modifications to the filter, the predicate device, and in the          03:32PM

6    bottom the delivery system, and then to the right the tests

7    that were performed based on those changes.

8    Q.  If we could turn to Page 20, please.

9           What is clot trapping efficiency?

10   A.  It's how well the filter performs its ultimate function          03:32PM

11   which is to stop clots from going to the lungs which is called

12   a pulmonary embolism.

13   Q.  If we could look down at the bottom of that page under

14   summary, did Bard provide the FDA with a summary of the test

15   results regarding clot trapping efficiency that the company had          03:33PM

16   performed?

17   A.  Yes, we did.

18   Q.  Now, Mr. Carr, to be clear, were some of the tests that

19   Bard was submitting to the FDA tests that had been performed

20   with your or Mr. Chanduszko's involvement while still at NMT?          03:33PM

21   A.  Yes.

22   Q.  Were there other tests that you performed or various

23   engineers performed once you moved to Bard that were also part

24   of the submission?

25   A.  Yes.          03:33PM

1    Q.  If we could turn to Page 21, please.

2           What is this particular test that you are describing

3    for the FDA?

4    A.  It's the migration test that was performed.

5    Q.  Did the -- looking down at this summary did the company          03:34PM

6    again provide the FDA with a summary of the test results

7    regarding migration resistance?

8    A.  Yes, we did.

9    Q.  And let's turn to Page 23, please.

10          Is the same true for tests performed by NMT and Bard          03:34PM

11   concerning weld, integrity, and hook strength for the device?

12   A.  Yes, it is.

13   Q.  And again, was all of that information shared with the FDA?

14   A.  Yes.

15   Q.  If we could turn to Page 24, please.  Corrosion fatigue          03:34PM

16   testing.  Did the company share with the FDA, again, all

17   information concerning those tests that had been performed on

18   the Recovery Filter?

19   A.  Yes, we did.

20   Q.  And then if we could turn to Page 25.  Is the same thing          03:35PM

21   true with regard to radial strength testing?

22   A.  Yes.

23   Q.  26, please.

24          The same with simulated use testing?

25   A.  Yes.                                                             03:35PM

1   Q.   What is simulated use study?

2   A.   It studied the ability to deploy the filter and then how

3   the filter centered in the vessel that it was put into as well

4   as the forces and trackability, we call it, so the ability to

5   track through the tortuous vessels to the site that you want to     03:35PM

6   implant it.

7   Q.   If we could turn to Page 29.

8          Did Bard, in this submission in November of 2002,

9   provide the FDA with information in a detailed summary of the

10  study, clinical study, conducted by Dr. Murray Asch?              03:35PM

11  A.   Yes.

12  Q.   If we could turn to Page 33, please.

13         Now, we heard testimony, this jury heard testimony

14  couple weeks ago about two patients who had complications in

15  that study.  Do you recall those patients?                        03:36PM

16  A.   Yes.

17  Q.   And were they referred to as Patient Number 9 and Patient

18  Number 33?

19  A.   Yes.

20  Q.   In this submission to the FDA to obtain clearance for the    03:36PM

21  Recovery Filter in November of 2002, did Bard provide

22  information to the agency about those complications reported in

23  the Asch study?

24  A.   Yes.

25  Q.   And did you also provide information here to the agency      03:36PM

1    about your investigation of those complications?

2    A.  Yes.

3    Q.  If we could bring up 5187.

4           MR. NORTH:  I believe this is admitted.  Oh.  I'm

5    sorry, Your Honor.                                          03:37PM

6    BY MR. NORTH:

7    Q.  Tell us what 5187 is, Mr. Carr.

8    A.  It is a response by the FDA to our submission where they

9    asked us a series of questions.

10   Q.  And have you seen those questions before?               03:37PM

11   A.  Yes, I have.

12   Q.  And were you involved in helping prepare Bard's response to

13   those questions?

14   A.  Yes.

15          MR. NORTH:  Your Honor, at this time we would tender   03:37PM

16   5187 for admission.

17          MR. O'CONNOR:  We have no objection, Your Honor.

18          THE COURT:  Admitted.

19          MR. NORTH:  May we display, Your Honor?

20          THE COURT:  Yes.                                      03:37PM

21          MR. NORTH:  Thank you.

22   BY MR. NORTH:

23   Q.  Scroll down to the last page, if you would.  Go back one

24   page, I'm sorry.  One more.

25          How many questions total did the FDA pose to Bard     03:38PM

1   regarding the submission?

2   A.  17.

3   Q.  And this letter is dated August of 2002.  Is that correct,

4   the first page, please?

5   A.  Yes, August 5th.                                      03:38PM

6   Q.  And I may have misspoke earlier referring to the actual

7   510(k) as dated November of 2002.  Is that date the actual date

8   that it was cleared?

9   A.  Yes.  I believe so.

10  Q.  Let's look at Page 2, if we could.                    03:38PM

11          In Question 3, what -- 3, 4, and 5, what is the agency

12  asking the company regarding the testing information that had

13  been provided in the 510(k)?

14  A.  All three are in response or on the subject of clot

15  trapping efficiency.  And so Question Number 4, they are asking  03:39PM

16  for the data for the test.  And then Question 5 is a

17  clarification of the testing parameters.

18  Q.  Okay.  If we could look further down that page at Question

19  8.  What is the agency requesting here?

20  A.  Our testing that shows that the Recovery Filter doesn't    03:39PM

21  cause caval perforation, meaning it doesn't go through the

22  vessel.

23  Q.  If we could look on the same page at Question 10.  What is

24  the agency asking Bard about here?

25  A.  For the data, again, behind the simulated use study.       03:39PM

1    Q.  If we could turn to Page 3, please.

2           Let's look at Questions 11 through 13, please.  What

3    is the agency interested in here?

4    A.  A lot of the force testing.  So the first one is the weld

5    integrity and hook strength, which is a measure of how strongly    03:40PM

6    the wires are welded to the top of the device.  Question 12 is,

7    again, they are asking for the protocol and the results.

8    Q.  If we could go down to Question 14, please.  What is the

9    agency asking about here?

10   A.  A radial strength test.                                        03:40PM

11   Q.  And then if we could look together at 15 and 16.

12   A.  It's about biocompatibility.

13   Q.  Now, if we could bring up Exhibit 5182, please.

14          Do you recognize what this document is?

15   A.  Yes.                                                           03:41PM

16   Q.  What is it?

17   A.  It is our responses to those questions.

18   Q.  And what is that dated?

19   A.  August 30, 2002.

20          MR. NORTH:  Your Honor, at this time we would offer         03:41PM

21   for admission Exhibit 5182.

22          MR. O'CONNOR:  No objection, Your Honor.

23          THE COURT:  Admitted.

24   BY MR. NORTH:

25   Q.  What sort of information did Bard provide the agency in        03:41PM

1    response to those 17 questions they had posed?

2    A.   As much information as we could.   Certainly whether they --

3    some of them had just asked for protocols and test methods so

4    we provided them our documentation for that.   Where it required

5    further testing we would have done that.   We tried to answer          03:41PM

6    each question as thoroughly and responsibly as possible.

7    Q.   If we could look at Page 11, please.

8              MR. NORTH:   Could we display, Your Honor?

9              THE COURT:   You may.

10   BY MR. NORTH:                                                          03:42PM

11   Q.   Did Bard respond to the agency's questions regarding

12   corrosion and fatigue testing?

13   A.   Yes.

14   Q.   By providing what sorts of information?

15   A.   We provided our cyclical testing that we did at the time         03:42PM

16   per standard.   We also provided our fatigue testing at the

17   time.

18   Q.   Did Bard actually provide test reports themselves to the

19   agency with these answers to the questions?

20   A.   Yes.                                                              03:42PM

21   Q.   If we could turn to Page 30, please.   For example, is this

22   a cyclic polarization testing that was provided as an appendix

23   to the letter response?

24   A.   Yes, it is.

25   Q.   117, please.   Next page.   Is this the report on simulated      03:43PM

1  use that you actually then submitted to the agency in

2  conjunction with that letter?

3  A.  Yes.

4  Q.  And were there a number of other similar type test reports

5  that you actually gave to the agency?                        03:43PM

6  A.  We would have given them anything that supported the

7  answer, so yes.

8  Q.  So after that information was provided in that letter dated

9  August 30 of 2002, did you hear back from the FDA?

10 A.  Yes.  They had some more questions.                       03:43PM

11 Q.  If we could bring up Exhibit 5179, please.

12         What is this, Mr. Carr?

13 A.  This is that letter back from them with their additional

14 questions.

15 Q.  Were you involved on behalf of the company in preparing    03:43PM

16 responses to this letter?

17 A.  Yes.

18         MR. NORTH:  Your Honor, at this time we would offer

19 for admission Exhibit 5179.

20         MR. O'CONNOR:  No objection, Your Honor.              03:44PM

21         THE COURT:  Admitted.

22         MR. NORTH:  May we display, Your Honor?

23         THE COURT:  Yes.

24 BY MR. NORTH:

25 Q.  Let's look at Question Number 1, if we could.             03:44PM

1              What is the agency asking here with its follow-up

2   questions?

3   A.   Further clarification on our clot trapping testing.

4   Q.   Let's look at Question Number 2.   What is the agency asking

5   about here?                                                                03:44PM

6   A.   Further clarification for a radial strength testing.

7   Q.   Let's highlight the first line, if we could.

8              Is the FDA in this letter specifically referencing its

9   guidance that was published in 1999 for filters?

10  A.   Yes, it is.                                                           03:45PM

11  Q.   And if we could turn to the next page, please.

12             Looking at Question 3, about midway down that

13  paragraph, does the agency ask you to revise your indications

14  for use?

15  A.   Yes, they do.                                                         03:45PM

16  Q.   Now, if we could bring up Exhibit 5178, please.   What is

17  this?

18  A.   That's our responses to their second round of questions.

19  Q.   Now --

20             MR. NORTH:   Well, Your Honor, at this time we would           03:45PM

21  tender Exhibit 5178 for admission.

22             MR. O'CONNOR:   No objection.

23             THE COURT:   Admitted.

24             MR. NORTH:   May we display, Your Honor?

25             THE COURT:   Yes.                                              03:45PM

1    BY MR. NORTH:

2    Q.  Mr. Carr, just so we're not all confused here, this list or

3    seems to be on the letterhead of a company called IMPRA.  Could

4    you tell us what IMPRA was?

5    A.  It was the former name of what is now Bard Peripheral                 03:46PM

6    Vascular.

7    Q.  At the top left does it identify IMPRA as a subsidiary of

8    C.R. Bard?

9    A.  Yes, it does.

10   Q.  So did Bard provide various information to the FDA in this            03:46PM

11   letter in response to the second round of questions the agency

12   had?

13   A.  Yes.

14   Q.  If we could bring up Exhibit 5177, please.

15          And is this the letter from the agency providing                  03:46PM

16   clearance for the Recovery Filter for permanent indication?

17   A.  It is their concurrence letter, yes.

18          MR. NORTH:  Your Honor, I think this one may be

19   admitted.

20          THE COURT:  5177?  No.                                            03:47PM

21          MR. NORTH:  Then I would tender it for admission, Your

22   Honor.

23          MR. O'CONNOR:  No objection.

24          THE COURT:  Admitted.

25          MR. NORTH:  And could we display, Your Honor?                     03:47PM

1          THE COURT:  Yes.

2     BY MR. NORTH:

3     Q.  What's the date of this again, Mr. Carr?

4     A.  November 27th, 2002.

5     Q.  And is that the same date that we saw on the actual 510(k)     03:47PM

6     submission that we viewed earlier?

7     A.  Yes, it is.

8     Q.  Now, did Bard thereafter submit an additional 510(k) for

9     the Recovery Filter to obtain clearance as a retrievable

10    device?                                                           03:47PM

11    A.  Yes, we did.

12    Q.  Let's bring up 5169.

13          Is this a copy of the application for clearance as a

14    retrievable filter?

15    A.  Yes.                                                          03:47PM

16    Q.  And this shows a date of July 25, 2003?

17    A.  Yes.

18    Q.  Again, is that the date that the application was ultimately

19    cleared?

20    A.  I'd have to look inside to be sure.                           03:48PM

21          MR. NORTH:  Your Honor, at this time if not already

22    admitted we would tender 5169.

23          MR. O'CONNOR:  No objection.

24          THE COURT:  Admitted.

25          MR. NORTH:  Could we display, please?                       03:48PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1           THE COURT:  You may.

2  BY MR. NORTH:

3  Q.  Let's look at the second page, if we could.

4           Does this demonstrate what date this was actually

5  first submitted to the FDA?                                    03:48PM

6  A.  Yes.  April 25th.

7  Q.  Did the FDA ultimately clear the device for retrievable

8  use?

9  A.  Yes, they did.

10  Q.  As a part of this submission, did you provide the FDA with   03:48PM

11  additional information more than you had previously provided

12  with the first 510(k)?

13  A.  Yes.

14  Q.  Did that include additional clinical information from the

15  Asch study?                                                    03:49PM

16  A.  Yes, it did.

17  Q.  Did that include animal study information?

18  A.  Yes.

19  Q.  If we could bring up Exhibit 5197, please.

20           And what is 5197?                                     03:49PM

21  A.  It is the FDA's letter agreeing with us and their

22  concurrence letter.

23  Q.  And did that clear the device for sale as a retrievable

24  filter in this country?

25  A.  Yes, it did.                                                03:49PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1          MR. NORTH:  Your Honor, at this time we would tender

2     for admission Exhibit 5197.

3          MR. O'CONNOR:  No objection.

4          THE COURT:  Admitted.

5          MR. NORTH:  And could we display?                    03:49PM

6          THE COURT:  Yes.

7     BY MR. NORTH:

8     Q.  Mr. Carr, when did Bard start the development process for

9     the G2 filter?

10    A.  Sometime in early 2004.                               03:50PM

11    Q.  Why did Bard decide to start developing the G2 Filter?

12    A.  We thought we could make an improved device.  For all of

13    our devices we were constantly trying to make the next

14    generation device that is better and to replace ourselves

15    rather than have somebody else replace us.                03:50PM

16    Q.  And were there specific design attributes of the Recovery

17    Filter that Bard hoped to improve with the G2 Filter?

18    A.  Yes.  We wanted to improve migration and fracture

19    resistance.

20    Q.  What is a product performance specification?          03:50PM

21    A.  It is the document that outlines how you want the device to

22    behave so the design inputs that I mentioned earlier are

23    referenced in this document.  So how big it is, how tall it is,

24    how -- what size sheath it needs to go through, the performance

25    criteria that you want the device to have.                03:51PM

1        MR. NORTH:  If we could bring up Exhibit 5296, please.

2    And bring up the second page, please.

3    BY MR. NORTH:

4    Q.  Can you identify what this is, Mr. Carr?

5    A.  It is the PPS, or performance -- Product Performance                 03:51PM

6    Specification for the G2 Filter.

7        MR. NORTH:  Your Honor, at this time we would offer

8    for admission Exhibit 5296.

9        THE COURTROOM DEPUTY:  I show it in.

10       MR. O'CONNOR:  No objection.                                         03:51PM

11       THE COURT:  We show it in evidence.

12       MR. NORTH:  I'm sorry, Your Honor.  Could we display?

13       THE COURT:  Yes.

14   BY MR. NORTH:

15   Q.  If we could turn to Page 17, please.  What does this mean            03:52PM

16   by "design input"?

17   A.  Again, we have what we want the device to be, both from a

18   user point of view as well from how that translates to an

19   engineering specification.

20   Q.  And if we could look under user requirement for filter               03:52PM

21   migration resistance.  And what was the aim for the G2 Filter?

22   A.  That the filter be statistically -- the migration

23   resistance of the filter be statistically greater than that of

24   the Recovery Filter in a 28 millimeter diameter simulated IVC

25   or vessel.                                                               03:52PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1   Q.  And under pass or fail, did the G2 pass or fail these

2   criteria?

3   A.  It ultimately passed.

4   Q.  Let's talk -- were there also some animal tests performed

5   on the G2 Filter?                                        03:53PM

6   A.  Yes.

7   Q.  And are there two types of animal tests that are generally

8   performed?

9   A.  Yes.  We did what's called chronic testing, which is

10  shorter term, and then we did testing where we implanted    03:53PM

11  filters for a longer time and tried to remove them.

12  Q.  If we could bring up Exhibit 5301.

13          Do you recognize what this is?

14  A.  Yes.

15  Q.  What is this?                                        03:53PM

16  A.  It's a test report from the G2 animal study.

17          MR. NORTH:  Your Honor, at this time we would offer

18  5301.

19          MR. O'CONNOR:  Your Honor, just foundation in terms of

20  date or time of this document, please.                   03:53PM

21          THE COURT:  Mr. North, can you lay that foundation?

22          MR. NORTH:  Bring up the second page for Mr. Carr, if

23  you would.

24  BY MR. NORTH:

25  Q.  Can you tell the general time frame of this test was    03:54PM

1  performed by looking at the second page?

2  A.  Yes.  It's January of 2005.

3         MR. O'CONNOR:  Thank you.  I appreciate that.  No

4  objection.

5         THE COURT:  5301 is admitted.                    03:54PM

6         MR. NORTH:  If we could turn back to the first page.

7         If we could display, Your Honor.

8         THE COURT:  You may.

9  BY MR. NORTH:

10 Q.  What is meant here where they call it the Recovery Filter   03:54PM

11 G1A?

12 A.  Just the name of the filter that ultimately became G2.

13 Q.  Is this the chronic or the acute animal study or can you

14 tell?

15 A.  I would have to see the next page.                  03:54PM

16 Q.  Okay.  Let's see the next page, if we could.

17 A.  Probably the next one.  Sorry.  Probably the next one.

18 There.  I'd have to see the outline of the study.

19        I can't tell off the top of my head here.  Sorry.

20 Q.  Tell you what.  Let's bring up Exhibit 5034 if we can.  And   03:55PM

21 do you recognize what this is?

22 A.  Yes.  This is the chronic report.

23 Q.  So is this a separate animal study than the one we were

24 just looking at?

25 A.  Yes.                                               03:55PM

1   Q.  If we could look at the next page.  Was this performed in

2   early 2005 also?

3   A.  Yes, in March.

4           MR. NORTH:  Your Honor, at this time we would offer

5   for admission 5304.                                              03:55PM

6           MR. O'CONNOR:  No objection.

7           THE COURT:  Admitted.

8           MR. NORTH:  If we could display, Your Honor.

9           THE COURT:  You may.

10  BY MR. NORTH:                                                    03:56PM

11  Q.  Does this indicate that Andrzej Chanduszko was involved in

12  approving the test on behalf of the engineering department?

13  A.  Yes, it does.

14  Q.  And if we could turn to Page 11, please.

15          Looking at the second paragraph towards the -- it's     03:56PM

16  talking about physician investigators.  Do you recall who the

17  physician investigators were assisting with the animal studies?

18  A.  Yes.  It was Dr. Venbrux and Dr. Kaufman.

19  Q.  Did Bard also perform bench testing when developing the G2?

20  A.  Yes.                                                         03:56PM

21          MR. NORTH:  If we could bring up Exhibit 5302.  I

22  believe this is already admitted.

23          THE COURT:  It is.

24          MR. NORTH:  Could we display, Your Honor?

25          THE COURT:  Yes.                                         03:56PM

1    BY MR. NORTH:

2    Q.  And are you familiar with this, Mr. Carr?

3    A.  Yes, I am.

4    Q.  And tell us just -- we have heard a little bit of testimony

5    about it.  Tell us generally what this is.                          03:57PM

6    A.  So this is the protocol on how to conduct our verification

7    and validation testing for what became the G2 Filter.

8    Q.  What is design verification?

9    A.  It's showing that your design meets your design inputs.

10   Q.  And what is design validation as opposed to -- as it may      03:57PM

11   differ from verification?

12   A.  You are validating that it meets your user needs.

13          MR. NORTH:  If we could bring up Exhibit 5303.  I

14   believe that's admitted also if we could display, Your Honor.

15          THE COURT:  You may.  I.                                    03:57PM

16   BY MR. NORTH:

17   Q.  Is this the actual design verification and validation

18   report regarding the G2?

19   A.  Yes, it is.

20   Q.  If we could look at Page 9, please.  Does this begin a         03:57PM

21   section talking at the top of the page about test results and

22   summary of data?

23   A.  Yes, it does.

24   Q.  And what is this particular test?

25   A.  This is a dimensional test of the outer diameter of the        03:58PM

1    dilator which is the sheath that the filter goes through.

2    Q.  And did the G2 pass this test?

3    A.  Yes, it did.

4    Q.  If we could turn to Page 12, please.  Is this the same sort

5    of simulated use test that the FDA had asked all those                    03:58PM

6    questions about with regard to the Recovery Filter?

7    A.  Yes.

8    Q.  Does this contain the results of the simulated use test on

9    the G2?

10   A.  Yes, it does.                                                          03:58PM

11   Q.  And how did the G2 fare with that testing?

12   A.  It passed all the tests.

13   Q.  If we look down at the left, next to the last row, filter

14   centering.  What is that assessing with regard to the filter?

15   A.  So when you deploy the filter into the tube, you measure            03:59PM

16   where the tip of the filter is with respect to the center of

17   the vessel.

18   Q.  If we could turn to Page 13, please.

19          What is filter leg radial strength?  What are you

20   measuring there?                                                          03:59PM

21   A.  You are measuring the force that a leg of the filter exerts

22   outward.

23   Q.  Did the G2 pass that particular test?

24   A.  Yes, it did.

25   Q.  Let's look on the same page at Section 7.6.  What does            03:59PM

1   filter removal force assess?

2   A.   It is the force that it takes to remove the filter from the

3   vessel.

4   Q.   And did the G2 pass that test?

5   A.   Yes, it did.                                                04:00PM

6   Q.   Let's go to Page 14, please.   Looking at the first one up

7   there, what is tensile strength test results?   What's that

8   assessing?

9   A.   So it measured two different joints or bonds.   We have a

10  dilator to the hub of the dilator, which is how you attach to     04:00PM

11  it, and then the spline is a piece of the delivery system to --

12  it sits on a wire.   And so we measure the force required to

13  separate them or remove the spline from the wire.

14  Q.   Did the G2 pass these tests?

15  A.   Yes, it did.                                                04:00PM

16  Q.   If we could look on the same page at the bottom regarding

17  filter migration test results.   Do you see that?

18  A.   Yes, I do.

19  Q.   Was this a particular aim for the G2 development?

20  A.   Yes.                                                       04:01PM

21  Q.   And is this testing the stability of the filter when hit by

22  a large clot?

23  A.   Yes.

24  Q.   And so is it testing migration resistance to migration from

25  a cephalad direction, or going up?                              04:01PM

1   A.  Going cranially, yes, from the bottom.

2   Q.  And why would you do this test with different sizes of

3   cavas?

4   A.  To try and show the range of anticipated vessel sizes and

5   test the filter in a small lower limit and then 28 is the upper   04:01PM

6   limit that the filter is indicated for.

7   Q.  Let's go to Page 15, if we could.  And let's look at the

8   bottom table.

9           This table indicate how the G2 compared to the

10  Recovery Filter in the migration resistance?   04:02PM

11  A.  Yes, it does.

12  Q.  And what column can you see that best demonstrates that

13  comparison?

14  A.  The mean, or the third column from the left.

15  Q.  Does that indicate that -- well, the G1A was the G2?   04:02PM

16  A.  Yes.

17  Q.  And was this migration, the mean for its migration

18  resistance, almost twice that of the Recovery Filter?

19  A.  Yes, it is.

20  Q.  And the abbreviation on the title for the table mmHg, what   04:02PM

21  does that stand for?

22  A.  Millimeters of mercury.

23  Q.  And tell us briefly what that is as a means of measurement

24  here?

25  A.  It's a pressure -- way to measure pressure, so like your   04:03PM

1    blood pressure or something else.

2    Q.  Now, there's been some suggestion that the G2 failed this

3    test somehow because its mean for migration resistance was less

4    than the Simon Nitinol.  Did that concern you?

5    A.  No.                                                          04:03PM

6    Q.  Why is that?

7    A.  Because the intent of the program was to improve the

8    Recovery Filter to create the G2.  We have competitive testing

9    which showed that the G2 is now very comfortably in the upper

10   range of competitive devices, and we felt that that migration    04:03PM

11   resistance was more than adequate.

12   Q.  Did the company share this design verification and

13   validation test report with the FDA?

14   A.  Yes, we did.

15   Q.  And was the FDA aware of how the migration resistance of     04:04PM

16   the G2 compared both to the Recovery Filter and the Simon

17   Nitinol Filter?

18   A.  Yes.  We separated it out and explained our rationales.

19   Q.  Let's look at Page 21, if we could, section 9.16.  Is this

20   a discussion of the migration resistance of the G2 versus the    04:04PM

21   Simon Nitinol?

22   A.  Yes, it is.

23   Q.  And what does it mean when it says the testing did not meet

24   the acceptance criteria as defined in the protocol?

25   A.  So the initial acceptance criteria was to be statistically   04:05PM

1   equivalent to the Simon Nitinol Filter or greater, and it did

2   not meet that specification.  But again, the goal of the

3   project was to be significantly better than the Recovery

4   Filter.

5   Q.  And then in the next line, what did you conclude with          04:05PM

6   regard to the G2 as compared to the Recovery Filter?

7   A.  That it was significantly better.

8   Q.  And again, was all of this shared with the FDA?

9   A.  Yes, it was.

10  Q.  Could we bring up Exhibit 5252, please.                        04:05PM

11       Do you recognize what this test report is?

12  A.  Yes, I do.

13  Q.  And what is this?

14  A.  It's a characterization study that we did on competitive

15  devices.                                                          04:06PM

16       MR. NORTH:  Your Honor, at this time we would tender

17  5252.

18       MR. O'CONNOR:  No objection.  Thank you.

19       THE COURT:  Admitted.

20       MR. NORTH:  Could we display, Your Honor?                    04:06PM

21       THE COURT:  Yes.

22  BY MR. NORTH:

23  Q.  Let's turn to Page 6, if we could, please.  There are a lot

24  of abbreviations under the left sample ID.  Can you tell us,

25  are those identifying various filters that were being tested?     04:06PM

1   A.  Yes, it is.

2   Q.  And what are some of those filters?

3   A.  RF stands for Recovery; SF stands for Simon Nitinol; GT is

4   Greenfield; GS is Stainless Steel Greenfield; VT is the Vena

5   Tech Filter; TP is the Tulip Filter; O is the OptEase Filter;        04:07PM

6   and T is the Trapease Filter.

7   Q.  If we could then highlight the mean section.  I believe we

8   saw earlier that the mean migration resistance for the G2 was

9   approximately 106.3 millimeters of mercury?

10  A.  Yes.        04:07PM

11  Q.  And how did that test result compare to a lot of the

12  competitors here?

13  A.  It was greater than all of the filters but the Trapease and

14  the OptEase.

15  Q.  Now, as a part of the development of the G2, did Bard also        04:07PM

16  conduct a finite element analysis?

17  A.  Yes.

18  Q.  If we could bring up Exhibit 5307.

19          And can you identify this?

20  A.  This is a process FMEA.        04:08PM

21  Q.  And if we could look at the second -- or I'm sorry.  Go

22  back to the first page.

23          Is this for the G2?

24  A.  Yes.  But this isn't the FEA, I don't believe.

25  Q.  I'm sorry.  I juxtaposed numbers.  Let's try 5037.  It's        04:08PM

1    getting late in the day, I think.

2           Do you recognize 5037?  And if so, what is this?

3    A.  Yes.  This is the report for the FEA analysis.

4    Q.  Was this for the G2?

5    A.  Yes.                                                    04:09PM

6           MR. NORTH:  Your Honor, at this time we would tender

7    5037.

8           THE COURT:  It's already any evidence.

9           MR. NORTH:  Thank you, Your Honor.  Could we display?

10          THE COURT:  You may.                                 04:09PM

11   BY MR. NORTH:

12   Q.  Was the express purpose of this FEA to evaluate the effect

13   of the changes that had been made to the Recovery Filter to

14   create the G2?

15   A.  Yes.                                                    04:09PM

16   Q.  Let's turn to Page 7, please.

17          Did Bard conduct this finite element analysis itself,

18   or did it employ an expert to do so?

19   A.  No.  We contracted out the work to Computer Aided

20   Engineering.                                                04:09PM

21   Q.  And why did you do that?

22   A.  As you pointed out, they are experts in finite element

23   analysis.

24   Q.  And then if we could go to Page 4, please.  And let's look

25   at test rationale.  What does this indicate that the two       04:10PM

1   filters were being assessed for?

2   A.  So they were being assessed in both the loaded, which is

3   what we call when the filter's in the package before it's

4   delivered so it is constrained in a very small tube.  So that's

5   the loaded condition.  And then the deployed condition is in          04:10PM

6   the diameters that are the size of the vessel.

7   Q.  Why did you decide to test it in two different scenarios?

8   A.  The first one has to do with the ability to store the

9   device on a shelf, so part of it is aging or shelf life testing

10  and also where it's under the most load; and then in the             04:10PM

11  deployed condition because that's where the device is going to

12  operate.

13  Q.  And then if we could turn to Page 5, please.  And looking

14  at the conclusion, what was the conclusion?

15  A.  That the modified filter in this case, the G2, shows            04:11PM

16  substantially lower peak stresses compared to the original

17  design up to 90 percent.

18  Q.  And is that a good thing to have substantially lower peak

19  stresses?

20  A.  Yes, it is.                                                       04:11PM

21  Q.  Now, it does say there's an exception with the legs.

22  Explain to us what that means.

23  A.  So the legs of the G2 Filter in its resting dimension is

24  wider than the resting dimension of the Recovery Filter.  So

25  the same leg, because it's further out, will impart more force       04:11PM

1    outward so the stress is higher in that element.

2    Q.  Now, we have talked generally, I know we haven't covered

3    every single test, we have talked generally about the bench

4    testing that was performed for the G2 Filter, correct?

5    A.  Yes.                                                          04:12PM

6    Q.  And were there additional tests performed after the initial

7    design verification and validation report?

8    A.  Yes, there was.

9    Q.  Let's bring up Exhibit 5949, please.

10           Do you recognize what that is?                            04:12PM

11   A.  Yes, I do.

12   Q.  What is this?

13   A.  It is a clot trapping test.

14   Q.  And I believe this is already admitted.  No?

15           MR. NORTH:  We tender for admission, Your Honor.          04:12PM

16           THE COURT:  5949?

17           MR. NORTH:  Yes.

18           MR. O'CONNOR:  One second, please.

19           No objection.  Thank you.

20           THE COURT:  Admitted.                                     04:12PM

21           MR. NORTH:  And if we could display, Your Honor.

22           THE COURT:  You may.

23   BY MR. NORTH:

24   Q.  Tell us, Mr. Carr, why Bard, after you had already -- well,

25   I'm sorry.  Let me back up.                                       04:13PM

1          This appears to have been performed in 2006.  Does

2    that look correct?

3    A.   Yes, in May, I believe.

4    Q.   Was the G2 already on the market at that time being sold?

5    A.   Yes, it was.                                              04:13PM

6    Q.   What was the impetus behind doing this test after the

7    product was already being sold?

8    A.   We wanted to confirm that the product would operate as

9    intended if it happened to be tilted, meaning would it still

10   trap clots and prevent pulmonary embolism.                     04:13PM

11   Q.   Did you compare the G2 to some other specific filter?

12   A.   The Greenfield Filter, which was the gold standard for clot

13   trapping.

14   Q.   And why did you choose the Greenfield Filter?

15   A.   Again, because it was the filter that everyone compared to  04:13PM

16   for clot trapping.

17   Q.   Let's turn to Page 14 of this exhibit, please.  Does this

18   indicate under "conclusion" how the G2 performed in this test?

19   A.   Yes.  It's hard to read, but --

20   Q.   It is, isn't it?  It's easier to read without the blowup, I 04:14PM

21   think.

22          And how did the G2 generally perform?

23   A.   That the clot trapping efficiency, which is what it's

24   called, was greater than the Greenfield Filter tilted in the

25   tube.                                                           04:14PM

1   Q.   Now, once Bard completed the design verification and

2   validation testing, what does the company do next?  Do you

3   perform a design review?

4   A.   Yes.

5   Q.   And what's the purpose of that design review at that stage      04:14PM

6   of the development process?

7   A.   It is to review all of the testing that's done to date,

8   again, to confirm and reconfirm that all of the design inputs

9   have been met and that we have statistically shown them to be

10  met and approve the submission of that data to the FDA and, in     04:15PM

11  this case, a 510(k).

12  Q.   If we could bring up Exhibit 5315, please.

13          Could you identify what that is?

14  A.   It's the cover page for that meeting.

15  Q.   Did you participate in the design review for the G2?           04:15PM

16  A.   I think so, but I don't remember 100 percent.  If you go to

17  the next page.  And the next one.  So I wasn't at this one but

18  I was at subsequent ones.

19          MR. NORTH:  Your Honor, if not already admitted we

20  would like to tender 5315.                                          04:15PM

21          MR. O'CONNOR:  No objection.

22          THE COURT:  Admitted.

23          MR. NORTH:  If we could display, please.

24          THE COURT:  You may.

25  BY MR. NORTH:                                                       04:16PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1   Q.  If we could turn to Page 21, please.  What were the

2   conclusions of this design review regarding the G2?

3   A.  That the filter demonstrated superior performance in

4   fatigue resistance to Recovery; demonstrated acceptable

5   performance in all the tests except for migration resistance          04:16PM

6   equivalence at 28 millimeters; and the G2 Filter demonstrated

7   superior performance in migration compared to the Recovery.

8   Q.  The second bullet point you read, was that migration

9   resistance equivalent to the Simon Nitinol like we discussed

10  earlier?                                                              04:16PM

11  A.  Yes, it is.

12  Q.  Let's look at 5316, please.

13          Is this another design review conducted for the G2

14  Filter?

15  A.  Yes, it is.                                                       04:17PM

16  Q.  And did you participate in this one?

17  A.  I believe so.

18          MR. NORTH:  Your Honor, at this time we would offer

19  for admission Exhibit 5316.

20          MR. O'CONNOR:  No objection.                                  04:17PM

21          THE COURT:  Admitted.

22          MR. NORTH:  Could we display, Your Honor?

23          THE COURT:  You may.

24  BY MR. NORTH:

25  Q.  If we could turn to Page 6, please.  Under "Project Team          04:17PM

5-29-18-MD 15-2641-Jones v Bard-Jury Trial-Day 9-Carr-Direct

1   Members," does that indicate that you participated?

2   A.  Yes, it does.

3   Q.  And there were a number of other people that participated

4   from all different types of functions around the company,

5   correct?                                                        04:17PM

6   A.  Yes.

7   Q.  Let's turn to Page 7, if we could.

8           Objective.  What does this define as the purpose for

9   this particular design review?

10  A.  To review all the testing and documentation to ensure      04:18PM

11  compliance to design specifications and ensure that the device

12  will perform in a reliable, safe, and effective manner prior to

13  full market release.

14  Q.  If we could turn to Page 9, please.  What were the

15  conclusions from this particular review?                       04:18PM

16  A.  The design review team conditionally approved the review.

17  There was some extra items that needed to be completed prior to

18  final approval, which they ultimately were.

19  Q.  Then if we could change gears.

20          THE COURT:  If we're changing gears, we'll go ahead     04:19PM

21  and break until morning, Mr. North.

22          We'll plan, Ladies and Gentlemen, to resume at 9:00.

23  We'll see you then.

24          (Jury out at 4:19 p.m.)

25          THE COURT:  You can step down, Mr. Carr.  You can have   04:19PM

UNITED STATES DISTRICT COURT

1    a seat.

2              Start gathering up, counsel.  I have a sentencing

3    starting in 10 minutes.  If you can start gathering up your

4    stuff, I will calculate the time.

5              All right.  Counsel, as of now, plaintiff has used 26    04:22PM

6    hours and 12 minutes and defendants have used 20 hours and 24

7    minutes.

8              Let's talk about tomorrow.  How long do you anticipate

9    going tomorrow, Mr. North?

10             MR. NORTH:  Certainly until after lunch, Your Honor.    04:22PM

11   I would think a minimum of 2 and more likely until 3 or so.

12             THE COURT:  And what is your current thinking,

13   counsel, on rebuttal case?

14             MR. O'CONNOR:  Well, Your Honor, we are talking about

15   it.  I think we are planning on one.  It would not be    04:23PM

16   significantly long.  It may be a video deposition.

17             THE COURT:  Okay.  All right.  Well, let's talk at

18   noon about where we are.  Be prepared, if you would, please, to

19   talk about jury instructions in the morning.

20             I got some deposition excerpts from the plaintiff    04:23PM

21   today that looked like they were for the punitive damages case.

22   One thing that wasn't clear to me as I scanned the objections

23   from the defense was they were 403 and relevancy objections

24   citing the Supreme Court cases and saying that the numbers

25   should be limited to the Eclipse Filter in Georgia.    04:23PM

1    My question was how that squares with what we did to

2    the jury instructions where we took out disgorgement of profits

3    as a factor and left in overall profitability.

4        MS. HELM:  Your Honor, I think the objections were

5    left in simply to preserve them because that's where --            04:24PM

6        THE COURT:  You are certainly entitled to preserve

7    them.

8        MS. HELM:  And I believe that the issue that we

9    addressed in the jury instruction conference was actually

10   resolved.  That testimony was withdrawn, the disgorgement       04:24PM

11   testimony was withdrawn.

12       MR. STOLLER:  Correct.  There's nothing but the stuff

13   we discussed with respect to what the jury instructions.  We

14   will get the numbers that go to the financial worth of the

15   company and those sort of things.                                04:24PM

16       THE COURT:  All right.  So were there any -- I don't

17   know if you remember this.  Were there -- do I need to go

18   through line by line, or were there other objections besides

19   the one you are preserving to Georgia-based profits and limited

20   to the Eclipse Filter?                                           04:25PM

21       MS. HELM:  No, Your Honor.

22       MR. STOLLER:  There are some objections by plaintiffs

23   towards the end.  They are discrete.

24       THE COURT:  I don't plan to get through those tonight

25   since we're not going to be using them for a day or two if we    04:25PM

1    use them.

2            MR. O'CONNOR:  Your Honor, just quickly, tomorrow is

3    going to be a lot of evidence coming in.  Just for scheduling

4    purposes in view of what Mr. North has indicated, can we safely

5    plan to start closings on Thursday morning?                    04:25PM

6            THE COURT:  Yes.

7            MR. O'CONNOR:  Thank you.

8            THE COURT:  Well, unless we're done with the evidence

9    by noon.

10            MR. NORTH:  I will talk slowly.                         04:25PM

11            THE COURT:  You will put the jury to sleep.  Okay.

12    Assuming we go until 2 in the afternoon, and I think it makes

13    sense to do closings on Thursday morning just because we

14    probably wouldn't get through them all tomorrow afternoon and

15    better to have a fresh jury for closings on Thursday morning.   04:25PM

16            MR. O'CONNOR:  Also just for purposes of putting

17    together, I think there's going to be a lot of adjustments by

18    tomorrow because of the evidence.

19            THE COURT:  Right.  Okay.  We'll see you tomorrow

20    morning at 8:30.                                               04:26PM

21            MS. HELM:  Traci, can we work on the exhibits?

22            THE COURT:  You can, outside the courtroom.  I think

23    we need to close the courtroom for this sentencing.

24            MS. HELM:  We'll take them in our little room and

25    Traci will let us know when she needs them.                    04:26PM

1           THE COURT:  That's fine.

2           Is that okay with you, Traci?

3           (Proceeding recessed at 4:26 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5              C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 30th day of May, 2018.

16

17                         s/Laurie A. Adams
                           _____
18                         Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25