1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **In Re: Bard IVC Filters**          )   **MD-15-02641-PHX-DGC**
     **Products Liability Litigation**    )

5                                         )   Phoenix, Arizona
                                          )   **May 30, 2018**
6    _____)
     **Doris Jones, an individual,**      )

7                                         )
                         Plaintiff,       )

8                                         )   CV-16-00782-PHX-DGC
              v.                          )

9                                         )
     **C.R. Bard, Inc., a New Jersey**    )

10   **corporation; and Bard Peripheral** )
     **Vascular, Inc., an Arizona**       )

11   **corporation,**                     )
                                          )

12                       Defendants.      )
     _____)

13

14

15       **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17            <u>**TRIAL DAY 10 - A.M. SESSION**</u>

18               (Pages 2131 - 2265)

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR

22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41

23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24

     Proceedings Reported by Stenographic Court Reporter

25   Transcript Prepared with Computer-Aided Transcription

```
1                      A P P E A R A N C E S

2    For Plaintiff:

3            Gallagher & Kennedy
             By: MARK S. O'CONNOR, ESQ.
4            By: PAUL L. STOLLER, ESQ.
             By: SHANNON L. CLARK, ESQ.
5            By: C. LINCOLN COMBS, ESQ.
             2575 East Camelback Road, Suite 1100
6            Phoenix, AZ  85016

7            Lopez McHugh, LLP
             By: RAMON ROSSI LOPEZ, ESQ.
8            100 Bayview Circle, Suite 5600
             Newport Beach, CA  92660
9
             Lopez McHugh, LLP
10           By: JOSHUA MANKOFF, ESQ.
             214 Flynn Ave.
11           Moorestown, NJ  08057

12           Heaviside Reed Zaic
             By: JULIA REED ZAIC, ESQ.
13           By: LAURA E. SMITH, ESQ.
             312 Broadway, Ste. 203
14           Laguna Beach, CA  92651

15

16   For Defendants:

17           Nelson Mullins Riley & Scarborough
             By: RICHARD B. NORTH, JR. ESQ.
18           By: ELIZABETH C. HELM, ESQ.
             201 17th Street NW, Suite 1700
19           Atlanta, GA  30363

20           Nelson Mullins Riley & Scarborough.
             BY: JAMES F. ROGERS, ESQ.
21           1320 Main St.
             Columbia, SC  29201
22
             Snell & Wilmer
23           By: AMANDA C. SHERIDAN, ESQ.
             400 East Van Buren
24           Phoenix, AZ  85004

25
```

**EXAMINATION**

| WITNESS | PAGE |
| --- | --- |

ROBERT CARR

    Direct Examination (Cont'd) By Mr. North    2154

    Cross-Examination By Mr. O'Connor    2160

MICHAEL RANDALL

    Direct Examination By Mr. Rogers    2180

    Voir Dire Examination By Mr. Stoller    2204

    Direct Examination(Resumed) By Mr. Rogers    2205

    Cross-Examination By Mr. Stoller    2233


Video testimony of William Little played    2261


**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 7900 | Demonstrative depiction of sales of Bard's retrievable IVC filters | 2156 |
| 3262 | Complaint File – 03/09/2010, 263280, G2 – RF310F, 2907 Detachment of device or device component | 2160 |
| 3270 | Complaint File – 03/30/2010, 266286, G2 – RF310F, 2907 Detachment of device or device component | 2160 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 3304 | Complaint File – 07/28/2010, 282326, Eclipse – EC500J, 2907 Detachment of device or device component; 2907M Filter Limb(s) | 2160 |
| 4515 | Monthly Management Report, dated 4/8/10 | 2160 |
| 4519 | Monthly Management Report, dated 8/9/10 | 2160 |
| 4504 | Monthly Management Report, dated 4/8/09 | 2160 |
| 4522 | Monthly Management Report, dated 11/8/10 | 2160 |
| 4528 | Monthly Management Report, dated 5/9/11 | 2160 |
| 4565 | FRE 1006 Chart – Plaintiff's Compilation Complaint Record Detail | 2160 |
| 1680 | McDonald Deposition, 07/29/2016 – Exhibit 21 – 7/13/2015 Warning Letter from the FDA | 2160 |
| 802 | Carr Deposition, 12/19/2014 – Exhibit 20 – NMT R&D Technical Report, RD-RPT-128, 09/01/2000, Investigation Report of a Migrated Recovery Filter in the Human Use Experience at Mt. Sinai Hospital | 2165 |
| 504 | Eclipse Concept POA | 2168 |

1                              **(Index of Exhibits Continued)**

2                                      **EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 769 | Carr Deposition, 12/19/2013 – Exhibit 05 – BPV Meridian Claims Matrix, dated 7/2/2010 | 2173 |
| 8546 | Draft Test Report re Rotary Beam Fatigue of Nitinol Wire | 2210 |
| 1618 | Little Deposition, 06/27/2016 – Exhibit 2005 – 4/27/2010 BPV Memo from Filter Marketing to Bill Little Re. "Filter naming", detailing the name rationale for the Eclipse and Denali | 2260 |
| 2045 | Sullivan Deposition, 09/16/2016 – Exhibit 431 – Marketing Brochure – G2 Filter System for Permanent Placement | 2261 |
| 1617 | Little Deposition, 06/27/2016 – Exhibit 2004 – Chart entitled "EVEREST/Cook Celect Clinical Comparison" | 2261 |

# P R O C E E D I N G S

08:30:08 1

2        (Proceedings resumed in open court outside the presence

3    of the jury.)

4

08:30:30 5        THE COURT:  Please be seated.

6              Morning, everybody.

7              EVERYBODY:  Morning, Your Honor.

8              THE COURT:  As you saw, I got an order out last night

9    that ruled on the monthly management report and Rule 1006

08:31:28 10   chart issues.  My conclusion was that plaintiff can present

11   Exhibit 4519 with the filter-related complaints attached, and

12   I think that's sufficient to show the complaints went to

13   senior management regularly, as well as the Rule 1006 summary,

14   which looked fine to me.

08:31:47 15        I guess one of the questions is whether defendants

16   have any objections to the form of the 1006 summary?

17              MR. NORTH:  No, Your Honor.  We conveyed to them last

18   night that we are okay with the summary.  Well, subject to the

19   earlier objections before the Court, of course, decided to

08:32:03 20   allow the summary.

21              THE COURT:  Yeah, you're reserving those objections.

22   I know.

23              MR. NORTH:  Right.  As to form of this we're fine.

24              THE COURT:  Okay.  So whenever you choose to do so

08:32:12 25   you can move to admit the 1006 summary and 4519.

08:32:16  1        MR. CLARK:  We'll take care of those housekeeping

2   things first thing this morning, Your Honor.

3        THE COURT:  Okay.  I also concluded that Section 3 of

4   the FDA warning letter can come in.  That, I think, is

08:32:25  5   Exhibit 1680 as redacted.  So you can move that in when you

6   choose to do so.

7        I raised two questions as I was thinking about the

8   cephalad migration death issue.  One to be addressed by

9   plaintiff, which is more of a concern than a question.  And

08:32:42 10   the other by defendants.

11        My concern with respect to plaintiff is what was

12   characterized yesterday as a key argument in the case that if

13   the Recovery filter had been recalled, there would have been

14   no Eclipse.

08:32:57 15        I continue to be unable to see how that is part of

16   any of the claim in this case and -- well, you saw the concern

17   that I described in the order.  I just want to make sure I'm

18   thinking about it clearly, so I wanted to give plaintiff an

19   opportunity to address the issue.

08:33:20 20        MR. CLARK:  Your Honor, we do not intend to argue

21   that the Recovery should have been recalled.  I think you've

22   correctly identified that the Recovery story is an

23   indispensable part -- those are my words, not yours --

24        THE COURT:  Right.

08:33:34 25        MR. CLARK:  -- of the filter history here.

08:33:35    1            What we do intend to argue, that the Recovery filter

2    was a single point of failure and that there were a number of

3    deficiencies that occurred with the development of the -- of

4    that particular filter.  And we've heard a lot of testimony

08:33:50    5    about testing inadequacies from Dr. McMeeking, that this also

6    produced a design, the conical design, that is problematic for

7    a number of reasons, and we do -- and some of those issues

8    carry through, through the G2 and into the Eclipse.

9            We do try to -- and we will tie it together in our

08:34:09   10    argument, but our argument is not going to be that they should

11    have recalled the Recovery filter and therefore we would have

12    never had the Eclipse filter.  But we do intend to argue that

13    had they done proper engineering and proper analysis and took

14    the information they had and used that to improve the filter,

08:34:27   15    as opposed to maintaining it on the market and kind of using

16    the sort of human test trials, that that -- I think that is

17    fair game.

18            Does that assuage your concerns?

19            THE COURT:  Yes.  I think that's fair argument.  I

08:34:38   20    think the history of the filter development is absolutely fair

21    game when it comes to the design defect claim.  So that does.

22    I had just thought yesterday it was perhaps going to be argued

23    in the way I described in the order.  But that is obviously

24    incorrect.

08:34:53   25            And I put a question to defendants.

08:34:57  1         I was -- well, let me say initially that I went back

2  and I read last night the articles -- one's an article, one's

3  an FDA adverse event report, about death in morbidly obese

4  patients by other filters.  I thought more about the IFU and

08:35:17  5  the reference to morbidly obese, and I don't think that opened

6  the door to further death evidence.

7         But I am concerned, as I indicated, that Dr. DeFord

8  very clearly argued, or not argued, testified to the jury that

9  the Recovery filter saved many more lives than it put at risk.

08:35:34  10  And that does seem to me, in fairness, to suggest that the

11  jury should understand that there were people who died with

12  the Recovery filter as well.

13         I'm still uncertain about this whole issue, but I

14  wanted to get defendants' response to that specific issue from

08:35:52  15  Dr. DeFord.

16         MR. NORTH:  Well, first of all, we would maintain

17  that it's not the defendants that may have opened the door

18  here; it is the plaintiffs.  If you go and look at the DeFord

19  transcript and which side designated which portions, large

08:36:09  20  parts of the information they're now complaining about was

21  designated by them.  They asked -- they designated questions

22  asking Dr. DeFord on the criteria the company had for

23  determining whether to hold the product if migration requiring

24  surgical intervention were reported.  They asked him questions

08:36:34  25  about the decision to keep on the market the product despite

08:36:38   1   the fact there were additional migrations being reported.

2   They referenced a number of questions about the company's

3   actions with regard to the number of migrations.

4         We then, in turn, designated the one point where he

08:36:52   5   says that the company still believed this was important

6   technology and was saving lives and made the decision to keep

7   it on the market.  We believe that that's fair to respond when

8   they are designating all these questions.

9         They even designated a question with respect to the

08:37:10   10   Simon Nitinol, and this was testimony pled to the jury, that

11   said so when Bard was weighing do we take this off the market,

12   do we keep it on the market, and you're telling me that Bard

13   decided, well, we need to go save all these patients from all

14   these massive pulmonary embolisms that are killing people all

08:37:31   15   over the country, you had a device that was already doing

16   that; right?  You had the Simon Nitinol filter.

17         They designated questions like that.  And in turn we,

18   as I said, just designated a short response from Dr. DeFord

19   saying that the company weighed the risks and benefits,

08:37:49   20   acknowledging that there were reports of serious

21   complications, and that they made the decision to leave it on

22   the market.

23         I would also noted yesterday, Your Honor, they asked

24   Dr. Morris on cross-examination, they said from reading the

08:38:03   25   medical literature, you're aware that the Recovery filter had

08:38:07  1   reports of complications including complications that injured

2   patients.

3           That's on pages 1981 and -82 of the transcript, and

4   Dr. Morris acknowledged that.

08:38:19  5           So on this record, Your Honor, there's already an

6   ample amount of evidence that the Recovery filter was

7   associated with a lot of migration events.  That's replete in

8   the questions they designated from Dr. DeFord.  There's a lot

9   of evidence that these were serious complications.  There's

08:38:37  10   even this reference that it could lead to pulmonary emboli

11   causing death and all sorts of references already.

12           We believe that they have the evidence that they

13   should be entitled to.  At this point and at this stage in the

14   trial, to allow them to put in more gritty detail about death

08:38:56  15   incidents is only marginally relevant in a case which, as the

16   Court has pointed out, the legal issues at hand are the design

17   and warnings associated with the Eclipse filter.

18           So in short, they posited the entire why didn't we

19   take the Recovery filter off the market.  And I would submit

08:39:16  20   that, if anything, they attempted to induce an opening of the

21   door with that.

22           And for those reasons we don't believe the door's

23   been opened and we also believe that the record has sufficient

24   evidence to rebut any argument that they believe Dr. DeFord

08:39:30  25   made.

08:39:32   1          THE COURT:  All right.

       2          MR. CLARK:  Your Honor, I think that history is a

       3   little tortured.  These designations were exchanged a long

       4   time ago before we had the Court's ruling on cephalad

08:39:44   5   migration death.  We elected not to play this deposition.  The

       6   portions of the transcript that we did, we removed a whole

       7   bunch of stuff from our designations.  There were substantial

       8   redactions made to the deposition in light of the Court's

       9   ruling.  But the questions we left in there, we had to in

08:40:02  10   fairness to give context to defendants' designations.

      11          Again, this is a defense offered piece of evidence.

      12   We did not inject this into the case.  We did designate a few

      13   questions to balance out and give some context to that, but we

      14   were essentially hamstrung by the fact that we could not

08:40:17  15   counter the designations Bard offered to essentially tell the

      16   jury, look, we're a responsible company, we continue to

      17   believe that this was great technology that was saving lives,

      18   and that that meant we should keep this thing on the market.

      19   We couldn't put that in there that they -- in fact, they had

08:40:33  20   lots of evidence that there were a number of lives that it

      21   claimed, independent of pulmonary embolism.

      22          So, again, it's a sword and shield thing, Your Honor.

      23   And I think fairness would require that we be allowed to put a

      24   narrow amount of evidence in on this topic just to help the

08:40:48  25   jury understand that what we're talking about here when

08:40:51  1    they're looking at that is that there were, in fact, deaths.

2    And I think that is particularly important with the suggestion

3    that we believe that these things were saving lives.  And we

4    heard statements yesterday about filters save lives.  And,

08:41:03  5    again, we don't think there's really evidence that they do, at

6    least the retrievable filters do, in fact, save lives, but

7    that is a dispute here.  But we do know that there were deaths

8    as a result of these.

9           We don't know exactly what we would do.  We probably

08:41:18  10   need to see what the Court's disposition was on that.  But I

11   think two to three narrow pieces of evidence that we could

12   introduce in an efficient way.  We certainly don't have time

13   to do a lot more than that.  But I think a couple documents,

14   perhaps a little bit of deposition testimony that we were not

08:41:33  15   able to play in light of the Court's ruling would give some

16   balance to that issue that frankly Bard has injected by

17   playing Dr. DeFord's deposition.

18          THE COURT:  Do you all have a copy of the DeFord

19   deposition that shows the designations and counterdesignations

08:41:50  20   in different colors?

21          MR. CLARK:  If I may approach, Your Honor.

22          THE COURT:  Yeah, that would be fine.

23          MR. NORTH:  I do.

24          THE COURT:  That's okay.

08:42:01  25          MR. CLARK:  And for the record --

08:42:01  1        THE COURT:  So this is the as-played version?  Is

       2  this the same you have?

       3        MR. NORTH:  I believe so, Your Honor.

       4        THE COURT:  And plaintiff is red, defendant is blue.

08:42:17  5        MR. NORTH:  I would draw the Court's attention

       6  particularly to page 141.

       7        THE COURT:  Well, what I'm going to do is I'm going

       8  to look at this.  But what I'd also like you to think about --

       9  I don't know how I'm going to come out on this.  But it will

08:42:35 10  help me think about it if I have in mind what exactly you all

      11  think you should be permitted to admit.

      12        So if you could give some thought to that.  I don't

      13  need your answer right now if you need to confer about it.

      14  But, say by the morning break or something.  If somebody on

08:42:51 15  your team could think through that, it will help me think

      16  about this in more concrete terms.

      17        MR. CLARK:  Your Honor, I think that would be fine.

      18  The only concern we have is that my understanding is Mr. North

      19  only has about ten more minutes with Mr. Carr and this is a

08:43:08 20  topic that would probably fit best with our examination of

      21  him, which would happen fairly shortly.

      22        I guess we could try to do some of this with

      23  Mr. Modra, but I worry that he may --

      24        THE COURT:  Do you have only ten more minutes with

08:43:21 25  Mr. Carr?

08:43:22  1          MR. NORTH:  Approximately ten to 15, Your Honor.

          2          THE COURT:  I'm going to impose on Mr. Carr and ask

          3   him to remain until after the morning break.  And that way if

          4   you could give me something concrete I'll think about it and

08:43:32  5   I'll allow you to recall him for that purpose if I decide it

          6   should come in.  So if you could tell him I'm going to impose

          7   on him in that way.

          8          MR. NORTH:  Sure.

          9          THE COURT:  So what that means is as soon as you can

08:43:46 10   come up with the idea, even if it's while we're in the middle

         11   of evidence, why don't you just ask to approach, give it to

         12   Nancy or give it to Traci, and I'll at least be able to see

         13   and think about what it is you're proposing.

         14          I also want to have a chance to look at the DeFord

08:44:05 15   deposition before I make a decision on this to decide if I

         16   think the door's really been opened.

         17          All right.  On another issue, I read the Trerotola

         18   and the Stavropoulos.

         19          MR. NORTH:  We call him Dr. Stav.

08:44:29 20          THE COURT:  And I do not think this is excluded by

         21   Rule 403 as unduly cumulative, so I'm going to overrule that

         22   objection.

         23          And that leaves jury instructions.  Now, we're going

         24   to have potentially some time at the end of the day to talk

08:44:45 25   about them.  If the there are other matters we need to talk

08:44:48  1   before we get started with the jury this morning, so let's

2   cover other matters if there are any before we go to jury

3   instructions.

4        MR. CLARK:  None for the plaintiff, Your Honor.

08:45:00  5        MR. NORTH:  None for the defendant, Your Honor.

6        THE COURT:  Okay.

7        All right.

8        The purpose today is -- you saw from redlining what I

9   changed, what I didn't change.  It's really just for you to

08:45:13 10   make any final comments for me to consider before we instruct

11   the jury, which looks like it will happen tomorrow morning.

12        Plaintiff's counsel?

13        MR. CLARK:  Your Honor, there were a couple of

14   issues.  One of them relates to instruction 14 and it's

08:45:36 15   connected to instruction 16.

16        As the Court will recall, at defendants' request, you

17   added some language to the negligent design instruction that

18   directed the jury to consider or that it should consider the

19   risk/benefit analysis for design defect about which I

08:45:54 20   previously instructed you.

21        Our concern, Your Honor, is that if the jury is to

22   consider that same analysis and were to find a negligent --

23   that Bard was negligent in the design without also finding

24   that there was strict liability for the design, then there

08:46:13 25   could potentially be an inconsistent verdict there.

08:46:16   1          I see the warning and information defect claims as

2     distinct there, for the reasons we've talked about in terms of

3     how the jury's attention was directed in the various positions

4     there, but we would -- I think in light of the Court's

08:46:29   5     inclination to include the risk/benefit language in

6     instruction 16 we think there should be language added to

7     instruction 14 essentially to the effect that, ladies and

8     gentlemen of the jury, you cannot find that the product was

9     negligently designed unless you also find that defendants were

08:46:50  10     strictly liable for a design defect.  Or words to that effect.

11    And I have some proposed language.

12          My understanding is Bard does not agree to this.  And

13    as long as the objection is clear on the record, we're fine

14    not including that but we just don't want there to be an issue

08:47:06  15    where this type of situation comes up and there is a potential

16    inconsistent verdict argument that we could have cured here

17    today.

18          THE COURT:  I will -- I will tell you that as

19    recently as two weeks ago, three weeks ago, the Georgia Court

08:47:22  20    of Appeals -- last week the Georgia Court of Appeals issued

21    another decision saying that risk utility is part of a

22    negligent design defect analysis.  So there's no avoiding that

23    legal view in Georgia which creates this ambiguity.

24          What exactly is the language you're proposing,

08:47:42  25    Mr. Clark?

08:47:44 1           MR. CLARK:  Let me find it, Your Honor.

2           THE COURT:  It would be where?

3           MR. CLARK:  This would be at the end of

4   instruction 14.

08:47:54 5           The language I would propose adding is, quote, you

6   may not find that the Eclipse filter was negligently designed,

7   parenthesis, instruction 16, close parens, unless you also

8   find that the design of the Eclipse filter was defective.

9   Period, close quote.

08:48:29 10           THE COURT:  Unless you also find --

11           MR. CLARK:  That the design of the Eclipse filter was

12   defective.  Period.

13           THE COURT:  Wouldn't that more appropriately be in

14   instruction 16 rather than 14?  Because it is an instruction

08:48:48 15   about what they can do with negligent design.

16           MR. CLARK:  The way I conceptualized it, Your Honor,

17   was that it was -- we're talking about the risk utility test

18   in 14 and to -- basically that's the -- essentially, they

19   don't have to go to 16 if they don't find 14.  So it made more

08:49:03 20   sense to deal with it there.  I could see arguments the other

21   way.

22           THE COURT:  All right.

23           And what is defendants' view on this?

24           MR. NORTH:  We would like some time to think about

08:49:28 25   that if it would not impose on the Court and talk about it

08:49:32  1    right after we let the jury go, which I'm sure will be

2    midafternoon.

3               THE COURT:  That's fine.

4               All right.

08:49:37  5               There was another comment, Mr. Clark?

6               MR. CLARK:  One of them relates to the Court's

7    interest in looking at instruction 19 concerning damages.

8               THE COURT:  Oh, that's right.  We need to -- I think

9    I asked you to propose a narrowing, see if you could agree on

08:49:53 10    something.

11               MR. CLARK:  You did, Your Honor, and --

12               MS. HELM:  May I approach, Your Honor?

13               THE COURT:  Yes.

14               MS. HELM:  I apologize.  Our printer has a little bit

08:50:08 15    of a streak in it, but I think you can see everything.

16               MR. CLARK:  Is that the one you proposed --

17               (Counsel confer.)

18               MR. CLARK:  Your Honor, we have a competing

19    instruction on that that, I guess, accepts some of it, changes

08:50:28 20    some language, and would not agree to the language on the

21    second page.

22               If I could approach?

23               THE COURT:  Yes.  Please.

24               So what is the red type, Ms. Helm, on yours?

08:50:45 25               MS. HELM:  Your Honor, that's what we added to the

08:50:49   1   damages instruction based on the plaintiffs clarifying their

2   claims.

3            THE COURT:  Okay.  So that's what you've added.

4            And then, Mr. Clark, the yellow is what you want to

08:51:01   5   do with their first paragraph --

6            MR. CLARK:  That's correct, Your Honor.

7            THE COURT:  -- and the blue means it's not your

8   proposal?

9            MR. CLARK:  We don't agree to the blue.  We think the

08:51:10  10   blue really is surplusage in light of the fact that there are

11   four other instructions that talk about causation and it kind

12   of transcends into comment on the evidence.

13           THE COURT:  Okay.  I will look at these different

14   proposals over the lunch hour so that we can talk about them

08:51:25  15   at the end of the day.

16           What else have you got that you want to comment on,

17   Mr. Clark?

18           MR. CLARK:  The last one, Your Honor, was the FDA

19   instruction.  I know you've been keeping score on that.  I did

08:51:37  20   want to highlight one thing, though, that I did not have in

21   front of me when we spoke the other day, and that was

22   Dr. Tillman's testimony in the morning.  I think I highlighted

23   a few things from the afternoon.

24           But in the morning, she was asked the question:  "And

08:51:54  25   to be clear, does the FDA make the same pronouncement with

08:51:58   1   regard to 510(k) devices like IVC filters?"

         2        Her answer was:  "No.  It instead makes a

         3   determination that the new device is as safe and effective as

         4   the predicate device which is a different finding than in a

08:52:14   5   PMA."

         6        The problem is, Your Honor, that that's basically

         7   saying that the FDA is making a determination that the new

         8   device is as safe and effective.

         9        And you've looked at this a lot of different ways but

08:52:26  10   I think the way that you articulated it in your preemption

        11   ruling is that the FDA does not make a determination that the

        12   device is as safe and effective, it concludes the device is

        13   substantially similar.  And there could be safety

        14   considerations that get in there but the focus is on

08:52:42  15   substantial similarity.

        16        So again, with those types of things in this case, I

        17   don't think it's harmful to give a corrective limiting

        18   instruction, and we can certainly talk about what the language

        19   is.  I've gone back and tweaked what I proposed before to, I

08:52:57  20   think, address some of Mr. North's concerns about that.  But

        21   we do think it is very important that the jury have a very

        22   clear, articulated instruction from the Court on this issue.

        23        THE COURT:  Do you have that language?

        24        MR. CLARK:  Your Honor, one second.  I do.

08:53:14  25        Would you like me to read it to you?  If you could

08:53:17 1   read my handwriting, I'd be happy to approach.

2          THE COURT:  Have you shared it with --

3          MR. CLARK:  I have not.  Let me just read what it

4   is --

08:53:23 5          THE COURT:  How long is it?

6          MR. CLARK:  It only changes the third paragraph of

7   our proposed limiting instruction.

8          THE COURT:  I don't have your proposed in front of

9   me.  So why don't you share it with defendants and, if you

08:53:33 10  can, get it to me before the noon hour and I'll read that over

11  the noon hour along with the others.

12         MR. CLARK:  Be happy to.

13         THE COURT:  Mr. North?

14         MR. NORTH:  Your Honor, if I could just briefly

08:53:45 15  respond.  I believe the testimony they quoted from Dr. Tillman

16  is exactly what the FDA guidances and regulations say and what

17  this Court has cited in the past, which is that 510(k)

18  clearance involves a determination that the new device is as

19  safe and effective as the predicate device.  And so I believe

08:54:02 20  that is an accurate statement of the law.

21         THE COURT:  Okay.

22         Did you have -- were those all of your issues,

23  Mr. Clark?

24         MR. CLARK:  They were, Your Honor.

08:54:13 25         THE COURT:  Did you have instruction issues you

08:54:16   1    wanted to raise?

2                   MR. NORTH:  We do not, Your Honor.

3                   THE COURT:  Okay.

4           So what we're going to do is, plaintiffs, you'll get

08:54:25   5    to me the narrow -- I think was the word you used,

6    Mr. Clark -- proposal for Recovery filter death evidence.  If

7    I decide that I'm going to permit it.  And I think you'll try

8    to get it to me, if possible, sometime during the morning.

9                   MR. CLARK:  Your Honor, I could approach with three

08:54:46  10    documents we think we would probably offer if the Court is

11    inclined.

12                  THE COURT:  Yeah, just share them with defendants,

13    please.

14                  MR. CLARK:  It's Exhibit 1722, which is the --

08:54:56  15                  THE COURT:  Do you have copies?

16                  MR. CLARK:  I only have one copy with me.  What I'll

17    do is get clean copies for defense and you.

18                  THE COURT:  Well, you can get them to me now because

19    I've got three minutes.  Just tell him what -- tell them what

08:55:10  20    the exhibit numbers are.

21                  MR. CLARK:  I think Felice has extra copies --

22           Do you have extra copies right now?

23           Actually, Your Honor, I think I have them.

24           Sorry.

08:55:28  25           May I approach, Your Honor?

DIRECT EXAMINATION (CONT'D) - ROBERT CARR

08:55:49   1          THE COURT:  Yes.

         2          Okay.  Anything else we need to address?

         3          Let's take a three-minute break and then we'll get

         4   the jury in here.

08:56:31   5       (Recess was taken from 8:56 to 9:00.  Proceedings resumed

         6   in open court with the jury present.)

         7          THE COURT:  Morning, ladies and gentlemen.

         8          THE JURY:  Morning.

         9          THE COURT:  Thanks for being here.

09:01:31  10          For your information, we anticipate that we are going

        11   to finish the evidence today.  And our plan will be to break

        12   after we have finished the evidence and then to start tomorrow

        13   morning with the closing arguments -- well, with jury

        14   instructions and then the closing arguments of the lawyers, so

09:01:48  15   that you'll be getting the case by midday tomorrow for

        16   deliberation.

        17          Mr. North, you may continue.

        18          MR. NORTH:  Thank you, Your Honor.

        19                    **ROBERT CARR,**

        20   recalled as a witness herein, after having been previously

        21   sworn or affirmed, was examined and testified as follows:

        22        D I R E C T   E X A M I N A T I O N   (CONTINUED)

        23   BY MR. NORTH:

        24   Q   Mr. Carr, over your years with Bard Peripheral Vascular,

09:02:06  25   have you had involvement with the Simon Nitinol filter also?

DIRECT EXAMINATION (CONT'D) - ROBERT CARR

09:02:11   1   A    Yes.

2   Q    Based on your 20-plus years of experience working with IVC

3   filters, do you consider the Simon Nitinol filter a reasonable

4   alternative for a patient who would customarily receive a

09:02:21   5   retrievable filter?

6   A    No.

7   Q    And why is that?

8   A    Because it's not retrievable.

9   Q    In your experience, what are the types of patients who

09:02:30   10   typically receive a permanent filter or the Simon Nitinol

11   filter?

12   A    Nowadays they'd be much older patients who may not have a

13   long life expectancy.  They might be terminal in their

14   disease and really have no chance at any time of potentially

09:02:50   15   needing the filter removed.

16   Q    Does Bard still sell the Simon Nitinol filter in the

17   United States?

18   A    No, we don't.

19   Q    And why did Bard stop selling that filter?

09:03:02   20   A    The -- it didn't sell very well.

21          MR. NORTH:  If we could bring up Exhibit 7900,

22   please.

23   BY MR. NORTH:

24   Q    Do you recognize this exhibit, Mr. Carr?

09:03:17   25   A    Yes.

DIRECT EXAMINATION (CONT'D) - ROBERT CARR

09:03:18  1    Q    What is this?

2    A    It's the sales from 2002 to through September of 2016 of

3    our retrievable filters and the Simon Nitinol filter.

4    Q    And was this prepared at Bard as part of the business?

09:03:34  5    A    Yes.

6             MR. NORTH:  Your Honor, at this time we would tender

7    Exhibit 7900.

8             MR. O'CONNOR:  No objection, Your Honor.

9             THE COURT:  Admitted.

09:51:03 10        (Exhibit 7900 admitted.)

11             MR. NORTH:  Could we display, Your Honor?

12             THE COURT:  Yes.

13    BY MR. NORTH:

14    Q    And does this demonstrate the low sales of the

09:03:51 15    Simon Nitinol filter as compared to Bard's retrievable filters

16    over this 15-years or 14-year period?

17    A    Yes, it does.

18    Q    Now, in your experience, why were Simon Nitinol filters

19    sales so low compared to the sales of the retrievable filters?

09:04:11 20    A    Because the reality of it is, is the retrievable filters

21    are permanent, and if you could put a filter in that could

22    potentially be removed, because you don't always know if a

23    patient will need a filter forever, why wouldn't you do that.

24    And the Simon Nitinol filter had some nuances to it, if you

09:04:34 25    will, from a delivery point of view.  And it was seen as old.

DIRECT EXAMINATION (CONT'D) - ROBERT CARR

09:04:40   1   It's probably, what, 1991 to 2016.  It's a pretty old device.

           2   Q    And were there some sorts of complications associated with

           3   the Simon Nitinol filter that gave some physicians concern?

           4   A    Yes.

09:04:53   5   Q    And what were those?

           6   A    So, again, the ability to deliver it, to deploy it

           7   exactly where you wanted to.  Sometimes the dome, we call it,

           8   the top of the filter would tilt to the side and sometimes

           9   the legs would penetrate into the wall.  So all known

09:05:10  10   complications.

          11   Q    Mr. Carr, based upon your 20-plus years of working with

          12   IVC filters for Bard and previously for NMT, have you also

          13   followed the marketplace in general and those companies'

          14   products that compete with Bard filters?

09:05:33  15   A    Generally, yes.

          16   Q    Are you aware of any IVC filter on the market today that

          17   does not have reports of filter fracture?

          18   A    No.

          19   Q    Are you aware of any IVC filter on the market today that

09:05:42  20   does not have reports of filter migration?

          21   A    No.

          22   Q    Are you aware of any IVC filter on the market today that

          23   does not have reports of filter perforation?

          24   A    No.

09:05:54  25   Q    What about any filter on the market today that does not

DIRECT EXAMINATION (CONT'D) - ROBERT CARR

09:05:57   1   have reports of filter tilt?

2   A   No.

3   Q   Mr. Carr, if there were reports coming in, as we have

4   seen, of fracture incidents involving Bard's G2 or Eclipse

09:06:12   5   filters, why did the company continue to market those

6   products?

7   A   Because it provided a tremendous benefit to the vast

8   majority, greater than 99.5 percent of all patients.

9   Q   From your involvement in developing IVC filters, what is

09:06:35   10   your understanding in terms of the typical clinical

11   consequences of filter fracture?

12   A   Usually it's -- there's not much significance, but there

13   can be.

14   Q   And how do you know that?

09:06:50   15   A   Over time, experience, reading articles, understanding

16   the environment.

17   Q   Does Bard vigilantly review all reports that come into it

18   of filter fracture?

19   A   Absolutely.

09:07:05   20   Q   Now, you said that you started working with IVC filters

21   first around 1996?

22   A   Yes.

23   Q   During your 20-plus years, first at NMT and then at

24   Bard -- well, no, let me back up and ask you:  How long was

09:07:21   25   the development process for the Recovery filter from the time

DIRECT EXAMINATION (CONT'D) – ROBERT CARR

09:07:25  1  you first began working on it at NMT until it was introduced

2  on the market by Bard?

3  A    Six years.

4  Q    Was there any point in time during your years at NMT and

09:07:40  5  then at Bard that the companies ever compromised the integrity

6  of the development of these devices in order to somehow rush

7  them to the market?

8  A    Absolutely not.

9  Q    In your experience, Mr. Carr, did Bard ever cut any

09:07:55  10  corners in the development of its retrievable filters?

11  A    No.

12       MR. NORTH:  Thank you.  That's all the questions I

13  have.

14       THE COURT:  All right.  Thank you.

09:08:03  15       Cross-examination?

16       MR. O'CONNOR:  Yes, Your Honor.  But I think first

17  we're going to move in some exhibits into evidence.

18       THE COURT:  All right.

19       MR. O'CONNOR:  So I'm going to ask Mr. Clark to move

09:08:12  20  them in, and then I'll proceed to cross.

21       THE COURT:  All right.

22       MR. CLARK:  At this time, Your Honor, the plaintiff

23  would move into evidence Exhibits 3262, 3271 -- I'm sorry,

24  3270, 3304, 4415 as redacted, 4519 redacted, 4504 redacted,

09:08:43  25  4522 redacted, 4528 redacted, 4565, and 1680 redacted.

CROSS-EXAMINATION - ROBERT  CARR

09:09:00  1          THE COURT:  I'm losing a battery here, Traci.

        2          Was it 4415 or 4515?

        3          MR. CLARK:  4515.  I apologize if I misspoke.

        4          THE COURT:  Okay.

09:09:12  5          THE COURTROOM DEPUTY:  4515?

        6          THE COURT:  4515.

        7          Ms. Helm?

        8          MS. HELM:  As redacted, no objections, Your Honor.

        9          THE COURT:  All right.  Those exhibits are admitted.

09:09:22 10          (Exhibits 3262, 3270, 3304, 4515, 4519, 4504, 4522, 4528,

       11   4565, 1680 admitted.)

       12          THE COURT:  Go ahead.

       13          MR. O'CONNOR:  May I proceed, Your Honor?

       14          THE COURT:  Yes.

11:19:09 15              C R O S S - E X A M I N A T I O N

       16   BY MR. O'CONNOR:

       17   Q   Good morning, Mr. Carr.  My name is Mark O'Connor, and I'm

       18   one of the lawyers that represents Doris Jones.

       19   A   Good morning.

09:09:43 20   Q   Let me just go back to a couple of basic points, Mr. Carr.

       21          The Recovery, the G2, and the G2X were optional

       22   filters; is that correct?

       23   A   Yes.

       24   Q   And that means that they were each filters that were

09:10:03 25   permanent that had the option to be retrieved.  Fair?

CROSS-EXAMINATION - ROBERT   CARR

09:10:06  1   A   Yes.

2   Q   And as for the Recovery and the G2, each of those filters

3   were first cleared on the market as permanent filters.   True?

4   A   Correct.

09:10:21  5   Q   Thank you.

6            Now, you agree that the Recovery, the G2, and the G2X

7   should perform as well as a permanent filter.   True?

8   A   They are permanent filters.

9   Q   Do you agree with my question that they should perform as

09:10:37  10   well as a permanent filter?

11   A   I don't understand the question.   They are permanent

12   filters.

13   Q   Well, let me just go to your deposition, then.

14            MR. O'CONNOR:   Gay, the November 5, 2013, deposition,

09:10:50  15   please.

16   BY MR. O'CONNOR:

17   Q   And, Mr. Carr, do you recall this deposition?   I know

18   there were others.   This is your deposition, again, on

19   November 5, 2013.

09:11:02  20            Do you see that?

21   A   No, I don't see any dates but I see my deposition.

22   Q   All right.   Will you take my word for it that it was on

23   that date?

24   A   Sure.

09:11:21  25   Q   Thank you.

CROSS-EXAMINATION - ROBERT   CARR

09:11:23   1          And at page 41, line 11, the question was asked to

2     you:  "Sir, would you agree that optional filters -- the

3     Recovery, the G2, G2 Express -- should perform as well as

4     permanent filters?"

09:11:37   5          And your answer was:  "Yes."

6          Now, did I did read that correctly, sir?

7     A    Yes.

8     Q    Thank you.

9          During the entire time the Recovery was on the market

09:11:51   10    it was a permanent filter.   True?

11    A    It was an optional filter after it received that

12    indication.

13    Q    Meaning it could be used as a permanent filter; correct?

14    A    Yes.

09:12:03   15    Q    And the same goes with the G2 and the G2X.   They were --

16    the entire time they were both on the market, they were

17    permanent filters.

18    A    Again, they're optional filters.   There is a difference

19    between optional filters and permanent filters only.

09:12:17   20    Q    But they were permanent -- in addition to optional,

21    permanent meaning that they were permanent filters that could

22    be used and indicated for permanent use.   True?

23    A    In addition to being optional, yes.

24    Q    Now, sir, you agree that the G2 should perform as well as

09:12:37   25    the Simon Nitinol filter.   True?

CROSS-EXAMINATION - ROBERT   CARR

09:12:39  1    A    No.  I think it performs differently in certain areas.

2    Q    All right.

3              MR. O'CONNOR:  Gay, can we go to the deposition,

4    November 5, 2013, at page 42.

09:12:52  5    BY MR. O'CONNOR:

6    Q    And, Mr. Carr, I'm looking down on page 42, line 14, you

7    were asked:  "Would you agree that they should perform as well

8    as a Simon Nitinol filter?"

9              Let me put it in context.

09:13:09  10             Do you see above where the questions that were asked

11   about the G2 and the G2 Express?  At line 5.

12             Let me read that.

13             "And within the context of what you just told me,

14   would you agree that the Recovery filter, the G2, and the

09:13:24  15   G2 Express should perform as well, if not better than, the

16   Simon Nitinol filter?"

17             Your answer was:  "I don't know if they can perform

18   better."

19             Next question:  "Would you agree that they should

09:13:38  20   perform as well as the Simon Nitinol filter?"

21             Your answer was:  "Yes, they are substantially

22   equivalent."

23             Now, did I read that correctly?

24   A    Yes.  They are substantially equivalent.  That's correct.

09:13:51  25   Q    Thank you.

CROSS-EXAMINATION – ROBERT   CARR

09:13:57  1          Now, the Eclipse filter was the G2X filter; correct?

2          I'm sorry.  Excuse me.  The Eclipse was the G2X with

3     electropolish.  Is that fair?

4     A   Substantially, yes.

09:14:14  5     Q   What the Eclipse did was it was the G2X that added

6     electropolish.  True?

7     A   It's a lot more than that but, yes, it had

8     electropolishing.

9     Q   And the Eclipse was a permanent filter with the option to

09:14:32  10    retrieve.  True?

11    A   Yes.

12    Q   Sir, I want to ask you a question about the Asch study.

13    Early in that study a cephalad migration occurred with an

14    occluded Recovery filter; is that correct?

09:15:18  15    A   Yes.

16    Q   And you agree that you --

17    A   I'm sorry, did you say cephalad?  It was a cranial

18    migration.

19    Q   Going up.

09:15:32  20    A   Yes.

21    Q   And am I correct cranial and cephalad mean the same thing?

22    A   Yes.

23    Q   All right.  So we are -- our terminology is correct?

24    A   Yes.

09:15:41  25    Q   And do you agree at that time you had stated that if there

CROSS-EXAMINATION - ROBERT   CARR

09:15:47   1   was another migration that occurred the study would be

2   stopped?

3   A   I didn't state it.  It was the consensus of the group

4   that was talking, I believe.

09:15:55   5   Q   Fair enough.

6        MR. O'CONNOR:  Exhibit 802, please, Gay.

7   BY MR. O'CONNOR:

8   Q   Do you --

9        MR. O'CONNOR:  I apologize, Your Honor.  I don't

09:16:06  10   recall if 802 is in evidence?

11        THE COURT:  It is not.

12   BY MR. O'CONNOR:

13   Q   Mr. Carr, do you recall this technical report?

14   A   Yes.  This doesn't look like the final version, but it's

09:16:17  15   a draft probably.

16   Q   This is a draft you're familiar with?  It's a document

17   you're knowledgeable about; correct?

18   A   Yes, I wrote it.

19        MR. O'CONNOR:  I move to admit Exhibit 802, please.

09:16:29  20        MR. NORTH:  No objection, Your Honor.

21        THE COURT:  Admitted.

22        MR. O'CONNOR:  Thank you.

23      (Exhibit 802 admitted.)

24        MR. O'CONNOR:  And, Gay, if we could go to page 7,

09:16:38  25   please.

CROSS-EXAMINATION - ROBERT  CARR

09:16:40   1        And, Gay, if you could highlight the first sentence

2    in that full paragraph, "in the end."

3        May I display to the jury, Your Honor?

4        THE COURT:  You may.

09:16:55   5    BY MR. O'CONNOR:

6    Q   Mr. Carr, in this report talking about that cranial or

7    cephalad migration, it was stated in the report you prepared:

8    "In the end, everyone agreed that we would continue the

9    experience at Mt. Sinai and that if another 'major' migration,

09:17:14  10    greater than 2 centimeters, occurred, we would stop the study

11    and reevaluate the filter design."

12        Now, did I read that correctly?

13    A   Yes.

14    Q   I want to talk a moment, Mr. Carr, again about the G2 and

09:17:37  15    the G2X, if we could.

16        Do you agree that clinical data had indicated that

17    the G2 and the G2X were tilting after placement?

18    A   There were reports of tilting in the clinical trial, I

19    believe, yes.

09:17:58  20        MR. O'CONNOR:  Gay, if we could go to Mr. Carr's

21    deposition dated April 17, 2013, at page 94, please.

22    BY MR. O'CONNOR:

23    Q   Mr. Carr, in this deposition, at line 16, do you see where

24    I'm going to read from?

09:18:16  25    A   Yes.

CROSS-EXAMINATION - ROBERT  CARR

09:18:17   1   Q    It's highlighted, sir.

           2            Do you see that?

           3   A    Yes.

           4   Q    And the question was posed to you at that time on

09:18:22   5   April 17, 2013:  "Was there clinical data indicating that the

           6   G2 and the G2 Express were subsequently tilting after

           7   placement?"

           8            And your answer was:  "Yes."

           9            Now, did I read that correctly, sir?

09:18:36  10   A    Yes.

          11   Q    Thank you.

          12            Mr. Carr, do you --

          13            MR. O'CONNOR:  You can take that down, Gay.

          14   BY MR. O'CONNOR:

09:18:42  15   Q    -- you -- tilting in the G2X can lead to penetration.  You

          16   agree with that testimony, true?

          17   A    It can.

          18   Q    Tilting and penetration can change the stress on the

          19   filter.  True?

09:18:56  20   A    Yes, it can.

          21   Q    A change in stress on the filter can lead to fracture.

          22   Agreed?

          23   A    Yes.

          24            MR. O'CONNOR:  Gay, let's show Mr. Carr Exhibit 504,

09:19:10  25   please.

CROSS-EXAMINATION - ROBERT   CARR

09:19:12   1   BY MR. O'CONNOR:

2   Q   Are you -- you were involved in the Eclipse anchor filter

3   project; correct?

4   A   Not daily, no.

09:19:30   5   Q   But it's something you were aware of and had involvement

6   in.  Is that true?

7   A   I knew it was going on, yes.

8   Q   All right.

9        MR. O'CONNOR:  Your Honor, I thought 504 was in

09:19:41  10   evidence.

11        THE COURT:  It is not.

12        MR. O'CONNOR:  All right.

13   BY MR. O'CONNOR:

14   Q   Do you recognize this document, the idea Eclipse anchor

09:19:47  15   POA?

16   A   It's without a cover page, so I don't know if it's the

17   final one or a draft.

18   Q   But are you familiar with the -- the document in general?

19   A   I'm familiar that there is an Eclipse POA, yes.

09:20:03  20        MR. O'CONNOR:  Move for its admission, Your Honor.

21        MR. NORTH:  No objection, Your Honor.

22        THE COURT:  Admitted.

23      (Exhibit 504 admitted.)

24        MR. O'CONNOR:  And, Gay, if you could go to

09:20:11  25   Mr. Carr's deposition on April 17, 2013, at page 92.

CROSS-EXAMINATION – ROBERT   CARR

09:20:18  1    BY MR. O'CONNOR:

2    Q    And, Mr. Carr, the question to you was at line 13:  "All

3    right, again, explain to us what your involvement was with

4    respect to the Eclipse anchor filter system."

09:20:41  5            Do you see that question?

6    A    Yes.

7    Q    Your answer was "I was the director responsible for the

8    development team" –- or, excuse me, "the development team

9    reported to me."

09:20:52 10            Did I read that correctly?

11   A    Yes.

12   Q    And this was a device that contemplated having an anchor

13   on the filter; correct?

14   A    Meridian is the filter that has an anchor on it.

09:21:14 15   Q    But in this project --

16            MR. O'CONNOR:  Gay, let's go ahead and --

17   BY MR. O'CONNOR:

18   Q    Well, let me just ask you this:  The Simon Nitinol filter

19   had an anchor filter system.   True?

09:21:25 20   A    No.

21            MR. O'CONNOR:  Gay -- well, we're right there.

22   BY MR. O'CONNOR:

23   Q    The question on page 92, line 18:  "Did the Simon Nitinol

24   have an anchor filter system similar to what was ultimately

09:21:41 25   used in the Eclipse?"

CROSS-EXAMINATION - ROBERT  CARR

09:21:43  1   A    Sorry, I thought we were referring to the anchors that

2   were added to the G2 and G2X and Eclipse filter, which are

3   downward anchors.

4   Q    Let me finish, sir.

09:21:52  5   A    Sorry.

6   Q    In this part of the deposition you were talking about the

7   Eclipse anchor filter system.  Do you recall that?

8        Do you see the question above that?

9   A    Yes.

09:22:03  10  Q    All right.

11       And then at line 18, the question was: "Did the

12  Simon Nitinol have an anchor filter system similar to what was

13  ultimately used in the Eclipse?"

14       Do you see where I read that from?

09:22:15  15  A    I do.

16  Q    Your answers was: "Similar and it had six hooks.  So yes."

17       Did I read that correctly?

18  A    Yes.

19       MR. O'CONNOR:  And, Gay, if you would put Exhibit 504

09:22:27  20  back up.

21       May I publish to the jury, Your Honor?

22       THE COURT:  Yes.

23  BY MR. O'CONNOR:

24  Q    And, sir, at the time of the Eclipse anchor filter project

09:22:44  25  you were discussing at that time --

CROSS-EXAMINATION - ROBERT  CARR

09:22:46  1        MR. O'CONNOR:  Under Summary, Gay, "the application

2   of caudal anchors."  Highlight that, please.

3        At the top under Summary.  Second sentence there.

4        Thank you.

09:23:04  5        And -- well, let's just read the second sentence, the

6   first sentence, Gay.

7        Go ahead and highlight the entire summary.

8   BY MR. O'CONNOR:

9   Q   It says:  "This POA" -- which is a product opportunity

09:23:29  10  appraisal, is that correct, Mr. Carr?

11  A   Yes.

12  Q   "This POA describes the addition of anchors to the Eclipse

13  filter.  Feedback from customers, the field, and our own

14  clinical data have shown an increased frequency of migration

09:23:42  15  in the caudal direction with the G2 and G2X filters as

16  compared to the Recovery."

17       Did I read that correctly?

18  A   Yes, you did.

19  Q   "The application of caudal anchors would potentially

09:23:55  20  eliminate this failure mode and reduce tilting of the filter."

21       Did I read that correctly?

22  A   Yes, you did.

23  Q   And you were talking about a project where there would be

24  an addition of caudal anchors.  True?

09:24:09  25  A   Yes.

CROSS-EXAMINATION - ROBERT  CARR

09:24:09  1    Q    All right.

2            MR. O'CONNOR:  Gay, go down to Problems section.

3    BY MR. O'CONNOR:

4    Q    And according to this document, the project that you were

09:24:20  5    the director on, it was stated that "Filter movement may lead

6    to tilting, undesirable cava wall incorporation, increased

7    risk of filter fracture, and vena cava penetration."

8            Did I read that correctly?

9    A    Yes, you did.

09:24:36  10   Q    And this was a project that was evolving while the Eclipse

11   filter was on the market.  True?

12   A    Yes.

13   Q    Thank you.

14           And the Eclipse filter was released in January of

09:24:51  15   2010; correct?

16   A    I don't know.

17   Q    Does that sound about right, sir?

18   A    I don't know.

19   Q    If that's been the testimony, you don't have any reason to

09:25:01  20   disagree with that.  True?

21   A    Sure.

22   Q    Thank you.

23           The Meridian filter was also being involved around

24   that time; correct?

09:25:14  25   A    That is the POA for the Meridian filter.

CROSS-EXAMINATION - ROBERT   CARR

09:25:18   1   Q   All right.   Then let's show -- let me show you 769.

2          This is a document dated July 2, 2010, entitled

3   "Meridian Claims."

4          Do you see that?

09:25:30   5   A   Yes, I do.

6   Q   All right.   And so what you're telling us is that the

7   Eclipse anchor project was the same as the Meridian?

8   A   It's the name.   Yes.

9   Q   All right.   And you've seen this document before, haven't

09:25:41   10   you?

11   A   I don't know that I have but I guess I did at a previous

12   testimony.

13          MR. O'CONNOR:   Move to admit 769 into evidence,

14   please.

09:25:52   15          MR. NORTH:   No objection, Your Honor.

16          THE COURT:   Admitted.

17       (Exhibit 769 admitted.)

18   BY MR. O'CONNOR:

19   Q   The Meridian IVC filter was designed to resist caudal

09:26:02   20   migration and thereby decreasing the likelihood of penetration

21   to occur; is that correct?

22   A   Yes.

23   Q   And those design features were discussed back in time of

24   when the G2, G2X, and Eclipse were on the market.   Fair?

09:26:21   25   A   Yes.

CROSS-EXAMINATION - ROBERT   CARR

09:26:25   1          MR. O'CONNOR:  May I publish this, please,

2   Your Honor?

3          THE COURT:  Yes.

4   BY MR. O'CONNOR:

09:26:34   5   Q   And then if we go to paragraph F on this document, it

6   says:  "The Meridian IVC filter is designed to resist caudal

7   migration, decreasing the likelihood that fracture to occur."

8          Did I read that correctly?

9   A   Yes.  There's an asterisk, it appears, though.  I don't

09:26:55  10   know what that goes to.

11   Q   Well, there's "small print" there.  Do you see where it

12   says that?

13   A   Yes.

14   Q   All right.

09:27:01  15          MR. O'CONNOR:  Gay, highlight that.

16   BY MR. O'CONNOR:

17   Q   And what that goes on to say is that:  "Based on clinical

18   evidence from the EVEREST trial, when migration and tilt are

19   present, there is a higher probability for fracture to occur."

09:27:15  20          Did I read that correctly?

21   A   Yes, you did.

22   Q   Thank you.

23          Now, Mr. Carr, I heard you on direct examination talk

24   about the amount of money over the years that Bard invested in

09:27:38  25   research and development for IVC filters.  Do you recall that

CROSS-EXAMINATION - ROBERT  CARR

09:27:44   1    testimony?

2    A    Yes.

3    Q    And I think you also talked about the amounts of money

4    that were invested for marketing; correct?

09:27:53   5    A    Yes.

6    Q    Bard was very invested in the success of IVC filters.

7    True?

8    A    Yes.

9              MR. O'CONNOR:  Gay, show Mr. Carr Exhibit 4519.

09:28:21  10              And let's go to page 5 of that document.

11              Your Honor, I believe 4519 is in evidence.

12              THE COURT:  Correct.

13              MR. O'CONNOR:  May I display to the jury, please?

14              THE COURT:  Yes.

09:28:37  15    BY MR. O'CONNOR:

16    Q    Mr. Carr, what we're looking at is a memorandum, also

17    known as a Monthly Management Report, dated August 9, 2010.

18              Would you like to see the first page?

19    A    Yes, please.

09:28:51  20              MR. O'CONNOR:  Gay, would you please go back to the

21    first page for Mr. Carr.

22              Thank you.

23              And now go to page 5.

24    BY MR. O'CONNOR:

09:29:02  25    Q    And the Monthly Management Report, as you saw, was written

CROSS-EXAMINATION - ROBERT  CARR

09:29:09  1    by Tim Ring.  And who is he, sir?

2             Who is Tim Ring?

3    A    I don't think it was written by Tim Ring.

4    Q    I'm sorry.  It was directed to Mr. Ring.

09:29:19  5             Who is Mr. Ring?

6    A    He was the CEO -- president, CEO of the company.

7    Q    And it was from Jim Beasley.  Who is Mr. Beasley?

8    A    He was the president of our division.

9    Q    Important people at Bard; correct?

09:29:34  10   A    We're all important.

11   Q    I believe that.

12             And going to page 5, you see at the top there, there

13   is a row that talks about or titled "Key Product Line Sales

14   Per Day."

09:29:54  15            Do you see that?

16   A    Yes, I do.

17   Q    And then it reports for the months in 2010.

18            Do you see where I'm referring to?

19   A    Yes.

09:30:03  20   Q    And it indicates sales per day.

21            Are you following me?

22   A    Yes.

23   Q    And according to this exhibit, in February of 2010, there

24   were, for example, 2,000- -- excuse me, 219 filters sold per

09:30:22  25   day during that month of February.

CROSS-EXAMINATION - ROBERT   CARR

09:30:24  1          Do you see where I'm reading?

2     A    I don't think that's correct, no.

3     Q    Well, do you have any reason to dispute this document?

4     A    No.  But the title is "Sales" and there's thousands of

09:30:37  5     dollars listed on the left.  So I think that's dollars, not

6     units.  Without seeing the rest of it.

7     Q    So you think that what is said is that 219 means 219

8     thousands of dollars?

9     A    I haven't seen the document before, so what's not

09:30:55  10    redacted, I would assume that's dollars.

11    Q    All right.  With three zeros after it?

12    A    Yes.  But, again, I don't know.

13    Q    All right.  Well, if we interpret the way you have -- and

14    thank you for that clarification.

09:31:07  15         So if we assume it's your interpretation, during the

16    month of February of 2010 there would have been $219,000 of

17    filter sales; correct?  If we interpret the way you just did.

18    A    Again, without seeing the rest of the document, yes.

19    Q    And if we go through all the way until July, in July, for

09:31:30  20    example, 2010, there was $213,000 of filter sales for that

21    month alone.  True?

22    A    Yes.

23    Q    All right.  Thank you.

24         (Counsel conferring.)

25

CROSS-EXAMINATION – ROBERT  CARR

09:31:42   1   BY MR. O'CONNOR:

2   Q    Oh.  Excuse me.  Let me just clarify something.  I was

3   just reminded of something.

4          The numbers that we're looking at are per day, if you

09:31:58   5   read the top title, not per month.

6          Do you see that?

7   A    I do, yes.

8   Q    All right.  So per day.  We would be looking at, in the

9   month of February, 219,000 per day.

09:32:08   10         Do you see where I'm reading?

11   A    I do, yes.

12   Q    And that's a fair interpretation of this document;

13   correct?

14   A    Without seeing the rest of it, yes.

09:32:17   15   Q    And then if we go all the way through just by way of

16   example, July of 2010, filter sales generated in that month,

17   $213,000 per day in the month of July.  True?

18   A    That's what it says.

19   Q    All right.  And so we could -- assuming this document is

09:32:38   20   correct, we could calculate those amounts and figure out how

21   much each month in, for example, 2010 Bard was making from

22   filter sales, true?

23   A    Yes.

24   Q    So, for example, in July, the number of days times 213,000

09:32:55   25   would give us an indication of the total amount in July of

CROSS-EXAMINATION - ROBERT   CARR

09:32:59  1    2010 that Bard made for filter sales; correct?

2    A    Of course.

3    Q    Sir, one other area.  When you were talking about FEA and

4    stress and strain tests with Mr. North, do you recall that

09:33:25  5    testimony?

6    A    Yes.

7    Q    There was an FEA analysis that dealt with the strains that

8    were on the filter when it was in the delivery tube; is that

9    right?

09:33:33  10   A    Partially, yes.

11   Q    And that's different than stresses and strains when the

12   filter is actually in the vena cava.  True?

13   A    Yes.  That's why we did both.

14   Q    But just so we're clear, stresses and strains, the FEA you

09:33:48  15   discussed, you discussed an FEA that dealt with stresses and

16   strains while the filter was in the delivery tube.  You do

17   recall that.  True?

18   A    It's both, sir.  It's both cases.

19         MR. O'CONNOR:  That's all I have, Your Honor.  Thank

09:34:10  20   you.

21         THE COURT:  Redirect?

22         MR. NORTH:  Nothing further, Your Honor.

23         THE COURT:  All right.  Thank you, sir.  You can step

24   down.

09:34:28  25         MR. ROGERS:  Your Honor, at this time the defense

DIRECT EXAMINATION — MICHAEL RANDALL

09:34:29  1   calls Michael Randall.

2          THE COURT:  If you want to stand up, ladies and

3   gentlemen, while he's coming in, feel free.

4          THE COURTROOM DEPUTY:  Go ahead and take a seat.

09:35:03  5                **MICHAEL RANDALL,**

6   recalled as a witness herein, after having been previously

7   sworn or affirmed, was examined and testified as follows:

8              D I R E C T   E X A M I N A T I O N

9   BY MR. ROGERS:

09:35:16 10   Q   Good morning, Mr. Randall.

11   A   Good morning.

12   Q   The jury had a chance to meet you briefly last week.

13   Would you mind reintroducing yourself, please.

14   A   Sure.  My name is Michael Randall.  I'm a director for

09:35:28 15   research and development and I oversee the vena cava filter

16   franchise right now.

17   Q   Are you an engineer by training?

18   A   Yes.  Mechanical engineer.

19   Q   Can you give us a brief rundown of your educational

09:35:42 20   background?

21   A   Sure.  I'm a mechanical engineer, graduated from

22   University of California, Irvine.  And then also I have an

23   MBA in international business from Thunderbird School of

24   Global Management.

09:35:56 25   Q   How long have you lived in the Phoenix area?

DIRECT EXAMINATION – MICHAEL RANDALL

09:35:59 1    A    About 12 years.

2    Q    Do you have a family?

3    A    Yes, I do.

4    Q    Can you tell the jury about your family?

09:36:04 5    A    Yes.  So me and my wife, we've been together for over 27

6    or some-odd years, and we have three boys.  And we relocated

7    out from California here and actually enjoy the Phoenix area.

8    Q    Did you move to Phoenix in order to come work for Bard

9    Peripheral Vascular?

09:36:25 10   A    Yes, I did.

11   Q    And was Bard the first medical device company that you

12   worked for?

13   A    No.  I started my medical device career at Baxter

14   Healthcare in California.  And then also Edwards Life

09:36:38 15   Sciences.  So about 23 years in the med device industry.

16   Q    And have you been involved in the medical device industry

17   for your entire professional career?

18   A    Yes.

19   Q    Can you please tell the jury how you got into that?  What

09:36:52 20   was your reason for getting into the industry of medical

21   devices?

22   A    Yeah.  So initially, I wanted to be a physician.  I

23   wanted to be a interventional cardiologist.  And, you know,

24   the year before I graduated I had my first son and, you know,

09:37:09 25   I got my degree and I kind of felt that it was -- I should

DIRECT EXAMINATION - MICHAEL RANDALL

09:37:12  1    probably start working as an engineer.  And engineers get

2    paid, you know, decent, so I kind of stuck with it, but I

3    wanted to stay with medical devices.  That way, you know,

4    instead of treating patients, I can design products to help

09:37:27  5    patients.

6    Q    And during the time that you've been at Bard, what are

7    some of the types of products that you've worked on?

8    A    I've worked on, of course, vena cava filters, I've worked

9    on PTA balloons which expand arteries and veins.  Also

09:37:46 10    stents.  Crossing devices, a device used to cross a occluded

11    artery.  Those are -- those are -- oh.  Some embolization

12    things for cancer, too, as well.

13    Q    And, Mr. Randall, what year did you come to Bard?

14    A    2006.

09:38:07 15    Q    And when you came to Bard in '06, did you start working on

16    IVC filters as soon as you got there?

17    A    No.  Not right away.  I was working in the PTA franchise,

18    the balloon franchise.

19    Q    And so when did you start working with IVC filters?

09:38:23 20    A    I was -- about 2007, beginning 2007.

21    Q    Mr. Randall, did you have any role in the -- with the

22    Recovery filter?

23    A    No.

24    Q    And did you have any involvement with the G2 filter?

09:38:38 25    A    No, I did not.

DIRECT EXAMINATION - MICHAEL RANDALL

09:38:40    1    Q    And so what was the first Bard IVC filter that you played

          2    a role in on a day-to-day basis?

          3    A    It was the G2X filter.  And that was a filter where we

          4    were adding a snarable retrievable tip to the apex of the

09:38:57    5    filter and making some delivery system modifications.

          6    Q    And have you worked on the subsequent generations of the

          7    Bard IVC filters?

          8    A    Yes, I have.

          9    Q    Mr. Randall, I want to kind of change up a little bit and

09:39:10   10    talk to you about the inferior vena cava itself.

         11    A    Um-hmm.

         12    Q    And as part of your work on Bard filters, have you done

         13    any personal research in order to learn about the inferior

         14    vena cava?

09:39:26   15    A    Yes.  We've done a lot of research.

         16    Q    And describe for us what you've done.  What are the types

         17    of things?

         18    A    Well, you first start off with trying to find everything

         19    that's out there that's known that's been published.  So

09:39:40   20    journal publications, case studies by physicians, different

         21    universities have done different types of experiments.  So

         22    you start off with that.

         23         Then after that you want to talk to the experts in

         24    the field.  So KOLs, or key opinion leaders.  So different

09:40:01   25    physicians who are known worldwide to be experts in this

DIRECT EXAMINATION - MICHAEL RANDALL

09:40:04   1   field.  So you talk to those people.

2   You also do experiments on your own.  Animal studies.

3   Things like that.

4   Q   And did you yourself volunteer for some testing in order

09:40:17   5   to learn about the inferior vena cava?

6   A   Yeah.  Actually, it was myself and four of my engineers.

7   We went to HR and we said, hey, we want to rent an MRI,

8   because it's safe, it's not like radiation, and they said,

9   yes, you can do it.  You have to sign a waiver.

09:40:37   10   So four of my engineers, myself, went down and jumped

11   in an MRI and we started measuring our IVCs in different

12   locations.  We did it in a supine and in a prone position.  So

13   laying on your back, and then laying on your stomach.

14   And then we also did things where we beared down to

09:40:57   15   do a Valsalva maneuver, kind of like when you're pushing in,

16   like doing a bowel movement or if you cough.

17   So we did different things like that to try and learn

18   about the vena cava.

19   Q   And what sorts of things did you learn about the inferior

09:41:13   20   vena cava based on the research?

21   A   Yeah.  So the vena cava, it is unlike your aorta, which

22   is the main artery that blood comes -- leaves your heart and

23   goes out of.  The vena cava is a -- kind of like an oval

24   shape vessel.  It's -- it -- it's constantly changing shape

09:41:35   25   when you breathe.  And then when you bear down to do a

DIRECT EXAMINATION - MICHAEL RANDALL

09:41:38  1    Valsalva maneuver, you're actually able to flatten out your

2    vena cava.

3              So those are some of the things that we learned from

4    that.

09:41:48  5    Q    And, Mr. Randall, if the jury has heard some implications

6    in this trial that Bard did not understand the dynamics of the

7    inferior vena cava, how would you respond to that?

8    A    I would say Bard is, in my opinion, the leading expert in

9    vena cava.  They were the first to come out with a

09:42:09 10    retrievable vena cava filter.  They understand the dynamics

11    to the best they could, given the technology that's available

12    at that time.

13              So I say even to this day I still believe we are the

14    leaders in this space.

09:42:27 15    Q    Is it fair to say that over the course of your 12 years or

16    so at Bard that your knowledge and Bard's knowledge of the IVC

17    has continued to grow?

18    A    Yes.  Absolutely.

19    Q    I think you mentioned this a moment ago, but are you able

09:42:39 20    to do things today that you couldn't have done 12 years ago to

21    learn about the IVC?

22    A    Yes.  There's different technologies, different imaging

23    that's available.  And there's different things you can do to

24    learn about the IVC.  So as time moves forward, you learn

09:42:58 25    more.  And you take what you learn and you make improvements.

DIRECT EXAMINATION - MICHAEL RANDALL

09:43:03  1   Q   And have you taken the information that you have learned

2   and tried to sort of bring that to the development of

3   different generations of IVC filters?

4   A   Yes.  As we learn new technologies -- also in

09:43:16  5   manufacturing processes.  There's different ways to

6   manufacture something, and then there's always new technology

7   on how to improve manufacturing.

8         So as we heard -- as we got new technologies to

9   manufacture, as we got new information about caval dynamics,

09:43:32  10  you're constantly trying to innovate and incorporate those

11  into your next generation filters.

12  Q   What sorts of challenges as far as the design of an

13  inferior vena cava filter is concerned do you run into as an

14  engineer who is trying to develop and improve the IVC filters?

09:43:49  15  A   You know, there's a lot of things that you have to

16  consider.  It's a balance of different attributes.  For

17  instance, in order for the filter to really stay in place, it

18  has to have radial strength.  So basically how strong the

19  filter pushes and exerts force against the vena cava.  That

09:44:09  20  keeps it from kind of from moving up and down.

21        Well, if it's too strong, what happens is, is the

22  filter can start going -- growing out of the cava wall.  I

23  guess the best analogy for that is kind of like you have a

24  fence and a tree next to it, and the tree wants to grow and

09:44:29  25  sometimes the tree will grow through the fence.  That's the

DIRECT EXAMINATION - MICHAEL RANDALL

09:44:32   1   same with the vena cava.  So if you have too much radial

       2   strength it could cause what we refer to as transmural

       3   incorporation, basically grow out of the vena cava wall.

       4   That's for radial strength.

09:44:44   5            There are other things that you have to consider,

       6   such as how you make your anchors.  So you want your anchors

       7   to be able to hold the cava in place -- excuse me, hold the

       8   vena cava filter in place, but you also want to make it

       9   retrievable so when you retrieve it, it pulls out.

09:45:02  10            So if you make an anchor that has a closed cell

      11   design, closed cell design means all sides are attached, and

      12   then you get tissue incorporation over it, then when I go to

      13   pull it, I have to shear off that material.  So you're kind of

      14   limited to an anchor that is not a closed cell design.  That

09:45:21  15   way, when you pull it out, it's like taking a sock off almost.

      16   You don't rip the tissue.  So that's like, you know, radial

      17   strength, anchors.

      18            And then --

      19   Q   Let me stop you for just a second.  When you're talking

09:45:35  20   about these anchors, are you talking about what might be

      21   described as the hooks at the bottom --

      22   A   Yes.

      23   Q   -- of the filter?

      24   A   Yes.

09:45:42  25   Q   Okay.  Because the jury's heard some about caudal anchors

DIRECT EXAMINATION – MICHAEL RANDALL

09:45:44   1   and then also anchors like the hooks.  And can you distinguish

2   between those two things?

3   A   Well, we refer to caudal anchors as an anchor that points

4   downward.  And it's an anchor that's designed to keep the

09:45:58   5   filter from moving in the down direction.

6           And the cranial anchor points upward, so when it

7   grabs tissue it prevents it from moving upwards.  But it's

8   flexible enough that when you retrieve it, it will release.

9   So there's kind of a fine balance there.

09:46:15   10   Q   When you are designing a retrievable filter, what are some

11   of the issues you run into as far as the thickness of the arms

12   and legs and the structure of the filter?

13   A   Yeah.  If the filter is too thick, that affects the

14   radial strength; it can be too strong, it can be bulky and

09:46:34   15   have a lot of material.  It can be hard to retrieve.  If

16   there's too much thickness material in there it could also

17   cause a negative effect and can be thrombogenic, meaning it

18   could want to cause a clot.  So you've got to be careful with

19   that.

09:46:53   20   Q   And how about the span or the width of the legs or arms of

21   filter, what issues did those bring to the table?

22   A   Yeah.  So the span is essentially, you know, the width of

23   the filter, of the arms.  You make it too small, you can run

24   into issues where you can get some tilting or you can get

09:47:11   25   some movement up.

DIRECT EXAMINATION - MICHAEL RANDALL

09:47:12  1        If it's too big, then I'm making this angle in the

2    neck too flat, and then if I have deflection it could cause

3    increased stresses.

4        So there's things to consider when you look at the

09:47:25  5    dynamics of the cava, you look at residual stresses or cyclic

6    stresses in the neck.

7        So like I'd said, it's a fine balance.

8    Q   And what are the types of things that Bard has done in

9    order to address some of these challenges?

09:47:43  10   A   On the filters?

11   Q   Yeah.  By that, I mean as far as developing methods of

12   testing and developing new products.

13   A   So, I mean, we came up with this -- the test that really

14   strikes me the most is probably one of the tests I'm really

09:47:59  15   proud of.  It's -- we came up with this test, and it's a tube

16   that we have simulated cava tissue in.  And we pressurize it,

17   causing the cava to flatten out.  But then also with this

18   tube, we have pistons hooked up to it and we can cause the

19   tube to stretch and collapse.

09:48:19  20       So what we do is we put filters in it and we try to

21   make them tilt, move up, move down, and then we use that test

22   to design filters that resist, you know, tilting, moving up

23   and down.

24       So that is kind of one of the -- one of the really

09:48:38  25   novel tests that no manufacturer has that we put together to

DIRECT EXAMINATION - MICHAEL RANDALL

09:48:42   1   help us design next generation filters.

2   Q   Mr. Randall, let's talk a little bit about the projects

3   that have gone on at Bard as far as filters are concerned.

4   And this case involves an Eclipse filter.

09:48:57   5           And can you tell the jury when the project to design

6   the Eclipse filter kind of kicked off?

7   A   I believe Eclipse kicked off in 2008, 2009 time frame,

8   around there.

9   Q   And before the Eclipse, was the product that was on the

09:49:13  10   market the G2X?

11   A   Yes, it was.

12   Q   And before that, was it the G2 filter?

13   A   Yes, it was.

14   Q   And so when you got to Bard, did you do some looking back

09:49:26  15   to kind of review documents and figure out what had been done

16   before you arrived as far as the development of filters?

17   A   Yeah.  I looked at the G2 folder because that was the

18   predicate device, and then we're making enhancements to that.

19   So I looked at the design history file there.

09:49:47  20   Q   And, very briefly, can you tell us what some of the other

21   projects are that you worked on as far as either filters that

22   were developed for the market or potential filters that didn't

23   make it?

24   A   Oh, yeah.  There were quite a bit.

09:50:01  25           So there's G2X, that was the first one I was on.

DIRECT EXAMINATION - MICHAEL RANDALL

09:50:05  1    There was also G3, which was the next generation platform.

2    There was a project called G2 Platinum, then Eclipse, and then

3    simultaneously there was the Meridian filter, and then also

4    the Denali filter.

09:50:24  5            MR. ROGERS:  And can we pull up Exhibit 8482, please.

6    BY MR. ROGERS:

7    Q   Mr. Randall, on your screen right now you have got a

8    timeline that shows the various dates of the development of

9    the projects that you were just describing.

09:50:45 10            Was this timeline made at your direction?

11   A   Yes, it was.

12   Q   And did you have input in the creation of this timeline?

13   A   Yes, I did.

14   Q   And would this timeline assist you in describing for the

09:50:57 15   jury when these various projects were taking place?

16   A   Yes.

17            MR. ROGERS:  Your Honor, at this time I move that we

18   be allowed to display this timeline for demonstrative

19   purposes.

09:51:08 20            MR. STOLLER:  No objection.

21            THE COURT:  You may.

22   BY MR. ROGERS:

23   Q   All right.  Mr. Randall, let's kind of go through these a

24   little bit one by one.  And over there on the far left we can

09:51:17 25   see that there is the Recovery filter.

DIRECT EXAMINATION - MICHAEL RANDALL

09:51:19  1          Do you see that?

2     A    Yes, I do.

3     Q    And you obviously did not work on the Recovery filter.

4     A    No, I did not.

09:51:25  5     Q    But does this accurately represent about when the Recovery

6     filter was in development?

7     A    Yes.  Development to commercialization.

8     Q    And then the next one we have is the G2 filter.  Again,

9     you didn't work on that; right?

09:51:38  10    A    No, I did not.

11    Q    But do you think that this timeline accurately reflects

12    the time period where the G2 filter was under development?

13    A    Yes, I do.

14    Q    And so the next thing we see is a time point in April of

09:51:50  15    2006 for the G3 filter.

16          Do you see that?

17    A    Yes.

18    Q    And can you describe that project for the jury?

19    A    The G3 filter was essentially the next generation vena

09:52:04  20    cava filter.  The team was allowed to make changes to

21    thicknesses, shapes, anchors, and they really were trying to

22    benchmark against all of the other filters there.

23          And this particular filter project, it was

24    anticipated there would be a clinical study for this because

09:52:30  25    it was kind of like a really big revamp or a complete platform

DIRECT EXAMINATION – MICHAEL RANDALL

09:52:34   1   design.

2   Q    And so what happened with that project?

3   A    There were some animal studies conducted.  And based on

4   the results of the animal studies, we saw increased

09:52:46   5   penetration in animals.  So that project was put on hold

6   indefinitely.

7   Q    Well, the next thing we have is the G2X.  And I believe

8   you told us that you did work on that project?

9   A    Yes, I did.

09:52:58   10   Q    And does this accurately represent the time period where

11   the G2X was being developed?

12   A    Yes, it does.

13   Q    All right.  And so let's move on to the Platinum project.

14        And can you tell us about that?

09:53:12   15   A    So the Platinum project, we were going to take the G2X

16   filter, and we started looking at things initially with

17   improving fatigue resistance, and then at the very beginning

18   of the project we were thinking about, okay, what can we do

19   for improving migration resistance caudally, and improve

09:53:37   20   tilt.  So when we initiated this project we were going to

21   terminally electropolish the filter.  So terminally means

22   it's the last step.  And then we put it in an electropolish

23   bath and that would help improve fatigue resistance.  That

24   was the main goal.  But we never got past that step and that

09:53:59   25   project was put on hold.

DIRECT EXAMINATION - MICHAEL RANDALL

09:54:02  1   Q   And just so we're clear, when you say "terminally," do you

2   mean that the entire filter at the end of manufacturing

3   process would be electropolished?

4   A   Yes.

09:54:11  5   Q   And what was your role with this project, the Platinum

6   project?

7   A   Initially, I kicked it off as the project leader, and

8   then kind of provided support for the oncoming project

9   leader.

09:54:25  10  Q   And, Mr. Randall, the jury's heard a little bit about

11  electropolishing, but could you remind us what that is.

12  A   Sure.  Electropolishing is like an electrical chemical

13  process, and what it does is it removes fine micro

14  imperfections off of the surface of Nitinol.  If you were to

09:54:43  15  look at it with an unaided eye, you couldn't tell the

16  difference.

17          And then when you do this process, it will actually

18  make the Nitinol shiny like silver or platinum.  That's why it

19  was called Platinum, because we were going to terminally

09:54:58  20  electropolish.  But it basically removes micro imperfections

21  to help improve fatigue resistance.

22          MR. ROGERS:  Scott, can we take this down and pull up

23  Exhibit 4430.

24          And, Your Honor, may we publish?  This is in

09:55:13  25  evidence.

DIRECT EXAMINATION - MICHAEL RANDALL

09:55:18  1          THE COURT:  Hold on just a second.

2          THE COURTROOM DEPUTY:  4430 is admitted.

3          THE COURT:  Yes, you may.

4          MR. ROGERS:  Oh, I'm sorry.  Thank you.

09:55:25  5     And can you go to the second page, please.

6          Next page.

7          Here we go.

8          And can you pull that out, those two pictures.

9          Thank you.

09:55:38  10  BY MR. ROGERS:

11  Q   And so, Mr. Randall, if you would, kind of take us through

12  what we're seeing here and describe for us about the

13  differences between the two photos.

14  A   Yeah.  So the image to the left, the nonelectropolished

09:55:51  15  wire, you can see on that surface there, there's kind of like

16  some blemishes of the Nitinol.  And this is really normal

17  from extrusion.  And these are polished mechanically.  If you

18  were to look at this with an unaided eye, you wouldn't see

19  these.  But this is, you know, 20 micron, micrometers.  If

09:56:14  20  you look at the scale on the bottom, that little black line,

21  the 20 micrometers there, that's like point -- I'll put it in

22  terms of inches.  It's like .0008.  So, I mean, it's small.

23  So that kind of gives you the relative scale how zoomed up we

24  are.

09:56:30  25          The image on the left is that same wire after you

DIRECT EXAMINATION – MICHAEL RANDALL

09:56:34  1   undergo an electropolishing process.  And what it does is it

2   really smooths out those imperfections.  And the reason that's

3   important is because, you know, when you have any type of

4   cyclic loading, typically cracks or fatigue start at

09:56:56  5   imperfections.  So the smoother you can make it, the more

6   fatigue resistant the material will be.

7   Q    And before we move on from this, were these photographs

8   taken with a microscope?

9   A    It was taken with a scanning electron microscope.  So

09:57:11 10   that is probably one of the most powerful microscopes.

11   Q    And before you started working on the project to

12   electropolish an IVC filter, had you had previous experience

13   with other medical devices and electropolishing?

14   A    Yeah.  So I have a really strong background in Nitinol

09:57:31 15   implantable devices.  Previously at my other employer I

16   worked on stents, Nitinol self-expanding stents, and those

17   stents had electropolishing on it.  So I was very familiar

18   with electropolishing.

19   Q    And you mentioned this a moment ago, but was the goal of

09:57:53 20   electropolishing to improve fatigue resistance?

21   A    Yes, it was.

22   Q    And did you believe that electropolishing would completely

23   eliminate any potential fracture with IVC filters?

24   A    No.  We did not believe that.  I think -- and I've got a

09:58:11 25   lot of experience in this industry.  Anything that you

DIRECT EXAMINATION - MICHAEL RANDALL

09:58:16  1    implant that sees a dynamic load, whether it's stents, it's

2    vena cava filters, balloon expandable stents, they will

3    exhibit fracture.  There's no such thing as a fracture-proof

4    product like that.  Now, very small amount of fracture, but

09:58:35  5    still.  To eliminate it completely, no, we do not believe

6    that.

7    Q    And what sorts of issues did you run into when -- with the

8    project Platinum that -- where you were trying to

9    electropolish the entire filter at the end of the

09:58:50  10   manufacturing process?

11   A    Yeah, so the Platinum project, like I said, this

12   electropolishing process removes a small amount of material.

13   So what was happening since we were doing it at the end of

14   the process, the electropolishing electrolyte was getting

09:59:09  15   inside the apex of the filter where we have the snare tip

16   that's welded on and it was eating away the welds.

17        So what we introduced was a new failure mode where we

18   compromised the weld.  So once we saw that, we stopped that

19   project.  We could not terminally electropolish that

09:59:29  20   particular filter.

21   Q    And did the Platinum filter as you described it, did it

22   make it out of the concept phase?

23   A    No, it did not.

24   Q    And so did Bard decide to pursue other efforts to try to

09:59:43  25   employ electropolishing in its filters?

DIRECT EXAMINATION - MICHAEL RANDALL

09:59:46  1  A   Yeah.  It was at that time where we were then kicked off

2  the Eclipse project.  And --

3  Q   Let me interrupt you for just a minute, Mr. Randall.  I'm

4  sorry.

09:59:55  5          MR. ROGERS:  Can we take this down and go back to the

6  timeline, 8482, please.

7  BY MR. ROGERS:

8  Q   Okay.  So --

9          MR. ROGERS:  And can you connect up the Platinum and

10:00:06  10  the Eclipse work there?

11          THE COURT:  Can you display that, Traci.

12          MR. ROGERS:  I'm sorry.  Yeah, can we display that.

13  BY MR. ROGERS:

14  Q   Okay.  So when did Bard end the Platinum project and start

10:00:22  15  the Eclipse project?

16  A   It was the August 2009 time frame.

17  Q   And can you tell the jury what was going to be different

18  about the work you were going to do to develop the Eclipse

19  filter versus what you had already done with the Platinum

10:00:36  20  filter?

21  A   Yeah.  So once we realized we couldn't terminally

22  electropolish the entire filter, what we decided to do is

23  let's take a shot at electropolishing every single component.

24  So there's 12 wires that make up six arms, six legs, and then

10:00:55  25  there's also a tip.  So we were going to electropolish every

DIRECT EXAMINATION – MICHAEL RANDALL

10:00:59  1   single component separately and then assemble it together.

2              MR. ROGERS:  Can we take this down and pull up

3   Exhibit 8575.

4              Your Honor, this is admitted.  May we publish?

10:01:30  5              THE COURTROOM DEPUTY:  Yes, it's admitted.

6              THE COURT:  Yes, you may.

7   BY MR. ROGERS:

8   Q    Okay.  Mr. Randall, what is this document?

9   A    This is the cyclic fatigue testing of electropolished

10:01:39 10   vail filter wire.  Vail is the internal code name for the

11   project which became Eclipse.

12   Q    And so was this the first step in order to try and start

13   the testing process for the Eclipse filter?

14   A    Yeah.  This is one of the -- the first steps to really

10:01:55 15   see is electropolish going to go help out.  So that's why we

16   conducted this test.

17   Q    Okay.

18              MR. ROGERS:  So let's go to page 5.

19              And up at the top there's a table there.  Would you

10:02:11 20   mind pulling that out, please.

21   BY MR. ROGERS:

22   Q    And just before we move into the table, can you describe

23   for us generally what this test was doing, how it worked.

24   A    Yeah.  So this was a cyclic fatigue test.  So essentially

10:02:29 25   we took wire, and imagine doing a bend test where we can push

DIRECT EXAMINATION – MICHAEL RANDALL

10:02:33  1    it up and down and cause the wire to basically flex.  Right.

2    And we did this -- we did these deflections to be -- I mean,

3    they were really challenging deflections, not like the

4    deflections you see in IVC.

10:02:50  5          And the reason you do this is because you want to

6    force a failure fast.  That way you can then come back and do

7    your improvement and see how does that one fail.  So it was a

8    test specifically designed to make the product fail as fast as

9    possible.

10:03:07 10    Q    In the table that we see, what were the two steps of wires

11    you were testing.

12    A    It was the G2X wire on electropolishing and the Eclipse

13    electropolished filter wire.

14    Q    And is the document that we see now, is this the protocol

10:03:23 15    for the wire testing?

16    A    Yes, it is.

17    Q    Okay.

18          MR. ROGERS:  So can we move that down, please, and

19    pull up Exhibit 8574.

10:03:32 20          And, Your Honor, may we publish?  This has been

21    admitted.

22          THE COURTROOM DEPUTY:  Yes.

23          THE COURT:  Yes.

24    BY MR. ROGERS:

10:03:47 25    Q    And, Mr. Randall, are these the -- the document that

DIRECT EXAMINATION - MICHAEL RANDALL

10:03:50  1    reports the tests of the wire fatigue tests that you were

2    describing earlier that reports results --

3    A    Yes, it is.  It's the test report.

4         MR. ROGERS:  And so let's go to page 10.

10:04:04  5         And how about pull out those two tables up there.

6    BY MR. ROGERS:

7    Q    And, so, Mr. Randall, if you would, how about explain to

8    us what the results of the test were.

9    A    Yeah.  So if you look at this top table and you look at

10:04:20 10   the third column, which says "mean cycles," that's

11   essentially the number of cycles it took to make that wire

12   fail given those really high forces that we put on high

13   deflections.  And what it showed is the G2X on average 194,

14   and then Vail or Eclipse, 345 to get that wire to fracture.

10:04:49 15   Q    And so how about Table 8 just below there?

16   A    Yeah.  So mean cycles to fracture resulted in a

17   77.4 percent increase.  If you look at the mean.

18   Q    So how did the electropolished wire stack up against the

19   nonelectropolished wire?

10:05:09 20   A    It was 77.4 percent better in fatigue performance with

21   these testing parameters here.

22   Q    So let's continue to move through some of the other

23   testing that you did.

24        MR. ROGERS:  And let's go now to Exhibit 8546.

25

DIRECT EXAMINATION – MICHAEL RANDALL

10:05:31   1   BY MR. ROGERS:

2   Q    And, Mr. Randall, can you see that on your screen?

3   A    Yes, I can.

4   Q    And just in general, can you just tell us what it is?

10:05:45   5   A    This is a memo documenting the rotary beam fatigue of

6   Nitinol wire.  So I believe there was some nonelectropolished

7   and also electropolished wire that was tested.  And it was

8   tested via a rotary beam, so.

9   Q    Let me stop you for just a second.

10:06:06  10        Was this document kept in the ordinary business at

11   Bard?

12   A    Was it kept -- I don't understand.

13   Q    I'm sorry.  Was this document maintained and kept in the

14   ordinary course of business at C.R. Bard?

10:06:20  15   A    Yes.

16   Q    And was it made at or near the time that Bard did this

17   test?

18   A    Yes.

19   Q    And was it Bard's regular practice in order to create this

10:06:28  20   document and maintain the document?

21   A    Yes.

22        MR. ROGERS:  Your Honor, I would now move 8546 into

23   evidence.

24        MR. STOLLER:  Your Honor, we object under 803(6).  I

10:06:40  25   don't believe under 602 this witness has the foundation to

DIRECT EXAMINATION - MICHAEL RANDALL

10:06:42  1    testify about the matters he just described.  And I'm happy to

2    address it more fully.

3              THE COURT:  Would you lay additional foundation,

4    please, on the witness's knowledge.

10:06:53  5              MR. ROGERS:  Sure.

6    BY MR. ROGERS:

7    Q    And, Mr. Randall, do you have personal knowledge of this

8    document?

9    A    Yes, I do.

10:06:59 10    Q    And would you have been involved in the creation of this

11    document?

12    A    Yes.  I basically worked with Andrzej when he put this

13    together.

14    Q    And can you attest here today that this document was

10:07:10 15    maintained in the ordinary course of Bard's business?

16    A    Yes.

17              MR. ROGERS:  Your Honor, I would move it into

18    evidence.

19              MR. STOLLER:  Your Honor, under 803(6)(E), we

10:07:20 20    challenge that they're not able to show that the source of the

21    information or method or circumstances of the preparation

22    indicate that there's a lack of trustworthiness with respect

23    to this document.

24              THE COURT:  Well, that's your burden.

10:07:32 25              MR. STOLLER:  I understand.  Can I voir dire the

VOIR DIRE EXAMINATION - MICHAEL RANDALL

10:07:33  1    witness?

2              THE COURT:  Sure.

3              MR. STOLLER:  I'll do it from here.

4                 V O I R   D I R E   E X A M I N A T I O N

11:19:09  5    BY MR. STOLLER:

6    Q    Mr. Randall, are you the author of this document?

7    A    No.  Andrzej is.

8    Q    And if you look on the first page, it has a TD number at

9    the very top; correct?

10:07:47 10    A    Correct.

11    Q    And there are question marks at the end of that?

12    A    Correct.

13    Q    Indicating it is not done; you don't know what number this

14    has been assigned.  Correct?

10:07:55 15    A    Correct.  This draft here.

16    Q    This is a draft document; correct?

17    A    This is.

18    Q    And if we look under the "from," there is no indication of

19    who it is from; correct?

10:08:05 20    A    Correct.

21    Q    And if we go to the last page of the document it's

22    unsigned.

23              MR. STOLLER:  Could we go to the last page, please,

24    I'm sorry, the signature page.

25

DIRECT EXAMINATION - MICHAEL RANDALL

10:08:16   1   BY MR. STOLLER:

2   Q   Unsigned; correct?

3   A   Correct.

4   Q   You have processes in place at Bard for the review and

10:08:25   5   finalization of test reports.  True?

6   A   True.

7   Q   They're reviewed by people who sign off on them.  True?

8   A   Correct.

9   Q   Okay.  And this report does not have any have those

10:08:35   10   indicia that it went through that process.  True?

11   A   True.

12        MR. STOLLER:  No further questions, Your Honor.

13        THE COURT:  Anything further, Mr. Rogers?

14        D I R E C T   E X A M I N A T I O N   (RESUMED)

10:08:43   15   BY MR. ROGERS:

16   Q   Mr. Randall, is this the only document that you're aware

17   of that would relate to the rotary beam test that you were

18   describing?

19   A   Yeah, this is the only one that I know of.

10:08:55   20        THE COURT:  All right.  Let's approach for a minute

21   Counsel.

22        Feel free to stand up, ladies and gentlemen.

23     (Bench conference as follows:)

24        THE COURT:  Mr. Stoller, if he testifies he was

10:09:15   25   involved, he knows it was created, he knows it was related to

DIRECT EXAMINATION - MICHAEL RANDALL

10:09:17  1   a test that he was involved in, and it was kept in the

2   ordinary course of business, what's the lack of

3   trustworthiness for business records purposes?

4          MR. STOLLER:  Your Honor, there's a couple of

10:09:27  5   problems I have with this document.

6          One is that we've not objected to the entry of tests

7   generally where it's been through the process he just

8   described, which is that they go through that process to

9   ensure that it is accurate, which is one of the indicia of

10:09:42  10   trustworthiness, why business records are business records and

11   they're allowed to come in --

12          THE COURT:  Let me interrupt you.  That's not

13   correct, in my view.  There is no requirement in the business

14   records exception that there be some internal trustworthiness

10:09:56  15   evaluation that there is for purposes of a test result.  It's

16   a different question.  It's trustworthiness for purposes of

17   whether or not it's a business record.

18          MR. STOLLER:  I'm not disagreeing with Your Honor.

19   I'm saying that the other elements of the business record

10:10:10  20   exception are to meet that indicia of trustworthiness, which

21   is why the exception in (E) exists, which is that if I can

22   come in -- if they can establish (A) through (D), which would

23   get them past the preliminary hurdle we have with most hearsay

24   documents, right, which is a --

10:10:25  25          THE COURT:  Right.

DIRECT EXAMINATION - MICHAEL RANDALL

10:10:25   1        MR. STOLLER:  -- concern about lack of

2   trustworthiness, I can come in and challenge it and

3   demonstrate it doesn't have proper indicia of it.

4        My point being their processes, their internal

10:10:35   5   processes that get them to this is a regularly kept

6   business -- regularly kept record in the course of their

7   business --

8        THE COURT:  Pardon me for interrupting.

9        That's where I'm having a problem.  I don't think

10:10:48  10   their internal processes for validating test results are

11   internal processes for determining whether or not this is a

12   business record.  You seem to be conflating the two.

13        MR. STOLLER:  I am, and intentionally so, and I don't

14   mean to be conflating them.  I believe they're one in the

10:11:01  15   same, which is, is you have their process of -- I don't

16   believe this is a regularly maintained business record.  It's

17   not relating -- again, it is not a final report.  Their

18   regularly maintained business records are consistently final

19   reports that have been through this process.

10:11:15  20        This is a document that is pulled -- and I will tell

21   you, Your Honor, I went through -- after they identified it, I

22   went through -- this is the only version.  There's no final

23   version anywhere.  There is no metadata associated with this

24   particular piece of -- this particular exhibit that I can find

10:11:32  25   anywhere.  It's not clear where it came from.

DIRECT EXAMINATION - MICHAEL RANDALL

10:11:34   1         It's not part of this project, the Eclipse filter

       2   we're talking about here.  It has a number associated with an

       3   entirely different project.  So where it came -- it doesn't --

       4   I don't think that they've established that it meets the -- it

10:11:50   5   is a regularly maintained business record in the sense that it

       6   is kept as part of -- and I've distinguished from they have an

       7   obligation for each of these devices to maintain a design

       8   history file, as you know and you've heard.

       9         This is not part of the design history file of any of

10:12:04  10   the devices that went to market.  It's a record that was

      11   gathered from somewhere.  And sitting here, not every record,

      12   just because it's maintained, is a business record just

      13   because it is somewhere in the bowels.  It has to meet those

      14   indicia that are part of (A) through (D) that it is such that

10:12:18  15   we can -- you can -- you can offer it in evidence over a

      16   hearsay objection.

      17         And I think for the reasons we've articulated, this

      18   particular document has not been through the processes that it

      19   gets to those files.

10:12:30  20         THE COURT:  Okay.  Did you have more to say?

      21         MR. STOLLER:  I do not, Your Honor.

      22         MR. ROGERS:  Your Honor, it is a draft, but I think

      23   we've established it is maintained in the ordinary course of

      24   business at Bard.  It's the only document Bard has been able

10:12:44  25   to locate for this particular test.

DIRECT EXAMINATION - MICHAEL RANDALL

10:12:45  1      We've admitted scads of documents in this case that

2   are drafts.  And if we're going to enter a standard where

3   draft documents are not considered regularly kept business

4   records, I think that could be an interesting new twist on

10:13:03  5   things.

6           It's there in the files at Bard.  And the witness has

7   testified that it's maintained in the ordinary course.

8           THE COURT:  All right.  Any other points?

9           MR. STOLLER:  No, Your Honor.

10:13:13  10          THE COURT:  Okay.  My conclusion is that Mr. --

11  what's his name?

12          MR. ROGERS:  Randall.

13          THE COURT:  -- Mr. Randall is a qualified witness for

14  purposes of 803(6)(D).  He has testified that the elements of

10:13:29  15  803(6)(A), (B), and (C) exist.  The jury can choose to believe

16  or disbelieve him.  But I think that's enough to establish

17  those four elements if the jury accepts it.  That's the

18  standard for authentication of admission.

19          The question then is whether the points you've made,

10:13:45  20  Mr. Stoller, that it wasn't completed or made a final version

21  and put into the regular testing files of Bard makes the

22  document untrustworthy for purposes of the business records

23  exception, and I do not think it does.  I think he has laid

24  sufficient foundation for it to be admitted.  And everything

10:14:05  25  you just pointed out goes to the weight, not the

DIRECT EXAMINATION – MICHAEL RANDALL

10:14:09  1   admissibility.

2           MR. STOLLER:  I'll cross-examine him on it,

3   Your Honor.

4           THE COURT:  So I will overrule the objection.

10:14:14  5       (Bench conference concludes.)

6           THE COURT:  Thank you, ladies and gentlemen.

7           The objection is overruled, and 8546 is admitted.

8       (Exhibit 8546 admitted.)

9           MR. ROGERS:  Thank you, Your Honor.

10:14:27 10           May we publish the document?

11           THE COURT:  Yes.

12   BY MR. ROGERS:

13   Q   And, Mr. Randall, if you would, I think at one point you

14   were about to tell the jury about this particular test, the

10:14:41 15   rotary beam test, and I stopped you.  And so let me ask you

16   again to tell us about that.

17   A   Yeah.  So rotary beam fatigue, to explain the test, it's

18   a kind of interesting test.  So if you take a wire, okay, if

19   I have a wire and if I bend it, this outside surface is in

10:15:02 20   tension.  The inner surface is in compression.  Right?

21           So now if I hold the wire, and, say, I have some

22   pulley here and I have this radius made, on this end I hook

23   up, say, like a drill.  On this end I have a free spindle.

24   And I rotate the wire with this drill so the wire is just

10:15:21 25   constantly rotating.  Then the outside surface/inside surface

DIRECT EXAMINATION – MICHAEL RANDALL

10:15:26   1    is alternating back and forth.  So that's why it is called

2    rotary beam fatigue.  So I'm flexing it in tension,

3    compression, tension, compression.

4          And then the pulley size that I use, I use different

10:15:40   5    size pulleys.  The different size pulleys account for the

6    different strains I put on the wire.  So I'll run it at a

7    particular strain and I'll run it for certain amount of cycles

8    and see how many breaks.

9          Then I change out the pulley to increase strain, see

10:15:58  10    how many breaks.  And then I increase it again and increase it

11    again.  And what I'm ultimately looking for is the endurance

12    limit of the wire.  So basically the maximum strain limit I

13    can induce in that wire.

14          And that's the purpose of a rotary beam fatigue test.

10:16:17  15    Q   And you mentioned that you're looking at the endurance

16    limit.  Can you tell us a little bit more what that means?

17    A   So endurance limit, it's essentially -- for Nitinol based

18    products, the product, how fatigue resistant the product is,

19    you deal with strain.  How much can I basically bend it.

10:16:37  20    Strain it.  Strain is just bending it.

21          So the more I can strain it, if it can take more

22    strain before it fractures, that means you improve the fatigue

23    performance.  If it takes less strain, meaning I can only bend

24    it less, cycle it less, and then it fractures, that means it

10:16:56  25    is reduced fatigue limit.  So it's a material property that

DIRECT EXAMINATION – MICHAEL RANDALL

10:17:01  1    I'm looking at right now.

2          MR. ROGERS:  And, Scott, would you pull out the table

3    that's at the bottom of the page.

4          Thank you.

10:17:08  5    BY MR. ROGERS:

6    Q    And, Mr. Randall, if you would, tell us what are the wires

7    that you were testing?

8    A    Looks like there's some Johnson Matthey control wire,

9    which I believe is probably the regular G2, G2X type of

10:17:28 10   wires.  Then we have some Eclipse wires that were tested in

11   different diameters.

12         MR. ROGERS:  So let's go to page 3 and look at the

13   conclusion.  And would you pull that out.

14   BY MR. ROGERS:

10:17:44 15   Q    And, so, Mr. Randall, tell us what the results of this

16   test were.

17   A    Yeah.  So this says all the tested wires can be

18   considered equivalent or better than the control wire at

19   .65 percent strain level.

10:18:00 20        MR. ROGERS:  And if you would, would you take that

21   down, Scott, and I believe there's some additional information

22   in the preceding paragraph.  Would you pull out that

23   paragraph, please.

24   BY MR. ROGERS:

10:18:08 25   Q    And, Mr. Randall, can you explain this to us.

DIRECT EXAMINATION - MICHAEL RANDALL

10:18:13  1    A    Yeah.  If you go to --

2    Q    You want that last sentence highlighted?

3    A    It's the last sentence that you would want to highlight.

4    Q    Okay.

10:18:30  5    A    Yeah.  And since no actual data exists due to the limited

6    number of samples available for testing, the endurance limit

7    of the RD08, that's the G2 one, can be conservatively

8    estimated at .65 percent strain.  And then the endurance

9    limit of electropolished wires can be conservatively

10:18:53  10   estimated at .85 percent strain.

11            So the improvement, the regular unelectropolished

12   wire, you can flex it .65, .65 percent strain.  And then

13   when -- and over and over again and it should be fine.  Right?

14   If you go past that, then you'll run into fracture.

10:19:18  15           The electropolished wire can be cyclic fatigue and

16   strain more than that to go .85.  And if you go past that,

17   that's when you can run into fracture.

18   Q    And so if you were to express the -- how would you compare

19   the .65 percent to the .85 percent, in a percentage how those

10:19:43  20   two things compare to each other from a percentage performance

21   standpoint, what would that be?

22   A    So the percent increase in improvement of going to

23   electropolishing results in 30 percent.  So 30 percent

24   improvement in the fatigue endurance limit of the wire.

10:20:07  25           MR. ROGERS:  Okay.  Would you pull that down, please,

DIRECT EXAMINATION - MICHAEL RANDALL

10:20:09   1    Scott, and let's pull up Exhibit 8373.

2              Your Honor, this has been admitted.  May we publish?

3              THE COURTROOM DEPUTY:  Yes.

4              THE COURT:  Yes, you may.

10:20:33   5    BY MR. ROGERS:

6    Q    Mr. Randall, can you tell us what this document is?

7    A    Yes.  This is the DV&V Vail filter arm fatigue

8    evaluation.

9    Q    And we looked at one arm fatigue test already.  And so

10:20:51  10   it -- what does DV&V stand for?

11   A    Design verification and validation.

12   Q    And, Mr. Randall, how does this test differ from the one

13   that we looked at previously?

14   A    The one that we looked at previously, we just took the

10:21:05  15   wire itself and flexed it.  This particular test here we

16   built whole filters out of and we tested the filter arm in

17   it.  So we made a filter, went and saw all of the processes

18   of forming, heat setting, shape, and so forth, and then we

19   fatigued it.

10:21:28  20   Q    And did you -- can you describe how you manipulated the

21   arm in order to test it?

22   A    Yeah.  So like I said, you know, with these tests here

23   you're trying to drive a failure soon.  Right?  And then you

24   want to see how it compares to the change you made.  So if

10:21:45  25   the arm naturally sits like this, what we did is we went to

DIRECT EXAMINATION - MICHAEL RANDALL

10:21:49   1   kind of a saluting arm where we bent it up.  Up, you know,

2   something that normally it would not see.  And we did this

3   type of flex test on it because we wanted to accelerate the

4   failure.  And then we test the change and see how it

10:22:06   5   performs.

6          MR. ROGERS:  Okay.  Scott, would you take that down

7   and pull up 8359.

8          Your Honor, this has been admitted.  May we publish?

9          THE COURT:  Yes.

10:22:27  10   BY MR. ROGERS:

11   Q   Mr. Randall, are these the reports that provided the

12   results of the DV&V arm fatigue testing you just described?

13   A   Yes, it is.

14          MR. ROGERS:  And can we go to page 9, please.

10:22:43  15          And let's pull out the -- I guess starting with the

16   box and whisker plot down to the chart that's there at the

17   bottom.

18   BY MR. ROGERS:

19   Q   And so if you would, Mr. Randall, can you tell us, please,

10:22:57  20   what the results of this test were?

21   A   Yeah.  So I would look at Table 7.  And I would look at

22   the third column, which says "mean cycles."  So that's the

23   mean cycles to failure.

24          And what it shows is that the Vail took 719 was the

10:23:18  25   mean, and then the G2X, which is a nonelectropolished wire,

DIRECT EXAMINATION — MICHAEL RANDALL

10:23:23  1   would take 440 cycles.  So it showed an improvement.

2   Q    So did the electropolished wire appear to have more

3   fracture resistance than the previous wire?

4   A    Yes, it does.

10:23:37  5        MR. ROGERS:  Okay.  Let's take that down and go to

6   document 8368.

7        And, Your Honor, I believe this is in evidence.  May

8   we publish?

9        THE COURT:  Yes.

10:23:51  10  BY MR. ROGERS:

11  Q    And, Mr. Randall, if you would, could you explain what

12  this test is.

13  A    Yeah.  So this is the DV&V flat plate fatigue and

14  corrosion examination of the filter.  This is also an

10:24:07  15  accelerated fatigue test, but unlike the previous tests that

16  were shown, this is not a test to failure.  This is a test

17  that you have to pass.  And this is one of the tests that is

18  required by the FDA agency when submitting for approval.

19        And the way this test works is, remember I said that

10:24:27  20  the vena cava is oval shaped?  So we had to utilize a test,

21  and we call it flat plate because we took a tube, because a

22  tube -- you don't get tubes extruded ovally, typically come

23  round.  But then we put them between two flat plates and you

24  smash it so it makes an oval, and then you load the filters in

10:24:50  25  and then you deflect it and then come back and forth.  So you

DIRECT EXAMINATION - MICHAEL RANDALL

10:24:53  1    have an oval, a smaller oval.  And that is why it's called

2    flat plate fatigue.  And you do it for a number of cycles and

3    it has to pass.

4         MR. ROGERS:  Let's go to page 7 of the document.  And

10:25:05  5    there's a section there called "Test Duration 12.3."  Would

6    you pull that out.

7    BY MR. ROGERS:

8    Q    And you mentioned the number of cycles.  And, Mr. Randall,

9    can you explain to the jury how you determined how many cycles

10:25:21  10   the filters would be put through for this test?

11   A    Yeah.  So based on guidance documents, standards in the

12   industry, the devices need to be accelerated age fatigue for

13   ten years equivalent.  And for this particular test here, we

14   were trying to mimic Valsalva maneuvers.  Remember, like I

10:25:46  15   said, if you bear down or if you cough, that can cause that

16   major deflection.

17        So, you know, we wanted to make it challenging.  So

18   one of the frequencies that -- the frequency we decided to go

19   with is someone who has coughing frequencies of 43 coughs per

10:26:09  20   hour.  And that is someone who is really, really sick and has

21   some respiratory issues.

22        So 43 coughs per hour, and if you take hours, you

23   know, 24 hours a day, how many days, 365 a year, you wind up

24   with -- if you can highlight the 3,700- -- it's the

10:26:39  25   second-to-the-last sentence to the left.

DIRECT EXAMINATION – MICHAEL RANDALL

10:26:42   1   Q    Second to last line?

2   A    Yeah.  Right there.

3        So that 3,766,800 cycles represents ten years of

4   coughing 43 times per hour over 24 hours.  You're not even

10:27:04   5   sleeping.  So, like, I'm assuming you're coughing 24 hours in

6   your sleep.

7        So it's probably more than ten years.  But then we

8   also round it up to 4 million just to have a round number.

9   And we had the device be deflected for these really -- you

10:27:25  10   know, the diaphragmatic type of deflections, and it had to

11   meet this requirement.

12   Q    And how does this test work so that you are using the flat

13   plates to squeeze the filter for an equivalent of ten years?

14   A    Yeah.  So, you know, it's hard to conduct accelerated

10:27:44  15   fatigue tests because the actual apparatus that's causing the

16   deflection could cause what we call fretting fatigue.

17   Basically, if I push something so fast it can't keep up.

18   This test was probably ran at 40 hertz, which means 40

19   deflections per second, and essentially it was taken at oval

10:28:08  20   with the flat plate and going to a smaller one per the

21   deflections that were defined that represented diaphragmatic

22   movement and pressures.

23        MR. ROGERS:  Okay.  Let's take that down and go to

24   document 8358.

10:28:25  25        Your Honor, this has been admitted.  May we publish?

DIRECT EXAMINATION – MICHAEL RANDALL

10:28:29   1          THE COURT:  Yes.

        2   BY MR. ROGERS:

        3   Q   And, Mr. Randall, are these the document that reports on

        4   the results of the flat plate testing?

10:28:37   5   A   Yes, it is.

        6          MR. ROGERS:  And if we could go to page 6 of the

        7   document, please.

        8   BY MR. ROGERS:

        9   Q   And under the "Results" section, can you tell us what the

10:28:49  10   results were, please.

       11   A   Yeah.  So November of 2009, all the filters were

       12   successfully pulsated to 4 million cycles, which is

       13   equivalent to ten years.  Probably greater than ten years.

       14   Q   So all the filters that were subjected to the flat plate

10:29:12  15   testing passed the test?

       16   A   Yes.

       17   Q   And if you would, let's move on down to 11.2.  And this

       18   says "Examination of Corrosion Resistance."  What does that

       19   mean?

10:29:22  20   A   In the guidance doc, there needs to be an examination of

       21   the filter surface to make sure we do not see any things like

       22   rust or anything like it's corroding.  There was an

       23   examination done and there was no evidence of corrosion

       24   present.

10:29:40  25          THE COURT:  We're going to break at this point,

DIRECT EXAMINATION – MICHAEL RANDALL

1    Mr. Rogers.

2              We will resume, ladies and gentlemen, at 10:45.

3          (The jury exited the courtroom at 10:29.)

4              THE COURT:  Counsel, the three exhibits that

5    plaintiff's counsel gave me related to Recovery filter related

6    deaths were 1032, 1722, and 2148.

7              I don't know if defense counsel have had a chance to

8    look at those three?

9              MR. NORTH:  We have, Your Honor.

10             THE COURT:  Do you have comments on those --

11             MR. NORTH:  In addition to the previous arguments we

12   made, we believe that the introduction of these three

13   documents would just trigger an enormous amount of prejudice

14   at this time, particularly on this last day of trial.  It's

15   going to give the appearance, when the jury sees those three

16   documents, that they're admitted, that the defense has been

17   hiding something.  We think it's a level of prejudice that we

18   cannot recover from.  And that these three documents singly or

19   together are overkill, given the very measured testimony of

20   Dr. DeFord, and the plaintiff's clear solicitation in that

21   deposition that he -- there had been pulmonary embolism

22   deaths.  And that is something they designated and was put in.

23             Alternatively, and we're not suggesting this as a

24   compromise, Your Honor, because we do not believe the door has

25   been opened, and to open it at this point is going to create

DIRECT EXAMINATION - MICHAEL RANDALL

10:31:29  1    insurmountable 403 prejudice --

2              THE COURT:  Before you go there for a minute,

3    Mr. North, the language that you identified from the DeFord

4    deposition, it's in a question that was asked --

10:31:43  5              MR. NORTH:  Right.

6              THE COURT:  -- doesn't have anything to do with

7    filter deaths.  It says:  So when Bard was weighing, do we

8    take this off the market, do we keep it on the market, and

9    you're telling me that Bard decided, well we need to go save

10:31:59 10   all these patients from these massive pulmonary embolisms that

11   are killing people all over the country, you had a device that

12   was already doing that; right?  You had the Simon Nitinol.

13             So it's not referring to filter deaths.  It's saying

14   Bard was going to save people from pulmonary embolism death.

10:32:19 15   That's the way I'm reading the question on page 41.

16             And the point is --

17             MR. NORTH:  Your Honor, you are correct.  I did

18   misread that reference to that.  I apologize.

19             THE COURT:  I wanted to make sure --

10:32:38 20             MR. NORTH:  I believe there were other sections where

21   they're bringing up serious migration incidents without the

22   word death.

23             But if I could lastly say as an alternative -- and,

24   again, we think the 403 prejudice is there for all of them,

10:32:50 25   but the alternative would be to only allow them to present the

DIRECT EXAMINATION – MICHAEL RANDALL

10:32:54  1    health hazard evaluation that provides a very sort of

2    scientific overview of the adverse events.  And if they are

3    allowed to do that, Your Honor, we have a couple more

4    documents that we would have put in with two of our previous

10:33:10  5    witnesses that we would then like to introduce in rebuttal.

6            THE COURT:  What are those documents?

7            MR. NORTH:  One would be the Dear Colleague letter,

8    that's Exhibit 5247, where Bard specifically sent out a letter

9    that was reviewed by the FDA to doctors advising them of these

10:33:31 10    deaths.  I think it's important that we be allowed to show we

11    warned about that and sent -- and made some effort to some

12    warn people --

13            THE COURT:  Is that the letter about deaths in

14    morbidly obese patients?

10:33:43 15            MR. NORTH:  Yes, Your Honor.

16            THE COURT:  All right.

17            MR. NORTH:  And the second one would be an FDA

18    contact report that came in at the last trial, that's

19    Exhibit 5239.  That is a contact report that if this issue had

10:33:52 20    been part of the trial beforehand we would have discussed with

21    Ms. Shari Allen, it was admitted in Booker, she authored this,

22    and it memorializes her conversations with the FDA about much

23    of this data they're trying to get in.

24            THE COURT:  Okay.  Any comments from plaintiff's

10:34:11 25    counsel?

DIRECT EXAMINATION - MICHAEL RANDALL

1      Mr. Clark.

2      MR. CLARK:  Your Honor, we don't think that these --

3  let me go to the podium -- three documents are overkill.

4  Obviously there are a number of documents.  We tried to select

5  ones that we thought were representative of the chronology in

6  that snapshot of the story.  I think that all three would be

7  appropriate and could be dealt with reasonably quickly.

8      So, again, and just to go back to this idea that this

9  was not a door we opened.  We did not present Dr. DeFord.  We

10  did not -- we had some designations in there, but that was in

11  response to what the defendants had put into evidence.  So we

12  feel like we need to be able to tell the other side of the

13  story.

14      THE COURT:  Okay.  I will keep thinking about this.

15  Thank you, all.

16      MR. NORTH:  Your Honor, should we have Mr. Carr

17  remain here still?

18      THE COURT:  Please.

19      MR. NORTH:  Thank you.

20      (Recess taken from 10:35 to 10:52.  Proceedings resumed

21  in open court outside the presence of the jury.)

22      THE COURT:  Thank you.  Please be seated.

23      All right, Counsel, let me give you my decision on

24  this issue.

25      I've looked at the three exhibits the defendants

DIRECT EXAMINATION – MICHAEL RANDALL

10:53:09  1   proposed.  I have reviewed again the DeFord excerpts and I've

2   reviewed my notes of the DeFord excerpts.

3         This is where I come down on the issue.

4         I continue to be of the view that deaths related to

10:53:25  5   the use of the Recovery filter are marginally relevant at best

6   in this case because of the fact that cephalad migration and

7   deaths related to cephalad migration largely stopped when the

8   Recovery filter ended, and were not present in any meaningful

9   degree in the G2, G2X, or the Eclipse.

10:53:51  10   The possibility that the deaths should have caused

11   Bard to recall the Recovery and therefore it wouldn't have

12   been the predicate for the G2, in my view, isn't a relevant

13   point in this case for reasons I stated in the order last

14   night.

10:54:06  15   However, I do agree that the complaint history with

16   the Recovery filter is a relevant point in the history of this

17   whole line of filters and is relevant for the jury to

18   understand.  I have not felt that the death component of that,

19   which, again, was largely eliminated with the G2, was

10:54:26  20   sufficiently relevant that it survived a 403 analysis.  I

21   thought the risk of unfair prejudice substantially outweighed

22   that limited relevance.

23         The question now is whether the testimony of

24   Dr. DeFord changes that balance.

10:54:41  25   What Dr. DeFord said specifically was in response to

DIRECT EXAMINATION - MICHAEL RANDALL

10:54:45   1   a question about whether, if Bard put patient safety at the

2   forefront, it should have stepped back from selling the

3   Recovery.  In other words, pull it off the market, I think is

4   what the question was.  And his answer was that he disagreed

10:55:06   5   because the evaluation at the time was, and now I'm quoting,

6   "That this technology was saving many more lives than it was

7   unable to save.  And by -- and if we took it off the market

8   and did not have that technology available, then that would

9   further increase the risk to patients versus decrease the risk

10:55:25   10   to patients."  That's the end of the quote.

11      I do believe that for the jury to accurately evaluate

12   that decision by Bard with respect to the Recovery filter, it

13   would be relevant for them to know there were reported deaths

14   related to the Recovery filter.  If that were the central

10:55:48   15   issue in the case, it would be absolutely critical evidence.

16   But the DeFord testimony does, in my view, suggest that

17   knowledge of death would better allow the jury to evaluate the

18   decision made in 2004 and 2005 as to whether or not the

19   Recovery should not be sold.

10:56:05   20      So the question then becomes whether that increased

21   relevancy from Dr. DeFord's testimony changes the 403 balance

22   that I've been reaching a number of times throughout the case.

23      I think reasonable jurors -- jurists could come to

24   different conclusions on this.  It's a close question, in my

10:56:28   25   view.

DIRECT EXAMINATION - MICHAEL RANDALL

10:56:28   1          But I continue to believe that death evidence

         2     presents a risk of unfair prejudice when it's by a method of

         3     migration that was not present in the G2, G2X, or Eclipse

         4     filters, and when it occurred five and six years before the

10:56:44   5     Eclipse filter that was implanted in this case.

         6          And whether or not Bard struck the right balance in

         7     dealing with Recovery complications at that point in time,

         8     although a relevant point on the history, is a remote relevant

         9     point on the history.  And the jury's ability to evaluate that

10:57:05  10     specific point, in my view, with this additional death

        11     evidence does not make that evidence so relevant that I come

        12     to a different conclusion on the 403 balancing.  I continue to

        13     think that the death evidence from a method of migration that

        14     no longer existed, a filter that no longer existed, which is

10:57:28  15     likely to elicit an emotional response, creates a danger of

        16     unfair prejudice that substantially outweighs the probative

        17     value of the evidence, even with Dr. DeFord's additional

        18     answer to that question.

        19          That's my best judgment on the question.

10:57:44  20          So I'm going to continue to stand by the decision

        21     I've been making, that the cephalad migration death evidence

        22     should not be admitted.

        23          That means I think you can have Dr. -- pardon me,

        24     Mr. Carr excused.

10:58:01  25          MR. NORTH:  Thank you, Your Honor.

DIRECT EXAMINATION - MICHAEL RANDALL

10:58:02  1        THE COURT:  We'll continue with Mr. Randall.

        2      (The jury entered the courtroom.)

        3        THE COURT:  All right.  Thank you, ladies and

        4   gentlemen, for your patience.  We're late getting you back in.

10:59:21  5   We were resolving an evidence issue that we needed to resolve

        6   before we finished the evidence.

        7            Please be seated.

        8            Mr. Rogers, you may continue.

        9            MR. ROGERS:  Thank you, Your Honor.

10:59:30 10            Your Honor, may I we publish 8358, which is in

       11   evidence and was on the screen?

       12            THE COURT:  Yes, you may.

       13            MR. ROGERS:  Thank you.

       14   BY MR. ROGERS:

10:59:38 15   Q   Mr. Randall, before we took our morning break, you were

       16   telling us about the portion of this document about corrosion

       17   testing.

       18            MR. ROGERS:  And if we could pull that back out.

       19   11.2.  Or, excuse me, not corrosion testing, corrosion

10:59:53 20   resistance.  I'm sorry.  And -- thank you.  Well, almost

       21   there.

       22            All right.  Perfect.

       23   BY MR. ROGERS:

       24   Q   And, Mr. Randall, in this particular paragraph there's a

11:00:05 25   couple of references to 40x.  Could you explain to the jury

DIRECT EXAMINATION - MICHAEL RANDALL

11:00:08   1   what that is?

2   A    That is the magnification that was used on the microscope

3   to evaluate these.

4   Q    And is that a scanning electron microscope or something --

11:00:21   5   A    Just a regular microscope.

6   Q    And based on the review with the microscope, did Bard see

7   any evidence of corrosion in the tested filters?

8   A    No.  No evidence of corrosion.

9   Q    All right.

11:00:36  10          MR. ROGERS:  Let's take that down and go to the next

11   paragraph, the 11.3.

12   BY MR. ROGERS:

13   Q    And, Mr. Randall, this says "Examination of weld strength

14   following cycling."  Can you tell us what that means?

11:00:49  15   A    Yeah.  So after the fatigue testing, what we then did is

16   we attached a five-pound load onto each filter appendage.  So

17   each arm and leg had to hold five pounds and not come off.

18   And it successfully passed that.

19   Q    Mr. Randall, I think you told us this earlier, but did all

11:01:13  20   12 of this Eclipse filters pass this test?

21   A    Yes, they did.

22   Q    And so what did that mean?

23   A    That meant that it passed the results to simulate ten

24   years of implant life.  Met the requirements for the DV&V

11:01:31  25   testing which we would use for this submission.

DIRECT EXAMINATION – MICHAEL RANDALL

11:01:33   1   Q   And after all of these various fatigue-related tests were

2   completed, what did Bard conclude regarding the Eclipse filter

3   and whether it had the potential to improve fatigue once it

4   was used in patients?

11:01:47   5   A   Yeah, so after the various fatigue testing and conducting

6   the flat plate, we concluded that electropolishing would, in

7   fact, help improve the fatigue resistance of the vena cava

8   filter.

9   Q   And did any of the electropolishing that was added to --

11:02:11  10   with the Eclipse filter, would that help improve migration,

11   tilt, or perforation?

12   A   No, it would not.

13   Q   And did Bard have other projects that were underway to try

14   to address those issues?

11:02:24  15   A   Yes, we did.

16        MR. ROGERS:  Scott, if you would, would you take that

17   down and bring back 8482.

18        And, Your Honor, this is the demonstrative.  May we

19   publish?

11:02:37  20        THE COURT:  Yes.

21   BY MR. ROGERS:

22   Q   Mr. Randall, we talked now about the Platinum and the

23   Eclipse projects, and those were the ones that related to

24   electropolishing; is that right?

11:02:46  25   A   Correct.

DIRECT EXAMINATION - MICHAEL RANDALL

11:02:47   1    Q    And let's talk about some of those other projects.  We

           2    have here also on the screen the Meridian project.  And can

           3    you tell us when that began.

           4    A    Meridian began in February of 2009.

11:03:01   5    Q    And how about the Denali project, when did it begin?

           6    A    August 2009.

           7    Q    So at some point around 2009 did you have four different

           8    filter projects that overlapped as far as they were being done

           9    at the same time?

11:03:17  10    A    Yes.

          11    Q    And, if you would, the Meridian project, what did the

          12    Meridian filter add that had not been in the previous filters?

          13    A    For the Meridian project, what we set out to do was to

          14    add features that would improve caudal migration resistance.

11:03:34  15    So there was some new types of anchors that we were exploring

          16    adding onto the filter at that time.

          17    Q    And how about the Denali project, how is it different?

          18    A    The Denali project was completely, completely different

          19    platform.  It's like the next generation platform.

11:03:55  20            That filter is constructed out of a single piece of

          21    Nitinol tubing, as opposed to the 12 wires that are welded.

          22    So you would take Nitinol tubing, laser weld the pattern into

          23    it.  Had penetration limiters on it, caudal anchors, cranial

          24    anchors, snarable tip, terminally electropolished.  So there

11:04:19  25    were a lot of manufacturing improvements that were implemented

DIRECT EXAMINATION - MICHAEL RANDALL

11:04:22  1   on this.  There was an advancement in technology.

2   Q   And did you plan to do a clinical trial involving the

3   Denali filter?

4   A   Yes.

11:04:35  5   Q   Did that ultimately come to pass?

6   A   Yes.

7   Q   Mr. Randall, let me ask you this:  The case that we're

8   here for today involves an Eclipse filter that was implanted

9   in August of 2010.  Did Bard have the technology and ability

11:04:54 10   to add caudal anchors onto Bard's filters that was ultimately

11   done with the Meridian project at that time?

12   A   No, we did not.

13   Q   And did Bard have the technology and ability to create a

14   filter completely out of Nitinol tubing like it did with the

11:05:14 15   Denali filter in 2010?

16   A   No, we did not.

17   Q   Mr. Randall, the jury has heard at various points in the

18   trial about a cascade of events.  And is that something that

19   you have heard of in the engineering world?

11:05:34 20   A   No, I have not.  The only time I've ever heard it is

21   preparing for this case.

22   Q   And when -- at certain points in time did Bard look to see

23   whether there was potentially some interrelatedness between

24   various failure modes like tilt, perforation, and fracture?

11:05:53 25   A   Yes, we did.

DIRECT EXAMINATION - MICHAEL RANDALL

11:05:54  1    Q    And what did Bard conclude about that?

2    A    The conclusion is that there is no cascade effect.  In

3    fact, when you look at Meridian, you know, initially there

4    was a hypothesis if you stop caudal migration that then leads

11:06:16  5    to stopping tilt, that leads to then potentially, you know,

6    reducing fracture.  That did not happen.

7         What happened with Meridian is we stopped caudal

8    migration.  But there was still fracture that happened.  Very

9    small amount.  Still some tilt.  Very small amount.

11:06:36  10        So the whole cascade effect, that did not exist.

11   Q    And in the current version of the Bard filter, the Denali,

12   the latest technology, do those same failure modalities happen

13   in the Denali filter?

14   A    Yes, they do.

11:06:52  15   Q    Are you aware of any filter on the market that does not

16   have reports of fracture, migration, or perforation?

17   A    I'm not aware of any filter on the market.

18   Q    Mr. Randall, is it the goal at C.R. Bard to reduce

19   complications as much as possible?

11:07:08  20   A    Absolutely.  You're always going to have complications,

21   and what we see is well below 1 percent and we're trying to

22   get it even lower.  Anything we can do -- introducing new

23   technologies, modifying processes to make improvements, we'll

24   do.

11:07:25  25   Q    And is it possible to completely eliminate things like

CROSS-EXAMINATION - MICHAEL RANDALL

11:07:28   1   fracture, tilt, perforation, migration?

2   A   No.

3   Q   And even though those things happen with an Eclipse

4   filter, did you believe the risks of the filter outweighed the

11:07:42   5   benefits of the Eclipse filter?

6   A   No.

7        MR. ROGERS:  Thank you, Mr. Randall.  I have no

8   further questions.

9        THE COURT:  Cross-examination?

11:08:09   10        MR. STOLLER:  Thank you, Your Honor.

11        I'll move the microphones a bit.

12             C R O S S - E X A M I N A T I O N

13   BY MR. STOLLER:

14   Q   Good morning, Mr. Randall.

11:08:16   15   A   Good morning.

16   Q   We've met before.  My name is Paul Stoller, I hope you

17   remember.

18        MR. STOLLER:  I would like to start, if we can,

19   exhibit with -- Gay, with the last exhibit we saw, which I

11:08:28   20   think is the demonstrative 8482.  If you would put that up,

21   please.

22        Could we display to the jury, Your Honor?

23        THE COURT:  Yes.

24   BY MR. STOLLER:

11:08:37   25   Q   Mr. Randall, I believe you just testified that this is

CROSS-EXAMINATION - MICHAEL RANDALL

11:08:41  1    something that accurately depicts the timeline of various

2    developments of the IVC filters at Bard; correct?

3    A    Yeah.  To the best of my knowledge, going back and

4    looking at documentation.

11:08:52  5    Q    And did you put this together?

6    A    I worked with the lawyers to put this together.

7    Q    So to the best of your knowledge this is accurate.  True?

8    A    True.

9    Q    You started at Bard in 2006.  True?

11:09:04 10    A    Correct.

11    Q    And you started working heavily in filters in about 2008.

12    True?

13    A    2007.

14    Q    Okay.  Fair enough.

11:09:11 15         So in 2006, the G2 was on the market when you came to

16    Bard; correct?

17    A    Correct.

18    Q    And you understood shortly after you became involved with

19    IVC filters that Bard had some problems with caudal migration.

11:09:29 20    True?

21    A    Shortly -- I didn't understand that we had problems.  I

22    knew we wanted to make enhancements to reduce any

23    complications that we're seeing.  So it was caudal migration

24    we were looking at, improve fatigue resistance, improving

11:09:47 25    tilt.  So it wasn't that I came in and felt there was issues,

CROSS-EXAMINATION - MICHAEL RANDALL

11:09:49  1    it's what's the next project, how do we make the project

2    better.

3    Q    Sir, I'm going to ask you yes or no questions.  If you can

4    answer yes or no, please answer yes or no.  If you can't

11:09:59  5    answer my question yes or no, just tell me I can't answer your

6    question yes or no, and I'll do my best, if I can, to rephrase

7    the question.  Is that fair?

8    A    Yes.

9    Q    So were you aware in 2006 that Bard had determined that

11:10:13  10    the G2 filter was suffering caudal migration at a rate that it

11    deemed unacceptable?

12    A    No, I was not aware.

13    Q    Okay.  Were you aware in 2008, when you began to work on

14    the G2 Platinum project, that Bard had, with the G2, suffered

11:10:31  15    caudal migrations at a rate that it deemed unacceptable?  Yes

16    or no?

17    A    I can't answer that yes or no.

18    Q    You can't answer whether you were aware in 2008 that that

19    determination had been made?

11:10:46  20    A    Yeah, because I don't know if that that determination was

21    made.

22    Q    Okay.  Fair enough.

23        Let's talk about 2008.  And I'm not going to put up

24    the exhibit, but you testified earlier in this trial about the

11:10:59  25    PowerPoint presentation about the effects -- I'm sorry, the

CROSS-EXAMINATION - MICHAEL RANDALL

11:11:04  1   results of the EVEREST trial.  Do you recall that?

2   A   Yes.

3   Q   And in the EVEREST trial, that was a closed study;

4   correct?

11:11:12  5   A   What do you mean by closed study?

6   Q   It had a defined patient population that was observed from

7   the time of implant until the time the study was concluded.

8   True?

9   A   I don't know if it had a defined patient population.

11:11:26 10   There was -- I believe cancer patients were allowed, patients

11   that had pelvic trauma.  So I'm not sure I understand what

12   you mean by closed.  It was a prospective study.

13   Q   Sir, I'm going to -- again, if you can't answer my

14   question yes or no, just tell me, say I can't answer that

11:11:44 15   question yes or no, and I'll do my best to rephrase.

16   A   Okay.

17   Q   All right?

18       The study you had with the EVEREST trial was 100

19   patients; correct?

11:11:55 20   A   I believe EVEREST was -- yes.

21   Q   And you knew who those patients were from the time they

22   had their filters implanted until the end of the study.  True?

23   A   I'm sorry, can you repeat that?

24   Q   You knew and identified the patients who had those filters

11:12:10 25   implanted and they were part of the study from the beginning

CROSS-EXAMINATION - MICHAEL RANDALL

11:12:13  1    until the end.   True?

2    A    Yes.

3    Q    So it wasn't a transient population of people in and out

4    and not knowing who was getting filters and who was not;

11:12:22  5    correct?

6    A    I cannot answer that question.

7    Q    It was a set group of people; you knew who they were.

8    True?

9    A    Yes.

11:12:29  10    Q    And of those, you followed -- were able to follow through

11    on 83.  You lost 17 somewhere along the way for various

12    reasons.   True?

13    A    I cannot answer that question.  I'd like to elaborate if

14    you'd let me.

11:12:48  15    Q    The final results you looked at in the PowerPoint

16    presentation that this jury saw earlier in this trial you

17    testified was about 83 patients.   True?

18    A    Okay, if you say so.  True.

19    Q    And of those 83 patients, you had 12 percent who had

11:13:01  20    caudal migration.   True?

21    A    I cannot answer that question because I don't remember

22    all those numbers off the top of my head.

23          MR. STOLLER:  Gay, could we pull up Exhibit 1222, I

24    believe.

11:13:20  25          And could you go to the page with the Venn diagram.

CROSS-EXAMINATION - MICHAEL RANDALL

11:13:27  1              There we go.

2      BY MR. STOLLER:

3      Q   We see under caudal migration, sir, there are four plus

4      three plus one plus two, so ten patients out of 83 who had

11:13:40  5      caudal migration in that observed study.  True?

6      A   True.

7              MR. STOLLER:  Can I publish this to the jury,

8      Your Honor?

9              THE COURT:  Yes.

11:13:49 10              MR. STOLLER:  Thank you.

11      BY MR. STOLLER:

12      Q   I'm not going to make you do math on the stand, but about

13      12 percent.

14      A   Appreciate that.  True.

11:13:56 15      Q   Would you agree?

16              And you saw in that same study that tilt was in 15 of

17      the 83; correct?

18      A   Correct.

19      Q   Again, not exact math but about 18 percent.  True?

11:14:04 20      A   Yes.  True.

21      Q   And you saw perforation existed in, looks like 12 plus two

22      plus three plus one.  So if my math is correct, that is 18 out

23      of the 83; correct?

24      A   Correct.

11:14:19 25      Q   Twenty-something percent.  23 percent.  Is that about

CROSS-EXAMINATION - MICHAEL RANDALL

11:14:22   1    right?

2    A    Sure.

3    Q    What we see in the middle of the chart is some numbers

4    where they overlap; right?

11:14:30   5    A    Correct.

6    Q    And you were -- you knew, at least no later than 2008 when

7    you had this PowerPoint presentation put together, those were

8    complications you saw in a closed group of identified patients

9    with this filter.  True?

11:14:46  10    A    True.

11              MR. STOLLER:  Gay, can we go back to the last

12    exhibit, please.

13              Your Honor, may we display again?

14              THE COURT:  Yes.

11:14:58  15    BY MR. STOLLER:

16    Q    This your timeline.  So at least by mid 2008 you knew

17    those things.  True?

18    A    Yes.

19    Q    Okay.  And at that time in mid 2008, you are the team

11:15:10  20    leader for the new project, the G2 Platinum; correct?

21    A    Correct.

22    Q    And your boss at the time, the head of research and

23    development, is Ms. Raji-Kubba.  True?

24    A    2008.  I believe so.

11:15:28  25    Q    In fact, she was your boss all the way through the

CROSS-EXAMINATION – MICHAEL RANDALL

11:15:30  1   development of the Eclipse.   True?

2   A    Actually, I never reported to her.

3   Q    She was the head of R&D, the head of your department.

4   A    True.

11:15:37  5   Q    If she wasn't your boss, she was your boss' boss; correct?

6   A    True.

7   Q    So when we look at this chart and we talk about when did

8   you -- you knew back at least as early as 2008 that caudal

9   migration was happening at 12 percent in an identified patient

11:15:53 10  population study by Bard; right?

11   A    Yes, I knew that data.

12   Q    And but you didn't start anything, at least here according

13   to this, to looking at changing the design or development of

14   that feature until February of 2009; right?

11:16:07 15  A    You're talking about for caudal?

16   Q    Yes, sir.

17   A    The G3 actually had elements for that.

18   Q    Okay.   Apparently you stopped that, didn't you?

19   A    Yeah.   That project.   It was not successful.

11:16:23 20  Q    And then there's a large gap there before we get to

21   February of 2009 when, in the Meridian, we start looking at

22   solving caudal migration.   True?

23   A    Yeah.   There was another idea of how to go about the

24   solution.

11:16:37 25  Q    Can you answer my question yes or no, sir.   It wasn't

CROSS-EXAMINATION - MICHAEL RANDALL

11:16:40   1   until February of 2009 before you started the work again on

2   trying to solve caudal migration?

3   A    Yes.

4   Q    And you knew, at least in mid 2008, that we had a

11:16:50   5   significant incidence of caudal migration in the EVEREST

6   study.    True?

7   A    Can you repeat that?

8   Q    You knew in mid 2008 that you had a significant incidence

9   of caudal migration in the EVEREST study.    True?

11:17:06  10   A    I cannot answer that yes or no.

11   Q    You can't say whether 12 percent is a significant

12   incidence?

13   A    Significant clinically?

14   Q    I'm asking you, sir, do you think 12 percent caudal

11:17:19  15   migration is significant incidence of caudal migration with

16   these filters?

17   A    Statistically?   Yes.

18   Q    Okay.   So you knew in July of 2008 you had a significant

19   incidence of caudal migration with the existing filter on the

11:17:34  20   market.    True?

21   A    Yeah, I would think so.   Yes.

22   Q    And the next project didn't start for at least a year.

23   True?

24   A    No, not true.

11:17:51  25   Q    Okay.   Fair enough.

CROSS-EXAMINATION - MICHAEL RANDALL

11:17:52  1        But if Bard knew in February of 2006 that it had an

2    unacceptable rate of caudal migration, you didn't actually

3    start the Meridian project until February 2009.  True?

4            THE COURT:  You said February 2006.

11:18:07  5            MR. STOLLER:  I said if they knew in February 2006,

6    which is, Your Honor, the date of the February HHE.

7    BY MR. STOLLER:

8    Q   They didn't start the Meridian project until February

9    2009; correct?

11:18:19 10   A   I'm sorry, can you repeat that question?

11   Q   You know what, I'll move on.  I think the jury's seen that

12   evidence.

13        You testified in response to some questions by

14   Mr. Rogers about developing some -- a bench test, I think you

11:18:34 15  said, that twists and compresses and moves the IVC filter in a

16   simulated fashion.  Is that true?  Did I understand that

17   testimony correctly?

18   A   Stretch and compress.

19   Q   Stretch and compress.  That is something more recent.

11:18:49 20  True?

21   A   Define more recent.

22   Q   More recent than the Eclipse filter we're talking about in

23   this case.

24   A   Correct.

11:18:58 25  Q   That test was never run on this filter.

CROSS-EXAMINATION - MICHAEL RANDALL

11:19:04  1    A    Not during --

2    Q    Let me ask --

3    A    Not during the development.

4    Q    Not during the development of this filter.

11:19:10  5    A    Right.

6    Q    Okay.  Let me talk to you real quickly about some of the

7    tests you actually testified to about that happened in this

8    case.

9         One of the things you said you went back after you

11:19:18  10   got started, you looked at the design history file for the G2;

11   correct?

12   A    Um-hmm.  Correct.

13   Q    And when you looked at that, did you look at the testing

14   that was done on that filter prior to it being released to the

11:19:30  15   market?

16   A    Correct.  Yes.

17   Q    And one of the things the jury saw earlier today was

18   Exhibit 5037.

19        MR. STOLLER:  Gay, could you bring this up.

11:19:40  20        And Mr. Carr testified about this test a bit.

21        Your Honor, this is in evidence.  May we display?

22        THE COURT:  Yes.

23        MR. STOLLER:  Thank you.

24   BY MR. STOLLER:

11:19:56  25   Q    Sir, this is the FEA for the G2 filter.  Do you recognize

CROSS-EXAMINATION – MICHAEL RANDALL

11:20:01   1   that?

2   A    No.

3   Q    You don't recognize this document?

4   A    No.

11:20:07   5   Q    Let's take a look at the second page and see if you

6   recognize it there.

7             Engineering test report ETR-05-02-02.  Effect of

8   changes to the Recovery filter and the femoral delivery system

9   on filter stresses based on FEA analysis.

11:20:28  10             Are you familiar with this document?

11   A    No, I'm not.

12   Q    Would you have reviewed it in 2006 or 2008 when you went

13   back through the DHF, the design history file, for the G2?

14   A    No, not to the changes I was making to the Eclipse

11:20:44  15   filter.  I would never look at this part.

16   Q    Why not?

17   A    The changes that I was implementing for Eclipse revolved

18   around the cyclic arm fatigue test that would be conducted,

19   the corrosion analysis that was done on it.  So I'm looking

11:21:04  20   at tests, like how it performed previously, and then the

21   change or improvement we're implementing to see then how it

22   stacks up.  So I'm not going through the entire review of the

23   design history file.  I'm only looking at relevant tests per

24   the change I'm going to be making.

11:21:21  25   Q    So it was not relevant to your study for the Eclipse

CROSS-EXAMINATION – MICHAEL RANDALL

11:21:23  1    filter, the FEA that assessed the filter stresses for the G2?

       2    A    No.  Empirical data was more important to me.

       3    Q    Fair enough.  We'll set that aside and talk about that

       4    with the jury later.

11:21:38  5         Let's talk about the first test you discussed today,

       6    which is Exhibit 8574.

       7         MR. STOLLER:  Gay, would you put that up, please.

       8         Your Honor, I believe this is in evidence.  May we

       9    publish?

11:21:54 10         THE COURT:  Yes, you may.

      11         MR. STOLLER:  Thank you.

      12    BY MR. STOLLER:

      13    Q    Sir, you described this earlier as the cyclic fatigue

      14    testing of the wire; correct?

11:22:02 15    A    Correct.

      16    Q    And the wire here, I believe you testified that this

      17    was -- this was the -- you bent the wire; is that correct?

      18    A    Yeah.  This was a bending test of the wire.

      19    Q    Now, the jury's seen this before so I don't want to go in

11:22:24 20    too much detail into this test, but would you agree with me,

      21    sir, this is not a test of the whole wire, it was only a test

      22    of the foot.  True?

      23    A    No, this was a test of the wire.

      24    Q    Let's take a look.

11:22:36 25         MR. STOLLER:  Gay, would you turn -- take us to

CROSS-EXAMINATION – MICHAEL RANDALL

11:22:38  1    page 3, please.

2         Let's look at the very top:  Purpose.

3    BY MR. STOLLER:

4    Q   It says:  "The purpose of this study was to compare the

11:22:48  5    fatigue life of the electropolished Vail filter wire to the

6    mechanically ground G2X wire by cyclically bending the ground

7    portion of the wire."

8         Do you see that?

9         Mr. Randall?

11:23:05  10   A   Yes, I do.

11   Q   I read that correctly.  True?

12   A   Yes, you did.

13   Q   Let's go look under Background.  Second paragraph.

14        It says: "the Vail wire" -- excuse me.  "The Vail

11:23:15  15   filter wire is individually electropolished by an external

16   supplier and will exhibit a smoother surface along its entire

17   length."  This is the part I'd like to focus on, sir.

18   "However, the most evident improvement to the surface finish

19   will be along the tapered and smaller diameter sections of the

11:23:32  20   wire that are formed by the grinding operation."

21        Did I read that correctly?

22   A   You have.

23   Q   Then it says: "This is because the marks inherent to the

24   grinding operation wire will be smoothed by the polishing

11:23:44  25   process.  The portion of the wire" -- sorry, let me start

CROSS-EXAMINATION - MICHAEL RANDALL

11:23:48   1   over.  "This portion of the wire forms the filter hooks in the

2   finished device."

3          Did I read that correctly?

4   A   You did.

11:23:56   5   Q   Then it says:  "And as such, this test evaluated fatigue

6   life of the Vail wire in this area in comparison to the G2X

7   filter wire."

8          Did I read that correctly?

9   A   You did.

11:24:10   10  Q   Okay.  Let me ask you --

11          MR. STOLLER:  Gay, would you turn to page 6, please.

12  BY MR. STOLLER:

13  Q   These are the results.  True?

14  A   True.

11:24:19   15  Q   And if we look at the top table, it tells us G2X filter

16  wire measurements.  True?

17  A   True.

18  Q   The average overall measurement in the wire diameter for

19  the G2X says it's .01042; correct?

11:24:40   20          Do you see overall average?

21  A   Yes, I do.

22  Q   Let's look at the same table, table 5, for the Vail wire.

23          Do you see that?

24  A   Yes, I do.

11:24:53   25  Q   Table 5.  Vail wire diameter measurements.

CROSS-EXAMINATION - MICHAEL RANDALL

11:24:56 1          Are you with me, sir?

2    A    Yes.

3    Q    Overall average .01076; correct?

4    A    Yes.

11:25:04 5    Q    If my math is correct, it's -- whatever the last two

6    digits, it's 32 higher for the Vail wire than for the G2X

7    wire.  True?

8    A    I'm sorry, could you repeat that question?

9    Q    Sure.  The last two digits of the Vail wire number are

11:25:21 10   32 -- I've lost -- I won't do my full math, but hundred

11   thousandths of whatever the measurement greater than the G2X

12   filter wire.  True?

13   A    You're asking how thick the Vail wire is?

14   Q    The overall average for the Vail wire was bigger than the

11:25:43 15   overall average for the G2X wire in this comparative study.

16   True?

17   A    By .0003.

18   Q    Sir, my question is, is it true the wires were not the

19   same size?

11:26:09 20   A    I don't agree with that.

21   Q    Okay.  Let's move on to the next test that you testified

22   about.  Exhibit 8546.

23          MR. STOLLER:  Your Honor, this is in evidence.  May

24   we display?

11:26:27 25          THE COURT:  Yes.

CROSS-EXAMINATION - MICHAEL RANDALL

11:26:29  1    BY MR. STOLLER:

2    Q    Sir, this was the test you referred to as the beam --

3    rotary beam fatigue test.  True?

4    A    True.

11:26:37  5    Q    And this test is not for the Eclipse, is it?

6         Let me ask you this:  Take a look at the "To" line in

7    there.  It says To:  Design history file, project number 8088.

8         Do you see that?

9    A    Yes, I do.

11:26:59  10   Q    You know that project number 8088 was not the project

11   number for the Eclipse, don't you?

12   A    I forget what the project number for Eclipse is.

13   Q    Would 81 -- I've lost my notes.  Doesn't matter.

14        You know that that is the project number for the G2

11:27:22  15   Platinum, don't you, sir?

16   A    I don't remember the project number.  It was years ago.

17   Q    Well, the jury will see that later, so let's not spend

18   time on that.

19        We talked a bit about this.  At the top there is no

11:27:35  20   TD number; correct?

21   A    Correct.

22   Q    There is no "From" on this; correct?

23   A    Correct.

24   Q    There's no signature on this anywhere.  True?

11:27:45  25   A    True.

CROSS-EXAMINATION - MICHAEL RANDALL

11:27:46  1    Q    This is not a final report, it's a draft.

        2    A    I believe it is a draft.

        3    Q    And, in fact, we see there's some highlighting even on the

        4    first page.  It says "ingot Ap."  True?

11:27:57  5    A    True.

        6    Q    As an engineer and scientist, you know it's important to

        7    go through the full process of a complete formal test before

        8    you come to final conclusions.  Would you agree with that?

        9    A    True.

11:28:11  10   Q    In fact, at Bard you have policies and procedures that

        11   require people to sign off on a test report before it's

        12   considered final.  True?

        13   A    If there is a test protocol, you would.  But we do a lot

        14   of tests where it's not on protocol.

11:28:30  15   Q    If you're going to rely on it for something related to the

        16   final design validation, verification, or determinations with

        17   respect to marketing claims, you're going to have to go

        18   through that process.  True?

        19   A    If it's -- yeah, if it's going to be used for that.

11:28:46  20   Q    You conduct tests on a regular basis that aren't

        21   necessarily used for purposes of substantiating claims about a

        22   product.  Is that fair?

        23         Let me withdraw the question.  I'll ask a different

        24   question.

11:29:00  25         If you're going to test something in order to verify

CROSS-EXAMINATION – MICHAEL RANDALL

11:29:06  1    or substantiate a claim, it has to go through formal process.

2    True?

3    A    Yes.  We do have formal process.

4    Q    And this document did not.  True?

11:29:20  5    A    This is just a draft.  I don't know where the original's

6    at.  But there's also, I believe --

7    Q    Sir --

8    A    -- a report from Johnson Matthey or the person who

9    conducted the rotary beam test.

11:29:31  10   Q    Sir, my question to you is, this is not a final report

11   that's been through that process.  True?

12   A    This is not a report.  Correct.

13   Q    Part of the reason you go through that process is to

14   ensure that the tester, whoever conducted the test, followed

11:29:43  15   the protocol.  True?  One of the reasons.

16   A    I cannot answer that question you have --

17   Q    Okay.  One of the reasons you go through formal process is

18   to ensure the accuracy of the results of the test.  True?

19   A    True.

11:29:59  20   Q    Let's talk about next Exhibit 8359.

21        MR. STOLLER:  And, Your Honor, this is in evidence.

22   May we display to the jury?

23        THE COURT:  Yes.

24   BY MR. STOLLER:

11:30:21  25   Q    You testified, sir, to this.  This is the saluting arm

CROSS-EXAMINATION - MICHAEL RANDALL

11:30:23  1   test; correct?

2   A   Cyclic arm fatigue test.

3   Q   This is what you described to the jury as the saluting arm

4   test.  True?

11:30:37  5   A   I said this is a test for a cyclic arm and the

6   deflections raise the arm up here, almost like a saluting

7   fashion.  But I didn't say this is the saluting arm test.

8   Q   Again, sir, if -- you can answer yes or no.  If I'm wrong,

9   tell me no.  If I'm right, tell me yes.  If you can't answer

11:30:54 10   say I don't know or I can't answer that.

11           Let me ask you this question:  Did you internally

12   refer to this report as the saluting arm test, or have you

13   heard it referred to as the saluting arm test?  This test.

14   A   No.

11:31:08 15   Q   No.  Okay.  Well, I'll tell you the jury has heard it

16   referred to as the saluting arm test.  Does that make sense to

17   you given that the -- the way the filter arms are moved in

18   this test?

19   A   Sure.

11:31:21 20   Q   Sure.  And you said that this test was one of the things

21   that demonstrated the superior performance of the Eclipse

22   filter as against the G2X.  Is that true?

23   A   True.

24   Q   And if we look at page -- I'm not going to go through

11:31:36 25   this -- well, let's do it.  Let's quickly go through it.

CROSS-EXAMINATION - MICHAEL RANDALL

11:31:39    1          MR. STOLLER:  Can we go, Gay, quickly to page 6.

         2     BY MR. STOLLER:

         3     Q   And this shows that the overall average before the wires

         4     fractured for the G2X were 440 and the overall cycles before

11:31:55    5     the wires fractured for the filter -- I'm sorry, for the Vail,

         6     which was the Eclipse, were 719.  True?

         7     A   True.

         8     Q   And that was the basis of your conclusion that the Eclipse

         9     filter performed better than the G2X; right?

11:32:18   10     A   True.

        11     Q   But you knew, sir, you had conducted a similar test on the

        12     G2X previously; right?

        13     A   Yes, there was cyclic arm fatigue done.

        14     Q   In fact, let's --

11:32:34   15          MR. STOLLER:  Gay, could we please look at

        16     Exhibit 5385.

        17          Your Honor, I believe this is in evidence.  May we

        18     display to the jury, please?

        19          THE COURT:  Yes.

11:32:51   20     BY MR. STOLLER:

        21     Q   Sir, this is Exhibit 5385, which is the G2 Express filter

        22     arm fatigue comparison test.  True?

        23     A   True.

        24     Q   And you are --

11:33:00   25          MR. STOLLER:  Gay, if you'll take that down, please.

CROSS-EXAMINATION - MICHAEL RANDALL

11:33:02   1   BY MR. STOLLER:

2   Q   You're one of the people on the release panel there

3   underneath it.   True?

4   A   True.

11:33:07   5   Q   And, in fact, if we go to page 2 --

6        MR. STOLLER:  Sorry, Gay, I'm moving pretty quickly.

7   BY MR. STOLLER:

8   Q   If we go to page 2, you're a signatory on this document:

9   Mike Randall under R&D.   True?

11:33:19  10   A   True.

11   Q   And this test is the same test conducted on the Eclipse

12   for the G2, except this one was conducted in 2007; correct?

13   A   I'd have to confirm on the test method if they're exactly

14   the same.   It's the same name, though.

11:33:36  15        MR. STOLLER:  Well, let's go quickly, Gay, if you

16   would, to page -- I have a different page.  3 of 11.   I

17   believe it's page 5.  And -- no.  Next page.  Sorry.

18   BY MR. STOLLER:

19   Q   If we go up at the top and References, we'll see the test

11:33:56  20   method; correct?  TM1133800; right?

21   A   Right.  Rev. 0.

22   Q   And if that test method is the same test method as used in

23   the Eclipse one, they're the same.   True?

24   A   They would be the same, yes.

11:34:20  25        MR. STOLLER:  Let's look, Gay, if we could, two pages

CROSS-EXAMINATION – MICHAEL RANDALL

11:34:21   1   in.  Three pages in, I'm sorry.  6 of 11.  So it would be

2   page 9.

3   BY MR. STOLLER:

4   Q   The jury's seen this before as well, sir, but if we look

11:34:32   5   at the G2 Express filter results on the saluting arm test --

6         MR. STOLLER:  Just the top table, if you would, Gay.

7         Thank you.

8   BY MR. STOLLER:

9   Q   -- that in that time the G2 Express averaged 668 cycles

11:34:49  10   before they broke.  True?

11   A   True.

12   Q   And would you agree with me, without doing a lot of math,

13   668 is fairly close to 710, on average.  True?  Maybe

14   statistically the same.

11:35:05  15   A   They're not statistically the same because they're not

16   the same test.  You have to do them at the same time.

17   Q   Sir, you ran the same test on the same machine, did you

18   not?

19   A   I don't know what machine this was ran on.

11:35:22  20   Q   Did you have two different machines to run this test?

21   A   We have a fixture and then it's whatever Instron can be

22   used.  I'm not sure what Instron test this is used on.

23   Q   But let me ask this, sir:  This test in 2009 -- excuse me,

24   2007, tells you that the G2 Express on that saluting arm test

11:35:45  25   lasted an average of 668 average cycles before the arms

CROSS-EXAMINATION - MICHAEL RANDALL

11:35:50  1   fractured.  True?

2   A   Yes.  True.

3   Q   And you knew in 2009 when you conducted the saluting arm

4   test on the Eclipse comparison to the G2X that the result then

11:36:03  5   was 440; correct?

6   A   Yes.

7   Q   Did you go back and look at, hey, maybe we should rerun

8   those tests given we've only used 15 samples and see why we're

9   getting different results on the G2 Express from one test to

11:36:18 10   the next?

11   A   No.

12   Q   Let's look, sir, at the last test you testified about,

13   which is 8358.

14        MR. STOLLER:  And, Your Honor, I believe this is in

11:36:37 15   evidence.  May we display it to the jury?

16        THE COURT:  Yes.

17   BY MR. STOLLER:

18   Q   Sir, this is what you described as the flat plate fatigue

19   test and corrosion testing.  True?

11:36:48 20   A   True.

21   Q   I'd like to talk about those in two parts.  And I'd like

22   to talk about corrosion examination first, if that's okay.

23   A   Sure.

24   Q   The corrosion examination is you just look to see if the

11:36:58 25   acidic qualities under which you had these testing done chewed

CROSS-EXAMINATION - MICHAEL RANDALL

11:37:01   1   away at the device.  True?

           2   A   Yeah, in layman's terms.  True.

           3   Q   It was not to determine whether there was a fracture as a

           4   result of fatigue in that testing; right?  The corrosion

11:37:13   5   testing was not aimed at determining whether the device would

           6   fatigue by fracture.  True?

           7   A   Hmm.

           8   Q   Excuse me, I asked that wrong.  Fracture by fatigue.

           9   A   Yeah, it was -- it was a fracture -- yeah.  We're looking

11:37:33  10   at if you fatigued it, would you get a fracture in a

          11   corrosive environment.

          12   Q   But the part of examining the corrosive qualities was to

          13   see -- not to see whether the fatigue had caused corrosion, it

          14   was whether the acidic environment had caused corrosion.

11:37:50  15   True?

          16   A   Yes.

          17   Q   Okay.  I want to focus on the flat plate part of this.

          18   This was not a comparative test.  True?

          19   A   True.

11:37:58  20   Q   This was a test where you took the device and you put it

          21   in a set of conditions and you squeezed it, effectively, to

          22   see over time whether that squeezing and back and forth would

          23   cause fatigue and result in fracture.  True?

          24   A   True.

11:38:12  25   Q   Okay.  And as an engineer, you know, sir, that different

CROSS-EXAMINATION - MICHAEL RANDALL

11:38:18  1   angles and different conditions can affect the amount of

2   stress experienced by a device.  True?

3   A   True.

4   Q   And so the stress experience that you measured by that

11:38:29  5   device was the device sitting equally balanced in the tube.

6   True?

7   A   We -- we biased it to put the highest stress point in

8   line with the greatest amount of deflection.  So we tried to

9   put it in a position where it saw the most stress.

11:38:49  10  Q   Okay.  But you know, sir, that if you take something, for

11  example, and you were to -- you were to tilt it significantly,

12  that can change the amount of stress it experiences.  True?

13  A   It could potentially, yeah.

14  Q   It could.  And if it endothelializes, it could change the

11:39:11  15  amount of stress experienced at different places.  True?

16  A   Theoretically, yeah.

17  Q   Well, if you take something longer and make it shorter,

18  that increases the stress; right?

19  A   It depends on how that geometry's interacting with the

11:39:27  20  stress.

21  Q   Okay.  But if I have a ruler and I bend it and it's a long

22  ruler, there's less stress on it as a whole than if I have a

23  short ruler and use the same amount of force on it.  You would

24  agree with that, wouldn't you?

11:39:40  25  A   If you use the same amount of force?

CROSS-EXAMINATION - MICHAEL RANDALL

11:39:42  1   Q   Yes, sir.

2   A   And apply it at the end of a long ruler versus short

3   ruler what the stress would be?

4   Q   Yes, sir.

11:39:48  5   A   I think it would be lesser if it's longer.

6   Q   If I -- I'm not going to get into this.

7       Let me ask you this question:  This testing didn't

8   simulate endothelialization.  True?

9   A   No.

11:40:07  10   Q   And it didn't simulate perforation of the device.  True?

11   A   No.

12   Q   It didn't simulate significant tilt of the device.  True?

13   A   True.

14   Q   And would you agree with me, sir, that the bench testing

11:40:19  15   you performed should predict as closely as possible what

16   happens to the device in the real world?

17   A   Sure.

18   Q   And the way it's going to perform in people?

19   A   Sure.

11:40:38  20       MR. STOLLER:  No further questions.  Thank you.

21       THE COURT:  Redirect?

22       MR. ROGERS:  None, Your Honor.

23       THE COURT:  Okay.  Thank you, sir.  You can step

24   down.

11:40:58  25       MS. HELM:  Your Honor, before we call our next

11:41:00  1    witness may we approach on just a little administrative issue?

2    THE COURT:  Yes.

3    (Bench conference as follows:)

4    MS. HELM:  It doesn't take a cast of thousands for

11:41:20  5    this.

6    I just wanted to let you know this video is 22

7    minutes long and maybe we could play the whole thing before

8    lunch.

9    THE COURT:  Is there a problem stopping at noon?

11:41:31  10    MS. HELM:  No.  I just wanted to let you know.

11    THE COURT:  Let's just stop at noon and continue

12    after lunch.

13    MS. HELM:  Okay.

14    (Bench conference concludes.)

11:41:42  15    THE COURT:  Thanks, ladies and gentlemen.

16    MS. HELM:  Your Honor, at this time the defendants

17    call William Little by video deposition.

18    There are five exhibits to Mr. Little's deposition,

19    two of which have been previously admitted.  They are 1616,

11:42:01  20    which is Deposition Exhibit 2003; and 1621, which is

21    Deposition Exhibit 2009.

22    At this time we move for admission of Exhibit 1618,

23    which is deposition Exhibit Number 2005; Exhibit 2045, which

24    is deposition Exhibit 2002; and Exhibit 1617, which is

11:42:33  25    Deposition Exhibit 2004.

11:42:38   1          THE COURT:  Any objection?

           2          MR. CLARK:  No, Your Honor.

           3          Did you say 1618 as well?

           4          MS. HELM:  Yes.

11:42:44   5          THE COURT:  Okay.  Those are admitted.

           6      (Exhibits 1617, 1618, and 2045 admitted.)

           7          MS. HELM:  William Little was global vice president

           8   of marketing at Bard Peripheral Vascular from 2008 to 2012.

           9   Prior to his time at Bard, Mr. Little worked in marketing at

11:43:00  10   medical device manufacturer Boston Scientific.

          11          Since leaving Bard in 2012, Mr. Little has held

          12   various senior-level positions in marketing at St. Jude

          13   Medical, a medical device manufacturer which is a division of

          14   Abbott.

11:43:18  15      (Video testimony of William Little played.)

          16          THE COURT:  Stop the video at this point.

          17          We will resume at 1 p.m. and will excuse the jury.

          18      (The jury exited the courtroom at 12:00.)

          19          THE COURT:  Counsel, is there a time allocation on

12:00:03  20   the video?

          21          MS. HELM:  Yes, Your Honor.  Six minutes should be

          22   allocated to the plaintiff.

          23          MR. CLARK:  That's correct, Your Honor.

          24          THE COURT:  All right.  As of now, plaintiff has used

12:00:43  25   27 hours and 15 minutes.  And defendants have used 21 hours

12:00:48  1   and 54 minutes.

2          We will see you at 1 o'clock.

3          MR. O'CONNOR:  Your Honor, can we talk about the time

4   issue at some point today?

12:00:59  5          THE COURT:  Yes.

6          MR. O'CONNOR:  Your Honor, respectfully, we think

7   that we should receive some additional time back.  There's

8   been some orders and rulings in this case that have

9   understandably resulted in a number of sidebars, and we have

12:01:16 10   done our best on our side to be time efficient.  But because

11   of the ruling -- I'm sorry.  Because of the way the rulings

12   have gone and the way the evidence has come in and the way

13   we've had to navigate with witnesses, we think that we should

14   receive some of that time back for us.

12:01:38 15          THE COURT:  What time back are you talking about?

16          MR. O'CONNOR:  Well, I think at least, at least an

17   hour and a half back.

18          THE COURT:  Back from where?

19          MR. O'CONNOR:  From the sidebars, from the time that

12:01:48 20   we spent with Modra laying the foundation to get this evidence

21   in that we're finally getting in.

22          We don't think it was a waste of time, we just think

23   trials -- things happen that are unpredictable.  And with the

24   rulings and the things that have changed the way the evidence

12:02:05 25   came in or the landscape or the evidence that was going to be

12:02:10   1   decided later, it's caused a number of sidebars and it's

2   caused us to have to rethink and redo the way we presented our

3   case.

4         And so we think we've acted in good faith and tried

12:02:22   5   to comply with the clock, but under the circumstances, with

6   our burden of proof, we think that under these circumstances

7   there should be time allotted back to us.

8         THE COURT:  Comment from the defendants.

9         MR. O'CONNOR:  To both sides.

12:02:35   10        MR. NORTH:  I don't think we need additional time,

11   Your Honor.  We would object, just as we did in Booker.

12         I would note for the record that this Court issued a

13   warning in a previous order on a motion in limine indicating

14   the Court intended to strictly adhere to the time limitations

12:02:51   15   this time.

16         Without questioning -- I mean it's not my place to

17   question how the plaintiffs try their case, but I would note

18   today, with only two hours left, approximately, they spent

19   over approximately an hour cross-examining two witnesses they

12:03:06   20   had on the stand two weeks ago for a combined three and a half

21   to four hours already, and spent another hour crossing them

22   today.

23         I would also draw the Court's attention to the

24   *General Signal Corporation* case, Ninth Circuit case that we

12:03:21   25   cited in the pretrial order, where the Ninth Circuit ruled in

12:03:25   1   that situation it would be unfair to provide the plaintiff

           2   additional time after the defendant had already made strategic

           3   decisions based on the Court's original allocation.

           4         THE COURT:  All right.  I will think about this

12:03:36   5   issue.  I'll let you know when I come back from lunch.

           6         See you at 1 o'clock.

           7         MR. O'CONNOR:  Thank you.

           8      (End of a.m. session transcript.)

           9                    *  *  *  *  *

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1          **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8     a full, true, and accurate transcript of all of that portion

9     of the proceedings contained herein, had in the above-entitled

10    cause on the date specified therein, and that said transcript

11    was prepared under my direction and control, and to the best

12    of my ability.

13

14         DATED at Phoenix, Arizona, this 30th day of May,

15    2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25