1              UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ARIZONA

3            _____

4

   In Re:  Bard IVC Filters    ) MD-15-02641-PHX-DGC
5  Products Liability Litigation )
                                ) Phoenix, Arizona
6  _____) May 30, 2018
   Doris Jones, an individual,  ) 12:57 p.m.
7                                )
                 Plaintiff,      )
8                                ) CV 16-00782-PHX-DGC
        vs.                      )
9                                )
   C.R. Bard, Inc., a New        )
10 Jersey corporation; and Bard )
   Peripheral Vascular, Inc., an )
11 Arizona corporation,          )
                                )
12              Defendants.      )
   _____)
13

14

15        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

16           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17           (*Jury Trial - Day 10 - P.M. Session*)
             (*Pages 2266 through 2381, inclusive.*)

18

19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

```
1   APPEARANCES:

2   For the Plaintiff:

3           GALLAGHER & KENNEDY PA
            By:  Mark S. O'Connor, Esq.
4           By:  Paul L. Stoller, Esq.
            By:  Shannon L. Clark, Esq.
5           By:  C. Lincoln Combs, Esq.
            2575 East Camelback Road, Suite 1100
6           Phoenix, Arizona 85016

7           LOPEZ MCHUGH LLP
            BY:  Ramon Rossi Lopez, Esq.
8           By:  Joshua Mankoff, Esq.
            100 Bayview Circle, Suite 5600
9           Newport Beach, California 92660

10          HEAVISIDE REED ZAIC
            By:  Julia Reed-Zaic, Esq.
11          By:  Laura Elizabeth Smith, Esq.
            312 Broadway, Suite 203
12          Laguna Beach, California 92651

13  For the Defendants:
            NELSON MULLINS RILEY & SCARBOROUGH LLP
14          By:  Richard B. North, Jr., Esq.
            By:  Elizabeth C. Helm, Esq.
15          By:  James F. Rogers, Esq.
            201 17th Street NW, Suite 1700
16          Atlanta, Georgia 30363

17

18

19

20

21

22

23

24

25
```

```
 1                            I N D E X

 2    WITNESS:                DIRECT   CROSS   REDIRECT   RECROSS
      WILLIAM LITTLE
 3    By Video Deposition
      (Resumed)               2270
 4
      SCOTT TREROTOLA, M.D.
 5    By Video Deposition     2270

 6    CHAD MODRA
      By Mr. North            2271              2347
 7    By Mr. O'Connor                  2331

 8    MARK MORITZ, M.D.
      By Video Deposition     2354
 9

10

11                      INDEX OF EXHIBITS

12    EXHIBIT                                         RECEIVED
      1680      Warning Letter from the FDA
13              to Timothy M. Ring                      2303
      2217      Memo to Chad Modra from Judy Ludwig
14              Dated January 23, 2015                  2346
      5483      Statistical Complaint Trending Procedure
15              PMA Related  sopq1417500 Rev 1 --
                Statistical Complaint Trending Procedure
16              PMA Related                             2315
      5563      Standard Operating Procedures/Division
17              Operating Procedures--CQA-STD-R002 Rev 14  2319
      5872      FDA Warning Close Out Letter            2313
18    5874      Bard filter rate information
                December 2016                           2326
19    7411      2008 Surgeon General's Call to Action
                Re PE and DVT                           2310
20    7961      Standard for Product Complaint Handling
                CQA-STD-24 2-9-15                       2278
21    7962      Standard for Medical Device Reporting
                CQA-STD-54-04                           2288
22

23

24

25
```

1          P R O C E E D I N G S

2          THE COURT:  All right, counsel.  I have thought about

3     the request from plaintiff on more time.  I could not agree --

4     I could not disagree more with the suggestion you made, Mr.

5     O'Connor, that you should get time back because you have been          12:57PM

6     forced to expend it at sidebars or due to evidentiary rulings.

7     The longest sidebar we had was maybe five minutes.  Most have

8     been two or three.  They have all been on evidentiary issues in

9     the case.  The longest discussions we have had have all been

10    off the clock when the jury is out of the courtroom.  And I'm          12:57PM

11    not aware of any evidentiary ruling that has required you to

12    put in more evidence.  So I absolutely disagree with that

13    suggestion.

14          I have been watching closely the plaintiff's case.  I

15    believe plaintiff's attorneys have done a much better job in          12:57PM

16    this case than Booker of using their time wisely.  There's been

17    little repetition.  There was a lot of repetition in Booker.

18    There have been several witnesses I noted that I thought could

19    have been done more quickly, but that's a strategic call.

20          So I don't believe plaintiffs have wasted time.  I          12:58PM

21    said in my order I wouldn't bail them out if they did.  I don't

22    believe they have.  I believe they have been efficient so I am

23    going to grant one additional hour of time to plaintiff for

24    purposes of completing the case.

25          MR. O'CONNOR:  Thank you.          12:58PM

1        THE COURT:  And we'll bring in the jury.

2        (Jury in at 1:00 p.m.)

3        THE COURT:  We will continue, Ladies and Gentlemen,

4   with the video that was being played before the noon hour.

5        (Video testimony of William Little resumed.)        01:04PM

6        MS. HELM:  Your Honor, at this time the defendants

7   call Dr. Scott Trerotola by video.  There are no exhibits with

8   this deposition.

9        Dr. Trerotola is a board certified radiologist with a

10  specialty in interventional radiology.  He maintains a clinical  01:09PM

11  practice in interventional radiology at the Hospital of

12  University of Pennsylvania where he has been chief of the

13  Radiology Department since 2001.

14       He graduated from the University of Pennsylvania

15  Medical School in 1986 and has been implanting IVC filters   01:09PM

16  since the 1990s.  And he has been retrieving optional filters

17  since they first came on the market in the early 2000s.

18       MR. CLARK:  I'm sorry, Your Honor.  That did not

19  include a sentence that we also added on there.

20       The proposed sentence was to the effect that he has   01:10PM

21  also served as a paid consultant for Bard over the years.

22       THE COURT:  Okay.  Thank you.

23       (Video testimony of Scott Trerotola, M.D. played in

24  open court.)

25       MR. NORTH:  Your Honor, at this time Bard would call   01:14PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    its final witness, Mr. Chad Modra to the stand.

2           THE COURT:  If you want to stand up, Ladies and

3    Gentlemen, while he's coming in, feel free.

4           Mr. Modra, you are still under oath for purposes of

5    the trial, so you can come directly back to the witness stand.    01:22PM

6           THE WITNESS:  Thank you.

7                         CHAD MODRA,

8    called as a witness herein, having been previously sworn, was

9    examined and testified as follows:

10                    DIRECT EXAMINATION

11   BY MR. NORTH:

12   Q.  Good afternoon, Mr. Modra.

13   A.  Good afternoon.

14   Q.  Could you tell the members of the jury how long you have

15   worked with Bard?    01:22PM

16   A.  17 and-a-half years.

17   Q.  And what is your current title at Bard?

18   A.  Continuous Improvement Leader.

19   Q.  And what do you generally do in the position as Continuous

20   Improvement Leader?    01:22PM

21   A.  Well, because of my knowledge of Bard and the processes

22   that we have, I have a task to find ways to improve either the

23   processes, the systems, the efficiencies, the way we do things.

24   Q.  At one point were you working specifically with the

25   division Bard Peripheral Vascular?    01:23PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   A.   I was.

2   Q.   And were you the Vice President of Quality at that

3   division?

4   A.   I was.

5   Q.   And while you were at Bard Peripheral Vascular, what          01:23PM

6   products did you work on?

7   A.   Filters, of course; stents; grafts; PTA balloons; dialysis

8   catheters; ports; biopsy needles.

9   Q.   Please describe for the jury your role and your

10  responsibilities as the Vice President of Quality.               01:23PM

11  A.   Well, as the Vice President of Quality, all of the quality

12  department reports to me.  So the Quality Department is sort of

13  a check and balance and a participant in all the things that go

14  on at the facility, both from a manufacturing design and

15  systems standpoint.  We're typically in charge of               01:23PM

16  investigations.  We also handled post-market surveillance,

17  which is complaint handling, event handling, experience from

18  the customers' experience from clinicians and processing of

19  those and making sure that we maintain compliance with the

20  regulations.                                                     01:24PM

21  Q.   So as a part of your role as the Vice President of Quality

22  did you generally oversee the investigation of complication

23  reports?

24  A.   I did.

25  Q.   Did you also review trending and tracking of those          01:24PM

1  complications?

2  A.  I did.

3  Q.  And did that job extend to the IVC filters?

4  A.  It did, amongst all the other problems we had.

5  Q.  Where did you grow up, Mr. Modra?                    01:24PM

6  A.  In the midwest.

7  Q.  Where do you live now?

8  A.  In Phoenix.

9  Q.  How long have you lived in Arizona?

10  A.  Seven years next week.                              01:24PM

11  Q.  Can you describe for the members of the jury your

12  educational background?

13  A.  I have a Bachelor of Science in Mechanical Engineering from

14  Purdue University.

15  Q.  And you have worked in the medical device industry since   01:25PM

16  1994?

17  A.  That's correct.

18  Q.  When did you first join any part of Bard?

19  A.  I joined Bard first in August of 2000.

20  Q.  And tell us who you worked for before August of 2000.    01:25PM

21  A.  For Abbott Laboratories.  They were a company in the

22  midwest.

23  Q.  What did you do for Abbott Laboratories?

24  A.  I was on a development program where I went to different

25  sites for a period of time and learned their processes.  I    01:25PM

1    worked on baby formula.  I worked on pharmaceuticals and also

2    mechanical or medical devices.

3    Q.  And when you first joined Bard in 2000, tell us where you

4    worked within the Bard family.

5    A.  In the Bard Access Systems, which is just another location          01:25PM

6    in Salt Lake City of Bard.  They make different kinds of

7    products.

8    Q.  What kind of products did you work with at Bard Access

9    Systems?

10   A.  At the time, peripherally inserted catheters, so catheters          01:26PM

11   they put in your lower arm or upper arm.  We had originally

12   developed the dialysis catheters there, the cancer ports there

13   as well, feeding catheters.

14   Q.  At Bard Access, did you work in the Quality Department?

15   A.  I did.                                                              01:26PM

16   Q.  And what sort of positions did you hold within the Quality

17   Department add Bard Access?

18   A.  I went there originally as a senior quality engineer

19   working in the new product development area, so developing new

20   products.  And I held positions of manager, senior manager,           01:26PM

21   director of quality engineering.

22   Q.  And what was your highest position before you left Bard

23   Access?

24   A.  Director of Quality Engineering.

25   Q.  And did you go from Bard Access here to Tempe for Bard             01:26PM

1    Peripheral Vascular?

2    A.  I did.

3    Q.  And when did you make that move?

4    A.  In -- I joined in March of 2011.  My family joined me

5    shortly thereafter.                                                01:27PM

6    Q.  And you stayed at Bard Peripheral Vascular for how long

7    until you took this broader role?

8    A.  Until December 2015.  I was asked to take a more broad

9    role.

10   Q.  Mr. Modra, why have you decided to devote your career to      01:27PM

11   medical devices?

12   A.  I thought about that a lot, and there's a lot of things you

13   can do.  I feel like you can make a lot of things.  You can

14   design a lot of things, which is already exciting.  But I feel

15   like if you can design something that's helping people.  A lot    01:27PM

16   of times these devices are used on friends, family, so that's a

17   big responsibility.  So that's the great thing about it.  You

18   feel like a proud parent when your device is used on them.

19          MR. O'CONNOR:  Objection, Your Honor.  I move to

20   strike that response for reasons that were raised in the          01:27PM

21   motion.

22          THE COURT:  Let's talk at sidebar for a minute,

23   counsel.

24          If you want to stand up, Ladies and Gentlemen, feel

25   free.                                                             01:28PM

───5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct───

```
1              (Discussion was had at sidebar out of the hearing of
2       the jury:)
3              THE COURT:  My memory, Mr. North, is I specifically
4       ruled on use of devices in friends and family.
5              MR. NORTH:  He went much further than I had any      01:28PM
6       anticipation he was going to.
7              THE COURT:  I think I should instruct the jury to
8       disregard his last answer.
9              MR. NORTH:  That's absolutely fine.  I apologize.
10             (In open court.)                                     01:28PM
11             THE COURT:  Thank you, Ladies and Gentlemen.  Please
12      have a seat.
13             I'm going to instruct you to disregard the witness's
14      last answer.
15             Go ahead, Mr. North.                                 01:28PM
16             MR. NORTH:  Thank you, Your Honor.
17      BY MR. NORTH:
18      Q.  Mr. Modra, was your first experience with IVC filters when
19      you came to Bard Peripheral Vascular in 2011?
20      A.  It was.                                                 01:28PM
21      Q.  How soon after you started at Bard Peripheral did you have
22      exposure or begin working on projects involving filters?
23      A.  During my transition time my predecessor and I had
24      discussions on all sorts of products, including IVC filters.
25      So it was in the springtime of 2011.                       01:29PM
```

1   Q.  And as you became familiar with IVC filters, did you also

2   become familiar with the fact that there were some reports of

3   complications with the device?

4   A.  Yeah.  That was part of the, I guess, transition is

5   understanding a little bit of the history but also the benefits    01:29PM

6   and risks involved in them.

7   Q.  During the 20-plus years you have been involved with the

8   medical device industry, have you ever worked on any devices

9   that did not carry at least some risk of complications?

10  A.  No.                                                            01:29PM

11  Q.  As a part of your role as the Vice President of Quality at

12  Bard Peripheral Vascular, what were your responsibilities

13  regarding the development of policies and procedures for the

14  department?

15  A.  Ultimately, I'm responsible for ensuring that those are       01:30PM

16  written in a manner that can be followed, are followed, and are

17  compliant to regulations and laws.

18  Q.  And did you have responsibility to be familiar with past

19  practices and policies for the Quality Department?

20  A.  I did.                                                         01:30PM

21  Q.  Does Bard have policies and procedures that govern how

22  complaints or complication reports are handled?

23  A.  Yes.  Quite a few.

24  Q.  In your business and work within the Quality Department,

25  did you generally use the term "complaint" to describe a report   01:30PM

1   you might receive of a complication with a device?

2   A.   Generally complaint, complaint event.

3   Q.   If we could bring up Exhibit 7961, please.

4        Do you recognize this document?

5   A.   I do.                                                    01:31PM

6   Q.   What is this document?

7   A.   It's the standard for how to handle product complaints

8   that's used by BPV, or Bard Peripheral Vascular.

9        MR. NORTH:  Your Honor, at this time we would offer

10  for admission Exhibit 7961.                                   01:31PM

11       MR. O'CONNOR:  No objection.

12       THE COURT:  Admitted.

13  BY MR. NORTH:

14  Q.   Mr. Modra, what is Bard's overarching or ultimate goal for

15  processing incoming complaints?                               01:31PM

16  A.   We want to make sure that, one, we're compliant to all

17  regulation.  But the end goal of it is really to understand

18  customer experience, the patient experience, and the clinician

19  experience and understand if there is any safety signals,

20  failure modes that are happening with those and the ability to 01:31PM

21  track and trend those.

22  Q.   Does this policy for complaint handling that Bard has in

23  place, would that also extend to complication reports regarding

24  IVC filters?

25  A.   It would.  It would be for all products.                 01:31PM

1   Q.  What departments at Bard are responsible for receiving

2   complaints?

3   A.  Well, really, all departments are responsible for receiving

4   them, meaning if they hear of any incident, even casually in

5   literature, they are responsible for reporting that to what we        01:32PM

6   call the Field Assurance Department.  So they will take that

7   information from whoever gives it to them and write the report

8   and begin the investigation of that event.

9   Q.  Does the Field Assurance Department, is that part of the

10  quality group that you headed up?                                     01:32PM

11  A.  It is.

12  Q.  And did the Field Assurance Group report to you?

13  A.  They did.

14          MR. NORTH:  Your Honor, could we publish Exhibit 7961?

15          THE COURT:  Yes.                                              01:32PM

16  BY MR. NORTH:

17  Q.  What are the various sources of complaints or complication

18  reports that the Field Assurance Department might receive?

19  A.  It could be from anywhere, but primarily it's literature.

20  It's sales reps.  Its doctors directly.  It's FDA.  It's             01:33PM

21  patients, they call them in.  So any of those.

22  Q.  Do doctors sometimes report complications directly to Bard?

23  A.  Rarely, but on a few occasions I know they do.

24  Q.  Do sometimes patients report complications?

25  A.  Not typically.  Not directly.  Usually it's the hospital.        01:33PM

1    Even the risk manager in the hospital will send it either to us

2    directly or our sales rep based on information they received

3    from a doctor.

4    Q.  If a sales rep calls upon a doctor to discuss Bard's

5    products and the doctor mentions some adverse event that          01:33PM

6    occurred in his or her practice recently, would that be

7    reported?

8    A.  Yes.

9    Q.  And what sort of training do you give the sales

10   representatives to report anything they hear concerning an        01:33PM

11   adverse event?

12   A.  They go through procedural training as well as a slide

13   presentation that I used to give at their conference events to

14   make sure that they are aware of their responsibility for once

15   they hear about any sort of complaint, any sort of alleged        01:34PM

16   issue that they immediately send it to the field assurance

17   area.

18   Q.  You mentioned the literature.  Does Bard generally keep an

19   eye on medical journals in the fields where it makes products

20   to service or to assist those doctors?                            01:34PM

21   A.  We do.  We do.  We review them periodically to look for

22   these sorts of events.

23   Q.  If your department were to learn of an article, let's say,

24   in the SIR's publication regarding complication incidents with

25   Bard filters, would those be investigated by your team?          01:34PM

1    A.   They would.  And we would look to see if they had already

2    crossmatched it to an event that may have already been

3    reported.

4    Q.   Now, does Bard also have a service called MS&S?

5    A.   They do.                                                    01:35PM

6    Q.   Tell us what MS&S stands for.

7    A.   I believe it's a Medical Service and Support.  And really

8    they are on the other end of an 800 line, 1-800 line where

9    anyone can call in and if they have any sorts of questions

10   regarding the products or if they want to report a complaint     01:35PM

11   event, they call that number and then it's triaged by asking a

12   few simple questions, whether it's just a comment that they

13   receive or whether it's -- could be related to a complaint.  If

14   it's related to a complaint then MS&S transfers it to the field

15   assurance area.                                                  01:35PM

16   Q.   Is MS&S physically located in Covington, Georgia, outside

17   of Atlanta?

18   A.   Yes.

19   Q.   If a call were to come in to 1-800 number and it's picked

20   up by somebody at MS&S, and let's say it's a doctor on the       01:35PM

21   other side or a patient reporting some complication with a Bard

22   device, would that word of that call then make it to your

23   department?

24   A.   Yes.

25   Q.   And would your department then investigate that call?       01:36PM

1   A.   Yeah.   They take it from there.   They get all the contact

2   information from the person that called in regardless of who it

3   is.   And then the Field Assurance Group has procedures where

4   they will go back and follow up and get additional information

5   as much as they can from every event.                          01:36PM

6   Q.   With regard to IVC filters, was there any pattern or trend

7   you saw over the years as to when complications might be first

8   perceived?

9   A.   Typically they are at retrieval.   That's where I have seen

10  them most reported.                                            01:36PM

11  Q.   In your experience over the years, were most of the

12  complaint or complication reports received by the company

13  regarding IVC filters, were most of those asymptomatic or

14  symptomatic?

15  A.   Asymptomatic.                                             01:37PM

16  Q.   Over the years, did Bard sometimes compare its internal

17  complication reported rates among various filters?

18  A.   We have from time to time, yes.

19  Q.   And did that sometimes include comparing the complication

20  reports you had received regarding the Simon Nitinol Filter    01:37PM

21  with the reports you had received regarding the, let's say,

22  Eclipse Filter?

23  A.   Yes.

24  Q.   And do you think that was always a fair comparison?

25  A.   It's not really the same thing.   They have different     01:37PM

1    indications.  So they are both filters, but you just -- yeah.

2    It's not really all that close.

3    Q.  In your experience were Simon Nitinol Filters that had been

4    implanted monitored as closely as retrievable filters?

5              MR. O'CONNOR:  Objection.  Lack of foundation.                    01:38PM

6              THE COURT:  Overruled.

7              THE WITNESS:  Not typically.

8    BY MR. NORTH:

9    Q.  Once field assurance receives a report of a complication,

10   are there circumstances where other departments in Bard become    01:38PM

11   involved in analyzing or investigating the incident?

12   A.  Yeah.  Field assurance is really the point people that take

13   the narrative of the event.  They ask -- they are trained to

14   ask those questions specifically to get as much detail.  But

15   based on the narrative we get quality engineering involved, we    01:38PM

16   get research and development engineers involved, we get some of

17   the other product designers and experts involved and try and

18   determine what might be the cause of the situation.  So it's

19   any number of folks across the organization would be involved

20   in that.                                                          01:38PM

21   Q.  In what ways does the Field Assurance Department work with

22   research and development, for example, in assessing and

23   learning from complication reports?

24   A.  Well, by analyzing across all of the reports that we get,

25   you can really understand maybe the way the devices are being     01:39PM

1    used, maybe the way they are not being used, what kinds of

2    complications you might have.  And that's great information to

3    give back to the research and development because when you have

4    a continuum of product improvements, you have great new ideas

5    and you get a lot of those just from the experiences you hear          01:39PM

6    in post-market surveillance.

7              So they have a pretty good and a routine discussion

8    period like every two weeks where they have time set aside to

9    kind of share that information back and forth.

10             MR. NORTH:  Your Honor, could we display again 7961?         01:39PM

11             THE COURT:  Yes.

12             MR. NORTH:  Could we turn to Page 5, please.

13   BY MR. NORTH:

14   Q.  Does this standard that Bard has outline a procedure for

15   the investigation of the complaints?                                   01:40PM

16   A.  It does.

17   Q.  And when a complaint is received, what steps does field

18   assurance take to investigate it?

19   A.  Well, first, they take that information that they have to

20   start with.  They have to make a decision whether it really is        01:40PM

21   a complaint and then also whether it's reportable to FDA.  And

22   there's a certain percentage of those that are reportable that

23   are covered under another standard.  But they walk through just

24   basic questions:  Is there an alleged deficiency, as it says

25   here; what was the situation that was happening at the time of        01:40PM

1  the event; is it a product suggestion, you know.  We take those

2  as well, but that wouldn't necessarily be a complaint.  And so

3  they work through these series of questions, take down the

4  narrative, and then begin to try and get all that information,

5  the patient information, the doctor information, what they were          01:40PM

6  seeing, what they were observing at the time, and then they try

7  to get the device back if it's possible.  Because we have a lab

8  we can do some testing on it, measurements and things to see if

9  it's remained within specification.

10            MR. NORTH:  If we can go to Page 6, please.                   01:41PM

11  BY MR. NORTH:

12  Q.  Does this particular standard that's contained in Exhibit

13  7961 set forth in great sort of step-by-step detail the method

14  utilized to investigate complication reports?

15  A.  It includes the details of all the things we need to               01:41PM

16  include in a complaint investigation and those are used in

17  complication reports, so yes.

18  Q.  Now, does Bard make an attempt if it's a device that has

19  failed in some way, make an attempt to get the actual device

20  back from the physician or from the hospital?                          01:41PM

21  A.  We do.  The typical target is always three attempts to get

22  information and the device back.  And so you would maybe call,

23  leave a message, or you would try to get that device back from

24  the person, from the risk manager, from the hospital, whoever

25  may have it.  So it's a little bit of tracking people down, but        01:42PM

1  they are pretty persistent.  So we try to get as many back as

2  we can because then you can do more analysis on it.

3  Q.  Well, if you do succeed in getting the device back at Bard,

4  what do you do with it?

5  A.  We have an analysis lab, and we have high precision          01:42PM

6  equipment to measure it, to observe it, take pictures.  We can

7  do some minor testing on it.  Unfortunately, after a device has

8  been used, typically, if it's failed it's been compromised or

9  it's been -- we don't know exactly how it's been handled but we

10  do have a pretty comprehensive lab to be able to do testing on  01:42PM

11  it.

12  Q.  Now, does the FDA have a set of codes that you are supposed

13  to utilize in classifying complication reports?

14  A.  Yes, they do.

15  Q.  And are those by failure mode?                              01:43PM

16  A.  They are.  Some are more general than others, but they are

17  descriptive enough to use consistently in products.

18  Q.  And do you use those FDA codes for internal trending and

19  tracking of adverse complications?

20  A.  We do.  Regardless of the severity of the complication, the 01:43PM

21  good thing about the codes is you can put multiple codes in a

22  single event.  So instead of reading through every complaint

23  that you get and you look at a narrative you can kind of boil

24  it down to the codes that are used.  And that way you can track

25  and trend those across all the multiple events.                01:43PM

1    Q.   Is there a particular code FDA has used to govern a report

2    of a fracture with a device such as an IVC filter?

3    A.   They have.

4    Q.   And what is that particular code called?

5    A.   I think it's detachment.  I think that's the term,          01:44PM

6    detachment.

7    Q.   Now, once the Field Assurance Department has collected all

8    the information they can and analyzed that information in

9    conjunction with engineers and research and development

10   personnel, does the company have to make a decision as to        01:44PM

11   whether to report that event to the FDA?

12   A.   We do.

13   Q.   And does the FDA have certain regulations that govern when

14   you have to report adverse events to the agency?

15   A.   Yeah.  There's criteria called MDR, Medical Device          01:44PM

16   Reporting requirements.

17   Q.   How do you go about doing that?  Do you call the FDA up on

18   the telephone?  Submit something electronically?  File a

19   written report?  How does that work?

20   A.   In the last couple years they have gone to E-MDR so they    01:44PM

21   are all submitted electronically.  In the past, they were

22   submitted via a certain form that they have, 3500A form.  But

23   it has certain fields that you fill out, and once you have

24   determined it to be a reportable based on a series of

25   questions, I think there's maybe 11 or 12 questions that we      01:45PM

1    have based on the regulation, then you have to report it.  So

2    if you report it now then it is electronically reported.

3              MR. NORTH:  Could we bring up Exhibit 7962, please.

4    BY MR. NORTH:

5    Q.  Can you tell us what 7962 is, Mr. Modra?                    01:45PM

6    A.  It's similar to the other standard but it's the standard

7    that includes instructions for when to and how to report the

8    MDR record to FDA.

9    Q.  And is that the standard that your department followed in

10   making determinations as to whether to report adverse events to  01:45PM

11   the FDA?

12   A.  Yes.

13   Q.  And was this standard created to comply with the FDA's

14   regulations?

15   A.  Yes.                                                        01:46PM

16             MR. NORTH:  Your Honor, at this time we would offer

17   for admission Exhibit 7962.

18             MR. O'CONNOR:  No objection.

19             THE COURT:  Admitted.

20             MR. NORTH:  Could we display, Your Honor?             01:46PM

21             THE COURT:  Yes.

22   BY MR. NORTH:

23   Q.  Mr. Modra, does Bard report to the FDA only those

24   complaints that occur in the United States or also those that

25   occur outside of this country?                                 01:46PM

1    A.   We actually report those that are on similar devices

2    outside the country.  So even though the situation didn't occur

3    within the United States, they have the requirement that if you

4    have a similar device sold here, even though the event happened

5    somewhere else, you have to report an MDR as well.                    01:46PM

6    Q.   Let's look at Page 2, a series of definitions in the

7    corporate -- or the Bard standard.  At the bottom of the page

8    there is a definition for malfunction.  Tell us why that's

9    important.

10   A.   When you are reporting an MDR, you have to report it as        01:47PM

11   either a malfunction or a serious injury.  And the definition

12   is important because that's the definition with which FDA uses

13   to determine reportability, they say if it meets this

14   definition you have to report it.

15   Q.   So even if you decide that the event should be                 01:47PM

16   characterized as a malfunction and not as a serious injury, is

17   it still reported to the FDA?

18   A.   Yes.

19   Q.   Okay.  If we could turn to Page 4, please.

20           Is there also at 4.20 a definition for serious injury?     01:47PM

21   A.   There is.

22   Q.   Now, did Bard come up with these definitions for

23   malfunction and serious injury itself, or what were you

24   counselled by in coming up with these definitions?

25   A.   These are from the FDA themselves, so they publish both the   01:48PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    regulation but then also subsequent guidelines that they send

2    out that helps manufacturers guide them on the interpretation

3    of what the regulation is.  So it's from that.

4    Q.  What sort of events are not reported to the FDA at all?

5    A.  Non-malfunction, non-serious injury, more minor severity    01:48PM

6    events.  Maybe if someone doesn't like the color of a device,

7    we still -- we don't report it unless it's related to some

8    impact to the patient.  But we still keep it tracked as a

9    complaint, because that's information that either the clinician

10   or the patient have provided to us.                             01:48PM

11   Q.  Devices such as IVC filters are sterilized before they are

12   packaged, aren't they?

13   A.  Yes.

14   Q.  If a device, let's say an IVC filter, was opened by the

15   doctor and the packaging had been ripped somehow, perhaps in    01:49PM

16   shipment, and they reported that, would that be reported to the

17   FDA?

18   A.  Yeah.  It's a sterile breach of barrier.

19   Q.  So even if there's no impact on the patient, that sort of

20   event would be reported?                                        01:49PM

21   A.  Yeah.  Yeah.

22   Q.  And did -- well, regardless of whether you characterize

23   under this standard an event as a malfunction or as a serious

24   injury, is it nevertheless reported to the FDA?

25   A.  Yeah, both of those.  Anything in those two areas are       01:49PM

1    definitely reported.

2    Q.  Now, on those very minor reports such as somebody

3    complaining about the color of a device like you mentioned, and

4    you are having to make the decision whether to report the

5    complaint to the FDA, how many Bard employees are involved in          01:49PM

6    making that determination?

7    A.   Typically at least three:  One, the person that has taken

8    down the narrative; then there's a field assurance check, so

9    that person will check to make sure that the record is

10   completed correctly, that all the narrative is appropriately          01:50PM

11   filled out; and then there's a third person that is a quality

12   check that, again, takes a look at that and then looks at the

13   decision making as well.

14   Q.  If Bard cannot determine whether the information provided

15   rises to the level of the FDA's requirement to file a medical         01:50PM

16   device report, or MDR, what does Bard's policy require in terms

17   of whether to report?

18   A.  If there's any question about it you need to report it, if

19   you can't rule it out.  Like in the example of a color, if even

20   someone may not like the color, but if the narrative includes         01:50PM

21   the fact that they didn't like the color and it caused them to

22   choose something incorrectly, that could be a reportable

23   incident.  So you would have to report that.

24   Q.  After making -- how quickly does Bard report a -- report to

25   the FDA information regarding, let's say, a serious injury or          01:51PM

1    malfunction that the company has learned about?

2    A.  You have got 30 days.  There's a 30-day time requirement

3    that you have got to report it.  So you have got to try and get

4    that information pretty quickly, you know, the three attempts

5    to get it back and determine what really has happened in the          01:51PM

6    event and then put together whatever information you can to

7    make that decision within the first 30 days.

8    Q.  If after that 30-day period Bard were to receive additional

9    information regarding an adverse event, what do you do with

10   that new information?                                                  01:51PM

11   A.  You document it.  There's a process where we go through the

12   record and then let's say you get more medical records, you get

13   additional information from the hospital, you have to include

14   that back in the record.  So you open it back up, and then

15   again, you go through the same process.  Is it reportable?  If        01:52PM

16   it's reportable then you have got to file it.

17   Q.  Now, we were talking earlier about sources of information,

18   or where sources of information regarding adverse events might

19   come that would initiate an investigation.  Let's say a lawsuit

20   was filed like Ms. Jones filed the lawsuit here.  When you           01:52PM

21   received, your company, that lawsuit, would you also initiate

22   an investigation regarding that claim?

23   A.  We would.

24   Q.  Mr. Modra, we have been talking about complications and the

25   policy we were looking at a few moments ago about when to            01:53PM

1    report those to the FDA and when not to.  With regard to IVC

2    filters, did Bard report each and every report of a fracture it

3    received?

4    A.  To my knowledge, yes.

5    Q.  What about with regard to each and every report of          01:53PM

6    migrations of a filter?

7    A.  Yes.

8    Q.  And what about a perforation?

9    A.  Yes.

10   Q.  And what about a tilt with regard to a filter?              01:53PM

11   A.  Yes.

12   Q.  Now, does Bard periodically compute or trend and track the

13   adverse events that you have become aware of?

14   A.  Yes.

15   Q.  And do you try to determine what the rates of complication  01:53PM

16   reports are that you have received as compared to the sales of

17   particular products?

18   A.  We do.

19   Q.  What's your purpose in doing that trending and tracking

20   internally?                                                     01:54PM

21   A.  Well, one, it's the best way to understand if the product

22   is performing as you would expect compared to previous

23   estimates and to see if there's anything out of the ordinary

24   that has occurred.

25   Q.  Now, do you sometimes review the -- well, tell us what the  01:54PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   MAUDE database is.

2   A.  It's an acronym, I believe, on the FDA website.  And it's

3   when we report these MDRs they go to FDA and they are placed in

4   the MAUDE database.  So it's a public record.  You can search

5   it for any type of device or time period or manufacturer.          01:54PM

6   Q.  On occasion, has Bard reviewed data from the MAUDE

7   database?

8   A.  We do.

9   Q.  Do you review the information in the MAUDE database

10  regarding competitive products?                                    01:55PM

11  A.  You do.

12  Q.  And have you, on occasion, looked to see what you can find

13  in the MAUDE database with regard to other filters manufactured

14  by other companies?

15  A.  Yes.                                                           01:55PM

16  Q.  Now, when you analyze that sort of data, do you share those

17  rate calculations either internally as to Bard's products or

18  any attempt to compare what you see on the MAUDE database with

19  other products?  Do you provide that information to physicians?

20  A.  No.                                                            01:55PM

21  Q.  And why is that?

22  A.  Well, one, we can't because anything you share with a

23  clinician, it's just like the advertising requirements.  It's

24  got to be fair, balanced, and clinically relevant or clinically

25  based.  So even with the MAUDE database there's a disclaimer      01:55PM

1    right on the FDA website that says don't do that, don't share

2    it, or don't make comparisons strictly on this data alone.  And

3    also, the estimates of the sales or the denominator for that

4    rate isn't included in the MAUDE database.  So those are

5    estimates that we would have to get from somewhere else.          01:56PM

6            MR. NORTH:  Could we bring up Exhibit 7795, please.  I

7    believe this has already been admitted.

8            THE COURT:  Yes.

9            MR. NORTH:  Could we display to the jury, please?

10           THE COURT:  Yes.                                          01:56PM

11   BY MR. NORTH:

12   Q.  Mr. Modra, is this the part of the FDA website or from the

13   MAUDE database that you were discussing?

14   A.  It looks like it is, yes.

15   Q.  If we could highlight the second bullet point here.  Is      01:56PM

16   this what you were referencing earlier as to how MDR data or

17   the FDA says MDR data alone cannot be used to establish rates

18   of events?

19   A.  It was.

20   Q.  Well, let's say even if you looked at the MAUDE database     01:57PM

21   and you learned that there had been 10,000 complaints with a

22   Cook inferior vena cava filter, you wouldn't be able to

23   determine what their complication rate is unless you also knew

24   the number of filters that Cook had sold, correct?

25   A.  Correct.  I mean that -- an absolute number as just          01:57PM

1    reported on here, we don't know necessarily the denominator.

2    Q.  You mentioned the IMS data.  What is that?

3    A.   IMS, I forget the acronym, what that stands for, but it's a

4    service where you can get competitive data, sales data.  So you

5    could make some estimates based on that, but there's still, as          01:57PM

6    I understand it, a quarter lag, meaning a three-month lag in

7    those estimates plus you don't know how accurate they are.  So

8    there's always some variability in those.

9    Q.  So would you consider any complication rate of a

10   competitive filter derived from looking at the MAUDE database          01:58PM

11   for the number of events and the IMS data for a projection of

12   sales to be a reliable rate?

13   A.  It might be interesting, but it's not to a suitable

14   scientific level where you could publish that sort of thing or

15   share that anywhere.                                                    01:58PM

16   Q.  Now, would you, as a quality assurance professional in the

17   medical device industry, feel comfortable in putting

18   competitive rate data based on the MAUDE database and IMS sales

19   projections into an IFU?

20   A.  No.  Not at all.                                                    01:58PM

21   Q.  Do you believe that it would be appropriate to do so in

22   accordance with your understanding of what the FDA requires for

23   medical device companies?

24   A.  No.  I don't think that would be allowed at all.

25   Q.  Do you think it would be appropriate for Bard to share rate        01:59PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    projections or calculations based on MAUDE data of other

2    manufacturers' devices and IMS projections in handouts to

3    physicians and hospitals?

4    A.  No.

5    Q.  Over the 20-plus years you have worked in the medical          01:59PM

6    device industry, are you aware of any device manufacturer that

7    that has included its internal complication rates within its

8    Instructions For Use?

9    A.  No.

10   Q.  What is a DFMEA?                                               01:59PM

11   A.  Design Failure Modes Effects Analysis tool.

12   Q.  Is that a quality assurance analysis tool that you used at

13   Bard to assess risks associated with various products?

14   A.  I would even make it more broad than that.  Not just

15   quality assurance but it's a tool that's used to assess          02:00PM

16   potential risks and occurrence rates for those failure modes

17   related to those risks.

18   Q.  Over the 20-plus years you have worked in the medical

19   device industry, are you aware of any device manufacturer that

20   has included its DFMEA calculations within its Instructions For  02:00PM

21   Use?

22   A.  No.

23        MR. O'CONNOR:  Objection.  Lack of foundation.

24        THE COURT:  I couldn't hear what you said, Mr.

25   O'Connor.                                                        02:00PM

1          MR. O'CONNOR:  I'm sorry, Your Honor.  Lack of

2     foundation.

3          THE COURT:  Hold on just a minute.

4          Overruled.

5          THE WITNESS:  No.  I'm not aware of any.                    02:00PM

6     BY MR. NORTH:

7     Q.  During your 20-plus years in the medical device industry,

8     have you ever seen an instance where any medical device

9     manufacturer disclosed its internal calculations of

10    complication rates in an IFU?                                    02:00PM

11    A.  No.  Not that I'm aware of.

12    Q.  Mr. Modra, periodically, does Bard conduct internal audits

13    of its own complaint handling systems?

14    A.  We do.  We conduct internal audits as well as a lot of

15    other audits.  We're subjected to a lot of other audits,        02:01PM

16    external audits as well.

17    Q.  How often does Bard conduct internal audits?

18    A.  Of just that area or all the areas every year?

19    Q.  Of all the areas?

20    A.  We have in our practices where we conduct audits of all the 02:01PM

21    different areas in the business in a calendar year.

22    Q.  Does Bard sometimes retain third parties, outside private

23    consultants, to come in and audit your various processes?

24    A.  Yes.

25    Q.  Have you done that periodically over the years with your    02:01PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    complaint handling process?

2    A.  Yes.

3    Q.  How rigorous are these audits that are internally conducted

4    or conducted by consulting firms hired by Bard?

5    A.  Pretty thorough, because they will pull a pretty deep            02:02PM

6    sample of records.  They will go through each record.  They sit

7    down and not just look at are people following the procedure

8    but is the procedure correct.  So in my experience they are not

9    afraid of running up observations.

10   Q.  Now, after the FDA clears a device that comes to market        02:02PM

11   through a 510(k), does the FDA, is it finished with the device

12   or does it continue to be involved with the device in the

13   company?

14   A.  They are always involved in the company.

15   Q.  Does the FDA itself conduct audits of medical device           02:02PM

16   companies?

17   A.  They do.

18   Q.  What sorts of audits does the FDA perform?

19   A.  Typically they will be -- I don't know if the right term is

20   periodic, but the schedule is usually about every two years,       02:02PM

21   two, maybe three at the most, and they are usually unannounced

22   audits.  So, I mean, you are ready at any time.  FDA can show

23   up at your door at 9 a.m. and you just escort them right to a

24   conference room, and it's all hands on deck.  So whatever they

25   want, everyone knows that that's -- they get what they want.       02:03PM

1    Q.  As the Vice President of Quality Assurance, how does it

2    feel to sit at your disk at 9 a.m. having a cup of coffee and

3    have the receptionist tell you the FDA is in the lobby of the

4    building?

5    A.  My coffee usually gets cold after that.                    02:03PM

6    Q.  Are these audits by the FDA routine?

7    A.  Yeah.  Like I said, typically every two years.  They can

8    schedule them at any time, though, for Bard Peripheral Vascular

9    because we had device submissions.  They would come even more

10   frequently than that.                                          02:03PM

11   Q.  Are all -- does the FDA conduct these sorts of audits of

12   all medical device companies?

13   A.  Yes.

14   Q.  Does the inspection process sometimes result in an FDA

15   finding of deficiencies in your various quality systems?       02:04PM

16   A.  It does.

17   Q.  During your time at Bard Peripheral Vascular, was the

18   company subject to some of these periodic routine FDA audits?

19   A.  Yes.

20   Q.  And did the FDA, as a result of some of those audits, issue 02:04PM

21   a warning letter to Bard Peripheral Vascular while you were

22   employed with the company?

23   A.  They did.

24   Q.  And when was that?

25   A.  July 13th, 2015.                                           02:04PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    Q.  You seem to remember that date well.

2    A.  I do.

3    Q.  In your experience, are FDA warning letters rare?

4    A.  Maybe in the past, but not so much anymore.

5    Q.  Is that something that's only happened to Bard or has it         02:04PM

6    happened to some of your competitors in other major medical

7    device companies in the industry?

8    A.  It happens to most all the ones I'm aware of.

9    Q.  Now, was the warning letter issued in July of 2015, was

10   that related to the complaint processing systems, at least in      02:05PM

11   part?

12   A.  In part, yes.

13   Q.  Now, prior to the inspection in the 2015 time frame, the

14   audit, had BPV or Bard Peripheral, ever been audited by the FDA

15   before?                                                             02:05PM

16   A.  Yeah.  Twice since I had been there, so twice since March

17   2011.

18   Q.  And had you personally met with FDA auditors in the past

19   while working at Bard Peripheral Vascular?

20   A.  I did.                                                          02:05PM

21   Q.  And on those two occasions when the company was audited

22   prior to 2015, what were the results of those audits of the

23   company?

24   A.  No observations.

25   Q.  Had the policies or procedures or ways you did your             02:06PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    business changed since those two audits where there were no

2    observations until 2015?

3    A.  Not substantially.

4    Q.  Prior to 2015, to your knowledge had Bard Peripheral ever

5    received an FDA warning letter?                                    02:06PM

6    A.  Not that I'm aware of, no.

7    Q.  Were you surprised when the company received that warning

8    letter?

9    A.  I was, given I was involved in the thoroughness at which we

10   had answered previous observations.  We had covered not just     02:06PM

11   what they had -- we believed they had an issue with but also

12   looked around and made other system-wide significant changes.

13   So I really thought that, you know, it had been an extended

14   time period between when we received the observations and the

15   warning letter.  So I felt like maybe we had addressed the       02:07PM

16   their concerns adequately.  And we hadn't heard anything back

17   from them during the entire time period.

18   Q.  If we could bring up Exhibit 1680, please.

19          MR. NORTH:  I'm sorry.  Bring that up.  Let me see the

20   second page, if you could.                                       02:07PM

21          Okay.  Go back to the first page.

22   BY MR. NORTH:

23   Q.  Do you recognize Exhibit 1680?

24   A.  I do.

25   Q.  And is this the warning letter from the FDA that we talked   02:07PM

1  about?

2  A.  It is.

3  Q.  And who is it addressed to?

4  A.  Timothy M. Ring.

5  Q.  And he was the Chief Executive Officer of Bard at the time?   02:07PM

6  A.  He was.

7       MR. NORTH:  Your Honor, at this time we would offer

8  for admission Exhibit 1680 as redacted.

9       MR. O'CONNOR:  No objection.

10       THE COURT:  Admitted.   02:07PM

11  BY MR. NORTH:

12  Q.  Let me ask you some questions about this warning letter,

13  Mr. Modra.  Did this warning letter in any way address whether

14  there was any defect in the design of Bard's Recovery Filter?

15  A.  No.   02:08PM

16  Q.  Did it in any way address whether there was any defect in

17  the design of Bard's G2 Filters?

18  A.  No.

19  Q.  And did it in any way address whether there was any design

20  defect in the Eclipse Filter?   02:08PM

21  A.  No.

22  Q.  Did it in any way address whether there was a defect of any

23  sort in the warnings provided by Bard with regard to the

24  Recovery Filter, the G2 Filters, or the Eclipse Filter?

25  A.  No.   02:08PM

1    Q.  Did it in any way suggest that Bard's Recovery Filter, G2

2    Filter, or -- G2 filters or Eclipse Filter were unsafe?

3    A.  No.

4             MR. O'CONNOR:  Objection.  Irrelevant, Your Honor.

5             THE COURT:  Overruled.                              02:08PM

6    BY MR. NORTH:

7    Q.  Mr. Modra, there was some discussion in the warning letter

8    regarding an issue with misreporting of an event associated

9    with a patient death.  Do you know what happened regarding

10   that?                                                       02:09PM

11   A.  Yes.

12   Q.  Tell us what happened there.

13   A.  We had received the initial complaint and filed it as a

14   reportable event, but at some point in time later we had

15   received additional information that said that the patient had  02:09PM

16   died.  And between the files that we had in house and the way

17   we reported it on the MDR form, it was a paper form at the

18   time, the box that said patient had died was not checked.  So

19   there was inconsistency between what was reported and our

20   internal paperwork.                                         02:09PM

21   Q.  Over the years, has the FDA clarified its position on what

22   events should be filed with the FDA?

23   A.  It has.

24   Q.  And does the FDA periodically hold meetings with industry

25   to discuss how it's interpreting its standards at the time?  02:10PM

1    A.   Yeah.  There's meetings.  There's Day at the FDA.  There's

2    an MDR conference where those issues are discussed.  So most

3    recent interpretations can be discussed not just amongst FDA

4    and industry but against -- with multiple companies and FDA.

5    Because it's -- sometimes it's complicated on what they would          02:10PM

6    like reported beyond just what is stated in regulation.

7    Q.   Has it been your experience that the FDA's interpretation

8    of how it's going to apply its standards evolves over time?

9    A.   I believe it has, because they have put out as recently as

10   just a few years ago a pretty extensive guidance that explains       02:10PM

11   how companies are supposed to interpret how -- their

12   regulation.  So the regulation hasn't really changed, but

13   obviously devices have grown increasingly more complicated and

14   they are just putting out their expectations that this is way

15   you should interpret that.  So we all have to adjust.                 02:11PM

16   Q.   What are some of the challenges that industries like you

17   face with deciding how to classify an event report, an adverse

18   event report?

19   A.   It's -- because the regulations are written broad to cover

20   all devices, it doesn't just say, oh, this is a dialysis            02:11PM

21   catheter you reported on this particular situation.  It's not

22   that specific.  It's -- it talks in generalities.  It talks if

23   it's this kind of device, this kind of incident, examples of

24   those should be reported.  So you have to do some

25   interpretation of, okay, how does that example apply to my           02:11PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   particular device.

2          So as they have gotten more and more complicated and

3   we get more and more data, which is good, it's increasingly

4   more difficult to make sure that that reporting is consistent.

5   Q.  Did one of the FDA's concerns expressed in the warning       02:12PM

6   letter regarding Bard's complaint handling have to do with how

7   the company distinguished between serious injury cases and

8   malfunction cases with regard to a few complaints?

9   A.  It did.

10  Q.  And how many -- how many complaints did the FDA cite in the  02:12PM

11  warning letter as to how they were characterized?  Do you

12  recall?

13  A.  I want to say 10.  10 or 12 across the individual citations

14  of numbers.

15  Q.  Now, was the FDA telling the company that some of the        02:13PM

16  complaints you had characterized as malfunctions should have

17  been characterized as serious injuries?

18  A.  They were.

19  Q.  But were the complaints, regardless whether characterized

20  as a malfunction or a serious injury, were all of those         02:13PM

21  actually reported to the FDA?

22  A.  If they are characterized as either one of those then they

23  are already reported.  So that's correct.

24  Q.  So was the FDA's complaint not that you failed to report

25  those complaints but simply how you characterized them?          02:13PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   A.   Correct.

2   Q.   And did the FDA express concern about the company not

3   having reported another handful of complaints?

4   A.   They did.

5   Q.   And what did those complaints have to do with?        02:13PM

6   A.   They were mostly related to the delivery system or the

7   catheter that the filter sits on.  So we had interpreted those,

8   because there was no mention in the narrative of any of those

9   where there was any sort of patient injury or issue with the

10  filter itself, it was only the delivery system that was        02:14PM

11  difficult to deploy.  So they noted that we should have

12  reported those where because there was no injury, we hadn't

13  been reporting those.

14  Q.   Mr. Modra, this jury has heard some testimony about the

15  latest generation Bard IVC filter, the Denali.  Are you        02:14PM

16  familiar with that?

17  A.   I am.

18  Q.   And is it made through a different process than the earlier

19  generation filters?

20  A.   It is.        02:14PM

21  Q.   And is it actually manufactured in significant part by a

22  component supplier as opposed to Bard itself?

23  A.   It is.

24  Q.   Did a number of the criticisms of the FDA in the warning

25  letter have to do with how you investigated complaint reports        02:14PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   that involve the Denali Filter because of the interaction with

2   the component supplier?

3   A.   They did.   They objected to the fact that even though we

4   had taken corrective actions, we didn't include that number of

5   the document in the complaint event.                          02:15PM

6   Q.   Now, did any of the criticisms of the FDA in the warning

7   letter have to do with a failure on Bard's part to report any

8   event that involved a patient injury?

9   A.   Not that I'm aware of.

10  Q.   Now, after the issuance of the warning letter did you have  02:15PM

11  meetings or discussions with the FDA?

12  A.   We did.   We were fortunate to have some discussions with

13  them.

14  Q.   And did the FDA provide feedback to the company about its

15  reporting systems?                                            02:15PM

16  A.   We did.   It was great feedback.

17  Q.   And did Bard then conduct a larger internal audit of its

18  complaint handling systems on its own and report those findings

19  to the FDA?

20  A.   We did.                                                  02:16PM

21  Q.   Now, with regard to the points cited by the FDA in the

22  warning letter regarding complaint handling, did any of those

23  points affect the validity or accuracy of your internal

24  tracking and trending that you do on events?

25  A.   No, because we track and trend all the events whether they  02:16PM

1    are reportable or not based on the code that's assigned that we

2    talked about before.

3    Q.  Mr. Modra, in your role in BPV's Quality Department did you

4    get an understanding of what sort of patients are indicated for

5    Bard optional IVC filters?                                          02:17PM

6    A.  I did.

7    Q.  And did you also gain an understanding of what the purpose

8    of an IVC filter is?

9    A.  Yes.

10   Q.  And generally, did you become generally familiar, if you       02:17PM

11   weren't already, about how blood clots or deep vein thrombosis

12   can turn into pulmonary embolism?

13   A.  I did.

14   Q.  And what's your understanding from your work at Bard

15   regarding the clinical danger of pulmonary embolism?                02:17PM

16   A.  Well they can be fatal, which is what the filter's purpose

17   is trying to prevent.

18   Q.  Are you aware of any action that the federal government via

19   the surgeon general has taken with regard to the threat of

20   pulmonary embolism?                                                 02:18PM

21   A.  Yes.

22   Q.  Did you become familiar with that as a part of your work at

23   Bard?

24   A.  I did.

25          MR. NORTH:  Could we pull up Exhibit 7411, please.          02:18PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    BY MR. NORTH:

2    Q.  Are you familiar with this document?

3    A.  Uh-huh.  Yes.

4    Q.  And what is it?

5    A.  Surgeon general's -- it's a call to action, but it's a          02:18PM

6    report on just how big a problem the pulmonary embolism is in

7    our country.

8    Q.  Have you reviewed this before?

9    A.  I have.

10   Q.  Is it available on the surgeon general's website?              02:18PM

11   A.  I believe so, yes.

12          MR. NORTH:  Your Honor, at this time we would offer

13   for admission Exhibit 7411.

14          MR. O'CONNOR:  Well, objection, 803.18 and lack of

15   foundation.                                                        02:18PM

16          THE COURT:  Well, overruled on 803.18.  And overruled

17   on foundation.  I believe it's admissible under 803.8.

18          MR. NORTH:  Your Honor, may we publish, please?

19          THE COURT:  Yes.

20   BY MR. NORTH:                                                      02:19PM

21   Q.  If we could turn to Page 9, please, looking at the first

22   paragraph, the sentence that becomes, "Estimates."

23   A.  Yes.

24   Q.  Begins, "Estimates."

25          Does the FDA provide an estimated rate of DVT and           02:19PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1  pulmonary embolism in this country every year?

2  A.  It provides the total numbers for each of those.  They

3  calculate a rate from there.

4  Q.  And in the sentence above that does the FDA advise what the

5  purpose of its call to arms is?                                    02:19PM

6  A.  It does.

7  Q.  If we could turn to Page 11, please.

8          Looking at the second paragraph, what does it say with

9  regard to the estimated number of deaths every year from deep

10  vein thrombosis and pulmonary embolism?                          02:20PM

11  A.  Some estimates suggest that there are more than breast

12  cancer, AIDS, or motor vehicle incidences.

13  Q.  If we could turn to Page 25 at Section 2, right-hand

14  column.  Right above the bolded caption.

15          MR. O'CONNOR:  Excuse me.  Are you talking about Bates   02:21PM

16  Number 25 or the document number?

17          THE COURT:  What page number?

18          MR. NORTH:  25.

19          MR. O'CONNOR:  Which page?  There's two page numbers.

20          MS. HELM:  The exhibit Number 25.                         02:21PM

21          MR. O'CONNOR:  Okay.  Thank you.

22  BY MR. NORTH:

23  Q.  Does the surgeon general here discuss in this paragraph IVC

24  filters?

25  A.  It does.                                                      02:21PM

1   Q.  And what does it say regarding these devices?

2   A.  That they act like miniature umbrellas with holes that can

3   trap blood clots thus preventing PE without stopping the flow

4   of blood.

5   Q.  Turning back to the warning letter just a minute, Mr.                02:21PM

6   Modra, did Bard take that warning letter seriously?

7   A.  Absolutely.

8   Q.  And what -- once the company received the letter, what

9   actions did you take?

10  A.  Within 15 days you have to respond fully and completely            02:22PM

11  what you have done in those 15 days, reiterate what you have

12  done prior to the warning letter and also what are you going to

13  do to address each individual item that they have cited.

14          So you have to have that prepared and sent, delivered

15  right to their doorstep within 15 days.                               02:22PM

16  Q.  And how much time did you personally spend to ensure

17  adequate and appropriate responses addressing FDA's concerns in

18  the letter?

19  A.  The vast majority of every 15 of those days.

20  Q.  Did Bard ultimately satisfactorily respond to FDA's               02:22PM

21  concerns expressed in the warning letter?

22  A.  We did.

23  Q.  And what is a warning letter closeout letter?

24  A.  It's the communication from FDA that says they reviewed in

25  totality our responses, but then they have also conducted            02:23PM

1  follow-up visits, unannounced follow-up visits to verify on

2  site that we have done everything we said we were going to do

3  and they have observed the evidence for that.  And then they

4  say that the warning letter is officially closed.  So they send

5  a letter back to us.                                          02:23PM

6          MR. NORTH:  Can we bring up Exhibit 5872, please.

7  BY MR. NORTH:

8  Q.  Mr. Modra, do you recognize 5872?

9  A.  I do.

10  Q.  And what is that?                                        02:23PM

11  A.  It is the warning letter closeout letter.

12          MR. NORTH:  Your Honor, at this time we would offer

13  5872 as an exhibit.

14          MR. O'CONNOR:  No objection.

15          THE COURT:  Admitted.                                02:23PM

16          MR. NORTH:  Could we display, Your Honor?

17          THE COURT:  You may.

18  BY MR. NORTH:

19  Q.  If we could look, what does the FDA say in the first two

20  sentences, the first paragraph there?                       02:24PM

21  A.  The Food and Drug Administration has completed their

22  evaluation of corrective actions, which is typically that

23  on-site audit that I talked about and then in our response.

24  And then based on that, their assessment, it appears you have

25  addressed all of the violations contained in the warning letter  02:24PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   and that future inspections will further assess the adequacy of

2   the continued sustaining of that.

3   Q.   Now, since that time has the FDA conducted any other audits

4   or inspections of Bard Peripheral Vascular?

5   A.   Yes.                                                          02:24PM

6   Q.   And did they find any violations or any issues on

7   subsequent inspections, to your knowledge?

8   A.   No.

9   Q.   So to your knowledge, over the course of the years you have

10  been involved with Bard Peripheral Vascular there have been at   02:24PM

11  least four FDA audits of the complaint handling system?

12  A.   At least four, yes.

13  Q.   And has the complaint handling system changed significantly

14  in any fashion over that period of time?

15  A.   During what period of time?                                  02:25PM

16  Q.   In the period of time that those four audits have taken

17  place?

18  A.   We had the procedures in place that characterized and did

19  the same things, if anything, in addressing the warning letter

20  items we provided additional detail.  But it didn't really      02:25PM

21  change the tracking and trending practices.  It didn't track

22  how or change how we did that.  Those were already in place.

23  So that didn't really change.

24  Q.   Again, was there anything in the warning letter involving a

25  failure on the part of Bard to report to the FDA any incident    02:25PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

 1    involving a patient injury?

 2            MR. O'CONNOR:  Objection.  Asked and answered.

 3            THE COURT:  Sustained.

 4    BY MR. NORTH:

 5    Q.  Let's start talking about trending and tracking.  Does the          02:25PM

 6    company have a policy that governs trending and tracking?

 7    A.  Yes.

 8    Q.  If we could bring up Exhibit 5483, please.  Can you

 9    identify what this is for the record?

10    A.  It's the procedure related to complaint trending.                   02:26PM

11    Q.  And is this maintained by the Quality Assurance Department

12    at Bard Peripheral Vascular?

13    A.  It's maintained by quality as well as for the use of

14    everyone involved.

15            MR. NORTH:  Your Honor, at this time we would offer             02:26PM

16    for admission Exhibit 5483.

17            MR. O'CONNOR:  No objection.

18            THE COURT:  Admitted.

19            MR. NORTH:  If we could display, Your Honor?

20            THE COURT:  You may.                                           02:26PM

21            MR. NORTH:  If we could turn to Page 2, Scott.

22    BY MR. NORTH:

23    Q.  Does this delineate or outline what sort of trending and

24    tracking your department does?

25    A.  It does.                                                            02:26PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    Q.  Tell us, if you will, what some of the things are that the

2    quality department does trend and track.

3    A.  As it reads there, there's daily reports, weekly reports, a

4    comprehensive monthly report where it's tracked by product

5    family, by product line, by month by month the date the event          02:27PM

6    is reported as well as failure modes.  So it also goes through

7    the rates, the device codes, so all of those.

8    Q.  If we could look -- highlight Number 6 for a moment.

9         When you talk about rates, are you talking about rates

10   of complications received by a company?                                02:27PM

11   A.  We are.

12   Q.  And how frequently are those monitored?

13   A.  At least monthly.

14   Q.  And how do you compute those rates?

15   A.  You take the number of reported incidences and divide it by        02:28PM

16   the reported sales for that particular product family or

17   product code itself.

18   Q.  Now, do you do any tracking or trending with regard to

19   patient outcomes or the severity of the complications?

20   A.  We do only in such that you include MDRs as tracking and           02:28PM

21   trending.  But it's focused on the types of failure modes, the

22   product lines themselves, what the reported event was.

23   Q.  And what do you do with that information?

24   A.  Well, when you track and trend it as required, you can tell

25   if there's an increasing trend, a decreasing trend.  If, for          02:28PM

1    instance, there's one particular month that has a lot of

2    incidences, that might be triggered in our early warning

3    system, as it says here, to look into that further.  Is it just

4    that people reported a lot more incidences in a particular

5    month or was it because there was something different going on?    02:29PM

6           So it's important to look at it month for month on a

7    periodic basis to compare it to the months around it to know is

8    it increasing or decreasing.

9    Q.   Is that information reported to management at Bard

10   Peripheral Vascular?    02:29PM

11   A.   It is.

12   Q.   On a routine basis?

13   A.   At least monthly.

14   Q.   What is the Management Board at Bard Peripheral Vascular?

15   What does that mean?    02:29PM

16   A.   It consists of the heads of each of the different

17   departments and the president.  So it's his staff essentially.

18   It's research and development, quality, regulatory, marketing

19   sales, manufacturing.  I think that's it.

20   Q.   And does the Management Board at Bard peripheral meet on a    02:29PM

21   regular basis?

22   A.   Every month at least.

23   Q.   And does the Management Board share information at these

24   monthly meetings about adverse events that have been reported

25   to the company?    02:29PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    A.  We spend a lot of time discussing a very thick packet of

2    analysis that typically was put together by my department and

3    shared through me to that team.

4            THE COURT:  We're going to break at this point, Mr.

5    North.  We'll continue at 2:45.                              02:30PM

6            MR. NORTH:  Thank you, Your Honor.

7            (Jury out at 2:30 p.m.)

8            THE COURT:  Mr. North, how much longer do you have?

9            MR. NORTH:  I think I have about 20 more minutes on

10   direct.                                                      02:30PM

11           THE COURT:  All right.  We'll see you in 15 minutes.

12           (Recess from 2:30 p.m. until 2:47 p.m.)

13           THE COURT:  You may continue, Mr. North.

14           MR. NORTH:  Thank you, Your Honor.

15   BY MR. NORTH:                                                02:47PM

16   Q.  Mr. Modra, does Bard have a policy for remedial actions?

17   A.  Yes.

18   Q.  What does that mean in your business, product remedial

19   action?

20   A.  It's the process to decide whether a particular issue could  02:47PM

21   result in a product recall of some kind, either communication

22   to customers or pulling product from the field.

23   Q.  If we could bring up Exhibit 5563, please.

24           Do you recognize what this is?

25   A.  Yes.                                                     02:47PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    Q.  And what is this?

2    A.  It's the product remedial action standard.

3    Q.  And this is the one that governs what your company does?

4    A.  Yes.

5            MR. NORTH:  Your Honor, I believe this may be                02:48PM

6    admitted, but if not, could we tender for admission?

7            THE COURT:  It's not admitted.  What is your response,

8    Mr. O'Connor?

9            MR. O'CONNOR:  No objection.

10           THE COURT:  Admitted.                                         02:48PM

11           MR. NORTH:  May we display to the jury, Your Honor?

12           THE COURT:  Yes.

13   BY MR. NORTH:

14   Q.  Is this sometimes nicknamed internally the R002 policy?

15   A.  It is.                                                            02:48PM

16   Q.  How does Bard decide whether remedial action must be taken?

17   A.  We conduct an investigation into the root cause of what the

18   issue is, and then you pair that -- you take that information

19   and you have a medical director assess the severity, potential

20   severity of that issue and the breadth of that issue and you         02:48PM

21   match that with the rate of occurrence of the particular issue,

22   and in a chart it determines what additional action you have to

23   take.

24   Q.  If we could turn to Page 12, please.

25           Tell us what this matrix means.                              02:49PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   A.  That's the chart I was referring to that it takes the

2   severity along the bottom and then the rate of occurrence,

3   worst-case occurrence on the left-hand side.  And when you

4   match those two up, it gives you different regions with which

5   the actions are required below that.                          02:49PM

6   Q.  How are occurrences determined?

7   A.  They are worst-case scenarios for the particular issue.  So

8   if it's related to a particular month, you would take the units

9   made in that month, or -- so it's the observed and the

10  potential units related to that issue.                        02:49PM

11  Q.  And how is severity determined?

12  A.  By the medical director.  They review literature.  They are

13  aware of the procedures and then they make an assessment called

14  an HHE, Health Hazard Evaluation.  And that is put into a

15  bucket, either catastrophic, critical, moderate, marginal, or   02:50PM

16  negligible.

17  Q.  On the second chart underneath there, you have action

18  levels.  How do you determine those action levels?

19  A.  When you have, let's say, a marginal, which is a Number 2

20  severity, paired with something that happens 1 in 5000, a       02:50PM

21  Number 4, you have the yellow category.  And then that says

22  potentially acceptable, we have to review that meaning you have

23  to assess the investigation itself and the actual incidences

24  and the potential effect on regulation if you are evaluating

25  that.  And then you take the appropriate action.               02:50PM

1    Q.  And what does it mean by Division PAT?

2    A.  That's the Management Board, essentially, or some members

3    of that that have to review that and then determine whether

4    additional action is required.  They can approve that.

5    Q.  Now, you were talking to us earlier --                          02:50PM

6         MR. NORTH:  You can take that down now.

7    BY MR. NORTH:

8    Q.  Let me ask you this, Mr. Modra:  Over the course of your

9    seven years at Bard using this R002 policy for product remedial

10   action, has Bard ever internally determined that the Eclipse     02:51PM

11   Filter is unsafe?

12   A.  No.

13   Q.  And using that same policy, has Bard ever determined that

14   the Eclipse Filter should be recalled based on internal company

15   policies?                                                        02:51PM

16        MR. O'CONNOR:  Objection.  Irrelevant, Your Honor.

17   May we approach?

18        THE COURT:  Yes.  If you want to stand up, Ladies and

19   Gentlemen.

20        (Discussion was had at sidebar out of the hearing of        02:51PM

21   the jury:)

22        MR. O'CONNOR:  I thought we talked about this earlier

23   today that we could not discuss recall whether they recalled

24   something or not.

25        MR. NORTH:  Certainly no claim for --                       02:52PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1      THE COURT:  I don't know what you are talking about.

2      MR. O'CONNOR:  We don't have any claim for recall.

3  That's why you have made some rulings the way that you did.

4      THE COURT:  Recall of Recovery.  I said that last

5  night in my order.  What does that got to do with whether the          02:52PM

6  problems with the Eclipse ever got into the severity range that

7  would cause the --

8      MR. O'CONNOR:  Maybe I misunderstood the extent, but I

9  still think it's irrelevant.  I mean, non-enforcement is

10  different than enforcement.  And whether they had this recall          02:52PM

11  or not, I think that causes this jury to speculate on, once

12  again, what the FDA knew or didn't know about this device.

13      MR. CLARK:  We also aren't making a claim for failure

14  to recall.

15      MR. NORTH:  Your Honor, first of all, this question          02:52PM

16  was not posed in terms of the FDA recalling but whether their

17  internal safety processes of this policy and others triggered

18  an internal decision that remedial action was necessary.  And I

19  believe that is a fair question as to the reasonableness of

20  their conduct.          02:53PM

21      I also believe the FDA decision, because that's coming

22  down in about 10 minutes, I will ask a question about that, I

23  think the Court has ruled on that already.  Certainly this is

24  not even determining what the FDA, this is corporate decision

25  making.          02:53PM

─────5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct─────

1          THE COURT:  Anything further?

2          All right.  I'm going to overrule the relevancy

3     objection.  I think it's relevant.

4          (In open court.)

5          THE COURT:  Thank you.                              02:53PM

6          The objection is overruled.

7     BY MR. NORTH:

8     Q.  Let me phrase the question again, Mr. Modra.  Pursuant to

9     this R002 policy or any other internal policies the company

10    has, has Bard ever determined that the Eclipse Filter should be   02:53PM

11    recalled?

12    A.  No.

13    Q.  Now, as a part of Bard's tracking and trending, what does

14    it use for the numerator in coming up with projected rates of

15    reporting complications?                                    02:54PM

16    A.  The reported events.

17    Q.  And then what does it use for the denominator in

18    determining -- calculating that rate?

19    A.  Sales numbers.

20    Q.  Why don't -- why do you use sales numbers, the number of   02:54PM

21    devices sold?  Why don't you use the actual number of devices

22    implanted in patients?

23    A.  One, it's we can't get the number of devices actually

24    implanted; and two, the sales numbers are reliable.  We can get

25    them for each month and so that's why.                      02:54PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   Q.  But don't you have concern that using sales numbers as the

2   denominator in calculating rates might artificially depress the

3   ultimate rate because not all filters that are sold are

4   actually implanted?

5   A.   True.  But the sales number, in my experience in these        02:55PM

6   products, is close because they are technical, used in very

7   specific situations.  They are typically expensive.  So it's --

8   the hospitals, in my experience, don't keep a lot of them on

9   the shelf.  And anything that is returned we take out of the

10  sales number each month.                                           02:55PM

11        So that's why I would say it's close but not

12  significantly different than the rate that we're getting

13  reported.

14  Q.  Now, as a part of forming the -- or performing these rate

15  calculations, does the company utilize adverse events in coming   02:55PM

16  up with a number regardless whether characterized as a serious

17  injury or as a malfunction?

18  A.  We do.  The rates are based on the failure mode and the

19  code itself.  And the code is applied to all complaints, so

20  it's not whether it's reportable or not.  That's a subset.        02:56PM

21  It's -- the tracking and trending is done on complaints.

22  Q.  Now, as a part of this rate calculation that Bard trends

23  and tracks, do you do so or use events even, or regardless

24  whether they are actually reported to the FDA?

25  A.  Yes.                                                           02:56PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    Q.  Now, does Bard perform all of these sorts of rate

2    calculations we have been talking about generally with regard

3    to IVC filters?

4    A.  Yes.

5    Q.  Do they do so with regard to fracture, migration,                02:56PM

6    perforation, and tilt among other complication modes?

7    A.  Yes.

8    Q.  If we could bring up Exhibit 5874, please.

9            Are you familiar with this document?

10   A.  I am.                                                            02:57PM

11   Q.  Tell us what this is, please.

12   A.  It's a summary of those complications that you mentioned

13   with a few others for each of the filter families from, looks

14   like, from the date of their launch to December 16.

15   Q.  Is this the sort of calculation or tracking that Bard           02:57PM

16   performs with regard to filters on a regular basis?

17   A.  Yes.

18   Q.  And are these tracking and trending calculations made by

19   the company, approximately how often are they performed?

20   A.  These are calculated each month and then on an ad hoc basis     02:57PM

21   in addition.

22   Q.  And are these rate calculations maintained in the ordinary

23   course of Bard's business?

24   A.  Yes.

25           MR. NORTH:  And, Your Honor, at this time we would          02:58PM

1    tender Exhibit 5874 into evidence.

2            MR. O'CONNOR:  No objection.

3            THE COURT:  Admitted.

4            MR. NORTH:  May we display, Your Honor?

5            THE COURT:  You may.                          02:58PM

6            MR. NORTH:  Could we somehow blow this up a little.

7            Let's look, if we could, just through halfway, through

8    Denali.  Right there.  Yeah.

9    BY MR. NORTH:

10   Q.  Tell us what this is depicting here.  Is it showing, first    02:58PM

11   of all, the rates through December of 2016?

12   A.  It says sales through December '16, and it's not the rates

13   it's the numerator and denominator separately.

14   Q.  And as of December 2016, how many Eclipse Filters had been

15   sold?                                               02:59PM

16   A.  66,563.

17   Q.  And how many reports of fracture with the Eclipse out of

18   that 66,563 sold have there been?

19   A.  110.

20   Q.  How many migrations would there have been?          02:59PM

21   A.  50.

22   Q.  Now, migration here, would that include both migrations in

23   the cephalad or upward direction and migrations in the downward

24   or cranial -- I mean caudal direction?

25   A.  It includes all reports of migration.              02:59PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    Q.  And how many perforations had been reported as of December

2    of 2016?

3    A.  101.

4    Q.  And then look at the very bottom.  How many tilts would

5    have been reported as of then?                                     02:59PM

6    A.  127.

7    Q.  And then further on the right, does it actually compute the

8    rate?

9    A.  It does.

10   Q.  So based on sales through 2016, what was the rate of         03:00PM

11   reported fractures for the Eclipse Filter?

12   A.  .17 percent.

13   Q.  What was the rate of reported migrations?

14   A.  .08 percent.

15   Q.  What was the rate for perforation?                           03:00PM

16   A.  .15 percent.

17   Q.  And what was the rate for reports that Bard had received of

18   tilt?

19   A.  .19 percent.

20          MR. NORTH:  Now, if we could bring down the G2 rate       03:00PM

21   column, please.

22   BY MR. NORTH:

23   Q.  Was the reported rate of fracture with regard to the

24   Eclipse an improvement over the reported rate of fracture with

25   the G2?                                                          03:01PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1    A.  It was.

2    Q.  And what about with migration.  It appears it was twice as

3    or half as much for Eclipse as for the G2.  Is that correct?

4    A.  That's correct.

5    Q.  And with regard to perforation, were the reported rate of          03:01PM

6    perforations with regard to the Eclipse an improvement over the

7    G2?

8    A.  It was.

9    Q.  And lastly, what about tilt?

10   A.  That was as well.                                                  03:01PM

11   Q.  Based upon the data that Bard has been able to collect,

12   does it appear that Bard was successful in reducing the

13   incidence of fractures in the Eclipse Filter?

14   A.  It does.

15   Q.  Does it appear that Bard was successful in reducing the           03:02PM

16   rate of migrations?

17   A.  It does.

18   Q.  Now, Mr. Modra, these aren't perfect calculations as to

19   what the rate is in the real world, are they?

20   A.  No.                                                               03:02PM

21   Q.  And you would agree that not all 66,000 filters sold,

22   Eclipse Filters sold as of that date were actually implanted in

23   patients?

24   A.  No.  No.

25   Q.  But as you have indicated earlier, would you expect that         03:02PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Direct

1   most of them were?

2   A.  I would expect so, yes.

3   Q.  In your experience with Bard, do you believe that these

4   rates would include any adverse event that the company had

5   heard about?                                                  03:02PM

6   A.  Yes.

7   Q.  Including all complications reported in the medical

8   literature?

9   A.  Yes.

10  Q.  All complications reported by doctors?                    03:02PM

11  A.  Yes.

12  Q.  All complications overheard by, received from, sales

13  representatives in the field?

14  A.  Yes.

15  Q.  And all complications reported to the hotline in Covington? 03:03PM

16  A.  Yes.

17  Q.  Would this even include all reports of complications

18  discussed at SIR conferences?

19  A.  They would.

20  Q.  In fact, Bard peripheral sends delegates or people to     03:03PM

21  attend and monitor the Society of Interventional Radiologists

22  annual conferences, correct?

23  A.  Correct.

24  Q.  And there are a number of presentations there?

25  A.  Yes.                                                      03:03PM

1   Q.  So would the employees that have gone and visited that come

2   back and report to the Quality Assurance Department any adverse

3   events they had learned about in those presentations?

4   A.  They would.

5   Q.  Mr. Modra, does Bard Peripheral Vascular make every effort          03:03PM

6   to find out and investigate every report of fracture,

7   migration, perforation, and tilt regarding its filters?

8   A.  I believe we do.

9   Q.  Now, did your department consistently track these events

10  throughout the time you were at Bard Peripheral?                        03:04PM

11  A.  They did.

12  Q.  And does it continue to do so?

13  A.  Yes, it does.

14  Q.  And, in fact, even though you have this other position your

15  office is still in the same building as Bard Peripheral                 03:04PM

16  Vascular, correct?

17  A.  My phone line is still here.

18  Q.  Over your years with Bard Peripheral Vascular and your work

19  with these IVC filters, Mr. Modra, to your knowledge, has the

20  FDA ever suggested or said to Bard that the Eclipse Filter              03:05PM

21  needed to be recalled?

22  A.  No.

23  Q.  Has, at any point, the FDA, to your knowledge, during your

24  years with the company, ever suggested that the warnings or the

25  IFU with regard to the Eclipse needed to be changed in any way?         03:05PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    A.   No.

2              MR. NORTH:   Thank you.   That's all the questions I

3    have.

4              THE COURT:   Cross-examination.

5                        CROSS-EXAMINATION                         03:05PM

6    BY MR. O'CONNOR:

7    Q.   Hello, Mr. Modra.   How are you?

8    A.   Fine.   Thank you.

9    Q.   Let's just talk about something you just talked about.   You

10   do not know how many filters of any kind that Recovery, G2,      03:05PM

11   G2X, or Eclipse have been implanted, correct?

12   A.   Correct.

13   Q.   And you do know that the Eclipse was only on the market

14   from January 2010 to 2011.   True?

15   A.   I don't know the date that it was not on the market.   The   03:05PM

16   Eclipse?

17   Q.   Yes.   Eventually the Meridian took over the Eclipse, right?

18   A.   Correct.

19   Q.   And the Eclipse, Bard stopped selling the Eclipse, correct?

20   A.   We did.                                                      03:06PM

21   Q.   And you do know that the only complaints that you receive

22   are those that are reported.   True?

23   A.   That's correct.

24   Q.   You also know that there are complaints that are

25   underreported, correct?                                          03:06PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    A.  Yes.

2    Q.  That's a problem with reporting.  There are many that don't

3    ever make it.  There's a problem with underreporting?

4    A.  There are some.  That's correct.

5    Q.  And you know who Dr. Ciavarella was?                          03:06PM

6    A.  Yes.

7    Q.  And are you aware that he testified that he believes that

8    maybe only 1 to 5 percent of actual failures or problems with

9    filters are reported?

10   A.  I wasn't aware that he testified that.                       03:06PM

11   Q.  You don't have any reason to dispute that he testified to

12   that?

13   A.  In my experience it's not 1 to 5 percent.

14   Q.  Now, in terms of underreporting, there are also patients

15   out there who may have a failed Eclipse who don't know it,       03:07PM

16   correct?

17   A.  True.

18   Q.  And it could be a fracture that is in a location that may

19   be dangerous but they don't have symptoms, so a patient has no

20   reason to report that to a doctor, correct?                      03:07PM

21   A.  True.

22   Q.  And you simply don't know how many patients are walking out

23   there with failed Bard filters.  Fair?

24   A.  True.

25        MR. O'CONNOR:  Now let's go to Exhibit 1680, Gay.           03:07PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    May we publish this to the jury, Your Honor?

2    THE COURT:  Yes.

3 BY MR. O'CONNOR:

4 Q.  Mr. Modra, this is the warning letter that Bard received on

5 January 15, 2015, correct?                                        03:08PM

6 A.  Correct.

7 Q.  And this was an inspection by the FDA, correct?

8 A.  Prior to this there was an inspection, correct.

9 Q.  An inspection that was conducted by an FDA investigator.

10 True?                                                            03:08PM

11 A.  True.

12 Q.  And what the warning letter was, it addressed violations.

13 Correct?

14 A.  That's what it says.  Correct.

15 Q.  And, in fact, the FDA found violations.  Is that right?      03:08PM

16 A.  They cited them, correct.

17    MR. O'CONNOR:  Gay, let's go to Page 4.

18 BY MR. O'CONNOR:

19 Q.  The FDA found that you, in your procedures in Tempe, failed

20 to establish procedures for receiving, reviewing, and            03:08PM

21 evaluating complaints.  Is that correct?

22 A.  Yes.  That's what they stated and that's standard language

23 that they would use to cite things.

24 Q.  That's what it says in this letter that's a warning letter,

25 correct?                                                         03:09PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    A.  That's what it says, correct.

2    Q.  And it's an official document from the FDA.  True?

3    A.  It is.

4    Q.  And also you were also -- the FDA also found that Bard

5    failed to not have adequate instructions for ensuring that        03:09PM

6    complaints involving a device or device component provided by a

7    supplier are adequately evaluated for root cause of the alleged

8    device failure.  Do you see where that is?

9    A.  I do.

10   Q.  And root cause is an important part of post-market          03:09PM

11   surveillance.  True?

12   A.  Not just post-market surveillance, but day-to-day

13   activities.  Correct.

14   Q.  When you find out a filter has failed, you are supposed to

15   do a root cause analysis, correct?                               03:09PM

16   A.  An investigation root cause analysis.

17   Q.  And that is an important piece of not only developing the

18   filter but surveillance following up with the filter after it's

19   on the market.  True?

20   A.  Correct.                                                     03:10PM

21   Q.  I mean, you know that there are people out there that rely

22   on Bard to accurately report complaints, correct?

23   A.  Yes.

24   Q.  And doctors are out there who have to make risk/benefit

25   decisions about filters.  True?                                  03:10PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1   A.  Yes, they do.

2   Q.  And one thing a doctor must be able to rely on is that a

3   company like Bard has done an adequate root cause analysis of

4   failures that it discovers.  Fair?

5   A.  True.                                                        03:10PM

6   Q.  Now, you -- Bard was also found to have violated the

7   requirement on how it characterized complaints; malfunctions

8   versus serious injury.  True?

9   A.  Correct.

10  Q.  For example, one of the complaints that Bard found involved  03:10PM

11  an Eclipse Filter that concerned a detached filter limb which

12  resulted in pericardial effusion and cardiac catheterization.

13  Right?

14  A.  Yes.

15  Q.  Bard said that was a malfunction; FDA said that was a        03:11PM

16  serious injury.  Correct?

17  A.  I believe that was it, yes.

18  Q.  And going on, G2 Express, for example, the next one, a

19  patient had a broken filter and surgical intervention.  And

20  again, the FDA said that's a serious injury.  That is not a     03:11PM

21  malfunction.  Right?

22  A.  Yes.

23  Q.  And when the jury receives, as they can look at this

24  paragraph, these paragraphs on Page 4 and 5, and they can see

25  examples of what Bard was calling malfunctions that should have  03:11PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    been serious injuries.  True?

2    A.  True.

3    Q.  And it's important that Bard is accurate when it reviews a

4    complaint and refers to it either as a serious injury or a

5    malfunction, right?                                              03:12PM

6    A.  Yes.

7    Q.  Because you know that doctors are going to rely on your

8    reporting to the MAUDE database.  Right?

9    A.  I don't know that to be the fact that they are going to

10   rely on MAUDE.                                                   03:12PM

11   Q.  You have an obligation to be accurate, correct?

12   A.  Yes.

13   Q.  And you at Bard need to know the difference between what is

14   a serious injury and what is a malfunction.  True?

15   A.  Yes.                                                         03:12PM

16   Q.  And then you were also -- the FDA also found that there

17   were complaints that weren't adequately reported that involved

18   procedures that were not successful, and that's in Paragraph C.

19   Right?

20   A.  Yes.                                                         03:12PM

21   Q.  In other words, when a filter fails, and the patient

22   requires surgery because of that failure, and that's reported

23   to Bard, Bard needs to report that fact.  True?

24   A.  It didn't say that the filters were failing in this

25   incident.  It was just that they had difficulty retrieving      03:13PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    them.

2    Q.  Fair enough.  But you understand that difficult retrievals

3    can occur because of failed filters, right?

4    A.  Yes.  But normal operating procedures with normal operating

5    filters would require retrieval as well.                          03:13PM

6    Q.  But in any event, this, again, was an example that the FDA

7    found was a violation of regulations.  True?

8    A.  They cited those -- out of those 10 patients, the two that

9    were resulting in injury to the patient were filed.

10   Q.  Now, the Bard inspection that occurred, that led to this      03:13PM

11   letter, did not look at the design of your filters, did it?

12   A.  It did.

13   Q.  They didn't go -- excuse me -- the FDA does not examine and

14   inspect devices.

15   A.  They went through the design file, and I defended it          03:14PM

16   personally to the inspector.

17   Q.  They didn't inspect the actual filters.  True?

18   A.  No.

19   Q.  And FDA inspections are a form of post-market surveillance.

20   True?                                                             03:14PM

21   A.  Ongoing surveillance, correct.

22   Q.  Well, excuse me.  It happens during the post-market period,

23   correct?

24   A.  Not always.  It happens during submissions, regulatory

25   submissions of new products prior the release of products.        03:14PM

1    Q.  I think here's the point:  The 510(k) clearance process is

2    handled in the division of cardiovascular devices which is

3    located in Silver Springs, Maryland.  Is that right?

4    A.  I believe so, yes.

5    Q.  This inspection, this warning letter, came from the Los      03:14PM

6    Angeles District Office of Compliance in Irvine, California.

7    True?

8    A.  Yes.

9    Q.  You had mentioned that there were other issues about the

10   deployment process.  Do you recall that?                        03:15PM

11   A.  I do.

12   Q.  And you are familiar with the device?

13   A.  I am.

14          MR. O'CONNOR:  Your Honor, may I show Mr. Modra an

15   exemplar of a device?                                           03:15PM

16          THE COURT:  Yes.

17   BY MR. O'CONNOR:

18   Q.  Mr. Modra, you are familiar with how the devices are

19   packaged, correct?

20   A.  Correct.                                                    03:15PM

21   Q.  And they are delivered to hospitals in this type of

22   package.  Right?

23   A.  Correct.

24   Q.  And they are also in -- the deployment instrument is in

25   this type of a container, right?                                03:15PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    A.  Correct.

2    Q.  And you understand that there's paperwork inside this box,

3    correct?

4    A.  There is.

5    Q.  And what happens is when -- before it ever gets to the          03:15PM

6    operating room, you understand that somebody will open this

7    package and get it into the sterilized room.  Is that right?

8    A.  Correct.

9    Q.  That process of opening the package is done before the

10   procedure is ever performed on a patient.  True?                    03:16PM

11   A.  It would have to be, correct.

12   Q.  And when it gets to sterilization the concern is was this

13   unwrapped sometime or was there some risk of sterilization, for

14   example, before it got to the procedure room?

15   A.  Some risk of sterilization?  I'm not familiar.                  03:16PM

16   Q.  Lack of sterilization I thought you talked about was one of

17   the issues.

18   A.  Well --

19   Q.  The deployment is a process that happens after the device

20   is removed from the package, correct?                               03:16PM

21   A.  It has to be, correct.

22   Q.  And the device is brought to the room and given to the

23   doctor, correct?

24   A.  Correct.  And I don't know at what point the handoff

25   between their support staff and them takes place.                   03:16PM

1        THE COURT:  Mr. O'Connor, does that have an exhibit

2   number?

3        MR. O'CONNOR:  No, it doesn't.  Just for the record,

4   Your Honor, it's an exemplar G2X Vena Cava Filter in a box, in

5   the deployment system.  Is that right?                          03:16PM

6        THE WITNESS:  I can't see it from here.

7        MR. O'CONNOR:  May I approach?

8        THE COURT:  I will stipulate that it is.

9        MR. O'CONNOR:  Gay, could we go to Exhibit 4519.  I

10  believe this is in evidence, Your Honor.                        03:17PM

11       THE COURT:  Yes.

12       MR. O'CONNOR:  May I publish?

13       THE COURT:  You may.

14       MR. O'CONNOR:  And Gay, just go to Page --

15  BY MR. O'CONNOR:                                                03:17PM

16  Q.  Well, first of all, Mr. Modra, you recognize this is the

17  monthly management report, correct?

18  A.  It looks similar to a report I have been familiar with

19  later on.  But this was before I arrived at BPV.

20  Q.  This is dated August 9, 2010?                               03:17PM

21  A.  Right.  I arrived there in March of 2011.

22  Q.  Thank you.  So you arrived after the Eclipse had been put

23  on the market?

24  A.  Yes.

25  Q.  And in any event, in this monthly report, we talked about   03:18PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1    these last time you were here.

2            MR. O'CONNOR:  Gay, if you go to Page 12, please.

3    BY MR. O'CONNOR:

4    Q.  And when the jury sees 4519, they will know that there are

5    parts of the report that have to do with the business of Bard          03:18PM

6    up front, correct, how sales are going and how products are

7    doing on the market.  That's the first few pages.  You looked

8    at that before?

9    A.  I don't recall that.

10   Q.  For example --                                                      03:18PM

11           MR. O'CONNOR:  Let's go to Page 5, Gay.

12   BY MR. O'CONNOR:

13   Q.  As you can see, for example, one page of this report deals

14   with key product line sales per day.  Do you see that?

15   A.  Yes.                                                                03:18PM

16   Q.  And then as you get to the end of the report, go to Page

17   12.  That's where adverse events that are reported to Bard are

18   included in the report based upon the information that comes

19   from your department.  True?

20   A.  That's where they would be reported, correct.                      03:19PM

21   Q.  And you have seen this format.  We talked about this when

22   you first came two weeks ago.  Do you recall that?

23   A.  Yes.

24   Q.  Thank you.

25           MR. O'CONNOR:  Gay, if you could go to Exhibit 4565.           03:19PM

1          And, Your Honor, I believe this is in evidence.  This

2     is the 1006 summary.

3          THE COURT:  Yes, it is.

4     BY MR. O'CONNOR:

5     Q.  Mr. Modra, when I had talked to you two weeks ago, we          03:20PM

6     talked about the event descriptions that developed in the

7     complaint process.  Do you recall that discussion?

8     A.  Yes.

9     Q.  And so --

10          MR. O'CONNOR:  May I publish this, Your Honor?                03:20PM

11          THE COURT:  Yes.

12     BY MR. O'CONNOR:

13     Q.  This is Exhibit 4565.  And what we have done here is we

14     have done failures reported to Bard.  That's in complaints that

15     have come to Bard between the period of 2003 and 2015.  Do you    03:20PM

16     see that?

17     A.  I see it at the top.

18     Q.  And we have summarized and put in there examples, we have

19     the total failures are 345, for the period 2003 to 2015.  And

20     then for the jury to understand, we can go through this.  And     03:21PM

21     on the first page, on Page 1, we have put 10 examples of total

22     failures of -- 10 examples of Recovery Filter failures.  Do you

23     see that?

24     A.  I see it.

25     Q.  And so we have the date on the left.  We have the product     03:21PM

1    on the next column.  We have the primary FDA code which you

2    have talked about and then other information including the

3    event description.  Do you see that?

4    A.  I see the column heading, correct.

5    Q.  And then on Page 2, what we have done following the event                03:21PM

6    descriptions that were provided by you at Bard, we have given

7    10 examples of G2 Filter failures.  Do you see that?

8         MR. NORTH:  Your Honor, I'm going to object.  I think

9    Mr. O'Connor is just testifying.

10         THE COURT:  Overruled.                                                 03:22PM

11   BY MR. O'CONNOR:

12   Q.  Do you see that, sir?

13   A.  I see that.  I don't know where this report had originally

14   come from because it doesn't look like a report I put together

15   before.                                                                      03:22PM

16   Q.  No, it has been put together and we have admitted it in

17   evidence.  And I'm just having you take a look at it.  This is

18   the type of information you and I talked about two weeks ago,

19   the format of how you use event description.

20   A.  Sure.                                                                    03:22PM

21         MR. O'CONNOR:  If we go to Page 3, Gay, so I can show

22   Mr. Modra we have 10 examples of G2X Filter failures.  And then

23   Page 4 we have 10 examples of Eclipse failures.

24   BY MR. O'CONNOR:

25   Q.  And then at the last page, what we have, and the jury can                03:22PM

1  see, is that we have broken down by types of failures for each

2  of the filters in terms of fractures, perforations, migrations,

3  and tilts.  Do you see that?

4  A.  I see it.

5  Q.  And that's something Bard has been able to do, too, is to          03:23PM

6  categorize complaints by filter, by failure.  There's a number

7  of things that you can do with your system, your TrackWise

8  system.  Fair?

9  A.  There are a number of things, but I don't know the validity

10 of these numbers here, though, because the people trained in          03:23PM

11 the procedure didn't do that for me.

12 Q.  All right.  Now, when you talk about tracking and trending,

13 you agree that there are limitations to be accurate in your

14 tracking and trending at Bard.  Correct?

15 A.  Correct.                                                           03:24PM

16 Q.  Underreporting is one limitation.  True?

17 A.  To a small extent, correct.

18 Q.  You just don't know the extent, though, do you?

19 A.  Based on experience, I have a pretty good guess.

20 Q.  Well, I'm not looking for guesses here.  But you also don't       03:24PM

21 know, and nobody at Bard knows, how many patients are out there

22 who have filters that have failed; tilted, perforated,

23 fractured, or embolized to hearts or lungs that simply don't

24 know it.  Correct?

25 A.  We don't know it.                                                  03:24PM

1  Q.  And it's only when a patient reports or sees a doctor and

2  the doctor learns about the problem that it may be reported to

3  Bard.  True?

4  A.  True.

5  Q.  And even then there are times that you don't know at Bard,          03:25PM

6  that even doctors in the medical community aren't reporting

7  everything they see.  Fair?

8  A.  True.  But the more severe an event the more likely they

9  are to report it.

10 Q.  I understand.  One issue about asymptomatic is a piece of a        03:25PM

11 filter can be in a place that's dangerous to the patient and

12 the patient may not know about it.  True?

13 A.  And if it's asymptomatic, it is not really causing any

14 issue, either.

15 Q.  But you understand there's diseases that are asymptomatic          03:25PM

16 but they can be potentially fatal.  Correct?

17 A.  I understand that.

18 Q.  And that's the problem with failed filters and fragments.

19 They can be in a patient and be located in a dangerous position

20 or location that could be potentially fatal or seriously             03:25PM

21 harmful to a patient.  You understand that, don't you?

22 A.  I understand that.  And they could be in a non-harmful

23 location as well.

24 Q.  But one thing you have to be concerned about is the

25 patients that have those that don't know about them.  True?         03:26PM

1    A.  I'm concerned about all of them.

2    Q.  Thank you.

3             THE COURT:  Redirect?

4             MR. O'CONNOR:  I have one more question.

5             Gay, would you put up Exhibit 2217?  Go to the next          03:26PM

6    page, Gay.

7    BY MR. O'CONNOR:

8    Q.  Mr. Modra, do you recognize this document?

9    A.  I do.

10   Q.  It's to you from Judy Ludwig, and it's dated January 23,         03:26PM

11   2015?

12   A.  It is.

13   Q.  And it's an IVC filter retrospective review?

14   A.  Correct.

15            MR. O'CONNOR:  May I publish?                               03:27PM

16            THE COURT:  It's not admitted yet.

17            MR. O'CONNOR:  I offer it into evidence, Your Honor.

18   I apologize.

19            MR. NORTH:  No objection, Your Honor.

20            THE COURT:  Admitted.                                       03:27PM

21   BY MR. O'CONNOR:

22   Q.  Do you recall how many --

23            THE COURT:  Do you want it published now?

24            MR. O'CONNOR:  Yes, please, Your Honor.

25            THE COURT:  All right.  You may.                            03:27PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Cross

1  BY MR. O'CONNOR:

2  Q.  And Mr. Modra, it says that the results of the

3  retrospective review identified a total of 274 complaint

4  records which meet the definitions of malfunction and serious

5  injury.  Do you see that?                                    03:27PM

6  A.  I do.

7  Q.  That's dated January 23, 2015?

8  A.  That's correct.

9          MR. O'CONNOR:  No more questions.

10         THE COURT:  All right.  Redirect?                    03:28PM

11         MR. NORTH:  Yes, Your Honor.

12         Could we bring that same exhibit up, 2217?

13         Your Honor, can we publish?

14         THE COURT:  You may.

15         MR. NORTH:  Could we go to the second page?          03:28PM

16                  REDIRECT EXAMINATION

17  BY MR. NORTH:

18  Q.  Mr. Modra, after this retrospective review was conducted,

19  did you have discussions with the FDA about the retrospective

20  review?                                                     03:28PM

21  A.  We did.

22  Q.  And did you, based on those discussions, make any

23  determination as to whether you had been overly aggressive in

24  how you recharacterized those events?

25  A.  We did.  The original review was done without input from 03:28PM

UNITED STATES DISTRICT COURT

1    FDA.  We had to kind of interpret what they were saying in

2    their observation.  So we overcorrected.

3              MR. O'CONNOR:  Objection.  Hearsay, Your Honor.

4              THE COURT:  Overruled.

5              THE WITNESS:  And then we prepared this memo to                     03:28PM

6    summarize it.  But then after discussions with FDA that I was

7    involved in directly over the phone, they said that you were

8    overcorrected.  You had done too much in over-interpreting that

9    and actually 93 percent of these were really not reportable in

10   that manner to them.                                                          03:29PM

11             So we have a subsequent memo that says that, but to be

12   conservative, we left them as reported with FDA.

13   BY MR. NORTH:

14   Q.  But regardless how they were characterized as malfunction

15   or serious injury, had they at all times been reported to the                03:29PM

16   agency?

17   A.  They were reported, or I mean tracked and trended

18   regardless of whether they were reported or not.  So this

19   didn't really have any impact on that.

20   Q.  Well, if something was simply just mischaracterized as a                  03:29PM

21   malfunction versus a serious injury, would it still have been

22   reported to the FDA?

23   A.  Yes.

24   Q.  I mean, are malfunctions -- if you characterize an event as

25   a malfunction, does that go to the FDA?                                       03:29PM

1    A.  Yes, it does.

2    Q.  Now, you also mentioned, I believe, or did you say that

3    during the FDA inspections in 2015 they also reviewed design

4    documents regarding Bard's IVC filters?

5    A.  They did.                                                03:30PM

6              MR. NORTH:  Thank you, sir.  That's all I have.

7              THE COURT:  All right.  Thanks.  You can step down.

8              MR. NORTH:  Your Honor, at this time the defendants

9    would rest.

10             THE COURT:  Okay.  Counsel, would you approach for a   03:30PM

11   minute, please?

12             You can stand up, Ladies and Gentlemen.

13             (Discussion was had at sidebar out of the hearing of

14   the jury:)

15             THE COURT:  Do you have any rebuttal evidence you want  03:30PM

16   to present?

17             MR. CLARK:  We do, Your Honor.  And we also have a

18   Rule 50 motion that we can take up at a different time.

19             THE COURT:  A Rule 50 motion on --

20             MR. CLARK:  Mitigation of damages and assumption of    03:30PM

21   risk.

22             THE COURT:  Let's deem that as made and we'll hear

23   argument when we're not keeping the jury waiting.

24             MR. CLARK:  Your Honor, we would like to play the

25   eight and-a-half minute deposition of Dr. Moritz.  Mindful of   03:31PM

1    the Court's admonition that that should not be cumulative.  We

2    think it is both proper rebuttal and not cumulative because it

3    deals with a little bit of --

4            THE COURT:  Tell me who he is why this is an issue.

5            MR. CLARK:  He is an expert that formerly had been      03:31PM

6    retained by Bard and withdrawn.  So he, like Dr. Rogers, is

7    subject to your order that could be used but you are going to

8    instruct the jury neither party is offering him.  And obviously

9    it could not be cumulative and we do not think it is

10   cumulative.                                                     03:31PM

11           THE COURT:  What is it he's going to cover?

12           MR. CLARK:  He's going to cover primarily a little bit

13   about that would be responsive to Dr. Trerotola about the type

14   of information a physician would like to get and why that's

15   important, very little about that.  Most of what he would cover 03:31PM

16   is there are risks to patients who have fragments lodged in the

17   pulmonary artery, and there are other risks.  I don't think

18   anybody has really developed the type of risk he talked about

19   in terms of infection.  He does talk about thrombosis but one

20   of seven or eight things he mentions.  In fairness, he did say  03:32PM

21   it's a small risk.  But I think that's important particularly

22   after Dr. Stein said she's not in danger.  I would tell my

23   patients there's nothing to worry about.

24           MS. HELM:  Your Honor, we disagree that this is in

25   rebuttal to anything, particularly to anything that Dr.         03:32PM

1    Trerotola testified about.  And, in fact, it is -- we don't

2    believe the plaintiffs have made the showing required under

3    your order, which is Docket 10382.  And I have a copy for you.

4            THE COURT:  I remember the order.

5            MS. HELM:  In the fact that your order specifically    03:32PM

6    said that they must make the showing that no other expert of

7    similar qualifications is available or that that unavailable

8    expert has some unique testimony to contribute.

9            I have gone through Dr. Moritz's testimony, and I can

10   actually refer to page and line numbers of the transcript where   03:33PM

11   Dr. Hurst and Dr. Muehrcke and their cross of Dr. Stein covered

12   virtually everything in this transcript.  He talks about

13   physician expectations which were covered at length by Dr.

14   Hurst and Dr. Muehrcke.  He talks about articles which were

15   covered, the Nicholson article.  He talks about articles that    03:33PM

16   they used to cross-examine Dr. Stein.  He talks about a

17   description of the pulmonary artery which was described by

18   Muehrcke, Dr. Hurst.  He talks about physician expectations,

19   which Dr. Hurst testified about at length.

20           And then he talks about Ms. Jones, including claims    03:33PM

21   that they have withdrawn in the case, that she needs to have

22   continued follow-up and monitoring by a doctor and the

23   complications of the strut in her pulmonary artery which have

24   been covered at length.  There's simply nothing new or unique

25   in his testimony.  There's nothing in it that rebuts Dr.    03:34PM

1    Trerotola.  And we don't believe that they can make or have

2    made the showing as required by your order.

3           THE COURT:  Okay.

4           MR. CLARK:  I think we do have to treat him similar to

5    the way Dr. Trerotola was treated.  Since he's not being        03:34PM

6    retained as an expert, essentially is a neutral party who would

7    come in and give some commentary on some of these issues.  And

8    I don't think that any of the experts have covered things like

9    infection or bleeding, corrosion.  So those are other symptoms

10   she's at risk for.                                             03:34PM

11          Again, it's a small point, short point, but it's to

12   rebut this notion there's nothing really to worry about and

13   doctors have thrown away the IFU.

14          THE COURT:  Do you have another expert who is

15   available to testify at this point?                            03:34PM

16          MR. CLARK:  No, Your Honor.

17          THE COURT:  What about Ms. Helm's point that he

18   describes damages categories you have withdrawn?

19          MR. CLARK:  I think we cannot take that out of the

20   run.  We would be open to the idea with an instruction saying   03:35PM

21   there's no claim made for that monitoring component.

22          THE COURT:  I understand that this is stuff that's

23   previously been covered but this is a rebuttal case.  And it's

24   in response to what defendants have presented.  I think that

25   makes it relevant and unique in that respect.  There isn't      03:35PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Redirect

1   another doctor available so I am going to permit plaintiffs to

2   play it.

3          Let's hold off on the issue of me instructing the jury

4   on damages because we're about to talk about a damages

5   instruction and if you think that we need to include something          03:35PM

6   in there that specifically addresses this doctor, you can

7   certainly raise it.  And I'm saying that to defendants.

8          MR. CLARK:  And one thing, we did have an agreed upon

9   summary.  I would like to track the Rogers one says Dr. Moritz

10  is not being presented as an expert witness by either party          03:35PM

11  like we did for Dr. Rogers.

12         MS. HELM:  Actually, I think this is a little

13  different in the fact that Dr. Rogers testified specifically

14  about an article that he wrote.  He did not provide any

15  specific testimony about Ms. Jones.  In this case --          03:36PM

16         THE COURT:  Well, so do you want him to be presented

17  to the jury as an expert?

18         MS. HELM:  Well, I don't want him presented as an

19  expert on the behalf of the defendants.

20         MR. CLARK:  But he was.          03:36PM

21         THE COURT:  Do you want him to be presented as an

22  expert on behalf of the plaintiff?

23         MS. HELM:  I guess not.  You talked me into it, Your

24  Honor.

25         (In open court.)          03:36PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10-Modra-Redirect

1        THE COURT:  Thank you, Ladies and Gentlemen.

2        All right.  You have some brief rebuttal evidence, Mr.

3    Clark?

4        MR. CLARK:  Your Honor, very briefly the plaintiff

5    would call Dr. Mark Moritz via video deposition.  May I be          03:36PM

6    permitted to read his background?

7        THE COURT:  Yes, you may.

8        MR. CLARK:  Mark Moritz is a medical doctor

9    specializing in the area of vascular surgery.  He has examined

10   Mrs. Jones's medical records and has opinions concerning the       03:36PM

11   filter fracture lodged in the middle lobe of her right

12   pulmonary artery.  Dr. Moritz is not presented as an expert

13   witness by either party.

14       THE COURT:  All right.  Thank you.  You can play that.

15       (Video testimony of Mark Moritz, M.D. was played in          03:37PM

16   open court.)

17       MR. O'CONNOR:  Plaintiff rests, Your Honor.

18       THE COURT:  All right.  Ladies and Gentlemen, that's

19   the end of the evidence.  So what we are going to do is break

20   for the day.  We'll start at 9:00.  I will give you some          03:46PM

21   instructions then we'll hear the closing arguments by the

22   lawyers, and you should have the case for deliberation before

23   the lunch hour tomorrow.

24       So we will excuse you.  Reminding you not to do any

25   research or discuss the case.  And we'll see you in the           03:46PM

1    morning.

2                (Jury out at 3:46 p.m.)

3                THE COURT:  Please be seated.

4                As of now, plaintiff has used 27 hours and 47 minutes.

5    The defendants used 23 hours and 46 minutes.  And I don't have      03:47PM

6    my mic on.  Did you all hear that?

7                Let's hear the Rule 50 motion you wish to make, Mr.

8    Clark.

9                MR. CLARK:  Thank you, Your Honor.

10               Your Honor, I was informed that the assumption of the   03:47PM

11   risk charge will be withdrawn, so we don't have to take that

12   up.

13               THE COURT:  Okay.

14               MR. CLARK:  That narrows the issue to whether there is

15   evidence sufficient -- legally sufficient evidence under Rule       03:47PM

16   50 to support a charge to the jury on mitigation of damages.

17   And, Your Honor, we do not think that there has been any proof

18   about mitigation of damages let alone that any such mitigation

19   effort would have been successful.  I looked through Mrs.

20   Jones's testimony, and really, the closest we come was some         03:48PM

21   questions about did you ever follow up and go to the doctor.

22   And Ms. Helm asked her some questions about going to Memorial

23   in 2016 after the filter was removed and what they told her

24   about the filter.  And essentially the testimony was that the

25   filter is in a safe place.                                          03:48PM

1     So I don't really understand how going to Dr. Cooper

2  or any other type of mitigation would support that instruction

3  in this particular case.  They would have to prove that there

4  was some type of appropriate mitigation that could have been

5  done, which we do not think has been shown under these facts.          03:48PM

6     And more importantly, that had that effort been

7  undertaken it would have translated into some type of effect,

8  some type of cognizable reduction in her damages.  And given

9  that her primary damages in this case are the mental anxiety

10  and the stress and the fear of what could happen with this          03:49PM

11  filter, we don't think there's been any evidence to suggest to

12  her -- or to the jury in this case that it -- that she needed

13  to do something to mitigate her damages.

14     So it's really just a straight lack of evidence

15  argument, Your Honor.          03:49PM

16     THE COURT:  Okay.  Thank you.  Defense counsel.

17     MS. HELM:  I apologize, Your Honor.  I'm allergic to

18  Arizona, I think.

19     Your Honor, Ms. Jones' testimony actually was that she

20  is worried about the filter and that she worries about it          03:49PM

21  constantly.  And she testified, I asked her specifically, you

22  haven't done anything about that.  You have not been to any

23  doctor to check on the strut, have you?  And her answer was, no

24  I haven't.

25     So she has come before the Court, and they are making          03:50PM

1    a claim, their primary claim is for emotional damages for

2    worry.  And Ms. Jones herself testified that she hasn't done

3    anything to, in fact, mitigate that worry.

4           The prior testimony before that was that she was going

5    to go to a doctor to determine whether she had anything to          03:50PM

6    worry about and, in fact, she didn't do that and she admitted

7    she didn't do it.

8           So contrary to Mr. Clark's assertion, her own

9    testimony shows that she has failed to address her emotional

10   distress claim, her emotional damages claim, by seeking medical    03:50PM

11   attention which everyone agrees would give her an answer.

12          So that alone should be sufficient evidence to get

13   past the Rule 50 motion.  And again, we are not seeking

14   mitigation on her past pain and suffering claim or her possible

15   future pain and suffering claim but on her emotional damages       03:51PM

16   claim.

17          THE COURT:  All right.  Mr. Clark.

18          MR. CLARK:  Yes, Your Honor.

19          I would take issue with Ms. Helm's statement that

20   everyone agrees that seeing a doctor would alleviate her           03:51PM

21   concerns.  I think the testimony was that she was going to go

22   see Dr. Cooper, who is a physician in Savannah, Georgia.  She

23   did not.  But there has been no testimony or evidence of any

24   sort establishing what Dr. Cooper would have told her had she

25   gone to see him.                                                    03:51PM

—5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10—

1          So what we're left with, Judge, is that we would be

2     asking the jury to essentially speculate that if she had gone

3     to a doctor that doctor would have given her some comfort that

4     this is nothing to worry about somehow would have allayed her

5     concerns.  And that is just pure speculation, and we don't have          03:51PM

6     juries do that.  In fact, this case sort of proves that point.

7     There was a robust debate between a number of physicians about

8     whether she does have something to worry about.

9          So again, to sort of speculate about what a physician

10    in Savannah, Georgia, would have told her in respect to a visit          03:52PM

11    about this, it just gets way too far into a territory that we

12    just don't have the juries look at.

13          THE COURT:  Well, let me ask you this question, Mr.

14    Clark:  The plaintiff did testify, according to my notes, that

15    she started worrying about the strut when she learned it was in          03:52PM

16    her lung.  She testified in her deposition that she was going

17    to go see Dr. Cooper to see if it was a mental thing or if it

18    was actually the strut.  She has not done that, hasn't seen Dr.

19    Cooper.  She hasn't seen any doctor to check on the strut.

20          It seems to me what you are arguing is that a failure          03:53PM

21    to mitigate defense requires proof of two things:  One is that

22    there was some action the party could have taken to reduce

23    damages; and the second is that had they taken that action it

24    actually would have reduced damages.  I think your point is

25    that there's no evidence of the second of those two elements.          03:53PM

1          MR. CLARK:  That's correct, Your Honor.  It would be

2     speculation.

3          THE COURT:  What is your response on that, Ms. Helm?

4          MS. HELM:  Your Honor, the jury charge as stated under

5     Georgia law does not require the second element.  It simply                    03:54PM

6     requires that they use the practice of ordinary care and

7     diligence to mitigate the damage.  It does not require a

8     finding.  And the charge is not asking the jury to make a

9     finding.

10         THE COURT:  But look at the last sentence.  If you                        03:54PM

11    believe that by use of such care she could have reduced the

12    damages.  What evidence is there that she could have reduced

13    the worry?

14         MS. HELM:  Well, Your Honor, you are asking us --

15    that's, in fact, asking us to prove a negative.  We didn't call              03:54PM

16    Dr. Cooper because he never treated the patient.  I think

17    there's significant testimony in this case by the experts on

18    both sides that the strut is stable.  Dr. Muehrcke admitted to

19    it.  Dr. Hurst admitted to it.  Dr. Stein admitted to it.

20         So what the charge is saying to the jury is you have                     03:54PM

21    to use reasonable care to mitigate the damages.  The defendant

22    doesn't have to prove that if you did that, everything would be

23    better.  It, in fact, instructs the jury that if you believe

24    that such care would have reduced the damages you can determine

25    that.  Doesn't require a finding that it would reduce the                     03:55PM

———— 5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10————

1    damages.

2              THE COURT:  Thanks.

3              Mr. Clark, there has been testimony from some doctors

4    like Dr. Moritz that we just listened to that this is a serious

5    problem that a patient should follow.  Presumably talking to        03:55PM

6    that doctor would not have necessarily alleviated her worries.

7    But she also testified herself that the doctor at Memorial

8    Hospital told her the strut was safer where it was and there

9    was no need for follow-up.

10             MR. CLARK:  That's true, Your Honor.                      03:55PM

11             THE COURT:  So it seems to me a jury could, if they

12   have competing opinions from doctors about whether or not it's

13   something to worry about, and couldn't the jury say well, we

14   think if she would have talked to a doctor she probably would

15   have been reassured because we found more reasonable the          03:56PM

16   testimony from the doctors that this really isn't something to

17   worry about.

18             MR. CLARK:  I don't think so, Your Honor.  I think

19   that the point you have identified is appropriate for the

20   jury's consideration when they are determining whether she has    03:56PM

21   been damaged, and if so, how much to award her.  That's one

22   part of it.  But I don't think that we get there by having

23   competing experts in here talk about what is reasonable when

24   you are looking at the actual mitigation of damages is going to

25   Dr. Cooper, which is the remedy, I guess, that is proven or        03:56PM

1   that there's evidence establishing that she could have availed

2   herself of.  But the jury would be left to guess at what Dr.

3   Cooper would have told her.  And the jury has heard no evidence

4   other than Dr. Cooper, I think, is a family doctor, what he

5   would know about this thing.  He might have referred her to a      03:56PM

6   specialist who may have said one thing or may have said another

7   thing.  But again, we're getting into conjecture.  And I just

8   don't think that's appropriate for a mitigation of damages

9   instruction.  It doesn't really fit with the evidence in this

10  case.                                                              03:57PM

11          Usually when we see this it's a preexisting condition

12  issue or someone who is overtreated or you have got a property

13  damage claim and the person didn't return the rental car fast

14  enough.  But when you are talking about fear, there has to be

15  some evidence that had she availed herself of the remedy the      03:57PM

16  defendants say she should have that that would have given her

17  some relief.  And we know she talked to one doctor and it

18  didn't give her any relief.

19          THE COURT:  All right.  Thank you.

20          My determination under Rule 50 on a defense or a claim     03:57PM

21  is to consider whether the jury has sufficient evidence in

22  front of it that a reasonable jury could find in favor of the

23  party that's asserting the claim or defense.  And if there is

24  enough evidence, a reasonable jury could make such a finding

25  then I can't grant a Rule 50 motion.                               03:58PM

1    My conclusion here is that there is enough evidence

2    for a jury to conclude that she was worried.  She did consider

3    going to see a doctor, and it has heard evidence from some

4    doctors there was nothing to worry about.  I think that's

5    enough evidence for a jury to conclude had she gone to see a          03:58PM

6    doctor it would have alleviated her worries.  I don't know if

7    is the jury will find that way, but I think there is evidence

8    in the record that would support such a finding and therefore,

9    I'm going to deny the Rule 50 motion on the failure to mitigate

10   claim.                                                              03:58PM

11   So I will take the question mark out after Instruction

12   Number 20, and I am going to delete Instruction Number 18,

13   which is the assumption of risk defense.  And we'll renumber

14   the instructions.

15   Let me make a couple of other comments about jury                  03:58PM

16   instruction issues.

17   MR. NORTH:  Your Honor, at some point I need two

18   minutes to renew a Rule 50 motion also for the record.

19   THE COURT:  Okay.  Why don't we do that now.

20   MR. NORTH:  Your Honor, at the conclusion of all the               03:59PM

21   evidence we would simply renew the same motion we made at the

22   conclusion of the plaintiff's case where we moved for judgment

23   as a matter of law on the plaintiff's design defect claim, on

24   the warning claim, on the claim for future pain and suffering

25   because of the absence that it was -- of evidence that was more    03:59PM

1    likely than not there would be any complications.

2         And on the punitive damage claim, I would like to just

3    incorporate all the arguments I made at the conclusion of the

4    plaintiff's case so as not to reiterate those, repeat those at

5    this point.                                                    03:59PM

6         But we still believe that Rule 50 relief is

7    appropriate for those four reasons.  We think it's even more so

8    after we have heard the defense case with regard to the

9    punitive damage claim since the plaintiff's entire punitive

10   damage claim is premised on an assumption that the rates of     03:59PM

11   Bard complications are in excess of the rates of competitive

12   filters.  There's been affirmative evidence as a part of the

13   defense case, including this Rule 1006 summary that the

14   plaintiff introduced today that show very low rates of

15   complications with regard to the Eclipse, and they produce no   04:00PM

16   affirmative evidence of excessive complication rates with the

17   device.  And therefore, we don't believe they meet the clear

18   and convincing standard of egregious behavior necessary for a

19   punitive award.

20        So for that reason and the reasons stated at the           04:00PM

21   conclusion of the plaintiff's case, we would renew our motion.

22        THE COURT:  All right.

23        MR. MANKOFF:  Your Honor, I believe that the evidence

24   has become stronger during the presentation of the defense

25   case.  First of all, we continue to reject the proposition that 04:00PM

1    we're required to prove that the rates of fractures for the

2    Eclipse Filter are higher than for competitor filters, but we

3    believe we have done that.

4            Dr. Tillman testified that if you have a design defect

5    you need to correct it and that if the complication that is          04:01PM

6    experienced in a particular device is different, or unexpected,

7    that that needs to be disclosed in the labeling.  So simply for

8    that reason alone, you have evidence of an inadequate warning

9    because we do have evidence of this unique problem of caudal

10   migration.                                                           04:01PM

11           We heard that the instructions are misleading, and

12   that the warning needs to take into account the severity of the

13   harm as well.  Bard has also made a false comparison, continues

14   to make a false comparison, between the rates in SIR guidelines

15   and the reported rates.  As we have heard time and again, if          04:02PM

16   you are looking at reported rates you have to take into account

17   underreporting and essentially multiply the rate by 100 to make

18   a proper comparison.

19           We saw from the Eclipse trial that the rates went

20   into -- when you have a clinical trial the rates went into the        04:02PM

21   teens.  And the overall rate, I believe, when you add up the

22   fracture, migration, perforation, and tilt, was approximately

23   28 percent.

24           There are charts in evidence showing that even looking

25   at just reporting rates, Exhibit 1940 shows that the fracture         04:02PM

1    rate for the Eclipse Filter when it was first put on the market

2    was higher than 5 out of 8 of the competitor filters.  And we

3    heard that the fracture rates go up as time goes on.

4            So we saw from the studies that if you look at a

5    short-term like with the EVEREST trial, just five months the          04:03PM

6    rate might be 1 percent.  But if you go out two years it jumps

7    to 12 percent and the studies that project out to five years

8    show fracture rates up to 38 percent with the G2 slash Eclipse

9    line of filters.  Dr. Moritz just testified looking at a study

10   that the Bard fractures were more common than with other              04:03PM

11   filters.

12           If the Court has no questions we would rest on that

13   evidence.

14           THE COURT:  All right.  Thanks.  I'm going to deny the

15   Rule 50 motion for the same reasons I did at the close of the        04:03PM

16   evidence.

17           All right.  Let's talk about jury instructions for a

18   moment.  Defense counsel, you were going to consider

19   plaintiff's proposal that there be a link between instructions

20   14 and 16.  Where are you on that issue?                              04:04PM

21           MR. NORTH:  Your Honor, we have decided that that

22   would be okay.  We do believe that the Court's suggestion that

23   it go in the negligent design charge as opposed to the strict

24   liability seemed to make more sense to us.  But we thought that

25   was okay.                                                            04:04PM

1        We also thought that if you were going to do it there

2   the same sort of addition might be need to be made to the

3   negligent failure to warn.

4        THE COURT:  My thought has been on this issue we ought

5   to put it in both places -- not, I'm sorry, not negligent       04:04PM

6   failure to warn but we ought to put it in both Instruction 14

7   and 16 to make clear that the jury must find that the Eclipse

8   was defectively designed.

9        But we also ought to do it in the verdict form.  We

10  ought to also make clear that if they find as to one of those    04:05PM

11  claims that it's not defectively designed they should make the

12  same finding to the other so that they are not mislead by the

13  jury form thinking they can separate those two.

14       Does that make sense to plaintiff's counsel?

15       MR. CLARK:  It does, Your Honor.                            04:05PM

16       MR. NORTH:  Yes, Your Honor.

17       THE COURT:  Okay.  So the language that you had

18  proposed, Mr. Clark, was on Instruction 14, you may not find

19  that the Eclipse Filter was negligently designed unless you

20  also find that the design of the Eclipse Filter was defective.   04:05PM

21  I want to consider that a little more as to whether I want to

22  reword it at all.  But I will have that for you in the morning.

23  And we'll have the same language on 14 and 16 so you can look

24  at it and comment on it before the instructions.  And we'll

25  also make a change to the verdict form for you to review on      04:06PM

1    that issue tomorrow morning as well.

2          With respect to the damages instruction, the question

3    that I wanted to ask was of defense counsel.  The paragraph

4    that I understand defendants have proposed to be added to

5    Instruction Number 19 in red, on the first page is changed by     04:06PM

6    plaintiff simply to say that you must find that the evidence

7    shows that it is more likely than not that Mrs. Jones will

8    incur future pain and suffering.

9          And the way the defendants had phrased it is that

10   plaintiff must show with reasonable medical certainty.  What is   04:06PM

11   the basis for -- I mean, in light of what we say in Paragraph 2

12   that burden is preponderance of the evidence.  What is the

13   basis for defense's suggestion that the burden has to be with

14   reasonable medical certainty?

15         MS. HELM:  May I approach the podium?                       04:07PM

16         THE COURT:  Yeah.

17         MS. HELM:  Your Honor, if you look at the paragraph --

18   two paragraphs above that that says Mrs. Jones seeks to

19   recover, and the pattern charge says if you find that the

20   evidence shows with reasonable certainty that she will sustain    04:07PM

21   future medical expenses, that's where the reasonable certainty

22   language came from because that's the language in the pattern

23   charge.  So that's why I chose the language reasonable

24   certainty.

25         And then there's case law in Georgia that says that it     04:07PM

1    requires expert testimony to show that there's a need for

2    future medical care.  Her future pain and suffering claim is

3    based on the ability -- on her future medical care.  So I'm

4    relying on *Womack versus Burgess*, B-U-R-G-E-S-S, at 200 Georgia

5    Appeal 347.  And there's a whole line of cases that talks about    04:08PM

6    what's required, like a doctor can't say there's a 50/50

7    likelihood.  It has to be a greater likelihood.

8              So I actually chose the language of reasonable

9    certainty based on the language in the charge, and I added the

10   term "medical" based on the case law in Georgia.                   04:08PM

11             THE COURT:  Okay.  What's the response from

12   plaintiff's counsel?

13             MR. CLARK:  Your Honor, I think that the medical

14   expenses issue is different because there needs to be some

15   definition of what those expenses are.  The jury can't just       04:08PM

16   pick a number out of the air.  So that makes sense to us.

17             I did review the *Womack* case that Ms. Helm was kind

18   enough to send me, and fortunately it's short so I think I

19   could understand it.  And it doesn't talk about medical

20   certainty in terms of those magic words.  It does talk about in   04:08PM

21   citing some other cases in which the Court ruled, for example,

22   that denied relief when there was established only a

23   possibility and not a probability of a causal connection.  So

24   again, this case is talking about probability which is what

25   we're telling the jury in Paragraph 2.                            04:09PM

1        So I think it would be very confusing to the jury to

2    have a new term that is not defined anywhere else in the

3    instructions that it somehow has to apply in deciding whether

4    she is likely to have future pain and suffering.  And I think

5    the evidence on the future pain and suffering is in front of it      04:09PM

6    and it's like any other issue that we have the burden on, we

7    should establish it's more likely than not or preponderance of

8    the evidence.

9        THE COURT:  I will read the *Womack* case and have the

10   instruction for you to look at tomorrow morning at 8:30.             04:09PM

11       On the last paragraph that the defendants propose

12   adding, I should say the last two sentences, plaintiffs propose

13   for the last paragraph, that seems to me to be a restatement of

14   the proximate cause requirement that is clearly included in the

15   instructions before that.  So it looked to me to be             04:10PM

16   unnecessary, but I want to get defense counsel's reasons for

17   proposing it before I strike it out.

18       MS. HELM:  I really wasn't --

19       THE COURT:  Before I consider striking it.

20       MS. HELM:  That's okay.  I really wasn't trying to be        04:10PM

21   duplicative, Your Honor.  I believe that there are some

22   preexisting conditions here.  And you are instructing the jury

23   that Bard takes the plaintiff as they find her, but at the same

24   time, to the extent that she has preexisting conditions, those

25   can't be -- that were not attributed to the filter or not       04:10PM

1    exacerbated by the filter, those should not be considered by

2    the jury.  So Bard cannot be responsible for those preexisting

3    conditions.

4         I actually pulled that language out of the pattern

5    charge and so it may need a phrase or a sentence that I left          04:10PM

6    out to make it clear.  But that's what I was referring to

7    there.

8         THE COURT:  All right.  Mr. Clark, you think

9    preexisting conditions are adequately covered elsewhere, and if

10   so, where?          04:11PM

11        MR. CLARK:  Your Honor, I think just in the sentence

12   right above the language Bard seeks to add:  Thus, if you find

13   that Mrs. Jones's injuries were increased by her existing

14   physical condition, so again, it's a predicate that they have

15   to find to the extent that they are looking at the preexisting          04:11PM

16   issues they have to find some type of change or increase in

17   them.  That's a predicate for this finding, and that's what's

18   instructed there.  So I think to add another causation issue on

19   top of that would be a restatement of instructions given

20   elsewhere which I think they appear in Instructions 14 through          04:11PM

21   17 in terms of proximate cause and borders into comment on the

22   evidence.

23        THE COURT:  What if we were to do this:  Make it clear

24   that in this final paragraph, that plaintiff can recover for

25   exacerbated conditions but not for pre-existing conditions.          04:12PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10

1    What if we were to, in the sentence that you just referred to,

2    Mr. Clark, it says:  If you find that her injuries were

3    increased by her existing physical condition you may award

4    damages for those increased injuries provided you find they

5    were proximately caused by Bard.                              04:12PM

6         What if we then changed the next sentence and deleted

7    the final one so the next sentence says:  However, no plaintiff

8    may recover for injuries or disabilities that are not

9    proximately caused by the defendants.  So you are sort of

10   completing the thought that's in the preceding paragraph.     04:13PM

11        MR. CLARK:  I don't love it, but I think it's fine.

12        THE COURT:  Ms. Helm.

13        MS. HELM:  I agree, Your Honor.

14        THE COURT:  Okay.  That's what we'll do.  I think it

15   does complete the idea stated in the sentence that begins with  04:13PM

16   "thus" and will clarify for the jury.

17        MS. HELM:  Your Honor, I actually have an additional

18   request to -- request to charge Number 19 in light of the

19   rebuttal testimony.

20        THE COURT:  All right.                                   04:13PM

21        MS. HELM:  I believe that on the first page of the

22   instruction -- sorry.  In Georgia we call them charges.  In the

23   paragraph that says:  Ms. Jones seeks to recover, it's in the

24   middle of the page, I believe after that sentence and before

25   the "if you find" sentence that there should be some           04:14PM

1    instruction to the jury that she is not seeking medical

2    monitoring or routine medical care, that the only future

3    medical expenses she's seeking are either a percutaneous

4    retrieval or the surgery.  And I haven't crafted that without

5    it being a comment on the evidence.  But I do believe that that    04:14PM

6    instruction is warranted there.

7            THE COURT:  Mr. Clark.

8            MR. CLARK:  Your Honor, I think the instruction as

9    written is very clear that she's only seeking medical expenses

10   that may be incurred in the future.  The only evidence of    04:14PM

11   future medical expenses are those presented by Sims and

12   White -- I'm sorry, Lora White's report, which is basically for

13   the two future surgeries.  There has been no presentation of

14   evidence relating to medical monitoring.

15           THE COURT:  What about the testimony you just    04:15PM

16   presented from Dr. Moritz that said he thinks she should

17   receive regular follow-up with a doctor in the future and

18   that's what he would advise her to do.  That would be a future

19   medical expense.

20           MR. CLARK:  Right, but what this instruction says is    04:15PM

21   they have to -- the evidence shows with reasonable certainty

22   that she will sustain medical expenses.  So I think the

23   instruction covers it.  We're certainly not going to argue

24   anything about monitoring.

25           THE COURT:  Could the jury reasonably say well, Dr.    04:15PM

1   Moritz said she's going to get -- she needs to be monitored.

2   She's going to get that expense with reasonable certainty.

3   We're going to award her medical monitoring damages.

4           MR. CLARK:  I don't know how they would make that

5   calculation.  They would have to guess at something.  And          04:15PM

6   that's the only thing they are going to hear from us as far as

7   future medical expenses are what you heard from Nurse White.

8           THE COURT:  What if we -- what if in the second

9   sentence of that paragraph we said something like, if you find

10  that the evidence shows with reasonable certainty that Mrs.       04:16PM

11  Jones will sustain future medical expenses for removal of the

12  filter fragment, comma, proximately caused by the actions of

13  Bard, comma.

14          MR. CLARK:  No objection.

15          THE COURT:  So it's precise to what you are seeking.      04:16PM

16          MR. CLARK:  That would be fine with the plaintiff.

17          MS. HELM:  I think that resolves it, Your Honor.

18          THE COURT:  Okay.  All right.  Any other comments on

19  the damages instruction?

20          MR. CLARK:  Not for the plaintiff.                        04:17PM

21          THE COURT:  With respect to the FDA instruction, I'm

22  still a bit undecided but I want to get the plaintiff's

23  reaction to a concern that I have.  The way you have proposed

24  the instruction in the version that was handed to me today by

25  Traci that I assume came from plaintiff's counsel, we would say  04:17PM

5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10

1    in the second sentence of the third paragraph that the FDA does

2    not make a determination that the device being cleared is safe

3    and effective.  My concern is that the statute, 21 United

4    States Code Section 360c(i)(1)(A)(ii), says that one the ways

5    the FDA can decide that a product is substantially equivalent          04:18PM

6    is if the proponent, quote, "demonstrates that the device is as

7    safe and effective as a legally marketed device," close quote.

8           And the regulation, which is a 21 CFR 807.100, subpart

9    (b), says that substantially equivalency can be based on a

10   finding that, quote, "The data submitted establishes that the         04:19PM

11   device is substantially equivalent to the predicate device and

12   contains information, including clinical data if deemed

13   necessary by the commissioner, that demonstrates that the

14   device is as safe and as effective as a legally marketed

15   device,"  close quote.                                                  04:19PM

16          So there are situations where safety and effectiveness

17   in a comparative sense are considered by the FDA in a 510(k)

18   submission.  And it seems to me if I were to instruct the jury

19   on the 510(k) process, I would have to include that because

20   that's what the law allows them to do.  And I worry that's just       04:19PM

21   going to muddy the waters more if I start down that road of

22   telling them how and in what way the FDA can consider safety

23   and effectiveness.

24          That's my concern.  I'm interested in a response of

25   plaintiff's counsel.                                                   04:20PM

─────5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10─────

1          MR. CLARK:  I understand the concern, Your Honor.  The

2    concern we have is the only regulatory expert the jury heard

3    from was Dr. Tillman who said this is what the FDA does.  It

4    makes a determination that it is as safe and effective as a

5    different device.  So that's the impression the jury is left      04:20PM

6    with.  And I think the water is already muddied in that sense.

7          So I think there needs to be some instruction that

8    what we have here in a 510(k) is a different threshold.  There

9    are different considerations.  And maybe it's as easy as

10   saying, you know, that that is one of the factors that can be     04:20PM

11   considered.  But it's -- but to kind of leave that impression,

12   and again, we keep hearing it in the case.  I didn't write down

13   what the context of the question was.  But there was some

14   discussion, I think even from Mr. Randall today, about FDA

15   approval.  And those words keep getting bandied about.  So I      04:20PM

16   think that's very prejudicial to the plaintiff.

17          THE COURT:  So my notes show that on this point you

18   are talking about, Mr. Clark, Ms. Tillman was reading from the

19   FDA guidance document on the 510(k) process which is Exhibit

20   7758.  And she was reading from Page 9 that sets forth the        04:22PM

21   substantial equivalent standard which said that the standard

22   differs from the PMA standard which requires independent

23   determination of safety and effectiveness.  And then Ms.

24   Tillman testified the FDA does not make a safety and

25   effectiveness determination on a 510(k), but it can find that     04:22PM

1    the device is as safe and effective as the predicate device.

2    And then she said 510(k)s are fundamentally about safety and

3    effectiveness.  I assume that's the concern you have.

4         MR. CLARK:  Well, that and her statement in response

5    to Mr. North's question:  And to be clear, does the FDA make          04:22PM

6    the same pronouncement with regard to 510(k) devices like IVC

7    filters?  The answer was no, it instead makes a determination

8    that the new device is as safe and effective as the predicate

9    device which is a different finding than in a PMA.  And again,

10   it's basically saying they make a determination that it is as        04:23PM

11   safe and effective.  They may have reached their determination

12   that it is substantially equivalent through that process, but

13   they aren't making a determination that device is as safe and

14   effective.  And that's the conundrum we have.

15        THE COURT:  It seems to me what the regulation I just           04:23PM

16   read says is that it says:  FDA will determine that a device is

17   substantially equivalent to a predicate device using the

18   following criteria.  It's intended for the same use; it has the

19   same technological characteristics; it has different

20   technological characteristics.  And I'm now quoting again, "The      04:24PM

21   data submitted establishes that the device is substantially

22   equivalent to the predicate device and contains information

23   including clinical data if deemed necessary by a commissioner

24   that demonstrates that the device is as safe and effective as a

25   legally marketed device."                                           04:24PM

—5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10—

1        So it seems to me the FDA in those instances looks at

2    the submission and says this data demonstrates that it is as

3    safe and effective.

4        MR. CLARK:  That's a list of factors that are

5    considered, right.  I mean, that is one of the things that is        04:24PM

6    considered.

7        THE COURT:  True.  Well, so my concern is, if I try to

8    instruct the jury on this, it seems to me I need to essentially

9    read to them what's in the regulation with the various factors

10   that are to be considered which would say this is one that can     04:25PM

11   be considered.  And the question I have is does that help?

12   Does that clarify the issue you are trying to clarify?

13       MR. CLARK:  I think it does, Your Honor, because it

14   shows that there are many considerations and it's distinct from

15   the PMA process.  And it's kind of similar to what we have in       04:25PM

16   Instruction 14 that there are a variety of factors that get

17   examined.  And I think what we heard in the Booker trial was

18   that Ladies and Gentlemen of the jury, the FDA looked at the

19   same evidence that you are seeing in this case and made a

20   determination this is safe and effective.  And it would be very    04:25PM

21   fair and helpful for us to be able to argue that based on the

22   instruction that there are a variety of factors that the FDA

23   looks at of which safety and efficacy can be one.

24       THE COURT:  All right.  Response from defense counsel.

25       MR. NORTH:  Yes, Your Honor.  For the reasons the           04:25PM

UNITED STATES DISTRICT COURT

1   Court alluded to, we believe the third paragraph is not a

2   complete statement of the law.  We do believe it's not

3   necessary to give any instruction, but if the Court did, we

4   believe the third paragraph should be replaced as the Court

5   just suggested by the lengthy standard and more detailed       04:26PM

6   synopsis that the Court read.  Because the fact of the matter

7   is, Dr. Tillman's testimony was correct.  Based on the

8   regulations and the guidance that the Court just read, the FDA

9   does make a determination in the 510(k) context whether the new

10  device is as safe and effective as the predicate device.       04:26PM

11          THE COURT:  Well, I'm not sure I agree with the way

12  you say that, Mr. North.  Because if the FDA finds that the

13  device has the same technological characteristics as the

14  predicate, it can find substantial equivalence without

15  considering safety and effectiveness because it's disjunctive.  04:26PM

16  It says either that or.  So I think part of plaintiff's point

17  is yeah, they can consider it, but we don't know if they did in

18  this case.  We don't know whether or not the FDA blessed or

19  said that it's as safe and effective because they could have

20  based it on the fact that it had the same technological         04:27PM

21  characteristics.

22          MR. NORTH:  But I'm not certain, Your Honor, that

23  reading of that would be consistent with the statute that the

24  Court read, which didn't seem to so limit it as I read it.

25          THE COURT:  The statute also says -- I won't read you   04:27PM

———————5-30-18-MD 15-2641-Jones v Bard - Jury Trial - Day 10———————

1    the whole thing.  It's long.  But for purposes of the

2    substantial equivalence determination, the agency finds that

3    the device, one, has the same technological characteristics as

4    the predicate device; or, two, finds that it's as safe and

5    effective.  It's disjunctive in the statute as well.                    04:28PM

6            I think what I'm going to do is my best to in plain

7    English incorporate these factors into an instruction for you

8    to look at in the morning.  Because I do think that it's

9    relevant for the jury to know that FDA can clear a product

10   under 510(k) without deciding that it's as safe and effective   04:28PM

11   if they find it is -- has the same technological

12   characteristics.

13           MR. NORTH:  Your Honor, if I could just add, we would

14   also object to the Fourth paragraph of that charge as we

15   believe that is a clear comment on the evidence and the Court   04:28PM

16   should conclude that charge with the third paragraph.

17           THE COURT:  I understand that.  I will have a proposed

18   instruction for you all to look at in the morning on that.

19           Are there other jury instruction issues we need to

20   cover?                                                           04:28PM

21           MR. CLARK:  Not for the plaintiff, Your Honor.

22           MS. HELM:  None for the defendant, Your Honor.

23           THE COURT:  Jeff, are we missing any?

24           MR. CLARK:  Just to be clear, though, Mr. North had

25   offered a suggestion that perhaps we make some more change to   04:29PM

1    the failure to warn strict liability and negligent failure to

2    warn.  We vehemently disagree with that.

3              THE COURT:  I understand that.  I'm not going to do

4    that.  I'm going to do it on the two design defect claims.

5              All right.  How long do you all think your closings      04:29PM

6    will be in the morning?

7              MR. NORTH:  Your Honor, while they are looking, I

8    would say I think ours will be an hour to hour 15.  I certainly

9    will not use the three hours I have left.

10             MR. O'CONNOR:  Probably an hour on the plaintiff.         04:29PM

11             THE COURT:  Well, the plaintiff has an hour and 13

12   minutes left in the case.

13             MR. O'CONNOR:  I will work with that.

14             THE COURT:  Keep that in mind.

15             All right.  My plan then will be to instruct the jury,    04:30PM

16   go right into plaintiff's arguments, take a break between the

17   two, have defense arguments, any rebuttal, and then break for

18   lunch.  So we'll get all the arguments done before the lunch

19   hour.

20             Okay.  We'll see you at 8:30.                            04:30PM

21             (Proceeding recessed at 4:30 p.m.)

22

23

24

25

1

2

3

4

5

6                      C E R T I F I C A T E

7

8          I, LAURIE A. ADAMS, do hereby certify that I am duly

9     appointed and qualified to act as Official Court Reporter for

10    the United States District Court for the District of Arizona.

11         I FURTHER CERTIFY that the foregoing pages constitute

12    a full, true, and accurate transcript of all of that portion of

13    the proceedings contained herein, had in the above-entitled

14    cause on the date specified therein, and that said transcript

15    was prepared under my direction and control.

16         DATED at Phoenix, Arizona, this 31st day of May, 2018.

17

18                            s/Laurie A. Adams

19                            _____
                              Laurie A. Adams, RMR, CRR

20

21

22

23

24

25