# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. MDL 15-02641-PHX DGC |
| _____ | |
| Sherr-Una Booker, an individual, | No. CV-16-00474-PHX-DGC |
|      Plaintiff, | |
| v. | |
| C. R. Bard, Inc., a New Jersey corporation; and Bard Peripheral Vascular, Inc., an Arizona corporation, | **ORDER** |
|      Defendants. | |

This multidistrict litigation proceeding involves thousands of personal injury cases related to inferior vena cava ("IVC") filters manufactured and marketed by Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard").  The case brought by Plaintiff Sherr-Una Booker was selected for one of several bellwether trials. A jury trial was held in March 2018.  The jury found in favor of Plaintiff Booker on one of four claims and awarded her $3.6 million in damages.

Defendants have filed a renewed motion for judgment as a matter of law and a motion for a new trial.  Docs. 10879, 10880.  The requests for oral argument are denied because the issues have been fully briefed and oral argument will not aid in the Court's decision.  For reasons stated below, the motions will be denied.

## I.     Background.

Before surgery in June 2007, Plaintiff was implanted with a Bard G2 IVC filter given her history of blood clots and the risk of experiencing a pulmonary embolism during or after surgery.  Seven years later, it was discovered that the G2 filter had tilted, penetrated the IVC wall, and fractured, and that one strut of the filter had migrated to the right atrium of Plaintiff's heart.  Subsequent x-rays revealed two other fractured struts and multiple legs perforating the IVC.  Plaintiff underwent surgery in July 2014, and the G2 filter and one of the fractured struts in the IVC were removed.  During attempts to remove the strut from the heart, however, Plaintiff's tricuspid valve was damaged.  Plaintiff had open heart surgery to repair the tricuspid valve and remove the strut from the right atrium.  One fractured strut remains embedded in Plaintiff's IVC wall.

Plaintiff filed suit against Defendants in February 2016, alleging that Bard filters are more dangerous than other IVC filters because they have higher risks of complications, and that Bard failed to warn physicians and patients about these higher risks.  Doc. 364; Doc. 1, CV-16-00474-PHX-DGC.  She asserted various claims under Georgia law.  *Id.*  Four claims were presented to the jury at trial:  strict liability design defect, negligent design, strict liability failure to warn, and negligent failure to warn.  *Id.* The jury found Defendants liable on the negligent failure to warn claim and awarded Plaintiff $1.6 million in compensatory damages and $2 million in punitive damages.  Docs. 10595, 10596.[1]

Defendants seek judgment as a matter of law under Federal Rule of Civil Procedure 50, contending that the evidence was insufficient to support the verdict.  Doc. 10879.  Defendants alternatively seek a new trial pursuant to Rule 59 on the ground that the verdicts on the strict liability and negligent failure to warn claims are inconsistent.  Doc. 10880.  Plaintiff argues that substantial evidence supports the verdict in her favor.  Doc. 11014.  She further argues that the verdicts are not inconsistent, that

---

[1] For further discussion of IVC filters and Plaintiff's claims, see the Court's orders addressing Defendants' summary judgment motions.  Docs. 8872, 8874.

Defendants have waived their challenge to the alleged inconsistency, and that the Court is without authority to order a new trial even if the verdicts are inconsistent. Doc. 1107.

## II.    Motion for Judgment as a Matter of Law.

Rule 50 provides that a court may grant judgment as a matter of law if a party has been fully heard on an issue and the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a)(1). The Rule 50 standard mirrors the standard for granting summary judgment under Rule 56 – "the inquiry under each is the same." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding whether to grant a Rule 50 motion, "the court 'may not make credibility determinations or weigh the evidence.'" *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000)). Rather, the court "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Reeves*, 530 U.S. at 150. The test is "whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Go Daddy*, 581 F.3d at 961 (citation omitted).

Defendants argue that the evidence presented at trial is insufficient to support the jury's verdict on the negligent failure to warn claim and punitive damages. Doc. 10879 at 2. The Court denied Defendants' initial request for judgment as a matter of law during trial, and denied their earlier motion for summary judgment. Docs. 8874, 10580. The Court continues to conclude that there is sufficient evidence to support a finding in favor of Plaintiff.

### A.    Negligent Failure to Warn Claim.

To establish a negligent failure to warn under Georgia law, "the plaintiff must show the defendant had a duty to warn, the defendant breached that duty and the breach was the proximate cause of the plaintiff's injury." *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351, 1362 (N.D. Ga. 1999). The duty to warn arises "whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product."

*Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994). The duty generally is "breached by (1) failing to adequately communicate the warning to the ultimate user or (2) failing to provide an adequate warning of the product's potential risks." *Wilson Foods Corp. v. Turner*, 460 S.E.2d 532, 534 (Ga. Ct. App. 1995) (citation omitted).[2]

Defendants contend that the negligent failure to warn claim fails as a matter of law for three reasons. First, Plaintiff presented no evidence to support the fundamental premise of the claim – that the G2 filter had higher risks of complications than other IVC filters. Doc. 10879 at 3-6. Second, she proposed no alternative warning. *Id.* at 5. Third, there is insufficient evidence of causation. *Id.* at 6-8. Plaintiff counters that the evidence presented at trial, when taken as a whole and construed in her favor, is more than sufficient to support the jury's finding that Bard failed to provide an adequate warning to her treating physicians and that this failure was a proximate cause of her injuries. Doc. 11014 at 2-12.

### 1. Evidence of an Inadequate Warning.

Plaintiff presented sufficient evidence for the jury reasonably to find that the G2 filter failed at higher rates than other filters, including Bard's own Simon Nitinol Filter ("SNF"), and that Bard failed to warn Plaintiff's treating physicians about these higher rates. As early as February 2006, less than two months after the G2's launch, Bard had received ten reports of G2 filter migration. Bard performed a health hazard evaluation and concluded that "unlike the literature reports, the migration events with the G2 filter have been associated with a high percentage of caudal migrations accompanied by significant filter tilting and limb displacement." Doc. 11014-1 at 348 (Trial Ex. 8355). Bard further concluded that the G2's actual failure rate was probably higher than the rate suggested by ten migrations "due to the asymptomatic nature of some of the migration events and because the actual number of G2 filters implanted is very probably less than

---

[2] Under the "learned intermediary" doctrine, which Georgia applies in cases involving medical devices, the manufacturer has no "duty to warn the patient of the dangers involved with the product, but instead has a duty to warn the patient's doctor, who acts as a learned intermediary between the patient and manufacturer." *McCombs v. Synthes (U.S.A.)*, 587 S.E.2d 594, 595 (Ga. 2003) (citation omitted).

the number distributed." *Id.* at 349. Bard's internal analysis showed that the G2 experienced caudal migration at rates higher than those for the SNF and the G2 filter's predicate device, the Recovery, and that Bard found the risks associated with caudal migration to be "unacceptable." *Id.* at 93-119 (Trial Ex. 2248). Further analysis showed that the G2 filter tilted, perforated the IVC, and fractured more often than the Recovery. *Id.* at 327 (Trial Ex. 2052). The Everest clinical trial, which limited patient follow-up to only six months, showed a G2 filter migration rate of 12%, a tilt rate of 18%, and a penetration rate of 22%. *Id.* at 192 (Trial Ex. 5290). Bard's review of the Everest study and its internal complaint database showed that 80% of caudal migrations were associated with tilt and penetration, and 43% of fractures were associated with tilt. *Id.* at 132, 138 (Trial Ex. 1517). One of Bard's leading design engineers testified that the design features of the G2 made it less resistant to caudal migration and this complication could lead to tilting, perforation, and fracture. *Id.* at 5, 10-12. The jury reasonably could have concluded from this evidence that Bard knew the G2 filter experienced caudal migration at rates higher than other filters and that this type of failure could lead to other complications.

There was also evidence that Bard failed to warn physicians about the G2 filter's higher complication rates, and that physicians generally would want to know this information when making treatment decisions. The G2 filter's instructions for use ("IFU") and promotional materials did not warn about higher risk rates or that caudal migration was often associated with other complications. Doc. 11012-1 at 95-98 (Trial Ex. 5283); Doc. 11014-1 at 34 (testimony that the IFU set forth a "laundry list of complications" that did not disclose risk rates and diluted the warnings about the most common and severe complications). Nor did Bard provide this information to its sales force or to physicians directly through "dear doctor" letters. Doc. 11012-1 at 31-32. Two of Plaintiff's experts, Drs. Hurst and Muehrcke, testified that information about higher risks rates and the potential for a cascade of complications is information interventional radiologists generally would want to know when deciding to treat a patient

with an IVC filter. Doc. 11014-1 at 22-23, 35-40.

Defendants assert that they presented the unrebutted testimony of Dr. Grassi that establishes "the norm" for what the medical community knew about adverse events of IVC filters generally. Doc. 10879 at 6. But the jury was free to give little or no weight to Dr. Grassi's testimony (Doc. 10589 at 7), and the Court may not "substitute[] its judgment concerning the weight of the evidence for the jury's." *Reeves*, 530 U.S. at 153. Moreover, when construed in Plaintiff's favor, Dr. Grassi's testimony about adverse event rates in the literature does not contradict the evidence that the G2 filter failed at rates higher than other filters and that Plaintiff's treating physicians were not warned about the higher rates.

Contrary to Defendants' assertion, sufficient evidence supports the jury's finding that Bard failed to provide an adequate warning about the G2 filter's complications and risks.

### 2. Alternative Warning.

Defendants contend that Plaintiff proposed no alternative warnings for the jury to consider when deciding whether the warnings Bard provided about the G2 filter were adequate. Doc. 10879 at 5. Throughout trial, however, Plaintiff made clear that Bard should have warned physicians that the G2 filter failed at rates higher than other filters, and that its propensity to migrate caudally could lead to other complications such as tilt, perforation, and fracture. Both Dr. Hurst and Dr. Muehrcke testified that this information should have been included in the G2 filter's IFU or otherwise provided to physicians. Doc. 11014-1 at 22-23, 35-40.

Defendants' reliance on *Nolley v. Greenlee Textron, Inc.*, No. 1:06-CV-228-MHS, 2007 WL 5369405, at *7 (N.D. Ga. Dec. 6, 2007), is misplaced. Doc. 11078 at 2-3. The district court in that case concluded that, without expert testimony as to what alternative warnings should have been given, the jury would "have no means by which to adjudge whether the existing warnings were adequate." *Id.* at 6 (citing *Pineda v. Ford Motor Co.*, No. 04-3359, 2006 WL 3762015, at *2 (E.D. Pa. Dec.19, 2006)). That is not the

situation in this case. Based in part on the testimony of Drs. Hurst and Muehrcke, the jury was equipped to determine whether the warnings given by Bard were adequate.

### 3. Causation.

Defendants contend that Plaintiff failed to present evidence showing that her implanting physician, Dr. D'Ayala, would have made a different treatment decision had he been adequately warned about the higher risks associated with the G2 filter. Doc. 10879 at 7-8. This contention is without merit.

Plaintiff presented substantial evidence that Dr. D'Ayala was not aware of the risks associated with the G2 filter and would have made a different treatment decision had the information been provided. He testified that the frequency and severity of adverse events was important to his treatment decisions, and that he relied on warnings provided in IFUs when making such decisions. Doc. 1012-1 at 12-15. When he implanted the G2 filter in Plaintiff in June 2007, he had no knowledge of the high number of adverse events associated with Bard's Recovery filter, the predicate device for the G2. *Id.* at 13. Nor was he aware of certain Bard documents showing higher complication rates in the Recovery device compared to other filters. *Id.* at 14. He testified that this information would have influenced his prescribing habits and he would have wanted to know about the high number of adverse events before implanting the G2 filter in Plaintiff. *Id.* Regarding his decision to use a Bard filter, Dr. D'Ayala stated:

> With regards to the Bard filter, would I have used a different device if I knew at the time that the Bard filter was not ideal or as good as some of the other implants? The answer would have to be yes. . . . I would have used a different filter if there was a different filter that I knew of that was better, in terms of its safety profile.

*Id.* at 16. From this testimony, the jury reasonably could find that Bard's failure to communicate adequate warnings about the G2 filter to Dr. D'Ayala was a proximate cause of Plaintiff's injuries.

### B. Punitive Damages.

Under Georgia law, punitive damages may be awarded where "it is shown by clear

and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Ga. Code Ann. § 51-12-5.1(b). Given the jury's verdict in their favor on the design defect claims, Defendants contend that the scope of evidence the jury could consider in awarding punitive damages is limited and was legally insufficient to support the award. Doc. 10879 at 9-13. The Court does not agree.

The evidence, construed in Plaintiff's favor, shows that before the G2 filter was implanted in Plaintiff and before it failed years later, Bard knew that the filter had a higher risk of caudal migration than other filters (including its predicate device), and that migration could lead to the series of failures that caused Plaintiff to suffer serious injuries. Bard gained this knowledge through its own bench testing and internal analyses, a review of adverse event reports and other complaints by hospitals, physicians, and patients, and the Everest clinical trial. The evidence supported a finding that despite knowing that G2 filters placed patients at a greater risk of harm, Bard chose not to warn physicians and instead downplayed the risk.

"[T]here is sufficient evidence in the record to permit a reasonable fact finder to conclude that [Bard] knew the G2 filter was failing at a significantly higher rate than other IVC filters but did nothing . . . to warn doctors or patients of the increased risk." *Cason v. C.R. Bard, Inc.*, No. 1:12-CV-1288-MHS, 2015 WL 9913809, at *6 (N.D. Ga. Feb. 9, 2015). A jury reasonably could "conclude that Bard acted with an entire want of care such that Bard was consciously indifferent to the consequences of its actions." *Cisson v. C. R. Bard, Inc.*, No. 2:11-cv-00195, 2013 WL 5700513, at *14 (S.D. W. Va. Oct. 18, 2003); *see Weilbrenner v. Teva Pharms. USA, Inc.*, 696 F. Supp. 2d 1329, 1344 (M.D. Ga. 2010) (punitive damages appropriate for jury consideration where drug manufacturer knew risks of adverse effects in adolescents but did nothing to warn about the dangers); *Mack Trucks, Inc. v. Conkle*, 436 S.E.2d 635, 640 (Ga. 1993) (punitive damages appropriate where truck manufacturer failed to warn purchasers of frame

problems); *Ford Motor Co. v. Sasser*, 618 S.E.2d 47, 58 (Ga. Ct. App. 2005) (punitive damages warranted where manufacturer was aware of danger from seat latching system but failed to warn consumers).

### III.    Motion for New Trial.

Bard contends that a new trial is warranted under Rule 59 because the jury's verdicts on the strict liability and negligent failure to warn claims are inconsistent. Doc. 10880. As an initial matter, however, it is important to address the nature of the verdicts because "inconsistent general verdicts typically are permitted to stand, . . . whereas irreconcilably inconsistent special verdicts may require a new trial." *Duhn Oil Tool, Inc. v. Cooper Cameron Corp.*, 818 F. Supp. 2d 1193, 1219 (E.D. Cal. 2011) (citing *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1036-38 (9th Cir. 2003)). Whether a verdict is general or special also affects the waiver rules that apply when a party fails to object to inconsistent verdicts prior to the jury's discharge. *See id.*; *Dawkins v. City & Cty. of Honolulu*, No. CIV. 10-00086 HG-KSC, 2012 WL 1982461, at *5 (D. Haw. May 31, 2012).

### A.    The Jury Rendered General Verdicts.

The Federal Rules of Civil Procedure contemplate three types of verdicts: special verdicts and general verdicts with interrogatories under Rule 49, and common law general verdicts without interrogatories. *Zhang*, 339 F.3d at 1031. Both special verdicts and interrogatories ask the jury to make only factual findings. *Id.* General verdicts do not involve factual findings but, rather, ultimate legal conclusions. *Id.* Thus, "in a general verdict the jury announces only the prevailing party on a particular claim, and may announce damages." *Id.*

In this case, the jury returned ordinary general verdicts. For each of the four claims, the verdict form asked the jury whether it found Bard liable to Plaintiff. Doc. 10595. The jury answered "Yes" on the negligent failure to warn claim and "No" on the other three claims. *Id.* at 1-2. The jury then determined the total amount of compensatory damages. *Id.* at 2. The jury was asked questions concerning certain

affirmative defenses and whether punitive damages should be awarded (*id.* at 2-3; Doc. 10596), but these additional questions do not change the general nature of the verdicts. "Although some general verdicts are more general than others, . . . the key is not the number of questions on the verdict form, but whether the jury announces the ultimate legal result of each claim. If the jury announces only its ultimate conclusions, it returns an ordinary general verdict[.]" *Zhang*, 339 F.3d at 1031.

In short, both "the court's instructions and the verdict form required the jury to perform the most essential function that marks a general verdict: to decide which party prevails." *Mason v. Ford Motor Co.*, 307 F.3d 1271, 1275 (11th Cir. 2002) (finding that the verdict form used for strict liability and negligence claims under Georgia law "was best characterized as one that solicited a general verdict on each of two theories of liability"); *see Zhang*, 339 F.3d at 1031 (jury returned general verdicts where most questions on the verdict form asked whether the jury found for the plaintiff).

## B.    The General Verdicts Must Stand.

Rule 59 allows a district court to grant a new trial on all or some issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). Because "Rule 59 does not specify the grounds on which a motion for a new trial may be granted," the court is "bound by those grounds that have been historically recognized." *Zhang*, 339 F.3d at 1035. These "grounds include: 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Dawkins*, 2012 WL 1982461, at *4 (quoting *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007)); *see Crowley v. EpiCept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018).

"The Supreme Court and the Ninth Circuit have not recognized an inconsistent verdict as one of the historically recognized grounds allowing the court to grant a new trial." *Venezia v. Bentley Motors, Inc.*, No. CV-07-1511-PHX-SMM, 2009 WL 10673383, at *3 (D. Ariz. Apr. 2, 2009) (citing *Zhang*, 339 F.3d at 1035). In fact, longstanding Ninth Circuit precedent dictates that most general verdicts should stand

even if there is an inconsistency. In *International Longshoremen's & Warehousemen's Union (CIO) v. Hawaiian Pineapple Co.*, 226 F.2d 875 (9th Cir. 1955), the jury returned general verdicts finding the unions liable but exonerating individual union officials. *Id.* at 881. The Ninth Circuit had difficulty understanding why the jury found the unions liable and did not also hold some of the leaders responsible, but it upheld the verdicts because "[t]hat is the jury's prerogative." *Id.* More than 40 years later in *Zhang*, the Ninth Circuit expressed confidence that "this rule is historically sound and remains the majority rule." *Id.* at 1035-36 (citing a long list of decisions). The court ultimately concluded that "[u]nless one legal conclusion is the prerequisite for another, inconsistencies between [general verdicts] must stand." *Id.* at 1035. The Ninth Circuit recently reaffirmed this position. *See Williams v. Gaye*, 885 F.3d 1150, 1176 (9th Cir. 2018) ("We have held, in accordance with the majority rule, that legally inconsistent verdicts may nonetheless stand . . . . We see no reason to deviate from this rule today.") (citing *Zhang* and *Int'l Longshoremen's & Warehousemen's Union*).

Defendants contend that the verdicts on the strict liability and negligent failure to warn claims present the precise situation contemplated in *Zhang*, and that there is "more than a perquisite here because the claims are identical under Georgia law." Doc. 10880 at 10. But even if the strict liability and negligence claims were identical, this would not make one the legal prerequisite for the other.

In *Zhang*, the jury instructions given for employment discrimination under federal and state law were substantially identical. 339 F.3d at 1029. The defendants argued that a new trial was warranted because the claims were legally indistinguishable, and thus no rational jury could find liability on one and not the other. *Id.* at 1032. The Ninth Circuit rejected this argument because "[n]either [claim] is predicated on the other, nor is exoneration from discrimination under state law an affirmative defense to discrimination under federal law." *Id.* at 1037. The court noted that the only time the Ninth Circuit has reviewed the consistency of general verdicts is where "the jury makes multiple legal conclusions relating to a single claim, one of which may be legally predicated on

another." *Id.* at 1036-37 (citing *Vaughan v. Ricketts*, 950 F.2d 1464, 1466 (9th Cir. 1991)).

That is not the situation here. Although the strict liability and negligence claims have similarities, they "simply are not predicated on one another." *Bonner v. Normandy Park*, No. C07-962RSM, 2009 WL 279070, at *2 (W.D. Wash. Feb. 2, 2009). "Instead, this is exactly the type of apparent inconsistency between general verdicts that has long been allowed to stand in this Circuit and others." *Zhang*, 339 F.3d at 1037.

Based on the well-established principles set forth in *Zhang* and the cases it cites, the Court finds no reason to disturb the general verdicts in this case. 339 F.3d at 1035-36; *see Williams*, 885 F.3d at 1176 (district court erred in overturning the jury's general verdicts); *Lam v. City of San Jose*, No. 14-CV-00877-PSG, 2016 WL 10654047, at *1 (N.D. Cal. May 13, 2016) ("Even if the jury's verdict was internally inconsistent, the Ninth Circuit has long preserved to the jury the prerogative of issuing a legally irreconcilable general verdict."); *Dawkins*, 2012 WL 1982461, at *9 ("In the Ninth Circuit, legal inconsistencies between general verdicts on different claims are upheld."); *Giel v. Gen. Motors Acceptance Corp.*, No. C-07-5270-RJB, 2009 WL 57114, at *1 (W.D. Wash. Jan. 7, 2009) ("The verdicts in this case were *general*, not special, verdicts as defined in *Zhang*, [and] it is inappropriate to set aside inconsistent general verdicts.") (emphasis in original); *Best W. Int'l, Inc. v. Patel*, No. CV 04-02307-PHX-JAT, 2008 WL 205286, at *2 (D. Ariz. Jan. 23, 2008) ("Even if the Court did find the verdicts irreconcilable, case law suggests that irreconcilable verdicts can stand."); *Elsevier, Inc. v. Comprehensive Microfilm & Scanning Servs., Inc.*, No. 3:10-CV-02513, 2014 WL 7140003, at *10 (M.D. Pa. Dec. 12, 2014) (citing *Zhang* and noting that "[o]ther courts across the country have adopted this willingness to let inconsistent verdicts stand"); *see also United States v. Powell*, 469 U.S. 57, 65-67 (1984) (noting that "it is unclear whose ox has been gored" when a jury renders inconsistent verdicts and that "[o]nce the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment"); *Dunn v. United States*, 284 U.S. 390, 393-94 (1932) ("Consistency

in the verdict is not necessary . . . . That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.").

Cases cited by Defendants are inapposite. Doc. 10880 at 4. The verdicts in *Floyd v. Laws*, 929 F.2d 1390 (9th Cir. 1990), were special verdicts under Rule 49(a), not general verdicts. *Id.* at 1394-95. And the district court was faced with no inconsistency because the jury's answer to a superfluous question was disregarded. *Id.* at 1399-1400. Similarly, the court in *Toner v. Lederle Labs.*, 828 F.2d 510, 511 (9th Cir. 1987), found that "the jury's special verdicts were not inconsistent." Unlike the present case, *Duhn Oil Tool* involved precisely the type of situation contemplated in *Zhang* – verdicts where one legal conclusion was the prerequisite for the other. 818 F. Supp. 2d at 1220 (jury found that an independent patent claim was not anticipated or obvious but certain dependent claims were invalid for anticipation and obviousness).

## C. Defendants Waived the Objection to Inconsistent Verdicts.

Defendants assert that they had no opportunity to object to the verdicts before the jury was discharged. Doc. 10880 at 5 n.2. The Court does not agree for reasons explained below, but even if this were true, Defendants waived their objection by failing to propose jury instructions and a verdict form equating the strict liability and negligence claims, and failing to object to the final instructions and verdict form given to the jury.

### 1. Waiver Under Rule 51.

"[T]he potential for a legally irreconcilable verdict should be addressed through jury instructions proposed under Rule 51," and "instructional errors are waived if not raised in a timely fashion." *Zhang*, 339 F.3d at 1037 (citing *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002)); *see Venezia*, 2009 WL 10673383, at *3. Rule 51 requires that an objection to jury instructions "stat[e] distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51(c)(1). "The purpose of the Rule is to allow the trial court an opportunity to cure any defects in the instructions before sending the jury to deliberate." *Jarvis*, 283 F.3d at 56 (citation omitted). Thus, objections are

untimely if not made "before the instructions and arguments are delivered[.]"  Fed. R. Civ. P. 51(b)(2), (c)(2)(A).

Defendants contend that the alleged inconsistency in the verdicts "cannot easily or definitively be traced to any alleged error in the jury instruction or verdict sheet," and thus no waiver occurred.  Doc. 11079 at 9 n.5.  But the jury instructions Defendants proposed said nothing about the strict liability and negligence claims being identical, and instead set forth entirely different elements for the two claims.  Doc. 10254 at 44-45, 49.  Consistent with Defendants' proposed instructions, the final instructions specifically advised the jury that Plaintiff asserted four claims against Bard and the jury "should consider each claim separately."  Doc. 10589 at 13.  Defendants raised no objection to the final instructions either before or after they were given to the jury.  Doc. 10584 at 12.

Defendants' proposed verdict form also treated the strict liability and negligence claims separately, naming one as a "warning defect" claim and the other as a "negligent failure to warn" claim.  Doc. 10253 at 3-4.  And before the jury retired to deliberate, Defendants made clear that they were comfortable with the final verdict form, which also treated each claim separately.  Doc. 10694 at 130.  At no time did Defendants propose a jury instruction or verdict form that told the jury the strict liability and negligence claims were the same and should stand or fall together.  Nor did Defendants propose combining the two theories of liability into one claim.  In fact, even after Defendants filed the present motion for a new trial, they proposed separate jury instructions and verdict form questions for strict liability and negligence claims in the second bellwether case, which also is governed by Georgia law.  Doc. 10930-5 at 23-24, 29; Doc. 10927 at 3.

In short, Defendants have waived their objection to inconsistent verdicts by proposing jury instructions and a verdict form that invited the alleged inconsistency, and then failing to timely object to the final instructions and verdict form given to the jury. *See* Fed. R. Civ. P. 51(b)-(c); *Zhang*, 339 F.3d at 1037; *Best W. Int'l*, 2008 WL 205286, at *2 (citing *Zhang* and finding that the party "waived its objection to the alleged inconsistent verdicts by failing to address the issue through jury instructions pursuant to

Rule 51"); *Jarvis*, 283 F.3d at 56 (defendant waived its post-trial objection where the verdicts comported with the jury instructions and the inconsistency was permitted by the verdict form); *Merchant. v. Ruhle*, 740 F.2d 86, 91 (1st Cir. 1984) (inconsistent verdicts upheld where the defendant agreed with the instructions given despite the substantial identity of the claims).

### 2. Waiver by Failing to Timely Object to the Verdicts.

"A party 'waives its objection to the jury's verdict . . . by not objecting to the alleged inconsistency prior to the dismissal of the jury.'" *Williams*, 885 F.3d at 1175 (quoting *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir. 1995)). Defendants assert that they had no opportunity to object before the jury was discharged. Doc. 10880 at 5 n.2. This assertion is without merit.

The parties stipulated that the case would be bifurcated by having the jury determine liability, compensatory damages, and whether punitive damages should be awarded in the first phase of trial, and, if necessary, determine the amount of punitive damages in the second phase. Doc. 10071. The alleged inconsistency became apparent when the jury's general verdict on each claim was announced after the first phase. Doc. 10695 at 4-6. The Court did not immediately discharge the jury. The Court instead polled the jurors to confirm that the verdicts were unanimous, and then informed the jury that they would receive additional evidence and instructions regarding the amount of punitive damages. *Id.* at 6-8. The Court then had a bench conference with counsel about how the second phase of trial should proceed. *Id.* at 8-13. Counsel for Defendants objected to Plaintiff presenting evidence of Bard's out-of-state activities for purposes of punitive damages, but said nothing about the verdicts being inconsistent. *Id.* The second phase lasted nearly two hours, during which two additional bench conferences were held. *Id.* at 13-49. The jury was discharged only after it determined the amount of punitive damages. *Id.* at 47-49.

Despite having multiple opportunities to do so, Defendants simply did not object to the verdicts before the jury was discharged. This failure constitutes a waiver. *See*

*Williams*, 885 F.3d at 1175 ("[Defendants] did not object to the jury's verdicts prior to jury discharge. Nor did they object during a colloquy with the district court after the jury was discharged. They thus waived their challenge to any perceived inconsistencies between the jury's general verdicts."); *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 806 (9th Cir. 1984) (party "waived its claim of jury confusion or compromise when it failed to raise it at the time the verdict was read"); *Mason*, 307 F.3d at 1275-76 (the defendant's "failure to raise its objection before the jury was discharged waived the right to contest the verdicts on the basis of alleged inconsistency"); *Venezia*, 2009 WL 10673383, at *3 (objection waived where the party "did not object to the jury's verdict or ask that the verdict form be resubmitted to the jury with other instructions"); *Best W. Int'l*, 2008 WL 205286, at *2 (objection waived by "failing to raise the objection at the time the verdict was read").

Defendants cite *Los Angeles Nut House v. Holiday Hardware Corp.*, 825 F.2d 1351 (9th Cir.1987), for the proposition that a waiver occurs only where "counsel affirmatively mislead[s] the court such as when counsel was given the opportunity to object but declined to do so." Doc. 11079 at 7. But as explained above, Defendants had ample opportunities to object to the verdicts before the jury was discharged. Moreover, *Los Angeles Nut House* involved a general verdict with special interrogatories under Rule 49(b), not an ordinary general verdict. This distinction was critical to the court's ruling. The court explained that Rule 49(b) gives a district judge only three options for resolving an inconsistency between the verdict and answers to special interrogatories, and allowing the general verdict to stand is not one of them. 825 F.2d at 1354 ("We will not amend the rule and provide a fourth alternative, one that permits the party in whose favor the general verdict runs to prevail merely by remaining silent.").

Defendants' reliance on *Flores v. City of Westminster*, 873 F.3d 739 (9th Cir. 2017), fares no better. That case also involved a verdict under Rule 49. *Id.* at 756-57. The court held that the defendants were not entitled to a new trial because they had "waived any objection to the jury's allegedly inconsistent answers when they failed to

object before the jury was discharged." *Id.* at 757. The court noted that the parties were asked if they saw any reason the jury could not be discharged and the defendants did not object, but this invitation to object was not central to the court's holding. *Id.* at 757 n.11.

### 3. Waiver Conclusion.

Defendants waived their objection to inconsistent verdicts by failing to object to the jury instructions, the verdict form, and the verdict itself. "'To excuse [Defendants] from the well-established rules of waiver would permit the sort of 'sandbagging' that the rules are designed to prevent, while undermining the ideal of judicial economy that the rules are meant to serve.'" *Zhang*, 339 F.3d at 1037 (quoting *Jarvis*, 283 F.3d at 62).[3]

### D. The Verdicts Are Not Irreconcilably Inconsistent.

Consistent with the Seventh Amendment's guarantee of the right of trial by jury, courts "must accept any reasonable interpretation of the jury's actions, reconciling the jury's findings 'by exegesis if necessary[.]'" *Zhang*, 339 F.3d at 1038 (quoting *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963)). "In an inconsistent verdict case, a court asks, not whether the verdict necessarily makes sense under any reading, but whether it can be read in light of the [instructions and] evidence to makes sense." *White v. Ford Motor Co.*, 312 F.3d 998, 1005 (9th Cir. 2002); *see Zhang*, 339 F.3d at 1038. Thus, a party "bear[s] a high burden to establish an irreconcilable inconsistency." *Zhang*, 339 F.3d at 1038.

Defendants contend that under Georgia law the elements of failure to warn claims under strict liability and negligence theories are identical, and reconciling the jury's verdicts on the two claims is an impossible task. Doc. 10880 at 5-8. The verdicts in this case are not without tension, but the Court finds that they can be harmonized.

Generally speaking, "the focus in negligence is on the manufacturer's conduct, while in strict liability it is on the product and the user's expectations." *Toner*, 828 F.2d

---

[3] The Court rejects Defendants' assertion that a timely objection to the verdicts would have been inappropriate. Doc. 11079 at 8-9. A contemporaneous objection may have presented difficult issues, but the Court could have sought to resolve them with counsel's assistance and potentially resubmitted the case to the jury with further instructions. *See Duk v. MGM Grand Hotel, Inc.*, 320 F.3d 1052, 1057 (9th Cir. 2003).

at 513. Consistent with this general principle, the negligence instruction in this case addressed whether Bard breached its duty of reasonable care to Plaintiff by failing to provide adequate warnings about the G2 filter. The strict liability instruction, by contrast, focused on the adequacy of the warning given with the G2 filter at the time of sale. Doc. 10589 at 18. Specifically, the instruction provided that a manufacturer of a product may be liable to any person who is injured because of an inadequate warning that "existed at the time the manufacturer sold the product." Doc. 10589 at 18. It further provided that a required element for strict liability is that the inadequate warning "existed at the time the product left the control of Bard," and that a product may be said to be in a defective condition if it is "sold without an adequate warning[.]" *Id.* at 18-19. The negligence instruction contained no such timing element; unlike the strict liability instruction, it did not require a finding that the warning was defective at the time of sale. *Id.* at 21. Thus, the jury could have found, consistent with the instructions and the evidence, that the warning provided with the G2 filter when it was sold was not inadequate, but that Bard was negligent in failing to warn about later-acquired information.

Defendants note that, consistent with Georgia law, the strict liability instruction told the jury that a manufacturer has a "continuing duty to adequately warn of defects in a product even after the product has left the control of the manufacturer[.]" Doc. 10589 at 19; *see* Ga. Pattern Jury Instruction § 62.683 (citing *Chrysler v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994)); *Woods v. A.R.E. Accessories, LLC*, No. A18A0292, 2018 WL 2354925, at *2 (Ga. Ct. App. May 24, 2018) ("[A] manufacturer which (before or after the sale of its product) knows or reasonably should know of a danger arising from use of the product 'has a duty to give warning of such danger.'") (quoting *Batten*, 450 S.E.2d at 211). But this additional instruction could reasonably have been read by the jury as imposing a continuing duty to provide the warning that was due when the product left Bard's control, a timing requirement not present in the negligent failure to warn claim.

The Court recognizes that Defendants' interpretation of the verdicts is plausible,

particularly given the lack of clarity Georgia law provides regarding the distinction between strict liability and negligence claims in product liability cases. But "a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Zhang*, 339 F.3d at 1038 (citation omitted). Defendants have not met their high burden of establishing an irreconcilable inconsistency between the verdicts. *See id.*; *White*, 312 F.3d at 1005 ("Ford's reading [of the verdict] is plausible . . . . But that isn't the only plausible reading. After reading the record, we agree with the district court that, as the case was presented to the jury, there was an alternative plausible understanding that makes sense of the verdicts."); *Toner*, 828 F.2d at 513 (recognizing the "abstract symmetry" of the defendant's argument that the jury's finding of liability for negligence but not strict liability was inconsistent, but affirming the judgment because the court "must adhere to [its] duty to reconcile the jury verdicts if there is a reasonable way to do so"); *Rutherford v. McKissack*, No. C09-1693 MJP, 2011 WL 3421532, at *2 (W.D. Wash. Aug. 4, 2011) ("Like the outcome in *Zhang*, Defendants have not shown the verdicts to be legally irreconcilable. The two claims involve different legal standards, and neither is a prerequisite to the other.").

**IT IS ORDERED** that Defendants' motion for judgment as a matter of law (Doc. 10879) and motion for new trial (Doc. 10880) are **denied**.

Dated this 19th day of June, 2018.

_____
David G. Campbell
United States District Judge

- 19 -