# Exhibit A

**<u>EXPERT REPORT</u>**

**THOMAS KINNEY, M.D., M.S.M.E.**

**ANNE CHRISTINE ROBERTS, M.D.**

**SANJEEVA KALVA M.D.**

a.  What information, including the severity, character and frequency of complications, would a practicing physician want and need to know concerning an IVC filter's safety and efficacy in order to conduct a proper (i.e., standard of care) risk/benefit evaluation for treatment of a patient? Considering patient safety is the primary concern and that open, honest and complete performance, safety and complaint data from manufacturers are required for physicians to fulfill their standard of care responsibility to provide informed consent to their patients;

b.  Physicians' reasonable expectations of the requisite pre-clinical and clinical safety and effectiveness/risk-benefit evidence that is mandatory to justify widespread marketing of IVC filters for both temporary and permanent placements;

c.  Data that Bard possessed, including testimony of witnesses regarding the Recovery, G2 and Eclipse IVCFs.   What a reasonable physician's expectations, and acceptability of risks/complications versus benefits, were and are in view of such data and whether Bard met those expectations. These opinions, as with all others set forth herein, apply principles of medical standard of care which we believe should, apply to the standard of care and requisite principles to medical device manufacturers in the same or similar circumstances.

d.   In our capacity as practicing physicians and members of SIR, what is the purpose and intent of the SIR quality control improvement and practice parameter publications, including the Society of Interventional Radiology

doctor to make risk/benefit determinations. Along with our own combined experience, education and training, our opinions are based on these articulated principles. (*See* Schedule 3-Testimony of Bard employees regarding the important of providing information to a physician to make a risk/benefit determination):

> *"The company needs to put the information out there in a way that it is relevant, understandable, not confusing to a physician about its product."*

> *"There is no higher duty that a device company has than to make sure the doctor has all the information he needs to decide whether or not he's going to put his patient at risk of this treatment, this device, or maybe he would choose something else…"*

> *"Expectations, acceptability of certain device and its risks and benefits, those are exclusively the rights of a doctor and a patient…"*

> *And if the doctor has a certain expectation about a device, it's important for him to have that information as to whether or not this device is going to meet his expectations…"*

> *"It has to be information that you know that doctors -- that are important to doctors and ultimately to patients in an informed consent decision about whether or not they should choose your product over some other alternative means of treating the patient*"
> (David Ciavarella, M.D., Deposition Transcript, Nov. 12, 2013 (91:23 -92:11, 92-95)

6.     We need the safety and effectiveness data that companies possess from their testing and monitoring of their medical devices, especially implanted devices such as IVC filters, to allow physicians to provide full and fair balanced informed consent to patients for whom these devices are prescribed and indicated.  The ultimate decision about acceptability of inherent IVC filter risk(s) rests with our patients as juxtaposed with the clinical benefit obtained by filtration, and they are entitled to full disclosure of all material information that companies possess about the safety, performance, design and complications of recommended medical devices when it comes to rendering these decisions.

7.     The reasonable expectations physicians and patients have of medical device companies, like CR Bard and Bard Peripheral Vascular, who market these devices to physicians

who order and/or who implant them, include complete, honest and accurate, and frequently updated communications of any and all safety and effectiveness data and information the companies possess and to allow physicians to properly and completely fulfill their obligations of informed consent. This information is required by physicians in making appropriate therapeutic decisions on behalf of their patients where an IVC filter may be indicated or considered as a therapeutic option. This includes the expectations of what a reasonable patient and physician would want and need to know in the same or similar circumstances for which an IVC Filter has been prescribed, considered or recommended.

8.     The ACR–SIR PRACTICE GUIDELINE ON INFORMED CONSENT FOR IMAGE-GUIDED PROCEDURES (Rev. 2016). These same principles, although possibly stated differently in prior publications of this Practice Guideline, have remained constant throughout the relevant time periods we address in this report.  This Practice Guideline calls for informed consent for all invasive procedures, and states in pertinent part:

> Prudent and ethical medical practice requires close communication between the patient and the physician. If the patient is unable to provide consent, the patient's legal representative or, in the case of a minor, the patient's parent(s) or legal guardian, represents the patient in the consent process. The patient or representative and, when appropriate, the patient's family must have every opportunity to understand the treatment or procedure the patient is to receive and its reasonable risks, benefits, and alternatives; to have all questions answered; and to fully consent to the treatment and procedure.

> I. Introduction
> This guideline was revised collaboratively by the American College of Radiology (ACR) and the Society of Interventional Radiology (SIR). Prudent and ethical medical practice requires close communication between the patient and the physician. The patient, or if the patient is unable to provide consent, the patient's legal representative and, when appropriate, the family, must have every opportunity to understand the treatment or procedure the patient is to receive and its reasonable alternatives, to have all questions answered, and to fully consent to the treatment and procedure. The degree of disclosure required for a valid consent varies from state to state, but there are two generally

10

recognized standards. The first is measured by what a reasonable physician in his or her professional judgment believes is appropriate to disclose to the patients. The degree of disclosure depends on perceptions of the physician in each case. The second standard is based on what a reasonable patient would want to know in the same or similar circumstances.

The trend is toward the "reasonable patient" standard, which usually requires greater and more detailed disclosure of information.

…

B. Protocol for Informed Consent for Elective Procedures

> 1. Before the proposed procedure is performed, the following will be explained to the patient or, if the patient is unable to provide consent, to the patient's legal representative:
>
> a. The purpose and nature of the procedure or treatment.
>
> b. The method by which the procedure or treatment will be performed.
>
> c. The risks, complications, and expected benefits or effects of such procedure or treatment.
>
> d. The risk of not accepting the procedure or treatment.
>
> e. Any reasonable alternatives to the procedure or treatment and their most likely risks and benefits.
>
> f. The right to refuse the procedure or treatment.

*See* https://www.acr.org/~/media/1A03224CA4894854800C516012B6DB5A.pdf.

9.     As physicians caring for patients who are candidates for IVC filters, or have them implanted, we must provide our patients with full informed consent, specifically the risks, complications, and expected benefits or effects of such procedure or treatment. In order to fulfill this obligation to our patients, the companies who manufacture, market and sell IVC filters, including Bard, must provide current and *up-to-date* safety information regarding the frequency, severity and type(s) of complications associated with their specific filter(s). The more severe the injury or complication, the greater the urgency, and oftentimes, immediacy to act and advise. With this vital information, physicians can decide whether his or her patient is appropriate for IVC filter placement and, if so, which specific filter should be implanted.

52.   I have won numerous awards for my clinical, teaching, and research acumen. I was privileged to receive the Dr. Athanasoulis Award for Excellence in Teaching and the Outstanding Performance Award for excellence in patient care and teaching while at Massachusetts General Hospital. In 2012, I was honored to be named as Fellow of the Society of Interventional Radiology.

53.   My billing rate is $700 per hour.

54.   I have reviewed the material referred here in and listed in our Facts and Data Considered, Appendix A.

55.   I understand I may be called upon to offer opinions in rebuttal to experts designated by Defendants.

56.   A true and accurate copy of my current CV, including a list of our publications for the last 10 years, is attached as Appendix B.

57.   I have never testified in any legal matter.

## III.    OPINIONS

58.   As physicians with patients who are candidates for IVC filters, or have them implanted, it is our opinion that in the interest of patient safety, informed consent, risk-benefit considerations and analyses, medical and scientific ethics and honesty, that reasonable members of SIR, ACR and other medical doctors who prescribe or implant IVC filters would expect the following clarity, detail, alerts, warnings and action by Bard:

59.   The failure of the Recovery Filter device to maintain adequate migration resistance when the hooks are not engaged raises questions about potential safety and effectiveness of the device. Bard should have not sold this device until it adequately studied and

**REDACTED**

278. **REDACTED**

279.   An a final example, CardioVascular and Interventional Radiology, March 24, 2006, "*Recovery" Vena Cava Filters: Experience in 96 Patients*, Sanjeeva P. Kalva, Christos A. Athanasoulis, Chieh-Min Fan,, Marcio Curvelo, Stuart C. Geller, Alan J. Greenfield, Arthur C. Waltman,, Stephen Wicky.

    a.   An unacceptable adverse event rate at Mass General.

    b.   This was information known to Bard long before Dr. Kalva's experience at Mass General; this failure rate is unacceptable - exposes patients to an unacceptable risk without informed consent.

    c.   Informed consent is a two-step process – the doctor has to be adequately advised of the device before they use the device, and that information has to be imparted ultimately to the patient so they can make an informed decision.

    d.   When companies like Bard withhold that crucial information, the doctors and patients are uninformed about the utility and risks of the device, and therefore, there is no informed consent.

## XII.  CONCLUSION

280.  This expert report was a collaborative effort among the authors, similar to the methodology employed had we been contributing to a medical article, professional society guidance or practice parameters document, or presentation to the medical community, or to professional societies and organizations, like the Society of Interventional Radiologists and the American College of Radiology.

281.  Our expert opinions are to a reasonable degree of medical probability and based on standard of care principles and practices, as those relate to the expectations of what a reasonable physician, reasonable members of our professional societies, and reasonable consultants to medical device companies would want, need and expect from data and information possessed by medical device companies like Bard, and especially in the context of IVC filters, both prior to and after their products are released into the open market.

282.  Our expert opinions are to a reasonable degree of medical probability and grounded on standard of care principles that would permit proper, complete and fact-based informed consent obligations to patients who are deemed to be candidates for IVC filtration, and obligations to physicians involved in these decisions to be sufficiently and continually informed by manufacturers and sellers IVCF devices of the data and information they possess that are important to physicians in making appropriate therapeutic decisions on behalf of their patients where an IVC filter may be indicated or considered as a therapeutic option.