# Exhibit B

**Expert Report**

**Lisa Hyde v. CR Bard Inc.**

**Darren R. Hurst, M. D.**
**Director Vascular and Interventional Radiology**
**Department of Radiology**
**St. Elizabeth Health System**
**1 Medical Village Drive**
**Edgewood, KY 41017**

    i. REDACTED

    j. REDACTED

    k. REDACTED

4. **Opinions:**

   a. <u>Summary:</u>

   REDACTED

   b. <u>Reasonable Expectations of Physicians for Medical Devices:</u>

   i. In the everyday practice of medicine, I along with my colleagues/implanting and treating physicians have expectations of medical device companies like C.R. Bard, Inc. and Bard Peripheral Vascular (referred to collectively in this report as "Bard") when they design, manufacture, market, and sell medical devices. Fulfilling these expectations in their design, testing, manufacturing, warning, and marketing of IVC Filters allows physicians to properly and completely obtain informed consent from their patients. Fulfillment of these expectations also allows physicians to select the appropriate IVC filter and make appropriate therapeutic decisions on behalf of their patients whether an IVC filter is indicated or considered as a therapeutic option, and whether to use or not use a particular type of IVC filter.

   ii. Moreover, a patient has reasonable expectations on what he/she should know in the same or similar circumstances as a reasonable patient who has been prescribed or has considered having an IVC filter implanted.

c. <u>Informed Consent:</u>

 i. The AMA Code of Medical Ethics - CHAPTER 2: OPINIONS ON CONSENT, COMMUNICATION & DECISION MAKING, *2.1.1 Informed Consent* states: Informed consent to medical treatment is fundamental in both ethics and law. Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care. Successful communication in the patient-physician relationship fosters trust and supports shared decision making. The process of informed consent occurs when communication between a patient and physician results in the patient's authorization or agreement to undergo a specific medical intervention. In seeking a patient's informed consent (or the consent of the patient's surrogate if the patient lacks decision-making capacity or declines to participate in making decisions), physicians should: (a) Assess the patient's ability to understand relevant medical information and the implications of treatment alternatives and to make an independent, voluntary decision. (b) Present relevant information accurately and sensitively, in keeping with the patient's preferences for receiving medical information. The physician should include information about: (i) the diagnosis (when known); (ii) the nature and purpose of recommended interventions; (iii) the burdens, risks, and expected benefits of all options, including forgoing treatment.

    https://www.ama-assn.org/sites/default/files/media-browser/code-of-medical-ethics- chapter-2.pdf.

 ii. The AMA Code of Medical Ethics' Opinion 8.08 – Informed Consent states: The patient's right of self-decision can be effectively exercised only if the patient possesses enough information to enable an informed choice. The patient should make his or her own determination about treatment. The physician's obligation is to present the medical facts accurately to the patient or to the individual responsible for the patient's care and to make recommendations for management in accordance with good medical practice. The physician has an ethical obligation to help the patient make choices from among the therapeutic alternatives consistent with good medical practice. Informed consent is a basic policy in both ethics and law that physicians must honor, unless the patient is unconscious or otherwise incapable of consenting and harm from failure to treat is imminent. In special circumstances, it may be appropriate to postpone disclosure of information (see Opinion 8.122, "Withholding Information from Patients").

    Physicians should sensitively and respectfully disclose all relevant medical information to patients. The quantity and specificity of this information should be tailored to meet the preferences and needs of individual patients. Physicians

need not communicate all information at one time, but should assess the amount of information that patients are capable of receiving at a given time and present the remainder when appropriate.

http://journalofethics.ama-assn.org/2012/07/coet1-1207.html.

I have adopted the above AMA Codes in my daily practice and, in my opinion, they represent the standard of care relative to Informed Consent, Patient Communication, and Decision Making.

d. Failure to Notify:
   i. Given the above responsibilities of the medical device manufacturer to the patient and the physician, and the physician to the patient, it is my opinion that Bard failed to notify the operating physicians and the implanted patients of the much higher complication rates associated with the Recovery®, G2x®, and Eclipse® filters in comparison to the original predicate device, the Simon Nitinol Filter®, and competitor filters.  Instead, Bard continued to represent its filters as having superior safety, quality and performance.  (Example: G2 Brochure: "…strength and stability to a new level.")
   ii. There were multiple early safety signals with the Recovery®, G2x®, and Eclipse® filters.  These signals came from adverse event reports/sales data, from reports in the medical literature, from Bard's internal risk analysis, and from Bard's own in vitro testing indicating low migration resistance compared to other filters, and in some instances, failing to meet the minimum arbitrary threshold for migration resistance under a variety of foreseeable circumstances.  For example, Bard's own internal risk analysis deemed the G2 filter to pose an "unacceptable risk" of caudal migration.
   iii. Despite the above warning signs that the predicate device to Ms. Hyde's filter, the Recovery filter, had significant issues with safety, Bard continued to market the device for both permanent and retrievable indications in the prevention of PE from DVT.  During this time, Bard acknowledged design flaws that needed to be corrected, but instead chose to inappropriately utilize the data from the Grassi paper, and ignore their in-house studies, risk analysis, and the current medical literature, to justify the high complication rates and continued marketing practices.  In essence, Bard chose to keep the product on the market until a new product was released rather than focusing on its duty to remove unsafe devices from the market.
   iv. In addition, Bard marketing materials falsely represented newer generation devices as greatly improved strength and stability when many of the changes in the devices from generation to generation were minimal and unproven in their safety and efficacy.