# Exhibit L

SHARI ALLEN O'QUINN - Direct

1               (Exhibit Number 5001 was admitted into evidence.)          02:14:04

2    BY MR. NORTH:

3    Q.    Is this Dear Doctor letter -- oh.

4               MR. NORTH:  Could we display this to the jury, Your

5    Honor?                                                              02:14:15

6               THE COURT:  Yes.

7    BY MR. NORTH:

8    Q.    Does this specifically advise physicians what has been

9    changed in the instructions for use based upon the clinical

10   reports?                                                           02:14:32

11   A.    Yes, it does.  It indicates that -- it actually summarizes

12   the changes to the IFU and indicates how the warnings and the

13   precautions in the safety sections of the IFU were updated

14   specifically to identify the risks of fracture and migration

15   and some other procedural information that we wanted to make       02:14:57

16   the physicians aware of that was important.

17   Q.    Was this the only communication the company made regarding

18   the Recovery filter and possible migration incidents to

19   physicians?

20   A.    I don't recall if there was some individual communications   02:15:22

21   with physicians but we did do a second letter later, a Dear

22   Colleague letter, that also went out to physicians.

23              MR. NORTH:  Let's look at 5247 if we could.

24   BY MR. NORTH:

25   Q.    Do you recognize this document?                              02:15:53

United States District Court

SHARI ALLEN O'QUINN - Direct

1   A.   Yes.   That's the Dear Colleague letter that I just                     02:16:05

2   mentioned.

3   Q.   And before you sent -- the company sent this letter out,

4   did you have discussions with the FDA about the fact that the

5   company was going to send this letter out to physicians?          02:16:14

6   A.   Yes, we did.

7            MR. NORTH:   Your Honor, at this time we would tender

8   5247.

9            MR. JOHNSON:   Your Honor, we did not see this on

10   their list -- oh.   Never mind.   I apologize.   We don't have any   02:16:31

11   objection.

12            THE COURT:   All right.   5247 is admitted.

13            (Exhibit Number 5247 was admitted into evidence.)

14            MR. NORTH:   Could we publish it?

15            THE COURT:   You may.                                      02:16:44

16   BY MR. NORTH:

17   Q.   If we would look in the first sentence at the paragraph

18   that begins "Over the past two years."   And going to the end of

19   that paragraph.   Could you tell us what the company advised

20   physicians about with regard to the Recovery filter here?        02:17:21

21   A.   Yes.   We advised them about the risk of filter migration

22   and that some of them had been associated with interventions

23   and death and we shared that although those events had

24   occurred, they were below the rates that had been reported in

25   the Society of Interventional Radiology guidelines and that the   02:17:48

SHARI ALLEN O'QUINN - Direct

1  A.   Yes.  We noted that the patient should be returned to          02:19:46
2  their anticoagulation therapy as soon as it was deemed safe.
3  Q.   And turn to the next page, page three of this document.
4  Did the company also encourage physicians to report any adverse
5  events both to the company and to the FDA?                          02:20:07
6  A.   Yes, we did.  We provided the FDA contact information and
7  our contact information and reiterated to the physicians that
8  it was very important for them to report the events to both us
9  and to the FDA.
10 Q.   Now, when the company, during your time there, would send      02:20:28
11 out a letter like this, a Dear Colleague letter or a Dear
12 Doctor letter like the previous one we saw, what sort of steps
13 did the company take to ensure that this got the widest
14 distribution or dissemination possible?
15 A.   We looked at our entire customer database of anyone that       02:20:47
16 had purchased the product and sent the product out to those
17 physicians and we tracked the delivery of those letters to make
18 sure that they were delivered.
19 Q.   Now, over the course of this time period in the late 2004,
20 early 2005 time frame, were you having a number of                  02:21:24
21 conversations with the FDA?
22 A.   Yes, I did.  I had frequent communications with the FDA.
23 Q.   And did you have communications that specifically
24 discussed the reports of migration with regard to the Recovery
25 filter that the company was receiving?                              02:21:41

United States District Court

SHARI ALLEN O'QUINN - Direct

1   A.   Yes, I did.  I had frequent phone contacts with the FDA          02:21:44

2   where --

3            MR. O'CONNOR:  Objection, Your Honor.  This is

4   hearsay.

5            THE WITNESS:  I have contact had reports --          02:21:52

6            THE COURT:  Hold on, please.

7            Overruled so far.  There has been nothing said about

8   the content of the conversations.

9   BY MR. NORTH:

10  Q.   Just generally, describe what these conversations were,          02:22:00

11  the topics of these conversations.

12  A.   Yeah.  The topics of the conversations were to update FDA

13  on the current rates.  We would always talk about the rates.

14  We would talk about where we were in the investigation and any

15  additional work that we were doing like feedback from          02:22:17

16  physicians or any internal testing that we were doing, we would

17  share that with the -- I would share that with the FDA.

18  Q.   Now, there has been a reference, I think you just

19  referenced it, to the SIR guidelines?

20  A.   Yes.          02:22:35

21  Q.   What are those?

22           MR. O'CONNOR:  Objection, Your Honor.  Lack of

23  foundation.  This is not a medical doctor.

24           THE COURT:  You just have to state the objection.

25  Sustained.  You have to lay foundation for that.          02:22:43

United States District Court