# PLAINTIFFS'

# EXHIBIT 2

James R. Condo (005867)
Amanda C. Sheridan (027360)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
jcondo@swlaw.com
asheridan@swlaw.com

Richard B. North, Jr. (GA Bar No. 545599)
(admitted *pro hac vice*)
Matthew B. Lerner (GA Bar No. 446986)
(admitted *pro hac vice*)
Nelson Mullins Riley & Scarborough, LLP
201 17th St. NW, Suite 1700
Atlanta, GA 30363
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants C. R. Bard, Inc.
and Bard Peripheral Vascular, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | No. 2:15-MD-02641-DGC |
| | **DEFENDANTS' SUBMISSION REGARDING SELECTION OF CASES FOR BELLWETHER GROUP 1** |

In accordance with Case Management Order No. 11 [Doc. 1662], Para. V.A.2., and No. 20 [Doc. 4335], Defendants (hereinafter "Bard") hereby file their Submission Regarding Selection of Cases for Bellwether Group 1, providing their memorandum in support of their selections, proposed Order of Trials, and memorandum in opposition to certain of Plaintiffs' selections, and show the Court as follows:

The overarching goal of the bellwether trial process in MDLs is to allow the parties to test their claims and defenses and ultimately to evaluate the strengths and weaknesses of their cases, thereby assisting in facilitating global settlement. Manual for Complex

Litigation (Fourth) § 20.132. However, the likelihood of bellwether trials yielding information useful in furthering these goals depends upon a critical factor; the extent to which bellwether trials fairly represent the cases making up the greater MDL as a whole:

> If individual trials, sometimes referred to as bellwether trials or test cases, are to produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of case. Some judges permit the plaintiffs and defendants to choose which cases to try initially, but this technique may skew the information that is produced. To obtain the most representative cases from the available pool, a judge should direct the parties to select test cases randomly or limit the selection to cases that the parties agree are typical of the mix of cases.

Manual for Complex Litigation (Fourth) § 22.315. [1]

When bellwether cases are not fairly representative of the MDL as a whole, their trials lose the ability to inform the parties' respective assessments of their cases' strengths and weaknesses and can actually decrease the likelihood of eventual global settlement, ultimately resulting in a waste of substantial amounts of money and judicial resources. *See,* Eldon E. Fallon, et al., *The Problem of Multidistrict Litigation: Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2343-44 (2008). Defendants have concern that such could be the case here, should Plaintiffs' strategy of selecting cases intended to

---

[1] Only when a "representative…range of cases" is selected may "individual trials…produce reliable information about other mass tort cases." MCL § 22.315; *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2010 U.S. Dist. LEXIS 108107, at *4, *6-7 (S.D. Ill. Oct. 8, 2010) (finding that it is critical to a successful bellwether plan that an honest representative sampling of cases be achieved because "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the run-of-the-mill case."). *See also In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087 BTM (KSC), 2012 U.S. Dist. LEXIS 1118980, at *56 (S.D. Cal. Aug. 21, 2012) ("The bellwether cases should be representative cases that will best produce information regarding value ascertainment for settlement purposes or to answer causation or liability issues common to the universe of plaintiffs."); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) (finding that "representativeness" is a "core element" that must be present for a bellwether trial to achieve its purpose of value ascertainment for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants).

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

reap the largest judgments possible be permitted to predominate this bellwether selection process.

From the beginning of the bellwether selection process in this case, Bard's approach has been premised on the widely accepted belief that the process loses its utility if the cases in each respective stage of the process are not representative of the overall makeup of the MDL. Moreover, the Court instructed the parties to identify bellwether cases "in a manner consistent with the goal of identifying representative cases." *See* Case Management Order No. 18 [Doc. 3684]. As a result, Bard has expended considerable resources to determine which cases are representative of the pool in this MDL, the trial of which will most likely further the fundamental goals of this process.

In making selections for Discovery Group 1 (from which Bellwether Group 1 cases will be selected), Bard analyzed the MDL pool and sought to select representative cases for that group. Bard then used the time period afforded it by Case Management Order No. 20 [Doc. 4335] to further investigate the cases in Discovery Group 1. The six (6) cases Bard has selected make up a truly representative group of cases that meet the goals of the Court, and all parties, in this case. Bard and Plaintiffs have both selected one case in common -- the **Debra Mulkey** case. Defendants agree that the *Mulkey* case meets the goals of this litigation, but believe that the remaining five (5) cases selected by Plaintiffs do not, either individually or as a group.

To demonstrate which cases are, or are not, representative in this litigation, Bard relies on the data drawn from the 1330 Plaintiff Profile Sheets submitted in the litigation

through March 29, 2017[2]. Bard has used that data as a guide to select representative cases, and has compared that data to the characteristics of the remaining five bellwether cases selected by the Plaintiffs. In this submission, Bard will summarize that data. Additionally, Bard will provide the Court with overviews on each of its selected cases, including *Mulkey*, demonstrating both the representative nature of each case individually, and the cases as a group. Bard then provides overviews regarding each of the five cases identified by the Plaintiffs and explains why each lacks representativeness.

## I. The MDL Pool Data[3]

The Plaintiff Profile Forms provide a wealth of detailed information regarding each case. On the Forms, the Plaintiffs specify the model filter they had implanted. They specify each complication (fracture, migration, tilt, perforation, etc.) they are alleging. Importantly, the Plaintiffs are specifically asked whether they have undergone any surgery in an effort to remove the filter. In that regard, they are asked to specify whether the

_____

[2] In their Submission Re Discovery Group 1 [Doc. 4341], the Defendants provided the Court with the same data for 936 cases with served Plaintiff Profile Forms at that time. The data provided in this submission includes 1330 Plaintiff Profile Forms and data from any supplements provided by the plaintiffs in those cases over time.

[3] Bard has carefully reviewed the information provided in, and in some cases attached to, the 1330 Plaintiff Profile Forms submitted in this MDL through March 29, 2017, and believes that its quoted data is accurate. Nevertheless, Bard anticipates that Plaintiffs will argue that the data Bard has cited is somehow not accurate, or is incomplete. However, Bard notes that the data relevant to the parties' and the Court's analysis, for bellwether selections, can only be obtained through review of the information discovered to date through the Plaintiff Profile Forms submitted in this MDL. Case Management Order No. 5 [Doc. 365] required that these forms be "substantially complete in all respects", noted that "a completed PPF shall be considered interrogatory answers under Fed. R. Civ. P. 33 . . . and will be governed by the standards applicable to written discovery under Federal Rules 26 and 37." Further, Fed. R. Civ. P. 26(e)(i)(A) requires timely supplementation of disclosures to provide new, responsive information. To the extent that any data cited by Bard here is inaccurate, that inaccuracy is a failing on Plaintiffs' part and should be construed against them.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

surgery was an open abdominal or open chest procedure. Plaintiffs are also required to disclose whether they have any retained struts from a fractured filter, and if so, where in the body those struts are located.

When tabulated, those profile forms reveal a number of pertinent data points regarding the MDL inventory. For example, the data demonstrates that cases involving the G2 and Eclipse filters exceed the number of cases involving other filters by a substantial margin:

|  | Total | Percent |
|---|---|---|
| SNF | 17 | 1.28% |
| Recovery | 136 | 10.23% |
| G2 | 435 | 32.71% |
| G2X | 55 | 4.14% |
| G2 Express | 64 | 4.81% |
| Eclipse | 286 | 21.50% |
| Meridian | 177 | 13.31% |
| Denali | 150 | 11.28% |
| Unknown | 10 | 0.75% |
|  | 1330 | 100.00% |

Of significance, the G2 group of filters and Eclipse filters are virtually identical in configuration, the difference being that the Eclipse was electropolished.

The data also demonstrates that fracture and migration – the two complications emphasized by the plaintiffs – are alleged by only a minority of the plaintiffs:

| Complication | Number of Cases | Percentage |
|---|---|---|
| Fracture | 336 | 25.26% |
| Migration | 76 | 5.71% |
| Other (tilt, perforation, non retrieval, etc.) | 808 | 60.75% |
| No Injury | 110 | 8.27% |
| Total | 1330 | 99.99% |

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

The data also compellingly demonstrates that only a very small number of plaintiffs have undergone an open surgical procedure:

| Procedure | Number of Cases | Percentage |
|---|---|---|
| Open Chest | 28 | 2.11% |
| Other Open Procedure | 51 | 3.83% |
| No Open Surgery | 1,251 | 94.06% |
| Total | 1330 | 100% |

## II. Bard's Case Selections

Bard's case selections *Hyde, Jones, King, Kruse, Mulkey*, and *Nelson* are representative cases, individually and as a group. Those cases include representative filters (three G2 and three Eclipse filters, which together represent 63% of the pool), representative plaintiffs (plaintiffs with typical medical histories, indications for use, social and employment histories), and representative filter complications (plaintiffs with tilt, perforation, fracture, unsuccessful filter retrieval, retained filter struts, and combinations of such complications). Both parties have selected either G2 group or Eclipse filter cases for Bellwether Group 1, with the exception of Plaintiffs' selection of the *Tinlin* Recovery filter case.[4] Bard explains in its opposition to the *Tinlin* case why a Recovery filter case should not be included in Bellwether Group 1.

## Lisa Hyde (G2X)

Ms. Hyde had a G2X implanted on 2/25/2011. Ms. Hyde's case is representative as it involves a filter fracture (25% of the pool) and also involves multiple complications in a single case including tilt, perforation, a filter strut to the heart, and a complex filter retrieval. Ms. Hyde claims that her filter fracture caused her to experience back and abdominal pain. As such, the case gives the parties the opportunity to test their arguments as to these numerous complications, including any interrelationship between the complication modes. This case was one of the cases initially selected by Plaintiffs for Discovery Group 1. The transferor court is USDC Wisconsin, Eastern District.

---

[4] Bard notes that neither Plaintiffs nor Bard have selected a Meridian or Denali case for Bellwether Group 1, which together make up 24% of the MDL pool. See Table, Section I, p. 5 above.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**Nelson Mullins Riley & Scarborough**
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

## Doris Jones (Eclipse)

Ms. Jones had a G2 placed on 8/24/2010, following two episodes of DVT and bleeding from a peptic ulcer. She experienced a fracture. Her filter was percutaneously retrieved; one filter strut remains in her right middle lobe pulmonary artery. Plaintiff Jones is representative of the 94% of the pool who did not require subsequent surgery. Plaintiff Jones is further representative of the MDL plaintiffs alleging fracture, which make up approximately 25% of the MDL pool. The transferor court was the USDC Georgia, Southern District.

## Michael King (G2)

Mr. King had a G2 placed on 8/6/2003 following a plane crash which resulted in pulmonary embolus, multiple fractures, and other injuries. He underwent a percutaneous retrieval of the filter on 2/15/2016, which was unsuccessful. The filter remains *in situ*. The case is representative of cases in which the allegation is that the filter tilted, perforated, and cannot be retrieved. The transferor court was the USDC Illinois, Central District. The *King* case presents a unique situation in this selection process, which Bard discusses further in **Section V** below.

## Carol Kruse ( G2)

Ms. Kruse, who suffered from degenerative joint disease and a history of right knee replacement surgery, developed a DVT, was placed on anticoagulants, and had a G2 filter implanted on 7/08/2009. She underwent a percutaneous retrieval of the filter on 4/07/2011, which was unsuccessful. The filter remains *in situ*. Plaintiff alleges migration, tilt and pain associated with the filter. This case is representative of numerous cases in the MDL pool with tilt, perforation, and/or an unsuccessful retrieval attempt. The transferor court was the USDC Nebraska.

## Debra Mulkey  (Eclipse)

Ms. Mulkey had an Eclipse filter placed on 4/11/2012 prior to bariatric surgery, gall bladder surgery, and a liver biopsy. She underwent a percutaneous filter retrieval procedure on 10/4/12, at which time the filter was noted to have perforated and tilted with the tip of the filter abutting the medial wall of the IVC. Despite multiple retrieval attempts, the retrieval procedure was unsuccessful. This case is representative as it involves multiple complications including tilt and non retrieval. The transferor court is the USDC West Virginia, Southern District.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

**Randy Nelson (Eclipse)**

Mr. Nelson had an Eclipse filter placed on 6/20/2013, several days after sustaining a subdural hematoma in a moped accident. The hematoma prevented him from taking anticoagulants to treat a DVT that developed in his right leg days after the accident. His filter was successfully retrieved, percutaneously, on 10/24/13. At that time, it was observed that the filter was tilted and there was one fractured strut embedded in the IVC wall. The fractured limb could not be dislodged from the IVC wall and was left *in situ*. This case is representative of 25% of MDL pool cases which involve fracture, and it includes the further complications of tilt and a retained filter strut. The transferor court was the USDC South Dakota.

Bard respectfully suggests that its proposed selections of *Hyde, Jones, King, Kruse, Mulkey* and *Nelson* will result in a group of cases most representative of the cases pending in this MDL as a whole.

**III.   Bard's Proposed Order of Trials for its Bellwether Group 1 Selections**

Bard proposes that the cases it has argued for selection into Bellwether Group 1 should be ordered for trial as follows, and for the reasons set forth below: *Mulkey, Hyde, Jones, Kruse, Nelson, King*.

*Mulkey* was the only case selected by both Plaintiffs and Bard for inclusion in the Bellwether Group 1 cases. For that reason alone, selecting *Mulkey* as the first case tried has merit. *Mulkey* is an Eclipse case. The G2 group of filters plus Eclipse filters make up 63% of the MDL pool. See Table, Section I, p. 5 above. The filter was placed for prophylactic use, in advance of bariatric surgery. The filter tilted and perforated. Despite retrieval attempts, the filter remains *in situ*. The case therefore provides an opportunity for the parties to present several different complications to the jury for a filter type that is well represented in the MDL Pool. The transferor court is the USDC, West Virginia.

West Virginia products liability and other law that may be applicable to this case is similar to the law of a majority of the states represented in the MDL pool.

Bard recommends that the *Hyde* case be second in order for trial. That case involves a G2X with fracture, with a strut embolizing to the heart. It also involves complications of tilt, perforation, and a complex percutaneous retrieval of the filter and strut by a medical doctor at Stanford University. The transferor court is the USDC Wisconsin. Wisconsin has not specifically adopted learned intermediary or Comment k, providing the parties the opportunity to try a case applying a minority view of the law. *Hyde* was initially one of Plaintiffs' selections into Discovery Group 1.

Bard then recommends that *Jones* and *Kruse* be tried as Cases No. 3 and 4. *Jones* is another Eclipse case in which the filter was placed due to a history of DVT and while the plaintiff was suffering from bleeding from an ulcer. In *Jones*, the filter has been percutaneously retrieved, but a fracture occurred, and the strut is retained in her pulmonary artery, giving the parties the opportunity to try a case where a fragment of the filter remains *in situ*. *Kruse* is a G2 case placed in a patient with history of DVT and before knee replacement surgery, who had an unsuccessful attempt at retrieval, and her entire filter remains *in situ*.

Bard recommends as Case No. 5, *Nelson*, another Eclipse case placed prophylactically following trauma including a head injury and development of DVT. Plaintiff's filter was percutaneously retrieved, but fractured, and a fractured strut remains in his IVC wall.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Finally, Bard recommends as Case No. 6 the *King* case. As explained in Section V. of this Submission, *King* presents an unusual situation which Bard argues can only be remedied by the parties agreeing to a Bellwether Group 1 limited to five cases. Bard has ordered *King* last for the reasons stated in Section V.

Bard respectfully shows the Court that its proposed Order of Trials will allow trial of the most common filter types, and all of the common complications types represented in the MDL pool as a whole.

## IV. Bard's Opposition to Plaintiffs Case Selections

With the exception of *Mulkey*, Plaintiffs' selections – *Booker, Dewitt, Mixson, Peterson* and *Tinlin* -- are disproportionately weighted toward the most serious types of injuries, including open surgeries, fractures of a strut to the heart, and fractures in general. The selections also include plaintiffs who have personal histories, unrelated to the IVC filter, making them uniquely sympathetic to a jury. Further, one case, *Tinlin*, involves the Recovery filter, which is at issue in only 10% of the MDL cases. These cases, if accepted, will result in Bellwether Group 1 failing to serve as a group of cases capable of informing the parties' respective assessments of cases strengths and weaknesses which may apply to large groups of other cases pending in the MDL.

## Sherr Una Booker (G2)

Ms. Booker had a G2 filter implanted 6/21/2007, prior to surgery for a cervical mass, due to a history of DVT and PE. In 2013, a fractured strut was seen on imaging. Ms. Booker alleges she was not informed of that finding. In 2016, three fractured struts were identified (one in the heart). Her filter and two of the struts were percutaneously retrieved. During efforts to retrieve the strut in her heart, her tricuspid valve was damaged and her doctors opted to perform open heart surgery to repair that valve and to retrieve the strut in the heart. While Bard cannot confirm if there are any other cases in the MDL pool involving percutaneous retrieval attempts leading to damage requiring open heart surgical repair, if such a case exists it is certainly a small subset of the open heart surgery cases in the MDL pool, which comprise only 2% of the total pool. Therefore selecting *Booker* into Bellwether Group 1, even without including any of the other open surgery cases selected by Plaintiffs, would place a highly non representative case in the group. The MDL pool

data shows that open surgeries of any kind make up only 6% of the pool. Including *Booker* with the *Dewitt, Peterson* and *Tinlin* cases selected by Plaintiffs brings to 75% the percentage of open surgery cases Plaintiffs seek to include in Bellwether Group 1, and brings to 33% (*Booker/Tinlin*) the percentage of cases involving open chest surgery when those types of surgery make up but 2% of the MDL pool, making the group Plaintiffs have selected highly non representative as a whole. The transferor court was the USDC Georgia, Northern District.

## Brent Dewitt (G2)

Plaintiff had a G2 implanted on 9/5/2009, following a vehicular accident in which he suffered multiple long bone and other fractures. At some point in time, his filter was observed to have tilted, perforated and fractured. Mr. Dewitt's case should not be included in Bellwether Group 1 because, according to his Second Amended Plaintiff Fact Sheet "he is currently coordinating removal of the filter through an open procedure, which will require a prolonged recovery time . . ." See Exhibit A, pp. 12-13. His intent to consult with a surgeon for open filter removal surgery was confirmed in Mr. Dewitt's deposition. See Exhibit B, Dewitt Deposition, pages 212:18 – 213:4. Given Mr. Dewitt's expected surgery, presumably an open abdominal surgery, Bard is currently unable to assess his case fully. It is unknown what the timing of his open procedure will be or what period of time will be necessary for his recovery from that surgery. Accordingly, the selection of *Dewitt* in the initial bellwether pool is premature. Additionally, *Dewitt* should not be selected because his alleged injuries are not representative of the majority of plaintiffs in the case pool, given that he experienced multiple fractures, with one strut to the heart. Including *Dewitt* in Bellwether Group 1, even without including any other open surgery case selected by Plaintiffs, would place a highly non representative case in the group. The MDL pool data shows that open surgeries of any kind make up only 6% of the pool. Including *Dewitt,* along with the *Booker, Tinlin,* and *Peterson* cases selected by Plaintiffs, brings to 75% the percentage of open surgery cases Plaintiffs seek to include in Bellwether Group 1, making the entire group highly non representative. The transferor court was the USDC New York, Southern District.

## Joseph Mixson (G2)

Mr. Mixson is an Iraq War hero who received a Bard filter when, at age 21 and while on active duty, his military vehicle was struck with an "IED" (improvised explosive device). The door adjacent to Mr. Mixson was blown off, and he was thrown out. He suffered multiple injuries including open head wounds, fractures to limbs and substantial injuries to his legs. He was also wounded by small arms fire. He was airlifted to a base near Baghdad, and received emergency care before being flown to Germany. Both of his legs had to be amputated. Mr. Mixson was then flown to Brooke Army Medical Center in Texas where he received a Bard filter after having flat-lined multiple times and experienced bilateral pulmonary embolism. Mr. Mixson's service to this country has left him wheelchair bound and a double, above-the-knee amputee. Mr. Mixson's presentation,

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵀᴴ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

treatment with a filter, and his subsequent medical course are inextricably bound to, and intertwined with, his war veteran status. These facts inject significant sympathy for the plaintiff into the case, unrelated to any filter issue, which may prejudice Bard and impact the outcome of the case. Given those circumstances, any verdict for the plaintiffs would not be predictive of other plaintiffs' cases. Mr. Mixson's case is not representative of the cases in the MDL and therefore is not a suitable bellwether case. The transferor court was the USDC Florida, Northern District.

**Debra Mulkey (Eclipse)**

Ms. Mulkey is addressed in **Section II** above. Bard agrees her case is representative.

**Justin Peterson (Eclipse)**

Mr. Peterson's filter was implanted with an Eclipse filter on 6/26/2010 following a leg fracture, and due to his history of bilateral PE and right leg DVT one year beforehand. He had a history of May-Thurner syndrome (compression of the iliac vein) and polycythemia (increased viscosity of the blood), both of which increase the risk for devloping DVT. He experienced perforations leading to open abdominal surgery. In addition, while the parties disagree as to whether the post surgery events relate to the IVC filter, Mr. Peterson experienced unusual medical complications following his surgery, including a hematoma and hernia, making his case non-representative on that basis as well. This case is not representative of the overall MDL pool in that only 6% of cases involve open surgery. Including *Peterson* in Bellwether Group 1, even without including any other open surgery case, would place a highly non-representative case in the group. Including *Peterson* with Plaintiffs' selections of *Booker, Dewitt* and *Tinlin* brings to 75% the percentage of cases Plaintiffs seeks to include in Bellwether Group 1 that include open surgeries, making the entire group highly non representative. The transferor court was the USDC Oregon.

**Debra Tinlin (Recovery)**

Ms. Tinlin had a Recovery filter implanted on 5/07/2005 which fractured, with struts migrating to the heart, resulting in a pericardial effusion, cardiac tamponade, and open-heart surgery. Ms. Tinlin's medical history includes Multiple Sclerosis, Graves disease, Type I diabetes, prothrombin genetic mutation with related deep vein thrombosis and pulmonary embolism, osteoarthritis, short-term memory loss, and other conditions. Ms. Tinlin testified in her February 2017 deposition that she was diagnosed with MS in 2005, at which time she became permanently disabled and wheelchair bound. During her deposition, Ms. Tinlin both appeared to be, and testified that she was, uncomfortable and in pain while sitting for the deposition. Exhibit C, Tinlin deposition at 144:6 – 145:3. Mr. Tinlin's deposition, which took place immediately after Ms. Tinlin's, could not be completed, as Ms. Tinlin was in significant discomfort and needed to be taken home. Ms. Tinlin, who lives in Wisconsin, testified that her physicians recommend she not fly on an airplane, or travel by car for any long distance.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Ms. Tinlin's case is not representative, as the filter type, a Recovery filter, makes up only 10% of the MDL pool of cases. Second, her complications of fractures with struts to the heart and open heart surgery, are very rare complications within the MDL pool (2% of cases involve an open chest surgery), making her case an outlier with respect to the complications involved as well. Including *Tinlin* in Bellwether Group 1, even without including any other open surgery case in that group, would over represent the cases in the MDL pool with these complications. The MDL pool data shows that open surgeries of any kind make up only 6% of the pool. Including *Tinlin* with the *Booker, Dewitt,* and *Peterson* cases selected by Plaintiffs brings to 75% the percentage of open surgery cases Plaintiffs seek to include in Bellwether Group 1, and brings to 33% (*Booker/Tinlin*) the percentage of cases involving open chest surgery, making the group Plaintiffs have selected highly non representative as a whole. Third, Ms. Tinlin is likely to have some limitations in her ability to participate at trial of the case. Finally, Ms. Tinlin's many medical ailments, which predate the placement of her filter, inject significant sympathy for the plaintiff into the case, unrelated to any filter issue, which may prejudice Bard and impact the outcome of the case, thereby not meeting the goals of bellwether cases. The transferor court was the USDC Wisconsin, Eastern District.

## V. The Michael King Case Presents a Unique Issue

Complicating matters in this selection process is the inclusion in Discovery Group 1 of the *King* case. Bard originally selected the *King* case for Discovery Group 1. Plaintiffs previously argued against the designation of *King* because its addition "over represented non retrieval cases," and Plaintiffs have indicated they will object to his inclusion in Bellwether Group 1 as well. However, the real reason that King may lack representativeness is the curious manipulation by plaintiffs' counsel of a "treating doctor" in this case. What became apparent to Defendants during the Discovery Group 1 discovery phase – but was known to Plaintiffs counsel in that case before *King* was ever selected into Discovery Group 1 – is that Plaintiffs' counsel provided King with a "no interest" loan to travel far from his home and his initial filter treater, Dr. Andrew Chiou, to visit a testifying medical expert who had been retained by the plaintiff's attorney. After that retention, the expert attempted, but was unsuccessful in, retrieval of the filter in Mr. King. That retrieval attempt occurred on February 15, 2016. Strangely, the imaging and full procedure report from the attempted retrieval performed by Plaintiffs' counsel's retained expert has disappeared.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

Bard previously demonstrated that *King* was representative of the pool in filter type and the complications experienced and the case was included in Discovery Group 1 for those reasons. Admittedly, the fact that there may have been odd involvement by an expert witness in *King* now makes the case non-representative in that regard (at least Bard is unaware at this time of other cases in the pool involving a similar situation). However, any "lack of representativeness" in this case is a self-inflicted wound by Plaintiffs. The issue in the case was known to them before the case was ever placed into Discovery Group 1. The elimination of *King* from Discovery Group 1 due to this issue would give Plaintiffs an unfair advantage in the group that remains from which Bellwether Group 1 can be selected. If the Court is inclined to eliminate *King* because of the unusual circumstances, Bard respectfully requests that the Court strike one case (other than the parties' agreed upon case of *Mulkey)* from Plaintiffs other five selected cases, to even the playing field. In that scenario, the Bellwether Group I should be reduced to five cases.

## VI. Conclusion

Plaintiffs' selections are not representative, and are clearly aimed toward choosing the most sympathetic cases and cases more likely to produce larger verdicts. However, that is not the purpose of the bellwether process. Other MDL courts have emphatically rejected that strategy.

The judge handling the General Motors Ignition Switch litigation perhaps put it best. In that case, certain plaintiffs' counsel sought to replace the existing leadership after the first bellwether trial went badly. They complained that "it is axiomatic that plaintiffs' counsel always want to try their best case first in an MDL litigation." *See* Plaintiffs' Motion to Remove the Co-Leads and Reconsider the Bellwether Trial Schedule at 1, 10; *In re General Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (S.D.N.Y. Feb 1, 2016) (Dkt. No. 2179). The MDL court, however, rejected that argument:

> [I]f by "best," the Cooper Plaintiffs mean "most likely to result in a large plaintiff's verdict," that proposition is by no means "axiomatic."  After all, because the primary purpose of bellwether trials is to provide data points for settlement discussions with respect to the universe of cases, **the goal is to select the "best" representatives of the universe of cases, not outliers likely to result in victory for one side or the other.**  To that end, the Order setting up the bellwether selection process dictated that the bellwether selections be "representative" claims.

*In re:  General Motors LLC Ignition Switch Litig.,* No. 14-MC-2543 (JMF), 2016 WL 1441804, at *9 (S.D.N.Y. Apr. 12, 2016).

Here, the plaintiffs' selections are "outliers" clearly chosen to generate disproportionately high verdicts.  Three of their six cases have had open surgery (with a fourth presently scheduling an open procedure), when only 6% of the entire MDL inventory involves plaintiffs who have endured invasive surgery.  Three of their six cases involve a filter strut in the heart.  One of their selections is an Iraq war veteran who lost his legs in combat, and another selection suffers from extremely debilitating MS, both guaranteed to present unique sympathy factors.

The trial of those cases will not be enlightening.  They will not be representative.  The results will not "provide data points for settlement discussions with respect to the universe of cases."  To make this process meaningful, the defendants therefore respectfully ask that the Court accept their recommendations for Bellwether Group I, and reject the "outliers" proposed by the plaintiffs.

Nelson Mullins Riley & Scarborough
L.L.P.
201 17ᵗʰ Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000

DATED this 24th day of April, 2017.

By: s/Matthew B. Lerner
Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
Nelson Mullins Riley & Scarborough LLP
201 17th Street, NW / Suite 1700
Atlanta, GA  30363

James R. Condo
Amanda C. Sheridan
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona  85004-2202

Attorneys for C. R. Bard, Inc. and Bard
Peripheral Vascular, Inc.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

*MDL No. 2641*
*In Re Bard IVC Filter Products Liability Litigation*

## SECOND AMENDED PLAINTIFF FACT SHEET

Each plaintiff who allegedly suffered injury as a result of a Bard Inferior Vena Cava Filter must complete the following Plaintiff Fact Sheet ("Plaintiff Fact Sheet"). In completing this Fact Sheet, you are **under oath and must answer every question.** You must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details as requested, please provide as much information as you can and then state that your answer is incomplete and explain why, as appropriate. If you select an "I Don't Know" answer, please state all that you do know about that subject. If any information you need to complete any part of the Fact Sheet is in the possession of your attorney, please consult with your attorney so that you can fully and accurately respond to the questions set out below. If you are completing the Fact Sheet for someone who cannot complete the Fact Sheet for himself/herself, please answer as completely as you can.

The Fact Sheet shall be completed in accordance with the requirements and guidelines set forth in the applicable Case Management Order. A completed Fact Sheet shall be considered interrogatory answers pursuant to Fed. R. Civ. P. 33 and responses to requests for production pursuant to Fed. R. Civ. P. 34 and will be governed by the standards applicable to written discovery under Fed. R. Civ. P. 26 through 37. Therefore, you must supplement your responses if you learn that they are incomplete or incorrect in any material respect. The questions and requests for production of documents contained in this Fact Sheet are non-objectionable and shall be answered without objection. This Fact Sheet shall not preclude Bard Defendants from seeking additional documents and information on a reasonable, case-by-case basis, pursuant to the Federal Rules of Civil Procedure and as permitted by the applicable Case Management Order.

In filling out this form, "healthcare provider" shall mean any medical provider, doctor, physician, surgeon, pharmacist, hospital, clinic, medical center, physician's office, infirmary, medical/diagnostic laboratory, or any other facility that provides medical care or advice, along with any pharmacy, x-ray department, radiology department, laboratory, physical therapist/physical therapy department, rehabilitation specialist, chiropractor, or other persons or entities involved in your diagnosis, care and/or treatment.

In filling out this form, the terms "You" or "Your" refer to the person who received a Bard Inferior Vena Cava Filter manufactured and/or distributed by C. R. Bard, Inc. or Bard Peripheral Vascular, Inc. ("Bard Defendants") and who is identified in Question 1(a) below.

To the extent that the form does not provide enough space to complete your responses or answers, please attach additional sheets as necessary, Information provided by Plaintiff will only

be used for the purposes related to this litigation and may be disclosed only as permitted under the protective order in this litigation.

## I. BACKGROUND INFORMATION

1. Please state:

   (a) Full name of the person who received the Bard inferior vena cava filter, including maiden name: <u>Brent Dewitt</u>

   (b) List all names by which you have ever been known, if different from that listed in 1(a): <u>N/A</u>

   (c) Full name of the person completing this form, if different from the person listed in 1(a) above, and the relationship of the person completing this form to the person listed in 1(a) above: <u>N/A</u>

   (d) The name and address of your primary attorney:

   <u>Lopez McHugh LLP</u>

   <u>100 Bayview Circle, Suite 5600</u>

   <u>Newport Beach, CA 92660</u>

   (e) When did you first retain an attorney to represent you in your lawsuit against Bard? <u>In or around December 2010</u>

2. Your Social Security Number: <u>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</u>

3. Your Date of Birth: <u>October 5, 1971</u>

4. Your current residential address: <u>617 Lybolt Road, Bullville, NY 10915</u>

5. If you have lived at this address for less than 10 years, provide each of your prior residential addresses from 2000 to the present:

| Prior Residential Address | Dates You Lived At This Address |
|---|---|
| 89 M&M Road Middletown, NY 10940 | In or around October 1995 to July 2008 |

6. Have you ever been married? Yes ___X___      No_____

   If yes, provide the names and addresses of each spouse and the inclusive dates of your marriage to each person:

   <u>Providencia Dewitt, 617 Lybolt Road, Bullville, NY 10915, April 2016 to present; and</u>

   <u>Leigh Dewitt, New York, June 1995 to August 2008.</u>

2

7. Do you have children? Yes\_\_\_\_\_ No\_\_\_X\_\_\_\_\_

   If Yes, please provide the following information with respect to each child:

   | Full Name of Child | Date of Birth | Home Address | Whether Biological/Adopted |
   |---|---|---|---|
   | N/A | N/A | N/A | N/A |

8. Identify the name and age of any person who currently resides with you and their relationship to you:

   Providencia Dewitt, 46, wife

9. Identify the name and age of any person who has resided with you at any point over the past ten (10) years:

   Providencia Dewitt, 46

10. Identify all secondary and post-secondary schools you attended, starting with high school, and please provide the following information with respect to each:

    | Name of School | Address | Dates of Attendance | Degree Awarded | Major or Primary Field of Study |
    |---|---|---|---|---|
    | Middletown High School | 24 Gardner Ext Ave. Middletown, NY 10940 | In or around 1985 to 1989 | High School Diploma | N/A |
    | The Art Institute of Philadelphia | 1622 Chestnut Street Philadelphia, PA 19103 | In or around 1989 to 1991 | N/A | Visual Communications |

11. Please provide the following information for your employment history over the past 10 years up until the present:

    | Employer Name | Address | Job Title/Description of Duties | Dates of Employment | Salary/Rate of Pay |
    |---|---|---|---|---|
    | Blue Dog Contracting | PO Box 457 Bullville, NY 10915 | Owner | In or around 2005 to present | $24,000 per year |

12. Have you ever served in any branch of the military? Yes\_\_\_\_\_ No\_\_\_X\_\_\_\_\_

    If Yes, please provide the following information:

    (a) Branch and dates of service, rank upon discharge, and type of discharge received:

    _____

    (b) Were you discharged from the military at any time for any reason relating to your medical, physical, or psychiatric condition? Yes\_\_\_\_\_ No\_\_\_\_\_

3

If Yes, state what that condition was: _____

13. Within the last ten years, have you been convicted of, or plead guilty to, a felony and/or crime of fraud or dishonesty? Yes_____ No ___X___

If Yes, please set forth where and when and identify the felony and/or crime:

_____

14. Before contacting any attorney regarding this lawsuit or claim, had you ever seen any television or print advertisements regarding possible claims against inferior Vena Cava Filter manufacturers? Yes_____ No___X_____

If Yes, set forth the approximate date and nature of any such advertisement, whether the advertisement included the name of a law firm, whether the advertisement specifically mentioned C. R. Bard, Inc., Bard Peripheral Vascular, Inc., or "Bard", and other details that you recall. _____

## II. CLAIM INFORMATION

1. Have you ever received a Bard Inferior Vena Cava Filter? Yes___X___ No_____

If Yes, please check the box(es) for each type of Bard Inferior Vena Cava Filter you have received:

☐ Recovery®

☑ G2®

☐ G2®X

☐ G2®Express

☐ Eclipse®

☐ Meridian®

☐ Denali®

☐ Simon Nitinol

☐ Other (please identify):_____

2. For each Bard Inferior Vena Cava Filter identified above, please provide the following information:

(a) The date each Bard Inferior Vena Cava Filter was implanted in you:

4

On or about September 5, 2009 _____

(b)  The product code and lot number of each Bard Inferior Vena Cava Filter implanted in you:

RF-310F, Lot No. GFTD2015 _____

(c)  Current location of the Bard Inferior Vena Cava Filter, including any portion thereof, if known:

The filter body remains implanted, last seen in the inferior vena cava. The two _____

fractured struts that have been removed both reside at Steelgate Inc., 2307 58th _____

Avenue East, Bradenton, FL 34203. _____

3.  Describe your understanding of the medical condition for which you received the Bard Inferior Vena Cava Filter(s):

Plaintiff's car was hit by a drunk driver and he suffered open left femur and right _____

tibia/fibular fractures, with hip dislocation, and splenic laceration. He would be at _____

increased DVT risk while bedridden. _____

4.  Give the name and address of the doctor who implanted the Bard Inferior Vena Cava Filter(s): Romeo Mateo, M.D., 19 Bradhurst Avenue Suite 700, Hawthorne, NY 10532

5.  Give the name and address of the hospital or other healthcare facility where the Bard Inferior Vena Cava Filter was implanted: Westchester Medical Center, 100 Woods Road, Valhalla, NY 10595 _____

6.  Have you ever been implanted with any other vena cava filters or related product(s) besides the Bard Inferior Vena Cava Filter(s) for the treatment of the same or similar condition(s) identified in your response to question 3 above? Yes_____   No___X___ If Yes:

(a)  Please identify any such device(s) or product(s). _____

(b)  When was this device or product implanted in you? _____

(c)  Did the implantation take place before, at the same time, or after the procedure during which you were implanted with a Bard Inferior Vena Cava Filter?

_____

(d)  Who was the physician who implanted this other device or product?

_____

(e)  At what hospital or facility was this other device or product implanted in you?

5

(f)     Why was this other device or product implanted in you?

_____

7.     Other than the Bard Inferior Vena Cava Filter device that is the subject of your lawsuit or identified in response to question 6 above, are you aware of any other Vena Cava Filter(s) implanted inside your body at any time?     Yes_____     No___X_____

If yes, please provide the following information:

(a)     Product name:_____

(b)     Date of procedure placing it and name and address of doctor who placed it:

_____

(c)     Condition sought to be treated through placement of the device:

_____

(d)     Any complications you encountered with the medical product or procedure:

_____

(e)     Does that product remain implanted inside of you today?     Yes_____     No_____

8.     Prior to implantation with a Bard Inferior Vena Cava Filter, did you receive any written and/or verbal information or instructions regarding the Bard Inferior Vena Cava Filter, including any risks or complications that might be associated with the use of the same?

Yes_____     No___X_____     Don't Know_____

If Yes:

(a)     Provide the date you received the written and/or verbal information or instructions:

_____

(b)     Identify by name and address the person(s) who provided the information and instructions:

_____

(c)     What information or instructions did you receive?

_____

(d)     If you have copies of the written information or instructions you received, please attach copies to your response.

_____

6

(e)    Were you told of any potential complications from the implantation of the Bard Inferior Vena Cava Filter(s)? Yes _____ No _____ Don't Know _____

(f)    If yes to (e), by whom?

_____

(g)    If yes to (e), what potential complications were described to you?

_____

9.    Do you believe that the Bard Inferior Vena Cava Filter(s) remains implanted in you?

Yes___X___ No _____ Don't Know _____

If Yes:

(a)    Has any doctor recommended removal of the Bard Inferior Vena Cava Filter(s)?

Yes___X___       No _____

If Yes:

(i)    Identify by name and address every doctor who recommended removal of the Bard Inferior Vena Cava Filter(s): <u>Romeo Mateo, M.D., 19 Bradhurst Avenue Suite 700, Hawthorne, NY 10532; Frank Lynch, M.D., 500 University Drive, Hershey, PA 17033; and David Han, M.D., 500 University Drive, Hershey, PA 17033</u>

(ii)    For each doctor identified in response to question 8(a)(i) above, state your understanding of why the doctor recommended removal. <u>When retrieval was first attempted, the filter was only intended as a temporary device and was no longer needed. When it was discovered that the retained filter had fractured and one of the struts had migrated to his heart, it was recommended that he undergo a second procedure in an attempt to retrieve the fractured filter and strut from the heart. When it was discovered that the retained strut had moved from the heart to the lung, it was recommended that he undergo a third procedure to retrieve the fractured strut from the lung. Plaintiff's physicians have now recommended that he undergo an open abdominal procedure to remove the severely tilted, perforating filter.</u>

7

(iii)   For each doctor identified in response to question 8(a)(i) above, state when the doctor recommended removal. In or around December 2009, February 2016, January 2017

10.   Has the Bard Inferior Vena Cava Filter(s) implanted in you been removed, in whole or in part?

Yes___X___          No_____          Don't Know_____

If Yes:

(a)   Where, when, and by whom was the Bard Inferior Vena Cava Filter(s), or any portion of it, removed? Penn State Milton S. Hershey Medical Center, Frank Lynch, M.D., on or about June 17, 2016; and Penn State Milton S. Hershey Medical Center, Frank Lynch, M.D., on or about February 21, 2017

(b)   What portion of the Bard Inferior Vena Cava Filter(s) was removed on the date indicated in response to question 9(a) above? Two fragments of the filter were removed.

©   Please check all that apply regarding the removal procedure(s):

☑   Removed percutaneously

☐   Removed via an open abdominal procedure

☐   Removed via an open chest procedure

☐   Other, Describe: _____

☐   Unknown

(d)   Does any portion of the Bard Inferior Vena Cava Filter(s) remain implanted in you?   Yes___X___          No _____          Don't Know _____

If Yes, explain what portion of the Bard Inferior Vena Cava Filter(s) you believe is still implanted in you: The filter body remains implanted, last seen in the inferior vena cava.

©   Explain why you consented to have the Bard Inferior Vena Cava Filter(s), or any portion thereof, removed? The filter was only intended as a temporary device and was no longer needed, so retrieval was attempted as planned, at which time it was discovered that the filter had tilted and at least three legs were perforating outside the vena cava. When it

8

was discovered that the device had fractured and a piece had migrated to the right ventricle of his heart, Plaintiff consented to a second procedure, in an attempt to retrieve the embedded filter and the intracardiac strut. When it was discovered that the retained strut migrated from his heart to the lung, Plaintiff consented to a third procedure to retrieve the strut. Plaintiff's physicians have now recommended open abdominal surgery to retrieve the severely tilted, perforating filter.

(f)  Does any medical provider, physician, entity, or anyone else acting on your behalf have possession of any portion of the Bard Inferior Vena Cava Filter that was previously implanted in you and subsequently removed?

Yes___X___      No_____      Don't Know_____

If Yes, please state the name and address of the person or entity having possession of same. Steelgate Inc., 2307 58th Avenue East, Bradenton, FL 34203.

11. Has any doctor or healthcare provider unsuccessfully attempted to remove the Bard Inferior Vena Cava Filter(s) implanted in you?

Yes___X___      No_____      Don't Know_____

If Yes:

(a)  How many attempts have been made to remove the Bard Inferior Vena Cava Filter(s) implanted in you? Two attempts, both of which were unsuccessful

(b)  Provide the name and address of the doctor who removed (or attempted to remove) the filter strut(s) and the hospital or medical facility at which it was removed (or attempted to be removed).

> Filter Attempted Removal #1
> Doctor: Romeo Mateo, M.D.
> Hospital/Medical Facility: Westchester Medical Center
> Date: On or about December 15, 2009
> Filter Attempted Removal #2
> Doctor: Frank Lynch, M.D.
> Hospital/Medical Facility: Penn State Milton S. Hershey Medical Center
> Date: On or about June 17, 2016

©  Please check all that apply regarding attempted removal procedure #1:

☑  Attempted but unsuccessful percutaneous removal procedure

9

    ☐    Attempted but unsuccessful open abdominal procedure

    ☐    Attempted but unsuccessful open chest procedure

    ☐    Other, Describe: _____

    ☐    Unknown

(d)    Please check all that apply regarding attempted removal procedure #2:

    ☑    Attempted but unsuccessful percutaneous removal procedure

    ☐    Attempted but unsuccessful open abdominal procedure

    ☐    Attempted but unsuccessful open chest procedure

    ☐    Other, Describe: _____

    ☐    Unknown

12.    Do you claim that your Bard Inferior Vena Cava Filter(s) fractured?

Yes___X_____    No_____

If Yes:

(i)    Please state the number of fractured struts retained in your body?
None.

(ii)    Please identify the location(s) within your body of each retained filter strut.
N/A

(iii)    Please provide the date or approximate date when you were first informed of each fractured strut.
On or about March 9, 2016

(iv)    Has any health care provider recommended to you that a retained filter strut(s) should be removed?
Yes_X___    No_____
If Yes, provide the name and address of any such healthcare provider, as well as the approximate date on which the communication occurred.

10

Romeo Mateo, M.D., 19 Bradhurst Avenue Suite 700, Hawthorne, NY

10532, in or around March 2016; and Frank Lynch, M.D., 500 University

Drive, Hershey, PA 17033, in or around January 2017

(v)     Has any health care provider recommended to you that a retained filter
strut should <u>not</u> be removed?

Yes_____     No_X_

If Yes, provide the name and address of any such healthcare provider, as
well as the approximate date on which the communication occurred.

_____

(vi)    Have any fractured struts been removed, or attempted to have been
removed, from your body?

Yes_X_     No_____

If Yes:

(1)     If any fractured filter strut has been removed (or a doctor has
attempted to remove any strut), please check <u>all</u> that apply
regarding the removal/attempted removal procedure(s):

☑     Removed percutaneously

☐     Removed via an open abdominal procedure

☐     Removed via an open chest procedure

☑     Attempted but unsuccessful percutaneous removal
procedure

☐     Attempted but unsuccessful open abdominal procedure

☐     Attempted but unsuccessful open chest procedure

☐     Other, Describe: _____

☐     Unknown

(2)     Provide the name and address of the doctor who removed (or
attempted to remove) the <u>filter strut(s)</u> and the hospital or medical
facility at which it was removed (or attempted to be removed).

<u>Filter *Strut* Removal/Attempted Removal #1</u>

11

Doctor: <u>Frank Lynch, M.D.</u>

Hospital/Medical Facility: <u>Penn State Milton S. Hershey Medical</u>

<u>Center</u>

Date: <u>On or about June 17, 2016</u>

<u>Filter *Strut* Removal/Attempted Removal #2</u>

Doctor: <u>Frank Lynch, M.D.</u>

Hospital/Medical Facility: <u>Penn State Milton S. Hershey Medical</u>

<u>Center</u>

Date: <u>On or about February 21, 2017</u>

13.   Do you claim that you suffered bodily injuries as a result of the implantation of the Bard

Inferior Vena Cava Filter(s)? Yes____X_____          No_____

If Yes:

(a)   Describe the bodily injuries, including any emotional or psychological injuries

that you claim resulted from the implantation, attempted removal and/or removal

of the Bard Inferior Vena Cava Filter(s)?

<u>Plaintiff refers Defendants to his medical records for complete details of the</u>

<u>injuries he has suffered stemming from Defendants' IVC filter. Plaintiff's</u>

<u>symptoms and injuries include, but are not limited to, emotional and physical pain</u>

<u>and suffering. Specifically, Plaintiff returned for planned removal of the filter on</u>

<u>December 15, 2009, at which time a venogram demonstrated the filter to have</u>

<u>tilted, with three of the filter legs perforating outside the vena cava. The filter</u>

<u>could not be removed and the procedure was aborted. In March 2016, Plaintiff</u>

<u>developed an increase in blood pressure and it was discovered on March 9, 2016</u>

<u>that the device had fractured and one strut had migrated to his right ventricle,</u>

<u>while another strut still resided in the IVC but had incorporated into the IVC wall</u>

<u>Retrieval of the filter and strut was attempted again on June 17, 2016, but detailed</u>

<u>angiography of the filter apex showed significant perforation of the filter cap,</u>

<u>arms, and legs; the surgeon felt that retrieval carried a high risk of caval injury</u>

<u>and elected not to proceed. He did attempt to remove the strut in the right</u>

<u>ventricle, but it was fully embedded and could not be captured. The fractured strut</u>

<u>retained in the IVC was removed at this time. On December 27, 2016, the</u>

<u>fractured strut could not be located in the right ventricle on an imaging scan. An</u>

<u>x-ray on December 28, 2016 discovered that it had migrated to the right upper</u>

<u>lobe of the lung. The fractured strut was successfully removed from his lung on</u>

<u>February 21, 2017. Plaintiff continues to have severe anxiety and insomnia while</u>

<u>the filter remains implanted and is currently coordinating removal of the filter</u>

12

through an open abdominal procedure, which will require a prolonged recovery time and cause disfigurement in the form of an extensive abdominal scar. He must also continue to take blood pressure medication, having been diagnosed with hypertension at the time the filter strut was discovered in the heart.

(b)  When was the first time you experienced symptoms of any of the bodily injuries you claim in your lawsuit to have resulted from the Bard Inferior Vena Cava Filter(s)?

In or around December 2009

(c)  When did you first attribute these bodily injuries to the Bard Inferior Vena Cava Filter(s)? On or about December 15, 2009

(d)  To the best of your knowledge and recollection, please state the approximate date when you first saw a health care provider for any of the bodily injuries, or symptoms related thereto, you claim to have experienced related to the Bard Inferior Vena Cava Filter(s)?

On or about December 15, 2009

(e)  To the best of your knowledge and recollection, has any health care provider ever told you orally or in writing that any symptoms related to bodily injury are related to the Bard Inferior Vena Cava Filter(s)?

Yes_____   No___X_____

If Yes, please state the name and address of any such health care provider, as well as providing the approximate date the statement was made, and provide the details of the communication:_____

(f)  Are you currently experiencing symptoms related to your claimed bodily injuries?

Yes___X___   No_____

If Yes, please describe your symptoms in detail:

Plaintiff's blood pressure has increased since the fractured strut moved into his right ventricle and he must now take blood pressure medication for the rest of his life. He also has severe anxiety since learning that the device has fractured and the fractured filter and strut could not be retrieved as planned. His anxiety only worsened upon learning that the fractured strut had migrated from his heart to his lung and would require additional intervention. Plaintiff continues to suffer from severe anxiety in anticipation of the open abdominal surgery to remove the filter.

13

(g)    Are you currently seeing, or have you ever seen, a doctor or healthcare provider
       for any of the bodily injuries or symptoms listed above?

       Yes___X___        No_____

       If Yes, please list all doctors you have seen for treatment of any of the bodily
       injuries you have listed above.

| Provider Name and Address | Condition Treated | Approximate Dates of Treatment |
|---|---|---|
| Romeo Mateo, M.D. 19 Bradhurst Avenue, Suite 700 Hawthorne, NY 10532 | Attempted retrieval of filter, with discovery of tilt and perforation | In or around December 2009 to present |
| David Spielvogel, M.D. Westchester Medical Center 100 Woods Road Valhalla, NY 10595 | Evaluation of the fractured strut in the right ventricle | In or around March 2016 |
| Frank Lynch M.D. 500 University Drive Hershey, PA 17033 | Attempted retrieval of filter and intracardiac strut, with retrieval of floating fragment | In or around June 2016 and December 2016 to present |
| David Han, M.D. 500 University Drive Hershey, PA 17033 | Evaluation of filter, with plans to attempt removal of the filter through an open abdominal procedure | In or around February 2017 to present |

h)    Were you hospitalized at any time for the bodily injuries you listed above?

       Yes___X___        No_____

       If Yes, please provide the following:

| Provider Name and Address | Condition Treated | Approximate Dates of Treatment |
|---|---|---|
| Westchester Medical Center 100 Woods Road Valhalla, NY 10595 | Failed retrieval of filter, with discovery of tilt and perforation | On or about December 15, 2009 |
| Penn State Milton S. Hershey Medical Center 500 University Drive Hershey, PA 17033 | Failed retrieval of filter and intracardiac strut, with retrieval of floating fragment | On or about June 17, 2016 |
| Penn State Milton S. Hershey Medical Center 500 University Drive Hershey, PA 17033 | Retrieval of fractured strut from lung | On or about February 21, 2017 |

14.    Are you making a claim for lost wages or lost earning capacity?

       Yes_____        No___X___

14

(a)     If yes, state the annual gross income derived from your employment for each year, beginning five (5) years prior to the implantation of the Bard Inferior Vena Cava Filter(s) until the present: _____

(b)     If yes, for what period of time are you claiming lost wages?_____

©     If you are claiming lost earning capacity, do you claim that you have a claim for future lost wages?

        Yes_____     No_____

        If yes, for what period of time do you claim you have lost future wages?

15.   Are you making a claim for lost out-of-pocket expenses?   Yes ____     No___X_____
      If yes, please identify and itemize all out-of-pocket expenses you have incurred.

16.   Has anyone filed a loss of consortium claim in connection with your lawsuit regarding the Bard Inferior Vena Cava Filter(s)?

      Yes ___     No___X_____

      If yes, identify by name and address the person who filed the loss of consortium claim ("Consortium Plaintiff") and state the relationship of that person to you and state the specific nature of the Consortium Plaintiff's claim. N/A _____

17.   Please indicate whether the Consortium Plaintiff alleges any of the damages set forth below:

| Claims | Yes/No |
|---|---|
| Loss of services of spouse | N/A |
| Impaired sexual relations | N/A |
| Lost wages/lost earning capacity | N/A |
| Lost out-of-pocket expenses | N/A |
| Physical injuries | N/A |
| Psychological injuries/emotional injuries | N/A |
| Other | |

18.   Please list the name and address of any healthcare providers the Consortium Plaintiff has sought treatment for any physical, emotional, or psychological injuries or symptoms alleged to be related to his/her claim. N/A _____

19.   Have you or anyone acting on your behalf had any communication, oral or written, with any of the Bard Defendants and/or their representatives?

5450502v2/26997-0001

Yes _____   No___X_____      Don't Know _____

If yes, set forth: (a) the date of any communication, (b) the method of communication, (c) the name of the person with whom you communicated, and (d) the substance of the communications._____

## III. MEDICAL BACKGROUND

1.  Provide your current: Age <u>44</u>       Height <u>5'8"</u>   Weight <u>185 lbs.</u>

2.  Provide your: Age <u>37</u>       Weight <u>165 lbs.</u> (approximate, if unknown) at the time the Bard Inferior Vena Cava Filter was implanted in you.

3.  In chronological order, list any and all surgeries, procedures and/or hospitalizations you had in the ten (10) year period BEFORE implantation of the Bard Inferior Vena Cava Filter(s).  Identify by name and address the doctor(s), hospital(s) or other healthcare provider(s) involved with each surgery or procedure; and provide the approximate date(s) for each:

| Approximate Date | Description of Surgery or Hospitalization | Doctor or Healthcare Provider Involved (including address) |
|---|---|---|
| On or about September 5 to September 22, 2009 | Open left femur and right tibia/fibular fractures, hip dislocation, and splenic laceration, with placement of IVC filter | Westchester Medical Center 100 Woods Road Valhalla, NY 10595 |

*[Attach additional sheets as necessary to provide the same information for any and all surgeries and hospitalizations leading up to the implantation of the Bard Inferior Vena Cava Filter.]*

4.  In chronological order, list any and all surgeries, procedures and/or hospitalizations you had AFTER implantation of the Bard Inferior Vena Cava Filter(s).  Identify by name and address the doctor(s), hospital(s) or other healthcare provider(s) involved with each surgery or procedure; and provide the approximate date(s) for each:

| Approximate Date | Description of Surgery or Hospitalization | Doctor or Healthcare Provider Involved (including address) |
|---|---|---|
| On or about December 15, 2009 | Attempted retrieval of filter, with discovery of tilt and perforation | Romeo Mateo, M.D. 19 Bradhurst Avenue, Suite 700 Hawthorne, NY 10532 |
| On or about June 17, 2016 | Attempted retrieval of filter and intracardiac strut, with retrieval of fractured strut embedded in IVC wall | Frank Lynch, M.D. Penn State Milton S. Hershey Medical Center 500 University Drive Hershey, PA 17033 |

16

| On or about February 21, 2017 | Retrieval of fractured strut from lung | Frank Lynch, M.D. Penn State Milton S. Hershey Medical Center 500 University Drive Hershey, PA 17033 |
|---|---|---|

*[Attach additional sheets as necessary to provide the same information for any and all surgeries and hospitalizations after the implantation of the Bard Inferior Vena Cava Filter.]*

5.  To the extent not already provided in the charts above, provide the name, address, and telephone number of every doctor, hospital or other health care provider from which you have received medical advice and/or treatment from ten (10) years before the date the filter was implanted to the present:

| Name and Specialty | Address | Approximate Date/Years of Visits |
|---|---|---|
| Craig Amnott, M.D. Family Medicine | 1200 NY-208 Monroe, NY 10950 | In or around 2014 to present |
| Jacek Kura, MSPT Physical Therapy | 80 Sullivan Street Wurtsboro, NY 12790 | In or around 2009 to present |

6.  *Before the implantation* of the Bard Inferior Vena Cava Filter(s), did you regularly exercise or participate in activities that required lifting or strenuous physical activity? (Please include all physical activities associated with daily living, physical fitness, household tasks, and employment-related activities.)

Yes___X___      No_____

If yes, please describe each activity in detail.

Mixed martial arts, power lifting, weight training, body building, karate

7.  *Since the implantation* of the Bard Inferior Vena Cava Filter(s), have you regularly exercised or participated in activities that required lifting or strenuous physical activity? (Please describe all range of physical activities associated with daily living, physical fitness, household tasks, and employment-related activities.)

Yes___X___      No_____

If yes, please describe each activity in detail.

Work as a contractor and yard work

8.  During the past ten (10) years, what have been your primary hobbies or recreational activities? Mixed martial arts, power lifting, body building, karate

17

5450502v2/26997-0001

(a) Do you claim that you are unable to participate in any of the hobbies or recreational activities listed in response to question 8 above as a result of you having been implanted with a Bard Inferior Vena Cava Filter(s)?

Yes___X_____  No_____

(b) If yes, what hobbies or recreational activities do you claim that you are unable to participate in as a result of having been implanted with a Bard Inferior Vena Cava Filter(s)? The filter's malfunction has drastically altered Plaintiff's lifestyle, as he has been forced to live a restrained lifestyle and refrain from power lifting, body building, karate, and mixed martial arts.

(c) For what period of time do you claim that you were or have been unable to participate in any hobbies or recreational activities as a result of having been implanted with a Bard Inferior Vena Cava Filter(s)?

In or around September 2009 to present

9. To the best of your knowledge, have you ever been told by a doctor or another health care provider that you have suffered, may have suffered, or presently do suffer from any of the following:

_No_ Lupus

_No_ Crohn's Disease

_No_ Factor V Leiden

_No_ Protein Deficiency

_No_ Spinal Fusion or Other Back Procedures

_No_ Anti-thrombin Deficiency

_No_ Prothrombin Mutation

_No_ Deep Vein Thrombosis

_No_ Pulmonary Embolism

_No_ Auto Immune Disorder

_No_ Varicose Veins

_No_ Heart Procedures

_No_ Blood Disorder

Please Describe:_____

_No_ Bariatric Surgery

18

_No_   Anticoagulation Medication (e.g., Coumadin, Warfarin, etc.)

_No_   Ulcerative Colitis/Inflammatory Bowel Disease (IBD)

_No_   Cancer

Please Describe:_____

\* \* \* \* \* \* \* \* \* \*

THE FOLLOWING QUESTIONS ARE CONFIDENTIAL AND SUBJECT TO THE
PROTECTIVE ORDER APPLICABLE TO THIS CASE.

(A)   Have you been diagnosed with and/or treated for any drug, alcohol, chemical
and/or other addiction or dependency during the five (5) years prior to the filing
of this lawsuit through the present?   Yes_____   No___X___

If yes, specify type and time period of dependency, type of treatment received,
name of treatment provider, and current status of condition:

_____

(B)   Have you experienced, been diagnosed with or received psychiatric or
psychological treatment of any type, including therapy, for any mental health
conditions including depression, anxiety, or other emotional or psychiatric
disorders during the five (5) years prior to the filing of this lawsuit through the
present? Yes___X___        No_____

If yes, specify condition, date of onset, medication/treatment, treating physician
and current status of condition:

Anxiety and insomnia following accidents; in or around 2009; prescribed_____

Ambien; Mark Guido, Ph.D. and Quazi Al-Tariq, M.D.; and ongoing_____

\* \* \* \* \* \* \* \* \* \*

10.   Do you now or have you ever smoked tobacco products?   Yes_____   No___X___

If yes:

How long have/did you smoke?_____

11.   List each prescription medication you have taken for more than three (3) months at a time
during the timeframe beginning five (5) years prior to implantation of the Bard Inferior
Vena Cava Filter and continuing to the present, giving the name and address of the

19

pharmacy where you received/filled the medication, the reason you took the medication, and the approximate dates of use.

| Medication and Dosage | Prescribing Physician | Pharmacy Name and Address | Reason for Taking Medication | Approximate Date(s) of Use |
|---|---|---|---|---|
| Ambien 10mg once daily | Craig Amnott, M.D. | Rite Aid Pharmacy 1 Fitzgerald Drive Middletown, NY | Anxiety and insomnia | In or around January 2016 to present |
| Amlodipine (Norvasc) 10mg once daily | Craig Amnott, M.D. | Rite Aid Pharmacy 1 Fitzgerald Drive Middletown, NY | Blood pressure | In or around March 2016 to present |

## IV. INSURANCE INFORMATION

1.  Provide the following information for any past or present medical insurance coverage from the timeframe beginning five (5) years prior to implantation of the Bard Inferior Vena Cava Filter and continuing to the present:

| Insurance Company Name and Address | Policy Number | Name of Policy Holder/Insured (if different than yourself) | Approximate Dates of Coverage |
|---|---|---|---|
| Health Republic Insurance of New York 30 Broad Street New York, NY 10004 | Y60531901 | N/A | In or around 2013 to 2015 |
| State Farm Insurance | 528345990 | N/A | In or around September 2009 to present |

2.  To the best of your knowledge, have you ever been approved to receive or are you currently receiving Medicare/Medicaid benefits due to age, disability, condition, or any other reason or basis?

    Yes_____   No___X_____

    If yes, please specify the date on which you first became eligible:_____

    *[Please note: if you are not currently a Medicare-eligible beneficiary, but become eligible for Medicare during the pendency of this lawsuit, you must supplement your response at that time. This information is necessary for all parties to comply with Medicare regulations. See 42 U.S.C. 1395y(b)(8), also known as Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 and 42 U.S.C. 1395y(b)(2) also known as the Medicare Secondary Payer Act.]*

## V.  PRIOR CLAIM INFORMATION

1.  Have you filed a lawsuit or made a claim in the last ten (10) years, other than in the
present suit relating to any bodily injury?

Yes_____     No____X_____

If yes, please specify the following:

(a)     Court in which the lawsuit/claim was filed or initiated:_____

(b)     Case/Claim Number:_____

(c)     Nature of Claim/Injury:_____

2.  Have you ever applied for Workers' Compensation (WC), Social Security disability (SSI
or SSD) benefits, or other State or Federal disability benefits?

Yes_____     No____X_____

If yes, please specify the following:

(a)     Date (or year) of application:_____

(b)     Type of benefits sought:_____

(c)     Agency/Insurer from which you sought the benefits:_____

(d)     Nature of the claimed injury/disability:_____

(e)     Whether the claim was accepted or denied:_____

## VI.  FACT WITNESSES

1.  Identify by name, address, and relationship to you, all persons (other than your healthcare
providers) who possess information concerning your injuries and/or current medical
condition:

| Name | Address | Relationship to You | Information You Believe Person Possesses |
|---|---|---|---|
| Providencia Dewitt | 617 Lybolt Road Bullville, NY 10915 | Wife | Injuries caused by filter |

## VII. IDENTIFICATION OF DOCUMENTS AND OTHER ELECTRONICALLY STORED INFORMATION

For the period beginning three (3) years prior to the implantation of the Bard Inferior Vena Cava
Filter until the present, please identify all research, including on-line research, that you
conducted regarding the medical complaints or condition for which you received the Bard
Inferior Vena Cava Filter (pulmonary thromboembolism, anticoagulant therapy, etc.)  Identify
the date, time, and source, including any websites visited.  (Research conducted subsequent to

21

and for the purpose of understanding the legal and strategic advice of your counsel is not considered responsive to this request.)

<u>In or around December 2009, Plaintiff conducted online research on Google and YouTube about the Bard IVC filter and the various malfunctions that have occurred in other patients. Upon learning that the filter fractured and a strut had migrated to his heart in March 2016, Plaintiff conducted various online research about IVC filter retrieval methods and his doctor, Dr. Frank Lynch, who performed the filter retrieval, attempted retrieval of the strut from the heart, and the successful retrieval of the strut from his lung.</u>

## VIII. DOCUMENT REQUESTS

1. **RELEASES.**

   **NOTE:**      **Please sign and attach to this Fact Sheet the authorizations for the release of records appended hereto.**

2. DOCUMENTS.  State whether you have any of the following documents in your possession, custody, and/or control.  If you do, please provide a true and correct copy of any such documents with this completed Fact Sheet.  Please ensure that the production of documentation includes specific reference to the questions to which the document is provided in response.

   (a)  If you were appointed by a Court to represent the plaintiff in this lawsuit, produce any documents demonstrating such appointment.

      (i)    Not applicable _ X _

      (ii)   The documents are attached_____   [OR]   I have no documents_____

   (b)  If you represent the Estate of a deceased person in this lawsuit, produce a copy of the decedent's death certificate and autopsy report (if applicable).

      (i)    Not applicable _ X _

      (ii)   The documents are attached_____   [OR]   I have no documents_____

   (c)  Produce each and every medical record of each and every medical facility, pharmacy, or practitioner of the healing arts identified by you in response to the questions in Sections II and III above regarding your medical care and history for the time period beginning ten (10) years prior to the implantation of the Bard Inferior Vena Cava Filter and continuing to the present.

      (i)    Not applicable_____

      (ii)   The documents are attached_ X _   [OR]   I have no documents_____

(d)    Produce any communication (sent or received) in your possession, which shall
       include materials accessible to you from any computer on which you have sent or
       received such communications, concerning the Bard Inferior Vena Cava Filter(s)
       or subject of this litigation, including, but not limited to all letters, emails, blogs,
       Facebook posts, Tweets, newsletters, etc. sent or received by you.  (Research
       conducted subsequent to and to understand the legal and strategic advice of your
       counsel is not considered responsive to this request.)

       (i)     Not applicable   X

       (ii)    The documents are attached_____      [OR]   I have no documents_____

(e)    Produce all documents, including journal entries, lists, memoranda, notes, diaries,
       photographs, video, DVDs or other media, discussing or referencing the Bard
       Inferior Vena Cava Filter(s), the injuries and/or damages you claim resulted from
       the Bard Inferior Vena Cava Filter(s), and/or evidencing your physical condition
       from three (3) years prior to the implantation of the Bard Inferior Vena Cava
       Filter(s) to present. (Research conducted subsequent to and to understand the legal
       and strategic advice of your counsel is not considered responsive to this request.)

       (i)     Not applicable   X

       (ii)    The documents are attached_____      [OR]   I have no documents_____

(f)    Produce any Bard Inferior Vena Cava Filer product packaging, labeling,
       advertising, or any other product-related items in your possession, custody or
       control.

       (i)     Not applicable   X

       (ii)    The documents are attached_____      [OR]   I have no documents_____

(g)    Produce all documents concerning any communication between you, your
       attorney(s), your agent(s), your expert(s), or your representative(s) and the Food
       and Drug Administration (FDA), or between you and any employee or agent of
       the Bard Defendants, regarding Bard Inferior Vena Cava Filters.

       (i)     Not applicable   X

       (ii)    The documents are attached_____      [OR]   I have no documents_____

(h)    Produce all documents that you, your attorney(s), your agent(s), your expert(s), or
       your representative(s) provided to the Food and Drug Administration (FDA)

23

and/or the Department of Health and Human Services regarding Bard Inferior Vena Cava Filters.

(i)     Not applicable__X___

(ii)    The documents are attached_____   [OR]  I have no documents_____

(i)     Produce all documents concerning any communication between you, your attorney(s), your agent(s), your expert(s), or your representative(s) with anyone at any television station, radio station, newspaper, periodical, magazine, weblog, internet website, or any other media outlet regarding Bard Inferior Vena Cava Filters.

(i)     Not applicable__X___

(ii)    The documents are attached_____   [OR]  I have no documents_____

(j)     Produce all documents that you, your attorney(s), your agent(s), your expert(s), or your representative(s) provided to anyone at any television station, radio station, newspaper, periodical, magazine, weblog, internet website, or any other media outlet regarding Bard Inferior Vena Cava Filters.

(i)     Not applicable__X___

(ii)    The documents are attached_____   [OR]  I have no documents_____

(k)     Produce all documents in your possession, custody, or control evidencing or relating to any correspondence or communication between C. R. Bard, Inc. or Bard Peripheral Vascular, Inc. (or any related companies or divisions) and any of your doctors, healthcare providers, and/or you relating to Bard Inferior Vena Cava Filters, except as to those communications which are protected by the attorney-client privilege or attorney work product doctrine.

(i)     Not applicable__X___

(ii)    The documents are attached_____   [OR]  I have no documents_____

(l)     Produce all documents in your possession, custody, or control reflecting, describing, or in any way relating to any instructions or warnings you received prior to implantation of any Inferior Vena Cava Filter(s) concerning the risks and/or benefits associated with Inferior Vena Cava Filter(s), including but not limited to the Bard Inferior Vena Cava Filter implanted in you.

(i)     Not applicable__X___

      (ii)     The documents are attached_____    [OR]  I have no documents_____

(m)    Produce any and all documents reflecting the model number and lot number of the Bard Inferior Vena Cava Filter(s) you received.

      (i)     Not applicable_____

      (ii)     The documents are attached__X____ [OR]  I have no documents_____

(n)    If you underwent surgery or any other procedure to remove, in whole or in part, the Bard Inferior Vena Cava Filter(s), produce any and all documents, other than documents that may have been generated by expert witnesses retained by your counsel for litigation purposes, that relate to any evaluation of the Bard Inferior Vena Cava Filter(s) removed from you.

      (i)     Not applicable_____

      (ii)     The documents are attached__X____ [OR] I have no documents_____

(o)    If you claim lost wages or lost earning capacity, produce copies of your Federal and State tax returns for the five (5) years prior to implantation of the Bard Inferior Vena Cava Filter(s) to the present redacting irrelevant information.

      (i)     Not applicable__X___

      (ii)     The documents are attached_____    [OR]  I have no documents_____

(p)    Produce all documents in your possession, custody, or control concerning payment by Medicare on behalf of the injured party and relating to the injuries claimed in this lawsuit.  This includes, but is not limited to Interim Conditional Payment summaries and/or estimates prepared by Medicare or its representatives regarding payments made on your behalf for medical expenses relating to the subject of this litigation.

      (i)     Not applicable__X___

      (ii)     The documents are attached_____    [OR]  I have no documents_____

*[Please note: if you are not currently a Medicare-eligible beneficiary, but become eligible for Medicare during the pendency of this lawsuit, you must supplement your response at that time. This information is necessary for all parties to comply with Medicare regulations.  See 42 U.S.C. 1395y(b)(8), also known as Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 and 42 U.S.C. 1395y(b)(2) also known as the Medicare Secondary Payer Act.]*

(q)    Produce all screenshots of all webpages of each type of social media used by you (including, but not limited to, Facebook, Twitter, Instagram, Vine, Snapchat,

YouTube, LinkedIn) showing any and all "posts" and/or "messages" from the date of implantation to the present.

(i)     Not applicable__X__

(ii)    The documents are attached_____   [OR]  I have no documents_____

(r)    Produce the Bard Inferior Vena Cava Filter(s) or any and all components thereof previously implanted in you.

26

**VERIFICATION**

I, _Brent DeWitt_ , declare under penalty of perjury, subject to all applicable laws and in the presence of the below named witness, that I have carefully reviewed the final copy of this Amended Plaintiff Fact Sheet dated March 1, 2017 and verified that all of the information provided is true and correct to the best of my knowledge, information and belief.

_____          _____
Signature of Witness                             Signature of Plaintiff

_____
Name of Witness

_____
Address of Witness

27

# EXHIBIT B



Deposition of:
# Brent Dewitt

*February 15, 2017*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 212

1    strut?

2         A.    Yes.

3         Q.    When is that retrieval scheduled to

4    proceed?

5         A.    Tuesday.

6         Q.    February 21st, 2017?

7         A.    Yes.

8         Q.    Who's doing the procedure?

9         A.    Dr. Lynch.

10        Q.    What did Dr. Lynch tell you about the

11   likelihood of being able to retrieve the filter

12   strut from your lung?

13        A.    It's a 50 percent -- 50 to 60 percent

14   chance it will be successful.

15        Q.    Is the procedure going to be

16   percutaneous or is it an open surgery?

17        A.    Percutaneous.

18        Q.    Are you also scheduled to have an open

19   abdominal procedure to retrieve the filter in your

20   IVC?

21        A.    I'm going to have a consult, the same

22   time I meet with Dr. Lynch, with another physician

23   that he's referring, who's more specialized in doing

24   open abdominal retrievals.

25        Q.    What's the name of the doctor that

Brent Dewitt                    February 15, 2017
In Re: Bard IVC Filters Products Liability

Page 213

1  you're going to have a consult with in order to

2  determine whether or not to have an open abdominal

3  procedure to remove the IVC filter?

4        A.    David Hahn.

5        Q.    Have you spoken to Dr. Han before?

6        A.    No.

7        Q.    You seem like you paused for a second,

8  or maybe that's just me.

9        A.    I've spoken with --

10             MR. MANKOFF:  Object to form.

11             Go ahead.

12             THE WITNESS:  I've spoken with his

13       staff in reference to scheduling.

14 BY MR. BUSMAN:

15       Q.    Okay.  You've never had any

16 conversations with Dr. Han; right?

17       A.    No.

18       Q.    The only conversations you've had with

19 anybody in Dr. Han's office have been with his staff

20 in order to try to schedule appointment with him;

21 right?

22       A.    Yes.

23       Q.    Is Dr. Han located in Hershey,

24 Pennsylvania?

25       A.    Yes.

# EXHIBIT C



Deposition of:

**Debra Tinlin**

*February 8, 2017*

In the Matter of:

**In Re: Bard IVC Filters Products Liability**

Veritext Legal Solutions
1075 Peachtree St. NE , Suite 3625
Atlanta, GA, 30309
800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Debra Tinlin                        February 8, 2017
In Re: Bard IVC Filters Products Liability

Page 144

1      THE VIDEOGRAPHER:  We are back on the
2      record.  The time now is 2:57 p.m. and this is
3      the beginning of Media Unit 4 of the video
4      deposition of Debra Ann Tinlin.
5      BY MS. KOWALZYK:
6   Q  Ms. Tinlin, I know that we've been going for a
7      long time today, for, I don't know, maybe five
8      hours total depo time.  And I can see that
9      you're a little uncomfortable.  Are you okay
10     with keeping going or would you, I guess, how
11     are you feeling?
12  A  I would like to get it finished.
13  Q  Are you uncomfortable?
14  A  I'm uncomfortable just sitting here.  It's
15     painful, yes.
16  Q  Okay.  And if you were at home it would be less
17     painful because you would be able to be laying
18     down or in your recliner?
19  A  Yes.  Yeah, move around more, yes.
20  Q  Okay.  Well, I will try to finish up as quickly
21     as I can, but I'm trying to avoid us all having
22     to do this again, so -- but if you want to
23     stop --
24  A  No.
25  Q  -- at any point --

Page 145

```
1    A    Let's go.

2    Q    -- let me know.

3    A    Okay.  Thank you.

4    Q    Uh-huh.  What was the most recent doctor visit

5         that you had?

6    A    The 19th I had the endoscopy.

7    Q    Okay.

8    A    Before that the 13th I saw Dr. Gautam, the

9         hematologist, in his office so he could bridge

10        me off of my Coumadin for the procedure.

11   Q    So Dr. Gautam is the hematologist who now

12        handles your Coumadin?

13   A    Well, he -- he only handles it if I need to

14        bridge.  Dr. Leah Nitke takes care of it on a

15        daily basis.

16   Q    Got it.

17   A    But if I need to go off for a procedure then

18        he'll handle the bridging.

19   Q    What appointments do you have currently to see

20        doctors?

21   A    I see Dr. Newell, the endocrinologist this

22        month.  I'm going to see a neurologist this

23        month.  In March I'm going to see an

24        orthopedic, Dr. Schnaubelt.

25   Q    Who's the neurologist that you see this month?
```