# Exhibit B

11:53:49  1   A    I have to answer that question as a relative no because,
          2   by way of explanation, the SIR guidelines and the publications
          3   by the SIR were intended, as I had described earlier, to be
          4   educational, informative, and helpful for those working with
11:54:12  5   IVC filters.
          6            The goal was not to create a specific, rigid,
          7   definitive threshold; it was to help practitioners.
          8            And so in the sense of your question to me I would
          9   have to say that the guidelines are just that, they're a
11:54:32 10   series of guidelines.
         11   Q    All right.  And these guidelines did not imply that the
         12   rates in the ranges referenced were fine, acceptable, or okay.
         13   Do you agree with that?
         14   A    Well, I can only say that the ranges referenced were those
11:54:54 15   what we had found, what were in the medical literature, what
         16   we as physicians in the field experienced, and what our
         17   colleagues experienced.  And so in that regard, we relied on
         18   published data and we relied on our own day-to-day practical
         19   experience with patients.
11:55:20 20   Q    Tell you what, let's see what you had to say about that in
         21   August of 2014 at page 524 of your deposition.
         22            MR. JOHNSON:  May I publish it, Your Honor?
         23            THE COURT:  To the witness.
         24            MR. JOHNSON:  Yes.
11:55:34 25            THE COURT:  Just to the witness.

11:55:36  1              Oh, you mean generally?
          2              MR. JOHNSON:  Yes.
          3              THE COURT:  Oh, it's a video?
          4              MR. JOHNSON:  It is.
11:55:44  5              THE COURT:  You may.
          6         (The following video testimony was played:)
          7              THE WITNESS:  "And certainly I can say that in the
          8  quality improvement guidelines for IVC filter placement
          9  through the SIR, for which I was the first author, we did not
11:55:58 10  imply that rates in that range are fine or acceptable or okay.
         11  We simply said that those were trackable events and that
         12  responsible individuals should look at any adverse event,
         13  trigger a review, and do a quality assurance monitoring to
         14  make sure that they understand some of the root causes behind
11:56:26 15  such a serious problem."
         16  BY MR. JOHNSON:
         17  Q   Do you remember giving that answer?
         18  A   I do.
         19  Q   Okay.  And would you agree with me that the SIR guidelines
11:56:38 20  do not create safety thresholds for filters that relate to
         21  embolization, tilt, perforation, fracture, and the inability
         22  to remove the filter?
         23  A   I can certainly say that the guidelines have attempted and
         24  I think in a very reasonable way have documented what our
11:57:08 25  total considered experience was in this field.

11:57:13  1    As I mentioned on the video, our intent was to be
          2    informative, instructive, and to offer these as a set of
          3    guidelines for those working with vena cava filters.  And the
          4    guidelines are what they are.
11:57:25  5  Q  All right.  Let's go back to your deposition given on
          6    September 24 of 2014 at page 770.
          7        MR. JOHNSON:  With the Court's permission, I'd like
          8    to play that video.
          9        THE COURT:  You may.
11:57:37 10      (The following video testimony was played:)
         11        QUESTION:  "Just so we're clear, that exhibit and the
         12    committee that you're a part of did not create safety
         13    thresholds with respect to the filters study that relate to
         14    perforation, fracture, migration, tilt, or the inability to
11:58:04 15    remove the filter.  Is that correct or not correct?"
         16        ANSWER:  "Yes, that's fair."
         17  BY MR. JOHNSON:
         18  Q  Do you recall that answer to that question?
         19  A  I do in the context of the question which was asked of me.
11:58:21 20  Q  All right.  And would you agree with me that the SIR
         21    guidelines are not intended as an instruction manual for
         22    filter manufacturers like Bard?
         23  A  They were not an information for users manual or an
         24    instruction manual.  I think that that's clear.  They were a
11:58:44 25    set of guidelines drawn up by the SIR in a committee to those

CROSS-EXAMINATION - CLEMENT GRASSI, M.D.

| | |
|---|---|
| 11:58:50 | 1   working with filter devices -- |
| | 2   Q   They're not -- I'm sorry. |
| | 3   A   -- so in answer to your question, that's correct, they |
| | 4   were not an instruction manual. |
| 11:59:01 | 5   Q   They were not to be used by manufacturers like Bard; |
| | 6   correct? |
| | 7   A   Well, I can't offer an opinion on that.  The SIR |
| | 8   guidelines are widely available online and in print.  It's not |
| | 9   for me to say who should or should not use them.  And |
| 11:59:19 | 10   certainly by way of education or to be informative in the |
| | 11   field, anyone could read them. |
| | 12   Q   Let's see what you had to say back in July -- |
| | 13           THE COURT:  Mr. Johnson, we'll do that after lunch. |
| | 14   We've reached the 1 o'clock -- I'm sorry, the noon hour. |
| 11:59:33 | 15           Ladies and gentlemen, we will break now and resume at |
| | 16   1 o'clock. |
| | 17        (The jury exited the courtroom.) |
| | 18           THE COURT:  Please be seated. |
| | 19           Counsel, I understand that we don't have the |
| 12:00:09 | 20   redactions on the exhibits yet that you all have been working |
| | 21   on.  I understand defendants have identified some and are |
| | 22   waiting for plaintiffs. |
| | 23           Just an update on where that is, please. |
| | 24           MS. MATARAZZO:  Yes, Your Honor. |
| 12:00:23 | 25           We went back and forth on the first round of |

| | | |
|---|---|---|
| 1 | **P R O C E E D I N G S** | 12:58:34 |
| 2 | (Jury enters at 1:00.) | |
| 3 | (Court was called to order by the courtroom deputy.) | |
| 4 | (Proceedings begin at 1:01.) | |
| 5 | THE COURT: Thank you.  Please be seated. | 01:01:07 |
| 6 | You may continue, Mr. Johnson. | |
| 7 | MR. JOHNSON: Thank you. | |
| 8 | (CLEMENT GRASSI, M.D., a witness herein, was duly | |
| 9 | sworn or affirmed.) | |
| 10 | **CROSS - EXAMINATION** (Continued) | 01:01:12 |
| 11 | BY MR. JOHNSON: | |
| 12 | Q.   Dr. Grassi, when we broke for lunch, we were talking about | |
| 13 | the uses of the, SIR information by manufacturers by Bard's and | |
| 14 | we were about to play a clip from your deposition that was | |
| 15 | given in July of 2014. | 01:01:31 |
| 16 | MR. JOHNSON: With the Court's permission, I would | |
| 17 | like to play his testimony at page 89. | |
| 18 | THE COURT: All right. | |
| 19 | (Video clip of Dr. Grassi's deposition was played.) | |
| 20 | BY MR. JOHNSON: | 01:02:34 |
| 21 | Q.   Doctor, with respect to your work on the SIR committee, | |
| 22 | you folks did not study a situation where there was a cascading | |
| 23 | set of adverse events where a filter migrates in a caudal | |
| 24 | fashion leading to tilt, leading to multiple perforations of | |
| 25 | the vena cava, leading to multiple penetrations of nearby vital | 01:02:57 |