# Exhibit C

```
          IN THE CIRCUIT COURT OF THE 17TH JUDICIAL
      CIRCUIT OF FLORIDA, IN AND FOR BROWARD COUNTY


               CASE NO.:  CACE-15-008373
               DIVISION:  07

CLARE AUSTIN,

    Plaintiff,

vs.

C.R. BARD, INC., a foreign
corporation; and
BARD PERIPHERAL VASCULAR, INC.,
an Arizona corporation;
MATTHEW ROBBINS, M.D.; and
CLEVELAND CLINIC FLORIDA,

    Defendants.


              DEPOSITION OF DEREK D. MUEHRCKE, M.D.

              Taken on Behalf of C.R. BARD, INC.,
                  a foreign corporation; and
                BARD PERIPHERAL VASCULAR, INC.,
                    an Arizona corporation


 DATE TAKEN:    THURSDAY, JULY 21ST, 2016

 TIME:          9:01 A.M. - 1:49 P.M.

 PLACE:         HILTON ST. AUGUSTINE
                HISTORIC BAYFRONT
                32 AVENIDA MENENDEZ
                SAINT AUGUSTINE, FLORIDA  32084




              STENOGRAPHICALLY REPORTED BY:

                ANTHONY TRUJILLO, RMR, CRR
                 Registered Merit Reporter
                Certified Realtime Reporter
```

1      A.    I don't know, but I would think so.

2      Q.    Okay.

3            MR. JOHNSON:  How about a break?  Or do you

4      want to finish your line?  I need to make a phone

5      call.

6            MS. DALY:  Can I just --

7            MR. JOHNSON:  You want to continue?  Sure.

8            MS. DALY:  I just wanted to finish up on sales

9      and marketing.

10    BY MS. DALY:

11     Q.    Anything -- anything misleading, if you're

12     going to have an opinion on anything that was

13     misleading?

14     A.    I --

15     Q.    We've talked about the --

16     A.    -- I, as an implanter, was never told about

17     these complications.  And when asked about why are there

18     so many iterations of this Bard IVC filter, it's because

19     it would improve centering; it would improve the ability

20     to -- to retrieve it in somebody.  We were never told

21     about the internal Bard documents and their concern --

22     they did a health hazard analysis or any crisis meetings

23     to figure out this device, and we were never told about

24     that.

25     Q.    And that was back in 2004, the one that you're

```
 1   talking about?
 2        A.    Right.  But, I mean --
 3        Q.    Health hazard.
 4        A.    -- but they've also made other iterations to
 5   the device and were not really honest with us about why
 6   those changes were made, why the anchoring was put on
 7   the ECLIPSE®.  You know, why -- and -- the MERIDIAN®,
 8   rather, and why they went to the DENALI®.  I mean, you
 9   know --
10        Q.    Well, haven't -- haven't sales brochures and
11   salespeople explained to you, oh, the MERIDIAN® has this
12   new feature and it's supposed to do that, haven't they?
13        A.    The G2® -- the G2® brochure says, oh, okay,
14   improved centering, less migration, less perforation --
15   that's not true based on Bard's internal data.
16        Q.    Right.  Is that what's misleading to you --
17        A.    Yeah.
18        Q.    -- is you think Bard's internal data does not
19   support those claims?
20        A.    Correct.
21        Q.    Okay.
22        A.    Also -- and also, if a doctor wants to find out
23   what the true rate of fracture in these devices --
24   Rob Carr said they're not going to give it to a doctor.
25   It's proprietary information, even though they said it's
```