# EXHIBIT A

Do Not Disclose - Subject to Confidentiality Review

```
 1                IN THE CIRCUIT COURT OF

 2         THE SEVENTEENTH JUDICIAL CIRCUIT, IN

 3            AND FOR BROWARD COUNTY, FLORIDA

 4

 5   ------------------------------x

 6   CLARE AUSTIN,                  )  Case No.

 7             Plaintiff,           )  CACE-15-008373

 8      v.                          )

 9   C.R. BARD, INC., a foreign     )

10   corporation and BARD           )

11   PERIPHERAL VASCULAR, INC.,     )

12   an Arizona corporation,        )

13             Defendants.          )

14   ------------------------------x

15    Do Not Disclose - Subject to Further Confidentiality Review

16

17     VIDEOTAPED DEPOSITION OF KRISHNA KANDARPA, M.D.

18                   BETHESDA, MARYLAND

19                THURSDAY, JULY 19, 2018

20                     12:57 P.M.

21

22

23   Pages: 1 - 237

24   Reported by: Leslie A. Todd
```

Do Not Disclose - Subject to Confidentiality Review

```
 1         Q    All right.  Doctor, did there come a
 2   time when you were the director of radiology at
 3   the University of Massachusetts when a company by
 4   the name of Bard and a company by the name of
 5   Austin Biomedical Associates selected you to act
 6   as the medical monitor for a study known as the
 7   EVEREST Study?
 8         A    Yes.
 9         Q    All right.  And you understand we're
10   here to talk to you about your role as the medical
11   monitor in that study and to also talk about the
12   G2 filter?
13         A    Mm-hmm.
14         Q    Is that a "yes"?
15         A    Yes.
16         Q    All right.  What were your
17   responsibilities as the medical monitor for this
18   study?
19         A    Okay.  So my responsibility was
20   primarily to Boston Biomedical Associates, and I
21   was a medical monitor.  I was hired as a medical
22   monitor, and I was to adjudicate events reported
23   by the investigator, and to -- and to say whether
24   they -- the investigator correctly attributed
```

 1    whatever the problem was to either the filter or

 2    something unrelated to the filter.  So I went over

 3    all those cases and made that determination.

 4         Q    All right.  Let's back up a step.  If

 5    you would, tell us what the EVEREST Study was.

 6         A    Okay.  The EVEREST Study was a

 7    retrievability study for a filter that Bard had

 8    called the G2 filter, which was originally, I came

 9    to find out, was approved as a permanent filter,

10    but they wanted to make it retrievable or an

11    option to retrieve, and so they did the EVEREST

12    Study of a hundred patients.

13         Q    All right.  And when you describe this

14    as a retrievability study, tell us what you mean

15    by that.

16         A    Okay.  So we generally feel that -- that

17    when patients need filters, there comes a time

18    when they may no longer need the filter to filter

19    the clots as they come in from the legs.  At that

20    point there is a medical determination made that

21    this can be removed -- the filter can be removed.

22              Prior -- prior filters, the original

23    filters were not designed to be taken out.  So

24    around that time that I was monitoring the study

```
  1    put in or taken out, if that were the case, and if

  2    it was appropriately put in.  And then you would

  3    determine if the person said, let's say, the

  4    filter got -- caught a clot, then you would look

  5    at the images, and you would say, Yes, I agree the

  6    filter got -- stopped a clot.  So that's the way

  7    you do it.

  8              Or if you say, I don't see the clot,

  9    then you go back to the investigator and say,

 10    Where is the clot?  He might have sent you the

 11    wrong film or whatever, but we work it out that

 12    way.  That's typically the way it worked.

 13         Q    Would you look at patient records?

 14         A    Yes.

 15         Q    Would you look at --

 16         A    If I had to.  If I had to probe into it,

 17    I would, yes.

 18         Q    All right.  But patient records were

 19    available to you for review?

 20         A    Yes.  Mm-hmm.

 21         Q    Were what I call imaging studies

 22    available to you for review?

 23         A    When I wanted them, yes.

 24         Q    All right.
```

```
 1        A    Or sometimes even when I didn't want
 2   them.
 3        Q    All right.  What else would have been
 4   available to you for review as your role or as
 5   your work as the medical monitor?
 6        A    Basically the study reports and anything
 7   that I thought I wanted was usually provided to
 8   me.
 9        Q    Were you provided with documents known
10   as adverse event summaries as part of your work in
11   this study?
12        A    Yes.  So every time we met, we'd have a
13   summary list of adverse events, and then we would
14   go to that list, and -- and then I would determine
15   whether that had actually -- was an adverse event
16   or not.
17        Q    Were you also provided with a document
18   known as a device observation summary?
19        A    I'm having trouble distinguishing the
20   two, but, yes, general information was made
21   available to me.
22        Q    So that information was provided to you
23   as your work as the medical monitor in this
24   retrievability study.
```

```
 1              MR. JOHNSON:  Can you read back the
 2    question two questions ago.
 3              (Whereupon, the requested record
 4              was read.)
 5    BY MR. JOHNSON:
 6         Q    I think it's based on what you saw, did
 7    you develop a belief as to whether a reasonable
 8    physician would want to know about the
 9    observations that you were making in your role as
10    the medical monitor in this study?
11         A    Yes -- yes to that.
12         Q    Yes?
13         A    Yes.  To that, yes.
14              (Kandarpa Exhibit No. 2 was marked
15              for identification.)
16    BY MR. JOHNSON:
17         Q    All right.  Doctor, I'm going to hand
18    you what I've marked as Exhibit --
19         A    2.
20         Q    -- 2.
21              MR. NORTH:  Do you have another copy?
22              THE WITNESS:  I only have one.  It's
23    here if you want.
24              MR. NORTH:  Okay.
```

```
 1              Or any further down from where it was,
 2   yeah.
 3   BY MR. JOHNSON:
 4       Q    All right.  Filter tilt, what does that
 5   mean?
 6            MR. NORTH:  Objection to the form.
 7   Seeks expert opinion.
 8   BY MR. JOHNSON:
 9       Q    Doctor, as part of your role in this
10   case as the medical monitor, were you evaluating
11   this filter as it relates to tilt?
12       A    Yes, I was.
13       Q    Okay.  What does "filter tilt" mean?
14       A    Okay.  Well, the implications of filter
15   tilt, if you look at a filter that's deployed
16   properly and you look at it head on within the
17   interior vena cava, you know, a cross-section if
18   you will, you will see that a certain -- there is
19   a certain area that is restricting the clots.
20   What happens when the filter tilts is that those
21   areas increase -- I mean there are studies on
22   this -- and so larger clots can go through.
23            And in its extreme, it could -- it's
24   not doing -- it's not functioning at all, and --
```

```
 1       A      Well, filter fracture generally --
 2              MR. NORTH:  Objection to the form.
 3              THE WITNESS:  Generally means --
 4   BY MR. JOHNSON:
 5       Q      Let me reask the question, Doctor.
 6       A      Okay.
 7       Q      As your role in this retrievability
 8   study as the medical monitor, were you looking for
 9   and assessing filter fracture as an adverse event?
10       A      Yeah, because -- yes, I was.  Yeah.
11       Q      And tell us what "filter fracture" is.
12       A      Okay.  So filter fracture is when one of
13   the components of the filter breaks away.  It
14   may -- for example, a leg can break, but the two
15   pieces could be still in place sort of, just away
16   from each other.  Sometimes they can fracture to a
17   degree that, you know, the filter can no longer do
18   its job.  And occasionally a fragment might end up
19   in the heart, which you don't want either.
20       Q      All right.  Filter migration, filter
21   tilt, filter perforation and fracture of the
22   filter, are those all examples of adverse events
23   that you were looking for as the medical monitor
24   during this retrievability study?
```

```
 1   the things obviously that we look for and made

 2   sure that there wasn't an undue amount of that.

 3   BY MR. JOHNSON:

 4        Q    Did you form a belief as the medical

 5   monitor that there was an association between

 6   filter migration, filter tilt, and perforation of

 7   the filter through the vena cava?

 8            MR. NORTH:  Objection to the form.

 9            THE WITNESS:  I didn't form -- I didn't

10   form that opinion because of the study.  It's

11   something that happens that's generally known that

12   you don't want that because these are the

13   consequences of a migrating filter.  Okay.  So

14   I -- I consciously probably didn't say it, but I

15   sort of understood that that was what was going

16   on.

17   BY MR. JOHNSON:

18        Q    Okay.  Did you -- are you saying you

19   understood that was going on with the G2 filter?

20        A    Yes.

21            MR. NORTH:  Objection to the form.

22            THE WITNESS:  In the study, yes.

23   BY MR. JOHNSON:

24        Q    Okay.  This retrievability study, was it
```

```
 1      Q    All right.
 2      A    So being that this was probably one of
 3   the early ones, that's why you're seeing so many.
 4      Q    And just, again, define some terms for
 5   us.  Is that a patient identification number
 6   01-001?
 7      A    Yeah.
 8      Q    And so this document would have been
 9   provided to you as part of what you did in your
10   role as the medical monitor?
11      A    Correct.
12      Q    All right.  And it says "extravascular
13   penetration of the IVC."  What does that mean?
14      A    The very first patient, that means that
15   the -- it would imply to me that IVC legs most
16   likely went way -- through the wall of the
17   inferior vena cava.
18      Q    And it goes on to say that:  "The tip of
19   the medial arm of the filter is 5 millimeters
20   uncorrected beyond the contrast column of the
21   IVC."
22      A    Right.
23      Q    Again, what does that mean?
24      A    Okay.  So when --
```

```
 1   retrievability study?
 2              MR. NORTH:  Objection to the form.
 3              THE WITNESS:  Well, I -- I can't speak
 4   to what the IFU should have said or the -- but I
 5   can tell you the expectation of the physician is
 6   that we've been told that truth -- the entire
 7   truth about it and we can make our own judgments.
 8   So, yes, a reasonable and practicing physician
 9   would want to know all -- all the details.
10   BY MR. JOHNSON:
11        Q    All right.  Let me rephrase the
12   question.
13              As the medical monitor having seen and
14   observed the migrations associated with the G2
15   filter, do you have a belief as to whether a
16   reasonable physician would want to know about the
17   totality of these migrations?
18        A    Yes.
19              MR. NORTH:  Objection to the form.
20              THE WITNESS:  I would think they would
21   want to know.
22   BY MR. JOHNSON:
23        Q    Why do you believe a reasonable
24   physician would want to know that information?
```

```
 1      Q    Now, when you were the medical monitor
 2   for this study, you did not conduct a literature
 3   review at that time of any published studies
 4   regarding the G2 filter or other retrievable
 5   filters, correct?
 6      A    No, I didn't, because that wasn't my
 7   task yet.
 8      Q    And you did not make an attempt to look
 9   at the medical literature to assess how Bard's
10   complication rates were comparing to those of
11   other manufacturers' filters, did you?
12      A    Because they were not available, no, I
13   did not.
14      Q    And Bard never put any pressure or
15   twisted your arm concerning your adjudication of
16   these adverse events, did they?
17      A    No.
18           MR. NORTH:  Do you have any --
19           (A discussion was held off the record.)
20           (Kandarpa Exhibit No. 12 was
21           marked for identification.)
22   BY MR. NORTH:
23      Q    If I could, Doctor, let me hand you
24   what's been marked as Exhibit 12.
```

```
 1      A     Okay.
 2      Q     Are you familiar with this document?
 3      A     Adjudication Manual of Operations, yep.
 4   Yeah.
 5      Q     And if we could turn to page 3 of 68.
 6      A     Okay.
 7      Q     Does that define what your
 8   responsibilities were --
 9      A     Yep.
10      Q     -- as the medical monitor?
11      A     You mean the bottom three that says
12   "Roles and Responsibilities"?
13      Q     Yes.
14      A     "Establish adverse event complication
15   definition."  Yep.  "Review and adjudicate
16   complications as --
17             THE REPORTER:  Excuse me.  I'm going to
18   need you to either read out loud --
19             THE WITNESS:  Read it louder?  Oh, you
20   mean slow down?
21             THE REPORTER:  Or just read to yourself.
22             THE WITNESS:  I'll read it to myself.
23             Yeah, that seems about correct, yeah.
24   BY MR. NORTH:
```

```
 1        Q    And that was what you were provided by
 2   BBA as officially defining what your role in this
 3   study --
 4        A    Correct.
 5        Q    -- would be, correct?
 6        A    Mm-hmm.
 7        Q    And -- I'm sorry, yes or no?
 8        A    Yes, yes.
 9        Q    And the first primary responsibility was
10   to establish definitions for adverse event
11   complications, correct?
12        A    Yes.
13        Q    And the second role or primary
14   responsibility was to review and adjudicate
15   complications and adverse events as they occur,
16   correct?
17        A    Correct.
18        Q    And then the third, which was somewhat
19   related primary responsibility, was to review and
20   adjudicate device malfunctions and filter imaging
21   assessments, correct?
22        A    Correct.
23        Q    Doctor, in your work at NIH, you don't
24   deal with IVC filters specifically, do you?
```

```
 1   reviewed those minutes --
 2        A    Mm-hmm.
 3        Q    -- confirmed the accuracy of those
 4   minutes and what was discussed at the meeting that
 5   resulted in those minutes by your having your
 6   signature on it, right?
 7        A    Correct, yeah.
 8        Q    Mr. North also -- can I -- this is 16,
 9   right?
10             (Kandarpa Exhibit No. 16 was
11              marked for identification.)
12             MR. LOPEZ:  I don't have an extra copy
13   of this because I didn't think this was going to
14   come up, but you can -- you will see it on your
15   screen.
16   BY MR. LOPEZ:
17        Q    You have to look at it on -- at the
18   screen for this one, Doctor.
19        A    Okay.
20        Q    See this Exhibit 16, do you see that
21   this is an e-mail from you to John DeFord?
22        A    Okay.
23        Q    And I'll represent that the underlining
24   and the highlighting were not on the original.
```

```
 1     A     Okay.  I'm having a hard -- trouble
 2  reading it, but --
 3     Q     And that Mr. DeFord wrote -- writes back
 4  to you.  Do you see where we are?
 5     A     Mm-hmm.
 6     Q     And do you see where it says on
 7  October -- on August 3, 2007, where you wrote:  "I
 8  was also under the impression that I was under
 9  contract to BBA, but stand corrected per your note
10  below.  I am glad the findings will not be
11  challenged.  It might make it easier for me.  I do
12  not want any misunderstandings between BBA and/or
13  Bard and/or me.  Kris."
14           Do you see that?
15     A     Yeah.  Can I -- can I just look at it?
16  I'm having -- I see that, but I'm having
17  trouble --
18     Q     Okay.
19     A     Oh, yeah, I -- yeah.  Okay.  You want to
20  finish and then I can look --
21     Q     Yeah, then I'll let you --
22     A     Okay, fine.
23     Q     And then Mr. DeFord writes back to you:
24  "This has unfortunately become a real mess.
```

```
 1    Apparently, the Bard/BBA relationship is
 2    deteriorating on a host of studies (including
 3    EVEREST) where BBA has been contracted at Bard's
 4    CRO."
 5            Did I read that correctly?
 6       A    Yes.
 7       Q    Were you able to see that?
 8       A    Yeah, I see that.
 9       Q    Okay.  Now, I want to draw your
10    attention to the bottom.  I want to make sure you
11    can read that.  Can you see that clearly?
12       A    Yeah, I see it.  Okay.  I'll have to
13    read it again, but I see it.
14       Q    Is there any way I can --
15       A    I think it's just a reproduction -- it's
16    okay.  I'll look at it.
17       Q    Well, I want to be able to -- the camera
18    needs to see this clearly so the jury can read
19    this too.
20       A    Oh, I see.
21            MR. LOPEZ:  Is there any way you can fix
22    that?  Because it's -- it's the focus.
23    BY MR. LOPEZ:
24       Q    There we go.  Is that better?
```

```
 1      A     Yeah, mm-hmm.
 2      Q     Okay.  "It is my understanding" -- this
 3   is Mr. DeFord writing to you, correct?
 4      A     Mm-hmm.
 5      Q     And you know Mr. DeFord?
 6      A     Yes, I do.
 7      Q     Actually is it Dr. DeFord?
 8      A     He has a -- he's a Ph.D.
 9      Q     Ph.D.
10            "It is my understanding that you were
11   contracted by Bard Peripheral Vascular (not BBA)
12   as the Clinical Events Committee (CEC) for the
13   study."
14            Do you say that?
15      A     Yeah, I see that.
16      Q     "I also understand that BBA has been
17   handling all payments to you for your services as
18   well as facilitating all interactions."
19      A     Correct.
20      Q     Do you see that?
21      A     Yes.
22      Q     Now, do you understand that Mr. DeFord
23   or Dr. DeFord is a very high official at Bard?
24      A     Yes.
```