1              **UNITED STATES DISTRICT COURT**

2                 **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **IN RE: Bard IVC Filters Products**     )
     **Liability Litigation,**                )  MD 15-02641-PHX-DGC
5                                             )
     _____)
6                                             )
     **Lisa Hyde and Mark Hyde, a married**   )  Phoenix, Arizona
7    **couple,**                              )  **September 18, 2018**
                                              )
8                        Plaintiffs,          )
                                              )
9           v.                                )  CV 16-00893-PHX-DGC
                                              )
10   **C.R. Bard, Inc., a New Jersey**        )
     **corporation, and Bard Peripheral**     )
11   **Vascular, an Arizona corporation,**    )
                                              )
12                       Defendants.          )
     _____)
13

14

15       **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16          **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17              **TRIAL DAY 1 - A.M. SESSION**

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                       **A P P E A R A N C E S**

2     For the Plaintiffs:

3              Lopez McHugh
               By: **RAMON R. LOPEZ**, ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
5
               Gallagher & Kennedy
6              By: **MARK S. O'CONNOR**, ESQ.
               By: **PAUL L. STOLLER**, ESQ.
7              2575 East Camelback Road, Suite 1100
               Phoenix, AZ  85016
8
               Heaviside Reed Zaic
9              By: **JULIA REED ZAIC**, ESQ.
               By: **LAURA E. SMITH**, ESQ.
10             312 Broadway, Ste. 203
               Laguna Beach, CA  92651
11
               Goldenberg Law PLLC
12             By: **STUART GOLDENBERG**, ESQ.
               By: **MARLENE GOLDENBERG**, ESQ.
13             800 LaSalle Ave., Ste. 2150
               Minneapolis, MN  55402
14
               Lopez McHugh, LLP
15             By: **JOSHUA MANKOFF**, ESQ.
               1 International Plaza, #550
16             PMB-059
               Philadelphia, PA 19113
17

18

19    For the Defendants:

20             Nelson Mullins Riley & Scarborough.
               BY: **JAMES F. ROGERS**, ESQ.
21             1320 Main St.
               Columbia, SC  29201
22

23             Snell & Wilmer
               By: **JAMES R. CONDO**, ESQ.
24             400 East Van Buren
               Phoenix, AZ  85004
25

1                    **A P P E A R A N C E S   (CONTINUED)**

2

3    For the Defendants:

4            Nelson Mullins Riley & Scarborough
             By: **RICHARD B. NORTH, JR.,** ESQ.
5            By: **MATTHEW B. LERNER,** ESQ.
             By: **ELIZABETH C. HELM,** ESQ.
6            201 17th Street NW, Suite 1700
             Atlanta, GA  30363
7

8            C.R Bard, Inc.
             Associate General Counsel, Litigation
9            By:  **GREG A. DADIKA,** ESQ.
             730 Central Avenue
10           Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2

3        (The following proceedings took place in open court,

4    outside the presence of the jury panel.)

5              THE COURTROOM DEPUTY:  MDL 2015-23641, Bard IVC

6    filters product liability litigation, on for the jury trial

7    regarding Plaintiff Hyde.

8              Will the parties please announce.

9              MR. O'CONNOR:  Yes.  Good morning.  Mark O'Connor for

10   the Plaintiffs Hyde.

11             MR. LOPEZ:  Good morning, Your Honor.  Ramon Lopez

12   for the Plaintiffs Hyde.

13             MS. REED ZAIC:  Good morning, Your Honor.

14   Julia Reed Zaic for the Plaintiffs Hyde.

15             MR. ROGERS:  Good morning, Your Honor.  Jim Rogers on

16   behalf of defendants.

17             MS. HELM:  Kate Helm on behalf of defendants.

18             MR. CONDO:  Morning, Your Honor.  Jim Condo on behalf

19   of the defendants.

20             MR. DADIKA:  Good morning, Your Honor.  Greg Dadika,

21   associate general counsel for litigation for C.R. Bard.

22             THE COURT:  All right.

23             Good morning, everybody.

24             EVERYBODY:  Good morning.

25             THE COURT:  Let's cover a few jury selection matters.

1          In the last few days we have received requests to be

2     excused from four jurors and I've excused three of them.

3          Juror 105 contacted us a few -- contacted the jury

4     office a few days ago and indicated that there had been a

5     death of an immediate family member and so I excused

6     Juror 105.

7          Juror 103 contacted the jury office with a doctor

8     note that she was suffering from a serious medical condition

9     that would prevent her from participating in the trial.  So I

10    went ahead and excused Juror 103.

11         And Juror 64 also contacted the jury office with a

12    doctor's note indicating she had been ill the last several

13    days and would be unable to participate in the trial, so I

14    excused Juror 64 for that reason.

15         So Jurors 105, 103, and 64 will not be appearing

16    today.

17         We also received this morning a note from -- well,

18    from a doctor for Juror Number 68 and I think we should ask

19    some follow-up questions probably after we've excused the rest

20    of the jury panel.

21         Did you get a copy of the note regarding Juror 68?

22         MR. ROGERS:  Yes, Your Honor.

23         THE COURT:  So we ought to ask some follow-up

24    questions.

25         Did you see the other documents from the other

1    jurors?

2            MR. ROGERS:  Yes, Your Honor.

3            THE COURT:  Okay.  Any questions about that?

4            All right.  So we'll keep Juror 68 in the process and

5    follow up on the questions about that juror when we are going

6    through the jury selection.

7            MR. O'CONNOR:  Your Honor, while we're on jurors, can

8    I raise another issue?

9            THE COURT:  Yes.

10           MR. O'CONNOR:  Going through the people who are going

11   to be coming today, I found -- there might be more, but I

12   found at least two who I think we should probably ask

13   questions of in private.

14           And that was Juror 16.  She actually answered

15   "privacy" on a couple of responses.

16           I think the other one I believe we should consider

17   for a sidebar would be Juror Number 6.  If you remember he has

18   a bladder stimulator issue.  Rather than talking about that

19   up-front, we had raised that last time.

20           And then there is a Juror Number 44 who, again, set

21   forth "privacy" in a couple of answers on medical conditions.

22   And so I just wanted to bring that to the Court's attention.

23   I think it would be -- I would request that we not ask the

24   questions in front of the panel but we bring them up.

25           THE COURT:  Mr. Rogers, any disagreement with that?

1          MR. ROGERS:  No, Your Honor.  I think that is okay.

2          And I also have got one that we may also add to the

3    list if we're going to be questioning jurors outside of the

4    presence of the entire panel.  And that is Juror Number 59.

5    And, Your Honor, this gentleman indicated that he may have

6    difficulty applying the law as instructed due to an experience

7    where his sister experienced a wrongful death that they

8    attributed to her doctors.  And so I think we might need to

9    follow up with him and maybe we can do that outside of the

10   presence of the rest of the panel.

11         THE COURT:  Okay.  All right.

12         And I will keep that list of Juror 6, 16, 68 is the

13   one we got a note on today, 44, and 59 for jurors that I'll

14   ask to remain behind when we excuse the rest of the jury

15   panel.  And I will ask the question of the panel that I have

16   before, that if anybody would prefer to address an issue

17   privately, they can just tell us that and we'll add them to

18   the list of who we'll talk to after we excuse the main jury

19   panel.

20         Plaintiffs' counsel, do you have comments or

21   corrections on the voir dire questions?

22         MR. O'CONNOR:  None from us, Your Honor.

23         THE COURT:  How about from defense?

24         MR. ROGERS:  No, Your Honor.

25         THE COURT:  How about on the preliminary jury

1   instructions?

2          MR. O'CONNOR:  I don't think we had any issues.

3          MR. ROGERS:  None, Your Honor.

4          THE COURT:  All right.  Then I'll plan to ask those

5   voir dire questions and give the preliminary jury

6   instructions.

7          Plaintiffs' counsel, do you have other matters that

8   we ought to address before we get started this morning?

9          MR. LOPEZ:  Yes, Your Honor.  They deal with the

10  opening statement and one of the rulings issued I think

11  yesterday on deposition.  I don't know if that's something you

12  want to do after we pick a jury or whether you want to do it

13  now.

14         THE COURT:  Let's do it now.

15         MR. LOPEZ:  I think there are two issues.  Actually

16  what I'm doing, I'm dealing with the objections that defense

17  counsel had to two of our slides.  One of them has to do with

18  the document that you've now excluded, at least from

19  Janet Hudnall's testimony, users can be swayed by aggressive

20  marketing in spite of negative clinical experience, and I

21  think the basis of that was the defendants objecting to that

22  had something to do with failure to warn.  And I think I speak

23  for all of us, on our side we're confused about why that's a

24  warning issue, Your Honor, because it actually is a marketing

25  issue.  And you'll recall that the defendants filed a motion,

1   a motion in limine regarding marketing materials, and then

2   they withdrew it.  So that issue's still ripe in this case.

3           The other thing is that under the punitive damages

4   cases in Wisconsin, the jury may consider defendants' attitude

5   and conduct and the degree of defendants' awareness of the

6   hazards and the successiveness.  And this document is a staple

7   for the awareness this company has for negative clinical

8   experiences, yet they know they can still be successful

9   marketing the product with aggressive marketing.  I mean,

10  that's -- there's going to be evidence of that.  We have

11  actually someone who hasn't testified yet, Mr. Hug, who is now

12  their national sales something.  There's going to be a lot of

13  evidence about the way they market this device.

14          So I just -- I -- maybe for clarification for us, I

15  don't know why that's a warning issue.  And even if it was, we

16  wanted to take the warnings, all the things that dealt with

17  warnings and IFU out of the case.  It's the defendants'

18  position they want to be able to tout their warnings as part

19  of the fact that this thing's not negligently designed.

20          And what happens with warnings, there's a lot of case

21  law about this, and it also deals with learned intermediary

22  doctrine, but aggressive marketing can water down a warning.

23  So, in other words, if you have an IFU, they're going to say

24  doctors knew and there's an IFU, and you're marketing this

25  thing and you're not fairly balancing it, you -- you are

1    keeping away from, as part of your design and marketing of the

2    device, the fact that there's a negative clinical experience

3    and you're weighing heavily on marketing, and that just waters

4    down this IFU defense they have.

5         We just got hit with this yesterday with your order

6    and we're concerned that's not giving us a fair opportunity to

7    counter that part of their defense, the fact that they

8    think -- they're going to say their IFU and they've properly

9    advised doctors and they've withdrawn their marketing

10   materials on motion in limine.  It's one of the slides we

11   have.  I don't know whether you're kicking that document out

12   or just Mrs. Hudnall's testimony about it.

13        THE COURT:  Did you say there was a second issue?

14        MR. LOPEZ:  The other issue is that the defense --

15   there's a slide that deals with the Recovery migration to the

16   heart issue.  The slide I think that follows is an HHE, and

17   we've adopted the language in the HHE which calls what was

18   happening at that time catastrophic injuries.  They don't want

19   us to use that.  They want us to use a different word.  But in

20   the HHE, which includes both fractures with migrations to the

21   heart.  Like what happened to Mrs. Hyde, and it also includes

22   the migration or embolization of the entire device into the

23   heart, Dr. Ciavarella uses the term "catastrophic."  And

24   there's an issue about whether or not we can use "catastrophic

25   injuries reported" as it relates to the Recovery filter.

1          THE COURT:  Do you have copies of these slides?

2          MR. LOPEZ:  I do, Your Honor.

3          May I?

4          THE COURT:  All right.  Who from the defense side

5    would like to address these issues?

6          MR. LOPEZ:  Then there's some issues with their

7    slides.  We'll come back after that.

8          THE COURT:  Okay.

9          MR. ROGERS:  Your Honor, we -- as Mr. Lopez informed

10   the Court, we did have objections to three of their slides.

11   And the first thing that he brought up, your docket entry

12   12598, was the docket entry that dealt with Ms. Hudnall's

13   testimony, and the testimony about this document was excluded

14   under Rule 402.  And the objection was that it related to

15   failure to warn, and that objection was sustained.

16         And so, Your Honor, when we saw that this was in

17   their opening slide deck, it appeared to us that the Court was

18   inclined to exclude that evidence, and hence we objected.

19         And do you want me to continue, Your Honor, or do you

20   want to follow up?

21         THE COURT:  Did you want to address the other slide?

22         MR. ROGERS:  Yes, sir, I'll be glad to.

23         Your Honor, you've got these two slides.  The first

24   one, as you can see, up at the top it's got the header

25   "catastrophic injuries reported," and there are two

1  descriptions of two different incidents, both of which are

2  described as catastrophic.  And then the information below

3  them indicates that the entire filter migrated to the right

4  atrium or to the right ventricle.

5       And, Your Honor, even though this particular slide

6  does not mention the word death, we thought that it could

7  easily be discerned from the descriptor that the filter went

8  to the heart and that it was a catastrophic injury that it was

9  a death so we objected to that slide.  I was under the

10  impression with the third slide we had worked that out, but I

11  don't know if that's accurate.

12       MS. REED ZAIC:  It is.  We've withdrawn it.

13       MR. ROGERS:  It is.

14       Okay.  Thank you, Your Honor.

15       THE COURT:  Okay.

16       By my count I've reviewed 34 depositions in the last

17  week and a half.  All of them on weekends or evenings.  So I

18  can't say with confidence that I remember my precise thinking

19  on the Hudnall issue.  But let me explain to you the line I've

20  tried to draw.  And I don't know if we can resolve this this

21  morning or not or if we'll need more argument on it.

22       There is no failure-to-warn claim in the case so the

23  jury cannot find defendant liable for a failure to warn.

24       The jury cannot award punitive damages for a failure

25  to warn because the failure-to-warn claim is gone.

1              When defendants argued that they should be able to

2    put into evidence the IFU and the SIR guidelines, my initial

3    reaction was that is a warning and shouldn't be in the case.

4    But then as I read the Wisconsin statute and I read the

5    Restatement, although I know there's still a question of how

6    many of the comments of the Restatement are actually a part of

7    Wisconsin law that we have to work through on jury

8    instructions, I concluded that since the jury must decide

9    whether or not the product was not reasonably safe, that is

10   language right from the statute, it was relevant for the jury

11   to know what users of the product had been told about risks of

12   the product.

13             If I get a product and I'm not informed of a risk

14   that it has, it may be unreasonably dangerous to me because I

15   don't know of that risk and I'm going to fall prey to it.

16             But if I get a product with instructions or warnings

17   that say here's a risk of this product so that I can assess

18   it, deal with it, avoid it if I can, then it might not be

19   unreasonably dangerous.

20             I think that's the thinking behind the comment to

21   Restatement section 2.  And I concluded that since there are

22   risks with medical products, it was relevant for the jury to

23   understand what doctors had been told about those risks, and

24   patients, too, in deciding whether or not the product was not

25   reasonably safe.  That's why I let in the IFU and the SIR

1    guidelines -- well, that's why I let in the IFU.  I let in the
2    SIR guidelines because those guidelines talk about acceptable
3    levels of risk for filters.  Now, that's not law, but it's
4    something that comes from the medical community that uses it,
5    and I thought that's important perspective for a jury to have
6    in deciding whether this product was not reasonably safe:
7    What does the medical community view as a reasonable level of
8    risk with this product?
9         So my view was the IFU and the SIR guidelines both
10   went to the question of whether the product was not reasonably
11   safe.  Not that it went to failure to warn.  But that's why it
12   was relevant.
13        I then concluded, well, if the defendants are going
14   to be able to tell the jury, here's everything we told the
15   jury about risks, then plaintiffs should be able to say,
16   here's everything they didn't tell the jury about risks.  And
17   that's why I let in a lot of testimony in my deposition
18   rulings where the question was, "Were doctors informed of this
19   risk" or "Did you ever communicate this test result to
20   doctors."  And there's a lot of that evidence that I've
21   admitted for exactly that reason.  Because defendants are
22   going to stand up and say this wasn't an unreasonably
23   dangerous product because the medical community understood
24   these risks, plaintiffs should be able to say this was
25   unreasonably dangerous because the medical community did not

1    know about these risks.

2         That's all going to whether it's unreasonably

3    dangerous.  That's what I was trying to do when I went through

4    the depositions.

5         When I saw a question and an answer that seemed to me

6    to go to duty, namely a question of a witness, "Would you

7    agree that a medical manufacturing company has an obligation

8    to warn patients of everything it knows about risks," that, to

9    me, doesn't go to whether the product is unreasonably

10   dangerous, that goes to a duty to warn, and there is no breach

11   of a duty to warn claim in this case.  So I tried to exclude

12   questions that I thought went to duty.  Although I found it

13   was difficult sometimes to draw the line between a question

14   that talks about an undisclosed risk and a question that talks

15   about a duty.  But I did my best to do that.

16        When I came to the Hudnall questions where she was

17   talking about a marketing technique, that seemed to me to go

18   to the duty to warn or the failure-to-warn issue.  Because it

19   seemed to me what she was testifying about was how do we

20   market the product?  What's the pitch we make to doctors?

21   That seemed to me to go to whether or not the warnings that

22   were given as part of that pitch were adequate.  It wasn't

23   talking about test results or risks that weren't communicated,

24   it was what's our marketing technique.  And therefore that

25   seemed to me to fall on the duty to warn side of the line

1    rather than on the unreasonably dangerous side of the line.

2         Now, that's my best memory of why I concluded when I

3    came to those questions that they should be not admissible.

4         I'm not sure that I've drawn the line correctly.  I

5    did my best going through 34 deposition transcripts to do

6    that.

7         But it may be as we go through the trial and I hear

8    the evidence I'll conclude, no, I was too far to one side or

9    the other on the line.  But that was the rationale I was

10   using.

11        Because we're seven minutes to 9:00, what I think I'd

12   like to do on this issue is keep it under advisement.  Allow

13   the plaintiffs certainly to argue later to me that Hudnall's

14   memo and her testimony should come in because it goes to how

15   the product is not reasonably safe.  And I'll be happy to

16   think about it.  But that was my rationale at the time that I

17   made the decision.

18        So I think on the Hudnall evidence what we should do

19   is not include it in the opening, but I'll be happy to hear

20   further argument on why that really does go to the product

21   defect issue that the jury's going to have to decide.

22        By the way, one other thing to keep in mind.  I

23   understand the arguments that this testimony and similar

24   testimony goes to punitive damages.

25        My concern about that was there's lots of stuff about

1    a failure to warn that could go to punitive damages, and this

2    is not a failure-to-warn case.  So I tried again on punitive

3    damages evidence to tie it to what is the issue in the case,

4    product defect.  And in drawing a line between what was or was

5    not told to doctors, it seemed to me to be the same line.

6    Namely, when they were told of risks that's relevant to

7    unreasonable dangerousness.  When they were not told of risks,

8    that goes to it as well.  And to punitive damages.

9            And, finally, I was concerned about the law which

10   suggests that the conduct that gives rise to punitive damages

11   should be related to the conduct that gives rise to liability.

12   And so if we've got a wrongful or arguably wrongful marketing

13   technique six years before this defective product was sold,

14   I'm not sure it satisfies that law.

15           I say that so you can address my thinking as we argue

16   this further, but I don't think we have time to work through

17   all of that this morning, so --

18           MR. LOPEZ:  We do have a number --

19           THE COURT:  Let's leave Hudnall out.

20           On the catastrophic injury issue, I didn't understand

21   your point, Mr. Lopez, about the word catastrophic.

22           MR. LOPEZ:  We want to use it --

23           THE COURT:  I know.

24           MR. LOPEZ:  It's in the IFU and it talks about -- I'm

25   sorry, the HHE.

```
 1            THE COURT:  I heard you say that.  I didn't know what
 2   you mean by it's in the HHE.
 3            MR. LOPEZ:  It's described in the HHE as a
 4   catastrophic injury.  Plus -- and it does have the migratory
 5   deaths.  But keep in mind there were also deaths from a piece
 6   of the metal going into the heart.  That's a catastrophic
 7   injury.
 8            THE COURT:  Mr. Rogers, do you agree that the HHE
 9   uses the phrase "catastrophic injury"?
10            MR. ROGERS:  Yes, Your Honor, I believe it does.
11            THE COURT:  All right.  I'm going to allow you to use
12   that slide.
13            Okay.  Let's go through -- how many -- looks like you
14   have about 15 --
15            MR. LOPEZ:  I don't know how many he's agreed to.
16            THE COURT:  Well, figure that out before you talk to
17   me.
18        (Counsel conferring.)
19            THE COURT:  How many are there, Mr. Lopez?
20            MR. LOPEZ:  I don't know.  Probably a dozen.
21            MR. ROGERS:  Your Honor, I've got objections to over
22   25 slides, so I don't know how many we're talking about this
23   morning.
24            THE COURT:  Well, we've got four minutes.  We don't
25   have time to go through a dozen slides.
```

```
 1              MR. LOPEZ:  Could we do it before he gives his
 2    opening?
 3              THE COURT:  Well, yeah.  What I want to do is -- you
 4    really ought to be able to work out these issues.  We've had
 5    two trials.  You know my rulings, you know the evidence.  I'm
 6    going to charge you with having another conference about this.
 7    You ought to be able to work it it to a lower number.  But we'll
 8    take up the ones where you really can't reach agreement after
 9    we've picked the jury and before opening.
10              MR. LOPEZ:  All right.  That's fine, Your Honor.
11    Thank you.
12              THE COURT:  Okay.
13              Defense counsel, do you have matters to discuss
14    before we start with the jury this morning?
15              MR. ROGERS:  No, Your Honor.
16              THE COURT:  Okay.
17              We will go ahead and have the jurors come up.  We'll
18    get them seated.
19              Folks in the back, you're going to need to move so we
20    can seat jurors in those three rows behind, and we'll charge
21    into jury selection.  Thank you.
22              (Recess was taken from 8:30 to 9:19.  Proceedings resumed
23    in open court with the jury panel present.)
24              THE COURTROOM DEPUTY:  MDL case 2015-2641, Bard IVC
25    Filters Product Liability Litigation, jury trial for Lisa and
```

1    Mark Hyde.

2            Will the parties please announce.

3            MR. O'CONNOR:  Good morning.  Mark O'Connor for the

4    Plaintiffs, Lisa and Mark Hyde.

5            MR. LOPEZ:  Good morning.  Ramon Lopez also for the

6    Plaintiffs, Lisa and Mark Hyde.

7            MS. REED ZAIC:  Good morning.  Julia Reed Zaic for

8    the Plaintiffs Lisa and Mark Hyde.

9            MR. ROGERS:  Good morning.  I'm Jim Rogers on behalf

10   of Defendant C.R. Bard.

11           MS. HELM:  Good morning.  I'm Kate Helm on behalf of

12   the Defendants.

13           MR. CONDO:  Good morning.  Jim Condo on behalf of the

14   Defendants.

15           MR. DADIKA:  And good morning.  Greg Dadika from

16   C.R. Bard.

17           THE COURT:  All right.  Thank you, Counsel.

18           And good morning, ladies and gentlemen who are on the

19   jury panel.  Thank you all for being here this morning.

20           Our task this morning is going to be to choose a jury

21   that will consist of nine persons and that will hear and

22   decide this case that you've read something about in the

23   questionnaire that we sent to you.

24           And in order to accomplish that task this morning, we

25   are going to ask you some questions.  I'll ask a few general

1    questions at the beginning and then the lawyers may have

2    follow-up questions for you based on your questionnaires,

3    which we have reviewed and which will remain confidential.

4          And at the end of that process, which should take us

5    to about the noon hour, we will choose a jury and excuse the

6    rest of you.  We're going to do our best to get through this

7    as quickly as we can so those of you who are not seated on the

8    jury will be able to get back to your lives and the business

9    you need to take care of today.

10          We're going to ask you these questions in addition to

11    the information you've provided so that we can choose the most

12    fair and impartial jury possible to decide this case.

13          Please understand that the questions that are going

14    to be asked of you are not intended to embarrass you or to pry

15    unnecessarily into your personal affairs.  Each question is

16    designed to assist us in selecting the jury today.

17          Before we ask you any questions this morning, we're

18    going to place all of you under oath.  We do that to make sure

19    we have completely accurate information when we select the

20    jury in this case.  Obviously it is very important that you

21    answer the questions that are asked truthfully and completely.

22    Please do not withhold any information in order to be seated

23    on this jury.  Please be straightforward in your answers

24    rather than answering them in a way you think that I or the

25    lawyers would expect you to answer.

1          When I ask you a general question at the beginning of

2     this questioning, if your answer to the question is yes,

3     please raise your hand and I will then ask you a few follow-up

4     questions.

5          If your answer to a question is no, you don't have to

6     do anything.  We will assume that the answer was no by virtue

7     of the fact that you did not raise your hand.

8          I recognize that it might be difficult for you to

9     stand and speak in front of this large group.  It's not easy

10    to talk in front of a large group.  But please recognize that

11    all jurors are in the same situation and it is important that

12    you answer every question to which you have relevant

13    information.

14         If you would feel more comfortable responding to a

15    particular question in a less-public setting, just tell me

16    that and we'll wait and ask you that question after we've

17    excused the rest of the jury panel members this morning.

18         When I ask you follow-up questions or when the

19    lawyers ask you questions, they're not going to use your name,

20    they're going to use the number that you've been assigned.

21         The reason we do that is because this discussion we

22    have this morning will someday be on the public record,

23    available to anybody who wants to view it, and we don't want

24    your name with information you've disclosed about yourself in

25    the public record in this day of identity theft.  So we're

1    going to be a bit impersonal and refer to you by number, and

2    that way when somebody reads the transcript they'll have no

3    idea who provided the information, and that will help protect

4    your privacy.

5           All right.  With that preliminary instruction, I'm

6    going to ask those of you who are on the jury panel to please

7    stand to be sworn.

8           (The jury panel was sworn.)

9           THE COURT:  Okay.  Please be seated.

10          (The Court and the courtroom deputy confer.)

11          THE COURT:  As mentioned at the beginning, well, at

12   least the courtroom deputy mentioned it, my name is

13   Dave Campbell.  I'm a United States District Court Judge.

14          Traci Abraham is the courtroom deputy clerk.  She'll

15   be keeping us organized and on track during the trial.

16          Tricia Lyons is the court reporter.  She's taking

17   down everything that is said during the trial, and there will

18   be a second court reporter helping during the trial by the

19   name of Jennifer Pancratz.

20          My law clerks are Luci Davis, Janet Howe,

21   Jeff Kilmark, and Ahmad Al Dajani.

22          My judicial assistant is Nancy Outley.  You'll see

23   her coming in and out during the course of the trial.

24          Do any of you know me or any members of my staff on

25   any basis, social, professional, or otherwise?  If so, please

1   raise your hand.

2        I see no hands.

3        The plaintiffs are represented by a number of attorneys.

4        I'm going to ask you, if you would, Mr. O'Connor, to

5   stand again.

6        This is Mark O'Connor from the firm of

7   Gallagher & Kennedy.  He is going to be assisted by

8   Paul Stoller from the firm.  Mr. Stoller is in the back.

9        Plaintiffs are also represented by Ramon Lopez --

10       If you would stand.

11       -- and Josh Mankoff of the Lopez McHugh firm.

12       Julia Reed Zaic and Laura Smith from the

13   Heaviside Reed Zaic firm are also going to be involved.

14       And Stuart Goldenberg and Marlene Goldenberg of the

15   Goldenberg Law Firm are also going to be participating.

16            Do any of you know these attorneys on any basis?

17            I see no hands.

18            Okay.  Go ahead and have a seat.

19            Mr. O'Connor, could you introduce your clients,

20   please.

21            MR. O'CONNOR:  Yes, Your Honor.  Thank you.

22            Lisa Hyde and Mark Hyde.  Would you please stand up.

23            THE COURT:  All right.  Do any of you know the Hydes

24   on any basis?

25            I see no hands.

```
 1              Okay.  Thank you.  You can be seated.
 2              Defendants are represented in this case by
 3   James Condo from the firm of Snell & Wilmer.
 4              If you would stand.
 5              James Rogers, who is also standing.
 6              And Matthew Lerner, Elizabeth Helm, and Richard North
 7   from the firm of Nelson Mullins Riley & Scarborough.
 8              Do any of you know these individuals on any basis?
 9              All right.  Mr. Rogers, could you introduce the
10   others who are with you at counsel table.
11              MR. ROGERS:  I'd be glad to, Your Honor.
12              With me today is Kate Helm.  We're both with the law
13   firm of Nelson Mullins.
14              THE COURT:  They actually -- she stood while you were
15   looking that way.
16              MR. ROGERS:  Thank you, Your Honor.
17              With us today -- would you please stand -- is
18   Mr. Greg Dadika from C.R. Bard.
19              And, Your Honor, I also want to let the jurors know
20   that at some point Mr. Dadika will have to leave and we will
21   have another attorney here who is with C.R. Bard, and her name
22   is Candace Camarata.
23              THE COURT:  All right.  And the other gentlemen,
24   would you introduce them too.
25              MR. ROGERS:  With us today, too, are Mark Gerard and
```

1    Mark Linder.

2          THE COURT:  All right.  Do you know any of these

3    individuals on any basis?

4          I see no hands.

5          Downstairs in the jury room you should have been

6    handed a list of witnesses who may testify in the trial.  We

7    don't think all of them will, but a lot of them will.

8          Do any of you think you might know any of the persons

9    who are listed on that witness list?  If so, please raise your

10   hand.

11         Hold on just a minute, sir, we're going to bring you

12   a mic.

13         And if you could stand up and identify yourself by

14   your juror number.

15         PROSPECTIVE JUROR:  Juror 29.  It seems unlikely, but

16   Mark Wilson.  I work with someone named Mark Wilson.

17         THE COURT:  Okay.  Counsel, where is the Mark Wilson

18   witness?

19         Sir, do you work with him here in Arizona?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Is Mark Wilson from Arizona?

22         MR. ROGERS:  Yes, Your Honor.

23         Take it back.  Ms. Helm is telling me he's not.  He's

24   a Bard employee.

25         PROSPECTIVE JUROR:  Oh.  No.

1          THE COURT:  Okay.  So if he's a Bard employee, you

2     don't know him; is that correct?

3          PROSPECTIVE JUROR:  That's correct.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  Juror Number 28.  And also seems

6     unlikely, but I do work with a physician named John Wheeler

7     that is listed on the sheet.

8          THE COURT:  Okay.  Counsel, any information?

9          MR. ROGERS:  Your Honor, he is also a Bard employee

10    and is not a doctor.

11         THE COURT:  Okay.  Thanks.  That takes care of that.

12         Does anybody else recognize any names on the witness

13    list?

14         I see no other hands.

15         I didn't mention it, ladies and gentlemen, but I

16    will.  We're going to take a break about midway through the

17    morning, probably about 10:30, for 15 minutes.  Just so you

18    know we're not going to go straight through to noon.

19         We recognize, ladies and gentlemen, that jury service

20    is probably an inconvenience for you, taking you away from

21    your jobs and families and disrupting your daily routine.

22         Jury service is, however, one of the most important

23    duties that citizens of this country can perform.  In fact, we

24    have a right to jury in the Constitution of the United States

25    just because of its importance in our justice system.

1          For this reason, from time to time we ask citizens to

2    make sacrifices and serve on juries even when inconvenient.

3    Prospective jurors can be excused from jury service if the

4    length of the trial or the daily schedule would impose an

5    undue hardship.  By undue hardship, I mean more than

6    inconvenience.  I mean a genuine hardship that would be

7    experienced by you or your family.

8          This trial, as I think we indicated in the

9    questionnaire, is expected to last three weeks.  The specific

10   days we are going to be in trial are the following:  We're

11   going to be in trial today, for whoever is seated on the jury,

12   through probably 4:30 today; tomorrow, Thursday, and Friday.

13   So the next three days of this week.

14         Next week we're going to start on Monday midday,

15   about 12:30 or 1:00 because of a conflict in the morning.  So

16   we'll go Monday afternoon, and then Tuesday through Friday

17   next week with full days.

18         And the week after that we will go the full week,

19   October 1st through October 5th.

20         We have timed the trial.  We've allocated time.  We

21   are confident we will get the trial done by October 5th.

22         But it will probably go up to the 4th or 5th.

23         The daily schedule will be to start at 9 o'clock in

24   the morning.  We will go until noon, take a one-hour break for

25   lunch, resume at 1:00, and go until about 4:30 in the

1    afternoon, and we'll take a 15-minute break in the morning or

2    the afternoon.

3              I know we asked you in the questionnaire whether this

4    would be a hardship and those of you who are here didn't

5    indicate it would be or, if so, we wanted to ask follow-up

6    questions.  So my question to you now is whether this schedule

7    or the daily duration of the trial would create an undue

8    hardship for any of you.  If so, please raise your hand.

9              Just identify your number, if you would, sir.

10             PROSPECTIVE JUROR:  Number 2.

11             THE COURT:  Go ahead and tell us the issues.

12             PROSPECTIVE JUROR:  I attend college and I'm just a

13   little concerned of how I'm going to keep up with the

14   classwork for three weeks.

15             THE COURT:  Are you in college this semester?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  What kind of schedule do you have?

18             PROSPECTIVE JUROR:  Tuesday and Thursday I go for

19   like 8:00 to 12:00.

20             THE COURT:  Okay.  How many classes are you taking?

21             PROSPECTIVE JUROR:  Two.

22             THE COURT:  Is there any arrangement that can be

23   made -- is that the kind of college you can listen later

24   online or do you have to be in class?

25             PROSPECTIVE JUROR:  I currently already paid for the

1    semester, so I don't know how it would be refunded for that.

2            THE COURT:  Okay.  All right.  Thanks for that

3    information.

4            PROSPECTIVE JUROR:  Juror 5.  Just have a trip

5    planned to California at the end of the month.

6            THE COURT:  When were you going to go?

7            PROSPECTIVE JUROR:  The last week of the month.

8            THE COURT:  Of September?

9            PROSPECTIVE JUROR:  Of this month, yes.

10           THE COURT:  Is this a trip that can be rescheduled?

11           PROSPECTIVE JUROR:  Yeah, I imagine so, but there's

12   already, like, stuff paid for for a fishing trip.

13           THE COURT:  Okay.  Thanks for that information.

14           PROSPECTIVE JUROR:  Juror Number 28.  And I have

15   young children that will be going on fall break that last --

16   that first week of October and it would require me to get a

17   babysitter during that time.

18           THE COURT:  That's -- what week is that?

19           PROSPECTIVE JUROR:  The first week of October.

20           THE COURT:  Okay.  And is that something that could

21   be arranged for?

22           PROSPECTIVE JUROR:  Could be arranged, but I'd prefer

23   not to have to with little kids.

24           THE COURT:  Okay.  Would it create a particular

25   hardship for you to do that?

1          PROSPECTIVE JUROR:  It would be just an extra

2    financial expense that would be required.

3          THE COURT:  Okay.  Thanks for that information.

4          PROSPECTIVE JUROR:  Juror Number 21.  I'm a single

5    mother with a three-month-old child and my mother's taking

6    care of him, but I work and generally she already takes care

7    of him those days, and then having to have her take care of

8    him extra days, I cannot financially pay her more than what I

9    do.

10          THE COURT:  I'm sorry, I can't hear what you're

11    saying.  Can you speak a little louder.

12          PROSPECTIVE JUROR:  I'm a single mother with a

13    three-month-old son and I have to take care of him.  And my

14    mom already takes care of him during the week for the days

15    that I do work, and she just found out yesterday that she's

16    going to be soon getting a blood transfusion as well, so she's

17    going to have to recuperate from that, and asking her for the

18    extra time to watch my son is really hard.

19          THE COURT:  Okay.  Do you know when that medical

20    procedure is going to occur?

21          PROSPECTIVE JUROR:  Sometime within the next few

22    weeks is what I've been told.

23          THE COURT:  When that happens, would she be unable to

24    care for your son?

25          PROSPECTIVE JUROR:  It's just -- yeah.  Basically.

```
 1              THE COURT:  Okay.  Thank you for that information.
 2              PROSPECTIVE JUROR:  62.  I just started a job
 3    recently where I provide care and transportation to two
 4    children with autism, and that's Monday, Wednesday, and
 5    Thursdays.  So I take them to school and then I pick them up.
 6    And that's because nobody else can take them and pick them up.
 7              THE COURT:  And what are the times when you need to
 8    be on that job?
 9              PROSPECTIVE JUROR:  I drop them off about 8:15 in the
10    morning and then I have to pick them up around 3:15, 3:10.
11              THE COURT:  Okay.  Thanks for that information.
12              PROSPECTIVE JUROR:  Juror Number 68.  I found out
13    middle of last week that the doctors finally come to a
14    conclusion.  My wife has to move out this area or lose her
15    lungs, and we're in the process of moving.  I need to do that
16    immediately.
17              THE COURT:  Okay.  We saw --
18              PROSPECTIVE JUROR:  Letter to that effect.
19              THE COURT:  Yeah.  We saw the doctor's letter.  It
20    didn't have any timing in it.  That was going to be our
21    follow-up question to you.  How soon do you need to act on
22    that?
23              PROSPECTIVE JUROR:  As soon as possible.
24              THE COURT:  So that is something you're going to be
25    doing in the next few weeks?
```

1          PROSPECTIVE JUROR:  Already started packing.

2          THE COURT:  Okay.  Thanks for that information.

3          PROSPECTIVE JUROR:  Juror 70.  My personal vehicle

4    broke down on Sunday, and in order to make it up here in a

5    timely manner I had to rent a vehicle, and with the priority

6    that the mechanic has put on my vehicle, I don't know if I'll

7    be able to get it back any time soon.  And I live more than

8    170 miles away.

9          THE COURT:  Okay.  Thanks for that information.

10         PROSPECTIVE JUROR:  Juror 106.  I recently graduated

11   college and I'm doing my job hunt right now and I have

12   interviews that I have to attend to, and I feel that this jury

13   duty would interfere with me finding a job opportunity.

14         THE COURT:  Do you have interviews scheduled?

15         PROSPECTIVE JUROR:  Yes, I have an interview

16   scheduled on Thursday.

17         THE COURT:  Okay.  Is that during the workday?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Okay.  Thanks for that information.

20         All right.  I will take that information into

21   account, ladies and gentlemen, when we are picking the jury in

22   this case.

23         Do any of you have any other reasons, such as a

24   physical difficulty, or a health problem or home problem that

25   would interfere with your ability to serve on this jury?

1            PROSPECTIVE JUROR:  Juror Number 3.  I have a hard

2      time hearing, and just in this -- this morning when the

3      attorneys were giving their names, I missed half their names.

4      When this young lady and this gentleman was talking, I didn't

5      understand a word that they said.

6            THE COURT:  We might be able to help.

7            PROSPECTIVE JUROR:  Okay.

8            THE COURT:  Try this.

9            PROSPECTIVE JUROR:  And when people talk -- besides

10     this, if someone's talking, their back to me, I'm going to

11     lose half the stuff they said unless they're really talking

12     loud.  If they talk low, I will lose that conversation as

13     well.

14           THE COURT:  Okay.  We're going to have people talking

15     into mics.  Why don't you put that on right now.  Goes just

16     like that.

17           Is that better?  Can you --

18           PROSPECTIVE JUROR:  Certainly hear you now.

19           THE COURT:  Okay.  We'll keep people talking in the

20     mics and, if at any time something is happening and you can't

21     hear, raise your hand and we'll fix it.

22           PROSPECTIVE JUROR:  I will do that.

23           THE COURT:  Okay.

24           PROSPECTIVE JUROR:  Juror Number 6.  I do have a

25     stimulator, a bladder stimulator.  It may require a couple of

1    bathroom breaks.  But if we can do a break like every two and

2    a half hours, I don't think I'd have any problem.  I wanted

3    you to be aware of that.

4             THE COURT:  Okay.  We should be taking a break every

5    hour and a half or hour and 45 minutes.

6             PROSPECTIVE JUROR:  Fantastic.

7             THE COURT:  Again, if that becomes an issue, raise

8    your hand and we'll be happy to take a break.

9             PROSPECTIVE JUROR:  Juror 15.  I have the same

10   problem Juror 3 has.  I have hearing aids in right now.  But

11   half the people that are talking this morning, I can't hear a

12   word they're saying.

13            THE COURT:  Let's see if this helps.  Let's try this.

14            This is not an uncommon problem in this courtroom.

15            We'll just wait to see if this helps.

16            All right.  Can you hear me --

17            PROSPECTIVE JUROR:  Yes.

18            THE COURT:  Sorry, about that.  That dial on the

19   front controls volume, so you can turn it down if you need to.

20   And if at any time you're having trouble hearing, raise your

21   hand.

22            PROSPECTIVE JUROR:   (Thumbs-up gesture)

23            THE COURT:  By the way, Jurors 3 and 16 -- or 15, I'm

24   sorry, those batteries don't last forever.  So you might hear

25   it starting to fade.  Raise your hand.  As you can see, we've

1    got another bunch up here and we'll give you a fresh one.

2            Yes, ma'am.

3            PROSPECTIVE JUROR:  I'm Juror 31.  I too, have nerve

4    deafness in my left ear from birth, so my right ear is very

5    good, I can hear, but depending on where they're sitting on my

6    left side, I can barely hear.

7            THE COURT:  Why don't we try this with you as well.

8            PROSPECTIVE JUROR:  Okay.

9            THE COURT:  All right.  Can you hear us there?

10           PROSPECTIVE JUROR:  Very good.

11           THE COURT:  Okay.  If that becomes difficult to hear,

12   just raise your hand.

13           PROSPECTIVE JUROR:  (Thumbs-up gesture)

14           THE COURT:  Any other responses?

15           Yes, sir?

16           PROSPECTIVE JUROR:  Juror 51.  I have a doctor

17   appointment Thursday afternoon at 4 o'clock.

18           THE COURT:  Okay.  Is that something that can be

19   rescheduled?

20           PROSPECTIVE JUROR:  It's for blood pressure medicine,

21   so I -- they missed the appointment in the last week, so I

22   probably should get to it.

23           THE COURT:  Okay.  Thanks for that information.

24           PROSPECTIVE JUROR:  Number 68.  It's not a physical

25   ailment, but I feel that you need to know that I've had

1    information from the Bard system before with my youngest son

2    and --

3                THE COURT:  Let me go ahead and interrupt you,

4    Juror 68.  I'm going to excuse you at the end of the morning

5    so you can take care of your wife.  I'll just let you know

6    that.

7                PROSPECTIVE JUROR:  Hello.  I'm Number 85.  I, too,

8    need a hearing device.

9                THE COURT:  Okay.  We've got another one.

10               How does that sound?

11               PROSPECTIVE JUROR:  (Two thumbs-up gesture)

12               THE COURT:  Okay.  Great.

13               Any other responses?

14               All right.  One of the questions, ladies and

15   gentlemen, that I'll ask you at the end of the morning is

16   whether you know any member of the jury panel.  So as folks

17   are standing, just kind of take note of them.  Because we'll

18   want to know if any of you have a preexisting relationship so

19   that I can ask you some questions if you happen to know any

20   member of the jury panel.

21               My last question to you before we turn it over to the

22   lawyers is this:  Have any of you done any research or been

23   exposed to any information about this case since you filled

24   out your jury questionnaire?  If so, please raise your hand.

25               I see no hands.

1             All right.  Plaintiffs' counsel, let's go ahead with
2     your questions.
3             MR. O'CONNOR:  Thank you, Your Honor.
4             Your Honor, by the way, this is David Wenner and
5     John Campbell, who will be assisting us at this part of the
6     trial.
7             THE COURT:  Okay.  Say that into the mic.
8             MR. O'CONNOR:  I'm sorry.  David Wenner and
9     John Campbell.
10            THE COURT:  Do any of you know these individuals on
11    any basis?
12            I see no hands.
13            Okay.  Go ahead, Mr. O'Connor.
14            MR. O'CONNOR:  Thank you.
15            Again, my name is Mark O'Connor and I'm one of the
16    lawyers representing Lisa and Mark Hyde, or the plaintiffs in
17    this case.  I'm going to ask you some follow-up questions on
18    what you answered in your questionnaire.  And what I'd like
19    you to understand is that the intent of my questions is not to
20    cause you embarrassment.  We're just trying to understand so
21    that we can understand who will be fair and impartial in this
22    case.  There may be other cases that anybody can be fair and
23    impartial, but that's the purpose of my questions, just to
24    question you and follow up on answers to your questionnaires.
25            So I'll start off with Number 2.

1              I thought I saw that you had some fire science

2       training.

3              PROSPECTIVE JUROR:  That's correct.

4              MR. O'CONNOR:  And did that involve training in any

5       type of medical care?

6              PROSPECTIVE JUROR:  Yes.  I currently have my EMT.

7              MR. O'CONNOR:  And in the course of that training,

8       did you receive information about blood clots or IVC filters?

9              PROSPECTIVE JUROR:  Yes.  There's a chapter on blood

10      clots.

11             MR. O'CONNOR:  Are you going to have any difficulty

12      setting aside what you learned in those classes in this case

13      when you hear the evidence which will involve medical

14      evidence?

15             PROSPECTIVE JUROR:  I don't think it will be a

16      problem.

17             MR. O'CONNOR:  I saw that in response to a question

18      that you have a less favorable view about personal injury

19      attorneys and a bit of a higher favorable view for medical

20      device companies.  Do you recall that answer?

21             PROSPECTIVE JUROR:  Yes.

22             MR. O'CONNOR:  Have you had an experience with a

23      personal injury attorney in the past?

24             PROSPECTIVE JUROR:  No.

25             MR. O'CONNOR:  But do you recall that answer, is that

```
 1    right, Number 2?
 2              PROSPECTIVE JUROR:  That's correct.
 3              MR. O'CONNOR:  Obviously the Hydes are represented by
 4    lawyers who are personal injury lawyers.  I'm a personal
 5    injury lawyer.  And the other side is a medical device
 6    company.  Is our side starting out with you leaning slightly
 7    against us as we go into this trial?
 8              PROSPECTIVE JUROR:  Yes.
 9              MR. O'CONNOR:  In other words, you felt this way long
10    before you came here, that you have less than favorable views
11    about plaintiff attorneys?
12              PROSPECTIVE JUROR:  That's correct.
13              THE COURT:  Mr. O'Connor, let me interrupt for a
14    minute.  I'm glad you asked this question because this is
15    something that I'd like all of the jurors to consider.
16              Juror Number 2, every one of us in this room have
17    life experiences or opinions that could influence a decision
18    in the case if we allowed them to and if we took them into
19    account.
20              We're going to ask jurors to set aside their personal
21    opinions, any biases or preferences or prejudices, and not
22    consider those, but to decide this case solely on the basis of
23    the evidence and the law that they hear during the trial.
24              Do you think you would be able to do that?  Or would
25    that be difficult for you to do?
```

1          PROSPECTIVE JUROR:  I think I could probably set

2    aside my opinions.

3          THE COURT:  Okay.

4          That's the question that all of you should keep in

5    mind.  Mr. O'Connor can inquire into any of them, but the

6    question at the end of the day that I'll ask, if he doesn't,

7    he probably will, is can you set aside those personal views

8    and opinions and not decide on the basis of those, but decide

9    on the basis of the facts and the evidence that you will hear.

10         And you think you could do that, Juror 2?

11         PROSPECTIVE JUROR:  I do, yes.

12         THE COURT:  Okay.  Go ahead, Mr. O'Connor.

13         MR. O'CONNOR:  Thank you.

14         And I appreciate that, Number 2.  But my question's a

15   little different just in response to your answer about

16   personal injury lawyers.  Do you feel, even though you

17   certainly intend to be neutral in this case, that that feeling

18   that you have that is less than favorable about personal

19   injury attorneys could affect how you listen to evidence and

20   affect your feelings about the parties in this case?

21         PROSPECTIVE JUROR:  Just going into it, I feel like

22   it kind of affects it, but I'm willing to be open during the

23   case and hear both sides.

24         MR. O'CONNOR:  All right.

25         You had indicated that you -- you mentioned that

1   you're against frivolous lawsuits.  Do you recall that

2   response?

3           PROSPECTIVE JUROR:  Yes.

4           MR. O'CONNOR:  And, again, do you feel that simply

5   because a party has brought a claim into court that it's

6   frivolous?

7           PROSPECTIVE JUROR:  No.

8           MR. O'CONNOR:  When you talk about frivolous

9   lawsuits, can you tell me what you mean?

10           PROSPECTIVE JUROR:  Just I've seen a lot of lawsuits

11   that I feel like people are just trying to get money for.

12   They don't really have cause for why they're trying to

13   actually get the money.

14           MR. O'CONNOR:  All right.  Well, this is going to be

15   a case where the plaintiffs are going to be requesting an

16   award that will involve money damages.  Is that difficult for

17   you to sit down and listen and hear and deliberate on a case

18   where money damages are going to be asked for?

19           PROSPECTIVE JUROR:  Yes, it would.

20           MR. O'CONNOR:  It will be difficult?

21           PROSPECTIVE JUROR:  Yes.

22           MR. O'CONNOR:  And do you think, knowing that this is

23   a case that involves money damages that, again, that we, the

24   plaintiffs -- you're starting leaning against us, knowing that

25   about our part of the case?

1          PROSPECTIVE JUROR:  That's correct.

2          MR. O'CONNOR:  And will that affect your ability to

3     be less than neutral when considering the case of Mr. and

4     Mrs Hyde?

5          PROSPECTIVE JUROR:  It could potentially be.  But,

6     again, I'm willing to listen to both sides during the trial.

7          MR. O'CONNOR:  But in fairness, as you said, starting

8     right now, your feelings, you're leaning against our side, the

9     plaintiff side.  Is that fair?

10          PROSPECTIVE JUROR:  Yes.

11          MR. O'CONNOR:  Thank you.

12          Number 3.

13          Can you hear me okay?

14          PROSPECTIVE JUROR:  I can hear you fine.

15          MR. O'CONNOR:  Thanks.  And thank you for coming

16     today.

17          I think you said that you believe that there should

18     be legislative limitations or caps on damages in response to

19     your questionnaire.

20          PROSPECTIVE JUROR:  I do.

21          MR. O'CONNOR:  And is that a feeling and opinion you

22     developed before you ever came to this courtroom?

23          PROSPECTIVE JUROR:  Yes.

24          MR. O'CONNOR:  You felt, I thought, that you feel

25     there's extreme awards out there.

1              PROSPECTIVE JUROR:  Definitely, yes.

2              MR. O'CONNOR:  Does that mean in your mind, sir, that

3     you think that no matter what the case is that there should be

4     a limitation on how much people should be able to recover?

5              PROSPECTIVE JUROR:  I think it should be -- like I

6     say, not frivolous.  Can I give an example?

7              MR. O'CONNOR:  Sure.  Please.

8              PROSPECTIVE JUROR:  I read the paper, I watch the

9     news, I watch a lot of television, and you see sometimes cases

10    people are given 4-, 5-, $600 million, 30-, 40 million, in my

11    opinion that they'll never collect on that from the company

12    because I think they'll appeal and it will go on and it's not

13    helping those people.

14             I think if the award is within a reasonable amount,

15    not an excessive amount, the people that are suing and if they

16    win the case they can get their money quicker and go on with

17    their lives.

18             MR. O'CONNOR:  Thank you.  I appreciate that, sir.

19             Now, at the end of this case, the lawyers that

20    represent the plaintiffs, we will be asking for an award that

21    we believe is fair.  But is it conceivable that we may ask for

22    an amount that we believe is fair but you may, because of your

23    feelings that you brought here to court, feel that that is

24    just too high and despite what the law is, you could not award

25    that?

```
 1              PROSPECTIVE JUROR:  I have to hear the case, to be
 2    perfectly honest.  You have to hear what it is.  Yeah, if it's
 3    an excessive award I may not necessarily vote against the
 4    plaintiff or whatever, but I would take that into
 5    consideration of -- like I said, I have to hear the case.  If
 6    it's negligence or however you want to put it, then I may
 7    consider it, but extreme or excessive awards, I don't believe
 8    in.
 9              MR. O'CONNOR:  Knowing that we are on the plaintiff
10    side, the side that is claiming damages in this case, are we
11    starting out in sort of an uphill climb with you?
12              PROSPECTIVE JUROR:  I don't believe you are.  No.  I
13    can be objective on this.
14              MR. O'CONNOR:  All right.  Is there any feeling that
15    you may be leaning against us --
16              PROSPECTIVE JUROR:  No.
17              MR. O'CONNOR:  -- or being suspicious because we are
18    going to be asking for damages?
19              PROSPECTIVE JUROR:  No.  None whatsoever.
20              MR. O'CONNOR:  All right.  Thank you.  Appreciate
21    that.
22              Juror Number 6.  How are you, sir?  Thank you for
23    coming down here today.
24              I thought I read in your answers that you have very
25    strong feelings in favor of corporations.  Did I read that
```

1    correctly?

2            PROSPECTIVE JUROR:  I don't think so.

3            MR. O'CONNOR:  In terms of -- you, I think, told us

4    before that you have received -- have you received a medical

5    device?

6            PROSPECTIVE JUROR:  Yes.  It's Medtronics.  It's a

7    small computer about the size of a pack of cigarettes.  It's a

8    bladder stimulator, and it's inserted into my lower back.

9            MR. O'CONNOR:  Does your experience with your medical

10   device, does that affect your ability to hear a case involving

11   a medical device?

12           PROSPECTIVE JUROR:  No, not at all.

13           MR. O'CONNOR:  Do you have a more favorable view of a

14   medical device company such as Bard, who is a party in this

15   case?

16           PROSPECTIVE JUROR:  I don't think so at all.

17           MR. O'CONNOR:  Is there anything that you think of

18   that is going to affect your ability in this case to be fair

19   and impartial?

20           PROSPECTIVE JUROR:  No, I think I'd be fair and

21   impartial.

22           MR. O'CONNOR:  And I don't want to get too far about

23   the things you told us before.  Is there anything that you

24   feel about your condition that may cause you to be distracted

25   or not be able to give us your full attention?

1          PROSPECTIVE JUROR:  I don't think so.  As long as we

2    had a break every two hours, two and a half hours.

3          MR. O'CONNOR:  We need those too.

4          Thank you.

5          THE COURT:  Thank you, Juror 6.

6          MR. O'CONNOR:  Thank you, sir.

7          Number 16.  Good morning.

8          And thank you.  Thank you for completing your

9    questionnaire and for being forthright with us and understand,

10   again, that my questions are just to follow up with you on

11   your feelings.

12         You have strong feelings against plaintiff --

13   personal injury attorneys; is that correct?

14         PROSPECTIVE JUROR:  Yes.

15         MR. O'CONNOR:  And it sounds as though that is

16   something that you've carried with you and --

17         PROSPECTIVE JUROR:  For the last 30 years.  I worked

18   in the emergency room for ten, 15 years.

19         MR. O'CONNOR:  I also saw that you have concerns

20   about frivolous lawsuits.

21         PROSPECTIVE JUROR:  Who?

22         MR. O'CONNOR:  Did you talk about in your answer

23   about greedy attorneys that you feel personal injury --

24         PROSPECTIVE JUROR:  No, I didn't -- everything on the

25   survey was personal.

1          MR. O'CONNOR:  Okay.  But you understand that the

2     plaintiffs in this case, Lisa Hyde and Mark Hyde, they're

3     represented by lawyers, us, and we're personal injury lawyers?

4          PROSPECTIVE JUROR:  Sure.  I have nothing against

5     personal injury lawyers, but in cases where it matters.  But

6     it's -- not matters, but -- I'm strongly pro medical devices

7     because that's what helps thousands and thousands and millions

8     of people to go on with their lives.  Every day you get in the

9     car, you don't know whether you get out of it.  And yet you

10    get in the car anyway.  You know, everything that is there

11    when you get behind the wheel and you get anywhere because

12    you're hoping you're going to get to the different

13    destination.

14         The same thing with medical devices.  That's my

15    opinion, though.  You're trying to improve your life.  You're

16    trying to live longer.  They develop those devices, but not

17    everything can be perfect in this world.  So, yes --

18         MR. O'CONNOR:  So as you started this case, you have

19    strong feelings in favor of medical device companies.

20         PROSPECTIVE JUROR:  Yes.  They prolong our lives and

21    they help us every single day of our lives.  People live

22    longer.  And if this person is alive and well, there is no

23    point to this case, in my opinion.

24         MR. O'CONNOR:  And you also felt there's too many

25    lawsuits being filed?  Did I understand your answer correctly?

1          PROSPECTIVE JUROR:  I didn't -- no.  See, everybody

2     makes mistakes.  It depends, of course, on the mistake,

3     whether it's worth to be sued, but against the company who is

4     trying to improve our lives, who is trying to make us function

5     more, who's trying to keep us with our families longer, I

6     don't see why it needs to be done.

7          MR. O'CONNOR:  All right.  Is it fair to say that

8     right now, as you sit here, based upon the feelings that

9     you've developed long before you came here that --

10          PROSPECTIVE JUROR:  30 years ago.

11          MR. O'CONNOR:  -- you will favor the medical device

12     company in this case?

13          PROSPECTIVE JUROR:  Yes.

14          MR. O'CONNOR:  And is it also fair that the party

15     here, the plaintiffs that brought the claim against the

16     medical device, you're leaning and have feelings that you

17     can't be as neutral with that party as you can --

18          PROSPECTIVE JUROR:  Yes.  I won't be neutral.  I

19     cannot be.

20          MR. O'CONNOR:  So you cannot be fair and impartial.

21     Is that fair?

22          PROSPECTIVE JUROR:  Yes.

23          MR. O'CONNOR:  Thank you.  I appreciate that.

24          PROSPECTIVE JUROR:  You're welcome.

25          MR. O'CONNOR:  Number 20.

1              You answered some questions about your grandmother.

2    Do you recall that?

3              PROSPECTIVE JUROR:  Yes, sir.

4              MR. O'CONNOR:  Is that something that you would

5    rather talk about privately?

6              PROSPECTIVE JUROR:  No, I'm open to talk about it.

7              MR. O'CONNOR:  I thought you said that your

8    grandmother received an IVC filter.

9              PROSPECTIVE JUROR:  She has, yes.  She had.

10             MR. O'CONNOR:  And I'm sorry about your loss.

11             PROSPECTIVE JUROR:  Thank you.

12             MR. O'CONNOR:  Do you know the company that made that

13   IVC filter?

14             PROSPECTIVE JUROR:  I do not.

15             MR. O'CONNOR:  But my reading of your questionnaire

16   is that you feel strongly in favor of medical device companies

17   that make filters because of your grandmother's experience.

18             PROSPECTIVE JUROR:  That's correct.

19             MR. O'CONNOR:  And is it fair to say that that

20   feeling is something that you bring here to court today?

21             PROSPECTIVE JUROR:  Yes.

22             MR. O'CONNOR:  Do you think that knowing that there's

23   a plaintiff, the plaintiffs here are bringing a claim against

24   a medical device company, that as we're starting out you feel

25   strongly in favor of the medical device company compared to

```
1    the party bringing the lawsuit?
2            PROSPECTIVE JUROR:  I do, just because I've had a
3    first-hand experience with the exact product we're talking
4    about.
5            MR. O'CONNOR:  And that's fair, and I appreciate
6    that, and it sounds like what you're saying is you can't set
7    that experience aside when you hear evidence in this case.  Is
8    that fair?
9            PROSPECTIVE JUROR:  It's fair.  It's difficult.
10           MR. O'CONNOR:  And it sounds that you just -- as much
11   as you'd like to, you can't be neutral in this case?
12           PROSPECTIVE JUROR:  It would be difficult for me.
13           MR. O'CONNOR:  So while certainly there's other cases
14   you can be fair and impartial, is it fair to say that this is
15   one that you cannot be fair and impartial?
16           PROSPECTIVE JUROR:  I would agree with that just
17   because of the specific product that I've actually, you know,
18   had experience with.
19           MR. O'CONNOR:  I appreciate your answer.  Thank you.
20           PROSPECTIVE JUROR:  Thank you.
21           MR. O'CONNOR:  Number 21.
22           I just have a couple questions for you.
23           I noticed, looking at your responses to the
24   questionnaire, and I appreciate you being forthright, but I
25   thought you said in a question about whether you could be a
```

1    fair and impartial juror you just didn't understand the

2    dynamics of this lawsuit.  Do you recall that answer?

3              PROSPECTIVE JUROR:  Yes.

4              MR. O'CONNOR:  Could you explain what you meant?

5              PROSPECTIVE JUROR:  I've never personally had an

6    experience with anyone in my family or friends that have had

7    any filters or any devices put in them so I don't -- I never

8    really researched it and I don't fully understand some things

9    that they're there for or what they exactly do.

10             MR. O'CONNOR:  There's going to be evidence in this

11   case that will explain a lot about filters and lot about blood

12   disorders.  Are you able to listen to that evidence?

13             PROSPECTIVE JUROR:  Yes.

14             MR. O'CONNOR:  And sounds as though that whatever you

15   answered in your questionnaire, that you feel that you can be

16   fair and impartial in this case?

17             PROSPECTIVE JUROR:  Yeah.  If it's really explained

18   and I can understand it, then yes.

19             MR. O'CONNOR:  Is there anything that you saw when

20   you read the questionnaire that you thought that bothers you

21   or thought that, you know, I wonder, I don't know that I can

22   set aside my feelings in this case?

23             PROSPECTIVE JUROR:  No.

24             MR. O'CONNOR:  Okay.  Thank you.

25             Number 22.

1                   You live in Globe?

2                   PROSPECTIVE JUROR:  I do.

3                   MR. O'CONNOR:  I used to drive back and forth.

4     That's a long drive.

5                   PROSPECTIVE JUROR:  Yes, it is.

6                   MR. O'CONNOR:  How long is it?

7                   PROSPECTIVE JUROR:  To here, it's about an hour and a

8     half.  But I stayed at a hotel last night.

9                   MR. O'CONNOR:  All right.  If you're selected to be

10    on this case, is that drive back and forth going to be a

11    hardship for you?

12                  PROSPECTIVE JUROR:  No, I'll be staying in a hotel

13    here.

14                  MR. O'CONNOR:  All right.  Now, I saw you worked --

15    did I read that correctly, you work in HR?

16                  PROSPECTIVE JUROR:  Yes, sir, I'm an HR director.

17                  MR. O'CONNOR:  And I also thought that I saw in your

18    response that you have some responsibility for risk management

19    administration.

20                  PROSPECTIVE JUROR:  Yes, sir.  It's mainly the

21    property and casualty, but I also oversee the employee

22    benefits.

23                  MR. O'CONNOR:  When you say property and casualty, do

24    you get involved in claims, injury claims?

25                  PROSPECTIVE JUROR:  It is more my risk management

1    associate.  I have a staff, and then it goes to that insurance

2    company, and then they give us their decisions.  I don't get

3    very involved in the claims.

4         MR. O'CONNOR:  But do you have any involvement in

5    claims against the county?  You work for the county; is that

6    correct?

7         PROSPECTIVE JUROR:  Correct.  I do work for Gila

8    County.  Only what claims get sent to our insurer.

9         MR. O'CONNOR:  And your experience, just to what

10   extent it is, being involved in claims and knowing that people

11   have brought claims for all sorts of cases against the county,

12   how does that affect you?  Does that affect you coming to a

13   case where there's going to be a claim for injuries against

14   the medical device company?

15        PROSPECTIVE JUROR:  No, I don't believe so.  I feel

16   that my job, I'm kind of the liaison between the management of

17   the county and the employees, and my job is to protect both.

18   So I, actually on a daily basis, make decisions, but they're

19   all decided on evidence, witnesses, documentation.  Anything

20   outside of that is just hearsay.  I have to make sure I have

21   the facts.

22        MR. O'CONNOR:  All right.  So do you actually get

23   involved in the evaluation of claims and evidence to support

24   or not support claims?

25        PROSPECTIVE JUROR:  Not very often.  If it goes to

1    the level of needing to be -- our county attorney would step

2    in.  I would not be involved.  Very rarely am I involved in

3    anything like that.

4            MR. O'CONNOR:  Is there anything about those

5    experiences in handling claims that you feel you may not be

6    able to set aside in hearing the evidence in this case?

7            PROSPECTIVE JUROR:  Oh, no.  No.  Not at all.

8            MR. O'CONNOR:  You did -- I thought you indicated

9    there there's too many lawsuits.

10           PROSPECTIVE JUROR:  I'm sorry?

11           MR. O'CONNOR:  I thought you indicated that you feel

12   there's too many lawsuits.

13           PROSPECTIVE JUROR:  I probably, like the juror behind

14   me, just frivolous ones where, you know, I order hot coffee

15   and I spill it on my leg and now I'm going to sue somebody

16   because it was hot.  I mean, that's the type of thing I mean.

17   I knew it was hot.

18           MR. O'CONNOR:  I understand.  Well, there's no hot

19   coffee in this --

20           PROSPECTIVE JUROR:  No, I don't.

21           MR. O'CONNOR:  Is there something about that feeling,

22   too many lawsuits, that you think it may cause you to be

23   suspicious or have questions as you get in and you hear this

24   case that it may suddenly dawn on you, you just feel you can't

25   be fair?

1          PROSPECTIVE JUROR:  No, sir.  Like I said, even in my

2     own job, until I have evidence and until I've listened to

3     witnesses, I have no view one way -- I try to be very neutral

4     until I have all of the evidence before me.  It's imperative

5     to my job.

6          MR. O'CONNOR:  All right.  Thank you.

7          PROSPECTIVE JUROR:  Thank you.

8          MR. O'CONNOR:  And Number 23.

9          How are you?

10         PROSPECTIVE JUROR:  Good morning.

11         MR. O'CONNOR:  Did I read correctly that you're a PE

12    teacher?

13         PROSPECTIVE JUROR:  Yes, I am.

14         MR. O'CONNOR:  Is your husband a firefighter?

15         PROSPECTIVE JUROR:  Yes, he is.

16         MR. O'CONNOR:  And does he talk to you about being

17    out there in his job and what he sees out there?

18         PROSPECTIVE JUROR:  He does.

19         MR. O'CONNOR:  Anything about what your husband does

20    or what you do that you feel may affect your ability to be

21    neutral or not so neutral in a case where we have a party

22    that's bringing a claim for damages against a medical device

23    company?

24         PROSPECTIVE JUROR:  No, I would be very neutral.

25         MR. O'CONNOR:  You've had -- you sat on two juries

1    before.

2             PROSPECTIVE JUROR:  Yes, I have.

3             MR. O'CONNOR:  Were you the foreperson?

4             PROSPECTIVE JUROR:  I was not.

5             MR. O'CONNOR:  One, I think, was in district court in

6    this building?

7             PROSPECTIVE JUROR:  Yes, in the early '90s.

8             MR. O'CONNOR:  What type of case was that?

9             PROSPECTIVE JUROR:  It was a criminal case.

10            MR. O'CONNOR:  Are you able to tell us the results of

11   that?

12            PROSPECTIVE JUROR:  It was -- the guy had committed a

13   murder, but on the Arizona side he had lied on the application

14   for a gun and was in possession of and -- and things of those

15   sorts.

16            MR. O'CONNOR:  And what was the outcome?

17            PROSPECTIVE JUROR:  He was found guilty.

18            MR. O'CONNOR:  And then your other case, was that a

19   civil case?

20            PROSPECTIVE JUROR:  It was a civil case.

21            MR. O'CONNOR:  And was that in a superior court?

22            PROSPECTIVE JUROR:  Arizona court.

23            MR. O'CONNOR:  And what type of case was that?

24            PROSPECTIVE JUROR:  It was a Tempe businessman and a

25   sporting goods company in the midwest.

1      MR. O'CONNOR:  Was it a contract or did it involve

2  injuries at all?

3      PROSPECTIVE JUROR:  It did not involve injuries.  It

4  was all based on boat motors.

5      MR. O'CONNOR:  I think you said your experience on

6  both of those was favorable?

7      PROSPECTIVE JUROR:  Yes.

8      MR. O'CONNOR:  Now, and again, if this is something

9  that you're not comfortable talking about, please let me know,

10  but I saw that your dad, your father had issues with deep vein

11  thrombosis.

12      PROSPECTIVE JUROR:  Yes, he had.

13      MR. O'CONNOR:  And do you know how he was treated?

14      PROSPECTIVE JUROR:  His was all treated with

15  medication.

16      MR. O'CONNOR:  Okay.  Knowing this is going to

17  involve medical testimony on issues that relate to DVTs and

18  filters, is there anything about your dad or your experience

19  with your father that would affect your ability to be fair and

20  impartial?

21      PROSPECTIVE JUROR:  Not at all.  Not at all.

22      MR. O'CONNOR:  All right.  Thank you.  I appreciate

23  that.

24      THE COURT:  Counsel, could you approach for just a

25  minute.

1          Ladies and gentlemen, if you want to stand up for a

2    minute while we talk, but don't go anywhere.  But feel free to

3    stand up for just a minute.

4          (Bench conference as follows:)

5          THE COURT:  I wanted to point out you've taken 25

6    minutes to cover 12 jurors.  And by my calculation, at this

7    rate you will have more than two hours of questioning.  I know

8    you need to cover what you need to cover, but I think we need

9    to pick up the pace.  Otherwise we're not going to be through

10   jury selection until 4 o'clock.

11         MR. O'CONNOR:  I'll move along.

12         THE COURT:  Okay.  Thanks.

13         (Bench conference concludes.)

14         THE COURT:  Thank you all.

15         MR. O'CONNOR:  Number 25.

16         I thought I read in your questionnaire you don't want

17   to sit as a juror.  Did I read that correctly?

18         PROSPECTIVE JUROR:  Yes.

19         MR. O'CONNOR:  And why is that?

20         PROSPECTIVE JUROR:  I've never been a juror before.

21         MR. O'CONNOR:  Is it something that you feel you

22   would prefer not to do in this case, is to be here for three

23   weeks listening to this case?

24         PROSPECTIVE JUROR:  Yes.

25         MR. O'CONNOR:  And do you think that knowing that you

1   don't want to be here could affect your ability to be fair and

2   impartial?

3            PROSPECTIVE JUROR:  Probably not.  No.

4            MR. O'CONNOR:  But you would prefer not to be here?

5            PROSPECTIVE JUROR:  Right.

6            MR. O'CONNOR:  All right.  Thank you.

7            Number 28.

8            Do you work in a health care profession?

9            PROSPECTIVE JUROR:  I do.

10            MR. O'CONNOR:  And I thought you said you know

11   somebody who works for Bard.

12            PROSPECTIVE JUROR:  I do.

13            MR. O'CONNOR:  And what does that person do?

14            PROSPECTIVE JUROR:  She's a sales rep that brings in

15   products.  I work in a operating room as a nurse.  She brings

16   in products to our operating room.

17            MR. O'CONNOR:  Okay.  And is she somebody you deal

18   with on a regular basis?

19            PROSPECTIVE JUROR:  That's correct.

20            MR. O'CONNOR:  Can you tell us her name?

21            PROSPECTIVE JUROR:  Her name is Andrea Urlaub.

22            MR. O'CONNOR:  And knowing that this is a case

23   against Bard -- are you friends with her?

24            PROSPECTIVE JUROR:  I mean, not like we've ever gone

25   anywhere together.  Just acquaintances, I would say.

1           MR. O'CONNOR:  Do you think it will be difficult for

2    you knowing that she works for the company, Bard, who is also

3    a defendant in this case?  Do you think it would be difficult

4    for you to find against Bard and have to go back and see her

5    at work sometime?

6           PROSPECTIVE JUROR:  No, I don't.

7           MR. O'CONNOR:  All right.  You're in nursing.

8           PROSPECTIVE JUROR:  Correct.

9           MR. O'CONNOR:  You've had a lot of experience in

10   medical and nursing issues.

11          PROSPECTIVE JUROR:  Um-hmm.

12          MR. O'CONNOR:  How are you going to -- are you going

13   to be able to set those -- what you've learned in your

14   experience aside in listening to the evidence in this case?

15          PROSPECTIVE JUROR:  I believe I would be able to.

16          MR. O'CONNOR:  Thanks.

17          Number 29.

18          It looked as though that you have stronger better --

19   more favorable feelings for medical device companies than you

20   do for personal injury lawyers.  Do I read that correctly?

21          PROSPECTIVE JUROR:  I can imagine that I would have

22   written that.  I mean, in filling out the questionnaire.  But,

23   I mean, if we listen to what has -- the questions you've asked

24   already, I don't have any problem being impartial in this

25   case.

1              MR. O'CONNOR:  All right.  Thanks.

2         And Number 30.

3         You feel that there's too many lawsuits and that

4    money damages awards have been too high.  Did I read your

5    answers correctly?

6              PROSPECTIVE JUROR:  Yes.

7              MR. O'CONNOR:  And I think you also feel that there

8    should be legislative caps, reforms, limitations on the amount

9    of damages that people should ask for.

10             PROSPECTIVE JUROR:  Yes.

11             MR. O'CONNOR:  That, to me, seems like that was a

12   strong feeling that you had long before you came here today.

13             PROSPECTIVE JUROR:  Sure.

14             MR. O'CONNOR:  Knowing that and the way you feel, do

15   you have limitations in your mind that anything above that is

16   just too much?

17             PROSPECTIVE JUROR:  For this particular case, no,

18   because I don't know anything about it.  I just think if

19   you -- anybody who looks at the internet, reads something

20   on -- you know, newspaper, reads -- sees the news, there are

21   cases that make you go how did a jury ever come up with that

22   number.  It just doesn't seem like a reasonable outcome.  So I

23   don't think it would affect a specific case.  I mean, I just

24   think -- I don't know, life situations.  You come up with

25   opinions.

1          MR. O'CONNOR:  But in this case we have a party, the
2     plaintiffs are going to be asking for money damages.  Does
3     that concern you or cause you to be more suspicious of them
4     before we even start?
5          PROSPECTIVE JUROR:  Not at all.
6          MR. O'CONNOR:  Do you think there's anything about
7     your feelings about the need for limitations on damages that
8     would affect your ability to be fair and impartial here?
9          PROSPECTIVE JUROR:  No.
10         MR. O'CONNOR:  Okay.  Thank you.
11         Number 32.
12         Just the question -- I see you're from Payson.
13    You're going to be traveling quite a distance every day.  Will
14    that cause you any difficulty?
15         PROSPECTIVE JUROR:  I'll be staying at a hotel.
16         MR. O'CONNOR:  Pardon me?
17         PROSPECTIVE JUROR:  I'll be staying at a hotel.
18         MR. O'CONNOR:  So you don't see that travel's going
19    to impose any problem for you?
20         PROSPECTIVE JUROR:  No.
21         MR. O'CONNOR:  Thank you.
22         Number 46.
23         Good morning.  Thank you for coming.
24         You had indicated that you felt that you would not be
25    able to be fair and impartial because of what you called your

 1    concern about unscrupulous companies and greedy individuals.

 2    Did I read your answers correctly?

 3             THE COURT:  Sir, can you hold the mic up closer.

 4    Thank you.

 5             PROSPECTIVE JUROR:  Really depends.  I've seen cases

 6    on both sides.  I've seen -- I've heard -- I've heard cases

 7    like spilling coffee on one side and of course pop culture

 8    movies like Rainmaker.  There are -- there are those cases on

 9    both sides.  That's what my feeling.

10             MR. O'CONNOR:  Well, right now as you sit here today,

11    do you feel you can be neutral, listen to the evidence?

12             PROSPECTIVE JUROR:  I do.  But I have to mention that

13    I -- I was a brought up --

14             THE COURT:  Pardon me, sir, could you --

15             PROSPECTIVE JUROR:  -- you know, in a different

16    culture.  So in a country that was entirely different system,

17    a communist country where the system works entirely

18    differently.  So I've been living in this country for over 20,

19    30 years.  I have tried -- I'm sure I have adapted to the

20    cultures in this country, but I'm afraid that subconsciously

21    I'm not sure whether those values that was deep inside me

22    would come up.  So I don't know.

23             MR. O'CONNOR:  Well, I appreciate that.  And it

24    sounds like you recognize there's differences from the

25    experience where you grew up and where you live now; is that

1    right?

2              PROSPECTIVE JUROR:  Yes.  Correct.

3              MR. O'CONNOR:  Do you think just with your background

4    and your experience in the country where you were born and

5    raised that it will be hard to set aside your life and what

6    you've learned and that culture, it would be difficult for you

7    to set that aside in listening to a case here where a party,

8    if proven, is allowed to recover damages from a party who is

9    proven to be at fault?

10             PROSPECTIVE JUROR:  I wouldn't say it's difficult,

11   but it's something I have to be very conscious of all the

12   time.  In the culture where I grew up, if you are found guilty

13   and even if you are sentenced to death, there are very few

14   people that would repeal the court, the ruling.  This is the

15   case even today.  So those are the -- this was the atmosphere

16   where I was brought up.  I'm conscious that this is not our

17   value, so I'm just conscious of the differences.

18             MR. O'CONNOR:  And you understand this is a civil

19   case not a criminal case?

20             PROSPECTIVE JUROR:  I understand.

21             MR. O'CONNOR:  All right.  Thank you.

22             Number 50.

23             Good morning.

24             PROSPECTIVE JUROR:  Morning.

25             MR. O'CONNOR:  I think I saw where you answered that

1    you have very strong feelings in favor of medical device

2    companies.  Did I read that correctly?

3           PROSPECTIVE JUROR:  Yes.

4           MR. O'CONNOR:  And that's something -- that's a

5    belief and a feeling that you brought to this court that you

6    developed long before you came here.  Fair?

7           PROSPECTIVE JUROR:  Yes.

8           MR. O'CONNOR:  And you also indicated that you have

9    difficulties because you feel that most lawsuits are brought

10   against big companies or people of wealth.  Did I read that

11   correctly?

12          PROSPECTIVE JUROR:  Yes.

13          MR. O'CONNOR:  And it sounds as though that's

14   something you're concerned about when you hear about any type

15   of a civil lawsuit.

16          PROSPECTIVE JUROR:  Correct.

17          MR. O'CONNOR:  And something that you just can't set

18   aside no matter what the evidence would be in a case like

19   this.  Is that fair?

20          PROSPECTIVE JUROR:  No, I don't think so.  I think I

21   would be able to -- they're all individual cases.

22          MR. O'CONNOR:  Knowing that there's a case that is

23   brought against a medical device company, do you feel, though,

24   your feelings strongly in favor of that, of a medical device

25   company, that that will affect your ability as you start this

1    case?  In other words, the party suing the medical device

2    company is starting with you leaning somewhat against us?

3              PROSPECTIVE JUROR:  No.

4              MR. O'CONNOR:  Is there anything about your feelings

5    about awards being too high that you feel would affect your

6    ability to listen to the evidence in this case?

7              PROSPECTIVE JUROR:  No.

8              MR. O'CONNOR:  You support legislative reform caps on

9    damages?

10             PROSPECTIVE JUROR:  No.

11             MR. O'CONNOR:  I thought I read that you felt that

12   the judicial system should not be used for people to get money

13   for retirement.  Did I read that correctly?

14             PROSPECTIVE JUROR:  Not necessarily just retirement,

15   but just in general.

16             MR. O'CONNOR:  And again, that's a feeling that you

17   developed long before you came here?

18             PROSPECTIVE JUROR:  Absolutely.

19             MR. O'CONNOR:  And does that mean, though, that you

20   have concerns or questions or suspicions about people who are

21   going to request money damages in a lawsuit?

22             PROSPECTIVE JUROR:  No, because I haven't heard the

23   case yet.

24             MR. O'CONNOR:  Are there any type of damages you

25   think you just simply don't believe should be recovered, such

1   as pain and suffering?

2          PROSPECTIVE JUROR:  No.

3          MR. O'CONNOR:  All right.  Anything about your

4   answers, about your life experiences that you think will

5   affect your ability to be neutral or fair and impartial in

6   this case?

7          PROSPECTIVE JUROR:  I don't think so.

8          MR. O'CONNOR:  Okay.  Thank you, sir.  Appreciate

9   that.

10          Number 51.

11          PROSPECTIVE JUROR:  Good morning.

12          MR. O'CONNOR:  Good morning.  Thank you for coming.

13          You, too, sir, I thought I saw that you feel that

14   there are too many lawsuits and the awards are too high.

15          PROSPECTIVE JUROR:  I may have answered it that way

16   on the questionnaire, but they're all different.

17          MR. O'CONNOR:  I thought I read that you support

18   legislative reform for caps on damages?

19          PROSPECTIVE JUROR:  I probably in general would agree

20   with that statement, yes.

21          MR. O'CONNOR:  Do you have a limit in mind where you

22   think anything above that is just too much, no matter what the

23   evidence showed?

24          PROSPECTIVE JUROR:  Despite what I think, every case

25   is different.

```
 1              MR. O'CONNOR:  Now, it's possible that the plaintiffs

 2    in this case may ask this jury to award an amount of money

 3    that we believe is fair.  Is there a risk or a chance that

 4    that amount that we're asking for, you may feel that, no, I've

 5    got to go back to my feeling I think that limitations should

 6    be imposed in this case?

 7              PROSPECTIVE JUROR:  I think I can get past any

 8    personal bias.

 9              MR. O'CONNOR:  Right.  Do you have personal bias

10    against money damages as you start out?

11              PROSPECTIVE JUROR:  No.

12              MR. O'CONNOR:  Thank you.

13              Number 52.

14              PROSPECTIVE JUROR:  Yes.

15              MR. O'CONNOR:  You have less than favorable views for

16    personal injury attorneys in response to your questionnaire.

17    Do you recall that?

18              PROSPECTIVE JUROR:  That sounds correct.

19              MR. O'CONNOR:  And obviously the Hydes are

20    represented by personal injury lawyers.  Does that mean that

21    in your mind that you're already leaning against this side

22    compared to the medical device company?

23              PROSPECTIVE JUROR:  I think it would be the burden of

24    proof might be higher on you with my prejudices.

25              MR. O'CONNOR:  So you would, just because of your
```

1    feeling, would hold us --

2              THE COURT:  Excuse me, Mr. O'Connor.  Mr. O'Connor,

3    could you just hold that mic up a little closer.

4              MR. O'CONNOR:  Okay.

5              THE COURT:  Thank you.

6              MR. O'CONNOR:  I think you said that you feel you

7    would probably hold to us a higher burden.

8              PROSPECTIVE JUROR:  Yes, I think that's correct.

9              MR. O'CONNOR:  Meaning we're starting behind or

10   you're leaning against us at the start.

11             PROSPECTIVE JUROR:  I think so.  I mean, I would make

12   every attempt to be impartial.

13             MR. O'CONNOR:  But as you sit here today, you just

14   don't know if you can be fair and impartial.

15             PROSPECTIVE JUROR:  Yes.

16             MR. O'CONNOR:  Is that correct?

17             PROSPECTIVE JUROR:  Yes, that's correct.

18             MR. O'CONNOR:  All right.  Thank you.

19             Number 68.

20             I'm sorry, sir.  I don't need to talk to you.  Thank

21   you.  I would love to but I don't need to right now.

22             Your Honor, may I take a moment to consult --

23             THE COURT:  Yeah.

24             Actually, why don't we go ahead and take a break.

25   But before you stand up and walk out, ladies and gentlemen,

1     let me mention a couple of things to you.

2          First, please don't talk to each other or anybody

3     else about this case during the break.  That's an instruction

4     I'm going to give the jury from now until the end of trial so

5     that you're not influenced by other views that you might hear.

6          Second, please put that sheet with the number on it

7     that you have on your seat so that when you come back in you

8     sit in the same place.

9          As you go out the doors, there are bathrooms on this

10    floor in both directions and on the two floors below.

11         We apologize for the heat in the atrium outside.  You

12    can talk to the architect about that.

13         And we will resume at quarter to 11:00.  10:45.  If

14    you could be back in your seats by then, we would appreciate

15    it.

16         Thank you all.

17      (Recess taken from 10:29 to 10:44.  Proceedings resumed

18    in open court with the jury panel present.)

19         THE COURT:  Please be seated.

20         Counsel, approach just a minute, please.

21      (Bench conference as follows:)

22         THE COURT:  Counsel, I understand Juror Number 68 was

23    trying to assertively speak with counsel during the break.

24    He's the guy we're going to excuse because of his wife's

25    illness.  I think we just ought to go ahead and excuse him

```
 1   now.
 2           MR. ROGERS:  Mark, you look like you don't know
 3   what's going on.
 4           MS. HELM:  Julia -- he tried to engage in a
 5   conversation.  And I was present, I saw her cut it off.
 6           THE COURT REPORTER:  Counsel, I can't hear.
 7           THE COURT:  Right.  So my thought is I won't do it at
 8   this moment because I don't want him to think we've been up
 9   here talking about him, but in five or ten minutes I'll look
10   at the clock and say we'll excuse you, Juror 68.
11           MR. O'CONNOR:  That's fine.
12           Let me give you an update.  I have two quick
13   follow-ups and then I'm done.  28 and 29 for two follow-ups
14   that I missed.
15           THE COURT:  Okay.  That's fine.
16       (Bench conference concludes.)
17           THE COURT:  Thank you, ladies and gentlemen.  We will
18   continue.
19           MR. O'CONNOR:  Thank you.  I'm almost done here.
20           Number 29, I apologize, I just wanted to follow up on
21   one area with you.
22           And, again, I just want to ask about questions you
23   answered about your family members, and if it's something you
24   feel you can't talk to in open court, let me know, but --
25           PROSPECTIVE PROSPECTIVE JUROR:  Okay.
```

1          MR. O'CONNOR:  -- my question was it sounds as though

2     there were family members, I think your dad, had issues with

3     DVTs.  Did we read that correctly?

4          PROSPECTIVE PROSPECTIVE JUROR:  Yeah.  He had a

5     blood -- he had a blood clot.

6          MR. O'CONNOR:  Was he treated with any type of

7     filter?

8          PROSPECTIVE PROSPECTIVE JUROR:  No, not that I'm

9     aware of.  I think it was only medication.

10          MR. O'CONNOR:  All right.  Thanks.  That's all I had.

11          PROSPECTIVE PROSPECTIVE JUROR:  Okay.

12          MR. O'CONNOR:  And then Number 28.  I had follow-up

13     with you.  And, again, thank you.

14          Just going back to Bard filters, you're in the

15     operating room, I believe; is that correct?

16          PROSPECTIVE PROSPECTIVE JUROR:  That's correct.

17          MR. O'CONNOR:  And you probably have been involved

18     with filters in your practice as a nurse.

19          PROSPECTIVE PROSPECTIVE JUROR:  Yes, as just a floor

20     nurse when I was working at the heart hospital next door to

21     the current hospital where I work, but in my operating room

22     right now we don't do any cardiac things, so I don't have any

23     current working with filters.

24          MR. O'CONNOR:  Do you feel that you have a favorable

25     impression of Bard products, medical devices?

1          PROSPECTIVE PROSPECTIVE JUROR:  I do not.

2          MR. O'CONNOR:  And so the relationship you have with

3    that sales rep, does that affect you at all in how you feel

4    about one company that makes products versus another?

5          PROSPECTIVE PROSPECTIVE JUROR:  It does not.

6          MR. O'CONNOR:  All right.  Thank you.

7          That's all, Your Honor.  Thank you.

8          THE COURT:  Okay.  Thanks.

9          Defense counsel, your questions.

10          MR. ROGERS:  Thank you, Your Honor.

11          THE COURT:  As Mr. Rogers is walking up, Juror 68,

12    I'm thinking of you packing up.  We'll go ahead and excuse you

13    now.  There's no point having you remain the rest of the

14    morning.  Why don't we go ahead and let you go.  And best of

15    luck to your wife.

16          PROSPECTIVE PROSPECTIVE JUROR:  Thank you.

17          THE COURT:  Mr. Rogers, you may proceed.

18          MR. ROGERS:  Thank you, Your Honor.

19          Can everybody hear me okay?  Can everybody in the

20    back hear me okay?

21          All right.  Thank you.

22          I'm going to try to be fairly brief, but

23    Juror Number 4, I'd like to start with you, please.

24          I'd like to understand, if it's okay with you, a

25    little bit more about what you do.  And let me ask you first

1    of all -- and I'm sorry, I didn't mean to cut you off -- but I

2    wasn't clear what the name of the company was that you work

3    for.  Can you explain that to us.

4            PROSPECTIVE JUROR:  I currently work with IQVIA.  I'm

5    actually a clinical research associate.  One of my clients --

6    my company's clients is Amgen Pharmaceutical, so we make

7    drugs -- Amgen Pharmaceutical make drugs.  So I'm a clinical

8    research associate.  I go to different locations where they're

9    having studies, clinical trials, and I make sure that the

10   study sites are adhering to protocol and they don't deviate

11   from the protocol.  I have a protocol division and have to

12   report to IRB, which is Institutional Review Board.  I also

13   make sure the subjects are given the right drugs and that the

14   site is approved to conduct the trial.

15           MR. ROGERS:  And so you are involved in multiple

16   different sites; is that correct?

17           PROSPECTIVE JUROR:  Yes, every week I go to different

18   location.

19           MR. ROGERS:  And as part of that, it sounds like

20   maybe you have sort of an inspection function, would that be

21   accurate, to make sure everything is being done appropriately?

22           PROSPECTIVE JUROR:  Yes, according to the protocol.

23           MR. ROGERS:  And I believe from your background you

24   have a master's in business; is that correct?

25           PROSPECTIVE JUROR:  Yes.  I also just completed my

1    masters in clinical research last month.

2           MR. ROGERS:  Let me ask you specifically, and I may

3    have misread what you wrote, but I believe you put on your

4    questionnaire that you are a CRA monitor.  Is that accurate?

5           PROSPECTIVE JUROR:  Yes.  Yes.  It can be used

6    interchangeably.  You can say clinical research associate or

7    you can say a monitor.  It's the same thing.

8           MR. ROGERS:  So when you say monitor, can you explain

9    what you mean by that term.

10          PROSPECTIVE JUROR:  Again, as a monitor I go to

11   different locations where they're having clinical trials, I

12   make sure that the -- we refer to the patient as subjects.  We

13   don't know them by name.  My job is to make sure that the site

14   is adherent to protocol, making sure that the site, the

15   doctor, the principal investigators, and clinical study

16   coordinators, adhere to protocol, they're giving the subjects

17   the right medication, the investigational product, and that

18   the site is appropriately approved by the Institutional Review

19   Board to conduct that trial.

20          MR. ROGERS:  In your work, do you have a lot of

21   contact with doctors who are involved in running the clinical

22   studies?

23          PROSPECTIVE JUROR:  Absolutely.

24          MR. ROGERS:  I believe you said that the entity that

25   you work for, the company, that they do clinical trials for

1   Amgen; is that right?

2           PROSPECTIVE JUROR:  Yes.

3           MR. ROGERS:  Is that the only company they do

4   clinical trials for?

5           PROSPECTIVE JUROR:  I'm sorry, what's your question

6   again?

7           MR. ROGERS:  I'm sorry.  Is Amgen the only company

8   that your company does clinical trials for?

9           PROSPECTIVE JUROR:  I'm only involved in the Amgen

10  product, Amgen studies.  Like I said, my company right now is

11  IQVIA, which was merged with IMC.  Used to be Quintiles.  I

12  know I have other colleagues that work with other, we call it

13  FSP, which means other sponsors.  But for me, I specifically

14  work on the Amgen trials.

15          MR. ROGERS:  And does your company do any clinical

16  trials for any medical device companies?

17          PROSPECTIVE JUROR:  Not that I know of.

18          MR. ROGERS:  All right.  Thank you, Juror Number 4.

19          Juror Number 18, would you mind if I asked you a

20  couple of questions?

21          And, ma'am, again, I'm trying to understand what it

22  is that you do.  Can you first explain for me who the company

23  is you work for and what they do.

24          PROSPECTIVE JUROR:  That's Standard Aero.

25          THE COURT:  Excuse me, ma'am, can you hold the mic up

1    closer.

2              PROSPECTIVE JUROR:  It's Standard Aero.  It's a

3    plating company where we do chemicals for airplanes.

4              MR. ROGERS:  And so can you explain for us what your

5    job is, what you do on a day-to-day basis.

6              PROSPECTIVE JUROR:  We prepare parts for aircrafts.

7    So chemical -- so platers do the chemical part for the parts

8    for the airplanes.

9              MR. ROGERS:  And are you involved yourself in

10   handling the chemicals?

11             PROSPECTIVE JUROR:  No.

12             MR. ROGERS:  So day-to-day what it is that you do?

13   More administrative or more hands-on?

14             PROSPECTIVE JUROR:  More hands-on.

15             MR. ROGERS:  And can you try to tell me a little bit

16   more about that.

17             PROSPECTIVE JUROR:  Well, we just prepare parts for

18   chemicals, like putting tape on the areas where they're not

19   going to be plating.

20             MR. ROGERS:  Ma'am, I believe you indicated on your

21   questionnaire that you had a family member that was involved

22   in a lawsuit; is that right?

23             PROSPECTIVE JUROR:  Yes.

24             MR. ROGERS:  Would you mind if I asked you a question

25   about that?  Is that okay?

1          PROSPECTIVE JUROR:  That's okay.

2          MR. ROGERS:  I understand it was your father; is that

3  correct?

4          PROSPECTIVE JUROR:  Yeah, that's my father.

5          MR. ROGERS:  And am I correct that he brought a suit

6  that sounds like a medical malpractice suit; is that right?

7          PROSPECTIVE JUROR:  Yes.

8          MR. ROGERS:  And is there anything about that

9  experience, having seen your father go through that, that you

10  think would lead you to be unfair or impartial in this case?

11          PROSPECTIVE JUROR:  No.

12          MR. ROGERS:  Do you think you could listen to all the

13  evidence and be fair to both sides?

14          PROSPECTIVE JUROR:  Yes.

15          MR. ROGERS:  Okay.  Thank you, ma'am.

16          Juror Number 25, please.

17          Ma'am, again, I'm trying to understand what it is

18  that you do.  I believe you said that you worked for Banner

19  Wound Care; is that correct?

20          PROSPECTIVE JUROR:  Yes.

21          MR. ROGERS:  And I think your questionnaire said that

22  you were a medical scheduler; is that right?

23          PROSPECTIVE JUROR:  Yes.  I schedule the new patients

24  that come into our clinic.

25          MR. ROGERS:  So as part of your job, do you have a

1    lot of contact directly with patients?

2           PROSPECTIVE JUROR:  No.  It's over the phone.

3           MR. ROGERS:  And how about doctors, do you have a lot

4    of day-to-day contact with doctors?

5           PROSPECTIVE JUROR:  Yes, doctors that come into our

6    clinic.

7           MR. ROGERS:  And so what sort of interactions would

8    you have with those medical professionals?

9           PROSPECTIVE JUROR:  Just if we're -- if I have an

10   authorization pending for a patient that's coming in.  Not

11   really too much.

12          MR. ROGERS:  So would you consider it more

13   administrative?  Would that be accurate?

14          PROSPECTIVE JUROR:  Yes.

15          MR. ROGERS:  Okay.  Thank you, ma'am.

16          Poor Juror 28, you've been on your feet a lot.

17          I do want to understand a little bit more about what

18   you do.  I think you said that you were a circulating nurse;

19   is that correct?

20          PROSPECTIVE JUROR:  That's correct, yes.

21          MR. ROGERS:  Can you tell me what it is you do, kind

22   of day in and day out what your responsibilities are.

23          PROSPECTIVE JUROR:  Day in, day out I prepare the

24   operating room for the particular surgery that we're going to

25   be doing.  Myself and scrub tech set up the room, get

1    everything counted appropriately, and then I go out to the

2    preop area and actually interview the patient along with the

3    anesthesiologist, find out their health history.  And once we

4    see the surgeon, I bring the patient actually back to the

5    operating room, assist in getting them off to sleep.  And then

6    during the surgery, get anything that we might need during it.

7    And then also I'm responsible for all the charting during the

8    surgery.  And then when we're all done, I take the patient out

9    to the recovery room.  And then do that 12 more times.

10            MR. ROGERS:  And do you have contact with multiple

11   representatives from medical device companies?

12            PROSPECTIVE JUROR:  That's correct.

13            MR. ROGERS:  Not just a person from C.R. Bard; is

14   that right?

15            PROSPECTIVE JUROR:  That's correct.

16            MR. ROGERS:  And are they kind of in and out of there

17   all the time?

18            PROSPECTIVE JUROR:  They're in and out of there all

19   the time, yes.  That particular sales rep is selling mesh, and

20   so she comes in and answers any questions that the surgeon

21   might have about that particular mesh that we're putting in a

22   patient.  But, yes, multiple different representatives from

23   all types of companies.

24            MR. ROGERS:  And have you had any experiences with

25   any of those representatives that would lead you to view

1    medical device companies in an unfavorable way?

2              PROSPECTIVE JUROR:  No, I have not.

3              MR. ROGERS:  Okay.  Thank you.

4              Next is Juror Number 31.

5              How are you?

6              PROSPECTIVE JUROR:  Just fine, thank you.

7              MR. ROGERS:  Good.

8              And, ma'am, I understand you're retired; is that

9    correct?

10             PROSPECTIVE JUROR:  Correct.

11             MR. ROGERS:  But if I'm reading your questionnaire

12   correctly, you used to work at the VA Medical Center; is that

13   right?

14             PROSPECTIVE JUROR:  Correct.

15             MR. ROGERS:  Can you tell me what you did there?

16             PROSPECTIVE JUROR:  I was a LPN nurse on -- our floor

17   specialized in medical patients.  I mean not specialized.  It

18   was a medical floor, but we specialized on oncology.

19             MR. ROGERS:  And so what were your duties when you

20   were an LPN?

21             PROSPECTIVE JUROR:  My duties were to do patient

22   care, administer medications, IVs that are not narcotic,

23   certain care for patients who are -- have some type of tubing

24   like Duo-Tubes.  Patients that are not able to eat, we had to

25   care for that.

 1          MR. ROGERS:  So sounds like you had a lot of direct

 2    patient care.

 3          PROSPECTIVE JUROR:  Right.  Right.

 4          MR. ROGERS:  And it looks like you are working

 5    currently too; is that right?

 6          PROSPECTIVE JUROR:  Yeah, but not in my special field

 7    due to knee problems and back problems.  So I'm doing it

 8    part-time --

 9          MR. ROGERS:  Can you tell me what you do now.

10          PROSPECTIVE JUROR:  Now I'm just -- I work at the

11    LP- -- LBJ jail.  It's Maricopa County, the jail, and I sit

12    and monitor the patients because it's in a psych facility.

13    And monitor to make sure they're safe.  Or do no harm to

14    themselves.

15          MR. ROGERS:  And so you continue to have a lot of

16    direct patient care, sounds like?

17          PROSPECTIVE JUROR:  Not direct.  I just sit and watch

18    them and make sure they don't hurt themselves.  Mostly the

19    staff there does the direct care.  Or the DOs.

20          MR. ROGERS:  Okay.  Thank you, ma'am.

21          Juror Number 52.

22          PROSPECTIVE JUROR:  Yes, sir.

23          MR. ROGERS:  How are you, sir?

24          PROSPECTIVE JUROR:  Good.  Thanks.

25          MR. ROGERS:  I understand you are a veterinarian; is

1    that correct?

2              PROSPECTIVE JUROR:  Correct.

3              MR. ROGERS:  Could you tell me what sort of practice

4    you have as a veterinarian?

5              PROSPECTIVE JUROR:  Small animal.

6              MR. ROGERS:  And are you in your own practice?

7              PROSPECTIVE JUROR:  Yes.  And we have multiple

8    locations.

9              MR. ROGERS:  So you work with multiple other vets; is

10   that right?

11             PROSPECTIVE JUROR:  Yes.

12             MR. ROGERS:  Let me follow up on something you got

13   asked by Mr. O'Connor.  And you were asked specifically as to

14   whether or not you were going to hold the plaintiffs to a

15   certain burden of proof that may be higher.  Do you recall

16   that?

17             PROSPECTIVE JUROR:  Yes.

18             MR. ROGERS:  And if you were to be put into this case

19   as a juror and you sat and you listened to the evidence for

20   two and a half weeks or so and you were instructed by the

21   Judge as to what the legal burdens are on the parties, do you

22   think you could appropriately apply those burdens?

23             PROSPECTIVE JUROR:  I think so.  I would make every

24   attempt.

25             MR. ROGERS:  And do you think you could be fair and

1    impartial to both sides in that effort?

2              PROSPECTIVE JUROR:  I do.

3              MR. ROGERS:  All right.  Thank you, sir.

4              Your Honor, I don't have any further questions.

5              THE COURT:  All right.  Thanks, Mr. Rogers.

6              Ladies and gentlemen, from what you have seen, did

7    any of you know any other member of the jury panel before this

8    morning?

9              PROSPECTIVE JUROR:  (Juror 29)  88, Juror 88.

10             THE COURT:  You are Juror 29?

11             PROSPECTIVE JUROR:  I'm 29.  We have a common friend

12   and we most commonly ran into each other at intermission at

13   the Herberger.

14             THE COURT:  Okay.  If you and the other juror were

15   placed on the jury together, could you exercise independent

16   judgment and not be unduly influenced by his views?

17             PROSPECTIVE JUROR:  Absolutely.

18             THE COURT:  Okay.  I'm going to ask the same question

19   of Juror -- is it 88?

20             PROSPECTIVE JUROR:  (Juror 88)  Yes.

21             THE COURT:  Oh, I called you a him.  I'm sorry,

22   ma'am.  I thought he was pointing to somebody else.

23             Same question for you.  If you were on the jury with

24   Juror 29, could you exercise independent views and not be

25   unduly influenced by his views?

1          PROSPECTIVE JUROR:  (Juror 88)  Yes.

2          I also -- I don't remember your name, but there's a

3    PE teacher I've worked with years and years ago.

4          Yes.

5          THE COURT:  You are Juror Number --

6          PROSPECTIVE JUROR:  (Juror 23)  23.

7          THE COURT:  -- 23.

8          Same question.  If you were on the jury with

9    Juror 23, could you exercise your own independent judgment?

10         PROSPECTIVE JUROR:  (Juror 88)  Yes.

11         THE COURT:  Should I ask you, Juror 23, if you

12   remember Juror 88?

13         PROSPECTIVE JUROR:  (Juror 23)  Looks a little

14   familiar.

15         THE COURT:  Could you be independent if you were on

16   the jury with her?

17         PROSPECTIVE JUROR:  (Juror 23)  Yes, I would be.

18         THE COURT:  Okay.  Thanks.

19         Anybody else know any other member of the jury panel?

20         Okay.  Give me just a minute.

21         All right.

22         Ladies and gentlemen, we, the lawyers and I, are now

23   going to go through the process of choosing the jury, and that

24   takes a bit of time.  So we're going to excuse you again and

25   ask that you be back up here in a half hour.  So by -- well,

1    I'll tell you what.  Instead of that, it's warm outside on

2    this floor, as you know, why don't you be in the jury room, if

3    you would, downstairs by 11:35.  That's in a half hour.  It's

4    air conditioned.

5            We'll call down there when we're ready.  That way you

6    won't be waiting up outside the doors here for ten minutes if

7    we run a little long.

8            I would like to ask that the following jurors remain

9    behind for just a minute:  Jurors 16, 44, and 59.

10           Anyone else, Counsel?  I think those were the

11   remaining three from what we talked about this morning.

12           MR. O'CONNOR:  That's consistent with my notes.

13           MR. ROGERS:  May we have a brief sidebar, Your Honor?

14           THE COURT:  Sure.

15           Hold on just a minute, ladies and gentlemen.

16       (Bench conference as follows:)

17           MR. WENNER:  Morning, Your Honor.

18           THE COURT:  Good morning.

19           MR. ROGERS:  Apparently my client knew something I

20   didn't know, and that is that Juror Number 4 used to work for

21   a -- she mentioned it, it's called Quintiles, which is a

22   clinical trial company and they have done work for C.R. Bard.

23           THE COURT:  Okay.  Then let's have Juror 4 remain

24   behind as well.

25           MR. ROGERS:  Yes, Your Honor.

```
 1              MR. O'CONNOR:  I didn't hear what you said.

 2              THE COURT:  You can talk as you walk back, but I'll

 3    have Juror 4 remain behind.

 4         (Bench conference concludes.)

 5              THE COURT:  Let's also have Juror 4 remain for a

 6    minute, if you would.  So Jurors 4, 16, 44, and 59, please

 7    wait here for just a minute.

 8              We will excuse the rest of you.  And please be in the

 9    jury room at 11:35 and we'll get you up here as soon as we

10    can.

11              You can hand those sheets to Traci as you leave.

12    When you come back, you don't have to sit in the same seats.

13         (Excused jury panelists exit the courtroom.)

14              THE COURT:  Okay.  Please be seated.

15              Jurors 4 and 16, why don't you remain here for a

16    minute.

17              Jurors 44 and 59, if you would just step outside the

18    double door.  You can wait right there; we'll get you in here

19    in about three minutes.

20              All right.  Juror 4, there's a follow-up question or

21    two that we need to ask you.

22              Mr. Rogers, you can do it right there if you want,

23    talk right into that mic.

24              MR. ROGERS:  I'm sorry I held you back, but

25    apparently there was something I wasn't familiar with.  But
```

1    did you say you worked for a company called Quintiles; is that

2    correct?

3                PROSPECTIVE JUROR:  Quintiles, yes.  Quintiles merged

4    with INC and now called IQVIA, that's the one I work with.

5    And I started working with them in January 2018.  Prior to

6    that I worked with InVentiv Health, which has merged with INC

7    to become Syneos.

8                MR. ROGERS:  And at what point were you working for

9    Quintiles?

10               PROSPECTIVE JUROR:  I didn't work with Quintiles.  I

11   work with IQVIA.  But just letting you know that they merged

12   with INC to form IQVIA.  So I work with IQVIA.  I never worked

13   with Quintiles.

14               MR. ROGERS:  Thank you.

15               And have you, to your knowledge, ever worked for any

16   company that's done any sort of work related to C.R. Bard?

17               PROSPECTIVE JUROR:  No.  No.

18               MR. ROGERS:  Okay.  Thanks, Juror 4.

19               THE COURT:  Thank you, Juror 4.

20               Plaintiffs' counsel, any questions?

21               MR. O'CONNOR:  None, Your Honor.  Thank you.

22               THE COURT:  Juror 4, we'll go ahead and excuse you.

23   Just be in the jury room at 11:35, please.

24               Okay.  Counsel, follow-up questions for

25   Juror Number 16.

```
 1            Mr. O'Connor, I didn't know if you had the questions
 2    or if defense counsel did.
 3            MR. O'CONNOR:  Now that you're here privately --
 4            THE COURT:  You've got to speak into a mic,
 5    Mr. O'Connor.
 6            MR. O'CONNOR:  I forget that all the time.
 7            Just needed some information that you didn't provide
 8    in your questionnaire.
 9            First of all, in response to the question about
10    family members and what they do for a living, you said
11    "privacy."  I know there were categories, accounting,
12    engineering, medical.  Can you tell us --
13            PROSPECTIVE JUROR:  My husband's a physician.
14            MR. O'CONNOR:  What type of physician is he?
15            PROSPECTIVE JUROR:  Hospitalist.
16            MR. O'CONNOR:  Do you know what hospital he works at?
17            PROSPECTIVE JUROR:  Estrella Banner.  Banner
18    Estrella.  Banner Estrella in Phoenix.
19            MR. O'CONNOR:  And does he get involved in medical
20    devices?
21            PROSPECTIVE JUROR:  No.  He just follows up with the
22    patients.  I'm sure he deals with the patients with medical
23    devices.  I never discuss with him about it.
24            MR. O'CONNOR:  I thought -- and what your husband
25    does, is that a reason that you have expressed your feelings
```

1    against plaintiff attorneys?

2              PROSPECTIVE JUROR:  No.  I have nothing against

3    plaintiff attorneys, it's just against the companies to be

4    sued that are trying to improve our lives on daily basis.

5    That's the only thing I'm against.  Nothing to do with

6    plaintiffs' attorneys.  Because in some cases I strongly

7    believe certain companies do need --

8              MR. O'CONNOR:  All right.  I just --

9              PROSPECTIVE JUROR:  -- do need to be held

10    responsible.

11             MR. O'CONNOR:  Let me just get to another question

12    here.

13             And the reason we're asking and why it's important to

14    us is because when you answered question 36, you put a 1 for

15    personal injury lawyers, which means you have extreme negative

16    feelings.

17             PROSPECTIVE JUROR:  I don't -- I don't have personal

18    injury -- maybe it was mistake, I'm sorry, but I don't have

19    any personal injuries.  I never had any personal injuries.

20             MR. O'CONNOR:  My question is a little different.

21    There's a question number 36 and it asked you to rank your

22    feelings, being extremely negative as a 1 to extremely

23    positive, and when it came to personal injuries you put a 1,

24    meaning you feel extremely negative towards personal injury

25    attorneys.  That's what we want to follow up.

1           PROSPECTIVE JUROR:  Okay.  It depends, again.

2    Because I read what the case was about.  So according to this

3    case, I'm strong against this case.

4           MR. O'CONNOR:  Pardon me?

5           PROSPECTIVE JUROR:  Because the person is well, I

6    mean recovered the surgery and alive today and in our society

7    and with their families, I strongly believe this case

8    shouldn't be happening.  That's why I did only for this case.

9    Not in general.

10          MR. O'CONNOR:  I appreciate that.  Thank you.

11          THE COURT:  Anything from defense?

12          MR. ROGERS:  No, Your Honor.

13          THE COURT:  Okay.  Thanks, Juror 16.  If you could be

14   downstairs at 11:35 --

15          PROSPECTIVE JUROR:  Can I stay upstairs, though?

16   It's warmer.

17          THE COURT:  You sure can.

18          Traci, would you have Juror 44 come in, please.

19          Juror 44, you are good right there if you don't mind

20   standing for a minute.  We'll do this quickly.

21          PROSPECTIVE JUROR:  I prefer standing.  Thank you.

22          THE COURT:  There were follow-up questions for

23   Juror 44?  Mr. O'Connor?

24          MR. O'CONNOR:  Yes.

25          THE COURT:  Let's have you talk into a mic so Tricia

1    can hear you.

2         MR. O'CONNOR:  Number 44, we just wanted to follow up

3    with you.  You were asked questions in your questionnaire.

4    Question 50 was whether you had a relative or someone close to

5    you that was diagnosed with blood clots, deep vein thrombosis,

6    or pulmonary embolism, and your response was "private."  So we

7    would like to follow up with you on that.

8         PROSPECTIVE JUROR:  It's still private.

9         MR. O'CONNOR:  Pardon me?

10        PROSPECTIVE JUROR:  It's still private.

11        MR. O'CONNOR:  The reason we're asking, obviously we

12   need to know some of the deals about that experience.  We're

13   not trying to pry, but --

14        THE COURT:  Let me ask it this way, Mr. O'Connor.

15        Juror 44, would the experience you've had with that

16   affect your ability to be a fair juror in this case?

17        PROSPECTIVE JUROR:  No.  Not at all.

18        THE COURT:  Then I think we do need to know a bit

19   more about it, if that's all right.

20        PROSPECTIVE JUROR:  My mother died from a deep vein

21   thrombosis.  Pulmonary embolism traveled from her leg.  I have

22   similar conditions.  I will die from this condition most

23   likely.  I'm not treating it with a box or a pill, I'm just

24   preparing my life.

25        THE COURT:  Okay.

1              Go ahead, Mr. O'Connor.

2              MR. O'CONNOR:  And Number 44, do you have beliefs or

3     philosophies that prevent from you seeking treatment?

4              PROSPECTIVE JUROR:  No.

5              MR. O'CONNOR:  Have you ever been advised that you

6     should receive treatment and received recommendations for the

7     type of treatment you should receive?

8              PROSPECTIVE JUROR:  I have.

9              MR. O'CONNOR:  And have you declined that treatment?

10             PROSPECTIVE JUROR:  I have not responded positively

11    to that treatment invitation.

12             MR. O'CONNOR:  Pardon me?

13             PROSPECTIVE JUROR:  I have not responded in the

14    positive to that offer.  I have not taken anybody up on that

15    offer for treatment.

16             MR. O'CONNOR:  Were you ever recommended an IVC

17    filter?

18             PROSPECTIVE JUROR:  I don't know what that is.

19             MR. O'CONNOR:  Okay.  So you don't have any

20    background or experience --

21             PROSPECTIVE JUROR:  No.  I'm really quite sano

22    between the ears.  I have no idea about what this trial is

23    about and I have no idea about the treatment available to me.

24    I just answered that question on the questionnaire as I did.

25             MR. O'CONNOR:  Okay.  Thank you.

```
 1            Is there anything else, David?

 2            Thank you, sir, I appreciate that.

 3            THE COURT:  Mr. Rogers -- hold on, Juror Number 44.

 4   Just a minute.  Let's give the other side a chance.

 5            MR. ROGERS:  I just wanted to ask a very brief

 6   follow-up question.

 7            Is the treatment that you have been offered, if you

 8   don't mind sharing it with us, has it been -- I think you said

 9   it was drugs; is that right?

10            PROSPECTIVE JUROR:  I don't recall mention about

11   drugs.

12            MR. ROGERS:  Okay.  So --

13            PROSPECTIVE JUROR:  Is blood thinner a drug?  I don't

14   even know if that's a drug.

15            MR. ROGERS:  There are several blood thinners that

16   are drugs, yes.

17            PROSPECTIVE JUROR:  That was referenced and that's

18   the only thing I remember.

19            MR. ROGERS:  Okay.  And you've made an election not

20   to pursue the use of --

21            PROSPECTIVE JUROR:  At this point in my life, that's

22   correct.

23            MR. ROGERS:  Okay.  Thank you, sir.

24            PROSPECTIVE JUROR:  Thank you.

25            THE COURT:  Thank you, sir.
```

1              Traci, could you have Juror 59 come in, please.

2              Juror 59, thanks very much for remaining behind for a

3      minute.

4              Plaintiffs' counsel, you had a follow-up question, I

5      think.

6              MR. ROGERS:  Your Honor, this is one that I had

7      asked --

8              THE COURT:  Oh.  Go ahead, Mr. Rogers.

9              MR. ROGERS:  Hello, sir.  How are you?  And thank you

10     for coming back.

11             I just wanted to follow up about some of the things

12     that you had in your questionnaire.  And it sounds like you

13     had an experience with a family member that expired; is that

14     correct?

15             PROSPECTIVE JUROR:  Three years ago and six days.

16             MR. ROGERS:  And it sounds like there was some

17     lawsuit that was brought as a result of that?

18             PROSPECTIVE JUROR:  My parents sought.  Yeah.

19             MR. ROGERS:  Is that suit still ongoing?

20             PROSPECTIVE JUROR:  No.

21             MR. ROGERS:  Has the suit resolved?

22             PROSPECTIVE JUROR:  No.  They -- it ran out of steam.

23     My parents were left --

24             MR. ROGERS:  Understand.  And one of the things I

25     need to specifically follow up on, you had marked in response

1     to a question that indicated that you weren't sure if you

2     could apply the law fairly and impartially in this case based

3     on that experience.

4             PROSPECTIVE JUROR:  It is a concern.

5             MR. ROGERS:  And is that something that you feel like

6     you were biased against the medical community?

7             PROSPECTIVE JUROR:  Not necessarily.  But it would --

8     I -- I would be afraid it would shade my consideration.

9             MR. ROGERS:  Do you feel like you would favor the

10    plaintiff over the defendant in this case with the defendant

11    being a medical product company?

12            PROSPECTIVE JUROR:  Not necessarily.

13            MR. ROGERS:  And is there some reason why you feel

14    like you might favor the defendant over the plaintiff?

15            PROSPECTIVE JUROR:  No.

16            MR. ROGERS:  Okay.  I'm just trying to understand

17    what your concern is, if you don't mind helping me out.

18            PROSPECTIVE JUROR:  Well, it's still pretty fresh

19    circumstance.  And I think -- I think, and the judge mentioned

20    this at the beginning, that perhaps it's possible to set aside

21    a personal experience like that.  I'm not certain.  I would

22    make every effort to be impartial, but I can't say that that

23    life experience, because it was substantial in my life, it

24    wouldn't shade my -- shade my thinking.

25            But, again, I'm a fairly intelligent person, so I

1    think I would be able to set it aside.

2          MR. ROGERS:  Is it fair to say that even if you did

3    your best to try to set aside that personal experience, that

4    you still have some reservation that you may not be able to do

5    that and that it could impact the way you would decide this

6    case?

7          PROSPECTIVE JUROR:  I think -- I think understanding

8    more of the -- more of the case, because all I was given was a

9    synopsis, an overview, that I would be able to make a decision

10   based on that.  Or I would hope so.

11         MR. ROGERS:  But is there any doubt in your mind that

12   you could -- that you may not be able to do that?

13         PROSPECTIVE JUROR:  I wouldn't say the word "no"

14   would apply.  I --

15         THE COURT:  Let me jump in, Juror 59.  What I'm

16   hearing you saying, sir, tell me if this is right, is that

17   you've had experience that is still fresh enough in your mind,

18   still enough a part of you, that it is possible it could have

19   an influence.  You don't know that because you don't know the

20   case, but it's something that is very present in your life.

21         PROSPECTIVE JUROR:  Yeah.  I -- the circumstances are

22   different because it wasn't a medical device circumstance, it

23   was improper standard of care.  So I think it would be

24   difficult.  But, again, using what your instructions were at

25   the very beginning of this process, I think I could still be

```
 1   impartial.
 2           THE COURT:  Okay.  Thanks.
 3           Did you have more questions, Mr. Rogers?
 4           MR. ROGERS:  No, Your Honor.
 5           THE COURT:  Mr. O'Connor?
 6           MR. O'CONNOR:  Yes, some follow-up.
 7           We're sorry for your loss.
 8           You said that the case lost steam.  Does that mean
 9   the case just stopped, didn't go any further?
10           PROSPECTIVE JUROR:  The attorneys, I don't know who
11   they were, hopefully not you, but they lost interest in the
12   case.  It started to move along pretty well.  We had -- my
13   parents.  I say "we."  It was my sister, so -- but we had
14   quite a bit of steam at the beginning, had a witness, somebody
15   who was directly involved who was probably putting their
16   medical license at risk in supporting our -- supporting our
17   claim.
18           MR. O'CONNOR:  Your parents retained lawyers, I take
19   it?
20           PROSPECTIVE JUROR:  Absolutely, yes.
21           MR. O'CONNOR:  Is there anything about that and the
22   loss of interest that would affect the feelings you may have
23   against lawyers that represent people on our side?
24           PROSPECTIVE JUROR:  Possibly.
25           MR. O'CONNOR:  You do have feelings?
```

1          PROSPECTIVE JUROR:  Well, I don't know that it would

2     influence my decision.  Again, I don't know -- I don't

3     recollect the name of the attorneys.

4          MR. O'CONNOR:  And fair enough.  And I appreciate --

5          PROSPECTIVE JUROR:  That's more personally animus

6     against those particular individuals more likely.  But, again,

7     not knowing who they are, I can't --

8          MR. O'CONNOR:  Do you feel, based upon that

9     experience, that you are suspicious and do have some concerns

10    about people who represent people bringing claims?

11         PROSPECTIVE JUROR:  Not necessarily, no.  No.  I get

12    sued all the time.

13         MR. O'CONNOR:  Pardon me?

14         PROSPECTIVE JUROR:  I get sued all the time.

15         MR. O'CONNOR:  Okay.  I'm sorry about that.

16         PROSPECTIVE JUROR:  That's all right.

17         MR. O'CONNOR:  I wanted to follow up with one other

18    point.  What do you do for a living?

19         PROSPECTIVE JUROR:  I'm in residential property

20    management.

21         MR. O'CONNOR:  And that's where the lawsuits --

22         PROSPECTIVE JUROR:  Absolutely.  Against my company

23    and my PLLC, not against me personally.

24         MR. O'CONNOR:  It sounds as though, as you sit here

25    today, it's going to be difficult for you to start out this

```
 1    case neutral; you can't predict if you're going to be able to
 2    set aside your feelings.  Is that fair?
 3              PROSPECTIVE JUROR:  I don't think that's accurate.  I
 4    don't think that's characterized properly.
 5              I think that -- like I said, I think I would make
 6    every effort to -- to approach it in a -- as an impersonal
 7    process as I possibly could.
 8              MR. O'CONNOR:  Now, there's going to be testimony
 9    from doctors in this case.  And knowing that, the experience
10    with your parents in that case, is that going to affect you in
11    terms of how you look or view or assess the credibility of
12    medical professionals that come in here and testify?
13              PROSPECTIVE JUROR:  Possibly, yeah.
14              MR. O'CONNOR:  Okay.  Thanks.  So you just don't know
15    that you may be looking at a medical professional --
16              PROSPECTIVE JUROR:  And harboring suspicion.
17              MR. O'CONNOR:  Pardon me?
18              PROSPECTIVE JUROR:  And harboring suspicion, to
19    finish your thought.  Possibly.  I -- I -- I honestly can't --
20    this is the difficulty I had in the way I answered it in my
21    questionnaire.  I wouldn't want to be unduly influenced by a
22    personal experience, and that would be my fear.
23              MR. O'CONNOR:  Fair enough.
24              THE COURT:  All right.  Thank you very much,
25    Juror 59.
```

```
 1              All right.  Counsel, I'm going to identify the jurors

 2     that I'm going to excuse for hardship.

 3              I'm going to excuse --

 4              Are you ready, Traci?

 5              THE COURTROOM DEPUTY:  Yes.

 6              THE COURT:  -- Juror Number 2, 5, 21, 28, 51, 62,

 7     we've already excused Juror 68, 70, and 106.

 8              So, Counsel, to save time on challenges for cause,

 9     let's initially just have you state challenges to cause

10     through Juror 74, because I don't think we'll need higher than

11     that.  If we do, we'll come back to them.

12              So Juror 3 through 74, plaintiffs' counsel, do you

13     have challenges for cause?

14              MR. O'CONNOR:  I'll let Mr. Wenner take that,

15     Your Honor.

16              THE COURT:  That's fine.

17              If you want to stay seated, Counsel, that's fine.

18     Just be sure you've got the mic right in front of you.

19              MR. WENNER:  First one is Juror Number 16,

20     Your Honor.

21              THE COURT:  Let's do what we did before.  That is,

22     have you identify them, see if the defendants agree or

23     disagree.  If they disagree I'll hear reasons.

24              MR. ROGERS:  Your Honor, I wish I could come up with

25     a reason to keep Juror 16, but I don't think there is one.
```

```
 1              THE COURT:  All right.  I'm going to grant the
 2   challenge for cause to Juror 16.  I think she was very clear
 3   in her answers that she could not be a neutral juror.
 4              MR. WENNER:  Juror -- I have Juror Number 20.
 5              THE COURT:  All right.  Let's hear -- Juror --
 6              MR. WENNER:  Juror Number 20 --
 7              THE COURT:  Let's hear if defense counsel agree or
 8   disagree first.
 9              MR. ROGERS:  Your Honor, I believe she is also
10   somebody we're going to agree with.
11              THE COURT:  All right.  I'm going to grant the
12   challenge for cause to Juror 20.  She said she cannot set
13   aside her favorable views of device manufacturers.
14              Next one, plaintiffs' counsel.
15              MR. WENNER:  Number 50, Your Honor.
16              THE COURT:  Let's first hear defense counsel's views.
17              MR. ROGERS:  Your Honor, I would not agree with
18   Juror 50.
19              THE COURT:  Okay.  Go ahead, let's hear plaintiffs'
20   reasons.
21              MR. WENNER:  Yes, Your Honor.  Mr.- --
22              THE COURT:  Let's not mention names.
23              MR. WENNER:  Okay.  Juror 50 basically said he
24   started out with very favorable feelings against medical
25   device companies.  He doesn't like lawsuits against
```

1    corporations with wealth.  And essentially he starts out with

2    bias in favor of the medical device manufacturers.  And so, I

3    don't know, in light of the fact we have so many jurors, I

4    just don't see how we can keep a juror like that in light of

5    the predisposition in favor of medical device manufacturers.

6    "Very favorable feelings," I wrote down.

7              He doesn't like lawsuits against corporations with

8    wealth.  We're going to be talking about the wealth of this

9    corporation.  This is a large, very large, wealthy

10   corporation.  Starts out -- we start out, I think, in a

11   one-down position in this case with this particular juror,

12   Number 50.

13             THE COURT:  Mr. Rogers.

14             MR. ROGERS:  Your Honor, I believe that Juror 50

15   consistently said that all cases are different, he needs to

16   hear the facts of the case.  He said he could set aside his

17   biases, and I think he was very clear he would have to hear

18   the facts of this case and the evidence and he could make a

19   decision on that.

20             THE COURT:  Okay.  Well, you're right, Mr. Rogers, he

21   said that.  There are some instances where I have to make a

22   decision on the basis of demeanor.  And on the basis of

23   Juror 50's demeanor, I'm going to grant the challenge for

24   cause.  I just had doubts after he finished about his

25   fairness.

1          All right, next one for plaintiffs.

2          MR. WENNER:  Your Honor, Juror Number 52.  Juror

3    Number 52 --

4          THE COURT:  Before you make your argument, let's hear

5    defense views.

6          MR. WENNER:  Sorry, Your Honor.

7          MR. ROGERS:  I disagree, Your Honor.

8          THE COURT:  Okay, go ahead.

9          MR. WENNER:  Juror Number 52, he -- first of all, in

10   his questionnaire he said he has very unfavorable feelings

11   about personal injury lawyers, he's got concerns about

12   frivolous lawsuits.  Those questions 57 through 59, you know,

13   he answered that too many lawsuits, too much -- he doesn't --

14   the damages are too high, believes in caps.

15         But specifically in court he said that he would

16   require a higher burden of proof because of, and I quote,

17   prejudices that he has, and he would hold the plaintiff to a

18   higher burden of proof.  And he said, "I don't know if I can

19   be fair and impartial."  And so I think that under any

20   circumstances this juror needs to be struck for cause.

21         THE COURT:  Mr. Rogers.

22         MR. ROGERS:  Your Honor, Juror 52 stated that he

23   could listen to the evidence and apply the law regarding

24   burdens as instructed.  I think that his general demeanor was

25   that he could be fair and impartial if he was provided the

1    sufficient evidence in order to do so.

2              THE COURT:  Juror 52 gave answers both ways.  At one

3    point he said he did not know if he could be fair and

4    impartial.  Later, he said that he thought he could be fair

5    and impartial.

6              He did say that he would start with a higher burden

7    of proof on plaintiff.  Plaintiff does have the burden of

8    proof, but I didn't think that's what he was talking about.

9              So I'm going to grant the challenge for cause to

10   Juror 52.

11             MR. WENNER:  The next one is Juror Number 59.

12             THE COURT:  Let's hear defense's view.

13             MR. ROGERS:  I would agree, Your Honor.

14             THE COURT:  I'm going to grant the challenge for

15   cause to Juror 59.  It was evident that the loss of his family

16   member is a very fresh memory for him and he was concerned it

17   might have some influence.  So I will grant that challenge.

18             Any others from plaintiff?

19             MR. WENNER:  Let me --

20             THE COURT:  We're stopping at 74.

21             MR. WENNER:  Right.

22             You struck 62 for cause, right, Your Honor, or

23   hardship?

24             THE COURT:  62 we excused --

25             MR. WENNER:  Struck for hardship.

1          THE COURT:  -- for hardship.

2          MR. WENNER:  Do you have others?

3       (Counsel confer.)

4          MR. WENNER:  Hold on one second, Your Honor, I have

5    to get to that particular juror.

6          The -- so Juror Number 44, Your Honor.  We heard --

7          THE COURT:  Are you challenging him for cause?

8          MR. WENNER:  Yes.

9          THE COURT:  All right.

10          Defense view?

11          MR. ROGERS:  Disagree, Your Honor.

12          THE COURT:  Go ahead, Counsel.

13          MR. WENNER:  He said that -- I believe he said that

14    he would possibly have concerns about our side because of his

15    concerns about plaintiffs' lawyers, that he would be -- the

16    thing that was difficult about his testimony is he couldn't --

17    he said he possibly would be biased, but he couldn't tell us

18    in what way he could be biased in this case.

19          But it's clear that he's deeply affected by the loss

20    in this case.  Mr. O'Connor asked him about the plaintiffs'

21    lawyers seeming to be dropping the case, if he gets into this

22    case and he decides somehow that that bias, you know, is

23    important to his judgments --

24          THE COURT:  I think -- I think you're talking about

25    Juror 59.

MR. WENNER: Oh. Am I?

(Counsel confer.)

MR. WENNER: Oh, yeah, yeah, yeah. You're right, you're right, you're right.

I guess Juror Number -- I apologize, Your Honor. Juror Number 44. So we know he's being untreated for his blood clots. His mother died of a blood clot.

Now, he wasn't sure about IVC filters. If he gets in here and says, wow, that might be a good idea, how can I find against this company when they have such a great product that could save my life, could have saved my mother's life, how can we trust that juror sitting on this case? He has so much personally at stake in this case and how it could come out, how it could turn, that, you know, I think it would be unfair for him to sit as a juror in this case.

THE COURT: Mr. Rogers.

MR. ROGERS: Your Honor, I didn't hear anything from Juror 44 that indicated a bias. He's clearly got some personal issue as to why he remains untreated, but he said he did not know anything about IVC filters, never heard of them. He said multiple times nothing about his decisions would impact his ability to be fair, no beliefs that prevent him from being fair. So I didn't hear anything, really, from a bias standpoint from that juror.

THE COURT: I did not either. I don't think he said

1    anything about bias.  But I'm concerned about Juror 44 as a

2    person who says he will die from a DVT or PE; his mother died;

3    he's turned down medical advice; and he couldn't really or

4    wouldn't articulate why.  I'm just concerned about a juror who

5    was not as forthcoming as I would expect with these issues and

6    yet has direct personal life experiences that will be touched

7    upon by this trial.  So I'm going to grant the challenge for

8    cause to Juror 44.

9              Are there others from plaintiffs' side?

10             MR. WENNER:  No, Your Honor.

11             THE COURT:  All right.

12             Mr. Rogers, from the defense side?

13             MR. ROGERS:  Your Honor, I think our one and only

14   strike for cause is Juror Number 25.  She works at Banner

15   Wound Care as a scheduler.  I'm sure you will recall her.  In

16   Mr. O'Connor's questioning she said she did not want to be

17   involved in the trial and generally just seemed opposed to the

18   idea of being here at all.  So, Your Honor, for that reason we

19   would move to strike her for cause.

20             MR. WENNER:  I would agree, Your Honor.

21             THE COURT:  All right.  I will grant the challenge

22   for cause to Juror 25.

23             Okay.  Let's then count up the 15 lowest-numbered

24   jurors that remain and make sure we all end up on the same

25   number.

1        I get through Juror 71.  Traci does as well.  Does

2   that sound right to you, Counsel?

3        Let me just give you the 15 by my count.

4        They are Jurors 3 --

5        MR. O'CONNOR:  I'm sorry, could you start over,

6   Your Honor.

7        THE COURT:  3, 4, 6, 15, 18, 22, 23, 29, 30, 31, 32,

8   46, 58, 67, and 71.

9        Does that look right?

10       MR. ROGERS:  Yes, Your Honor.

11       THE COURT:  Plaintiffs' counsel, does that look

12   right?

13       MR. O'CONNOR:  Yeah, that looks good to us.

14       THE COURT:  Okay.

15       You've got three peremptory strikes per side.  Let's

16  try to do those reasonably quickly.  We've had the jurors

17  waiting for five minutes downstairs.  Let us know as soon as

18  you've identified the three.

19       You look puzzled, Mr. O'Connor.

20       MR. O'CONNOR:  I hope I didn't --

21       THE COURT:  Pull the mic over.

22       MR. O'CONNOR:  I think I wrote notes on the Judge's

23  list.  Is this what we're supposed to use for our strikes or

24  are we going to get a clean copy?

25       THE COURT:  No, that's what you use.  We're not going

1    to give it to anybody.  I assume you can read your own notes.

2              MR. WENNER:  We'll make do.

3              MR. O'CONNOR:  We'll do all right.

4              THE COURT:  Okay.  All we need are the three numbers.

5    You don't need to hand us back a clean list.

6              MR. O'CONNOR:  All right.

7              THE COURT:  Please move along as expeditiously as

8    reasonable.

9         (Pause in proceedings from 11:41 to 12:03.  Proceedings

10   resumed in open court with the jury panel present.)

11             THE COURT:  Please be seated.

12             Counsel, would you come to sidebar, please.

13        (Bench conference as follows:)

14             THE COURT:  Traci said you had an issue you wanted to

15   raise.

16             MR. WENNER:  Yes, Your Honor.  I wanted to raise a

17   *Batson* challenge.  The defense struck three jurors, two of

18   which were black.  I think this woman may have been from

19   Africa.  I don't know where she's from, so I don't want to

20   call her African-American, but she's clearly black.  She is

21   Juror Number 4.

22             And they struck Juror Number 31.  Juror Number 31 was

23   saying she was an LPN.  Under *Batson* --

24             THE COURT:  I remember who they are.  Go ahead.

25             MR. WENNER:  Okay.  Under *Batson*, as you probably

1    well know better than me, they have to have a facially neutral

2    reason other than race being the basis for striking them and

3    it just seems a little curious two out of the three jurors

4    they strike are, you know, black.

5             (Pause in bench conference.)

6             THE COURT:  We'll be with you in just a minute,

7    ladies and gentlemen.

8             (Bench conference resumed.)

9             THE COURT:  All right.  So I think that the challenge

10   is a prima facie case of discrimination, which is the first

11   step in the Ninth Circuit under a *Batson* challenge and the

12   burden then shifts to the defense to come forward with a

13   nondiscriminatory, meaning race neutral, explanation for the

14   strikes.

15            MR. ROGERS:  I agree, Your Honor.

16            Sure.  Starting with Juror Number 4, she, as you

17   heard, is a clinical research associate.  She works for a

18   company that does clinical trials for a drug company.  She

19   told or said in the voir dire questioning that she has

20   contacts with doctors who are involved in conducting those

21   trials.

22            As the Court is aware, the plaintiffs are going to be

23   playing the deposition of Dr. Kandarpa in this case, who is a

24   medical monitor for a clinical trial sponsored by Bard.  He is

25   going to have unfavorable things to say about Bard.  And that

1    is our race-neutral reason for striking Juror Number 4.

2              THE COURT:  And 31.

3              MR. ROGERS:  31 is an LPN.  She said in voir dire

4    that she worked for the Veterans Hospital when she was

5    working, and she took care of oncology patients.  She said she

6    had a lot of direct patient care as part of that job.  She

7    said that she currently is working for what sounded to me like

8    a hospital connected with the jail, and that she is in a

9    position where she monitors psychiatric patients currently.

10             And I think that she has a lot of empathy,

11   potentially, for people who are in hospitals and under medical

12   care, and I think that she may identify with the plaintiff in

13   this case, and that is the reason that we struck her.

14             THE COURT:  All right.  I think those are

15   race-neutral explanations.  So the burden shifts back to

16   plaintiff to make a showing that these reasons are pretext for

17   discrimination.

18             MR. WENNER:  Your Honor, Juror Number -- is it 31?

19   Juror Number 31 hardly ever spoke.  She's an LPN.  The fact

20   she could be empathetic towards the plaintiff, she never said

21   that empathy was going to somehow bias her.  I understand they

22   can do that, but they can choose to strike whoever they want

23   if it's -- if -- unless it's racially motivated, and it just

24   seems odd that out of the two of three jurors they used their

25   peremptories on, two of them are black.

1          And the last one, the last juror, I don't see how --

2     what -- I don't think that anything he said was a

3     justification from --

4          THE COURT:  Let me interrupt you.  You're talking

5     about a juror other than the two black jurors now?

6          MR. O'CONNOR:  No, I'm talking about the two black

7     jurors.  I don't think anything counsel just said is a

8     justification for defendants to think that somehow that they

9     would -- that she would be an adverse juror.  If anything, she

10    may be a good juror for them.  The fact she's in the medical

11    field, both in the medical field.  They may like the medical

12    witnesses and be more inclined to side -- to side with the

13    defendant.

14         So -- I don't think it's a close question to

15    Juror Number 31.  Perhaps Juror Number 4 I could see, you

16    know, that argument.  Not on Juror 31.  Not even close, in my

17    mind.  So -- she didn't say anything on her questionnaire,

18    nothing, that put her in a bias category.  And the only thing

19    I can see is that she happens to be African-American.

20         THE COURT:  All right.  I'm going to deny the *Batson*

21    challenge.  The reason I'm going to do it is because the

22    defense has provided, in my view, reasonable race-neutral

23    grounds for having used their peremptory strikes against

24    Jurors 4 and 31.

25         I understand plaintiffs' counsel doesn't agree with

1    the reasons, but that is not the test.  The test is whether

2    they're reasonable race-neutral grounds.  I think they are.

3    Therefore, I don't think purposeful discrimination or even

4    nonpurposeful race discrimination has been shown, and so I

5    will deny the *Batson* challenge.

6            MR. ROGERS:  Your Honor, may I state one more thing

7    just for purposes of the record?

8            THE COURT:  Yes.

9            MR. ROGERS:  In response to what plaintiffs' counsel

10   just stated, Juror 31 in her questionnaire did rank

11   plaintiff's attorneys a 5, devices manufacturers a 4, and

12   corporations a 3.  She also has a son who has been sued for

13   downloading music and so she may have bias against businesses.

14   So I just wanted to say that in response to what plaintiffs'

15   counsel said.

16           THE COURT:  Okay.  That's on the record.

17       (Bench conference concludes.)

18           THE COURT:  All right.  Thank you very much for your

19   patience, ladies and gentlemen.  We're well aware we took a

20   half hour longer than we told you we would.  But we've

21   completed the process now of choosing the jury.

22           Traci is going to call forward the nine of you who

23   have been chosen to serve.

24           THE COURTROOM DEPUTY:  Juror Number 3.

25           Juror Number 15.

1          Juror Number 18.

2          Juror Number 22.

3          Juror Number 23.  Ma'am, you're going to be right

4    here.

5          Juror 29.

6          Juror 46.

7          Juror 58.

8          Juror 71.

9          THE COURT:  All right.  For those of you who have

10   been chosen to serve on the jury, before we excuse the rest of

11   the jury panel, have any of you thought of anything that you

12   did not mention in your questionnaire or in response to

13   questions this morning that could affect your fairness to

14   serve as a juror in this case?

15         All right, I see no hands.

16         For the rest of you -- yes, Juror 4, we'll get those

17   things to you.

18         For the rest of you, thank you very much for being

19   here.  We appreciate your presence.  We were able to choose

20   the jury because you were here.

21         We will excuse you.  Please just check in at the jury

22   office before you leave.  We'll excuse you now with our

23   thanks.

24       (Excused panelists exit the courtroom.)

25         THE COURT:  Please be seated.

1          All right.  Would those of you who have been chosen

2     to serve on the jury please stand to be sworn as jurors.

3          THE COURTROOM DEPUTY:  Raise your right hands,

4     please.

5        (The jury is sworn.)

6          THE COURT:  Thank you.  Please be seated.

7          Ladies and gentlemen, we know you've been waiting for

8     an hour, but during that hour we've been working and we now

9     need to take a lunch break for the benefit of everybody before

10    we actually start the trial.  So we're going to excuse you in

11    just a moment.  But let's figure out for how long.

12         Counsel, how much time do we need to address the

13    issue we didn't get to this morning, about openings?

14         MR. LOPEZ:  Ten minutes, Your Honor.

15         THE COURT:  Okay.  So let's do this, ladies and

16    gentlemen.  We will plan to start at 1:30.  That will give us

17    time to deal with an issue and then give everybody a lunch

18    break before we start.

19         When you come back, I'll give you some preliminary

20    instructions.  We'll then hear opening statements from each

21    side about what they think the evidence will show, and then

22    we'll start with our first witness.

23         While you are on lunch break, please remember not to

24    talk to anybody about the case.  Don't let anybody talk to you

25    about it.

1          In fact, in your book you will see there's a badge

2     that says "Juror" on it.  We would ask you to wear that when

3     you're in the courthouse.  So if you don't go around for lunch

4     and you're just hanging out in the courthouse, put that on and

5     that way people in the courthouse know not to discuss a case

6     anywhere within your earshot.

7          You can take off the numbered stickers you've had.

8          When you leave the courthouse, you don't have to keep

9     the juror badge on unless you want to.

10         We don't have a cafeteria in the courthouse.  We have

11    a little kiosk down by the elevators that sells some salads

12    and sandwiches.

13         If you go out the door to Washington and go east,

14    there's a restaurant immediately across 4th Avenue on the

15    south side and one on the north side.  There are other

16    restaurants further down into town.

17         When you come back, we'll have you gather in the jury

18    room, and Traci or Nancy will take you out this door and show

19    you where that room is and where to gather.  And if you could

20    be there at 1:30, we'll get started with the trial.

21         Counsel, anything else before we excuse the jurors?

22         MR. O'CONNOR:  Nothing from our side, Your Honor.

23         MR. ROGERS:  No, Your Honor.

24         THE COURT:  Okay.  We'll see you at 1:30.

25       (The jury exited the courtroom at 12:18.)

```
 1                THE COURT:  All right.  Please be seated.

 2                Mr. Lopez, you have some objections to slides, I

 3      think.

 4                MR. LOPEZ:  Can I approach here, Your Honor?

 5                THE COURT:  You may.

 6                MR. LOPEZ:  The good news is they've gone from

 7      whatever the number was to about maybe certainly less than

 8      half of what they originally were.

 9                Counsel, make sure, you're going to take out

10      Number 9.  And I agree with your addition to the others about

11      adding "reported rates."

12                Let me just get to the ones that concern us the most.

13                I mean, you've heard us talk about this all the time,

14      Your Honor, about the filters being lifesaving devices.  We're

15      still waiting -- we've had two trials where there's been no

16      scientific evidence of that.

17                I don't mind the data on here, but the caption --

18                THE COURT:  What slide are you talking about?

19                MR. LOPEZ:  Slide 22.

20                THE COURT:  I don't have a copy.

21                MR. LOPEZ:  Are these numbered the same?

22                MR. ROGERS:  At some point, Ramon, I think they may

23      start to be one slide off.  If we get to that point, I'll let

24      you know.

25                THE COURT:  So it's in the vicinity of 22?
```

1          MR. LOPEZ:  I think that one might actually be 22.

2          THE COURT:  And it's the one that has "Lifesaving

3     Devices" in the title?

4          MR. LOPEZ:  Right.  I don't mind the evidence, but to

5     me that's argument, whether or not these things are lifesaving

6     devices.

7          THE COURT:  So what you're objecting to is the

8     reference at the beginning of "Lifesaving Devices"?

9          MR. LOPEZ:  Yes, sir.  Yes, Your Honor.

10         THE COURT:  All right.

11         MR. ROGERS:  Your Honor, we do plan to present to the

12    jury that evidence will show that filters are lifesaving

13    devices and I think, Your Honor, that we will support that

14    evidence at trial.  And this is what we believe the evidence

15    will show.

16         THE COURT:  All right.  I'm going to overrule the

17    objection in light of the representation that there will be

18    evidence on that point.

19         MR. LOPEZ:  Slide 52.  This one, Your Honor.

20         THE COURT:  99.99 --

21         MR. LOPEZ:  Bard filters are 99.99 percent effective.

22         THE COURT:  Okay.

23         MR. LOPEZ:  There's been no evidence to that thus

24    far.  I mean, that's argument.  I mean, there's no facts that

25    I'm aware of that have come in in either of the prior two

```
1    trials that show that Bard filters are 99.99 percent
2    effective.
3            THE COURT:  All right.
4            Mr. Rogers.
5            MR. ROGERS:  Your Honor, we believe there is evidence
6    of that and it is based on Bard's internal rates for tracking
7    that issue.
8            And Mr. Lopez -- I told him I would add to certain
9    slides it was a reported rate and he accepted that, and if it
10   would make him comfortable I can add that same language to
11   this slide.
12           THE COURT:  Do the math for me.  What is the internal
13   data that allows you to tell the jury the evidence will show
14   99.99 percent effectiveness?
15           MR. ROGERS:  That is the reported rate of PE deaths
16   with the Bard filters.
17           THE COURT:  All filters?
18           MR. ROGERS:  Well, that specific data point is in
19   relation to the G2X and the Eclipse filters, which are the
20   filters we have at issue in this trial.
21           THE COURT:  So you're saying the data will show that
22   deaths in recipients of G2X and Eclipse filters is less than
23   one --
24           MR. ROGERS:  .01 percent.
25           THE COURT:  -- one one-hundredth of 1 percent?
```

1          MR. ROGERS:  Yes, Your Honor, if that's the way the

2    math works out.  I'm not real good at that.

3          THE COURT:  That's what it is, one one-hundredth of

4    1 percent.

5          Do you disagree that the internal data from Bard will

6    show that?

7          MR. LOPEZ:  That the internal -- the internal data

8    shows that there have been that many reports, but this is

9    telling the jury that the other 99.99 got hit with a clot and

10   the device worked.

11         We didn't know anything about those other 99.- --

12   this is about effectiveness.  He already has in here the

13   reported rates of fractures, migrations in the 90 percentile.

14   This is telling the jury that 99.99 --

15         THE COURT:  I understand your point.

16         What is your response to that, Mr. Rogers?

17         MR. ROGERS:  Your Honor, we believe the evidence will

18   show that.  I mean based on the Bard internal rates.

19         THE COURT:  Well, but for this to be right, wouldn't

20   100 percent of the filters have to have trapped a clot for

21   them to be --

22         MR. ROGERS:  I would say, Your Honor, close to

23   100 percent of the patients experienced no known pulmonary

24   embolism.

25         THE COURT:  Well, but that doesn't say that the clot

1    worked to stop the pulmonary embolism in each of them; right?

2              MR. ROGERS:  That is correct, Your Honor.  I have no

3    data that I could present to the jury that would show that a

4    clot was stopped by every filter that was placed.

5              THE COURT:  And isn't that what 99.99 percent

6    effective means?  It's effective in stopping clots

7    99.99 percent of the time?

8              MR. ROGERS:  Your Honor, I would disagree, but I see

9    that's where you're going and if you want me to pull this

10   slide, I'll be glad to do it.

11             THE COURT:  I'll sustain the objection to that slide.

12             MR. LOPEZ:  The next one is 53.  And this is

13   Dr. Kinney.  Dr. Kinney, the risk/benefits claims.  They're

14   identifying Dr. Kinney as a plaintiffs' expert.  And, of

15   course, the rule has been that if you're going to use the

16   testimony of the other side's expert, you can't -- as

17   testimony, you can't identify that expert as the plaintiffs'

18   ex- -- plaintiffs' expert.

19             Dr. Kinney may or may not testify in this case.

20   Depends on time and his availability.  He has not testified

21   thus far so there is no testimony from him about that.

22             THE COURT:  Mr. Rogers.

23             MR. ROGERS:  Well, Your Honor, based on some of

24   Mr. Lopez's prior representations, I thought that Dr. Kinney

25   was going to appear as a witness at the trial.  If that's the

1   case, he's testified to this in his deposition so I assume

2   he'll testify to this at trial.

3           If Mr. Lopez can tell us for sure he's not going to

4   be here, I'll be glad to pull the slide.

5           MR. LOPEZ:  No, I can't say that for sure.  But he

6   can cross-examine him on this if he does.  But if he

7   doesn't -- if he's not here --

8           THE COURT:  Are you going to call him as a witness?

9           MR. LOPEZ:  If we can.  I mean, he's -- depends

10  whether or not he qualifies as a rebuttal witness.  That's the

11  only time he's available.

12          THE COURT:  So you will only use him as a rebuttal

13  witness if you use him at all?

14          MR. LOPEZ:  Right.  He's not available otherwise.

15          THE COURT:  And if he isn't called as a witness, then

16  this won't come in; right?

17          MR. ROGERS:  I'm glad to pull the slide if we know

18  he's not going to be here in the case in chief.

19          THE COURT:  Let's pull it, then, for that reason.

20          MR. LOPEZ:  The one I have the most concern about,

21  Your Honor, is -- the one I have --

22          Mark, you have -- oh, here.  I'm almost there.

23          Slide 82.  Should say "No Warnings Claim, Design

24  Defect Only."

25          I mean, this -- there is a warnings claim, but the

1    warnings claim is the defendants', that their warnings somehow

2    make the device not unreasonably dangerous.

3         This is going to mislead the jury that warnings --

4    that when we start talking about warnings and the sufficiency

5    of what is in the IFU or the sufficiency of what information

6    they provided as part of their duty to make the device safer,

7    it's going to confuse the jury about whether or not that's

8    something they're supposed to consider in this case.

9         So what they do here, they say there's no warnings

10   claim and then it's followed by all the slides with the IFU

11   where the jury is going to get a false impression that

12   whatever is stated on these slides are adequate because we're

13   not claiming -- there's no warnings claim.  That's a legal

14   argument.

15        THE COURT:  I understand the objection.

16        Mr. Rogers.

17        MR. ROGERS:  Your Honor, I was planning on using this

18   slide to let the jury know that there is no warnings case

19   against Bard in this case.  But they are going to be hearing

20   about the instructions for use that accompany the product, and

21   I think it's important for them to know that they're going to

22   only be hearing about those instructions that come with the

23   product in the context of how they relate to the design claim.

24   And, Your Honor, I think that's where we are in this case and

25   I think the jury's going to need to understand that.

1    THE COURT:  I'm going to -- I'm going to sustain the

2    objection for this reason, Mr. Rogers.  If we say highlighted

3    in yellow "there is no warnings claim," that's suggesting to

4    the jury that the plaintiffs are not challenging the

5    sufficiency of the warnings.  And they clearly are when it

6    comes to the warnings' relevancy to whether or not the product

7    is safe.  And they clearly asserted a warnings claim that I

8    ruled against them on as a matter of law.

9    I think it's okay for you to say this is a design

10   defect case and for you to explain to them how, in your view,

11   the risks that are disclosed ensure the safety of the product,

12   which is what the case is about.  But I don't think we should

13   say there's no warnings claim because I think they'll infer

14   that means the plaintiffs aren't complaining in any way about

15   the warnings, and they clearly are in the case.  So I think we

16   should take that yellow highlighted statement out.

17   MR. ROGERS:  Very good, Your Honor.  I just want to

18   make sure it's okay to use this slide if the yellow portion is

19   removed?

20   THE COURT:  I think it's okay to say this is a design

21   defect case because that clearly -- that's what it is.

22   MR. ROGERS:  Thank you, Your Honor.

23   THE COURT:  Are there others, Mr. Lopez?

24   MR. LOPEZ:  No, Your Honor.  I said I was going to be

25   ten minutes or less.

```
 1                THE COURT:  You made it in ten minutes.  Good job.

 2            Okay.  We will plan to resume at 1:30.  I will do the

 3    instructions and we'll go into openings.

 4            If you want to pull the lectern over so we'll be

 5    ready, that will be fine.  We'll see you then.

 6        (Recess taken from 12:29.)

 7        (End of a.m. session transcript.)

 8                          *  *  *  *  *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        **C E R T I F I C A T E**

2

3            I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7            I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14           DATED at Phoenix, Arizona, this 18th day of

15  September, 2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25