## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| IN RE:  Bard IVC Filters Products ) | MD 15-02641-PHX-DGC |
| Liability Litigation,            ) | |
|                                  ) | |
| _____ ) | |
| Lisa Hyde and Mark Hyde, a married ) | Phoenix, Arizona |
| couple,                          ) | **September 18, 2018** |
|                                  ) | |
|         Plaintiffs,              ) | |
|                                  ) | |
|         v.                       ) | CV 16-00893-PHX-DGC |
|                                  ) | |
| C.R. Bard, Inc., a New Jersey     ) | |
| corporation, and Bard Peripheral  ) | |
| Vascular, an Arizona corporation, ) | |
|                                  ) | |
|         Defendants.              ) | |
| _____ ) | |


BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE


<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>


<u>TRIAL DAY 1 - P.M. SESSION</u>


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                     **A P P E A R A N C E S**

2

      For the Plaintiffs:

3

          Lopez McHugh
4         By:  **RAMON R. LOPEZ**, ESQ.
          100 Bayview Circle, Suite 5600
5         Newport Beach, CA 92660

6         Gallagher & Kennedy
          By:  **MARK S. O'CONNOR**, ESQ.
7              **PAUL L. STOLLER**, ESQ.
          2575 East Camelback Road, Suite 1100
8         Phoenix, AZ 85016

9         Heaviside Reed Zaic
          By:  **JULIA REED ZAIC**, ESQ.
10             **LAURA E. SMITH**, ESQ.
          312 Broadway, Suite 203
11        Laguna Beach, CA 92651

12        Goldenberg Law PLLC
          By:  **STUART GOLDENBERG**, ESQ.
13             **MARLENE GOLDENBERG**, ESQ,
          800 LaSalle Avenue, Suite 2150
14        Minneapolis, MN 55402

15        Lopez McHugh, LLP
          By:  **JOSHUA MANKOFF**, ESQ.
16        1 International Plaza, #550
          PMB-059
17        Philadelphia, PA 19113

18

19

20

21

22

23

24

25

<u>**A P P E A R A N C E S**</u> **(CONTINUED)**

For the Defendants:

    Nelson Mullins Riley & Scarborough
    By:  **JAMES F. ROGERS**, ESQ.
    1320 Main Street
    Columbia, SC 29201

    Snell & Wilmer
    By:  **JAMES R. CONDO**, ESQ.
    400 East Van Buren
    Phoenix, AZ 85004

    Nelson Mullins Riley & Scarborough
    By:  **RICHARD B. NORTH, JR.**, ESQ.
        **MATTHEW B. LERNER**, ESQ.
        **ELIZABETH C. HELM**, ESQ.
    201 17th Street NW, Suite 1700
    Atlanta, GA 30363

    C.R. Bard, Inc.
    Associate General Counsel, Litigation
    By:  **GREG A. DADIKA**, ESQ.
    730 Central Avenue
    Murray Hill, New Jersey 07974

1                        **I N D E X**

2    **SUMMARY OF COURT PROCEEDINGS**                    **PAGE:**

3    Preliminary Jury Instructions                         133
     Opening Statements
4            By Ms. Reed Zaic                             147
             By Mr. Rogers                                189

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **P R O C E E D I N G S**

2           (Proceedings resumed at 1:29 p.m.)

3           (Jury present.)

4           THE COURT:  All right, ladies and gentlemen, welcome

5    back.

6           As indicated, I'm going to now give you some

7    preliminary jury instructions.  And these instructions

8    primarily will function -- or focus on some general

9    instructions about the law and how the trial is going to

10   proceed and your duty as jurors.

11          It is your duty as jurors to find the facts from all

12   of the evidence in the case.  To those facts as you find them,

13   you will apply the law as I give it to you.  And I will give it

14   to you in instructions at the end of the trial.

15          You must follow the law as I give it to you, whether

16   you agree with it or not, and you must not be influenced in

17   your decision by any personal likes or dislikes, opinions,

18   prejudices, or sympathy.  That means that you must decide the

19   case solely on the evidence before you and the law as I give it

20   to you.  You will recall that you took an oath to do so.

21          As I mentioned, at the end of the trial I will give

22   you final jury instructions.  It is those final instructions

23   that will govern your deliberation in the case.

24          Please do not read into my instructions or anything I

25   may say or do during the trial as indicating any opinion I have

1   of the evidence or of what your verdict should be.  The verdict

2   is entirely a matter for you to decide.

3           To help you follow the evidence, I will give you a

4   brief summary of the positions of the parties.

5           This is a personal injury case against a medical

6   product manufacturer.  The plaintiffs are Lisa Hyde and her

7   husband, Mark Hyde.  Mrs. Hyde is a 54-year-old woman who had a

8   Bard filter placed in her inferior vena cava, the vein that

9   carries blood back to the heart.  An IVC filter, as it is

10  called, is intended to catch blood clots before they reach the

11  heart or lungs.

12          Defendants, C.R. Bard Inc. and Bard Peripheral

13  Vascular, designed, manufactured, and sold the Bard filter.

14          Plaintiffs claim that the Bard filter was defectively

15  and negligently designed.  They allege that Mrs. Hyde was

16  injured by the filter, and they seek to recover money from

17  defendants to compensate for her injuries and for Mr. Hyde's

18  loss of consortium.  Plaintiffs also seek damages to punish

19  defendants for their allegedly wrongful conduct.

20          Defendants deny that they are liable or that the

21  filter was defectively or negligently designed.  Defendants

22  assert that they are not responsible for any injuries or

23  damages suffered by plaintiffs.

24          Although there are two defendants in this case,

25  C.R. Bard Inc. and Bard Peripheral Vascular Inc., you should

1    decide the case as to the two defendants jointly.  As a result,

2    in these instructions and often in my comments during trial and

3    the lawyers' comments, we will refer to the defendants

4    collectively as "Bard."

5         Unless otherwise stated, the instructions that I give

6    you apply to both Bard and the plaintiffs.

7         The evidence that you will consider in deciding what

8    the facts are consists of the sworn testimony of the witnesses

9    that you will hear, the exhibits that are admitted into

10   evidence, any facts to which the lawyers have agreed -- and if

11   they have agreed on facts, that will be made clear to you --

12   and any facts that I may instruct you to accept as proved.

13        In reaching your verdict, you may consider only the

14   testimony and the exhibits received in the evidence and the

15   facts to which the parties have agreed.  Certain things are not

16   evidence, and you may not consider them in deciding what the

17   facts are.  I will list them for you.

18        First, arguments and statements by lawyers are not

19   evidence.  The lawyers are not witnesses.  What they may say in

20   their opening statements, closing arguments, and at other times

21   is intended to help you interpret the evidence, but it is not

22   evidence.  If the facts as you find them differ from the way

23   the lawyers have stated them, your finding of the facts

24   controls.

25        Second, questions and objections by lawyers are not

1    evidence.  Attorneys have a duty to their clients to object

2    when they believe a question is improper under the rules of

3    evidence.  You should not be influenced by the objection of a

4    lawyer or by my ruling on it.

5         Third, any testimony that is excluded or stricken by

6    me or that I instruct you to disregard is not evidence and must

7    not be considered.  In addition, some evidence may be received

8    only for a limited purpose, and if it is, I will instruct you

9    that it is being received for a limited purpose.  When I

10   instruct you to consider certain evidence only for a limited

11   purpose, you must do so, and you may not consider that evidence

12   for any other purpose.

13        Fourth, anything you may see or hear when the court is

14   not in session is not evidence, even if it is said or done by a

15   party or by a lawyer.  Or by a witness, for that matter.  You

16   are to decide the case solely on the evidence that is received

17   here in the courtroom during the trial.

18        Evidence may be direct or circumstantial.  Direct

19   evidence is direct proof of a fact such as testimony by a

20   witness about what that witness personally saw or heard or did.

21   Circumstantial evidence is proof of one or more facts from

22   which you can find another fact.

23        You should consider both kinds of evidence.  The law

24   makes no distinction between the weight to be given to either

25   direct or circumstantial evidence.  It is for you to decide how

1   much weight to give to any evidence.

2          There are rules of evidence that control what can be

3   received into evidence during the trial.  When a lawyer asks a

4   question or offers an exhibit and the lawyer on the other side

5   thinks that it is not permitted by the rules of evidence, that

6   lawyer may object.

7          If I overrule the objection, the question may be

8   answered or the exhibit may be received in evidence.  If I

9   sustain the objection, the question cannot be answered and the

10  exhibit cannot be received.  Whenever I sustain an objection to

11  a question, you must ignore the question and must not guess

12  what the answer might have been.

13         Sometimes I might order that evidence be stricken from

14  the record and that you disregard or ignore that evidence.  As

15  I mentioned, that means that when you are deciding the case,

16  you must not consider evidence that was stricken.

17         In deciding the facts in the case, you may have to

18  decide which testimony to believe and which testimony not to

19  believe.  You may believe everything a witness says or part of

20  it or none of it.

21         In considering the testimony of any witness, you may

22  take into account the opportunity and ability of the witness to

23  see or hear or know the things testified to; the witness's

24  memory; the witness's manner while testifying; the witness's

25  interest in the outcome of the case, if any; the witness's bias

1    or prejudice, if any; whether other evidence contradicted the

2    witness's testimony; the reasonableness of the witness's

3    testimony in light of all the evidence; and any other factors

4    that bear on believability.

5         Sometimes a witness may say something that is not

6    consistent with something else he or she said.  Sometimes

7    different witnesses will give different versions of what

8    happened.  People often forget things or make mistakes in what

9    they remember.  Also, two people may see the same event but

10   remember it differently.  You may consider these differences,

11   but do not decide the testimony is untrue just because it

12   differs from other testimony.

13        However, if you decide that a witness has deliberately

14   testified untruthfully about something important, you may

15   choose not to believe anything that witness said.  On the other

16   hand, if you think the witness testified untruthfully about

17   some things but told the truth about others, you may accept the

18   part you think is true and ignore the rest.

19        The weight of the evidence as to a fact does not

20   depend on the number of witnesses who testify about it.  What

21   is important is how believable the witnesses are and how much

22   weight you think their testimony deserves.

23        I will now say a few words about your conduct as

24   jurors.

25        First, please keep an open mind throughout the trial,

1    and do not decide what the verdict should be until you and your

2    fellow jurors have completed your deliberations at the end of

3    the case.

4          Second, because you must be the -- because you must

5    decide this case based only on the evidence received in the

6    case and on my instructions as to the law that applies, you

7    must not be exposed to any other information about the case or

8    to the issues it involves during the course of your jury duty.

9          Thus, until the end of the case or until I tell you

10   otherwise, do not communicate with anyone in any way and do not

11   let anyone else communicate with you in any way about the

12   merits of the case or anything to do with it.

13         This includes discussing the case in person, in

14   writing, by phone or electronic means, by email, text

15   messaging, or any internet chat room, blog, website, or

16   application, including but not limited to Facebook, YouTube,

17   Twitter, Instagram, LinkedIn, Snapchat, or any other form of

18   social media.  I didn't have to give that instruction five

19   years ago, but we do now.  The point is, you don't communicate

20   with anybody in any form.

21         This applies to communicating with your fellow jurors

22   until I give the case to you for deliberation, and it applies

23   to communicating with everyone else, including your family

24   members, your employer, the media or press, and the people

25   involved in the trial, although you obviously can tell your

1    family and your employer that you have been chosen to serve on

2    this jury.  But if you are asked or approached in any way about

3    your jury service or anything about this case, you must respond

4    that you have been ordered not to discuss the matter and to

5    report any contact to the Court.

6         Because you will receive all the evidence and legal

7    instruction you may properly consider to return a verdict, do

8    not read, watch, or listen to any news or media accounts or

9    commentary about this case or anything to do with it, although

10   I have no information that there will be news reports about

11   this case.

12        Do not do any research such as consulting

13   dictionaries, searching the internet, or using other reference

14   materials, and do not make any investigation or in any other

15   way try to learn about the case on your own.  Do not visit or

16   view any place discussed in this case, and do not use internet

17   programs or other devices to search for or view any place

18   discussed during the trial.

19        Also, do not do any research about the law or the

20   people involved in the case, including the parties, the

21   witnesses, or the lawyers, until after you have been excused as

22   jurors.  If you happen to read or hear anything touching on

23   this case in the media or in any other form, turn away and

24   report it to me as soon as possible.

25        These rules that I have just described protect each

1   party's right to have this case decided only on the evidence

2   that has been presented here in court.  Witnesses in court take

3   an oath to tell the truth, and the accuracy of their testimony

4   is tested through the trial process.  If you do any research or

5   investigation outside of the courtroom on your own or gain any

6   other information through improper communications, then your

7   verdict may be influenced by inaccurate, incomplete, or

8   misleading information that has not been tested by the trial

9   process, and it could be influenced by information that these

10   parties never had an opportunity to address.

11      Each of the parties is entitled to a fair trial by an

12   impartial jury.  And if you decide the case based on

13   information not presented in court, you will have denied the

14   parties a fair trial.  Please remember that you have taken an

15   oath to follow these rules, and it is very important that you

16   follow them.

17      A juror who violates these restrictions jeopardizes

18   the fairness of these proceedings, and a mistrial could result

19   that would require the entire trial process to start over

20   again.  Again, if any of you is exposed to any outside

21   information, please notify me immediately.

22      I urge you to pay close attention to the trial

23   testimony as it is given.  During the deliberations at the end

24   of the case, you will not have a transcript of the trial

25   proceedings.  Even though we have court reporters here taking

1   down everything that is said, when they get to the end of a

2   trial, they go back and proofread those transcripts and check

3   them against the record and the exhibits to make sure they're

4   completely accurate, and that takes days to do.  That won't be

5   finished by the time that you are deliberating, so there will

6   be no transcript, and as a result, it will be important for you

7   to pay close attention as the testimony is given.

8         If you wish, you may take notes to help you remember

9   the evidence.  If you do take notes, please keep them to

10  yourself until you go to the jury room to decide the case.  Do

11  not let note-taking distract you.  When you leave the courtroom

12  during a break or at the end of the day, you can simply leave

13  your notes on your chair.  Nobody will read your notes, and

14  they will be here for you when you return to court.

15        Whether or not you take notes, you should rely on your

16  own memory of the evidence.  Notes are only to assist your

17  memory.  You should not be overly influenced by your notes or

18  the notes of other jurors.

19        From time to time during the trial, it may become

20  necessary for me to talk with the lawyers outside of your

21  hearing, either by having a conference here at the side of the

22  bench, as we've done a couple of times this morning, or perhaps

23  even calling a recess for a few minutes.

24        Please understand that while that happens, we are

25  working.  The purpose of this conference -- or these

1    conferences will not be to keep relevant information from you,

2    but to decide how certain evidence is to be treated under the

3    rules of evidence and to avoid confusion and error.

4            We will do what we can to keep the number and length

5    of these conferences to a minimum.  I may not always grant a

6    lawyer's request for a conference.  Please do not consider my

7    granting or denying a request for a conference as any

8    indication of my opinion of the case or of what your verdict

9    should be.

10           Trials proceed in the following way:

11           First, each side may make an opening statement.  An

12   opening statement is not evidence.  It is simply an outline to

13   help you understand what that party expects the evidence will

14   show.  A party is not required to make an opening statement.

15           The plaintiffs will then present evidence, and counsel

16   for the defendants may cross-examine.  Then the defendants may

17   present evidence, and counsel for the plaintiffs may

18   cross-examine.

19           After the evidence has been presented, I will instruct

20   you on the law that applies to the case, and the attorneys will

21   make closing arguments.  After that, you will go to the jury

22   room to deliberate on your verdict.

23           Counsel, do you have any corrections or additions to

24   the instructions?

25           MS. REED ZAIC:  No, Your Honor.

1              MR. ROGERS:  No, Your Honor.

2              THE COURT:  All right.  Folks, I don't know if you

3     noticed it, but there's been a little static sound in the

4     speakers.

5              You're losing that?

6              JURY MEMBER:  I'm beeping, and when it starts beeping,

7     I lose what you're saying.

8              THE COURT:  Let's get you another one.

9              JURY MEMBER:  Thank you.

10             THE COURT:  Beeping means your battery is wearing out,

11    so by all means, raise your hand when that happens.

12             You might have heard a little static on the speaker.

13    That means somebody in the courtroom has their cell phone on.

14    It doesn't work just to mute it.  You either need to turn it

15    off or put it on airplane mode, so everybody please check your

16    cell phone now and make sure it's either turned off or on

17    airplane mode.

18             All right.  As I mentioned, ladies and gentlemen,

19    there are some facts to which the parties have agreed, and you

20    should treat those facts as having been proved for purposes of

21    the trial.  I'm going to read you some introductory facts that

22    the parties have agreed to, and so these are established as

23    accurate for purposes of the trial.

24             The defendant in this case -- the defendants in this

25    case are C.R. Bard Inc. and Bard Peripheral Vascular Inc.,

1    sometimes referred to as BPV.  BPV is a wholly owned subsidiary

2    of C.R. Bard Inc., which is the parent company.  As I

3    mentioned, throughout this case and in the final jury

4    instructions, we will simply refer to C.R. Bard and BPV

5    collectively as "Bard" or as "defendants."

6         The product that is the subject of this lawsuit is a

7    retrievable Bard IVC filter.  And as mentioned, IVC stands for

8    inferior vena cava, the large vein that returns blood to the

9    heart.  The Bard filter that is at issue in this case was

10   manufactured, marketed, designed, and sold by Bard.

11        The plaintiffs and the defendants disagree on the

12   specific identity of the Bard filter.  Plaintiffs contend that

13   the filter implanted in Mrs. Hyde was known as a G2X filter.

14   Defendants contend that the filter was an Eclipse filter.  Both

15   the G2X and the Eclipse are Bard IVC filters; they're just

16   different generations of the IVC filter.  But there's a

17   disagreement on whether it was a G2X or an Eclipse.

18        The filter is a conical device, conical in shape, that

19   consists of a main shaft to which 12 struts are attached.  And

20   the struts are referred to either as arms or legs.  The

21   filter -- and you'll see examples of filters during the trial.

22   The filter is constructed of a nickel titanium alloy called

23   Nitinol.

24        The filter is a medical device and is implanted in the

25   inferior vena cava, the largest vein in the human body.  The

1    United States Food and Drug Administration, that will be

2    referred to sometimes as the FDA, cleared the filter for

3    commercial availability through what is known as the 510(k)

4    process outlined in the Food, Drug, and Cosmetic Act.

5         The G2X filter was cleared for commercial availability

6    in the United States for use in patients as a permanent filter

7    with an option of retrieving the filter on October 31st, 2008.

8         The Eclipse filter was cleared for commercial

9    availability in the United States for use in patients as a

10   permanent filter with an option of retrieval on November 23rd,

11   2009.

12        The plaintiff, Lisa Hyde, was under the care of

13   Dr. Shah, S-H-A-H.  I can't pronounce his first name well.

14   It's Vinodkumar.  Dr. Vinodkumar, is my pronunciation, Shah.

15   Dr. Shah referred Mrs. Hyde to Dr. David Henry, an

16   interventional radiologist, to consult with Mrs. Hyde regarding

17   possible use of an IVC filter.

18        On February 25th of 2011, Dr. David Henry implanted --

19   let me start that over.

20        On February 25th, 2011, Dr. David Henry implanted the

21   filter in Mrs. Hyde's inferior vena cava.  On May 6th, 2014,

22   Mrs. Hyde underwent a CT scan, revealing that her IVC filter

23   had fractured, with a fractured strut having migrated to the

24   right ventricle of her heart.

25        On August 26th of 2014, Dr. William Kuo, which is

1    spelled K-U-O, removed the filter and the fractured strut.

2          All right.  With those facts having been described, we

3    will proceed now with the opening statement.

4          Ms. Reed Zaic?

5          MS. REED ZAIC:  Just wanted to test that up on this

6    monitor.

7          Good afternoon.  I believe I introduced myself, and my

8    colleague introduced myself earlier today during the jury

9    selection process, and now you are the jurors that are now

10   impaneled.

11         And beyond the -- or outside of the jury selection

12   process, as the lawyers and representatives of Lisa Hyde and

13   Mark Hyde, we don't get an opportunity to communicate directly

14   with the jury.  We get to do it now during opening and one more

15   time before the end of the trial, so I wanted to take the

16   opportunity to thank you for your service.  Jury service is

17   extremely important.

18         The judge has given an introduction to this case with

19   some agreed-upon facts and some rules that have been stated to

20   you to follow, not necessarily of your own choosing but --

21         Are you having an issue?

22         JURY MEMBER:  Sorry.

23         MS. REED ZAIC:  I think she's having an issue with her

24   hearing, the device.

25         If that happens again, I'm sure one of us in the

1    course of who's standing here can get the Court's attention.

2         Is that working?

3         JURY MEMBER:  Yes.

4         MS. REED ZAIC:  Okay.

5         The judge has given you an introduction to the case,

6    and as the attorney representing the plaintiffs, we get to go

7    first.  And that's good, but in a complex case, there are some

8    issues, as the judge discussed, with acronyms and some phrases,

9    and taking notes may be an issue.  So if I'm repetitive,

10   forgive me, but in describing the evidence that will come into

11   this case, this being a complex case and being the first one to

12   describe some of this evidence, I want to be very, very clear

13   about it, about this device and about the anatomy.

14        But stepping backwards, you will be receiving evidence

15   in this trial in many different forms.  It will come in test --

16   the form of testimony, live witnesses, videotaped witnesses,

17   documents.  And some of the documents that you'll be looking at

18   are actually Bard's internal documents within the company

19   during the relevant time period.

20        As the plaintiffs, we believe that the evidence that

21   will be presented to you will support the claims in this case.

22   Those claims include that Mrs. Hyde received a Bard IVC filter.

23   The judge has explained in these stipulated facts that there is

24   an issue and a dispute over which filter she received, but

25   there's no dispute that it was a Bard filter.

1          Second, we believe the evidence will support the fact

2   that this filter in its design was defective.  It did not meet

3   the specifications and the risk analysis internally that Bard

4   developed for these filters, and that there was not long-term

5   testing on these filters to predict what might happen to

6   Mrs. Hyde when she received the filter.  That includes the fact

7   that the filter, when it was inserted into her, broke apart and

8   one of the pieces traveled to her right ventricle, which was

9   not part of the design of this filter.

10         Now, again, I get to go first, but I want to go back

11  over something that the judge described.  The inferior vena

12  cava, the IVC, the largest vein in the body.  The idea behind

13  the device, an IVC filter device, is that we have a large vein

14  and a large artery, to put it in very simple terms.

15         If you can see on your screens, the IVC, the inferior

16  vena cava, is the largest vein in the body, represented by the

17  blue column.  This is the vein that returns blood from your

18  lower extremities back up to your heart to be oxygenated again,

19  to travel back to your body and keep your tissues healthy.

20         So the aorta, the largest artery in the body, sends

21  the blood away from the heart to oxygenate, and once the oxygen

22  is depleted, that oxygen comes back up through the IVC, the

23  inferior vena cava, as the highway back to the heart and

24  through to the lungs.

25         The concept of the filter, the evidence will show, is

1    that once it is placed in a patient who is at risk for DVT,

2    deep vein thrombosis, which are clots that form in the lower

3    extremities -- and if they form, they might travel up through

4    this vein, the largest vein in the body, to the heart and to

5    the lungs, and that can be very dangerous.

6         So the concept of an IVC filter is a medical device

7    inserted in patients at a higher risk for DVTs to potentially

8    catch a blood clot if it forms, so that like the blood

9    traveling back to the heart and the lungs, it does not go

10   there.

11        So I have an animation to show the insertion of an IVC

12   filter and to give you a better example, or in the context of

13   the evidence coming into this case, the organs that surround

14   the IVC.

15        This is not Mrs. Hyde.  This does not depict her

16   specifically, but again, the general depiction of the anatomy

17   of the body.  The lungs to the left and right.  The heart in

18   the center.

19        As we step behind them, you'll see a moving version of

20   the cartoon that I just displayed, with the inferior vena cava

21   on the left.  And the depiction generally of a filter in the

22   vein.

23        And this area, you'll hear from expert witnesses in

24   the case, is an area that is very active with blood flow.  And

25   as you can see, it also moves.  It's a very, very dynamic area,

1    with the filter affixing with the intention of catching any

2    potential blood clots that form in the legs, if they form and

3    if they travel.

4         So this is the general anatomy.  You can see the

5    organs that are close by the IVC, close by that filter, inside

6    an IVC generally.  And with that short anatomy lesson, let's

7    step back to the actual filter and the filter history.

8         Bard has a long filter history, starting in the 1990s

9    with a permanent filter.  In the 1990s, stepping back in time,

10   if you recall, definitely a different era.  In that time period

11   in the medical device world, IVC filters were permanent.  They

12   were not designed to be placed and retrieved.

13        And testimony in this case from expert witnesses --

14   there will be experts on both sides.  It will not surprise you

15   they won't always agree.  But testimony will come into this

16   case through experts stating that once this device is placed

17   and can't come out, it's there forever.  And that leads to a

18   decision in a patient's care, to make a decision to put a

19   device in a patient permanently.  And that was the situation in

20   the 1990s.

21        Bard -- I'll add to some more acronyms, as you can see

22   up on the screen.  Actually, it's not on this slide, but I'll

23   add to your list of acronyms.  Bard had an SNF filter.  It was

24   called the Simon Nitinol filter.  Mr. Simon was a doctor, he

25   was a physician, who invented this version of a permanent

1    filter that Bard acquired from a company called NMT.  They

2    acquired the technology and had a permanent filter.  I have

3    under this slide that it's 1995.  They actually originally had

4    this filter in 1990.

5            But as these filters come on the market, the

6    regulatory pathway that they go through builds upon the

7    previous design or builds upon other filters, which is how Bard

8    got their filters cleared.

9            So in the 1990s, the permanent filter that Bard had

10   was the SNF.  To give you a general overview of the continuum,

11   as Bard went forward, again, a segue of what you're going to

12   see a preview in a bit, their first retrievable filter was

13   called the Recovery filter.

14           So the Simon Nitinol filter was first.  It was

15   permanent.  They developed a retrievable filter, permanent

16   filter that could be retrieved.

17           Then they developed the G2, developed the G2X, which

18   as you heard is one of the filters -- is the filter in dispute

19   in this case.  But there is a dispute between which filter

20   Mrs. Hyde had.  The other one -- I've outlined them in red --

21   is the Eclipse.  And the one that came on the market, developed

22   and manufactured and marketed by Bard, was the Meridian filter.

23           So now heading backwards, starting with the SNF, like

24   I said, it was -- acquired the technology from the NMT company.

25   I mention that because you may see it on documents in evidence

1    coming into the case.  Not to be confused, it is a Bard filter.

2    It was a permanent filter that Bard's own employees expressed,

3    including their medical director, had an impressive safety

4    record.

5           But as I mentioned, it was the 1990s and towards the

6    end of the 1990s, and my mention of testimony that would come

7    into evidence regarding the fact that these were permanent

8    filters, and decisions needed to be made about placing

9    something permanently in a patient forever with no design to

10   get it out at the time it was manufactured.

11          The state of the medicine in the end of the 1990s and

12   into the early 2000s is that there was a desire in the medical

13   community, specifically the interventional radiology community,

14   where you have a radiologist that reads a different array of

15   films, you have interventionalists that may go in and do

16   procedures on patients while viewing them at the same time.

17          And amongst the interventional radiology community

18   that would place a lot of these permanent filters, there was a

19   desire to have a device that you wouldn't have to leave in

20   permanently.  It would go in permanently, and you could have

21   the option of taking it out.

22          There were filters that were available for very

23   short-term retrievals, short term as in about two weeks, but

24   again, that desire of being able to put in a filter to

25   protect -- with the intention of protecting a patient from

1  potential blood clots going to their heart and lungs and

2  leaving it for a period of time and taking it out was very

3  attractive and very desirable to the interventional radiology

4  community.

5          And towards the end of the 2000s, I anticipate the

6  defendants will bring evidence in about a report from the

7  Surgeon General called "Call to Action."  Blood clots can be a

8  serious injury.  And in 2008, the Department of Human and

9  Health Services held a workshop.  It resulted in a paper being

10 published by the Surgeon General called "Call to Action" about

11 how dangerous blood clots could be.  So this is an issue that

12 was known, and interventional radiologists in the early years

13 of the 2000s wanted different options.

14         Seeing as there was no filter on the market in the

15 late '90s and early 2000s that could satisfy this desire of

16 wanting a retrievable filter, there was quite an opportunity in

17 the market.  And the first company that could develop one of

18 these permanent filters that could also be retrieved would lead

19 the market.  They would have the lead market share.

20         So Bard having acquired the technology for a permanent

21 filter called the Simon Nitinol, when they acquired that

22 technology, also in development was a retrievable filter, a

23 permanent filter based on the original design of the Simon

24 Nitinol filter that could be placed and retrieved.  These

25 devices at this time, before clearance to the market, had not

1   been tested in humans.

2           So let me describe some of the testing that went on.

3   First of all, the first step was to test it on the bench.  And

4   the bench in a lab is simply a piece of furniture.  I've got a

5   depiction of a very clean one there.  A bench will be in a

6   laboratory with equipment and testing equipment on top or on

7   the side or around, and this is where bench scientists perform

8   tests that are -- don't occur in the human body.

9           There was also animal testing going on in sheep,

10  developing this first retrievable filter that Bard wanted to

11  send to market first.  One of the tests I'll describe --

12  actually, several tests that went on looked for filter failures

13  that were happening very rarely in the permanent filters before

14  retrievables were developed.  That included the tilting of the

15  filter.

16          The design was desirable if it would go in and stay in

17  place.  A medical device, when it goes in, needs to stay in

18  place, especially in an environment, you'll hear from our

19  experts, where it -- as I showed you in the little movie, that

20  the blood flowing through there and the movement of the vein,

21  stability was very important in the highway back to the heart.

22          So they would do benchtop testing for tilting to make

23  sure that it would center.  They would do benchtop testing to

24  make sure it wouldn't perforate that vein.  You saw the other

25  organs that were surrounding the vein, that it wouldn't

1    penetrate.  It wouldn't go to the aorta or the spine right

2    behind it.  They also did testing for fracture resistance.

3            They would do different tests and cyclical tests,

4    you'll hear from one of our engineers.  He may actually -- you

5    may actually hear from him this afternoon if I can get through

6    this fast enough, yet still understandably, that there was

7    testing about fractures on these devices to make sure that they

8    would stay intact.  A fracture is what actually happened in

9    Mrs. Hyde.

10           And they also tested for migration resistance.  And if

11   you look on the screen right now, the very first one I have is

12   a very short description of a migration resistance test.  For

13   example, the tests that they used originally with their first

14   retrievable involved PVC pipe to simulate the vein.  They lined

15   it with sausage casing.  They deployed the Recovery filter to

16   see if it would tear or other failure methods, but the one I'm

17   describing is migration resistance, which was very important,

18   because again, as you saw, the blood was flowing.  You don't

19   want it to move.

20           Pressure is the measurement for migration resistance.

21   The goal is to make sure that this filter can resist the

22   pressure coming from below it.

23           And you'll see in later slides, and you'll see in

24   evidence throughout the trial, the measure for pressure is

25   millimeters of mercury, which is a really easy way to describe

1    the method of a thermometer and how it measures temperature.

2    There are ticks on the thermometer.  The mercury goes up the

3    higher the pressure of the heat.  The symbol for millimeters of

4    mercury is mmHg, millimeters of Hg, which are two Greek words

5    for liquid silver, I believe.

6          So if you see those terms, that is a measurement of

7    pressure.  The higher the number, the better the filter can

8    resist that migration pressure.  And resist is what you want it

9    to do.

10         So with their bench testing and testing for those

11   different failure modes that they had seen rarely in the

12   permanent filters, and with the migration resistance testing

13   that they also did in animals, one thing they didn't have is

14   any human testing.

15         And again, the goal was to make this a retrievable

16   filter.  So the initial clinical study done, and the only

17   clinical study done on humans on retrievable filters up until

18   the mid-2000s for Bard's filters, anyway, was done in Canada.

19         And why Canada?  Dr. Murray Asch, the interventional

20   radiologist that ran the lab and was the study director, will

21   testify by videotape.  It was because of the regulatory

22   pathways.  It was easier for them, "them" being Bard, to come

23   to Canada to have the study done than to have it done in the

24   States.  It was easier to get permission to use an experimental

25   device in Canada.  So Bard took this study to Canada, and

1    Dr. Murray Asch ran it.

2              Now, studies always have to have an end point, and

3    Bard wanted to know if this filter could be retrieved.  The

4    study did not test anything except the insertion and the

5    removal.  It did not study long-term safety.  It did not study

6    placement long term.  It was a six-week test in 35 patients

7    with the goal of determining if it could be removed

8    successfully.

9              And these are some of the results.  There were 22

10   procedural difficulties, there were five tilts, one

11   perforation, one caudal migration.  Caudal means down to the

12   feet.  There was one cephalad migration.  Cephalad means up to

13   the head.  So sometimes the filter would go up, sometimes it

14   would go down.  There was one arm fracture, which is the

15   failure mode that Mrs. Hyde suffered with the arm breaking on

16   her later filter and going to her heart.  And there was one

17   fractured leg hook.

18             On the bench, the testimony will show, Bard was

19   already witnessing that its first retrievable filter moved

20   more.  It did not stay as stable as the earlier permanent

21   filters and when compared against its own permanent filter, the

22   SNF.

23             But the study was successful according to Dr. Asch,

24   and that is because it met its end point.  Recall, the end

25   point was to see if it could be retrieved, not long-term

1    safety, not the effects of what would happen in a human being

2    if it stayed in long term.

3         So Bard packaged up its data, put together a

4    submission, and sent it to the FDA.

5         Now, let's take another segue here.  More testimony

6    and evidence you will hear in this case about the FDA.  There

7    are two ways to get your medical device on the market in the

8    United States.

9         The first one is PMA, premarket approval.  None of the

10   Bard devices went through this pathway.  Premarket approval

11   actually approves a medical device.  You get a stamp of FDA

12   approval.  It is an independent safety review of that device.

13   IVC filters generally do not go through that pathway.  Per FDA

14   regulations, Bard's filters did not go through that pathway.

15        The second method of getting a medical device to the

16   market in the United States through the FDA is called 510(k),

17   which is similar to a -- it's a code section of the law.  Sort

18   of like your 401(k) is a tax code, the 510(k) is a code in the

19   FDA regulations explaining the rules and the regulations you

20   have to follow and the submission required in order to get

21   clearance.  It is not safety review.

22        When you go through the 510(k) process with your

23   medical device, your device at the end is not FDA approved.  It

24   is cleared.  Now, those two words get twisted -- get

25   interchanged quite a bit when people are discussing generally.

1    Lawyers do it.  Judges do it.  Witnesses do it.  They

2    interchange them when talking about the fact that it's been

3    permitted to be sold in the United States.

4         But there is a very clear regulatory and legal

5    distinction that our experts will discuss between these two.

6    510(k) gives you clearance for your device, not approval.  It's

7    an honor system.  It is not an official approval nor a

8    determination by the FDA that the product is safe and

9    effective.

10        The 510(k) process does not approve or certify the

11   design of the medical device.  It clears it.  And the basis for

12   clearing it as opposed to the PMA process of review and

13   providing independent safety review, the standard for the

14   510(k) process is a comparison.

15        If you take your medical device and you have what is

16   called a predicate, a device that is already on the market,

17   which also can be through the 510(k) process, as long as it is

18   comparable and substantially equivalent with regard to safety

19   and efficacy of a device already being sold, that is the

20   standard.  If you can show the FDA it doesn't raise any new

21   safety concerns and it's comparable to another device that's

22   already being sold, you can get your medical device cleared for

23   sale.

24        The manufacturer has to certify to the FDA that its

25   information it has submitted in the 510(k) application is true

1    and accurate.  They have to provide this with their submission.

2    The FDA is not responsible in the end for the safety of those

3    devices.  Our regulatory expert will explain that very clearly.

4    The manufacturer, at the end of the day, is responsible for the

5    safety of the product it manufactured, not the FDA.

6            Again, it's an honor system.  The FDA does not

7    independently test these medical devices.  Every single one of

8    the applications that will come into evidence, the FDA did not

9    test it.  The FDA did not go in and individually independently

10   verify the test data that came in to the FDA.  It relies on the

11   manufacturers to be accurate.

12           And as I mentioned, after bench testing, animal

13   testing, and a short-term clinical trial evaluating the ability

14   to retrieve the device, Bard submitted a 510(k) application to

15   the FDA for clearance.  And when it received it, it was the

16   first to market with the very first permanent IVC filter that

17   could be retrieved.  Again, through the less rigorous process

18   of the FDA.

19           It was cleared as a permanent device in 2002

20   initially, and once Dr. Asch's data was submitted, it got the

21   clearance in July 2003.  I go back and point that out simply

22   because the next slide, I want to point out that once it was on

23   the market and being marketed as a retrievable filter, the

24   initial first retrievable filter manufactured by Bard,

25   designed, manufactured, and sold, started to experience adverse

1    events.

2         By December of that year, they were already discussing

3    the design review.  Within three months, there were questions

4    about the testing.  I mentioned the 50 -- the millimeters of

5    mercury standard.  The original specification was that the

6    Recovery filter needed to resist 50 millimeters of mercury, and

7    they were questioning that because of the adverse events that

8    were being reported.  There were migrations of this filter

9    indicating the pressure test may not have been accurate, may

10   not have been adequate.

11        Once it was cleared in July 2003 for retrievability,

12   by October, November, and December, they were seeing migrations

13   in both directions, towards the head and towards the feet in a

14   caudal fashion, and fractures.

15        And by the first of the next year, they experienced

16   their first catastrophic injury reported with their first

17   retrievable filter, the Recovery.  By April, they had

18   experienced their second.  It had been reported to them a

19   second catastrophic injury of a filter migrating.

20        And I want you to look at that date, April 14th, 2004.

21   Within 12 days, Bard was redesigning the filter while the first

22   one was still on the market.  They were coming up with their

23   next-generation G2 filter.  Stands for Generation 2.  It was

24   also called the modified Recovery.

25        I make these segues because as you see the evidence

1    come in, it might be called those things.  The modified

2    Recovery, the G2, the G1A.  There's different references to it,

3    but the point being is that based on the limited clinical data

4    that they had, and once it was cleared to the market, the

5    clinical data that was coming in was being experienced by

6    patients who were receiving the filter.

7          They sat down and discussed a redesign while still

8    selling the Recovery.  And internally, they were conducting

9    health hazard evaluations.  So as written by their medical

10   director at the time describing, in the first line, you'll see

11   the catastrophic injuries.

12         They had also reported -- also received reports of 17

13   reports of limb fractures.  It was breaking apart.  A total of

14   20 arm fractures were reported in 14 cases.  20 arm fractures

15   in 14 cases means more than one arm was breaking.  And 11 of

16   the 20 arms remained in the patients, with six patients, and

17   detached arm migrations to the heart or lungs.

18         The MAUDE database contained 25 reports of filter

19   fracture.  And Dr. Ciavarella, their medical director, goes

20   through and looks at the events as they're being reported.  The

21   MAUDE database, I will do a segue and explain later, it's the

22   FDA database of reports that come in to the FDA of adverse

23   events.

24         But the date of this is July 9th.  It was

25   approximately one year.  They're still receiving reports of the

1    first retrievable device the first year that it's on the

2    market.

3           Another segue.  You will not hear evidence from the

4    plaintiffs that there is any medical device on the market that

5    is 100 percent safe.  The testimony and evidence will actually

6    show that all medical devices carry risks.

7           But when manufacturers design a device, they need to

8    make it safe for patients, and they need to guard against

9    defective conditions.  And the evidence that you will see

10   coming in with regard to their testing shows that their testing

11   in humans, especially, was not reasonable or adequate.

12          And as the reports continued to come in with the first

13   retrievable device, their marketing director actually stated in

14   an email, "We knew very little about the long-term clinical

15   performance of this device when we launched it."

16          And as I mentioned, they began their redesign,

17   Generation 2.  Using the Recovery filter this time and not the

18   Simon Nitinol as the comparator for their 510(k) application to

19   the FDA to get it cleared, they redesigned the Recovery, made

20   the G2.

21          If you look at the pictures, they took the arms and

22   made them longer.  And the evidence will show the decision to

23   do that was to try and prevent these migrations that were

24   happening with the original device.

25          It went on the market in August 2005.  And when they

1    began to market it, it was only as a permanent filter.  Because

2    similar to the first time when they submitted the 510(k)

3    application for the Recovery, their first retrievable, they

4    didn't have any data to show that they could retrieve it.

5         So when the G2 was officially cleared for market, the

6    second generation, they marketed it as taking strength and

7    stability to a new level based on their redesign, increased

8    migration resistance, improved centering, and enhanced fracture

9    resistance.  They sold it as a permanent filter because they

10   did not have the data yet.

11        But data is coming in.  Reports of adverse events from

12   the field are coming in again with the second-generation G2

13   filter.  And the medical director, once again, "I'd like to

14   look more generally at the G2 complaints.  I've seen problems

15   with caudal migration, tilting, perforation, mis-deployment,

16   and maybe one or two others.  The G2 is a permanent filter.  We

17   also have one, the SNF, that has virtually no complaints

18   associated with it.  Why shouldn't doctors be using that one

19   rather than the G2?"

20        The evidence, through Dr. Ciavarella's testimony, will

21   show that there was a safer alternative, and it was their

22   filter.

23        But there were competitors coming into the market at

24   this point.  Bard was no longer the sole provider of the first

25   retrievable filter that could be left in permanently or taken

1   out as they advertised, and so they began to set up another

2   clinical trial, enrolling patients -- similar to the Asch study

3   but a little bit bigger -- in order to collect that one data

4   point of inserting it and being able to retrieve it so that

5   they could then market it as retrievable.

6           On the previous slide, I showed you Dr. Ciavarella

7   commenting on the safety aspects of the SNF compared to the G2.

8   That was in December of 2008 -- I'm sorry, 2005.

9           And in that same month, they began enrolling patients

10  in a small clinical trial to get the retrievability indication.

11  And this is what it looked like.  100 patients.  Six months.

12  Not permanent.  Not long term.  End point, retrievability.

13          When the study was completed, 91 patients completed

14  the study, 52 filters were able to be retrieved, and there was

15  no follow-up with these patients for six months.

16          Important to note is that clinical trials have a

17  medical monitor, and someone who monitors a clinical trial

18  looks at the adverse events as they're coming in.  And the

19  medical monitor in this trial, called the EVEREST trial, I'll

20  point out, his name was Dr. Krish Kandarpa.  As the medical

21  monitor, he was assigned with the duties to look at adverse

22  events and also to provide input to the sponsor, who was Bard.

23          At the initial meeting, he had some questions.  One of

24  the questions was:  What were the problems you faced with the

25  old device?

1          Bard's answer was:  Legs breaking off or getting

2    caught.

3          He also asked:  At what point must the filter be

4    considered permanent?

5          And Bard's response was:  Six months.

6          So once that G2 filter went in, they relayed to the

7    medical monitor in the clinical study for retrievability, at

8    what point is it considered permanent and no longer

9    retrievable?  The answer was six months.

10          During the course of the clinical trial, Dr. Kandarpa,

11    as the medical monitor, became concerned about the number of

12    adverse events that were coming in through the clinical trial.

13    Over 50 percent of the patients had had an adverse event or

14    serious adverse events.

15          The evidence will show Dr. Kandarpa, who will appear

16    by video testimony, suggested that it could have used a

17    redesign at that point.  Again, looking back, thinking of my

18    slide about the continuum of these devices, this is the history

19    of Bard's retrievable devices and the design elements that went

20    into it.

21          Testimony and evidence you will see and hear in this

22    case will talk about the results of the EVEREST trial.  And

23    what's important here to see is that there were overlaps

24    between the adverse events coming in.  It wasn't just singular

25    adverse events.  Sometimes they were happening all at the same

1    time.

2             So where there were 12 penetrations of the filter

3    penetrating the vein reported in a 91-person study, they were

4    coupled with other adverse events.  And testimony and evidence

5    will show that is when the failures happened.  When these

6    events come together, not just a singular fracture, but a

7    migration, a tilt, and a fracture, that is when the filter

8    becomes more dangerous.

9             In the EVEREST clinical study, Bard took a look at the

10   data, and they also took a look at the MAUDE database, which

11   I'm going to explain in a minute, the FDA database that

12   collects adverse events.  And one of the internal discussions

13   they had -- this is directly from evidence that will come in on

14   a PowerPoint slide reporting back about the EVEREST clinical

15   study.

16            "Caudal migration, tilt, perforation, and fractures

17   are the most commonly occurring complications associated with

18   the filter."  This is the G2.  "Eliminating these failure modes

19   would reduce number of filter complaints from 152 to 34."

20   That's by 78 percent.

21            This internal discussion was not submitted in their

22   510(k) application to the FDA when they submitted the EVEREST

23   data to get the permission to sell the device as a retrievable

24   device.

25            And when I say they took a look at the data and they

1    took a look at the MAUDE database, evidence will come into the

2    case about the MAUDE database.  I anticipate that the

3    defendants' evidence will suggest that the MAUDE database is

4    not to be used to calculate rates.

5            This is actually a screenshot from the FDA database,

6    and it's not complete.  I've taken the headers to explain what

7    it is.  MAUDE stands for Manufacturer And User Facility Device

8    Experience.

9            And there is a quote that says, "The incidence or

10   prevalence of an event cannot be determined from this reporting

11   system alone due to potential underreporting of events and lack

12   of information about frequency of device use."

13           In the United States, the reporting system to the FDA

14   is voluntary, whereas a manufacturer and some people involved

15   in the manufacture and distribution of medical devices are

16   required by regulation to report adverse events that come in to

17   them.  For example, if an adverse event is reported to Bard,

18   they are required under the regulations to report it to FDA.

19   And that information goes into the MAUDE database, which is

20   publicly available.

21           But they're not the only reporters.  Doctors report.

22   Patients report.  Individual family members report adverse

23   events.  But they're not required to.  And that is the point.

24   One of the weaknesses of a public database like MAUDE is not

25   all events get reported.

1          And Dr. Ciavarella, Bard's medical director during the

2     relevant time period, actually testified that the

3     underreporting involves 1 to 5 percent, meaning only about 1 to

4     5 percent -- as he says, there's a consensus.  About only 1 to

5     5 percent of adverse events are reported to the FDA.

6          And the last quote I have down there is that "MDR

7     data," which is medical device reporting -- more acronyms.

8     "MDR reporting" -- I'm sorry, "MDR data alone cannot be used to

9     establish rates of events, evaluate a change in event rates

10    over time, or compare event rates between devices."

11         But the evidence will show that's exactly what Bard

12    did.  That is the information that they began to use about

13    their competitors.

14         Fractions.  If you use them or you remember them,

15    you'll remember there's a numerator and a denominator.  And one

16    of the issues with the FDA indicating you shouldn't use this

17    information as a rate is because it's only the numerator.  You

18    only have a number of events.  The denominator would be the

19    units, the devices.  You have to have a division.  That's what

20    creates a rate.

21         But Bard knows its rates.  It knows its adverse events

22    because they're reported to them and they report them to the

23    FDA, and they know how many units they have sold.  But the

24    evidence and testimony will show that they can also get these

25    resources from their competitors.

1           They can see how the competitive device is performing

2    by looking at the number of adverse events.  Although

3    underreported, it's fewer than actual, they can look at how

4    many events have happened with a competitor, such as a fracture

5    of a competitor's device.  And they have resources that they

6    can gather estimates of the number of devices sold and create a

7    rate, and Bard has used this information internally in the

8    past.

9           Again, EVEREST end point was retrievability.  They

10   were able to retrieve the device in a short-term study with a

11   few number of patients.  They were able to package that device

12   application for 510(k) clearance and submit it to the FDA.

13          And the predicate that they used this time, remember,

14   was this Simon Nitinol, then the first retrievable was the

15   Recovery based on the Simon Nitinol, and then the G2 based on

16   the Recovery.  Now the G2 has based itself on itself.  The

17   original application to get permanent clearance, and now they

18   have a study with data showing that it can be retrieved.

19          So between August of 2005 and January of 2008, Bard

20   did not have a device on the market that was retrievable.  But

21   the 510(k) application went in in light of the -- despite the

22   data of EVEREST of the failures.

23          The FDA does not conduct their own tests, recall.

24   This is a less rigorous pathway.  The FDA does not

25   independently dig underneath and interview and verify the data.

1    And Bard did not provide that internal discussion about if we

2    reduce the complaints by this amount, we could eliminate up to

3    78 percent.

4           And again, between 2005 and 2008, they had no

5    retrievable filter.  And the evidence will show they were

6    trying to keep their market share, so they continued to issue

7    and get clearance for additional devices.  Again, it was a long

8    continuum I started with.

9           So once the G2 device, the G2 filter itself was

10   cleared for permanent placement, three years later it was

11   cleared for retrievable placement.  And in the absence of a

12   newer filter coming out, they also changed the device systems.

13   Same filter, changing the device, adding a hook at the top.  A

14   benefit of retrievability, is the way that they market it.

15          And by October of 2008, the G2 filter that had gone

16   through the EVEREST trial, reports coming in, being compared to

17   the original permanent device as not as safe, it is now the G2X

18   with the hook on the top, the same filter.  And this is the

19   filter that Lisa Hyde received.

20          Again, there is a dispute over which one she received,

21   in full candor, but this is the one that we feel the evidence

22   will support that she received.  It was cleared in 2008.  She

23   received her filter in February of 2011.

24          And part of the specifications -- we've been talking

25   about design.  Part of the design specifications originally for

1    the G2 filter, you'll see on the screen.  Clinical terms.  The

2    intended use.  Permanent or temporary.  And user needs include

3    permanent or temporary.

4            There's also a dispute, you'll see in the evidence as

5    it comes in, as to whether Lisa Hyde needed a permanent or a

6    temporary filter.  But the evidence will show that the design

7    specification for the G2 filter was for permanent or temporary.

8    That is the way it was designed.

9            Those are the specifications, including the fact that

10   the medical monitor asked the questions:  At what point does

11   the G2 filter become permanent?  And Bard's answer was:  At six

12   months.  So despite permanent or temporary, the specification

13   is that it's supposed to be both.

14           And again, competitors had entered the market by 2008,

15   so this was also about the same time, the evidence will show,

16   that the Surgeon General's report was released about the

17   problems and the concern about blood clots.

18           As you can see in the top line of this SWOT, which

19   stands for Strengths, Weaknesses, Opportunities, and Threats --

20   it is a marketing term.  And the objective was to increase

21   revenue and capture more market share.

22           This is evidence that will come in as a PowerPoint

23   presentation that was presented discussing gathering more

24   market share for this particular area of devices.  And the

25   issues that came up were a lack of thorough understanding of

1    the dynamics of caval anatomy.  Remember, going back to the

2    initial retrievable filter, there was commentary that it was

3    released without long-term clinical data and how it might

4    perform.

5         They also mentioned:  We have historical reactive

6    evolution design mind-set.  Product complications forcing focus

7    on reactive designing.  And a limited understanding of user

8    needs.

9         So by May of 2008, they're discussing the market and

10   how they would like to gather more of a market share.

11        To quickly recap, they started with the SNF, the

12   permanent filter.  Their first retrievable was the Recovery,

13   which was based and predicated on the Simon Nitinol filter.  In

14   August of 2005, the G2 filter was a redesign of the Recovery

15   based on the adverse events that were coming in.  There were no

16   human clinical trials other than the initial 35-patient study

17   with Dr. Asch in Canada.

18        After the EVEREST trial that I just described with

19   Dr. Kandarpa as the medical monitor, the data was packaged and

20   they received a retrievable indication and could market it that

21   way.

22        By June of 2008, the G2 filter was out.  If you look

23   at these dates, in July of 2003 with their first retrievable,

24   the Recovery, and June of 2008 -- excuse me, I believe that

25   date is wrong.  It is October 31st, 2008, the G2X was cleared

1    for market.  I apologize.  Just noticed that.

2           But the point being is that in five years, they've had

3    four filters in a competitive market.  And they designed

4    another one.  The Eclipse filter, which was, the testimony will

5    show from their lead engineer, a G2 filter that was

6    electropolished.  Electropolishing was a buffing and polishing

7    of the surface in an attempt to reduce fractures.

8           And despite the dispute of whether Lisa Hyde received

9    a G2X filter or an Eclipse filter, it fractured regardless of

10   the specifications and increasing fracture resistance in the

11   Eclipse filter.

12          The next generation was the Meridian filter.  The

13   reports that were coming in over the years associated with

14   Bard's retrievable filters is they were moving and they were

15   not stable.

16          By 2010, they had developed the Meridian filter that

17   was essentially the G2 filter with an addition of what they

18   called caudal anchors.  They looked like little anchors on the

19   arms of the filter to stabilize it and keep it in place, and

20   the testimony will show that was an effort to make it safer.

21          But the issue I want to point out here is that Lisa

22   Hyde received an Eclipse filter in February of 2011.  Those

23   were the filters that were on the shelves at her hospital, the

24   evidence will show.  And during that time period, they had

25   already submitted, two generations later, a filter for

1    clearance to the FDA.  There is no evidence that sales

2    representatives were asked to go and get old filters, whether

3    it was the G2X or the Eclipse.

4         By 2010, they had a filter that they marketed, were

5    trying to market, as even more stable.  They had the filter

6    itself.  It wasn't a concept.  It wasn't a prototype.  It was

7    one that they thought was safer.

8         So at this point in the continuum, you have the

9    medical director saying originally with the G2 -- questioning

10   why doctors would be using it instead of the SNF.  Then you

11   have the Meridian that was already submitted to the FDA when

12   Lisa Hyde got her filter.

13        This is one of Bard's own documents showing these

14   filters and how similar they were.  The original G2.  The G2

15   Express, where they've indicated the only change is the hook.

16   It's the same filter.  The Eclipse filter was electropolished

17   to reduce fractures, but it was still in the G2 family of

18   filters.  And the Meridian I just described, that was submitted

19   to the FDA prior to her getting her G2 filter, added caudal

20   anchors to stabilize the device.

21        And regardless of whether Lisa Hyde needed a temporary

22   or permanent filter and regardless of whether it was a G2X or

23   an Eclipse, the safety characteristics based on Bard's own risk

24   analysis, you can see on the screen for the G2X, the Eclipse,

25   and the Meridian, all had the same language.  The

1    characteristics related to the safety of the device.  What

2    determines the lifetime of the medical device?  The comment is:

3    The intended implant duration is for the life of the patient.

4         Lisa Hyde's filter, whether a G2X or an Eclipse, did

5    not live up to this internal risk analysis.  It did not survive

6    the life of her.  It malfunctioned and broke, in opposite to

7    the specification and the analysis.

8         As I mentioned, SNF was indicated by the medical

9    director as a safer device.  The Meridian was already submitted

10   as a safer device to the FDA before she received her filter,

11   Lisa Hyde.

12        And this is the specification for the Meridian.

13   Again, a product performance specification for a device that in

14   2010, before she received her filter, they had already run

15   these tests on and developed these specifications.

16        I'd like to point out -- if I knew how to turn on the

17   red dot -- the column that starts with the word "OptEase."  It

18   is in yellow.

19        The OptEase filter is a competitor.  And when they

20   were designing these specifications and testing this device,

21   this later device with caudal anchors to make it more stable,

22   they had done an analysis with the OptEase, their competitor.

23   It has an acceptable clinical history of caudal migration

24   resistance as well as a lower complaint rate for caudal

25   migration then G2, G2X, and Eclipse.

1          And the information that they pulled in order to

2     develop that standard, that specification for their next

3     product, was the MAUDE database.  This is one of the failure

4     modes that the G2X filter and the Eclipse filter suffered from,

5     caudal migration.

6          So this is three, by my count.  The testimony and

7     evidence will show three different safer alternative designs to

8     the one that Lisa Hyde received.  And the next slide -- I

9     should have gone to it first.  I'd blown up that small language

10    I was trying to send you to.  The OptEase has an acceptable

11    clinical history, has a lower complaint rate for caudal

12    migration than two of the filters in dispute in this case.

13         So looking back, even at this point, even with the

14    Meridian, there was no long-term clinical testing of these

15    retrievable devices.  There were a total of two clinical trials

16    that Bard sponsored, put together, designed, and run and

17    collected data from.  They were small patient pools, one 35

18    patients, one under 100 patients.  One was for only six weeks

19    looking at retrievability, and one was only for six months.

20    There was no human clinical trial data on the long-term use of

21    leaving this in permanently.

22         I anticipate during the course of this trial the

23    evidence that the defendants will bring in in defense of this

24    is that the failure rates complied with industry standards.

25    And one of the documents they will introduce is called the SRI

1    guidelines.

2           But evidence and testimony and expert witness

3    testimony, including some of Bard's own witnesses, will

4    indicate that these guidelines were never intended to predict

5    risk.  They were not intended to be a tool to reduce risk, and

6    they were not intended to guide manufacturers as to the safety

7    of their devices.

8           And with regard to efficacy, Bard's own medical --

9    excuse me, marketing director, not medical director --

10   marketing director, Janet Hudnall, who you will hear from,

11   admitted that there is no way to know if a filter has ever

12   stopped a clot.  Developing a DVT, it converting to a clot that

13   travels, there is no study to show exactly how many times a

14   filter actually stops a clot.

15          And in 2008, when the Surgeon General's report came

16   out concerned about blood clots, there's been information

17   that's come out since, including a report -- a retrospective

18   analysis.  In other words, not a clinical trial that Bard put

19   together looking forward, but going back into patient databases

20   and pulling information on people who have had IVC filters.

21          And you will hear his testimony that in a

22   retrospective evaluation of an analysis of looking at patient

23   data, 30 million people:  We do not know based on this study of

24   30 million people whether or not vena cava filters were

25   effective in decreasing the rate of fatal PE, which is

1   important.  That was after the Surgeon General's report.

2           There will also be medical literature that you'll hear

3   about discussed amongst the experts that came after that 2008

4   report, including a paper by a gentleman with the last name

5   Angel, who did a study of the G2 filter in particular and

6   looking at the available medical reports.

7           84 percent of all reports of IV filter fracture to the

8   United States FDA were that of the Bard filter.  And they're

9   responsible for 59 percent of all reports of adverse events to

10  FDA concerning IVC filters.  Again, the science developing

11  after the Surgeon General's report.

12          In addition to the medical director touting the Simon

13  Nitinol filter as a safer alternative to the G2 and the early

14  development of the IVC design history for Bard, the sales force

15  was also saying:  May I suggest the filter on the market that

16  has been on the market for the longest time in its current

17  form, the Simon Nitinol.  You want a filter that will give you

18  the greatest chance of reducing your complications.  The Simon

19  Nitinol is that filter.

20          I have a spreadsheet from MAUDE that shows this.

21          I want to change gears a little bit about the dispute

22  between what filter Lisa Hyde received.

23          You'll hear from marketing individuals in this case

24  that will testify live and by videotape.  And one of the

25  communications that went out to the sales staff in April of

1    2010 -- this is almost a year before Lisa received her G2X

2    filter -- was an indication to the sales team that:  We have

3    officially stopped selling G2X in the United States and have

4    transitioned over to the Eclipse.

5            Again, remember, the continuum was the G2, the G2X,

6    then the Eclipse, then the Meridian.

7            So after they had developed and gotten clearance for

8    the Eclipse filter, this memo went out saying:  We're not

9    selling the G2X anymore.  We're transitioning to the Eclipse.

10           But as I mentioned, there is no evidence that Bard

11   sent an edict or a directive for sales individuals to go out to

12   hospitals to make sure that hospitals were changing out their

13   inventory.  If they purchased them beforehand and the inventory

14   was still on the shelves, there was no directive from Bard to

15   take those filters off the shelf and arrange some replacement

16   or buyout for them to have the newer filters.  That was in

17   2010.

18           In February of 2011, just days before Lisa got her

19   filter in February, on February 25th, there was an email

20   exchange between the sales representative in the region of the

21   hospital in Wisconsin where Lisa Hyde received her filter.  The

22   response was they still had G2 in stock.  Days before she

23   received her filter.

24           And after she received her filter, in April, if you

25   read from the bottom up as emails go, Matt, who was the sales

1   representative, Matt Fermanich:  I have two G2 filter systems

2   that have expired, with the reference numbers.  Would you

3   please be able to replace these?

4         His response:  Cynthia, I'm more than happy to help

5   you out there.  First, the G2 filter system is being phased

6   out.

7         This is after she received her filter.  Phased out.

8   Not "We're not selling it," not "It no longer exists," not "You

9   shouldn't have it on your shelves."  It's being phased out.  We

10   have a new filter called the Eclipse, which is of the same

11   design of the G2 but has a few new features included.  First,

12   the hook on the top, allowing for snare retrieval as well as

13   the normal cone retrieval.  Second, the filter itself has been

14   electropolished, as I described, the G2, to lower fracture

15   resistance.

16         As I pointed out earlier, regardless of whether it was

17   a G2 or an Eclipse, the evidence will show that the design

18   specification and the safety and risk analysis were the same in

19   the sense that they should be temporary or permanent,

20   regardless of which one she received.

21         Now, I really want to switch gears and talk about Lisa

22   Hyde.  I have it on the slide here generally for your dates --

23   because again, you're limited to taking notes -- that in

24   February she was diagnosed with a pulmonary embolism.

25         Lisa Hyde, she will take the stand and she will

1    testify.  She's a mother of three.  She is extremely devoted to

2    her children.  She's been married to Mark, who was an air

3    traffic controller at the time when they were living in

4    Wisconsin.  She has a protein C deficiency, and those sorts of

5    hematology illnesses do make people prone to DVTs.

6         She had a DVT, and she went to the hospital.  And it

7    was recommended that she receive an IVC filter to protect her

8    for the potential of a clot traveling to her lungs, and she had

9    had a history of this happening before.

10        You'll hear from Lisa.  She agreed to this procedure

11   and to have the filter, believing and expecting that this would

12   protect her and this would help her, a mother with three young

13   children.  It was important to her.

14        Between February and May -- let me back up and tell

15   you a little bit more about Lisa and Mark.  They lived in

16   Wisconsin at the time that this happened.  Mark was an air

17   traffic controller.  He was transferred to Las Vegas, Nevada,

18   to McCarran International Airport, as an operations manager.

19   So that may explain the background of why we were in Wisconsin

20   and why they live in Las Vegas now.

21        They've since retired, and they spend a lot of their

22   time doing volunteer work.  And their youngest daughter was a

23   later production, so she's still only in high school.  So they

24   are at home and active with their daughter.

25        Between 2011 and 2014, after she received her filter,

1    Lisa in 2012, 2013, started to experience various complaints of

2    pain that she couldn't quite put her finger on.  She went to a

3    series of doctors' appointments and saw different doctors

4    trying to diagnose this and didn't know what it was.

5           In May of 2014, the pain became bad enough that she

6    thought she had a kidney stone and went to the doctor, and they

7    gave her a CT scan.  And it was found incidentally while

8    checking her for a kidney stone that her filter had broken, and

9    part of it had traveled to her heart.  It was in her right

10   ventricle.

11          In looking at that CT scan, you can see the placement

12   of it, and it was also butted up against -- it had perforated

13   and penetrated through the vein, and the legs had come in

14   contact with her vertebral body.

15          Lisa will take the stand and she will describe what it

16   was like to experience that, the cold fear.  And the only thing

17   good about that day is she finally had an answer to what had

18   been causing her pain, what -- what was it.  She had been

19   through several doctors' appointments to figure it out and

20   incidentally discovered that this happened.

21          When she describes finding out about that, she will

22   relay her medical history to you and her doctors' visits and

23   what she was told.  Her doctor had not seen this before.  She

24   was referred to a cardiologist.  The cardiologist had not seen

25   this before.  But he immediately told her -- and she'll explain

1    this to you in her testimony as part of the evidence that comes

2    into trial.  He explained to her:  You need to not do anything

3    that will raise your heart rate.

4         With a piece of metal in her heart, she will explain

5    to you that during the course of her treatment with him, he

6    relayed to her that:  You're one beat away from this possibly

7    going through your heart.

8         This was May.  They had a trip planned to go to

9    Wisconsin.  They had moved to Las Vegas.  They wanted to go

10   back and see some family members.  Lisa, when she takes the

11   stand, you'll understand, who does not take anything lightly,

12   in dealing with the cardiologist and not having immediate

13   answers, went to find her own answers.  She went on the

14   internet, Googled it.  She had not heard of this before, and

15   the shock she will relay to you in looking for treatment and

16   options and how did this happen.

17        She came across a doctor online who specialized in

18   removing broken pieces of IVC filters.  She went back to her

19   cardiologist, who had done research since then, and Dr. Kuo,

20   who was the doctor, I believe the judge mentioned his name,

21   K-U-O, called her and said, "I believe I can get this filter

22   out.  I don't know if I can get the piece out of your heart.

23   And consequently, if we can't get it out, it will be open heart

24   surgery."

25        So in dealing with her cardiologist, dealing with this

1   doctor that she found who could treat her, who was in Stanford,

2   California, he couldn't get her in until August.  She was under

3   the care of her cardiologist, who told her:  Don't raise your

4   heart rate.

5        And Lisa will testify that this trip to Wisconsin

6   became very important because of the fear of not knowing what

7   would happen to her next.  In her mind, this might be the last

8   time she was going to see a lot of these people that she went

9   to see.

10        Her cardiologist who cared for her agreed she should

11   go on this trip.  He suggested that they plan out every

12   hospital on the way, or at least know where it is when they are

13   there, and that is what Mark Hyde did.  They went on this trip

14   together and planned out the hospitals on the exits on the way

15   on the trip, and she visited with her family.

16        In August she was able to go in and see Dr. Kuo.  And

17   I understand this is kind of small.  But this was his note:

18   After conducting her own research online, Ms. Hyde discovered

19   the Stanford IVC Filter Clinic.  She arrives today with her

20   husband, Mark, and they drove eight hours yesterday from Las

21   Vegas, Nevada, to pursue a complex filter retrieval at

22   Stanford.  Her clinical history being an IVC filter and

23   fractured fragment which embolized to the right ventricle, and

24   the operation would be a complex IVC filter removal.

25        The testimony and evidence will show these filters

1    were not designed to be retrieved in a complex manner.  They

2    were designed to be implanted percutaneously, and if they were

3    to be removed, they would be removed percutaneously.  It would

4    not be a complex procedure to go in and then weave into the

5    heart to take out a broken fragment.  It was not part of the

6    design.

7              This next slide is another note that you'll see in

8    evidence from Dr. Kuo with regard to her Bard placement.  She

9    was -- had subsequent complications of IVC penetration and a

10   fractured fragment that embolized into the right ventricle.

11   She's here for her complex filter retrieval of a fragment from

12   her right ventricle.

13             On the next slide, you will see a scan that the expert

14   in interventional radiology testifying on behalf of the

15   plaintiffs will go over.  This depicts the fact that it was

16   touching her vertebrae and gave her the explanation, finally,

17   of what that pain was.

18             This is a film to show -- if you can see, the contrast

19   in the vena cava is that dark column, with it coming outside

20   the vein itself.

21             And the next slide is actually an x-ray without

22   contrast.  You can see the piece that's in her heart, which you

23   can't see on the screen because it's soft tissue.  But you can

24   see the procedure that Dr. Kuo put her through in order to

25   retrieve that metal.

1          And with regard to this issue of product

2    identification and the dispute, the testimony that Dr. Kuo will

3    give is that initially on imaging he called this a Bard Eclipse

4    filter.  But his impression after it was removed was that it

5    was a Bard G2X filter.  This is the man that took it out.

6          Now, I've been talking for a long time, and again,

7    it's the last -- first until the last time that we can address

8    you directly.  And the rest of this trial and the way that it's

9    going to go, you're going to hear the testimony and the

10   evidence come in, and we come back at the end and we'll talk to

11   you directly again in our closing arguments.

12         And at that point, I'm confident that the evidence and

13   testimony that comes into this case will support a verdict for

14   Lisa Hyde.  And at that point, we will come back and ask you

15   for one.

16         Thank you for your attention.  Again, thank you on

17   behalf of the plaintiffs and Mrs. Hyde and Mr. Hyde for your

18   service on this jury today.

19         THE COURT:  All right.  Thanks, Ms. Reed Zaic.

20         Members of the jury, we're going to take the afternoon

21   break at this time before we hear the defendants' opening

22   statement.

23         So we will resume at a quarter after.  Please remember

24   not to discuss the case.  We'll excuse you at this time, and

25   you can head out this way to the jury room.  We'll see

1    everybody at a quarter after.

2            (Recess taken, 3:01 p.m. to 3:15 p.m.)

3            THE COURT:  Mr. Rogers, you may continue.

4            MR. ROGERS:  Thank you, Your Honor.

5            May it please the Court, and ladies and gentlemen of

6    the jury.  My name is Jim Rogers, and I along with Ms. Helm and

7    Mr. Condo are honored and privileged to represent C.R. Bard in

8    this case.

9            Now, I expect that you --

10           THE COURT:  Sorry, Mr. Rogers.

11           We're still getting static.

12           MR. ROGERS:  Oh, I'm sorry.

13           THE COURT:  We frisked the jury during the break, and

14   we know it's not their problem.  Somebody has your phone on.

15   Please, everybody, turn them off.  Don't just put them on

16   airplane mode.  Turn them off.

17           Let's wait for a minute, Mr. Rogers, until that

18   happens, and that way you won't get interrupted again.

19           MR. ROGERS:  Thank you.

20           THE COURT:  All right.  Go ahead, Mr. Rogers.  Sorry

21   for the interruption.

22           MR. ROGERS:  No problem.  Thank you, Your Honor.

23           I expect that you have heard some things during the

24   presentation from Ms. Zaic this afternoon that caused you

25   concern.  And you may be asking yourself right now, I wonder if

UNITED STATES DISTRICT COURT

1    IVC filters are a good idea.  I wonder if they're safe.

2           I submit to you, ladies and gentlemen, that what

3    you've heard this afternoon so far is just part of the story.

4    And there is a completely different side of this story, a story

5    that will be more whole and more complete than what you heard

6    earlier this afternoon.

7           And at the end of all the evidence that you're going

8    to hear in this case, you're going to be asked to decide one

9    essential question, and that is, did the benefits of the IVC

10   filter that was implanted in Mrs. Hyde -- and that benefit

11   would be to potentially prevent a life-threatening pulmonary

12   embolism -- did it outweigh, did those benefits outweigh the

13   potential risks of an IVC filter?

14          And I will submit to you that the evidence is going to

15   show that there certainly are risks, and we're not going to try

16   and tell you that there's not.  But I'll also submit to you

17   that the evidence is going to show from both sides, when you

18   hear experts and witnesses, that these risks of these filters

19   were well known and well understood, and doctors were willing

20   to accept those risks in order to treat their patients.

21          And I also submit to you, as you hear all the

22   evidence, that ultimately you will come to the conclusion that

23   Bard is wrongfully accused in this case.  Because the benefits

24   of the IVC filter that was implanted in Mrs. Hyde indeed do

25   outweigh those risks.

1              Now, it's my job this afternoon to try and give you a

2    little bit of a road map about where we're going and try to

3    summarize the evidence that you're going to hear over the

4    course of the next two and a half weeks, so I know that's a

5    long road that you see a map for.  But I want to talk to you

6    about four primary things.

7              First, I want to talk about the defendants, C.R. Bard.

8    And that's not just a nameless, faceless corporation.  It is

9    comprised of people who are engineers, regulatory

10   professionals, and scientists, who go to work every day just

11   like you do, and they put their skills to work in order to

12   bring medical products to the market so those products can be

13   put in the hands of doctors so those doctors can then improve

14   the health and lives of their patients.

15             I also want to talk to you about the device, the IVC

16   filter.  And I expect that when you came into court today, a

17   lot of you had never heard of an IVC filter and didn't know

18   what it was.  But what I want to talk to you about is, first of

19   all, the disease state, pulmonary embolism, what IVC filters

20   are intended to prevent.

21             And then I also want to talk to you about the efforts

22   that Bard has made over the years to develop these products, to

23   put them on the market, and continue to innovate over the

24   course of time to make these products better and better year

25   after year.

1          And I'm also going to talk to you about the plaintiff.

2     Now, of course, there's two plaintiffs in this case, both Mr.

3     and Mrs. Hyde.  But the person I'm going talk to you about

4     today is Mrs. Hyde.  And really, what I want to speak to you

5     about is her medical history and background and why her doctors

6     believed that it was critically important that she receive the

7     maximum protection from a potential pulmonary embolism as

8     possible.

9          And lastly, I want to talk to you about the

10    plaintiffs' burden.  You heard some discussion about this

11    during jury selection this morning.  But as the individuals who

12    have brought this case against Bard, the Hydes do bear the

13    burden of proof in this case, and I want to talk to you about

14    that and I want to talk to you about the legal hurdles that the

15    Hydes have got to prove to you in order to recover in this

16    case.

17         But first of all, let's talk about the defendants.  As

18    you see from this photograph, C.R. Bard is a company that's

19    been around for a very long time.  It's over a hundred years

20    old.  And the gentleman you see here is Charles Russell Bard,

21    and that's who C.R. Bard is named for and the founder of the

22    company.

23         And he worked with a doctor named Dr. Foley way back

24    when in order to invent a catheter called the Foley catheter.

25    And it's been around now for a hundred years, and it's still

1    used in hospitals today.

2         And of course, you know, things didn't stay stagnant

3    like you see in this picture, but Bard has continued to evolve

4    over the years.  And today, C.R. Bard is a large corporation

5    that is based in New Jersey.  And it's got multiple divisions

6    that make all kinds of medical devices, including products to

7    be used in the vascular world, urology, oncology, and surgery.

8         But the division that we're going to talk about the

9    most is the peripheral vascular division, and that is the

10   division that makes IVC filters for Bard.  And that company is

11   located right here in Phoenix, in the Phoenix area.  It's in

12   Tempe.

13        And that company focuses on primarily two different

14   types of products.  First of all, vascular products.  That

15   means products that you're going to use in your veins.  And to

16   give you some examples of that, you see up on the screen now

17   there's a stent.  And that's something that you put inside of a

18   blood vessel to hold it open if it's become closed or clogged.

19        And in the bottom left-hand corner, you see what are

20   known as catheters, and those are Power catheters, so doctors

21   can inject a dye called contrast into the veins of a patient so

22   that they can see what's going on inside of their veins.

23        And then Bard also makes -- and Bard Peripheral

24   Vascular makes products that relate to oncology; in other

25   words, the treatment of cancer.  And they make a number of

1   biopsy products that help diagnose those kind of conditions.

2   And they also make these products that you see up there called

3   ports, which are surgical ports.  And those are used in

4   patients who have to receive medication long term, where you

5   have to have access to people's veins.  Something like

6   chemotherapy.  And those ports are put into a vein so that the

7   doctors can run the drug through the port and not continually

8   stick the patients over and over again.

9          But most importantly, you're going to meet real

10  people.  You're going to meet employees from Bard who are these

11  engineers and regulatory professionals, and you're going to get

12  to hear their stories in this courtroom of their work to bring

13  these products to market and how they continually strive to

14  improve these products over and over again.  And you'll get to

15  judge these folks for yourself.

16         The next thing I'm going to talk to you about is the

17  device, the IVC filter.  And the first thing I wanted to speak

18  to you about is the disease state.  You've heard plenty about

19  this, but I want to talk about it a little bit more.

20         But deep vein thrombosis is a very serious issue in

21  this country, and as you've heard, I mean, this is blood clots

22  that can occur in the veins in your legs and hips, the lower

23  part of the body.  And this can happen, you've probably heard,

24  like if you're taking a long flight, you need to get up and

25  walk around, drink plenty of water so that you don't develop

1    these clots.

2         But there's other things that can cause them too.

3    There's certain people that have genetic clotting disorders

4    that they're just naturally prone to develop blood clots.  And

5    you can also develop these if you're laid up for a long time,

6    if you've had a surgery that's major or if you've been in a

7    serious accident where you're going to be immobile for a good

8    while.  All those people are at risk of developing these clots.

9         And DVT is a very serious problem that needs to be

10   addressed, but the real thing that we're here for today is

11   pulmonary embolism.  And that's a much, much more risky

12   complication.  As you can see from the diagram that's up on the

13   screen, that happens when one of these blood clots in your legs

14   breaks off and it swims upstream, up through the IVC, the

15   inferior vena cava, goes to the heart, goes through the heart,

16   and then goes to the lung.

17        And if one of those clots hits in just the right

18   place, it can completely stop the blood flow in the lung and

19   cause immediate death.  And this is obviously a very serious

20   issue that needs to be addressed and prevented.

21        Now, just a few facts and figures about DVT.  A lot of

22   people experience this in the United States.  As you can see,

23   it's very high numbers.  600,000 people can be hospitalized a

24   year for that condition, and you also see up here where 200,000

25   to 300,000 people in the U.S. alone can die from a pulmonary

1    embolism each year.  And 33 percent of people who will have a

2    DVT or a PE are going to experience another one.  So it's

3    particularly dangerous for those individuals who have already

4    got a clotting issue.

5            And you also see up here that the standard treatment

6    for these blood clots is something called anticoagulants.  And

7    those are drugs.  And they can come in a couple of different

8    forms.  You can get them intravenously, and that happens

9    sometimes in hospitals where you get a drug called either

10   heparin or Lovenox.  You may have heard of those.

11           Or they can be oral as well.  And the one that was

12   around for years and years was a drug called Coumadin, and its

13   trade name is called warfarin, so they're the same thing, but

14   you probably have heard of both of those.

15           And there's also a lot of new-generation

16   anticoagulants that are on the market now that you probably

17   have seen ads for on television, like Xarelto and Eliquis.  And

18   those are very effective treatments for blood clots, but

19   certain people are either contraindicated from taking those

20   drugs, meaning that they've got a potential issue to bleed

21   themselves, and you don't want to put somebody who's got a

22   bleeding issue on a blood thinner; or there's other people who

23   might be fine taking a blood thinner but they have to come off,

24   you know, to have surgery or something like that.  And at that

25   point, they don't have any protection from a clot.

1          And with some of these individuals, that's really

2    where IVC filters come in, is when somebody's either -- the

3    drug is not effective, it doesn't work, or if they have got a

4    situation where they need to come off and then they can be

5    restored to the anticoagulant later on.

6          But you heard some reference to this during Ms. Zaic's

7    presentation.  And this was a document that was published in

8    2008.  And as you heard, this was put out by the Surgeon

9    General, and it's a report, but the Surgeon General at the time

10   did not call it a report.  He called it a Call to Action.

11          And as you can see from the callout that we have up

12   there, the Surgeon General felt that these issues, which are

13   critically important and which cost the lives of so many

14   Americans, are kind of under the radar screen.  And you can see

15   for yourself that the Surgeon General pointed out that very

16   common things that we're all very familiar with, car wrecks,

17   AIDS, breast cancer, those issues do not cause as many deaths

18   as DVT and PE.

19          And so the Surgeon General found the status quo, as he

20   calls it there, unacceptable and wanted to get more information

21   out about what to do with these very serious medical

22   conditions.

23          And two of the things that the Surgeon General

24   includes in this report as effective treatments for DVT and PE

25   are anticoagulants and IVC filters, including retrievable IVC

1      filters, which you're going to hear more about in a moment.

2              Now, what is an IVC filter?  Now, you heard some about

3      this, obviously, already.  And up on the screen you have

4      pictures of the G2X and the Eclipse filter.

5              But I first want to show you kind of where those go.

6      And you may have gotten a sense of this from the earlier

7      animation.  But as you can see, the IVC filter is implanted

8      right there in the inferior vena cava, and it's put usually

9      right where the veins from the kidneys are flowing into the

10     inferior vena cava.

11             And the reason for that is, is when one of these

12     filters catches a clot, it will kind of sit there.  And this

13     blood that kind of rushes in from the kidneys washes over the

14     clot and just naturally breaks it up.  And so it can then

15     shrink to a size where it is not dangerous, or it just

16     dissolves completely.

17             And I'm going to show you a little animation here --

18     I've got to have an animation, too -- of a filter catching a

19     clot.

20             And here you see the clot traveling up the IVC.  It

21     hits the filter, and its blood flow continues to go around it.

22     The clot will ultimately break up and dissolve.

23             Now, let me pick up with Bard's story about IVC

24     filters.  And as Ms. Zaic indicated, kind of the story sort of

25     starts in 1990.  And you've got a picture here of a filter

UNITED STATES DISTRICT COURT

1    called a Simon Nitinol filter.  And that filter was not

2    developed by C.R. Bard, and it entered the marketplace in 1990.

3    And the company that put it there was called NMT, which stands

4    for Nitinol Medical Technologies.

5            But then later, in the early 2000s, Bard purchased the

6    rights to that filter.  But they also purchased the rights to

7    another filter, the Recovery filter, which NMT had under

8    development at the time.  And that was going to be a big deal,

9    because that filter was going to be a retrievable filter.

10           The Simon Nitinol filter and all filters that came

11   before that were permanent filters.  If they went into a

12   patient, they did not come out unless you removed it

13   surgically.  And that really limited the patient population

14   that doctors could use with those filters, because they could

15   only put them into people that they knew would need them for

16   really long term, for the remainder of their lives.  And so

17   they primarily got used in terminally ill patients, the very

18   elderly, folks like that.

19           But the retrievable filters kind of revolutionized

20   that world, and I'm going to talk to you a little bit more

21   about that in a minute.  But first I'm going to continue this

22   sort of timeline of these IVC filters from Bard.

23           In 2003, Bard introduced the Recovery filter.  And

24   then in August of 2005, Bard made its first second-generation

25   filter, the G2 filter.  And they learned from their experience

1    with the Recovery filter on how they could potentially improve

2    that filter, and they made improvements to it.  And we'll talk

3    about those.

4         And then a few years later, Bard introduced the G2X

5    filter.  And as you can see, I put in parentheses there G2

6    Express, because you may see documents through the course of

7    the trial that say G2 Express.  But G2 Express and G2X are the

8    same thing.  I mean, they're completely synonymous, and I just

9    wanted to flag that for you.

10        But that filter added a hook on the top of the G2

11   filter.  And then in January of 2010, Bard introduced the

12   Eclipse filter, which was electropolished.  And we'll talk

13   about what that means in just a moment.

14        But first let's talk about retrievable filters.  And

15   as I indicated, this was a really big deal, because these

16   filters were just permanent.  You know, way back when, when

17   they first started doing this like in the '40s, you know,

18   patients had to be actually opened up surgically and the

19   filters implanted and sewn in and then sewed back up.

20        But as they continued to evolve and make strides in

21   technology, these filters could be put in what we call

22   percutaneously.  In other words, you could make just a small

23   incision either in the jugular vein or your femoral vein and

24   run a catheter through there and put these filters in, and

25   that's what the Simon Nitinol filter was.  But it was only

1    indicated for permanent use.

2        But there did start to be some what were called

3    retrievable filters, but they were indicated for only very

4    short periods of time.  So they were available to a doctor, but

5    they could only stay in for, you know, up to about two weeks or

6    so.  And if that wasn't an option and if the patient needed

7    protection longer than that, the filter still needed to come

8    out.

9        And some of these filters actually had a tether on it,

10   so that when they got put in, I mean, there was a wire that

11   literally stayed out of the patient for the filter to be

12   retrieved.

13       But ultimately, these retrievable filters came out,

14   and those allowed doctors to be able to put these in and take

15   them out much, much easier.  And these filters could stay in

16   patients for much longer periods of time, or at least some of

17   them could.

18       And the Bard retrievable filters, when they first came

19   into the market, they did not have a specific time period by

20   which they had to be removed.  They could be put in and kept in

21   at the discretion of the physician.

22       And so this is really beneficial to patients that only

23   needed temporary protection from an IVC filter.  So if you've

24   got a patient who's doing fine on anticoagulants but all of a

25   sudden they need to have surgery, so they have to come off the

1    anticoagulant, then you can put one of these temporary filters

2    in.  And then once that surgical period is over and the patient

3    is reestablished on their anticoagulant, you can take the

4    filter out.  So that gave a different option to what doctors

5    could do.

6             And you heard some about this Nitinol.  I mean, that

7    is what the Bard filters are all made out of.  And I certainly,

8    before I got involved in this, I'd never heard of that.  But it

9    was developed by Navy scientists in the 1960s, and it really is

10   kind of interesting because this particular metal has what is

11   called shape memory.  And so when it is originally forged into

12   a shape at a certain temperature, the filter or the product,

13   whatever it is that's made of Nitinol, will remember that

14   shape.

15            So you can take this and forge it and then keep it

16   cold, and it will stay in a certain shape.  And then you can

17   twist it up and do whatever you want to, and if it's cold, it's

18   going to be -- retain whatever shape you put it in.  But if

19   it's exposed to a warmer temperature, like when it gets into

20   the actual interior of the body, the filter will remember, or a

21   product made of Nitinol will remember what shape it was

22   originally forged in, and it will kind of immediately just

23   return to that shape.

24            And I'm going to show you an animation of kind of the

25   implantation of a filter so that you can see this.

1          But as I mentioned a moment ago, you can either do a

2     jugular approach or a femoral approach.  And with the Bard

3     filters, you can do either.  With certain filters, it's limited

4     to one or the other.

5          But what you're going to see here is a femoral

6     approach.  In other words, this is going to be a situation

7     where the doctor would have made a small incision in the leg

8     and then is running catheters and wires up through the leg into

9     the IVC.  So I just wanted you to have that orientation of what

10    this was like.

11         All right.  The first thing you see, that's a

12    guidewire.  That's the first thing that goes in, and then a

13    sheath goes over the guidewire.  And the sheath gets pulled

14    back.  And then the catheter that has got the filter on it is

15    put in, and as soon as that catheter is pulled back, the filter

16    springs back into shape because these Nitinol filters

17    understand and remember what shape they were supposed to have.

18         And this is just a little bit different angle.  And

19    there's the filter, catheter comes back, and the filter springs

20    into shape.

21         And along those same lines, I want to show you an

22    animation of a retrieval.  And retrievals, unlike the

23    implantation of a filter which can kind of come from either the

24    jugular or the femoral -- with the Bard filters, it has to come

25    from the jugular direction because those are the -- you know,

1    it's got the hooks on the top, and that's what you have to kind

2    of catch.

3            But you'll see here how this works.  First, the

4    guidewire is going to come down and run through the filter.

5    And then a catheter is going to follow.  And this is using a

6    little device called the recovery cone.  And it is going to

7    open up like an umbrella and then grab the tip of the filter,

8    and then the doctor pulls it back.  And the filter will

9    dislodge from the cava and then go back up into the catheter

10   where it can be retrieved.

11           Okay.  Let's talk a little bit about the Recovery and

12   the G2, and you heard some of this in Ms. Zaic's presentation.

13   And the Recovery was the first-generation retrievable filter.

14   Now, I need to spend some time on this, even though these were

15   not the products that Mrs. Hyde received.

16           And based on this experience with the Recovery filter,

17   Bard did learn.  And what happened was when the Recovery filter

18   was out there, Bard did receive complaints or reports of things

19   that were occurring.  And the thing that was the most

20   concerning, you heard Ms. Zaic talk about this, was what is

21   known as cranial migration or cephalad migration.  And as she

22   told you, that is migration when the filter moves up toward the

23   head or toward the heart.  And that's really something you want

24   to avoid.

25           And so based on that experience, Bard made some

1    dimensional changes between the Recovery and the G2 to prevent

2    that as well as to try and prevent additional fractures.  And

3    as you can see here, I mean, you can -- it's not that hard to

4    see, but the arms of the filter got made longer and a little

5    bend got put in them, and the span of the legs got made a

6    little wider.  And then you can also see the hooks -- it's kind

7    of hard to tell here, but they got made a little longer and a

8    little stronger.  And all of that was to try and bring more

9    stability to the filter.

10          And the evidence is going to show that these things

11   worked.  I mean, they helped.  And Bard's own internal testing

12   will show that the G2 filter, which you hear called the G1A --

13   everything's got two names in this case, so I apologize for

14   that.  But the G2 filter compared to the Recovery filter did

15   have better fracture resistance, and it also did better with

16   migration resistance.

17          But importantly, this is not what this case is about.

18   These are the early generation filters, and neither one of

19   those filters are the filter that's in Ms. Hyde.  There's no

20   dispute about that.  We know that.

21          And I'm going to talk a little bit more about Bard

22   filters as they continued to innovate.  You see there the G2

23   and the Eclipse, and you heard something about this too.  But

24   after Ms. Hyde's filter was put in her in 2011, there were

25   additional filters that came on the market.  And the one you

1    see here on the left is the Meridian filter.  And that added

2    some additional anchors to try and keep the filter, again, more

3    stable within the cava and to prevent it from moving down, from

4    migrating caudally, and that's the direction toward the feet.

5          But that filter was not on the market when Ms. Hyde

6    got her filter.  It was still being tested, and it had not yet

7    been cleared by the FDA.  And the filter that's on the market

8    now, the Denali filter, is really quite unusual.  Before the

9    Denali filter, all of these filters were made by various

10   component parts that were welded together.  But the Denali

11   filter is made from one piece of Nitinol.  It's forged out of

12   one single thing, so everything about that filter is all one

13   piece.

14         And at the time Ms. Hyde got her filter, this was

15   completely in the development stage, and it did not get

16   introduced into the marketplace until 2013.

17         So this case is not about these subsequent filters,

18   and it's not about the prior filters.  And what this case is

19   really more about are the G2X filter -- which you see here, and

20   you can see the difference where the G2X has got the hook on

21   top.  And that allows the doctor more options to try and

22   retrieve the filter -- and then the Eclipse filter.  And that

23   added electropolishing, and you heard a little bit about this.

24   And this process, electropolishing, really smooths out the

25   surface of the filter.

1          And that's some photographs that were taken with an

2     electron microscope.  I mean, this is the kind of level we're

3     talking about.  But you can see that prior to electropolishing,

4     there were some imperfections in the surface of the filter, and

5     those are things that potentially could be the source of a

6     fracture.  So electropolishing was added to try and reduce

7     fracture even more.

8          Now, you've obviously heard something about this.  I

9     mean, what is the filter in Mrs. Hyde, or that Mrs. Hyde had in

10    her at the time?  Of course, it's out now.  And the real answer

11    is nobody knows, and this is really weird.  I mean, this is a

12    very unusual situation for a case, because usually everybody

13    always knows what product is in a patient.

14         But there's several sources of potential information

15    that might shed light on this, and I'm just going to go through

16    them with you and tell you what we think the evidence will show

17    on them.

18         First of all, the filter has a hook, so we know it's

19    not a Recovery or a G2.  And we know that based on the imaging

20    that was taken of the filter, the x-rays and the CT scans that

21    were done of Mrs. Hyde's filter when it was in her body.  So

22    you will see those yourself, and you can look at it, and you

23    will see that it's got a hook on it.  So that completely

24    eliminates the possibility of it being a G2 or a Recovery.

25         But even though those x-rays will tell us that it's

1    got a hook, if you look at the G2X and the Eclipse under an

2    x-ray, they really look exactly the same.  Dimensionally, they

3    are really pretty much -- there's no difference.  And you're

4    not going to hear a witness that is going to come into the

5    courtroom and tell you that "I can look at these images and

6    tell you that this is a G2X or an Eclipse filter."

7             When Mrs. Hyde went to Stanford and had the filter

8    removed, it was not retained.  That's obviously another source

9    that you could have, but Stanford disposed of the filter.  And

10   I'm not ascribing any fault to Mrs. Hyde because of that.  I

11   mean, Stanford just didn't keep it.  So if the filter was still

12   around, it could be inspected and we could figure out what

13   filter it was, but it just doesn't exist anymore.

14            And then medical records, as you may have picked up

15   some from Ms. Zaic's presentation, they call it G2X, they call

16   it G2, they call it Eclipse.  So it's kind of all over the

17   place.

18            And usually when these products are implanted, you

19   know, when the kit comes for the doctor to open up and use,

20   there's a sticker that can get peeled off of the material that

21   comes with the product, and it gets just stuck right there in

22   the medical record.  And that's usually what we always use to

23   know what product it was.

24            But in this case, again, through no fault of

25   Mrs. Hyde, that doesn't exist.  We don't know why.  Just for

1   whatever reason, in the records from the hospital where the

2   filter was implanted, there's no sticker.  There's no lot

3   number.  There's no real identifier of what this filter is.

4          And you're also going to hear the testimony of her

5   treating doctors.  You heard some about Dr. Henry.  He's the

6   doctor that put this in in Wisconsin.  And you heard about

7   Dr. Kuo, who was the doctor who took it out in Stanford.  And I

8   want you to listen very carefully to their testimony.  They

9   won't be here live.  You're going to see both of them by what

10  we call depositions, but it's a video deposition, so you'll get

11  to see what they look like.

12          And you'll hear both of these doctors tell you that

13  "Sitting here today, I can't tell you what filter this is."  So

14  listen carefully for that, and make those decisions for

15  yourself.

16          But there are some records that we think provide some

17  circumstantial evidence of what this filter is, and these are

18  billing records.  I mean, this is -- you know, we're kind of

19  hitting the bottom of the barrel here as far as these types of

20  evidence.  But I did want to tell you what we've got.

21          And this is a chronology that kind of lays some of

22  this out.  And let me go through this with you, but I'm going

23  to start you with February 25th, 2011, just to kind of orient

24  you, because that's the day that Mrs. Hyde got her filter.

25          And then -- and as you see, Mrs. Hyde's filter was

1    placed by a jugular approach, so her doctor, Dr. Henry, went in

2    through her neck.  And we can tell that from the medical

3    records, so that we know that the kit that got used was a

4    jugular kit.  So that's what we're looking for is a jugular

5    filter.

6           And so if you go back up to the top, in October of

7    2009, that's when the G2X came on the market, about 18 months

8    before Mrs. Hyde received her filter.

9           And then in January of 2010, the Eclipse came on the

10   market.  So it had been on the market for a little more than a

11   year when Mrs. Hyde got her filter.

12          Now, we know that the last time that the hospital

13   where her filter was placed, when -- the last time they ordered

14   a G2X filter that could be used from a jugular approach was in

15   January of 2010.  So if this was a G2X, it sat on the shelf for

16   more than a year before it got used on Ms. Hyde.  And I'm not

17   telling you that's impossible, but that's what would have had

18   to have happened.

19          And then you see in these sort of interim dates, those

20   are dates when the hospital ordered Eclipse filters.  And from

21   November to January the 12th, there were six different filters

22   that were ordered, but they were all femoral filters.  So we

23   know that none of those filters were used in Ms. Hyde because

24   she got a jugular filter.

25          But on February 23rd, two days before Mrs. Hyde's

1    procedure, a filter -- an invoice was done by Bard to the

2    hospital for a jugular filter, an Eclipse filter, and a femoral

3    filter as well.  There were two that day.  But those filters

4    were shipped out from C.R. Bard to the hospital for two-day

5    delivery FedEx, and we know that the filters arrived the

6    morning of Mrs. Hyde's procedure.  And we also know from the

7    medical records that Mrs. Hyde's procedure did not start until

8    about 1:00 in the afternoon.

9            And then one other fact to be aware of is that after

10   her procedure was done, a few days later, on March the 1st,

11   2001 [sic], the filter ordered -- excuse me, the hospital

12   ordered another jugular Eclipse filter.  And I submit to you

13   that that is some circumstantial evidence that the hospital was

14   replacing the jugular filter that was used in Ms. Hyde, the

15   Eclipse filter.  But again, we don't know; but I do think this

16   is some circumstantial evidence that the filter used in

17   Ms. Hyde was an Eclipse filter.

18           But at the end of the day, as far as Bard is

19   concerned, we don't think it matters.  Both of these filters

20   were really good filters.  And importantly, these are rates

21   that Bard uses to track complications and things that occur

22   with its products.  I mean, that's something they do on a

23   routine and regular basis.

24           And you heard Ms. Zaic talk about this some, but, you

25   know, when reports come into Bard from various sources, from

1    doctors or hospitals or an individual, Bard is obliged to keep

2    up with that information and provide that to the FDA.  And so

3    as part of this process, Bard does these trending numbers.  And

4    what they do, they take the number of complications that are

5    reported to them and compare that to the sales of that product,

6    and come up with these rough rates about what are the

7    complication rates that Bard is being -- receiving from the

8    field.

9           And as you can see, for the G2 Express and the

10   Eclipse, these rates continue to trend down from the prior

11   filters.  That first column you see is -- the RF, that's the

12   Recovery filter.  And then the next one is the G2, then the G2

13   Express and the G2X, one column, and then the Eclipse.  And

14   over the course of time, these numbers come down.  And that's

15   what's important to Bard, that the improvements that they're

16   making to these products are working.

17          And there are the numbers that Bard has for reported

18   rates for some of the things you've heard about that can happen

19   with filters, some of these complications for fracture,

20   migration, perforation, and tilt.

21          And to look at these numbers in a little bit different

22   way, you know, this means that for the G2X, that as far as the

23   reported amount of complications that's coming to Bard, you

24   know, it's almost a hundred percent of -- slightly over

25   99 percent of the filters that they're selling, they're not

1    hearing back reports of complications.

2           And with the Eclipse, that is -- numbers get a little

3    bit better.

4           Now, I'm sure you're going to hear evidence during the

5    course of the trial that these numbers are not that great.  I

6    mean, that these are subject to criticism.  And Ms. Zaic talked

7    about that some in her presentation.  She talked about

8    underreporting, that all the things that happen with these

9    products don't get reported.

10          And Bard does not dispute that.  I mean, that's real.

11   That happens.  And busy doctors are not going to report every

12   single complication they see.

13          And -- but this is a very important part of Bard's

14   story, because this is something that they do ongoing,

15   constantly, to try and see what these numbers are doing and how

16   they're trending and are they getting better.  And that's the

17   important thing.  And we're not here to tell you these numbers

18   are perfect, but they are some information that Bard relies on

19   based on its internal information.

20          Now, next I'm going to talk about the plaintiff,

21   Mrs. Hyde.  But before I do, I need to tell you that the last

22   thing we are here to do is to criticize Mrs. Hyde.  And we do

23   need to talk about Mrs. Hyde, because I think her medical

24   history is very important to this case, but we all feel

25   sympathy for her.  I mean, she went through an ordeal, no

1    question.  I mean, she found out she had a piece of metal in

2    her heart.  Nobody wants to hear that.

3            But even though we're human and we feel sorry for her

4    and feel sympathy for that situation, her overall medical

5    history is very important to this case.  And there's some

6    things that I want to address with you.

7            And here's the timeline, and I hope you can see

8    that -- those points on there, because they're a little bit

9    small.  But in the late 1980s, Mrs. Hyde experienced her first

10   PE.  And that was a point in her life when she was younger and

11   she was taking birth control pills.  And there's a known

12   association between birth control pills and blood clots.  And

13   so at that point in time, that's what that clot was attributed

14   to.

15           Then you fast-forward many years later to February of

16   2009, and Mrs. Hyde experienced another -- a second PE and a

17   DVT.  And standard therapy is to receive anticoagulants.  First

18   when she was hospitalized for that, she received intravenous

19   anticoagulants like we discussed earlier, and then when things

20   were a little better, she was discharged but she continued to

21   take oral anticoagulation for a standard period of about six

22   months.

23           That's usually what happens, and if you don't have any

24   clotting issues for about six months, your doctors will usually

25   take you off those medications.  And that's what happened with

1   Mrs. Hyde.

2          But then in February of 2011, almost two years exactly

3   from when she had the DVT and the PE in '09, Mrs. Hyde

4   developed another DVT and PE.  And this was quite a large

5   pulmonary embolism in her lung, and in fact, she had a

6   pulmonary embolism in both of her lungs, both her right lung

7   and her left lung.

8          And the one that was on the right was really quite

9   large.  And her doctors really kind of went immediately back

10  into that same treatment mode, where she receives intravenous

11  blood thinners in order to try and treat those clots.

12         But this time, because of the proximity of this event

13  to the prior event just two years before, an interventional

14  radiologist named David Henry was called in to assess whether

15  Mrs. Hyde should receive an IVC filter.  And it was Dr. Henry's

16  medical judgment that she needed as much protection as possible

17  while these anticoagulants were getting up to speed and

18  starting to work in order to protect her from PE.

19         And you'll also hear that Dr. Henry specifically

20  wanted her to receive a retrievable filter.  And that's what he

21  did, and he implanted that filter on February the 25th at this

22  hospital in Wisconsin.

23         Next day, the doctors are doing some more testing on

24  Mrs. Hyde, and that is when it's determined that she has got

25  this clotting disorder called a protein C deficiency.  And that

1    means, unfortunately for Mrs. Hyde, that she is going to need

2    to take anticoagulants for the rest of her life.  And hopefully

3    that will all go very, very smoothly.

4           And so when she was discharged at this period, she

5    ultimately was taking Coumadin for a period of time, and then

6    later she switched to one of the newer generation

7    anticoagulants, a drug called Xarelto, and she's still taking

8    that drug today.  And Mrs. Hyde sees the doctor on a regular

9    and routine basis multiple times a year in order to check her

10   for -- to make sure that everything's going okay on those

11   anticoagulants.

12          But as Mrs. Zaic discussed in her presentation, in

13   August of 2011, the Hydes moved from Wisconsin to Las Vegas so

14   that Mr. Hyde could pursue a new job in Las Vegas.  And I just

15   again orient you, just like she did, that at that point in time

16   we shift from medical care in Wisconsin to medical care in

17   Nevada.

18          And so several years later, as Ms. Zaic indicated,

19   Mrs. Hyde was being worked up in May of 2014 to see if she had

20   a kidney stone.  And as part of that, a CT scan was done, an

21   imaging study, to see if she had a stone.  And the doctor that

22   read the images from that CT scan noticed what he thought was a

23   piece of metal in her heart.  And as Ms. Zaic indicated, this

24   was an incidental finding.  Nobody was looking for this at the

25   time, but the doctor was smart enough to pick up on it.

1          And so they did some confirmatory imaging after that

2     and realized that this was a piece of the filter.  One of the

3     struts, an arm of the filter, had broken off and migrated to

4     her heart and ended up in her right ventricle.

5          And as Mrs. Zaic indicated, Mrs. Hyde did do her own

6     research, and she found a doctor in Stanford that she wanted to

7     go see to see if he could remove the filter and the strut from

8     her heart.  And that's the decision that she made.  And as

9     Mrs. Zaic indicated, she could not get an appointment with him

10    until August of 2014.  And in the interim, she did see a doctor

11    named Richard Shehane, who was a cardiologist in Las Vegas.

12         But ultimately, the Hydes did travel from Las Vegas to

13    Stanford, which is in Palo Alto, California, and they saw

14    Dr. Kuo on the -- you know, one day.  He -- she was admitted to

15    the hospital the next.  He did the procedure.

16         And as you can see on the timeline, the total time to

17    remove both the filter and the strut was about an hour and a

18    half, and then she was discharged from the hospital the next

19    day.

20         Now, those are kind of facts that are very basic that

21    I think everybody sort of agrees on.  But the evidence will

22    show those facts.  But there's certain things we're probably

23    going to have some dispute about, and so I'm going to have to

24    ask you jurors to put your medical detective hats on.

25         And when I first started as a lawyer, you know, the

1    medical detective that everybody identified with was Quincy.

2    And we've got jurors here who I'm sure have never heard of

3    Quincy and have no idea who he is.  So I included some other

4    once.  We've got Dr. House, and then we've got some of the

5    people from -- Abby Sciuto from NCIS and Loretta Wade from CSI

6    New Orleans.  There's so many CSIs, I can't even keep up with

7    them anymore, but that's the one she's from.

8           But what you're going to get a chance to do is to see

9    Mrs. Hyde's medical records yourself.  And you're going to get

10   to make determinations based on your own experience, your own

11   judgment, about what you think those records show.

12          And as you go through those records, and you heard

13   Ms. Zaic allude to this, I want to talk about two specific

14   periods.  First of all, February 2011 to August of 2014, and

15   that was the period of time when the filter was in Mrs. Hyde's

16   IVC.  And you may hear claims in this case that it was causing

17   things like abdominal pain, the filter itself, and back pain

18   from where it was interacting with other organs.

19          But as you see these medical records and you hear the

20   testimony, I want you to ask yourselves, were there other

21   things that were going on that might attribute to these things

22   that Mrs. Hyde was experiencing.  And be on the lookout for

23   things like:  Did she indeed have a kidney stone?  Did she get

24   diagnosed with endometriosis?  Did she have to have surgery for

25   that?  Did she get diagnosed with diverticulitis and get

1    treated for that?  Does she have degenerative disk disease, and

2    if she does, when did that start and what kind of issues can

3    that cause?  And was she diagnosed with something called

4    fibromyalgia, which is a generalized pain disorder?

5            And again, you're going to have to sort through all

6    those things yourself.

7            And you also may hear claims about -- during this time

8    period about chest pain and chest palpitations that perhaps may

9    be attributed to the strut that unfortunately wound up in

10   Mrs. Hyde's right ventricle.  And when you hear evidence about

11   that, ask yourself, when did those things start?  And when did

12   they stop?  And were there other things that were going on that

13   perhaps might cause those particular types of conditions?

14           And again, that is your decision as the jurors.

15           Another important time period is going to be September

16   the 14th to September the 18th [sic].  And that's the four-year

17   time period that has elapsed since the filter and the strut

18   have been removed from Mrs. Hyde by Dr. Kuo at Stanford.

19           And you may hear evidence in this case that Mrs. Hyde

20   may be at risk of certain heart conditions because of the strut

21   that was in her heart.  And so you may want to ask yourself

22   things like, has she been under the care of a cardiologist

23   since Dr. Kuo took the strut out of her heart?  And if she was

24   admitted to the ER in February of 2016, did she get a full

25   cardiac workup at that time?  And if she did, were certain

1      tests done?  And what did they show?

2             And again, that's going to be things for you to look

3      for and you to make your own decisions about.

4             And there's going to be another important medical

5      detective aspect of this case, and that is these complications.

6      And you've heard some about that.  Tilt.  Caudal migration,

7      migration down.  Perforation.  Are parts of the arms or legs of

8      the filter, are they poking outside of the inferior vena cava?

9             And you're going to get to see the imaging yourselves.

10     And experts from both sides will probably talk to you about

11     that imaging and tell you what they think it means.  And these

12     are people that are very smart that have been to medical

13     school, and they know a lot.  But at the end of the day, you're

14     the people that decide those issues.  And you'll be able to

15     view those images yourself, and you'll be able to decide, do I

16     think that this filter tilted?  Do I think it caudally

17     migrated?  And if it did perforate, what did that mean?

18            And again, those are things you're going to have to

19     look for and come to your own conclusions.

20            All right.  Last thing I'm going to talk about is the

21     plaintiffs' burden, and it's going to take a while.  I realize

22     that sounded like I was going to wrap up, so I need to at least

23     be honest with you.

24            But Mrs. Hyde is asserting an alleged defect case, the

25     design defect.  You heard about that.  We're going to talk

1   about that.  We're going to talk about causation.  And then

2   last thing, I'm going to talk about damages.

3           But first of all, let's talk about design.  And that

4   gets back to sort of where we started.  That's the issue of did

5   the benefits of this filter outweigh the risks of this filter.

6   And that's really what is a critical question in this case.

7           And I submit to you that the evidence is going to show

8   that the benefits are quite substantial.  If you have a

9   recurrent PE, you have up to a 30 percent risk of death from a

10  subsequent PE.  And Mrs. Hyde was on her third PE,

11  unfortunately, when this filter was placed in February of 2011.

12          And even though anticoagulants provide very good

13  protection from blood clots, those products are not without

14  risks.  And you may have heard about some of this.  But

15  anticoagulants, both the intravenous kind and the oral kind,

16  come with risks, and primarily it's risks of significant

17  bleeding.  They don't cause bleeding, but if you happen to have

18  a bleed, the bleeding can obviously be much worse if your blood

19  has been thinned.

20          And particularly, one of the biggest issues there is

21  if you have a hemorrhage in your brain and you have a stroke,

22  that can be potentially fatal or cause permanent damages.  So

23  those products are not without risk.

24          But what you're going to see is that of the patients

25  who receive a Bard filter, according to Bard's internal data,

1   very, very few of those patients report experiencing a

2   pulmonary embolism when a filter is in place.  And again, I'm

3   not here to tell you that filters are a replacement for

4   anticoagulants.  That is really kind of the gold standard where

5   doctors typically go to in order to treat these conditions.

6   But filters are an excellent treatment for doctors that they

7   can use instead of anticoagulants if it's the right patient.

8       And so why do they do that?  Why do doctors do that?

9   I submit to you that's because the doctors realize that these

10  filters have the benefit of potentially saving a patient's life

11  from a deadly pulmonary PE.  And they realize that there are

12  risks that come with these products, but they're willing to

13  accept those risks and advise their patients about those risks

14  in order to give them the protection they need against

15  pulmonary embolism.

16      All right.  Let's talk a little bit about the design

17  challenges.  And you're going to hear some of the Bard

18  witnesses talk to you about this yourselves.  But as Ms. Zaic

19  indicated, the IVC is a very dynamic environment.  There's a

20  lot of forces that are going on.  And when you design a product

21  in order to be put into the human body, you have to have a lot

22  of different considerations at play.

23      And as you can see from this, I mean, this shows the

24  IVC, the blue one, the inferior vena cava, the venous side, and

25  then it's next to the aorta, which is the red one, the arterial

1  side.  And of course, in this cartoon, you know, these things

2  are straight up and down like a tree trunk kind of.  And, of

3  course, you know as well as I do that that's not the way people

4  are.  I mean, people are continually moving in all kinds of

5  different ways.  We're not walking around, you know, like

6  trees.  So there's a lot of forces that are obviously exerted

7  from time to time on the inferior vena cava.

8      And people also do things like cough.  You know, you

9  have what's called a Valsalva maneuver if you put pressure down

10  into your abdomen, and that can also increase the stresses in

11  that environment.  But all of those things have to be

12  considered, and you're going to hear the Bard people talk about

13  that.

14      And as you're designing these products, it's kind of a

15  continual trade-off as well, and that's what the evidence is

16  going to show through the Bard witnesses.  When you design a

17  product that is intended to go in the body and then to be

18  retrieved percutaneously, you have to have some considerations

19  as to what are going to be the design attributes that are going

20  to allow the filter to be put in the body, remain there, and be

21  effective, but also to be retrieved later on.

22      And you can strengthen all of the various parts of the

23  filter.  You can make the legs more strong.  You can use

24  thicker metal.  You can make the hooks stronger.  You can use

25  thicker hooks.  But all of that means that you're one step

1    closer to this filter either being very difficult to retrieve

2    or perhaps not possible to be retrieved.

3            So those are all design considerations that you're

4    going to hear about from the folks at Bard.

5            Ms. Zaic talked about this, too, briefly, and this is

6    something you're going to hear about.  The Society of

7    Interventional Radiologists, that is an organization that is

8    comprised of the doctors who are primarily the people who do

9    procedures to put these types of products in.  And in 2001,

10   this document was pulled together by a gentleman named Clem

11   Grassi or Clement Grassi.  And you're going to see him testify

12   in Bard's case.

13           And Dr. Grassi led this effort to try to get a working

14   group within this organization to basically cull the medical

15   literature and try and pull together the information that was

16   available in the medical literature about what types of rates

17   of complications are being seen with IVC filters.

18           And this was not about Bard's IVC filters.  This was

19   about IVC filters in general.  And when this was first

20   published in 2001, Bard's retrievable filter had not even come

21   on the market yet.  The Recovery was not on the market, so all

22   this data was about the filters that were permanent filters.

23           But you'll see that they put this chart together that

24   appears in this article, and this is some of the information

25   that they found, that with IVC penetration, you saw rates from

1    0 to 41 percent.  Migration, you saw 0 to something.  I can't

2    see it.  You have to forgive me.  I hope you folks can.  And

3    then for filter fracture, the rates they saw were 2 to

4    10 percent.

5          And so that was information, again, that was available

6    to the medical community and was an important data point for

7    people involved in the IVC filter world to be knowledgeable

8    about and cognizant about.  And again, you're going to probably

9    hear criticism from the plaintiffs that this is not intended

10   for IVC filter manufacturers.

11         We do not disagree.  That was not what it was intended

12   for.  But again, if you are a manufacturer of an IVC filter, I

13   submit to you this is important information for you to be

14   cognizant of and to be aware of.

15         All right.  The design process.  And again, I think

16   you folks know that, you know, you can't just snap your fingers

17   and put a filter on the market.  There is a regulation that

18   process -- regulatory process, excuse me, you have to go

19   through through the FDA.  And as you heard, these products have

20   to be what is called "cleared" in order to enter the

21   marketplace.

22         And this story kind of starts, again, way back in the

23   mid-'90s.  And, you know, before this period, IVC filters were

24   what were known as a Class III medical device, and that's the

25   class that most implantable devices fall into.  And if you were

1    a Class III device, you have to go through this process that

2    Ms. Zaic talked about called a premarket application, and it is

3    quite a rigorous process, and submit that to the FDA.

4           But in 1996, the FDA started looking at IVC filters,

5    and they were analyzing whether they should do what is known as

6    down-classify IVC filters.  In other words, move them from a

7    Class III medical device to a Class II medical device, which

8    requires less regulation and is not as rigorous in order to put

9    it on the market.

10          And so this is an internal memo from FDA that you'll

11   see during the evidence here.  And you'll see that FDA looked

12   into IVC filters and decided that the risks that those filters

13   can cause are potentially life threatening, they realized that,

14   but they also looked at what the rates were that they were

15   seeing in the medical literature, just like the Society of

16   Interventional Radiologists did, and that was included in this

17   memo.

18          And ultimately, the FDA determined, because pulmonary

19   embolism is such a serious clinical issue, that they determined

20   that filters do not present an unreasonable risk of illness and

21   injury.  And they moved IVC filters from Class III to Class II.

22   And so at that point, these filters could go through this

23   regulatory process called the 510(k) process.

24          Now, another document you'll see is an FDA guidance.

25   And that document was published by FDA in 1999.  And these

1    guidances are just what they sound like, they're guidance for

2    people who are in the manufacturing business so that you will

3    know FDA's best thinking about what the FDA expects.

4         And the FDA publishes things that they expect, if

5    you're going to submit a 510(k) application, should be in the

6    application.  And that includes a wide range of testing that

7    they expect you to submit to them.

8         And as you see here, that's deployment, clot trapping,

9    filter fracture, caval perforation, and migration.  Those are

10   all tests that FDA wants to see.

11        And Bard, in each of its applications, submitted that

12   type of information.  But Bard also did more testing than what

13   is just simply required via these 510(k) applications.  And you

14   will, unfortunately, get to go through all of this in

15   painstaking detail.

16        But the G2 filter, for instance, when it was put on

17   the market, there is a list of the types of tests that were

18   done:  migration studies, fracture, stimulated use, radial

19   strength, finite element analyses, tensile strength, leakage

20   tests, et cetera.  And they also did some in vivo testing with

21   animals, with sheep.

22        And again, these tests that they performed showed

23   improvement in many categories, including fracture, over the

24   prior-generation filter, the Recovery filter.  And so that

25   application for the G2 was submitted to FDA.  There was some

1    back and forth where FDA wanted to ask additional questions,

2    and ultimately, the FDA did clear the G2.

3           And then the G2 Express comes next, and there's more

4    testing.  And they compared the fracture resistance of the G2X

5    to the G2 filter and found improvement.  And you'll hear Bard

6    witnesses talk about these tests.

7           And again, there's multiple tests.  Kind of going

8    through this sort of quick, and I apologize.  But, you know,

9    that's a test there that they did called flat plate testing

10   where the filter is put in a simulated environment to kind of

11   press it up and down, over and over again, and the filter

12   survived at this point a 77-year test.  And you'll see that,

13   and you'll hear a Bard witness talk about that.

14          And then the Eclipse comes along with the

15   electropolishing, and so there's more testing that's done.  And

16   the Eclipse is also compared, as far as fracture resistance, to

17   the prior-generation filters.  And in this bench testing that

18   Ms. Zaic talked about, again, there is continued improvement.

19          And that's, again, comparing it to the

20   prior-generation filters.  This particular test showed that it

21   was 77 percent better for fracture resistance.

22          And this just gives you a little bit of history of the

23   clearances that FDA has given to Bard filters over time.  The

24   G2 was cleared on two occasions, once as a permanent indication

25   and once as a retrievable indication.  The delivery system for

1    the G2 was approved on two occasions.  The G2X was approved.

2    The delivery system for the G2X was -- I said approved, excuse

3    me.  I should correct myself -- was cleared.

4        The G2X delivery system was cleared.  The FDA cleared

5    the Eclipse.  And then the FDA also cleared a patient brochure

6    that relates to the Eclipse, and we're going to look at that in

7    just a minute.

8        But before we leave the FDA story, this is something

9    else that I think is an important piece of this.  And in 2010,

10   in August, the FDA issued what is known as a safety

11   communication about retrievable IVC filters.  And so this would

12   have been a few months before Mrs. Hyde's filter was implanted.

13       And as you can see from the document that we have, the

14   FDA directed this -- the audience they directed it to were the

15   medical community that put these filters in and monitors

16   patients who have these filters.

17       And the FDA doesn't regulate medicine.  It regulates

18   medical devices and drugs and things like that, but it doesn't

19   regulate the practice of medicine.  So this is kind of an

20   advisory thing that the FDA issued.

21       And as you can see, below there, the FDA suggested

22   that if you have patients that have retrievable filters and

23   you're following them, and if the indication for why that

24   filter was originally put in is no longer present, in other

25   words, if you're that patient who takes an anticoagulant and

230

1    you came off the anticoagulant for surgery and you're able to

2    go back on the anticoagulant, then the indication is now gone.

3    And at that point, doctors should consider removing the filter

4    at that time.

5            But more importantly, the FDA also acknowledged in

6    this communication to the medical community that there were

7    risks that they knew existed with retrievable filters and that

8    doctors should be cognizant of, and that included all the

9    things you've heard:  perforation, fracture, and migration of

10   these products.

11           Now, you heard Ms. Zaic mention this.  This is another

12   part of this case.  It's called reasonable alternative design.

13   This is a design defect case.  And so part of the burden that

14   the Hydes have is to prove to you that there was a reasonable

15   alternative design.  In other words, you can't just say it's

16   defective.  There has to be something that would have been a

17   different design that would have either eliminated the risk or

18   reduced the risk.

19           And I want you to listen to this evidence very

20   carefully, because you're going to hear from a number of people

21   throughout trial who are going to speak to this issue.  But

22   you're, again, going to have to decide for yourselves, are the

23   products that -- or product attributes that I'm hearing about,

24   do I consider that to be a reasonable alternative design for

25   the G2X filter or the Eclipse filter?

1              And ladies and gentlemen, I submit to you that one

2    enormous difference between what you might hear about filter

3    attributes are whether it is a permanent filter, a filter that

4    was only meant to go in and never be removed percutaneously,

5    versus a retrievable filter like the G2X and the Eclipse that

6    could be removed percutaneously.  And so listen out for those

7    things.

8              And also listen very carefully to Dr. Henry's

9    testimony, and listen to see if he says that the filter he put

10   in Mrs. Hyde was a filter that he wanted to be a filter that

11   could be retrieved.

12             Now, you're also going to see the instructions for use

13   that accompany this product.  And this is information that is

14   provided with the product to provide doctors information about

15   the product.

16             Now, these do come in every single box, and I don't

17   suggest to you that in the OR the doctor is opening the box and

18   pulling this out and reading it and trying to figure out what's

19   going on.  I mean, these things are available via the website,

20   many other different sources.

21             And I also submit to you the evidence will show that

22   most of the things that are contained in here are things that

23   doctors generally already know.  But there's nothing wrong with

24   the belt and suspenders to provide this information.

25             But the information you're going to see about these

1   warnings relates to the design defect claim.  And you're going

2   to have to look at this and see if the information that is in

3   the warning is information that would provide the potential

4   user information that may help them understand the risks and

5   understand the design of the product.

6        And so to look at this, I'm going to pull out some

7   portions of this.  And in both the G2X and the Eclipse filter,

8   this language appears.  And it's identical, so it really

9   doesn't matter which one we're talking about at this point.

10       But there's a section about potential complications.

11  And as you see up at the top, it says:  Movement, migration, or

12  tilt of the filter are known complications of vena cava

13  filters.  Migration of filters through the heart or lungs have

14  been reported.  There have also been reports of caudal

15  migration of the filter.

16       That was in this instructions for use.

17       Next bullet says:  Filter fracture is a known

18  complication of vena cava filters.  There have been reports of

19  serious pulmonary and cardiac complications with vena cava

20  filters requiring the removal of the fragments using

21  endovascular and/or surgical techniques.

22       That was information that was contained in the

23  instructions for use.

24       It also says that perforation or other acute or

25  chronic damage of the IVC can occur.

UNITED STATES DISTRICT COURT

1          And lastly, it says that filter tilt can occur.

2          Other portions of this, it does indicate that all of

3     the complications could be associated with adverse events such

4     as medical intervention or death, and it even goes on to say

5     that the risk-benefit needs to be analyzed for everybody

6     patient.  You have to do an individual risk-benefit analysis to

7     determine if this is an appropriate device for that patient

8     based on their own individual medical history.  And that's up

9     for the doctor to decide.

10          And lastly, it does note that the standards and

11     guidelines developed by the Society of Interventional

12     Radiologists recommend that patients with filters, both

13     permanent and retrievable filters, be tracked and receive

14     routine follow-up subsequent to the placement of the device.

15          That's other information that's in the IFU.

16          And I mentioned this a moment ago.  This is the

17     patient brochure that was accompanied -- well, it wasn't

18     accompanied with the filter, but it was something that was

19     available to doctors that they could give to their patients if

20     they wanted to.  And this is something that contains in fairly

21     layman language some information about the IVC filter.

22          And I'm going to pull this section out for you.  And

23     as you can see, it says:  What are the risks associated with

24     implantable filters?  As with all implantable devices, there

25     have been risks associated with vena cava filters.  You should

1    discuss the possible adverse effects of this procedure and the

2    filter with your physician.  Potential risks include the

3    following:

4         The entire filter or pieces of the filter may break

5    loose and travel to the heart or lungs, causing injury or

6    death.  You may need to have an additional surgery to retrieve

7    the filter or pieces if they break loose.

8         And ladies and gentlemen, I submit to you that's

9    exactly what transpired in Mrs. Hyde's case.

10        And as I mentioned to you earlier, this particular

11   patient brochure was specifically cleared by the FDA.

12        You did hear some information about the MAUDE

13   database, and that's a database that's proprietary with the FDA

14   that they keep up with.  And any report that comes from

15   anywhere to the FDA is put into this MAUDE database as it

16   relates to devices.

17        And it's probably going to be a disputed issue, but

18   you may hear evidence that Bard's -- the information it

19   provided doctors should have put in comparative rates.  In

20   other words, you should tell doctors about how one filter

21   compares to the next.

22        And if that information is based on the MAUDE

23   database, if you hear evidence about that, I think you should

24   be aware that the evidence will show that right there on the --

25   you know, the website for the MAUDE database, it says:  MAUDE

1    data is not intended to be used either to evaluate rates of

2    adverse events or to compare adverse events occurrence rates

3    across devices.

4           All right.  Let me speak just really briefly to kind

5    of address some of the things that Ms. Zaic said.  And you will

6    hear evidence throughout this case, and I do want to mention

7    it, a lot of the evidence you're going to hear from the

8    plaintiffs, I submit to you, will likely be based on the early

9    generation filters, the Recovery filter and the G2 filter,

10   which we know were not the filters implanted in Mrs. Hyde.

11          And if we're spending a lot of time in this trial

12   talking about those filters, I just ask you to ask yourself

13   why, when we know that's not what was implanted in Mrs. Hyde.

14   And I submit to you that it will be presented by well-paid

15   experts, but listen, that street's going to run both ways.  All

16   the experts that you see in this case are going to be well

17   paid.

18          MR. LOPEZ:  I'm going to object.  He's arguing now.

19   He's not really presenting evidence, what the evidence is going

20   to show.

21          THE COURT:  All right.  That objection is overruled,

22   but stick to the evidence.  And we've got about four minutes,

23   Mr. Rogers.

24          MR. ROGERS:  Thank you, Your Honor.  I'm going to wrap

25   it up very quickly.

1          And also look at documents and see if they're taken in

2     context if you're just seeing snippets and pieces.

3          And again, I submit to you that the evidence that

4     you're going to see from the plaintiffs is contradicted by the

5     whole story, the complete story, and it's also contradicted by

6     the numbers.  And these are these same tracking and trending

7     numbers that I showed you earlier for both the G2X and the

8     Eclipse.

9          Very briefly, I'm going to talk about causation.

10    That's something the plaintiffs have the burden of.  And as you

11    hear information in this case, if you hear claims about these

12    things, again, it's up to you to decide, you know, are these

13    attributable to the filter, to the strut, or are there other

14    issues?  And that's your decision.

15         But it is Mrs. Hyde's burden to prove these things to

16    you, as is it her burden to prove damages.  So any information

17    you hear about damages, Mrs. Hyde has got the burden of proof

18    to prove to you that those are damages that should be

19    attributed to the filter.

20         So to conclude, I'm back to my scales.  This key issue

21    is the risk-benefit analysis.  Did the benefits of this filter

22    outweigh the risks that were always there and potential with

23    this filter?  And I submit to you, as you hear the evidence

24    over the course of this next two and a half weeks, that it will

25    show that the benefits of this filter for Mrs. Hyde outweighed

1    the risks.

2          And I think as soon as you see this whole story, you

3    will come to the conclusion that Bard has been wrongfully

4    accused in this case.  And we'll come back to you and ask you

5    to return a verdict based on that basis at the close of the

6    evidence.

7          Thank you very much.

8          THE COURT:  All right.  Thanks, Mr. Rogers.

9          Ladies and gentlemen, we're going to break for the

10   day.  We will plan to begin at 9:00 o'clock.  If you could

11   please factor in travel time getting here, that would be

12   helpful.  I will tell you that in about half of my trials, when

13   we're ready to go at 9:00 o'clock on the second day, one juror

14   is not here because they didn't anticipate traffic, so please

15   factor that in so we can start right at 9:00 o'clock.

16         As I mentioned, we've got a schedule and a time limit

17   in the case, so we're going to try and stay right on schedule

18   so we finish it on time.

19         Please also remember not to talk about the case or do

20   any research about it, and we will plan to see you at 9:00 in

21   the morning.

22         We'll excuse the jury.  Thank you.

23         (Jury not present.)

24         THE COURT:  All right, counsel.  For your information,

25   plaintiff used 1 hour and 5 minutes, and defendants used 1 hour

1    and 9 minutes.

2         I've got another hearing that I need to start in a

3    couple of minutes.  Are there any urgent matters that we need

4    to take up?

5         MR. LOPEZ:  Well, I'm not sure it's urgent, but in his

6    opening statement, he made the statement about Dr. Henry

7    getting a patient brochure and whether or not he shared it with

8    Mrs. Hyde.  I mean, he just turned this into a warnings case.

9         I mean, he said that right at the end when he was

10   going through the patient brochure.  And he went through every

11   single complication that's relevant in this case.  Now the

12   jury's wondering, well, she must have got this from Dr. Henry.

13        I mean, this has now become a warnings case.  If it

14   is, then we ought to be able to put on, you know, our evidence

15   of all that.  I'm just putting it out there, Judge.

16        THE COURT:  Mr. Lopez, how is that different from what

17   I described this morning, that they're entitled to tell doctors

18   about -- or to tell the jury about what risks doctors were

19   advised of and you're entitled to tell the jury of what risks

20   doctors weren't advised of so the jury can decide if this

21   product was reasonably safe?

22        MR. LOPEZ:  He went beyond -- he stepped over the

23   line.  He talked about Dr. -- he talked about Dr. Henry sharing

24   that with Mrs. Hyde.  That becomes a warning now that goes to

25   Mrs. Hyde and whether or not Dr. Henry provided that.

1          I just -- I mean, I understand this line that we're

2     dealing with, Judge.  We're dealing with it, too, so I

3     appreciate it.  But I have to be mindful as I hear the

4     evidence, is it becoming an unfair advantage that they get to

5     talk about certain things and we don't.

6          So, I mean, you said it this morning, it's a struggle.

7     And I don't know where that -- it's a blurred line.  But I

8     think he crossed it in his opening.  I'm just -- not that we

9     have to resolve it now.

10          THE COURT:  Well, therefore, what?

11          MR. LOPEZ:  Well, I mean, therefore, we will look at

12     the way maybe some of the evidence has been ruled on with

13     respect to that to see if we can convince you that maybe you

14     ought to let some of that in, if that's what's going to happen

15     at trial.

16          THE COURT:  Well, you're certainly free to raise that

17     later on.

18          MR. LOPEZ:  I understand.

19          THE COURT:  Okay, counsel.  Please be here at 8:30 in

20     the morning, and we'll plan to get started then and deal with

21     any issues.  And we'll get the jury right in here at 9:00.

22          Thank you.

23          (Proceedings concluded at 4:29 p.m.)

24

25

1                          C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 19th day of

13   September, 2018.

14

15

16
                         s/Jennifer A. Pancratz_____   _____   ___
17                       Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25