### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | MD 15-02641-PHX-DGC |

_____

| | |
|---|---|
| Lisa Hyde and Mark Hyde, a married couple, | Phoenix, Arizona **September 19, 2018** |
| Plaintiffs, | |
| v. | CV 16-00893-PHX-DGC |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | |
| Defendants. | |

_____


BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


TRIAL DAY 2 - A.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                            **A P P E A R A N C E S**

2

For the Plaintiffs:

3

      Lopez McHugh
4     By:  **RAMON R. LOPEZ**, ESQ.
      100 Bayview Circle, Suite 5600
5     Newport Beach, CA 92660

6

      Gallagher & Kennedy
7     By:  **MARK S. O'CONNOR**, ESQ.
           **PAUL L. STOLLER**, ESQ.
8     2575 East Camelback Road, Suite 1100
      Phoenix, AZ 85016
9

      Heaviside Reed Zaic
10    By:  **JULIA REED ZAIC**, ESQ.
           **LAURA E. SMITH**, ESQ.
11    312 Broadway, Suite 203
      Laguna Beach, CA 92651
12

      Goldenberg Law PLLC
13    By:  **STUART GOLDENBERG**, ESQ.
           **MARLENE GOLDENBERG**, ESQ,
14    800 LaSalle Avenue, Suite 2150
      Minneapolis, MN 55402
15

      Lopez McHugh, LLP
16    By:  **JOSHUA MANKOFF**, ESQ.
      1 International Plaza, #550
17    PMB-059
      Philadelphia, PA 19113
18

19

20

21

22

23

24

25

1           **A P P E A R A N C E S** (CONTINUED)

2

For the Defendants:

3

4      Nelson Mullins Riley & Scarborough
       By:  **JAMES F. ROGERS**, ESQ.
       1320 Main Street

5      Columbia, SC 29201

6      Snell & Wilmer
       By:  **JAMES R. CONDO**, ESQ.

7      400 East Van Buren
       Phoenix, AZ 85004

8

9      Nelson Mullins Riley & Scarborough
       By:  **RICHARD B. NORTH, JR.**, ESQ.
            **MATTHEW B. LERNER**, ESQ.

10           **ELIZABETH C. HELM**, ESQ.
       201 17th Street NW, Suite 1700

11     Atlanta, GA 30363

12     C.R. Bard, Inc.
       Associate General Counsel, Litigation

13     By:  **GREG A. DADIKA**, ESQ.
       730 Central Avenue

14     Murray Hill, New Jersey 07974

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2      **SUMMARY OF COURT PROCEEDINGS**                        **PAGE:**

3      Proceedings Outside the Presence of the Jury      290, 327

4

5      **WITNESSES FOR THE**          **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**
       **PLAINTIFF:**

6

7      **Darren R. Hurst, M.D.**
       By Mr. O'Connor              250
       By Mr. Rogers                           306

8

9                          **INDEX OF EXHIBITS**

10     **EXHIBIT**                                           **RECEIVED**

11     NO.          DESCRIPTION

12     4921         Hyde imaging: Abdomen CT 6/14/13       265
                    2:08:30pm

13

       4873         Demonstrative: Hurst                   268

14
       4922         Hyde imaging: Abdomen CT 5/16/14       269
15                  11:18:59am

16     4923         Hyde imaging: Abdomen CT 6/14/13       273
                    8:18:59

17
       4924         Hyde imaging: Chest CT 5/16/14         275
18
       4820         Fermanich Deposition, 3/17/17 -        284
19                  Exhibit 37:  Health Hazard Evaluation
                    memo from David Ciavarella to Gin
20                  Schulz, 2/15/06, Re:  G2 Inferior
                    Vena Cava Filter - Migration (3 pages)
21
        443         11/30/2008 G2 and G2X Fracture Analysis 287
22                  Reporting date range 7/1/2005 thru
                    11/30/2008
23
       1861.0070    Randall, 01/18/2017, Exhibit 634 -     301
24     1861.0038    Binder labeled "Meridian Design History 304
                    File DHF, Vol. II"
25

1                     **INDEX OF EXHIBITS (Continued)**

2      **EXHIBIT**                                            **RECEIVED**

3      NO.              DESCRIPTION

4      8695             History and Physical                   340

5      8694             CT of Chest                            344

6      8697             Consent - Filter Placement - F/U with   347
                        Wheaton to get consent signed by Hyde
7
       8512             IVC Filter placement- Tabular trends    348
8
       8705             ER Visit                               350
9
       8706             CTA of Chest                           351
10
       8709             Abdominal Ultrasound                   355
11
       8710             CT of Abdomen and Pelvis               360
12
       8521             6/13/2013 CT Abdomen and Pelvis        362
13
       8523             5/16/14 CT Abdomen                     366
14
       8740             Filter Procedure Log                   371
15
       8516             CT Image (axial) December 16, 2011,     376
16                      Las Vegas Radiology

17     8517             CT Image (axial) June 14, 2013         377

18     8518             CT Image (axial) May 16, 2014          378

19     8519             Side by Side Comparison of CT Images    378
                        from December 16, 2011, June 14, 2013,
20                      and May 16, 2014 CT Scan -
                        Composite of three images
21
       8520             CT Image Coronal view (5/16/14)        379
22

23

24

25

UNITED STATES DISTRICT COURT

1                        **P R O C E E D I N G S**

2              (Jury not present.)

3              (Proceedings commenced at 8:30 a.m.)

4              THE COURT:  Morning, everybody.

5              MR. ROGERS:  Morning, Your Honor.

6              MR. LOPEZ:  Morning.

7              THE COURT:  All right.  Plaintiffs' counsel, do you

8    have matters you want to raise before we start this morning?

9              MR. O'CONNOR:  I don't think we have anything, Your

10   Honor.

11             THE COURT:  How about defense counsel?

12             MR. ROGERS:  Yes, Your Honor.  We have a couple of

13   matters that we want to bring up that relate to today's

14   witnesses.

15             And -- Your Honor, can you hear me okay?

16             THE COURT:  Yes.

17             MR. ROGERS:  The first relates to Dr. Hurst, who is

18   going to be our first witness, I understand, this morning.

19   And, Your Honor, I did want to bring to the Court's attention

20   that this morning at 7:30 a.m. we received seven additional

21   exhibits for Dr. Hurst's testimony today from plaintiffs.

22             And I know, Your Honor, when we had our pretrial

23   conference that we discussed trying to make best efforts to get

24   exhibits the night before, and you said that we would have a

25   hard stop at 1:00 a.m., and we all laughed.

1          And I want the Court to be aware of that.  And one of

2     the things that is particularly problematic about the exhibits

3     we got this morning is that they are seven identified exhibits

4     but they're all CT scans, each which will be composed of

5     literally hundreds of images within each of those CT scans.

6          So apparently the plaintiffs this morning are going to

7     display to the jury select images from these CT scans, and I

8     don't have any advance notice of that.  And I'm assuming I will

9     see it for the first time when the jury sees it.

10         So Dr. Hurst did disclose these images in his report.

11    He told us he reviewed them.  But as far as which images we're

12    going to see today in the courtroom, I have no idea what

13    they're going to be.

14              THE COURT:  So what are you requesting, Mr. Rogers?

15              MR. ROGERS:  Your Honor, what I'm requesting -- I'm

16    not planning on trying to object or exclude these.  I

17    understand the plaintiffs have done what they can do best, but

18    I wanted to flag it for the Court's attention.  And if we

19    continue to see this, Your Honor, we will need to begin to

20    object if that's going to be a pattern.

21              THE COURT:  So you're not asking me to do anything on

22    that issue?

23              MR. ROGERS:  That is correct, Your Honor.

24              THE COURT:  Okay.  Do you have other matters that you

25    want to raise?

1          MR. ROGERS:  Do you have something, Jim?

2          MR. CONDO:  I do.  Your Honor, small matter.

3          I believe it was either Juror 3 or Juror 15, the first

4    two gentlemen in the back row.  I was standing out this morning

5    at the edge trying to grab what cool air there was.  As he came

6    past me, he saw our boxes, six boxes on a handcart.  He smiled

7    and said, "I hope we don't have to read all of that."  I smiled

8    and didn't respond.  He kept walking.

9          I think it might be appropriate for Your Honor, if

10   Your Honor is inclined to do so, to just remind the jurors that

11   the lawyers and the parties are not being rude by not engaging

12   them in conversation.  But it's not appropriate for us to have

13   those kinds of conversations, particularly on a subject like

14   are they going to have to read all of these, whatever's in the

15   boxes.

16         THE COURT:  Any objection to that?

17         MR. LOPEZ:  No, Your Honor.

18         THE COURT:  All right.  I will remind -- well, I will

19   tell the jury of that.

20         MR. CONDO:  Thank you.

21         THE COURT:  Anything else we need to address?

22         MR. ROGERS:  Nothing else at this time, Your Honor.

23         THE COURT:  We will come back in, then, when the

24   jury's seated at 9:00 o'clock.  Thanks.

25         (Recess taken, 8:34 a.m. to 8:59 a.m.)

1              (Jury present.)

2         THE COURT:  Good morning, ladies and gentlemen.

3         JURY MEMBERS:  Morning.

4         THE COURT:  Thank you for being with us this morning.

5    I want to mention one thing to you that I had thought about

6    mentioning yesterday and then I forgot.

7              Over the next several days as you're here in the

8    courthouse during trial, you may find yourself from time to

9    time in a hallway or an elevator with one of these folks.  If

10   that happens, they're going to ignore you.  Please don't think

11   they're being rude because they're not talking to you or they

12   look away and don't make eye contact.

13             They're doing that for the obvious reason that you're

14   a juror in the case, and they shouldn't be interacting with you

15   outside of the courtroom.  So please understand they're all

16   really nice folks.  They're just trying to keep that line in

17   place if they encounter you outside the courtroom.

18             All right.  We are going to begin this morning with

19   plaintiffs' evidence.

20        MR. O'CONNOR:  Yes, Your Honor.  At this time, we

21   would call Dr. Darren Hurst.

22        THE COURTROOM DEPUTY:  Dr. Hurst, if you'll please

23   come forward.

24             If you'll please stand right here, sir, and raise your

25   right hand.

```
 1                    DARREN R. HURST, M.D.,
 2   called as a witness herein by the plaintiffs, having been first
 3   duly sworn or affirmed, was examined and testified as follows:
 4          THE COURTROOM DEPUTY:  Could you please state and
 5   spell your name for the record.
 6          THE WITNESS:  Darren Robert Hurst.  D-A-R-R-E-N,
 7   R-O-B-E-R-T, H-U-R-S-T.
 8          THE COURTROOM DEPUTY:  Thank you, sir.  Please come
 9   and have a seat.
10                    DIRECT EXAMINATION
11   BY MR. O'CONNOR:
12   Q.  Are you organized?
13   A.  I am.
14   Q.  All right.  Good morning.  Would you introduce yourself to
15   the jury, please.
16   A.  Hi.  My name is Darren Hurst.  I'm a physician in
17   Cincinnati, Ohio/northern Kentucky area.  I'm an interventional
18   radiologist.
19   Q.  Why don't you, if you would, Dr. Hurst, explain to the
20   jury -- we'll go into more of your qualifications, but if you
21   could explain to the jury what is an interventional
22   radiologist, please.
23   A.  So I'm a vascular interventional radiologist.  I'm a
24   physician, and I take care of patients who have a myriad of
25   issues but mostly vascular problems.  We use minimally invasive
```

1    procedures that are image guided to perform procedures to help

2    treat vascular disease.

3    Q.  And would you explain to everyone here today what you were

4    asked to do in this case, what your role is here.

5    A.  So I was asked to review the medical records and images for

6    Lisa Hyde and evaluate Ms. Hyde's Bard filter and determine if

7    the filter failed and its modes of failure.

8            I was also asked to determine whether there was an

9    alternative device that could have been used at the time and to

10   determine whether physicians had adequate information from Bard

11   at that time to make a reliable decision on whether or not to

12   use their device.

13   Q.  And could you tell us what you found?

14   A.  So what I found was that the Bard filter in -- the G2

15   filter in Mrs. Hyde --

16   Q.  G2X?

17   A.  G2X, sorry -- failed.  And what it did was it penetrated

18   her inferior vena cava, and then an arm from the filter

19   fractured off the device and migrated through her vascular

20   system, through the right atrium of her heart to the right

21   ventricle of her heart.

22           This necessitated both removal of the filter and the

23   fragment of the device using a complex endovascular procedure.

24   Q.  And we're going to talk more about your opinions in a bit.

25           And before we talk about your qualifications, could

1   you just explain to the members of the jury what your work

2   entailed exactly?  What did you review and what did you look

3   at?

4   A.  So for Mrs. Hyde, I reviewed her medical records and her

5   images.  I reviewed the Bard internal corporate documents that

6   are related to this case.  I reviewed the medical literature

7   having to do with IVC filters, both permanent and retrievable

8   devices.  And I reviewed the depositions in this case and the

9   medical expert reports.

10  Q.  And you also brought with you -- you reviewed imaging

11  studies?

12  A.  Yes, imaging, yeah.

13  Q.  And you have some here to talk to the jury about today?

14  A.  I do.

15  Q.  And it looks as though you have a collection of something.

16  It looks like fishing lures.  What are those?

17  A.  These are IVC filters.  And these devices -- actually, this

18  is the Recovery device and the Simon Nitinol device.  These are

19  two Bard filters.  This is a Cook Gunther Tulip filter, a

20  Boston Scientific Greenfield filter here, and then a VenaTech

21  filter right here.

22  Q.  All right.  And we'll talk more in detail about the Bard

23  filters that you brought with, and we have an ELMO there.

24         Would you explain to the jury your education and your

25  training, please.

1    A.  So I went to the University of Cincinnati for medical

2    school from '91 to '95.  From '95 to '99, I went to the

3    University of Michigan for radiology residency, and then went

4    on to do a fellowship in vascular and interventional radiology

5    from 2000 to 2001.

6    Q.  And currently --

7    A.  I'm sorry, '99 to 2000.  Sorry.

8    Q.  So you graduated from medical school when?

9    A.  I'm sorry?

10   Q.  When did you graduate from medical school?

11   A.  1995.

12   Q.  And then did you go on and become board certified?

13   A.  You become board certified following your radiology

14   residency.  Yes, I became board certified.

15   Q.  And would you explain to the jury briefly what that means.

16   A.  So board certification means that I've completed the

17   requisite training and testing for radiology and also for

18   interventional radiology that's required by the American Board

19   of Radiology, and then you become certified by the American

20   Board of Radiology.

21   Q.  Where do you work currently?

22   A.  I work at St. Elizabeth Health System.  We have three large

23   hospitals that are in the Cincinnati area, in northern

24   Kentucky, actually, across the river.  We're a tertiary care

25   medical center providing care for hundreds of thousands of

 1   patients a year.

 2   Q.  And are you a director?  Do you hold those type of

 3   positions?

 4   A.  Yeah.  I'm -- I have been the director of vascular and

 5   interventional radiology since 2003.  I'm also the chairman of

 6   the product committee where we review products like this for

 7   the cath labs.  We review over a hundred products a year and go

 8   through a very specific process that's very similar to the

 9   review that we did in this case.

10   Q.  You talked to us before about what interventional

11   radiologists do, and I think you talked about minimally

12   invasive procedures.  Is that -- what do you do in regard to --

13   or tell us your experience with IVC filters, if you would.

14   A.  So IVC filters have been around for quite a long time, well

15   before I even started residency, so I began placing multiple

16   different types of IVC filters in residency and fellowship.

17   And then in my own practice, I've placed multiple different

18   types of filters.  I've probably placed over a thousand filters

19   in my career.

20          And also, we retrieve the retrievable filters, the

21   temporary filters, and we do complex retrievals at our

22   institution as well.

23   Q.  And if you could, explain to the members of the jury what

24   purpose or what are filters for, IVC filters.

25   A.  So an inferior vena cava filter is a device that is used in

1    patients who have deep vein thrombosis.  So deep vein

2    thrombosis is when you get clot in your leg.  And sometimes

3    that clot stays in your leg and it causes issues down there,

4    but other times it can migrate through the vascular system,

5    through the main vein of the body called the inferior vena

6    cava, which is right in the center of your body, through that

7    vein to the heart and then to the lungs.

8           When it gets to the lungs, that clot can cause

9    significant issues, even cause death from cardiac problems.

10          Most of the time, patients who have clot in their legs

11   and who are at risk for clot traveling to their lungs, which is

12   called pulmonary embolism, most of the time those patients are

13   treated with medication.  It's called anticoagulation.  There's

14   several different kinds of ways to treat the patients, but the

15   goal is basically to thin the blood so that that clot doesn't

16   propagate and then travel to the lungs.

17          Some patients, however, can't receive the

18   blood-thinning medication, for multiple different issues.  They

19   could be that they are at high risk for bleeding already, or if

20   they do have bleeding, they could have significant

21   complications.  And some patients are just unreliable.  They

22   can't take the medication.

23          For those patients, the alternative therapy is to

24   place a device within -- this is my model of the inferior vena

25   cava, which would be right in the center of your body here, a

1    device within the inferior vena cava that blocks the clots from

2    getting to the lungs.  So the device sits in the inferior vena

3    cava, and as the clot travels up through the inferior vena

4    cava, it gets caught in the device before it gets to the lungs

5    to cause problems.

6    Q.  Dr. Hurst, I think there's an ELMO there.  Maybe if you

7    could switch that on, and it might show --

8    A.  Yeah.

9              MR. O'CONNOR:  Your Honor, can he display that on the

10   ELMO, please?

11             THE COURT:  Yes.

12             THE COURTROOM DEPUTY:  I'm not getting a signal.

13             THE WITNESS:  Do I need to --

14             THE COURTROOM DEPUTY:  Hold on.  You have to hold it

15   down.

16             I've displayed it to the right area.  The actual

17   camera is not working.  I know we had to -- the little button

18   is red.

19             MS. WORTMAN:  That means it's off.

20             THE WITNESS:  That means it's off?

21             MS. WORTMAN:  Yeah, we're trying to be efficient and

22   leave it on.

23             THE COURTROOM DEPUTY:  Let's give it a second to see

24   if it will pop up.

25             THE WITNESS:  There we go.  Says it's hooked up to

```
 1   HDMI.

 2            THE COURTROOM DEPUTY:  Hang on.

 3   BY MR. O'CONNOR:

 4   Q.  Well, we can come back to that.

 5   A.  Yeah.

 6   Q.  If you could --

 7   A.  So the device -- the device traps the clot as it comes up

 8   the inferior vena cava.  That's basically it.  It's like a --

 9   it's a filter.

10   Q.  So for clarification, Dr. Hurst, you just showed us that

11   tube, and as -- that is a simulation of the vena cava; correct?

12   A.  Yes.

13   Q.  And you showed us on your body where the vena cava is, but

14   could you explain to the members of the jury what the vena cava

15   is, the inferior vena cava, and why does a filter go there?

16   A.  So the inferior vena cava is the -- basically the largest

17   vein of your body that the two large veins of your legs flow

18   into and connect to.  And then it -- it's in the very center of

19   your abdomen, going from about the level of your belly button

20   all the way up to the heart.  It's about, you know,

21   2.4 centimeters in diameter, so it's nearly the same diameter

22   as this tube.

23   Q.  All right.  And how many IVC filters have you implanted in

24   your career?

25   A.  I would say probably near a thousand.  I mean, a lot.
```

1    Q.  In your practice, do the physicians in your practice that

2    you work with, do you retrieve filters?

3    A.  Yes.

4    Q.  And approximately how many?

5    A.  We probably retrieve about 20 a year.  So I would say in

6    our practice, it's, you know, near 60 or 70 filters that we've

7    retrieved in the last three or four years.

8    Q.  Have you implanted Bard IVC filters?

9    A.  Yes.  We've used the Simon Nitinol filter, the G2 filter,

10   the G2X filter, and I believe the Eclipse filter.

11   Q.  And are you still using Bard filters?

12   A.  We use the Denali filter now, yes.

13   Q.  Any others?

14   A.  The rest of those filters are not available now.  They're

15   off the market.

16   Q.  Do you know why they're off the market?

17   A.  I believe because of safety issues.

18   Q.  Thank you.

19          Now, you're here as an expert; correct?

20   A.  Yes.

21   Q.  And you spent time reviewing information in this case,

22   including Mrs. Hyde's records, imaging studies, and also Bard

23   internal documents.  Did you also conduct and look at the

24   medical literature?

25   A.  I did.  I did an extensive review of the medical literature

1    for this case and other cases, including a review of the power

2    of the studies, the number of patients, the applicability of

3    the studies to each case.

4    Q.  Now, in your work as an expert, are you compensated for

5    your time?

6    A.  Yes.

7    Q.  And how are you compensated?

8    A.  I bill on an hourly rate, $500 an hour.

9    Q.  And how many hours have you spent in this case?

10   A.  I'd say roughly 25.

11   Q.  How often do you agree to be an expert in matters that come

12   to court?

13   A.  It takes up about 10 percent of my work time as an

14   interventional radiologist.

15   Q.  And just so we're clear, are you being paid to come here

16   today?

17   A.  Yes.

18   Q.  Why do you do expert work?

19   A.  I do it for multiple reasons.  I find it very interesting.

20   I think it's helpful for both me and my patients because I

21   learn new things all the time.  It's -- it helps you delve

22   deeply into issues, medical issues and interventional radiology

23   issues.

24          I also do it because I believe that community

25   physicians should be involved in these types of cases to give a

```
 1    perspective of a nonacademic physician.  So, you know, I do it

 2    for multiple reasons.

 3    Q.  All right.  Now, as it relates to what you've done in this

 4    case, you've told us that you've reviewed medical records and

 5    imaging studies and you also looked at Bard's internal

 6    documents; is that correct?

 7    A.  Yes.

 8    Q.  And you said you reviewed other experts' reports.  Did you

 9    review information from Bard that's typically not shared with

10    physicians in the field?

11    A.  Yes.

12    Q.  And also, did you look at instructions for use for the

13    filters?

14    A.  I did.

15    Q.  Thank you.

16            And tell us what you did by way of looking at the

17    medical literature, why you did it.

18    A.  Why I did it?

19    Q.  Yes, sir.

20    A.  Well, the medical --

21            MR. ROGERS:  Objection, Your Honor.  Nondisclosure.

22            THE COURT:  Well, this is literature he reviewed; is

23    that right?

24            MR. ROGERS:  Yes, Your Honor.  There's no discussion

25    of medical literature in his report.
```

1          THE COURT:  Is that right?

2          MR. O'CONNOR:  Well, he says he reviewed medical

3  literature, and he listed the ones that he reviewed.  That's

4  all I'm asking about.

5          THE COURT:  Okay.  So he said that.  You're asking him

6  now to give further opinion based on it?

7          MR. O'CONNOR:  I'm not asking him to give opinion.

8  I'm asking him why he did it for his work in this case.

9          THE COURT:  All right.  I think that's foundational.

10  Objection's overruled.

11  BY MR. O'CONNOR:

12  Q.  Can you explain why?

13  A.  Sure.

14          Are we okay?  Yeah.

15          So I reviewed the medical literature because that

16  basically gives you an idea of what's going on out in the

17  community and with patients and with the device.  The medical

18  literature is peer reviewed, so people submit studies to the

19  journals, and the studies are evaluated for their veracity or

20  the truth.  So it's a good way to glean information about a

21  particular device or procedure that you're doing.

22  Q.  All right.  Talk to us a moment about informed consent.

23  What is the process?

24  A.  So informed consent is when a physician discusses the

25  risks, alternatives, and benefits of a particular line of

1    treatment, therapy, or procedure.  When we do this, what we do

2    is we weigh the patient's clinical situation, the procedure or

3    treatment that they may need, and then the potential risks and

4    complications of that procedure or device.

5         And then in weighing that, we determine whether the

6    patient will receive a benefit or whether the patient shouldn't

7    have any procedure at all or should have some sort of

8    alternative procedure.

9    Q.  And what do you expect as a physician from a medical device

10   company like Bard to assist you in the informed consent

11   process?

12   A.  So when you're doing the informed consent process, you need

13   to have a clear understanding of how a -- for devices,

14   especially, how the device is going to behave and what the

15   risks of using that device are.

16        If you do not have, you know, clear, accurate, and

17   timely information about the device, then your ability to

18   perform informed consent is kind of inhibited because you just

19   don't have enough information to do the risk-benefit analysis.

20   Q.  All right.  Now, tell us, if you would, Dr. Hurst -- and I

21   think you have imaging.  And at this point, I'd like you to

22   explain to the members of the jury what happened to Lisa Hyde's

23   filter.

24   A.  So Lisa Hyde's filter, after it was placed, the arms and

25   some of the legs of the filter, that's this part of the filter,

1    penetrated through the inferior vena cava, which is obviously

2    the vessel that it was in.

3            And in penetrating through the inferior vena cava, one

4    of the arms became -- started to interact with the vertebral

5    body, which is the bone that's right behind the inferior vena

6    cava.  And then the arm fractured off of the filter and

7    migrated through the inferior vena cava, through the heart, and

8    into the right ventricle of the heart.

9    Q.  And from what you've -- the work you've done in this case,

10   can you explain to the jury what stability means in terms of a

11   filter?

12   A.  So a brief history of filters, for a very long time IVC

13   filters were permanent devices, which means that when you were

14   making a decision to place the device in a patient, you were

15   making a decision to place that device in the patient for the

16   rest of their life.

17           And the permanent device, the permanent devices -- I'm

18   sorry, I lost my train of thought.  Would you give me your

19   question again?

20   Q.  Sure.  What I'm asking you is why is stability --

21   A.  Stability, right.

22   Q.  -- is that an important feature of a filter?

23   A.  So because the device was going to be in the patient for a

24   long period of time, you require stability.  You know, it could

25   be in the patient for up to 15, 20, 30 years depending on the

1    age of the patient when you place the device and their other

2    medical issues.

3         When these devices were released, the new devices,

4    they were purported to be what we call retrievable and

5    permanent devices.  So they had a new indication.  You were

6    able to actually place the device, but then you could remove it

7    after the contraindication to anticoagulation had passed.

8         In other words, the patient could receive oral

9    medication to protect them from PE, or maybe their risk for

10   pulmonary embolism had passed.  So you could remove the device

11   and get it out of the patient.

12        But they also were supposed to be devices that could

13   be left in permanently.  And, again, if a device is left

14   permanently in the patient, it has to be stable.  It can't

15   move.  It can't migrate.  It can't fracture.

16   Q.  All right.  And in your opinion, did Lisa Hyde's filter

17   meet the expectation of being stable?

18   A.  No, it did not.

19   Q.  Do you want to talk about imaging right now to show the

20   jury what happened to this filter?  And then we'll talk about

21   some of your other opinions.

22        MR. O'CONNOR:  If we could, could we go to

23   Exhibit 4921?

24        THE COURT:  What was that number?

25        MR. O'CONNOR:  4921, Your Honor.

 1              THE COURT:  All right.

 2              THE WITNESS:  Can I pull up my report here?

 3              MR. O'CONNOR:  And, Your Honor, I believe that we have

 4    an agreement, a stipulation that this may come into evidence.

 5              THE COURT:  Are you moving it into evidence?

 6              MR. O'CONNOR:  Yes, Your Honor.

 7              THE COURT:  Any objection?

 8              MR. ROGERS:  No, Your Honor.

 9              THE COURT:  Admitted.

10              (Exhibit No. 4921 admitted into evidence.)

11              MR. O'CONNOR:  All right.  May we display to the jury,

12    Your Honor?

13              THE COURT:  Yes.

14    BY MR. O'CONNOR:

15    Q.  So, Dr. Hurst --

16              THE COURT:  Excuse me just a minute.

17              Does everybody have it on your screens?

18              Okay.  Thank you.  Go ahead.

19    BY MR. O'CONNOR:

20    Q.  Would you explain to us what we're looking at?

21    A.  Sure.  So this is an axial section, which means it's a

22    cross-section --

23              THE COURT:  Sorry, Doctor.  Keep talking into the mic,

24    if you would.

25              THE WITNESS:  So this is an axial section or a

1    cross-sectional image of the abdomen of Mrs. Hyde on June 14,

2    2013.  In the center of the picture, you will see the inferior

3    vena cava; and within the inferior vena cava, you see those

4    brighter dots.  That is actually a cross-section of the arms

5    and legs of the filter itself.

6            And you can see that this arm right here where I'm

7    drawing the arrow, very poorly, is up against or adjacent to

8    and interacting with the L3 vertebral body, the bone.

9    BY MR. O'CONNOR:

10   Q.  And let me just stop you there so we can make sure we're

11   clear what you've just done.

12           What you've done for us here in the courtroom is you

13   have actually circled the filter from the perspective of this

14   imaging; is that correct?

15   A.  Yes.

16   Q.  And you have an arrow pointing to what, Doctor?

17   A.  That's the 6:00 o'clock arm of the filter.

18   Q.  And when you talk about this being a sagittal view, what

19   does that mean?  Can you orient us?

20   A.  This is actually axial.  This is the axial view.

21   Q.  Axial view.  Would you orient us to that, please?

22   A.  So it is a cross-sectional, like kind of a bread slice

23   between -- of your body.  A picture.  Just one slice through.

24   Q.  All right.  And if you would, then, you were telling us

25   about the surrounding anatomy to orient us.  Please continue.

1    A.  Yeah.  So the white structure behind the inferior vena cava

2    here, this structure right here is the L3 vertebral body.

3            And then this structure over here is the large artery

4    of the body called the aorta.

5    Q.  All right.  And what is the date of this imaging?

6    A.  6/14/13.

7    Q.  And should we go to the next imaging to show a different

8    view?

9    A.  Yes.

10   Q.  Let's look at Exhibit 4873.

11           Oh, excuse me.  That is 4873.

12   A.  Yeah, we have it.  How do I erase the markings?

13           THE COURTROOM DEPUTY:  I'll do it.

14           THE WITNESS:  Thank you.

15           MR. O'CONNOR:  Oh, I see.  You've got to erase that.

16           THE WITNESS:  Thanks.

17   BY MR. O'CONNOR:

18   Q.  What are we looking at here, Dr. Hurst?

19   A.  So this is a --

20           THE COURT:  You want this displayed?

21           MR. O'CONNOR:  Oh, you know what, excuse me, Your

22   Honor.  I apologize.  Again, all the imagings that I'm going to

23   be showing here have been stipulated.

24           THE COURT:  You need to move every one into evidence.

25           MR. O'CONNOR:  All right.  And at this time I would

1    move Exhibit 4873 into evidence.

2              THE COURT:  Any objection?

3              MR. ROGERS:  No, Your Honor.

4              (Exhibit No. 4873 admitted into evidence.)

5              MR. O'CONNOR:  And I request that we display this one

6    to the jury, Your Honor.

7              THE COURT:  You may.

8              MR. O'CONNOR:  Thank you.

9    BY MR. O'CONNOR:

10   Q.  Go ahead, Dr. Hurst.

11   A.  So this is a three-dimensional reconstruction of the CT

12   scan that you saw before.  It means we took the images and

13   stacked them on top of each other, and now we're looking at

14   it -- actually, the equivalent of looking at it from the side.

15   It's called a sagittal reconstruction.

16             So we're looking at the filter from the side here, and

17   you can see this is the device right there in the center of the

18   image.  And at the back of the image there, you will see the

19   posterior portion of the filter.  There is the leg right up

20   against that vertebral body and interacting with it, and

21   actually, almost bent forward in the patient's body by that

22   bone right there.

23   Q.  And what do you call that bone?

24   A.  That's the L3 vertebral body.

25   Q.  All right.  And L3 means lumbar?

1    A.  Yes.

2    Q.  And so as you look at the spine, could you just orient us

3    where the lumbar is in relation to the rest of the spine?

4    A.  So the lumbar spine is the lower portion of your spine that

5    goes basically from the middle of your back down to the top of

6    your belt line.

7    Q.  And you number each vertebrae as they go down?

8    A.  Yes.

9    Q.  All right.  Thank you.

10          And is this exhibit showing -- this imaging study

11   showing interaction between the filter struts and any part of

12   the anatomy?

13   A.  Yes.  The -- specifically, the arm and the L3 vertebral

14   body.

15   Q.  All right.  Thank you.

16          MR. O'CONNOR:  And then, Your Honor, the next one I'd

17   like to move into evidence is Exhibit 4922.

18          THE COURT:  Any objection?

19          MR. ROGERS:  No, Your Honor.

20          THE COURT:  Admitted.

21          (Exhibit No. 4922 admitted into evidence.)

22          MR. O'CONNOR:  May we display?

23          THE COURT:  You may.

24   BY MR. O'CONNOR:

25   Q.  And, Dr. Hurst, if you could just orient us and tell us

1    what we are looking at here and what is the significance of

2    this imaging study.

3    A.   So, again, we're -- we have an axial slice of a CT scan of

4    the abdomen.  This, again, shows the filter within the inferior

5    vena cava.  I'm going to circle the inferior vena cava here.

6            And you will see that the arm that was interacting

7    with the vertebral body that used to be right here is now gone.

8    So the filter is now missing an arm.  There should be six arms

9    and six legs.  If you count -- the arms are on the outer

10   portion of the filter on this image.  If you count the legs,

11   there's five -- I'm sorry, if you count the arms, there's five

12   arms, and obviously one is missing, the one that was

13   interacting with the L3 vertebral body.

14   Q.   All right.  And as you explained, what happened to that

15   strut?  That was an arm of the filter?

16   A.   Yes.  That arm embolized or migrated through the inferior

17   vena cava, through the right atrium of the heart, to the right

18   ventricle of the heart.

19   Q.   And I don't think the ELMO's working yet, but could you

20   explain from the G2X filter the difference between the arms and

21   the legs on that filter?

22   A.   So the arms of the filter form sort of an upper tier of the

23   device, sort of an umbrella above an umbrella.  The legs then

24   have a lower tier -- the legs are then the lower tier of the

25   umbrella.

1           The legs have small hooks that -- the legs have small

2    hooks on them.  We can pass it around.  Have small hooks on

3    them that engage the inferior vena cava, whereas the arms do

4    not have any hooks.  They are only connected to the cone or the

5    top of the filter.

6           MR. O'CONNOR:  Your Honor, may we show the jury the

7    filter?

8           THE COURT:  Yes.

9           MR. O'CONNOR:  And have them pass it around?

10          THE COURT:  Yes, you may.

11   BY MR. O'CONNOR:

12   Q.  As we let the jury inspect, are there any specific

13   instructions you have for them?

14   A.  Just that the -- there's a difference between the arms and

15   the legs.  The leg has a little hook on it on the bottom of the

16   leg, whereas the arm has no secondary attachment point.  Its

17   only attachment point is to the cone or the filter, which is

18   important in the design of this product and it's an important

19   reason why it has the failures that it does.

20          THE COURTROOM DEPUTY:  Okay.  It's working.

21          THE WITNESS:  Just in time.

22          Do you have the Eclipse one?  I could show that one

23   while they're looking at the other one.

24   BY MR. O'CONNOR:

25   Q.  All right.  Go ahead and show them the --

1   A.  I don't have the Eclipse.  Do you have it?

2   Q.  All right.  That's okay.  We'll let the members review

3   this, and then we'll go back.

4   A.  So as you're looking at that filter, there's a couple other

5   interesting characteristics of that device in comparison to the

6   permanent device from which it came.

7           The wires on that device are actually a little bit

8   smaller and a little more fragile.  The hooks on the device are

9   a little smaller and are designed to release from the inferior

10  vena cava when the device is retrieved instead of tearing the

11  inferior vena cava wall.

12          The hooks are also ground down to be more tapered than

13  the hooks on this device as well.  And that's also to encourage

14  release from the inferior vena cava.

15          In my opinion, that -- all those things contribute to

16  the instability of the device.

17          In addition, this device is unique in that -- in that

18  the arms, like I said, have one attachment point to the cone

19  right here.  There is no other attachment point, and they don't

20  attach to the wall of the inferior vena cava.  That means if

21  they fracture and release from the cone of the filter, they're

22  not attached to anything so that they can embolize or migrate

23  through the inferior vena cava.

24          This is the Simon Nitinol filter, which was the device

25  from which these devices, these retrievable devices were

1   designed.  You can see the cone of this filter is totally

2   different.  Instead of having arms, it has what we call a

3   flower.  And this wire that makes up the flower is actually

4   continuous.  It has two attachment points, you know, so if this

5   device fractures right here, it still has an attachment point

6   here and attachment point here so that this portion of the

7   device cannot embolize or migrate through the -- or get free

8   from the device, basically.  It's basically stuck to the

9   device.

10  Q.  All right.  Dr. Hurst, I just want to go back and get a few

11  more imaging studies in quickly, and then I would like to talk

12  about the imaging that shows the ventricle -- the strut that

13  went to the ventricle.  Okay?

14  A.  Yes.

15          MR. O'CONNOR:  So quickly, if we could display 4922,

16  Your Honor, and I would offer this imaging study into evidence

17  at this time.

18          THE COURT:  You just covered 4922.

19          MR. O'CONNOR:  Okay.  4923, excuse me.

20          THE COURT:  Any objection?

21          MR. ROGERS:  No, Your Honor.

22          THE COURT:  Admitted.

23          (Exhibit No. 4923 admitted into evidence.)

24  BY MR. O'CONNOR:

25  Q.  And, Dr. Hurst, could you explain to the members of the

1    jury what we are looking at in this imaging study?

2    A.  Yes.  So this is a CT scan --

3           THE COURT:  Mr. O'Connor, do you want this displayed?

4           MR. O'CONNOR:  Yes.  Thank you, Your Honor.  May we

5    display?

6           THE COURT:  Be sure to ask that each time.

7           MR. O'CONNOR:  I will.  Thank you.  I see it, but I

8    have to remember to have it displayed to everybody.

9           May we display this now, Your Honor?

10          THE COURT:  Yes.

11   BY MR. O'CONNOR:

12   Q.  Go ahead, Dr. Hurst.

13   A.  Okay.  Again, we have an axial view of a CT of the abdomen

14   on Ms. Hyde.  This is from May 16, 2014.

15          What this demonstrates is that the legs also can

16   penetrate the inferior vena cava and interact with adjacent

17   organs or structures.  This particular leg, the 3:00 o'clock

18   leg, is actually interacting with the wall of the main artery

19   of the body, the aorta, which is a high-pressure vessel that

20   carries a lot of blood.

21          There are also interactions with the L4 vertebral body

22   with this 6:00 o'clock leg.  And then there -- the other legs

23   are also penetrated -- have penetrated the inferior vena cava

24   and are in the fat adjacent to the inferior vena cava.

25   Q.  All right.  Thank you.

1          And we're going to come back to some of those findings

2   in a moment.

3          MR. O'CONNOR:  If we could look at 4925, and I would

4   offer this into -- excuse me, not 4925.  4924.  And I would

5   offer this imaging study into evidence, Your Honor.

6          MR. ROGERS:  No objection.

7          THE COURT:  Admitted.

8          (Exhibit No. 4924 admitted into evidence.)

9          MR. O'CONNOR:  May we display to the jury?

10         THE COURT:  Yes.

11  BY MR. O'CONNOR:

12  Q.  What are we looking at here on 4924, Dr. Hurst?

13  A.  Sure.  This is the coronal view of the CT scan that was

14  performed of her abdomen but included a portion of her chest

15  from 5/16/14.  So coronal, a coronal view is basically slicing

16  through the body this way, so you're looking at the body from

17  basically as if you were looking at it front on.

18         So this structure right here is the heart.

19  Specifically, this would be called the right ventricle of the

20  heart, which is the portion of the heart that pumps blood from

21  the venous system into the lungs through the pulmonary arteries

22  so that it can get oxygenated.

23  Q.  Dr. Hurst, now, is this the piece that you indicated on the

24  earlier CT scan was missing?

25  A.  So, yes, this is the 6:00 o'clock arm right here.

1    Q.  Let me ask you this while we're talking about this.  What

2    is the risk when a filter moves after implant?

3    A.  What is the risk if a filter moves after implant?

4    Q.  Yeah.  What risk does that create to a patient?

5    A.  It depends on how far it moves.  So the IVC filters, when

6    they're deployed, you would hope that they would stay in the

7    position that you deployed them in.  You want them to be

8    stable.

9         If the device does not stay in the same position,

10   several things can happen.  Number one, the device can

11   migrate -- the whole device can migrate or release from the

12   cava and migrate up all the way to the heart, and that can be a

13   catastrophic event.  The patient oftentimes -- well, requires

14   open heart surgery and removal of the device, and they can die

15   from a migration, a total migration of the device to the heart.

16        The device can also migrate towards the feet, and when

17   it migrates towards the feet, what happens is the device

18   starts -- this device, the G2, when it migrates towards the

19   feet, the device starts to sort of flower out or the legs start

20   to splay out.

21        That is not a significant feature in this particular

22   case, but when those legs start to splay out, that can increase

23   the risk of penetration of the inferior vena cava and then also

24   can increase the risk of fracture, because as those legs splay

25   out, they're reaching further out into the body and can

1    interact with organs such as vertebral bodies and the aorta and

2    even the bowel and muscles.

3           So when a filter moves in the body, several different

4    things can happen.  In addition, there's one other type of

5    movement that can occur.  The filter can tilt.  So ideally the

6    filter stays centered within the inferior vena cava.  It's

7    designed to sit like that.  If the device becomes significantly

8    tilted like that, that can put additional stress on the legs

9    and also opens the filter up to allow blood clot to pass

10   through it, so it effectively is not doing what it's supposed

11   to do.  It's not going to block clot from going to the lungs.

12   Q.  What were the failure modes that you determined were

13   specific to Lisa Hyde's G2X filter?

14   A.  So Lisa Hyde's G2X filter had a minimal amount of tilt

15   anteriorly, and then also, she had predominantly penetration of

16   her arms and legs of the filter and then interaction with

17   adjacent structures.  And then finally, the most significant

18   failure was that the arm fractured off the filter and then

19   migrated to her heart, requiring a complex procedure to remove.

20   Q.  And you talked about the ventricle, the structure that went

21   to the ventricle of the heart.

22   A.  Yes.  That's what we have --

23   Q.  Explain to us --

24   A.  -- in the picture.

25   Q.  Pardon me?

1    A.  That's our picture right here, yes.

2    Q.  And what risk, what problems are associated when a strut

3    goes to the ventricle of the heart?

4    A.  So when an arm or a leg from a filter migrates to the

5    heart, several things can happen.  The worst possible thing

6    that can happen is that the arm or leg can penetrate the wall

7    or perforate the wall of the right ventricle of the heart and

8    cause bleeding from the heart into the sac that surrounds the

9    heart.  And then that can actually compress the heart so the

10   heart won't beat anymore, and it can cause sudden death.

11   That's called cardiac tamponade.

12        The device can also migrate through the heart wall

13   into the pericardial sac and then out -- basically out of the

14   heart and into the chest wall.  All of those things can cause

15   chronic pain, arm pain, chest pain, neck pain, similar to what

16   people would have with, you know, a heart attack or whatnot.

17        In addition, the arm can penetrate the muscles of the

18   heart and interfere with conduction.  So the heart muscle

19   carries the conductive nerves for the heart, and if the arm

20   penetrates through the muscle in the right location, it can

21   cause arrhythmias, which are abnormal heart rates -- I'm sorry,

22   abnormal heart rhythms, which could also be life threatening.

23   Q.  You talked about Lisa Hyde's IVC filter and that it had

24   penetrated through the vena cava at other locations.  Do you

25   recall that testimony?

1    A.  Yes.

2    Q.  For example, you told us that it was interacting with the

3    vertebrae, and I thought you said it was also interacting with

4    the aorta.

5    A.  Yes.

6    Q.  And what is the aorta?

7    A.  The aorta is the largest blood vessel, arterial blood

8    vessel of the body.  It carries basically all the blood from

9    the heart to the vital organs of the abdomen and the legs.

10   Q.  And what problems are associated or what risks exist when a

11   filter will penetrate and interact with those types of organs?

12   A.  So the inferior vena cava is located right in the center of

13   the abdomen, so it's kind of like ground zero.  There's a lot

14   of different things surrounding it.

15        So when the filter legs or arms interact with the

16   bowel, that can cause abdominal pain or kind of GI distress.

17   It can also cause -- it can also interact with the muscles of

18   the back that are very close to the lumbar spine and cause pain

19   that radiates down the leg or pain that is sharp when the

20   patient moves in specific ways.

21        I've seen these fragments interact or legs interact

22   with the urinary tract, with the ureters.  Those are the --

23   basically the structures that carry urine from the kidneys to

24   the bladder.  When they interact with the vertebral bodies,

25   they can cause back pain.  And when they interact with the

1    aorta, very rarely they can cause the aorta to develop what's

2    called a pseudoaneurysm, which is basically when the strut

3    punctures the aorta and a small hole happens in the aorta that

4    can chronically seal off, but occasionally that can rupture and

5    patients can --

6    Q.  Based --

7    A.  -- bleed to death.

8    Q.  Go ahead.  I'm sorry.

9    A.  That's okay.

10   Q.  Based upon your conclusions about the failure modes that

11   were experienced by Lisa Hyde's G2X filter, do you have an

12   opinion whether the G2X filter in Lisa Hyde met the reasonable

13   expectations of physicians like you?

14   A.  No.  It did not.

15   Q.  Okay.  Can you explain why?

16   A.  Because the filter was unstable.  It became unstable and

17   fractured, and the fragment from the fracture went to her

18   heart, requiring an additional procedure to remove.

19        The filter penetrated the inferior vena cava and began

20   acting -- interacting with adjacent organs, and I believe that

21   those sort of interactions are progressive, so this device had

22   to come out.

23   Q.  Now, you talked about the fact that this filter penetrated

24   and that led to the fracture of the arm that went and migrated

25   to the ventricle; is that correct?

1    A.  Yes.

2    Q.  And I think you said that there was tilt, slight, and that

3    the filter moved down?

4    A.  There is very slight tilt and probably about 5 millimeters

5    of caudal migration, which is migration towards the feet, but

6    that is not the predominant issue.

7    Q.  But regardless, is tilt and caudal migration, are those

8    also attributes of instability?

9    A.  Those are characteristics of the -- this family of filters,

10   the Bard filters, the caudal migration and tilt, yes.

11   Q.  And are those modes of failure, the migration, the

12   penetration, and the fracture and the migration and the

13   tilting, are those modes that are inconsistent with the

14   expectation of stability in a filter?

15   A.  So, yes.  When we look at the family, the G2X, the G2, and

16   the Eclipse, those devices were unique in that they had

17   basically all of the types of failure that a filter can have,

18   together.

19        You know, individual devices like the ones that I have

20   brought today, like the Greenfield filter, which is this device

21   here, it's a fairly old device.  It suffered from some

22   complications or issues, predominantly tilt, but did not have

23   the fracture issues and the same penetration issues.

24        So when we look at the G2X, it had all of the issues

25   that you could possibly have, and it had them at either the

1    same rate or greater rates than the prior permanent devices.

2          MR. ROGERS:  Objection, Your Honor.  I think we've

3    entered an area that's addressed by your Daubert order.

4          THE COURT:  Sustained.

5    BY MR. O'CONNOR:

6    Q.  Okay.  Let's move on to a different area, Doctor.

7          As an interventional radiologist and a physician that

8    works with filters, what -- would you expect a manufacturer

9    like Bard to disclose what it knows about risks and dangers of

10   its filters, the Bard family of filters?

11   A.  Yes.

12   Q.  And what type of information would you expect Bard to

13   provide doctors for purposes of performing informed consent and

14   ongoing care of their patients?

15   A.  So when we deal with medical device companies, we expect

16   them to do their due diligence up front when they're designing

17   a device to make it reasonably safe and to determine whether

18   the device is safe before they release it for use.

19         In addition, we expect the device companies to have a

20   program of surveillance, where they are kind of basically

21   watching their device as it's being used in patients and to

22   alert us if they come upon unexpected issues or problems that

23   could be dangerous to the patient.

24   Q.  All right.  Now, in the course of your work in this case,

25   you reviewed Bard documents?

1    A.  Yes.

2    Q.  Did you come across information that you learned in this

3    case that you would have reasonably expected Bard to provide

4    physicians but wasn't?

5    A.  Yes.

6    Q.  And what type of information did you come across?

7    A.  There were informations related to -- information related

8    to health hazard evaluations, which are evaluations of a device

9    when there are multiple complaints about a device.  There was

10   also information from their internal studies that had

11   concerning data about increased risk of migration, fracture,

12   tilt.

13          So in reviewing the internal documents, there was

14   definitely information that would have been very helpful for me

15   in making informed decisions for my patients when I'm placing

16   devices.

17          MR. O'CONNOR:  Let's show Exhibit 4820 to Dr. Hurst.

18   BY MR. O'CONNOR:

19   Q.  Dr. Hurst, showing you Exhibit 4820, is this a document

20   that you reviewed and considered in your -- formulating your

21   opinions in this case?

22   A.  Yes.

23          MR. O'CONNOR:  And, Your Honor, I believe this is

24   stipulated into evidence.

25          THE COURT:  Are you moving it into evidence?

```
 1              MR. O'CONNOR:  I'm going to move it into evidence,
 2    yes.
 3              MR. ROGERS:  No objection, Your Honor.
 4              THE COURT:  Admitted.
 5              (Exhibit No. 4820 admitted into evidence.)
 6    BY MR. O'CONNOR:
 7    Q.  All right.  Dr. Hurst, now, just to put this all in
 8    perspective, back at the time that doctors like you were using
 9    Bard filters, you had reasonable expectations of Bard and the
10    type of information it would provide; correct?
11    A.  Yes.
12    Q.  And would that include information that Bard was aware of
13    of how its filters were behaving, including what failure modes
14    they were causing?
15    A.  Yes.
16              MR. O'CONNOR:  May I publish Exhibit 4820, Your Honor?
17              THE COURT:  You may.
18    BY MR. O'CONNOR:
19    Q.  And would you explain to the members of the jury what this
20    document is, from your understanding?
21    A.  So this is a Bard internal document --
22              MR. ROGERS:  Objection, Your Honor.  There's no
23    foundation for this.
24              THE COURT:  Well, the question is calling for his
25    understanding based on having read the document.  So I'm not
```

1   understanding your objection, Mr. Rogers.

2          MR. ROGERS:  Your Honor, if he wants to explain his

3   understanding, that's fine.  But if he's going to describe to

4   the jury what this document means, that's a different story,

5   and I thought that's where he was going.

6          THE COURT:  Well, I think the question was "What is

7   your understanding?"  So I'll overrule the objection.

8          MR. ROGERS:  Thank you, Your Honor.

9          THE WITNESS:  So my understanding is that this is an

10  evaluation of the device that was performed because of multiple

11  reports by physicians in regards to complications that were

12  occurring with the G2 filter.

13  BY MR. O'CONNOR:

14  Q.  And we talked about this and we heard information about the

15  history, the family of Bard filters, but the G2, what's its

16  relationship to the G2X or the Eclipse?

17  A.  So the G2 filter was first, and it is actually -- this is a

18  G2 right here, I think.  The G2 filter was first, and it did

19  not have a retrieval hook on top of it.  The G2X, they added a

20  hook to the top of the device so that it could be more easily

21  retrieved.

22  Q.  And let me ask you this:  Was there any -- other than that

23  hook on the top, was there any difference, from your

24  perspective as a physician, between the G2 and the G2X?

25  A.  No, there was no difference.

UNITED STATES DISTRICT COURT

1    Q.  And what about the Eclipse?

2    A.  So in response to the fracture issues that were being seen

3    with the G2 and G2X and the device before it, the Recovery,

4    the -- Bard made some changes --

5            MR. ROGERS:  Objection, Your Honor.  No foundation.

6    The witness is telling the jury what Bard --

7            THE COURT:  Sustained.

8            MR. ROGERS:  -- does.

9    BY MR. O'CONNOR:

10   Q.  Just the difference between --

11   A.  The difference --

12   Q.  Is there any difference --

13   A.  Yes.

14   Q.  -- that you could tell from the G2 and the X and the

15   Eclipse?

16   A.  Yes.  Basically, what they did was they did a procedure

17   called electropolishing of the filter so that they could reduce

18   fracture risk.

19   Q.  And did that, in your experience, did that filter

20   experience fractures as well, the Eclipse?

21   A.  Yes.

22   Q.  All right.  Now, going to Exhibit 4820, can you

23   specifically tell us what information is in this document that

24   you would have expected Bard to provide you but was not

25   provided to you as a physician treating patients?

1    A.  Well, the mere fact that they were having early reports of

2    migration and that these migrations were unusual, they were

3    caudal migration, and that in 75 percent or 70 percent of the

4    cases, the filter was found to be out of position or it was

5    tilted or in an anatomically suboptimal position, which raised

6    questions about the effectiveness of the device.

7    Q.  And, again, is that any information that Bard shared with

8    you and physicians practicing in interventional radiology who

9    were implanting filters, including the G2s and G2X?

10   A.  No.

11        MR. O'CONNOR:  Can we show Dr. Hurst Exhibit 443,

12   please.  4-4-3.

13   BY MR. O'CONNOR:

14   Q.  Doctor --

15        MR. O'CONNOR:  At this time, Your Honor, I would move

16   443 into evidence.

17        MR. ROGERS:  No objection, Your Honor.

18        THE COURT:  Admitted.

19        (Exhibit No. 443 admitted into evidence.)

20        MR. O'CONNOR:  May we display to the jury?

21        THE COURT:  Yes.

22   BY MR. O'CONNOR:

23   Q.  Dr. Hurst, is Exhibit 443 another document, Bard internal

24   document that you reviewed?

25   A.  Yes.

1    Q.  And explain to us what was significant -- what information

2    was important to you in this document that you did not receive

3    and would have expected to have received?

4    A.  Can we move to the next page?  Yeah.  Thank you.

5         So in this particular document, the most concerning

6    thing to me is that there seems to be an increasing rate of

7    complaints related to fracture from the G2 and G2X devices,

8    beginning in 2005 with, you know, a 0 percent complaint rate,

9    going up to a 0.9 -- .09 percent rate.  So it seems like there

10   is a trend for increasing risk of fracture over the time that

11   the device has been on the market.

12   Q.  And if we go back to page 1, we can see that it's called a

13   draft, but it's dated November 30, 2008; is that correct?

14   A.  Yes.

15   Q.  And when is your understanding that Lisa Hyde received her

16   G2X -- and there's been some contention it may have been an

17   Eclipse.  When is your understanding she received that filter?

18   A.  2011, I believe.

19   Q.  February 2011?

20   A.  Yes.  February 25th, 2011.

21   Q.  And by the time February 2011 had arrived, had Bard

22   provided any information that we looked at in Exhibit 443 or in

23   the health hazard evaluation, 4820, to physicians?

24   A.  No.

25   Q.  And is that information by then you would have expected to

1  have received?

2  A.  Yes.

3  Q.  And what would you have done with that information in your

4  practice?

5  A.  Well, we would have evaluated each patient for alternative

6  devices based on, you know, the benefit -- the risk-benefit

7  analysis.  So we likely would have either placed a permanent

8  device or put the patient -- tried to put the patient on

9  anticoagulation, or we would have placed a different

10 retrievable device.

11 Q.  The G2X that Lisa Hyde received, was that promoted as a

12 permanent filter with an option to retrieve?

13 A.  Yes.

14 Q.  And as a permanent filter with an option to retrieve, what

15 was the reasonable expectations of physicians as to how it

16 would behave in terms of failure modes?

17 A.  Well, you would expect it to behave as a permanent device.

18 Q.  Meaning what?

19 A.  Meaning that it would maintain stability within the

20 inferior vena cava.

21 Q.  In terms of risks and benefits, do you have an opinion in

22 this case based upon the failure modes you described whether

23 the risks and dangers associated with this filter outweighed

24 any benefit to Lisa Hyde?

25 A.  In this particular case, the risk did not outweigh the

1    benefits.

2    Q.  Now, you told us that her filter did not behave as a

3    reasonable physician would have expected; is that correct?

4    A.  Yes.

5    Q.  And, but as you look at Exhibit 443 and that exhibit we

6    looked at earlier, the health hazard evaluation, 4820, that's

7    information Bard had back in 2006 and 2008.  Did Lisa Hyde's

8    filter display those same type of failure modes that Bard was

9    aware of as early as 2008 and 2006?

10   A.  Absolutely.  The filter fractured.

11   Q.  And Bard never disclosed that to physicians?

12   A.  No.

13   Q.  Now, you talked about, in your case -- about the Meridian

14   filter in this case.  Do you recall --

15   A.  Yes.

16   Q.  -- your opinions on that?

17           What are your opinions regarding the Meridian filter?

18           MR. ROGERS:  Objection, Your Honor.  We have

19   nondisclosure, and I think this also approaches an area in your

20   Daubert order.

21           MR. O'CONNOR:  May we approach?

22           THE COURT:  Yes.

23           If you want to stand up for a minute, ladies and

24   gentlemen, feel free.

25           (At sidebar on the record.)

1              MR. O'CONNOR:  He talks about the Meridian several

2      places.

3              THE COURT:  What page are you on?

4              MR. O'CONNOR:  Page 9.

5              THE COURT:  Okay.  Where?

6              MR. O'CONNOR:  Paragraph 6.

7              THE COURT:  It says:  The next generation, the

8      Meridian?

9              MR. O'CONNOR:  Right.

10             THE COURT:  Okay.

11             MR. O'CONNOR:  Adding caudal anchors for the purpose

12     of --

13             (Court reporter clarification.)

14             THE COURT:  Well, tell me where you're going.  What is

15     it you are going to ask him to testify about on the Meridian?

16             You can't put this by the mic.

17             MR. O'CONNOR:  I'm sorry.  I apologize.

18             I'm going to have him testify what he said in his

19     report, that the Meridian was being discussed in Bard, that

20     caudal anchors were an important feature on the Meridian, and

21     that physicians like him were not told about that.

22             THE COURT:  Mr. Rogers?

23             MR. ROGERS:  Your Honor, my concern is is that when he

24     was reeling off his laundry list of opinions, one of the things

25     he said he was going to talk about was a reasonable alternative

 1   design.  And this is not a design expert.  We have not gotten

 2   any design opinion from him.  And I don't think that's an area

 3   that he can go to.

 4        THE COURT:  Well, are you concerned about him saying

 5   the things that Mr. O'Connor just described?

 6        MR. ROGERS:  Your Honor, I think if he limits himself

 7   to this report, I think that's okay.

 8        THE COURT:  Okay.  So identify exactly what it is you

 9   intend to ask.

10        MR. O'CONNOR:  Okay.  I'm going to ask him, number

11   one, what he understands about when Bard became aware of the

12   features on the Meridian and what those features were.  And

13   whether he was aware of that and whether that information

14   should have been disclosed to physicians at the time Lisa Hyde

15   received her filter.

16        MR. ROGERS:  Your Honor, I don't think he has any

17   basis to say -- or knowledge to say when Bard became aware of

18   the Meridian filter.  I mean, that's a foundational issue.

19        THE COURT:  What's the basis for that?

20        MR. O'CONNOR:  He's received internal documents, like

21   we all have, that they were talking about the caudal migration

22   issues beginning in 2006; and he's reviewed documents as early

23   as 2010 that talk about the Meridian project and the product

24   opportunity appraisal.

25        THE COURT:  Mr. Rogers?

1          MR. ROGERS:  Your Honor, again, my concern is is that

2    this witness is going to try and tell this jury what Bard was

3    doing and what they were thinking, and he can't do that.

4          THE COURT:  Well, can he, in your view, testify that

5    he has seen Bard internal documents suggesting that caudal

6    anchors were being discussed in February of 2006?

7          MR. ROGERS:  Yes, Your Honor, he can.

8          THE COURT:  So I think it needs to be the same kind of

9    phrasing, which is what has he seen and what is his

10   understanding of it, so he's not testifying about what Bard

11   knew.

12         MR. O'CONNOR:  But he's going to address why the

13   caudal anchors were important and how they would have been

14   important in this case.

15         THE COURT:  From the perspective of?

16         MR. O'CONNOR:  The caudal anchors would have reduced

17   the risk of the penetration that this filter experienced.

18         MR. ROGERS:  That's a design opinion.

19         THE COURT:  Where is that in his report?

20         MR. O'CONNOR:  Right here.  The last sentence of

21   paragraph 6:  Ms. Hyde ultimately suffered from the G2/G2X

22   filter complications the Meridian attempted to correct,

23   including caudal migration, fracture, perforation, and tilt of

24   the filter.

25         THE COURT:  Well, what he's saying there is that she

 1    suffered from complications Meridian attempted to correct.

 2    He's not opining that Meridian would have corrected them.

 3            MR. O'CONNOR:  Right.

 4            THE COURT:  Right?

 5            MR. O'CONNOR:  And I'll --

 6            THE COURT:  So he's not saying this was a design that

 7    was a better one.  He's not expressing that opinion; right?

 8            MR. O'CONNOR:  I'll make sure he -- well, I'm

 9    trying -- I'll try to control that.  I'll just tell him to look

10    at his report and let's just stay specific with what he said in

11    the report.

12            THE COURT:  Ask leading questions.

13            MR. O'CONNOR:  I will.

14            THE COURT:  Okay?

15            All right.

16            MR. ROGERS:  All right.

17            THE COURT:  Did you have another issue?

18            MR. ROGERS:  Well, the only other thing I'll raise,

19    Your Honor, is we do have a substantive portion of the statute

20    that I think we need to be cognizant of, and that is an --

21    incorporating into the Wisconsin product liability statute is a

22    very -- provision based on the Federal Rule 407 that

23    essentially says that you cannot give testimony about a --

24            You've got it?

25            MS. HELM:  It's Section 4 of the statute.  It says

 1  that you can't present evidence of a subsequent remedial

 2  measure to prove defect of the product at issue.  It's only

 3  admissible to show alternative design.  It's paragraph 4.  I

 4  can grab the statute.

 5          THE COURT:  Yeah.  I know it says that.  Here's my

 6  problem with that.  The reason you're showing alternative

 7  design is to prove defect.  So to say you can't show a later

 8  design to prove defect doesn't make any sense, because that's

 9  how you show it is because there was an alternative design.

10          MS. HELM:  Actually, Your Honor, I think if you go

11  back to paragraph 1 of the statute, if you read them in

12  connection, paragraph 1 says you have to show a reasonable

13  alternative design, and failure to incorporate the design

14  rendered the product --

15          THE COURT:  Right.

16          MS. HELM:  -- defective.  But you can't -- you have to

17  independently show that the product was defective, and you

18  can't use the new design --

19          THE COURT:  Well, it seems to me the way you show

20  defectiveness is two steps.  One, you show there was a

21  reasonable alternative design; and two, you show that the

22  failure to use that alternative design made the product not

23  reasonably safe.  Right?

24          MS. HELM:  Right.  So -- correct.  So you have to show

25  the product -- not -- if you flip it, because it's an "and"

1    standard.  If you flip it, you have to show that the product

2    without the alternative design was not reasonably safe.

3    Because --

4              THE COURT:  I agree.

5              MS. HELM:  Okay.

6              THE COURT:  But are you saying that if they want to

7    put in evidence that there was a caudal anchor design later

8    developed by Bard, that that is inadmissible in this case?

9              MS. HELM:  No.  It's admissible if they can meet the

10   statute language to show alternative design.  It's not

11   admissible under the Wisconsin statute to show that the G2X or

12   the Eclipse was defective.

13             THE COURT:  But that's how you show it was defective,

14   by showing there was not -- that there was an alternative

15   reasonable design.

16             MS. HELM:  Actually, Your Honor, I disagree.  You have

17   to show that it was not reasonably safe, the product itself.

18             THE COURT:  That's one of the two elements.  The other

19   one is --

20             MS. HELM:  Right.  It takes both.

21             THE COURT:  Yeah.  So to prove one of the elements,

22   you need to show the later design.  Right?

23             To me -- I mean, we can talk more about this, but when

24   I saw that, I thought this doesn't make any sense.  Because

25   alternative reasonable designs, even if they're later designs,

1    do come into evidence to show there was a reasonable

2    alternative design.

3           MS. HELM:  It exists at -- right, the statute has

4    specific language.

5           THE COURT:  Right.  And this clearly was being

6    considered at the time.

7           MS. HELM:  Yes.

8           THE COURT:  So it seems to me the use of caudal

9    anchors in the Meridian being considered at the time is clearly

10   admissible in this case as a reasonable alternative.  Do you

11   agree with that?

12          MS. HELM:  Yes.

13          THE COURT:  Okay.  Well -- so I don't see where 407

14   becomes an issue.

15          MS. HELM:  Well, I think it's -- what I don't agree is

16   the next step, for them to say that proves that the G2X --

17          THE COURT:  Well, they would say that plus the fact

18   that it was not reasonably safe proves.

19          MS. HELM:  Right.  It's the plus.

20          THE COURT:  Okay.  Well, but in terms of

21   admissibility, I think it comes in.  If you think we get to a

22   point where it doesn't, that's fine.

23          So I think we know where we're going, but control it.

24   In my view, just so you know, Mr. O'Connor, what he can't do is

25   start giving design opinions.  He can't say this was a better

 1    design.  Bard knew something or didn't know something.  He's

 2    got to testify from his perspective as a doctor.

 3              MR. O'CONNOR:  And I will keep him there, and if he

 4    does go that way, I will say that I don't want you to talk

 5    about design.  I want you to talk about your perspective as a

 6    doctor.

 7              Thank you, Your Honor.

 8              (End of discussion at sidebar.)

 9              THE COURT:  Thank you for your patience, ladies and

10    gentlemen.

11    BY MR. O'CONNOR:

12    Q.  All right, Dr. Hurst.  Before we go on, I think a moment

13    ago either you or I or both of us got tongue-tied.  I want to

14    just make sure we left off with your opinion.

15              Is it your opinion that in this case of Lisa Hyde,

16    that the risks associated with her G2X filter outweighed any

17    benefit of that filter?

18    A.  Yes.

19    Q.  And is that an opinion you hold to a reasonable degree of

20    medical probability?

21    A.  Yes.

22    Q.  Now, let's talk about the Meridian and specifically about

23    caudal anchors.  You've arrived at opinions about those;

24    correct?

25    A.  Yes.

1    Q.  Now, let me be very specific.  Based upon your review in

2    this case, when in your review of internal documents did it

3    appear to you that Bard had a project for caudal migration?

4    When did that begin, to address caudal migration in its

5    filters?

6    A.  As early as 2006.

7    Q.  And did Bard -- did you review documents that discussed the

8    Meridian?

9    A.  Yes.

10   Q.  Let me show you a document that you have reviewed.

11           MR. O'CONNOR:  If you could put up Exhibit 1861.

12           And let's see.  Go to page -- first of all, Your

13   Honor, I think that I would move Exhibit 1861 into evidence at

14   this time.

15           MR. ROGERS:  And you're moving the entire document

16   into evidence?

17           MR. O'CONNOR:  Sure.

18           MR. ROGERS:  Well, Your Honor, this is a 1,600-page

19   document that's on the exhibit list.  If he wants to move a

20   page in, that's fine.

21           MR. O'CONNOR:  All right.  Go to page 70.  Before we

22   display it, Your Honor, I'll show you the page that I am asking

23   the doctor to look at.

24           It's the last page on the document.

25           Excuse me one moment, Your Honor, if I may help.

1    We're having a technical difficulty.

2    BY MR. O'CONNOR:

3    Q.  And I don't want to talk about anything -- what was the

4    feature that the Meridian filter that was promoted by Bard,

5    what features did it have that were important to you as an

6    interventional radiologist?

7    A.  So the Meridian filter differed from the G2X in that they

8    added little anchors or reversed hooks to the arms of the

9    device to limit penetration of the arm and to limit caudal

10   migration or migration of the filter to the feet, basically to

11   improve its stability.  So they put little tiny hooks, reverse

12   hooks on the arms of the filter.

13   Q.  And is that information that Bard was working on a change

14   in the filter as early as 2006, is that information that you

15   would have reasonably expected Bard to share with physicians?

16   A.  I don't know if they would have shared that specific

17   information, that they were doing that.  I think that they

18   would have shared that they -- it would have been nice if they

19   had shared that they had concerns with the design of the G2X

20   and the current -- concerns were so significant that they were

21   going to change the design of the device to add anchors.

22   Q.  And I just want to talk about what they added, caudal

23   anchors.  All right?

24   A.  Yes.

25   Q.  Now, based upon your work in this case, did you arrive at

1    an opinion that the anchors that you talked about that were put

2    on the Meridian, was that an attempt by Bard to correct the

3    failures that Lisa Hyde --

4    A.  Yes.

5    Q.  -- the type of failures that Lisa Hyde experienced in her

6    filter?

7    A.  Yes.  That's my opinion.

8            MR. ROGERS:  Objection, Your Honor.

9            THE COURT:  He said based on what he reviewed.  That

10   was the way the question was phrased.

11           MR. ROGERS:  Thank you, Your Honor.

12           THE COURT:  So the objection is overruled.

13   BY MR. O'CONNOR:

14   Q.  And just so we're clear on the record, it -- based upon

15   your review and what you saw with the caudal anchors, that

16   addition to the Meridian filter, was that, from your

17   perspective, an attempt by Bard to correct the type of failure

18   modes that Lisa Hyde's G2 filter had experienced?

19   A.  Yes.

20           MR. O'CONNOR:  And I would move to admit 1861,

21   page 70.

22           THE COURT:  Any objection?

23           MR. ROGERS:  No, Your Honor.

24           THE COURT:  That page is admitted.

25           (Exhibit No. 1861, page 70 admitted into evidence.)

1            MR. O'CONNOR:  May we publish to the jury?

2            THE COURT:  You may.

3    BY MR. O'CONNOR:

4    Q.  And, Dr. Hurst, could you show the jury the caudal anchors

5    you were talking about that were added to the Meridian filter.

6    A.  Sure.  So this is obviously a picture of the Meridian

7    filter here.  Tough to do a -- draw on this device here.  That

8    is a caudal -- that is a penetration limiter or caudal anchor.

9    That is a penetration limiter.

10            And then the other ones are actually not well

11   visualized on here, but they're actually on the end of the --

12   on the end of the leg.

13            So basically they put three of these penetration

14   limiters or caudal anchors on three of the arms and then the

15   other three arms received this device right here, this

16   modification, which was also a caudal anchor or penetration

17   limiter.

18   Q.  And based upon what you told us before, we looked at the

19   HHE from 2006 and then we looked at the G2/G2X fracture

20   analysis in 2008.  And you told us that Bard was aware of

21   complications, including the very complications that Lisa

22   Hyde's filter experienced; correct?

23   A.  Yes.

24            MR. ROGERS:  Objection, Your Honor.

25            THE COURT:  Sustained.  You had him testify about what

UNITED STATES DISTRICT COURT

1  Bard knew.

2          MR. O'CONNOR:  Pardon me?

3          THE COURT:  You had him testify about what Bard knew.

4          MR. O'CONNOR:  Oh, I apologize.

5  BY MR. O'CONNOR:

6  Q.  Those documents addressed the behaviors that you found

7  existed in failure modes of Lisa Hyde's filter; correct?

8  A.  Yes.

9  Q.  And as you have told us, from what you reviewed in the

10  Meridian filter, the caudal anchors appear to you to be an

11  attempt by Bard to correct those failure modes?

12  A.  Yes.

13          MR. ROGERS:  Objection, Your Honor.

14          THE COURT:  Overruled.

15          MR. O'CONNOR:  And if we could put up Exhibit 1861.

16          THE COURT:  That's the one that's up.

17          MR. O'CONNOR:  Oh, I see.  I'm looking at a different

18  section.

19          Can we go to page 38?

20  BY MR. O'CONNOR:

21  Q.  Dr. Hurst, this is part of Exhibit 1861 -- or is this a

22  page in the exhibit that you reviewed that you just discussed?

23  A.  Yes.

24          MR. O'CONNOR:  At this time I would move to admit

25  Exhibit 1861, page 38 into evidence, Your Honor.

1          MR. ROGERS:  No objection, Your Honor.

2          THE COURT:  Admitted.

3          (Exhibit No. 1861, page 38 admitted into evidence.)

4          MR. O'CONNOR:  May we display to the jury?

5          THE COURT:  You may.

6  BY MR. O'CONNOR:

7  Q.  Now, Dr. Hurst, is this among the documents that you have

8  reviewed from Bard?

9  A.  Yes.

10  Q.  And would you tell us what is significant about this

11  document to you?

12  A.  The date on this document is basically June or July of

13  2010, when these -- well, when these executives signed off on

14  this document to approve the concept of the Meridian anchors.

15  Q.  And a moment ago in the same document, page 70, we saw a

16  diagram of the Meridian with the caudal anchors?

17  A.  Yes.

18  Q.  Thank you.

19          Now, Dr. Hurst, in arriving at your opinions that the

20  failure modes experienced by Lisa Hyde's G2X filter were

21  contrary to the reasonable expectations of a physician, is that

22  an opinion that you hold to a reasonable degree of medical

23  probability?

24  A.  Yes.

25  Q.  And in terms of the dangers that that filter posed that you

1    discussed, the migration and the fracture and the embolization

2    to the heart, is that a risk of a filter, a Bard filter, that

3    was never explained or provided to physicians by Bard?

4    A.  The fracture and migration risk was not described

5    adequately, yes.

6    Q.  And is that a risk or, excuse me, a failure that was

7    contrary to the reasonable expectations of a physician, an

8    interventional radiologist?

9    A.  That was a new complication that was unique to that family

10   of devices.

11   Q.  And in terms of that complication, is that a serious

12   complication?

13   A.  Yes.  Potentially, it could be life threatening.

14   Q.  And as you know, Lisa Hyde had that strut removed.

15   A.  Yes, she did.

16   Q.  Okay.  And who removed that strut?

17   A.  An interventional radiologist named William Kuo at Stanford

18   University, who is an expert at removing failed devices.

19   Q.  Have we discussed all the opinions that you've reached in

20   this case today?

21   A.  Yes.

22   Q.  And are the opinions that you talked to the jury about

23   opinions that you hold to a reasonable degree of medical

24   probability?

25   A.  Yes.

```
 1            MR. O'CONNOR:  Thank you.  That's all I have.
 2            THE COURT:  All right.  Cross-examination.
 3                         CROSS-EXAMINATION
 4   BY MR. ROGERS:
 5   Q.  Good morning.
 6   A.  Good morning.
 7   Q.  How are you, Doctor?
 8   A.  I'm good.
 9   Q.  Good.
10            I want to kind of pick up where Mr. O'Connor left off,
11   and you had started to talk about Dr. Kuo removing the filter
12   and the strut from Mrs. Hyde's heart; correct?
13   A.  Yes.
14   Q.  And would you agree with me that Dr. Kuo successfully
15   removed both the filter and the fractured strut?
16   A.  Yes, he did.
17   Q.  And would you agree that Mrs. Hyde should have no other
18   future complications from her filter or the strut?
19   A.  That's not my area of expertise, but I don't -- I don't
20   know.  I don't know if she'll have any further complications.
21   Q.  Okay.  And, Doctor, would you agree with me that you
22   previously had testified that you would not -- that you weren't
23   aware of any complications that she would have?
24   A.  I'm not aware of any complications that she's had
25   post-retrieval.
```

1    Q.  And would you agree that Mrs. Hyde did not experience any

2    pulmonary embolism for the three and a half years that the

3    filter was in place?

4    A.  Not that we know of.

5    Q.  And would you agree that there is no evidence that her

6    cardiac function has been damaged by the strut that was removed

7    from her heart?

8              MR. O'CONNOR:  Objection.  Foundation.

9              THE WITNESS:  I don't know of any.

10             THE COURT:  Hold on just a minute.  When he objects,

11   hold on.

12             I couldn't hear your objection, Mr. O'Connor.  Please

13   stand.

14             MR. O'CONNOR:  My objection is lack of foundation.

15             THE COURT:  Okay.  Let me look at the question again.

16             Overruled.  You can answer it, sir.

17             THE WITNESS:  Can you repeat your question again,

18   please?

19   BY MR. ROGERS:

20   Q.  Sure.  What I asked you was would you agree that there is

21   no evidence that Mrs. Hyde's cardiac function has been damaged

22   by the strut that was removed from her heart?

23   A.  Not that I know of.

24   Q.  And, Doctor, you testified about several things that

25   were -- that you consider to be possible things that could

DARREN R. HURST, M.D. - CROSS-EXAMINATION                    308

1   happen when a strut enters the heart.  Do you recall that?

2   A.  Yes.

3   Q.  And I believe you said that there was some risk that the

4   strut may penetrate the heart; is that right?

5   A.  Yes.

6   Q.  And would you agree there's no evidence of that in

7   Mrs. Hyde's case?

8   A.  I would agree there is no evidence that it penetrated

9   through the heart.

10  Q.  And you also said that the strut may cause some sort of

11  issue with the conduction center of the heart.  Do you recall

12  that?

13  A.  Arrhythmias, yes.

14  Q.  And would you agree that there's no evidence of that

15  occurring in Mrs. Hyde's case?

16  A.  Post-retrieval or while she had the --

17  Q.  Post-retrieval.

18  A.  Post-retrieval, I don't think there's any permanent damage

19  that I know about, but that's, again, not -- that's kind of

20  outside my area of expertise, chronic damage to the heart.

21  Q.  And you also mentioned the possibility of experiencing

22  arrhythmias.  Do you recall that?

23  A.  Yes.

24  Q.  And would you agree that we have no evidence that Mrs. Hyde

25  has experienced any arrhythmias?

1    A.  I don't know if she's experiencing arrhythmias beyond

2    what -- after her retrieval.  I have no idea.

3    Q.  And let me talk to you a little bit, too, about some of the

4    things that you said were risks if a filter penetrates through

5    the cava.  Do you recall that?

6    A.  Yes.

7    Q.  And one of the things you said, that it can interact with

8    the bowel.  Do you remember that?

9    A.  Yes.

10   Q.  And would you agree with me there's no evidence in

11   Mrs. Hyde's case that her filter interacted with her bowel?

12   A.  I agree.

13   Q.  And would you agree with me there's no evidence in this

14   case that Mrs. Hyde's filter interacted with any muscles in her

15   back?

16   A.  I agree.

17   Q.  And would you agree with me that there's no evidence in

18   this case that Mrs. Hyde's filter interacted with her urinary

19   tract?

20   A.  I agree.

21   Q.  And would you agree that there is no evidence in this case

22   that Mrs. Hyde experienced a pseudoaneurysm because of her

23   filter?

24   A.  That's true.

25   Q.  Doctor, let me ask you a little bit more about your

1   background and your kind of experience as an expert witness.

2          Am I correct that you first started doing expert

3   witness work in 2014?

4   A.  Yes.

5   Q.  And so you had been in practice for about 15 years or so?

6   A.  That's correct.

7   Q.  And, Doctor, since then, am I right that you have been an

8   expert in at least 20 medical malpractice cases?

9   A.  At least, yes.

10  Q.  And am I correct that the majority of the work that you

11  have done in those medical malpractice cases has been for

12  plaintiffs who are suing for personal injury?

13  A.  I would say it's about 80 percent.

14  Q.  And am I correct that all of the testimony that you have

15  given in either a deposition or at trial has always been on

16  behalf of the plaintiff in a personal injury case?

17  A.  That's right.  My defendant cases haven't gone to court.

18  Q.  And, Doctor, you've got a business that you've created for

19  your expert witness consulting; correct?

20  A.  Correct.

21  Q.  And I believe that's called Tristate Medical Legal

22  Consulting; is that right?

23  A.  Yes.  I do some consulting outside of trial testimony and

24  expert witness.

25  Q.  And you have a LinkedIn page; correct?

```
 1    A.  I do.  Yes, I do.

 2    Q.  And am I correct that you have a mention of your medical

 3    legal consulting business on your LinkedIn page?

 4    A.  I do, yes.

 5    Q.  And is the purpose of that, Doctor, so that if an

 6    attorney's out there are looking for an expert witness on

 7    LinkedIn, that he may find you or she may find you?

 8    A.  No.  The purpose is more so that people who want

 9    consultation in practice management, and specifically vein

10    practice management and practice building and marketing can

11    contact me.

12    Q.  And have you received any contacts from lawyers through

13    that source?

14    A.  Not through LinkedIn, no.

15    Q.  Okay.  But am I right, Doctor, that you also list yourself

16    on expert witness referral sources?

17    A.  Just one, yes.

18    Q.  Okay.

19             THE COURT:  We're going to break at --

20    BY MR. ROGERS:

21    Q.  And what's the name of the --

22             THE COURT:  Hold on, counsel.  We're going to break at

23    this time.

24             It's 10:30, ladies and gentlemen, so we'll take a

25    15-minute break.  We will resume at 10:45.
```

1              Please remember not to discuss the case, and we will

2    see you then.

3              (Recess taken, 10:30 a.m. to 10:44 a.m.)

4              THE COURT:  You may continue, Mr. Rogers.

5              MR. ROGERS:  Thank you, Your Honor.

6              Can everybody hear me okay?

7    BY MR. ROGERS:

8    Q.  Dr. Hurst, before we took the morning break, we were

9    starting to talk about some of the specifics about the expert

10   witness work that you have done.

11             And I believe we were starting to talk about you

12   listing yourself with some expert witness referral services.

13   Do you recall that?

14   A.  Just one, yes.

15   Q.  And the one that you list yourself with is a company called

16   SEAK?

17   A.  Yes.

18   Q.  Is that right?

19   A.  Yes.

20   Q.  And that's S-E-A-K?

21   A.  Correct.

22   Q.  And, Doctor, have you also accepted legal work through a

23   company called Experts by Experts?

24   A.  I did one case from them, yes.

25   Q.  And the name of that case was *Fish versus Diallo*; is that

1   correct?

2   A.  Yes.

3   Q.  And am I right that if you accept work through Experts by

4   Experts, they take a 20 percent cut of your fees; is that

5   correct?

6   A.  I think it was 10 or 20, yeah.  It was -- yes.

7   Q.  Okay.  Thank you.

8           And the listing that you have with the SEAK expert

9   directory, is that something you pay to do?

10  A.  Yes.

11  Q.  And I believe you pay $600 a year in order to have that

12  listing?

13  A.  Yes.

14  Q.  And am I correct that the SEAK company does more than just

15  list expert witnesses, they also offer services like books and

16  classes for people who want to be experts?

17  A.  Yeah.  They offer training, yes.

18  Q.  And I believe you've purchased a book from the SEAK company

19  about being an expert witness; is that correct?

20  A.  Yes.  I thought it was important, yeah.

21  Q.  And, Doctor, would you agree with me that the SEAK

22  directory is a way for people who want to be experts to market

23  themselves?

24  A.  Absolutely, yeah.  So that -- it's a place where lawyers

25  can find expert witnesses, yes.

1   Q.  And, Doctor, I have with me -- is this the current 2019

2   SEAK expert directory?

3   A.  Sure looks like it, yes.

4   Q.  And this is what you pay to list yourself in; is that

5   right?

6   A.  Correct, yes.

7   Q.  And, Doctor, am I right that you have got three separate

8   entries in this book?

9   A.  For states, yeah.  Three states, yes.

10  Q.  I understand.  And so you've got --

11  A.  It goes by state, yeah.

12  Q.  -- one entry for Kentucky; is that right?

13  A.  Correct.

14  Q.  And you have a second entry for --

15  A.  Indiana.

16  Q.  -- Indiana; is that right?

17  A.  Yes.  And the next -- and the other one is for Ohio,

18  where -- those are the three states where I'm licensed as a

19  physician and where our practice covers.

20  Q.  Thank you.

21          So your third listing is for Ohio; is that correct?

22  A.  Yes.  Yeah.

23  Q.  And am I correct, Doctor, that the only state that you

24  admit and treat patients is Ohio?  That's the only state?

25  A.  The only --

1    Q.  Excuse me, Kentucky.  Forgive me.

2    A.  The only state where we admit and treat patients is

3    Kentucky, yes.  We cover a hospital in Indiana as well.

4    Q.  Right.  But you don't --

5    A.  We don't do -- but this is -- we just took over the

6    practice for that hospital six months ago.  We are in

7    negotiations for call coverage and IR coverage, so yes,

8    we'll -- eventually Indiana.

9    Q.  And, but that hasn't happened yet?

10   A.  No, not yet.

11   Q.  All right.  But you're listed in all three states in this

12   expert witness directory; correct?

13   A.  Right.

14   Q.  And you only treat and perform procedures on patients in

15   one state, and that's Kentucky?

16   A.  Correct.

17   Q.  Doctor, in addition to this physical book, am I correct

18   that the SEAK service also has got a website?

19   A.  Yes.

20   Q.  And so if I'm a lawyer looking for an expert, I can go on

21   that and try and find an expert; is that right?

22   A.  Absolutely.

23   Q.  And you're on their website as well; correct?

24   A.  Yes.

25   Q.  And, Doctor, did you write the description of your

1  expertise that appears on that website?

2  A.  I did.

3  Q.  And did you think it was important to include all the

4  information about you that you would want lawyers to know

5  about?

6  A.  Sure.  When you're -- yeah.  Yeah.

7  Q.  And, Doctor, is one of the areas of expertise that you

8  include on the SEAK website called expertise in IVC filter

9  product liability cases?

10  A.  Yes.

11  Q.  And that's a description that you wrote?

12  A.  It is.

13  Q.  And that's the type of case that we're here for today;

14  correct?

15  A.  That's correct.

16  Q.  And did you think it was important for lawyers who might be

17  looking for an expert witness in an IVC filter product

18  liability case to know about you?

19  A.  Yeah.

20          MR. O'CONNOR:  Objection.

21          THE WITNESS:  Absolutely.

22          MR. O'CONNOR:  Calls for speculation.

23          THE COURT:  Overruled.  Overruled.

24          THE WITNESS:  Yeah.

25

1    BY MR. ROGERS:

2    Q.  The answer is yes?

3    A.  Yes, yeah.

4    Q.  Okay.  Thank you.

5            And, Doctor, let's do talk a little bit more about

6    your experience with IVC filters.  Am I right that you have

7    never published an article on IVC filters?

8    A.  No.

9    Q.  And you've never published any books or book chapters about

10   IVC filters?

11   A.  No.  I'm a private practice physician.  I practice in a

12   large tertiary care medical center.  The research that we do is

13   predominantly registry based.  We submit patients to larger

14   studies.  My practice is so busy that I don't have time to

15   write papers.

16   Q.  So I'm correct that you've never published on IVC filters?

17   A.  I've never published on IVC filters.  I have published

18   papers, but not on IVC filters.

19   Q.  Thank you.

20           And, Doctor, you've never designed an IVC filter;

21   correct?

22   A.  I have not.

23   Q.  And you've never worked for a medical device company?

24   A.  No.

25   Q.  And so you have no experience whatsoever in the process

1    that is necessary in order to design an IVC filter and bring it

2    to market?

3    A.  I have no personal experience, no.

4    Q.  And, Doctor, you are a member of an organization called the

5    Society of Interventional Radiology; correct?

6    A.  I am.

7    Q.  And that's composed of doctors like yourself who are

8    interventional radiologists?

9    A.  Correct.

10   Q.  And that group has meetings from time to time; is that

11   correct?

12   A.  Yes.

13   Q.  And that would include an annual meeting every year where

14   all the members are invited?

15   A.  Correct.

16   Q.  And, Doctor, am I right that you have never given any

17   presentations at the SIR meetings about IVC filters?

18   A.  No.

19   Q.  And have you ever given a presentation at an SIR meeting?

20   A.  No.  I presented at R, S and A, which is a larger meeting.

21   Q.  Thank you.

22        And, Doctor, within this group, the SIR, is there

23   something that you can become called a fellow?

24   A.  Yes.

25   Q.  And that would be a fellow of interventional radiology?

 1    A.  Well, no.  It's not a fellow.  A fellow -- so there's two

 2    uses of the word "fellow."  So there's a fellow in

 3    interventional radiology who is doing a fellowship.  That means

 4    you're in advanced subspecialty training in interventional

 5    radiology.

 6           And then you can become a fellow, which is a

 7    designation that the Society of Interventional Radiology has.

 8    It's predominantly, about 90 percent of it is academic

 9    physicians, and it's based on articles published, number of

10    articles published and years in an academic institution.  There

11    are very few private practice physicians who are given fellow

12    status, mainly because one of the criteria is the number of

13    papers that you have to submit.

14    Q.  And, Doctor, am I right that only about 5 percent of the

15    members of the SIR are deemed fellows?

16    A.  Yes.  It's small.

17    Q.  Is it an honor to be deemed a fellow by that organization?

18    A.  Yeah, absolutely.

19    Q.  And you have never been through that vetting process to

20    become a fellow; correct?

21    A.  Again, I wouldn't qualify.  I'm not an academic physician.

22    I don't work in an academic hospital, and I don't -- not

23    tenured.  I don't have to produce papers for tenure or anything

24    like that.

25    Q.  And it's your testimony today that unless you're an

1    academic, you cannot become a fellow of the SIR?

2    A.  That is not entirely true.  I mean, you can.  There are

3    different ways, through community service, teaching, other ways

4    to become a fellow.  But predominantly, it is based on being an

5    academic physician and journals, articles.

6    Q.  Doctor, you've never held any positions in the SIR; is that

7    correct?

8    A.  No, I have not.

9    Q.  Let me shift gears and talk a little bit about something

10   you covered, and that was how you charge for your time.

11           And, Doctor, I believe you said that you charge $500

12   an hour to review records; is that right?

13   A.  That's correct.

14   Q.  And if you have to give a deposition in a case, you also

15   charge for that?

16   A.  Yes.  $750 an hour.

17   Q.  And am I right, Doctor, that in 2016, you increased your

18   hourly fee for depositions from $600 an hour to $750 an hour?

19   A.  Correct.  Because it takes more time away from my practice

20   during the day when I can be seeing patients.

21   Q.  And you felt that justified the increase in raising your

22   rates, so to speak?

23   A.  Yes, uh-huh.

24   Q.  And, Doctor, let me ask you one time -- one more time:  Is

25   it your testimony today that the reason you changed your fee

1    was because it takes more time being away from your practice;

2    is that correct?

3    A.  Yes.

4    Q.  All right.  And, Doctor, do you recall a case called *Alley*

5    *versus Tulsa X-Ray*?

6    A.  Vaguely.

7    Q.  And that was a medical malpractice case in Oklahoma that

8    you were involved in; do you recall that?

9    A.  Okay.

10   Q.  And do you remember giving a deposition in that case?

11   A.  Vaguely, yes.  I think it was a few years ago.

12          MR. ROGERS:  Can we pull that up, please?  That's from

13   March 15th, 2016.

14          And, Scott, if you would, can you go to page 9,

15   line 18.

16   BY MR. ROGERS:

17   Q.  Doctor, can you see this testimony?

18   A.  Yes.

19   Q.  And you would agree with me that when you gave this

20   testimony, you were under oath just as you are today; correct?

21   A.  Yes.

22   Q.  And you would agree with me that you were obligated to tell

23   the truth; right?

24   A.  Right.

25   Q.  Just like what you're telling this jury today; correct?

1    A.  Yes.

2    Q.  And if you read along with me on page 9, beginning at

3    line 18, do you see that?

4    A.  I do.

5    Q.  And the question is:  How much do you charge for giving

6    depositions?

7           And was your answer $750?

8    A.  Correct.

9    Q.  And next question:  From reading your previous two

10   depositions, the price went up?

11          And your answer was yes?

12   A.  Yes.

13   Q.  And next question:  When did it go up?

14          And your answer is:  I had a discussion with a friend

15   of mine who's a malpractice attorney.

16          Did I read that correctly?

17   A.  That's correct.  I had a discussion with a friend of mine

18   who said, "You should be charging more if you're away from your

19   clinic."

20   Q.  Okay.  Well, let's continue on.

21          And the next question is:  So when did it go up?

22          Is that correct?

23   A.  Yes.

24   Q.  And your answer:  I think it went up two months ago, three

25   months ago.

```
 1              Is that correct?
 2   A.  Right.
 3   Q.  And next question:  One of the depositions you've
 4   previously given was this past January.
 5              And you responded:  Right.
 6              Correct?
 7   A.  Correct.
 8   Q.  And next question is:  And the fee went up since then?
 9              And your answer is:  Correct.
10   A.  Yes.
11   Q.  And the next question is:  Does the fee for record review,
12   has it changed as well?
13   A.  No.
14   Q.  Right.  And you responded:  No.
15              And then at line 13, the next question is:  So your
16   friend who is a malpractice attorney, he advised you that you
17   were cheap?
18              And your response was:  Yes.
19              Correct?
20   A.  Correct.
21   Q.  Thank you, Doctor.
22              And what are you charging to appear in court today?
23   A.  6,000.
24   Q.  And is that a fee that you charge for the entire day?
25   A.  Yes.
```

1    Q.  And did you charge that same $6,000 fee for traveling out

2    here?

3    A.  That includes the travel out here, but it's basically by

4    half day.  So if I have to leave my practice for a half day,

5    it's 3,000.  So I left yesterday, Cincinnati, Ohio, at, you

6    know, 3:00 in the afternoon or 4:00 in the afternoon.  And so

7    that will be a $3,000 charge, and then today I will be here the

8    whole day.  I will likely get home at somewhere -- if I can get

9    a flight out, sometime after midnight.  And so that will be

10   $6,000 for today.

11   Q.  So that will be a charge of at least $9,000?

12   A.  $9,000, yes.

13   Q.  Correct?

14        And if you couldn't get out today, are you going to

15   charge again for tomorrow?

16   A.  Yeah, probably.

17   Q.  Okay.  And would you charge the 3,000 or the 6,000?

18   A.  I would charge the 3,000 because it would be a half day.

19   Q.  All right.  Thank you.

20        And, Doctor, let me follow up again on a different

21   line of questioning.  I believe you testified that you

22   currently place a Bard filter called the Denali filter; is that

23   right?

24   A.  Yes, I do.

25   Q.  And when is the last time you implanted a Bard Denali

1   filter?

2   A.  I would say it's probably about three or four weeks ago.

3   Q.  And do all the facilities where you implant filters, do

4   they all keep Bard filters in stock?

5   A.  Yes.  That is our retrievable filter.

6   Q.  And am I correct that you testified on direct examination

7   that you were on something called a product committee or

8   product assessment committee?

9   A.  I'm the chair of our product committee for interventional

10  radiology and vascular surgery, yes.

11  Q.  And I believe you stated that you vet products as part of

12  that process with that committee?

13  A.  We do, yes.

14  Q.  And the Denali filter has been through this vetting process

15  with your committee?

16  A.  Yes, it has.

17  Q.  And, Doctor, when you first became involved in this

18  litigation, were you using the Bard Denali filter?

19  A.  Yes.

20  Q.  And you haven't stopped; is that correct?

21  A.  We have not.

22  Q.  And you never stopped; is that right?

23  A.  We did not stop using the Denali device because the Denali

24  device as a retrievable filter, the way we use it, we don't

25  leave it in the patient as a permanent device.  The

1   modifications that were made to the device over the series of

2   devices from the original Recovery device through the G2, the

3   G2X, the Eclipse, and the Meridian, each one of those devices,

4   as problems were coming up, they were making changes.

5           And the Denali filter as a retrievable device is an

6   acceptable device based on how we use it.  We don't leave it in

7   the patient for longer than three months, usually.  And if the

8   patient does need a permanent device, we will retrieve that

9   Bard filter to get it out of the patient and put in a permanent

10  device.

11  Q.  And, Doctor, let me ask you one more time:  Was there a

12  point when you became involved in this litigation that you

13  stopped using the Denali filter?

14  A.  No, I never stopped using it.  I mean, we sometimes use the

15  Gunther Tulip as an alternative device.  And some of that may

16  have been based on stocking.  But I don't think I ever stopped

17  completely using it.

18          MR. ROGERS:  Can we pull up Dr. Hurst's prior

19  testimony from August 9, 2016?  Excuse me, August 19, 2016.

20  And can you go to page 32, please.

21          And, Doctor -- excuse me.  Not Doctor.  I'm sorry.

22          Your Honor, may I publish lines 32, line 17, to

23  page 33, line 3?

24          THE COURT:  To the witness?

25          MR. ROGERS:  To the jury.  Well, I would like to

 1    publish it in video format, if I can.

 2            THE COURT:  Oh, you mean display it?

 3            MR. ROGERS:  Yes, Your Honor.

 4            THE COURT:  Let's talk about that for a minute,

 5    counsel.

 6            You can stand up, ladies and gentlemen.

 7            (At sidebar on the record.)

 8            THE COURT:  Is that a deposition in this case?

 9            MR. ROGERS:  No, sir, it's not in the MDL.  It is in a

10    filter case, called the Austin case.

11            THE COURT:  Okay.  Is there an objection?

12            MR. O'CONNOR:  Yes.

13            THE COURT:  What's the basis?

14            MR. O'CONNOR:  Well, you haven't allowed us to publish

15    testimony to the jury in any of these cases.  I mean --

16            THE COURT:  Well, I have on cross-examination with

17    depositions taken in the case.

18            MR. O'CONNOR:  You've allowed us to cross them and

19    read them, but you have not allowed us --

20            THE COURT:  Yeah.  We play deposition excerpts during

21    cross in trials.

22            MR. ROGERS:  It happened in Booker.

23            THE COURT:  I know that's happened, but this isn't a

24    deposition in this case?

25            MR. ROGERS:  It was not taken in the MDL, Your Honor.

 1   It was taken in a state court case.

 2          THE COURT:  Okay.  So what's the basis for your

 3   objection?

 4          MR. O'CONNOR:  My objection is it was a state court

 5   case.  It's irrelevant to any testimony he gives in this case,

 6   the MDL.

 7          THE COURT:  Well, it's clearly not irrelevant, I mean,

 8   if it's testimony he's given on a filter issue.  So I don't

 9   think irrelevancy works.

10          MR. LOPEZ:  That's going to open the door.  He's going

11   to be able to talk about that case then.

12          MR. O'CONNOR:  Yeah, I mean, that is a problem.  They

13   want to impeach them under the cases you've restricted us to,

14   not allowing them to talk about other litigation.  It puts us

15   in a bind.  It puts this expert in a bind.  I mean, Austin I

16   think was one of the early ones that he became involved in in

17   this case, and --

18          THE COURT:  What is the rule under which you want to

19   play the deposition?

20          MR. ROGERS:  I'd like to impeach him, Your Honor.

21   And --

22          THE COURT:  What's the impeachment?

23          MR. ROGERS:  The impeachment is he -- and, I'm sorry,

24   he's sitting here listening to me talk.  But the impeachment is

25   he is --

```
 1              THE COURT:  He can't hear you with --
 2              MR. ROGERS:  Well, he's looking at me.
 3              But he just testified on the stand completely contrary
 4    to what he testified to in this deposition.
 5              THE COURT:  On what?  That he stopped using the
 6    Denali?
 7              MR. ROGERS:  Yes, sir.  Yeah.
 8              THE COURT:  So --
 9              MR. ROGERS:  He testified in the deposition he stopped
10    using the Denali filter because of what he learned in this
11    litigation.
12              THE COURT:  Okay.  So Rule 613(b) says:  Extrinsic
13    evidence of a witness's prior inconsistent statement is
14    admissible only if the witness is given an opportunity to
15    explain or deny the statement and an adverse party is given an
16    opportunity to examine the witness about it, or if justice
17    requires.
18              But -- well, 613(a) says -- well, that's about
19    cross-examining on a statement.
20              So they can introduce extrinsic evidence of a prior
21    inconsistent statement.  You get the chance to question him
22    about it.  That's what this appears to be.
23              Is there any basis for your objection of its
24    admissibility or its use under 613(b)?
25              MR. O'CONNOR:  Well, I don't have the rule in front of
```

1   me, but from what you read, I agree.  But the problem is, Your

2   Honor, is they do this and then they want to limit him

3   explaining what the case was, what the circumstances of that

4   case was, and it's a whole different case.

5           He has testified in a number of Bard cases.

6           THE COURT:  Well, I would agree with that if what he

7   was doing was giving an opinion about the other case, like

8   about a filter.  But if he's talking about his practice of

9   using Denali filters, that's not specific to a case.  That's

10  his practice.

11          MR. O'CONNOR:  Well, I haven't looked at the

12  testimony.  I was unaware that they were going to do this

13  today.  I don't know.  Did you disclose that as an impeachment?

14          MR. ROGERS:  I'm not obligated to disclose

15  impeachment.

16          THE COURT:  He's not obligated to disclose

17  impeachment.

18          MR. O'CONNOR:  Well, they didn't list this to us last

19  night that they were going to use this with this witness.  I

20  mean, if it's just for something he said about his use of the

21  Denali, I don't see that we can stop him from doing that under

22  that rule.

23          MS. REED ZAIC:  He gets to explain --

24          THE COURT:  Gets to explain what?

25          MR. LOPEZ:  It says he has an opportunity to explain

 1    that.

 2              THE COURT:  To explain the inconsistent statement?

 3              MR. LOPEZ:  Right.  Right.

 4              THE COURT:  I agree with that.  But I don't think it

 5    opens the door to him testifying about the Austin case.

 6              MR. LOPEZ:  I don't know if it does.  Maybe part of

 7    his explanation has to do with -- I don't know.

 8              THE COURT:  My view is it won't unless he starts -- if

 9    he's asked something about the Austin case.  If he's asked

10    about his practice on Denali, my view is that doesn't open up

11    the Austin case.

12              So I'm going to overrule the objection.

13              MR. LOPEZ:  Thank you, Your Honor.

14              (End of discussion at sidebar.)

15              THE COURT:  Thanks for your patience, ladies and

16    gentlemen.

17              MR. ROGERS:  Can you pull the testimony back up,

18    please?

19              And, Your Honor, may I publish this testimony via

20    video deposition?

21              THE COURT:  Yes.

22              MR. ROGERS:  Thank you, Your Honor.

23              These are the words.  I want to publish the video

24    deposition.

25              Okay.  Your Honor, I apologize.  We don't have the

 1  video loaded, so that's my bad.

 2          THE COURT:  Okay.  Then what you can do is have him

 3  look at the transcript and you can ask him about it.

 4          MR. ROGERS:  Thank you, Your Honor.

 5  BY MR. ROGERS:

 6  Q.  Dr. Hurst, do you agree that the first question in this

 7  deposition is:  Did you stop using the Bard Denali filter?

 8          And your response is:  Yes.

 9          Correct?

10  A.  Correct.

11  Q.  And next question:  When did you stop using the Bard Denali

12  filter?

13          And your answer was:  Two months ago.

14          Correct?

15  A.  Correct.

16  Q.  Next question:  What caused you to stop using the Bard

17  Denali filter two months ago?

18          And your answer was:  My involvement in this case,

19  what I've learned about retrievable filters and the behavior of

20  conical retrievable filters, especially the Bard devices.

21          Did I read that correctly?

22  A.  Correct.  And we did stop using the Bard Denali filter as a

23  permanent device.  That's what I meant by that.

24  Q.  And just to call your attention to your testimony, did I

25  read it correctly where you said "I've learned about

1    retrievable filters and the behavior of conical retrievable

2    filters, especially the Bard devices"?

3    A.  Correct.  I learned how retrievable devices cannot be used

4    as a permanent device.

5    Q.  And you continue to use the Bard Denali filter as a

6    retrievable device today?

7    A.  Yes.

8    Q.  Thank you.

9           Doctor, you gave some testimony in your direct

10   examination with Mr. O'Connor about some Bard documents.  Do

11   you recall that?

12   A.  I do.

13   Q.  And do you also recall writing a report in this case?

14   A.  Yes, of course.

15   Q.  And your report was signed by you on June the 2nd, 2017; is

16   that right?

17   A.  Yes.

18   Q.  And when you wrote that report, were you trying to give as

19   complete a picture and as accurate a picture of your opinions

20   in this case?

21   A.  With the available evidence, yes.

22   Q.  And am I correct that when you wrote that report, you

23   identified somewhere between 20 and 25 Bard documents; is that

24   right?

25   A.  That's correct.

 1   Q.  And so you rendered your opinions in this case based on

 2   those 20 to 25 documents; is that right, Doctor?

 3   A.  Well, I don't think that's entirely true.  I've been

 4   involved in several of these cases, and I've reviewed many.

 5            MR. ROGERS:  Objection, Your Honor.  The witness is --

 6            THE COURT:  Well, I think you shouldn't describe other

 7   cases, but I think he can respond fairly to what he has been

 8   exposed to as the basis for --

 9            MR. ROGERS:  Thank you, Your Honor.

10            THE WITNESS:  In the course of reviewing multiple

11   cases, I've reviewed many, many, many Bard documents, some of

12   which might not be included in that list.

13   BY MR. ROGERS:

14   Q.  And am I correct when you prepared your opinions in

15   Mrs. Hyde's case, the case we're here for today, you identified

16   these 20 to 25 documents; is that right?

17   A.  I did, yes.

18   Q.  And am I correct that those documents were provided to you

19   by plaintiffs' counsel?

20   A.  Those documents were part of a large Dropbox, a repository

21   of information from this case.  There's over a million

22   documents in this case that are available.

23   Q.  And, Doctor, when you wrote your opinion in 2017, you did

24   not have access to that Dropbox, did you?

25   A.  I don't know.

1   Q.  Well, you certainly didn't include anything about a Dropbox

2   or thousands of pages of documents in your report in this case

3   involving Mrs. Hyde, did you?

4   A.  I did not.

5   Q.  And, Doctor, you felt comfortable rendering all your

6   opinions based on these 20 to 25 documents that were provided

7   to you by plaintiffs' counsel; is that correct?

8   A.  I don't -- no, that's not correct.  I just said that I've

9   probably reviewed hundreds and hundreds of Bard documents.

10  Q.  I'm hearing you, Doctor, but when you wrote your report in

11  this case about Mrs. Hyde, you didn't identify any of those

12  documents --

13  A.  I didn't --

14          (Court reporter clarification.)

15          THE COURT:  Let's not interrupt each other.

16          Ask the question again.

17  BY MR. ROGERS:

18  Q.  Doctor, when you wrote this report, you only identified 20

19  to 25 Bard documents that you had reviewed; true?

20  A.  I identified 25 documents in the report.

21  Q.  All right.  Thank you.

22          And, Doctor, am I correct that you implant other IVC

23  filters besides Bard filters?

24  A.  Yes.

25  Q.  And you currently implant a filter called the VenaTech

1    filter; is that right?

2    A.  I do.

3    Q.  And you currently implant a filter called the Gunther

4    Tulip?

5    A.  I do.

6    Q.  And am I right that you have never seen any internal

7    documents from any other filter manufacturer other than Bard?

8    A.  I have never seen any documents from other -- other than

9    Bard.

10   Q.  And is that true for any medical device that you use in

11   your practice?

12   A.  Not necessarily true.  There are times when we go to Boston

13   Scientific and they do reveal documents to us about new

14   products.

15   Q.  And is that when you're a consultant for that company?

16   A.  No.  That's when I'm a physician learning about devices.

17   Q.  All right.  But as far as IVC filters are concerned, you've

18   never seen any internal documents of any company other than

19   Bard; is that right?

20   A.  Correct.

21   Q.  And you have no earthly idea what is in any internal

22   document from any other filter manufacturer; is that true?

23   A.  That's true.

24   Q.  And you've never seen any internal documents that relate to

25   the Gunther Tulip or to the VenaTech filter; is that right?

1    A.  I have not.

2    Q.  And you feel comfortable using those products; correct?

3    A.  I feel comfortable using those products, yes.

4    Q.  Doctor, kind of a few silly questions, so forgive me.

5            But the G2X and the Eclipse filters could be either

6    left in permanently or retrieved at the election of the doctor;

7    correct?

8    A.  Yes.  That's how they were marketed.

9    Q.  And if you place a permanent filter like the Simon Nitinol

10   filter, it is intended to remain in the patient for the

11   patient's life; is that correct?

12   A.  That is correct.

13   Q.  And, Doctor, would you agree with me that all IVC filters

14   have risks?

15   A.  All medical devices have risks, yes.

16   Q.  And that's true of IVC filters; correct?

17   A.  Yes, it is.

18   Q.  And with regard to IVC filters, would you agree that all

19   current retrievable filters can fracture?

20   A.  Yeah.  Yeah, they can.

21   Q.  And would you agree with me that all IVC filters, both

22   permanent and retrievables filters, can perforate or penetrate

23   the walls of the IVC?

24   A.  Correct.

25   Q.  And would you agree that the Gunther Tulip, another

 1   retrievable filter that you implant currently, can also migrate

 2   caudally?

 3   A.  Yes, it can migrate caudally.

 4   Q.  And would you agree that the Gunther Tulip can also tilt

 5   from time to time?

 6   A.  It's a conical device, yes.  It's shaped like a cone, so it

 7   can tilt.

 8   Q.  And, Doctor, you implant IVC filters knowing that they have

 9   the potential to tilt, caudally migrate, perforate the IVC

10   wall, and fracture; is that right?

11   A.  Yes.

12   Q.  And when you implant an IVC filter, do you do it in order

13   to provide a potential benefit to your patient?

14   A.  Yes.

15   Q.  And is that true of the Bard Denali filter that you

16   currently implant?

17   A.  Yes.

18   Q.  And the benefit is to potentially save the patient's life

19   if they're at high risk of pulmonary embolism; is that true?

20   A.  Potentially, yes.  You could block PE, yes.

21   Q.  And do you need to make an individual determination,

22   patient by patient, based on that patient's individual medical

23   history if the potential benefits of the device outweigh the

24   potential risks?

25   A.  Yes.  That's the informed consent process.

1   Q.  Doctor, let's talk a little bit more about some of these

2   complications that you talked about, or potential

3   complications.

4          And would you agree with me that the fracture of an

5   IVC filter can be an asymptomatic event?

6   A.  Yes, fracture can be, especially if it stays right where --

7   especially if it doesn't move, yes.

8   Q.  And by asymptomatic, it would mean that it doesn't cause

9   the patient any symptoms?

10  A.  Correct.

11  Q.  And would you also agree with me that penetration of the

12  IVC by a filter can also be an asymptomatic event?

13  A.  Yes, it can.

14  Q.  And can tilt be an asymptomatic event?

15  A.  Absolutely.

16  Q.  And can caudal migration be an asymptomatic event?

17  A.  Yes.

18  Q.  And, Doctor, would you agree that all medical devices,

19  including IVC filters, can be made safer?

20  A.  Yes.

21  Q.  And do you think that that's something a company should

22  strive to do?

23  A.  Absolutely.

24  Q.  Doctor, let's turn our attention specifically to Mrs. Hyde,

25  if that's okay.

1    A.  Sure.

2    Q.  And you would agree with me that Mrs. Hyde was an

3    appropriate patient to receive an IVC filter when she got it in

4    2011; correct?

5    A.  Yes.

6            MR. ROGERS:  And if you would, can we pull up

7    Exhibit 8695, please?

8            And, Your Honor, I'll move this into evidence.

9            THE COURT:  Any objection?

10           MR. O'CONNOR:  No objection.

11           THE COURT:  Admitted.

12           (Exhibit No. 8695 admitted into evidence.)

13           MR. ROGERS:  May we publish, Your Honor?

14           THE COURT:  Yes.

15   BY MR. ROGERS:

16   Q.  And, Doctor, is this up on your -- on the jury's screens?

17           JURY MEMBER:  Yes.

18   BY MR. ROGERS:

19   Q.  Doctor, this is a medical record that relates to Mrs. Hyde;

20   correct?

21   A.  Yes.

22   Q.  And you would agree with me that this is the record from

23   her admission to the emergency department on February the 24th,

24   2011; right?

25   A.  Correct.

1    Q.  And this is one of the records that you reviewed when you

2    were writing your report in this case; right?

3    A.  That is correct.

4    Q.  And, Doctor, would you agree with me at the time -- let's

5    see.  I'm going to get to pull out a little bit of language

6    here.

7    A.  Uh-huh.

8           MR. ROGERS:  If we would pull out that first

9    paragraph, please.

10   BY MR. ROGERS:

11   Q.  And can you see that okay, Doctor?

12   A.  Yes.

13   Q.  And, Doctor, would you agree with me that Mrs. Hyde was

14   identified at this point as a 46-year-old female; is that

15   right?

16   A.  Yes.

17   Q.  And she had right thigh pain; is that true?

18   A.  According to this document, yes.

19   Q.  And she had shortness of breath and dyspnea; is that right?

20   A.  Yes.

21   Q.  And can you explain for the jury what dyspnea is?

22   A.  It's basically saying shortness of breath again, but yes.

23   Q.  Does it imply any sort of pain with breathing?

24   A.  Usually not.  Maybe a little bit, but -- yeah.

25           MR. ROGERS:  Okay.  Thank you.  You can pull that part

1    down.

2              And let's go to the next paragraph, please, and if you

3    would pull that out.

4    BY MR. ROGERS:

5    Q.  And, Doctor, this next paragraph, does it describe some of

6    the patient's history with similar events?

7    A.  Yes.

8    Q.  And would you agree with me that the record says that the

9    discomfort she had in the right thigh was similar to pain that

10   she had in the past with a history of DVT; is that right?

11   A.  That's correct.

12   Q.  And, Doctor, would you agree that the next line says:

13   Patient states that she had this discomfort, but she's never

14   had it in the thigh.

15             Is that right?

16   A.  Yes.

17   Q.  And does the record go on to say that she had had a history

18   of DVT twice in the past; is that right?

19   A.  Yep.

20   Q.  And the first DVT was about 22 years ago; is that correct?

21   A.  Yes.

22   Q.  And it was presumed to be associated with birth control

23   pills; correct?

24   A.  Correct.

25   Q.  And, Doctor, is there a known association between birth

1    control pills and experiencing blood clots?

2    A.  Yes.

3    Q.  And the next one indicates that about two years ago, she

4    had a recurrent DVT and PE noted on the CT scan.  Is that

5    right?

6    A.  That is right.

7    Q.  And that would have been in about 2009; is that correct?

8    A.  Yeah.

9    Q.  And does it indicate that the DVT and PE in 2009 were

10   treated with anticoagulants?

11   A.  Yes, it does.

12   Q.  And, Doctor, on this day, did the treating doctors --

13           MR. ROGERS:  And we can pull this down.  Thank you.

14   BY MR. ROGERS:

15   Q.  -- did they perform a CT scan on Mrs. Hyde?

16   A.  They did.

17   Q.  And that's an image that you reviewed in preparing your

18   opinions in this case; correct?

19   A.  I did.

20   Q.  And, Doctor, would you agree with me that that CT scan

21   showed that Mrs. Hyde had pulmonary embolism in both her right

22   lung and her left lung?

23   A.  It did.

24   Q.  And would you agree with me that the pulmonary embolism in

25   her right lung was large?

1    A.  It was pretty good size, yes.  Moderate, yeah.

2    Q.  Moderate?

3              MR. ROGERS:  Can we pull up Exhibit 8694, please.

4    BY MR. ROGERS:

5    Q.  And, Doctor, I would --

6              MR. ROGERS:  Your Honor, first let me move this into

7    evidence, please.

8              MR. O'CONNOR:  No objection.

9              THE COURT:  8694 is admitted.

10             (Exhibit No. 8694 admitted into evidence.)

11             MR. ROGERS:  And may we publish?

12             THE COURT:  You may.

13   BY MR. ROGERS:

14   Q.  And, Doctor, you would agree with me that this is the

15   report that the radiologist that read the CT at the hospital

16   where Mrs. Hyde was treated, that this is that doctor's report;

17   correct?

18   A.  That's correct.

19   Q.  And under the section that says Impression, do you see

20   that?

21   A.  It says "large central pulmonary emboli."

22   Q.  Right.  And you don't disagree with the treating doctor's

23   description this was large?

24   A.  I don't disagree with that.

25   Q.  Okay.  Thank you, Doctor.

1          MR. ROGERS:  And can we flip back to the -- well, I

2     don't know that we need to do this.  You can pull that down,

3     please.

4     BY MR. ROGERS:

5     Q.  But when Mrs. Hyde was hospitalized with this PE and DVT,

6     would you agree with me that she was treated with

7     anticoagulants?

8     A.  Yes.

9     Q.  And she received initially intravenous anticoagulants; is

10    that correct?

11    A.  Heparin, yes.

12    Q.  And, let's see.  Hang on.

13          And, Doctor, do you agree that Mrs. Hyde, as part of

14    this hospitalization, was ultimately diagnosed with a clotting

15    disorder?

16    A.  That's correct.

17    Q.  And was the clotting disorder known as protein C

18    deficiency?

19    A.  Yes.

20    Q.  And is that a congenital disorder that Mrs. Hyde was born

21    with?

22    A.  Yes.

23    Q.  And is that going to be a lifelong disorder?

24    A.  Yes.

25    Q.  And would you agree with me that that disorder necessitates

1    that she take anticoagulants for life?

2    A.  Absolutely.

3    Q.  And after she was admitted to the hospital, do you agree

4    that she received an IVC filter the following day?

5    A.  She did.

6    Q.  And would you agree with me that the filter that was

7    implanted was intended to be a retrievable or a temporary

8    filter?

9    A.  I think the filter was -- they placed it -- no, I won't

10   agree with that.  I mean, it was intended to be either

11   retrievable or permanent.  I mean, I don't know that the intent

12   was clearly stated.

13   Q.  As part of your preparation of your report, you said you

14   reviewed some depositions; right?

15   A.  Correct.

16   Q.  And I believe you did not review the deposition of

17   Dr. Henry, the implanting doctor, when you prepared your

18   report; is that correct?

19   A.  I did not have that deposition at that time.

20   Q.  Okay.  Thank you.

21          MR. ROGERS:  And can we pull up Exhibit 8697, please.

22          And, Doctor -- Your Honor, I keep calling you Doctor.

23   I apologize.  But I move this into evidence, please.

24          MR. O'CONNOR:  No objection.

25

UNITED STATES DISTRICT COURT

```
 1    BY MR. ROGERS:

 2    Q.  And, Doctor, do you have this form --

 3               THE COURT:  Hold on.

 4               Mr. O'Connor, is there an objection?

 5               MR. O'CONNOR:  Oh, I said no objection, Your Honor.

 6               THE COURT:  Okay.  A little louder, please.

 7               MR. O'CONNOR:  I will.  Thank you.

 8               THE COURT:  8697 is admitted.

 9               (Exhibit No. 8697 admitted into evidence.)

10               MR. ROGERS:  May we publish?

11               THE COURT:  You may.

12    BY MR. ROGERS:

13    Q.  And, Doctor, would you agree with me that this is one of

14    the records that is part of the procedure that Mrs. Hyde went

15    through prior to receiving her IVC filter?

16    A.  Yes.

17    Q.  And do you see down there at the physician's signature,

18    does it indicate D. Henry?

19    A.  It does.

20    Q.  And that's the doctor that implanted the filter?

21    A.  Yes.

22    Q.  And if we look there up at number 4 where it says

23    Procedure, do you see that?

24    A.  Yes.

25    Q.  And would you agree with me that it says:  Inferior vena
```

1    cavagram and temporary IVC filter?

2    A.  I do.

3    Q.  Thank you.

4           And, Doctor, just to ask you a little bit more about

5    this particular hospitalization --

6           MR. ROGERS:  Can we pull up Exhibit 8512, please.

7           And, Doctor -- Judge, I'm sorry.  I move this into

8    evidence.

9           MR. O'CONNOR:  No objection.

10           THE COURT:  Admitted.

11           (Exhibit No. 8512 admitted into evidence.)

12           MR. ROGERS:  May I publish?

13           THE COURT:  You may.

14   BY MR. ROGERS:

15   Q.  Doctor, would you agree that this is one of the records

16   from the cath lab where Mrs. Hyde's filter was implanted?

17   A.  Yes.

18   Q.  And you see up there at the top, the date is February 25th,

19   2011?

20   A.  It is.

21   Q.  Is that right?

22   A.  Yeah.

23   Q.  And, Doctor, the writing that's on there, would you agree

24   that that came from the original medical record?  It wasn't

25   added later?

1   A.  It looks like it, yes.

2   Q.  And if we look at this, is this a way of monitoring

3   Mrs. Hyde's vital symptoms during this procedure?

4   A.  Yes.

5   Q.  And, for instance, at the very top thing that -- on the

6   left-hand column that says HR, is that heart rate?

7   A.  Yes.

8   Q.  And is this the type of thing that when somebody's

9   undergoing a procedure like the placement of an IVC filter,

10  these vital signs are being monitored throughout the procedure?

11  A.  That's correct.

12  Q.  And, Doctor, if we look at that very first column up at the

13  top, and it's highlighted now, do you see where that says 1305?

14  A.  I do.

15  Q.  And is that military time for 1:05?  Is that right?

16  A.  Yes.

17  Q.  And so would that be 1:05 in the afternoon?

18  A.  Correct.

19  Q.  And so would you agree with me that this procedure to

20  implant Mrs. Hyde's filter began sometime around 1:00 o'clock

21  in the afternoon; is that right?

22  A.  Yes.

23  Q.  And it looks like it concluded somewhere around 1:45; is

24  that correct?

25  A.  That looks like it, yeah.

1              MR. ROGERS:  All right.  You can take that down,

2    please.

3    BY MR. ROGERS:

4    Q.  Dr. Hurst, would you agree that a few weeks after Mrs. Hyde

5    received this IVC filter, that she again reported to the

6    emergency room?

7    A.  Yes.

8    Q.  And did you review those records as part of the preparation

9    of your report?

10   A.  Yes.

11             MR. ROGERS:  And can we pull up, please, Exhibit 8705?

12             And, Your Honor, I move this into evidence.

13             MR. O'CONNOR:  No objection.

14             THE COURT:  Admitted.

15             (Exhibit No. 8705 admitted into evidence.)

16             MR. ROGERS:  May we display?

17             THE COURT:  Yes.

18   BY MR. ROGERS:

19   Q.  And, Doctor, do you agree with me that this is the

20   emergency department chart from where Mrs. Hyde went to the

21   hospital in -- I believe that's March 16th, 2001 [sic]; is that

22   right?

23   A.  It is.

24   Q.  And this would have been about three weeks after she had

25   her IVC filter implanted; is that correct?

1    A.  That's correct.

2    Q.  And when she presented on that day, was she again

3    complaining of chest pain?  Is that right?

4    A.  Yes.

5    Q.  And was a CT scan ordered in order to see what was going

6    on?

7    A.  Yes.

8    Q.  And you reviewed that CT scan; is that right?

9    A.  Yes.

10          MR. ROGERS:  And could we pull up Exhibit 8706,

11   please?

12          And, Your Honor, I move this into evidence.

13          MR. O'CONNOR:  No objection.

14          THE COURT:  Admitted.

15          (Exhibit No. 8706 admitted into evidence.)

16          MR. ROGERS:  May we publish?

17          THE COURT:  Yes.

18   BY MR. ROGERS:

19   Q.  And, Doctor, do you agree with me that this is the report

20   from the CT scan that was done on Mrs. Hyde in March of 2011?

21   A.  Yes.  This is from the CT angiogram of her chest, yes.

22   Q.  Thank you.

23          And would you agree with me that this -- the

24   impression indicated that it was positive for pulmonary emboli;

25   is that correct?

1    A.   That is correct.

2    Q.   And it was on both sides of her lung; is that accurate?

3    A.   Yes.

4    Q.   But this clot burden had decreased when the radiologist

5    compared it from three weeks ago; is that correct?

6    A.   Yeah, that's usually what occurs.

7    Q.   And during this time period, Mrs. Hyde would have been on

8    anticoagulants; is that right?

9    A.   Yes.

10   Q.   And would you agree with me that this means that the

11   anticoagulants that Mrs. Hyde was taking were working?

12   A.   Well, actually, anticoagulants don't cause the clot to

13   break up.  It's actually your own internal clot lysis system

14   that breaks down the clot.

15   Q.   Okay.

16   A.   So the reason that you use anticoagulants is so that you do

17   not have further extension of the clot.  It actually does not

18   break up clot.

19   Q.   All right.  But you would agree that this -- the clot in

20   her right lung had shrunk from three weeks prior; right?

21   A.   It was undergoing the normal maturation process, yes.

22   Q.   And you would agree with me that this is the same clot that

23   she had three weeks before; correct?

24   A.   Definitely.

25   Q.   And so would you agree that at this point in time,

1    Mrs. Hyde was still at risk of pulmonary embolism?

2    A.  Well, she had -- she had chronic PE at this point.  She was

3    still at risk for -- what do you mean by that?  You'll have

4    to -- I don't know what you mean by that.

5    Q.  Well, she still had some clot; is that accurate?

6    A.  She still had some clot, yes, in her pulmonary arteries.

7    Q.  And she also had a clot in her leg, the DVT; correct?

8    A.  Correct, but she was receiving anticoagulation.

9    Q.  I agree with you.  But do you agree that that clot was

10   still potentially in her leg three weeks out from prior?

11   A.  Oh, yeah.  And it would undergo the same maturation process

12   as well.

13   Q.  And so is it certainly possible that that clot that's in

14   her leg could still -- a piece could break off and could travel

15   to her lungs without protection?

16   A.  Well, that potential is extremely small.  That's why she's

17   on anticoagulants is so that that clot doesn't get larger and

18   then break free.

19   Q.  Understand, but that potential is there.  Do you agree?

20   A.  Very small, yes.

21   Q.  But you agree there is a potential; right?

22   A.  Correct.

23   Q.  And so Mrs. Hyde was at risk for a pulmonary embolism at

24   this point; correct?

25   A.  Well, her protein C deficiency makes her at risk for

1   pulmonary embolism and recurrent DVT.  That's really the

2   biggest issue.

3   Q.  Okay.  Thank you.

4           And, Doctor, if you would, before we move on from

5   this, above the Impression section, am I correct that the

6   radiologist that read this CT study noted that Mrs. Hyde had

7   degenerative changes of her spine?

8   A.  That would be the thoracic spine, not the lumbar spine.

9   Q.  Well, would you agree with me that it noted that she had

10  degenerative changes of the spine?

11  A.  I agree that that -- yes.

12  Q.  And would you agree that degenerative changes of the spine

13  can cause back pain?

14  A.  In this particular case, that would be upper back pain,

15  because the images were not lower than T12, which is the lowest

16  thoracic level, which is about the level of your -- where your

17  chest ends.

18  Q.  Okay, Doctor.  Let's --

19          MR. ROGERS:  We can take this down, and let's kind of

20  move on.

21  BY MR. ROGERS:

22  Q.  And I want to move now to December 2011, to that time

23  period.

24          And do you recall that you showed the jury a 3D image

25  from a CT scan from that time period?  Do you recall that?

1    A.  I do.

2    Q.  And I believe you showed the jury how that 3D image, in

3    your opinion, showed how the filter was interacting with

4    Mrs. Hyde's spine; is that right?

5    A.  With the L3 vertebral body, yes.

6    Q.  And three weeks before that CT scan was performed, were you

7    aware that Mrs. Hyde had a pelvic ultrasound performed?

8    A.  I'm pretty sure I have that, yes.

9    Q.  And that was not included in your report as any of the

10   imaging that you reviewed; correct?

11   A.  Yeah.  I didn't think it added anything, but yes.

12   Q.  I'm sorry.  Say again?

13   A.  I didn't think it added anything, so I didn't add it to my

14   report.

15          MR. ROGERS:  Okay.  Can we pull up Exhibit 8709,

16   please.

17          Your Honor, I move this into evidence.

18          MR. O'CONNOR:  I'm sorry.  What number is it?

19          MR. ROGERS:  8709.

20          MR. O'CONNOR:  May I just take a second to look at

21   this one, please?

22          No objection.

23          THE COURT:  Admitted.

24          (Exhibit No. 8709 admitted into evidence.)

25          MR. ROGERS:  May we publish?

1          THE COURT:  You may.

2    BY MR. ROGERS:

3    Q.  Doctor, would you agree that this is the treating

4    radiologist's report from the ultrasound that was performed on

5    Mrs. Hyde's abdomen?

6    A.  Yes.

7    Q.  And this was done, again, three weeks before -- or, excuse

8    me, this was done toward the latter part of the year after she

9    had had the IVC; is that right?

10   A.  After she had a filter implanted, yes.

11   Q.  Thank you.

12          But this was about three weeks before the image that

13   you showed the jury that was in that 3D format; is that

14   correct?

15   A.  Yes.

16   Q.  All right.  And would you go to the Impressions section,

17   please, next page.

18          And under the Impressions section, would you agree

19   with me that it notes that she had small bilateral renal

20   calculi?

21   A.  Yes.

22   Q.  And is that something that we would commonly call a kidney

23   stone?

24   A.  Correct.

25   Q.  And so she had kidney stones in both of her kidneys; is

1    that accurate?

2    A.  In the kidneys, yes.

3    Q.  All right.  Can we move on, then, to the next page.

4          And, Doctor, is this another report from the same

5    pelvic ultrasound?

6    A.  Yes.

7    Q.  And can we go to the Impressions section there, please.

8          And, Doctor, would you agree with me that it notes

9    that Mrs. Hyde had a left ovarian cyst that measured

10   3.5 centimeters?

11   A.  Yes.

12   Q.  And would you agree with me that kidney stones and ovarian

13   cysts can cause pain?

14   A.  Yes.

15   Q.  Doctor, let me ask you a little bit about this -- the 3D

16   image that you showed the jury.

17   A.  Sure.

18   Q.  Am I correct that that particular study from December of

19   2011, that CT scan was not something that you disclosed in your

20   report that you had reviewed?

21   A.  The image that I showed wasn't from 2011.

22   Q.  The image you showed that was the 3D scan?

23   A.  It was not.

24          MR. ROGERS:  Can we pull that up?  Do you have access

25   to it?

```
 1              Beg the Court's indulgence.

 2              THE WITNESS:  It's a sagittal reconstruction from

 3   6/14/13.

 4              MS. HELM:  4873.

 5              MR. ROGERS:  4873?

 6   BY MR. ROGERS:

 7   Q.  And that's the image that you showed the jury; is that

 8   correct?

 9   A.  That is.

10   Q.  And that's from 2013; is that right?

11   A.  Yes.

12   Q.  Okay.  Thanks for that correction, Doctor.

13              And let me ask you this about this image now that we

14   have it up.

15              MR. ROGERS:  May we display, Your Honor?

16              THE COURT:  You may.

17              MR. ROGERS:  Is it up on the screen?

18              THE COURT:  You may.

19              This is 4873?

20              MR. ROGERS:  Yes, sir.

21              THE COURT:  All right.

22   BY MR. ROGERS:

23   Q.  And, Doctor, do you agree with me that this is an image

24   that would not have existed in this format with the CT imaging

25   at the hospital where it was taken?
```

1    A.  I'm not sure of that.  Actually, it was interesting.  Her

2    prior CT examination that she had that you were mentioning had

3    a sagittal reconstruction, that -- I didn't have that when I

4    originally prepared my report.  But this particular set of

5    imaging did not.  It had a coronal reconstruction that was done

6    at the hospital but not the sagittal.  I'm not sure why they

7    didn't send those images.  Usually they do.

8    Q.  And is this something that you would call a fixed slab CT

9    scan?

10   A.  Yeah.  This is a -- this is a MIP reconstruction, a

11   multi -- it's a -- sorry.  Yes.  It's a thicker slab, yes.

12   Q.  And so in order to prepare this for the jury to see, did

13   you have to do some manipulation of the imaging?

14   A.  Well, what the computer does is it reconstructs the images

15   based on -- it takes the axial cuts, stacks them all together,

16   and then recomputes it into a view like this where you're

17   looking at it from the side.

18          And what you can do, then, is actually make the --

19   they're called voxels.  Make the voxels thicker and thicker to

20   give you a little bit more definition and a little more -- a

21   thicker -- basically a thicker slice.  Kind of putting slices

22   together.

23   Q.  And you would agree with me that the doctor who reviewed

24   this CT scan in the hospital did not look at an image that

25   looked like this; correct?

```
 1    A.  I'm not sure.  Like I said, it would be very unusual to

 2    just do the coronal reconstruction at the hospital and not do

 3    the sagittal when it was their -- basically their protocol to

 4    do all those images on the prior studies that we have.

 5    Q.  But in order to present this to the jury today, you did do

 6    something with this -- with a computer; is that correct?

 7    A.  I did, yes.

 8    Q.  Okay.  Thank you.

 9            Doctor, let's shift our attention back to 2011.

10            MR. ROGERS:  And can we pull up Exhibit 8710?

11            And I move this into evidence.

12            MR. O'CONNOR:  No objection.

13            THE COURT:  Admitted.

14            (Exhibit No. 8710 admitted into evidence.)

15            MR. ROGERS:  May we display?

16            THE COURT:  You may.

17    BY MR. ROGERS:

18    Q.  And, Doctor, would you agree with me that this is a report

19    from a CT scan of Mrs. Hyde's abdomen and pelvis from December

20    the 16th, 2011?

21    A.  Yes.

22    Q.  And would you agree with me that the doctor that read this

23    noted that Mrs. Hyde had a hiatal hernia; is that right?

24    A.  Yeah.

25    Q.  And he also noted that IVC filter or vena cava filter is
```

1    identified; is that right?

2    A.  That's correct.

3    Q.  All right.  Next page, please.

4           And under the Impression section, in addition to the

5    hiatal hernia, it also notes diverticulitis; is that correct?

6    A.  No.  That's diverticulosis, which is actually uninfected

7    diverticular disease.

8    Q.  Okay.  And it -- all right.  Thank you.

9    A.  It can be asymptomatic.

10   Q.  And the next thing, it notes again a 9-millimeter kidney

11   stone; is that correct?

12   A.  Yeah, that's correct.

13   Q.  And would you agree with me that kidney stones, again, and

14   hiatal hernias can be sources of pain; is that correct?

15   A.  Yes, they can.

16   Q.  And, Doctor, would you agree with me that the radiologist

17   that read this CT scan did not note anything about any

18   complications such as tilt, migration, perforation with this

19   filter?

20   A.  They did not.

21   Q.  Now, Doctor, you showed the jury how the -- you believe

22   that the strut was interacting with her spine; is that correct?

23   A.  Yes.

24   Q.  And am I correct, Doctor, that you have no idea whether

25   Mrs. Hyde was experiencing any back pain due to her filter?

1    A.  You'd have no idea.  Right.

2    Q.  I'm sorry.  Say again?

3    A.  I have no idea whether she was experiencing back pain

4    related to her filter or not.

5    Q.  Okay.  Thank you.

6           And would you agree that if a patient has degenerative

7    disk disease, that it's not possible for you to sort out

8    whether pain would be caused to that versus a filter; is that

9    correct?

10   A.  If she had degenerative disk disease, yes, that would be

11   the case.

12          MR. ROGERS:  Can we go now to June 14, '13, please?

13   And pull up Exhibit 8521.

14          And, Your Honor, I move this into evidence.

15          MR. O'CONNOR:  No objection.

16          THE COURT:  8521 is admitted.

17          (Exhibit No. 8521 admitted into evidence.)

18          MR. ROGERS:  May we display this?

19          THE COURT:  You may.

20   BY MR. ROGERS:

21   Q.  Doctor, would you agree that this is a report from a CT

22   scan from June of 2013?

23   A.  That's correct.

24   Q.  And is this the CT scan where you showed the jury the 3D

25   image?

UNITED STATES DISTRICT COURT

1    A.  Yes.

2    Q.  And did you review this report when you were preparing your

3    case?

4    A.  Yes.

5    Q.  And would you note down there in number 7, it says there is

6    a caval filter; is that correct?

7    A.  That's correct.

8    Q.  And would you agree with me that the radiologist that read

9    this report did not note anything about any complications with

10   this filter?

11   A.  One of the reasons -- this is the second time you brought

12   this up, so I'm going to address it.

13          One of the reasons that radiologists were not

14   describing much about caval filters on CT scans is most general

15   radiologists at that time had never seen a filter have a

16   significant complication.

17          The perforations of permanent filters rarely caused

18   problems, and the fractures in permanent filters rarely caused

19   problems because they didn't migrate.  So most general

20   radiologists, when they'd read a CT scan in the past, would

21   have just commented on the filter being present.  They wouldn't

22   have given a complete description of it because they were

23   unaware of significant complications that really could occur

24   with filters until they started occurring, and now they know

25   more about them.

1    Q.  And, Doctor, are you familiar with a safety communication

2    the FDA issued in August of 2010?

3    A.  Yes.

4    Q.  And that's something that you've been aware of for quite

5    some time; is that correct?

6    A.  That's correct.

7              MR. ROGERS:  And can we pull up Exhibit -- shoot.  I

8    don't have it with me.  That's okay.

9    BY MR. ROGERS:

10   Q.  But you would agree with me that the safety communication

11   from FDA '10 was directed toward the community of doctors that

12   deal with IVC filters; is that correct?

13   A.  It was -- it was pretty much directed at interventional

14   radiologists, yes.

15   Q.  And you would agree with me that that safety communication

16   identified issues with retrievable filters such as fracture,

17   tilt, and migration?

18   A.  It did.

19   Q.  And you would agree with me that by 2011, this

20   communication from the FDA was widely known among the community

21   of doctors; is that correct?

22   A.  I don't know if I -- no.  I don't think that's true.  I

23   mean, FDA communications, they're not sent directly to

24   physicians.  You would have to actually look for it or be aware

25   of it.

DARREN R. HURST, M.D. - CROSS-EXAMINATION                    365

1    Q.  But that was something that's available to the medical

2    community from the FDA; is that right?

3    A.  It was available from the FDA.

4    Q.  And you were aware of that; right?

5    A.  We were, yes.  As a person who places filters, yes.

6    Q.  And that would have been published a few months before this

7    event; is that correct?

8    A.  That's correct.

9    Q.  So heading back to our exhibit, 8521, can we go to the next

10   page, please.

11          And, Doctor, as far as this particular finding in

12   2013, would you agree with me that the reading radiologist said

13   that findings are compatible with uncomplicated diverticulitis;

14   is that correct?

15   A.  Yes.

16   Q.  And, Doctor, would you agree with me that shortly after

17   this study was performed, that Mrs. Hyde had a colonoscopy?  Do

18   you recall that?

19   A.  Yes, she did.  Yeah.

20   Q.  And do you recall that the treating doctor who performed

21   the colonoscopy also diagnosed her with diverticulitis?

22   A.  Yeah.  It's pretty obvious on her CT scan.

23   Q.  And would you agree with me that she was prescribed

24   antibiotics and told to change her diet due to diverticulitis?

25   A.  Correct.

1    Q.  And that would be different than what you were pointing out

2    earlier where you said it wasn't an active infection or

3    something?

4    A.  She eventually developed diverticulitis.

5    Q.  And diverticulitis is a source of pain?

6    A.  Usually not chronic, but yes.  The acute episode is very

7    painful.

8                MR. ROGERS:  Okay.  Let's go to Exhibit 8523.

9                And, Your Honor, I move this into evidence.

10               MR. O'CONNOR:  No objection.

11               THE COURT:  Admitted.

12               (Exhibit No. 8523 admitted into evidence.)

13               MR. ROGERS:  May we publish?

14               THE COURT:  You may.

15   BY MR. ROGERS:

16   Q.  And, Dr. Hyde, this is another report from a CT scan done

17   of Mrs. Hyde's abdomen; is that right?

18   A.  Dr. Hurst.  Yes.

19   Q.  And -- excuse me.  I apologize.

20   A.  That's okay.  It's fine.

21   Q.  And this was done in May of 2014; is that correct?

22   A.  It was, yes.

23   Q.  And this was the CT scan that the treating radiologist

24   identified the metal fragment in Mrs. Hyde's heart; correct?

25   A.  Yes.  He identified the arm that had embolized to the

1   heart, yes.

2   Q.  And in the Clinical History section, does it indicate that

3   Mrs. Hyde was experiencing right lower quadrant pain; is that

4   correct?

5   A.  That's correct.

6   Q.  And is that lower pain on the right side of the abdomen?

7   A.  Right.

8   Q.  And does it also indicate that she had hematuria?

9   A.  It does.

10  Q.  And what is that, please?

11  A.  That's blood in your urine.

12  Q.  And again, looking down at the Impressions section, and

13  this is where the doctor identified the fractured portion in

14  her heart; is that correct?

15  A.  Yes.

16  Q.  And, Doctor --

17          MR. ROGERS:  Can you pull that down, please?

18  BY MR. ROGERS:

19  Q.  And would you agree with me -- I'm looking for the part.

20  Ah, yes.  Up in the Findings section.  Do you see that?

21  A.  Yes.

22  Q.  And do you agree that this doctor noted that there is an

23  IVC filter in place?

24  A.  Yeah.  Yes.

25  Q.  And this doctor also did not note any other complications

1   with this filter other than the fracture that had the fragment

2   in the heart; is that correct?

3   A.  Correct.

4   Q.  And this would have been now at this point almost about

5   four years since the FDA safety communication; correct?

6   A.  Correct.

7   Q.  And, Doctor, would you agree with me that Mrs. Hyde, after

8   this was discovered, this fragment in her heart, that she went

9   to see a cardiologist in Las Vegas named Dr. Shehane?

10  A.  Yes, that's correct.

11  Q.  And I believe she saw him on two occasions; is that right?

12  A.  She did.

13  Q.  And on at least one of those occasions, she complained of

14  some chest pain; is that correct?

15  A.  She did.

16  Q.  And would you agree with me that at that point, that was

17  the first time that she had complained of any chest pain that

18  you're aware of; is that right?

19  A.  Besides the chest pain that she presented with initially

20  for her -- yeah.  Yes.  Since 2011 or something like that,

21  right.  Correct.

22  Q.  But I'm talking about her presenting with symptoms of

23  actual chest pain.  Right?

24  A.  It's the first time, yes.

25  Q.  Okay.  Thanks.

1    A.  I would say, yeah.

2    Q.  And, Doctor, would you agree with me that Mrs. Hyde did not

3    complain of any symptoms of chest pain until after the strut

4    had been identified in her heart; is that correct?

5    A.  As far as we know, yes.

6    Q.  And would you agree with me that it's difficult to say

7    whether Mrs. Hyde began to experience any chest pain once she

8    learned that the filter fragment was in place; is that right?

9    A.  Yes.

10   Q.  All right.  Let's turn our attention to the retrieval of

11   this filter.

12          You agree that Dr. Kuo at Stanford removed the filter;

13   is that right?

14   A.  Yes.

15   Q.  And that happened in August of 2014; correct?

16   A.  Yes.

17   Q.  And, Doctor, at the time you did your report in this case

18   that you wanted to be as complete and accurate as possible, am

19   I correct that you had not reviewed any of the imaging of the

20   retrieval of the filter?

21   A.  I had the report, but no, I had not reviewed the imaging.

22   Q.  Okay.  So you didn't look at any imaging from the retrieval

23   that would tell you what position the filter was in at that

24   point in time; is that correct?

25   A.  That's correct.

1    Q.  And, Doctor, is it your understanding that Dr. Kuo was able

2    to remove the filter and the strut from the heart using

3    something called snares?

4    A.  Yes.

5    Q.  And is that the typical -- or one of the typical devices

6    that are used to retrieve IVC filters?

7    A.  Yes.

8    Q.  And that's also typically used to retrieve a strut;

9    correct?

10   A.  Yes.

11   Q.  And would you agree with me that Dr. Kuo did not have to

12   use any sort of advanced techniques such as a use of forceps or

13   a laser to remove the filter from Mrs. Hyde?

14   A.  He didn't have to use those advanced techniques, but it's

15   fairly advanced to be fishing around in the heart with a snare.

16   Q.  And, Doctor, when you perform the retrieval of a filter,

17   are there usually records that are kept that document exactly

18   what is going on in the cath lab at that time?

19   A.  Of course.

20   Q.  I mean, it's like a minute-by-minute kind of document;

21   right?

22   A.  Yes.  Yeah.

23            MR. ROGERS:  Can we pull up Exhibit 8740, please?

24            And, Your Honor, I move this into evidence.

25            MR. O'CONNOR:  No objection.

```
 1              THE COURT:  Admitted.

 2              (Exhibit No. 8740 admitted into evidence.)

 3              MR. ROGERS:  May we publish?

 4              THE COURT:  You may.

 5              MR. ROGERS:  And, Scott, if you could just blow up

 6   the -- well, first of all, how about go to the next page,

 7   please.  Back it up.  Let's see.  Next page.

 8              Yeah, that's what we want.  Can you blow that up,

 9   please, the center part?

10   BY MR. ROGERS:

11   Q.  And, Doctor, is this an example of the type of records that

12   are kept in cath labs where you can see what's going on sort of

13   minute by minute and second by second?

14   A.  Yes.

15   Q.  And would you agree with me that the -- this document

16   indicates that the case to remove the filter and the strut

17   started at -- looks like about 9:10 in the morning; is that

18   right?

19   A.  It did.

20   Q.  And then if you go on down and look there on the right, do

21   you see where it says "filter retrieved and sheathed"?

22   A.  Yes.

23   Q.  And the time for that was -- looks like almost about 9:29;

24   is that correct?

25   A.  Yes.
```

1  Q.  And so you would agree with me, Doctor, that this filter

2  was removed in about 18, 19 minutes?

3  A.  Yeah.

4  Q.  And then looking down below that, at 9:36, would you agree

5  that the snare was open that would be used to retrieve the

6  strut from the heart?

7  A.  Yes.

8  Q.  And does it appear that the strut was removed right at

9  about 10:00 o'clock; is that right?

10 A.  It does, yeah.

11 Q.  So the portion of that procedure took about 24 minutes; is

12 that correct?

13 A.  Yeah.  Dr. Kuo's pretty good.

14 Q.  Now, Doctor, you've never attempted to remove a filter

15 strut from a heart; is that correct?

16 A.  I've been fortunate enough not to have one.

17 Q.  And you've never cared for a patient who's had that issue;

18 is that right?

19 A.  I have not.

20 Q.  And, Doctor, would you agree with me that Mrs. Hyde was

21 discharged from Stanford the day following this procedure?

22 A.  Yes.

23 Q.  And as best as you know, she's never returned to see

24 Dr. Kuo; is that correct?

25 A.  She has not.

1  Q.  And as I understand it, you have not reviewed any medical

2  records that relate to Mrs. Hyde following the removal of the

3  strut and the filter; is that correct?

4  A.  I was not asked to do that in this case.

5  Q.  And, Doctor, I want to talk to you a little bit about some

6  of the potential filter complications that you discussed in

7  your direct testimony.

8          And one of the things you talked about was tilt.  Is

9  that correct?

10 A.  That's correct.

11 Q.  And I believe you said that you noticed something was a

12 slight tilt; is that right?

13 A.  Minimal, yeah.

14 Q.  And minimal would be what, if you had to put a degree on

15 it?

16 A.  Somewhere between 2 and 4 degrees.  I mean, it's very

17 minimal.

18 Q.  2 to 4 degrees; is that right?

19 A.  Yeah, 2 to 4 degrees anterior tilt, yeah.

20 Q.  And did you measure that?

21 A.  Yes.

22 Q.  And as I understand it, when you do this, you draw a line

23 on an image where you can see the IVC filter -- or, excuse me,

24 the wall of the IVC itself?

25 A.  Parallel to the IVC filter.

1   Q.  And then you draw a second --

2            THE COURT:  Hold on.  Hold on just a minute,

3   Mr. Rogers.

4            JURY MEMBER:  I'm sorry.  Mine's dead.  I'm sorry.

5   Apologize.

6            THE COURT:  How is that?

7            JURY MEMBER:  Perfect.  Thank you.

8            MR. ROGERS:  Thank you.

9            THE WITNESS:  I'm sorry, I said -- I meant to say

10  parallel to the inferior vena cava and then in line with the

11  filter.

12  BY MR. ROGERS:

13  Q.  Right.  And as I understand it, you draw one line that you

14  think represents the wall of the vena cava; correct?

15  A.  Yes.

16  Q.  And then you draw another line that you think represents

17  the midline of the filter?

18  A.  That's correct, yes.

19  Q.  Is that right?

20  A.  Yeah, that's the best way to do it.

21  Q.  And then you ask the computer to compare those lines; is

22  that correct?

23  A.  Well, the computer just measures the angle, yes.  It's an

24  angle.

25  Q.  Okay.  And that's how you come up with 2 percent or

1    4 percent or whatever?

2    A.  Degrees, yes.  2 to 4 degrees.

3    Q.  Correct?

4    A.  Correct.

5    Q.  And, Doctor, in your practice, when you have been treating

6    patients that have IVC filters, have you ever noted in a report

7    a degree of tilt that's less than, say, 15 degrees?

8    A.  Have I ever reported it?

9    Q.  Yes.  Have you ever put it in a report from an image of an

10   actual patient?

11   A.  No, I haven't.

12   Q.  And have you ever performed this technique where you

13   compare these two lines when you are treating an actual

14   patient?

15   A.  If the degree of tilt is significant, yeah.  So you kind

16   of -- what you do is you end up eyeballing it.  If you think,

17   wow, that looks pretty significant, then you'll measure it.

18   Q.  Okay.  And if you had seen Mrs. Hyde's filter in the

19   imaging as a treating physician, would you have thought it

20   necessary to do this measurement that you did?

21   A.  No.

22   Q.  And, Doctor, do you think another way that is effective to

23   measure tilt is to use an axial cut from a CT scan?

24   A.  It's more difficult.

25   Q.  But it's possible to measure tilt; correct?

1    A.  I'm not sure how you would get the angle but you can kind

2    of eyeball it and say, well, the -- obviously -- so when you're

3    looking at the filter in cross-section, the image that shows

4    where the tip of the filter is, if the tip of the filter is up

5    against the inferior vena cava like the way I showed you

6    before, you know, that is pretty obvious on a CT scan when it's

7    sitting like that on the axial images.  But that can be

8    difficult to get an exact measurement of your tilt.

9             MR. ROGERS:  Okay.  Let's pull up Exhibit 8516,

10   please.

11            And, Your Honor, I would move this into evidence.

12            MR. O'CONNOR:  No objection.

13            THE COURT:  Admitted.

14            (Exhibit No. 8516 admitted into evidence.)

15            MR. ROGERS:  May we publish?

16            THE COURT:  You may.

17   BY MR. ROGERS:

18   Q.  And, Doctor, is this what we would call an axial cut from a

19   CT scan?

20   A.  Yes.

21   Q.  And would you agree with me that this is an image from

22   December the 16th, 2011; is that right?

23   A.  It is.

24   Q.  And I think you pointed this out in your direct

25   examination, but that big bright thing that we can see, that's

1    the spinal column; correct?

2    A.  In the back, yes.

3    Q.  And then the little bright dot that we can see, would you

4    agree that that's the tip of the IVC filter?

5    A.  It certainly is, yes.

6    Q.  And would you agree with me that the tip of that IVC filter

7    is pretty much dead center in the vena cava?

8    A.  Yes.

9             MR. ROGERS:  Can we pull up Exhibit 8517, please.

10            And, Your Honor, I move this into evidence.

11            MR. O'CONNOR:  No objection.

12            THE COURT:  Admitted.

13            (Exhibit No. 8517 admitted into evidence.)

14            MR. ROGERS:  And may we publish, please?

15            THE COURT:  Yes.

16   BY MR. ROGERS:

17   Q.  And, Doctor, would you agree that this is another axial CT

18   cut from a CT from June the 14th, 2013?

19   A.  Yes.

20   Q.  And, again, we can see the little bright dot that's the tip

21   of the IVC filter?

22   A.  That's correct.

23   Q.  And would you agree that that's also about dead center in

24   the middle of the cava?

25   A.  It's a little anterior, but yes, it's close.

1              MR. ROGERS:  And can we pull up Exhibit 8518, please.

2              And, Doctor, this -- excuse me.  Your Honor, may I

3   move this into evidence?  I mean, Your Honor.  I apologize.

4              MR. O'CONNOR:  I have no objection.

5              THE COURT:  8518 is admitted.

6              (Exhibit No. 8518 admitted into evidence.)

7              MR. ROGERS:  Thank you.  May we publish?

8              THE COURT:  Sure.

9   BY MR. ROGERS:

10  Q.  And, Dr. Hurst, is this another axial cut from a CT from

11  Mrs. Hyde from May the 16th, 2014?

12  A.  And this shows the device pretty well centered.

13  Q.  Okay.  Thank you.

14             MR. ROGERS:  And can we pull up Exhibit 8 -- 8519,

15  please.  And can you draw that out a little bigger, if that's

16  possible?

17             Well, before I do it, let me move it into evidence,

18  Your Honor.  They're actually all three already in evidence,

19  but this is just a comparison film.

20             THE COURT:  Mr. O'Connor, any objection?

21             MR. O'CONNOR:  No objection.

22             MR. ROGERS:  May we publish?

23             THE COURT:  This is 8519?

24             MR. ROGERS:  Yes, Your Honor.

25             THE COURT:  All right.  That's admitted.

1              (Exhibit No. 8519 admitted into evidence.)

2              THE COURT:  You may publish.

3    BY MR. ROGERS:

4    Q.  And, Dr. Hurst, is this a -- does this show the three

5    images we've looked at separately all together?

6    A.  Yes, it does.

7    Q.  And the first one we started off in 2011; right?

8    A.  Yes.

9    Q.  And the next one was May of 2014, which is some almost

10   three years later or so; right?

11   A.  Correct.

12   Q.  And would you agree with me that this filter, based on

13   these images, has stayed centered within the cava throughout

14   the course of this time?

15   A.  No.  I think it's leaning a little bit anteriorly, but

16   that's it.

17   Q.  Okay.  And you think that's that 2 to 4 degrees you talked

18   about?

19   A.  Yes.  Yeah, absolutely.

20             MR. ROGERS:  And can we pull up Exhibit 8520, please.

21             Your Honor, I move this into evidence.

22             MR. O'CONNOR:  No objection.

23             THE COURT:  Admitted.

24             (Exhibit No. 8520 admitted into evidence.)

25             MR. ROGERS:  May we publish?

```
 1            THE COURT:  Yes.

 2   BY MR. ROGERS:

 3   Q.  Now, Dr. Hurst, this is a different view from a CT scan

 4   from the CT from May of 2014; is that correct?

 5   A.  Correct.

 6   Q.  And this is slicing the body in the coronal fashion; right?

 7   A.  Correct.

 8   Q.  And so if you look at this filter here, does it appear to

 9   be centered in the cava to you?

10   A.  In this orientation, absolutely, yeah.  It's very close.

11   Q.  And, Doctor, going back to your method of measuring tilt,

12   when you draw the two lines, would you agree to me -- with me

13   that if three different radiologists did that, they may get

14   three different results?

15   A.  There might be some observer variability, yes.

16   Q.  And so is the measurement only as good as the lines that

17   are drawn on the image?

18   A.  When you're trying to measure small differences in degrees,

19   yes.  Obviously, if it's 90 degrees to the cava or 30 degrees

20   or 20 degrees, it's pretty easy to get that measurement.  But

21   these small measurements like you're talking here, yeah, you

22   probably would get two or three different measurements.

23            MR. ROGERS:  Your Honor, I was getting ready to shift,

24   but is it noon for the break or --

25            THE COURT:  It is.
```

1          Ladies and gentlemen, we will break for an hour.

2     We'll plan to resume at 1:00 o'clock.  Please remember not to

3     discuss the case, and we will see you then.

4          (Jury not present.)

5          THE COURT:  You can step down, Doctor.

6          Please be seated.

7          All right.  Counsel, as of now, plaintiff has used 2

8     hours and 23 minutes, and defendants have used 2 hours and 32

9     minutes.

10         And we will see you at 1:00 o'clock.

11         MR. ROGERS:  Thank you, Your Honor.

12         (Proceedings recessed at 12:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 20th day of

13   September, 2018.

14

15

16
                         s/Jennifer A. Pancratz_____ _____ ____
17                       Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25