1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3              _____

4   **IN RE: Bard IVC Filters Products**          )
    **Liability Litigation,**                      )  MD 15-02641-PHX-DGC
5                                                  )
    _____   )
6                                                  )
    **Lisa Hyde and Mark Hyde, a married**         )  Phoenix, Arizona
7   **couple,**                                     )  **September 19, 2018**
                                                   )
8                          Plaintiffs,              )
                                                   )
9            v.                                     )  CV 16-00893-PHX-DGC
                                                   )
10  **C.R. Bard, Inc., a New Jersey**              )
    **corporation, and Bard Peripheral**           )
11  **Vascular, an Arizona corporation,**          )
                                                   )
12                         Defendants.              )
    _____   )
13

14

15      **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17          <u>**TRIAL DAY 2 – P.M. SESSION**</u>

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Plaintiffs:

3              Lopez McHugh
               By: **RAMON R. LOPEZ**, ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
5
               Gallagher & Kennedy
6              By: **MARK S. O'CONNOR**, ESQ.
               By: **PAUL L. STOLLER**, ESQ.
7              2575 East Camelback Road, Suite 1100
               Phoenix, AZ  85016
8
               Heaviside Reed Zaic
9              By: **JULIA REED ZAIC**, ESQ.
               By: **LAURA E. SMITH**, ESQ.
10             312 Broadway, Ste. 203
               Laguna Beach, CA  92651
11
               Goldenberg Law PLLC
12             By: **STUART GOLDENBERG**, ESQ.
               By: **MARLENE GOLDENBERG**, ESQ.
13             800 LaSalle Ave., Ste. 2150
               Minneapolis, MN  55402
14
               Lopez McHugh, LLP
15             By: **JOSHUA MANKOFF**, ESQ.
               1 International Plaza, #550
16             PMB-059
               Philadelphia, PA 19113
17

18

19   For the Defendants:

20             Nelson Mullins Riley & Scarborough.
               BY: **JAMES F. ROGERS**, ESQ.
21             1320 Main St.
               Columbia, SC  29201
22

23             Snell & Wilmer
               By: **JAMES R. CONDO**, ESQ.
24             400 East Van Buren
               Phoenix, AZ  85004
25

1               **A P P E A R A N C E S   (CONTINUED)**

2

3      For the Defendants:

4               Nelson Mullins Riley & Scarborough
                 By: **RICHARD B. NORTH, JR.,** ESQ.
5               By: **MATTHEW B. LERNER,** ESQ.
                 By: **ELIZABETH C. HELM,** ESQ.
6               201 17th Street NW, Suite 1700
                 Atlanta, GA  30363
7

8               C.R Bard, Inc.
                 Associate General Counsel, Litigation
9               By:  **GREG A. DADIKA,** ESQ.
                 730 Central Avenue
10              Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**EXAMINATION**

| WITNESS | PAGE |
|---|---|
| DARREN R. HURST, M.D. | |
| Cross-Examination (Cont'd) By Mr. Rogers | 387 |
| Redirect Examination By Mr. O'Connor | 396 |
| MICHAEL STREIFF, M.D. | |
| Direct Examination By Mr. Lopez | 413 |
| Cross-Examination By Mr. Condo | 441 |
| Redirect Examination By Mr. Lopez | 467 |
| ROBERT McMEEKING | |
| Direct Examination By Mr. O'Connor | 485 |
| | |
| Video testimony of Frederick Rogers, M.D. | 484 |

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 8325 | Eclipse IFU 02.2010 PK5100600 Rev. 1 | 389 |

CROSS-EXAMINATION (CONTINUED) - DARREN R. HURST, M.D.

1          **P R O C E E D I N G S**

2          (Recess was taken until 12:58.  Proceedings resumed in

3     open court with the jury present.)

4

12:59:42  5          THE COURT:  Thank you.  Please be seated.

6          You may continue, Mr. Rogers.

7          MR. ROGERS:  Thank you, Your Honor.

8          Dr. Hurst, are you ready?

9          THE WITNESS:  Yes, sir.

10          **DARREN R. HURST, M.D.,**

11     resumed as a witness, after having been previously sworn or

12     affirmed, and was examined and testified as follows:

13          C R O S S - E X A M I N A T I O N   (CONTINUED)

14     BY MR. ROGERS:

12:59:53  15     Q   Dr. Hurst, we're kind of in the home stretch so we'll try

16     and wrap this up.

17          I wanted to ask you now a few questions about caudal

18     migration.  Am I correct that when you were answering

19     questions from Mr. O'Connor that you testified that you

13:00:09  20     estimated that Mrs. Hyde's filter migrated in the caudal

21     direction approximately 5 millimeters; is that right?

22     A   Very minimal, yes.

23     Q   And I believe you said that that is not a predominant

24     issue in this case; is that correct?

13:00:24  25     A   That's correct.

CROSS-EXAMINATION (CONTINUED) – DARREN R. HURST, M.D.

13:00:25  1    Q    And, Doctor, would you agree with me that when we are

2    breathing in and out, that the vena cava moves?

3    A    It does, yes.

4    Q    And so on an imaging study, if we are breathing in and

13:00:36  5    out, if the vena cava's in a different position can that cause

6    on the imaging for the filter that's inside the vena cava to

7    be in different positions?

8    A    Yes, it can.

9    Q    Are you familiar with the SIR standards for tracking of

13:00:50  10   complications with filters?

11   A    Yes.

12   Q    And would you agree with me that according to that

13   organization that the standard for tracking of caudal

14   migration requires that the migration be at least two

13:01:03  15   centimeters; is that correct?

16   A    Yes, that's correct.

17   Q    And so the migration that you would have observed in your

18   opinion in Mrs. Hyde's case would not be considered a

19   trackable event by the Society of Interventional Radiologists;

13:01:16  20   correct?

21   A    I wouldn't consider it a trackable event; correct.

22            MR. ROGERS:  Could we pull up Exhibit 8325, please.

23            Is it up?  I'm sorry, my screen must not be working.

24   I don't know why that is.

13:01:50  25            THE COURTROOM DEPUTY:  It's on the monitors at your

CROSS-EXAMINATION (CONTINUED) - DARREN R. HURST, M.D.

13:01:52  1   table; right?

2            MR. ROGERS:  Yeah.  This one's just dark.

3            THE COURTROOM DEPUTY:  It just got turned off.

4            MR. ROGERS:  Turned off.  Would it be that

13:02:00  5   complicated?  Okay.  Thank you.

6            Your Honor, I move this document into evidence.

7            MR. O'CONNOR:  No objection, Your Honor.  I'm sorry.

8            THE COURT:  Admitted.

9         (Exhibit 8325 admitted.)

13:02:20 10  BY MR. ROGERS:

11  Q    Dr. Hurst, you have in front of you Exhibit 8325, and you

12  would agree that that is the IFU for the Eclipse filter;

13  correct?

14  A    Yes, the front page.

13:02:30 15  Q    And you are familiar with this document; right?

16  A    Yes.

17  Q    And I believe you were critical of this document in your

18  testimony on direct; is that right?

19  A    Yes.

13:02:40 20  Q    And specifically -- well, I'll skip that.

21            MR. ROGERS:  Can we go to section E, please.

22            Can we pull that out.

23  BY MR. ROGERS:

24  Q    And, Doctor, do you see this section that's on your

13:02:55 25  screen?

CROSS-EXAMINATION (CONTINUED) – DARREN R. HURST, M.D.

13:02:56  1  A   Yes.

2          MR. ROGERS:  And, Your Honor, may we publish for the

3  jury?

4          THE COURT:  Yes.

13:03:03  5  BY MR. ROGERS:

6  Q   And, Doctor, you're familiar with this section called

7  "Warnings" in the instructions for use; correct?

8  A   Correct.

9  Q   And if we look at this --

13:03:11  10          MR. ROGERS:  Let's just go down a few, please.

11  BY MR. ROGERS:

12  Q   There's several bullets; right?  And looking at bullet

13  number 8, do you see that?

14  A   I do.

13:03:20  15          MR. ROGERS:  And could you pull that out, please.

16  BY MR. ROGERS:

17  Q   And, Doctor, you would agree that this says:  "Filter

18  fractures are a known complication of vena cava filters.

19  There have been some reports of serious pulmonary and cardiac

13:03:38  20  complications with vena cava filters requiring retrieval of

21  the fragment utilizing endovascular and/or surgical

22  techniques."

23          Did I read that correctly?

24  A   Yes.

13:03:48  25  Q   And you would agree that filter fractures are a known

CROSS-EXAMINATION (CONTINUED) – DARREN R. HURST, M.D.

13:03:51  1    complication of vena cava filters?

2    A    What do you mean by known complication?

3    Q    It would mean that it's known within the medical

4    community.

13:03:58  5    A    It is known, but by saying in this IFU that it's a known

6    complication, the assumption is that it is similar to other

7    devices that were previously used.

8    Q    All right.  And, Doctor, would you agree, though, that

9    this says there can be serious pulmonary and cardiac

13:04:15  10   complications with vena cava filters?

11   A    Serious pulmonary and cardiac complications were extremely

12   rare.  This doesn't describe how often they occur.

13   Q    And you would agree that this says that you may have to

14   use surgical techniques to retrieve these pieces; is that

13:04:29  15   correct?

16   A    This was a unique complication of that device, yes.

17   Q    And you would agree with me that based on this

18   information, as a doctor, you can certainly discern that a

19   fragment can travel to the heart; is that correct?

13:04:40  20   A    Yes.

21   Q    And it may need to be removed?

22   A    Correct.

23   Q    And would you agree that that is precisely what happened

24   in Mrs. Hyde's case?

13:04:48  25   A    That is what happened.

CROSS-EXAMINATION (CONTINUED) – DARREN R. HURST, M.D.

13:04:52  1         MR. ROGERS:  All right.  And let's -- you can pull

        2   that down, and let's pull out the next section, number 9.  I'm

        3   sorry, number 9.  Apologize.

        4   BY MR. ROGERS:

13:04:59  5   Q    And, Doctor, would you agree with me that this says:

        6   "Movement, migration, or tilt of the filter are known

        7   complications of vena cava filters.  Migration of filters to

        8   the heart or lungs has been reported."

        9         Did I read that correctly?

13:05:16 10   A    Again, yeah, you did read it correctly.

       11   Q    And you would agree it says:  "There have also been

       12   reports of caudal migration of the filter."

       13         Did I read that correctly?

       14   A    Yes.  Again, by saying known complications, you're not

13:05:28 15   really giving an incidence of when these complications occur

       16   and the degree of seriousness of the complications.

       17   Q    And are you aware of any manufacturer of IVC filters that

       18   includes these incidence rates that you're talking about?

       19   A    No, actually they don't.  However, the previous IFUs only

13:05:45 20   listed probably about four complications for the devices,

       21   where this particular IFU lists almost 30.

       22         And by saying "known complication" over and over

       23   again in your IFU, basically you're rendering that -- I'm

       24   sorry.  By saying your wording in this IFU, it doesn't give

13:06:06 25   enough information.  It makes me assume that the complication

CROSS-EXAMINATION (CONTINUED) – DARREN R. HURST, M.D.

13:06:12  1    rate for this device is the same as the previous devices or

2    the predicate device or any other permanent device that I've

3    used.  So over time, in using all these devices, you generate

4    sort of a feeling for what the incidence of and the

13:06:29  5    seriousness of the complications are.  By saying it's a known

6    complication in here and not providing a rate, my assumption

7    is that it's the same as all the other filters, and it wasn't.

8    Q    And, Doctor, you continue to implant the Denali filter;

9    correct?

13:06:46  10   A    Yes.

11   Q    And it's got this same language in it, does it not?

12   A    That's correct.  But my experience with it is it behaves

13   differently.

14        MR. ROGERS:  All right.  Let's move on down to the

13:06:54  15   next section, please.  Not the bullet, but the -- let's go

16   down to section F.

17   BY MR. ROGERS:

18   Q    And, Doctor, do you see this section?

19   A    Yes.

13:07:08  20   Q    This is known as "Precautions"; correct?

21   A    Yes.

22        MR. ROGERS:  All right.  And if we scroll on down,

23   please.

24        All right.  And keep on scrolling, I'm sorry.

13:07:21  25        All right.  Let's move on down past that section and

CROSS-EXAMINATION (CONTINUED) - DARREN R. HURST, M.D.

13:07:29  1   keep on going, I'm sorry.

2            There we go.  Yeah.  Part G, can you pull that out,

3   please.

4   BY MR. ROGERS:

13:07:37  5   Q   And, Doctor, this is a section called "Potential

6   Complications"; correct?

7   A   It is.

8   Q   And would you agree those first two bullets are the same

9   things that we have reviewed; is that right?

13:07:50 10   A   Correct.

11   Q   And the next bullet says:  Perforation or other acute

12   chronic damage of the IVC wall is a potential complication;

13   correct?

14   A   Exactly.  Yes.

13:07:59 15            MR. ROGERS:  All right.  And scoot down just a little

16   bit.

17            Keep going.  A little more.  There you go.

18   BY MR. ROGERS:

19   Q   And then, Doctor, do you see where it says "filter tilt"?

13:08:10 20   A   Yes.

21   Q   And you agree that that is a disclosed complication;

22   correct?

23   A   This IFU discloses basically every known complication that

24   could occur with an IVC filter and probably almost every

13:08:22 25   device.

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:08:23  1   Q   And, Doctor, are you familiar with the IFU for the G2X?

2   A   Yes.

3   Q   And would you agree with me that the G2X IFU contains the

4   same information?

13:08:33  5   A   Agreed.  By having this many warnings and precautions, you

6   basically dilute out any particular warning that could be

7   effective for a physician to use.

8   Q   And so you're critical of this IFU because it provides too

9   much information, in your opinion?

13:08:48  10  A   It dilutes out any warning that it could be important.

11  Q   All right.  Doctor, I notice that in your questioning from

12  Mr. O'Connor that you referred to Mrs. Hyde's filter as a G2X

13  filter; is that right?

14  A   That's my understanding, yes.

13:09:04  15  Q   And in your review of the imaging of that filter, would

16  you agree with me that you could not see anything in any of

17  the imaging where you could discern based on that imaging

18  whether the filter was a G2X or an Eclipse filter?

19  A   There is no way to know based on imaging.

13:09:20  20  Q   All right.  Thank you, Doctor.  I don't have any further

21  questions.

22          THE COURT:  Any redirect?

23          MR. O'CONNOR:  Yes, Your Honor.

24

25

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

R E D I R E C T   E X A M I N A T I O N

BY MR. O'CONNOR:

Q   Dr. Hurst, let's go back to when you were questioned about the different conditions that Ms. Lisa Hyde suffered from.

     Were you asked in this case to look at the relationship between the filter failures that her filter experienced and any symptoms she had?

A   No.

Q   One of the problems that you pointed out, is it true that other than interventional radiologist who implanted this, was the rest of the medical community, doctors in different disciplines, aware of the failures that were occurring with Bard filters?

A   Not at that time, no.

Q   And would doctors who did not practice in interventional radiology have any reason to know whether they should be looking at a filter for -- a Bard filter for potential complication if a patient presented with a certain type of symptom?

A   No.

Q   And by the way, you understand that there is another expert in our case, Dr. Muehrcke; correct?

A   Yes.

Q   And he's a cardiovascular surgeon.

A   Yes.

REDIRECT EXAMINATION - DARREN R. HURST, M.D.

13:10:38   1   Q   Have you reviewed his report?

2   A   Yes.

3   Q   And you understand that he is going to talk about

4   causation and the -- the issues with Mrs. Hyde, Lisa Hyde,

13:10:47   5   from the failures that her filter experienced?

6   A   From a clinical standpoint, yes.

7   Q   And by the way, you were asked questions about

8   asymptomatic.  If a Bard filter fractures and migrates

9   anywhere, including the right ventricle, does the fact that

13:11:06   10   it's not causing symptoms to a patient make it any less

11   serious?

12   A   No.  I don't think we know the natural history of having a

13   filter fragment in the right ventricle.  We don't know what

14   the potential risks are over time.

13:11:21   15       I see it as kind of like a -- almost like a needle

16   sitting in a moving structure that is compressing, you know,

17   hundreds and hundreds of times a day.  That needle can move,

18   or that arm, fragment, whatever it is, can puncture the heart

19   at any moment.  We just don't know the natural history of

13:11:44   20   these fragments in the heart.  So they're potentially very,

21   very dangerous.

22   Q   Now, on your compensation, first of all, does it matter

23   which side you are on when you look at a case?

24   A   No.

13:12:03   25   Q   And why do you do expert work?

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:12:08 1   A   Well, I find the work --

2                MR. ROGERS:  Object.  That's been asked and answered.

3                THE COURT:  Overruled.

4                THE WITNESS:  I find the work interesting.  Again, I

13:12:15 5   said this before, but I think it makes me a better physician,

6   it makes my practice better.  I do it for my patients.  And I

7   enjoy the process of helping the attorneys and the jury and

8   everyone understand the medical issues at hand in the case.

9   So I find it very rewarding.

13:12:37 10  BY MR. O'CONNOR:

11   Q   Do you ever turn down cases?

12   A   Absolutely.  I turn them down all the time.

13   Q   For what reasons?

14   A   For insufficient -- well, I turn down because they're bad

13:12:47 15  cases.  They're not cases that really -- that I feel that I

16   can either support one way or the other.  Either they lack

17   evidence or they seem frivolous.

18   Q   Have you looked at what other doctors in your area charge

19   when they do medical-legal consulting and come and talk to

13:13:13 20  courts and juries?

21   A   Yeah.  Actually there's a survey that goes out every year

22   and comes back to me from the S-E-A-K, the SEAK company that

23   lists expected and the average reimbursements.

24   Q   And where do your fees fall?

13:13:29 25  A   I'm a little bit below average to average.

REDIRECT EXAMINATION - DARREN R. HURST, M.D.

13:13:32  1   Q   And you've reviewed reports from experts that have been

2   retained by Bard.

3   A   Yes.

4   Q   And are they charging that company?

13:13:40  5   A   Yes.

6   Q   And is there much difference between what they have been

7   charging and what you talk about?

8   A   No.

9   Q   Now, just to be clear, on this Denali, you did stop using

13:13:57  10   it for a reason; is that correct?

11   A   I stopped using it as a permanent device.

12   Q   Is it still promoted by Bard and represented as a

13   permanent device?

14   A   Yes, it is.

13:14:10  15   Q   As a matter of fact, every device that we've talked about

16   from Bard, the G2, the G2X, and the Eclipse, were they always

17   represented by Bard to be permanent filters?

18   A   Yes, they were.

19   Q   And in terms of doctor expectations, what did that mean?

13:14:25  20   A   That means that you would expect it to be stable over the

21   lifetime of the patient.

22   Q   Now, you were asked questions about your report and how

23   you listed out 20 to 25 Bard documents.

24   A   Yes.

13:14:40  25   Q   You've been deposed in this case; correct?

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:14:41  1    A    Yes.

2    Q    Have you told the people at Bard before that you've

3    reviewed more?

4    A    Yes.

13:14:48  5    Q    Well, let me ask you a question.  Have the attorneys from

6    Bard ever presented a Bard document to you and asked you to

7    look at that and see if it refutes the documents you brought

8    in here and talked about in court today?

9    A    No, they have not.

13:15:03  10   Q    Have they ever came to you and said, you know, Doctor,

11   that HHE you relied on or that G2, G2X fracture analysis, we

12   have something to show you that may change your mind?

13   A    I've never had that happen.

14   Q    Have you welcomed that opportunity?

13:15:17  15   A    I've asked for them.  Yes.

16   Q    Now, you were asked questions about the FDA August 9,

17   2010, recommendation.  Do you recall that?

18   A    I do, yes.

19         MR. O'CONNOR:  Was that exhibit put into evidence,

13:15:46  20   Your Honor?  80 –– 6993?

21         THE COURT:  I don't think so, no.

22         MR. O'CONNOR:  Pardon me?

23         THE COURT:  No.

24   BY MR. O'CONNOR:

13:15:54  25   Q    In any event, are you aware of what that FDA

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:15:57 1   communications stated?

2   A    Yes.

3   Q    And what type of filter was it talking about?

4   A    It was talking about all retrievable filters.

13:16:05 5   Q    Retrievable filters?

6   A    Right.  Yes.

7   Q    And did it indicate that -- first of all, does the FDA

8   regulate the medical practice, the practice of medicine?

9   A    They do not regulate the -- no.  Practice of medicine,

13:16:19 10   they do not.

11   Q    Did Bard ever contact physicians using Bard filters to let

12   those physicians know about the FDA communication?

13   A    No.

14   Q    And did Bard ever do anything to change any of the

13:16:33 15   documents such as these instructions for use based upon the

16   FDA?

17   A    No.

18   Q    In fact, did Bard ever, in any document, any information

19   for use document, ever state that doctors should be monitoring

13:16:54 20   patients who have received Bard filters?

21   A    Not using imaging.  And they did not give a time for

22   retrieval.  The FDA recommendation that came out in 2010

23   recommended that implanting physicians and clinicians who were

24   responsible for the ongoing care of patients with retrievable

13:17:13 25   IVC filters consider removing the filter as soon as protection

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:17:16  1   for PE was no longer needed.

2   Q    And that was retrievable filters.

3   A    That was retrievable filters, yes.  So at that point the

4   recommendation was that any device that was in the retrievable

13:17:31  5   category should be removed once the indication or protection

6   from PE was no longer needed.

7   Q    And you were asked questions about the instructions for

8   use, I think it was Exhibit 8325.

9            MR. O'CONNOR:  Could we put that up, please, Felice.

13:18:31  10            And, Felice, if you could go --

11            Your Honor, may I display this to the jury?  I

12   believe it's in evidence.

13            THE COURT:  You may.

14            MR. O'CONNOR:  Felice, go to what looks like Bates

13:18:44  15   number 3.

16            Thank you.  And then, I don't know -- can you enlarge

17   it just above MRI safety, above that I want you to highlight

18   the section, that paragraph right above MRI Safety, the one

19   right above it.

13:19:08  20            The one I'm looking at is this paragraph, the last

21   paragraph before MRI safety.

22            Let me show you --

23            THE WITNESS:  Do we have a better copy?

24            MR. ROGERS:  Your Honor, Mr. O'Connor is welcome to

13:19:21  25   use the document that I used.

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:19:24    1          MR. O'CONNOR:  Could we have that one up.  I think
        2    ours is worse quality.
        3          Thank you.
        4          It's 8325.
13:19:36    5          Thank you.
        6          And it was at page 3.  And the paragraph right above
        7    "MRI Safety."
        8          Could you highlight -- there you go.
        9    BY MR. O'CONNOR:
13:19:53   10    Q    Now, this is the Eclipse instructions for use; correct?
       11    A    Yes.
       12    Q    And does this indicate that Bard continued to represent
       13    and promote its filter, the Eclipse, as well as the G2X, as a
       14    permanent filter?
13:20:11   15    A    Yes.
       16          MR. O'CONNOR:  And then if we could go to the
       17    "Warning" section, subparagraph 8, please.
       18    BY MR. O'CONNOR:
       19    Q    What I wanted you to look at, Dr. Hurst, when did the
13:20:45   20    Eclipse filter start coming out into the market?
       21    A    Was it 2008?  I think.
       22    Q    Eclipse was closer to 2010.  Does that sound right?
       23    A    2010.  Sorry.  August 2010.  So 8/2010.  Yes.
       24    Q    So you have looked at all of the instructions for use;
13:21:05   25    correct?

REDIRECT EXAMINATION — DARREN R. HURST, M.D.

13:21:06  1   A    Yes.

        2   Q    Number 1, if you look at this, it says under section 8:

        3   "There have been some reports of serious pulmonary and cardiac

        4   complications with the vena cava."

13:21:18  5        Do you see that?

        6   A    Yes.

        7   Q    Now, did you learn from looking at Bard internal documents

        8   that the complications that you saw and what Bard was aware of

        9   was more than just some reports?

13:21:33 10   A    Yes.  Yeah.  And on top of that, I mean, this particular

       11   complication can be catastrophic.  I mean, this is almost --

       12   should be like a black box warning, not just --

       13        MR. ROGERS:  Objection, Your Honor.  This is beyond

       14   his report and expertise.

13:21:54 15        MR. O'CONNOR:  He was asked about this very paragraph

       16   and on these very issues on cross-examination.

       17        THE COURT:  Well, let's approach for a minute,

       18   Counsel.

       19        You can stand up, ladies and gentlemen.

13:22:03 20     (Bench conference as follows:)

       21        THE COURT:  Where are you going with this, Counsel?

       22   How far are you going to go?

       23        MR. O'CONNOR:  Just wanted him to explain his opinion

       24   that these warnings that they brought up are inadequate and

13:22:31 25   the reason why is they don't spell out what he knows about as

REDIRECT EXAMINATION - DARREN R. HURST, M.D.

13:22:34  1    adverse events.  And also that Lisa Hyde's complication is a

2    serious catastrophic complication, not just something that's

3    been reported.

4              THE COURT:  Okay.

13:22:46  5              MR. ROGERS:  Your Honor, he just testified that this

6    should have been a black box warning.  It's clearly a

7    regulatory opinion.  Not disclosed in his report.  He's not

8    qualified to talk about it.

9              THE COURT:  Well, do you agree that it's fair game

13:22:59 10    for them to ask him why he doesn't think this warning is

11    adequate since you introduced --

12             MR. ROGERS:  I completely do, Your Honor.  I agree

13    with that.

14             THE COURT:  It's the black box --

13:23:11 15             MR. ROGERS:  He's just starting to slide into areas

16    he's not an expert in or not disclosed.

17             THE COURT:  I don't think the jury has any idea what

18    a black box warning is.

19             MR. ROGERS:  I don't think they do.

13:23:20 20             THE COURT:  I don't think they know it's an FDA

21    matter, so I don't think we need to go back and correct that.

22    Do you agree?

23             MR. ROGERS:  I'm fine with that, You're Honor.

24             THE COURT:  I think going forward it's fair game.

13:23:28 25    But obviously you should steer him away from FDA opinions if

REDIRECT EXAMINATION - DARREN R. HURST, M.D.

13:23:31  1   he ventures --

2          THE COURT REPORTER:  Excuse me.  I can't hear.

3          THE COURT:  She can't hear you.

4          MR. LOPEZ:  A black box warning is not an FDA issue.

13:23:45  5   A black box warning is a company issue and whether or not the

6   warnings on the label are prominent enough and adequate enough

7   to put doctors on notice of a serious complication.

8          THE COURT:  Do you --

9          MR. LOPEZ:  He's familiar with what a black box

13:23:58  10  warning means.

11          THE COURT:  Have you disclosed him as a witness who

12  could testify about what should or should not be a black box

13  warning?

14          MR. LOPEZ:  We didn't intend to until he started

13:24:06  15  cross-examining him on --

16          THE COURT:  I think he -- I think you can fairly

17  redirect him on why he thinks this is inadequate without him

18  starting to give opinions on black box warnings.

19          MR. LOPEZ:  Okay.  I mean, I respectfully disagree,

13:24:18  20  Judge.  He needs to go to the extent of what his opinion is.

21  If his opinion as a physician is that it's such a catastrophic

22  injury that we're talking about here that involved these --

23  for a physician to really see it, it --

24          THE COURT:  Okay --

13:24:35  25          MR. LOPEZ:  You can't just --

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:24:36  1        THE COURT:  -- you can disagree with me, that's okay.

2        MR. LOPEZ:  I know.  But, you know --

3        THE COURT:  No, my point is this is fair game for

4   cross, but if he's venturing into things like there are

13:24:44  5   certain categories of warnings that the company should have

6   given, that's beyond explaining why he thinks the language

7   that's called to his attention was not sufficient.

8        MR. LOPEZ:  Okay.  I mean --

9        THE COURT:  So I think it's fair game to go into it

13:24:56  10  but stay away from those sorts of affirmative opinions.

11        MR. ROGERS:  Thank you, Your Honor.

12     (Bench conference concludes.)

13        THE COURT:  Thank you all.

14        MR. O'CONNOR:  May I resume, Your Honor?

13:25:30  15        THE COURT:  Yes.

16  BY MR. O'CONNOR:

17  Q   Dr. Hurst, you've reviewed these instructions for use;

18  correct?

19  A   Yes.

13:25:35  20  Q   And I think you told us it's your opinion that these

21  instructions for use do not adequately provide information to

22  physicians like you about the complications that Bard was

23  aware of its filters.

24  A   Right.  The comp- -- the -- instructions for use should be

13:25:51  25  clear and accurate and consistent.  The Bard Eclipse IFU lists

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:26:00  1    over 20, maybe 25 potential complications, and then you saw a

2    laundry list of every possible complication that could occur

3    without giving you an idea of which ones you should really be

4    worried about.

13:26:14  5          This number 8 that we're looking at here would be one

6    that I would highlight if I -- I would want to know that this

7    is a severe, significant, issue that is occurring with this

8    filter that is not occurring with other filters and that I

9    should look out for it.

13:26:33  10   Q   As we saw, Bard did an internal analysis of fractures

11   comparing the G2 and the G2X with other filter; correct?  Do

12   you recall that?

13   A   Yes.

14   Q   And when you saw that, did you -- is it your opinion that

13:26:47  15   that is the type of information Bard should have provided to

16   physicians and physicians should have reasonably expected Bard

17   to disclose that information?

18   A   In some shape or form, yes.

19   Q   And was it?

13:27:01  20   A   No.

21   Q   And in terms of Bard filters, you talked about on cross

22   that the issues with Bard is that the Bard filters experienced

23   more than one or -- complication; is that correct?

24   A   Yes.  They experienced almost all of them.

13:27:20  25   Q   And in Lisa Hyde's case, is her case a case where her

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:27:25  1    filter engaged in more than one failure mode?

2    A    It definitely had penetration and it definitely fractured,

3    with migration of the fracture fragment.

4    Q    And did you attribute those to the insufficient stability

13:27:40  5    of Bard filters?

6    A    I attribute it to the design of the Bard filter, yes.

7    Q    The instability part of it?

8    A    Yes.  Right.

9    Q    Did Bard represent its filters as having strength and

13:27:52  10   stability?

11   A    Yes.

12   Q    Did Lisa Hyde's filter prove to live up to that

13   representation by Bard?

14   A    No.

13:28:23  15   Q    Now, you were asked questions about the SIR guidelines and

16   trackable events.  Can you just tell us what those are.

17   A    The SIR guidelines were created to allow -- I'm sorry,

18   they were created as guidelines for hospitals and

19   interventional radiology departments to use for quality

13:28:40  20   assurance to identify when complications or issues regarding

21   devices or procedures fall out of sort of an agreed upon

22   benchmark so that you can have basically a quality assurance

23   program.

24   Q    And whether a filter has a trackable event or not, when it

13:29:04  25   fails, it can cause injury and risk of harm to patients;

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:29:07   1   correct?

2   A   Yes.

3   Q   And in terms -- you had said on cross-examination, you

4   said that Lisa Hyde experienced a catastrophic event?

13:29:15   5   A   I would consider a filter migration of a fragment to the

6   heart catastrophic, yes.  Or potentially catastrophic.

7   Q   And the reason?

8   A   It's going to require intervention of some sort.  Either

9   surgery or a complex endovascular technique that has high

13:29:30   10   risk.

11   Q   And did Bard ever talk to physicians about its filters

12   that they were aware those filters posed a risk of

13   catastrophic events as opposed to some failure modes?

14   A   No, they never used that language.

13:29:43   15   Q   Would that be something physicians should reasonably

16   expect from medical device company like Bard?

17   A   Yes.

18   Q   And Bard filters were, as we said, the G2, the G2X, were

19   promoted and represented as permanent filters with the option

13:30:08   20   to retrieve.  When they talked about retrieval, what type of

21   procedure were they talking -- Bard talking about?

22   Percutaneous?

23   A   Yes.

24   Q   Meaning what?

13:30:19   25   A   Usually you place a small sheath through the internal

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:30:23  1  jugular vein of the neck.  Under X-ray guidance, you guide

2  that sheath down to the position just above the filter, and

3  then you take either a grasping device or a lasso if it has a

4  hook and you grab it and pull it up into the sheath, just like

13:30:41  5  would you take a umbrella and take your hand and just close it

6  like that, and then you pull it out of the patient.

7  Q   Now, Lisa Hyde underwent a complex procedure; is that

8  correct?

9  A   Her removal of her filter as was shown did not appear to

13:30:55  10  be complex.  There were no fragments that occurred during the

11  removal.  It seems like they were able to retrieve the device

12  that was in her inferior vena cava pretty straightforward.

13  The fact, though, that she had to have a procedure,

14  the second part of the procedure where they guided that sheath

13:31:14  15  that I'm talking about into her heart and then attempted to

16  retrieve a -- basically a needle from her heart that was

17  actively beating with a lasso, it's pretty impressive how

18  quickly he got it out and, you know, she did not have any

19  complications.  But you can have tremendous complications

13:31:35  20  trying to remove these fragments.

21  Q   And you're not here to talk about what issues she may have

22  from having a procedure to her heart.  Fair?

23  A   I'm not here to talk about that.

24  Q   But is it fair to say, Dr. Hurst, that when doctors like

13:31:49  25  you were implanting these filters, is it fair to say that

REDIRECT EXAMINATION – DARREN R. HURST, M.D.

13:31:55  1    neither you as the doctors nor the patients ever had any

2    expectation or should have reasonably expected that the filter

3    would break, embolize, land in the ventricle, and then require

4    a procedure, and possibly an open procedure?

13:32:09  5         MR. ROGERS:  Objection, Your Honor, to the portion of

6    the question where he's addressing what patients would have

7    known.

8              THE COURT:  Overruled.

9              THE WITNESS:  So no, that's not what we expected.

13:32:18 10   And, in fact, I was discussing this with someone that when you

11   have that clinic visit, that is a terrible clinic visit when

12   you have to talk to a patient about a device that's failed.

13   And fortunately I have not had one that has failed where the

14   patient has had to have some sort of cardiac procedure to

13:32:36 15   remove it.

16             But, you know, explaining to a patient that their

17   device that you put in has broken and a piece of it has gone

18   into their heart and now they're going to have to have some

19   sort of cardiac procedure is a really big deal.  It's a pretty

13:32:53 20   quiet room when you're having that discussion.

21   Q    Bard, did they ever alert physicians to be on the lookout

22   for catastrophic events?

23   A    No.

24             MR. O'CONNOR:  That's all I have.  Thank you.

13:33:04 25             THE COURT:  Thank you.  You can step down, sir.

                    DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:33:45  1          MR. LOPEZ:  Your Honor, plaintiffs will call

       2   Dr. Michael Streiff.

       3                    **MICHAEL STREIFF, M.D.,**

       4   called as a witness herein, after having been first duly sworn

13:34:22  5   or affirmed, was examined and testified as follows:

       6          MR. LOPEZ:  May I proceed, Your Honor?

       7          THE COURT:  You may.

       8          MR. LOPEZ:  Thank you.

       9                D I R E C T   E X A M I N A T I O N

13:34:33 10   BY MR. LOPEZ:

      11   Q   Good afternoon, Dr. Streiff.  Thank you for being patient.

      12   I know you've been here since the morning.

      13          Would you please introduce yourself to the members of

      14   the jury.

13:34:56 15   A   Certainly.  So I'm Michael Streiff.  I'm a hematologist,

      16   so a doctor that takes care of people with blood diseases.

      17   And I did my training in the early 1990s, have been on staff

      18   at Hopkins since 1997 as a hematologist.  Primarily I focus on

      19   diseases which involve blood clots or bleeding disorders, so

13:35:23 20   people that have developed DVT or pulmonary embolism or have

      21   diseases that increase your risk of having a blood clot or

      22   diseases that cause bleeding problems.  That makes up probably

      23   65 to 70 percent of the patients I see on a daily basis.

      24   Q   And a hematologist, what are the types of patients -- I

13:35:44 25   know you mentioned some, but what is your basic patient

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:35:49  1   population that you see as a hematologist?

2   A   So if you look at all the patients I see, I'd say all of

3   them, almost all of them, 95 percent of the patients I see

4   have benign blood diseases.  So there are malignant blood

13:36:06  5   diseases like leukemia, lymphoma, myeloma.  I tend not to see

6   very many of those patients.  There are other specialists at

7   our center that I would ref- -- if I were to happen to make a

8   diagnosis of someone with one of those diseases, I refer them

9   to because there are doctors that specialize in that type of

13:36:23  10  blood disease.  So I focus primarily on benign blood diseases.

11  So bleeding, clotting, diseases of anemia, sickle cell anemia,

12  low platelets, high or low white blood cell counts.

13  Q   Do you make -- you make therapeutic decisions on behalf of

14  those patients that might include pharmaceuticals or medical

13:36:43  15  devices?

16  A   Certainly, yes.  Yes.

17  Q   And among those methods of treating those patients, have

18  you had in your experience as a hematologist patients who have

19  had IVC filters?

13:36:58  20  A   Yes.  Certainly.  I think any hematologist that sees --

21  practically any hematologist, but I'd say any hematologist who

22  sees a bulk of patients that have blood clotting diseases,

23  you're going to have patients that you have to make that

24  decision.  And we get -- I'm on service every month of the

13:37:16  25  year, and I'd say that every month I'm on, we get asked about

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:37:20  1   a patient that had has a blood clot where they're having

2   difficulty treating it, and so then you have -- a filter would

3   be one of the things you would consider in that case.

4   Q   Now, I -- we've heard anticoagulants or anticoagulation

13:37:34  5   therapy already in this trial.  Is that a method of treatment

6   for this type of patient that you've studied and that you've

7   used that type of medication with this patient population?

8   A   Certainly.  So one of my roles at Hopkins is I run an

9   anticoagulation clinic.  So we have a clinic in our cancer

13:37:56  10  center and then a clinic over on the -- where we have patients

11  that don't have cancer that go too that also need blood

12  thinners or -- which is kind of a common parlance for an

13  anticoagulant, and I have a staff of pharmacists that manage

14  warfarin, but they also help manage other blood thinners,

13:38:12  15  injectable blood thinners like loma- -- heparin or some of the

16  new drugs that are on the market now that you don't need to

17  monitor.  So I see lots of patients that are on an

18  anticoagulant for treating blood clots or preventing another

19  blood clot from happening.

13:38:30  20  Q   Have you also studied and written articles regarding IVC

21  filters and the potential use of those devices to treat that

22  patient population?

23  A   Certainly.  So early on in my training when I was a

24  fellow, my mentor, Dr. Bell, who I think occupied a similar

13:38:47  25  clinical niche to me, had very certain ideas about vena caval

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:38:54  1   filters and was very vocal about it.

2        But I thought -- as a fellow, I thought, well, I

3   really want to know what the literature is behind these

4   devices because they were -- this is before we had retrievable

13:39:06  5   filters.  In the 1990s they were all permanent filters.  But I

6   wanted to know what was the literature behind why -- you know,

7   why was he so negative about vena caval filters and was he

8   being balanced about this view of filters.

9        And so one of the first papers I wrote was doing a

13:39:26  10  comprehensive review of the literature.  I published this in

11  2000 in Blood.  Of all of the clinical studies that had been

12  done at that point on vena caval filters, because I wanted to

13  make up my own mind.  I wasn't just going to -- although

14  Dr. Bell was a very, very knowledgeable physician --

13:39:44  15       MR. CONDO:  Your Honor, I would object to any hearsay

16  offered through this witness about Dr. Bell's views or points

17  of view.

18       THE COURT:  Sustained.  I think this is just

19  background, but going forward obviously it is just

13:39:56  20  Dr. Streiff's opinions that are --

21  BY MR. LOPEZ:

22  Q   Now, sir, I'm not going to walk you through all of the

23  different articles and things you've written as they relate to

24  IVC filters, but I'm going to ask you about a couple.

13:40:07  25       Do you know a Dr. John Kaufman?

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:40:13  1   A    John Hoffman.

2   Q    No, Kaufman.

3   A    Kaufman.  Yes.  Of course.  Yes.  I've worked with him on

4   several papers, yes --

13:40:19  5   Q    And did you write an article --

6   A    -- radiologist.

7   Q    I'm sorry.  Did you write an article with Dr. Kaufman that

8   was published in the Society of Interventional Radiology

9   Journal in 2006 entitled "Guidelines for Use of Retrievable

13:40:34 10   and Convertible Vena Cava Filters:  Report from the Society of

11   Interventional Radiology Multidisciplinary Consensus

12   Conference"?

13   A    Yes, sir.  He reached out to me in 2005 and asked me to be

14   part of that meeting that they had after a conference in Miami

13:40:51 15   Beach that year.

16   Q    Okay.  Now let's fast-forward to the present.  Are you

17   still writing significant authoritative articles, text

18   chapters that deal with the use of IVC filters?

19   A    Certainly it's still one of my -- it was one of my early

13:41:08 20   interests in hematology and I still keep an eye on the

21   literature there.  I -- I'd say I spent a lot more time on

22   anticoagulant therapy and optimizing that, but I do, you know,

23   continue to write articles on that.  And we just, a colleague

24   of mine, Anita Rajasekhar, and I published a chapter that just

13:41:32 25   came out the last month in a textbook of thrombosis and

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:41:36  1   hemostasis, which is a textbook for people that treat blood

2   clots.

3   Q   Is that a chapter devoted to IVC filters?

4   A   Yes.  IVC filters and venous access devices, so catheters

13:41:47  5   that you can put medicines into.

6   Q   We'll get back to this, but you actually have a certain

7   patient population recommend and prescribe IVC filters.  True?

8   A   Certainly.  I think that I -- I consider filters in

9   patients where you can't use anticoagulants.  And,

13:42:07  10   fortunately, that's a small segment of the patient population

11   that has blood clots.  But occasionally people, right after

12   major surgery, neurosurgery, and they're not -- it wouldn't be

13   safe to use a blood thinning medication in that situation.

14   You would have -- could have a catastrophic bleed.  And so

13:42:26  15   those patients are patients that we would consider -- I would

16   consider using a filter.  If they have a blood clot that would

17   put them at risk for the pulmonary embolism, then you have to

18   do something to prevent that from happening.

19   Q   Now, you've been retained in this case to serve as an

13:42:38  20   expert on behalf of the plaintiffs.  True?

21   A   Yes.

22   Q   And what is it that we asked that you address for purposes

23   of your role here as an expert?

24   A   So you asked me to, because I keep my eye on the

13:42:55  25   literature, to look at the literature that supports the use of

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:42:58   1   vena cava filters and indications for a vena cava filter based

2   on the literature.  So an evidence-based review of it.  And

3   also what would I, as a physician that refers patients to

4   interventional radiologist like Dr. Hurst, who just spoke, I

13:43:18   5   make referrals to those physicians for filter placement, and

6   what knowledge, what information would I want from

7   manufacturers of filters to make a good evidence-based

8   judgment and give my best advice to patients, because that's

9   what you want to do is you want to, here are the risks we're

13:43:36   10   facing for using a blood thinner, here are the risks with a

11   filter, and you want to know all of the information that

12   relates to the risk/benefit balance.

13   Q    Now, Doctor, I'm going to -- I think one of the other

14   things that we asked you to do is to look at some of the

13:43:51   15   scientific evidence and medical evidence that exists to -- to

16   give what you would consider a risk/benefit assessment in

17   prescribing these --

18          MR. CONDO:  Objection.  Leading.

19          THE COURT:  Overruled.  This is background.

13:44:06   20   BY MR. LOPEZ:

21   Q    -- in the use of these filters?

22   A    Certainly.  So with filters, the things you get concerned

23   about, as we've heard earlier today, are, are they stable?

24   Are they going to remain at the location where they're

13:44:21   25   implanted?  They're supposed to operate as a barrier to a clot

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:44:24  1   moving from the legs to the lungs, which could be a fatal

2   event, and so there's supposed to be a stable barrier there.

3   They're not supposed to move, they're not supposed to

4   fragment.  The legs, which keep them anchored in that location

13:44:37  5   are not supposed to perforate the vessel that they're in and

6   enter into other organs where they could cause problems.  And

7   so you'd want the information about how often does that occur

8   with this device versus this other device versus -- to make a

9   judgments.

13:44:54 10   Q   Doctor, describe -- there are certain ways that medical

11   devices can be studied to determine whether or not they're

12   safe, whether they're effective.  Let's talk about the

13   effectiveness of these devices.  What kind of studies have

14   been done to determine whether or not IVC filters do what

13:45:13 15   they're represented and intended to do?

16   A   So that -- unfortunately haven't been -- although there

17   are lots and lots of studies, if you happen to do a Google

18   search or a PubMed search for the vena cava filter, you'll see

19   thousands of articles out there, including a few that I've

13:45:29 20   written, but thousands and thousands of articles.

21        But actually only really two randomized trials that

22   have been published regarding vena caval filters, and that is

23   when you -- if there's a hierarchy of the medical literature,

24   randomized trials are at the top of that hierarchy because in

13:45:48 25   a randomized trial, the investigators blindly sort.  You know,

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:45:52  1    they have their certain pool of patients that could

2    participate in this study.  You present the risks and benefits

3    of participating, and then people are randomly sorted toward

4    one treatment or another, and the investigators don't choose

13:46:06  5    who gets what treatment.  So you then get an unbiased view, a

6    relatively unbiased view, of what the risks and benefits and

7    the efficacy of that device or that drug is.

8         And the highest -- I guess in the hierarchy, the best

9    randomized control trials are blinded trials where neither the

13:46:26  10   patient nor the investigator know what intervention they're

11   getting.  There's two studies that have been done in -- with

12   vena caval filters, both in Europe, were open trials.  So the

13   doctors knew who got the filters.  The patients of course knew

14   who got the filters.  It would be hard to do a study with --

13:46:44  15   pretty hard to do a study without telling them.  And so it's

16   not the best level of evidence, but it's the best we have.

17        For the other 8,000 studies that are out there, there

18   are lesser degrees of quality where people have looked back at

19   past practice and kind of see what happens with filters or

13:47:03  20   have had a prospective, in other words, they follow people

21   forward in time to see what happens with filters, but there's

22   no random assortment into one treatment or another.

23   Q    Okay. We're actually getting into those.  You're used to

24   teaching, aren't you?

13:47:19  25   A    Yeah.  Sorry.

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:47:19  1    Q    All right.

        2    A    Talk a lot.  Yeah.

        3    Q    So let me ask this:  Has Bard ever conducted a randomized

        4    clinical trial of their filters to determine whether or not

13:47:31  5    they actually do what they're intended to do?  That is, to

        6    prevent fatal pulmonary embolism?

        7    A    No.  Not to my knowledge.

        8    Q    And the two studies you're talking about, did they look at

        9    IVC filters to determine whether or not in the two groups that

13:47:50 10    were being studied, whether or not the folks in the filter

       11    group actually had a better result from the standpoint of

       12    mortality or causing fatalities than the group that did not

       13    have filters?

       14    A    So in both those studies that I've referred to, there was

13:48:08 15    no difference in mortality between the people that didn't get

       16    a filter and the people that did get a filter.  Now, everybody

       17    got anticoagulants or blood thinners in those studies, so you

       18    were adding up -- in half the patients you were adding a

       19    filter on top of anticoagulation.

13:48:25 20    Q    Just so we're clear, the only two studies that exist that

       21    would be considered as high level randomized control study

       22    that compares whether or not filters actually do what they are

       23    intended to do, or maybe not do, are these two studies you're

       24    talking about?

13:48:44 25    A    Yes, sir.  Yeah.

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:48:45  1           MR. LOPEZ:  And could we have Exhibit 3709, please.

2    BY MR. LOPEZ:

3    Q    And it should come up on your screen.

4    A    Do I have to do anything --

13:49:02  5           THE COURT:  No.

6           THE WITNESS:  Oh, yeah, I see it.  Yes.

7           MR. LOPEZ:  3709.

8           THE WITNESS:  Yeah.  That looks like it.

9           MR. LOPEZ:  Oh, okay, yours is in color.

13:49:14 10    BY MR. LOPEZ:

11   Q    All right.  So this is the -- is this that first study

12   that you talked about where they did a randomized control

13   study?

14   A    Yes, sir.  This is the eight-year follow-up of that first

13:49:23 15   study.

16           MR. LOPEZ:  And, Your Honor, I know we can't show

17   this to the jury, but can I publish the title to the jury?

18           THE COURT:  You can have him state the title.

19           MR. LOPEZ:  Okay.

13:49:31 20           THE COURT:  If it's not in evidence, you can't show

21   it.

22   BY MR. LOPEZ:

23   Q    And this is published in an authoritative journal?

24   A    Yes, sir, in Circulation.

13:49:40 25   Q    In a journal that's a reputable journal that's read by

DIRECT EXAMINATION — MICHAEL STREIFF, M.D.

13:49:44  1   physicians like yourself?

2   A    Yes, sir.

3   Q    Could you read the title of this article to the jury,

4   please.

13:49:53  5   A    So the title is "Eight-Year Follow-Up of Patients with

6   Permanent Vena Cava Filters in the Prevention of Pulmonary

7   Embolism:  The PREPIC", that's an abbreviation for a number of

8   words in French --

9   Q    You don't have to read the French.

13:50:11 10   A    -- "Randomized Study."

11   Q    Let's go to the next page, and explain to the jury again

12   the randomized part of the study, but who was in one group and

13   who was in the other group.

14   A    So the investigators had a -- at the I guess central

13:50:31 15   center where the study was being coordinated from would send

16   random -- they would generate random numbers that would -- if

17   you had a patient that said, yeah, I'd like to participate in

18   this study, I have a blood clot and I would like to be

19   involved in this study, then the central center that was

13:50:47 20   coordinating the study, they have a random number generator

21   that would tell the physicians that are working in that

22   medical center, because it was in many, many different medical

23   centers, would tell them whether that patient was going to get

24   a filter or not.  So it randomly chosen.  Kind like randomly

13:51:02 25   out of a hat.  They were told whether or not this patient

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

13:51:06   1   would receive a filter or not.

2            All of the patients were already started on blood

3   thinners for their blood clot.  The patients all had a

4   pulmonary embolism and were felt to be at high risk for having

13:51:15   5   another, which is why they were chosen.

6   Q   Okay.  Doctor, this was in 2005?

7   A   This paper came out in 2005, yes.

8   Q   And there under "Background," would you please read the

9   last sentence to the jury under "Background."

13:51:28  10   A   "An eight-year follow-up was performed to assess their

11   very long term effects.  The filters" --

12   Q   Okay.  So this was an eight-year follow-up to look at the

13   long-term effects of the effectiveness of IVC filters?

14   A   Yes.

13:51:44  15   Q   Okay.  And the conclusion, could you read that to the

16   jury, please.

17   A   Sure.  "At eight years, vena cava filters reduced the risk

18   of pulmonary embolism but increased the risk -- or increased

19   that of deep vein thrombosis and had no effect on survival.

13:52:03  20   Although their use may be beneficial in patients at high risk

21   of pulmonary embolism, systematic use in the general

22   population with venous thromboembolism," another term for deep

23   vein thrombosis and pulmonary embolism, "is not recommended."

24   Q   Now, when it said -- when the conclusion of this study

13:52:22  25   reads "that there is no effect on survival," what does that

DIRECT EXAMINATION — MICHAEL STREIFF, M.D.

13:52:25  1   mean?

2   A    It means that the survival rates in both arms of the study

3   were similar.

4   Q    And then was there a later study similar to this one where

13:52:36  5   there was a follow-up with a similar patient population?

6   A    Yes.  You'd be referring to the PREPIC, the second in a

7   series of studies, the second PREPIC trial that looked at

8   retrievable --

9   Q    Hold on.  Hold on.  Slow down.

13:52:53  10   A    Oh, I'm sorry.

11        MR. LOPEZ:  We're going to bring up Exhibit 4147.

12   BY MR. LOPEZ:

13   Q    Okay.  Do you see that?  Do you have that in front of you,

14   Doctor?

13:53:06  15   A    Yeah.

16   Q    And this was published in what journal?

17   A    This was published in the Journal of the American Medical

18   Association known as JAMA.

19   Q    Okay.  And that is an authoritative journal,

13:53:16  20   well-recognized, peer-reviewed?

21   A    Yes.  It's very well respected.

22   Q    And this was in 2015?

23   A    Yes, sir.

24   Q    So this is at a time after retrievable filters had been on

13:53:28  25   the market for a while; right?

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:53:30  1   A    Yes, sir.

2   Q    In fact, this is a retrievable filter study, is it not?

3        MR. CONDO:  Your Honor, I'm going to objection to

4   leading the --

13:53:39  5        THE COURT:  I'm going to sustain that.  It's clearly

6   leading.

7   BY MR. LOPEZ:

8   Q    Is this a retrievable filter study?

9   A    Yes, sir.  This is a retrievable filter study because by

13:53:44  10  this time there was -- by the time this study was starting --

11  started up in 2006, there was a lot of interest in testing

12  whether retrievable filters, whether they would behave

13  differently than the permanent devices that had been on the

14  market.

13:53:59  15  Q    Maybe I should have just read you -- had you read the

16  title of this article.  Will you do that?

17  A    "The Effect of a Retrievable Inferior Vena Cava Filter

18  Plus Anticoagulation vs Anticoagulation Alone on the Risk of

19  Recurrent Pulmonary Embolism.  A Randomized Clinical Trial."

13:54:19  20  Q    So you're familiar with the Bard G2, Recovery, G2X,

21  Eclipse filters.  Those would be considered retrievable

22  filters; correct?

23  A    Yes, sir.

24  Q    Would you please read the "Importance" portion of the

13:54:35  25  front page of this article.

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:54:39  1   A   It states:  "Although retrievable vena cava filters are

2   frequently used in addition to anticoagulation in patients

3   withs acute venous thromboembolism, their benefit-risk ratio

4   is unclear."

13:54:53  5   Q   And what was the objective of this randomized control

6   study?

7   A   To demonstrate that if you used the vena cava filter in

8   addition to anticoagulation, you would decrease the risk of

9   pulmonary embolism because you'd be -- in addition to

13:55:08  10  anticoagulation be placing a physical barrier to clots

11  transmitting to the lungs and that that might have an output.

12  You know, decrease pulmonary embolism, decrease death rates

13  due to pulmonary embolism.

14  Q   And just read the first paragraph, Doctor, if you will,

13:55:23  15  under "Design Setting and Participants."

16  A   "Randomized open-label blinded end point trial."  So that

17  means that it was everybody -- you know, doctors and patients

18  both knew if they got a filter or not or if they just got

19  anticoagulation.

13:55:40  20          And then the outcomes that happened, if you happen to

21  have another episode of chest pain that turned out to be a

22  pulmonary embolism, that was adjudicated by a group of

23  investigators that had nothing to do with the study and

24  wouldn't know which arm of the study the patient was on.  So

13:55:58  25  they were blinded as to what treatment the patient got.  They

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:56:01  1   would just judge, yes, that is a pulmonary embolism or no,

2   that's not a pulmonary embolism, based on the images and data

3   that they were given.  So they were blinded to what group the

4   patients were in.

13:56:11  5   Q   And, again, between 2005 and 2015, did Bard or any other

6   IVC filter manufacturer sponsor a clinical trial like this?

7   A   No, sir.

8   Q   Are there any other clinical trials like this published in

9   the world literature?

13:56:28  10  A   There are no other randomized control trials like this.

11  Q   There are some other types of trials that are maybe

12  lower -- like retrospective, is that what those are called?

13  A   Yeah.  Retrospective or prospective single arm studies

14  where there is no comparator.

13:56:42  15  Q   Now, in the last -- since 2015, now we're in 2018, have

16  there been other articles written in the medical literature

17  that looked at whether or not filters save lives?

18  A   I think there have been articles that looked at -- so

19  there have been articles that look at large populations of

13:57:05  20  patients that, if you have access to, like, Medicare or

21  Medicaid data, you can look at thousands and thousands of

22  patients and see based -- see people that got filters and did

23  not get filters, and then look and see how they did by just

24  looking at in kind of a blinded fashion at the medical

13:57:24  25  records.  So those kind of studies, but those are not

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:57:26  1  randomized studies.

2       That's where you're following what doctors did and

3  therefore it's -- because doctors may place filters in one

4  type of patient and not in another type of patient.  It's not

13:57:37  5  like a randomized trial.

6  Q   I understand.  But it's still physicians -- is it still

7  physicians looking at outcomes to see whether or not there is

8  any evidence that IVC filters actually reduce the risk of

9  fatal pulmonary embolism?

13:57:53  10  A   True.  That they've done studies like that.

11  Q   Let's turn back to Exhibit 4147.

12       MR. LOPEZ:  Your Honor, I understand if he's reading

13  it I can't publish what's what he's reading to the jury.

14       THE COURT:  It's not in evidence.

13:58:08  15  BY MR. LOPEZ:

16  Q   So under the "Design Settings and Participants," I wanted

17  you to point out that first sentence about the six-month

18  follow-up.  Can you read that to the jury and explain what

19  that means.

13:58:22  20  A   So I --

21  Q   Read the sentence first?

22  A   Yeah.  "Randomized open-label, blinded end point trial,"

23  so I did that before, "with 6-month follow-up conducted from

24  August 2006 to January 2013."

13:58:35  25  Q   Okay.  And then let's go right to the "Results."  Okay?

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

13:58:40   1   And could you read that first paragraph of the "Results."

       2   A    So, "In the filter group, the filter was successfully

       3   inserted in 193 patients and was retrieved as planned in 153

       4   of the 164 patients in whom retrieval was attempted.  By 3

13:59:01   5   months, recurrent pulmonary embolism had occurred in 6

       6   patients, 3.0 percent; all fatal, in the filter group and in 3

       7   patients in the control group, 1.5 percent; 2 fatal."

       8   Q    Keep reading.

       9   A    So the relative risk with the filter for the outcome of

13:59:22  10   pulmonary embolism was 2.0.  So that means there's twice as

      11   likely to occur in the filter group as the nonfilter group,

      12   but there's some statistics that follow that basically suggest

      13   that although it's twice as likely, it's not significant

      14   because it's a very -- they're very small numbers of patients

13:59:41  15   that had that outcome, fortunately.

      16        And the "results were similar at 6 months.  No

      17   difference was observed between the 2 groups in regards to the

      18   other outcomes."  And "filter thrombosis occurred in 3

      19   patients."

13:59:57  20        I think the other outcomes were death, deep vein

      21   thrombosis, are the ones that come to mind.

      22        MR. LOPEZ:  I'd like to move 4147 into evidence.

      23        MR. CONDO:  Your Honor, he may have established --

      24        THE COURT:  What's the objection?

14:00:19  25        MR. CONDO:  Hearsay.

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

14:00:21  1          THE COURT:  What's your response on hearsay?

2          MR. LOPEZ:  This is a -- one of two articles --

3          THE COURT:  Is it --

4          MR. LOPEZ:  -- that goes to notice.

14:00:32  5          THE COURT:  -- learned treatise under 803(18)?

6          MR. LOPEZ:  Yes, Your Honor, learned treatise.

7          THE COURT:  Denied.  803(18) specifically says the

8    exhibit is not shown to the jury.

9          MR. LOPEZ:  I understand, but the exception would be

14:00:43  10   notice to Bard about articles that are being written that they

11   monitor and read for purposes --

12         THE COURT:  Are you saying you want it admitted not

13   for the truth of what's in the article?  That's what you're

14   saying if you're making a notice argument.

14:00:59  15         MR. LOPEZ:  Well, I mean, if it doesn't come in, it's

16   not coming in that way anyway.

17         THE COURT:  Well, he can read it under 803(18) but

18   the exhibit isn't shown to the jury under 803(18).

19         MR. LOPEZ:  All right.

14:01:10  20   BY MR. LOPEZ:

21   Q   So let's go back to the "Results" section, and I want to

22   make sure we're clear about what you read there.

23         In the filter group there were three patients that

24   died from a pulmonary embolism; right?

14:01:28  25   A   There were six patients that --

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

14:01:30  1    Q    I'm sorry --

2    A    -- died of pulmonary embolism.  3 percent since it was 200

3    patients in the filter arm.

4    Q    So 3 percent of the patients who received the filter died

14:01:43  5    of recurrent pulmonary embolism?

6    A    Yes, sir.

7    Q    And in the nonfilter group, three patients or 1.5 percent

8    died of a recurrent pulmonary embolism; correct?

9    A    Yes.  Three patients had a pulmonary embolism and two of

14:01:57  10   those three died.  So --

11   Q    So 3 percent --

12   A    I guess 1 percent fatal pulmonary embolism rate.

13   Q    3 percent of the patients that had a filter had died of

14   recurrent pulmonary embolism.  Is that what that says?

14:02:14  15   A    Yes, sir, on the filter --

16   Q    And 1.5 percent, half as many, died of recurrent pulmonary

17   embolism in the control group.

18   A    Or -- yeah.  1.5 percent had a pulmonary embolism and

19   1 percent or two of those patients, died of their pulmonary

14:02:28  20   embolism.  Two of the three.

21   Q    Have there been any other randomized controlled clinical

22   trials that look at this -- these same kind of outcomes since

23   PREPIC-2 which was published in 2015?

24   A    Not -- they're not of this size.  I mean, they're small

14:02:50  25   trials -- there's a small randomized trial in trauma patients

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

14:02:54  1   but it's such a small trial you really can't look at these

2   type of outcomes.

3   Q   What is the current state of the medical evidence with

4   respect to the benefits or the effectiveness of IVC filters?

14:03:09  5   A   Well, I think as a result of this article and the previous

6   study, it's been evolving, I would say, since the late 1990s

7   through to today, such that I think physicians -- or I would

8   say -- I should probably just speak as a hematologist.  That

9   hematologists would generally reserve filters, placing or

14:03:29  10   referring a patient to an interventional radiologist or

11   vascular surgeon to place a filter in someone where

12   anticoagulation is not possible because there are concerns

13   about device flaws and bad outcomes with placing filters, and

14   so we only use them now in patients that you can't use your

14:03:53  15   first line therapy, which is anticoagulation.

16   Q   Because of the -- what you just told us about, the current

17   state of scientific evidence regarding the benefits or the

18   effectiveness of IVC filters, do you have an opinion as to the

19   tolerance of risks that physicians and patients should accept

14:04:22  20   when they might need an IVC filter?

21   A   Yes.  I would think tolerance for risk would be very, very

22   low.  You don't -- because we don't think they have major

23   benefits except for a very small patient population.  You only

24   want to place them in a small group of people, people that you

14:04:42  25   can't anticoagulate.  And then you would want to place the

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

14:04:46  1    safest filter possible because we do know these have -- the

2    devices have side effects.

3    Q    How can product manufacturers, device manufacturers, help

4    you in determining whether or not the risk for their device is

14:04:59  5    acceptable to you as a hematologist?

6    A    Well, I think just similar to what you expect from drug

7    companies that manufacture anticoagulants.  If you're using an

8    anticoagulant, you want that compared to the -- whatever is

9    out there on the market, whatever the gold standard is.  You

14:05:20  10    want that and you'd want to have in a randomized trial, and

11    you wouldn't accept less.  And then you'd want the results of

12    that randomized trial completely transparently out in the

13    medical literature and in their product's labels so that you

14    can make a comparison when you're deciding on drug X versus

14:05:39  15    drug Y.  And in this case, you would be deciding on device X

16    versus device Y.  And you would want to know head to head how

17    those devices compare to each other.

18    Q    Doctor, let me ask you this.  Let's assume -- we know that

19    those studies don't exist.  So let's assume that a company has

14:05:58  20    collected clinical data about the complications or the risks

21    of their devices and they've compared those rates and risks to

22    other devices on the market, and their own internal analysis

23    shows their devices are more dangerous than other devices.  Is

24    that the kind of information you would expect to be told by

14:06:20  25    that product manufacturer?

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

A    Of course.  I think it's incumbent on manufacturers of all

products that if you have knowledge that your product may not

be as good as another product on the market, you need to make

everybody aware that's potentially using your product so that

they can make the right judgments on whether or not you want

to use it.

Because as a physician, as a patient, you want to

know all of the information about any decision you make for

your health.

Q    Yeah.  Let's assume that a product manufacturer of these

devices had -- and they do a risk analysis to determine

whether or not a design of a new device is performing in a

manner in which they expected or intended it to perform, and

the risk analysis from the data that they've collected

determined that there is an unacceptable risk of serious harm

because of the design of that new device.  Is that the kind of

information that you expect companies to pass on to you so you

can pass it on to your patients?

A    Certainly.  You want to make everybody aware of it, all

physicians that are placing these devices are using this drug.

And remove it from the market if it's serious enough.  I mean,

I think it depends on the severity, but you want that --

everyone to be well aware of it.

Q    What if the information that's being collected by the

company shows something different than what physicians are

DIRECT EXAMINATION – MICHAEL STREIFF, M.D.

14:07:47   1   used to with respect to, say, the risk of fracture with this

2   device because instead of the fracture staying close to the

3   filter, they now have multiple cases of that fragment

4   migrating to the heart or lungs or even to other parts of the

14:08:00   5   body.  Is that the kind of information you'd expect a company

6   to reveal to you?

7   A   Of course.  It's incumbent, I think, upon manufacturers of

8   any device that you make everyone aware that -- of what the

9   flaws are of that device so that they can make the proper

14:08:16   10   decision when treating their patients.

11   Q   Now, you've been involved with patients that have IVC

12   filters going back to at least 2000, I think?

13   A   Yes, sir.

14   Q   You wrote an article in 2000.

14:08:30   15   A   Yes, sir.

16   Q   You used Bard filters in the past?

17   A   I know our hospital has used Bard filters in the past,

18   yes.

19   Q   Have you ever met with Bard representatives to have

14:08:38   20   discussions with them about their devices?

21   A   I think --

22        MR. CONDO:  Your Honor, I would object.  This is a

23   disclosure issue.  Exceeds the scope of the expert

24   designation.

14:08:48   25        THE COURT:  Is it in the report?

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

14:08:49  1          MR. LOPEZ:  No, Your Honor.

        2          THE COURT:  Sustained.

        3   BY MR. LOPEZ:

        4   Q    Let's assume that Bard -- assuming Bard knew that they had

14:09:01  5   a filter and they knew that the design of the filter was not

        6   allowing it to perform in the manner in which they were

        7   representing it was performing, what would your expectations

        8   be of Bard under those circumstances?

        9   A    To remove the device from the market and repair the

14:09:21 10   defects --

       11          MR. CONDO:  Object, Your Honor.  This goes beyond the

       12   scope of the report too.

       13          THE COURT:  Is that in the report?

       14          MR. LOPEZ:  No, Your Honor.

14:09:30 15          THE COURT:  Pardon?

       16          MR. LOPEZ:  Well, this specific testimony isn't, but

       17   the -- it's -- it's his general subject matter he's testifying

       18   to.

       19          THE COURT:  Objection sustained.

14:09:44 20   BY MR. LOPEZ:

       21   Q    Just give us -- the jury your opinion.  In order -- in

       22   order for you to do an appropriate risk/benefit analysis with

       23   respect to the use of IVC filters, what are your expectations

       24   of manufacturers providing you with information about that

14:10:08 25   performance about those design issues?

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

14:10:11   1   A   So it's -- as it's alluded to before that if you -- let's

2   say you have a patient that you can't anticoagulate that's

3   after surgery, you're considering a filter.  You'd want to

4   know what the success rate of that filter is; how many

14:10:27   5   pulmonary emboli.  They have -- placed in patients that have

6   that device placed.  And you'd also want to know the side

7   effects of the device.  How often does it fracture, how often

8   do the legs go through the wall of the vessel, how often does

9   it migrate.

14:10:45   10         You'd want to know all about that so that you can

11   make a good -- an educated decision for your patient, or at

12   least give your patient advice on this device, that's the --

13   this is the behavior profile of that device and this other one

14   has these results, and maybe this one we should consider

14:11:04   15   better than this one because of the outcomes.

16   Q   What needs to be done, Doctor, in your opinion, to

17   affirmatively answer the question do IVC filters actually save

18   people from fatal pulmonary embolism?

19   A   So ideally you would have a trial where you had patient --

14:11:25   20   the patient population that require a filter, and you would

21   compare them to patients that -- you know, in a randomized

22   fashion, compare them to patients that didn't get a filter so

23   you could prove that filters were efficacious in preventing

24   pulmonary embolism.

14:11:44   25         I think you couldn't -- obviously couldn't do a study

DIRECT EXAMINATION - MICHAEL STREIFF, M.D.

14:11:47  1    where you're not giving people any treatment at all, and so I

2    think you'd have to prove it in another way.  Maybe in people

3    that were at risk for DVT and PE who were getting preventive

4    treatment, didn't have one yet, and then do a study there

14:12:02  5    where you're looking for -- looking for pulmonary emboli and

6    show that the device reduced the number pulmonary emboli.

7    Q    And that hasn't been done yet; right?

8    A    No.

9    Q    Do you know if anyone's in the process of sponsoring such

14:12:17 10    a study?

11    A    No.  I know that a colleague of mine, Anita Rajasekhar,

12    looked in a population, in the trauma population.  So people

13    with who had a major trauma, motor vehicle accidents, are at a

14    very high risk for blood clots, very high risk for pulmonary

14:12:31 15    embolism.  They did a small study at the University of Florida

16    where they had everyone on preventative -- kind of

17    preventative blood thinners but not full-dose anticoagulation,

18    and then randomized them to get filters or not get filters.

19    But it was a very small study to show its potential to be

14:12:45 20    done, that type of study.

21    Q    Now, Doctor, the way you advocate the use of IVC filters,

22    is that different from maybe some of the other specialties or

23    even some of your colleagues choose to use IVC filters?

24    A    I think in the hematology community, my opinions are

14:13:05 25    similar to many other hematologists.  And that may be because

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:13:10  1  we have a lot of familiarity with anticoagulants and know who

2  we can use them in and who we can't use them in safely and

3  have a very high comfort level of using drugs to treat blood

4  clots.  It may be different in the vascular surgery community

14:13:26  5  or in the interventional radiology community.

6  Q   Now, are you here to criticize or do you have criticism of

7  the manner in which the IVC filter was used in Mrs. Hyde's

8  case?  In other words, the decision to use an IVC filter?

9  A   Not at all because I -- yeah, I didn't -- yeah, I didn't

14:13:42  10  look at those records and don't have any opinion on that.

11  Q   Doctor, the opinions that you rendered today, are they to

12  a reasonable degree of medical certainty?

13  A   Of course, sir.  Yes.

14      MR. LOPEZ:  That's all the questions I have at this

14:13:58  15  time.

16      THE COURT:  Cross-examination?

17      MR. CONDO:  Yes, Your Honor.

18      Thank you, Judge.

19          C R O S S - E X A M I N A T I O N

14:14:29  20  BY MR. CONDO:

21  Q   Good afternoon, Doctor.

22  A   Good to meet you.

23  Q   Let me see if we can start with a couple points of

24  agreement between you and I.

14:14:50  25      As a hematologist, you don't place IVC filters;

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:14:54  1    correct?

2    A    No.  I -- generally my role in that would be that I am

3    asked to see somebody who is having difficulty with a blood

4    clot, is post-op or bleeding heavily, and then I advise the

14:15:08  5    medical physicians or the surgical physicians caring for that

6    patient that they ought to contact either a vascular surgeon

7    or, more often, an interventional radiologist about such a

8    device.  They would be asking my opinion on that.

9    Q    But you yourself do not place and have never placed an IVC

14:15:22  10   filter in a patient; correct?

11   A    That's absolutely correct, yes.

12   Q    And you've never removed or retrieved an IVC filter from

13   patient; correct?

14   A    No.  No.

14:15:31  15   Q    Correct statement?

16   A    Yes, that's correct.

17   Q    Okay.  And I believe you told the jury just moments ago

18   that in your personal practice you use anticoagulation as the

19   primary treatment --

14:15:46  20   A    Yes, sir.

21   Q    -- for blood clots or DVT.  And if you use

22   anticoagulation, you don't feel that there's any reason to use

23   an IVC filter; correct?

24   A    Correct.

14:16:00  25   Q    But conversely, if for some reason a patient can't accept

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:16:05  1    anticoagulation therapy or it has failed in the patient, then

2    you do recommend, from time to time, the placement of IVC

3    filters, don't you?

4    A   I would say -- so I'd qualify that in -- if I have a

14:16:19  5    patient who has an acute deep vein thrombosis in the first few

6    weeks after having their events and they cannot be placed on

7    the anticoagulants because they're already bleeding or they're

8    at very high risk for bleeding, they've just had a major

9    surgical procedure where bleeding is in an area where it could

14:16:38 10    cause major harm, then that would be a patient that I would,

11    you know, tell the people I'm consulting for that they should

12    consider an IVC filter.

13         As far as failure of anticoagulation, I don't think

14    I've ever placed one for that because most of the time, if

14:16:51 15    there's a failure of anticoagulation, either the wrong drug's

16    being given, the wrong dose is being given, there's some other

17    issue you can fix medically, generally.  You don't have to use

18    a filter.

19    Q   So in the subset of patients where you would recommend the

14:17:05 20    placement of an IVC filter, you believe that that would be an

21    appropriate and proper method of treatment for the patient;

22    correct?

23    A   Yes.  I think when you're in that patient population where

24    you have -- you can't use blood thinners and they're at risk

14:17:21 25    for a pulmonary embolism, you have to do something, and

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:17:23  1   although we don't have very high quality data to support that

2   intuit, you know, you have to do something.  And so in that

3   case, that's the patient population that I would place a

4   filter in.

14:17:34  5   Q   And I think you would agree with me that in that subset of

6   patients, you previously described IVC filters as representing

7   an important alternative to therapy.

8   A   Certainly.  And still do think of them in that when you

9   can't do anything else and you have to prevent the pulmonary

14:17:50  10   embolism from --

11   Q   And I think you also described IVC filter implantation in

12   that subset of patients as being an important weapon in every

13   clinician's toolbox, so to speak, when treating patients?

14   A   True.  I think it is in that small segment of the patient

14:18:09  15   population, I think you have to -- you can't do nothing.  It's

16   not acceptable.

17   Q   Right.  You can't do nothing.

18   A   Right.

19   Q   And when you can't do nothing, do you something; correct?

14:18:20  20   A   Yes.

21   Q   And when you recommend the implantation of an IVC filter,

22   it's because, as you testified earlier, you thought or you

23   assumed that the filter will catch clots before they reach the

24   heart and lung; correct?

14:18:38  25   A   True.  That's -- that's -- the supposition is that they

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:18:40   1   form a barrier to a clot going to the heart.

2   Q    And you've testified that pulmonary embolisms are serious

3   medical events; correct?

4   A    Yes.

14:18:50   5   Q    And they are potentially fatal; correct?

6   A    Yes.

7   Q    And when you recommend the placement of an IVC filter in a

8   subset of patients where you believe it is appropriate, you

9   are doing that because you believe that you are potentially

14:19:05   10   installing a lifesaving device in that patient; correct?

11   A    I think there's -- well, as I said before, we don't have

12   good data that they save lives because the studies haven't

13   been done.  But I would say that based on the data we have,

14   let's say there's a very old study that looked at not treating

14:19:26   15   patients with pulmonary embolism at all back in the 1960s

16   randomized trial, no anticoagulation versus anticoagulation.

17   People in the no anticoagulation arm, 25 percent of them died

18   of a pulmonary embolism and 50 percent of them had a recurrent

19   event.  So this is back in the '60s, before we thought

14:19:44   20   anticoagulation was safe.

21        So based on that experience and the clot rates with a

22   pulmonary -- with a vena cava filter in the 3 to 5, 6 percent

23   range, they probably -- you know, it's extrapolation, but they

24   probably cut down on pulmonary emboli happening.  But we don't

14:20:02   25   have high-level data.  You're kind of taking data from here

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:20:05   1   and data from here and making a decision.

2   Q    Actually, I'm not.  I asked a simpler question.

3   A    Sorry.  I tend to go on.

4   Q    If -- you have to do something, as you testified, and that

14:20:16   5   something is implanting an IVC filter; correct?

6   A    And that's my rationale for it, is that -- that analysis I

7   gave you.

8   Q    And that is because the doing something will potentially

9   save the life of the patient from a pulmonary embolism that

14:20:34  10   could be fatal; correct?

11   A    "Potentially" is important in that phrase.  Potentially.

12   We don't have -- that evidence level is not high, but

13   potentially.  Yes.

14   Q    So you agree with my statement that you are implanting or

14:20:49  15   recommending the implantation of an IVC filter in that subset

16   of patients because potentially it will save the plaintiff's

17   life -- the patient's life in an event of a pulmonary

18   embolism; correct?

19   A    Yes.

14:21:06  20   Q    Thank you.

21        Now, you're aware that statistics show that several

22   hundred thousand people each year suffer from pulmonary

23   embolisms?

24   A    Yes, sir.  There are various estimates out there, but that

14:21:17  25   sounds accurate.

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:21:18  1    Q   And you're also aware that of those people afflicted with

2    pulmonary embolism, numbers in the hundreds of thousands

3    between, 100- and 200,000, die each year as a result of

4    pulmonary embolisms; correct?

14:21:34  5    A   I would say in U.S. that sounds high.  I mean, the

6    estimates vary about anywhere from 30- to 50-, sometimes as

7    high as 100,000.  Many of those -- unfortunately many of those

8    patients don't ever come -- they're having sudden death events

9    outside of the hospital, so most have not seen medical -- a

14:21:51  10   medical facility when they die, unfortunately.

11   Q   But --

12   A   So a lot of those events, deaths are in the first 30

13   minutes or so.  Yes.

14   Q   But I think you've written at least once that pulmonary

14:22:00  15   embolism is the most deadly form of venous thromboembolic

16   disease; correct?

17   A   Yes.  Correct.  Yes, sir.

18   Q   Now, you were asked a series of questions about randomized

19   studies.  I want to talk about that and those studies.  But

14:22:30  20   before I do, I want the jury to have a little bit more

21   background on your experience.

22        You would agree that Johns Hopkins is probably one of

23   the leading medical centers in the world?

24   A   Yes.  It's a very good institution.

14:22:46  25   Q   And at Johns Hopkins, even today, you are aware that

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:22:52  1   interventional radiologists and others place IVC filters in

2   patients.

3   A   Certainly.

4   Q   And you're aware of doctors at Johns Hopkins who implant

14:23:04  5   IVC filters even when anticoagulants are being administered to

6   the patient; correct?

7   A   It's possible.  I wouldn't --

8   Q   You wouldn't do it.

9   A   I wouldn't do it, but there are certainly -- I mean, there

14:23:16 10   certainly may be people that are doing that, yes.

11   Q   And you're also aware there are doctors at Johns Hopkins

12   who place IVC filters prophylactically where the patient

13   doesn't have a history of DVT or pulmonary embolism, but the

14   patient is at risk and coagulants are contraindicated.

14:23:38 15   A   I'd say that is a decreasing number of patients, but yes.

16   More popular in the past, less common now.  But let's say

17   there's still probably some being placed like that.

18   Q   And I think you told us that as a hematologist, you

19   probably approach the practice of management of blood clots

14:23:59 20   and pulmonary embolisms a little more conservatively than

21   perhaps interventional radiologists?

22   A   Or differently, certainly.  Just we see a different

23   patient population and so --

24   Q   Well, you would agree --

14:24:15 25   A   -- our experience is different.

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:24:16  1    Q    I acknowledge the experiences are different.  But you

2    would agree with me that generally in your practice, you have

3    a more narrow view of when filters are appropriate than

4    interventional radiologists.

14:24:27  5    A    Yes.  I think that's been -- in the past, it's been

6    even -- there are even bigger differences.  I think the number

7    of indications that people think is appropriate has decreased

8    over time because of evolving medical literature.

9    Q    And you would agree with me some of the major physician

14:24:48  10   organizations have differing criteria than you do for when it

11   is appropriate to implant filters; correct?

12   A    Yes, sir.

13   Q    You agreed quickly, so --

14   A    I --

14:24:56  15   Q    The Society of Interventional Radiologists have broader

16   criteria than you do for when implanting a filter is

17   appropriate?

18   A    I'm certain they do, yes.

19   Q    Okay.  And you also know that the FDA has cleared filters

14:25:10  20   for indications that are broader than what you would

21   recommend; correct?

22   A    True.  Sure.

23   Q    So we can agree that various types of physicians have

24   disagreements or at least differing criteria as to when IVC

14:25:25  25   filters should be implanted; correct?

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:25:28   1   A    True.

2   Q    Some patients are at risk for developing DVT and pulmonary

3   embolism are at greater risk for developing DVT and pulmonary

4   embolism than others; correct?

14:25:46   5   A    Yes, sir.

6   Q    And you would agree that anticoagulants themselves are not

7   without risk.

8   A    No.  Of course not.  Yeah.

9   Q    There are sometimes fatal bleeding events that can be

14:26:02  10   associated with the taking of anticoagulants; correct?

11   A    Certainly.  Yeah.  Small percentage.  I'd say, you know,

12   it's getting -- with newer drugs it's gotten better and our

13   control of warfarin has gotten better.  So I would say that if

14   you look at recent studies with rivaroxaban, Xarelto,

14:26:18  15   apixaban, it is a fraction of 1 percent, maybe .5 percent

16   fatal bleeding events in a year of patients on that drug.

17   Q    Historically, going back even 20 years, those rates have

18   been as high as 7, 8 percent, and have been coming down,

19   haven't they?

14:26:36  20   A    I would say it depends on what patient population you

21   focus on and management of the anticoagulation, if it's good

22   or not so good.  So with warfarin in people that are -- where

23   it wasn't managed well and you have patients that are -- as

24   you get older, you are at higher risk for bleeding, that you

14:26:53  25   could get into those ranges, although I think that would be

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:26:56  1   rare now with conventional management.

2   Q   Over the course of the last 20 years, there are patient

3   populations that have experienced 7 to 8 percent fatal

4   bleeding events associated with the taking of anticoagulants;

14:27:09  5   correct?

6   A   Seems -- 7 percent seems high.  Major bleeding, yeah, I'd

7   say 7 to 8 percent is reasonable.

8   Q   5 percent?

9   A   I'd still -- fatal -- it still seems high to me, unless

14:27:26  10  you had an extraordinarily high-risk population.  So I'd have

11  to -- it's -- have to look at the study.

12  Q   I'm sorry.

13          Even patients who are on anticoagulation, a small

14  number of them may suffer from a pulmonary embolism anyway;

14:27:43  15  correct?

16  A   Yes.  Small number, yes.

17  Q   So if you just anticoagulate a patient, there is a risk of

18  fatal bleeding; correct?

19  A   Yes.  Small, but it's a risk.  It's not zero.

14:27:57  20  Q   And there is a risk that even with anticoagulation, the

21  patient may suffer a pulmonary embolism; correct?

22  A   Yes.  It's small again, but not zero.

23  Q   And are you aware of reports of patients who have died

24  from a pulmonary embolism while taking anticoagulants?

14:28:14  25  A   Yes.  Again, it's a small number, but not zero.  I would

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:28:19  1    say, again, in those -- if you look at the recent large

2    randomized studies where -- you know, these new drugs,

3    rivaroxaban, it is a fraction of 1 percent of people.  I think

4    there's a 2 out of 2400 patients in the Xarelto arm who had a

14:28:34  5    fatal pulmonary embolism, so it's small, .1 percent or so, but

6    it's not zero.

7    Q    Let's talk about the two PREPIC studies.  The two studies

8    that were done in France.

9    A    Um-hmm.

14:28:45 10    Q    On direct you told the ladies and gentlemen of the jury

11    that both studies were done in France?

12    A    Yeah.  Largely.  Both the principal investigators for both

13    studies were from France, but they had -- it's a multicenter

14    study so there may have been some other European centers

14:29:03 15    involved.

16    Q    It wasn't done in the U.S.?

17    A    I don't think so.  I don't think there are any centers in

18    the U.S.

19    Q    And the PREPIC 1 study only used permanent filters;

14:29:12 20    correct?

21    A    True.  It used vena type filters, Greenfield filters, Bird

22    Nests.  You know, all permanent filters.  Many of them not

23    used much anymore.

24    Q    And that study concluded after an eight-year follow-up in

14:29:26 25    2008; correct?

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:29:28  1    A    Yes, sir.

2    Q    And then there was a second PREPIC study that involved

3    optional filters or retrievable filters; correct?

4    A    That's true.

14:29:39  5    Q    But none of those optional filters were filters that

6    were -- are used here in the United States; correct?

7    A    I think the ALN filter has some utilization in the U.S.

8    That's the one filter they used in that study.

9    Q    They only used one filter manufactured outside of the

14:29:54  10   U.S., the ALN filter; correct?

11   A    Yes.

12   Q    They didn't use the Greenfield filter?

13   A    No, because that is a permanent filter.  But yeah, you're

14   right.  They didn't use --  I think they got support from the

14:30:05  15   manufacturers of ALN for that study.  I think they got the

16   devices.  So it was just that device.

17   Q    None of the filters that we're talking about here -- the

18   G2, G2X, or Eclipse -- were part of either PREPIC study;

19   correct?

14:30:20  20   A    That's true.

21   Q    And these weren't actually blind randomized studies

22   because the patients knew what they were getting; correct?

23   A    That's true.  These were open -- both were open label

24   studies, although the end points were adjudicated by people

14:30:36  25   who didn't know who got a filter and who didn't get a filter,

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:30:39   1   but the physicians placing the filters and the patients knew

2   they had a filter or didn't have a filter.

3   Q   And you've actually criticized both studies because the

4   physicians knew who got which filters?

14:30:52   5   A   Yeah.

6   Q   You thought that affected the results; correct?

7   A   Well, it could.  I mean, it's a limitation because if you

8   know someone has a filter or doesn't have a filter, your

9   suspicion if they have shortness of breath for moving to the

14:31:03   10   next step, getting a pump or a CT scan may be different if you

11   have -- know they have a filter or don't have a filter.  So

12   that's why blinded studies are better, because you don't --

13   you don't -- your judgment's not clouded by knowing what their

14   treatment was.

14:31:17   15   Q   Has any IVC filter manufacturer that you're aware of done

16   a randomized controlled blind clinical study to determine the

17   efficacy or effectiveness of IVC filters?

18   A   Not that I know of, no.

19   Q   None in the United States?

14:31:36   20   A   None in the United States.

21   Q   None outside of the United States that you're --

22   A   No.  There's no blinded randomized trials in this area of

23   medicine.

24   Q   So Bard's not unique in not doing one of these studies;

14:31:47   25   correct?

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:31:48  1    A    True.  I mean -- although -- yeah.

       2    Q    Now, these filters -- these two studies, in both studies,

       3    the patients were anticoagulated; correct?

       4    A    That's true.

14:32:04  5    Q    There were 400 patients in PREPIC 1, as I recall?

       6    A    Correct.

       7    Q    And 200 received anticoagulation?

       8    A    Yes, sir.

       9    Q    And the other 200 received anticoagulation plus the

14:32:17 10    filter?

      11    A    Yes, sir.

      12    Q    Okay.  There has never been a study that you're aware of

      13    that measured the efficacy of filters, just one population of

      14    patients with filters versus one population of patients

14:32:37 15    receiving just anticoagulants; correct?

      16    A    Oh, yeah.  So where the filter arm didn't get any

      17    anticoagulation, true, that's never been done.

      18    Q    Okay.

      19    A    To my knowledge.  Yeah.

14:32:48 20    Q    And probably ethically couldn't be done; correct?

      21    A    Yeah.  I think it would be tough to do that study.

      22    Q    Now, we talked about internal risk assessments as the kind

      23    of information that you thought manufacturers should supply to

      24    physicians like yourself, clinicians like yourself with

14:33:15 25    respect to how their products perform.  Agree?

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:33:23 1    A    True.  So if they see from reports, their own internal

2    reports coming back from the field that there's a certain

3    increase in a certain adverse event with their device or their

4    drug, they should make the physicians that use that device or

14:33:41 5    drug aware of it.  If it looks like there's a problem that

6    needs to be fixed, then I think they would to not only make

7    them aware of it, but also, depending on the disparity between

8    different devices, consider removing that device or drug from

9    the market to repair that.

14:34:01 10   Q    From the other IVC retrievable filter manufacturers that

11   you're aware of, have you seen internal risk assessments of

12   what you're talking about?

13   A    No.  No.

14   Q    So Bard is not --

14:34:14 15           THE COURT:  Hold on we're going to take a break here,

16   Mr. Condo.

17           MR. CONDO:  Thank you.

18           THE COURT:  We will resume, ladies and gentlemen, at

19   10 minutes to the hour.  Please remember not to discuss the

14:34:21 20   case.  And we will see you then.

21       (Recess taken from 2:34 to 2:49.  Proceedings resumed in

22   open court with the jury present.)

23           THE COURT:  Thank you.  Please be seated.

24           You may continue, Mr. Condo.

14:50:08 25           MR. CONDO:  Thank you, Your Honor.

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

BY MR. CONDO:

Q   Doctor, where we left off, I had asked you whether or not in your experience you had received internal risk assessments from other IVC filter manufacturers, and your answer to me, as I recall, is you had not experienced that; correct?

A   No, no, haven't seen any internal risk assessments from other companies.

Q   And my follow-up question, then, is Bard, then, is not unique among IVC filters in not providing you with internal risk assessments; correct?

A   True.  I would say it would be good, though, if there's a problem, that that would be transparently transmitted.

Q   But they're not the only IVC filter manufacturer who doesn't give you --

A   Right.

Q   -- internal risk assessment.

A   Yes.

Q   Now, turning back to the PREPIC tests, one of the sets of data that was collected in the PREPIC studies were incidents of symptomatic PE experienced by participants in the study, patients; correct?

A   Yes, sir.

Q   Now, to be clear, the PREPIC study -- PREPIC studies were not head-to-head studies comparing the benefits of IVC filters versus coagulation therapy; correct?

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:51:37  1    A    No.  It was kind of added on top of it as an extra

2    treatment.

3    Q    So my statement is correct?

4    A    True.  Yes.

14:51:46  5    Q    And patients were excluded from the PREPIC studies if they

6    had a contraindication to anticoagulant therapy; correct?

7    A    Yes, sir.

8    Q    So one of the criticisms of the PREPIC studies is that

9    they did not include the very patients for whom you believe

14:52:13 10    IVC filters are most appropriate; correct?

11    A    Yes, I think that's -- it would be good to do a study that

12    at least approached a population where you're testing the

13    filter's -- I guess where you're testing against less than

14    full-dose anticoagulation.  And, unfortunately, that hasn't

14:52:39 15    happened.

16    Q    And a further criticism of the PREPIC studies is that the

17    patients were not the typical patients who received IVC

18    filters; correct?

19    A    I guess they're not, at least for my population of

14:52:59 20    patients.  Right.  They're people that couldn't get

21    anticoagulation.  I think they were one of indications where

22    both studies included people that were at a very high risk for

23    having another pulmonary embolism.  There are people that had

24    unprovoked blood clots, had pulmonary emboli already and were

14:53:17 25    considered at high risk for having another pulmonary embolism.

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:53:20  1    So they were a high-risk population where some, certainly one

2    of the indications in the past that some have promoted filters

3    for was prevention of a possibly fatal event in someone that's

4    on anticoagulation, so adding it on top of anticoagulation

14:53:41  5    would give added benefit.

6    Q   But they weren't the typical patient population of the

7    kind of patients for whom you recommend IVC filters because

8    all of the participants in the PREPIC study were administered

9    anticoagulants; correct?

14:53:57  10   A   True.  Although I think, to further expound upon that,

11   that the -- particularly the second study where they were

12   placing retrievable filters in people at high risk for having

13   another event, one of the indications you might have seen in

14   the SIR document for a filter, patients that are at high risk

14:54:15  15   for having another event, and so you're adding a filter on top

16   of that, that study basically has dissuaded us now for -- or

17   provided evidence we don't need to do that even if they're

18   high risk for having a pulmonary embolism because adding a

19   filter didn't add anything in that second study.  There was no

14:54:35  20   difference.  In fact, there were a few more pulmonary emboli

21   numerically in the filter group than there were in the

22   non-filter group.

23   Q   Let's look at some of the results of the PREPIC 1 study

24   with respect to symptomatic pulmonary embolism.

14:54:57  25   A   Sure.

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:54:58  1   Q   You would agree with me in PREPIC 1, the results there

2   showed in the first eight to 12 days after implantation,

3   filters were associated with a significant reduction in

4   pulmonary embolism?

14:55:13  5   A   That's true.  At eight to 12 days in this study, unlike

6   the second study, they screened everybody for having pulmonary

7   emboli so they redid another scan, they did a ventilation

8   profusion scan, to look for clots.  So they picked up some

9   asymptomatic clots and then there were some people that had

14:55:34  10  symptomatic clots.  And if you add both asymptomatic and

11  symptomatic pulmonary emboli at the eight- to 12-day window,

12  there were fewer in the filter group.

13  Q   Correct.  So it was a correct statement that in PREPIC 1

14  in the first eight to 12 days, filters were associated with a

14:55:50  15  significant reduction in pulmonary embolisms; correct?

16  A   Yes, at eight to 12 days.

17  Q   And at the 12-day mark there were zero pulmonary embolism

18  deaths for the filter-plus-anticoagulation group compared to

19  four --

14:56:07  20  A   True.

21  Q   -- pulmonary embolism deaths related to the

22  anticoagulant-only group; correct?

23  A   True.

24  Q   At --

14:56:17  25  A   Sorry.

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:56:18  1   Q    At the 12-day mark, besides showing fewer pulmonary

2   embolism deaths associated with the filter group, fewer people

3   also suffered a PE; correct?

4   A    True.  For total pulmonary embolism, yes.

14:56:34  5   Q    Two for the filter group experienced a pulmonary embolism

6   versus nine patients who only had the anticoagulant

7   administered experienced pulmonary embolism; correct?

8   A    True.  With -- but with these permanent filters that

9   were --

14:56:53  10  Q    And after two years, symptomatic pulmonary embolisms

11  occurred in six patients with one death in the filter group

12  but 12 deaths, 12 patients with five deaths in the non-filter

13  group; correct?

14  A    True.  Yes.

14:57:13  15  Q    In other words, there were six more symptomatic pulmonary

16  embolisms and four more deaths after two years in the

17  non-filter group in the PREPIC 1 study; correct?

18  A    True.

19  Q    Now, there was an eight-year follow-up study in the

14:57:33  20  PREPIC 1; correct?

21  A    Yes.  Although I guess two years wasn't statistically

22  significant, but it was numerically more.

23  Q    At the eight-year mark in this follow-up of PREPIC 1, the

24  filter-plus-anticoagulant group had nine symptomatic PEs

14:57:52  25  versus 24 symptomatic PEs experienced in the non-filter group;

CROSS-EXAMINATION - MICHAEL STREIFF, M.D.

14:57:58   1   correct?

2   A    That's true.  I would point out that in this study, why

3   you see dramatic differences between this study and then when

4   you look at the second study and I think the differences you

14:58:11   5   see there are differences in anticoagulation.  In the older

6   study, after three months, many, many people stopped

7   anticoagulation.  So there was only about 60 percent of people

8   on anticoagulation beyond three months, and at eight years

9   there were only 30 percent, 38 percent or so, that stayed on

14:58:27   10   the whole time.  So a lot of the people -- nowadays we extend

11   anticoagulation much longer.  So I think that's why you don't

12   see it in the second study when they looked earlier where I

13   think anticoagulation -- I think -- anticoagulation has

14   advanced since the 1990s.

14:58:43   15   Q    Well, let's keep talking about PREPIC 1 and then we'll

16   talk about PREPIC 2.

17   A    Okay.

18   Q    At the eight-year follow-up mark of PREPIC 1, there were

19   two deaths in the filter group compared to 24 in the

14:58:58   20   non-filter group; correct?

21   A    For pulmonary embolism?

22   Q    Pulmonary embolism.

23   A    Okay.  Yeah, I think that's correct.  I'd have to look --

24   Q    At the eight-year mark there were two deaths from

14:59:11   25   pulmonary embolism and those patients who had an IVC filter

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

14:59:17  1   implanted, compared to 24 deaths from pulmonary embolism in

2   those participants who didn't have an IVC filter implanted;

3   correct?

4   A   Yes, I think that's correct.  I'd have to look at the

14:59:32  5   study to see if that's actually correct.

6   Q   So we can agree that at least at the eight-year follow-up

7   mark there's at least some evidence that having a filter in

8   place reduced the risk of symptomatic pulmonary embolism for

9   those patients; correct?

14:59:45  10   A   Yeah.  I would say, again, it would be in patients that

11   those are people that probably would have been on

12   anticoagulation nowadays that are not, and there were

13   permanent devices, not Bard filters.  So we don't know.

14   Q   And you would agree with the conclusion of the authors of

15:00:03  15   the PREPIC 1 eight-year follow-up study that vena cava filters

16   in patients with deep vein thrombosis, with or without

17   pulmonary embolism, protect against the long-term development

18   of pulmonary embolism without favoring the development of

19   post-thrombotic syndrome?

15:00:26  20   A   So I'd say I'd qualify it.  Yes, in people if you stop

21   anticoagulation in general after three months, that they

22   probably help you prevent some pulmonary emboli in that case.

23   Although that would be considered antiquated therapy now.  As

24   far as post-thrombotic syndrome, not a good study to look at

15:00:48  25   post-thrombotic syndrome because over 30 percent of the

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

15:00:51  1   patients already had clots before, so they already likely had

2   post-thrombotic syndrome already started before they started

3   the study.

4         So to really look at post-thrombotic syndrome in a

15:00:59  5   clean fashion, you have to have people that have never had

6   clots before, because once you have a DVT, you start -- a lot

7   of people, up to 50 percent of the people, develop

8   post-thrombotic syndrome.  So it wasn't a good study to look

9   at post-thrombotic syndrome.

15:01:14  10  Q   And you agree with the authors of the PREPIC 1 study group

11  follow-up when they wrote, "The filter insertion remains

12  significantly associated with reduction of pulmonary

13  embolism"?

14  A   I think yes, in people that did not -- not -- if you don't

15:01:29  15  put on anticoagulation for an appropriate period of time, that

16  it does something.  Which is why I think we should use it in

17  that population where you can't use anticoagulation.

18        Of course also in that group there were 14 percent of

19  people had IVC thrombosis that had filters too.  So that's a

15:01:48  20  downside of filters.  And there were more DVTs too.  So --

21  Q   Let's talk about PREPIC 2, then.  That was published in

22  2015?

23  A   Yes, sir.

24  Q   And it, too, is not a head-to-head study comparing IVC

15:02:01  25  filters to anticoagulants?

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

15:02:03  1   A   Right.  Yeah.

2   Q   And many of the same limitations that you and I discussed,

3   the criticisms that you have of PREPIC 1 apply to PREPIC 2;

4   correct?

15:02:11  5   A   True.  An open, study.  Yes.

6   Q   An open study.  And everyone received anticoagulation,

7   even those with filters.

8   A   Yes.  So the only question you were testing then was can

9   filters in people that are at very high risk for having a

15:02:24  10   pulmonary embolism, do they add anything to anticoagulation.

11   And I think this study definitively showed that they don't.

12   Q   Now, the study did not involve any Bard filter; correct?

13   A   True.  None of these studies involved Bard filters.

14   Q   This was the ALN filter?

15:02:42  15   A   Right.  A French retrievable filter; correct.

16   Q   You'll agree with me PREPIC 2 showed that after the

17   eight-year mark, those in the filter-plus-anticoagulant group

18   had ten fewer symptomatic PEs?

19   A   I don't think they have ten-year follow-up or eight-year

15:02:58  20   follow-up.

21   Q   I'm sorry.

22   A   I think there's confusion.

23   Q   Two-year mark.

24   A   Two-year mark.  I think they have three-month and

15:03:06  25   six-month follow-up on PREPIC 2.  Or are we on PREPIC 1?  I'm

CROSS-EXAMINATION – MICHAEL STREIFF, M.D.

15:03:10   1   confused.

2   Q   I meant to go to 2 and I looked at a question from 1.  My

3   apologies.

4   A   Oh.  Okay.  Sure.

15:03:18   5   Q   Between having a recurrent DVT and a pulmonary embolism,

6   is having a pulmonary embolism a greater risk to one's life?

7   A   I think, yeah, one to one if you have -- you'd rather have

8   a DVT than a pulmonary embolism.

9   Q   And like PREPIC 1, patients in PREPIC 2 were

15:03:37   10   contraindicated and could not receive anticoagulation;

11   correct?

12   A   True.  Yes, you had to be a candidate for anticoagulation

13   for both those studies.

14   Q   Neither of the PREPIC studies, including PREPIC 2,

15:03:49   15   addresses the benefits of IVC filters in patient populations

16   where anticoagulation is not an option; correct?

17   A   True.  That's where -- I think that's one of the holes in

18   the literature.  Although Anita Rajasekhar's study would have

19   been doing it in people that are at high risk but on -- high

15:04:13   20   risk on prophylactic dose anticoagulation might have been a

21   better approach to try to get at that where you don't have

22   full-dose anticoagulation, and get closer to a test of what

23   filters bring.

24   Q   In neither PREPIC 1 nor PREPIC 2, the results can be used

15:04:29   25   to say that filters, just filters, versus just anticoagulants

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:04:35   1   is better one than the other; correct?

         2   A   Right.

         3        MR. CONDO:  I have no further questions.  Thank you,

         4   Your Honor.

15:04:45   5        THE COURT:  Redirect?

         6        MR. LOPEZ:  Thank you, Your Honor.

         7        R E D I R E C T   E X A M I N A T I O N

         8   BY MR. LOPEZ:

         9   Q   So let's -- I got kind of lost in all those numbers for

15:05:03  10   PREPIC 2, Doctor.

        11        MR. LOPEZ:  Can you put up so Dr. Streiff can see it

        12   Exhibit 3709.

        13   BY MR. LOPEZ:

        14   Q   If you need to read it -- actually --

15:05:19  15   A   Yeah.

        16   Q   -- I'd ask you to read the "Conclusions" section.  In

        17   other words, you just got cross-examined on all of the data

        18   that was in that study and I want the jury to know what the

        19   bottom line conclusions were from PREPIC 2 that you just went

15:05:38  20   through.  Could you just read that word for word, please.

        21   A   Yeah.  So authors at the end conclude "vena cava filters

        22   reduce the risk of pulmonary embolism but increase the risk of

        23   deep vein thrombosis and had no effect on survival."

        24   Q   That was actually PREPIC 1; right?

15:05:58  25   A   Yes.  Eight-year follow-up, yeah.  That's 3709, yeah.

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:06:06   1          And then PREPIC 2 --

         2   Q    Hold on.  Before you go on.

         3          One of the conclusions there was while it reduces the

         4   risk of pulmonary embolism, which caused no harm, it had no

15:06:20   5   effect on fatal pulmonary embolism, the reason that you would

         6   prescribe an IVC filter, is that correct, Doctor?

         7   A    It wasn't a significant reduction, I guess, in that.  I'd

         8   have to go look at the tables to see if --

         9   Q    Now let's look at PREPIC 2.  4147.

15:06:37  10          Let's go to that first page and the "Conclusions."

        11   In fact, it says "Conclusions and Relevance," does it not, at

        12   the bottom?

        13   A    Yes, sir.

        14   Q    What does that mean when authors put that in an article

15:06:54  15   like this?

        16   A    So the relevance to your current medical practice.

        17   Whether you -- what -- how do you translate these results into

        18   what you're going to do with patients.

        19   Q    Is it a takeaway message, basically, from the study and

15:07:05  20   the data that's in the study that the authors want the readers

        21   to have?

        22          MR. CONDO:  Objection.  Leading.

        23          THE COURT:  Sustained.

        24          THE WITNESS:  I would say --

15:07:13  25          THE COURT:  Hold on, please.  Let's wait for a new

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:07:15  1   question.

2            THE WITNESS:  Oh.

3       BY MR. LOPEZ:

4       Q   So let's read that, Doctor, the "Conclusions and

15:07:19  5   Relevance."

6       A   So --

7       Q   "Among hospitalized patients" --

8       A   Yeah.  "Among hospitalized patients with severe" --

9            MR. LOPEZ:  Can you make that bigger?

15:07:29  10           THE WITNESS:  -- "acute pulmonary embolism, the use

11      of a inferior vena cava filter plus anticoagulation" --

12           THE COURT REPORTER:  Excuse me, Doctor.  I need you

13      to read slower.

14      BY MR. LOPEZ:

15:07:38  15  Q   Slow down.

16      A   I'm sorry.  Should I start again?

17      Q   Please.  And just read very slow.

18      A   "Among hospitalized patients with severe acute pulmonary

19      embolism, the use of a retrievable inferior vena cava filter

15:08:02  20  plus anticoagulation compared with anticoagulation alone did

21      not reduce the risk of symptomatic recurrent pulmonary

22      embolism at three months.  These findings do not support the

23      use of this type of filter in patients who can be treated with

24      anticoagulation."

15:08:29  25  Q   I also don't want this to be lost, Doctor.  In the

REDIRECT EXAMINATION – MARTIN STREIFF, M.D.

15:08:33  1   "Results" part, the three of the patients that died with a

2   filter, they not only had a filter in them, they had the added

3   protection of anticoagulation.  True?

4              MR. CONDO:  Leading.

15:08:50  5              THE COURT:  Sustained.

6              THE WITNESS:  True.  We went over this --

7              THE COURT:  Sir, when I sustain an objection you need

8   to wait for another question.

9              Go ahead, Mr. Lopez.

15:08:56 10   BY MR. LOPEZ:

11   Q   Doctor, in the group that had a filter, did

12   anticoagulation give them added protection against a clot?

13   A   No, it did not.  This study showed that there's no utility

14   in adding a filter to patients you can give anticoagulation,

15:09:13 15   even if they're at high risk for pulmonary embolism.

16   Q   So did the group which had the higher fatalities actually

17   have two modes of treatment that were meant to protect them

18   from a fatal pulmonary embolism?

19   A   True.  So filters didn't add anything.  And numerically

15:09:34 20   there were more fatal pulmonary emboli -- in this study, more

21   numerically pulmonary emboli in the filter group than there

22   were in the non-filter group.  Kind of the reverse.

23   Q   Mr. Condo asked you, has any IVC filter manufacturer ever

24   done a study like the one you're suggesting.  Remember that?

15:09:54 25   A   True, and I think --

REDIRECT EXAMINATION – MARTIN STREIFF, M.D.

15:09:55  1   Q   Hold on.  You think it's an excuse for a company not to do

2   the kind of safety and long-term efficacy study necessary to

3   answer some of the questions we've been talking about today

4   just because their competitors are not doing it?

15:10:11  5   A   No, and I think that's an opportunity for them to prove

6   the value of their product.

7   Q   And, by the way, how do these two studies he just

8   criticized, the one in 2005 and 2013 that did not include Bard

9   filters, compare to similar studies Bard sponsored and

15:10:29 10   conducted?

11          MR. CONDO:  Objection, Your Honor.  This goes beyond

12   the scope of the cross.

13          THE COURT:  Sustained.

14   BY MR. LOPEZ:

15:10:39 15   Q   Now, he also talked about the type of patient population

16   that you treat -- that you decided to treat with these

17   filters.  This is generally a very sick patient population?

18   A   True.  These are very sick patients where you want to use

19   the best available device.  You want to use the device with

15:10:55 20   the least chance for failure, for side effects.  That's why

21   it's very important to know device characteristics when you're

22   giving advice to physicians that are treating someone who's

23   very sick and you can't treat them with anticoagulation.  You

24   want the safest device, most effective device.

15:11:12 25   Q   My question is going to be just because this is a sick

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:11:15  1   patient population, would their desire to have the safest

2   device be different than a population that wasn't that sick?

3   A   No.   Actually would be more, I would think.   You have less

4   chance for -- the -- I guess margin of error is much smaller.

15:11:29  5   Q   Let me ask you this:  Do they have less rights to know

6   about safety information that you expect to get from a product

7   manufacturer just because they're a sicker population?

8   A   No.   No.

9   Q   And he asked you some questions about the FDA's cleared

15:11:48  10   indications.   Does the FDA treat patients?

11   A   No, they --

12   Q   Do they design medical devices like IVC filters?

13   A   No.

14   Q   Do they test them?

15:12:00  15   A   No.   They rely on the test results that are submitted to

16   them to make a determination if it should be on the market.

17   Q   Now, you heard the name of a filter called an ALN filter.

18   Are you familiar with that filter?

19   A   Yes, sir.

15:12:17  20   Q   And that filter is -- that was used in the PREPIC study.

21   Do you know whether or not, because they used an ALN filter,

22   whether or not you have information that the patients were put

23   actually at a lesser risk of complications because they used

24   an ALN filter versus a Bard filter?

15:12:36  25   A   Well, I mean, you -- obviously in that study there weren't

REDIRECT EXAMINATION – MARTIN STREIFF, M.D.

15:12:39  1    any Bard filters.  But if you look at the studies that have

2    been done with Bard filters and ALN filters, ALN filters, at

3    least if you do a head-to-head comparison, obviously it's not

4    a randomized study between an ALN filter and a Bard filter,

15:12:54  5    but if you look -- because none of the companies have compared

6    their filters head-to-head, but if you look at the outcomes

7    for ALN filters versus outcomes for Bard filters or OptEase

8    filters, Bard filters have higher rates of fracture and higher

9    rates of migration and higher rates of IVC penetration than

15:13:13  10   ALN filters or OptEase filters.

11   Q    Let me ask you, Doctor, do you know if ALN filters have

12   the history of fractures like the history that Bard has

13   experienced with their G2 family of filters, including the

14   Eclipse, where the fracture doesn't stay where it is but it

15:13:33  15   actually embolizes to people's hearts and lungs and sometimes

16   die?

17             MR. CONDO:  Objection --

18   BY MR. LOPEZ:

19   Q    Do they have that in their history?

15:13:42  20             THE COURT:  Hold on.

21             What is the objection?

22             MR. CONDO:  The scope of the cross and it's a

23   nondisclosure issue.

24             THE COURT:  I'm going to sustain on the second

15:13:51  25   ground, not the first.  I think it was within the scope.

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:13:53  1        Well, I should ask you, is that disclosed, Mr. Lopez?

       2        MR. LOPEZ:  No, but he -- he crossed him on the use

       3   of ALN filters versus Bard filters.

       4        THE COURT:  I think your last question was fair game

15:14:05  5   on that.  I think this does call for an affirmative opinion.

       6   BY MR. LOPEZ:

       7   Q   Do you know if Bard has ever sponsored a registry to

       8   follow patients on any of their filters to see how they're

       9   performing?

15:14:19 10        MR. CONDO:  Your Honor, could we approach?

      11        THE COURT:  Yes.

      12        If you want to stand up, ladies and gentlemen, feel

      13   free.

      14      (Bench conference as follows:)

15:14:50 15        MR. CONDO:  We crossed this bridge once before in the

      16   Booker trial when they wanted to raise the issue of this

      17   witness being approached by Bard to talk about sponsoring a

      18   registry.  Much different than a clinical trial.  And

      19   Your Honor prohibited them from getting into that area.  It

15:15:16 20   wasn't part of the expert opinion.  It was a piece of fact

      21   evidence that it has to do with whether or not Bard does a

      22   study, not whether or not -- not his opinions about what

      23   Bard -- what physicians expect to be told or his survey of the

      24   medical literature, which is the two things he was disclosed

15:15:43 25   on.

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:15:47   1          MR. LOPEZ:  I think once you ask the question, have

           2   any -- has any manufacturer showed us their internal documents

           3   or shown internal documents, has any other manufacturer

           4   sponsored such a study, even if it's not in his report, the

15:16:01   5   fact he asked those questions, I have a right to come back on

           6   redirect and rehabilitate him on what he's putting in front of

           7   the jury.  And the fact that none have done it, I think it's

           8   fair game that Bard had opportunities to do this, and he's

           9   aware of that.

15:16:21  10          THE COURT:  To do what?

          11          MR. LOPEZ:  To do surveys and their own studies.  In

          12   other words --

          13          THE COURT:  What is it you want to elicit?

          14          MR. LOPEZ:  There's two things.  Number one is he

15:16:32  15   offered to do a study.  He consulted with them.  They came to

          16   him and got his advice as a hematologist ten years ago, maybe

          17   12 years ago.  His advice, had they called him back, would

          18   have been you need to do a long-term study to figure out

          19   whether or not these things work or whether or not they don't

15:16:50  20   work and what the risks really are with these devices.

          21          The fact that he says --

          22          THE COURT:  Well, the question to you was what do you

          23   want to elicit.

          24          MR. LOPEZ:  The fact that he had that information and

15:17:05  25   he had those -- at least one meeting with Bard about that.

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:17:09   1    He --

2              THE COURT:  Okay.  That's what you want to elicit?

3              MR. LOPEZ:  Yes.

4              THE COURT:  I don't want to hear your argument about

15:17:15   5    it, I just need to know what you want to elicit.

6              What is your objection to that, Mr. Condo?

7              MR. CONDO:  Both relevance and nondisclosure.  As we

8    went through, this is exactly the argument Mr. O'Connor made

9    in the Booker trial.  They wanted to because we cross-examined

15:17:30  10    on whether or not anybody had ever done a study.  They wanted

11    to come back and talk about the offer that -- the conversation

12    he had between Bard and -- some unknown Bard person about

13    doing this registry.

14             You asked a question:  Did you list him as a fact

15:17:54  15    witness on this issue?

16             And the answer was no.

17             Mr. O'Connor:  I think he's just designated and

18    disclosed consistent with the report and that was what he was

19    deposed on and asked about.  It wasn't part of his expert

15:18:09  20    opinion.  It was a fact piece of evidence you want to get in

21    about Bard not doing a study.  He's an expert witness.  He

22    needs to stick to his opinions.

23             This is exactly the same issue we crossed in Booker.

24             THE COURT:  Hold on just a minute.

15:19:12  25             I didn't make a note last time.

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:19:24   1          What the witness has been asked on cross is whether

2     any company has done this kind of a study, and he had said no,

3     he's not aware of any.

4          It's been established on your direct that Bard has

15:19:41   5     never done such a study.

6          What I'm not understanding, Mr. Lopez, is -- you've

7     established to the jury Bard's never done it.  They've

8     established to the jury nobody's ever done it.  A direct

9     contradiction of that would be, no, somebody has done it.  But

15:20:15  10     that apparently isn't available.

11          What I'm wrestling with is why his conversation with

12     Bard changes the fact that Bard never did it.  Or no other

13     company ever did it.

14          I mean, if the point you want to make to the jury is

15:20:33  15     Bard was approached and told to do it and never did it, that

16     seems to me to be part of your affirmative proof if you want

17     to criticize this company for not doing studies.  And

18     obviously you didn't list him as a fact witness on that point

19     or put in a report.

15:20:48  20          I'm trying to figure out the line between fair cross

21     and what gets into undisclosed affirmative evidence.

22          MR. LOPEZ:  I know you are.  I think because when

23     they ask a question, they ask it for a reason.  It's to leave

24     the impression that none of these -- none of these companies

15:21:04  25     are doing studies.  And therefore there's maybe not a reason

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:21:08   1    to do studies.  That's a good enough excuse not to do a study.

2    And I think now for me to be able to ask him -- this case

3    should be about Bard and whether or not Bard had an

4    opportunity, based on conversations he's had with them, to do

15:21:25   5    the kind of study that's not been done.  You know.  I mean,

6    we've already established this study was done in 2005 and

7    2015.

8         THE COURT:  But on that point, isn't -- you said to

9    do the kind of study that's not been done.  I think it's been

15:21:40  10    established in previous trials you can't do this kind of a

11    study on the patient population for which filters are used.

12    You can't tell people who are on anticoagulants, you get a

13    filter, you don't, we'll see who dies.

14         So the fact -- you're not going to be able to have

15:21:59  15    this doctor say you can do those studies.

16         MR. LOPEZ:  No.  Actually there's -- I'm not going

17    to, but there's actually an article that says you can actually

18    do a study like that.  There's a design for a study like that.

19         THE COURT:  So what you want to do is say there's

15:22:14  20    something else they could have done that's a less-perfect form

21    of a study that you talked to them about --

22         MR. LOPEZ:  You know, I'm not going to pursue this.

23    I think whatever you're going to leave me with won't be much

24    anyway.  I want to get him on and off.

15:22:29  25         THE COURT:  Okay.  And, by the way, on these kinds of

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:22:31   1   sidebars I'm splitting time.  I'm not charging it all to one

         2   side.

         3           MR. LOPEZ:  Thank you.

         4           MR. CONDO:  Thank you, Your Honor.

15:22:39   5      (Bench conference concludes.)

         6           THE COURT:  Thanks for your patience, ladies and

         7   gentlemen.

         8           MR. LOPEZ:  Can you pull up Exhibit 3859, please.

         9   BY MR. LOPEZ:

15:23:35  10   Q   Dr. Streiff, you have Trial Exhibit 3859 in front of you?

        11   A   Yes, sir.

        12   Q   And is this an article written by a colleague of yours?

        13   A   Yes, sir.

        14   Q   Is it written in an authoritative journal by someone that

15:23:56  15   you know to be an expert in the field?

        16   A   Yes, sir.

        17           MR. CONDO:  Objection, Your Honor.  This beyond the

        18   scope of the cross.

        19           THE COURT:  I haven't heard any question yet so I

15:24:06  20   can't determine that.

        21   BY MR. LOPEZ:

        22   Q   And who is Anita -- I'm --

        23   A   Rajasekhar.

        24   Q   How do you pronounce that?

15:24:16  25   A   Rajasekhar.

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:24:18  1  Q    I'll let do you that.

2  A    She taught me.

3  Q    Who is she?

4  A    She's a colleague.  Hematologist at the University of

15:24:26  5  Florida.

6  Q    And she's someone who you've written this chapter with and

7  that we talked about earlier?

8  A    Yes.  Yes.  Has an interest in filters.

9  Q    And could you please read the title of this article.

15:24:43  10  A    "Pilot Study on the Randomization of Inferior Vena Cava

11  Filter Placement for Venous Thromboembolism Prophylaxis in

12  High-Risk Trauma Patients."

13  Q    And this was published in --

14       MR. CONDO:  Objection, Your Honor.  This is a subject

15:24:59  15  that was not addressed on cross.

16       MR. LOPEZ:  It deals with --

17       THE COURT:  Hold on just a minute.

18       Objection's overruled.

19  BY MR. LOPEZ:

15:25:17  20  Q    Could you -- this was published in Trauma in August of

21  2011?

22  A    Yes, sir.

23  Q    And for the sake of time --

24       MR. LOPEZ:  Felice, can you blow up the "Conclusion"

15:25:25  25  section of that, please.

REDIRECT EXAMINATION – MARTIN STREIFF, M.D.

15:25:28  1        THE WITNESS:  "Our pilot study demonstrates for the

2   first time that a randomized controlled trial evaluating the

3   efficacy of prophylactic IVC filters in trauma patients is

4   feasible.  This pilot data will be used to inform the design

15:25:49  5   of a multicenter randomized controlled trial to determine the

6   incidence of PE and DVT in high-risk trauma patients receiving

7   prophylactic inferior vena cava filters versus no prophylactic

8   inferior vena cava filters."

9   BY MR. LOPEZ:

15:26:11  10  Q   So according to your colleague, she successfully found a

11  way --

12        MR. CONDO:  Leading.

13        MR. LOPEZ:  I'm sorry.

14  BY MR. LOPEZ:

15:26:21  15  Q   What is the -- what is the conclusion -- what is the --

16  what is the message here from this study?

17  A   So this purpose of this study was to show it's feasible in

18  a test to randomize patients who are high risk for clots but

19  don't have them yet that are not on full-dose anticoagulation

15:26:40  20  to show that they would decrease the incidence of pulmonary

21  embolism in a patient population that's just getting low-dose

22  preventative doses of blood thinners.  And trauma patients are

23  already at high risk for pulmonary embolism, and so this would

24  be an ideal population to test this hypothesis.  And, in fact,

15:26:59  25  trauma surgeons have often used filters without this data

REDIRECT EXAMINATION - MARTIN STREIFF, M.D.

15:27:04  1    because they were concerned about pulmonary embolism in their

        2    patients.

        3    Q    Are IVC filters -- have they been used in trauma patients

        4    extensively over the years?

15:27:17  5    A    Yes, yes.  As a prophylactic measure in people that could,

        6    or sometimes could not, receive prophylactic preventative

        7    doses of anticoagulation.

        8    Q    Do you know if any representative from Bard's approached

        9    you or your colleagues --

15:27:31 10         MR. CONDO:  Objection, Your Honor.

       11    BY MR. LOPEZ:

       12    Q    -- conduct such a study?

       13         THE COURT:  Sustained.

       14         MR. LOPEZ:  Those are all the questions I had.

15:27:36 15         THE COURT:  Thank you, Doctor.  You can step down.

       16         MR. LOPEZ:  Your Honor, plaintiffs are going to call

       17    Dr. Frederick Rogers by videotape at this time.

       18         THE COURT:  Is this from a deposition?

       19         MR. LOPEZ:  Yes, Your Honor.

15:28:12 20         THE COURT:  Okay.

       21         Ladies and gentlemen, let me give you an instruction

       22    on this.

       23         A deposition is sworn testimony of a witness taken

       24    before trial.  The witness is placed under oath to tell the

15:28:38 25    truth and lawyers for each party may ask questions.  The

REDIRECT EXAMINATION – MARTIN STREIFF, M.D.

15:28:42  1    questions and answers are recorded, in this case with a

2    videotape.

3         When a person is unavailable to testify at trial, the

4    deposition of that person may be used at trial.

15:28:53  5         The deposition of this witness was taken before

6    trial.  It's -- a portion of it is going to be played to you.

7    Insofar as possible, you should consider deposition testimony

8    presented to you here in court in lieu of live testimony in

9    the same way as if the witness were to testify here in court.

15:29:15 10         And that instruction will apply to a number of

11    different deposition excerpts you'll see during the trial.

12         All right.  Counsel, I think, as in the previous

13    trials, the understanding is the court reporter won't try to

14    keep a record of what's on the tape, you all will submit that

15:29:31 15    in the deposition --

16              MR. LOPEZ:  Yes, Your Honor.

17              THE COURT:  -- transcript.  Okay.

18              MR. LOPEZ:  I'm going to read a stipulated background

19    summary.

15:29:37 20              THE COURT:  Let me give one other instruction,

21    Mr. Lopez.

22         When you hear deposition excerpts played, ladies and

23    gentlemen, to save time so you don't to have listen to any

24    more than you need to, the parties have typically agreed on a

15:29:49 25    little summary that will describe who the witness is, what

REDIRECT EXAMINATION – MARTIN STREIFF, M.D.

15:29:51  1    their qualifications are, et cetera.  These are agreed facts

2    that will be read to you before these depositions, so you

3    should take those as true.  It's just to save time so that

4    stuff doesn't need to be played to you.

15:30:02  5            Go ahead, Mr. Lopez.

6            MR. LOPEZ:  Thank you, Your Honor.

7            Dr. Frederick Rogers specializes in critical care and

8    has over 37 years of experience in the field of medicine.  He

9    is board-certified in surgery and surgical critical care.  He

15:30:16  10   graduated from the University of Vermont College of Medicine

11   with his medical degree in 1981.

12           In 2008 Dr. Rogers assumed the trauma medical

13   directorship at Lancaster General Hospital, a Level 2 trauma

14   center in southeastern Pennsylvania, and in January of 2017 he

15:30:37  15   became director of the Lancaster Hospital clinical research

16   program.

17           He has conducted clinical research involving IVC

18   filters for more than 20 years.

19           Dr. Rogers is not being presented as an expert

15:30:50  20   witness by either party.

21       (Video testimony of Frederick Rogers, M.D. was played.)

22           MR. LOPEZ:  There was an answer there.  I'm going to

23   have to read it.

24           The answer was, "Yes."

15:41:34  25           THE COURT:  Is that the end of the videotape?

DIRECT EXAMINATION – ROBERT McMEEKING

15:41:36  1        MR. LOPEZ:  Yes, it is, Your Honor.

2        THE COURT:  Okay.

3        MR. O'CONNOR:  Your Honor, our next witness is

4    Dr. Robert McMeeking.

15:42:38  5                   **ROBERT McMEEKING,**

6    called as a witness herein, after having been first duly sworn

7    or affirmed, was examined and testified as follows:

8                  D I R E C T   E X A M I N A T I O N

9    BY MR. O'CONNOR:

15:42:58  10   Q    You can get yourself organized.  Relax.

11        Would you introduce yourself to the members of the

12   jury, please.

13   A    My name is Robert McMeeking.

14   Q    And, Dr. McMeeking, can you tell us what you do for a

15:43:10  15   profession.

16   A    I'm a professor of mechanical engineering and professor of

17   material science and engineering and I teach and do research

18   on those subjects at the University of California, Santa

19   Barbara.

15:43:24  20   Q    Tell us, what is a mechanical engineer?

21   A    A mechanical engineer is someone who creates, designs, and

22   analyzes mechanical devices and structures.

23   Q    And does that include medical devices?

24   A    It does.  Medical devices are a special form of mechanical

15:43:49  25   structures.

DIRECT EXAMINATION – ROBERT McMEEKING

15:43:50  1    Q   Can you explain to the members of the jury what your role

2    here is in this trial.

3    A   I've come here today to testify about the design and

4    testing that Bard carried out on its inferior vena cava

15:44:06  5    filters.  Particularly, the Recovery, the G2, the G2X, and the

6    Eclipse filters.

7            I will tell you about the problems I found with those

8    filters.  For example, the problems with the resistance of the

9    filter to fracture and its resistance to what's called

15:44:32  10   fatigue.

11           I will also tell you about problems I found that the

12   filter is not safe for its intended use.

13           MS. HELM:  Your Honor, may we approach?

14           THE COURT:  Already?

15:44:46  15           MS. HELM:  Yes, Your Honor.

16           THE COURT:  Okay.  Yes, you may.

17        (Bench conference as follows:)

18           MS. HELM:  Your Honor, in your *Daubert* ruling the

19   plaintiff stated that Dr. McMeeking was not going to offer an

15:45:18  20   opinion that Bard filters are dangerous.  And I'm on

21   Docket 10051 at page 8.  And you said that defendants may

22   object if they believe Mr. McMeeking -- Dr. McMeeking is

23   rendering an opinion that Bard filters are dangerous.

24           I acknowledge he did not use the word "dangerous."

15:45:37  25   He used the word "not reasonably safe" or "unsafe."

DIRECT EXAMINATION - ROBERT McMEEKING

15:45:41  1          The statute in Wisconsin --

       2          THE COURT:  Hold on just a minute.

       3          Are you intending to elicit opinions from

       4  Dr. McMeeking that the Bard filter is not safe?

15:45:52  5          MR. O'CONNOR:  Well, I think we're going to elicit

       6  opinions that it is not -- it's an unsafe design, yes.

       7          THE COURT:  Hold on.  Let me read --

       8          So you apparently said in your response to the

       9  *Daubert* motion, Mr. O'Connor, that Dr. McMeeking would give no

15:46:50 10  opinion that filters are dangerous or that they have dangerous

      11  complication rates or regarding their relative complication

      12  rates.

      13          MR. O'CONNOR:  He's not talking about complication

      14  rates.  He's going to talk about how they fail and how those

15:47:13 15  failures are dangerous.

      16          THE COURT:  What's he going to say about how they're

      17  dangerous?

      18          MR. O'CONNOR:  Well --

      19          THE COURT:  It's one thing to say it fails for this

15:47:20 20  reason.  It's another thing to say, and that makes the product

      21  dangerous to the patient.

      22          MR. O'CONNOR:  I don't know how we get around it

      23  because he's also going to testify, as you know, that there

      24  are safer alternative designs.  "Safer" implies something that

15:47:34 25  is safer than a previous filter.  And obviously the corollary

DIRECT EXAMINATION - ROBERT McMEEKING

15:47:38  1    to that is that another device is not safe or dangerous.

2              THE COURT:  Are you going to have him render an

3    opinion that the Bard filters as designed are not safe?

4              MR. O'CONNOR:  I believe so.

15:47:54  5              THE COURT:  Based on what?

6              MR. O'CONNOR:  Based upon his work and his opinions

7    in this case.

8              THE COURT:  Based on what?  What is going to be the

9    basis for him stating an opinion about whether or not they're

15:48:04  10   safe to patients?

11             MR. O'CONNOR:  That filters are prone to all the

12   complications -- that they tilt, they migrate, they penetrate,

13   they fracture -- and that they are not safe for the use

14   they're intended for when they're placed in the vena cava.

15:48:23  15             THE COURT:  Okay.

16             Ms. Helm.

17             MS. HELM:  Your Honor, I have a couple of statements

18   to make.  Number one --

19             THE COURT:  You ought to listen to this because I'm

15:48:31  20   going to ask you to respond.

21             MS. HELM:  Number one, there's no disclosure in any

22   report or in any deposition in which he calls the filters

23   unsafe.  The only disclosure was his in his report which we

24   addressed in the *Daubert* motion where he called them

15:48:49  25   dangerous.  They said we're not going to call them dangerous.

DIRECT EXAMINATION - ROBERT McMEEKING

15:48:52   1   And you said that we could object, that he cannot call them

        2   dangerous.

        3          The Wisconsin statute uses the term "not reasonably

        4   safe" and "unreasonably dangerous" in two different sections

15:49:05   5   of the strict liability code.  So they're one in the same.

        6          He has not -- he has not disclosed that they're not

        7   safe for patients.  He's never said that prior to today.  So

        8   we have a nondisclosure.  We did not have the opportunity to

        9   cross-examine him on that.  And you've previously ruled that

15:49:27  10   he can't say they're dangerous.

       11          THE COURT:  So it's nondisclosure.

       12          MS. HELM:  It's both, actually.

       13          THE COURT:  Well, where is it in his report?

       14          MR. O'CONNOR:  We've got several reports.  There's

15:49:36  15   several hundred pages.

       16          THE COURT:  Okay.  Well, you need to show me where it

       17   is in his report --

       18          MS. HELM:  Your Honor, I will state --

       19          THE COURT:  Hold on.

15:49:43  20          MS. HELM:  Excuse me.

       21          THE COURT:  That's the rule.  If they challenge

       22   nondisclosure, you have to be able to show where it is.

       23          MR. O'CONNOR:  I'm going to have to move on.  Right

       24   now I won't ask him about dangerous.  I'll ask him what he did

15:49:51  25   to arrive at his opinions.

DIRECT EXAMINATION - ROBERT McMEEKING

15:49:53   1          THE COURT:  Okay.  But before you elicit testimony it

          2    is unsafe or dangerous show me where it is in the report.

          3          MR. O'CONNOR:  He testified --

          4          THE COURT REPORTER:  Excuse me.  Someone is rustling

15:50:02   5    papers and I can't hear.

          6          THE COURT:  Say that again, I think she missed it.

          7          MR. O'CONNOR:  I wasn't expecting this type of an

          8    objection this early because I think he has testified, and

          9    will continue to testify, along the same lines he's testified

15:50:21  10    in the other cases and in his depositions.

         11          THE COURT:  Okay.  That's fair.  If you could have

         12    somebody find it so that we can confirm the nondisclosure

         13    issue.

         14          MR. O'CONNOR:  All right.  So I just want to make

15:50:31  15    sure I'm careful here.  Here's the next thing I'm going to do.

         16    I'll stay away from that.  I was going to have him give his

         17    opinions today, and he may give some.  Just working backwards

         18    I'll try to do what I can to keep him from "dangerous."  But

         19    he does have an opinion about the Simon Nitinol being a safer

15:50:52  20    design.

         21          THE COURT:  Is that disclosed?

         22          MR. O'CONNOR:  Yes.

         23          MS. HELM:  He was precluded --

         24          THE COURT:  I wasn't asking you that question.

15:51:03  25          MR. O'CONNOR:  Oh.  I'm sorry.

DIRECT EXAMINATION – ROBERT McMEEKING

15:51:04  1          MS. HELM:  Your Honor, I have to rustle papers again.

2          THE COURT:  Just tell me if it's in there.

3          MS. HELM:  In the *Daubert* ruling there's a specific

4     line that says he cannot offer an opinion that the

15:51:11  5     Simon Nitinol is a safer alternative design for a particular

6     plaintiff.  And I can show you in your ruling.

7          THE COURT:  Go ahead.

8          MR. O'CONNOR:  I agree with that.  I mean, he's not a

9     medical --

15:51:21  10         THE COURT:  Well, he's going to be on the stand for a

11    while; right?

12         MR. O'CONNOR:  Yes.

13         THE COURT:  It seems to me you can go forward and

14    cover a lot of ground without getting him to say anything on

15:51:31  15    safe or dangerous and we'll address this issue when we're not

16    keeping the jury waiting and you can cover that ground in the

17    morning, if I allow it.

18         MR. O'CONNOR:  That's fine.  But just so you know my

19    intention, my intention is to follow your order and he's not

15:51:44  20    going to say anything about this particular patient other than

21    this patient's filter experienced the failures he has studied

22    and saw and tested.

23         MS. HELM:  That's fair.

24         THE COURT:  Okay.

15:51:55  25         MR. ROGERS:  Your Honor, is today a 4:30 day?

DIRECT EXAMINATION - ROBERT McMEEKING

15:51:57  1          THE COURT:  Yes.

       2          MS. HELM:  Your Honor --

       3       (Bench conference concludes.)

       4          THE COURT:  Thank you, ladies and gentlemen.

15:52:16  5  BY MR. O'CONNOR:

       6  Q   All right.  Dr. McMeeking, I think we've got a lot of

       7  ground to cover, so I'm going to kind of go a different

       8  direction with you right now.  And what I'd like you to do

       9  first of all is talk to the members of the jury and let's talk

15:52:33 10  about your background, your qualifications to come here, and

      11  talk to them about filter -- Bard filters and their designs.

      12  Okay?

      13  A   Okay.

      14  Q   So let's start with if you could just talk us through and

15:52:47 15  tell us what you did to become an engineer in the first place.

      16  A   Well, I went to University of Glasgow to do my

      17  undergraduate degree, where I earned a bachelor of science and

      18  engineering with first class honors, which is the highest

      19  grade of degree at Glasgow.

15:53:05 20          I then went to Brown University in Providence,

      21  Rhode Island, and I earned my master of science degree and my

      22  doctor of philosophy degree in engineering at Brown

      23  University.

      24          Thereafter I went to the Stanford University and I

15:53:22 25  began my teaching career as a professor, although I had been

DIRECT EXAMINATION – ROBERT McMEEKING

15:53:29  1    teaching at Brown as a graduate assistant before I left there.

2         So I moved to Stanford and I was an acting assistant

3    professor at Stanford for two years.  Then I moved to the

4    University of Illinois at Urbana-Champaign, where I taught for

15:53:43  5    seven years, and I was on the faculty of the Department of

6    Theoretical and Applied Mechanics.

7         I then moved to the University of California,

8    Santa Barbara, and I have been there since 1985.  And as I

9    mentioned before, I'm now a professor of mechanical

15:54:04 10    engineering and professor of materials science engineering

11    there where I carry out research on those subjects and I teach

12    those subjects as well.

13         And I teach a number of topics.  I teach stress

14    analysis, finite element computer analysis, stability of

15:54:21 15    structures, design of components and structures, behavior of

16    materials, strength of materials, fracture of materials,

17    fatigue of materials, and these are all issues which are

18    involved in today's trial.

19    Q    So did this all start at the University of Glasgow?

15:54:39 20    A    That's correct.

21    Q    Where are you from?

22    A    I was born in Glasgow.  So I'm a Glaswegian, which is

23    somebody who's from Glasgow.

24    Q    You became an engineer.  And you're a Ph.D.; is that

15:54:53 25    right?

DIRECT EXAMINATION – ROBERT McMEEKING

15:54:54   1    A    That's correct.

         2    Q    What does that mean?

         3    A    A Ph.D. is a graduate degree in which the recipients of

         4    the degree are trained in doing research and creating

15:55:06   5    knowledge and passing that knowledge on to others in the

         6    field.  And in my case it specifically was in the field of

         7    engineering.

         8    Q    So if we were at the University of California,

         9    Santa Barbara, and went to one of your classes, give us an

15:55:22  10    idea.  Do you teach students at all levels in college?

        11    A    Yes, I do.  I teach students from the sophomore level all

        12    the way to students who are well advanced in their graduate

        13    degrees.  In fact, next week I'll start to teach a class to

        14    juniors on the computer analysis of and design of structures.

15:55:43  15    Q    And do you teach subjects that are relevant to what you're

        16    going to be talking about here today?

        17    A    That's correct, yes.

        18    Q    What types of subjects?

        19    A    I teach the subjects that I mentioned earlier that range

15:55:56  20    from stress analysis, finite elements, stability of

        21    structures, behavior of materials, and the fracture and

        22    fatigue of materials.

        23    Q    Now, are you a member of professional organizations or

        24    honorary societies?

15:56:10  25    A    Yes, I am.  I'm an elected member of the National Academy

DIRECT EXAMINATION – ROBERT McMEEKING

of Engineering.  The National Academy of Engineering is a United States association which has about 3,500 members who are elected for the quality and impact, the high quality and impact of the engineering work that they've done.  And I note that there's 3,500 of us who are members and there's about one and a half million engineers in the United States who practice engineering.  And so it's a very high honor to be elected to the National Academy of Engineering.

I'm also a fellow of the Royal Academy of Engineering in the United Kingdom, which is the equivalent body in the United Kingdom.  And I'm a fellow of the Royal Society of Edinburgh.  The Royal Society of Edinburgh elects its members in a similar fashion.  It's the national academy of Scotland.

I'm a life fellow of the American Society of Mechanical Engineers, and life fellows are given that distinction and honor for the quality and impact of the mechanical engineering work they've done over their career.

Q   And have you received honors and awards for your work in engineering?

A   Yes.  I was awarded the Timoshenko Medal of the American Society of Mechanical Engineers.  The Timoshenko Medal is the highest honor and award that's given to those of us who practice stress analysis and solid mechanics, as it is known, and it's given to one mechanical engineer each year, and I was fortunate enough to be awarded it in 2014.

DIRECT EXAMINATION – ROBERT McMEEKING

15:57:58  1   Q   Now, do you write authoritative articles?

2   A   Yes.  I write publications and papers on the research that

3   I do and I publish them in the journals of my field, my

4   fields, and these are articles which are peer reviewed.

15:58:17  5   They're inspected and assessed by other researchers, by other

6   professors, by other Ph.D's to ensure that they're of the

7   quality and significance and reliability that meets the

8   standard of a peer-reviewed publication.

9   Q   Have you written about any of the subjects that you're

15:58:39 10   going to address here in this court?

11   A   Yes.  I've written about 250 -- or over 250 peer-reviewed

12   papers, and the topics that I've published on include stress

13   analysis, finite computer analysis, strength of materials,

14   behavior of hard and soft materials, fatigue of materials,

15:58:59 15   stability of structures, adhesion of biological cells and

16   tissues to other materials and surfaces, the remodeling of

17   biological cells and tissues, and also on medical implants,

18   specifically prosthetic heart valves.  So I've published

19   papers in all of these areas and many are relevant to what

15:59:22 20   we'll be talking about today.

21   Q   There are journals and periodicals that professionals in

22   your field look to and review and rely for updated engineering

23   principles?

24   A   Yes.  There are many journals that range from the solid

15:59:38 25   mechanics and stress analysis area, such as Journal of Applied

DIRECT EXAMINATION – ROBERT McMEEKING

15:59:41   1    Mechanics all the way through to journals such as one called

2    Biomechanics and Mechanobiology, which I also publish in,

3    which are focused more on the biological end of the subjects I

4    do research on.

15:59:59   5    Q   Are you an editor for any professional journal in

6    engineering?

7    A    Well, I'm an associate editor or an editorial advisor for

8    many journals.  But from 2002 to 2012 I was editor-in-chief of

9    the American Society of Mechanical Engineers Journal of

16:00:16  10    Applied Mechanics, which is the premiere and most important

11    journal that publishes scientific research papers on the

12    subjects of solid mechanics and stress analysis, and also the

13    flagship journal of the American Society of Mechanical

14    Engineers.  It's the oldest and most important of their

16:00:37  15    journals.

16         As I mentioned, I was its editor-in-chief for ten

17    years and I supervised a panel of associate editors to carry

18    out the process of peer review to ensure the papers we

19    published were of satisfactory standard.  And we rejected

16:00:55  20    about twice as many papers as we accepted, so we had a very

21    high level of stringency in the reviews, the review process.

22    Q   Okay.  Thank you.

23         Now, in addition to teaching engineering students, do

24    you practice engineering?

16:01:14  25    A   Yes, I do.  As I've mentioned already, I carry out

DIRECT EXAMINATION – ROBERT McMEEKING

16:01:18 1   research in engineering.  But I also am a consultant in

2   mechanical engineering and material science to companies that

3   work in that area.

4   Q   Do you consult with medical device companies?

16:01:31 5   A   Yes, I do.  I've consulted for about 15 of them over a

6   period of about 30 years, and I've also consulted for about

7   another 15 companies which are in areas other than medical

8   implant devices.

9   Q   What types of implants have you consulted on?

16:01:48 10  A   I've consulted on prosthetic heart valves; stents, the

11  cardiovascular stents that go into your blood vessels and so

12  on; and also on breast implants.  And I've also done

13  consulting on an inferior vena cava stent that is used to

14  stabilize a prosthetic tricuspid heart valve.

16:02:21 15  Q   When you consult with companies, can you give us an idea

16  of the types of professional activities you engage in.  Do you

17  review designs, for example?

18  A   Yes.  I review the designs they're undertaking, proposing.

19  I make suggestions for how to possibly improve the designs.  I

16:02:37 20  make assessments of potential problems with the designs and

21  the possible ways in which the design or the device that's

22  eventually made will fail or not function as it should.

23       I review the testing that the company carries out for

24  the same purpose of assessing problems and possible failures.

16:03:05 25  And I also review their calculations and their analysis that's

DIRECT EXAMINATION – ROBERT McMEEKING

16:03:11  1    carried out to support both the designs and testing of their

2    devices.

3    Q    You told us earlier, and you gave us a basic understanding

4    of the subjects you teach and the type of engineering analyses

16:03:24  5    that you teach, and we'll talk in more detail how those apply

6    to this case, but when you consult with medical device

7    companies, companies that are making devices that go into the

8    human body, as an engineer do you take steps to learn about

9    the anatomy where the device is going to be placed?

16:03:43  10    A    Yes, that's correct.  I make an assessment of the

11    environment and the conditions that the device is going to

12    experience and I take into consideration what that environment

13    will impose on the device, the forces and deformations and

14    distortions that the device will be subjected to, and I take

16:04:07  15    that information into consideration when I consider whether

16    the device will function satisfactorily or whether it will

17    have problems and potentially fail in some way.

18    Q    Now, the work that you've done here in this court case,

19    number one, are you paid for your time?

16:04:27  20    A    I am.

21    Q    And have you approached the work you were required to do

22    in this case any differently than when you are asked to

23    consult with a medical device company?

24    A    No.  I've approached this work in very much the same way

16:04:44  25    as I approach and do the work I carry out for the companies

DIRECT EXAMINATION – ROBERT McMEEKING

16:04:47  1   that I consult with.

2           I've reviewed the designs and testing protocols and

3   plans that Bard had in place for their inferior vena cava

4   filters and I've reviewed the testing that they've carried

16:05:04  5   out.  I made assessments of the conditions and the environment

6   that the device will experience and I've made an assessment of

7   the problems and the failure modes which may arise in

8   association with the device.

9           I've reviewed the designs and I've made assessments

16:05:25 10   of those designs.  And to undertake those assessments I've

11   carried out my own calculations, which is something I also do

12   when I'm working with the companies that I consult for.

13   Q   When you are coming -- when you are doing work as an

14   expert in a court case like this, how often do you do that?

16:05:46 15   A   Well, I did a small amount of work about 25 years ago in a

16   couple of cases.  One was a bicycle accident and the other was

17   a failed knee prosthesis.  And then about 15 or more years I

18   did no litigation work.

19           And, by the way, those two cases didn't go anywhere

16:06:06 20   in terms of trial or any serious activity, so they were quite

21   brief episodes.

22           And I went for ten or 15 years without any activity

23   in that area.  And more recently I've been involved in the

24   Bard litigation, as you know, and in some other litigation

16:06:26 25   currently that's going on.

DIRECT EXAMINATION – ROBERT McMEEKING

16:06:28  1    Q    Are you involved in any other cases involving IVC filters?

2    A    Yes.  I'm involved in cases that involve IVC filters

3    manufactured by Cook Company.

4    Q    Now, how much of your income do you derive from acting as

16:06:47  5    an expert witnesses in these type of cases and court cases?

6    A    Less than 15 percent over the last eight or so years.

7    Q    And you're being paid for your time in this case; correct?

8    A    I am, yes.

9    Q    How are you being compensated?

16:07:04  10   A    I'm paid $400 an hour for preparatory work and $800 an

11   hour for events such as today when I'm testifying.

12   Q    Is that amount any different than what you charge medical

13   device companies?

14   A    I charge medical device companies $400 an hour, so I

16:07:21  15   charge the same rate to them as I'm charging for the

16   preparatory work.  Since I don't do any testifying for the

17   companies I consult with, I don't charge them the $800 an hour

18   figure.

19   Q    Now, I want to talk to you for a moment about how

16:07:42  20   mechanical engineers do their work and approach engineering

21   issues.  Are there principles that engineers are trained to

22   follow and that medical devices should look at when they are

23   designing medical devices?

24   A    Yes, there are.

16:08:01  25   Q    And where are the -- what are those principles or rules,

DIRECT EXAMINATION – ROBERT McMEEKING

1  please.

2  A   Well, the first and most important principle is that

3  patient safety is paramount.  The next rule is that the

4  engineer engaged in this should investigate thoroughly the

5  conditions and environment that the device will experience.

6      With that information in hand, the engineer should

7  next make assessments of problems that may arise with the

8  device and potential failure modes that may occur as a

9  consequence of the device's conditions and the environment

10 within which it will operate.

11 Q   So -- so is there a step where device companies and their

12 engineers should look at a device to anticipates problems that

13 may arise?

14 A   Yes.  They should, of course, look at the design as they

15 develop it to anticipate such problems.  Once the design is

16 some way along, it's very important to carry out tests of the

17 device to assess the potential problems and the potential

18 failure modes that may be in place for this device.

19     And in the testing it's important to replicate very

20 carefully the conditions that the device will experience and

21 the forces and deformations and so on that it will experience

22 as a result of the environment that it will be placed in.

23 Q   And are there rules that should be followed by medical

24 device companies in the testing of a device for the reasons

25 you discussed?

DIRECT EXAMINATION - ROBERT McMEEKING

16:09:47   1   A   Yes.  They should thoroughly test the devices and they

2   should use what we call worst-case conditions among the tests

3   that they're doing, and it's most important to do the

4   worst-case conditions test to ensure that the potential

16:10:05   5   problems and potential failure modes are fully explored in the

6   testing which is undertaken.

7   Q   What do you mean by worst-case conditions?

8   A   Well, worst-case conditions are the conditions that are

9   reasonably foreseeable that will cause the greatest difficulty

16:10:25  10   of stress or the greatest problems for the device.

11       So a simple example would be conditions that would

12   impose the highest level of forces that the device might

13   experience and that might be reasonably foreseen in the

14   environment and conditions that the device will be used in.

16:10:45  15   Q   Should tests used by medical device companies in the

16   development of an implantable medical device include testing

17   that requires an understanding of the environment of use?

18   A   Yes.  They should -- the engineer who is engaged in this

19   activity should investigate thoroughly the conditions that the

16:11:06  20   device will experience.  And if there is inadequate knowledge

21   of conditions that the device will experience, then steps

22   should be taken to find out more about that environment.

23       The tests and calculations should be designed to

24   replicate the conditions as closely as possible and, as I

16:11:31  25   mentioned before, should be chosen to ensure that worst-case

DIRECT EXAMINATION – ROBERT McMEEKING

16:11:35  1    conditions are encompassed in the kind of testing and

2    calculations that are carried out.

3    Q   Well, when you talk about foreseeable worst-case

4    conditions and the requirement of testing, is that like the

16:11:47  5    requirement for auto companies to test for front-end crashes?

6    A   That's right.  If you're designing and developing a car,

7    you need to consider the ways it can be compromised, such as

8    in a crash.  You have to think about front-end crashes, side

9    impacts.  Rollovers, perhaps.  So even if every crash is a

16:12:11  10   little bit different, you have to have a robust design that

11   will take care of all of the possibilities that are reasonably

12   foreseeable.

13        And it's also appropriate to build in some safety

14   features that will help to ameliorate the consequences of bad

16:12:29  15   things happening to the car.  So things like airbags and

16   seatbelts are appropriate as part of the design of the car.

17   Q   In terms of IVC filters, if you don't mind.  In terms of

18   IVC filters and testing foreseeable worst-case conditions,

19   what is the environment that should be looked at and

16:12:51  20   understood in order to develop the appropriate tests?

21   A   Well, the environment is the inferior vena cava and the

22   organs and tissues around it, which are in the abdomen, which

23   interact with the inferior vena cava as people move and

24   breathe and so on.

16:13:13  25   Q   Are there sources out there that are understood and

DIRECT EXAMINATION – ROBERT McMEEKING

16:13:15   1   recognized by engineers and medical device companies, sources

2   for the foreseeable worst-case condition?

3   A    Yeah.  The principles of how to approach a design and the

4   importance of implementing worst-case conditions in testing

16:13:33   5   and assessments and so on is something that is sourced from

6   organizations such as the American Society of Mechanical

7   Engineers, which emphasizes the importance of doing things

8   like worst-case condition testing and analysis.

9        Specifically -- and American Society of Mechanical

16:13:55  10   Engineers has a fairly big footprint in the medical devices

11   area.  There are perhaps more specialized organizations such

12   as the International Medical Device Regulators Forum, which

13   has generated a series of recommendations as to how to

14   approach the design and testing of medical devices, and it

16:14:19  15   includes the principle of worst-case condition testing and

16   analysis.

17        And then authoritative textbooks such as Dieter and

18   Schmidt and other design and education textbooks emphasize the

19   importance of identifying worst-case conditions and

16:14:40  20   implementing them in the process of design analysis and

21   testing.

22   Q    Is worst-case condition, testing for that, a basic rule of

23   design in engineering for medical devices?

24   A    It's a basic rule.  It's a fundamental principle of design

16:15:03  25   and development of medical devices.

DIRECT EXAMINATION - ROBERT McMEEKING

16:15:05   1   Q   We're going to go into detail, but the work you've done in
        2   this case, did you look at the design and testing that Bard
        3   did on its IVC filters?
        4   A   I did, yes.
16:15:11   5   Q   And I think you told us you looked at filters, including
        6   the Simon Nitinol filter, the Recovery filter, the G2, G2X,
        7   Eclipse, and other filters; correct?
        8   A   That's correct, yes.
        9   Q   And based upon your review of the testing that Bard did on
16:15:30  10   its filters, did you -- do you have an opinion as to whether
       11   Bard followed the basic rule of testing for the worst-case
       12   condition?
       13   A   I have an opinion, and that opinion is that they did not
       14   follow the basic and fundamental rule of carrying out
16:15:44  15   worst-case condition testing and analysis of their IVC
       16   filters.
       17   Q   Can you give us an example.
       18   A   Well, for example, when the Recovery filter, which is the
       19   first in the line of filters that we're here to talk about,
16:16:02  20   when it was being developed, a test was carried out in which
       21   it was subject to forces applied to it that would expand it
       22   and contract it in a way that it would experience when it was
       23   in the inferior vena cava, subject to a person breathing,
       24   which causes the vena cava to expand and contract.
16:16:28  25           And in that test they did not include conditions such

DIRECT EXAMINATION – ROBERT McMEEKING

16:16:33   1   as tilting, such as the limbs of the filter perforating

2   through the wall of the IVC.  They did not include

3   endothelialization of the filter to the wall of the IVC in

4   that test.  And these are all conditions which would make the

16:16:54   5   conditions of the test much worse and apply worst-case

6   conditions to the filter.  And these are all foreseeable

7   conditions that the filter will experience once it is

8   implanted in the human body.

9   Q   All right.  So let's go to a different area.

16:17:13   10       And let's talk about the work you did in this case to

11   arrive at your opinions.  Could you tell us how you did that.

12   How you approached your role in this case and the things that

13   you did.

14   A   Yes.  So I first of all obtained and read a very large

16:17:36   15   number of documents which had been generated by Bard in the

16   process of their design and development of this series of

17   filters that we're discussing.  And those documents looked at

18   things like the definition of the design and it's nature.  In

19   other words, the shape, size, the material the device is made

16:18:03   20   from.

21       I looked at the documents that describe the testing

22   that the device was put through in the process of its

23   development, and I read documents that describe the

24   calculations that engineers carried out for Bard to make

16:18:24   25   assessments of the performance of the device.

DIRECT EXAMINATION - ROBERT McMEEKING

16:18:27  1        I also read expert reports and depositions and

2    testimony from other experts in this litigation and I read

3    scientific and medical literature that is concerned with the

4    behavior of IVC filters, especially the Bard line of Recovery,

16:18:51  5    G2, G2X, and Eclipse filters.  And I --

6    Q    Now -- go ahead.

7    A    I made assessments of the designs myself and I carried out

8    calculations of my own to make such assessments.

9    Q    Let's talk about that.  First I want to ask you this:  Did

16:19:13 10    you look at specific types of tests in your analysis?

11    A    Yes.  My focus in my work was to look at the protocol

12    bench tests and calculations.  And in this case the

13    calculations are what we called finite element analysis

14    calculations.  That's often abbreviated FEA, and I think

16:19:34 15    you'll hear that from me quite a lot.

16        So, as I said, my focus was on bench tests and finite

17    element analysis calculations.

18    Q    So I almost hate to open this up, but what is a finite

19    element analysis?

16:19:49 20    A    Finite element analysis is a computer method of doing

21    calculations that will predict what will happen to a device

22    such as a filter when forces are applied to it or it is caused

23    to undergo distortions and deformations.  It's a computer

24    method of doing calculations that embody basic principles of

16:20:16 25    physics and materials behavior.  And it's actually just a

DIRECT EXAMINATION – ROBERT McMEEKING

16:20:19  1   computer version of calculations that you can do on a piece of

2   paper.  The principles of the calculations are identical to

3   mathematical calculations that analyze the same principles of

4   physics and materials behavior.

16:20:33  5           Doing the calculations in the computer is often

6   convenient because the calculations are sometimes very

7   complicated and the computer can do those calculations much

8   faster than doing algebra on a piece of paper.

9   Q   But do engineers do it in both forms, computer and also by

16:20:53  10  hand?

11  A   Yes.  It's very wise to do the calculations using both

12  methodologies because there are different advantages from

13  doing different kinds of calculations.

14           When I do calculations on a piece of paper, I can

16:21:11  15  often do that because the calculations are sufficiently

16  straightforward that they're amenable to that kind of

17  analysis.

18           And by doing that kind of calculation, I can get much

19  greater insight, and perhaps cover much more territory, in

16:21:26  20  terms of different shapes and sizes and different

21  possibilities that can occur in the calculation.

22           But then there are other situations where the

23  situation of the calculation is much more complicated.  And

24  then doing the calculation by the computer becomes the option

16:21:51  25  that is best in that case.  But, as I said, it's often

DIRECT EXAMINATION - ROBERT McMEEKING

16:21:54  1   important to do the calculations both ways so that one serves

2   as a check on the other.

3   Q   Did you do computer calculations and hand calculations in

4   this case?

16:22:05  5   A   I did.  I did both computer calculations and calculations

6   by hand.

7   Q   And what was your objective in performing those

8   calculations?

9   A   My objective was to investigate the worst-case conditions

16:22:20 10   that the filter would experience in terms of what might happen

11   to it that would cause it to fail.  Those failures would

12   include the possibility of it tilting, the possibility of it

13   migrating or moving in the vena cava, the possibility of the

14   filter perforating the wall of the vena cava by cutting one of

16:22:48 15   its limbs through the tissue of the wall.  And also the

16   possibility of a fracture occurring so that a piece of the

17   filter breaks off and is loose in the body and can move

18   elsewhere, such as to the heart or other organs.

19   Q   So can you just explain to us how an engineering

16:23:08 20   calculation like an FEA, finite element analysis, or the

21   handwritten version will help a medical device company

22   understand if its device will fracture.  How does that even

23   work?

24   A   Well, it is -- it is -- the calculations enable you to

16:23:28 25   thoroughly investigate the conditions that the device or the

DIRECT EXAMINATION - ROBERT McMEEKING

16:23:32   1   filter will experience.

2          In almost all circumstances it's possible to assess

3   how a device will deform, the forces it will be subject to,

4   and the consequences that those deformations and forces will

16:23:52   5   have on the device.

6          There's a large amount of both theory and

7   experimental results that guide one in terms of how that

8   behavior will occur, and so one can undertake a calculation

9   that will predict how such responses will take place.  And I

16:24:18  10   can demonstrate this with a paper clip.

11   Q   Is this a good time -- I think we've got a few minutes

12   left.  Is this a good time -- hold that.  Is this a good time

13   to talk about stresses and strengths?

14   A   Yes, this is a good time.

16:24:32  15   Q   All right.  And so can you illustrate to the jury what

16   stresses and strains mean to engineers.

17   A   Yes.  So I can demonstrate with this rubber band.  And as

18   I'm sure you're all familiar with rubber bands, when you

19   stretch them they get longer.  So an engineer characterizes

16:24:51  20   that stretching by what we call strain.  So strain is a

21   measure of how something will lengthen or distort or change

22   shape.

23   Q   Let me stop you there on that point.

24          You're showing us something on a rubber band.  Do the

16:25:09  25   same principles apply to something more solid such as metal,

DIRECT EXAMINATION - ROBERT McMEEKING

16:25:14  1   steel, wood?

2   A    Yes.  I've got a wooden dowel here and a threaded steel

3   shaft.  Again, I'm sure you're familiar with the fact it's

4   quite easy to stretch a rubber band.

16:25:29  5   Q    That's strain what you're showing us there; right?

6   A    That's strain.

7   Q    All right.  Then what would you do to illustrate stress?

8   A    If I try to stretch the dowel, it's very hard.  It is

9   actually stretching, but you can't see.  Even I can't see from

16:25:41  10  close up.  However, I can bend it.  I don't think you can see

11  much bending, but I am distorting it.

12        So this is much more difficult to distort, but it is

13  possible for me to distort it.  So the strains that I'm

14  managing to achieve are much less in this case with the wooden

16:26:04  15  dowel.

16        But then if I move to the steel shaft, I am actually

17  distorting it, but you can't see it and I can't see it, and

18  the only way that you would be able to measure it is with a

19  microscope, perhaps even an electron -- what's called an

16:26:19  20  electron microscope.

21        I can't even bend this.  So it's much more difficult

22  to deform and therefore the strains that I'm managing to

23  impose on the material are much less.  Typically, the bigger

24  the strain that you impose on the material, the more dangerous

16:26:38  25  is the situation.

DIRECT EXAMINATION - ROBERT McMEEKING

16:26:39  1        So if I could stretch this enough -- I don't want to

2   break it because it will fly over and hit Mr. O'Connor in the

3   face, but --

4   Q   And then I'll experience stress.

16:26:51  5   A   But if I stretch it enough, it will break.  And that

6   illustrates the point that big strains can be bad for

7   materials.

8   Q   All right.  Can you tell us what stress is --

9   A   Okay.

16:27:02  10   Q   -- because sometimes they seem interchangeable.  But are

11   they?

12   A   No, they're not.

13        In everyday life they are, but we engineers

14   distinguish between stresses and strains.

16:27:15  15        So stress measures forces.  Forces are things like

16   gravity and the effect, for example that pistons have when

17   they drive the shaft of an engine.

18        So there's lots of devices that -- and natural

19   conditions that impose forces on other objects.

16:27:37  20        So at the same time I'm straining this rubber band,

21   I'm applying a force with my fingers.  My muscles are

22   generating that force.  And the force is, if you like, what is

23   stretching the material.

24        So two things happen simultaneously.  Stress and

16:27:56  25   strain happen simultaneously.

DIRECT EXAMINATION – ROBERT McMEEKING

16:27:59   1          However, strictly speaking, stress measures the

       2     intensity of the force.  It's the force divided by the

       3     cross-sectional area of the thing that is being stretched.

       4          And so I'm applying a certain level of stress to this

16:28:16   5     object and it extends.

       6          And I can apply a certain level of stress to this

       7     object.  You can't see the extension, but I can measure, I can

       8     compute the force over area and therefore the stress.

       9          And I can do the same thing to the steel shaft.

16:28:34  10          And I'll say one more thing, which is just as

      11     excessive strains are bad for materials, excessive stresses

      12     are bad for materials and cause -- and can cause them to fail

      13     and fracture.

      14     Q   And I just have one more question.

16:28:50  15          Are you telling us that engineers have the ability

      16     through these calculations to understand what stresses and

      17     strains are going to be imposed on a device when placed in a

      18     specific environment?

      19     A   That's exactly what these things called finite element

16:29:07  20     analysis calculations do, and it's exactly what I do when I do

      21     the calculations on a piece of paper.

      22     Q   And when we return, are you going to explain to the jury

      23     how those calculations can tell a company like Bard what will

      24     happen to an IVC filter when it's put in the environment of a

16:29:23  25     vena cava?

DIRECT EXAMINATION – ROBERT McMEEKING

16:29:23  1   A   Yes, I will.

2          MR. O'CONNOR:  Your Honor, I could go into another

3   area, but --

4          THE COURT:  No, we'll break.

16:29:32  5          Ladies and gentlemen, we will plan to resume at

6   9 o'clock tomorrow morning.  Please remember not to

7   investigate the case or discuss it.  We will see you then.

8      (The jury exited the courtroom at 4:30.)

9          THE COURT:  You can step down, Doctor.

16:30:12 10          Please be seated.

11          Counsel, is there an allocation of the Rogers

12   deposition time to the defendants?

13          MS. SMITH:  Yes.

14          Your Honor, eight minutes and eight seconds for the

16:30:28 15   plaintiffs.  For defendants, it's two minutes and 41 seconds.

16          THE COURT:  Okay.  Thank you.

17          All right, Counsel, as of the end of today plaintiff

18   has used four hours and 42 minutes.  Defendants have used

19   three hours and 26 minutes.

16:32:37 20          I wanted to mention, in case you didn't see it, I

21   received an order today from the panel on multidistrict

22   litigation granting the remand of the mature cases.  And the

23   order -- I've got a copy if you want it.  But the order --

24          Actually, this is the conditional order that we

16:32:56 25   printed, Jeff.  There's a final order as well, I think.

DIRECT EXAMINATION – ROBERT McMEEKING

16:33:04  1        They also notified us the final order is out.

2        It says that the parties will need to provide the

3   clerk of this Court with a stipulation on the contents of the

4   record to be remanded.  So you all need to figure out what

16:33:20  5   portion of the MDL record should go back to these districts.

6   I assume it can be the same record for all of them but you

7   need to work that out and give the stipulation to our clerk

8   here so they know what to send to those courts.

9        Anything we need to address before tomorrow morning?

16:33:43  10        MR. O'CONNOR:  Nothing from plaintiffs, Your Honor.

11        MR. ROGERS:  Nothing from defendants, Your Honor.

12        THE COURT:  All right.  See you at 8:30.

13        Counsel, one other matter.  What you've just been

14   handed is a list of standard Wisconsin jury instructions that

16:34:19  15   we can't access and that you cite.

16        MS. HELM:  Your Honor, they're only available in hard

17   copy.  I'll be happy -- it's a three-volume notebook.

18        THE COURT:  All we need are those.

19        MR. O'CONNOR:  We have the volumes too.

16:34:34  20        THE COURT:  If you would just copy those.  We've

21   decided those are the key ones that we need to be able to look

22   at for jury instructions.  If you could just get us a copy of

23   those.

24        MS. HELM:  We borrowed them first and we bought a

16:34:49  25   set.  They're big and red.

16:34:52  1          MR. O'CONNOR:  Wisconsin rejects electronic -- they

2     have a lot of trees up there.

3          MR. ROGERS:  Keeping it old school.

4          THE COURT:  By the way, Mr. O'Connor, if you could be

16:36:11  5     ready tomorrow morning if you want to go into the safe versus

6     dangerous issue with Dr. McMeeking, if you could show me where

7     that is in the report.

8          MR. O'CONNOR:  I was just planning on that.

9          THE COURT:  That would be great.  We'll talk about

16:36:22 10     that in the morning.

11          (Recess taken at 4:37.)

12          (End of p.m. session transcript.)

13                          *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 20th day of

15   September, 2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25