UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | ) ) ) | MD 15-02641-PHX-DGC |
| _____ | ) | |
| Lisa Hyde and Mark Hyde, a married couple, | ) ) ) | Phoenix, Arizona **September 20, 2018** |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV 16-00893-PHX-DGC |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 3 - P.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

      For the Plaintiffs:

3

          Lopez McHugh
4         By:  **RAMON R. LOPEZ**, ESQ.
          100 Bayview Circle, Suite 5600
5         Newport Beach, CA 92660

6         Gallagher & Kennedy
          By:  **MARK S. O'CONNOR**, ESQ.
7              **PAUL L. STOLLER**, ESQ.
          2575 East Camelback Road, Suite 1100
8         Phoenix, AZ 85016

9         Heaviside Reed Zaic
          By:  **JULIA REED ZAIC**, ESQ.
10             **LAURA E. SMITH**, ESQ.
          312 Broadway, Suite 203
11        Laguna Beach, CA 92651

12        Goldenberg Law PLLC
          By:  **STUART GOLDENBERG**, ESQ.
13             **MARLENE GOLDENBERG**, ESQ,
          800 LaSalle Avenue, Suite 2150
14        Minneapolis, MN 55402

15        Lopez McHugh, LLP
          By:  **JOSHUA MANKOFF**, ESQ.
16        1 International Plaza, #550
          PMB-059
17        Philadelphia, PA 19113

18

19

20

21

22

23

24

25

1          **A P P E A R A N C E S** (CONTINUED)

2

For the Defendants:

3

       Nelson Mullins Riley & Scarborough
4      By:  **JAMES F. ROGERS**, ESQ.
       1320 Main Street
5      Columbia, SC 29201

6      Snell & Wilmer
       By:  **JAMES R. CONDO**, ESQ.
7      400 East Van Buren
       Phoenix, AZ 85004

8

       Nelson Mullins Riley & Scarborough
9      By:  **RICHARD B. NORTH, JR.**, ESQ.
            **MATTHEW B. LERNER**, ESQ.
10          **ELIZABETH C. HELM**, ESQ.
       201 17th Street NW, Suite 1700
11     Atlanta, GA 30363

12     C.R. Bard, Inc.
       Associate General Counsel, Litigation
13     By:  **GREG A. DADIKA**, ESQ.
       730 Central Avenue
14     Murray Hill, New Jersey 07974

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2    **SUMMARY OF COURT PROCEEDINGS**                        **PAGE:**

3    Proceedings Outside the Presence of the Jury   687, 737,
                                                     744
4

5    **WITNESSES FOR THE          DIRECT   CROSS   REDIRECT**
     **PLAINTIFF:**

6

7    **Robert McMeeking, Ph.D.**
     By Ms. Helm                            659
     By Mr. O'Connor                                 665
8
     **Rebecca Betensky, Ph.D.**
9    By Mr. Mankoff            673                    751
     By Ms. Helm                            725
10
     **Murray Asch** (Videotaped Deposition)                 758
11
                      **INDEX OF EXHIBITS**
12

13   **EXHIBIT**                                       **RECEIVED**

     NO.    DESCRIPTION
14
     1763   Modra, 01/26/2017, Exhibit 771A - Chart        681
15          entitled "Design Failure Mode and Effects
            Analysis" on the Simon Nitinol Filter -
16          SNF/SL Filter Sets (DFMEA070042 Rev. 1)

17    631   Betensky Expert Report - DFMEA070044,          682
            Rev. 3: G2 Express - Design Failure Mode
18          and Effects Analysis

19    635   Betensky Expert Report - DFMEA070077,          684
            Rev. 1: Eclipse (Vail) Filter System -
20          Design Failure Mode and Effects Analysis

21   2063   Tessmer Deposition, 06/12/2013 -               714
            Exhibit 08 - 2/25/2004 E-mail from Alex
22          Tessmer to Robert Carr and Brian Hudson
            Re. "Filter Migration Test Results"
23

24

25

## INDEX OF EXHIBITS (Continued)

**EXHIBIT**                                                    **RECEIVED**

NO.        DESCRIPTION

1940       Schulz Deposition, 01/30/2014 -                      723
           Exhibit 11 - Chart of Adverse Events and
           Deaths for all competitors from Prior
           Evaluation through Q3 2005 and from
           Q4 2005 to present

 614       Betensky 02/2017 Expert Report - Adverse             755
           event reports and monthly sales totals
           through May 2011

 552       Asch Deposition, 05/02/2016 - Exhibit 202 -          758
           5/18/1999 Letter from Thomas Kinst, Product
           Manager of Filters at NMT Medical, to Monica
           Coutanche, Marketing Manager at Bard
           Canada, Inc.

 553       Asch Deposition, 05/02/2016 - Exhibit 203 -          758
           9/14/2002 Memo from Thomas Kinst to Recovery
           Filter Design History File Re. Recovery Filter
           Compassionate Use, Subject: "Conference call
           with Bard Peripheral Technologies regarding
           clinical assessment of Recovery Filter
           removal #5"

 561       Asch Deposition, 05/02/2016 - Exhibit 212 -          758
           Special 510(k) Submission for the Recovery
           Filter System, K022236, dated 11/27/2002

 563       Asch Deposition, 05/02/2016 - Exhibit 218 -          758
           Information for Use - Recovery Filter System,
           Dated 2004

 567       Asch Deposition, 05/02/2016 - Exhibit 223 -          758
           3/10/2003 Letter from Dr. Asch Re support
           for RF

1               **P R O C E E D I N G S**

2               (Jury not present.)

3               (Proceedings resumed at 1:12 p.m.)

4               THE COURT:  Counsel, there were matters you wanted to

5      raise?

6               MR. O'CONNOR:  Yes, Your Honor.  I have drafted a jury

7      instruction and met with counsel, and they have agreed to the

8      language.  I can read it to you.  We've agreed to language on

9      that instruction about other litigation.  I can read it to you

10     and then give it to you if you'd like.

11              THE COURT:  Well, that's fine.  Why don't you read it

12     into the record.

13              MR. O'CONNOR:  What we've agreed to, and Ms. Helm was

14     kind enough to agree to this:  There were questions about

15     litigation against another medical device company called Cook.

16     This is the only lawsuit that Lisa and Mark Hyde are involved

17     in.  They are not involved in other filter litigation.

18              THE COURT:  All right.

19              MR. O'CONNOR:  Would you like it?

20              THE COURT:  You agreeable to that, Ms. Helm?

21              MS. HELM:  I am, Your Honor.

22              THE COURT:  Yeah.  I'll give that to the jury when we

23     get them in here.

24              MR. O'CONNOR:  Want to see if you can read my

25     handwriting?

1          THE COURT:  Yeah.  I can read it, I think.  So I'll
2     give that.
3          MS. REED ZAIC:  Just a -- literally just thought of
4     this because it was sitting on my table.  We are going to play
5     a video today if we can squeeze it in; if not, tomorrow.  But
6     it's going to be the first video where we read an introduction
7     and then we're going to have that conversion of deposition
8     exhibits to trial exhibit numbers.  I didn't know if you wanted
9     me to explain that to the jury or if you want to explain that
10    before I move them in.
11         THE COURT:  This will be where you'll give the
12    deposition exhibit number and then you'll give the trial
13    exhibit number so the jury --
14         MS. REED ZAIC:  The corollary, yes.
15         THE COURT:  How many are there?
16         MS. REED ZAIC:  In this one, there are only five.
17         THE COURT:  Okay.  And I will explain to the jury
18    that's what we're doing.  Are you then going to move all of
19    those in --
20         MS. REED ZAIC:  Yes.
21         THE COURT:  -- before the witness testifies?
22         Okay.  Let's move them in so there's a record of it
23    coming in.  If you want to add something to what I say, feel
24    free, but I'll explain that to them.
25         MS. REED ZAIC:  Okay.  Thank you.

1          THE COURT:  Anything else we need to raise?

2          MR. ROGERS:  No, Your Honor.

3          THE COURT:  Okay.  Let's bring in the jury.

4          You can come back up, Dr. McMeeking.

5          (Jury present.)

6          THE COURT:  Please be seated.  Welcome back, ladies

7     and gentlemen.

8          I'll wait for everybody to get their earpieces in.

9          Let me say one thing to you before we resume with the

10    cross-examination of Dr. McMeeking.  Before the lunch hour,

11    there were questions about litigation against another medical

12    device company called Cook.  This case that you're hearing is

13    the only lawsuit that Lisa and Mark Hyde are involved in.  They

14    are not involved in other filter litigation.

15         MS. HELM:  Thank you, Your Honor.

16         THE COURT:  Go ahead.

17              ROBERT MCMEEKING, PH.D.,

18    called as a witness herein by the plaintiffs, having been

19    previously duly sworn or affirmed, resumed the stand and

20    continued to testify as follows:

21              CROSS-EXAMINATION (Continued)

22    BY MS. HELM:

23    Q.  Dr. McMeeking, in your work in the Cook litigation, you

24    have been retained by either the plaintiffs or the attorneys

25    representing the plaintiffs in those cases; correct?

1    A.   That's correct.

2    Q.   Okay.  And you have offered opinion in those -- in those

3    cases that the Cook filters are defective; correct?

4    A.   That's correct.

5    Q.   Okay.  And one of the opinions you offered is that the Cook

6    filter tilts more than any other filter that you've examined;

7    correct?

8    A.   That's correct.

9    Q.   Okay.  I want to talk very, very briefly about the

10   calculations you did in this case.  You did three sets of

11   calculations; correct?

12   A.   I think I did more, but I did a handful of calculations.

13   Q.   And one of the calculations you did was about the arm

14   strain in the Recovery filter; correct?

15   A.   That's correct.

16   Q.   And you only tested or you only analyzed one arm; correct?

17   A.   That's -- I analyzed one arm as it represented all six.

18   Q.   And then another analysis you did concerned tilt in a G2

19   filter; correct?

20   A.   That's correct.

21   Q.   And the third analysis you did also dealt with tilting

22   calculations; correct?

23   A.   That's correct.

24   Q.   Okay.

25   A.   But may I point out, I did more calculations than the ones

ROBERT MCMEEKING, PH.D. - CROSS-EXAMINATION          661

1    you've mentioned.

2    Q.  But those are three of the main calculations that you

3    performed; correct?

4    A.  No.  I -- some of the main calculations I calculated were

5    finite element calculations for both the G2 and the Recovery in

6    regard to fatigue strains and calculations on a piece of paper

7    for the same purpose.

8    Q.  Okay.  You understand that when Ms. Hyde's filter was

9    retrieved by Dr. Kuo, he retrieved the entire filter plus the

10   strut that had fractured; correct?

11   A.  That's correct.

12   Q.  Okay.  And so when he retrieved it, the filter had 11

13   struts, and then he retrieved the 12th strut separately;

14   correct?

15   A.  That's my understanding.

16   Q.  Okay.  You do not have Ms. Hyde's filter or the fractured

17   strut to examine, do you?

18   A.  I do not.

19   Q.  And you would agree with me that in order to determine

20   whether that strut fractured from a fatigue failure, you need

21   to examine the strut?

22   A.  Well, the most direct way of determining whether it fails

23   by fatigue failure is to look at the surfaces that have broken

24   on the parts involved.  However, the correlation of so many

25   filters failing by fatigue is an indication that her filter

1    failed by fatigue fracture as well.

2    Q.  You're making that assumption?

3    A.  I'm making that inference.

4    Q.  Okay.  Because you have not examined the filter?

5    A.  Because I have not examined the filter.

6    Q.  Okay.  You also offered opinions that Ms. Hyde's filter

7    fractured as a result of perforation resulting in fracture;

8    correct?

9    A.  That's correct.

10   Q.  Okay.  You don't know if the strut that fractured had

11   previously perforated her IVC, do you?

12   A.  I do not know that.

13   Q.  You also mentioned in this case that the -- that the

14   failures contributed or caused -- that the failures that you've

15   identified -- migration, tilt, perforation, and fracture -- all

16   occurred in Ms. Hyde's filter; correct?

17   A.  That's correct.

18   Q.  Okay.  Are you aware that Dr. Hurst testified yesterday

19   that the degree of tilt of Ms. Hyde's filter was somewhere

20   between 2 and 4 degrees?

21   A.  I'm aware of the fact he said it was a very small amount of

22   tilt.  I didn't know those exact numbers.

23   Q.  And you're also aware that he testified that her migration,

24   if any, was around, at the most, 2 millimeters?

25   A.  Again, I was aware that it was a very small amount of

1    migration.  I did not know that specific number.

2    Q.  Okay.  In relying on information about Ms. Hyde, you have

3    to rely on information from others; correct?  You're not a

4    medical doctor?

5    A.  That's correct.

6    Q.  And you've relied on information from Dr. Hurst and

7    Dr. Muehrcke; correct?

8    A.  That's correct.  I also looked at some medical records and

9    some imaging for her filter.

10   Q.  And would you agree with me that at the time of your

11   deposition in this case, you did not know whether the fractured

12   strut was an arm or a leg?

13   A.  I -- I looked at my deposition, and I believe I said that

14   the arm had broken but that struts had perforated.  And I

15   didn't know whether the struts that had perforated were either

16   arms or legs.  That was the meaning of what I said.

17   Q.  Okay.  You don't have any information on your own or from

18   Dr. Hurst or Muehrcke about the environment, the specific

19   environment in Ms. Hyde's vena cava, do you?

20   A.  Not specific information about it.

21   Q.  You don't know what her blood flow was; correct?

22   A.  Correct.

23   Q.  You don't know what her respiratory rate was?

24   A.  No, I do not know that.

25   Q.  You don't know what her experiences were with Valsalva, the

1   term you used; correct?

2   A.  Correct.

3   Q.  You don't know -- Ms. Hyde has sleep apnea.  You don't know

4   how that impacted her filter, do you?

5   A.  No, I do not know that.

6   Q.  You didn't try to determine at all how her anticoagulant

7   use may have impacted her filter, did you?

8   A.  No, I did not.

9   Q.  And neither Dr. Hurst nor Dr. Muehrcke offered you any of

10  that information, did they?

11  A.  I didn't ask for it and they didn't offer it to me.

12  Q.  You didn't investigate anything specific about Ms. Hyde's

13  anatomy or her medical conditions; correct?

14  A.  That's correct.

15  Q.  I want to stand corrected.  I said that Dr. Hurst said that

16  it had migrated approximately 2 millimeters.  He actually said

17  5.  So I don't want to -- I don't want to have misrepresented

18  his testimony.

19  A.  It's still a number I did not know, so...

20  Q.  Pardon me?

21  A.  It's still a number I did not know, so...

22  Q.  Okay.  And my last question is:  As you sit here today,

23  within a reasonable degree of engineering certainty, you cannot

24  tell this jury whether your proposed ideas of caudal anchors,

25  penetration limiters, or a change in the angle of the struts

1    coming out of the chamfer would have reduced or prevented

2    Ms. Hyde's injury, can you?

3    A.  I would say that based on an engineering assessment, which

4    contains a reasonable degree of certainty, that I believe -- it

5    is my assessment that those features would have improved the

6    performance of her filter.

7    Q.  And that's based on your assessment.  It's not based on any

8    design drawings, any calculations, any finite element analysis,

9    any prototype or any testing; correct?

10   A.  That's correct.

11          MS. HELM:  Thank you.  Nothing further.

12          THE COURT:  Redirect?

13          MR. O'CONNOR:  Yes, Your Honor.

14                      REDIRECT EXAMINATION

15   BY MR. O'CONNOR:

16   Q.  Dr. McMeeking, you've reviewed how many Bard documents?

17   A.  Hundreds, if not thousands.

18   Q.  Now, Mrs. Hyde's filter, as you know, was February of 2011.

19   Are you aware of that?

20   A.  I'm aware of that, yes.

21   Q.  Did you come across any information in the Bard documents

22   you looked at where Bard knew about and had been considering

23   caudal anchors long before 2011?

24   A.  Yes, I did.

25   Q.  That's a feature --

1          MS. HELM:  Your Honor, excuse me.  This exceeds the

2     scope of the cross-examination.

3          THE COURT:  Overruled.

4     BY MR. O'CONNOR:

5     Q.  And the same question:  Had Bard, before Mrs. Hyde received

6     her filter, known about penetration limiters?

7     A.  Yes, they did.

8     Q.  And certainly did you expect that Bard would know how the

9     Simon Nitinol filter behaved?

10    A.  Yes.  They would be aware of its performance and

11    attributes.

12    Q.  And in -- the questions about other filters, you haven't

13    done any type of analysis yourself to compare to what extent

14    Bard compares to other filters, have you?

15    A.  I have not done such assessments.

16    Q.  But you do understand there is evidence?

17    A.  I do, yes.

18    Q.  And in your -- from what you have seen with Bard filters,

19    are Bard -- the filters that you've seen in Bard, do they show

20    in a single filter often more than one failure mode?

21    A.  Yes.  They often have all of the failure modes I've been

22    discussing.

23    Q.  And that question about what you've done in Cook, that's a

24    different filter than this filter; is that right?

25    A.  That's correct.

1    Q.  And the filter that you were asked about made by this other

2    company, Cook, that you have rendered opinions on, what

3    happened to that filter?

4    A.  It was taken off the market.

5    Q.  Now, you were asked questions about being retained as an

6    expert.  But I want you to tell the jury, is there anything

7    differently you would have been -- done if this was a medical

8    device company that retained you?

9    A.  No.  I did everything in the same way that I work when I'm

10   consulting for a medical device company.  I review their

11   documents.  I look at their bench testing.  I don't do the

12   bench testing myself.  I do calculations of both a pencil and

13   paper type and finite element calculations for them.  And I

14   review their designs and make suggestions about how to improve

15   designs and the testing that the products are put through.

16   Q.  And you -- I think you told us you're a design and

17   materials engineer?

18   A.  Yeah.

19   Q.  I can't remember --

20   A.  I'm a mechanical engineer, and I'm a materials scientist

21   and materials engineer.

22   Q.  Did you do all the work in this case that engineers in your

23   field would do?

24   A.  Yes, I did.

25   Q.  And by the time you did your calculations, did you feel

UNITED STATES DISTRICT COURT

1    there was any need for bench testing?

2    A.  No, because I was convinced by my calculations and also by

3    reviewing Bard documents, which had some bad examples of

4    testing in them, that there was no need to carry out bench

5    testing or ask someone else to do it.

6    Q.  And this question to you about microscopic evaluation, have

7    you evaluated cases involving filter failures where there have

8    been no microscopic evaluations?

9    A.  Yes.  I've evaluated cases where the filter was not

10   available for inspection.

11   Q.  Is there any question at all that the arm came off of the

12   filter and migrated into the right ventricle of Mrs. Hyde's

13   heart?

14   A.  There's no doubt about that.  I saw the image myself from

15   Dr. Kuo.

16   Q.  And based upon your calculations and the work you've done

17   with Bard filters, did you determine to a reasonable degree of

18   engineering probability that the most probable cause was what?

19   Fracture?

20   A.  Yes.

21         MS. HELM:  Object, Your Honor.  It's leading.

22         THE COURT:  Sustained.

23   BY MR. O'CONNOR:

24   Q.  Let me start another way.

25         From your perspective as an engineer, did you do

1    everything you needed to do to determine that the reason

2    that -- how that piece of the heart -- why it got to the

3    ventricle?

4    A.  I did what I needed to do to determine that it was a

5    fatigue failure that caused the fracture and led to the arm

6    migrating to her heart.

7    Q.  And you were asked about all these other so-called hundreds

8    of tests that Bard conducted.  Do you recall those questions?

9    A.  Yes.

10   Q.  I mean, are there many, many other tests that have nothing

11   to do with failure modes?

12   A.  That's correct.  I read many, many documents that describe

13   those other tests, and I even looked at tests, animal tests and

14   clinical evaluations.  But the ones I needed to focus on came

15   to my attention because I identified the failure modes and the

16   problems, and I focused on those documents that were relevant

17   to that situation, the documents that discussed the tests and

18   the calculations that were focused on those failure modes.  I

19   didn't want to take the jury's time to discuss all these other

20   tests because they were not relevant.

21   Q.  Were they the tests that pertained directly to the failure

22   modes that Bard was aware of?

23   A.  Those -- the tests that I did describe to the jury are the

24   ones that were directly related to those failure modes, or the

25   tests that didn't exist were those that would have related to

1    those failure modes.

2    Q.   And you told the jury both about the tests you reviewed,

3    the inadequacy, and did you talk about today the tests that

4    should have been done that weren't?

5    A.   That's correct.

6    Q.   Do engineers in your field do animal testing?

7    A.   Not in my field.  Not in the area of mechanical engineering

8    that I specialize in.

9    Q.   And if you believed any other testing was necessary to

10   confirm opinions, would you have asked for it?

11   A.   Yes, I would have.

12   Q.   And did you?

13   A.   I found no reason to ask for further tests or calculations.

14   Q.   Now, in terms of Bard documents, have you disclosed

15   everything that you have reviewed in your opinions?

16   A.   Yes, I have.

17   Q.   And are you aware that that information was given to Bard

18   and its lawyers?

19   A.   I'm aware of that, yes.

20   Q.   And before today, have the Bard lawyers talked to you,

21   taken your deposition?

22   A.   Yes, they have.

23   Q.   And during that deposition, has a Bard lawyer ever showed

24   you a document and asked you to consider it --

25              THE COURT:  Mr. O'Connor, we need you to stay at the

1    mic, please.

2    BY MR. O'CONNOR:

3    Q.  -- and asked you to consider that document to see if it

4    would change your opinions?

5    A.  Not to my recollection, no.

6    Q.  Has a Bard lawyer ever told you that they had documents,

7    they had tests that would refute the findings and conclusions

8    that you made?

9    A.  The only one where that was the case is the 400 million

10   cycle test of the Recovery.  But other than that, I -- that

11   situation never arose in my interactions with the Bard lawyers.

12   Q.  Have you ever seen a 400 million -- what did you say,

13   recycle test?

14   A.  400 million breathing fatigue test on the Recovery.  I've

15   never seen the lab notebook or a report on that test.

16   Q.  And certainly if there was a document that Bard had that

17   would show that the ones you looked at may not be accurate, you

18   certainly would have -- would you have expected them to show it

19   to you?

20   A.  I would have, yes.

21   Q.  Are you comfortable that you have reviewed everything you

22   needed to review, everything that was available, to come in

23   here and give the opinions you've given to the members of this

24   jury?

25   A.  I am.

1    Q.  And if you needed anything else, would you have advised us?

2    A.  I would have asked for it, and I would have expected to

3    receive it.

4    Q.  And, again, are your opinions here today to a reasonable

5    degree of scientific and engineering probability?

6    A.  Yes, they are.

7             MR. O'CONNOR:  Thank you.

8             THE COURT:  All right.  Thank you, Dr. McMeeking.  You

9    can step down.

10            (Witness excused.)

11            MR. LOPEZ:  Your Honor, at this time the plaintiffs

12   are going to call Dr. Rebecca Betensky.

13            THE COURTROOM DEPUTY:  Ma'am, if you'll stand right

14   here and raise your right hand.

15            (The witness was sworn.)

16            THE COURTROOM DEPUTY:  Could you please state and

17   spell your name for the record, ma'am.

18            THE WITNESS:  Rebecca Betensky.  R-E-B-E-C-C-A,

19   B-E-T-E-N-S-K-Y.

20            THE COURTROOM DEPUTY:  Thank you, ma'am.  Please come

21   have a seat.

22            MR. MANKOFF:  May I proceed?

23                       REBECCA BETENSKY, PH.D.

24   called as a witness herein by the plaintiffs, having been first

25   duly sworn or affirmed, was examined and testified as follows:

UNITED STATES DISTRICT COURT

```
 1                     DIRECT EXAMINATION

 2  BY MR. MANKOFF:

 3  Q.  Good afternoon, Dr. Betensky.  Could you please introduce

 4  yourself to the jury.

 5  A.  Yes.  Good afternoon.  I'm Rebecca Betensky.

 6  Q.  And what is your field of expertise?

 7  A.  I'm a statistician.

 8  Q.  And do you also study in the area of biostatistics?

 9  A.  Yes.  So I'm in a department of biostatistics, meaning that

10  the applied work that I do and the methods that I develop are

11  motivated by problems in medicine and science.

12  Q.  And in your field, do you also use epidemiology?

13  A.  Yeah, I do.

14  Q.  And can you explain what epidemiology is?

15  A.  So epidemiology encompass -- is primarily focused on

16  understanding risks of disease, for example, or risks of

17  certain kinds of events.  It also includes a large

18  methodological component, so there are methods developed within

19  epidemiology.

20          Epidemiology is often what's needed and used for data

21  that come from observational studies, so studies that are not

22  nice engineering-type experiments or nice clinical trial

23  experiments, but purely observational data require certain

24  kinds of methods, and those fall within the category of

25  epidemiologic methods.  But there's a very large intersection
```

REBECCA BETENSKY, PH.D. - DIRECT EXAMINATION                674

1    with statistics.

2    Q.  And where did you get your undergraduate degree?

3    A.  Harvard College.

4    Q.  And what was your degree in?

5    A.  Mathematics.

6    Q.  And your doctoral degree, where did you get that degree?

7    A.  Stanford.

8    Q.  And is there one degree or are there multiple degrees?

9    A.  Just one Ph.D. in statistics.

10   Q.  And do you currently have an academic appointment?

11   A.  I do.  I am professor of biostatistics at the Harvard T.H.

12   Chan School of Public Health.  And then I also have an

13   appointment as biostatistician at Massachusetts General

14   Hospital.

15   Q.  And do you teach in this field?

16   A.  I do.

17   Q.  What level of student?

18   A.  Graduate students, so just graduate students, although I

19   have advised undergraduates.  But my courses are graduate

20   courses.

21   Q.  And how long have you been doing research in biostatistics

22   and epidemiology?

23   A.  25 years.

24   Q.  Do you do original research on statistical techniques?

25   A.  I do.

1    Q.  And do you do research involving studies -- do you

2    collaborate with doctors in doing research as well?

3    A.  Yes.

4    Q.  And I understand that you are starting a new appointment

5    soon?

6    A.  I am.

7    Q.  Okay.  Can you explain what that is?

8    A.  Sure.  So as of October 1st, I'm leaving my positions at

9    Harvard and Mass General, and I am beginning a position as

10   chair of the biostatistics department at New York University,

11   NYU.

12   Q.  And what -- can you explain more about that department?

13   How big is that department?

14   A.  So it's a new department that's -- the School of Public

15   Health, which they call the College of Global Public Health at

16   NYU, is about three years old, and I'll be the inaugural chair

17   of the department.  So currently there are three faculty

18   members in the department, and I have arranged to be able to

19   hire several more over the next several years.

20          And there currently are, I believe -- this may not be

21   exactly correct -- but I believe about 30 master students and

22   about 400 undergraduates who concentrate in public health.  And

23   one thing I'll be doing there is starting a Ph.D. program as

24   well.

25   Q.  Have you published peer-reviewed articles involving these

REBECCA BETENSKY, PH.D. - DIRECT EXAMINATION                676

1    fields, biostatistics?

2    A.  Yes.

3    Q.  And have you published peer-reviewed articles involving

4    collaborative research with doctors?

5    A.  Yes.

6    Q.  Have you consulted with companies, pharmaceutical or

7    medical device companies?

8    A.  Yes, I have.

9    Q.  Can you explain a little bit more about that?

10   A.  Yes.  So I currently serve on maybe five to seven data

11   safety monitoring boards.  Sometimes they're called data

12   monitoring committees, so DMCs or DSMBs, for pharmaceutical

13   companies for the purpose of monitoring the safety of clinical

14   trials.

15           So I, as the statistician member of the committee, sit

16   with physicians and sometimes patient advocates and others and

17   review safety data, sometimes efficacy data as well, but mainly

18   safety data from the trials and look very carefully at the

19   risks that patients are incurring on these trials and make

20   decisions as to whether the trials should continue or should be

21   stopped due to safety concerns.

22   Q.  Are you being paid for your time testifying here today?

23   A.  Yes, I am.

24   Q.  Are you charging an hourly rate?

25   A.  I am.

1    Q.  What is the rate?

2    A.  $850 an hour.

3    Q.  And approximately how many hours will you be charging for?

4    A.  Well, as long -- however long I testify for.  And then

5    other time, I charge $700 an hour for litigation consulting

6    time, which regarding this trial may be -- may be 10 to 15 to

7    20 hours.  I'm not sure.

8    Q.  Okay.  And is your research that you were describing

9    earlier supported by grants?

10   A.  Yes.  Yes, grants from the National Institutes of Health,

11   mainly, or I think entirely.

12   Q.  Okay.  And can you estimate the total amount of grant money

13   you've brought in, say, in the last five years?

14   A.  So the last five years would be approximately over a

15   million dollars.

16   Q.  Okay.  So turning to your opinions in this case, you were

17   asked to provide three separate analyses; right?

18   A.  That's correct.

19   Q.  Okay.  So just -- can you just give a brief overview?  You

20   looked at Bard's failure predictions.  Can you just describe

21   briefly what that analysis involved?

22   A.  So I was provided with documents that Bard compiled at the

23   launch of new products in which they considered all the

24   different various failure -- failures that could occur within

25   patients and made predictions as to the likelihood of those

1    occurrences, is what they call them.  And so I did an analysis

2    comparing different products looking at Bard's own assessment

3    of likelihood of these occurrences.

4    Q.  And what was your overall conclusion based on that

5    analysis?

6    A.  So based on that analysis, in comparing various products

7    with the Simon Nitinol filter product, most uniformly, the

8    later Bard products had higher or equal likelihoods of failure

9    as compared to the SNF, the Simon Nitinol filter.

10   Q.  And we'll go into that in more detail in a minute.

11          Now, your second analysis involved failure reports;

12   correct?

13   A.  That's correct.

14   Q.  And can you, again, give an overview of what you looked at

15   there?

16   A.  So for that analysis, again, I used data that was provided

17   by Bard that included detailed counts of failures, the various

18   different types of failures that are relevant and of interest

19   for these filters.  So Bard provided the counts of these

20   failures as well as the sales data, so the numbers of these

21   filters presumably that went into patients.

22          And so using those -- those data, I was able to make

23   comparisons between products as to the risks of those events

24   over different time periods.

25   Q.  And what was your overall conclusion in that analysis?

REBECCA BETENSKY, PH.D. - DIRECT EXAMINATION            679

1   A.  So, again, in that analysis it appears that the Bard

2   products, beginning with the Recovery filter and moving later

3   in time, are associated with higher risks of the different

4   failure types as compared to the SNF.  And in some cases much,

5   much higher; in some cases higher.  And in a few cases, it

6   was -- because of some sparse data, it might be indeterminate.

7   Q.  And your third analysis involved looking at Bard's bench

8   test data; correct?

9   A.  That's correct.

10  Q.  Okay.  And again, can you give an overview of that

11  analysis?

12  A.  Yes.  So I was provided with data from an experiment, from

13  a bench test experiment, looking at an outcome of resistance.

14  And the comparison was between the SNF filter and the Recovery

15  filter, and it was looking at two different temperatures and

16  comparing those two devices with respect to resistance.  And so

17  I analyzed that data to investigate whether there was a

18  difference in this resistance measure between devices.

19  Q.  So let's look now in detail at the analysis involving

20  Bard's failure predictions.

21       You looked at documents titled  Design Failure Mode

22  Effects Analysis.  Can you explain what that means, what those

23  are?

24  A.  Yes.  So those are -- those are complicated tables that

25  include the different failure modes and then several

UNITED STATES DISTRICT COURT

1    subcategories of those and -- of those failure types and then

2    an assessment by Bard, which is -- was a score that they

3    assigned either from 1 to 10 or 1 to 5, which was associated

4    with the likelihood of the occurrence of the health effect of

5    that failure.

6    Q.  So it's a prediction of how often a particular failure

7    would occur?

8    A.  Of the likelihood of that failure.

9    Q.  And how many of these separate documents did you review?

10   A.  Several.  There are many of them, many -- many, many pages

11   of them.

12   Q.  Okay.  So let's look at one briefly.

13          MR. MANKOFF:  Can you pull up trial Exhibit 1763?

14   BY MR. MANKOFF:

15   Q.  Is this one of those documents you're describing?

16   A.  Yes, it is, but is it possible to make it a little bigger?

17   Q.  We'll zoom in on the relevant area.

18   A.  Okay.

19          MR. MANKOFF:  But first I'd like to move for admission

20   of trial Exhibit 1763.

21          MS. HELM:  I'm sorry, Your Honor.  I'm having a hard

22   time.

23          MR. MANKOFF:  Can you zoom in on the header?

24          MS. HELM:  No objection, Your Honor.

25          THE COURT:  Admitted.

```
 1                (Exhibit No. 1763 admitted into evidence.)

 2                MR. MANKOFF:  May we display it to the jury?

 3                THE COURT:  Yes.

 4                MR. MANKOFF:  And if you could zoom in on the top

 5   text in the header, please.

 6   BY MR. MANKOFF:

 7   Q.  And so does this document relate to the Simon Nitinol

 8   filter?

 9   A.  Yes, it does.

10   Q.  Okay.  And what time period is this document relevant to?

11   A.  So that is in the comments field, and it's look -- it's

12   relevant to January 2004 through December 2006.

13   Q.  Okay.  And if we could go to page 5, please.

14                And is this showing a category of a particular

15   potential failure?

16   A.  Yes.

17   Q.  So, for example, number 5 is deployment?

18   A.  Yes.

19   Q.  And what provides the prediction of the occurrence?

20   A.  So I guess it's a little bit hard to see that from this

21   blown-up view, but back on the original view, there is a column

22   a little bit to the right of the middle that's labeled O.  And

23   that refers to occurrence.

24                And within that column is a number, in this case it

25   would include -- could potentially include 1 -- the numbers 1
```

1    through 10.  On this page we only see 1 through -- maybe we

2    only see 2 through 6.  And that's a code for an associated

3    range of probabilities of -- meaning the likelihood of the

4    event.

5    Q.  Okay.  And let's go to page 18, please.

6            And under 2, does this involve Bard's predictions

7    about the likelihood of migration for the SNF filter?

8    A.  Yes, it does, or at least for the categories shown on this

9    page.

10   Q.  And page 21, please.

11           And under 3.2, does this show Bard's prediction for a

12   particular occurrence of fracture with the SNF filter?

13   A.  Yes, it does.

14           MR. MANKOFF:  Okay.  Can we pull up trial Exhibit 631,

15   please.

16   BY MR. MANKOFF:

17   Q.  Is this another document providing Bard's failure

18   predictions for the G2 Express?

19   A.  Yes.  I see that labeled on the top.

20           MR. MANKOFF:  Can you blow that up, please?

21           And I would move for admission of Exhibit 631.

22           MS. HELM:  No objection, Your Honor.

23           THE COURT:  Admitted.

24           (Exhibit No. 631 admitted into evidence.)

25

REBECCA BETENSKY, PH.D. - DIRECT EXAMINATION                683

```
 1    BY MR. MANKOFF:
 2    Q.  Now, it's hard to read, but on the upper right-hand corner
 3    there's an identifier number.  I believe it's 7044.  And we'll
 4    see that correspond later, so I wanted to point that out.
 5            Can you tell us what time period is relevant for this
 6    document?
 7    A.  Yes.  June 2005 through February 2007.
 8            MR. MANKOFF:  And can we go to page 16, please?
 9            May we publish, please?
10            THE COURT:  Which one?
11            MR. MANKOFF:  Trial Exhibit 631.
12            THE COURT:  The page you're going to or the page you
13    just left?
14            MR. MANKOFF:  The page I'm going to.
15            THE COURT:  Yes.
16    BY MR. MANKOFF:
17    Q.  And is this -- does this show Bard's predictions for
18    deployment issues similar to what we saw with the SNF?
19    A.  Yes.  I do think it says deployment there, yes.
20    Q.  Okay.  And we're going to turn to a better copy of this in
21    a minute.
22            Can we go to page 20, please.
23            And under 2 at the bottom, does this show Bard's
24    prediction -- at least one of Bard's predictions for migration
25    for the G2 Express?
```

1    A.  Yes.  I can't read that word all the way on the left next

2    to 2, but I see it says migration is the second word.

3    Q.  And I don't know if you can read it, but is the 2.1, is

4    that category different from what we saw with the SNF?

5    A.  Yeah.  So 2.1 is -- and I may be mispronouncing this --

6    cephalad migration.  So it's a subcategory of migration which

7    Bard has introduced in these documents with the G2 Express that

8    was not used, they did not use in their SNF version of these

9    documents.

10   Q.  Can we go to page 26, please.

11         And does this show another type of migration

12   prediction?  If you can zoom in on the 2.8.

13   A.  Yeah.  So this is showing what's called caudal migration,

14   which is downward migration, so again, a different subcategory

15   of migration.  And, again, what -- something that wasn't

16   provided or used in the SNF version of these documents.

17   Q.  Can we pull up trial Exhibit 635, please.

18         And is this the same document relative to the Eclipse?

19   A.  Yes.

20         MR. MANKOFF:  I move for admission of trial

21   Exhibit 635.

22         MS. HELM:  May we see it enlarged, please?

23         No objection, Your Honor.

24         THE COURT:  Admitted.

25         (Exhibit No. 635 admitted into evidence.)

```
1              MR. MANKOFF:  May we publish?
2              THE COURT:  Yes.
3  BY MR. MANKOFF:
4  Q.  And in the upper right-hand corner, the identifier number
5  ends in 7077.
6              But can you tell us what time period this document is
7  relevant for?
8  A.  June 2005 through March 2009.
9  Q.  And did you use this document in your analysis?
10 A.  Yes, I did.
11 Q.  And does it follow a similar format to the other two we
12 looked at?
13 A.  Yes.
14 Q.  Did you see any testimony from Bard employees about how
15 these documents are used by Bard?
16 A.  Yes, I did.
17 Q.  Okay.  And what did you learn?
18 A.  Yeah, so -- so I know that the vice president of quality,
19 Mr. Chad Modra, testified regarding these documents.  And he
20 said that the occurrence rating is an important part of Bard's
21 risk assessment.  And in support of that, Bard has a standard
22 operating procedure document, an SOP, related to this which
23 uses the occurrence ratings from their evaluation process.
24              And he also -- this is from my report.  He also
25 testified that prior to launch --
```

1              MS. HELM:  Objection.

2              THE COURT:  Hold on.

3              MS. HELM:  Objection, Your Honor.  It's hearsay.

4    She's reading from her report.

5              THE COURT:  Well, the testimony is from your memory,

6    Doctor.  If you need to have it refreshed, you can tell the

7    questioner.  But you need to testify not from your report but

8    from your memory.

9              THE WITNESS:  Okay.  That, according to my memory, he

10   testified additionally that these ratings were important at

11   launch for the company to evaluate the new product with regard

12   to its risks and potentially to make adjustments, if necessary,

13   and to know what they were.

14             MR. MANKOFF:  Can we pull up trial Exhibit 641,

15   please.

16             Your Honor, I move to publish -- I'm sorry.

17   BY MR. MANKOFF:

18   Q.  Can you describe what this document is, please?

19   A.  Yes.  So this is a distillation of the previous documents

20   that we looked at into a format that allowed me to compare, as

21   best as possible between filters, comparable categories.  And

22   so this extracted -- so in this document, the different

23   categories are extracted and lined up to make for apples to

24   apples kind of comparison.

25   Q.  And will this help you to explain your opinions to the

1    jury?

2    A.  Yes.

3         MR. MANKOFF:  Your Honor, I move to publish trial

4    Exhibit 641 as a demonstrative.

5         MS. HELM:  Your Honor, I have an objection.  And may

6    we approach at sidebar?

7         THE COURT:  Yes.

8         If you want to stand up, ladies and gentlemen, feel

9    free.

10        (At sidebar on the record.)

11        THE COURT:  I think I'm going to give each side about

12   six beans or chits, and you can use them for sidebars.

13        MS. HELM:  All right.

14        THE COURT:  That's okay.  We've had a lot of sidebars

15   in our first two days.

16        MS. HELM:  I'm feeling appropriately chastised, Your

17   Honor.

18        That exhibit and the column should be redacted.  It

19   has a column for Recovery death.  And pursuant to our prior

20   agreements and your prior rulings, I couldn't see -- I'm

21   looking at it on the screen, but I'm able to see Recovery

22   deaths, so he can't publish that.

23        THE COURT:  Is there a Recovery death column?

24        MR. MANKOFF:  I was not aware of a Recovery death

25   column, but can I -- is this on the first page?

1          MS. HELM:  No.  It's on the page that you're getting

2     ready to publish.

3          MR. MANKOFF:  On that first page?

4          MR. ROGERS:  Whatever page is up on the screen.

5          MS. HELM:  Whatever page is on the screen.

6          MR. MANKOFF:  I will switch pages before I publish,

7     and I will not show any page involving Recovery death.

8          MS. HELM:  You'll agree that the exhibit before it's

9     admitted will be redacted?

10         THE COURT:  So it's not going to be admitted.  It's a

11    demonstrative.

12         MS. HELM:  He moved to admit the document.

13         THE COURT:  He moved to publish, not to admit.

14         MS. HELM:  It needs to be --

15         THE COURT:  Well, so you're not going to use the page

16    with Recovery deaths?

17         MR. MANKOFF:  I'm not.  But I would also point out

18    that this is just a prediction.  It doesn't say what happened.

19         THE COURT:  Well, I haven't seen it so I -- but it

20    sounds like you don't need that for what you're about to do.

21         MR. MANKOFF:  Yeah.

22         THE COURT:  Why don't we go ahead and publish it

23    without that.  If you think at some point it's needed, then we

24    can talk again about whether it's appropriate.

25         MR. MANKOFF:  Okay.

1              THE COURT:  Okay.

2              MS. HELM:  And, Your Honor, I didn't feel like I could

3    address that from counsel table.

4              THE COURT:  I understand.  I'm still going to hand out

5    beans.

6              (End of discussion at sidebar.)

7              THE COURT:  Thank you all.

8              All right.  Counsel, you can publish the page we

9    discussed.

10             MR. MANKOFF:  Well, can we switch to page 5, please.

11             And I would move to publish this page as a

12   demonstrative.

13             THE COURT:  Any objection?

14             MS. HELM:  We have three sets of very old eyes looking

15   at this, Your Honor.

16             THE COURT:  That's evident to the rest of us in the

17   courtroom.

18             MS. HELM:  No objection, Your Honor.

19             THE COURT:  All right.  You may publish.

20             MR. MANKOFF:  Can we blow that up, please?

21             MR. LOPEZ:  You want just the first -- like the top

22   first or the whole thing?

23             MR. MANKOFF:  The first half, top half.

24   BY MR. MANKOFF:

25   Q.  Can you describe what we're looking at here?

1   A.  Yes.  So here we're looking at comparison of SNF on the

2   left and G2 Express in the middle and the right.  And again, as

3   I mentioned, this is sort of a summary and a distillation of

4   what we had seen on those Bard documents just previously.

5           So in particular here, the failure mode is migration.

6   And so for SNF, it's just migration because that was the

7   category that was used in the SNF document.  And potential

8   causes of failure there are listed, such as twisted legs,

9   tilted filter, et cetera, going down that third column from the

10  left.

11          And then there is an occurrence rating, which we saw

12  on the previous Bard table, that O column that I pointed out.

13  And then the next column over titled "Probability Range" is

14  just the translation of that code.

15      So a 2 for occurrence means a range of probability between

16  1 over 150,000 to 1 over 20,000.  And so that was the

17  assessment of Bard as to the cause -- as to the cause of

18  failure, that particular cause of failure associated with

19  migration.

20  Q.  And so -- and what's the category being compared for the G2

21  Express?

22  A.  So for G2, it's -- the overall migration from SNF is, in

23  this case, compared to the cephalad migration, because as I

24  mentioned previously, the G2 document from Bard separated out

25  migration into the two categories of different types of

1     migration and didn't consider a single category of migration.

2              So here I've listed the cephalad migration category.

3     Q.  And the probability ranges are the same?

4     A.  In this case, they are the same, in what we're looking at

5     on this screen, yes.

6     Q.  And I should tell you that if you want to emphasize a

7     particular area, you can draw on it.  You can circle on the

8     screen.  That may help.

9     A.  With what?

10    Q.  With your finger.

11             THE COURT:  With your finger.

12             THE WITNESS:  Okay.  Great, thank you.

13             MR. MANKOFF:  Can we go to the next page, page 6?  And

14    zoom in on the top half again, please.

15             And may we publish this to the jury as a

16    demonstrative?

17             THE COURT:  Yes.

18    BY MR. MANKOFF:

19    Q.  And so here we're looking at -- can you explain what we're

20    looking at here?

21    A.  Yes.  So it's the same -- same idea as what we just looked

22    at.  So, in fact, it's exactly the same for SNF.  So here it --

23    I just repeated the migration failure mode from what was

24    previously shown on the previous page.  But for G2 Express now,

25    I have listed the other migration subcategory because, again,

UNITED STATES DISTRICT COURT

REBECCA BETENSKY, PH.D. - DIRECT EXAMINATION

1    the G2 Express document from Bard broke it down into the two

2    categories of migration.  This one is called the caudal or

3    downward migration category.

4    Q.  So is Bard predicting that each type of migration for the

5    G2X will happen as often as the one type for SNF?

6              MS. HELM:  Object to form, Your Honor.  It's leading.

7              THE COURT:  Sustained.

8    BY MR. MANKOFF:

9    Q.  What is Bard's projection for each category for the G2

10   Express compared to the one category in the SNF?

11   A.  So on this document, on this page, just like on the

12   previous page for the cephalad migration, the probability

13   ranges are the same for the G2 Express as they are for the SNF.

14   However, we need to remember that -- or in evaluating this, we

15   need to take into account that the SNF migration includes both

16   categories that the G2 Express is listing separately.

17             So in order to really make the comparison between G2

18   Express and SNF, we would have to add the probabilities between

19   the two sheets.  So the caudal plus the cephalad could better

20   be compared to the overall migration on the SNF.

21   Q.  I'd like to look at the same information for the Eclipse.

22             MR. MANKOFF:  Can we go to page 9, please.  And can

23   you zoom in on the same area?

24             I move to publish this to the jury.

25             THE COURT:  You may.

1    BY MR. MANKOFF:

2    Q.  Is this the same comparison except SNF with Eclipse?

3    A.  I'm sorry, can you repeat that?

4    Q.  Yeah.  Is this the same comparison as we looked at for the

5    G2X only now we have the Eclipse?

6    A.  So this is the comparison of the cephalad migration for

7    Eclipse to the overall migration for SNF, yes.

8    Q.  And can we go to page --

9            And, sorry, and the probability ranges are the same

10   for each filter; correct?

11   A.  They are.  However, I'm noticing that the subcategories on

12   Eclipse seem a little -- are a little different at the bottom.

13   So whereas SNF combined wire fracture and detachment, here it

14   looks like Eclipse may have further separated out -- although

15   maybe if we could see a little bit lower in the document.

16   Q.  Can you indicate where you're looking?

17   A.  Yeah.  I'm sorry.

18           Okay.  Right.  So these two circles are what I'm

19   comparing, and I'm just noticing that SNF -- the SNF document

20   combined the wire fracture and detachment category, whereas the

21   Eclipse broke those out into two subcategories within their

22   subcategory of cephalad migration.  So now they have a

23   sub-subcategory or they've introduced sub-subcategories of

24   migration.

25   Q.  And do they make separate predictions for each of those?

1    A.  Yes.

2              MR. MANKOFF:  Can we go to page 10, please?

3              May we publish?

4              THE COURT:  Yes.

5              MR. MANKOFF:  Can we zoom in on the same area?

6    BY MR. MANKOFF:

7    Q.  And what are you comparing here?

8    A.  So here it's the caudal migration for Eclipse compared to

9    overall migration for SNF.

10             MR. MANKOFF:  And if we can back up to page 8, please.

11             Can you highlight the bottom half -- or zoom in on the

12   bottom half.

13             And I move to publish.

14             THE COURT:  You may.

15   BY MR. MANKOFF:

16   Q.  Can you explain what's being compared here?

17   A.  So here we have fracture being compared between the SNF and

18   the G2.

19   Q.  And what was Bard's prediction for fracture for the SNF?

20   A.  So for the SNF on the left, the prediction for user error

21   is the range 1 over 150,000 to 1 over 20,000.  So that's this

22   top circle.

23             And the range for material fatigue due to movement is

24   1 over 20,000 to 1 over 10,000.  And that's the bottom.

25   Q.  And what was Bard's prediction for the G2 Express?

REBECCA BETENSKY, PH.D. - DIRECT EXAMINATION          695

1    A.  So let's see.  So if I compare the second category, the

2    material fatigue due to movement, and then it's further

3    qualified against osteophyte of a vertebra of IVC wide branch

4    vessel, compare -- so that seems like a -- to be a subcategory

5    of -- circling too many things, but subcategory of what the SNF

6    had, which was just material fatigue due to movement and didn't

7    further qualify it.

8          So the prediction by Bard of that occurrence is what I

9    have underlined here for G2, 1 over 10,000 to 1 over 5,000.  So

10   it's a smaller category but has actually a larger and, in fact,

11   twice the likelihood predicted as over in the SNF for the

12   larger category of material fatigue due to movement, which is 1

13   over 20,000 to 1 over 10,000.  So twice as likely for SNF as

14   for G2 Express.

15   Q.  Do you know what movement against osteophyte of a vertebra

16   is?

17   A.  I know that osteophyte is bone-related.

18   Q.  Fair enough.

19          And did Bard make other predictions on this page about

20   G2 Express fractures?

21   A.  Yes.  So there are other -- other -- these other categories

22   are all related to fractures for G2, so these different

23   categories that are all listed here.  So going from the bottom,

24   snare tip -- I can't -- I can't -- weld joint to bundle

25   fractures.  Anyway, biomechanical forces here, filter delivery

1    issues, caudal movement.

2    Q.  Sorry to interrupt.  Can you indicate what you're reading?

3    A.  Yeah.  I'm sorry.  So I'm looking in this column here, and

4    I'm just reading up the different kinds of failure -- failures

5    related to fracture listed here for the G2.

6          And their probability -- their associated

7    probabilities, except for this last category, which is this one

8    here, so except for this one, they're all 1 over 10,000 to 1

9    over 5,000, which is much larger than the predicted probability

10   for the SNF in the first case, so that's this one, which is 1

11   over 150,000 to 1 over 20,000; and twice the likelihood as for

12   the second category, the 1 over 10 -- sorry, 1 over 20,000 to 1

13   over 10,000.

14   Q.  And so are you able to make a comparison of the total

15   expected fractures or predicted for the SNF versus the G2

16   Express?

17   A.  So -- so what we could do -- so I can make a couple of

18   comparisons.  So one comparison would be that the G2 predict --

19   the prediction of these fracture events for G2 Express are

20   equal to or -- sorry, let me take that back -- are less than

21   those predicted for SNF in all cases except for this last case,

22   which is equal to -- I'm sorry.  I think I misstated that.  Let

23   me completely back that up.

24         So the predictions for the G2 fracture events are

25   larger than those predicted for the SNF, except for this one

1    down here that I circled and now pointed to, which is

2    comparable to one of the SNF predictions.  So that's one

3    comment I can make.

4            The other comment would be that if I tried to -- if I

5    tried to combine across all events to try to get a single

6    probability for a fracture event for SNF and a single

7    probability of a fracture event for G2 Express, it would be

8    larger for the G2 Express.  In other words, if I just added up

9    these probabilities for the G2 Express and compared them, that

10   single number to the sum of the probabilities for the SNF, it

11   would be larger.

12   Q.  And are these predictions for the likelihood of a fracture,

13   or what exactly is being predicted here?

14   A.  So these predictions are for the --

15           MS. HELM:  Your Honor, I have to object.  She's

16   interpreting the document, and she's not here as an engineer or

17   an expert on DFMEA.

18           THE COURT:  Overruled.

19           THE WITNESS:  Can you repeat your question, please?

20   BY MR. MANKOFF:

21   Q.  So are the -- what is Bard predicting specific to fractures

22   here?

23   A.  So the prediction is for the health event, the health

24   effect of the fracture.  And so it's the end result of a

25   fracture, and then the fracture leading to a complication, and

1    then that complication leading to the ultimate critical health

2    effect.

3    Q.  And if I could direct your attention to the second column

4    for the G2 Express, what is the health hazard that is being

5    evaluated here?

6    A.  So as it says in this category here, critical, it's

7    called -- it's designated as a critical health hazard, which

8    can contribute indirectly to a death, severe injury, permanent

9    significant disability, or severe occupational illness in a

10   patient.

11   Q.  Now, just stepping back for a minute, did you make an

12   overall assessment of what Bard's prediction was for the G2X

13   filter related to fracture?

14   A.  I didn't --

15   Q.  I believe you had that in your report.  I can pull that up

16   if you need to refresh your recollection.

17   A.  Okay.  Sure.

18           MR. MANKOFF:  Can we have -- I'm sorry.  I don't have

19   the exhibit number, so I will move on.

20           Is she able to refresh her recollection with her

21   report in front of her?

22           THE COURT:  Yeah, if you identify the document.  Do

23   you have an exhibit number?

24           MR. MANKOFF:  I don't have the exhibit number.

25           THE COURT:  We need to identify it by exhibit number.

1    BY MR. MANKOFF:

2    Q.  Well, let's move on to your analysis of Bard's failure

3    reports.

4            What data did you use to analyze those reports or to

5    gather the information necessary?

6    A.  So I used data provided by Bard that, as I explained

7    before, included the counts, the numbers of these adverse

8    events or failures by failure type, by filter, and by year,

9    along with sales data that they provided for their filters

10   within the same time periods.

11   Q.  Can we see trial Exhibit 665, please.

12           Did you prepare this to help explain your opinions to the

13   jury?

14   A.  Yes, I did.

15           MR. MANKOFF:  May we publish as a demonstrative?

16           THE COURT:  Any objection?

17           MS. HELM:  Not as a demonstrative, Your Honor.

18           THE COURT:  You may publish.

19           MR. MANKOFF:  Can we zoom in to the first six rows in

20   the first block?

21   BY MR. MANKOFF:

22   Q.  Can you explain what we're looking at, please?

23   A.  Yes.  So first of all, starting all the way on the left,

24   July 2010 means that I included here data that was provided by

25   Bard through July 2010.

1          And then in the next column, which I'm underlining

2     right now, I've listed the comparisons that I'm making between

3     the various filters.  And then what's in the table are what's

4     called reporting risk ratios.  So let me explain that.

5          So I'll start with risk.  So by "risk," I mean simply

6     the number of events of a given type.  So, for example, if

7     we're talking about migration, such as in this first column,

8     the risk would be the number of migration events through July

9     2010 divided by the number of sales of -- of a particular

10    filter through 2010.  So that would be the risk of migration.

11         But that's not what I'm showing you here.  I'm showing

12    you a risk ratio.  So what I've calculated is the ratio of two

13    risks.  So that's just, again, simply, the risk of migration

14    through July 2010 in this case -- in this first case for

15    Recovery, divided by the risk of migration through July 2010

16    for SNF.  So that's what I mean by "risk ratio."

17         And then finally, I've used the qualifier "reporting"

18    to indicate that these are based on reports or various other

19    ways that Bard collected their data on these events.  And so

20    I've listed them -- again, so risk ratio is a comparative

21    measure, and so that's what this table is.  It's about

22    comparing pairs of filters; and then furthermore, I did it

23    separately by category of failure type.

24    Q.   Okay.  And by way of example, if we can focus in on the G2X

25    filter fracture number, can you boil it down and explain what

1    information we have from that?

2    A.  So if you -- do you mean filter fracture plus?

3    Q.  Yes.

4    A.  Okay.  So that would be this column here all the way over

5    on the right.  And so the G2X as compared to SNF has a

6    reporting risk ratio of 4.29.  And so what that means is that

7    the risk of filter fracture plus, which includes another

8    category which later showed up in Bard's data that they

9    provided, so the risk of that filter fracture event for G2X is

10   estimated to be 4.29 times the risk of filter fracture for the

11   SNF filter.

12   Q.  So does that mean that relative to the sales for the two

13   filters, the fractures are being reported more often with the

14   G2X?

15             MS. HELM:  Object to the form, Your Honor.  It's

16   leading.

17             THE COURT:  Sustained.

18   BY MR. MANKOFF:

19   Q.  If we could look at the Eclipse row, the filter fracture

20   column as well, can you explain the .47?

21   A.  Yeah.  So that .47 is -- has the same -- it's a different

22   number, obviously, but has the same interpretation.  And so

23   what that means is based on the data, meaning based on the

24   numbers of filter fracture plus events, the risk of that event

25   for a patient receiving the Eclipse is .47 times the risk of

```
 1    that event for a patient receiving an SNF filter based on data

 2    through July 2010.

 3    Q.  Does that mean that there were fewer fractures occurring

 4    with the Eclipse?  Are you able to make a comparison?

 5              MS. HELM:  Object to the form, Your Honor.  He's

 6    leading.

 7              THE COURT:  Overruled.

 8              THE WITNESS:  So that means that that's the estimate

 9    based on the data, but the estimate alone is not all that

10    informative as it is -- or similarly to every other number

11    within this table.  So what has to accompany any estimate is

12    some measure of precision of that estimate, how close to the

13    unknown is it.

14              And so -- so we would want to know that for that

15    number, that .47, and for every other number in the table.  As

16    a statistician, or anyone analyzing data or anyone analyzing a

17    study needs to go beyond the estimate and look at the

18    information contained within that estimate, and we don't get

19    that from this table alone.

20    BY MR. MANKOFF:

21    Q.  So are you saying that you evaluate whether the statistic

22    is meaningful or whether the differences are meaningful?

23    A.  Right.  So that's what would need -- that's what does need

24    to accompany these estimates.

25    Q.  Okay.  And what was your conclusion with respect to the
```

1    Eclipse?

2    A.  So I think -- I need -- is it possible to maybe enlarge

3    this part of the table, please?

4          MR. LOPEZ:  I think we have to erase it first, don't

5    we, Judge?

6          THE WITNESS:  Okay.

7          Okay.  So, let's see.  So what I've listed here are

8    what's called p-values.  And so the p-value is a measure of

9    evidence, and it's used all the time in any kind of statistical

10   analysis, whether it's an experiment of machines or animals or

11   people or anything.

12         And so this gives us a measure of how -- of how

13   different the observed estimate is relative to some benchmark.

14   And in this case, the benchmark is a risk ratio of 1, because a

15   risk ratio of 1 would mean that the two filters that are being

16   compared are the same with respect to risk.  If you divide one

17   risk by the other and it's 1, then that would mean that there's

18   no difference between the risks of those two filters.

19         And so what I've done here is I've conducted a

20   statistical test based on Bard's data that were provided to me

21   to assess how -- what's the likelihood that -- or how certain

22   can I be to reject that benchmark of 1 given the observed data

23   that I have.

24         And so the way that this works is that a very small

25   p-value, which is a probability, gives me strong evidence that

1    the estimate did not arise by chance alone but did arise

2    because that true underlying risk ratio in this case is

3    different from 1.

4           And so that's a long-winded answer, but if we look at

5    these p-values in the top part of the table, so that's these --

6    this part of the table, and these are associated with that

7    original top part of the table that we were looking at, the

8    July 2010 data, and you can see the comparisons there.

9           And so what we can see -- we were talking about the

10   comparison of SNF -- sorry, of Eclipse versus SNF.  The

11   estimate, remember, was .47.  So that's what was here.  And on

12   this portion of the table, I've listed the p-value associated

13   with that, in other words, with testing whether that .47 is

14   significantly different from 1, our benchmark.

15          And so I get a large p-value, .7168, et cetera.  And

16   so I conclude from that that there's no evidence that it's less

17   than 1; there's no evidence that it's greater than 1.  And

18   that's -- and that's what I take away from this Eclipse versus

19   SNF comparison.

20   BY MR. MANKOFF:

21   Q.  So to try and boil it down a little bit, is there evidence

22   that there is -- is there enough evidence to draw a conclusion

23   about this particular comparison?

24   A.  Based on the p-value, there isn't.

25          I would additionally look at what's called the

1   confidence interval, which I also calculated.  And I don't know

2   if we can pull that up or if I can just tell you what it --

3   Q.  You can -- if you remember --

4   A.  It was -- it's on this same document, just a subsequent

5   tab.

6   Q.  Do you remember what you wanted to say about the confidence

7   interval?

8   A.  Yeah.  So the confidence interval for this comparison --

9   so, remember, the estimate was .47.  The confidence interval --

10  and I'll explain in a second what that is, but the confidence

11  interval was something like .05 to 5.  I'm certainly not right

12  about that, but that's more or less the gist of it, or maybe it

13  was .05 to 3.  The point is is that it's wide and it contains

14  that benchmark value of 1.

15         Now, a confidence interval is an interval that gives

16  us 95 percent confidence, in this case, that that true ratio is

17  contained within it.  And so if we have a very wide confidence

18  interval, including that benchmark value of 1, we really don't

19  have any information at all.

20         MR. MANKOFF:  Can we go to page 12, please.

21  BY MR. MANKOFF:

22  Q.  How many events were evaluated --

23         Let me just back up and ask what -- generally, what

24  are we looking at here on this page?

25  A.  So I --

UNITED STATES DISTRICT COURT

1    Q.  Is this the underlying data for what we were looking at

2    before?

3    A.  Yes.  So this is the data through July 2010, the underlying

4    data that went into those calculations that were on that

5    summary sheet, yes.

6    Q.  So what -- on the far right-hand column, filter fracture

7    plus detached component, how many of those occurred with the

8    Eclipse?

9    A.  One.  So that's -- that's right here.

10   Q.  And what does that tell you about the estimate we were

11   looking at?

12   A.  So that's a small number; and in addition to that, the

13   sales number is small, relatively small.  And so that's really

14   what's driving that confidence interval and that p-value.  In

15   other words, we don't have enough information to be able to

16   make a strong definitive conclusion or to make an inference

17   from that data.  The error in that estimate is too large due to

18   the small numbers.

19   Q.  And were you able to gather additional data about Eclipse

20   fractures?

21   A.  Yes.  I was -- I later was provided with or was able to

22   access and was provided data through a later time point in 2010

23   and also through 2011.  And with more data, this began to

24   stabilize.

25           And the Eclipse versus SNF reporting risk ratio was --

1    I forget the number, but maybe something like 3.5.  And it was

2    statistically significant, meaning a small p-value.  Very small

3    p-value, yeah.

4    Q.  And is the -- can you describe, then, what your overall

5    conclusion is about your analysis of the failure reports

6    compared to the SNF?

7    A.  Yes.  So based on, you know, what we saw in the summary

8    page and all of the -- and all of the analyses that I did, it's

9    very consistently seen that the Recovery filter and then

10   subsequent filters, including the G2, G2X, Eclipse, all have

11   higher reporting risk ratios than the SNF.  And in some cases,

12   they're considerably higher; and in later cases, they're

13   higher.

14   Q.  Now, as we just saw, as you have more data, you can be more

15   precise; but we never have perfect data.  Did you do anything

16   to account for the imperfect information you were working with

17   here?

18   A.  Yes.  I did a couple of what we call sensitivity analyses,

19   which means I tried different ways of analyzing the data or

20   tried tweaking the numbers, not because that's what I believe

21   as the truth but just to see what would happen.

22   Q.  And so did you do a sensitivity analysis involving the

23   reports for SNF?

24   A.  Yes, I did.  So one analysis that I did was to add five

25   events to each category for the SNF filter.  And then I reran

1    my analysis.  So that -- that would be penalizing the SNF by

2    giving it more events, but given that there were a small number

3    of events, I wanted to see how sensitive the results were to

4    having a very -- you know, having zeros or having very small

5    numbers.  So I added five just to see what would happen.

6    Q.  Is this type of analysis that we just went over involving

7    the reported failures, is that something that you've seen in

8    the peer-reviewed literature?

9    A.  Which type of analysis are you talking about?

10   Q.  This comparison that you've been describing to us involving

11   the failure reports.

12   A.  So this is a -- this would be a common kind of analysis.

13   I'm aware of a couple published papers that have similarly

14   looked at events and tried to estimate event rates or event

15   proportions and -- or risks and have compared them.

16   Q.  Okay.  Let's talk about potential limitations.  Can you

17   explain what that means?

18   A.  Yeah.  So -- so any data analysis has potential

19   limitations.  That's just the nature of experimentation,

20   whether it's a designed experiment or an observational study.

21   So there will be limitations.

22           And we don't know if those are -- if -- so we can

23   identify potential limitations, so in other words, factors that

24   if they were true, if they held true, could influence or affect

25   the interpretation of the results.  We often don't know if

1    those factors are true or not, but it's still important as a

2    scientist, any -- you know, for any scientist to consider what

3    could possibly be wrong or what could possibly be a limitation.

4          And so that's one aspect of what I thought about with

5    regard to this analysis.

6    Q.  And what potential limitations did you consider?  Let's go

7    through them one by one.

8    A.  Okay.

9          So one limitation -- one potential limitation is that

10   the sales numbers don't exactly reflect the numbers of people

11   who were implanted with these filters.  So just because Bard

12   sells a certain number of filters to a hospital doesn't mean

13   they use them all.  Maybe they sit on the shelf.  Maybe they

14   get returned.

15         And so I ran one sensitivity analysis where I

16   discounted the number of sales.  So -- and I discounted it by

17   20 percent, just as a number that I chose that seemed not too

18   big, not too small, but perhaps reasonable given that any buyer

19   wouldn't want to -- wouldn't want to overpurchase.

20         And the reason for doing that would be not that it

21   would change the risk ratio, because it wouldn't given that

22   we're talking about a ratio discounting by the same amount

23   falls out of the estimate, but it could have an effect on the

24   precision of the estimate.  Again, as we saw when we were

25   talking about Eclipse, the numbers of events matter and the

1    numbers of sales matter.

2         And my finding -- my findings were the same.  And

3    certainly the numbers changed, the p-values changed, the

4    confidence intervals changed a little bit, but the overall

5    findings were the same with regard to that consideration.

6    Q.  Okay.  Any other potential limitations that you considered?

7    A.  Yeah.  So -- let's see.  What else did I consider?

8         So another consideration in an analysis like this

9    could be what's called confounding or channelling of patients.

10   So one very big serious concern in any kind of observational

11   study is that since it's not randomized, so patients are not

12   randomly given SNF versus G2X, there may be some reason why a

13   patient receives one versus the other.

14        And that would be important to potentially consider,

15   because if -- but only if whatever that factor is that

16   determines which filter they get is also associated with their

17   likelihood of the failure event.

18        So if it's -- if their characteristic as a patient is

19   only associated with one of those, let's say, you know, I'm

20   making -- if they have blonde hair, they're more likely to get

21   the SNF, but having blonde hair has no impact at all on

22   migration, then that doesn't matter.  It doesn't matter at all

23   if there's an imbalance in blonde hair.

24        Where it would matter is if that feature were related

25   both to the failure event as well as to the selection into the

1    filter.  Unfortunately, I couldn't do any analysis that took

2    account of that because I didn't have the data.  Bard did not

3    provide that data.  I don't have patient-level data that was

4    provided that I could use.

5    Q.  But on the bottom line, did you estimate that that would

6    change your conclusions?

7    A.  So that -- that -- I'm not aware of any such feature, and

8    typically that may make a small -- you know, could have a small

9    impact.

10         My overall sense is that given that these estimated

11   risk ratios in many cases are very, very large, it might change

12   them and reduce them somewhat but probably wouldn't make them

13   go to 1.  That's my sense from looking at the numbers and the

14   magnitudes of the numbers and their consistency across events

15   within filters or within comparisons.

16   Q.  Now, did you find data or counting errors when you were

17   reviewing the underlying spreadsheets that Bard provided to do

18   your analysis?

19   A.  Yes, I did.  So when I began this analysis of the adverse

20   event, the failure estimation, and I went to the original Bard

21   spreadsheets, they're complicated spreadsheets.  And for those

22   of you who work in Excel, you know how easy it is to make

23   mistakes within Excel, and especially if you're using formulas

24   between sheets.

25         And so the way that these sheets were structured is

```
1    that the first page was a summary page of numbers of events, so

2    numbers of migrations, numbers of fractures, that kind of

3    thing.  And then subsequent tabs on this worksheet, this

4    workbook, included the raw data.

5           And there were formulas that were used to count the

6    individual rows, which were events from each -- you know, from

7    individual patients.  So there were formulas, because nobody

8    would want to go through thousands of rows or however many

9    there were, so formulas were used to count the numbers of

10   events using text fields.  And there were some mistakes that

11   were made that I discovered when I clicked on the cells and

12   looked more carefully.

13          So in one case there was just an error there that

14   amount -- that led to zero migration events.  I think it was

15   for the Recovery filter, although I don't remember exactly

16   which filter it was for -- when, in fact, there were something

17   like 37 migration events.

18          Another example was the formula that was used in the

19   spreadsheet to count tilted filters counted "tilted filter" but

20   not "filter tilts."  So sometimes the text had been entered in

21   a reverse fashion.  And maybe I got that backwards, I don't

22   know, but that's the idea.

23          So there were several mistakes like that that I

24   discovered.  They all led to underestimates of the counts of

25   events for these filters.
```

1    Q.  The underestimates were for which filters?

2    A.  So for the Bard filters.  I mean, for the Recovery and G2,

3    G2X, Eclipse filters.

4    Q.  Did you find any such errors when you analyzed the data for

5    the SNF?

6    A.  I did not.  So the SNF has almost -- has very few events,

7    and I did not see errors there.

8    Q.  Okay.  Let's move on to your third analysis, the migration

9    bench test analysis.

10           Can you describe what you did there?

11   A.  Yes.  So for that, I was provided with data from an

12   experiment that measured resistance, so a measure of resistance

13   in millimeters of mercury.  And the -- it was measuring -- so

14   the factors in the experiment were -- so it looked at Recovery,

15   the Recovery device, and it looked at the SNF device.  And it

16   did so at two different temperatures, 37 Celsius and

17   40 Celsius.

18           MR. MANKOFF:  And can we look at trial Exhibit 2063?

19           2063.  Can we see page 2?

20   BY MR. MANKOFF:

21   Q.  Is this the test that you're describing?

22   A.  These are the data that I used, yes.

23           MR. MANKOFF:  I move for admission of trial

24   Exhibit 2063.

25           MS. HELM:  No objection, Your Honor.

1              THE COURT:  Admitted.

2              (Exhibit No. 2063 admitted into evidence.)

3              MR. MANKOFF:  May we publish?

4              THE COURT:  Yes.

5              MR. MANKOFF:  Can you blow that up, please?

6    BY MR. MANKOFF:

7    Q.  And did you analyze whether temperature had an effect in

8    these data?

9    A.  Yes.  So what I did was, given the data that were available

10   to me, basically what I had were the device, and so that's

11   encoded in the sample ID, so RF for Recovery filter or

12   Recovery; and the outcome measure of interest is this pressure

13   at filter migration, which I understood to mean a resistance

14   measure.  So that's here.

15             And then temperature was another factor that was

16   included here, so here on this page you see 37 degrees Celsius,

17   plus or minus 2.  And down below, if we look further, we would

18   see 40 as the other temperature.

19             And then finally, there's tube diameter, but there's

20   no variation in this.  So for every entry here, the diameter is

21   28.  So there was nothing I could look at with respect to 28,

22   since every unit here was at diameter 28.

23             THE COURT:  We're going to stop here and take the

24   afternoon break.  We will resume at 3:00 p.m.

25             Please remember not to discuss the case, and we'll

 1    excuse the jury.

 2            (Recess taken, 2:45 p.m. to 3:01 p.m.)

 3            THE COURT:  You may continue.

 4    BY MR. MANKOFF:

 5    Q.  Before the break, we were looking at the migration test

 6    data.  My question is, did -- when Bard increased the

 7    temperature to run the test, did that have an effect on the

 8    migration resistance of the filters?

 9    A.  Yes, it did.

10    Q.  And what effect -- what direction was that effect?

11    A.  So I actually don't remember.  May I look at my -- so I

12    know it changed the average pressure or resistance by nine

13    units.

14            MR. MANKOFF:  Can you zoom in to the full page,

15    please.

16    BY MR. MANKOFF:

17    Q.  Does the data summary refresh your recollection about --

18    A.  Oh, yes.  So increasing the temperature by 3 degrees

19    increased the average resistance or pressure.  Here, it's seen

20    by about six units.  In the model, the fancier model that I

21    fit, it was more like nine units.

22    Q.  And was that increase statistically significant?

23    A.  Yes.  It was highly significant.

24    Q.  Which means what?

25    A.  Which means the p-value, if I remember correctly, was

1    certainly less than 0.01.  I think it was 0.004.

2    Q.  But in laymen's terms, what does that mean?

3    A.  It means that there is very strong evidence that this

4    difference between 45.2, as you see here, and 51.5, the average

5    resistance for -- of the two temperature levels, 37 versus 40,

6    is real and not due to chance alone and that the true

7    difference is -- the true difference in pressure is not zero.

8    Q.  And you also then looked at the Recovery filter compared to

9    the SNF filter overall; correct?

10   A.  That's correct.

11   Q.  And was the result of that analysis consistent with the

12   other two analyses that we've gone over?

13   A.  Yes, it was.

14   Q.  Okay.  So I'd like to now back up and discuss your overall

15   conclusions about Bard's failure predictions.  And if you need

16   to refresh your recollection, you can turn to Exhibit 2447.

17            THE COURT:  Is there a question?

18   BY MR. MANKOFF:

19   Q.  Do you have that report in front of you?

20   A.  So that exhibit is one of my reports?

21   Q.  Right.  That's the report involving Bard's failure

22   predictions.

23   A.  Okay.  Yes, I have that in front of me.

24   Q.  And so what was your overall conclusion with respect to the

25   G2X and Bard's predictions of penetration?

```
 1              MS. HELM:  Objection, Your Honor.  He's asking her to

 2    read from her report.

 3              THE COURT:  Yeah.

 4              Dr. Betensky, you have to testify from memory.  If you

 5    need to refresh your memory, say so.  You can look at the

 6    document, set it aside, and then testify from memory.  But you

 7    can't read from the document.

 8              THE WITNESS:  Okay.  I need to refresh my memory,

 9    please.

10              THE COURT:  What's the question?

11    BY MR. MANKOFF:

12    Q.  The question is, what was Bard's overall prediction for G2X

13    with respect to penetration compared to the Simon Nitinol

14    filter?

15              THE COURT:  You can look at the document.

16              THE WITNESS:  Okay.  Thank you.

17              Okay.  Put it aside and --

18    BY MR. MANKOFF:

19    Q.  Do you need the question again?

20    A.  No.  I got the question.

21              So the prediction that Bard made with respect to G2X

22    versus SNF with respect to penetration was that G2X would

23    always -- that they assigned G2X a greater than or equal to

24    likelihood of penetration overall between -- so as compared to

25    SNF.
```

REBECCA BETENSKY, PH.D. - DIRECT EXAMINATION                    718

1               And with respect to at least one category, they

2     assigned the G2X a considerably increased level of likelihood

3     of a particular penetration event -- penetration event as

4     compared to SNF.

5     Q.  And can you quantify the considerable increase?

6     A.  Over 10 times.

7     Q.  Okay.

8     A.  Maybe much more.  I just don't remember the number.

9     Q.  Okay.  So a similar question:  What was Bard's overall

10    prediction with respect to the G2X compared to the Simon

11    Nitinol filter with respect to fracture?

12    A.  I'm going to refresh my memory for a moment.

13              So with respect to one category of fracture, the

14    estimate was one to four times higher for G2X as compared to

15    SNF.

16    Q.  And I have the same set of questions for Bard's predictions

17    for the Eclipse.  Were they -- how do they compare?

18    A.  So those -- they were the same.  So the comparisons are the

19    same as what I told you for G2X versus SNF.

20    Q.  In other words, they're higher than SNF, the same as G2X?

21    A.  Right.  So the Eclipse -- so Bard predicted higher

22    likelihoods of those events, the penetration event --

23    penetration overall, a particular penetration event, and a

24    fracture event at much higher levels for Eclipse as compared to

25    SNF.

1   Q.  Okay.  Now, turning back to the failure reports, now that

2   we've gone into the details about how you derive those numbers,

3   can you tell us what you found for filter fracture for the

4   Recovery filter for the May 2011 time period?

5   A.  Can we look at that, please?

6   Q.  Yes.  So if you need to refresh your recollection, I would

7   direct you to Exhibit 4498.

8   A.  Which is my report?

9   Q.  Yes.

10  A.  Okay.  So, I'm sorry, can you please ask the question

11  again?

12  Q.  So what was your prediction for the Recovery for filter

13  fracture for May 2011?

14          THE COURT:  You said Recovery?

15          MR. MANKOFF:  Yes.

16          THE WITNESS:  Okay.  So for May 2011, the risk -- the

17  reporting risk ratio for Recovery versus SNF was 56.  So in

18  other words, 56 times the risk for that fracture event for

19  Recovery as compared to SNF.

20  BY MR. MANKOFF:

21  Q.  Okay.  And for the G2 filter, can you tell us what your

22  result was for the December 2010 time period, just before

23  Mrs. Hyde got her filter, for filter fracture?

24  A.  Okay.  I need to look at my report again.

25  Q.  Okay.

1   A.  I just -- yeah.  So, I'm sorry, you said G2 or G2X?

2   Q.  Yes.  The G2 for December 2010 for the event of filter

3   fracture.

4   A.  So that reporting risk ratio is 7.1, so 7 times the risk

5   for G2 as compared to SNF for filter fracture.

6   Q.  And do you have data for the G2 going forward through 2014?

7   A.  May I check?

8   Q.  Yes.

9   A.  Okay.

10  Q.  Well, let me ask it this way:  Did you have an estimate for

11  G2 filter fracture for December 2011?

12  A.  Okay.  Yeah.  So actually, so I do have estimates.  I did

13  have data from those years, so 2011, '12, '13, and '14.  And

14  those risk ratios are on the order of 7, 8, 9, 10 over those

15  years.  In other words, 7 or 8 or 9 or 10 times the risk of

16  that event for G2 as compared to SNF.

17  Q.  Okay.  And did you have an estimate for the risk of caval

18  perforation for --

19          So let me ask this first:  Did you do a combined

20  analysis involving the G2 and the G2X?

21  A.  Yes, I did.

22  Q.  And did you do an analysis for caval perforation for July

23  2010?

24  A.  I'm going to check.

25          Okay, yes.  So for caval perforation for July 2010,

1    for G2 combined with G2X, that reporting risk ratio is 18.  So

2    18 times the risk for G2 or G2X as compared to SNF.

3    Q.  And Bard had a category called migration plus embolization.

4    Did you calculate a ratio for that event for July 2010?

5    A.  For the combined G2?

6    Q.  G2/G2X.

7    A.  Let me check.

8           Yes.  And for that category, so migration plus

9    embolization, that risk ratio is 35.  So 35 times the risk for

10   G2/G2X combined as compared to SNF.

11   Q.  And what about when you combine G2 and G2X and looked at

12   fracture for 2010 through 2014?  What values did you find

13   there?

14   A.  Let me check.

15          I'm sorry, I lost your question.  Can you repeat that,

16   please?

17   Q.  So the combined reports for G2 and G2X, the filter fracture

18   analysis.

19   A.  Okay.  So for that, I have a reporting risk ratio of 6, so

20   6 times the risk for G2/G2X versus SNF.

21   Q.  And what was the trend from 2011 through 2014?

22   A.  Also similar, level 6, 7, 8, 9.  Maybe slightly increasing,

23   but certainly holding at that level of risk ratio.

24   Q.  And then turning to the Eclipse, did you do an analysis for

25   July 2010 for Eclipse migration?

1    A.  Yes, I did.  And the reporting risk ratio was 20 in that

2    case.

3    Q.  And what was the result for caval perforation?

4    A.  Risk ratio of 5.

5    Q.  And then as of December 2011, what was your analysis for

6    Eclipse filter fracture?

7    A.  A reporting risk ratio of 2.9.

8    Q.  And did that -- did you also look at a trend from 2012

9    through 2014?

10   A.  Yes.  And it appeared pretty stable, going from 4 to 5 to

11   close to 6.

12   Q.  Now, did Bard do analyses similar to this failure reporting

13   analysis that we were just discussing?

14   A.  In part, they did.

15   Q.  Okay.  What part?

16   A.  So I've seen a document, a spreadsheet in which they

17   calculated these relative risks or risk ratios.  I'm using

18   those terms interchangeably.  But they just provided the

19   estimates.  They did not -- they did not conduct any

20   statistical analysis or quantify the actual precision of the

21   estimates or the information contained in the estimates.

22   Q.  Are your results here consistent with the results that you

23   saw?

24   A.  I believe -- actually, is it possible to see those results?

25   Q.  Well, I do have --

1           MR. MANKOFF:  Can we pull up trial Exhibit 1940?

2           I would move to admit trial Exhibit 1940 into

3    evidence.

4           MS. HELM:  No objection, Your Honor.

5           THE COURT:  Admitted.

6           (Exhibit No. 1940 admitted into evidence.)

7           MR. MANKOFF:  May we publish?

8           THE COURT:  You may.

9           MR. MANKOFF:  Can we zoom in to the bottom table?

10   BY MR. MANKOFF:

11   Q.  Now, I don't think this was the analysis you were just

12   referring to, but is this a similar analysis to what you did?

13   A.  So this would be an earlier stage in my analysis.  So what

14   Bard has done here is they've reported the rates, they call

15   them rates, of these events, fracture and migration, et cetera.

16          I did not report the rates separately.  Instead, I

17   reported the ratios of the rates because I was interested and

18   was asked to compare filters.

19          So this is -- that analysis could be done on these

20   data, but it wasn't done directly here.  So...

21   Q.  But are these -- is this analysis consistent with your

22   analyses?

23   A.  So it's absolutely consistent in terms of the approach.  So

24   the approach, meaning taking -- calculating risk as number of

25   failures divided by number of sales.  And you can see that in

1   this leftmost column where they've listed numbers of sales, and

2   you can see that they're taking in numbers of events up from

3   this table above.

4          So their approach is exactly the same as mine, using

5   events divided by sales.  They just haven't carried it as

6   downstream as I have.

7   Q.  Now, based overall on this -- all three analyses, have you

8   come to an overall conclusion?

9   A.  Yeah.  So -- so this is an issue of, you know, of patient

10  safety.  And so given that patient safety is the matter of

11  consideration here by the company, given a couple of things --

12  so given the very large magnitudes of these risk ratios that

13  I've shown you, given their consistency across events that

14  we've looked at, given the support from the additional

15  experiments such as the bench testing, all of that together,

16  even if the data are not as perfect as in an ideal world we'd

17  like them to be, they're certainly concerning enough because

18  they impact, you know, patient health, patient safety, that

19  they should be paid -- should have been paid very, very close

20  attention to and certainly follow-up studies should have been

21  conducted at least.

22  Q.  Are all of the opinions you've given here today to a

23  reasonable degree of scientific certainty?

24  A.  Yes.

25          MR. MANKOFF:  No further questions at this time, Your

1   Honor.

2           THE COURT:  Cross-examination?

3           MS. HELM:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5   BY MS. HELM:

6   Q.  Good afternoon, Dr. Betensky.

7   A.  Good afternoon.

8   Q.  My name is Kate Helm.  And I'm going to confess before I

9   start, I don't have a graduate-level education in statistics.

10          The first thing I want to do is I want to try to make

11  sure that I understand that you were asked to do three

12  different things; correct?

13  A.  Correct.

14  Q.  Okay.  One thing you were asked to do was to take a look at

15  Bard's design failure mode effects analysis for different

16  filters and compare them; correct?

17  A.  Correct.

18  Q.  The second thing you were asked to do was to take certain

19  adverse event rates, where you took adverse events and divided

20  it by sales and came up with a rate number; correct?

21  A.  I wouldn't call that a rate.  I'd call that a risk or a

22  proportion.

23  Q.  Okay.  And you did that for the Simon Nitinol, and then you

24  did it for the Recovery, the G2, the G2X, and the Eclipse; and

25  for each of those retrievable filters, you compared it back to

REBECCA BETENSKY, PH.D. - CROSS-EXAMINATION                726

1    the Simon Nitinol.  Correct?

2    A.  Correct.

3    Q.  Okay.  And the third thing you were asked to do was take a

4    look at a specific bench test; correct?

5    A.  Correct.

6    Q.  Okay.  At one point, you said Bard did not provide certain

7    information.  And I want to make sure it's very clear to

8    everyone:  All of the information that you received to conduct

9    your analysis in this case came from the plaintiffs' attorneys;

10   correct?

11   A.  Correct.  All of the underlying data, yes.

12   Q.  And what you were asked to do in this case was to use the

13   Simon Nitinol as your basis for each of your comparisons;

14   correct?

15   A.  Yes.

16   Q.  You didn't choose the Simon Nitinol, did you?

17   A.  No.

18   Q.  It was chosen for you?

19   A.  Yes.

20   Q.  Okay.  Do you know anything about the Simon Nitinol filter?

21   A.  I do.

22   Q.  And do you understand that it's a permanent filter?

23   A.  I do.

24   Q.  And do you understand that the Recovery, the G2, the G2X,

25   and the Eclipse are what are called either optional or

1   retrievable filters that can be retrieved percutaneously?

2   A.  I understand that at various points they were cleared for

3   retrievability, and they may or may not be retrieved.

4   Q.  Okay.  And so you understand that those filters have a

5   different utility than the Simon Nitinol; correct?

6   A.  Perhaps potentially.

7   Q.  Okay.  And you also know, don't you, that the Simon Nitinol

8   has been on the market since the early 1990s?

9   A.  Yes.

10  Q.  You're aware of that; correct?

11  A.  Yes, although my understanding is that it's not currently

12  on the market but --

13  Q.  But that filter, that permanent filter, was on the market

14  starting in the early 1990s; correct?

15  A.  Yes.

16  Q.  And I want to ask one quick question.  You said certain

17  data, that you found some mistakes, and you explained what I

18  find to be the very complicated process of switching back and

19  forth between spreadsheets.  Those kind of mistakes, those are

20  common.  They're clerical mistakes and easy to make; correct?

21  A.  They're easy to make.

22  Q.  Thank you.

23       Okay.  Let's start with the bench test.

24  A.  Although, may I amend my answer to that, please?

25  Q.  Sure.

REBECCA BETENSKY, PH.D. - CROSS-EXAMINATION          728

1    A.  Some of them are easy to make.  Some of them, it's not
2    quite clear how they could have been made; if a formula should
3    have been in a cell, how it came to be hard coded as a zero.
4    That is less understandable than if a formula doesn't quite
5    capture all of the text within a box.
6    Q.  Okay.  Let's talk about the bench testing, okay?
7    A.  Sure.
8    Q.  You're not an engineer?
9    A.  No.
10   Q.  You've never designed an IVC filter?
11   A.  Correct.
12   Q.  You've never tested an IVC filter?
13   A.  Correct.
14   Q.  You've never established test protocol or set up a test for
15   an IVC filter; correct?
16   A.  Correct.
17   Q.  Okay.  And what you did in this report was you provided
18   analysis between certain migration testing of the Recovery
19   filter versus the Simon Nitinol filter; correct?
20   A.  Well, the data were a pressure or resistance measure, which
21   as I understand it is related to migration.
22   Q.  Okay.  And you were -- you were provided the data and
23   simply asked -- and I'm not saying that what you do is simple
24   by any means, but you were simply asked to do the comparison;
25   correct?

REBECCA BETENSKY, PH.D. - CROSS-EXAMINATION        729

1    A.  I was asked to analyze the data.

2    Q.  Okay.  And you were not asked to review fatigue testing,

3    were you?

4    A.  No.

5    Q.  And you were not asked to review radial strength testing,

6    were you?

7    A.  No.

8    Q.  And you were not asked to review hook strength testing,

9    were you?

10   A.  No.

11   Q.  And you were not asked to evaluate animal study tests, were

12   you?

13   A.  No.

14   Q.  And you weren't asked to review corrosion resistance

15   testing, were you?

16   A.  No.

17   Q.  And the test that you were asked to review, do you

18   understand that that was a test -- you said pressure, and it

19   was a test to evaluate cranial migration testing; in other

20   words, movement of the filter up?

21   A.  I didn't know to that level of detail what kind of

22   migration.

23   Q.  But it was a test for a Recovery filter; correct?

24   A.  It was a comparison between Recovery and SNF.

25   Q.  Okay.  And for this Recovery testing you reviewed, you

1    reviewed data conducted at 40 degrees Celsius; correct?

2    A.  And 37.

3    Q.  Okay.  And you didn't actually review test data at

4    37 degrees; you actually converted to 37 degrees.  Correct?

5    A.  No.  I don't think so.  I think the raw data were included

6    from both levels of temperature.

7    Q.  Okay.  Do you understand in this case that Ms. Hyde did not

8    have a Simon Nitinol filter?

9    A.  Yes.

10   Q.  Do you understand in this case that Ms. Hyde did not have a

11   Recovery filter?

12   A.  Yes.

13   Q.  Okay.  And you didn't analyze any testing relating to a G2X

14   filter, did you?

15   A.  No.

16   Q.  And you didn't analyze any testing relating to an Eclipse

17   filter, did you?

18   A.  No.

19   Q.  Okay.  And do you know -- have you been provided

20   information to show that there were dimensional changes and

21   design changes between the Recovery filter and the G2X and the

22   Eclipse filter?

23   A.  I know that anecdotally.

24   Q.  Okay.  And were you made aware that the width of the legs

25   of the G2X and the Eclipse filter are 40 millimeters?

1    A.  No.

2    Q.  And were you made aware that the width of the legs of the

3    Recovery filter are 32 millimeters?

4    A.  No.

5    Q.  And would you agree with me that a comparison of

6    40 millimeters to 32 millimeters is approximately 25 percent

7    wider?

8    A.  That's correct.

9    Q.  Okay.  And you didn't do any analysis of the wider filter

10   compared to the SNF on this specific test, did you?

11   A.  I'm sorry, which is the wider filter?

12   Q.  The G2X or the Eclipse.

13   A.  Do you mean the bench tests?

14   Q.  Yes, ma'am.

15   A.  No.  I didn't have that data.

16   Q.  That wasn't provided to you?

17   A.  Correct.

18   Q.  Okay.  Let's talk about DFMEAs for a minute.

19          A DFMEA, you learned recently, correct, is a mechanism

20   used by engineers to evaluate a product; is that right?

21   A.  Yes.

22   Q.  And, in fact, when you were -- gave a deposition in July of

23   2016, you didn't even know what a DFMEA was, did you?

24   A.  No.

25   Q.  So since July of 2016, you've been provided with a number

REBECCA BETENSKY, PH.D. - CROSS-EXAMINATION                    732

1    of Bard's DFMEA's; is that correct?

2    A.  Yes.

3    Q.  And, again, you're not an engineer; correct?

4    A.  I'm not an engineer.

5    Q.  Okay.  And you have never created a DFMEA; correct?

6    A.  Correct.

7    Q.  And you have never been asked to evaluate a product and put

8    those predictions that you found and talked about in a DFMEA;

9    correct?

10   A.  Correct.

11   Q.  Are you aware that a DFMEA is not a static snapshot?  It's

12   not a one-shot, one-time analysis?

13   A.  I think I'm vaguely aware of that.

14   Q.  Okay.  And are you aware that through the development and

15   actually through the life of a product, the DFMEA analysis can

16   change based on information received by the engineers?

17   A.  Yes.

18   Q.  And you didn't take that into consideration; you used

19   finite time periods for the DFMEAs.  Correct?

20   A.  I used what was provided.

21   Q.  What was provided to you by the plaintiffs' attorneys;

22   right?

23   A.  Yes.

24   Q.  Okay.  And the DFMEAs that we talked about today were dated

25   somewhere around 2004 to 2007; right?

1    A.  They were from pretty close to the launch dates of the G2

2    and the Eclipse, which would have put them a little bit later

3    than that, yes.

4    Q.  But by that time, the Recovery filter had been on the

5    market for well over 10 years; correct?  I'm sorry.  I

6    misspoke.

7          By that time, the Simon Nitinol filter had been on the

8    market for well over 10 years; correct?

9    A.  Yes.

10   Q.  And you weren't asked to look at earlier versions of the

11   Simon Nitinol DFMEA, were you?

12   A.  I looked at the Simon Nitinol filter DFMEA from 2006, which

13   is what was available.

14   Q.  Okay.  You didn't look at any earlier versions --

15   A.  No.

16   Q.  -- of the Simon Nitinol to see how the engineer -- if the

17   engineer's analysis had changed, if they had changed the

18   failure modes, if they had changed the predictive rates.  You

19   didn't look at any of that, did you?

20   A.  No.

21   Q.  And you made a point of saying that the Simon Nitinol only

22   had migration, where the retrievable filters had either caudal

23   or cranial migration.  Do you remember that testimony?

24   A.  I think the -- there was different terms, the cephal- --

25   Q.  Cephalad or --

1    A.  Yes.

2    Q.  -- cranial migration?

3    A.  That's -- so, and I don't know about all of the

4    retrievable.  I was just looking at the G2s and the Eclipse.

5    Q.  Okay.  And you don't know what analysis the engineers went

6    through to include those categories on the DFMEAs and why those

7    categories were different for different filters, do you?

8    A.  No.

9    Q.  You simply took the broad categories of, for example,

10   migration versus migration and looked at the numbers they

11   predicted and the outcomes they predicted and compared them;

12   correct?

13   A.  Where I could.  I mean, in some cases the migration was

14   broken down.

15   Q.  And you did that without any understanding as to how they

16   got to those numbers, how they got to those conditions, or how

17   they got to their analysis; correct?

18   A.  Well, I had the vague -- I mean, the overall high-level

19   understanding that those were the categories that were

20   important as they were launching the product.  Those were the

21   categories for which they needed to consider failure.

22   Q.  But, again, you weren't privy and you don't know what their

23   analysis or process was in creating the DFMEAs; correct?

24   A.  I know that they reviewed their prior data or their

25   prior-to-current data to come up with the estimates.

1    Q.  Okay.  And, again -- and this is a -- this is not a

2    statistical word, but your bogey, your comparison every single

3    time was against the Simon Nitinol filter; correct?

4    A.  Yes.

5    Q.  Which is a permanent filter that cannot be retrieved

6    percutaneously; correct?

7    A.  My understanding was that it could be retrieved if it -- if

8    necessary.

9    Q.  But it wasn't designed to be retrieved?

10   A.  Correct.

11   Q.  Okay.  Let's talk about, now, your third category, which I

12   think you called -- and I want to make sure I got it right --

13   you called a reporting risk ratio.

14   A.  Yes.

15   Q.  Is that the term you used?

16   A.  Those are the estimates that I provided.

17   Q.  Okay.  And you've been very careful to say that you are not

18   calculating rates; correct?

19   A.  Correct.

20   Q.  Okay.  But what you're calculating is a comparison of the

21   adverse events of the Simon Nitinol filter versus the -- versus

22   adverse events for the retrievable filters, and you're creating

23   a risk ratio; correct?

24   A.  Not quite.  Because I'm not just comparing the numbers of

25   events.  I'm dividing them by the numbers of sales.

1    Q.  Okay.  Fair.  Fair.

2            So you're taking the number of events for the Simon

3    Nitinol for a finite period of time, you're dividing it by the

4    sales for that period of time, and you get a number; correct?

5    A.  Correct.

6    Q.  And then you're doing that same analysis for the G2X;

7    correct?

8    A.  Correct.

9    Q.  And then you're looking to see how they relate to one

10   another; correct?

11   A.  I'm calculating the ratio of those.

12   Q.  Okay.  Which is a comparison of the Simon Nitinol to the

13   G2X or the Eclipse or the G2; correct?

14   A.  Correct.

15   Q.  Okay.  You talked a little bit ago about making sure you

16   took into consideration data inconsistencies and errors.

17           Do you remember that?

18   A.  Yes.

19   Q.  Okay.  And I had the benefit of reading your report, and in

20   the section of your report, you point out various problems or

21   errors --

22   A.  Sorry.

23   Q.  It's okay.  These things get us all.

24           -- you point out several problems or errors in the

25   data you reviewed; correct?

REBECCA BETENSKY, PH.D. - CROSS-EXAMINATION            737

1    A.  Yes.

2    Q.  Okay.  And you set about to resolve or fix any errors;

3    correct?

4    A.  In some cases, I did.

5    Q.  Okay.  We talked a few minutes ago, the Simon Nitinol

6    filter was available as early -- in the early 1990s; correct?

7    A.  Yes.

8    Q.  Okay.  And you didn't consider any data on the Simon

9    Nitinol filter or any adverse events against sales for the

10   Simon Nitinol filter prior to 2000; correct?

11   A.  The data sheets that I had started in 2000.

12   Q.  Okay.  And when you did your analysis, were you aware that

13   the Simon Nitinol filter had been on the market for several

14   years prior to 2000?

15   A.  Yes.

16          And, actually, I should amend what I said.  And

17   subsequently I -- to my reports, I did find -- or I was

18   provided with some data prior to 2000.  But it was very sparse,

19   and I did some analyses, and it didn't really change anything.

20          I also was aware even at the time that even though it

21   may have been cleared for use in 1990 or thereabouts, there was

22   no death until 1997 was my understanding.

23          MS. HELM:  Your Honor, may we approach?

24          THE COURT:  Yes.

25          (At sidebar on the record.)

UNITED STATES DISTRICT COURT

```
 1              MS. HELM:  I don't know how -- she just referred to
 2    death.
 3              THE COURT:  For the Simon Nitinol.
 4              MS. HELM:  Okay.  All right.  I apologize.  I --
 5              THE COURT:  I don't think -- that wasn't a Recovery --
 6              MS. HELM:  I overreacted.
 7              THE COURT:  -- cephalad migration death.
 8              MS. HELM:  I overreacted.
 9              THE COURT:  Okay.
10              (End of discussion at sidebar.)
11              THE COURT:  Thank you.
12    BY MS. HELM:
13    Q.  You don't have complete data before 2000 for the Simon
14    Nitinol; correct?
15    A.  Correct.
16    Q.  And in the analysis you did, and in the spreadsheets and
17    the risk ratios -- I'm being very careful -- that you created,
18    you did not include any information about pre -- that you
19    showed to the jury today, you didn't include any information
20    about pre-2000 events for the Simon Nitinol; correct?
21    A.  So I need to -- I want to be careful in answering this.
22              So there actually was a document from Bard that I saw
23    that listed numbers of events and numbers of sales since launch
24    through 2011, and SNF was on that list.  And those numbers were
25    very similar for fracture -- I think the data were just for
```

1    fracture.  Those were very similar to what I had used, so that

2    leads me to believe, again, that perhaps I did have close to

3    what the data were since launch.

4    Q.  But you didn't include any pre-2000 Simon Nitinol numbers

5    in those -- in the data that you've shown to the jury today;

6    correct?

7    A.  So, no, not quite.  My other answer to that is that the

8    sensitivity analysis that I had mentioned previously, in which

9    I added, you know, five events to all SNF categories of

10   failure, isn't correct.  It's not precise -- in that it's not

11   precise.  But that also could potentially address that point.

12   Q.  Okay.  These events that you referred to, these are adverse

13   events that were reported to Bard about its filters; correct?

14   A.  I'm not sure if they were all reported to Bard or if some

15   were reported to the FDA and then retrieved by Bard -- not to

16   use that word, but, you know, downloaded by Bard.  So I'm not

17   exactly sure how they got to Bard --

18   Q.  Okay.

19   A.  -- whether directly or through the FDA database.

20   Q.  Okay.  So there are two potential sources for your -- for

21   these adverse events:  One is directly reported to Bard, and

22   two is events that were reported in the FDA database, called

23   the MAUDE database, which Bard looked at and took into its

24   analysis.  Correct?

25   A.  There perhaps are other sources as well.

1    Q.  But those are at least two of the sources; right?

2    A.  I mean, ultimately, the source for me was Bard.

3    Q.  Okay.  And you would agree with me that an adverse event

4    can be asymptomatic?  In other words, someone can have an

5    adverse event and not know it; correct?

6    A.  It's possible.

7    Q.  And you would agree to me that depending on a patient's

8    healthcare and what's going on with them, it may or may not --

9    an asymptomatic adverse event may or may not be detected;

10   correct?

11   A.  Correct.

12   Q.  And you didn't do anything in this case to control for the

13   possibility that there are more reports for the G2X or the

14   Eclipse as opposed to the Simon Nitinol because those are

15   retrievable filters, did you?

16   A.  Well, one thing that I know from reading some reports is

17   that even among the retrievable filters, many of them, if not

18   most of them, are not retrieved and are left in.

19   Q.  Yeah, I understand that, ma'am.

20          My question was, you didn't take into account either

21   the asymptomatic nature or the fact that it may be a different

22   course of treatment for a patient who has a retrievable filter;

23   correct?

24   A.  Well, the interpretation takes that into account.

25   Q.  Okay.  You didn't go back and look into patient files or

1    adverse event files to determine whether the event that was

2    reported was asymptomatic, whether it was found incidentally,

3    whether it had caused the patient any pain.  You didn't do any

4    of that, did you?

5    A.  No.

6    Q.  You just simply took the numbers; correct?

7    A.  I took the numbers.

8    Q.  Okay.  Dr. Betensky, you've been hired by plaintiffs'

9    attorneys who have filed lawsuits against Cook Medical, haven't

10   you?

11   A.  Yes.

12   Q.  And that's another manufacturer who manufactures IVC

13   filters; correct?

14   A.  Yes.

15   Q.  Okay.  And you've been retained to them -- by them to do a

16   similar analysis and to testify in litigation against Cook;

17   correct?

18   A.  The gist of the analyses are similar, not identical.

19   Q.  And unlike this case, in the Cook cases you went back and

20   actually read narratives to provide some background on the

21   reports you analyzed, didn't you?

22   A.  Yes.

23   Q.  And one thing you did in Cook, in the Cook litigation, was

24   you attempted to look at this retrieval bias, whether a

25   retrievable filter made a difference or not, didn't you?

REBECCA BETENSKY, PH.D. - CROSS-EXAMINATION          742

1    A.  Yes.

2    Q.  You have not done that here, have you?

3    A.  No.

4    Q.  And what you did was actually, you went back and looked at

5    adverse event reports, reviewed narratives, and excluded from

6    your calculations with Cook were adverse event reports were

7    first discovered at the time the filter was retrieved; correct?

8    A.  When they would have been asymptomatic.

9    Q.  Right.  So if it was asymptomatic, found incidentally at

10   retrieval or for some other reason, you excluded those;

11   correct?

12   A.  I don't think it had to be at retrieval.

13   Q.  Okay.  If they were asymptomatic, you excluded them;

14   correct?

15   A.  Correct.

16   Q.  In the numbers that you evaluated for the plaintiffs'

17   attorneys in this case, you did not exclude any asymptomatic

18   numbers because you didn't have that information to make that

19   evaluation; correct?

20   A.  I was not provided that data.

21   Q.  Okay.  And you never asked for it, did you?

22   A.  No.

23   Q.  So in those numbers that you provided today, in the risk

24   ratio that you provided today, you have no idea how many of

25   those patients were asymptomatic, whether the finding was

1    incidental, whether the finding was made at the time the filter

2    was retrieved.  You have no idea about any of that, do you?

3    A.  Well, I have some idea from my work in Cook, in which I

4    found that the results held up and were essentially the same

5    when I did that analysis.  And so that makes me feel some

6    confidence that the same would hold true here.

7    Q.  And you're aware that the FDA cautions against making

8    comparisons of reports of adverse events between one filter to

9    another filter.  You're aware of that, aren't you?

10   A.  That's one caution that they make.

11   Q.  Okay.  And, in fact, you cited in your report a publication

12   where the FDA specifically says that it -- you should exert

13   extreme caution when making an analysis of the reports of

14   adverse events between one filter and another filter?

15   A.  That's one quote from among many in that report.

16   Q.  And you're also aware that the FDA has said that MAUDE

17   data -- which is adverse event data; correct?

18   A.  MAUDE data is adverse events.

19   Q.  MAUDE is the database --

20   A.  Yes.

21   Q.  -- where adverse events are reported; right?

22          And that MAUDE data is not intended to be used either

23   to evaluate rates of adverse events or to compare adverse

24   events occurrences across devices.  You're aware of that,

25   aren't you?

```
1    A.  Yes, though they suggest using it if nothing else is
2    available.
3    Q.  But they caution against it; correct?
4    A.  Yes.
5    Q.  Because it's not reliable; correct?
6    A.  It's not as reliable as other sources of data, if they were
7    available, would be.
8              MS. HELM:  Thank you.  That's all I have.
9              THE COURT:  Redirect?
10             MR. MANKOFF:  Yes, please.
11             Your Honor, before I start, may we approach?
12             THE COURT:  Yes.
13             This will get better as we go on through the trial,
14   ladies and gentlemen.
15             (At sidebar on the record.)
16             MS. HELM:  I just want to make sure the record
17   reflects that I didn't ask for this one.
18             THE COURT:  I'm aware of that.
19             MS. HELM:  This is his bean, not mine.
20             MR. MANKOFF:  Yes, I'm using a bean.
21             MR. LOPEZ:  I eat my beans.
22             THE COURT:  We're going to follow the one-counsel rule
23   here, counsel.
24             MR. LOPEZ:  Okay.
25             THE COURT:  I see you stepping up close, Mr. Lopez.
```

REBECCA BETENSKY, PH.D.                        745

1              Go ahead.

2              MR. MANKOFF:  So Dr. Betensky was asked --

3              THE COURT:  Talk into the mic.

4              MR. MANKOFF:  -- about asymptomatic events and whether

5     she did anything to account for that.  And she did look at the

6     severity of the events, because severe events, you would expect

7     to be reported.  And this gets into filter embolization deaths.

8              So I believe the door has been opened to then ask her

9     about that.

10             THE COURT:  Ask her about what?

11             MR. MANKOFF:  About whether -- what she did to account

12    for the potential for asymptomatic events.  A filter

13    embolization death is not going to be asymptomatic, and that's

14    her opinion.

15             THE COURT:  So what is she going -- what is it you

16    want to elicit from her?

17             MR. MANKOFF:  That the rates for that event did not

18    differ -- there was no trend across different adverse events

19    that showed that there was a difference because of an event

20    being potentially asymptomatic versus not asymptomatic.

21             But I don't know how to bring that out without

22    bringing up this particular event.

23             THE COURT:  I'm still not following you.  Tell me what

24    she would say.

25             MR. MANKOFF:  She would say that she looked at the --

1      those numbers that she calculated, the reporting risk ratios

2      for filter embolization death and compared them fracture --

3      some of the other events, fracture and perforation.  And

4      because they were consistent, her conclusion is that the

5      asymptomatic potential of some of the events was not a factor

6      in her analysis.

7               THE COURT:  So are you saying specifically to deal

8      with the subject of asymptomatic --

9               MR. MANKOFF:  Yes.

10              THE COURT:  -- events, she looked at death data and

11     compared it to other adverse events to see if there was a

12     difference which would be accounted for by asymptomatic events,

13     and she couldn't find a difference?

14              MR. MANKOFF:  Correct.

15              THE COURT:  All right.

16              MS. HELM:  Your Honor, I don't think I opened the

17     door.  I asked her about whether she took into account that the

18     numbers came from asymptomatic events.  That was my question,

19     was you didn't take into account that these were asymptomatic

20     events.

21              And she said, "No, I didn't.  That information wasn't

22     provided to me."

23              I don't see how that opens the door to a caudal

24     migration or cranial migration, cephalad migration Recovery

25     death.  Because I didn't ask her if she compared -- if she

1    tried to compare asymptomatic versus symptomatic.  I just said

2    did you look at -- at adverse event reports and determine.

3              THE COURT:  Well, but the clear implication of your

4    questioning was that asymptomatic events are going to be

5    discovered more often in retrievable filters than in the SNF,

6    and therefore, the numbers are going to be higher for

7    retrievable filters than the SNF.  Right?

8              MS. HELM:  That --

9              THE COURT:  Isn't that the point you wanted to make?

10             MS. HELM:  Yes, but that's not the question I asked.

11             THE COURT:  But that's clearly the message you were

12   communicating.

13             MS. HELM:  But I didn't ask the question that you just

14   articulated about the comparison or did she take it in.  I just

15   simply stopped with, you didn't take into consideration

16   asymptomatic events.

17             THE COURT:  But --

18             MR. MANKOFF:  My answer --

19             THE COURT:  Hold on.

20             MR. MANKOFF:  Sorry.

21             THE COURT:  But the point you were making to the jury

22   is that the data for retrievable filters is skewed in favor of

23   reporting events because they find more asymptomatic events

24   when they remove filters.  That's what I understood you to be

25   saying.

1          MS. HELM:  Well, yes, and actually my point was that

2     she didn't take that into consideration.

3          THE COURT:  But what I understand is being said is she

4     did look into that.

5          MS. HELM:  Well, she said no.

6          THE COURT:  Well, she didn't look -- she had no way to

7     tell what was an asymptomatic versus symptomatic event in

8     retrievable filters, but it sounds like she tested for

9     asymptomatic event bias by looking at events that couldn't be

10    asymptomatic, mainly deaths, and didn't find that bias and

11    therefore concluded it wouldn't exist for other events either.

12    It sounds like that's what she did.

13         MR. MANKOFF:  Right.  So the question was did she do

14    anything to take this into account, and the answer is yes, she

15    did.  But she couldn't answer that because she's under orders

16    not to bring it up.

17         THE COURT:  Well, did she do this for all filter

18    categories?

19         MR. MANKOFF:  It was --

20         THE COURT:  I mean, all filter types.

21         MR. MANKOFF:  So the -- because there are -- because

22    the filter embolization reports relate to the Recovery, she

23    used that filter.  Is that your question?

24         THE COURT:  So the data she was looking at was

25    Recovery filter migration deaths?

1          MS. HELM:  Exactly.

2          MR. MANKOFF:  Compared to --

3          THE COURT:  SNF filter migration deaths.

4          MR. MANKOFF:  Compared to Recovery fracture and

5    Recovery perforation and Recovery.  So she can extend that

6    comparison and draw conclusions about all of the events.

7          THE COURT:  So what you would have her testifying

8    about are Recovery filter migration deaths?

9          MR. MANKOFF:  Right.  But her -- but her response

10   applies to all of the filters and all of the events.

11         THE COURT:  Have you talked to her about a way to

12   elicit this testimony without mentioning deaths?

13         MR. MANKOFF:  No.  And if you say that the door has

14   been opened, I don't know how I would elicit it because she

15   wouldn't know that.

16         THE COURT:  Well, it seems to me you could have

17   prepped her to say that she looked at severe categories of

18   events that would not have been asymptomatic and compared them

19   to those that would be asymptomatic, and she didn't find a

20   difference.

21         But I take it she's not -- she hasn't been clued in to

22   something like that.  In other words, the only way you can

23   cover it now is to have her describe Recovery filter migration

24   deaths.

25         MR. MANKOFF:  Which she won't do because she doesn't

REBECCA BETENSKY, PH.D.                                    750

1     know she's allowed to.

2              THE COURT:  Well, but if you --

3              What are you saying?

4              MR. LOPEZ:  I'm just trying to help, Judge.

5              THE COURT:  You're violating the two-lawyer rule.  Go

6     ahead.

7              MR. LOPEZ:  I know.

8              We'd have to spend a few minutes with her because we

9     weren't prepared with her.  We told her not to do it, so --

10             THE COURT:  Right.  Well, so we'd have to take a

11    break.

12             It seems to me, Ms. Helm, that if she did something to

13    try to control for the very point you were making, it's fair

14    for her to be able to explain it.  It also seems to me that

15    there's a way to explain it without describing Recovery filter

16    migration deaths.

17             And so I'm inclined to take a five-minute break, let

18    you all talk to her about the way she can describe it without

19    talking about Recovery filter migration deaths, but to make the

20    point she tested for severe events that wouldn't have

21    asymptomatic bias and found it was the same as those that

22    might.

23             So that's my conclusion is we ought to do that.  We'll

24    take a five-minute break, and you can walk through that with

25    her so that when she gets on the stand, she can describe it

1    without mentioning Recovery filter migration deaths.

2            MR. MANKOFF:  Thank you, Your Honor.

3            MS. HELM:  Thank you.

4            (End of discussion at sidebar.)

5            THE COURT:  Ladies and gentlemen, thanks for your

6    patience.  I don't want to keep you sitting there for another

7    few minutes.  We're going to take just a five-minute break to

8    finish up the issue that we're talking about.  We're going to

9    only go till 4:30, so we'll get you back in here at

10   4:00 o'clock or two minutes after 4:00, and we'll go for

11   another half hour.

12           But why don't I go ahead and excuse you for five

13   minutes, and then we'll come get you in just a moment.

14           (Recess taken, 3:54 p.m. to 4:02 p.m.)

15           THE COURT:  Let's continue.

16                          REDIRECT EXAMINATION

17   BY MR. MANKOFF:

18   Q.  Dr. Betensky, with respect to reports for retrievable

19   filters versus permanent filters, did you analyze serious

20   adverse events to come to a conclusion about that effect?

21   A.  Yeah.  So I did -- I did do one analysis where I -- I -- so

22   I was interested in trying to figure out how the reporting risk

23   ratio, which are the very large numbers that you've seen, how

24   those relate to a true risk ratio if we didn't have any

25   problems of reporting or detection such as we've been

1    discussing.

2         And so mathematically, I wrote down a relationship

3    between that true risk ratio, which is what we'd all like to

4    know, and how that relates to the reporting risk ratio.  And

5    it's absolutely true that it's affected by potential

6    differences in reporting rates, differences in detection rates,

7    which could be due to retrievability versus permanence, for

8    example.

9         But then it occurred to me that under certain

10   assumptions, if that true risk ratio were equal to 1, meaning

11   no difference in risk between two filters, if that true risk

12   ratio were 1, then we couldn't see the variation in the

13   reported risk ratios that we're seeing.

14        So if you remember from that spreadsheet with the

15   yellow highlighting, going -- each row was a comparison, let's

16   say, between G2X and SNF or Recovery and SNF.  If you went

17   across rows and looked at the different failure events, they

18   weren't constant.  They weren't even approximately constant.

19   They varied quite a bit.

20        And based on the math that underlies that, that

21   suggests that even with differential reporting and even with

22   differential detection, which might be the case due to a

23   permanent device versus a retrievable device, that could -- if

24   the true -- so, sorry -- if the true risk ratio were 1, we

25   couldn't see that variation.

UNITED STATES DISTRICT COURT

1          And being a statistician, I didn't want to rely just

2     on the estimates again, so I tested statistically whether those

3     estimates of the reporting risk ratios did differ across

4     events.  And from a statistical point of view, not just from

5     the raw number point of view.

6          And I did this analysis for the Recovery versus the

7     SNF, and they were indeed, for some of the comparisons among

8     the failure types, they were indeed statistically significantly

9     different from each other, which leads me to conclude that my

10    original assumption that the true risk ratio is 1 couldn't be

11    true.  In other words, that risk -- that true risk ratio, even

12    with all of this -- these differential reporting and detection

13    aside, that true risk ratio has to be greater than 1.

14    Q.  And what do you mean by "true risk ratio"?  How does that

15    relate to filter failures?

16    A.  So the true risk ratio would be the risk ratio applied to,

17    you know, to a huge population prospectively.

18    Q.  So is the true risk ratio, would that be the failures if

19    you had perfect information?

20    A.  Correct.  Or -- yes.  Complete information, yes.

21    Q.  With respect to the documents you reviewed and where you

22    got them from, did you have the opportunity to ask the lawyers

23    for additional information if you needed it?

24    A.  Yes.

25    Q.  And did you get everything that you felt you needed in

1    order to do these analyses?

2    A.  I felt I -- my understanding was that I received everything

3    that was available that I could use, yes.

4    Q.  There were some questions about the dates or the -- Bard's

5    failure prediction documents, what dates they related to.  Did

6    those documents reflect Bard's knowledge at the time of the

7    documents?

8    A.  So my understanding is that those documents reflected the

9    knowledge -- their knowledge at the launch of the G2, G2X, and

10   Eclipse, and the current -- their current knowledge of the

11   probabilities of these occurrences at those contemporaneous

12   times.  So at that 2006 period, what they understood the SNF

13   risks of occurrences to be.

14             MR. MANKOFF:  Can we pull up Exhibit 614, please?

15             I believe this is in evidence.  May we publish?

16             THE COURTROOM DEPUTY:  It's not in.

17             THE COURT:  We don't show it in evidence.

18   BY MR. MANKOFF:

19   Q.  Is this one of the documents that you relied on in doing

20   your adverse event analysis?

21   A.  I believe I may have used this in the analysis that I did,

22   some of which we discussed earlier, on the through May 2011

23   comparisons.

24             MR. MANKOFF:  I move for admission of Exhibit 614.

25             MS. HELM:  No objection, Your Honor.

```
 1              THE COURT:  Admitted.

 2              (Exhibit No. 614 admitted into evidence.)

 3              MR. MANKOFF:  May we publish?

 4              THE COURT:  You may.

 5   BY MR. MANKOFF:

 6   Q.  There were some questions about whether you had evaluated

 7   any data regarding the SNF before 2000, and you mentioned a

 8   document.  Is this the document you're referring to?

 9   A.  Yes, it is.

10   Q.  And what does it tell you about the SNF data?

11   A.  So according to this document, SNF data are provided from

12   the time of its launch, so I guess approximately 1990, and it

13   lists the number of fracture complaints as eight and the number

14   of units sold as 80,187.

15   Q.  And can you indicate where you're seeing that it's from

16   launch?

17   A.   Up here.  That's where it states it's from launch.

18   Q.   Now, there were -- going back to the potential issue of

19   asymptomatic events, if there are events like we're seeing on

20   the screen here that are asymptomatic, would they show up in

21   these reports?

22   A.  That would depend if they were detected or not.

23   Q.  So what about an event that's -- has not caused any

24   symptoms and has not been detected?

25   A.  Then that's not here.
```

1    Q.  And if that were the case for the G2X or the Eclipse

2    filter, how would that influence your results?

3    A.  So that would -- so their absence decreases the rates.

4    So -- or let me say it the other way around.  If those events

5    had been captured, that would produce larger rates than what

6    are here.

7              MR. MANKOFF:  No further questions.

8              THE COURT:  All right.  Thank you, Doctor.  You can

9    step down.

10             (Witness excused.)

11             MR. LOPEZ:  Your Honor, we're going to start a

12   deposition that we won't complete, but --

13             THE COURT:  A video deposition?

14             MR. LOPEZ:  Video deposition.

15             THE COURT:  All right.  Ladies and gentlemen, let me

16   mention something.

17             Ms. Reed Zaic, you can come on up.

18             Some of these depositions you are going to see have

19   the witness looking at and testifying about documents that

20   we're using in the trial, but at the time the depositions were

21   taken, they've been assigned different numbers than we're using

22   here in the trial.  And I know it sounds like you should be

23   able to anticipate that, but litigation doesn't work that way.

24             So what we're going to do when we get to a deposition

25   where there's a trial exhibit being discussed with a different

1    number, is at the start of the deposition we'll tell you what

2    the deposition number is and the corresponding trial number.

3    So that will at least help you in your notes know which trial

4    exhibit is being testified about.  I think there's only four or

5    five on this one.

6              MS. REED ZAIC:  Five.

7              THE COURT:  Some, there may be a longer list that

8    we'll actually hand you so you can keep track in your notes of

9    what the trial exhibits are.  And we will also, when we get to

10   the start of the deposition, have the exhibits moved into

11   evidence so you know that what the witness is testifying about

12   in the deposition is a trial exhibit that has come into

13   evidence.

14             MS. REED ZAIC:  This is the background summary of

15   Dr. Murray Asch.

16             Dr. Murray Asch is an interventional radiologist with

17   30 years of experience in the field of interventional

18   radiology.  He is a board -- he is board certified in

19   interventional radiology.  He graduated from the University of

20   Western Ontario with his medical degree in 1983.

21             In 1999, Dr. Asch received funding from Nitinol

22   Medical Technologies and C.R. Bard for a study called "Initial

23   Human Use of the Recovery Retrievable IVC Filter."  He served

24   as the principal investigator of that study, a retrievability

25   study involving 58 patients in Toronto, Canada.

1           And the exhibits that will be displayed during the

2   video are numbers 202, which will be trial Exhibit 552;

3   Exhibit 203, which will be trial Exhibit 553; Exhibit No. 212

4   will be trial Exhibit 561; Exhibit 218 will be trial

5   Exhibit 563; and Exhibit 223 will be trial Exhibit 567.

6           We'd like to move those exhibits into evidence now,

7   Your Honor.

8           THE COURT:  Any objection?

9           MS. HELM:  I'm sorry, Your Honor.  I missed the first

10  two.  Do you mind rereading those?

11          THE COURT:  The first two were 552 and 553.

12          MS. HELM:  Thank you, Your Honor.  No objection.

13          THE COURT:  All right.  So trial Exhibits 552, 553,

14  561, 563, and 567 are admitted.

15          (Exhibit Nos. 552, 553, 561, 563, and 567 admitted

16  into evidence.)

17          THE COURT:  And we can play the deposition.

18          Sounds like we don't have any sound.

19          MS. REED ZAIC:  May we start that over, Your Honor?

20          THE COURT:  Yeah, please.  But let's turn it up even

21  louder if we can.

22          (Video deposition played.)

23          THE COURT:  Let's pause it for just a minute.

24          Ladies and gentlemen, can you hear it?

25          JURY MEMBER:  It's hard, but yeah.

1          THE COURT:  Let's see if we can make that sound

2    better.

3          (Video deposition played.)

4          THE COURT:  Let's stop there.

5          All right.  Members of the jury, we're going to break

6    until tomorrow morning.  We plan to see you at 9:00 o'clock.

7    We'll excuse you at this time.

8          (Jury not present.)

9          THE COURT:  Counsel, how is the time on the Asch

10   deposition being divided?

11         MS. REED ZAIC:  She's looking.

12         MR. LOPEZ:  She's looking right now.

13         MS. SMITH:  It's -- can you hear me?

14         THE COURT:  Yeah, I can hear you.

15         MS. SMITH:  37 minutes and 55 seconds for plaintiffs,

16   and 15 minutes and 26 minutes for defendants.  And -- sorry, 15

17   minutes and 26 seconds for defendants.

18         And how do we take care of the joint designations?

19   50/50?  Okay.

20         MR. LOPEZ:  It's a minute and a half for each on the

21   joint.

22         MS. HELM:  Your Honor, it's 39 minutes for the

23   plaintiffs and 17 minutes for the defendants.

24         MR. LOPEZ:  Yeah.

25         THE COURT:  Okay.  Give me just a minute here.

```
 1              All right, counsel.  As of the end of today,

 2    plaintiffs have used 8 hours and 58 minutes; defendants have

 3    used 4 hours and 47 minutes.

 4              And we will plan to see you tomorrow morning at 8:30.

 5    I've got a call now that I need to take.

 6              MR. ROGERS:  Thank you, Your Honor.

 7              MR. LOPEZ:  Thank you, Your Honor.

 8              That was through Asch; right?  In other words,

 9    calculating all of Asch into --

10              THE COURT:  No.  Actually, what I did, just to balance

11    it out, there was actually 17 minutes of Asch we played.  I

12    gave that all to the defendants in this, meaning the 39 minutes

13    of Asch we play tomorrow will all go to you.

14              MR. O'CONNOR:  Got it.

15              MS. HELM:  Understood.  Thank you, Your Honor.

16              (Proceedings adjourned at 4:35 p.m.)

17

18

19

20

21

22

23

24

25
```

761

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 21st day of

13   September, 2018.

14

15

16
                        s/Jennifer A. Pancratz_____ _____ ____
17                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25