1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4    **IN RE: Bard IVC Filters Products**        )
     **Liability Litigation,**                   )  MD 15-02641-PHX-DGC
5                                                 )
     _____ )
6                                                 )
     **Lisa Hyde and Mark Hyde, a married**      )  Phoenix, Arizona
7    **couple,**                                  )  **September 21, 2018**
                                                  )
8                        Plaintiffs,              )
                                                  )
9            v.                                   )  CV 16-00893-PHX-DGC
                                                  )
10   **C.R. Bard, Inc., a New Jersey**           )
     **corporation, and Bard Peripheral**        )
11   **Vascular, an Arizona corporation,**       )
                                                  )
12                       Defendants.              )
     _____ )
13

14

15        **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16           **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17              **TRIAL DAY 4 – A.M. SESSION**

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                      A P P E A R A N C E S

 2    For the Plaintiffs:

 3            Lopez McHugh
              By: RAMON R. LOPEZ, ESQ.
 4            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 5
              Gallagher & Kennedy
 6            By: MARK S. O'CONNOR, ESQ.
              By: PAUL L. STOLLER, ESQ.
 7            2575 East Camelback Road, Suite 1100
              Phoenix, AZ  85016
 8
              Heaviside Reed Zaic
 9            By: JULIA REED ZAIC, ESQ.
              By: LAURA E. SMITH, ESQ.
10            312 Broadway, Ste. 203
              Laguna Beach, CA  92651
11
              Goldenberg Law PLLC
12            By: STUART GOLDENBERG, ESQ.
              By: MARLENE GOLDENBERG, ESQ.
13            800 LaSalle Ave., Ste. 2150
              Minneapolis, MN  55402
14
              Lopez McHugh, LLP
15            By: JOSHUA MANKOFF, ESQ.
              1 International Plaza, #550
16            PMB-059
              Philadelphia, PA 19113
17

18

19    For the Defendants:

20            Nelson Mullins Riley & Scarborough.
              BY: JAMES F. ROGERS, ESQ.
21            1320 Main St.
              Columbia, SC  29201
22

23            Snell & Wilmer
              By: JAMES R. CONDO, ESQ.
24            400 East Van Buren
              Phoenix, AZ  85004
25
```

1              **A P P E A R A N C E S   (CONTINUED)**

2

3    For the Defendants:

4            Nelson Mullins Riley & Scarborough
             By: **RICHARD B. NORTH, JR.,** ESQ.
5            By: **MATTHEW B. LERNER,** ESQ.
             By: **ELIZABETH C. HELM,** ESQ.
6            201 17th Street NW, Suite 1700
             Atlanta, GA  30363
7

8            C.R Bard, Inc.
             Associate General Counsel, Litigation
9            By:  **GREG A. DADIKA,** ESQ.
             730 Central Avenue
10           Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**I N D E X**

**EXAMINATION**

| WITNESS | PAGE |
|---|---|

DEREK MUEHRCKE, M.D.

      Direct Examination By Mr. O'Connor    769

      Cross-Examination By Mr. Rogers    828

Video testimonhy of Dr. Murray Asch    768

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 2248 | Wong Deposition, 10/18/2016 – Exhibit 543 – PAT PowerPoint Presentation entitled "G2 Caudal Migration Update," dated 3/2/2006, which Wong circulated via e-mail on 3/2/2006 to several for the presentation that afternoon | 797 |
| 4800 | Fermanich Deposition, 3/17/17 – Exhibit 17: Email from David Ciavarella to Brian Berry (and others), 12/27/05, Subject:  FW:  G2 Caudal Migrations (2 pages) | 811 |
| 8528 | part of a CT scan from June 14, 2013 | 855 |
| 8712 | Hematology Consultation – Dr. Thummala | 856 |
| 8732 | Office Visit (PCP) – Dr Lehrner | 860 |
| 8729 | Cardiology Consultation – Dr Shehane | 864 |
| 8731 | Cardiology Visit – Dr Shehane | 867 |

**P R O C E E D I N G S**

    (Proceedings resumed in open court outside the presence of the jury.)

        THE COURT:  Thank you.  Please be seated.

        Morning, everybody.

        EVERYBODY:  Morning, Your Honor.

        THE COURT:  Plaintiffs' counsel, do you have matters you'd like to raise this morning before we get started?

        MR. LOPEZ:  Well, we have a deposition that we want to play.  We probably don't have to deal with it now.  We're still kind of going back and forth with the defense about a couple of exhibits.  I don't think we're going to get to it till this afternoon, Your Honor, but maybe give us five minutes between the lunch break and --

        THE COURT:  If you need to raise an issue, just tell me at that time.

        Anything from defendants?

        MR. ROGERS:  No, Your Honor.

        THE COURT:  All right.

        Counsel, we are going to get you draft jury instructions probably on Monday or Tuesday of next week.  And then we'll set a hearing a couple days later to talk through those jury instructions.

        What witnesses are you going to be calling today on

08:32:30  1    the plaintiff side?

2         MR. O'CONNOR:  Let's see.  We have Murray Asch, the

3    video deposition that we'll conclude this morning.

4         We have Derek Muehrcke, cardiovascular surgeon, our

08:32:42  5    expert.

6         We have Alex Tessmer.

7         And then we have Tim Hug, who's --

8         THE COURT:  Are Tessmer and Hug experts?

9         MR. O'CONNOR:  No.  Tessmer and Hug are Bard people.

08:32:56  10        THE COURT:  I always ask because I want to read my

11    *Daubert* motion before an expert.

12        So Muehrcke will be the one expert today.  Okay.

13        MR. O'CONNOR:  Muehrcke will be on this morning,

14    Your Honor.

08:33:04  15        THE COURT:  Okay.  I'll come back in at 9 o'clock

16    when the jury's here.  Go ahead and about your business.  I've

17    got to get my computer set up.

18        MR. ROGERS:  Thank you, Your Honor.

19        (Recess taken from 8:33 to 08:59.  Proceedings resumed in

08:59:45  20    open court with the jury present.)

21        THE COURT:  Thank you.  Please be seated.

22        Good morning, ladies and gentlemen.

23        JURORS:  Good morning.

24        THE COURT:  Thanks for being here.

09:00:49  25        We will continue with the deposition of Dr. Asch,

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:00:54  1    which will go for a little over another half hour, and then

2    we'll return to live witnesses.

3            So let's go ahead and resume that deposition.

4        (Video testimony of Dr. Murray Asch played.)

09:44:12  5        MR. LOPEZ:  Your Honor, can we have two minutes?

6        THE COURT:  You may.

7            If you want to stand up, ladies and gentlemen, feel

8    free.

9        THE COURTROOM DEPUTY:  Sir, if you'll please come

09:45:03  10   forward and raise your right hand.

11                **DEREK MUEHRCKE, M.D.,**

12   called as a witness herein, after having been first duly sworn

13   or affirmed, was examined and testified as follows:

14       THE COURTROOM DEPUTY:  Please state your name and

09:45:15  15   spell it for the record, sir.

16       THE WITNESS:  Derek Muehrcke.  D-E-R-E-K

17   M-U-E-H-R-C-K-E, M.D.

18       THE COURTROOM DEPUTY:  Could you turn around and

19   spell your name for the jury, please.

09:45:28  20       THE WITNESS:  Derek, D-E-R-E-K, Muehrcke,

21   M-U-E-H-R-C-K-E.

22       MR. O'CONNOR:  Your Honor, it all happened before I

23   was going to announce we're calling Dr. Derek Muehrcke at this

24   time.

25

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:45:58  1               D I R E C T   E X A M I N A T I O N

2     BY MR. O'CONNOR:

3     Q   Good morning.  Would you introduce yourself to the Court

4     and members of the jury, please, sir.

09:46:04  5     A   Sure.  My name is Derek Muehrcke.  I'm a cardiothoracic

6     surgeon out of Jacksonville, Florida, and my practice involves

7     doing open-heart surgery, chest surgery, and vascular surgery.

8     Q   In simple terms, are you a heart surgeon?

9     A   Yes, I'm a heart surgeon.

09:46:24 10     Q   And do you operate on major vessels in the body?

11     A   Yes, I do.

12     Q   Do you hold board certifications, Dr. Muehrcke?

13     A   Yes.  I'm board-certified in thoracic surgery.

14     Q   How do you go about getting a board certification?  We'll

09:46:38 15     talk in more detail in a moment about your qualifications.

16     A   Sure.  The board-certification process involves going to

17     medical school and passing examinations to make you eligible

18     for a residency program.  My residency program was five years.

19               And then passing my general surgery training, I

09:46:58 20     stayed on to do a cardiothoracic surgery and had boards for

21     general surgery, which I passed, and thoracic surgery boards

22     also.

23     Q   Can you explain to the members of the jury what your role

24     is in this case, please.

09:47:11 25     A   Sure.  I've been asked to evaluate the case and look at it

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:47:16    1    to determine what I think happened in the case.

2    Q    And have you arrived at opinions --

3    A    Yes, I have.

4    Q    -- to a reasonable degree of medical probability?

09:47:26    5    A    Yes, I have.

6    Q    Can you tell us what your opinions are?

7    A    I think that the Bard filter that Mrs. Hyde had had

8    failure modes, catastrophic failure modes, and a combination

9    of them, including the falling down of the filter, the tilting

09:47:46   10    of the filter, the perforation of the filter and the limb of

11    that filter breaking off and going to her heart, setting up an

12    extremely dangerous situation with a right ventricle fragment,

13    in someone who's anticoagulated.

14    Q    Do you have opinions about doctors and what they expect

09:48:07   15    from medical device companies?

16    A    Yes.  During this litigation, I've had an opportunity to

17    look at some of the Bard internal documents and I've come to

18    the conclusion that the representation of the Bard company is

19    different from what the Bard documents show.  The

09:48:32   20    representation of the function of that filter did not function

21    in the way a doctor would want or a patient would want.

22    Q    Do you use IVC filters in your practice?

23    A    Yes, I do.

24    Q    Have you implanted IVC filters?

09:48:47   25    A    Yes, I have.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:48:48  1    Q   Would you explain to the members of the jury your

2    experience with IVC filters.

3    A   I have been putting in IVC filters for over 24 years.  I

4    have put in the Simon Nitinol filter, which is the permanent

09:49:06  5    Bard filter, which is the precursor to the first retrievable

6    Bard filter, the Recovery filter.  I've put that in.  I've put

7    in the G2 filter.  I've put in G2X filters.  I've put in

8    Eclipse filters and I've put in Meridian filters and I've put

9    in the Denali filters.  I've also put in Greenfield filters,

09:49:29  10   I've put in Cook Celect Platinum filters, and I put in the

11   Cordis OptEase and TrapEase filters.

12   Q   Are you still using Bard filters in your practice?

13   A   No, I'm not using Bard filters.

14   Q   Now, we've heard from Dr. Darren Hurst in this case, he's

09:49:52  15   an interventional radiologist.  Is that another discipline

16   that uses filters?

17   A   Yes.  Very much so.

18   Q   I'd like you to discuss now, at this point, and explain

19   your qualifications.  Your education and your training.  What

09:50:06  20   it took to become a cardiovascular surgeon.

21   A   Sure.

22       My pathway was a little different than most people.

23   I went to a seven-year college medical school program at

24   Grinnell College in Rush Medical College in Chicago.

09:50:20  25       Then I matriculated to Harvard to do my general

DIRECT EXAMINATION — DEREK MUEHRCKE, M.D.

09:50:24  1    surgical training.  And during my general surgical training, I

2    had an opportunity to go to Great Britain and practice in the

3    National Health Care System in Great Britain with a year of

4    general surgery -- a year of general and vascular surgery and

09:50:38  5    a year of thoracic and cardiac surgery.

6         After that I came back and went to San Francisco and

7    was involved with the University of California, the

8    Cardiovascular Research Institute, where I did bench research

9    for a year on myocardial blood flow.

09:50:53  10        Following that I went back to Harvard and finished my

11    fourth and fifth year of general surgery, and they asked me to

12    stay on to do my adult cardiac surgery, which I did, and then

13    I went and did a fellowship in congenital heart surgery at

14    Boston Children, which is also part of Harvard Medical School.

09:51:10  15    Q   And explain the fellowship for us, if you would.

16    A   Well, the fellowship is a very focused area on

17    cardiothoracic surgery and the heart, heart and lung surgery.

18    Both parts.

19        I spent two and a half years as a fellow, and then

09:51:26  20    the extra six months was added on at the end as congenital

21    heart surgery.  It is an intense study period of time,

22    requires a separate set of boards to practice medicine.  Most

23    hospitals require you to be board-certified to get privileges.

24    Q   Now, you mentioned that you, in the course of your

09:51:44  25    training, you did clinical research.  Did I understand that

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:51:45  1    correctly?

2    A    Yes, I did.  I did bench research.

3    Q    Would you -- what type of research, I'm sorry?

4    A    Bench research in the lab.

09:51:51  5    Q    As in bench testing?

6    A    Yes.

7    Q    Tell us exactly -- give us an overview what that involved.

8    A    So my research is at the Cardiovascular Research

9    Institute.  I was very interested in finding out, trying to

09:52:04  10   solve the problem of blood flow to the heart.  And we know

11   when babies are born with congenital anomalies that they have

12   the capacity to grow blood vessels as their heart muscle

13   hypertrophies if they have to work against a pressure

14   gradient.

09:52:23  15        But humans lose that ability at some point.  And we

16   wanted to find out when they lose it, why they lose it, and

17   what stimulates the growth of vessels, because if someone were

18   to have a heart attack and you can give them growth factor,

19   you may be able to improve the blood supply to the heart.  And

09:52:38  20   that was the research project I was on.

21   Q    Now, do you -- where do you practice currently?

22   A    I'm in Jacksonville, Florida.

23   Q    And do you -- are you credentialed at a hospital?

24   A    Yes.

09:52:52  25   Q    Which one?

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:52:53  1   A   Flagler Hospital, Baptist Hospital, St. Vincent's

2   Hospital, Memorial Hospital, and Orange Park.

3   Q   And do you hold positions at those hospitals?

4   A   I'm chairman of the Department of Cardiovascular and

09:53:03  5   Thoracic Surgery at Flagler.  I'm part of a group, eight

6   cardiac surgeon, five vascular surgeon group.  So we're a

7   pretty big group in the city.

8   Q   And when you're a chairman, what does that mean?

9   A   I'm involved with all policies, all order sets, meetings,

09:53:22  10   some hiring and disciplinary actions.  Involved with redesigns

11   of the cath lab and interventional radiology lab, hybrid ORs.

12   It's -- you get involved with a lot of stuff.

13          You know, maybe basically from the cardiovascular

14   services line, I've been the chairman of that department for

09:53:42  15   16 years now, and we try to facilitate the working together of

16   all of the cardiovascular surgical lines, including

17   interventional radiology, cardiology, emergency room, and

18   heart surgery.

19   Q   I imagine there's a lot of different departments in a

09:53:58  20   hospital.

21   A   Yes.

22   Q   And in addition to surgeons and nursing people, are there

23   people that handle day-to-day business?

24   A   Oh, yes.  Yes.

09:54:09  25   Q   For example, are there divisions or departments that order

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:54:12   1   equipment or devices?

2   A   Yes.

3   Q   Is that unrelated to what doctors will typically do?

4   A   I think doctors can have a say in what devices are

09:54:20   5   ordered.

6   Q   All right.

7        Now, are you charging a fee to be here today?

8   A   Yes, sir, I am.

9   Q   Would you explain to the members of the jury what you're

09:54:35   10  charging and how you determine that rate, please.

11  A   So my charge for testifying today is $7,000.  And I charge

12  $3,000 for travel.  And the reason I charge that much is based

13  on my education and also that I'm away from my work and I'm

14  not making money by operating, and I have a staff to pay,

09:54:53   15  malpractice and overhead to pay.

16  Q   Now, let's talk about Lisa Hyde, if we could.  And if you

17  could talk in more detail about her filter and what happened

18  to the filter.  What type of filter is it, your understanding?

19  A   She had a G2X.

09:55:14   20  Q   There's been a suggestion it may have been an Eclipse.

21  Are you familiar with that device?

22  A   Yes, I am.

23  Q   And in your experience, is there any difference between a

24  G2, G2X, or an Eclipse filter?

09:55:24   25  A   There's a difference between a G2.  A G2 is the first --

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:55:27  1   was the second iteration from the Recovery device, but the G2

2   tried to solve a lot of the problems which the Recovery device

3   had.  The G2X is the exact same filter, but it has a hook on

4   the top so you can retrieve it easier.  And then the Eclipse

09:55:43  5   is the exact same thing as a G2X except it has

6   electropolishing, and it was felt that electropolishing may

7   reduce the risk of filter fractures.  It's used in other

8   stents and devices in humans.

9   Q    Now, as a cardio- --

09:55:59  10  A    Electropolishing.

11  Q    -- cardiovascular surgeon, what is the reason that doctors

12  in your area would use IVC filters?

13  A    Well, I've used it -- the indications for a placement of

14  an inferior vena cava filter have changed over time.  The

09:56:14  15  primary indication for putting an inferior vena cava filter in

16  is someone who cannot or will not take blood thinners who has

17  deep venous thrombosis.

18        One area which I put them in which most people don't

19  is I operate on people who have -- who are dying from a

09:56:29  20  pulmonary embolus.  I take them to the operating room and try

21  to take the clot out of the pulmonary artery.  And we have a

22  pretty good success rate, but I put a filter in those people

23  because they would never tolerate a second pulmonary embolus

24  to their lungs.

09:56:44  25        The use of filters after that have kind of secondary

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:56:45  1   indications.  People use them prophylactically, they use them

2   in trauma patients, but I think people are backing off that a

3   little bit.  They found that they're not as beneficial as they

4   thought.

09:56:53  5          People are also backing off the use of IVC filters

6   now because they found out that they may be thrombogenic.  The

7   artificial material in the venous system may actually cause

8   more clotting, so people tend to -- are backing away from it.

9          But filters have been used for many things in people

09:57:10 10   who have, you know, a large clot burden or the clot's grown

11   while they have been on anticoagulates, anticoagulation.

12          People are becoming more circumspect in the use of

13   these filters, though, because of the complications they have.

14   Q   And just an overview of the anatomy that's involved in an

09:57:26 15   IVC filter, could you tell us about that, please.

16   A   So the anatomy of the body's involved with arteries and

17   veins.  Arteries take the blood away from the body.  The major

18   artery in the body is the aorta.  That comes off the heart.

19   And, of course, the first vessels it gives off are the

09:57:43 20   coronary arteries which supply the heart with blood.

21          After that, it goes up and gives off the right arm,

22   the neck vessels, the left arm, and then it goes down as a

23   descending aorta, goes through the diaphragm, gives off the

24   vessels to the liver, pancreas, spleen, small intestines, and

09:57:59 25   then the kidney arteries come off and it goes on down to the

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:58:02  1   lower abdomen where it bifurcates and goes down to the supply,

2   the blood supply of the legs.

3        That brings the oxygenated blood to the tissues and

4   nutrients to the tissues.  That blood has to get back some

09:58:15  5   way.  And that is the venous system.

6        The venous system returns the blood to the body by

7   collecting it in the periphery, and the veins get

8   progressively larger until they get to the inferior vena cava

9   coming up from below into their heart.

09:58:27  10       And, of course, the head, the upper body, the torso

11  has a commensurate system, a venous system which leads to the

12  superior vena cava, and that returns blood to the right heart.

13       Sometimes people can develop clots in their legs and

14  their lower extremities, and that can be from sitting on a

09:58:44  15  plane too long with your knees bent.  And if those clots break

16  off, they can travel up the vena cava, through the tricuspid

17  valve, into the right ventricle, through the pulmonary valve,

18  out into the pulmonary arteries.

19       And the lungs have a tremendous capacity to accept

09:59:03  20  small clots over a period of time, but does not have the

21  capacity to take one large clot which might bottleneck into

22  the pulmonary artery with a saddle embolus.  Those are the

23  ones that I operate on.  Those are the ones that will kill

24  you.

09:59:16  25       The use of an inferior vena cava filter is to prevent

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

09:59:19  1    those big clots from going to the lungs.

2    Q    Are there --

3    A    Those are placed -- sorry -- those are placed just below

4    the renal veins in the inferior vena cava to catch clots from

09:59:31  5    the legs.

6    Q    In your practice, was there a time when you were using

7    Bard filters?

8    A    Yes.

9    Q    Do you now?

09:59:37  10   A    I do not.

11   Q    Why did -- did you stop for any reason?

12   A    I stopped because I had an opportunity to see the Bard

13   internal documents, and the presentation or the representation

14   of the Bard filters was different than what the Bard documents

09:59:52  15   showed.

16   Q    All right.  We'll talk about that in more detail.

17            But, first of all, would you tell members of the jury

18   how you went about approaching this case, what work you did to

19   arrive at the opinions today?

10:00:07  20   A    Well, I tried to use the same type of methodology I would

21   use if I was evaluating a patient and develop a differential

22   diagnosis, which is kind of a plan to look at what could cause

23   these issues at hand.  What could cause the filter to migrate

24   inferiorly, tilt, perforate and break off.  Are there any --

10:00:25  25   what are the -- what are the causes of that.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:00:27  1      And that's basically the approach I use, the same way

2      that I would look at a patient.

3          And I felt that the filter has an issue with

4      instability in the vena cava, and that's the nidus for the

10:00:44  5      problems of the filter.

6      Q   And before we go on to specific work you did, can you just

7      tell us briefly how are these filters implanted and how are

8      they removed?

9      A   There's two ways to implant filters.  One is from the

10:01:01 10     groin, and the other is from the neck.  And the filters are

11     placed with a percutaneous technique, which means that you

12     stick a needle into the vein and you put a wire in, and over

13     that wire you put a larger sheath, it's called a Seldinger

14     technique and could be done from the groin or neck.  And you

10:01:18 15     put the sheath in the position, and then for the Bard filters

16     it's paramount that you do a vena cavagram.  You inject

17     contrast to actually try and measure the size of the vena cava

18     because when the filter's inserted, it has kind of a wingspan,

19     if you will, and you cannot put that filter in a inferior vena

10:01:39 20     cava that's over 28 millimeters wide.

21         Now, Mrs. Hyde had her G2X filter placed from the

22     jugular vein, from above, and the technique is very similar.

23     You stick the needle into the neck, fish your wire down, past

24     the heart.

10:01:57 25         And then Mrs. Hyde had some fluttering of the heart

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:01:59   1   when it was inserted.  But once the wire goes past the heart

2   down into the inferior vena cava, a catheter is put over that,

3   contrast is injected to measure the size of the vena cava, and

4   then the filter is kind of circumferentially crunched down,

10:02:15   5   it's loaded into the catheter and pushed into position and

6   popped out.  And then the -- theoretically, the filter should

7   pop out, stay in position and do its job.  Stay in position,

8   don't move, and catch clots.

9   Q   And then the way they are removed.

10:02:33  10   A   How are they removed?

11   Q   Yes, sir.

12   A   The removal process is generally done from above, because

13   you want to be above the filter.  And if the filter has a hook

14   on it, which is a big advancement, you can stick a needle in

10:02:46  15   the vein again, put a wire down, put a larger sheath over it,

16   this time a much bigger sheath.  We use about a 7 French

17   sheath, which is pretty small, to put them in.  But to take

18   them out we use 11 French sheath, it is a bit larger.

19       And the capturing, the straightforward capturing

10:03:05  20   technique involves putting a loop around the hook and then

21   having the sheath come down and grab the legs and to pull it

22   up and pull it out of the patient, and then put pressure on

23   the neck.  It typically is a straightforward thing to do if

24   the filter stays midline.  If the filter tilts, the hook can

10:03:25  25   be incorporated into the side of the vena cava, it can be very

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:03:29   1   difficult to get out.

2   Q   All right.  Dr. Muehrcke, tell us -- you gave us an

3   overview of what -- how you approach the case and what you

4   generally do.  So tell us the information that you looked at

10:03:44   5   and reviewed in this case.

6   A   I looked at Mrs. Hyde's medical records from a Dropbox, a

7   computer, you know, a website which had all of the medical

8   records involved with it.  I've also had an opportunity to

9   look at, I believe, the majority of her radiological studies,

10:04:04   10   including the implantation of the IVC filter, and the CT scans

11   when she came in in 2011 with her right leg DVT and the

12   pulmonary embolus.  I reviewed her 2013 abdominal CT scan,

13   reviewed her 2014 chest and abdominal CT scans, and I've also

14   reviewed the retrieval of her IVC filter in 2014, August 2014,

10:04:28   15   by Dr. Kuo at Stanford.

16   Q   Okay.  And you told us, too, that you had an opportunity

17   to review Bard internal documents; is that correct?

18   A   Yes.  I'm under protective order which allows me to have

19   access to Bard's internal documents, but I cannot discuss

10:04:46   20   those with my partners or anybody.  It's a protective order.

21   Q   Did you review Bard internal documents?

22   A   Yes, sir, I did.

23   Q   And you talked about your opinion regarding doctor and

24   patient expectations.  Do you recall that?

10:05:01   25   A   Yes, sir.

DIRECT EXAMINATION - DEREK MUEHRCKE, M.D.

10:05:05    1   Q    I'd like to show you Exhibit 4444, please.

2          MR. ROGERS:  Objection, Your Honor.  We have a

3   disclosure issue.

4          MR. O'CONNOR:  We had agreement today I could show

10:05:25    5   him this.   You said that he's seen this before.

6          MR. ROGERS:  Not this document.

7          MR. O'CONNOR:  All right.  You can take that down.

8   BY MR. O'CONNOR:

9   Q    Doctor, in your practice have you looked at and received

10:05:36   10   Bard promotional filters?

11   A    Yes.  As an implanting physician, the way that we learn

12   about devices is that we talk to the representatives, we're

13   given marketing material.  The device also has an information

14   for use packet which explains how it should be used.  That's

10:05:53   15   how we get our information.

16   Q    And in terms of Bard filters, when you began using them,

17   what were the expectations you, as a physician, had for those

18   filters?

19   A    Well, my -- for the Recovery or G2 or just any of them?

10:06:06   20   Q    Well, let's talk about the Recovery, the G2, and the G2X.

21   A    Well, my expectations as a physician were the Recovery

22   filter was the -- if not the first one, the first Recovery

23   filters, filters that could be removed.  And they -- initially

24   when they came out, I kind of was -- queried why would you

10:06:28   25   want to remove one of these IVC filters?  And it turns out

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:06:32   1    that there are reasons why you would remove them.  Sometimes

2    people have temporary situations where they have a clot and

3    that goes away and you can remove that filter.  And the use of

4    inferior vena cava filters has grown since then.

10:06:46   5            So my expectation would be to put in a Recovery

6    filter, have it stay in position and not move and catch clots.

7    That's for the Recovery.

8            Now, the G2 filter, I have kind of the same

9    expectations, but the Recovery filter was a little bit more

10:07:01  10    cumbersome to retrieve because it would require a special

11    Recovery Cone, which was more awkward to use.

12            The Recovery moved to a new filter, the G2, which had

13    a wider wingspan.

14            MR. ROGERS:  I believe we're moving into a bit of an

10:07:18  15    area.

16            THE COURT:  Let's proceed by question and answer,

17    Mr. O'Connor.

18            MR. O'CONNOR:  All right.

19    BY MR. O'CONNOR:

10:07:23  20    Q    Now, you have seen in your own practice promotional

21    brochures for the Bard devices --

22    A    Yes, sir.

23    Q    -- is that correct?

24    A    Yes.

10:07:30  25    Q    And in your opinions in this case, the opinion that you

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:07:34  1  talked about, the Bard filters did not meet the expectations,

2  did not perform as they were represented.

3          Do you remember telling us those opinions?

4  A   Yes.  Specifically for the G2 filter, the marketing

10:07:46  5  materials said they were taking the --

6              MR. ROGERS:  Objection.  We have a disclosure issue.

7              THE COURT:  What's the disclosure issue?

8              MR. ROGERS:  What he's discussing is not in his

9  report.

10:07:59  10             THE COURT:  Is it in the report, Mr. O'Connor?

11             MR. O'CONNOR:  One moment.

12             The specific brochure is not, Your Honor.

13             THE COURT:  Objection sustained.

14             MR. O'CONNOR:  I'm just trying to get to the basis of

10:08:13  15  his opinions for reasonable expectations.

16             THE COURT:  Well, if it's not in the report, the

17  objection is sustained.

18  BY MR. O'CONNOR:

19  Q   Dr. Muehrcke, did you list documents in the report that

10:08:22  20  you reviewed and relied upon?

21  A   Yes, sir.

22  Q   And did you list out the type of documents -- the

23  documents you reviewed to support your opinions that these

24  Bard filters did not perform as represented by Bard?

10:08:35  25  A   I believe I might have not listed them all, but I tried to

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:08:38   1   list the ones I thought were important.

       2   Q    And among the documents that you reviewed, let me show

       3   you --

       4           MR. ROGERS:  Objection, Your Honor.

10:08:48   5           THE COURT:  What's the objection?

       6           MR. ROGERS:  Well, I'll sit down.  I thought we were

       7   about to talk about the same document.  That may be incorrect.

       8           MR. O'CONNOR:  No.  I'm going to talk about the ones

       9   that I thought we had discussed this morning.

10:09:01  10           MR. ROGERS:  You're good.

      11           MR. O'CONNOR:  Is that all right?

      12           MR. ROGERS:  Yeah.

      13           MR. O'CONNOR:  I think we're okay here, Your Honor.

      14           Would you please show Dr. Muehrcke Exhibit 443,

10:09:14  15   Felice.

      16   BY MR. O'CONNOR:

      17   Q    Dr. Muehrcke, showing you 443, is this a document that you

      18   reviewed to arrive at your opinions in this case?

      19   A    Yes, it is.

10:09:27  20           MR. O'CONNOR:  And I believe 443 is in evidence,

      21   Your Honor.  May we display to the jury?

      22           THE COURT:  You may.

      23   BY MR. O'CONNOR:

      24   Q    Dr. Muehrcke, when you told us that among your opinions is

10:09:40  25   that the Bard filters did not perform in accordance with

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:09:47  1    physician expectations as represented by Bard, is this a

2    document that you saw that assisted you in arriving at that

3    opinion?

4    A   Yes, this document very much assisted me.  I was told the

10:10:00  5    G2 filter would be better than the Recovery filter, that the

6    G2 filter would be stronger and be more stable and be easier

7    to remove because it would stay centered more.

8            MR. O'CONNOR:  And if we go, Felice, to page 17 of

9    this document.

10:10:22 10   BY MR. O'CONNOR:

11   Q   Now, Dr. Muehrcke, looking at this information, is this

12   the type of information that you actually received from Bard

13   when you were using Bard filters?

14   A   Yes, it is, but this --

10:10:36 15   Q   No, no, no.  My question is while you were using the

16   filters, did you receive the information that we're looking

17   at?

18   A   No, I didn't, but this is -- I think this is probably not

19   the page you want.

10:10:45 20   Q   What page do you want?

21   A   The comparison of the G2 and Recovery --

22           MR. ROGERS:  Objection, Your Honor.  I think we

23   should proceed in a question-and-answer format.

24           THE COURT:  Yeah.  I think you need to ask the

10:10:55 25   question, Mr. O'Connor.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:10:55  1          MR. O'CONNOR:  All right.

2          Let us just go on through to page 2, if we would, of

3    this document.

4    BY MR. O'CONNOR:

10:10:59  5    Q    Dr. Muehrcke, did you reviewed this page 2 of the

6    document?

7    A    Yes, I did.

8    Q    And what was important to you on this page?

9    A    Well, it's important on this page because it shows 56

10:11:20 10    patients were looked at, because it's important to understand

11    this is MAUDE data.  MAUDE data is data which the FDA collects

12    and underrepresents the total number of complaints.  They're

13    felt to be, based on the testimony of Bard executives, they

14    only represent 1 or 2 percent of all the problems they have.

10:11:38 15          MR. ROGERS:  Objection, Your Honor.  He is using

16    hearsay.

17          THE COURT:  Sustained.

18          MR. O'CONNOR:  All right.

19    BY MR. O'CONNOR:

10:11:43 20    Q    Dr. Muehrcke, more importantly, is this the type of

21    information you would have expected a company like Bard to

22    provide physicians?

23    A    Yes.  This is very much the type of information which I

24    would need to give the best informed consent to my patients.

10:11:56 25    Q    And why would this information be important to you as a

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:11:59 1  cardiovascular surgeon?

2  A   Well, this is realtime data of problems with the filter.

3         MR. ROGERS:  Objection, Your Honor.  Foundation.

4         THE COURT:  Overruled.

10:12:12 5  BY MR. O'CONNOR:

6  Q   Go ahead, Dr. Muehrcke.

7  A   This represents the complaints that Bard was getting from

8  physicians as they voluntarily turned them in or which the

9  company would give to the FDA and then the database.

10:12:27 10  Q   Had Bard advised physicians like you that it had actually

11  classified fractures as type A and type B?

12  A   They did not advise me, no.

13  Q   Is that important information?

14  A   It is important.

10:12:40 15  Q   And why is that?  What did you learn about how Bard

16  classifies into type A and type B?

17  A   Well, the type A fractures are the more severe fractures

18  going to the heart or the lungs, where the type B are less,

19  less important fractures which may stay locally.  And if you

10:12:55 20  have a filter which has more type A fractures, it's a more

21  dangerous filter.

22  Q   And is that something that you would have needed to know

23  in making a risk/benefit decision?

24  A   I would like to know that information very much.

10:13:09 25  Q   All right.  And then, were you aware that Bard had done

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:13:12  1  analysis between its filters in terms of fractures?

2  A    Yes, I was.

3  Q    Pardon me?

4  A    Yes, I was.

10:13:20  5  Q    You're aware of that now since you've been involved in

6  this case.  As a physician back when you were using Bard

7  filters, is that information you would have expected Bard to

8  provide you?

9  A    I would like --

10:13:30  10           MR. ROGERS:  Objection.  Leading.

11           THE WITNESS:  -- information to be --

12           THE COURT:  Hold on just a minute.  When he objects,

13  please hold on.

14           What was the objection?

10:13:35  15           MR. ROGERS:  The objection was leading, Your Honor.

16           THE COURT:  Overruled.

17           THE WITNESS:  I'm sorry, can you repeat the question?

18  BY MR. O'CONNOR:

19  Q    Sure.  I'll just draw your attention to page 4 of Exhibit

10:13:54  20  443.

21           Now, when you became involved in this case and

22  reviewed -- received and reviewed Bard documents, was this the

23  first time you became aware of something like a G2 and G2X

24  fracture analysis?

10:14:06  25  A    Yes, sir.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:14:07  1   Q   And how did that -- what was it about that information, if

2   any, that assisted you in formulating your opinions about the

3   failure of Bard to comply with physicians' reasonable

4   expectations?

10:14:22  5   A   Well, the G2 filter was promoted to us as being an

6   improvement, but the G2 filter, based on the analysis in this

7   report, had worse results with caudal migration.  It was very

8   clear that the G2 filter would slip down more than the

9   Recovery device would.  It had more perforations and more

10:14:47  10   tilting.

11   Q   And was that something, in your experience, was consistent

12   with other filters you were using?

13   A   No.  No.  But I didn't have this kind of internal data.

14        MR. O'CONNOR:  And if we can go to the next page,

10:15:03  15   page 6, please.

16   BY MR. O'CONNOR:

17   Q   And, Dr. Muehrcke, in reviewing and arriving at your

18   opinions, did you look at this table?

19   A   Yes, sir, I did.

10:15:18  20   Q   And what was significant, if anything, about this table on

21   page 6?

22   A   Just the number of problems in people that were

23   asymptomatic.  These people are not followed, and a lot of

24   these filters were slipping down and having problems.

10:15:36  25   Q   Is the fact that a patient may -- has a failed filter but

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:15:39  1  it is asymptomatic, is that important to know as a physician?

2  A   It is important to know because the filter, if it's in a

3  position where it's fallen back and unstable and tilted, it

4  may perforate and it may cause -- it may progress and

10:15:54  5  perforate organs around the vena cava or may fracture and

6  break off and go to the heart or lungs, which can be extremely

7  dangerous.

8        MR. O'CONNOR:  And if we could go to page 128,

9  Felice.

10:16:16  10  BY MR. O'CONNOR:

11  Q   Now, Dr. Muehrcke, when you were using Bard filters, did

12  you understand the history in terms of the Recovery and then

13  the G2 and G2X following the Recovery?

14  A   Yes, sir.

10:16:29  15  Q   And as we look at page 18, is this a page of the document

16  that you reviewed in formulating your opinions?

17  A   Yes, it is.  It's a comparison of the G2 with the RNF,

18  which is the Recovery Nitinol filter or the Recovery filter.

19  Q   And is this the type of information you would have

10:16:48  20  expected Bard to share with physicians at the time they were

21  promoting both -- when they were promoting the G2 or the G2X?

22  A   They were promoting the G2 as being safer, more stable,

23  and stronger, and this document shows it's not.

24  Q   Okay.  And --

10:17:06  25        MR. ROGERS:  Your Honor, may we approach?

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:17:08  1          THE COURT:  You may.

2          If you want to stand up, ladies and gentlemen, feel

3     free.

4        (Bench conference as follows:)

10:17:29  5          THE COURT:  Go ahead.

6          MR. ROGERS:  Your Honor, the witness is drifting into

7     areas precluded by your *Daubert* order.  For instance, saying

8     that this filter was more defective, more dangerous,

9     et cetera.

10:17:38 10          I'm trying to be as quick as I can, but the questions

11     don't indicate to me that it's coming.

12          As I understand it, he's precluded in your *Daubert*

13     order from saying that the filter has got design issues and

14     that sort of thing.  It's got rate problems.  And he has to

10:17:54 15     filter all that through physician expectations, and he's not

16     doing that.

17          MR. O'CONNOR:  I think he is.  I mean, I think he's

18     keeping this as physician expectations and he's not going to

19     render an opinion that -- he's been instructed not to talk

10:18:07 20     about in his opinion that this was an unacceptable rate of

21     failure, but he's going to see a document in which they said

22     it was an unacceptable rate of failure, and that is

23     information he would have expected to receive from Bard at the

24     time he was using these filters.

10:18:21 25          MR. ROGERS:  I disagree, Your Honor.

DIRECT EXAMINATION - DEREK MUEHRCKE, M.D.

10:18:22  1    THE COURT:  Well, if he looks at a document and it

2    has a comparison between the G2 and the Recovery, and he

3    thinks it says the G2 was worse than the Recovery, you agree

4    he can opine, you know, as a doctor, I would have expected to

10:18:39  5    know --

6    MR. ROGERS:  I agree that's fair --

7    THE COURT:  -- that information?

8    MR. ROGERS:  -- yes, Your Honor.

9    THE COURT:  Isn't that what he's doing?

10:18:45 10    MR. ROGERS:  I thought his last answer went beyond

11   that.

12   THE COURT:  Let me look at it.

13   So the last question was, "Is this the type of

14   information you would have expected to receive?"  And his

10:19:18 15   answer was, "This document shows that the G2 was worse than

16   the Recovery and they told me it was not."

17   MR. ROGERS:  All right, Your Honor.

18   THE COURT:  I mean, I agree that my order says he

19   can't give defect opinions --

10:19:32 20   MR. ROGERS:  Correct.

21   THE COURT:  -- based on his view that it was

22   improperly designed.  But he can as a doctor testify about

23   what he expected.  And he can as a doctor, on the basis of a

24   differential diagnosis, say I think this product was

10:19:47 25   defective --

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:19:48   1        MR. ROGERS:  I understand.

2        THE COURT:  -- because of this effect and --

3        MR. ROGERS:  Your Honor, I think he's making

4    affirmative statements here and there.  He certainly said the

10:19:54   5    filter was dangerous or more dangerous.  I mean, and I think

6    that's past the line.

7        THE COURT:  All right.  We know where the line is.

8    If he keeps staying on this side.  If you think he crosses it,

9    you can object and I'll rule.

10:20:10  10        MR. O'CONNOR:  I'm trying to keep him on the line,

11   but, again, this is a question, too, of just how people talk

12   and the English language.  I'm trying to keep --

13        THE COURT:  Part of the problem with this witness is

14   he wants to talk and he's going well beyond your questions in

10:20:22  15   a lot of his answers.  You ask him is this your opinion, and

16   he lunches into a pretty long explanation why.  So if he

17   starts doing that, I think it's incumbent upon you to ask him

18   to stay right within your question to the extent he can.

19        MR. O'CONNOR:  I will try the best I can.

10:20:41  20        THE COURT:  The reason that's important, obviously,

21   is because that way they know what's coming, because there is

22   going to be an answer to your question.  And he is going

23   beyond the question.  So I think that's up to you to try to

24   help control that, Mr. O'Connor.

10:20:53  25        MR. O'CONNOR:  Okay.  Well, I think I have been, and

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:20:54  1    I will continue.

2              THE COURT:  I think your questions have been.  I

3    think some of his answers have gone beyond where your

4    questions have asked.

10:21:01  5              MR. O'CONNOR:  I'm trying to listen too.

6              THE COURT:  All right.

7          (Bench conference concludes.)

8              THE COURT:  Thank you, ladies and gentlemen.

9    BY MR. O'CONNOR:

10:21:38  10   Q    And so, Doctor, to sum up on the exhibit that we are

11   looking at, and I need to find the number again because I

12   don't see it here.  Exhibit 443.  Does this exhibit contain

13   the type of information that physicians would have reasonably

14   expected Bard to provide them at the time the G2, and even the

10:22:04  15   Eclipse and the G2X were being used out there in the medical

16   field?

17   A    Yes.

18   Q    And was this information provided to you?

19   A    No.

10:22:15  20   Q    What was provided to you?

21   A    Marketing materials saying that the G2 was better,

22   stronger, and more stable.

23   Q    Thank you.

24             MR. O'CONNOR:  Let's put up Exhibit 2248.

25

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:22:42   1   BY MR. O'CONNOR:

2   Q    And, Dr. Muehrcke, do you recognize this document as among

3   the internal documents you reviewed -- received from Bard --

4   or received that were Bard documents?

10:22:54   5   A    Yes, sir.

6   Q    And was this exhibit, Exhibit 2248, important to you in

7   arriving at your opinions that Bard failed to meet physician

8   expectations and the filter did not perform as represented by

9   Bard?

10:23:11   10   A    Yes.

11          MR. O'CONNOR:  And let's go, if we could, Felice, to

12   page 16.

13          Oh, you know what, Your Honor?  I don't know if this

14   has been admitted yet.  At this time --

10:23:33   15          THE COURT:  It has not been admitted.

16          MR. O'CONNOR:  Thank you.

17          I would move to admit 2248.

18          MR. ROGERS:  No objection, Your Honor.

19          THE COURT:  Admitted.

10:23:39   20       (Exhibit 2248 admitted.)

21          MR. O'CONNOR:  I'm sorry, Your Honor.  Can we go back

22   to page 1 so I can display that to the jury?

23          THE COURT:  You may.

24          MR. O'CONNOR:  Go back to the first page.

10:24:11   25          Thank you, Felice.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

BY MR. O'CONNOR:

Q   Dr. Muehrcke, for the benefit of the members of the jury,
this is Exhibit 2248, and this is among the Bard documents
that you reviewed in formulating your opinions; correct?

A   Correct.

Q   And the date of this document is March 2, 2006; is that
correct?

A   Correct.

Q   And by that time the G2 filter had been on the market?

A   Yes.

Q   And by the way, when we talk about the G2, the G2X, and
the Eclipse, were those all promoted and marketed as permanent
filters?

A   Yes.  That's their first --

Q   And what did that mean in terms of physician expectations?

A   That the filter could last through the lifetime of the
patient.  Permanent filters.

Q   Remain in place?

A   Yes.

Q   Without failures?

A   Without failures.

Q   All right.

        MR. O'CONNOR:  If we could go to page 16.

BY MR. O'CONNOR:

Q   And, Dr. Muehrcke, you did review the entirety of

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:25:15  1    Exhibit 2248 --

2    A    Yes.

3    Q    -- is that correct?

4         And looking at page 16, did you review this in the

10:25:21  5    course of your analysis in arriving at your opinions?

6    A    Yes, I did.

7    Q    And was this page, page 16, important to you in arriving

8    at your opinions?

9    A    Yeah.  It's an internal scoring system from Bard and

10:25:32 10    talking about the different severity --

11         MR. ROGERS:  Objection, Your Honor.  No foundation.

12    The witness is beyond --

13         THE COURT:  Sustained.  Sustained on lack of

14    foundation.

10:25:41 15    BY MR. O'CONNOR:

16    Q    All right.  Well, tell us why this was important to you.

17    What did this tell you as a physician?

18    A    This is a scoring system for the --

19         MR. ROGERS:  Same objection, Your Honor.

10:25:52 20    BY MR. O'CONNOR:

21    Q    Well, were you aware that Bard had a scoring system for

22    the severity of filter complications?

23    A    Not until I read this.

24    Q    All right.  And would you -- is that information that

10:26:02 25    physicians reasonably would have expected a company like Bard

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:26:06  1   to provide back at the time it was promoting their filters?

2   A   Yes.

3   Q   And would it be important to a doctor to know about

4   whether a medical company like Bard was scoring the severity

10:26:18  5   of complications?

6   A   I'd like to know more about that in general.  Why are they

7   scoring it and what are the scores.

8   Q   And would you want to know how Bard arrived at that

9   information?

10:26:33  10   A   Well, this describes the -- how -- their system.  I mean,

11   but I guess they made this up internally.

12   Q   All right.  And it talks about caudal migration.

13   A   Yes.

14   Q   And in your review of Bard documents, was caudal migration

10:26:53  15   something that you saw frequently?

16   A   In Bard documents, yes.

17   Q   And what did you learn about caudal migration that was

18   specific to Bard filters?

19   A   In terms of all of the complications, Bard has a problem

10:27:08  20   with caudal migration with the G2 filter.

21   Q   And does that go to stability?

22   A   Very much so.

23   Q   Thank you.

24          MR. O'CONNOR:  Go to page 2248.

10:27:26  25          Excuse me.  I'm sorry, Felice.  Page 20.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:27:35  1    BY MR. O'CONNOR:

2    Q   Now, Dr. Muehrcke, did you review page 20 in the course of

3    your review in this case?

4    A   Yes, I did.

10:27:45  5    Q   And certainly you're not here to talk about rates because

6    you've never done that yourself; correct?

7    A   Correct.

8    Q   But can you tell us as a physician, how did this affect

9    your opinions regarding reasonable expectations?

10:28:02  10   A   Well, if they thought that this -- if Bard thought this

11   was important enough to say that it was unacceptable, I'd like

12   to know that.

13   Q   And was that information shared with you and individuals

14   in the medical profession back in 2006?

10:28:18  15   A   It was not.  But --

16   Q   Was it ever shared with you in any document that you

17   received from Bard?

18   A   No.  But there's one very important part of this diagram.

19   It's the last sentence.

10:28:32  20   Q   Why is that last sentence important?

21   A   If there's a quad 3 or 4 with detection of 3 to 5 requires

22   recommendation for action prior to product release.  The

23   product's already out.

24        MR. ROGERS:  Objection, Your Honor.

10:28:44  25        THE WITNESS:  Well --

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:28:44   1        MR. ROGERS:  Foundation.

         2        THE COURT:  Hold on.

         3        Overruled.  Go ahead.

         4   BY MR. O'CONNOR:

10:28:50   5   Q   And as you looked at this document and you're arriving at

         6   your opinions, what inference did you draw that led you to

         7   believe that that was important and that's something you

         8   should have known?

         9   A   Well, Bard doesn't think it's a good product.

10:29:04  10        MR. ROGERS:  Objection, Your Honor.  The witness is

        11   testifying about what Bard thinks.

        12        THE COURT:  No, he's testifying what he thinks from

        13   having read the document.  I think that was clear.

        14   BY MR. O'CONNOR:

10:29:14  15   Q   May we hear your response again, Doctor.

        16   A   Yes.  I –– if this meets the criteria of 3 to 5 –– it's

        17   almost double, 3 to 5 problems in the quad 3 or 4, and it

        18   recommends action prior to product release.  The product's

        19   been released by this time.  It's already out in public.

10:29:34  20   They –– the product should probably be recalled and fixed.

        21   Q   And this is something Bard never shared with you?

        22   A   No.  No.  No.

        23   Q   Is there any reason you can think of that Bard should not

        24   have shared that with the medical community?

10:29:47  25   A   There is no –– there's no reason why I would think they

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:29:49  1    would not share that.

2                    THE COURT:  We're going to break at this point.

3                    Ladies and gentlemen, we will resume at 10:45.

4                    Please remember not to discuss the case.

10:30:30  5        (Recess taken from 10:30 to 10:44.  Proceedings resumed

6    in open court with the jury present.)

7                    THE COURT:  Thank you.  Please be seated.

8                    You may continue, Mr. O'Connor.

9                    MR. O'CONNOR:  May I proceed, Your Honor?

10:45:40  10                    THE COURT:  You may.

11                    MR. O'CONNOR:  Thank you.

12    BY MR. O'CONNOR:

13    Q    Dr. Muehrcke, you discussed earlier, the work in this

14    case, that you reviewed and relied upon Bard internal

10:45:53  15    documents to formulate your opinions; is that correct?

16    A    Yes, it is.

17    Q    Can you discuss with us the documents, type of documents

18    you reviewed in this case.

19    A    Sure.  Can I look at my report?

10:46:05  20    Q    Will that -- do you need that to refresh your

21    recollection?

22    A    Yes, please.

23                    MR. O'CONNOR:  May he look at his report, Your Honor?

24                    THE COURT:  Yeah.  We need to identify it by exhibit

10:46:12  25    number.

DIRECT EXAMINATION - DEREK MUEHRCKE, M.D.

10:46:14   1          MR. O'CONNOR:  Can we show 4639, please.

2          Let's go to -- let's go to page 4.

3          THE COURT:  What is the specific question,

4     Mr. O'Connor?

10:46:34   5          MR. O'CONNOR:  To tell us the internal documents that

6     he actually reviewed in formulating his opinions.

7          THE COURT:  You mean list them --

8          MR. O'CONNOR:  List them.

9          THE COURT:  -- or describe the category?

10:46:44  10          MR. O'CONNOR:  List of them.  May he proceed?

11          MR. ROGERS:  Objection, Your Honor.  I don't believe

12     the witness should read from his report.

13          THE COURT:  Well, we can have him refresh his memory

14     document by document and describe them all on the record.  Do

10:46:59  15     you have an objection to him identifying the documents?

16          MR. ROGERS:  No, Your Honor.

17          THE COURT:  Okay.  I'm going to let him do that

18     with --

19     BY MR. O'CONNOR:

10:47:05  20     Q   So best you can, testify from memory.  But I think if you

21     need to refresh your recollection with your report, I think

22     you should.

23     A   Okay.

24     Q   Go ahead.

10:47:18  25     A   I've reviewed several e-mails from Bard, internal e-mails.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:47:27  1   E-mails from the medical director.  I've also looked at health

2   hazard evaluations which were performed.  Fracture analysis.

3   Migration analysis.  Migration and tilt analysis.  I've read

4   several depositions from people who were involved with these

10:47:49  5   e-mails about the data which is present in --

6   Q   Now, did you have access to more documents than you

7   actually reviewed?

8   A   Yes, I had more access, and I did take advantage of that.

9   I did ask for more documents.

10:48:04 10   Q   And the documents you listed, were those the basis of your

11   opinions regarding reasonable expectations and how they were

12   not met?

13   A   Yes.

14       MR. O'CONNOR:  Let's show Dr. Muehrcke Exhibit 4800.

10:48:32 15   BY MR. O'CONNOR:

16   Q   Is this an e-mail that you reviewed in formulating your

17   opinions, Dr. Muehrcke?

18   A   Yes, it is.

19       MR. ROGERS:  Objection, Your Honor.  I'm sorry to

10:48:41 20   interrupt, but disclosure.

21       THE COURT:  Is this in his report?

22       MR. O'CONNOR:  Yes.  It's at page 4 --

23       MR. ROGERS:  Your Honor --

24       MR. O'CONNOR:  -- number --

10:48:52 25       THE COURT:  Hold on just a minute.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:48:54  1        MR. ROGERS:  It is listed as a document in his report

2    but there is no discussion of the document.

3        THE COURT:  Is there any opinion testimony about that

4    document in the report?

10:49:02  5        MR. O'CONNOR:  Yes, Your Honor.  If you look at --

6    first of all, page 1, he says he bases his opinion on

7    including internal documents.

8        THE COURT:  Right.  The question is does he say

9    anything about the document in his report besides listing it?

10:49:13 10        MR. O'CONNOR:  He talks about the documents

11   categorically in his report at both page 7 and then again he

12   says based upon the information available, page 8, his

13   opinions regarding --

14        THE COURT:  Does he say anything about this document

10:49:32 15   specifically?

16        MR. O'CONNOR:  Does he talk about this document?  No.

17   But this is a document that went to his opinions.

18        THE COURT:  The objection's sustained.

19        You can ask him about those general opinions but not

10:49:41 20   to give opinion about a particular document that was not

21   included in his report.

22        MR. O'CONNOR:  All right.  Then let's take it down.

23   BY MR. O'CONNOR:

24   Q   Let me ask you a question, Dr. Muehrcke.  You are aware

10:49:53 25   Bard had a medical director and always has; correct?

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:49:56  1   A    Yes, sir.

2   Q    And do you know who the medical director was at the time

3   that the G2 was promoted?

4   A    Yes.

10:50:04  5   Q    Who it was?

6   A    David Ciavarella.

7   Q    And would doctors reasonably expect to want to know

8   anything that a medical director of a medical device company

9   said about a filter?

10:50:19  10  A    Yes, because he brings the unique aspect of being a doctor

11  to the product.

12  Q    So if the medical director made a statement about two Bard

13  filters and which one is better and why aren't doctors using

14  that filter, is that important to cardiovascular surgeons

10:50:36  15  using this filter?

16  A    Very much.

17  Q    Why?

18  A    Because if Bard has a better filter, I want to put the

19  best filter in my patients.  I want to do what's right for the

10:50:45  20  patients and not have problems.

21  Q    Now, you saw a document you discussed before about the

22  comparison between the Recovery and G2.

23  A    Yes.

24           MR. ROGERS:  Objection, Your Honor.

10:50:56  25           THE COURT:  He only asked him if he saw it.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:50:59   1          MR. ROGERS:  Thank you.

        2   BY MR. O'CONNOR:

        3   Q   Is the type of comparison in that document important?

        4   Would doctors expect to receive that information if Bard had

10:51:07  5   actually analyzed a comparison between two filters they were

        6   marketing as permanent with the option to retrieve?

        7   A   Yes.

        8          MR. ROGERS:  Your Honor, I'm sorry to interrupt --

        9          THE COURT:  Hold on.  If he stands up, hold on.

10:51:19 10          MR. ROGERS:  Problem is we can't see each other.

       11          THE COURT:  Then just speak loudly as you're

       12   standing.

       13          MR. ROGERS:  I will try and do so, Your Honor.

       14          I think we're just discussing the document that is

10:51:26 15   not in his report in a different way.  So I object to the

       16   disclosure issue.

       17          THE COURT:  Is there a disclosure about his opinion

       18   on the comparison between two filters in his report?

       19          MR. O'CONNOR:  Again, his report is about -- he did

10:51:42 20   talk about what happened in early 2005, 2006 and we talked

       21   about those reports.  And in his deposition he was asked

       22   questions about Dr. Ciavarella and the emails from

       23   Dr. Ciavarella at that time at page 58 of his deposition.

       24          THE COURT:  That's not what we're talking about now.

10:52:02 25   You asked a different question.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:52:02  1      My question is, is there --

2           MR. O'CONNOR:  It's not in his report, but he did

3    discuss it in his deposition.

4           THE COURT:  The comparison?

10:52:10  5      MR. O'CONNOR:  Pardon me?

6           THE COURT:  The comparison that you just asked about?

7           MR. O'CONNOR:  The e-mail that discusses that.

8           THE COURT:  You left the e-mail behind and you asked

9    him a question about comparisons.  Is that disclosed?

10:52:21  10     MR. O'CONNOR:  We've talked about that before.  I can

11   rephrase the question.

12          THE COURT:  Okay.

13   BY MR. O'CONNOR:

14   Q   If the medical director had made a statement comparing a

10:52:32  15  Bard filter to another, would that be important information to

16   a physician?

17   A   Yes.

18   Q   In the course of your review, did you review such a

19   document?

10:52:39  20  A   Yes.

21   Q   Have you discussed that document with Bard attorneys?

22   A   Yes.

23   Q   Have you been deposed in this case?

24   A   Yes.

10:52:45  25  Q   Do you recall testifying about that specific e-mail from

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:52:48  1  the medical director that talked about two Bard filters?

2  A    Yes.

3           MR. O'CONNOR:  At this time I would move to -- I

4  would like to show the witness 4800 and move for its

10:52:59  5  admission.

6           MR. ROGERS:  Your Honor, may we approach?  I

7  apologize.

8           THE COURT:  Okay.  This is your third bean.

9           MR. ROGERS:  I know my beans are running out, Your

10:53:10  10  Honor.

11          THE COURT:  Okay.

12          If you want to stand up, ladies and gentlemen.

13     (Bench conference as follows:)

14          THE COURT:  Beans go in the jar.

10:53:37  15          MR. ROGERS:  Need to start out with more.  And

16  they're not even jelly beans.

17          THE COURT:  That's all you get.  That's your daily

18  allocation.  We thought about giving you edible beans, but

19  then they would disappear.

10:53:44  20          What's the --

21          MR. ROGERS:  Your Honor, I apologize.  We're talking

22  about this deposition and I didn't want to say it in front of

23  the jury, I don't know what deposition we're talking about.  I

24  suspect it's probably not his MDL deposition, but I don't know

10:53:55  25  that.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:54:08  1          MR. STOLLER:  MDL deposition, page 58.

2          I'm sorry, I'm cognizant of the jury.

3          MDL deposition, page 58, he testified exactly to this

4  document and the comparison made from the SNF to G2.

10:54:20  5          MR. ROGERS:  If that's true, Your Honor, I have no

6  objection.

7          THE COURT:  All right.

8        (Bench conference concludes.)

9          THE COURT:  Thank you.  You can be seated.

10:54:47 10          Go ahead, Mr. O'Connor.

11          MR. O'CONNOR:  Thank you, Your Honor.

12          Felice, could we display Exhibit 4800, please, for

13  Dr. Muehrcke.

14  BY MR. O'CONNOR:

10:54:58 15  Q   Dr. Muehrcke, is this --

16          THE COURT:  I think you had moved it into evidence.

17          MR. O'CONNOR:  I had moved it into evidence.

18          MR. ROGERS:  No objection, Your Honor.

19          THE COURT:  All right.

10:55:10 20          MR. O'CONNOR:  May I publish --

21          THE COURT:  Hold on.

22          4800 is admitted.

23          You may publish.

24        (Exhibit 4800 admitted.)

10:55:19 25          MR. O'CONNOR:  Thank you.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:55:24  1          THE COURT:  Go ahead, Mr. O'Connor.

        2     BY MR. O'CONNOR:

        3     Q   Dr. Muehrcke, we're looking at Exhibit 4800.  Do you see

        4     that?

10:55:29  5     A   Yes, I see it.

        6     Q   Is this a document you reviewed in the course of your work

        7     in this case?

        8     A   Yes.

        9     Q   And so we are clear --

10:55:38 10          MR. O'CONNOR:  Is there any way you can enlarge it,

       11     Felice?

       12     BY MR. O'CONNOR:

       13     Q   It's an e-mail from David Ciavarella to Cindi Walcott

       14     dated December 23, 2005.  And, again, marked as Exhibit 4800.

10:55:54 15          Number one, do you recognize the name David

       16     Ciavarella?

       17     A   Yes.

       18     Q   Who was David Ciavarella?

       19     A   He was the medical director at Bard.

10:56:04 20     Q   And when you reviewed this document among others, can you

       21     tell us the reason that this was important in arriving at your

       22     opinions regarding that Bard failed to meet your reasonable

       23     expectations as a physician?

       24     A   Well, this e-mail's written two months after the G2 filter

10:56:19 25     was released and they're already seeing complications of

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:56:23   1   caudal migration, tilt, perforation.  And his comment was,

2   well, if the G2 filter is a permanent filter, we also have one

3   which has virtually no complaints, so obviously the Simon

4   Nitinol filter is a good filter, why should doctors use

10:56:39   5   anything other than the Simon Nitinol filter?

6         And that's information I'd like to know.

7   Q   All right.  And you were familiar with the Simon Nitinol

8   filter?

9   A   Yes.

10:56:48  10   Q   And that was a permanent filter?

11   A   That was the permanent Bard filter before the Recovery

12   filter.

13   Q   Would it be important for physicians to know from Bard at

14   the time that Bard was promoting these filters that the --

10:57:02  15   whether the medical director had questions about the recently

16   released filter?

17   A   Yeah.  I think this is a very honest e-mail.  I think he's

18   trying to find out what's going on here.

19   Q   And did Bard ever share with you or other doctors any

10:57:17  20   information concerning comments by the medical director or

21   concern within Bard that the G2 was not even meeting -- or

22   wasn't living up to the reputation that Simon Nitinol filter

23   had with respect to failures?

24   A   That's true.  That's true.

10:57:33  25   Q   That's something you would have wanted --

DIRECT EXAMINATION - DEREK MUEHRCKE, M.D.

10:57:36  1    A    I'd want to know that.

2    Q    And did you?

3    A    I'd wanted to know that, yes.

4    Q    But at the time, did they give you -- did Bard give you

10:57:42  5    any indication?

6    A    No.

7    Q    All right.  And let's talk in your practice, did you have

8    Bard sales representatives coming to your practice?

9    A    Yes.

10:57:54  10   Q    And did you rely on those representatives to communicate

11   information to you about filters?

12   A    Yes.

13   Q    And were there other ways that medical device companies

14   were able to communicate with medical doctors?

10:58:05  15   A    The IFU and the marketing material.

16   Q    And so if Bard needed to convey important information, do

17   you believe they could have found you and doctors like you

18   that were using this?

19   A    Yes.

10:58:23  20   Q    And would you have expected them to contact you if they

21   were, Bard, was aware that its filters were failing?

22   A    I think that's very important.

23   Q    Thank you.

24        And you mentioned the IFU.  Was this type of

10:58:36  25   information ever placed in the IFU?

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:58:39   1   A    No, it was not.

2   Q    What is an IFU?

3   A    IFU stands for information for use.  Every medical device

4   has an IFU.  Even a heart valve has one.  It shows you how to

10:58:48   5   put it in, how it should be treated, how it should be

6   maintained, how it should be deployed.

7   Q    Is that a document that doctors review --

8   A    Yes.

9   Q    -- in their practice?

10:58:59   10   A    Yes, in general.

11   Q    And is that a document that doctors rely on medical device

12   companies like Bard to be accurate and truthful?

13   A    Yes.

14   Q    And from what you know about the IFUs for the G2, the G2X,

10:59:13   15   and the Eclipse and what you've learned in this case, were

16   those IFU's accurate?

17   A    Well, they didn't relay this type of information.

18   Q    Is that the type of information you would have expected?

19   A    I think it's essential for getting informed consent from

10:59:26   20   patients.

21   Q    And would that have affected your decision earlier about

22   using Bard filters?

23   A    Absolutely.

24   Q    How so?

10:59:36   25   A    I would not have used Bard filters.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

10:59:39  1   Q   And what would you have expected Bard to do?

2   A   To take this device off the market.

3   Q   Let's talk about Lisa Hyde.

4            MR. O'CONNOR:  Felice, can we have Exhibit 4923.

11:00:03  5   BY MR. O'CONNOR:

6   Q   Before we talk about it, Dr. Muehrcke, can you tell the

7   members of the jury exactly what happened to Lisa Hyde's

8   filter, be it the G2X or even an Eclipse.  What happened to

9   this filter?

11:00:19  10  A   Her -- Mrs. Hyde's filter was placed in 2011, and in 2014

11  she came in with some abdominal pain and a CT scan was done of

12  her abdomen.  This was a CT scan of her abdomen.  A CT scan is

13  x-ray taken if you slice across the body looking up from the

14  feet.  So on your --

11:00:46  15           THE COURT:  Excuse me, Doctor.  This is not in front

16  of the jury.

17           THE WITNESS:  Oh.

18           THE COURT:  Reask the question, would you, please,

19  Mr. O'Connor.

11:00:52  20           MR. O'CONNOR:  Right.

21  BY MR. O'CONNOR:

22  Q   I'm going to show you this in a minute, so we can take

23  this down for a second.

24           My question to you was to tell the jury what happened

11:01:02  25  to Mrs. Hyde's filter, then I'll have you explain to it.  If

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:01:05  1    you could just tell what you found and where the filter was in

2    relation to parts of her anatomy.

3    A    Sure.  So I had the opportunity to review CT scans of her

4    abdomen over time.  And what I believe happened to her filter

11:01:18  5    is the filter was unstable and fell down a little bit and

6    tilted a little bit, and then struts from the filter

7    perforated the inferior vena cava and interacted with her

8    aorta and with her vertebral body.  And in 2013 the CT scan

9    shows all 12 struts are present.  In 2014 there's only 11

11:01:41  10   present, so one of those took off --

11   Q    Now, we've been told by other experts that the filter, the

12   G2X or Eclipse, had arms and legs.

13   A    Yes.

14   Q    Is it your understanding an arm had perforated and

11:01:53  15   fractured?

16   A    Yes.

17   Q    Let's look at the Exhibit 4923.

18        You can draw on this if it will help you explain to

19   the jury your findings regarding Mrs. Hyde.

11:02:07  20   A    Sure.

21        MR. O'CONNOR:  First of all, I move to admit this

22   into evidence.

23        THE COURT:  It's in evidence.

24        MR. O'CONNOR:  Okay.  Thank you.

11:02:12  25        THE WITNESS:  This is a CT scan.  On your right is

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:02:15  1   patient's left; on your left is the patient's right.  This is

2   a cross-sectional area of the vena cava.

3          Here is the --

4          MR. O'CONNOR:  Excuse me, Dr. Muehrcke.  I didn't

11:02:26  5   publish this to the jury.

6          May I publish, Your Honor?

7          THE COURT:  You may.

8          MR. O'CONNOR:  Thank you.

9   BY MR. O'CONNOR:

11:02:30  10  Q   Why don't you start over.  I failed to have --

11  A   This is a cross- --

12          THE COURT:  Excuse me, Doctor.

13          Traci, would you clear the screen so he can start

14  over.

11:02:39  15          Okay.  Go ahead.

16          THE WITNESS:  So this is a CT scan.  We're looking up

17  from the feet.  This is a cross-sectional area of the abdomen

18  showing the intestines over here and here is the aorta.

19  BY MR. O'CONNOR:

11:02:54  20  Q   Dr. Muehrcke, I think you're having the same problem I do

21  every now and then.  Could you keep the microphone --

22  A   Sure.

23          I put the mark on the aorta where the blood is going

24  away from the heart to the legs.  And this is below the

11:03:06  25  kidneys.  And then this organ over here is the vena cava where

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:03:11  1    the filter is placed to help catch clots.

2        You can see the metallic objects radiating outward

3    are the arms and legs of the inferior vena cava filter.  The 3

4    o'clock leg is interacting with the aorta and the 5:30, 6

11:03:30  5    o'clock leg is interacting with the vertebral body and you can

6    see there is a sclerotic pattern there.  There is interaction

7    and scarring from where that leg has interacted with the

8    vertebral body, which is likely the cause of pain, causing

9    lower back pain.

11:03:54 10    Q   All right.

11        Now, you noted in your opinions that the fragment --

12    a fragment, an arm, broke and embolized to her ventricle?

13    A   Correct.

14        MR. O'CONNOR:  Felice, I think the next exhibit,

11:04:08 15    4924, could you put that up.

16        I believe -- is 4924 into evidence?  I thought it was

17    moved in yesterday.

18        THE COURT:  Yes.  It is.

19        MR. O'CONNOR:  May I display this to the jury,

11:04:32 20    publish to the jury, Your Honor?

21        THE COURT:  You may.

22    BY MR. O'CONNOR:

23    Q   Dr. Muehrcke, can you explain to us here in the courtroom

24    today what we're looking at.

11:04:39 25    A   This is a CT scan from a lateral view of the chest.  It

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:04:46    1    shows the diaphragm here, the separation between the chest and

2    abdomen.

3                    It shows the liver here.

4                    And it shows the heart here.  And inside the heart is

11:04:58    5    a metallic object and it looks like there's two objects

6    because the CT scan can get fooled with motion.

7                    If you were to do a gated CT scan where you slow the

8    heart down, then the CT scan would just see one image there.

9    But because of the motion artifact, you see two filters.

11:05:19   10                    To me as a heart surgeon, this is a very dangerous

11   situation because these are perpendicular to the walls of the

12   ventricle.  So every time the heart beats, it crushes or gets

13   poked by this fragment.  And the heart beats 72 times per

14   minute.  You know, 60 minutes in an hour, 24 hours a day,

11:05:39   15   seven days a week.  And how many times is this going to beat

16   before there's a perforation of the right ventricle.  The

17   right ventricle is one-seventh of the --

18                    MR. ROGERS:  Your Honor, I believe we're drifting

19   into a narrative.

11:05:51   20                    THE COURT:  Sustained.

21                    Let's proceed by question and answer.

22                    MR. O'CONNOR:  All right.

23   BY MR. O'CONNOR:

24   Q    And was the filter found in the right ventricle?

11:05:57   25   A    Yes, this is the right ventricle.

DIRECT EXAMINATION - DEREK MUEHRCKE, M.D.

11:05:59  1    Q    And what is the right ventricle?

2    A    The right ventricle is the pumping chamber for the right

3    heart which pumps blood to the lungs.

4    Q    Was it significant to you that this strut embolized into

11:06:12  5    the right ventricle?

6    A    Yeah.  This is a very dangerous situation.  Yes.

7    Q    Why?

8    A    Because she's one heartbeat away from dying.  She's

9    anticoagulated.  If this perforates, she'll have blood around

11:06:22  10   the heart, and that's a very dangerous situation.  This is --

11   this is the type of phone call you do not want to get as a

12   heart surgeon.

13   Q    Now, did you look at Lisa Hyde records and arrive at

14   opinions as to what this -- what kind of injuries and problems

11:06:42  15   or discomfort or pain this caused to her?

16   A    Yes.  I did.

17   Q    And what did you find?

18   A    In my reading of the record and my reading of her

19   deposition led me to believe that after she was found to have

11:06:56  20   this fractured fragment in her right ventricle, she relayed

21   that back to symptoms she had been having when she would

22   exercise.  And she would get sharp pain when she would

23   exercise vigorously and it would go away when she would rest.

24          Her cardiologist referred to it as a fluttering,

11:07:15  25   but --

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:07:16  1          MR. ROGERS:  Objection, Your Honor.  Hearsay.

2          THE COURT:  Sustained.

3          Ask the next question.

4     BY MR. O'CONNOR:

11:07:24  5     Q   Well, were there records that ind- -- in which doctors

6     described her condition?

7     A   Yes.

8     Q   What was described?

9     A   That she had a fluttering in her heart by her cardiologist

11:07:32  10    and she described pain, sharp pain, with exercise.

11    Q   And that's information that, in doing your work as a

12    medical doctor and as an expert, you would look at, review,

13    and rely upon; is that correct?

14    A   Yes.

11:07:45  15    Q   And from those findings in the medical records, did you

16    conclude, make a conclusion, as to whether there was a

17    relationship between the fluttering and this strut in the

18    right ventricle?

19    A   Yes.  I felt more likely than not that the strut was the

11:07:59  20    cause of her sharp pains in her chest or her fluttering.

21    Q   And I think you touched on this, but there's been a

22    suggestion that she started reporting this and relating it to

23    the filter after she learned about the imaging.  Does that

24    strike you as unusual?

11:08:14  25    A   That's not unusual.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:08:15  1   Q   Explain.

2   A   Well, because people are stoic.  People get aches and

3   pains.  If something's consistent and they find out they have

4   a filter fragment in their right ventricle, they would say, oh

11:08:25  5   my god I've been having this pain the whole time.

6   Q   So, first question.  Did Lisa Hyde's Bard filter, whether

7   G2X or Eclipse, perform, behave, as reasonable doctors and

8   patient -- as patients and doctors would reasonably expect?

9   A   No, it did not.

11:08:45  10   Q   Is that an opinion you hold to a reasonable degree of

11   medical probability?

12   A   Yes.

13   Q   And is that information that Bard should have been

14   advising doctors about to make a risk/benefit decision for

11:08:56  15   their patients?

16   A   Yes.

17   Q   Was it?

18   A   No, it was not.

19   Q   Now, in your work in this case, then, did you also look

11:09:06  20   at, so you could tell the jury, what this ventricle -- what

21   type of medical treatments, procedures, this injury that she

22   sustained from this filter necessitated?

23   A   Well, the patient had the filter in the inferior vena cava

24   and in the right ventricle removed with the percutaneous

11:09:25  25   technique.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:09:26  1   Q   And describe the procedure from Dr. Kuo as you understand

2   it.

3   A   Yes.  Dr. Kuo went in and removed -- making a stab wound,

4   put a wire down, put a catheter down, removed the inferior

11:09:43  5   vena cava filter.

6         He was not sure he could get the right ventricular

7   fragment out, but was able to snare it and get it and pull it

8   out.  And that's a great thing because if he couldn't do that,

9   she would require open-heart surgery.

11:09:57 10   Q   Okay.

11   A   It was a short operation.  It was under general

12   anesthesia.  She went home the next day.

13         MR. ROGERS:  Objection, Your Honor.  There's no

14   question pending.

11:10:05 15         THE COURT:  Overruled.

16         Go ahead.

17         MR. O'CONNOR:  Thank you.

18   BY MR. O'CONNOR:

19   Q   Dr. Muehrcke, in your opinion, the problems with this

11:10:14 20   filter, were those procedures necessitated by those problems?

21   A   Yes, the filter led to those.

22   Q   Did you look at the records and look at this case and

23   consider whether Lisa Hyde need any future type of care as a

24   result of what the Bard filter did to her?

11:10:31 25   A   Yes.

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:10:32   1   Q   And what did you determine?

2   A   Well, I think she's going to need to be monitored from a

3   cardiac point of view for arrhythmias because of the trauma to

4   the internal surface of the heart and the muscle.

11:10:45   5           She's not had problems with it now, but I think she

6   needs to be watched for future arrhythmias.  And she does have

7   persistent back pain.  That's going to need to have therapy

8   also.

9   Q   All right.  And what do you attribute -- so, first of all,

11:11:00  10   when you say she's going to have to consistently follow up,

11   what do you mean by that?

12   A   Well, she needs to be monitored for arrhythmias of the

13   ventricle.  Scarring can cause arrhythmias.  And, also, the

14   scarring is a precursor for endocarditis.  I don't think she's

11:11:19  15   got that.  I'm not sure what the likelihood of it happening

16   is, but it's something that needs to be watched.

17   Q   Okay.  And have you discussed your findings about future

18   care with another expert in this case?

19   A   Yes.

11:11:28  20   Q   Lora White?

21   A   Lora White.

22   Q   And what did you -- what do you believe is reasonable for

23   follow up?

24   A   I think she should be followed up at least on a yearly

11:11:37  25   basis with EKGs and she needs to follow up with her primary

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:11:41  1   care physician for her protein C deficiency and her

2   anticoagulation.

3   Q   Why do you relate that in any way to what happened with

4   this Bard filter?

11:11:50  5   A   Well, that would be standard.  The postoperative

6   anticoagulation therapy would be standard regardless whether

7   she had the filter or not.  But she needs to follow up with a

8   cardiologist because she can develop arrhythmias.

9   Q   Do you have an opinion she may need any other type of

11:12:05  10   device or equipment?

11   A   If she's found to develop arrhythmia, she could require an

12   AICD in the future, an automatic implantable defibrillator.

13   Q   Explain to the members of the jury what that is, please.

14   A   The scar inside her ventricle can cause the milieu for

11:12:23  15   ventricular arrhythmias, which can be lethal.  If she were to

16   develop those arrhythmias, she would have to have a device

17   implanted that would shock her out of lethal arrhythmias.

18   Q   So, Dr. Muehrcke, as we begin to wrap up here, number one,

19   do you have an opinion to a reasonable degree of medical

11:12:41  20   probability whether Lisa Hyde's Bard filter, whether G2X or

21   Eclipse, performed in a way that should be reasonably expected

22   by physicians and patients?

23   A   It did not perform in a fashion physicians or patients

24   would expect.

11:12:59  25   Q   Did the Bard filter that Lisa Hyde receive cause her

DIRECT EXAMINATION – DEREK MUEHRCKE, M.D.

11:13:02  1  injuries?

2  A   Yes.

3  Q   And can you summarize the injuries?

4  A   The injuries are her injury to her vertebral body, I

11:13:09  5  believe L3, back pain.  She's had problems with chest pain.

6  She required two unnecessary operations:  One to remove the

7  defective filter -- one to implant the defective filter, two

8  to remove it, and the ventricular -- the fragment.  And

9  there's injury to the myocardium, the endocardium of the

11:13:30  10  heart.

11  Q   And do you have an opinion today about what the future

12  care will -- that Lisa Hyde will need as a result of this Bard

13  filter?

14  A   Well, I think she's going to need to have monitoring,

11:13:43  15  pretty much.

16  Q   And then, if necessary, you talked about --

17  A   AICD is a possibility.

18  Q   Dr. Muehrcke, I'm going to wrap it up, but, again, so we

19  covered -- have we covered all of your opinions in this case?

11:14:00  20  A   I believe so.

21  Q   And are those opinions that you hold to a reasonable

22  degree of medical probability and certainty?

23  A   Yes, sir.

24      MR. O'CONNOR:  Thank you.  That's all I have.

11:14:09  25      THE COURT:  All right.

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:14:09   1          Cross-examination.

         2          MR. ROGERS:  Thank you, Your Honor.

         3              C R O S S - E X A M I N A T I O N

         4   BY MR. ROGERS:

11:14:34   5   Q   Good morning, Dr. Muehrcke.

         6   A   Good morning.

         7   Q   Happy Friday.

         8   A   Happy Friday.

         9   Q   How are you?

11:14:40  10   A   Very well.  Thank you.

        11   Q   Good.

        12          Dr. Muehrcke, let me start off by asking you some

        13   questions about your background.  I think this was clear but I

        14   wanted to follow up on it a little bit more.

11:14:51  15          You are a cardiothoracic surgeon; correct?

        16   A   Correct.

        17   Q   And so the main thing that doctors in your profession do

        18   is you operate on the heart and lungs and chest area; is that

        19   correct?

11:15:03  20   A   That's correct.

        21   Q   And you are not a radiologist; correct?

        22   A   That's correct.

        23   Q   And you are not board certified in diagnostic radiology;

        24   correct?

11:15:13  25   A   No.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:15:13   1   Q   And you did not do a residency in diagnostic radiology;

2   correct?

3   A   That's correct.

4   Q   And diagnostic radiologists are doctors who are trained to

11:15:24   5   review and interpret images; is that correct?

6   A   That's correct.

7   Q   And, Doctor, you are also not an interventional

8   radiologist; correct?

9   A   I do interventional procedures, but I'm not an

11:15:37  10   interventional radiologist.

11   Q   Okay.  Fair enough.  But you're not -- you didn't do a

12   fellowship in interventional radiology?

13   A   No.

14   Q   Doctor, you would agree that folks who want to become an

11:15:47  15   interventional radiologist first do a residency in diagnostic

16   radiology; correct?

17   A   Correct.

18   Q   And then they do an additional fellowship so that they can

19   become trained to do invasive procedures, minimally invasive

11:16:00  20   procedures and become an interventional radiologist?

21   A   Correct.

22   Q   Right?  And so, Doctor, we do agree you are not an

23   interventional radiologist; right?

24   A   We agree.

11:16:10  25   Q   And, Doctor, you have not published any articles in the

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:16:13  1   medical literature about IVC filters, have you?

2   A    No, I have not.

3   Q    You have not written any books or book chapters about IVC

4   filters.  True?

11:16:24  5   A    True.

6   Q    And you have not given any presentations on IVC filters;

7   right?

8   A    I have given presentations on IVC filters in my hospital.

9   Q    I understand.  But you haven't given any presentations at

11:16:36 10   large medical meetings; is that correct?

11   A    No.  That's correct.

12   Q    And, Doctor, you have never been an employee of a medical

13   device company; right?

14   A    I have been a consultant but not an employee.

11:16:47 15   Q    And you've never designed an IVC filter; correct?

16   A    Correct.

17   Q    And you've never been involved in the process of the

18   development of an IVC filter, testing it, and bringing it to

19   market; correct?

11:16:59 20   A    Correct.

21   Q    Doctor, before we get to your opinions about Mrs. Hyde, I

22   want to cover a few other subjects with you.

23         Am I right that you have advertised yourself as an

24   expert witness with expert witness referral sources?

11:17:17 25   A    I think I did that 15 years ago for one year.

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:17:20  1    Q    Okay.  So it's been about 15 years; is that right?

2    A    I believe so, yeah.

3    Q    And you've advertised yourself with a company called Seak,

4    S-E-A-K; correct?

11:17:32  5    A    I -- I don't know that I did any work for Seak.  I -- I

6    got continuing medical education hours, which I need for my

7    license, to learn the anatomy of -- I think the course was

8    called Anatomy of a Lawsuit.  Because lawyers tend to sue

9    doctors and I wanted to know the process involved with that.

11:17:55 10    Q    Okay.  We'll talk about that in a little bit.  First I

11    want to show you something.

12         Doctor, would you agree with me this is a Seak Expert

13    Witness Directory from 2015?

14    A    Yes.

11:18:08 15    Q    And, Doctor, would you disagree with me if I told you that

16    if I go to the portion of the 2015 book from Seak, where it

17    lists doctors from Florida, that Derek Muehrcke is listed as

18    one of the expert witnesses?

19    A    I don't pay them to put that in there.  I don't know why

11:18:31 20    that's in there.  I don't do cases for them.

21    Q    I see.  But you did pay for a listing in the Seak

22    directory; true?

23    A    15 years ago.

24    Q    And that's been 15 years?

11:18:40 25    A    I would think they would charge yearly to be part of that

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:18:43   1   directory.

2   Q   Doctor, let me ask you a few things, though.  When you

3   appear in the Seak directory, do you write the description of

4   your expertise yourself?

11:18:53   5   A   I can't remember.

6   Q   Okay.  And, Doctor, in this book, you were listed as an

7   expert in vascular and interventional radiology.  Did you know

8   that?

9   A   I did not know that.

11:19:04  10   Q   And you didn't write that yourself?

11   A   Well, I'm not an interventional radiologist.  I do do

12   interventional procedures and vascular procedures, but I'm not

13   an interventional radiologist.

14   Q   Do you know how that information would wind up in the Seak

11:19:18  15   directory if you didn't provide it to them?

16   A   I have no idea.  Could I see the book please?

17           MR. ROGERS:  That's fine with me, Doctor.

18           Is it okay if I hand it to the witness?

19           THE COURT:  Yes.

11:19:40  20           THE WITNESS:  Wow.  That's interesting.

21   BY MR. ROGERS:

22   Q   Doctor, let me ask you this:  First of all, you had talked

23   about this course; right?

24   A   Yes.

11:19:55  25   Q   And that's a course you took that was offered by the Seak

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:19:57   1   company; is that correct?

       2   A   Correct.

       3   Q   And that course was in Chicago --

       4   A   Yes it was.

11:20:02   5   Q   -- right?

       6        And you paid over $1,000 to attend that course?

       7   A   I don't remember.

       8   Q   And, Doctor, you wouldn't disagree with me if I went back

       9   and looked at what the prices were and it was over $1,000?

11:20:14  10   A   Fine.

      11   Q   And that course is taught by a lawyer; right?

      12   A   It's taught by a bunch of lawyers and judges, yes.

      13   Q   Okay.  And it's not taught by any doctors; is that

      14   correct?

11:20:24  15   A   I don't know.  I don't remember.

      16   Q   Okay.

      17        The course is about eight hours long; is that right?

      18   A   I don't remember, but I defer to you.

      19   Q   And you would agree with me that the purpose of this

11:20:37  20   course was to train people how to be an expert witness; is

      21   that right?

      22   A   Well, the -- part of the course was to teach expert

      23   witness but part of it was also to learn the -- learn the law.

      24   Learn how to -- how a lawsuit works, what's evidence, the

11:20:56  25   whole deal.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:20:58    1    Q    And you would agree with me that part of this was a class

         2    on how to testify in depositions and at trial; correct?

         3    A    Yes, absolutely.

         4    Q    And did you have practice sessions as part of this?

11:21:11    5    A    I don't know -- I think there may have been practice

         6    sessions where people would, you know, would role act.

         7    Q    I'm sorry, say again.  I can't hear you.

         8    A    Would role act.  But this is 15 years ago.  I don't

         9    really -- when did I take that course?

11:21:27   10    Q    Let's find out.  Let's see, Doctor.  Do you recall giving

        11    a deposition in a medical malpractice case in my home state of

        12    South Carolina called *Cross versus Odom* (phonetic)?

        13    A    I remember that case.

        14    Q    And that was a case where you were testifying as a medical

11:21:51   15    malpractice standard of care expert; correct?

        16    A    Yes.

        17    Q    And you were giving an opinion that a family doctor had

        18    deviated from the standard of care.

        19    A    Yes.

11:22:00   20    Q    Do you recall that?

        21    A    Yes.

        22    Q    And, Doctor, in that deposition that was taken in that

        23    case, you testified in 2013 that you had taken that course in

        24    the last couple of years.  Do you recall that?

11:22:12   25    A    I do not recall that.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:22:14  1   Q   But you wouldn't dispute that's what the transcript said?

2   A   I'm not disputing it, I just don't recall it.

3   Q   So that would have been sometime around 2011; is that

4   right?

11:22:22  5   A   That sounds right.  Just seems longer, but --

6   Q   And you did receive business through the Seak company for

7   not just one case in South Carolina but two; is that correct?

8   A   I don't remember the details.

9   Q   And didn't you receive another case from that same medical

11:22:39 10   malpractice plaintiffs lawyer in South Carolina?

11   A   I think one went to trial and one might have -- might have

12   been settle -- I think there might have been two.

13   Q   And that was through the Seak service; is that right?

14   A   Yeah.  I actually -- for full disclosure, I can't remember

11:22:58 15   the lawyer's name but he has contacted me recently about

16   another case.  But I don't -- this is not through Seak but,

17   you know --

18   Q   I understand.  So he's followed up and hired you

19   independently of Seak; is that right?

11:23:12 20   A   Well, after looking at this expert witness directory, I

21   don't know.

22   Q   Now, Doctor, but you would agree with me that the two

23   cases you're retained in in South Carolina were through the

24   Seak directory; is that right?

11:23:27 25   A   You know, yeah, I don't remember the details of it but I

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:23:29  1   was part of Seak and I was for a short period of time.

2   Q    And if you testified in those cases that that's where your

3   retention came from, you don't dispute that, do you?

4   A    No, no.

11:23:39  5   Q    Doctor, let's talk a little bit about IVC filters.  And

6   would you agree with me that IVC filters can save lives?

7   A    They can.

8   Q    And in your practice, you have had patients where you have

9   placed a Bard IVC filter and the filter was successful in

11:23:56  10  catching a clot and potentially preventing a PE; is that true?

11  A    I have seen that, yes.

12  Q    And you have seen that yourself?

13  A    I have seen that myself.

14  Q    And, Doctor, would you agree that even though IVC filters

11:24:09  15  can be a lifesaving device, they do have risks?

16  A    All filters have risks.

17  Q    And you would agree all filters can fracture?

18  A    All filters can fracture.

19  Q    And you would agree that the medical literature contains

11:24:22  20  dozens of articles about all kinds of manufacturers' filters

21  fracturing.  True?

22  A    True.

23  Q    That's not just a Bard thing that's out there; correct?

24  A    It's not just a Bard thing for fractures.

11:24:32  25  Q    And, Doctor, would you think that for every filter

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:24:35  1   manufacturer you can find some medical article that would

2   report on a filter fracturing?

3   A    Probably.

4   Q    And if a filter fractures, the fragments from any

11:24:46  5   manufacturer's filter can embolize to the heart or lungs; is

6   that true?

7   A    It depends on the filter.

8   Q    And, Doctor, if you testified to that previously would you

9   disagree with me?

11:24:56 10   A    Well, it depends on the filter.  They can fracture, but if

11   you have -- certain filter designs are very unlikely to

12   embolize if they're fractured.

13   Q    I did hear you, but do you agree that you previously

14   testified that any filter manufacturer, if it fractures, has

11:25:13 15   the potential to embolize and go to the heart or lungs?

16   A    They can.

17   Q    And all filters can migrate; correct?

18   A    Correct.

19   Q    And all filters can perforate the IVC; correct?

11:25:24 20   A    Correct.

21   Q    And all filters can caudally migrate; right?

22   A    Yes.

23   Q    And, Doctor, you still implant filters today; right?

24   A    Yes, I do.

11:25:34 25   Q    And you wouldn't do that if it did not bring benefits to

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:25:37  1    the patients that you implant them in.  True?

2    A    True.

3    Q    And, Doctor, for each individual patient in which you

4    implant an IVC filter, you would agree with me it's important

11:25:48  5    for you to perform an individualized risk/benefit analysis for

6    that patient; correct?

7    A    Correct.

8    Q    Doctor, you talked a little bit in your direct examination

9    about the Simon Nitinol filter.  Do you recall that?

11:26:04  10    A    Yes, sir.

11    Q    And that is a permanent only filter; correct?

12    A    Correct.

13    Q    And, Doctor, would you agree that you have not placed a

14    Simon Nitinol filter in over ten years?

11:26:15  15    A    Correct.

16    Q    And you haven't even recommended a Simon Nitinol filter to

17    any patient in over ten years; true?

18    A    Correct.

19    Q    And, Doctor, you also mentioned a filter called the

11:26:27  20    OptEase filter.  Do you recall that?

21    A    Yes.

22    Q    And it's got -- that's a retrievable filter; right?

23    A    It is a retrievable filter.

24    Q    And there is another filter by the same company called the

11:26:38  25    TrapEase filter; right?

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:26:40  1    A    Yes.  It's a permanent filter.

2    Q    And TrapEase is permanent only and OptEase is retrievable;

3    right?

4    A    Correct.

11:26:46  5    Q    Would you agree, Doctor, that given the design of those

6    two filters that they really are the same filter but the

7    OptEase just has a hook on it?  Is that correct?

8    A    Yes.

9    Q    And, Doctor, are you familiar with the instructions for

11:27:00  10   use that come with the OptEase filter?

11   A    It's been a long time since I looked at them.

12   Q    Well, let me ask you this.  I don't think we need to pull

13   it out, but you would agree that the OptEase filter, according

14   to the instructions for use, is only indicated for a very

11:27:14  15   short window of implantation?

16   A    Absolutely.

17   Q    And would you agree it's only indicated for 14 to 23 days

18   of implantation?

19   A    Yes.

11:27:24  20   Q    And, Doctor, you yourself have tried that filter and you

21   didn't like it; is that fair?

22   A    I did not like it at all.  I've used it.  I've put it in

23   for people who have requested it, but I'm not a big fan of it.

24   Q    And, Doctor, am I correct that you have referred to the

11:27:43  25   OptEase filter using a four-letter expletive?

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:27:51  1    A    I'd like to hear that one.

2    Q    Well, I don't want to read it in front of the jury.  But

3    if I had the deposition where you had referred to the OptEase

4    filter by a four-letter curse word, you wouldn't argue with

11:28:03  5    me, would you?

6    A    I wouldn't argue with you, but I'd like to see it.

7    Q    Well, I'll be glad to bring it up if you want me to.

8    A    Okay.  Sure.

9         MR. ROGERS:  Could we have Dr. Muehrcke's prior

11:28:16  10   testimony from July 21, 2016.

11        You don't have it?

12        Your Honor, we don't have it on the screen, but we

13   should have it in a hard-copy format.

14        THE WITNESS:  That's all right.  But if I said a

11:28:29  15   four-letter word in a deposition, I apologize.  That's

16   probably the not the best thing to do.

17        MR. ROGERS:  I understand, Doctor.

18        THE COURT:  Let's go ahead and move on.

19        MR. ROGERS:  I'm moving on, Your Honor.  I think

11:28:40  20   we're done.

21   BY MR. ROGERS:

22   Q    And let me shift gears and talk to you a little bit about

23   Bard documents.  You recall giving that testimony; correct?

24   A    I do.

11:28:48  25   Q    And am I right that when you prepared your report in

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:28:52  1    Mrs. Hyde's case that you had only reviewed 24 documents; is

2    that right?

3    A    Yes.

4    Q    And all those documents were provided to you by

11:29:01  5    Plaintiffs' counsel; is that correct?

6    A    Yes, sir.

7    Q    And they selected which documents you would review; right?

8    A    They did.  And I asked for some extra ones.

9    Q    And you're aware that Bard has produced millions of pages

11:29:14  10   of documents in this litigation; correct?

11   A    Yes, they have.

12   Q    And I think you testified in your direct exam that based

13   on what you saw in those documents, you quit using Bard

14   filters.  Correct?

11:29:26  15   A    Correct.

16   Q    And -- but that was only after you had been contacted by

17   Plaintiffs' counsel and retained as an expert witness; true?

18   A    Well, no.  That's interesting you should say that.

19   It's -- I only had access to the Bard documents after I signed

11:29:42  20   a protective order which prevents -- a gag order, prevents me

21   to talk about it, so I could get a look at them.

22        But our interventional radiologists who used the

23   TrapEase and OptEase were on me for a long time about the Bard

24   filters because I didn't appreciate the nuances of the

11:29:58  25   problems that Bard was having.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:30:00  1          So I was prepared to move on from Bard after I saw

2    the documents.

3    Q    Understand.  And have you seen internal documents from any

4    other manufacturers?

11:30:11  5    A    No.  No manufacturer would give those out.

6    Q    Do you have manufacturers' representatives knocking on

7    your door wanting to show you internal documents all the time?

8    A    Showing me internal documents all the time?  No.

9    Q    That's never happened, has it?

11:30:24  10    A    No, I don't believe it has.

11    Q    That's true of any manufacturer; correct?

12    A    In general, yes.

13    Q    All right.  Doctor, let's look specifically at a couple of

14    the documents you showed to the jury.

11:30:34  15          MR. ROGERS:  And can we bring back it was plaintiffs

16    Exhibit 443 but it may be 2052.

17               You got it?  Okay.  Thank you.

18               Your Honor, may we display this to the jury please?

19               THE COURT:  Which one is this?

11:30:51  20          MR. ROGERS:  Exhibit 443.

21               THE COURT:  Yes, you may display it.

22    BY MR. ROGERS:

23    Q    Dr. Muehrcke, you remember testifying about this document;

24    right?

11:31:00  25    A    Yes.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:31:01  1    Q    Silly question, but you weren't involved in the

2    preparation of this document; right?

3    A    Yes.

4    Q    But you don't know the purpose for which this was

11:31:08  5    prepared; correct?

6    A    Well, I think the purpose of it was to compare the G2 and

7    the Recovery filter.  MAUDE data.

8    Q    As far as how Bard used this document and the reasons they

9    put it together, it would be complete speculation on your

11:31:24 10    part; correct?

11    A    Well, I think -- I think if you go to page 2, it shows you

12    the years of the 56 complaints that were made out.

13    Q    Understand.  But you don't know what was going on in the

14    mind of the person that prepared this document, do you?

11:31:37 15    A    Well, I think it was prepared to compare the G2 to the

16    Recovery Nitinol filter.

17    Q    Right.  But you would agree with me that as far as the

18    individual who prepared this document, you can't tell this

19    jury what that person was doing and thinking; correct?

11:31:51 20    A    Can you repeat the question?

21    Q    Sure.  I mean, for the person that prepared this document,

22    you would agree with me you can't tell this jury what that

23    person was thinking when they prepared this document?

24    A    It's impossible for me to know what they're thinking.

11:32:05 25    Q    All right.  Now let's go to -- first of all, to get

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:32:10   1   oriented, this is the first page; correct?

2   A   Looks like it.

3   Q   And up at the top it does say G2 and G2X Fracture

4   Analysis; right?

11:32:19   5   A   Yes.

6   Q   So let's move to the second page.

7        And, Doctor, you recall discussing this page with the

8   jury?

9   A   Yes.

11:32:26  10   Q   And if you take a look here --

11        MR. ROGERS:  And, Scott, if you wouldn't mind just

12   kind of blowing up the table, please.

13        Yeah, that's good.

14   BY MR. ROGERS:

11:32:38  15   Q   And, Doctor, you would agree that according to this

16   document there were 100,000 filters that had been distributed

17   at this point; correct?

18   A   Yes, according to this document.

19   Q   And the next line indicates that of that 100,000, there

11:32:55  20   had been 56 reports of fracture; correct?

21   A   That's what the report says.

22   Q   And then there is a commercial complaint rate that is

23   calculated there.  Do you see that?

24   A   I do.

11:33:05  25   Q   That rate is .06 percent; is that right?

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:33:09  1   A    That's correct.

2   Q    You would agree with me that is less than one percent;

3   true?

4   A    That is less than one percent.

11:33:14  5   Q    And you would agree with me that would be the equivalent

6   of six reports of fracture in 10,000 filters; right?

7   A    Reports, yes.

8   Q    True.  Reports.  Right.  And it indicates these are

9   reports, right?

11:33:27  10   A    Yes.

11   Q    And, Doctor, if you look down at the bottom of this chart,

12   and you would agree with me it says there that there have been

13   two G2 Express complaints reported to date; is that correct?

14   A    Yes.

11:33:40  15   Q    That is indicated in the data analysis; right?

16   A    Yes.

17   Q    Doctor, would you agree that the G2 Express filter and the

18   G2X filter are the same filter?

19   A    They're very similar, yes.

11:33:52  20   Q    All right.

21               MR. ROGERS:  Let's take that down, please.

22               And can you bring back document number 2248, please.

23               And, Your Honor, may we display this to the jury?

24               THE COURT:  Yes, you may.

25

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:34:11  1  BY MR. ROGERS:

2  Q   Dr. Muehrcke, you recall testifying about this document;

3  correct?

4  A   Yes, I did.

11:34:17  5  Q   And, again, you didn't prepare this document; right?

6  A   That's correct, I did not prepare this document.

7  Q   And you don't know the purpose for which Bard would

8  prepare or use this document, do you?

9  A   Well, from my understanding, there was a health hazard

11:34:32  10  evaluation done the month before this was done and the medical

11  director wanted more information about the caudal migrations,

12  and I believe he asked Natalie Wong to investigate that

13  further.

14  Q   Okay.

11:34:45  15  A   And this is her report.

16  Q   And this is based on what you would have learned in

17  litigation; correct?

18  A   How else would I learn it?  Yes.

19  Q   And, again, Doctor, you don't know what was going on in

11:34:56  20  the mind of the individual who prepared this document;

21  correct?

22  A   I do not -- I've seen her e-mails and I believe that she

23  was trying to give clarity to the health hazard report of the

24  ten reported cases of caudal migration which the medical

11:35:14  25  director talked about in February of '06, I believe.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:35:18  1   Q   All right.   Thanks, Dr. Muehrcke.   I think my question is

2   different.

3         Would you agree you do not know what was going on in

4   the mind of the individual that prepared this document?

11:35:27  5   A   My understanding is she was trying to add clarity -- he

6   asked for more data on the caudal migrations and she was

7   adding clarity by looking at the data, MAUDE data.

8   Q   So you do think you know what she was thinking when she

9   prepared it?

11:35:41  10  A   I don't know everything she was thinking, but I think that

11  was the impetus for this report.

12  Q   Okay.

13        Let's go to page 20, please.

14        And, Doctor, you showed the jury this page of this

11:35:54  15  report; correct?

16  A   It was shown to the jury.

17  Q   And you pointed out for them this word that says

18  "unacceptable"; correct?

19  A   Yes.

11:36:04  20  Q   And, Doctor, you would agree you do not know what

21  thresholds that criteria was based on, do you?

22  A   We can see on the page before, two pages before, it shows

23  you there were eight Type III severe fractures out of 13.   And

24  the Bard criteria are if you have three to five of those, then

11:36:27  25  that is an unacceptable risk and action needs to be taken

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:36:32  1   before the product released.  That's right in the document.

2   Q   Okay.  And so, Doctor, you would agree with me, though, as

3   far as how Bard decides what these thresholds are, you don't

4   know how they got there; correct?

11:36:44  5   A   It's internal.  Yes.  It's arbitrary based on their

6   development of devices.

7   Q   And let's look over at the column there that's the last

8   row in the top that looks sort of like an Excel sheet.  Do you

9   see that?

11:37:00 10   A   Yes.

11            MR. ROGERS:  Scott, would you put that out, please,

12   where it says Total.  See what I'm looking at?

13            No.  I'm sorry.  The last row in that part.

14            Thank you.

11:37:18 15   BY MR. ROGERS:

16   Q   Now, Doctor, would you agree with me that this would

17   indicate -- let me back up for a sec.  You would agree that

18   this is a caudal migration document, that's what it relates

19   to; right?

11:37:30 20   A   Correct.

21   Q   And, Doctor, would you agree that the number of complaints

22   listed there is 13?

23   A   Number of complaints is 13.

24   Q   And would you agree the total units sold is close to

11:37:39 25   9,000; is that right?

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:37:41   1    A    Correct.

           2    Q    And you would agree that the complaint rate identified

           3    here is .15 percent; correct?

           4    A    Yes.

11:37:48   5    Q    And that's obviously less than one percent; right?

           6    A    Less than one percent.

           7    Q    Would that be the equivalent of 15 caudal migrations in

           8    10,000 filters?

           9    A    Of MAUDE-reported results, yes.

11:38:02  10    Q    All right.

          11            MR. ROGERS:  You can take that down.  Thank you,

          12    Scott.

          13    BY MR. ROGERS:

          14    Q    Doctor, let's move on and talk about your opinions about

11:38:09  15    Mrs. Hyde.

          16            And, first of all, would you agree that she was an

          17    appropriate candidate for an IVC filter?

          18    A    I think at the time, 2011, she was considered an

          19    appropriate candidate.

11:38:25  20    Q    And I believe on your direct examination you said

          21    something along the lines, and I don't want to misquote you,

          22    but you said something along the lines you put filters in

          23    people that have had a pulmonary embolism because they won't

          24    be able to withstand another pulmonary embolism to their lung;

11:38:40  25    is that right?

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:38:40   1   A    In people I have to remove -- I've done a pulmonary

2   embolectomy and I put a IVC filter in them, yes.

3   Q    And were you aware at the point when Mrs. Hyde's filter

4   was implanted that she had experienced three pulmonary

11:38:53   5   embolisms?

6   A    She did.

7   Q    Okay.  And so that goes into your calculation that she was

8   a appropriate candidate for a filter?

9   A    Well, I think it's the timing.  Her CT scan showed no

11:39:05  10   evidence of right ventricular strain.  Current day, people

11   might take issue with that.

12   Q    All right, sir.  But you would agree, though, that she was

13   an appropriate candidate in 2011 when she received a filter?

14   A    Yes.

11:39:21  15   Q    And, Doctor, when Dr. Kuo went to remove the filter and

16   the strut, he was able to do that percutaneously; correct?

17   A    That's correct.

18   Q    And he -- she did not have to have any open-heart surgery,

19   like what you perform, to remove either of those portions of

11:39:39  20   the filter; correct?

21   A    That's correct.

22   Q    And you would agree that when Mrs. Hyde's doctors

23   discovered that she had a piece of the filter in her heart,

24   that that was an incidental finding.  True?

11:39:51  25   A    It was an incidental finding on the CT scan.

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:39:55  1   Q   And in the 3.5 years that the filter was implanted in

2   Mrs. Hyde, she was never diagnosed with any pulmonary

3   embolism.   True?

4   A   Correct.

11:40:07  5   Q   Doctor, as part of your review of a case like Mrs. Hyde's,

6   do you think it is important to review all of the available

7   medical records so that you can render a fair and reasonable

8   and objective opinion?

9   A   I think it's important to review the documents to come

11:40:23  10  up -- that you feel comfortable with to come up with a

11  opinion.

12  Q   Okay.   And, Doctor, if you had given an opinion in another

13  case where you testified that you thought it was important to

14  review all available medical records to render a fair,

11:40:37  15  reasonable, and objective opinion, you would not dispute that;

16  correct?

17  A   I don't know if I -- if I said that -- I don't know that I

18  ever can really review all of the medical records.

19  Q   Well, but you aren't arguing with me you testified to

11:40:52  20  that; correct?

21  A   I don't -- I don't argue that.

22  Q   Doctor, am I correct that when you prepared your report in

23  Mrs. Hyde's case, that you looked at medical records in 2011,

24  around the time the filter was implanted, and you looked at

11:41:08  25  records in 2014, around the time her filter was removed; is

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:41:14  1    that correct?

2    A    Yes.

3    Q    And you would agree with me that the in-between time, you

4    did not review any records or CT images at the time you

11:41:24  5    prepared your report from that time period?

6    A    I subsequently reviewed those records, but, yes, that's

7    true.  Hasn't changed my opinion.

8    Q    And, Doctor, you did not review any of Mrs. Hyde's records

9    from her primary care doctor in that window; correct?

11:41:41  10   A    Correct.

11   Q    And you didn't review any records from her hematologist

12   during that window?

13   A    Correct.

14   Q    And, Doctor, am I correct that after the filter and strut

11:41:51  15   were removed in 2014, that you had not seen any medical

16   records that relate to Mrs. Hyde beyond that time; is that

17   true?

18   A    I've not seen the medical records, I've just seen her

19   deposition about her treatment.

11:42:03  20   Q    Okay.

21        So you haven't seen any medical records after 2014;

22   correct?

23   A    Correct.

24   Q    And so if there are any records that are important that

11:42:11  25   relate to her cardiac status, you would not have reviewed

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:42:14   1   those; true?

2   A   I have not reviewed the records, but I read her

3   deposition.

4   Q   Okay.  And speaking of her deposition, would you agree

11:42:21   5   with me that in your report you do not list Mrs. Hyde's

6   deposition or Mr. Hyde's deposition as something you've

7   reviewed?

8   A   Correct.  I've not reviewed Mr. Hyde's deposition but I

9   have reviewed hers.

11:42:31  10   Q   Right.  But at the time you wrote your report in this

11   case, you had not reviewed Mrs. Hyde's deposition; true?

12   A   Correct.

13   Q   And you had also not reviewed the deposition of Dr. Henry,

14   the implanting physician in this case; correct?

11:42:44  15   A   Correct.

16   Q   And you had not reviewed the deposition of Dr. Kuo, the

17   doctor who removed the filter; correct?

18   A   Correct.

19           I have reviewed all those depositions subsequently,

11:42:54  20   though.

21   Q   Right.  But when you issued your report with your true and

22   accurate opinions, you had not reviewed any of that material;

23   correct?

24   A   It did not alter my opinion.

11:43:04  25   Q   Let's kind of drill down a little bit on some of your

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:43:06  1  opinions.

2          One of the things that you told the jury is that you

3  thought that Mrs. Hyde may have palpitations; is that correct?

4  A   Well, I didn't say palpitations.  She -- her cardiologist

11:43:17  5  described it as fluttering.  And she said she had pain when

6  she exercised when she -- and related it to the fragment in

7  her right ventricle.

8  Q   And would you agree fluttering and palpitations are the

9  same thing?  Or is that different?

11:43:31  10  A   You know, she was seeing a cardiologist, so I would have

11  thought a cardiologist would use the word "palpitations."  I

12  guess they're very similar.  I think "fluttering" is kind of a

13  lay term.  "Palpitations" is what a medical doctor would use.

14  Q   Okay.  And I believe you testified on direct examination

11:43:50  15  that you believe these either palpitations or fluttering were

16  caused by the strut in her heart because there was really no

17  other good explanation; is that right?

18  A   Yeah.  I think that her cardiac symptoms were probably due

19  to the filter fragment in her right ventricle.

11:44:04  20  Q   Okay.

21          MR. ROGERS:  And, Scott, would you pull up Exhibit

22  8528, please.

23          Can you make that a little larger.

24          Your Honor, I move Exhibit 8528 into evidence.

11:44:25  25          MR. O'CONNOR:  I'm sorry, could I get the date of

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:44:27  1    this?  I didn't hear that.

2              MR. ROGERS:  Sure.  It's from June 14th, 2013.

3              MR. O'CONNOR:  No objection.

4              THE COURT:  Admitted.

11:44:33  5         (Exhibit 8528 admitted.)

6              MR. ROGERS:  May we display, Your Honor?

7              THE COURT:  You may.

8              MR. ROGERS:  All right.

9              Let's shrink it down a little bit, I want to orient

11:44:42 10    the doctor.  I apologize.

11    BY MR. ROGERS:

12    Q   But, Doctor, you would agree with me that this is a part

13    of a CT scan from June of 2013; right?

14    A   Yes.

11:44:52 15    Q   And this would be what is called an axial cut of a CT

16    scan; correct?

17    A   Yes.

18    Q   And that means the cuts are coming up the torso going

19    toward the head; is that right?

11:45:01 20    A   Yes.

21    Q   And, Doctor -- I'm sorry.

22              MR. ROGERS:  Scott, let's make that just a little

23    larger, please.

24              A little smaller, that's starting to pixel me out.

11:45:16 25              Can you make it a tad bigger?

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:45:22  1        Well, let's go with the big one to begin with.

2    That's fine.  Thank you, Scott.

3    BY MR. ROGERS:

4    Q    So, Doctor, where we see the little bright dots, you agree

11:45:30  5    those are the struts from Mrs. Hyde's filter; is that correct?

6    A    Correct.

7    Q    And both the G2X filter and the Eclipse filter have got 12

8    struts; is that right?

9    A    Correct.

11:45:42  10   Q    And six arms, six legs; correct?

11   A    Correct.

12   Q    And, Doctor, if you count those little dots, would you

13   agree with me there are 12 that are there?

14   A    Yes.

11:45:52  15   Q    So would you agree at this point in time in 2013,

16   Mrs. Hyde's filter had not fractured?

17   A    I agree.

18   Q    Okay.  Thank you.

19        MR. ROGERS:  Scott, you can take that down.

11:46:07  20        And can we pull up Exhibit 8712, please.

21        And, Your Honor, I move this into evidence.

22        MR. O'CONNOR:  No objection.

23        THE COURT:  Admitted.

24     (Exhibit 8712 admitted.)

11:46:42  25        MR. ROGERS:  May we display?

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:46:44    1            THE COURT:  You may.

           2    BY MR. ROGERS:

           3    Q   Doctor, do you have the record in front of you there?

           4    A   Yes.

11:46:48    5    Q   And you would agree with me that this is a record from

           6    March the 5th, 2012; right?

           7    A   Yes.

           8    Q   And you would -- this is not something you reviewed; is

           9    that correct, Doctor?

11:47:02   10    A   I've seen this.

          11    Q   When you were preparing the report you had not seen this;

          12    right?

          13    A   Not seen it.

          14    Q   And the doctor that's listed there is Anu Thummala; is

11:47:10   15    that right?

          16    A   Looks like it.

          17    Q   And she is Mrs. Hyde's hematologist; is that correct?

          18    A   I believe so.

          19    Q   Okay.

11:47:19   20            MR. ROGERS:  And can you shrink that up there, Scott,

          21    or take that part down?

          22            Would you go two pages over, please.

          23            Actually, I'm sorry, one back.  I apologize.

          24            And can you pull out that "Review of System" section

11:47:34   25    there.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:47:35   1   BY MR. ROGERS:

2   Q   And, Doctor, do you have the review of symptoms that's

3   there?

4   A   Yes.  I saw that.  I saw that before.

11:47:43   5   Q   Well, don't get ahead of me please.  I need to ask you a

6   question.

7   A   Okay.

8   Q   Doctor, you would agree that this document from 2012

9   indicates Mrs. Hyde was having intermittent palpitations;

11:47:56   10  right?

11  A   That's what that document shows, but I couldn't

12  corroborate that with any of her other medical records

13  contemporaneously.

14  Q   So are you saying you think this record is inaccurate?

11:48:07   15  A   I don't know if this carried over before because it's an

16  electronic record and they just moved it forward.  But her

17  cardiologist said in her first admission -- her first visit to

18  her when she had the fragment in her that she was asymptomatic

19  and she only retrospectively remembered the pain.

11:48:22   20          But, you know, I saw that intermittent palpitations

21  but I couldn't corroborate that with any of the other medical

22  records that are contemporaneous with it.

23          MR. ROGERS:  Scott, would you take the box down and

24  let's go back to the first page, please.

25

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:48:40  1   BY MR. ROGERS:

2   Q    Do you see the "History of Present Illness" there?

3   A    Yes.

4   Q    And do you see where Dr. Thummala's first sentence is

11:48:48  5   "Thank you Dr. Nicole Moss for this consult"?  Do you see

6   that?

7   A    Yes.

8   Q    And so, Doctor, would you agree with me that this is the

9   first time that Mrs. Hyde had ever been seen by Dr. Thummala?

11:48:59  10   A    Yes.

11   Q    So there's no prior history to carry forward; correct?

12   A    Okay.  Yeah.  I guess I'd agree with that.

13   Q    And you wouldn't argue that Dr. Thummala did a thorough

14   history of Mrs. Hyde; right?

11:49:12  15   A    I just didn't see palpitations anyplace else before.

16   Q    Okay.  And so we do agree, though, at this point in 2012,

17   Dr. Thummala had recorded intermittent palpitations as a

18   symptom Mrs. Hyde was having; true?

19   A    She has recorded it.

11:49:26  20   Q    And, Doctor, you would agree with me you cannot correlate

21   this to Mrs. Hyde's strut in her heart because it had not

22   arrived there yet; correct?

23   A    Well, this is not related to it because it has not arrived

24   there, but I do believe her strut was symptomatic.

11:49:44  25   Q    But you would agree with me Mrs. Hyde experienced

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:49:47  1   intermittent palpitations in the absence of that strut;

2   correct?

3   A    You know, I know you want to use the word "palpitations,"

4   but she's described this as a chest pain when she worked out

11:49:58  5   and exercised, and only retrospectively realized that that's

6   probably what's going on.  So the palpitations, they're there.

7   I don't know that I correlate those to her strut fracture.

8   Q    And can we all experience palpitations from time to time

9   from undue stress?

11:50:14  10  A    We can, sure.

11  Q    And --

12          MR. ROGERS:  We can take this down, please.

13          And I'd like to pull up Exhibit 8732.

14          And, Your Honor, I move this into evidence.

11:50:35  15         MR. O'CONNOR:  No objection.

16          THE COURT:  Admitted.

17       (Exhibit 8732 admitted.)

18          MR. ROGERS:  May we display?

19          THE COURT:  You may.

11:50:41  20  BY MR. ROGERS:

21  Q    Doctor, you have the record there?

22  A    Yes, I do.

23  Q    Doctor, you would agree this is a record from August of

24  2014; right?

11:50:49  25  A    Yes.

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:50:50  1    Q   And this, you would agree, is a record from Mrs. Hyde's

2    treating primary care doctor Stephanie Lehrner; is that right?

3    A   Let me see her name.

4    Q   I'm sorry.  You haven't seen this; correct?

11:51:05  5    A   I don't know that I've seen this.

6    Q   Okay.  Let's look.

7        MR. ROGERS:  If you scoot down to the very end, Scott

8    we can show the doctor's name.

9    BY MR. ROGERS:

11:51:14  10   Q   And do you see there where the electronic signature says

11   Stephanie Lehrner?

12   A   Yes.

13   Q   You don't dispute with me that that is Mrs. Hyde's primary

14   doctor; right?

11:51:27  15   A   Yes.  That was the one she changed to after Dr. Sparks.

16       MR. ROGERS:  Okay.  And if you would take the box

17   down, please, Scott, and back up one page.

18       Okay.  And if you would pull out the top section,

19   please.

11:51:41  20   BY MR. ROGERS:

21   Q   And, Doctor, do you see where on this date in 2014

22   Dr. Lehrner recorded the information that Mrs. Hyde reported

23   about cardiovascular symptoms?

24   A   Yes.

11:51:57  25   Q   Do you see where she noted Mrs. Hyde had complained of

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:52:03  1  irregular heartbeat?  Is that right?

2  A   I see that.

3  Q   Do you see where she indicated that is palpitations due to

4  stress; is that right?

11:52:11  5  A   Yes.

6  Q   And do you also see it indicates that Mrs. Hyde denied

7  chest pain and pressure on that date; is that right?

8  A   Yes.  That would be appearance with her deposition.

9  Q   So you would agree with me that Dr. Lehrner, Mrs. Hyde's

11:52:27  10  primary care doctor, attributes the palpitations to stress?

11  A   Looks like it, yes.

12       MR. ROGERS:  All right, you can take that down,

13  please.

14  BY MR. ROGERS:

11:52:38  15  Q   Doctor, did you give the opinion, I believe, that

16  Mrs. Hyde needs to refrain from activities that increase her

17  heart rate?  Is that right?

18  A   I think her cardiologist told you that.

19  Q   Okay.  And the cardiologist you're talking about is

11:52:54  20  Dr. Shehane.

21  A   Shehane.

22  Q   We'll get to that in a little bit more.  But you didn't

23  read Dr. Kuo's deposition; right?

24  A   I did.

11:53:03  25  Q   And -- but I think you did say you reviewed Mrs. Hyde's

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:53:08  1   deposition; correct?

2   A   I did review Mrs. Hyde's deposition.

3   Q   And did you see in Mrs. Hyde's deposition that she

4   testified that Dr. Kuo said she could resume normal activities

11:53:19  5   after he discharged her?

6   A   I did.

7   Q   Let's shift gears a little bit and talk about arrhythmias.

8       I believe you testified that that is something you

9   think Mrs. Hyde is at risk of because of the strut that has

11:53:32  10  been removed from her heart --

11  A   Because of the trauma caused by the strut in her heart,

12  yes.

13  Q   And, Doctor, are you aware of any treating physician of

14  Mrs. Hyde who has put in their medical records that they

11:53:48  15  believe she's at risk of arrhythmias?

16  A   I'm not aware.

17  Q   Am I correct, Doctor, that we all can develop arrhythmias

18  for no reason at all?

19  A   Usually there's a cause for arrhythmias.  It can be

11:54:04  20  anxiety and Epinephrine release.  But typically scarring is a

21  well-known cause for arrhythmias.

22  Q   But arrhythmias can develop for no known reason; correct?

23  A   I'd have to think about that a little bit.  I'm not so

24  sure I can agree with that.

11:54:22  25  Q   Okay.  And, Doctor, am I right that as far as what the

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:54:27  1  likelihood of Mrs. Hyde developing arrhythmias in the future

2  is, that you can't quantify that?

3  A    That's correct.

4  Q    You simply have no idea how likely it is; right?

11:54:37  5  A    I have no idea how likely it is, but it's a possibility.

6          MR. ROGERS:  Scott, you can pull up Exhibit 8729,

7  please.

8          Your Honor, I move this into evidence.

9          MR. O'CONNOR:  No objection.

11:55:06  10          THE COURT:  Admitted.

11        (Exhibit 8729 admitted.)

12          MR. ROGERS:  May we display?

13          THE COURT:  You may.

14  BY MR. ROGERS:

11:55:12  15  Q    Now, let me get oriented -- let you get oriented, Doctor.

16  But you agree this is a record from June 9, 2014; right?

17  A    Correct.

18          MR. ROGERS:  And, Scott, if you would run to the end

19  real quick.  I just want to show the doctor's signature.

11:55:29  20          Let's scroll up one.

21  BY MR. ROGERS:

22  Q    Okay.  Do you see there, Doctor, where it says Dr. Richard

23  Shehane?

24  A    Yes.

11:55:38  25  Q    This is the cardiologist you've been talking about; right?

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:55:41  1    A    That's her cardiologist.

2    Q    And you would agree that Mrs. Hyde only saw Dr. Shehane on

3    two occasions; is that correct?

4    A    Correct.

11:55:48  5    Q    And the record that we're looking at here is from June the

6    9th, 2014; right?

7    A    Yes.

8    Q    And so this would have been about three weeks or so after

9    the strut was discovered in Mrs. Hyde's heart; correct?

11:56:02  10    A    Yes.

11         MR. ROGERS:  Let's back up to the front, please.

12    BY MR. ROGERS:

13    Q    And under the review of symptoms -- do you see that part?

14    A    Yes.

11:56:13  15    Q    And do you see under the cardiovascular part it indicates

16    Mrs. Hyde complained of vague chest discomfort; is that

17    correct?

18    A    Yes.

19         MR. ROGERS:  And, Scott, if you would pull that down.

11:56:27  20    And let's go to the next page, please.

21    BY MR. ROGERS:

22    Q    And do you see the middle section where it says "physical

23    examination"?

24    A    Yes.

11:56:35  25    Q    And you would agree with me that Dr. Shehane, the

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:56:38  1    cardiologist, performed a cardiac exam on Mrs. Hyde on that

2    date; correct?

3    A    Yes.

4    Q    And from reviewing what he indicates here in the

11:56:47  5    cardiovascular section, would you agree that this is a normal

6    heart exam?

7    A    Her physical examination seems normal.

8         MR. ROGERS:  You can pull that box down, please.

9         And now let's go to the next page.

11:57:03  10         And let's pull out the discussion section.

11    BY MR. ROGERS:

12    Q    And, Doctor, under the discussion section, would you agree

13    Dr. Shehane indicate her physical exam is benign?

14    A    Yes.

11:57:17  15    Q    And that means normal; correct?

16    A    Correct.

17    Q    All right.  And so if we look down in this second

18    paragraph, do you see that sentence there that's being pulled

19    out?  And do you agree that Dr. Shehane at this point said

11:57:32  20    Mrs. Hyde was basically asymptomatic?

21    A    I agree with that.

22    Q    And does that mean no symptoms?

23    A    Right.  But it kind of jibes with her having chest pain

24    the page before.  But he's a cardiologist.  I don't know how

11:57:46  25    to reconcile those two things because they contradict each

CROSS-EXAMINATION – DEREK MUEHRCKE, M.D.

11:57:50   1   other.

2   Q   Okay.  Understood.  But you agree Dr. Shehane wrote

3   "basically asymptomatic"?

4   A   Yes, he did.

11:57:57   5             MR. ROGERS:  Scott, can you take that down, please.

6             And can we pull up Exhibit 8731.

7             Your Honor, I move this into evidence.

8             MR. O'CONNOR:  No objection.

9             THE COURT:  Admitted.

11:58:13   10          (Exhibit 8731 admitted.)

11             MR. ROGERS:  May we publish?

12             THE COURT:  Yes.

13   BY MR. ROGERS:

14   Q   Doctor, this is a follow-up visit with Dr. Shehane; do you

11:58:22   15   agree?

16   A   Yes.

17   Q   And the date is June the 25th, 2014; right?

18   A   Right.

19             MR. ROGERS:  And, Your Honor, can we display this?  I

11:58:31   20   can't remember if I asked.

21             THE COURT:  It's displayed.

22             MR. ROGERS:  Okay.  Thank you.

23   BY MR. ROGERS:

24   Q   And, Doctor, again, if we look down at the cardiovascular

11:58:40   25   section at the bottom --

CROSS-EXAMINATION - DEREK MUEHRCKE, M.D.

11:58:42  1          MR. ROGERS:  Well, I'm sorry, Scott.  Yeah, let's

2    leave that up.  I'm sorry.  I was asking for something else

3    but this is good.

4    BY MR. ROGERS:

11:58:50  5    Q    And so, Doctor, looking at this history, do you agree that

6    Dr. Shehane recorded Mrs. Hyde was going to see Dr. Kuo at

7    Stanford; is that right?

8    A    I think he knew about it.

9    Q    Okay.  Do you want to look at the screen.

11:59:05  10   A    Yeah.

11   Q    And you would agree that he noted she had contacted

12   Dr. Kuo at Stanford; correct?

13   A    She noted -- you mean Dr. Sparks?

14   Q    Well, actually I don't.  I'm sorry.

11:59:16  15   A    I'm confused.  I'm sorry.

16   Q    If you want to take this down --

17   A    I don't remember -- that's fine.  Dr. Sparks -- basically

18   I think what happened was Mrs. Hyde kind of sought out Dr. Kuo

19   and made an appointment, had to wait for that appointment.

11:59:28  20   I'm not so sure her cardiologist kind of really knew what to

21   do with this fragment in her ventricle.

22          MR. ROGERS:  Can you take that down, Scott.

23          I first want to get the doctor oriented.  Can you go

24   to --

11:59:41  25          THE COURT:  We're going to pick this up after lunch.

11:59:43  1           MR. ROGERS:  Thank you, Your Honor.

2           THE COURT:  We'll take a one-hour break, ladies and

3    gentlemen, and resume at 1 o'clock.  Please remember not to

4    discuss the case, and we'll see you then.

12:00:15  5       (The jury exited the courtroom at 12:00.)

6           THE COURT:  All right.  We will see you at 1 o'clock,

7    Counsel.

8           MR. ROGERS:  Thank you, Your Honor.

9       (Recess taken at 12:00.)

10       (End of a.m. session transcript.)

11                    *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **<u>C E R T I F I C A T E</u>**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4  appointed and qualified to act as Official Court Reporter for

5  the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8  a full, true, and accurate transcript of all of that portion

9  of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14          DATED at Phoenix, Arizona, this 22nd day of

15  September, 2018.

16

17

18

19

20                              <u>s/ Patricia Lyons, RMR, CRR</u>
                                Official Court Reporter

21

22

23

24

25