UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| IN RE:  Bard IVC Filters Products | ) | MD 15-02641-PHX-DGC |
| Liability Litigation, | ) | |
| | ) | |
| _____ | ) | |
| Lisa Hyde and Mark Hyde, a married | ) | Phoenix, Arizona |
| couple, | ) | **September 21, 2018** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV 16-00893-PHX-DGC |
| | ) | |
| C.R. Bard, Inc., a New Jersey | ) | |
| corporation, and Bard Peripheral | ) | |
| Vascular, an Arizona corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


TRIAL DAY 4 - P.M. SESSION


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

3    For the Plaintiffs:

4        Lopez McHugh
         By:  **RAMON R. LOPEZ**, ESQ.
         100 Bayview Circle, Suite 5600
5        Newport Beach, CA 92660

6        Gallagher & Kennedy
         By:  **MARK S. O'CONNOR**, ESQ.
7             **PAUL L. STOLLER**, ESQ.
         2575 East Camelback Road, Suite 1100
8        Phoenix, AZ 85016

9        Heaviside Reed Zaic
         By:  **JULIA REED ZAIC**, ESQ.
10            **LAURA E. SMITH**, ESQ.
         312 Broadway, Suite 203
11       Laguna Beach, CA 92651

12       Goldenberg Law PLLC
         By:  **STUART GOLDENBERG**, ESQ.
13            **MARLENE GOLDENBERG**, ESQ,
         800 LaSalle Avenue, Suite 2150
14       Minneapolis, MN 55402

15       Lopez McHugh, LLP
         By:  **JOSHUA MANKOFF**, ESQ.
16       1 International Plaza, #550
         PMB-059
17       Philadelphia, PA 19113

18

19

20

21

22

23

24

25

<pre>
 1                  A P P E A R A N C E S (CONTINUED)

 2

     For the Defendants:
 3
         Nelson Mullins Riley & Scarborough
 4       By:  JAMES F. ROGERS, ESQ.
         1320 Main Street
 5       Columbia, SC 29201

 6       Snell & Wilmer
         By:  JAMES R. CONDO, ESQ.
 7       400 East Van Buren
         Phoenix, AZ 85004
 8
         Nelson Mullins Riley & Scarborough
 9       By:  RICHARD B. NORTH, JR., ESQ.
              MATTHEW B. LERNER, ESQ.
10            ELIZABETH C. HELM, ESQ.
         201 17th Street NW, Suite 1700
11       Atlanta, GA 30363

12       C.R. Bard, Inc.
         Associate General Counsel, Litigation
13       By:  GREG A. DADIKA, ESQ.
         730 Central Avenue
14       Murray Hill, New Jersey 07974

15

16

17

18

19

20

21

22

23

24

25
</pre>

1                          **I N D E X**

2   **SUMMARY OF COURT PROCEEDINGS**                          **PAGE:**

3   Proceedings Outside the Presence of the Jury          981

4

5   **WITNESSES FOR THE**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**
    **PLAINTIFF:**

6

7   **Derek Muehrcke, M.D.**
    By Mr. O'Connor                                        893
    By Mr. Rogers                              880

8

9   **Alex Tessmer**
    By Mr. Lopez                  903                       973
    By Mr. Condo                           968

10

11  **Timothy Hug**
    By Mr. O'Connor               976

12

13                      **INDEX OF EXHIBITS**

14  **EXHIBIT**                                         **RECEIVED**

15  <u>NO.</u>       <u>DESCRIPTION</u>

16  8756      History and Physical                        886

17  8757      CTA of Chest                                887

18  8758      Myocardial Perfusion Scan                   888

19  8760      Discharge Summary                           889

20  2059      Tessmer Deposition, 06/12/2013 - Exhibit 02 -  910
              Project Status Report Form for the Recovery
21            Filter, Project No. 7081, initiated 7/1/2002
              with the goal to "Investigate Migration";
22            FM0700160, Rev. 1

23  1006      DeCant Deposition, 05/24/2016 - Exhibit 254 -  912
              12/9/2003 Meeting Minutes Memo from Brian
24            Hudson to Len DeCant, Mike Casanova, Robert
              Carr, and Alex Tessmer Re. "Special Design
25            Review for Recovery (Project #'s 7081 and 8008)"

**INDEX OF EXHIBITS (Continued)**

| EXHIBIT | | RECEIVED |
|---|---|---|
| NO. | DESCRIPTION | |
| 2062 | Tessmer Deposition, 06/12/2013 - Exhibit 07 - 1/14/2004 Memo from Rob Carr to File Re. "Design Review Meeting Minutes Response" | 920 |
| 1383 | Hudson Deposition, 01/17/2014, Exhibit 13 - BPV Engineering Test Report - Characterization of Recovery Filter Migration Resistance in Comparison to Competitive Product - Phase 1, ETR-04-03-02, Rev 0 | 923 |
| 79 | 2/19/2004 Characterization of RNF - Migration resistance; TPR-04-02-02 REV 0 Test protocol for migration resistance Characterization of RNF - Migration resistance | 950 |
| 2065 | Tessmer Deposition, 06/12/2013 - Exhibit 11 - BPV Engineering Test Report - Characterization of Recovery Filter Migration Resistance When Legs are Crossed or Hooks Removed - Phase 2, ETR-04-03-10, Rev 0 | 953 |
| 1369 | Hudson Deposition, 01/17/2014 - Exhibit 16 - 3/24/2004 E-mail from Alex Tessmer to Charlie Benware and Ed Fitzpatrick Re. "Starguide Filter Migration Test Results" | 958 |
| 2068 | Tessmer Deposition, 06/12/2013 - Exhibit 17 - 6/8/2004 "High" Importance E-mail from Alex Tessmer to Carr, Chanduszko, and Hudson Re. "Filter Improvement DOE" | 962 |
| 1023 | DeCant Deposition, 05/24/2016 - Exhibit 275 - Internal Presentation on the G2 Filter System for Permanent Use, detailing the design modifications, features/benefits, and comparison to the Recovery Filter | 963 |
| 4798 | Fermanich Deposition, 3/17/17 - Exhibit 15: Email from Bret Baird to TPW-PV Sales-DG, 4/28/10, Subject:  When was the last time… (2 pages) | 1005 |

1                    **INDEX OF EXHIBITS (Continued)**

2    **EXHIBIT**                                        **RECEIVED**

3    NO.      DESCRIPTION

4

     4806     Fermanich Deposition, 3/17/17 - Exhibit 23:   1012
5             Email from Cynthia L. Haas to Matt Fermanich,
              4/21/11, Subject:  RE:  Expired product
6             (7 pages)
              (Page 2 admitted)
7
     4804     Fermanich Deposition, 3/17/17 - Exhibit 21:   1018
8             Email from Mary Christine Starr to Matt
              Fermanich, 2/17/11, Subject:  RE: Technician
9             Registration (4 pages)
              (Page 1, second part admitted)
10
     4842     Hug Deposition, 8/23/17 - Exhibit 1117:       1024
11            Email to Nine Aghakhan from Tim Hug,
              3/8/11, Subject:  FW:  GW Fem Filter
12            Backorder (2 pages)

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                    **P R O C E E D I N G S**

2              (Proceedings commenced at 12:55 p.m.)

3              (Jury not present.)

4              THE COURT:  Counsel, you wanted to raise a matter?

5              MR. O'CONNOR:  Yeah, Your Honor.  This was brought to

6    my attention.  So defense used this SEAK expert directory

7    and --

8              MS. REED ZAIC:  Microphone.

9              MR. O'CONNOR:  Pardon me?  Oh.

10             -- the expert directory in cross-examination, and I

11   was told by our team that this was never disclosed.  And when

12   our team member approached them, and said that they -- and

13   showed them the order that said that the impeachment exhibits

14   must be delivered to the courtroom deputy 24 hours.  I just

15   want to raise that with the Court.

16             Because I think if it's in the order and we're going

17   to enforce these rules about disclosing exhibits, that's

18   something I think that needs to be enforced here.  If there's

19   going to be something not disclosed that's going to be used

20   with a witness for forms of impeachment, I think that the rules

21   have to be complied with.

22             THE COURT:  What is the rule that you think needs to

23   be complied with?

24             MR. O'CONNOR:  The parties met and conferred on the

25   issue exchanging providing to the courtroom clerk with

```
1    impeachment exhibits 48 hours in advance of trial.  The parties
2    agree they would --
3              THE COURT:  Just tell me.  Don't read it.  Just what
4    is the --
5              MR. O'CONNOR:  It's apparently at Page 69.
6              THE COURT:  No.  I'm not understanding what the issue
7    is.  Are you saying they didn't put it in an envelope in the
8    courtroom 24 hours --
9              MR. O'CONNOR:  Yeah.  There was no -- there was no --
10   the procedure was not followed.  We didn't have appropriate
11   notice.
12             THE COURT:  Well, it would be in an envelope in here
13   if it's impeachment.
14             MR. O'CONNOR:  It was not in an envelope.
15             THE COURT:  So the complaint is they didn't put this
16   in an envelope 24 hours ahead of time?
17             MR. O'CONNOR:  Yes.
18             THE COURT:  Okay.  What are you requesting?
19             MR. O'CONNOR:  I just think if it's going to be a
20   rule, I would like the Court to reinforce that.  If we're going
21   to comply with it, we should comply across the board.
22             THE COURT:  Okay.  And my understanding is that would
23   mean it would have been in here yesterday in an envelope.
24             MR. O'CONNOR:  Well, yeah.  I think there was a
25   similar one with -- used with Hurst, and I didn't realize that
```

1    it had not been disclosed.

2            THE COURT:  Defense counsel?

3            MR. ROGERS:  I'll come up.

4            Your Honor, it was not given to the Court in an

5    envelope, and the reason why is is that I never had any

6    intention of submitting it into evidence.  And it's not

7    evidence.  It was not tendered.  And as the Court has

8    instructed the jury, that's not evidence because it's not in

9    the record.

10            And like I said, I never had any intention of ever

11    entering it.  And if I misunderstand the PTO, I will certainly

12    comply.

13            THE COURT:  Well, my view is that it's like a

14    demonstrative exhibit.  You held it up in front of the jury.

15    You read from it.  It should have been marked with an exhibit

16    number.  I didn't say anything because there was no objection

17    from the plaintiff on that point.

18            But clearly it was used as a demonstrative, at least,

19    in the courtroom, so it ought to be numbered.  It ought to be

20    in the folder, and we should comply with the rule.

21            MR. ROGERS:  I understand, Your Honor.

22            THE COURT:  Okay.  All right.  We'll bring the jury

23    in.

24            Yeah, you can come back up, Doctor.

25            (Jury present.)

1              THE COURT:  Thank you.  Please be seated.

2              All right.  You may continue, Mr. Rogers.

3              MR. ROGERS:  Thank you, Your Honor.

4                       DEREK MUEHRCKE, M.D.,

5    called as a witness herein by the plaintiffs, having been

6    previously duly sworn or affirmed, resumed the stand and

7    continued to testify as follows:

8                    CROSS-EXAMINATION (Continued)

9    BY MR. ROGERS:

10   Q.  Dr. Muehrcke, I hope you had a good lunch.

11   A.  Thank you.  Good.

12   Q.  I believe before we took our break, we were about to talk

13   about a medical record, and that was Exhibit 8731.

14             MR. ROGERS:  Can you pull that up, please?

15             And, Your Honor, forgive me.  I can't recall if I

16   moved this into evidence before the break.  I think I did.

17             THE COURT:  You did, and it was admitted.

18             MR. ROGERS:  All right.  May we display?

19             THE COURT:  You may.

20             MR. ROGERS:  Scott, if you could, can you go to the

21   final page, please.

22   BY MR. ROGERS:

23   Q.  Okay, Doctor.  Do you see the signature line there for

24   Richard Shehane?

25   A.  Yes.

1          MR. ROGERS:  And can you go back to the front page,

2    please?

3    BY MR. ROGERS:

4    Q.  And so, Doctor, I think we were having a little confusion,

5    because you do see the name Amy Sparks up there, up top;

6    correct?

7    A.  Yes.

8    Q.  And, Doctor, would you agree that she's the referring PCP

9    and that this is Dr. Shehane's record?

10   A.  Yes.

11         MR. ROGERS:  And if we could, can you go to the review

12   of symptoms section -- well, the second part down, up there at

13   the review of systems.  Do you see that?

14         And I'll tell you what, why don't you go ahead and

15   bring up the box above it too.  Just do them together.  Yeah,

16   thank you.

17   BY MR. ROGERS:

18   Q.  Okay.  You got that, Doctor?

19   A.  I see it.

20   Q.  And, Dr. Muehrcke, would you agree that on this particular

21   day, Mrs. Hyde, when she presented to Dr. Shehane, the

22   cardiologist, that she, again, provided information to him that

23   she was experiencing atypical chest pain?

24   A.  Yes.

25   Q.  And it does indicate that she had made an -- had contact

1    with Dr. Kuo at Stanford; is that right?

2    A.  Correct.

3    Q.  But she was not able to get an appointment for a few weeks;

4    is that right?

5    A.  Yes.

6    Q.  Okay.  And if we could go to the Discussion section on the

7    next page, please.

8           And, Doctor, do you see the Discussion section there?

9    A.  I do.

10   Q.  And does it indicate that her echocardiogram showed the

11   device was in her right ventricle; correct?

12   A.  Yes.

13   Q.  And then the following sentence reads:  There is no

14   pericardial effusion or evidence of bleeding.

15          Is that correct?

16   A.  Yes.

17   Q.  And can you tell the jury what pericardial effusion is,

18   please.

19   A.  Fluid in the pericardium.

20   Q.  I'm sorry, say again?

21   A.  Fluid in the pericardium.

22   Q.  And there was no evidence of that; is that right?

23   A.  That's what it says.

24   Q.  And there was no evidence of bleeding; is that correct?

25   A.  Correct.

DEREK MUEHRCKE, M.D. - CROSS-EXAMINATION          883

1    Q.  And looking down at the bottom of that record, right above

2    the doctor's signature, does it indicate that the next visit

3    was scheduled for August the 12th, 2014?

4    A.  Yes.

5    Q.  And when we were together before lunch, I think you agreed

6    with me that Mrs. Hyde had only had two visits with

7    Dr. Shehane; is that correct?

8    A.  Correct.

9    Q.  And so are you aware of any visits where Mrs. Hyde returned

10   to Dr. Shehane after this visit in June of 2014?

11   A.  No.

12   Q.  And, Doctor, in the records from Dr. Shehane, did you see

13   any instructions where he had indicated that she should not

14   elevate her heart rate?

15   A.  I did not.

16   Q.  And did you see any instructions that she needed to be near

17   a hospital at all times?

18   A.  I did not.

19         MR. ROGERS:  All right.  You can take that down.

20   BY MR. ROGERS:

21   Q.  Doctor, as I believe -- well, I'm sorry.  Hang on.  I do

22   need to cover one other opinion.

23         Doctor, I think you testified in the morning that you

24   believed that there is some possibility that Mrs. Hyde may need

25   a defibrillator in the future; is that right?

DEREK MUEHRCKE, M.D. - CROSS-EXAMINATION                    884

1    A.  There's a possibility, yes.

2    Q.  And that would be an implantable device that would go in

3    her heart; is that correct?

4    A.  It would be an implantable device that would go in her

5    shoulder with a wire going into her heart.

6    Q.  Right.  And those little wires are called leads; is that

7    correct?

8    A.  Those are called leads.

9    Q.  And do you have to screw those leads into the heart?

10   A.  Typically you screw them in.  They can have -- an anchor is

11   the alternative, but typically you screw them in.

12   Q.  And would it be your opinion that the only reason that

13   Mrs. Hyde may need this implantable defibrillator would be if

14   she developed arrhythmias later; is that right?

15   A.  That's correct.

16   Q.  And, Doctor, I think you've also offered an opinion that

17   Mrs. Hyde is at some risk of sudden death from arrhythmias; is

18   that correct?

19   A.  She's at some risk, yes.

20   Q.  And you would agree that that risk wouldn't exist unless

21   she actually has arrhythmias; right?

22   A.  She would have to have an arrhythmia to have sudden death,

23   yes.

24   Q.  And you're not aware of any records that any treating

25   physicians have diagnosed Mrs. Hyde with any arrhythmias;

1    correct?

2    A.  That's correct.

3    Q.  And, Doctor, have any of her treating physicians, to your

4    knowledge, referred Mrs. Hyde to a cardiologist since the strut

5    and the filter were removed?

6    A.  I haven't seen any of the records since then.

7    Q.  And are you aware of any reports in the medical literature

8    of an individual developing a cardiac arrhythmia due to a

9    filter fragment in the heart?

10   A.  Well, I think this is such a new thing -- we're seeing more

11   and more of these filter fragments -- that I don't think that

12   anyone's ever studied it.

13   Q.  But you're not aware of any reports in the literature?

14   A.  That's correct.

15   Q.  Doctor, as I understand it from this morning, that you did

16   not review any of Mrs. Hyde's medical records following the

17   extraction of the filter and the strut; correct?

18   A.  I have not seen -- well, I've seen her deposition saying

19   that she went into the hospital, I think, February of -- yeah,

20   February of 2015 with chest pain radiating to her jaw, was

21   diagnosed with angina.  But that's just her deposition report.

22   I haven't seen any medical records of that.

23   Q.  And you wouldn't mind if we took a look at that record,

24   would you?

25   A.  If you look at it?

1    Q.  If we took a look at it together.

2    A.  I haven't seen it.

3            MR. ROGERS:  Well, can you pull up Exhibit 8756,

4    please.

5            And, Your Honor, I move this into evidence.

6            MR. O'CONNOR:  We don't object.

7            THE COURT:  Admitted.

8            (Exhibit No. 8756 admitted into evidence.)

9            MR. ROGERS:  May I display?

10           THE COURT:  You may.

11   BY MR. ROGERS:

12   Q.  Doctor, just to get oriented, up in the top right-hand

13   corner, would you agree that this is a record from February the

14   4th, 2016?

15   A.  Yes.

16   Q.  And this is an ER visit; is that right?

17   A.  It looks like it.

18   Q.  And if we look down to the section on the left-hand corner,

19   would you agree that the chief complaint that Mrs. Hyde

20   reported was substernal chest pain radiating to both sides of

21   the jaw?

22   A.  Yep.

23   Q.  And, Doctor, were you aware of any tests that were ordered

24   as part of this ER visit to evaluate her --

25   A.  You have me at a disadvantage.  I've never seen these

 1   records before.  This is all new.

 2          MR. ROGERS:  And if you would, can you pull up

 3   Exhibit 8757, please.

 4          And, Your Honor, I move this into evidence.

 5          MR. O'CONNOR:  No objection.

 6          THE COURT:  Admitted.

 7          (Exhibit No. 8757 admitted into evidence.)

 8          MR. ROGERS:  May we display?

 9          THE COURT:  Yes.

10   BY MR. ROGERS:

11   Q.  All right.  Dr. Muehrcke, do you see where this is the

12   report of a CT scan that was done on that date?

13   A.  Yes.

14   Q.  And down at the bottom, under the Impression, do you see

15   that?

16   A.  I see that.

17   Q.  And would you agree with me that this is a negative CT of

18   the chest?

19   A.  Yes.

20   Q.  And so that's essentially a normal finding; is that right?

21   A.  Pardon me?

22   Q.  Is that a normal finding?

23   A.  A negative finding?

24   Q.  Yes.

25   A.  It's a negative CT of the chest.

DEREK MUEHRCKE, M.D. - CROSS-EXAMINATION          888

1    Q.  Right.  And does that mean that there were no abnormal

2    findings as part of the CT?

3    A.  Yeah, no pulmonary emboli.

4          MR. ROGERS:  And can you pull up Exhibit 8758.

5          Your Honor, I move this into evidence.

6          MR. O'CONNOR:  No objection.

7          THE COURT:  Admitted.

8          (Exhibit No. 8758 admitted into evidence.)

9          MR. ROGERS:  May we display?

10         THE COURT:  You may.

11   BY MR. ROGERS:

12   Q.  And, Dr. Muehrcke, is this a report from a nuclear medicine

13   myocardial perfusion examination?

14   A.  That's what it looks like to me.

15   Q.  Can you explain to the jury what that is?

16   A.  It's a stress test.

17   Q.  And if we look down at the bottom, under the Impression

18   section, do you agree with me it says:  No evidence of

19   stress-induced ischemia.

20         Is that correct?

21   A.  I agree with you.

22   Q.  And so that's a normal finding?

23   A.  I agree with you.

24         MR. ROGERS:  And you can take that down, please.

25         And would you pull up 8760.

1          Your Honor, I move this into evidence.

2          MR. O'CONNOR:  No objection, Your Honor.

3          THE COURT:  Admitted.

4          (Exhibit No. 8760 admitted into evidence.)

5          MR. ROGERS:  May we display?

6          THE COURT:  Yes.

7   BY MR. ROGERS:

8   Q.  Dr. Muehrcke, would you agree that this is the discharge

9   summary from this ER visit?

10  A.  That's what it looks like to me.

11         MR. ROGERS:  And if you could, can you go to the --

12  down to the -- kind of the end of this.  And I think it's

13  probably on the next page.

14     Next page.  Next page.  I'm sorry.  Okay, I'm sorry.  Back

15  up one.

16     Okay.  Can you pull out the section that says Hospital

17  Course.

18  BY MR. ROGERS:

19  Q.  And, Dr. Muehrcke, do you see the section that says

20  Hospital Course?

21  A.  I do see that.

22  Q.  And you would agree that the discharging doctor noted

23  Mrs. Hyde's prior history of protein C deficiency; correct?

24  A.  Correct.

25  Q.  And noted her prior history of pulmonary embolism; is that

1   right?

2   A.  Correct.

3   Q.  And the doctor noted that she had a CT scan which showed

4   she had no pulmonary embolism; correct?

5   A.  Correct.

6   Q.  And as we discussed, the doctor noted that the stress test

7   was found to be negative; is that right?

8   A.  Correct.

9   Q.  And does it indicate that the discharge instructions were

10  to give her Carafate Slurry for atypical presentation of

11  reflux?

12  A.  Yes.

13  Q.  And can you tell us what a Carafate Slurry is, please?

14  A.  It's for antireflux.

15  Q.  And, Doctor, can symptoms of reflux, can those sometimes

16  provide symptoms that might mimic chest pain or things of that

17  nature?

18  A.  I think so.  That's why they gave it to her.

19  Q.  And, Doctor, as far as any other care and treatment that

20  Mrs. Hyde has received since then, would you agree that she's

21  gotten routine and regular visits with her primary care doctor,

22  Dr. Lehrner?

23  A.  I have not seen her records since she came back from

24  Stanford.

25  Q.  And you wouldn't dispute the notion that she's been to see

1    her primary care doctor routinely?

2    A.  I have no opinion.

3    Q.  And if one goes for annual visits with a primary care

4    doctor, does that usually include receiving an EKG at least

5    once a year?

6    A.  I don't know that it does.

7    Q.  Okay.  And, Doctor, were you aware that Mrs. Hyde is also

8    seeing her hematologist more than once a year?

9    A.  I have not seen the records.  I have no opinion.

10   Q.  And, Doctor, would you think that Mrs. Hyde's primary care

11   doctor and her hematologist, when they see her, would inquire

12   about any sorts of cardiac symptoms that she may have?

13   A.  Perhaps.

14   Q.  And would you think that those doctors, if they thought it

15   necessary to refer her to a cardiologist, would do so?

16   A.  I would think she should probably see a cardiologist.

17   Q.  And if her treating doctors have not referred her to a

18   cardiologist you would not be critical of them, would you?

19   A.  Well, it's a little out of their specialty.

20   Q.  And, Doctor, would you think that Dr. Lehrner, her primary

21   care doctor, and Dr. Thummala, her hematologist, would not have

22   the medical wherewithal to know if a patient needs to be

23   referred to a cardiologist?

24   A.  I don't know if they feel comfortable doing that.

25   Q.  Doctor, let me ask you a few more questions.

1          I believe you told the jury this morning that you

2    believed that there was some interrelationship between what you

3    have described as the failure modalities with the Bard filters;

4    correct?

5    A.   Yes.

6    Q.   And are you aware of any medical literature that discusses

7    this interrelation that you described?

8    A.   Absolutely.

9    Q.   And did you bring that literature with you today?

10   A.   No, I didn't bring it with me.  It's the EVEREST report,

11   which Bard funded.

12   Q.   And, Doctor, are you aware of any other literature that

13   describes this as you say?

14   A.   Bard documents.

15   Q.   I mean medical literature.

16   A.   Oh, I'm sorry.  No.

17   Q.   Okay.  And, Doctor, to kind of wrap this up, you reviewed

18   imaging that showed Mrs. Hyde's filter; correct?

19   A.   Yes.

20   Q.   And you would agree with me that the imaging demonstrated

21   that there was a hook on the filter; correct?

22   A.   I would have to review them.  I can't remember.

23   Q.   Okay.  Well, if the -- if the image shows that there is a

24   hook on the top of the filter, would you agree with me that it

25   is not a Recovery filter?

1    A.  Correct.

2    Q.  And you would agree with me that it's not a G2 filter?

3    A.  Correct.

4    Q.  And, Doctor, would you also agree with me that in your

5    report in this case, you consistently referred to the filter as

6    a G2 filter?

7    A.  I agree.

8    Q.  Okay.  And was -- strike that.

9            MR. ROGERS:  Your Honor, I have no further questions.

10           THE COURT:  All right.

11           Redirect?

12                      REDIRECT EXAMINATION

13   BY MR. O'CONNOR:

14   Q.  Let's talk about your medical/legal work, Dr. Muehrcke,

15   that you were asked about.

16           Have you reviewed the reports of the experts who have

17   filed reports on behalf of Bard?

18   A.  I have not.

19   Q.  I thought you said you looked at other experts' reports.

20   A.  I can't -- I can't remember them.  I have not reviewed them

21   for this trial.

22   Q.  Have you reviewed them in the past?

23   A.  I have to look.  I can't remember.  I most likely have, but

24   I cannot remember.

25   Q.  Let me just ask you this --

DEREK MUEHRCKE, M.D. - REDIRECT EXAMINATION                894

1    A.  I apologize.

2    Q.  -- do doctors who come in and work with parties in court

3    cases and explain medical issues to juries, do they charge for

4    their time?

5    A.  I'm sure they do.

6    Q.  And the amount that you charge, have you looked to see if

7    it's in line?

8    A.  I think mine's actually a little bit less than a lot of

9    people's.

10   Q.  And why do you do this?  Why do you work in the legal

11   system from time to time?

12   A.  Well, I work in the legal system from time to time to take

13   care of patients, to do what's right, and to make sure that

14   patients get taken care of.  I don't take all cases.  I

15   don't -- I turn down a lot of cases.  It's just a lot of time.

16   Q.  And you said you turn down cases.  And do you work on --

17   for the side that's been -- is the defendant in lawsuits as

18   well?

19   A.  I've worked on the defendants' side and the plaintiffs'

20   side, about 50/50 for the medical malpractice.

21   Q.  And do you agree there's no issue about doctor care in this

22   case?

23   A.  Yeah.  There's no doctors being sued here.

24   Q.  Now, you were -- do you recall being asked questions about

25   that directory, that expert directory?

UNITED STATES DISTRICT COURT

1  A.  The SEAK directory, yes.

2  Q.  And you were showed that today?

3  A.  Yes.

4  Q.  And then the Bard attorney also brought up the fact that

5  you said a four-letter word.

6          Do you recall that?

7  A.  Yes.

8  Q.  Have the Bard attorneys ever asked you to look at a

9  document, of these millions of documents, to look at it to see

10 if a document would refute the ones you've reviewed?

11 A.  No.  They've never given me documents to look at.

12 Q.  And you know that document we looked at with the G2, the

13 G2X analysis?

14 A.  Yes.

15 Q.  You've talked to the Bard attorneys in depositions; right?

16 A.  Yes.

17 Q.  And then they came here and talked to you today; correct?

18 A.  Correct.

19 Q.  At any time have they given you anything to show why you

20 should not rely on their internal documents?

21 A.  No, they have not.

22 Q.  Have they ever suggested to you, "Doctor, you missed a

23 couple, and I think if you look at these, you might change your

24 opinion"?

25 A.  No.

1    Q.  And, by the way, when you did your report and reported your

2    opinions, did you reserve the right to amend those opinions?

3    A.  Yes, I did.

4    Q.  And fair to say that information kept coming to you --

5    A.  Yes.

6    Q.  -- after your report?

7         Did you receive other information such as depositions?

8    A.  Yes.

9    Q.  And, Doctor, if you had come across anything that affected

10   or changed your opinion, would you have notified us and amended

11   your report?

12   A.  Yes.

13   Q.  Now, you mentioned that you also looked at a health hazard

14   evaluation.

15        Do you recall that testimony?

16   A.  Yes.

17        MR. O'CONNOR:  Can we see Exhibit 2248?

18        I'm sorry.  Let me see 443, please.  Or 4820, I'm

19   sorry.

20   BY MR. O'CONNOR:

21   Q.  And, Doctor --

22        MR. ROGERS:  Your Honor, I'm sorry to interrupt, but

23   objection.  Nondisclosure.

24        MR. O'CONNOR:  It's on his list.  He was asked

25   questions about --

1          THE COURT:  Well, I haven't heard a question yet.

2    4820 is in evidence.

3          So let's hear the question, and then if you want to

4    object, you can, Mr. Rogers.

5    BY MR. O'CONNOR:

6    Q.  Well, Dr. Muehrcke, when you were talking about before

7    that -- and you were explaining the other exhibit about the

8    rates that were shown in that exhibit, do you recall that

9    testimony?

10   A.  Yes, the fracture analysis.

11   Q.  I thought I heard you mention that that came on the tail of

12   a health hazard evaluation.

13   A.  Yes.

14   Q.  And is Exhibit 4820 the health hazard evaluation you were

15   referring to?

16   A.  Yes, it is.

17   Q.  And is this something that you reviewed and relied upon in

18   your opinions?

19   A.  Yes, it is.  It talks about the --

20          MR. O'CONNOR:  Hang on.

21          May I publish this to the jury, Your Honor?

22          THE COURTROOM DEPUTY:  I don't show 4820.  I show

23   4800.

24          THE COURT:  Hold on just a minute.  I show it in

25   evidence.

```
 1                 THE COURTROOM DEPUTY:  Yes.  I'm sorry.  The 19th,
 2   yes.
 3                 THE COURT:  Yes, you may.
 4   BY MR. O'CONNOR:
 5   Q.  And, Dr. Muehrcke, can you --
 6                 MR. ROGERS:  Your Honor, objection.  Nondisclosure.
 7                 THE COURT:  Are you going to have him opine about the
 8   document?
 9                 MR. O'CONNOR:  I was just going to have him put his
10   answer in context as to why this was important to the questions
11   on the other document about rates he reviewed.
12                 THE COURT:  Is that in his report?
13                 MR. O'CONNOR:  Pardon me?
14                 THE COURT:  Is that in his report?
15                 MR. O'CONNOR:  No.  I'm just doing a redirect because
16   he was asked about that.
17                 THE COURT:  Objection sustained.
18                 MR. O'CONNOR:  Okay.  I'll move on.
19   BY MR. O'CONNOR:
20   Q.  Doctor, on cross-examination you were asked about all
21   filters and whether all filters fail, fracture, migrate.
22                 Do you recall those questions?
23   A.  Filters can have the problems, yes.
24   Q.  In your experience, though, is Bard different?
25   A.  Bard is different.
```

1    Q.  Why?

2    A.  The Bard filters are different because not only do they

3    have the problems of caudal migration, tilt, perforation, and

4    fracture, but they all occur together in a much higher rate.

5    Q.  And you mentioned the EVEREST report in response to

6    questions by defense counsel?

7    A.  Yes.

8    Q.  And what report is that?  Did that involve Bard filters?

9    A.  The EVEREST report is a -- it's one of two prospective

10   trials which Bard funded which were short-term trials to look

11   at the retrievability, not the long-term safety, of filters.

12   The first study, the Asch study, was for the Recovery filter,

13   and this one was for the G2 filter.

14   Q.  And what was your point about that study?

15   A.  Well, there's a -- they -- I've had a chance to see the raw

16   data, and the authors came to the conclusion that there was a

17   statistically significant association between caudal migration

18   and tilt.  And the data in the -- the raw data of the filters

19   shows that only 35 percent of filters which are placed in

20   position --

21            MR. ROGERS:  Your Honor, objection.  I think we're

22   getting into an area beyond the Daubert order.

23            THE COURT:  Overruled.  I think this is within the

24   scope of cross.

25

1    BY MR. O'CONNOR:

2    Q.  Can you finish your answer, please?

3    A.  Just that the raw data from the EVEREST study showed that

4    only 35 percent of the G2 filters which were placed stayed

5    where they were placed.  They moved either up or down, mostly

6    caudally.

7    Q.  And when Bard's counsel asked you questions about Bard

8    documents and asked you to look at those rates, do you recall

9    those questions?

10   A.  Yes, sir.

11   Q.  And he showed the figures of filter -- Bard filters that

12   were distributed or sold?

13   A.  Yes.

14   Q.  Is that helpful in trying to figure out what's really

15   happening out there?

16   A.  It's the only data which was available to be assessed.  But

17   that data is MAUDE data, and it's data which is voluntarily

18   submitted by doctors or by the manufacturer, and it

19   tremendously underestimates the amount of complaints.

20   Q.  Now, you were asked about patients who have failed filters

21   but may be asymptomatic.  Is that something that medical device

22   companies should not be concerned about?

23   A.  They should be very concerned about that.  You know, you

24   can be asymptomatic from a lung cancer, but you'd still take it

25   out.  You don't know -- these things progress.

1    Q.  And in terms of the medical records you were asked about in

2    2016 regarding Lisa Hyde --

3    A.  Yes.

4    Q.  -- by that time, she had her filter out?

5    A.  Yes.

6    Q.  And did those records show she hadn't had a PE without a

7    filter?

8    A.  They showed she did not have a PE without a filter present,

9    yes.

10   Q.  And when -- simply because a patient has a filter and

11   doesn't have a PE during that period, does that mean somehow

12   the filter -- can you say under those circumstances

13   automatically the filter stopped a clot?

14   A.  No, you can't.  In her situation, she had three DVTs.  Two

15   of them were associated with pulmonary emboli.  Each time they

16   affected her right leg.  The first two affected her calf; the

17   third DVT affected her thigh.

18          So she had no episodes of leg swelling, which is where

19   99 percent or 95 percent of pulmonary emboli originate from.

20   So I don't think she had a DVT or a PE in the past.

21   Q.  When Mr. Rogers was asking you about those internal

22   documents that purported to show rates, do you recall that?

23   A.  Yes.

24   Q.  How do you -- what do you think -- how do you respond to

25   what you saw?

1    A.  Well, I think there should be no rate.  I think the rate

2    should be zero for any adverse events, as close to zero as

3    possible.

4    Q.  And when you reviewed -- did your work in this case, and

5    you saw documents that nobody else has seen other than the

6    experts in this case, other than Bard, what do you think Bard

7    should have done during the time of those documents?

8    A.  Well, I think that, you know, no one knows more about their

9    device than the medical device company.  And my feelings are

10   just like the medical doctor who did the EVEREST study; I think

11   the G2 filter should have been pulled from the market.

12   Q.  And should doctors be able to rely on medical device

13   companies to be honest and forthright?

14   A.  Yes.

15   Q.  Is that why you've told this jury that Bard should have

16   disclosed that information?

17   A.  I think it would be -- yes.  That would be very helpful to

18   get that information.

19   Q.  Did Bard ever disclose that to you when you were out there

20   helping your patients?

21   A.  No.

22          MR. O'CONNOR:  That's all I have.

23          THE COURT:  All right.  You can step down, Doctor.

24          (Witness excused.)

25          MR. LOPEZ:  Your Honor, at this time, the plaintiffs

UNITED STATES DISTRICT COURT

```
1    call Mr. Alex Tessmer.

2              THE COURTROOM DEPUTY:  Sir, if you'll please come

3    forward.  You can stand right here and raise your right hand,

4    please.

5              THE WITNESS:  Sure.

6              (The witness was sworn.)

7              THE COURTROOM DEPUTY:  Please state your name and

8    spell it for the record.

9              THE WITNESS:  Alex Tessmer.  A-L-E-X, T-E-S-S-M-E-R.

10             THE COURTROOM DEPUTY:  Thank you very much.

11             MR. LOPEZ:  Excuse me one second.

12             Your Honor, I have a copy of Mr. Tessmer's deposition

13   that was taken.  He might need to reference it.  Can I give it

14   to the clerk to give to the witness?

15             THE COURT:  You can, yes.

16             MR. LOPEZ:  Thank you.

17             May I proceed?  May I proceed, Your Honor?

18             THE COURT:  You may.

19                            ALEX TESSMER,

20   called as a witness herein by the plaintiffs, having been first

21   duly sworn or affirmed, was examined and testified as follows:

22                         DIRECT EXAMINATION

23   BY MR. LOPEZ:

24   Q.  Good afternoon, Mr. Tessmer.  How are you?

25   A.  Good afternoon.  Doing well.  How are you?
```

1    Q.   Good.

2         I know that this is -- you've been here a couple days, and

3    I apologize for some of the delays.  We intended to get you on

4    sooner, so I'll keep that in mind as we proceed.  Okay?

5    A.   Thank you.

6    Q.   Introduce yourself to the jury, please.

7    A.   Sure.  My name is Alex Tessmer.  I am an ideation marketing

8    manager at Bard.

9    Q.   And before you were a marketing manager at Bard, did you

10   work in some capacity with Bard's IVC filters?

11   A.   Yes, I did.

12   Q.   And do you have an engineering degree?

13   A.   No, I do not.

14   Q.   I think you -- were you trained in -- I think you have a

15   degree in chemistry; correct?

16   A.   That's correct.  I have a Bachelor of Science in chemistry

17   with a biochemistry emphasis.

18   Q.   And did you have an engineering position at some point when

19   you were working at Bard?

20   A.   Yes, I did.

21   Q.   And I believe you actually started at Bard in 1998; does

22   that sound about right?

23   A.   January 1997.

24   Q.   Okay.  And you left in 2005?

25   A.   That is correct.

1   Q.  And then you returned sometime after that; is that right?

2   A.  Correct.

3   Q.  And were you involved with filters between 2002 and 2005?

4   A.  Yes.

5   Q.  And that would have been primarily the Recovery filter era,

6   or phase, of Bard filters?

7   A.  That's correct.

8   Q.  Now, I think in 2005 they were at least trying to get the

9   G2 on the market.  Did you do any work on the G2?

10  A.  Not that I recall.  My primary purpose was working on the

11  jugular delivery system.  So I know at some point I probably

12  saw the design and tried to make it work with that --

13  Q.  Okay.

14  A.  -- the delivery system.

15  Q.  And what is ideation marketing manager?

16  A.  So basically what my role is now is I work a lot with

17  doctors.  I go to different conferences.  And we're really

18  trying to determine the unmet needs within a market and

19  develop -- come up with the next best ideas, if you will, and

20  look at the business case and also look at the clinical and

21  economic value proposition to see if there's something we can

22  develop to help doctors help patients.

23  Q.  And today you have no involvement with IVC filters;

24  correct?

25  A.  That is correct.

1    Q.  In fact, since you rejoined Bard in 2012, you've been in

2    the marketing department?

3    A.  That is correct, and now I'm technically in R&D, but...

4    Q.  So we want to talk about that time period when you were at

5    Bard and working on filters.

6    A.  Okay.

7    Q.  And were you -- was your -- did you have like a position or

8    a title?  Were you considered -- were you called an engineer or

9    did you have some kind of -- where they designated you in some

10   position?

11   A.  Yeah.  I was a -- I believe it was an Engineer II at that

12   time.

13   Q.  Okay.  What does that mean?

14   A.  That means there's an Engineer I, Engineer II, so basically

15   I was an engineer working on a project, which was the jugular

16   delivery system, used for a jugular approach to deliver the

17   filter.

18   Q.  So your focus during those three years was with engineering

19   concepts and working with fellow engineers at Bard?

20   A.  I was working with fellow engineers, correct.

21   Q.  And did you -- who did you report to during that period of

22   time?

23   A.  Most of the time I reported to Rob Carr.

24   Q.  And when did you first get involved in doing any kind of

25   work on the Recovery filter?

1    A.  So the work I got involved with, I believe it was in

2    October 2002.  And I basically joined the team to work on a

3    jugular delivery system.

4    Q.  Okay.  Did there come a time when instead of you doing that

5    sort of work, in other words, prospective work on maybe

6    something new, that you got drawn into evaluating the

7    performance of the Recovery filter?

8    A.  I did get called in to help, to help on some testing with

9    the filter.

10   Q.  Was there a team known as the Filter Franchise Team?

11   A.  Yes, there was.

12   Q.  And were you on that team?

13   A.  Yes, I was.

14   Q.  And we're going to come back, but I'm going to try to put

15   some perspective here.

16           So you're familiar that there was a G2 filter after

17   the Recovery filter; correct?

18   A.  That's what I understand, correct.

19   Q.  Is it also your understanding that the reason there became

20   a G2 filter because there was some design issues with the

21   Recovery filter?

22   A.  What I understood is we're continually ideating at Bard.

23   We always try to create new devices.  So my understanding for

24   that device is we were coming out with another device to

25   market.

1   Q.  And I understand that's what you wanted to say, but please

2   listen to my question.

3   A.  Sure.

4   Q.  My question was whether or not the G2 filter evolved

5   because of some design issues and problems that the company had

6   with the Recovery filter.  Can you answer that yes or no?

7   A.  I can answer that I understood that there were some -- I

8   think, if I recall, there were some different complaints and

9   they were looking into some things.

10  Q.  Well, there were some complaints that potentially were

11  related to the manner in which the Recovery filter was

12  designed; correct?

13  A.  I don't know if I could say that for certain.

14  Q.  Pardon me?

15  A.  I don't know if I could say that for certain.

16  Q.  Well, let me ask you this question.

17  A.  Sure.

18  Q.  You changed the G2 to a design that was different than

19  Recovery filter; true?

20  A.  Yes.  We --

21  Q.  And those design changes were made specifically to try to

22  improve what had previously been not a very good performance by

23  the Recovery filter once implanted in human beings; true?

24  A.  What I'd say, we were always trying to --

25  Q.  Is that true, what I just said?

1          THE COURT:  Hold on just a minute.

2          If he asks you for a yes or no answer, give it if you

3    can.  But if you can't, tell him you can't answer it yes or no.

4          THE WITNESS:  Okay.

5    BY MR. LOPEZ:

6    Q.  Is that true that the G2 filter design changes were made

7    because of experiences that were happening with the Recovery

8    filter where real human beings were having some problems with

9    the Recovery filter and having complications and injuries?

10   A.  I would defer to Rob Carr to answer that.

11         MR. LOPEZ:  Well, let's -- can we have 2059 exhibit,

12   please, Felice.

13   BY MR. LOPEZ:

14   Q.  You were a member of the franchise -- Filter Franchise

15   Team; correct?

16   A.  Yes, that's correct.

17   Q.  And was Rob Carr the team leader?

18   A.  Yes, he was.

19   Q.  And do you remember what department you represented on that

20   team?

21   A.  Engineering.

22   Q.  Okay.  Do you see this document I'm looking at right now?

23   Are you familiar with that document?

24   A.  Yes.  I've seen it before.

25         MR. LOPEZ:  Your Honor, I would like to offer 2059

 1    into evidence and publish it to the jury.

 2            MR. CONDO:  No objection.

 3            THE COURT:  Admitted.

 4            (Exhibit No. 2059 admitted into evidence.)

 5            MR. LOPEZ:  So, Felice, I just need -- first of all,

 6    can we --

 7    BY MR. LOPEZ:

 8    Q.  This document is dated October 27, 2003.  See right there

 9    at the bottom?

10    A.  Yes, I see that.

11    Q.  And this was -- the Recovery filter had already gotten

12    cleared as a retrievable filter by then; true?

13    A.  I believe so.

14    Q.  All right.

15    A.  I don't quite recall.

16    Q.  And -- but as of that date, the Recovery filter had not

17    gone through what the company would call full market launch.

18    Do you remember that?

19    A.  Yeah.  I don't -- yeah, I don't know -- I don't recall one

20    way or another on the full market release.

21            MR. LOPEZ:  Felice, could you enlarge the top

22    one-third of this exhibit?  Perfect.

23            THE WITNESS:  Thank you.

24    BY MR. LOPEZ:

25    Q.  Do you see that well enough?

1    A.  Yeah.  That helps.  Yep.

2    Q.  So you see there where it says:  Launch date, January 26th,

3    2004?

4    A.  Yeah.  I see that's the latest best estimate that they were

5    anticipating a launch, it looks like, in January 2004.

6    Q.  And that was in the U.S.; right?

7    A.  I believe so.

8    Q.  Well --

9    A.  It says U.S., yes, correct.

10   Q.  And then there was -- the plan was then to launch in Europe

11   in the second quarter of 2004?

12   A.  That's what it appeared -- that's what it says in this

13   document, correct.

14   Q.  And there are you, Alex Tessmer, right there; right?  R&D?

15   A.  That is correct.

16   Q.  What is R&D?

17   A.  Research and development.

18   Q.  And there's Mr. Carr?

19   A.  Correct.

20   Q.  All right.

21          MR. LOPEZ:  So could we have 1006, please, Felice?

22          And could you show Mr. Tessmer page 2?  One before

23   that.  There you go.

24   BY MR. LOPEZ:

25   Q.  Are you familiar with that memorandum, Mr. Tessmer?

1    A.  Yes, I am.

2            MR. LOPEZ:  Okay.  Your Honor, I'd like to offer

3    Exhibit 1006.

4            MR. CONDO:  No objection.

5            THE COURT:  Admitted.

6            (Exhibit No. 1006 admitted into evidence.)

7            MR. LOPEZ:  May I publish it to the jury, Your Honor?

8            THE COURT:  Yes.

9            MR. LOPEZ:  Thank you.

10           Can we just go to the first page, Felice, quickly?

11   And I don't mean to rush you.  I'm meaning I don't need it for

12   very long.

13   BY MR. LOPEZ:

14   Q.  You're on this email; right?

15   A.  Yes.

16   Q.  This document was sent to you?  Do you see your name there

17   in the "To"?

18   A.  That is correct.

19   Q.  All right.  And who's Mr. Hudson?

20   A.  Brian Hudson worked in quality.

21   Q.  And who's Mr. DeCant?

22   A.  I believe at the time he was the vice president of R&D.

23   Q.  And who's Mr. Uelmen?

24   A.  I think he was a vice president of quality.

25   Q.  And Janet Hudnall, do you remember that she was the

1    marketing director for the filter?

2    A.  Yes.

3            MR. LOPEZ:  All right.  So if we go to the next page,

4    please.  And just -- we're going to walk through this, Felice.

5    Why don't we do a third of the page at a time so the witness

6    and the jury can both see this.

7    BY MR. LOPEZ:

8    Q.  So this was a special design review for the Recovery

9    filter.

10           Do you see that?

11   A.  Yes, I do.

12   Q.  And do you remember the purpose -- without looking at the

13   document, just from memory -- why there was a meeting about a

14   month before the product was going into full market launch in

15   the United States and about four months before full market

16   launch in Europe that all of you were getting together to have

17   a design review meeting?

18   A.  Yeah.  So, again, I was called -- what I recall, I was

19   called in to do some testing.  And some of the information on

20   here talks about the testing that they wanted me to perform.

21   Q.  Okay.  Testing that had not been performed before the

22   Recovery filter was submitted for clearance by the FDA?

23   A.  I believe there -- for some of the testing I was doing, I'm

24   not sure what or what had not been performed before or after.

25   Q.  But testing that was done before that had not done -- that

1    had not been done before the company had decided it was going

2    to launch it nationwide in the United States and throughout

3    Europe; correct?

4    A.   They were doing --

5    Q.   Is that true?

6    A.   Repeat the question, please.

7    Q.   I'll just go on to the next question.

8    A.   Okay.

9    Q.   Let's just look at the document.  If you look at --

10   A.   Sure.

11   Q.   -- the purpose of this special review meeting, it's in the

12   very first paragraph.

13           MR. LOPEZ:  Can you highlight that, where it says "The

14   purpose" and down, just down to January 2004.

15   BY MR. LOPEZ:

16   Q.   You can see that okay, can't you?

17   A.   Yes, I can.  Thank you.

18   Q.   All right.  So:  The purpose of this special review was to

19   gain further understanding related to the design elements of

20   these products in anticipation of the up-and-coming full market

21   release in January of 2004.

22           Do you recall that being the purpose of the meeting?

23   A.   Yes.  That's what it says in the document.

24           MR. LOPEZ:  And let's go down to, Felice, where --

25   right on "The elements."  There you go.

1    BY MR. LOPEZ:

2    Q.  And:  The elements that were reviewed during the meeting

3    are outlined in an earlier memorandum.

4          So you actually got an earlier memorandum about this

5    meeting; correct?

6    A.  I might have.  I'd have to take a -- I'd have to see it.  I

7    don't recall.  That was, again, over 13 years ago.

8    Q.  And that meeting that we're talking about in this memo was

9    based on a review upon the degree of risk obtained from a

10   design failure modes and effect analysis, a DFMEA.

11         Do you see that?

12   A.  I see that.

13   Q.  For the Recovery filter?

14   A.  Yes, I see that.

15   Q.  And a DFMEA, could you -- we've had some testimony about

16   that already in this trial.  Could you tell the jury what a

17   DFMEA is?

18   A.  Yeah.  So it's a design failure modes and effect analysis.

19   Basically, we're trying to assess the risk and the harm that a

20   medical device could have on a patient.

21   Q.  And was there some DFMEA that was run about that that

22   suggested that maybe that was something that was already

23   happening with the Recovery filter after it had been cleared

24   and already being sold?

25   A.  I would have to defer to Brian Hudson, because he was in

1    charge of the DFMEA.  There definitely was a DFMEA.  I just

2    don't recall the exact.

3            MR. LOPEZ:  Okay.  Let's go to number 3 at the bottom

4    of this exhibit.

5    BY MR. LOPEZ:

6    Q.  And, sir, that relates to the issue of migration.

7            Do you see that?

8    A.  Yes, I do.

9    Q.  Now, were you aware that there had already been some issues

10   with migration with the Recovery filter prior to this meeting

11   and prior to full market release?

12   A.  So in my testimony review, yes.

13   Q.  Okay.  And as part of your preparation for this meeting,

14   and maybe you've refreshed your recollection as well about

15   this, there had been a migration in a very small study done in

16   Canada by a Dr. Asch on the Recovery filter.

17           Were you aware of that?

18   A.  I think I recall something about that from prior testimony,

19   but I do not know the exact specifics.

20   Q.  And after Dr. Asch's study and Bard got a clearance to sell

21   and market the Recovery filter, there were similar results that

22   Dr. Asch experienced in this small study that he had done for

23   retrievability.  True?

24   A.  I don't know.

25   Q.  You just don't remember or --

1    A.  I don't recall.

2    Q.  Okay.  So this meeting was -- one of the things this

3    meeting was going to be related to was reviewing to see

4    objective evidence of the following elements:

5              a.  Documentation that explains the establishment of

6    the 50 millimeter of mercury acceptance criteria for migration

7    resistance.

8              Do you see that, sir?

9    A.  Yes, I do.

10   Q.  And what does that mean?

11   A.  It's asking for documentation explaining establishment of

12   50 millimeters of mercury.

13   Q.  Wasn't there some concern at that time that Bard had

14   established that to be their safety threshold and that they

15   ought to -- they might ought to think about using a different

16   threshold of safety for migration resistance?

17             Can you answer that yes or no?

18   A.  I do not know.  I'd have to defer to Rob for that.

19   Q.  Okay.  Now, let's go to page 2, please.

20             And then at this same meeting, there is discussion

21   about some of the additional studies that should be done on the

22   Recovery filter; true?

23   A.  True.  That's what it says on the document, correct.

24   Q.  And b describes one of those:  A migration resistance study

25   that analyzes the performance of the Recovery filter in

1    conjunction with tilting and the quality of the legs and the

2    hooks.

3              Do you see that?

4    A.  Yes, I do.

5    Q.  And then the next one is:  A migration resistance study

6    that compares the Recovery filter to competitive products, for

7    example, the Greenfield.

8              True?

9    A.  Yes.

10   Q.  Now, as far as you know, neither one of those two tests had

11   ever been run before on a Recovery filter; right?

12   A.  I don't recall.  I'd have to defer to Rob because I was the

13   guy just brought in for testing.

14   Q.  They didn't show you a test that was similar to that

15   that -- so you could look at it to see if you should design

16   your test the same or differently?

17   A.  I did have a copy of the design verification and

18   validation, I believe, if I can recall, from NMT which we tried

19   to duplicate the testing, correct.

20   Q.  Well, let me ask you this question.

21   A.  Sure.

22   Q.  Are you -- other than the tests that we're going to be

23   talking about here in a minute and that are described here,

24   before Recovery was launched, were there any migration

25   resistance tests that compared the Recovery filter to

1    competitive products that you're aware of?

2    A.  I'm not aware of.

3    Q.  Were there any radial force studies that compared the

4    Recovery filter to competitive products there at number d, or

5    letter d?

6    A.  I do not know.

7    Q.  Okay.  So let's look at 2062, please.  Exhibit 2062.

8         So that was in December of 2003.  And then in -- you

9    see the next document there, the memorandum from Rob Carr?

10   A.  I see it.

11   Q.  And you would have gotten a copy of this memorandum because

12   it -- wouldn't you agree that this is a memorandum in response

13   to those issues that were raised in the December minute meeting

14   that we just discussed?

15   A.  Not -- I mean, I can't recall exactly.  My name's not on

16   the document.  Is there another page with my name on it, maybe?

17   Q.  You were still on the team; right?

18   A.  Yes, I was.

19   Q.  This talks about tests that you ran, ultimately.  Wouldn't

20   you agree that you probably would have gotten a copy of this

21   memo?

22   A.  I possibly might have gotten a copy.  That's fair.

23        MR. LOPEZ:  Your Honor, I'd like to move to admit 2062

24   at this time.

25        MR. CONDO:  No objection.

```
 1            THE COURT:  Admitted.

 2            (Exhibit No. 2062 admitted into evidence.)

 3            MR. LOPEZ:  May I publish it to the jury?

 4            THE COURT:  Yes.

 5   BY MR. LOPEZ:

 6   Q.  I'm not going to go through every single item in here, I

 7   promise.  So let's look at the full page for a moment.

 8            This has those issues that were raised -- that were on

 9   that document that we just looked at before, and then there's

10   some answers here, responses to each of those.  Do you agree

11   with that?

12   A.  It appears that way.

13   Q.  And there's some dates here about when some of these things

14   are going to take place; correct?

15   A.  There are some dates on there, correct.

16   Q.  For example, if you look down there at the bottom, where it

17   says:  The DFMEA was updated and approved on QUMAS.

18            Do you see where I am?

19   A.  Oh, yes, I do.  Thank you.

20   Q.  And the DFMEA, was that -- what you just described.  They

21   updated that; right?

22   A.  According to this document, yes.

23   Q.  And there was nothing about that DFMEA that was updated

24   that caused you and the company to not go forward with all

25   these tests; true?
```

1    A.  Not that I'm aware of.

2    Q.  So let's look at, for example, b at the very bottom, 3b,

3    where there was going to be a migration resistance study that

4    analyzes the performance of the Recovery filter in conjunction

5    with tilting and the quality of the legs and hooks.

6         Do you see where I am right there at the bottom?

7    A.  Yes, I see that.

8    Q.  And that test was going to be conducted on March 12, 2004;

9    right?

10   A.  I don't -- I'm not seeing the date on here.

11   Q.  The next page, I'm sorry.  My bad.  My apologies.

12   A.  No problem.

13   Q.  Right at the very top.  There.

14        And then if you go down to the next test that's going

15   to be run, it's migration resistance study that compares the

16   Recovery filter to competitive products.

17        Do you see that?

18   A.  Yes, I do.

19   Q.  And that was going to be conducted on March 12, 2004?

20   A.  That's what it says in the document, yes.

21   Q.  And if you look at just the page -- if we can look at the

22   full page again -- all of these tests that were going to

23   analyze the migration resistance of the Recovery filter were

24   all scheduled to take place after the company was going to

25   launch the Recovery filter into the open U.S. market; true?

1   A.  It appears that way, yes.

2   Q.  And there was nothing about the fact that you had no idea

3   about the results of this test that stopped the company from

4   launching the Recovery filter widely in the United States;

5   true?

6   A.  There was nothing -- so, again, I was the guy pulled into

7   testing.  I'd defer Rob Carr to that, to answer that.

8   Q.  My point is:  You didn't have the results of these tests

9   that had never been run before on the Recovery filter, and you

10  still launched the Recovery filter widely across the United

11  States in January of 2004.  True?

12  A.  Well, there was migration testing done, but specifically

13  these tests, perhaps not.  I'm not completely sure on that.

14  Q.  Okay.  Let's go to one of the tests.

15       MR. LOPEZ:  Can we have 1383, please?

16  BY MR. LOPEZ:

17  Q.  Now, this is -- is this one of the tests that were earlier

18  described that you actually ran?

19  A.  So I was the one that wrote the protocol and report, and I

20  had technicians run the test.

21  Q.  You oversaw the test, made sure they followed the protocol

22  of the test, and made sure the test was run properly; correct?

23  A.  That is correct.

24       MR. LOPEZ:  And I'd like to offer at this time 1383,

25  Your Honor.

1          MR. CONDO:  No objection.

2          MR. LOPEZ:  May I publish to the jury?

3          THE COURT:  Admitted.

4          (Exhibit No. 1383 admitted into evidence.)

5          THE COURT:  You may publish.

6          MR. LOPEZ:  I'm sorry.

7          May I publish, Your Honor?

8          THE COURT:  You may.

9   BY MR. LOPEZ:

10  Q.  Okay.  This is a characterization of Recovery filter

11  migration resistance in comparison to competitive product.

12          Do you see that?

13  A.  Yes.

14  Q.  If we go to the next, very next page -- and you wrote this

15  protocol?

16  A.  This is the engineering report.

17  Q.  Okay.  But --

18  A.  And I wrote the protocol, too, yeah.

19  Q.  Okay.  Thank you.

20          So the objective --

21          MR. LOPEZ:  Can we just look at the very -- 1.0

22  there, Felice, under Objective.

23  BY MR. LOPEZ:

24  Q.  So the objective of this study was to compare the Recovery

25  filter to competitive products in relationship to migration

UNITED STATES DISTRICT COURT

1    resistance.

2             Do you see that, sir?

3    A.  Yes, I do.  Correct.

4             MR. LOPEZ:  And if we go to the 2.0, the last

5    paragraph, and this -- I'm sorry.  2.0, not the last paragraph.

6    The second to the last paragraph.  "In conjunction with the

7    field activities."

8        If you can just blow that part up.  Thank you.

9    BY MR. LOPEZ:

10   Q.  So this refers back to the design review meeting we talked

11   about earlier in December of 2003; right?

12   A.  That is correct.

13   Q.  And that -- this also confirms that that meeting was to

14   gain a further understanding of the design elements of this

15   product; true?

16   A.  That's what it says, correct.

17   Q.  And in preparation of this design review, the DFMEA for

18   Recovery filter was analyzed for critical elements to be

19   discussed during the review; true?

20   A.  That is what it says, correct.

21   Q.  And migration resistance was one of the critical elements

22   identified for review; true?

23   A.  True.

24   Q.  And now, sir, as of this date, as of the date you had that

25   review, there was already a migration of a Recovery filter in a

1   patient that caused a catastrophic injury.  Do you recall that?

2   A.  I do not recall the specifics, but I know there was -- I

3   think I recall that there was some type of migration.

4   Q.  And there were some serious migration issues with the

5   Recovery filter that caused your team to get together before

6   market launch and make a decision that maybe we ought to test

7   this device differently than we may have tested it before we

8   got clearance at FDA; true?

9   A.  I would have to defer to Rob on that.

10  Q.  And there had already been, before full market release,

11  when this team got together and now you're trying to -- what

12  did you say -- get a further understanding of the design

13  elements of the product, a fracture like Dr. Asch had

14  experienced in his small study.  But instead, that fracture

15  actually embolized through the vena cava and went into a

16  patient's heart.

17          You knew about that, right, before these tests?

18  A.  I'm not sure if I was made aware of it during these tests

19  or after it, but yes.

20  Q.  You know two lesser events happened in the Asch study.

21  You're aware of that?

22  A.  I don't know the exact details with Dr. Asch 's study.

23  Q.  Okay.  Dr. Asch had a fracture that was able to be removed

24  without causing any injury to the patient.  You know about

25  that; right?

1    A.  Again, I -- I don't know anything about -- I haven't read

2    any of Dr. Asch's studies or dove into that.  I was on the team

3    to work on the jugular delivery system and pulled in, so -- and

4    I don't recall exact specifics.

5    Q.  Let me share with you --

6    A.  Sure.

7    Q.  -- some evidence that's come into this case.

8           In the Asch pilot study in Canada, where patients were

9    being very closely monitored --

10   A.  Okay.

11   Q.  -- there was a migration that -- after it got hit by a clot

12   that went 4 centimeters towards the patient's heart.

13   A.  Okay.

14   Q.  And as a result of that, those involved in the study,

15   including the ethics board, stopped the study.

16          Were you aware of that?

17          MR. CONDO:  Your Honor, I think witness -- counsel is

18   testifying.

19          THE COURT:  Sustained.  I think he said he doesn't

20   know the details of the Asch study.

21   BY MR. LOPEZ:

22   Q.  Well, let's put it this way:  After the results of the

23   early marketing of the Recovery filter prior to full market

24   release, whatever incidents that happened in the open market

25   where people weren't being monitored in a clinical trial, Bard

UNITED STATES DISTRICT COURT

1    did not stop selling the Recovery filter; true?

2    A.  The Recovery filter was still being sold, correct.

3              MR. LOPEZ:  So the objective -- where are we on this?

4    Okay.  Let's go down to Test Procedure, please.  4.0.

5              And I'm just doing this so the jury can see these

6    names.

7    BY MR. LOPEZ:

8    Q.  And this test was designed to compare the migration

9    resistance of the Recovery filter against -- I mean, is that

10   virtually every device that was on the market, both retrievable

11   and permanent?

12   A.  I believe it was most of them in the U.S., anyway.

13   Q.  So you didn't take the Recovery filter and separate it out

14   and say "We just have to be as migration resistant as other

15   permanent devices that have retrievables" and test it that way

16   and not test it just against permanent devices; true?

17             You tested it against devices that had permanent

18   indications and some that had both retrievable and permanent

19   indications; correct?

20   A.  Yes.  I believe they all had -- yeah.  They had some

21   retrievable ones in there, correct.

22   Q.  And you're somewhat familiar with the 510(k) process,

23   aren't you?

24   A.  Somewhat.

25   Q.  And you know that there has to be a predicate device?

1    A.  That is correct.

2    Q.  And the predicate device for Recovery was Greenfield and

3    Simon Nitinol filter?

4    A.  I know from prior testimony it's Simon Nitinol filter, but

5    I'm unsure about the Greenfield, or I can't remember.

6    Q.  And in order for a company to get another product on the

7    market through the 510(k) process, they have to establish that

8    the device -- the new device they want to sell has to be

9    substantially equivalent in safety and effectiveness to the

10   predicate device.  You've heard that before?

11   A.  Yes, that's correct.

12   Q.  So in this case, in order for the Recovery filter to be

13   legally marketed in the U.S., it would have to have been

14   substantially equivalent from a safety and effectiveness

15   standpoint as the Simon Nitinol filter; true?

16   A.  As defined by the 510(k) protocol.

17           MR. LOPEZ:  Okay.  Can we go to the next page, please.

18           So just go down to the very bottom of that sample

19   identification.

20   BY MR. LOPEZ:

21   Q.  I'm only doing this because I'm hoping your Friday

22   afternoon memory and my Friday afternoon memory is helped a

23   little bit.  Because we're going to see some of these symbols

24   when we start walking through this.

25   A.  Thank you.  Yeah, that's helpful.

1    Q.  For example, we're going to see some comparisons to the

2    Cook filter.  And when we see TPs, let's -- I'm going to write

3    that down.  TP is Cook, and O is Cordis.  RF is Recovery.  GT

4    is the Greenfield.  And then this SF is Simon Nitinol.  I'm

5    sure I missed a couple, but I'm not going to walk through every

6    single one of these.

7              So when we look at these results, we'll be able to see

8    how the Recovery compared to these other devices.

9              THE COURT:  I think you need to be asking questions --

10             MR. LOPEZ:  I'm sorry.

11             THE COURT:  -- Mr. Lopez.

12             MR. LOPEZ:  Let's go to page 6 of the document.  And,

13   Felice, I'm going to ask you to just highlight -- well, first

14   of all, before you --

15   BY MR. LOPEZ:

16   Q.  These are the results, the summary results of the test;

17   right?

18   A.  That is correct.

19             MR. LOPEZ:  And can we just highlight the first six

20   lines of the summary report, the one that ends at SF1-SF10.

21   There you go.  Did we miss one?  Oh, five lines, okay.

22   BY MR. LOPEZ:

23   Q.  So this doesn't have it on there.  I'm not going to have

24   her put it on the screen, but 37, that's a temperature;

25   correct?

1    A.  That's correct.

2    Q.  And is that roughly -- that's Celsius?

3    A.  That is correct.

4    Q.  And that's roughly human normal body temperature?

5    A.  Yes, that's correct.

6    Q.  And how about 40 Celsius?  Is that roughly 104 degrees in a

7    human?

8    A.  Yeah, roughly.

9    Q.  Okay.  And was there a reason why you tested this device at

10   104 degrees?

11   A.  We -- all that I can recall is I recall that we set up in

12   the protocol 37 degrees and 40 degrees.  I think 40 degrees was

13   what it was originally tested at NMT.  So I was just doing it

14   per -- basically because I would write the protocol and so

15   forth, but then I'd give it to my boss and he'd be like, hey,

16   this is what we're doing.

17   Q.  So the testing that was done at NMT that was used to clear

18   the Recovery filter was done at 40 degrees?

19   A.  I believe so, but I'd have to look at the document to

20   confirm.

21   Q.  So let's look at these results.  And we'll talk about that

22   in a second.

23        Do you see it's the 28 diameter millimeter, that's the

24   width of the vena cava that was sampled, that it was tested in;

25   correct?

1    A.  The diameter.

2    Q.  The diameter.

3          And this test apparatus or what it was tested in was

4    not like a cadaver IVC.  It was actually done on the bench.

5          And I can go to the document.  Let me see if I can

6    refresh your recollection.

7          Silicone tubing with sausage casing in it; right?

8    A.  That's correct.

9    Q.  And that was being used by the company to simulate the -- a

10   human vena cava; right?

11   A.  That's what we were using to simulate the vena cava for

12   this bench test, correct.

13   Q.  And, of course, the difference between a silicone tube and

14   sausage casing for testing and a human vena cava is a human

15   vena cava is a very dynamic vessel; right?  It's not going to

16   stay at 28 millimeters rigid.  It's going to be moving

17   constantly; true?

18         MR. CONDO:  Again, Your Honor, I think counsel is

19   testifying.  Can we have a question?

20   BY MR. LOPEZ:

21   Q.  Is that true?

22         MR. LOPEZ:  I'm sorry.

23         THE COURT:  Overruled.

24         THE WITNESS:  So the vena cava's definitely more

25   dynamic than a silicone tube.

1    BY MR. LOPEZ:

2    Q.  Okay.  Let's look at the results of the 28-millimeter

3    diameter.  And I don't think I've asked you this.

4            28-millimeter diameter was the maximum diameter of a

5    vena cava that the Recovery filter was indicated to be used in;

6    true?

7    A.  I believe that's the case.

8    Q.  And it was tested that way at NMT; right?  Do you remember

9    that?

10   A.  I believe it was.

11   Q.  Okay.  So, and did you also know that NMT, and adopted

12   by -- later adopted by Bard, used 50 millimeters of mercury as

13   the migration resistance threshold as to whether or not a

14   filter failed or passed a migration test?

15   A.  That was the D&V testing you're talking about?

16   Q.  Yeah.  There was --

17   A.  That was -- yeah, they established the 50 millimeters of

18   mercury acceptance criteria for the DV&V, correct.

19   Q.  That was the internal product specification for this test,

20   that if it was 50 or better, you passed; if it was under 50,

21   you failed?

22   A.  That was the specification for the documents that had

23   acceptance criteria, like the DV&V.

24   Q.  Now, I'm jumping ahead a little bit, but later when Bard

25   started getting advice, including yourself, there were some

1    suggestions that that was -- that threshold was way too low to

2    test it to see whether or not that really simulated what was

3    going to happen in a human.  True?

4    A.  I am not aware of that.

5    Q.  So let's just use the 50 millimeter of mercury threshold.

6            In the RF -- again, those are all Recovery filters

7    that were tested; true?

8    A.  That is correct.

9    Q.  And just so the jury understands the sampling, there were

10   ten different samples -- actually, ten plus what, three more --

11   13 samples?

12   A.  That's what it appears to be, yes, correct.

13   Q.  And the mean was under 50 millimeters of mercury.  True?

14   A.  The mean was under 50 millimeters of mercury in this test,

15   correct.

16   Q.  And, in fact, the -- there was a minimum of 32.1 and a

17   maximum of 64.8.  Do you see that?

18   A.  That is correct.

19   Q.  Now, just because it was the mean didn't mean that there

20   was only a couple.  There could have been a lot -- and we'll

21   look at that in a second.

22            There were a number of these runs of the test that

23   were below 50, some of them significantly below 50.  True?

24   A.  There's definitely some below 50.

25   Q.  Now, let me ask you, if Bard in a 510(k) were to submit a

 1   test like this and they told FDA that, by the way, our minimum

 2   threshold for migration safety and performance is

 3   50 millimeters of mercury but we're only getting 47.5, would

 4   that have had an influence on whether or not --

 5           MR. LOPEZ:  I'm going to move -- I'm not going to ask

 6   that question, Judge.

 7           Let's go to the next one, because I want to get to the

 8   Simon Nitinol filter.

 9   BY MR. LOPEZ:

10   Q.  Do you see the difference between the Simon Nitinol filter

11   at normal human body temperature, 76.3?

12   A.  Yes, I do.

13   Q.  And you see the minimum there was 65 to 105.8.  Do you see

14   that?

15   A.  Yes, I do.

16   Q.  That means -- does that mean that every single Simon

17   Nitinol filter that was tested was at 65 or better?

18   A.  That would be correct, yes.

19   Q.  And, in fact, if you look at the difference between the

20   Recovery filter and the Simon Nitinol filter, just for

21   migration resistance, in a 28-millimeter tube the Simon Nitinol

22   filter is virtually twice more resistant to migration than the

23   Recovery filter.  True?

24   A.  Yep.  Almost.

25   Q.  Is that -- was that Bard's definition of substantially

```
 1   equivalent, that they could be that far apart but yet have the
 2   same safety and effectiveness?
 3   A.  Again, I'd have to look at the design verification
 4   validation protocol.  Because that would outline the details
 5   and acceptance criteria.
 6   Q.  Okay.  Now, let's look at the next three lines.
 7            And NMT, do you see where I am there?  NMT?
 8   A.  Yes, I do.
 9   Q.  Okay.  And NMT, what does that mean?  We didn't talk about
10   that earlier when we were making our notes.
11   A.  Hmm.  Trying to recollect here.
12   Q.  Well, NMT was --
13   A.  Yeah, that was -- oh, that was NMT.  It's probably -- I
14   would think it's -- it might have been NMT.  I'm not sure if
15   NMT -- filters from NMT.
16   Q.  In other words, maybe they were manufactured at NMT?
17   A.  Potentially, yeah.  I'm having difficulty to recall, but...
18   Q.  Okay.  And then RF was the Recovery filter?
19   A.  That is correct.
20   Q.  And SF, again, is the Simon Nitinol filter; correct?
21   A.  That is correct.
22   Q.  And this is 104 degrees; right?
23   A.  That is correct.
24   Q.  And this is the test that NMT ran, as far as you recall;
25   true?
```

1   A.  As far as I recall, true.

2   Q.  And it passes this test; right?  At least if you use the

3   50 millimeters of mercury as the minimum safety threshold, the

4   NMT devices and the Recovery devices are both over 50.  True?

5   A.  They're all over 50, correct.

6   Q.  So if you're 104 degrees and you've got one of these

7   filters, you've got a little better chance of migration

8   resistance than if you are putting these in patients that are

9   in normal body temperature; is that fair to say?

10  A.  I'd say it's fair to say it looks like the migration

11  resistance goes up slightly.  Correct.

12          MR. LOPEZ:  Okay.  Let's go down to, please, the --

13  and before you do that, let's -- can we just look at that whole

14  first box?  Before we go down to the 30-millimeter tube,

15  please, Felice.

16          MS. REED ZAIC:  You have to be clear.

17          MR. LOPEZ:  Just the 28 -- just where it says 28 tube

18  diameter.  I just want the box with the 28 tube diameter.  I'm

19  sorry.  That whole big box.  The top one, yes.  Thank you.

20  BY MR. LOPEZ:

21  Q.  So against all of these competitors, GT was the Greenfield,

22  O was Cordis, and TP was Cook.  Do you see that?

23  A.  Yes, I do.

24  Q.  And would you agree with me that the Recovery filter is

25  significantly less in migration resistance than every other

1   device that Bard tested except for whatever TP is?

2   A.  It appears it's a lower mean than the TP.  I mean -- excuse

3   me.  It appears that the Bard Recovery is lower than all these

4   other filters, with the exception that it appears to be higher

5   than the TP.

6          MR. LOPEZ:  Okay.  And, Felice, could you go down to

7   the middle box that has 30 as the tube diameter.

8   BY MR. LOPEZ:

9   Q.  Now, why is it being tested in a vena cava, a simulated

10  vena cava that's 30 millimeters -- I'm sorry, 30 millimeters

11  wide?

12  A.  Because I was asked to test in a 30-millimeter cava.  Our

13  silicone tube, I should say.

14  Q.  Did they tell you why?

15  A.  I don't know if -- recollect if we went into the details as

16  to why, but I was definitely asked to test at that.

17  Q.  Now, as an engineer, are you familiar with the phrase

18  testing to worst-case scenario?

19  A.  Yes, I am.

20  Q.  And are you -- were you also familiar when you were running

21  these tests that Bard had determined that the vena cava does

22  not stay static but actually has -- it's actually pretty common

23  for the vena cava to expand and contract every day, just normal

24  human living?  Sometimes if you cough too hard, it can expand.

25  Were you aware of that?

1   A.  I'm not sure, you know, if I was completely aware of that

2   or not.  Again, I was just pulled into the test.

3   Q.  Okay.  So in a 30-millimeter diameter, in other words, if

4   this was tested -- let's say you put it in a 25-millimeter

5   diameter vena cava.  If it were to expand 5 millimeters and get

6   to 30 -- I think I did that math right, 25 to 30 --

7   A.  Yeah, yeah.

8   Q.  -- you would -- you can test it to see what -- how the

9   filter might behave.  At least in the lab you could do that;

10  right?

11  A.  Yeah, that sounds reasonable.

12  Q.  And then, again, this is -- this is all 104 degrees; right?

13  This summary report.  Everything else that we're going to be

14  looking here is at 104 degrees temperature?

15  A.  That is correct.

16  Q.  But even at 104 degrees, if the vena cava expands just a

17  few millimeters after it's placed in the human body, it fails

18  just the mean number, the 50-millimeter mercury migration

19  resistance, by 20 percent, more than 20 percent; right?

20  A.  It looks that way, yes.

21  Q.  And the Simon Nitinol filter is still -- even though the

22  Simon Nitinol filter at the time was indicated for a smaller

23  vena cava, it was better than the Recovery filter by almost

24  about two and a half times in migration resistance in a

25  30-millimeter test tube.  True?

1   A.  Yes.  It looks higher.

2   Q.  And then if we go down to 32, in the next box,

3   32 millimeters --

4           And, by the way, we're not talking about very much;

5   right?  What -- in inches, how much is 2 millimeters?

6   A.  I don't know, on the top of my head, how much that is.  I'd

7   have to do the math.

8   Q.  Well, how many millimeters in an inch?  Let's do it

9   together.

10  A.  I don't know off the top -- I mean, what is it, 25?

11  Q.  Let's go with that.

12  A.  Yeah, okay.

13  Q.  So 2 millimeters would be about 1/12 of an inch.  Can we

14  agree on that?

15  A.  I guess so.

16  Q.  Okay.  So that's just moving -- just the vena cava moving

17  2 millimeters, like a 12th of an inch.  Okay?

18  A.  Okay.

19  Q.  So you tested it now moving 1/6 of an inch against the

20  Simon Nitinol filter; and, again, at 104 degrees, it was 34

21  versus 79 for the Simon Nitinol filter.  Correct?

22  A.  Correct.

23  Q.  And then O, the Cordis device, which was a combination

24  retrievable/permanent device; true?

25  A.  Correct.

1    Q.  It was 86.  It was even a little better than the Simon

2    Nitinol.

3            Do you see that?

4    A.  Yes, I do.

5    Q.  Let me ask you, sir, were these results shared with anyone

6    outside of Bard, the results of these tests?

7    A.  I do not know.  Obviously these would be shared with Rob

8    Carr, my boss, and some of those others on the team, but I

9    don't know if these results were or not.

10   Q.  This was in -- I believe in March of 2004.  Is that right?

11   A.  I believe so.

12   Q.  And at that time, was there any slowdown or halt on the

13   marketing effort by Bard?

14   A.  Not that I'm aware.

15   Q.  Did they change their IFU or their warnings or their

16   marketing material to reflect that Bard was failing its own

17   bench testing on migration resistance?

18   A.  So this bench testing had no acceptance criteria, if you

19   look at the protocol.

20   Q.  Okay.  But it was consistent -- the fact that it was

21   failing, it was migrating and didn't have good migration

22   resistance, had already been seen in human beings in a clinical

23   pilot study and in the open market.  So you knew this device

24   could migrate; right?

25   A.  Well, the challenge is some of these filters were used over

1    and over.

2    Q.  We'll get to that.

3    A.  Okay.

4           MR. LOPEZ:  Let's look at 2063, please.

5           Your Honor, I'd like to offer 2063 into evidence.

6           THE COURTROOM DEPUTY:  It's admitted.

7           THE COURT:  It's already in evidence.

8           MR. LOPEZ:  Oh, it is?  Okay.

9           And can we go to the very first page.  Is there a

10   cover email for this on page 1?  Okay.  There we go.

11   BY MR. LOPEZ:

12   Q.  Okay.  So this is you sending an email with the results of

13   the migration resistance testing you just ran; correct?

14   A.  I'm not sure -- so this just says:  I have attached the

15   most current results.

16          I don't know if this was the study we were just

17   looking at or another study.

18   Q.  We can figure that out if you just go to the next page.

19   A.  Sure.

20   Q.  The very next page.

21          And these are all the individual runs that were done

22   and the summary we just looked at.  Would you agree with me?

23   A.  Yeah.  We might need to compare this data to the data that

24   was in the report.  I don't know if that's possible.

25   Q.  Okay.  If -- let's -- all right.  Actually, maybe it's not,

1  so let's look at the mean of the -- of this report.  Page 2 of

2  the exhibit.

3         And, again, if you look at the average, it's 45.2 for

4  the Recovery filter at normal body temperature.  See that?

5  A.  Yes, I do.

6  Q.  And then at 104 degrees, it's 51.5.  Do you see that?

7  A.  Not yet, but -- yeah, I do now.  Thank you.

8  Q.  Pretty similar to what we just looked at in another test.

9  Correct?

10 A.  I think so.

11 Q.  And then if you go to the next page, and that was in a --

12 that was a 28-millimeter tube again; right?

13 A.  Yeah.  Can you flip it back one more time, just so I can --

14        Yes.  Thank you.

15 Q.  And then the next page are the results for the Simon

16 Nitinol filter, again, under the same conditions that the

17 Recovery filter was tested?

18 A.  Yes.

19 Q.  And we have a 76.3, an 89.1.

20        Do you see that?

21 A.  I do.

22 Q.  All right.  And then if you go to page 5 and 6 -- let's

23 look at 5 first.

24        Do you see, that's VT?  That's a competitor, VenaTech.

25 You have the results for VenaTech.  You have the results for

1    Greenfield.  You have the results for Cook.  And all the other

2    competitors that are on the market.  True?

3    A.  True.

4    Q.  And let's go to page 10 of this exhibit.

5            And the OptEase was a competitor.  It had both

6    retrievability and permanent indication; correct?

7    A.  Correct.

8    Q.  And this shows 136.6 resistance in the tests that you

9    subjected the Recovery to, which was almost three times the

10   migration resistance of the Recovery filter.  Is that true?

11   A.  True.

12           MR. LOPEZ:  Can I publish this to the jury, Your

13   Honor?  Just this last page is fine.

14           THE COURT:  You may.

15           MR. LOPEZ:  Thank you.

16           And can we just go back to page 2, Felice, please.

17   And you just -- okay, you have it.  Page 2, yeah.

18   BY MR. LOPEZ:

19   Q.  You have highlighted there the mean that we just talked

20   about, 56 point -- 45.2 and then 51.5 for the Recovery.  Then

21   the next page, 76.3.

22           MR. CONDO:  Your Honor, can we have a question,

23   please?

24           THE COURT:  Yes, we need to proceed by question and

25   answer.

1    BY MR. LOPEZ:

2    Q.  Do we have 76.3 and 89.1 on page 3 of this exhibit?

3    A.  Yes.

4              THE COURT:  Is that a question?

5    BY MR. LOPEZ:

6    Q.  Yeah, do we have it --

7    A.  Yes.

8    Q.  Is that what we see here?

9    A.  Yes.

10   Q.  And that relates to the Simon Nitinol filter; correct?

11   A.  That's correct.

12   Q.  Okay.  So this temperature issue, does raising the

13   temperature on a material like Nitinol actually cause it to

14   expand?

15   A.  It should.

16   Q.  And so there might be a difference in what the size of the

17   Simon -- I'm sorry, of the Nitinol in these filters at

18   104 degrees versus a normal human temperature, right, 98.6?

19   A.  Are you talking about -- I'm not sure about the -- you're

20   talking about the size?

21   Q.  The expansion, yes.

22   A.  I don't know if it would expand further out or not.  I

23   would talk to Andre about that.

24   Q.  Did you send all these results of the tests we just talked

25   about to Mr. Carr?

1    A.  Yes.

2    Q.  Did you send them to everybody on that team that we just --

3    we saw earlier, Mr. Uelmen, Ms. Hudnall?

4    A.  So I don't know -- if you go back to the cover letter, it

5    should say everybody I shared it with.

6          So I definitely shared it with those people there, Rob

7    Carr, Brian Hudson.  I'm not sure, this specific test right

8    here, because I'm not -- doesn't say where it's coming from

9    exactly, if it went to the others.

10   Q.  Did you express any personal concern yourself when you saw

11   the results of this test that the Recovery filter was not

12   passing even its bench testing threshold for migration?

13   A.  So I did not exhibit any concern.

14   Q.  Okay.  Was it -- do you know if Mr. Carr or anyone else,

15   when you were discussing these tests, expressed any concern

16   about the findings?

17   A.  I don't recall.  Again, this was -- this testing had no

18   acceptance criteria, so...

19   Q.  Did the performance of the Recovery filter get any better

20   out in the open U.S. market after these tests were performed?

21   A.  Not that I'm aware of.

22   Q.  In fact, it got -- didn't it get progressively worse?

23   A.  Not that I know of.

24   Q.  You don't know about the fact that the Recovery filter was

25   causing some fairly significant injuries, catastrophic

1    injuries, even after these tests were run?

2    A.  I knew that there were some different complications in the

3    field from past prior -- you know, past testimony.  But in

4    recalling, you know, I wasn't tracking the filter.  My job was

5    to test it and to work on the jugular delivery system, so I'd

6    have to defer to Rob to that.

7    Q.  But what you do know is that while all of this testing was

8    going on and discussions about redesigning the Recovery filter,

9    it was business as usual in the marketing and sales department

10   with this device.  True?

11   A.  As far as I recall.

12   Q.  And were you at all involved in discussing, you know, maybe

13   conceptually how you might improve the design of the Recovery

14   filter to at least minimize if not eliminate some of the

15   serious injury and patient safety problems that were being

16   experienced by the Recovery filter?

17   A.  Again, my job was the jugular delivery system.  I got

18   called into testing.  Andre is the person who is responsible

19   for designing and innovating on the filter.

20   Q.  We're going to go over a couple more tests.

21   A.  Sure.

22   Q.  Probably won't do it right now because we're getting close

23   to the break, but let me ask you --

24           THE COURT:  We're going to go till 2:45.

25           MR. LOPEZ:  Okay.

1    BY MR. LOPEZ:

2    Q.  Once you ran the tests, and the ones we've already done and

3    the ones that -- when I say "done," the one you and I have

4    already discussed and some of the ones coming up -- did you

5    have any further involvement in meetings that took place where

6    the results of those tests were discussed?

7    A.  I would -- you know, again, I think I would have had

8    involvement to some degree, but, you know, that was 13 to

9    15 years ago.  So most of the stuff I'm recalling today is just

10   thankfully because we have this documentation in front of me.

11   Q.  When you delivered the results of these tests, the ones we

12   just went through --

13   A.  Yes.

14   Q.  -- and you gave them to those who were your supervisors

15   like Mr. Carr -- and when you say Andre, you're talking about

16   Mr. Chanduszko; right?

17   A.  That's correct, yeah.

18   Q.  When you gave these to them, did they say to you that:  You

19   need to rerun these tests because we don't like the way it was

20   run; the protocol was wrong; we should have used a different

21   approach to this?

22          Anything like that?

23   A.  Not that I recall.

24   Q.  In fact, you went on to test these same devices and doing

25   the same comparisons in other potentially worst-case scenarios,

1    like with the legs crossed and maybe a hook, one, two, three,

2    four, five, six, not attached to the vena cava wall; correct?

3    A.  That is correct, yeah.

4    Q.  And do you recall that the reason you were doing that is

5    because that was anticipated real-life situation with these

6    devices, that you can either have a hook that breaks and now

7    you don't have an attachment of one of the six legs or one --

8    you know, one just breaks and it's not there.  Right?

9    A.  I was testing it because I was told to test it, and I did.

10   Q.  Did you think that doctors, hospitals, and patients would

11   want to know that your company was selling a device and that

12   you're questioning the testing and you're still testing it to

13   see whether or not it's performing safely from a migration

14   standpoint?

15           MR. CONDO:  Foundation.  602.

16           THE COURT:  Sustained on foundation.

17   BY MR. LOPEZ:

18   Q.  Well, you're an engineer when you were doing this; right?

19   A.  That is correct.

20   Q.  And you made -- and I think engineers have a code with

21   respect to their conduct and their principles; right?

22   A.  We -- yeah.  I mean, we -- well, I mean, what do you mean

23   by "code"?

24   Q.  Well, I mean, engineers should have a high threshold of the

25   way they design, test devices that potentially are going to go

1    in human beings and if not designed and tested properly could

2    cause some serious harm?

3    A.   Yeah, we want to -- I mean, our job is to make the most

4    safe and effective device to help physicians and help patients.

5    Q.   When you saw the results of this test, knowing that the

6    device was already on the market, knowing that under reasonably

7    foreseeable human conditions this test was not even performing

8    in the laboratory, did it cause your engineering sense, your

9    training as an engineer, to question whether or not this device

10   should be on the market until Bard brought that device back in

11   to see if they could fix that?

12   A.   I did not question it because, again, this is the protocol.

13   There's no acceptance criteria.  Filters are reused.  There's

14   different things.  Rob Carr would be better to speak to that.

15   Q.   How long did you stay on this team?

16   A.   I left, I believe it was June of 2005.

17   Q.   Okay.  Oh, so you were on it for -- almost till Bard

18   stopped selling Recovery; right?

19   A.   I'm not sure when we stopped selling it.

20   Q.   Well, would you have been at meetings when there were

21   discussions about the ongoing serious problems that Bard was

22   having with the Recovery filter?

23   A.   I was not part of those meetings that I recall.

24   Q.   Did you ever get any health hazard evaluations during that

25   period of time?

1  A.  I never was involved with that.

2  Q.  So was that just a select group of people that were able to

3  get access to that kind of information?

4  A.  You'd have to ask Rob Carr.  Again, I was not pulled into

5  that -- those types of meetings, I guess.  I mean, what

6  happened is I was working on a jugular delivery system.  They

7  pulled me in to do testing.  That was my -- you know, my main

8  focus was developing the jugular delivery system.

9  Q.  So after you had done all this -- the testing that we've

10  been talking about on the Recovery filter, there was another

11  few months that went by until you stopped working on the

12  Recovery.  I think you said in the middle of 2005.  What were

13  you doing during that period of time?

14  A.  During the -- you know, that period of time, what I can

15  recall is my main -- I was developing the jugular delivery

16  system.  So we were working on molding, catheters, you know,

17  the stop mechanism, all for the jugular approach.

18          MR. LOPEZ:  Let's look at Exhibit 79, please.

19          Your Honor, I'd like to move Exhibit 79 into evidence.

20          MR. CONDO:  No objection, Your Honor.

21          MR. LOPEZ:  May I publish?

22          THE COURT:  Admitted.

23          (Exhibit No. 79 admitted into evidence.)

24          MR. LOPEZ:  Sorry, Your Honor.  May I publish?

25          THE COURT:  You may.

1    BY MR. LOPEZ:

2    Q.  So this is another test that I think you helped design and

3    oversaw.  True?

4    A.  That is correct.

5    Q.  And this document we're looking at, is this the product of

6    your input and your writing?

7    A.  Yes.  It would be the product of my input.  Of course, my

8    boss would review it and make edits.

9    Q.  Okay.  This was another migration resistance test; correct?

10   A.  This appears to be a protocol.

11   Q.  If you go to page 2, the purpose of this test was to

12   further the characterization of Recovery in relationship to

13   migration resistance.  True?

14   A.  True.

15   Q.  Didn't you find it odd that they're still trying to figure

16   out the migration resistance issues with this device on the

17   bench and they're -- but they're now selling it into the open

18   marketplace?

19   A.  To be honest with you, not really, because we're always

20   trying to innovate and develop products further and further.

21   So, you know, this is something we continually do in the

22   medical device industry --

23   Q.  Are you saying --

24   A.  -- we try to make things better.

25   Q.  I'm sorry.  I apologize.

1    A.  Go ahead.  Sorry.

2    Q.  Are you saying that these testing had nothing to do with

3    what was happening in real-life human beings who were getting

4    the Recovery filter?

5    A.  I'm saying obviously there was that special design review

6    called.  They were asking me to do that testing, but in regards

7    to the specifics of why, I'd have to leave that to Mr. Carr to

8    talk about.

9    Q.  So are you speculating when you're saying that this just

10   was normal, everyday, we're trying to go to the next level type

11   testing?

12   A.  Oh, that could be -- yeah, that could be potentially true.

13   Q.  Because if I were to ask you if there were some real live

14   human safety issues that caused this design review meeting and

15   all these tests afterwards, you wouldn't know about that; true?

16   A.  That is correct.

17   Q.  Okay.  So let's look at -- this is the test -- yeah, this

18   is when you were going to test it with one hook and the legs

19   twisted.  Correct?

20           MR. LOPEZ:  And let's go to page 7.

21           THE COURT:  You need to let him answer the question,

22   Mr. Lopez.

23           MR. LOPEZ:  I'm sorry.

24           MR. CONDO:  Thank you, Your Honor.

25           THE WITNESS:  Correct.

1              MR. LOPEZ:  Can we go to page 7, please?

2   BY MR. LOPEZ:

3   Q.  And we talked about this earlier.

4              So this is what Bard used to simulate a human vena

5   cava, silicone tubing; right?

6   A.  Correct.

7   Q.  And a sausage casing.

8              And then certain pressures would be applied to see

9   what the migration resistance was of this device in that

10  environment.  Correct?

11  A.  Correct.

12  Q.  And let's go to 2065, please.  And page --

13             Let me ask you this:  You're familiar with this test;

14  right?  This is the test that we just talked about in the

15  protocol just before it; correct?

16  A.  That's correct.

17             MR. LOPEZ:  Your Honor, I'd like to offer 2065.

18             MR. CONDO:  No objection, Your Honor.

19             MR. LOPEZ:  May I publish?

20             THE COURT:  It is admitted, and you may publish.

21             (Exhibit No. 2065 admitted into evidence.)

22  BY MR. LOPEZ:

23  Q.  Can we go to the second page of this exhibit?

24             Okay.  See where it says "Recent field activities"?  I

25  was just asking you about that, so let's look at this on

1    page 2, in the middle, 2.0, that middle paragraph.

2              "Recent field activities."  Could you read that,

3    please, out loud?

4    A.  Yep.

5              "Recent field activities indicate that migration

6    failures have been reported for the RF product.  Therefore,

7    further testing of this specific characteristic is warranted."

8    Q.  Does that help refresh your recollection that this just

9    wasn't a routine --

10   A.  Yes, it does.

11   Q.  -- situation?

12             That there were actually some things going on in the

13   open marketplace that was of concern; true?

14   A.  According to this, it says recent field activity, so

15   something was going on.

16   Q.  Well, if you look at the next paragraph, there's that same

17   sentence we read -- we saw earlier.  Do you see that?  A

18   special design review --

19   A.  Yes, I do.

20   Q.  -- to gain a further understanding of the, quote, design

21   elements of this product.

22             True?

23   A.  Correct.

24   Q.  And then if you look where it says "Migration resistance,"

25   what does that -- read that entire sentence.

1   A.  Sure.

2        "Migration resistance was one of the critical elements

3   identified for review."

4   Q.  And by the way, the words that we're reading in here are

5   your words because you prepared this document; right?

6   A.  They're partially my words, because I have other people

7   that review it and then I make changes.

8   Q.  And then you would -- before it was submitted to others,

9   you would review it; and the final product would be something

10  that you reviewed, potentially edited, and approved?

11  A.  So the team would work together and, you know, we'd all

12  sign off on this document.  But ultimately, you know, certain

13  changes could be made on this document, like from Rob that

14  would say, hey, we got to change this or whatnot so -- but,

15  yes, we all reviewed it together.

16  Q.  Page 3, please.  Under 6.0.  See where I am, that first

17  bullet point?

18        So you record when you have difficulties or some

19  issues during the course of the test?  That's something you do

20  in this report?

21  A.  Correct.

22  Q.  And so one of the problems you were having was that the

23  simulated sausage casing clots were getting caught on the rough

24  transition in the 1-inch PVC piping.

25        Did I read that correctly?

1   A.   That is correct.

2   Q.   And so that's something you had to deal with as you were

3   running these tests?

4   A.   What's that again?  Sorry.

5   Q.   That's something you had to deal with that --

6   A.   Yeah.  I mean, sometimes when we're running the tests

7   and -- things happen, and we try to mark down deviations and

8   capture, hey, what happened.

9   Q.   Okay.  Now, I'm going through this, and I'd ask you to do

10  the same, and ask you if there was any testing done at

11  37 degrees.

12  A.   Is that it?

13  Q.   Was there any testing done?

14  A.   Not that I saw.

15  Q.   Do you have any recollection as to why you would just test

16  under the conditions of 104 degrees and not under the

17  conditions of a normal body temperature?

18  A.   I do not have any recollection.

19  Q.   And let's look at page 5 of this exhibit.

20        MR. LOPEZ:  And, Felice, if you could go down to the

21  very bottom, under the section that has the 28-millimeter tube

22  and 1 through 6, just that box right there.

23  BY MR. LOPEZ:

24  Q.   Just so we're clear, this was a test with one leg detached

25  from the side of the vena cava -- well, sausage casing.  True?

1    A.  Was it a leg or a hook?

2    Q.  I don't know what -- can you tell me?

3    A.  Can you pan out?  It would say right there.

4          A hook.  On the top, it says number of hooks removed.

5    So it would have been just the hook.

6    Q.  So if a hook had broken off like what happened in the Asch

7    study, or just for some reason got detached, this would

8    simulate what might happen under those conditions; true?

9    A.  So this would simulate what happens in this particular

10   bench test if the hook's removed.

11   Q.  And with one hook removed at 104 degrees in a 28-millimeter

12   tube, the migration resistance of the Recovery filter had a

13   mean of 33; correct?

14   A.  That is correct.

15   Q.  And there wasn't one sample that was greater than 41.7;

16   true?

17   A.  That was -- correct.

18   Q.  And, again, 50 millimeters of mercury was -- the company

19   had decided was going to be the threshold for safety from a

20   migration resistance standpoint in the laboratory; true?

21   A.  So that was the threshold of safety for the control DV&V

22   testing and those tests.  This had no acceptance criteria.

23   Q.  Now, later when there were discussions about raising the

24   threshold to something higher than 50, say 70 or 80 or -- in

25   that area, even a hundred, were you included in those

1  discussions?

2  A.  I was not.

3  Q.  Were you ever asked to do any of these tests where the

4  minimum threshold for pass or fail was 70?

5  A.  Not that I recall.

6  Q.  Okay.  Can we have 1369, please.

7          Mr. Tessmer, this is an email from you in March of

8  2004; correct?

9  A.  That is correct.

10  Q.  And you wrote this memo?

11  A.  Yes, I did.

12         MR. LOPEZ:  And, Your Honor, I'd like to offer 1369.

13         MR. CONDO:  No objection, Your Honor.

14         THE COURT:  Admitted.

15         (Exhibit No. 1369 admitted into evidence.)

16         MR. LOPEZ:  May I publish?

17         THE COURT:  Yes.

18  BY MR. LOPEZ:

19  Q.  Okay.  This is -- there's a new name here, Charlie Benware.

20  Who's Charlie?

21  A.  I think he was in the manufacturing department, but I might

22  be incorrect on that.

23  Q.  And who's Ed Fitzpatrick?

24  A.  He would have been at the manufacturing facility.

25  Q.  So what was the issue here with this memo that you wrote?

```
1    A.  Is there something specific you want me to read here?

2    Q.  Yeah, I mean, what -- there had to be a reason why you

3    wrote this.  Without us reading it, can you just explain to the

4    jury?

5    A.  It looks like we did -- the issue was it looks like we were

6    trying to qualify a wire of some sort.  And when I ran the

7    testing, all the different things I was trying to test, it

8    looked like there were some that fell below the 50 millimeters

9    of mercury acceptance criteria.

10          And then I noted, I guess later on, that something's

11   wrong here.  Something's going on with the testing, because we

12   just tested these and they all passed.  So that's kind of a

13   synopsis of the whole email.

14   Q.  All right.  And what was --

15          THE COURT:  We're going to break at this point.  We

16   will resume at 3:00 o'clock, ladies and gentlemen.  We'll

17   excuse you at this time.

18          (Recess taken, 2:45 p.m. to 3:00 p.m.)

19          THE COURT:  You may continue, Mr. Lopez.

20          MR. LOPEZ:  Thank you, Your Honor.

21   BY MR. LOPEZ:

22   Q.  Mr. Tessmer, let's just look at 1369.

23          And 1369 was -- involved some actual -- actually,

24   fresh filters that were taken off the assembly line that you

25   were concerned were not passing some of the tests; is that a
```

1    fair statement?

2    A.  This was from what, 1369?

3    Q.  Yeah, Exhibit 1369.  It's the --

4    A.  Yeah, I'm not -- go ahead.

5    Q.  It's the Starguide filter migration test results.

6    A.  Got it.

7            Yeah, I don't know if they -- I would imagine they

8    would be fresh filters, but I don't recollect exactly, and I'm

9    not sure if it says it in the document here.  That's what I'm

10   looking at.

11   Q.  This regards another migration test?

12   A.  Yes.  Migration testing was performed on these.

13           MR. LOPEZ:  And if you -- Felice, if you could give us

14   that middle -- the fourth paragraph, "You will quickly notice."

15   BY MR. LOPEZ:

16   Q.  Do you see that?

17   A.  Yes, I do.

18   Q.  "That there were values below 50 millimeters of mercury

19   acceptance criteria for all three Starguide manufacturing

20   lots."

21           Do you see that, sir?

22   A.  Yes, I do.

23   Q.  And these were filters that were manufactured using the

24   current supplier?

25   A.  That's what it says here, correct.

1    Q.  And then if you go down to the next paragraph, you were

2    trying to do an analysis of this situation where you had these

3    fresh filters not passing the resistance testing?

4    A.  We were -- I think we were taking filters and testing them

5    against each other from various suppliers, it appears, and they

6    were below the 50 millimeters of mercury.

7    Q.  So, but you also wanted to see if maybe it had something to

8    do with the sausage casing in the next paragraph; right?  Right

9    there at the bottom?

10   A.  Where is it?

11   Q.  The next paragraph down.

12   A.  Oh.  Okay, yep, I see it.  Correct.

13   Q.  Okay.  And then so what you did there is you inspected the

14   sausage casing, that last sentence.  It says:  The sausage

15   casing was packaged the same and came from the same supplier.

16          Do you see that?

17   A.  Yes, I do.

18   Q.  It had the same appearance, feel, and odor as the previous

19   casing.

20          Do you see that?

21   A.  Yes, I see that.

22   Q.  So it seemed like it probably wasn't the sausage casing;

23   right?

24   A.  Yep, possibly, yeah.  That's what that's saying right

25   there.  That's what the operators noticed.

1    Q.  Did you ever figure out what it was?  Was it -- that caused

2    those -- the tests to be below 50 millimeters of mercury?

3    A.  Not that I'm aware.

4    Q.  So you thought it might be the Nitinol supplier or the

5    sausage casing?

6    A.  I think I said -- let me see here.

7            I think I -- well, I stated here in the middle

8    paragraph:  This points to the fact there was some issue with

9    the migration resistance testing.

10   Q.  Okay.  All right.  Let's go to Exhibit 2068, please.

11           And this was an email from Mr. Carr to you; right?  In

12   June of 2004?

13   A.  That's correct.

14           MR. LOPEZ:  I'd like to offer 2068 into evidence at

15   this time, Your Honor.

16           MR. CONDO:  No objection, Your Honor.

17           THE COURT:  Admitted.

18           (Exhibit No. 2068 admitted into evidence.)

19           MR. LOPEZ:  May I publish?

20           THE COURT:  You may.

21           MR. LOPEZ:  Thank you.

22   BY MR. LOPEZ:

23   Q.  Now, this -- let's just go to page 2 of this exhibit.

24           Let me just ask you this:  Is this email between you

25   and Mr. Carr -- actually, if you look at the -- on the first

1  page, Mr. Chanduszko is now involved in -- was originally

2  involved in the discussion with Brian Hudson.

3          Do you see that?

4  A.  Yes, I do.

5  Q.  Okay.  And was this -- looks like they're sending you or --

6  some information about potential changes in the design of the

7  Recovery filter to take care of some of these migration

8  problems.

9          Would that be a fair statement?

10  A.  It looks like they got me involved in a design of

11  experiments, correct.

12  Q.  And what does DOE mean?

13  A.  Design of experiments.

14  Q.  So there's no question that the Recovery filter -- there

15  was activity to look at how to redesign the Recovery filter to

16  take care of some of these migration and fracture issues; true?

17  A.  Well, there's always activity to innovate, true.

18  Q.  And 1023, is that -- are you familiar with that document?

19  A.  I believe I've seen this in prior testimony.

20          MR. LOPEZ:  I'd like to offer 1023 into evidence, Your

21  Honor.

22          MR. CONDO:  No objection, Your Honor.

23          THE COURT:  Admitted.

24          (Exhibit No. 1023 admitted into evidence.)

25          MR. LOPEZ:  May I publish?

1          THE COURT:  Yes.

2     BY MR. LOPEZ:

3     Q.  Now, sir, this is called a Summary of Design Modifications.

4     True?

5     A.  That's what it says, correct.

6     Q.  And these were modifications that were being made to the

7     Recovery filter to create the G2 filter; correct?

8     A.  It appears to be, correct.

9     Q.  The Recovery filter was the platform, basically, for

10    whatever changes were going to be made to the next-generation

11    filter known as the G2 filter; correct?

12    A.  It appears so.

13    Q.  Did you do any of the testing to see how the wider leg span

14    on the filter would affect the performance or -- I'm sorry --

15    affect potentially increasing the potential for perforation in

16    the -- on the vena cava with the G2 filter?

17    A.  I don't recall.  I know I did that -- that prior document

18    you showed, the DOE, I must have -- they got me involved,

19    because I was more expert in the DOE stuff, to potentially set

20    up some runs.  But I don't recall, myself, being involved in

21    that.

22    Q.  How much farther were you involved in these design changes

23    that are described in Exhibit 1023?

24    A.  Pretty much not at all.  I mean, my involvement was more

25    so, you know, to set up the DOE and then the biggest thing was

UNITED STATES DISTRICT COURT

1  I believe, if I recall correctly, we started working on how to

2  put this in a jugular delivery system.

3          MR. LOPEZ:  Could we go to page 2 of 1023, please?

4  Can you blow that up?  Thank you.

5  BY MR. LOPEZ:

6  Q.  And these talk about the G2 filter and the summary of some

7  of the things that were going to be changed on the G2 filter.

8  Is that a fair statement?

9  A.  That's what this document says.

10  Q.  For example, wider leg span, longer arms, things like that?

11  A.  That's what it says.

12  Q.  Do you know how any of these changes were going to affect

13  the stability of the G2 filter once implanted in the vena cava?

14  A.  I'd definitely refer to Andre for that.

15  Q.  Do you know how any of these changes that were being made

16  to the Recovery filter was going to affect the ability -- the

17  strength of the hooks and the arms on the G2 filter from

18  fracturing?

19  A.  I will say from the -- that prior document you had up, that

20  I did say in the document, because I just read it, that

21  increasing the -- I believe it was the hook diameter increases

22  the migration resistance, I believe.

23          But if you pull that up, I can be for sure -- I can

24  tell you for sure.

25  Q.  Now, this radial -- the wider legs was meant to have

1    stronger radial force against the wall of the vena cava to keep

2    it in place?

3    A.  I do not know if that's true or not.

4    Q.  Do you know what tests were run to confirm whether or not

5    any of these changes were going to create maybe different

6    complications with the G2 filter that didn't exist in the

7    Recovery filter?

8    A.  I wasn't involved in any of the testing as far as I recall,

9    except the migration testing that I was pulled into.

10   Q.  And the idea was to make the G2 filter safer than the

11   Recovery filter; right?

12   A.  I believe it was to make some design modification to

13   improve and innovate and make a better design.

14   Q.  Were you involved in, like, discussing what the new design

15   should be?

16   A.  Not specifically that I recall.

17   Q.  Do you know if any tests were run to see whether or not the

18   design of the G2 on the Recovery platform was going to

19   introduce new and different and maybe even as serious injuries

20   as were being caused by the Recovery filter?

21   A.  I'm sure that there was testing done, but again, I wasn't

22   involved with those tests.

23   Q.  Did the Recovery filter stay on the market until the G2 was

24   launched?

25   A.  I would have to look at documentation to be for sure.  I am

1   not sure.

2   Q.  Other than what we just saw, this memo between you and

3   Mr. Carr, I think Mr. Chanduszko was on it, did you have any

4   further involvement in the G2?

5   A.  Not that I'm aware of.

6   Q.  So who ran the tests on the G2 before it was launched if

7   not you?

8   A.  So, again, I was pulled in with the Recovery filter for

9   sure for different migration testing, but there was all kinds

10  of other testing that was performed on that filter besides that

11  that I was not involved with.

12          I believe, you know, I think that would be Andre and

13  the quality department.  That's who you'd want to probably talk

14  to about that.

15  Q.  Do you know if during the time that you were engaged in

16  conversations with Mr. Chanduszko and Mr. Carr and maybe others

17  regarding the Recovery filter, that maybe the company ought to

18  do a long-term clinical trial for safety and effectiveness

19  before they launched the G2 because of the problems they had

20  had with the Recovery filter after having not done that?

21  A.  I was not involved in any of that.

22  Q.  Did you ever recommend that, as an engineer who may have

23  been concerned about the findings on your tests about the

24  Recovery filter?

25  A.  I didn't ever -- I never recommended that.

1    Q.  Were your -- the findings that you had on the bench testing

2    we just went through consistent with what was happening in real

3    human beings when it came to migration?

4    A.  I can't answer one way or another because I don't have all

5    the data.

6    Q.  So after they gave you that initial data that led to these

7    tests, they didn't keep you apprised of all the additional

8    catastrophic events that happened when the company chose to

9    leave the Recovery filter on the market?

10              MR. CONDO:  Objection, Your Honor.

11              THE COURT:  Sustained.

12              THE WITNESS:  I do --

13              THE COURT:  I sustained the objection.

14              THE WITNESS:  Oh, okay.

15              MR. LOPEZ:  Pass the witness, Your Honor.

16              THE COURT:  All right.

17              MR. CONDO:  May I proceed?

18              THE COURT:  Yes.

19                        CROSS-EXAMINATION

20   BY MR. CONDO:

21   Q.  Mr. Tessmer, when you left Bard for the first time in 2005,

22   June of 2005, did you go to another company?

23   A.  Yes, I did.

24   Q.  And did your new job have anything to do with IVC filters?

25   A.  No, it did not.

1    Q.  And you've already told the ladies and gentlemen of the

2    jury that your new job has nothing to do with IVC filters;

3    correct?

4    A.  That is correct.

5    Q.  So you haven't had any firsthand or direct involvement with

6    IVC filters since you left in 2005?

7    A.  That is correct.

8    Q.  During the time that you were at Bard in the early 2000s,

9    what was the main thing that you were working on?

10   A.  I was working on the jugular delivery system.

11   Q.  And what is the jugular delivery system?

12   A.  So it's basically the delivery system that would deploy the

13   filter.  So we had a femoral delivery system that would use a

14   femoral approach, which is in the groin area, and you approach

15   up the femoral artery.  And they wanted one for a jugular

16   approach, to come in your neck from your jugular vein to deploy

17   it this way.

18          And so my job was to design the actual -- the delivery

19   device.

20   Q.  Was it your job to figure out how to get a filter that

21   someone else designed to deploy properly in the patient and

22   then to be retrieved in the patient?

23   A.  It was, yeah, to deploy properly in a patient, correct.

24   Q.  And it was someone else's responsibility, not yours, to

25   design the filter that you were working on the delivery system

1   for; correct?

2   A.  That is correct.

3   Q.  Now, I think you told the ladies and gentlemen of the jury

4   that from time to time you got called in to do projects for the

5   Recovery filter.  Correct?

6   A.  That is correct.

7   Q.  And was that the migration testing that you discussed with

8   Mr. Lopez?

9   A.  It was.

10  Q.  And did these projects from time to time take you away from

11  your primary responsibility, which was the delivery system, the

12  jugular delivery system?

13  A.  Yes.

14  Q.  And who was the person who from time to time would call you

15  in and ask you to take on these new assignments?

16  A.  It would be my boss, Rob Carr.

17  Q.  And at the time, were you a relatively junior engineer in

18  the research and development group?

19  A.  Yes.

20  Q.  And when the tests were run on the Recovery filter, you

21  were the one who was actually reporting the results.  Do I

22  understand that correctly?

23  A.  That is correct.

24  Q.  But did you run the tests yourself?

25  A.  I did not.

ALEX TESSMER - CROSS-EXAMINATION                    971

1    Q.  You drafted the test protocols for some of the tests; is

2    that correct?

3    A.  That's correct.

4    Q.  Were you the one who had to approve the test protocols?

5    A.  I would approve, and others would approve as well.

6    Q.  You didn't have the ability to simply decide that a test

7    would be run according to a specific protocol all by yourself,

8    did you?

9    A.  That is correct.

10   Q.  And who told you what tests to run?

11   A.  My boss.

12   Q.  Were you given any choice in deciding which tests to run?

13   A.  No.

14   Q.  Did you have any decision-making responsibility after you

15   reported the test results to Mr. Carr and others as to what

16   would be done with those test results?

17   A.  No, I did not.

18   Q.  Were all of the migration tests that Mr. Lopez showed you

19   tests that related to the Recovery filter?

20   A.  Yes, they were.

21   Q.  Did he show you any tests related to the G2X filter?

22   A.  Not that I saw.

23   Q.  Did he show you any tests related to the Eclipse filter?

24   A.  Not that I saw.

25   Q.  Were all the Recovery migration tests that were shown to

1    you by Mr. Lopez cranial migration tests?

2    A.  Were they cranial migration tests?

3    Q.  Yes.

4    A.  Yes.

5    Q.  Were any of them caudal migration tests?

6    A.  No.

7    Q.  Your involvement with the development of the G2 was even

8    more limited than your involvement with the Recovery filter;

9    correct?

10   A.  That is correct.

11   Q.  Because you were, as I understand it, charged with

12   developing the deployment system for the G2?

13   A.  Correct.

14   Q.  A new filter that you didn't have any design input on; is

15   that correct?

16   A.  That is correct.

17   Q.  Were you involved in any fashion with the development of

18   the G2X filter?

19   A.  No, I wasn't.

20   Q.  Were you involved on any of the regulatory filings that

21   were made to the FDA related to the G2X filter?

22   A.  No.

23   Q.  In fact, was the G2X filter cleared by the FDA and

24   introduced into the market after you left Bard, to your

25   understanding?

1    A.  To my understanding, yes.

2    Q.  Were you involved with the Eclipse filter in any fashion?

3    A.  No.

4    Q.  Did you perform any testing on the Eclipse filter?

5    A.  No, I did not.

6    Q.  Were you involved in any regulatory filings made to the FDA

7    related to the Eclipse filter?

8    A.  No, I wasn't.

9    Q.  We've heard testimony in this courtroom that the Eclipse

10   filter was electropolished.  Did you have any involvement in

11   developing the electropolishing process for the Eclipse filter?

12   A.  No.

13   Q.  You've made reference to Mr. Carr, and I think we saw a

14   document that identified him as the team leader?

15   A.  That is correct.

16   Q.  You also mentioned Mr. Chanduszko, but we don't have a

17   title for him.  To your understanding, what was his involvement

18   as you were able to discern in connection with the Recovery

19   filter?

20   A.  He was an engineer and involved in designing the filter.

21            MR. CONDO:  Thank you.  I have no further questions.

22            THE COURT:  Redirect.

23                      REDIRECT EXAMINATION

24   BY MR. LOPEZ:

25   Q.  Mr. Chanduszko [sic], I didn't ask you questions about the

1   G2X and the Eclipse, and had I, you wouldn't have known

2   anything about that; right?

3   A.  Correct.

4   Q.  And Mr. Condo just brought something up.  There was no

5   caudal testing of the G2 or the Recovery; true?  Bench testing?

6   A.  Not that I'm aware.

7   Q.  Did they tell you that there had been some caudal migration

8   reports in the Asch study and in the field with the Recovery

9   filter before you did your test?

10  A.  I was unaware.

11  Q.  So the G2 device was launched into the U.S. marketplace

12  without Bard having even done a bench test to see whether or

13  not its new design would cause it to actually move downwards;

14  true?

15  A.  I don't know what testing was done, so...

16  Q.  And you also mentioned electropolishing.  Is that an

17  engineering concept, design that you were familiar with when

18  you were working at Bard?

19  A.  Somewhat.

20  Q.  And what is electropolishing?

21  A.  It's just basically where they take the -- they smooth out

22  the surface of the Nitinol, and I think it gets like an oxide

23  coating on it.

24  Q.  And what's the purpose of electropolishing?

25  A.  I think it enhances the strength of the filter, but I would

1    defer to Andre for that.

2    Q.  And that was never done to the G2 filter was it,

3    electropolishing?

4    A.  I don't know.

5    Q.  Was Bard actually electropolishing other medical devices

6    that they were manufacturing and selling while you were at

7    Bard?

8    A.  I'm unaware.

9    Q.  And no one asked you to look into what electropolishing

10   might do to increase the fracture resistance of the Recovery

11   filter or the G2 filter; true?

12   A.  True.  I was -- I worked on the delivery system, not the

13   filter.

14   Q.  Now, at any time while you were there -- I know you were

15   only there for a short time working on filters.  Did anyone,

16   Mr. Carr, Mr. Chanduszko, anyone at Bard ever say, "We need you

17   to run some tests on our Simon Nitinol filter because we're

18   having some field complaints about migration, fracture,

19   perforation, tilt," anything like that?

20              MR. CONDO:  Beyond the scope of cross.

21              THE COURT:  Sustained.

22              MR. LOPEZ:  Nothing further, Your Honor.  Thank you.

23              THE COURT:  All right.  Thank you.

24              You can step down.

25              THE WITNESS:  Thank you.

1              (Witness excused.)

2              MR. O'CONNOR:  Your Honor, at this time we're going to

3     call Mr. Tim Hug.

4              THE COURTROOM DEPUTY:  Sir, if you'll please come

5     forward and raise your right hand.

6              (The witness was sworn.)

7              THE COURTROOM DEPUTY:  Please state and spell your

8     name for the record.

9              THE WITNESS:  Sure.  Timothy Hug.  It's T-I-M-O-T-H-Y,

10    Hug, H-U-G.

11             THE COURTROOM DEPUTY:  Thank you.  Please come have a

12    seat.

13                          TIMOTHY HUG,

14    called as a witness herein by the plaintiffs, having been first

15    duly sworn or affirmed, was examined and testified as follows:

16                      DIRECT EXAMINATION

17    BY MR. O'CONNOR:

18    Q.  Mr. Hug, my name is Mark O'Connor.  How are you?  We

19    haven't met before, have we?

20    A.  We have not.

21    Q.  Well, nice to meet you.

22    A.  Nice to meet you.

23    Q.  Do you live here in Arizona now?

24    A.  I do.

25    Q.  How long have you been here?

1    A.  I moved on July 5th of 2017, so just over a year.

2    Q.  Was that from Wisconsin?

3    A.  It sure was.

4    Q.  Big change?

5    A.  Big change.  Big change.

6    Q.  Well, thanks for coming down today.

7             You work for Bard; is that correct?

8    A.  That is correct, sir.

9    Q.  In Tempe?

10   A.  That is correct, sir.

11   Q.  And as I understand, you are the vice president of sales?

12   A.  I am, sir.

13   Q.  And how long have you held that position?

14   A.  Since approximately January of 2017.  So just over a year

15   and a half.

16   Q.  You are new --

17   A.  Yes, sir.

18   Q.  -- to the area.

19            And before that, I think you were regional manager?

20   A.  I had a variety of different roles, but yes, including a

21   regional manager.

22   Q.  So, quickly, when did you start at Bard?

23   A.  Sure.  In 2007 I started out as a representative.  I

24   carried the bag, if you will.  I was a territory manager.  And

25   then I became a district manager approximately two years later,

1   so I was kind of a manager of representatives.  And then after

2   that, I was a regional manager, so sort of like a manager of

3   managers.

4           And then at that point I became what's called a

5   Lutonix business director.  I won't go into the details, but

6   basically it's sort of a launch manager, for a couple years.

7   And then I became director of sales for the peripheral sales

8   team, so the team that deals with peripheral arterial disease,

9   so blockages in the leg.  And then in January of 2017 I became

10  vice president of sales, sir.

11  Q.  What was your position in 2011?

12  A.  I'd have to check, but I believe I was district manager at

13  that time, sir.

14  Q.  At that time you were also supervising a Bard employee, a

15  sales representative by the name of Matt Fermanich?

16  A.  That is correct, sir.

17  Q.  And he reported to you?

18  A.  He was one of the representatives, yes, sir.

19  Q.  So is it fair to say, sir, that the entire time you've been

20  at Bard, you've been involved in sales?

21  A.  Yes, sir.

22  Q.  And you're responsible in the time you've been at Bard for,

23  among other things, the promotion of Bard devices; correct?

24  A.  Yes, sir.

25  Q.  And when you talk about Bard Peripheral Vascular here in

1   Tempe, when we think of IVC filters, which we're here to talk

2   about, that's where that business is handled; correct?

3   A.  That is correct.  Our headquarters for that is in Tempe,

4   Arizona, sir.

5   Q.  And in 2011, so were you the regional sales manager at that

6   time?

7   A.  Yeah.  We called it a district sales manager, but yeah.  If

8   I could, sir.

9   Q.  Yeah, I still -- I've seen that -- but I'll leave it at

10  district sales manager.

11          And at that time, what was your area?

12  A.  Sure.  My recollection is is that I covered the great state

13  of Wisconsin and then a variety of other sort of central

14  states.  So, for example, Illinois, parts of Michigan, and I

15  believe Minnesota at the time.

16  Q.  And you oversaw sales representatives?

17  A.  Yes, sir.

18  Q.  And territory managers?

19  A.  Yes, sir.

20  Q.  And what you oversaw was a sales force responsible for

21  promoting and selling Bard products; correct?

22  A.  That's correct, sir.

23  Q.  And even now, I think I saw in your deposition where you're

24  responsible for the commercialization of Bard devices and

25  products?

1    A.  Yes, sir.

2    Q.  And in 2011 and even now, is it fair to say that one of

3    your responsibilities is to monitor the sales force?

4    A.  That is correct, sir.

5    Q.  And when you were doing your work as a district manager,

6    you were responsible to coach, educate, and help your sales

7    force with the development and promotion of Bard products; is

8    that fair?

9    A.  That is a fair characterization, sir.

10   Q.  And what that means is that in sales, in Bard, what's

11   important is relationships with the medical community; fair?

12   A.  Fair, sir, yes.

13   Q.  And what you would do was you would help your sales

14   representatives develop those relationships, which would

15   hopefully result in the sale of Bard devices and products?

16   A.  Yeah, that would be one aspect of my job, sir, yes.

17   Q.  And I understand.  I think you probably were working on

18   educating and training people; true?

19   A.  Absolutely true, sir, yes.

20   Q.  And working with people and helping them make sales, which

21   in turn would help Bard be competitive?

22   A.  Yes, sir.  I believe that's a fair characterization, sir.

23   Q.  As a matter of fact, sales works a little bit differently

24   than other parts of the company because they -- people in sales

25   are paid in a way that provides an incentive; correct?

1    Commission?

2            MR. CONDO:  I would object, Your Honor.  I think this

3    is covered by your Hudnall ruling.

4            THE COURT:  I don't know what you're referring to.

5            Come up here, if you would.

6            MR. CONDO:  Is there a bean left?

7            THE COURT:  One.

8            Go ahead and stand up, if you'd like.

9            (At sidebar on the record.)

10           THE COURT:  There's only going to be three on Monday.

11           Go ahead.

12           MR. CONDO:  I think, Your Honor, when you went through

13   on the 18th and explained your rationale for drawing the line

14   between the duty -- the failure to warn claim and the design

15   defect claim and the physician -- where physician expectations

16   fell in that continuum, I think you used several times the

17   phrase "marketing techniques."  Things that went to how the

18   product was marketed.

19           And you addressed in Janet Hudnall's deposition, I

20   think, as Your Honor explained it --

21           THE COURT:  I remember.

22           MR. CONDO:  -- the --

23           THE COURT:  I just didn't know what you were referring

24   to.

25           MR. CONDO:  And I didn't know how else to refer to it.

1    And I think once you start talking about incentive compensation

2    and you start talking about sales competitions and things like

3    that, we have moved into the area of marketing techniques that

4    have nothing to do with the design defect claim that remains.

5         MR. O'CONNOR:  Well, I disagree.  I mean, first of

6    all, they've raised this product identification issue.  And one

7    of the issues is going to be what happened in his district in

8    Wisconsin.

9         Our position is, and we have evidence, that even

10   though the Eclipse was on the market and the failed Eclipse was

11   coming right around the corner, that there were still G2Xs and

12   G2s in the hospital where Mrs. Hyde received her filter.

13        THE COURT:  Well, but he didn't object to that.  He

14   objected to your starting to ask about being paid by

15   commissions.  Where are you going with that?

16        MR. O'CONNOR:  Because I want to go into documents

17   that showed how they were incentivizing them to get the

18   Meridian out there, and eventually the Meridian ran out and

19   they were back to the G2.

20        And, you know, I mean, we're up here and now I'm

21   giving away my whole strategy of this cross-examination, but

22   that's where I'm going to go.

23        And, Your Honor, I mean, when you get to Wisconsin

24   punitive damages, how they handle the product, how they handle

25   the information, what the employees know, if they're involved

1    in the concealment, those are all relevant issues.

2          THE COURT:  Well, the whole failure to warn case can

3    be relevant under that thinking.  Everything they did in a

4    failure to warn could arguably be relevant.

5          MR. O'CONNOR:  Well, I'm not going into everything the

6    failure to warn --

7          THE COURT:  Well, it sounds like you want to get into

8    sales techniques, you want to get into sales compensation, and

9    I'm having trouble understanding what that has to do with the

10   design defect.

11         MR. O'CONNOR:  Well, it's going to go to the product

12   identification.

13         THE COURT:  What does commissions have to do with

14   product identification?

15         MR. O'CONNOR:  Because, Your Honor, at the same time

16   they're going to claim -- I think we're going to show this jury

17   that even though they want to claim that this was the Eclipse

18   and maybe the Eclipse was there because they believed it was a

19   better product, she got a G2.  And she got a G2 --

20         THE COURT:  What does compensation have to do with

21   that?

22         MR. O'CONNOR:  Because there's going to be evidence in

23   the same time period that they were talking about a Meridian

24   promotional project where they were going to win monetary

25   prizes.

1              THE COURT:  What has that got to do with whether this

2    was a G2X?

3              MR. O'CONNOR:  It goes to show how confused this

4    company was about what device should be there and how they

5    ignored -- and it goes to their disregard of patient rights.

6    Because they were so focused on trying to get a different

7    device out, they neglected a hospital that still had these G2s

8    and G2Xs.

9              THE COURT:  I don't see any connection between being

10   paid by commission and whether it was a G2X at this hospital.

11   That's what I'm struggling with.

12             MR. LOPEZ:  Well, I -- you don't want two of us to

13   talk.

14             THE COURT:  You can talk.  Go ahead.

15             MR. LOPEZ:  I think we made this point before, but the

16   IFU is obviously in full bloom.  When they market these things,

17   they say they're restricted to just the IFU and to stay within

18   the IFU.

19             Well, if they're marketing this thing based on

20   information that is not in the IFU, that means they're

21   marketing it in a manner in which doctors are -- you know, have

22   a certain idea about the performance of this thing when, in

23   fact, marketing -- the guys that are in sales are not meeting

24   the reasonable expectations of doctors because what's in the

25   IFU does not describe what the true performance is of this

1    device.

2              THE COURT:  What has that got to do with commission

3    compensation?

4              MR. LOPEZ:  Because -- Your Honor, because it has to

5    do with the fact that they're being incentivized to not focus

6    on anything else but to sell this device against other devices.

7    And to -- and to maintain that message that we've -- we're the

8    strongest, the most durable, the best device on the market.

9              I mean, this is -- if labeling is going to come into

10   this as something that fixes the design, then we have -- I

11   think we have the right to tear down the labeling.  And the

12   labeling is not just what's buried in an IFU; it has to do with

13   the messaging that the company gives to the doctors.  The

14   doctors don't even read it.

15             THE COURT:  Well, hold on, Mr. Lopez.  I know you

16   could go on for another five minutes on this, genuinely.  I

17   mean, I'm not being critical, but I don't want to do that while

18   the jury's waiting.

19             The line I've tried to draw is you can bring out facts

20   that weren't disclosed, information that wasn't conveyed to

21   doctors, because that goes directly to the question of whether

22   there was a basis for them to deal with it in a reasonably safe

23   manner.

24             It seems to me it's a far cry from that to get into

25   incentives of salespeople.  I mean, you can bring -- if you

1    think there are facts they didn't disclose, that's fair game.

2    But I don't understand how compensation incentives --

3              MR. LOPEZ:  Well, let me take one more shot at it.

4              THE COURT:  Okay.

5              MR. LOPEZ:  Because I think what we have -- when we're

6    talking about the design and all these issues that deal with

7    liability and you have a punitive damage claim, it goes to the

8    conduct and the attitude of the company in view of this device

9    having design problems.

10             THE COURT:  Well, here's the problem I have with that,

11   so you can address it.

12             Let's say you convince this jury that they were bad

13   marketers, that they lied when they talked to doctors.

14             MR. LOPEZ:  Uh-huh.

15             THE COURT:  That's not punitive conduct for a

16   defective design.  I mean, the only punitive damages that can

17   be awarded in this case are for defectively designing a

18   product.

19             MR. LOPEZ:  Okay.

20             THE COURT:  There isn't a fraudulent marketing claim

21   that could be a basis for punitive damages, and yet it sounds

22   to me like you want to say this company was behaving badly in

23   how it was misrepresenting or omitting information in its

24   marketing for purposes of punitive damages.  That seems to me

25   to be a far cry from designing a defective product to justify

1    punitive damages.

2              MR. LOPEZ:  Well, I mean, you know, the way we all --

3    we read this, especially the negligence part of this -- I know

4    Your Honor has read it differently than we have about letting

5    in IFUs, SIRs, FDA, and all that stuff.  I mean, it's like,

6    well, that seems to be going to an extreme on whether or not

7    the company is looking at a design of its product, realizing

8    it's failing.  It's not performing.  They're not testing it.

9              I have no idea what an IFU and the SIR guidelines and

10   FDA have to do with that, but I'm living with that.  But if I

11   have --

12             THE COURT:  Well, I'm really comfortable on that.

13             MR. LOPEZ:  I know you are.

14             THE COURT:  Because of what the restatement says and

15   what your own expert said.  Dr. McMeeking said:  You got to

16   tell the user of the risks so that they can take those into

17   account and deal with it in a safe manner.

18             MR. LOPEZ:  Let me take one more shot.

19             THE COURT:  Okay.

20             MR. LOPEZ:  The conduct is, in this case, in the

21   negligent design part of the case, the conduct that's --

22             THE COURT:  It's negligent design.  I agree with that.

23             MR. LOPEZ:  As it pertains to the conduct of the

24   company.  And if there are things relating to the design of

25   this product that have deprived our client of her rights to

1    know exactly why this thing is being put in her, and that is

2    maybe because the marketing department and sales department are

3    aggressively marketing this product without knowing anything

4    that she's supposed to know --

5           MR. O'CONNOR:  And her doctor.

6           MR. LOPEZ:  -- and a reasonable doctor's supposed to

7    know, how is a reasonable -- we've had reasonable doctors now

8    testify already twice that a reasonable -- in fact, we've had

9    some of their corporate people say that reasonable doctors'

10   expectations would be that the company would be forthright and

11   transparent and tell us about everything that they know about

12   this product so we can make an informed decision about whether

13   or not we're going to use the device.

14          If that is being masked by the conduct of the

15   company's marketing practices, I mean, that is relevant on --

16   you know, her -- the violation -- I don't have the statute in

17   front of me.  I probably couldn't read it right now if it was

18   there, but this goes to punitive damages because it's immersed

19   in the conduct that has caused this device to be negligently

20   designed and not fixed.

21          I mean, I don't know how to pull it out of there.  I

22   don't.  Because the conduct's always going to be involved in

23   why -- in the why part of the case, Judge.  I mean, the why

24   part of the case, you have to look at why.  Why did this

25   happen?

1          And if it happened because the defendants were more

2     focused on bonusing their sales reps and marketing this product

3     and not fixing it, we have a right to make that argument, I

4     think, to the jury.

5          THE COURT:  Well, I hear what you're saying.  I mean,

6     I still am of a view that the line that should be drawn is

7     based on the statute.  The question is was there a reasonable

8     alternative design that wasn't used, and was the failure to use

9     that reasonable alternative one that made the product not

10    reasonably safe.  That's ultimately what the jury's going to

11    have to decide in this case.

12         And I've concluded that whether or not the product is

13    reasonably safe when used depends in part upon what the doctor

14    was told about how to use it.  And if he wasn't told of risks,

15    then it might not be reasonably safe to use it.  And that's why

16    I think the failure to disclose risks is very relevant to that.

17         MR. LOPEZ:  But if that was motivated by profit over

18    safety -- I mean, we have -- if this case is about that -- them

19    having failed there because they put their profits and their

20    marketing share over safety, we have a right to tell the jury

21    that under -- you know, under the punitive -- at least the

22    punitive damage part of this case and maybe to explain why

23    it -- you know, that that didn't happen.

24         It didn't happen because this was a new iteration that

25    was so wonderful because we're making now our fifth case and

```
 1    we're doing what any prudent medical device manufacturer is,

 2    and that is always trying to improve our product.  No.

 3            They're doing it because they're protecting the market

 4    share.  And we have evidence of that in this case.  You know,

 5    we have evidence --

 6            THE COURT:  Hold on just a minute.  This would be

 7    easier if it wasn't Friday afternoon.

 8            Mr. Condo, if it is relevant to the design defect

 9    claim for the jury to know what was told to doctors and

10    patients and what wasn't told to doctors and patients -- which

11    you've argued that it is relevant.  That's why you wanted to

12    get in the IFU -- why is it not also relevant as part of

13    plaintiffs' case for them to say part of the proof that the

14    whole truth wasn't told is found in the financial motivation of

15    the company and of the people who were selling it?

16            That's part of the picture that proves that the whole

17    truth wasn't told, and therefore, that the product was not

18    reasonably safe because people didn't know everything they

19    needed to about it.

20            I think that's --

21            MR. LOPEZ:  It is.

22            THE COURT:  -- your point.

23            MR. CONDO:  Well, and I may call on Mr. Rogers here --

24            THE COURT:  That's all right.

25            MR. CONDO:  -- to assist me.
```

1          But I think, Your Honor, if we understand the way you

2     have drawn the line and what the jury will be instructed, the

3     issue of design defect is a different issue than whether or not

4     they were compensated appropriately or inappropriately.

5          The issue, as we understand it, is is the design

6     defective.  And there's been no testimony, Your Honor, about

7     any of the failure to warn issues.  We've kept that out so far.

8     We've stayed away from that.

9          And I don't see -- and again, maybe it would be easier

10    if it weren't Friday afternoon, but I don't see how if what

11    you're saying is the motive to design the product defectively

12    was driven by sales, they can --

13          THE COURT:  No, I'm not saying that.

14          MR. CONDO:  They can argue that.

15          THE COURT:  I'm not saying it.  That's not my point.

16    I don't think that's his point.

17          MR. LOPEZ:  No.

18          THE COURT:  Let me try it again.

19          MR. CONDO:  I'm sorry.  Then I misunderstood.

20          THE COURT:  The thing that first convinced me that the

21    jury should hear information about what the doctors received

22    was your argument that the fact that the doctors had the IFU

23    helped make this a reasonably safe product, which is the second

24    part of the test.  Because doctors understood the risks.  They

25    understood how to use it.  They could do an analysis and use it

1     in a safe manner.

2              And I thought, yeah, you're right.  What the doctors

3     knew has a lot to do with whether the product was safe.

4              So we started down the road of saying, okay, what is

5     communicated about the product bears on the question of whether

6     it's safe.  Well, that necessarily has to include what wasn't

7     communicated about the product.  Because if they can show that

8     the risks were much greater than were stated in the IFU, that

9     helps show the doctors couldn't use it in a reasonably safe

10    manner, and the jury can therefore say it wasn't reasonably

11    safe.

12             That's why I've opened the door to what the doctors

13    were told.  I understand Mr. Lopez and Mr. O'Connor to be

14    arguing that in order to prove what the doctors did and didn't

15    know, it's important for the jury to understand the financial

16    incentives of who was speaking to.  And the incentive was such

17    so as not to be forthcoming.

18             MR. CONDO:  And the question for the jury is not why

19    they weren't told that.  The question is what were they told.

20    That will be the ultimate decision that the jury has to answer.

21    That is why this is not relevant.  The question is what were

22    they told.  That's the ultimate question the jury is going to

23    have to decide.

24             THE COURT:  Did you want to say something?

25             MR. ROGERS:  No.  Mr. Condo summed it up.  I think if

1    you move into a situation where you have the potential for them

2    awarding punitives based on the motivation as to what the

3    doctors were told, you are then awarding punitives based on a

4    claim that is not in the case.

5              We agree completely that plaintiffs can introduce

6    evidence of what was not told if the lack of information goes

7    to how the doctors would understand how to use the product.

8    And that is completely relevant.  But motivation for what

9    they're not told, you are then allowing a punitive award based

10   on a claim that's not in the case.

11             THE COURT:  I know you have much to say.

12             MR. LOPEZ:  I do.

13             THE COURT:  Hold on just a moment.

14             MR. LOPEZ:  Okay.

15             THE COURT:  How long do you have with this witness?

16             MR. O'CONNOR:  Well, I mean, it depends.

17             THE COURT:  If you don't go into the sales commission

18   stuff, how long do you have with this witness?

19             MR. O'CONNOR:  Well, I kind of need these sales for a

20   little background of where I want to go, but I'll try to work

21   it --

22             THE COURT:  Well, no.  I'm trying to figure out if we

23   should keep the jury waiting while we continue to wrestle with

24   this.  Because I think this is -- the reason I'm taking so much

25   time on the sidebar is because this is an important issue in

1    the case.  This is going to determine where you get to go on

2    some of your evidence, and he's on the stand and I want to make

3    sure --

4            MR. O'CONNOR:  I have a lot with him, and depending on

5    how you rule is going to change things.  Because what I have

6    set up and the year that's important to me with this witness is

7    the year 2011.  And what I intend to elicit from him is

8    information about sales, products that were being pushed, the

9    incentives that were given to the salespeople to push these

10   products, and how other devices and how other hospitals were

11   overlooked.

12           THE COURT:  Well, it seems to me you could, so that I

13   have time to think about this when it's not 4:00 o'clock on a

14   Friday afternoon, you could cover 2011, what products were

15   being sold, what was in various hospitals, et cetera.  And then

16   if I allow it, you could come back on Monday and talk about the

17   incentives that were behind it all.

18           And if we don't do that, I've got to make a call now.

19           MR. O'CONNOR:  The documents that I'm using are sales

20   documents which have points in time.  I think they're

21   admissible as business documents.  I think they're admissible

22   for a lot of reasons, but they have sales information in them,

23   sales contests and that.

24           And I'm using those to set up --

25           THE COURT:  Okay.  So you're saying I do need to make

```
 1    the decision now.
 2              MR. LOPEZ:  Well, maybe not -- well --
 3              THE COURT:  Well, I will --
 4              MR. O'CONNOR:  Let me try to work it --
 5              THE COURT:  This may influence you.  I tell you, I'm
 6    leaning away from allowing this right now, because I think it
 7    opens the door to a full-blown failure to warn case, and that's
 8    not what this is.  And I think it very much opens the door to
 9    the jury awarding punitive damages on a failure to warn and bad
10    intent behind a failure to warn.  That's not in this case.
11              I understand your argument, and I think it's relevant,
12    but we've got to draw the line somewhere on that continuum.
13    And I'm inclined to draw it at the point of what were they
14    told, from both of your perspectives, but rather get in -- than
15    get into motives and things like that and strategy.  That's
16    where I'm inclined to draw the line now.
17              MR. O'CONNOR:  Your Honor, I'm being forced to give up
18    some work product here, but one of the important --
19              THE COURT:  Well, I can rule now.  I'm just telling
20    you --
21              MR. O'CONNOR:  But I want you to understand the line
22    of questioning where I think --
23              THE COURT:  Okay.
24              MR. O'CONNOR:  -- I think this is relevant.  That what
25    was important to them were relationships with doctors and how
```

1    doctors relied on sales to give them accurate information and

2    the sales department relied on Bard.  That's going to be an

3    important feature.

4         THE COURT:  That's fair.  I think that's fair.  That

5    doesn't get into compensation and incentives.

6         MR. LOPEZ:  I think you can do that without --

7         MR. O'CONNOR:  And, you know, we're going to be up

8    here again because I have emails on this product identification

9    issue that start with Mr. Hug, then they go to Mr. Fermanich.

10   And we've already got wind from these guys they're going to

11   make some objection on it.  I don't know what it's going to be.

12        THE COURT:  What's going to be the basis for the

13   objection?

14        MR. CONDO:  Get more beans.

15        THE COURT:  Hold on.  Look, we're almost at 4:00.  We

16   can't keep doing this.

17        MR. CONDO:  I'm not sure what he's talking about.  If

18   it's an email from Mr. Hug to Mr. Fermanich and it doesn't

19   include the kinds of marketing techniques that we're objecting

20   to, I don't know that --

21        THE COURT:  Well, we can do what we've done before,

22   which is we can put it in and not show the marketing technique

23   stuff to the jury, and if I rule against you on that, we can

24   redact it later.

25        MR. O'CONNOR:  No marketing techniques.  It's an email

UNITED STATES DISTRICT COURT

1    that goes from Hug to Fermanich, from a hospital employee to

2    Hug, Hug -- she identifies the problem.  Two emails.  He says

3    Matt Fermanich is the person you got to get.  The email goes to

4    Fermanich and this hospital person.

5           MR. CONDO:  Well, then there's hearsay issues with

6    that.

7           THE COURT:  Well, I'll have to deal with hearsay

8    issues.

9           MR. O'CONNOR:  I don't think there is a hearsay issue.

10          THE COURT:  Well, you can explain why when we get

11   there.

12          MR. O'CONNOR:  Well, we're going to be back up so --

13   if I'm going to switch, we're going to be back up.  I'm just

14   telling you, Judge, we are going to be back up here.

15          MR. LOPEZ:  It's this whole product ID thing.  Wait

16   till you see the evidence, what was going on.

17          MR. O'CONNOR:  Let me go where I'm going to go with

18   him.  We'll see.

19          THE COURT:  All right.  Well, I do not want to have

20   another sidebar on this jury.

21          MR. O'CONNOR:  I don't either.

22          THE COURT:  Let's go for the 35 minutes without

23   raising those issues if we can.  Without getting us back up

24   here if you can.

25          MR. O'CONNOR:  If I'm not going to be able to do this,

1    I got to get right into that issue.

2              THE COURT:  You what?

3              MR. O'CONNOR:  If I'm not going to go here, I have to

4    get right into that issue.

5              THE COURT:  Well, you've heard my thinking.  Do the

6    best you can.

7              (End of discussion at sidebar.)

8              THE COURT:  Thanks, ladies and gentlemen.  Sorry, that

9    broke a record.  We'll try not to break it again.

10             Go ahead, Mr. O'Connor.

11   BY MR. O'CONNOR:

12   Q.  Mr. Hug, what was important for you and your sales force, I

13   think you told us, was to develop relationships with the

14   medical community, including doctors; correct?

15   A.  That is correct, sir.

16   Q.  Good relationships are based on trust; you would agree with

17   that?

18   A.  Yes, the best ones are.  Yes.

19   Q.  And certainly you wanted your sales reps to develop such a

20   relationship with doctors in the medical community so that the

21   medical community, the customers, could rely on your sales reps

22   for truthful and accurate information about Bard devices;

23   correct?

24   A.  Can you ask me that question again?

25   Q.  Sure.

1              What was important about the relationship and what you

2    encouraged your sales reps to do would be develop relationships

3    that were built on trust.  Fair?

4    A.  That is fair, sir.

5    Q.  And you wanted your sales force to set up a relationship

6    whereby a doctor knew he or she could rely on a member of the

7    sales force for truthful and accurate information about Bard

8    devices; fair?

9    A.  Yes.  That's fair.  Our -- yes.

10   Q.  And you and your sales force in turn relied on the company

11   to supply you with any information you needed to know, for

12   example, about IVC filters?

13   A.  Yes.  The company trained us, and -- accordingly, initially

14   and throughout my tenure, yes, sir.

15   Q.  And that would include strengths and weaknesses of the

16   devices; true?

17   A.  That is true.  The data that's in our IFU, for example,

18   yes, sir.

19   Q.  All right.  Thank you.

20             Now, going back in time a little bit while you were in

21   Wisconsin, in Milwaukee.  And Matt Fermanich was on your sales

22   force; correct?

23   A.  He was, sir.

24   Q.  Is he still with the sales force of Bard?

25   A.  He is.

1   Q.  All right.  And Matt Fermanich, is he still a sales rep,

2   representative?

3   A.  He is not.  He was promoted to a manager role, sir.

4   Q.  Well, tell him I said congratulations.

5   A.  I will, sir.

6   Q.  I've met Matt.

7   A.  Okay.

8   Q.  But one of the hospitals in the Milwaukee area that Matt

9   was responsible, and ultimately you were responsible for, was

10  Wheaton Franciscan Health Systems; correct?

11  A.  That is correct, sir.

12  Q.  And that's in the Milwaukee area?

13  A.  It is.

14  Q.  And there's one in Franklin; right?

15  A.  Yes.  That is one of the hospitals that is part of the

16  Wheaton Franciscan Hospital System, yes, sir.

17  Q.  And for Matt to act within the course and scope of his

18  employment as a Bard sales representative, you assisted him in

19  having communications and promoting products and devices there;

20  correct?

21  A.  Yes.

22  Q.  And if a customer had questions from any hospital or any

23  healthcare provider about a device, he or she could contact

24  you, Tim Hug?

25  A.  They could.

1   Q.  And oftentimes you might refer them to the person who was

2   responsible for the hospital; correct?

3   A.  Yeah.  Normally they would contact the territory rep, so

4   Matt Fermanich.  Sorry, I have to -- it's Fermanich.  But,

5   yeah, I'm flowing with you here.

6   Q.  Is it Fermanich?

7   A.  It is.  But you're good, though.

8          And then -- and then they would normally contact him.

9   But if something needed to get escalated or Matt had a

10  question, right, they would either contact me or Matt would

11  contact me, sir.

12  Q.  Part of Matt's --

13  A.  You're great.  Don't worry about Matt, yeah.

14  Q.  I want to make sure I get it right.  Fermanich?

15  A.  Fermanich.

16  Q.  Fermanich?

17  A.  Yeah.

18  Q.  Part of his job, the course and scope of his job was to

19  respond to concerns or questions of customers of his in the

20  Milwaukee area; fair?

21  A.  That is fair, sir.

22  Q.  And if he had any questions, he could come to you; correct?

23  A.  That is correct, sir.

24  Q.  And there were times when a customer may contact you and

25  you, in turn, would direct that customer to somebody like Matt

1   to respond to the question or the concern?

2   A.  Sure.  For example, specifically in Milwaukee, that used to

3   be my old territory so I knew a lot of those customers.  So

4   yes, sir.

5   Q.  And that probably gave you an advantage in training your

6   sales force in that area because you could help people like

7   Matt develop relationships and promote devices?

8   A.  Some would differ with the term "advantage," but perhaps it

9   did -- it did help Matt out, I'm sure, so sure.

10  Q.  Now, you were there at Bard when the G2 and G2X were being

11  promoted; correct?  The filters?

12  A.  I believe that's accurate.  I think in 2007 when I started,

13  the G2 was part of the filter actually there, yes, sir.

14  Q.  And the IVC devices were within your responsibility in

15  terms of promotions, sales in that area, the region of -- that

16  included Milwaukee, Wisconsin?

17  A.  Yes, sir.  At that time, yes, sir.

18  Q.  Right.  And I'm just focused right now 2010/2011.

19          And at some point in time you had the G2, the G2X, and

20  then do you recall when the Eclipse filter came on the market?

21  A.  I can't recall specifically, but I do know it was after.

22  Q.  Let me show you what's been marked as Exhibit 4843.

23          Do you recognize this document?  It's a Bard document.

24  You see the Bard letterhead?

25  A.  I see the letterhead.  This looks like it was from Bill

1    Little, who was our -- I believe our VP of marketing, to the

2    filter marketing team, so it doesn't look like I would have

3    seen this document, sir.

4    Q.  Well, it appears to be a Bard document on business -- on

5    Bard's business letterhead; correct?

6    A.  It does, sir.  I just would have no -- I wouldn't have seen

7    this, more than likely, sir.

8    Q.  And you were aware of the Eclipse anchor project; correct?

9    A.  I was --

10   Q.  Meridian?

11   A.  Yeah.  It just kind of depends when.  Sure.  At training or

12   at the start of the launch of it, absolutely, sir.

13          MR. O'CONNOR:  Your Honor, at this time I would move

14   to admit 4843.

15          MR. CONDO:  No foundation.

16          THE COURT:  Sustained.

17          MR. O'CONNOR:  I'm asking for it to come in under the

18   business exception, and to establish when the anchor project

19   started.  Independently --

20          THE COURT:  You haven't laid -- you haven't laid

21   foundation under 803(6).

22   BY MR. O'CONNOR:

23   Q.  Do you recall discussions about the Eclipse anchor project

24   back in 2010?

25   A.  I'm sorry, I don't recall that, sir.

1    Q.  All right.  Let's show you Exhibit 4798.

2    A.  Okay.

3    Q.  This is an email from Bret Baird.  It's dated 2010.  And

4    this, I believe, was discussed at your deposition.

5            Have you seen this before?

6    A.  I have some recollection of going over it at the

7    deposition, sir, yes.

8    Q.  All right.  And were you aware that on April 28, 2010 --

9    who is Bret Baird, by the way?

10   A.  I believe -- I don't know his official title, but I believe

11   he was product manager for IVC filters.

12   Q.  And if there was a communication that the Eclipse was --

13   the sales and promotion of Eclipse filters had to start in

14   April 2010, is that something you would have expected to

15   receive?

16   A.  Yes.  I think that -- yes, sir.

17   Q.  Okay.  It's directed to the sales team.  True?

18   A.  Yes, sir, it is.

19   Q.  And you were a member of the sales team back at that time

20   in 2010; correct?

21   A.  I was, sir.

22           MR. O'CONNOR:  Move for the admission of Exhibit 4798.

23           THE COURT:  I thought it was 8036.

24           MR. O'CONNOR:  4798.

25           MS. HELM:  Can we get the exhibit so we can see the

1    exhibit number on the bottom, please?

2              MR. O'CONNOR:  I'm sorry.

3              THE COURT:  So I thought you said this was 8036.  What

4    is this?

5              MR. O'CONNOR:  Pardon me?

6              THE COURT:  You earlier referred to this as 8036.

7    This is 47 --

8              MR. O'CONNOR:  I put up a new one.  I'm sorry.  This

9    is 4798.

10             THE COURT:  Okay.  So you're moving for the admission

11   of 4798?

12             MR. O'CONNOR:  Yes.

13             MR. CONDO:  No objection.

14             THE COURT:  Admitted.

15             (Exhibit No. 4798 admitted into evidence.)

16   BY MR. O'CONNOR:

17   Q.  Now, this is an email from Bret Baird.  Do you see that,

18   Mr. Hug?

19   A.  I do, sir.

20   Q.  And it's a communication to the sales team; right?

21   A.  It is, sir.

22   Q.  And it talks about officially stop selling the G2X in the

23   United States.

24             Do you see that?

25   A.  I do.

1   Q.  And that there -- you --

2            MR. O'CONNOR:  Oh, may I publish this to the jury,

3   Your Honor?

4            THE COURT:  You may.

5   BY MR. O'CONNOR:

6   Q.  And let's just go back to what we talked about at the

7   beginning.

8            According to Mr. Baird, he states to the sales team

9   that Bard has officially stopped selling the G2X in the United

10  States and have transitioned over to the Eclipse.

11           Correct?

12  A.  Yes, sir.  That's what it says.

13  Q.  And he asks the question:  Have your customers successfully

14  switched over to?

15           Did I read that correctly?

16  A.  Yes, sir, you did.

17  Q.  And it goes on to say:  If you haven't had a chance to tell

18  all of your customers regarding the transition from the G2X to

19  the Eclipse, now is the time to reach out and check in on them.

20           Now, did I read that correctly?

21  A.  You did, sir.

22  Q.  And that would be something that you would, with your sales

23  force, carry out that directive and see that it would happen

24  within your region; fair?

25  A.  Yes.  That would be fair.  I would take that direction and

1    work with my team.

2    Q.  All right.  Now, let me show you Exhibit 4806.  And this is

3    the beginning of an email chain.  And you can see at page 4 --

4    can we go to page 4?

5         You are on this email thread from Cynthia Haas.  Do

6    you see that?

7    A.  I do, sir.

8    Q.  And Ms. Haas was somebody who worked at Wheaton Franciscan

9    Healthcare; is that right?

10   A.  That is accurate, sir.  She worked at Wheaton Franciscan

11   Healthcare, yes, sir.

12   Q.  And she directed a request to her, and you responded to her

13   request in the same email; is that right?

14   A.  That is correct, sir.

15   Q.  And if we go to page 5.

16        This is Ms. Haas's statement to you in an email, and

17   you responded to this; correct?

18   A.  I'm just trying to understand the context.  I believe this

19   is her first email.  Am I looking at this right, sir?

20   Q.  I believe that's correct.

21   A.  Okay.  That's how I see this.

22        So, yes, to answer your question, she sent me an email

23   and then I responded to it.

24        MR. O'CONNOR:  I move for the admission of 4806.

25        MR. CONDO:  Hearsay objection, Your Honor.

1       THE COURT:  What's your response on hearsay?

2       MR. O'CONNOR:  Well, my response is is that this is an

3  email.  In the course and scope of his employment, he responds

4  to the email.  It's a request by a customer about a device.

5       THE COURT:  I understand all of that.  Why is it not

6  hearsay?

7       MR. O'CONNOR:  Because it's an exception to the

8  hearsay rule.

9       THE COURT:  Which one?

10      MR. O'CONNOR:  I'll have to get it.

11      THE COURT:  You mean as a business record?

12      MR. O'CONNOR:  Yes.

13      THE COURT:  You need to lay the foundation under

14  803(6) then.

15      MR. O'CONNOR:  Well, let me -- can we go to page 4?

16  BY MR. O'CONNOR:

17  Q.  In response to Cynthia Haas, you responded to her; correct?

18  A.  I did respond to her, sir.

19  Q.  And at that time you were regional sales manager for Bard;

20  is that right?

21  A.  Just to clarify, I was district, but yes, sir.  I was a

22  district manager, yes, sir.

23  Q.  District manager.

24      And your communication was done within the course and

25  scope of your employment as the district manager for Bard;

1    correct?

2    A.  Yes, sir.

3            MR. O'CONNOR:  So, Your Honor, I'd move under --

4    excuse me.  Let me find it.

5            I'm taking the position, Your Honor, this is not

6    hearsay, and I draw your attention to 801(d)(1), (2),

7    subsection (A) and subsection (D).

8            THE COURT:  Your response, Mr. Condo?

9            MR. CONDO:  Your Honor, I think -- I think the

10   totality of the exhibit violates Rule 805.  Because each of the

11   combined statements -- there has not been a showing that the

12   combined statements conform to an exception to the hearsay

13   rule, particularly with respect to communications not between

14   this witness and the recipient of the document.

15           THE COURT:  Well, I don't have a copy of the document

16   so I can't tell if there's other communications between --

17           MR. O'CONNOR:  Would you like to see the entire copy?

18           THE COURT:  Yeah.  If you want me to rule on that, I

19   need to see the whole thing.

20           MR. O'CONNOR:  Should we approach?

21           THE COURT:  Sure.  Hand it to Traci.

22           What communications are you referring to, Mr. Condo?

23           MR. O'CONNOR:  Well, right now I'm at --

24           THE COURT:  Mr. Condo.

25           MR. CONDO:  If you start on the first page, Your

1    Honor, the -- and this is actually working backwards in time.

2    The last email, but it's on the top one on the first page, then

3    the second email on the first page.

4            THE COURT:  Well, I'm not understanding that.  The top

5    one on the first page is --

6            MR. CONDO:  Ms. Haas.

7            THE COURT:  To?

8            MR. CONDO:  Mr. Fermanich.

9            THE COURT:  Right.

10           MR. CONDO:  That's the first one I'm referring to.

11           THE COURT:  And you're saying that's not a statement

12   by an agent of Bard for purposes of 801(d)?  Is that what

13   you're saying?

14           MR. CONDO:  I am saying she is the author.

15           THE COURT:  What's your response to hearsay within

16   hearsay?

17           MR. O'CONNOR:  Well, I think that goes to notice.  I

18   think it goes to -- it's relevant to a material fact that they

19   placed at issue, and I think it's the best evidence that we

20   have.

21           THE COURT:  Well, none of that addresses the hearsay

22   problem.  Are you saying that portions of this are not admitted

23   for the truth of the matter asserted?

24           MR. O'CONNOR:  Right.

25           THE COURT:  Which portions?

1          MR. O'CONNOR:  Well, her contact to Mr. Fermanich is

2     being offered for notice, and what is key there is going to be

3     Mr. Fermanich's response to her.

4          THE COURT:  Well, so why don't you just admit

5     Mr. Fermanich's response, which I think -- well, wait a minute.

6     Mr. Fermanich's response or Mr. Hug's response?

7          MR. O'CONNOR:  Well, Mr. Hug and then Mr. Fermanich

8     under the same theory.

9          THE COURT:  These are within the course and scope of

10    an agent; right?

11         MR. CONDO:  They are.

12         THE COURT:  So those would come in under 801(d).

13    Correct?

14         MR. CONDO:  Mr. Fermanich's would, correct.

15         THE COURT:  Right.  So it's the Haas statements that

16    you're --

17         MR. CONDO:  Correct.

18         THE COURT:  Okay.  Can you just go with the admission

19    of what Mr. Fermanich and Mr. Hug said?

20         MR. O'CONNOR:  I have to see it.

21         THE COURT:  Sorry, ladies and gentlemen, to take your

22    time on this, but we need to abide by the rules of evidence.

23         MR. O'CONNOR:  Felice, would you go to page 2, please.

24    BY MR. O'CONNOR:

25    Q.  Mr. Hug, do you see page 2 is an email from Mr. Fermanich

1    dated April 21, 2011?

2    A.  I do, sir.

3    Q.  And it is an email whereby he is discussing issues that are

4    relevant to the course and scope of his employment as a sales

5    representative for Bard?

6    A.  I would say so, sir.

7            MR. O'CONNOR:  Move for the admission of at least

8    page 2, Your Honor.

9            THE COURT:  Any objection?

10           MR. CONDO:  No objection, Your Honor.

11           THE COURT:  All right.  So the April -- can you put

12   that back up, please?

13           The April 21st, 2011, email on page 2 is admitted, by

14   Mr. Fermanich.

15           (Exhibit No. 4806, page 2 admitted into evidence.)

16   BY MR. O'CONNOR:

17   Q.  And, Mr. Hug, let's just talk about this date.  This is

18   April 21, 2011.  And this is an email from Matt Fermanich to

19   Cynthia Haas, who as you have told us was at Wheaton Franciscan

20   Hospital; correct?

21           MR. O'CONNOR:  Oh, may I publish this document, Your

22   Honor?  I'm sorry.  It's late.

23           THE COURT:  Yes.

24           THE WITNESS:  Yes, she was an employee of Wheaton; and

25   it was sent by Matt, yes, sir.

1    BY MR. O'CONNOR:

2    Q.  And Mr. Fermanich tells Ms. Haas, who is a customer of

3    Bard, on April 21, 2011, that:  We have a new filter called the

4    Eclipse, which is of the same design of the G2 but has a few

5    new features included.

6              Do you see that?

7    A.  I do, sir.

8    Q.  And then we can read the rest.  He goes on to talk about

9    the Eclipse and how it -- the electropolishing on the Eclipse.

10             Do you see that?

11   A.  Yes.  I -- yes, I see two sentences having to do with that,

12   sir; yes, sir.

13   Q.  Now, Mr. Hug, you were aware that the company had directed

14   the sales force earlier to change out, in 2010, the G2X and

15   replace it with the Eclipse; correct?

16             We talked about that in about April of 2010; do you

17   recall that?

18   A.  The conversation we just had; yes, sir, I do.

19   Q.  And here is a Wisconsin healthcare provider who a year

20   later is contacting Matt Fermanich, and Matt Fermanich is

21   explaining the Eclipse and the need to replace the G2X.

22             Do you see that in this document?

23   A.  I see -- yes, sir, I do.

24   Q.  All right.  Thank you.

25             And is it fair to say that Bard was promoting the

1   Eclipse, at least telling customers that the Eclipse had some

2   type of improvement over the G2/G2X?

3   A.  I think it's fair to say that my folks at the time and us,

4   we were communicating that there were some differences between

5   the Eclipse and G2X.  For example, here it says the

6   electropolished, it says here, sir.

7   Q.  All right.  And do you know if after this contact, this

8   hospital, Wheaton Franciscan, received the change-out, the

9   Eclipse, after April -- excuse me, April 21, 2011?

10  A.  I'd have to look at the sales records again, but I would

11  assume that eventually they did, sir, yes.

12  Q.  And by the way, these hospitals have many different

13  departments that you dealt with; correct?

14  A.  Yes.  There's an OR, which is where the surgeries happen;

15  there's a cath lab, where they do a lot of heart procedures;

16  and then there's an IR, which is called interventional

17  radiology, where they do a lot of -- like, they put catheters

18  in and PICC lines and ports and those types of things.  So,

19  yes, I dealt with all three.

20  Q.  So you may receive different orders from different devices

21  from a number of different departments within a single

22  hospital?

23  A.  Yeah.  That's very fair, yes, sir.

24  Q.  And that may include a special request from a doctor in a

25  department that wants a device to be sent to him or her on a

1   specific day for a patient; correct?

2   A.  Yeah.  That does happen, sir, yes.

3   Q.  But for the most part, in Wheaton Franciscan Hospital, you

4   understood that Bard was promoting the IVC filters and that

5   these hospitals were purchasing them and keeping them stocked;

6   right?

7   A.  Yes.  I do believe that at Wheaton Franciscan, which had

8   multiple hospitals and then multiple, right, parts of the

9   hospital that would put in filters, I believe that they kept

10  most of them stocked at all times, yes, sir.

11          I think I answered that.

12          MR. O'CONNOR:  May I show Mr. Hug Exhibit 4804?

13          And if you would like, if it may be easy for Mr. --

14  easier for Mr. Hug if I show him -- this is an email thread.

15  And can I give him this page rather than stand here and flip

16  through it on the computer?

17          THE COURT:  Yeah.  Hand it to Traci.  She can do that.

18          THE WITNESS:  Thank you.

19          MR. O'CONNOR:  Your Honor, at this time --

20  BY MR. O'CONNOR:

21  Q.  First of all, do you see that that's an email thread?  That

22  includes Matt Fermanich responding to a customer; correct?

23  A.  Yes, sir.

24  Q.  And within the course and scope of his employment as a

25  sales rep, it would be typical for him to receive an email from

1   a customer who may have a question about a device; correct?

2   A.  Yes, sir.

3   Q.  And that's what's going on in that email; true?

4   A.  That is true, sir.

5   Q.  And Mr. Fermanich has responded to that email, and he

6   responded on February 16; 2011; is that right?

7   A.  He did, sir.

8   Q.  And he is advising -- in February 16, 2011, he is

9   communicating with yet another representative of Wheaton

10  Franciscan Hospital; correct?

11  A.  Yes, sir, he is.

12  Q.  And he is advising her that she wants to order the Eclipse

13  at that point in time?

14  A.  It looks like that, sir, yes.

15  Q.  Not the G2X?

16  A.  It's not sir; it's the Eclipse, yes, sir.

17          MR. CONDO:  Your Honor --

18          MR. O'CONNOR:  I move for admission of --

19          THE COURT:  Hold on.

20          MR. CONDO:  I would object to the witness being asked

21  questions about the content of the document until it's

22  admitted.

23          MR. O'CONNOR:  Well, I would ask to admit 4804, Your

24  Honor.

25          THE COURT:  Your response?

1          MR. CONDO:  I would object to those portions that

2     contain the hearsay of statements by Mary Christine Starr to

3     Mr. Fermanich.

4          MR. O'CONNOR:  It goes to notice again, Your Honor,

5     and Mr. Fermanich's -- the reason for him responding to her.

6     And it goes to the separate issue of the product

7     identification.

8          THE COURT:  Well, its relevancy doesn't solve the

9     hearsay problem.

10          MR. O'CONNOR:  Well, Your Honor, I think it goes --

11          THE COURT:  I don't understand what you mean when you

12     say it goes to notice.

13          MR. O'CONNOR:  For us and our position, this is the

14     best evidence we can provide on the product --

15          THE COURT:  That doesn't overcome the hearsay

16     objection either.

17          MR. O'CONNOR:  Well, I would ask you to look at the

18     residual rule, Rule 807(a)(2).  It's being offered as evidence

19     of a material fact.

20          THE COURT:  That's not -- there are four requirements

21     in Rule 807.  It has to satisfy all four of the requirements in

22     Rule 807.

23          MR. O'CONNOR:  I'll move now for -- just for the

24     admission of Matt Fermanich's response that we see on the

25     second part of page 1, if that's okay, then.

 1              THE COURT:  Any objection?

 2              MR. CONDO:  No objection, Your Honor.

 3              THE COURT:  Okay.  We will admit the second part of

 4     page 1.

 5              (Exhibit No. 4804, page 1, second part admitted into

 6     evidence.)

 7              MR. O'CONNOR:  All right.  May I publish to the jury,

 8     Your Honor?

 9              THE COURT:  Yes.

10     BY MR. O'CONNOR:

11     Q.  And here, again, this is a month earlier, February 16,

12     2011.

13              Do you see that, Mr. Hug?

14     A.  I do, sir.

15     Q.  From Matt Fermanich to Mary Christine Starr.

16              Do you see that?

17     A.  I do.

18     Q.  And Mary Christine Starr worked at Wheaton Franciscan

19     Hospital; is that correct?

20     A.  Yes.  She worked at the Wheaton Franciscan Hospital in

21     Franklin, sir, yes.

22     Q.  And here, Matt is telling her as of February 16, 2011, not

23     quite a year after the launch of the Eclipse, that she wants

24     and should order the Eclipse.

25              Fair reading?

1    A.   That's how I read that, sir, yes.

2    Q.   Do you recall having discussions with Matt about the need

3    to get the device changed out from the G2/G2X to the Eclipse

4    back at that period of time?

5    A.   I don't remember.  It was a while ago.  And I don't

6    remember -- are you asking specifically about this account?

7    Q.   About Matt --

8    A.   Yeah.

9    Q.   -- being delayed on getting the word out to the medical

10   community that they should be changing the G2/G2X for the

11   Eclipse.

12   A.   I can't recall having that conversation with Matt.

13   Q.   But today you've seen two examples where he was a year late

14   in doing so.  Fair?

15   A.   I don't -- no.  I don't think that's fair.  I don't know

16   about late.  Hospitals actually at times move at their own

17   pace.  Right?  They have processes.  They have systems.  They

18   have structure.

19   Q.   Bad question.

20   A.   Okay.  Sorry.

21   Q.   Let me try it again.

22        You have seen emails that show that Matt was first

23   communicating about the Eclipse almost a year after it was

24   released, if it was released in April of 2010.  Is that fair?

25   A.   If it was, that would be fair, sir.

```
 1   Q.  Thank you.
 2           Now, you knew Dr. David Henry; correct?
 3   A.  I called on Dr. Henry as his representative, sir, yes.
 4   Q.  I thought it appeared to me that he was somebody you knew
 5   fairly well in your world back there.
 6   A.  I can put it in perspective for you.  I probably talked --
 7   called on him probably 20, 30 times over my years of calling on
 8   him as a rep, so yeah.
 9   Q.  He was an important customer of Bard's in that area?
10   A.  I would say every customer is important for Bard, but --
11   Q.  Good answer.
12   A.  Yes.
13   Q.  That's why you're good at what you do.
14   A.  Sure.
15   Q.  But he was somebody that you saw frequently; correct?
16   A.  I would say I saw him -- sorry.  I would say that I saw him
17   frequently, sure, yes, sir.
18   Q.  And he's a doctor that both you and Matt promoted products
19   and devices to; correct?
20   A.  We did have conversations and promote product, yes, sir.
21   Q.  And he was a doctor, I imagine, you knew who was a doctor
22   that listened and trusted you?
23   A.  Yeah.  We -- you would have to ask him that.  But I believe
24   I had a good relationship, actually, with him, if I recall
25   correctly.  And we often discussed, actually, clinician or
```

1   patients in different types of films and those types of things,

2   sir.

3   Q.  And if you discussed a product and a device with Dr. Henry,

4   he would listen to you?

5   A.  I think he would -- sure, he would listen to me, just like

6   he listens to a lot of people.  But yes, sir, I'm sure he would

7   listen to me.

8   Q.  He was familiar with Bard devices, including IVC filters;

9   fair?

10  A.  Yeah, I would say he was familiar with them, yes, sir.

11  Q.  And he knew the various different names and brands of Bard

12  filters; correct?

13  A.  I -- you would have to ask him that.  I don't know for

14  sure.  Obviously there was innovation along the way there;

15  right?  So -- but he knew Bard filters.  How about that?

16  Q.  And he certainly would be a doctor who you would have

17  promoted the G2 and the G2X to; correct?

18  A.  Yes.  I would have communicated and talked to him about

19  clearly the G2, the G2X, and the various innovation iterations

20  we had, yeah.

21  Q.  From your perspective, he was a doctor who knew what a G2

22  and a G2X was; right?

23  A.  Are you asking about the differences or just --

24  Q.  About those filters.  He knew the G2 line of filters?

25  A.  He did, sir, yes.

1    Q.  And do you recall giving your deposition in this matter?

2           Do you recall being asked if you would be surprised if

3    in March of 2011 that there were still G2s and G2Xs being

4    promoted in your region, including Milwaukee?

5    A.  There are a lot of dates here.  Let me take it back.

6           So March of 2011 -- why don't you just ask the

7    question again, sir, if you could?

8    Q.  Sure.

9           Do you recall testifying about you would -- it would

10   not have surprised you if your sales reps were still promoting

11   the G2 and G2X in March of 2011?

12   A.  I can't recall that specific question in the deposition.

13   That very well could have happened, sir.

14   Q.  So you have no reason to disagree with that?

15   A.  I think I would just -- if you're asking me the question

16   now -- are you asking me the question now?

17   Q.  Yeah.

18   A.  I probably would say that it would not surprise me that due

19   to that there's ORs and there's IRs and cath labs and multiple

20   hospitals within the Wheaton Franciscan system, that there were

21   probably some places that had G2s, because some physicians

22   wanted G2s; there's some physicians that had G2X; you know,

23   there's some -- and some sites that had Eclipse.

24   Q.  And I think your point at deposition was if Bard wanted a

25   product to be transitioned, that that where you were working in that

1    Milwaukee area, that could take a while?

2    A.  It very well could because of those administrative

3    processes for each hospital and the different bureaucracies and

4    committees that you have to sort of work through.  So I -- it

5    would, sir.

6    Q.  Let me show you --

7              Excuse me.  I've got to regroup here.

8    A.  Sure.

9    Q.  I had to switch my areas before I started talking to you,

10   Mr. Hug, and I apologize.  I just got a little bit out of order

11   here.

12             MR. O'CONNOR:  Let's show Exhibit 4842.

13   BY MR. O'CONNOR:

14   Q.  Now, Mr. Hug, if you look at the top of this, this is an

15   email dated March 8, 2011.

16             Do you see that?

17   A.  I do.

18   Q.  And that's an email from you to a number of people on your

19   sales force; correct?

20   A.  Yes, sir.

21   Q.  And you're forwarding an email from Bret Baird; correct?

22   A.  Yes, sir.

23   Q.  And the subject of the email is Bard devices, and

24   information that is necessary for the sales force to carry out

25   their responsibilities while acting in the course and scope of

1    their responsibilities for Bard.  Fair?

2              I'm just asking you if that's a fair summary of the

3    email.

4    A.  Yes, sir.

5    Q.  I mean, it was important enough for you to forward to your

6    sales staff; right?  If you look at the top email.

7    A.  Yes.  It looks like we were going on backorder with the G2

8    filter.

9              MR. O'CONNOR:  I move to admit Exhibit 4842.

10             MR. CONDO:  No objection.

11             THE COURT:  Admitted.

12             (Exhibit No. 4842 admitted into evidence.)

13   BY MR. O'CONNOR:

14   Q.  All right.  Let's talk about this.

15   A.  Okay.

16   Q.  Here we are, and I'm just still staying in the March time

17   period.  We looked at emails in February of 2011 and we looked

18   at emails in April of 2011.  And now we're at March 2011.

19             Do you see that?

20             MR. O'CONNOR:  Oh, I'd move to publish -- I'd request

21   to publish this to the jury, Your Honor.

22             THE COURT:  You may.

23             THE WITNESS:  Yes, sir, I do see that.

24   BY MR. O'CONNOR:

25   Q.  And the email that you were forwarding was from Bret Baird.

1   And, again, could you tell the members of the jury who

2   Mr. Baird was?

3   A.   Bret Baird is the sort of product manager for the IVC

4   filter line.

5   Q.   And he's telling you, a district manager -- well, he's

6   advising DMs, district managers, that in the next day or so, we

7   will be going on backorder for the femoral G2 filter as a

8   result of the Meridian delay.

9        Did I read that correctly?

10  A.   You did read that correct, sir.

11  Q.   He said:  As you are aware, we had been working to finish

12  the remaining G2 product in preparation for discontinuation,

13  but with the Meridian delay, we have turned production back on

14  temporarily.

15       Did I read that correctly?

16  A.   You did, sir.

17  Q.   He said:  We should be out of backorder by next week.

18       Did I read that correctly?

19  A.   You did, sir.

20  Q.   And he said:  At this time, we do not foresee a backorder

21  for the G2 Jug system since we have enough product to cover us.

22  A.   Yes, sir.

23  Q.   Did I read that correctly?

24  A.   Yes, sir.

25  Q.   And from your perspective as a DM, the Meridian was a new

1   device that you had been talked to, trained, and you were

2   training your sales force about in terms of IVC filters;

3   correct?

4   A.  Yeah.  I don't know about the timing of that, but prior to

5   launch we would do training, sir.

6   Q.  All right.  And you understood that before March 8th, 2011,

7   Bard had been in the development process and the testing

8   process of the Meridian; right?

9   A.  I don't remember the timeline, sir.

10  Q.  But wouldn't that make sense; if they were talking about

11  launching it, there had to be activity before that?

12  A.  It would, sir.  Yes, sir.

13  Q.  And you recall that the features of the Meridian was that

14  it had caudal anchors on the shoulders of the arms and caudal

15  anchors on the feet of some of the legs of the filter; right?

16  A.  I believe so, sir, yes.

17  Q.  I mean, the feature was to reduce or eliminate the caudal

18  migration that was perplexing and haunting the G2, G2X, and

19  Eclipse.  Fair?

20  A.  I don't know about the haunting, but --

21  Q.  Well, bad question.

22  A.  I think what -- yeah.

23  Q.  You knew that the G2, G2X, and even Eclipse had problems

24  with caudal migration?

25  A.  Yeah, I believe that there were complications at times with

1  filters, and I believe that the caudal anchors were probably

2  built to address some of those complications.  But you would

3  have to ask an engineer, sir.

4  Q.  I understand.  But --

5  A.  Yeah.

6  Q.  -- engineers and people like that taught you in sales;

7  right?

8  A.  That is true.  They do.

9  Q.  And what you were taught in sales is that this Meridian's

10 going to be very good because it's going to increase stability

11 of the filter when it's in the vena cava.  Fair?

12 A.  I think it's fair that they would actually present it that

13 way, that it would potentially minimize some movement, sir.

14          THE COURT:  All right.  We're going to break at this

15 time, ladies and gentlemen.

16          We're going to break until Monday.  Please remember

17 Monday we're just here in the afternoon because of other

18 reasons in the morning that have to be attended to.  So if you

19 could be here and ready to go at 1:00 o'clock, we'll get

20 started right then.

21          You're going to have a long weekend.  Please keep in

22 mind the admonition not to discuss the case, not to do any

23 research about it on your own.

24          Anything we need to address before we excuse the jury,

25 counsel?

```
 1              MR. O'CONNOR:  Nothing from us.

 2              MR. ROGERS:  No, Your Honor.

 3              THE COURT:  Okay.  Have a good weekend.  Thank you

 4     all.

 5              (Jury not present.)

 6              THE COURT:  Please be seated.

 7              MR. O'CONNOR:  Can the witness --

 8              THE COURT:  Yeah, you can step down.  Thanks.

 9              THE WITNESS:  Okay.  Thank you.

10              THE COURT:  Counsel, so we can talk about issues

11     before we start on Monday, let's have you here at 12:30.

12              MR. O'CONNOR:  Yes.

13              MR. ROGERS:  Yes, Your Honor.

14              THE COURT:  And we'll address any issues.

15              Are there matters we should address before we break

16     today?

17              MR. O'CONNOR:  None that I can think of.

18              THE COURT:  Well, where do you want to leave the issue

19     we were discussing at sidebar?

20              MR. O'CONNOR:  Well, I think we need time to -- it's

21     late in the day, as everybody said, Your Honor, and I really

22     think that we need time to look at that over the weekend so we

23     can present to you our best argument on that issue.  I don't

24     think we have to spend a lot of the Court's time, but -- and I

25     also think that, you know, it's late in the day and obviously
```

```
1    we're getting objections to some of these parts of these

2    exhibits, so I would like time to look at that.

3            You know, the problem is we're only going to have this

4    witness here once and --

5            THE COURT:  I understand.

6            MR. O'CONNOR:  -- I would rather get as much evidence

7    as we can on this issue done right here, right now.

8            THE COURT:  Okay.  If you want to work on that over

9    the weekend --

10           MR. O'CONNOR:  That's fine.

11           MR. LOPEZ:  Yeah.

12           THE COURT:  Okay.  We'll take that up on Monday.

13           Anything from the defendants?

14           MR. ROGERS:  No, Your Honor.

15           THE COURT:  Okay.  We'll see you on Monday.

16           (Proceedings concluded at 4:31 p.m.)

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 22nd day of

13   September, 2018.

14

15

16                        s/Jennifer A. Pancratz

17                        Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25