1                UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3              _____

4   IN RE: Bard IVC Filters Products    )
    Liability Litigation,               ) MD 15-02641-PHX-DGC
5                                       )
    _____ )
6                                       )
    Lisa Hyde and Mark Hyde, a married  ) Phoenix, Arizona
7   couple,                             ) September 24, 2018
                                        )
8                    Plaintiffs,        )
                                        )
9           v.                          ) CV 16-00893-PHX-DGC
                                        )
10  C.R. Bard, Inc., a New Jersey       )
    corporation, and Bard Peripheral    )
11  Vascular, an Arizona corporation,   )
                                        )
12                   Defendants.        )
    _____ )

13

14

15       BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                       TRIAL DAY 5

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2    For the Plaintiffs:

3            Lopez McHugh
             By: **RAMON R. LOPEZ**, ESQ.
4            100 Bayview Circle, Suite 5600
             Newport Beach, CA  92660

5
             Gallagher & Kennedy
6            By: **MARK S. O'CONNOR**, ESQ.
             By: **PAUL L. STOLLER**, ESQ.
7            2575 East Camelback Road, Suite 1100
             Phoenix, AZ  85016

8
             Heaviside Reed Zaic
9            By: **JULIA REED ZAIC**, ESQ.
             By: **LAURA E. SMITH**, ESQ.
10           312 Broadway, Ste. 203
             Laguna Beach, CA  92651

11
             Goldenberg Law PLLC
12           By: **STUART GOLDENBERG**, ESQ.
             By: **MARLENE GOLDENBERG**, ESQ.
13           800 LaSalle Ave., Ste. 2150
             Minneapolis, MN  55402

14
             Lopez McHugh, LLP
15           By: **JOSHUA MANKOFF**, ESQ.
             1 International Plaza, #550
16           PMB-059
             Philadelphia, PA 19113

17

18

19   For the Defendants:

20           Nelson Mullins Riley & Scarborough.
             BY: **JAMES F. ROGERS**, ESQ.
21           1320 Main St.
             Columbia, SC  29201

22

23           Snell & Wilmer
             By: **JAMES R. CONDO**, ESQ.
24           400 East Van Buren
             Phoenix, AZ  85004

25

1              **A P P E A R A N C E S   (CONTINUED)**

2

3    For the Defendants:

4           Nelson Mullins Riley & Scarborough
            By: **RICHARD B. NORTH, JR.,** ESQ.
5           By: **MATTHEW B. LERNER,** ESQ.
            By: **ELIZABETH C. HELM,** ESQ.
6           201 17th Street NW, Suite 1700
            Atlanta, GA   30363
7

8           C.R Bard, Inc.
            Associate General Counsel, Litigation
9           By:  **CANDACE CAMARATA,** ESQ.
            730 Central Avenue
10          Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**EXAMINATION**

| WITNESS | PAGE |
|---|---|
| TIMOTHY HUG | |
|     Cross-Examination By Mr. Condo | 1066 |
|     Redirect Examination By Mr. O'Connor | 1079 |
| BRET BAIRD | |
|     Direct Examination By Mr. O'Connor | 1095 |
|     Cross-Examination By Ms. Helm | 1147 |
|     Redirect Examination By Mr. O'Connor | 1165 |
| | |
| Video testimony of Dr. John Lehmann played | 1174 |
| Video testimony of Joseph deJohn played | 1175 |
| Video testimony of Carol Vierling played | 1176 |
| Video testimony of Dr. David Henry played | 1176 |

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 8837 | Defendants' Exhibit 10 to Joint Report on Determining Filter Type | 1070 |
| 571 | Baird Deposition, 06/09/2016 – Exhibit 301 – PowerPoint Presentation entitled BPV Filter Franchise Review dated 5/6/2008 (colored and 43 pages) | 1101 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 4454 | Eclipse Vena Cava Filter Concept POA, Revision 2 | 1112 |
| 4455 | Vail Vena Cava Filter DIS | 1117 |
| 592 | Baird Deposition, 06/09/2016 – Exhibit 325 – 4/28/2010 E-mail from Bret Baird to the Sales Team | 1119 |
| 1568 | Kessler Report – September 30, 2010 memo from Bret Baird to Eclipse DRT, with the subject line "Eclipse Post-Market Design Review/Marketing Summary," stated: "The objective of the Eclipse Filter project was to enhance the G2 X filter surface finish…" | 1125 |
| 4416 | Bill Little email re Eclipse Filter Naming | 1132 |
| 591 | Baird Deposition, 06/09/2016 – Exhibit 322 –  Bard Idea POA on the Denali Filter, Project No. 8108 Rev. 0.0, revised August 2009 by Bret Baird | 1135 |
| 1788 | Orms Deposition, 08/16/2016 – Exhibit 14 – 10/2/2010 E-mail Thread from Jeffrey Pellicio Re. "Meridian Commercialization Plan" | 1143 |

**(Index of Exhibits Continued)**

**EXHIBITS**

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 1149 | Fuller Deposition, 01/11/2016 – Exhibit 123 –  NMT Report Entitled "Line Extension to the Simon Nitinol Filter®/Straight Line System, To Be Referred As: TRADEMARK Retrievable Filter" | 1175 |
| 1643 | McDermott Deposition, 02/05/2014 – Exhibit 02 – Bard's Product Performance Specification Report on the Recovery Filter and Femoral Delivery System, PPS No. PPS070016 Rev. 0 | 1175 |
| 4392 | Truthfulness and Accuracy Statement Vierling Deposition, Exhibit 227 | 1176 |
| 2149 | Vierling Deposition, 05/11/2016 – Exhibit 231 – 12/13/2001 E-mail from Carol Vierling to kaufmajo@ohsu.edu, Paul Stagg, and Connie Murray Re. "RF Protocol" | 1176 |
| 2153 | Vierling Deposition, 05/11/2016 – Exhibit 236 – 6/3/2002 Memo from Lynn Buchanan-Kopp to Project 7081 Design History File Recovery Filter Project Team Re. "Project Phase Clarification", defining the 3 phases of the Recovery filter project (I. Permanent; II. Intraprocedural Removal; and III. Long-Term Removable), as decided at the project team meeting on 5/20/2002 | 1176 |

**P R O C E E D I N G S**

(Proceedings resumed in open court outside the presence of the jury.)

08:31:22   THE COURT:  Thank you.  Please be seated.

Good afternoon, everyone.

EVERYONE:  Good afternoon, Your Honor.

THE COURT:  Mr. Lopez, we hope things went well for your family.

12:30:09   MR. LOPEZ:  They did, Your Honor.  Appreciate that.

THE COURT:  What matters do we need to talk about before we get started?

MR. O'CONNOR:  We're going to talk about the issue raised last week, Your Honor.  I'd like to revisit the

12:30:18   e-mails we talked about, and then Ms. Helm advised me there's going to be an issue about attorney advertising when Bret Baird comes up and I think if we can just talk about that while we're here, we can iron that out.

THE COURT:  Okay.  We've only got 29 minutes.  We

12:30:34   need to cover it efficiently.

MR. O'CONNOR:  And Ms. Zaic brought jelly beans for the jar if we need replacements.

THE COURT:  We're not going to use edible beans; that will complicate the process.  But you each have three

12:30:46   beans now.

12:30:47 1          MR. ROGERS:  I understand, Your Honor.

2          THE COURT:  We reduced from four to three.

3          MR. ROGERS:  And tomorrow is two; right?

4          THE COURT:  Not necessarily.

12:30:54 5          Go ahead, Mr. O'Connor or Mr. Lopez.

6          MR. LOPEZ:  Your Honor will recall we had a long

7 discussion at sidebar about this and I know it's already on

8 the record with respect to our position, but it's pretty

9 clear that warnings, and not just the IFU but the warnings

12:31:17 10 and the information that's provided to consumers is part of

11 the case and I want to bring to the Court's attention a

12 couple of things that are in the comments section of the

13 Restatement.

14     In particular, comment F states such expectations

12:31:35 15 and, we're talking about consumer expectations, about product

16 performance and the dangers attendant to the product's use,

17 affect how risks are perceived and relate to foreseeability

18 and frequency of the risks of harm.

19     So comment F states, "Such expectations are often

12:31:54 20 influenced by how products are portrayed and marketed and can

21 have a significant impact on consumer behavior."

22     So -- and of course we had the punitive damage

23 discussion at sidebar as well.  And if, in fact -- what is in

24 an IFU?  What is this issue about fair balance and how you're

12:32:21 25 supposed to portray a device?  That's a requirement under the

12:32:24   1   federal regulations when you market a medical device or

2   pharmaceutical was you have to be fairly balanced.

3       I think we have the right to show that there's a

4   dilution in what's in the IFU.  We already heard the IFUs are

12:32:39   5   the same.  They basically say the same thing.  There's a

6   laundry list of known complications.

7       This case is about whether or not that warning can

8   somehow relieve under the negligence cause of action we have

9   for design defect, the defense from that -- at least that

12:32:56  10   charge.  In other words, that their warnings are sufficient.

11       Well, if those warnings are diluted by the company

12   spending more time and money and being more aggressive and

13   more motivating to their sales and marketing department to

14   reach certain goals, reach certain quotas, then that's what's

12:33:17  15   out in the consumer field with respect to these devices.  It's

16   not what's in the IFU.  And I think that the more aggressive

17   that marketing is, the less likely that doctors are going to

18   pay much attention to an IFU they know is basically -- says

19   what every other IFU does state.

12:33:37  20       So in order for us to be able to establish against

21   Bard that their IFU was not sufficient, under this defense

22   they have that somehow or another relieves them of a defective

23   design under negligence theory, I think we have the right to

24   show exactly what Bard did and how aggressive they were at

12:33:57  25   marketing this device as being more safe and more effective

12:34:00  1    and the incentive that the sales representatives got to do

       2    that.

       3            And, again, I think the way -- how the products are

       4    portrayed and marketed can have a significant impact on

12:34:13  5    consumer behavior is right in the comment.

       6            There's another comment, this is comment L, I

       7    believe.

       8            It is.  "Relationship between design and instruction

       9    or warning.  Reasonable designs and instructions or warnings

12:34:34 10    both play important roles in the production and distribution

      11    of reasonably safe products."

      12            "In general, when a safer design can reasonably be

      13    implemented and risk can be reasonably designed out of a

      14    product, adoption of the safer design is required over a

12:34:51 15    warning and leaves a significant residuum of such risk.  For

      16    example, instructions and warnings may be ineffective because

      17    users of the product may not be adequately reached, may be

      18    likely to be inattentive or may be insufficiently motivated to

      19    follow instructions or heed the warnings."

12:35:08 20            So, again, especially that last bullet point.  If

      21    they're trusting the messaging of some, I don't know how many

      22    hundreds of salespeople they have out there in the marketplace

      23    where they're being aggressively marketed by salespeople who

      24    know that they have to reach certain quotas and if they do

12:35:27 25    they get certain incentives for doing so, then that has a

12:35:30  1    tendency to insufficiently motivate doctors from even looking

       2    at an IFU.

       3        This is comment J.  "However, obviousness of risk

       4    does not necessarily obviate a duty to provide a safer design.

12:35:47  5    Just as warnings may be ignored, so may obvious or generally

       6    known risks be ignored leaving a residuum of risk great enough

       7    to require adopting a safer design."

       8        Again, this goes to whether or not, because of Bard's

       9    attitude and conduct and the way they marketed this device,

12:36:06 10    that it resulted in doctors ignoring other aspects of what's

      11    in the IFU or what should have been warned about that we're

      12    saying that should have been not only in the IFU but maybe

      13    warned about in other methods of labeling.

      14      (Phone tone.)

12:36:33 15        MR. CONDO:  I take responsibility.

      16        MR. LOPEZ:  The record should reflect my phone I

      17    forgot, so it's not going to be me today.

      18        MR. ROGERS:  Afternoon, Your Honor.

      19        Your Honor, I may be overly simplistic about this,

12:36:48 20    but I don't really know that I've heard anything different

      21    than what we heard on Friday afternoon.  And as we discussed

      22    during the sidebar, the Court recognized that there has to be

      23    some point where we are cutting off failure-to-warn evidence

      24    because that claim is not in this case.

12:37:06 25        And I think we all agree that under the comments, the

12:37:10  1    Restatement, Third, the IFU comes in and that's the way we

       2    treated the case.  And as Your Honor has correctly determined,

       3    if there is information that was not provided, that is also

       4    relevant.  That makes perfect sense.

12:37:22  5            What the information was that provided to the doctors

       6    is relevant, as are consumer, i.e., physician, expectations,

       7    which the plaintiffs have already introduced plenty of

       8    evidence of in the case.

       9            But if we get to that next step of the why behind the

12:37:39 10    conduct, what is the motive for not providing the information,

      11    then I think we are trying a failure-to-warn claim and we run

      12    the risk that if punitives goes to the jury and they decide

      13    that they're going to award punitive damages, that they will

      14    be awarding punitive damages based on a failure-to-warn claim

12:38:02 15    which is not in existence in this case.

      16            And as I heard Mr. Lopez, he was saying that he wants

      17    to establish this causal connection of why doctors perhaps

      18    ignored the warning or why salespeople were incentivized to

      19    not provide information, and that there's going to be some

12:38:24 20    parts of the IFU that were ignored or not paid attention to by

      21    doctors, but in this case, I think that is exactly why failure

      22    to warn was tossed out on summary judgment, because the

      23    evidence was that Dr. Henry, the implanting physician, was not

      24    influenced by this IFU and, hence, the Court granted summary

12:38:45 25    judgment.  So as near as I can tell, that's the reason why

12:38:49   1   that claim in the case was dispensed.  And so we shouldn't be

        2   getting into evidence of motive behind this conduct.

        3            THE COURT:  Okay.  Thank you.

        4            MR. LOPEZ:  Could I have 30 seconds, Judge?

12:39:02   5            THE COURT:  Let me -- I'm going to give you a chance

        6   to comment in a minute.  I want to share a few thoughts I've

        7   had.

        8            By the way, a side issue on all of this is what we do

        9   with the comments to the Restatement in the instructions.

12:39:12  10   Each side cites their favorite comments and says no other

       11   comments should be part of the instructions.

       12            They've either got to come in or out.

       13            Here's -- here's the thinking that I've done since we

       14   were here on Friday, and your comments today have been

12:39:30  15   helpful.

       16            This is a hard call, in my judgment, as to how much

       17   failure-to-warn evidence ought to come into this case in

       18   support of the design defect claim.

       19            I worry that if we try a full-blown failure-to-warn

12:39:55  20   case in front of the jury and put in all the evidence that

       21   they will be confused on liability and they could impose

       22   liability because they think the defendants negligently failed

       23   to warn.  That wouldn't be the right result in this case.

       24            That's why I've tried to find a place to draw a line

12:40:11  25   as to how far down the failure-to-warn road we're going to go.

12:40:20  1     The difficulty, further difficulty, I ran into over

2     the weekend as I thought about it was this:  At least in

3     Arizona when punitive damages are awarded, I know this isn't

4     Wisconsin law but it's the same conduct, the jury is told they

12:40:36  5     have to find an evil mind.  Meaning malicious or wrongful

6     intent.

7          Question I asked myself over the weekend was if, and

8     I emphasize "if" and am speaking hypothetically, a

9     manufacturer had the wrongful intent of knowingly putting a

12:40:57  10    defective market on the product and sought to make money off

11    it by marketing it aggressively, how could you separate the

12    evil mind behind putting a defective product on the market and

13    the evil mind behind marketing it aggressively?  It's hard to

14    say those are two different evil minds.

12:41:20  15         And I began to wonder if, on the punitive damage

16    case, it's possible to draw a line between what plaintiffs

17    claim is evidence of an intent to sort of paper over the

18    defect in the market by aggressive marketing and any intent to

19    put a defective product out there.

12:41:41  20         That had me wondering for a while, in talking through

21    it with my law clerks for about an hour on Friday night and

22    some of their thoughts, whether what we ought to be doing in

23    this case, and I'm not going here but I want to let you know

24    what I was thinking, if we should restructure how we're going

12:41:59  25    to deal with punitive damages and say what we'll do first is

12:42:04   1   put liability and compensatory damages to the jury, and if

2   they come back holding the defendant liable and awarding

3   damages, then we would put to them two questions on punitive

4   damages:  First, do you award punitive, or should punitive

12:42:19   5   damages be awarded; and, second, what amount?  And in that

6   second phase we could let defendants put in failure-to-warn

7   evidence they think goes to evil mind in order to justify

8   granting punitive damages.

9        That way it doesn't infect the liability

12:42:35  10   determination but it's fairly considered by the jury in

11   awarding punitive damages.

12        Now, that would require some restructuring of

13   witnesses and things, and I don't know that we ought to do

14   that.

12:42:46  15        That is one thing I was wrestling with because I

16   really do have difficulty dividing the evil mind evidence as

17   neatly as I described it Friday at sidebar.

18        The other thing I have wondered, and I thought about

19   this as I was listening to you this afternoon, is whether part

12:43:06  20   of the answer is a pretty detailed jury instruction explaining

21   to the jury, and you haven't proposed anything like this, that

22   this is not-a-failure to warn case; they cannot hold Bard

23   liable for a failure to warn because there is no such claim in

24   this trial.  However, they can consider failure-to-warn

12:43:24  25   evidence in the following way.  So we try to -- and that

12:43:29  1    would, I think, necessarily have us discussing to some degree

2    what's in the Restatement comments.

3         We try to make sure that by putting in the evidence

4    that plaintiffs want to, we're not risking a liability verdict

12:43:43  5    based on failure-to-warn evidence.

6         That's got problems as well.

7         And so where I am now is I continue to be very

8    worried that if we -- well, if we go down the road the

9    plaintiffs want to go down, we're putting all of the

12:44:01 10    failure-to-warn evidence in in front of the jury.  I can't

11    think of anything that has come in on failure-to-warn claims

12    that doesn't go in front of them.  And I think that does

13    create a serious risk of a liability determination based on

14    the failure to warn not defective -- not product defect.

12:44:18 15         So that's what I've been wrestling with.  How do we

16    give the defendants a fair trial on the product defect

17    liability but get plaintiffs a fair trial in getting in

18    evidence on punitive damages and the appropriate level of

19    failure-to-warn evidence in support of a product defect claim?

12:44:42 20         Having said that much, I'm interested in 30-second

21    comments from you if we're really going to get to other issues

22    before the jury comes in.

23         MR. LOPEZ:  Your Honor, I just -- one of the -- what

24    I wanted to say is to remind the Court that we wanted the IFU

12:44:58 25    out of this case.  We didn't want any --

12:45:00  1          THE COURT:  I know that.  I know.  But I think it's

2     appropriately in the case because of the very comment to the

3     Restatement that you cited.

4          MR. LOPEZ:  And that as you know, the defense made a

12:45:10  5     motion for -- in limine on marketing and they withdrew it.

6     So I'm not sure what effect that has on your thinking, but --

7     it probably doesn't enter into the thought or rationale and

8     thought process that you're struggling with.

9          But, you know, our position is simple, and that is

12:45:31  10    even if this was just a design case and there was a defect- --

11    a known defectively designed case and the evidence in the case

12    showed that they continued to market the device knowing it had

13    defects in it and they didn't tell anybody, they knew it had

14    to be fixed, they knew it was increasing the risk, all those

12:45:51  15    things we're going to, frankly, argue to the jury because I

16    think we have evidence of that, their conduct with respect to

17    that evidence, the fact that they knowingly have a defective

18    design device, they knowingly have done an internal analysis

19    determining it's an unacceptable risk and it's not performing

12:46:12  20    in the manner in which they're representing it in their

21    brochure, that's marketing.  And instead of changing their

22    brochure and instead of changing their marketing practices,

23    they upped the anti.  They doubled down on marketing.

24          And I think -- I don't know how you separate that out

12:46:30  25    of our case even if the IFU wasn't in this case because the

conduct surrounds this company's knowledge regarding the fact that they have a defectively designed product.

Now, I know they're arguing against it.  But if we convince the jury this company knowingly continued to sell a device they knew had to be fixed and that because of its design, because it wasn't adequately tested, it was increasing the risk of some serious, serious harm, these fragments to the heart that's never been reported nearly to this magnitude with any other device and never in the Simon Nitinol filter, shouldn't they not be able to look at, well, what did the company do about that?

Well, what they did is they incentivized their salespeople to sell more and more of it.

I mean, I don't think there's a blurred line there, Your Honor.  I think it's a very clear, you know, circle of evidence dealing with the same conduct, the same evidence, and what I think the jury has the right to consider with respect to the company's conduct surrounding that evidence.

MR. ROGERS:  Your Honor, two brief points.

First of all, in response to your two thoughts about how to deal with the issue, my initial reaction is that both of those are problematic and I think that they would both run risk of jury confusion and -- for the jurors to award punitives or liability for conduct that is not at issue in the case.  I just am not sure either of those things are a fix for

12:48:02  1    the problem that you've identified.

      2           Secondly, in response to Mr. Lopez, I just don't

      3    really hear anything really any different.  I think if we go

      4    there, we're trying the case on the conduct issue that relates

12:48:21  5    to failure to warn, and that claim is not in this case.

      6           THE COURT:  Mr. Hug is the witness on the stand.

      7    He's local, right?

      8           MR. ROGERS:  Yes, Your Honor, but he has -- he needs

      9    to go today because he has a conflict for the remainder of

12:48:36  10   the week.

      11          THE COURT:  How about next week?

      12          MR. ROGERS:  I would have to check.  I don't know

      13   the answer to that.

      14          THE COURT:  This is an important enough decision for

12:48:44  15   the whole case that I don't want to shoot from the hip and

      16   make a decision.  I mean, for one thing I haven't looked

      17   back, because I was working on other stuff over the weekend,

      18   at the law on how close the link needs to be between evidence

      19   of punitive damages and the conduct that is at issue in the

12:49:03  20   tort.

      21          One possibility would be to finish what we can with

      22   Mr. Hug, not go into the sales incentive evidence.  If I

      23   decide to let it back in, then have him come back next week if

      24   he's available and allow the plaintiffs to put the evidence in

12:49:18  25   at that time.  That gives me time to ponder it before the door

12:49:23 1  is closed on getting that evidence in.  But that depends on

2  his availability.

3          MR. ROGERS:  Yes, Your Honor.  We're trying to find

4  that out, Your Honor.

12:49:30 5          And the other concern I have about that is I think

6  the next witness, or at least one of the witnesses who is

7  supposed to be called today, we're going to be dealing with

8  the same issue.  And, again, I do not know his availability

9  either.

12:49:43 10         THE COURT:  Who is that?

11         MR. ROGERS:  That's Bret Baird, who was also a sales

12  and marketing person.

13         THE COURT:  Are you intending to cover the same kind

14  of material with Mr. Baird?

12:49:52 15        MR. O'CONNOR:  Well, no.  The material --  the

16  material that got the objection going was when I was going to

17  ask Mr. Hug about how sales are paid and those types of

18  things.  Mr. Baird is a whole different issue.

19         He talks about the Eclipse, he talks about baggage,

12:50:10 20  and he talks about the reason for the name change, which our

21  position is from that the jury can infer that there was no

22  difference between the G2 and G2X and Eclipse --

23         THE COURT:  Let's not go down the road of what

24  you're going to -- my question is are you going to present

12:50:26 25  any sort of sales marketing information through Mr. Baird?

12:50:30  1          MR. O'CONNOR:  I don't regard it as sales and

2      marketing, I regard it as admissions by the defendant

3      about --

4          THE COURT:  It's not how you regard it.  I need to

12:50:36  5      know if he's going to raise the same issues so I know if I

6      need to rule now or later.

7          MR. O'CONNOR:  I'm going to ask him questions about

8      statements he made in documents where he talks about why the

9      name change of the Eclipse happened, which I believe -- and I

12:50:55 10      think I've heard there are two other documents they claim he

11      can't talk about without talking about advertising, attorney

12      advertising.  We were going to raise that to you this

13      morning.

14          But, yes.  I mean, in terms of if that's marketing, I

12:51:09 15      intend to ask it of him about how they regarded these filters

16      and what these documents say.

17          I'm not going to be asking him about compensation.

18          THE COURT:  Is Mr. Baird local?

19          MS. HELM:  Yes, he's local.  He's a former employee.

12:51:27 20      So we have to work -- we have less control over him than we

21      do Mr. Hug who is a current employee.  But he's in the

22      Phoenix area, and I can check on his availability.

23          THE COURT:  Is Mr. Hug here?

24          MS. HELM:  They're both here.

12:51:40 25          THE COURT:  Could you check with them?

12:51:42  1          MS. HELM:  Yes.

2          THE COURT:  All right.

3          We've got seven minutes left.

4          Mr. Rogers.

12:51:47  5          MR. ROGERS:  Your Honor, very briefly, you may be

6  familiar with this case, it's a Wisconsin case --

7          THE COURT:  Are we talking about the same issue?

8          MR. ROGERS:  Yes, Your Honor.

9          THE COURT:  Okay.

12:51:57 10          MR. ROGERS:  Is that okay?  I'm glad not to --

11          THE COURT:  Yeah, if there's something I can read --

12          MR. ROGERS:  I was going to hand it up if you were

13  interested --

14          THE COURT:  That's fine.

12:52:05 15          MR. ROGERS:  It's a case that involves the

16  connection between the award of punitive damages and the

17  conduct at issue in the case.

18          THE COURT:  Okay.  That's fine.

19          MR. O'CONNOR:  Your Honor, and I --

12:52:14 20          MR. LOPEZ:  Can we have a copy.

21          MR. O'CONNOR:  And I have another issue I wanted to

22  raise --

23          THE COURT:  Hold on a minute.  Let's get that --

24          MR. ROGERS:  The case is *Keel versus Economy Fire*

12:52:22 25  *and Casualty Company,* and the citation is 433 N.W. 2d 279,

12:52:31  1    and I have a copy for Plaintiffs' counsel.

        2              THE COURT:  Okay.  That's fine.  You can bring it

        3    up.

        4              All right.  We've got six minutes.  What were you

12:52:39  5    going to raise, Mr. O'Connor.

        6              MR. O'CONNOR:  I wanted to reraise this issue about

        7    these e-mails and -- and I believe that they are admissible

        8    as adoptive admissions under 801(d)(2)(B).  I have found two

        9    cases, if you're interested.

12:52:53  10              THE COURT:  How are they adopted admissions?

        11              MR. O'CONNOR:  Adopted admissions because, number

        12    one, the testimony was that the sales reps, part of their

        13    responsibility is to field emails and concerns and questions

        14    about filters, the fact that these out-of-court people said

12:53:06  15    that they were still using G2 puts defendant on notice and

        16    gives the defendant knowledge --

        17              THE COURT:  Notice is different from an adoptive

        18    admission.

        19              MR. O'CONNOR:  Pardon me?

12:53:17  20              THE COURT:  Notice is different from adoptive

        21    admission.  Why are you saying they're an adoptive admission?

        22              MR. O'CONNOR:  Well, you know, Your Honor -- .

        23              THE COURT:  Let me ask this question:  An adoptive

        24    admission occurs when the opposing party accepts and

12:53:33  25    promulgates a statement somebody else made.  They adopt it as

12:53:37   1   their own.  When in these e-mails did Bard adopt as its own
           2   the statements made by these hospital officials?
           3           MR. O'CONNOR:  When they told the people, the two
           4   people in the two separate e-mails, that they needed to use
12:53:49   5   the Eclipse and not the G2.
           6           THE COURT:  That's a response to what they said.
           7   That isn't adopting what the hospital people said.
           8           MR. O'CONNOR:  Well, under those circumstances, the
           9   statement from the declarant's not hearsay.
12:54:02  10           THE COURT:  Why?  It's an out-of-court statement by
          11   a nonparty that you want to admit for the truth of the matter
          12   asserted.  Why is that not hearsay?
          13           MR. O'CONNOR:  Well, listen, I have two cases and I
          14   can show them to you if you would like the names of them.
12:54:17  15           THE COURT:  Well, I'll be happy to look at them.
          16   Are they adoptive admission cases?
          17           MR. O'CONNOR:  They go both to adoptive admission
          18   and notice about out-of-court statements prove that the
          19   defendant was aware of something.  We're not offering them
12:54:30  20   for the truth of it.  There it was a note --
          21           THE COURT:  Let me interrupt you on that.  You said
          22   notice a number of times.  Here's what I understand you to be
          23   arguing.  You're arguing that because the hospital official
          24   said we have G2s in stock, I'm making this up, the defendants
12:54:46  25   were on notice that the hospital had G2s in stock.  But that

25

can only come in as non-hearsay if you're not asking the jury

to accept the truth of the fact they had G2s in stock.

        If you're asking -- if you want to use it to prove to

the jury they had G2s in stock, then it is for the truth of

the matter asserted, it isn't limited to notice of the

defendant, and it's still hearsay.  That's the problem I've

had with your notice argument.

        It seems you want the jury to accept as true that

they had G2s in stock, what the hospital was saying to Bard.

That's for the truth of the matter asserted by the hospital.

        MR. O'CONNOR:  I'm say something slightly different.

        That e-mail is that they're not using Eclipse.  I'm

not trying to say that that's the truth.  What I am trying to

say is that goes directly to the heart of the issue, that that

puts the defendant on notice that despite a year earlier when

they said stop selling the G2 and start selling the Eclipse,

they hadn't done it.  And they tell in that e-mail, in the

response e-mail, that they need to change over to Eclipse.

        It goes to an issue they've raised now with the

product identification and it goes to other issues.  But in

order for this jury to understand the context of it, I don't

need to suggest that those were truthful.  But what Bard did

in response certainly means they use that as notice that their

plan wasn't working out in Wisconsin to change the Eclipse --

change the G2X out with the Eclipse.

12:56:21  1        THE COURT:  I think if I'm going to rule that what

2    you want to bring in from the hospital is not for the truth

3    of the matter asserted, I've got to see the e-mails and see

4    exactly what it is you're proposing to present.

12:56:30  5        MR. O'CONNOR:  Sure.

6        THE COURT:  We've got two minutes left now, so --

7        MR. O'CONNOR:  May I approach?

8        MR. CONDO:  Mark, what exhibits are you --

9        MR. O'CONNOR:  These are 4804 and 4806.

12:56:49 10        THE COURT:  Okay.  We've got to move quickly,

11   Mr. O'Connor.  Show me exactly what it is --

12        MR. O'CONNOR:  Right on the first page --

13        THE COURT:  You've got to be at a mic.

14        MR. O'CONNOR:  I didn't bring an extra copy.

12:57:00 15        First page at the top.  She says we still I have G2

16   in stock after -- in response to the man who told her she

17   needs the Eclipse.  And earlier she said they're still using

18   the G2 in an e-mail that started that chain.

19        THE COURT:  So what you want to admit is the

12:57:22 20   hospital's statement where she says "Matt, I filled out the

21   first half of the form.  The second half you fill out,"

22   question mark.  "I need to order some filters.  Is it the

23   Eclipse or the G2," question mark.

24        MR. O'CONNOR:  Yes.

12:57:38 25        THE COURT:  And he says, "You want the Eclipse."

12:57:43  1        And she gets back and says, "Thanks, Matt.  We still

       2   have a G2 in stock.  Are those still being used?"

       3        Later, "I know that the cath lab can't send anyone

       4   this round either."

12:57:59  5        I had understood, and this may be where I'm

       6   misunderstanding you, that you wanted to argue to the jury on

       7   product identification this shows they had G2s in stock and

       8   therefore what was used on Ms. Hyde was likely a G2.

       9        If that's what you want to argue from it, then it's

12:58:18 10   for the truth of the matter asserted that there are G2s in

      11   stock.

      12        MR. O'CONNOR:  I want to argue that this defendant

      13   has taken inconsistent positions and now they're suggesting

      14   this is an Eclipse, and what that e-mail shows is they were

12:58:35 15   aware that there were hospitals in this territory that were

      16   not aware of the changeover between the Eclipse and the G2X.

      17        THE COURT:  I thought this was going to product

      18   identification.

      19        MR. O'CONNOR:  That is going to product

12:58:53 20   identification.  They're going to suggest to the jury we have

      21   invoices to show that somebody somewhere got the Eclipse.  I

      22   want to show it certainly wasn't these people and they knew

      23   it.

      24        THE COURT:  And it wasn't these people because the

12:59:08 25   hospital is saying they have G2 in stock?

12:59:12  1        MR. O'CONNOR:  Because of what they told them put

2    them on notice where they knew at that point in time that

3    this hospital did not have the Eclipse in stock.

4        THE COURT:  My problem is I don't know how you tell

12:59:21  5    the jury that this shows that the product used was a G2

6    without them accepting the truth of the assertion made by the

7    hospital in this e-mail:  We have G2s in stock, we don't know

8    what to order.

9        MR. O'CONNOR:  I have two cases that illustrate that

12:59:39 10    point.

11        THE COURT:  I'm happy to look at them, but I can't

12    rule in your favor right now because that looks to me like

13    the truth of the matter asserted.

14        MR. O'CONNOR:  Well, here's my question to you, Your

12:59:44 15    Honor, to move things along.  Have I made an adequate enough

16    record with this witness that if I show you the cases we can

17    admit the rest later?

18        THE COURT:  Well, yeah.  I mean, I think if it's not

19    hearsay, if I conclude it's not hearsay -- that's the

13:00:01 20    objection that's been made to it; right?

21        MR. CONDO:  Yes, Your Honor.

22        THE COURT:  So if I conclude it's not hearsay, I'll

23    admit the whole exhibit.  So I don't think there's more

24    foundation you need to raise.

13:00:12 25        MR. CONDO:  Your Honor, the objection is still

13:00:13  1    hearsay, but this doesn't go to product identification

2    because we're talking about whether it's a G2X or Eclipse.

3    This is a G2.  Every expert who's --

4            THE COURT:  That's a relevancy objection.

13:00:27  5            MR. CONDO:  Yes.

6            THE COURT:  Okay.  You're reserving the relevancy

7    objection, but that still doesn't require him to lay more

8    foundation.

9            MR. CONDO:  Not as to that; correct.

13:00:35 10            THE COURT:  I think you've done all you need to on

11    the exhibits.  If I end up agreeing with your arguments, the

12    whole thing will come in.  If I disagree, then only the

13    admissions will come in.

14            MR. O'CONNOR:  May I have one second?  I think we

13:00:46 15    can --

16            THE COURT:  We've got to get the jury in.

17            MR. O'CONNOR:  I don't think I have anything --

18            MS. SMITH:  This issue is going to come up when we

19    play the Fermanich deposition because they've objected to

13:00:58 20    this same exhibit, although they never object to the --

21            THE COURT:  My ruling at this point is it's hearsay.

22    I can't change my view without reading the cases and

23    considering your argument so --  but I'm happy to consider

24    it.

13:01:04 25            MR. O'CONNOR:  I'll give you the cases at the break.

13:01:06   1     May I have my exhibit?

           2              THE COURT:  You can have your exhibit.

           3              MR. CONDO:  Your Honor, we have Mr. Hug and would

           4     like some guidance from the Court.  He can come back.

13:01:22   5              THE COURT:  How about Baird?

           6              MS. HELM:  Mr. Baird -- I have their very detailed

           7     availability.  Mr. Hug is available this Friday and next

           8     Monday morning only.  He has to be --

           9              THE COURT:  Okay.  That's fine.

13:01:37  10              MS. HELM:  Mr. Baird is available next week Tuesday

          11     through Friday.

          12              THE COURT:  Okay.  What I'm going to do --

          13              You've got to hear this, Mr. O'Connor, Mr. Lopez.

          14              What I'm going to do is this:  I am not today going

13:01:50  15     to allow you to go into compensation methods with Mr. Hug, or

          16     if I think there's something else in that category with

          17     Mr. Baird, with Mr. Baird.  I want to think about this more.

          18     I want to read the cases.

          19              If I decide to allow it, you can call them back for

13:02:08  20     that purpose in one of these time slots when they're

          21     available.  That gives me more time to make my most informed

          22     decision.

          23              MS. HELM:  Your Honor, I know we're out of time, but

          24     we have an issue that impacts Mr. Baird relating to this

13:02:21  25     attorney advertising.  We discussed it some in Jones.

13:02:24    1          There are three exhibits that we believe open the

            2    door to attorney advertising back in 2009 and 2010.  I'm happy

            3    to raise it at sidebar.  I don't really want to use a bean

            4    because we intended to raise it before he takes the stand and

13:02:41    5    I informed Mr. O'Connor we were going to raise it before he

            6    takes the stand.

            7          THE COURT:  Well, what, in a nutshell, is the issue?

            8          MS. HELM:  There are three documents, at least, that

            9    in order to truthfully answer questions about the documents,

13:02:57   10    Mr. Baird would have to talk about attorney advertising that

           11    was occurring in 2009 and 2010 involving -- not involving

           12    these lawyers.  But the competitors had taken the attorney

           13    advertising and were using it to sell against Bard, and his

           14    testimony would be he spent a tremendous amount of his time

13:03:23   15    addressing that and these documents and statements in these

           16    documents, that's what they refer to.

           17          THE COURT:  Counsel, correct me if I'm wrong, my

           18    memory --

           19          Mr. Lopez, I need your thoughts on this, too.

13:03:32   20          My memory from the last trial -- I don't know if it

           21    was the last one or the Booker trial -- was that I allowed

           22    that explanation, but I instructed the jury that the attorney

           23    advertising being discussed didn't involve plaintiffs' counsel

           24    in this case, so they understood it wasn't these folks, but it

13:03:52   25    was the response as to why he was doing what he was doing.  Am

13:03:56  1    I correct that that's how I dealt with it last time?

2              MS. HELM:  Yes, Your Honor.

3              MR. O'CONNOR:  I believe that's how you did it.  But

4    now they're telling us three documents, not one.  And there's

13:04:05  5    no mention of attorney advertising in any of that and they're

6    saying he has to talk about that to explain something in

7    context.

8              Your Honor, we've been required to talk about the

9    Recovery filter and catastrophic events but not this.  I don't

13:04:18  10   see why they can't do the same thing.  I don't see why these

11   three documents they feel have to inject this issue to

12   continue to pound it into the ground --

13             THE COURT:  Well, but you've already told me you

14   want to ask him about baggage --

13:04:30  15             MR. O'CONNOR:  Baggage --

16             THE COURT:  -- and he wanted to say baggage was

17   created, in part or in whole, by lawyer advertising.

18             MR. O'CONNOR:  I think it's in part.

19             THE COURT:  In part.  But that's directly responsive

13:04:39  20   to the issue you want to put in front of the jury.

21             MR. O'CONNOR:  The other two documents, I don't see

22   where there's baggage mentioned in them.

23             THE COURT:  Well, I don't know what the other two

24   documents are.  But my ruling on this issue is going to be

13:04:51  25   the same as in the previous trial.  If the truthful

13:04:54   1   explanation of what he was talking about involved lawyer

  2   advertising, he can say that, but I will instruct the jury

  3   that it's not advertising by anybody involved in this case.

  4   And that, I think, eliminates the prejudice but allows him to

13:05:05   5   testify truthfully as to what he was talking about.  So that

  6   will be my decision on that point.

  7           MS. HELM:  Thank you, Your Honor.

  8           MR. LOPEZ:  Your Honor, the great irony is they get

  9   to talk about lawyer marketing and we can't talk about them

13:05:16 10   marketing the device.

11           THE COURT:  Those are unrelated, Mr. Lopez.

12           MR. LOPEZ:  Well, what does that have to do with

13   design defect, I'm wondering.  Lawyer advertising.

14           THE COURT:  You don't have to bring up the baggage

13:05:25 15   memo.  E-mail.  If you leave that out, he won't have to

16   answer it.  But if you're going to bring it up, he gets to

17   answer it, in my judgment.

18           MR. O'CONNOR:  Well, they say there's two other

19   documents --

13:05:36 20           THE COURT:  I know you've said that.  We've got to

21   get the jury in.  So what I'm doing is I'm withholding

22   judgment on where I'm drawing the line in advertising and I

23   will allow Hug and others to come back if I decide it comes

24   in.  I'm going to consider the hearsay argument before I

13:05:48 25   admit these documents.  And I will allow him to answer with

13:05:52  1    respect to lawyer advertising but I will then instruct the

2    jury that it doesn't involve the parties in this case.  And

3    we are seven minutes over, so let's get the jury.

4            MR. O'CONNOR:  I don't have any further questions

13:06:02  5    for Mr. Hug.

6            THE COURT:  I'm sorry?

7            MR. O'CONNOR:  Based upon what you've told us, at

8    this time I have no further questions for Mr. Hug.

9            THE COURT:  Okay.

13:06:46  10           MR. CONDO:  Your Honor, may Mr. O'Connor announce in

11   front of the jury he has no further questions?

12           THE COURT:  Yeah, you should.

13           You can come back up to the witness stand.

14      (The jury entered the courtroom at 1:07 p.m.)

13:07:36  15           THE COURT:  Please be seated.

16           Thank you for your patience, ladies and gentlemen.

17   We know you've been waiting for seven minutes and we're late

18   getting you in here.  We had a number of issues we had to talk

19   through.

13:07:48  20           So we're picking up from where we left off on Friday.

21           Mr. O'Connor, you had been on direct with Mr. Hug.

22           MR. O'CONNOR:  I have no more questions for Mr. Hug

23   at this time, Your Honor.

24           THE COURT:  All right.  So we will turn, then, to

13:08:02  25   cross-examination of Mr. Hug.

CROSS-EXAMINATION - TIMOTHY HUG

13:08:03   1        MR. CONDO:  Thank you, Your Honor.

2             Ladies and gentlemen of the jury, good afternoon.

3                        **TIMOTHY HUG,**

4    recalled as a witness herein, after having been previously

5    sworn or affirmed, was examined and testified as follows:

6             C R O S S - E X A M I N A T I O N

7    BY MR. CONDO:

8    Q   Mr. Hug, remind all of us what your position was with

9    Bard in 2009 and through 2011.

13:08:21  10   A   Sure.  I was the district manager, which means in essence

11   I have -- I'm the manager of approximately seven territory

12   managers or representatives and covering the state of

13   Wisconsin, Illinois, probably parts of Michigan and parts of

14   Minnesota.

13:08:39  15   Q   And when were you promoted to that position, sir?

16   A   I was promoted, I believe, sir, at the end of 2009.  I'd

17   have to check my records but it's approximately right around

18   there.

19   Q   And how long did you remain as a district manager?

13:08:52  20   A   It was approximately two years.  So at that point I was

21   promoted to regional manager, sir.

22   Q   The plaintiff in this case, Ms. Hyde, had her filter

23   placed on February 25th, 2011.  At the Wheaton Franciscan

24   Hospital in Franklin, Wisconsin.  Did that hospital fall

13:09:13  25   within your district at that time?

CROSS-EXAMINATION - TIMOTHY HUG

13:09:15  1    A    It does did.   It fell within my district, sir.

2    Q    Are you familiar with the Wheaton Franciscan Hospital in

3    Franklin?

4    A    I am familiar with it, sir.

13:09:24  5    Q    And are you familiar with the Wheaton Franciscan hospital

6    system or chain?

7    A    Yes, I am.

8    Q    Is the Franklin hospital one of several hospitals within

9    the Wheaton hospital chain?

13:09:36  10   A    Yes.   It is one of several hospitals, sir.

11   Q    And it is located in Franklin, Wisconsin?

12   A    It is located in Franklin, Wisconsin.

13   Q    And are there Wheaton hospitals also located in the

14   Milwaukee, Wisconsin area?

13:09:50  15   A    There are.   Milwaukee, Wisconsin; Racine, Wisconsin, yes,

16   sir.

17   Q    Now, you talked about the hospital system.   What --

18   describe for the ladies and gentlemen of the jury the

19   relative size of the Franklin hospital with respect to other

13:10:11  20   hospitals that you're familiar with in the Wheaton Franciscan

21   hospital system.

22   A    Sure.   I'll do my best.

23          So it's probably similar to probably a Banner or

24   Honor Health here in the greater Phoenix area.   Meaning that

13:10:27  25   there are approximately -- there are a number of hospitals

CROSS-EXAMINATION – TIMOTHY HUG

13:10:30  1    that fall within the Wheaton Franciscan system.  At that time,

2    the Franklin hospital was one of the newer hospitals, but it

3    was also one of the smaller hospitals within that Wheaton

4    Franciscan system.  Right?

13:10:46  5         So just like Banner has a whole bunch of hospitals

6    and there's larger and smaller, so does -- at that time

7    Wheaton Franciscan had somewhat of a similar setup.

8    Q   And while you were the district manager in that area, did

9    each of the Wheaton Franciscan hospitals in the chain

13:11:05 10    purchase IVC filters separately?

11    A   Yes, sir, they do.  They did.

12    Q   Did the Wheaton Franciscan hospital in Franklin purchase

13    Bard IVC filters during your time as district manager in 2010

14    and 2011?

13:11:21 15    A   Yes, they did.

16    Q   And in preparation for your testimony today, have you

17    reviewed the IVC filter orders placed by the Wheaton

18    Franciscan hospital in Franklin, Wisconsin?

19    A   I have reviewed the order history, yes.

13:11:40 20    Q   And you are currently the vice president of sales with

21    Bard Peripheral Vascular?

22    A   I'm currently the vice president of sales.

23         MR. CONDO:  And if we can see, please, Exhibit 8873.

24    BY MR. CONDO:

13:12:06 25    Q   Is this one of the documents that you reviewed in

CROSS-EXAMINATION - TIMOTHY HUG

13:12:08    1    preparation for your testimony?

          2    A    It is, sir.

          3         MR. CONDO:   And let me ask, Scott, would you just

          4    turn through each of the pages of the exhibit to give the

13:12:19    5    witness a chance to review them.

          6    BY MR. CONDO:

          7    Q    Did you review each of those individual documents, sir?

          8    A    I did, sir.  I have.

          9    Q    Are you familiar with how Bard invoices its customers

13:12:40   10    when the customer orders an IVC filter?

         11    A    I am.

         12    Q    And is the type of document that you've reviewed

         13    routinely generated by Bard in the regular course of

         14    business?

13:12:51   15    A    Yes, sir.

         16    Q    And does Bard generate an invoice immediately upon the

         17    day the filter is ordered?

         18    A    Usually, sir, yes.

         19    Q    And is the information on the invoice provided by or to

13:13:04   20    or with someone with knowledge?

         21    A    Yes, sir.

         22    Q    And is the invoice kept in the ordinary course of Bard's

         23    sales business?

         24    A    Absolutely, sir.

13:13:15   25    Q    Is this making -- is making the invoice a regular

CROSS-EXAMINATION – TIMOTHY HUG

13:13:17  1   practice of the sales process?

2         MR. O'CONNOR:  Objection, Your Honor.  The witness

3   has this document in front of him while he's asking

4   foundational questions.  Right now it's hearsay.

13:13:27  5         THE COURT:  You're objecting to the question as

6   hearsay?

7         MR. O'CONNOR:  To the witness reviewing this

8   document as his questions are going forward.

9         THE COURT:  Overruled.  There's no hearsay called

13:13:37 10   for in the question.

11         MR. CONDO:  We would offer Exhibit 8837.

12         MR. O'CONNOR:  Objection, Your Honor.  Lack of

13   foundation.  Hearsay.

14         THE COURT:  Overruled.  The requirements of Rule

13:13:52 15   803(6) have each been established.  The exhibit is admitted.

16       (Exhibit 8837 admitted.)

17         MR. CONDO:  May we publish starting with page 2,

18   Your Honor?

19         THE COURT:  You may.

13:14:06 20   BY MR. CONDO:

21   Q   Mr. Hug, would you tell the ladies and gentlemen of the

22   jury what this page is.

23   A   This is a invoice from Bard to Wheaton Franciscan

24   Healthcare specifically in Franklin, Wisconsin, sir.

13:14:28 25         MR. CONDO:  Can you please bold the Ship To

CROSS-EXAMINATION - TIMOTHY HUG

13:14:31   1   information.

2   BY MR. CONDO:

3   Q   And what is the date of this purchase order or invoice,

4   sir?

13:14:43   5   A   January 7, 2010, sir.

6   Q   And what is the date the product ordered by this invoice

7   was shipped?

8   A   Right underneath there it says shipped -- I'm sorry,

9   2000 -- January 2000 -- I'm sorry.  January 7, 2010.  Once

13:15:03  10   again, January 7, 2010.

11   Q   And what items were ordered on this invoice by the

12   Wheaton Franciscan hospital in Franklin, Wisconsin?

13   A   Sure.  I see quantity 1 of the G2 Express femoral filter

14   and quantity 1 of the G2 Express jugular filter.

13:15:27  15   Q   And how were these products shipped to the Franciscan

16   hospital in Franklin?

17   A   Right above that it says second day.  So if they shipped

18   out on January 7, it approximately would take two days to get

19   there.  I.e., January 9th.

13:15:45  20   Q   Okay.  Thank you.

21          Let's turn to the next page in the exhibit.

22          Can you tell the ladies and gentlemen of the jury

23   what was ordered by this purchase order or invoice.

24   A   Sure.

13:16:01  25          This was quantity 2 of the Eclipse femoral filter.

CROSS-EXAMINATION - TIMOTHY HUG

13:16:07  1    Quantity 2 of the Eclipse femoral filter.

2    Q   What was the date of the invoice, sir?

3    A   Sure.  These were ordered on January -- I'm sorry,

4    November 29th, 2010.  November 29, 2010.

13:16:22  5    Q   And what date was these filters shipped to the Franklin

6    hospital?

7    A   The same date, November 29, 2010, sir.

8    Q   So at least by the end of November 2010, the Franklin --

9    the Wheaton Franciscan hospital in Franklin was ordering

13:16:45  10   Eclipse filters from Bard; correct?

11   A   That is correct, sir.

12   Q   All right.  Can we turn to the next page of the exhibit.

13       Is this the third invoice we're looking at?

14   A   It is, sir.

13:17:08  15   Q   What was ordered by from Bard by the Wheaton Franciscan

16   hospital in Franklin on this purchase order?

17   A   Quantity 2 of the Eclipse femoral filter, sir.

18   Q   What was the date of the purchase order?

19   A   The purchase date was November 30th, 2010.

13:17:26  20   Q   What was the shipping date?

21   A   Ship date was the exact same date, November 30th, 2010.

22   Q   And what were the shipping instructions?

23   A   It says just underneath there, "Shipping:  Please use the

24   customer account, ship their items second day."  So two-day

13:17:43  25   delivery.

CROSS-EXAMINATION - TIMOTHY HUG

13:17:45  1    Q    Was it the practice of Wheaton Franciscan Healthcare

2    Franklin hospital to order IVC filters and request they be

3    shipped second day delivery?

4    A    Yes, sir.

13:18:00  5    Q    Let's turn to the next invoice.

6         What product was ordered by this invoice?

7    A    Quantity 1 of the Eclipse femoral filter.

8    Q    What is the date of the purchase order?

9    A    The purchase was December 15th, 2010.

13:18:20  10   Q    And what is the ship date?

11   A    The same day, sir, December 15th, 2010.

12   Q    And like the previous three invoices, where were these

13   products shipped to?

14   A    They were shipped to the Wheaton Franciscan Healthcare

13:18:39  15   System in Franklin, Wisconsin.  Franklin, Wisconsin.

16   Q    What were the shipping instructions?

17   A    Shipping second day or two day.

18   Q    If we can turn to the next page in the exhibit, please.

19        What was ordered by this invoice?

13:19:04  20   A    Quantity 1 of the Eclipse femoral filter.

21   Q    What is the date of the order please?

22   A    January 12th, 2011.

23   Q    And what is the date the filters were shipped?

24   A    Same date, January 12th, 2011.

13:19:24  25   Q    And these were all shipped to the Franklin hospital?

CROSS-EXAMINATION – TIMOTHY HUG

13:19:28  1    A    That is correct, sir.

2    Q    And were these shipped using second day air?

3    A    It is noted they're shipping second day.

4    Q    Thank you.

13:19:43  5         If we can turn to the next page of the exhibit.

6         What was ordered on this purchase order, sir?

7    A    Quantity 1 of the Eclipse jugular filter.

8    Q    Is there more on that exhibit?

9    A    I'm sorry, I didn't see the second one.  And quantity 1

13:20:12  10   of the Eclipse femoral filter.  So there were two Eclipse

11   filters ordered on this day.

12   Q    And what is the date --

13   A    The date --

14   Q    -- this order was placed?

13:20:25  15   A    Sir, the date was February 23rd, 2011.

16   Q    And what is the date the products were shipped?

17   A    Same day.  February 23rd, 2011.

18   Q    What were the shipping instructions for the filters on

19   this invoice?

13:20:42  20   A    Once again, shipped second day.  Or two-day delivery.

21   Q    And to whom were these filters shipped?

22   A    Sir, they were shipped to Wheaton Franciscan Healthcare,

23   specifically in Franklin, Wisconsin.

24   Q    I'm going to ask you to --

13:21:04  25        MR. CONDO:  Scott, would you skip the next page and

CROSS-EXAMINATION - TIMOTHY HUG

13:21:06   1   go to page 9, because these, I think, are assembled out of

        2   order.

        3           Thank you.

        4   BY MR. CONDO:

13:21:14   5   Q   What was ordered on this invoice?

        6   A   Quantity 1 of the Eclipse jugular filter.

        7           MR. O'CONNOR:  Objection.  This one's irrelevant,

        8   Your Honor.  This is after the hospitalization at issue.

        9           THE COURT:  Overruled.

13:21:32  10   BY MR. CONDO:

       11   Q   And what's the date of this order, please?

       12   A   March 1st, of 2011.

       13   Q   What was the date the product was shipped, please?

       14   A   Same day, sir, March 1st, 2011.

13:21:50  15   Q   And what location were the products shipped to?

       16   A   Wheaton Franciscan Healthcare in Franklin, Wisconsin.

       17   Q   And what were the shipping directions?

       18   A   Once again, shipping second day or two-day delivery.

       19   Q   Thank you.

13:22:08  20           MR. CONDO:  Now, Scott, if you would turn back to

       21   page 8 in Exhibit 8837.  Thank you.

       22   BY MR. CONDO:

       23   Q   What products were ordered on this invoice, Mr. Hug?

       24   A   Quantity 1 of the Eclipse femoral filter.

13:22:28  25   Q   What was the date of the order?

CROSS-EXAMINATION - TIMOTHY HUG

13:22:30    1    A    March 16th, 2011.

            2    Q    What was the date the products were shipped?

            3    A    March 16th, of 2011.

            4    Q    And where were the filters shipped to, please?

13:22:44    5    A    Wheaton Franciscan Healthcare in Franklin, Wisconsin.

            6    Q    And how were those filters shipped?

            7    A    Once again, second day or two-day delivery.

            8            MR. CONDO:  Thank you.  You can take that down,

            9    Scott.  Would you call up Exhibit 8836, please.

13:23:07   10    BY MR. CONDO:

           11    Q    Mr. Hug, in preparing for your testimony today, did you

           12    work with my office to prepare a table or chart of the

           13    invoices that we have been discussing that were entered as

           14    Exhibit 837?

13:23:38   15    A    Yes, sir.

           16    Q    Does this chart fairly and accurately reflect the

           17    information on previous invoices we looked at on Exhibit

           18    837?

           19    A    Yes, sir.

13:23:48   20    Q    Would it assist you in explaining your testimony?

           21    A    Yes, sir.

           22            MR. CONDO:  We would offer Exhibit 836 -- 8836 as a

           23    demonstrative exhibit.

           24            MR. O'CONNOR:  Cumulative.  Objection, Your Honor,

13:24:01   25    cumulative.  We just saw the exhibits that are the basis of

CROSS-EXAMINATION - TIMOTHY HUG

13:24:04   1   this.

2          THE COURT:  All right.  This is demonstrative, so

3   we're not admitting it into evidence, but I will allow it to

4   be used in the testimony.

13:24:17   5          MR. CONDO:  Thank you, Your Honor.

6   BY MR. CONDO:

7   Q   Mr. Hug, will you describe for the ladies and gentlemen

8   of the jury what this chart shows.

9   A   Sure.  It shows the IVC filter ordering history from

13:24:37  10   January 2010 to February of 2011.

11   Q   And based on the records in Exhibit 8837 as summarized on

12   this chart, Demonstrative Exhibit 8836, when was the last

13   time Wheaton Franciscan hospital in Franklin, Wisconsin

14   ordered a G2X filter?

13:25:04  15   A   The last G2X filter I see ordered is in January of 2010.

16   Q   And between November of 2010 and February 2011, how many

17   Eclipse filters did the Franklin hospital offer -- order?

18   Excuse me.

19   A   Sir, from November of 2010 to February of 2011 I see

13:25:31  20   eight filters ordered, sir.

21   Q   And based on your experience, can you draw any inferences

22   from the pattern and dates of orders of these filters as to

23   whether the hospital is purchasing filters to replace filters

24   that were being used?

13:25:46  25          MR. O'CONNOR:  Object.  Lack of foundation on that

CROSS-EXAMINATION - TIMOTHY HUG

13:25:48  1    one.

2          THE COURT:  Overruled.

3          THE WITNESS:  In my experience, it looks like

4    they're reordering after using a filter, sir.

13:25:57  5    BY MR. CONDO:

6    Q   And can you explain why the sales history in Exhibit 8836

7    leads you to that inference?

8    A   There's a consistent pattern of ordering from month to

9    month and it starts in November of 2010 and works through

13:26:17 10   February of 2011.  Most accounts only keep a few IVC filters

11   in their lab, sir.

12         MR. CONDO:  Now if we can turn back to Exhibit 8837,

13   please.

14         May we publish, Your Honor?

13:26:36 15        THE COURT:  You may.

16         MR. CONDO:  And specifically, Scott, page 7.

17   BY MR. CONDO:

18   Q   Let me ask you to assume that the jury has heard and the

19   evidence is uncontradicted that Mrs. Hyde had her IVC filter

13:27:01 20   implanted on February 25th, 2011.

21         On page 9 -- excuse me, page 7 of Exhibit 8837, there

22   is an invoice dated February 23rd, 2011; correct?

23   A   Yes, sir.

24   Q   And what is the order -- what are the shipping

13:27:28 25   instructions for this order?

REDIRECT EXAMINATION - TIMOTHY HUG

13:27:32   1    A    They were shipping two day, or second day delivery, sir.

2    Q    In your experience, have you seen instances where product

3    have been ordered a day or two before a procedure and where

4    it arrives on the day of the procedure?

13:27:47   5    A    Yes, sir.  Very common.

6    Q    And based on your familiarity with the Wheaton Franciscan

7    hospital in Franklin and its size, do you believe that it is

8    appropriate if the filter was received on the morning of

9    February 25th, pursuant to the shipping instructions, that it

13:28:05   10   could be implanted in the afternoon?

11   A    Yes, sir.

12   Q    And based on your experience and the documentation that

13   you've seen, do you believe it is more likely that Mrs. Hyde

14   has a G2X filter or an Eclipse filter?

13:28:17   15           MR. O'CONNOR:  Objection.  Lack of foundation.

16           THE COURT:  Sustained.

17           MR. CONDO:  I have no further questions, Your Honor.

18           THE COURT:  Redirect.

19           MR. O'CONNOR:  Thank you, Your Honor.

13:28:31   20            R E D I R E C T   E X A M I N A T I O N

21   BY MR. O'CONNOR:

22   Q    You don't know what day Mrs. Hyde was admitted to

23   Franklin Wheaton, do you?

24   A    The day she was admitted?

13:28:45   25   Q    Yes.

REDIRECT EXAMINATION – TIMOTHY HUG

13:28:45  1    A    No, sir.

2    Q    And you don't know which doctor may have used the Eclipse

3    filter that was ordered on -- what date was it --

4    February 23, 2011, do you?

13:29:02  5    A    I'm sorry, can you ask me again, I'm going to try to

6    answer it.

7    Q    You showed us invoices.

8    A    I did.

9    Q    You don't know which departments those filters went to,

13:29:12 10    is that fair?

11    A    If I remember correctly, sir, I believe Franklin -- I

12    believe they went to interventional radiology but I don't

13    know for sure, sir.  Yeah.

14    Q    Thank you.  As a matter of fact, Mr. Hug --

13:29:40 15         MR. O'CONNOR:  Let's put up Exhibit 23, please.

16         I'm sorry, let me change that.  Let's put up Exhibit

17    4804, Felice.

18         Now, may we publish the section that was admitted for

19    the jury, Your Honor?

13:30:08 20         THE COURT:  That's the second part of page 1; is

21    that right?

22         MR. O'CONNOR:  Yes.

23         THE COURT:  Yes, you may.

24    BY MR. O'CONNOR:

13:30:17 25    Q    Now, we're looking at Matt Fermanich's response to a

REDIRECT EXAMINATION – TIMOTHY HUG

13:30:25  1   person, Mary Starr at Wheaton Franciscan, is that right, in

2   Franklin?

3   A   Yes, that's how I read this.

4   Q   Nowhere in that e-mail does Matt say stop using the

13:30:39  5   Eclipse, does he?

6           Excuse me, let me rephrase that.

7           Nowhere in that e-mail does Matt Fermanich tell

8   Ms. Starr to stop using the G2 or the G2X; true?

9   A   I believe he says "Mary, you want the Eclipse."

13:30:55 10   Q   My question is different.  He doesn't say stop using the

11   G2, G2X, if you haven't been stopped?

12   A   No, he doesn't say that in here.

13   Q   And you have not reviewed Dr. Henry's records, have you?

14   A   I have not reviewed his records, sir.

13:31:10 15   Q   And the evidence has shown he's the implanting doctor in

16   this case; right?

17   A   I believe that's the case, sir, yes.

18   Q   And you knew, and we talked about this last time you were

19   here, that doctors, if they wanted to use the G2 or G2X, they

13:31:23 20   were doing that; fair?  Do you recall that testimony?

21   A   Could you ask me that again, sir.

22   Q   Sure.  When we met last week, you said that if doctors

23   wanted to still use the G2 or G2X, that was their

24   prerogative.  Do you recall that testimony?

13:31:39 25   A   I do.  I stand by the statement that the physician

REDIRECT EXAMINATION - TIMOTHY HUG

13:31:42  1  chooses what he or she wants to use, sir, yes.

2  Q   And you know when Matt responded to Mary, she was

3  indicating to him she still had G2s and G2Xs in stock; true?

4         MR. CONDO:  Your Honor, I believe he's quoting from

13:31:58  5  a part of the document that has been excluded from evidence.

6         THE COURT:  It has not been admitted, so I sustain

7  the objection.

8  BY MR. O'CONNOR:

9  Q   But you knew that Matt, when he responded, said "you want

13:32:08  10  to use the Eclipse," that the hospital had questions what to

11  do with the G2s; isn't that fair?

12         MR. CONDO:  Same objection.

13         THE COURT:  You're asking him to determine that from

14  the document.  That portion of the document is not in

13:32:19  15  evidence.

16         MR. O'CONNOR:  I'm asking him from Matt Fermanich's

17  response that she wants to use -- order the Eclipse.

18         THE COURT:  So what's the question?

19  BY MR. O'CONNOR:

13:32:29  20  Q   Number one, that e-mail doesn't say to -- Matt did not

21  tell her to stop using the G2 or G2X; fair?

22  A   That's what -- yes, sir.

23  Q   And you understood that this was the first time Matt had

24  a communication with Mary Starr about using the Eclipse;

13:32:45  25  correct?

REDIRECT EXAMINATION - TIMOTHY HUG

13:32:46  1    A    I can't speak to that for sure, sir, I don't know.

       2    Q    So if that's Matt's testimony, you have no reason to

       3    dispute it; correct?

       4    A    I don't have any reason to dispute it if that would be

13:32:59  5    the case.

       6    Q    And if Dr. Henry said he used the G2 or G2X for Lisa

       7    Hyde, you have no reason to dispute that either, do you?

       8    A    I -- I do -- certain issues here.  Only thing I'd say is

       9    that a lot of folks get these filters confused, right?  So I

13:33:18 10    don't know.  I can't say with certainty here.  Dr. Henry may

       11    have actually said the G2 meaning the G2X or G2X meaning G2

       12    or Eclipse.

       13    Q    You don't know what Dr. Henry said.

       14    A    I don't.  You'd have to ask him, sir.

13:33:30 15    Q    Without knowing, you can't dispute anything he said about

       16    the filter; true?

       17    A    I can just speak to what I've seen, sir, yes.

       18    Q    Now, the Eclipse wasn't on the market very long, was it?

       19    A    I think you have to define "long."  I don't know, sir.

13:33:47 20         MR. O'CONNOR:  Let's show 4842, please.

       21         And I believe this is in evidence.  May I display to

       22    the jury, Your Honor?

       23         THE COURT:  You may.

       24    BY MR. O'CONNOR:

13:34:18 25    Q    Mr. Hug, this is an e-mail dated March 8, 2011.  Do you

REDIRECT EXAMINATION — TIMOTHY HUG

13:34:22  1   see that?

2   A   I do, sir.

3   Q   And says just a few days after Lisa Hyde received her

4   filter.  If she received it on February 25, 2011, does that

13:34:36  5   make sense?

6   A   About two weeks after, sir, yes.

7   Q   And here they're telling people within Bard that they're

8   going to have to start to backorder the femoral G2 filter, do

9   you see that, because of the delay of the Meridian.

13:34:56 10   A   I see they say we're going on back order for the G2

11   filter, yes, sir.

12   Q   And on March 8, 2011, Mr. Baird said, "As you are aware,

13   we have been working to finish the remaining G2 product in

14   preparation for this continuation but with the Meridian

13:35:15 15   delay, we have turned production back on temporarily."  Did I

16   read that correctly?

17   A   You did read that correctly, sir.

18   Q   Thank you.

19       He goes on to say, "At this time we do not foresee a

13:35:34 20   backorder of the G2 jug system since we have enough product to

21   cover us."  Did I read that correctly?

22   A   You did, sir.

23       MR. O'CONNOR:  Let's show Exhibit 4806 please.

24       And if you'd go to page 2 to the part that was

13:36:08 25   admitted last week.

REDIRECT EXAMINATION – TIMOTHY HUG

13:36:12  1        4806, please, page 2.

2    BY MR. O'CONNOR:

3    Q    And here Matt Fermanich is responding to another

4    individual within the Wheaton Franciscan system; correct?

13:36:32  5    A    Yes, in the system, but not at the specific hospital I

6    was referring to, sir.

7    Q    That's fine.  But this is dated April 21, 2011; right?

8    A    It is dated April 21st, 2011.

9    Q    That is almost two months after Lisa Hyde received her

13:36:48  10   filter if she received her filter February 25, 2011; true?

11   A    Yes, sir, that is true.  This is speaking -- that is the

12   date and speaking about the G2 filter system, yes.

13        MR. O'CONNOR:  I need to publish.  I apologize.  May

14   I publish, Your Honor?

13:37:04  15        THE COURT:  The specific --

16        MR. O'CONNOR:  The specific page.

17        THE COURT:  -- e-mail that was admitted, I think, is

18   the April 21st e-mail?

19        MR. O'CONNOR:  I believe that's the page we're

13:37:12  20   looking at.  April 21st, 2011.

21        THE COURT:  You may publish.

22   BY MR. O'CONNOR:

23   Q    And if we look at Matt's e-mail dated April 21, 2011, on

24   that day he responded to Cynthia Haas, as follows:

13:37:33  25        "Cynthia, I'm more than happy to help you out here."

REDIRECT EXAMINATION - TIMOTHY HUG

13:37:37  1    Do you see where I've read that?

2    A    Yes, sir, I'm following you.

3    Q    And he says "First, the G2 filter system is being phased

4    out."  Did I read that correctly?

13:37:49  5    A    Yes.  The G2 is being phased out.  Yes, sir.

6    Q    And April 21, 2011, he tells her "We have a new filter,

7    the Eclipse, which is the same design as the G2 but has a few

8    new features included."  Do you see that?

9    A    I do, sir.

13:38:07 10    Q    And the only thing that was different between the G2, the

11    G2X, and the Eclipse was electropolishing; true?

12    A    I'm sorry, can you ask me that question again.

13    Q    Sure.  The only feature that was different on the Eclipse

14    was the electropolishing compared to the G2X; true?

13:38:26 15    A    Yes, but this is speaking to the G2.

16    Q    But if you took the G2 or the G2X, you understood those

17    were the same filter; true?

18    A    No, those are different.

19    Q    Well, the G2X had a hook on the top.

13:38:36 20    A    Right.  You can't minimize that, though, sir.  There's

21    differences there, though.

22    Q    Okay.  But in terms of -- you're not an engineer.  You

23    don't know about any other design differences; true?

24    A    One has a hook, the other does not.

13:38:48 25    Q    Other than that, you're not aware of any other changes;

REDIRECT EXAMINATION - TIMOTHY HUG

13:38:51  1  correct?

2  A   I'd have to go back and look.  I'm not, sir.  I'd have to

3  go back and look.  Got to ask the engineers that.

4  Q   And you've never reviewed any engineering documents

13:38:59  5  regarding these filters, have you?

6  A   I have not reviewed any engineering documents.

7  Q   And in terms of what Bard's position has been about the

8  Eclipse and what difference there may be between the G2, G2X,

9  and Eclipse, you simply don't know; true?

13:39:11 10  A   Could you ask me that one more time, sir.

11  Q   Sure.  Whatever Bard -- whatever Bard determined was the

12  difference between the Eclipse, the G2X, the G2, you simply

13  do not know; fair?

14  A   I only know some differences, sir.

13:39:27 15  Q   You know about electropolishing.

16  A   I'm not an engineer, but I know it was electropolished,

17  sir.

18  Q   Thank you.  And --

19  A   Yeah.

13:39:40 20  Q   He says, "First there is now a hook on top of the filter

21  allowing for snare retrieval as well as the normal cone

22  retrieval."  Did I read that correctly?

23  A   You did, sir.

24  Q   And the G2X had a hook on top?

13:39:52 25  A   It did, sir.

REDIRECT EXAMINATION – TIMOTHY HUG

13:39:53  1   Q   "Second, the filter itself has been electropolished."

2   Did I read that correctly?

3   A   Yes.  Yes, you did read that correctly, sir.

4   Q   He says, "This process which removes imperfections on the

13:40:06  5   struts of the filter making them stronger."

6   A   Yes, sir.

7   Q   Then he goes on to say, "Because of these changes, the

8   best I could do at this point would be 50/50 on replacement."

9   Did I read that correctly?

13:40:21  10   A   You did, sir.

11   Q   Now look at this page.

12   A   Okay.

13   Q   Nowhere did Matt Fermanich tell her, Cynthia Haas, that

14   she should immediately stop using the G2 or G2X; is that

13:40:36  15   correct?

16   A   No.  Nor would he in this e-mail.  No, sir, he doesn't.

17   Q   I am correct; true?

18       What I said is an accurate statement?  Matt Fermanich

19   did not tell her in this e-mail to stop using G2 or G2X; is

13:40:54  20   that true?

21   A   G2 or G2X.  No, sir, he does not say to stop using it,

22   no.  He said it's being phased out.

23   Q   He says as of April 21, 2011, that it's being phased out;

24   right?

13:41:08  25   A   Yes, sir, that is accurate.

REDIRECT EXAMINATION – TIMOTHY HUG

13:41:23   1            MR. O'CONNOR:  Now, let's go back, Felice, to

         2   Exhibit 1024.

         3            10 -- I'm sorry.  I apologize.  4842.  I was looking

         4   at the wrong side.

13:41:49   5            THE COURT:  What is it?

         6            MR. O'CONNOR:  4842.  I was looking at a page

         7   number.  I apologize.

         8   BY MR. O'CONNOR:

         9   Q   Now, by the time February and March rolled around in

13:42:05  10   2011, the people in sales were aware that the Meridian was

        11   going to be launched soon; correct?

        12   A   Yeah.  I would say that depends on your definition

        13   "soon," but eventually, yes.  I would say that is somewhat of

        14   an accurate statement, yes, sir.

13:42:26  15   Q   And the difference was the Meridian had caudal anchors on

        16   the shoulders and at the base of the legs, the feet; correct?

        17            MR. CONDO:  Objection, Your Honor.  Exceeds the

        18   scope of cross.

        19            THE COURT:  What's your response?

13:42:39  20            MR. O'CONNOR:  My response is it goes into the whole

        21   issue about what was available at the time.

        22            THE COURT:  Overruled.

        23            MR. O'CONNOR:  Pardon me?

        24            THE COURT:  Overruled.

13:42:55  25            THE WITNESS:  Sir, could you ask me the question one

REDIRECT EXAMINATION – TIMOTHY HUG

13:42:56  1    more time.  Thank you.

2    BY MR. O'CONNOR:

3    Q    The Meridian was designed to have caudal anchors at the

4    shoulders, where the arms were, and at the feet of the

13:43:06  5    filter, of bottom of the legs; correct?

6    A    That's my understanding.  I'm sure the engineers could

7    better explain it than you and I could, hopefully.

8    Q    But ultimately these e-mails came to people like you

9    because you were the ones that were promoting the filters;

13:43:21  10   correct?

11   A    Yeah.  It's important they update us accordingly on this,

12   yes.

13   Q    And one thing Bard never shared with you in sales is

14   things like health hazard evaluations; is that correct?

13:43:35  15              MR. CONDO:  Again, exceeds the scope of cross.

16              THE COURT:  Sustained.

17   BY MR. O'CONNOR:

18   Q    Well, you relied on Bard to tell you which filters to

19   promote and when to promote them; true?

13:43:46  20              MR. CONDO:  Same objection.

21              THE COURT:  Overruled.

22              THE WITNESS:  Yes, sir.  That's an accurate

23   statement.

24   BY MR. O'CONNOR:

13:43:51  25   Q    So if Bard told you that you needed to continue promoting

REDIRECT EXAMINATION - TIMOTHY HUG

13:43:54  1    the G2 or even the G2X --

2              MR. O'CONNOR:  May I published this exhibit?  I

3    apologize.  4842.

4              THE COURT:  Yes.

13:44:07  5    BY MR. O'CONNOR:

6    Q    So if Bard stated to the people on the sales force as of

7    March 8, 2011, to continue to promote the G2 product line,

8    you would continue to do that in sales; true?

9    A    That's all that was approved at that time, sir, right?

13:44:24  10   Q    Right.  That's what you would be promoting; correct?

11   A    Right, because that's all that was approved.  That's

12   correct, sir.

13             MR. O'CONNOR:  One moment, Your Honor.

14   BY MR. O'CONNOR:

13:44:51  15   Q    Now, I thought earlier you -- your point to Mr. Condo was

16   that if a doctor wanted to order a filter, it could be

17   delivered in two days; is that correct?

18   A    Yeah.  It could actually be delivered in one day.

19   Q    And so if we look at Exhibit 8837 --

13:45:24  20             MR. O'CONNOR:  8837, please.  Page 7.

21   BY MR. O'CONNOR:

22   Q    As I understood what you were saying, that there was a

23   doctor within this system that communicated that as of

24   February 23, 2011, he had a patient who he wanted a filter

13:45:47  25   for.  Is that the inference you were asking us to draw?

REDIRECT EXAMINATION - TIMOTHY HUG

13:45:50  1    A    I'm not sure if that's the inference.  I would stand by

2    the statement it looks like reordering pattern.

3    Q    Okay.

4    A    That's what I would say.

13:46:00  5    Q    I thought you told us that if a doctor wanted a filter,

6    somebody could call Bard and order from Bard and Bard would

7    get it delivered on that date, it may take two days to

8    deliver?

9    A    That's true, sir, yeah.

13:46:15  10   Q    But, again, you I don't know when Lisa Hyde was admitted

11   to Franciscan Wheaton, do you?

12   A    I believe I know the date of the procedure.  I don't know

13   when she was admitted, sir.

14   Q    And you don't know when Dr. Henry first saw Lisa Hyde to

13:46:32  15   discuss a Bard filter with her, do you?

16   A    No, sir, I don't.

17   Q    As a matter of fact, you don't know and you can't tell

18   the jury whose hands, if any, the Eclipse jugular filter on

19   page -- on 8837.007, whose hands that filter landed in;

13:46:54  20   correct?

21   A    You mean which physician placed it --

22   Q    Yes.

23   A    -- is that what you mean, sir?

24   Q    Yes.

13:47:00  25   A    I can't say with absolute certainty, no, sir.

REDIRECT EXAMINATION – TIMOTHY HUG

13:47:02  1   Q   You don't even know if that filter was ever placed, do

2   you?

3   A   No.  I can speak to it shipped, Bard, and received by

4   Wheaton Franciscan in Franklin, Wisconsin.  I can speak to

13:47:16  5   that.

6   Q   What you can't say and can't tell this jury is what time

7   it arrived to the hospital.

8   A   No, sir, I was not there.  I can't tell you that, no.

9   Q   You can't say and won't tell this jury who collected the

13:47:30  10   filter when it arrived at Franciscan Wheaton.

11   A   I can't tell you that, no.

12   Q   You can't say where the filter went when it arrived at

13   Franciscan Wheaton?

14   A   No, sir, I wasn't there.

13:47:45  15   Q   You don't know which department it went to.

16   A   I can't say with certainty, sir, no.

17   Q   You can't say what shelf it may have gone to.

18   A   No, not necessarily.

19   Q   And it is conceivable that that filter's collecting dust

13:47:57  20   on some shelf at Franciscan Wheaton today; correct?

21   A   I would not say that's conceivable, but it's possible,

22   sure.

23   Q   The point is, you can't tell the jury what Dr. Henry did

24   or what he implanted in Lisa Hyde; correct?

13:48:16  25   A   No, I can't tell you.  I can just tell you the reordering

REDIRECT EXAMINATION – TIMOTHY HUG

13:48:19   1   pattern, sir.

2   Q    What you can tell the jury is this:  Regardless what you

3   people did on sales, doctors continue to have their own

4   preferences and there's no way you can change their mind;

13:48:32   5   correct?

6   A    One more time, sir?  I'm sorry.

7   Q    What you can tell this jury, from your experience, is

8   doctors have their preferences of which filters to use;

9   correct?

13:48:42   10   A    Absolutely.  Physicians did make their choice.  They have

11   preferences.  That's how they choose things, yes, sir.

12   Q    And what they would rely on Bard would be, through the

13   salesperson, anybody, is to tell them if Bard is aware of a

14   danger, they should stop using that filter; correct?

13:49:00   15        MR. CONDO:  Exceeds the scope of cross.

16        THE COURT:  Sustained.

17   BY MR. O'CONNOR:

18   Q    Bard relied on you to tell them about the filters, the

19   good, the bad; true?

13:49:13   20        MR. CONDO:  Same objection.

21        THE COURT:  Sustained.

22   BY MR. O'CONNOR:

23   Q    All right.  Just to wrap it up, then, Mr. Fermanich, do

24   you even know the approach Lisa Hyde had?  Jugular?  Femoral?

13:49:26   25   A    I don't, not off the top of my head, sir.

DIRECT EXAMINATION - BRET BAIRD

13:49:29    1            MR. O'CONNOR:  All right.  Thank you.

           2            THE COURT:  All right.  Thank you, sir.  You can

           3     step down.

           4            MR. O'CONNOR:  Your Honor, at this time we call

13:49:58    5     Mr. Bret Baird.

           6            THE COURTROOM DEPUTY:  Mr. Baird, if you would come

           7     forward, stand right here and raise your right hand.

           8                      **BRET BAIRD,**

           9     called as a witness herein, after having been first duly

13:50:50   10     sworn or affirmed, was examined and testified as follows:

          11            D I R E C T   E X A M I N A T I O N

          12     BY MR. O'CONNOR:

          13     Q    Hello, Mr. Baird.  My name is Mark O'Connor.  I think

          14     we've met, but we've never talked; is that correct?

13:51:06   15     A    Possibly.  I don't recall.  I don't remember.

          16            THE COURT:  Excuse me.

          17            Mr. Baird, could you get the mic in front of you.

          18     Thank you.

          19     BY MR. O'CONNOR:

13:51:16   20     Q    You were employed by Bard Peripheral Vascular beginning

          21     in 2006.

          22     A    Correct, yes.

          23     Q    And how long were you there?

          24     A    From 2006 to I believe 2011.

13:51:27   25     Q    And you started as a senior project manager; is that

DIRECT EXAMINATION - BRET BAIRD

13:51:30  1   fair?

2   A    Senior product manager.

3   Q    And then you became the franchise manager; is that right?

4   A    That's correct.

13:51:37  5   Q    And you were responsible for marketing and marketing Bard

6   products, including filters.

7   A    I was the marketing function.

8   Q    You had global responsibilities for a very, very large

9   division; is that correct?

13:51:52 10   A    I had global responsibility during the franchise -- when

11   I was franchise manager for the filters.

12   Q    You coordinated full upstream and downstream marketing

13   and development activities; true?

14   A    True.

13:52:13 15   Q    Now, you aren't working for Bard at the time presently,

16   are you?

17   A    Presently I'm not.

18   Q    But is Bard compensating you for your time to come down

19   here today?

13:52:24 20   A    I hope so, yes.

21   Q    As a matter of fact, when you were deposed in this case,

22   Bard paid you for your time then; correct?

23   A    Correct.  Time away from work.

24   Q    Now, you're currently -- or are you still working for an

13:52:39 25   orthopedic financial group?

DIRECT EXAMINATION – BRET BAIRD

13:52:41  1    A    Correct, yes.

2    Q    That's a group that works with attorneys representing

3    injured people; correct?

4    A    Correct.

13:52:50  5    Q    And what you do is work with attorneys that represent

6    those people, plaintiff attorneys; right?

7    A    Correct.  Yes.

8    Q    And what you do is you help those attorneys find care for

9    their patients who may not otherwise be able to afford it and

13:53:06  10   you look for recovery out of any settlement; true?

11   A    We provide medical services, connecting them to medical

12   providers to help them.  They usually don't have health

13   insurance so we help connect them to medical providers and

14   finance for them and then get paid through their settlement.

13:53:26  15   Q    So what happens is your company helps the patient, the

16   plaintiff, obtain medical services and you wait until the end

17   of the lawsuit to collect what you're owed.

18   A    Sure.  Correct.  Yes.

19   Q    That's what you do.

13:53:38  20   A    That's what I do today.

21   Q    And to do that, you market yourself and market the

22   company; correct?

23   A    Correct.  Yep.

24   Q    You advertise in local plaintiff directories and

13:53:48  25   plaintiff subscriptions here in Arizona; right?

DIRECT EXAMINATION – BRET BAIRD

13:53:53   1   A   I think we only did that once.  That's really not the

2   primary way we market.

3   Q   But you work with attorneys.

4   A   Oh, correct.  Yes.

13:54:09   5   Q   Now, when you were at Bard while you were the franchise

6   manager, you worked extensively with filters; is that

7   correct?

8   A   For the period of time when I was franchise manager, yes.

9   Q   You also supported existing lines of business and

13:54:23   10   products; fair?

11   A   When I was franchise manager, no.  It was just vena cava

12   filters.  Prior to that I was on angioplasty balloons.

13   Q   So after that you were exclusively supporting lines of

14   business relating to filters at Bard?

13:54:41   15   A   Correct.

16   Q   And you worked with different divisions of Bard including

17   the sales force.

18   A   Oh, yeah.  The product marketing role works with a

19   significant number of different parties in the organization.

13:54:53   20   So, yeah.

21   Q   You interfaced with upper management at Bard; right?

22   A   Interfaced with them, yeah.  It's really a linchpin.  The

23   marketing role is one of many --

24   Q   My question just asks a yes or no question -- or answer.

13:55:07   25   A   Yes.

DIRECT EXAMINATION – BRET BAIRD

13:55:07   1   Q   You interfaced with other people in marketing; true?

2   A   True.

3   Q   You interfaced with other people who were in engineering;

4   correct?

13:55:15   5   A   Correct.

6   Q   You interfaced with the sales force; true?

7   A   True.

8   Q   Bard's ultimate customer was physicians; correct?

9   A   Correct.

13:55:33  10   Q   Now let's just talk about the product filter chronology

11   you're familiar with during your time at Bard.

12        When you started, the G2 filter was on the market;

13   correct?

14   A   Correct.

13:55:47  15   Q   And then the Eclipse was eventually launched; true?

16   A   You skipped one.  G2X, I believe, was the next one.

17   Q   Thank you.  G2X was then the next -- I had that.  Thank

18   you for correcting me.  After the G2 came the G2X.

19   A   Yes.

13:56:03  20   Q   That was essentially the G2 with a hook on top; right?

21   A   Correct.

22   Q   And then the Eclipse was launched; correct?

23   A   Correct.

24   Q   And the Eclipse was like the G2X, it had a hook, but also

13:56:14  25   had legs that were electropolished; true?

DIRECT EXAMINATION – BRET BAIRD

13:56:17  1    A    It was an electropolished filter, yeah.  True.

       2    Q    And it was essentially the G2X with electropolishing;

       3    fair?

       4    A    Fair.

13:56:29  5    Q    You were not at Bard when the Denali filter was launched?

       6    A    No.

       7    Q    But you were there when the idea concept came into place;

       8    correct?

       9    A    Correct.

13:56:42 10    Q    What you did, among other things, Mr. Baird, you helped

      11    the sales force get these products out to the customers.  You

      12    helped the sales force do that; true?

      13    A    I launched products for the company, yeah, that's my

      14    role.

13:56:56 15         MR. O'CONNOR:  Let's show Mr. Baird Exhibit 571,

      16    please.

      17    BY MR. O'CONNOR:

      18    Q    Mr. Baird, you recognize this document and your name is

      19    on it; true?

13:57:12 20    A    True.

      21    Q    And filter franchise reviews were something that you were

      22    involved with while you were at Bard; correct?

      23    A    Correct.

      24    Q    And this one is dated May 6, 2008 --

13:57:24 25    A    Yes.

DIRECT EXAMINATION - BRET BAIRD

13:57:25  1   Q   -- right?

2   A   Yes.

3            MR. O'CONNOR:  Move to admit Exhibit 571, Your

4   Honor.

13:57:32  5            MS. HELM:  No objection, Your Honor.

6            THE COURT:  Admitted.

7         (Exhibit 571 admitted.)

8            MR. O'CONNOR:  I may have to approach with a quick

9   question, Your Honor, on one page.

13:57:57  10           THE COURT:  You may have to or you want to?

11           MR. O'CONNOR:  May I?

12           THE COURT:  I'm sorry --

13           MR. O'CONNOR:  I would rather not but I think I

14  better.

13:58:03  15           THE COURT:  Okay.  That's fine.

16           MR. O'CONNOR:  May we display Exhibit 571?

17           THE COURT:  Well --

18        (Bench conference as follows:)

19           THE COURT:  Taking a bean out of your cup.

13:58:24  20           MR. O'CONNOR:  I have jelly beans to replace them.

21           I'd like to display that right now --

22           THE COURT:  The exhibit's in evidence.  You can

23  display any part of it.

24           MR. O'CONNOR:  Okay.  I just didn't want anybody to

13:58:38  25  think I was going against what we discussed --

DIRECT EXAMINATION – BRET BAIRD

13:58:41   1        THE COURT:  Well, it was just admitted; right?  You

2   can display.

3        (Bench conference concludes:)

4        THE COURT:  Thank you, ladies and gentlemen.

13:59:02   5        MR. O'CONNOR:  Felice --

6        Your Honor, may we publish Exhibit 571 to the jury,

7   please?

8        THE COURT:  Yes.

9   BY MR. O'CONNOR:

13:59:10  10   Q    And -- and Mr. Baird, if we go to page 2 of the franchise

11   review here there's a discussion about market share.  Do you

12   see that?

13   A    Yep.  Yes.

14   Q    And it looks like it's somewhat of a pie diagram.  Do you

13:59:35  15   see that?

16   A    I do.

17   Q    And BPV is Bard Peripheral Vascular --

18   A    Correct.

19   Q    -- right?

13:59:43  20   A    Yes.

21   Q    And the point of this slide is to show people who are at

22   this meeting, to show that Bard has 28 percent of the market;

23   true?

24   A    True.

14:00:14  25        MR. O'CONNOR:  And, Felice, if we could go to 571,

DIRECT EXAMINATION — BRET BAIRD

14:00:20   1    page 7.  I'm sorry.

2    BY MR. O'CONNOR:

3    Q    And this is a document called SWOT; true?

4    A    True.

14:00:37   5    Q    Can you simply tell us what S-W-O-T stands for?  All I

6    want are the words; would you do that for me?

7    A    Strengths, weaknesses, opportunities, threats.

8    Q    What was the T?

9    A    Threats.

14:00:50  10    Q    And that is something that is used in marketing to help

11    with people in sales force, and other people in the

12    department, to understand all of the issues that may be

13    facing a product such as filters; true?

14    A    That is used as a standard marketing tool in just about

14:01:06  15    every marketing organization around.

16    Q    So as the members of the jury look at this, on the

17    left-hand side is a list of what you're educating people at

18    Bard on, what the strengths were of the filters; correct?

19    A    Correct.

14:01:21  20    Q    And on the right were what you were advising what the

21    weaknesses of filters were that would affect the market;

22    true?

23    A    False.  Not me.  This is a whole team document of people

24    that are doing this.  These are just perceptions of what that

14:01:38  25    group came together and did.

DIRECT EXAMINATION – BRET BAIRD

14:01:40  1   Q   It's a consensus from your team; fair?

2   A   Fair.

3   Q   And what your team wanted to do was educate the people in

4   Bard about weaknesses inherent in Bard IVC filters and the

14:01:52  5   market perception of Bard filters; correct?

6   A   According to that model, filling that model out that's

7   what they were trying to do.

8   Q   And as we went down the list we can say one weakness

9   identified by your team was that Bard was device focused as

14:02:09  10   opposed to being disease state focused; correct?

11   A   That's what it reads.

12   Q   Next point from the team was that Bard's weakness was

13   that Bard was reactive, had reactive evolutionary designs; is

14   that correct?

14:02:26  15   A   That's how it reads.

16   Q   And then as we look down the page, the last statement in

17   the column, a weakness that your team wanted to alert Bard to

18   was there was a perception that Bard filters had higher

19   complication rates; true?

14:02:47  20   A   That's how it reads.

21   Q   And I read it correctly?

22   A   Market perception of BPV filter, higher complication

23   rates.

24          MR. O'CONNOR:  Felice, go to the next page.

25

DIRECT EXAMINATION – BRET BAIRD

14:03:06    1   BY MR. O'CONNOR:

2   Q    And on this you talk about -- your team talked about

3   opportunities and threats.  Did I read that correctly?

4   A    Yep.  Yes.

14:03:22    5   Q    And one threat was there was a trend to focus on

6   complications related to optional IVC filters in the clinical

7   literature; true?

8   A    That's how it reads, yes.

9   Q    And, by the way, when we're talking about May 6, 2008, is

14:03:53   10   that the time the G2X was on the market, do you know?

11   A    I believe -- so this was, I think, a month after I joined

12   the team.  That was around the time frame G2X was launching.

13   But I'd have to defer to those who know time frame on that.

14             MR. O'CONNOR:  Let's go to page 14, Felice.

14:04:21   15   BY MR. O'CONNOR:

16   Q    And this page, is entitled Product Line Strategies; is

17   that correct?

18   A    Yes.

19   Q    And one product line strategy that was being discussed at

14:04:44   20   this time was "To implement short-term modifications to

21   enhance the current platform."  Did I read that correctly?

22   A    Yes.

23   Q    And in parens, G3.  Right?

24   A    Correct.

14:05:00   25   Q    And G3 was a way that Bard was talking about the upcoming

DIRECT EXAMINATION – BRET BAIRD

14:05:04  1    Eclipse filter; true?

2    A   I don't know.  I don't remember what G3 really was.  It

3    wasn't a terminology we used a whole lot.

4    Q   Well, I can show you testimony that you gave earlier this

14:05:20  5    year.

6          MR. O'CONNOR:  Felice, could you put up the

7    transcript of page 834.

8          Are you able to do it?

9          That's okay, let's –– oh, here we go.

14:05:53  10   BY MR. O'CONNOR:

11   Q   "You understood that the G2 was also referred to as the

12   second generation filter at Bard; correct?  That's why it got

13   the name G2."

14   A   Correct.

14:06:12  15   Q   "Then you see that after the G2 came the G3, and that was

16   the Eclipse."  Do you recall that?

17   A   Actually, as I read this it says, "I don't know.  I

18   remember the name G3.  I know it eventually –– I know Eclipse

19   was the next filter."

14:06:27  20         So, again, I don't know what G3 was really referring

21   to.  I know Eclipse was the next one after G2X.

22   Q   All right.  Let me ask you this.

23         MR. O'CONNOR:  We can go back to the exhibit,

24   please.

25

DIRECT EXAMINATION – BRET BAIRD

14:06:38  1    BY MR. O'CONNOR:

2    Q    What you did know is that what became the Eclipse was in

3    design and evolution at this time; fair?

4    A    Again, I don't know if it was in evolution at this time.

14:06:47  5    Q    Well, we'll talk more about that.

6              But one thing that you were discussing back in

7    May 2008 was the need to implement short-term modifications to

8    enhance the current platform; true?

9    A    True.

14:07:07 10    Q    And in addition, at that time in the filter franchise

11    review, you and your team were also discussing "The need to

12    introduce a next gen optional filter that significantly

13    reduces complications."  Did I read that correctly?

14    A    Yes.

14:07:29 15    Q    And that is "Reduce the complications that Bard was

16    becoming aware of"; true?

17    A    All it says is "reduces complications."  I don't know

18    exactly the nuances of the complications that are there.  But

19    complications.

14:07:46 20    Q    You and your team wrote this; correct?

21    A    Correct, the whole team.

22    Q    You were addressing filter complications; true?

23    A    True.

24    Q    You were addressing Bard filters; correct?

14:07:55 25    A    Correct.

DIRECT EXAMINATION – BRET BAIRD

14:07:56  1    Q    You were addressing short-term modifications; true?

2    A    True.

3    Q    And you were also addressing a next generation of a

4    filter that would significantly reduce complications;

14:08:06  5    correct?

6    A    Correct.

7              MR. O'CONNOR:  Let's go to 19, Felice.

8    BY MR. O'CONNOR:

9    Q    And at page 19, your team further explained to Bard

14:08:48  10   objectives that were set forth in your franchise review at

11   that time; true?

12   A    I'm sorry, can you restate that.

13   Q    Sure.  Page 19.  We're looking at your franchise review;

14   correct?

14:09:01  15   A    Correct.

16   Q    This is, again, information that was developed by your

17   team; right?

18   A    Correct.  Yes.

19   Q    And here, what your team told Bard is when you look at

14:09:10  20   this G3, the third generation, whatever that filter was going

21   to be, that "an objective had to be improve G2 platform to

22   address current complications without a clinical trial."  Did

23   I read that correctly?

24   A    Correct.

14:09:26  25   Q    And you and your team advised Bard that the filter -- you

DIRECT EXAMINATION – BRET BAIRD

14:09:33  1    used the word, "Delivers: Electropolishing; reduced

2    tilt/penetration/migration." Did I read that correctly?

3    A    Yes.

4    Q    A risk you and your team identified for Bard is also set

14:09:50  5    forth on this page; correct?

6    A    Yes. There's risks here.

7    Q    And that risk was "unable to make changes to a filter

8    without a clinical trial." Did I read that correctly?

9    A    Yes.

14:10:09  10   Q    And that there was a timeline that Bard was dealing with;

11   fair?

12   A    That's the way it reads: "Timeline challenges based on

13   changes."

14   Q    What you and the folks at Bard knew was the clinical

14:10:23  15   trial would take quite a bit of time; true?

16   A    Clinical trials take a lot of time. Correct.

17   Q    And that was a risk Bard had to deal with if it was going

18   to address something in the short term; correct?

19   A    Correct.

14:10:47  20        MR. O'CONNOR: Felice, go to page 28.

21   BY MR. O'CONNOR:

22   Q    You and your team put together a financial forecast for

23   Bard; true?

24   A    True.

14:11:06  25   Q    And what you did on the left, so that when the members of

DIRECT EXAMINATION – BRET BAIRD

14:11:09   1    the jury review this they'll know, you identified the Bard

2    line of filters and related products; correct?

3    A    Correct.

4    Q    And then as you go through each column, they can follow

14:11:23   5    the title and they can get to Forecast for different quarters

6    in 2009; correct?

7    A    Correct.

8    Q    And what you and your team were doing was forecasting

9    monetary money numbers for the company so they can understand

14:11:44   10   where their various devices would be and what they may bring

11   in to the company; correct?

12   A    Correct.

13   Q    And the total forecast at the bottom and all the way over

14   at the right hand was how much?

14:12:03   15   A    For what year?

16   Q    For just these four quarters in 2009; true?

17   A    You want me to read 2009?

18   Q    Yeah, I'm just talking about 2009.  Forecasted for each

19   of the four quarters and then, as you go down, the total at

14:12:15   20   the bottom you see an amount; is that correct?

21   A    Correct.

22   Q    What is that amount?

23   A    For all four quarters combined it looks like 65,000 --

24   65,000,131.

14:12:35   25   Q    Thank you.

DIRECT EXAMINATION – BRET BAIRD

14:12:36  1          MR. O'CONNOR:  Felice, let's go to Exhibit 4454.

2     BY MR. O'CONNOR:

3     Q   This document is an Eclipse Vena Cava Concept POA.  Do

4     you see that?

14:12:57  5     A   Yes.

6     Q   And you have seen this document before; correct?

7     A   I've seen a concept POA, yeah.  That was part of

8     marketing.

9     Q   All right.

14:13:09  10         MR. O'CONNOR:  I offer -- I admit this into

11    evidence, Your Honor, Exhibit 4454.

12         MS. HELM:  Your Honor, I'm going to object.  I don't

13    think he's laid the proper foundation to admit it through

14    this witness.

14:13:22  15         THE COURT:  What's the specific foundation you're

16    objecting on?

17         MS. HELM:  He said he's seen this type -- I may have

18    misunderstood him.

19         MR. O'CONNOR:  I can --

14:13:31  20         THE COURT:  Hold on a minute, Mr. O'Connor.

21         What is the exact objection?

22         MS. HELM:  I'm sorry, Your Honor, I was looking for

23    the exhibit.  I thought he said "I've seen this type of

24    document before."  I don't know that he indicated that he

14:13:41  25    knew this document.  If I misspoke, I apologize.

DIRECT EXAMINATION – BRET BAIRD

14:13:44  1      THE COURT:  Do you have a foundation objection to

2      4454?

3      MS. HELM:  Yes, Your Honor.  I don't think this

4      witness has identified the document as something he's

14:13:51  5      familiar with.

6      THE COURT:  Well, but that's not the requirement for

7      admissibility.  I mean, do you have an authentication concern

8      that it's not a Bard document?

9      MS. HELM:  No, Your Honor.

14:14:00  10     THE COURT:  Objection's overruled.  4454 is

11     admitted.

12     (Exhibit 4454 admitted.)

13     MR. O'CONNOR:  Let's go to page 3 so there's no

14     question about your knowledge of this document.

14:14:10  15     Can we go there, Felice.

16     BY MR. O'CONNOR:

17     Q   This concept POA is dated October 14, 2009, is that

18     right, Mr. Baird?

19     A   Correct.

14:14:19  20     Q   And you're identified as the individual that prepared

21     this document; correct?

22     A   That's the way it appears.

23     MR. O'CONNOR:  May we publish this to the jury, Your

24     Honor?

14:14:31  25     THE COURT:  Yes.

DIRECT EXAMINATION – BRET BAIRD

14:14:36  1        MR. O'CONNOR:  And let's go to page 4, Felice.

2    BY MR. O'CONNOR:

3    Q   The concept that you were talking, POA means product

4    opportunity appraisal?

14:14:58  5    A   I think it is product opportunity assessment.  It may

6    be -- may be one or the other, I don't know.

7            Oh, it says "appraisal" at the top.

8    Q   So did I read that correctly?

9    A   You did.

14:15:08  10   Q   And you go through and you talk about a project

11   description.  Do you see that?

12   A   Correct.  Yes.

13       MR. O'CONNOR:  And then, Felice, if you go down to

14   description of Unmet Needs and if you could just enlarge the

14:15:25  15  Situation.

16   BY MR. O'CONNOR:

17   Q   What you were stating in this document is the belief that

18   there was a practice in the industry to use electropolishing;

19   correct?

14:15:43  20   A   Correct.

21   Q   And you were telling Bard that that was a standard

22   practice and that this should be done with the new device;

23   fair?

24   A   The team was saying that; correct.

14:15:58  25       MR. O'CONNOR:  And go ahead and put that down.

DIRECT EXAMINATION – BRET BAIRD

14:16:01   1          Go to Problem, Felice.

2   BY MR. O'CONNOR:

3   Q    You identified the problem is that Bard filters were not

4   electropolished with what you claimed was an industry

14:16:12   5   standard; true?

6   A    It says, yeah, Bard filters are not electropolished.

7   Q    Now, you're not an engineer; correct?

8   A    I'm not.

9   Q    And you certainly weren't publishing any test or test

14:16:33  10   results in this document, were you?

11   A    I'd have to look at the document.  I have no idea.  This

12   is a team document.

13   Q    This is, again, a team document?

14   A    Yeah.

14:16:42  15          MR. O'CONNOR:  Let's go to page 5.

16          And, Felice, if you could enlarge Critical Success

17   Factors.

18   BY MR. O'CONNOR:

19   Q    Mr. Baird, what you and your team were telling Bard is

14:17:02  20   that if the filter, this concept of the Eclipse, were to be

21   successful, that the Eclipse electropolished filter must

22   provide equivalent or improved performance compared to the

23   G2X filter and not introduce additional complications;

24   correct?

14:17:21  25   A    Correct.

DIRECT EXAMINATION – BRET BAIRD

14:17:24  1   Q   So couldn't be any worse --

2   A   Right.

3   Q   -- right?

4   A   You don't ever want to introduce a worse product on the

14:17:30  5   market.

6   Q   But you were suggesting that the Eclipse should be better

7   than the G2X; true?

8   A   True.  Absolutely.

9          MR. O'CONNOR:  And then let's go to page 7.

14:18:13  10         Go ahead and enlarge it.

11  BY MR. O'CONNOR:

12  Q   As of this date, you and your team believed that for the

13  launch of the Eclipse, the G2 and G2X should be discontinued;

14  correct?

14:18:26  15  A   Correct.  That's what this document says.

16  Q   At least from a marketing perspective that was important

17  to you; true?

18  A   Oh, I have no idea from a marketing perspective it's

19  important.  All I know, as a team document we're saying

14:18:40  20  that's what our plan was.

21  Q   Let me ask you this:  That statement was important enough

22  to put in a document you intended Bard to review and rely

23  upon; correct?

24  A   Correct.

14:18:51  25  Q   And you actually -- and your team had suggested that the

DIRECT EXAMINATION – BRET BAIRD

14:18:54  1    phase out would be aggressive, within a five-week period post

2    launch.  Did I read that correctly?

3    A    That's the way it reads.

4    Q    But you don't know what happened on that end, do you?

14:19:12  5    A    I don't remember anything about this that many years ago.

6    Q    As a matter of fact, you don't know whether the G2 or G2X

7    were aggressively continued while Eclipse was on the market;

8    true?

9    A    I'm sorry, can you say that question again.

14:19:24 10    Q    You don't know if the G2 or G2X were ever completely

11    eliminated while the Eclipse was on market; fair?

12    A    Fair.

13         MR. O'CONNOR:  Felice, let's go to Exhibit 4455

14    please.

14:19:39 15    BY MR. O'CONNOR:

16    Q    Exhibit 4455 is a DIS Approval Form and it is talking

17    about a Vail vena cava filter.  Do you see that?

18    A    I do.

19    Q    Do you see your signature, Bret Baird?

14:20:01 20    A    Correct.

21    Q    Dated 11/23/2009.  Do you see that?

22    A    I do.

23         MR. O'CONNOR:  Move to admit Exhibit 4455, Your

24    Honor.

14:20:22 25         MS. HELM:  No objection, Your Honor.

DIRECT EXAMINATION - BRET BAIRD

14:20:27  1          MR. O'CONNOR:  May I publish to the jury?

        2          THE COURT:  Admitted.

        3       (Exhibit 4455 admitted.)

        4          THE COURT:  We're going to take a break at this

14:20:31  5   point, Mr. O'Connor.  So we will break until 2:37.

        6          We'll excuse the jury.

        7       (The jury exited the courtroom at 2:21.)

        8          THE COURT:  Counsel, we took that break abruptly

        9   because one of the jurors caught Traci's eye and said she

14:21:13 10   needed a break, so we took a break.

       11          We'll see you in 15 minutes.

       12          MR. ROGERS:  Thank you, Your Honor.

       13          MR. O'CONNOR:  Did I put on the record I wanted to

       14   publish?

14:21:22 15          THE COURT:  Pardon?

       16          Oh.  You can say it again.

       17       (Recess taken from 2:21 to 2:37.)

       18          THE COURT:  Thank you.  Please be seated.

       19          You may continue, Mr. O'Connor.

14:37:47 20          MR. O'CONNOR:  Thank you, Your Honor.

       21          I would like to publish 4455.

       22          THE COURT:  You may.

       23          MR. O'CONNOR:  Thank you, Felice.

       24   BY MR. O'CONNOR:

14:38:03 25   Q   By the way, Mr. Baird, DIS stands for design input

DIRECT EXAMINATION – BRET BAIRD

14:38:08  1   summary; true?

2   A    True.

3           MR. O'CONNOR:  Felice, if we can go to page 3.

4           And -- wait until you get there.

14:38:28  5           In paragraph 4.0, that last paragraph in there,

6   Felice, the last sentence, could you enlarge that.  "As part

7   of BPV's continued improvement."

8   BY MR. O'CONNOR:

9   Q    As part of this design input summary, you and your team

14:38:47 10   are stating that, "As part of BPV," Bard Peripheral

11   Vascular's, "continued improvements to our filter technology,

12   we are undertaking the effort to improve the surface of the

13   G2X filter"; true?

14   A    True.

14:39:03 15           MR. O'CONNOR:  Felice, let's puts up Exhibit

16   Number 592, please.

17   BY MR. O'CONNOR:

18   Q    This is an e-mail from you at the top dated April 28,

19   2010 to a Brian -- how do you say his last name?

14:39:24 20   A    Reinkensmeyer.

21   Q    Reinkensmeyer?

22   A    Reinkensmeyer.

23           MR. O'CONNOR:  Move to admit 592, Your Honor.

24           MS. HELM:  No objection, Your Honor.

14:39:33 25           THE COURT:  Admitted.

DIRECT EXAMINATION — BRET BAIRD

09:25:03    1          (Exhibit 592 admitted.)

            2                  MR. O'CONNOR:  May we publish, Your Honor?

            3                  THE COURT:  Yes.

            4     BY MR. O'CONNOR:

14:39:46    5     Q    Brian Reinkensmeyer was also working at Bard at the time;

            6     correct?

            7     A    Correct.

            8     Q    You were working on messaging to get to the customers

            9     about the transition to the Eclipse; is that correct?

14:39:58   10     A    The marketing department was, yes, with the team.

           11     Q    Pardon me?

           12     A    Yes.

           13     Q    That's the subject of the e-mail; true?

           14     A    Not the subject of working on it.  This is what we were

14:40:12   15     explaining to the sales force, what messaging they can use.

           16     Q    All right.  Let me change the question then.

           17              The subject is "Message to filter customers regarding

           18     transition to Eclipse."  Correct?

           19     A    Correct.

14:40:25   20     Q    And Mr. Reinkensmeyer is asking you about language for

           21     that message; correct?

           22     A    Correct.

           23     Q    And you say in your response, your last sentence, "We

           24     must use all of the verbiage, though.  Just can't say it's

14:40:41   25     now fracture resistant."  Did I read that correctly?

DIRECT EXAMINATION – BRET BAIRD

14:40:45  1    A    You did.

2    Q    And, again, you're talking about messaging for the

3    Eclipse; correct?

4    A    Correct.

14:40:52  5    Q    Thank you.

6                You can take that down.

7                Now, Mr. Baird, you're familiar with a study that

8    came from Dr. Nicholson in August of 2009?

9    A    Yes.

14:41:27  10   Q    And Dr. Nicholson wrote an article about filter

11   experience at a hospital he was at; correct?

12   A    I believe so.

13   Q    And he concluded that the Bard Recovery and Bard G2

14   filters had a high prevalence of fracture and embolization;

14:41:41  15   true?

16   A    I'd have to see the details.  I can't say until I read

17   it.

18   Q    You read the article; correct?

19   A    Years ago.

14:41:51  20   Q    You were familiar with it; true?

21   A    True.

22   Q    Because Bard reacted to that document; correct?

23   A    I believe so.

24               MR. O'CONNOR:  Felice, let's show Mr. Baird Exhibit

14:42:01  25   587, please.

DIRECT EXAMINATION - BRET BAIRD

14:42:04  1        And if you could enlarge the Conclusion to see if

2    that will fresh Mr. Baird's recollection.

3    BY MR. O'CONNOR:

4    Q   Are you able to review that Conclusion and does that

14:42:18  5    refresh your recollection about what Dr. Nicholson concluded,

6    Mr. Baird?

7    A   So it says a Bard Recovery and Bard G2 filters had high

8    prevalences of fracture and embolization with potentially

9    life-threatening sequelae.

14:42:36 10    Q   Thank you.  And that was significant to Bard because this

11    article was critical of the G2 line of filters; true?

12    A   Wow, that's a loaded question.  When you say things like

13    critical and things like that, again, I was a marketing

14    person not a clinical person.

14:42:56 15        MR. O'CONNOR:  Let's go to testimony, Felice, back

16    in May of this year to page 841.  841, please.

17    BY MR. O'CONNOR:

18    Q   All right.  Now, Mr. Baird, do you recall back on May 18,

19    2018, that you testified?

14:43:37 20    A   Correct.  Yes.

21    Q   And you were under oath at that time; correct?

22    A   Correct.

23    Q   And if you look down towards page -- excuse me.  We're at

24    page 841, and if you look down towards line 18, you were

14:43:56 25    asked "Do you remember a study by Dr. Nicholson that came out

DIRECT EXAMINATION - BRET BAIRD

14:44:00   1   in August 2009?"

2        Your answer was "Yes."

3        Did I read that correctly?

4   A   Correct.   Yeah.

14:44:05   5   Q   The question then was, "And that was a significant study

6   from Bard's perspective because it was critical of the G2

7   filter; right?"

8        And your answer was, "Sure."

9        Did I read that correctly?

14:44:17   10   A   Oh.   Interesting.   In usage of "critical" here it's

11   saying it was critical of G2 filter.   Meaning it was negative

12   on the G2 filter.

13   Q   Now, did I read your testimony correctly, sir?

14        MS. HOLMAN:   Your Honor, I'm going to object.   He

14:44:31   15   didn't read the question correctly.

16        MR. O'CONNOR:   Let me try it again.

17        THE COURT:   Could you reread the question --

18        MR. O'CONNOR:   It's possible I missed a word.

19   BY MR. O'CONNOR:

14:44:38   20   Q   "And that was a significant study from Bard's perspective

21   because it was critical of the G2 filter; right?"

22        And your answers was "Sure."

23   A   Correct.

24   Q   I just realized what I left out.   I apologize for that.

14:44:49   25        Did I read it correctly now?

DIRECT EXAMINATION — BRET BAIRD

14:44:51  1   A    Yes.

2   Q    Thank you.

3        MR. O'CONNOR:  Keep that up there, Gay.

4   BY MR. O'CONNOR:

14:44:55  5   Q    The study was not favorable to Bard; true?

6        MR. O'CONNOR:  Felice.  I'm sorry.

7        THE WITNESS:  True.

8   BY MR. O'CONNOR:

9   Q    And Bard had a reaction to that study; correct?

14:45:08  10  A    I don't recall what reactions we had.

11       MR. O'CONNOR:  Let's go to 842, Felice.

12  BY MR. O'CONNOR:

13  Q    All right.  And looking down at line -- beginning line

14  17, Mr. Baird.  Are you there?

14:45:26  15  A    Yep.

16  Q    The question was presented to you, "Bard had a reaction

17  to this document.  That's fair to say; right?"

18       And your answer was "Correct."

19       Did I read that correctly?

14:45:37  20  A    Sure.

21  Q    Thank you.

22       MR. O'CONNOR:  Felice, go back to Exhibit 587.

23       Your Honor, at this time I would move to admit

24  Exhibit 587 into evidence.

14:45:55  25       MS. HELM:  Your Honor, we object on Rule 802.

DIRECT EXAMINATION – BRET BAIRD

14:45:59   1          THE COURT:  Sustained.

        2          MR. O'CONNOR:  I'm offering it for notice to Bard.

        3          THE COURT:  It's still hearsay.  I assume you're

        4   offering it -- well, I think it's hearsay.  I think you're

14:46:11   5   offering for the truth of the matter asserted.

        6          MR. O'CONNOR:  Okay.  Thank you, Your Honor.

        7          Let's go to 1621, Felice.

        8   BY MR. O'CONNOR:

        9   Q   Mr. Baird, you were involved in talking points to respond

14:46:33  10   to the Nicholson article; is that correct?

       11   A   I don't recall.  I don't remember.

       12   Q   Do you recall this document?

       13   A   No.

       14   Q   Isn't this document something you would have had input

14:46:46  15   on?

       16   A   I have no idea.

       17   Q   Well, we can go to your testimony.  844.

       18          Well, let me ask -- that's all right.  We'll move on.

       19          MR. O'CONNOR:  Exhibit 1568, Felice, please.

14:47:20  20   BY MR. O'CONNOR:

       21   Q   Mr. Baird, you are familiar with this document; correct?

       22   Your name is on it.  Do you see that?

       23   A   I see my name on it, yes.

       24   Q   It's dated September 30, 2010; correct?

14:47:31  25   A   Correct.

DIRECT EXAMINATION – BRET BAIRD

14:47:31  1   Q   And this is entitled -- or the subject is "Eclipse

2   post-market design review/marketing summary."  Did I read

3   that correctly?

4   A   Yes.

14:47:41  5           MR. O'CONNOR:  Move to admit 1568, Your Honor.

6           MS. HELM:  Your Honor, I have no objection except

7   for subject to the discussion we had prior to court today.

8   This is one of the exhibits that we discussed relating to

9   Mr. Baird.

14:47:57  10           THE COURT:  Well, the exhibit is admitted.  I think

11   you're asking that if I rule certain ways in the future,

12   portions of it will not be, but other portions will be

13   admitted?

14           MS. HELM:  I think so, Your Honor.

14:48:10  15           THE COURT:  Well, I'm admitting it at this point

16   without prejudice to your raising that later.

17           MS. HELM:  Thank you.

18       (Exhibit 1568 admitted.)

19           MR. O'CONNOR:  So may we publish to the jury?

14:48:20  20           THE COURT:  Yes.

21   BY MR. O'CONNOR:

22   Q   And what you are doing here you is have prepared a report

23   for Bard talking about the Eclipse filter and findings that

24   were made after it was on the market.  Correct?

14:48:52  25   A   Yes.  The post-market design review.  Every time you

DIRECT EXAMINATION — BRET BAIRD

14:48:55  1    launch a product there is always an assessment how you did

2    launching the product.

3    Q    That's what this is a report about, post-market design

4    review; true?

14:49:06  5    A    True.

6    Q    And if you look, some of the things that you had talked

7    about earlier did not work out.  Look at product performance.

8              THE COURT:  Go ahead, Mr. O'Connor.

9    BY MR. O'CONNOR:

14:49:43  10   Q    If you look at the last sentence of this paragraph, it

11   says "it was decided by the team and management to make the

12   phase-out of the G2 longer."  Do you see where I read from?

13   A    I do.

14   Q    Thank you.  Let's continue with the document.

14:50:10  15             MR. O'CONNOR:  Felice, let's go to page 3.

16   BY MR. O'CONNOR:

17   Q    You talked in this report about feedback and lessons

18   learned from the Eclipse experience; correct?

19   A    Correct.

14:50:26  20   Q    And what you did was you went through and you discussed

21   input you received from both customers and sales; true?

22   A    Looks like it.

23   Q    So, for example --

24             MR. O'CONNOR:  Felice, if you could enlarge the

14:50:44  25   bullet point "When asked."

DIRECT EXAMINATION – BRET BAIRD

14:50:52  1          Thank you.  You can take it below there –– at the

2    last bullet point, maybe enlarge that so we see the entire

3    last bullet point, "needed improvements."

4    BY MR. O'CONNOR:

14:51:32  5    Q    And here in the first bullet point, you discuss when

6    asked if their customers –– referring to sales reps; true?

7    A    I'm sorry, say that again.

8    Q    You're saying, "When asked if their customers perceived

9    the surface changes valuable, 75 percent of the reps stated

14:51:51  10    their customers saw it as somewhat valuable."

11    A    Correct.

12    Q    Did I read that correctly?

13    A    Yes.

14    Q    To place that in context, you're talking about sales

14:52:00  15    representatives and communications they had with customers

16    who used the Eclipse filter; true?

17    A    All I can say is what it says here, the interaction with

18    customers.

19    Q    Does it make sense from what you told me before that

14:52:13  20    customers of filters were primarily doctors?

21    A    Correct.  Yes.

22    Q    And then you go on to state, "When asked what the

23    customers perceptions were of these changes, the overall

24    message was that it was accepted as improvements but they

14:52:36  25    asked where the data was and if it would improve fractures."

DIRECT EXAMINATION – BRET BAIRD

14:52:41  1        Did I read that correctly?

2    A    Yes.

3    Q    And you quoted some of the questions which included a

4    question, "Nice, but what does that really do?  Is it going

14:52:56  5    to fix the fracture issues of the G2?"

6        Did I read that correctly?

7    A    Yes.

8    Q    And then in the next paragraph, "Sales reps were

9    asked" --

14:53:15 10        MR. O'CONNOR:  If we could go to that, Felice.

11   BY MR. O'CONNOR:

12   Q    You state, "Sales reps were asked whether they were able

13   to capture uplift in ASP" --

14        What is ASP?  What do those letters stand for?

14:53:36 15   A    Average selling price.

16   Q    You asked that with the Eclipse introduction; is that

17   correct?

18   A    Correct.  Yes.

19   Q    18 out of 22 were not able to respond to that question.

14:53:46 20   Is that a fair reading?

21   A    18 of the 22 were not able to --

22   Q    Were not able to capture the uplift.

23   A    Correct.  That's the way it reads.

24   Q    "And some of the reasons were," and you listed some of

14:54:02 25   the reasons.

DIRECT EXAMINATION – BRET BAIRD

14:54:10   1          One reason was you didn't see the uplift in ASP was

  2   "It was perceived more of a fix by our customers or simply a

  3   change in process, but not a product redesign."

  4          Did I read that correctly?

14:54:23   5   A   Yes.  Wait.  Where are you reading?

  6   Q   First bullet point.  "It was perceived more of a fix by

  7   our customers or simply a change in process, but not a

  8   product redesign."

  9          Did I read that correctly?

14:54:35 10   A   Yes.

11   Q   And then you quoted other responses you received from the

12   sales reps; true?

13   A   I quoted some responses.  I don't know where it came

14   from.

14:54:49 15   Q   But you wrote -- you wrote the document and put in the

16   quotation marks; correct?

17   A   Correct.

18   Q   Meaning you were trying to show what somebody told you;

19   fair?

14:54:59 20   A   Fair.

21   Q   What you learned was, "Customers don't see it as a

22   product change or redesign, merely a change in polishing

23   technique.  Probably cheaper to electropolish than

24   mechanically polish."

14:55:11 25          Did I read that correctly?

DIRECT EXAMINATION - BRET BAIRD

14:55:13  1    A    You did.

2    Q    And you also learned from your sales reps that "docs,"

3    doctors, "think it is simply the right thing to do for the

4    product and not something groundbreaking."

14:55:24  5         Did I read that correctly?

6    A    Yes.

7    Q    I want to go back to page 1 for a moment.

8         And we talked about customers wanting concrete data

9    to show improvements at the bottom.  Do you recall that

14:55:59  10   testimony, Mr. Baird?

11   A    Sorry, where are you?

12   Q    Bottom of page 1.  "We have discussed a concern that was

13   brought to your attention about the lack of concrete data to

14   show improvements made it less effective."  Do you see that?

14:56:14  15        Your last sentence there on page 1.  Do you recall we

16   talked about that already?

17   A    "In a follow-up sales representative survey several TM's

18   had mentioned the lack of concrete data to show improvements

19   made it less effective."  Okay.

14:56:28  20   Q    You recall talking about that; right?

21   A    Yes.

22   Q    The sentence before it, though, you state -- well, the

23   subject or the issue you were addressing was concern about

24   the name change from the G2X to the Eclipse; correct?

14:56:46  25   A    That's what it reads here, yes.

DIRECT EXAMINATION – BRET BAIRD

14:56:54   1   Q   And you were saying that the name change, as you referred

2   to it, was necessary to maintain G2X and Eclipse product

3   differentiation.

4   A   Where are you?  Is that at the top?

14:57:03   5   Q   Second-to-last sentence.

6   A   Correct.

7   Q   That was the point.  You changed the name so customers

8   would at least perceive a difference in the product by name;

9   correct?

14:57:19  10   A   Correct.

11           MR. O'CONNOR:  Excuse me, Your Honor.  May I

12   consult?

13           Felice, 4416, please.

14   BY MR. O'CONNOR:

14:58:03  15   Q   As of April 27, 2010, you were a member of marketing;

16   correct?

17   A   Correct.

18   Q   And you knew Bill Little; true?

19   A   True.

14:58:12  20   Q   Pardon me?

21   A   Yes, I did know him.

22   Q   And this is a document to Bill Little from Filter

23   Marketing; right?

24   A   Correct.

14:58:22  25   Q   That included you, true, filter Marketing?

DIRECT EXAMINATION – BRET BAIRD

14:58:25   1   A    I assume so.

2            MR. O'CONNOR:  Move to admit Exhibit 4416, Your

3   Honor.

4            MS. HELM:  No objection, Your Honor.

14:58:31   5            THE COURT:  Admitted.

6          (Exhibit 4416 admitted.)

7            MR. O'CONNOR:  May I publish to the jury?

8            THE COURT:  Yes.

9   BY MR. O'CONNOR:

14:58:44   10   Q    Now, in Exhibit 4418, this is still April 27, 2010;

11   correct?

12   A    Correct.

13            THE COURTROOM DEPUTY:  4416?

14            MR. O'CONNOR:  Pardon me.  I'm sorry.  4416.  4416.

14:59:03   15   BY MR. O'CONNOR:

16   Q    And by April 27, 2010, you and marketing and people in

17   Bard were talking about the Eclipse with anchors; correct?

18   A    That's what it says right here.

19   Q    A new and different product from the Eclipse; correct?

14:59:20   20   A    Correct.

21   Q    What you talked about in this document was a value

22   proposition; true?

23   A    Let me take a look.

24            Yes.  There's a value prop there.

14:59:34   25            MR. O'CONNOR:  Felice, can you enlarge the paragraph

DIRECT EXAMINATION – BRET BAIRD

14:59:36   1   Value Proposition.

2         If you could enlarge that Value Proposition

3   paragraph.  If you could enlarge that, please.

4   BY MR. O'CONNOR:

15:00:06   5   Q   And what Bard was talking about in April 27, 2010, that

6   "there would be a filter and it would be the Eclipse with

7   anchors, which would retain the advantages of the G2, G2X,

8   and the Eclipse, including the retrievable indication, while

9   improving caudal migration resistance."

15:00:30  10         Now, did I read that correctly?

11   A   You did.

12   Q   And what was important about this new device was the next

13   statement:  "This improvement in caudal migration resistance

14   should reduce subsequent tilt, fracture, and penetration."

15:00:51  15         Did I read that correctly?

16   A   You did.

17   Q   You also discussed in this document naming rationale.  Do

18   you see that?

19         MR. O'CONNOR:  Let's go to that.  Would you enlarge

15:01:24  20   the first paragraph, please, of the Name Rational.  Yes.

21   BY MR. O'CONNOR:

22   Q   And, Mr. Baird, what you were talking about in this

23   document was the rationale from changing the name G2 to G2X

24   to Eclipse; correct?

15:01:48  25   A   No, I think this is for something past Eclipse.  Is that

DIRECT EXAMINATION – BRET BAIRD

15:01:51   1   what your question is?

2   Q   Well, you said the Eclipse launch introduced a product

3   that addressed a shortcoming with its predecessors, G2X and

4   G2, through electropolishing.

15:02:03   5   A   Yeah.

6   Q   Then you talk about the name, change in branding, do you

7   see where I'm reading?

8   A   Yep.

9   Q   And the brand name was changed.  It was previously G2,

15:02:11   10   which was generation 2; correct?

11   A   Correct.  G2X, yeah.

12   Q   And you people in marketing and the people in Bard

13   decided it was -- you should change the name from G2 to

14   something else; fair?

15:02:24   15   A   Fair.

16   Q   And you said "The change in brand name and codes was to

17   create a break with the baggage associated with the previous

18   versions despite the fact that the new iteration was the same

19   as the G2X in every way but one."

15:02:40   20       Did I read that correctly?

21   A   Correct.

22   Q   And the only difference was electropolishing; true?

23   A   For the Eclipse.  Yes.

24   Q   Correct?

15:02:50   25   A   Correct.

DIRECT EXAMINATION – BRET BAIRD

15:03:01   1   Q   And eventually the Eclipse with anchors did not retain

2   the Eclipse name, did it?

3   A   That's a different product.  The Eclipse with anchors was

4   the Meridian.

15:03:12   5   Q   Pardon me?

6   A   The Eclipse with anchors was the next generation, the

7   Meridian.

8   Q   Eclipse with anchors which was talked about in April 27,

9   2010, was eventually called the Meridian; right?

15:03:26  10   A   Meridian was the next generation product after Eclipse.

11   Q   I'm trying to understand what you said.  Eclipse with

12   anchors became the Meridian; true?

13   A   True.  That was what that product was.

14        MR. O'CONNOR:  Felice, put up Exhibit 591.

15:03:59  15   BY MR. O'CONNOR:

16   Q   This was an Idea POA and this is August of 2009 and you

17   prepared this document.  You, Bret Baird.  Correct?

18   A   Correct.

19        MR. O'CONNOR:  Move to admit Exhibit 591.

15:04:11  20        MS. HELM:  No objection, Your Honor.

21        THE COURT:  Admitted.

22     (Exhibit 591 admitted.)

23   BY MR. O'CONNOR:

24   Q   And if we could go to page 2.

15:04:27  25        To put this all in a timeline, even before 2010 came

DIRECT EXAMINATION - BRET BAIRD

15:04:31  1    around, and certainly long before February of 2011, Bard was

       2    already talking about the concept in a filter called the

       3    Denali; true?

       4    A    It appears that way.

15:04:45  5           MR. O'CONNOR:  May I publish this to the jury,

       6    please?

       7           THE COURT:  Yes.

       8    BY MR. O'CONNOR:

       9    Q    And the purpose of this Product Opportunity Appraisal in

15:04:56 10    2009 was to have a record of the design changes that Bard was

      11    going to use in the Denali filter; true?

      12    A    To have a record?  This is a -- POA is the -- this is the

      13    first one, the idea POA, which is the first approach of

      14    proposing a new product.

15:05:15 15    Q    By "record," I mean something in writing that reflected

      16    the ideas and the plan to have a new filter.  Does that make

      17    sense to you?

      18    A    Yes.

      19    Q    In other words, you weren't just talking about it, you

15:05:25 20    wrote about it.

      21    A    Correct.

      22    Q    Wrote about it so people could see it, people could read

      23    about it, and people could become excited about it.

      24    A    I have no idea -- yes.  To write it, to discuss it.

15:05:37 25    Q    Well, in marketing you certainly wanted the people,

DIRECT EXAMINATION – BRET BAIRD

15:05:40   1   including the sales force, to be excited about developments

2   in the products; true?

3   A   I don't think the sales force is allowed to see early,

4   early stage development stuff.

15:05:50   5   Q   Fair enough.

6        But anyway, you wrote this and I imagine, like most

7   things you did at Bard, you made efforts to be accurate in

8   anything you wrote; correct?

9   A   Correct.

15:06:00   10   Q   And you certainly weren't going to write anything that

11   was false or misleading, would you?

12   A   No.

13   Q   And so certainly when we look at this exhibit, we can

14   rely that you were making your best effort to make this

15:06:15   15   accurate about the ideas and ideas for design that Bard had

16   back in 2009; true?

17   A   Sure.  Reflective of the teams thoughts.

18   Q   Your team.

19   A   Yeah.

15:06:26   20   Q   Thank you.

21        MR. O'CONNOR:  And, Felice, if we could go to page

22   2.  And that second paragraph, Felice.

23   BY MR. O'CONNOR:

24   Q   And, Mr. Baird, in your effort to be accurate and

15:06:46   25   thorough, you wrote about inputs that Bard had received from

DIRECT EXAMINATION – BRET BAIRD

15:06:53  1    customers and the sales force; correct?

2    A    That's what this document is saying.  That's all I can

3    refer to.

4    Q    This was prepared by your team; correct?

15:07:05  5    A    Correct.

6    Q    And a fair reading is that you received inputs from your

7    customers and from your sales force.  Fair reading; true?

8    A    True.

9    Q    And those inputs from customers and sales force included

15:07:17  10   that the G2X -- "The G2 and G2X products pertain to filter

11   complications that compromise retrievability, including

12   filter migration, tilt, and penetration."

13              Did I read that correctly?

14   A    Yes.

15:07:32  15   Q    And something else that your customers and your sales

16   force were telling you in Bard, that "Filter fractures are

17   not reported as often but tend to have more serious results."

18   Did I read that correctly?

19   A    I think that with your emphasis, you changed it.

15:07:48  20              "Filter fractures not reported as often," meaning

21   they're not as often -- incident rate isn't as high but tend

22   to have more serious results.

23   Q    Well, let's just read it together.  Maybe I misread it.

24   I apologize.

15:08:00  25              "Filter fractures are not reported as often."

DIRECT EXAMINATION – BRET BAIRD

15:08:02  1    Correct?  That's what you wrote?

2    A    Yes.

3    Q    "But," referring to filter fractures, "tend to have more

4    serious results."  Did I read that correctly?

15:08:11  5    A    Yes.  Correct.

6    Q    And so you were discussing how this new design that Bard

7    was aware of in August of 2009 would help reduce these

8    complications; fair?

9    A    The usage of saying "aware."  This is a product

15:08:29  10   opportunity assessment which means there's always all sorts

11   of ideas to try to improve our product line.

12   Q    Let me see if I can get something we both can agree on.

13        You and your team said in order to reduce these types

14   of complications, this project, "will incorporate design

15:08:45  15   modifications that will help limit the movement, keep the

16   filter centered, and minimize fracturing."  Did I read that

17   correctly?

18   A    Correct.  Yes.

19   Q    And those features that you wrote about being accurate in

15:08:59  20   2009 to reduce movement, help keep the filter centered, and

21   to minimize fracturing, included penetration limiters.

22   Correct?

23   A    Yes.

24   Q    Caudal anchors; true?

15:09:14  25   A    True.

DIRECT EXAMINATION – BRET BAIRD

15:09:15  1    Q    Laser cut one-piece design; true?

2    A    Yes.

3    Q    Electropolished finish.

4    A    Yes.

15:09:22  5    Q    And enhanced design with broad shoulders for centering.

6    Correct?

7    A    Correct.

8    Q    Meaning these design modifications were intend to do

9    reduce the complications that we just talked about:

15:09:40 10    Migration, tilt, penetration, and fracture; fair?

11    A    Fair.

12    Q    And in 2009 --

13         MR. O'CONNOR:  If we go down to Problems, Felice.

14    BY MR. O'CONNOR:

15:10:07 15    Q    In your effort to be accurate and thorough, you stated

16    the following:  "Though the reported incident rates of G2

17    filter fractures is low, the severity of fractures can be

18    significant."

19         Did I read that correctly?

15:10:26 20    A    Yes.

21    Q    And that's something you learned from input from your

22    sales force and from doctors that had those experiences;

23    correct?

24    A    I have no idea what the inputs were for that.

15:10:36 25    Q    Well, certainly it's not something that came to your mind

DIRECT EXAMINATION - BRET BAIRD

15:10:40  1   on it's own.

2   A    No, because this is a team document.

3   Q    You got this from others.  You were talking with

4   customers and you were talking with sales reps; right?

15:10:48  5   A    Amongst many other inputs.

6   Q    And here's the point:  The information you wrote in this

7   document in your attempt to be accurate and thorough was

8   based upon information that you affirmatively went out to

9   learn within Bard.  Correct?

15:11:05  10  A    And this is a POA?  It could be going forward or also

11  passive information that we can find.

12  Q    You wouldn't have made this up?

13  A    No.

14  Q    You wouldn't have stated it unless you felt it was needed

15:11:17  15  to be truthful and accurate; true?

16  A    Sure.

17       MR. O'CONNOR:  Go to page 591.

18  BY MR. O'CONNOR:

19  Q    And here back in August 2009, Mr. Baird, before

15:11:40  20  April 2010, certainly before February of 2011, here's what

21  you and your team wrote being accurate.

22       MR. O'CONNOR:  Let's go to page 3, Felice.  And if

23  you could, the top bullet point.

24  BY MR. O'CONNOR:

15:12:04  25  Q    "A fractured arm or leg of a filter has the potential to

DIRECT EXAMINATION – BRET BAIRD

15:12:09  1  travel from the vena cava to the heart or lungs."

2      Did I read that correctly?

3  A   Yes.

4  Q   That was a serious problem; correct?

15:12:21  5  A   I'm not a clinical person or doctor to say what's serious

6  or what's not.

7  Q   Certainly you're a person that was trying to be accurate

8  and thorough and when you wrote it you were referring to a

9  problem with the filter; true?

15:12:32  10  A   Right.  Yes.

11  Q   And you knew regardless of your training, regardless --

12  that anything going to a heart is serious; correct?

13  A   Can you restate that question?

14  Q   You knew just based upon living, being a human being,

15:12:46  15  that anything going to the heart was potentially serious;

16  true?

17  A   Potentially, sure.

18  Q   Thank you.

19      MR. O'CONNOR:  Let's go to Exhibit 1788, please,

15:13:34  20  Felice.

21  BY MR. O'CONNOR:

22  Q   And this is an e-mail with a series of people on it dated

23  October 2, 2010; is that correct?

24  A   Correct.

15:13:49  25  Q   And you see your name on the cc list?  Do you see it down

DIRECT EXAMINATION - BRET BAIRD

15:13:53  1   there on cc next to Robert Righi?

2   A    Rob Righi.  Yes.  Correct.

3           MR. O'CONNOR:  Move to exhibit admit 1788, please.

4           MS. HELM:  I'm sorry.  No objection, Your Honor.

15:14:10  5           THE COURT:  Admitted.

6         (Exhibit 1788 admitted.)

7           MR. O'CONNOR:  May I publish?

8           THE COURT:  You may.

9   BY MR. O'CONNOR:

15:14:22  10   Q    This subject or the document attached to this was a

11   commercialization plan for the Meridian; right?

12   A    Correct.

13   Q    Meaning the Meridian was going to be launched fairly

14   soon.

15:14:36  15   A    I don't know time, but it looks like that's what it is.

16   Q    Certainly in October of 2010 everything was ready and the

17   commercialization plan was, when we launch it, what are we

18   going to do with it when it's in the market; fair?

19   A    Fair.  That's what a commercialization plan is.

15:14:53  20           MR. O'CONNOR:  If we go to page 4, Felice.

21   BY MR. O'CONNOR:

22   Q    And here's what Bard anticipated back in October 20,

23   2010, about the Meridian when it would be launched.  Under

24   Value Proposition, if we could enlarge that.

15:15:31  25           "The Meridian, Eclipse anchors filter, will retain

DIRECT EXAMINATION – BRET BAIRD

15:15:34    1    the advantages of the G2, G2X, and Eclipse, including

2    retrievable indication while improving caudal migration

3    resistance."

4          Did I read that correctly?

15:15:44    5    A    Yes.

6    Q    And then it goes on to state, "The addition of caudal

7    anchors should limit the amount of tilt, which may reduce the

8    likelihood of penetration and fracture."

9          Did I read that accurately?

15:16:02   10    A    Yes.

11    Q    Thank you.

12          MR. O'CONNOR:  And if we go to page 6, Felice.

13    BY MR. O'CONNOR:

14    Q    And what we're looking at are two diagrams, one of the

15:16:18   15    Eclipse and one of the Meridian.  Correct?

16    A    Correct.

17    Q    And what this design is showing are the things talked

18    about on the previous page, the things that would make this

19    filter more resistant to caudal migration; fair?

15:16:34   20    A    Correct, the anchors.

21    Q    Which in turn would reduce tilt, penetration, and

22    fracture.  Correct?

23    A    That was the hope.

24    Q    Pardon me?

15:16:44   25    A    That was the hope.

DIRECT EXAMINATION – BRET BAIRD

15:16:53  1          MR. O'CONNOR:  And if we go to page 9, Felice.

2          19.  I'm sorry.

3     BY MR. O'CONNOR:

4     Q    And the effort to reduce caudal migration was an

15:17:21  5     important feature of this Meridian filter.  You agree with

6     that?

7     A    Oh.  Correct.  I think that was the feature of this

8     product.

9     Q    And that's because if we look at problems --

15:17:32 10          MR. O'CONNOR:  Felice, go ahead and enlarge that.

11     BY MR. O'CONNOR:

12     Q    "What Bard was aware of was that filter migration or

13     movement may lead to tilting, increased risk of filter

14     fracture, and vena cava penetration."

15:17:47 15          Did I read that correctly?

16     A    You read it correctly.  That was an assumption.

17     Q    I'm sorry, sir?

18     A    I said yes --

19     Q    Did I read that correctly?

15:17:56 20     A    Yes.

21     Q    This is a document circulated within Bard; correct?

22     A    Internally, yes.

23     Q    It was a document that was intended to be used to

24     commercialize this filter; correct?

15:18:06 25     A    Correct.

DIRECT EXAMINATION – BRET BAIRD

15:18:08  1    Q    You knew that Bard would be involved in promotional
          2    brochures for the Meridian filter; true?
          3    A    Of course, yes.
          4    Q    And that Bard wanted to keep its customers -- that is,
15:18:20  5    the doctors -- happy; correct?
          6    A    That's always the objective.  Correct.
          7    Q    And Bard knew that to achieve customer satisfaction in
          8    2000 it was necessary to do something to reduce tilt,
          9    migration, and fracture; correct?
15:18:43 10    A    To do something -- say that again.
         11    Q    Yes.  Bard knew it had to do something to reduce those
         12    complications:  Tilt, penetration, and fracture; true?
         13    A    Bard knew the way to improve their technology is to
         14    address that.  Correct.
15:18:56 15    Q    So my statement is correct?
         16    A    Restate your statement, please.
         17    Q    I will state it.
         18         Bard knew that it was going -- that doctors wanted
         19    and Bard intended to promote a filter that would reduce tilt,
15:19:16 20    migration and fracture; true?
         21    A    True.
         22         MR. O'CONNOR:  That's all I have, Your Honor.  Thank
         23    you.
         24         THE COURT:  Redirect -- I'm sorry.
15:19:34 25    Cross-examination.

CROSS-EXAMINATION - BRET BAIRD

15:19:35   1          MS. HELM:  Yes, Your Honor.

        2              C R O S S - E X A M I N A T I O N

        3     BY MS. HELM:

        4     Q   Good afternoon, Mr. Baird.  I'm going to follow up on a

15:20:14   5     number of questions and exhibits that Mr. O'Connor asked you

        6     about, but before I do that I want to ask you a few

        7     questions.

        8              You left Bard in 2011; correct?

        9     A   Correct.

15:20:27  10     Q   You've been asked a lot of questions today about things

       11     that occurred in 2009, 2010.  Since 2011, have you thought

       12     about IVC filters?

       13     A   Not at all.

       14     Q   Have you come in here today and done your best to tell

15:20:40  15     the truth and to remember events that occurred nine and ten

       16     years ago?

       17     A   Yes.

       18     Q   Mr. O'Connor also mentioned that you were at Bard for --

       19     from approximately 2006 to 2011.  Correct?

15:20:55  20     A   Correct.

       21     Q   Would you tell the jury both your educational background

       22     and work background prior to being at Bard.

       23     A   Sure.  So I've been in the medical space for a while.

       24     Prior to Bard I worked at a company called Medtronic, one of

15:21:10  25     the largest medical device companies in the world, really.  I

CROSS-EXAMINATION – BRET BAIRD

15:21:12  1    was in product marketing, similar to what I was doing at

2    Bard.

3           Before that I was an MDA graduate of Harvard Business

4    School.  Prior to that I was worked at a rehab company.

15:21:24  5    Product marketing again.  So that's my product development,

6    product marketing history.

7    Q    And is it fair to say you've spent most of your

8    professional career in product marketing?

9    A    Correct.

15:21:37 10    Q    And would you briefly describe your duties, very briefly,

11   to the jury as the franchise manager for IVC filters at Bard.

12   A    Sure.  Franchise manager is the marketing head of that

13   group, we call it a franchise, and you play a liaison role.

14   You basically play a role between the sales force, customers,

15:21:57 15   and to engineers and other internal people.  You're one of

16   several different ways that information can pass through in

17   and out of the company, and a primary role of it is to launch

18   new products.

19   Q    Okay.  Were you responsible for communicating with the

15:22:13 20   FDA?

21   A    No, not at all.

22   Q    Others were responsible for that in Bard?

23   A    Absolutely.

24   Q    Were you responsible for determining or conducting design

15:22:20 25   activities, including testing for development of filters or

CROSS-EXAMINATION – BRET BAIRD

15:22:22  1   the next generation of filters?

2   A    No.  That's engineering.

3   Q    Engineers do that; right?

4   A    Correct.  Yes.

15:22:29  5   Q    And we've talked today, and we're going to go back into

6   it, we've talked today a lot about a lot of ideas and changes

7   to filters over time.  Do you recall that discussion?

8   A    Yes.

9   Q    Is it marketing's role to determine what it takes to make

15:22:44 10   those changes to a filter?

11   A    No.

12   Q    Who makes that decision?

13   A    Engineering.

14   Q    Is it marketing's role to determine how long it takes to

15:22:54 15   implement changes to a filter?

16   A    No.  That's engineering.

17   Q    Is it marketing's role to determine whether there are --

18   how to alleviate unintended consequences from a change that

19   is tried from an idea to a filter?

15:23:09 20   A    No.  That's is engineering.

21   Q    Engineering.

22        It's marketing's role to make the most of it and to

23   try to help sell the product; correct?

24   A    Correct.

15:23:15 25   Q    It was also not your role or your responsibility at Bard

CROSS-EXAMINATION - BRET BAIRD

15:23:20   1   to market adverse events or monitor rates or anything like

2   that; correct?

3   A    Correct.

4   Q    There were others in the company who had that

15:23:29   5   responsibility --

6   A    Absolutely.

7   Q    -- correct?

8            Likewise, it wasn't your role to determine how

9   competitors market -- products were performing in the market

15:23:41   10   as far as rates and things like that; correct?

11   A    Correct.

12   Q    At the beginning of your testimony you were also asked

13   whether you were being paid for your time today.  Do you

14   recall that?

15:23:55   15   A    Sure.

16   Q    You missing work today?

17   A    Yes.

18   Q    Are you missing the opportunity to do what you actually

19   get paid for?

15:24:02   20   A    Yes.

21   Q    Are you asking for any compensation besides being

22   reimbursed for what you're actually losing by being in court

23   today rather than doing your job?

24   A    No.

15:24:13   25   Q    At the beginning of your testimony you were asked about a

CROSS-EXAMINATION - BRET BAIRD

15:24:18  1   Bard franchise review.  Do you recall that?

2   A    Yes.

3        MS. HELM:  Scott, could you pull up Exhibit 571,

4   please.

15:24:29  5   BY MS. HELM:

6   Q    Do you recall this document --

7        MS. HELM:  May I publish, Your Honor?  It's

8   admitted.

9        THE COURT:  You may.

15:24:34  10       MS. HELM:  Thank you.

11   BY MS. HELM:

12   Q    Do you recall this document and the discussion about it?

13   A    Yes.

14   Q    Would you explain to the jury what a franchise review is.

15:24:44  15   What was the purpose of it when you were at Bard?

16   A    Sure.  A filter franchise review -- take the word "filter

17   franchise" off.  That was just one division.

18        A franchise review is a technical term for something

19   that happens every -- I believe every year, if not every six

15:25:00  20   months.  It's a company-wide activity all divisions had to go

21   through in order to assess the investment for the company and

22   the next generation products.

23        So you go through assessment, you go through all

24   these tools, like the SWOT we talked about.  We discuss it as

15:25:17  25   a team and we propose to upper management what we'd like to do

CROSS-EXAMINATION - BRET BAIRD

15:25:23  1    to continuously improve our product line.

2    Q    Bard required it of every product line, correct?

3    A    Yes.  And it was set on a specific time.

4    Q    It was not unique to filters, correct?

15:25:35  5    A    No.

6    Q    It is a part, one piece, of a budgeting process; correct?

7    A    Correct.

8    Q    It is one piece of a continuous improvement project;

9    correct?

15:25:45 10    A    Correct.

11    Q    Okay.  This concept of looking at products and planning

12    ahead, and we'll talk about the SWOT analysis in a minute,

13    but doing an evaluation of your product and looking at ways

14    to improve it and looking ahead, that's not unique to Bard,

15:26:00 15    is it?

16    A    No.  No, that's --

17    Q    That's what a prudent manufacturer does; correct?

18    A    Absolutely.

19    Q    And you talked about that SWOT analysis.  And, again, a

15:26:09 20    SWOT analysis --

21             MS. HELM:  Scott, if you would turn to page 7.

22    BY MS. HELM:

23    Q    That SWOT analysis is not unique to Bard; correct?

24    A    Not at all.

15:26:28 25    Q    Not unique to filters; correct?

CROSS-EXAMINATION – BRET BAIRD

15:26:30  1   A   Not at all.

2   Q   This is a process that marketing departments go through

3   and other departments and companies go through; correct?

4   A   Correct.  It's a marketing tool.

15:26:43  5   Q   And it's an internal self-assessment; correct?

6   A   Correct.

7   Q   And you look at what we think we're doing okay, what we

8   think our weaknesses are, what we think can improve, and what

9   we think the challenges to those improvement are?

15:27:00  10   A   Correct.

11   Q   All of that is a part of continuous improvement; correct?

12   A   Correct.

13   Q   It does not mean the current product is defective;

14   correct?

15:27:07  15   A   Not at all.

16   Q   If you had felt that the products you were marketing at

17   Bard were defective, would you have marketed them?

18   A   No.

19   Q   As the marketing manager and the franchise manager at

15:27:18  20   Bard, you took pride in what you did; correct?

21   A   Correct.

22   Q   You took pride in marketing a product that you were proud

23   of; correct?

24   A   Sure.  Yes.

15:27:27  25   Q   And you would not have marketed a product, you would not

CROSS-EXAMINATION - BRET BAIRD

15:27:31    1    have gone to work every day and done your job if you didn't

2    believe in the product, would you?

3    A    Correct.

4    Q    Would it be proper, in your opinion, or would it be

15:27:42    5    appropriate marketing, in your opinion, to let a product be

6    on the market and not look at ways to continuously improve

7    it, both --

8         MR. O'CONNOR:  Objection.  Lack of foundation.  And

9    this calls for expert testimony; he's not an expert.

15:27:54   10         THE COURT:  Overruled.

11    BY MS. HELM:

12    Q    Would it be, from your perspective, in your experience in

13    product marketing over the years, would it be proper and

14    prudent for a manufacturer to have a product on the market

15:28:05   15    and not look for ways to continuously improve it?

16    A    No.

17    Q    I'm jumping around a little bit, but I want to make sure

18    I address this before I forget about it.  Bard in 2008, Bard

19    in 2009, was looking way ahead, they were looking at ideas

15:28:37   20    from a marketing perspective; correct?

21    A    Correct.

22    Q    They were looking at ideas from an engineering

23    perspective; correct?

24    A    Correct.

15:28:45   25    Q    And marketing and engineering work together, come up with

CROSS-EXAMINATION - BRET BAIRD

15:28:51   1   ideas, and then engineering has to see if they're going to

2   work; correct?

3   A   Correct.

4   Q   And engineering has to do all of the things that

15:28:57   5   engineers do before that idea can come to fruition; correct?

6   A   Absolutely.

7   Q   And in that process when you start at ideas, you make

8   assumptions; correct?

9   A   Correct.

15:29:08   10   Q   You make assumption on how it's going to be received in

11   the market; correct?

12   A   Yep.

13   Q   The engineers make assumptions about how the product's

14   going to perform; correct?

15:29:18   15   A   Correct.

16   Q   They make assumptions whether it will be an improvement

17   under the current performance or whether there might be

18   unintended consequences --

19   A   Right.

15:29:28   20   Q   -- things that they don't want to have happen.  Correct?

21   A   Correct.

22   Q   You never want to put a product on the market that is not

23   an improvement of the one you already have; correct?

24   A   Correct.

15:29:42   25   Q   In March 2011 was the Meridian filter available for sale

CROSS-EXAMINATION – BRET BAIRD

15:29:47   1   by Bard?

2   A   I don't recall.

3   Q   If the Meridian filter was not cleared by the FDA until

4   August of 2011, was it available for sale by Bard in March of

15:30:02   5   2011?

6   A   No.  You can't sell it without FDA approval.

7   Q   Okay.  So let's go back and talk about our timeline.

8        Marketing and engineering have an idea.  Engineering

9   has to do what -- and we'll here from engineers about what

15:30:17  10   they have to do.  You can't simply snap your fingers and the

11   next day have a new product; correct?

12   A   Correct.  It takes a significant amount of time.

13   Q   It can take years, can't it?

14   A   Yes.

15:30:29  15   Q   So you can be talking about a product, for example, in

16   2009 that might not be available until 2013.

17   A   Correct.  Correct.

18   Q   Because engineering has to look at materials, they have

19   to look at systems, they have to look at how we do it, can we

15:30:43  20   do it, what do we need to do it; correct?

21   A   Correct.

22   Q   So marketing has great ideas but engineering has to

23   implement them and they have to implement them so that it's

24   an improvement; correct?

15:30:57  25   A   Correct.

CROSS-EXAMINATION - BRET BAIRD

15:30:58   1    Q    And all these documents that we've been talking about

         2    today, this concept POA, marketing documents, those are all

         3    ideas.

         4    A    Correct.

15:31:04   5    Q    Those are all the first step; correct?

         6    A    Yes.  The idea POA.

         7    Q    And those are all the first step talking about ways to

         8    continually improve the product; correct?

         9    A    Yes.  Correct.

15:31:18  10    Q    And they're ideas to talk about ways to address known

        11    complications of the product; correct?

        12    A    Correct.

        13    Q    And these are complications that the physicians and the

        14    community also knew about; correct?

15:31:28  15    A    Correct.

        16    Q    And when you come up with new ideas and when you want to

        17    address complications, that doesn't mean that the current

        18    product is defective, does it?

        19    A    No.

15:31:42  20    Q    You're always looking to improve.

        21    A    Yes.

        22         MS. HELM:  Can you pull up 4454, please.

        23         Mr. Baird --

        24         May I publish, Your Honor?  It's been admitted.

15:32:08  25         THE COURT:  Yes.

CROSS-EXAMINATION - BRET BAIRD

15:32:09  1   BY MS. HELM:

2   Q   Mr. Baird, this is a POA for the Eclipse vena cava

3   filter.  You remember being asked about that?

4   A   Yes.

15:32:17  5   Q   And, again, what does POA stand for?

6   A   Product opportunity appraisal.

7   Q   Okay.  So we're still at the idea phase; right?

8   A   Correct.

9   Q   Okay.  And is this a document used internally at Bard to

15:32:34 10   say we have an idea, we think this will help us improve our

11   product, and we need, in part, budgeting so we can ask on

12   this idea and move forward with it?

13   A   Correct.  And I apologize, this is a concept POA.

14   Q   Okay.  What does that mean?

15:32:53 15   A   I'm sorry, I don't remember the details of this, this is

16   some years ago, but I think it's the next one after an idea

17   POA.

18         MS. HELM:  Scott, would you turn to page 4, please.

19   BY MS. HELM:

15:33:02 20   Q   And you remember talking about this with Mr. O'Connor and

21   he was talking about electropolishing?

22   A   Yes.

23   Q   And the hope that electropolishing would make the surface

24   smoother and -- you recall that?

15:33:20 25   A   Yes.

CROSS-EXAMINATION - BRET BAIRD

15:33:21  1  Q   Okay.  Do you know what was required from an engineering

2  perspective to be able to electropolish the Bard filters?

3  A   No.

4  Q   Do you know what steps they had to go through?  What

15:33:30  5  equipment was required?  Anything about that?

6  A   No.

7  Q   Okay.  And, again, that's something that the engineers

8  would have to talk about --

9  A   Yes.

15:33:39  10  Q   -- is that right?

11  A   Correct.  Yes.

12  Q   Mr. O'Connor asked you a question about the name of the

13  Eclipse --

14       MS. HELM:  And, Scott, if you would pull up 4416.

15:33:59  15       Do you remember --

16       May I publish, Your Honor.  It's admitted.

17       THE COURT:  Yes.

18  BY MS. HELM:

19  Q   Do you remember this document, Mr. Baird?

15:34:08  20  A   I do.

21  Q   Okay.  And it talks about looking forward beyond the

22  Eclipse to what eventually became the Meridian; is that

23  right?

24  A   That's right.

15:34:18  25  Q   So, again, in 2010 the company's planning ahead, they're

CROSS-EXAMINATION – BRET BAIRD

15:34:21  1    looking at ways for continuous improvement; correct?

2    A    Correct.

3    Q    Okay.  Is there anything in this document or anything

4    based on your experience at Bard that indicated that this was

15:34:31  5    anything other than continuous improvement?

6    A    I'm sorry, would you restate that question.

7    Q    Is there anything that indicates to you that the filters

8    prior to the Eclipse with anchors were defective?

9    A    No.

15:34:48  10   Q    Okay.  And you make some assumptions, again:  It should

11   improve things; it may improve things.

12   A    Correct.

13   Q    Those were important words, weren't they?

14   A    Absolutely.

15:34:58  15   Q    And, again, because you're at the concept and ideas

16   stage; correct?

17   A    Yes.

18   Q    And it's up to the engineers to determine what's

19   necessary it see if you can make that happen; correct?

15:35:07  20   A    Correct.

21   Q    Okay.  In this document, in the naming rationale,

22   Mr. O'Connor asked you about a specific sentence that says

23   "The change in name -- brand name and codes was to create a

24   break with the baggage associated with the previous

15:35:25  25   versions."

CROSS-EXAMINATION - BRET BAIRD

15:35:26   1          Do you see that language?

2     A    I do.

3     Q    Do you know what the baggage was that he's referring to?

4     A    Baggage is a number of things.  It included some of the

15:35:37   5     things that was on the market for perception of the filter,

6     previous filter.  Filters.  It also included some things that

7     were happening in the market, and I can't remember all the

8     timelines, but we had advertising attorneys who were

9     advertising do you have a vena cava filter?  If so, call us,

15:35:55  10     we can help you.

11     Q    And in 2009 and 2010, were there attorneys advertising on

12     television about if you have a vena cava filter, we can help

13     you?

14     A    I believe so.

15:36:06  15     Q    Were your competitors using those advertisings as a sales

16     mechanism against Bard?

17     A    I don't know what our competitors were doing.  I do know

18     they were using MAUDE database to try to dissuade and compete

19     against us.

15:36:20  20     Q    As the marketing and franchise manager in 2009 and 2010,

21     were you dealing with this inaccurate information that was in

22     the marketplace and was impacting Bard's ability to market

23     and sell its filters?

24     A    I was definitely --

15:36:33  25          MR. O'CONNOR:  Objection to the question, Your

CROSS-EXAMINATION - BRET BAIRD

15:36:34   1   Honor.  That is a misstatement and assumes facts not in
         2   evidence about what was misstating evidence.
         3           THE COURT:  Overruled.  She's allowed to ask leading
         4   questions.
15:36:44   5           You can agree or disagree.
         6           Would you reask the question, please.
         7   BY MS. HELM:
         8   Q   In 2009 and 2010, were you -- as marketing and franchise
         9   manager for Bard for IVC filters, were you spending a
15:36:57  10   considerable amount of your time addressing misinformation
        11   that was being provided to your customers about Bard filters?
        12   A   Yes.  With MAUDE database, or also reflecting reacting to
        13   the advertisements.
        14   Q   Okay.  Thank you.
15:37:35  15           The development of the Eclipse, the development of
        16   the Meridian, were any of those done with urgency or were all
        17   of those done in the normal course of business of Bard and its
        18   continuous improvement of its IVC filters?
        19   A   I'm sorry, I can't answer the cadence and rhythms of that
15:37:54  20   that.  It's primarily the engineering side.
        21   Q   Okay.  Again, from a marketing perspective, was the
        22   Eclipse a continuous improvement of the G2X?
        23   A   Yes.
        24   Q   Was the Meridian -- I know when you left it was 20011,
15:38:09  25   but was the Meridian planned and designed to be continuous

CROSS-EXAMINATION – BRET BAIRD

15:38:13  1    improvement of the Eclipse?

2    A    Yes.

3    Q    And all of these were to address known complications with

4    filters; correct?

15:38:21  5    A    Correct.

6         MS. HELM:  That's all I have.  Thank you, Your

7    Honor.

8         THE COURT:  Redirect.

9         MR. O'CONNOR:  Your Honor, is there going to be an

15:38:46  10   instruction based upon what we had discussed earlier?

11        THE COURT:  Yeah.  I think we ought to talk about

12   what it should be.

13        MR. O'CONNOR:  Do you want to do that now?

14        THE COURT:  Well, do you want the instruction now?

15:38:56  15        MR. O'CONNOR:  Yes, please.

16        THE COURT:  Okay.  Let's approach.

17        If you want to stand up, ladies and gentlemen.

18        (Bench conference as follows:)

19        MR. O'CONNOR:  I don't recall the exact wording on

15:39:21  20   the instruction last time, but I think you basically told the

21   jury that none of these lawyers were involved in advertising

22   that are representing Lisa Hyde in this case.

23        THE COURT:  Right.  Yeah, that was my understanding.

24        What I would say to them is "You've just heard

15:39:35  25   testimony about lawyer advertising that was occurring back in

CROSS-EXAMINATION – BRET BAIRD

15:39:39  1    2009 and 2010.  None of that advertising was done by any of

2    the lawyers involved in this case or any lawyer representing

3    the plaintiff the Hydes."

4         MR. O'CONNOR:  That would be great.

15:39:52  5         THE COURT:  That do it?

6         MR. O'CONNOR:  That will take care of it.

7         MS. HELM:  I think "involved by the lawyers

8    representing Ms. Hyde."  You said "lawyers involved in this

9    case or lawyers representing" --

15:40:02  10         THE COURT:  By "this case," I mean the Hyde case.

11         MS. HELM:  Okay.

12         THE COURT:  The jury doesn't know about another

13    case.  But I think it's important for them to understand the

14    attorneys involved in this courtroom were not part of the

15:40:13  15    advertisers --

16         MS. HELM:  I agree.  I agree with that.

17         THE COURT:  Okay.

18         (Bench conference concludes.)

19         THE COURT:  Thank you, ladies and gentlemen.

15:40:23  20         Before Mr. O'Connor starts -- if you want to stand,

21    you can.  Or you can have a seat.

22         Before Mr. O'Connor starts his redirect, the parties

23    have agree that I should give you an instruction.

24         You just heard testimony about lawyer advertising

15:40:37  25    regarding filters that was done in 2009 and 2010.  The

REDIRECT EXAMINATION – BRET BAIRD

15:40:42  1  instruction is that none of the lawyers involved in this case

2  or lawyers representing the Hydes were involved in any of that

3  advertising.

4           Okay.  Mr. O'Connor, you may proceed.

15:40:54  5           MR. O'CONNOR:  Thank you, Your Honor.

6               R E D I R E C T   E X A M I N A T I O N

7  BY MR. O'CONNOR:

8  Q    Mr. Baird, I just heard you testify in response to

9  Ms. Helm's question that since 2011 you haven't thought at

15:41:06  10  all about IVC filters.  Do you recall that testimony?

11  A    Yes.

12  Q    But, really, since 2011 you have.  You've been through a

13  deposition; correct?

14  A    Correct.

15:41:18  15  Q    And just last May you testified on behalf of Bard; right?

16  A    Correct.

17  Q    So twice before today you've thought about Bard filters,

18  haven't you?

19  A    Sure.

15:41:33  20  Q    And you've worked with the Bard attorneys to prepare to

21  come here and talk to this jury; correct?

22  A    Sure.

23  Q    And you spent time with them; correct?

24  A    Correct.

15:41:43  25  Q    How many hours?

REDIRECT EXAMINATION - BRET BAIRD

15:41:46  1    A    I don't know.

2    Q    A lot?

3    A    I don't know.  Depends which deposition, which time.

4    Q    You've spent hours to prepare for your deposition in this

15:41:58  5    case; true?

6    A    A few hours for this time.

7    Q    You spent hours before you testified in May of 2018 this

8    year; correct?

9    A    Correct.

15:42:07  10   Q    And you spent hours to come here and talk to this jury,

11   true, to prepare with these Bard attorneys?

12   A    True.

13   Q    And you were paid.

14   A    True.  For my time.

15:42:17  15   Q    And what are you paid?

16   A    For my last time I think it was 150 per hour.

17   Q    Is that what you're expecting this time?

18   A    I don't know what I'm getting this time.

19   Q    But it's really not fair to say you haven't thought about

15:42:36  20   Bard filters since 2011 since you've thought quite a bit

21   about them to come down here and talk to this jury; right?

22   A    Oh, I haven't needed to until it was these trials.

23   Q    You thought about it before you came here today.

24   A    Oh, sure.

15:42:53  25   Q    And you thought about it while you met with these Bard

REDIRECT EXAMINATION - BRET BAIRD

15:42:55   1   lawyers; right?

2   A    Yeah.  Of course.

3   Q    I imagine they were thinking about it too.

4   A    You have to ask them.

15:43:04   5        THE COURT:  Is that a question?

6        MR. O'CONNOR:  I'll move on.

7   BY MR. O'CONNOR:

8   Q    You knew, sir, that the FDA doesn't approve filters;

9   true?

15:43:15  10   A    Oh, if we get into clinical, I'm not a clinical person.

11   Regulatory, I don't know the terminology of regulatory.

12   Q    You should not be addressing regulatory issues; fair?

13   A    Fair.

14   Q    You don't know what it means to have a device cleared;

15:43:27  15   correct?

16   A    Correct.

17   Q    You don't know what the difference is between clearing a

18   device and approving a device; fair?

19   A    Fair.

15:43:43  20        MR. O'CONNOR:  Felice, if you could show 4416.

21        And, Felice if, you could hone in on "improved

22   stability" in that paragraph and enlarge that, that sentence.

23        Raise it higher so we can see more in context,

24   please.

25

REDIRECT EXAMINATION - BRET BAIRD

15:44:16  1    BY MR. O'CONNOR:

2    Q    Now, when Bard was talking and marketing was talking --

3              Oh.  May I publish, Your Honor?

4              THE COURT:  Yes.

15:44:30  5    BY MR. O'CONNOR:

6    Q    When Bard was talking about the Eclipse with anchors back

7    in April 2010, there was discussion about how this filter

8    with anchors would improve stability; right?

9    A    Correct.

15:44:45  10   Q    And those are words you came to know because you used

11   those words in documents that you would prepare; right?

12   A    I don't know if I used that specific term through the

13   documents.

14   Q    Certainly in this document to describe what a filter can

15:44:58  15   could to reduce complications, Bard used the words "improved

16   stability"; true?

17   A    True.

18   Q    Even at this time, April 27, 2010, Bard was still

19   promoting the G2X and the Eclipse; correct?

15:45:16  20   A    I'd have to ask supply chain.  I don't know timelines for

21   the products at this point any more.

22   Q    Well, you knew, sir, that filters were constantly being

23   sold out there; Bard never stopped sales of --

24   A    Of any product, sure.

15:45:29  25   Q    Let me finish that point.

REDIRECT EXAMINATION - BRET BAIRD

15:45:31  1    A    Sure.

2    Q    Knowing that they were going to develop a filter with

3    improved stability, Bard never stopped selling the G2, the

4    G2X, or the Eclipse; correct?

15:45:46  5    A    I don't know.  Again, I'm not -- that's the point, I

6    don't remember when we stopped or started filter sales.

7    Q    Let me try it a different way.

8    A    Sure.

9    Q    The entire time you were there, you were monitoring

15:45:56  10   filter sales; right?

11   A    Correct.

12   Q    The entire time you were at Bard, filters, whatever the

13   line, were out there and they were being sold; correct?

14   A    Correct.

15:46:05  15   Q    And whatever the filter was, or whatever that filter

16   lacked, you were supporting the sales force to get those

17   filters out there and get them sold and close sales; right?

18   A    Correct.

19   Q    And, by the way, let's -- we talked about the Nicholson

15:46:27  20   article that came out in August 9, 2010, by Dr. Nicholson.

21   Do you recall that?

22   A    Yes.

23   Q    And even at that time --

24        MS. HELM:  Your Honor --

15:46:40  25        THE COURT:  You need a mic.

REDIRECT EXAMINATION - BRET BAIRD

15:46:43   1          MS. HELM:  Apologize.  Exceeds the scope of the

         2   cross.

         3          THE COURT:  What's your response?

         4          MR. O'CONNOR:  They continued to sell filters during

15:46:49   5   that period of time even after this particular date.

         6          THE COURT:  Overruled.

         7          MS. HELM:  May I just make my record, Your Honor?

         8   The question was specific to the Nicholson article and I

         9   didn't cover the Nicholson article in cross.

15:47:04  10          THE COURT:  I know that.  Objection's overruled.

        11          MR. O'CONNOR:  Thank you.

        12   BY MR. O'CONNOR:

        13   Q   Going back to August 9, 2010, which the Nicholson came

        14   out and noted the high prevalence a failure rates in the G2

15:47:15  15   and the Recovery, do you recall that?

        16   A   Yes.

        17   Q   And even then, Bard continued to sell filters; right?

        18   A   Continued to sell filters, yes.

        19   Q   Now, you left the design issues to the engineers;

15:47:53  20   correct?

        21   A   Correct.

        22   Q   But you still were monitoring filters and the problem

        23   Bard filters were experiencing, weren't you?

        24   A   No, I'm not -- that's not my role.  That's -- adverse

15:48:08  25   events are captured by quality people.

15:48:11  1   Q    As a member of Bard, was patient safety important to you?

2   A    Sure.

3   Q    And therefore you understood the need to have a filter

4   with improved stability; correct?

15:48:24  5   A    Sure.

6            MR. O'CONNOR:  That's all I have.

7            THE COURT:  Okay.  Thanks.  You can step down.

8            MS. REED ZAIC:  Your Honor, the next witness will

9   appear by videotape, Dr. John Lehmann.

15:48:54 10           MS. HELM:  Your Honor, may we approach, please?

11           THE COURT:  Yes.

12           We'll do this quickly, ladies and gentlemen.

13         (Bench conference as follows:)

14           MS. HELM:  I know I'm using a bean.  I have to.

15:49:15 15           THE COURT:  Go ahead.

16           MS. HELM:  Your Honor, we have a witness that was

17   asked to be here today, Mr. Rob Carr, and he is missing a

18   very important meeting to be here today and now, instead of

19   calling him, they're playing videos.  And we just ask

15:49:29 20   Mr. Carr be released so that he can go to his meeting.  We've

21   tried to work with their conflict, but they've made him come

22   down here.  They know he's not available until tomorrow

23   afternoon.  We just ask he be released.

24           THE COURT:  Any objection?

15:49:43 25           MR. O'CONNOR:  No, not at all.

15:49:45   1          MS. SMITH:  I have one thing to add.  We have all

        2    these videos.  If we don't have enough video to play, we're

        3    going to have to call him.

        4          MS. HELM:  Then you need to call him.

15:49:56   5          THE COURT:  How much video do you have?

        6          MS. HELM:  There's the video of the sales rep

        7    Mr. Fermanich that's been discussed in relation to Mr. Hug,

        8    and based on your rulings related to Mr. Hug, I need to look

        9    at the Fermanich video and so I haven't --

15:50:11  10          THE COURT:  It seems to me if we don't have enough

       11    video to get us through the rest of the day, we ought to call

       12    Mr. Carr now, put him on, play the video after.

       13          MS. HELM:  There's enough video approved --

       14          MS. SMITH:  Are you only objecting to that one?

15:50:26  15          MS. HELM:  The Fermanich?  Yeah.  And Little.

       16    Fermanich and Little are the only two.  And little may have

       17    been resolved.

       18          MS. SMITH:  So there should be about 45 minutes.

       19          THE COURT:  We'll, we've got 40 minutes left.

15:50:37  20          MR. LOPEZ:  We don't want to have all video at the

       21    end of the case.  We're trying to intersperse it here and

       22    there.

       23          THE COURT:  That's fine.  Let's release Carr and

       24    play the videos until 4:30.

15:50:46  25          MS. HELM:  And he's released until tomorrow

15:50:48   1   afternoon; right?

2                  MR. LOPEZ:  He's not available until then; right?

3                  MS. HELM:  Correct.

4                  Your Honor, may I be excused to go tell Mr. Carr --

15:51:01   5                  THE COURT:  Hold on.

6                  Is there more?

7                  MS. REED ZAIC:  I just want to verify we have enough

8   video.  Because of this continuing and ongoing issue with

9   Fermanich, I just want to verify we do have enough time --

15:51:10   10                  MS. SMITH:  And Dr. Henry.

11                  MS. REED ZAIC:  And Dr. Henry.

12                  MS. HELM:  Henry is approved.

13                  MS. REED ZAIC:  Henry is approved.  That's my

14   clarification.  Okay.  Thank you.

15:51:16   15                  THE COURT:  Okay, yes, you may.

16                  MS. HELM:  Thank you, Your Honor.

17              (Bench conference concludes.)

18                  THE COURT:  Thank you, ladies and gentlemen.

19                  MS. REED ZAIC:  Your Honor, I'll read a short

15:51:35   20   introduce of the videotape witness that will appear.

21                  Dr. John Lehmann obtained a medical degree from

22   Harvard University.  He was employed by C.R. Bard as vice

23   president of medical affairs from 1991 until 1995.  In this

24   role he was responsible for medical, clinical, and

15:51:50   25   biostatistical services for several Bard products and oversaw

15:51:55  1   various FDA-related submissions.

2        After leaving Bard in 1995, Dr. Lehmann started a

3   consulting business focusing on medical device strategy and

4   development.

15:52:07  5        In 2003, Bard hired Dr. Lehmann as a consultant.  As

6   a consultant to Bard, Dr. Lehmann evaluated product

7   performance and data relating to the Recovery filter.

8        Video is about one minute.

9        THE COURT:  All right.  Thank you.

15:52:27 10        MS. REED ZAIC:  There are no exhibits.

11   (Video testimony of John Lehmann played.)

12        MS. REED ZAIC:  The next witness appearing by

13   videotape is Joseph DeJohn who received a BS degree in

14   education from Bowling Green State University.

15:53:24 15        Mr. DeJohn joined C.R. Bard in 1992.  He held various

16   sales management positions then served for eight years as vice

17   president of sales of the peripheral vascular division from

18   2000 to 2008.  While working at Bard, he was responsible for

19   the sales of a variety of products including IVC filters such

15:53:47 20   as SNF, Recovery, and G2 filters.

21        Currently Mr. DeJohn is the vice president of global

22   sales at Endologix, a medical device company.

23        There are two exhibits.

24        For the conversion, the Trial Exhibit Number 345 will

15:54:08 25   be Trial Exhibit 1149.

15:54:12  1          The Trial Exhibit -- excuse me.  Deposition Exhibit

2     346 will be 1643.

3          THE COURT:  And are you moving those in?

4          MS. REED ZAIC:  I am moving those into evidence,

15:54:24  5     Your Honor.

6          THE COURT:  Any objection?

7          MS. HELM:  None, Your Honor.

8          THE COURT:  All right, then 1149 and 1643 are

9     admitted.  And you may play the deposition.

09:25:03 10       (Exhibits 1149 and 1643 admitted.)

11       (Video testimony of Joseph DeJohn played.)

12          MS. REED ZAIC:  The next witness who will appear by

13     videotape is Carol Vierling, V-I-E-R-L-I-N-G.  She graduated

14     from Indian university in 1981 with a degree in nursing and

15:57:35 15     received MBA from Mercer University in 1998.

16          From 1992 to 2002 she was the director of regulatory

17     affairs for C.R. Bard.  In this role, Ms. Vierling was

18     responsible for developing and implementing regulatory

19     strategies for Bard's peripheral vascular devices, including

15:57:57 20     its IVC filters.

21          Since leaving Bard in 2002, Ms. Vierling has

22     continued to work in regulatory affairs in the medical device

23     industry.

24          There are three exhibits, the conversion of which

15:58:14 25     will be Deposition Exhibit 227 is Trial Exhibit 4392.

15:58:20   1          Deposition Exhibit 231 is Trial Exhibit 2149.

        2          And Deposition Exhibit 236 is Trial Exhibit 2153.

        3          And I'd like to move those into evidence, Your Honor.

        4          MS. HELM:  No objection.

15:58:39   5          THE COURT:  All right, those three exhibits are

        6   admitted.

        7          (Exhibits 4392, 2149, 2153 admitted.)

        8          THE COURT:  And you may play the deposition.

        9          (Video testimony of Carol Vierling played.)

16:20:08  10          MS. REED ZAIC:  The next witness appearing by

       11   videotape is Dr. David Henry.  He is the interventional

       12   radiologist who placed Mrs. Hyde's filter.

       13          He is board certified in both diagnostic and

       14   interventional radiology.  During his career he has worked at

16:20:25  15   Wheaton Franciscan Hospital in Milwaukee, Wisconsin, and

       16   UnityPoint Health in Sioux City, Iowa.

       17          There are no exhibits.

       18          (Video testimony of Dr. Henry played.)

       19          THE COURT:  Let's stop the video there.  We can

16:29:34  20   start at that question tomorrow.

       21          Ladies and gentlemen, we have reached 4:30.  We'll

       22   plan to resume at 9 o'clock in the morning.  We'll excuse you

       23   at this time.

       24          (The jury exited the courtroom at 4:30 p.m.)

16:30:07  25          THE COURT:  Please be seated.

16:30:07  1          Counsel, I have a 4:30 hearing waiting on the phone.

2     Let me ask a couple of quick questions.

3          How much -- I have been just recording all of the

4     time on the videos to plaintiff, so I need to know how much

16:30:21  5     time to assign to defendants for the Lehmann, DeJohn, Vierling

6     and Henry depositions.

7          MS. HELM:  Your Honor, zero for Lehmann and DeJohn.

8          And Vierling is 15 minutes for the plaintiff and 6

9     minutes for the defendants.

16:30:46 10          THE COURT:  And how about Henry?

11          MS. HELM:  Once completed, Henry will be 8 minutes

12     for the plaintiff and 14 minutes for the defendant.

13     Actually, make that 15 minutes for the defendant.

14          THE COURT:  Okay.  Give me just a minute.  By the

16:31:25 15     way, I couldn't see DeJohn on the witness list.  I don't know

16     why.  Obviously he's been heard.  I don't know what we do

17     with that.

18          Okay.  Hold on.

19          Okay, Counsel, as of the end of today, plaintiffs

16:33:03 20     have used 15 hours and 34 minutes; defendants have used 7

21     hours and 13 minutes.

22          On the issues we talked about this morning, what

23     would help me in trying to figure out where to draw this line

24     on the failure-to-warn evidence is to know if -- I know you

16:33:28 25     want to get in evidence of sales commission, how sales were

16:33:32  1    structured, sales incentives, you want to get in the Hudnall

2    e-mail.  Is there other evidence in that category that will

3    present the same kind of issue that you can think of.

4                 MR. LOPEZ:  I don't think so, Your Honor.

16:33:47  5                 THE COURT:  Okay.

6                 Then I have the case that I think defendants gave

7    me --

8                 MR. ROGERS:  Yes, Your Honor.

9                 THE COURT:  -- on the punitive damages issue, which

16:33:57 10    I'll read.

11                 If you have other thoughts tomorrow morning, I'll be

12    happy to hear them.

13                 At some point when you choose to, we'll need to

14    address that hearsay issue on the two e-mail exhibits that we

16:34:07 15    talked about this morning.

16                 MR. O'CONNOR:  Do you want my case citations, these

17    two cases that I found this morning?

18                 THE COURT:  Yeah, sure.

19                 MR. O'CONNOR:  One is an unpublished decision.  I'm

16:34:18 20    not an expert on legal research, but it's a Ninth Circuit

21    case.  I'll tell what you it is.

22                 THE COURT:  What's the date of it?

23                 MR. O'CONNOR:  1997.

24                 THE COURT:  I can't consider Ninth Circuit

16:34:28 25    unpublished decisions until 2007.  Only after 2007.

16:34:34  1              MR. O'CONNOR:  I think there's more cases.  I'll

       2    have somebody help me do it and I'll bring cases on the point

       3    I'm trying to raise tomorrow.

       4              THE COURT:  Okay.  That's fine.

16:34:42  5              Okay.  Anything else we need to address before we

       6    break?

       7              MR. ROGERS:  No, Your Honor.

       8              THE COURT:  Okay.  We'll see you at 8:30 in the

       9    morning.

16:34:55 10         (Recess taken at 4:34.)

      11         (End of transcript.)

      12                          *  *  *  *  *

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

## C E R T I F I C A T E

        I, PATRICIA LYONS, do hereby certify that I am duly
appointed and qualified to act as Official Court Reporter for
the United States District Court for the District of Arizona.

        I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion
of the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control, and to the best
of my ability.

        DATED at Phoenix, Arizona, this 25th day of
September, 2018.

                              s/ Patricia Lyons, RMR, CRR
                              Official Court Reporter