UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| IN RE:  Bard IVC Filters Products | ) | MD 15-02641-PHX-DGC |
| Liability Litigation, | ) | |
| | ) | |
| _____ | ) | |
| Lisa Hyde and Mark Hyde, a married | ) | Phoenix, Arizona |
| couple, | ) | September 26, 2018 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV 16-00893-PHX-DGC |
| | ) | |
| C.R. Bard, Inc., a New Jersey | ) | |
| corporation, and Bard Peripheral | ) | |
| Vascular, an Arizona corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


TRIAL DAY 7 - A.M. SESSION


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1      <u>**A P P E A R A N C E S**</u>

2

       For the Plaintiffs:
3
           Lopez McHugh
4          By:  **RAMON R. LOPEZ**, ESQ.
           100 Bayview Circle, Suite 5600
5          Newport Beach, CA 92660

6          Gallagher & Kennedy
           By:  **MARK S. O'CONNOR**, ESQ.
7               **PAUL L. STOLLER**, ESQ.
           2575 East Camelback Road, Suite 1100
8          Phoenix, AZ 85016

9          Heaviside Reed Zaic
           By:  **JULIA REED ZAIC**, ESQ.
10              **LAURA E. SMITH**, ESQ.
           312 Broadway, Suite 203
11         Laguna Beach, CA 92651

12         Goldenberg Law PLLC
           By:  **STUART GOLDENBERG**, ESQ.
13              **MARLENE GOLDENBERG**, ESQ,
           800 LaSalle Avenue, Suite 2150
14         Minneapolis, MN 55402

15         Lopez McHugh, LLP
           By:  **JOSHUA MANKOFF**, ESQ.
16         1 International Plaza, #550
           PMB-059
17         Philadelphia, PA 19113

18

19

20

21

22

23

24

25

## A P P E A R A N C E S (CONTINUED)

For the Defendants:

    Nelson Mullins Riley & Scarborough
    By:  **JAMES F. ROGERS**, ESQ.
    1320 Main Street
    Columbia, SC 29201

    Snell & Wilmer
    By:  **JAMES R. CONDO**, ESQ.
    400 East Van Buren
    Phoenix, AZ 85004

    Nelson Mullins Riley & Scarborough
    By:  **RICHARD B. NORTH, JR.**, ESQ.
         **MATTHEW B. LERNER**, ESQ.
         **ELIZABETH C. HELM**, ESQ.
    201 17th Street NW, Suite 1700
    Atlanta, GA 30363

    C.R. Bard, Inc.
    Associate General Counsel, Litigation
    By:  **GREG A. DADIKA**, ESQ.
    730 Central Avenue
    Murray Hill, New Jersey 07974

1

**I N D E X**

2    **SUMMARY OF COURT PROCEEDINGS**                                    **PAGE:**

3    Proceedings Outside the Presence of the Jury            1437

4    Motion for Mistrial                                     1478

5


6    **WITNESSES FOR THE**            **DIRECT**   **CROSS**   **REDIRECT**
     **PLAINTIFF:**

7
     **Lora K. White**
8    By Ms. Smith                1447                 1465
     By Ms. Helm                          1460

9
     **James Matthew Sims**
10   By Ms. Smith                1469

11   **Matt Fermanich** (Videotaped deposition)              1436

12   **Guillermo Altonaga** (Videotaped deposition)          1442

13   **Natalie Wong** (Videotaped deposition)                1443

14   **Jason Greer** (Videotaped deposition)                 1443

15   **Janet Hudnall** (Videotaped deposition)               1446

16   **Dr. Krishna Kandarpa** (Videotaped deposition)        1477

17

**INDEX OF EXHIBITS**

18
     **EXHIBIT**                                            **RECEIVED**

19
     <u>NO.</u>       <u>DESCRIPTION</u>

20
     2243      Wong Deposition, 10/18/2016 - Exhibit 537 -    1443
21             4/23/2004 E-mail from John Lehmann to Carr
               and Uelmen Re. "Draft data set for statistician"
22
     2245      Wong Deposition, 10/18/2016 - Exhibit 540 -    1443
23             Confidential PowerPoint Presentation entitled
               "Recovery (Gen 1) - Fracture and Migration
24             Complaint Update," dated 6/20/2006

25

UNITED STATES DISTRICT COURT

**INDEX OF EXHIBITS (Continued)**

| EXHIBIT | | RECEIVED |
|---|---|---|
| NO. | DESCRIPTION | |
| 2247 | Wong Deposition, 10/18/2016 - Exhibit 542 -<br>12/2/2009 E-mail exchange b/w Sandy Kerns<br>and Natalie Wong Re. "Filter Fractures" | 1443 |
| 2249 | Wong Deposition, 10/18/2016 - Exhibit 544 -<br>5/18/2006 Natalie Wong meeting documents,<br>email re "Caudal Investigation" with<br>attachments of G2 Caudal Report 05.18.06<br>and Caudal Pre-PAT minutes | 1443 |
| 1912 | Romney Deposition, 09/07/2016 - Exhibit 2039<br>3/16/2006 E-mail from Jason Greer to<br>Janet Hudnall | 1443 |
| 2250 | Wong Deposition, 10/18/2016 - Exhibit 545 -<br>BPV's Failure Investigation Report on the<br>G2 Filter - Caudal Migration, FIR-06-01-01,<br>unsigned and forwarded by Wong to Gin Schulz<br>for her review, in anticipation of the<br>Friday deadline | 1444 |
| 2254 | Wong Deposition, 10/18/2016 - Exhibit 552 -<br>2/17/2006 Memo from Mickey Graves and Natalie<br>Wong Re. "Recovery Filter (Generation 1)<br>Product Assessment Team Minutes - Fractures" | 1444 |
| 545 | Altonaga Deposition, 10/22/2013, Exhibit 03 -<br>2/26-2/27/2004 E-mail exchange b/w Hudnall<br>and David Rauch of BPV Re. "Case for Caval<br>Centering" | 1446 |
| 1337 | Hudnall Deposition, 11/01/2013, Exhibit 23 -<br>G2 Brochure (permanent) - Patient Questions &<br>Answers and Bard's website page about G2<br>Filter System, Indicated for removal, 6/10/2010 | 1446 |
| 1053 | Edwards Deposition, 01/20/2014 - Exhibit 02 -<br>3/28/2003 Document RE. "Product Opportunity<br>Appraisal for Recovery Filter", FM070018,<br>Doc No. POA-7081, Version 000 | 1446 |

**INDEX OF EXHIBITS (Continued)**

| EXHIBIT | | RECEIVED |
|---|---|---|
| NO. | DESCRIPTION | |
| 1335 | Hudnall Deposition, 11/01/2013, Exhibit 21 - Brochure - Recovery Cone Removal System | 1446 |
| 1336 | Hudnall Deposition, 11/01/2013, Exhibit 22 - Recovery G2 Filter System brochure | 1446 |
| 1339 | Hudnall Deposition, 11/01/2013, Exhibit 29 - 7/6/2004 E-mail exchange b/w Hudnall and Bob Cortelezzi Re. "Maude Website Discussion" | 1446 |
| 4595 | Kandarpa Deposition, 07/19/2018 - Exhibit 05 - Medical Monitor Meeting Minutes, August 29, 2005, Beechwood Hotel, Worcester, MA, Version 1.0  (6 pages), signed 12/16/05. *only the last page is Bates stamped BBA-00012962 | 1477 |
| 4596 | Kandarpa Deposition, 07/19/2018 - Exhibit 06 - Everest Clinical Trial, Medical Monitor Meeting agenda and PowerPoint, June 19, 2006, Revision B | 1477 |
| 4599 | Kandarpa Deposition, 07/19/2018 - Exhibit 09 - Summary of Filter Movement, 5mm or greater, Final Clinical Summary Report EVEREST | 1477 |
| 4600 | Kandarpa Deposition, 07/19/2018 - Exhibit 10 - Device Observation Table (as of 10/23/2006) | 1477 |
| 4601 | Kandarpa Deposition, 07/19/2018 - Exhibit 11 - Listing of Device Observations, Final Clinical Summary Report EVEREST | 1477 |
| 4602 | Kandarpa Deposition, 07/19/2018 - Exhibit 12 - Adjudication Manual of Operations, EVEREST (trial exhibit 5983) | 1477 |
| 4603 | Kandarpa Deposition, 07/19/2018 - Exhibit 13 - Recovery G2 Filter System - Femoral and Jugular/Subclavian Delivery Kits, Tradition 510(k),  October 31, 2007 | 1477 |

1    **INDEX OF EXHIBITS (Continued)**

2    **EXHIBIT**                                              **RECEIVED**

3    NO.      DESCRIPTION

4    4604     Kandarpa Deposition, 07/19/2018 -                1477
              Exhibit 14 - Article entitled "Technical
5             Success and Safety of Retrieval of the
              G2 Filter in a Prospective, Multicenter Study",
6             Nov. 2009

7    4607     Kandarpa Deposition, 07/19/2018 -                1477
              Exhibit 17 - Memorandum dated June 21, 2006
8             Subject: G2 Caudal Migration Failure
              Investigation Team Agenda, From Natalie Wong

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2             (Jury not present.)

3             (Proceedings commenced at 8:30 a.m.)

4             THE COURT:  Good morning, everybody.

5             SIMULTANEOUS VOICES:  Morning, Your Honor.

6             THE COURT:  Counsel, do you have matters that you want

7    to raise this morning?

8             MR. O'CONNOR:  Nothing from our side, Your Honor.

9             MR. ROGERS:  Your Honor, we have a couple of things.

10            And first of all, Your Honor, I want to start sort of

11   where we started yesterday morning, and that was with the issue

12   of counsel asking witnesses questions which clearly not only

13   identify the fact that witnesses testified in a prior trial,

14   but specifically a reference to a case.  And as we know, we

15   heard two references to the Booker trial yesterday in the

16   morning, and then in the afternoon we had a question of

17   Mr. Carr about his testimony in the May trial.

18            And, Your Honor, we also had the incident where during

19   Dr. Ciavarella's deposition there were two exhibits that were

20   displayed to the jury, which it was our understanding were

21   going to be redacted and that was what was represented to us,

22   and they were not.  I mean, both of the exhibits contained a

23   legend at the bottom of the document that indicated that they

24   were produced as part of a different case.  It said Maricopa

25   County.  It had a civil action number, but no specific case

1    name mentioned.

2           And, Your Honor, when we had our sidebar yesterday, I

3    did say that if this happens again, we would move for mistrial.

4    But having conferred with our client, we are not inclined to

5    move for a mistrial at this point.  But I do believe that this

6    is becoming more prejudicial with the cumulative effect, and

7    again, I think if this continues or we have another incident,

8    Your Honor, we will have no choice but to move for a mistrial.

9           THE COURT:  All right.  Plaintiffs' counsel, do you

10   want to respond?

11          MR. O'CONNOR:  Well, I can just respond to the one,

12   and I can tell you this, Your Honor:  There were a couple times

13   throughout this trial other people have mentioned "trial."  My

14   question to Mr. Carr, I was asking for the transcript and I

15   changed quickly.  I said May -- I wanted to identify the May

16   transcript, and I did say May transcript.  I may have started

17   to say trial, but I quickly changed it.

18          That was inadvertent, by no way any means to violate

19   any order.  It's just the thought process that's going on when

20   you're trying to move back and forth to impeach a witness.  But

21   I don't think there was any prejudice, and certainly they

22   didn't raise it at that point in time.

23          So I can assure the Court and counsel that that

24   question was entirely inadvertent, and I believe that I quickly

25   caught myself and changed it.  It was just a tongue-twister,

1    really, with a word that began with a "t-r."

2        THE COURT:  Well, you clearly said "May trial," and

3    then you said "transcript."  But you said "May trial" very

4    clearly in front of the jury.

5        MR. O'CONNOR:  Well --

6        THE COURT:  I made eye contact with defense attorneys

7    to see if they were going to say anything.  They looked at me.

8    They clearly heard it but decided not to object.  There is no

9    doubt you mentioned "trial" in front of the jury after we'd had

10   a sidebar in the morning where we all agreed that wasn't going

11   to happen again.

12       And my concern is -- I accept the proposition that it

13   happened inadvertently twice yesterday.  By the way, I only

14   heard one reference to Booker yesterday, not two.

15       MR. ROGERS:  Your Honor, I did check the transcript

16   and Booker was said twice.

17       THE COURT:  All right.  The question is, what are we

18   going to do to avoid further inadvertent lapses in this manner?

19   I'd say put a yellow sticky note on the monitor that says

20   "Don't say trial," but we know how effective those yellow

21   sticky notes are.

22       MR. O'CONNOR:  There's too many of them right now.

23       I think when it's come to bringing up other testimony

24   with these witnesses, we're using transcripts from the trials

25   now.  I think that we just need to -- and I can certainly

1    assure the Court I will -- and counsel -- be more attentive to

2    that.  It's just a thought process going on trying to identify

3    which of many transcripts for Mr. Carr where there are several

4    depositions and now two trial transcripts, too, where I wanted

5    what I needed up on the screen.  So I certainly will be more

6    careful on that.

7            MR. LOPEZ:  Your Honor, just to further explain, I

8    had -- we have two trial transcripts, and in my outline I

9    wanted to make sure that when I was going to impeach the

10   witness, I went to the Booker trial transcript and not the

11   Jones one.  So I had a note there, and of course when I

12   transitioned to the next question, I mean, I just -- I

13   explained to you at sidebar, I just inadvertently said "Booker

14   trial transcript," trying to distinguish which one I wanted.

15           So I'm going to fix that, obviously, in my outlines,

16   my future outlines.

17           THE COURT:  Okay.  Well, do what you need to to fix

18   it.  You should be able to avoid saying it.

19           And if you have a concern about something that

20   happens, you can certainly raise it.

21           I do want to note for the record that the -- so

22   there's a clear record, that the reference to another case that

23   was on the documents that were displayed on the screen was a

24   reference at the bottom of the page in smaller type than what

25   was on the page that said "Subject to protective order in

1    Maricopa County Case Number," and then there was a number.

2          Other pages that were shown just said "Subject to

3    protective order."  I think it's fairly unlikely that a juror

4    would have been reading the bottom of the page, particularly

5    since most of the time it was up in front, there was something

6    above it being emphasized.

7          But if they did read it, I think it's fairly unlikely

8    a juror would have distinguished between when it says "Subject

9    to protective order" and "Subject to protective order in

10   Maricopa County Case Number."

11         So it wasn't as though it were a blatant reference to

12   another trial.  You're right, it was there.  We ought to redact

13   it, but I just wanted the record to be clear that that's what

14   appeared a few times on the screen.

15         MR. ROGERS:  I agree, Your Honor, and I noted when I

16   brought that up that no case name appeared on the document.

17         THE COURT:  Right.

18         MR. ROGERS:  So I don't know that a juror would tie

19   that up, since we're sitting here in Maricopa County.

20         But I think the issue is more, Your Honor, that it was

21   represented to us that that had been redacted and when it

22   appeared on the screen, it was not redacted.  And obviously,

23   when you are in that scenario, you really have no remedy.

24   There's really nothing you can do at that point in time if

25   you're sitting here as defense counsel.  So that's the reason I

1    bring it up.

2            MR. LOPEZ:  I can explain that, Your Honor.  First of

3    all, that -- the way that was played in that video played

4    exactly the same way in the Jones and the Booker trial, so

5    counsel didn't even notice it when we did that the first time.

6            We were under rapid fire to get these transcripts done

7    yesterday.  I wasn't involved in that; Ms. Smith was.  But it

8    was -- I'm sure that as whoever was doing that cut went through

9    it, probably didn't notice that either.  Because it looks like

10   it was taken out of some other ones.  I mean, it was a

11   nonlawyer who did it, who assumed maybe that Maricopa County is

12   what we're talking about here.

13           So that wasn't just purposely, you know, rejecting

14   what we had said we would have done for defense counsel.  It

15   was just inadvertent.

16           MS. REED ZAIC:  And I'm going to address, because

17   Ms. Smith is my associate.

18           My understanding after conferring with Felice, our

19   paralegal, is that the document that's actually in evidence and

20   going back is redacted.  Because of the rapid-fire cut, it had

21   come from the deposition, to get it into the video.  So that

22   exhibit is redacted on the exhibit list and the electronic

23   version for the jury.

24           THE COURT:  Okay.  Well, let's make sure in any

25   further videos, it's redacted as well.

1          Did you have a second matter you wanted to raise?

2          MS. HELM:  Yes, we do, Your Honor.

3          Last night the plaintiffs identified Exhibit 66 -- I'm

4   sorry, 4668, which they intend to use with Mrs. Hyde today.  It

5   is on their exhibit list, but we've gone back and looked, and

6   this document was not produced in discovery.  It was called for

7   in discovery but it wasn't produced, so we didn't receive it

8   during the discovery process.  And we would ask that it be

9   excluded.

10          I have evidentiary objections to it, but for purposes

11   of this morning, my objection is under Rule 37, we believe it

12   should be excluded because it was not produced in discovery.

13          THE COURT:  What's the document?

14          MS. HELM:  It is a compilation document.  It's four

15   letters that apparently Ms. Hyde wrote in August 2014.  They're

16   written as if she has passed away.  And our discovery

17   response --

18          THE COURT:  Letters written to whom?

19          MS. HELM:  Her children and stepchildren.

20          And our discovery responses specifically asked for all

21   documents that they may use to support their claim and

22   defenses, and there's a -- there are 47 categories of

23   documents, and they're not mentioned.  And obviously, the

24   corresponding request for production asks for the production of

25   all these documents.  So they were neither identified in the

1    interrogatory responses to which they were responsive, nor

2    produced in the request for production.

3           And I have the discovery responses, both sets, for the

4    Court and for counsel if you'd like them.

5           THE COURT:  Okay.  Were those -- was that exhibit

6    produced in discovery?

7           MR. O'CONNOR:  Your Honor, Laura Smith is going to

8    come in and address that.

9           The issue is the letters.  Were they produced in

10   discovery?  Were they discussed at deposition?

11          MS. SMITH:  They were discussed at the deposition, and

12   then --

13          THE COURT:  Speak into the mic.

14          MS. SMITH:  They were discussed at her deposition, and

15   then when we received copies of them prior to trial, we

16   included them on the exhibit list and gave them to the

17   defendants.

18          THE COURT:  How were they discussed at the deposition?

19          MS. SMITH:  They brought up her experience before the

20   removal, and she discussed what she did.  And that was one

21   thing she did, was write letters to her family.

22          THE COURT:  And when exactly were they produced?

23          MS. SMITH:  When the exhibit list was exchanged.

24          THE COURT:  So when the final pretrial order was being

25   compiled?

1        MS. SMITH:  That's correct.

2        THE COURT:  Do you know why they were not disclosed

3    during discovery?

4        MS. SMITH:  We didn't have copies of them then, and

5    our plaintiff was trying to figure out where she had kept them.

6        THE COURT:  All right.  Your response?

7        MS. HELM:  Your Honor, we obviously did not have an

8    opportunity to depose the plaintiff about these or to evaluate

9    them during the discovery process.

10        The duty under Rule 34 is ongoing.  Frankly, when she

11    mentioned them at her deposition, that should have triggered

12    their ongoing duty under Rule 34 to find them and produce them

13    and not wait until the week before the pretrial conference and

14    produce them as part of their exhibit list.

15        THE COURT:  Well, if they're going to be used in

16    trial, they're also required to be disclosed under Rule 26 as

17    initial disclosures and supplemented.

18        Hold on just a minute.

19        As you all know, Rule 37(c)(1) states that information

20    that a party fails to disclose under Rule 26(a), which includes

21    documents a party intends to use at trial to support their

22    case, failure to disclose such information means that the

23    information cannot be used at trial unless the failure was

24    substantially justified or is harmless.

25        So that's the question, whether the failure to

UNITED STATES DISTRICT COURT

1  disclose the letters was either substantially justified or is

2  harmless.  If it's either of those, it can be used.  If it's

3  not, it can't be used.

4         So that's what I need to hear your thoughts on.

5         MS. SMITH:  If you'd like me to respond, I think first

6  and foremost that it's harmless because it was discussed at her

7  depo at length.  She went into how she wrote them, how she felt

8  about them.  She was questioned about it.

9         And then as soon as she was able to obtain copies of

10  them -- they're both retired and don't use computers very

11  often, so it was a little bit of a process to try to get them

12  to find these.  They initially were trying to find the actual

13  handwritten letters, and they were in some closet in an

14  envelope.

15         Anyways, when they were found and produced to us, then

16  we included them on the exhibit list and moved forward with

17  them.

18         So I think it was harmless and also was -- the first

19  requirement --

20         THE COURT:  Substantially justified.

21         MS. SMITH:  -- substantially justified.

22         THE COURT:  Do you have the deposition excerpts where

23  they're discussed?

24         MS. SMITH:  We should, yes.

25         THE COURT:  Okay.  Ms. Helm?

1    MS. HELM:  Your Honor, her deposition was January 25,

2    2017.  They were not produced until September of 2018, almost

3    two years later.

4         I will be happy to provide you with a copy of the

5    document.  I don't think it's harmless.  I think these are -- I

6    have evidentiary objections to them, but from Rule 26 and

7    Rule 37, we should have had the opportunity to know the content

8    of these letters.

9         I acknowledge that the person who took her deposition

10   did not follow up.  But I don't think that takes away the

11   plaintiffs' obligation under Rule 26 or Rule 34, especially

12   when they knew the existence of the letters in January of 2017,

13   not to produce them or start looking for them until 18, 19

14   months later, 20, whatever the math is.

15        I don't think the failure to produce them was

16   justified.  They knew about them.  They knew about them as of

17   January of 2017 and didn't do -- they knew their obligation.

18   They knew they had the outstanding discovery and didn't do

19   anything to produce them.

20        THE COURT:  All right.  Could you hand me a copy of

21   the exhibit, please?

22        MS. HELM:  May I approach, Your Honor?

23        THE COURT:  Yes.

24        MR. LOPEZ:  Your Honor, if I can just make one more

25   point, I just want to remind the Court that Ms. Hyde's case was

1    not set for trial until sometime way -- it got leapfrogged over

2    two other cases before we started looking at this, which

3    probably explains some of the reason why this got to defense

4    counsel later.

5            And, again, one of the points is they did not request

6    it.  That certainly would have prompted us to find it.  But

7    you'll recall that the Hyde case was not going to be set for

8    trial until sometime well into next year.

9            THE COURT:  I understand that.  My view is that the

10   failure to disclose these in discovery is not substantially

11   justified.  She had them in her possession.  She knew she had

12   them.  It was discussed a year and nine months before they were

13   disclosed.

14           There was a discovery period set for the bellwether

15   cases, during which all of the relevant information should have

16   been disclosed.  She had them in her possession the whole time.

17           So I do not think it was substantially justified.  The

18   question in my mind, then, is whether the failure to disclose

19   was harmless.  And I think that depends in part upon how much

20   defendants learned about these letters in the deposition, and I

21   want to read the deposition section for that purpose.

22           MS. HELM:  Your Honor, I have a condensed version, and

23   I actually have the -- it has highlighting on it, but I'm happy

24   to show it to the Court.

25           THE COURT:  That's fine.

```
 1              MS. HELM:  May I approach?

 2              THE COURT:  Yes, you may.

 3              MS. HELM:  You can't miss it.

 4              THE COURT:  So, Ms. Smith, for your information, what

 5    I've been handed is a transcript that has language on pages 125

 6    and 126 highlighted.  Let me read this.

 7              So the reference highlighted only has one sentence --

 8    I'm sorry -- well, yeah, one sentence about the letters where

 9    she says, this is page 125, lines 16 through 18:  I went back

10    to Wisconsin to say my final good-byes to my family, and I

11    wrote letters to my children.

12              I guess my question to plaintiffs' counsel is whether

13    there is any other testimony in the deposition about the

14    letters.

15              MS. SMITH:  I don't believe so.  This is all I've

16    located as well.

17              THE COURT:  Okay.  Well, I'm interested in each side's

18    argument as to whether or not that reference makes the failure

19    to disclose harmless.

20              Ms. Helm?

21              MS. HELM:  Your Honor, I represent, respectfully, that

22    it does not make it harmless.  If you look at the contents of

23    the letters, they are quite emotional.  They're written as if

24    she has passed away.  Nowhere in the deposition did she say, "I

25    wrote letters to my children because I thought I was -- as if I
```

1     was going to die."

2             She does say, "I didn't think I was going to make it

3     through" or -- I don't have the transcript, but something like

4     that.  But she does not say -- she does not describe the

5     content of the letters.  And if you read them, they are --

6     they, again, they are written as if she has passed away.

7     They're written from the grave.

8             And I think the failure to disclose those and to have

9     the opportunity to discuss those with her at her deposition

10    makes it far from harmless.

11            Further, had we received them during the discovery

12    process, we would have had the ability to evaluate whether we

13    wanted to reconvene her deposition and inquire about them.  We

14    were not given that opportunity.

15            Now, I don't know how we would have come out, but by

16    not having the documents that the plaintiff clearly knew about

17    and should have produced, we were not afforded the opportunity

18    to fully evaluate them in the context of them, and we didn't

19    have an opportunity to file a motion in limine prior to trial

20    to address them.

21            MS. SMITH:  In response, Your Honor, I would say that

22    this was -- that they had the opportunity at the deposition

23    when this was brought up.  She says that it was her final

24    good-bye letters to her family, so she insinuates what the

25    content of the letters are.  At that point in time, they could

UNITED STATES DISTRICT COURT

1    have asked any follow-up questions.  They had the opportunity.

2          They also had the opportunity to follow up afterwards.

3    If they believed them to be relevant, they could have sought

4    for us to produce them.  And they also could have reconvened

5    her deposition or asked for any follow-up on them as well.

6          THE COURT:  All right.  My conclusion is that the

7    failure to disclose the letters was not harmless.  The

8    statement in the deposition simply says, "I wrote letters to my

9    children."  It doesn't say anything about the content, doesn't

10   say anything about the perspective from which it was written of

11   someone having died, doesn't give the defendants any sense for

12   what is actually in the letters.

13         I can't conclude it's harmless because the defendants

14   failed to follow up.  The burden was on the plaintiffs to

15   disclose it.  It wasn't the defendants' burden.  There was an

16   affirmative obligation under Rule 26(a) and apparently under

17   Rule 34 as well to disclose it.  So the failure to follow up

18   does not render it harmless.

19         The question is -- that I had reading the deposition

20   was did the defendants learn in the deposition what they would

21   have learned from reading the letters, and they clearly did

22   not.  So I can't conclude that it was harmless.

23         And since the failure to disclose was not

24   substantially justified and was not harmless, Rule 37(c)(1)

25   says the letters cannot be used at trial.  And so I'm going to

1    sustain the objection to Exhibit 4668.

2            MR. O'CONNOR:  Your Honor, may I ask a question --

3            THE COURT:  Yes.

4            MR. O'CONNOR:  -- on this?

5            Will she be able to testify consistent with her

6    deposition about writing those letters?

7            THE COURT:  She can testify that she wrote letters to

8    her children, because she said that in the deposition.  That's

9    absolutely fair.  What she can't do is in effect recite the

10   contents of the letters that were not timely disclosed to

11   defendants.

12           MR. O'CONNOR:  Understood.

13           THE COURT:  All right.  Are there other matters that

14   we need to address?

15           MS. HELM:  No, Your Honor.  May I approach and --

16           THE COURT:  Yeah.

17           All right.  We will --

18           MR. ROGERS:  Your Honor, I have one thing I just want

19   to bring to the Court's attention.  I'm sorry.

20           THE COURT:  Go ahead.

21           MR. ROGERS:  Your Honor, we understand from

22   plaintiffs' counsel that they are likely to rest sometime

23   tomorrow, and we would like to make a Rule 50 motion.  And I

24   don't know when the Court wants to do that, but I'm just

25   advising you.

1          THE COURT:  That's fair.  I don't want to do it while

2    the jurors are waiting.

3          MR. ROGERS:  Right.

4          THE COURT:  What I would like you to do is -- well,

5    let's do this so we don't have to worry about remembering.  We

6    will deem you to have reserved your right to make the motion

7    when they close.  I'll hear argument on it after we've excused

8    the jury.

9          That reminds me, plaintiffs, are you calling any more

10   experts today?

11         MR. O'CONNOR:  Yes.

12         THE COURT:  Which ones, so I can look at their Daubert

13   rulings?

14         MR. O'CONNOR:  Lora White and Matt Sims.  They're cost

15   of care people.

16         THE COURT:  Okay.  I don't think there were Daubert

17   motions on those.

18         MR. O'CONNOR:  Oh, I'm sorry, Dr. Parisian will be

19   coming in too.

20         THE COURT:  Okay.  I will look at that.

21         The last thing I want to mention is, although I have

22   been trying to get through them, I haven't finished jury

23   instructions yet.  I will do my best to get them to you by

24   tomorrow evening at the end of the day.  If I can't, I'll get

25   them to you tomorrow night later, because I'll work on it

1    tomorrow night.

2         And what we'll probably then do is give you the

3    weekend to look at them.  I've got hearings every day at 4:30

4    next week.  I think I'm going to move one, I don't know on

5    which day, so that we have the time after trial on -- probably

6    Tuesday.

7         I think it's a Rule 16, isn't it, on Tuesday, Traci?

8         And that -- that will be where we'll discuss jury

9    instructions.  I will tell you, I am not putting into the

10   instructions the restatement comments.  They're not part of the

11   standard instruction.  The case law even raises questions as to

12   whether they're part of Wisconsin law.  So that -- you can be

13   anticipating your argument on that.

14        Both sides would like pieces of the instruction in

15   there.  You would like me to be saying something about the

16   consumer expectation test; you'd like me to be saying something

17   about risk-benefit analysis and compliance with regulations.

18        It seems to me the only way we put comments into the

19   instructions is if everybody agrees they should.  If you don't

20   agree, I've got to go with the Wisconsin standard instructions,

21   and it won't have any of that in it.

22        That doesn't mean you can't argue to the jury that it

23   was not reasonably safe because consumers would have expected

24   something safer or it was reasonably safe because the

25   information shared with doctors mitigated the risks.  You can

1    make the arguments, but I'm not planning to put them in the

2    instructions unless we have agreement on that, so you can be

3    thinking about that in advance.

4              MR. GOLDENBERG:  Your Honor, can I just add one quick

5    thing?

6              THE COURT:  Sure.

7              MR. GOLDENBERG:  We -- after your ruling, we wanted to

8    make sure to give you a new special verdict form.  And we'll be

9    getting that to you today.

10             THE COURT:  After my ruling on what?

11             MR. GOLDENBERG:  You made a ruling on the negligence

12   per se, and so we just had to modify our special verdict form.

13             THE COURT:  Okay.  I'm happy to look at that.

14             Did you all see the ruling I entered last night on the

15   evidence that was at issue?

16             MR. LOPEZ:  Yes, Your Honor.

17             THE COURT:  All right.  I'll come back in two minutes

18   when the jury is in.

19             (Recess taken, 8:57 a.m. to 9:00 a.m.)

20             (Jury present.)

21             THE COURT:  Good morning, ladies and gentlemen.

22             JURY MEMBERS:  Morning.

23             THE COURT:  Thanks for being here this morning.

24             We will continue with the deposition of Mr. Fermanich.

25             (Video deposition played.)

1          THE COURT:  Counsel, could you pause the video,

2    please?

3          Would you come forward, please?  Both counsel.

4          (At sidebar on the record.)

5          THE COURT:  You just highlighted and displayed a

6    portion of an exhibit that I ruled was inadmissible yesterday.

7    The very sentence I ruled inadmissible, you just highlighted in

8    yellow and called up in bold on the screen.

9          MR. O'CONNOR:  I didn't know that was on this --

10         THE COURT:  I mean, I ruled on this yesterday.

11         MR. O'CONNOR:  I know you did.

12         THE COURT:  I said you can't use this in the Fermanich

13   deposition.

14         MR. LOPEZ:  The problem is we have a videographer

15   who's getting hit from all different directions on this thing.

16         I didn't notice it.

17         THE COURT:  Well, it's on the screen right now,

18   highlighted in yellow and blown up.  The very phrase that I

19   said was inadmissible because it was for the truth of the

20   matter asserted.  It is, "We still have G2 in stock."  You just

21   highlighted that in front of the jury.

22         MR. LOPEZ:  It didn't continue to play, did it?

23         THE COURT:  Yeah.  It's on the screen now as he

24   testifies.  So if we turn it back on, it's going to be right

25   there in front of the jury.

1       MR. O'CONNOR:  I suggest we move to a different video

2   right now.  We'll get this fixed right away.  I had no idea.

3       MR. LOPEZ:  What's happening, Judge, these videos

4   with -- as we're going back and forth and recutting them --

5       THE COURT REPORTER:  I can't hear you.

6       THE COURT:  Well, there's a way to solve this problem,

7   and that's to say no more videos.  We read deposition

8   transcripts from now on.

9       If we're going to have inadmissible stuff being

10  displayed to the jury, I don't know another solution.  That's

11  not good for the jury.  That makes it dreadfully boring.

12      MR. LOPEZ:  Yeah.

13      THE COURT:  Other than just boring, which it already

14  is.  But, I mean, this is as clear an error as we've had.

15      MR. LOPEZ:  We told whoever was working on this thing

16  to make sure that that was out.

17      THE COURT REPORTER:  I can't hear you.

18      THE COURT:  Well, we can't go on playing it.

19      MR. LOPEZ:  I understand.

20      THE COURT:  Because if we turn it back on, we're

21  displaying the very point that I ruled inadmissible.

22      MR. LOPEZ:  We can stop it.

23      MR. O'CONNOR:  I think we should stop it, fix it, and

24  then see what we need and go on to different videos is what I

25  would suggest.

1         THE COURT:  Are you going to go on to another video --

2         MR. LOPEZ:  Yes.  Another video.

3         THE COURT:  -- or another witness?

4         MR. LOPEZ:  Another video.

5         THE COURT:  Does this video have stuff that's supposed

6   to be redacted displayed?

7         MS. HELM:  Who is it?

8         THE COURT:  I don't know how we got four beans for

9   each of you.  I'm going to correct this right now.  I'm still

10  at three.

11        MR. LOPEZ:  Jason Greer and --

12        THE COURT REPORTER:  I can't hear you.

13        MR. LOPEZ:  Your Honor, let me tell you what's

14  happening.  We're telling them we're going to play the same

15  one, and it takes forever for them to get back to us and tell

16  us whether or not they're okay with that.

17        THE COURT:  I am sure there are problems going both

18  ways.

19        What's your objection to Jason Greer?

20        MS. HELM:  Your Honor, as you know, there's -- you

21  made additional rulings in Hyde on the Jason Greer video.  We

22  reviewed it, made sure they were being applied, that the

23  information had been redacted or deleted that you -- for

24  rulings you sustained, asked for a video to come back.

25        And I've just spoke with Mr. Chavez a minute ago.  He

1   said, "Let me follow up on Greer.  I don't know that it's

2   finished."  So --

3           THE COURT:  You saw what they were going to play and

4   approved it?

5           MS. HELM:  Well, we saw -- we saw this.

6           THE COURT:  And what is it you want back from them

7   besides that?

8           MS. HELM:  The final one, which I have not seen.

9           THE COURT:  And have the parties been exchanging --

10  that's what you called a script yesterday?

11          MS. HELM:  Yes, Your Honor.  And the reason is,

12  because the court reporter's not taking down the video, I have

13  to -- but you're asking us to submit it so it's part of the

14  record, I actually have -- I follow it to make sure that it's

15  played and that all of our cuts are in it.

16          THE COURT:  What was the second one you were going to

17  play?

18          MR. LOPEZ:  Altonaga.

19          MS. HELM:  That one's ready to go.

20          THE COURT:  How much is that?

21          MS. HELM:  Nine minutes.

22          THE COURT:  Let's do that, see if you can get Greer to

23  them during the nine minutes.

24          MR. LOPEZ:  We have others.  We have Wong.

25          MS. HELM:  Wong's ready.  There are a number that are

1    ready.

2             MR. O'CONNOR:  It's just a matter of getting them

3    downloaded and the equipment in court.

4             THE COURT:  Okay.

5             (End of discussion at sidebar.)

6             THE COURT:  Thanks for your patience, ladies and

7    gentlemen.  We're going to interrupt the Fermanich deposition

8    at this point.  We'll come back to it later.  We're going to

9    move to another deposition excerpt that will be explained to

10   you.

11            MS. REED ZAIC:  The next witness appearing by

12   videotape is Jason Greer, G-R- --

13            THE COURT:  Actually, it's not.  We just decided at

14   sidebar we're not doing Greer next.  We're doing the other one

15   you have next.

16            MR. LOPEZ:  Altonaga.

17            MS. REED ZAIC:  Okay.  Take two.

18            The next witness appearing by videotape is Guillermo,

19   G-U-I-L-L-E-R-M-O, known as Bill Altonaga.

20            Guillermo Altonaga practiced as an optometrist for 19

21   years, after which he began work for a medical device company

22   in its field assurance department.

23            In 2008, he began work with Bard Peripheral Vascular

24   as a consultant, and then in 2010 became a full-time employee

25   of BPV, working in quality assurance and medical affairs, where

1    his responsibilities included providing clinical input to

2    failure modes analyses, health hazard evaluation, and

3    promotional materials.  He is not a licensed medical doctor.

4              There are no exhibits.

5              (Video deposition played.)

6              MS. REED ZAIC:  The next witness appearing by

7    videotape is Natalie Wong, W-O-N-G.

8              Natalie Wong is currently employed at Bard Peripheral

9    Vascular and since 2008 has been a quality engineering manager

10   in field assurance.

11             Ms. Wong earned a bachelor's degree in industrial

12   engineering in 2001 and a master's in business administration

13   in 2007 from Arizona State University.

14             She began working at BPV in April of 2002 as a quality

15   engineer and has been with the company since, with the

16   exception of a brief stint at Lockheed Martin in Georgia.

17             At BPV, she handles quality assurance issues and

18   conducts trending analyses related to BPV's IVC filters.

19             And there are four exhibits to this deposition.  Trial

20   Exhibit -- pardon me.  Deposition Exhibit 537 will be trial

21   Exhibit 2243; deposition Exhibit 540 will be trial

22   Exhibit 2245; deposition Exhibit 542 will be trial

23   Exhibit 2247; and deposition Exhibit 544 will be trial

24   Exhibit 2249.

25             And I'd like to move these into evidence at this time,

1    Your Honor.

2              MS. HELM:  No objection, Your Honor.

3              THE COURT:  Those exhibits are admitted.

4              (Exhibit Nos. 2243, 2245, 2247, and 2249 admitted into

5    evidence.)

6              (Video deposition played.)

7              MR. LOPEZ:  That concludes that testimony, Your Honor.

8              MS. REED ZAIC:  The next witness that will appear by

9    videotape is Jason Greer.

10             Jason Greer graduated from the University of

11   Mississippi and became a sales representative at Bell South

12   Mobility in 1991 and worked for two other companies doing sales

13   until he joined Bard Peripheral Vascular in 1999 as a sales

14   representative.

15             In 2005, he became a district manager.  Throughout

16   this time at Bard, he sold Bard's IVC filters.

17             There is one exhibit.  Deposition Exhibit 7 will be

18   trial Exhibit 1912.  I'd like to move that into evidence, Your

19   Honor.

20             MS. HELM:  No objection, Your Honor.

21             THE COURT:  Admitted.

22             (Exhibit No. 1912 admitted into evidence.)

23             (Video deposition played.)

24             MR. LOPEZ:  Your Honor, it has been brought to my

25   attention that there was an exhibit -- deposition exhibit

1    played in Natalie Wong's deposition that was deposition

2    Exhibit 545, which is trial Exhibit 2250.  We'd like to move

3    that document into evidence at this time.

4            MS. HELM:  Your Honor, it was displayed before it was

5    admitted, but we have no objection to the admission.

6            There's another exhibit that was also displayed that

7    hasn't been admitted.

8            THE COURT:  All right.  I will admit 2250.

9            (Exhibit No. 2250 admitted into evidence.)

10           MR. LOPEZ:  And, again, Your Honor, these were

11   provided to counsel before we played it and they knew what

12   exhibits were coming in.  We just failed to have that on our

13   list.

14           Deposition Exhibit 552, trial Exhibit 2254, plaintiffs

15   move those into -- moves that exhibit into evidence at this

16   time.

17           MS. HELM:  Again, Your Honor, it was displayed before

18   it was admitted, but we have no objection to the admission.

19           THE COURT:  I will admit 2254.

20           (Exhibit No. 2254 admitted into evidence.)

21           MR. LOPEZ:  Thank you, Your Honor.

22           MS. REED ZAIC:  Next witness that will appear by video

23   is Janet Hudnall.

24           Janet Hudnall has a degree in industrial engineering

25   from the Georgia Institute of Technology and an MBA from ASU.

1    She began working for what became Bard Peripheral Vascular in

2    June of 1998 as a product development engineer and was promoted

3    to senior product manager in 2002 and marketing manager in

4    2004.

5           As marketing manager, Ms. Hudnall managed marketing

6    activities of BPV's IVC filter product line and was involved in

7    the launch of both the Recovery filter and G2 filter.

8    Ms. Hudnall left BPV in 2008 and since then has worked in

9    marketing for several medical device manufacturers.

10          Exhibits that will be played with her deposition are

11   deposition Exhibit 24, which is trial Exhibit 545; deposition

12   Exhibit 23, which is trial Exhibit 1337; deposition Exhibit 20

13   is trial Exhibit 1053; deposition Exhibit 21 is trial

14   Exhibit 1335; deposition Exhibit 22 is trial Exhibit 1336;

15   deposition Exhibit 29 is trial Exhibit 1339.

16          I'd like to move those into evidence at this time,

17   Your Honor.

18          MS. HELM:  Your Honor, deposition Exhibit 29, which is

19   Exhibit 1339, should be redacted.  We just want to make sure

20   that it's redacted consistent with your prior order.  And I

21   haven't seen the script, so I don't know if it's going to be

22   displayed, but it should be redacted.

23          THE COURT:  Has that been redacted, counsel?

24          MS. REED ZAIC:  I'm --

25          MR. LOPEZ:  Well, what exhibit is it?

```
 1              MS. REED ZAIC:  It's trial Exhibit 1339.

 2              MR. LOPEZ:  Yes, Your Honor.  Yes, Your Honor.

 3              THE COURT:  All right.

 4              (Exhibit Nos. 545, 1337, 1053, 1335, 1336, and 1339

 5     admitted into evidence.)

 6              MR. LOPEZ:  And counsel does have a script.

 7              THE COURT:  Ms. Helm, do you have the script?

 8              MS. HELM:  Yes, Your Honor.  What I don't have is

 9     what's being displayed, so I'll just have to follow along.

10              THE COURT:  All right.  Go ahead.

11              (Video deposition played.)

12              THE COURT:  Let's stop the video there.

13              All right, ladies and gentlemen.  We've reached 10:30.

14     We will resume at 10:45.  We will excuse you at this time.

15              (Recess taken, 10:30 a.m. to 10:45 a.m.)

16              THE COURT:  You may continue with the Hudnall

17     deposition.

18              (Video deposition played.)

19              MR. LOPEZ:  That concludes that testimony, Your Honor.

20              We're checking the control room, Your Honor, to see if

21     there's another video.  If not, we have another witness we can

22     call live.

23              MR. O'CONNOR:  Your Honor, at this time we're going to

24     be calling Lora White.  And Laura Smith on our team will be

25     doing the questioning.
```

```
 1                THE COURTROOM DEPUTY:  Ma'am, if you'll please come

 2   forward right here and raise your right hand.

 3                (The witness was sworn.)

 4                THE COURTROOM DEPUTY:  Could you please state your

 5   name and spell it for the record.

 6                THE WITNESS:  Lora, L-O-R-A, K. White, like the color,

 7   W-H-I-T-E.

 8                THE COURTROOM DEPUTY:  Thank you, ma'am.  Please come

 9   have a seat.

10                          LORA K. WHITE,

11   called as a witness herein by the plaintiffs, having been first

12   duly sworn or affirmed, was examined and testified as follows:

13                       DIRECT EXAMINATION

14   BY MS. SMITH:

15   Q.  Good morning.  Can you introduce yourself to the jury.

16   A.  My name's Lora White.

17   Q.  And, Ms. White, can you tell us about why you're here today

18   and your role in this case?

19   A.  So I'm a nurse life care planner, so I'm damages --

20                THE COURT:  Excuse me, Ms. White.  Could you pull that

21   mic a little closer to you, please?

22                THE WITNESS:  Yes, sir.

23                So I'm a nurse, and so my job is to figure out how

24   much future medical care is going to cost for Ms. Hyde

25   specifically for this injury.  So for the filter breaking apart
```

LORA K. WHITE - DIRECT EXAMINATION                    1448

1    in her, what the doctors have told me she's going to need.  So

2    my job is to figure out how much that cost is going to be.

3    BY MS. SMITH:

4    Q.  And can you explain to the jury what you did in this case

5    to find out those figures.

6    A.  So I went through all the medical records, and I contacted

7    Dr. Hurst and Dr. Muehrcke.  They're two physicians that were

8    hired to evaluate this case and look at all the medical records

9    and the deposition testimony.  One of them is an interventional

10   radiologist and the other one is a cardiothoracic surgeon, and

11   so they know what's going on with these filters.

12          And so I spoke with both doctors and got their

13   recommendations -- because I'm a nurse, right, so I'm not a

14   doctor.  I can't say that medical care -- I can do nursing care

15   all day long but not medical care.

16          So I then called providers in the area, got the costs

17   for those things that the doctors recommended, and put them in

18   a report.

19   Q.  Excellent.

20          And what training do you have that you applied to your

21   work in this case?

22   A.  So like I said, I'm a registered nurse.  So I graduated

23   from the University of Utah College of Nursing in 1993.  I

24   worked in the hospital for a while, and then when I moved to

25   Arizona I started doing home care so then I started doing case

```
 1    management, which is -- home care is case management too.
 2            And then I got certified as a nurse life care planner
 3    and a certified case manager, so --
 4            And you said training; right?  You wanted to know
 5    about my training?
 6    Q.  Training, qualifications, yes.
 7    A.  Yeah.
 8    Q.  Thank you.
 9    A.  And now I'm in graduate school.
10    Q.  And what are you in graduate school for?
11    A.  For some reason I decided I wanted to get my nurse
12    practitioner's license, and I'm not really quite sure why.  So
13    that's what I'm doing.
14    Q.  And is this your full-time job?
15    A.  Yes.
16    Q.  Working as a life care consultant?
17    A.  Yes.  I do some case management, very little anymore
18    because I just don't have so much time.  But I do mostly life
19    care plans and cost projections, which is what this is.
20    Q.  And do you own a business specializing in this line of
21    work?
22    A.  I do.  Back in 2008, we went out on our own.  The next
23    person you're going to hear from is my business partner and
24    so -- as Sims and White.  And we work for attorneys, plaintiff
25    and defense, and we do these reports a lot.
```

1    Q.  And as your work as a consultant with Sims and White, how

2    many life care plans do you think you've done over the years?

3    A.  Almost 1,100 now.  Which is a lot.

4    Q.  And what type of companies and people hire you?

5    A.  Mostly attorneys.  Well, pretty much always attorneys

6    because they want to figure out what -- when someone's hurt,

7    they want to figure out what the medical care is going to cost

8    in the future so that the person can care for themselves.  So

9    I'm hired by attorneys.

10   Q.  And are you charging for your services today?

11   A.  Yes.

12   Q.  And what are you charging?

13   A.  For testimony, it's 450 an hour.  Because it's really hard

14   and scary.

15        MS. SMITH:  Next I'd like to see if, Felice, if you

16   could display the demonstrative 4887.

17   BY MS. SMITH:

18   Q.  It's going to come up on the screen in front of you.

19        And, Ms. White, is this a chart from your expert

20   report?

21   A.  Yes.  So this is the chart that --

22   Q.  Let me follow up with a few questions.

23        Do you think this demonstrative will help explain your

24   opinions?

25   A.  Oh, yes.  Part of them, yes.

1          MS. SMITH:  Your Honor, may I publish this

2    demonstrative to the jury?

3          MS. HELM:  No objection as a demonstrative, Your

4    Honor.

5          THE COURT:  All right.  You may display it.

6    BY MS. SMITH:

7    Q.  All right.  Now, Ms. White, can you tell us what we're

8    looking at here.

9    A.  So this is -- this is a chart that outlines -- do you want

10   me to go through what it is?

11   Q.  Just in general, what type of chart is this, and is this

12   something you use when you're making cost projections?

13   A.  Okay.  So when a doctor tells me the medical care that's

14   going to be needed, this is an easy way to look at it.

15          And when she tells me to, I'll explain it to you.

16   Q.  Yeah.  And just to be clear, is this a traditional life

17   care plan?

18   A.  No.  This is just a cost projection.  A life care plan

19   is -- imagine like if someone's a paraplegic and they're going

20   to have to have a lot of equipment and home care services.

21   That would be a life care plan.

22          This is specifically for this filter, so it doesn't

23   take into consideration anything but the medical care that this

24   lady needs.

25   Q.  And would you say that the methodology that you utilized to

1    create this is what experts in your field use?

2    A.  Yes.  When you get your certification, you're taught how to

3    do these, the methodology to do these, so yes.

4    Q.  And you mentioned earlier that you spoke with Dr. Muehrcke

5    and Dr. Hurst regarding Ms. Hyde's future medical care.  Why

6    did you choose to speak to them?

7    A.  Because they were familiar with Ms. Hyde's situation with

8    the -- they had reviewed all the medical records.  They know

9    about what's going on with these filters.  They looked at all

10   the deposition testimony, so they were the most qualified ones

11   for me to reach out to and get the medical care recommendations

12   from.

13   Q.  And is that your usual practice when doing life care plans

14   and cost projections?

15   A.  Yes.  Yes, it is.

16   Q.  All right.  And can you tell the jury about the two

17   recommendations that the doctors have recommended here?

18   A.  The two scenarios, you mean?

19   Q.  The two scenarios, in general.

20   A.  So the first scenario is just the ongoing medical care that

21   she's going to need, so that's really simple.  She's going to

22   need to be followed by a cardiologist, so that means an EKG, an

23   echocardiogram, and physician follow-up.  That's through the

24   rest of her life, and that's just annual evaluations.  So

25   that's this chart.

1        So if you look at it, that's exactly what it says.  So

2   it's the care, where I got the cost, the date that it starts,

3   the date that it ends, how many times a year, which is

4   annually, and then the base cost.

5        And the second scenario, there's a surgery that I put

6   in for consideration.  Because it's possible that she's going

7   to flip into an arrhythmia again, so Dr. Muehrcke told me that

8   I should put in the pacemaker/defibrillator placement, so

9   that's the second scenario.

10  Q.  And that's --

11  A.  They're two separate ones.

12  Q.  Okay.  So that's the second scenario.

13       And so right here in front of us is the first one that

14  you mentioned; is that correct?  Regarding --

15  A.  Correct.

16  Q.  -- cardiac monitoring?

17  A.  Yes.

18  Q.  So let's go through this a little bit to explain to the

19  jury what they're looking at.

20       So here, what types of treatments do you believe,

21  based on these recommendations, that Ms. Hyde would need on a

22  regular basis?

23  A.  So the evaluation is to establish care with a cardiologist.

24  And then the next one down, where it says physician services,

25  that's just the annual care.  So do you see the years -- just

1    one year, 2017.  Now it would be 2018.  But then annually,

2    she's going to need to get looked at by a doctor.  She's going

3    to need an electrocardiogram and an EKG.

4    Q.  And how did you come up with these costs, particularly for

5    the physician evaluation by a cardiologist?

6    A.  I called providers in the area.

7    Q.  And how did you determine that these costs were reasonable?

8    A.  Well, I subscribe to a number of different databases, and I

9    get something called a CPT Fee Schedule book every year.  And

10   so those give you a range of what's usual and customary for any

11   geographic area.  You just multiply it by a factor.

12        And so I have those, and anytime I get a cost from a

13   provider I will look at those databases to make sure that they

14   fall within the range, right, so I know that they're within

15   that range.

16   Q.  Yeah.  And one thing you mentioned is that a follow-up --

17   she needs to have an annual echocardiogram.  Could you explain

18   to the jury, what is an echocardiogram?

19   A.  An echocardiogram is kind of like -- it is.  It's an

20   ultrasound of your heart.  So like baby, you know, you put the

21   jelly on and you look at the baby.  It sees the actual

22   structure of the heart.  So it's more than an EKG.

23        Remember, an EKG, that's when they put wires all over

24   you and then they look at a thing that does like this little

25   thing (indicating).  That's an EKG.  An echocardiogram is an

1   ultrasound, so...

2   Q.  Right.

3       And how many follow-up visits did you include in your

4   analysis?

5   A.  Just annually.

6   Q.  And did you determine the number of years Ms. Hyde will

7   require annual follow-up visits?

8   A.  Well, that goes through her statistical life expectancy.

9   And the next guy's going to tell you about that.

10  Q.  All right.  We'll wait to hear from Mr. Sims on that.

11      And what was the total figure that you arrived at for

12  the cardiac monitoring with annual follow-up visits?

13  A.  $226,439.  That's for her whole life.

14  Q.  All right.  And next I'd like to turn to the second

15  recommendation.

16      Can you describe again what the second recommendation

17  was from the doctors you spoke with?

18  A.  Yes.  So you're going to put it -- so that's just the AICD,

19  the pacemaker and the defibrillator placement.  So that will

20  kick her back into rhythm if she were to flip in and out of a

21  rhythm, of an arrhythmia.  And so she doesn't need one right

22  now, but there's a possibility that she would go back into an

23  arrhythmia; and if she does, they'll have to do this pacemaker

24  placement.

25      MS. SMITH:  And, Felice, could you put up Exhibit, as

LORA K. WHITE - DIRECT EXAMINATION                          1456

1    a demonstrative, 4888.

2    BY MS. SMITH:

3    Q.  And, Ms. White, this demonstrative that's in front of you,

4    is that from your expert report?

5    A.  Yes.

6    Q.  Will this help you explain your opinions regarding the

7    second recommendation?

8    A.  Yes.

9            MS. SMITH:  Your Honor, may I publish this to the

10   jury?

11           MS. HELM:  No objection, Your Honor, as a

12   demonstrative.

13           THE COURT:  It may be displayed.

14   BY MS. SMITH:

15   Q.  And so if it's decided that Ms. Hyde does need a pacemaker,

16   what are the medical procedures that go along with this

17   implant?

18   A.  So the first one is the preoperative diagnostic, so that's

19   labs.  Remember, she has a cardiac history, so she's going to

20   need to get the full monty for labs.  So a complete blood

21   count, a urine analysis, a complete metabolic panel, pro

22   time -- PT/PTT.  So it's pro time, prothrombin time.  So it

23   checks bleeding levels.  So that's the first one.

24           The second one is the clearance from the doctor to

25   make sure she can -- this is all to make sure she can undergo

1  anesthesia; right?  You don't want to put her under if she's

2  got a urinary tract infection or something like that.

3  Q.  And is that part of the preoperative diagnostics?

4  A.  Yes.  Those two first things are the preoperatives.

5          Then the surgeon plus the assistant to help him.

6  That's the guy that's going to put it in; right?  And then the

7  next one is the facility charge, which is the biggest cost

8  because they have -- they actually purchase the defibrillator

9  and then bill for that as well.

10          And then the anesthesia to put her out, because you

11  don't want her awake; right?  And then the cardiovascular

12  stress test afterwards.

13  Q.  And can you tell us how you derived these costs and

14  determined them?

15  A.  Again, I called the providers in the area.  They have a

16  price line, so when I called up, Patricia always answered the

17  phone.  It was always Patricia, because I called several times.

18  And she would -- I would give her the codes that I needed, and

19  she would tell me the costs.

20  Q.  And did you determine that these costs were reasonable?

21  A.  Yes.  I did the same thing with these costs as I did with

22  the other ones.  I looked -- I compared them against the

23  databases.

24  Q.  And here, it appears that the hospital and the surgery

25  costs, they are going to be the main costs; is that correct?

1    A.  Yes.

2    Q.  And what was the total figure for the pacemaker if Ms. Hyde

3    needs to have one?

4    A.  $116,834.

5    Q.  Thank you.

6          MS. SMITH:  And to compare these costs, I don't think

7    that the total came up on the other demonstrative that I had.

8          Could we display it from the report as a

9    demonstrative?

10         THE COURT:  What is it you want to display?

11         MS. SMITH:  The total for the first recommendation.

12         MS. HELM:  Objection, Your Honor, to displaying the

13   witness's report.

14         MS. SMITH:  Are we allowed to display just the portion

15   with the total as a demonstrative?

16         THE COURT:  Show Ms. Helm exactly what you want to

17   display.

18         MS. HELM:  Your Honor, we object to it being

19   displayed, and it's not --

20         THE COURT:  All right.

21   BY MS. SMITH:

22   Q.  All right.  So the figure that you cited out loud is the

23   one -- previously was the first recommendation, that was the

24   total?

25   A.  Yeah.  The total for just the lifelong monitoring was

1    $226,439.

2    Q.  And then the total that you just spoke with us about the

3    demonstrative on the screen is regarding the second

4    recommendation?

5    A.  Yes.  That's only the placement of the defibrillator.

6    Q.  All right.

7    A.  So there are two --

8    Q.  Thank you for clarifying that.

9          Was all your work here done today using the standard

10   methodology of a life care planner?

11   A.  Yes, it was.

12   Q.  And how do you double-check; how do you confirm for

13   accuracy of these numbers?

14   A.  Well, like I said, I compare against the databases that I

15   subscribe to, the books that I buy every year.  And then all I

16   do all day long when I'm not doing schoolwork is this,

17   literally, and walk my dogs.  That's it.  So...

18   Q.  And are all your opinions here given today in this case to

19   a reasonable degree of life care planner probability?

20   A.  They are.

21          MS. SMITH:  Thank you.

22          THE COURT:  Cross-examination?

23          MS. HELM:  Yes, Your Honor.

24

25

1                            CROSS-EXAMINATION

2     BY MS. HELM:

3     Q.  Good morning, Ms. White.

4     A.  Hi.

5     Q.  You testified that what you do is get information,

6     calculate costs of medical care, and provide it to attorneys or

7     testify in court.  Correct?

8     A.  Yes.  I make these reports, and then I usually -- sometimes

9     I have to testify, sometimes I don't.

10    Q.  And you are here to tell this jury about what you consider

11    to be the future medical costs for Ms. Hyde; correct?

12    A.  That's correct.

13    Q.  You did not make any determination about what medical care

14    she will actually need; correct?

15    A.  No.  I got that from Dr. Muehrcke.

16    Q.  You never spoke to a single treating physician, did you?

17    A.  That's right.

18    Q.  Okay.  And your report is not based on any information from

19    her medical care from her actual treating physicians, is it?

20    A.  That's correct.

21    Q.  And, in fact, you didn't read the medical records to see

22    what recommendations her treating physicians had made, did you?

23    A.  I actually don't know of any medical recommendations that

24    were made by her physicians at this point in time.

25    Q.  And are you aware that no treating physician who has seen

1    Ms. Hyde in the last four years recommends the care that you've

2    cost out today?

3    A.  I don't know that they are.

4    Q.  Okay.  You never asked to speak to her treating physicians

5    before you costed this out, did you?

6    A.  No.  There was no need to.

7    Q.  You simply relied on Dr. Hurst and Dr. Muehrcke; is that

8    right?

9    A.  Mainly Dr. Muehrcke.

10   Q.  You relied on Dr. Muehrcke?

11   A.  That's correct.

12   Q.  Okay.  Are you aware that Dr. Muehrcke testified that

13   Ms. Hyde has never been diagnosed with an arrhythmia?

14   A.  No.  I know that she had an arrhythmia at one point because

15   I saw it in the medical records.

16   Q.  Okay.  So it's your opinion that she had an arrhythmia?

17   A.  Yeah.  When the strut broke off from the filter and landed

18   in her right ventricle, it was -- when I read the medical

19   records, it looked like there was an arrhythmia diagnosed.

20   Q.  But Dr. Muehrcke never told you that, did he?

21   A.  We didn't talk about past medical.  We only talked about

22   the future medical.

23   Q.  And you're aware that Dr. Muehrcke has never treated

24   Ms. Hyde as a patient; correct?

25   A.  That's right.

1   Q.  And you're aware that Dr. Hurst has never treated Ms. Hyde

2   as a patient?

3   A.  That's correct.

4   Q.  Are you also aware that Dr. Muehrcke, when he asked you to

5   cost these treatments out, had not reviewed any of Ms. Hyde's

6   medical records from 2014 through the present?

7   A.  I don't know what he reviewed.  You have to ask him.

8   Q.  And are you aware that all of her medical care and

9   diagnostic studies from 2014 through the present indicate that

10  she has no heart or cardiac-related issues?

11  A.  At the current time, I don't know what she has because I

12  don't have updated records.

13  Q.  And are you aware that since 2014, no treating physician

14  has recommended that she see a cardiologist?

15  A.  That does not surprise me.

16  Q.  Are you aware that Dr. Muehrcke did not tell this jury,

17  when he testified about Ms. Hyde's possible future care, that

18  she needed echocardiograms?

19  A.  I don't know what he told you guys.  I just know what he

20  told me.

21  Q.  Okay.  So Dr. Muehrcke told you something that was

22  different than what he testified to in front of this jury;

23  correct?

24          MS. SMITH:  Objection.  Argumentative and misstates

25  testimony.

1        THE COURT:  Overruled.

2   BY MS. HELM:

3   Q.  Correct?

4   A.  I didn't understand your question.  I'm sorry.

5   Q.  Dr. Muehrcke testified to this jury something different

6   than he told you if he told you to price an echocardiogram and

7   he did not tell the jury she needed one; correct?

8   A.  He not only told me, but he put it in writing.  I have a

9   letter from him and an email saying that that's what he wanted

10  put in.

11  Q.  Okay.  You testified a few minutes ago that you use the

12  standard methods of a life care planner.  Correct?

13  A.  I do.

14  Q.  And you have databases and books that you use to get costs

15  in geographic areas; correct?

16  A.  No.  I don't get my costs from the databases.  I compare

17  the cost from the providers to the databases to ensure that

18  they're within reasonable amounts.

19  Q.  Okay.  And it's important for you to be accurate; correct?

20  A.  That's correct.

21  Q.  And it's important for you to provide medical care and the

22  costs of medical care that would be reasonable for Ms. Hyde;

23  correct?

24  A.  Yes.  The medical care that was recommended by

25  Dr. Muehrcke, yes.

1   Q.  And in your calculations that you presented to the jury and

2   you've testified about today, you calculated medical care in

3   Milwaukee, Wisconsin; correct?

4   A.  That's correct.

5   Q.  And you were told to calculate medical care in Milwaukee,

6   Wisconsin; correct?

7   A.  That's not correct.

8   Q.  How did you determine Milwaukee, Wisconsin?

9   A.  That's where she got the original filter.  That's where her

10  family is.  That's where I know she can get good care.  I know

11  she lives in Vegas now.  But when you talk to her -- I mean,

12  and I haven't talked to her -- she can go back and she has

13  family there that can help take care of her in Milwaukee.

14  So -- and I know Vegas.

15  Q.  So you costed -- you presented to the jury hypothetical

16  medical costs that would require Ms. Hyde to travel 1,800 miles

17  from Las Vegas to Milwaukee on an annual basis to go see a

18  cardiologist; is that right?

19  A.  I did.  But the cost -- I didn't put in any travel costs,

20  and the costs for Wisconsin versus Vegas are going to be

21  comparable, so there's not going to be that much difference.

22  Q.  You didn't come in here today and provide any costs for

23  medical care in the Las Vegas, Nevada, area, did you?

24  A.  No, but I have a lot of --

25  Q.  Did you?

1    A.  No, but I have a lot of cases in Vegas, and I price -- like

2    I said before, that's all I do all day long.

3    Q.  You didn't price -- you didn't talk to any cardiologist in

4    Las Vegas and get those costs, did you?

5    A.  For this particular case?

6    Q.  Correct.  For Ms. Hyde.

7    A.  For this particular case, I did not.

8    Q.  You didn't talk to any hospital and get any costs in Las

9    Vegas for Ms. Hyde, did you?

10   A.  For this case, I did not.

11          MS. HELM:  Thank you.  No further questions.

12          THE COURT:  Redirect.

13                      REDIRECT EXAMINATION

14   BY MS. SMITH:

15   Q.  Hi, Ms. White.  A few follow-up questions for you.

16   A.  Okay.

17   Q.  So in your role as a nurse, do you interpret medical

18   records?

19   A.  All the time.

20   Q.  And so did you feel comfortable in this case interpreting

21   the medical records --

22   A.  I did.

23   Q.  -- for Ms. Hyde?

24   A.  I did.

25   Q.  And in your role as a life care planner, do you often talk

1    to doctors and look at medical records to make these

2    determinations?

3    A.  Yeah.  That's what you have to do.  Like I said, I'm a

4    nurse.  I can make nursing recommendations all day long.  But

5    when it comes to actual medical care, surgeries, follow-up

6    visits, I get those straight from the doctor.  And you have to

7    do it the same for everybody.

8    Q.  And why did you think it was important to rely on

9    Dr. Muehrcke and Dr. Hurst's recommendations?

10   A.  Because, like I said, they were familiar with this -- you

11   know, when you look at different doctors and their specialty --

12   and I'm sure everybody's aware that you go to your primary care

13   doctor, they're going to turf you to a dermatologist for your

14   skin and a cardiologist for your heart and a pulmonologist for

15   your lungs and a proctologist for your prostate and an OB -- so

16   I knew that these doctors know about this filter.  Right?

17          So they knew about her medical records.  They knew

18   about what she was going to need.  They were familiar with the

19   case.  They're familiar with the problems that the filters have

20   been having.  So I knew that they knew what they were talking

21   about.

22   Q.  So you understood that they had access to her entire

23   medical history?

24   A.  Right.  And the depositions and everything else that was

25   done.

1  Q.  And is it typical for you to make a recommendation based on

2  these medical records alone without a patient evaluation?

3  A.  You mean without talking to Ms. Hyde or what?

4  Q.  Correct.

5  A.  For --

6  Q.  For a cost --

7  A.  For a cost projection, it is very typical.  For a life care

8  plan, I would like to meet with a patient.  But for a cost

9  projection, it's very narrow, so...

10  Q.  And regarding your choice to use Wisconsin as a base, is

11  there a regional difference between evaluating the costs in

12  Wisconsin versus in Las Vegas?

13           MS. HELM:  Objection, Your Honor.  It's not disclosed

14  in her report.

15           THE COURT:  Overruled.  It's fair redirect.

16           THE WITNESS:  So, yes.  As long as you're not in the

17  high-dollar areas, I call, like New York, right, everything's

18  more expensive there.  Chicago.  That's another place.  L.A.,

19  everything's really expensive there.  Certain parts of Seattle,

20  certain places around Washington.

21           As long as you're within the central part of the

22  country, it's pretty comparable.  You're going to pay maybe $20

23  difference, $50 difference.  So, yes, it's about the same.

24  BY MS. SMITH:

25  Q.  And you testified that you chose Wisconsin for the rates

1    because that is where Ms. Hyde's filter was implanted and she

2    has an infrastructure there?

3    A.  Yeah.  She has a family there.  She has people that can

4    help her.

5    Q.  And are you familiar with medical care in Las Vegas, the

6    medical area?

7    A.  I am.

8    Q.  Did that play at all into your reason to choose Wisconsin

9    for the rates?

10   A.  Yeah, a little bit.  Well, you know, they say if you get

11   sick in Vegas, get on a plane.  That's what they say.  And the

12   reason is because some of the hospitals aren't that great.  So

13   I'm very busy in Vegas doing this kind of work.

14   Q.  All right.  And do you believe that your opinions that you

15   had today, that you had a good basis for them and the costs

16   that you've talked to the jury about?

17   A.  Yes.

18              MS. SMITH:  Thank you.

19              THE WITNESS:  Thanks.

20              THE COURT:  All right.  Thanks.  You can step down.

21              THE WITNESS:  Thank you.

22              (Witness excused.)

23              MS. SMITH:  Plaintiffs would like to call the next

24   witness, Matthew Sims.

25              THE COURT:  All right.

```
 1              THE COURTROOM DEPUTY:  If you'll please stand right
 2    here and raise your right hand.
 3              (The witness was sworn.)
 4              THE COURTROOM DEPUTY:  Will you please state your name
 5    and spell it for the record, sir.
 6              THE WITNESS:  James Matthew Sims.  J-A-M-E-S,
 7    M-A-T-T-H-E-W, S-I-M-S.
 8              THE COURTROOM DEPUTY:  Thank you, sir.  Please come
 9    have a seat.
10                          JAMES MATTHEW SIMS,
11    called as a witness herein by the plaintiffs, having been first
12    duly sworn or affirmed, was examined and testified as follows:
13                          DIRECT EXAMINATION
14    BY MS. SMITH:
15    Q.  Good morning.
16    A.  Morning.
17    Q.  Could you please introduce yourself to the jury.
18    A.  I go by my middle name, Matt.  Matt Sims.
19    Q.  And, Mr. Sims, can you tell the jury why you're here today.
20    What is your role in this case?
21    A.  In this case, I performed -- it's called a present value
22    calculation.  It's an economic calculation on the -- one of the
23    scenarios my partner, Lora White, did for the ongoing cardiac
24    monitoring.
25    Q.  And, Mr. Sims, can you tell us about your training and
```

1    qualifications that you applied in your work on this case?

2    A.  I have been doing -- I do vocational work, not in this

3    case, but I also do economic calculations.  I've been doing it

4    since the year 2000.  I initially started underneath a

5    gentleman who did economic calculations.  I liked it so much, I

6    went back to school and I got my second master's degree.  My

7    first one's in counseling, and so I'm a vocational expert.

8              My second master's degree is a Master's of Science in

9    economics that I got from Arizona State University.  Since the

10   year 2000, I've worked on probably about 125 cases a year.  A

11   little more this year.  This year I'm getting kind of

12   overwhelmed.

13   Q.  So is this your full-time job?

14   A.  Yes.

15             THE COURT:  Sir, could you get closer to the mic,

16   please?

17             THE WITNESS:  Of course.

18   BY MS. SMITH:

19   Q.  And you own a business with Ms. White specializing in this

20   line of work; is that correct?

21   A.  Yes.  Sims and White.

22   Q.  And can you explain to the jury what you did in this case

23   for Ms. Hyde?

24   A.  The table that was presented to you that had cardiologists

25   and EKG every year, what I did is I estimated Ms. Hyde's

JAMES MATTHEW SIMS - DIRECT EXAMINATION                    1471

1    statistical life expectancy.  It goes up to just about age 84.

2    And that comes from a government publication, the National

3    Vital Statistics Report by the CDC.

4          And I took the dollar amounts, the cardiologists and

5    the EKGs, and I put them in a couple of different inflation

6    categories.  And what I did is I applied medical inflation in

7    order to increase those dollar amounts over the years, because

8    we're going so far into the future.

9          Chances are things tomorrow's going to cost more than

10   things today.  I think everyone has heard of medical cost

11   inflation in the news, so that's real.  So I applied inflation

12   rates for the medical costs into the future through the life

13   expectancy.

14         And then I performed a calculation called a

15   present-day value calculation.  It's a discount.  Essentially,

16   if someone needed money today to cover a cost tomorrow, they

17   can earn some interest if you invest in it.  And so I picked an

18   investment vehicle, U.S. Treasury securities, and I figured out

19   how much interest could be earned if she had a big dollar

20   amount today to cover these costs.

21         For example, if someone needed --

22   Q.  And let me interrupt you right there, because I will put it

23   up on the screen and it might be a little bit easier for the

24   jury to see your explanation along with seeing the chart of it.

25         MS. SMITH:  So let's get to that exhibit.  It's a

1    demonstrative, 4886.  Felice, could you display that?

2    BY MS. SMITH:

3    Q.  And, Mr. Sims, will this exhibit help explain your opinions

4    particularly on present-day value for Ms. Hyde's injuries?

5    A.  Yes.  Yes.

6    Q.  There's a second page to it as well.

7    A.  Correct.

8         MS. SMITH:  Your Honor, may we publish as a

9    demonstrative?

10        MS. HELM:  No objection as a demonstrative.

11        THE COURT:  Yes, you may.

12   BY MS. SMITH:

13   Q.  And, Mr. Sims, before we get started reviewing the chart,

14   can you explain the methodology that you used?

15   A.  The methodology is standard in the field of forensic

16   economics.  It's really just some math calculations of growing

17   a dollar amount over the years and then discounting the present

18   value that -- it's essentially factoring out the amount of

19   interest you can earn.

20        In this exhibit, the first column is calendar year,

21   and then we have Ms. Hyde's age as the second column.

22        The third one, under Professional Care Services,

23   that's seeing the cardiologist every year, so I have that

24   annual dollar amount, $337 a year going every year to the

25   future.

1        The next column over that says Growth Rate Factor,

2   that's -- you multiply the $337 by the growth rate, and that's

3   essentially the medical growth rate for doctors' visits.

4        The next one over, it says Hospital and Related.

5   That's really facility costs for EKG, echocardiogram, so that's

6   a little bit different growth rate.  So you take the $5,428 a

7   year, multiply it by that particular growth rate.

8        The next two columns you can skip because we're not

9   using any medical commodities here.

10        And the Discount Rate Per Year, essentially I'm

11   factoring out interest you can earn, and the interest comes

12   from safe investment, U.S. Treasury securities.  And so if

13   someone needs $105 a year from now and if the growth rate is

14   about -- or, I'm sorry, if interest rate is about 5 percent,

15   you only need a hundred dollars today.  Because you invest it,

16   you earn that 5 percent interest, and you'll have the 105 you

17   need tomorrow.  So this discount column, it subtracts out the

18   amount of interest you can get.

19        And then the last one just adds it all up.

20   Q.  Thank you for explaining --

21   A.  Present value.

22   Q.  And that would be the present-day value?

23   A.  Yes.

24   Q.  Okay.

25   A.  Then if you go to the next page, you can see the dollar

1    amount that my partner testified to.

2              MS. SMITH:  Felice, please turn the page.

3              THE WITNESS:  Towards the top right side, that

4    $226,439.

5    BY MS. SMITH:

6    Q.  Is that the total?

7    A.  That's the total for the ongoing care.  That's the amount

8    my partner testified to for that scenario.

9    Q.  All right.  And the resources that you used to come up with

10   these figures and calculations, is this something that other

11   economists rely on?

12   A.  Yes.

13   Q.  And would you say that you tend to be more conservative or

14   liberal in your estimates?

15   A.  I must be in the middle because I work half the time for

16   defense attorneys and half the time for plaintiff attorneys.

17   Q.  And did you arrive at a statistical life expectancy for

18   Mrs. Hyde?

19   A.  Yes.  It's actually to age 83.99.

20   Q.  And how did you determine that?

21   A.  There's a publication called National Vital Statistics

22   Report, and it's based on Ms. Hyde's age at the time of this

23   incident.

24   Q.  And so this figure up here in the right-hand corner, is

25   this the total value of the medical costs based on your partner

1   Lora White's estimates regarding the medical monitoring --

2   A.  Yes.  I rely on her.

3   Q.  -- cardiac medical monitoring?  Okay.

4           And would you say all this work was done with the

5   standard methodology of an economist?

6   A.  Yes.

7   Q.  So are all your opinions here today given in this case to a

8   reasonable degree of economic probability?

9   A.  Yes.

10          MS. SMITH:  Thank you.

11          THE COURT:  Cross-examination.

12          MS. HELM:  None, Your Honor.

13          THE COURT:  All right.  Thank you.  Sir, you can step

14  down.

15          THE WITNESS:  Thank you.

16          (Witness excused.)

17          MS. REED ZAIC:  The next witness that will appear by

18  videotape is Dr. Krishna Kandarpa.

19          Dr. Krishna Kandarpa is a board-certified radiologist

20  and interventional radiologist currently serving as a director

21  of research sciences at the National Institute of Health.  He

22  is a former president of the Society of Interventional

23  Radiology Research and Education Foundation.

24          He received his training in radiology from Harvard

25  Medical School, where he also served as an associate professor.

1  He also holds degrees in aerospace and mechanical engineering

2  from Washington University in St. Louis and a Ph.D. in

3  engineering science and mechanics from Penn State University.

4          Dr. Kandarpa has been employed as a professor teaching

5  students at the University of Massachusetts, MIT, Cornell, and

6  Columbia.  While working at the University of Massachusetts, he

7  joined Boston Biomedical Associates, a medical consulting

8  company, where he served as the medical monitor for Bard's G2

9  retrievability study called EVEREST.

10          Exhibits that will be associated with the videotape

11  will be deposition Exhibit 5, which is trial Exhibit 4595;

12  deposition Exhibit 6, which will be trial Exhibit 4596;

13  deposition Exhibit 9, which will be trial Exhibit 4599;

14  deposition Exhibit 10, which will be trial Exhibit 4600;

15  deposition Exhibit 11 will be trial Exhibit 4601; deposition

16  Exhibit 12 will be trial Exhibit 4602; deposition Exhibit 13

17  will be trial Exhibit 4603; deposition Exhibit 14 will be trial

18  Exhibit 4604; deposition Exhibit 17 will be trial Exhibit 4607.

19          And I'd like to move these into evidence at this time,

20  Your Honor.

21          MS. HELM:  I apologize, Your Honor.  I need to look at

22  one thing very quickly.

23          I believe I have no objection to these, Your Honor.

24  There are two that I wasn't aware of and I'll check them very

25  quickly, but no objection.

1           THE COURT:  Okay.  Those exhibits are admitted.

2           (Exhibit Nos. 4595, 4596, 4599, 4600, 4601, 4602,

3   4603, 4604, and 4607 admitted into evidence.)

4           MS. REED ZAIC:  Thank you.

5           MR. O'CONNOR:  Your Honor, we're having a momentary

6   difficulty -- well, it's not difficulty.  I think it's loading,

7   and I think we have about a minute or less left.

8           THE COURT:  If you want to stand up, ladies and

9   gentlemen, while that's done, feel free.

10          MR. LOPEZ:  We're ready to go, Your Honor.  May we

11  start, Your Honor?

12          THE COURT:  You may.

13          (Video deposition played.)

14          THE COURT:  All right.  Let's terminate the video

15  here.

16          All right, ladies and gentlemen.  We've reached the

17  lunch hour.  Let me remind you during the lunch hour and

18  otherwise not to discuss the case, including among yourselves.

19  You shouldn't be discussing the case until we get to the end of

20  the trial, or doing any research.  And we will excuse you at

21  this time.

22          (Jury not present.)

23          THE COURT:  All right, counsel.  I'll get the depo

24  allocations at the end of the day so that we can allocate for

25  the whole day.  I won't give you the time now.  We'll just do

1     that at the end of the day.

2              MR. LOPEZ:  That's fine.

3              MR. ROGERS:  Your Honor, I'm sorry to interrupt, but I

4     do feel the need to move for a mistrial.  And I can do that now

5     or at another time that Your Honor feels would be appropriate.

6              THE COURT:  On what basis?

7              MR. ROGERS:  On the basis of continued prejudice to

8     the defendant with things that were -- should be out of this

9     case appearing in front of the jury.

10             This morning, very shortly after we had the opening

11    hearing and we discussed the issues about things being in

12    depositions that shouldn't be there, you know, almost

13    immediately thereafter we had the Fermanich deposition where

14    the exhibit was shown that contained the hearsay that you had

15    excluded.  And that appeared in front of the jury.

16             And Your Honor, very correctly, stopped the video and

17    we had the sidebar.  We had the discussion.  So we're kind of

18    in the midst of that deposition right now.

19             And, Your Honor, I -- I don't think that is prejudice

20    that can be fixed at this point.  You know, the jury obviously

21    realized that the deposition was stopped.  I think if the

22    deposition is resumed, it is going to have more impact in their

23    mind than it should have.

24             And, Your Honor, the issue that the email information

25    goes to is a critical part of this case, and that goes to

1     product identification.  We didn't sneak up on this.  We had

2     several days of argument about whether that was coming in or

3     coming out, and Your Honor ultimately held that it should be

4     excluded.  And it appeared right in front of the jury for them

5     to see.

6            And, Your Honor, I submit to you that that along with

7     the other issues that we discussed this morning are cumulative

8     to Bard, and that's prejudice that we cannot overcome.  And

9     we'd move for a mistrial.

10           THE COURT:  All right.

11           MR. LOPEZ:  Your Honor, I think the -- well, first of

12    all, again, it wasn't read to the jury.  I'm not even sure the

13    jury even got to that point when they played it.

14           But if there's anything that's not that critical in

15    this case, it's what the device is, whether it's a G2, a G2X,

16    or an Eclipse.  That email said a G2.  It did not say a G2X.

17    Did not say -- and we're not going to allege that it was a G2

18    device.  We're going to allege that it was a G2X device, or

19    maybe an Eclipse.  But we're going to have to say that the

20    evidence weighs heavily.

21           I don't know how this prejudices anything in the case

22    as to whether or not this thing was a G2X or an Eclipse.  I

23    don't know what the difference is with respect to -- you know,

24    anyway, the evidence that's coming in and how we're going to be

25    presenting this case on design defect.

1       So far the testimony in the case -- I mean, we've even

2   had Ms. Taylor asking questions as a defense lawyer identifying

3   it as a G2X device.  And, you know, again, that -- I mean, I

4   just don't see how the weight of a jury maybe seeing in an

5   email that got shown to them for a brief period of time is

6   going to change whether or not this is a G2X or an Eclipse

7   case.

8       We can tell them clearly this is not about whether or

9   not this is a G2.  It's whether or not it's a G2X or an

10  Eclipse.  That email clearly says G2.

11      And you can just instruct them if they did -- if they

12  ever see G2, there's -- in any of the records or any of the

13  testimony, the allegations in this case are not saying --

14  because that does change the case.  I agree with you.  If it's

15  a G2 versus a G2X, I mean, there is a big difference between

16  the time period of that device and now.

17      But, I mean, it said G2.  There's no allegation in the

18  case that that was a G2, or in this case that we're saying it

19  was a G2.  It was either G2X or Eclipse.

20      THE COURT:  Anything else, Mr. Rogers?

21      MR. ROGERS:  No, Your Honor.  I'll only point out

22  that, first of all, if this is nonprejudicial, plaintiffs

23  certainly spent a lot of time trying to get that piece of

24  evidence in.  We had a lot of argument on that.  They tried

25  multiple times, so they clearly think it is important.

1          There's also been implications throughout the case

2    that people would refer to this kind of generically.  And Your

3    Honor excluded it specifically for the truth of the matter.

4    That's what it was going to, to try to show that this was a G2

5    filter and hence a G2X filter.

6          And so, Your Honor, I submit that that is prejudice,

7    again, that cannot be overcome for Bard.

8          THE COURT:  Okay.  I'll take this under advisement.

9          MS. SMITH:  If you wouldn't mind, I'd like to address,

10   because I represented that it was out of the video, and the cut

11   scene was out, and it was completely, completely an inadvertent

12   mistake on our part.

13         We had to do several rounds of these cuts, and I think

14   that whatever document got here was -- it was mislabeled, and

15   so it was the wrong video displayed.  And it was by no way to

16   be malicious or to go against your order.  We certainly know

17   that -- we're very clear on what we are supposed to do.

18         I also will say that it said whether it was in stock

19   or not, and it was not saying anything to do with Ms. Hyde or

20   what the filter was.

21         THE COURT:  Okay.  I'll take this under advisement.

22   Thank you.

23         MR. ROGERS:  Thank you, Your Honor.

24         (Proceedings recessed at 12:05 p.m.)

25

1    C E R T I F I C A T E

2

3        I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7        I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12       DATED at Phoenix, Arizona, this 26th day of

13   September, 2018.

14

15

16

                        s/Jennifer A. Pancratz_____ _____ ____
17                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25