1           UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF ARIZONA

3                _____

4   IN RE: Bard IVC Filters Products      )
    Liability Litigation,                 ) MD 15-02641-PHX-DGC
5                                         )
    _____)
6                                         )
    Lisa Hyde and Mark Hyde, a married    ) Phoenix, Arizona
7   couple,                               ) September 28, 2018
                                          )
8                        Plaintiffs,      )
                                          )
9            v.                           ) CV 16-00893-PHX-DGC
                                          )
10  C.R. Bard, Inc., a New Jersey         )
    corporation, and Bard Peripheral      )
11  Vascular, an Arizona corporation,     )
                                          )
12                       Defendants.      )
    _____)

13

14

15      BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16        REPORTER'S TRANSCRIPT OF PROCEEDINGS

17           TRIAL DAY 9 - A.M. SESSION

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257

24

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared with Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2      For the Plaintiffs:

3              Lopez McHugh
               By: **RAMON R. LOPEZ**, ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
5
               Gallagher & Kennedy
6              By: **MARK S. O'CONNOR**, ESQ.
               By: **PAUL L. STOLLER**, ESQ.
7              2575 East Camelback Road, Suite 1100
               Phoenix, AZ  85016
8
               Heaviside Reed Zaic
9              By: **JULIA REED ZAIC**, ESQ.
               By: **LAURA E. SMITH**, ESQ.
10             312 Broadway, Ste. 203
               Laguna Beach, CA  92651
11
               Goldenberg Law PLLC
12             By: **STUART GOLDENBERG**, ESQ.
               By: **MARLENE GOLDENBERG**, ESQ.
13             800 LaSalle Ave., Ste. 2150
               Minneapolis, MN  55402
14
               Lopez McHugh, LLP
15             By: **JOSHUA MANKOFF**, ESQ.
               1 International Plaza, #550
16             PMB-059
               Philadelphia, PA 19113
17

18

19     For the Defendants:

20             Nelson Mullins Riley & Scarborough.
               BY: **JAMES F. ROGERS**, ESQ.
21             1320 Main St.
               Columbia, SC  29201
22

23             Snell & Wilmer
               By: **JAMES R. CONDO**, ESQ.
24             400 East Van Buren
               Phoenix, AZ  85004
25

1                    **A P P E A R A N C E S**  **(CONTINUED)**

2

3    For the Defendants:

4            Nelson Mullins Riley & Scarborough
             By: **RICHARD B. NORTH, JR.,** ESQ.
5            By: **MATTHEW B. LERNER,** ESQ.
             By: **ELIZABETH C. HELM,** ESQ.
6            201 17th Street NW, Suite 1700
             Atlanta, GA  30363
7

8            C.R Bard, Inc.
             Associate General Counsel, Litigation
9            By:  **CANDACE CAMARATA,** ESQ.
             730 Central Avenue
10           Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

**EXAMINATION**

3

<u>WITNESS</u>                                                                                      <u>PAGE</u>

4

CLEMENT GRASSI, MD

5                    Direct Examination (Cont'd) By Mr. Condo        1853

6                    Cross-Examination By Mr. Lopez                        1879

7                    Redirect Examination By Mr. Condo                1915

8

CHRISTOPHER MORRIS, MD

9                    Direct Examination By Mr. Rogers                    1917

10

**EXHIBITS**

11

<u>NUMBER</u>    <u>DESCRIPTION</u>                                                    <u>PAGE</u>

12

7312       2001 SIR Guidelines for IVC                              1866
           filters, Grassi et al., J

13         Vasc Interv Radiol.

14

6842       ACR-SIR-SPR Practice                                        1872
           Parameter for the Performance

15         of Inferior Vena Cava (IVC)
           Filter Placement for the

16         Prevention of Pulmonary
           Embolism. Revised 2016.

17

6993       FDA Safety Communications,                            1940
           Removing Retrievable Inferior

18         Vena Cava Filters: Initial
           Communication. 08/09/2010.

19         http://www.fda.gov/MedicalDev
           ices/Safety/AlertsandNotices/

20         ucm221676.htm

21

5268       NMT's 510(k) (K963016) for                           1955
           modifications to the SNF

22         (submitted by Hogan &
           Hartson)

23

24

8485       Wheaton Franciscan- CT Scan                        1960
           Images

25

**P R O C E E D I N G S**

(Proceedings resumed in open court outside the presence of the jury.)

08:31:07  THE COURT:  Thank you.  Please be seated.

Morning, everybody.

EVERYBODY:  Morning, Your Honor.

THE COURT:  Defense counsel, let's start with your Rule 50 motion.

08:31:29  MR. ROGERS:  Thank you, Your Honor.  Your Honor, Ms. Helm is going to begin and then we're going to switch off a little bit.

THE COURT:  Okay, but we've only got a few minutes to do this.

08:31:39  MR. ROGERS:  Understand.

THE COURT:  We can't go for 15 minutes in argument.

MS. HELM:  Thank you, Your Honor.

Your Honor, the first claim on which we move for judgment as a matter of law is the loss of consortium claim.

08:31:57  Under Wisconsin law, the derivative claim for loss of consortium is a claim to recover for the loss of love and affection, companionship, society, the privileges of sexual relations, the comfort, aid, advice and solace, the rendering of marital services, the right of support, and any other

08:32:17  elements that normally arise in a close, intimate, and

08:32:20   1   harmonious marriage relationship.

2        To recover, there must be evidence of an impairment

3   or deprivation of those rights resulting from a disabling

4   injury to a spouse.  That's *Ballard versus Lumbermens Mutual*

08:32:38   5   *Casualty Company,* 148 Northwest 2d 65.

6        Mr. Hyde testified about his worry for Ms. Hyde and

7   his concern for her.  He testified -- he -- neither he nor

8   Ms. Hyde testified about any impact that her alleged injuries

9   had on their relationship, their marital relations, or her

08:33:02  10   ability to do the things that she normally did for the family.

11        There's no evidence from either Mr. Hyde nor

12   Mrs. Hyde that he, for example, had to assume household chores

13   that she normally did, that he had to take over care of their

14   daughter.  There's no evidence of any change in their marital

08:33:21  15   or intimate relationship.  There was also no evidence that she

16   was not able to share with him her love and affection.

17        While I respect his worry and concern, that is not an

18   element of the claim for loss of consortium.  He does not have

19   an independent claim.

08:33:38  20        And I reviewed Mr. Hyde's testimony very carefully

21   this morning and he expressed his worry and his concern for

22   his wife.  He talked about having to take off work.  But

23   nowhere in his testimony or in Mrs. Hyde's testimony is there

24   any description or any evidence of any impact that her alleged

08:33:58  25   injuries had on their marital relationship or the elements of

08:34:01  1   the claim for loss of consortium.

2        So for those reasons, plaintiffs have failed to prove

3   the essential elements of a claim of loss of consortium and

4   judgment as a matter of law should be entered on that claim.

08:34:15  5        THE COURT:  All right.  Thank you.

6        Mr. Rogers.

7        MR. ROGERS:  Your Honor, I'm going to talk about the

8   claim for future injuries.

9        As the Court knows, there's evidence that came in

08:34:32  10  through primarily Dr. Muehrcke that Mrs. Hyde has a

11  possibility of experiencing arrhythmias in the future, and if

12  she does she may need a pacemaker.  Your Honor, under

13  Wisconsin law, that is not sufficient for a jury to find

14  future injuries.

08:34:50  15       Wisconsin law requires that future injuries be

16  established to a probability not a mere possibility.  You may

17  recall that Dr. Muehrcke said that there was a possibility,

18  and when asked if he could quantify that in any way, he could

19  not.

08:35:05  20       Your Honor, there are several cases I'd like to hand

21  up to the court that have discussed this issue and also have a

22  copy of Dr. Muehrcke's testimony on the subject.  For that

23  reason, we move under Rule 50 to dismiss the claim for future

24  damages.

08:35:23  25       THE COURT:  Do you have copies for counsel?

08:35:25  1          MR. ROGERS:  I do.

2          THE COURT:  Let me be clear.  I think, if I

3   understand you correctly, what you're moving for, Mr. Rogers,

4   is a judgments on the aspect of future damages that would

08:35:59  5   include implant of a defibrillator; is that right?

6          MR. ROGERS:  That is correct.  And any claim for

7   future arrhythmias developing in the future.

8          THE COURT:  All right.

9          Ms. Helm.

08:36:13 10          MS. HELM:  At this time we move for judgment as a

11   matter of law on plaintiffs' strict liability claim.

12          Under Wisconsin statute --

13          MR. MANKOFF:  Sorry to interrupt you.  I'm having a

14   little trouble hearing.  Can you move the microphone.

08:36:27 15          MS. HELM:  Under Wisconsin statute 895.0471(a), in

16   order for a manufacturer to be held strictly liable for

17   defective design, the plaintiff bears the proving -- burden of

18   proving with reasonable certainty that the foreseeable risk of

19   harm posed by the product could have been reduced or avoided

08:36:47 20   by the adoption of a reasonable alternative design.

21          The first aspect, first element, of the statute in

22   strict liability is reasonable alternative design.

23          Plaintiffs have failed -- we submit plaintiffs have

24   failed as a matter of law to prove a reasonable alternative

08:37:05 25   design as defined by the statute.

08:37:08  1          The first alternative design that plaintiffs have

2     offered is the Simon Nitinol.  And it is important to remember

3     that Dr. McMeeking testified that he was not offering an

4     opinion that the Simon Nitinol was a reasonable alternative

08:37:27  5     design for Ms. Hyde.

6          The second important thing in the testimony is that

7     Dr. Henry testified that when he chose the G2X filter, one of

8     the benefits he considered in placing the G2X filter was the

9     fact that it did have the option to be retrieved.  And that

08:37:48 10     was a question.  His answer:  Yes, yes, definitely.

11          Dr. McMeeking testified at page 63 of the transcript,

12     lines 3 to 8, that a Simon Nitinol filter is not designed to

13     be retrieved.

14          He also testified that a Simon Nitinol filter is a

08:38:07 15     permanent filter and that would indicate it shouldn't be used

16     as a retrievable filter.

17          Your Honor, quite recently a New York federal court

18     addressed the issue of alternative design in a comparison of a

19     permanent IVC filter to a temporary or retrievable IVC filter.

08:38:28 20     The case is *Oden*, O-D-E-N, *versus Boston Scientific.*  Civil

21     action file number 18-0334.  And I have a copy of the case

22     and -- I have copy for the Court.  My copy's highlighted, but

23     I'll be happy to give it to plaintiffs' counsel.  And we found

24     it on Lexis and not on Westlaw, so I did bring copies.

08:38:54 25          And what's interesting in that case is the Court said

08:38:57  1   that a permanent filter is permanent.  A retrievable has a

2   different option, it has the option to retrieve.  So they're

3   not the same product.  An alternative design cannot be a

4   different product.

08:39:13  5          Your Honor, the analogy is a hard-top car is a car.

6   It's designed to get you -- drive you from one place to

7   another.  A convertible car is a car.  It has the same

8   intended use, but it has an option.  It has -- that is

9   different than the permanent car.  Just like the Simon Nitinol

08:39:32 10   is a permanent filter.  The G2X or the Eclipse is a permanent

11   filter with the option to retrieve.

12          So under a number of cases -- and there are no

13   Wisconsin cases interpreting this statute that we've been able

14   to find.  But under a number of cases addressing Restatement,

08:39:52 15   Third, cases, the courts have held that even if a product has

16   the same intended use, if it's not the same product, it cannot

17   be a reasonable alternative design.

18          And specifically in *Brockert*, B-R-O-C-K-E-R-T, versus

19   *Wyeth Pharmaceuticals*, Texas case at 287 Southwest 3d 760, the

08:40:18 20   court held that a plaintiff cannot prove that a safer

21   alternative design exists by pointing to a substantially

22   different product even when the other product has the same

23   general purpose as the allegedly defective product.

24          That's also consistent with New York who's addressed

08:40:36 25   the Third Circuit -- I mean the Restatement, Third, cases in

08:40:40  1    *Pinello*, P-I-N-E-L-L-O versus Andreas S-T-I-H-L AG and

       2    Company, 211 Westlaw, 1302223.

       3         Your Honor, as a matter of law the Simon Nitinol --

       4    we submit that the Simon Nitinol cannot be considered as a

08:41:05  5    reasonable alternative design under the strict liability

       6    statute.

       7         Likewise, Your Honor, Dr. McMeeking testified about

       8    the possibility of an alternative design to the G2X and the

       9    Eclipse.  His testimony was a filter that had a different

08:41:25 10    angle coming out at the cap, caudal anchors, and penetration

      11    limiters, it had all three design elements, he admitted that

      12    he was not aware of any such filter that existed at the time

      13    Ms. Hyde's filter was implanted.

      14         Importantly, he admitted that he has done no

08:41:48 15    calculations, no design, no finite element analysis, no

      16    drawings, and no testing of this proposed filter with these

      17    proposed alternative designs.  And his testimony at -- in the

      18    transcript at page 632, line 20, to 633 through the whole page

      19    and into 634, I went through every single one of those alleged

08:42:20 20    design -- alternative designs, and he admitted every single

      21    time that he had done nothing other than have the idea.

      22         Your Honor, under Wisconsin law, proposed designs are

      23    theoretical only and if not supported with any data, testing,

      24    or analysis, may not serve as a reasonable alternative design.

08:42:45 25         *American Family Mutual Insurance Company versus*

08:42:48  1    *Electrolux Home Products*, 2014 Westlaw, 2893179.

        2            Your Honor, he admitted -- Dr. McMeeking admitted he

        3    came in with an idea, a concept.  He admitted that prudent

        4    engineering practices required design, analysis, testing,

08:43:12  5    analysis of the testing, and a whole list of things that

        6    engineers must do.  He also admitted that he came in here with

        7    three ideas:  Changing the angle of the cap --

        8            THE COURT:  You've covered that ground.

        9            MS. HELM:  Okay.

08:43:27 10    So, Your Honor, as a matter of law we believe

       11    plaintiffs have failed to establish a reasonable alternative

       12    design and we're entitled to judgment on their strict

       13    liability claim.

       14            THE COURT:  All right.

08:43:39 15            MS. HELM:  One more.

       16            THE COURT:  Okay.  You're at 13 minutes.

       17            MS. HELM:  Your Honor, we also move for judgment as a

       18    matter of law on the punitive damages claim.  Under Wisconsin

       19    law, punitive damages may only be awarded when a plaintiff

08:43:53 20    proves by clear and convincing evidence that the defendant

       21    acted maliciously towards the plaintiff or in intentional

       22    disregard of the plaintiff's rights.

       23            That's Wisconsin statute 8895.043(3).

       24            The standard in Wisconsin is heightened.  It is not

08:44:14 25    willful, wanton, or reckless.  It's a higher standard.  The

08:44:19  1    seminal case is *Strenke*, S-T-R-E-N-K-E, *versus Hogner*,

        2    H-O-G-N-E-R, 694 Northwest 2d 296.

        3         And under this heightened standard and the law --

        4    actually, in that case they talk about this is a heightened

08:44:37  5    standard.  Under that heightened standard, the frame of mind

        6    of the alleged wrongdoer is a necessary consideration in

        7    determining whether punitive damages may be imposed.

        8         First, the first part of the statute requires is

        9    whether the defendant acted maliciously.  To establish that a

08:44:56 10    defendant acted maliciously, the plaintiff must show by clear

       11    and convincing evidence hatred, ill will, desire for revenge,

       12    or actions inflicted under circumstances that were -- where

       13    insult or injury is intended.  Intent is a clear element of

       14    the acting maliciously.  Again, that's the *Strenke* case.

08:45:21 15         Your Honor, there is simply no evidence.  There's no

       16    evidence at all of any intent to harm -- by Bard to harm

       17    Ms. Hyde.  There's no evidence at all of any hatred, ill will,

       18    desire for revenge, or actions to insult or injure her.

       19         The second half of the statute is intentional

08:45:44 20    disregard.  And under the *Strenke* case again, that means that

       21    a -- that the wrongdoer acts with the purpose to disregard the

       22    plaintiffs' rights or is aware that his or her acts are

       23    substantially certain to result in the plaintiffs' rights

       24    being disregarded.

08:46:04 25         Supreme Court of Wisconsin has set forth three

08:46:07  1    elements that you must show by clear and convincing evidence

2    in order to show intentional disregard.

3         The first one is that the actions by the defendant

4    were deliberate.  The second is there was an actual disregard

08:46:22  5    for the plaintiff's right to safety or health, and third was

6    the conduct -- it's an "and" standard.  Third was the conduct

7    was sufficiently aggravated to warrant punishment by punitive

8    damages.

9         Again, Your Honor, there's no evidence that Bard

08:46:38  10    acted deliberately or with an actual disregard for Ms. Hyde's

11    health or well-being and we would move for judgment as a

12    matter of law on the punitive damages claim.

13         THE COURT:  Okay.

14         MS. HELM:  And I have copies of the cases that I'll

08:46:53  15    bring up as soon as I get them to the plaintiff.

16         THE COURT:  That's fine.

17         Plaintiffs' counsel.

18         MR. MANKOFF:  Thank you, Your Honor.

19         Regarding the first claim for loss of consortium, the

08:47:20  20    standard quoted by defense counsel included the impairment of

21    a harmonious marriage.  And we did hear testimony yesterday

22    that Mrs. Hyde was waking up at night, that she was suffering

23    from anxiety.  And the jury could reasonably infer from that

24    that the injury has impaired their relationship, has caused

08:47:42  25    harm to Mr. Hyde.

08:47:49   1          Regarding the future risk of harm, as an initial

           2   matter, there's no specific claim for future risk of harm.

           3   It's subsumed in the category of injury.  So I don't believe

           4   it's even proper for a Rule 50 motion.  But that said, there

08:48:08   5   is sufficient evidence for the jury to find that there is a

           6   future risk of harm.

           7          Dr. Muehrcke testified she's at some risk for

           8   arrhythmia at 884.  And there are Wisconsin cases that support

           9   the idea that when there's testimony that there's some future

08:48:30  10   risk, that is sufficient to get to the jury.  I would direct

          11   your attention to *Ehlinger v Sipes*, 454 Northwest 2d 754.

          12          This was actually a case involving failure to

          13   diagnose.  It was a couple of twins and the doctor -- the

          14   doctor failed to determine that there were twins and failed to

08:48:54  15   take any steps to try to lengthen the pregnancy, so the twins

          16   were born prematurely and injured.  And there's no testimony

          17   about any amount of how much the increase in -- any increase

          18   in pregnancy, whether that would have been successful.  There

          19   was no quantification of the risk of harm that could have been

08:49:19  20   avoided, and the court ruled that was sufficient.

          21          The court cited approvingly of the Restatement,

          22   Second, of torts Section 323 which says that someone can be

          23   liable for failing to reduce a risk of harm if the failure to

          24   exercise such care increases risk of such harm.  Again, no

08:49:39  25   quantification required there.

08:49:41   1          The *Bleyer* case that defendants cited today also

           2   talks about future harm, I believe without any quantification,

           3   and the jury verdict in that case was affirmed.

           4          And finally *Brantner v Jenson* at 360 Northwest 2d

08:50:00   5   529.

           6          The *Ehlinger* case and this case are Wisconsin Supreme

           7   Court cases.

           8          There was testimony in that case that a future

           9   surgery might be necessary but there was no indication about

08:50:13  10   how probable.  Similar to this case.  And the court held that

          11   just the fear of surgery may be reasonably certain even if

          12   there is no certainty that the surgery will occur and even

          13   though the physician cannot testify to a reasonable degree of

          14   medical probability that the consequences feared will occur.

08:50:30  15   And in that case the court upheld an award -- I'm sorry,

          16   denied -- I believe it denied a directed verdict motion for

          17   mental distress for that fear of future risk.

          18          Turning to alternative design, we would submit there

          19   are at least eight alternative designs that the jury heard

08:51:05  20   evidence of and could reasonably conclude were reasonable

          21   alternative designs in this case.

          22          First, the jury could conclude from the evidence that

          23   Ms. Hyde received a G2X filter.  The defendants admitted there

          24   was, at best, circumstantial evidence and that it was a jury

08:51:31  25   decision which filter she received.

08:51:33   1       If they conclude that she received the G2X filter,

       2   then the Eclipse was a reasonable alternative design and

       3   defendants have claimed that that design with the

       4   electropolish reduced the risk of fracture.

08:51:44   5       Second, Dr. McMeeking testified that caudal anchors

       6   were a reasonable alternative design, and Exhibit 2249

       7   indicates that the Greenfield filter had caudal anchors, at

       8   least as of 2006.  So that was a design commercially

       9   available.

08:52:02  10       Dr. McMeeking also testified about penetration

      11   limiters and Bard did, in fact, design a filter with

      12   penetration limiters.

      13       So his not having prototyped or designed or tested

      14   such a filter does not prevent the jury from reasonably

08:52:23  15   concluding that that was an alternative design.

      16       Dr. McMeeking also testified that the chamfer of the

      17   cap of the G2X and Eclipse filter were defectively designed

      18   and that rounder chamfer would have been a reasonable

      19   alternative design, and he testified at 621 that the SNF had a

08:52:48  20   better cap.  And that is also commercially available.  Even if

      21   you don't find that the SNF filter itself is an available

      22   reasonable alternative design.

      23       That said, we believe the SNF is -- does qualify as a

      24   reasonable alternative design because the G2X and Eclipse

08:53:07  25   filters convert into permanent filters at six months.  And

08:53:11   1    Mrs. Hyde testified she believed the filter would remain in

       2    place for the rest of her life.

       3            Other alternative reasonable designs include the ALN

       4    and OptEase filters which there's evidence to show that they

08:53:27   5    had fewer fractures.  Most notably Exhibit 1940.  I believe

       6    Dr. Streiff testified to that as well.

       7            Finally -- I've lost count how many I mentioned, but

       8    the two-tiered -- Dr. McMeeking testified the two tiered

       9    design from the SNF was a safer design, and so that also could

08:54:05  10    have been a design component that was commercially available

      11    that could have been incorporated.

      12            And I believe that's seven.

      13            An eighth alternative design would be a G2 or G2X,

      14    Eclipse, that was indicated for that six-month time period.

08:54:27  15            And there are cases -- I did not find a Wisconsin

      16    case but there is a case from the Western District of

      17    Pennsylvania which cites Restatement, Third, which I believe

      18    applies in this case stating a jury could reasonably conclude

      19    that a feature could have been designed -- sorry.  That a

08:54:42  20    prototype is not necessary.  So some of these features, the

      21    jury could conclude, could be designed into the G2.  That is

      22    *Lynn versus Yamaha Golf-Car Company*, 894 F.Supplemental 2d

      23    606.  That's Western District of Pennsylvania 2012.

      24            Regarding punitive damages, the evidence in this case

08:55:10  25    is very similar if not stronger than the evidence in the Jones

08:55:14  1    and Booker trials.

       2             Again, we saw that Bard started with the Recovery

       3    filter and in a short-term pilot study the only time it was

       4    challenged with a clot it failed and they put it on the market

08:55:33  5    anyway and they never determined the root cause of the

       6    failures.  They saw fractures and migrations and they kept it

       7    on the market while they quickly tried to design a fix that

       8    they didn't sufficiently test, namely the G2 filter.  They

       9    launched it without even a pilot study.  And they created this

08:55:51 10    unique problem of caudal migration.

      11             There's evidence in this case that Mrs. Hyde's filter

      12    did migrate caudally, even if minimally, and there was

      13    testimony that penetration is a form of caudal migration.

      14    Which clearly occurred in this case.

08:56:13 15             The EVEREST study was not a safety study, it was

      16    really to increase and maintain market share by gaining

      17    retrievability indication.  And the medical monitor had

      18    serious concerns about the safety and stability and that more

      19    than half of the filters moved and tilted and he discussed

08:56:35 20    stopping the study or redesigning the filter, but he didn't

      21    have authority to do that.  Of course Bard went ahead any way.

      22    And probably the only doctor involved in the submission to the

      23    FDA regarding the EVEREST study said that the filter did not

      24    demonstrate substantial equivalence and that claim should not

08:56:54 25    be made.  But that claim was made anyway.  Then Bard turned

08:56:57  1    around and --

          2            THE COURT:  Who is that you're referring to?

          3            MR. MANKOFF:  That was Dr. Lehmann.

          4            THE COURT:  All right.

08:57:13  5            We've got just a couple minutes before we bring in

          6    the jury.

          7            MR. MANKOFF:  Okay.  Bard turned around and marketed

          8    the filter for lifetime implantation, which meant even though

          9    they tested it for ten years for fatigue resistance, they were

08:57:28 10    marketing it for 60 or more years of implantation.

         11            And Bard -- we heard that Bard manipulated tests, and

         12    this is evidence of a conscious disregard for the rights to

         13    Mrs. Hyde.  They increased the testing temperature so it

         14    didn't reasonably mimic the environment of use.  They only --

08:57:58 15    with the Recovery they only passed the migration tests when

         16    the temperature was 104 degrees.  And they maintained this

         17    temperature through the G2 testing.

         18            When the G2 was on the market, they found an

         19    unacceptable risk.  And they found statistically significant

08:58:21 20    differences in the performance of their product relative to

         21    the predicate devices and relative to competitor devices.

         22            I'm cognizant we don't want to keep the jury waiting,

         23    so unless the Court has questions, that concludes my argument.

         24            THE COURT:  Okay.  Thank you.

08:58:44 25            I'm going to take this under advisement.  If I think

08:58:47  1    we need more argument I will ask for it.  I'll review the

2    cases and the arguments that have been made.

3            Is there anything else we need to address before we

4    get the jury in?

08:58:57  5            MS. HELM:  May I approach with the case law?

6            THE COURT:  Yes.

7            MR. ROGERS:  Your Honor, I have one thing I think

8    should be very brief.

9            For the exhibits that the plaintiffs identified for

08:59:07 10    use with Dr. Morris, they identified an e-mail that deals with

11    the NBC news story and, Your Honor, I believe that is in

12    violation of your Docket Order 3313 and I wanted to bring that

13    up before we had the jury in.

14            THE COURT:  Plaintiffs' counsel?

08:59:24 15            MR. O'CONNOR:  We won't be using it.

16            THE COURT:  Okay.

17            MR. O'CONNOR:  We were just trying to get the

18    exhibits.

19            THE COURT:  Okay.  We'll bring in the jury in.

08:59:41 20        (The jury entered the courtroom at 9:00.)

21            Thank you.  Please be seated.

22            Morning, ladies and gentlemen.

23            JURORS:  Morning.

24            THE COURT:  Thanks for being here this morning.

09:01:02 25            We're going to continue where we left off with the

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:01:04    1   testimony of Dr. Grassi.

2           You may continue, Mr. Condo.

3           MR. CONDO:  Thank you, Your Honor.

4           Good morning, ladies and gentlemen.

5                   **CLEMENT GRASSI, MD,**

6   recalled as a witness herein, after having been previously

7   sworn or affirmed, was examined and testified as follows:

8        D I R E C T   E X A M I N A T I O N   (CONTINUED)

9   BY MR. CONDO:

09:01:09   10   Q   Good morning, Dr. Grassi.

11   A   Good morning.

12   Q   Yesterday when we broke I think we had spent a little bit

13   of time not only talking about your qualifications but talking

14   about the purpose for the SIR guidelines that were developed

09:01:22   15   for inferior vena cava filters.

16           To help us all return to that point, would you tell

17   us again what the purpose was for the development of those

18   guidelines.

19   A   The purpose of the guidelines was to fill a need for those

09:01:41   20   working with inferior vena cava filters, and especially

21   practitioners, so they could have a document that they could

22   reference.  And its goals were to educate and inform and

23   summarize for them essential data for those using IVC filters.

24   Q   And what was the data that was summarized, sir?

09:02:10   25   A   Well, it started with a review of the literature, that is

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:02:15  1    the world literature, on the subject.  And through a process

2    of committee meetings and the formation of the document that

3    led to the publication.

4    Q    Were you involved in that process?

09:02:30  5    A    Yes, I was.

6    Q    What was your role in the process?

7    A    Well, I was pleased to have been identified as a person to

8    lead the processes as the first author of the document because

9    my colleagues knew of my interest in inferior vena cava

09:02:48  10   filters.  And so I was the first author and lead author in

11   that project.

12   Q    What does it mean to be the first author or lead author in

13   a peer-reviewed article?

14   A    What it means is that that person is the leadership

09:03:03  15   individual.  He or she would speak with the other members on

16   the committee, would work with the SIR support staff, and

17   would really spearhead the whole process, which took just

18   about two years.

19   Q    Now, can you summarize the full process that took two

09:03:24  20   years to develop the guidelines.

21   A    Well, it was multi part.  It started with our identifying,

22   with the SIR support staff at their office, that we needed to

23   do a literature search.  And the world literature was

24   collected using Google Scholar, Medline, PubMed, and other

09:03:48  25   search engines.

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:03:50  1    From those articles, which were literally thousands,

2    we began by reviewing what we thought were the most pertinent

3    references.  Those references went to the working committee.

4    I would speak to committee members, identify people

09:04:08  5    who I thought would be suitable and talented in terms of

6    writing or assisting with certain parts of the document.  And,

7    as a second step, individuals would contribute and we would

8    have conference calls, usually a weekday evening at 8:00 p.m.

9    to 10:00 p.m.  And there were also at least four meetings in

09:04:36  10   person, and those occurred at the annual society meeting of

11   the Society of Interventional Radiology and also at the

12   Radiological Society of North America meeting, which is held

13   in Chicago each year.

14   Q    And were drafts developed of the guidelines?

09:04:55  15   A    They were.

16   Q    And were those circulated and to whom?

17   A    Yes.  And so the drafts went to all committee members and

18   a preliminary document was produced with my leading that.  At

19   that point the document was then again reviewed, this time by

09:05:16  20   the executive committee of the Society of Interventional

21   Radiology, or I'll refer to it as the SIR.  And at that point

22   after their input, we also called for -- invited commentary

23   with public -- prepublication, really, of the document in

24   electronic form so that other interventionalists could weigh

09:05:44  25   in on the document, on the text.

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:05:48  1        At the conclusion of that process and that approval,

2   which, again, as you can imagine, took some time, the entire

3   document was then submitted in a prepublication state to the

4   official journal of the SIR called the JVIR, Journal of

09:06:07  5   Vascular Interventional Radiology, and that went through its

6   own peer-review process by the editor.

7   Q   Thank you.

8        MR. CONDO:  If we could, Scott, call up Exhibit 7312.

9   BY MR. CONDO:

09:06:30 10   Q   Doctor, is Exhibit 7312 the SIR guidelines that emerged as

11  a result of that two-year process you've just described for

12  the jury?

13  A   Yes, it is.

14  Q   Can you please read the title.

09:06:44 15  A   Quality Improvement Guidelines for Percutaneous Permanent

16  Inferior Vena Cava Filter Placement for the Prevention of

17  Pulmonary Embolism.

18  Q   And you said this was a peer-reviewed article?

19  A   That's correct.

09:06:59 20  Q   And in what journal did it appear?

21  A   In the official journal of the SIR, which is called the

22  JVIR or Journal of Vascular and Interventional Radiology.

23  Q   And how many members are there or were there in 2001 of

24  the SIR?

09:07:17 25  A   At that time I would estimate approximately 5,500 members.

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:07:25  1  Q   And were these guidelines, when published, also made

2  available to others who might have an interest in IVC filters?

3  A   Yes, they were, because, as I mentioned, in addition to

4  our print prepublication versions, this was placed on the SIR

09:07:41  5  website electronically so that others had access and could

6  read it.

7  Q   I may have asked you this yesterday, and if I did, I

8  apologize, but are these guidelines used in teaching

9  hospitals?

09:07:55  10  A   Yes, they are.

11  Q   And what is your understanding as to how members of the

12  medical community make use of these guidelines, sir?

13  A   My understanding is they refer to them, read them, and

14  consult them when dealing with inferior vena cava filters and

09:08:16  15  looking for information in summary fashion.

16           MR. CONDO:  Your Honor, we offered Exhibit 7312.

17           MR. LOPEZ:  802(12), Your Honor.  Objection.

18  802(18), I'm sorry.

19           THE COURT:  Well, let's talk about this for just a

09:08:36  20  minute at sidebar, Counsel.

21           MR. LOPEZ:  Did you say sidebar, Your Honor?

22           THE COURT:  Yes, please.

23        (Bench conference as follows:)

24           THE COURT:  Mr. Lopez, I assume you mean 803(18)?

09:09:00  25           MR. LOPEZ:  I do.  I'm sorry.  Did I say 802?

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:09:01  1        THE COURT:  I assume your objection is it's a learned

2    treatise and therefore can only be read and not admitted?

3        MR. LOPEZ:  Right.

4        THE COURT:  What's your response, Mr. Condo.

09:09:10  5        MR. CONDO:  Same response as last time.  It's offered

6    for notice and we propose it be admitted with the limiting

7    instruction Your Honor has given previously.

8        THE COURT:  So in the previous trials, at least I

9    know in the Jones trial because I checked my notes this

09:09:22 10   morning, I admitted it with the instruction the jury was not

11   to consider the article for the truth of what's asserted in

12   the article, namely these are truthful findings, but, rather,

13   for notice of what the medical community was told by the SIR

14   guidelines.  What's your response on that?

09:09:42 15        MR. LOPEZ:  That was a good plan.  I probably should

16   have said 401, 402, 403.  It's a 2003 article.  It's relevant

17   to that time period, maybe, and only relevant on permanent

18   devices.  And there's no -- no one testified that they used

19   that 2003 article now to determine whether or not they're

09:10:03 20   acceptable rates of migration, all these other complications.

21   Especially it has nothing to do with design.  Doesn't talk

22   about the design of these devices.

23        It's just going to mis- -- if there's anything that's

24   going to mislead and confuse this jury and be prejudicial to

09:10:18 25   our design defect case, it's their representation that this

DIRECT EXAMINATION (CONT'D) - CLEMENT GRASSI, MD

09:10:22  1    article somehow is the acceptability of the rates of

2    complications of these devices and therefore how can these

3    devices possibly -- I mean the Bard devices possibly be

4    unreasonably dangerous when they're putting up rates that are

09:10:39  5    .14, .17, .16 against -- which are reportable rates against

6    rates that are in this from medical articles of devices that

7    are now 30, 40 years old and some not even on the market any

8    more.

9         I -- we've made this argument before, but I think now

09:11:01 10    that we're talking about a case where design is an issue, that

11    doesn't discuss the differences in the risks of the design.

12         THE COURT:  Okay.

13         MR. CONDO:  I believe this was all addressed in your

14    minute entry, your motion in limine order on the relevancy and

09:11:18 15    appropriateness going to design defect.

16         This goes to the notice of the medical community and

17    manufacturers as to -- and there is -- there's not going to be

18    an argument and we're not going to say these are acceptable

19    rates.  In fact, there will be a question in my outline that

09:11:38 20    says is this an intent to establish acceptable rates and the

21    witness said before of course not.

22         THE COURT:  What is your response to Mr. Lopez's

23    argument that this is a 2003 guideline that -- well, might

24    have been earlier.

09:11:53 25         MR. CONDO:  It's 2001.

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:11:55  1          Well, their whole case is built on the series of

2     predicate devices.  They had put in evidence of the Recovery

3     filter, which is a permanent filter.  This was what the state

4     of the art was in terms of the knowledge of the industry at

09:12:07  5     that time.

6          They then carried it forward and said G2 is bad, G2X

7     is bad, Eclipse is bad.  This goes exactly to the state of the

8     knowledge of the industry in 2001 when these predicate

9     devices, as they have argued it, were being designed and when

09:12:28  10    others were making decisions.

11         Now, there is a later.  We're going to come into the

12    2016 SIR guidelines and we'll show those, if permitted, or

13    read those, if permitted, to show those rates.  Those include

14    the retrievable filters.

09:12:47  15         But this is all part of, as Your Honor recognized, I

16    thought, in the motion in limine, this is all part of the

17    design defect that goes to the jury's decision as to whether

18    or not this is a reasonable design.

19         THE COURT:  Are you going to be objecting on the

09:13:03  20    2016?

21         MR. LOPEZ:  There's one section in it that I think is

22    relevant, and that is the SIR clarifying that their use of

23    thresholds and trackable events is not meant to be the

24    SIR's -- I can't remember the language.  But, Your Honor, I'm

09:13:25  25    going to object to all of the data that's on there.  It says

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:13:29   1   the rate's zero to 100 percent on some of these.

2         THE COURT:  So you are going to object to admission

3   of the 2016 guidelines?

4         MR. LOPEZ:  Yes.

09:13:38   5         THE COURT:  What will the basis be?

6         MR. LOPEZ:  Well, 803(18) again, and plus it deals

7   with articles that show rates between zero and 100 percent.

8   It's going to mislead this jury that -- these things are

9   dangerous.  What's -- what's .16, .17, .27.  It's just going

09:13:59  10   to mislead the jury.  These are medical -- I can't

11   cross-examine -- I can't -- if you gave me time, I could walk

12   this jury through every single one of those references and

13   show -- excuse me, show them why these are not relevant to

14   this case and show them that some of these additional

09:14:20  15   percentages that are in the most recent SIR are because of

16   Bard's filters.

17         THE COURT:  Okay.  I understand your position.

18         Give me a minute.

19         All right, Counsel, this is my conclusion on this

09:15:39  20   issue:

21         803(18) becomes relevant only if information is being

22   offered for the truth of the matter asserted.  Information

23   that is not being offered for the truth of the matter asserted

24   is not within the hearsay rules and therefore not within

09:16:08  25   803(18).

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:16:12   1          Defendants are proposing that they offer these SIR

           2   guidelines not for the truth of the matter asserted within

           3   them, namely that these are the rates reflected in the

           4   literature through this literature search but, rather, to

09:16:31   5   establish the knowledge of the medical community concerning

           6   what were rates.

           7          In other words, what did the medical community

           8   understand from the SIR, particularly the interventional

           9   radiology community, understand from the guidelines about

09:16:54  10   rates that had been reflected in medical literature.

          11          The question in my mind that I've been pondering is

          12   whether in this case under Wisconsin law that knowledge within

          13   the community is relevant.  Is that a fact that these ought to

          14   be admitted to address?

09:17:15  15          Under the Wisconsin statute, the jury has to consider

          16   not only whether there was a reasonable alternative design but

          17   also whether the failure to adopt a reasonable alternative

          18   made the product not reasonably safe.

          19          I've already concluded that in addressing the

09:17:35  20   question of whether the product was not reasonably safe, it's

          21   relevant for the jury to understand what doctors knew, both

          22   through the IFU, what they didn't know, stuff that plaintiffs

          23   have brought out that weren't told to them, so that they could

          24   decide whether the Bard filters were reasonably safe in the

09:17:54  25   hands of doctors given what doctors knew.

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:17:57 1        I think part of what doctors knew is the SIR

2    guidelines.  And the knowledge of the medical community is,

3    therefore, a relevant fact in this case.

4        I do not believe that it is unfairly prejudicial

09:18:13 5    under Rule 403 because plaintiffs can bring out the fact that

6    the guidelines are not manufacturing standards, that the SIR

7    said explicitly, I assume the 2016, they're not manufacturing

8    standards and they therefore did not establish sort of safe

9    haven for Bard.  I think that can all be brought out.

09:18:37 10        And the jury can then put into the mix of their

11    assessment as to whether the product was reasonably safe, what

12    the doctors knew about the SIR guidelines.

13        So I'm going to admit this exhibit and the 2016 with

14    the limiting instruction I gave in the Jones case, that it's

09:18:53 15    not for the truth of what's in the article but, rather, for

16    the knowledge the medical community had.

17        MR. MANKOFF:  Your Honor, may I make a brief record?

18        THE COURT:  Yes.

19        MR. MANKOFF:  I believe what the rates show are only

09:19:08 20    relevant to what doctors knew if they're actually true.  So

21    then it would be for the truth of the matter.  Further, I

22    don't believe there is any evidence Dr. Henry was aware of

23    this article or any of the SIR articles, so that would also

24    make it not relevant.

09:19:24 25        THE COURT:  Okay.  I understand that point.

DIRECT EXAMINATION (CONT'D) - CLEMENT GRASSI, MD

09:19:26  1        On the second point, I haven't understood the

       2    question to be whether this product was not reasonably safe in

       3    a specific case.  It's whether, when launched, it was not

       4    reasonably safe.  So I'm not sure Dr. Henry's knowledge

09:19:43  5    controls the jury's determination of what was or was not

       6    reasonably safe.  I mean, you can make that argument, but I

       7    don't think that's the determinative fact.

       8        Were you going to say something?

       9        MR. LOPEZ:  One thing, Your Honor.  To be honest, the

09:19:55 10    article as it's read, as it is, my main concern is the way

      11    it's represented by counsel, by witnesses, that this somehow

      12    establishes an acceptable rate.  In fact, you even said that

      13    before trial, I think, when we were talking about those rates.

      14        THE COURT:  I said what?

09:20:14 15        MR. LOPEZ:  You said that this was adopted by the SIR

      16    as an acceptable -- that these were acceptable rates.  And

      17    they're not.  The article -- I can cross-examine on that, too.

      18    But I just -- I don't -- the thing that bothers me most about

      19    these two articles is the way it's being represented by

09:20:32 20    witnesses and counsel about what they really say.  I mean,

      21    he's testified -- you know what, I'll cross-examine.

      22        THE COURT:  I think all of that is fair

      23    cross-examination and closing argument.

      24        MR. LOPEZ:  Okay.

09:20:44 25        THE COURT:  All right.

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:20:45  1        (Bench conference concludes.)

       2            THE COURT:  Thanks for your patience.

       3            Ladies and gentlemen, I'm going to give you an

       4    instruction in connection with the exhibit that is about to

09:21:08  5    come in to evidence.

       6            You remember at the beginning I indicated that there

       7    may be evidence that comes in for a limited purpose and then I

       8    give a limiting instruction.

       9            We're talking now about Exhibit 7312.  I'm going to

09:21:22 10    admit it in evidence, but only for a limited purpose.

      11            You are not to consider Exhibit 7312, which are the

      12    SIR guidelines, for the truth of what is stated in the

      13    guidelines.  In other words, you shouldn't read it as proof

      14    that what is in the guidelines is a true statement.  We're not

09:21:43 15    admitting it for the truth of the matter asserted.  We're

      16    admitting it only so that you can consider what the medical

      17    community understood from the SIR guidelines.  So it goes to

      18    what's in the head of doctors and what doctors knew.

      19            The parties disagree on the significance of the

09:22:03 20    guidelines and you'll hear those arguments.  But it's not

      21    admitted for the truth of what's in them but rather simply as

      22    evidence of what the medical community heard and received from

      23    multiple sources about IVC filters and other medical devices.

      24            So with that limiting instruction, Exhibit 7312 will

09:22:24 25    be admitted.

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:22:25   1        (Exhibit 7312 admitted.)

           2            MR. CONDO:  Thank you, Your Honor.  May we publish?

           3            THE COURT:  Yes, you may.

           4            MR. CONDO:  Could you zero in more closely on the

09:22:38   5    list of authors.

           6    BY MR. CONDO:

           7    Q    Dr. Grassi, who were some of the other individuals who

           8    served as authors on these guidelines along with you as the

           9    lead author?

09:22:56  10    A    The other individuals were also practicing physicians,

          11    interventional radiologists, and very active in the SIR and in

          12    percutaneous interventions in general, and many were

          13    considered to be thought leaders on the subject.

          14    Q    Thank you.

09:23:20  15            MR. CONDO:  Scott, if you could pull up first Table

          16    1.

          17    BY MR. CONDO:

          18    Q    Can you explain to the jury what complications are as

          19    shown in Table 1 of these guidelines.

09:23:38  20    A    Yes.

          21    Q    What definitions was used to characterize the event is a

          22    better question.

          23    A    Yes.  Complications are adverse events or occurrences as

          24    evidenced in patients.  And several of them were listed here

09:23:58  25    on this Table 1.

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:24:00  1   Q    And death was one of the complications?

2   A    Yes.

3   Q    Based on this extensive medical literature search, was a

4   reported rate established for death from IVC filter

09:24:15  5   complications by the SIR guidelines?

6   A    Yes.

7   Q    And what is that reported rate?

8   A    That rate is 0.12 percent.

9   Q    And was a threshold established for the reported events of

09:24:32  10   death, adverse events of death, involving complications from

11   IVC filters?

12   A    Yes.

13   Q    And what was the threshold?

14   A    The threshold reported is less than one percent.

09:24:45  15   Q    And this is in a survey of all medical literature that was

16   done over a two-year period between 1999 and 2001?

17   A    Yes.

18   Q    Now, to be clear, the SIR guidelines, when they establish

19   a threshold number, never intended to establish acceptable

09:25:04  20   thresholds for these complications, did they?

21   A    Correct.

22   Q    What is the threshold?  Explain to the ladies and

23   gentlemen of the jury what the threshold numbers mean.

24   A    The threshold, what that means is a level which would

09:25:23  25   prompt a quality assurance review.  It's important to

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:25:27  1   understand this a quality assurance document.

2           So if a doctor, he or she, or group of doctors,

3   observed these threshold numbers in their own practice, the

4   recommendation of the SIR and of the committee is that this

09:25:46  5   would prompt them to conduct their own quality assurance

6   review.  That is, see what they were doing, how their practice

7   looked, and if there were any specifics that contributed to

8   those numbers.

9   Q   And there are numbers in parentheticals after each of the

09:26:06  10  described complications.  What are those numbers in

11  parentheticals?

12  A   Yes.

13          On the left-hand part of the table, those represent

14  the references or citations which were included in the

09:26:22  15  particular topic.

16          For example, recurrent pulmonary embolus.

17  Q   So this was the source of the information that was used to

18  establish the information in the guidelines?

19  A   Yes.  This would not have been the only reference or

09:26:39  20  citation, but these were the references or citations which, in

21  the opinion of the committee, were the most relevant.

22          MR. CONDO:  Can we pull up, Scott, the last page of

23  Exhibit 7312 to show the jury the list of references.

24          And can you zoom in on, say, the bottom half of this

09:27:05  25  under Appendix 2, Methodology.  Across the page.

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:27:09   1   BY MR. CONDO:

2   Q    So we see a section there that says References.

3   A    Yes.

4   Q    So when the ladies and gentlemen of the jury look at this,

09:27:21   5   each complication rate or threshold rate or other reference

6   can be found in this list of references.

7   A    That's correct.

8   Q    Okay.

9         If you'd take that down.  Can we go to table number

09:27:36  10   2, please.

11        7312.  I'm sorry, Scott.

12   BY MR. CONDO:

13   Q    Table 2 refers to something identified as trackable

14   events.  Can you explain to the ladies and gentlemen of the

09:28:02  15   jury what the definition of trackable events was as used by

16   the SIR in these guidelines.

17   A    Yes.  Trackable events would represent other occurrences,

18   other things which were observed which would not necessarily

19   be adverse events or complications for the particular patient.

09:28:21  20        So it's important to understand these were things

21   which, in the opinion of the committee and in my opinion, we

22   felt would be pertinent for those working with IVC filters,

23   especially physician interventional radiologists, to look at

24   and review and be aware of in their own practice day to day.

09:28:45  25   Q    And for each of these trackable events, there were

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:28:49  1   reference sources cited in the SIR guidelines; correct?

2   A    Yes.

3   Q    There is an entry for migration.  Do you see that, sir?

4   A    I do.

09:29:07  5   Q    Does that include both caudal and cranial migration?

6   A    Yes, it would.

7   Q    All right.  Let's go through each of them.

8        For penetration --

9        MR. CONDO:  Can you highlight "IVC penetration."

09:29:24 10   BY MR. CONDO:

11   Q    How many reference sites are cited for the information

12   that was used to establish that rate?

13   A    In this citation, there are seven.

14   Q    And what did the SIR guidelines -- I'm going to have a

09:29:44 15   hard time saying SIR through this trial.  The SIR guidelines

16   establish as the reported rates in the medical literature for

17   IVC penetration?

18   A    Between zero and 41 percent.

19   Q    And are those reported events as experienced by doctors in

09:30:07 20   their individual offices as reported in the medical

21   literature?

22   A    Yes.  They would be events that would be experienced by

23   interventionalists, seen on imaging, and these were numbers

24   which were observed and which were reported in the literature.

09:30:28 25   Q    Now, if we look at migration, can you tell the ladies and

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:30:34  1    gentlemen of the jury how many reference citations appear for

2    the reported rate for migration.

3    A    There appear to be approximately 10.

4    Q    And what was the reported rate of migration as established

09:30:55  5    by the SIR guidelines in this study?

6    A    Between zero and 18 percent.

7    Q    And for filter fracture, how many reference citations were

8    provided?

9    A    There were two.

09:31:14  10    Q    And what was the reported rate established by the SIR

11    guidelines from the medical literature for filter fracture?

12    A    Between 2 and 10 percent.

13    Q    These rates involve only permanent filters, correct, sir?

14    A    They do because it's important to understand at the time

09:31:46  15    of the organization and writing of this document, permanent

16    filters for the IVC were the filter type that was available to

17    doctors.

18    Q    These rates include filter manufacturers other than Bard

19    or NMT; correct, sir?

09:32:06  20    A    Yes.

21    Q    Now, the SIR guidelines were updated again in 2016,

22    weren't they?

23    A    Yes.

24           MR. CONDO:  If we could see Exhibit 6842, please.

25

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:32:28  1   BY MR. CONDO:

2   Q   And were the SIR guidelines as updated in 2016, did they

3   go through the same general process as the 2001 original SIR

4   guidelines?

09:32:47  5   A   To the best of my knowledge, they did.  And of course

6   since there was the prior document which we just discussed,

7   they would have referenced that and updated and added

8   information to the newer one.

9         MR. CONDO:  Your Honor, we would offer Exhibit 6842.

09:33:11 10        MR. LOPEZ:  Objection as we said at sidebar, Your

11   Honor.  803(18).

12        THE COURT:  All right.  Ladies and gentlemen, I'm

13   going to admit Exhibit 6842 with the same instruction.  You

14   are not to consider 6842 for the truth of what is contained in

09:33:27 15   the guidelines, but, instead, simply for knowledge that was

16   had among the medical community at the time.

17       (Exhibit 6842 admitted.)

18        MR. CONDO:  May we publish, Your Honor?

19        THE COURT:  You may.

09:33:40 20        MR. CONDO:  Scott, could you enlarge the top half

21   through the title, please.

22   BY MR. CONDO:

23   Q   What is the title of Exhibit 6842, sir?

24   A   ACR-SIR-SPR Practice Parameters for the Performance of

09:33:57 25   Inferior Vena Cava, in parenthesis IVC, Filter Placement for

DIRECT EXAMINATION (CONT'D) – CLEMENT GRASSI, MD

09:34:03   1   the Prevention of Pulmonary Embolism.

2   Q   This Exhibit has a different title than the last Exhibit

3   7312.  Are these the updated SIR guidelines?

4   A   It does have a different title.  And by way of

09:34:20   5   explanation, since this is published by --

6   Q   Let me ask you the next question because we need to go by

7   question and answer.  But this is what would be considered the

8   updated SIR guidelines?

9   A   Yes.

09:34:33   10   Q   All right.  Now, explain to the ladies and gentlemen of

11   the jury the references to ACR and SPR and how this document

12   came to be.

13   A   Yes.  The ACR, or American College of Radiology, SIR, and

14   the SPR, which stands for Society of Pediatric Radiology,

09:34:53   15   published these practice parameters in their format as a print

16   and electronic publication.  So because this overall body was

17   doing the publication, they adopted the format which you see

18   here in terms of the text differences.

19   Q   So ACR is the American College of Radiology?

09:35:19   20   A   Yes.

21   Q   And how many members, to your knowledge, are members of

22   the American College of Radiology?

23   A   To the best of my understanding, more than 30,000 members

24   now.

09:35:30   25   Q   And is SPR a reference to the Society of Pediatric

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:35:35  1    Radiology?

2    A    Yes.

3    Q    And is that also a large professional organization?

4    A    Fairly large organization as well.

09:35:44  5    Q    Are these -- was this publication peer reviewed?

6    A    Yes.

7    Q    Did it appear in a reliable professional journal?

8    A    Yes.  It appeared from, and as I mentioned the publication

9    by the ACR, which is definitely a major and reliable society.

09:36:08  10   Q    And were these guidelines distributed and made available

11   to members of the American College of Radiology, the Society

12   of Interventional Radiologists, and in fact anyone else who

13   had a reason to be interested in IVC filters?

14   A    Yes.  They were available to the people that you

09:36:27  15   mentioned.

16   Q    Did these guidelines concern both permanent and

17   retrievable filters?

18   A    These did because these were published chronologically in

19   2016.

09:36:39  20   Q    And do the guidelines -- these guidelines in Exhibit 6842

21   have tables 1 and 2 just like the 2001 SIR guidelines?

22   A    Yes.

23              MR. CONDO:  Would you please pull up Table 1.

24              And would you -- thank you, Scott.

25

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:37:10  1    BY MR. CONDO:

2    Q    It appears as if Table 1 adopted the same style as the

3    2001 SIR guidelines.

4    A    Yes, it did.

09:37:22  5    Q    Now, we have a reported rate for deaths in all of the

6    medical literature through 2016 for deaths in these

7    guidelines.  What was established as a reportable rate?

8    A    The reported rate is 0.12.

9    Q    Is that the same rate as was reported in the 2001

09:37:44 10    guidelines?

11    A    It is.

12    Q    And what threshold was established for death complications

13    by the 2016 guidelines?

14    A    Less than one percent.

09:37:56 15    Q    Is that the same number as the 2001 threshold for death as

16    a complication?

17    A    It is.

18         MR. CONDO:  Can we go to Table 2, please.

19    BY MR. CONDO:

09:38:16 20    Q    Table 2 appears similar to the format utilized in the 2001

21    guidelines.

22    A    Yes.

23    Q    What is the reported rate for IVC penetration according to

24    the 2016 guidelines?

09:38:32 25    A    The reported rate is zero to 100 percent.

DIRECT EXAMINATION (CONT'D) - CLEMENT GRASSI, MD

09:38:37  1    Q    And what is the reported rate for migration of filter and

2    filter components?

3    A    The reported rate is zero to 25 percent.

4    Q    What is the reported rate for filter fracture in 2016 SIR

09:38:53  5    guidelines?

6    A    Zero to 50 percent.

7    Q    And do these rates all come from the medical literature

8    reviewed by the committee established in the guidelines?

9    A    They would.  And the references which you see are cited

09:39:14  10   here.

11   Q    All right.  Let's go back up to filter fracture.  There

12   are, by my count, 34 citations or references listed.

13   A    Yes.

14   Q    You don't need to count them, but accept that.  If I'm

09:39:33  15   wrong, someone will correct me.

16        Are any of the articles cited for filter fracture

17   actual clinical studies of the Eclipse filter?

18   A    No.  To the best of my knowledge, the Eclipse filter is

19   not included in these.

09:39:52  20   Q    And you've reviewed these 34 references in preparation for

21   your testimony today; correct, sir?

22   A    I have had a chance to review them either in whole or in

23   part.

24   Q    And do any of the articles cited for filter fracture

09:40:06  25   involve the G2X filter?

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:40:08  1   A   To the best of my knowledge, no.

        2   Q   Now, let's go up to migration of filter and filter

        3   components.

        4       Have you reviewed the references cited for the

09:40:23  5   reported rate established for migration of filter and filter

        6   components?

        7   A   Yes.

        8   Q   Do any of the reported references involve clinical studies

        9   of the G2X or the Eclipse filters?

09:40:39  10  A   Again, to the best of my knowledge, no, they do not.

        11  Q   And if we go up to penetration.

        12      I would ask you the same question:  Do any of the

        13  reported references include studies, clinical studies,

        14  involving the G2X or the Eclipse filter?

09:41:00  15  A   To the best of my knowledge, these do not.

        16  Q   If none of the reference materials, citations, includes

        17  specific citations to articles involving clinical studies of

        18  the G2X or the Eclipse filters, what conclusion do you draw

        19  from that with respect to the influence of fractures,

09:41:29  20  penetration, or migration of those filters, Bard filters, on

        21  the reported rates?

        22      MR. LOPEZ:  Objection, Your Honor, this is not in his

        23  report.

        24      THE COURT:  Is this in the report, Mr. Condo?

09:41:42  25      MR. CONDO:  I believe it was covered in prior

DIRECT EXAMINATION (CONT'D) — CLEMENT GRASSI, MD

09:41:45  1    testimony on pages 1539 to 1542.

2                   THE COURT:  Is that deposition testimony?

3                   MR. CONDO:  It is not, Your Honor.

4                   THE COURT:  Is it in deposition testimony or the

09:41:56  5    report?

6                   MR. CONDO:  It is not in either.

7                   THE COURT:  Okay.  Objection is sustained.

8                   MR. CONDO:  Thank you, Your Honor.

9    BY MR. CONDO:

09:42:08 10    Q   Final question, Dr. Grassi.  Series of questions.  Do you

11   have an understanding that some witnesses have offered opinion

12   testimony that perforation, tilt, and filter migration are

13   interrelated and contribute to filter fracture?

14   A   Yes.  I've heard that opinion expressed by some.

09:42:32 15    Q   To your knowledge, in the medical literature has there

16   been any study proving that tilt, migration, and/or

17   perforation increases the risk of filter fracture?

18                   MR. LOPEZ:  Objection, Your Honor.  Not in his

19   report.

09:42:46 20                   THE COURT:  Is that disclosed, Mr. Condo?

21                   MR. CONDO:  I believe.  Page 10.

22                   THE COURT:  Of the report?

23                   MR. CONDO:  Of the report, yes, Your Honor.

24                   THE COURT:  Objection is overruled based on the first

09:43:09 25    full paragraph on page 10.

CROSS-EXAMINATION – CLEMENT GRASSI, MD

09:43:12   1   BY MR. CONDO:

2   Q   The question to you, sir, was, to your knowledge in the

3   medical literature has there been any study proving that tilt,

4   migration, and perforation together increase the risk of

09:43:30   5   filter fracture?

6   A   To the best of my knowledge there is no study that has

7   shown or proved that relationship.

8   Q   There is no study that establishes the interrelationship

9   or interrelatedness of those three conditions?  Is that what

09:43:52  10   you're saying?

11   A   Yes.  What I'm saying is that in my view, there's no

12   study, again, to the best of my knowledge, that proves the

13   interrelated nature or pathogenesis of the factors which you

14   mentioned.

09:44:11  15   Q   Final question, sir.  To your knowledge, has the SIR

16   recommended that physicians stop using IVC filters?

17   A   No, it has not.

18       MR. CONDO:  Thank you, Your Honor.  I have no further

19   questions.

09:44:24  20       THE COURT:  Cross-examination?

21       MR. LOPEZ:  Yes, Your Honor.

22       C R O S S - E X A M I N A T I O N

23   BY MR. LOPEZ:

24   Q   Morning, Dr. Grassi.

09:44:46  25   A   Good morning.

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:44:47  1   Q   I pronounce it Grassi but I think you pronounce is Grassi.

2   Dr. Grassi, is that how you pronounce it?

3   A   That would be fine.

4   Q   No, I want to pronounce it the way you and your family

09:44:56  5   pronounce it.

6   A   Yes, that's correct.

7   Q   Grassi?  Okay.

8       I'm actually going to start kind of where Mr. Condo

9   left off.  He asked you questions about whether or not there

09:45:07  10  were any clinical studies that were in the SIR with the most

11  recent guidelines about fractures and migrations and other

12  problems with the G2, G2X, or Eclipse.  Remember those

13  questions?

14  A   Yes, I do.

09:45:26  15  Q   Well, the fact is that Bard has never sponsored such a

16  study, so no such study would exist; true?

17  A   That's correct.  I'm not aware of any Bard-sponsored study

18  on that topic.

19  Q   I mean, as a matter of fact, I think back in 1990 you were

09:45:46  20  urging the IVC filter manufacturing industry to conduct those

21  kinds of studies, long term safety and effectiveness study.

22  Do you recall that article in 1990?

23  A   Yes, I do.  I was certainly interested in there being more

24  information and education on the subject in general.

09:46:15  25  Q   So naturally there would not be any references in any

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:46:21  1    article written today about any clinical study performed by

2    Bard or on Bard products sponsored by Bard because no such

3    studies exist; true?

4    A    Well, perhaps you could narrow down your question a little

09:46:37  5    bit for me.  In terms of a study of filter fracture,

6    penetration, perforation, is that the subject that you're

7    asking?

8    Q    Doctor, is the bottom line is that Bard has not conducted

9    a study to see how prevalent their G2, their G2X, or their

09:46:58 10    Eclipse filter is to fracture and to have a fracture embolize

11    to people's hearts and lungs.  True?

12    A    In trying to answer that question as accurate as I can,

13    I'm not aware of any study published in the literature, world

14    literature or literature available to me, on that subject.

09:47:20 15    That's correct.

16    Q    I don't want the jury to be confused.  We've heard the

17    phrase "reported rates" every day in this trial from opening

18    statement until this morning.

19         When the SIR article that we've been talking about

09:47:33 20    uses the phrase "reported rates," that means that somebody

21    found an article that talked about one filter in some

22    instances, a case report, and there was a fracture in that

23    case report, so naturally that would be 100 percent reported

24    rate captured by that literature review.  Is that a fair

09:47:59 25    statement?

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:48:00  1   A   Well, that's a bit of a hypothetical question but I'll say

2   certainly, if a study were conducted of a small number of

3   patients as you described and there were fracture in those

4   patients, then mathematically that would constitute

09:48:16  5   100 percent, yes.

6   Q   Right.  So -- and the same is true with all of these

7   rates.  These are just people that -- doctors that have looked

8   at a patient population, and if they find in looking back at a

9   patient population that they found ten perforations, that

09:48:36  10  would be reported as a 50 percent perforation rate; correct?

11  A   Well, it's not for me to comment on what the doctors

12  themselves saw.  I can only comment on what I read in the

13  literature.  And I can say that there are a variety of

14  different articles.  Some have few patients, some will have 30

09:49:00  15  or more patients, some may include 100 or more patients,

16  depending, of course, on the article.

17  Q   Now, again, I want to make sure we're clear.  What is

18  being designated as a reported rate in these two articles are

19  what is in the literature that's being reported by a number of

09:49:19  20  doctors and that this reported rate is not specific to any one

21  device.  Correct?

22  A   Correct.  So that --

23  Q   Okay.  So -- the answer's correct; right?

24      So if you look at this, these articles, you don't

09:49:36  25  know what the differences are in the reported rates to

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:49:44  1    companies about these complications compared to what's

2    reported to other companies; correct?  You can't tell that

3    from looking at these two articles; right?

4    A    Are you asking, please, whether I can tell myself?

09:49:59  5    Q    No.  Nobody can tell.  You can't look at these articles

6    and say the G2, G2X, and Eclipse filter has a higher

7    prevalence of filter migration -- filter fracture that

8    embolized to the heart than other devices that are on the

9    market.  True?

09:50:14 10    A    I can only say that -- I can only tell and comment on --

11    Q    Sir, is what I just said true?  That's all I'm asking.  Is

12    it true that you can't -- doctors can't look at the 2001,

13    2003, 2016 articles that you've been discussing and find out

14    anything about the prevalence of any Bard product to fracture

09:50:37 15    and embolize into people's hearts and lungs compared to either

16    a competitive device or any of its own devices.  True?

17    A    No, I would have to disagree with that statement.  There

18    are articles which are published at reputable hospitals and

19    other centers that discuss the Bard device as well as

09:50:57 20    different manufacturers.  So in terms of how a doctor would

21    determine that, he or she would look at the reference and read

22    that to gain that information.

23    Q    Sir, I think you completely misunderstood my question.

24         My question was whether or not there's anything in

09:51:12 25    any of the articles, the 2001, '3, '16, article, articles,

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:51:19  1   that specifically will tell a doctor who reads them about the

2   G2, G2X, or the Eclipse filters' propensity or prevalence to

3   fracture and migrate to people's hearts or lungs in comparison

4   to competitive devices and their own Simon Nitinol filter.

09:51:39  5   There's nothing in the articles that will tell doctors about

6   that; correct?

7   A   In which set of documents, please?  In the guidelines?

8   Q   Right.  There's nothing in the guidelines that talk about

9   that.  True?

09:51:50  10  A   The guidelines, as has been discussed here just recently,

11  that's correct.  Do not deal with the G2X or the Eclipse.

12  Q   Okay.  And these guidelines do not deal with the company's

13  internal tracking and trending of their own complications and

14  the way those complications match up to competitive devices or

09:52:17  15  their own devices that they're selling.  True?

16  A   That would be company or proprietary information so that

17  that is true.

18  Q   I think you agreed when Mr. Condo asked the question, none

19  of these guidelines control what are acceptable and

09:52:34  20  unacceptable risks with respect to what should be warned about

21  to doctors; true?  What doctors should know about a particular

22  company's own device.  They don't control that; right?

23  A   The guidelines that we've discussed are meant for -- to

24  educate and to inform, and that is their purpose.

09:52:56  25  Q   And the guidelines don't address whether or not a product

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:53:00  1    is properly designed or not that might be contributing to

        2    these rates; true?

        3    A    The guidelines don't comment on that factor.  Correct.

        4    Q    And they don't comment on whether or not a device is in

09:53:16  5    compliance with federal regulations; true?

        6    A    The guidelines do not include that commentary.  All of the

        7    devices, I should say, which we've discussed here have been

        8    accepted by the FDA.  So I'm trying to answer your question as

        9    accurately as possible.

09:53:37 10    Q    The other thing I noticed about both of these when you put

       11    up the tables, there was some zeros on there.  Like zero to

       12    41 percent, zero to 100 percent.  I would assume it's the

       13    SIR's position that irrespective of what may be reported in

       14    the literature about devices that go back to 1982 and 1990s

09:53:58 15    and even up to the present, that they want a device that is at

       16    zero or close to zero as you can get with respect to those

       17    complications that are being referenced in these articles;

       18    true?

       19    A    I cannot speak on behalf of the SIR as a whole, but I can

09:54:18 20    say to you certainly in the patients I treat it would be my

       21    goal, my preference, to have no complications with my patients

       22    if that were possible.

       23    Q    Okay.

       24           MR. LOPEZ:  Could we put up the 2001, Exhibit 7312.

09:54:42 25           May I publish, Your Honor?  This is the one that just

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:54:43  1    got admitted --

2                    THE COURT:  This is -- yes, you may.

3                    MR. LOPEZ:  Can we go to the second page of that and

4    go down to where it says "death" right in the first column,

09:55:22  5    Felice.

6    BY MR. LOPEZ:

7    Q    Now, this is the -- this has got one reference called the

8    Becker article; right?

9    A    Yes.

09:55:41 10    Q    And I think even in 2016 it references the same article;

11    correct?

12    A    Yes.

13    Q    And the Becker -- do you know the Becker article well?

14    A    Well, I know of the Becker article.  If there's a part of

09:55:56 15    it that you'd like me to talk about I would have to probably

16    look at the article in order to reference it.

17    Q    Well, the Becker article describes the type of deaths that

18    are being reported in these two articles, these two SIR

19    articles, do they not?

09:56:17 20    A    In that case, that would be true.

21    Q    And do you recall they involve deaths from a misplacement

22    of a Greenfield filter during insertion?

23    A    It was a procedurally related death unfortunately.

24    Q    And cephalad migration of an early version of the bird's

09:56:34 25    nest filter to the pulmonary artery.  Those are the four

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:56:39  1   deaths that are referenced in the Becker article; correct?

2   A   Yes.

3   Q   Now, are there any -- so this article doesn't deal with

4   deaths caused by a filter that -- any particular filter or

09:56:53  5   Bard filter that may have failed as a result of a design

6   deficiency; true?

7   A   I can only comment on the article and say that the article

8   and the committee reviewed any procedurally related deaths, as

9   you described, and what filters with what -- with what filters

09:57:18  10  they occurred in at the time.

11  Q   Now, there's been evidence in this case that the first

12  retrievable filter that Bard made, out of which the rest of

13  these devices were designed, in the first year, first few

14  months, really, it was on the market, had a statistically

09:57:37  15  significantly increased risk of fatalities --

16              MR. CONDO:  Your Honor, may we approach?

17              THE COURT:  Yes, let's approach for a minute.

18              If you want to stand up, ladies and gentlemen, feel

19  free.

09:57:50  20      (Bench conference as follows:)

21              THE COURT:  Looks like we're assuming our usual

22  sides.

23              Mr. Condo.

24              MR. CONDO:  I think we're walking into the Recovery

09:58:12  25  death issue and Recovery death evidence and I think that's

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:58:17   1    been foreclosed by the Court.

2        THE COURT:  What is it you're referring to?

3        MR. LOPEZ:  I'm referring to the testimony that came

4    in in Ms. Natalie Wong, she did statistical analysis of the

09:58:30   5    Recovery filter that showed it had a significantly increased

6    risk of fatalities compared to other devices on the market and

7    that didn't -- you wouldn't have known that by looking at this

8    article.  And it also opens the door, Your Honor, too, the

9    number of deaths that are not in that article.

09:58:48  10        THE COURT:  Let's not talk about that right now.

11    Let's talk about Mr. Condo's issue.

12        If it's a reference to the Wong testimony, do you

13    have an objection?

14        MR. CONDO:  No if he specifically references the Wong

09:58:59  15    testimony.  That's not where he was going.

16        THE COURT:  Well, he did start out by saying,

17    "There's been evidence in this case that there was a

18    statistically significant increase of death in the Recovery."

19        I understood that to be referring to the Wong

09:59:14  20    testimony.

21        MR. CONDO:  Wong testimony.

22        THE COURT:  And I assume if that's what he's

23    referring to, you're not objecting?

24        MR. ROGERS:  No, I just want to understand the

09:59:23  25    parameters of --

CROSS-EXAMINATION - CLEMENT GRASSI, MD

09:59:24  1        THE COURT:  Okay.  We'll talk about that in a minute.

        2        So what's been put in with respect to Wong, I think,

        3    is you can ask the witness about that.  You wanted to --

        4        MR. LOPEZ:  Well, I mean, if the jury's going to get

09:59:37  5    a fair picture of what these guidelines really are to doctors,

        6    and what these rates really are, and I've got 19 deaths in a

        7    Recovery filter caused by a migration to the heart by the

        8    device being dislodged, these guys don't talk about that type

        9    of risk, Judge.  You cannot look at these guidelines and say

09:59:59 10    there's a risk of an acceptable threshold of death for that

       11    type of event.  I asked him that in his deposition.  He said

       12    these guidelines do not cover that event.  You cannot go to

       13    the SIR guidelines and determine by looking at them that there

       14    is any risk of a filter being hit by clot and embolizing.

10:00:24 15        THE COURT:  Well, you just brought that out with him;

       16    right?  You just had him confirm that the only deaths that are

       17    described in the article are procedurally related deaths.  So

       18    it seems to me you've made the point that it doesn't cover

       19    other kinds of deaths.

10:00:40 20        MR. LOPEZ:  Okay.

       21        THE COURT:  I'm not understanding how your

       22    question --

       23        MR. LOPEZ:  The 2016 -- we've gone down the road now

       24    15 years.  They're still talking about four different -- four

10:00:52 25    types of deaths for the medical community to read about

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:00:56    1    because Bard's not given the medical community the reality

        2    about the deaths that have occurred with their design of this

        3    filter.

        4        THE COURT:  Here's the question I have.  You have

10:01:05    5    established, I think, through the questions you just asked,

        6    that there's only a particular kind of death reported in the

        7    SIR guidelines.  And therefore other kinds of deaths aren't

        8    reported.  So that's established.

        9        I don't see how your establishing of that limit then

10:01:25   10    opens the door to your bringing in deaths that are not covered

       11    by the SIR guidelines.

       12        MR. LOPEZ:  Your Honor, to me it's simple.  I hope I

       13    can say it the way I want to say it.

       14        They've used the SIR guidelines to keep the Recovery

10:01:41   15    filter on the market so it can be predicate for the G2.  The

       16    Recovery should not have been on the market.  And they use the

       17    SIR guidelines to do that.  That the death rate was less than

       18    .12 percent.  Okay?

       19        And they use those guidelines that discuss deaths

10:01:59   20    that have nothing to do with the malfunction and the design

       21    defects and the deaths that were caused by the Recovery

       22    filter.  They've been abusing SIR guidelines with FDA industry

       23    since the Recovery filter.

       24        I think I have a right to establish that starting

10:02:15   25    with the Recovery filter and walking myself through the G2,

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:02:18  1    the G2X, and the Eclipse.

2          They're using that as an acceptable rate of these

3    complications knowing that these articles, the actual

4    guidelines reference articles that don't even describe what's

10:02:33  5    going on with the Bard devices.  That's why it's so unfair to

6    have these, without -- I can -- this would be a mini trial.  I

7    should be able to go through every article and establish these

8    SIR guidelines will not tell you what's going on with the Bard

9    filter.

10:02:48 10         THE COURT:  I think you just asked those questions.

11   But, okay.  I understand your point.

12         What you're arguing is that you should be able to go

13   into cephalad migration death evidence.

14         MR. LOPEZ:  Because the SIR guidelines do not address

10:03:00 15   that.  This jury thinks a .12 percent risk of death is

16   acceptable to the Society of Interventional Radiologists

17   because the Society of Interventional Radiologists do not know

18   about the 20-something deaths that happened with the migration

19   of the filter.  Migration of filter after a clot hits it and a

10:03:25 20   it failing after that.  Because it's not covered.  It's not

21   there.

22         THE COURT:  Okay.  I think I understand your point.

23         What's the response?

24         THE COURT REPORTER:  I can't hear Mr. Condo at all.

10:03:44 25         MR. CONDO:  We're trying to do a word search for the

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:03:46   1    Wong transcript to see if the word "death" appears.

           2            THE COURT:  I'm pretty sure it was covered; I've got

           3    it in my notes.

           4            MR. CONDO:  I know you did.  That's why Ms. Helm was

10:03:56   5    just --

           6            MR. LOPEZ:  Can I get a drink of water real quick,

           7    Judge?

           8            THE COURT:  No.  Yes.

           9            What are you searching?

10:06:12  10            MS. HELM:  You know how I get the transcript of the

          11    video that's being played and read through it?  I'm

          12    word-searching the transcript.

          13            THE COURT:  My memory is that she talked about the

          14    statistically significant difference in death rates.

10:06:25  15            MR. LOPEZ:  It's at the bottom.

          16            THE COURT:  Okay.  Listen.  How I rule on this is not

          17    going to affect what you bring out with Dr. Grassi.  He

          18    doesn't know about the Bard cephalad migration deaths; right?

          19    Your argument that it's opened the door, it seems to me, is

10:06:39  20    other evidence that you would put it if I agreed with you.

          21            MR. LOPEZ:  He does know about it.  He knows about

          22    it.  He's been deposed ten times.  I mean, he knows about it.

          23    He knows that this article --

          24            THE COURT:  Well, okay.  If you want me to rule now,

10:06:55  25    I'm not persuaded that your questions limiting the SIR

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:07:00  1    guidelines to procedural deaths has opened the door to your

       2    bringing in non-procedural deaths.  And that is essentially

       3    the argument.

       4            I understand your broader argument, that you think

10:07:12  5    the jury is being misled by the SIR guideline's references to

       6    death if they don't know about the cephalad migration deaths.

       7            I want to think about that and think about whether

       8    Wong opens that door.  But I've got to go back and look in

       9    more detail at Wong.  So I'm not going to say you've opened

10:07:31 10    the door now and you can go into cephalad migration deaths

      11    with Dr. Grassi.  What I will say is you can, as you were

      12    about to do, because my memory is that she referred to

      13    statistically significant increase in death rates, ask that

      14    question about Wong.

10:07:46 15            MR. LOPEZ:  Right.  It's in there.  I wasn't sure it

      16    was --

      17            MS. REED ZAIC:  I can't make it bigger, I'm sorry.

      18    And there's a second reference.  153 and 158.

      19            THE COURT:  So I'm going to allow you to do what you

10:08:08 20    were about to do, but you shouldn't go into cephalad migration

      21    deaths until we have addressed this further.

      22            MR. LOPEZ:  Okay, Your Honor.

      23        (Bench conference concludes.)

      24            THE COURT:  Thank you for your patience, ladies and

10:08:20 25    gentlemen.  We will continue.

CROSS-EXAMINATION – CLEMENT GRASSI, MD

10:08:22  1  BY MR. LOPEZ:

2  Q   Dr. Grassi, I want you to assume there's been testimony in

3  this case that Bard had done a statistical analysis of the

4  Recovery filter in the early months it was on the market and

10:08:49  5  had determined that there was a statistically significant

6  increased risk of fatalities with the Recovery filter compared

7  to a number of other filters that were on the market at the

8  time, including the Simon Nitinol filter.

9        Can you assume that for me?

10:09:08 10        I'm just asking you to assume that's true for the

11  purposes of my next question.  Okay?

12  A   I'll --

13  Q   Is that --

14  A   Go ahead.

10:09:15 15  Q   Is that -- is that information contained in the 2001,

16  2003, or 2016 SIR article?  Articles.

17  A   Is that specific information, which I would imagine from

18  your description is internal company-conducted tests and

19  trials, would not be included in the IVC filter guidelines

10:09:44 20  published by the SIR, nor would I expect it to be.

21  Q   I want you to assume further that there's been evidence in

22  this case that with respect to the G2, G2X, and Eclipse filter

23  that with respect to caudal migration that the company

24  determined that, based on what was being reported to them by

10:10:06 25  doctors, not medical literature but by doctors to the company,

CROSS-EXAMINATION – CLEMENT GRASSI, MD

10:10:11  1  posed an unacceptable risk of serious injury to patients,

2  would you find that by looking at the SIR guidelines in any

3  year that they were published?

4  A    Again --

10:10:24  5  Q    Sir, can you just answer that yes or no.  Would you find

6  that information in the SIR guidelines?

7  A    I think it's clear, as you can see the guidelines with

8  myself, that that information is not contained in the SIR

9  guidelines.

10:10:37  10  Q    So your answer is no, you would not find them in any of

11  these articles we've been discussing; true?

12       Sir, true?

13  A    You're going to have to please repeat your question

14  because you asked me if --

10:10:48  15  Q    I'll go on to my next question.

16  A    -- if it would be found, and what I'm trying to explain

17  just carefully and accurately, it is not found in reading

18  these guidelines.

19  Q    And if a company was selling a device that it had

10:11:06  20  determined had design flaws that were increasing the risks of

21  those complications that are discussed in the SIR guidelines,

22  you wouldn't find that by looking in the SIR articles, would

23  you?

24  A    It is not contained in the guidelines, that's correct.

10:11:20  25  The guidelines were not intended to publish that type of

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:11:23   1   information.

2   Q   Now, Mr. Condo pointed out that in the Fracture section

3   for the 2001 guidelines article, filter fracture, there were

4   two references.  Right?  17 --

10:11:43   5           MR. LOPEZ:  Can we go to the references, please,

6   Felice, so we can show -- well, first of all, go to Table 2

7   and -- there you go.

8   BY MR. LOPEZ:

9   Q   And references 17 and 24, do you see that?

10:12:05  10   A   Under --

11   Q   It has --

12   A   Under --

13   Q   It has two references.

14   A   Under the third line, filter fracture; is that right?

10:12:13  15   Q   Again, this is not a threshold rate, this just happens to

16   be what this large group of your colleagues over a two year

17   period of time scanning the world literature, correct, found

18   two articles they thought was relevant to filter fracture.

19   True?

10:12:31  20   A   That's correct on this category, yes.

21   Q   And that was -- I mean, you looked everywhere to see what

22   you could find out about filter fracture and you found two

23   articles; right?

24   A   These were the two articles which were considered to be

10:12:45  25   the most relevant and they were used as the citation.

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:12:50  1    Q    So if I was a practicing radiologist from 2001 until 2016

       2    and I was going to look at these guidelines to see what's the

       3    history of fractures with filters, Dr. Grassi and his

       4    colleagues, and later some other doctors who wrote these,

10:13:09  5    would refer them to reference number 17 and number 24;

       6    correct?

       7    A    Yes.

       8         MR. LOPEZ:  Can we go to the Reference section,

       9    Felice, please, and show the jury what 17 and 24 are.

10:13:23 10    BY MR. LOPEZ:

       11    Q    Reference 17 is an article by a Dr. Ferris and a

       12    Dr. McCowan; correct?

       13    A    Correct.

       14    Q    And the next reference is an article by Dr. McCowan.

10:13:58 15    A    Correct.

       16    Q    Actually, it looks like written by the same two

       17    physicians, looks like they just reversed who was going to be

       18    first, right, in these articles?

       19    A    Tim McCowan and Ernie Ferris, each of whom I know, each

10:14:14 20    had a long-standing interest in IVC filters and were active in

       21    the field.

       22    Q    Let's look at the --

       23         MR. LOPEZ:  Can we have Exhibit 1215 -- I'm sorry,

       24    Exhibit 3608.

10:14:26 25         Can you show that to Dr. Grassi, please.

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:14:30  1  BY MR. LOPEZ:

2  Q   This is one of the articles that was a reference to the

3  fracture rate that doctors could refer to to find out what was

4  going on with filter fractures; right?

10:14:44  5  A   This is one of the articles that was referenced.

6         MR. LOPEZ:  Can we just highlight for doctor -- so

7  both Dr. Grassi and I can read the top part of that.

8  BY MR. LOPEZ:

9  Q   This involves the Simon Nitinol -- the Simon Nitinol

10:14:58  10  filter; correct?

11  A   It does.

12  Q   And this was -- it involved 20 patients; right?

13  A   It did involve 20 patients.

14  Q   And there was a followup of an average of 14 months in 16

10:15:18  15  of the patients; true?

16  A   Yes.

17  Q   And they found delayed fracture of a filter, after having

18  gone back and looked, of two patients; true?

19  A   Yes.

10:15:29  20  Q   That's the ten percent fracture rate that doctors think

21  has been reported in the literature; true?

22  A   It was two out of ten patients or a rate of ten percent in

23  his article.  That's what it appears to be.

24  Q   Now, this article was written in 1992; right?

10:15:50  25  A   Yes, in the JVIR.

CROSS-EXAMINATION – CLEMENT GRASSI, MD

10:15:54   1   Q   What does Bard have in its internal files going down

2   ten-plus years, almost 20 years, past 1992, about the fracture

3   rate of the Simon Nitinol filter?

4           MR. CONDO:  Foundation and exceeds scope of direct.

10:16:14   5           THE COURT:  Overruled.

6   BY MR. LOPEZ:

7   Q   Do you know?

8   A   I can't comment on that because I'm not privy to a company

9   or other proprietary data.

10:16:23  10   Q   What changes did NMT, the predecessor to Bard, make to the

11   Simon Nitinol filter to improve its fracture rates?  Do you

12   know?

13   A   Well, what I know --

14   Q   Sir, do you know what changes were made to the Simon

10:16:38  15   Nitinol filter that improved its design and fracture rates?

16   A   Yes, I'm trying to answer your question.

17   Q   Okay.

18   A   It's my understanding that the Simon Nitinol filter was

19   treated, a surface coating.  That was one of the steps that

10:16:59  20   was taken in the refinement of the device in an effort to

21   prevent biocompatible reactions and also give it more

22   resistance as an improved or upgrade to the device,

23   improvement, I should say, or upgrade to the device to give it

24   more fracture resistance.

10:17:21  25   Q   And did either one of the two fractures in this study

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:17:24  1   migrate to a patient's heart or lung?

2   A   From looking at the abstract, it does not appear that that

3   occurred.

4   Q   Okay.  Again, do you know what the current reported

10:17:44  5   fracture rate is for the Simon Nitinol filter as of 2003 or

6   '4?

7   A   Well --

8   Q   Sir, do you or don't you?

9   A   Yes.  Again, I'll try to answer that question.  The Simon

10:18:01 10   Nitinol filter, as you know, is a earlier type device, not in

11   active clinical use now as it had been.  And there have been a

12   variety of reports on complications, including fracture rates,

13   of the Simon Nitinol filter.

14       It's my understanding that after some of the

10:18:23 15   refinements, such as the electropolishing, of the Simon

16   Nitinol filter occurred, that its fracture rate decreased.

17   There have been reports, if I'm correct, of as high as 7 to

18   9 percent by some investigators.

19   Q   Sir, let me ask you this:  Has Bard shown you any of their

10:18:43 20   internal documents regarding the complication rates that are

21   being reported to them by other doctors, colleagues of yours?

22   Have they shown you any of that data?

23   A   No, they have not shown it to me.

24   Q   Have they shown you any data about what their -- what --

10:18:58 25   they're tracking and trending the Simon Nitinol filter.  What

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:19:02  1   their reported rate is for fractures in the Simon Nitinol

       2   filter, have they shown you that data?

       3   A   No.  I would not be --

       4   Q   Have they shown you any data that -- where the fracture

10:19:14  5   rate is .006 percent fractures for the Simon Nitinol filter?

       6   Have you seen that data?

       7   A   No.

       8   Q   And you wouldn't know about that data by reading any of

       9   the SIR guidelines; true?

10:19:31 10   A   Well, that information's not contained in these

      11   guidelines, that's correct.

      12        MR. LOPEZ:  Can we look at Exhibit 3614.

      13   BY MR. LOPEZ:

      14   Q   This is the -- instead of McCowan-Ferris, it is the

10:19:45 15   Ferris-McCowan article; correct?

      16   A   That's correct.  In this first article Dr. Ernie Ferris in

      17   the study of 320 patients was the lead author.

      18   Q   And that was in 1992 was the first one and this one is

      19   1993; correct?

10:20:03 20   A   Yes.

      21   Q   And this is a little larger study.  It involved 320

      22   patients; right?

      23   A   Yes.  This was a significant study at the time.

      24   Q   Was this a retrospective study?

10:20:17 25   A   Let me refresh my memory on that, please, if I can refer

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:20:22  1    to it.

2             And if I might be able to see page 2.

3    Q    Okay.

4    A    And would it be possible to go back, please, to page 1?

10:20:41  5    Q    Sure.  If you need any of it blown up, just let me know.

6             In fact --

7    A    So that on page 1 under the Materials and Methods it

8    states from April 1985 through June 1992, 324 IVC filters were

9    inserted in 320 patients at University hospital of the

10:21:11 10   University of Arkansas for medical sciences.  And without

11   reading further, this would seem to indicate it was a cohort

12   study of that group of patients.  Meaning the number of

13   patients that they saw over that period of time are reported

14   on as a group in this publication.

10:21:41 15   Q    How many fractures were reported in this study?

16   A    In your question, if you could be more specific --

17   Q    Let me ask this question --

18   A    -- which filter?

19   Q    Let me ask the question differently.

10:21:53 20        How many fractures reported in this study, which was

21   like 20, 25, 30 years ago, involved a strut, piece of metal

22   from the filter, migrating beyond the site of the filter

23   itself and going into patient's hearts or lungs?

24   A    Obviously it's very difficult for me to answer that

10:22:17 25   question because that involves drilling down in a fine level

CROSS-EXAMINATION – CLEMENT GRASSI, MD

10:22:21  1    of detail.  That would probably be the kind of question you'd

2    have to direct to Dr. Ferris or Tim McCowan.

3    Q   All right.  What's reported -- these are one of your

4    references that was reported.

10:22:34  5         It's true that neither the article we just looked at

6    nor this article describes a fracture that goes beyond the

7    site of the filter and embolizes into a patient's heart or

8    lung; true?

9    A   I'll take your word for that.

10:22:49 10         MR. LOPEZ:  Can we go to the last page.  It's

11   actually not the last page.  Page 855 of the article.

12         Go back.  I'm sorry.  Right before that.  In the

13   middle column.  Beginning with the words "some" down -- right

14   there.  "Some complications occur many days or years after

10:23:21 15   filter placement."

16         There you go.  You were just there.

17   BY MR. LOPEZ:

18   Q   Doctor, see where I am here?  This is the end of this

19   article.  This is one of the articles you reference for

10:23:37 20   fractures; right?

21   A   This was referenced.

22   Q   "Some complications occur many days or years after filter

23   placement and many complications such as filter fracture,

24   migration, and caval perforation can be asymptomatic."

10:23:51 25        Did I read that correctly?

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:23:52  1    A    You did.

        2    Q    "In view of these facts, in patients with short life

        3    expectancies, such as those with terminal malignances,

        4    long-term filter complication rates may be less important than

10:24:02  5    ease and safety of insertion.

        6         "In patients with longer expected life spans, the

        7    lack of delayed complications becomes more important.  We

        8    believe continuous long-term followup, both clinical and

        9    radiologic, of these permanently implanted devices is

10:24:18 10    essential.

       11         "A national filter registry or multicenter study of

       12    IVC filters might help resolve some of the unanswered

       13    questions regarding filter efficacy and safety."

       14         Did I read that correctly?

10:24:31 15    A    You did.

       16    Q    And that was something that was written in 1993; correct?

       17    A    Yes.  And as you know, the Preserve trial registry is

       18    being conducted now.

       19         MR. LOPEZ:  All right.  Move to strike the last

10:24:45 20    portion of his answer.

       21         THE COURT:  Sustained.  Nonresponsive.

       22    BY MR. LOPEZ:

       23    Q    If I were to go through many of the references in this

       24    2001 article that Bard has used to compare its rates as

10:25:04 25    acceptable rates, would I find more and more --

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:25:09  1            THE COURT:  Hold on just a minute.

        2            MR. CONDO:  I think that's a comment on the evidence.

        3    Also argumentative.

        4            THE COURT:  Hold on just a minute.

10:25:22  5            Restate the question would you, please, Mr. Lopez.

        6            MR. LOPEZ:  Could we look at Dr. Grassi's article,

        7    Trial Exhibit 7039.  Just go to the last page.

        8            Go to the first page first and have him acknowledge

        9    he wrote this article in 1990.

10:25:42 10            THE WITNESS:  Yes.

       11            MR. LOPEZ:  And can we go to the last page,

       12    Conclusion portion of this.

       13            Right there.

       14    BY MR. LOPEZ:

10:26:08 15    Q   Doctor, this is an article you wrote.  No co-authors, this

       16    is Dr. Clement Grassi's statement in 1990; correct?

       17    A   Yes, this was an invited review article which I wrote for

       18    the American Journal of Radiology.

       19    Q   "Conclusions.  A group of new, smaller percutaneous filter

10:26:27 20    devices are now available, each with its advantages and

       21    disadvantages as described.  The ideal vena cava filter is not

       22    yet available."

       23            Did I read that correctly?

       24    A   You did.

10:26:38 25    Q   "Further clinical trials of these devices with randomized

CROSS-EXAMINATION – CLEMENT GRASSI, MD

10:26:43  1  prospective study are necessary in order to further refine the

2  existing filters and to assist in the development of a filter

3  that will be superior for the prevention of pulmonary

4  embolism.  Until that time, the choice of an IVC filter from

10:26:55  5  those available should be based not only on interventional

6  radiologist's preference, but also on the specific clinical

7  situation and the filter's performance."

8       Did I read that correctly?

9  A  Yes.

10:27:06  10  Q  Filter performance meaning the device's best safety

11  profile and effectiveness; true?

12  A  Well, filter performance, in fairness, would include

13  several factors, and safety and effectiveness would be two of

14  those.

10:27:23  15  Q  So 1990 Dr. Grassi, Dr. Grassi, and some of his colleagues

16  he cited in his article in 2003 are telling industry that they

17  need to do some clinical trials so we can find out how

18  effective or maybe how dangerous these devices are; true?

19  A  No, counselor.  My comments in this article are directed,

10:27:48  20  as you can see in the next to last sentence, to interventional

21  radiologists.  This was not a commentary to industry.  I would

22  not presume to comment to industry as to what they should be

23  doing or not doing.  I can comment on my practice as a doctor,

24  as an interventional radiologist.

10:28:08  25  Q  We heard some testimony in this trial about call to arms

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:28:12  1  or call to action about pulmonary embolism.  Are you familiar

2  with that document?  The Surgeon General document?

3  A  I've certainly heard of those types of health discussions

4  for the benefits of patients, yes.

10:28:28  5  Q  Let me ask you this question, Doctor.  Based on the

6  literature reviewed as an interventional radiologist, if I

7  were to -- there are a number of articles where there's been a

8  call to arms or call to action for industry to please do a

9  study for IVC filters to see whether or not they work and to

10:28:45 10  tell us how dangerous they might be if we leave them in

11  patients longer than six months, a year, two years.  True?

12  A  Yes.  And that registry, the Preserve trial's, being

13  conducted now.

14  Q  A little too late for people who didn't get a Denali

10:29:04 15  filter; right?  In other words, a little too late for people

16  who got filters before the Denali filter and other filters

17  currently on the market; true?

18          MR. CONDO:  Argumentative.

19          THE COURT:  Sustained.

10:29:17 20  BY MR. LOPEZ:

21  Q  Sir, the Preserve trial you're talking about started when?

22  A  It started approximately a year and a half ago.  The date

23  I would have to check exactly when Dr. Matt Johnson began with

24  that Society of Vascular Surgery and Society of Interventional

10:29:32 25  Radiology, but it's been a more recent trial registry.

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:29:38  1  Q   And that study is not going to involve the G2, the G2X,

2  the Eclipse, the Recovery filter; true?

3  A   Well, as you know, it involves --

4  Q   Sir, does it involve those four devices?

10:29:48  5  A   It doesn't because it involves more modern filter designs.

6  Q   Those devices are now off the market; correct?

7  A   Well those devices have had upgrades and refinements to

8  the ones that are currently used by myself and others.

9  Q   For safety reasons.

10:30:06  10  A   Well, for a variety --

11  Q   Was safety one of the reasons why they were upgraded or

12  redesigned?

13  A   No, I can't comment on that particular point.  What I can

14  say is with any device and with technology in general, there

10:30:23  15  are improvements and refinements that occur in multiple

16  things, and filter devices are just one of those.

17       THE COURT:  All right.  We're going to break at this

18  point.  We will resume at 14 minutes to the hour.

19       We'll excuse the jury.

10:31:06  20     (Recess taken from 10:31 to 10:45.)

21       THE COURT:  Thank you.  Please be seated.

22       You may continue, Mr. Lopez.

23       MR. LOPEZ:  Thank you, Your Honor.

24  BY MR. LOPEZ:

10:46:48  25  Q   Dr. Grassi, I'm going to show you Exhibit 7084.  It will

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:46:54  1   be on your screen.  And I'll represent to you this is one of

2   the articles that you reference in your report as having been

3   an article you reviewed in preparation of your expert witness

4   report.

10:47:04  5             Do you recognize the article?

6   A    Yes.

7   Q    And this article was published in the Journal of Vascular

8   and Interventional Radiology; correct?

9   A    Yes.

10:47:20  10   Q    And these articles are peer reviewed and it is an

11   authoritative journal?

12   A    Yes.

13   Q    Do you know Matthew Johnson?

14   A    I do know Matt, yes.

10:47:31  15   Q    How do you know Matthew Johnson?

16   A    As a colleague and knowing him through SIR and I know him

17   for his work in the midwest.

18   Q    Is his article -- is this 2012 article referenced in any

19   of the SIR articles that we've been talking about?

10:47:53  20   A    I would have to double check because this --

21   Q    If you don't know, that's fine.  Just wondered if you

22   knew.

23   A    This invited commentary was in 2012, so I would have to.

24   Double check where it was referenced.

10:48:07  25   Q    Okay.  No problem.

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:48:10  1        We just talked about 1992 and 1993 with those

       2  articles; right?  Those were fracture articles.  We're going

       3  to fast forward 20 years to 2012.

       4        MR. LOPEZ:  Could we look at twenty -- the next page.

10:48:29  5        And go all the way down here.

       6  BY MR. LOPEZ:

       7  Q   As your colleague, Dr. Johnson, wrote in 2012 in this

       8  journal that "Rather than develop aggressive techniques for

       9  the removal of fractured filters, it would seem more

10:49:08  10 appropriate to try to prevent that complication and other

       11 complications to the greatest extent possible."

       12       Do you agree with that?

       13 A   I believe --

       14 Q   Do you agree with the statement or don't agree with the

10:49:22  15 statement?  That's all I'm asking you right now.

       16 A   Well, I would in fairness have to ask from you what he

       17 meant by "aggressive techniques."

       18       I suspect Matt Johnson writing this means advanced

       19 techniques because we tend to separate filter retrievals into

10:49:38  20 conventional techniques and then other assisted techniques,

       21 such as laser, which has been performed by other doctors, such

       22 as you know Dr. William Kuo.

       23       So in answering this question, I do agree with his

       24 approach that it's important to prevent complications with

10:49:57  25 filters.  But at the same time, in my own practice, I feel

CROSS-EXAMINATION – CLEMENT GRASSI, MD

10:50:03  1   that removing them with --

2              MR. LOPEZ:  Your Honor, beyond the scope.  Objection.

3              THE WITNESS:  -- judgment is employment --

4              THE COURT:  I think he's trying to respond.

10:50:14  5         If you want him to answer a question yes or no, ask

6   him to.

7              If he asks you to, Dr. Grassi, either answer yes or

8   no, or, if you can't answer yes or no, tell him you can't.

9              All right.

10:50:22  10             MR. LOPEZ:  I'm going to withdraw the question and

11   ask the question again.

12             THE COURT:  You can move on to another question.

13   BY MR. LOPEZ:

14   Q   I'm going to ask him whether or not Dr -- your colleague,

10:50:33  15   Dr. Johnson, wrote, "Rather than develop aggressive techniques

16   for the removal of fractured filters, it would seem more

17   appropriate to try to prevent that complication and other

18   complications to the greatest extent possible."

19             Did he write that in 2012?

10:50:49  20   A   Yes.

21   Q   And did Dr. Johnson also write "To that point, it is

22   important to note that the fractured filters removed in both

23   of the studies were almost exclusively filters marketed by

24   Bard Peripheral Vascular, Tempe, Arizona."

10:51:07  25             Did I read that correctly?

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:51:08  1    A    You did.

2    Q    "13 of 15 in the study of Dinglasan, et al., and 63 in the

3    study of Vijay, et al.  Both articles describe removal of not

4    only Recovery filters but also of G2 filters, and the latter

10:51:22  5    article also describes removal of fractured G2 Express

6    filters."

7              Did I read that correctly?

8    A    Yes.

9    Q    "Although fracture is not a complication exclusive to Bard

10:51:32 10   filters, review of the literature suggests that they fracture

11   at a much higher rate than do other filters."

12             Did I read that correctly?

13   A    You do.

14   Q    Have you ever talked to Dr. Johnson about this?

10:51:51 15   A    I have talked to him about subjects of filters, but not

16   this particular detail point.

17   Q    All right.  Now, would you expect that a medical device

18   manufacturer would undertake to study its own safety issues

19   regarding its own products?

10:52:06 20             MR. CONDO:  Objection.  Foundation.  Beyond the

21   scope.

22             THE COURT:  I think foundation needs to be laid.

23   BY MR. LOPEZ:

24   Q    Let me move on to another question.

10:52:16 25             You were not given open access to Bard's database of

CROSS-EXAMINATION – CLEMENT GRASSI, MD

10:52:19  1  internal documents; correct?

2  A    Correct.

3  Q    Yet you're here to talk about complication rates and the

4  various rates of complications and risks and those sorts of

10:52:29  5  things with respect to IVC filters; correct?

6  A    Yes.

7  Q    And you know that Bard, just like all device

8  manufacturers, is required to maintain detailed information

9  about the injuries and complications caused by their filters.

10:52:44  10  True?

11  A    Yes, as I understand, they are.

12  Q    And you haven't been provided access to any one of those;

13  correct?

14  A    No, I've not been provided any of that company-specific

10:52:54  15  information.

16  Q    And you understand that the plaintiffs, the people -- the

17  lawyers that are representing Mr. and Mrs. Hyde have provided

18  that information to our experts for their testimony and

19  opinions.  Do you understand that?

10:53:13  20  A    I would take your word for that statement, counselor.

21  Q    And so Bard or its lawyers have not shared with you their

22  health hazard evaluation documents regarding their retrievable

23  filters?

24  A    No.

10:53:30  25  Q    They've not shared with you their bench testing results;

CROSS-EXAMINATION - CLEMENT GRASSI, MD

10:53:33  1    true?

2    A    True.

3    Q    They've not shared with you their complaint files, I just

4    asked you that.   True?

10:53:40  5    A    True.

6    Q    They've not shared with you their root cause analysis for

7    filter fracture, perforation, migration, or tilt, have they?

8    A    No, they have not, nor have other manufacturers.

9    Q    I know.   We're talking about Bard in this case; right?

10:53:55  10         And they have not shared with you the statistically

11   significant comparative analysis of complications that various

12   of their stat -- biostatisticians have performed in comparing

13   their devices to competitive devices and to the original

14   predicate device, the Simon Nitinol filter; true?

10:54:15  15   A    Correct, I've not received any of that company

16   information.

17   Q    Do you expect device manufacturers would adequately test a

18   product before it puts it on the market?

19        MR. CONDO:   Your Honor, objection.   No foundation.

10:54:40  20   Exceeds the scope.

21        THE COURT:   Sustained on exceeds the scope.

22   BY MR. LOPEZ:

23   Q    And I think -- I'm not sure Mr. Condo asked you this

24   question, but you would agree that the SIR guidelines, whether

10:55:06  25   they're the 2001, the 2003, the 2016 article, are not intended

REDIRECT EXAMINATION - CLEMENT GRASSI, MD

10:55:14  1   as an instruction manual for the design and marketing and

2   manufacturing of devices for manufacturers; true?

3   A   That's true.  They were intended as guidelines.

4   Q   Sir, would you agree that -- I'm not going to name them

10:55:52  5   all, but the ones discussed today, the SIR guidelines do not

6   provide any information about the reported rates that might be

7   influenced by design flaws in any Bard product; true?

8   A   No, I couldn't say that.  I would have to simply say that

9   they report the rates and the events as described in the

10:56:18 10   literature.  I could only word it as simply as that.

11   Q   So if you wanted to find out anything about whether or not

12   a company was complying with federal regulations, industry

13   standards, testing thresholds, insuring that a device was safe

14   before it went on the market, you could not find that

10:56:38 15   information in the articles that Mr.-- that you and Mr. Condo

16   discussed during your direct examination; true?

17   A   True, because those documents were intended as guidelines

18   not to address the points that you mentioned.

19        MR. LOPEZ:  Those are the only questions I have at

10:57:01 20   this time, Your Honor.

21        THE COURT:  Redirect.

22        MR. CONDO:  Yes, Your Honor.

23        R E D I R E C T   E X A M I N A T I O N

24   BY MR. CONDO:

10:57:22 25   Q   Dr. Grassi, let me follow up on the last series of

REDIRECT EXAMINATION - CLEMENT GRASSI, MD

10:57:26  1    questions.

2         When the Society of Interventional Radiology

3    undertook its two-year survey of the published medical

4    literature and then when it subsequently updated the SIR

10:57:37  5    guidelines in 2016, did the SIR or the American College of

6    Radiologists have access to the databases, complaint files,

7    internal reporting records, of any IVC manufacturer?

8    A    No, they did not, to the best of my knowledge.

9    Q    And are the SIR guidelines that were published in both

10:58:09  10    2001 and 2016 intended to educate and inform persons who plant

11    and retrieve IVC filters?

12    A    Yes.

13    Q    And that includes doctors who plant -- implant and

14    retrieve Bard filters; correct?

10:58:26  15         MR. LOPEZ:  Objection.  Leading.

16         THE WITNESS:  Yes.

17         THE COURT:  Hold on a minute.

18         Sustained.

19    BY MR. CONDO:

10:58:31  20    Q    Does that include doctors who implant and retrieve Bard

21    IVC filters?

22    A    Yes, it does.

23    Q    Is there anything in the SIR guidelines that tells doctors

24    who implant Bard filters that these thresholds don't apply or

10:58:54  25    should not apply in their individual clinical practices?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

10:58:57   1   A   No, there isn't.

2   Q   Are they in fact intended to apply in Bard -- in clinical

3   practices where doctors implant and retrieve Bard filters?

4   A   Yes.

10:59:09   5         MR. CONDO:  Thank you.  I have no further questions.

6         THE COURT:  Okay.  Thanks.  You can step down,

7   Doctor.

8         MR. ROGERS:  Your Honor, at this time the defendants

9   call Dr. Christopher Morris.

10:59:44  10         THE COURTROOM DEPUTY:  Dr. Morris, if you would

11   please stand right here and raise your right hand.

12         **CHRISTOPHER MORRIS, MD,**

13   called as a witness herein, after having been first duly sworn

14   or affirmed, was examined and testified as follows:

11:00:29  15         D I R E C T   E X A M I N A T I O N

16   BY MR. ROGERS:

17   Q   Morning, Dr. Morris.

18   A   Morning.

19   Q   Happy Friday.

11:00:35  20   A   Thank you.

21   Q   Doctor, can you tell the jury what your profession is,

22   please.

23   A   I'm an interventional radiologist.

24   Q   Where do you work?

11:00:44  25   A   I work at the University of Vermont Medical Center.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:00:47  1   Q   And can you describe for the jury your educational

2   background.

3   A   Yes.  I went to Case Western Reserve University School of

4   Medicine in Cleveland.  Graduated from there in 1985.  Year

11:01:01  5   after that, I spent a year doing my internship at the same

6   institution in Cleveland.

7          And then I traveled to Ohio State University Hospital

8   where I did my diagnostic radiology residency for four years.

9          After that I did my interventional radiology

11:01:17  10  fellowship at Massachusetts General Hospital in Boston.

11         And then I have since then been at the University of

12  Vermont ever since, starting in 1991.

13  Q   Doctor, in addition to your medical degree, do you also

14  have a masters of science?

11:01:32  15  A   Yes, I do.

16  Q   What is that in?

17  A   That's in radiological sciences with an emphasis in

18  radiation physics and radiobiology.

19  Q   The jury has heard somewhat about the difference between

11:01:48  20  diagnostic radiology and interventional radiology.  Would you

21  mind explaining that again.

22  A   Certainly.  Diagnostic radiology is involved with making

23  diagnoses by interpreting medical imaging.  That includes

24  things like X-rays and CT scans, MRI scans, ultrasound

11:02:07  25  studies.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:02:08  1          Interventional radiologists are also diagnostic

2    radiologists but we have done further training to use imaging

3    as a guidance tool to perform minimally invasive procedures

4    such as biopsies, drainages, angiograms, IVC filter

11:02:27  5    implantations and retrievals.  Those types of procedures.

6    Q    How many years have you been practicing as an

7    interventional radiologist?

8    A    I've been at the University of Vermont for a little over

9    27 years.

11:02:42  10   Q    And so as part of your responsibilities there, do you

11   teach?

12   A    Yes, I do.

13   Q    And explain to the jury what you do.

14   A    Well, we have a very active residency program in

11:02:52  15   diagnostic radiology.  I was the residency director for that

16   program for a number of years.

17          I've also been the director of our fellowship program

18   in interventional radiology, and we teach fellows, who are the

19   radiologists that go on to learn specialized training in

11:03:10  20   interventional radiology.

21          I also, throughout my career, have taught medical

22   students because we have a medical school at the same

23   institution, as well as other residents from other services

24   such as surgery and internal medicine, pediatrics, OB-GYN.

11:03:30  25          I serve not only as professor of radiology but I'm

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:03:33  1   also professor of surgery.

2   Q    Doctor, are you board certified?

3   A    Yes, I am.

4   Q    In what areas, please.

11:03:38  5   A    I have a dual certificate in diagnostic radiology and

6   interventional radiology.

7   Q    Are you a member of any professional societies?

8   A    Yes.

9   Q    And can you tell the jurors what are some of the main

11:03:49  10  professional societies --

11  A    Society of Interventional Radiology, American College of

12  Radiology, Radiological Society of North America,

13  International Society of Peritoneal Dialysis.

14  Q    And, Doctor, is there something called a senior fellow

11:04:07  15  within the society of interventional radiologists?

16  A    Yes, there is.

17  Q    And can you tell the jury what that is.

18  A    Well, I'm not quite sure it's designated a senior, but

19  there is a fellow, fellowship award, in interventional

11:04:20  20  radiology.  I think less than ten percent of the members of

21  the Society of Interventional Radiology become fellows.  And

22  that is basically just an honorary designation for those

23  members that have made major contributions to interventional

24  radiology.

11:04:38  25  Q    And are you a fellow of the Society of Interventional

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:04:40  1  Radiology?

2  A   Yes, I am.

3  Q   And, Doctor, have you held any leadership positions within

4  the Society of Interventional Radiology?

11:04:50  5  A   Yes.  For a number years I was on the IVC filter workshop

6  series that is put on at the annual meeting of the Society of

7  Interventional Radiology, and I was the workshop coordinator

8  of that series for three years.

9       I'm also on the Standards Committee of the Society of

11:05:07  10  Interventional Radiology, the Subcommittee on Complications,

11  and as well as a number of other subcommittees such as Renal

12  Tumor Ablation and Women's Intervention, things like that.

13  Q   Doctor, you referenced a moment ago one of the things you

14  do is place IVC filters; is that correct?

11:05:29  15  A   Yes, I do.

16  Q   When did you first start to place IVC filters?

17  A   My first year of residency in radiology, so that would

18  have been 1986.

19  Q   And do you currently maintain a clinical practice?

11:05:42  20  A   Yes, I do.

21  Q   Approximately how many days of the week do you spend in

22  your clinical practice?

23  A   Five days a week.

24  Q   That's seeing patients and performing procedures?

11:05:51  25  A   Yes.  That's full-time interventional radiology.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:05:57  1   Q   And, Doctor, since you started to use IVC filters in your

2   residency, have you continued to do so throughout your career?

3   A   Yes, I have.

4   Q   And do you implant IVC filters currently?

11:06:09  5   A   Yes, I do.

6   Q   And do you currently retrieve IVC filters?

7   A   Yes, I do.

8   Q   And can you estimate for the jury approximately how many

9   IVC filters you would have implanted yourself.

11:06:18  10  A   I would say personally, conservative estimate, more than

11  800.

12  Q   And can you approximate for the jury about how many IVC

13  filters you would have retrieved.

14  A   That's a little bit more difficult to estimate but

11:06:32  15  somewhere between 100 and 200.

16  Q   And have you published in the peer-reviewed medical

17  literature on IVC filters?

18  A   Yes, I have.

19  Q   And can you tell the jurors about one of your more recent

11:06:45  20  articles.

21  A   We had a study that came out in 2017 that was related to

22  our multidisciplinary clinic that evaluates patients that have

23  filters that we placed, and it was related to increasing the

24  IVC filter retrieval rate, which we were able to do by using

11:07:06  25  the multidisciplinary clinic.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:07:09  1  Q   Doctor, are you charging for your time today?

2  A   Yes.

3  Q   And what is the rate at which you're charging for your

4  time?

11:07:15  5  A   I have a flat fee of $500 per hour.

6  Q   And prior to working as an expert witness in IVC filters,

7  have you ever served as an expert witness in any case for C.R.

8  Bard?

9  A   No.

11:07:31  10  Q   Doctor, other than being an expert witness, have you had

11  any other sort of business relationship with C.R. Bard?

12  A   I was a consultant for Bard roughly 15 years ago when

13  retrievable filters were first introduced.  And I did that

14  for -- on a low-key basis for about four, five years.  But I

11:07:55  15  haven't had any relationship since, I want to say, 2006 or so.

16  Q   Doctor, are you going to provide the jury today opinions

17  about IVC filters in general?

18  A   Yes.

19  Q   And you're also going to provide opinions about the G2X

11:08:11  20  and Eclipse filters?

21  A   Yes.

22  Q   Are you going to provide opinions that are specific to

23  Mrs. Hyde, the plaintiff in this case, and her care and

24  treatment?

11:08:21  25  A   Yes.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

| | | |
|---|---|---|
| 11:08:22 | 1 | Q   Doctor, let's start with your general opinions.  And let |
| | 2 | me ask you generally some questions about DVT and PE to begin |
| | 3 | with. |
| | 4 |       And during the course of your career, have you |
| 11:08:34 | 5 | treated patients with those conditions? |
| | 6 | A   Yes, I have. |
| | 7 | Q   And have you had patients that unfortunately have died as |
| | 8 | a result of PE? |
| | 9 | A   Yes, I have. |
| 11:08:47 | 10 | Q   You've seen that in your clinical practice? |
| | 11 | A   Yes. |
| | 12 | Q   And without treatment, if an individual is -- has a DVT, |
| | 13 | what is the risk of that patient for death if they develop a |
| | 14 | pulmonary embolism? |
| 11:09:00 | 15 | A   Studies have shown it's between 26 and 30 percent. |
| | 16 | Q   And are there certain tools that doctors have in order to |
| | 17 | try and treat DVT and PE and prevent PE? |
| | 18 | A   Yes, there are. |
| | 19 | Q   And so what is the primary standard for treating an |
| 11:09:20 | 20 | individual who has got a DVT or PE? |
| | 21 | A   The mainstay treatment is systemic anticoagulation. |
| | 22 | Q   And if you've got a patient who cannot be anticoagulated |
| | 23 | or who has to come off of anticoagulants for some reason, is |
| | 24 | there any alternative treatment for those patients? |
| 11:09:40 | 25 | A   Only known treatment is IVC filtration. |

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:09:48  1   Q   And, Doctor, do you have an opinion to a reasonable degree

2   medical certainty as to whether IVC filters are effective in

3   stopping clots?

4   A   Yes, I do.

11:09:56  5   Q   What is that opinion?

6   A   I believe they are effective.

7   Q   And what is your opinion based on?

8   A   My personal experience, review of the medical literature,

9   as well as discussions at scientific meetings and colloquia.

11:10:11  10  Of that sort.

11  Q   Let's break that down a little bit, if you don't mind, and

12  start perhaps with the medical literature.  Is that good?

13  A   That's fine.

14  Q   And are you aware, Doctor, of any studies which are

11:10:24  15  randomized clinically controlled studies about IVC filters?

16  A   Yes, I know of two of them.

17  Q   What are those studies?

18  A   PREPIC 1 and PREPIC 2.

19  Q   Doctor, the jury heard some about PREPIC 1 and PREPIC 2,

11:10:39  20  but it's been a while.  Let's try to take those one at a time.

21  Can you describe for the jurors what the PREPIC 1 study was

22  and what they did.

23  A   PREPIC 1 was a randomized control trial that came out in

24  1998, and there was also an eight year followup of that study

11:10:55  25  as well.  And it was a French study.  What they did was bring

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:11:01   1    in 400 patients, all of which had proximal DVT, deep vein

2    thrombosis.  Some of them had a PE as well, but not all of

3    them.

4            And then they randomized those patients after giving

11:11:17   5    all of them systemic anticoagulation.  So all 400 got

6    anticoagulation.  Half received one of about four or five

7    different IVC filters and the other half did not receive a

8    filter at all.

9            Then this was very interesting because then at 12

11:11:31   10   days they did imaging to look for pulmonary embolism.  And

11   that included asymptomatic pulmonary emboli as well as

12   symptomatic pulmonary emboli.  And they recorded what that

13   rate was, as well as then following these patients up to two

14   years, and then, of course, the eight-year followup period.

11:11:52   15           It was interesting that they found that although

16   there was no difference in overall mortality, at two years as

17   well as eight years there was a decreased pulmonary --

18   recurrent pulmonary embolism rate with the patients that had a

19   filter, compared to the patients that did not receive a

11:12:13   20   filter.

21   Q   Doctor, to break that down a little bit, the original

22   results of the PREPIC study were published in roughly what

23   year?

24   A   1998.

11:12:21   25   Q   Then the followup study that you referred, to when was

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:12:23  1   that published?

2   A   It was -- the follow up was about eight years after, but

3   the actual paper came out I think like 9 or 10 years after the

4   original study.

11:12:34  5   Q   And so for your practice in treating patients with the DVT

6   and PE, what did the results of the PREPIC 1 study mean to

7   you?

8   A   Well, it meant to us that filters do decrease the

9   recurrent pulmonary embolism rate.

11:12:48  10  Q   And so, Doctor, let's move on to the PREPIC 2 study.  And

11  can you describe for the jurors the design of that study.

12  A   The PREPIC 2 study was a similar design but not quite, and

13  I'll tell you what the distinction was.  It was more recent,

14  it was published in I believe 2012 or '14 or something like

11:13:12  15  that.

16          It was one single retrievable filter called the ALN.

17  It was also a French study.  The ALN filter is a French

18  filter.  And they also looked at 400 patients.  All of them

19  had PE this time.  And they also had to have a few other

11:13:31  20  selection criteria to enter into the study.

21          They were all anticoagulated.  About half of them

22  received this ALM retrievable filter and the other half

23  didn't.

24          The difference is, though, in this PREPIC 2 they did

11:13:48  25  not look for -- asymptomatic pulmonary emboli.  They only

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:13:53  1    looked for symptomatic pulmonary emboli at two months and at

2    six months.

3            And, by the way, PREPIC 1 as well as PREPIC 2, do not

4    really simulate real world conditions in the sense all these

11:14:08  5    patients were anticoagulated.  Most of our patients we place a

6    filter in are those that can't be anticoagulated.  So that is

7    a distinction as well.

8            But in the PREPIC 2 study, they did not find a

9    difference, significant difference, or decrease in the

11:14:24 10    pulmonary embolism rate, symptomatic pulmonary embolism rate,

11    of the patients that received the filter compared to ones that

12    did not receive the filter.

13            They weren't looking for all the asymptomatic

14    pulmonary emboli.

11:14:37 15    Q    So in the PREPIC 1 study, Doctor, the first one done, what

16    types of filters did that involve?

17    A    There were about four or five different ones.  They were

18    all permanent filters such as the Greenfield and the VenaTech,

19    the two biggest ones, I believe, that they used.

11:14:56 20    Q    That was a French study?

21    A    French study.

22    Q    Both of these studies were French studies?

23    A    Yeah, both of them were multi-center French studies.

24    Q    Do you recall the VenaTech filter was involved in both of

11:15:07 25    these?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:15:08  1   A   Yes.  No.  Only in the first one, PREPIC 1.

       2   Q   Okay.  And the PREPIC 2 study, did it involve retrievable

       3   filters.

       4   A   It was only one single retrievable filter called the ALN

11:15:19  5   retrievable filter.

       6   Q   And so for you and your practice, what was your takeaway

       7   from the results of the PREPIC 2 study?

       8   A   Not much because I don't think it really told us a lot

       9   because it didn't simulate real world conditions and, also,

11:15:33 10   they didn't look for asymptomatic pulmonary emboli.

      11         We know most pulmonary emboli are asymptomatic.  We

      12   know that from imaging studies.

      13   Q   And in the community of interventional radiologists, have

      14   you and your colleagues continued to use retrievable IVC

11:15:51 15   filters after the results of the PREPIC 2 study were

      16   published?

      17   A   Yes, of course.

      18   Q   Doctor, are you aware any of other what we call randomized

      19   clinically controlled studies regarding IVC filters?

11:16:05 20   A   There was a pilot study that came out of University of

      21   Florida, but it was not related to patients that had

      22   documented thromboembolic disease, it was looking at

      23   prophylactic IVC filters.  I think there was a multi-center

      24   trial in Australia, same sort of nature.  Again, not patients

11:16:23 25   that have documented thromboembolic disease.  These are trauma

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:16:27  1  patients do not have DVT or PE.

2  Q    And are you aware of any randomized clinically controlled

3  studies that have taken a population of patients who have a

4  DVT or at a risk of PE and have not received any treatment

11:16:46  5  whatsoever and compared that to a group of patients who have a

6  DVT and are at risk of PE but who have an IVC filter in place?

7  A    I'm not aware of any, no.

8  Q    Would there be issues in doing such a study?

9  A    I think there would be major issues.  I think it would be

11:17:01  10  unethical to perform a study like that.

11  Q    What's the ethical issue?

12  A    Well, because one side of the arm would be untreated and

13  they would be subjected to 26 to 30 percent death rate if they

14  had a pulmonary embolism.  We didn't know what it would be if

11:17:18  15  they had a DVT, but it would still be significantly high.

16  Q    So, Doctor, are there other types of studies on IVC

17  filters that inform your opinions about whether they are

18  efficacious?

19  A    I believe there are lots of observational -- what we call

11:17:32  20  observational type studies that show a benefit of IVC filters.

21  Yes.

22  Q    Are you prepared to tell the jury about a few of those?

23  A    Yes.  I reviewed many of them.  Four that come to mind

24  include Proctor and Greenfield, came out in 1997.

11:17:49  25  Q    Let me stop you.  Why don't we stop and talk about that

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:17:52  1   for a minute.  What is that study and what did it show?

2   A   Well, Mary Proctor was an associate of Dr. Greenfield who

3   invented the Greenfield filter and they did a lot of

4   collaborative studies together.

11:18:03  5        They were at the University of Michigan.  They looked

6   at a single center, University of Michigan, and their

7   experience with PE patients.  To make a long story short, they

8   basically found that the patients that were hospitalized with

9   PE that received a filter had a 18 percent PE-related

11:18:22 10   mortality rate, but those who didn't receive the filter had a

11   44 percent PE-related mortality rate.  So they concluded

12   filters were significantly helpful in those type of patients.

13   Q   And is there another large observational study you wanted

14   to discuss with the jury?

11:18:39 15   A   Well, I know lots of them.  There was probably other

16   database type study, it was a community based study published

17   by Spencer in 2010.  That group looked at VTE, or venous

18   thromboembolic, patients.  Those are the ones that have PE or

19   DVT.  We lump them all together and call it VTE.  And that was

11:19:03 20   about 1500 patients in the Worcester, Massachusetts area

21   hospitals.

22        And they basically found that the PE -- recurrent PE

23   rate at three years was significantly lower with the patients

24   that had a filter versus those that did not get a filter.  And

11:19:25 25   the difference of the percent are like 1.7 percent to

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:19:28  1   5.3 percent.  So like a three-fold difference.

2   Q   Doctor, you've seen many other studies of that same nature

3   that are large observational studies --

4   A   Yes, sir, I have.

11:19:38  5   Q   I'm sorry, let me get the question out.  That's okay.

6         Have you seen other large observational studies that

7   you believe support your opinion that IVC filters are

8   efficacious?

9   A   Yes, I have.

11:19:51  10  Q   Doctor, let's switch gears.  You had said another basis

11  for your opinion that IVC filters are effective in stopping

12  clots is personal experience; is that right?

13  A   Yes.

14  Q   And so let me break that down with you a little bit.  When

11:20:07  15  you first started your career as an interventional

16  radiologist, what type of filter were you originally trained

17  to put in patients?

18  A   The original Greenfield filter.

19  Q   And was that filter kind of the gold standard filter for a

11:20:24  20  number of years?

21  A   Quite a long time, yes.

22  Q   What was your personal experience with the Greenfield

23  filter?

24  A   We had a very positive experience with it.  We placed it

11:20:33  25  in all of our patients.  Was a primary filter.  We were one of

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:20:39  1    the first centers to use it in the trauma population back in

      2    the early 1990s.  That was our mainstay IVC filter throughout

      3    the 1990s.

      4    Q    Was the Greenfield filter a permanent filter or a

11:20:48  5    retrievable filter?

      6    A    Permanent filter.

      7    Q    So once that filter was implanted, it remained typically

      8    in the patient for the remainder of their life?

      9    A    Yes.

11:20:57 10    Q    And so, Doctor, over the course of your career, moving on

     11    from the '90s, were other permanent IVC filters introduced

     12    into the marketplace?

     13    A    Yes, there were.

     14    Q    Can you describe for the jurors briefly what some of those

11:21:14 15    filters would be?

     16    A    Sure.  The cook bird's nest filter.  We already talked

     17    about the VenaTech filter and the VenaTech low-profile filter.

     18    The Simon Nitinol filter.  The OptEase -- sorry.  The

     19    TrapEase.  These were all permanent filters, all introduced in

11:21:30 20    either the late '80s, mid to late '80s, or the '90s.

     21    Q    And are those all filters you had experience with

     22    personally?

     23    A    Yes.

     24    Q    You placed all of those filters?

11:21:43 25    A    Yes.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:21:44  1    Q    Doctor, let's move on through time a little bit.  So did

2    there come a point where retrievable filters started to appear

3    in the market and be available to interventional radiologists

4    such as yourself?

11:21:54  5    A    In the United States in the early 2000s we had the

6    availability to place retrievable filters, yes.

7    Q    And so what was the first retrievable filter you had

8    experience with?

9    A    It was the Cook Tulip filter.

11:22:08  10   Q    And did the Cook Tulip filter have a limited time during

11   which it could be indwelling in the patient?

12   A    Yes.  We called it a limited window of retrievability.  We

13   thought it was anywhere from 14 to 21 days.

14   Q    So what did you have to do if you had a patient where you

11:22:25  15   had implanted one of these Cook filters and you were

16   approaching that outside window of the 14 days?

17   A    We had to bring these patients back down to the

18   interventional radiology suite and essentially reposition.

19   Collapse the filter like we were going to remove it and

11:22:42  20   instead of removing it out of the body, we had to redeploy it

21   maybe a centimeter inferior or superior from where its

22   original place was so it had a new positioning, and then we

23   could buy them another 14 to 21 days.  Sometimes we had to

24   continually do that multiple times out to six months in some

11:23:00  25   of these young trauma patients in order to do that.  Became

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:23:04   1    very onerous and relatively high risk for these patients to

       2    keep doing this invasive procedures.

       3    Q   And did you ultimately also have experience with the Bard

       4    Recovery filter?

11:23:13   5    A   Yes, we did.

       6    Q   And did the Recovery filter offer different treatment

       7    options for the interventional radiology community?

       8    A   Yes.  Right away we realized it could stay in a lot

       9    longer.  So it's duration of retrievability was, we thought at

11:23:29  10    least initially, was six months.

       11   Q   And so what did that mean for you and the treatment of

       12   your patients who are at risk of pulmonary embolism?

       13   A   Well, we didn't need to bring them back down continuously

       14   to reposition these filters and we could wait until we needed

11:23:45  15   to retrieve it and then remove it if necessary.

       16   Q   And what was your experience with the ability to retrieve

       17   the Recovery filter at the longer indwelling periods?

       18   A   It was very favorable.  I mean, we soon learned that lot

       19   of people were taking this filter out much longer than six

11:24:04  20   months and there were reports early on they were being taken

       21   out after a year.  So some of our patients had it in longer if

       22   they needed to have it in longer.

       23   Q   So did you have patients that, because of the Recovery

       24   filter, who would have had protection from PE that otherwise

11:24:19  25   would not have had protection from PE?

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:24:22   1    A    Yes.

2    Q    And, Doctor, have you continued over the course of time to

3    use the family of Bard retrievable filters?

4    A    Continuously, yes.

11:24:32   5    Q    And did you implant and retrieve the G2 filter?

6    A    Yes, we did.

7    Q    And did you implant and retrieve the G2X filter?

8    A    Yes.

9    Q    And did you implant and retrieve the Eclipse filter?

11:24:45  10    A    Yes.

11    Q    And have you implanted and retrieved the Meridian filter?

12    A    Yes.

13    Q    And is the same true of the Denali filter?

14    A    Correct.

11:25:00  15    Q    And, Doctor, can you estimate for the jury approximately

16    how many Bard retrievable filters you would have placed over

17    the course of your career?

18    A    It's hard to say.  I would say around 200 or more.

19    Q    And do you have an opinion as to a reasonable degree of

11:25:14  20    medical certainty as to whether the Bard G2X filter and the

21    Eclipse filter are effective in capturing clots?

22    A    I believe they are --

23              MR. O'CONNOR:  Objection.

24              THE COURT:  Hold on just a minute.

11:25:23  25              MR. O'CONNOR:  Nothing in the report about the

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:25:24   1   Eclipse filter being effective.

2              THE COURT:  Can you show me where it is in the

3        report?

4              MR. ROGERS:  I'll move on, Your Honor.

11:25:31   5              THE COURT:  All right.

6   BY MR. ROGERS:

7   Q    So, Doctor, let's -- in addition to the Bard family of

8        filters, have you used other retrievable filters?

9   A    Yes.

11:25:40  10   Q    What are some of the retrievable filters you've used other

11        than Bard?

12   A    Other than, you know, the Cook Tulip, which I already

13        mentioned.  The OptEase.  The Crux.  And I think that's -- oh,

14        the Cook Celect.  Those are our main ones that we've used.

11:25:57  15   Q    So let's talk and switch gears and talk about the

16        retrieval of an IVC filter.

17              What do you do as treating doctor to consider when is

18        the time to remove a retrievable filter?

19   A    Well, we have a multidisciplinary clinic that we utilize

11:26:15  20        and that consists of trauma surgeons, who aren't putting many

21        filters in now but they used to a few years ago.  Mainly it's

22        the interventional radiologists in our institution.  Our

23        hematology experts have a keen interest in thrombosis and

24        hemostasis are the ones that evaluate our patients for when

11:26:35  25        the best time to remove the filter may be.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:26:38  1    So we refer -- make a clinic referral to our

2    hematology specialists, and they are the experts in

3    determining all of the different medical issues that may be

4    affecting that patient and then refer that patient back to us

11:26:51  5    for removal when indicated.

6    Q   And do some filters when they're implanted as a

7    retrievable filter, do they remain in a patient on a permanent

8    basis?

9    A   They can, yes.

11:27:02  10   Q   And what are some of the reasons that a doctor may decide

11   for the patient that the filter should remain as a permanent

12   filter?

13   A   Yes.  In a lot of our patients, they may not -- that have

14   a filter remain in place long term, they may not have a

11:27:19  15   continuing indication for IVC filtration, but they may have

16   some other issues that supersede that.  Such as a limited life

17   expectancy.

18        Say a cancer patient that may only be expected to

19   live 10, 12 months.  We feel it's compassionate not to subject

11:27:36  20   them to another filter -- to another procedure to take out

21   their filter.  So that type of situation.  Or maybe a very

22   elderly patient.  Someone who is 96 years old.  We're not

23   going to necessarily bring that patient back for another

24   invasive procedure.

11:27:50  25   Q   And, Doctor, are some patients -- do they have a filter

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:27:53  1   that does not get retrieved because they're what's called lost

       2   to followup?

       3   A    That does occur, but that is very rare with us now.

       4   Q    And what does that mean?

11:28:01  5   A    That means that they may move away and we lose contact

       6   with that patient, or that patient may be noncompliant, not

       7   hold their appointments to come back to be assessed,

       8   clinically assessed, about removing their filters.  There's

       9   lots of issues that may be in play when they're lost to

11:28:21 10   followup.

      11   Q    And over the course of your career, have you seen the

      12   community of interventional radiologists take different

      13   approaches over the course of time to the removal of

      14   retrievable filters?

11:28:36 15   A    Yes.

      16   Q    And can you describe for the jury what that means?

      17   A    What I've outlined what our approach has been, to use a

      18   multidisciplinary clinic approach.  Others have used their own

      19   service.  We all see patients in our clinics.  We have an

11:28:47 20   interventional radiology clinic and some of our colleagues

      21   around the country are very diligent and dedicated about

      22   bringing patients back to their own clinic and they make the

      23   call about whether or not to remove the filter for instance.

      24   Q    Doctor, are you familiar with the a safety communication

11:29:05 25   that the FDA issued about retrievable filters in 2010?

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:29:10  1   A    Yes, I am.

2            MR. ROGERS:  Scott, would you mind pulling up Exhibit

3        6993, please.

4            And, Your Honor, we move this into evidence.

11:29:27  5            MR. O'CONNOR:  I thought it was in.  But no

6        objection.

7            THE COURT:  Let me check and see.

8            MR. ROGERS:  I don't believe it is, but I may be --

9            THE COURTROOM DEPUTY:  It's not in.

11:29:37 10            THE COURT:  It's not in evidence.

11            Did I hear no objection?

12            MR. O'CONNOR:  No objection.

13            THE COURT:  6993 is admitted.

14          (Exhibit 6993 admitted.)

11:29:45 15            MR. ROGERS:  May we publish?

16            THE COURT:  You may.

17       BY MR. ROGERS:

18       Q    So, Doctor, up on your screen can you see the FDA safety

19       communication?

11:29:53 20       A    Yes.  It is pretty small print but I can read it.

21       Q    Fortunately, we can make it bigger for all of us.

22            And is this something that you were cognizant of when

23       it came out in 2010?

24       A    Yes.

11:30:07 25       Q    And so, Doctor, you have reviewed this in the past?

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:30:11   1   A    Yes, I have.

2   Q    And so let's take a look at it, if you don't mind.  Does

3   it appear to you it was issued in August of 2010?

4   A    Yes.

11:30:20   5        MR. ROGERS:  Scott, if you would, can you pull out

6   the section that says Audience, please.

7   BY MR. ROGERS:

8   Q    And so, Doctor, who was this safety communication directed

9   toward?

11:30:33  10   A    Interventional radiologists; interventional cardiologists;

11   vascular surgeons; emergency room physicians, parentheses

12   trauma; bariatric surgeons; orthopedic surgeons; and primary

13   care physicians.

14   Q    And are those doctors who would be within the community of

11:30:48  15   doctors who may either implant IVC filters or who may run into

16   patients who have an IVC filter?

17   A    Yes, they are.

18        MR. ROGERS:  And Scott you can take that down.

19        And, let's go down to the section that says Summary

11:31:06  20   of Problem and Scope.

21        If you would, if you'd pull that out, please.

22   BY MR. ROGERS:

23   Q    And, Doctor, I'm not going to read this to you, but what

24   is your understanding what the FDA's purpose was in issuing

11:31:18  25   this safety communication?

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:31:20  1   A   Well, they were illustrating that IVC filters have long

2   term -- are associated with long-term complications and that

3   essentially there has been -- at this point there had been

4   sort of a failure of communication between the implanting

11:31:37  5   physicians and the physicians taking care of these patients to

6   get these patients back and to clinically reassess them

7   about -- particularly with these retrievable filters, about

8   removing them when they're no longer indicated.

9   Q   So do you sometimes have patients who receive a

11:31:56  10  retrievable IVC filter who have what you called an indication

11  for the filter but then later the indication goes away?

12  A   Yes.

13  Q   Can you give the jury an example what that may be?

14  A   Well, let's say that a patient is diagnosed with pulmonary

11:32:09  15  embolism and they have a contraindication to anticoagulation.

16  They may be a hemophiliac or something like that.  And so they

17  have -- they get a filter to protect them from a recurrent

18  pulmonary embolism, which can be a lethal event.

19           And we know that after roughly between three months

11:32:32  20  and six months the original DVT that they most likely had

21  experienced has stabilized and therefore they generally do not

22  need to be further treated prophylactically against that

23  recurrent pulmonary embolism.  So after that three or six

24  month window, it is safe, then, to remove that filter.

11:32:50  25  Q   Doctor, let's take a look here at the last sentence that

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:32:53   1   is on the screen.  If you'd just read along with me I'd

2   appreciate it.

3          It says, "Know long-term risks associated with IVC

4   filters include but are not limited to lower limb deep vein

11:33:08   5   thrombosis, filter fracture, filter migration, filter

6   embolism, and IVC perforation."

7          Did I read that correctly?

8   A    You did.

9   Q    And were those all risks of retrievable IVC filters that

11:33:23  10   were known in the community of doctors who used IVC filters in

11   2010?

12   A    Very much so, yes.

13   Q    And did you -- were you personally aware of this before

14   this publication came out from FDA?

11:33:35  15   A    Yes.

16          MR. ROGERS:  Okay, Scott, you can take that down,

17   please.

18   BY MR. ROGERS:

19   Q    Doctor, let's talk a little bit more about some of these

11:33:47  20   risks, and we just identified some, but are those risks that

21   you just identified, are those associated with all IVC

22   filters?

23   A    Yeah, pretty much.  There may be a few that may be

24   uniquely excluded.  For instance, the design of the OptEase

11:34:03  25   filter makes it so that perforation or penetration is very

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:34:09    1    rare with that filter.  Just as an example.

2         MR. O'CONNOR:  Not in this report, Your Honor.

3         THE COURT:  Is this in the report?

4         MR. ROGERS:  No, Your Honor.

11:34:14    5         THE COURT:  Objection is sustained.

6         MR. ROGERS:  I'll be glad to move on.

7    BY MR. ROGERS:

8    Q   Well, let me kind of change gears on you, ask a little bit

9    different question.

11:34:22   10         The public health notice we were just looking at, did

11   that have an impact on the community of doctors who utilize

12   IVC filters?

13         MR. O'CONNOR:  Objection.  Lack of foundation.

14         THE COURT:  Overruled.

11:34:33   15         THE WITNESS:  Yes, it did.

16   BY MR. ROGERS:

17   Q   And what was that impact?

18   A   I think it brought up to the forefront this issue that, at

19   least in my world, interventional radiologists need to be very

11:34:42   20   proactive and bring these patients back and clinically

21   reassess them and determine when the best time to take that

22   filter out is and not just forget about these patients, like

23   we were doing with permanent filters.

24   Q   And is there such a thing as a perfect filter with no

11:35:00   25   complications?

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:35:01  1  A   Does not exist.

2  Q   Let me follow up on what you just said a moment ago.

3       Did you -- within your practice, do you perceive a

4  difference between the amount of followup that patients would

11:35:11  5  get who received a permanent filter versus a retrievable

6  filter?

7  A   Yes.

8  Q   And what is that differential?

9            MR. O'CONNOR:  Objection.  Not in the report.

11:35:19 10            THE COURT:  Where's that in the report?

11            MR. ROGERS:  Your Honor, it is in the generic report

12  page 9, paragraph 4.

13            The paragraph that begins "Despite the fact."  Do you

14  see that?

11:36:01 15            THE COURT:  Oh.  Yes.

16            MR. ROGERS:  Second sentence.

17            THE COURT:  That looked like paragraph 3 to me.

18            MR. ROGERS:  I'm sorry.

19            THE COURT:  Objection's overruled.

11:36:13 20  BY MR. ROGERS:

21  Q   So, Doctor, do you recall the question?

22  A   Yes, I do.

23  Q   And so can you explain for the jurors why you think that

24  permanent filters retrieve -- that retrievable filters don't

11:36:25 25  receive as much scrutiny perhaps as -- I can't get this

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:36:28  1   question out.  Let me try again.

2          So, Doctor, can you explain for the jury why you

3   believe that permanent filters don't get as much scrutiny as

4   retrievable filters.

11:36:37  5   A   Because when we place permanent filters, we were never

6   planning to ever remove that filter and so we did not evaluate

7   them with imaging or through clinical parameters because we

8   were never going to remove that filter.  So most of those

9   filters did not get imaged.

11:36:55  10          Whereas with the retrievable filters that we were

11   placing, we scrutinize them because every time we would take

12   out that filter we're going to be intensely imaging that

13   filter.  So they got a much more robust imaging followup that

14   did not exist with the permanent filters the generation

11:37:12  15   before.

16   Q   And, Doctor, do you believe that that differential may

17   account for why there are reports of more complications with

18   retrievable filters versus permanent filters?

19   A   I believe that is part -- part of the issue, yes.

11:37:25  20   Q   Doctor, let's switch gears and talk a little bit about the

21   Simon Nitinol filter.  And I believe you said that is a filter

22   that you've used; correct?

23   A   Yes.

24   Q   And when would be approximately the last time that you

11:37:35  25   would have implanted a Simon Nitinol filter?

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:37:38  1    A    For me personally it's been probably 20 years.

      2    Q    And is the Simon Nitinol filter a permanent only filter?

      3    A    Yes, it is.

      4    Q    And in your experience, did you see patients who had an

11:37:55  5    indwelling Simon Nitinol filter who experienced complications?

      6    A    Yes.

      7    Q    Can you describe for the jury what some of those

      8    complications were?

      9         MR. O'CONNOR:  Apologize, Your Honor, but I do not

11:38:04 10    see this in his report.

     11         THE COURT:  Mr. Rogers.

     12         MR. ROGERS:  Your Honor, this is covered in his

     13    deposition, July 2017, pages 151 to 153.

     14         THE COURT:  Objection's overruled based on page 153

11:39:30 15    starting at line 16.

     16         MR. ROGERS:  Thank you, Your Honor.

     17    BY MR. ROGERS:

     18    Q    So, Dr. Morris, can you describe for the jury some of the

     19    complications you saw with the Simon Nitinol filter in your

11:39:42 20    personal experience.

     21    A    Well, the most dramatic complication that we saw was it's

     22    eccentric positioning or deformation, which basically -- the

     23    best way to describe it is that the upper daisy wheel would

     24    fold in on itself.  Sort of equivalent to a tilt.  And I don't

11:40:04 25    know if it was because it also brought the wall of the cava

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:40:08  1  with it and created a narrowing or whether there was so much
       2  metal now in a horizontal position, but that seemed to
       3  increase the thrombosis rate of the inferior vena cava.  So we
       4  saw a number of IVC thromboses with Simon Nitinol filter.
11:40:24  5  Q   And what does that mean if you have a thrombosis in the
       6  IVC?
       7  A   Well, the patient may be asymptomatic when that occurs,
       8  but it can also be a life-threatening a situation.  It's
       9  called phlegmasia cerulea dolens.  Latin term for basically a
11:40:42 10  surgical emergency.  But now interventional radiologists treat
      11  that with thrombolytic medications.  But it's a very
      12  significant situation.  None of the blood from the lower
      13  extremities can get back up to the heart in that case.
      14  Q   Is thrombosis essentially a clot?
11:40:58 15  A   Yes.  Clot.
      16  Q   If there's an occlusion via a clot, does that block off
      17  the entire blood flow from the lower extremities from coming
      18  back up to the heart?
      19  A   Yes, it does.
11:41:10 20  Q   So what sort of symptoms might these patients experience
      21  if that happens?
      22  A   Pain.  Hypotension, low blood pressure.  Severe swelling
      23  of the lower extremities.  And ischemia.  That means basically
      24  not only can the blood not get back but the swelling is so bad
11:41:32 25  that it's also constricting the arterial flow down to the feet

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:41:39  1    and legs, and so the patients can lose their limbs, their

2    legs, because of that.

3              MR. O'CONNOR:  Objection.  Your Honor, this is beyond

4    the report and beyond the deposition pages we just looked at.

11:41:49  5              THE COURT:  Where is this disclosed?

6              MR. ROGERS:  Same deposition, Your Honor.

7              THE COURT:  Same pages?

8              MR. ROGERS:  Yes, Your Honor.

9              THE COURT:  Objection is sustained.

11:41:57  10             MR. ROGERS:  Thank you.  We'll move on.

11    BY MR. ROGERS:

12    Q    Doctor, are you aware of literature that has examined

13    complication rates with the Simon Nitinol filter?

14    A    Yes.

11:42:05  15    Q    Are you aware of a long-term study that looked at

16    complication rates with the Simon Nitinol filter?

17    A    By Poletti, yes.

18             MR. ROGERS:  And, Scott, would you mind bringing up

19    Exhibit 7226, please.

11:42:15  20    BY MR. ROGERS:

21    Q    And, Doctor, do you see this article on your screen?

22    A    Yes, I do.

23    Q    Would you mind telling the jury what the title of this

24    article is.

11:42:28  25    A    This was The Long Term Results of the Simon Nitinol

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:42:33    1    Inferior Vena Cava Filter.

2    Q    And, Doctor, what journal was this study published in?

3    A    This was published in the Journal of European Radiology,

4    the cardiovascular radiology section.

11:42:49    5    Q    Is that authoritative journal?

6    A    Yes, it is.

7    Q    And is this a peer-reviewed article that would appear in

8    the medical literature?

9    A    Yes.

11:42:56   10    Q    And, Doctor, if you would, tell the jury when this study

11    was published.

12    A    I believe it came out in 1998.

13    Q    And at that point in time do you know roughly how long the

14    Simon Nitinol filter would have been on the market?

11:43:13   15    A    About ten years.  Maybe a little longer than ten years.

16    Q    And so can you describe for the jury the basic design of

17    this study.  What were these researchers trying to do?

18    A    They were -- this is the first, and as far as I know the

19    only, long-term study of the Simon Nitinol.  There were a few

11:43:30   20    evaluations of it early on after a few years that it was on

21    the market, but this looked at the Simon Nitinol at about

22    almost three years.  I think it was 32 months.

23    Q    And so how many patients were originally enrolled in this

24    study?

11:43:47   25    A    They looked at 114 patients originally.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:43:50   1   Q   And did they follow these patients over the course of

2   time?

3   A   Yes, they did.

4   Q   And so at the end of this study, how many patients were

11:43:57   5   still -- made it all the way through the review period for

6   those patients?

7   A   I believe it was 38 patients got their extensive imaging

8   followup, which consisted of X-ray, abdominal X-ray, and the

9   average followup here was 32 months.  They also got a

11:44:15   10   ultrasound study to look at patency of the inferior vena cava,

11   and they also got a CT scan of the abdomen and pelvis at the

12   same time.  So all three of those imaging studies.

13   Q   What is patency?

14   A   Patency means whether or not it's open.

11:44:29   15   Q   Meaning there's no occlusion?

16   A   Right.

17   Q   And so, Doctor, why was it only 38 patients out of the

18   original 114 reached the end of the review period for those

19   patients?

11:44:40   20   A   Some of them died.  These are very often very sick

21   patients that are getting these filters.  Some were lost to

22   followup, and some just didn't consent to have all those

23   imaging studies performed.

24   Q   And, so, Doctor, let's go to page 292 of this article.

11:44:58   25         MR. ROGERS:  And I'm looking for Table 2, if you can

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:45:01  1  pull that up, please, Scott.

2        There we go.

3  BY MR. ROGERS:

4  Q   And so, Doctor, can you tell the jury what the results

11:45:16  5  were about some of the complications that were observed in the

6  Poletti study?

7  A   Yes.

8        Well, first of all, there was a strut -- a strut

9  fracture of around 16 percent.  And these struts perforated

11:45:36  10  the IVC at a rate of 95 percent.

11        And 76 percent of patients had what we consider a

12  grade 3 perforation, meaning one of their struts was

13  interacting with an adjacent structure around the IVC.

14        And then about 68 percent of these patients had what

11:45:58  15  we call the eccentric positioning, meaning that daisy wheel

16  sort of bending and collapsing on its itself.

17  Q   Were any of these patients that were in this Poletti study

18  on the Simon Nitinol filter symptomatic?

19  A   No, they were not.

11:46:15  20  Q   And that's despite a 95 percent perforation rate in that

21  study?

22  A   Correct.

23  Q   And what was the percentage of individuals in that study

24  that had perforation of their IVCs by the filter that was

11:46:29  25  interacting with other organs?

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:46:31   1   A    76 percent.

2   Q    And none of those patients were symptomatic?

3   A    No.

4   Q    And let me ask you, before we leave this, I do want to ask

11:46:42   5   you about what the authors of this study found about IVC

6   occlusions.  Can you describe that for the jury, please.

7   A    If we look at the table on the -- under the Doppler

8   ultrasound, they found surprisingly that in all 38 patients

9   the IVC was patent.

11:47:00  10   Q    And did they also examine via autopsy patients who expired

11   during the study?

12   A    Yes.

13   Q    Do you recall what they found on some of those --

14   A    There were some occlusions on the patients that died

11:47:12  15   during the study period.

16           MR. ROGERS:  Okay, Scott, you can pull that down,

17   please.

18   BY MR. ROGERS:

19   Q    And, Doctor, over the course of your career, do you try to

11:47:22  20   stay abreast of the medical literature regarding studies that

21   are published about IVC filters?

22   A    Yes, I do.

23   Q    And have you seen the various risks that we just

24   discussed, things like IVC filter perforation and fracture,

11:47:38  25   have you seen that reported in the medical literature about a

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:47:41  1    number of different types of filters?

2    A    Yes.

3    Q    And are perforation, tilt, migration, fracture of IVC

4    filters, are those known complications with all filters?

11:47:54  5    A    Yes.

6    Q    Was that all known to the community of IVC filter users in

7    2011?

8    A    I believe so, yes.

9    Q    Doctor, let's move on again, and I want to spend a little

11:48:08  10    bit of time with you talking about instructions for use that

11    come with IVC filters.  Is that something that you're familiar

12    with?

13    A    Yes.

14    Q    And have you reviewed over the course of your career the

11:48:19  15    instructions for use that accompany the Bard family of

16    filters?

17    A    Yes, I have.

18    Q    And would that include the G2 filter?

19    A    Yes.

11:48:35  20    Q    And before I ask you some specific questions about that,

21    let me ask you this:  Is the IFU the sole source of

22    information that you rely on to inform yourself about the

23    potential benefits and risks of the IVC filter?

24    A    No.

11:48:54  25    Q    And what are some of the other things you rely on to keep

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:48:57  1    yourself informed about what those benefits and risks are?

2    A    The medical literature.  My own personal experience.

3    Discussing these topics with my colleagues around the country

4    and around the world, essentially, at various venues.  What I

11:49:15  5    was taught during my training, my residency, fellowship, those

6    types of things.

7    Q    And those are all things you consider in addition to the

8    information that's contained in an IFU?

9    A    Yes.

11:49:26 10    Q    All right.

11         MR. ROGERS:  Scott, would you mind pulling up Exhibit

12    5286, please.

13         And, Your Honor, I move this into evidence.

14         MR. O'CONNOR:  No objection.

11:49:52 15         THE COURT:  Admitted.

16       (Exhibit 5268 admitted.)

17         MR. ROGERS:  May we display?

18         THE COURT:  You may.

19    BY MR. ROGERS:

11:49:57 20    Q    Doctor, is this on your screen, is that an IFU for the G2

21    filter?

22    A    Yes, it is.

23    Q    And was the G2 filter the predecessor to the G2X filter?

24    A    Well, there was G2 Express in between them, but, yes, it

11:50:11 25    was one of them.

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:50:12    1    Q   Very good point.  Are the G2 Express and G2X the same

2    filter?

3    A   The actual filter is the same.  The delivery device is

4    slightly different.

11:50:21    5    Q   Okay.  Let's take a look at one section of this.

6             MR. ROGERS:  And, Scott, if you would go to page 3,

7    please.

8             Do you see that section right in the middle that's

9    bolded.  Go down.  You see where it says "Note," can you pull

11:50:35   10    that paragraph out, please.

11   BY MR. ROGERS:

12   Q   And can you see that, Doctor?

13   A   Yes, I can.

14   Q   And if you would, if you would just read along with me

11:50:45   15   again.  This particular provision says, "Note:  Standards and

16   guidelines developed by the Society of Interventional

17   Radiologists recommend that patients with filters, either

18   permanent or retrievable, be tracked and receive routine

19   followup subsequent to the placement of the device."

11:51:04   20             Did I read that correctly?

21   A   Yes, you did.

22   Q   And so was that information that was already known to you

23   before you would have seen it in an IFU?

24   A   Yes.

11:51:13   25   Q   And what does this provision mean to you as a

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:51:15   1   interventional radiologist?

2   A   Well, as I mentioned before, in practice we were not

3   following permanent -- patients that had a permanent IVC

4   filter in, but with the filters that could potentially be

11:51:27   5   retrieved, we believed that this was a further recommendation

6   that these patients needed to be followed up and then

7   determine when the best time to take that filter out if it had

8   limited indication for filtration.

9   Q   And has this particular provision been in the IFUs for the

11:51:51  10   Bard family of retrievable filters starting with G2?

11   A   Yes.

12   Q   So it would have been in the G2X and the Eclipse IFUs?

13         MR. O'CONNOR:   Objection.  Not in his report.

14         MR. ROGERS:   I'll move on, Your Honor.

11:52:03  15         THE COURT:   All right.

16         MR. ROGERS:   Can we take that down, please.

17         And then go to the Complication section.

18         Scott, if you would, would you pull out the second

19   bullet point, please.

11:52:27  20   BY MR. ROGERS:

21   Q   And, Doctor, if you would read along with me again.  Does

22   this read "Filter fractures are a known complication of vena

23   cava filters.  There have been some reports of serious

24   pulmonary and cardiac complications with vena cava filters

11:52:42  25   requiring the retrieval of the fragment utilizing endovascular

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:52:47  1    and/or surgical techniques."

       2            Did I read that correctly?

       3    A    Yes.

       4    Q    And, again, was this information that you were

11:52:53  5    independently aware of other than this IFU?

       6    A    Yes.

       7    Q    And, Doctor, was this information that was available to

       8    the community of users of IVC filters in 2011?

       9    A    Yes.

11:53:05 10    Q    And was this information contained in the IFU for the G2X

      11    filter?

      12    A    Yes.

      13    Q    Was it contained in the Eclipse filter IFU?

      14            MR. O'CONNOR:  Objection.  Not in the report.

11:53:17 15            THE COURT:  Your response?

      16            MR. ROGERS:  Your Honor, I refer to the generic

      17    report, pages 11 and 12.  It's the last sentence on page 11

      18    and it carries over.

      19            THE COURT:  Objection sustained.  That doesn't say

11:53:58 20    anything about the G2X and Eclipse IFUs, as I read it.

      21            MR. ROGERS:  Okay.  Thank you, Your Honor.

      22    BY MR. ROGERS:

      23    Q    Dr. Morris, I want to shift gears a little bit and talk to

      24    you now about your specific opinions about Mrs. Hyde.  And let

11:54:17 25    me begin by asking you, did you review Mrs. Hyde's medical

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:54:20  1  records?

2  A   Yes.

3  Q   And can you approximate for the jury roughly how many

4  pages of medical records you would have reviewed?

11:54:28  5  A   Many hundreds if not thousands.

6  Q   And did you review all of Mrs. Hyde's medical records that

7  were available that existed prior to the implantation of her

8  filter?

9  A   Yes.

11:54:39  10  Q   And did you review all of the medical records and imaging

11  that was available between when her filter was implanted and

12  when it was removed?

13  A   Yes.

14  Q   And have you reviewed medical records that exist after her

11:54:54  15  filter was retrieved?

16  A   Yes.

17  Q   And what is the most recent records, what period of time

18  are they from that you have reviewed?

19  A   I believe in 2018.

11:55:06  20  Q   Did you review a number of different imaging studies for

21  Mrs. Hyde?

22  A   Yes.

23  Q   Okay.  And let's start this discussion with February 2011.

24  Do you know the period I'm talking about?

11:55:19  25  A   Yes.

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:55:20  1    Q   And what was the medical issue that took Mrs. Hyde to seek

2    medical care in February of 2011?

3    A   Well, she was diagnosed with a DVT of her right lower

4    extremity.

11:55:33  5    Q   And did she have a prior history of having pulmonary

6    embolism?

7    A   She -- yes.

8    Q   And when she presented on that date in the hospital, was a

9    CT scan performed?

11:55:49 10    A   Yes.

11    Q   And the purpose of the CT scan would have been what?

12    A   To look for a pulmonary embolism, a PE.

13            MR. ROGERS:  Let's pull up Exhibit 8485.

14            Your Honor, I move this into evidence.

11:56:10 15            MR. O'CONNOR:  No objection.

16            THE COURT:  Admitted.

17        (Exhibit 8485 admitted.)

18            MR. ROGERS:  May we publish?

19            THE COURT:  Yes.

11:56:16 20    BY MR. ROGERS:

21    Q   Doctor, do you see on your screen there an image?

22    A   Yes, I do.

23    Q   Can you describe for the jury what this is.  What are we

24    seeing?

11:56:25 25    A   This is a coronal reformatted section that was obtained

DIRECT EXAMINATION – CHRISTOPHER MORRIS, MD

11:56:31  1   during the CT angiogram of her pulmonary arteries, and this

2   particular coronal section, these are sort of in the frontal

3   direction.

4   Q   Let me stop you there.  When you say coronal section, can

11:56:44  5   you tell the jury what you mean by that.

6   A   Right.  So the CT scans are acquired in the axial, or

7   cross-sectional bread loaf type acquisition.  But then the

8   computer can reconstruct the images in any different plane

9   that we need it to.  And typically they're often reconstructed

11:57:03  10  in the side view, called the sagittal, and this view, called

11  coronal, which is front to back.

12        And so this is a slice of that dataset that is front

13  to back, sort of in the middle of her chest, to look at her --

14  in particular her right pulmonary artery.

11:57:21  15  Q   Just to make sure that I understand what you mean by that,

16  so when a CT is done, the original slice is what you called

17  axial?

18  A   Yes.  Axial.

19  Q   Do those slices move up the body in this direction?

11:57:32  20  A   Yes.

21  Q   You described it as kind of bread loaf sort of fashion.

22  A   Yes.

23  Q   So about how much space in between each of those sections

24  when an image is taken?

11:57:42  25  A   It varies depending what the parameters are set to, but

DIRECT EXAMINATION - CHRISTOPHER MORRIS, MD

11:57:45  1  they can be anywhere from five millimeters to sub-millimeters,

2  0.25 millimeters, for instance.  So they can be pretty, pretty

3  thin.

4  Q    Doctor, I believe you said this is what you said was

11:57:59  5  called a coronal image.

6  A    Yes.

7  Q    And so does that look at slices of the body moving from

8  the front of the body to the back of the body?

9  A    Yes.

11:58:08  10  Q    So what organ are we seeing here?

11  A    We're seeing both lungs.  If I take the cursor here, I can

12  show this is -- the black area is the right lung and over on

13  her left side, this is the left lung.

14       This is the heart.

11:58:22  15       All of the white area here is the gadobenated

16  contrast media that's injected, also known as the dye.

17       This is the slice through the right pulmonary artery.

18  And then you notice there's a dark area here.  This is all her

19  clot that's on the right side of her lung extending from

11:58:42  20  her -- essentially that lower end of the right main pulmonary

21  artery and into what we call lobar arteries involving her

22  middle lobe and her lower lobe of her right lung.

23  Q    So is that dark area you just described, is that all

24  portions of the lung that are being deprived of blood flow?

11:59:02  25  A    Yes.  So this would be -- all this area of the lung down

11:59:06  1   here would be deprived of blood flow, yes.

2   Q    All right.  Let's move on --

3              MR. ROGERS:  You want me to stop --

4              THE COURT:  We're going to break at this point.

11:59:14  5              Members of the jury, we will break until 1 o'clock.

6   Please remember not to discuss the case or do any research.

7   We'll see you then.

8         (The jury exited the courtroom at 11:59.)

9              THE COURT:  You can step down, Doctor.

11:59:53  10             Counsel, let me give you your time.

11             As of the lunch hour, plaintiffs have used 28 hours

12   and 40 minutes.  Defendants have used 14 hours and 28 minutes.

13   And we will see you at 1 o'clock.

14             MR. ROGERS:  Thank you, Your Honor.

12:00:24  15        (Recess taken from 12:00.)

16        (End of a.m. session transcript.)

17                             *  *  *  *  *

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14             DATED at Phoenix, Arizona, this 29th day of

15   September, 2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25