## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| IN RE:  Bard IVC Filters Products ) | MD 15-02641-PHX-DGC |
| Liability Litigation,            ) | |
|                                  ) | |
| _____  ) | |
| Lisa Hyde and Mark Hyde, a married ) | Phoenix, Arizona |
| couple,                          ) | **September 28, 2018** |
|                                  ) | |
|          Plaintiffs,             ) | |
|                                  ) | |
|          v.                      ) | CV 16-00893-PHX-DGC |
|                                  ) | |
| C.R. Bard, Inc., a New Jersey    ) | |
| corporation, and Bard Peripheral ) | |
| Vascular, an Arizona corporation, ) | |
|                                  ) | |
|          Defendants.             ) | |
| _____  ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 9 - P.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          <u>**A P P E A R A N C E S**</u>

2

For the Plaintiffs:

3

4       Lopez McHugh
        By:  **RAMON R. LOPEZ**, ESQ.
        100 Bayview Circle, Suite 5600
5       Newport Beach, CA 92660

6       Gallagher & Kennedy
        By:  **MARK S. O'CONNOR**, ESQ.
7            **PAUL L. STOLLER**, ESQ.
        2575 East Camelback Road, Suite 1100
8       Phoenix, AZ 85016

9       Heaviside Reed Zaic
        By:  **JULIA REED ZAIC**, ESQ.
10           **LAURA E. SMITH**, ESQ.
        312 Broadway, Suite 203
11      Laguna Beach, CA 92651

12      Goldenberg Law PLLC
        By:  **STUART GOLDENBERG**, ESQ.
13           **MARLENE GOLDENBERG**, ESQ,
        800 LaSalle Avenue, Suite 2150
14      Minneapolis, MN 55402

15      Lopez McHugh, LLP
        By:  **JOSHUA MANKOFF**, ESQ.
16      1 International Plaza, #550
        PMB-059
17      Philadelphia, PA 19113

18

19

20

21

22

23

24

25

1      <u>A P P E A R A N C E S</u> (CONTINUED)

2

       For the Defendants:

3

           Nelson Mullins Riley & Scarborough
4          By:   **JAMES F. ROGERS**, ESQ.
           1320 Main Street
5          Columbia, SC 29201

6          Snell & Wilmer
           By:   **JAMES R. CONDO**, ESQ.
7          400 East Van Buren
           Phoenix, AZ 85004

8
           Nelson Mullins Riley & Scarborough
9          By:   **RICHARD B. NORTH, JR.**, ESQ.
                 **MATTHEW B. LERNER**, ESQ.
10               **ELIZABETH C. HELM**, ESQ.
           201 17th Street NW, Suite 1700
11         Atlanta, GA 30363

12         C.R. Bard, Inc.
           Associate General Counsel, Litigation
13         By:   **GREG A. DADIKA**, ESQ.
           730 Central Avenue
14         Murray Hill, New Jersey 07974

15

16

17

18

19

20

21

22

23

24

25

1       # I N D E X

2       **SUMMARY OF COURT PROCEEDINGS**                                    **PAGE:**

3       Proceedings Outside the Presence of the Jury    1999, 2081

4

5       **WITNESSES FOR THE                DIRECT    CROSS    REDIRECT**
        **DEFENDANT:**

6

7       **Christopher Morris, M.D.**
        By Mr. Rogers              1970
8       By Mr. O'Connor                      2004

9       **David W. Feigal Jr., M.D.**
        By Mr. Condo               2023              2072
10      By Mr. Lopez                         2041

11      **Robert Michael Carr Jr.**
        By Mr. Rogers              2074

12

13      # INDEX OF EXHIBITS

14      **EXHIBIT**                                            **RECEIVED**

15      <u>NO.</u>      <u>DESCRIPTION</u>

16      8538      Radiograph - 2/25/11                           1974

17      8527      CT Image - 2/25/11 compared to 8/26/14         1979

18      8529      CT Image - 12/16/2011 abdomen and pelvis       1983

19      8643      Comprehensive and Interventional Pain          1992
                  Management - Medical
20
        8539      4/21/11 Medical Record                         1994
21
        4938      Bard Peripheral Vascular Consulting            2009
22                Request Form re Dr. Christopher Morris
                  dated 5/11/2004
23
        6089      Product Development Cycle PPT                   2084
24

25

**INDEX OF EXHIBITS (Continued)**

| EXHIBIT | | RECEIVED |
|---|---|---|
| NO. | DESCRIPTION | |
| 5189 | July 10, 2002 IMPRA Recovery Permanent Special 510(k) (K022236) | 2094 |
| 5187 | Aug. 5, 2002 Letter FDA to IMPRA re Recovery (K022236) | 2099 |
| 5182 | Aug. 30, 2002 Letter IMPRA to FDA re Recovery (K022236) | 2101 |
| 5179 | Oct. 4, 2002 Letter FDA to IMPRA re Recovery (K022236) | 2104 |
| 5178 | Oct. 25, 2002 Letter IMPRA to FDA re Recovery (K022236) | 2105 |
| 5169R | Apr. 25, 2003 Recovery Retrievable Abbreviated 510(k) (K031328) | 2107 |
| 5197 | July 25, 2003 FDA Clearance Letter re Recovery Retrievable (K031328) (Substantial Equivalence) | 2108 |
| 5301 | ETR-05-01-06 Animal Model Evaluation of Recovery Filter G1A Femoral System Report | 2111 |
| 5304 | ETR 05-02-11 G1A Recovery Filter Femoral System Chronic Animal Study Report | 2112 |

1                      **P R O C E E D I N G S**

2              (Proceedings resumed at 12:58 p.m.)

3              (Jury present.)

4              THE COURT:  You may proceed, Mr. Rogers.

5              MR. ROGERS:  Thank you, Your Honor.

6                      CHRISTOPHER MORRIS, M.D.,

7      called as a witness herein by the defendants, having been

8      previously duly sworn or affirmed, resumed the stand and

9      continued to testify as follows:

10                     DIRECT EXAMINATION (Continued)

11     BY MR. ROGERS:

12     Q.  Mr. -- not Mr., Dr. Morris, are you ready to proceed?

13     A.  Yes.

14     Q.  Before we took our lunch break, we were looking at the

15     image that's on the screen.

16             MR. ROGERS:  And, Traci, is that still being

17     displayed?  It is.  Okay.

18     BY MR. ROGERS:

19     Q.  And had we discussed everything about this particular image

20     that you wanted to show the jury?

21     A.  Yes.  I think I was just completing talking about the

22     extent of the thrombus or the clot in that right pulmonary

23     artery.

24     Q.  All right.  Let's move to the second page, please.

25             THE COURT:  Folks, that's somebody's cell phone.

1    Everybody, please make sure it's off.

2              JURY MEMBER:  Sorry, it's mine.

3              THE COURT:  You're the first person who's ever

4    admitted it.

5              All right.

6              MR. ROGERS:  Are we ready to proceed, Your Honor?

7              THE COURT:  We are.

8    BY MR. ROGERS:

9    Q.  All right.  So, Dr. Morris, is this another CT image from

10   that --

11             THE COURT:  That's somebody else's.  Everybody pull

12   out your phone and turn them off.

13             Okay.  Go ahead.

14             MR. ROGERS:  Thank you, Your Honor.

15   BY MR. ROGERS:

16   Q.  Dr. Morris, is what we see here on the screen, 8485, second

17   page, is that another CT image from that same series?

18   A.  Yes.

19   Q.  And can you tell the jury what we see here.

20   A.  So this is a -- a section a little more what we say is

21   posterior, closer towards the back.  And we're seeing a little

22   bit more of the left pulmonary artery.  And this dark area is a

23   smaller clot in the descending left pulmonary artery.

24             We're also seeing part of the spine because we're

25   further back, and there's some degenerative, what we say,

1    spondylosis, degenerative arthritis of the dorsal spine as

2    well.

3    Q.  Now, Dr. Morris, is it correct to say that at this time

4    Mrs. Hyde had what is known as bilateral pulmonary embolism?

5    A.  Yes.

6    Q.  And what does that mean?

7    A.  That means --

8         THE COURT:  Well, maybe it's not a phone.  We'll try

9    to adjust the mics.

10        THE WITNESS:  So that means --

11        May I start or --

12        THE COURT:  Yeah, go ahead.

13        THE WITNESS:  Okay.  That means that the clot that

14   came up to the main pulmonary artery either broke up and went

15   to both sides, the right and the left lung, or there were

16   multiple clots that came up and went to the right as well as

17   the left lung.

18   BY MR. ROGERS:

19   Q.  And how did Mrs. Hyde's doctors try to treat or deal with

20   this pulmonary embolism?

21        THE COURTROOM DEPUTY:  Not quite sure --

22        THE COURT:  Let's do our best.  We'll call Brian up to

23   check it out.

24        MR. ROGERS:  Can everyone hear okay?

25        If it's just a matter of having some static, Your

1    Honor, I'm glad to proceed.

2            THE COURT:  Please.

3    BY MR. ROGERS:

4    Q.  Okay.  So, Dr. Morris, what did Mrs. Hyde's doctors do to

5    try and treat this issue?

6    A.  They decided to treat her with anticoagulation, first

7    heparin and then converting eventually over to an oral pill

8    form of warfarin.

9    Q.  And warfarin is the same thing as Coumadin?

10   A.  Yes.

11   Q.  And so did the doctors who were caring for Mrs. Hyde at the

12   time, did they ultimately decide that an IVC filter should also

13   be placed?

14   A.  Yes, they did.

15   Q.  And have you reviewed the images that are available from

16   the placement of the IVC filter?

17   A.  Yes, I have.

18           MR. ROGERS:  And, Scott, would you mind pulling up

19   Exhibit 8538, please.

20           And can you bring out the center section a little bit?

21   Is that possible with this image?

22   BY MR. ROGERS:

23   Q.  Okay.  Can you see that, Dr. Morris?

24   A.  Yes, I can.

25   Q.  And just to orient the jury, can you tell the jury what

1    procedure is going on here?  What are we seeing?

2         THE COURT:  This is not in front of the jury,

3    Mr. Rogers.

4         MR. ROGERS:  Oh, I'm sorry.  Thank you, Your Honor.  I

5    apologize.

6         THE COURT:  I don't think it's in evidence either.

7         MR. ROGERS:  Your Honor, I would move this into

8    evidence.

9         THE COURT:  Any objection?

10        MR. O'CONNOR:  Can I get the exhibit number again,

11   please?

12        MR. ROGERS:  Sure.  It's 8538.

13        MR. O'CONNOR:  No objection.

14        Are you going to ask him about --

15        Can we get the date of this particular radiograph from

16   the witness, Your Honor?

17        THE COURT:  Yes.  Let's go ahead and do that.

18        The exhibit is admitted, and you may display it.

19        (Exhibit No. 8538 admitted into evidence.)

20        MR. ROGERS:  Thank you, Your Honor.

21        MR. O'CONNOR:  Thank you.

22   BY MR. ROGERS:

23   Q.  So, Dr. Morris, first of all, what's the date of this film?

24   A.  February 25th, 2011.

25   Q.  Thank you.

1    Now, can you orient us and tell us what it is we're

2    seeing, what kind of procedure is going on?

3    A.  Yeah.  So this is the lumbar spine.  It's curved a little

4    bit to the left.  That's called scoliosis.  But there's the

5    delivery device here that was used to place the filter.  So

6    this is going to be eventually taken out.

7    And it's hard to see because this is somewhat of a

8    blurry picture that Dr. Henry took during the procedure, it's

9    called a radiographic spot film, but this shows the IVC filter

10   in place.  And the nose of that filter is terminating at the

11   lower margin, at least at the level of the lower margin of the,

12   what we call the pedicle.

13   This is the left pedicle.  And the right pedicle would

14   be seen here.  Because she has the scoliosis and the curvature,

15   we're not seeing it as well, but it's at that lower margin of

16   the right pedicle of the L-2 vertebral body.  This is L-2.

17   This is -- meaning lumbar vertebral body number 2.  So that's

18   our reference point.

19   Q.  And when you use the term the "nose" of the filter --

20   A.  Yes.

21   Q.  -- what do you mean by that?

22   A.  I mean the top part.  Just above it is a hook that we can

23   barely see because the image is somewhat poor quality, but it's

24   the most cranial directed portion of the filter.

25   Q.  And based on this image that you see, and other images that

CHRISTOPHER MORRIS, M.D. - DIRECT EXAMINATION          1976

1    you've seen of this filter, can you say what specific filter

2    this is, as far as the type?

3    A.  No.  All we know is that there is a hook, so it's somewhat

4    a later version than the G2, because the G2 did not have a

5    hook.  But we can't tell if this is a G2 Express, a G2X, an

6    Eclipse.  We know it's probably not --

7            MR. O'CONNOR:  Objection, Your Honor.  This is not in

8    the report about a question of what filter --

9            THE COURT:  All you have to say is "nondisclosure."

10           MR. O'CONNOR:  Nondisclosure.

11           THE COURT:  Is it in the report?

12           MR. ROGERS:  He says what type it is in the report,

13   Your Honor, but this particular stuff is not in the report.

14           THE COURT:  Objection is sustained.

15           MR. ROGERS:  Thank you, Your Honor.

16   BY MR. ROGERS:

17   Q.  And so can you tell us about the position of this filter?

18   Would you consider this a well-placed filter?

19   A.  Yes.  It's well positioned.

20   Q.  And how about as far as it being centered and upright?

21   Would you consider it to be those things?

22   A.  Yes.

23           MR. ROGERS:  We can take that down, Scott.

24   BY MR. ROGERS:

25   Q.  Let me ask you about some of the -- some of the issues in

1    this case that the jury's heard about related to Mrs. Hyde's

2    filter.

3            And why don't we start with tilt.  Did you review

4    various images of this filter throughout the course of time?

5    A.  Yes, I did.

6    Q.  And does that take you from the implant of the filter all

7    the way up to the time that it was explanted?

8    A.  Yes.

9    Q.  And what is your opinion, to a reasonable degree of medical

10   certainty, of whether or not this filter was tilted?

11   A.  I saw no significant amount of tilt in this filter.

12   Q.  And did you -- the jury's heard that this filter is tilted

13   2 to 4 percent.  Would you think that that's accurate?

14   A.  I can't say it's not tilted 2 to 4 percent, but that's such

15   a small degree of tilt that we don't really have a good way to

16   measure that tiny amount of tilt.

17   Q.  All right.  Well, let's move on and talk about caudal

18   migration.  And can you tell the jury what that is, please.

19   A.  Caudal migration is movement of the entire filter towards

20   the feet.

21   Q.  And when your -- people such as yourself, interventional

22   radiologists, are there standards within your organization

23   about migration of a filter?

24   A.  Yes.

25   Q.  And can you describe for the jury what those standards say?

CHRISTOPHER MORRIS, M.D. - DIRECT EXAMINATION                1978

1    A.  The Society of Interventional Radiology defines migration

2    to be at least 2 centimeters, or 20 millimeters, in distance.

3    Q.  And why is that?  Why is that sort of the threshold?

4    A.  Because smaller degrees of apparent migration may or may

5    not be true migration.  It may be accounted for by other

6    factors such as the way the image was created.

7             There's a phenomenon called parallax.  Because when an

8    x-ray is made, they're not all orthogonal beams.  They may

9    diverge.  And if the object that we're looking at is on the

10   edge of the film or not exactly in the middle, it may be

11   projected or shadowed further away than where it really is.

12            There are other factors, such as hydration of the

13   patient.  In patients that are really well hydrated, the IVC

14   will dilate up in diameter, and that can then widen the struts

15   and then lower the nose of the filter based on the physics of

16   the way the filter is presented.

17            And other factors like respiratory variation can

18   change that apparent location of the filter.  Cardiac issues.

19   Patients that have reflux or congestive heart failure will have

20   a more dilated IVC at various times as well.  So lots of

21   factors that can change subtle amounts of apparent migration

22   when it's really not even migration.

23            MR. ROGERS:  Can we have Exhibit 8527, please.

24            And, Your Honor, I move this into evidence.

25            MR. O'CONNOR:  No objection.

UNITED STATES DISTRICT COURT

1          THE COURT:  Admitted.

2          (Exhibit No. 8527 admitted into evidence.)

3          MR. ROGERS:  May we display?

4          THE COURT:  Yes.

5   BY MR. ROGERS:

6   Q.  All right.  So, Dr. Morris, can you see that image on your

7   screen?

8   A.  Yes.  I can see both of them.

9   Q.  And on the left-hand side, is that the image that we just

10  saw of the IVC filter at the time of implant?

11  A.  Yes.

12  Q.  And what do we see on the right-hand side?

13  A.  This is a much more clear spot film that Dr. Kuo obtained

14  when he -- right before he was going to remove this filter.

15  Q.  So on the left-hand side we have the filter when it was

16  placed, and on the right-hand side we have the filter right

17  before it was retrieved; is that right?

18  A.  Yes.

19  Q.  And so what can you tell the jury, Dr. Morris, about what

20  you observe here about whether this filter caudally migrated?

21  A.  Well, we know that this is the pedicle, and I'll outline

22  the actual ped -- right pedicle of L-2.

23          So when this filter was placed, this nose was in --

24  projected over -- right where the tip of my arrow is right now.

25  And based on where it is now, it has, you know, changed its

1    apparent position a very small amount.

2    Q.  And would the amount of change that you could perceive in

3    these images, would that be more or less than 5 millimeters?

4    A.  Less than 5 millimeters.

5    Q.  And so according to the standards applied by the Society of

6    Interventional Radiologists, would that be considered to be

7    migration?

8    A.  Absolutely not.

9    Q.  And is that because it's within the margin of error that

10   you just described?

11   A.  Yes.

12   Q.  All right.  Dr. Morris, I want to move on to perforation.

13          MR. ROGERS:  And you can take that image down, Scott.

14   BY MR. ROGERS:

15   Q.  Because the jury's also heard about perforation.  Can you

16   describe for the jury what perforation is.

17   A.  Perforation is when a strut of an IVC filter extends

18   through the wall of the inferior vena cava.

19   Q.  And are there an accepted grading system that is available

20   to interventional radiologists such as yourself in order to

21   assign the level of perforation that can be observed?

22          MR. O'CONNOR:  Objection.  Nondisclosure.

23          MR. ROGERS:  Your Honor, in the Hyde report, it's on

24   page 8, starting at line 5.

25          THE COURT:  Page 8 -- oh.  That's not in his main

1   report?

2           MR. ROGERS:  No, sir, Your Honor.  It's in --

3           THE COURT:  Okay.

4           MR. ROGERS:  You got it?

5           THE COURT:  I see it.

6           Objection is overruled.

7   BY MR. ROGERS:

8   Q.  All right, Dr. Morris.  So is there a grading system that

9   is available to interventional radiologists such as yourself in

10  order to place an amount of how much an IVC filter may have

11  perforated?

12  A.  There are multiple grading systems.  The one that I like to

13  use was basically described by Oh and Trerotola a number of

14  years ago.

15  Q.  And when you say Oh, is that a person's name?

16  A.  Yes.

17  Q.  And that's spelled how?

18  A.  O-H.

19  Q.  And do you know Dr. Oh?

20  A.  I don't know him, no.

21  Q.  And do you know what institution he practices at?

22  A.  I think they're all at University of Pennsylvania.

23  Q.  And so let's talk about this grading system.  And so as I

24  understand it --

25          Well, let me ask you:  What is the lowest level of

1   perforation under this grading system?

2   A.  Grade 0.

3   Q.  And what does that mean?

4   A.  That basically means there is zero -- there is no

5   penetration at all.  The strut is entirely within the lumen or

6   the inside of the inferior vena cava.

7   Q.  And what's the next grade after grade zero?

8   A.  1.  Grade 1.

9   Q.  And what does that mean?

10  A.  That means that the strut may or may not actually be

11  piercing through the wall.  It may still be within a thickened

12  part of the wall of the IVC on an x-ray or an inferior vena

13  cavagram type of a study.  It may appear like it's outside, but

14  it's what we call tenting.  It may just be pushing the wall out

15  a little bit in a thickened area, so it's not true

16  through-and-through penetration.

17  Q.  And so what is the next level after Grade 1?

18  A.  Grade 2.

19  Q.  And can you explain to the jury what that is?

20  A.  That means the strut is terminating clearly outside of the

21  inferior vena cava and it is within the fat, called the

22  retroperitoneal fat, around the inferior vena cava.

23         And typically on a CT scan -- because that's how these

24  are diagnosed, by CT scanning -- there is a metal artifact, so

25  there is like what we call a halo around the metallic part of

1    the strut that's within the fat of the retroperitoneum.

2    Q.  And is the next level Grade 3?

3    A.  Correct.

4    Q.  I catch on to these things.

5         And so what -- can you describe what Grade 3 is?

6    A.  Grade 3 means that the strut is interacting with a

7    structure outside of the inferior vena cava.

8    Q.  And, Doctor, before we move on, are things like an inferior

9    vena cava, are they what we call radiopaque?  I mean, can they

10   be seen on an x-ray?

11   A.  Not inherently on a standard radiograph or x-ray study, no.

12   Q.  Okay.

13        MR. ROGERS:  Scott, let's pull up Exhibit 8529,

14   please.

15        And, Your Honor, I move this into evidence.

16        MR. O'CONNOR:  No objection.

17        THE COURT:  Admitted.

18        (Exhibit No. 8529 admitted into evidence.)

19   BY MR. ROGERS:

20   Q.  And, again, Dr. Morris, to get us oriented, what's the date

21   of this study?

22   A.  This is December 16th, 2011.

23   Q.  And what was going on at this point in time clinically with

24   Mrs. Hyde that caused this study to be ordered?

25   A.  Several days before this, maybe four or five days before,

1    she had -- Mrs. Hyde had an ultrasound study of her kidneys

2    because they suspected kidney stones.  And that study actually

3    did show bilateral kidney stones, and so that prompted this

4    study to be performed.

5    Q.  And, Doctor, do you have with you a mouse there that you --

6    A.  I do.

7    Q.  -- can manipulate this image?

8    A.  I do.

9    Q.  And before we do that, can you tell the jury, when you're

10   in your office or in your hospital looking at CT images, what

11   do you do in order to kind of move through the series of

12   images?

13   A.  Well, we can do what we call scroll through the set of

14   images from either top to bottom or bottom to top.

15   Q.  And can you just demonstrate for the jury what that means,

16   what you're going to do?

17   A.  Okay.  So I'm just slowly scrolling through these images

18   now from the top, and now I'm coming down --

19          MR. ROGERS:  Oh, I'm sorry, Your Honor.  May we

20   display?

21          THE COURT:  You may.

22          MR. ROGERS:  I apologize.

23   BY MR. ROGERS:

24   Q.  So I apologize.  But can you start again?

25   A.  Okay.

1    Q.  I guess from the bottom.

2    A.  So this is -- well, I'm actually starting from the top.

3    This is the highest part.  And we can see the liver over in

4    this location.

5            This is the inferior vena cava.  No contrast media or

6    dye has been administered in this study because it's been

7    performed to look more for kidney stones.  So that's why they

8    did not give the dye or the contrast media.

9            So as I scroll slowly from top to bottom, we'll start

10   to see the nose of the filter dead center within the middle of

11   the inferior vena cava.  If I draw a circle around the inferior

12   vena cava, that bright spot right in the middle is the nose.

13   So I'm going to keep coming down in an inferior direction, and

14   we start to see the strut start to become in view.

15           And, by the way, here is the right kidney stone just

16   seen incidentally there.

17           As I come down another section, we now see these outer

18   struts.  There's six outer struts, which are the arms of this

19   filter.  And there are -- if you count closely, there are six

20   inner struts.  Those are the legs of the filter.  Everything

21   seems to be really well positioned.  No detectable tilt

22   identified here.

23           As we keep coming down, there's a well distribution of

24   the outer arms and the -- the six outer arms and the six inner

25   legs.

1         I'll come down one more section, and we're seeing --

2    imagine a clot coming up, and it's going to get stuck right in

3    the middle.  If I go up a little bit, that's what the clot

4    sees.  That's how these filters work.

5         I'm going to come back down again.

6         And I touched that screen.  That red dot should not be

7    there, so I'll go undo.  Okay.

8         Keep coming down.  And now we start to see what may be

9    considered -- what may end up appearing to be perforation.  We

10   can see that this strut, for instance, where my cursor is, is

11   getting towards the confines of that inferior vena cava wall.

12   But also notice that the inferior vena cava is draped over the

13   spine.  I mean, there's no -- there's no retroperitoneal fat.

14   This is what fat looks like.  It's dark.

15        There's no intervening fat, so that inferior vena cava

16   is literally on top of the vertebral body, which is this

17   structure here.  There's also bowel right up on top of it, so

18   there's not much room there for things to -- you know, to let

19   fat get insinuated in between these structures.

20        As we keep coming down, we're starting to lose the

21   arms because they're shorter than the legs.  But here is an arm

22   that is interacting with the aorta.  This structure here is the

23   aorta.  So we don't know if it's actually touching it or

24   touching the outer wall or right adjacent to it.  That's why we

25   just use this sort of vague term "interacting" because we don't

1   know exactly what it's doing.

2          And these other struts, some of those are Grade 1 or

3   Grade 2 because we don't know whether they're actually tenting

4   or within the retroperitoneal fat.  I don't see any halo around

5   them, so I can't clearly call them Grade 2.

6          But that's what the kind of things we're looking at

7   when we're evaluating these filters at that point.

8   Q.  And based on your review of this image, do you see any

9   indication that a strut of the filter has pierced into the

10  aorta?

11  A.  Into the aorta, no.

12  Q.  And do you see any indication in this study where you could

13  say, to a reasonable degree of medical certainty, that one of

14  the filter struts has entered the patient's spine?

15  A.  I can't say that, because if we look up high, you can see a

16  distance here between the wall of the inferior vena cava and

17  the vertebral body, which is part of the spine.

18         But as we come down where we may think some of these

19  struts could theoretically be penetrating, everything's against

20  the spine.  So we can't tell if they're still within the IVC or

21  they're right next to the outside of the IVC, so there's -- we

22  can't, with a degree of certainty, tell whether or not they're

23  actually penetrating into the spine at that location.

24  Q.  And, Doctor, did you review other CT images that are

25  similar to this in that same axial plane from 2013 and 2014?

CHRISTOPHER MORRIS, M.D. - DIRECT EXAMINATION          1988

1    A.  Yes, I did.

2    Q.  And what can you tell the jury about these struts and their

3    position and whether they changed over time?

4    A.  Everything looked pretty much exactly the same except for

5    the last CT scan of May of 2014 showed a missing arm, which we

6    know had fractured at this point and had embolized to the right

7    ventricle of the heart.

8    Q.  And, Doctor, if you were reviewing this imaging in regard

9    to perforation, would this be of any clinical concern to you?

10   A.  Which part?

11   Q.  As far as the strut positions as far as perforation is

12   concerned.

13   A.  Oh, we see this routinely.  All types of filters.

14   Q.  And would this be of any clinical concern?

15   A.  No.

16   Q.  So, Doctor, let's talk about fractures, since you brought

17   that up.  And you mentioned an image from May of '14; is that

18   right?

19   A.  Yes.

20          MR. ROGERS:  And so, Scott, if you would, can you pull

21   up Exhibit --

22          Well, I take it back.  I don't have it.

23   BY MR. ROGERS:

24   Q.  Let's just talk about it, Doctor.

25          And you reviewed that image; correct?

UNITED STATES DISTRICT COURT

1  A.  Yes.

2  Q.  And so when you saw the image, was one of the struts, had

3  it disappeared?

4  A.  Yes.

5  Q.  And so can you pinpoint a time at which we knew that the

6  strut was still in place and when we knew it was gone?

7  A.  Yes.  We know that that strut was in place on the CT scan

8  of the abdomen and pelvis June of 2013, and it was not there on

9  the next CT scan that was obtained in May of 2014.  So sometime

10 in that window, that strut had fractured and embolized.

11 Q.  And did you review any CT images of the strut itself in the

12 patient's heart?

13 A.  Yes.

14 Q.  And what did those show?

15 A.  Those showed the strut that looked like an arm was in the

16 right ventricle of the heart.

17 Q.  All right.  So, Doctor, let's talk about the removal of the

18 filter and the strut.

19        And can you remind the jury where that procedure took

20 place?

21 A.  That was done at Stanford University Hospitals by Dr. Kuo.

22 Q.  And have you reviewed the imaging that was taken during

23 that procedure that relates to the removal of the filter?

24 A.  Yes, I have.

25 Q.  And can you describe for the jury the process that Dr. Kuo

1    used to remove that filter?

2    A.  He used -- well, first of all, he entered the venous system

3    by puncturing the right internal jugular vein in the neck, and

4    he advanced a catheter down the venous system and into the

5    inferior vena cava where he took pictures of what -- with

6    what's called an inferior vena cavagram.  He wanted to make

7    sure there was no clot trapped in the filter which would

8    preclude removing it.

9           And after that, he was then able to exchange that

10   catheter for the sheath system.  A sheath is basically just a

11   bigger catheter.  These are all routine techniques that we use

12   to remove filters.  And that sheath was placed down right near

13   the top of the filter.  And through that sheath he inserted

14   what's called a snare, a catheter and snare, a gooseneck snare,

15   or in this case he used a tri -- a tri-loop snare, which is a

16   special guidewire that forms a loop.

17          And then he can use that loop, and he did use the

18   loop, to engage the hook of that filter.  He pushed his

19   catheter down over the loop to basically cinch down that snare

20   wire on that hook.  Then he could actually pull the whole

21   filter system directly into the sheath and out of the body.

22   And that's exactly what he did.

23   Q.  And, Doctor, were there any instruments used that were

24   special instruments to remove that filter?

25   A.  He only used a catheter and loop snare.  That's the most

1    simple technique known to remove a filter.  And he did not use

2    any advanced techniques to remove that filter.

3    Q.  And so, Doctor, did you also review the imaging of the

4    removal of the strut from the heart?

5    A.  There was -- there was not much in the way of imaging,

6    because they did that primarily by real-time fluoroscopy and

7    didn't really save images.  But he did describe the whole

8    process in his report, so I did review his report very well,

9    yes.

10   Q.  And, Doctor, did the -- was Dr. Kuo successful in the

11   removal of the strut?

12   A.  Yes.

13   Q.  And so once the procedure was over, were all the portions

14   of the IVC filter out of the patient at that time?

15   A.  Yes.

16   Q.  Doctor, let me again sort of move forward.  I want to kind

17   of change topics, and I want to talk to you about some things

18   that the jury's heard through the trial.

19       And the first thing I want to talk to you about are

20   potential symptoms that were caused by the filter.  And do you

21   have an opinion, to a reasonable degree of medical certainty,

22   as to whether the filter or the strut caused Mrs. Hyde to

23   experience any abdominal pain or back pain?

24   A.  Yes, I do.

25   Q.  And what is that opinion?

1    A.  Well, she has -- Mrs. Hyde has so many problems that can

2    cause abdominal pain and back pain.  We know that a lot of

3    those problems commonly cause abdominal pain and back pain.

4    IVC filters rarely cause pain, so I think the likelihood of the

5    filter causing those symptoms is less than the likelihood of

6    her other concomitant disease processes causing those same

7    symptoms.

8    Q.  And did you see records that indicated that there had been

9    issues about back pain that were long-standing?

10   A.  Yes.

11           MR. ROGERS:  And, Scott, would you mind pulling up

12   Exhibit 8643, please.

13           Your Honor, I move this into evidence.

14           MR. O'CONNOR:  I'm just having a hard time seeing the

15   date.  I'm sorry.

16           MR. ROGERS:  Sure.  Up at the top.

17           MR. O'CONNOR:  All right.  Thank you.

18           No objection.

19           MR. ROGERS:  Your Honor, may we display?

20           THE COURT:  Admitted.

21           Yes, you may display.

22           (Exhibit No. 8643 admitted into evidence.)

23           MR. ROGERS:  Thank you.

24           So just to get oriented, Scott, would you pull up the

25   top thing there.

1    BY MR. ROGERS:

2    Q.  And so, Doctor, to help us know what we're seeing, can you

3    tell us the date of this record and what's going on here.

4    A.  This visit date was May 13th, 2013.  It was a visit by

5    Dr. -- I don't know how to pronounce it, but "Reyes," "Reyes."

6    And it was in the Comprehensive Interventional Pain Management

7    portion of this healthcare system.

8            MR. ROGERS:  And, Scott, you can take that down, that

9    box.

10           And can you pull out the -- not the next box down but

11   the next box, please.

12   BY MR. ROGERS:

13   Q.  And so, Doctor, in this particular portion, was there

14   anything that you thought that was significant regarding the

15   length of time that the patient had had issues with back pain?

16   A.  Well, it describes it as a chronic problem and -- have to

17   read through here, but it looks like Mrs. Hyde described --

18   described it as it was precipitated by a fall into a trench.

19   Q.  And when is the date that was relayed about when that fall

20   occurred?

21   A.  September 24, '07.  2007.

22   Q.  All right.  Thank you.

23           MR. ROGERS:  And, Scott, you can take that down.

24   BY MR. ROGERS:

25   Q.  And let me ask you about another topic that the jury has

1    heard some evidence of, and that is evidence of sleep

2    difficulties.

3             In your review of the records, did you see records

4    that you thought were important regarding how long those issues

5    had been going on?

6    A.  Yes, I did.

7             MR. ROGERS:  And, Scott, can we pull up Exhibit 8539,

8    please.

9             And, Your Honor, I move this into evidence.

10            MR. O'CONNOR:  No objection.

11            THE COURT:  Admitted.

12            (Exhibit No. 8539 admitted into evidence.)

13            MR. ROGERS:  May we display?

14            THE COURT:  Yes.

15   BY MR. ROGERS:

16   Q.  And, Dr. Morris, if you would, can you again just orient

17   the jury to what we're seeing here, when this is and what it

18   is?

19   A.  Sure.  The date here is April 21st, 2011.  That's several

20   months after the IVC filter was placed.

21   Q.  And just as a reminder, the filter was placed in February

22   of 2011; is that correct?

23   A.  Yes.

24   Q.  So at this point in time, approximately how long had the

25   filter been indwelling?

1   A.  About two months.

2   Q.  And so, Doctor, if we could --

3          MR. ROGERS:  Scott, can you pull up the second

4   paragraph, please.

5   BY MR. ROGERS:

6   Q.  And, Doctor, was this an evaluation by a sleep specialist?

7   A.  Yes, a sleep neurologist.

8   Q.  And what did you see in this record that you thought was

9   important about the length of time that these issues had been

10  going on?

11  A.  Well, she described sleep issues for quite a long time.

12  And, you know, she goes on to talk a lot more about, at least

13  to Dr. Treisman here, about the actual symptoms that she

14  experiences at night and why she can't sleep well.  But she'd

15  been treated with a CPAP, you know, a continuous positive

16  airway pressure machine, for quite a while before this.

17  Q.  And, Doctor, does this record indicate that the patient had

18  at night felt like she was going to die and she is gasping for

19  air?

20  A.  Yes, it does.

21  Q.  All right.  Thank you.

22          And, Doctor, let me ask you, I guess, just a couple of

23  more questions.  You know, the jury has also heard about chest

24  pain and whether it may be related to the strut that was in the

25  heart.

1          And let me ask you:  Do you have an opinion, to a

2   reasonable degree of medical certainty, as to whether the

3   patient experienced chest pain from the strut?

4   A.  Yes.

5   Q.  And what is that opinion?

6   A.  Well, number one, I know based on studies that I've read

7   and analyzed that fractured fragments rarely cause symptoms.

8   Fractured fragments in the heart or in the pulmonary arteries

9   rarely cause symptoms.

10          MR. O'CONNOR:  Objection.  Lack of disclosure on this,

11   Your Honor.

12          MR. ROGERS:  Your Honor, we'll move on.

13          THE COURT:  All right.

14   BY MR. ROGERS:

15   Q.  So to kind of narrow your opinion down a little bit,

16   Doctor, as far as Mrs. Hyde specifically is concerned, what is

17   it that made you reach this conclusion?

18   A.  Well, she has lots of underlying medical issues that are

19   commonly associated with chest pain, GE reflux disease being

20   one of them.  She had cervical spinal -- does have cervical

21   spinal stenosis and a bulging disk in her cervical spine.  And

22   we know from her imaging that she has diffuse spondylosis of

23   her thoracolumbar spine with bridging osteophytes and rotatory

24   sigmoid scoliosis.  All those can cause pain in the chest area.

25          MR. O'CONNOR:  Your Honor, I move to strike this

1    testimony as nondisclosed.

2              THE COURT:  Mr. Rogers?

3              MR. ROGERS:  Your Honor, that's fine.  We'll move on.

4              THE COURT:  Well, I will grant the motion and instruct

5    the jury to disregard the last answer.

6    BY MR. ROGERS:

7    Q.  And let me ask you this, Dr. Morris:  In your experience as

8    an interventional radiologist, do you perform procedures from

9    time to time on patients' hearts?

10   A.  Well, we do retrieve foreign bodies in the heart, yes.  We

11   also pass catheters through the heart to gain access to the

12   pulmonary artery system.

13             Interventional radiologists, many, many years ago, did

14   a lot of the early interventional procedures directly on the

15   heart, but I personally only -- I restrict myself to the types

16   of procedures I just mentioned.

17   Q.  And are you familiar with procedures where there are pieces

18   of metal that are intentionally placed in a patient's heart for

19   their health?

20   A.  Yes.

21   Q.  And what would that be?

22   A.  Pacemaker.  Pacemaker leads are placed in the heart all the

23   time.  Very commonly.

24             MR. O'CONNOR:  Objection.  Nondisclosure.

25             THE COURT:  Where is that, Mr. Rogers?

1          MR. ROGERS:  Your Honor, I believe it's in there, but

2     I'm not going to take the time to find it.

3          THE COURT:  All right.  Objection is sustained.

4     BY MR. ROGERS:

5     Q.  All right.  So, Dr. Morris, let me ask you this:  Are you

6     aware of any literature on struts in hearts causing patients

7     death or to be at risk of sudden death?

8     A.  I've never seen a report of that, no.

9          MR. O'CONNOR:  Objection.  Nondisclosure.

10          THE COURT:  Where is that, Mr. Rogers?

11          MR. ROGERS:  Your Honor, I believe it's page 9,

12     number 5.

13          THE COURT:  Of the Hyde report?

14          MR. ROGERS:  No.  I take it back, Your Honor.  Top of

15     page 10, number 6.  Next to the last sentence.

16          THE COURT:  Objection is overruled.

17     BY MR. ROGERS:

18     Q.  And, Dr. Morris, just to conclude, if you were Mrs. Hyde's

19     doctor, what would you tell her today about what impact that

20     this -- the filter and the strut would have on her?

21     A.  So I would probably be seeing -- see her in my office, and

22     I would sit down with her and counsel her --

23          MR. O'CONNOR:  This is -- nondisclosure.

24          THE COURT:  Where is this disclosed, Mr. Rogers?

25          MR. ROGERS:  Your Honor, that specific thing is not in

 1   the report.

 2           THE COURT:  Objection is sustained.

 3           Let's stick to the report and the deposition.

 4           MR. ROGERS:  Thank you, Your Honor.

 5   BY MR. ROGERS:

 6   Q.  Dr. Morris, have all the opinions that you've expressed

 7   today been to a reasonable degree of medical certainty?

 8   A.  Yes, they have.

 9           MR. ROGERS:  All right.  Thank you.  I have no further

10   questions at this time.

11           THE COURT:  Cross-examination.

12           MR. O'CONNOR:  May we approach?

13           THE COURT:  You may.

14           (At sidebar on the record.)

15           MR. O'CONNOR:  Your Honor, early on in his testimony

16   he touted the Recovery and what a great filter it was and how

17   there were no problems with it in his practice.  That's not a

18   true story.  He knows reality.

19           Just now they tried to get in testimony about no

20   literature about struts going to the heart.  Well, we know that

21   there have been Recovery filters going to the heart and killing

22   people.  His specific question was if there is any literature

23   out there about struts causing death, and he said no.

24           Based upon what he has said about the Recovery, he

25   told this jury, and they went quite a while about it, we think

1    they've opened the door that we should now be able to ask this

2    witness about Recovery deaths.

3            MR. ROGERS:  Your Honor, I disagree.  I mean, I asked

4    him very specifically about literature about struts going to

5    the heart and causing death.  It's in his report.

6            And as Your Honor knows, the jury has heard a lot of

7    evidence from the other side about how she was at risk of

8    sudden death from this.  And, Your Honor, it's all specifically

9    addressed in his report.  And it's not -- it doesn't have

10   anything to do with cephalad migration death, and I fail to see

11   how there's a connection.

12           THE COURT:  Mr. O'Connor, my memory of the cephalad

13   migration death evidence was that they were instances where the

14   entire filter went to the heart, sometimes with a clot burden,

15   that resulted in death.

16           MR. LOPEZ:  I think there were some strut fracture

17   deaths too.

18           THE COURT:  Well, that's what I'm not remembering.  I

19   remember reading instances where it was the whole filter going

20   to the heart causing death.

21           The specific question that was asked of the witness

22   was whether -- and I checked my notes on this too -- whether he

23   was aware of any literature -- I was pretty closely following

24   the language -- showing that a strut going to the heart can

25   cause, I think the question was, specifically, sudden death,

1    which seemed to me to be in response to Dr. Muehrcke's

2    testimony that it can cause sudden death.

3            So would you explain why you think evidence of the

4    entire filter going to the heart is made relevant by that

5    specific testimony of the lack of literature on a strut going

6    to the heart.

7            MR. O'CONNOR:  Well, I'd have to go back and look for

8    strut Recovery deaths.  As I sit here, I can't tell you that.

9            But I think when you take the context of all the

10   evidence and what they tried to do with this witness, they

11   clearly were getting this witness to talk about how great this

12   Recovery filter was and how great it was in his practice.

13           Now, they have made this guy out to be a foremost

14   expert -- they have made this expert to be a foremost expert.

15   He was a KOL, and so they basically had him come in here --

16           THE COURT:  What's a KOL?

17           MR. O'CONNOR:  A key opinion leader for Bard.

18           THE COURT:  Okay.

19           MR. O'CONNOR:  He was a consultant, key opinion leader

20   for Bard.  And they brought him in here to talk about what

21   great experiences that his facility had with the Recovery.  And

22   I think he knows -- I know that he knows what happened in

23   Recovery.  I know that if he is who he says, with the

24   experience he has, he knows of Recovery deaths.

25           I don't think it's fair for us to leave that with this

 jury without having him to explain that he was aware of Recovery deaths and that that filter was not that good, and, in fact, they stopped selling it.

MR. ROGERS: Your Honor, I think I spent a very brief time on the Recovery filter. It's not like I dwelled on it and said it's the greatest filter ever. I mean, we talked about it as far as being the first filter on the market with long-term retrievability, and that's really all I did and moved on. I didn't ask him any questions about the safety on it. You know, it was really focused on the retrievability aspect of it.

And in my cross-examination of Dr. Muehrcke, I asked him if he was aware of any literature of a strut from a filter causing a death, and he agreed he was not. So this witness has said nothing different than what their witness has said.

THE COURT: Hold on just a minute.

So I can't look at this morning's transcript since we have a new reporter and she switched it over, but I've gone through my notes. The only reference I can find specifically to the Recovery filter -- and I've been taking pretty detailed notes -- was when he said that the Recovery filter was -- I don't know what his words he used, but a benefit over the previous filter which had had to be removed every 14 to 21 days. It could stay in six months. It was particularly beneficial to trauma patients, I think he said.

He did say later that he has used all of the Bard line

1    of filters.  I don't think he's focused specifically on the

2    Recovery.

3             My conclusion is that the specific question about

4    medical literature on struts causing heart deaths is directly

5    responsive to Dr. Muehrcke's opinion that the strut going to

6    her heart could cause sudden death and that he hasn't focused

7    on specifically complications with the Recovery.

8             You certainly can, Mr. O'Connor, go into complication

9    rates with the Recovery and the things you've been arguing to

10   the jury about problems with the Recovery, if you want to

11   demonstrate to him or have him agree that there were problems

12   with the Recovery.  But I don't think this opens the door to

13   cephalad migration deaths.

14            MR. O'CONNOR:  Well, I think we've made a sufficient

15   record, so thank you.

16            THE COURT:  Yeah.  Okay.

17            MR. LOPEZ:  Thank you, Your Honor.

18            THE COURT:  Hold it.

19            MR. O'CONNOR:  I think that should --

20            THE COURT:  I haven't taken anybody's beans today.

21            (End of discussion at sidebar.)

22            THE COURT:  Thanks, ladies and gentlemen.

23            MR. O'CONNOR:  May I proceed, Your Honor?

24            THE COURT:  You may.

25

```
 1                        CROSS-EXAMINATION

 2   BY MR. O'CONNOR:

 3   Q.  Hello, Dr. Morris.

 4   A.  Good afternoon.

 5   Q.  Again, I'm Mark O'Connor.

 6   A.  Good afternoon.

 7   Q.  How you been?

 8   A.  Good.

 9   Q.  Dr. Morris, you're here as an expert retained by Bard;

10   correct?

11   A.  By Nelson Mullins, yes.

12   Q.  But you understand you're testing -- you're testifying on

13   behalf of Bard Peripheral Vascular and C.R. Bard; you know

14   this?

15   A.  Yes.

16   Q.  And, regardless, you have been an expert in other cases;

17   correct?

18           You serve as expert in other types of cases, do you?

19   A.  Rarely, yes.

20   Q.  And you do know that when you come to court to give

21   opinions, that your opinions must be accurate and truthful?

22   You understand that?

23   A.  Yes.

24   Q.  And they must be based upon facts and evidence and other

25   information; correct?
```

CHRISTOPHER MORRIS, M.D. - CROSS-EXAMINATION                    2005

1    A.  Yes.

2    Q.  And they must be capable of being substantiated; true?

3    A.  Yes.

4    Q.  And that means that you rely on the party that retained you

5    to supply you with information that you need to look at to

6    arrive at a fair and truthful opinion; correct?

7    A.  Absolutely.

8    Q.  That means that you rely on the party that retained you to

9    give information that may help that party; right?

10   A.  Yes.

11   Q.  But you also expect a complete volume of information,

12   including information that may not be favorable to the side

13   that represents you, that has retained you; true?

14   A.  True.

15   Q.  So you expect both the good and the bad so that you could

16   evaluate it in arriving at your opinions; right?

17   A.  As long as it's reliable, yes.

18   Q.  And when you come in here and you tell this jury that your

19   opinions are to a reasonable degree of medical probability, as

20   you did, that's because you are under the impression that you

21   have reviewed all the important information; true?

22   A.  Reliable, important information, yes.

23   Q.  And in this case, and you have -- you have done a report, a

24   large report, a general report; true?

25   A.  Yes.

1   Q.  And you've also done a report specific to Lisa Hyde;

2   correct?

3   A.  Yes.

4   Q.  And in both reports, you understood that you had that

5   obligation to be thorough, to be complete, and to be truthful;

6   right?

7   A.  Yes.

8   Q.  And to be accurate, so anybody that would review that

9   report or question you about that report could rely that you

10  had looked at all the information possible?

11  A.  Just like -- as I treat my own patients, yes.

12  Q.  And you received everything you needed from the lawyers

13  representing Bard.  That's at least what you assume; true?

14  A.  Reliable information, yes.

15  Q.  Now, one thing is that, in at least six different places in

16  your report, you identify Lisa Hyde's filter as a Bard G2X;

17  correct?

18  A.  I didn't count the number, but that may be true.

19  Q.  Okay.  You wrote your report about Lisa Hyde's G2X filter;

20  correct?

21  A.  Yes.

22  Q.  Now, what you have not received are any internal documents

23  from Bard; true?

24  A.  Correct.

25  Q.  You have not received any documents from Bard or Bard's

1  lawyers that relate to any analysis that Bard did about failure

2  trends within Bard that Bard was aware of; correct?

3  A.  Correct.

4  Q.  You didn't receive any information from Bard about

5  information Bard was aware about increasing rates of failures

6  with the G2 filter that was not told to doctors; correct?

7  A.  Correct.

8  Q.  You didn't receive, for example, a G2 caudal report that

9  was prepared by Natalie Wong; right?

10  A.  I don't even know who Natalie Wong is.  No.

11  Q.  You didn't receive a G2 and G2X fracture analysis that was

12  prepared by Bard, did you?

13  A.  As long as it wasn't published in the public domain, I

14  would not have seen it, no.

15  Q.  It wasn't supplied to you, is my point, from the lawyers at

16  Bard; true?

17  A.  True.

18  Q.  And you didn't receive documents, for example, on the G2

19  Platinum, did you?

20  A.  No.

21  Q.  You didn't receive any documents in terms of what Bard was

22  doing by way of alternative designs during the period of 2006,

23  2007, 2008, 2009, did you?

24  A.  No interest in that.  No.

25  Q.  You didn't receive documents from Bard about caudal anchors

1    that explained the reasoning Bard thought that caudal anchors

2    would prevent certain failures, did you?

3    A.  No.

4    Q.  You didn't receive any type of PowerPoints from Bard or its

5    attorneys that showed that Bard engineers were operating under

6    a hypothesis that if they could eliminate caudal migration,

7    they would also eliminate a high percentage of other failures,

8    including fractures?  You didn't receive that, did you?

9    A.  No, I did not.

10   Q.  You didn't receive a document from Bard that talked about

11   caudal movement and movement that Bard regarded as relating to

12   other failures that wasn't considered to be caudal migration?

13   You didn't receive anything from Bard where Bard was concerned

14   about that, did you?

15   A.  No.

16   Q.  And you didn't receive e-mails or statements from the

17   medical directors of Bard, did you?

18   A.  Not that I'm aware of, no.

19   Q.  You didn't receive, for example, an e-mail from

20   Dr. Ciavarella, a medical director at Bard back in December of

21   2005?

22   A.  I can't remember that far back, so I do not --

23   Q.  You didn't receive an e-mail where Dr. Ciavarella stated

24   that the Simon Nitinol filter had virtually no complaints, and

25   he questioned why wouldn't doctors want to use the Simon

1   Nitinol filter as opposed to the G2 filter?  You never received

2   that, did you?

3   A.  I don't know about -- I doubt it, but I don't think so.  I

4   don't -- I don't know.

5   Q.  But what you do know is that the Recovery, the G2, the G2X,

6   and the filters down the line, including the Eclipse, were all

7   cleared and launched and represented by Bard to be permanent

8   filters; right?

9   A.  Yes.

10  Q.  Now, you had been associated with Bard long before your

11  involvement in this case as a consultant; right?

12  A.  Yes.

13          MR. O'CONNOR:  As a matter of fact, if we could put up

14  Exhibit 4938.

15          Move for admission of 4938, Your Honor.

16          MR. ROGERS:  No objection, Your Honor.

17          THE COURT:  Admitted.

18          (Exhibit No. 4938 admitted into evidence.)

19  BY MR. O'CONNOR:

20  Q.  You received --

21          MR. O'CONNOR:  May I publish, Your Honor?

22          THE COURT:  You may.

23  BY MR. O'CONNOR:

24  Q.  Here's the point, Dr. Morris.  As early as May 18, 2004,

25  Bard was paying you as a consultant to come in and speak on

1   things like the Recovery filter; correct?

2   A.  Yes.

3   Q.  And you knew about the Recovery filter; true?

4   A.  I had experience with it, yes.

5   Q.  And you were following the Recovery filter; true?

6   A.  What do you mean by following it?

7   Q.  You were following the literature about the Recovery filter

8   and how it was behaving in patients across the country --

9   A.  Yes.

10  Q.  -- correct?

11          And you know that the Recovery was experiencing very

12  serious failures; true?

13  A.  We had heard of --

14  Q.  Well, I want to be careful here.  Can you just answer the

15  question yes or no?

16  A.  Okay.  Sure.

17  Q.  Were you aware of serious failures, serious consequences

18  being caused by the Recovery filter that were being reported?

19  A.  Like all filters, I knew that Recovery was --

20  Q.  That's not my question.  I'm being specific --

21  A.  I had no experience.

22  Q.  -- about Recovery.

23  A.  I had no experience with the failure of the Recovery

24  filter.

25  Q.  Let me try it over again.

1    A.  Okay.

2    Q.  Were you aware -- and I'm only talking about the

3    Recovery -- about serious consequences that were being caused

4    by the Recovery filter during the time that it was on the

5    market, yes or no?

6    A.  Yes.  I knew about some.

7    Q.  By the way, when you were consulting, were you identified

8    as a key opinion leader?

9    A.  I have subsequently learned that, yes.

10   Q.  And so when Bard would talk about doctors like you, they

11   would refer to you as a key opinion leader.  You know that now;

12   right?

13   A.  I never heard about that back then, but now I've heard

14   about that, yes.

15   Q.  But you knew Bard was retaining your services to help

16   spread the word about its filter products; right?

17   A.  I gave several, two or three talks about retrievable

18   filters in general.  Bard, Cook, and Cordis were all companies

19   at that time, so --

20   Q.  Well, hang on.  I just want to talk about Bard filters.

21   I'm going to talk about one person.

22          You remember Janet Hudnall; right?

23   A.  Yes.

24   Q.  And Janet Hudnall was in marketing; right?

25   A.  Yes.

1    Q.  And Janet Hudnall, who was in marketing at Bard, is the

2    person that retained you to come in and talk to other doctors

3    about the Recovery filter; true?

4    A.  I want to say like three times, and it was not exclusive

5    about the Recovery filter.  I want to make that clear.

6    Q.  Let me try this again.

7           Janet Hudnall was a person at Bard who retained you to

8    come to different panel meetings and other types of conferences

9    to discuss, among other things, the Recovery filter; true?  Yes

10   or no?

11   A.  I don't know what you mean by conference.  You mean several

12   focus groups?  Is that what you're talking about?

13   Q.  Yes.

14   A.  Yes, we talked -- that was one of the topics at those focus

15   groups, yes.

16   Q.  Thank you.

17          Now, I want to talk to you about your testimony

18   earlier when you were talking about an IFU and that statement

19   about recommending patients -- that doctors follow up with

20   patients.

21          Do you recall that testimony?

22   A.  Not word for word, but I do remember we talked about the

23   IFU, yes.

24   Q.  But that statement in the IFU wasn't about Bard advising

25   doctors and patients that their filter may fail and that's why

1    it came -- that's why they should return; correct?

2            Let me put it to you this way:  That statement was in

3    there so that doctors would consider bringing patients who had

4    retrievable filters back to determine whether the retrieve --

5    the filter was still indicated; fair?

6    A.  I guess I don't really understand your question.  Are you

7    talking about the IFU or --

8    Q.  The IFU.

9    A.  -- the FDA notice or which?

10   Q.  The IFU.

11   A.  Okay.

12   Q.  You talked about a statement in the IFU.

13   A.  I'd have to see the statement.  I just can't remember

14   exactly what -- how to put it in the context of your question.

15   Q.  There has never been any warning in any Bard IFU that

16   you're aware of that stated that doctors should follow up and

17   monitor patients to look at failures, including perforation,

18   migration, tilt, or fracture; true?

19   A.  That's true.

20   Q.  Thank you.

21           Now, Doctor, you told us that you're charging $500 an

22   hour today?

23   A.  Yes.

24   Q.  But you have charged for your work in this case, which is

25   including preparing an extensive report and a case-specific

CHRISTOPHER MORRIS, M.D. - CROSS-EXAMINATION                2014

1   report; correct?

2   A.  Yes.

3   Q.  How many hours have you charged Bard for your work for Bard

4   IVC filters?

5   A.  I don't know.  I haven't counted up the hours.

6   Q.  Well, can you give us an estimate today?

7   A.  It would be pure speculation.  I think -- don't you have my

8   billing sheets?  You should know them.

9   Q.  Not with me, no.

10  A.  Okay.  Well, I don't have them with me either.  I'd have to

11  count them up.

12  Q.  But you've spent several upon several hours, haven't you?

13  A.  I've spent several hours, yes.

14  Q.  And as a matter of fact, when did you come here to Phoenix

15  to testify?  When did you arrive to Phoenix?

16  A.  Wednesday around 11:00 p.m.

17  Q.  And what are you charging Bard for the time --

18  A.  Oh.

19  Q.  -- you're spending here?

20  A.  Two eight-hour days here.

21  Q.  All right.  And so how much is that?

22  A.  That's 4,000 a day, so that would be a total of $8,000.

23  Q.  And that's what you're expecting to be paid just to come

24  here to court today; correct?

25  A.  Yes.

CHRISTOPHER MORRIS, M.D. - CROSS-EXAMINATION                    2015

1    Q.  And you talked about the Poletti article and the Simon

2    Nitinol filter -- regarding the Simon Nitinol filters before;

3    correct?

4    A.  Yes, I have.

5            MR. O'CONNOR:  Do you have that exhibit number that we

6    could put up?

7            Do you have it, Felice?

8            Felice, can you go to the conclusion, please?  And

9    this is Exhibit 726 -- 7226.

10           No, conclusion.  One more page.  Trying to get to the

11   conclusion.

12           You had it.  Right there.  What happened?  You had it.

13           MR. LOPEZ:  Is that what you wanted?

14           MR. O'CONNOR:  Yeah, I want that part, please.  Thank

15   you.

16   BY MR. O'CONNOR:

17   Q.  Now, one thing that the Poletti article did not show is

18   that when the Simon Nitinol filter fractured, there was no

19   pieces that broke off or embolized to other parts of the body;

20   correct?

21   A.  They didn't look for distal embolization, as far as I know,

22   but they didn't mention that, no.

23   Q.  And I take it -- and in the Simon Nitinol filter, the

24   conclusion of the Poletti article, the last sentence, do you

25   see that?

CHRISTOPHER MORRIS, M.D. - CROSS-EXAMINATION           2016

1    A.  Yes, I do.

2    Q.  Could you read that, please?

3    A.  Perforation of the vena caval wall, filter fracture, and

4    axial deviation are common but without clinical sequelae.

5    Q.  Thank you.

6            Now, let me just talk to you about your opinions

7    regarding Lisa Hyde.  First of all, nothing in the Bard IFUs

8    give instructions to doctors as to how to remove a fractured

9    strut from a patient's heart; true?

10   A.  True.

11   Q.  And you know who Dr. Kuo is, don't you?

12   A.  Yes.

13   Q.  And Dr. Kuo is one of few doctors that is highly

14   experienced in doing complicated retrievals of filter

15   fragments; correct?

16   A.  I wouldn't say it's a few, but he's one of them, yes.

17   Q.  Well, I think you told us that you only have done about 200

18   retrievals?

19   A.  Of actual retrievals?

20   Q.  Yes.

21   A.  Yes.

22   Q.  And you're talking about retrievals that you've done are

23   the percutaneous retrieval that removes the filter from the

24   vena cava; right?

25   A.  That's a retrieval of an IVC filter, yes.

CHRISTOPHER MORRIS, M.D. - CROSS-EXAMINATION                2017

1    Q.  But Lisa Hyde underwent that type of retrieval in addition

2    to a procedure to remove the strut from her heart; correct?

3    A.  Yes.

4    Q.  And Dr. Kuo called that a complex retrieval; true?

5    A.  He did, yes.

6    Q.  And certainly, Dr. Morris, you have patients of your own;

7    right?

8    A.  I sure do.

9    Q.  And patients that you have, you meet with and you talk to

10   and you take histories from; right?

11   A.  Yes.

12   Q.  And you want to know about the patients, when you see them,

13   about their histories of pain and discomfort; correct?

14   A.  Yes.

15   Q.  And you understand that, as a doctor that works with IVC

16   filters, you're in a select group.  Not every doctor across the

17   board, general practitioners, family doctors, or other type of

18   doctors have familiarity with Bard -- with Bard filters or any

19   type of filter like you do; correct?

20   A.  Correct.

21   Q.  And certainly a reason that you take a history is for you

22   to make a diagnosis and to try to differentiate between

23   symptoms and what may be causing those symptoms; correct?

24   A.  Yes.  I take the whole picture into consideration.

25   Q.  And oftentimes you rely on your patients in your practice

UNITED STATES DISTRICT COURT

1    to give you a history so that you can help the patient and

2    yourself understand what may be causing a symptom; correct?

3    A.  That's one component, yes.

4    Q.  What you are not, Doctor -- and I understand it -- you're

5    an interventional radiologist.  You're not a neurologist, are

6    you?

7    A.  No.

8    Q.  And you're not an orthopedic surgeon, are you?

9    A.  No.

10   Q.  And you understand that those doctors are the type of

11   doctors that can look at nerves and parts of the body that may

12   be susceptible to pain or provide -- produce sensation in a

13   patient; right?

14   A.  Yes.

15   Q.  And you also understand and have seen cases where patients

16   have had symptoms and it turned out that there was a fractured

17   filter that caused -- was causing the symptoms, it's just

18   simply that doctors were not aware that filters could do that?

19   You've seen those cases?

20   A.  Not necessarily, no.

21   Q.  All right.  Well, do you know what Bard has seen by way of

22   symptomatic versus asymptomatic patients?

23   A.  Bard, the company?

24   Q.  Yes.

25   A.  No.  I don't know what they're --

1    Q.  You haven't received or reviewed any of the complaint files

2    that Bard has received, have you?

3    A.  No, I haven't.

4    Q.  And certainly you can understand how there are patients out

5    there who may have Bard filters that have fractures, have

6    tilted filters, have perforating filters, have fractures that

7    have migrated in any -- other places of their body who are

8    unaware of that?  You understand that; correct?

9    A.  There are patients like that, yes.

10   Q.  And unless those patients go see a doctor or have an

11   imaging study, they may not know; correct?

12   A.  Imaging study would make the diagnosis, yes.

13   Q.  And the point is, there have been no studies to date, have

14   there, that have looked at fragments from filters in patients

15   to determine what may happen to that fragment over a lifetime?

16   A.  A lifetime?  No.

17   Q.  Simply, the medical community doesn't know, do they?

18   A.  Like almost all medical devices --

19   Q.  No.

20   A.  -- true.

21   Q.  I'm not talking about medical devices.

22          There's no studies in the medical literature that

23   specifically addresses the problems that struts that fracture

24   and embolize may cause in the future; you're not aware of

25   anything, are you?

1    A.  There are studies that have looked at shorter periods of

2    time where they've been symptomatic or not, yes.

3    Q.  Nothing in the long term, though; right?

4    A.  Well, remember, retrievable filters have only been out for

5    a short period of time, relatively speaking, so how can there

6    be a lifetime of data?

7    Q.  Well, I'm not going to debate with you on that.

8    A.  Right.  I'm just answering your question.

9    Q.  I think you and I are on the same page.

10   A.  Right.

11   Q.  Because of either the timing or whatever, nobody knows what

12   an embolized strut may or may not do to a patient in the

13   future; true?

14   A.  Well, we know what foreign bodies do in general.  I mean,

15   we have lots of data on the natural history of small metallic

16   structures in the body.  Surgical clips, for instance, they've

17   been in the body for at least 40 to 50 years in a lot of

18   patients.  We know what the foreign body reaction is to that

19   type of thing --

20   Q.  Well, Dr. Morris --

21   A.  -- if that's what you're asking.

22   Q.  -- my question is specifically about fractured struts.

23   Okay?

24   A.  Right.

25   Q.  And I think you understand that.

1          There have been no studies on the long-term effect of

2     that; is that true?

3     A.   True.

4     Q.   Thank you.

5          And you have patients of your own; correct?

6     A.   Yes.

7     Q.   And you, when you see your patients, patient safety is a

8     priority of yours; correct?

9     A.   Yes.

10    Q.   And certainly, if you have a patient that would walk into

11    your office who had a fractured strut in her heart, you would

12    be concerned for your patient; true?

13    A.   Well, we -- you want me to explain my experience with that?

14    Q.   Would you be concerned, yes or no?  That's what I want.

15    A.   Well, I'm always concerned about every patient, yes.

16    Q.   And a strut in a heart, certainly a patient has a right to

17    be concerned about that.  You agree with that?

18    A.   They should know about it, yes.

19         MR. O'CONNOR:  Thank you.  That's all I have.

20         THE COURT:  Redirect?

21         MR. ROGERS:  No, Your Honor.

22         THE COURT:  Okay.  Thank you.  You can step down.

23         (Witness excused.)

24         MR. ROGERS:  Your Honor, at this time the defendants

25    call David Feigal.

1          THE COURT:  If you want to stand up, ladies and

2     gentlemen, while he's coming in, feel free.

3          THE COURTROOM DEPUTY:  Dr. Feigal, if you'll please

4     raise your right hand.

5          (The witness was sworn.)

6          THE COURTROOM DEPUTY:  Sir, if you'll please state

7     your name and spell it for the record so the jury can hear it.

8          THE WITNESS:  My name is David William Feigal,

9     F-E-I-G-A-L, Jr.

10          MR. CONDO:  Thank you, Your Honor.

11          There will come a point in my examination of

12     Dr. Feigal when I'm going to ask him to create a list.  May he

13     step down, use the white board, create the list, and then

14     return to the stand to explain?

15          THE COURT:  Yeah.  If he's going to be testifying

16     while at the white board, let's make sure he has a hand mic.

17          MR. CONDO:  Thank you.

18          THE COURT:  Otherwise, let's not have him testify till

19     he's back at the mic.

20          MR. CONDO:  Thank you.

21

22               DAVID W. FEIGAL, JR., M.D.,

23     called as a witness herein by the defendants, having been first

24     duly sworn or affirmed, was examined and testified as follows:

25

```
1                          DIRECT EXAMINATION

2    BY MR. CONDO:

3    Q.  Dr. Feigal, please introduce yourself to the jury and tell

4    us where you live.

5    A.  My name is David Feigal.  I'm an internist, an

6    epidemiologist.  I live part time here in Phoenix, in

7    Ahwatukee, and teach at ASU.  And most of the time I live in

8    Southern California, just a little bit north of Los Angeles.

9    Q.  And what is an epidemiologist?

10   A.  Epidemiology is the field of the study of the patterns of

11   diseases in populations.  The word originally came from the

12   word "epidemic," because originally people were studying

13   mostly, you know, infectious diseases.  But the methods were

14   adapted to study other diseases and adapted to use for studying

15   the safety of medical treatments.

16         And so epidemiologists study the patterns, estimate

17   the occurrences, and study the methods.  You study these

18   things.

19   Q.  And what are the tools or methods that epidemiologists use

20   to study?

21   A.  Epidemiologists study -- are human studies.  And so they

22   look at the pattern of diseases, sometimes with studies which

23   are experimental, such as clinical trials; other times they're

24   observational studies, taking a look at what happened in

25   different populations and trying to estimate information about
```

DAVID W. FEIGAL JR., M.D. - DIRECT EXAMINATION             2024

1    risk factors or safety information.

2    Q.  And in this case, what were you asked to do, sir?

3    A.  I was asked if I would look at the medical literature about

4    inferior vena cava filters, in particular -- and, in

5    particular, the Bard inferior vena cava filters, and look to

6    see if the information in the literature, the studies of

7    different types, were studies that you could estimate rates and

8    proportions of adverse events that occurred with inferior vena

9    cava filters.

10   Q.  And have you formed an opinion on that subject?

11   A.  Yes, I have.

12   Q.  And was that opinion formed to a reasonable degree of

13   medical and scientific certainty?

14   A.  Yes.

15   Q.  Let's talk about your training and education that you have

16   in the field of clinical epidemiology.

17           Where did you go to medical school, sir?

18   A.  Stanford Medical School in California.

19   Q.  And do you have any -- were you a -- you took a residency,

20   didn't you, sir?

21   A.  That's right.  I did an internship and residency in

22   internal medicine, which is primary care for adults, at the

23   University of California Davis Medical Center in Sacramento.

24   Q.  And were you a chief resident at any hospital or teaching

25   facility?

1    A.  I was.  I was the chief resident after I finished my

2    residency, which was a faculty position, and I remained as the

3    residency coordinator for another year.  And then I sought some

4    additional training.

5    Q.  And beyond your residency, do you have further education

6    and training?

7    A.  Yes.  I next went to -- was in a program called the Andrew

8    Mellon Clinical Scholars in clinical epidemiology, which was a

9    joint program between the University of California San

10   Francisco and UC Berkley.  So as part of that, I got a master

11   of public health.

12         But I also worked in clinical epidemiology studies at

13   the University Medical Center in San Francisco.

14   Q.  And how many years' experience do you have in the field of

15   clinical epidemiology?

16   A.  About 40.

17   Q.  And in that 40 years, have you consulted on medical devices

18   for various companies?

19   A.  I have.

20   Q.  And have you taught on the subject of epidemiology and

21   biostatistics at universities or colleges?

22   A.  I have.  I taught -- I was -- after finishing my

23   fellowship, I became the deputy director of the fellowship

24   program and a member of the faculty at the department of

25   epidemiology, biostatistics, international health, as well as

1    the department of medicine.  And I taught there, and I

2    taught -- later I moved to UC San Diego, and I taught the

3    methods there.  And in various ways, I've lectured and taught

4    about research methods in epidemiology all over throughout my

5    whole career.

6    Q.  And have you practiced medicine?

7    A.  Yes.  As an internist, I saw patients probably about half

8    of my time, third to half of my time, when I was on the faculty

9    for 12 years at three different university medical centers.

10   Q.  Have you ever implanted or retrieved an IVC filter?

11   A.  I have not, but I have ordered and -- or requested that a

12   surgeon evaluate a patient for an implantation.  So I've had

13   patients of mine who I recommended for an implant where a

14   surgeon did the implant.

15   Q.  Would you believe that your lack of experience with

16   implanting or retrieving IVC filters inhibits or limits your

17   ability --

18           (Court reporter clarification.)

19   BY MR. CONDO:

20   Q.  Doctor, do you believe that your lack of experience with

21   implanting and retrieving filters inhibits your ability to

22   evaluate the sufficiency of information in the medical

23   literature to determine the rate of adverse events involving a

24   product?

25   A.  No.  It doesn't inhibit that in any way.

1    Q.  And do you still hold an active medical license?

2    A.  I do.  I've been continuously licensed in the state of

3    California since I was eligible for that in 1977.

4    Q.  And have you ever worked for the Food and Drug

5    Administration?

6    A.  Yes.  I -- after 12 years as faculty at the University of

7    California, I went to the Food and Drug Administration in 1992,

8    and I worked there for the next 12 years.

9    Q.  And can you tell us chronologically each of the positions

10   you held over those 12 years at the FDA.

11   A.  Sure.

12        So just to back up a little bit, my research area

13   evolved into looking at the clinical epidemiology and clinical

14   trials for the HIV epidemic.  I was based at San Francisco

15   General in the '80s.  The epidemic came along.  We didn't even

16   know what we were looking at when we started.

17        And I got involved with evaluating studies for

18   products, and some of those products were -- became -- were

19   approved by FDA for treatment of infections associated with

20   complications.  So that was a large part of my faculty research

21   interest and practice in the late '80s.

22        And so in 1991, the position opened for -- to be the

23   director of the division of antiviral products at FDA, which

24   would give me the sign-off authority on all new products and

25   involvement in the design of the studies and studying the

1    safety of the drugs coming along for AIDS.  And at that time,

2    there was only two drugs approved.

3          So even though we were brand new, had just moved to UC

4    San Diego -- my wife had been recruited there -- we picked up

5    and went to Washington for 12 years.  And so I worked at the

6    Food and Drug Administration, first in the center for drugs for

7    five years, mostly on drugs relating to infections; and then I

8    was deputy director of the center for biologics, that's blood

9    and vaccines; and then finally I was the director of the center

10   for devices for the last five years that I was in FDA.

11   Q.  As a physician and as an epidemiologist, have you conducted

12   medical research studies yourself?

13   A.  I have.  And actually, I continue to since I've left FDA.

14   I've designed protocols.  I've been principal investigator.

15   I've been a statistician on many, many trials.

16          And at FDA, part of our job was to approve studies on

17   investigational products, and so I've been involved in

18   different ways in hundreds, if not thousands, of protocols over

19   the last 40 years.

20   Q.  And have you also served as a peer reviewer for journals?

21   A.  I have.  Mostly when I was still an academic and when I was

22   at FDA, but I was a peer reviewer for the American Journal of

23   Medicine, New England Journal of Medicine, Journal of

24   Controlled Clinical Trials.  I've forgotten, actually, which

25   journals since I haven't done much of that in recent years, but

1   that was an active part of my career.

2   Q.  And during your career, have you had responsibility for

3   evaluating studies of adverse events associated with drugs and

4   medical devices?

5   A.  Yes, I have.  I had responsibility for that, actually, with

6   some of the studies that we did at San Francisco General that

7   used medical devices to deliver drugs and we had to file

8   reports to FDA.

9        At FDA, in the drug and biologics center, again, I saw

10  the devices that delivered drugs and those types of things.

11  And then in the device center, the safety people reported --

12  reported to me.

13       And after leaving FDA, I was -- I've primarily been

14  part of a firm that helps start-up companies with their early

15  studies; but for four years I was in industry, and I was

16  responsible for safety departments in -- directly in one

17  pharmaceutical company and shared responsibility in another.

18  Q.  And are you being compensated for your time appearing here

19  today?

20  A.  Yes, I am.

21  Q.  And what is your hourly rate for appearance here?

22  A.  My hourly rate is $650 an hour.

23  Q.  And does your rate change depending on whether you're

24  giving testimony or sitting in your office doing research as

25  part of your engagement in this matter?

1    A.  No, it's just -- that's just the fee for when I'm actively

2    working on a matter, that plus out-of-pocket travel costs.

3    Q.  Can you tell the ladies and gentlemen of the jury the type

4    of medical literature that you reviewed and the work that you

5    did in connection with this case?

6    A.  Certainly.  There are hundreds of papers written of

7    studies.  I looked at the studies that had original data.  I

8    also looked at some editorials, but I really was interested in

9    the studies that had original data, because that's where you're

10   going to learn, you know, the primary information.

11          And so you can -- there are search indexes that you

12   can actually use to identify and pull up those papers.  And

13   then I got -- you know, I obtained the copies of the original

14   papers.  Then when reading the papers, they often would refer

15   other papers, and if those hadn't shown up in my search, I

16   would track those down.

17          So I put together a collection of several hundred

18   papers, of which probably a little less than 200 were really

19   germane to these kinds of topics, were about Bard filters.  But

20   I also familiarized myself with some of the literature about

21   other types of filters as well.

22   Q.  In addition to the materials that you collected as a result

23   of your own searches, were you also provided information from

24   counsel for Bard?

25   A.  Yes, I was.  There was some discovery relating to one of

1    the studies, and as part of that discovery there was a

2    deposition and study records that were available, and I

3    reviewed those as well.

4    Q.  But from your assignment, did you need to review Bard's

5    internal review, company records, internal reporting rates,

6    fracture analysis, or any of those kinds of materials in order

7    to do what you were asked to do in this case?

8    A.  No.  That was not what I was asked -- that was not what I

9    was asked to do.

10   Q.  But did you get everything from Bard that you asked for?

11   A.  Yes, I did.

12   Q.  Now, you told the jury that you were asked to look at the

13   published literature to determine whether there was a reliable

14   basis to derive a rate for adverse events from that literature.

15           And have you formed an opinion on that subject?

16   A.  Yes, I have.

17   Q.  And what is your opinion, sir?

18   A.  My opinion is is that if you look at the literature, if you

19   look at the studies that were clinical trials -- and there's

20   very few of those; if you look at the prospective studies where

21   they collected the patients and then followed them forward; if

22   you looked at the studies where they called patients back; if

23   you looked at the studies where they looked at x-ray references

24   and chart reviews, none of them were designed in a way that

25   they could calculate the rates of the occurrence of the events.

1          And so we know that -- what types of events occur, and
2     we know a good deal about individual cases of how some of those
3     occurred, but my opinion is that the medical literature does
4     not provide any information about the rates or the proportion
5     of adverse reactions that occur for common adverse events such
6     as fracture, migration, tilt, embolization.  The data just
7     doesn't exist.
8     Q.  And is that specific to the Bard G2 filter?
9     A.  Yes, it is.
10    Q.  With respect to that opinion, do you hold it to a
11    reasonable degree of scientific certainty?
12    A.  Yes, I do.
13    Q.  Now, let's talk about the tools of epidemiology.
14          First of all, is all scientific evidence created
15    equal?
16    A.  No.
17    Q.  Is there, in the world of epidemiologists, a hierarchy of
18    scientific evidence?
19    A.  There is, yes.
20    Q.  And can you step down and explain to the ladies and
21    gentlemen of the jury the hierarchical nature of that evidence?
22    A.  Sure.
23          MR. CONDO:  May he be permitted to do so, Your Honor?
24          THE COURT:  Yes.
25          Mr. O'Connor, if you need to -- or whoever's going to

1   do the cross-examination, if you need to step around into the

2   side of the jury box so you can see this, that's fine.

3          THE WITNESS:  So the gold --

4          MR. CONDO:  Wait.  There needs to be a question first.

5          THE WITNESS:  Oh, I'm sorry.

6          THE COURT:  Let's turn it just a little bit more this

7   way so Mr. Lopez can see.  That's good.

8   BY MR. CONDO:

9   Q.  When we talk about a hierarchical nature of studies, what

10  do you mean by a hierarchy?

11  A.  Well, there's some studies that are kind of the gold

12  standard that you can rely on because they've been designed in

13  such a way that they remove bias from the studies and the

14  results can be generalized to the population at large.

15  Q.  And can you list and write for the ladies and gentlemen of

16  the jury, starting with the gold standard, as you've put it,

17  and descending, the various levels of studies in your

18  hierarchy.

19  A.  Sure.

20          Well, at the top of the heap is the randomized

21  controlled trial.  So if you're to schematically draw this,

22  you'd have a population that you were drawing people from, and

23  some of them would volunteer to be in the study.  And then

24  you'd randomize them, flip a coin.  Some would go into one

25  group, some would go into the other group, and then you'd

1   follow them over time.  And you'd have planned observations to

2   look for the events that you're looking for until the study was

3   over.

4          And so that has the advantage that it controls -- it

5   makes two groups very comparable, and it has a protocol that

6   sets out all the rules for that.  So these are the studies you

7   can really rely on.

8   Q.  What is the next study?

9   A.  The next group of studies -- all the rest of the studies

10  are observational.  They take things that are happening in

11  practice and they take the -- they take a group of patients

12  forward.  There may only -- and there -- with these studies,

13  there was most often just a single group that just -- there was

14  just one filter studied, for example.

15         And, again, there would be carefully planned

16  prospective measurements, and at the end they would be able to

17  say what happened.  They would have information on everybody,

18  and they would have a protocol and a plan for following that.

19  Q.  Would you just label that as a prospective?

20  A.  Yeah.  This is a cohort study, and it's prospective,

21  meaning that it starts at the beginning and goes forward.

22         MR. LOPEZ:  I'm sorry, Your Honor.  I didn't hear him.

23         Did you say prospective?

24         THE WITNESS:  Prospective, yes.

25         Then there's a similar study that is retrospective.

DAVID W. FEIGAL JR., M.D. - DIRECT EXAMINATION          2035

1    It tries to actually do this study, but it starts at a point in

2    time and they go back and they say, well, what if we go to the

3    radiology department and find the patients who had filters

4    placed or go to the medical records?  And so we're going to

5    look back and try and find out what happened back here.

6          And if it's done well, they actually know everybody

7    who got the filter, so that's okay.  But not all the

8    information's going to be available because they didn't plan

9    the study in advance, and they don't have any scheduled

10   observations.  So not all the patients will even have

11   observations.  Some might have one, some might have two.  They

12   all have different kinds of follow-up.

13         This is a retrospective, looking back.  And often the

14   patients aren't even -- aren't even called in.

15         Now, a variation on that is that they identify

16   patients at a point in time and there's a callback study.  And

17   there's a couple of those in the literature where they identify

18   people back here that had filters, and they try and contact

19   them and then they evaluate them out here, you know, with new

20   information collected at that point in time.

21         And there may be some old information but there's no

22   real protocol because they didn't even think of doing the

23   study, just like in the retrospective, until some later point

24   in time.

25

1    BY MR. CONDO:

2    Q.  And what, in descending order, is next on your hierarchy of

3    studies?

4    A.  Well, the weakest of the -- the weakest of the studies

5    would be the studies where you have a group of patients at this

6    point in time.  You actually have no idea where they came from,

7    but you're studying some issue that they have at that point in

8    time.  You're not even necessarily looking at complications.

9    And so these are -- you find these in the retrieval studies.

10          As you know, the filters originally couldn't be

11   removed, or at least not removed very easily.  Then they were

12   designed to be removed, and so people would come in for

13   retrieval.  And so people at the time of retrieval would say,

14   well, what's the status of the implant in the people who have

15   come in for retrieval?

16          But they often came from multiple different hospitals.

17   They didn't know how many population -- they didn't know -- you

18   know, whatever they were seeing in this, you can't calculate a

19   rate because you don't have that whole group.  You don't know

20   who everybody is.  You just know the ones that came in to see

21   you, and they may have come to -- they're probably not very

22   representative, particularly if you're a referral hospital

23   because you're particularly good.

24          There are some retrieval studies where they had

25   patients referred because they had a failed retrieval at

1    another hospital.  Those patients are going to be a little

2    different.  So retrieval studies are a little lower yet on the

3    hierarchy for establishing rates.

4    Q.  And now have we completed the hierarchy, or are there any

5    more studies?

6    A.  Well, we have one thing left, and that is collections of

7    individual cases.  Different hospitals.  Different kinds of

8    reports.  Sometimes just a single report.  We call case

9    reports.

10           And here you don't know anything about the population.

11   You don't know anything about the follow-up.  One of the

12   challenges of a rate is that a rate is how something occurs

13   over time.  You know, in a mortgage rate, that's how much you

14   pay per year over time.  And without the time element -- you

15   increasingly lose the time element in these earlier studies so

16   that you can't calculate this.

17           So it's very challenging from the existing literature.

18   We know what the side effects are.  We know how many they saw

19   at some institutions in their studies.  But we really can't

20   calculate rates or proportions from the designs because most of

21   the studies are down in these categories.

22   Q.  Thank you.

23           MR. CONDO:  May he return to the witness chair?

24           THE COURT:  Yes.

25           MR. CONDO:  Thank you.

1          And while he's doing that, Your Honor, may I mark this

2    for identification as Exhibit 8540?

3          THE COURT:  You may.

4          MR. CONDO:  Thank you.

5          And by "this," I was referring to the tablet that

6    Dr. Feigal has written on.

7          MR. LOPEZ:  I'm sorry.  I was moving, Your Honor.  Is

8    there an exhibit number to that?

9          MR. CONDO:  It is 8540.

10          MR. LOPEZ:  Thank you.

11   BY MR. CONDO:

12   Q.  Now, if we look at the randomized controlled study --

13          THE COURT:  Let's do that after the break.

14          All right, ladies and gentlemen.  We will resume at 10

15   minutes to the hour.

16          (Recess taken, 2:33 p.m. to 2:49 p.m.)

17          THE COURT:  You may continue, Mr. Condo.

18          MR. CONDO:  Thank you, Your Honor.

19   BY MR. CONDO:

20   Q.  Dr. Feigal, returning to your hierarchy chart and your

21   opinion that you expressed earlier in your testimony, do the

22   prospective or retrospective studies that appear on your chart,

23   do they -- were they able to provide reliable estimates of

24   IVC -- Bard IVC filter migration?

25   A.  No, they were not.

1    Q.  Were the prospective, retrospective studies, or the

2    lower-ranked studies able to provide reliable estimates of Bard

3    IVC filter fracture?

4    A.  No.

5    Q.  And were the prospective, retrospective, or lower-ranked

6    studies able to provide reliable estimates of Bard IVC filter

7    perforation?

8    A.  No, they were not.

9    Q.  And were the prospective or retrospective or lower-ranked

10   studies able to provide reliable estimates of Bard IVC filter

11   tilting rates?

12   A.  No, they were not.

13   Q.  And you hold all of those opinions to a reasonable degree

14   of medical certainty?

15   A.  Yes, I do.

16   Q.  Now, I want to turn to a new subject, if I can.

17        There has been testimony in this case about an article

18   or study referred to as the Nicholson study.  As part of your

19   engagement in this matter, were you asked to comment upon the

20   Nicholson study?

21   A.  Yes, I was.  And I had materials to review that study in

22   quite a bit of detail.

23   Q.  Let me just ask you a few very simple questions.

24        First, was the Nicholson study a study of all patients

25   who received Bard IVC filters at the York Hospital?

1    A.  No.  He said it was in the publication, but in fact, there

2    were 600 filters that were used during the time period of his

3    study, and there were only 189 patients in his study.  And we

4    know that he excluded patients from the study who'd had filters

5    during that time period, so it was not a study of all patients.

6    Q.  Was the selection of the patients for the study complete --

7    or incomplete and biased?

8    A.  In my opinion, yes, it was.

9    Q.  And is it important to control for bias in epidemiological

10   studies?

11   A.  It is.  In other words, if you don't control for bias then

12   the estimates will be too high.  They could also be too low,

13   but the kinds of biases introduced by the choices made in this

14   study actually artificially increased the rate but also left us

15   uncertain about what the rates were at all.

16   Q.  And did the study protocol lack standard procedures to

17   identify and even contact patients?

18   A.  It did.  The methods changed during the study, and

19   decisions were made actually not to contact or to include in

20   the study patients who were known not to have filter fractures.

21   Q.  As a clinical epidemiologist, can the Nicholson study be

22   relied upon as scientifically reliable, in your opinion, sir?

23   A.  No, it cannot.

24          MR. CONDO:  Thank you.  I have no further questions.

25          THE COURT:  Cross-examination?

 1                    MR. LOPEZ:  Yes, Your Honor.

 2                         CROSS-EXAMINATION

 3    BY MR. LOPEZ:

 4    Q.  Dr. Feigal, good afternoon.

 5    A.  Good afternoon.

 6                    MR. LOPEZ:  Can I turn this chart towards him, Your

 7    Honor?

 8    BY MR. LOPEZ:

 9    Q.  So without going through all these --

10                    THE COURT:  You need to be talking into the mic.  You

11    want the handheld mic?

12                    MR. LOPEZ:  If I could, Your Honor.

13                    THE COURT:  Yeah.

14                    MR. CONDO:  May I move?

15                    THE COURT:  Yes, you can move over there, Mr. Condo.

16                    MR. CONDO:  Thank you.

17                    THE COURT:  Or if you want, Mr. Condo, since he's

18    going to be talking to the jury and the witness, you can come

19    up here.

20                    MR. CONDO:  Thank you.  Excuse me.

21                    MR. LOPEZ:  May I proceed, Your Honor?

22    BY MR. LOPEZ:

23    Q.  So, Dr. Feigal, as far as you could tell from the research

24    that you did, that Bard Peripheral Vascular, C.R. Bard did not

25    conduct, support, or fund any of the studies that are on here;

                    UNITED STATES DISTRICT COURT

1   correct?

2   A.  Actually, I don't know that.  The studies and the

3   literature sometimes -- you know, usually reveal their source

4   of funding.  But I would say in general that's probably true.

5   The majority of them were probably investigator studies and not

6   funded, so they were independent of a company.

7   Q.  You don't know if they've done a registry or a survey to

8   look retrospectively at any hospital where their devices may

9   have been used to see what the fracture rate is and how many of

10  those fractures went to people's hearts and lungs?  As far as

11  you know, none of this exists from anything that Bard has done

12  in the 20 -- 10, 20, almost 30 years that they've had IVC

13  filters on the market; true?

14  A.  Again, I'm not sure what Bard has funded, but there has not

15  been a registry.  Registries actually enroll people at the time

16  of implantation.  They don't look back.

17          But I'm not aware of any studies that were Bard-funded

18  that were registries or other study designs.

19  Q.  So if there was room out here, I'd have you come up and

20  draw it.

21          But what we have here -- what we have here from Bard's

22  involvement in the study of their IVC filter devices is the

23  choice they made is below all of these, and that is just to put

24  their device out on the open market to see how it performs.

25  True?

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION                    2043

1    A.  No, it's not correct.  They actually did collect and had a

2    responsibility to collect case reports that were sent directly

3    to them.  And so they did have individual case report data.

4           And then, of course, companies -- and I was not asked

5    to review any internal Bard documents, but companies monitor

6    the literature with their products.

7    Q.  I think you misunderstood me.

8           I asked you that -- well, let me just follow up with

9    what you just said.  In order for them to get these case

10   reports, what is happening out in the open market, Bard's

11   choice was to, instead of doing any of this, was to actually

12   put their device on the market without any clinical evidence of

13   its safety and effectiveness, and just, let's see what happens

14   and see what these reports look like when doctors voluntarily

15   start reporting back to us.  True?

16   A.  No, that's not true.  Would you like me to explain?

17   Q.  No.  I mean, is there something that Bard did to study the

18   clinical safety and effectiveness of these devices long term

19   before they launched any of them?

20   A.  Well, that's a different question than you asked me before.

21   Q.  Okay.  That's the one I want you to answer right now,

22   please.

23   A.  They -- before the studies were approved, prospective

24   studies were done of the G2 and the Eclipse filter.  And those

25   were part of the information that were part of the approval

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION          2044

1    process.

2         They were not long-term studies, if you mean that they

3    were longer than a year.  But the prospective studies -- there

4    were prospective studies sponsored by Bard that were done prior

5    to putting the products on the market.

6    Q.  I'm sorry.  But what studies -- what's the name of the two

7    studies you're talking about?

8    A.  The first study is the Asch study.

9    Q.  Wasn't that a retrievability study to see if the device

10   could be removed?

11   A.  No, it was not.

12   Q.  Retrieved?

13   A.  No, it was not.  They did study retrievability as well.

14   Q.  Have you looked at the internal documents where Bard is

15   discussing what happened in the Asch study?

16   A.  No.  It's outside the scope of what I was asked to look at.

17   Q.  And do you know what internally Bard was discussing with

18   Dr. Asch and what Dr. Asch says about that study?

19   A.  Again, no.  I looked at the medical literature, but I was

20   aware that that was a study that was done as part of the

21   approval.

22   Q.  Did you see any emails or internal documents that we've

23   seen in this trial already where people that are working at

24   Bard, including one of their marketing people, said we didn't

25   know much, if anything, about the long-term clinical

2045

1  performance of this device when they launched it?

2      You didn't see that?

3  A.  That was outside the scope of what I reviewed.

4  Q.  Okay.  That's what I thought.

5      So now let's talk about the EVEREST study.  People

6  have testified already in this court, including some Bard

7  employees, that that study was specific to retrievability.  And

8  they did not study patients beyond six months for long-term

9  safety and effectiveness.  Did you know that?

10 A.  Yes.  As I mentioned, the prospective studies usually did

11 not go longer than a year; yes, that's correct.

12 Q.  And you mentioned approval process.  None of these devices

13 went through an approval process, did they?

14 A.  Well, they went through a clearance process, which is what

15 it's called when it's a Class 2 product.  FDA calls those

16 clearances rather than approvals.

17 Q.  And the truth is that before Bard launched any of these

18 devices, the Recovery filter, the G2, the G2X, and the Eclipse,

19 they had no clinical data about the long-term effects of those

20 devices beyond about six months; true?

21 A.  From studies that they were directly involved with, that's

22 true.  But there was also the medical literature on the

23 products that were developing as these products were

24 modifications of previous products.

25 Q.  I'm not sure I understood that.

1              But the bottom line is that the American consuming

2    public was going to have to answer the question how these

3    devices would perform, what their rates of risk are, what the

4    seriousness of the risks were, by having them implanted in them

5    and hopefully a doctor would report that back to Bard so they

6    could see how their device was performing.  True?

7              MR. CONDO:  Objection, Your Honor.  Argumentative.

8              THE COURT:  Hold on just a sec.

9              Overruled.

10             THE WITNESS:  It's true that these devices, like many

11   devices, rely on the clinical information from similar products

12   when they're initially launched and that you learn as the

13   product is put in use what the safety profile is of the

14   product; yes, that's correct.

15   BY MR. LOPEZ:

16   Q.  Well, don't you think that the people who are getting

17   these --

18             THE COURT:  Hold on just a minute.  We're going to let

19   Mr. Condo walk back without interrupting you, Mr. Lopez.

20             MR. CONDO:  Thank you.

21             THE COURT:  Go ahead, Mr. Lopez.

22             MR. LOPEZ:  I liked him better over there.

23             THE COURT:  You can keep your eye on him.

24             MR. CONDO:  Nobody puts Baby in a corner.

25

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION              2047

1    BY MR. LOPEZ:

2    Q.  The people that were getting these devices, like Mrs. Hyde

3    and other people that were getting the Recovery, the G2, the

4    G2X, and the Eclipse, don't you think that they should have

5    known that they were going to be the ones that had to answer

6    the question about the safety and effectiveness of those

7    devices long-term for Bard?

8    A.  Well, I wouldn't agree with the way you characterized that.

9    Q.  Well, I mean, did Bard know something about the long-term

10   effectiveness of their IVC filters by having conducted any of

11   these studies so that they knew what was going to happen to

12   Mrs. Hyde and others that were receiving these devices?

13   A.  Well, a company doesn't rely only on the studies that they

14   conduct.  And as products are introduced, they're often slight

15   variations on the previous product.

16   Q.  Well, for --

17   A.  And so they would learn from the experience that they had

18   with previous products what they would expect.  They would

19   expect most of the same adverse effects would occur, and these

20   are low frequency events.  And so they will learn as the

21   product is put in use how that product performs.

22          But it's not that they don't know anything about it.

23   They just learned from the earlier models and from the medical

24   literature.

25   Q.  No, what they were -- they were learning from -- what was

UNITED STATES DISTRICT COURT

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION                2048

```
 1    going to happen to these people if these devices remained in

 2    their bodies for long periods of time and if a doctor would

 3    report back to them about what happened after six months, after

 4    a year, because Bard couldn't tell anybody what was going to

 5    happen with these devices because they hadn't done any of the

 6    studies that you listed up here.  True?

 7    A.  No.  I disagree with the way you characterized that.

 8    Q.  Okay.  Now, but it is true that Bard has not conducted any

 9    of the studies that are listed in your hierarchy from the top

10    to the bottom; correct?

11    A.  No.  We already talked about how, in fact, there are two

12    studies that --

13    Q.  I'm sorry.  Let me rephrase the question.

14          They have not conducted any of these studies to answer

15    the question about the long-term safety and effectiveness of

16    any of their devices beyond what we see in the two studies

17    we've already discussed about retrievability.  True?

18    A.  They have not sponsored those studies, but they had the

19    information from the studies that were being developed in the

20    medical literature and the information on older products.  And

21    they knew from the four prospective studies that fracture, for

22    example, was a very low frequency event.  Only two cases of

23    fracture in almost 300 patients.

24    Q.  Right.

25    A.  So they did have information, and this is part of the
```

```
1    ongoing process of studying a product during its life cycle.
2    You study it before, you look at the products that were similar
3    to it that were on the market already, and you continue to
4    follow it.
5    Q.  Now, sir, would you agree that if you're going to get data
6    to see if your device is performing safety and effectively,
7    instead of just waiting for reports you might or might not get
8    from the voluntary reporting, there are other ways Bard could
9    have gotten more reliable safety information.  True?
10   A.  I'm not sure -- I mean, it's such -- I'm not sure I can
11   answer that question as a true and false.  I mean,
12   hypothetically, yes, there are other methods.  And, again, I
13   don't think they relied simply on the spontaneous reports.
14   They looked at all of the studies as well.
15   Q.  Now, so Dr. Nicholson, he worked in a hospital.  I think it
16   was called York Hospital?
17   A.  Yes, that's right.
18   Q.  And he was a loyal Bard radiologist; right?  That hospital
19   put in a lot of Bard products; correct?
20   A.  I don't know.
21   Q.  And on his own, Dr. Nicholson and some of his colleagues
22   did a retrospective review of Bard products; true?
23   A.  They did what was called a callback study.  They identify
24   patients, and 189, as I recall, came in and had fluoroscopy to
25   look at the state of their filter.
```

1    Q.  And that's on the list; right?

2    A.  Yes.  That is one of the types of studies, yes.  A callback

3    study is a retrospective cohort study where you actually

4    interact and contact the patients as opposed to just looking at

5    their charts or their x-rays.

6    Q.  And this happened, what, six, seven, eight years after the

7    Recovery filter was on the market and about five years after

8    the G2 was on the market?

9    A.  As I recall, it was published in 2010, so he obviously did

10   the studies in the late -- you know, the late 2007, 2008,

11   something in that time period.

12   Q.  And Dr. Nicholson did this on his own; right?  Bard didn't

13   ask him to do it.  No one prompted him to do it.  He did it on

14   his own because he thought there might be important information

15   for him to share with the rest of the medical community.  Fair?

16   A.  Yes.  I think he did it on his own; yes, that's correct.

17   Q.  And then he conducts this study, and he finds out there's a

18   prevalence of fractures in both the Recovery and the G2

19   filters, including embolization of struts into people's hearts

20   and lungs.  And Bard's reaction to Dr. Nicholson doing

21   something they never did was to attack Dr. Nicholson's study;

22   true?  Which is what you're doing today.

23   A.  Well, I think you asked me about four questions there.

24   Q.  Okay.  I probably did.

25           But you are aware that Bard's reaction to the

1    Nicholson study, to a physician on his own looking at a patient

2    population because he was concerned about Bard products, was to

3    attack Dr. Nicholson and to try to discredit him?

4    A.  I don't think I have any data that would allow me to

5    interpret the state of mind of the company, whether they were

6    attacking or trying to discredit.  They had serious questions

7    about the study, and they requested information of the study.

8          And as it turned out, they found out that he grossly

9    misrepresented that study.  He did not have rates of

10   prevalence.  He did not have incidence.  He did not have a

11   finding that multiple implanters had all had a fracture

12   problem.

13         He found that a single physician at York, Dr. Agarwal,

14   had implanted 10 of the 13 products that fractured.  No single

15   physician in the literature's ever been published to have had

16   that many complications.  So he was really reporting about

17   Dr. Agarwal and Dr. Agarwal's experience with Bard.

18         Without Dr. Agarwal, he had three events.  And the

19   embolization patient wasn't even part of his study.  He added

20   that in, just as he subtracted out patients who hadn't had

21   filters.

22         So this is a study that actually doesn't meet basic

23   scientific principles of good study conduct.

24   Q.  So now eight years later, Dr. Feigal is coming into this

25   courtroom and still attacking Dr. Nicholson's findings.  True?

1    A.  I don't know if you'd describe it as an attack.  I think

2    I'm stating things that are factually correct --

3    Q.  All right.  Let's --

4    A.  -- and which I think he misrepresented in his paper.

5    Q.  Let me ask you --

6    A.  So I'm correcting the record.

7    Q.  All right.  Let me ask you, when a medical article does not

8    stand up to the type of scrutiny, the type of protocol that

9    you're talking about, there are other ways to deal with that.

10   You can send letters to the editor.  You can do another study.

11   You can have someone go in and look at the data again.

12        That never happened, did it?

13   A.  By whom?

14   Q.  By anybody.

15   A.  No, not to my knowledge.  It would have been inappropriate

16   for me to do so since I had seen information that was

17   privileged as part of lawsuits.

18   Q.  Well, I mean, those records were still available at the

19   hospital.  I mean, they could have hired Dr. Feigal.  They

20   could have hired a number of different people who know how to

21   do studies.  Dr. Grassi was here earlier today.  He's done

22   clinical studies.  He's done retrospective studies.

23        They could have hired somebody and said, lookit, we

24   want you to go in and look at this data to see whether or not

25   Dr. Nicholson's findings are actually accurate.  They could

1   have done that; right?

2   A.  I don't have any direct knowledge of that having been done.

3   My understanding is that the hospital did review the situation

4   with Dr. Agarwal.

5           MR. LOPEZ:  Can we look at 587, which was

6   Dr. Nicholson's study, please.

7   BY MR. LOPEZ:

8   Q.  And by the way, Dr. Agarwal, do you know anything about

9   him?

10  A.  Not very much.

11  Q.  Do you know that he was also a loyal Bard customer?

12  A.  I don't know anything -- I don't know what you mean by

13  loyal, and I don't know if he purchased those products or if

14  the hospital did.  But -- so I can't answer your question.

15  Q.  Do you know that actually Bard -- folks from Bard,

16  consultants with Bard, actually trained Dr. Agarwal and others

17  at that hospital on the implantation and the retrieval of their

18  devices.  Did you know that?

19  A.  I did not.  But there is -- there is variation of skill and

20  ability to actually implant these products without damaging

21  them.  Not everybody reaches that level of skill.

22  Q.  And this idea about skill, there's no evidence in this case

23  about Dr. Agarwal's skill in the placement or retrieval of

24  these devices, is there?

25  A.  No.  There's just the finding that in over 200 papers,

```
 1   there isn't another report of a single physician -- in fact,

 2   most -- there's very few reports and even studies having as

 3   many filter fractures as Dr. Agarwal had.

 4   Q.  Well, how many --

 5          Let's look at Exhibit 587.  This is the Nicholson

 6   study we've been talking about; correct?

 7   A.  Yes.

 8   Q.  Published in an authoritative journal.  What is it,

 9   Archives of Internal Medicine?

10   A.  Yes, that's correct.

11   Q.  And could we just look at the results section of that,

12   please.

13          And the result of this study, let's just read it.  Let

14   me just read it to you.

15          13 of 80 patients had at least one strut fracture

16   (16 percent).  At least one strut in seven of the 28 Bard

17   Recovery filters fractured and embolized (25 percent).  In five

18   of these seven cases, patients had at least one fragment

19   embolize to the heart.

20          Did I read that correctly?

21   A.  You did.  But I think the study --

22   Q.  71 percent?

23   A.  Yes.  But I think the study misrepresents what actually --

24   Q.  I understand what your opinion is.  I'm just reading what

25   Dr. Nicholson's writing.
```

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION                        2055

1    A.  Yes, that's what he wrote.

2    Q.  Three patients experienced life-threatening symptoms of

3    ventricular tachycardia and/or tamponade -- tamponade --

4    A.  Tamponade.

5    Q.  Tamponade, including one patient who experienced sudden

6    death at home.

7            Did I read that correctly?

8    A.  You did.

9    Q.  6 of 52 Bard G2 filters fractured (12 percent).

10           Did I read that correctly?

11   A.  You did.

12   Q.  In two of these six cases, the patients had asymptomatic

13   end organ fragment embolization.

14           Explain what that "end organ fragment embolization"

15   means.  Does that just mean a piece of that fragment went to a

16   distant part of the body?

17   A.  Yes, that's what that means.

18   Q.  Now, there's been no evidence as far as you know that, as

19   described, that this is not accurate information; true?

20   A.  Well, there is evidence.  He did not include all of the

21   patients --

22   Q.  No, sir.  As reported, these fractures, just the way these

23   are described, whether or not he included other people, these

24   are real findings of real problems in real people that happened

25   in one hospital as reported by Dr. Nicholson; correct?

1   A.  The number of fractures is correct.  The proportions are

2   not.

3   Q.  Okay.  And then Dr. Nicholson actually --

4           MR. LOPEZ:  Can I have 3924, please?

5   BY MR. LOPEZ:

6   Q.  The Nicholson study is still cited.  It hasn't been taken

7   down.  It hasn't been retracted.  It's still in the medical

8   literature to be cited in other medical literature; true?

9   A.  That's correct.

10  Q.  And Dr. Nicholson -- do you see where I'm looking at there?

11  In June --

12  A.  Yes.

13  Q.  -- of 2012, in the same journal, he wrote:  Corrections to

14  article about prevalence of fracture and fragment embolization

15  of Bard retrievable vena cava filters.

16          Correct?

17  A.  Yes.

18  Q.  You didn't write a letter to the editor, did you?

19  A.  No.  I wouldn't --

20  Q.  No other interventional radiologist, no one else who read

21  this article, no other physician who had an interest in IVC

22  filters wrote a letter to this journal criticizing or saying

23  anything about this article.  True?

24  A.  I don't know if there's other articles criticizing other

25  things, but this is information only known to Dr. Nicholson and

1   which he learned during a deposition when the information was

2   presented --

3           MR. LOPEZ:  Move to strike, Your Honor.

4   Nonresponsive.  He's going -- he's giving a narrative that's

5   beyond what I asked him.

6           THE COURT:  Hold on just a minute.

7           Why don't you reask the question.  The first part of

8   his answer was responsive.

9   BY MR. LOPEZ:

10  Q.  Let's just go to Dr. Nicholson's letter to the -- in

11  correction of his article.

12          We are writing to inform the readers and editors of

13  the Archives that we have discovered errors in our article

14  titled "Prevalence of Fracture and Fragment Embolization of

15  Bard Retrievable Vena Cava Filters and Clinical Implications,

16  Including Cardiac Perforation and Tamponade."

17          The 189 patients described in the published study were

18  identified from general surgery and interventional radiology

19  logs and were a subset of all patients who underwent

20  implantation of vena cava filters between 2004 and 2009.

21          Did I read that correctly?

22  A.  Yes, you did.

23  Q.  Despite requesting complete patient lists from each

24  division, a log of radiology patients who received the Bard G2

25  filter -- and it says Bard Peripheral Vascular -- at York

1    Hospital between 2007 and 2009 was not made available to

2    investigators, and therefore, these patients were not included

3    in the fluoroscopy study.

4            Did I read that correctly?

5    A.  That's correct.  The logs he was provided by his own

6    hospital were incomplete.

7    Q.  It only included the time period 2004 to 2000 -- to maybe

8    2006 or '7; right?

9    A.  Yes.  He had -- yes.

10   Q.  All right.  Now, a copy error in Figure 2 incorporate --

11   incorrectly stated that 83 patients agreed to fluoroscopy.  The

12   correct number is 80.

13           Did I read that correctly?

14   A.  You did.

15   Q.  As reported in the text abstract and statistical

16   calculations of the article.  In Table 2, four different

17   physicians implanted filters which went on to fracture, with

18   ten of these devices implanted by the same physician.

19           Did I read that correctly?

20   A.  You did.

21   Q.  While these issues do not have significant bearing on the

22   results reported in our study and do not change our

23   conclusions, we thought that they should be disclosed.

24           William J. Nicholson, Department of Cardiology, York

25   Hospital.

1          Did I read that correctly?

2   A.  You did.

3   Q.  Actually, the percentages should have been a little bit

4   higher, because instead of the denominator being 83,

5   Dr. Nicholson is saying the denominator's 80; true?

6   A.  No.  The denominator's 189.

7   Q.  But they did 80 fluoroscopies instead of 83; correct?

8   A.  That's correct.  Out of the -- but --

9   Q.  All right.

10  A.  -- again, it does not include the patients that he already

11  knew did not have fractures.  He just excluded those and didn't

12  include them.  So his numbers are still not correct, even with

13  his corrections.

14  Q.  Now, let me ask you, part of epidemiology and the science

15  that you practice, you don't just look at one piece of evidence

16  to determine whether or not there is something there; right?

17  You look at other evidence, even if it's low-value evidence,

18  because you don't have this higher level of evidence.  True?

19  A.  That's correct.  You consider it all.

20  Q.  Okay.  Now, did Bard show you their internal tracking and

21  trending of the same type of events that Dr. Nicholson

22  describes in his study?

23  A.  The scope of my report was to review the medical

24  literature, and that's what my report was about.  In response

25  to information in Bard -- in plaintiffs' experts, who cited

1    spontaneous report data, I also had additional data provided by

2    Bard about spontaneous reports.

3    Q.  So you didn't know when you were doing this analysis that

4    Bard had in its complaint files 355 total fractures of the

5    Recovery through Eclipse filters as of July 2010, did you?

6    A.  I'd have to go back to see the records to see what was

7    there, but they are not records -- I mean, my task was to

8    calculate the incidence and prevalence of different types of

9    fractures, and that information is not -- you can't get that

10   information from that.  So I --

11   Q.  You didn't have it.  That's all I'm trying to find out.

12   A.  No, I think I may have had it.  I was supplied some

13   information, but I didn't rely on it because it couldn't

14   actually provide information about what I was asked to do.

15   Q.  I'm talking about looking for things that are consistent

16   with what you looked at in the literature.

17           How many of those 355 fractures during that period of

18   time were what Bard calls Type A fractures?

19   A.  I don't -- I don't know.  Again, I did not rely on the --

20   Q.  Sir --

21   A.  -- on that single report, so I did not try and analyze them

22   in any way.

23   Q.  Do you know what a Type A fracture is as defined by Bard?

24   A.  No, I do not.

25   Q.  Do you know what a Type B fracture is as defined by Bard?

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION          2061

1    A.  No.

2    Q.  Do you know how those Type A and Type B fractures compare

3    to other filters that were on the market at the same time with

4    respect to their reporting risk rate?

5    A.  Well, there aren't any reliable reporting risk rate

6    calculations.

7    Q.  You didn't do any; right?  You didn't do any reporting risk

8    analysis, did you?

9    A.  The information to do reporting risk rates is not

10   available, so I wouldn't have done them.  But it was, again,

11   beyond the scope of what I was asked to look at.  I was asked

12   to look at the medical literature.

13   Q.  Doctor, do you know who Natalie Wong is?

14   A.  I'm not sure.

15   Q.  Do you know that Natalie Wong did a statistical analysis of

16   the adverse events as they relate to Recovery and other filters

17   that were on the market?

18   A.  I don't recall.

19   Q.  Do you know who Dr. John Lehmann is?

20   A.  I do not recall.

21   Q.  Do you know that Dr. -- that Natalie Wong was still an

22   employee at Bard while the Recovery filter was only on the

23   market for a short period of time, did a statistical analysis,

24   and determined that there was a statistically significant

25   increased risk of fatalities with the Recovery filter in the

1    first several months it was on the market compared to a number

2    of other filters including its predicate device, the Simon

3    Nitinol filter?  Did you know about that?

4    A.  I've seen those analyses.  I was -- did not consider them

5    in my calculations because I didn't think that the statistics

6    and the calculations they were doing were valid and could be

7    relied upon.

8    Q.  Did you see the statistical analysis that it was reported

9    by a Dr. John Lehmann, who is --

10   A.  I don't recall.

11   Q.  Do you know who Dr. Lehmann is?

12   A.  I don't recall.

13   Q.  Do you know that he's an epidemiologist from Harvard?

14   A.  I don't -- I don't recall ever having -- recall who

15   Dr. Lehmann is.

16   Q.  Do you know that Dr. Lehmann concluded, and it was reported

17   in one of their health hazard evaluations, that the Recovery

18   filter was four to five times more likely to cause perforation,

19   migration, fracture, tilt, and catastrophic injuries, more so

20   than any other device on the market at that time?  Did you know

21   that his analysis concluded that?

22   A.  I'm not sure if I ever saw that.  But, again, if it's based

23   on spontaneous reports and comparisons across reports, that's

24   exactly the kind of comparison that FDA themselves says you

25   can't use this information to do that.  It's not reliable.

1    Q.  It's the only data that Bard left us with, isn't it?

2    Because they didn't do any of these other things for us to

3    evaluate.  We're stuck with that safety data, aren't we?

4    A.  No.  We have the whole body of the medical literature which

5    is reported on the experience of these products in thousands of

6    patients, and we have the experience of the reports of studies

7    with different, you know, strengths and weaknesses.  And as you

8    pointed out, we consider it all.  We don't just limit ourselves

9    to the spontaneous reports and try and make mathematics out

10   of --

11   Q.  Do you know whether or not the findings in -- that

12   Dr. Nicholson has and that these other people we just talked

13   about had with respect to their statistical analysis was

14   consistent with the bench testing that was done by Bard on

15   these products?

16   A.  I was not asked to evaluate the bench testing.

17   Q.  You just looked at these articles and the data and said

18   there's just -- we just don't have anything that's going to

19   allow anyone to really know how bad or how good Bard IVC

20   filters are once they're implanted in patients; true?

21   A.  No, that's not correct.  The medical literature is

22   available to all physicians.  It describes the spectrum of

23   complications that occur.  It describes how to treat them.

24   Describes how to retrieve filters, how to retrieve difficult

25   filters.  It describes case reports of individual patients.

1        All of that is kind of clinical information clinicians

2   need for risk-benefit.  What it doesn't do is it doesn't give

3   you a rate.  You can't say that it's a rate or proportion.

4   Q.  Right.  And you know that this case is about whether or not

5   these rates, whatever they are, may have been increased by

6   design deficiencies that Bard acknowledged they had in some of

7   their devices?  Did you know that that was what this case was

8   about?

9   A.  I understood that that was an issue in this case, yes.

10  Q.  And whether or not the rate increases 10 percent,

11  20 percent, or 30 percent, wouldn't you agree that if that was

12  caused by a design defect, that the first thing that Bard ought

13  to do is fix the design to lower whatever that rate might be?

14  Don't you agree with that?

15          MR. CONDO:  Beyond the scope.

16          THE COURT:  Sustained.

17  BY MR. LOPEZ:

18  Q.  Now, you, in prior testimony -- I'm just going to ask you

19  this question and see if you answer it the same.

20          One of the primary reasons companies cannot use

21  adverse events to state that "This is our failure or

22  complication rate" is because you don't know whether there were

23  10 or a hundred times that this same event happened in other

24  patients where it was just not recorded; true?

25  A.  Yes.  That's the phenomenon of --

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION        2065

1    Q.  Is that true, Dr. Feigal?

2    A.  Yes.  That's underreporting, and I acknowledge that that's

3    an issue with the reports.  That's why you can't calculate

4    rates from --

5    Q.  Doctor, I want you to please answer this question whether

6    or not it's true or false:  A responsible and ethical company

7    should -- what a responsible and ethical company should do, in

8    the interest of patient safety, is to assume that they're only

9    seeing the tip of the iceberg when doctors are reporting these

10   fractures that are migrating to the heart and lung and other

11   complications that Bard filters are having.

12   A.  Yes, I agree with that.  And what companies do is they look

13   at each of those cases individually and say, what do we learn

14   from this case and is there something we can do to mitigate

15   this case, which could involve changing the device, could

16   involve better training.  That's what companies do.

17   Q.  Now, I want you to assume that if -- assuming you've sold a

18   hundred Bard filters, and among those hundred, you get one

19   report of a serious injury.  Would it be misleading for someone

20   to say that the unreported cases are evidence of a 99 percent

21   success rate?

22   A.  I don't know if I have enough information from your

23   hypothetical to answer that.

24   Q.  Well, what happens if they're not reported?  If you

25   don't -- if you don't know anything about the other 99 because

1    no one's telling Bard about them, they're not reporting it to

2    them, they don't know what happened with those devices?  They

3    don't know whether or not they stopped a PE or didn't stop a

4    PE; true?  No one's reporting that; right?

5            MR. CONDO:  Beyond the scope, Your Honor.

6            THE COURT:  Sustained.

7    BY MR. LOPEZ:

8    Q.  Now, Doctor, would you agree that the reason you look for

9    safety signals once a device is on the market, especially if

10   there have been no long-term clinical trials for safety, is to

11   find out whether or not something unexpected or unintended is

12   happening with your product so that you can take steps to

13   protect people from those risks; true?

14   A.  Yes.

15   Q.  And adverse events give the company a first hint that they

16   may have a design issue with their product.  You would agree

17   with that?

18   A.  They can.  Not always, but that's one of the ways that you

19   look at the design.

20   Q.  And you've actually made public statements in your career

21   that there are times a single case can identify a design issue.

22   True?

23   A.  That is true.

24   Q.  Do you know that Bard -- do you know whether Bard had

25   actually acknowledged that they had design issues with their

1    Recovery, their G2, their G2X, and Eclipse filter just based on

2    signals they were getting from doctors that were implanting

3    these?

4    A.  Again, I wasn't really asked to look at anything internal

5    to Bard or what their conclusions were.

6    Q.  And you were not provided with documentation based on these

7    adverse events and the company's risk analysis that included

8    that the G2 filter posed an unacceptable risk of serious harm

9    to patients; true?

10   A.  It was outside the scope of my report.  I don't know if

11   I've seen documents like that in depositions of other -- of

12   other experts, but it was not something that was -- that I

13   considered in my report and whether you could calculate rates

14   or proportions.

15   Q.  And you were not provided with documentation that, based on

16   that analysis, they should not launch the product into the open

17   market until they fixed the problem?  You weren't provided with

18   that data, were you?

19   A.  Again, that was not a question that I was asked to review

20   and was not part of the scope of what I was asked to be an

21   expert about.

22   Q.  And you didn't look at any internal documents that

23   discussed the design -- the design deficiencies and how the

24   correction of those design deficiencies would significantly

25   reduce the type of event that happened to Mrs. Hyde as a result

1   of having a G2X implanted in her; true?

2   A.  I was not asked to offer opinions about the design, and I

3   did not ask for documents about the design.

4   Q.  Doctor, you would agree that whether we know what the exact

5   rate is, whether the -- well, let me ask you this question:

6   Every time we look at a number, a statistic, we're talking

7   about real human beings; right?

8   A.  Absolutely.

9   Q.  We're talking about people --

10  A.  Yes.

11  Q.  -- correct?

12  A.  Absolutely.

13  Q.  So if Bard has 200 people by 2010 who have had this thing

14  migrate to their heart, pieces migrate to their heart, they

15  shouldn't -- should they say, well, let's see if we can

16  statistically justify not taking that device off the market?

17  They shouldn't do that; right?

18          MR. CONDO:  Objection.  Beyond the scope, Your Honor.

19          THE COURT:  Sustained.

20          MR. LOPEZ:  Those are all the questions I have, Your

21  Honor.

22          THE COURT:  Redirect?

23          MR. CONDO:  Yes, Your Honor.

24          MR. LOPEZ:  Actually, Your Honor, I do have -- I have

25  one more document I want to show Dr. Feigal.  I apologize.

DAVID W. FEIGAL JR., M.D. - CROSS-EXAMINATION          2069

1              Exhibit 1212, please.

2    BY MR. LOPEZ:

3    Q.  Dr. Feigal, you recognize this article; correct?

4    A.  Yes.  I wrote this at the request of Guidant Corporation

5    with two other -- with two cardiologists.  I'm not a

6    cardiologist.

7    Q.  And it was published in the New England Journal of

8    Medicine?

9    A.  That's correct.

10   Q.  And this is an article that you wrote in 2006; correct?

11   A.  I think -- yes, that's correct.

12   Q.  And let's look at this real quickly.  Let's look at -- the

13   title is what?

14   A.  "Life-Threatening Malfunctions of an Implantable Cardiac

15   Device."

16   Q.  Okay.  And I'd like to direct your attention to the last

17   page of this article.  And if you look at the first column,

18   where it says, "In the past."

19              Do you see where I am?

20   A.  Yes.

21   Q.  And you wrote:  In the past, this industry -- and you're

22   talking about the medical device industry; correct?

23   A.  That's correct.

24   Q.  The medical device industry involving implantable cardiac

25   devices; correct?

1    A.  Yes.

2    Q.  This industry has not had a good record of open

3    communication, but transparency does benefit companies that

4    want to be viewed as trusted partners in the healthcare

5    enterprise.  As the panel noted, transparency may be passive,

6    with information made available to those who seek it; active,

7    with information targeted to specific groups of stakeholders;

8    or forced, with a third party bringing forth information that

9    elicits further disclosure by a company as a defensive move.

10            Did I read that correctly?

11   A.  Yes.

12   Q.  From the perspective of physicians' and patients'

13   expectations, corporate responsibility, and public perception,

14   we believe that proactive communication policies centering on

15   the proper use of active and passive transparency should be the

16   norm.

17            Did I read that correctly?

18   A.  Yes, you did.

19   Q.  Insofar as such communication is hindered by perceived

20   business conflicts, the solution may lie in new regulatory

21   definitions that distinguish informational actions from those

22   that indicate the removal of a device.

23            Did I read that correctly?

24   A.  You did.

25   Q.  Changing language can be difficult since much of it is

1    embedded in statutory requirements.

2            Did I read that correctly?

3    A.  You did.

4    Q.  Now, let's go down to -- just down in that same column.

5    And right at the very bottom, it says:  "With the explosive

6    growth of the industry."

7            Do you see where I am?

8    A.  Yes.

9    Q.  In recent years, previously unrecognizable signals have

10   become increasingly visible.  Clearly, strategies for

11   evaluating and communicating device malfunctions must be

12   adjusted accordingly.  Our conclusion is that industry should

13   work collaboratively with physicians, professional societies,

14   patient representatives, and regulatory agencies to establish

15   reasonable standards and guidelines for the device industry to

16   follow.  Patients deserve nothing less.

17           Did I read that correctly?

18   A.  You did.

19   Q.  And you still believe that today; correct?

20   A.  I do.

21           MR. LOPEZ:  All right.  Those are all the questions I

22   have, Your Honor.  Thank you for letting me do that.

23           THE COURT:  Redirect?

24           MR. CONDO:  Yes, Your Honor.  Thank you.

25

1                          REDIRECT EXAMINATION

2    BY MR. CONDO:

3    Q.  Dr. Feigal, you were asked a series of questions about the

4    number of fractures attributed to Dr. Agarwal in the Nicholson

5    study?

6    A.  Yes.

7    Q.  How many fractures were attributed to Dr. Agarwal?

8    A.  10 of the -- 10 of the 13 patients who had fractures were

9    implanted by Dr. Agarwal.

10   Q.  And can the skill and technique of the implanter contribute

11   to a complication rate?

12            MR. LOPEZ:  Your Honor, beyond the scope.  He's --

13            THE COURT:  Overruled.  It's not beyond the scope.

14            MR. LOPEZ:  Then I'm going to object based on

15   foundation and --

16            THE COURT:  I think there does need to be foundation

17   for this question.

18   BY MR. CONDO:

19   Q.  As part of your epidemiological training, do you look at

20   factors which can influence complication rates?

21   A.  Yes.

22   Q.  And is human factor, the human factor in an event, one of

23   those elements that you look at to determine whether or not it

24   influences a complication rate?

25   A.  Yes, it is.  And here --

1            MR. LOPEZ:  I'm going to object.  He's going to launch

2      into a narrative that may include something I might want to

3      object to.

4            THE COURT:  Well, if he does, you can object.

5            MR. LOPEZ:  Pardon me?

6            THE COURT:  If he does, you can object.

7            THE WITNESS:  And problems caused by human errors,

8      even when there's nothing wrong with the device, are reportable

9      adverse events to the FDA.

10     BY MR. CONDO:

11     Q.  So let me ask the question again.  Like all surgical

12     procedures, are there human factors that may contribute to the

13     complication rate depending on the skill and technique of the

14     operator implanting an IVC filter?

15           MR. LOPEZ:  Your Honor, objection.  Foundation.

16           THE COURT:  Overruled.

17           THE WITNESS:  Yes.

18           MR. CONDO:  Thank you.  I have no further questions.

19           THE COURT:  All right.  Thanks.  You can step down,

20     Doctor.

21            (Witness excused.)

22           MR. ROGERS:  Your Honor, at this time defendants call

23     Rob Carr.

24           THE COURT:  Mr. Carr, you can come directly back to

25     the witness stand since you're still under oath for purposes of

1    this trial.

2                        ROBERT MICHAEL CARR JR.,

3    called as a witness herein by the defendants, having been

4    previously duly sworn or affirmed, was examined and testified

5    as follows:

6                        DIRECT EXAMINATION

7    BY MR. ROGERS:

8    Q.  Good afternoon, Mr. Carr.

9    A.  Good afternoon.

10   Q.  Can you remind the jury, please, of what your full name is?

11   A.  Robert Michael Carr Jr.

12   Q.  And can you remind the jury how long you've worked at Bard.

13   A.  Almost 20 years.  22 years.

14   Q.  What division of Bard do you work for?

15   A.  Peripheral Vascular.

16   Q.  And what sort of products does that division make?

17   A.  We make mostly implantable devices, either some vascular

18   stents, we make a lot of balloon angioplasty devices, we have a

19   full biopsy -- cancer biopsy line, vena cava filters.  Those

20   sorts of things.

21   Q.  And so, Mr. Carr, are you an engineer by training?

22   A.  I am, yes.

23   Q.  Can you tell the jury about your educational background.

24   A.  I have a Bachelor of Biomedical Engineering at Catholic

25   University in Washington, DC.

1   Q.  And can you describe for us what is biomechanical -- or

2   biomedical engineering?

3   A.  So it's really a combination of -- at Catholic was a

4   mechanical engineering curriculum with kind of a pre-med or

5   nursing curriculum.

6   Q.  So what led you into that field?

7   A.  Just interest in sciences, mostly, and then -- and also

8   engineering, so thought I would be a doctor one day but was

9   just a nice major.

10  Q.  And since you finished with that degree, have you been

11  working in the medical device industry pretty consistently

12  since then?

13  A.  Only since then, yes.  Fully.

14  Q.  And so what was your first job after you left school, when

15  you got your degree?

16  A.  I was an entry level engineer at a company called

17  Organogenesis, which was in Boston, Massachusetts.

18  Q.  And what types of products did that company make?

19  A.  We made skin, actually.  So a professor from MIT determined

20  a way to grow human skin from certain cells.  And we then sold

21  those products to cosmetic companies to do testing on as well

22  as to some burn victims for skin replacement.

23          And then I worked specifically on products that were

24  made from collagen, which is a natural protein in your body.

25  Q.  And did there come a point where you left that company and

1    went to a company called NMT?

2    A.  Yes.

3    Q.  And so what positions did you hold at NMT?

4    A.  I started as the director of R&D at NMT, and when I left to

5    go to Bard, I was a program director.

6    Q.  What does NMT stand for?

7    A.  Nitinol Medical Technologies.

8    Q.  And while you were at NMT, what product did you spend the

9    majority of your time on?

10   A.  Vena cava filters.

11   Q.  And when you started working with vena cava filters, what

12   types of filters were on the market at that time?

13   A.  There were only permanent devices at that time.

14   Q.  And can you describe for the jury, as far as the filters

15   that were at NMT, what were they made of?

16   A.  They were made of a material called Nitinol.

17   Q.  And the jury's heard a little bit about Nitinol, but can

18   you describe for us what that is?

19   A.  So Nitinol is a pretty cool material.  It's what's called a

20   shape memory material.  Whereas at one temperature it can be

21   one shape and you can form it into that shape, and then you can

22   program it by cooking it in an oven to then form at a different

23   shape at a given temperature.

24   Q.  And so can you tell the jury, though, what happens if the

25   Nitinol is then changed to a different temperature, once it's

UNITED STATES DISTRICT COURT

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION                2077

1  forged into a shape?

2  A.  So as I said, so, for example, our filters primarily start

3  as a series of straight wires.  And then they're wound around

4  what we call a jig, or a three-dimensional object.  We put that

5  in an oven at a given temperature for a given amount of time,

6  remove it from that jig, and if you cool it down, it can go

7  back to being those straight wires.  If you heat it up, it will

8  form into the shape of a filter in that case.

9  Q.  So does it essentially remember the shape in which it is

10 forged?

11 A.  Yes.  Shape memory.

12 Q.  And so did you work some at NMT with a doctor named

13 Dr. Morris Simon?

14 A.  Yes, very much.

15 Q.  And can you tell the jury who he is?

16 A.  So he was the founder of NMT, or Nitinol Medical

17 Technologies.  He was a world-renowned interventional

18 radiologist in Boston at a very famous hospital there, Beth

19 Israel Hospital.

20 Q.  And is that the person that Simon Nitinol filter is named

21 for?

22 A.  It is.

23 Q.  And did you work with Dr. Simon in regard to the Simon

24 Nitinol filter?

25 A.  Not in the original development of it, but later while I

UNITED STATES DISTRICT COURT

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION          2078

1    was there, we actually transferred the manufacturing of that

2    device into NMT.  We had contracted somebody to make it for the

3    first few years it was made.

4    Q.  And did you and Dr. Simon work on the development of a

5    retrievable filter?

6    A.  Yes.

7    Q.  And what filter was that?

8    A.  What ultimately became the Recovery filter.  There were

9    many iterations prior to us being successful and making the

10   Recovery.

11   Q.  What led you and Dr. Simon to try to develop a retrievable

12   filter?

13   A.  So, really, it was his idea.  You know, being an

14   interventional radiologist who saw tremendous amount of

15   patients and being an inquisitive guy, he knew that while

16   permanent filters, his own especially, provided a great benefit

17   to patients, that they really needed one that was able to be

18   taken out.  Most patients don't need a vena cava filter

19   forever.  They need it for an undisclosed period of time.

20           And so his idea was could we develop a filter that

21   could stay in permanently or could be removed when it was

22   needed -- or no longer needed.

23   Q.  In addition to Dr. Simon, did you work with other

24   interventional radiologists in the development of the

25   retrievable filter?

1    A.  Yes, we had several we worked very closely with.  John

2    Kaufman was one primarily.  He was at Massachusetts General

3    Hospital at the time.  He's now at the Dotter Institute in

4    Portland, Oregon.  And another, Tony Venbrux is his name.  He

5    was at Johns Hopkins University in Baltimore.

6    Q.  And so what was the atmosphere like at NMT about the

7    possibility of this retrievable filter?

8    A.  So it was exciting.  An incredibly collegial atmosphere.

9    Brilliant minds of these physicians and the other people who

10   were there, with an opportunity to do something, frankly,

11   nobody else had ever done.  Being a 20-something-year-old out

12   of school, it was an incredible place to be.

13   Q.  Mr. Carr, at some point did NMT sell the rights to the

14   Recovery filter to C.R. Bard?

15   A.  Yes.  The Recovery and the SNF.

16   Q.  And did you eventually move to Bard?

17   A.  I did, in 2002.

18   Q.  And is that what brought you to the Phoenix area?

19   A.  It is, yes.

20   Q.  And you've been in Phoenix ever since then?

21   A.  I have been.

22   Q.  And so when you were working at Bard, did you have an

23   opportunity to continue to work on this same project?

24   A.  Yes.

25   Q.  And so what was your title or your capacity in that regard?

1    A.  I started as the program director of R&D for our vena cava

2    filter programs; our angioplasty program, which is balloons

3    that open up your vessels; and as well as our biopsy products

4    at the time.

5    Q.  And were there other engineers that came over from NMT to

6    Bard in addition to you?

7    A.  Yes.  About probably 18 months later, I brought one of our

8    principal engineers named Andre Chanduszko from NMT to Bard.

9    Q.  And as part of your continued work on the development of

10   this filter, did you continue to work with Dr. Kaufman and

11   Dr. Venbrux?

12   A.  Yes, we did.

13   Q.  Mr. Carr, I want to kind of change gears on us and talk

14   about just the general development of a new medical device and

15   what that entails.

16           MR. ROGERS:  And, Scott, would you mind pulling up

17   Exhibit 6089?

18   BY MR. ROGERS:

19   Q.  And do you see that on your screen, Mr. Carr?

20   A.  I do.

21   Q.  And is this a PowerPoint presentation?

22   A.  Yes, it is.

23   Q.  And is it something that you helped prepare as part of your

24   work at Bard?

25   A.  I did make this, yes.

1          MR. ROGERS:  Your Honor, I move this into evidence.

2          MR. O'CONNOR:  Hold on.  I don't know that we received

3     that.

4          Oh, I'm sorry.

5          Your Honor, I've been told this has been not -- this

6     document has not been produced.

7          MR. ROGERS:  Your Honor, it's my understanding it has.

8          THE COURT:  Not produced when?

9          MR. LOPEZ:  As part of discovery.

10         MR. O'CONNOR:  It has no Bates number.

11         THE COURT:  All right.  Let's talk about that at

12    sidebar.

13         You can stand up, ladies and gentlemen.

14         (At sidebar on the record.)

15         THE COURT:  What's your objection?

16         MR. O'CONNOR:  Well, nondisclosure.

17         THE COURT:  Did you preserve that objection in the

18    final pretrial order?

19         MR. LOPEZ:  Pardon me?

20         THE COURT:  Did you preserve that objection in the

21    final pretrial order?  Did you make the objection to the

22    document in the final pretrial order?  I required you to

23    indicate all your objections to all exhibits.

24         MR. LOPEZ:  I thought we were reserving that to trial.

25         THE COURT:  Well, that's why we got the long list of

1   exhibits and objections in the final pretrial.

2           MR. LOPEZ:  I know, but this was never produced to us

3   in discovery.

4           THE COURT:  Well, the point is if it was in the final

5   pretrial order, you should have listed that as an objection.

6   And I said when I adopted the final pretrial order, any

7   objections not contained in the final pretrial order are waived

8   unless you can make a showing of manifest injustice.

9           MR. LOPEZ:  I thought we were reserving those for when

10  they were offered at trial.  That was my understanding of the

11  Booker trial and --

12          THE COURT:  I didn't --

13          MR. LOPEZ:  In other words, there's --

14          THE COURT:  My order specifically says you have to

15  list objections to exhibits.

16          MR. LOPEZ:  But I thought -- I may be wrong, Your

17  Honor, but I thought because there were going to be 8,000 of

18  these, that we were reserving the right to make those

19  objections when they were -- any of them were being offered.

20  Otherwise we'd spend six months going through documents

21  objecting to them.

22          THE COURT:  That's why I suggested before Booker that

23  you reduce the size of your exhibit list, was for that reason.

24          Am I misunderstanding what your understanding is?

25          MR. ROGERS:  No, Your Honor.

1          MS. HELM:  We did objections.

2          MR. O'CONNOR:  Pardon me?

3          MS. HELM:  We did objections to exhibits.

4          MR. LOPEZ:  I know, but if something's not produced in

5     discovery --

6          THE COURT:  Then you should object in the final

7     pretrial order.  That's the whole point of it.

8          MR. LOPEZ:  All right.  Well, we can talk about that

9     later, but obviously it's not this trial.  But it's impossible

10    for us to do that.

11         THE COURT:  Well, you've never said that before just

12    now, and we're in the middle of our third bellwether trial.

13         MR. LOPEZ:  I know.  This is the first time it's

14    happened where I see something that wasn't produced in

15    discovery.

16         THE COURT:  Was this produced in discovery?

17         MR. ROGERS:  I genuinely do not know the answer, Your

18    Honor.  But what I do know is that this document was used in

19    another federal case that was tried, not one of the MDL --

20         THE COURT:  Well, but that doesn't answer the

21    question.

22         MR. ROGERS:  No, and I told you I don't know the

23    answer.

24         THE COURT:  Was it used in Booker or Jones?

25         MR. LOPEZ:  The Phillips trial?

1          MS. HELM:  Yes.

2          MR. ROGERS:  Yes.

3          MS. HELM:  And those trial transcripts and exhibits

4     have all been produced.

5          MR. LOPEZ:  I can't say -- I can't say anything other

6     than the fact -- what prompted me, there's no Bates numbers on

7     here.  So I don't know whether this was dated --

8          MS. HELM:  That happens a lot with PowerPoints.  When

9     you regenerate them, Bates numbers don't come off, so we have a

10    number of exhibits --

11         THE COURT:  Well, it sounds like I can't decide

12    whether or not it was produced in discovery and I can't decide

13    whether or not it was objected to in the final pretrial order

14    because we don't know sitting here.  So I don't think I have a

15    basis for excluding it.

16         MR. LOPEZ:  I'm sure it was --

17         MR. O'CONNOR:  What are you going to use it for?

18         MR. ROGERS:  We're going to look at one slide, which

19    is going to be fairly innocuous.

20         (End of discussion at sidebar.)

21         THE COURT:  Thank you, ladies and gentlemen.

22         Exhibit 6089 is admitted.

23         (Exhibit No. 6089 admitted into evidence.)

24         MR. ROGERS:  Thank you, Your Honor.  May we display it

25    to the jury, please?

UNITED STATES DISTRICT COURT

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION                    2085

1              THE COURT:  You may.

2   BY MR. ROGERS:

3   Q.  Mr. Carr, you have the document on your screen?

4   A.  Yes, I do.

5              MR. ROGERS:  And, Scott, if you wouldn't mind taking

6   us to the third page, please.

7   BY MR. ROGERS:

8   Q.  And, Mr. Carr, is this a slide that you helped develop

9   while you were at C.R. Bard?

10  A.  Yes.  I created this slide.

11  Q.  And can you describe for the jury, just generally to begin

12  with, what does this slide -- what is it about?

13  A.  So it's a pictorial representation of our product

14  development process, so how we go about through what's called a

15  phased approach of developing our products.

16  Q.  And let's -- if you don't mind, I'm going to walk through

17  the phases with you.

18             And the first thing that we see there is -- I guess in

19  that fist circle on the left-hand side, it says Idea Generation

20  Process.  Can you tell the jury what that means?

21  A.  So we generate ideas.  So before a product or an idea can

22  be thought of, we do a lot of research, experiential, being --

23  talking with physicians, being in cases, reading literature,

24  whatever it may be.  And we try and identify what's called an

25  unmet need, and then we try and develop solutions to unmet

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION            2086

1    needs.

2          And so in this process, it's kind of a time where we

3    can just think of solutions to ideas or to needs and develop

4    different prototypes and things like that that ultimately, one

5    day, hopefully, reach a point where they're worth considering

6    to move on further, to invest in, both in people and money.

7    And so the Idea Phase.

8    Q.  All right.  And the next bubble or circle, I guess, it says

9    Concept Phase.  What happens during that phase?

10   A.  So that's really where a tremendous amount of work is done

11   to really put a lot of meat around that unmet need, to validate

12   the assumptions that go into that need, be they monetary, be

13   they material, can you make it, is it actually needed, you

14   know, what patients does it serve.

15         All of the work to develop a working prototype and a

16   working, in this case, device that would then be worth testing

17   in feasibility and what's called development later.

18   Q.  All right.  And so I guess we've kind of gone through the

19   Feasibility and Development Phase.

20         And then you've got sort of a different thing there

21   that says Launch, in between Development and Post Launch.  Tell

22   us what that means.

23   A.  So I think before we get to Launch, we should talk about

24   the arrows below, which is the reviews.  So none of these

25   phases are moved past until you have a very significant review

1    by independent people at the company from different walks of

2    life, be they engineering, marketing, sales, et cetera, where

3    the team presents their data at the time to then get approval

4    to move forward across that process.

5          If you successfully move through Concept, Feasibility,

6    Development, there is another review that is done prior to

7    submission to the -- in our case, the FDA.  And then

8    ultimately, hopefully, Launch.

9    Q.  And then the final circle on the right says Post Launch.

10   Can you describe that for the jury please?

11   A.  Yes.  So at a period of time after the product's been on

12   the market, we review manufacturing data, so did we make it for

13   the cost and the time that we thought we would.  We walk

14   through any complaints that may have happened through that

15   time.  We go out and see cases and get a general sense for how

16   the product was doing.

17         And then we have a design review again to ensure that

18   we want to continue with that product commercially.

19   Q.  And when you were at first NMT and then at C.R. Bard, was

20   this general product development cycle, was that followed by

21   you in the development of IVC filters?

22   A.  Yes.  This process is generally followed by all device

23   manufacturers.

24   Q.  All right.  So, Mr. Carr --

25         MR. ROGERS:  You can take that down, please, Scott.

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION                    2088

1    Thank you.

2    BY MR. ROGERS:

3    Q.  I want to talk to you a little bit about the development of

4    the Recovery filter.  But before I do that, I want to back up

5    and ask you just some general questions about filters.

6            The jurors have heard some references through the

7    trial about conical filters.  Can you describe for us, please,

8    what that means?  What is a conical filter?

9    A.  So a conical filter is one that is cone shaped, so that

10   generally at the bottom of the filter, or towards the legs,

11   would be the widest part, and it would move up into a cone

12   shape.

13   Q.  And so are there particular advantages of a conical design

14   for a filter?

15   A.  There are dramatic advantages, yes.

16   Q.  And what are those?

17   A.  Mostly, the way the filter traps clot.  So that when you

18   have a clot burden, if it were to be trapped by the filter, a

19   conical filter allows that clot to move to the center of the --

20   in this case, vena cava.  And it leaves the most surface area

21   for the rest of the blood to flow through.  Versus if it were

22   the opposite way, if the tip of the cone was facing down, the

23   clot would move to the outside, and that would actually tend to

24   cause the vessel to thrombose, potentially.

25   Q.  And are you generally familiar with the design of

1    competitor companies' filters that are on the market?

2    A.  Yes.

3    Q.  And so of the competitor filters, how would you describe

4    how many, from a percentage standpoint or what's easiest for

5    you to describe, how many are conical filters?

6    A.  They are all conical filters except for one called the

7    Bird's Nest, which is a -- looks like a nest.  It's for very,

8    very large vena cava where other filters don't work.  So

9    it's -- everybody has kind of one of them on a shelf for that

10   kind of patient.

11          But, generally, every other filter is conical in

12   shape.

13   Q.  And was the Simon Nitinol filter a conical filter?

14   A.  Yes.  The bottom half of it is conical.

15   Q.  And are you familiar with a filter called the OptEase

16   filter?

17   A.  Yes.

18   Q.  Is it a conical filter?

19   A.  It is, with the noted exception that it is one of the

20   filters that the cone faces outward.

21   Q.  And is that the difference, as far as being a conical

22   filter, between the OptEase filter and the Bard filters?

23   A.  That's one of the differences, yes.

24   Q.  And so would the Bard filters, would they be considered

25   inward cone-shaped IVC filters?

 1    A.   Yes.

 2    Q.   And that would be different from the OptEase because it's

 3    an outward shaped cone filter; is that right?

 4    A.   At the bottom of it, yes.

 5    Q.   And so what are some of the advantages or disadvantages of

 6    having a filter which is an inward cone-shaped filter versus

 7    one that is an outward cone-shaped filter?

 8    A.   So like I said, the primary one is the ability to trap clot

 9    and move it to the center of the vessel.  What that also does

10    is it allows the flow or the velocity of the blood going past

11    it to be faster and potentially break up the clot, is one of

12    the things people think about, versus the outward one.  And

13    again, like I said, it would tend to be more thrombosing.

14    Q.   And when you say thrombosing, what do you mean by that?

15    A.   Well, just that the clot on the outside would fill the

16    vessel faster than the same volume of clot if it were in a

17    cone -- an upward cone shape.

18    Q.   And can thrombosis lead to something called occlusion of

19    the IVC?

20    A.   Yes.

21    Q.   And tell the jury what that is, please.

22    A.   So it would be where you have so much mass in the vessel

23    that blood flow is no longer going past the filter and the

24    clot.

25    Q.   Let's talk specifically about the development of the

1    Recovery filter.

2           Can you tell the jury approximately when the process

3    started to develop the Recovery filter?

4    A.  The first ideas were in 1996.

5    Q.  And so how many prototypes did NMT go through in the

6    development process?

7    A.  A bunch.  A half a dozen, probably.

8    Q.  And why were some of the prototypes rejected, ultimately?

9    A.  Well, ultimately they would have failed one test or

10   another, either they couldn't be deployed properly or they

11   didn't perform well in a certain bench test or in an animal

12   test, for whatever reason.  There were various reasons and

13   various designs that were tried.

14   Q.  And approximately when was the initial design of the

15   Recovery filter complete?

16   A.  1999 time frame.

17   Q.  And the Recovery filter was cleared by FDA approximately

18   when?

19   A.  As a permanent device, in 2002.

20   Q.  All right.  Let's talk about some of the testing that was

21   performed on the Recovery filter when it was being developed.

22          Can you describe generally for the jury the types of

23   tests that would have been performed on that filter?

24   A.  So we do what's called bench testing, so in the lab where

25   we can control certain parameters we want to test.

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION          2092

1          We do animal testing where we implant, in this case,

2     the filters into animals and see how they -- the vessel

3     responds as well as could we remove the device and what damage,

4     if any, that might have caused.

5          And then, ultimately, we did a clinical trial.

6     Q.  And speaking of clinical trials, when you were at NMT, was

7     a clinical trial performed on the Simon Nitinol filter?

8     A.  Before I was there, yes.

9     Q.  And do you know approximately how long that clinical trial

10    lasted?

11    A.  Those patients were followed for 180 days.

12    Q.  So that's approximately about six months?

13    A.  Yes.

14    Q.  And for the Recovery filter, did you do a long-term

15    randomized clinical trial?

16    A.  Ultimately, for Recovery we did a special access study in

17    Canada.

18    Q.  But as far as doing -- before the product went on the

19    market, was any long-term clinical trial done in human beings?

20    A.  Yes.  Those -- that study, those patients were followed out

21    to 180 days.

22    Q.  And let me be clear about -- just because the term

23    "long-term" has obviously got some subjectivity to it.

24          But did the company do a study that would have lasted,

25    let's say, 5 years, 10 years, or 20 years as a clinical study

UNITED STATES DISTRICT COURT

1    in humans?

2    A.  No, we did not.

3    Q.  And why is that?  Why was such a study not performed?

4    A.  Because it's not practical.  So if you studied something

5    for that long, first of all, our intention was for filters to

6    be removed.  So the time after that, they were followed to 180

7    days, which was what permanent filters -- the prior permanent

8    filter clinical trial that we did was.

9            To follow a device for 10 or 20 years or a patient for

10   10 or 20 years, that device wouldn't be on the market today.

11   It never would have seen the light of day.

12   Q.  And what would generally happen to the technology for that

13   filter if you were doing a study that lasted 10 years to 20

14   years?

15   A.  Well, it might have gone nowhere because it never -- it

16   would have just been in study forever.  But, you know, you have

17   to balance the study time versus the value that it provided to

18   patients.

19   Q.  All right.  Mr. Carr, let's talk about the testing that was

20   done on the Recovery filter and also the provision of that

21   testing to the FDA.

22           MR. ROGERS:  Can we pull up Exhibit 5189, please.

23   BY MR. ROGERS:

24   Q.  And, Mr. Carr, do you see that?

25   A.  I do, yes.

1   Q.  And can you tell the jury what that document is?

2   A.  It is a 510(k) submission for the Recovery filter in 2002.

3          MR. ROGERS:  And, Your Honor, we move this document

4   into evidence.

5          MR. O'CONNOR:  No objection.

6          THE COURT:  5189 is admitted.

7          (Exhibit No. 5189 admitted into evidence.)

8          MR. ROGERS:  May we display?

9          THE COURT:  You may.

10  BY MR. ROGERS:

11  Q.  And, Mr. Carr, if you could, can you remind the jury what

12  exactly a 510(k) application is?

13  A.  So it's the submission that we give to the FDA.  It's our

14  regulatory pathway to get our devices -- this type of device on

15  the market.

16         MR. ROGERS:  And, Scott, if you could go to page 18 of

17  that document, please.

18         And can you pull out the -- I guess the sort of middle

19  part?  Yeah.  Thank you.

20  BY MR. ROGERS:

21  Q.  Okay.  So, Mr. Carr, can you describe for the jury what

22  we're seeing here?

23  A.  This is a summary of the modifications to the filter on the

24  left-hand column.  And then the tests that were performed on

25  the right-hand column.

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION          2095

1    Q.  All right.  And let's just kind of walk through some of

2    these, if you don't mind.

3              The first thing that's listed there is Clot Trapping

4    Efficiency.  What is that?

5    A.  So it is the ability of the filter to trap or hold clot

6    from going past it.

7    Q.  And the next thing we see is something called Migration

8    Study.  What is that?

9    A.  So that's the pressure required to dislodge a filter from

10   where it was placed.

11   Q.  And below that is Weld Integrity.  What is that?

12   A.  That is a test of the strength of the filters assembled --

13   there's 12 wires that are welded together thermally with heat,

14   and so we test the strength of that bond.

15   Q.  All right.  And below that is Hook Strength.  What is that?

16   A.  It is the force that is required to pull the hook,

17   straighten the hook out.  The way our filter is developed is

18   the hook is -- enters the vessel wall and there is a force that

19   is able to straighten that hook out because it is Nitinol, and

20   that's what allows it to be removed from the vessel.

21   Q.  All right, sir.  And the next is Corrosion/Fatigue Testing.

22   Can you describe that?

23   A.  So it's a material test that shows whether the filter

24   corrodes in the body in a salt or aqueous environment.  And

25   then the fatigue testing is how many cycles can the filter move

1    before it breaks, like if you took a paper clip or something

2    like that.

3    Q.  All right, sir.  And then below that is Radial Strength.

4    What kind of test is that?

5    A.  So that measures the outward force that the filter places

6    on the vessel.  So the elements of the device, and you measure

7    how hard they push out.

8    Q.  All right.  And below that we see Spine Glue Joint Tensile

9    Test.  What is that?

10   A.  It's a strength test where we -- several pieces of what we

11   call the delivery system, the piece that helps the filter get

12   where it's going, there's things that are glued together or

13   welded together, and we break them apart.

14   Q.  And so -- and the last thing that's in that box is

15   Simulated Use Study.  What is that?

16   A.  So we try and simulate the use of the filter in a given

17   environment.  So be they animal studies or whatever they may

18   be.

19   Q.  All right.  Let's go to page 21, please.

20            And so, Mr. Carr, can you describe for us what we're

21   seeing here.

22   A.  This is a description of the migration study and the

23   results.

24   Q.  And let's go on to the following page, 22.

25            And is that the continuation of the description?

1    A.  Of the summary, yes.

2    Q.  All right.  And then on to 23, please.

3    A.  So this is, again, another outline of the weld integrity,

4    which we talked about, hook strength.

5    Q.  All right.  And then on to page 24.

6    A.  And this is the corrosion and fatigue testing.

7    Q.  And so what is the purpose of these descriptions for FDA?

8    What are you providing them?

9    A.  An outline of what the test was and then ultimately the

10   results of those tests.

11   Q.  All right.  And let's go on to page 25.

12          And so what do we see here?

13   A.  Our radial strength summary.

14   Q.  On to page 26.

15          And what is that?

16   A.  Simulated use testing.

17   Q.  All right.  And then let's go on to page 29, please.

18          And as far as the tests that we have seen earlier that

19   are described, what is the information that you provide to FDA

20   about those tests, just in general?

21   A.  We provide them the protocols in the reports, so the

22   results of the testing.

23   Q.  And, Mr. Carr, the jury's heard that that type of

24   information or tests are not submitted to FDA.  In this

25   process, did you submit your test results to FDA in this 510(k)

1    application?

2    A.  Yes.

3    Q.  All right.  Now, let's look at page 29.  And this says

4    Clinical Experience.

5           And so what is this information that is being provided

6    to FDA?

7    A.  This is a summary of the special access study I referred to

8    that we were doing in Canada.

9    Q.  And does this go on for several pages?

10   A.  Yes, it does.

11          MR. ROGERS:  All right.  And, Scott, if you would, go

12   to page 33, please.

13   BY MR. ROGERS:

14   Q.  And this particular page, is this a continuation of the

15   information that was provided to FDA about the study that was

16   done by Dr. Murray Asch in Canada?

17   A.  Yes.

18   Q.  And so what is the information we're seeing here about

19   Patient 9 and Patient 33?

20   A.  For Patient 9, there was a noted or an observed migration

21   when we were going to remove the filter.  So that's described

22   here.

23   Q.  All right.  And so what's the information that's being

24   provided about Patient 33?

25   A.  It's a -- oh, 33, I'm sorry.  That there was -- in this

1   patient, that there was an observation of a filter fracturing

2   in the arm; and then upon removal, it was noticed that one of

3   the hooks had also fractured.

4   Q.  And so was that information laid out for FDA?

5   A.  Yes, in this document.

6           MR. ROGERS:  All right.  We can pull that down,

7   please, Scott.  And let's go to page -- excuse me, to

8   Exhibit 5187.

9           And, Your Honor, I move this document into evidence.

10          MR. O'CONNOR:  No objection.

11          THE COURT:  Admitted.

12          (Exhibit No. 5187 admitted into evidence.)

13          MR. ROGERS:  May we display?

14          THE COURT:  You may.

15  BY MR. ROGERS:

16  Q.  All right.  Mr. Carr, can you tell the jury what this

17  document is, please?

18  A.  This is a letter from the FDA back to us with questions on

19  our submission.

20  Q.  And so we won't go through all of the questions, but

21  looking down at the bottom, it says Clinical Testing.  Do you

22  see that?

23  A.  Yes.

24  Q.  And was that some of the subjects that FDA had questions

25  about, was about the clinical testing?

1    A.  Yes.

2              MR. ROGERS:  All right.  And, Scott, can you take that

3    down, and let's go to the next page.

4    BY MR. ROGERS:

5    Q.  And so here, is this a list of questions that the FDA had

6    about bench performance testing?

7    A.  Yes, it is.

8    Q.  All right, sir.  And there we see on the page how many

9    questions from FDA?

10   A.  Seven.

11   Q.  Yes, you're correct.  It starts at 3.  It's late in the

12   day, Mr. Carr.  Thank you.

13             All right.  Following page, 3, please.

14             And is that a continuation of the questions that the

15   FDA had that we see there at the top of the page?

16   A.  Yes, it is.

17   Q.  And did the FDA also have questions about biocompatibility?

18   A.  They did.

19   Q.  And then below that, did the FDA have questions about

20   administrative elements?

21   A.  Yes, they did.

22   Q.  All right.  And next page.

23             And so there were a total of 17 questions that the FDA

24   asked Bard about the submission that Bard gave to FDA?

25   A.  Yes.

1   Q.  And so, Mr. Carr, what did Bard do in response to these

2   questions?

3   A.  We reviewed them and did whatever was necessary to provide

4   answers, and then we did provide written answers to them for

5   all of the questions.

6           MR. ROGERS:  All right.  Can you take that down,

7   Scott?  Thank you.

8           And can you pull up Exhibit 5182.

9           And, Your Honor, we move this document into evidence.

10          MR. O'CONNOR:  I think, Your Honor, we're agreeing to

11  admission and subject to some objections about parts of this

12  exhibit that we have notified the other side about.

13          THE COURT:  Has there been some agreement on

14  redactions?

15          MR. ROGERS:  I'm unaware.

16          MS. HELM:  There have been, Your Honor.

17          THE COURT:  All right.  I'll admit it subject to the

18  redactions you discussed.

19          (Exhibit No. 5182 admitted into evidence.)

20          MR. ROGERS:  Okay, thank you.

21  BY MR. ROGERS:

22  Q.  And so, Mr. Carr, can you tell the jury generally what this

23  is?

24  A.  This is our response letter to those questions.

25  Q.  And were you involved in the preparation of the responses

1    to FDA to their 17 questions?

2    A.  Yes.

3    Q.  And so what types of things -- and we're not going to get

4    into the specifics of these question by question, but what

5    types of things did Bard tell FDA in response to some of their

6    questions?

7    A.  We answered their questions directly, so whatever they may

8    have been, we -- whether we did testing or just answered them

9    from knowledge or clarification.  They were of all different

10   kinds.

11   Q.  And did you go through just individually question by

12   question?

13   A.  Question by question, yes.

14   Q.  All right, sir.  And can we go to page 30 of this document.

15        And was this part of that same response?  Was this

16   part of what went back to FDA?

17   A.  Yes.

18   Q.  And can you tell the jury what we're seeing here.

19   A.  This is a test report that was done on the cyclical

20   polarization for the filter, the Nitinol.

21   Q.  All right.  And was that one of the things that you felt

22   like FDA needed to see in order to answer all of their

23   questions?

24   A.  Yes.  They had a specific question on it.

25        MR. ROGERS:  And, Scott, would you mind going to

1    page 118.

2    BY MR. ROGERS:

3    Q.  And, Mr. Carr, what is this?

4    A.  This is a test report for our simulated use testing that

5    was done.

6    Q.  And was this sent to FDA in response to their questions?

7    A.  Yes, it was.

8    Q.  And so can we go to now page 127.

9           And what is this, Mr. Carr?

10   A.  It is a procedure for the weld integrity testing.

11   Q.  All right.  And was that provided to FDA in response to

12   their questions?

13   A.  Yes, it was.

14   Q.  All right.  And now how about page 132.

15          And what is this we see here?

16   A.  It's the report for that weld integrity testing.

17   Q.  So were you providing the FDA both the protocol and the

18   actual test report?

19   A.  Yes.

20   Q.  All right.  Let's go to page 140.

21          And what is this, Mr. Carr?

22   A.  It is the test report for the hook strength testing.

23   Q.  And that was provided to FDA in response to their

24   questions?

25   A.  Yes.

1    Q.  All right.  And how about page 153.

2            And what is this, Mr. Carr?

3    A.  It is the procedure for the radial strength testing.

4    Q.  And so is all of this information that we have seen here

5    about Bard's testing, was this all provided to FDA in response

6    to their questions about the Recovery filter?

7    A.  Yes, it was.

8    Q.  And so, Mr. Carr, once this information was sent to FDA,

9    did you receive a response from FDA?

10   A.  Yes.  They had a few more questions.

11           MR. ROGERS:  And if we could pull up Exhibit 5179,

12   please.

13           And, Your Honor, I move this into evidence.

14           MR. O'CONNOR:  No objection.

15           THE COURT:  Admitted.

16           (Exhibit No. 5179 admitted into evidence.)

17           MR. ROGERS:  May we publish?

18           THE COURT:  Yes.

19   BY MR. ROGERS:

20   Q.  And, Mr. Carr, is this what FDA sent back?  Is that right?

21   A.  Yes, it is.

22   Q.  And let's look at something just as a "for example" here.

23           MR. ROGERS:  Can we pull out number 1, please?  And

24   that's a little lopsided, I guess.  It may not be fixable.  Try

25   it again, Scott.

1          Okay.  Thank you.

2    BY MR. ROGERS:

3    Q.  And so just in general, Mr. Carr, so the jury gets a sense

4    of it, so what is FDA asking of Bard after it's received the

5    testing reports and protocols that we just took a look at?

6    A.  This was a clarifying question on the clot trapping that we

7    did.

8    Q.  All right.  And so after FDA asked more questions, what was

9    the next step in the process?

10   A.  We responded to them.

11          MR. ROGERS:  All right.  And can we take this down,

12   please, Scott?

13          And can you pull up Exhibit 5178.

14          And, Your Honor, I move this into evidence.

15          MR. O'CONNOR:  Excuse me.  No objection.

16          THE COURT:  Admitted.

17          (Exhibit No. 5178 admitted into evidence.)

18          MR. ROGERS:  May we display?

19          THE COURT:  You may.

20   BY MR. ROGERS:

21   Q.  And, Mr. Carr, is this the letter that went back to FDA

22   regarding the additional questions that they asked?

23   A.  Yes, it is.

24   Q.  And so again, just for an example, can we pull out Question

25   No. 1?

1          And, Mr. Carr, does that just repeat the question that

2    FDA asked?

3    A.  Yes.  We state the question and then the answer.

4          MR. ROGERS:  Okay.  And so, Scott, would you mind

5    taking that down?

6          And then let's go to the answer.  And so -- I think

7    it's really just the whole page, if you don't mind.

8    BY MR. ROGERS:

9    Q.  And so as an example, again, Mr. Carr, is this the type of

10   thing that you provided FDA information about?

11   A.  Yes, it is.

12   Q.  All right.  And so what happened after Bard responded to

13   these questions that FDA posed?

14   A.  They sent us a letter concurring with our submission.

15         MR. ROGERS:  All right.  And can we pull up

16   Exhibit 5177, please.

17         And, Your Honor, I believe this is in evidence.  May

18   we display?

19         THE COURTROOM DEPUTY:  It is.

20         THE COURT:  You may.

21   BY MR. ROGERS:

22   Q.  And, Mr. Carr, is this the letter where FDA cleared the

23   Recovery device for a permanent indication?

24   A.  It's the letter where they concurred with us, yes.

25   Q.  All right.  Thank you.

1          MR. ROGERS:  And, Scott, you can take that down.

2    Thank you.

3    BY MR. ROGERS:

4    Q.  And, Mr. Carr, did Bard submit an additional 510(k)

5    regarding the Recovery filter for retrievability?

6    A.  Yes, we did.

7          MR. ROGERS:  All right.  And can we pull up

8    Exhibit 5169R, please.

9          And, Your Honor, I move this into evidence.

10          MR. O'CONNOR:  No objection.

11          THE COURT:  Admitted.

12          (Exhibit No. 5169R admitted into evidence.)

13          MR. ROGERS:  Your Honor, may we display?

14          THE COURT:  You may.

15    BY MR. ROGERS:

16    Q.  And, Mr. Carr, is this the 510(k) application that was

17    submitted to FDA for the clearance of the Recovery device as a

18    retrievable filter?

19    A.  Yes, it is.

20    Q.  And, Mr. Carr, do you know generally approximately how

21    large this submission is?  I mean, I know we can just see pages

22    on the screen, but can you give us some idea of how big this

23    document is?

24    A.  It's probably 2 or 3 inches tall.

25    Q.  And, Mr. Carr, did the -- what type of information was Bard

1  providing FDA about this retrievable indication?

2  A.  Any additional bench testing, animal testing, and our

3  clinical trial testing for -- to support the retrievability of

4  the filter specifically.

5  Q.  And did FDA ultimately clear the Recovery filter for a

6  retrievable indication?

7  A.  They did.

8          MR. ROGERS:  All right.  And can we pull up

9  Exhibit 5197, please.

10         And, Your Honor, I move this into evidence.

11         MR. O'CONNOR:  No objection.

12         THE COURT:  Admitted.

13         (Exhibit No. 5197 admitted into evidence.)

14         MR. ROGERS:  May we display?

15         THE COURT:  You may.

16  BY MR. ROGERS:

17  Q.  And so, Mr. Carr, is this the clearance letter from FDA of

18  the Recovery filter for retrievable indication?

19  A.  Again, it's their concurrence letter to us, yes.

20  Q.  Okay.  Thank you.

21         Mr. Carr, let's move forward a little bit in time, and

22  let's talk about the G2 filter.  And the jury's heard a lot

23  about both the Recovery filter and the G2 filter.  What's the

24  relationship between those two devices?

25  A.  The G2 was the next generation removable vena cava filter

1   for us.

2   Q.  And when did you start your work on the development of the

3   G2 filter?

4   A.  2004 or '5.

5   Q.  And so why did Bard start developing the G2 filter?

6   A.  We looked for ways we could improve the current device.

7   We're always looking to replace ourselves in the market and

8   improve the device.  We call it the total product life cycle,

9   if you will.

10  Q.  And what were the specific attributes of the device that

11  you wanted to work on to try to improve its performance?

12  A.  The migration resistance of the filter and the fracture

13  resistance of the filter.

14  Q.  And when you say migration resistance, the jury's heard

15  about migration, but we've also heard about caudal migration

16  and cranial migration.

17          So, first of all, what is cranial migration?

18  A.  It is movement upward or towards the heart.

19  Q.  And if we talk about caudal migration, what type of

20  movement is that?

21  A.  Down towards the legs.

22  Q.  And so the design changes that were made from the Recovery

23  filter to the G2 filter to try and address migration, what was

24  the type of migration that you were trying to address?

25  A.  Cranial migration.

1  Q.  All right.  Let's talk some, Mr. Carr, about the various

2  tests that were performed on the G2.

3           And let me ask you first, did you conduct animal

4  studies on the G2 filter?

5  A.  Yes, we did.

6  Q.  And what types of animal studies did you do?

7  A.  So we essentially repeated the animal study we did for

8  Recovery where we implant the filters into the animals.  At

9  given time points we look at them while they're still in place,

10  and we also, at another time point and a different set of

11  animals, remove those filters and see what effect they may or

12  may not have had on the vessel after they were removed.

13  Q.  And what types of animals would these filters be implanted

14  in?

15  A.  Sheep in our case.  Could be pigs.  Depends on the size.

16  Q.  And why sheep or pigs?

17  A.  They have a vessel diameter that allows you to test them,

18  so that's the main reason.

19  Q.  And in the animal world, would those be the animals that

20  have a cava that's closest to the human cava?

21  A.  Not in the whole animal world, but in the practical animal

22  world for testing these sorts of things.

23  Q.  Thanks for that clarification.

24           In the easily accessible animal world.  Is that right?

25  A.  Fair enough.  Yes.

1          MR. ROGERS:  Can we pull up Exhibit 5301, please?

2          And, Your Honor, I move this into evidence.

3          MR. O'CONNOR:  No objection.

4          THE COURT:  Admitted.

5          (Exhibit No. 5301 admitted into evidence.)

6          MR. ROGERS:  May we publish?

7          THE COURT:  You may.

8    BY MR. ROGERS:

9    Q.  And, Mr. Carr, can you tell us what this document is that's

10   on the screen right now?

11   A.  It's the report for the animal study for the G2 filter.

12   It's called the G1A here, but it is the same filter.

13   Q.  All right.  And was that -- tell us about G1A.  Was that a

14   different name for the same filter?

15   A.  Yes, it just was a transition.

16   Q.  And let's go to page 9, please.

17          And up there in Table 3, under the analysis of data,

18   what is this test result?  What does it show?

19   A.  It shows an assessment for the various characteristics on

20   the left column for the filters that were tested.

21          MR. ROGERS:  All right.  And, Scott, if you would take

22   that down, and then go to the conclusions and pull that out,

23   please.

24   BY MR. ROGERS:

25   Q.  All right.  And, Mr. Carr, tell us about the conclusions.

1    What were they?

2    A.  The conclusion was that the G1A design, the G2 in this

3    case, can feasibly meet customer need and performance

4    requirements that this study was designed to assess.

5             MR. ROGERS:  All right.  Scott, you can take that

6    down, please.  And can you pull up Exhibit 5304.

7             And, Your Honor, I move this into evidence.

8             MR. O'CONNOR:  No objection.

9             THE COURT:  Admitted.

10            (Exhibit No. 5304 admitted into evidence.)

11            MR. ROGERS:  May we publish?

12            THE COURT:  You may.

13   BY MR. ROGERS:

14   Q.  All right, Mr. Carr.  Can you tell the jury what we see

15   here.

16   A.  This is a report for a second animal study for one that's

17   chronic.  So it continues.

18   Q.  And so explain the difference between these two animal

19   studies.  You used the word "chronic."  What do you mean by

20   that?

21   A.  So it's what I mentioned before:  In one set we implanted

22   the filters and then left them in to study them; and then in a

23   second set, we implanted them, removed them, and then assessed

24   them.

25   Q.  All right.  And would you go to page 11, please.

ROBERT MICHAEL CARR JR. - DIRECT EXAMINATION                2113

1          And in this discussion of results, Mr. Carr, does it

2    indicate that there were physicians that were also helping in

3    this testing?

4    A.  Yes.

5    Q.  And who were those physicians, please?

6    A.  Dr. Kaufman and Dr. Venbrux.

7    Q.  And they're both interventional radiologists?

8    A.  They are.

9    Q.  All right.  And, Mr. Carr, did this animal testing test for

10   filter perforation?

11   A.  Yes.

12   Q.  And how did it test for filter perforation?

13   A.  So when we implanted the filters, as I said, one of the

14   ways we tested was we left them in place.  When we sacrificed

15   the animals, we were able to open up their chest and abdomen

16   and directly visualize the filter in the vena cava, and so we

17   photographed them and assessed them that way.

18   Q.  And --

19          THE COURT:  One more question.

20   BY MR. ROGERS:

21   Q.  Okay.  And did this test also assess for filter tilt?

22   A.  Yes.

23   Q.  And how did it do that?

24   A.  So on x-ray, you assess the orientation of the filter in

25   the vessel.

 1  Q.  And what were the conclusions about perforation and tilt?

 2          THE COURT:  That's the last question.

 3          MR. ROGERS:  Absolutely.

 4          THE WITNESS:  That it met the requirements.

 5          MR. ROGERS:  All right.  Thank you, Mr. Carr.

 6          THE COURT:  All right.  Ladies and gentlemen, we will

 7  break.

 8          MR. LOPEZ:  Your Honor, we can do this on Monday, but

 9  there's three exhibits from Dr. Kuo's deposition that we agreed

10  that we can offer to be admitted.

11          THE COURT:  Why are we doing this with the jury still

12  here?

13          MR. LOPEZ:  Pardon me?

14          THE COURT:  Why are we doing this with the jury still

15  here?

16          MR. LOPEZ:  Well, because it's evidence that I want to

17  have admitted.  There's just three.

18          THE COURT:  Let's deal with it Monday morning, because

19  we need to discuss it.  So let's let them go.

20          Remember, no research, no discussion.  We'll see you

21  Monday morning at 9:00 o'clock.

22          (Jury not present.)

23          THE COURT:  All right.  Counsel, as of the end of

24  today, plaintiffs have used 29 hours and 49 minutes; defendants

25  have used 16 hours and 32 minutes.

1          I will give you my ruling on the Rule 50 motion, I

2    expect by Monday morning, depending on how much time I have to

3    spend on it this weekend given other matters.

4          And we will plan to see you on Monday morning.  Do we

5    need to deal with those exhibits now?

6          MR. LOPEZ:  No, Your Honor.  I apologize.  I thought

7    you had to actually offer to admit in front of the jury.

8    That's the only reason why I did that.

9          THE COURT:  Yeah, you do, but I think you can just

10   move them in Monday morning or at some point when you choose

11   to.

12         MR. LOPEZ:  Yeah, that's fine.  We can do it Monday.

13         THE COURT:  Okay.  Have a nice weekend.

14         MR. ROGERS:  Thank you, Your Honor.

15         (Proceedings concluded at 4:32 p.m.)

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3           I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 29th day of

13   September, 2018.

14

15

16

                        s/Jennifer A. Pancratz_____
17                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25