1              **UNITED STATES DISTRICT COURT**

2               **FOR THE DISTRICT OF ARIZONA**

3                     _____

4    **IN RE: Bard IVC Filters Products**      )
     **Liability Litigation,**                 ) MD 15-02641-PHX-DGC
5                                              )
     _____  )
6                                              )
     **Lisa Hyde and Mark Hyde, a married**    ) Phoenix, Arizona
7    **couple,**                               ) **October 2, 2018**
                                               )
8                        Plaintiffs,           )
                                               )
9          v.                                  ) CV 16-00893-PHX-DGC
                                               )
10   **C.R. Bard, Inc., a New Jersey**         )
     **corporation, and Bard Peripheral**      )
11   **Vascular, an Arizona corporation,**     )
                                               )
12                       Defendants.           )
     _____  )
13

14

15        **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17           <u>**TRIAL DAY 11 – A.M. SESSION**</u>

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
1                      A P P E A R A N C E S

2      For the Plaintiffs:

3              Lopez McHugh
               By: RAMON R. LOPEZ, ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
5
               Gallagher & Kennedy
6              By: MARK S. O'CONNOR, ESQ.
               By: PAUL L. STOLLER, ESQ.
7              2575 East Camelback Road, Suite 1100
               Phoenix, AZ  85016
8
               Heaviside Reed Zaic
9              By: JULIA REED ZAIC, ESQ.
               By: LAURA E. SMITH, ESQ.
10             312 Broadway, Ste. 203
               Laguna Beach, CA  92651
11
               Goldenberg Law PLLC
12             By: STUART GOLDENBERG, ESQ.
               By: MARLENE GOLDENBERG, ESQ.
13             800 LaSalle Ave., Ste. 2150
               Minneapolis, MN  55402
14
               Lopez McHugh, LLP
15             By: JOSHUA MANKOFF, ESQ.
               1 International Plaza, #550
16             PMB-059
               Philadelphia, PA 19113
17

18

19     For the Defendants:

20             Nelson Mullins Riley & Scarborough.
               BY: JAMES F. ROGERS, ESQ.
21             1320 Main St.
               Columbia, SC  29201
22

23             Snell & Wilmer
               By: JAMES R. CONDO, ESQ.
24             400 East Van Buren
               Phoenix, AZ  85004
25
```

1              **A P P E A R A N C E S   (CONTINUED)**

2

3    For the Defendants:

4              Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.,** ESQ.
5              By: **MATTHEW B. LERNER,** ESQ.
               By: **ELIZABETH C. HELM,** ESQ.
6              201 17th Street NW, Suite 1700
               Atlanta, GA  30363
7

8              C.R Bard, Inc.
               Associate General Counsel, Litigation
9              By:  **CANDACE CAMARATA,** ESQ.
               730 Central Avenue
10             Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2                              EXAMINATION

3    WITNESS                                              PAGE

4    DONNA-BEA TILLMAN, Ph.D

5            Direct Examination By Mr. Rogers            2398

6            Cross-Examination By Mr. Lopez              2486

7            Redirect Examination By Mr. Rogers          2496

8    PAUL BRIANT, Ph.D

9            Direct Examination By Ms. Helm              2500

10

11   Video testimony of Dr. DeFord                       2397

12   Video testimony of Dr. Scott Trerotola              2499

13

14

15                              EXHIBITS

16   NUMBER    DESCRIPTION                               PAGE

17   992       7/16/2005 E-mail from Jason               2398
             Greer to many Re. "Westy's
18           situation…everyone's
             situation", detailing Bard's
19           need to respond to Cordis'
             bringing forward the Maude
20           database to physicians and
             "causing a problem"
21
     7758      2014 FDA Guidance re 510k                 2414
22           Evaluating Substantial
             Equivalence in Premarket
23           Notifications

24

25

**(Index of Exhibits Continued)**

<u>**EXHIBITS**</u>

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 7753 | 2014 Draft FDA Guidance re Benefit-Risk Factors When Determining Substantial Equivalence in Premarket Notifications 510k with Different Technological Characteristics | 2420 |
| 6064 | July 26, 2005 Internal FDA memo re BPV Responses to FDA AI re Modified Recovery (K050558) | 2449 |
| 6061 | Aug. 22, 2005 Internal FDA memo reviewing BPV's Responses to FDA AI re G2 (K050558) | 2450 |
| 5373 | Mar. 7, 2008 BPV's G2 Express Filter Special 510(k) (K080668) | 2455 |
| 5272 | Nov. 23, 2009 BPV's Eclipse Filter System Special 510(k) (K093659) | 2457 |
| 5588 | Dec. 15, 2009 Letter FDA to BPV re FDA AI Demand re Eclipse (K093659) | 2470 |
| 5486 | Dec. 17, 2009 Letter from BPV to FDA re Eclipse Filter System Response to FDA Questions (K093659) | 2472 |
| 5586 | May 20, 2010 BPV's Eclipse Filter Special 510(k) (K101431) | 2473 |
| 7787 | Cordis Optease Femoral Jugular Antecubital – 2013 | 2483 |
| 7771 | Braun Vena Tech LP Femoral – October 2010 | 2484 |

1

**(Index of Exhibits Continued)**

2

**EXHIBITS**

3

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| 696 | Testimony of Marcia Crosse, Director of Health Care, before the Subcommittee on Health, Committee on Energy and Commerce, House of Representatives Re. "Medical Devices – Shortcomings in FDA's Premarket Review, Postmarket Surveillance, and Inspections of Device Manufacturing Establishments", dated 6/18/2009 | 2495 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

    (Proceedings resumed in open court outside the presence of the jury.)

08:31:01         THE COURT:  Thank you.  Please be seated.

         Morning, everybody.

         EVERYBODY:  Morning, Your Honor.

         THE COURT:  Counsel, later this morning we will file the order on the Rule 50 motion.  I am granting it on the

08:31:32 future damages on possible arrhythmias and possibility of a defibrillator.  My conclusion is that the evidence isn't sufficient under Wisconsin law for that claim.

         I am denying it on the loss of consortium claim, the strict product liability claim, and the punitive damages

08:31:54 claim.  And that's all explained in an order that will be filed later this morning.

         So one of the things to think about for purposes of the jury instructions that we'll talk about at the end of the day is how we clarify what damages are available for the jury

08:32:10 to award.

         Are there matters plaintiffs' counsel would like to raise before we get started this morning?

         MR. O'CONNOR:  Let me just --

         MS. REED ZAIC:  You can't move it until court.

08:32:25         MR. O'CONNOR:  I'm just letting him know.

08:32:27   1          We'll move an exhibit in before we start -- well, at

           2    the appropriate time, we have an exhibit we agreed to, 992.

           3          THE COURT:  Okay.

           4          MR. ROGERS:  Nothing from defendants, Your Honor.

08:32:35   5    And I think this video's only probably got few more minutes

           6    left.  And if that's a good time, they can certainly move the

           7    document into evidence at that point.

           8          THE COURT:  Okay.  And then what other witnesses will

           9    you be calling today?

08:32:48  10          MS. HELM:  Your Honor, I'll answer.  Our first

          11    witness is going to be Dr. Donna-Bea Tillman and then she'll

          12    be followed by Dr. Paul Briant, and there may be a short video

          13    in between.

          14          THE COURT:  And then what?

08:33:04  15          MS. HELM:  And then Mr. Van Vleet.

          16          THE COURT:  Okay.  I don't -- I don't think there

          17    were motions, *Daubert* motions, filed on either of those; is

          18    that right?

          19          MS. HELM:  That's right, Your Honor.

08:33:25  20          MR. ROGERS:  Correct.

          21          THE COURT:  Okay.  How long do you think that

          22    evidence will go?

          23          MS. HELM:  We anticipate -- we have Mr. Randall also

          24    available at the end of the day if we don't finish today.  We

08:33:39  25    do have a couple of short videos in between live witnesses.

08:33:43  1    We're not going to put them all at the end of the day.

2                THE COURT:  So you're not going to rest today?

3                MS. HELM:  We don't think so.

4                THE COURT:  Okay.

08:33:50  5           Okay, we'll come back at 9 o'clock.  Go ahead about

6      your business.

7                MR. ROGERS:  Thank you, Your Honor.

8           (Recess taken from 8:34 to 9:00.  Proceedings resumed in

9      open court with the jury present.)

09:01:28 10              THE COURT:  Thank you.  Please be seated.

11              Good morning, ladies and gentlemen.

12              JURORS:  Good morning.

13              THE COURT:  Hope you're not too wet.  Thank you for

14     being here.

09:01:43 15            We're going to start this morning where we left off,

16     with the video testimony of Dr. DeFord.

17              You may proceed.

18          (Video testimony of Dr. DeFord concluded.)

19              MR. ROGERS:  Your Honor, at this time defendants call

09:08:39 20     Dr. Donna-Bea Tillman.

21              MR. O'CONNOR:  Can I move this into evidence?

22              MR. ROGERS:  Oh.  Yeah.  I'm sorry.  Forgot about the

23     housekeeping matter.

24              MR. O'CONNOR:  Your Honor, we were going to move one

09:08:50 25     exhibit into evidence that I believe is stipulated to.  That

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:08:53  1    would be Exhibit 992.

      2            MR. ROGERS:  No objection, Your Honor.

      3            THE COURT:  All right.  992 is admitted.

      4         (Exhibit 992 admitted.)

09:09:07  5            THE COURTROOM DEPUTY:  If you'll please come forward

      6    and raise your right hand.

      7            **DONNA-BEA TILLMAN**, Ph.D,

      8    called as a witness herein, after having been first duly sworn

      9    or affirmed, was examined and testified as follows:

09:09:51 10               D I R E C T   E X A M I N A T I O N

     11    BY MR. ROGERS:

     12    Q   Good morning, Dr. Tillman.

     13    A   Good morning.

     14    Q   How are you?

09:09:57 15    A   I'm very well, thank you.

     16    Q   Good.  Can you tell the ladies and gentlemen of the jury

     17    what your profession is.

     18    A   Yes.  I'm a regulatory affairs professional and I'm an

     19    engineer by training.

09:10:08 20    Q   Can you tell us where you live?

     21    A   I live in Columbia, Maryland.

     22    Q   And are you married?

     23    A   Yes, I am.

     24    Q   How about your educational background, can you describe

09:10:18 25    that for the jurors?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:10:20  1    A    Sure.  I have an undergraduate degree in engineering and

2    biology, and then I went to graduate school at Johns Hopkins

3    and I got a Ph.D in biomedical engineering.  When I was at the

4    FDA I went back and got a masters in public administration.

09:10:38  5    Q    You mentioned you were at FDA.  I'm going to walk through

6    your career.  When you first got out of school, can you tell

7    the jurors what your first job was?

8    A    Yes.  When I finished my Ph.D I went to work for the US

9    Consumer Product Safety Commission.  That's a branch of the

09:10:57  10   federal government that not a lot of people know about, and

11   their responsibility is to ensure the safety of consumer

12   products.

13   Q    What were the years you were at the Consumer Product

14   Safety Commission?

09:11:10  15   A    I was there roughly from 1992 to 1994.

16   Q    And so thereafter did you ultimately go to FDA?

17   A    Yes, I did.

18   Q    And what year did you begin working at FDA?

19   A    I believe it was 1994.

09:11:23  20   Q    And so what was your first position when you started

21   working at FDA?

22   A    So I started at FDA as a reviewer.  So which is the sort

23   of introductory position of people who actually do reviews of

24   premarket submissions.

09:11:39  25   Q    And as a reviewer, what would you -- what would your job

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:11:42  1    duties be?

2    A    So I would be responsible for reviewing 510(k)s and PMAs

3    and IDEs and other regulatory submissions.  I would look at

4    the submissions and evaluate the quality of the information in

09:11:57  5    there to determine whether it met FDA's regulatory

6    requirements.  So that was mostly what I did.

7    Q    And approximately how many years did you spend as a

8    reviewer?

9    A    I was a reviewer for three years.

09:12:12  10   Q    Then thereafter did you move to a different position?

11   A    Yes.  I decided it was time to look at other career

12   options, and so I applied for and got a position as a branch

13   chief.  So I was basically promoted to a sort of first level

14   of management within FDA.

09:12:28  15   Q    So when you shifted from being a reviewer to branch chief,

16   you were still at FDA?

17   A    I was.

18   Q    And I think you said this, but was that considered a

19   promotion?

09:12:38  20   A    Yes, it was.

21   Q    What were your job duties as a branch chief?

22   A    That was a first level management position.  So I had 14

23   to 16 scientists and clinicians that worked for me and they

24   would review submissions, and my job was to ensure the

09:12:55  25   consistency and the quality of the work done by the reviewers

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:12:59  1    in my branch and to sign off on their review recommendations.

       2    Q    And what was the branch you were in charge of?

       3    A    So it was the -- it changed a little bit over time, but it

       4    was the Pacing Branch and then the Cardiac Electrophysiology

09:13:17  5    Branch.  These are branches involved with the review of

       6    cardiovascular devices.

       7    Q    And did you again receive a promotion within FDA?

       8    A    Yes.  After a couple of years in that position I was

       9    promoted to be the deputy director for the Division of

09:13:35 10    Cardiovascular Devices.

      11    Q    And what were your job duties in that position?

      12    A    So as the deputy division director, I had three branches

      13    that reported to me and my job there was to ensure that, once

      14    again, the consistency and quality of the science and the

09:13:53 15    regulatory work that went on in those three branches, to make

      16    sure that our division was following appropriate regulatory

      17    policy, and then basic organizational management functions.

      18    Q    So in that position, approximately how many people would

      19    you have that would be reporting to you?

09:14:11 20    A    So I had three branch chiefs that reported to me, and then

      21    they had reviewers reporting to them.  So roughly 30 to 40

      22    people reported to me in that position.

      23    Q    And did you then move to a different position?

      24    A    Yes.  So then after a couple of years in that position I

09:14:29 25    once again got promoted to be the deputy director for

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:14:33  1  technology and review policy for the Office of Device
       2  Evaluation.
       3  Q    Can you tell us what the Office of Device Evaluation is?
       4  A    Yeah.  So the center at FDA that's responsible for medical
09:14:45  5  devices is called the Center for Devices and Radiological
       6  Health, and it has a number of offices within it.  And one of
       7  those, the office that's responsible for premarket review of
       8  submissions, is Office of Device Evaluation.  So at this point
       9  in time I had been promoted to be the deputy office director
09:15:03 10  for that office.
      11  Q    And is it okay with you if we refer to the Office of
      12  Device Evaluations as ODE?
      13  A    Yeah, that's what most people call it.
      14  Q    Okay.  Thank you.
09:15:15 15       And so ultimately did you move to a different
      16  position within FDA?
      17  A    Yes.  So I had -- I was the deputy director for about six
      18  months when I actually got the opportunity to become the
      19  director of the Office of Device Evaluation.  So I was
09:15:29 20  promoted from the deputy to being the director of the Office
      21  of Device Evaluation in I think it was 2004.
      22  Q    And how long did you hold that position?
      23  A    So I had that position for six years.
      24  Q    And what would your job responsibilities have been as the
09:15:44 25  director of the ODE?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:15:47   1    A   So in that position I was responsible for overseeing the

2    premarket review program for all medical devices except for

3    the In Vitro Diagnostic Devices, and that included things like

4    developing policy and procedures about how we would review

09:16:04   5    submissions, reviewing and being responsible for signing off

6    on some of the more novel and first-of-a-kind devices for the

7    novel products.  Organizational management.  You know,

8    functions, managing a large organization, people stuff.  But

9    mostly it was sort of -- it was to make sure that we had a

09:16:24  10    consistent review policy across the office.

11    Q   And how many people would have been, to use -- I'm not

12    coming up with a better word right now.  How many people would

13    have been under you in that position?

14    A   So my office at that time was about 350 scientists,

09:16:40  15    engineers, and medical officers.

16    Q   So how many years total were you at FDA?

17    A   I was at FDA for 17 years.

18    Q   And when you were the office director for the ODE,

19    approximately how many premarket submissions were you involved

09:16:58  20    with for medical devices?

21    A   So during my time at FDA, I was involved with probably

22    thousands of submissions.  When I was the director of ODE, I

23    was only involved with the sort of higher level

24    first-of-a-kind submissions.  The first drug-eluting stent,

09:17:19  25    reintroduction of silicone gel breast implants, first

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:17:26  1   pacemaker for heart failure.  So I was involved in those

2   submissions.  And then for certain kinds of more novel 510(k)

3   submissions.

4   Q   Was one of your job responsibilities when you were the

09:17:37  5   director of ODE to actually sign off on clearance letters for

6   510(k) applications?

7   A   Yes, it was.

8   Q   And approximately how many letters did you sign off on

9   when you were in that position?

09:17:49  10   A   So when I was in the -- when I was office director, I

11   probably signed off on maybe 20 or 30.  Where I ended up

12   signing off on more 510(k)s was back when I was in

13   cardiovascular.  When I was deputy director of cardiovascular,

14   I signed off on all of the 510(k)s that went through the

09:18:11  15   cardiovascular division in those three years.  During that

16   time, probably several hundred 510(k)s.

17   Q   I think you told us you left FDA sometime in 2010; is that

18   right?

19   A   Yes.

09:18:21  20   Q   And so where did you go after that?

21   A   I went to work for Microsoft.  One of my areas of interest

22   is medical device software and when software is regulated as a

23   medical device.  Microsoft was interested in getting into the

24   medical device space and so I went there and helped them

09:18:39  25   establish a FDA regulatory program for their medical device

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:18:43    1    software.

2    Q    How long were you with Microsoft?

3    A    I think I was there about two and a half years.

4    Q    And what led you to leave Microsoft?

09:18:51    5    A    So they decided that they were going to engage in –- merge

6    into a joint venture with another company and they wanted me

7    to move to Seattle, which it was not going to be a good thing

8    for me to do due to some family obligations, and so that's why

9    I decided to leave.

09:19:08   10    Q    So have you been, I guess what I would call sort of the

11    greater Washington, D.C. area your entire career?

12    A    Yeah.  I came up to go to grad school to go to Hopkins in

13    '85 and I never left.  Met my husband, got married, had a

14    house, got a bunch of dogs.  I've lived there since then.

09:19:28   15    Q    And so, Dr. Tillman, who do you work for now?

16    A    I work for a company called Biologics Consulting Group.

17    Q    What do you for that company?

18    A    So Biologics Consulting consists of people like myself who

19    worked at FDA or people from the medical device and

09:19:45   20    pharmaceutical industry, and we help companies, startups or

21    large companies sometimes, figure out what kind of data do

22    they need in order to support marketing applications for FDA,

23    and we help them basically navigate the FDA review process.

24    Q    Dr. Tillman, while you were at FDA, were you directly

09:20:06   25    involved with any applications regarding IVC filters?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:20:09   1    A    I was.

2    Q    Let me ask you this:  You did -- I'm sorry, I'm kind of

3    bouncing around on you.

4         You told us you're working for a consulting company

09:20:22   5    now --

6    A    Yes.

7    Q    -- right?

8         And so as part of that job, do you do some litigation

9    consulting?

09:20:30   10   A    I do.  Roughly 15 to 20 percent of the work I do is

11   litigation consulting work.  But the vast majority of what I

12   do is what I would call traditional regulatory consulting.

13   Q    And are you charging for your time today?

14   A    Yes.  I am an employee of a company, so I get paid a

09:20:48   15   salary, but my company clearly bills for my time.

16   Q    And what is the rate at which your company is billing for

17   your time?

18   A    So my company bills $500 an hour for my time when I'm

19   involved with litigation work.

09:21:01   20   Q    In addition to consulting with Bard on the matter we're

21   here for today, have you also worked with Bard in regard to

22   other products besides IVC filters?

23   A    Yes, sir, I have.

24   Q    And what is that, please?

09:21:15   25   A    So I'm also involved in Bard's litigation for the

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:21:19  1   transvaginal mesh products.

2   Q    And, Dr. Tillman, is it fair to say you have spent the

3   majority of your career working in areas of FDA regulation of

4   medical devices?

09:21:32  5   A    Yes, that's what I've done for the vast majority of my

6   career.

7   Q    And will you be offering opinions about the regulatory

8   processes for the Bard IVC filters for the jury today?

9   A    Yes, I will.

09:21:44  10  Q    Okay.  Let me start you off, I guess, with some more

11  general things.

12       You know, we have heard some evidence in this case

13  about there being different classes of medical devices, but

14  can you describe that generally.

09:21:58  15  A    Sure.

16       Because medical devices are so varied, you have

17  things ranging from tongue depressors and toothbrushes all the

18  way up to pacemakers and heart valves, the regulation of

19  medical devices is risk based.  So FDA basically classifies

09:22:15  20  medical devices into three categories depending on the level

21  of risk.

22       The Class I devices are the lowest risk devices.

23  Things like toothbrushes and tongue depressors, manual

24  surgical instruments.  And those devices generally do not

09:22:32  25  require any premarket submission to FDA.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:22:36   1         The second group of devices, which is really the

2    largest group, are the Class II devices.  And those are

3    devices that are more moderate risk where FDA understands the

4    risks and the benefits of these devices and those devices

09:22:51   5    generally require companies to submit something called a

6    510(k), which I think you guys have heard about, premarket

7    notification to FDA, and FDA has to review that information

8    and clear the 510(k) before those devices can be sold.

9         And then the third class of devices are the Class III

09:23:10   10   devices.  Those are the most risky or the most novel medical

11   devices.  The highest risk.  And in order to sell a class III

12   device, most Class III devices, a company has to submit

13   something called a PMA to FDA and demonstrate that there's a

14   reasonable assurance of safety and effectiveness.

09:23:30   15        So that's the kind of regulatory paradigm that exists

16   for medical devices.

17   Q    All right.  Let me followup with you about the PMA.  What

18   does that stand for?

19   A    So a PMA is a premarket approval application.

09:23:43   20   Q    And so if a device goes through the PMA process, what is

21   the regulatory standard FDA will apply to that device?

22   A    So in order for FDA to approve a PMA, it must find that

23   there is a reasonable assurance of safety and effectiveness.

24   Q    And is that what we call an approval if FDA gives the

09:24:08   25   thumbs up to one of those devices?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:24:10  1   A    Yes.   When a PMA -- when FDA finishes it's review of a PMA

2   we say it is approved.

3   Q    Can you compare that process to the process called 510(k)

4   process?

09:24:22  5   A    Yes.   So the 510(k) process is also a process that

6   involves an assessment of safety and effectiveness, but the

7   finding FDA makes is that the device is substantially

8   equivalent to another device.

9        And so while there is a consideration of safety and

09:24:40  10   effectiveness, it's not a finding of a reasonable assurance of

11   safety and effectiveness in the same way a PMA is.

12   Q    So when the device goes through a 510(k) process and FDA

13   allows that device onto the market, how do we refer to that?

14   What is it known as?

09:24:57  15   A    So we say the 510(k) is cleared.   Not that it's approved.

16   Q    And of these two different types of processes to enter a

17   medical device into the market, can you describe for the jury

18   approximately what percentages of devices go through the PMA

19   process versus how many go through the 510(k) process?

09:25:22  20   A    So the vast majority of medical devices out there have

21   gone through the 510(k) process.

22        FDA receives roughly 3- to 4,000 new 510(k)

23   submissions every year and they receive, depending on the

24   year, anywhere from 30 to 50 PMA submissions.   So the vast

09:25:41  25   majority of the devices you might encounter when you go to

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:25:45   1   your doctor's office or the hospital are devices that are

2   cleared through the 510(k) process.

3   Q    And the IVC filters that we're talking about today, the

4   G2X filter and Eclipse filter, are those filters -- do they go

09:25:58   5   through the 510(k) process?

6   A    Yes, they do.

7   Q    So let's talk about that in a little more detail.  You

8   described for us the substantial equivalence process.  Or that

9   being the standard at which those devices are measured.

09:26:10  10        Can you give the jury more information about what

11   that standard means.

12   A    Yes.

13        So it's a little bit complicated, so bear with me.

14        So substantial equivalence is about a comparison to

09:26:24  15   something we call a predicate.  A predicate is another device

16   that's already legally marketed for the same intended use.

17        So if you've developed a new medical device and it's

18   Class II and it's subject to 510(k), you would identify some

19   other device that is already out there that has the same

09:26:43  20   intended use as your device, and you would say that's going to

21   be my predicate.

22        And then once you've determined or demonstrated that

23   the device has the same intended use, then the next question

24   is how do the technological characteristics of your device

09:27:00  25   compare to the other device you're comparing to?  So does your

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:27:03  1  device have the same technological characteristics?  Does it

2  have a different design?  Does it use a different energy?  If

3  it does, then those are different technological

4  characteristics.

09:27:13  5          And if it has different technological

6  characteristics, then the next question is do those

7  differences raise different kinds of questions?  Are the kinds

8  of risks and things that we have to consider so different from

9  your device and the other device that they can't really be

09:27:31  10  compared?  If that's the case, then you need a PMA.  If the

11  technological characteristics are different but they're not so

12  different you can't do a meaningful comparison, then what FDA

13  does is it looks at data and it says, okay, you've got this

14  device, it's got the same intended use.  Yeah, it looks a

09:27:50  15  little different, has different technological characteristics,

16  but if you can provide data to show that the performance

17  demonstrates that the safety and effectiveness are comparable

18  to that of the predicate device, then FDA can determine that

19  it's substantially equivalent.

09:28:06  20  Q   Dr. Tillman, the jury has heard at various times during

21  the trial about FDA guidance documents.  But can you remind us

22  what those are?

23  A   Yes.  So there is -- there is statute, which is the laws

24  that Congress passes.  And then FDA implements things called

09:28:22  25  regulations, which is where FDA takes the statute and develops

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:28:27  1  regulations about how it's going to -- how it's going to apply

2  that statute.  And then underneath that are guidance

3  documents.  These are documents that FDA writes to help people

4  understand its review programs.

09:28:40  5       The same way that the Internal Revenue Service

6  publishes tax guidance where if you've got a question about a

7  particular tax matter, you can go look it up.

8       FDA writes guidance documents to help companies

9  understand what its requirements and regulations are.

09:28:54  10  Q    Has the FDA issued a guidance document on the substantial

11  equivalence process?

12  A    Yes.  FDA has issued many guidance documents on the

13  substantial equivalence process.

14  Q    And are you familiar with those guidance documents?

09:29:09  15  A    I'm deeply familiar with them.

16       MR. ROGERS:  Scott, can we pull up Exhibit 7758,

17  please.

18  BY MR. ROGERS:

19  Q    And, Dr. Tillman, can you see on your screen the document?

09:29:20  20  A    Yes, I can.

21  Q    What is the title of that document?

22  A    So The 510(k) Program:  Evaluating Substantial Equivalence

23  in Premarket Notifications.

24       MR. ROGERS:  Your Honor, I move this into evidence.

09:29:33  25       MR. LOPEZ:  I object.  I'm going to object to it as a

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:29:40  1    2014 document, which is a time period not relevant to this

2    case.

3              THE COURT:  I think additional foundation's needed on

4    that point.

09:29:49  5              MR. ROGERS:  Thank you, Your Honor.

6    BY MR. ROGERS:

7    Q    Dr. Tillman, have you reviewed this guidance document?

8    A    Yes, I have.

9    Q    And was it in place when you were at FDA?

09:29:57 10    A    This particular version of this guidance document was not.

11    This is a newer version of a document that was established

12    back in the 1990s.

13    Q    And based on your review of this guidance document, are

14    the standards that this document describes consistent with the

09:30:15 15    standards that were applied when you were at FDA regarding

16    substantial equivalence?

17    A    Yes.  The basic principles in this guidance document, the

18    concepts of intended use, different technological

19    characteristics, when is a question a new type of question,

09:30:30 20    that basic -- those concepts and how FDA interprets those

21    haven't changed in the 30-some years since the program was put

22    in place.  This guidance provides a sort of more detailed

23    explanation of those, but it reflects a review policy and an

24    approach that really has existed since the 510(k) program

09:30:49 25    first came into being.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:30:52  1  Q   Does this document reflect FDA standards regarding

2  substantial equivalence that would have existed in 2009 and

3  2010?

4  A   Absolutely.

09:31:02  5          MR. ROGERS:  Your Honor, I move this document in

6  evidence.

7          MR. LOPEZ:  I'm still going to object.  She said more

8  detail than before.  This is a 2014 document.

9          THE COURT:  All right.  That's a relevancy objection,

09:31:11 10  I assume.

11          MR. LOPEZ:  Yes, Your Honor.

12          THE COURT:  I'm going to overrule it on relevancy

13  grounds.  You certainly can go into those differences on

14  cross-examination.

09:31:19 15          MR. LOPEZ:  Thank you, Your Honor.

16          THE COURT:  Exhibit 7758 is admitted.

17      (Exhibit 7758 admitted.)

18          MR. ROGERS:  Your Honor, may we publish?

19          THE COURT:  Yes.

09:31:30 20  BY MR. ROGERS:

21  Q   So, Dr. Tillman, again, just to orient the jury, if you

22  would, can you tell us what this guidance document is intended

23  to do.

24  A   So this guidance document is intended to help both FDA

09:31:40 25  reviewers and medical device companies understand what they

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:31:44  1    need to do, what information needs to be provided in a 510(k)

2    submission, and what are the standards and criteria FDA uses

3    for determining when a device is substantially equivalent.

4              MR. ROGERS:  Okay.  Can we go to page 9, please.

09:32:01  5              And can we pull out that portion that says "The

6    Statutory Standard," please.

7    BY MR. ROGERS:

8    Q    And, Dr. Tillman, can you explain for the jury what this

9    is?  What are we seeing here?

09:32:15  10   A    So this is basically going over the same thing we just

11   talked about a few minutes ago, which is the 510(k) standard

12   is one of substantial equivalence whereas the PMA standard is

13   one of reasonable assurance of safety and effectiveness.  And

14   so FDA is pointing out that there's a difference in those

09:32:35  15   standards but that, however, the principles of safety and

16   effectiveness underlie the substantial equivalence

17   determination in every 510(k) review.

18             So what FDA's saying here, in my opinion, is that

19   even though the standard is not the same, in both cases FDA is

09:32:51  20   looking at safety and effectiveness.

21   Q    And does substantial equivalence mean that a device, new

22   device that's being proposed to FDA, must share the same

23   design characteristics as the predicate device?

24   A    No.  In fact, as I was saying a little bit ago, when you

09:33:09  25   have a new device it can have different technological

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:33:12  1  characteristics and still be found substantially equivalent.

2  Q    And what are the types of data a manufacturer needs to

3  submit to FDA to show FDA that a new device is substantially

4  equivalent to a predicate device?

09:33:27  5  A    So the types of data in a 510(k) depends on the type of

6  device.  If it's a device like a filter, FDA would be looking

7  at things like the materials, are they bio compatible.  If the

8  device is sterile they want to know, is it sterile.  They want

9  to understand what are the mechanical properties of it?  Is it

09:33:46  10  strong enough to withstand the forces it's going to be

11  subjected to?  If the device has software, there's software

12  documentation.  If the device is electrical, FDA asks

13  companies show it is electrically safe.

14      The types of testing and data in a 510(k) is very

09:34:02  15  much dependent on the particular type of device.

16  Q    Does substantial equivalence mean a proposed device must

17  have the exact same benefits profile as a predicate device?

18  A    No, it does not have to have the same benefits.

19  Q    And does substantial equivalence mean that a proposed

09:34:19  20  device has to have the exact same risks as a predicate device?

21  A    No, it does not.

22  Q    Have you seen instances where the FDA has cleared a new

23  device even though it may have a different type of

24  complication than the predicate device?

09:34:34  25  A    Yes, I have certainly seen situations where FDA looks at

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:34:38  1  different risk/benefit profiles when it clears a device.

2        MR. ROGERS:  All right.  Scott, would you mind taking

3  that down, please.

4        And can you pull up Exhibit 7753.

09:34:49  5  BY MR. ROGERS:

6  Q    And, Dr. Tillman, can you see this on your screen?

7  A    Yes, I can.

8  Q    And what do we see here?

9  A    So this is another FDA guidance about 510(k) and this one

09:35:03  10  is about benefit/risk factors to consider when determining

11  substantial equivalence in premarket notifications with

12  different technological characteristics.

13  Q    And when was this guidance document issued?

14  A    So this document was issued in 2014.

09:35:20  15  Q    So this issued after you were at FDA?

16  A    Yes, it was.

17  Q    And have you reviewed this guidance document?

18  A    I have.

19  Q    Are the general standards that this guidance document

09:35:32  20  describes consistent with the standards that applied when you

21  were at FDA?

22  A    Yes.  This guidance document was written in order to put

23  down on paper, basically, what FDA had been doing for the past

24  20 or so years so that companies and FDA staff who review

09:35:50  25  510(k)s could better understand how to think about benefit and

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:35:55   1   risk in the context of a 510(k) submission.

2   Q   And were the standards that are described in this guidance

3   document, were they being applied in 2009 and 2010 at FDA?

4   A   Yes, they were.

09:36:10   5            MR. ROGERS:  Your Honor, I move this document into

6   evidence.

7            MR. LOPEZ:  Objection.  Relevance and foundation.

8   It's a draft document.

9            THE COURT:  I think you need to address the draft

09:36:19  10   issue and foundation.

11            MR. ROGERS:  Thank you, Your Honor.

12   BY MR. ROGERS:

13   Q   Dr. Tillman, as we just heard, is this a draft guidance?

14   A   Yes, it is.

09:36:27  15   Q   Can you describe for the jury the process that guidance

16   documents are created by FDA.

17   A   Yes.  So when FDA develops a guidance document it first

18   puts out a draft and that draft is published and then people

19   are able to comment on that draft and then FDA will issue a

09:36:45  20   final guidance document.

21            In a case like this where you've got a guidance --

22   this guidance did not exist before 2014.  Even though it is a

23   draft guidance document, it still reflects what FDA was doing

24   and had been thinking.  So the fact that it is draft doesn't

09:37:03  25   really change the fact that it reflects what FDA had been

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:37:08  1   thinking for many years before it was published.

2   Q    And when FDA publishes draft guidance for the industry, do

3   those sometimes stay in draft for several years?

4   A    Yes.  In fact, this draft -- this device has been draft

09:37:27  5   since 2014 and it was -- only actually recently has been

6   issued in final.

7   Q    And does the fact it is a draft guidance reduce its

8   importance as far as the information it is providing to

9   industry?

09:37:45  10   A    You know, I would say that because it's a draft guidance

11   it can't be enforced by FDA.  Although I would say that

12   guidances are never required, so it's kind of funny to talk

13   about them being enforced.

14       The fact it's draft, though, doesn't change the fact

09:38:01  15   that it still reflects how FDA thinks about risk/benefit.

16       And so because this guidance is really more about

17   explaining how FDA thinks about risk/benefit versus telling

18   companies what to do, I think the fact it's a draft doesn't

19   really change the fact that it explains what FDA is thinking

09:38:24  20   about.

21       MR. ROGERS:  Your Honor, I move this document into

22   evidence.

23       MR. LOPEZ:  Same objection.  Foundation.

24       THE COURT:  All right.  Objection is overruled.

09:38:30  25   Exhibit 7753 is admitted.

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:38:34  1        (Exhibit 7753 admitted.)

2                MR. ROGERS:  May we display?

3                THE COURT:  You may.

4        BY MR. ROGERS:

09:38:39  5        Q   All right.  And so, again, to orient the jurors,

6        Dr. Tillman, what was the purpose behind this particular

7        guidance document?  What information was it intended to

8        convey?

9        A   I think it's intended to convey how do you think about

09:38:52 10        risk and benefit when you have devices that have different

11        technological characteristics.

12                So if I have a device with this design and it has a

13        set of risks and benefits and I have another device I'm

14        comparing it to with another design and different risks and

09:39:07 15        benefits, how do I compare those two devices and show that the

16        risk/benefits are the same for purposes of substantial

17        equivalence.

18                MR. ROGERS:  Can we go to page 7 of the document,

19        please.

09:39:19 20                Under that section, the big section called Scope down

21        at the bottom, can you pull that out, please.

22        BY MR. ROGERS:

23        Q   Okay.  Dr. Tillman, can you describe for us what we're

24        seeing here?

09:39:32 25        A   So this is talking about the scope of the guidance.  And,

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:39:35  1   once again, it's reminding the reader that new device doesn't

2   have to be identical to a predicate device in order to be

3   found substantially equivalent.

4   Q   Is that consistent with your understanding and opinions as

09:39:52  5   a regulatory expert?

6   A   Yes, and also consistent, frankly, with how the

7   regulations sort of define and characterize substantial

8   equivalence.  Because the regulations clearly say that a

9   device can have new technological characteristics and still be

09:40:08  10  substantially equivalent.

11          MR. ROGERS:  Can you pull that box down and go to the

12  next page, please.

13          And can you pull out the section called Benefit and

14  Risk Factors.

09:40:17  15  BY MR. ROGERS:

16  Q   Okay.  Dr. Tillman, can you describe for us what this

17  paragraph is about?

18  A   So in this paragraph, FDA is noting that a device can be

19  found substantially equivalent even if it has different

09:40:36  20  benefits and risks.  It talks about the fact -- and the whole

21  guidance, in fact, talks about how does FDA look at benefits

22  and risks, how does it attempt to quantify them, and how does

23  it use that information to determine that a new device has a

24  equivalent benefit/risk profile to a predicate device.

09:41:00  25          MR. ROGERS:  Scott, would you mind taking that down

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:41:01  1   and going to the next page, please.

2              And can you pull out the section called Increased

3   Risk/increased Benefit.

4   BY MR. ROGERS:

09:41:10  5   Q   And, Dr. Tillman, do you see that on your screen?

6   A   Yes, I do.

7   Q   Can you describe for the jury what this paragraph is about

8   and what FDA is conveying in this paragraph?

9              MR. LOPEZ:  This is not in her report.

09:41:23 10              THE COURT:  Is this in her report?

11             MR. ROGERS:  Yes, Your Honor.  Page 40, top of the

12  page.

13             MR. LOPEZ:  Not the entirety of it, Your Honor.

14             THE COURT:  All right, let me look at it.

09:42:13 15             The report only quotes language, it doesn't go into

16  an explanation of it, so I think you can have her --

17             MR. ROGERS:  We'll --

18             THE COURT:  You can't have her explain it since it's

19  not in the report.

09:42:26 20             MR. ROGERS:  Okay.  Thank you, Your Honor.

21             MR. LOPEZ:  It's being displayed to the jury right

22  now, can we take it down.

23             THE COURT:  Pardon?

24             MR. LOPEZ:  It's being displayed to the jury right

09:42:30 25  now.  Can we take it down.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:42:30  1      THE COURT:  It's in evidence.

2      MR. LOPEZ:  I know.  Okay.

3      MR. ROGERS:  Scott, if you could, could you pull out

4  the just the first sentence of that paragraph, please.

09:42:40  5      THE COURT:  Well, let me make -- it's in evidence and

6  this portion, the first sentence, is quoted in the report.

7  That's why I think it's within the scope.

8  BY MR. ROGERS:

9  Q   Dr. Tillman, what does this sentence say?  I mean can you

09:42:58 10  just read it for us, please.

11  A   Yes.  It says, "If the risks associated with the new

12  device increase as compared to the predicate device, FDA may

13  still determine that the new device is SE to the predicate

14  device if, for example, FDA finds from a review of the new

09:43:16 15  device's performance data that there are also increased

16  benefits with the new device as compared to the predicate

17  device."

18  Q   Okay.  Thank you.

19      MR. ROGERS:  You can take that down.

09:43:27 20      And you can take the document down.

21  BY MR. ROGERS:

22  Q   So, Dr. Tillman, who ultimately decides whether a

23  predicate device is appropriate for clearance in comparison to

24  an existing predicate device?

09:43:42 25  A   So FDA makes the determination that the predicate device

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:43:45  1   is appropriate.

2   Q   And when the FDA is making that determination, does the

3   FDA sometimes have more information than the manufacturer who

4   is submitting the application?

09:43:55  5   A   Yes, it does.

6   Q   And so how does FDA use that information that it has, if

7   it uses it at all?

8   A   So FDA uses any information it has available to it in

9   making these decisions.  It may consider data from the

09:44:11 10   post-market setting, it may consider data that it knows from

11   other submissions that it's reviewed.  All of that information

12   is considered by the agency when it makes these decisions.

13   Q   And who make the decision whether a device raises any new

14   or different types of safety or efficacy questions?

09:44:30 15            MR. LOPEZ:  Objection.  Just vague and ambiguous,

16   Your Honor, as to time.

17            MR. ROGERS:  I can ask for a specific time.

18            THE COURT:  Please ask for a time.

19   BY MR. ROGERS:

09:44:41 20   Q   Dr. Tillman, in 2009 and 2010 who makes the decision about

21   whether or not a device raises new types of safety and

22   efficacy questions?

23   A   FDA makes that decision.

24   Q   And when does FDA make the determination whether a device

09:44:56 25   is substantially equivalent to a predicate device?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:44:59  1    A   So a company submits a 510(k) submission, FDA reviews it,

       2    and then FDA makes a determination that the device is

       3    substantially equivalent and then sends a letter to the

       4    company saying that it has found it as substantially

09:45:13  5    equivalent.

       6    Q   And were you involved in those types of decisions when you

       7    were at FDA?

       8    A   I have been involved in those decisions at FDA and as a

       9    consultant as well.

09:45:23 10    Q   And once FDA has determined that a new device should be

      11    cleared as substantially equivalent to a predicate device,

      12    what does FDA do to continue a review of substantial

      13    equivalence after the new device is on the market?

      14    A   So there is not a continued assessment of substantial

09:45:43 15    equivalence.  That is a finding that FDA makes and then that

      16    is -- that's called a premarket review.  And then from then on

      17    FDA has post-market authorities that it can use, such as

      18    assessing adverse events or looking at how devices are

      19    performing in the post-market setting.  But it doesn't

09:46:04 20    continually evaluate substantial equivalence.

      21    Q   And how does FDA monitor or evaluate a device in the

      22    post-market setting after a device has been introduced into

      23    the marketplace?

      24    A   So I already mentioned there is a mandatory adverse event

09:46:19 25    reporting system called the MDR system.  FDA has also

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:46:25  1    authorities to monitor companies' quality systems.  It goes

2    and inspects companies.  FDA has the ability to look at

3    information, statements, companies are making about their

4    products and making sure that they are not misleading.

09:46:41  5        So FDA has a number of post-market authorities that

6    it can apply.

7    Q   If there is a -- what I would call a chain of clearances,

8    and by that I mean if you have a device and a new device is

9    cleared in comparison to an original device and then another

09:46:59 10   device is cleared in comparison to the second device, is there

11   any connection between the clearance of the third device

12   versus the original device?

13        MR. LOPEZ:  Your Honor, I'm going to object.  This is

14   not in her report.

09:47:14 15        MR. ROGERS:  Your Honor, deposition page 330, lines 8

16   to 12.

17        MR. LOPEZ:  What was the page again?  I missed the

18   page.

19        MR. ROGERS:  330.

09:47:36 20        MR. LOPEZ:  8 to 12.

21        THE COURT:  Objection's overruled.

22   BY MR. ROGERS:

23   Q   Dr. Tillman, do you recall the question.

24   A   Yes, I can.

09:47:55 25        So substantial equivalence is a comparison of a

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:47:59  1    device to a predicate device.  And there is not a requirement

2    that you trace that equivalence all the way back to the first

3    device in the chain.  Because if you think about it, we've

4    talked about a device can have different technological

09:48:14  5    characteristics and different risk/benefits compared to its

6    predicate.  And that might happen here.  And then if that

7    happened before, you end up with devices that sometimes can be

8    very different from the original predicate but are still

9    substantially equivalent to the first predicate.

09:48:32 10    Q    All right.  Let me shift your -- shift gears and talk a

11    little bit about IVC filters in particular.

12         What class of devices do IVC filters fall in?

13    A    IVC filters are currently Class II devices.

14    Q    Were IVC filters always Class II devices?

09:48:52 15    A    No.  Originally IVC filters were actually what we call

16    pre-amendment Class III devices.

17    Q    And generally speaking, when the FDA -- well, let me back

18    up for a second.

19         Can the FDA from time to time do what is called down

09:49:06 20    classifying a device?

21    A    Yes, it can.

22    Q    What is that?

23    A    So based on information that is available, as we learn

24    more about devices, sometimes FDA may decide that the

09:49:19 25    classification is no longer appropriate and it may decide that

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:49:24    1   a device was in Class III can now be appropriately regulated

            2   in a lower class.  That is what we referred to as down

            3   classification.  It was Class III and now it's Class II.

            4   Q   And did that process happen with IVC filters?

09:49:39    5   A   Yes, it did.

            6   Q   And as part of FDA's decision to down classify IVC filters

            7   from Class III to Class II, did FDA identify any special

            8   controls for IVC filters?

            9   A   Yes.  In deciding to down classify the device, the IVC

09:49:59   10   filters, the FDA determined it understood what the risks and

           11   benefits were and that it could identify how to mitigate those

           12   risks.

           13        So we've got these risks.  What can we do to make

           14   sure we can mitigate them?  And then that information then

09:50:13   15   gets put into a guidance document called a Special Control

           16   Guidance Document.  And FDA created Special Control Guidance

           17   Document for IVC filters when they down classified them from

           18   Class III to Class II.

           19   Q   And just in general, can you describe for us what a

09:50:31   20   special control is.

           21   A   So a special control is a -- it is something that a

           22   company will do in order to address a risk.  So if I have a

           23   risk -- for example, if the risk is that the material is not

           24   compatible with the human body, then a special control for

09:50:54   25   that might be that the company needs to demonstrate that the

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:50:57  1   device complies with a standard for biocompatibility testing

2   and that they've done testing to show the device is safe for

3   contact with human tissue.

4           So special controls are things that have to be done

09:51:12  5   in order to show that a risk has been mitigated.

6           MR. ROGERS:  Can we pull up Exhibit 5126, please.

7           And, Your Honor, I believe this is in evidence.

8           THE COURTROOM DEPUTY:  Yes.

9           THE COURT:  It is.

09:51:30  10          MR. ROGERS:  May we publish?

11          THE COURT:  You may.

12  BY MR. ROGERS:

13  Q   Dr. Tillman, is this the guidance that FDA issued for IVC

14  filters?

09:51:39  15  A   Yes, it is.

16  Q   And is it a common practice for FDA to issue a guidance

17  that relates to a particular type of device?

18  A   So, actually, the vast majority of devices do not have

19  device-specific guidance documents.  There are cross-cutting

09:51:59  20  guidance documents that apply to these devices, like for

21  biocompatibility or software or electrical safety, but the

22  vast majority of devices do not have an actual specific

23  device-specific guidance document.

24  Q   If FDA issues a device-specific guidance document like

09:52:19  25  this one does FDA expect manufacturers, when they submit

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:52:23  1   applications, to follow the guidance document?

2   A    Yes.  Even though guidances are supposed to only be

3   recommendations, FDA very much expects companies to comply

4   with the recommendations in the guidance or to have a very

09:52:38  5   good reason for why they did not.

6   Q    And how does a guidance like this help a manufacturer like

7   Bard submit a 510(k) for an IVC filter?

8   A    The benefit of a guidance like this is both FDA and the

9   manufacturer understand what is the data that FDA expects to

09:52:57 10   see in this submission.  So it helps the manufacturer because

11   they understand the types testing FDA expects to see and it

12   also helps FDA in that they can be consistent and make sure

13   they're asking all of the companies that are submitting

14   510(k)s for the same kinds of information.

09:53:19 15   Q    Can you tell us generally what categories of information

16   the guidance document suggests that a manufacturer of an IVC

17   filter should provide to FDA?

18   A    So the kinds of information include different kinds of

19   testing to address the risks.  So we talked about

09:53:33 20   biocompatibility.  Information about the mechanical integrity

21   of the device.  Can it withstand the forces that are being

22   applied to it?  So bench testing, mechanical testing.

23          The guidance talks about how to make sure that you've

24   established that the device is sterile and maintains its

09:53:54 25   sterility.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:53:55  1          It also talks about labeling.  So FDA does review

2     labeling as part of 510(k) submissions.  This guidance

3     document talks about what kind of information needs to be in

4     the label for a intravascular filter.

09:54:11  5          MR. ROGERS:  Can we go to page 5, please.

6     BY MR. ROGERS:

7     Q    And, Dr. Tillman, are these some examples of the types of

8     testing that FDA suggests to manufacturers that they would

9     like to see before they submit an application for a 510(k)

09:54:26 10   clearance of an IVC filter?

11    A    Yes.  There is biocompatibility and filter performance,

12    for example.

13         MR. ROGERS:  And can we go to the next page.

14    BY MR. ROGERS:

09:54:37 15   Q    And what are the things that are listed here?

16    A    So these are more specific examples about the types of

17    mechanical testing that FDA expects to see for an IVC filter.

18    So things like simulated deployment.  So if when you introduce

19    the filter into the patient, demonstrating you can, in fact,

09:54:58 20   deploy the device into the patient's vessel.  Things like

21    clot-trapping ability or fracture and migration.

22         This is descriptions of the different kinds of

23    testing that FDA expects to see in the submission.

24    Q    And in your opinion as a regulatory professional, do you

09:55:20 25   think it's possible for a manufacturer of an IVC filter to

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:55:24  1   foresee and test for everything that might happen in the real

2   world once these devices get into patients?

3               MR. LOPEZ:  Objection, Your Honor.  Disclosure.

4               MR. ROGERS:  Page 95 of the report, Your Honor.  It's

09:55:46  5   the second paragraph, second sentence.

6               MR. LOPEZ:  I'll withdraw the objection, Your Honor.

7               THE COURT:  All right.

8   BY MR. ROGERS:

9   Q   Dr. Tillman, do you recall the question?

09:56:07  10  A   Can you repeat it, please.

11  Q   I'll be glad to.

12          In your opinion as a regulatory professional, do you

13  think it is possible for a manufacturer of an IVC filter to

14  foresee and test for everything that might happen in the real

09:56:21  15  world once those devices get into patients?

16  A   No, I do not think it's possible to test for every

17  possible scenario.  I think it's only possible to test for

18  reasonably foreseeable scenarios and the kinds of failures

19  that we've seen in the past.  But it's impossible to predict

09:56:38  20  everything that might happen.

21  Q   Now, turning our attention back to the guidance document,

22  does the document also identify known risks associated with

23  IVC filters?

24  A   Yes, it does.

09:56:52  25              MR. ROGERS:  And can we go to page 7, please.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:56:59  1    BY MR. ROGERS:

       2    Q   And down at the bottom of the page there, Dr. Tillman, is

       3    this where there's a discussion that picks up in the document

       4    about potential clinical risks?

09:57:08  5    A   Yes.

       6    Q   All right.

       7         MR. ROGERS:  Can we go to the next page.

       8    BY MR. ROGERS:

       9    Q   And, Dr. Tillman, is fracture listed as one of the

09:57:16 10    potential complications?

      11    A   Yes, it is.

      12         MR. ROGERS:  And can we go to the next page, please.

      13         Down at the bottom where it says Filter Migration, is

      14    that one of the things that is identified by the FDA in the

09:57:30 15    guidance document as a potential risk?

      16    A   Yes, it is.

      17    Q   And next page, please.  Dr. Tillman here is caval

      18    penetration and filter tilting.  Are those also listed as

      19    known complications?

09:57:48 20    A   Yes, they are.

      21         MR. ROGERS:  You can take that down, Scott.  I'm

      22    going to switch it up a little bit.

      23    BY MR. ROGERS:

      24    Q   Dr. Tillman, who were you retained by in this case?

09:58:10 25    A   Nelson Mullins has retained me.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

09:58:15  1    Q    My law firm?

      2    A    Your law firm.

      3    Q    As part of that process, did you review documents that

      4    relate to the regulatory history of Bard's IVC filters?

09:58:23  5    A    Yes, I have.

      6    Q    If there's certain documents you thought you wanted to

      7    see, did you request those?

      8    A    Absolutely.

      9    Q    And did you also do your own research that was available

09:58:34 10    to you publicly regard IVC filters?

     11    A    Yes, I did.

     12    Q    Did you spend a good deal of time on FDA's website looking

     13    at things that are available publicly regarding IVC filters?

     14    A    Yes, I did.

09:58:47 15    Q    Did you review testing reports as part of your review of

     16    this material?

     17    A    Yes, I did.

     18    Q    And did you also review Bard's internal analyses they had

     19    done at various times about reports of complications?

09:59:00 20              MR. LOPEZ:  Objection.  This is leading.

     21              THE COURT:  I'm sorry?

     22              MR. LOPEZ:  Leading.  I'm sorry.

     23              THE COURT:  Overruled.

     24              THE WITNESS:  Yes, I did.

     25

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

09:59:07   1   BY MR. ROGERS:

2   Q    And did you review charts of complications that Bard used

3   to track the real-world performance of its devices?

4   A    Yes, I did.

09:59:17   5   Q    And did you review deposition testimony from Bard's

6   employees?

7   A    Yes.

8   Q    And as part of your review, did you review all of the

9   510(k) applications that were submitted by Bard to FDA?

09:59:34   10   A    Yes, I have reviewed them all.

11   Q    And did you review all of the correspondence between FDA

12   and Bard?

13   A    Yes, I have.

14   Q    Let me stop you there for a minute and let's talk a little

09:59:42   15   bit about something -- about a 510(k) application.  Does it

16   include something called a Truthful and Accuracy Statement?

17   A    Yes, it does.

18   Q    And can you describe for the jury what that is.

19   A    So the regulations require companies to include a

09:59:59   20   statement in their 510(k), and I'm going to paraphrase it,

21   that to the best of the person's knowledge all of the

22   information in the 510(k) is truthful and accurate and that no

23   material fact has been omitted.

24        So that is the Truthful and Accurate Statement.

10:00:17   25        It's required to be included in a 510(k) submission

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:00:21 1    and signed by the company that is submitting the 510(k).

2    Q    Does the FDA have what I will call verbatim language it

3    requires for 510(k) applications?

4    A    So the regulations actually require companies to include

10:00:37 5    that statement exactly as it's written in the regulations.

6    Unfortunately, sometimes companies make changes to it.

7    Q    And in your review of some of the 510(k) applications for

8    CR Bard, did the language that was included in the Truthful

9    and Accuracy Statement always match the verbatim language that

10:00:57 10   FDA requires?

11   A    No, it did not.

12   Q    And in your experience is it uncommon for manufacturers to

13   make adjustments to the truthful and accuracy language?

14   A    Yes.  My experience, both when I was at FDA and even still

10:01:10 15   today as a consultant, is that companies often think that that

16   language is language that can be modified when in fact can't.

17   It is supposed to be written exactly as it says in the

18   regulation.

19   Q    When did Bard submit a 510(k) application that did not use

10:01:30 20   the verbatim language the FDA requires for the Truthful and

21   Accuracy Statement, did FDA clear those applications?

22   A    Yes, they did.

23   Q    And did you see any indication that FDA was unhappy

24   because of the language of the Truthful and Accuracy

10:01:42 25   Statement?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:01:45  1  A   No, I did not see any indication FDA noticed the language
        2  was different.
        3  Q   When those applications that you reviewed that were
        4  submitted that used language that was not verbatim, was this
10:01:56  5  requirement of the Truthful and Accuracy Statement a
        6  relatively new requirement?
        7  A   I would say it was still relatively new to the medical
        8  device industry, yes.
        9  Q   And has FDA tightened up on that over the course of the
10:02:10 10  years?
       11  A   They have.  Their new Refuse to Accept Guidance is pretty
       12  explicit it has to have the exact verbatim language in it.
       13  Q   All right.  Dr. Tillman, let's talk about some of these
       14  clearances in 510(k) applications for some of the Bard
10:02:23 15  devices.  And I want to start you off with our discussion with
       16  the G2 device.  And what was the predicate device that was
       17  used in the G2 application in the 510(k) application?
       18  A   So the predicate for the G2 was Bard's Recovery.
       19  Q   And when the G2 510(k) application was submitted, was the
10:02:46 20  Recovery filter legally on the market?
       21  A   Yes, it was, to the best of my knowledge.
       22  Q   And would it be appropriate for the G2 application to use
       23  the Recovery filter as a predicate device?
       24  A   Yes.  In fact, in my opinion, because the whole intent of
10:03:04 25  the G2 program was to improve the migration and fracture

DIRECT EXAMINATION — DONNA-BEA TILLMAN, Ph.D

10:03:08  1   resistance capabilities of the G2 over the Recovery, the
2   Recovery was in fact the most appropriate device to use as the
3   predicate.
4   Q    And was there any requirement that Bard in this 510(k)
10:03:21  5   application compare the G2 device to the predicate device for
6   the Recovery filter, the Simon Nitinol filter?
7   A    No.  There's no requirement.  A company is allowed to
8   choose its own predicate device.
9   Q    And I want to hopefully save the jury a little bit of
10:03:42  10   time, but can you describe for us generally what the
11   circumstances were when Bard made its application to the FDA
12   for the G2 device.
13   A    So when Bard came to FDA with the G2, they submitted it as
14   a special 510(k), which is a type 510(k) that a company can
10:04:03  15   make if they make modifications to the device that don't
16   fundamentally affect its scientific performance or its
17   fundamental scientific properties.
18        So Bard had the Recovery.  They made modifications to
19   improve fracture resistance and migration and they submitted a
10:04:25  20   Special 510(k) to FDA for both the permanent and retrievable
21   indications.
22        When that went into FDA, FDA looked at it and said we
23   think we need some clinical data in order to support these
24   changes.  And so they said we can't clear the 510(k) for the
10:04:43  25   retrievable indications without some clinical data, but we

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:04:46  1    can, we think, clear the 510(k) for the G2 for the permanent

        2    indications based on what you have.

        3          So Bard submitted the 510(k) originally for

        4    retrievable and permanent as a Special.  Then when they heard

10:05:00  5    from FDA they withdrew the retrievable indications.  They

        6    said, okay, now we're going to just do the G2 for permanent.

        7    And as a result of that, then they had to submit additional

        8    testing information to support what we call a traditional

        9    510(k) submission.

10:05:17 10          So it gets kind of complicated, but basically they

       11    submitted the traditional 510(k) for the G2 for the permanent

       12    indication.

       13    Q    Excuse me.  As part of your work in this case, did you

       14    have access to internal documents that were created at FDA as

10:05:36 15    part of their evaluation process for the G2 filter?

       16    A    Yes, I did.  When FDA reviews a 5 --

       17          MR. LOPEZ:  Excuse me.

       18          THE COURT:  Hold on.

       19          MR. LOPEZ:  This calls for yes or no answer, and I

10:05:47 20    want to approach the bench with respect to where she's going

       21    after -- with where she's going with the answer.

       22          THE COURT:  Then let's go ahead and do that now.

       23          If you want to stand up, ladies and gentlemen, feel

       24    free.

10:05:58 25          (Bench conference as follows:)

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:06:13  1    MR. LOPEZ:  Your Honor, she signed the G2 clearance

2    letter.  She's now talking about things that I can't

3    cross-examine her on because the FDA doesn't allow me to

4    cross-examine her on when she was at FDA.  She signed off on

10:06:27  5    the G2 510(k).  Now she's going in and describing what

6    happened at FDA.  That's in violation of the FDA rules, first

7    of all, for her to give that kind --

8    THE COURT:  Let me interrupt you for just a minute.

9    I think the question you asked was whether she had

10:06:42  10   access to internal FDA documents.

11   MR. ROGERS:  Correct, Your Honor.

12   THE COURT:  Do you know what's being referred to with

13   internal FDA documents?

14   MR. LOPEZ:  It almost doesn't matter because she's

10:06:53  15   going to give testimony from her perspective as having been

16   there and been involved in that process.  So I can't

17   cross-examine her on that.  I was not able to take her

18   deposition on it because she's the one who was involved in the

19   process.

10:07:06  20   THE COURT:  I understand.

21   MR. ROGERS:  I have no intention of going into that.

22   THE COURT:  What are you going to do with these

23   internal FDA documents?

24   MR. ROGERS:  Well, these are internal FDA review

10:07:14  25   memos where they lay out their reason for clearing a device.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:07:18  1   What I'm going to do, what I would like to do, is enter them

2   into evidence and ask her if she's reviewed them and kind of

3   move on.  That's all I'm planning to do.

4        THE COURT:  Are you going to ask her to give any

10:07:27  5   information she acquired while within FDA?

6        MR. ROGERS:  Not anything extensive, Your Honor.

7        THE COURT:  Well, anything at all.

8        MR. ROGERS:  Well, I mean, just this is what it is

9   and kind of move on.  I mean, I'd love to do it but she's

10:07:41 10   going to be constrained by her report and she doesn't say a

11   lot.

12        THE COURT:  So you want to move into evidence the

13   internal FDA memos --

14        MR. ROGERS:  Correct.  Yes.

10:07:49 15        THE COURT:  -- ask her if she's reviewed them, she'll

16   say yes, and then you'll move on to a new area?

17        MR. ROGERS:  Yes.

18        THE COURT:  You're not going to ask her anything

19   about her memos or her review of them?

10:08:00 20        MR. ROGERS:  Well, I mean I'll probably just ask a

21   general question --

22        THE COURT:  Such as?

23        MR. ROGERS:  Does this reflect FDA's thinking at the

24   time.  Something along those lines.

10:08:07 25        THE COURT:  Okay.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:08:08   1          MR. LOPEZ:  I'd love to cross-examine her on that

2    from the standpoint of her role there, what she did, what

3    information she had, whether or not this was factored into her

4    when she signed that letter.  I can't do that.  I mean, her

10:08:22   5    role --

6          THE COURT:  But if what -- are you going to oppose

7    the admission of the internal FDA review documents?

8          MR. LOPEZ:  Well, yes.  We always object to those.

9          THE COURT:  What will be the basis --

10:08:36  10          MR. LOPEZ:  Hearsay and we don't have the opportunity

11    to cross-examine.

12          THE COURT:  What is your response on hearsay?

13          MR. ROGERS:  On hearsay, Your Honor, it's going to be

14    803, the public records.

10:08:45  15          THE COURT:  (8).

16          MR. ROGERS:  (8).  Yes, sir.  I can't remember the

17    subsection, but I can get it if we need it.

18          THE COURT:  What is your response on 803(8)?

19          MR. LOPEZ:  Well, I mean they're still hearsay.

10:08:56  20          THE COURT:  But if they satisfy 803(8) they can come

21    in.

22          MR. LOPEZ:  If they don't, how do they?  I mean I

23    don't know how they satisfy 803(8).

24          THE COURT:  So 803(8) applies if a record or

10:09:22  25    statement of a public office sets out the office's activities.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:09:27  1    These are disjunctive.  You don't have to satisfy all of them.

2    You can leave it there.  Which section are you going to rely

3    on?

4                MR. ROGERS:  803(8)(a)(1).

10:09:38  5                THE COURT:  So the argument is these are a record of

6    a public office that sets out the office's activities.  What

7    is your response.

8                MR. LOPEZ:  My response is it's 403.  I cannot --

9                THE COURT:  That's not a hearsay objection.  Let's

10:09:50 10    stay on hearsay.

11                MR. LOPEZ:  Okay.  I'm sorry.  These are -- what he's

12    saying are the internal thinking or whatever, I can't remember

13    what he said --

14                THE COURT:  He said they're internal review memos.

10:10:07 15                MR. LOPEZ:  Right.

16                THE COURT:  And you've made a hearsay objection.

17                MR. LOPEZ:  Right.

18                THE COURT:  My question to you is, why doesn't

19    803(8)(a)(1) solve the hearsay problem?

10:10:24 20                MR. LOPEZ:  Well, I mean -- Mr. O'Connor -- what's

21    the guarantee of trustworthiness?  The issue is -- that's

22    what's so unfair about FDA documents.  We don't have -- and

23    why there's a mini trial about this stuff.  We cannot -- we

24    can do nothing to determine trustworthiness of any of this

10:10:44 25    stuff because we can't cross-examine any of the people

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:10:47  1    involved.  I mean that's why it's a 403 issue.

2              THE COURT:  You're now looking at 803(8)(b); is that

3    right?

4              MR. LOPEZ:  Okay.  Yes.

10:10:55  5    THE COURT:  And for that to apply, the source of the

6    information or other circumstances must indicate a lack of

7    trustworthiness.

8              What indicates a lack of trustworthiness?

9              MR. LOPEZ:  I mean just -- I can't -- again, the

10:11:11  10   reason I can't answer that question is because we don't have

11   an opportunity to cross-examine anybody on those documents to

12   determine whether or not they're trustworthy, how they're

13   formed, who did it, was it done by, you know, an electrical

14   engineer, was it done by a medical doctor --

10:11:27  15   THE COURT:  I understand your point.

16             MR. LOPEZ:  -- things that would be important for

17   cross.

18             THE COURT:  Have you seen any case law which holds

19   that internal government documents that cannot be the subject

10:11:36  20   of a deposition are inadmissible under Rule 803(8)(a) because

21   of a lack of trustworthiness?

22             MR. LOPEZ:  No, I haven't.

23             THE COURT:  Wouldn't that be true of every government

24   document where you can't go depose the government people about

10:11:51  25   the document?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:11:52  1      MR. LOPEZ:  Well, I mean, probably.  But --

2      THE COURT:  Okay.  In the absence of any case law, my

3  conclusion is that -- I'm assuming these are publicly

4  available internal memos.  You didn't -- these weren't

10:12:03  5  spirited out of the FDA by this lady?

6      MR. ROGERS:  No, sir.  They were obtained via a FOIA

7  request.

8      MS. REED ZAIC:  In the Cook litigation.

9      THE COURT:  What did you say?

10:12:16  10      MS. REED ZAIC:  FOIA request that came in in the

11  Cook --

12      THE COURT:  Okay.  They're available through FOIA

13  requests.  I can't conclude a document obtained by a FOIA

14  request fails to satisfy 803(8)(a)(1).  It appears to set

10:12:26  15  forth the office's activities.  And the source or other

16  circumstances do not indicate a lack of trustworthiness.

17      Now, you have a different objection you made a moment

18  ago.

19      MR. LOPEZ:  You said that would apply to all of it.

10:12:39  20  This is the decision-making body.  If this is a memo in

21  another case involving some other department where there's a

22  decision making going on, then, again, the unfairness is us

23  not having an opportunity to challenge what's in those

24  documents by being able to cross-examine people at FDA.

10:12:58  25      THE COURT:  Do you have a copy of the document?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:13:00   1            MR. LOPEZ:  I don't.

        2            MR. ROGERS:  I do, Your Honor.  It's in the box over

        3    there.

        4            THE COURT:  Tell me what it says.

10:13:05   5            MR. ROGERS:  Your Honor, it is an official document,

        6    it's signed by the person, and it's a form that they file

        7    where they go through and put their reasons and all the things

        8    they analyzed based on their review of the 510(k) application.

        9            THE COURT:  So it's specific to --

10:13:24  10            MR. ROGERS:  Specific to the G2 filter.

       11            THE COURT:  The G2.  What is the document number?

       12            MR. ROGERS:  There's actually two, because if we get

       13    through this I was going to go to another.  But it's 6064 and

       14    6061.

10:13:35  15            THE COURT:  Hold on just a minute.

       16            MR. ROGERS:  Sure.

       17            THE COURT:  I was just checking.  Both 6064 and 6061

       18    were admitted in the Jones trial.

       19            MR. ROGERS:  Yes, sir.

10:14:28  20            MR. LOPEZ:  I don't know where he's going.  It talks

       21    about activities.  I mean, these are conclusions, these are

       22    findings, these are --

       23            THE COURT:  You've seen these documents.  They've

       24    been in evidence in this courtroom in a previous trial.  So

10:14:38  25    there's no mystery as to what the documents are.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:14:43  1        MR. LOPEZ:  I don't know what one he's talking about.

       2        THE COURT:  He just said 6064 and 6061.

       3        MR. LOPEZ:  I need to know whether he's going beyond

       4   activities.  Is he going to ask her to give an opinion whether

10:14:53  5   or not this is --

       6        THE COURT:  My understanding from what Mr. Rogers

       7   said -- and you need to tell me if this is right,

       8   Mr. Rogers -- you're going to move the document into evidence,

       9   you are going to ask if she reviewed it, and then you said you

10:15:08 10   intended to ask a general question such as does this document

      11   set forth the agency's reasons, and then you're going to move

      12   on and not ask her --

      13        MR. ROGERS:  I'm not going to ask her to render an

      14   opinion or anything of that nature.

10:15:22 15        THE COURT:  All right.

      16        Are there other objections, Mr. Lopez?

      17        MR. LOPEZ:  No.

      18        THE COURT:  I'll wait until you move them into

      19   evidence to admit them.

10:15:29 20        MR. ROGERS:  Okay.  Thank you, Your Honor.

      21     (Bench conference concludes.)

      22        THE COURT:  Thank you, ladies and gentlemen.

      23        Go ahead, Mr. Rogers.

      24        MR. ROGERS:  Thank you, Your Honor.

      25

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:15:54   1    BY MR. ROGERS:

2    Q   Dr. Tillman, before we took our sidebar we were talking

3    about whether you had the opportunity to review some internal

4    documents from FDA.  Do you recall that?

10:16:01   5    A   Yes, I did.

6    Q   And did you have a chance to do that?

7    A   Yes, I did.

8    Q   And did those documents that you included from FDA include

9    memos from FDA that were created regarding their review of the

10:16:17  10    G2 application?

11   A   Yes, I did.  Yes, they did.

12        MR. ROGERS:  And can we pull up Exhibit 6064, please.

13   BY MR. ROGERS:

14   Q   And, Dr. Tillman, do you have that on your screen?

10:16:31  15   A   Yes, I do.

16   Q   And is that one of the internal documents that you

17   reviewed from FDA?

18   A   Yes, it is.

19        MR. ROGERS:  And, Your Honor, at this time I move

10:16:38  20   this document into evidence.

21        MR. LOPEZ:  I'd like to see the second page.

22        My only objection is there's some redactions on here,

23   Your Honor.  I don't see what they are.  If we're going to

24   move this into evidence I'd like to have an opportunity to see

10:17:11  25   what's been redacted in the event I want that included.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:17:15   1          THE COURT:  Well, let's go ahead and leave that

       2    subject to your conferring.  If you want to raise it again,

       3    I'll be happy to consider it.

       4          MR. LOPEZ:  Thank you, your honor.

10:17:21   5          THE COURT:  I'll admit it subject to plaintiffs'

       6    ability to review the redaction.

       7          (Exhibit 6064 admitted.)

       8          MR. LOPEZ:  Thank you, Your Honor.

       9          MR. ROGERS:  Thank you, Your Honor.  May we display?

10:17:29  10          THE COURT:  You may.

      11    BY MR. ROGERS:

      12    Q   Dr. Tillman, in your review of this document, was this one

      13    of internal documents you reviewed that set forth FDA's

      14    analysis of the 510(k) application for the G2 filter?

10:17:43  15    A   Yes, it is.

      16          MR. ROGERS:  All right, we can take that down,

      17    please.

      18          And would you pull up Exhibit 6061.

      19          And, Scott, why don't you go ahead and scroll through

10:17:59  20    the pages.

      21    BY MR. ROGERS:

      22    Q   And, Dr. Tillman, is this another document that you

      23    reviewed that was an internal memo from FDA regarding their

      24    analysis of the 510(k) application for the G2 filter?

10:18:16  25    A   Yes, it is.  Yes, I did review it.

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

10:18:19 1        MR. ROGERS:  And, Your Honor, I move this into

2    evidence.

3        MR. LOPEZ:  Your Honor, same objections as we

4    discussed at sidebar, plus there are some redactions on this

10:18:28 5    one.

6        THE COURT:  All right.  6061 is admitted subject to

7    plaintiffs' opportunity to review the redactions.

8        (Exhibit 6061 admitted.)

9    BY MR. ROGERS:

10:18:35 10   Q   Dr. Tillman --

11       MR. ROGERS:  May we display the document, please?

12       THE COURT:  Yes.

13   BY MR. ROGERS:

14   Q   So, Dr. Tillman, does this document set forth several

10:18:43 15   pages --

16       MR. ROGERS:  And can you scroll to the next page,

17   please, Scott.

18   BY MR. ROGERS:

19   Q   Does it set forth several pages of FDA's analysis and

10:18:50 20   reasoning behind their ultimate clearance of the G2 filter?

21   A   Yes, it does.

22       MR. ROGERS:  All right.  Can you scroll again,

23   please, Scott.

24       And one more time.

10:19:08 25       Thank you.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

BY MR. ROGERS:

Q   And so, Dr. Tillman, did the FDA ultimately clear the G2 device as a permanent filter?

A   Yes, they did.

Q   Do you recall approximately when that was?

A   Somewhere in the August of 2005 time.

Q   And in your experience as a regulatory professional, if the FDA was concerned about the issues related to the IFU that accompanied the G2 filter or in general the safety and efficacy of the G2 filter, would it have cleared the device?

A   No.  In my experience, if FDA had had any concerns they would not have cleared the device.

Q   All right.  Dr. Tillman, let's kind of move forward a little bit in time.  And after the FDA had cleared the G2 filter as a permanent device, did FDA also conduct a clinical trial regarding the G2 filter?

A   Bard conducted the clinical trial.  Yes.

Q   That trial was known as what?

A   That was the EVEREST trial.

Q   And the jury has heard the term IDE or investigational device exemption.  Can you describe for us again what that is.

A   So an IDE is a submission that a company makes to the FDA when they want to do a clinical study of a device that's not yet approved.  And so -- or cleared.  So the purpose is to make sure that human subjects are appropriately protected

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:20:37  1   before FDA allows the device to be studied.

2   Q    And can a manufacturer conduct a clinical trial involving

3   human subjects if it does not obtain an IDE first?

4   A    Not -- not for an IVC filter, no.

10:20:51  5   Q    And when a manufacturer develops a clinical study for an

6   implantable device like an IVC filter, to what extent is FDA

7   involved in that process?

8   A    So FDA is often very much involved.  There's often a lot

9   of back and forth between FDA and the sponsor in developing

10:21:10 10   the study.

11   Q    And what are the sponsor, or in this case Bard's,

12   obligations regarding the study in regard to communicating

13   with FDA?

14   A    So the -- Bard has to submit an application that includes

10:21:24 15   all of the testing that shows the device is safe to be used in

16   human subjects.  And once FDA approves the IDE and the study

17   begins, the company also has to submit periodic reports to FDA

18   about the study progress.

19   Q    All right.

10:21:39 20           MR. ROGERS:  Can we pull up Exhibit 5340, please.

21           And, Your Honor, I believe this document is in

22   evidence.

23           THE COURT:  Yes.

24           MR. ROGERS:  May we display?

10:21:51 25           THE COURT:  Yes.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

BY MR. ROGERS:

Q   So, Dr. Tillman, for the benefit of the jury, can you tell us what this document is, please.

A   So I believe this is the traditional 510(k) submission to add the retrievable indications to the G2 filter.

Q   And when a manufacturer submits a 510(k) application to FDA, must it include the labeling or IFU that will accompany the product?

A   Yes, that is a required part of any 510(k) submission.

Q   And as part of FDA's review of the 510(k) application, does the FDA review the labeling or the content that's contained in the IFU?

A   Yes.  FDA most definitely reviews the labeling.

Q   And what is FDA's role in reviewing that labeling?

A   So FDA's role is to make sure that the labeling is consistent with guidance, if there is guidance, and to make sure that the labeling appropriately presents the risk information about the product.

Q   And if FDA believes the labeling or the IFU that the manufacturer submits is deficient, what can FDA do?

A   If FDA finds any deficiencies in the labeling or any other part of the submission, they will contact the submitter and ask them to make changes or express their concerns.

Q   And in your review of the 510(k) application for the G2 as a retrievable device, did Bard provide FDA the data regarding

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:23:22  1   complications that were seen in the EVEREST study?

2   A   Yes, they provided the full data about all of the

3   complications.

4   Q   And did Bard provide EVEREST -- excuse me.  Did Bard

10:23:33  5   provide to FDA the data from the EVEREST study that related to

6   reports of tilt and caudal migration?

7   A   Yes, they did.

8   Q   And did they also provide data regarding perforation that

9   was seen during that study?

10:23:45  10  A   Yes, they did.

11  Q   And did FDA ultimately clear the 510(k) application for

12  the G2 filter as a retrievable filter?

13  A   Yes, they did.

14  Q   All right.

10:23:57  15           MR. ROGERS:  You can take that down, please, Scott.

16  BY MR. ROGERS:

17  Q   All right.  Let's again move forward in time, Dr. Tillman,

18  and let's talk now about the G2X or the -- the G2 Express

19  filter.  Can you tell the jury what that filter did as far as

10:24:12  20  changing the design of the filter.

21  A   So the purpose of the G2X was to add -- to modify the hook

22  on the top of the filter to enable the filter to be retrieved

23  by a snare.  So it was a modification to change the way the

24  filter could be retrieved.

10:24:31  25  Q   And once that hook was added, what was the original name

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:24:34   1    that that filter was known by?

2    A    I'm not sure what you're referring to, I'm sorry.

3    Q    I'm sorry, I'm just trying to make clear that this -- this

4    filter with the hook on it at some point was known as both the

10:24:54   5    G2X and G2 Express.

6    A    Oh, I'm sorry.  Yes.  G2X and G2 Express are the same.

7    And I may refer to them interchangeably.

8    Q    Okay.  If we see a document with reference to G2 Express,

9    is that a G2X filter?

10:25:09   10   A    That is my understanding.

11   Q    Okay.  Thank you.

12        MR. ROGERS:  Can we pull up Exhibit 5373, please.

13   BY MR. ROGERS:

14   Q    And, Dr. Tillman, can you tell us what this is, please.

10:25:20   15   A    So this is the Special 510(k) submission that Bard

16   submitted to make that modification we just discussed.  So

17   this is the 510(k) for the G2 Express.

18        MR. ROGERS:  And, Your Honor, I do not believe this

19   is in evidence and I move it in, please.

10:25:36   20        MR. LOPEZ:  No objection, Your Honor.

21        THE COURT:  Admitted.

22      (Exhibit 5373 admitted.)

23        MR. ROGERS:  May we display?

24        THE COURT:  You may.

25

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:25:42  1    BY MR. ROGERS:

2    Q    Dr. Tillman, what we see here, is this the cover page for

3    the application to the FDA for 510(k) clearance for the G2

4    Express or G2X filter?

10:25:54  5    A    Yes, it is.

6    Q    What is the date of that document?

7    A    March 7th, 2008.

8    Q    And have you reviewed this application in its entirety?

9    A    Yes, I have.

10:26:04  10    Q    And did FDA have any questions or concerns about the

11    modification that was made in adding the hook to the filter?

12    A    I believe FDA had some questions about the

13    biocompatibility for the change in the design.

14    Q    And do you recall if FDA sent any correspondence to Bard?

10:26:26  15    A    Yes.  FDA sent a letter to Bard that asked for additional

16    information about the biocompatibility and Bard was then --

17    responded to that request.

18    Q    And what was the difference between the hook and the rest

19    of the device?

10:26:42  20    A    So the hook was actually electro -- mechanically

21    electropolished, and so FDA, when they looked at that change,

22    they said how did you determine that by electropolishing it

23    you didn't change the material properties and that that might

24    have affected whether that material was compatible with the

10:27:02  25    human tissue.  Biocompatibility.  So FDA asked Bard about

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:27:08  1    that.

2    Q   And did Bard respond to FDA?

3    A   Yes, they did.

4    Q   And was FDA ultimately satisfied with the response Bard

10:27:14  5    gave?

6    A   Yes, they were.

7    Q   Did FDA clear the G2X or G2 Express filter?

8    A   Yes, they did.

9    Q   All right.

10:27:24  10       And again, Dr. Tillman, let's continue to move

11   forward in history and talk about the Eclipse filter.

12       MR. ROGERS:  And can we pull up Exhibit 5272, please.

13   BY MR. ROGERS:

14   Q   Dr. Tillman, what is this document?

10:27:40  15   A   So this is the Special 510(k) that Bard submitted to the

16   FDA for the Eclipse filter.

17       MR. ROGERS:  And, Your Honor, I move this document

18   into evidence.

19       MR. LOPEZ:  No objection, Your Honor.

10:27:50  20       THE COURT:  Admitted.

21      (Exhibit 5272 admitted.)

22       MR. ROGERS:  May we display?

23       THE COURT:  You may.

24   BY MR. ROGERS:

10:27:55  25   Q   And first of all, just to orient us from a time

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

10:27:58   1   standpoint, what's the date of this document?

2   A   November 23rd, 2008.

3   Q   And --

4   A   2009.  2009.

10:28:07   5   Q   Thank you for that correction.

6           And above the date it says Special 510(k) submission.

7           Can you describe for the jury what is a Special

8   510(k).

9   A   So a Special 510(k) is a type of a 510(k) that a company

10:28:24   10   can submit if they've already got a regular 510(k).

11           So Bard already had a 510(k) that was cleared for the

12   G2X.  And if they make a modification to their own device and

13   they don't change the indications and they don't change the

14   fundamental scientific technology, they can submit a Special

10:28:43   15   510(k) where, instead of having to provide a detailed

16   explanation for substantial equivalence and providing all of

17   the test reports, instead, what they have to do is they have

18   to basically describe what are the new risks that this change

19   could cause?  How have we mitigated the risks?  And then they

10:29:04   20   have to summarize the testing, but they don't have to actually

21   provide the actual test reports.

22           And FDA reviews a Special 510(k) more quickly than a

23   traditional 510(k), and so that's why the program exists, to

24   allow incremental changes to be reviewed more quickly.

10:29:23   25   Q   And what was the technological difference between the G2X

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:29:26   1   filter and the Eclipse filter?

2   A    So on the G2X, if you recall, I mentioned that the hook

3   was electropolished.  For the Eclipse, all of the wire was

4   electropolished.

10:29:40   5           MR. ROGERS:  All right.  Can we go to page 35 of this

6   document, please.

7           And can we pull out that section says call Risk

8   Analysis?

9           THE COURT:  We'll deal with that after the break.

10:29:49  10   We'll break until 10:45.  We'll see you at that time.

11          (Recess taken from 10:30 to 10:47.  Proceedings resumed in

12   open court outside the presence of the jury.)

13          THE COURT:  Please be seated.

14          Counsel, you wanted to raise a matter before the jury

10:47:27  15   comes back in?

16          MR. LOPEZ:  Yes, Your Honor.  We looked at 6064,

17   which is the FDA -- the FDA letter that came in July 26, 2005,

18   while the Recovery was still on the market, and they redacted

19   without our agreement, "population have led to death."  They

10:47:58  20   took out "have led to death" out of that document.  Twice, I

21   think.  Isn't there a second spot here?

22          Then on page 4, "There have been reports of

23   complications" redacted, "including death, associated with the

24   use of the Recovery filter," et cetera.

10:48:23  25          Anyway, they took death out of both of these FOIA

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

10:48:27   1   documents.  Pretty significant redaction.

        2            THE COURT:  What are you requesting?

        3            MR. LOPEZ:  I'd like you to have this testimony and

        4   these documents stricken from the record because --

10:48:40   5            THE COURT:  What testimony stricken?

        6            MR. LOPEZ:  The testimony about these two documents,

        7   6064 and 6061.  Another redaction in 6061.

        8            THE COURT:  We admitted them subject to your

        9   reviewing the redactions.  Are you saying you don't want them

10:48:55  10   unredacted, you want everything stricken?

       11            MR. LOPEZ:  No, I'd like them unredacted.

       12            THE COURT:  All right, is that your request, then?

       13   That's different than striking them from the record.

       14            MR. LOPEZ:  Yes, unredacted.

10:49:05  15            THE COURT:  Okay.

       16            Response?

       17            MR. ROGERS:  Your Honor, it's my understanding those

       18   were the redactions that were agreed to in the Jones case.

       19   And it was also my understanding that as a starting point for

10:49:15  20   this trial we were going to use the documents as they were

       21   ultimately redacted in the Jones case so that we would not

       22   have this last-minute problem that we ran into with the Jones

       23   trial where we were trying to get all the things redacted so

       24   they could go to the jury room.

10:49:31  25            And so the documents I'm using have got the Jones

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:49:34  1    redactions.

2         And I'll also point out very briefly yesterday

3    Mr. O'Connor was examining Mr. Carr -- or when I was putting

4    in documents with Mr. Carr and Ms. O'Quinn he kept saying

10:49:47  5    "subject to redactions."  I mean, they wanted these redactions

6    in the documents.  So I think we've got an inconsistent

7    position over here and I think, frankly, it doesn't make any

8    sense not to start with the redactions from the Jones case.

9         THE COURT:  Well, were those redactions in the Jones

10:50:03 10    case, Mr. Lopez?

11         MR. LOPEZ:  I don't know.

12         THE COURT:  Well, you should know.  What does your

13    side say?  You agreed to all of that in the Jones case.

14         MR. LOPEZ:  I don't know what happened in the Jones

10:50:11 15    case.  All I know is this is the Hyde case.

16         THE COURT:  Well, but did the parties have an

17    agreement that the documents would be subject to the same

18    redactions in the Jones case as a starting point?

19         MS. SMITH:  I think what happened in these documents

10:50:25 20    is these exceed the scope of what the actual redactions were

21    supposed to be in the Jones case.

22         THE COURT:  Were they redacted in the Jones case?

23         MS. SMITH:  I don't know --

24         THE COURT:  Well, figure that out and then we'll talk

10:50:36 25    about the issue.

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

10:50:37  1          Counsel, you've got to be on top of this stuff.  The

       2   "I don't know what happened in the Jones case" isn't helpful

       3   at all to my resolving these issues.

       4          MR. LOPEZ:  Well, Your Honor, when I get notice of

10:50:46  5   documents that they're going to use, I go to the document.  I

       6   don't go to the Jones document, I go to the document --

       7          THE COURT:  But if you've agreed that you're going to

       8   start with redactions in the Jones case --

       9          MR. LOPEZ:  I never agreed with that.  That's never

10:51:00 10   been an agreement ever.

      11          THE COURT:  You said they agreed to that, Mr. Rogers.

      12          MR. ROGERS:  Your Honor, that was my understanding.

      13   Ms. Helm may know more about that than I do.

      14          THE COURT:  Tell me what you think the agreement is.

10:51:10 15          MS. HELM:  Your Honor, we addressed it in the

      16   pretrial order and we proposed it, and the list of the -- the

      17   exhibits that have been exchanged on an ongoing basis

      18   throughout the course of the litigation, we've always been

      19   sending them the redacted version as it was admitted in Jones.

10:51:27 20          THE COURT:  And what did you say in the pretrial

      21   order about it?

      22          MS. HELM:  We said -- I've lost my -- I'm sorry.  Oh.

      23   I'm sorry, Your Honor.  In the pretrial order we limited it to

      24   the Recovery migrations deaths.  It's on page 69 on page 3.

10:51:44 25   I'm sorry.  Page 69, paragraph 3, line 10.  Our proposal was

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:51:52   1   limited to Recovery migration deaths.

2          But the exchange going back has been the redacted

3   documents and the documents that we've been operating on based

4   on their insistence of the redactions have been those admitted

10:52:07   5   in Jones.

6          THE COURT:  All right.  Well --

7          MS. SMITH:  Can I clarify something --

8          MR. LOPEZ:  We have one more --

9          THE COURT:  Let's get to the heart of this.  We have

10:52:14  10   the jury waiting.

11         Whatever is your reasons for suggesting we should not

12   redact those portions of this document?

13         MR. LOPEZ:  Well, I mean, it deals with her testimony

14   that FDA was well informed about what was -- from the company

10:52:30  15   about what was going on with the Recovery device when in fact

16   they were not.  I can't cross-examine now on that issue

17   because the most important thing that FDA probably would have

18   wanted to know about were the number of times Recovery filter

19   was causing deaths.

10:52:45  20         THE COURT:  Well, but -- I'm not understanding that.

21   This is an FDA document where FDA is referring to the deaths.

22   So that doesn't support your argument that the FDA didn't know

23   about the deaths.

24         MR. LOPEZ:  Well, I know, but how -- it says "Adverse

10:53:01  25   events in this patient population have led to death."  What

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

10:53:05   1    the does that mean?  How much did the FDA really know about

2    the Recovery filter as it's contemplating the G2 filter?

3         THE COURT:  Well, Mr. Lopez, my understanding is you

4    want the jury to see that the FDA made reference to death in

10:53:25   5    this document.  That's why you want it unredacted.  Correct?

6         MR. LOPEZ:  Yes.  But then I want to be able to

7    cross-examine someone with it, too, with that issue in it.

8         THE COURT:  Sounds like you want to open a door and

9    walk through it.

10:53:44   10        MR. LOPEZ:  Well, you know, I mean, I can't.  I don't

11   have time to do it --

12        THE COURT:  So what do we do?  I'm getting

13   inconsistent signals --

14        MR. LOPEZ:  They used a document on her direct

10:53:54   15   examination that was not agreed to.  Two documents.  This one,

16   I have no idea they redacted "The sponsor states the filter's

17   implantation and removal stimulates worse case conditions for

18   evaluation of the vessel grossly and histopathologically."

19   What does that have to do with deaths?  I mean, that's also a

10:54:13   20   very significant redaction.

21        I'd like them stricken from the record and her

22   testimony about them stricken.

23        THE COURT:  Okay, that's the relief you're

24   requesting?

10:54:22   25        MR. LOPEZ:  I'm sorry?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

10:54:22  1          THE COURT:  That's the relief you're requesting?

2          MR. LOPEZ:  Yes, Your Honor.

3          THE COURT:  Okay.

4          Your response?

10:54:25  5          MR. ROGERS:  Your Honor, I would need to confirm the

6   transcript.  I don't believe I asked this witness one question

7   about the Recovery filter other than to say it was the

8   predicate device for the G2.

9          I did not go over any safety issues with her with the

10:54:40  10  Recovery filter.  Did not go over the regulatory history with

11  the Recovery filter.  And I just cannot understand how this is

12  some door-opening situation.

13         THE COURT:  And what is the reason for the second

14  redaction that Mr. Lopez read?

10:54:55  15         MR. ROGERS:  This is not -- I don't know this for

16  sure, but I have what I think is a solid guess.  When we were

17  admitting the documents --

18         THE COURT:  Solid guess.

19         MR. ROGERS:  I'm sorry, Your Honor.

10:55:05  20         THE COURT:  I'll remember that phrase.

21         MR. ROGERS:  When we were going through the redaction

22  process with the Jones documents, Plaintiffs' counsel was very

23  insistent that they wanted to remove all hearsay within

24  hearsay in the FDA record.  And I will bet a lot of money that

10:55:21  25  that statement that says "the sponsor states," et cetera, was

10:55:25 redacted because they insisted on it coming out because it was hearsay within hearsay.

So these are redactions that were agreed to in Jones and I just don't understand why we're talking about this.

10:55:35 THE COURT: All right.

Well, on the question of whether these will be stricken from the record, what I want is confirmation that these were redactions made in the Jones case. So look at the Jones exhibits.

10:55:51 If they were redactions made in the Jones case, it would have been by agreement of the parties because I didn't dictate redactions in any of the documents.

If parties agreed to these redactions in the Jones case I'm not going to strike the document from the record 10:56:07 because they included the same redactions as the Jones case. I don't see a basis for doing that. So I'm going to deny the request to strike the documents from the record if these redactions were in the Jones case. Sounds like you need to do some work to confirm that. Do that and let me know when you 10:56:24 get to it.

While we were on break we got a note from Juror Number 6. I'll read it to you. It says, "Please help me understand," quote, "housekeeping," close quote "that results in evidence being admitted that has not been discussed in the 10:56:39 course of the trial. At least not obviously to me. Thank

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

10:56:43  1    you."

2         I think this must be a reference to you this morning,

3    Mr. O'Connor, saying we have a housekeeping matter we want to

4    move into evidence that one exhibit.  And the juror is not

10:56:58  5    understanding why that's happening when it wasn't discussed

6    with a witness.

7         That's seems to me to be the intent of the note.

8         MR. O'CONNOR:  That was an exhibit, and perhaps it

9    can be clarified, from the Jason Greer deposition.  It should

10:57:17  10   have come in but it didn't.  And I'll let Ms. Zaic --

11        MS. REED ZAIC:  It wasn't on the summary we normally

12   read prior to --

13        THE COURT:  For Greer?

14        MS. REED ZAIC:  It was for Greer.  And it was

10:57:28  15   discussed, but it wasn't on the list and erroneously we did

16   not move it in at the time --

17        THE COURT:  What I would suggest is I just explain

18   that at the time the jury comes in, that it was Greer document

19   that didn't come into evidence, as a housekeeping matter we

10:57:40  20   got it into evidence.

21        We'll do a better job in the future of explaining

22   what a document is when we're doing that.  Is that fair?

23        MR. ROGERS:  Yes, Your Honor.

24        MR. O'CONNOR:  Yes, Your Honor.

10:57:50  25        THE COURT:  Okay.  Let's get the jury back in.

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

10:57:54   1    (The jury entered the courtroom at 10:58.)

2         THE COURT:  Thank you.  Please be seated.

3         Thanks for your patience, ladies and gentlemen.  We

4    had a legal issue to work through, and rather than have you

10:58:56   5    sit in here while we did it at sidebar, we just took care of

6    it before you returned.

7         Also, I received a note from Juror Number 6 asking

8    about a housekeeping matter that results in evidence being

9    admitted that wasn't discussed.

10:59:12  10         I assume that was a reference to the statement this

11   morning, as a housekeeping matter we want to admit an exhibit

12   and I admitted it and nothing more was said.  Or yesterday

13   we'd done that.

14         The one that came in this morning was an exhibit that

10:59:25  15   should have been moved into evidence in the Jason Greer video

16   excerpt and it just was omitted from the list.  So the

17   housekeeping matter was to formally get it into evidence.  But

18   that document that came in this morning was related to the

19   Jason Greer deposition.

10:59:46  20         When we do this in the future, we'll do a better job

21   of saying where it's coming from so it just isn't a number out

22   of space like I allowed this morning.

23         Okay.  Mr. Rogers, you may proceed.

24         MR. ROGERS:  Thank you, Your Honor.

10:59:59  25         Scott, can you pull back up Exhibit 5272, please.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:00:03   1   BY MR. ROGERS:

2   Q   And, Dr. Tillman, since we've had our break, I do want to

3   just ask you briefly, so the document we were looking at was

4   what?

11:00:11   5   A   So this is the Special 510(k) for the Eclipse filter.

6   Q   All right.

7          MR. ROGERS:  Would you mind pulling out the Risk

8   Analysis section, please.

9          Maybe we display, Your Honor?

11:00:24  10          THE COURT:  Yes.

11   BY MR. ROGERS:

12   Q   Okay.  So, Dr. Tillman, can you tell us, if you would,

13   what this information is that is contained in the 510(k)

14   application that is being conveyed to FDA.

11:00:39  15   A   So as I mentioned, when you make a modification to a

16   device, you have to consider how that change impacts the risk

17   of the device.  So what this says is that Bard conducted a

18   type of a risk analysis called a design failure modes and

19   effects analysis in order to evaluate the risks associated

11:01:01  20   with the change that they made.

21          And so they've identified what the risks were and

22   then, based on what those risks were, they identified how they

23   were going to mitigate them and what verification and

24   validation activities they were going to do.  So how they were

11:01:15  25   going to test the device to show that the risks had been

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:01:19  1   mitigated.

2   Q   And did Bard show FDA that information how it was testing

3   the device?

4   A   Yes.  There was a summary of the testing that was done to

11:01:28  5   mitigate the risks.

6   Q   In your opinion, was the presentation of the information

7   that was contained in the Special 510(k) for the Eclipse

8   consistent with what FDA would want to see for a Special

9   510(k)?

11:01:41  10  A   Yes.  The information is consistent with how Special

11  510(k)s are put together.

12  Q   Okay.

13           MR. ROGERS:  Can you take that down and pull up

14  Exhibit 5588, please.

11:01:53  15           And, Your Honor, I move this into evidence.

16           MR. LOPEZ:  No objection, Your Honor.

17           THE COURT:  Admitted.

18       (Exhibit 5588 admitted.)

19           MR. ROGERS:  May we display?

11:02:09  20           THE COURT:  You may.

21  BY MR. ROGERS:

22  Q   So, Dr. Tillman, again, just to orient us, can you see the

23  document there on your screen?

24  A   Yes, I do.

11:02:14  25  Q   And is this a letter that FDA wrote to Bard in response to

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:02:18  1   the 510(k) application for the Eclipse?

2   A   Yes.   This is what we call an additional information

3   request.

4            MR. ROGERS:   Scott, would you mind pulling out the

11:02:28  5   second paragraph, please.

6   BY MR. ROGERS:

7   Q   So, Dr. Tillman, what is FDA asking of Bard in this

8   particular paragraph?

9   A   So FDA is saying that they have recognized that Bard has

11:02:41  10   conducted corrosion testing, cyclic fatigue testing, and arm

11   fatigue testing, but that FDA says that electropolishing the

12   device may affect their strength and that Bard needs to do

13   radial force testing, migration and clot testing, and filter

14   tensile strength testing.

11:03:01  15            MR. ROGERS:   Okay.   Can you take that down and pull

16   up Exhibit 5486.

17   BY MR. ROGERS:

18   Q   And, Dr. Tillman, have you reviewed this document?

19   A   Yes, I have.

11:03:11  20   Q   Is this the responses that Bard gave to FDA to their

21   questions about the Eclipse filter?

22   A   Yes, it is.

23            MR. ROGERS:   Your Honor, I move this into evidence.

24            MR. LOPEZ:   No objection, Your Honor.

11:03:21  25            THE COURT:   Admitted.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:03:22  1   (Exhibit 5486 admitted.)

2          MR. ROGERS:  May we display?

3          THE COURT:  You may.

4          MR. ROGERS:  And if you would, Scott, can you turn to

11:03:28  5   page 7 of that document, please.

6   BY MR. ROGERS:

7   Q   And so, Dr. Tillman, in your review of this, did Bard

8   respond to FDA specifically about the testing that it was

9   asking about?

11:03:42 10  A   Yes, they did.

11  Q   And if we looked there at the bottom of the --

12          MR. ROGERS:  Yeah.  Thank you, Scott.  At the bottom

13  of the page there.

14  BY MR. ROGERS:

11:03:52 15  Q   Did FDA report the results of the testing that FDA was

16  requesting?

17  A   Yes.  So Bard reported the results of the testing for the

18  radial force testing in this paragraph.

19          MR. ROGERS:  And can we go to the second page,

11:04:05 20  please.  Or the next page.

21  BY MR. ROGERS:

22  Q   And did Bard also report the results of the migration/clot

23  trapping testing?

24  A   Yes, they did.

11:04:13 25  Q   And if we go to the next page, did Bard also report the

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:04:19  1   filter tensile strength testing to FDA?

2   A    Yes, they did.

3   Q    After Bard submitted these responses to the FDA's specific

4   questions, did FDA ask Bard for any additional testing?

11:04:33  5   A    No, they did not.

6   Q    And did FDA ask any additional questions of Bard regarding

7   the content of the IFU?

8   A    No, I do not believe that they did, no.

9   Q    And did the FDA ultimately clear the Eclipse filter?

11:04:49  10  A    Yes, they did.

11  Q    And if FDA had been concerned about potential of fracture

12  with the Eclipse filter, would Bard have cleared the device?

13  A    So FDA would not have cleared the device if they were

14  concern about potentials for fracture.

11:05:06  15  Q    And, Dr. Tillman, are you aware of an additional 510(k)

16  application that got submitted by Bard to FDA for the Eclipse

17  filter?

18  A    Yes, I am.

19              MR. ROGERS:  And can we pull up Exhibit 5586, please.

11:05:21  20             And, Your Honor, I move this into evidence.

21              MR. LOPEZ:  No objection, Your Honor.

22              THE COURT:  Admitted.

23            (Exhibit 5586 admitted.)

24              MR. ROGERS:  May we display?

11:05:31  25             THE COURT:  You may.

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

11:05:31  1   BY MR. ROGERS:

2   Q   Dr. Tillman, can you tell the jury what this is?

3   A   Yes.  So this is another Special 510(k) submission and the

4   purpose of this one was to add a patient brochure and an

11:05:42  5   implant card that Bard had developed in order to provided

6   additional information for patients.

7   Q   And in your opinion as a regulatory professional, was Bard

8   required to submit a 510(k) application for the patient

9   brochure and implant card?

11:05:59  10  A   No.  It's my opinion that they actually did not need to

11  submit a 510(k) for this change.

12  Q   And so if they were not required to do that, what would be

13  the reason why that would occur?

14  A   So it's my understanding that the only reason to do this

11:06:15  15  would be to obtain FDA's feedback on the information and make

16  sure FDA was comfortable with the information.

17  Q   All right.

18        MR. ROGERS:  Let's go to page 78 and 80 of that,

19  please.  And can you put them both up, Scott?  And if you

11:06:37  20  can't, don't worry about -- oh.  Okay.  Great.  Thank you.

21  BY MR. ROGERS:

22  Q   So, Dr. Tillman, what do we see there on -- we've got them

23  sort of in backwards order.  That's okay, we'll go that way.

24  On the left-hand part of the screen, what is that that we see

11:06:52  25  there?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:06:53   1   A    That is an implant card that is often developed for

2   devices that are permanent implants and it's given to patients

3   and they carry it around in their wallet so that they can let

4   people know what devices they have.

11:07:06   5   Q    And is that something that was part of this submission to

6   the FDA for the Eclipse filter brochure and implant card?

7   A    Yes, it was.

8   Q    Okay.

9           MR. ROGERS:  And can you take down the left-hand

11:07:18  10   screen, please.

11   BY MR. ROGERS:

12   Q    And then, Dr. Tillman, what are we seeing here?

13   A    So this is, I believe, the patient brochure that Bard

14   developed for the Eclipse filter.

11:07:32  15   Q    Did FDA ultimately clear this patient brochure?

16   A    Yes.  So this brochure was submitted in the Special 510(k)

17   which FDA cleared.

18   Q    To your knowledge, was there any questions FDA had about

19   this patient brochure?

11:07:47  20   A    I believe that there was one question and that Bard made

21   the change that FDA requested and then FDA cleared the 510(k)

22   submission.

23   Q    Okay.  Thank you.

24           MR. ROGERS:  Scott, you can take that down.

25

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:07:59    1    BY MR. ROGERS:

2    Q    Dr. Tillman, let's talk a little bit about IFUs.  And

3    specifically I want to ask you about the IFU's that accompany

4    the G2X filter and the Eclipse filter.  And based on your

11:08:18    5    experience as a regulatory professional, do you have an

6    opinion as to whether or not Bard provided to doctors in those

7    two IFUs appropriate information about their products?

8    A    Yes.  It's my opinion that the IFUs include risk

9    information that was consistent with FDA's guidance document

11:08:40   10    and also consistent with sort of current industry practice for

11    IFUs for these kinds of devices.

12    Q    If FDA had wanted changes in the language or additional

13    information included in those IFUs, could FDA have asked for

14    that?

11:08:54   15    A    Yes, they could, and they certainly did throughout the

16    sort of history of these filter submissions.  We've seen

17    several instances where FDA has asked for changes to the

18    filter labeling.

19    Q    All right.  And continuing on in this, I guess line of

11:09:10   20    questioning about IFU's, would it be, in your opinion as a

21    regulatory professional, appropriate for a manufacturer like

22    Bard to provide information in an IFU that would compare its

23    rates of complications with another manufacturer's rates of

24    complications?

11:09:28   25    A    So in my opinion the only time it would be appropriate to

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

11:09:32  1  do that would be if you had done actually a clinical study

2  where you had -- you had done a study where you had studied

3  both devices and you were comparing those rates.  I do not

4  believe it would be appropriate to include that kind of rate

11:09:46  5  information based on, for example, the publicly available MDR

6  adverse event data.

7  Q    Okay.  And jury has heard from time to time during this

8  trial the MAUDE database.  Can you tell us what MAUDE stands

9  for?

11:10:00  10  A    So the MAUDE database is the database that is publicly

11  available that includes adverse events that are reported to

12  FDA by healthcare facilities and by manufacturers for medical

13  devices.  So it's basically the database of adverse events.

14  Q    All right.

11:10:18  15          MR. ROGERS:  And can we pull up Exhibit 7795, please.

16          And, Your Honor, I would move this into evidence,

17  please.

18          MR. LOPEZ:  Can you -- can I ask counsel to just

19  describe it.  I can't really read it.  If he tells me what I

11:10:56  20  think is, I'm not going to object to it.

21          THE COURT:  Why don't you have the witness say what

22  it is.

23          MR. ROGERS:  Sure.  I'll be glad to.

24  BY MR. ROGERS:

11:11:02  25  Q    Dr. Tillman, do you recognize what is on the screen?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:11:04  1    A    Yes, I do.

2    Q    Can you tell us what that is, please.

3    A    Yes.  So as I mentioned, the MAUDE database is actually

4    searchable.  So there's actually a website where you can go

11:11:14  5    and you can type in search terms and you can search FDA's

6    database for information about adverse events.

7         And so what we're looking at right now is a -- is a

8    screen shot showing what you would see if you were using sort

9    of an old browser, it looks like.  The formatting is a little

11:11:35  10   bizarre.  But what you would see if you went to FDA's website

11   and you were to actually go to search the MAUDE database.

12   Q    Thank you, Doctor.  This isn't the version I was looking

13   for either, but it's what I got.

14        MR. ROGERS:  Your Honor, I move this into evidence.

11:11:47  15        MR. LOPEZ:  My only objection is this is not a

16   document that is on her reliance list or included in her

17   report.

18        THE COURT:  Is this in her report, Mr.--

19        MR. ROGERS:  Yes, it is, Your Honor.  And if you go

11:11:59  20   to page 86 of the report, above number 2.

21        THE COURT:  Did you say above number 2?

22        MR. ROGERS:  I did, Your Honor.

23        THE COURT:  You mean the paragraph above --

24        MR. ROGERS:  I'm sorry.  The paragraph that is

11:12:23  25   numbered number 2, which is at the bottom of the page, and the

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

11:12:27  1  sentence just above that.

2       THE COURT:  Well, that's not a discussion of this

3  exhibit; right?  It may have a sentence from it, but it's not

4  a discussion of the exhibit generally.

11:12:44  5       MR. ROGERS:  All right, Your Honor.  May I pull out

6  that one sentence?

7       THE COURT:  Well, I mean, there's no objection, I

8  assume, based on the report, to her recounting what's in that

9  sentence in her report; is that right, Mr. Lopez?

11:12:57  10      MR. LOPEZ:  Yeah, the sentence in her report's fine.

11  My only concern is this is a 2018 web shot.

12      THE COURT:  All right.  So the objection is sustained

13  with the exception of the sentence quoted in her report.

14      MR. ROGERS:  Thank you.

11:13:08  15      Scott, if you would -- excuse me.  Can you pull out

16  the sentence that reads -- starts "MDR data alone."

17  BY MR. ROGERS:

18  Q   All right.  Dr. Tillman, what does the FDA state on this

19  website in this sentence, please?

11:13:32  20  A   FDA states that "MDR data alone cannot be used to

21  establish rates of events, evaluate a change in event rates

22  over time" --

23      MR. LOPEZ:  I'm sorry, Your Honor, this is going

24  beyond what is in her report.  I ask it be taken -- it's not

11:13:46  25  shown.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:13:47  1      THE COURT:  It's not being shown.

2      MR. LOPEZ:  There's a sentence -- it stops at

3  "between devices."

4      THE COURT:  That's what she was just reading.

11:13:55  5      MR. LOPEZ:  I know, but if you look at the screen, it

6  goes beyond that.

7      THE COURT:  So it's the first sentence.

8  BY MR. ROGERS:

9  Q   Dr. Tillman, would you mind reading the first sentence,

11:14:05  10  please.

11  A   "MDR data alone cannot be use to establish rates of

12  events, evaluate a change in event rates over time, or compare

13  event rates between devices."

14  Q   Thank you.

11:14:16  15      MR. ROGERS:  You can take that down, please.

16  BY MR. ROGERS:

17  Q   As part of your review of materials in this case, did you

18  look at IFUs for other IVC filter manufacturers?

19  A   Yes, I did.

11:14:29  20      MR. ROGERS:  Can we pull up Exhibit 7787, please.

21      And can you go to the next page, please, Scott.

22      And next page.

23      Next page.

24  BY MR. ROGERS:

11:14:43  25  Q   Okay.  So, Dr. Tillman, can you describe for the record

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:14:45  1    what this document is.

2              MR. LOPEZ:  Your Honor, disclosure in the report.

3              MR. ROGERS:  Your Honor, it's discussed on page 79.

4    Or it's listed on page 79 of her report.

11:14:55  5            THE COURT:  All right.  Where's the discussion of it

6    in the report?

7              MR. ROGERS:  The document is identified on page 79,

8    and then there is a discussion about other manufacturers'

9    IFU's on page 84 of the report.

11:15:24 10            THE COURT:  And where is the document identified on

11   page 79?

12             MR. ROGERS:  Do you see the table there?

13             THE COURT:  I do.

14             MR. ROGERS:  It is the second one -- actually, the

11:15:33 15   first entry under the table.

16             THE COURT:  Instructions for use?

17             MR. ROGERS:  Yes, Your Honor.

18             THE COURT:  Okay.  Then the discussion is on page 84?

19             MR. ROGERS:  Yes, Your Honor.  The first sentence.

11:16:00 20            THE COURT:  I think you can ask her questions that

21   elicit the sentence statement at the top of page 84, but that

22   seems to be as far as she goes in the discussion.

23             MR. ROGERS:  Your Honor, I would like to move this

24   into evidence.

11:16:17 25            THE COURT:  Objection?

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:16:18   1          MR. LOPEZ:  Yes, Your Honor.

2          THE COURT:  Based on?

3          MR. LOPEZ:  Hearsay and not -- also not relevant to

4    this case and it's not included, any part of this other than

11:16:27   5    what he just stated, included in her report.

6          THE COURT:  What is the response on hearsay?

7          MR. ROGERS:  Your Honor, I'm not moving it in for

8    truth of the matter but to offer evidence of industry

9    standards.

11:16:40  10          THE COURT:  What's your response on that, Mr. Lopez?

11          MR. LOPEZ:  Well, only to the extent what is included

12    in her report.  I mean, he wants to get in the entire document

13    when that is not something that is included.

14          THE COURT:  Well, but the exhibit isn't subject to a

11:16:52  15    report limitation.  Exhibits can be admitted if they're

16    relevant.  What can she say about it is limited to her report.

17    So the fact -- so that isn't an objection to the

18    admissibility.  What I heard you object on was hearsay and

19    relevancy.

11:17:08  20          MR. LOPEZ:  Yes, Your Honor.

21          THE COURT:  Are there other objections?

22          MR. LOPEZ:  No, Your Honor.

23          THE COURT:  All right.  I think it's relevant and I'm

24    going to admit it with an instruction to the jury, which is

11:17:17  25    Exhibit 7787 is not being admitted for the truth of anything

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:17:22  1   stated in the document.  It's not being admitted to prove

2   what's in the document.  Only as an example of what was in

3   documents like this in the industry.  That's the only basis

4   upon which it is being admitted.

11:17:36  5        And with that instruction I will admit 7787.

6        (Exhibit 7787 admitted.)

7        MR. ROGERS:  May we display?

8        THE COURT:  You may.

9        MR. ROGERS:  Scott, would you mind going back to page

11:17:47 10  1.

11  BY MR. ROGERS:

12  Q   Dr. Tillman, again for the benefit of the jury can you

13  describe what this document is?

14  A   Yes.  This is the instructions for use or the IFU for the

11:17:56 15  Cordis OptEase vena cava filter.

16  Q   And did you review this as part of your work in this case?

17  A   Yes, I did.

18  Q   And Dr. Tillman, are you aware of any medical device that

19  includes adverse event data based on post-marketing

11:18:12 20  information such as the MAUDE database in its IFU?

21  A   No, I'm not aware of any device that includes that

22  information in its IFU.

23  Q   And would that be consistent with this IFU that is on the

24  screen?

11:18:24 25  A   Yes, it would be.

DIRECT EXAMINATION – DONNA-BEA TILLMAN, Ph.D

11:18:26  1    MR. ROGERS:  All right.  Thank you, Scott.  You can

2    take that down.

3    And can you pull up Exhibit 7787.  I'm sorry, excuse

4    me.  7771.

11:18:38  5    BY MR. ROGERS:

6    Q   And Dr. Tillman, can you identify this document?

7    A   Yes.  This is the IFU for another vena cava filter, the B.

8    Braun VenaTech.

9    Q   And did you review this document in the course of your

11:18:53  10   work in this case?

11   A   Yes, I did.

12   MR. ROGERS:  Your Honor, I move this into evidence.

13   MR. LOPEZ:  No objection, Your Honor.

14   THE COURT:  Admitted.

09:25:03  15   (Exhibit 7771 admitted.)

16   BY MR. ROGERS:

17   Q   So, Dr. Tillman, if you would, explain again for the jury

18   what we're seeing.

19   I don't think I asked to display.  May I display,

11:19:14  20   Your Honor?

21   THE COURT:  You may.

22   MR. ROGERS:  Thank you.

23   THE WITNESS:  So once again, this is the IFU for the

24   B. Braun VenaTech IVC filter.

25

DIRECT EXAMINATION - DONNA-BEA TILLMAN, Ph.D

11:19:24   1   BY MR. ROGERS:

2   Q   And as part of this, your work, did you review what this

3   particular IFU includes regarding complications that they warn

4   of?

11:19:33   5   A   Yes, I did.

6   Q   And did you see anything in this IFU that would indicate

7   that this particular IFU provides information that would

8   provide any sort of comparative analysis of the complications

9   with this filter to any other filter based on MAUDE data?

11:19:50   10   A   No.  I did not see that there was any evidence of that

11   information being included in this IFU.

12   Q   Okay.  Thank you.

13        MR. ROGERS:  You can pull that down, Scott.

14   BY MR. ROGERS:

11:20:00   15   Q   And, Dr. Tillman, just to wrap up, in your opinion as an

16   expert in FDA regulatory affairs, did the G2X and Eclipse IFUs

17   contain risk information that were consistent with industry

18   standards that existed at the time?

19   A   Yes, they did.

11:20:21   20   Q   And in submitting 510(k) applications to the FDA and

21   responding to FDA's questions, did you see any occasion where

22   you believed, in your opinion, Bard had not appropriately

23   disclose information to the FDA as part of the 510(k) process?

24   A   I did not see any evidence of that, no.

11:20:39   25   Q   And are all of the opinions you've offered here today,

CROSS-EXAMINATION - DONNA-BEA TILLMAN

11:20:41  1    have they all been given to a reasonable degree of certainty

2    as an expert in the field of regulatory affairs?

3    A    Yes, they have.

4         MR. ROGERS:  Thank you, Dr. Tillman, I don't have any

11:20:52  5    further questions at this time.

6         THE COURT:  Cross-examination.

7              C R O S S - E X A M I N A T I O N

8    BY MR. LOPEZ:

9    Q    Morning, Dr. Tillman?

11:21:10 10   A    Morning.

11   Q    How are you?

12   A    I'm fine, thank you.

13   Q    Okay.  As part of your charge in this case as an expert,

14   were you asked to look at the risk -- any risk analysis that

11:21:27 15   was done by Bard in comparing the safety and performance of

16   any of the Bard devices to the Simon Nitinol filter or any of

17   its competitive devices?

18   A    As I sit here today, I'm not sure.  I saw a risk analysis

19   that directly -- what I would call a risk analysis that made

11:21:49 20   that comparison.

21   Q    And Dr. Asch -- you know who Dr. Asch is; right?

22   A    Yes, I do.

23   Q    And you were not provided, as part of your doing your

24   report in this case and rendering an opinion, you were not

11:22:05 25   provided with Dr. Asch's 2016 deposition that was played in

CROSS-EXAMINATION – DONNA-BEA TILLMAN

11:22:09  1    this trial; true?

       2    A    I don't believe I requested to be -- to review that

       3    deposition, no.

       4    Q    Well, what happened, you had discussions with counsel

11:22:20  5    about the fact there was a 2016 deposition and you asked, is

       6    there really any reason for me to read his deposition, and

       7    they told you there was no reason for you to read that

       8    deposition; true?

       9         MR. ROGERS:  Objection, Your Honor.  Statement

11:22:31 10    contains hearsay and it's also 403.

      11         THE COURT:  Sustained on hearsay grounds.

      12         MR. LOPEZ:  Okay.

      13    BY MR. LOPEZ:

      14    Q    You did ask about that deposition; true?

11:22:51 15    A    I'm not sure what you mean when you say I asked about the

      16    deposition --

      17    Q    Well, let me put it this way.  You discussed earlier that

      18    you had conversation with the defense counsel about what you

      19    should look at and what you shouldn't look at, and one of the

11:23:04 20    things they told you didn't need to look at was the 2016

      21    deposition of Dr. Asch; true?

      22    A    So I wouldn't characterize it as them saying I didn't need

      23    to look at it.

      24         MR. LOPEZ:  Can I have the deposition, 2017

11:23:20 25    deposition, page 62, please.  Line 9.

CROSS-EXAMINATION – DONNA-BEA TILLMAN

BY MR. LOPEZ:

Q   Do you remember your deposition was taken just about a year ago?

A   Yes, I remember this deposition.

Q   The question was, "And the same would hold true for Dr. Murray Asch.  You read Dr. Asch's deposition that was taken in January of 2011, but you knew there was a deposition taken in 2016; right?"

"Answer:  I would have seen it on the list."

"Question:  And you had discussions with counsel about the fact that there was a 2016 deposition and you asked, 'Is there really any reason for me to read his 2016 deposition?'And they said no.  Is that essentially what happened?"

"Answer:  Essentially.  It may not have been those exact words, but, yes."

Did I read that testimony correctly?

A   Yes, I believe that's correct.

Q   Okay.  Now, there's never been a determination by FDA that any of the Bard filters is safe and effective; true?

A   That is correct.

Q   And would you agree that federal regulations require all information in a 510(k) be truthful, accurate, and no material fact to be omitted; correct?

A   That is correct.

CROSS-EXAMINATION - DONNA-BEA TILLMAN

11:24:41  1   Q   Part of your charge was not to perform an audit of Bard's

2   internal documents see if there was important material

3   information that they withheld from FDA; true?

4   A   That is correct.

11:24:57  5   Q   So you can only form your opinions based on the

6   information that you provided that were -- that was provided

7   to you by the lawyers; true?

8   A   And the information that I obtained through publicly

9   available sources.  Yes.

11:25:11  10  Q   Would you agree that companies have a responsibility to

11  make their products continue to be safe and effective

12  independent of any FDA action or inaction?

13  A   I think that companies -- yes, I would agree companies

14  need to make sure their products are safe and effective as

11:25:25  15  they can be.

16  Q   And you also agree that the overall study objective of

17  EVEREST was the safety of removal of the filter; true?

18  A   And also evaluation of adverse events.  Yes.

19  Q   And it was not intended to look at the long-term impact of

11:25:43  20  permanent implantation of the G2 filter; true?

21  A   I believe that's correct.

22  Q   And I think you previously testified that the Asch pilot

23  study was also not intended to look at long-term impact of the

24  permanent implantation of the Recovery filter; true?

11:25:58  25  A   Yes.  The Asch study was intended to look at the

CROSS-EXAMINATION – DONNA-BEA TILLMAN

11:26:03   1   retrievability of the Recovery filter.

2   Q    What was the clinical experience in the open market prior

3   to the EVEREST study completion?  Do you know?

4   A    I don't know what you're asking.

11:26:14   5   Q    Well, I want to know whether or not before the EVEREST

6   study was completed whether Bard provided you with any

7   clinical information about how the G2 device was actually

8   performing in the open market.  Did they provide you with

9   that?

11:26:29  10   A    So before the EVEREST study was completed the G2 filter

11   was only cleared for use as a permanent filter.  And so are

12   you asking me whether I was aware of what the adverse event

13   data were associated with the G2?

14   Q    No.  Any of the clinical performance of the device.

11:26:47  15   Whether -- what type of things were being reported about some

16   of the complications and risks and seriousness of some of

17   those complications.  Did you look at that material?

18   A    Yes.  I certainly do recall looking at material about

19   adverse events and experience Bard was having with the G2

11:27:10  20   filter while the EVEREST study was under way and some of the

21   communications they had with FDA about that.

22   Q    But part of your charge in this case as an expert was not

23   to render an opinion as to whether or not Bard should have

24   been doing something with respect to that information they

11:27:24  25   were receiving and whether or not the device should be

CROSS-EXAMINATION - DONNA-BEA TILLMAN

11:27:27  1    redesigned for those purposes; true.

2               In other words, you weren't evaluating the design of

3    the G2 filter or any of their filters to determine whether or

4    not for safety reasons it should be redesigned.  True?

11:27:42  5    A    My role in this is to give opinions about FDA regulatory

6    matters and whether Bard's actions were consistent with FDA's

7    regulatory requirements.

8    Q    And not whether or not the devices were appropriately and

9    safely designed; true?  Is that true?

11:28:00 10    A    Only in the context of whether or not Bard's actions were

11   consistent with the FDA's requirements.

12   Q    Dr. Tillman, is it important to understand the long-term

13   performance of a device before it's launch?

14   A    I think it's important -- I think it's important to have

11:28:18 15    information that will inform what we expect the long-term

16   performance to be before it's launched.

17   Q    And you agree a company like Bard doesn't need the FDA to

18   tell it to continue a study nor to do a long-term safety

19   study.

11:28:30 20    A    If it is appropriate for Bard to do such a study, then

21   they don't need FDA to tell them to do a study, they should do

22   it.

23   Q    And would you agree that if there were important

24   scientific questions that still need to be answered, then a

11:28:45 25    study should be done?

CROSS-EXAMINATION - DONNA-BEA TILLMAN

11:28:46   1   A   I think that studies -- if there are important questions
        2   that need to be answered, then, yes, study should be done.
        3   Q   Do you know what a Type A or Type B fracture is?
        4   A   I do.
11:28:54   5   Q   What is a Type A fracture?
        6   A   So my understanding is a Type A fracture is a fracture of
        7   a filter where there is -- where it embolizes, part of the
        8   filter embolizes I believe to the heart, but I couldn't be
        9   sure about that.  But it involves an embolic event versus just
11:29:11  10   a fracture.
       11   Q   You looked at some IFUs and you talked about that.  Did
       12   you ever look at the internal Bard data to determine the
       13   reporting rate differences between the Bard filters and any
       14   other filters as relates to Type A fractures?  Yes or no?
11:29:31  15   A   I'm not sure what you mean by a reporting rate difference
       16   because that's not a term that is usually used.
       17   Q   Well, you know that Bard did internal analysis and did
       18   statistical analysis between their device and the Simon
       19   Nitinol filter and other devices; true?
11:29:47  20   A   I know that over the years Bard looked at -- compared its
       21   adverse event rates to rates of other devices based on MAUDE
       22   data.  Yes, I'm aware of that.
       23   Q   Now, Dr. Tillman, if a company knows that it has design
       24   deficiencies, that is not only something that they ought to
11:30:05  25   share with doctors, but the company actually needs to do

CROSS-EXAMINATION – DONNA-BEA TILLMAN

11:30:09  1  something about that.  Wouldn't you agree?

2  A   I would agree that if a company has identified that

3  there's problems with the design of the device, that the

4  company needs to take some kind of action to -- at the very

11:30:20  5  least to investigate it, absolutely.

6  Q   I think you previously testified --

7       MR. LOPEZ:  Let's look at the 2017 deposition.  Line

8  17, page 189.

9       Page 189 on the 2017 deposition.

11:30:40  10  BY MR. LOPEZ:

11  Q   Do you see where I am, Dr. Tillman?  And you stated there

12  that "I think if a company knows it has, quote, design

13  deficiencies, then not only is that something physicians ought

14  to know, but the company actually needs to do something about

11:31:00  15  that.

16       "Question.  They ought to stop selling it?"

17       "Answer:  If they have design deficiencies."

18       That was your answer just a year ago; true?

19  A   I would say that still is my answer.  If they actually do

11:31:14  20  find there is a problem with the device, then I think they

21  should stop selling it.

22  Q   Do you agree Dr. Tillman, when you design a device and you

23  have a risk, ideally the best thing to do to mitigate the risk

24  is to design around it?  You design the device so that the

11:31:30  25  risk goes away; true?

CROSS-EXAMINATION - DONNA-BEA TILLMAN

11:31:32   1    A    Ideally that is absolutely the case.  Unfortunately, that

        2    is not always possible.

        3    Q    And you also agree that adverse event data can produce a

        4    signal and investigating that signal may lead a company to

11:31:44   5    determine that it needs to make design changes; true?

        6    A    Absolutely.

        7    Q    Just want to get one document, Exhibit 696.  Ask you to

        8    identify it.

        9         Do you recognize that document?

11:32:06  10    A    Yes.  This is a GAO report.

       11    Q    You were at FDA at that time?

       12    A    I was.

       13    Q    This document describes in some detail while you were

       14    there some of the shortcomings of the FDA because of its

11:32:18  15    resources, et cetera; true?

       16    A    This is a GAO report where they investigated problems --

       17    or shortcomings, as they found, with FDA's review process,

       18    yes.

       19    Q    And you had an opportunity to review this report prior to

11:32:33  20    it being finalized; true?

       21    A    I had the opportunity to review it and identify any errors

       22    in fact.  Yes.

       23         MR. LOPEZ:  I'd like to offer, Your Honor, Exhibit

       24    696 into evidence at this time and just show the -- publish

11:32:47  25    the cover page to the jury.

CROSS-EXAMINATION – DONNA-BEA TILLMAN

11:32:50  1        MR. ROGERS:  No objection, Your Honor.

2        THE COURT:  Admitted.

3     (Exhibit 696 admitted.)

4        THE COURT:  You may I publish.

11:32:57  5  BY MR. LOPEZ:

6  Q   There were other similar reports throughout the course of

7  the last 20 years where the GAO investigates FDA and has made

8  some findings about the FDA, because of its resources and lack

9  of funding, is incapable sometimes of carrying out its

11:33:14  10  mission; true?

11  A   I think that is probably an oversimplification, but there

12  have certainly been a number of GAO reports of FDA, I would

13  agree with that.

14  Q   Can we agree companies like FDA have to follow FDA's

11:33:27  15  regulations even if the FDA doesn't tell them to do so?

16        THE COURT:  I think you want to rephrase that

17  question.

18        THE WITNESS:  Yeah.

19  BY MR. LOPEZ:

11:33:33  20  Q   Do we agree companies like Bard have to follow FDA's

21  regulations even if FDA doesn't tell them to?

22  A   Absolutely.

23  Q   And you've never been provided information about

24  Dr. Kandarpa's comments at least with respect to the EVEREST

11:33:49  25  study; true?

REDIRECT EXAMINATION – DONNA-BEA TILLMAN

11:33:54  1    A    I believe I may have seen some of Dr. Kandarpa's comments,

2    but not -- not in the context of before I prepared this

3    report.

4    Q    Bottom line is the company is an entity that designs,

11:34:06  5    profits, markets, sells medical devices like IVC filters, and

6    they're the ones responsible for the safety and effectiveness

7    of the device; true?

8    A    I absolutely think medical device companies are

9    responsible for their devices.  Absolutely.

11:34:22  10            MR. LOPEZ:  Thank you, Your Honor.  No further.

11            THE COURT:  Redirect.

12            MR. ROGERS:  Very briefly.

13                R E D I R E C T   E X A M I N A T I O N

14    BY MR. ROGERS:

11:34:34  15    Q    Dr. Tillman, in your work in this case, were you provided

16    all of the material that you requested?

17    A    Absolutely.

18    Q    And were you also provided with lists of every deposition

19    that was taken as part of this litigation?

11:34:48  20    A    I was, and it was a rather long list.

21    Q    And were you able to go through that list and make

22    determinations about which deposition you thought it would be

23    appropriate for you, as a regulatory professional to review?

24    A    Yes, I was.

11:35:00  25    Q    And did you receive every deposition that you requested?

REDIRECT EXAMINATION - DONNA-BEA TILLMAN

11:35:03  1   A    Every one I asked for I received.

       2   Q    And, Doctor, can you give the jury some idea about how

       3   much material you have received.

       4   A    So I have an entire external hard drive that is just

11:35:15  5   dedicated to this project.

       6   Q    And approximately how much data is on that external hard

       7   drive?

       8   A    A lot.  If it were paper it would be kind of scary.

       9   That's one of the reasons it's all electronic.

11:35:28 10   Q    And, Doctor, while you were at FDA for 17 years, did you

      11   believe the FDA appropriately carried out its duties to

      12   examine medical devices and make appropriate decisions for the

      13   healthcare of the American people?

      14         MR. LOPEZ:  Objection, Your Honor.  Leading and

11:35:44 15   suggestive.

      16         THE COURT:  Sustained on leading.

      17         MR. ROGERS:  All right.  Thank you.

      18   BY MR. ROGERS:

      19   Q    Dr. Tillman, how would you describe the job you think FDA

11:35:54 20   did while you were at FDA for 17 years?

      21   A    I think the people that are there are incredibly

      22   passionate about what they do.  I think, yes, in the past they

      23   haven't always had the resources they would have liked to have

      24   had and so sometimes it was hard for them to do their jobs.

11:36:07 25   But I think everybody that's there is trying to do the best

REDIRECT EXAMINATION – DONNA-BEA TILLMAN

11:36:10   1   they can for public health because, after all, we all end up

2   using medical devices at one point in time.

3          MR. ROGERS:  Thank you, Dr. Tillman.  I don't have

4   any further questions.

11:36:20   5          THE COURT:  All right.  You can step down.

6          Defense counsel.

7          MS. HELM:  At this time we call Dr. Scott Trerotola

8   by video deposition.

9          Dr. Scott Trerotola is a board certified radiologist

11:36:55  10   with a specialty in interventional radiology.  He maintains a

11   clinical practice in interventional radiology at the Hospital

12   of the University of Pennsylvania where he has been chief of

13   the radiology department since 2001.

14          He graduated from the University of Pennsylvania

11:37:15  15   Medical School in 1986 and has been implanting IVC filters

16   since the 1990s.

17          He has been retrieving optional filters since they

18   first came on the market in the early 2000s.  He has also

19   served as a consultant for Bard in the past.

11:37:36  20          Your Honor --

21          THE COURT:  Hold on just a minute.

22          JUROR:  Can we ask for the name to be spelled.  Last

23   name.

24          THE COURT:  Would you spell the name, please.

11:37:50  25          MS. HELM:  I apologize.  I should have done that,

DIRECT EXAMINATION - PAUL BRIANT, Ph.D

11:37:51  1    Your Honor.  It is hard to pronounce.

2          It's T-R-E-R-O-T-O-L-A.  Trerotola.

3          THE COURT:  All right.  You may play the deposition.

4          (Video testimony of Dr. Scott Trerotola started.)Hold on

11:38:15  5    just a minute, Counsel.  Let's pause it for a minute.

6          We need to put the mic down by the speaker again,

7    please.

8          MR. O'CONNOR:  Is it coming out of here?

9          THE COURT:  Actually, we can hear it from a speaker

11:38:32  10   over here.

11         Why don't we restart it and see if it's better.

12         Would you please state your name for the record

13   please.

14         (Video testimony of Dr. Scott Trerotola played.)

11:55:12  15       MS. HELM:  Your Honor, at this time we call Dr. Paul

16   Briant.

17         THE COURTROOM DEPUTY:  Sir, if you'll please come

18   forward, stand right there, raise your right hand.

19         Could you State your name and spell your last name.

11:55:54  20       THE WITNESS:  Paul Briant, B-R-I-A-N-T.

21         MS. HELM:  Thank you, Your Honor.  May I proceed?

22         THE COURT:  You may.

23                    **PAUL BRIAN Ph.D,**

24   called as a witness herein, after having been first duly sworn

11:56:05  25   or affirmed, was examined and testified as follows:

DIRECT EXAMINATION - PAUL BRIANT, Ph.D

11:56:05  1        D I R E C T   E X A M I N A T I O N

2    BY MS. HELM:

3    Q    Dr. Briant, would you please introduce yourself to the

4    jury.

11:56:39  5    A    Sure.  My name is Paul Briant.

6    Q    What is your profession?

7    A    I'm a mechanical engineer and I work at Exponent Failure

8    Analysis Associates.

9    Q    And where is Exponent -- the office of Exponent Failure

11:56:50  10   Analysis that you work?

11   A    We're in Menlo Park, California.

12   Q    Would you please tell the jury your educational background

13   that resulted in you being a mechanical engineer.

14   A    Sure.  So I did my undergraduate work at Washington

11:57:02  15   University in St. Louis where I got my bachelors of science in

16   mechanical engineering and graduated summa cum laude, then I

17   went on to Stanford University where I got my masters and Ph.D

18   also in mechanical engineering.

19   Q    You said you graduated summa cum laude from Washington

11:57:20  20   University in St. Louis?

21   A    Yes, I did.

22   Q    What does that mean?  Is that the highest level --

23   A    Correct, that's the highest you can receive.

24   Q    Did you get straight As?

11:57:28  25   A    Almost.

DIRECT EXAMINATION - PAUL BRIANT, Ph.D

11:57:28  1   Q   Did you get a B?

2   A   I did.  I got one B.  It was in Greek pathology.

3   Q   And, again, would you explain to the jury, you went on and

4   got your masters and your Ph.D in mechanical engineering.

11:57:42  5   What was the topic of your Ph.D research?

6   A   Sure.  So I studied tissue mechanics.  So understanding

7   how biological tissues will respond to mechanical forces that

8   are applied to them.  In particular, I was looking at knee

9   cartilage and understanding causes for knee arthritis.

11:58:01  10   Q   And in what year was your dissertation approved and you

11   were awarded your Ph.D?

12   A   In 2008.

13   Q   Are you a licensed engineer?

14   A   Yes, I'm a professional engineer.

11:58:11  15   Q   Licensed in the state of California?

16   A   Yes.

17   Q   And you said you work for Exponent Failure Analysis

18   Associates.  What does that company do?

19   A   So we're a technical consulting firm.  So we provide

11:58:23  20   engineering and scientific consulting services.

21   Q   And how long have you been with Exponent?

22   A   I've been there for ten years.

23   Q   And at the Exponent offices in Menlo Park, California, are

24   you the only Ph.D?

11:58:36  25   A   No.  We have about 150 engineers there.

DIRECT EXAMINATION – PAUL BRIANT, Ph.D

11:58:42  1    Q    And why do companies come to Exponent to have you perform

2    analysis for them?

3    A    So they come for a variety of reasons.  They may not have

4    the expertise or the resources to do an analysis in house.

11:58:55  5    But most importantly we're often an independent reviewer to

6    analyze their devices.

7    Q    And what types of entities do you perform analysis for?

8    You personally.

9    A    Sure.  So I do a lot of work in medical devices.  I also

11:59:08 10    do a lot of work in electronics industry.  My work focuses on

11    solid mechanics, so understanding the stresses and strains

12    inside of various devices and structures.

13    Q    The jury's heard in this case that the IVC filters --

14         THE COURT:  Let me interrupt you.  We're going to

11:59:26 15    break at this point.

16         MS. HELM:  Thank you, Your Honor.

17         THE COURT:  Members of the jury, we'll resume at 1

18    o'clock and we'll excuse you at this time.

19      (The jury exited the courtroom at 12:00.)

11:59:56 20         THE COURT:  You can step down, Dr. Briant.  Thank

21    you.

22         Counsel, be seated for just a minute.  I assume you'd

23    like your time now?

24         MR. O'CONNOR:  Please, Your Honor.

12:00:05 25         MS. HELM:  Your Honor, I can get you the allocation.

DIRECT EXAMINATION – PAUL BRIANT, Ph.D

12:00:07  1      THE COURT:  Yeah, would you get me the DeFord and

2    Trerotola allocations.

3          MS. HELM:  Dr. DeFord was 8 minutes for the plaintiff

4    and 13 minutes for the defense.

12:00:22  5          Dr. Trerotola was 9 minutes for the plaintiff and 7

6    minutes for the defendant.

7          THE COURT:  Okay.  Give me just a minute.

8          Okay, Counsel, as of the lunch hour plaintiffs have

9    used 31 hours and 6 minutes.  Defendants have used 22 hours

12:02:43 10  and 58 minutes.  That includes the allocations of the

11   deposition time.

12         I did not charge to either side the 15 minutes we

13   spent while the jury was out.  But I did allocate 5 minutes of

14   the earlier sidebar to plaintiffs.  So that's included.  Plus

12:03:01 15  the deposition allocations.

16         We'll see you at 1 o'clock.

17         MR. LOPEZ:  Thanks.

18         MR. ROGERS:  Thank you, Your Honor.

19         MS. HELM:  Your Honor, before you leave the bench,

12:03:38 20  yesterday at the end of the day, plaintiffs had used 31 hours

21   and 1 minute.

22         THE COURT:  Right.

23         MS. HELM:  Today you said they've used 31 hours and 6

24   minutes.

12:03:48 25        THE COURT:  I said 31 hours and 36 minutes.

12:03:51  1          MR. ROGERS:  I'm sorry.  I misunderstood.

2          THE COURT:  Wait a minute.  Did I misspeak?  It was

3   31 hours and 36 minutes.

4          MS. REED ZAIC:  I heard the same thing as Ms. Helm.

12:04:01  5          THE COURT:  Okay, then I misspoke.  There was 35

6   total minutes allocated today.  31 hours 36 minutes.

7          MS. REED ZAIC:  I prefer yours.  Thank you, Kate.

8          (End of a.m. session transcript.)

9                         *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 3rd day of October,

15   2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter

21

22

23

24

25