# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, ) ) ) | MD 15-02641-PHX-DGC |
| _____ ) | |
| Lisa Hyde and Mark Hyde, a married couple, ) ) ) | Phoenix, Arizona **October 2, 2018** |
| Plaintiffs, ) ) | |
| v. ) ) | CV 16-00893-PHX-DGC |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, ) ) ) ) | |
| Defendants. ) _____ ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 11 - P.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    <u>**A P P E A R A N C E S**</u>

2

For the Plaintiffs:

3

        Lopez McHugh
4       By:  **RAMON R. LOPEZ**, ESQ.
        100 Bayview Circle, Suite 5600
5       Newport Beach, CA 92660

6       Gallagher & Kennedy
        By:  **MARK S. O'CONNOR**, ESQ.
7            **PAUL L. STOLLER**, ESQ.
        2575 East Camelback Road, Suite 1100
8       Phoenix, AZ 85016

9       Heaviside Reed Zaic
        By:  **JULIA REED ZAIC**, ESQ.
10           **LAURA E. SMITH**, ESQ.
        312 Broadway, Suite 203
11      Laguna Beach, CA 92651

12      Goldenberg Law PLLC
        By:  **STUART GOLDENBERG**, ESQ.
13           **MARLENE GOLDENBERG**, ESQ,
        800 LaSalle Avenue, Suite 2150
14      Minneapolis, MN 55402

15      Lopez McHugh, LLP
        By:  **JOSHUA MANKOFF**, ESQ.
16      1 International Plaza, #550
        PMB-059
17      Philadelphia, PA 19113

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1              **A P P E A R A N C E S** <u>(CONTINUED)</u>

2

   For the Defendants:

3

       Nelson Mullins Riley & Scarborough
4      By:  **JAMES F. ROGERS,** ESQ.
       1320 Main Street
5      Columbia, SC 29201

6      Snell & Wilmer
       By:  **JAMES R. CONDO,** ESQ.
7      400 East Van Buren
       Phoenix, AZ 85004

8
       Nelson Mullins Riley & Scarborough
9      By:  **RICHARD B. NORTH, JR.,** ESQ.
            **MATTHEW B. LERNER,** ESQ.
10           **ELIZABETH C. HELM,** ESQ.
       201 17th Street NW, Suite 1700
11     Atlanta, GA 30363

12     C.R. Bard, Inc.
       Associate General Counsel, Litigation
13     By:  **GREG A. DADIKA,** ESQ.
       730 Central Avenue
14     Murray Hill, New Jersey 07974

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**SUMMARY OF COURT PROCEEDINGS**                                    **PAGE:**

Proceedings Outside the Presence of the Jury              2663

Discussion on Jury Instructions                          2667


| **WITNESSES FOR THE**<br>**DEFENDANT:** | **DIRECT** | **CROSS** | **REDIRECT** |
|---|---|---|---|
| **Paul Briant, Ph.D.** | | | |
| By Ms. Helm | 2510 | | 2560 |
| By Mr. O'Connor | | 2553 | |
| **John Van Vleet** | | | |
| By Ms. Helm | 2563 | | 2661 |
| By Mr. O'Connor | | 2648 | |

**INDEX OF EXHIBITS**

**EXHIBIT**                                                      **RECEIVED**

| NO. | DESCRIPTION | |
|---|---|---|
| 5335 | Aug. 23, 2007 Letter BPV to FDA re G2 Everest Study (G051304) Annual Progress Report | 2572 |
| 5334 | Sept. 21, 2007 Letter FDA to BPV Questions re G2 Everest Study (G051304) | 2574 |
| 5336 | Oct. 25, 2007 Letter BPV to FDA re Responses to FDA re G2 Everest Study (G051304) | 2576 |
| 9080 | Oct. 24, 2007 Email from Dr. Lehmann | 2591 |
| 6892 | Binkert CA, Drooz AT, Caridi JG, Sands MJ, Bjarnason H, Lynch FC, Rilling WS, Zambuto DA, Stavropoulos SW, Venbrux AC, Kaufman JA. Technical success and safety of retrieval of the G2 filter in a prospective, multicenter study. J Vasc Interv Radiol. 2009 Nov;20(11): 1449-53. Doi: 10.1016/j.jvir.2009.08.007. | 2595 |
| 5368 | July 30, 2008 FDA Clearance Letter G2 Express Filter (K080668) (Substantial Equivalence) | 2604 |

1      **INDEX OF EXHIBITS (Continued)**

2    <u>EXHIBIT</u>                                                    <u>RECEIVED</u>

3    <u>NO.</u>      <u>DESCRIPTION</u>

4    5273    Jan. 14, 2010 FDA Clearance Letter Eclipse        2612
             Filter (K093659) (Substantial Equivalence)
5
     5587    June 18, 2010 Letter FDA to BPV re FDA AI         2615
6            Demand re Eclipse (K101431)

7    5589    June 22, 2010 -- FDA Clearance Letter for         2617
             Eclipse Filter (K101431)
8            (Substantial Equivalence)

9    8362    Eclipse Filter Patient Questions & Answers        2617

10   5931    G2X (Jugular) 2009.10 - PK5100070                 2625
             Rev. 5 IFU
11
     6991    FDA Safety - Inferior Vena Cava (IVC)             2641
12           Filters: Initial Communication: Risk of
             Adverse Events with Long Term Use, 08/09/2010.
13
     5923    September 2010 Letter to Clinicians re            2642
14           FDA PHN

15   7960    Chart: IVC Filters, Clinical Overview             2645

16   4499    Meridian Vena Cava Filter vs. Eclipse            2658
             Vena Cava Filter
17
     4892    Denali IFU Femoral - Rev. 6 2016.03               2660
18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2              (Proceedings resumed at 12:58 p.m.)

3              (Jury present.)

4              THE COURT:  You may continue, Ms. Helm.

5              MS. HELM:  Thank you, Your Honor.

6                        PAUL BRIANT, PH.D.,

7    called as a witness herein by the defendants, having been

8    previously duly sworn or affirmed, resumed the stand and

9    continued to testify as follows:

10                   DIRECT EXAMINATION (Continued)

11   BY MS. HELM:

12   Q.  Dr. Briant, before lunch I think I had asked a question

13   about are you familiar -- the jury has heard about IVC filters

14   made from a substance called Nitinol.  And are you familiar

15   with Nitinol?

16   A.  Yes, I am.

17   Q.  And would you explain to the jury what Nitinol is?

18   A.  Sure.  So Nitinol's a very interesting material.  It's a

19   metal, and it's used in a lot of cardiovascular implanted

20   devices.  And it exhibits this special property where you can

21   stretch it much further than a lot of metals, and then it will

22   spring back to its original shape.

23   Q.  And have you had any involvement with Nitinol from a

24   professional point of view?  Have you worked with it in your

25   professional career?

1   A.  Yes, I have.  I do a lot of work in cardiovascular

2   implanted devices, a lot of which are made of Nitinol, and I've

3   also published papers and given presentations.

4   Q.  And what type of work have you done with cardiovascular

5   Nitinol products?

6   A.  Sure.  So, again, this centers around understanding the

7   stresses and strains and the fatigue performance.  And it's for

8   devices like stents and heart valves and things like that.

9   Q.  You mentioned you have published articles on Nitinol?

10  A.  I have, yes.

11  Q.  Have you given presentations on Nitinol?

12  A.  I have.

13  Q.  What types of presentations?

14  A.  So they've been at technical conferences, researching

15  Nitinol and understanding its properties.

16  Q.  Were you retained by Nelson Mullins, Mr. Rogers and my law

17  firm, to assist in this case?

18  A.  I was, yes.

19  Q.  Actually, were you retained or was Exponent retained?

20  A.  Exponent was retained.

21  Q.  Okay.  And what specifically was Exponent asked to do in

22  this case?

23  A.  So we were asked to review the opinions of Dr. McMeeking,

24  who's the mechanical engineering expert for the plaintiff, and

25  to review the calculations that went into his opinions and to

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2512

1    do our own analysis as needed.

2    Q.  Are you familiar with Dr. McMeeking?

3    A.  I wasn't prior to this litigation, but I certainly am now.

4    Q.  Okay.  And who determined what your methodology would be in

5    undertaking the analysis that you were asked to perform in this

6    case?

7    A.  I did.

8    Q.  And what methodology did you use?

9    A.  So the standard methodology we use when analyzing these

10   devices, as I said, calculating the stresses and strains.  And

11   we also did laboratory testing to evaluate and verify our

12   calculations.

13   Q.  Is this a methodology you only use in litigation?

14   A.  No.  This would be standard for what we do for industrial

15   clients as well.

16   Q.  Okay.  So you've talked about you do work for industrial

17   clients and you do work in litigation.  Approximately what

18   percentage of your time at Exponent is currently spent on

19   litigation matters?

20   A.  It's about 40 percent of my time.

21   Q.  And can you give us a type -- a sampling of some of the

22   medical devices on which you have conducted analysis either in

23   litigation or in industry?

24   A.  Sure.  So as I mentioned, this is things like stents, heart

25   valves, occluders.  These are devices that are implanted inside

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2513

```
 1   the body for cardiovascular reasons.
 2   Q.  Are you exclusively -- do you exclusively work on medical
 3   devices?
 4   A.  No.  I do -- medical devices is about half of the work I
 5   do.  I also work a lot in the electronics industry as well,
 6   actually.
 7   Q.  Can you estimate approximately how many medical devices
 8   you've analyzed, tested, or reviewed as part of your work in
 9   Exponent over the last 10 years?
10   A.  So I don't have an exact number, but well over a hundred.
11   It's what I do day in and day out.
12   Q.  In your work for industry, has any of your analysis been
13   presented to the FDA as part of a device submission for
14   clearance by the FDA?
15   A.  Yes.  Many times.  And I also assist companies when they
16   have questions from FDA reviewers and things like that.
17   Q.  Okay.  To perform your analysis in this case, were you
18   provided documents?
19   A.  Yes, I was.
20   Q.  And what documents were you provided?
21   A.  Expert reports from other experts, deposition transcripts,
22   Bard documents for doing the submission process, 510(k)s,
23   things like that.
24   Q.  Were you provided materials regarding the development of
25   the Recovery, G2, G2X, and Eclipse filters?
```

PAUL BRIANT, PH.D. - DIRECT EXAMINATION          2514

1    A.  Yes, I was.

2    Q.  Were you provided testing materials; test protocol and test

3    results from Bard?

4    A.  Yes, I was.

5    Q.  And did you -- I'm sorry.  Let me -- did you review the

6    documents referenced by Dr. McMeeking in his reports and

7    depositions?

8    A.  I don't know if I reviewed all of them, but I certainly

9    reviewed most of them.

10   Q.  Okay.  And, again, as part of your work, you've talked

11   about analysis.  Did you also perform testing, physical testing

12   on any of Bard's IVC filters?

13   A.  Yes.  We performed experimental bench testing on filters in

14   our laboratory.

15   Q.  And did you do that testing yourself?

16   A.  So I have a team that helps me, so it was a combination of

17   technicians as well as other engineers at Exponent.

18   Q.  And were some of those other engineers Ph.D.s also?

19   A.  Yes.  They all were.

20   Q.  Do you know if any of them got a B in Greek Mythology?

21   A.  I'll ask.

22   Q.  Has Exponent charged my law firm for the testing, analysis,

23   and other efforts that you've performed in this case?

24   A.  Yes, we have.

25   Q.  Are you an employee or an owner of Exponent?

PAUL BRIANT, PH.D. - DIRECT EXAMINATION          2515

1    A.  I'm an employee.

2    Q.  Do the billings to Exponent reflect only your time, or is

3    it the time from everyone that's been involved from Exponent?

4    A.  It's the whole team.

5    Q.  And how much has Exponent billed my law firm for your

6    analysis relating to the Bard IVC filters?

7    A.  So my bill rate is 425 an hour.

8    Q.  And do you know how much total Exponent has charged my law

9    firm?

10   A.  It's about $700,000, I believe.

11   Q.  And do you get paid based on your hourly rate or the work

12   that you do, or are you simply a salaried employee?

13   A.  I get a salary.

14   Q.  Okay.  As the work -- as a result of the work and

15   investigation you've done in this case, have you reached any

16   opinions?

17   A.  Yes, I have.

18   Q.  Can you tell the jury what those opinions are?

19   A.  Sure.  So as you heard from Dr. McMeeking, who's the

20   engineering expert for the plaintiff, he renders a series of

21   claims and criticisms about the Bard filters, both about the

22   design of the filters as well as the testing and analysis that

23   Bard did during the design process.

24        And so my opinions boil down to three main things.

25   Number one is that the calculations that Dr. McMeeking

1    performed that underlie or the foundation for his design

2    opinions, that those calculations are unreliable.  And this is

3    due to the simplifications that were made in those calculations

4    as well as the assumptions that were fed into the analysis.

5    And as you'll see, those assumptions were often beyond the

6    limits of what the body can do.  So that's number one.

7           Number two --

8    Q.  Do you have another opinion?

9    A.  Yes.  Number two is, although Dr. McMeeking criticizes the

10   Bard testing, the testing did consider all the relevant

11   complications that are known to occur with IVC filters.  And

12   even though Dr. McMeeking provides these criticisms, he doesn't

13   put forth any analysis or engineering basis for alternative

14   test methods or alternative designs.

15          And lastly --

16   Q.  I'm sorry.  Do you have a third opinion?

17   A.  Yes, I do.

18          Lastly is that the Simon Nitinol filter, which you've

19   heard about, from an engineering perspective, is not an

20   alternative design.  And this is because it lacks the

21   retrievability of the Bard filters.

22   Q.  Did you prepare a summary of your opinions for us to

23   review?

24   A.  Yes, I did.

25          MS. HELM:  Your Honor, at this time I --

1           Would you pull up 7944?

2           That's not the right one.  7944.  We'll just go on if

3   we don't have it.

4   BY MS. HELM:

5   Q.  As part of your work, did you review some Bard filters,

6   actually physically hold, test Bard filters?

7   A.  Yes, I did.

8   Q.  What did you do with those filters that you examined?

9   A.  So we used those filters for our laboratory testing, and we

10  did that to validate our calculations to make sure that they

11  actually represent the real world and are consistent with

12  reality.

13  Q.  Did you review any materials specific to Mrs. Hyde?

14  A.  Just other expert reports.

15  Q.  Did you have Mrs. Hyde's filter available to you to test or

16  review?

17  A.  No.

18  Q.  Do you know what type of filter Mrs. Hyde has?

19  A.  My understanding is it was a G2X or an Eclipse filter.

20  Q.  In your report --

21          MR. O'CONNOR:  Objection, Your Honor.  Move to strike.

22  That was not disclosed.

23          MS. HELM:  Your Honor, I think the next question will

24  clarify it.  I was about to ask him specific --

25          THE COURT:  I don't think he stated an opinion.  He

1    just said he understood it was one or the other.

2            MR. O'CONNOR:  Well -- and that's not disclosed.

3            THE COURT:  Well, I think that's background.  I don't

4    think that's expert testimony.

5            So I'm going to overrule that objection.

6    BY MS. HELM:

7    Q.  Dr. Briant, did you identify Ms. Hyde's filter as a G2X in

8    your report?

9    A.  Yes, I did.

10   Q.  And why did you do that?

11   A.  That was based on the information I had at the time.

12   Q.  Are you aware of the types of events that occurred with

13   Ms. Hyde's filter?

14   A.  Yes, I am.

15   Q.  And what do you understand?

16   A.  So my understanding is that it tilted by about 2 to

17   4 degrees, that it had a caudal migration of about

18   5 millimeters, and that there was perforation and then an arm

19   that fractured and subsequently went to her right ventricle.

20           MR. O'CONNOR:  Again, Your Honor, I object.  Those

21   opinions are not in his report.

22           THE COURT:  Ms. Helm, where are those in the report?

23           MS. HELM:  His July 20, 2017, report.  It's page 3,

24   Section 2.1.

25           THE COURT:  Objection is overruled.  It's on page 3,

1    Section 2.1 of the July report.

2              MR. O'CONNOR:  I understand, but the specifics he

3    testified to are not there.

4              THE COURT:  Migration, fracture, embolization.  It's

5    all mentioned there.

6              MR. O'CONNOR:  The degrees.

7              THE COURT:  Pardon?

8              MR. O'CONNOR:  The degrees and the measurements were

9    not in his report.

10             THE COURT:  Well, you didn't object -- oh, I see.

11   You're saying the specific degrees that he mentioned.

12             MR. O'CONNOR:  Yes.

13             THE COURT:  Are those in the report?

14             MS. HELM:  No, Your Honor, they're not.

15             THE COURT:  Okay.  The jury should disregard the

16   degrees testified to and the length of the migration.

17   BY MS. HELM:

18   Q.  Dr. Briant, are you aware that there's been testimony in

19   this case that the degree of tilt of Ms. Hyde's filter was

20   approximately 2 to 4 degrees?

21   A.  Yes, I'm aware.

22   Q.  Are you aware that there's been testimony in this case that

23   the degree of caudal migration of Ms. Hyde's filter is

24   approximately 5 millimeters?

25   A.  Yes, I'm aware.

1    Q.  Okay.  And prior to that testimony in this case, you were

2    aware -- were you aware that there was indication of possible

3    perforations and that one arm had fractured and moved to her

4    heart?

5    A.  Yes, I'm aware.

6    Q.  Thank you.

7          Okay.  A minute ago, before I had some technical

8    difficulty, we talked about a slide that you had prepared that

9    summarized your opinions.

10         MS. HELM:  And can you pull up 7944, please?

11   BY MS. HELM:

12   Q.  And can you see that, Dr. Briant?

13   A.  Yes, I can.

14   Q.  Is that the slide that you prepared that summarizes your

15   opinions in this case?

16   A.  Yes, it is.

17         MS. HELM:  Your Honor, at this time I would tender

18   7944 for demonstrative purposes only.

19         MR. O'CONNOR:  Objection.  The summary is not

20   disclosed in the report, Your Honor.

21         THE COURT:  Is this in the report?

22         MS. HELM:  Yes, Your Honor.  It's a -- it is a

23   compilation of diagrams from his report that are on -- his

24   reports:  His April 2017 report, page 4, Section 3.1, Item 1;

25   his July 2017 report, page 7, Section 5, paragraph --

1          THE COURT:  Hold on just a minute.  I need to look at

2    them.

3          There's no diagram on page 4 of the April report.

4          MS. HELM:  Your Honor, if you -- April 2017 report,

5    page 9, Figure 2B, and page 18, Figure 11.

6          THE COURT:  All right.  All of those diagrams are

7    found on those pages, portions of them.

8          MR. O'CONNOR:  I'm not objecting to the diagrams.  I'm

9    objecting to the Opinions Summary.

10          THE COURT:  You disagree with the opinions that are --

11          MR. O'CONNOR:  Pardon me?

12          THE COURT:  Do they accurately summarize what's in the

13    report?  Is that your objection, Mr. O'Connor?

14          MS. HELM:  Your Honor, I have cites to the opinions.

15          MR. O'CONNOR:  Well, just to move things along, we'll

16    withdraw the objection.

17          THE COURT:  All right.  You may show 7944 as a

18    demonstrative.

19          MS. HELM:  Thank you.

20    BY MS. HELM:

21    Q.  Dr. Briant, is this the demonstrative or the exhibit you

22    prepared to further explain your opinions in this case?

23    A.  Yes, it is.

24    Q.  Okay.  And going back to your first opinion, would you

25    remind the jury what your first opinion is, please.

UNITED STATES DISTRICT COURT

1    A.  Sure.  So my first opinion relates to the calculations that

2    Dr. McMeeking performed and them being unreliable due to the

3    simplifications that were incorporated into the opinions and

4    the assumptions that were used.

5    Q.  And can you explain to us why it is your opinion that

6    Dr. McMeeking used incorrect assumptions?  And let me back up.

7         This is in his -- is this in his analysis of strain of

8    the filter?

9    A.  That's correct.

10   Q.  Okay.  And can you explain to us why it's your opinion that

11   Dr. McMeeking used incorrect analysis -- incorrect assumptions

12   in his analysis of the strain of the Bard IVC filters?

13   A.  Sure.  So Dr. McMeeking made -- only incorporated into his

14   analysis a single arm of an IVC filter.  And that's what's

15   shown on the right-hand side of the slide.  So the figures

16   depict the differences between the two analysis approaches or

17   methodologies.

18        So on the right-hand side we have, from Dr. McMeeking,

19   he had just a single arm incorporated explicitly into the

20   analysis.  And actually, it was just a portion of that.  It was

21   the upper portion above the elbow.

22   Q.  And why do those limitations by Dr. McMeeking of only

23   analyzing the portion of the arm above the elbow matter?

24   A.  Sure.  So to make that simplification, he'd have to make

25   assumptions about how the filter interacted with the IVC.  So

1    what he assumed was essentially that the IVC was infinitely

2    stiff or perfectly rigid, and so that the motion of the IVC

3    would not be affected by the presence of the filter, meaning

4    that the forces that the filter pushes back on the IVC would

5    not come into play.

6              In addition, he assumed that wherever the filter

7    touched the IVC, that it was essentially locked, and so the

8    filter just had to move wherever the IVC went, and he prevented

9    rotation there.  And he had to make assumptions about this

10   interaction in order to simplify the analysis to only include

11   that portion of the arm.

12   Q.  Beyond his analysis, did Dr. McMeeking conduct any bench

13   testing relating to his analysis of the strains in the Bard IVC

14   filters?

15   A.  No, he did not.

16   Q.  Now, did you perform your own analysis?

17   A.  Yes, we did.

18   Q.  And did you only analyze one arm of an IVC filter?

19   A.  No.  And that's depicted in the middle column there,

20   where -- so in the analysis, we have the entire filter, all six

21   arms and all six legs.  And then what we would do is we would

22   take that filter and we'd crimp it down and we would deploy it

23   into the surrounding soft tissue.

24              So we had in the model the surrounding tissues, and

25   that's shown on the bottom center, where the blue is the IVC,

```
 1   the green is the surrounding soft tissues, and orange

 2   represents a vertebra.

 3           So we incorporated the environment that the filter

 4   lives in rather than just including the filter and making

 5   assumptions about the interaction between the filter and the

 6   IVC.

 7   Q.  And did you make assumptions in performing your analysis?

 8   A.  So we -- we, by incorporating the environment that the

 9   filter lives in, we didn't have to make the assumptions that

10   Dr. McMeeking made.  So we could actually calculate this

11   interaction and understand what effect the filter would have on

12   the IVC and back and forth.

13   Q.  You mentioned you included the surrounding tissues and what

14   was going on with the IVC.  Would you explain to us what you

15   mean?

16   A.  Sure.  So the IVC -- or, sorry -- the filter, as you know,

17   is implanted in the abdominal region, and so it's in the IVC

18   and it's surrounded by digestive organs and things like that.

19   So the -- these materials have certain properties.  The IVC

20   generally has the stiffness of about a rubber band as opposed

21   to infinitely stiff, as we talked about.  And the surrounding

22   soft tissues are also soft, the digestive organs, and -- at

23   least on me, they're soft in that general region.

24   Q.  And you mentioned -- I'm sorry.

25           Did you prepare a demonstrative that would help
```

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2525

1    explain the impact of the assumption you made regarding the

2    surrounding tissue?

3    A.  Yes, I did.

4              MS. HELM:  Would you pull up 7813, please.

5              Your Honor, at this time I would move to admit 7813

6    for demonstrative reasons only.

7              MR. O'CONNOR:  No objection for demonstrative.

8              THE COURT:  All right.  You may display it for

9    demonstrative purposes.

10             MS. HELM:  Thank you.

11   BY MS. HELM:

12   Q.  Dr. Briant, would you explain to the jury what is depicted

13   on 7813?

14   A.  Sure.  So this is a -- on the left, we have a section of a

15   CT scan.  So this was taken from a patient.  And what we're

16   looking at is a cross-section of the abdomen.

17             That bright region in the middle, that's a vertebra.

18   You can see it labeled in the picture there.  The IVC is above

19   and a little bit to the left.  It's where those yellow circles

20   are.  And this one has a filter in it.  And then surrounding

21   that is the digestive tissues that you can see.

22             And then we -- this shows the motivation for the

23   model.  So we take this and we poured it over to the model

24   that's on the right.  This is what was actually done in the

25   analysis, where we have the IVC in blue, the surrounding soft

UNITED STATES DISTRICT COURT

PAUL BRIANT, PH.D. - DIRECT EXAMINATION          2526

1    tissues in green, and we incorporate the vertebrae that's

2    nearby.  And so this allows us to actually model the

3    environment of the filter in addition to the filter itself.

4    Q.  As part of your work, you did not assume that the IVC was

5    stiff; is that right?

6    A.  Correct.  It -- we included a stiffness for it, but it's

7    not infinitely stiff the way Dr. McMeeking assumes.  As I

8    mentioned, it's about the stiffness of a rubber band.

9    Q.  As part of your work in studying mechanical engineering

10   issues, are you familiar or do you have to become familiar with

11   medical literature that substantiates or supports your

12   assumption about the tissues surrounding the IVC, the lack of

13   stiffness?

14   A.  Yes.

15   Q.  And how do you validate that?

16   A.  Sure.  So there are two ways that this is motivated.

17   Number one is that people have actually taken IVCs and pulled

18   on them and measured their properties, so they've actually

19   measured what we call the stress-strain response.  And so

20   that's -- that's what we incorporate into our analysis.

21         In addition, studies have also looked at the diameter

22   of the IVC in patients that have filters deployed.  And what

23   they've found is that at the location of the filter, the IVC is

24   bigger than above or below it, indicating that the IVC is

25   responding to the forces from the filter as well as the

1    surrounding tissues.

2    Q.  And when you mention studies, are you referring to studies

3    in medical literature?

4    A.  They're in the published literature, yes.

5    Q.  And was that the source of your information for your

6    analysis of the stiffness or the lack of stiffness of the IVC

7    and the other organs in the body?

8    A.  That, and some of the data as reported in textbooks as

9    well.

10   Q.  Thank you.

11          Can you explain to the jury what hyperelastic

12   stress-strain means?

13   A.  Sure.  So this is -- hyperelastic is a formulation that we

14   use to represent the stress-strain response for biological

15   tissues.

16   Q.  And did you prepare a demonstrative that explains

17   hyperelastic stress-strain?

18   A.  I did, yes.

19          MS. HELM:  Scott, would you pull up 7945, please.

20   BY MS. HELM:

21   Q.  And, Dr. Briant, is this the demonstrative that you

22   prepared to help explain hyperelastic stress-strain response?

23   A.  Yes, I did.

24          MS. HELM:  Your Honor, at this time I tender 7945 for

25   demonstrative reasons only.

1           MR. O'CONNOR:  No objection for demonstrative

2      purposes, Your Honor.

3           THE COURT:  You may display it.

4      BY MS. HELM:

5      Q.  Dr. Briant, can you explain this slide to us?

6      A.  Sure.  So, yes, we're getting "mathy" here.

7           So this is a plot showing the stress-strain response

8      for the IVC.  And so what we have on the horizontal axis is

9      strain.  And that's a measure of the deformation or how much

10     the material has response to a given load, how much it's

11     deformed.

12          On the vertical axis we have stress, and that's a

13     measure of how much force is applied, so the intensity of the

14     force.  When you push on something or pull on it, you apply a

15     force, and that's what's plotted on the Y axis, the vertical

16     axis.

17          And then you can see the response of the tissue.  And

18     so initially it's soft.  It has this low modulus, this low

19     slope here.  And then eventually it stiffness up.

20          And this is due to the collagen fibers that are in

21     your tissue, where initially they're relatively disorganized,

22     and then as you pull on them, they become more and more

23     organized and aligned.  And that causes this stiffening that

24     you see later in the curve where it's harder to pull on.

25     Q.  Let me ask you just a couple questions.  There's some

1    references on here, and I want to make sure we understand them.

2          There's a reference to "modified data from Fung."

3    What is that?

4    A.  Sure.  So Fung is the author of a textbook that we acquired

5    the experimental data from.

6    Q.  And there's a reference to the "Marlow fit."  What is that?

7    A.  So Marlow's a particular formulation of the hyperelastic,

8    so it's a mathematical fit that we use to fit the data that we

9    put into the model.

10   Q.  In doing your stress-strain analysis here, did you take

11   into account this hyperelastic response of a person's IVC that

12   you talked about?

13   A.  Yes.  So this is directly incorporated into the analysis.

14   So this would be how the IVC itself responds to load, and this

15   was in the analysis.

16   Q.  Okay.  And how does your consideration, taking into account

17   the hyperelastic response of the IVC, make your assumptions and

18   calculations different from those of Dr. McMeeking?

19   A.  So as I mentioned, Dr. McMeeking assumed that the IVC

20   was -- it was infinitely stiff, that it would not respond to

21   the forces from the filter in any way.  And so rather than

22   making that assumption, we wanted to actually evaluate that.

23   And so we made this model that has the IVC and the surrounding

24   soft tissues and used these values from literature for the

25   properties and were actually able to calculate that

1    interaction.

2    Q.  And is that an important difference, this consideration of

3    the hyperelastic response of the IVC to the filter?

4    A.  Yes, by -- the assumptions that were made, assuming the IVC

5    is infinitely stiff, would result in higher strains than the

6    filter would actually occur.  Because you're not actually

7    accounting for the interactions directly, but you're making

8    this assumption of a very stiff vessel.

9    Q.  You've told us about your difference in your analysis from

10   Dr. McMeeking's as it relates to the actual IVC itself.  Did

11   you also have -- did you also consider differences or make

12   different assumptions relating to Nitinol than those made by

13   Dr. McMeeking?

14   A.  Yes, I did.

15   Q.  And did you prepare a demonstrative that would help you

16   explain your analysis of Nitinol?

17   A.  I did, yes.

18          MS. HELM:  And would you pull up 7677, please.

19          Your Honor, at this time I tender 7677 as a

20   demonstrative.

21          MR. O'CONNOR:  No objection for the purposes of

22   demonstrative.

23          THE COURT:  You may display it.

24   BY MS. HELM:

25   Q.  This is entitled -- or, Dr. Briant, would you read the

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2531

1   title of this slide to us, please.

2   A.  Sure.  So it's the Nitinol Constitutive Relationship.

3   Q.  What is Nitinol constitutive -- I can't even say it.  What

4   is the Nitinol constitutive relationship?

5   A.  Sure.  So, again, this is the stress-strain response of the

6   Nitinol.  So rather than looking at the tissue now, we're

7   looking at the Nitinol metal that makes up the filter.

8           And so as I mentioned, Nitinol is this very

9   interesting material that has this superelastic response.  And

10  so what we're looking at, again, is very similar to the

11  previous slide, where on the horizontal axis we have strain,

12  the deformation, and on the vertical axis we have stress.

13          And Nitinol goes through what we call a phase

14  transformation, where you start to load it up and then it

15  stretches a lot, so it moves a lot along the horizontal axis.

16  And then it completes the phase transformation and you get this

17  later stiff response.

18          And so this is the property that allows the Nitinol to

19  spring back after you've reached its deployment location for

20  the device.

21  Q.  And is that quality of Nitinol that allows it to spring

22  back, is that sometimes referred to as superelastic?

23  A.  Correct.  That's what it's called.

24  Q.  Did you take into consideration the superelastic or the

25  springback of Nitinol in your analysis?

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                2532

1    A.  Yes, we did.

2    Q.  Did Dr. McMeeking include that property in his analysis?

3    A.  In his strain analysis, he did not.  He just modeled it as

4    what we call linear elastic, which is basically just the

5    beginning part of the curve.

6    Q.  Is it well known in the mechanical engineering and material

7    sciences that Nitinol has this superelastic property?

8    A.  Yes.  It's what makes Nitinol Nitinol.

9    Q.  Do you believe it's possible to accurately model the

10   stresses and strains of Nitinol without taking into account the

11   superelastic nature of the material?

12   A.  You'll certainly get more accurate results if you model the

13   material as it is, which is the superelastic response.

14   Q.  We've talked about the difference in your analysis relating

15   to the tissue of the -- in the IVC and surrounding the IVC and

16   the distant -- difference in your analysis of Nitinol and the

17   superelastic properties of Nitinol.

18          Are there also differences between your analysis and

19   Dr. McMeeking's analysis relating to filter -- the actual

20   filter geometry itself?

21   A.  Sure.  So as I mentioned, Dr. McMeeking just had that

22   portion of the filter, just a portion of a single arm, whereas

23   our analysis had the entire filter with all six arms and all

24   six legs.

25   Q.  And does the filter impact, once it's implanted in the IVC,

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2533

 1    does it impact movement of the IVC?

 2    A.  Correct, it does.  And -- well, it depends on the diameter

 3    of the IVC.  And so the filter, when you -- you crimp it down

 4    onto the catheter and then it springs back, and so it deploys

 5    out.  And so it's putting a force on the IVC.  It's pushing

 6    against the walls of the IVC.

 7              And so that force will -- depending on the situation,

 8    may influence the motion of the IVC.  And that's why, by

 9    modeling the complete environment of the filter and the IVC,

10    we're able to capture when that happens and when that doesn't

11    very naturally.

12    Q.  And did you, again, prepare another demonstrative that

13    explains this?

14    A.  Yes.

15              MS. HELM:  May we see 7816, please?

16    BY MS. HELM:

17    Q.  And, Dr. McMeeking, is this the demonstrative that

18    explains -- I apologize.  I'm calling everyone the wrong name

19    and can't even get the right profession sometimes.

20              Dr. Briant, is this the demonstrative that explains

21    what you were just discussing?

22    A.  Yes, it is.

23              MS. HELM:  Your Honor, at this time I'd like to

24    publish 7816 as a demonstrative.

25              MR. O'CONNOR:  No objection.

UNITED STATES DISTRICT COURT

1           THE COURT:  You may.

2    BY MS. HELM:

3    Q.  Dr. Briant, would you explain in 7816, on the left-hand

4    side where it says G2 Filter in IVC With Surrounding Tissue,

5    would you explain to the jury what that depicts?

6    A.  Sure.  So this is the output from our analysis.  So we were

7    doing these analyses with a computer using finite element

8    analysis, as we talked about.  So we have the filter geometry.

9    We have the surrounding tissue, as we saw earlier.

10          And so this is the resulting output.  So on the left

11   what we're looking at is the deformed shape of the filter.  And

12   so we have two images.  We looked at various cases, but this

13   shows two of them.

14          On the far left is the not perforated case.  And what

15   I'll call your attention to is you can see where the arms

16   contact the filter -- or contact the IVC, how the IVC has been

17   bulged out.  And that's due to the forces from the filter

18   acting on the IVC.

19          We also looked at perforated cases, where we allowed

20   the filter to fully perforate.  And, again, you can see a

21   similar situation where it's bulged out on the right-hand side

22   of those images.

23   Q.  And on the right-hand side, where it says "perforated," how

24   much perforation did you use in your calculations?

25   A.  So we modeled it as fully perforated, where it's basically

```
 1   gone back to its original shape.
 2   Q.  And would you tell us what 7816 depicts on the right-hand
 3   side, where it says Comparison of Calculated Strains for
 4   Perforated G2 Filter?
 5   A.  Sure.  So what this is showing is a comparison of the
 6   strains you would get using Dr. McMeeking's calculations
 7   compared to our analysis.
 8          So we have three different cases that are plotted
 9   here.  Again, we looked at more than this, but this is three
10   different cases where we have different amounts of motion that
11   we're applying.  And then we have the strain on the Y axis, the
12   vertical axis, which is, again, how much strain the device has
13   seen or how much deformation it's got.
14          And so the red bars are the results using
15   Dr. McMeeking's assumptions and his calculations, compared to
16   the blue bars where we have the entire filter and the
17   surrounding soft tissues and model the whole thing.
18   Q.  Are you saying that the assumptions made by Dr. McMeeking
19   had a large influence on his results?
20   A.  Yes.  And you can see that by the difference --
21          THE COURT:  Hold on, please.
22          MR. O'CONNOR:  Objection.  Leading.
23          THE COURT:  If you stand, Mr. O'Connor --
24          Mr. Briant, if he stands, hold off on your answer.
25          THE WITNESS:  My apologies.
```

1           THE COURT:  Sustained as leading.

2    BY MS. HELM:

3    Q.  Dr. Briant, do you have an opinion as to whether

4    Dr. McMeeking's assumptions had an influence on the results he

5    obtained?

6    A.  Yes.  And you can see --

7    Q.  Would you explain that opinion, please?

8    A.  Sure.  And you can see that by the difference in the red

9    bars versus the blue bars in that plot, where if you had the

10   rigid IVC and constrained rotation, then you get much higher

11   strains than would actually occur if you have the filter in its

12   surrounding environment.

13   Q.  Did Dr. McMeeking make any other assumptions about the

14   Nitinol wire that Bard used in its filters?

15   A.  Yes, he did.

16   Q.  And did he make any assumptions relating to the fatigue

17   strength of those wires?

18   A.  Yes, he did.

19   Q.  And what were those assumptions?

20   A.  So once we've done these calculations in order to assess

21   the strains and see how severe they are, we compare the strains

22   to what's called the fatigue strength, which is the strength of

23   the material, which is determined from testing.

24           And so Dr. McMeeking, in order to do this comparison,

25   used data from Nitinol that was from the literature, so not

1    actually from testing of Bard wire.  And he used a value that

2    that was quite low, lower than just about anything I've ever

3    seen, that he pulled from literature.

4    Q.  And what information did you use to evaluate the fatigue

5    strength of the Bard Nitinol wire used in the Bard IVC filters?

6    A.  Sure.  So Bard has done testing on their wire and taken it

7    to failure and looked at the strength of the wire, and so that

8    was the value that we used.

9    Q.  Okay.  So we've talked about the differences in your

10   opinions relating to the IVC, the Nitinol, the superelastic

11   properties of Nitinol, and the dimensions of the filter itself.

12   And Dr. McMeeking came in earlier in this case and told the

13   jury that he had done analysis and calculations.

14   A.  Correct.

15   Q.  And you've just explained analysis and calculations that

16   you did.  Did you do anything beyond analysis and calculations

17   after you did those?

18   A.  Yes.  We did laboratory testing on the filters also.

19   Q.  And when you say "laboratory testing," would you explain

20   what you mean?

21   A.  Sure.  So that was -- we had actual filters, and we did

22   testing in our lab to verify or validate our calculations to

23   make sure that they were representative of reality.

24   Q.  And did the bench testing -- is laboratory testing

25   sometimes called bench testing?

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2538

1    A.  Yes.  They're the same, because you do it on a bench.

2    Q.  Did the bench testing you performed validate your

3    calculations and analysis?

4    A.  Yes, it did.

5    Q.  And how?

6    A.  So we compared the results from the bench testing to the

7    forces that we see from the calculations, and we saw good

8    agreement.

9    Q.  And did you prepare a demonstrative to show the bench

10   testing and the comparison that you received?

11   A.  Yes, I did.

12           MS. HELM:  Could we pull up 7815, please.

13   BY MS. HELM:

14   Q.  And, Dr. McMeeking, is this the document -- I give up.

15           Dr. Briant, is this the document you prepared to show

16   the bench testing comparison to your calculations?

17   A.  Yes, it is.

18           MS. HELM:  Your Honor, at this time I tender 7815 for

19   demonstrative purposes.

20           MR. O'CONNOR:  No objection.

21           THE COURT:  You may display it.

22   BY MS. HELM:

23   Q.  Dr. Briant, would you explain to the jury what this slide

24   shows.

25   A.  Sure.  So this shows the testing that we did for the strain

1    analyses as well as the results.

2    Q.  Okay.  And on the left is a picture.  And is that -- what

3    does that picture depict?

4    A.  Sure.  So on the left-hand side we see the test setup.  And

5    what you can see there is one of the filters that we have for

6    the testing, and that is a G2 filter.  We did testing on both

7    G2 and Recovery.

8         And so what happens during the tests is we hold the

9    filter, as you can see, and then we have this rod that comes

10   down vertically from the top.  And this is done on what we call

11   an Instron machine.

12        And so that rod comes down and it pushes on arms -- on

13   an arm or leg.  We tested both.  And then it measures the force

14   that's required to push down on that arm.

15   Q.  And on the right-hand side, there's another graph.  Can you

16   explain what that graph depicts?

17   A.  Sure.  So this is the result from the test, so this is the

18   output from the Instron machine.

19        And on the horizontal axis we have displacement, so

20   that's how much the rod has traveled.  And on the vertical axis

21   we have force, so it's how much force it took to do that.

22        And so the results from the tests, from the

23   experiments, are those solid lines that you can see there.

24   There's two of them.  And then the black dashed line, that's

25   the result from the analysis.

1              And as you can see, we got good agreement between our

2    calculation results, what was predicted by the analysis, as

3    well as the experimental testing.

4    Q.  And on the graph, on the right-hand side of 7815, it

5    says -- when you talk about analysis, it says "FEA."  Is that

6    finite element analysis?

7    A.  Correct.  Yes.

8    Q.  And could you, as simply as possible, and I know it's not

9    simple, explain to the jury again what finite element analysis

10   means?

11   A.  Sure.  So finite element analysis is an analysis technique

12   to do these strain calculations.  And it's a technique that we

13   use when the situation that you're trying to calculate is too

14   hard to do by hand.  It allows us to do the calculations with a

15   computer.

16   Q.  And did you do anything else other than -- in addition to

17   the bench testing, did you do anything else to verify the

18   accuracy of your calculations that you performed through finite

19   element analysis?

20   A.  So we did comparisons to literature.  And the main thing

21   I'm talking about there, as I mentioned, is studies have looked

22   at patients that have filters in them.  And as I mentioned, the

23   diameters of the IVCs that they measure with the filters at the

24   filter location is larger than above or below the filter.  And

25   again, this just verifies that the filter -- the IVC is

1    responding to the presence of the filter and the forces that

2    the filter puts on it.

3    Q.  Based on the calculations and analysis and the testing and

4    analysis of your testing, do you have an opinion as to whether

5    the strains that Dr. McMeeking calculated were accurate?

6    A.  I think that they were inaccurate, for all the

7    simplifications and assumptions that we've talked about.

8    Q.  And is that opinion held to a reasonable degree of

9    engineering certainty?

10   A.  Yes, it is.

11   Q.  Okay.  I want to switch briefly and talk to you very

12   briefly about tilt.

13           We've talked about the fact that Ms. Hyde only had a

14   2- to 4-degree tilt in her filter.  But did Dr. McMeeking also

15   do some analysis relative to tilt?

16   A.  Yes, he did.

17   Q.  And what was it -- very briefly, what did Dr. McMeeking do?

18   A.  So he, again, did analytical hand calculations as well as

19   finite element analysis related to tilt.

20   Q.  And what did Dr. McMeeking conclude about tilt in Bard

21   retrievable IVC filters?

22   A.  So he concluded that the filters were likely to tilt, all

23   the types of the filters.

24   Q.  And are you critical of the assumptions that Dr. McMeeking

25   used in his calculations and analysis relating to tilt?

1    A.  Yes, I am.

2    Q.  And why are you critical of it?

3    A.  So Dr. McMeeking, in his calculations, assumed three

4    things, all of which would resist tilting.

5         Number one, he assumed that the friction -- there was

6    no friction between the IVC and the filter, so -- and we know

7    that friction would happen.  Friction would be present between

8    the IVC and the filter.  And he didn't include that in his

9    analysis.

10        Number two was he again looked -- assumed that the IVC

11   was rigid as opposed to deformable.  And as you saw in those

12   previous images how the filter will cause the IVC to tent and

13   deform, and that will resist tilting further.

14        And then lastly, he didn't include the hooks on the

15   legs that would have to -- that would also resist tilting.

16   Q.  And did you do your own analysis of the propensity of Bard

17   filters to tilt?

18   A.  Yes, we did.

19   Q.  Okay.  And can you explain to us briefly what you did in

20   your analysis of tilting?

21   A.  Sure.  So we used the same basic setup that we did for our

22   strain calculations.  We had our filter, and we deployed it

23   into the IVC.  But this time, rather than pulsing it, we pushed

24   on the cap, on the top, and looked at the amount of force that

25   it took to tilt the filter over.

1    Q.  And did Dr. McMeeking express any opinions about the impact

2    of tilt on other filter complications?

3    A.  Yes, he did.

4    Q.  Do you agree with those opinions?

5    A.  No, I don't.

6    Q.  Why not?

7    A.  So Dr. McMeeking was of the opinion that tilt would

8    increase the likelihood for other complications such as

9    perforation and fracture.

10   Q.  And did his analysis permit one to make that scientific

11   conclusion?

12   A.  No, it did not.

13   Q.  And why not?

14   A.  So we did our own calculations to look at this.  And in

15   regard to perforation, what we did was we looked at filters --

16   the forces from filters in different diameters of the IVC, so

17   in large IVCs and small IVCs.

18        And what we found was that the force obviously

19   increases as you decrease the diameter of the IVC.  And those

20   increases in forces are well beyond what you get when you just

21   tilt the filter over, yet there's no indication in the

22   literature that, like, smaller IVCs are more prevalent to

23   perforation than larger ones or anything like that.

24        In addition, we looked at the interrelationship

25   between tilt and strain or fracture and found that -- we,

1    again, looked at -- analyzed tilted filters and actually found

2    very similar or slightly lower strains in tilted filters than

3    in straight ones.

4    Q.  And are the opinions that you are offering today about

5    Dr. McMeeking's analysis of tilt and the opinions you're

6    offering about your analysis of tilt, are those being offered

7    to a reasonable degree of engineering certainty?

8    A.  Yes, they are.

9    Q.  I want to switch gears and talk to you about some testing.

10            Dr. -- your second opinion that you told the jury

11   about was that Dr. McMeeking criticized Bard's testing of the

12   filter in the development process.

13   A.  Correct.

14   Q.  Okay.  Did you review his analysis of Bard's testing?

15   A.  Yes, I did.

16   Q.  And what is your understanding of Dr. McMeeking's criticism

17   of the testing Bard did for the G2, G2X, and Eclipse filters?

18   A.  That he was critical of it and thought it was inadequate.

19   Q.  Did you look at Bard's testing?

20   A.  I did, yes.

21   Q.  Do you do testing?

22   A.  I do, yes.

23   Q.  Other than the testing to confirm your analysis on strain

24   and tilt that we've just talked about, were you asked to do any

25   other testing in this case?

1    A.  The testing that we did was just to validate our

2    calculations.

3    Q.  Okay.  But based on the review of -- and, again, remind the

4    jury what you had available to you relating to Bard's testing.

5    A.  We had the testing documents.

6    Q.  Okay.  And based on your review of the testing documents

7    and your experience, do you have an opinion about Bard's

8    testing for the G2, G2X, and Eclipse filters?

9    A.  Yes.  My opinion was that the testing that Bard did

10   considered all the relevant complications that are known to

11   occur with IVC filters.

12   Q.  And in addition to calling you the wrong name and stumbling

13   over words, I also left off a filter, so let me ask it again.

14        Do you have an opinion about the testing that Bard did

15   for the Recovery, the G2, the G2X, and the Eclipse filters?  Is

16   it the same opinion?

17   A.  Yes, it would be the same.  The testing considered all the

18   relevant complications.

19   Q.  Did Bard take into consideration the superelastic nature of

20   Nitinol in its testing?

21        MR. O'CONNOR:  Objection.  Nondisclosure.

22        THE COURT:  Ms. Helm?

23        MS. HELM:  April 2017 report, page 51, Section 10.

24        THE COURT:  And where on that page?

25        MS. HELM:  Section 10, in the first full paragraph, in

```
 1    the second line, "Including the use of superelastic."

 2              THE COURT:  Okay.

 3              Objection is overruled.

 4    BY MS. HELM:

 5    Q.  Dr. Briant, do you remember the question?

 6    A.  Yes, I do.

 7    Q.  Do you mind --

 8    A.  Sure, yeah.  So Bard included the superelastic effects in

 9    their analyses.

10    Q.  Did Dr. McMeeking also have a criticism of whether Bard

11    took into account pulsation in its testing?

12    A.  Yes, he did.

13    Q.  And what was your -- did Bard take that into consideration?

14    A.  Bard looked at the effects of pulsation, yes.

15    Q.  Has Dr. McMeeking offered any alternative or any testing

16    that Bard should have done?

17    A.  He has made suggestions.

18    Q.  Are those suggestions, suggestions that you can analyze to

19    a reasonable degree of engineering certainty?

20    A.  No, because he hasn't provided anything to analyze.

21    Q.  And to be able to analyze a test, what would you need to

22    know?

23    A.  So you would need design drawings, you know, analysis

24    testing in order to be able to assess whether an alternative

25    design might work.
```

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2547

1    Q.  Okay.  We've talked about the differences between your

2    assumptions and calculations.  We've talked about your analysis

3    of Bard's testing.

4         Dr. McMeeking was here, and he said that Bard did not

5    test to worst case scenario.  Are you familiar with his opinion

6    on that?

7    A.  Yes, I am.

8    Q.  Okay.  And why did Dr. -- so do Dr. McMeeking's assumptions

9    that he made, why don't they represent worst case scenario?

10   A.  Sure.  So as we talked about, Dr. McMeeking made

11   assumptions such as the infinitely stiff IVC that are beyond

12   what the human body can do.  So his assumptions weren't a

13   reasonable worst case that actually could be experienced by the

14   filter but beyond a physically possible worst case.

15   Q.  And Dr. -- if Dr. McMeeking were to criticize your

16   assumptions as being favorable to filter performance, would you

17   agree with that?

18   A.  No.  Definitely not.  We used conservative values based on

19   the literature in a lot of different locations.  We also looked

20   at analyzing the motion of the filter and the strains from

21   three different ways, three different loading modes, in order

22   to try and bound the problem and understand the range of

23   strains that the filter could undergo.

24   Q.  Okay.  And did you make those analyses and those

25   conclusions independent of any work done by Bard?

UNITED STATES DISTRICT COURT

1    A.  Yes.  That was all ours.

2    Q.  I want to shift gears with you to your third major opinion,

3    and that relates to the Simon Nitinol filter.

4         And over the last couple of weeks, the jury's heard a

5    lot about the Simon Nitinol filter.  Would you please tell them

6    again what your opinion is in this case as it relates to the

7    Simon Nitinol filter.

8    A.  Yes.  It's that, from an engineering perspective, that the

9    Simon Nitinol filter is not an alternative design or

10   alternative product.  And that's because it lacks the

11   retrievability.  It lacks that functionality which the Bard G2

12   filters have.

13   Q.  What analysis would be required from an engineering

14   perspective to determine scientifically if there was an

15   alternative safer product to the one you already have?

16   A.  Sure.  So that would be what I talked about.  You'd have to

17   start with creating a design, design drawings, and then going

18   through analyses and testing in order to be able to verify that

19   your design is viable and that it would actually work.

20   Q.  And have you heard the term "unintended consequences"?

21   A.  Yes, I have.

22   Q.  And what does that mean from an engineering perspective?

23        MR. O'CONNOR:  Objection.  Nondisclosure.

24        MS. HELM:  Your Honor, may I reask the question so

25   that I can confirm the disclosure?

PAUL BRIANT, PH.D. - DIRECT EXAMINATION                    2549

1          THE COURT:  Reask it, please.

2    BY MS. HELM:

3    Q.  What do you mean -- I used the term "unintended

4    consequences."  I'm going to switch it.

5          What do you mean when we talk about consequences of a

6    change to a design?

7    A.  So when you change a design, you could -- while you may be

8    trying to help one complication that's occurring, it could

9    exacerbate other complications.

10   Q.  And, Dr. Briant, I have just a couple questions -- well,

11   let me back up.

12         Has any analysis been done by Dr. McMeeking to

13   determine what would be necessary to make the Simon Nitinol

14   filter a retrievable filter?

15   A.  No, he hasn't.

16   Q.  And I want to switch gears with you just a little bit more.

17         The jury has heard in this case that as of March of

18   2011, when Ms. Hyde got her filter, that Bard was working on

19   some other projects and some other filters, and that

20   subsequently Bard had filters on the market called the Meridian

21   and the Denali.

22         As part of your work in this case, were you -- did you

23   see any opinions by Dr. McMeeking relating to the Meridian and

24   the Denali filters?

25   A.  Yes, I did.

UNITED STATES DISTRICT COURT

1   Q.  And would you tell the jury, please, what Dr. McMeeking's

2   opinions are about the Meridian and the Denali filters.

3          MR. O'CONNOR:  This is not in this expert's report.

4          THE COURT:  Ms. Helm?

5          MS. HELM:  Your Honor, it's in his May 2017 report,

6   page 23.  In fact, that entire report addresses those two

7   filters, Your Honor.

8          THE COURT:  Where on page 23?

9          MS. HELM:  Paragraph 5.2.1.

10         THE COURT:  Objection is overruled if the criticism

11  you're going to have him describe is 5.2.1.

12  BY MS. HELM:

13  Q.  Dr. Briant, did Dr. McMeeking offer an opinion that the

14  design process of the Meridian and the Denali filters was not

15  valid?

16  A.  Yes.  That's what he thought.

17  Q.  And did he offer an opinion that the Meridian and the

18  Denali filters, from his point of view, would suffer from the

19  same complications as the previous generations of Bard filters?

20  A.  Yes.  That was his opinion.

21  Q.  And did he offer an opinion in his report that those

22  filters would experience tilt, perforation, migration, and

23  fracture?

24  A.  Yes, he did.

25  Q.  Have you had an opportunity to review Dr. McMeeking's

1  testimony in this case?

2  A.  Yes, I have.

3  Q.  Did he offer that opinion -- did he tell the jury that when

4  he was here?

5  A.  Not that I recall.

6  Q.  Okay.  When Dr. McMeeking was here, he testified that he

7  had the concept of a filter that had caudal anchors,

8  penetration limiters, and a change in the angle of the wires

9  coming out of the cap.

10           Did you read that testimony?

11 A.  Yes, I did.

12 Q.  Have you analyzed this idea that Dr. McMeeking has for this

13 changed filter?

14 A.  No, I have not.

15 Q.  Why not?

16 A.  Again, because there's been nothing to analyze.  Nothing's

17 been proposed.

18 Q.  In order to determine whether changes to caudal anchors,

19 penetration limiters, and the angle coming out of the wire,

20 whether a filter with those changes would work, what would you

21 need to do?

22 A.  Again, that would be, you know, coming up with a design,

23 actually doing engineering analysis on it, and testing it,

24 again, to see if your design is viable and if it would work.

25 Q.  If you don't come up with a design, you don't analyze it,

1    you don't build a prototype, and you don't test it, from an

2    engineering perspective, what do you have?

3              MR. O'CONNOR:  Objection.  Leading and nondisclosure.

4              THE COURT:  How do you respond on nondisclosure,

5    Ms. Helm?

6              MS. HELM:  Your Honor, on his July 2017 report, on

7    page -- well, page 7, Section 5.0, paragraph 3, lines 6 to 11.

8              MR. O'CONNOR:  I'm not aware of the July report for

9    this.  Hang on.  I'm sorry, what page?

10             MS. HELM:  7, Section 5, paragraph 3, lines 6 to 11.

11             THE COURT:  There's four paragraphs on that page.  I'm

12   assuming you mean paragraph 4, since paragraph 3 doesn't have

13   11 lines.

14             MS. HELM:  The opinion -- I numbered the paragraphs.

15   It's the last paragraph.

16             THE COURT:  Okay.

17             I think all he does is state what Dr. McMeeking does

18   not do.  He doesn't state what the effect would be, so the

19   objection is sustained.

20   BY MS. HELM:

21   Q.  Dr. Briant, within a reasonable degree of medical

22   certainty, do you have what you need to analyze Dr. McMeeking's

23   idea about changes to an IVC filter?

24   A.  From an engineering perspective, no.

25             MS. HELM:  No further questions at this time.

1           THE COURT:  All right.  Cross-examination.

2                       CROSS-EXAMINATION

3    BY MR. O'CONNOR:

4    Q.  Dr. Briant, how are you?

5    A.  Good.  How are you?

6    Q.  Good.  I'm impressed with a B in Greek Mythology.

7           Dr. Briant, I just want to go back to something about

8    what Exponent has made in this case.  It's been paid $700,000;

9    right?

10   A.  Approximately, yes.

11   Q.  And that has been for activities by you and engineers to

12   defend Bard in this case; right?

13   A.  It's been to do the analysis that was requested of us.

14   Q.  Which includes defending Bard; right?

15   A.  It's to analyze Dr. McMeeking's analysis.

16   Q.  So for $700,000, your firm, with other Ph.D. engineers just

17   like you, have been paid for the limited purpose of criticizing

18   Dr. McMeeking; is that fair?

19   A.  Yes.  My role in this case has been to analyze and assess

20   the opinions of Dr. McMeeking and the calculations that went

21   into those opinions.

22   Q.  Thank you.

23          And you did testing to verify your own calculations;

24   correct?

25   A.  That's correct.

UNITED STATES DISTRICT COURT

1    Q.  You and your other engineers did nothing to verify or

2    validate testing that was done at Bard; correct?

3    A.  Correct.  Our work was for our own calculations.

4    Q.  And let me ask you this, Dr. Briant:  You, at Exponent,

5    your firm does things like root cause analysis; correct?

6    A.  Yes, we do.

7    Q.  And you're certainly capable to be retained by Bard to do a

8    root cause analysis of its filters and filter problems that

9    you've become aware of; correct?

10   A.  That's something we could have looked at.

11   Q.  And Bard has never asked you to do that; correct?

12   A.  That's correct.

13   Q.  And what you do know is that Bard filters, including the

14   G2, the G2X, and the Eclipse, have tilted; right?

15   A.  I'm aware that tilting occurs, yes.

16   Q.  You're aware that Bard filters have perforated; correct?

17   A.  I'm aware of that, yes.

18   Q.  You're aware that they have perforated through the vena

19   cava walls; correct?

20   A.  I'm aware that can occur, yes.

21   Q.  And you're also aware that Bard filters fracture, break,

22   and embolize to other parts of the body; correct?

23   A.  I'm aware that can occur, yes.

24   Q.  What you haven't seen is internal information from Bard and

25   what Bard knows about the rate that occurs; true?

PAUL BRIANT, PH.D. - CROSS-EXAMINATION                    2555

1    A.  I've seen one table about complication rates.  But other

2    than that, no.

3    Q.  And what Dr. McMeeking did is he took out calculations and

4    he -- for his analysis and his assumptions, he assumed the

5    worst case scenario.  You agree with that?

6    A.  It's my opinion that he assumed -- incorporated assumptions

7    into his analysis that were beyond what -- the physical worst

8    case.

9    Q.  I'm just breaking it down.

10            He testified and wrote in his report that he assumed

11   the worst case scenario.  You agree with that?

12   A.  That's what he wrote.  That's correct.

13   Q.  And he assumed that Bard IVC filters have been known to

14   tilt; correct?

15   A.  He wrote that, yes.

16   Q.  He assumed that Bard filters have perforated the vena cava

17   walls; correct?

18   A.  Yes.

19   Q.  He assumed Bard filters have perforated and fractured;

20   correct?

21   A.  Yes.

22   Q.  And he assumed that filter arms will sometimes get stuck --

23   what do you call that -- endothelialized into the wall of the

24   vena cava; correct?

25   A.  He talked about that, yes.

1   Q.  And you know that all those things have happened to Bard

2   filters; correct?

3   A.  I'm aware those can occur, yes.

4   Q.  And one reason that a medical device company should do

5   testing and analysis and calculations is to help predict what

6   will happen when a device is in the real world; correct?

7   A.  Right.  Medical device companies are looking to evaluate

8   and understand how their devices will perform, yes.

9   Q.  You agree that's an absolute obligation they have, to

10  understand as best they can what's going to happen once that

11  filter is placed in human beings; true?

12  A.  Yes.  I think medical device companies should evaluate the

13  environments that their devices are going to be put into and

14  look at it.

15  Q.  And Bard filters have migrated, tilted, fractured,

16  embolized, and perforated; right?  We know that's happened in

17  the real world; correct?

18  A.  Yes.  I'm aware those occurred.

19  Q.  And Dr. McMeeking's calculations have shown that the

20  filters tilt under certain circumstances; correct?

21  A.  He shows they can tilt, yes.

22  Q.  Dr. McMeeking, through his finite element analysis and

23  calculations, has showed that Bard filters migrate under

24  certain circumstances; true?

25  A.  I don't believe he looked at migration.

PAUL BRIANT, PH.D. - CROSS-EXAMINATION          2557

1    Q.  Okay.  Well, you've -- we could check his report, both of

2    us, couldn't we?

3    A.  We could, yeah.

4    Q.  You know that Dr. McMeeking's calculations have shown that

5    Bard filters perforate and fracture; correct?

6    A.  He talks about those in his report, yes.

7    Q.  And those were consistent with what he testified were the

8    result of his calculations; true?

9    A.  Under the analysis assumptions that he did and

10   incorporated, yes.

11   Q.  And, in fact, those failure modes, we all know, have

12   occurred in the real world; true?

13   A.  Yes.  Those can occur.

14   Q.  The disagreements, when it comes right down to it, between

15   you and Dr. McMeeking are how stiff the tissue surrounding the

16   IVC is -- that's one area that you disagree; true?

17   A.  That's one of them, yes.

18   Q.  All right.  And another is how tightly the IVC can hold on

19   to an arm when it is perforated or endothelialized; correct?

20   A.  Yes.  Dr. McMeeking assumed that there couldn't be any

21   rotation where the filter contacted the arm.

22   Q.  And another area of disagreement between you and

23   Dr. McMeeking is how the filter responds to stresses and

24   strains; correct?

25   A.  Well, so both of us are calculating the stresses and

 1    strains inside the filter under these different conditions.

 2    Q.  His stresses and strains that he assumed in his

 3    calculations led to perforation, tilt, and fracture; right?

 4    A.  The calculations that he did suggest that, under his

 5    assumptions, that fracture would occur.

 6    Q.  Now, when you were retained in this case and you wrote your

 7    case-specific report, you said that Lisa Hyde had a G2X filter;

 8    correct?

 9    A.  Yes, that's correct.

10    Q.  You were clear and unequivocal about that; right?

11    A.  Yes.  That was based on the information I had at the time.

12    Q.  And nobody from Bard ever asked you to correct that; true?

13    A.  Correct the report?  No.

14    Q.  And you know that Lisa Hyde's filter, among other things,

15    perforated through the vena cava wall; correct?

16    A.  That's my understanding, yes.

17    Q.  And you're aware of that happening to other patients.

18    You've reviewed literature and have seen it happen and are

19    aware of that happening in Bard filters in other patients;

20    correct?

21    A.  Yes.  Perforations can occur.

22    Q.  And you're aware that her IVC filter perforated into or

23    above it or interacted with her aorta; correct?

24    A.  Yes.  That's correct.

25    Q.  Okay.  And you know that another filter leg interacted with

1    her vertebrae at L3; correct?

2    A.  I'd have to go back and review that detail.

3    Q.  Any reason to disagree with that?

4    A.  No.  I don't have any reason.

5    Q.  And you know from your work in -- with Bard that those

6    things have happened to Bard filters; correct?

7    A.  Yes.  I'm aware that happens.

8    Q.  And you also know that her filter arm perforated through

9    the vena cava, broke, and traveled to her heart and it required

10   a surgery.  You know that; correct?

11   A.  Yes, I'm aware.

12   Q.  And you know that has happened to other Bard filters;

13   correct?

14   A.  Yes, I'm aware.

15   Q.  And Dr. McMeeking explained through his calculations,

16   through his finite element analysis, why that happens; true?

17   A.  Under the assumptions that he used in his calculations, he

18   determined high strains that would suggest fracture.

19   Q.  Well, if you assume a filter's fracture and you can prove

20   it, there's something good about that test; right?

21   A.  That would depend on the assumptions that are used.

22   Q.  But, in fact, his assumptions and his calculations showed

23   tilt, perforation, fracture, and embolization; right?

24   A.  His calculations show that fractures could occur under his

25   assumptions and that tilt could occur, again, under his

1    assumptions.

2    Q.  You do agree that a medical device company must always put

3    patient safety first; correct?

4    A.  Yes, that should be first.

5    Q.  And a medical device company should do everything it can to

6    understand the environment where a device is going to be used.

7    You agree with that; correct?

8    A.  I think that companies should look at the environment of

9    the device, yes.

10   Q.  And when it comes to IVC filters, a medical device company

11   like Bard should, under all circumstances, understand the

12   dynamics of the vena cava; right?

13   A.  I think they should try to understand it to the best of

14   their abilities.

15          MR. O'CONNOR:  Thank you.

16          THE COURT:  Redirect?

17                     REDIRECT EXAMINATION

18   BY MS. HELM:

19   Q.  Dr. Briant, are you aware of whether all IVC filters can

20   fracture?

21   A.  Can they fracture?

22          MR. O'CONNOR:  Objection.  Nondisclosure.

23          THE COURT:  Overruled.  It's fair redirect.

24          THE WITNESS:  I'm sorry.  Can you repeat the question?

25

PAUL BRIANT, PH.D. - REDIRECT EXAMINATION        2561

1    BY MS. HELM:

2    Q.  Can all IVC filters fracture?

3    A.  They could.  My understanding is that they don't.

4    Q.  Okay.  Not every filter fractures?

5    A.  Correct.  That's my understanding.

6    Q.  But let me -- we got a little discombobulated there.  Let

7    me back up.

8            Are you aware of instances of filters manufactured by

9    companies other than Bard that have suffered fractures?

10   A.  I'm aware of them, yes.

11   Q.  And are you aware of instances where filters manufactured

12   by companies other than Bard have suffered from tilt,

13   perforation, and migration?

14   A.  I'm aware of those, yes.

15   Q.  Those are complications of IVC filters -- are those

16   complications of IVC filters?

17           MR. O'CONNOR:  Objection.  Leading and nondisclosure.

18           THE COURT:  Overruled.

19           THE WITNESS:  Yes, those are known complications of

20   IVC filters.

21   BY MS. HELM:

22   Q.  Thank you.

23           Okay.  And Mr. O'Connor stood up here and asked you

24   about all the calculations and Dr. McMeeking's calculations

25   assumed this and did this and did that.

1          In your opinion, to a reasonable degree of engineering

2     certainty, did Dr. McMeeking's assumptions and calculations

3     accurately depict what can happen to an IVC filter in the human

4     body?

5     A.  No, because he assumed things that we know were beyond

6     physical limits.  For example, we know the IVC is not

7     infinitely stiff.

8              MS. HELM:  Thank you.  No further questions.

9              THE COURT:  All right.  Thank you, sir.  You can step

10    down.

11             THE WITNESS:  Thank you.

12             (Witness excused.)

13             MS. HELM:  Your Honor, at this time we call John

14    Van Vleet.

15             THE COURT:  If you want to stand up, ladies and

16    gentlemen, while he's coming in, you may.

17             Mr. Van Vleet, you can come directly back to the

18    witness stand.  You're still under oath for purposes of this

19    trial.

20

21                    JOHN VAN VLEET,

22    called as a witness herein by the defendants, having been

23    previously duly sworn or affirmed, was examined and testified

24    as follows:

25

```
 1                          DIRECT EXAMINATION

 2   BY MS. HELM:

 3   Q.  Good afternoon, Mr. Van Vleet.

 4   A.  Good afternoon.

 5   Q.  Would you please reintroduce yourself to the jury, remind

 6   them who you are.

 7   A.  Sure.  My name is John Van Vleet.  I was the vice president

 8   of regulatory affairs and clinical programs for Bard Peripheral

 9   Vascular from June of 2007 until December of 2017.

10   Q.  Thank you.

11           When you joined Bard in 2007, did you have previous

12   experience in regulatory affairs for a medical device company?

13   A.  Yes.

14   Q.  And did you have an approach that you had developed over

15   the years in working in regulatory affairs for a medical device

16   company?

17   A.  Yes.  It was what I would call a collaborative approach

18   with regulators, whenever possible, with the FDA.

19   Q.  And when you arrived at Bard, did you see your approach

20   relating to regulatory affairs already in action at Bard?

21   A.  Yes, I did.

22   Q.  And what did you do?  How did you address that?

23   A.  I built on it.  It was a very organized and formalized

24   program, good documentation practices, good, thorough

25   communication.  Anytime there were telephone conversations with
```

1    FDA, an email was generated to document that, and these all

2    went into the regulatory files.

3    Q.  I injected, and I think the jury probably remembers, that

4    you said you were vice president of regulatory affairs and

5    clinical programs for Bard.  Would you just briefly explain

6    what your responsibilities were in that role?

7    A.  So I was responsible for overseeing the interactions

8    between Bard, my division of Bard, and any regulatory body,

9    whether it was in this country or in any other country.  The

10   Ministry of Health equivalent in the United States is the Food

11   and Drug Administration.

12          On the clinical side, many of our products required

13   certain levels of evidence to be submitted with applications to

14   regulatory bodies, to Ministries of Health.  And so we would

15   design studies in collaboration with the FDA, most of the time,

16   and other Ministries of Health globally.  And then another team

17   would be the operational team that would actually conduct these

18   clinical trials across medical centers in United States and

19   actually globally as well.

20   Q.  During the ten years that you were with Bard, did you have

21   responsibility for products other than IVC filters?  We're

22   assuming IVC filters because you're here today.

23   A.  Yes.  Yes.

24   Q.  Would you just briefly explain what other products you were

25   responsible for.

1   A.   Sure.   So this division of Bard serves the end stage renal

2   disease community, specifically, patients that are dialyzing;

3   they serve people that are being biopsied for different types

4   of cancer, mostly breast cancer; they serve peripheral arterial

5   disease patients, so a lot of balloon angioplasty and

6   self-expanding stents and drug-coated balloons; and then

7   vascular surgery products, in addition to the filter which is

8   for treating thromboembolic disease, but we also made

9   artificial grafts to enable people to do surgeries to bypass.

10  Q.   Okay.   And during this time period that you were at Bard

11  and responsible for regulatory affairs, explain the level and

12  amount of interaction you had with the FDA.

13  A.   We had weekly, at minimum, contact with FDA.   If you think

14  about the family and breadth of products and the different

15  groups and reviewers at FDA, we would at least have a

16  once-a-week contact with them.   That could be in the way of a

17  face-to-face meeting, it could be a phone conference, it could

18  be an email exchange, or just a simple one-on-one phone call.

19  Q.   Did you have conversations with FDA about Bard's IVC

20  filters?

21  A.   Yes.

22  Q.   Often?

23  A.   Often.

24  Q.   Let's back up.   I don't think the jury, the last time you

25  were here, the jury got to know you.

1          Where did you grow up?

2    A.  I was born and raised in the Dominican Republic, about 40

3    miles from Haiti.  My parents were missionaries there from 1941

4    to 1980.

5          Came to the States to go to university and went to

6    Purdue and kind of fell into Indiana and the orthopedic

7    business there for about 20 years.

8    Q.  And what degree did you receive from Purdue?

9    A.  A Bachelor of Science in biology with a minor in chemistry.

10   Q.  And after you graduated from Purdue, did you obtain any

11   other postgraduate education?

12   A.  Yeah, I was accepted into a medical technology internship

13   program for 12 months and then finished by taking my boards

14   by -- with the -- by the American Society of Clinical

15   Pathologists.  Still retain that license.  I've never really

16   practiced but -- other than volunteer health clinics.

17          And then years and years later, when I was no longer

18   working kind of on the bench or in a front-line capacity, I was

19   doing things that I didn't have business training for, so I

20   went back to get an MBA from Marian College.

21   Q.  And where do you live now?

22   A.  I live in Tempe.

23   Q.  And how long have you lived in the Phoenix area?

24   A.  Since June of 2007.

25   Q.  And I believe when you were here previously, you told the

1    jury that you left Bard at the end of last year.  Are you

2    employed?

3    A.  Yes.

4    Q.  And what are you doing today?

5    A.  I'm vice president of clinical affairs and regulatory

6    programs, almost exact opposite but the same, for a company

7    called Corindus Vascular Robotics.  It's an intravascular

8    robotics company based in Waltham, Massachusetts.

9    Q.  And do you have the privilege of being able to work from

10   Phoenix rather than Massachusetts?

11   A.  I have the privilege of being able to work from my office

12   in Tempe.  Thank you.

13   Q.  Phoenix feels a little bit like the East Coast today.

14   A.  Yes.

15   Q.  And would you just remind the jury how many years you've

16   been in the medical device industry.

17   A.  30 years.

18   Q.  Why have you decided to devote your career to the field of

19   medical devices?

20   A.  Through my undergraduate, I worked in a hospital

21   environment that actually had tuition reimbursement, and I

22   really enjoyed the interaction and the contact with patients

23   and that aspect of it.  But I learned that with a family and

24   more expenses, that I -- that there were other opportunities to

25   work in a medical environment but still be able to have that

1    same level of satisfaction of working clinically with patients

2    and seeing patients benefit from the type of work that you do

3    and the products that you help to create.

4    Q.  And what was your first opportunity to enter the medical

5    device industry?

6    A.  I was in the MBA program, and I was being interviewed by a

7    team.  And after they heard about my background working in the

8    hospital -- and at that point in time I was working for a

9    hazardous waste landfill as their chief chemist and lab

10   manager.

11          She wanted to know why I was working for a hazardous

12   waste company and not working for her, and I determined later

13   she was the director of human resources for Bristol-Myers

14   Squibb's orthopedic company, Zimmer, at that time.  And

15   literally two and a half weeks later, I stumbled into this

16   career.

17   Q.  Great.  Okay.  Let's fast-forward your career a little bit,

18   and let's come to the time when you started at Bard.

19          And when you started at Bard, did you start -- when

20   you got in, did you start, as part of your responsibility,

21   having responsibility for the regulatory and clinical affairs

22   for Bard's retrievable IVC filters?

23   A.  Yes.

24   Q.  And at the time that you arrived at Bard -- and we're going

25   to -- the jury's heard a lot of history in bits and pieces, and

1    I'm going to try to see if we can put it in time.

2          The EVEREST clinical trial was -- had just been

3    completed?

4    A.  Correct.

5    Q.  Okay.  And would you remind the jury just very briefly what

6    the EVEREST clinical trial was.

7    A.  It was a 100-patient multi-center trial that was designed

8    to evaluate the safety of retrieval of the G2 filter system.

9    Q.  So when you arrived at Bard, was the G2 filter available

10   for use as a permanent filter?

11   A.  Yes.

12   Q.  And when you arrived at Bard, had the clinical trial just

13   been completed to evaluate that filter to be available as a

14   retrievable filter?

15   A.  Yes.

16   Q.  And were you at Bard for the G2X and the Eclipse as well?

17   A.  Yes.

18   Q.  Okay.

19   A.  Correct.

20   Q.  Before we go into the clinical study and the -- and EVEREST

21   and bring ourselves forward in time, I have a couple questions

22   to ask you.

23          In your 30 years of working with medical devices, are

24   there any implantable medical devices of which you are aware

25   that do not carry the risk of complications?

1   A.  Not that I'm aware of.

2   Q.  Okay.  So when you got to Bard, the clinical trial, the

3   EVEREST clinical trial had been completed.  And let's put a

4   date on that, just so that we have our timeline in place.  When

5   was that?

6   A.  Sure.  So I arrived -- June 4th was actually my first day.

7   I believe the last follow-up in the trial had been completed in

8   May or April of that month.  And the clinical study report had

9   already been drafted when I started.

10  Q.  Okay.  So this is June of 2007?

11  A.  Yes.

12  Q.  Okay.  And when you arrived at Bard, did you go back and

13  study and determine what had taken place relating to the

14  regulatory and clinical work on the Bard G2 filter?

15  A.  Yes.

16  Q.  Did you review the EVEREST clinical study related files?

17  A.  Yes.

18  Q.  And once you started with Bard, did Bard have to provide

19  information and updates to the FDA relating to the EVEREST

20  clinical study?

21  A.  Yes.  As soon as the study is approved by the FDA to be

22  conducted, every six months we're required to prepare reports

23  to the FDA notating enrollment, which investigational sites are

24  currently enrolling, and then a summary of all complaints and

25  adverse events collected.

1    Q.  Thank you.

2              MS. HELM:  Would you pull up 5333, please.

3              Your Honor, this is -- I believe this is in evidence.

4    May I publish?

5              THE COURT:  You may.

6    BY MS. HELM:

7    Q.  Mr. Van Vleet, can you tell the jury what 5333 is, please?

8    A.  Sure.  It is one of the -- as I mentioned before, required

9    annual IDE progress reports.  I believe this was the one that

10   would be more comprehensive and including adverse events.

11   Q.  And this report was actually prepared before you arrived at

12   Bard, wasn't it?

13   A.  It was.

14   Q.  Okay.  And the jury heard about this from Ms. O'Quinn

15   yesterday.

16             So when you arrived at Bard in June, did the

17   responsibility for these reports become yours?

18   A.  Yes.

19             MS. HELM:  You can take that down, please.

20   BY MS. HELM:

21   Q.  And the next report is due six months later?

22   A.  Yes.

23   Q.  Okay.  So that would be approximately August of 2007?

24   A.  Yep.  Yes.

25   Q.  And were you responsible for the August 2007 report to FDA

1    relating to the EVEREST study?

2    A.  Yes.

3           MS. HELM:  Scott, could we pull up 5335, please.

4    BY MS. HELM:

5    Q.  And, Mr. Van Vleet, can you see that?

6    A.  Yes, I can.

7    Q.  Is that an August 2007 report prepared by Bard to the FDA

8    relating to the EVEREST study?

9    A.  Yes.

10   Q.  And was this report prepared either by you or at your

11   direction?

12   A.  Yes.

13          MS. HELM:  Your Honor, at this time I would move to

14   admit 5335, if it's not already in evidence.  I would move to

15   admit 5335.

16          MR. O'CONNOR:  No objection.

17          THE COURT:  Admitted.

18          (Exhibit No. 5335 admitted into evidence.)

19          MS. HELM:  May I publish, Your Honor?

20          THE COURT:  You may.

21          MS. HELM:  And may we go to page 18, please.  At the

22   bottom of the page, the last paragraph.

23   BY MS. HELM:

24   Q.  Mr. Van Vleet, did Bard tell the FDA about complications

25   that occurred with the G2 filters during the EVEREST study?

1   A.  Yes.

2   Q.  And what information did Bard provide to the FDA?

3   A.  All the information surrounding all adverse events observed

4   in the clinical trial.

5   Q.  And here, in the highlighted section, what did Bard -- was

6   Bard telling the FDA about reports of migration that occurred

7   during the EVEREST study?

8   A.  Yes.  It was talking about 10 filter migrations greater

9   than 2 centimeters reported with a mean follow-up of five

10  months.  It identified them as being downward, or caudal in

11  direction, between 2.0 and 4.1 centimeters, and without any

12  clinical sequelae or complications.

13  Q.  And it doesn't say without complications.  It says without

14  clinical sequelae.  And does that mean without complications or

15  symptoms?

16  A.  That means without any resulting clinical observations as a

17  result of the event.

18          MS. HELM:  You can take that down, Scott.

19  BY MS. HELM:

20  Q.  In response to reports on the -- such as this on the

21  EVEREST study, did Bard get questions or responses from the

22  FDA?

23  A.  We did.

24  Q.  In other words, you didn't just send a report in and then

25  radio silence?

 1    A.  No.

 2              MS. HELM:  Would you pull up 5334, please.

 3    BY MS. HELM:

 4    Q.  And, Mr. Van Vleet, can you see that?

 5    A.  Yes.

 6    Q.  And can you tell me what that is, please?

 7    A.  That is a letter to the Bard regulatory correspondent,

 8    Mr. Michael Ryan, from the FDA in response to their review of

 9    the annual IDE report.  And it has a series of -- first page

10    and like probably has two or three-page letter, and it has a

11    series of questions.

12              MS. HELM:  Your Honor, at this time I tender 5334.

13              MR. O'CONNOR:  Can we scroll through it, Your Honor?

14              Can I see the second page, please?

15              No objection.

16              THE COURT:  Admitted.

17              (Exhibit No. 5334 admitted into evidence.)

18              MS. HELM:  Publish, Your Honor?

19              THE COURT:  Yes.

20              MS. HELM:  And would you please turn to page 2.  And

21    Scott, could you highlight question -- the paragraph No. 3,

22    please?

23    BY MS. HELM:

24    Q.  And, Mr. Van Vleet, what did the FDA ask about migration in

25    the report of migration that you had made in August of 2007?

JOHN VAN VLEET - DIRECT EXAMINATION                    2575

1   A.  They stated that based on the 10 migrations and 100-patient

2   study, that would be equal to approximately a 10 percent rate.

3   They wanted to know why that rate of device migration would be

4   clinically acceptable, and then they would like to have a

5   comparison of the approximate migration rates of the currently

6   marketed Recovery and G2 filter devices based on our clinical

7   experience as compared to the investigational Recovery filter

8   studied in the EVEREST trial.

9   Q.  And did Bard undertake to put together the information and

10  respond to the FDA?

11  A.  Yes.

12          MS. HELM:  Would you pull up 5336, please.

13  BY MS. HELM:

14  Q.  Mr. Van Vleet, can you identify this document?

15  A.  Yes.  This would be our response to the letter from FDA

16  with their questions.

17  Q.  And was this prepared either by you or at your direction as

18  vice president of regulatory and clinical affairs for BPV in

19  October of 2007?

20  A.  Yes.

21          MS. HELM:  Your Honor, at this time I move to admit

22  5336.

23          MR. O'CONNOR:  May we scroll -- have it scrolled

24  through, Your Honor?

25          We have no objection.

1          THE COURT:  Admitted.

2          (Exhibit No. 5336 admitted into evidence.)

3          MS. HELM:  May I publish, Your Honor?

4          THE COURT:  Yes.

5          MS. HELM:  And, Scott, could you go to page 13,

6    please?  And would you highlight Question 3 at the bottom of

7    the page, please.

8    BY MS. HELM:

9    Q.  Mr. Van Vleet, is this Bard's response to FDA's questions

10   about the 10 migrations reported in the EVEREST study?

11   A.  Yes.  The text in bold is a direct lift from their letter

12   they sent to us, and then the indented text below would be our

13   response.

14   Q.  And what did Bard tell the FDA in response to the question

15   about the 10 migrations?

16   A.  Sure.  So FDA had done the math and calculated a migration

17   rate of 10 percent due to the hundred patients in the study.

18   But actually, in the study, there was only adequate imaging

19   available on 82 patients.

20          So we revised that percentage, so 10 divided by 82 is

21   12.2 percent.  And then we also, once again, reiterated in this

22   paragraph the distance that they had migrated.

23          MS. HELM:  And can we go on to the next page?  And at

24   the top, the first paragraph.

25

1   BY MS. HELM:

2   Q.  What else did Bard tell the FDA about those migrations?

3   A.  So we again repeated that in all of the cases of the

4   reported migration, it was in the downward or caudal direction,

5   and the patients were asymptomatic with no clinical sequelae.

6   Q.  And to your knowledge --

7          MS. HELM:  You can take that down, Scott.

8   BY MS. HELM:

9   Q.  -- were all adverse events, according to the clinical study

10  protocol that occurred in the EVEREST clinical trial for the G2

11  filter, reported to the FDA?

12  A.  Yes.

13  Q.  And to your knowledge, were all of FDA's questions raised

14  about those adverse events addressed by Bard?

15  A.  Yes.

16  Q.  Okay.  Based on the EVEREST study, did Bard ultimately ask

17  the FDA to clear the G2 filter for a retrievable indication?

18  A.  Yes, we did.

19         MS. HELM:  Would you pull up 5340, please.

20  BY MS. HELM:

21  Q.  Mr. Van Vleet, can you identify this document?

22  A.  Yes.  This is the actual application, which would include

23  the clinical study results and our request to have the FDA

24  clear the G2 filter for a retrievable indication.

25  Q.  The jury's heard the term 510(k) as the application

1    process.  Is this the 510(k) application for the G2 as a

2    retrievable indication dated October 31, 2007?

3    A.  Yes.

4           MS. HELM:  Your Honor, my note says this is admitted.

5           THE COURT:  It is.

6           MS. HELM:  May I publish?

7           THE COURT:  You may.

8           MS. HELM:  Thank you.

9    BY MS. HELM:

10   Q.  Mr. Van Vleet, was this 510(k) application submitted to the

11   FDA before or after the EVEREST study was completed?

12   A.  After.

13   Q.  And does this 510(k) application that was submitted to the

14   FDA include information about the EVEREST study, including the

15   EVEREST protocol?

16   A.  Yes.

17   Q.  The protocol for the study?

18   A.  Yes, it did.

19          MS. HELM:  Can we turn to page -- this is a very thick

20   document, isn't it?

21          THE WITNESS:  It's a thousand-some pages.

22          MS. HELM:  Can we turn to page 263, please.

23   BY MS. HELM:

24   Q.  And this appears to be like a header of a new section.

25   Would you explain what this section of the 510(k) application

1    is, please.

2    A.  Sure.  This is the actual clinical study protocol that's

3    included -- it's always included as part of the application,

4    and then the clinical study report follows that.

5    Q.  So this is explaining -- is this explaining to the FDA the

6    clinical protocol used for the EVEREST clinical trial?

7    A.  It is.  In this case, it's probably more of a technicality

8    because FDA would have already seen that because they would

9    have approved that two years or so before as part of the review

10   process, but it's really helpful to the reviewer when you

11   include it in the application.

12   Q.  Okay.  This document, right below the logo, it says Bard

13   Recovery Filter Study (EVEREST).

14            You see that?

15   A.  Yes.

16   Q.  Why does it say Recovery when it was actually the G2 filter

17   that was being -- for which Bard was submitting a request for

18   retrievability and clearance?

19   A.  Because at the time that that was originally written and

20   submitted to the FDA some two years before, they had -- the

21   marketing team, I guess, had not come up with a different name

22   for the device, and it was called Recovery.

23   Q.  So the Recovery just held over?

24   A.  Correct.

25   Q.  The device was eventually called the G2?

1   A.  G2, yes.

2   Q.  Thank you.

3          MS. HELM:  And could we turn to page 278, please.

4   BY MS. HELM:

5   Q.  And do you see, on the bottom of 278, it says in paragraph

6   numbered 5, Study Design?

7   A.  Yes.

8   Q.  What is a study design when discussing a clinical study

9   such as the EVEREST trial?

10  A.  It's basically a high-level overview that describes whether

11  or not the study is prospective, if it's single center,

12  multi-centered, or if it's randomized or nonrandomized, and

13  then the overall objective.  In this case, again, it was to

14  assess the safety of the retrieval of the filter.

15         MS. HELM:  Can we turn to page --

16         THE COURT:  Ms. Helm, we're going to break at this

17  point.

18         MS. HELM:  Thank you, Your Honor.

19         THE COURT:  We will resume, ladies and gentlemen, at

20  2:45, and excuse the jury.

21         (Recess taken, 2:29 p.m. to 2:45 p.m.)

22         THE COURT:  You may continue, Ms. Helm.

23         MS. HELM:  Thank you, Your Honor.

24         Your Honor, at the break we had Exhibit 5340

25  published.  May we republish?

1          THE COURT:  Yes.

2          MS. HELM:  And, Scott, could you turn to page 279,

3    please.

4          JURY MEMBER:  Traci, the screen went dead.

5          THE COURTROOM DEPUTY:  Okay.  Let me come look.

6          Is it on?  You're good?  Okay.

7          MS. HELM:  Can we -- and, Scott, can you highlight the

8    first paragraph -- I'm sorry, highlight the first paragraph,

9    please.

10   BY MS. HELM:

11   Q.  Mr. Van Vleet, before we took a break, we were talking

12   about the study design for the EVEREST study and the

13   information that was provided.

14         JURY MEMBER:  Excuse me.  I'm beeping.

15         THE COURTROOM DEPUTY:  Okay.

16         JURY MEMBER:  I'm sorry.

17         THE COURTROOM DEPUTY:  It happens.

18         THE COURT:  Is that working?

19         JURY MEMBER:  Yes.

20         THE COURT:  Okay.  Go ahead, Ms. Helm.

21   BY MS. HELM:

22   Q.  Mr. Van Vleet, we were talking about the design -- the

23   study design for the EVEREST clinical trial and the information

24   that was included in the 510(k) application for retrievability

25   of the G2.

UNITED STATES DISTRICT COURT

1           And on page 279 of the 510(k) application, what did

2    Bard tell the FDA about the patients enrolled in the study and

3    how long they would be followed?

4    A.  So it is a description of the hundred patients that are

5    going to be followed, and those patients would be recruited at

6    up to 15 sites.  Patient enrollment would be terminated once 30

7    patients complete the one-month post-retrieval follow-up visit.

8    All patients enrolled in the study would be followed to six

9    months post-filter placement, or to one month post-filter

10   retrieval, whichever comes first.

11   Q.  Why did Bard conduct follow-up up to six months?

12   A.  That was the official FDA template.  It was always 100

13   patients followed to six months or one month post-retrieval.

14   That was pretty much what all IVC filters evaluated were

15   studied to.

16   Q.  Before we talk about this further --

17           MS. HELM:  And, Scott, you can take it down.

18   BY MS. HELM:

19   Q.  In your experience of 30 years of working with medical

20   devices, and in your 10 years of working with IVC filters, are

21   you aware of any published prospective clinical study for IVC

22   filters that's five years or ten years or longer?

23   A.  No.

24   Q.  In your experience of 30 years of working with medical

25   devices and your 10 years of working with IVC filters at Bard,

JOHN VAN VLEET - DIRECT EXAMINATION          2583

```
 1  are you aware -- I'm sorry -- of any -- I'm sorry.  I've lost

 2  myself.

 3          Based on your experience, and based on your experience

 4  with Bard, would it be practical to run a clinical study for

 5  five years or ten years for an IVC filter?

 6  A.  No.

 7  Q.  Why not?

 8  A.  So the technology evolves pretty quickly.  If you had a

 9  ten-year clinical trial cycle and then added onto that the

10  product development cycle, you would be delaying access of

11  patients and doctors to new technology for a very long period

12  of time.

13  Q.  And if you got to the end of your ten years, would your

14  technology be current?

15  A.  No.  Likely it would be obsolete.

16  Q.  If you did a five-year or a ten-year or a longer

17  prospective study, would you ever get an implantable device

18  like an IVC filter on the market?

19  A.  You would, but it would be extremely long process.

20  Q.  Thank you.

21          Let's go back and talk about EVEREST and what was told

22  to the FDA.

23          MS. HELM:  And, Scott, could you pull up page 279,

24  please?  Again, 5340, page 279.  5340, page 279.

25
```

1   BY MS. HELM:

2   Q.  And, Mr. Van Vleet, in here it says that the device may be

3   left in permanently.

4   A.  Yes.

5   Q.  Do you see that?

6   A.  Yes.

7   Q.  Does this mean that Bard intended the G2 filter to be

8   permanent for patients who did not have their filter retrieved

9   at six months in the study?

10  A.  Yes.

11  Q.  Did it mean that they intended it to be permanent?

12  A.  They meant that they leave it up to the physician that's

13  evaluating the patient to determine if they still require

14  having a filter in place.  If their condition would be to

15  continue to need protection, embolic or caval protection, then

16  there is the option to leave it in place permanently.

17  Q.  After six months, after the completion of the study, whose

18  decision was it as to whether to retrieve the filter or leave

19  it in the patients who were part of the study?

20  A.  The surveilling physician or the physician taking care of

21  the patient for that condition.

22          MS. HELM:  Okay.  Let's look at page 339, please.

23  BY MS. HELM:

24  Q.  And, again, is this part of what was submitted to the FDA

25  for the -- for its -- by Bard for its application for the G2

1   filter to be cleared for retrievability?

2   A.  Yes, it is.

3   Q.  Okay.  And can you tell the jury what this section of the

4   510(k) is.

5   A.  This is the actual clinical study report or the final

6   clinical study report with all of the data that was collected

7   in the EVEREST trial.

8   Q.  So previously we were talking about sort of the protocol,

9   how the study worked, and now we're actually telling them,

10  here's what happened.  Here's the study report.  Is that right?

11  A.  Yes.

12          MS. HELM:  Okay.  And can we turn to page 406, please?

13  And the table in the middle.  And, Scott, could you highlight

14  that, please?

15  BY MS. HELM:

16  Q.  Mr. Van Vleet, what is this table?  What information is

17  Bard providing to the FDA in this table in the 510(k)

18  application?

19  A.  So Bard is summarizing the events that were observed in the

20  EVEREST trial and contexting it against the American College of

21  Radiology or the Society for Interventional Radiology

22  Classification, their published classification system.

23  Q.  Why compare it to the SIR guidelines?

24  A.  SIR published a -- and has on several occasions updated the

25  publication of the guidelines based on published literature

1    that summarized the study of different IVC filters, or the

2    trial results.

3            And they provide a means for physicians to context the

4    events that you're seeing here and what has been seen across

5    the medical field with different IVC filters.

6    Q.  The jury has seen a number of different documents that talk

7    about the adverse events that occurred during the EVEREST

8    study.  And let's just go through and summarize these very

9    quickly.

10           Was there one fracture?

11   A.  Yes.

12   Q.  There were ten migrations that you previously told about?

13   A.  Yes.

14   Q.  Were there eight penetrations?

15   A.  There were --

16   Q.  I'm sorry, 18 penetrations.

17   A.  -- 18 penetrations, correct.

18   Q.  Is penetration the same thing as perforation?

19   A.  No, it's not.  Most filters on the market have little hooks

20   that they use to anchor the filter to the sides of the inferior

21   vena cava.  And upon imaging, the hooks push kind of like as a

22   tent pole would push, and it's very difficult unless you have a

23   CT scan to know whether that's actually perforated or

24   penetrated.  In most cases it's penetrated, and it's just

25   simply pushing against versus making an actual hole in it.

1    Q.  And the last complication is there were 15 tilts.  Were

2    there 15 tilts?

3    A.  Yes.

4         MS. HELM:  And can we go to page 408, please, Scott?

5    And the table in the middle of the page.

6    BY MS. HELM:

7    Q.  Again, Mr. Van Vleet, what is this information that Bard

8    was providing to the FDA regarding the complications from the

9    EVEREST study?

10        THE COURT:  Hold on just a minute, Ms. Helm.

11        JURY MEMBER:  Sorry, I'm beeping again.

12        THE COURT:  That was short-lived.

13        THE COURTROOM DEPUTY:  Try this one.

14        THE COURT:  How's that?  Is that one working?

15        JURY MEMBER:  Yes.

16        THE COURT:  Okay.  Go ahead, Ms. Helm.

17        MS. HELM:  Thank you, Your Honor.

18   BY MS. HELM:

19   Q.  Mr. Van Vleet, do you remember my question?

20   A.  I do.

21   Q.  Okay.  Would you go ahead and answer it, please?

22   A.  Sure.  So this table is similar to the last one that we

23   saw, but the last one that we saw just gave the absolute

24   numbers of observed events.  What this did is take those cases

25   and use the appropriate denominator to calculate the percentage

1    of occurrence of those rates, which is most helpful because in

2    the SIR publication, the quality standards, they were presented

3    as also percentages, not absolute events.

4    Q.  Okay.  And let's go through this very quickly.  I want to

5    start with fracture.

6           What was the percentage -- what was the rate of

7    fracture for the filters evaluated in the EVEREST study?

8    A.  Right.  So there was one fracture, but because we only had

9    82 evaluable images, when you do the math it ends up being

10   1.2 percent.

11   Q.  And how does this compare to the SIR guidelines or reported

12   rates for fractures in IVC filters?

13   A.  The reported rates in the studies that the SIR surveyed to

14   include here ranged from 2 percent up to 10 percent.

15   Q.  And what was the G2 migration rate in the EVEREST study?

16   A.  12.2 percent.

17   Q.  And how does that compare to the SIR guidelines for

18   migration?

19   A.  The studies that SIR had evaluated included --

20          THE COURT:  Hold on just a minute.  This one isn't

21   working.

22          JURY MEMBER:  Sorry.  This one's beeping too.

23          THE COURTROOM DEPUTY:  That's fine.  Let's see if we

24   can get one that's going to work for you.

25          THE COURT:  Does that work?

UNITED STATES DISTRICT COURT

1          JURY MEMBER:  So far.

2          THE COURT:  Okay.  Let's go again.

3   BY MS. HELM:

4   Q.  Mr. Van Vleet, I think you were explaining what the SIR

5   guidelines were for migration.

6   A.  Yes.  For migration, the studies that SIR was able to

7   survey included reports of migration up to 18 percent.

8   Q.  And for penetration, what was the rate from the EVEREST

9   study?

10  A.  21.7 percent.

11  Q.  And what is the rate in the published SIR guidelines?

12  A.  Up to 41 percent.

13  Q.  Okay.  I want to talk a little bit more about the

14  migration.

15          MS. HELM:  Scott, could you go to page 797?

16          And can you turn the page, and can you blow up the

17  chart for us, please?

18  BY MS. HELM:

19  Q.  Mr. Van Vleet, again, is this part of the 510(k) submission

20  presented to the FDA for retrieval of -- retrievability of the

21  G2 filter?

22  A.  It is.

23  Q.  And can you explain to the jury what this table -- and what

24  information was provided to the FDA in this table?

25  A.  So this was a summary of all of the movements that were

1    observed in the clinical trial, whether or not they were over

2    the threshold of reportability, which would have been

3    2 centimeters.  It just categorized anything that was seen in

4    terms of movement.

5    Q.  And you said the threshold of movement is 2 centimeters.

6    What do you mean by that?

7    A.  It is.  So in order for a clinician or a trained health

8    professional to be able to see movement with the IVC in a plain

9    film, plain x-ray, you would have to have more than

10   2 centimeters to be sure that it's not simply movement of the

11   IVC.

12         The IVC is an incredibly elastic vessel, and just in

13   simply breathing in and breathing out, the IVC can move up and

14   down up to 5 centimeters.  So you can see how difficult it

15   would be to make a precise measurement.  So the radiological

16   community, recognizing that, felt that 2 centimeters or

17   20 millimeters was an appropriate threshold for reportability.

18         MS. HELM:  Again -- and you can take this down, Scott.

19   BY MS. HELM:

20   Q.  All of this information relating to the movement, the

21   fractures, all of the information from the EVEREST data was

22   provided to the FDA, was it not?

23   A.  Yes.

24   Q.  When you were here -- was it last week?  I've lost track of

25   time.

1    A.  Last week.

2    Q.  And Mr. Lopez was questioning you, he asked you some

3    questions about a Dr. Lehmann.

4    A.  Yes.

5    Q.  His involvement in the EVEREST final report.  Do you recall

6    those questions?

7    A.  I do.

8    Q.  Okay.  To your knowledge, did Dr. Lehmann actually sign off

9    on the EVEREST final study report?

10   A.  Yes, he did.

11          MS. HELM:  And can we pull up 9080, please?

12   BY MS. HELM:

13   Q.  And can you see that, Mr. Van Vleet?

14   A.  Yes.

15   Q.  And is this an email?

16   A.  Yes.

17   Q.  And are you included on this email?

18   A.  I am.

19          MS. HELM:  Your Honor, at this time I would move to

20   admit Exhibit 9080.

21          MR. O'CONNOR:  No objection.

22          THE COURT:  Admitted.

23          (Exhibit No. 9080 admitted into evidence.)

24          MS. HELM:  May I publish, Your Honor?

25          THE COURT:  You may.

1   BY MS. HELM:

2   Q.  Mr. Van Vleet, is this an email from Dr. Lehmann to

3   Dr. Ciavarella?

4   A.  Yes.

5   Q.  And what is the date of this email?

6   A.  October 24th, 2007.

7   Q.  And would you read to the ladies and gentlemen of the jury

8   what Dr. Lehmann wrote in his email to Dr. Ciavarella.

9   A.  Attached please find the EVEREST final study report,

10  version final 4, with all requests handled as agreed, along

11  with the necessary supporting documents for review and

12  signature by Michelle Michela and Dr. Ciavarella, and

13  forwarding to Bard PV.

14  Q.  And in this email, do you see that there are a number -- I

15  think there are five --

16  A.  There are five attachments, yeah.

17  Q.  -- attachments.

18          MS. HELM:  Okay.  Can we go to the very last page of

19  the attachments, which is page 278, please?  The next to last

20  page.

21  BY MS. HELM:

22  Q.  And what is this document, Mr. Van Vleet?

23  A.  It's the final study approval form required by the standard

24  operating procedure in clinical group.

25  Q.  So when we talk about the EVEREST study and the EVEREST

1  report, is this the final sign-off on the EVEREST report?

2  A.  It is.

3          MS. HELM:  And can we go to page 279, please?

4  BY MS. HELM:

5  Q.  And on page 279, do you see where it says "John Lehmann,

6  MD, Author"?  And what is checked under his name?

7  A.  He's checked it as approved.

8  Q.  And below that, did Dr. Lehmann sign this final report on

9  October 24, 2007?

10  A.  Yes.

11  Q.  So is there any question in your mind that Dr. Lehmann

12  actually did sign off --

13  A.  No.

14  Q.  -- on the EVEREST report?

15  A.  No.

16  Q.  Okay.  Thank you.

17          After the EVEREST study, did you continue to work with

18  Dr. Lehmann on future projects?

19  A.  I did not work for Dr. Lehmann -- or with Dr. Lehmann on

20  future projects.

21  Q.  And why not?

22  A.  Dr. Lehmann wasn't an employee of the division.  He was a

23  resource that the corporate clinical team had to work on a

24  variety of projects.  So I think he was merely helping out in

25  the authorship of this report.

1   Q.  Okay.  Let's talk about the EVEREST report one more time.

2        Bard had the information.  We've just learned that

3   Bard showed the information to the FDA.  Were the results of

4   the EVEREST study ever published and made available publicly to

5   the medical community?

6   A.  Yes, they were.

7        MS. HELM:  Can you pull up 6892, please?

8   BY MS. HELM:

9   Q.  And, Mr. Van Vleet, do you recognize this document?

10  A.  Yes, I do.

11  Q.  And what is this?

12  A.  This is the peer-reviewed publication authored by

13  Dr. Binkert and other of the principal investigators for the

14  study, detailing the results of the EVEREST clinical trial.

15       MS. HELM:  Your Honor, at this time we would move to

16  admit Exhibit 6892.

17       MR. O'CONNOR:  Objection.  Hearsay.

18       MS. HELM:  Your Honor, it's not being offered for the

19  truth of the matter asserted, it's being offered to show notice

20  to the medical community about the results of the EVEREST

21  study.

22       MR. O'CONNOR:  Maintain the objection.  I think it

23  would be appropriate under --

24       THE COURT:  You got to talk into a mic, Mr. O'Connor.

25       MR. O'CONNOR:  I maintain the objection as to hearsay.

1          THE COURT:  All right.  Well, since it's being offered

2    not for the truth of the matter asserted, it's not hearsay.

3          So the objection is overruled.

4          But I'm going to give you the same instruction, ladies

5    and gentlemen, on 6892 as on others, which is, this isn't being

6    admitted to prove to you the truth of what's in the article.

7    It's instead being admitted to show what was communicated to

8    the medical community by the article.

9          And with that clarification, the hearsay objection is

10   overruled.

11         (Exhibit No. 6892 admitted into evidence.)

12         MS. HELM:  May I publish, Your Honor?

13         THE COURT:  Yes.

14   BY MS. HELM:

15   Q.  Mr. Van Vleet, in this article, did Dr. Binkert and his

16   coauthors report the results of the EVEREST study?

17   A.  Yes.

18   Q.  And in the results --

19         MS. HELM:  Can you highlight the results, Scott?

20   BY MS. HELM:

21   Q.  -- did Dr. Binkert and his coauthors report the rate for

22   fracture, caudal migrations, tilts, and penetrations?

23   A.  Yes.

24   Q.  So this information about the G2 filter and the results of

25   the EVEREST study is available in public literature for the

1    medical community, is it not?

2    A.  It is.

3              MS. HELM:  Okay.  You can take that down, Scott.

4    BY MS. HELM:

5    Q.  After receiving all this information, what did the FDA do

6    in terms of clearing the G2 for retrievability?

7    A.  They cleared the device for -- with the option for

8    retrieval.

9              MS. HELM:  Scott, can you pull up 5339, please?

10             I believe this is in evidence, Your Honor.

11             THE COURT:  What's the number?

12             MS. HELM:  5339.

13             THE COURTROOM DEPUTY:  It is.

14             THE COURT:  It is.

15             MS. HELM:  May I publish, Your Honor?

16             THE COURT:  Yes.

17   BY MS. HELM:

18   Q.  Mr. Van Vleet, is this the letter from the FDA dated

19   January 15, 2008, clearing the G2 filter as a retrievable

20   filter?

21   A.  Yes.

22   Q.  Okay.  So this timeline, we went back the first -- we saw a

23   report from February of 2007, and it was finally cleared

24   approximately a year later, in January of 2008; is that right?

25   A.  Yes.

1   Q.   Thank you.

2           So the jury's been told that the G2 was cleared as a

3   permanent filter.  We just learned that the G2 was cleared as a

4   retrievable filter.

5           Were there additional clearances or additional

6   submissions to the FDA relating to the G2 filter?

7   A.   Yes, there were.

8   Q.   Was there one in August of 2005 and a subsequent one in

9   January of 2008?

10  A.   I can't remember the dates exactly, but that sounds

11  directionally accurate.

12  Q.   And did those two additional applications and clearances of

13  the G2 filter -- I'm sorry, clearances of some aspect or

14  application of the G2 filter relate to the delivery system?

15  A.   Yes.

16  Q.   Okay.  And would you explain to the ladies and gentlemen of

17  the jury what is meant by the delivery system?  It's not the

18  filter itself.

19  A.   No.  It's a tube in which the filter is loaded, and then

20  it's transferred from that tube into a catheter, and the

21  radiologist or whomever is going to use it drives it to

22  wherever he feels it's appropriate to be placed.

23          And there are several interfaces of the tubes as they

24  fit inside of each other that sometimes can cause there to be a

25  less-than-smooth deployment.  So there was an effort by the

1  team to reduce that riser so that it could be a smooth

2  deployment into the IVC filter -- or into the IVC.

3  Q.  And can an IVC filter be implanted from two different

4  places in someone's body?

5  A.  It can.

6  Q.  And is one of those places the neck?

7  A.  Yes.

8  Q.  And if it's implanted through the neck, how is that

9  referred to?

10  A.  It's through the jugular vein, so that's a jugular

11  deployment system.

12  Q.  So a jugular deployment system.

13          And if it's implanted -- where is the other place from

14  which it can be implanted?

15  A.  Through the femoral vein, which is in the groin.

16  Q.  Okay.  So when we talk about jugular and femoral, those are

17  the two places from which it can be implanted; correct?

18  A.  Yes.

19  Q.  Let's briefly go through these.

20          MS. HELM:  Can I have Exhibit 5354, please?

21  BY MS. HELM:

22  Q.  And, Mr. Van Vleet, can you tell us what this is?

23  A.  This was a special 510(k) on the G2 filter system, would

24  have been the permanent indication.  I think this might have

25  been making -- this predated me, but it might have been making

1    modifications to the delivery system.

2    Q.  We'll go ahead -- we'll skip that one.

3    A.  Okay.

4          MS. HELM:  Let's take a look at Exhibit 5361, please.

5    BY MS. HELM:

6    Q.  And can you tell the ladies and gentlemen of the jury what

7    this is?

8    A.  It is also another special 510(k) on the G2 filter system.

9    I believe it's a modification.  Again, this predates my time.

10   Q.  Okay.

11         All right.  So there were multiple submissions

12   relating to the G2 to the FDA, in addition to permanent and

13   retrievability; correct?

14         MR. O'CONNOR:  Objection.  Leading.

15   BY MS. HELM:

16   Q.  Were there multiple submissions to the FDA relating to the

17   G2 filter?

18   A.  Yes.

19   Q.  In addition to its clearance for -- as a permanent filter

20   and as a retrievable filter?

21   A.  Yes.

22   Q.  Let's move forward and let's talk about the G2X or the G2

23   Express.  And the jury has heard those terms interchangeably.

24         Were you at Bard at the time the G2X was developed and

25   submitted for clearance to the FDA?

JOHN VAN VLEET - DIRECT EXAMINATION                              2600

1    A.  Yes, I was.

2              MS. HELM:  And, Your Honor --

3              Scotty, can you pull up 5373, please?

4              Your Honor, I believe this is in evidence.  May I

5    publish?

6              THE COURT:  Yes, it is.  You may.

7    BY MS. HELM:

8    Q.  Mr. Van Vleet, what is this document?

9    A.  It is a 510(k) submission for the G2 Express.

10   Q.  And was this 510(k) for the G2 Express for both delivery

11   systems?

12   A.  Yes, for femoral and jugular.

13   Q.  Okay.  And were you involved in the preparation of this

14   510(k) submission to the FDA?

15   A.  Yes.

16             MS. HELM:  And can we turn to page 68, please?

17             And can you turn that, and can you blow it up a little

18   bit?

19   BY MS. HELM:

20   Q.  Mr. Van Vleet, can you explain to us what this is on

21   page 68 of Bard's submission to the FDA regarding the G2X

22   filter?

23   A.  Yes.  It's a summary of measurements that were taken and

24   some testing that was performed on the device.

25   Q.  And is this a -- this is actually telling the FDA about

 1   bench testing that was performed on the G2X?

 2   A.  Yes.

 3              MS. HELM:  And can we turn to page 70, please?

 4              And can you flip that page?

 5   BY MS. HELM:

 6   Q.  And, Mr. Van Vleet, on this page, in the description of

 7   testing, what test is being described to the FDA on page 70?

 8   A.  Sure.  It's called cyclic fatigue.  It's --

 9   Q.  And -- I'm sorry, go ahead.

10   A.  It's a test to replicate what conditions the filter can

11   undergo in a human body over a period of years.

12              MS. HELM:  And, Scott, can you highlight the paragraph

13   in the right column that says "The test method"?

14   BY MS. HELM:

15   Q.  And, Mr. Van Vleet, what is Bard telling the FDA about the

16   test method that it used for this cyclic fatigue test on the

17   G2X filter?

18   A.  So the FDA's expectation is that you will test a medical

19   device in a worst case situation.  And this is frequently

20   derived from experts or the literature, but it was felt that

21   the worst case situation would be a patient undergoing severe

22   chronic cough syndrome.  And that would be approximately 43

23   hard diaphragmatic coughs per hour over a period of ten years,

24   in which the test is also simulating the respiration that

25   happens in the patient.

 1              So the testing was set up to evaluate the filter in a

 2   human, breathing for ten years, and also coughing 43 times an

 3   hour, 24 hours a day.

 4   Q.  For ten years?

 5   A.  For ten years.

 6   Q.  And --

 7              MS. HELM:  Okay.  Thank you.  You can take that down.

 8              Oh, I'm sorry.  Will you put that back up?

 9   BY MS. HELM:

10   Q.  Where did Bard -- do you know where Bard got the

11   information or the criteria it used for this test that it's

12   reporting to the FDA?

13   A.  Sure.  We usually start discussing with a pulmonologist or

14   somebody familiar with breathing of patients, both normally and

15   severe.  And then at the same time do a complete search in the

16   literature and see whatever may have been published about the

17   boundary conditions that you would need to --

18   Q.  And there are footnotes at the bottom of the page.  Is that

19   the literature from which this information or test criteria

20   were retrieved?

21   A.  Yes.

22   Q.  Obtained?

23   A.  Yes.

24   Q.  Thank you.

25              MS. HELM:  And, Scott, could we turn to page 130 and

1   131?

2   BY MS. HELM:

3   Q.  Mr. Van Vleet, the jury's heard about IFUs.  Would you just

4   again explain to them what an IFU is?

5   A.  An IFU is a document that's included with every product

6   that's sold.  IFU stands for instructions for use or

7   indications for use.

8   Q.  And in its application for clearance of the G2X, did Bard

9   provide the FDA with a draft IFU for the G2X?

10  A.  Yes.

11  Q.  And after providing FDA with this information, the testing,

12  the IFU, and the other information relating to the G2X, did the

13  FDA clear the G2X for commercial use?

14  A.  Yes.

15          MS. HELM:  Can we pull up 5368, please?

16  BY MS. HELM:

17  Q.  Mr. Van Vleet, can you identify that document?

18  A.  Yes.  This is the clearance document for the G2 Express

19  femoral and jugular delivery systems.

20  Q.  And what's the date on that document?

21  A.  July 3rd, 2008.

22          MS. HELM:  And, Your Honor, at this time we move to

23  admit 5368.

24          MR. O'CONNOR:  No objection.

25          THE COURT:  Admitted.

1                    (Exhibit No. 5368 admitted into evidence.)

2                    MS. HELM:  May I publish?

3                    THE COURT:  You may.

4     BY MS. HELM:

5     Q.  Mr. Van Vleet, before we move on, would you remind the jury

6     about what the G2X is?  What was the difference between the G2

7     and the G2X?  Just so we keep building our timeline.

8     A.  Sure.  So the G2 had just a simple little nub at the very

9     top of it, and it was designed to be retrieved with a grasping

10    device called a cone.  And when you grasped around the neck and

11    shoulders of that and you pushed the tube or the catheter over

12    the cone, it would squeeze those little pinchers together, and

13    that's how you could remove it.  It was a specifically designed

14    tool for that filter.

15                   Many radiologists prefer to work with snares.  It's

16    just something that they all learn in their training.  And so

17    the desire was to create a hook for those people that were more

18    comfortable to retrieve it with a snare.

19    Q.  And that was the G2X?

20    A.  And that's the G2X.

21    Q.  Okay.  Subsequent to its clearance, was the G2X -- also was

22    information about the G2X presented to the FDA relating to the

23    delivery systems?

24    A.  Yes.

25    Q.  Let's move forward.

1           We've talked -- the jury's heard about the clearance

2    for the G2, the G2X, and now I would like to talk to you about

3    the next generation, which was the Eclipse.

4           Were you personally involved in the regulatory filings

5    for the Eclipse filter while you were at Bard?

6    A.  Yes.

7    Q.  Before Bard submitted any application to the FDA for

8    clearance of the Eclipse filter, did you have conversations

9    with the FDA about it?

10   A.  Multiple times.

11   Q.  Why?

12   A.  Anytime we wanted to submit an application to the FDA,

13   we -- it's best practice to get -- have an agreement with them

14   as far as what testing you need to submit and what they're

15   going -- expecting to see.

16          And that filter in particular, we were changing the

17   surface finish on it, and it was a topic that the FDA has been

18   very interested in.  They had gone through a period of time

19   where they required stent manufacturers to also electropolish

20   their devices.

21   Q.  So as we build our timeline, as we come forward in time,

22   are we in 2009, approximately?

23   A.  Yeah.  Yes.  Yes, 2009.

24   Q.  And in addition to the Eclipse, at this same time period,

25   were you having conversations with the FDA about the various

1  other projects that Bard was working on?

2  A.  Yes.

3          MS. HELM:  Scotty, would you pull up 5593, please.

4  BY MS. HELM:

5  Q.  Mr. Van Vleet, do you recognize this document?

6  A.  Yes.

7  Q.  And can you tell the ladies and gentlemen of the jury what

8  this is, please.

9  A.  It is meeting minutes from a meeting with FDA, with our

10 reviewer.

11 Q.  And --

12 A.  It's required as part of their process and our process that

13 we memorialize every meeting that we have and then send them

14 the meeting minutes to see if they agree with our

15 summarization.

16 Q.  And were you either involved in drafting or approving these

17 meeting minutes?

18 A.  Yes.

19 Q.  And were they prepared contemporaneously or soon after the

20 meeting took place in August of 2009?

21 A.  Yes.

22 Q.  Is this document maintained in the regular course of

23 business at Bard?

24 A.  It is.

25          MS. HELM:  Your Honor, at this time I move to admit

 1    Exhibit 5593.

 2            MR. O'CONNOR:  Objection.  Hearsay and hearsay within

 3    hearsay.

 4            THE COURT:  All right.  I'm going to overrule the

 5    first hearsay objection under 803(6).  She just laid the

 6    foundation to that.

 7            What's your response on hearsay within hearsay?

 8            MS. HELM:  Your Honor, to the extent the plaintiffs

 9    are concerned about hearsay within hearsay, we would be fine

10    with redactions of it.  The portion that I intend to ask him

11    about is not hearsay, in my opinion.

12            THE COURT:  Okay.  Which portion is it?  Why don't you

13    put it up on the screen so they can look at it.

14            MS. HELM:  Okay.

15            THE COURT:  I'm going to admit it subject to redaction

16    of any hearsay within the hearsay.

17            MR. O'CONNOR:  Thank you.

18            THE COURT:  Let's have you look at the section and

19    make sure you don't have an objection to that section.

20            MS. HELM:  Just paragraph 2, Your Honor.

21    BY MS. HELM:

22    Q.  Mr. Van Vleet, do you know Joni Creal?

23    A.  Yes.

24    Q.  Is she an employee of Bard -- or was she an employee of

25    Bard in August of 2009?

1    A.  She was, and she still is.

2           MR. O'CONNOR:  Objection.  This paragraph is hearsay

3    within hearsay.

4           MS. HELM:  Your Honor, I believe the paragraph is

5    recounting what Ms. Creal, a Bard employee, stated.

6           THE COURT:  That makes it hearsay within hearsay.

7           MS. HELM:  You know what, Your Honor, I'll move on.

8           THE COURT:  All right.

9    BY MS. HELM:

10   Q.  Mr. Van Vleet, did you -- in August of 2009, did you

11   discuss with the FDA a project called the G2 Platinum?

12   A.  Yes.

13   Q.  Why did Bard discuss with the FDA the project called the G2

14   Platinum?

15   A.  The FDA was very interested in moving to electropolish all

16   implants that go into the human body.  It's a process to make

17   the finish a lot smoother and remove imperfections.

18          MR. O'CONNOR:  Objection to the testimony about what

19   the FDA was interested in.  That is hearsay.  Move to strike.

20          THE COURT:  Hold on just a minute.

21          Well, the question was why Bard did it.  I think this

22   is from Bard's perspective.

23          You can cross-examine him on that.

24          MR. O'CONNOR:  All right.  Thank you.

25

JOHN VAN VLEET - DIRECT EXAMINATION                    2609

1    BY MS. HELM:

2    Q.  And in August of 2009, what did Bard tell the FDA about the

3    G2 Platinum project?

4    A.  So there had been a decision to not move forward with that

5    project.  It was too difficult to terminally electropolish the

6    filter.  There were imperfections left in corners, and it

7    wouldn't have been a validatable and safe way of doing it.

8    Q.  In light of the fact that the G2 Platinum project was not

9    successful, did Bard look to an alternative or a different way

10   to accomplish electropolishing?

11   A.  Yes.

12   Q.  And was that what eventually became the Eclipse filter?

13   A.  That was what eventually became the Eclipse filter, yes,

14   correct.

15   Q.  And in August of 2009, did you also discuss this concept of

16   the Eclipse filter with the FDA?

17   A.  Yes.

18   Q.  And what was the purpose?  Why did you want to talk to them

19   about the Eclipse filter?

20   A.  Because we knew that they had a lot of specific

21   requirements on how they wanted the final electropolished

22   product tested.  They'd want to test for leaching, surface

23   quality finish, a lot of things that their experts would want

24   to direct us in terms of what to include in testing protocols.

25   Q.  In August of 2009, did Bard also have a project in the

UNITED STATES DISTRICT COURT

1   research and development group relating to caudal anchors?

2   A.  Yes.

3   Q.  And did you tell the FDA about that project?

4   A.  We did.

5   Q.  And was that project ready to be presented to the FDA?

6   A.  Not immediately, but in principle, yes.

7   Q.  And did you also tell the FDA about a project relating to a

8   laser-cut filter with caudal anchors?

9   A.  Yes.

10  Q.  So in August of 2009, what project was Bard working on that

11  was the laser-cut filter with caudal anchors?

12  A.  It would have been the product concept that eventually

13  became the Denali filter.

14  Q.  But in 2009, was that project ready to be presented to the

15  FDA?

16  A.  No.

17  Q.  So why do you tell the FDA about all these projects, the

18  Platinum that you were no longer pursuing, the Eclipse that you

19  were pursuing, and the future projects of the Meridian and the

20  Denali?

21  A.  It helps them to kind of get a visibility as to the

22  staffing that they'll need to review.  These are lengthy

23  documents, and it takes a long time.  And so it's really a

24  courtesy.  We maybe don't necessarily have to do it, but they

25  very much appreciate knowing the relative timing of your

1    submissions.

2    Q.  And did Bard eventually develop a process to electropolish

3    its filters?

4    A.  Yes.

5    Q.  And, again, was that the Eclipse?

6    A.  That was Eclipse, correct.

7    Q.  And did Bard submit the Eclipse filter to the FDA for

8    approval through a 510(k) process?

9    A.  Yes.

10   Q.  And, again, what was the difference between the G2X filter

11   that had been cleared and the Eclipse filter?

12   A.  They were dimensionally identical.  The only difference was

13   in the treatment of the surface finish, electropolishing would

14   remove imperfections and any irregularities.

15           MS. HELM:  Scott, could you pull up 5272, please.

16           And, Your Honor, I believe this has been admitted.

17   May I publish?

18           THE COURTROOM DEPUTY:  Yes.

19           THE COURT:  You may.

20   BY MS. HELM:

21   Q.  Mr. Van Vleet, what is this document?

22   A.  It is a 510(k) submission on the Eclipse filter system.

23   Q.  And when was this submitted to the FDA?

24   A.  November 23rd, 2009.

25           MS. HELM:  Okay.  And could we turn to page 2, please.

1   BY MS. HELM:

2   Q.  And this is a Table of Contents?

3   A.  Yes.

4   Q.  And generally speaking, what types of information did Bard

5   provide to the FDA about the Eclipse filter?

6   A.  You would provide the design concept to the labeling, the

7   engineering drawings, any information about how that device is

8   different than a predicate device, and any additional testing

9   that would have been done.

10  Q.  And did the FDA eventually clear the Eclipse filter for

11  commercial use?

12  A.  They did.

13          MS. HELM:  And, Scott, can you pull up 5273, please?

14  BY MS. HELM:

15  Q.  And, Mr. Van Vleet, what is this document?

16  A.  That is the FDA's clearance letter for the Eclipse filter

17  system.

18          MS. HELM:  Your Honor, I move to admit 5273.

19          MR. O'CONNOR:  No objection.

20          THE COURT:  Admitted.

21          (Exhibit No. 5273 admitted into evidence.)

22          MS. HELM:  May I publish, Your Honor?

23          THE COURT:  Yes.

24  BY MS. HELM:

25  Q.  Mr. Van Vleet, when was the Eclipse filter cleared by the

1    FDA for commercial use in the United States?

2    A.  January 14th of 2010.

3    Q.  Before January 14, 2010, could Bard sell the Eclipse

4    filter?

5    A.  No.

6    Q.  Did Bard submit an additional --

7              MS. HELM:  Scotty, you can take that down.

8    BY MS. HELM:

9    Q.  -- additional 510(k) submission to the FDA regarding the

10   Eclipse filter?

11   A.  I think there may have been a modification to the delivery

12   system.  I'd have to --

13   Q.  Was there a second 510(k) that related to a patient

14   brochure and ID card for the Eclipse filter?

15   A.  Yes.  Sorry, I forgot about that one.  Yes.

16             MS. HELM:  Scott, would you pull up 5586, please?

17             Your Honor, I believe this is in evidence.  May I

18   publish?

19             THE COURT:  Yes.

20   BY MS. HELM:

21   Q.  Mr. Van Vleet, is this the submission that I just mentioned

22   relating to a brochure for the Eclipse filter?

23   A.  Yes.

24   Q.  And when was that submitted to the FDA?

25   A.  May 20th, 2010.

1   Q.  Why did Bard want to submit its patient brochure and

2   patient ID card to the FDA for clearance?

3   A.  It's considered to be part of labeling, just like the IFU

4   is.  And labeling has to be developed in collaboration with the

5   FDA.

6   Q.  The name stayed the same?

7   A.  Yes.

8   Q.  Did the product stay the same?

9   A.  Yes.

10       MS. HELM:  And can we turn to page 78, 79, and 80.

11  BY MS. HELM:

12  Q.  Mr. Van Vleet, were those pages the proposed brochure and

13  patient card that Bard sought clearance for the FDA -- from the

14  FDA?

15  A.  Yes.

16  Q.  Okay.  Do you know how this patient brochure and card were

17  going to be used by Bard after they were cleared by the FDA?

18  A.  Sure.  It's included in every product, but it was also

19  provided to implanting institutions that we knew had bought

20  Bard products.  The desire is that the card is removed from its

21  perforations, completed, and then given to each patient to be

22  able to carry with them.  Any patient that has to have an MRI

23  has to carry an implant card so that the technicians know

24  exactly how to do that type of test on them.

25  Q.  Before the FDA cleared the patient brochure and

 1    identification card, did they ask some questions or have some

 2    requests of Bard?

 3    A.  I'd have to remember.

 4    Q.  Sure.

 5    A.  I know there were conversations about the implant card and

 6    there were some edits that they proposed.

 7            MS. HELM:  Scott, could you pull up 5587, please?

 8    BY MS. HELM:

 9    Q.  Mr. Van Vleet, do you recognize this document?

10    A.  Yes.

11    Q.  And what is this?

12    A.  This is questions based on the submission of the implant

13    card and the patient brochure.

14    Q.  Does this refresh your recollection that the FDA had some

15    questions about the brochure?

16    A.  Yes.

17            MS. HELM:  Your Honor, at this time I'd move to admit

18    5587.

19            MR. O'CONNOR:  No objection.  I thought it was already

20    in.

21            THE COURT:  It is not.

22            5587 is admitted.

23            (Exhibit No. 5587 admitted into evidence.)

24            MS. HELM:  And may I publish?

25            THE COURT:  You may.

1    BY MS. HELM:

2    Q.  And in Section 1, what was the FDA asking Bard to do

3    regarding the patient brochure?

4    A.  There is a section of the brochure that says:  When can the

5    filter be removed?

6            And Bard had proposed the language that said:  The

7    Eclipse vena cava filter does not have a time in which it must

8    be removed.

9            FDA was objecting because we had not provided clinical

10   data to support this statement.  In the labeling on filter

11   retrieval for 58 patients with a mean retrieval of 148 days --

12   or 140 days, which was submitted, but FDA did not feel like

13   this was sufficient to substantiate the statement that the

14   filter does not have a time limit for retrieval -- or removal.

15   Q.  Did Bard eventually remove that language from the patient

16   brochure?

17   A.  I believe we did.  I think we believed that -- we modified

18   it to state that the patient needs to consult their physician,

19   and the physician would determine when it should be retrieved.

20   Q.  And was the patient brochure eventually cleared by the FDA,

21   the patient brochure for the Eclipse?

22   A.  Yes.

23           MS. HELM:  And can you pull up 5589, please, Scott.

24   BY MS. HELM:

25   Q.  And, Mr. Van Vleet, what is this document?

UNITED STATES DISTRICT COURT

1    A.  This is a clearance of the Eclipse filter system.  Looking

2    at the date here.  Yeah, I think that's the patient brochure.

3            MS. HELM:  Your Honor, at this time I move to admit

4    5589.

5            MR. O'CONNOR:  No objection.

6            THE COURT:  Admitted.

7            (Exhibit No. 5589 admitted into evidence.)

8    BY MS. HELM:

9    Q.  And once it was cleared, did Bard have a patient brochure

10   to include with its packaging and provide to doctors who were

11   implanting Eclipse filters?

12   A.  Yes.

13           MS. HELM:  Scott, could you pull up 8362, please.

14   BY MS. HELM:

15   Q.  And, Mr. Van Vleet, what is this document?

16   A.  That is the patient brochure.

17   Q.  And is this the patient brochure that we just discussed

18   that was cleared by the FDA relating to the Eclipse filter?

19   A.  Yes, I believe so.

20           MS. HELM:  Your Honor, at this time I'd move to admit

21   8362.

22           MR. O'CONNOR:  No objection.

23           THE COURT:  Admitted.

24           (Exhibit No. 8362 admitted into evidence.)

25

UNITED STATES DISTRICT COURT

1   BY MS. HELM:

2   Q.  Mr. Van Vleet --

3            MS. HELM:  May I publish, Your Honor?

4            THE COURT:  You may.

5   BY MS. HELM:

6   Q.  Mr. Van Vleet, is -- why did Bard decide to provide a

7   patient brochure with the Eclipse filter?

8   A.  For I believe all potentially permanently implanted devices

9   that patients leave the hospital with, there is a brochure that

10  Bard, as a matter of course, had historically presented, and

11  then it became something FDA expected to be included with every

12  one of those type of products.

13  Q.  Was this brochure intended to replace the advice and

14  warnings that a doctor provides to a patient?

15  A.  No.

16  Q.  On the first page, on the left-hand side, does the brochure

17  talk about information about pulmonary embolism?

18  A.  Yes.

19  Q.  And then does it talk about what an IVC filter is?

20  A.  Yes.

21  Q.  And then on the right side, does it talk about the

22  implantation procedure or process?

23  A.  Yes.

24            MS. HELM:  And could we turn to page 2, please, Scott.

25

1    BY MS. HELM:

2    Q.  And in the middle of the brochure, there's a blue bolded

3    section, said:  What are the risks associated with implantable

4    filters?

5           Do you see that?

6    A.  I do.

7    Q.  And moving down to the fifth bullet point, if you talked --

8    count down, can you tell the ladies and gentlemen of the jury

9    what it says?

10   A.  Yes.

11          The entire filter or pieces of the filter may break

12   loose and travel to the heart or lungs, causing injury or

13   death.  You may need to have additional surgery to retrieve the

14   filter or pieces if they break loose.

15   Q.  Why was Bard providing information about complications with

16   its filter -- potential complications with the Eclipse filter

17   to -- in the patient brochure?

18          MS. HELM:  Scott, you can take it down.

19          THE WITNESS:  With any type of labeling, which this is

20   considered labeling, that you provide, you have to have a fair

21   balance.  So you can't just simply say the good things that a

22   product does.  You also have to also be very transparent about

23   potential risks or complications that having the product may

24   have.

25          MS. HELM:  Actually, can you pull back up 8362,

1    page 2?

2    BY MS. HELM:

3    Q.  And on the far right, in the top corner, Mr. Van Vleet, do

4    you see the section that says, "Does the filter have to be

5    removed?"

6    A.  Yes.

7    Q.  And what did Bard tell -- include in its patient brochure

8    about whether the filter had to be removed?

9    A.  Yes.  So the question is:  Does the filter have to be

10   removed?

11         The answer is:  No.  The Eclipse vena cava filter is

12   designed to be a permanent implant and does not have to be

13   removed, repositioned, or replaced.  However, in the cases

14   where the risk for pulmonary embolism is temporary, your

15   physician may choose to remove the filter.  You should discuss

16   filter removal with your physician.

17   Q.  Why did Bard advise patients that they should discuss

18   filter removal with their physicians?

19   A.  The idea and decision to place a filter and any other

20   medical device is the decision of a physician.  In the interest

21   of caring for their patient, the conversation has to be between

22   the patient and the physician.

23   Q.  Thank you.

24         MS. HELM:  Scotty, you can take that down.

25

JOHN VAN VLEET - DIRECT EXAMINATION

1    BY MS. HELM:

2    Q.  I'm going to shift gears a little bit.  You mentioned in

3    the FDA clearance submissions, the IFUs, and you've explained

4    to the jury what those are.

5            Before we look at an IFU, I want to follow up on

6    something you said last week when you testified.  You mentioned

7    that Bard and the FDA, I think your words were, coauthored IFUs

8    in the past.

9            Do you recall that testimony?

10   A.  Yes.

11   Q.  Can you give us an example of where Bard and the FDA

12   coauthored an IVC IFU -- IVC filter IFU?

13   A.  On every submission, on every 510(k) to the FDA, there

14   would be a draft proposed by Bard or the sponsor, and always a

15   discussion that's provided in soft copy to the FDA so that they

16   can go in and make modifications to it.  And usually there's at

17   least one or two meetings held about that.

18   Q.  In fact, we saw in some submissions where the draft of the

19   IFU was actually included in the 510(k) submission, didn't we?

20   A.  Yes.

21           MS. HELM:  Scott, can you pull up 8325, please.

22   BY MS. HELM:

23   Q.  Mr. Van Vleet, what is this document?

24   A.  This is the IFU for the Eclipse vena cava filter.

25   Q.  And were you involved in -- were you employed at Bard at

UNITED STATES DISTRICT COURT

1    the time this IFU was drafted with the FDA?

2    A.  Yes.

3    Q.  And were you involved in that process?

4    A.  I was.

5              MS. HELM:  Your Honor, at this time I'd move to admit

6    8325.

7              THE COURTROOM DEPUTY:  I show 8325 in.

8              THE COURT:  8325 is already in evidence.

9              MS. HELM:  Thank you, Your Honor.  I apologize for not

10   catching that.

11             May I publish?

12             THE COURT:  You may.

13             MS. HELM:  And, Scott, can you go to page 4?  And can

14   you go down to where it says "Warnings."  That's at the top.

15   And can you go to number 11, please.

16             That's not the right one.

17             Can you go to number 8, please.

18   BY MS. HELM:

19   Q.  Mr. Van Vleet, did Bard include a warning in the Eclipse

20   IFU about filter fractures?

21   A.  Yes.

22   Q.  And what did Bard warn doctors about filter fractures --

23   filter fractures in the Eclipse IFU?

24             MR. O'CONNOR:  Objection.  Irrelevant.

25             THE COURT:  Overruled.

1          THE WITNESS:  It states that filter fractures are a

2    known complication of vena cava filters.  There have been some

3    reports of serious pulmonary and cardiac complications with

4    vena cava filters requiring the retrieval of the fragment

5    utilizing endovascular and/or surgical techniques.

6    BY MS. HELM:

7    Q.  And in the same IFU --

8          MS. HELM:  Scott, can you pull that out?

9    BY MS. HELM:

10   Q.  -- did Bard also inform doctors about the potential of

11   movement, migration, or tilt?

12   A.  Yes.

13         MS. HELM:  And, Scott, can we go to page -- there we

14   go.

15   BY MS. HELM:

16   Q.  Can you tell the jury what Bard told doctors about movement

17   in the Eclipse IFU?

18   A.  Sure.

19         Movement, migration, or tilt of the filter are known

20   complications of vena cava filters.  Migration of filters to

21   the heart or lungs has been reported.  There have also been

22   reports of caudal migration of the filter.  Migration may be

23   caused by placement in IVCs with diameters exceeding the

24   appropriate labeled dimensions specified in this IFU.

25   Migration may also be caused by improper deployment, deployment

1  into clots, and/or dislodgement due to large clot burdens.

2  Q.  In the Eclipse IFU, did Bard specifically mention reports

3  of caudal migration?

4  A.  Yes.

5          MS. HELM:  And, Scott, can we go to page 4, please?

6  And under the bolded section, Note.

7          That's not the right one.  My page and your page are

8  different.

9          You know what, I'm going to move on.  I'm not going to

10  take the jury's time because I don't have the right

11  complication.

12          Can you go to page 6, though, please.  And -- never

13  mind.

14  BY MS. HELM:

15  Q.  Mr. Van Vleet, do you recall whether the Eclipse IFU also

16  included the results from the EVEREST trial for the G2 filter?

17  A.  Yes.

18  Q.  So in addition to being provided to the FDA, available in

19  the medical literature, were the results of the EVEREST trial

20  also included in every Eclipse IFU that was -- went with every

21  Eclipse filter delivered to any doctor who was implanting a

22  filter?

23  A.  Yes.

24  Q.  Let's back up.  And I'm going against chronology, but let's

25  briefly talk about the G2X IFU.

1           MS. HELM:  Scott, can you pull up 5931, please?

2    BY MS. HELM:

3    Q.  Mr. Van Vleet, do you recognize this document?

4    A.  I do.

5    Q.  And what is this?

6    A.  It's the IFU for the G2X filter system.

7    Q.  Were you involved in the preparation or drafting of this

8    IFU during your time at Bard?

9    A.  Yes.

10          MS. HELM:  Your Honor, at this time I move to admit

11   5931.

12          MR. O'CONNOR:  No objection.

13          THE COURT:  Admitted.

14          (Exhibit No. 5931 admitted into evidence.)

15          MS. HELM:  May I publish?

16          THE COURT:  Yes.

17          MS. HELM:  And can we go to page 4, Scott?  And we'll

18   hope that my numbers on the same as yours.

19          And under "Warnings," number 9.  Can you just blow up

20   8 and 9?

21   BY MS. HELM:

22   Q.  Mr. Van Vleet, are these the same warnings that we just

23   read in the Eclipse IFU for fracture and movement, migration,

24   or tilt of filters?

25   A.  Yes.  They appear to be, yes.

UNITED STATES DISTRICT COURT

JOHN VAN VLEET - DIRECT EXAMINATION                    2626

1    Q.  Thank you.

2            And, again --

3            MS. HELM:  You can take that down, Scott.

4    BY MS. HELM:

5    Q.  -- did the G2X IFU also include the information from the

6    EVEREST study that we talked about in the Eclipse IFU?

7    A.  Yes.

8    Q.  Thank you.

9            Let's move forward.  We're getting there.

10           Starting in 2010, did Bard continue to provide

11   information to the FDA regarding its filters?

12   A.  Yes.

13   Q.  And in what ways did Bard continue to provide that

14   information to the FDA regarding the performance of its

15   filters?

16   A.  Well, as we've seen in many different submissions, serial

17   510(k) changes in submissions, but also in informal and also

18   formal face-to-face meetings.

19   Q.  And throughout this entire process, was Bard also providing

20   adverse event information to the FDA on a regular basis?

21   A.  Yes.

22   Q.  And Mr. Modra was here and testified about an MDR.  Would

23   you remind the jury what that is?

24   A.  It's a medical device report.  It's required by FDA, either

25   for a manufacturer or a physician or a hospital to report to

1    FDA every time a medical device malfunctions.

2            MS. HELM:  Would you put up 5602, please?

3    BY MS. HELM:

4    Q.  Mr. Van Vleet, is this another contact report regarding a

5    meeting that was held between Bard and the FDA?

6    A.  Yes.

7    Q.  And when did this meeting take place?

8    A.  January the 7th, 2010.

9    Q.  And do you recall -- do you recall this meeting?

10   A.  I definitely recall this meeting.

11   Q.  And who requested this meeting?

12   A.  I requested this meeting.

13   Q.  Did you attend the meeting?

14   A.  I did.

15   Q.  And was this contact report prepared by you or at your

16   direction contemporaneous to or soon after the meeting?

17   A.  Yes.

18           MS. HELM:  Your Honor, at this time I move to admit

19   5602 as redacted.

20           MR. O'CONNOR:  Objection.  Hearsay within hearsay.

21           THE COURT:  What's your response on that, Ms. Helm?

22           MS. HELM:  I'm not sure what section he's referring to

23   because I understood that we had addressed that with prior

24   redactions.

25           THE COURT:  What is the portion you're referring to,

1    Mr. O'Connor?

2           MR. O'CONNOR:  Well, Your Honor, there's a number of

3    them.  If you look at just the first full paragraph beginning

4    with "Doctor."

5           THE COURT:  Why is that not hearsay within hearsay,

6    Ms. Helm?

7           MS. HELM:  Your Honor, I'll move on and just ask

8    Mr. Van Vleet about the meeting.

9           THE COURT:  Okay.

10   BY MS. HELM:

11   Q.  Mr. Van Vleet, what was the purpose of this meeting in

12   January of 2010 that you asked for with the FDA?

13   A.  We had heard of a study that was conducted at a hospital in

14   Pennsylvania, first through a cath conference that was online

15   and available to replay and listen to, and then subsequent to

16   that, the article was actually published.

17          But the most important thing, whenever we see an

18   article or a case study that includes Bard products and

19   includes any kind of malfunction of that product, or apparent

20   malfunction, we have a responsibility, a legal responsibility

21   to report this to the FDA.

22          So, number one, the summarization of results from this

23   specific physician and hospital's experience was on orders of

24   magnitude completely different than anything that we'd ever

25   seen, easily by a log, by ten times.

1          And most importantly, we had made a number of efforts

2     to visit the hospital and collect this information in our

3     efforts to honor our requirement to report this to the FDA.

4     And we had gotten nowhere.

5     Q.  And this doctor and this study, was this the Nicholson

6     study?

7     A.  Yes.

8     Q.  So in January of 2010, you -- why -- you requested a

9     meeting with the FDA to specifically discuss the Nicholson

10    study?

11    A.  Yes.

12    Q.  And do you recall what efforts Bard made to contact

13    Dr. Nicholson or the York Hospital to get the information that

14    was necessary for Bard to comply with its reporting

15    requirements to the FDA?

16    A.  I do.  We made 13 distinct efforts, four of them in person

17    on site.

18    Q.  And was Bard able, through those 13 distinct efforts, four

19    on site, to obtain the information it needed to comply with the

20    regulations and report the information identified by

21    Dr. Nicholson in his study?

22    A.  No.

23    Q.  During this meeting -- or in preparation of this meeting

24    with the FDA, what did Bard do to get ready for the meeting?

25    A.  It reviewed all of the reports to Bard, either from

1    customers or reported by customers, as MDRs or complaints and

2    summarized those.  It looked at sales data to have an idea of

3    denominators.  It once again refreshed its literature search on

4    the IVC filter environment and interviewed experts that were

5    familiar with the device and had implanted the device numerous

6    times.

7    Q.  Did Bard take the Nicholson study seriously?

8    A.  Very seriously.

9    Q.  Did Bard try to bury the Nicholson study or hide from it?

10   A.  Never.

11   Q.  Thank you.

12        I want to switch gears.  We're going to move forward

13   in time.  We're getting closer to the present.

14        The jury's heard about the Meridian and the Denali.

15   Were you employed at Bard when the Meridian and the Denali were

16   submitted to the FDA for clearance?

17   A.  Yes.

18   Q.  And do you remember approximately when the FDA -- the

19   510(k) application for the Meridian was submitted to the FDA?

20   A.  Toward the end of '10 or beginning of '11, maybe.

21   Q.  And do you recall when the Meridian was actually cleared?

22   A.  I think maybe the first half of '11 or --

23   Q.  Was it August -- does August 2011 sound --

24   A.  It was definitely 2011.  August is probably the right date.

25   Q.  And prior to the clearance of the Meridian in August of

UNITED STATES DISTRICT COURT

1    2011, did you have conversations with the FDA about the

2    Meridian?

3    A.  Yes.

4    Q.  And do you recall having meetings where FDA personnel were

5    involved?

6    A.  Yes.

7    Q.  And who is Dr. Pablo Morales at the FDA?

8    A.  Dr. Pablo Morales is a medical reviewer employed full time

9    by the FDA.  He is a practicing interventional radiologist

10   that's also a vascular surgeon.

11   Q.  And did you have meetings that included Dr. Morales with

12   the FDA to talk about the Meridian filter before it was cleared

13   by the FDA?

14   A.  Yes.

15   Q.  And do you recall the FDA having some concerns about some

16   corrosion or surface characterizations of the filter?

17   A.  Yes.

18   Q.  Prior to its clearance in May of 2011, could Bard have sold

19   the Meridian filter?

20   A.  No.

21   Q.  And let's talk briefly about the Denali.  The jury's heard

22   about that.

23        Is the Denali the next generation after the Meridian?

24   A.  Yes.

25   Q.  And is there a difference between the Denali and the

1    previous filters as to the wire or how it's made?

2    A.  Yes.  The previous iterations were assembled wires of

3    Nitinol that were welded in certain places.  And the Denali

4    filter is -- I guess the best way to describe it would be a

5    solid state.  It's made out of one piece of Nitinol.  It's just

6    simply laser cut, so it's got more integrity.

7            And then also because it's not a welded-together group

8    of wires with lots of little cracks and crevasses, it's

9    possible to terminally electropolish it, which is the best way

10   of electropolishing, to treat the surface finish.

11   Q.  And am I correct that the Denali was not cleared by the FDA

12   until May of 2013?

13   A.  Correct, yes.

14   Q.  But we talked about earlier, back in 2009, you were talking

15   to the FDA about the concept and the idea of the Denali.  Do

16   you recall that?

17   A.  Yes.

18   Q.  So was there a four-year, at least, process in the

19   development and clearance of the Denali?

20   A.  Yes.

21            MR. O'CONNOR:  Objection.  Leading.

22            THE COURT:  Sustained.

23   BY MS. HELM:

24   Q.  Was there an at least four-year process in the development

25   and clearance of the Denali filter?

 1              MR. O'CONNOR:  Same objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  There was at least a five-year

 4    development process for the Denali.

 5    BY MS. HELM:

 6    Q.  Thank you.

 7              I want to switch gears.  And we've been through the --

 8    we've been through all of the filters, and let's switch gears

 9    and talk about a few more things in the regulatory and clinical

10    world for IVC filters.

11              Are you familiar with what FDA down-classification is?

12    A.  Yes.

13    Q.  Would you explain that to the jury, please.

14    A.  Medical devices are classified into one, two, or three

15    levels.  The third level would be the more significant risk

16    devices.  The second one could be some significant risk

17    devices, but it's felt that they're well understood and that

18    there had been performance standards and testing standards

19    developed that made it very easy to standardize the manufacture

20    of these.  Class I devices are canes, Band-Aids, just more

21    simpler medical devices.

22              When a petition is either brought from within the FDA

23    or from outside of the FDA, based on information to lower the

24    risk level of the device, there's a process whereby FDA listens

25    to all of this and processes it and can make a decision to, in

1   fact, down-class or not down-class a device.

2   Q.  And when you joined Bard, did you learn that IVC filters

3   had been -- before you got there had been down-classed?

4   A.  Yes.

5           MS. HELM:  And, Scott, would you pull up 5877, please.

6           Your Honor, I believe this is in evidence.  May I

7   publish?

8           THE COURT:  You may.

9   BY MS. HELM:

10  Q.  Mr. Van Vleet, are you familiar with this document?

11  A.  Yes, I am.

12  Q.  And in the course of your employment with Bard and working

13  with IVC filters, did you have an opportunity to review this

14  document?

15  A.  Yes.

16  Q.  And is this the document that down-classified IVC filters?

17  A.  Yes.

18  Q.  And what's the date on the document?

19  A.  December 2, 1996.

20  Q.  So by the time you had been at Bard, IVC filters had been

21  down-classified for about 11 years?

22  A.  Yes.

23          MS. HELM:  And could we turn to page 3 of 5877,

24  please.  And the sentence that starts, "Although the risks," at

25  the very top.  And just the rest of that paragraph, that's

1   fine.

2   BY MS. HELM:

3   Q.  Mr. Van Vleet, you see the sentence that says "Although the

4   risks"?

5   A.  Yes.

6   Q.  And what is the FDA saying about the risks of IVC filters

7   in this sentence?

8   A.  Although these risks are potentially life threatening, as

9   is the disease they are intended to treat, they are well known

10  to the users and are well characterized in the medical

11  literature.  FDA now believes that these risks can be

12  controlled by special controls.

13          MS. HELM:  And can you go to page 4, Scott?  And

14  page 5, page 6, and page 7.

15  BY MS. HELM:

16  Q.  Mr. Van Vleet, are those a number of risks that the FDA

17  identified with IVC filters in the memo dated 1996?

18  A.  Yes.

19          MS. HELM:  Now, Scott, can we go back to page 5,

20  please.  And under the section at the bottom where it says

21  "Filter Migration."  It goes on to page 6.

22  BY MS. HELM:

23  Q.  Mr. Van Vleet, do you see where the FDA's talking about

24  migration of the filters back in 1996?

25  A.  Yes.

1    Q.  And there's a sentence in there that starts, "Much of the

2    reported."

3           Do you see that?

4    A.  Yes.

5    Q.  Would you read that sentence, please?

6    A.  Much of the reported filter movement may actually be due to

7    measurement error resulting from differences in patient

8    positioning, breathing, and parallax.

9    Q.  Mr. Van Vleet, what do you understand parallax to mean?

10   A.  I'm not a radiologist, but parallax is a distortion that is

11   caused in an x-ray image or any other radiographic image based

12   on the angle that the x-ray beam comes through the patient.

13   Q.  And, again, is the FDA -- does the FDA state that

14   measurement error is a possibility -- is a complication in

15   trying to identify filter movement or migration?

16   A.  Yes, I believe so.

17   Q.  And does that relate back to your testimony earlier today

18   about how difficult it is to measure the movement because of

19   the breathing of people and other movements?

20   A.  Yes, it does.

21          MS. HELM:  And, Scott, can we go to page 6, please?

22   And under Section F.

23   BY MS. HELM:

24   Q.  Mr. Van Vleet, what is the reported rate of caval

25   penetration that the FDA reported in this memo dated 1996?

1    A.  They report a caval penetration rate of 9 percent.

2    Q.  And what does FDA say about whether this penetration is

3    symptomatic?  Do you see that above?

4    A.  Yes.

5           So they say that slight penetration of the caval wall

6    by filter struts is usually asymptomatic and clinically

7    insignificant, perhaps because penetration occurs gradually,

8    allowing the time for the vessel wall to fibrose.

9    Q.  And, again, this is a memo from the FDA dated 1996?

10   A.  Yes.

11          MS. HELM:  Can we go to page 7, Scott?  And under the

12   Filter Fracture.

13   BY MS. HELM:

14   Q.  And, Mr. Van Vleet, what did the FDA say in 1996 were the

15   reported rates of filter fracture in the literature?

16   A.  Yes.  The incidence of occurrence has been reported at

17   2 percent.

18   Q.  And did the FDA -- what did the FDA say might happen to a

19   fractured strut?  Do you see that?

20   A.  Yes.  They -- the fracture fragments may migrate locally or

21   distally.

22   Q.  Do you know what distally means?

23   A.  It means from north to south.

24   Q.  So to other parts of the body?

25   A.  Yes.

1    Q.  Thank you.

2           Okay.  I'm going to change gears one more time and

3    talk to you about the FDA guidance regarding IVC filters.  Is

4    that a document you're familiar with?

5    A.  Yes.

6           MS. HELM:  And, Scott, can you pull up 5126, please?

7    BY MS. HELM:

8    Q.  Mr. Van Vleet --

9           MS. HELM:  Your Honor, I believe this is admitted.

10   May I publish?

11          THE COURT:  You may.

12   BY MS. HELM:

13   Q.  Mr. Van Vleet, are you familiar with this document?

14   A.  I am.

15   Q.  Would you tell the jury what this is, please?

16   A.  So for Class II devices, FDA has developed a series of

17   guidance documents, and they attempt to describe for

18   manufacturers what their expectations are in terms of what

19   testing must be performed and what kind of evidence must be

20   submitted in these regulatory applications.  And this is their

21   one for intravascular filter.

22   Q.  And in your role as vice president of regulatory and

23   clinical affairs for Bard, did you rely on this document when

24   you were submitting 510(k) submissions for the Bard IVC filters

25   we've talked about today?

1    A.  Yes.

2    Q.  And did you use this for the submission for the G2 as a

3    retrievable filter?

4    A.  Yes.

5    Q.  For the G2X?

6    A.  Yes.

7    Q.  The Eclipse?

8    A.  Yes.

9    Q.  The Meridian?

10   A.  Yes.

11   Q.  And the Denali?

12   A.  Yes.

13         MS. HELM:  And, Scott, if we could turn to page 9,

14   please, under number 4, Filter Migration.

15   BY MS. HELM:

16   Q.  And in this FDA document, Mr. Van Vleet, does the FDA again

17   talk about the difficulty in measuring movement of an IVC

18   filter?

19   A.  Yes.

20   Q.  And does it again talk about patient positioning,

21   breathing, and parallax?

22   A.  Yes.

23   Q.  Is that language, as you understand it, similar to the

24   language we just read in the 1996 memo?

25   A.  It looks like it's the same sentence.

JOHN VAN VLEET - DIRECT EXAMINATION

1    Q.  I'm going to shift gears on you one more time and try to

2    get us up to date.

3            And I'd like to talk to you about an FDA safety

4    communication from 2010 regarding IVC filters.  Do you recall

5    that?

6    A.  I do.

7            MS. HELM:  Scott, could you pull up 6991.

8    BY MS. HELM:

9    Q.  Mr. Van Vleet, do you recognize this document?

10   A.  Yes, I do.

11   Q.  Is this the safety communication from the FDA that I just

12   discussed?

13   A.  Yes.

14           MS. HELM:  Your Honor, I believe this is in evidence.

15   May I publish?

16           THE COURTROOM DEPUTY:  6991?

17           THE COURT:  We don't have that in evidence.

18   BY MS. HELM:

19   Q.  Mr. Van Vleet, do you recognize this document?

20   A.  I do.

21   Q.  And is this a communication from the FDA that's available

22   publicly regarding IVC filters?

23   A.  Yes.

24           MS. HELM:  And, Your Honor, at this time I move to

25   admit 6991.

1          MR. O'CONNOR:  No objection.

2          THE COURT:  Admitted.

3          (Exhibit No. 6991 admitted into evidence.)

4          MS. HELM:  May I publish, Your Honor?

5          THE COURT:  You may.

6    BY MS. HELM:

7    Q.  Mr. Van Vleet, who was this communication directed to?

8    A.  It's directed to implanting physicians and clinicians

9    responsible for the ongoing care of patients with inferior vena

10   cava filters.

11   Q.  Was this communication directed specifically to Bard?

12   A.  No.

13   Q.  Was it a communication specifically about Bard IVC filters?

14   A.  No, it was not.

15          MR. O'CONNOR:  Objection.  Leading.

16          THE COURT:  Overruled.

17   BY MS. HELM:

18   Q.  Under the section -- let me see if I can find it.

19          In the section Summary of the Problem and the Scope,

20   in the last paragraph, do you see where the FDA is discussing

21   retrievable IVC filters?

22   A.  Yes.

23   Q.  And what does the FDA state about its concern about

24   retrievable IVC filters?

25   A.  They express concern that these retrievable IVC filters

1    intended for short-term placement are not always removed once a

2    patient's risk for PE subsides.  Known long-term risks

3    associated with IVC filters include but are not limited to

4    lower limb deep vein thrombosis (DVT), filter fracture, filter

5    migration, filter embolization, and IVC perforation.

6    Q.  After the FDA issued this communication in 2010, did Bard

7    do anything to make sure doctors using its devices were aware

8    of this FDA communication?

9    A.  Yes.

10            MS. HELM:  Scott, would you pull up 5923, please.

11   BY MS. HELM:

12   Q.  And, Mr. Van Vleet, do you recognize this document?

13   A.  I do.

14   Q.  And what is this?

15   A.  It's a letter that I authored for clinical caregivers or

16   anybody involved in the treatment of patients with IVC filters.

17   Q.  And does the letter bear your signature?

18   A.  Yes.

19            MS. HELM:  Your Honor, at this time I move to admit

20   5923, as redacted.

21            MR. O'CONNOR:  No objection.

22            THE COURT:  Admitted.

23            (Exhibit No. 5923 admitted into evidence.)

24            MS. HELM:  May I publish, Your Honor?

25            THE COURT:  Yes.

JOHN VAN VLEET - DIRECT EXAMINATION

1   BY MS. HELM:

2   Q.  Mr. Van Vleet, was this letter given to doctors or

3   hospitals that implant Bard IVC filters?

4   A.  Yes.

5   Q.  And what did Bard encourage doctors to do?

6   A.  We encouraged physicians to review the FDA initial

7   communication and to consider the risks and benefits of filter

8   removal for each patient.

9   Q.  And why did Bard provide this information to doctors?

10  A.  Because we wanted them to understand that we supported the

11  FDA and we supported surveillance of patients and following the

12  patients.

13  Q.  I'm going to shift gears one more time and talk to you

14  about another document.

15          MS. HELM:  Can we pull up 7960, please.

16  BY MS. HELM:

17  Q.  Mr. Van Vleet, do you recognize this document?

18  A.  I do.

19  Q.  Was this document prepared either by you or at your

20  direction while you were vice president of regulatory and

21  clinical affairs at Bard Peripheral Vascular in 2010?

22  A.  It was.

23  Q.  Was this document maintained in the regular course of

24  business at Bard?

25  A.  Yes.

1    Q.  And was it the regular practice of Bard to prepare

2    information to give to doctors providing information about its

3    products?

4    A.  Yes.

5    Q.  And what information was consulted in creating this

6    handout?

7    A.  This was a survey of published studies, either published

8    studies that were conducted as part of the approval or

9    clearance process for devices, or just any other study in the

10   literature on a variety of IVC filter platforms, but also a

11   published study on Bard IVC filter platforms.

12            MS. HELM:  Your Honor, at this time I move to admit

13   Exhibit 7960.

14            MR. O'CONNOR:  Objection.  Foundation.  I don't see a

15   date on this document.

16            THE COURT:  Can you lay foundation on the timing,

17   please?

18   BY MS. HELM:

19   Q.  Mr. Van Vleet, do you recall approximately when this

20   document was prepared?

21   A.  2010.

22            MS. HELM:  Is there a second page, Scott?

23   BY MS. HELM:

24   Q.  Mr. Van Vleet, on the second page in the bottom --

25            THE COURT:  Just a minute.

1          What was that, Mr. O'Connor?

2          MR. O'CONNOR:  No objection.  I see the date now.

3          THE COURT:  All right.  7960 is admitted.

4          (Exhibit No. 7960 admitted into evidence.)

5          MS. HELM:  May I publish, Your Honor?

6          THE COURT:  You may.

7   BY MS. HELM:

8   Q.  Mr. Van Vleet, now that the jury can see it, explain to

9   them what this is.

10  A.  So this is an attempt to compare studies on different IVC

11  filter systems, including Bard filter systems, and other

12  competitive filter systems against each other wherever

13  possible.

14  Q.  Just so we're clear, this is -- is this information that

15  Bard obtained through published literature about its IVC

16  filters and other IVC filters?

17  A.  Yes.  On the back is -- are all of the references from

18  where these data were derived.

19  Q.  Okay.  And did Bard -- and in this handout to doctors, Bard

20  included the reported rate information from each of those

21  published studies?

22  A.  Yes.

23  Q.  Mr. Van Vleet, does this include the Nicholson study?

24  A.  It does.

25  Q.  Why did Bard include the Nicholson study in a handout that

UNITED STATES DISTRICT COURT

1    it was providing to physicians about published information

2    regarding its filters and other filters?

3    A.  Because if you're providing information to clinicians, you

4    can't cherry-pick data that only suits your own purposes.  So

5    it's really important to be balanced and show the good, bad,

6    and the ugly.

7    Q.  And does this handout also provide information regarding

8    studies for filters that were made by manufacturers other than

9    Bard?

10   A.  Yes.  It includes data on the Celect filter by Cook option,

11   by Allen, Tulip, et cetera, and OptEase.

12   Q.  And why did Bard include information about other

13   manufacturers' filters?

14   A.  Because those are contextually -- those are filters that

15   were available for sale at that period of time so it would be a

16   fair comparison.

17          MS. HELM:  Thank you.  You can take that down.

18   BY MS. HELM:

19   Q.  Mr. Van Vleet, during the ten-plus years that you were at

20   Bard, did you become familiar with Bard's processes and

21   procedures regarding taking corrective actions or addressing

22   complications with its medical devices?

23   A.  Yes.

24   Q.  And were those policies and procedures also applicable to

25   Bard's IVC filters?

1  A.  Yes.

2  Q.  During your time at Bard, if Bard determined that the risks

3  of a benefit -- of a product outweighed the benefits, what type

4  of actions would Bard take?

5  A.  Bard could alert the practicing community, they could put a

6  hold on the product, or they could remove the product from the

7  market.

8  Q.  Over your almost 11 years at Bard, did Bard ever make a

9  determination that the G2, the G2X, or the Eclipse filters,

10  that the risks of those filters outweighed the benefits?

11  A.  No.

12  Q.  Mr. Van Vleet, when you were vice president of regulatory

13  and clinical affairs at Bard, did you have access to all

14  information regarding the products for which you were

15  responsible?

16  A.  Yes.

17  Q.  And you just used a term a few minutes ago, the good, the

18  bad, and the ugly.

19  A.  Correct.

20  Q.  Did you have access to all of that information?

21  A.  Yes.

22  Q.  During the approximately ten-plus years that you were at

23  Bard, did you ever feel that the risks of the G2, the G2X, or

24  the Eclipse filters outweighed the benefits of those filters?

25  A.  No.

1          MS. HELM:  Thank you.  I don't have any further

2    questions at this time.

3          THE COURT:  Cross-examination.

4          MR. O'CONNOR:  Yes.  Thank you, Your Honor.

5                      CROSS-EXAMINATION

6    BY MR. O'CONNOR:

7    Q.  Hello, Mr. Van Vleet.  My name is Mark O'Connor.  How are

8    you?

9    A.  Good.  Thank you.

10   Q.  Thanks for coming down here today.

11         Mr. Van Vleet, you agree that Bard should always make

12   patient safety a priority.  It should come first; correct?

13   A.  It always did.

14   Q.  Bard should not expose a patient to an unnecessary risk of

15   harm.  Do you agree with that?

16   A.  I would agree.

17   Q.  The Eclipse was promoted and was sold and marketed as a

18   permanent filter; true?

19   A.  Yes.

20   Q.  Meaning that, depending on the physician and the patient,

21   that filter, like the G2 and the G2X, could be put in a patient

22   for the duration of that patient's life; correct?

23   A.  It could be.  Uh-huh.

24   Q.  And the patient and the doctor who had used it as a

25   permanent device had the right to expect that the filter would

1   remain in place and do its job; true?

2   A.  For as long as the doctor felt the patient needed it,

3   correct.

4   Q.  And if it was permanent, that meant do its job, stay in

5   place for the duration of a patient's life; correct?

6   A.  That's the correct expectation.

7   Q.  And that filter, those filters, those three filters were

8   being placed in patients who had life expectancies much longer

9   than just ten years; true?

10  A.  I believe so.

11  Q.  Thank you.

12          The only design difference between the Eclipse and the

13  G2 filter was that the Eclipse was electropolished; correct?

14  A.  Correct.

15  Q.  Now, the Eclipse filter did not contain caudal anchors;

16  true?

17  A.  The Eclipse filter did not -- I believe that's correct,

18  yes.

19  Q.  Caudal anchors are designed to reduce caudal migration;

20  correct?

21  A.  Correct.

22  Q.  Bard understood as early as 2006 that caudal anchors could

23  reduce caudal migration; true?

24  A.  I was not an employee of Bard at that time.

25  Q.  I think you testified to that, though.  Do you want to go

1    to your testimony?

2    A.  Sure.

3    Q.  As long as you were at Bard, you knew Bard was aware that

4    caudal anchors could reduce caudal migration; fair?

5    A.  I believe so.

6    Q.  Thank you.

7             And Bard knew from the EVEREST trial that migration

8    could lead to tilt, perforation, and fracture in the Bard

9    filters that were used in that trial; correct?

10   A.  The complications in the EVEREST trial, yes, have been

11   reported.

12   Q.  And just so you and I are on the same page, a lesson Bard

13   learned from EVEREST was that migration in the G2 filter could

14   lead to tilt, perforation, and fracture; right?

15   A.  There were a lot of hypothesized theories that were being

16   evaluated about all of the complication modes that were seen.

17   Q.  You were seeing different complications, several -- more

18   than one complication in different patients; right?

19   A.  In the EVEREST trial, in some cases there were multiple

20   patients.

21   Q.  And nowhere in the IFU did Bard say that the G2 migration

22   can lead to perforation, tilt, or migration or fracture, did

23   it?

24   A.  It did not.

25   Q.  Thank you.

1           The filter with caudal anchors became the Meridian; is

2    that right?

3    A.  It is.

4    Q.  And caudal anchors made the Meridian 16 more times

5    resistant to caudal migration than the G2X and the Eclipse;

6    correct?

7    A.  I don't know of the multiple, but if there is something you

8    can show me, I can tell you if I've seen it before.

9    Q.  That's what you understood; correct?  That sound about

10   right?

11   A.  I don't know the multiple, but I know that there was an

12   increased resistance in migration.

13   Q.  You did know that the addition of caudal anchors would make

14   the filter more resistant to caudal migration; true?

15   A.  That was what was hypothesized, correct.

16           MR. O'CONNOR:  Felice, can we show Exhibit 4896 real

17   quick?

18           And Mr. -- Your Honor, I believe this is in evidence.

19   May I publish?

20           THE COURT:  4896 is the number?

21           THE COURTROOM DEPUTY:  It is.

22           THE COURT:  Yes, you may publish.

23           MR. O'CONNOR:  May I publish to the jury?

24           THE COURT:  Yes.

25

1    BY MR. O'CONNOR:

2    Q.  Mr. Van Vleet, you can see there are signatures dated

3    August 9 -- 19, 2010.  August 2010.  Do you see that to the

4    right?

5    A.  I do.

6    Q.  And there, back in 2010, Bard was testing the Meridian

7    against the OptEase filter; right?

8    A.  That's -- yeah.  That's what the title says.

9         MR. O'CONNOR:  Felice, can you put up Exhibit 5593?

10        I believe this is in evidence, Your Honor, subject to

11   redactions.

12        THE COURT:  What's the number?

13        MR. O'CONNOR:  5593.

14        THE COURT:  Yes, it is.  You may publish.

15        MR. O'CONNOR:  Felice, go to page 2, second to last

16   paragraph.

17        And highlight the last sentence in the last -- second

18   to last paragraph, please.  That last sentence, Felice.

19        THE WITNESS:  Sure.  It says:  John, that would be

20   me --

21        MR. O'CONNOR:  I'm sorry.  I'm talking to Felice.

22        THE WITNESS:  Oh, I apologize.

23        MR. O'CONNOR:  No, that's all right.  I'm trying to

24   control a couple different fronts here, Mr. Van Vleet, but

25   thank you for your cooperation.

1    BY MR. O'CONNOR:

2    Q.  I'll read it.

3            John said yes, but this is far out in the timeline.

4    John said that Angela could expect caudal anchors project in

5    Quarter 3 or Quarter 2 of 2010.

6            Now, did I read that correctly?

7    A.  Yes.

8    Q.  Thank you.

9            The point is, long before 2011, Bard was aware of

10   caudal anchors and how caudal anchors could resist caudal

11   migration; correct?

12   A.  Correct.

13   Q.  And, sir, during that period of time, Bard was developing a

14   filter with caudal anchors; correct?

15   A.  Yes.

16   Q.  And Bard did not stop selling the G2, the G2X, or the

17   Eclipse; is that correct?

18   A.  Correct.

19           MR. O'CONNOR:  Felice, would you please put up Exhibit

20   No. 1940.

21           Your Honor, I believe it's in evidence.  May we

22   publish?

23           THE COURT:  You may.

24   BY MR. O'CONNOR:

25   Q.  And, sir --

1              MS. HELM:  Excuse me, Your Honor.  Object.  This is

2      cumulative.  Mr. Van Vleet's already been cross-examined on

3      this document.

4              MR. O'CONNOR:  Your Honor --

5              THE COURT:  Well, he hasn't been cross-examined

6      before.  You mean during his direct testimony?

7              MS. HELM:  Yes, Your Honor.  My objection is it's

8      cumulative.  He's already been questioned about this document.

9              THE COURT:  Objection overruled.

10             MR. O'CONNOR:  Felice, if you would, just highlight

11     quickly "MDRs for G2 and G2X."

12             Very good.  Thank you.

13     BY MR. O'CONNOR:

14     Q.  All right.  Do you see -- this is as of July 2010,

15     Mr. Van Vleet.  And do you see that the G2 as of July 2010 had

16     689 MDR reports?

17     A.  I see that number, yes.

18     Q.  MAUDE data reports.

19             And the G2X had 153; is that correct?

20     A.  Yes, I see that.

21     Q.  And the Eclipse wasn't even launched in 2010; correct?

22     A.  Yes, correct.

23     Q.  And already in 2010, the Eclipse is experiencing 14 of

24     those MDRs; correct?

25     A.  Yes.

1    Q.  Now, earlier, when -- you discussed with Ms. Helm the

2    August 9, 2010, FDA letter.

3            Do you recall that?

4    A.  Yes.

5    Q.  And the letter mentioned the number of complaints that the

6    FDA had received, MAUDE data complaints.

7            Do you remember that statement in there?

8    A.  I do.

9    Q.  Did you go and look to see how many of those complaints

10   were Bard complaints?

11   A.  I believe the quality organization does that just routinely

12   every month.

13   Q.  You didn't, did you?

14   A.  I did not, no.

15   Q.  And so if you look at here, we have 337 plus 689 plus 153

16   plus 14.  I didn't calculate it, but that's an awful lot of

17   MDRs, isn't it?

18   A.  It is.

19   Q.  Thank you.

20           And that's just for Bard filters; right?

21   A.  It is.

22   Q.  And, sir, as we look at this document, Bard never included

23   this information, how many complaints Bard was aware of with

24   Bard filters, in any of its IFUs, did it?

25   A.  No.  That's not -- not something --

1    Q.  Sir --

2    A.  -- the FDA would agree with either.

3    Q.  Sir, you didn't put in any IFU the number of complaints

4    Bard was aware of; is that fair?  Yes or no?

5    A.  Only the ones that are reported in clinical trials.

6    Q.  My question is different.

7    A.  Okay.

8    Q.  We're looking at a lot of MDRs here.  You didn't put that

9    information in an IFU, did you?

10   A.  Nobody does that.

11   Q.  Thank -- well, you didn't, did you?

12   A.  No, I didn't.

13   Q.  And one thing's for sure:  You also didn't put in your IFU

14   or any document to a doctor in 2010 or even 2011 a warning or

15   an alert that Bard knew that caudal anchors would resist caudal

16   migration, did you?

17   A.  Not to my knowledge.

18   Q.  But you knew caudal anchors would; right?

19   A.  It was being tested at that time.

20   Q.  And the other thing you didn't put in any warning, any

21   document, any marketing information to any doctor was that Bard

22   had a hypothesis that when its G2 filter migrated, it would

23   lead to tilt, perforation, and fracture.  That wasn't included

24   in any information supplied to the medical community, was it?

25   A.  I don't believe so.

1    Q.  I just want to talk to you about Dr. Lehmann real quickly,

2    please.

3            He was an independent consultant for Bard during your

4    tenure at Bard; correct?

5    A.  He was -- he definitely was.

6    Q.  And he was originally intended to be the person who signed

7    Bard's submission to the FDA reporting on the EVEREST trial;

8    true?

9    A.  He was going to sign the clinical study report section,

10   correct.

11   Q.  And you do recall that Dr. Lehmann did not want to include

12   SIR guideline information in the Bard's EVEREST trial

13   submission; right?

14   A.  I do.

15   Q.  And Dr. Lehmann didn't want to include SIR guideline

16   information because that information, he felt, was intended

17   for -- was not intended for anyone other than physicians.

18   True?

19   A.  Correct.

20   Q.  And Dr. Lehmann did not believe it would be truthful and

21   accurate for Bard to represent that the EVEREST trial

22   demonstrated that the G2 was substantially equivalent to a

23   similar device; true?

24   A.  I believe he may have said that, yeah.

25   Q.  And after getting the report back from Dr. Lehmann, you

1    requested that he be removed as a submitting author for the

2    EVEREST trial report; correct?

3    A.  I did.

4    Q.  And the final report was ultimately sent to the FDA, and

5    that report did include comparison data from the SIR

6    guidelines; correct?

7    A.  It did.

8    Q.  Bard never told the FDA about Dr. Lehmann's concerns about

9    including SIR guidelines in the EVEREST submission, did they?

10   A.  I don't believe so.

11   Q.  Now, sir --

12          MR. O'CONNOR:  Put up Exhibit 4499, please, Felice.

13   And if you'll look down --

14          May I display to the jury, Your Honor?  I believe this

15   is in evidence.

16          THE COURT:  It is not in evidence.

17          MR. O'CONNOR:  It is not?

18          THE COURT:  No.

19          MR. O'CONNOR:  Okay.  I offer it into evidence.

20          MS. HELM:  No objection, Your Honor.

21          THE COURT:  Admitted.

22          (Exhibit No. 4499 admitted into evidence.)

23          MS. HELM:  May I see the next couple of pages on it,

24   Mark?

25          MR. O'CONNOR:  Pardon me?

1              MS. HELM:  May I see the --

2              MR. O'CONNOR:  Yeah.

3              MS. HELM:  Is that the last page?

4              Thank you.

5              MR. O'CONNOR:  All right.  Go to the first page.

6    Felice, just highlight "16 times improvement in caudal

7    migration," would you, please.

8    BY MR. O'CONNOR:

9    Q.  All right.  Now do you see where I was talking about

10   earlier?  That's something Bard became aware of in its testing

11   of the Meridian that started even before you came to Bard;

12   right?

13   A.  I don't know when it started, but it definitely is the 16

14   number that you discussed before.

15   Q.  And Bard never warned doctors in 2008, 2009, or 2010 or

16   2011 that they should stop using --

17             MR. O'CONNOR:  Oh, may I publish, Your Honor?

18             THE COURT:  Yes.

19   BY MR. O'CONNOR:

20   Q.  Bard never warned doctors in 2008, 2009, 2010, or even 2011

21   that they should stop using the G2, the G2X, or the Eclipse

22   because they had a filter with caudal anchors coming soon, did

23   they?

24   A.  No.

25             MR. O'CONNOR:  4892, please.

UNITED STATES DISTRICT COURT

1    BY MR. O'CONNOR:

2    Q.  Do you recognize this as the Denali IFU?

3    A.  Yes.

4            MR. O'CONNOR:  Offer into evidence, Your Honor.

5            MS. HELM:  No objection, Your Honor.

6            THE COURT:  Admitted.

7            (Exhibit No. 4892 admitted into evidence.)

8            MR. O'CONNOR:  Display to the jury, Your Honor?

9            THE COURT:  You may.

10           MR. O'CONNOR:  And may we go to page 6?  And, Felice,

11   can you highlight the complication rates, please?  And enlarge

12   it.

13   BY MR. O'CONNOR:

14   Q.  Turns out Bard did know how to put complication rates in

15   its IFU, didn't they, Mr. Van Vleet?

16   A.  I'm sorry.  What's the question?

17   Q.  Turns out when the IFU came around, Bard did figure out

18   that it could put complication rates in its IFU.  True?

19   A.  It certainly -- they certainly are in the Denali IFU.

20           MR. O'CONNOR:  All right.  Thank you.  I don't think I

21   have any more questions.

22           THE COURT:  Redirect?

23           MS. HELM:  Can you leave that exhibit up, please, with

24   the complication rates?

25

UNITED STATES DISTRICT COURT

1                        REDIRECT EXAMINATION

2    BY MS. HELM:

3    Q.  Mr. Van Vleet, before the FDA would clear the Denali, did

4    it require a clinical study of the Denali?

5    A.  Yes.

6    Q.  And is the IFU, are these the complication rates from that

7    clinical study of the Denali?

8    A.  Yes.

9            MS. HELM:  Thank you.  You can take it down.

10   BY MS. HELM:

11   Q.  In the previous IFUs, did Bard also include complication

12   information regarding the EVEREST study?

13   A.  Yes.

14   Q.  Mr. O'Connor asked you about MDRs, and that was a large

15   number.

16           Do you remember that?

17   A.  I do.

18   Q.  Does Bard report all complications and all adverse events

19   that it receives from patients or physicians?

20   A.  Bard reports all information, all feedback from patients or

21   physicians, even when they can't corroborate it.

22   Q.  Does that sometimes relate to packaging?

23   A.  Yes.

24   Q.  Deployment?

25   A.  Yes.

1    Q.  Many things that aren't adverse events relating to the

2    performance of the filter?

3    A.  Yes.

4    Q.  So if that number was all MDRs, would it include all of

5    those reports, not just those relating to the adverse events

6    we've been talking about today?

7    A.  Absolutely.

8              MR. O'CONNOR:  Objection.  Leading.

9              THE COURT:  Sustained.

10   BY MS. HELM:

11   Q.  Mr. Van Vleet, that total MDRs, what would that include?

12   A.  That would include anything that came from a hospital, a

13   physician, even if a patient were to call in -- probably the

14   silliest example is you change the number or you change the

15   color on the box and I don't like it.  That also is included as

16   an MDR.

17             I can tell you, in the 11 years that I worked for

18   Bard, I've never seen a company report more MDRs than Bard.

19             MR. O'CONNOR:  Objection.  Nonresponsive, Your Honor.

20             THE COURT:  Overruled.  That's the questioner's

21   objection.

22   BY MS. HELM:

23   Q.  Mr. Van Vleet, you had a professional disagreement with

24   Dr. Lehmann?

25   A.  I did.

1    Q.  Did that professional disagreement with Dr. Lehmann in any

2    way impact whether Bard provided all of the information to the

3    FDA regarding the EVEREST study and the adverse events in the

4    EVEREST study?

5    A.  Absolutely not.

6    Q.  Mr. O'Connor asked you on more than one occasion -- he got

7    you to state, to agree, that Bard did not remove the G2, the

8    G2X, or the Eclipse filters from the market.

9         Do you recall that?

10   A.  I do.

11   Q.  Based on your experience and your work at Bard, was there

12   ever any reason, in your opinion, for Bard to remove the G2,

13   the G2X, or the Eclipse filters from the market?

14   A.  No.

15        MS. HELM:  Thank you.

16        THE COURT:  All right.  Thank you, sir.  You can step

17   down.

18        (Witness excused.)

19        MR. ROGERS:  Your Honor, could we approach briefly?

20        THE COURT:  With three minutes to go?

21        MR. ROGERS:  Yes, Your Honor.

22        THE COURT:  Yes, you can.

23        MR. ROGERS:  Okay.

24        THE COURT:  You can stand up, ladies and gentlemen.

25        (At sidebar on the record.)

```
1            MR. ROGERS:  Your Honor, given the time of day and the
2    charge conference, would it be okay if we let the jury go so we
3    can start?  And we'll be glad to eat the time.
4            THE COURT:  I'm going to charge you for your three
5    minutes.
6            MS. HELM:  Fine.
7            MR. ROGERS:  Yeah, that's fine.
8            MS. REED ZAIC:  And a bean.
9            (End of discussion at sidebar.)
10           THE COURT:  We're going to break for the day, ladies
11   and gentlemen.  We will start tomorrow morning at 9:00 o'clock.
12   As I've indicated, I believe we'll get the case finished by
13   about this time tomorrow evening so that you'll be able to
14   begin your deliberations on Thursday morning.
15           Please remember until then not to discuss the case.
16   Don't do any research.  And we'll look forward to seeing you
17   tomorrow morning.
18           (Jury not present.)
19           THE COURT:  Please be seated.  Let me do the time
20   calculation, counsel.
21           MR. O'CONNOR:  Your Honor --
22           THE COURT:  All right, counsel.  As of the end of the
23   day, plaintiffs have used 32 hours.  Defendants have used 25
24   hours and 46 minutes.
25           MS. HELM:  I'm sorry, Your Honor, do you mind
```

1    repeating that?

2              THE COURT:  25 hours and 46 minutes.

3              MS. HELM:  And the plaintiff?

4              THE COURT:  32 hours.

5              MS. HELM:  And 0 minutes?

6              THE COURT:  And 0 minutes.  Yeah, they had 24 minutes

7    this afternoon, plus the 31.36 this morning.  It comes out to

8    exactly 32 hours.

9              Counsel for the defense, what are you planning to do

10   in the morning in terms of additional evidence?

11             MR. ROGERS:  Your Honor, we will be calling one last

12   live witness and perhaps also have a video, but we should be

13   resting tomorrow morning.

14             THE COURT:  How long do you think your evidence will

15   take?

16             MR. ROGERS:  I would say certainly no more than two

17   hours, and I think that's an outside limit.

18             THE COURT:  Okay.  Well, we'll just have to play it by

19   ear in terms of when we start argument.

20             Plaintiffs, do you anticipate much in the way of

21   rebuttal evidence?

22             MR. O'CONNOR:  Your Honor, I haven't had a chance to

23   meet with our team.  I can't imagine anything time-consuming,

24   if there's going to be any at all, but I would have to consult

25   with everybody this evening.

1          THE COURT:  All right.  Well, when we get to the end

2    of the evidence, I'll plan to instruct the jury; and then we'll

3    see where we are in terms of argument and the lunch hour so

4    that we try to make it as smooth as possible.

5          While I'm thinking of it, I would like all of you --

6    well, not all of you -- I would like whoever would be the

7    relevant folks to plan on an 11:00 a.m. hearing on Thursday to

8    talk about case management issues from here through the next

9    two bellwethers.  We've got to make sure we've got the dates

10   set for the final pretrial conference, when motions are going

11   to be due, et cetera.  So please be prepared, if you would, to

12   talk about that on Thursday at 11:00 while the jury is

13   deliberating.

14         Okay.  Let me get my jury instructions.

15         MS. HELM:  Your Honor, may I be excused for just a

16   minute?

17         THE COURT:  Yeah.

18         MS. HELM:  Thank you.

19         THE COURT:  That's fine.

20         MR. O'CONNOR:  Can I step out for five minutes, Your

21   Honor?

22         THE COURT:  I can't hear you, Mr. O'Connor.

23         MR. O'CONNOR:  Sorry.  I don't want to delay things.

24   I plan to be with my group here, but I just want to step out

25   for five minutes.  Is that okay?

1          THE COURT:  Yeah.  Can we start without you?

2          MR. O'CONNOR:  Yes, sir.

3          THE COURT:  Okay.  Mr. Rogers, Mr. North, do we need

4    to wait for Ms. Helm to come back before we get started?

5          MR. NORTH:  We do not, Your Honor.

6          THE COURT:  All right.

7          MR. ROGERS:  Your Honor, and just to -- I'm also going

8    to slip out, and Mr. North is going to handle for us.  But

9    unlike Mr. O'Connor, I'm not coming back.

10          THE COURT:  Okay.  We filed proposed final jury

11    instructions on September 27th, which was the end of last week.

12          What I'd like to do is find out first what comments

13    you have on Instructions 1 through 12.  And we particularly

14    need to talk for a moment about Instruction No. 7.

15          Before we get to 7, let's just find out, plaintiffs,

16    do you have comments on any of the 1 through 12 instructions

17    other than number 7?

18          MR. GOLDENBERG:  Hold on, Your Honor.

19          THE COURT:  Pull the mic over, would you?

20          MR. GOLDENBERG:  Sure.

21          Your Honor, I guess the only one that I would have a

22    comment on is we just need to discuss if there were any charts

23    and summaries actually admitted into evidence.  I'm not really

24    sure that there were.  I think there were demonstrative

25    exhibits used, but I'm not positive that number 9, charts and

1    summaries that have been admitted into evidence --

2              MR. O'CONNOR:  Yes, there were.

3              MR. GOLDENBERG:  There were?  Okay.

4              THE COURT:  Well, there was not a 1006 chart, was

5    there?

6              MR. O'CONNOR:  Well, I think we admitted a chart out

7    of the medical literature today, and yesterday there was a

8    graph that they admitted on sales.

9              THE COURT:  But that's not what this is talking about.

10   This is --

11             MR. GOLDENBERG:  These are the charts that would only

12   be for summary purposes.

13             THE COURT:  Yeah, this is a 1006 chart.

14             MS. REED ZAIC:  There was no 1000 chart entered.

15             THE COURT:  All right.  So I think you're right.

16             Any objection to taking out number 9?

17             MR. NORTH:  None, Your Honor.

18             THE COURT:  Any other comments from plaintiffs on 1

19   through 12 except for number 7?

20             MR. GOLDENBERG:  No, Your Honor.

21             MR. NORTH:  Only number 7, Your Honor.  Nothing

22   further.

23             THE COURT:  Okay.  Let's talk about number 7.

24             We've had, I think, three different witnesses testify,

25   experts testify, who had involvement at the FDA, and they've

1    given FDA expert testimony.

2         Let me tell you what my thought is, and you can tell

3    me what -- whether this is a bad idea.  I propose that we leave

4    the first paragraph the way it is, so it's clear that the

5    parties don't have access to personnel at the FDA about their

6    work at the FDA.

7         But then that we add a second paragraph that I just

8    sketched out at lunch, so it's a little rough, but it would say

9    something like this:  Each side has presented expert witnesses

10   to testify about FDA procedures and the 510(k) process in this

11   case, but this testimony was based on the expertise of these

12   witnesses and work they did after being retained as experts in

13   this litigation.

14        To make clear that they're experts testifying about

15   things they reviewed for this litigation, not people testifying

16   about what they did at the FDA.

17        MR. NORTH:  That's acceptable to the defendant.

18        MR. GOLDENBERG:  We're okay with that, Your Honor.

19   Thank you.

20        THE COURT:  All right.  So we'll give that

21   instruction.

22        Let me ask you another question that occurred to me

23   today.  We admitted in evidence some internal FDA meeting

24   notes.  And I can see a juror hearing this instruction and

25   saying, well, wait a minute.  Somebody got access to documents

1    inside the FDA.

2            So I was wondering if we need to add a sentence that

3    says something like:  Internal FDA meeting notes have been

4    admitted into evidence, but those were obtained through the

5    Freedom of Information Act available to -- just so -- I don't

6    know what the wording would be.  The idea is that there's a way

7    to get some but not most information that's internal to the

8    FDA.

9            MS. REED ZAIC:  So the distinction the Court is

10   attempting to make clear to the jury is that these experts did

11   not bring them with them in the course of their employment and

12   activities?

13           THE COURT:  Right.  And the parties don't have a way

14   to go get internal -- I think that's the point that plaintiffs

15   want to make clear, is that you don't have the ability to

16   depose FDA people, to inquire into the internal FDA

17   deliberations.  And I can see a juror saying, well, how did you

18   get internal meeting notes?

19           It seems to me it needs to be made clear that some

20   things, like those meeting notes, can be obtained through the

21   Freedom of Information Act.  Maybe that's unnecessary, but

22   that's a thought that occurred to me today.

23           MR. NORTH:  That's fine with the defendants, Your

24   Honor.

25           MR. GOLDENBERG:  Your Honor, I guess our position

1    would be that we're concerned that more highlights that

2    testimony, and I think we would probably think it's

3    unnecessary.  I don't think there should be an instruction on

4    that.

5             THE COURT:  Okay.  I'll leave it out then.  I mean,

6    this really is talking about testimony, and if somebody has

7    that question and they choose to ask it, they can ask it as a

8    juror.

9             Okay.  Let's, then, talk about -- by the way, I'm

10   obviously going to take off of each of these instructions the

11   source line at the bottom of them before we finalize them.

12            Let's talk about Instruction No. 12.  Any concerns

13   about Instruction 12?

14            MR. GOLDENBERG:  No, Your Honor.

15            MR. NORTH:  None, Your Honor.

16            THE COURT:  All right.  How about 13?

17            MR. GOLDENBERG:  None for the plaintiff, Your Honor.

18            MR. NORTH:  None for the defendants, Your Honor.

19            THE COURT:  All right.  As you see, I adopted this odd

20   wording of the preponderance of the evidence standard from

21   Wisconsin.  We tried to put it into sentences to make it as

22   clear as possible, but I think we have to use it.

23            Okay.  How about Instruction No. 14 from plaintiffs'

24   side?

25            MR. GOLDENBERG:  No objection, Your Honor.

1            THE COURT:  From the defense?

2            MR. NORTH:  Your Honor, we have no objection to

3    number 14, but we do want to -- the major issue I'd like to

4    talk about when it's appropriate is we believe number 14

5    standing alone is insufficient on the design defect, so we have

6    a couple things we want to mention about additional

7    instructions.

8            THE COURT:  Let's talk about that now.

9            MR. NORTH:  Okay, Your Honor.

10           We understand the Court's decision not to include the

11   comments.  But what we're concerned about -- comments to the

12   Restatement, those instructions that were proffered based on

13   those comments.

14           What we're concerned about is this Wisconsin pattern

15   instruction is such a bare bones instruction.  It's essentially

16   just a recitation of the statute without any explanation.  It's

17   been developed by a committee, promulgated by the law school, a

18   committee of judges, but there are no appellate decisions that

19   we've found that have even discussed the statute.

20           I'm sure the courts wouldn't fuss with the statute, in

21   part because it is just a recitation -- or the instruction

22   because it's just a recitation of the statute.  But the courts

23   have not in Wisconsin addressed whether additional instructions

24   need to be given.

25           Your Honor, we believe the terms in this instruction,

without further explanation, are vague and do not give the jury

appropriate guidance.  And those terms are the following:

reasonable alternative design, reasonably safe, and

unreasonably dangerous.

        Your Honor, in our view, the term "reasonable" in this

circumstance, without further explanation, is entirely

subjective.  You may have a juror on this panel who believes

that any filter that has any complications, even a single one,

is unreasonably dangerous without further guidance to that

juror on what the concept means.

        And I believe we all, sitting here, would agree that a

single complication with a medical device under the law does

not render it unreasonably dangerous.

        Conversely, you might have some really more

conservative jurors who believe that if a filter has a benefit

to any -- even a single person, that it's reasonable.  It's

reasonably safe, because it gives a benefit to that person,

even though the risks of that filter may overall far outweigh

the benefits.

        We believe that without further explanation, those

terms are simply too subjective.

        We know, of course, this Court's well aware that in

this sort of circumstance -- and it is a difficult

circumstance, we understand, with no guidance from the

Wisconsin courts of any meaning.  But this Court's task is to

1    try to predict what the highest court of Wisconsin would do if

2    faced with these issues.

3          The Ninth Circuit has cited sources, of course, like

4    intermediate appellate court decisions, decisions from other

5    jurisdictions, statutes, treatises, restatements.

6          The key for these instructions for the jury, again, as

7    I know the Court well knows, is that they need to adequately

8    convey what the law is to the jury.  And the Ninth Circuit has

9    held that they must allow the jury to determine the issues

10   presented intelligently and that sometimes, even if a juror --

11   a statement or instruction like this one is correct, it may not

12   be sufficient without further guidance.

13         And the Ninth Circuit has had some cases where there

14   are circumstances where they say specific terms need to be

15   explained further.  We believe that this is precisely that sort

16   of circumstance.

17         Now, in the proposed jury instructions,

18   Document 12438, we proposed four instructions on pages 46, 47,

19   48, and 49 that were taken directly from the comments of the

20   Restatement (Third), which are one avenue, we believe, to give

21   this jury further explanation as to what these terms mean.

22         Now, this morning we filed four other supplemental

23   instructions.  I don't know if the Court has had an opportunity

24   to see those.

25         THE COURT:  Yeah, I've seen them.

1          MR. NORTH:  And I told Mr. Goldenberg that we were

2    going to be filing those.

3          Your Honor, these are based on comments obviously from

4    dissenting or concurring justices of the Wisconsin Supreme

5    Court who were advocating before the legislature acted that

6    they -- the state needed to adopt Restatement (Third) and move

7    away from the consumer expectations test.

8          One of those decisions, the *Godoy* decision, is only a

9    year or two before the legislature finally acted.  We submit

10   that those justices, particularly in the *Godoy* case, those

11   justices' discussion of what the Restatement (Third) meant and

12   the application of that would entail is extremely insightful as

13   to the scope of the law.  It's probably the best evidence we

14   have there -- out there if we were going to further define

15   these terms.

16         Now, all of this, I think, Your Honor, is so important

17   for one reason.  You read the statutory language on its face,

18   and it doesn't say the words "risk utility."  But everybody

19   agrees that the Restatement (Third) involves a risk utility

20   analysis.

21         The authors of the Restatement (Third), Professors

22   Henderson and Twerski, made that very clear.  The justices in

23   the *Green* case, the dissenting Justice Sykes in the *Green* case,

24   and in the *Godoy* case, the concurring justice, both make it

25   clear that risk utility is at the heart of this particular

1   formulation, Restatement (Third).

2          There's nothing in the bare bones recitation of the

3   statutory language itself that makes it clear.  And therefore,

4   we think it's important to let the jury know that.

5          Lastly, Your Honor, the fourth instruction we

6   developed is taken from the *Green* case, or actually an older

7   case, and that was --

8          THE COURT:  What fourth are you talking about?

9          MR. NORTH:  That we did today.  The four that we did

10  this morning.

11         THE COURT:  Number 4 in this series that you provided?

12  You provided several different instructions.

13         MR. NORTH:  Right, okay.  This is on page 5 of 7.

14  It's called Proposed Instruction Re: Design Defect.  I think

15  several of them had the same name.  But it lists five factors.

16         THE COURT:  By the way, I'm told -- I haven't read

17  them yet -- I'm told by Jeff that those five factors come from

18  a Seventh Circuit case that got them from the Fifth Circuit in

19  Minnesota.  That's what the Seventh Circuit cited as the source

20  of the five factors.  Now, it was on an appeal from a Wisconsin

21  case, but it wasn't looking at Wisconsin law.

22         MR. NORTH:  Well, they were cited in the *Sumnicht*

23  *versus Toyota* case, as I understand it.

24         THE COURT:  They were cited in the concurring opinion;

25  right?

1            MR. NORTH:  No.

2            THE COURT:  Show me where you're looking at in the

3     citation.

4            MR. NORTH:  I do not have that case with me, Your

5     Honor, and I apologize.  I do have the *Green* case where Justice

6     Sykes, in the dissenting opinion, discusses those five factors

7     from *Sumnicht*.

8            THE COURT:  Well -- oh, I'm sorry, *Sumnicht*, that's

9     right.  That's the 1984 --

10           MR. NORTH:  Right.

11           THE COURT:  -- case.  Right.

12           MR. NORTH:  Justice Sykes, in her dissent in *Green*,

13    cites back to those five factors that -- it said:  This is the

14    test we've articulated.  And while we call it consumer

15    expectations, at its heart, it's essentially a risk utility.

16           So that's other evidence or, I think, or another

17    formulation that could be given to the jury.  These are all

18    proposals that we think one of them needs to be adopted to

19    further explain to this jury what reasonable means under these

20    circumstances.

21           MR. GOLDENBERG:  Thank you, Your Honor.

22           I think that this has been a valiant effort by the

23    defense, but I think that the pattern jury instructions are the

24    most instructive here on what exactly the law is and how you're

25    supposed to give instructions in this case.

1          It's been since 2011 that the statute has been changed

2     in Wisconsin for strict liability, and there is nothing other

3     than the Wisconsin jury instruction -- pattern instructions,

4     which are updated every single year, to give you instruction as

5     to how to advise the jury.

6          There's discussion in each of these -- in each of

7     these Wisconsin JI Civil instructions, and nowhere does it say

8     anything that the defense is advocating here.

9          I think, in particular, it's interesting that the case

10    law that the defense is now citing is something that they

11    already said had been overruled by the statute, like *Green*.

12    But now they're trying to get it in in a different way.

13         Anything that they -- I looked at all four of their

14    proposed instructions today, and each of them are based on

15    dissents or concurring opinions in these cases that weren't

16    even adopted by the majority in Wisconsin law.  So this has

17    never been adopted in Wisconsin law, in either case law or by

18    statute.

19         So we respectfully submit that, yes, Wisconsin law is

20    simple, and that is how it's laid out.  And the -- just as the

21    Court has said to both of us before, we're allowed to argue to

22    the jury what we think reasonable is and what defective design

23    is.  And it lays out in the statute -- in the actual

24    instructions themselves good information on what they should

25    consider.

UNITED STATES DISTRICT COURT

1            And so when they're looking at if a filter is

2    defective, they have to look at the foreseeable risks of harm

3    posed by the filter design that could have been reduced or

4    avoided by adoption of a reasonable alternative design.  And

5    they have to look at the omission of the alternative design

6    that could render the product not reasonably safe.  So there is

7    a definition in there of what they're supposed to look at.

8            And so we submit, Your Honor, that, respectfully, this

9    is the way the statute reads.  They've never adopted the

10   Restatement.  They've never adopted any of the kinds of

11   instructions that have been advocated by the defense, and we

12   would ask that they be read as you gave them to us.

13           THE COURT:  Okay.  I understand your positions.  I

14   want to think about this a bit more.  It seems to me my task,

15   what I ought to be doing in this case, is replicating as

16   closely as I can the kind of instructions you all would get in

17   federal district court in Wisconsin.

18           My memory is -- I haven't looked at these cases since

19   one of my earlier rulings in this case -- that even among the

20   federal judges in Wisconsin, there's disagreement on whether

21   the instructions are a part, with some federal judges saying --

22   I'm sorry, the comments to the Restatement are not part of

23   Wisconsin law.

24           It's a tough task to do the predicting that I'm called

25   upon to do, but I will think about it a bit more and I'll let

1    you know in the morning my decision.

2           MR. NORTH:  If I could just make one point, Your

3    Honor.

4           My recollection is -- and I believe I recall the case

5    you're talking about.  My recollection is the case said it's

6    not clear whether the Wisconsin law has adopted those comments,

7    but in any event, it would not matter here.

8           I'm not sure there's been a direct ruling that said

9    Wisconsin doesn't adopt the comments.

10          THE COURT:  Okay.  Fair point.

11          All right.  Let's talk about Instruction No. 15, which

12   is the negligent design case -- claim.

13          Are there comments from plaintiff?

14          MR. GOLDENBERG:  Yes, Your Honor.  We think that there

15   is some wording that just slightly needs to be reorganized, if

16   you could go to Wisconsin JI Civil 3240 and look at the actual

17   language.

18          THE COURT:  Hold on --

19          MR. GOLDENBERG:  Do you have that in front of you?

20          THE COURT:  Hold on just a minute.

21          MR. GOLDENBERG:  And I'm talking about the pattern

22   instruction, of course.

23          THE COURT:  Right.  Yes, I've got it.

24          MR. GOLDENBERG:  Okay.  If you look at the bottom of

25   it, the last sentence reads:  Failure of the manufacturer to

1    perform any such duty constitutes negligence.

2          If we look at the last sentence of your -- of the

3    instruction that was given to us, somehow that's kind of buried

4    into the second paragraph, and the last sentence is:  A

5    manufacturer is charged with knowledge of its own methods.

6          I'm not sure if that got transposed, but I think that

7    the "A manufacturer is charged with knowledge of its own

8    methods of designing its product and the defects in such

9    methods, if any," should go as the last sentence of

10   paragraph 3, and then the final sentence as it reads in the

11   instruction should be, "Failure of the manufacturer to perform

12   any such duty constitutes negligence."

13         Otherwise it looks as if -- it looks as if that last

14   sentence isn't considered negligence if they don't do it.

15         THE COURT:  All right.  I understand that point.

16         Do defendants have a comment on that?

17         MR. NORTH:  Your Honor, both sentences are in your

18   instruction.  I'm not sure it really matters as to the order.

19         THE COURT:  Do defendants have comments on this

20   instruction?

21         MR. NORTH:  No, Your Honor.  I'm sorry.

22         THE COURT:  Okay.  Give me just a second.

23         Here was the thinking in the placement of that

24   sentence.  You have 3240 there?

25         MR. GOLDENBERG:  I do.

2682

1          THE COURT:  The statement in 3240 is included in 3240

2   with the preceding paragraph, "It is the duty of the

3   manufacturer."  So it's specific to that duty instruction.

4          But what we did in this instruction, because we

5   thought it would be helpful to the jury, was we also included

6   the general definition of negligence.

7          MR. GOLDENBERG:  I thought that was smart.

8          THE COURT:  Well, so the thought was, since that

9   sentence that you've highlighted is specific to the

10  manufacturer's duties, we ought to put it into the paragraph in

11  this combined instruction that talks about manufacturer's

12  duties.  Otherwise, we are applying that sentence to anything

13  that might come before that paragraph that it doesn't apply to

14  in the standard instruction.

15         That was -- that was the reason for putting it right

16  after that paragraph.  And that general charge about what the

17  manufacturer is charged with wasn't really talking about

18  duties, so we thought that could be broken out separately.

19         So that was the thought.  I'm interested in your --

20         MR. GOLDENBERG:  Yeah.  I still think, Your Honor, it

21  seems like it's part of that paragraph.  If we look at 3240,

22  it's still -- that last sentence is really part of the second

23  paragraph.

24         And, I mean, if you wanted to put that "Failure of the

25  manufacturer to perform any such duty constitutes negligence"

1  in the same paragraph, we'd be okay with that.  But I think it

2  should be the last sentence.

3       THE COURT:  So you would say, take -- on my

4  proposal 15, take the last sentence, "A manufacturer is

5  charged," and put that before "The failure of a manufacturer to

6  perform" so it's in the same order as the standard

7  instructions?

8       MR. GOLDENBERG:  Yes.

9       THE COURT:  Mr. North, what do you think?

10       MR. NORTH:  No objection, Your Honor.

11       THE COURT:  Okay.  I also noted that the wording is a

12  little different in the failure to perform.  We wrote it

13  "Failure of the manufacturer to perform such duties," rather

14  than "any such duty," which is in the standard instruction.  We

15  should follow the standard instruction.

16       So what I will do is I will move that last sentence

17  and make it the next to last sentence in the paragraph above

18  it, and I will change what will then become the last sentence

19  to refer to "any such duty" rather than "such duties."

20       MR. GOLDENBERG:  That would be fine, Your Honor.

21  Thank you.

22       THE COURT:  Okay.  How about Instruction 16?  Any

23  comments from plaintiff?

24       MR. GOLDENBERG:  No objection to that, Your Honor.

25       THE COURT:  Defendants?

1          MR. NORTH:  No objection, Your Honor.

2          THE COURT:  All right.  How about -- well, let's first

3    talk about objections to Instruction 17 and then talk about how

4    we reflect my Rule 50 ruling in that instruction.

5          Are there objections to Instruction 17 as it was

6    proposed?

7          MR. GOLDENBERG:  No, Your Honor.

8          THE COURT:  Defendants?

9          MR. NORTH:  Your Honor, just a couple.  In the third

10   paragraph, the last sentence, we think, to be more precise,

11   where it says "certain to suffer in the future as a result of,"

12   it should say "caused by," since we'll have instructed on

13   proximate cause earlier.

14         THE COURT:  So you would say --

15         MR. GOLDENBERG:  I'm sorry, Richard.  Which paragraph

16   are you talking about?

17         MR. NORTH:  Third paragraph, last sentence.  We would

18   strike the words "as a result of" and just put "caused by."

19         THE COURT:  So it would say:  Reasonably compensate

20   Mrs. Hyde for the injuries she has suffered to date and is

21   reasonably certain to suffer in the future caused by the

22   defective or negligent design?

23         MR. NORTH:  Yes.

24         MR. GOLDENBERG:  I would disagree with that, Your

25   Honor.  I think it reads how it should read.  When it says "is

1    reasonably certain to suffer in the future as a result of

2    defective or negligent design," I think that that's -- that

3    reads exactly how it should.  I mean --

4            THE COURT:  Okay.

5            MR. GOLDENBERG:  I especially think, if there's going

6    to be in a special verdict form already, the word -- I think

7    we've already used the word "cause," you know, defined "cause"

8    actually in the special verdict form.  I don't think there's

9    any reason to change this part of the instruction.

10           THE COURT:  The "as a result of" language comes from

11   the Wisconsin standard instructions.  It's Instruction 1766,

12   and we had to modify it a bit, but the language in the second

13   paragraph of that standard instruction talks about damages

14   suffered as a result of.  That's where we got the language.

15           THE LAW CLERK:  I think defendants proposed it in

16   their instructions.

17           THE COURT:  I'm told defendants included it in your

18   proposed instruction as well, which I didn't pick up on.

19           MR. NORTH:  I'm sorry, Your Honor?

20           THE COURT:  Apparently you proposed it as well in your

21   instruction, Jeff tells me.

22           MR. NORTH:  Oh.  Your Honor, I apologize.

23           THE COURT:  Well, I'm not going to include it for that

24   reason, but I am going to include it because -- yeah, it

25   actually is in defendants' proposal.

2686

```
 1              It's in the standard instruction, so I'm going to
 2    leave it the way it is.
 3              Any other objection to 17 from defendants?
 4              MR. NORTH:  None, Your Honor.
 5              THE COURT:  Okay.  On the Rule 50 motion --
 6              MR. GOLDENBERG:  Oh, Your Honor, I did notice one
 7    thing.  If we turn to the second page of that --
 8              THE COURT:  Yes.
 9              MR. GOLDENBERG:  I'm just going to ask my team
10    something really quick.
11              So I think we can take out -- I don't think we
12    actually put in any billing statements, Your Honor, for
13    healthcare services.
14              THE COURT:  So the bracketed language at the top would
15    come out?
16              MR. GOLDENBERG:  You can subtract that, yes.
17              THE COURT:  Any objection from defendants?
18              MR. NORTH:  None, Your Honor.
19              THE COURT:  Okay.  Good catch.  We'll take that out.
20              So here is my thought with respect to the Rule 50
21    motion.
22              The things that I have granted judgment on would be
23    the cost of the future defibrillator -- I always lose track of
24    where the R is supposed to fall in that word.
25              MR. GOLDENBERG:  Try saying arrhythmia after that too.
```

1          THE COURT:  I know where the R comes in arrhythmia.

2    I'm okay with that.

3          Also any pain or suffering associated with future

4    arrhythmia, because Dr. Muehrcke was -- said future arrhythmia

5    is only a possibility, but not fear of future arrhythmia,

6    because the Wisconsin case says fear of a possible complication

7    is compensable.

8          So I guess the question is whether either side sees my

9    ruling differently.  I know plaintiffs disagree with it, but as

10   to where we draw the line in light of my ruling, does that make

11   sense?

12         MR. GOLDENBERG:  It does.  Certainly we understand

13   your ruling, Your Honor.  We would not be arguing in our

14   closing any costs for either the arrhythmia or the

15   defibrillator, but we certainly would be arguing the fear of

16   having an arrhythmia in the future or having a defibrillator.

17         I think it highlights the testimony too much if we

18   have an instruction.  I'm not really sure -- I wrote out a

19   couple instructions myself to see how I thought it would look,

20   and I didn't like any of them.

21         I'm really not sure what instruction would be --

22         THE COURT:  Well, here's my --

23         MR. GOLDENBERG:  What would flag it.

24         THE COURT:  I understand that point.  Here's my

25   concern.  I think it was Ms. White, your expert, put hard

1    numbers up, a cost estimate of what it will cost to implant the

2    defibrillator.  That got into the jurors' notes.

3            It seems to me if I don't tell them that that cost

4    that an expert testified to is not recoverable, then it may

5    well get into the damages when I've ruled it shouldn't be.

6            MR. NORTH:  Your Honor, sitting in the back of the

7    courtroom, I was trying to come up with some language, and I've

8    got something to propose if I could hand it out.

9            THE COURT:  Yeah, that's fine.

10           MR. GOLDENBERG:  Can I just talk with my team for a

11   second?

12           THE COURT:  Yeah, sure.

13           MR. NORTH:  The second page is moot, Your Honor, the

14   point I had there.

15           And, Your Honor, I would also note for the record

16   that --

17           THE COURT:  Let's wait till they finish talking so

18   they can hear what you say.

19           MR. GOLDENBERG:  Your Honor, I think our thoughts

20   might be that we might be able to work with something like

21   this, but we might want to do it on a stipulation.  I think

22   that that would be -- it would highlight less the issue itself,

23   and maybe we could say something -- again, I'm going to have to

24   think this out for a minute, but maybe we can say something

25   where "The parties have stipulated as follows," and say

1    something after that.

2            I just think that that might be trying to highlight --

3    this is why I had a concern about having an instruction at all,

4    is that, you know, when you say, "However, regardless of the

5    evidence," I mean, it makes it sound like whatever was

6    presented was unacceptable or, you know, something along those

7    lines.

8            So I think if you're inclined to give an instruction,

9    I think we might want to try to work out something that would

10   say "The parties stipulate" and say something after that.

11           THE COURT:  What are your thoughts?

12           MR. NORTH:  Your Honor, I respectfully don't believe

13   that's sufficient.  There are parts of this instruction that we

14   did not tamper with, for example, about future pain and

15   suffering, because of the Court's ruling.  And because there

16   are some elements of this instruction that properly, under the

17   Court's order, advises the jury they can present or award

18   damages for some future issues, I think it needs to be coupled

19   with a statement from the Court in the instruction as to what

20   they can't do.  And this is the language taken from your order.

21           MR. GOLDENBERG:  If that was the case, Your Honor, I

22   think it might want to read something like this:  However, you

23   should not award any damages for the cost of a defibrillator or

24   any future medical costs associated with cardiac arrhythmias.

25           THE COURT:  Yeah, that makes the same point.  If it's

1    clear, I don't think I need to say "regardless of evidence

2    you've received" if I'm telling them.

3            What I wondered was whether that leaves a question in

4    the jurors' mind as to why, since they heard evidence, and

5    whether I should say something like, "However, I have concluded

6    as a legal matter that you should not award," so they

7    understand it's a legal ruling.  It's not a comment on the

8    evidence.  It's not me weighing in on what evidence you should

9    or should not consider.  I don't know if that's a good idea or

10   not.

11           MR. GOLDENBERG:  I think that just highlights it

12   again, Your Honor.  I think we would be more comfortable with

13   just the concept of -- I mean, the instruction seems clear.

14   "However, you should not award any damages for the cost of a

15   defibrillator or any other medical costs associated with future

16   cardiac arrhythmias."

17           MR. NORTH:  Your Honor, I think what the Court

18   proposes is probably just a more artful way of saying what I

19   was trying to imply with the statement, "regardless of the

20   evidence."  They have heard evidence, and it went unchallenged.

21   And I think they need to understand emphatically that they

22   can't award damages for that, whether it's because we state

23   specifically because the Court's ruling or emphasize to them

24   that that's the rule here regardless of what they've heard.

25           MR. GOLDENBERG:  Your Honor, I think there's even a

1    Supreme Court case that says that the jurors are presumed to

2    follow the Court's instructions.

3         THE COURT:  Oh, there's lots of cases that say that.

4         MR. GOLDENBERG:  What?

5         THE COURT:  There's lots of cases that say that.

6         I think what I'm going to do is just give a clear

7    instruction as it's been proposed that says, "However, you

8    should not award any damages for the cost of a defibrillator or

9    any other medical costs or injuries associated with future

10   cardiac arrhythmias."  It's very clear that they shouldn't.

11        MR. GOLDENBERG:  I think the injuries are something,

12   though, that -- if we're allowed to argue the fear of, that

13   sounds like that's an injury, isn't it?

14        THE COURT:  Yeah, potentially.  So "any other medical

15   costs associated with future cardiac arrhythmias."

16        MR. GOLDENBERG:  Right.

17        THE COURT:  I think that captures the Rule 50 ruling.

18        Do you agree, Mr. North?

19        MR. NORTH:  I thought your ruling was slightly more --

20   I understand the caveat about pain and suffering.  I thought

21   the Court was saying that she just can't recover anything but

22   pain and suffering for any future cardiac arrhythmias.

23        THE COURT:  The only other thing would be medical

24   costs, right?  And I'm telling them here you can't award

25   medical costs for future arrhythmias.

1          MR. NORTH:  I would respectfully disagree.  There's

2     future impairment or -- and other things of that nature that

3     are not exactly pain and suffering, I think.

4          THE COURT:  What about a current fear of a future

5     arrhythmia?  Is that an injury associated with future cardiac

6     arrhythmias?  Probably.  I hate to start parsing this so

7     closely that I say what kinds of injuries you can or can't

8     recover.

9          MR. NORTH:  I would note that we left in the language,

10     the earlier language as far as pain and suffering does talk

11     about future pain and suffering.  It's not specific to cardiac

12     arrhythmias, but it does talk about future still.

13          THE COURT:  All right.  I want to think about this a

14     bit more.  I understand your positions.

15          Okay.  Let's turn to Instruction No. 18.  Any comments

16     from plaintiff?

17          MR. GOLDENBERG:  Your Honor, we disagree with the

18     concept of having to discount present value, but we understand

19     it and we will not object to it.

20          THE COURT:  Okay.  Any comments on that from

21     defendants?

22          MR. NORTH:  No comments, Your Honor.

23          THE COURT:  All right.  How about number 19?  Any

24     comments from plaintiffs?

25          MR. GOLDENBERG:  Your Honor, I do have a question for

UNITED STATES DISTRICT COURT

```
 1    you.  I think that this was --

 2           Well, hang on one sec.  I just need to talk to my team

 3    for a minute.

 4           MS. REED ZAIC:  Referring back to 18, Your Honor.

 5           MR. GOLDENBERG:  Your Honor, honestly -- we can leave

 6    it.  We're fine.  No objection.

 7           THE COURT:  Okay.  We'll leave it.  Hold on just one

 8    second.

 9           All right.  Number 19.  Any comment from plaintiffs?

10           MR. GOLDENBERG:  No, Your Honor.

11           THE COURT:  Defendant?

12           MR. NORTH:  The only comment for the record, Your

13    Honor, is we would just object to any instruction being given

14    on that based on the Rule 50 motion.

15           THE COURT:  All right.  That objection is preserved.

16           How about number 20?

17           MR. GOLDENBERG:  Can you repeat yourself?  I'm sorry.

18           THE COURT:  Number 20.

19           MR. GOLDENBERG:  Number 20, we have no objection, Your

20    Honor.

21           MR. NORTH:  No objection, Your Honor.

22           THE COURT:  21?

23           MR. GOLDENBERG:  No objection.

24           MR. NORTH:  No objection, Your Honor.

25           THE COURT:  22?
```

1          MR. GOLDENBERG:  No objection, Your Honor.

2          MR. NORTH:  Your Honor, again, for the record, only an

3     objection based on any charge being given based on the Rule 50

4     motion.

5          THE COURT:  All right.  23?

6          MR. GOLDENBERG:  No objection, Your Honor.

7          MR. NORTH:  Your Honor, we had already submitted this

8     to the Court earlier.  We would only object to the third

9     paragraph.  I understand that's part of the pattern

10    instruction, but I think the concept of a middle burden is much

11    too obtuse.

12         THE COURT:  Well, frankly, I agree with you.  I don't

13    know why -- I don't know why Wisconsin does that, but I don't

14    know where they came up with the other wording for their

15    burdens.

16         MR. GOLDENBERG:  I think, Your Honor, the concept is

17    they just want to distinguish between the two burdens, and

18    that's the best way they could come up with doing so.  I'm not

19    saying it's a brilliant instruction either, but I think that's

20    the way it's written.

21         THE COURT:  All right.  We'll leave 24 the way it is.

22         Any comment on any of the remaining instructions other

23    than Instruction A at the end?  That is, any of the

24    deliberation procedure instructions?

25         MR. GOLDENBERG:  We have no objection to the remaining

UNITED STATES DISTRICT COURT

1    instructions, Your Honor.

2           MR. NORTH:  No objection, Your Honor.

3           THE COURT:  Okay.  How about Instruction A, which is

4    the instruction that I'll give if we get to the punitive

5    damages phase?

6           Any comments from plaintiffs?

7           MR. GOLDENBERG:  Let me just pull that out, Your

8    Honor.  I'm sorry.

9           No objection, Your Honor.

10          MR. NORTH:  No objection other than any charge on

11   punitive damages.

12          THE COURT:  Right.  Okay.

13          How about comments on the proposed verdict form from

14   plaintiffs?

15          Mr. North?

16          MR. NORTH:  Your Honor, I had a couple of things just

17   on the instructions that weren't given, just to state for the

18   record.

19          THE COURT:  Okay.  Yeah, that's fine.

20          MR. NORTH:  We would object to the Court's decision

21   not to instruct on the compliance presumption that the Court

22   has already ruled against us on, and we would also object if

23   the Court decides not to do any of the four instructions on the

24   Restatement comments that I mentioned earlier.

25          The last thing, Your Honor, is the proposed

1    instruction regarding that inherent characteristic defense.

2    The Court denied summary judgment on that, but I don't know

3    that the Court granted summary judgment against us on that.

4    And we thought that the standard instruction on that should be

5    given.

6            THE COURT:  Do you remember the number on that?

7            MR. NORTH:  Your Honor, in our submission -- oh, the

8    number of the pattern charge?

9            THE COURT:  No, I'm sorry.  Where was it in your

10   submission?

11           MR. NORTH:  It was Document 12438, and it was page 50

12   of 71, I believe.  Yes.

13           THE COURT:  Yes.  Okay.

14           My memory, Mr. North, is that the cases that were

15   cited in summary judgment on this issue was -- I think it was a

16   lead paint case where you couldn't make the paint without the

17   lead, and some sort of a flammable sealant that you couldn't

18   make without making it flammable, the idea being that you can't

19   make the product without the characteristic.  Is that right?

20   Or am I thinking of the other ones?

21           MR. GOLDENBERG:  You're close, Your Honor, if you want

22   me to let you know.  I mean, it was a -- this was a -- I think

23   you're talking about the *Godoy* case, right?  This is the white

24   lead carbonate case?

25           THE COURT:  Right.

1          MR. GOLDENBERG:  Yeah.  And that was where the

2     characteristic of the product itself was something that was so

3     critical that they didn't find it defective.

4          MR. NORTH:  The *Godoy* case predated the statute by a

5     couple of years.

6          THE COURT:  Well, let me -- I understand what you

7     said, Mr. North.

8          What is the plaintiffs' view?  I see the objection you

9     stated on page 50.  Do you want to add to that?

10         MR. GOLDENBERG:  We have nothing to add, Your Honor.

11    That's our objection.

12         THE COURT:  Okay.  I will look back at that again and

13    think about what's been said.

14         Did you have any other comments on instructions,

15    Mr. North?

16         MR. NORTH:  Nothing further, Your Honor.

17         THE COURT:  Okay.

18         MR. GOLDENBERG:  Your Honor, I do want to mention,

19    too, we briefed that in our trial brief as well.  So if there's

20    anything more you want to look at, it's in our trial brief as

21    well.

22         THE COURT:  Okay.  How about comments on the verdict

23    form?

24         MR. GOLDENBERG:  Your Honor, our thoughts are that you

25    did a good job on this.  We -- our only concern are that we're

1    putting instructions into the jury verdict form.  The "Do you

2    find by greater weight of the evidence to a reasonable

3    certainty" is certainly the law.  But I don't see that in the

4    Wisconsin pattern instructions, and it seems to emphasize --

5           THE COURT:  You don't find that -- I mean, that

6    language is right from the pattern instructions.  That's their

7    definition of preponderance of the evidence.

8           MR. GOLDENBERG:  If I could just pull out --

9           THE COURT:  You mean a Wisconsin pattern jury form?

10          MR. GOLDENBERG:  Yeah, the pattern jury form.

11          THE COURT:  Okay.  You said instructions.

12          MR. GOLDENBERG:  It's certainly consistent with

13   Wisconsin law.  I'm not suggesting that.  It's just not

14   usually --

15          THE COURT:  Well, let me tell you why it went in.

16          MR. GOLDENBERG:  Sure.

17          THE COURT:  It went in because in our previous verdict

18   forms, we said "Do you find by a preponderance of the evidence"

19   in each of the questions.  We replaced that with the Wisconsin

20   definition of preponderance of the evidence.

21          But I'm happy to hear your argument on that.

22          MR. GOLDENBERG:  Our only thoughts are, Your Honor,

23   that because this is -- you know, you're reading the

24   instruction specifically to them about greater weight, you're

25   reading an instruction specifically to them about what the

1    burdens are, that we submitted the instruction simply as, you

2    know, the -- we did not put in, in every instruction, "Do you

3    find by the greater weight of the evidence to a reasonable

4    certainty."  We just simply asked the question.

5          So we would submit that that is the way Wisconsin does

6    it in their pattern instruction for verdict, and we would ask

7    that that be allowed.  I think it just overemphasizes specific

8    instructions.  I certainly understand that's the law.  We just

9    think it -- we could put lots of instructions into the jury

10   verdict form that we do not.

11         THE COURT:  All right.

12         MR. NORTH:  Your Honor, we believe it's very important

13   to have this language in, particularly because you have two

14   different burdens of proof at work in one verdict form.  You've

15   got the greater weight of the evidence there and then on the

16   punitive damages, you have the clear, satisfactory, and

17   convincing.

18         And I think it's necessary to make that distinction.

19   We've done so in the Jones and Booker case without problems,

20   and I think that needs to be there to make that clear.

21         THE COURT:  All right.  I understand the parties'

22   positions.  I've always been of the view that we should put a

23   burden of proof in the question when we've got more than one

24   burden of proof in one verdict form.  And I feel the same way

25   here, even though I don't like the Wisconsin wording, so I'm

1     going to stick with that verdict form.

2              Are there other matters that we need to address before

3     we break?

4              MS. HELM:  Your Honor, I understand that we're to come

5     in at 8:00 o'clock tomorrow morning to review the exhibits?

6              THE COURT:  If Traci says so.

7              MS. HELM:  Actually, it was reported to me that Nancy

8     said so.

9              THE COURT:  Well, then you've got two good authorities

10    on it.

11             MS. HELM:  And then, Your Honor, I don't know if

12    there's any further discussion we need to have about

13    Exhibit 6061 and 6064.  Those were the two that Mr. Lopez

14    objected to, and you told us to go back and do our homework.

15    And I've done mine, so I'm prepared to address those if there

16    need be.

17             THE COURT:  Yeah.  I did say that I wanted to find out

18    what had happened in Jones.  You want to go ahead and address

19    that?

20             MS. HELM:  Yes, Your Honor.

21             6061 was admitted into evidence subject to redactions

22    requested by the plaintiffs.  Their objection was that it was a

23    hearsay objection.

24             We have gone back and verified that it was indeed --

25    in fact, in the transcript it says it's admitted subject to the

UNITED STATES DISTRICT COURT

1  redactions.  And Mr. Lopez says he's making no concessions on

2  the redactions.

3        And we didn't necessarily agree with the redaction,

4  but it didn't impact the substance of the document, so 6061 was

5  admitted redacted in Jones, and the redaction in that document

6  was requested by the plaintiffs.

7        6064 was also admitted redacted in Jones.  Those

8  redactions were at our request.  They were agreed to by the

9  plaintiffs.  And that long evening where we kept Traci here

10  much too late, we went back and forth on a number of

11  redactions.  We removed some, we added some, but it was

12  admitted redacted in Jones.

13        And we actually have maintained those as admitted

14  Jones exhibits, and those are what we pulled for in the Hyde

15  case.

16        THE COURT:  All right.  Do plaintiffs have any

17  different view of the history?

18        MS. SMITH:  No, Your Honor.

19        So those were redacted in Jones, and we had an

20  opportunity to go back and look at them.  My only comment was,

21  is I think it was done at the eleventh hour and that there are

22  times, including that document, where things were beyond the

23  scope of the initial order.

24        For example, in that document, it only talks about

25  Recovery deaths and it doesn't relate to migration.

1          THE COURT:  Well, I understand that.  When I was

2   talking back and forth with Mr. Lopez on this issue, the

3   request that he made was to strike 6064 and 6061 from the

4   record and any testimony related to it.

5          As we talked, he then, I think, took the view that

6   instead what he wanted was to remove the redactions and have

7   them admitted without the redactions.  And then he changed back

8   and said the motion he was standing on was to strike those two

9   documents.

10          And I said -- this was at the 15-minute discussion

11   before we brought the jury in after the break -- that if, in

12   fact, these were the redactions in the Jones case, I wasn't

13   going to strike the documents.

14          And it sounds like they were the redactions, so I'm

15   not going to strike the documents.  And that's what had been

16   requested.

17          All right.  Are there other matters that we need to

18   address?

19          All right.  I will come in at 8:30 in the morning, and

20   we'll get started again.  Thank you all.

21          MR. NORTH:  Thank you.

22          MR. GOLDENBERG:  Thank you, Your Honor.

23          (Proceedings adjourned at 5:26 p.m.)

24

25

1                     C E R T I F I C A T E

2

3           I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 3rd day of October,

13   2018.

14

15

16
                      s/Jennifer A. Pancratz_____  _____ ____
17                    Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25