# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| IN RE:  Bard IVC Filters Products ) | MD 15-02641-PHX-DGC |
| Liability Litigation, ) | |
| ) | |
| _____ ) | |
| Lisa Hyde and Mark Hyde, a married ) | Phoenix, Arizona |
| couple, ) | **October 3, 2018** |
| ) | |
|          Plaintiffs, ) | |
| ) | |
|          v. ) | CV 16-00893-PHX-DGC |
| ) | |
| C.R. Bard, Inc., a New Jersey ) | |
| corporation, and Bard Peripheral ) | |
| Vascular, an Arizona corporation, ) | |
| ) | |
|          Defendants. ) | |
| _____ ) | |


**BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**


## REPORTER'S TRANSCRIPT OF PROCEEDINGS


## TRIAL DAY 12 - P.M. SESSION


Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

   For the Plaintiffs:

3

4       Lopez McHugh
        By:  **RAMON R. LOPEZ**, ESQ.
5       100 Bayview Circle, Suite 5600
        Newport Beach, CA 92660

6       Gallagher & Kennedy
        By:  **MARK S. O'CONNOR**, ESQ.
7            **PAUL L. STOLLER**, ESQ.
        2575 East Camelback Road, Suite 1100
8       Phoenix, AZ 85016

9       Heaviside Reed Zaic
        By:  **JULIA REED ZAIC**, ESQ.
10           **LAURA E. SMITH**, ESQ.
        312 Broadway, Suite 203
11      Laguna Beach, CA 92651

12      Goldenberg Law PLLC
        By:  **STUART GOLDENBERG**, ESQ.
13           **MARLENE GOLDENBERG**, ESQ,
        800 LaSalle Avenue, Suite 2150
14      Minneapolis, MN 55402

15      Lopez McHugh, LLP
        By:  **JOSHUA MANKOFF**, ESQ.
16      1 International Plaza, #550
        PMB-059
17      Philadelphia, PA 19113

18

19

20

21

22

23

24

25

1              **A P P E A R A N C E S** (CONTINUED)

2

   For the Defendants:

3

4       Nelson Mullins Riley & Scarborough
        By:  **JAMES F. ROGERS**, ESQ.
        1320 Main Street

5       Columbia, SC 29201

6       Snell & Wilmer
        By:  **JAMES R. CONDO**, ESQ.

7       400 East Van Buren
        Phoenix, AZ 85004

8

        Nelson Mullins Riley & Scarborough

9       By:  **RICHARD B. NORTH, JR.**, ESQ.
             **MATTHEW B. LERNER**, ESQ.

10            **ELIZABETH C. HELM**, ESQ.
        201 17th Street NW, Suite 1700

11      Atlanta, GA 30363

12      C.R. Bard, Inc.
        Associate General Counsel, Litigation

13      By:  **GREG A. DADIKA**, ESQ.
        730 Central Avenue

14      Murray Hill, New Jersey 07974

15

16

17

18

19

20

21

22

23

24

25

1

<u>**I N D E X**</u>

2

<u>**SUMMARY OF COURT PROCEEDINGS**</u>                                <u>**PAGE:**</u>

3

Final Jury Instructions                                              2834

4

Closing Arguments
              By Mr. Lopez                                          2858

5            By Mr. Rogers                                         2898
              By Mr. O'Connor                                       2946

6

Proceedings Outside the Presence of the Jury                        2945

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **P R O C E E D I N G S**

2              (Proceedings resumed at 12:56 p.m.)

3              (Jury not present.)

4          THE COURT:  All right, everybody.  Let me tell you

5    what I found in my lunchtime reading.

6              I reviewed every one of the cases cited in the note,

7    the comment after the jury instruction.  None of them was on

8    point, but there were some that are helpful.  One of the cases

9    was the *Fouse*, F-O-U-S-E, case.  I won't give the cites since

10   they're all in the comment.

11             It was a case where the plaintiff introduced evidence

12   of medical and hospital expenses of $5,400 and the jury awarded

13   $1,750.  And the Court of Appeals of Wisconsin said that the

14   jury's award had no rational relationship to the evidence, and

15   therefore set aside the verdict because they couldn't find a

16   basis the jury used to reduce the amount awarded.  This

17   suggests that a jury award must be tied to the evidence and the

18   jury just can't freelance and arrive at its own value.

19             A similar case was the *Nimlos*, N-I-M-L-O-S, case,

20   which was a Wisconsin case, where the jury arrived at what the

21   Court viewed as a high value for the cost of medical care, and

22   concluded that the value awarded by the jury wasn't closely

23   enough related to the evidence to have an evidentiary basis and

24   so set aside the award; again, suggesting a jury just can't

25   pick its own number for damages.

1          There was a case -- well, there's language in the

2     *Green* case, which is a Wisconsin case, that says where a

3     medical bill may relate to two separate maladies, one having

4     nothing to do with the plaintiff's claim, plaintiff must prove

5     which charges relate to the injury caused by the defendant.

6          So there has to be a connection between an amount of a

7     medical cost and a particular injury.  And in this case, I

8     don't believe there's a connection between future medical

9     monitoring costs and past medical expenses.

10         The most relevant case, it's not directly on point,

11    but the most relevant case, however, is not cited.  I should

12    say the most relevant one we found is not cited in the

13    instruction comments, but it's the *Reyes* case, R-E-Y-E-S, that

14    was actually cited by the parties on a different proposition,

15    actually, for the point that the possibility of future medical

16    expenses is not sufficient.

17         And it has this discussion talking about future

18    medical expenses, but I believe it is relevant to the issue in

19    front of me.  And this is a Wisconsin Court of Appeals decision

20    from 1998.

21         It says:  The amount of damages to award is a matter

22    resting largely within the jury's discretion, but the jury's

23    discretion to award damages is not without limits.  Credible

24    evidence in the record must support the amount of damages

25    awarded or it will be deemed excessive.

1          Reyes acknowledges that there is no direct evidence in

2     the record supporting an award of $39,820 for the cost of

3     removing the eye if it becomes shrunken.  This is a future

4     medical cost discussion.

5          Nonetheless, he argues that the award was not

6     speculative.  He contends that the cost of this type of medical

7     procedure is generally known to the public, though he does not

8     explain how that is so.  Also, Reyes claims that the jury could

9     accurately calculate any future medical costs based on the

10     testimony it heard regarding the medical costs Reyes incurred

11     trying to save the eye.  Again, Reyes does not inform us how

12     the jury could calculate, in quotes, in this instance.

13          We are not persuaded by Reyes's response.  An award of

14     future medical expenses will not be upheld if it is unsupported

15     in the record by expert medical testimony -- that's clearly not

16     required for past damages -- but then it says:  Reyes's

17     concession that no evidence in the record directly supports an

18     award of $39,820 defeats any argument that the award was not

19     speculative.

20          With no evidence in the record to support the award,

21     we can only conclude that the jury created a figure.  We,

22     therefore, reduce the award of future medical expenses to an

23     amount that it said was supported by credible evidence.  That

24     was an amount of $10,000.

25          So this tells me that there has to be some evidence in

1   the record from which the jury can calculate an amount, that

2   the jury simply can't look to unrelated future expenses in

3   calculating the amount of past expenses.

4        And as I said before lunch, in this case, I don't

5   believe there is any direct evidence from which the jury can

6   calculate the amount of past expenses.  It's not enough for the

7   jury to just freelance and do it on its own, nor, in my view,

8   do the future medical expenses relate sufficiently to past

9   medical expenses to support an award.

10       For that reason, I'm going to grant the Rule 50 motion

11  on past medical expenses.

12       The change I propose to make to Instruction No. 17, I

13  think, was handed to you.  I have redlined the language I

14  propose to delete from the fifth -- I'm sorry, sixth paragraph.

15  And I'm interested in your comments on whether that's the right

16  fix to the instruction in light of my ruling.

17       MR. ROGERS:  Your Honor, I understand from the defense

18  camp that we are okay with the language.

19       MR. GOLDENBERG:  Your Honor, I am so sorry.  I just

20  got this handed to me.  Can you just point out the area that

21  you changed?

22       THE COURT:  Yeah, it's the bottom -- do you have the

23  redlined version?  It's the smaller type.

24       MR. GOLDENBERG:  I don't have the redlined version.

25       THE COURT:  Traci, take this down, if you would.

1          You'll see what I'm taking out in the last paragraph

2     on the first page.

3          MR. GOLDENBERG:  I think that's fine, Your Honor.

4          THE COURT:  All right.  So I'll give the instruction

5     in that form.

6          Okay.  We'll bring in the jury and instruct them and

7     then go into arguments.

8          Traci, why don't you go ahead and get them.

9          Mr. Lopez, are you doing the closing?

10         MR. LOPEZ:  Yes, I am, Your Honor.

11         THE COURT:  How much time do you plan?

12         MR. LOPEZ:  I'm going to keep it at under an hour.

13         THE COURT:  Do you want me to do anything to prompt

14     you on time or do you want to take care of it?

15         MR. LOPEZ:  At 35 and 45.

16         THE COURT:  35 and 45?  Okay.  I'll give you a prompt

17     then.

18         MR. LOPEZ:  Thank you.

19         MS. REED ZAIC:  Your Honor, we have one more matter.

20     I was under the impression the defendants were going to bring

21     it up.

22         THE COURT:  Hold on just a minute.

23         MS. REED ZAIC:  It's a very quick housekeeping matter.

24         Document 12735 was filed by the defendants.  It was an

25     objection to evidence that has not come into evidence.  It was

1    the complaint summary that came in in Jones, which was not

2    entered into evidence here.

3          And rather than me having to make a filing because

4    they've not corrected it, I just wanted to put it on the record

5    that that is a clarification that's being -- that part of the

6    objection is being withdrawn.

7          MS. HELM:  Your Honor, we've agreed -- now that the

8    evidence is closed and it's not in, we've agreed to make that.

9    I'll file an amended objection.  We simply -- at your request,

10   we memorialized our objection in writing.  I'll file an amended

11   objection now that the evidence is complete.

12         THE COURT:  That's fine.

13         Who's doing the closing for defendants?

14         MR. ROGERS:  I will be, Your Honor.

15         THE COURT:  And how much time do you expect it to be?

16         MR. ROGERS:  I would expect it's going to be about an

17   hour and 15.

18         THE COURT:  Do you want me to give you any prompts on

19   the time?

20         MR. ROGERS:  Sure.  If I hit an hour --

21         THE COURT:  I don't -- it's not that I want to do it.

22         MR. ROGERS:  No, I understand, Your Honor.

23         THE COURT:  I'm just trying to be helpful if you

24   think it would.

25         MR. ROGERS:  No, and I would appreciate that.  If we

1     get to an hour, if you would let me know, that would be great.

2               THE COURT:  Okay.  I'll do that.

3               MR. ROGERS:  Thank you.

4               MR. LOPEZ:  And, Your Honor, Mr. O'Connor's going to

5     do rebuttal.  Is that okay?

6               THE COURT:  Yeah.  That's all right.

7               (Jury present.)

8               THE COURT:  Please be seated.

9               All right, ladies and gentlemen.  I am now going to

10    give you the jury instructions that will apply in this case.

11              Counsel, as I read these, if you could follow along,

12    since we've been doing some adjusting, just so that you catch

13    any errors if I make them.

14              Members of the jury, now that you have heard all of

15    the evidence, it is my duty to instruct you on the law that

16    applies to this case.

17              A copy of these instructions will be sent to the jury

18    room for you to consult during your deliberations.

19              It is your duty to find the facts from all the

20    evidence in the case.  To those facts, you will apply the law

21    as I give it to you.  You must follow the law as I give it to

22    you, whether you agree with it or not, and you must not be

23    influenced by any personal likes or dislikes, opinions,

24    prejudices, or sympathy.  That means that you must decide the

25    case solely on the evidence before you.  You will recall that

1    you took an oath to do so.

2         Please do not read into these instructions or anything

3    that I may say or do or have said or done as indicating that I

4    have an opinion regarding the evidence or what your verdict

5    should be.

6         Although there are two defendants in this case,

7    C.R. Bard, Inc., and Bard Peripheral Vascular, Inc., you should

8    decide the case as to the two defendants jointly.  As a result,

9    in these instructions and in the verdict form, we will refer to

10   defendants collectively as "Bard."  Unless otherwise stated,

11   the instructions apply to both Bard and the plaintiffs.

12        The evidence that you are to consider in deciding what

13   the facts are consists of the sworn testimony of the witnesses;

14   the exhibits that are admitted into evidence; any facts to

15   which the lawyers have agreed; and any facts that I have

16   instructed you to accept as proved.

17        In reaching your verdict, you may consider only the

18   testimony of the witnesses, the exhibits received into

19   evidence, and the facts to which the parties have agreed or

20   which I have instructed you to accept.

21        Certain things are not evidence, and you must not

22   consider them in deciding what the facts are.  I will list them

23   for you.

24        First, arguments and statements by lawyers are not

25   evidence.  The lawyers are not witnesses.  What they have said

1    in their opening statements, may say in their closing

2    arguments, and at other times, is intended to help you

3    interpret the evidence, but it is not evidence.  If the facts

4    as you remember them differ from the way the lawyers have

5    stated them, your memory of the facts controls.

6           Second, questions and objections by lawyers are not

7    evidence.  Attorneys have a duty to their clients to object

8    when they believe a question is improper under the rules of

9    evidence.  You should not be influenced by the objections or by

10   my rulings on them.

11          Third, testimony that is excluded or stricken or that

12   you were instructed to disregard is not evidence and must not

13   be considered.  In addition, some evidence is received only for

14   a limited purpose -- only for a limited purpose.  When I

15   instruct you to consider certain evidence only for a limited

16   purpose, you must do so, and you may not consider that evidence

17   for any other purpose.

18          Fourth, anything that you may have seen or heard when

19   the court was not in session is not evidence.  You are to

20   decide the case solely on the evidence received during the

21   trial.

22          Some exhibits admitted into evidence have been

23   partially redacted, which means that certain contents of the

24   exhibits have been blacked out or whited out.  The parties and

25   I have redacted information that is not properly admitted as

1   evidence.  You may give the unredacted information in any

2   exhibit whatever weight you choose, but you must disregard the

3   redacted information and must not speculate about what it might

4   say.

5           You have heard testimony from a number of witnesses

6   who testified to opinions and the reasons for their opinions.

7   This opinion testimony is allowed because of the education or

8   experience of those witnesses.

9           Such opinion testimony should be judged like any other

10  testimony.  You may accept it or reject it and give it as much

11  weight as you think it deserves, considering the witness's

12  education and experience, the reasons given for the opinion,

13  and all the other evidence in the case.

14          Federal law prohibits current FDA employees from

15  testifying in court regarding any function of the FDA, and

16  prohibits current and former FDA employees from testifying

17  about information acquired in the discharge of their official

18  duties without authorization from the Commissioner of the FDA.

19  As a result, neither side in this case was able to present

20  testimony from current FDA employees or former FDA employees

21  regarding the discharge of their duties related to this case.

22          Each side has presented expert witnesses to testify

23  about FDA procedures and the 510(k) process in this case, but

24  this testimony was based on the expertise of these witnesses

25  and work they did after being retained as experts in this

UNITED STATES DISTRICT COURT

1    litigation.

2           Certain charts and summaries not admitted into

3    evidence have been shown to you in order to help explain the

4    evidence in the case.  These have been referred to as

5    demonstrative exhibits.  The demonstrative exhibits are only as

6    good as the underlying evidence that supports them.  You

7    should, therefore, give them only such weight as you think the

8    underlying evidence deserves.

9           All parties are equal before the law, and a

10   corporation is entitled to the same fair and conscientious

11   consideration by you as any party.

12          Under the law, a corporation is considered to be a

13   person.  It can only act through its employees, agents,

14   directors, or officers.  Therefore, a corporation is

15   responsible for the acts of its employees, agents, directors,

16   and officers performed within the scope of authority.

17          Plaintiff Lisa Hyde asserts two claims against Bard:

18   strict liability based on design defect, and negligent design.

19   Plaintiff Mark Hyde asserts a derivative claim for loss of

20   consortium.  I will instruct you on the law that applies to

21   each of these claims.  You should consider each claim

22   separately.

23          Plaintiff seeks compensatory damages, which are

24   damages to compensate them for their alleged injuries.

25   Plaintiffs also seek punitive damages to punish Bard for its

1    allegedly wrongful conduct.  I will instruct you on the law

2    that applies to compensatory and punitive damages.

3            Before I give you instructions about plaintiffs'

4    specific claims, I will give you a few instructions about the

5    verdict form you will complete after your deliberations and the

6    burden of proof for the claims.

7            I'll talk about the burden of proof now and explain

8    the verdict form in a minute.

9            The verdict form requires you to state whether you

10   find for plaintiffs or Bard on each claim.  For each claim, the

11   burden is on plaintiffs to satisfy you by the greater weight of

12   the credible evidence, to a reasonable certainty, that you

13   should find for plaintiffs.  If you find that plaintiffs have

14   met this burden of proof on any claim, you should find for

15   plaintiffs on that claim.  If you find that plaintiffs have not

16   met this burden of proof on any claim, you should find for Bard

17   on that claim.

18           "Credible evidence" means evidence you believe in

19   light of reason and common sense.

20           The "greater weight" of the credible evidence means

21   that the evidence in favor of a finding for a party has more

22   convincing power than the evidence opposed to it.

23           "Reasonable certainty" means that you are persuaded

24   based upon a rational consideration of the evidence.  Absolute

25   certainty is not required, but a guess is not enough to meet

1    the burden of proof.

2          Mrs. Hyde contends that Bard is strictly liable

3    because of a design -- because of a defective design of the

4    Bard IVC filter she received.  To prove -- to prove the

5    liability of Bard for the strict liability design defect claim,

6    Mrs. Hyde must establish each of the following five elements:

7          First, the filter is defective because the foreseeable

8    risk of harm posed by the filter's design could have been

9    reduced or avoided by the adoption of a reasonable alternative

10   design by Bard, and the omission of the alternative design

11   renders the product not reasonably safe.

12         Second, the defective condition rendered the filter

13   unreasonably dangerous to persons or property.

14         Third, the defective condition existed at the time the

15   filter left the control of Bard.

16         Fourth, the filter reached the user or consumer

17   without substantial change in the condition in which it was

18   sold.

19         And, fifth, the defective condition was a cause of

20   Mrs. Hyde's damages.

21         Mrs. Hyde may not recover on the strict liability

22   design defect claim if the damages were caused by an inherent

23   characteristic of the product that would be recognized by an

24   ordinary person with ordinary knowledge common to the community

25   that uses or consumes the product.

1          Mrs. Hyde also claims that Bard was negligent in the

2     design of the Bard IVC filter she received.

3          A person is negligent when he or she fails to exercise

4     ordinary care.  A person is not using ordinary care if the

5     person, without intending to do harm, does something or fails

6     to do something that a --

7          Okay.  That's all right.

8          (Brief pause in proceedings.)

9          THE COURT:  How does that sound?

10         JURY MEMBER:  Good.

11         THE COURT:  All right.  I'm going to start this

12     instruction over.

13         Mrs. Hyde also claims that Bard was negligent in the

14     design of the Bard IVC filter she received.

15         A person is negligent when he or she fails to exercise

16     ordinary care.  Ordinary care is the care which a reasonable

17     person would use in similar circumstances.  A person is not

18     using ordinary care if the person, without intending to do

19     harm, does something or fails to do something that a reasonable

20     person would recognize as creating an unreasonable risk of

21     injury or damage to a person or property.

22         It is the duty of a manufacturer to exercise ordinary

23     care in the design of its product so as to render the product

24     safe for its intended use and also safe for unintended uses

25     which are reasonably foreseeable.

1          It is the further duty of the manufacturer, in the

2     exercise of ordinary care, to make all reasonable and adequate

3     tests and inspections of its product so as to guard against any

4     defective condition which would render the product unsafe when

5     used as it is intended to be used.  A manufacturer is charged

6     with knowledge of its own methods of designing its products and

7     the defects in such methods, if any.

8          Failure of the manufacturer to perform any such duty

9     constitutes negligence.

10          If you find that the Bard IVC filter was defectively

11     or negligently designed, you must also decide whether the

12     design caused injury to Mrs. Hyde.  An injury may have more

13     than one cause.  The defective or negligent design caused an

14     injury if it was a substantial factor in producing the injury.

15     An injury may be caused by one cause or by the combination of

16     multiple causes.

17          It is the duty of the Court to instruct you about the

18     measure of damages.  By instructing you on damages, I do not

19     mean to suggest for which party your verdict should be

20     rendered.

21          If you find for Mrs. Hyde on any claim, the verdict

22     form will require you to find the amount of damages that will

23     reasonably compensate her for her injuries or losses.  In

24     considering the amount to be awarded as damages, if any, the

25     burden of proof rests on Mrs. Hyde to satisfy you by the

1    greater weight of the credible evidence, to a reasonable

2    certainty, that she sustained damages with respect to the claim

3    and the amount of the damages sustained.

4          As you have seen, or will see when you see the copy of

5    the instructions, Instruction 12, which I have already given

6    you, provides a further explanation of this burden of proof.

7          If you find for Mrs. Hyde on one or both of her

8    claims, you must determine her compensatory damages.  Your

9    answer to this question should be the amount of money that will

10   fairly and reasonably compensate Mrs. Hyde for the injuries she

11   has suffered to date and is reasonably certain to suffer in the

12   future as a result of the defective or negligent design of the

13   Bard IVC filter.

14         Personal injuries include pain and suffering, which

15   means any physical pain, worry, distress, embarrassment, and

16   humiliation which Mrs. Hyde has suffered in the past and is

17   reasonably certain to suffer in the future.  You should

18   consider the extent to which Mrs. Hyde's injuries have impaired

19   and will impair her ability to enjoy the normal activities,

20   pleasures, and benefits of life.

21         Also consider the nature of her injuries, the effect

22   produced by her injuries in the past, and the effect the

23   injuries are likely -- are reasonably certain to produce in the

24   future, bearing in mind her age, prior mental and physical

25   condition, and the probable duration of her life.

1          Determining damages for pain and suffering cannot

2     always be made exactly or with mathematical precision.  You

3     should award as damages amounts which will fairly compensate

4     Mrs. Hyde for her injuries.

5          Personal injuries can also include healthcare and

6     treatment expenses.  If you are satisfied that Mrs. Hyde will

7     require healthcare and treatment expenses in the future for

8     injuries sustained as a result of the negligent or defective

9     design, include in your damages award the sum of money that

10    will reasonably and necessarily be expended in the future for

11    that care and treatment.

12         However, other than fear of future events, you should

13    not award any damages for the cost of a defibrillator or any

14    other medical costs or injuries associated with future cardiac

15    arrhythmias.

16         The amount of damages is for you to determine from the

17    evidence.  You should not be affected by sympathy or

18    resentment, nor should you make any deductions based on a doubt

19    in your minds as to the liability of Bard.

20         What the attorneys ask for in their arguments is not a

21    measure of damages.  The opinions or conclusions of counsel as

22    to what damages should be awarded should not influence you

23    unless it is sustained by the evidence.  Examine the evidence

24    carefully and dispassionately and determine the amount of

25    damages from the evidence in the case.

1          In determining the amount of damages for medical

2    expenses incurred by Mrs. Hyde in the future, if any, you must

3    determine the present worth in dollars of the future damages.

4          A lump sum of money received today may be worth more

5    than the sum paid in installments over a period of months or

6    years.  This is because a sum received today can be invested

7    and earn money at the current interest rates.  By making a

8    reduction for the earning powers of money, your answer will

9    reflect the present value in dollars of an award of future

10   damages.

11         This instruction, which asks you to reduce future

12   damages to present value, does not apply to that portion of

13   future damages which represent future pain and suffering.

14         Plaintiff Mark Hyde asserts a claim for loss of

15   consortium.  This claim is derivative of the strict liability

16   design defect and negligent design claims asserted by plaintiff

17   Lisa Hyde.  You, therefore, may award loss of consortium

18   damages to Mr. Hyde only if you find Bard liable to Mrs. Hyde

19   on one or both of her claims.

20         "Consortium" involves the love and affection, the

21   companionship and society, the privileges of sexual relations,

22   the comfort, aid, advice, and solace, the rendering of material

23   services, the right of support, and any other elements that

24   normally arise in a close, intimate, and harmonious marriage

25   relationship.  A wrongful invasion, impairment, or deprivation

1   of any of these rights resulting from a disabling injury to a

2   spouse is a legal loss and a basis for damages to the other

3   spouse harmed or deprived.

4        In evaluating this claim, you should consider the

5   nature, form, and quality of the relationship that existed

6   between the spouses up to the time of the injury.  Based on

7   that relationship, determine what sum of money will represent

8   fair and reasonable compensation for any loss of consortium

9   that was sustained by Mr. Hyde as a result of the injury.

10       If you find that the loss will continue in the future,

11  include an amount of damages for the period you are convinced

12  it will continue to exist.

13       Compensation for loss of consortium, except as it

14  relates to material services, is not measured by any rule of

15  market value.  Instead, it is measured on the basis of what you

16  find is fair and reasonable compensation for the loss sustained

17  by the deprived spouse.  Compensation for material services is

18  to be measured by what it would reasonably cost in the market

19  for like services.

20       In determining future damages as a result of

21  plaintiff's injuries or losses, you may consider the fact that

22  at this time Mrs. Hyde is 54 years of age and has a life

23  expectancy of 29.61 more years.

24       Testimony based on mortality tables -- that's where

25  that number came from -- was received in evidence as an aid in

1     determining such expectancy.  The evidence is not, however,

2     conclusive or binding upon you as to Mrs. Hyde's actual or

3     probable expectancy of life.

4           Mortality tables are based upon averages, and there is

5     no certainty that any person will live the average duration of

6     life rather than a longer or shorter period.  To determine the

7     probable length of life of Mrs. Hyde, you should consider all

8     of the facts and circumstances established by the credible

9     evidence bearing on that subject.

10          Does that work?

11          JURY MEMBER:  Yes.

12          THE COURT:  Did you hear the end of my last

13    instruction?

14          JURY MEMBER:  Possibly not the very last.

15          THE COURT:  All right.  I will read that instruction

16    again.

17          JURY MEMBER:  Thank you.

18          THE COURT:  In determining future damages as a result

19    of plaintiff's injuries or losses, you may consider the fact

20    that at this time Mrs. Hyde is 54 years of age and has a life

21    expectancy of 29.61 more years.

22          Testimony based on mortality tables was received in

23    evidence as an aid in determining such expectancy.  That

24    evidence is not, however, conclusive or binding upon you as to

25    Mrs. Hyde's actual or probable expectancy of life.

1          Mortality tables are based upon averages, and there is

2     no certainty that any person will live the average duration of

3     life rather than a longer or shorter period.  To determine the

4     probable length of life of Mrs. Hyde, you should consider all

5     the facts and circumstances established by the credible

6     evidence bearing upon that subject.

7          In determining the amount of compensatory damages, if

8     any, you must not include in the award, or add to it, any sum

9     to compensate plaintiffs for state or federal income taxes,

10    since damages received as an award for personal injuries or

11    loss of consortium are not subject to income taxes.  You may

12    not subtract from or exclude from your award of compensatory

13    damages any amount because plaintiffs are not required to pay

14    income taxes.

15         Punitive damages may be awarded, in addition to

16    compensatory damages, if you find that Bard acted maliciously

17    toward plaintiffs or in an intentional disregard of the rights

18    of plaintiffs.

19         A person acts maliciously when the acts are the result

20    of hatred, ill will, desire for revenge, or inflicted under

21    circumstances where the insult or injury is intended.

22         A person acts in an intentional disregard of the

23    rights of a plaintiff if the person acts with the purpose to

24    disregard the plaintiff's rights, or is aware that his or her

25    acts are substantially certain to result in the plaintiff's

rights being disregarded.  Before you can find an intentional

disregard of the rights of the plaintiff, you must be satisfied

that the defendant's acts or a course of conduct was:

First, deliberate;

Second, an actual disregard of the plaintiff's right

to safety, health, or life, a property right, or some other

right; and

Third, sufficiently aggravated to warrant punishment

by punitive damages.

A defendant's conduct giving rise to punitive damages

need not be directed at the plaintiff seeking punitive damages.

There is no requirement that the defendant intended to cause

harm or injury to the plaintiff.

The purpose of punitive damages is to punish a

wrongdoer or deter the wrongdoer and others from engaging in

similar conduct in the future.  Punitive damages are not

awarded to compensate the plaintiff for any loss he or she has

sustained.

A plaintiff is not entitled to punitive damages as a

matter of right.  Even if you find that the defendant acted

maliciously or in an intentional disregard of the plaintiff's

rights, you do not have to award punitive damages.  Punitive

damages may be awarded or withheld at your discretion.

Punitive damages may not be awarded to punish a

defendant for harming others.  Evidence of actual harm to

1    nonparties may help to show that the defendant's conduct that

2    harmed the plaintiff also posed a substantial risk to the

3    general public and so was particularly reprehensible.  However,

4    punitive damages may not be used to punish the defendant

5    directly for harm to these nonparties.

6         The burden for punitive damages rests on plaintiffs.

7    The burden is to convince you by evidence that is clear,

8    satisfactory, and convincing, to a reasonable certainty, that

9    an award -- that an award of punitive damages is warranted.

10        Clear, satisfactory, and convincing evidence is

11   evidence which, when weighed against that opposed to it,

12   clearly has more convincing power.  It is evidence which

13   satisfies and convinces you that punitive damages should be

14   awarded because of its greater weight and clear convincing

15   power.

16        This burden of proof is also known as the "middle

17   burden."  The evidence required to meet this burden of proof

18   must be more convincing than merely the greater weight of the

19   credible evidence but may be less than proof beyond a

20   reasonable doubt.

21        In the verdict form, you will be asked to specify

22   whether plaintiffs are entitled to recover punitive damages,

23   but you will not be asked to determine an amount of punitive

24   damages.  If you decide the plaintiffs should be awarded

25   punitive damages, then you will receive some additional brief

1    instructions, evidence, and argument before setting the amount.

2         There can be no recovery of punitive damages in this

3    case unless there is first a recovery by plaintiffs of

4    compensatory damages.

5         Before you begin your deliberations, please elect one

6    member of the jury as your presiding juror.  The presiding

7    juror will preside over the deliberations and serve as the

8    spokesperson for the jury in court.

9         You shall diligently strive to reach agreement with

10   all of the other jurors if you can do so.  Your verdict must be

11   unanimous.

12        Each of you must decide the case for yourself, but you

13   should do so only after you have considered all of the

14   evidence, discussed it fully with the other jurors, and

15   listened to their views.

16        It is important that you attempt to reach a unanimous

17   verdict, but, of course, only if each of you can do so after

18   having made your own conscientious decision.  Do not be

19   unwilling to change your opinion if the discussion persuades

20   you that you should, but do not come to a decision simply

21   because other jurors think it is right or change an honest

22   belief about the weight and effect of the evidence simply to

23   reach a verdict.

24        Because you must base your verdict only on the

25   evidence received in the case and on these instructions, I

1    remind you that you must not be exposed to any other

2    information about the case or to the issues it involves.

3    Except for discussing the case with your fellow jurors during

4    your deliberations, I remind you again:

5              Do not communicate with anyone in any way, and do not

6    let anyone else communicate with you in any way about the

7    merits of the case or anything to do with it.  This includes

8    discussing the case in person, in writing, by phone or

9    electronic means, via e-mail, text messaging, or any internet

10   chat room, blog, website, or application, including, but not

11   limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn,

12   Snapchat, or any other form of social media.

13             This applies to communicating with your family

14   members, your employer, the media or press, and the people

15   involved in the trial.  If you are asked or approached in any

16   way about your jury service or anything about this case, you

17   must respond that you have been ordered not to discuss the

18   matter and to report the contact to the Court.

19             Do not read, watch, or listen to any news or media

20   accounts or commentary about the case or anything to do with

21   it; do not do any research, such as consulting dictionaries,

22   searching the internet, or using other reference materials; and

23   do not make any investigation or in any other way try to learn

24   about the case on your own.

25             Do not visit or view any place discussed in this case,

1    the law, or the people involved -- including the parties, the

2    witnesses, or the lawyers -- until you have been excused as

3    jurors.  If you happen to read or hear anything touching on

4    this case in the media, turn away and report it to me as soon

5    as possible.

6         As I've explained before, these rules protect each

7    party's right to have this case decided only on evidence that

8    has been presented here in court.  Witnesses here in court take

9    an oath to tell the truth, and the accuracy of their testimony

10   is tested through the trial process.  If you do any research or

11   investigation outside the courtroom or gain any information

12   through improper communications, then your verdict may be

13   influenced by inaccurate, incomplete, or misleading information

14   that has not been tested by the trial process.

15        Each of the parties is entitled to a fair trial by an

16   impartial jury, and if you decide the case based on information

17   not presented in court, you will have denied the parties a fair

18   trial.  Remember that you have taken an oath to follow the

19   rules, and it is very important that you follow these rules.

20        A juror who violates these restrictions jeopardizes

21   the fairness of these proceedings, and a mistrial could result

22   that would require the entire trial process to start over.  If

23   any of you is exposed to any outside information, please notify

24   me immediately.

25        The exhibits that are in evidence are capable of being

1    displayed electronically and will be provided to you in that

2    form, and you will be able to review them in the jury room.

3    The machine that was sitting here earlier, the big screen with

4    the computer, has been moved back to the jury room.  Maybe it's

5    in the hall, but it will be placed in the jury room.

6              A computer, projector, printer, and accessory

7    equipment will be able available to you in the jury room.

8              Actually, I don't know if we have a printer.

9              THE COURTROOM DEPUTY:  No printer.

10             THE COURT:  I don't think we do.  That's in the

11   standard instruction, but there will be a computer and that big

12   screen where you can view it.

13             A court technician, or perhaps Traci or Nancy, will

14   show you how to operate the computer and other equipment, how

15   to locate and view the exhibits on the computer, and how to

16   print the exhibits -- well, they won't be printable, so

17   disregard that part.

18             THE COURTROOM DEPUTY:  They'll have hard copies of the

19   exhibits as well.

20             THE COURT:  You'll also have hard copies of the

21   exhibits.

22             You will also be provided with a paper list of all

23   exhibits received in evidence.  You may request a paper copy of

24   exhibits received in evidence.  You're going to get that

25   already, so disregard that.

1          If you need additional equipment or supplies or if you

2    have questions about how to operate the computer or other

3    equipment, you may send a note to the bailiff -- and I'll be

4    swearing Traci and Nancy in as bailiffs before you retire to

5    deliberate.

6          The note should be signed by your presiding juror or

7    by one or more members of the jury.  Again, using your number

8    rather than your name.  Do not refer to or discuss any exhibit

9    you are attempting to view in any note that you send out.

10         If a technical problem or question requires hands-on

11   maintenance or instruction, a court technician or one of the

12   bailiffs may enter the jury room for the sole purpose of

13   assuring that the only matter that is discussed is the

14   technical problem.

15         When the court technician or any nonjuror is in the

16   jury room, you should not deliberate.  No juror may say

17   anything to the court technician or any nonjuror other than to

18   describe the technical problem or to seek information about the

19   operation of the equipment.  Do not discuss any exhibit or any

20   aspect of the case.

21         The sole purpose of providing the computer in the jury

22   room is to enable you to view the exhibits received in evidence

23   in this case.  You may not use the computer for any other

24   purpose.  At my direction, technicians have taken steps to

25   ensure that the computer does not permit access to the internet

1   or to any outside website, database, directory, game, or other

2   material.

3           Do not attempt to alter the computer or obtain access

4   to such materials.  If you discover that the computer provides

5   or allows access to such materials, you must inform me

6   immediately and refrain from viewing such materials.  Do not

7   remove the computer or any electronic data from the jury room,

8   and do not copy any such data.

9           We're almost done.

10          If it becomes necessary during your deliberations to

11  communicate with me, you may send a note through the bailiff,

12  signed by any one or more of you.  Again, using your numbers.

13  No member of the jury should ever attempt to communicate with

14  me except in a signed writing.  I will not communicate with any

15  member of the jury on anything except -- on anything concerning

16  the case except in writing or here in open court with the

17  parties present.

18          If you send out a question, I will consult with the

19  lawyers before answering it, which may take some time.  You may

20  continue your deliberations while waiting for the answer to any

21  question.  Please remember that you are not to tell anyone,

22  including me, how the jury stands, whether in terms of vote

23  count or otherwise, until you have reached a unanimous verdict

24  or have been discharged.  Do not disclose any vote count in any

25  note you may send out to me.

1          A verdict form has been prepared for you.  It's a

2     pretty simple two-page form.  It simply says:  We, the jury,

3     duly impaneled and sworn in the above-entitled action, upon our

4     oaths, find as follows.

5          And then for each claim, there's a question of whether

6     or not you find for the plaintiff on that claim, and there's a

7     place to check yes or no on each of Mrs. Hyde's two claims and

8     then on the loss of consortium claim.

9          If you find liability on the claims, there's a place

10    for you to indicate the amount of damages that you award, and

11    then, finally, a place whether -- where you indicate whether or

12    not you decide that punitive damages should be awarded.  And if

13    you say yes to that, then we'll bring you in for some brief

14    additional argument and evidence before you actually set the

15    amount.

16         And the verdict form is then to be signed by the

17    foreperson using his or her number.

18         Counsel, are there any corrections or additions to the

19    instructions?

20         MR. LOPEZ:  No, Your Honor.

21         MS. HELM:  None for the defendant, Your Honor.

22         THE COURT:  Okay.  All right.  We are going to then

23    proceed with Mr. Lopez's closing argument.

24         The plaintiffs are allowed to make a closing argument,

25    then defendants make a closing argument, and then plaintiff

```
1   gets a brief rebuttal argument since they have the burden of
2   proof.
3           Mr. Lopez, since -- before you start, let's let
4   everybody stand up for a minute so --
5           MR. LOPEZ:  I'm going to test this, Your Honor,
6   while --
7           THE COURT:  You can test that.  That's fine.
8           All right.  Mr. Lopez, you may proceed.
9           MR. LOPEZ:  Thank you, Your Honor.
10          Good afternoon, ladies and gentlemen.  Your Honor.
11          First, on behalf of our entire very dedicated and
12  committed legal team that represented Mr. and Mrs. Hyde, we
13  want to thank you for your service as jurors.
14          You know, this isn't the first case that many of us
15  have tried.  We've tried cases, you know, in different parts,
16  we've seen -- of the country.  We've seen jurors.  I can tell
17  you this, I've never seen a jury pay as close attention to some
18  very complex things and take as much notes as you have.
19          So one thing you have is your notes.  You have the
20  evidence.  And my job right now is to, in a very short period
21  of time, try to help maybe refocus you on what we believe are
22  the real facts in this case and now apply to the law.
23          So a lot of this stuff you were hearing was just in a
24  vacuum.  I mean, what -- did it have any relevance?  What did
25  it really mean?
```

1          Now, the judge has given you the elements of the cause

2    of action in this case for a design defect, and we, as the

3    plaintiffs, have the burden to prove either -- not both -- that

4    there's strict liability for design defect or negligence for

5    design defect.

6          I want to thank my team.  They worked hard.

7          Your Honor, you and your staff, appreciate all the

8    accommodations.  And we know that you and your staff work hard

9    as well.

10         Now, there are two places we are all equal in this

11   country:  the ballot box and the courtroom.  Two places where

12   status, power, and wealth do not influence the outcome.  It's a

13   safe and guarded place where strangers come together and

14   effectuate change for the good of society.

15         Your decision in this case may very well be the most

16   important vote you cast in any election.  You have an

17   incredible power that you yield to make decisions that not only

18   affect this case but could affect the type of standards of

19   testing and design and conduct that we expect of not just

20   medical device companies but, you know, companies that make

21   products that are dangerous.  What do we expect them to do?

22         I mean, what do we expect of automakers?  Do we walk

23   in and we see a pretty brochure that says it's taken strength

24   and stability to a whole new level, and no one told us that

25   they never tested it in the real world?  They really don't know

1    how it's going to operate.  They don't know whether -- they

2    don't know whether or not this vehicle that they just produced

3    has taken away, through new design, a horrible history that the

4    vehicle before it had.  They have no idea.

5          And you walk into a dealership and you don't know that

6    you're going to be an experiment with this vehicle when you

7    start driving it.  You're not going to know whether or not this

8    vehicle has the same tendency for its suspension to break or

9    for it to roll over or for it to skid out of control because of

10   design defects that a prior device -- or a prior product had or

11   a prior automobile had, or whether or not the redesign actually

12   put in new risks that the other automobile didn't have.

13         So, you know, this is not just about medical devices.

14   This is about the standard that we all expect as a community.

15   And God bless the law.  The law guides you through what those

16   standards should be.

17         Your verdict will affect the paths that corporations

18   like Bard should choose when faced with choices between patient

19   safety, people's rights, and their commercial interests.  You

20   have the power to choose the paths that you, in your collective

21   wisdom, believe best protect people from getting hurt by

22   dangerous products, that products are not properly tested, that

23   products where a company doesn't know, because they didn't do a

24   clinical trial, how that product is going to perform once

25   unwitting consumers start to have them implanted in their

1    bodies.

2         And they don't even have the decency to say, you know,

3    we don't know, so they could break.  They could migrate.  They

4    could have a lot of problems.  You need to come back to your

5    doctor and have him look specifically for that.  Not just come

6    for a follow-up visit to see how you're doing after the

7    surgery, but tell the doctor, by the way, we don't know what's

8    going to happen with this device.  We don't know whether it's

9    going to break, whether it's going to migrate, tilt, perforate

10   or put your patient at risk, but we know that our prior device

11   did that.

12        So maybe do what Dr. Asch did when he had his patients

13   and he didn't know, and that is to have them come back and look

14   and see what happened.  Why do you think that migration was

15   found in Dr. Asch's study?  It's because they were being

16   controlled -- they were in a controlled clinical trial.

17        And that lucky man, that Patient No. 9, the only

18   patient in that study that got hit with a clot, where the clot

19   started to move the device 4 centimeters towards the heart,

20   what would have happened to him had he been a patient in the

21   open marketplace where he wasn't in that kind of controlled

22   environment?

23        Well, we know what happened.  The same thing happened

24   with the Recovery filter once it was on the market.  And that

25   device was not taken off the market until Bard had their next

1    one ready to launch.

2           Just remember that every time you hear about

3    statistics, those are human beings.  This case is not about

4    whether or not the statistic is .6 percent times a hundred --

5    which they don't do.  They're going to stand up and tell you

6    our rate is, you know, from the MAUDE database over our sales,

7    something they say they can't do -- or we can't do, but they do

8    it and tell you this is our rate, .16.

9           And their own medical director, Dr. Ciavarella, where

10   was he?  He was on videotape.  He didn't come here to address

11   you on this.  He said 1 to 5 percent, they have to assume this

12   is happening.  And they don't do that.  They're going to tell

13   you that that's the actual rate.

14          Now, the paths that you will be able to choose as

15   jurors is, number one, is you can say it's fine with us if

16   companies knowingly sell potentially dangerous products before

17   knowing how dangerous they will be once used in real live human

18   beings.

19          Or once they find out, when they put it on the market

20   and they find out that all that bench testing we did, all that

21   wonderful bench testing that was done, didn't reveal itself the

22   same way in human beings, and they ignore it.  Then they do

23   testing and find out, well, we better test this thing the way

24   it would really be in a human being.

25          Remember Mr. Tessmer was here?  And he said, well,

1   maybe we should test this thing not at 104 degrees, because not

2   everyone's going to have a fever that gets these things.  Most

3   people are going to have normal body temperature.  Let's test

4   it at normal body temperature.

5           Well, it failed on the bench three times.  And what

6   did Bard do?  They kept it on the market and allowed

7   catastrophic injuries with the Recovery filter to continue.

8   And you'll see some of that evidence.

9           This is the one that should concern us all.  Do we

10  condone experimenting and testing of potentially dangerous

11  products in human beings without their consent, and the

12  protection each would get if in a monitored and controlled

13  clinical trial?

14          They didn't tell Mrs. Hyde that, we're still trying to

15  figure out what's wrong with this device.  They didn't tell

16  Mrs. Hyde that, by the way, we've been trying to figure it out.

17          Remember the root cause analysis?  You're supposed to

18  figure out what's wrong with this thing.  We still don't know.

19  But we think we might have another product coming on the market

20  that might be better, might keep you safer.  And they don't

21  tell her that.

22          They want to talk about the IFU.  This case is not

23  about an IFU.  This is -- if it is about an IFU, it's about the

24  fact there should have never been one for this device, meaning

25  it should have never been on the market, and they know it.

1    Dr. Tillman said it.  Dr. Ciavarella said it.  Their own

2    doctor, their own medical director, said, when this device was

3    on the market for three months, why are we selling the G2 with

4    all of these problems when we have the SNF?

5         And I asked him at his deposition, I said:  What

6    you're saying is, let's stop selling the G2 and figure out

7    what's wrong with it.  In the meantime, let's sell the SNF.

8    And he said yes.  The medical director.

9         Why would you not follow the device -- I mean, the

10   advice of the only medical person on your staff who really

11   knows about patients?  The only person who took the oath,

12   "First do no harm."

13        I'll tell you why, because they only had a permanent

14   indication.  And you heard it, aggressive marketing, and I'm

15   going to show you some of that evidence in a little bit.

16        They knew in order to expand the marketplace, they had

17   to make it retrievable.  And so what did they do?  Instead of

18   stop -- stopping the sale and marketing of the G2 filter that

19   they represented to the world in their brochure -- you've seen

20   it.  They never changed that brochure.  We've taken strength

21   and stability to a new level.

22        I mean, my goodness, I mean, if there is anything in

23   this case that's been proven, not just by the weight of the

24   evidence but beyond any doubt, is that if it took strength and

25   stability to a new level, they should have said to a lower

1   level, not to a higher level.  They knew they had two or three

2   fractures in the Simon Nitinol filter in 20 years.  And in six

3   months, they had already well surpassed that.

4        But here was something that happened with the G2

5   filter, the G2X, and the Eclipse, and all these retrievable

6   filters that was not in the medical literature.  And remember

7   Dr. Grassi testified.  You know, they want to say these are the

8   guidelines.

9        He did a search of the world literature.  Right?  And

10  in 2001, 2003, when he reported this, he found four fractures

11  in the entire world literature, and none of those fractures did

12  what this device does.  There was nothing written in the

13  literature about fractures migrating to people's hearts and

14  lungs.

15       And you've seen this -- the statistics.  Mr. O'Connor

16  showed you some of those this afternoon.  That's what this

17  company knew.

18       There was no such thing as a Type A or Type B

19  fracture, and still they started making the G2, G2X, and

20  Eclipse filters, that whole family of filters, including the

21  Recovery.  And they want to say, well, doctors knew about this.

22  It's -- a fracture is a known complication.  No.  I'm sorry.

23       Vehicles can roll over, but if your vehicle rolls over

24  in a simple maneuver because you haven't tested it and you know

25  it's defective, and you know maybe even in some of your

1    simulated testing it rolls over at low speeds, or the

2    suspension breaks in a normal operation that puts you at

3    greater risk than other automobiles you can buy, including one

4    that they sell, you need to know that.

5         But the problem is, that vehicle would never be on the

6    showroom floor.  They couldn't sell a vehicle like that.  Say,

7    by the way, you know, we've got this new one.  It's prettier.

8    We've put a lot of time and effort into it.  It's got a couple

9    other nice features to it.  But, let me tell you, we've been

10   testing it and it's a lot more dangerous than the device --

11   than other devices we have.  No one -- I mean, that vehicle --

12   that product should not be on the market, and they know it.

13        Here's the other thing that's important to remember in

14   this case.  These internal documents that Dr. -- Mr. Ganser, I

15   think Mr. Carr, said all this important safety stuff about

16   their internal statistical analysis about risk compared to

17   their Simon Nitinol filter and other filters on the market,

18   their bench testing that shows that the thing's failing, their

19   own -- not just in human beings, but it's not even performing

20   safely in a PVC pipe and a sausage casing.  That kind of stuff,

21   they don't share.  It's proprietary.

22        Well, guess what else is proprietary?  All those

23   documents you saw in this case.  Those are all confidential

24   documents.  Let me tell you how confidential they are.  They

25   don't show their own experts these documents.  I mean, their

1    own key opinion leaders.  Dr. Trerotola, who's been their

2    consultant for I don't know how long -- he said he went way

3    back to the Recovery filter -- he's not seeing the internal

4    documents.  Well, guess what, ladies and gentlemen?  You have.

5    And you know what the truth is.

6            And, you know, if you want to not listen to any of the

7    experts in this case, you want to tell both sides they wasted

8    their time and money putting on experts, look at the evidence.

9    Look at the facts in the case.  Look at what Bard knew and the

10   evidence out of the mouths of their own witnesses and their own

11   documents.

12           The conclusions will be clearly that this company knew

13   what they were doing.  They violated Mrs. Hyde's rights and

14   interest.  They knew that they were putting her at risk.  You

15   know why?  Because they needed to get that retrievability.

16   I'll come back to where I was a few minutes ago.

17           They focused on retrievability, not on fixing their

18   permanent device that they knew was -- where Natalie Wong said

19   there was a statistically significant increased risk of a

20   serious injury from caudal migration that included death and

21   serious injury.

22           They didn't focus on that permanent device, the device

23   that got cleared in fixing it, which they should have done.

24   Because you know what, if they had to do that, no

25   retrievability for them.  No EVEREST study for them.

1          So what do they do?  They do the EVEREST study.

2    Remember, Dr. Kandarpa testified.  You saw some of the

3    documents.  The EVEREST study was for retrievability only.

4    They didn't even have the decency to say, well, you know, we've

5    seen a lot of serious problems with this device, with doctors

6    reporting it to us, fractures, perforations, you name it.  More

7    than our Simon Nitinol filter, other devices on the market.

8          And instead of telling Dr. Kandarpa and the clinical

9    subjects in the EVEREST trial, they continued the EVEREST

10   trial.  Because they wanted to get retrievability.  And they

11   got it, because they were able to prove that 58 out of 61, they

12   were able to remove it successfully.

13         And FDA, they put -- 1,500-page document they sent to

14   the FDA and they said at the end, this thing's safe and could

15   be removed.  That was the only issue in front of FDA at that

16   time, was whether or not this could be retrieved.  It was not a

17   long-term study.

18         I mean, I was shocked the other day.  I heard Mr. Carr

19   say that the Asch study was a long-term study for safety.  I

20   mean, Dr. Tillman said it wasn't.  Their own expert.  More

21   importantly, Dr. Asch said no, no, no.  This thing was to see

22   if I could take this thing out within 12 weeks.

23         And he wants you to believe that was a long-term

24   study.  I'll tell you why he wants you to believe that.

25   Because in one of the exhibits that you have -- I'm sorry, I

1    don't have the number, but I'll tell you what it is.  It's your

2    first submission to FDA for a retrievable device.

3            And you know what they say in that submission, in the

4    very last part of it, that they know the FDA is going to focus

5    on, because the issue is substantial equivalence?  They say

6    Dr. Asch's study established safety and effectiveness as a

7    permanent device.

8            I mean, that is as big a whopper as you can possibly

9    have when their own expert, their own people before them, have

10   all admitted -- there are other people that have admitted,

11   you've heard the testimony, there's no way that was a long-term

12   clinical trial.  In fact, they told Dr. Asch they were going to

13   do one before they tried to market it.

14           Their long-term clinical trial for the Recovery filter

15   was just putting it out in the open marketplace and having

16   catastrophic injury after catastrophic injury occur.  Then they

17   test it, find out it's not even performing to their performance

18   specifications for foreseeable uses.  They leave it on the

19   market.

20           Now, I know this case gets a little complicated

21   because we start talking about the FDA, you know, substantial

22   equivalence, and that's why you're on the market.  Well, every

23   important witness in this case, both experts, Dr. Parisian and

24   Dr. Tillman; Mr. Ganser, the vice president of regulatory

25   science -- I mean, probably the highest level person who

1    testified in this case, said that once you're on the market and

2    you clinically are not performing substantially equivalent to

3    the Simon Nitinol filter, you got to stop selling it.  You're

4    adulterated.

5          Well, they couldn't take the Recovery off the market

6    because they couldn't use an adulterated product as their

7    predicate device.

8          And, by the way, it doesn't matter.  Everyone agrees

9    that all of these have to be at least as safe and effective as

10   the Simon Nitinol filter.  It would make no sense if you could

11   have the original standard of safety and effectiveness be a

12   product that's been proven safe for 15 years and then lower the

13   standard as the devices get worse as you go.

14         Okay.  Mr. Ganser said it, Dr. Tillman said it,

15   Dr. Parisian said it, and others have said it, that your job

16   starts after you get clearance.  Okay.  Whatever the minimum

17   requirements are for you to be able to put it on the market,

18   your job starts when you start selling that product.

19         And as soon as you have evidence that that product is

20   not as safe and effective as the product that allowed you to

21   get on the market, which they all go back to the Simon Nitinol

22   filter, you need to stop selling it.  And you need to go to FDA

23   and tell them that, okay, so FDA knows.

24         They kept Dr. Kandarpa far away from FDA on the

25   EVEREST study.  Because, remember, he wanted -- he wished he

1  had the power to stop the study.  He told them they ought to

2  reconsider and reevaluate this.  He didn't even know it was on

3  the market at the time.

4         So let me take you through some of the evidence in the

5  amount of time that I have.  And I'll tell you that, you know,

6  one of the things I really enjoy about doing this, and it's

7  been almost 40 years, is I get to meet, you know, really,

8  really great people.

9         And I just -- I love being able to give people like

10  the Hydes an opportunity to take on the likes of a C.R. Bard,

11  an international company.  I do.  I mean, that's -- I've been

12  doing it for that long.

13         This is not about Mrs. Hyde's encounters with the FDA,

14  with the Society of Interventional Radiologists, with other IVC

15  filter manufacturers, or even Dr. Henry.  This case is about

16  her relationship and the trust and faith that she put in

17  C.R. Bard and Bard Peripheral Vascular, the defendants in this

18  case.

19         And it's not about whether the FDA did something or

20  didn't do something.  You heard the experts.  The FDA doesn't

21  design these things.  I mean, most of the time they were

22  talking to a chemist or a nurse or someone who's not -- I'm not

23  putting those --

24         Lookit, the FDA's a wonderful organization, but

25  they're only as good as the honesty and the integrity and the

1    information that they get from companies, especially in a

2    510(k) process.  I don't fault them for anything in this case,

3    and they're not a party to the case.  This is -- you have to

4    look at the conduct of C.R. Bard, of Bard, and her duties to

5    Mrs. Hyde; and more importantly, their duties under the law

6    that the judge read to you.

7          I know, lookit, as you go through this trial, you

8    get -- I mean, I was having -- it was like -- it's an emotional

9    roller coaster, believe me, even for the lawyers, and I'm sure

10   for you.  You hear -- you know, we get up and say something and

11   they make a different point, and you're wondering, you know,

12   who's making the good point.

13         Well, I can tell you this.  This case is not about an

14   IFU.  This case is not about FDA.  This case is not about SIR

15   guidelines, or anything else.  Not about statistics.  It's only

16   about statistics because they created statistics that should

17   have never been created.  That's the only relevance statistics

18   have in this case.

19         This is their -- Bard's duty to Mrs. Hyde as an

20   ordinary consumer.  A consumer who trusted that she was getting

21   a well-studied, thoroughly tested, clinically proven device

22   that she believed was actually going to protect her.  Give her

23   an extra barrier, an extra -- you know, she was on anti -- she

24   had a protein factor that caused her to be -- have -- not form

25   clots.  She was prone to clots.

1          She was on anticoagulants, and the doctor who put it

2     in said, well, I want a temporary filter just in case, or a

3     retrievable filter.  But guess what?  He did what Bard was

4     marketing them to do.  You can keep this in for your life.

5     It's an added protection.  It's a permanent device.

6          It's just not as safe and effective as the -- nowhere

7     near as safe and effective as the device that allowed them to

8     get marketed.

9          Now, no one -- before I leave that and get into more

10    of the evidence, remember this:  Natalie Wong, again, someone

11    who didn't testify in the case -- they brought Mr. Modra, who

12    wasn't even there at the time.  He got there -- how dare he

13    come in and criticize the work one of his own employees did, or

14    try to explain it away.  Let Natalie come in and do that.

15         You know, but they didn't -- that didn't happen.  So

16    Natalie Wong, who was a lead engineer on some of these things,

17    not Mr. Modra, in -- I think it was March, April, May of 2004,

18    the Recovery filter was behaving exactly the way Dr. Asch's

19    study was expecting it to behave but worse, because people

20    weren't being monitored, and the device was wreaking havoc out

21    in the clinical world without people realizing it was going to.

22         She did an analysis of the competitors of Bard.  She

23    did an analysis of the Simon Nitinol filter and found a

24    statistically significant increase in fatalities of the

25    Recovery filter compared to the Simon Nitinol filter and

1    every -- and five other competitors.  What did they do?  They

2    left it on the market.

3           You know, they're going to get up and say this case

4    isn't about the SNF and the Recovery filter.  You're right, it

5    isn't.  But it is.  Because these are the two devices that

6    allowed the G2, the G2X, and the Eclipse to come into

7    Mrs. Hyde's life, and those device -- that Recovery device

8    should have never been on the market, and they know it.

9           Here's what -- if you don't -- I think I'm going to

10   capsulize the two years this -- the Recovery device was on the

11   market.

12          Remember this testimony by Jason Greer, who was

13   talking to the architect of the Recovery filter.

14          Did I do it right?  He said -- not playing.

15          Let me read it.  You weather the storm as well as

16   anyone, he's saying to Janet Hudnall --

17          (Video played.)

18          MR. LOPEZ:  That's how they described the two years

19   with the Recovery filter.

20          Okay.  Let's -- let's fast-forward, 2008.  Because

21   this kind of grabs the Recovery era and the G2 and the G2X era.

22   And here's how -- this is a self-assessment of Bard, probably

23   their engineers.  I can't remember who did this.  But this was

24   their weaknesses.

25          Lack of thorough understanding, dynamics of caval

1    anatomy.  In other words, they knew they didn't even understand

2    where this device was being put in.

3           We have historical reactive/evolution design mindset,

4    meaning they wait and see what happens in the open marketplace.

5    Then they'll look at the design and see whether or not it's

6    time to maybe do something about it.

7           Product complications, forcing focus on reactive

8    designing.  There it is again.

9           Limited understanding of user needs.

10          Now, I didn't read the strengths part of it, but they

11   did not include in there marketing safe and effective products.

12          And then G2 -- so here's what -- got it.

13          Due to catastrophic injuries reported immediately with

14   the Recovery filter, they started to redesign it to create the

15   G2.  And, again, this is the Recovery.  Catastrophic.  From

16   January 2002 to June 2004, 17 reports of limb fracture.

17          That's a little misleading, because if you remember

18   the testimony, they didn't really do their full market launch

19   until January of 2004 because they wanted to wait for

20   retrievability.

21          But here's what was different about the Recovery

22   filter.  And by the way, everything I'm saying about the

23   Recovery was true about the G2.

24          A total of 20 arm fragments were reported in 14 cases.

25   Three patients had detached hooks and arms (11 of 20 arms

1    remained in the patient), and in six patients, 30 percent, the

2    detached arms migrated to the heart or lungs.

3         Nothing in the medical literature about this.  Or you

4    would have seen it in 2004.

5         They refer to the SIR guidelines.  Well, everyone knew

6    about fractures.  No.  Not everybody knew about Bard product

7    fractures and what happens when a fracture of their device in

8    this direct highway to the heart.

9         The root cause of the fractures has not been

10   determined.  You know what that means?  That means they have no

11   idea why.  And they think if they have no idea why, they can

12   just keep it on the market and still try to figure out.  But

13   you're going to see some testimony, if I have the time to do

14   it, Natalie Wong, it was 2012, they still don't know why their

15   devices fracture more than others fracture on the market.

16        And then Dr. Ciavarella:  There's no way to predict

17   which patients will develop this complication.  More frequent

18   monitoring of the filter, once placed, may facilitate discovery

19   of abnormal placement or indeed of a fractured filter.

20        Why did they not listen to the only medical doctor on

21   their staff?  And they still haven't.  Why didn't they do that

22   with the Recovery or the G2, the G2X?  After the experience in

23   the EVEREST trial, where they knew that these things were

24   moving all over the place.

25        You know, they talk about the guidance document as

1    well as the guide.  Well, the guidance document tells them

2    they're supposed to count 5-millimeter migrations.  They only

3    counted the 2-centimeter ones.

4         And you know what Dr. Kandarpa said?  There's

5    51 percent of the time these things were moving.  He was

6    concerned about stability.  It didn't matter whether it was

7    5 millimeters or 2 centimeters or 5 centimeters, because he

8    knew that the 5-centimeter ones, if not in a controlled trial,

9    were heading to 2 centimeters.  And he told them he was

10   concerned about the design of that device, and they ignored

11   him.

12        And Dr. Ciavarella wrote:  One could consider

13   providing summary information concerning the analysis of

14   reporting rates to physicians in the context of the limitations

15   of the data.  Further work into the collection of survey data

16   from surgeons or payors might be explored.

17        The medical doctor was recommending that in 2004.  And

18   in 2011, they still hadn't done that.

19        Dr. Ciavarella was saying, let's give these people a

20   chance for their doctors to find out whether or not they have a

21   fracture or a device that's moved that's putting them at an

22   increased risk.

23        Don't you wish -- doesn't Mrs. Hyde wish that Bard

24   would have told her doctor, told her, in the patient brochure

25   for the G2X, where it says "This is the only device you'll ever

1    need," by the way, these things can move.  If they move, they

2    could really cause some additional problems.  You need to come

3    back and have your doctor figure out whether or not this

4    thing's moving, perforating, and/or puts you at risk of

5    fracture.

6           Because Dr. Ciavarella told the rest -- everyone else

7    at Bard that maybe we ought to do that, to help maybe save

8    people from what she went through, which they minimize, you

9    know.  You're okay now.  You're asymptomatic.

10          So here's -- again, this is Dr. Ciavarella.  You know,

11   they actually did an analysis.  They hired Dr. Lehmann, who

12   they later fired from the EVEREST study --

13          We got to take that down.

14          So they like to say, well, the SIR guidelines are the

15   measure of what doctors accept and what's acceptable.  They

16   know that's not true.  They gave it to FDA and told them, don't

17   worry about that.  These are all within the acceptable rates of

18   complications by the Society of Interventional Radiologists.

19          Well, Dr. Grassi came here and said, no, they're not.

20   They don't even deal with these devices.  These deal with

21   devices that are 10, 20 years old.  These are not acceptable.

22          Here's what Bard knew what was acceptable to doctors;

23   this priority accounts.  They knew that doctors were

24   stopping -- they just heard of a migration and they stopped

25   using the device.  Not, oh, well, wait a minute.  Let me look

1    at the SIR guidelines that are -- deal with the devices that

2    are not on the market.

3           Okay.  So I forget what Mr. Carr told them, product

4    life -- no.  You know what this is?  Safety problem after

5    safety problem after safety problem, design problem after

6    design problem after design problem.  And they still don't know

7    if the Meridian has solved the problem.

8           And the one device they don't talk about is the

9    Denali.  And that -- and the Denali is finally in a clinical

10   trial.  We still don't know.

11          And here's the evolution again.  These all -- every

12   one of these is not a company saying, well, let's make our

13   really great product better.  No.  Let's make our unsafe, our

14   adulterated, our misbranded product that we're telling the

15   world has taken strength and stability to a new level, we need

16   to make it safer.

17          Okay.  Let me walk you through the law.  And you got

18   these instructions.  And the first instruction that -- the

19   first cause of action we have is strict liability, a design

20   defect.

21          So here's that law.  A foreseeable risk of harm posed

22   by the filter's design.  We know those are foreseeable risks.

23   They even admit.  I mean, they have a laundry list of these

24   risks.  But they think if you put a laundry list of these risks

25   in this fine-print IFU like auto manufacturers probably put in

1    their manuals that vehicles can roll over, that if theirs does

2    it worse, no harm, no foul.

3          Could have been reduced or avoided by the adoption of

4    a safer alternative design, and the omission of the alternative

5    design renders the product not reasonably safe.

6          Well, you saw the numbers.  You saw the statistics.

7    There's no other product on the market as of 2010 that had

8    more -- I mean, by a huge number.  I mean, some of their

9    competitors had zero Type A fractures.  That's what I want to

10   know about.  That's what patients want to know.  They don't

11   want to know does this thing fracture and stay where the device

12   is.  They want to know, does this device fracture whatever

13   hundred times where it actually migrates to the heart or lung?

14         And by the way, tip of the iceberg.  Dr. Feigal agreed

15   and Dr. Ciavarella agreed, if they're seeing a hundred-plus

16   Type A fractures and a hundred-plus Type B fractures, this

17   company can't come in here and say, well, that's unreliable.

18         Yeah, it is unreliable.  They should be assuming

19   there's a thousand of those.  Maybe 10,000 of those, because, I

20   mean, they brought it out with their own witnesses.  They're

21   asymptomatic.  They wear that like a badge.  Well, no.  That's

22   terrifying, that these devices could be behaving the way that

23   they behave and you don't even know it.

24         THE COURT:  Mr. Lopez, you asked me to prompt you at

25   35 minutes and 45 minutes.  And it's now 35.

1          MR. LOPEZ:  Thank you.

2          There's a reasonable alternative design that could

3     have reduced or avoided the risk of harm associated with the

4     device, and the device is not reasonably safe.  You saw -- I

5     mean, they were -- Meridian, Simon Nitinol filter.  Don't

6     forget the testimony, after six months, this thing converts to

7     a permanent device.  Plus, no one gave them a pass on it not

8     being safer than the Simon Nitinol filter after they got the

9     retrievability.

10          You saw the evidence on OptEase.  Just look at the

11     data on the OptEase in that 2010.

12          Okay.  Here's the Meridian.  Boy, didn't Mrs. Hyde

13     wish she could have seen this?  That the Meridian was

14     predicting that caudal migration would have that much of a

15     difference between the device that she got and other -- and the

16     device that Bard already had designed.

17          The OptEase, they compared themselves to the OptEase,

18     and they come in here this morning and bash the OptEase, yet

19     they're using it as a measure of safety when they're designing

20     the product.

21          They had a lower complaint rate for caudal migration

22     than the G2, G2X, in the MAUDE database.

23          And here's Dr. Ciavarella again, someone they just

24     didn't listen to:  The G2 filter is a permanent filter.  We

25     also have one, the SNF, that has virtually no complaints

1    associated with it.  Why shouldn't doctors be using that one

2    rather than G2?

3            And here's that chart.  These are their numbers.  We

4    didn't create this.  We didn't go into their files and put

5    these numbers together.  This was in their files.

6            And here's Type A fractures, something that didn't

7    exist in reality at Bard or anywhere else until they started

8    selling their Recovery, G2, G2X device.

9            Embolization of the fragment to heart or lung.

10   Migration of the fragment anywhere outside the vasculature.

11   Any additional surgery except filter removal or medical

12   treatment.  And then the other one is still fragments that are

13   broken off.

14           And just look at the numbers.  195 Bard fracture A,

15   and this is for a time period -- I think it's 2005 to 2010.

16   195 to 13.  And look at ALN, another one of their competitors.

17   Zero.  Cook, Cordis, zero.

18           And then I heard Ms. Helm get up and say, well, they

19   didn't show you the percentages.  Well, look at the

20   percentages.  Compare the increase, the .5 versus the .001.

21   And figure it out for yourself whether or not what was being

22   reported to them was 50, a hundred times greater risk.

23           So what we did is we brought in Dr. Betensky.  I mean,

24   if I ever felt like a mule at the Kentucky Derby, it's when she

25   read her credentials.  I mean, what an incredibly credentialed

1    scientist she is, and they didn't bring anyone here to combat

2    her and to say that what she presented was wrong.

3          G2, G2X penetrate 10 times more than SNF.  The G2X and

4    the Eclipse migrate 18 to 20 times more than SNF.

5          And by the way, the first part is they were predicting

6    it, and in reality it was worse than what they had predicted.

7    And she made that statement about, you know, for her, someone

8    who works with companies like this, who does these analysis,

9    that she was -- the magnitude of these risks were concerning to

10   her about patient safety.

11         And then the intended implant duration is for the life

12   of the patient.  At what point must the filter be considered

13   permanent?  Six months.

14         Well, they knew that from the EVEREST study.  And how

15   did they market it?  They marketed it as safe -- can be safely

16   removed at any time.  They had no science to back that up.  It

17   didn't say that in the clearance letter that they could say

18   that.  They just said it, because 510(k) products can do that.

19         Dr. Henry:  Safe to use as long-term and permanent

20   filter.  Yes.  It was temporary, but he said they were just

21   leaving them in so -- but he said they were just leaving them

22   in, so it would be a permanent filter for me.

23         Negligent design and testing.  Here are the elements.

24   A person is negligent when he or she fails to exercise ordinary

25   care.  Ordinary care is the care a reasonable person would use

1    in similar circumstances.

2            Ordinary care would be just, you know, test the thing.

3    Figure out what's wrong with it, and stop selling it until you

4    figure it out.  Because they knew it was causing -- I mean, I

5    don't know how clear -- how much clearer it could be.

6    Unacceptable risk of serious injury, their own internal

7    analysis.

8            It's the manufacturer's duty to exercise ordinary care

9    in the design of its product so as to render the product safe

10   for its intended use.  Not FDA's, not the SIR, not anybody

11   else.

12           Dr. Tillman, Dr. Parisian said no, no, no.  FDA

13   doesn't test these.  They don't design them.  The company is a

14   hundred percent responsible.  I mean, they could go to FDA

15   every day.  If they're selling a dangerous product, they're

16   responsible.

17           If they want help from FDA, they want guidance from

18   FDA, then show them what you got.  You know?  People that have

19   nothing to hide, hide nothing.  And why are they not sharing

20   with them their internal risk analysis?  Why are they not

21   sharing with them the Type A and Type B fractures that are

22   unique to their product?

23           And then when they go to get the device on the market,

24   they -- let's see.  Did I go too far?

25           Oh, here we go.

1          So they knew that they really needed to be as safe as

2     the Simon Nitinol filter, so they tested it.  Well, guess what

3     happened?  It failed.

4          So they said, well, we're not going to get substantial

5     equivalence from the FDA with a failed test on migration.  So

6     what do they do?  They changed it to substantially equivalent

7     to the most dangerous IVC filter on the market at the time, the

8     Recovery filter.

9          Let's hear from Mr. Ganser.

10          (Video played.)

11          MR. LOPEZ:  And here's what they did.  Changed from

12     Simon Nitinol filter to the Recovery filter.  Now they passed.

13     Now they can go to FDA and say, look what we got.  We're just

14     as good as the Recovery filter.

15          And then, of course, as -- again, these are internal

16     documents that nobody got to see, FDA or anyone, until now.

17     Just because we didn't think the answer would support our

18     design change as a viable option, we chose to run the test --

19     we chose not to run the test.  That's a pretty important word.

20          Anyway, the document says we chose not to run the

21     test, because they knew it was going to come out bad for them.

22          Now, you know, Dr. McMeeking.  You know, I --

23     Dr. Briant comes in here, very charming guy.  Stanford, you

24     know, I like Stanford.  But here's the bottom line.  Those

25     things that Dr. McMeeking was saying were predictable from the

UNITED STATES DISTRICT COURT

1     way he thought they should be tested, happened.

2          I mean, Dr. Briant didn't come in here and -- they

3     didn't hire him to run different tests.  You know, Dr. Briant

4     didn't say those things that Dr. McMeeking was saying was wrong

5     with the design of the device didn't actually happen.  They

6     actually happened.

7          This is Natalie Wong.

8          (Video played.)

9          MR. LOPEZ:  And here's what happens when you don't

10    know what the root cause analysis is.

11         (Video played.)

12         MR. LOPEZ:  Dr. McMeeking used Bard's own data and

13    worst case scenarios.  And Dr. Tessmer did that, too, and he

14    saw that they all failed.

15         Asch Recovery study.  Retrievable study only.  Not

16    designed -- we already talked about that.

17         Okay.

18         (Video played.)

19         MR. LOPEZ:  I mean, there are so many district

20    managers that sell these devices that Mr. Randall this morning

21    didn't know how many and didn't know most of their names.  I

22    mean, they had their people out there in force selling this

23    product.

24         THE COURT:  Mr. Lopez, 45 minutes.

25         MR. LOPEZ:  Thank you, Your Honor.

1          And then we've talked about this, the EVEREST study,

2    what was revealed in the EVEREST study.  But please pay

3    attention to this.  This is all in trial Exhibit 1222.  They

4    knew that if they put in the design changes that needed to be

5    designed, they were predicting that they could reduce these

6    complaints, these problems by 78 percent.

7          And they didn't do it.  They didn't tell Mrs. Hyde

8    that she was at an increased risk because they didn't -- hadn't

9    done this or that the Meridian or some other devices out there

10   were coming on to the scene.

11         Dr. Kandarpa.  Already talked about Dr. Kandarpa.

12         Lack of adequate testing.  Dr. Briant, again,

13   criticized Dr. McMeeking that there was a relationship between

14   tilt, perforations, and fractures.  Yet Bard's internal

15   documents all say that.  I mean, I heard Mr. Randall this

16   morning say it.

17         Let's hear from Mr. Ganser.

18         (Video played.)

19         MR. LOPEZ:  There were defects in the design of the G2

20   that led to Dr. Ciavarella's 2006 HHE where he said that the

21   problem was critical.

22         So let's talk about punitive damages.  I think -- I

23   think that's -- the evidence in this case clearly shows that

24   this company needs to be deterred from that kind of conduct in

25   the future, from using people like Mrs. Hyde and others for all

1    these years in an experiment that they don't even know they're

2    in.

3           Punitive damages may be awarded if you find that the

4    defendant, in an intentional disregard of the rights of the

5    plaintiff.

6           I mean, what more rights does a human being have than

7    to know that you're selling a product that's defective, you've

8    acknowledged it's defective, you've acknowledged it has to be

9    fixed, you acknowledge that it's creating serious injury and

10   harm and breaking more than any other device on the market?

11   What other right -- what more rights do people have than to

12   either know that or to not expose you to a device like that?

13          No one would have assumed that.  Everyone would have

14   assumed that they were getting the safest device possible.

15   They would have assumed that what Bard was saying to people,

16   that they took the G2, G2X, and Eclipse from a safety -- I

17   mean, from a strength and stability standpoint to a whole new

18   level, meaning it was better than any other device on the

19   market.

20          There's no requirement that the defendant intended to

21   cause harm to Mrs. Hyde.  Of course -- I mean, of course they

22   didn't.  I mean, they didn't even meet each other until this

23   case.

24          But the purpose is to punish a wrongdoer or deter the

25   wrongdoer and others who are engaging in similar conduct in the

1    future.  Actual -- evidence of actual harm to nonparties may

2    help to show the defendant's conduct that harmed the plaintiff

3    also posed a substantial risk.  But we know about all the other

4    folks that are out there.  I mean, how many are out there that

5    are asymptomatic who don't know this could be happening to

6    them?

7           We knew -- I mean, it doesn't get any clearer than

8    this.  This is not, you know, an expert.  This is not one of

9    our witnesses that we brought in.  This is Bard saying, we knew

10   very little about the long-term clinical performance of this

11   device when we launched it.  After a year of commercialization,

12   there are still many questions that need to be answered.  And

13   the response to that was to ramp up their sales.

14          The G2 is a permanent device, and we already talked

15   about this.  This is Dr. Ciavarella.  He said in his testimony,

16   when I presented this to him, what he meant by that is why

17   don't we stop selling the G2 until we figure out what's wrong

18   with it.

19          Well, I don't know where that went other than the fact

20   that they -- their step was to expand the marketplace.  And

21   here's what's incredible, is they knew how to fix it.  This is

22   in April of 2006.  They knew that the Greenfield filter had

23   experienced the same thing, and you know what the Greenfield

24   did?  They flipped two hooks to prevent caudal migration.

25          And then as they continued to evaluate the G2 against

1    the Recovery, which they should have been doing against the

2    Simon Nitinol filter.  One of the things you're going to see,

3    that spreadsheet we showed you with all those Type As and

4    Type Bs, they don't put the Simon Nitinol filter on there to

5    compare it.  I don't know why.  Other permanent filters are on

6    there, but they don't put the Simon Nitinol filter.

7              Because you know why?  The Simon Nitinol filter had

8    three fractures in 20 years, none of which went to the heart or

9    lung.

10             (Video played.)

11             MR. LOPEZ:  Dr. --

12             (Video played.)

13             MR. LOPEZ:  Don't we wish they would have listened to

14   the only medical doctor on the team.

15             Oh, I went the wrong way.  Sorry.

16             Dr. Kandarpa.  Do I press it again to play it?

17             (Video played.)

18             MR. LOPEZ:  They kept it -- they didn't tell anybody

19   that.  Nobody.

20             Maybe the most important document on punitive damages

21   in this case is they defiantly, after all that data they had

22   from EVEREST, from their own internal analysis, they continued

23   to market this device and all of the devices after it that were

24   based on the G2 as taking strength and stability to a new

25   level, as increasing migration resistance, improving centering,

1    and enhanced fracture resistance, while internally they were

2    creating PowerPoints and having discussions about how they

3    needed to fix their design to deal with those problems.

4         SIR guidelines, I've already talked about that.  I

5    don't know why we even talk about them in this case.  This is a

6    design defect case.  SIR guidelines don't have anything to do

7    with that.

8         FDA, they don't design these things.  They're not

9    responsible for the design.  They're not responsible -- they're

10   not the ones responsible for preventing people from being

11   exposed to a dangerous product or from -- they're not the ones

12   responsible when they expose people to a product where, you

13   know, the people are part of, you know, their experiment, part

14   of figuring out whether or not these things work.

15        (Videos played.)

16        MR. LOPEZ:  I mean, they don't get any higher in the

17   food chain, of all the people you've heard from, than

18   Mr. Ganser.

19        Okay.  I'm going to skip to the -- Mrs. Hyde's filter.

20   This still baffles me as to why they just don't admit it was a

21   G2X.  I think it's because they knew the Eclipse was on the

22   market and they didn't take the G2 or the G2X down.  And they

23   knew -- they at least thought that the Eclipse might have given

24   Mrs. Hyde a better opportunity of it not fracturing, but look

25   at the evidence.

1          I mean, they brought in some invoices that are like,

2    so what?  I mean, we know that the G2 was still in the market

3    and G2X.

4          So the implanting doctor, Dr. Henry, calls it a G2X.

5    Dr. Morris, their expert, didn't call it an Eclipse or -- he

6    called it a G2X.  The sales force, Tim Hug, G2X.

7          And remember when Dr. Henry was being cross-examined

8    by the defense attorney, Bard's attorney?  She wasn't asking

9    about the Eclipse.  She was asking about the G2X.

10          And what did Dr. Kuo call it?  One of the foremost

11    experts in the world in looking at these things and taking them

12    out.  He thought on the x-ray it was an Eclipse, because they

13    look the same on an x-ray.  But what did he call it in his op

14    report when he took it out?  A G2X.

15          That's Dr. Henry's testimony about that.

16          Okay.  Now, let me talk about Lisa Hyde and her

17    injuries.  She -- I mean, this is where it gets difficult for

18    me because I have to somehow or other make you understand, you

19    know, four years later, what she went through.  And for you to

20    figure out, you know, she's sitting there.  She's with her

21    husband.  I mean, she's retired.  She works for this wonderful

22    charity.  They got three lovely children, two adopted, one of

23    their own.  Seems like life is great for the Hydes.

24          But we have to talk about the three months of terror

25    and horror that she went through and to take you back to that

1    time so that you can feel what she went through and figure out,

2    what should Bard pay for having done that to her.  For

3    giving --

4           I mean, think about this.  You're in the -- you're

5    looking -- going through the newspaper, and you see the want

6    ads.  And it says there's a -- I want you to give up your

7    entire summer because I want to see -- and we're going to put a

8    metal piece of wire in you about an inch long, and we're going

9    to put it through your -- we're going to put two of them

10   through.

11          We've got one touching your spine and one touching

12   your aorta where, you know, people -- and we don't know whether

13   or not it's going to perforate the aorta, the largest artery in

14   the body.  We're going to put another one in the right

15   ventricle of your heart, and we're going to see what happens

16   over the next three months.  We don't know.  We've never

17   studied that.

18          And we're going to pay you $5 million.  Give up your

19   summer.

20          And you, you know, wait a minute.  Wait a minute.

21   You're telling me that you're going to -- you don't know what's

22   going to happen?  You don't know whether or not I'm one

23   heartbeat away from that little piece of metal perforating my

24   heart?

25          And Dr. Ciavarella -- that's why I played

1    Dr. Ciavarella's deposition, when he described what all could

2    happen.  He said it better than anyone, even our own expert.

3    All the horrible things that can happen when you have something

4    in your heart that's a piece of metal, where you're one breath

5    away, you know, from even sudden death.  One breath away from

6    it causing a clot in your heart.

7            You know, the thing that she had put in her to prevent

8    her from having clots was now in her heart where a clot could

9    form, according to Dr. Ciavarella, and migrate to your brain.

10   Migrate to other parts of your body.

11           Now, I know that didn't happen, but it doesn't change

12   the fact that this dangerous product that this company knew was

13   dangerous, that they knew needed to be fixed, that they

14   actually thought they had a fix in place and didn't tell her or

15   anyone else about it, left it on the market after Dr. Kandarpa,

16   who was the only one who saw patients in a clinical trial,

17   thought they should stop, maybe reevaluate this thing and not

18   sell it.

19           You know, she has this thing in her heart for three

20   months; June, July, August.  And you heard the story about her

21   and her husband driving to Stanford.  Her having to write a

22   good-bye letter to her children and her husband.  And I know

23   that seems like, okay, but, I mean, I just -- just the terror

24   and the horror that she must have been going through at that

25   time.

1          Not knowing whether or not the only doctor that she

2    could find on the internet that could take this thing out of

3    her heart and her -- and out of her vena cava, you know, was in

4    Stanford, and she didn't -- you know, she wanted -- I'm sure

5    she wanted to fly to get there as fast as she could.  They had

6    to drive.  And they had to drive and at night wondering whether

7    or not that was her last night.

8          And, you know, and we put on an expert who -- and you

9    have those numbers about how she needs to be monitored over the

10   next -- the remainder of her life.  And that totaled, I think I

11   saw you write it all down, as $226,439.

12         Well, do we know what's going to happen to her over

13   the next 40 years, whatever the life cycle -- her life

14   expectancy is?  No.  But Bard should know.  They should study

15   these things and find out -- you know, do a registry.  Have

16   people come in and find out, what are the risks of us having

17   caused a -- put a hole in your heart and causing scarring in

18   your heart?

19         Maybe ten years later, what happens to people?  We

20   don't know.  Well, we know that there's the potential that it

21   could lead to problems.

22         At the very least, allow her to go to a doctor and

23   have Bard pay for that to see if those things might happen as a

24   result of her heart having been scarred by this device.

25         I'm getting there.

1              Okay.  You saw the pictures.  And here's the other

2     thing, too.  I'm only going to touch on this briefly, but you

3     saw enough of this.

4              I don't know if these things work.  I really don't.

5     All's I know is that the testimony and the scientific evidence

6     suggests that they don't.  But doctors are still putting them

7     in because theoretically they might.

8              And I'm not faulting her doctor.  No one is.  But if

9     you're going to have a device that you don't even know works

10    because you haven't studied whether or not it works, you are at

11    the highest possible level of duty and obligation to the

12    American consuming public to make sure that you've taken every

13    step to design every potential risk out of that.

14             Now, no device is risk-free.  We agree with that.  But

15    if you know your device has design problems that are increasing

16    that risk, there is just no excuse for you to keep that device

17    on the market when you know there are safer alternatives that

18    you've already seen in your own engineering department and

19    safer alternatives in the market.

20             All right.  One last thought before I sit down.  I

21    want to leave Mr. O'Connor a little bit of time to -- for his

22    rebuttal.

23             And that is, when you -- when you deliberate, I want

24    you to think about the message that you want your verdict to

25    have, not only for Bard but for just corporations that make

                    UNITED STATES DISTRICT COURT

1     products.

2              I think that you want them to make different choices

3     than they made.  You want them to do something different than

4     they did.  You don't want people to be experiments in your

5     effort to have a product and maintain a competitive advantage.

6     You want to make sure they're well tested, that you do the

7     clinical trial that you promised Dr. Asch you would do.  You do

8     the clinical trial that Dr. Kandarpa thought you should do.

9              And, you know, I suggest to you that when Bard gets up

10    here and they -- Mr. Rogers is going to get up here in a

11    second.  I only ask this, that he talk about the facts in this

12    case.  He talks about the design and the choices his company

13    made.  And he talks about the evidence that came into this

14    case, not through anyone else but his own experts and his own

15    client's witnesses.

16             Ladies and gentlemen, thank you for your time.  I

17    appreciate your attention.  I know you have a task ahead of

18    you, and I know that you'll fulfill that task and that you'll

19    follow the law and you'll apply the facts of this case to that

20    law.

21             Thank you, Your Honor.

22             THE COURT:  All right.  Thanks, Mr. Lopez.

23             Members of the jury, we're going to take our 15-minute

24    break.  We will resume at 3:10.

25             Please remember not to discuss the case yet, and we'll

```
 1    see you in 15 minutes.

 2              (Jury not present.)

 3              THE COURT:  All right.  Defense counsel, that argument

 4    took 1 hour and 4 minutes, so you have 15 minutes remaining for

 5    your argument and punitives case.

 6              We'll see you in 15 minutes.

 7              MR. ROGERS:  Plaintiffs' counsel.

 8              THE COURT:  Oh, yes.  I'm sorry.  Plaintiffs' counsel.

 9              All right.  See you at 3:10.

10              (Recess taken, 2:54 p.m. to 3:09 p.m.)

11              (Jury present.)

12              THE COURT:  Mr. Rogers, you may proceed.

13              MR. ROGERS:  Thank you, Your Honor.

14              May it please the Court and ladies and gentlemen of

15    the jury, I first want to, on behalf of myself and Ms. Helm and

16    Mr. Condo and Ms. Camarata from C.R. Bard, and all the people

17    of C.R. Bard, I first want to thank you for your time and

18    attention.

19              I think that one thing that Mr. Lopez and I

20    enthusiastically agree about is that you are one of the most

21    attentive juries that I have ever seen.  And I agree with him

22    that I've never seen such furious and dedicated note-taking

23    from a jury before.  I can't imagine that something was said in

24    this courtroom that you guys have not recorded in some fashion.

25              But, you know, when we first got together some two and
```

1   a half weeks ago, you know, I asked you to listen to the whole

2   story.  And I thought that when you did hear the whole story,

3   that you would agree with me that Bard stands wrongly accused

4   in this case.

5           And today, after hearing all the evidence for two and

6   a half weeks, I believe that more than ever.  And I want to

7   tell you why.

8           But first we're going to do a few things.  You know,

9   when we first got together, I told you the key issue in this

10   case was a risk-benefit analysis.  And that's still correct.

11   And I'm going to get to that in a moment.

12           But there are some things that I want to kind of get

13   out of the way first that I think have been somewhat kind of

14   distractions in the case.  And I want to talk to you about what

15   is not at issue.

16           And Mr. Lopez completely correctly anticipated that I

17   was going to tell you that the Recovery filter is not an issue

18   in this case.  This is the first generation retrievable filter

19   that Bard put on the market.  It was on the market from 2002 to

20   2005, so it was gone for six years before Mrs. Hyde ever

21   received a filter.

22           And we have spent a lot of time throughout the course

23   of this trial talking about the Recovery filter.  And you may

24   recall when we first got together, when I gave the opening

25   statement, that I told you that if we do spend a lot of time in

1    this case talking about the Recovery filter, ask yourself why.

2    Why are we talking about that filter?  And I expect you to draw

3    your own conclusions.

4         But we saw witnesses throughout this case, mostly by

5    videotape.  We saw one live witness, Mr. Tessmer, regarding the

6    Recovery filter.  That's all those folks had to talk about.  We

7    saw many documents throughout the case that deal with the

8    Recovery filter.

9         So if you see documents during your deliberations from

10   2005, 2004, these are usually Recovery filter documents.  And I

11   submit to you that that's not the filter that's at issue in

12   this case.

13        And I next want to talk about a phenomenon that I

14   think we've seen, and that is what I'm going to call the real

15   world versus the litigation bubble.  You know, we all have got

16   lives, and when we're out there doing things, I mean, that's

17   the real world.  And I think that we all have our common sense,

18   and we apply things as we move throughout our day-to-day

19   decisions.

20        But I submit to you, ladies and gentlemen of the jury,

21   that what we've seen in this case, a lot of it are things that

22   exist only in what I will call the litigation bubble.  They're

23   things that are only here because we're in a case involved in

24   litigation.

25        And to give you some examples of that -- and these are

UNITED STATES DISTRICT COURT

1     other things I'm going to try to get rid of.  You know, we

2     spent an inordinate amount of time on some Bard documents, and

3     specifically, I want to talk to you about two right away.  And

4     these would be the Bard documents that I would say that we have

5     seen the majority of the time in the case.

6          And the first one that you may recall is called the G2

7     and G2X Fracture Analysis.  Now, you didn't probably see this a

8     whole lot, maybe you saw it some, but as you can see, the

9     numbers are all in there.  At this point in time, there had

10    been sales of a hundred thousand filters, G2 or G2X filters.

11    And you see at the bottom there, only two of the G2X filters

12    contained in that number have experienced a fracture.

13         But more importantly, there were only 56 of these

14    filters that had experienced a fracture out of that hundred

15    thousand.  And you can see for yourself that the rate at which

16    Bard was seeing these fractures was .06 percent.  That's not a

17    number that we really spent a whole lot of time on, but that

18    means that out of 10,000 filters, only 6 would have had reports

19    of fractures.

20         Now, you heard Mr. Lopez talk a lot about Type A and

21    Type B fractures, and he flashed this up on the screen.  And

22    this is the page you've probably seen regarding this document

23    more than any others in this particular document.

24         And down at the bottom, we've got these numbers that

25    are percentages.  And these percentages were represented to you

UNITED STATES DISTRICT COURT

1    to mean that the G2 filter performed more poorly than the

2    Recovery filter, which Mr. Lopez claims is the most dangerous

3    filter on the market.

4         But let's look at what that really means.  I mean,

5    those percentages that were laid out -- and Mr. Modra explained

6    this, that these are percentages of .06 percent.  That's what

7    we're talking about.  Not that 14 percent of the G2 filters on

8    the market experienced caudal migration, but that 14 percent of

9    the filters that had fractured, the 0.6 percent, also had

10   caudal migration.

11        And if you do the math on this, this means that .0084

12   at -- as part of this analysis, G2 or G2X filters had

13   experienced both a fracture and caudal migration at the same

14   time.

15        And, ladies and gentlemen of the jury, that means that

16   8 out of 100,000 filters would have experienced those two

17   failure modalities.  And I think that's a very different

18   representation than what you have gotten from plaintiffs'

19   counsel.

20        Next, we saw this document probably more than any

21   other.  And this document has got a word that the plaintiffs

22   like in it a lot, and that is the word that says

23   "unacceptable."  And we've heard it over and over again.

24        But, again, we didn't spend as much time on this

25   portion of the document.  And this is an analysis of caudal

1   migration, and this is what was the signal to Bard that there

2   may be something you need to go investigate.

3           And importantly, if you look at the numbers again, out

4   of about 9,000 filters that were sold, there were only 13

5   filters that had experienced caudal migration that set off

6   this, you know, signal to go investigate.

7           And that gives us a rate of .15 percent.  Again, you

8   have got 15 -- that means 15 filters out of 10,000 would have

9   experienced this particular issue so that you needed to go look

10  into it.

11          And what happened?  Well, we saw a whole lot of things

12  that happened as a result of this number and this particular

13  signal.  Bard did a failure investigation report, a health

14  hazard evaluation.  They convened a panel of physicians, flew

15  them all into Chicago.  This is over ten doctors that came in

16  to talk about this issue.

17          They also did a risk-benefit analysis and then

18  provided FDA plenty of information about what was going on.

19  And that's all because there were 13 reports out of close to

20  9,000 filters for caudal migration.  And I submit to you that

21  that is proactive activity of a company trying to make sure

22  that everything with their product is okay.

23          And you heard Mr. Modra explain to you why.  They try

24  to set rates so that you get signals very, very early.  It's a

25  very conservative notion to take, that you get the information

UNITED STATES DISTRICT COURT

1    that you need as soon as possible so that you can investigate

2    as soon as possible.

3          All right.  I also want to talk some more about the

4    litigation bubble, and I -- since it's football season, I have

5    to use a football analogy.  And I want to talk about Monday

6    morning quarterbacks.  And I expect that y'all can look at me

7    and tell that I didn't have a big football career, but that

8    does not stop me, you know, after the game from criticizing the

9    decisions that the real players on the field made.

10         And I will submit to you that the experts that the

11   plaintiffs have presented to you fall into that category.  And

12   let's take a look at them one by one.

13         First we've got Dr. McMeeking.  He has never designed

14   an IVC filter.  He's never tested an IVC filter.  He has done

15   nothing to bring a real filter in the real world to the market.

16   But yet he comes in and criticizes Bard about their testing and

17   how they've designed their filters.  And, importantly, he's

18   also doing the same thing in a completely different litigation

19   against a different filter manufacturer.

20         We also saw Dr. Parisian.  Dr. Parisian spent four

21   years at the FDA more than 20 years ago.  And since then, she

22   has had a very lucrative career testifying against drug

23   companies and medical product companies.  And I submit to you

24   that she is a career advocate for individuals like the

25   plaintiff in this case, and that's what she makes a living

1    doing.

2         We saw Dr. Betensky.  I agree with Mr. Lopez.  She is

3    incredibly well qualified.  She is a statistician.  And yet she

4    did exactly what plaintiffs' counsel asked her to do, and that

5    is to do this retrospective statistical analysis comparing the

6    Bard retrievable filters to the Simon Nitinol filters.  And

7    then she compared those two things and came up what she called

8    like a risk reporting ratio or something like that.

9         And, again, I will submit to you, that is not real

10   world data.  I mean, this is somebody carrying out and

11   executing specific instructions on what to do in litigation.

12        And notably, she's also doing the same thing in the

13   Cook litigation, so she's also involved in litigation against a

14   different manufacturer.  And she's also offered opinions about

15   the DFMEA that Bard did, but she didn't even know what one was.

16   So I suggest to you, again, what we're seeing are things that

17   only exist in the litigation bubble.

18        Next we have Dr. Muehrcke, and he is certainly a

19   qualified cardiothoracic surgeon.  But Dr. Muehrcke also has

20   advertised his services as an expert witness.  You heard him

21   say that he went and attended a class that lasted eight hours

22   in Chicago to learn how to be an expert witness.  And more

23   importantly, he's offering opinions after looking -- or arrived

24   at his opinions after looking at only a very small number of

25   Bard documents.

1          But I think more than anything, he came into court and

2   offered opinions about the cardiac status, the heart status of

3   the plaintiff.  But he had not looked at the majority of the

4   records that relate to her cardiac health.  He had looked at

5   the records from the implant of the filter and the explant of

6   the filter.

7          And I don't know if you remember this, but when I was

8   asking him about the records from the plaintiff's visit to a

9   cardiologist, he said, "Well, you have me at a disadvantage

10  because I've never seen this.  This is all new."

11         And I submit to you that doctors in the real world

12  don't look at company documents.  They look at medical records.

13  They look at test results.  They look at x-rays and imaging,

14  and they don't look at company documents.  But yet Dr. Muehrcke

15  gave you his opinion based on hardly any medical records or

16  medical information whatsoever.

17         Now, we also had Dr. Hurst, who also advertises his

18  services as an expert witness.  And he's never published on IVC

19  filters.  He still uses Bard IVC filters.  As a matter of fact,

20  he said two or three -- three or four weeks ago, he put one in.

21  And he's going to come in and criticize Bard and their filters

22  and tell you that something's wrong with them, but yet he

23  continues to use them in his own clinical practice.  And he

24  also did not review all of the records that relate to the

25  plaintiff.

1            All right.  Stable.  Mr. Lopez touched on this, and

2    we've heard some of this, that the Bard filters are somehow not

3    stable.  And I want you to ask yourselves, you know, what does

4    that mean?

5            You know, Dr. Muehrcke described it as falling back,

6    kind of, and we heard several different descriptions of this.

7    But I think you were intended to get the impression that once

8    these filters go in, they move all around.

9            Well, first of all, I want to point out that both

10   Dr. Hurst and Dr. Muehrcke both agree that all filters

11   fracture.  I mean, this is not something that is limited to

12   Bard.  But yet I think you were asked to believe that the Bard

13   filters experience tilt, caudal migration, and perforation and

14   that there's some interrelationship between those things that

15   lead Bard filters to fracture more than other manufactures.

16           But you also heard from Dr. Grassi, our expert, who

17   wrote the SIR guidelines, that yeah, he's heard that theory,

18   but he's not aware of any medical literature that bears that

19   out.

20           And I think the more important thing to ask

21   yourselves, too, is how does it relate to this particular case

22   and the evidence you've heard.  And did the plaintiff's filter

23   experience these failure modalities that the plaintiffs have

24   focused so much about.

25           And, you know, when we started, I asked you to be

UNITED STATES DISTRICT COURT

1    medical detectives, and I think you have done a very good job

2    of that because I see you furiously writing things down when

3    records and things are up there.

4              But I want to review some of those things, and first

5    let's talk about tilt.  And this is probably hard to see.

6    Maybe you can see it better on your screen, but you'll have it

7    back in the jury room.

8              But these are three images that I talked to Dr. Hurst

9    about.  And you might remember, these are images from CT scans

10   from 2011, 2013, and 2014.  And you might recall that if you

11   see the tip of that filter, the very top of it, in the center

12   of the cava, then the filter is not tilted.

13             And he agreed that this looks like a pretty

14   well-centered filter, so this filter is not tilting.  But what

15   did he tell you?  He said it's a very slight tilt of somewhere

16   between 2 and 4 percent.  I mean, it's very minimal.

17             But when I asked him if he had ever included in a

18   report in his clinic on a real live patient that he's examining

19   or looking at the images of, has he ever put any information in

20   a report that would say that he sees tilt of less than

21   15 percent, and he said no.

22             So I submit to you that that is litigation bubble

23   testimony that you're hearing in this courtroom that does not

24   exist in the real world.

25             All right.  Migration.  We also heard about that.  And

UNITED STATES DISTRICT COURT

1    you might recall that Dr. Morris put these two slides up that

2    showed the position of the filter when it was implanted and

3    then the position of the filter right before it was explanted.

4    And it's probably hard to see in that particular screen.

5         But Dr. Hurst testified that this was 5 millimeters of

6    migration that he perceived.  And to give you some sense of

7    5 millimeters, that's about as long as a grain of rice.  And he

8    said himself that this was not the predominant issue.  But yet

9    plaintiffs are trying to suggest to you that these things all

10   work together to cause fracture.

11        Now, you heard from Dr. Morris that in the SIR world,

12   the Society of Interventional Radiologists, that they don't

13   consider there to be migration unless it's more than

14   2 centimeters.  Because perceived differences that you might

15   see on an image of where a filter is can be accounted for by

16   something called parallax, that's just differences in the

17   imaging; hydration of the patient can change how much the

18   patient's cava is either swollen out or shrunken in; and then

19   this -- literally breathing in and out can move the position of

20   the cava up and down as much as 5 millimeters.

21        And the FDA has also acknowledged this issue with

22   migration.  And on the left-hand side, you see the document

23   from FDA.  That's their internal memo where they

24   down-classified IVC filters.  And on the right-hand side is

25   from the guidance document that you saw that FDA issued about

1    IVC filters.

2         And as you can see, both of those documents state that

3    caudal migration, number one, is usually clinically

4    insignificant; and, number two, can be accounted for by these

5    things that Dr. Morris described for you in the courtroom.

6         So I submit to you, again, this is things that we're

7    seeing in the litigation bubble world that don't exist in the

8    real world.  And as Dr. Morris told you, this is something that

9    just is not even clinically significant.

10        All right.  Let's talk about perforation.  And you

11   might recall Dr. Morris went through some images with you where

12   he kind of scrolled up and down just like you would if you're

13   sitting in the hospital and looking at a CT scan, and he talked

14   to you about perforation.

15        And he talked to you about how that's something you

16   see, but sometimes there is this thing called tenting that

17   might look like a filter strut is perforating or outside of the

18   caval wall, but it's really not.  And he informed you that he

19   sees this kind of thing that we see in the plaintiff's CT image

20   fairly routinely and that this is not something that he would

21   believe is clinically significant, and he sees it in all sorts

22   of filters.

23        Now, you saw this image in plaintiffs' closing

24   argument.  And this is the image or one of the images that

25   Dr. Hurst used, but it was the main one that he wanted you to

1    see where he was going to tell you that the strut of the filter

2    was interacting with the spine.  But when I asked him about

3    whether or not he had done something with his own computer to

4    change this image so that he could bring it to court, he

5    agreed.

6            And so, again, I submit to you that this is not real

7    world things that you're seeing, that you're seeing things that

8    are contained in the litigation bubble, and any perforation

9    that happened was completely clinically insignificant.

10           All right.  And let's look at the real world.  You

11   know, we had real doctors that were reviewing these CT images

12   that the plaintiff had for various reasons.  And you'll see

13   that when they were reviewing these images, the real doctors

14   that reviewed these wrote things like "IVC filter is

15   identified."  "There is a caval filter."

16           But these doctors did not note anything about

17   perforation, tilt, migration, until the one doctor saw the

18   strut that was in the heart of the plaintiff in an incidental

19   finding.  But these other failure modalities were not recorded

20   in any of the treaters' records.

21           All right.  G2X or Eclipse?  Mr. Lopez wants me just

22   to admit that this is a G2X.  And when I started with you a

23   couple of weeks ago, you know, I told you that I don't think we

24   know.  And I still believe that today.  I don't think there's

25   any evidence that you have seen where anybody can say, yes,

1   this is a G2X filter or an Eclipse filter.

2        But very briefly, Dr. Kuo did call both -- he used

3   both the words "Eclipse" and "G2X" when he looked -- you know,

4   in his records.  And in his testimony, I don't think he said

5   anything that would -- that could possibly be used to say,

6   well, gee, I saw this filter and it was a G2X filter.

7        If you see on the left-hand side, he is saying that

8   according to the imaging, I can't tell.  I mean, these two

9   filters look just alike on imaging.

10        And on that right-hand side, you know, he is again

11   talking about an image where he says G2X.  And he's -- and

12   specifically, if we go back in this particular thing, that same

13   word, "spot radiograph" -- do you folks see that?  You know,

14   he's getting asked about that particular image in this

15   right-hand piece of testimony, the spot radiograph.

16        So he's talking about an x-ray.  And he said, yeah,

17   G2X, because that's what that particular note of his about the

18   spot radiograph said.  But you can see on the left-hand side

19   that he clearly says that when you look at this on imaging, you

20   can't tell.

21        But Mr. Lopez also correctly predicted that I was

22   going to show you some invoice records, because I think that's

23   probably the best evidence we have about this.  And as you can

24   see, and if you might recall, the plaintiff had a jugular

25   approach with her filter.  And the last G2X that was sold to

1   this hospital with a jugular delivery kit was sold over a year

2   before her procedure.

3           And then if you look down, February '11, the month her

4   procedure was, there was a jugular kit that was sold to the

5   hospital.  And with the invoices, we saw that this was shipped

6   out of Bard on February the 23rd for two-day delivery to the

7   hospital, and it arrived on February the 25th, the day of her

8   procedure.

9           And as we saw from the notes in the records, and I

10  went through these with Dr. Hurst, that if you look at these --

11  the monitoring for the critical symptoms, that this procedure

12  started around 1:00 o'clock, which I submit to you gives plenty

13  of time for this filter to arrive and be used in the OR by

14  1:00 o'clock.

15          But as I told you in the opening, I don't know that

16  this really matters.  Again, I don't think we know if it's a

17  G2X or an Eclipse.  And I think the more important thing is

18  that it's Bard's position that both of those filters are safe

19  and effective filters.

20          And I think it's borne out by these rates that you've

21  seen several times that Bard is constantly tracking and

22  monitoring and keeping up with the reports that come in from

23  doctors, hospitals, competitors, wherever.  And they put these

24  things into these rates where they calculate the sales versus

25  the reports and they track and trend that.

1          And I submit to you it's always less than 1 percent.

2   And, again, I told you at the beginning and I'll tell you again

3   now, these rates are not perfect.  We know that there is some

4   level of events that happen that do not get reported.  But it's

5   the best information that Bard has, and it's a big piece of

6   their story.

7          Okay.  I'm finally going to get to risk-benefit.  And

8   first I want to talk to you about the allegations in this case

9   or the claims.  And these are the things that the plaintiff has

10  the burden of proof on.

11         We have a claim for a design defect, causation, and

12  damages.

13         And the first thing I want to do is point your

14  attention to a jury charge that you're going to receive.  And

15  you've already been charged, but I think you'll get a printed

16  copy of these.

17         But for each claim, the burden is on the plaintiff to

18  satisfy you by the greater weight of the credible evidence to a

19  reasonable certainty.  That is the burden that the plaintiffs

20  have to satisfy in order to recover in this case.

21         Now, there's two claims.  They're both design defect

22  claims.  One is strict liability and the other is negligence.

23  I'm going to talk about both.

24         But first I'm going to get you to look at the charge

25  on strict liability.  And we're going to focus now on this

UNITED STATES DISTRICT COURT

1    first portion of it, and it reads:  The filter is defective

2    because the foreseeable risks of harm posed by the filter's

3    design could have been reduced or avoided by the adoption of a

4    reasonable alternative design by Bard.

5            And so that's a requirement that the plaintiffs have

6    to prove to you that there was a reasonable alternative design.

7            But, this is very important, there is an "and" in this

8    portion of the Wisconsin law that is being applied to this

9    state -- or to this case.  And so you don't just get to recover

10   if you just have a reasonable alternative design.  You've also

11   got to prove that the omission of the alternative design

12   renders the product not reasonably safe.

13           And the first thing I'm going to focus on about strict

14   liability is that part, "not reasonably safe."  But let's take

15   a look at the negligence part as well.

16           And under the negligence standard that you're being

17   charged for design defect, the plaintiff has to prove that

18   there was an unreasonable risk of injury or damage.  So to put

19   those two things together, not reasonably safe and unreasonable

20   risk of injury or damage, if you look at both of those things,

21   it's a reasonable -- reasonableness standard which leads us to

22   the key question:  Did the benefits of the Bard G2X or Eclipse

23   filter outweigh the risk?  That is what is up for you to

24   decide.

25           Now, let's talk about benefits first.  And I think you

1   saw a lot of evidence about this, and this is the Surgeon

2   General's Call to Action from 2008.  And as you can see, the

3   Surgeon General identified that DVT and PE is the cause of as

4   many deaths in this country as car accidents, AIDS, and breast

5   cancer.

6           And you also saw that the Surgeon General has

7   identified what the Surgeon General believes to be treatment

8   modalities for DVT and the prevention of PE; and specifically,

9   the Surgeon General identified anticoagulant medication and, as

10  you see here, IVC filters.

11          All right.  And let's think about this in regard to

12  the plaintiff.  And I think you have heard plenty of this, but

13  I think everybody understands that at the time that the

14  plaintiff received her filter, she had experienced three DVTs

15  and this is her second PE.  And she also got diagnosed with a

16  clotting disorder called a protein C deficiency, which will

17  require anticoagulation for life.

18          And Dr. Morris went over this film with you, which was

19  the CT scan of the PE itself.  And you might recall that that

20  right-hand side, on your right part of your screen, that right

21  lung had this very large PE, that gray area where you see that

22  the blood flow is cut off from the rest of the lung, the lower

23  lung.  That was the PE that the plaintiff experienced.

24          Now, every medical witness that you heard in this case

25  who talked specifically about the plaintiff agreed that she

1    needed a filter.  And specifically, you heard about more

2    benefits than that, than just getting the filter.

3            But Dr. Morris told you that there is close to a

4    one-third risk of death from a recurrent PE.  And Dr. Henry,

5    the implanting doctor, said that he wanted to add the IVC

6    filter as an additional benefit for the plaintiff, a

7    belt-and-suspenders kind of approach, because she had already

8    started anticoagulant, but he wanted to make sure that there

9    was no risk for PE in that interim in case the anticoagulant

10   was not effective.

11           And even Dr. Muehrcke agreed that a patient very well

12   may not survive a second PE to their lung, particularly if it's

13   a large one, and he even testified that he himself has seen

14   Bard filters, not just any IVC filter, but Bard filters stop a

15   clot to prevent a PE.

16           Okay.  Another benefit I want to talk about is

17   long-term retrievability.  And you heard about some of this way

18   back in opening statement, and not just my opening statement

19   but plaintiffs' opening statement.  And you heard that in the

20   1990, it was a different era.  I completely agree with that.

21   The only filters that were available were permanent filters.

22           And you also heard in opening statement for

23   plaintiffs' counsel that there was this desire for retrievable

24   filters.  And that came from the medical community.  It wasn't

25   like Bard made that up.  Doctors wanted this as a treatment

UNITED STATES DISTRICT COURT

1    modality.

2         And you heard Dr. Morris say that that offered

3    treatment options for patients who previously would not have

4    had those treatment options.  For patients that could not be

5    anticoagulated on a longer term, you could put a filter in and

6    leave it in for a long-term period.

7         And our IFU, which Mr. Lopez says doesn't have

8    anything to do with the case, you know, does not have a

9    specific length of time that the filter has to be retrieved.

10   And that was a huge benefit for doctors who want to treat

11   patients.

12        Now, I submit to you that this played out in this

13   case.  I mean, after the filter had been in the plaintiff for

14   three and a half years, when Dr. Kuo went to retrieve it, he

15   was able to do it in a procedure.  I mean, from the time where

16   they gained access to the jugular vein to remove the filter, it

17   was about 18 minutes.  So the filter came out just like it's

18   supposed to, three and a half years after it had been

19   indwelling.

20        All right.  Another benefit I want to talk to you

21   about is the continuous improvement of the Bard IVC filter

22   retrievable line.  And you saw Mike Randall this morning talk

23   to you about this particular demonstrative, how Bard has worked

24   over the course of years to try to improve the filters, that

25   they continue to try and make them better and learn from

1    experience.

2           And he even told you about some stuff that didn't

3    work.  I mean, the G3 and the Platinum.  Those were ideas that

4    they tried to build prototypes and test, and ultimately they

5    were determined to not work.  And sometimes that happens.  And

6    so this stuff doesn't happen overnight.  It's an iterative

7    process that happens over time, and it takes time and a lot of

8    hard work.

9           All right.  Testing.  And this is, again, a benefit.

10   And you've probably seen more about filter testing than you

11   ever cared to see, and I'm not going to bore you with a whole

12   lot of it.

13          But we did see the FDA guidance that tells IVC filter

14   manufacturers, these are the types of tests that we want to see

15   when you submit your applications to us.  And Bard did submit

16   those things, and this is for the G2 filter, but they also

17   submitted more types of tests than what the FDA asked for,

18   including performing a clinical trial, the EVEREST study, which

19   plaintiffs are very critical of and say it was a

20   retrievability-only study.

21          Well, that was certainly one of the purposes of that

22   study, to determine if the filter could be safely retrieved

23   within a six-month period of time.

24          But as you can see from this document that we talked

25   about with, I believe, Shari Allen O'Quinn, that, you know, a

1    secondary endpoint for the EVEREST study was to collect safety

2    data.  And, you know, a study can be for more than one purpose.

3    I mean, you can gather data about safety while you're doing a

4    study at the same time.

5           And so I submit to you that Bard did do a clinical

6    study that did demonstrate safety and efficacy of the G2

7    filter.

8           All right.  This was also borne out on the bench in

9    the testing, and you folks have heard probably -- like I said,

10   you've had about a gutful of this stuff, but it did demonstrate

11   more fracture resistance of the G2.

12          And then we move to the G2X.  More bench testing

13   there.  The G2X was carried out to 77 years before failure.

14          And then we move to the Eclipse where electropolishing

15   is added.  You heard about that from Mr. Randall today.  And,

16   again, you heard about the various tests that were performed on

17   that filter.

18          And the bench testing, again, continues to bear out

19   that these filters are getting better and better as iterations

20   of the filters come into the design world.

21          Dr. Briant, this is another kind of litigation

22   bubble/real world thing.  You know, he is a retained expert of

23   ours, but, you know, when he testified, in his enthusiasm for

24   science, I mean, he talked about the real world things that

25   Dr. McMeeking did not take into account when he did his testing

1    and that the tests that Dr. McMeeking did, the kind of

2    theoretical tests, did things that the human body was really

3    not even capable of doing.

4            So, again, I submit to you that's real world testing

5    versus litigation bubble testing.

6            And Dr. McMeeking also talked about some things to

7    suggest to you what would be alternative designs, safety

8    features that could be added to the filter.  And he

9    specifically mentioned caudal anchors, perforation limiters,

10   and a smoother neck.

11           But if you were listening -- and I'm sure you were,

12   and probably taking notes, too -- you know, these, he said,

13   were ideas.  I mean, there's been no real world testing of any

14   of his ideas.

15           And if you remember kind of the product life cycle

16   that Mr. Carr talked to you about, yeah, ideas are good and

17   that's where they start.  But then you've got a concept phase,

18   a feasibility phase, a development phase.  All of that has to

19   happen before you can launch a product.

20           And I submit to you that Dr. McMeeking is stuck in an

21   idea phase, and the Bard engineers who are doing this in the

22   real world and not the litigation bubble are doing these things

23   day to day.  Every day they get up and go to work, and they're

24   not Monday morning quarterbacking and criticizing decisions and

25   testing what somebody did in the real world.

1          Okay.  Risks.  I told you at the beginning that these

2     products have risks.  There's no question about that.  Every

3     witness who has testified, every expert has told you that, yes,

4     all filters have complications.  We all agree with that.

5          And you saw a lot about this document.  And this is an

6     internal Bard document that analyzes MAUDE data.  And you might

7     recall that MAUDE data is the internal FDA database where

8     everybody submits all their information to, but it's completely

9     public.  You can go on a website and search within it.  You can

10    look up to see what products have had what reports.  But that's

11    what it is, it's reports.

12         And Bard was analyzing this data internally.  And

13    Mr. Lopez wants you to believe that this is where the deepest,

14    darkest secrets were held and that they didn't compare -- when

15    they did this report, you know, they didn't use the Simon

16    Nitinol filter.  He acts like that's really, really bad.

17         But I submit to you that if you're doing your deepest,

18    darkest secrets, you know, wouldn't you put everything in

19    there?  I don't really understand why the fact that the Simon

20    Nitinol is not in here is such a big deal.

21         But I submit to you that the more important thing is,

22    as we saw from the FDA website itself, that the MAUDE data,

23    because it comes from all kinds of different places -- and

24    manufacturers use perhaps different standards on how they

25    report.  And the FDA itself says right there on the cover page

1    of the MAUDE database that this data cannot be used to compare

2    rates of problems between products.

3           Now, so I'll let you ask yourself:  So is it a good

4    thing or bad thing that Bard's looking at this data and

5    analyzing it?  And I submit to you that's something that's a

6    good thing, I mean, that they're looking at it and they're

7    trying to figure out, can we improve?  And where do we stand?

8           And you heard John Van Vleet say, who has worked at

9    many different medical device companies, that he's never seen a

10   company that has a more conservative approach to reporting than

11   does C.R. Bard.

12          And so, again, we have no evidence in this case

13   whatsoever how any of the other companies that the plaintiffs

14   are asking you to compare Bard to in this MAUDE data, which FDA

15   says you can't do, but we have no evidence how they report

16   data.  I mean, we don't know what standards they use.  We don't

17   know how frequently they report.  So all of that is just

18   guesswork.  And so I submit to you, that is not some evidence

19   of something really bad going on in this case.  Because MAUDE

20   data is unreliable.

21          And the more important thing, again, is the numbers

22   that Bard tracks and trends continuously and constantly.  And

23   again, to look at those numbers in a little bit different way,

24   as far as reports to Bard of certain types of complications,

25   with the G2X, with fracture, migration, and tilt, it is over

1    99 percent of those filters receive no reports of that, and

2    that's out of over 50,000 filters that were sold.

3           And for the Eclipse filter, the numbers are even a

4    little better.  And that's out of 66,000 filters that were

5    sold.

6           All right.  Let's talk a little bit more about

7    reasonable alternative design, and I'm going to get back to

8    this particular jury charge.  And this is a requirement.  I

9    mean, the plaintiffs have got to prove a reasonable alternative

10   design to you.

11          And we've heard about sort of different things, maybe

12   different parts of different filters, but I think the ones that

13   have been posited to you as being reasonable alternative

14   designs are really these three filters:  the Simon Nitinol, the

15   OptEase, and the Meridian.

16          And we'll start with the Simon Nitinol.  Simon Nitinol

17   was cleared for use in 1990.  And that was the time where, you

18   know, videotapes were -- you know, that's how we watched

19   movies, were videotapes in 1990.  We had disposable cameras.

20   We had phones that were the large portable phone you could walk

21   around in your house with an antenna that you see Jerry

22   Seinfeld still in reruns using on that show.

23          But that was the '90s.  That was a completely

24   different era, like you were told in openings by plaintiffs'

25   counsel.  And this filter is just not a viable option, because

UNITED STATES DISTRICT COURT

1    as I'm sure you've heard over and over again, this is a

2    permanent-only filter.

3            So I ask you to ask yourselves, how can a

4    permanent-only filter be an alternative design for a filter

5    that is intended to be retrieved?  It makes absolutely no sense

6    to me.

7            All right.  But more importantly, we saw from

8    Dr. Henry's records and his testimony that he wanted a

9    retrievable filter.  And so a permanent-only filter is not the

10   product that he was looking for.

11           And even Dr. McMeeking agreed with that, that if it is

12   a retrievable filter that the doctor wanted, the Simon Nitinol

13   is not it.

14           And here's a piece of real world data.  I mean, the

15   filter, the Simon Nitinol filter that the plaintiffs are

16   suggesting is a reasonable alternative design, is not even

17   commercially viable.  It is not available for sale in the

18   United States today, and you saw this with Mr. Carr, how the

19   sales of this filter have continued to trail off.  And doctors

20   just don't want to use it.  It's just not something that

21   anybody in the medical profession wants to pursue.

22           I think we've probably heard -- I'm going to switch to

23   the OptEase now, and I think we've heard probably the least

24   about that filter than any other.  But that was suggested to

25   you as a potential reasonable alternative design.  It obviously

1    looks very different than the Bard filter.

2         But you heard Dr. Muehrcke say that he tried that

3    filter out, and he didn't like it.  And one of the big issues

4    with this filter is it's just like an early generation

5    retrievable filter.  It can only stay in a patient for a very

6    limited amount of time before it becomes a permanent filter.

7         And according to the labeling for it, Dr. Muehrcke

8    agreed with me that it was only indicated for 14 to 23 days of

9    indwell time in the patient, and then it's either removed or

10   has to be left in.  And so I submit to you that is not a

11   reasonable alternative design.

12        And you also heard Mr. Carr and Mr. Randall this

13   morning talk to you about how there's trade-offs in these

14   designs.  And with the OptEase filter, given its design, it is

15   much more likely to cause an occlusion of the IVC, which is an

16   issue that we really have not spent a lot of time on, but

17   that's also a very dangerous potential complication of IVC

18   filters.

19        All right.  And lastly, in the category of no good

20   deed goes unpunished, the plaintiffs suggest to you that the

21   Meridian filter, the next generation that Bard came out on the

22   market with, is also a reasonable alternative design.  So

23   plaintiffs want you to punish Bard for its continued iterations

24   of developing these filters.

25        And as you might recall, the Meridian filter added

UNITED STATES DISTRICT COURT

1    these caudal anchors to the filter.  And that, as you heard,

2    improved tilt and caudal migration.  It made those numbers

3    better.

4           But you heard from Dr. Hurst that tilt and caudal

5    migration are not predominant issues in this case.  And more

6    importantly, this filter was not on the market in February of

7    2011, when Mrs. Hyde received her filter.  It had not been

8    cleared yet by the FDA.  Dr. Parisian told you that meant if

9    you'd sold it before that or used it, it would be adulterated

10   and misbranded.

11          And it was still being tested.  So this filter was not

12   a viable option because it was not on the market and available

13   to Dr. Henry in order to use.

14          And most importantly, this was a very interesting

15   thing that we found out when Dr. Briant was testifying, that

16   Dr. McMeeking, who has suggested to you that caudal anchors and

17   perforation limiters, which are also -- been incorporated into

18   the Denali filter, the current Bard filter that's on the

19   market, that those are things that may have been something that

20   would be a reasonable alternative design to incorporate into

21   the Bard filter that's at issue in this case.

22          But what Dr. McMeeking did not tell you when he was on

23   the stand was that he's also issued opinions that the Meridian

24   filter and the Denali filter are not safe and effective and

25   that they do not improve fracture, migration, perforation, or

1    tilt.

2          So I submit to you, ladies and gentlemen, if we had

3    been in here and we had a Denali case, we'd have heard the same

4    testimony from Dr. McMeeking.  But because this is another case

5    with a different filter, we didn't hear about this opinion.

6          Okay.  Next up is this last part of the statute, which

7    is critically important, that the reasonable alternative design

8    that perhaps could have improved the product, the omission of

9    that made it not reasonably safe.

10          And so I was thinking about this and trying to think

11    about a way that might make sense.  But to start off, I want to

12    talk about Dr. Hurst.  And he agreed with me that all IVC

13    filters can be made safer.  And that's what we've seen with

14    this Bard line of products, iterations that add to and make

15    them safer.  And so that's a continuum that always is

16    constantly happening, hopefully, or that's the good thing that

17    should happen.

18          But so just because you can improve does not mean that

19    the product is not reasonably safe.  And so I started to think

20    about my own household, and I have three daughters who are in

21    college.  And one of them has the dubious distinction to have

22    been voted by her senior class, for senior superlatives, most

23    likely to cause a car accident given the number of at-fault

24    accidents that she had had while she was in high school.

25          And so in our household, we have got multiple cars

1    and -- because we've got five drivers.  And we only have one

2    car, my wife's car, that has got these blind spot alerts.  You

3    know, they're incorporated with sensors in your rearview

4    mirror, and so that is a safety feature of a car.

5           Mr. Lopez talked about cars, so I'm going to get into

6    that a little bit too.

7           But so that's something that would make a car safer,

8    and so that's a good thing.  But I don't think that that means

9    that the other cars that we have in our driveway are not

10   reasonably safe.  I mean, those are -- that's good to make

11   those things happen, but it doesn't mean that the cars -- the

12   Camry and the Honda Accord that my daughters drive, it doesn't

13   make those cars not reasonably safe.

14          It's an additional feature, but it doesn't render the

15   ones that don't have that feature something that's defective.

16   And that's what you're being asked to do in this case.

17          Okay.  Let's talk about weighing these risks and

18   benefits.  First of all, I submit the FDA's done this in some

19   respects when the FDA down-classified filters.  You saw some of

20   this.  You know, the FDA looked at what the potential risks

21   were, and they identified that the risks of IVC filters were

22   potentially even life threatening but so was the disease that

23   they're trying to cure or trying to prevent.

24          And they looked at the rates that were in the

25   published literature and identified various things for all

UNITED STATES DISTRICT COURT

1    these failure modalities, and then they determined that even

2    though there are those risks, that the benefits outweighed

3    those risks, and they down-classified filters from Class III to

4    Class II so that they could be -- go through the 510(k)

5    process, which doesn't require as much regulation as a product

6    that goes through the PMA process.  Sorry, that's getting

7    technical.

8            All right.  But let's look at what the history is,

9    though, with FDA.  You know, after the down-classification,

10   which happened in 1996, FDA issued that guidance document on

11   IVC filters.  And since then, there have been multiple

12   clearances of Bard products.

13           And you heard Dr. Tillman, our FDA expert, who was

14   there for 17 years and was the head of the office that looks at

15   510(k) applications, tell you that even though there is a

16   comparative standard for a 510(k) application, you're comparing

17   a new product to a product that's already on the market, but

18   it's still considered safety and efficacy.  That doesn't just

19   go out the window.

20           And Dr. Parisian, I think, wanted you to believe that

21   FDA was just an inept organization that is an honor system.

22   It's the manufacturers that have all the information, and that

23   FDA really doesn't do anything except just bumble around and

24   rubber stamp things when they come in.  But I think you got a

25   different view of the world when Dr. Tillman testified that the

1    FDA is a real organization that does its job in a very

2    dedicated fashion.

3         Okay.  This is another part of the strict liability

4    statute that I want to discuss.  And this is -- you're going to

5    be charged on this as well.  And -- or you have been charged,

6    but it will be in what you receive in the jury room.

7         But this is the inherent characteristic part of the

8    Wisconsin law.  And it reads:  The plaintiffs may not recover

9    on their strict liability claim if the damage was caused by an

10   inherent characteristic of the product that would be recognized

11   by an ordinary person with ordinary knowledge common to the

12   community that uses or consumes the product.

13        And so I suggest to you that the community that uses

14   or consumes the product are doctors.  They're the people who

15   know these products, and they're the ones that know about them.

16   And we saw a lot of evidence about what the community of users

17   of doctors of these products know.

18        And very briefly, we saw the SIR guidelines.  You saw

19   Dr. Grassi testify about how they compiled these.  And they

20   searched the world literature and tried to come up with what

21   were the ranges of complications that you see with filters.

22   And that was published in the medical literature.

23        And Bard has never taken the position, contrary to

24   what Mr. Lopez says, that the SIR guidelines, as long as you're

25   within that, you're okay.  That's not what Bard's position is.

1    But this is an important piece of data of what doctors would

2    know about IVC filters, and it relates to the whole community

3    of knowledge, and it relates specifically to this portion of

4    the statute that you've been charged on.

5         And what else did we see?  The EVEREST study.  It was

6    also published in the medical literature.  And so this is not

7    information that Bard is trying to hide or cover up.  All the

8    complication rates that appear in the EVEREST study were

9    published in the peer-reviewed literature for every doctor to

10   see.

11        And you also saw this little document, which was a --

12   what they call a placemat, something that was laminated for

13   people who are sales representatives when they call on doctors

14   to hand out.  And you might recall the Nicholson study that

15   Mr. Lopez questioned various witnesses about and how it showed

16   really high rates of complications with Bard filters.

17        But Bard put that information about the Nicholson

18   study in this document, in this little place card, to hand out

19   to doctors.  So this information was not covered up or swept

20   under the rug.

21        The 2010 FDA notification, that's another thing that

22   doctors would have known and seen.  And as you can see, this

23   was a few months before the plaintiff received her filter.  And

24   this notification was directed toward doctors who are likely to

25   either put in IVC filters or care for patients who might have

1      an IVC filter.

2              And as you can see, they specifically pointed out that

3      the known risks included fracture, penetration, and migration

4      of filters.  All of this information was known to the community

5      of doctors who used these products.

6              And you heard Dr. Morris say specifically that once

7      that public health notification came out, that that was

8      something that was well known in the medical community.  And he

9      agreed that that was something that the community of doctors

10     who used these products were aware of.

11             And it was also in the IFU.  This is the Eclipse IFU,

12     but it was in the G2X IFU as well.  And so all of these various

13     complications were included and warned of.  And as you can see,

14     we've got movement, migration, fracture, including the

15     potential removal of a fragment that's in there, as is

16     perforation and tilt.

17             All of that information, you can look at yourself when

18     you get to the jury room.  It's in the IFU for both the G2X and

19     the Eclipse filter.

20             But, you know, there's also this statement, that -- I

21     think every doctor knows this already, but it's part of the

22     Bard labeling.  But you've got to consider the risk-benefit for

23     every single person.  You've got to decide the risk that that

24     person is under given their potential risk of a deadly PE

25     versus the risks that come with the filter.  You have to weigh

1    that and make individual decisions.

2         And IFU also points out that the standards for the

3    Society of Interventional Radiologists suggest that patients

4    should be routinely followed once they have an IVC filter.  And

5    that's information that was known to the medical community

6    through this IFU.

7         And Bard didn't stop there.  You saw this, the patient

8    brochure that was cleared through the FDA.  And it contained

9    something in more layman terms that doctors could give to

10   patients if they chose to.  But it informed patients, if they

11   were to get this from their doctor, that the entire filter or

12   pieces of the filter may break loose and travel to the heart or

13   lungs, causing injury or death.  You may need to have

14   additional surgery to retrieve the filter or pieces if they

15   break loose.

16        That was information that doctors -- that Bard made

17   available to doctors, who could make that available to their

18   patients.

19        All right.  So in the verdict form, this is what it's

20   going to look like.  And you're going to have to answer

21   specific questions.

22        And the first one you're going to have to answer is:

23   Do you find by the greater weight of the evidence, to a

24   reasonable certainty, that Bard is liable to Mrs. Hyde on the

25   strict product liability design defect claim?

1           And I submit to you that the answer to that, based on

2      the risk-benefit information you've seen and based on what was

3      known to the community of users of IVC filters, that that

4      answer is no.

5           All right.  Now we need to move on to negligence.

6      This will go a lot faster, I promise.  But here's the charge.

7      And I can't see it over there, so let me find it.

8           It's a rather long charge, but what I am going to

9      focus on -- and you're obviously going to be able to read all

10     of this in the jury room -- is that it does require the

11     plaintiff to prove that the manufacturer, in the exercise of

12     ordinary care, did not use reasonable and adequate testing.

13          And I'm done with testing.  I'm not going to go back

14     over that for the most part.  But I think our testing, we

15     demonstrated to you, was reasonable and adequate.  And you've

16     also seen how this iterative process led to new generations of

17     filters along the way.

18          You've heard a lot about long-term clinical studies,

19     so I do need to talk about that.  And, you know, exactly what

20     is a long-term study?  I mean, that's a kind of relative term.

21          But I think plaintiffs are suggesting to you that

22     studies should be done that last 20 years, perhaps.  And if

23     that's the case, then when the plaintiff needed a filter in

24     2011, a study would have had to have been started and run for

25     20 years that would have had to start at least by sometime in

1    the early '90s for that filter to have gone through that whole

2    long-term study as the plaintiffs describe it and then put the

3    filter on the market.

4            So that would mean that by the time the plaintiff got

5    her filter, probably the Simon Nitinol would be ready for the

6    introduction to the marketplace in 2011.  And as we've seen,

7    that product is really kind of a dinosaur in the IVC filter

8    world.

9            We've also heard evidence that there is no known IVC

10   filter manufacturer, permanent or retrievable, that has done

11   any study like what plaintiffs are arguing to you should have

12   been done by Bard in this case.  And you heard evidence that

13   the Simon Nitinol filter, which is a permanent-only filter,

14   Mr. Carr talked about this from his experience at NMT, that the

15   study that was done for that filter, which was a permanent-only

16   filter, lasted six months.  I mean, that's how long they looked

17   at patients, for six months.

18           And the EVEREST study, which the plaintiffs are very

19   critical of as not showing anything about safety and efficacy,

20   had that same endpoint of six months if a person stayed in the

21   study that long and the filter remained in them that long.

22           So, again, I don't think this is real world things

23   that we're talking about here that plaintiffs are suggesting

24   that Bard should do.  I mean, these are things that exist in

25   the litigation bubble.

1          All right.  EVEREST results, we'll talk about this

2    very quickly.  All this information, even though plaintiffs are

3    critical of it, was shared with FDA.  I mean, here's a pullout

4    from the submission to the FDA about EVEREST when they were

5    asking for clearance of the G2 filter as a retrievable filter.

6    All of that data was included in the submission, and FDA

7    cleared that submission.

8          But more importantly, in the Eclipse and the G2

9    filter, in the IFU, all the information about the EVEREST study

10   is in the IFU.  Doctors can read this and know about it.

11   Again, this is not something that is being swept under the rug

12   and something that portends that there is something terrible

13   going on.  This is clinical data that is in the IFU, and

14   doctors can read it and analyze it for themselves.

15         We heard a lot about Dr. Kandarpa.  He was the medical

16   monitor for the EVEREST study.  And as you may have heard, you

17   know, he's been paid by plaintiffs' counsel to meet with them,

18   and he also last placed an IVC filter in the early 2000s.  He's

19   never placed a retrievable filter.  And he never told anybody

20   at Bard that he thought that the G2 filter should be redesigned

21   or that the EVEREST study should be stopped.

22         So as far as FDA communication is concerned, this is

23   kind of my -- probably -- hopefully my last stop on negligence.

24   You know, Bard provided a lot of testing and test protocols and

25   test results to the FDA.

1          You know, Dr. Parisian said, you know, all the FDA

2    gets is just summaries.  I mean, it's very high-level stuff,

3    and they just sort of rubber stamp it when it comes in.

4          But, you know, I think you saw over and over again

5    that these submissions that Bard has made to FDA are quite

6    large.  And they included a lot of the actual protocols and a

7    lot of very detailed information about the test results.

8          So I submit to you this is not something that's a

9    rubber stamp by the FDA, and this is not evidence of a company

10   that's been negligent in the way that it's gone about bringing

11   its IVC filters to market.

12         And, specifically, I wanted to point this out.  And

13   this is a submission to FDA, and this relates back to the

14   unacceptable document that we talked about when I first started

15   and that we've seen so much air time about.

16         But FDA was given this information about that by Bard.

17   Bard informed them that they had this signal and informed them

18   that they were going to change the way they were looking at

19   caudal migration versus cranial migration.  At one point they

20   were looked at all together, but they were going to break those

21   out and look at them, and all of that was given to FDA.  Again,

22   this is not the things that a negligent company does.

23         So I submit to you that on the verdict form, the

24   answer to was Bard negligent is no.

25         All right.  Now I'm going to move into causation, and

UNITED STATES DISTRICT COURT

1    hopefully I'll be wrapping up soon.  But --

2            THE COURT:  Mr. Rogers, you asked me to prompt you at

3    one hour.

4            MR. ROGERS:  Thank you, Your Honor.  I appreciate

5    that.

6            THE COURT:  We're at one hour.

7            MR. ROGERS:  But before I move into causation, I

8    wanted to say something.

9            You know, I think that we've all had experiences where

10   something happened two, three years ago and you feel like you

11   have a very crystal-clear memory of it, and you think, yeah,

12   this is exactly -- I have in my mind's eye exactly what

13   happened, perhaps the way someone looked or something of that

14   nature.

15           And then you see a picture several years later and you

16   go, "Gah," I mean, how did that happen?  Because my memory is

17   obviously, you know, not 100 percent accurate, and I think that

18   happens to all of us.  And I think we filter things as we move

19   along based on various experiences.

20           But as far as back pain and abdominal pain is

21   concerned, you've heard about that, and that is the plaintiff's

22   burden to prove to you from a causation standpoint, that the

23   filter caused these things.  And I don't doubt that the

24   plaintiff genuinely believes that that's the case.

25           But as we saw from the records, there were a lot of

1    things going on during this time period that the filter was

2    indwelling in the plaintiff.  And we went over some of those

3    things.  But there was the -- you know, kidney stones, ovarian

4    cysts, diverticulitis.  All of those things were other issues

5    that were occurring that I think perhaps account for the back

6    pain and abdominal pain.

7         And we also saw this record that indicates that at one

8    point when the plaintiff did go to a doctor who was a pain

9    specialist, that back pain had been an issue for really quite

10   some time, going back to 2007, well before the IVC filter was

11   implanted.

12        I need to talk about chest pain and chest palpitations

13   too.  That's another claim that you've heard.  And the record

14   from Dr. Shehane -- "Shehane" -- I'm not exactly sure how he

15   says it.  But, you know, this is the record where after the

16   strut was discovered in the heart, the plaintiff went to this

17   cardiologist in Las Vegas for two visits.

18        And as you can see, his record indicates that the

19   examination was benign and that the patient was essentially

20   asymptomatic.  And on the second visit -- and this is when the

21   plaintiff reported to Dr. Shehane that she was going to go to

22   Stanford and have the strut removed, that, you know, he said,

23   "Call me if you experience any symptoms."

24        But one thing that I think is important, we didn't

25   really see any complaints of chest pain until the strut was

1      discovered, and that's when that started.  And I'm not

2      suggesting that that was not a real perception, but I don't

3      think that it happened until the plaintiff had knowledge that

4      that -- that the strut was there.

5              And then as far as palpitations are concerned, you may

6      recall this.  Dr. Muehrcke agreed with me that based on imaging

7      in 2013, a CT scan, that the filter had not fractured at that

8      point.  You can see all the struts, all 12 struts present and

9      accounted for, you know, in this image.  And that's probably

10     awful small on your screen, but he agreed that at this point in

11     time, in June of 2013, there was no fracture and there was no

12     strut in the heart.

13             But yet on the left, we have a record from 2012 from

14     Dr. Thummala, the plaintiff's hematologist, that indicates that

15     she had complained at that point, almost really a year or more

16     before, that she was experiencing palpitations.

17             Now, Dr. Muehrcke also talked to you about future

18     issues and that the plaintiff may need to establish care with a

19     cardiologist, that she would need an annual echocardiogram,

20     annual EKG, and that these are things she needs for the rest of

21     her life.

22             And I'll submit to you that these are litigation

23     bubble things.  For reasons that still are not clear to me, we

24     heard that this care should happen in Wisconsin when the

25     plaintiff lives in Las Vegas, some 1,800 miles away.  So I'm

1    not exactly sure why the care needs to be in a completely

2    different part of the country, but that's the evidence that we

3    heard.

4           But more importantly, we heard from -- as far as the

5    real world records, that it's been four years since the strut

6    was removed, and there is no record, no evidence that the

7    plaintiff has experienced any arrhythmia.  There has been no

8    visit to a cardiologist in that four-year time period.

9           There was an ER visit in 2016 where a cardiac exam was

10   done.  There was a nuclear stress test that was done, CT scan,

11   EKG, and all of those things were normal, and the plaintiff was

12   discharged with the diagnosis of reflux.

13          And we also saw that Dr. Kuo, in his testimony, told

14   the plaintiff that she could return to normal activities.

15          We also heard from Dr. Poll.  He's a practicing

16   cardiologist at the University of Pennsylvania that he's been

17   doing for years and years.  And he reviewed all of the records,

18   unlike Dr. Muehrcke, who only looked at very few.  And he

19   determined that essentially the plaintiff had normal heart

20   function while the strut was in the heart, and then since then,

21   she's also had a completely normal heart and that she requires

22   no additional monitoring at this time.

23          So I also need to speak very briefly about damages.

24   That is something that, again, the plaintiff has the burden of

25   proof on.  And it's something that if you jurors believe that

1  damages should be awarded, it's up to you.  I will submit to

2  you that I think that that would not be indicated in this case

3  if you don't find for strict liability or negligence.

4        But if you do get into a discussion about damages, the

5  only thing I'll say is that you need to be fair.  I think the

6  law even says you need to be fair to both sides.  And it's up

7  to you as jurors based on your common experiences and your real

8  world experiences what you think that that's worth.

9        Punitive damages, I really don't even want to talk

10  about this, but I need to because the standard is very

11  different.  You know, there's two different standards that are

12  being applied in this case.  For punitives there's a heightened

13  standard.  It requires clear and convincing evidence, whereas

14  the other require -- just the liability claims require greater

15  weight of the evidence.  So this is a higher standard for

16  punitive damages.

17        But I would submit to you that there really has been

18  no evidence in this case to suggest that Bard should be liable

19  for punitive damages.  And I think that answer to that question

20  is no.

21        And there's also the charge that specifically says

22  that in order to find punitive damages, you have to find either

23  malicious conduct or intentional disregard.  And with

24  intentional disregard, you have to find that the conduct was

25  deliberate in actual disregard of the plaintiff's right to

1   safety, health, or life, and sufficiently aggravated to warrant

2   punishment by punitive damages.

3          I submit to you that is a very high standard, and we

4   have not seen evidence that comes close to an award for

5   punitive damages.

6          And at the beginning of the case, I told you you were

7   going to get to meet most of these folks, and you did.  And

8   it's up to you now to assess, based on your real world

9   experiences, the conduct of these individuals.

10          So punitive damages, I submit to you, is a no.

11          Now, before I wrap up, I'm going to take us all the

12   way back to the very, very beginning.  And -- but you do need

13   to understand, I'm going to sit down and Mr. O'Connor may have

14   a chance to speak to you very briefly.  But I don't get to

15   respond to that.  This is my last chance to talk to you.

16          And I'm sure you've figured out from watching sidebars

17   and watching us in the courtroom, if you let us go back and

18   forth, we'd be here for another three or four weeks.  But

19   anyway, I have to sit down after this.

20          But before I do, I do want to remind you of your oath,

21   and this is the oath everyone took.  Because it's very hard in

22   life to say no to people, like you're being asked today.

23   You're being asked to give an award of compensation to an

24   individual, and that's sometimes difficult to just say no, that

25   that's not the right thing to do, because we like to help

1    people.

2          But I want to remind you, at the beginning of this

3    case, each one of you took this oath:  Do each of you solemnly

4    swear or affirm that you will well and truly try the matters in

5    issue now on trial and render a true verdict according to the

6    law and the evidence, so help you God?

7          And so your bounded duty is to apply the law and the

8    evidence.  And that means you cannot let emotions or sympathy

9    or the desire to help people interfere with that.

10         And with that, I again suggest to you the risks and

11   benefits in this case, when you take that into account, that

12   that means that you should return a verdict for Bard.  And I

13   remind you again of these real world rates that Bard tracks and

14   trends, and I ask you to use your real world experiences and

15   analyze the evidence and apply the law and ask you to return a

16   verdict for C.R. Bard.

17         Thank you.

18         THE COURT:  All right.  Thanks, Mr. Rogers.

19         Everybody, stand up for a minute.

20         Counsel, would you approach for just a minute, please.

21         (At sidebar on the record.)

22         THE COURT:  It's just a question for Mr. O'Connor:  Do

23   you want me to give you prompts on any time?

24         MR. O'CONNOR:  Yes.  Give me 10 minutes, and I'm going

25   to have to take a gamble.  I think I have 20 minutes left.

1              THE COURT:  You got 15.

2              MR. O'CONNOR:  15?

3              THE COURT:  Yeah, there's 15 minutes left in your

4      time.

5              MR. O'CONNOR:  10 minutes.

6              THE COURT:  So give you a prompt at 10?  Okay.

7      There's what I'll do.

8              (End of discussion at sidebar.)

9              THE COURT:  You can keep standing for just a minute,

10     because we're not going to get out of here right at 4:30 today,

11     but it's better to finish the argument so we're done for the

12     day.

13             Mr. O'Connor?

14             MR. O'CONNOR:  Thank you, Your Honor.

15             Well, good afternoon, and as you can probably tell by

16     the clock, I have to be brief.  But I want to talk to you about

17     something that Mr. Rogers started talking about, about how this

18     case and critical it was about the Simon Nitinol filter and the

19     Recovery.

20             You know, those two filters are an inconvenient truth

21     for the defense because they know without the Simon Nitinol

22     filter, they don't ever get into what they tried to do in the

23     retrievable market.  Because that was the predicate device, and

24     that would dictate substantial equivalence on all their

25     devices, which the evidence has shown didn't occur.

1          Now, there's something else that I want you to think

2     about, and that's the EVEREST study and what they keep telling

3     you.  What Bard learned in the EVEREST study was there was a

4     relationship between those failures, tilt, perforation,

5     fracture, and migration.  And that was the purpose of the Venn

6     diagram.

7          And that was the study where they realized they had to

8     do something about it, and that is the study where it confirmed

9     in their mind the need for caudal anchors, something that had

10    been out there in the field of medical devices for quite a

11    while.  But it was then, right then, right there, that Bard

12    knew they needed caudal anchors because if they stopped caudal

13    migration that the G2 had major problems with and then caused

14    the other failures, they could eliminate failures.

15         And that's where we get into conscious disregard.

16    Because I want to talk to you about what they didn't tell

17    doctors.  They didn't tell doctors, stop using the G2 or the

18    G2X, that we have an anchor filter coming right around.  They

19    didn't tell doctors to stop.  Use another filter till we give

20    you the safe product.

21         They consciously disregarded the rights of Lisa Hyde

22    and every patient, including the asymptomatic patients who may

23    be walking out there today, a heartbeat away from death, to

24    protect their market share.

25              Now, that's a fact.  And we saw that.  We saw that in

UNITED STATES DISTRICT COURT

1    documents and emails and testimony today with Mr. Randall.

2    About how they kept selling it, kept selling it, knowing that

3    the Meridian was right around the corner, but they didn't tell

4    doctors.

5          And take a look at all the exhibits, but take a look

6    at Exhibit 1940, their own internal analysis of filter

7    failures.  Something they didn't tell doctors about.  Something

8    they knew and they kept secret, and it was a secret that they

9    did not want anybody to know.  They certainly didn't put it in

10   their IFU.

11         But you ask yourself, by July 2010, are 1,200 MDR,

12   medical device reports, way too many?  Are 355 fractures that

13   they're aware of because they got reported, not the

14   asymptomatic, too many?  And why are they so far above what the

15   other companies had?

16         That's not an inherent risk that ordinary people would

17   recognize.  That is a company that's hiding a dangerous secret,

18   that is greedy, that wants to keep its market share, and that

19   will make the patients like Lisa Hyde take the risk, the risk

20   they didn't want to take, the risk that would have been too

21   expensive for them.

22         And they made other choices.  They talk about

23   litigation bubble.  You know, I don't know what that is.  I

24   know what a courtroom is, and I know what a jury is.  And I

25   know that's where we get a chance to even things, where a Lisa

1    Hyde can take on a company like Bard.

2              And, you know, they had these problems with the G2,

3    the G2X, following the Recovery which was causing catastrophic

4    problems.  The G2 was no better.  It just went in a different

5    direction, but they kept it on the market.  And you saw Janet

6    Hudnall talk about aggressive marketing.  That's what won.  At

7    Bard, what won was aggressive marketing.  Aggressive marketing

8    beat out patient safety, and that's a fact.

9              And we know that, don't we?  Because we know they

10   continued to sell the G2.  They even brought it back because

11   they realized they weren't going to get the Meridian out there.

12             And the real question for you to ask is, what should

13   an Arizona jury -- what should we in Arizona expect of

14   corporations that we have a right to expect corporate

15   citizenship out of?

16             How about accountability, and if you have a problem

17   and it's dangerous and you have a solution, let the world know,

18   we're working on a solution, but stop.  Don't use our dangerous

19   filter.

20             Now, they talked about Dr. Briant and they talked

21   about Dr. McMeeking, and you can be the judge there.  But, you

22   know, Dr. McMeeking came to this courtroom with real solutions,

23   real tests that showed real predictions that we know had been

24   proven out there in the world why these filters fail.

25             And Bard made a choice.  They brought in Dr. Briant.

UNITED STATES DISTRICT COURT

1    You know what?  Dr. Briant's a very smart guy, and he's a good

2    guy, I think.  And he would eagerly jump at the chance to help

3    Bard get to the root cause.

4         But what they did was they spent $750,000 on Ph.D.

5    engineers just to take and convince you that McMeeking's wrong.

6    Not to come in here with a solution.

7         And that's because, the evidence has shown, that when

8    they want to talk about a litigation bubble, they made a

9    choice.  They made a choice, and they had to live with the

10   choice.  Let's keep these dangerous filters out there, and

11   we'll take our chances in court.

12        Well, that needs to stop right here.  Because you just

13   have seen Exhibit 1940, and you know how much worse the Bard

14   filters were and how Bard kept that to themselves.  Bard kept a

15   lot to themselves.  They kept it from the sales force, they

16   kept that information from the doctors, and if you think about

17   it, every expert that came in here and testified on behalf of

18   Bard -- and that would include Dr. Morris and Dr. Poll and

19   Dr. Briant -- didn't receive the internal documents that talked

20   about the failures that Bard was aware of.

21        They didn't want them to know because they didn't want

22   them to set them up where they might have to tell us the whole

23   truth and nothing but the truth.

24        Dr. Muehrcke and Dr. Hurst both had access to those

25   internal documents.  We gave them, and just like you, they are

1   among the few other than people in Bard that have seen the

2   truth.  And the truth is, Bard knew that its filters were

3   dangerous in design, and they knew they had to fix it.

4          They knew they had a caudal migration problem that led

5   to fracture.  They knew that the fractures were, their term,

6   Type A and go into people's hearts.  That's exactly what

7   happened in this case.  And they kept going.  Kept going.  Kept

8   selling.  And they wouldn't stop.

9          So when you think about a company and what we expect

10  here in Arizona, to put patient safety first, and you think

11  about accountability -- and they want to talk about a

12  litigation bubble.

13         Well, I think it's about time we talk about Arizona

14  juries.  And I think it's about time that we talk about why

15  you're here.

16         Because you're here because that's -- we need you.  We

17  need you to do things that the government can't do, the FDA

18  can't do.  They're, you heard, underresourced.  We need you

19  because you can sit here and hear the whole truth.  You can

20  run, but you can't hide from a jury.  And we need juries just

21  like you to find the truth and see everything and see the

22  entire picture.

23         And to put it as briefly as I can right now, the

24  picture we saw was Bard excited about the retrievable market,

25  but used a permanent device to get on there, and then marketed

1    every device as a permanent device.  Every patient had a

2    reasonable expectation and every doctor had a reasonable

3    expectation that that filter would remain in their body for the

4    lifetime, if that was the choice, and not move.

5           And Bard knew and kept it to themselves that there was

6    no way they were ever going to meet those patients'

7    expectations.  And so that's what this case has come down to.

8           And the best timeline is in that timeline when they

9    were talking about the caudal anchor right after, right after

10   EVEREST, right during EVEREST, all the way till 2010 and 2011

11   when the Meridian wasn't available and they went back to their

12   G2.  And they continued.

13          Now, they want to talk about -- I'll call it courtroom

14   math.  They know that the incidents and events are

15   underreported, but they use it when it's going to help them.

16   They know that all the filters sold is not the same as all the

17   filters implanted.  But they use that because it makes the

18   numbers look smaller.

19          But they also know, and you heard, that there are how

20   many patients -- nobody will ever know -- that are out there

21   walking around with a failed Bard filter that have no idea.

22          THE COURT:  Mr. O'Connor, you asked me to prompt you

23   at 10 minutes.

24          MR. O'CONNOR:  And they had the opportunity to stop

25   it, contact their doctors, get those patients back, and they

1    didn't do it.

2          The reasonable alternative design was there all along.

3    They had it.  They knew it.  They knew that they had a

4    dangerous design, but they kept the dangerous design out there

5    in the market.

6          So what I think that we would like you to do is to

7    look at the verdict form and let this company know that here in

8    Arizona, this has to stop.  What you decide on here in this

9    courtroom is going to affect countless people in -- it may

10   affect people who are out there now.

11         It's going to -- it has to be a message to Bard that

12   in Arizona, we expect good corporate citizenship.  And that

13   means if you're going to suggest and pretend like you put

14   patient safety first, we're going to hold you accountable for

15   it.

16         And that means when you know that your filter or your

17   device is dangerous, stop.  Don't continue to put the Lisa Hyde

18   of the world at risk of harm.

19         So as you go through this, we're going to ask you to

20   answer 1 and 2, yes.  And then down under compensatory damages,

21   Mr. Lopez talked to you about that.

22         And then when you get to punitive damages, remember

23   the evidence all the way through.  Look at what they knew back

24   in July 2010.  And that's Exhibit 1940.  And look at what Bard

25   also knew and came in here and admitted.  They almost mocked

1    the people that are out there asymptomatic.  And think about

2    the Lisa Hydes out there who may be a heartbeat away from

3    death.

4            And why should this company take the chance that

5    somehow they may be able to fool a jury when it's in their

6    hands all along to prevent the harm.  But they didn't.

7            And this is a case where you can make it stop by the

8    verdict that you deliver and the message you send, not to the

9    lawyers here, but a message that's big enough that gets to the

10   boardroom at Bard.  So they hear you from Arizona loud and

11   clear, and that perhaps this verdict will prevent a Lisa Hyde

12   from happening down the road or in the future.  Perhaps this

13   verdict may get them to contact doctors, tell the doctors to

14   get their patients back in, and start screening these patients

15   for failed filters.

16           I want to thank you for your time.  I had to rush

17   through this.  But we don't believe in a litigation bubble.

18   This is the jury system, and you are a hardworking jury, and we

19   trust you and know you will do the right thing.

20           And on behalf of myself and my team, I want to thank

21   you.

22           THE COURT:  All right.  Thanks, Mr. O'Connor.

23           All right, ladies and gentlemen.  Just a couple of

24   matters.  I mentioned that there are going to be two bailiffs

25   who can work with you in the courtroom.  They will be two

1    people you already know, Traci and Nancy.

2          If you would each come forward and please raise your

3    right hands.

4          (Bailiffs sworn.)

5          THE COURT:  All right.  Ladies and gentlemen, it's

6    4:36.  We're going to have you go to the jury room.  You can

7    take your notebooks with you.

8          What you choose to do today is up to you.  If you want

9    to break for the day and go home and come back and start in the

10   morning, that's fine.  If you want to spend a few minutes to

11   pick a foreperson and to start talking, that's up to you as

12   well.

13         You just decide on what you want to do.  If you're

14   going to leave, they will tell you how to contact us with a

15   phone call to let us know you're leaving and when you're going

16   to be back in the morning.

17         We will be sending back to the jury room with you the

18   jury instructions.  The electronic exhibits will be there.

19   We'll send back paper exhibits.

20         Is there anything else we need to address before we

21   excuse the jury?

22         MR. ROGERS:  Nothing from the defendant, Your Honor.

23         MR. LOPEZ:  Nothing from the plaintiffs, Your Honor.

24         THE COURT:  All right.  You may retire.  Thank you.

25         (Jury not present.)

1          THE COURT:  All right, counsel.  We'll let you know

2   what we hear from the jury.  If you could be sure, if you step

3   away from the courtroom, to leave contact information with

4   Traci so we'll be able to stay in touch with you.

5          And if they leave, I'm not going to have them come

6   back in here.  We'll just let them leave.  We'll tell you when

7   they say they're going to be back in the morning so you know

8   when to be back around the courtroom.  And otherwise, we'll let

9   you know when we hear anything from the jury.

10         Thanks.

11         MR. ROGERS:  Thank you, Your Honor.

12         MR. LOPEZ:  Thank you, Your Honor.

13         Do we still -- we have a CMC tomorrow, did I hear?

14         THE COURT:  Yes.

15         MR. LOPEZ:  11:00 o'clock; right?

16         THE COURT:  11:00 o'clock.  We'll talk about the

17  schedule for the last two bellwethers.

18         (Proceedings adjourned at 4:37 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 4th day of October,

13  2018.

14

15

16

                    s/Jennifer A. Pancratz_____
17                  Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25