1       **UNITED STATES DISTRICT COURT**

2         **FOR THE DISTRICT OF ARIZONA**

3              _____

4    **IN RE: Bard IVC Filters Products**     )
     **Liability Litigation,**                )  MD 15-02641-PHX-DGC
5                                             )
     _____ )
6                                             )
     **Lisa Hyde and Mark Hyde, a married**   )  Phoenix, Arizona
7    **couple,**                              )  **October 5, 2018**
                                              )
8                        Plaintiffs,          )
                                              )
9           v.                                )  CV 16-00893-PHX-DGC
                                              )
10   **C.R. Bard, Inc., a New Jersey**        )
     **corporation, and Bard Peripheral**     )
11   **Vascular, an Arizona corporation,**    )
                                              )
12                       Defendants.          )
     _____ )

13

14


15      **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

16        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

17            **TRIAL DAY 14 (Verdict)**

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For the Plaintiffs:

 3            Lopez McHugh
              By: RAMON R. LOPEZ, ESQ.
 4            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 5
              Gallagher & Kennedy
 6            By: MARK S. O'CONNOR, ESQ.
              By: PAUL L. STOLLER, ESQ.
 7            2575 East Camelback Road, Suite 1100
              Phoenix, AZ  85016
 8
              Heaviside Reed Zaic
 9            By: JULIA REED ZAIC, ESQ.
              By: LAURA E. SMITH, ESQ.
10            312 Broadway, Ste. 203
              Laguna Beach, CA  92651
11
              Goldenberg Law PLLC
12            By: STUART GOLDENBERG, ESQ.
              By: MARLENE GOLDENBERG, ESQ.
13            800 LaSalle Ave., Ste. 2150
              Minneapolis, MN  55402
14
              Lopez McHugh, LLP
15            By: JOSHUA MANKOFF, ESQ.
              1 International Plaza, #550
16            PMB-059
              Philadelphia, PA 19113
17

18

19    For the Defendants:

20            Nelson Mullins Riley & Scarborough.
              BY: JAMES F. ROGERS, ESQ.
21            1320 Main St.
              Columbia, SC  29201
22

23            Snell & Wilmer
              By: JAMES R. CONDO, ESQ.
24            400 East Van Buren
              Phoenix, AZ  85004
25
```

1                    **A P P E A R A N C E S   (CONTINUED)**

2

3      For the Defendants:

4              Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.,** ESQ.
5              By: **MATTHEW B. LERNER,** ESQ.
               By: **ELIZABETH C. HELM,** ESQ.
6              201 17th Street NW, Suite 1700
               Atlanta, GA  30363
7

8              C.R Bard, Inc.
               Associate General Counsel, Litigation
9              By:  **CANDACE CAMARATA,** ESQ.
               730 Central Avenue
10             Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

(Proceedings resumed in open court outside the presence of the jury.)

09:59:18   THE COURT:  Please be seated.

Mr. Stoller, you requested we get together this morning.  Why don't you share with me your thoughts on what the issue is.

MR. STOLLER:  Yes, Your Honor.  Thank you, Your
09:59:33  Honor.

Particularly the defense has raised objections to our presentation of evidence in the punitive phase, if we get there.  I thought we'd all be better served if we address these issues now rather than wait until the jury comes back.

09:59:50   I'll let them speak specifically to them, but we have submitted to them, Your Honor, video run of Mr. Syed.  You'll recall from the Booker trial that was the video we played in the punitive damage phase of that case that related to effectively the net worth of Bard, the income it made over
10:00:12  the relevant period of time, shareholders' equity in the company, and those similar types of financial information.

We gave over our intended run to the other side for that, got back a statement that they objected to all of it on two grounds, one of which has to do with time issue, which
10:00:31  I'll let Mr. Lopez address with you.  But the other one, I'd

10:00:34  1   like to deal with the substantive issue, if I can, which, as

2   I understand it, is their *State Farm*, *Gore* objection to it

3   contending this has to do with the general financial

4   condition of the company and its operations and not -- is not

10:00:48  5   limited to sales of this particular device in the particular

6   state at issue, Wisconsin.

7           I believe Your Honor addressed this at the last

8   hearing --

9           THE COURT:  Let me interrupt you, Mr. Stoller.  It

10:01:00  10  might be best for me to hear the objection first and then

11  your response to it.

12          MR. STOLLER:  I'm fine with that, Your Honor.

13          THE COURT:  Let's go ahead and hear what the

14  defendants have to say and then I'll hear from plaintiffs.

10:01:10  15          MR. ROGERS:  Your Honor, do you want to hear about

16  both issues?

17          THE COURT:  Yes.

18          MR. ROGERS:  Okay.  First, the first one is simple

19  and that's the time issue.  When we had our last sidebar, I

10:01:21  20  understood Your Honor to say the plaintiffs had 15 minutes

21  left.  That was before Mr. O'Connor's rebuttal, which by my

22  time ran about 13 or 14 minutes.  And the video run we've

23  been given has nine minutes for the plaintiff, and I also

24  gather they're planning on also making another argument to

10:01:42  25  the jury.

10:01:44  1          So I think, Your Honor, just they're out of time and

2      that's the basic objection on that issue.

3              THE COURT:  All right.

4              MS. HELM:  Do you want to hear the substantive --

10:01:55  5      may I approach the podium, Your Honor?

6              THE COURT:  Yes, you may.

7              Your Honor, in addition to the video run, the

8      plaintiffs have provided us with four, I assume

9      demonstratives that relate to net profits of C.R. Bard from

10:02:26 10      2012 through 2017.  Some of them are limited to 2016 and

11      2017.  And also officer compensation for 2014 to 2016.

12              None of these slides and none of the testimony that

13      they have designated relate to the percentage of sales or

14      profits for IVC filters or relate to the percentage of sales

10:02:58 15      or profits for sales in the state of Wisconsin.

16              And in *State Farm*, the supreme court held that a

17      defendant should be punished for the conduct that harmed the

18      plaintiff, not for being an unsavory individual or business.

19      That's 538 U.S. at 422 and 423.  And in *BMW versus Gore* the

10:03:23 20      Supreme Court held punitive damages based on conduct

21      unrelated to the plaintiffs' harm enters the zone of

22      arbitrariness that violates due process.  And that's 517 U.S.

23      at 568.

24              Your Honor, we have objections for two reasons.

10:03:42 25      One, Bard, C.R. Bard, is a company that makes many, many,

10:03:47   1   many products.  By putting forth the net profits of C.R. Bard

           2   there's no way for the jury to determine what of those

           3   profits relate to the alleged harm to Ms. Hyde because it's

           4   not broken down by product.  You can't tell in here what part

10:04:04   5   of the profits occurred because of IVC filters.

           6        It also allows the jury to punish Bard and BPV for

           7   conduct outside the state of Wisconsin.  And the Ninth

           8   Circuit following *Gore* in *White versus Ford Motor Company* at

           9   312 F.3d 998 held that punitive damages must -- it's a -- the

10:04:33  10   parties are prohibited and the jury's prohibited from

          11   imposing punitive damages outside the legitimate interests of

          12   the state.  In that state it was the state of Nevada.

          13        And interestingly, in *White versus Ford*, the

          14   plaintiffs presented national sales data.  So they presented

10:04:52  15   nationwide data and the jury awarded punitives based on

          16   nationwide data.

          17        I would ask for a limiting instruction because there

          18   is some case law that says overall profits go to

          19   reprehensibility, but they can't be used to determine

10:05:11  20   punitive damages, but there is no evidence to cure the issue.

          21   So you can -- you can give a curative instruction that says

          22   while you can consider profits for reprehensibility, you have

          23   to address what happened in Wisconsin and what happened with

          24   IVC filters, but there's been no evidence presented and none

10:05:29  25   provided to us to allow the jury to make that determination.

10:05:33   1          So I don't see how a curative instruction or

       2     limiting instruction that's been done by a number of other

       3     courts would be available in this case because there's no

       4     evidence available for the jury to make that determination.

10:05:47   5          So what we're left with in this testimony -- in the

       6     testimony and in the demonstrative exhibits, is evidence that

       7     would give the jury the ability and probably maybe the

       8     incentive to punish both BPV and C.R. Bard for acts unrelated

       9     to the filter and outside the state of Wisconsin.

10:06:14  10          THE COURT:  Okay.  Thank you.

      11              Just one second, counsel.

      12          (The Court and the judicial assistant confer.)

      13              THE COURT:  Nancy tells me we have a verdict; the

      14     jury just called.  Let's go ahead --

10:06:31  15          Nancy will you tell them it will be a few minutes

      16     before -- you told them that.  Okay.

      17              Go ahead Mr. Stoller.

      18              MR. STOLLER:  I'll be quick and we'll do this in

      19     reverse order.  I'll address the constitutional argument and

10:06:44  20     say we addressed this in the jury instructions phase in the

      21     Jones trial where the defense made the same argument and

      22     wanted inclusion in the instruction in the Jones case on

      23     punitive damages that this type of information must be noted

      24     to financial -- the sale and marketing of filters in Georgia.

10:07:02  25     And we noted then that the Georgia punitive damages

instruction, like the punitive damage instruction here, had as one of the elements the net worth of the company as something the jury could consider in the award of punitive damages.

THE COURT:  Hold on just a minute, Mr. Stoller.

To follow your argument fully, I just want to look at that instruction on punitive damages.  That's Instruction A?

MR. STOLLER:  Instruction A, Your Honor.

I'm going to start -- before we get to the instruction, Your Honor, I'm going to start with the punitive damage statute in Wisconsin which is 895.043.  And under 4, Procedure, it says "If the plaintiff establishes a prima facie case for the allowance of punitive damages, A, the plaintiff may introduce evidence of the wealth of a defendant."

It's the intention of the legislature to go to the issues we're going to talk about here.  And, in fact, in the jury instruction you've given to this jury, the charge includes Item Number 7, the financial condition of the manufacturer and the probable effect on the manufacturer of a particular product.

When we addressed these issues in the jury instructions in Jones, you noted, Your Honor, you anticipated that if we were going to argue in Jones like we had in Booker

10:08:25  1    that we had to get their attention that this was not about

2    disgorgement but about having a judgment that was of

3    sufficient size to in fact be punitive to draw the attention

4    of the boardroom, as we had argued in Booker, that you

10:08:43  5    thought that was appropriate.  For that reason, you thought

6    it was inappropriate to include the limiting language they

7    wanted in the instruction in that case with limiting it to

8    Georgia.  And that's what you did there.

9          And I suggest, Your Honor, we're dealing with the

10:08:55 10   same issue here.

11         The cases *Gore* and *State Farm* don't address this

12   issue.  They don't address the question of if you're hitting

13   somebody based on their net worth.  They're disgorgement

14   issues.  And they're also more limited about the facts and on

10:09:12 15   what basis can you award punitive damages.

16         Here -- let me step back for a second.

17         *State Farm* and *Gore* don't stand for the proposition

18   that the jury has to blindly put blinders on and can only

19   look at conduct and financial information within the corners

10:09:30 20   of the border of the state.  In fact, what it says is you

21   can't go outside the state if it's unrelated.

22         But here we've almost -- I won't say almost all.

23   Significant conduct that would support an award of punitive

24   damages occurred outside Wisconsin.  And I can't -- one of

10:09:47 25   the fears I have for the limiting instruction that Ms. Helm

10:09:51 1    proposes is I think it would improperly limit the jury.

2    Decisions about how this device was going to be designed were

3    made outside of Wisconsin.  Decisions about how this device

4    was going to be aggressively marketed were made outside of

10:10:07 5    Wisconsin.  Decisions about what information was going to be

6    shared with the public were made outside of Wisconsin.

7            If we had a jury instruction that limited them to

8    looking at the sales of IVC filters in Wisconsin, we would

9    effectively be telling the jury to ignore what is essentially

10:10:26 10    the bad conduct in this case that would form the basis for

11    the punitive damage decision in the first instance.

12            On a monetary basis we're not going to argue

13    disgorgement.  We're going to argue, as we did in Booker,

14    that under Item 7 of Instruction A the jury should look at

10:10:41 15    the net worth of the company, its wealth, how much money does

16    it have, what is it going to take to get their attention and

17    what size of judgment would this jury need to render in order

18    to deliver that message.

19            THE COURT:  Okay.

10:10:56 20            MR. STOLLER:  I'll let Mr. Lopez address the timing

21    issue.

22            MR. LOPEZ:  I know we face this issue every trial.

23    This, now our third bellwether trial, when you see the time

24    as distributed between the two parties, the defense always

10:11:21 25    has time left over and we're always struggling for more time.

10:11:24  1   And my argument went ten minutes longer than I thought, than

2   I planned.  You get in that moment and you're trying to do

3   the best job you can for your client and I look up and I've

4   gone over what I planned to do to leave us 15 minutes for the

10:11:44  5   punitive damage phase.

6         I thought Mr. O'Connor needed to spend the time he

7   spent on rebuttal.  And he will admit he went three or four

8   minutes longer than he had planned.

9         Again, this is a bellwether process and we're trying

10:12:02 10  to figure out where these cases might go if both sides are

11  allowed to try the full case.  I mean, I -- that's really the

12  only comments I have other than the fact that we tried, as we

13  have three cases in a row, to fit our case within the time

14  budgeted.  And we failed to do that here.

10:12:25 15        Now, I can't do -- I can't make this proposal on

16  behalf of Ms. Murkey because she's not my client, but I feel

17  confident that I can borrow 15 minutes from the Tinlin case.

18  and give it to this case.

19        This is a bellwether process.  These people are in

10:12:52 20  it together.  Not only are they in it together as five

21  bellwether cases but they're in it for 4,000 other people.

22  I've looked at that case and knowing it's just a Recovery

23  case, we should not have the time issues that we've had.

24        Keep in mind we had to try not just Simon Nitinol,

10:13:07 25  Recovery, G2, G2X, we didn't even know -- there's an issue

10:13:12   1   whether or not this is an Eclipse case or G2X case, so that

           2   took us some extra time.

           3       I think that we can -- if we can have 15 minutes

           4   from the Tinlin case, allow us to have it here, and just know

10:13:27   5   in good faith we tried to squeeze this case into the time and

           6   the extra time -- at least time they were able to call

           7   Dr. Betensky and Dr. Parisian, but we did have one other

           8   expert we didn't call, Dr. Kinney.

           9       So I'm making an interest of -- in the interest of

10:13:43  10   justice and in the interest of the bellwether process plea to

          11   the Court to allow us 15 minutes total to argue the punitive

          12   phase of the case.

          13       THE COURT:  Okay.

          14       I think what we ought to do is get the verdict.

10:14:00  15   That will tell us whether or not these issues need to be

          16   decided.

          17       If they do, then what I want to do is talk in a bit

          18   more detail about the demonstratives you mention.  I

          19   obviously haven't seen them.  I want to go back, which

10:14:13  20   shouldn't take long, and revisit what I decided in the

          21   previous cases.

          22       So what we'll do is bring in the jury now.  If

          23   punitives become necessary, I'll explain to them that we need

          24   a bit of time to get ready for that phase and excuse them

10:14:28  25   again and we can finish our discussion on these issues.

10:14:32  1          MR. STOLLER:  Your Honor, I'll give Traci copies of

2     the demonstratives so you have them.

3          THE COURT:  Okay.

4        (The jury entered the courtroom at 10:16.)

10:18:47  5          THE COURT:  Please be seated.

6          Good morning, ladies and gentlemen.

7          JURORS:  Good morning.

8          THE COURT:  Juror Number 6, you've got the red

9     folder.  Does that mean you're the chairperson?

10:18:58 10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Would you please hand the verdict form

12    to Nancy.

13          I'm going to ask Traci to read the verdict.

14          THE COURTROOM DEPUTY:  Omitting the formal caption,

10:19:43 15    We the jury duly empaneled and sworn in the above-entitled

16    action upon our oaths find as follows:

17          A, liability.  Number 1.  Do you find by the greater

18    weight of the evidence to a reasonable certainty that Bard is

19    liable to Mrs. Hyde on the strict product liability design

10:20:05 20    defect claim?

21          No.

22          Number 2.  Do you find by the greater weight of the

23    evidence to a reasonable certainty that Bard is liable to

24    Mrs. Hyde on the negligent design claim?

10:20:19 25          No.

10:20:23  1            Signed by foreperson Juror Number 6, dated

          2   October 5th, 2018.

          3            THE COURT:  Traci, would you please poll the jury.

          4            THE COURTROOM DEPUTY:  Juror Number 1 are these your

10:20:33  5   verdicts?

          6            JUROR:  Yes, they are.

          7            THE COURTROOM DEPUTY:  Juror Number 2, are these

          8   your verdicts?

          9            JUROR:  Yes, it is.

10:20:37 10            THE COURTROOM DEPUTY:  Juror Number 3, are these

         11   your verdicts?

         12            JUROR:  Yes.

         13            THE COURTROOM DEPUTY:  Juror Number 4, are these

         14   your verdicts?

10:20:43 15            JUROR:  (Nods head.)

         16            THE COURTROOM DEPUTY:  Juror Number 5, are these

         17   your verdicts?

         18            JUROR:  Yes.

         19            THE COURTROOM DEPUTY:  Juror Number 6, are these

10:20:46 20   your verdicts?

         21            JUROR:  Yes.

         22            THE COURTROOM DEPUTY:  Juror Number 7, are these

         23   your verdicts?

         24            JUROR:  Yes.

10:20:51 25            THE COURTROOM DEPUTY:  Juror Number 8, are these

10:20:52  1    your verdicts?

2         JUROR:  Yes.

3         THE COURTROOM DEPUTY:  Juror Number 9, are these

4    your verdicts.

10:20:58  5         JUROR:  Yes.

6         THE COURT:  Juror Number 4, you nodded your head.

7    Did you say yes?

8         JUROR:  I did.

9         THE COURT:  And Juror Number 9?

10:21:04 10         JUROR:  Yes.

11         THE COURT:  I just couldn't hear.  We need to make

12    sure we've got it on the record.

13         All right.  The polling shows that the verdict is

14    unanimous.

10:21:10 15         Ladies and gentlemen, thank you for the time and

16    attention you've devoted to this case.  We know it's been an

17    inconvenience for you, but it's been a very important part of

18    our judicial process and we appreciate all the attention

19    you've paid.

10:21:24 20         If you don't mind waiting in the jury room for a

21    minute, I'd like to come back and thank you personally.

22         So we'll go ahead -- let me ask:  Counsel, is there

23    anything we need to address before we excuse the jury?

24         MR. O'CONNOR:  Nothing from us.

10:21:40 25         MR. ROGERS:  Nothing from the defendant, Your Honor.

10:21:42  1        THE COURT:  Okay.  So we'll excuse you.  I'll be

2    back in just a minute to talk with you.

3        (The jury exited the courtroom at 10:21.)

4        THE COURT:  All right.  Are there any other matters

10:22:08  5    we need to address, Counsel, before we adjourn?

6        MR. LOPEZ:  Your Honor, this is just in followup to

7    our discussions we had yesterday about the bellwether

8    process, settlement, things like that.  I had an overnight to

9    think about some of the comments you made.  I don't want to

10:22:26 10   address them now but I would like to have the opportunity to

11   file papers with you regarding that.

12        THE COURT:  Which issue?

13        MR. LOPEZ:  The issue of -- you made some comments

14   yesterday about, you know, whether a different venue with

10:22:41 15   different rulings on some of the evidence -- and basically if

16   we're going to keep trying these cases without Recovery

17   deaths and without -- the *Cisson* ruling on FDA evidence,

18   these are going to be tough cases.  I mean, the only case

19   that probably has a chance right now is the Tinlin case.

10:23:06 20        I mean, it's an uphill battle based on -- and I'm

21   not criticizing your rulings, I'm just saying we're -- that's

22   what we have in this case.

23        And I will say heretofore in state courts, other

24   federal courts, that the Recovery death evidence has come in.

10:23:28 25   *Cisson* is fairly new so we weren't really able to use that

10:23:34   1   but we now have a Fourth Circuit and Eleventh Circuit case

2   restricting FDA evidence that we just can't counter.

3        We're not -- I mean, the Mulkey case is an Eclipse

4   case and, I mean, we tried the best case we could.  I don't

10:23:49   5   regret anything we did.  This jury found for the defense on

6   the best case we could give under the circumstances.  Us

7   having to pretend like the Recovery device did not have the

8   history it had in transitioning to the other devices is

9   always -- is us not really being able to put in front of the

10:24:07  10   jury what the evidence really is.  And then for us to have to

11   sit here for the length of this trial with, you know,

12   supposition and all these implications about why the -- that

13   the FDA didn't do anything, we can't counter that.  I mean,

14   unless it's a Recovery case with all of that stuff, I just

10:24:27  15   don't think it's going to be possible for us to get a good

16   bellwether picture of what these cases are going to look like

17   if they are tried with some of that evidence in.

18        I'm not suggesting other courts aren't going to do

19   exactly what you did, I'm sure they will, and with the

10:24:48  20   reasoning, but there will be a number of others where that's

21   not going to happen.

22        Unless C.R. Bard knows what's going to happen under

23   those circumstances, the bellwether process is going to serve

24   no purpose.  It's just going to be a string of, you know,

10:25:00  25   what we've had the last two trials except -- that's why I

10:25:04   1   want Tinlin to be next.  That's the only thing that's going

           2   to encourage C.R. Bard, the defendants, to think that they

           3   might have a problem and to settle these cases.  Or if we can

           4   expedite getting some of these other cases to trial.

10:25:18   5          The cases where -- the Delaware -- we had a case in

           6   Delaware where the judge took out basically the FDA evidence,

           7   Recovery deaths.  Of course that was a Recovery case.  But

           8   that case settled.

           9          Mrs. Tinlin deserves an opportunity to have her case

10:25:35  10   be in the same position as other Recovery cases.  And for me

          11   to ask this woman who's -- I hope she makes it healthwise to

          12   May.

          13          But, anyway, I want to be able -- I'm a little

          14   emotional right now, obviously, Your Honor, about this

10:25:50  15   verdict.  I want to be able to give you a better historical

          16   perspective about this case from the beginning and why delay

          17   is not going to serve anyone's purpose except C.R. Bard's and

          18   not really do anything for the plaintiffs.

          19          THE COURT:  Mr. Lopez, you absolutely can file that

10:26:06  20   memorandum, and defendants can respond.

          21          I would ask you to do that sooner rather than later

          22   because your arguments, if accepted, would affect what we're

          23   doing in February and we all need to know that sooner rather

          24   than later.  So don't wait three or four weeks to do this.

10:26:24  25   If you can, get it filed as soon as possible.

10:26:26  1          Whenever it's filed, if defendants can respond

2    within a week, I'll be happy to look at those issues.  And if

3    I think we need to, we'll get you on the phone and we can

4    talk about it.

10:26:35  5          MR. LOPEZ:  Appreciate it, Your Honor.  Thank you.

6          THE COURT:  Thank you all.

7          ALL:  Thank you, Your Honor.

8       (End of transcript.)

9                    *  *  *  *  *

**C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 6th day of October, 2018.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter