1
2
3

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

4
5
6

**In Re: Bard IVC Filters**                    ) MD-15-02641-PHX-DGC
Products Liability Litigation       )
                                    ) Phoenix, Arizona
                                    ) **October 4, 2018**
_____)

7
8
9
10

11      **BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

12           **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

13              <u>**CASE MANAGEMENT CONFERENCE**</u>

14
15
16
17
18
19
20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2    For the Plaintiffs:

3            Lopez McHugh
             By: **RAMON R. LOPEZ**, ESQ.
4            100 Bayview Circle, Suite 5600
             Newport Beach, CA  92660
5
             Gallagher & Kennedy
6            By: **MARK S. O'CONNOR**, ESQ.
             By: **PAUL L. STOLLER**, ESQ.
7            2575 East Camelback Road, Suite 1100
             Phoenix, AZ  85016
8
             Heaviside Reed Zaic
9            By: **JULIA REED ZAIC**, ESQ.
             By: **LAURA E. SMITH**, ESQ.
10           312 Broadway, Ste. 203
             Laguna Beach, CA  92651
11
             Goldenberg Law PLLC
12           By: **STUART GOLDENBERG**, ESQ.
             By: **MARLENE GOLDENBERG**, ESQ.
13           800 LaSalle Ave., Ste. 2150
             Minneapolis, MN  55402
14
             Lopez McHugh, LLP
15           By: **JOSHUA MANKOFF**, ESQ.
             1 International Plaza, #550
16           PMB-059
             Philadelphia, PA 19113
17

18

19   For the Defendants:

20           Nelson Mullins Riley & Scarborough.
             BY: **JAMES F. ROGERS**, ESQ.
21           1320 Main St.
             Columbia, SC  29201
22

23           Snell & Wilmer
             By: **JAMES R. CONDO**, ESQ.
24           400 East Van Buren
             Phoenix, AZ  85004
25

1                    **A P P E A R A N C E S**   **(CONTINUED)**

2

3       For the Defendants:

4               Nelson Mullins Riley & Scarborough
                By: **RICHARD B. NORTH, JR.,** ESQ.
5               By: **MATTHEW B. LERNER,** ESQ.
                By: **ELIZABETH C. HELM,** ESQ.
6               201 17th Street NW, Suite 1700
                Atlanta, GA  30363

7

8               C.R Bard, Inc.
                Associate General Counsel, Litigation
9               By:  **CANDACE CAMARATA,** ESQ.
                730 Central Avenue
10              Murray Hill, New Jersey 07974

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **P R O C E E D I N G S**

2

3            THE COURT:  Please be seated.

4            Morning, everybody.

11:01:49 5            EVERYBODY:  Morning, Your Honor.

6            THE COURT:  We set this time to talk about scheduling

7     and other matters related to the bellwether trials that

8     remain, plus a few additional issues.

9            Let me tell you the issues that I identified that we

11:02:18 10    ought to talk about.  We need to decide which plaintiff is

11    going in the February bellwether trial, Mulkey or Tinlin.  We

12    need to decide whether Ms. Mulkey looks like she's going to

13    be able to have a trial by May.  If not, then we need to find

14    another bellwether plaintiff for her.

11:02:40 15           I indicated in an order that was entered a few

16    months ago that we will talk about whether there should be a

17    sixth bellwether trial in this MDL since the Kruse case was

18    eliminated by summary judgment.

19           We need to set the schedule for what's going to

11:02:57 20    happen before the February and May trials.

21           We need to talk about the Simon Nitinol cases.  And

22    I've read the two submissions from the parties on those.

23           I want to talk to you a little bit about the form of

24    jury instructions that you submit.

11:03:11 25           We probably ought to talk about the motion to seal

11:03:13   1   issue for the Hyde case as well as the Jones case.

2   By the way, on an issue that came up during the

3   trial, which was whether the Jones redactions applied in

4   Hyde, I noticed -- actually, Jeff noticed and pointed out to

11:03:28   5   me that we addressed that at the final pretrial conference in

6   this case and I entered an order saying that Jones redactions

7   apply in Hyde.  So that was a matter that we covered then.

8   We probably ought to talk about whether that is true

9   for the next trial as well so there's no ambiguity on

11:03:47  10   redactions.

11   Those are the issues I've identified.  Do you have

12   others you think we ought to put on the list?

13   MR. NORTH:  Nothing for the defendant, Your Honor.

14   MR. LOPEZ:  Nothing for the plaintiffs, Your Honor.

11:03:59  15   THE COURT:  Okay.  Let's talk then, first, about

16   which case should be tried in February.

17   Plaintiffs' counsel, what are your thoughts?  Among

18   other things, you were going to check where Ms. Mulkey is in

19   terms of her condition.

11:04:26  20   MR. LOPEZ:  Well, I mean, I'm looking at your CMO

21   Numbers 36.  I think we've been -- at least I know from the

22   plaintiffs based on that CMO that Tinlin was already in place

23   to try in February.  But maybe I read it wrong.  It says "The

24   Court will plan to try the Tinlin and Mulkey cases in February

11:04:49  25   and May."

11:04:52    1          THE COURT:  Read the next sentence.

        2          MR. LOPEZ:  "The Court will decide the order of the

        3    trials" -- Okay.

        4          THE COURT:  I think that was left open.

11:05:01    5          MR. LOPEZ:  And we should discuss it because when --

        6    you gave a scheduling order for the Tinlin case.

        7          So we've tried a G2 case, we've tried an Eclipse

        8    case, and we've tried maybe a G2 -- well, we certainly tried

        9    a G2X case.  Whether or not that's where that comes out on a

11:05:19   10    product ID issue, we're still waiting for that.

       11          We need to try a Recovery case.

       12          I know counsel will be quick to point out that the

       13    Recovery cases only make up about 11 percent of the docket,

       14    but from a global perspective, historically from what's

11:05:41   15    happened in the past cases and just looking at the evidence

       16    and the injuries that happened with the Recovery, and,

       17    frankly, the potential for the plaintiff, and I don't want

       18    anyone to quote me on this because people that are trying to

       19    settle G2X and G2 and Eclipse cases are going to say why did

11:06:02   20    you say it, but I'm going to say it.  11 percent of the cases

       21    are probably 50 percent of the value the global litigation.

       22    I mean, the Recovery cases simply have more value for a

       23    number of reasons.  Mainly because of the liability case,

       24    potential for punitives and, frankly, the damages that are

11:06:19   25    caused by the Recovery.

11:06:22  1          If we want to get a true bellwether snapshot of

2     these cases, I think we have to try a Recovery case.

3          THE COURT:  Mr. Lopez, not to interrupt, I've already

4     agreed with you on that, that we should try a Recovery case.

11:06:36  5     That's why we put Tinlin in.

6          MR. LOPEZ:  But I think it should be the next case.

7          THE COURT:  The question is which do we take next,

8     because we're going to try them both.

9          MR. LOPEZ:  I understand.  I think the next should be

11:06:45 10     a Recovery case.  We don't need to try an Eclipse case next.

11     I think we need to try a Recovery case to get a better idea of

12     where we are on four different products.  I don't think it's

13     going to do us much good from a bellwether standpoint to try

14     another Eclipse case.

11:07:04 15          THE COURT:  Are you saying we shouldn't try Mulkey?

16          MR. LOPEZ:  Maybe.  Yeah.  I think I might be saying

17     that.  If the purpose of this process is to get the parties to

18     kind of get a feel for what's going to happen if you launch

19     all these cases back to the transferor courts, I think it may

11:07:30 20     not -- we may not have to try another Eclipse case.  I think

21     we need to see what an Arizona jury's going to do under your

22     guidance with a fourth case.  I mean a fourth model, and that

23     being the Recovery.

24          You know, one of the things I will say, Your Honor,

11:07:48 25     we addressed this last time we were before you, the cases are

11:07:51 1    settling as they get close to trial in state courts.  And

2    there's been G2, G2X cases, couple Recovery cases that have

3    settled.  And I think if this case is going to resolve

4    globally, we either have to start talking about that now on a

11:08:07 5    G2 and Eclipse, and maybe after this verdict a G2X case.  We

6    know how we're each going to try those three cases and we

7    know kind of what the feel of that case is and where -- what

8    might happen to those cases if we do start trying those cases

9    outside of the MDL.

11:08:29 10         These -- all these cases do not have to be remanded

11    at the same time.  We know what a G2 case will do at least in

12    a bellwether process, an Eclipse case, and soon we'll find

13    out what's going to happen with a G2X case.

14         I think, unless counsel wants to engage in

11:08:45 15    discussions about G2 and Eclipse cases now, because we've got

16    two bellwether cases that have gone to verdict, both we've

17    both seen each other's -- we didn't hold anything back, we

18    put everything on the table as to how those cases are going

19    to be tried.

11:09:02 20         Either those cases are going to settle because of

21    the experiences we had with those two bellwether trials or

22    they're not.  And to keep trying them here is not going to

23    change anybody.  It's not going to change what's going to

24    happen here with respect to is there going to be a settlement

11:09:18 25    here before you have to remand those cases.

11:09:21   1          And I -- I think we either engage in some kind of

2     global discussion about G2 and Eclipse cases, and potentially

3     a G2X case, or we just remand them.

4          I mean, I'd rather spend -- I shouldn't say it this

11:09:38   5     way.  Not rather.  But I think it would be a good thing for

6     us to spend our time educating 300 plaintiffs lawyers, or

7     however many remain now being in this MDL, how to try these

8     cases, especially for a G2 and Eclipse case.

9          As far as Recovery cases, those cases are settling.

11:10:00  10     I mean, they're getting close to the courthouse steps.  We

11     can't share with you how they're settling, but they're

12     settling for values that are allowing them to settle without

13     trial.

14          If the defense thinks we need to try a Recovery case

11:10:18  15     to figure out what position they're going to take and what

16     values they want to continue to put in those cases, then we

17     ought to try one.  Or we ought to maybe use the experience

18     we've had on already litigating -- the Judge Jones case that

19     we tried was a Recovery case.  11 days in trial.  And that

11:10:35  20     case settled four years ago.  And there hasn't -- and until

21     another Recovery case gets to the courthouse steps, they

22     don't settle.  So either they want to settle Recovery cases

23     because we've had that experience or we ought to try one here

24     and see whether or not that moves them or us to have -- we're

11:10:54  25     ready to talk about all these cases.  It's just really a

11:10:58   1   matter of what the defense is going to do.

2        I remember Mr. North said sometimes near the end of

3   the year we have this gap between now and February.  At the

4   very least we should either convince you that the cases can

11:11:10   5   or cannot settle here as far as G2 and Eclipse case, or, like

6   you said, they have to be remanded.  And I think that that's

7   what's going to have to happen to get these cases resolved --

8   lot of these cases, Your Honor, are five, six years old.

9        And if -- if defendants' strategy is to wait until

11:11:32  10   we get trial dates, then we need to go get trial dates for

11   these people, as opposed to going through a process that

12   maybe is not going to really mean anything to them as far as

13   coming together and dealing with the mass of cases that have

14   been filed here.

11:11:46  15        THE COURT:  Okay.

16        MR. LOPEZ:  So I'm strongly advocating that if we try

17   another case, it has to be Recovery case.

18        THE COURT:  Okay.

19        MR. NORTH:  Your Honor, if I could come to the

11:11:54  20   podium.

21        Your Honor, we are committed to this bellwether

22   process.  I think that we, both parties and the Court, years

23   ago came up with this process to try to determine values of

24   cases for global settlement.  We think it's important to take

11:12:15  25   this process to conclusion.  For a number of reasons.

11:12:18  1        Mr. Lopez says, well, we've tried a G2, we've tried

2    a Eclipse, we know what those are worth.

3        The problem is the identity of the filter involved

4    in a case is only one data point.  All we've tried are

11:12:34  5    fracture cases here.  Three fracture cases.  The latest data

6    we have, through August 17 of this year, is that 20 percent,

7    I think 20.4 percent, of the cases in this MDL involve a

8    fracture.  Less than .4 percent involve a migration.  And the

9    rest are much more less intrusive, less serious injuries.

11:13:01  10       Well, we're only trying the most severe cases, the

11   fracture cases.  And we think it's very important to try at

12   least one case where you don't have sort of more dramatic

13   injury.  And that would be the Mulkey case.  Which represents

14   80 percent of the case inventory.

11:13:19  15       We think it's important to try that case just like

16   they think it's important to try a Recovery filter case.

17   Which, unlike Mulkey representing 80 percent of the

18   inventory, Recovery cases represent about 9 percent of the

19   inventory.

11:13:35  20       But we understand the Court's reasoning and

21   plaintiffs' reasoning for wanting to include that.

22       We think this process needs to go to conclusion.

23       Your Honor, as far as us not settling until the

24   courthouse steps, that is wrong.  We've had meaningful

11:13:49  25   settlement discussions in a number of cases that Mr. Lopez

11:13:52    1    was not involved in.  We tried the Maricopa County -- settled

2    the first four Maricopa County cases that were set in front

3    of Judge Brodman approximately three months before the trial

4    date.  At least two months before the trial date.  We settled

11:14:08    5    another case at least two or three months before the trial

6    date.

7                Now, as far as Ms. Mulkey goes, Mr. Lopez did not

8    address the Court's original question, which was what is her

9    health condition.

11:14:20   10                We have obtained all the medical records we can thus

11    far and they suggest the following:  Ms. Mulkey reported

12    these symptoms of fainting last spring.  She went through an

13    extensive battery of tests this summer.  Tilt test, all sorts

14    of cardiac tests, all sorts of everything.  All the test

11:14:44   15    results were normal.  None of the medical records we have

16    been able to obtain indicate any diagnosis.  And there could

17    be some later medical records that we have not obtained yet,

18    but everything that we've seen shows that she has not had an

19    episode like this since the spring.

11:15:01   20                Again, I'm just telling you what we can tell from

21    the records.

22                She has not been diagnosed with anything because --

23    as far as we can tell, because all of the test results are

24    normal.

11:15:12   25                Now, the plaintiffs have come into this court in the

11:15:14  1    past and said that her doctors did not want her to travel.

2    That does not seem to be quite the case from the records.

3    There's actually a medical record where the doctor

4    memorialized a conversation where her attorney, it's not one

11:15:29  5    of the lead attorneys but her attorney called and said "Can

6    she really travel for this trial?"  And the doctor said "I

7    can't tell you until we get these test results back," was all

8    he said.  There's no travel ban in there.

9              So unless they have some new medical information

11:15:49  10   that we have not been furnished, we believe she should be

11   ready for trial.

12             And we also believe that it is very important, as I

13   said earlier, that we try at least one bellwether case that

14   does not involve a fracture like the previous three and like

11:16:05  15   Ms. Tinlin.

16             Now, if I can go to the Tinlin case just a minute,

17   Your Honor, there are other issues that I think militate

18   against trying the Tinlin case in February.  And would

19   suggest it ought to be in May.

11:16:20  20             And that's the fact that this Court, with the

21   agreement of the parties, I think, imposed a very aggressive

22   discovery schedule to get Tinlin ready.  Well, thus far, Your

23   Honor, that schedule is simply not working.  And I must say,

24   through no fault of my team, in my view.

11:16:40  25             We have obtained all of the medical records as fast

11:16:43 1   as we can.  There are some records right now that the medical

2   record collection company has but we can't review because the

3   orders, previous orders, give the plaintiffs ten days to

4   review those records before they can be turned over to us

11:16:59 5   once they're obtained.  We've contacted them several times in

6   the last ten days to ask them to waive that ten-day time.

7   We've heard no response.

8        The scheduling order also requires us, in reviewing

9   the records, to identify any physicians that we want to

11:17:16 10   depose.  It required us to do so and required those

11   depositions to be taken by October 5th.

12        We made a request beginning on September 18th

13   identifying the doctors we wanted to depose.  And we can't

14   call the doctors.  Under the scheduling order, we have to

11:17:36 15   tell the plaintiffs who those doctors are and they call the

16   doctors.

17        We advised them on September 18th.  My team has

18   written at least two follow-up or three follow up e-mails

19   asking them, please give us dates.  I had a telephone

11:17:51 20   conversation with Mr. O'Connor saying we need these dates.

21        We are now on October 4th, two and a half, three

22   weeks later, and we don't have any dates for these

23   depositions.  They were supposed to have been completed by

24   yesterday -- I mean tomorrow.  Mr. O'Connor approached me

11:18:10 25   last week and said we need a two-week extension because they

11:18:14  1   were supposed to designate their experts on September 28th.

2   And I've never been one, and don't intend to ever be one, to

3   deny the other party reasonable extension.

4           And I told Mr. O'Connor, I said that's fine, but we

11:18:28  5   need to delay this October 5th deadline, too, to get these

6   depositions scheduled so we can get them done.  He agreed.

7           We put in that order that the Court signed that that

8   deadline would be changed to October 19.

9           Well, here it is October 4 and we still don't have

11:18:47 10   dates for these depositions.  And the odds of getting dates

11   from busy doctors by the 19th is very difficult.

12           And then all of the other deadlines for Tinlin build

13   upon that deadline.  It's difficult for our experts to

14   prepare detailed reports, the sort that we can then have them

11:19:06 15   testify, without an understanding of present medical

16   condition.

17           THE COURT:  Do you know the date I entered the order

18   extending the dates?  Or the docket number.

19           MR. NORTH:  Yes, Your Honor.  It is Docket 12759.

11:19:43 20           THE COURT:  Would you print that, please, Traci.

21           Go ahead, Mr. North.

22           MR. NORTH:  Under that, as the Court will see, the

23   parties are supposed to have completed depositions by

24   October 19.  Again, as I mentioned, we've been requesting

11:19:55 25   those depositions, we've identified the doctors, they've had

11:19:58  1   that information since the 18th of September.

2        I understand everybody's busy with trial.  But my

3   point is I don't believe this Tinlin schedule is going to

4   work to have the case to get through motions, any *Daubert*

11:20:11  5   motions that might be appropriate, any motions for summary

6   judgment that may be appropriate, until we get this discovery

7   completed.  And it's not off to a good start.

8        So far all those reasons, Your Honor, we believe

9   it's appropriate to try the Mulkey case in February.

11:20:31 10        Do you want to look at that?

11        THE COURT:  No.

12        MR. NORTH:  Try the Mulkey case in February and

13   followed by the Tinlin case in May.

14        Now, if Ms. Mulkey's attorneys come back and say she

11:20:42 15   cannot testify still, we would ask the Court just for the

16   opportunity to verify that, and with a short telephone

17   deposition of her physicians, if there's some report to us

18   from the attorneys that she cannot testify.  Unless they have

19   a medical record that states that.  Because right now her

11:21:02 20   medical records do not indicate anything about her being

21   unable to travel.

22        THE COURT:  Okay.  Thanks.

23        Give me just a minute to look at this order.

24        All right.  Plaintiff's counsel, would you please

11:22:07 25   respond.

11:22:08  1        MR. LOPEZ:  Yes, Your Honor.  First on Mulkey, you're

2   right, I forgot to address Mulkey.  I have to actually read a

3   text from Mr. DeGreeff.

4        "Just talked to Debbie Mulkey.  This is my

11:22:23  5   understanding of her current status, but I did not have a

6   chance to speak with the doctor.  The neurologist did not

7   find any neurological problems.  Debbie has been released at

8   this point by a neuro on sort of a, quote, wait and see, end

9   quote, basis.  If she has another significant episode, she

11:22:38  10   may have to go see other specialists."

11        So that's it.  I mean, I agree that's probably --

12   there's probably not a medical reason any more -- I don't

13   want to speak for her and I read you verbatim what I got from

14   Mr. DeGreeff.  And I don't think that really is the issue,

11:22:55  15   whether or not her case can be ready before Ms. Tinlin's.

16        Mr. North's right, we asked for an extension.  We're

17   in the middle of trial and we wanted to make sure that the

18   right people put -- I know -- I was going to address that

19   today with them.  I'm working on the Tinlin case today.

11:23:12  20   October 19th is not here yet.  And I think Mr. Stoller just

21   sent an e-mail to folks that are working on it.  We probably

22   can have a report to them by the end of the day.

23        But I think we ought to talk about something that's

24   maybe the issue we should be more focused on.  Number one is

11:23:31  25   we put a lot of work into the Kruse case and that case was

11:23:37  1    getting ready for trial and, of course, the Court ruled on

2    the motion for summary judgment.  The same motion is pending

3    in the Mulkey case.

4         If that -- it could be that that might be something

11:23:50  5    we need to address sooner rather than later, Your Honor,

6    because if that case -- if you're going to rule on the

7    statute on the Mulkey case like you did in Kruse -- I don't

8    know what the issues are so I can't -- but I think that's

9    something -- we don't want to have that case be marched into

11:24:05 10    trial if in fact it's going to get dismissed because of the

11    statute of limitations.

12         There is a practical way for us to deal with

13    everything Mr. North said and still satisfy what I think is

14    the most important thing in a bellwether process, and that is

11:24:22 15    to get a better global picture of these cases, including a

16    device that has not been tried yet.

17         I don't think there should be a fourth bellwether.

18         I don't think anyone is going to learn anything from

19    trying another Eclipse case.  We know what the Eclipse

11:24:36 20    case -- they tried an Eclipse case here.  Values, you know,

21    that's just at matter of getting -- people getting in a room

22    and figuring that out.

23         THE COURT:  But, Mr. Lopez, what is your response to

24    his point that we need to try a non-fracture case?

11:24:58 25         MR. LOPEZ:  Well, Kruse was a non-fracture case,

11:25:01  1    right?  Oh, it was migration.  It was irretrievable.  Of

2    course it got kicked on the summary judgment motion.

3         I don't think that's necessary, Judge.  I really

4    don't.  To spend the kind -- I mean, those are the kind of

11:25:18  5    cases, I know, in an MDL when people have a lot of cases,

6    those settle with the cases that have larger value.

7         I mean, people -- sitting alone, people aren't going

8    to spend the kind of money we spend in these cases to try

9    these cases.  That's the kind of case where we send that back

11:25:40  10   to the transferor court.  Everything's going to be tried by

11   videotape because they're not going to be in Phoenix.

12   They'll probably have to do de bene esse depositions of all

13   these experts.  They can't be everywhere.  And it just

14   simplifies the economies of the cases being tried.

11:26:00  15        So if we try a non-fracture case and for some

16   reason -- and that case gets a verdict that is higher than

17   maybe they would have paid in settlement, that's not going to

18   set a new value for them to settle those cases.  It's not.

19   They're going to put people to the test of spending the kind

11:26:14  20   of money you have to spend on a case like that in order to

21   either drive the value down or not.  That's just the

22   practical reality of what happens with these cases.

23        So everyone knows that a non-fracture case does not

24   have the same value as these cases that are going to trial

11:26:32  25   that have larger injuries.  I don't think we're going to

11:26:35  1    learn anything from that.  And I don't think it's going to

       2    move the defendant to do anything different than they might

       3    have done had we not tried one of those.

       4         In other words, whether they get a low-value verdict

11:26:48  5    or defense verdict and somehow or other those cases bring a

       6    value here that is much higher than they think those cases

       7    are worth in settlement, it's not going to change their

       8    opinion about those cases.  They're going to have to continue

       9    to have certain value for those cases.

11:27:04 10         And I just think that, you know, this case didn't

      11    start in 20 -- what is it 15 we got sent to MDL?  Been three

      12    years.  There's a lot of history and there's been a lot of

      13    history since.  I just don't think there's much to be learned

      14    here from the standpoint whether or not you need to remand

11:27:24 15    the cases.

      16         THE COURT:  Well, let me -- let me -- let's talk

      17    practical timing for a moment.

      18         Under the extension that's been granted, updated

      19    medical records are to be identified -- actually, are to be

11:27:46 20    obtained and any new treaters identified by October 12th.

      21    Plaintiffs -- I'm sorry.  Physicians and fact witnesses to be

      22    deposed by October 19th.

      23         Plaintiffs' case-specific experts are due on

      24    October 12th.  Defendants' case-specific experts are due on

11:28:10 25    November 9th.

11:28:13  1          The parties didn't ask for a change on the

       2   deposition deadline for case-specific experts, so that is

       3   still November 16th, which is seven days after defendants'

       4   expert reports are due.  Is that feasible?

11:28:32  5          MR. LOPEZ:  We're working on it.  We're working hard.

       6   I think it is, yes.

       7          THE COURT:  How many plaintiff-specific experts will

       8   there be?

       9          MR. O'CONNOR:  I can address that.

11:28:40 10          What did we say, Paul, three or four?

      11          We think about five.

      12          THE COURT:  So if you have five plaintiff-specific

      13   experts and the defendants have counter-experts, that's eight

      14   or ten depositions.  How are you going to get that done in a

11:29:05 15   week?

      16          MR. LOPEZ:  Well, two are economists; right?  And

      17   three are the same -- three of the same people that have been

      18   testifying --

      19          THE COURT:  Are they going to need to be deposed?

11:29:15 20   Are you waiving depositions on the experts?

      21          MR. LOPEZ:  No.

      22          THE COURT:  Then all that's going to have to happen

      23   under this schedule between October -- I'm sorry, November 9th

      24   and November 16.

11:29:25 25          MR. LOPEZ:  Like I said, we're working on that and

11:29:27  1   we'll make it happen.

2          THE COURT:  Mr. North.

3          MR. NORTH:  Your Honor, that's the problem.  We were

4   committed to give them the extension to try to make that

11:29:37  5   happen, but there's no way now that we're going to even meet

6   this October 19th deadline.

7          There are medical records sitting at Marker, the

8   group that collects them.  We can't get a response to them to

9   waive the ten-day period so we can look at them.  We can't --

11:29:51 10   we've identified the doctors we want to depose three weeks

11   ago based on the records we have.  We're waiting for other

12   records for them to release those to us to see if there are

13   more.

14          I don't see how the doctors we need to depose can be

11:30:04 15   deposed when they don't have dates for them and they're

16   supposed to be deposed in 15 days from today.

17          I mean, it's logistically very difficult.  How many

18   experts we need?  Probably two or three.  But until we see

19   these medical records -- and her condition, as the Court

11:30:21 20   knows, is very complex because of very debilitating MS, and

21   the issues as far as differentiating between this complex

22   medical condition and any injury from the filter puts this

23   case at a whole different level as far as medical issues.  We

24   just don't see how these deadlines are going to work.  We're

11:30:44 25   committed to trying, but at this point I'm not sure that's

11:30:46   1   enough.

2           THE COURT:  Plaintiffs' counsel, is it true you were

3   asked for dates for physician depositions on September 18th

4   and still have not provided them to defense counsel?

11:30:57   5           MR. LOPEZ:  We were in the middle of trial.  There

6   were others -- that's when we went to Mr. North and said we're

7   the ones that need to deal with that, can you give us a

8   two-week extension.  I know that's being worked on.

9           But, Judge, let me say this.  They can have all the

11:31:12  10   time they want.  I don't care if we're taking defense expert

11   depositions a week before trial.  I really don't.

12           If they think they're prejudiced by this and they

13   want to move these things so they have more time, give us an

14   opportunity to fulfill the new schedule, like I said we're

11:31:27  15   working on it.  I don't see any reason we can't get that

16   done.

17           If they're concerned about their response, they can

18   have all the time they want.

19           The other thing I was going to suggest, Judge, I

11:31:37  20   don't know where you are on this, if we need a fifth

21   bellwether, I don't think we do.  I really don't.  I think

22   from my perspective I need to speak for a lot of people.

23   They want their cases to either resolve or they want their

24   cases to go back so they can get them marching towards a

11:31:54  25   trial date and try the case.  And I'm not even sure how much

11:31:56  1    attention they're paying to what's happening here other than

       2    waiting to see if the cases settle here.  And we're not

       3    gathering that much more information than already existed in

       4    these cases.

11:32:10  5              THE COURT:  I understand your point on that.

       6              MR. LOPEZ:  So I would suggest this --

       7              THE COURT:  Let me introduce another complication.

       8         I came in here this morning intending to compress

       9    the schedule for the February trial, not expand it.

11:32:21 10         Under the current schedule we don't finish *Daubert*

      11    and motion for summary judgment briefing until January 11.

      12    That's too late for me.  I'm going to be in criminal trials

      13    starting the next Monday until the start of the bellwether

      14    trial.  I've got them double booked.  I'm not going to have

11:32:36 15    time to work on motions for summary judgment and *Daubert*

      16    motions.

      17         So I was going to tell you we need to compress the

      18    schedule so we can get all of the briefing done by the end of

      19    December.  That means moving the motions even earlier, which

11:32:51 20    sounds like it's going to clash with the extended discovery

      21    that's going on.

      22              MR. LOPEZ:  Well, what I was going to suggest is

      23    this:  We don't need a May bellwether trial date.  That's my

      24    opinion.  That's what I'm saying to you.  And if you -- based

11:33:07 25    on your schedule, based on what counsel said about being

11:33:10  1    jammed up, the best way to resolve this is make this the last

2    final bellwether and move it to March.  Or move it to --

3         THE COURT:  I can't try it in March or April.  Those

4    months are fully booked.  Only time I have available for

11:33:24  5    bellwether trials in this case are February and May.  So if we

6    don't try a case in February, we don't try a case until next

7    May, which, to me, makes no sense.

8         MR. LOPEZ:  No, I agree.

9         THE COURT:  Let's see --

11:33:44  10   MR. LOPEZ:  I understand you're shortening the

11   schedule.  From the plaintiffs' perspective we don't think

12   it's beneficial to this MDL or this process to try, number

13   one, to get involved in maybe discovering a case where we

14   didn't know where Your Honor's going to be on the MSJ on the

11:34:01  15   statute.  So if that -- if you rule against the plaintiff on

16   that, then Tinlin is the next case and it will be a May date.

17        I mean, I would prefer that if this -- if the idea

18   of maybe dealing with the G2 and the Eclipse cases is not

19   something counsel's interested in or you're interested in

11:34:23  20   remanding, that we have a hiatus, we try a Recovery case in

21   May.  Because I don't think the Mulkey case is going to teach

22   anyone anything.

23        THE COURT:  Let's come back to that.  I want to talk

24   about a couple of other issues.

11:34:44  25        MR. LOPEZ:  Your Honor, I'm sorry.  Ms. Reed Zaic

11:34:48   1   wanted me to tell you that, and she's the one who's in charge

           2   of all this, we will shorten our MSJ and *Daubert* responses to

           3   meet your schedule.

           4              THE COURT:  Okay.

11:34:58   5              Let's talk about the Simon Nitinol cases.

           6              Plaintiff filed a memorandum which said that a

           7   portion of the cases are going to be dismissed.  I think 31

           8   cases will be dismissed.  Plaintiffs are going to seek remand

           9   of 39.  And then there's a handful which plaintiffs don't

11:35:28  10   take a position on yet.  10 cases.

          11              Defendants are of the view that the cases that

          12   otherwise would be remanded should not be remanded because

          13   that would simply result in discovery in 39 cases in

          14   different districts and that they should either be made part

11:35:49  15   of this MDL or a new MDL.

          16              What is plaintiffs' view on that issue?

          17              MR. LOPEZ:  Well, I mean, I'm sure you don't want us

          18   to start over with the discovery in a different product here

          19   because it was never intended to be an MDL for the SNF

11:36:12  20   devices.

          21              Sounds to me like counsel may want to move -- if he

          22   wants to consolidate those cases he's probably right, they

          23   probably should move for another MDL and have those cases

          24   transferred to a different MDL.  I mean discovery in that

11:36:26  25   case is completely different than the discovery in this case.

11:36:30  1    There will be some crossover, but we've not discovered the

      2    Simon Nitinol case as a case that we would try if there are

      3    obviously some discovery issues that are relevant to the

      4    later cases.  But I think --

11:36:48  5              THE COURT:  Let me ask you this question, Mr. Lopez.

      6    If Simon Nitinol cases were to be made a part of this MDL,

      7    this is going to be a question for you, as well, Mr. North,

      8    they'd clearly have to be put on a separate track from all of

      9    the retrievable filters.  We'd be starting with basic

11:37:06 10    discovery again.  I think it would be a shorter track because

     11    there aren't as many filters at issue.  But we're still

     12    looking at a discovery period that would take us out a year

     13    before we start talking about bellwether trials in Simon

     14    Nitinol cases.

11:37:26 15              If we were to do that, would we need to appoint

     16    different lead counsel and plaintiffs steering committee for

     17    those cases because I didn't see your firm on any of the

     18    Simon Nitinol cases listed in the report.

     19              MR. LOPEZ:  Actually, I was thinking -- as you were

11:37:43 20    saying it, I was thinking that anyway.

     21              So I would say that -- I would say yes, however I

     22    would at least stay involved from the standpoint of helping

     23    whoever those people might be to help navigate through the

     24    process based on my historical perspective of what's happened

11:38:09 25    the last three years.

11:38:10 1          I certainly would not want to stay on as lead

2     counsel in a case where we have no cases and we're not -- and

3     we're not prosecuting those cases anywhere.

4          I can't even tell you off the top of my head who

11:38:24 5     those lawyers are.  Ms. Reed Zaic was kind enough to take

6     that project and run with it, and she's the one who brought

7     it to where it is now.

8          I would say, yes, Judge, you probably have to have

9     someone at least in addition to Mr. O'Connor and I where

11:38:46 10     Mr. O'Connor and I would probably not be very actively

11     involved and probably more involved for your benefit more

12     than the benefit of whoever the plaintiffs' lawyers might be.

13          So something I haven't thought about, to be honest.

14          THE COURT:  There is a listing of Gallagher Law Firm

11:39:09 15     for some of these.  Is that different from Gallagher --

16          MR. LOPEZ:  Yeah, that's different.  That's a Texas

17     firm.

18          THE COURT:  Okay.  Mr. North, it sounds like if we

19     keep the SNF here, we start a new MDL proceeding with new lead

11:39:23 20     plaintiff's counsel, we start from scratch on -- well, not

21     from scratch, but almost from scratch, on SNF discovery,

22     there's been virtually none of that.  And we're looking at

23     another two- or three-year track in this MDL with the SNF

24     cases.

11:39:39 25          Do you see it differently?

11:39:41    1            MR. NORTH:  Your Honor, I do think we'd start way

2       back sort of at the beginning.  I agree with that.  I do

3       believe the process for these cases would be -- would not take

4       as long.  First of all, there aren't as many cases.  Secondly,

11:39:54    5       90 percent of the discovery has already been produced as to

6       what is available with the Simon Nitinol.  I'm not sure that

7       there's huge universe of stuff that hasn't been produce.  So I

8       think we could move much more quickly.  Plus only 40 cases

9       right now.  It's not an --

11:40:14   10            THE COURT:  But --

11            MR. NORTH:  -- deal --

12            THE COURT:  -- right now.  There were 40 cases -- 49

13       cases when we started this MDL.

14            MR. NORTH:  Fair enough.  And a new wave of

11:40:26   15       advertising.  I have to get that in.

16            Your Honor, it's a difficult situation.  They

17       filed -- not these folks here, but people have filed these

18       cases here.

19            When we brought this up our hope was, like 60 of

11:40:40   20       them, that people would just dismiss these cases.  But

21       there's some people that want to prosecute them.  I think the

22       statute of limitations will have run on the vast majority of

23       them.  But 40 people are saying we want to keep going.

24            It puts us in a very difficult situation.  We don't

11:40:58   25       want to go back to 40 different jurisdictions throughout this

11:41:02   1   country and duplicate the discovery.  It's antithetical to

           2   the purpose of an MDL.  So that's why we think, as much as we

           3   don't like it, we have no alternative to either seek new MDL

           4   or have this MDL expanded.

11:41:18   5           And, frankly, Your Honor, I think that would be your

           6   choice.  I mean, we would file the motion with the JPML

           7   asking for either/or.  Our preference would definitely be,

           8   because of your historical knowledge, to stay here.  And as I

           9   understand the process, the JPML would then contact you and

11:41:34  10   say what do you want to do?  And it would ultimately be your

          11   choice.

          12           THE COURT:  I turned down a new MDL this week.  I

          13   did.

          14           MR. LOPEZ:  You're welcome.

11:41:58  15           THE COURT:  All right.

          16           Well, here's my view on this case.  My view is that

          17   I agreed and the parties agreed that we would try the Mulkey

          18   and Tinlin cases.

          19           We should try the Mulkey and Tinlin cases.

11:42:20  20           I understand the point we've already tried Eclipse

          21   and G2 cases.  I agree we should try a Recovery case.  But I

          22   also agree that the identity of the filter is not the only

          23   factor in the play and the extent of the injuries is

          24   relevant.  That was known when the bellwethers were picked

11:42:40  25   and known when the bellwethers were scheduled.  I don't think

11:42:48   1    I should decline to try Murkey now -- Mulkey now,

2    notwithstanding the arguments that have been made.

3         So I'm going to try Mulkey and Tinlin.

4         The question then becomes the order in which they're

11:43:02   5    tried.  They're going to be tried in February and May, that's

6    the only dates I have in the first half of next year, and I'm

7    certainly not going to push it beyond the first half of next

8    year.

9         I am concerned that in Tinlin we're in a situation

11:43:19  10    where you haven't done fact or doctor depositions and here we

11    are in October 4th.  I appreciate your willingness to do all

12    expert depositions in a week, but I have my doubts about it.

13         There's the question mark of Mrs. Mulkey's health,

14    but it sounds like we're not going to learn more on that;

11:43:47  15    she's sort of in a hiatus to see if other problems develop.

16    We do need to rule on the motion for summary judgment, I

17    agree.

18         I think what I'm inclined to do is try Mulkey in

19    February and try Tinlin in May; get the Mulkey summary

11:44:04  20    judgment decision out as quickly as we can, which hopefully

21    will be within a couple of weeks so that if I do grant it --

22    I don't think there are many cases where it's going to be

23    granted.  It's a very fact-specific determination that needs

24    to be made when they were on notice and Kruse was unique, in

11:44:21  25    my view, because of what I thought was a clear record of when

11:44:24  1    she was on notice.  I don't know if that will exist in Mulkey

2    but we will certainly look at that.

3            And we should move forward and plan to try Mulkey in

4    February, get the Tinlin work done on a reasonable schedule

11:44:41  5    that gets it all finished and try Tinlin in May.

6            I am not -- one of the questions that was left over

7    in one of the past case management orders is whether we

8    should pick a sixth bellwether trial.  I don't think we

9    should.  And the reason I don't think we should is that I

11:45:00 10    actually think it would be good and informative for you to

11    try one of these cases in front of a different judge and in

12    front of a different state's jury.

13            Judges will see things differently than I do and

14    make different evidentiary calls and different calls on how

11:45:17 15    much time to afford the parties.  Juries from other states

16    may see things differently.  I think that would be

17    informative.

18            You now have ten mature cases that are ready for

19    trial.  You can try one or more of those.  You've got state

11:45:31 20    cases, you can try one or more of those.  You have the

21    ability to try them because you've got the ability to settle

22    them or not settle them.

23            So my view is, rather than pick a sixth bellwether

24    trial to be tried in front of me and in front of an Arizona

11:45:46 25    jury, if another trial is needed to inform you, you should

11:45:50  1   try one of those other cases in front of a different judge

2   and a different state's jury.

3         So I'm not going to hold a sixth bellwether trial.

4         Now, I need to think about what to do with Simon

11:46:05  5   Nitinol.  That's a different set of issues.

6         In light of that, what I think we should do is get

7   the schedule in place for both the February and May trials so

8   that everybody knows what's going to happen between now and

9   the end of May.

11:46:24 10        Mr. O'Connor, were you going to say something?

11        MR. O'CONNOR:  Yes, Your Honor.  I feel like I need

12   to save a little face here.  I did appreciate Mr. North giving

13   us that extension.  As a matter of fact, the lawyers that are

14   working on this have e-mailed us and said they're working on a

11:46:39 15   report to them today on the status of the depositions and the

16   waiver period.

17        So a ball was not dropped, at least not

18   intentionally.  It's just that it takes a lot to get ahold of

19   doctors in different states.  And so I'm sure they'll -- I'm

11:46:58 20   hoping they will get the status today on what's going on with

21   Tinlin.

22        THE COURT:  Okay.  Thank you.

23        MR. LOPEZ:  Your Honor, is it possible for us to

24   simultaneously try to get those cases ready for the February

11:47:10 25   trial?  I would hate to lose that date if something happens to

11:47:13  1    Ms. Mulkey, whether the statute or she has another

2    neurological event.  I would not want to wait until May.  At

3    least let us give it a shot to get that case worked up and

4    ready for the February slot in the event that becomes the more

11:47:33  5    feasible thing to do.

6            THE COURT:  What are your thoughts?

7            MR. NORTH:  We're certainly willing to give it a try.

8    We tried to give it a try under the Court's original schedule.

9    I have my doubts it will work out.  But we need to get it

11:47:54  10   prepared anyway so I agree, let's continue to prepare it.  But

11   I think it's more realistic to think about Mulkey being ready,

12   because it is ready, in February.

13           THE COURT:  Well, the schedule we have in place with

14   the exception of the *Daubert* and summary judgment briefing

11:48:11  15   schedule for Tinlin, would have it ready for February.  If you

16   can meet it.  If you can really depose the experts in the time

17   that's allowed and the other experts in the time that's

18   allowed.  I'm not opposed to you attempting that.  Because if

19   I do grant summary judgment in Mulkey or if she develops more

11:48:29  20   problems healthwise, it would be good to use that February

21   trial date and not push it off until May.  So --

22           MR. LOPEZ:  I'm sorry.  Didn't mean to interrupt.

23           THE COURT:  Go ahead.

24           MR. LOPEZ:  I know it's probably not going to make

11:48:44  25   much difference now but I just wanted to correct the record

11:48:46   1    about how we submit these cases.  Keep in mind that we

2    submitted -- we agreed to the first lineup.  We had two

3    Eclipse cases.  And because we thought the case -- the Hyde

4    case everyone agreed was a G2X case and we ended up having to

11:49:03   5    try another Eclipse case with Eclipse evidence that is not --

6    does not exist in a G2X case.  Mulkey will be three Eclipse

7    cases in a row, essentially, with three Eclipse evidence.  And

8    the way -- that patient brochure thing and some of the things

9    that happened in the Eclipse case are much different than just

11:49:28  10    trying a straight G2 case.  I would have loved to have just

11    tried a stright G2X case here, but we didn't.  We had to try

12    an Eclipse and G2X case.  But I wanted Your Honor to

13    understand we only agreed to lineup thinking we had only two

14    Eclipse cases in it, not three.  We ended up having

11:49:44  15    essentially three of the first five cases being Eclipse cases.

16                 THE COURT:  I understand that.  That's fair.

17                 Let's talk about the schedule, then.

18                 What I'm going to do is leave in place the Tinlin

19    schedule that's in place now, but I want to adjust the motion

11:50:02  20    dates, as I indicated a moment ago.

21                 So what we will do -- and it looks as though a go or

22    no-go decision on whether it's Mulkey and Tinlin, I'm

23    intending it to be Mulkey unless she can't go or I grant

24    summary judgment, will need to be made by November 30th.

11:50:24  25    Because November 30th will be the date when I'm going to

11:50:27   1   require you to submit proposed changes to the jury

2   questionnaire that will go out.

3            Actually, I need to adjust that.  Let me get the

4   right calendar up.

11:50:47   5            I'm actually going to make that instead of

6   November 30th I'm going to make it November 26th.

7            And then I'm going to have the clerk mail out jury

8   questionnaires in the February trial on November 30th

9   instructing prospective jurors to return the questionnaires

11:51:12  10   by January 4th.  That's a week longer than the return period

11   we've had in other cases, but we've also got the holidays at

12   the end of December in there.

13            Sticking with jury selection for a minute, we will

14   have the thumb drive available for you to pick up

11:51:32  15   questionnaires on January 11.

16            I will give you the list of people I propose to

17   excuse for hardship by January 18th.

18            And we will hold a final pretrial conference on

19   Monday, January 28, which is the only date I've got in late

11:51:52  20   January because of those criminal trials.  So it will be

21   January 28th at 10:00 a.m. for the final pretrial conference

22   for the February trial.

23            And the February trial will begin on February 11

24   which is a Monday, at 9 am.

11:52:15  25            The dates, which we previously set aside for the

11:52:17    1    February trial and will remain the same will be the 11th

2    through the 15th, the 19th through the 22nd, and Monday,

3    February 25 through Friday March 1st.  That will be the same

4    number of trial days we had for this trial.  My intent is to

11:52:40    5    grant plaintiffs 33 hours and defendants 30 hours of trial

6    time.

7            With respect to dispositive motions, I am going to

8    compress the schedule a bit so that dispositive and *Daubert*

9    motions will be due by December 7th.  That's the date I

11:53:09   10    already have on the Tinlin schedule.

11            Responses will be due by December 21st.  And replies

12    by December 28th.  And that will allow me time in early

13    December before I get into the criminal trials to rule on

14    those motions.

11:53:40   15            Motions in limine will be due by December 14th and

16    responses by December 28th.

17            Deposition designations by December 14th, because

18    I'm just not going to have time in January to spend on those.

19    I hope we have fewer for the next trial.  We had over 30 for

11:54:19   20    this trial.  I don't know if we can reduce it or not, but

21    I'll deal with what comes in.

22            The final pretrial order will be submitted on

23    January 11th for the final pretrial conference on

24    January 28th.

11:54:44   25            For the May trial, changes to the jury

11:54:49  1    questionnaire, proposed changes, will be due on March 1st of

2    2019.  We will mail the questionnaires on March 8th, with a

3    return date of April 5th.  We will give you the thumb drive

4    with questionnaires on April 12th.  I'll provide the list of

11:55:24  5    hardship excusals on April 19, and we will hold the final

6    pretrial conference on Tuesday, April 30th, at 10:00 a.m.

7         The trial will begin on Monday, May 13th at

8    9:00 a.m.  And the trial days for that trial will be May 13

9    through the 17; May 20th through the 24th; and --

11:56:21  10        Do we have something on May 27th, Traci?

11        THE COURTROOM DEPUTY:  That's Memorial Day.

12        THE COURT:  Ah, Memorial Day.

13        Well, it will include May 28th through the 31st,

14   which is a Tuesday through Friday.  So we're losing a day in

11:56:38  15   there.

16        I think those are the dates I'm going to block out.

17   We can talk as we get closer whether we need to find a day

18   before or at end of that.  But those are the days we'll set

19   aside for the trial.

11:57:02  20        In terms of the schedule of other events, motions

21   for summary judgment, if it turns out to be Tinlin that's

22   going, I know we've already got one in Mulkey, and *Daubert*

23   motions will be due on February 1st; responses on March 1st;

24   replies on March 15th.

11:57:58  25        MR. STOLLER:  Your Honor, I hate to interrupt you.

11:58:01  1          You set a briefing schedule in anticipation -- on

2     those motions in anticipation at least on summary judgment

3     for the trial you scheduled in February.  The Mulkey stuff is

4     briefed, so would we be doing --

11:58:14  5          THE COURT:  Are the *Daubert* motions briefed for

6     Mulkey?

7          MR. STOLLER:  I don't believe that's the case.  My

8     only point is I think if we're going to run Tinlin up as

9     effectively as a backup, we'll probably need to do all that

11:58:28  10    briefing on the schedule you've given us already.

11         THE COURT:  Well, but the problem with that is -- or

12    my concern about that is once we mail out those jury

13    questionnaires identifying the trial, then we're getting

14    responses based on the specific case.  You can't really change

11:58:45  15   course.  So if we've decided -- we've got to decide if it's

16    Mulkey or Tinlin when the jury questionnaires go out.

17         MR. STOLLER:  True.

18         THE COURT:  My thought was if it's going to be

19    Mulkey, why press you to do the Tinlin briefing in December

11:59:05  20   when it's not going to be necessary until later.

21         In other words, I don't know -- I understand your

22    thought, Mr. Stoller, that we could do it and then we could

23    switch even late in the game, but then we're switching with a

24    jury panel that hasn't addressed issues in the Tinlin case.

11:59:22  25        MR. STOLLER:  I'm not disagreeing with that and it

11:59:24  1   wasn't my suggestion -- and I thought of that as you were

2   talking about the jury questionnaire.  I think we have to have

3   some kind of a drop-dead date of determination, which we

4   haven't talked about.

11:59:34  5       I was only thinking that we're going to run -- I

6   don't want to say run to standstill, but we're going to run

7   on our end to get everything done in Tinlin, including, we

8   would think, the briefing we're talking about here.  And I

9   think you indicated that the mail-out date on the proposed

11:59:50  10  change -- I guess November 26th is before the briefing, so

11  we'll need to know then.

12       THE COURT:  That was my thought.  I think that sort

13  of needs to be the drop-dead date.  If it's Mulkey, why force

14  you to do the Tinlin briefing in December.

12:00:04  15      MR. STOLLER:  I understand.  Apologize.

16       THE COURT:  That's all right.

17       Motions in limine for the May trial would be due on

18  March 29th, with responses due on April 12th.

19       Deposition designations would be by March 29th.

12:00:34  20      The proposed final pretrial order would be due on

21  April 12th with the final pretrial conference, as I already

22  indicated, to be on April 30th.

23       Any other concerns or thoughts about that schedule?

24       MR. LOPEZ:  Not from the plaintiffs.

12:01:03  25      MR. NORTH:  None from the defendants, Your Honor.

12:01:05   1           THE COURT:  Okay.  We'll put that in an order that

           2   comes out.

           3           It seems to me two issues that we need to address

           4   before that drop-dead date are the Mulkey motion for summary

12:01:25   5   judgment, and we'll turn to that immediately and get a

           6   decision to you as soon as we can, and then her health

           7   condition.

           8           So I think what I will do is leave it to you all to

           9   communicate about that before November 26th.  And if

12:01:44  10   Ms. Mulkey can't be going to trial in February or if that's

          11   an issue you disagree on, that's going to need to be brought

          12   to me before November 26.  And, of course, November 26th is

          13   the Monday after Thanksgiving.

          14           So, really, if there's going to be a disagreement on

12:02:10  15   whether Ms. Mulkey can go, that issue ought to be brought to

          16   me during week of November 12 so we can get a hearing

          17   scheduled to resolve that before the Thanksgiving break so

          18   you know which jury questionnaire proposals to put in on the

          19   26th.

12:02:32  20           Let me make a note here.

          21           Okay.  I want to think about what the right -- I

          22   want to think about how I will answer the question of whether

          23   I should take a SNF MDL and I'll let you know in the next

          24   week or so.  There would be efficiencies involved in doing it

12:03:28  25   here, obviously.  But I've got to think about whether the

12:03:34   1    reasons I turned down the other MDL should carry weight here

         2    as well.  So I just want to think about that.

         3            Let me mention two other things.

         4            When you do your jury instructions for the next

12:03:49   5    trial, please don't do them in the form you did them for this

         6    trial.  What we had were four different sections:  Agreed

         7    upon, disputed, additional sections.

         8            Instead, take the instruction set you think most

         9    closely represents the Mulkey case, whether Jones or Hyde or

12:04:14  10    Booker, and go through it.  And if you get to the instruction

        11    on design defect, put in that section everything you agree

        12    upon, everything you dispute, and every supplemental

        13    instruction you propose to make on design defect.

        14            What we end up having to do, it happened on the

12:04:38  15    floor of my study at home, was I was sorting them into piles.

        16    Okay what are the design defect issues?  And I had to -- I

        17    did this for the last trial, not this one.  Jeff got to do it

        18    for this one, to try to sort into piles what really are all

        19    the instructions you're proposing on design defect, because

12:04:55  20    they were in different sections.

        21            So just put everything on design defect in one

        22    section.  If you've got agreement, put it in there.  If

        23    you've got disputes, put it in there.  If you've got five

        24    supplemental instructions on the topic, put it in there.

12:05:10  25            Then that way we know this is everything that's

12:05:12  1    being proposed and disputed on design defect.

2              If you can do that, that will save us some shuffling

3         and organizing.

4              And plaintiffs, when you propose an instruction,

12:05:23  5    propose one specific to the case.  In this trial what we got

6         were form instructions with blanks that are in the Wisconsin

7         instruction with brackets, "if you're going to do this" -- it

8         didn't help at all.  You just submitted the Wisconsin form

9         with nothing tailored to this case.  So that doesn't tell us

12:05:41  10   what you really want.  So tailor them, if you would, to the

11        case.

12             The last thing I had on the list was the motion to

13        seal briefing.

14             We've got a date, I think, of October 26, Ms. Helm,

12:05:59  15   for Jones.  If you're going to want to do it for Hyde, I

16        guess my question is should we just wait and do it once for

17        both cases?

18             MS. HELM:  Actually, Your Honor, I thought that's

19        what we had decided previously.

12:06:12  20        THE COURT:  We did decide that?

21             MS. HELM:  Yes.

22             THE COURT:  Oh.  Okay.  Will October 26 work?  Are

23        you going to have what you need from this trial by then?

24             MS. HELM:  I think so.

12:06:25  25        THE COURT:  Okay.  So that will remain October 26th.

```
12:06:32   1           All right.  What else do we need to address?

           2           MR. LOPEZ:  Just one of the things I brought up in

           3   the beginning:  Your thoughts on not just remanding all of the

           4   cases at one time but maybe having us engage in either

12:06:46   5   settlement discussions about maybe the G2 cases or all the

           6   fracture cases or maybe remanding the G2 cases.  Since we're

           7   not going to try another G2 bellwether case, we can start the

           8   process of educating lawyers on the trial of those cases, the

           9   value of the cases, as opposed to waiting and all of a sudden

12:07:11  10   these things get inundated all over the country by the

          11   hundreds if not thousands.  I'm sure that's a large number of

          12   the docket, Your Honor, the G2 cases.  They were on the market

          13   the longest.  I don't know if that's something you want to

          14   resolve now, but I think we ought to give it some thought.

12:07:28  15           MR. NORTH:  Again, Your Honor, I think that's looking

          16   at the bellwether process from only one data point

          17   perspective.  As I already argued earlier, I believe the

          18   nature of the injuries, regardless what generation filter, is

          19   just as important for the bellwether process and we need to

12:07:43  20   complete this.  We're only talking about through May at this

          21   point.

          22           THE COURT:  So what do you think, Mr. North, that I

          23   should do on remand?  When it comes to the -- I will tell you,

          24   I told you before, after we get through the bellwether trials,

12:07:59  25   I don't intend to hold on to this MDL.
```

```
12:08:02   1              So my intent would be when we get a verdict in the

           2    May trial, obviously we'll need to do -- if there's posttrial

           3    briefing, do it.  But in June or July, I would remand all of

           4    the cases in the MDL.

12:08:16   5              MR. NORTH:  I understand, Your Honor.  My client has

           6    been so notified and we're talking about that.  Our hope is

           7    that we can be in a position if not beforehand but certainly

           8    after the May trial to sit down with the plaintiffs' attorneys

           9    and see if a global resolution is possible, because we know

12:08:33  10    the Court's intent is to remand the cases.

          11              THE COURT:  Well, if you wait until after the May

          12    trial to sit down, I suspect you're not going to settle this

          13    in a week or two or three.  I just have a hunch.

          14              And I'm not going to be inclined to say, you know,

12:08:50  15    okay, you've got five months to go talk settlement when you

          16    could be doing it now.  You know a lot about the case now.

          17    We've got a big gap in time.  I know we're going to be busy

          18    on some things, but there's a fair amount of time between

          19    February and May.

12:09:04  20              If I remand these in June of next year, I'm pretty

          21    confident you're not going to reach a global settlement

          22    between the close of trial, the verdict in the May case, and

          23    the date in June.  But if I'm wrong, I'm interested in your

          24    thoughts on why I'm wrong.

12:09:22  25              MR. NORTH:  Your Honor, there are discussions with
```

12:09:24   1    certain entities or persons ongoing already.  So I don't think

2    it's naturally -- or inevitable that there are going to be no

3    settlements before May.

4         THE COURT:  Well, I understand your point that the

12:09:46   5    filter type is only one data point.

6         If we are not going to try another G2 case, which

7    we're not, and if my assignment under the MDL statute is to

8    dispose of all pretrial matters, if I were to remand the G2

9    cases sometime in the next few months, you could still have

12:10:23  10    your global discussions.

11         Tell me what's wrong with that.  What do you see as

12    the reason that I shouldn't do that?

13         MR. NORTH:  Several reasons, Your Honor.  Because I

14    think that undermines the bellwether process to some extent,

12:10:39  15    which, as I've indicated, is not filters only -- only filter

16    specific.  It has to do with different injuries, also.

17         I also think that we can't have global discussions

18    with plaintiffs -- various plaintiffs' attorneys based on one

19    type of filter.

12:10:56  20         We are not and never will value these cases based on

21    whether they're a G2 or Recovery.  That may be one factor but

22    I think more important is was it a fracture resulting in an

23    open surgery versus a case where the filter's in place and

24    just can't be removed.  Or doesn't want to be -- the patient

12:11:17  25    doesn't want it removed.

12:11:19   1        Those injuries spectrum is going to determine the

2   value of the cases.  And if we try to just pick out G2s

3   alone, I don't think we'll ever reach a global settlement

4   unless we're looking at the whole universe of cases with a

12:11:36   5   particular plaintiffs' firm.  So I don't think as a practical

6   matter that's going to exist.

7        And I also think, Your Honor, we've already got the

8   ten mature cases remanded.  And if we have 2000 G2 cases, and

9   I think there's probably 1500 to 2000 G2 and G2X, if we have

12:11:56  10   all those remanded, I think it's going to undermine the

11   bellwether process because it's going to divert attention of

12   those people involved in these two trials in handling all of

13   the logistical issues with those cases.

14        So we're only talking about waiting until May or

12:12:14  15   June.  I believe that to maintain the usefulness and

16   integrity of the bellwether process to its completion, we

17   need to avoid that.

18        MR. LOPEZ:  Yeah, I -- I mean, I frankly think we

19   have at least from the plaintiffs' perspective we have all the

12:12:35  20   data points and information that we need from what we've

21   already done.  Of course we didn't know what's going to happen

22   with this trial.

23        And I know what Mr. North is saying, that, you know,

24   it's not just the device in trying to reach a global

12:12:49  25   resolution with people because they all have different types

12:12:52  1    of cases.

2           But I also think if this is going to lead to not a

3    global resolution either by firm or globally as to everybody,

4    we ought to think about whether or not -- I mean, I've had a

12:13:08  5    lot of -- I'm ready -- I've been ready to do that with Bard

6    for the last four, five years.  They've never come to me.

7    We've got a lot -- my firm, my cases, we have a lot a data

8    points with them and there's been no sign at all ever that

9    they're interested in talking to me about my cases globally.

12:13:27 10    And I've been -- this is my fourth trial.

11           So I'm a little suspicious about whether or not that

12    is going to make a difference, at least for me and my expanse

13    of cases.

14           My thought, my concern, is this, Judge, is that if

12:13:46 15    in fact, you know, the plan is to say, no, we're not going to

16    pay globally to people, we're going to have to start trying

17    cases, I don't want that to happen a year from now.  Some of

18    these poor people have been -- I've got clients that filed

19    five years ago.  And, you know, who might have had a trial

12:14:11 20    date by now and their cases resolved.  And I do have a couple

21    in the state court case here.

22           But I realty think in order to kind of get people

23    moving and discussing the cases that we've got really good

24    data points on cases that have settled and now a third trial.

12:14:30 25    A fourth trial, actually, because they tried a case before.

12:14:34   1          We learned a lot from both of these trials.  They

2     learned a lot.  We learned a lot from the type of injury that

3     was in Mrs. Booker's case and the vintage and the evidence in

4     the G2 case.

12:14:49   5          We've been doing this a long time.  Mr. North has

6     been involved in mass torts, I've been involved in mass

7     torts.  This is my fourth decade.  You extrapolate from the

8     knowledge you get.  You don't have to now figure out if the

9     migration to the heart of a G2 that was put in in 2007

12:15:08  10     required open-heart surgery and got a one-to-one ratio of

11     punitive damages in front of an Arizona jury, we've all been

12     doing this long enough to say that might be the very top end

13     value of these cases, and it was in front of a jury, what

14     would I do with that case if I was getting ready to try it?

12:15:28  15          The sophistication of sitting down and having

16     discussions with these data points is something we normally

17     don't have in an MDL or mass tort.  More often than not these

18     cases settle without a single trial.  And now we've had two.

19          And I really think it makes some sense to stage this

12:15:52  20     thing for the benefit of the people that have been in this

21     for a long time and for the benefit of what we learned from

22     at least trying a G2 case with what might be a top-end

23     injury, you know.  I mean, that was a fairly dramatic injury.

24     We understand that might be near the top level value of those

12:16:15  25     cases.  Case like Mrs. Jones where she didn't get open heart

12:16:19  1    surgery, if that thing was being discussed in a global

        2    settlement, we've learned some things.

        3         But I'm very concerned that this is a process where

        4    delay is not doing the plaintiffs in this case any good.

12:16:35  5    We're talking about real people who are waiting for a process

        6    that, unfortunately, they're not in a program where cases are

        7    getting close to trial where they might be able to settle

        8    with some other cases like what happened in Arizona and other

        9    locations.

12:16:52 10         So I just think that both sides know enough about

       11    each side and what these cases are about and what each side

       12    does with these cases and there's no reason why we can't

       13    start the process somewhere with what we've learned thus far.

       14         THE COURT:  Well, Mr. Lopez, couple of times in what

12:17:15 15    you've said you talked about starting the process.  And I

       16    understand, I think, what you're saying.

       17         It's -- I don't know this but I'll tell you what I'm

       18    assuming.  I'm assuming if I were to say on November 1st, I'm

       19    remanding all G2 cases, and I were to make that

12:17:37 20    recommendation to the MDL panel and they were to agree with

       21    it, what would happen after November 1st would be all of

       22    these lawyers that have these cases around the country would

       23    get them back.  All of the judges around the country would

       24    have them hit their dockets.  Scheduling orders would be

12:18:01 25    entered.  Parties would be going into court around the

12:18:04   1   country setting trial dates.  Lawyers would be looking at

2   their own inventory and asking what do I do now?  Do a pick a

3   good case and push it to trial?  Do I start talking

4   settlement?

12:18:17   5          You would no longer be lead counsel in all of those

6   1500 G2 cases.  There may be plaintiffs lawyers who still

7   want to collaborate with you and talk global settlement, but

8   there may not be.

9          It seems to me that -- I guess what I'm saying is if

12:18:35  10   I just remand a chunk of the cases, I'm not sure that starts

11   the process on global settlement.  Seems to me it kind of

12   blows it up in a way and puts you all at the mercy of judges

13   around the country who are going to start setting trials and

14   complicates the case tremendously.

12:18:57  15          Sure, it puts pressure on defendants to talk global

16   settlement before November 1st because otherwise they've now

17   got to gear up and start fighting a battle in 50 states.  I

18   understand that.  I guess -- I'm just sort of thinking out

19   loud.

12:19:16  20          One approach would be to say I'm going to pick a

21   remand date in June of next year and I'm going to remand on

22   that date.  And, in addition to that, I'm going to order you

23   all to start settlement talks, and set a date by which you

24   sit down face to face for good faith settlement talks, which

12:19:40  25   I do in every civil case I've got, either alone or with

12:19:43  1    mediation, and try to start the process in that way, with you

2    all knowing the cases are going back to their states when we

3    finish that last trial.  That's an alternative to just

4    remanding a bunch.

12:20:00  5             MR. LOPEZ:  I mean, I understand that.  I probably

6    shouldn't have said just remand.

7             What I'm trying to say is let's see whether or not,

8    based on the data points we have thus far, at least on a G2

9    case and Eclipse case, I know we're going to try another

12:20:15 10    Eclipse case -- I mean Mr. North just said he's already

11    talking settlement with other people right now.  I know

12    they've settled a number of cases that -- some of which are

13    very similar to the cases that we've tried already.  Some

14    even with injuries that are more significant.

12:20:33 15             My suggestion to you, Your Honor, is this:  Why not

16    order the parties to engage in some type of mediation.

17    They've been using the same individual -- in fact, he's from

18    Phoenix -- no matter where the case is.  We did one in

19    Florida, he was involved in the one in Delaware, and also

12:20:53 20    involved in settling, very successfully settling, a group of

21    cases here in Arizona.

22             THE COURT:  Who is that?

23             MR. LOPEZ:  Is it Craig Phillips?

24             MR. O'CONNOR:  Craig Phillips.

12:21:05 25             He knows -- he has seen 11 or 12 -- I don't know how

12:21:09  1    many it is.  I don't want to overstate it.  11 cases maybe?

        2    How many were settled here?  Four, five?  Seven or eight

        3    cases.  Different courts, different venues.  Because those

        4    cases were getting close to trial.

12:21:25  5            What I'm suggesting to you is at least have the

        6    parties engage in a conversation about Eclipse and G2, at

        7    least G2 cases, and see where we are in two months.

        8            If it looks like we can't settle G2 cases based on

        9    the data points we have, not only from this trial but from

12:21:45  10   other settlements -- I mean, I had a number of G2 cases

        11   settle before there was even an MDL.  So we kind of know the

        12   ranges.

        13           In fact, I even have a chart, not with numbers in

        14   them but the different criteria for the values.

12:21:58  15           And then if that's not successful in the next two

        16   months, it's not going to be any more successful eight or

        17   nine months from now.  And then we know that those cases have

        18   to be remanded.

        19           But I think it's time to give the plaintiffs in this

12:22:18  20   case who've been waiting a long time an opportunity to see

        21   whether or not the cases can settle over the next month or

        22   two.  Mr. North actually said, I think at the last CMC, he

        23   thought his client might be ready by the end of the year.

        24   Now we're talking May or June.  That's a little different.

12:22:39  25   They can wait as long as they can wait.  I felt very strongly

12:22:41   1   for people here that have been involved in this process for a

2   long time, especially my own clients who, you know, have been

3   represented four, five, six years.

4         I was fortunate enough to have a number of those

12:22:58   5   cases set for trial that got settled.  But I'm concerned

6   about the ones that don't have trial dates and whether or not

7   this bellwether process is really going to have an effect on

8   whether C.R. Bard is going to be willing to settle their

9   cases without now being sent out all over the country and me

12:23:14  10   doing what I was doing before this MDL, which is one trial at

11   a time before they settle.

12         So I think it's time to test that process on a

13   finite number of cases based on the data points we have not

14   only from the trials we have but the settlements that have

12:23:30  15   happened in other jurisdictions where a lot was learned just

16   from going through that process.

17         And, you know, we can report back in two or three

18   months.  Who knows, that might lead to larger settlements.

19   He said he's talking to a number of people right now.  It's

12:23:50  20   not me.  But he's having discussions.  There have been a lot

21   of discussions -- keep in mind that each one of those

22   settlements that have happened have been a variety, much

23   broader variety of cases than we've seen in this bellwether

24   process.  Much wider variety.  And I know the people that

12:24:06  25   have been involved in.  Some of those cases I was attorney of

12:24:09   1    record.  Those were agreed upon values in those kinds of

           2    cases.  There are hundreds and hundreds of cases like that in

           3    this MDL.

           4            So I don't know what else to say other than the fact

12:24:24   5    why can't we learn and take advantage of that process and

           6    what's happened there and the trials to see whether or not

           7    C.R. Bard is really interested in a global settlement of

           8    those type of cases or whether or not it's going to be 2025

           9    when we start getting near the tail end of the people who are

12:24:41  10    getting an opportunity to try the case before they get

          11    settled.  That's what I'm saying, Judge.

          12            THE COURT:  I understand your point.

          13            Mr. North.

          14            MR. NORTH:  Just a couple comments, Your Honor.

12:24:49  15            Mr. Lopez just said he has doubts as to whether this

          16    bellwether process really has an effect.  I have doubts as to

          17    whether it can have any effect if we don't let it run its

          18    course.

          19            Right now our estimates are 50 to 70 percent of

12:25:06  20    these cases may be no-injury cases.  I think the Cook

          21    defendants in the Cook MDL have reached the same conclusion

          22    about their MDL:  50 to 70 percent of the cases may be no

          23    injury.

          24            Right now my client is probably not willing to pay

12:25:24  25    in a no-injury case.  If they try Mulkey, which is close to a

12:25:27  1  no-injury case and they're successful there, my client may

2  rethink it.  But it's not based on the sole data point, our

3  valuation of the case as to whether it's a G2 or Eclipse.

4  The nature of the injury is much more a driving factor.

12:25:43  5          And we have got, in my view, to let this bellwether

6  process conclude before we have the data points to really

7  have those sorts of discussions as far as everything is

8  concerned.

9          Now, if this Court orders us into mediation or into

12:25:58  10  settlement discussions, we certainly will do so, and we will

11  do so in good faith.  At I've said, we are having some

12  discussions and getting started in that regard.  We can't

13  talk to everybody at once, but we are doing that and starting

14  that.

12:26:16  15          I will tell you that my client, the attorneys who

16  work -- Ms. Camarata and her colleagues in the law department

17  have had a lot of experience with mass tort litigation over

18  the years and have resolved a number of MDLs. And they're

19  committed to doing so in this case.  The question is going to

12:26:37  20  be values.

21          And I also can assure the Court that I do not

22  believe my client's going to wait until June and have 4,000

23  cases simultaneously remanded.  That's a disaster for them

24  and plaintiffs.  We recognize that.

12:26:50  25          I think as we enter into 2019, discussions are going

12:26:54  1   to accelerate and I think that we will make a lot of strides

2   as the first six months of that year progresses.  But I don't

3   believe we should hinder the operation of this bellwether

4   process and its success by throwing some cases back to the

12:27:14  5   trial courts at this stage.  So we believe we should stay the

6   course and we're confident it's going to work the way it's

7   intended to do.

8           THE COURT:  Okay.  Thanks.  I'll address this issue

9   in the order that comes out.  I want to think about it a bit

12:27:29 10   more in light of what you've said.

11           Are there other matters we need to talk about before

12   we break?

13           MR. LOPEZ:  None from the plaintiffs, Your Honor.

14           MR. NORTH:  Nothing for the defendant, Your Honor.

12:27:40 15           THE COURT:  Okay.  Thanks.  We'll let you know when

16   we hear something from the jury.

17       (End of transcript.)

18                       *  *  *  *  *

19

20

21

22

23

24

25

1           **C E R T I F I C A T E**

2

3           I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14          DATED at Phoenix, Arizona, this 6th day of October,

15   2018.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25