1                UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF ARIZONA

3                _____

4   IN RE: Bard IVC Filters Products    )
    Liability Litigation,               ) MD 15-02641-PHX-DGC
5                                       )
    _____ )
6                                       )
    Lisa Hyde and Mark Hyde, a married  ) Phoenix, Arizona
7   couple,                             ) September 6, 2018
                                        )
8                       Plaintiffs,     )
                                        )
9            v.                         ) CV 16-00893-PHX-DGC
                                        )
10  C.R. Bard, Inc., a New Jersey       )
    corporation, and Bard Peripheral    )
11  Vascular, an Arizona corporation,   )
                                        )
12                      Defendants.     )
    _____ )
13

14

15      BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17            FINAL PRETRIAL CONFERENCE

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For the Plaintiffs:

 3            Lopez McHugh
              By: RAMON R. LOPEZ, ESQ.
 4            100 Bayview Circle, Suite 5600
              Newport Beach, CA  92660
 5
              Gallagher & Kennedy
 6            By: MARK S. O'CONNOR, ESQ.
              2575 East Camelback Road, Suite 1100
 7            Phoenix, AZ  85016

 8            Heaviside Reed Zaic
              By: JULIA REED ZAIC, ESQ.
 9            By: LAURA E. SMITH, ESQ.
              312 Broadway, Ste. 203
10            Laguna Beach, CA  92651

11            Goldenberg Law PLLC
              By: STUART GOLDENBERG, ESQ.
12            800 LaSalle Ave., Ste. 2150
              Minneapolis, MN  55402
13

14    For the Defendants:

15            Nelson Mullins Riley & Scarborough.
              BY: JAMES F. ROGERS, ESQ.
16            1320 Main St.
              Columbia, SC  29201
17
              Snell & Wilmer
18            By: JAMES R. CONDO, ESQ.
              400 East Van Buren
19            Phoenix, AZ  85004

20            Nelson Mullins Riley & Scarborough
              By: RICHARD B. NORTH, JR., ESQ.
21            By: MATTHEW B. LERNER, ESQ.
              By: ELIZABETH C. HELM, ESQ.
22            201 17th Street NW, Suite 1700
              Atlanta, GA  30363
23

24

25
```

**P R O C E E D I N G S**

10:00:24   1

2

3        THE COURTROOM DEPUTY:  MDL 2015-2641, in the matter

4    of Bard IVC Filters Product Liability Litigation, on for final

10:00:47   5    pretrial conference in the Hyde trial.

6        Will the parties please announce.

7        MR. O'CONNOR:  Good morning, Your Honor.  Mark

8    O'Connor, co-lead attorney for plaintiffs.

9        MS. REED ZAIC:  Julia Reed Zaic, plaintiffs'

10:00:58  10    executive committee.

11        MR. LOPEZ:  Good morning, Your Honor.  Ramon Lopez,

12    co-lead and attorney for the Hydes, plaintiffs Hydes.

13        MR. GOLDENBERG:  Stuart Goldenberg, Your Honor, for

14    the Plaintiffs' Steering Committee.

10:01:08  15        MS. SMITH:  Laura Smith.

16        MR. NORTH:  Good morning, Your Honor.  Richard North

17    on behalf of the defendants, and I am joined by James Rogers,

18    James Condo, Elizabeth Helm, and Matthew Lerner.

19        And, Your Honor, I also want to alert the Court that

10:01:23  20    Mr. Rogers will be taking the lead today because he's going to

21    be the lead trial counsel in the Hyde case.

22        THE COURT:  Okay.

23        Good morning, everybody.  Welcome back.  Hope you all

24    had a nice summer.

10:01:47  25        The first thing I would like to do is deal with the

10:01:49  1  juror issues.  I've issued two orders excluding folks for

2  hardship.  Those are dockets 12113 and 12375.  Those excuse a

3  total of 85 jurors for hardship.

4        Does either side have an objection to any of those

10:02:08  5  excusals?

6        MR. O'CONNOR:  No objection from the plaintiffs.

7        MR. ROGERS:  None, Your Honor, from the defendant.

8        THE COURT:  Okay, then we will excuse the 85 jurors

9  listed in those two dockets.

10:02:21  10        In addition, as I think you learned yesterday, we

11  have received a few additional jury questionnaires.  By my

12  count, looks like there are six that came in.  I reviewed

13  those and concluded that I should excuse Juror 19 and Juror

14  175.

10:02:46  15        Any objection to excusing those two?

16        MR. ROGERS:  None from the defendant, Your Honor.  I

17  do note what we received -- we didn't get a 175.  We got a

18  179.

19        THE COURT:  Oh, you're right.  It's 179.

10:02:59  20        MR. O'CONNOR:  I apologize, Your Honor, I did not see

21  that come through yesterday and I don't know anybody in my

22  office saw it to go through it --

23        THE COURT:  It was e-mailed to you about 9:30

24  yesterday morning.

10:03:19  25        Look, if you would --

10:03:20  1          MR. O'CONNOR:  I'm not going to object to hardships.

       2          THE COURT:  Okay.  Both of them on page 2 of their

       3    questionnaires say they would face a hardship for various

       4    reasons.

10:03:29  5          So I take it there's no objection on those?

       6          MR. O'CONNOR:  No objection.

       7          THE COURT:  Okay.  But we have, then, four others

       8    that are in the group.  They are jurors 21, 35, 42, and 144.

       9    And you haven't seen copies of their questionnaires,

10:03:49 10    Mr. O'Connor?

      11          MR. O'CONNOR:  No, but I don't think that has to

      12    delay what we're going to do.  If we could hold those off to

      13    the end, give me an opportunity to look at those, I would

      14    appreciate that, Your Honor.

10:04:00 15          THE COURT:  Yeah, that's fine.

      16          And you can actually look at our copies, if you want,

      17    and see if you have any concerns about them.

      18          Okay.

      19      (The Court and the courtroom deputy confer.)

10:04:17 20          THE COURT:  Okay.  So the next question, then, is

      21    whether you have challenges for cause based on the

      22    questionnaire answers.  Why don't we start with plaintiffs and

      23    get your challenges for cause based on the questionnaires.

      24          MR. O'CONNOR:  Yes.  We have a number of them, Your

10:04:36 25    Honor.  Would you like me to go through them?

| | |
|---|---|
| 10:04:39 | 1 |

THE COURT:  Yeah.  After I wipe all the water I just
spilled on my iPad.

Okay.  Go ahead, Mr. O'Connor.

MR. O'CONNOR:  Your Honor, do you mind if I remain
seated for my --

THE COURT:  I do not.  That's fine.

MR. O'CONNOR:  First of all, one thing we noted in
going through it, it looked as though number 2 may have a
hardship.  He had indicated that he would be missing classes
that seemed to be going on at the same time, and I think he
answered that all the way at the end.

THE COURT:  He said in response to question number 1
that jury service would not create a hardship for him.

MR. O'CONNOR:  I was looking at question 64.

THE COURT:  Yeah, I see that.

I don't see where he says anything else in his
questionnaire about those college classes.

MR. O'CONNOR:  He said, "If selected, I would be
unable to attend college classes this semester."

I just wanted to bring that to the Court's attention.
We may be dealing with that when he shows up here live.

THE COURT:  Do you see anything else in his
questionnaire about --

MR. O'CONNOR:  Nothing else.

THE COURT:  -- what college he attends?

10:06:19  1          MR. O'CONNOR:  There was nothing else.

2          THE COURT:  Looks like he says he's attended some

3    classes in fire science.

4          I think we ought to ask him.  I don't know if he's

10:06:29  5    saying he's contemplating possibly attending college classes

6    and it won't, or if he's actually enrolled and it will create

7    a problem.

8          So thanks for pointing that out, but I think we ought

9    to raise that with him when he comes.

10:06:41  10         MR. O'CONNOR:  And the other preliminary issue is

11   Juror Number 9.  He indicated that his mother works at

12   Gallagher and Kennedy.  I have no idea who that is.  But I

13   believe Juror 9 had indicated some knowledge of the IVC

14   litigation and apparently it's through his mother working at

10:07:00  15   the firm.  We have no idea who his mother would be.

16         MR. ROGERS:  Your Honor, I believe he addresses those

17   in question 63 and 40, if that would help you.

18         THE COURT:  Yeah, he says his mother works there.  He

19   knows that the firm represents such cases.  That seems to me

10:07:30  20   to be a relatively close connection, even though we don't know

21   who the individual is.

22         What are your thoughts on it, Mr. O'Connor?

23         MR. O'CONNOR:  Well, I brought it to the Court's and

24   counsel's attention.  I didn't go to human resources and find

10:07:47  25   out.  I don't know anybody with that last name.  But I don't

10:07:50   1   think we would have any objection to this one being excused.

2        THE COURT:  Mr. Rogers.

3        MR. ROGERS:  We agree, Your Honor.

4        THE COURT:  Do you think he should be excused?

10:08:02   5        MR. ROGERS:  Yes.

6        THE COURT:  All right.  I think he should as well.

7   It may be it's an attenuated connection, but when somebody

8   actually works for one of the firms involved in the case, I

9   think that's a close enough connection that I should grant the

10:08:15  10   challenge for cause.  So I will excuse Juror 9 for cause.

11        MR. O'CONNOR:  Beginning with cause, Juror Number 16,

12   Your Honor.  And the questions that are concerning where it

13   appears this juror definitely would have a predisposition

14   against the plaintiff begin at 36.  And I think if you look at

10:08:43  15   the other answers in conjunction with each other, she supports

16   tort reform at number 59 and made it a point that the reason

17   she thinks it's necessary is because there's frivolous

18   lawsuits and greedy plaintiff's attorneys.

19        So based upon that, we believe that this juror

10:09:04  20   clearly has indicated in writing that she would have a

21   predisposition against our side, one that's obviously formed

22   before she even got here to this courtroom, so we would move

23   to have her struck for cause.

24        MR. ROGERS:  Your Honor, we disagree.  This juror was

10:09:28  25   given the opportunity to answer four questions about whether

10:09:32   1   she would be biased or whether she thought she might not be

2   able to be impartial, and those were questions 39, 44, 62, and

3   63.  And of all those responses she indicated each time she

4   does not note a reason why she could not be unbiased.

10:09:49   5         She also answered question 59, which is the question

6   that asks if she had any strong feelings about people that

7   bring lawsuits, and she said no.

8         So I think there's enough balance there, Your Honor,

9   that she should not be struck for cause.

10:10:07  10         THE COURT:  I think this juror requires additional

11   questioning, so I'm not going to grant the challenge for cause

12   at this time.  But you certainly can inquire on those matters

13   during voir dire.

14         MR. O'CONNOR:  The next one we have is number 40,

10:10:26  15   Your Honor.  Apparently he is a medical doctor who uses IVC

16   filters.  He appears to be an equal opportunity disliker.  He

17   doesn't like us and he doesn't like them.

18         He has a personal bias against IVCs but he also

19   indicates in 63 straight out that he cannot be fair.  So we'd

10:10:51  20   move for cause on number 40.

21         MR. ROGERS:  We agree, Your Honor.

22         THE COURT:  I agree as well.  He clearly indicates

23   that his views would affect his ruling in the case.  So I'm

24   going to grant the challenge for cause to Juror 40.

10:11:13  25         MR. O'CONNOR:  Your Honor, I apologize I didn't bring

10:11:15  1    this one up earlier.  49 indicated at question 64 that he is

2    set to go to the Bahamas during this trial.  I think 64 is

3    where I saw it.

4         THE COURT:  You're right.  He does.  Doesn't say it

10:11:39  5    on question 1.

6         MR. ROGERS:  We agree, Your Honor.  I had him flagged

7    as well as somebody who would be extremely unhappy if he had

8    to be here.

9         THE COURT:  All right.  I will excuse Juror -- I will

10:11:50 10    grant the challenge for cause to Juror 49 because of his

11    unavailability.

12         MR. O'CONNOR:  Our next cause is number 50, Your

13    Honor.  Question 49.  He says he has strong negative feelings

14    about people who file lawsuits and he thinks most lawsuits are

10:12:10 15    against big corporations and people with a lot of money and

16    the reason they're brought is for money.

17         He doesn't feel that the system should be used for

18    retirement.  His answer to question 59.

19         And, again, I think when a person writes these kinds

10:12:26 20    of answers in response to these questions, it -- it's a clear

21    indication that he is starting out with a bias and is alerting

22    us that these are formed, and I think that there's no reason

23    to question him any more, that on the face, this juror has let

24    us know he's starting out with a clear predisposition against

10:12:48 25    plaintiffs and lawsuits.

10:12:53  1          MR. ROGERS:  Your Honor, we disagree.  Again, I think

        2  this is similar to Juror 16.  This juror responded in response

        3  to at least three questions that, when he was asked if he

        4  could be impartial or not biased, he indicated that he could.

10:13:06  5  And those are the responses to 63, 39, and 44.

        6          THE COURT:  Like the previous juror, I think we need

        7  to ask some additional questions of this juror, so I'm going

        8  to deny the challenge for cause at this time, subject to

        9  further questions of him.

10:13:26 10          MR. O'CONNOR:  That was number 50; correct?

       11          THE COURT:  Right.

       12          MR. O'CONNOR:  Number 52 is a veterinarian.  He

       13  responded, I thought it was -- let me find it.  That he --

       14  that just knowing about the lawsuit would affect his ability

10:13:44 15  to be fair and impartial.  And then at question 44 -- let me

       16  find the answer.  Apologize.

       17          He says he feels there are a lot of frivolous

       18  lawsuits against the medical community.

       19          So, again, based upon what he has clearly indicated,

10:14:17 20  we believe this witness has demonstrated to us and wants us to

       21  know that he is starting without with a predisposition against

       22  us and the system in general.

       23          THE COURT:  Hold on just a minute, Mr. Rogers.

       24          Traci, is that beeping coming from our equipment

10:14:36 25  room?

10:14:38  1          THE COURTROOM DEPUTY:  Yes.  I've e-mailed and I'm

2     trying to get it stopped.

3          THE COURT:  Mr. Rogers.

4          MR. ROGERS:  I think he falls in line with Jurors 16

10:14:45  5     and 50.  He indicated in response to, again, at least three

6     questions when asked about -- if he could be impartial, and he

7     didn't see any reason why he could not.  Those are responses

8     39, 62, and 63.

9          THE COURT:  I think this juror requires additional

10:15:08 10     questions as well, so I'm going to deny the challenge for

11     cause at this time.

12          MR. O'CONNOR:  All right.  The next one we are moving

13     on, Your Honor, is number 61.

14          Clearly this juror is starting out on a scale showing

10:15:31 15     her imbalance of partiality.  She gave personal injury lawyers

16     a 1 and medical device companies a 7.  More importantly, she

17     says in 63 she works for a disability insurance company and

18     therefore she cannot be fair and impartial.  And so for that

19     reason, we believe that this juror should be excused.

10:15:53 20          The question is, "Do you know of any reason you could

21     not be fair and impartial, unbiased, during this lawsuit?"

22          She answered, "Yes, I work in disability insurance as

23     stated previously."

24          MR. ROGERS:  Your Honor, I think we agree on this

10:16:10 25     one.

10:16:16  1          MR. O'CONNOR:  I thought you would.  I read 38, too.

      2          THE COURT:  I am going to grant the challenge for

      3   cause.  There's a number of comments in this questionnaire --

      4          MR. O'CONNOR:  That's number 61?

10:17:14  5          THE COURT:  -- where the juror indicates that she

      6   could not be fair or says in other situations she would have

      7   conscious or subconscious bias.  So I will grant the challenge

      8   for cause to Juror 61.

      9          MR. O'CONNOR:  Thank you.

10:17:31 10          Next on our list is number 66.  44 -- in answer to

     11   question 44 he said he cannot be -- well, indicated he cannot

     12   be fair and impartial.  He has an utter distaste for PI

     13   lawyers who have damaged America and its healthcare system.

     14   Later on he says that he is blaming lawyers for his need to go

10:17:54 15   out of country for care, I think.

     16          But 49 he says that he has mostly strong feelings

     17   about people who file -- negative feelings about people who

     18   file lawsuits.

     19          59, he believes that legislative reform is necessary

10:18:12 20   because lawsuits are damaging America and affecting his

     21   ability to get health care.

     22          And then in number 63 he says he cannot be fair and

     23   impartial.  He has honest dislikes and opinions as explained.

     24   "I can't imagine that others honestly do not."

10:18:35 25          So clearly we believe that this juror should be

removed for cause.

MR. ROGERS:  Your Honor, we agree, or have no objection.  This juror's obviously got extreme feelings about the American healthcare system and we agree he should be gone for cause.

THE COURT:  I'm going to grant the challenge for cause to Juror 66.

MR. O'CONNOR:  Next is Juror 78.

At question 44 this juror indicated she does not want to be on jury service.

At 49 she said she has strong negative feelings about people filing lawsuits.  She says they're cluttering up our court system.

And at 59 she wants legislative reforms and she said because she wants doctors to come here and practice and therefore she needs caps in malpractice.

There, again, Your Honor, when you combine a juror who is telling us she does not want to be here and she's already indicating her strong feelings that were obviously formed long before she got this questionnaire, we believe this juror -- we should not have to go to the task of questioning this juror in front of others.

78, Jim.

MR. ROGERS:  Your Honor, the juror does indicate several times she could be impartial or certainly doesn't know

10:20:17  1    any reason why she can't be impartial.

2         I don't have strong feelings about her, though.  If

3    Mr. O'Connor wants her gone, I'm glad to agree with him.

4         THE COURT:  Well, I'm going to grant the challenge

10:20:27  5    for cause to Juror 78.  I think the questionnaire clearly

6    indicates she wouldn't want to be here and wouldn't be fair.

7         MR. O'CONNOR:  Your Honor, I have an unusual note

8    here.  107.  I couldn't understand it, but in qualifying his

9    answer to number 64 he says, "As a prospective juror, a

10:20:55  10   personal challenge I will face will be" -- I wanted to bring

11   this to the Court's attention.  It appeared he was trying to

12   state a hardship, but to be perfectly honest, we had

13   difficulty reading this one.

14        THE COURT:  I think he says "As a prospective juror,

10:21:21  15   a personal challenge I would face will be going from being

16   on-the-go type individual to a slow-paced sitting type of

17   environment individual for eight hours a day."  And then I

18   can't read the words in between, but says "even the length of

19   the trial may be days/weeks."

10:22:06  20        I think that's what he's saying.  He'll be sedentary

21   for eight hours a day.  Which we all know is true.

22        MR. ROGERS:  I took it to mean, Your Honor, he just

23   didn't feel like sitting through this trial.  Other than that,

24   he didn't have any indicators of bias either way.

10:22:22  25        MR. O'CONNOR:  One issue with this juror though, and

10:22:26 1   I notice this with a couple others, but he specifically would

2   not answer questions that I think are important questions

3   about medical history related to him and his family.  And

4   obviously that's going to have to be a question both sides are

10:22:39 5   going to need answers to when he comes here.

6        THE COURT:  I agree.  But I think we need to ask him

7   those questions.

8        MR. O'CONNOR:  All right.

9        Next we have on our list, Your Honor, is number 146.

10:23:23 10   And starting with question 44.  He believes that lawsuits are

11   harmful to all.  And that's based upon a personal experience

12   he had.

13        49, he has strong negative feelings about people who

14   file lawsuits.

10:23:37 15        He thinks a number of lawsuits are too high and

16   verdicts are too high.  That's in response to 57 and 58.

17        In 59 he believes that legislative reform is

18   necessary and then -- let me make sure I have this right.

19        At 62 he says, "Since I have been personally sued, I

10:24:12 20   believe lawsuits should not take place without new laws."

21        Here, again, Your Honor, this juror is clearly

22   telling us that he is starting out with a bias against people

23   who file lawsuits and against the system in general.  He even

24   has suggested that he thinks -- he has implied that he doesn't

10:24:42 25   believe in the laws today because he thinks there's new laws.

10:24:47 1      And here again, in the written word he has

2      demonstrated a predisposition obviously formed long before he

3      even got this questionnaire showing that he has

4      predisposition.  And our position is we should not be forced

10:25:01 5      to question this witness -- juror in front of others and he

6      should be excused for cause here on the face of his

7      questionnaire.

8              MR. ROGERS:  We agree, Your Honor.

9              THE COURT:  This juror notes that he has a number of

10:25:18 10     family members who work in healthcare and he works for a

11     pharmacy benefits company, that a previous lawsuit nearly

12     bankrupted his family.  Sounds pretty personal.  So I agree.

13     I'm going to grant the challenge for cause to Juror 146.

14             MR. O'CONNOR:  So next, Your Honor -- I'm getting

10:25:56 15     close to the end here -- number 152.

16             Your Honor, I'll withdraw that.  I'm not going to

17     make a record on him.

18             THE COURT:  All right.

19             MR. O'CONNOR:  The next juror that we are moving on

10:26:45 20     is Juror 159.

21             Starting with his response to 49 where he talks about

22     frivolous lawsuits and then going down to -- I apologize, Your

23     Honor, I have my wrong notes.

24             Number 172.

10:27:48 25             I'll withdraw my position on number 159.

10:27:52 1          THE COURT:  Okay.

2          MR. O'CONNOR:  In response to question 44, the

3    question is, "Is there anything else that might affect your

4    ability to be fair and impartial?  And he answers yes and goes

10:28:23 5    on to talk about his experience with personal injury lawyers

6    and the claims industry he would not be -- he would not likely

7    be impartial.

8          And then he has responded that he thinks that the

9    number of lawsuits are too high and money damages are too

10:28:57 10   high.

11          But the point to us, Your Honor, is in a question

12   that directly asks about being fair and impartial he says no,

13   he does not believe he could be.

14          THE COURT:  Which question are you referring to?

10:29:17 15          MR. O'CONNOR:  Number 44.

16          THE COURT:  All right.

17          Mr. Rogers.

18          MR. ROGERS:  Your Honor, this juror indicates he

19   works in the auto claims area, and so I think that's probably

10:29:37 20   what he's talking about.

21          Mr. O'Connor's certainly correct, in response to

22   question 44 he did say that he had an experience with personal

23   injury lawyers that may lead him not to be impartial.  But in

24   regard to several other questions, he indicated he knew of no

10:29:54 25   reason why he could not be unbiased, and those are questions

10:29:58  1    39, 62, and 63.  And 39 is the question that specifically asks

2    him if he has any issues that would lead him to be unbiased in

3    a case regarding a medical product and he said he could be

4    unbiased.

10:30:17  5          THE COURT:  He says in response to question 44 that

6    he likely could not be impartial based on his experience in

7    the claims industry with personal lawyers.  It does appear

8    it's auto claims he's been involved with.

9          I think we need to ask this juror more questions to

10:30:37  10   determine whether that would affect this case, so I'm going to

11   deny the challenge for cause to Juror 172.

12         MR. O'CONNOR:  With the exception of the ones that I

13   was provided here today, Your Honor, that's all of the cause

14   motions we have.  I'll just need some time to go through

10:30:59  15   these.

16         THE COURT:  That's fine.  If you would, be sure you

17   get that back to us because that's our only copy of those

18   questionnaires.

19         MR. O'CONNOR:  Right.  Will there be five minutes at

10:31:09  20   the end where I get to look at these and go through them?

21         THE COURT:  Sure.  You can just do it during a break

22   in the morning and remind me to come back to that at the end.

23         Mr. Rogers.

24         MR. ROGERS:  Yes, Your Honor.

10:31:19  25         Our first strike for cause is Juror Number 59.  And

10:31:25   1    this gentleman is probably a little bit of the same category

           2    of the juror we just went over who had a negative experience

           3    being sued in a lawsuit.

           4         But this individual indicates that he and his family

10:31:40   5    brought a wrongful death action in regard to his sister's

           6    death and he indicates in response to question 62 and 63 that

           7    in his opinion and my family's opinion the doctor's poor

           8    standard of care caused his sister's death and that may

           9    possibly influence his ability to apply the law, was the

10:32:03  10    specific term he used.  So we believe he should be struck for

          11    cause, Your Honor.

          12         THE COURT:  Mr. O'Connor.

          13         MR. O'CONNOR:  Well, he qualified it like the last

          14    one we talked about.  And we're not here for any type of

10:32:15  15    medical malpractice or wrongful death lawsuit.  So given that,

          16    I think that both parties should be afforded to talk to this

          17    juror about his experience and then have an understanding how

          18    he would respond to the issues that are present in this case,

          19    not in a medical case.  Well, not a medical malpractice case.

10:32:40  20         THE COURT:  In response to question 62 he says, "It

          21    is possible this might influence my fairness," and 63 he says,

          22    "I am concerned this could influence me."

          23         I think we need to ask him more questions.  So I'm

          24    going to deny the challenge for cause to Juror 59.

10:32:56  25         MR. ROGERS:  Your Honor, our next strike for cause is

10:33:01 1    Juror Number 63.  And this juror indicates several times that

2    he is biased against IVC filters.  He works in the healthcare

3    industry.  It's a little unclear to me exactly what he does

4    because he says he is a project manager for Cancer Treatment

10:33:19 5    Centers for America.

6            But in response to question 42 he says that he has

7    heard IVC filters are very risky.

8            Question 39 he indicated he may not be able to be

9    impartial because "I have a bias toward IVC filters."

10:33:36 10    And then it's clear in questions 43, 44, and 63 that

11    he indicates he potentially cannot be fair because of his bias

12    against IVC filters.

13            MR. O'CONNOR:  We have no objection to that.

14            THE COURT:  All right.  I agree.  He's not equivocal.

10:33:56 15    He says directly "I am biased against IVC filters" and he

16    repeats it a number of times.  So I will grant the challenge

17    for cause to Juror 63.

18            MR. ROGERS:  Your Honor, our next juror is Juror

19    Number 80.

10:34:16 20    This individual indicated that she had an uncle who

21    got a Bard IVC filter who died shortly thereafter, and she

22    indicates that she has to turn the TV off when she sees

23    commercials because she gets so angry.  And she also indicated

24    that the FDA is clearly the problem in this country.

10:34:40 25    And specifically in response to question 63 she says,

10:34:44  1   "Without reading anything except what I read in the packet,

2   I've already formed an opinion in this case.  The medical

3   procedure was likely unnecessary and they did it for money."

4          MR. O'CONNOR:  Well, she's a naturalist.  Other than

10:35:08  5   that, we don't object.

6          THE COURT:  I'll grant the challenge for cause to

7   Juror 80.

8          MR. ROGERS:  Next, Your Honor, is Juror Number 114.

9   This gentleman is a retired pilot and he indicates in response

10:35:27 10   to question 39 that he's unsure that he can be fair and

11   impartial because of the volume of TV commercials that he has

12   seen about IVC filters and that leads him to believe there are

13   problems with the device.

14          And that's really the big issue with him, Your Honor.

10:35:46 15   He seems to have already formed an opinion that there are

16   issues with IVC filters, and we believe he should be struck.

17          MR. O'CONNOR:  Well, in response to other questions,

18   though, Your Honor, he certainly indicates he can be fair and

19   impartial.  We can't -- we can't control what people watch on

10:36:20 20   TV.  I think this juror -- we deserve to question this juror

21   to find out how he'll take this evidence and whether he can

22   set the TV ads aside.

23          THE COURT:  I agree we need more questioning of this

24   juror, so I'm going to deny the challenge for cause to 114.

10:36:45 25          MR. ROGERS:  Your Honor, our next and last challenge

10:36:46   1    for cause, at least with this group, is Juror 199.  I don't

2    know if Mr. O'Connor will agree, but this gentleman really

3    does not indicate he has any particular biases, but he does

4    have an IVC filter in place.  He does not know the

10:37:02   5    manufacturer.  Indicates he has not had any complications.

6    But I think it would be potentially problematic to have this

7    juror on the jury, so I think he should go.

8            MR. O'CONNOR:  Thanks.  That's the note I couldn't

9    read.  I agree.

10:37:18  10            THE COURT:  I'll grant the challenge for cause to

11    Juror 199.

12            MR. ROGERS:  Your Honor, even though there's not a

13    cause strike, there's a few more I want to bring to the

14    Court's attention.

10:37:34  15            THE COURT:  All right.

16            MR. ROGERS:  I start with Juror 118.  This gentleman

17    indicates that he's got a son who works as a file clerk at

18    Snell and Wilmer.  So I think he falls into the same category

19    as Juror Number 2.  Or Juror Number 9.  Excuse me.

10:37:53  20            THE COURT:  Your thoughts, Mr. O'Connor?

21            MR. O'CONNOR:  Yeah, no family members.  I agree.

22            THE COURT:  All right.  I will add Juror Number 118

23    to the challenges for cause.

24            MR. ROGERS:  Your Honor, the others were individuals

10:38:12  25    who I think the Court may want to consider for hardship

10:38:15   1   purposes.

2       Juror Number 6, for instance, did say in response to

3   question 1 that he was not asking for any hardship, but I did

4   want to bring to the Court's attention that he has had to have

10:38:30   5   bladder surgery and has a bladder stimulator.  I did want the

6   Court to note he needs to take frequent bathroom breaks.  So I

7   wanted to bring that to the Court's attention.

8       THE COURT:  I think we need to ask him about the

9   frequency.  I think I've had folks like that before who were

10:38:49   10   able to sit for an hour and a half on the jury.  He might be

11   able to as well, so we should ask him about that.

12       MR. ROGERS:  The next one, Your Honor, is Juror 68,

13   and this is another person that I think we ought to flag for

14   you for hardship purposes.

10:39:13   15       This gentleman indicates he's been disabled for nine

16   years.  His wife is disabled and his son is disabled.  And,

17   again, he did not ask for hardship excuse in response to

18   question 1, but in response to question 29 he did indicate

19   that he was a caretaker for his wife and son who are both

10:39:33   20   totally disabled.

21       THE COURT:  I think we need to ask him questions

22   about whether that will affect his jury service.  It's a fair

23   question, but I don't think it's answered by the

24   questionnaire.

10:40:01   25       MR. ROGERS:  Lastly, Your Honor, I wanted to bring to

10:40:02   1   your attention Juror Number 163.  And again as potential

2   hardship, and maybe this is somebody we need to bring in, but

3   this gentleman indicates that he had a severe traumatic brain

4   injury a few years ago and that it would affect his ability to

10:40:19   5   read and understand.  He also indicates he lost significant

6   parts of his memory, including his short-term memory.  And

7   that is in response to question 35.

8           THE COURT:  Where's the reference to short-term

9   memory?

10:40:58   10           MR. ROGERS:  I wrote in my notes question 35.  I may

11   have been mistaken.

12           MR. O'CONNOR:  I think he's talking about someone

13   who -- he was a witness in a suit against a healthcare

14   provider.

10:41:11   15           THE COURT:  Well, he says he has a permanent memory

16   loss in 35, but I don't see a reference to short-term memory.

17   That was my question.

18           MR. ROGERS:  Well, Your Honor -- well, I guess what I

19   was referring to, there is question number 2 where he said "I

10:41:34   20   had a severe traumatic brain injury a couple of years back

21   which affects short-term memory."

22           He doesn't necessarily say he has that, but that's

23   what I was referring to.

24           THE COURT:  I see.  Okay.

10:41:46   25           Your thoughts, Mr. O'Connor?

10:41:51   1          MR. O'CONNOR:  No, I do see that now.  I read the

2      other question differently and thought he was trying to

3      describe a lawsuit.

4          I don't know what to say.  I mean, obviously that

10:42:05   5      would be a problem if he came and told us.  I think that would

6      be a hardship.  But he was able to complete this questionnaire

7      fairly thoroughly, and he certainly didn't ask to be excused

8      because of that.

9          I do share the concern on other side, though.  I

10:42:21  10      think we certainly want people that are going to be able to

11      perceive and understand the evidence and recall what was

12      presented.  Well, we want them to recall what we said not what

13      the defense said.  But recall will be important to us.

14          We would not object if you wanted to excuse him for

10:42:45  15      hardship, Your Honor.

16          THE COURT:  All right.  I'm going to do that.  I'm

17      going to do it because he says that the traumatic brain injury

18      was four years ago and affects -- he says "affects," he

19      doesn't say "affected" -- affects short-term memory.  This is

10:43:00  20      a case that's going to require lots of short-term memory as

21      well as put stress on the jurors, so I think we should excuse

22      Juror 163.

23          Is that all of them, Mr. Rogers?

24          MR. ROGERS:  Yes, Your Honor.

10:43:12  25          THE COURT:  Subject, then, to the ones that we're

10:43:14  1    still reviewing, the jurors that we're going to -- where I've

2    granted challenges for cause are Jurors 9, 40, 49, 61, 66, 78,

3    146, 63, 80, 199, 118, and 163.

4         Does that look right, Traci?

10:43:43  5         THE COURTROOM DEPUTY:  Yes, sir.

6         THE COURT:  So we will add those to the folks we've

7    already excused for hardship.  We will not have them come in

8    on the 18th for jury selection.

9         In our previous two bellwether trials we have had 60

10:44:08  10   jurors come in and we've never gotten to 50 in our jury

11   selection.  There's a cost involved in bringing in jurors we

12   don't need.  So I'm inclined to have 50 appear because we've

13   made it pretty comfortably with 50 the last two times.  But

14   I'm interested in your thoughts whether you're comfortable

10:44:31  15   with that or whether you still think we need to bring in 55 or

16   60.

17        MR. LOPEZ:  Could we have two minutes?

18        THE COURT:  Sure.

19        MR. O'CONNOR:  I'm willing to turn it over to

10:45:07  20   Mr. Lopez, Your Honor.

21        MR. LOPEZ:  Based on history, we've never lost a

22   juror either, Judge.  We have three extras in case we lose

23   three.  So maybe the safe thing to do, if we're going to go

24   down to 50, maybe we only have eight jurors.

10:45:28  25        MR. ROGERS:  Your Honor, I disagree.  I think we've

10:45:31  1    done fine with nine and I don't really know why bringing in of

2    the entire panel really affects number of jurors we seat.  I

3    don't see the connection there, really.

4           But if Your Honor wants to bring in 50, we're fine

10:45:45  5    with that.

6           THE COURT:  All right.  Well, I really err on the

7    side of caution when it comes to the number of jurors.  I have

8    had the experience of losing a juror a week to cause.  Since

9    this is a three-week trial, that's why I picked three

10:46:04  10   additional jurors.

11          Why don't we bring in 55, Traci.  That will save us a

12   little money in jury funds yet still give us a margin of

13   comfort.

14          So we'll have 55 jurors appear on the 18th for jury

10:46:20  15   selection.

16          Please remember, Counsel, that you need to get to

17   Nancy, she'll be back by then, the witness list in a form that

18   we can hand it out to the jurors in the jury room on the

19   morning they appear.  So please be sure to get that to us,

10:46:40  20   let's say by noon on September 14th.  So by noon a week from

21   tomorrow.  That way there will be plenty of time to copy it

22   and have it down to the jury office on the 17th so they can

23   hand it out on the morning of the 18th.

24          We handed out the voir dire questions to you.

10:47:15  25   They're very generic.  I took out of them the FDA questions

10:47:21  1    that we asked in the Booker trial because we put those into

2    the questionnaire.

3         So they're just the very generic kinds of questions

4    that we asked to see if any other issues have come up.  So

10:47:34  5    look over those.

6         If there are additional voir dire questions you think

7    should be asked, please be prepared to address those when we

8    start at 8:30 on the 18th and I'll be happy to hear any

9    suggestions that you have.

10:47:47  10    I've also given you preliminary jury instructions.

11    They're also very generic.  Although the second one is a brief

12    description of the case that I've modified to reflect the

13    nature of this case.  So look over that and see if you have

14    any concerns, and we can hear those as well on the morning of

10:48:09  15    the 18th.

16         And we'll follow the same jury selection practices we

17    had before:  We'll seat all 55 jurors in order.  I'll ask my

18    general voir dire questions.  We'll then give plaintiff a

19    chance for follow up and defense a chance for follow up.  And

10:48:29  20    then we'll excuse the jurors, hear challenges for cause, and

21    then have you exercise your peremptory -- your three

22    peremptory challenges per side.

23         Any questions on jury selection?  Or issues?

24         MR. ROGERS:  No, Your Honor.

10:48:49  25         MR. O'CONNOR:  I'm just looking at -- no other

10:48:54  1    questions.  When you're ready, I think we can make a record on

2    the other -- on the other questionnaires.

3         THE COURT:  Oh.  Let's go ahead and do that now.

4         MR. O'CONNOR:  Your Honor, number 35 is the one that

10:49:13  5    we would move for cause on.  And just quickly going through

6    this, her response to number 36 she ranks us low, but I

7    thought -- in response to question 39, the question is, is

8    there anything in this that causes you to believe you could

9    not consider the evidence clearly?  And she let's us know that

10:49:53  10   her mother's a high-risk cardiac patient and she's also a

11   Banner Health employee.

12        She thinks there's too many lawsuits in response to

13   other questions.  And then at the end she again has alerted us

14   as to reasons why she can't be fair and impartial.  Due to her

10:50:14  15   current lifestyle she has a soft spot for elderly people.

16   Granted, I don't think that's directly relevant here, but what

17   is important is that she's already telling us she can't be

18   fair and impartial.

19        And then in response to 64 she made it a point to

10:50:33  20   tell us that she works in a healthcare facility.  She gets

21   told stories all the time from patients.

22        And so it seems to me that just on its face this is a

23   potential juror who is telling us that her life experiences

24   and what she's learned is going to cause her difficulty to be

10:50:51  25   fair and impartial in this case.

10:50:54 1    THE COURT:  All right.  Mr. O'Connor, you have my

2    copy.  Could you bring that up with the other three as well,

3    please.

4         MR. O'CONNOR:  Sure.

10:51:02 5    That's number 35.

6         THE COURT:  Mr. Rogers.

7         MR. ROGERS:  Your Honor, we agree.  This juror is a

8    little bit of a mixed bag, but she does indicate some biases.

9         And in response to 41 she also says she may -- she

10:51:47 10   doesn't really answer the question regarding bias, but she

11   says she has heard something about Bard and indicates she had

12   a patient, slash, friend, who had dislikes about Bard products

13   from her previous surgeries.  She doesn't indicate what those

14   are.  But I agree, Your Honor, she probably is showing some

10:52:04 15   biases and ought to be struck.

16        THE COURT:  She also says in her questionnaire, I

17   noticed this when I looked at it, that she could not follow

18   the Court's directions about not communicating on social media

19   regarding the case.

10:52:19 20        I'm going to grant the challenge for cause to Juror

21   35.

22        That means that Jurors 21, 42, and 144 will be added

23   to the list of jurors from whom we will bring in the 55 on the

24   18th.

10:52:38 25        MR. O'CONNOR:  Your Honor, I'm just reminded, we left

10:52:39  1    our Post-its on your copies.

2                   THE COURT:  Would you like them back?

3                   MR. O'CONNOR:  I think -- I'll come up and remove

4          them for you.

10:52:51  5                   THE COURT:  They're fine.  We'll throw them away.

6          Unless you need them for some purpose.

7                   MR. O'CONNOR:  I'm sorry?

8                   THE COURT:  So we'll add Juror 35 to the list of

9          jurors who will not be brought in.

10:53:07  10                  MR. O'CONNOR:  Again, Your Honor, can you repeat the

11         number?

12                  MS. REED ZAIC:  35?

13                  THE COURT:  35.

14                  MS. REED ZAIC:  I thought you said 144.

10:53:17  15                  MR. LOPEZ:  I missed the three that you said were

16         remaining, Judge.

17                  THE COURT:  The ones who are remaining, of the new,

18         are Jurors 21, 42, and 144.

19                  MS. REED ZAIC:  That's it.  Okay.

10:53:27  20                  THE COURT:  So we'll take the 55 lowest numbers that

21         remain and those will be the folks who will be asked to come

22         in on the 18th for jury selection.

23                  For purposes of trial, as we've discussed, we'll

24         start on the 18th.  We'll get the jury chosen by some point in

10:53:52  25         the noon hour.  So we should be able, after the lunch break,

10:53:56  1    to go right into openings and evidence.  We'll plan to go to

2    4:30 that day.

3              We'll be in trial on the 19th, 20th, and 21st.

4              We've agreed on Monday the 24th we will start in the

10:54:11  5    afternoon, so we'll start at 1 p.m. on the 24th.

6              Does that work for you, Mr. Lopez?

7              MR. LOPEZ:  Yes, Your Honor.

8              THE COURT:  And we will then be in trial on the 25th

9    through the 28th.  And on August 1st through the 5th.

10:54:27 10   October.

11             We've allocated 33 hours to plaintiff and 30 hours to

12   defense.  That was in Docket 11871.

13             As you've seen from my order, I've concluded that we

14   should bifurcate punitive damages as we did in the earlier two

10:54:48 15   trials.

16             By my count, if each side reserves an hour for the

17   punitive damages phase, then we should get this case to the

18   jury on the morning of October 4th, Thursday.  We might even

19   conclude closings on the afternoon of October 3rd.  And I

10:55:07 20   think that's good.  That gives us a couple days both for jury

21   deliberations and for the punitive presentation.

22             So that's the schedule we'll follow in the case.  And

23   I'll plan, as we have in the past, to go until probably 4:30

24   on the days I can.  I have -- I've already scheduled hearings

10:55:27 25   every day in the trial at 4:30, so there may be a day or two

10:55:31   1   where we have to break a few minutes early if there's

          2   something I need to do to prepare for one of those hearings.

          3        I will give you, as I have in the past, my prelim- --

          4   I'm sorry, my proposed final jury instructions early in the

10:55:45   5   trial.  If I can get them done next week I'll get them to you.

          6   Although, looking at next week, I'm not sure I'll be able to

          7   do that.  In any event we'll get them to you during the first

          8   week of the trial.

          9        I was told this morning that I have received 22

10:56:03  10   depositions from you all in the last two days.  Is that right?

         11        MR. LOPEZ:  Sounds about right.  Having reviewed --

         12   been involved in the process, that sounds about right.

         13        THE COURT:  I would be thinking we'd be reducing the

         14   number of depositions I have to review as we go through these

10:56:23  15   bellwethers.

         16        MR. LOPEZ:  Well, the numbers are the same, but --

         17   we'll probably have to meet and confer based on some of the

         18   rulings we've seen on others because of Wisconsin law and the

         19   effect of the MSJ on failure to warn.

10:56:33  20        If you recall, we just went through previously ruled

         21   on and designated to see if we had any objections based on the

         22   failure to warn MSJ ruling and Wisconsin law, and then you

         23   granted us leave to go back on some.

         24        We didn't -- neither side, I think, abused that.  We

10:56:52  25   were very selective about additional questions in a number of

10:56:57   1    those.

2              THE COURT:  Okay.

3              MS. HELM:  Your Honor, I just wanted to reiterate

4    many of those it's four, five pages.  So you didn't get 22

10:57:07   5    complete depositions to have to review again.

6              THE COURT:  Okay.  Well, I will do my best to get

7    through those soon, but given my schedule over the next week,

8    there may be some of those you don't get my rulings on until

9    late next week or even the weekend after this.

10:57:27  10         I've got some plane time on Wednesday going to DC

11   that I might be able to get the rest of them done, but I just

12   don't know.  So I'll do my best to get them out, but some of

13   these might come in pretty close to the start of trial.

14             MR. LOPEZ:  I think knowing that, and knowing that

10:57:47  15   sometimes we ask for -- we did this before.  We've got a sense

16   of where the Court was going on some of these things.  And

17   certainly by the time we get to trial, we don't play -- we

18   just want to make sure we have your rulings in case we take

19   stuff out and what we do.

10:58:05  20        I will tell this the Court this:  Since we're putting

21   that evidence on first, we'll commit to looking at those

22   depositions and getting to the Court probably pared down

23   versions of those based on what I think -- stuff I think we

24   probably need to take out based on your rulings, or maybe

10:58:24  25   leave in.

10:58:29  1          THE COURT:  Are you talking, Mr. Lopez, about the 22

       2   received today?  Do you want to take another pass through

       3   them?

       4          MR. LOPEZ:  No.  I'm just trying to accommodate the

10:58:36  5   Court more than anything else.  I'm not sure -- that might be

       6   an effort not worth doing because --

       7          THE COURT:  Well, I'm in meetings all day tomorrow

       8   and all day Saturday, but I'm going to have some breaks and I

       9   intend to start then.  I'm just going to load them all on my

10:58:51  10   iPad and start churning through them.  So I'd say don't -- I

       11   appreciate the suggestion, but I don't know when I'm going to

       12   get to them so I'll just start as soon as I can and I would

       13   say you shouldn't redo them.

       14          MR. LOPEZ:  Okay.

10:59:04  15          THE COURT:  All right.  Let's talk about the motions

       16   in limine.

       17          I've been through all of the motions in limine and I

       18   can get you my ruling on those probably today.  There's one

       19   that I wanted to talk through with and you, and if you have

10:59:19  20   others you want to make additional argument on I'll be happy

       21   to let you do that, and that's defense Motion in Limine

       22   Number 5 with respect to Dr. Kandarpa.

       23          I've read both sides' briefs.  I want to explain to

       24   you my thinking on this so you can point out where you

10:59:41  25   disagree.

10:59:44   1          Here -- here's my view.  Dr. Kandarpa is a fact

2     witness in this case.  He's not been designated as an expert.

3     There was no expert report given.

4          I didn't allow him in the first two trials because of

10:59:58   5     nondisclosure, but I concluded the prejudice from that can be

6     cured for this trial so I've allowed him as a fact witness for

7     this trial.

8          The issue that is addressed in the motion in limine

9     arises only to the extent that Dr. Kandarpa gives opinion

11:00:15  10     testimony.  He can testify as a fact witness without any

11     Rule 701 or 702 concerns.

12          He can give opinion testimony only under Rule 701 as

13     a lay witness.  He can't give opinion testimony under Rule 702

14     because he's not a designated expert in the case and has not

11:00:37  15     been identified as an expert.

16          Rule 701 says that a lay witness can give opinion

17     testimony but not if the opinion is based on scientific,

18     technical, or other specialized knowledge within the scope of

19     Rule 702.

11:00:58  20          So even if there's a factual basis and there's a

21     perception and 701 is otherwise satisfied, the opinion can't

22     be given under 701(c) if it is based on scientific, technical,

23     or other specialized knowledge within the scope of Rule 702.

24          The line between lay opinion testimony and testimony

11:01:20  25     covered by Rule 701(c) can sometimes be very difficult to

draw, in my experience.

         The Ninth Circuit has said in a decision last year,
*United States versus Barragan*, B-A-R-R-A-G-A-N, 871 F.3d 689
at page 704 that "The line between lay and expert opinion
depends on the basis of the opinion not its subject matter."
That's all they say.  You can read the rest of the case and
there's no more illumination than that.

         That helps a little bit, but here's the difficulty.
Let's say a witness, Dr. Kandarpa, makes statement expressing
his viewpoint or his opinion during the deposition that is
based in part on what he heard and saw and did in the EVEREST
study and in part upon his specialized knowledge as a doctor.
Is that a lay opinion or is that an expert opinion?

         I don't know any clear line you can articulate on
that in the absence of actually looking at the question and
making the best judgments.

         So my view is that what I need to do with respect to
Dr. Kandarpa is rule question by question on whether I think
an answer is a 701(c) opinion that is inadmissible or a 701(a)
and (b) opinion that is admissible.

         I will tell you the thinking I will go through on
that question.  When I look at a question I'm going to ask
three things:  Number one, is it an opinion.  If it's not,
it's okay.

         Number two, is it based on his work in the EVEREST

11:03:06  1    study or on his specialized knowledge as a doctor?

2           And number three, I'll look at the context to try to

3    answer that question.

4           And where I see a question or an answer, an opinion

11:03:20  5    that is based in part on his work in EVEREST and part on his

6    role as a doctor, I'm just going to have to make my best

7    judgment as to whether I think that is a legitimate lay

8    opinion or expert opinion.

9           That's the way I think I need to approach it and just

11:03:36 10   do it question by question.  But I'm interested in your

11   thoughts on whether any of you see it differently.

12          MR. LERNER:  Your Honor, do you want me at the

13   podium?

14          THE COURT:  Yeah, please, so everybody can hear you.

11:03:50 15   MR. LERNER:  Your Honor, I agree with you.

16   Dr. Kandarpa is one of the depositions we submitted to you.  I

17   think there's some questions in there that are clearly opinion

18   related and things that he had an opinion about before the

19   EVEREST study that's unrelated to the EVEREST study, and then

11:04:07 20   there's opinions that he's offering that are not just based on

21   facts or observations from that study that I think you just

22   have to make a ball-and-strike call on.

23          I will note that sometimes I think the plaintiffs

24   were thinking about this and sometimes in their questioning

11:04:19 25   they would ask the question as a medical monitor and ask the

11:04:22   1    question as if it was not opinion based.  So -- trying to get

2    over this hurdle.

3          So when you're reviewing that deposition, I think the

4    fact that they asked the question that says as a medical

11:04:35   5    monitor, X, Y, Z, it still may be something that calls for

6    expert opinions and that was not disclosed to us.

7          But I agree with your overall assessment.  It's going

8    to be ball and strike, question by question.

9          THE COURT:  Okay.  Thanks.

11:04:50  10    Mr. Lopez.

11          MR. LOPEZ:  I understand the struggle between those

12    sections in 701.  I did point out, however, I think I gave you

13    the testimony that for the most part I think he was testifying

14    about his observations as the medical monitor in the EVEREST

11:05:10  15    study.  I think where it gets difficult is if he answers a

16    question based on EVEREST, he's doing that as a person hired

17    by Bard because of his credentials and expertise.  So I'm not

18    sure how you parse that out.  I don't know that you can.  I

19    don't know that it's fair that you do if in fact his opinions

11:05:36  20    or his statements about the EVEREST study are based on the

21    fact that he is this highly qualified interventional

22    radiologist who was hired by Bard to adjudicate those adverse

23    events.

24          The other thing, Your Honor, I just -- again, I'm

11:05:54  25    mindful of the fact that we've had a number of other witnesses

11:05:57   1   who were not Rule 26 experts.  Dr. Trerotola is one that comes

2   to mind.  You'll see we submitted some additional objections

3   to his deposition testimony and ask you to actually add some

4   testimony to it.  There are opinion testimonies throughout

11:06:16   5   that deposition designation by the defense.  And same with

6   Dr. DeFord.

7       So I just bring that to the Court's attention because

8   there have been some exceptions to someone rendering opinions

9   even though they haven't been designated as Rule 26 experts

11:06:32  10   nor have they provided a report, but because of their special

11   relationship with Bard or the issues that are related to their

12   testimony, the Court has in fact allowed a lot of what I --

13   certainly the plaintiffs would consider expert testimony by at

14   least those two.  I'm sure I could think of others.  But those

11:06:53  15   are two depositions I happened to work on so I know about

16   those two right now.

17       But I understood the rules and I understand the

18   evidence that applies to these.  But I also wanted to bring to

19   the Court's attention the special relationship with Bard and

11:07:08  20   how -- one more point I wanted to make, Your Honor, is

21   sometimes opinions that he might have that he expressed are

22   opinions -- our position's going to be maybe these are

23   conversations that Bard should have had with Dr. Kandarpa when

24   he was in that role and these are opinions he would have

11:07:29  25   rendered to them or did.  And they should have been mindful of

11:07:35  1    his opinions as the medical monitor based on his expertise

2    when they made certain decisions and representations to the

3    FDA, doctors, patients, et cetera.

4         THE COURT:  I'm not sure I'm understanding your last

11:08:07  5    point, Mr. Lopez.

6         MR. LOPEZ:  Well, if Dr. Kandarpa has opinions about

7    what was going on, I mean some of the opinions you're talking

8    about were opinions that Bard had an opportunity to obtain

9    from someone like him before they submitted their final report

11:08:25 10    on EVEREST, before they decided to make certain decisions

11    about the continuing marketing of the G2 device without maybe

12    changing the warnings, making design changes.

13         So I think his opinions is in his capacity as an

14    agent at the time, and certainly he was an expert to them,

11:08:45 15    about what his -- what advice he would have given to Bard had

16    they asked.  That's -- I think that's relevant in the case.

17         Just like what Dr. Trerotola says about in his

18    opinions with respect to his experience in working with Bard,

19    with those devices, in particular the G2 device, him making a

11:09:10 20    statement that the medical community considered the Simon

21    Nitinol filter the Simon frightenol filter.  Those are expert

22    opinions in addition to hearsay.

23         But I think there is another issue here with respect

24    to Dr. Kandarpa's special role and relationship, not just to

11:09:29 25    the EVEREST study as a study, but to the patients and the

11:09:33  1    risks and complications of those patients and the kind of

2    advice they could have received from Dr. Kandarpa about that

3    had they asked.  And the opinions that he renders, I think.  I

4    think you're talking about opinions he's rendering, isn't that

11:09:49  5    something doctors should have known.

6         Certainly our position's going to be why didn't you

7    ask Dr. Kandarpa about that while you had access to him, who

8    was the person who that the most and the best knowledge about

9    what was going on with that patient population.

11:10:06  10         THE COURT:  Okay.

11         MR. LOPEZ:  Thank you, Your Honor.

12         THE COURT:  Mr. Lerner.

13         MR. LERNER:  Your Honor, Dr. Kandarpa's role was to

14    adjudicate whether something was a complication or not.  So to

11:10:18  15    the extent he's offering opinions, they asked questions about

16    does that relate to the brochures or this cascade theory they

17    developed.  Those are all opinion related things.  If they

18    wanted to disclose him as an expert, they had a disclosure

19    requirement or report requirement.

11:10:34  20         So I think it all goes back to what you said earlier.

21    Question by -- question by question analysis.  But he's there

22    to testify about his facts, his observations, what he saw, the

23    documents that he submitted.  Those sorts of things.  But

24    there's a lot of things here that go beyond those things that

11:10:51  25    are really opinion related and that, given the disclosure

11:10:55  1    requirement, report requirements, they should have been

2    disclosed if they were going to offer those opinions.

3              THE COURT:  Okay.  Thanks.

4              You know, there's a second issue that I've wrestled

11:11:09  5    with and I'll mention to you just so I can get the benefit of

6    your thinking.  One question that I just tried to outline is

7    what do you do when an expression of opinion is based in part

8    on what Dr. Kandarpa saw or heard or did in the EVEREST study

9    and in part on his expertise as a doctor.

11:11:32 10    There's another line that's been drawn in some of the

11    cases on expert disclosure.  It's a line that's drawn, used to

12    be drawn, when dealing with Rule 26 disclosures before Rule

13    26(a)(2)(C) was added, which is the obligation of a lawyer to

14    disclose expert opinions that don't have to be in an expert

11:11:54 15    report.

16             So cases that were dealing with the question of what

17    has to be in an expert report before there was an (a)(2)(C),

18    including the *Goodman* case in the Ninth Circuit, drew the line

19    between an opinion that was formed by a doctor in the course

11:12:09 20    of treatment and an opinion that was not formed in the course

21    of treatment, that was developed later.

22             The example being if a doctor, you know, who was

23    caring for a cancer patient developed the opinion in the care

24    that the patient had five years to live, that would be an

11:12:31 25    opinion developed as part of his care of the patient.  And if

11:12:35   1   there's a trial later and the doctor adds an opinion that the

2   cancer was caused by exposure to a particular substance, an

3   opinion that was not formed during the course of treatment but

4   was a causation type opinion.  The way the courts dealt with

11:12:53   5   that is that the opinion formed after the treatment or

6   independent of the treatment had to be disclosed under Rule

7   26(a)(2)(B) in an expert report.  The opinion formed during

8   the treatment didn't have to be because it was part of the

9   treatment.

11:13:07  10        Now, that was a Rule 26 way of thinking of things.

11        But I suppose in a case like this you could say that

12   opinions Dr. Kandarpa formed during and as a result of his

13   involvement in the EVEREST trial are facts related to the

14   EVEREST trial.  It's an opinion he developed that is now a

11:13:30  15   fact of something that arose from the EVEREST trial and is not

16   really the expression of a new opinion.

17        Whereas an opinion that he states in the deposition

18   that didn't arise from his involvement in the EVEREST trial is

19   an expert opinion under Rule 702.

11:13:49  20        It's another place to draw the line.  It's imperfect

21   for a number of reasons.  But I'm just interested in any

22   thoughts you all have on that question.

23        MR. LERNER:  Your Honor, when I was looking at this I

24   was looking at your standing order in the *Goodman* case as

11:14:07  25   well, and I thought that with the new requirement we can do

11:14:09  1   disclosures that you don't need a report that the distinction

2   was under Ninth Circuit law, the *Goodman* case, was that if you

3   had opinions formed during the course of treatment, maybe

4   during the EVEREST study, that requires a full expert report.

11:14:24  5   And then opinions formed -- I'm sorry.  Opinions formed during

6   the course of treatment or during the EVEREST study is ones

7   you do disclosures.  Opinions that are formed outside of the

8   EVEREST study, like outside of a treatment, that's when you

9   need the full report.

11:14:40  10        So I was thinking along the same lines that that's

11   how you distinguish those.

12        But even the opinions that are formed during the

13   EVEREST study, if you make that analogy to a treating

14   physician, you would have to do disclosure.  So when we took

11:14:55  15   the deposition, we're preparing for the deposition, we know

16   the summary of his opinions and basis and we can test those

17   and don't have to do it on the fly, and then we can analyze

18   *Daubert* challenges, see if we have to file a *Daubert* motion.

19   Here we didn't have that opportunity.  There's no disclosure

11:15:11  20   either way about the opinions that were going to be offered.

21        MR. LOPEZ:  Your Honor, I think we were very careful

22   in that deposition when we asked him questions about whether

23   or not this was based on his observations as the medical

24   monitor and the facts as related to his role as the medical

11:15:33  25   monitor in the EVEREST trial.  Not, you know, based on what

11:15:38  1   you've heard since and based on other facts after that time

2   period and his state of mind as it existed at that time.  We

3   made it clear this was based on those facts as they existed

4   and where his mind was at that time and not something that

11:15:54  5   would have transpired after that.

6        THE COURT:  All right.  Thanks for your comments.

7        The Kandarpa deposition transcript that came in I

8   deleted because you called and said don't use it.

9        MR. LOPEZ:  I'm sorry, I didn't hear that.

11:16:09  10        THE COURT:  I deleted the deposition transcript

11   because there was a call to our office saying don't rule on

12   this, we're still working on an issue.  So I don't have the

13   transcript you all previously submitted.

14        MS. HELM:  It's actually been resubmitted, Your

11:16:21  15   Honor.

16        THE COURT:  In the last couple days?

17        MS. HELM:  If you'll give me a minute, I'll search

18   and find when we sent it, but it definitely was resubmitted.

19        THE COURT:  All right.  It's not in the list of the

11:16:33  20   22 depositions that we counted this morning in our e-mails.

21        MS. HELM:  It came in before those.  But, Your Honor,

22   I'll find it and resend it to Nancy's e-mail.

23        THE COURT:  No.  Send it to Jeff's e-mail.  Nancy's

24   not in town and she has 4,000 e-mails in her inbox right now.

11:16:52  25   We'll never find it.

11:16:54  1          MS. HELM:  Okay.  I will find it and make sure I

2     e-mail it to Jeff.

3          THE COURT:  Okay.  I will think about what you've all

4     said and go through and rule question by question.

11:17:03  5          MR. LOPEZ:  I was going to say don't make that number

6     23, Judge.  Move those down and make Kandarpa maybe one, two,

7     or three on the list you go through.

8          THE COURT:  Because he's earlier in your

9     presentation?

11:17:14 10          MR. LOPEZ:  He will be.  Plus it's the subject of a

11     motion anyway.  You'll probably do that anyway.

12          THE COURT:  Well, do you need him earlier?

13          MR. LOPEZ:  Yes.

14          THE COURT:  Okay.  I'll try to get to him earlier.

11:17:28 15          Okay.  As I mentioned, I've been through all of the

16     other motions in limine.  Do plaintiffs want to make arguments

17     on any of those other motions that have been submitted?

18          MS. REED ZAIC:  Actually, it was in opposition to

19     defendants' motions, so I don't know that I should have jumped

11:17:52 20     up first.  It's not our motion.  The opposition to the

21     cephalad migration evidence.  I wanted to make a comment --

22          THE COURT:  That's fine.  Yeah, that's fine.

23          MS. REED ZAIC:  I'm not trying to be psychic, but I

24     did notice in a ruling on a particular transcript you

11:18:09 25     indicated that the Court seems to be leaning towards excluding

11:18:13  1    the Recovery death migration evidence because there is an

2    issue whether this was an Eclipse.

3          I just wanted to add comment, Your Honor, that in our

4    motion opposing the Recovery migration death evidence I

11:18:27  5    pointed out that we absolutely understood the Court's

6    admonitions in the Booker trial to not run away with that

7    evidence and we were very, very specific starting from opening

8    with regard to the design of the filter our position that it's

9    extremely important for us to be able to present to the jury

11:18:45 10    why the redesign from Recovery to the G2 filter took place.

11    And we were very careful to limit the evidence to that in

12    presenting it to the jury.

13          And the reason why it's particularly important in

14    this case is that we have to provide the -- presumably we will

11:19:02 15    have to provide some basis for feasibility.  Some sort of

16    argument about the feasibility.  And there was an immediate

17    reaction when it came to what was happening publicly regarding

18    the migration deaths and the timing of which they ran back to

19    the table to redesign, as opposed to later on with the G2

11:19:21 20    filter the argument from the defendants seems to be that these

21    were asymptomatic.  There was not this public outpouring and

22    knowledge of resistance to using the product.

23          So in presenting our ability -- their ability to sit

24    down and redesign a filter quickly, that's a key piece of

11:19:38 25    evidence.  Again, understanding the Court's admonition that

11:19:41  1    we're not to run away with that evidence.

2              I just wanted to make that additional comment or

3        argument.  And I'm taking advantage of I got a preview --

4              THE COURT:  Right.  Let me ask you a question on that

11:19:51  5    point, Ms. Reed Zaic, because I saw that argument in your

6        brief.

7              I understood you to be saying that it's going to be

8        important for you to be able to tell the jury that this

9        company can act quickly and make changes to filters when it's

11:20:06  10   motivated to do so.

11             MS. REED ZAIC:  Can act quickly, yes, Your Honor.

12             THE COURT:  If I were to stand by my ruling on

13       cephalad death evidence, there is nothing that would preclude

14       you from putting in evidence that Bard acted quickly to put

11:20:21  15   the G2 on the market when the Recovery filter problems were

16       known.  You could still show that within nine months it had

17       something on the market and therefore has the ability to be

18       nimble and quick when it wants to do so, to make the very same

19       point that it's not true that it takes years and years to

11:20:39  20   develop a filter.  What is your thought on that?

21             MS. REED ZAIC:  My thought on that is, again, because

22       it was public, because these deaths were -- pardon me.

23       Because this was a public issue that they were reacting to,

24       they were motivated.  Right?  It goes to their conduct.  They

11:20:59  25   were motivated to sit down more quickly when it's a death.

11:21:02  1          Right now what would be presented -- first of all,

2       there's evidence we wouldn't be able to put in front of the

3       jury at all regarding their ability, not only the feasibility

4       that their redesign but their conduct in we treat this

11:21:12  5       situation completely different.

6          Although people can die from G2 related injuries and

7       complications, in the moment when it was apparent and a public

8       communications risk with their company, that's what drove them

9       to sit down and redesign.  And whereas they didn't have that

11:21:29 10       second -- that scenario the second time around, they didn't

11       run back and redesign it.

12          I think that it's an issue of it not being complete

13       if I've got redacted statements about injuries and pointing

14       out this happened before they were able to sit down.  The

11:21:44 15       gravitas of it with regard to Bard's conduct is not going to

16       be clear to the jury.

17          THE COURT:  Okay.  Thank you.

18          All right.  Defense counsel, do you have points you

19       want to make on any of the motions in limine?

11:22:13 20          MR. ROGERS:  Your Honor, I believe Mr. North is going

21       to address Ms. Zaic's comments.

22          THE COURT:  That's fine.

23          MR. NORTH:  Your Honor, I would just point out

24       briefly that there's nothing in this Court's previous ruling

11:22:25 25       in Jones that precluded the plaintiffs from introducing

11:22:29  1   evidence that the Recovery filter did have reports of

2   migration and did have reports of fracture.  The complication

3   evidence was allowed to go in.  It was merely the inflammatory

4   and prejudicial evidence about the deaths themselves that did

11:22:45  5   not go in.

6        But they can make the point that Ms. Zaic is saying

7   they need to make by pointing out that we acted quickly when

8   there were reports of complications of fracture and of

9   migration.

11:22:59  10        I would also note, Your Honor, that this particular

11   instance in Hyde is very different from what the Court faced

12   in Booker because of the date of implant.

13        Ms. Booker's implant was 2006, only a year or so

14   after the G2 had been placed in the market.  Ms. Hyde's

11:23:18  15   implant was Feb- -- yeah, February of 2011.  And so the

16   Recovery filter migration death evidence is extremely remote

17   to any of the issues relevant to Ms. Hyde's claim.  And for

18   that reason, we would ask the Court to adhere to the ruling in

19   Jones.

11:23:37  20        THE COURT:  Okay.  I understand the parties' views on

21   that issue.

22        I will get you a decision on the non-Kandarpa motions

23   in limine today, I'm pretty confident.  Tomorrow in any event.

24        All right.  Let's talk about matters that are raised

11:24:07  25   in the final pretrial order.  I went through it.  There's

11:24:11  1    several issues I wanted to take up with you.

2              First, a procedural question.  Do you want me to read

3         to the jury, as I think I did before, the stipulations that

4         are contained on pages 4 and 5 of your final pretrial order?

11:24:43  5    MR. ROGERS:  Your Honor, the defendants would agree

6         to that.

7              THE COURT:  So what I'm referring to specifically are

8         the stipulations in section C(1)(a) through (l) that's on

9         pages 4 and 5.

11:25:24  10             MR. O'CONNOR:  That's fine.  Through (l) you said; is

11        that right, Your Honor?

12             THE COURT:  Yeah, through (l).

13             MR. O'CONNOR:  We have no objection.

14             THE COURT:  Okay.  I will read those stipulations,

11:25:35  15   then, before the openings.

16             It seems to me, as I do read that, that I ought to

17        read the footnote on page 4 about the fact that there's a

18        disagreement on whether this is a G2X or Eclipse so the jury

19        understands that going in.  And I'd just read that as part of

11:26:15  20   the sentence on paragraph (1)(b).  Does that make sense to you

21        all?

22             MR. ROGERS:  Yes, Your Honor.

23             MR. O'CONNOR:  That makes sense to us, Your Honor.

24             MR. LOPEZ:  I'm sorry, Your Honor.  I'm reading (l).

11:26:51  25   I'm thinking ahead to evidence and argument under (1)(l).

11:26:59  1    Dr. Kuo actually calls that a complex removal process.  The

2    use of the word "percutaneous" has some significance in this

3    case because certainly the patient brochure and things like

4    that use the term "percutaneous procedure."  That simply means

11:27:21  5    he didn't have to open up her chest.  But that doesn't mean

6    this device was removed in the manner in which Bard had

7    represented and which --

8         THE COURT:  Well, why don't I -- Mr. Lopez, why don't

9    I just take out the last four words of that sentence and say

11:27:35 10    Dr. William Kuo removed the filter and fractured strut.

11         MR. LOPEZ:  That's fine.  That works.

12         THE COURT:  That's the fact that needs to be told to

13    the jury.

14         Is that all right?

11:27:46 15         MR. ROGERS:  That's fine, Your Honor.

16         THE COURT:  All right.  The next question I wanted to

17    ask is on page 8 of the final pretrial order where the

18    defendants raise an argument -- they actually raise it on page

19    9.  It's actually over on page 10 -- that the negligence per

11:28:19 20    se claim in this case is preempted under the *Buckman* case.

21         There's a lot of briefing on that in the final

22    pretrial order.  I guess my question is what do you want me to

23    do with it?  Do you want me to rule on that before trial?

24         It wasn't brought in a motion for summary judgment.

11:28:51 25    But if I were to agree with it, it would presumably save some

11:28:56  1    trial time because I assume there's an expert who's going to

        2    testify about how the actions did not comply with certain

        3    federal statutes and regulations.

        4         So I guess my thought has been if that's an argument

11:29:09  5    that's going to be made in a Rule 50 motion at the close of

        6    plaintiffs' case, and if I were to agree with it, then the

        7    plaintiffs would have wasted several hours on it.

        8         So do you want me to rule on that before the start of

        9    trial?  That's really the question I have.

11:29:26 10         MR. ROGERS:  Your Honor, the defendants would.  And

        11   we did not move on it at summary judgment, you're correct

        12   about that, and -- but we did not know until we got the

        13   proposed pretrial order from plaintiffs exactly what the

        14   underlying bases for their negligence per se claim was.  And

11:29:46 15   when we did receive that, we learned that there were nothing

        16   but the federal statutes and regulations that relate to the

        17   FDA.  And so hence we put the negligence per se arguments into

        18   the pretrial order.  So I do think it would be helpful if the

        19   Court ruled on that prior to trial.

11:30:03 20         MR. O'CONNOR:  Your Honor, this was Mr. Goldenberg's

        21   issue, but I have -- do you want to go ahead -- are we in

        22   agreement?

        23         MR. GOLDENBERG:  Your Honor, I think it would be very

        24   helpful for you to rule on this before.  I think, again, we

11:30:15 25   feel confident in what our argument is, but I think everybody

11:30:20  1    should know this just because I think it will help streamline

2    the trial and also make sure that we're much more efficient as

3    to how we present evidence.

4            THE COURT:  Okay.

11:30:31  5            MR. LOPEZ:  One more point.  This also includes lay

6    witnesses.  There's a number -- in fact, the depositions we're

7    going to read where we ask questions about federal regulations

8    of even corporate witnesses, so I would just echo the thought

9    we'd like --

11:30:46  10           THE COURT:  All the more reason.  Okay.

11           I will get you a ruling on this issue based on the

12   briefing that's here as soon as we can.  By the middle of next

13   week, I think.

14           All right.  On page 45 of the final pretrial order,

11:31:06  15   defendants request that each side notify the other 48 hours in

16   advance as to who live witnesses will be and 24 hours in

17   advance regarding deposition designations.

18           Ms. Helm.

19           MS. HELM:  We've actually reached an agreement on

11:31:26  20   that this morning, Your Honor.

21           THE COURT:  Okay.

22           MS. HELM:  Mr. O'Connor and I --

23           THE COURT:  That's what you've agreed to?

24           MS. HELM:  Yes, Your Honor.

11:31:31  25           THE COURT:  Okay.  So as in the prior -- is that

11:31:33  1   right, Mr. O'Connor?

2         MR. O'CONNOR:  That's correct, Your Honor.

3         THE COURT:  Okay.  So as in the prior trial, be sure

4   to give the other side 48 hours advance notice on live

11:31:42  5   witnesses, 24 hours advance notice on deposition portions that

6   are going to be played.

7         MS. HELM:  Your Honor, we actually also agreed to 24

8   hours notice on exhibits for witnesses.  For any witness being

9   played the next day.

11:31:56  10        THE COURT:  Okay.

11        MS. HELM:  Presented the next day.

12        MR. O'CONNOR:  Well, we didn't -- I don't -- are we

13   in agreement with that?

14        MR. LOPEZ:  Well, I mean, the practice has been we've

11:32:09  15   said that, but both sides, because of how busy we are, usually

16   doesn't happen 24 hours, it happens the night before.  So I

17   don't want to be stuck with that rule and have it -- have you

18   rule we can't use a document because of it.  Because I know

19   from the practice of the past two trials we've said 24 hours

11:32:27  20   and we're both sending documents to each other at 1 o'clock in

21   the morning, which is about eight or nine hours before we

22   actually put on a witness.

23        THE COURT:  Ms. Helm.

24        MS. HELM:  Your Honor, I think both sides can use our

11:32:40  25   best efforts to get as much possible 24 hours -- as I recall

11:32:44  1    last time we talked about this, you said I'm not going to

2    exclude an exhibit because you thought of it at 1:00 in the

3    morning.

4         So I'm in agreement with that, but I do think it

11:32:53  5    would be beneficial for everyone to exchange as much as we

6    possibly can.

7         THE COURT:  All right.  Best efforts.  But hard

8    deadline by 1:00 a.m.

9         MS. HELM:  Thank you, Your Honor.

11:33:05  10        THE COURT:  I can't believe I really said that.

11        Next issue is Dr. Asch, which is on page 45 and 46.

12        I had indicated when I got to his deposition --

13    actually his trial testimony late at night that I thought it

14    was well-taken, but I realized later I hadn't even looked at

11:33:30  15    Rule 804, I looked at only Rule 801.  So I wanted to hear more

16    on it today.  And then defendants filed a brief on it last

17    night about why Dr. Asch's previous trial testimony is usable

18    in this trial.  So I know what defendants' positions are on

19    that issue.

11:33:51  20        Plaintiffs' counsel, do you want to respond?

21        MR. LOPEZ:  Okay.  I think I'm going to go through

22    the elements, Your Honor, and deal with them one at a time.

23    Let's deal with unavailability issue.

24        Obviously he is unavailable because he's outside of

11:34:20  25    the subpoena power of the court.  In fact, not even in this

country.

I want to talk about the reasonable means to procure attendance.  When we first rendered this objection when counsel, defense, designated his trial testimony, we told them that we don't intend to call him live, but feel free to call Dr. Asch yourself, and I think we may have even provided the contact information for him.  So they had -- they could have called him and procured his attendance here.

All they're saying is we didn't agree to produce him.  He's not our expert.  He's a fact witness.  So I don't know what, really, efforts -- what reasonable means, maybe counsel for defense can address this, they made to see if Dr. Asch could actually be here.

For a number of reasons, we're going to play his deposition instead of calling him live.  Some of it has to do with time factors and some of it has to do with the fact we're going to be more limited in what we present with him.

The other element here is the fact that this is being offered against a party who was not a predecessor in interest under the code.  In other words -- I didn't say that right.

The prior depositions, those plaintiffs were not predecessors in interest of Mrs. Hyde.  And counsel does cite two Ninth Circuit cases in the brief we got last night, but they're two district court cases, and both involve the same parties, I believe.  The other was the use of an MDL

11:36:06  1   deposition applicable to cases filed after the depositions.

2   That's something we had talked about, I think, in one of our

3   first or second CMC's in this MDL.  And those parties were

4   allowed an opportunity to redepose.

11:36:21  5               So neither one of those things really apply here.

6               Here's the one I think we need to spend some time on,

7   that's the opportunity and motive.  I know it would seem that

8   because the same plaintiffs' lawyers with the same device

9   would have the same opportunity and motive, but, in fact,

11:36:39  10  that's not true.

11              The results -- there were a number of evidentiary

12  things, evidence with respect to NMT, some of the testing,

13  bench testing, Dr. Asch's actions, interactions, with NMT that

14  we simply did not bring up at trial that were not addressed in

11:37:04  15  his deposition that we just didn't because we were counting

16  minutes and wanted to make sure that -- the way we had the

17  case mapped out, we had to leave some of that stuff on the

18  cutting room floor.

19              This is Wisconsin law.  We didn't know at that time

11:37:19  20  whether or not Wisconsin law or Nevada law was going to apply

21  in this case.  But for certain it was not going to be Georgia

22  law.

23              And the difference between Wisconsin law and Georgia

24  law is quite significant from the standpoint we're dealing

11:37:38  25  with a design defect statute here and the design defect

11:37:42 1  negligence per se and what the Court has left us and we don't

2  have a failure to warn case.

3       Another piece of evidence we did not introduce

4  through Dr. Asch were some of the flawed migration resistance

11:37:58 5  testing.  We're calling Dr. Parisian in this case.  He's going

6  to talk about some of this stuff.  We didn't call Dr. Parisian

7  in the last case because we didn't have time to.  Now we will

8  be able to do that.

9       There's Kay Fuller testimony and related exhibits.

11:38:11 10  Failed bench testing compared to the SNF and SIR guidance

11  article rebuttal that we could have put on through Dr. Asch

12  that are going to become more relevant in this case.

13       The importance of monitoring outside of this

14  retrievability study.  That's a big issue here.  As you know

11:38:28 15  from some of the filings, even though we don't have a failure

16  to warn case as relates to Dr. Henry, we're saying the company

17  still had the obligation to tell the medical community for

18  other doctors to maybe monitor this device to avoid what

19  happened to Mrs. Hyde.

11:38:58 20       The deposition -- we took a deposition in this case,

21  Your Honor, so both sides could deal with what the generic

22  issues might be as they relate to Dr. Asch and his study.

23       Both sides had an equal opportunity to depose

24  Dr. Asch, cross-examine Dr. Asch, on issues -- and I think

11:39:17 25  with respect to the deposition, we're offering the deposition

11:39:20 1   as testimony.

2          That deposition -- the cross-examination for that

3   deposition happened in the deposition.  To allow now for

4   additional testimony beyond deposition testimony that where

11:39:36 5   there's no question, both sides had an opportunity to

6   cross-examine, Mrs. Hyde is bound by that deposition because

7   she was part of the MDL then.  She should not be bound by any

8   testimony or cross-examination that was given in a trial where

9   she was not a party or that the party in which it was being

11:39:53 10  rendered is not her predecessor in interest.

11         So that's the basis of us stating that this trial

12  testimony should not be admitted into this case.

13         THE COURT:  Let me ask you a couple of questions on

14  your argument, Mr. Lopez.

11:40:11 15        You mentioned that because of time limits in the

16  Jones trial you didn't go into things like bench testing and

17  Kay Fuller --

18         MR. LOPEZ:  Right.

19         THE COURT:  -- testimony.

11:40:29 20        As I read Rule 804(b)(1)(B), in the -- you have a

21  copy in front of you.  In the phrase after the second dash, it

22  says, talking about Ms. Hyde, had an opportunity and similar

23  motive to develop it by direct, cross-, or redirect

24  examination.

11:41:03 25        "It" refers back to testimony in 804(b) and it's the

11:41:10  1    testimony being presented.

2         So as I understand the rule, the question is whether

3    the testimony that Bard would want to present through Dr. Asch

4    was fully developed through direct, cross, or redirect.  In

11:41:30  5    other words whether you had an opportunity to address the

6    points Bard wants now to present from that testimony.

7         I don't think it refers to matters that you may --

8    different matters that you may have chosen to ask Dr. Asch

9    about but didn't because of time limits.

11:41:48  10   The question is whether the excerpts they want to

11   present to the jury from Dr. Asch, you had a fair opportunity

12   to develop.  And it seems to me you clearly did because you

13   did redirect after Bard did its cross.

14        MR. LOPEZ:  There's one area of the cross and

11:42:05  15   redirect that we did not develop.  I wasn't involved in that.

16   I read the testimony, trial transcript pages 326 through 330.

17   There was a sidebar where Mr. North had opened the door to

18   asking Dr. Asch why he stopped the recovery -- stopped using

19   the Recovery filter.  You allowed Mr. O'Connor to get back up

11:42:27  20   and redirect Dr. Asch about that, who had previously been

21   admonished to not talk about the deaths he heard about, and

22   therefore we never got that testimony from Dr. Asch in that

23   trial.

24        THE COURT:  Which testimony?

11:42:43  25        MR. LOPEZ:  The testimony that you were going to

11:42:44   1   allow Dr. Asch to testify to before we could tell him, by the

2   way, that admonition you got about not mentioning because you

3   heard about deaths, you don't have to abide by that any more.

4           THE COURT:  Hold on.  I'm confused.

11:43:04   5           I thought we did abide by that.  We did abide by an

6   admonition on deaths.  We're talking about the second trial,

7   the Jones trial?

8           MR. LOPEZ:  Right.

9           THE COURT:  So say again --

11:43:23   10           MR. LOPEZ:  Mr. North had asked a question of the

11   witness that on sidebar, and, again, it's trial transcript 326

12   through 330, had opened the door to now being able to ask

13   questions of Dr. Asch about why he stopped using the Recovery,

14   and his ability to now be able to testify was because of the

11:43:45   15   deaths he heard about.

16           Well, he didn't know that admonition had been lifted

17   and so we never got that testimony from Dr. Asch.

18           So I mean that's -- that's just an instance, one

19   instance in the trial where we were not given a fair

11:44:01   20   opportunity to cross-examine or redirect Dr. Asch on, really,

21   a very significant issue in the case.

22           But I understand what Your Honor's saying.  We had --

23   we had opportunities to redirect on some of those issues that

24   they're talking about.  But those issues were also covered in

11:44:22   25   a deposition.  And I think the defense has to tell us where it

is, if those are different than the deposition, that we don't

have to fight about, we don't have to worry about whether or

not these exceptions under 804 and whether or not he's

available, not available, or whether or not there's a

predecessor in interest here.

And I think what we have here is that maybe he just

likes the direct -- the cross he did better in the trial on

the same issues.

But I just think in an MDL, in a matter of fairness

to all the parties, we all agreed that this deposition of

Dr. Asch was going to be the deposition, the generic fact

deposition, that applied to all parties.

For us to go back and say what would we have done

differently in anticipation of Wisconsin law, in anticipation

of Nevada law, in anticipation of maybe having some more time

in this case to have more fully developed the testimony

surrounding what's being offered, I mean, I listed some.

And so I don't think you can just focus in on just

the testimony they're offering.  We have to focus in on

whether or not as a pred- -- as a -- not as a predecessor in

interest, but as the lawyers involved in that with the same

motive and opportunity.  Did we really have the same motive

and opportunity?  Because we weren't thinking about

Mrs. Hyde's case.  We weren't thinking about some of the

unique aspects of her case where even one or two or three

11:46:03  1   questions that relate to that cross-examination might have

2   been different.  I don't know.

3         I mean I think that's the problem we have is that we

4   could have and we didn't.  We were not -- we did not have the

11:46:13  5   same motive and opportunity in a case that involved a

6   different product, involved a different injury, involved a

7   different time period, and, frankly, a different set of

8   evidence with respect to the issues here.  And certainly not

9   the same law.

11:46:33  10        THE COURT:  Well, let me -- let me ask another

11   question that's confusing me now.

12         I just looked back to the transcript that you

13   submitted.  It was from the Booker trial.

14         MR. LOPEZ:  Okay.  Someone put in my notes Jones

11:46:47  15   trial, 326 to 330.

16         THE COURT:  The transcript I have that's been

17   submitted is from the Booker trial.

18         MS. HELM:  Your Honor, we also over the weekend, the

19   18 includes part of the Jones transcript as well.

11:47:00  20        THE COURT:  Are you proposing to use what's from the

21   Booker trial?

22         MS. HELM:  Actually, Your Honor, we -- yes.  Part of

23   Booker and part of Jones.  And we went back and made sure they

24   didn't duplicate each other.

11:47:10  25        THE COURT:  But am I to rule on everything, if I

11:47:13 1    decide Dr. Asch's testimony can be used, in the Booker

2    transcript you gave me a week and a half ago?

3               MS. HELM:  Yes, Your Honor.

4               THE COURT:  Okay.

11:47:22 5             So what you're talking about, then, Mr. Lopez,

6    concerns a new transcript from the Jones trial?

7               MR. LOPEZ:  Yes.  I was addressing the Jones -- I

8    should have -- I thought the Court knew they designated both

9    Booker and Jones.

11:47:37 10            THE COURT:  Well, in Jones you weren't under a

11   limit -- I'm sorry.  In Booker you weren't under a limitation

12   not to inquire of Dr. Asch's decision based on death evidence.

13   That was in the trial.

14             MR. LOPEZ:  That's true.  That's true.

11:47:53 15            THE COURT:  Okay.

16             MR. LOPEZ:  Here's the other issue I have here.

17   I'm -- the Ninth Circuit case is the one that really popped

18   out at me.  That was an MDL deposition that was taken --

19             THE COURT:  What case are you referring to?

11:48:17 20            MR. LOPEZ:  It's in the trial brief.  Let's see.

21   Page 2 of their trial brief.  I apologize, Your Honor.  We got

22   this thing we -- we were doing a lot of other --

23             THE COURT:  There's *Hangarter*, H-A-N-G-A-R-T-E-R,

24   which is a 2004 Ninth Circuit case cited on page 2.  And I

11:48:57 25   think that's the only Ninth Circuit case on this point.

11:49:02  1    There's a later one dealing with Rule 32 which is the *Hub*

2    case.

3             Well, go ahead and make your point.

4             MR. LOPEZ:  That was a case where there was an MDL

11:49:18  5    deposition that was taken.  Certainly subsequent plaintiffs

6    that come into that case involving the same law, same venue,

7    same product, same liability case there would seem to be a

8    pretty good argument of motive and opportunity there when

9    someone becomes part of an MDL, but in that case I think the

11:49:42 10   Court allowed a subsequent deposition, an opportunity to

11   redepose after the MDL deposition because someone came on

12   board afterwards.

13            I just -- the issue here, Your Honor, is do we really

14   have a predecessor in interest here just because these

11:50:00 15   happened to be the plaintiffs in the same -- among 4,000

16   plaintiffs in an MDL and we're -- I mean, you're asking us to

17   test whether or not we were thinking ahead, even if it's just

18   one or two questions that might deal with that issue.  That's

19   why it's unfair.

11:50:21 20            I just ran through a list of things that we could

21   have explored but didn't explore that may have gone to that

22   issue, the issues that they want to present in their

23   cross-examination of Dr. Asch.  Which I will tell you they had

24   a full opportunity to do at the deposition, which is -- should

11:50:40 25   be the operative testimony in this case that both sides have

11:50:43  1   agreed would have in fact applied to Mrs. Hyde.

2            THE COURT:  Okay.  All right.  Thanks.

3            MR. LOPEZ:  The case is H-Y-N-I-X, page 2.  The *Hynix*

4   semiconductor case, Your Honor.

11:51:10  5            THE COURT:  I don't -- I see.  It's at the bottom.

6   It's not a Ninth Circuit case, it's a Northern District of

7   California case.

8            MR. LOPEZ:  Yeah.  They cited it.

9            THE COURT:  Okay.  Defense counsel.

11:51:27 10            MR. LOPEZ:  I apologize.  I shouldn't have said Ninth

11  Circuit.  My notes actually say district court.  My notes

12  actually say the Ninth Circuit really hasn't dealt with it.

13  This was a district court case.  I didn't want to misrepresent

14  myself to the Court.

11:51:40 15            THE COURT:  Okay.

16            MR. CONDO:  Your Honor, good morning.  James Condo on

17  behalf of the defendants.  My throat is a little raspy this

18  morning.  I apologize.  I'm sucking a cough drop and I hope I

19  can convey what I need to convey to the Court.

11:51:59 20            I wanted to start with the notion of the elements of

21  the Rule 804(b)(1).  I believe, as does Your Honor, that the

22  literal language of the rule does in fact the analysis to

23  focus on the specific testimony that is being offered and

24  whether or not, in the context of that testimony factually,

11:52:29 25  there was a motive and an opportunity to conduct redirect

examination in this case because the testimony designated

comes from, in part, the cross-examination done by Mr. North

in the Jones trial.

Theres was 13 pages of redirect examination in the

Jones transcript done by Mr. O'Connor after Mr. North's

cross-examination.  That was the second time that Dr. Asch has

testified on his involvement in the pilot study involving

retrievability of the Recovery filter.

There are an identity of issues and there is exactly

the same motive and opportunity that existed in Booker and in

Jones to develop the very specific testimony that is now being

proffered to the Court.

The notion that there needs to be an exact identity

or privity in partners -- in parties, I think, is still an

open question in the Ninth Circuit.  The only case that we

found was the *Hub* case, which talked about 32(a) in an earlier

generation which had the successor in interest language.  That

language obviously no longer appears in the current version of

32(a) with respect to depositions.

What appears in 804(b)(1), and is the language

predecessor in interest.

The so the Court has not rejected -- the Ninth

Circuit has not specifically rejected the notion that you need

identity of parties.  In fact, what they said was to the

contrary, you don't need exactly identical parties and exactly

11:54:31  1  identical issues.  And they left open the question as to

2  whether or not an advocate, an versus party is sufficient in

3  and of itself to establish that there was motive and

4  opportunity to develop through cross-examination in that case

11:54:52  5  the testimony.

6          Two later cases that we have found, only one dealing

7  with 804(b)(1), is the *Hynix* case, the Northern District of

8  California case, excuse me.

9          That case has, on page 250 FRD 452 page -- I'm sorry.

11:55:25  10  250 FRD 452 2008, and I think the cite I'm reading from is 77

11  Federal Rules of Evidence, Service 1, page 5.  There is some

12  language which I think is instructive talking specifically

13  about the predecessor in interest language.

14          They acknowledge that the witness is unavailable and

11:55:52  15  then the court goes on to state there that the modern test

16  does not require privity between the current party and the

17  party who participated in the prior proceeding.  A previous

18  party having like motive to develop the testimony about the

19  same material facts is a predecessor in interest to the

11:56:11  20  present party.

21          Privity is not the gravamen of Rule 804(b)(1).

22          And that same analysis appears in an opinion from

23  Judge McNamee in this district.  *Ernest Jackson versus ABC*

24  *Nissan, Inc.,* also cited in our trial brief.  2007 Westlaw

11:56:40  25  274315.

11:56:44  1          And there the court is taking up the issue of 32(a),

2     the prior version before it was amended, that contained the

3     successor in interest language.  And the court, looking at

4     *Hub*, quotes from *Hub* and says the requirements of 32(a) that

11:57:07  5     the present lawsuits involve the same subject matter and same

6     parties or their representatives or successors in interest

7     have been construed liberally in light of the twin goals of

8     fairness and efficiency.  Then goes on to quote from Hub the

9     accepted inquiry focuses on whether the prior

11:57:26 10     cross-examination would satisfy a reasonable party who opposes

11     admission.

12          And that's what we have here, Your Honor.  We have 13

13     pages of redirect examination on the very specific subjects

14     that were raised by Mr. North in the Jones trial.

11:57:43 15          So we think that there is no Ninth Circuit authority

16     that specifically precludes the utilization of the Jones

17     testimony.  We think the Ninth Circuit testimony -- authority

18     that does exist certainly lays the conceptual framework for

19     its admission by looking at the factual context in which it

11:58:06 20     was presented and in which there was an opportunity to

21     cross-examine or redirect the witness, the witness they have

22     now presented twice.

23          I also think, Your Honor, that there is a more than

24     colorful argument that the residual exception rule applies.

11:58:30 25     Rule 807.  It's not something we cited in our brief, but, as

11:58:36  1   Your Honor knows, the residual exception rule says that a

2   hearsay statement is not excluded if it meets certain elements

3   in 807.

4        It has to have the equivalent circumstantial

11:58:50  5   guarantee of trustworthiness.  I don't think there's any

6   question that that has been demonstrated here.  It's a

7   testimony that occurred in this courtroom in front of Your

8   Honor under oath involving qualified trial counsel on both

9   sides.

11:59:04  10        Clearly the testimony that we are offering is offered

11   as evidence of a material fact.  And the testimony from Jones

12   is more probative on the points for which it is offered than

13   any other evidence that we could present.

14        And, finally, admitting it will best serve the

11:59:27  15   purposes of the rules and the interest of justice, which I

16   think is another coterminous way of saying that you construe

17   the rules liberally in light of the twin goals of fairness and

18   efficiency that the *Hub* court identified.

19        So we think, Your Honor, all of the elements of

11:59:51  20   804(b)(1) have been met.  The witness is outside the

21   jurisdiction.  He's not subject to subpoena power.  We're not

22   required to engage in a futile gesture in order to try to

23   serve him with a subpoena in order to demonstrate that.

24        They are proffering him under 32(a) as an unavailable

12:00:17  25   witness.  Presumably he is as unavailable to us as he is to

12:00:21  1   them.

2   So all of the elements of 32(a)(4), which they are

3   offering this witness under, I think make it clear that if he

4   is unavailable to the plaintiffs, and they need to make the

12:00:40  5   requisite showings that he is unavailable, then he is

6   unavailable to us.  They can't subpoena him.  We can't

7   subpoena him.  They're not bringing him.  We asked them to

8   bring him.

9   He has been under their control and presented twice

12:00:57  10  in this courtroom live in the first two trials.  And we think

11  if the elements of 32(a)(4) demonstrate unavailability to

12  justify use of the deposition in this courtroom, then we have

13  demonstrated unavailability as well as our efforts to simply

14  acknowledging the fact that he is outside of the subpoena

12:01:25  15  power of the court in a foreign country, a doctor with a

16  medical practice.

17  THE COURT:  What is your response, Mr. Condo, to

18  Mr. Lopez's argument that you could have called him and asked

19  him to come to trial and therefore had reasonable means to

12:01:38  20  procure his attendance?

21  MR. CONDO:  Well, Your Honor, I think that goes to

22  the 32(a) element of what they are attempting to show.  And

23  under 32(a)(1)(C) the use has to be allowed by 32(a)(2)

24  through (a)(8).  And 32(a)(4) says that you can use the

12:02:07  25  deposition for any party if the court finds, and then there is

12:02:11  1    a series of elements.  And certainly he's not dead.

2          He is more than 100 miles from the place of trial or

3    outside of the United States, unless it appears that the

4    witness's absence was procured by the party offering the

12:02:26  5    deposition.

6          They brought him twice.

7          His absence, we would submit, is procured by the

8    party purporting to offer the deposition since they have not

9    asked him to come.

12:02:39  10          If they have asked him to come and he can't be here,

11    then our asking him to come to get the same answer's a futile

12    gesture.  But presumably, if they're proffering the

13    deposition, they've asked him.  He's come twice.  And they

14    have procured his absence and intend to offer the deposition.

12:03:01  15          THE COURT:  Okay.  Thanks.

16          Mr. Lopez, briefly, please.

17          MR. LOPEZ:  Yes, Your Honor.

18          First of all, 32 deals with depositions.  The issue

19    is not a deposition here.  It's 804 that requires reasonable

12:03:24  20    means --

21          THE COURT:  But -- but the point I think they're

22    making is you can't use his deposition unless he's

23    unavailable.  So by offering his deposition you're saying he's

24    unavailable.  And yet you're arguing for their use he's not

12:03:36  25    unavailable.

12:03:38  1        MR. LOPEZ:  Because 804 requires reasonable means to

2    procure his testimony.  They're the ones that want to offer

3    the testimony.

4        Your Honor, I think it's important for you to

12:03:46  5    understand historically what happened here.  We advised them a

6    month before trial.  More than a month before trial.  We

7    listed those new depositions that we would be submitting to

8    you on August 22nd.  We listed Dr. Asch as someone that we

9    were not going to call live, that we were going to offer his

12:04:04 10    deposition.  So they knew.  And they made designations

11    themselves, affirmative designations with respect to Dr. Asch

12    from his trial testimony.  Not just in response to our

13    offering his testimony.  So I wanted to make that clear.

14        We don't control Dr. Asch.  When his deposition was

12:04:21 15    first taken in this case, he met with counsel for the defense

16    before the deposition and counsel for the plaintiff before the

17    deposition.

18        We have -- we don't control him any more than anyone

19    else does.  If he is available -- for them to say he's not

12:04:36 20    available and not have taken any means or any steps to see

21    whether or not Dr. Asch was willing to come to this trial for

22    purposes of that testimony, you know, they haven't done that.

23        But there's one thing I think is important to

24    emphasize.  The operative testimony in this case is the

12:04:56 25    deposition of Dr. Asch.  And what they're now offering is

12:05:01  1    really cumulative evidence to that deposition.  That is the

2    testimony -- that is the MDL testimony in this case.

3         For the most part, and I haven't done a side-by-side

4    comparison yet, but the testimony certainly is cumulative

12:05:18  5    because they're asking questions about the same thing and a

6    lot of those questions have been asked and answered in what

7    you should consider the operative original testimony of

8    Dr. Asch for all purposes in this MDL.  Just something I

9    thought of, Your Honor, with respect to this being cumulative

12:05:37 10    and asked and answered.

11         Those are all the comments I have at this time.

12    Thank you.

13         THE COURT:  Okay.  Thanks.  We've gone way past an

14    hour and a half on Tricia's court reporting, so we need to

12:05:51 15    take a break.

16         MR. GOLDENBERG:  Your Honor, could I just ask a

17    favor?  I have a 2:30 flight today.  Are we going to be

18    talking about jury instructions?

19         THE COURT:  No.

12:06:07 20         MR. GOLDENBERG:  Okay.

21    (The Court and the courtroom deputy confer.)

22         THE COURT:  What I'd like to do is take a ten-minute

23    break, come back and finish this so we can get you out of

24    here.  I don't know that we've got that much longer to go.

12:06:26 25    But let's do that rather than take a lunch break now.

12:06:30    1           See you in ten minutes.

            2        (Recess taken from 12:06 to 12:16.)

            3           THE COURT:  Thank you.  Please be seated.

            4           MS. HELM:  Your Honor.  I e-mailed the Kandarpa

12:17:56    5   deposition --

            6           THE COURT:  I got it.

            7           MS. HELM:  Okay.  I just wanted to make sure.  Thank

            8   you.

            9           THE COURT:  Thanks.

12:18:02   10      Okay.  If I do permit any portion of the Asch trial

           11   testimony to be presented, how do you propose to present it,

           12   defense counsel?

           13           MR. CONDO:  Your Honor, we would ask that it all be

           14   presented in written format question and answer with someone

12:18:25   15   sitting on the stand reading the question and presenting the

           16   answer, as opposed to bifurcating it, some videotape, some

           17   read.

           18      We think the videotape will unfairly engage the jury

           19   to the extent they'll tune out, so to speak, at the Q and A.

12:18:52   20   We think there's about 70 percent of the deposition and

           21   designated testimony, because plaintiffs have designated their

           22   own Asch testimony if ours is permitted.  We think when you

           23   take all of it together, it's about 70 percent of the

           24   designations in deposition and trial testimony are plaintiffs'

12:19:10   25   and 30 percent are defendants'.  We think with that

12:19:14   1   percentage, it's just fair to do it the old-fashioned way with

2   someone reading the questions and someone playing the witness

3   and reading the answers.

4        THE COURT:  Are you talking about both the deposition

12:19:25   5   and the trial?

6        MR. CONDO:  Yes.

7        THE COURT:  So you say you want to present the trial

8   testimony by reading, but they should be precluded from

9   playing the deposition testimony?

12:19:35  10        MR. CONDO:  I'm asking the Court to exercise its

11   discretion in order to, for basic fairness, have what they

12   would otherwise play and what we would otherwise play, even

13   with our counter designations, have it all read because there

14   is no way, obviously, to play the trial testimony.

12:19:54  15        THE COURT:  Okay.  All right.

16        MR. LOPEZ:  Obviously, we would object to that.

17   First of all, the cross is attacking credibility.  And as the

18   Court knows, part of a witness's credibility is judged by his

19   demeanor on the stand, the way they answer the question,

12:20:10  20   things like that.  We don't want to lose that aspect of this

21   witness's testimony, especially if what they're offering is in

22   fact impeachment or cross-examination.

23        I'm not sure about these percentages he's talking

24   about.  I really haven't had a chance, Your Honor, to look at

12:20:26  25   what's cumulative, what's not cumulative.  I got the Jones

12:20:30  1    deposition 11 days later than I thought I was going to get it.

2    The trial testimony.  I'm sorry, Jones trial testimony.

3            THE COURT:  The only question --

4            MR. LOPEZ:  There may not be that much that's

12:20:41  5    different.

6            THE COURT:  And I can't decide that.  I don't have

7    any information on that.  But I take it from what you're

8    saying, Mr. Lopez, your suggestion would be that if any of the

9    trial testimony is allowed, it be read, and the deposition

12:20:53  10   testimony be played.

11           MR. LOPEZ:  Right.  And we can orchestrate that.  We

12   can cooperate with counsel how to orchestrate that.

13   Especially if there are some exhibits displayed on the video.

14   We want those to be presented to the jury.  Otherwise, we've

12:21:07  15   got another layer of complication here.

16           THE COURT:  Are you proposing, Mr. Lopez, that

17   something be done by me to eliminate overlap between the

18   deposition trial --

19           MR. LOPEZ:  No.  I don't think you should.  I've

12:21:28  20   asked counsel to do that, frankly.  I don't want to have to do

21   it either.

22           THE COURT:  Okay.  I don't know how I'm going to come

23   out on the 804 question, but if I do allow some or all of the

24   trial testimony, then I'll make a decision on reading versus

12:21:42  25   playing based on what you all have said.  I want to think

12:21:46  1    about that.

2         Okay.  On page 46 of the final pretrial order,

3    defendants ask that we follow the same practice in this trial

4    that we did in the previous trials regarding defense experts

12:22:02  5    who have been withdrawn.  Namely, that plaintiffs not disclose

6    the fact that they were experts originally retained by Bard

7    and to avoid or stand by my rule that cumulative expert

8    testimony shouldn't be permitted.

9         We also had the understanding there needed to be some

12:22:29 10    showing that the point that would be made by these withdrawn

11    experts is not available through other experts.

12         Is there an objection from plaintiffs on this

13    procedure that we followed in the previous trials?

14         MR. LOPEZ:  Well, I mean, just what we previously --

12:22:42 15    we know how the Court's ruled.  We have reasons to believe why

16    they should be identified because of the admission on behalf

17    of a party.  But we're -- in this case we don't waive the

18    objections previously made and our position on that, but we're

19    willing to go --

12:23:16 20         I mean, Your Honor, I understand your position on it.

21    You've stated it.  There are other experts that are named

22    experts, been deposed, and your ruling has been not to

23    disclose them as defense experts to keep it neutral, as a

24    condition to us being able to play the testimony.  We disagree

12:23:33 25    as we did in the past that we shouldn't be able to disclose

12:23:37  1    them, but we're not going to reurge that.  Let's put it that

2    way.

3         THE COURT:  Okay.  You've preserved the objection.

4         MR. LOPEZ:  Yes.

12:23:45  5         THE COURT:  But for purposes of trial, then, the same

6    rules will apply.  So we shouldn't disclose they were

7    originally defense experts.  And if you're going to use them,

8    you ought to be able to make a showing you're eliciting

9    opinion testimony from them that you're not getting from

12:23:58 10    another expert so we're not having cumulative experts.

11         All right.  On page 46, defendants ask whether

12    Dr. Kessler or Dr. Parisian or both will be testifying at

13    trial.  Sounds like Dr. Parisian is intended.  Are you going

14    to call Dr. Kessler as well?

12:24:19 15         MR. LOPEZ:  No.  Dr. Parisian.

16         THE COURT:  Okay.  That answers that question.

17         Defense counsel, you raised in the final pretrial

18    order on page 69 the issue of confidential documents.  You

19    say, as you did in prior trials, you raise the issue to

12:25:04 20    preserve it.  The problem we've run into from the prior

21    trials, though, is there's a lot of case law that says once a

22    deposition -- pardon me.  Once an exhibit is used in open

23    court any confidentiality is waived.

24         You don't address in here what you want to do with

12:25:21 25    protective order documents that are going to be admitted into

12:25:24  1    evidence.  What is your proposal on that?

2                     MS. HELM:  Thank you, Your Honor.

3                     Also, do you want me to address the rule -- Local

4        Rule 5.6 issue you also raised in your ruling on our motion

12:25:37  5    for reconsideration?

6                     THE COURT:  I don't remember what that issue is.

7                     MS. HELM:  In your order on the motion for

8        reconsideration you said to the extent an exhibit will be

9        published or discussed during trial and a party believes the

12:25:57 10    exhibit is confidential and should be protected from public

11       disclosure, it seems the procedures set forth in Local Rule

12       5.6 should apply.  And then asked us to address it today.

13                    THE COURT:  I think all I meant by that was that

14       before it's used there needs to be a showing under Ninth

12:26:14 15    Circuit law, which I think would be a compelling need

16       requirement that the document should be kept confidential.  I

17       don't mean you need to go down and lodge something in the

18       clerk's office before you try proposing it.

19                    MS. HELM:  Thank you, Your Honor.

12:26:32 20                    We are not -- as a preface, as we did as in Booker

21       and as in Jones, we are not asking the Court to seal the

22       courtroom.  And in most instances, and we have not yet asked

23       that the transcript be sealed.

24                    What has happened, though, is in this -- in Booker

12:26:51 25    and in Jones many, many exhibits were admitted, simply

12:26:55  1    admitted into evidence, and, frankly, they were never

       2    discussed.  Or they were admitted into evidence and they were

       3    simply identified as was this X document.

       4         The documents that were discussed, most of them were

12:27:12  5    only discussed in part.  And so you might have a 500-page

       6    document and four paragraphs were discussed.

       7         We don't believe, in light of the procedures that are

       8    in the courtroom, the fact that the exhibits are maintained,

       9    only go to the jury and then they're gone, that the full

12:27:29 10    extent of the documents have been published in open court.

      11    And we would like the opportunity to address, after the close

      12    of the trial, the portions of either the exhibits that were

      13    simply just identified and never addressed, because there were

      14    many, many of those.  For example, in Jones we admitted pages

12:27:53 15    of exhibits and then never discussed them.  Or the portions of

      16    exhibits that were discussed -- that were not discussed.

      17         And I -- we understand our burden under Ninth Circuit

      18    law as far as sealing.  I'm not sure those -- I mean, I'm not

      19    going to argue with the Court that that is not the proper

12:28:13 20    burden, and I understand the Court's position on that, but we

      21    should be given the opportunity to address the exhibits that

      22    were not discussed or exhibits that were only partially

      23    published in the open courtroom.  And that's what we're asking

      24    for.

12:28:26 25         We're asking for the ability, after the trial, to go

12:28:29 1    back, and it's a very tedious process, and look at exhibits

2    that were not admitted in Booker and that fall into those two

3    categories and to present you with evidence to try to meet the

4    compelling interest standard to seal those exhibits.

12:28:46 5         So I think that's -- the procedure is the same as

6    we're asking for, but I'm hoping I'm clarifying it a little

7    bit.

8         THE COURT:  Well, as I understand you, Ms. Helm, you

9    are saying that we will handle exhibits that the jury sees and

12:29:01 10   that get discussed in this trial the same way we did in the

11   previous trials; we won't be clearing the courtroom when we

12   get to a confidential exhibit.  What you want is the ability

13   to argue after the close of trial that an exhibit that was

14   admitted but not shown to the jury, or was admitted and only

12:29:23 15   shown in part to the jury, retains its confidentiality in some

16   degree.

17        MS. HELM:  Yes, Your Honor.

18        THE COURT:  Is that correct?

19        MS. HELM:  Yes, Your Honor.

12:29:33 20   THE COURT:  So you're not proposing any trial

21   procedure, just the opportunity to make that argument after

22   trial.

23        MS. HELM:  Yes, Your Honor.  And the finding that we

24   have not waived that position --

12:29:41 25   THE COURT:  Waived the argument.

12:29:43  1        MS. HELM:  Waived the argument.  Exactly, Your Honor.

        2        THE COURT:  That's not the same as saying you haven't

        3   waived the confidentiality.  That's the issue I'm going to

        4   have to decide.

12:29:52  5        MS. HELM:  Yes, Your Honor.

        6        THE COURT:  Okay.

        7        MS. SMITH:  And plaintiffs' position remains the same

        8   as we've argued in most of our briefing, is that when these

        9   exhibits are admitted into evidence, they then become public

12:30:04 10   record.

       11        THE COURT:  And that position isn't being decided by

       12   what Ms. Helm said; right?  That would be the issue we would

       13   address at the end of trial, which was whether you're right

       14   about that or whether they're right that by not publishing it

12:30:17 15   or by publishing only a portion, they retain confidentiality.

       16        MS. SMITH:  Right.

       17        THE COURT:  Okay.  I'm fine with that.  We won't

       18   adopt any special procedures in trial.  Defendants are not

       19   waiving their ability to make that argument.  But I'm not

12:30:31 20   deciding whether or not admission by itself is or is not a

       21   waiver of confidentiality.  That will be the issue we'll

       22   address.

       23        MS. HELM:  Your Honor, you asked me on Thursday to

       24   remind you about the motion for extension on the Jones

12:30:48 25   exhibits.

12:30:49  1        THE COURT:  Right.

2        MS. HELM:  And my proposal would be that we address

3    both Jones and Hyde after the Hyde trial so that we're not

4    trying to brief it during the Hyde trial.  Many of the

12:31:05  5    exhibits will be the same.  And the issues, I believe, are

6    identical.

7        THE COURT:  Any objection to dealing with Jones and

8    Hyde at the same time?

9        MS. SMITH:  No objection.

12:31:19  10        THE COURT:  Do you have a proposed date, Ms. Helm?

11        MS. HELM:  21 days after the Hyde verdict.

12        THE COURT:  Okay.  Just a second.

13        Just so that we're clear, let's say that October 26th

14    will be the date.  That's 21 days after October 5th.

12:32:02  15        October 26th will be the date for addressing this

16    issue with respect to both the Jones and the Hyde trials.

17        MS. HELM:  Thank you.

18        THE COURT:  So I will grant the motion which is at

19    Docket 12440 and set the date of October 26th to have those

12:32:24  20    issues addressed.

21        Okay.  Those were the only issues I had from the

22    final pretrial order.

23        Is there anything else any of you want to raise

24    that's in the final pretrial order?  There's some other things

12:32:41  25    I want to talk about from the trial briefs.

12:32:45  1          MS. REED ZAIC:  I have a red-lining malfunction I

        2     need to point out and correct with the pretrial order.

        3          Daniel Orms and Patrick McDonald are witnesses that

        4     should be on our witness list.  They've been in the pretrial

12:32:57  5     order and our witness list on previous trials and we've

        6     submitted deposition designations now for the third time, and

        7     I realize that when I -- at some point when I was red-lining

        8     the document, I deleted them from our list of witnesses.

        9     They're on the defendants' list.  But I just wanted to make

12:33:10 10     that correction.

       11          THE COURT:  So --

       12          MS. HELM:  Your Honor, we have no objection.  They're

       13     known witnesses and they're actually identified on the defense

       14     witness list.

12:33:24 15          THE COURT:  That's fine.

       16          So I will add, then, to the plaintiffs witnesses --

       17     who is it?  Daniel Orms --

       18          MS. REED ZAIC:  Daniel Orms, O-R-M-S, and Patrick

       19     McDonald, M-C-D-O-N-A-L-D.

12:33:38 20          THE COURT:  Okay.  Those will be added to the

       21     plaintiffs' witness list that begins on page 23.

       22          Ms. Helm, do you have something regarding the final

       23     pretrial order?

       24          MS. HELM:  Yes, Your Honor.  We have an objection to

12:33:58 25     a witness identified on plaintiffs' exhibit list, page 26.

12:34:01  1   Ms. Charis Campbell.  She was not identified in discovery

2   responses as a witness with knowledge, has not been

3   identified, and the first time she's been identified by the

4   plaintiffs as a witness in this case is in the pretrial order.

12:34:19  5   So we have an objection to her on the basis of nondisclosure.

6       MR. LOPEZ:  Your Honor, she is identified on BBA

7   documents and Bard documents as a Bard employee regarding

8   Dr. Kandarpa.  We have no intentions on calling her, but we

9   would like to reserve the right to show good cause should that

12:34:44  10  arise to offer her at the time of trial.  And we will not

11  offer her or try to proffer her testimony without having

12  brought that to the Court's attention.

13      THE COURT:  All right.  So the objection is on the

14  record.  I may not have to decide it if you don't call her.

12:34:58  15  If you decide to call her, I'll be happy to address the

16  nondisclosure issue.

17      MR. LOPEZ:  Thank you, Your Honor.

18      THE COURT:  I'll note in my copy of the pretrial

19  order that the defendants have a nondisclosure objection to

12:35:11  20  Ms. Campbell.

21      Anything else on the final pretrial order?

22      MS. HELM:  I don't have the page, Your Honor, but

23  I'll find it.  But we have reached an agreement that if your

24  prior ruling on Recovery migration death applies in the Hyde

12:35:31  25  case, that the redactions to exhibits that we agreed to and

12:35:36  1   finally accomplished in the Jones case will apply.  So we will

2   be using the as-redacted exhibits from Jones and only have to

3   redact new exhibits.  Hopefully that will keep us from keeping

4   Traci here late the night before.  And we've also agree to

12:35:54  5   work on those redactions both -- if it applies, both after we

6   get your ruling and throughout trial so the documents will be

7   redacted well in advance of them being submitted to the jury.

8                THE COURT:  Okay.

9                Anything else on the final pretrial order?

12:36:24 10              MR. O'CONNOR:  I don't think we have anything else on

11   the pretrial order.

12                THE COURT:  Okay.

13                With these modifications we've discussed, I'm going

14   to adopt the final pretrial order at Docket 12388 as the final

12:36:39 15   pretrial order in the case.  That means this is the blueprint

16   for the trial and Rule 16(e) will apply from this point on,

17   meaning that any changes to the final pretrial order will

18   require compliance with the standard in Rule 16(e), which is

19   to avoid manifest injustice.

12:37:07 20              Let's talk for a minute about the trial brief.

21                The defendants argued at pages 12 and 13 of their

22   trial brief that the presumption in Wisconsin statute

23   895.047(3)(b) should apply in this case, and defense counsel

24   cited a new case that wasn't -- that was the *Kilty* case,

12:37:52 25   K-I-L-T-Y, that wasn't available when I issued the summary

12:37:56  1    judgment ruling that said the presumption would not apply.

2         And I've read the *Kilty* case.  The -- well, I

3    shouldn't say I've read it.  I've read what I think are the

4    relevant portions.  I didn't read the whole thing.

12:38:19  5         What was unclear to me was Bard states on page 13,

6    "Bard submits that this question warrants more detailed

7    briefing."

8         What are you thinking we need to do on this issue?

9         MR. ROGERS:  Well, Your Honor, I don't have an answer

12:38:39 10    to that and I'm surprised we said that.  I think we pretty

11    much said our piece regarding the issue in the trial brief.

12    And, obviously, if the Court wanted more briefing we'd be glad

13    to do it, but I don't think we have anything else we need to

14    tell you.

12:38:51 15         THE COURT:  Well, let me ask you a question,

16    Mr. Rogers, about the *Kilty* case, which was a decision in June

17    of this year from the Western District of Wisconsin that was

18    dealing with this portion of the statute.

19         The product at issue in *Kilty* was a respirator to

12:39:15 20    protect workers from asbestos when they were presumably

21    remediating asbestos contamination.  The National Institute of

22    Occupational Safety and Health and Bureau of Mines had enacted

23    regulations that, according to the district court, concerned

24    the, quote, performance and quality of respirator equipment,

12:39:43 25    close quote.  And I'm reading from page 2 of the Westlaw

version.

The regulations themselves say that respirators are, quote, approved after meeting the minimum requirements for performance and respiratory protection prescribed in this part, close quote.

And then if a respirator satisfied those requirements, they actually issued a certificate saying this is a certified respirator.

Here's the question I have.  It seems to me this regulation that was being addressed in *Kilty* was a direct regulation of a product for purposes of safety and health.  It was the agency saying these are the minimum requirements you have to meet for respiratory protection for people involved in asbestos.  And without a great deal of discussion the district court said that where regulations comply -- require specific compliance with regulations and the agency issues a certification, then the presumption under Wisconsin applies.  Under Wisconsin law applies.

In my summary judgment ruling, I cited two decisions, as you know, from West Virginia, I think, which applied the same section and said 510(k) is not a safety determination and therefore doesn't invoke the presumption.

It seems to me that the regulation we're dealing with in *Kilty* is a direct regulation of a product to preserve safety.  And the 510(k) isn't that kind of program.

12:41:44   1        So when I read *Kilty*, my thought was this really

2     doesn't address the 510(k) issue that was decided by those

3     other cases.  But I'm interested in the response you have on

4     that issue.

12:41:57   5        MR. ROGERS:  Your Honor, I do not disagree with you

6     that the reg that was at issue in the *Kilty* case was a safety

7     regulation, and we note that in a footnote that that was

8     likely the case.

9        But I think the difference we wanted to draw the

12:42:10  10     Court's attention to was in the West Virginia cases they

11     grafted this notion of safety into the statute.  Into the

12     Wisconsin pipe liability statute.  And that word does not

13     appear in the statute, and the *Kilty* case does not ever say

14     that the reg at issue needs to be a safety regulation in order

12:42:36  15     for the presumption under the statute to become applicable.

16        And so, Your Honor, I don't disagree with you that

17     they were dealing with a safety statute, but the court

18     certainly never said in the *Kilty* case that we can only use

19     this reg as a basis for the application of the statute because

12:42:54  20     it is a safety regulation.  So that's just not present in the

21     language of the statute and I just don't think that it's

22     there.

23        THE COURT:  Well, I understand that point.  Let me

24     tell you the hypothetical that I've been thinking about on

12:43:10  25     this issue.

12:43:12  1        Let's take an automobile which must comply with
2    certain emissions regulations, certain miles per gallon under
3    federal law, that rolls over and injures somebody.

4        Could a party under this Wisconsin statute say
12:43:30  5    because this automobile complied with emissions regulations
6    there is a presumption that there is no safety defect that
7    caused the rollover?

8        MR. ROGERS:  That's a tough hypothetical, Your Honor,
9    I agree.

12:43:49 10        You know, and I think that the 510(k) process,
11    similar to the reg at issue in *Kilty*, does require the
12    regulator to certify or clear, whatever the actual words are
13    that would be applicable, whatever the product was.

14        And so here we've got a product that did go through
12:44:08 15    the regulator's process and the regulator decided that the
16    product could be sold.  And, again, Your Honor, I think that
17    that scenario with the 510(k) process is much closer to the
18    *Kilty* scenario than the emissions scenario that you just gave
19    me.

12:44:25 20        THE COURT:  But the argument you made seems to
21    concede that there has to be some health and safety component
22    to the Wisconsin statute.

23        MR. ROGERS:  Your Honor, listen, I can't find a way
24    out of your emissions scenario, so I -- I would think there
12:44:42 25    needs to be some logical nexus between whatever the regulation

12:44:46  1   is and the presumption.  I mean that only makes logical sense.

2   But, again, *Kilty* does not require the underlying bases to be

3   a safety statute.

4           THE COURT:  Okay.  All right.  Thanks.

12:45:03  5           Do plaintiffs have arguments on this?

6           MS. REED ZAIC:  Your Honor, I agree with everything

7   you said.  I would just point out the *Kilty* court likely did

8   not need to point out any aspect of safety because it was a

9   safety statute.  Those particular statutes are safety

12:45:17  10  regulations.

11          And another point of -- to discern between the 510(k)

12  process and the regulations under 30 CFR 11.2 is that in order

13  to get the certification, they have to be in compliance with

14  standards issued by a government agency.  The agency sets

12:45:36  15  them.  We don't have them in the 510(k) process, as we covered

16  last year in preemption.  There's no parallel regulation

17  setting specific specifications for an IVC filter.  That is

18  the case with regard to respirators that oversee and control

19  performance and emission -- a particular emissions level.

12:45:56  20          So, first of all, there has to be compliance with a

21  particular government standard that has been developed,

22  published, issued.  And once that certification is obtained by

23  the manufacturer of the respirator, there is a process of

24  recertification.

12:46:14  25          So the certificate is issued and I believe annually

12:46:16  1   they have to go back and get it recertified.  These particular

         2   respirators.  That is certainly not the case with an IVC

         3   filter.

         4          THE COURT:  Okay.  Thanks.

12:46:28  5          What I will do is I will address this in an order

         6   that comes out next week.

         7          I've got to address this, we've got to address

         8   Dr. Asch, we've got to address the negligence per se issue.

         9   So we'll probably do one order that covers all of those.

12:47:01 10          Two housekeeping matters.  Are you all invoking the

        11   rule of exclusion in this trial?

        12          MR. ROGERS:  Consistent with the prior two trials, I

        13   think we would, except for experts, which is the world we

        14   lived in under both Booker and Jones.

12:47:20 15          MR. O'CONNOR:  We're going to live with the prior

        16   rule.

        17          THE COURT:  Okay.  So the rule is invoked.  I'll

        18   leave it to you to tell fact witnesses it's in play and what

        19   it means.  But experts can sit in on testimony of other

12:47:31 20   experts.

        21          Last point, which I always try to remind counsel of,

        22   please remember in your openings not to venture into argument

        23   just so that I don't have to interrupt you.

        24          What other matters do Plaintiffs' counsel need to

12:47:47 25   raise?

12:47:48 1        MR. O'CONNOR:  I don't think we have anything.  We

2    don't have anything further, Your Honor.

3        MR. NORTH:  Your Honor, just one thing.  Couple of

4    weeks ago the plaintiffs filed a report to the Court regarding

12:47:58 5    the Simon Nitinol cases, and we would like to, the defense,

6    submit something ourselves.  We're a little concerned about

7    the proposal of 38 of those cases being remanded to various

8    district courts.

9        We understand the Court's belief, and I think the

12:48:15 10   Court's absolutely correct that permanent filters were not

11   part of the original MDL.  But we've been talking with our

12   client about a couple of ideas, so we'd like to file

13   something, if we could, two weeks from tomorrow concerning

14   Simon Nitinol.

12:48:31 15       THE COURT:  Yeah, that's fine.  I haven't even read

16   what plaintiff submitted.  I will not have time between now

17   and trial, so you can certainly file something else.

18       Did you want to say something on that?

19       MR. LOPEZ:  No, Your Honor.  I'm fine with that.

12:48:43 20       THE COURT:  Anything else from the defense?

21       MR. ROGERS:  No, Your Honor.

22       MR. LOPEZ:  This is -- as the Court knows, there are

23   other case, trials going, that have been set for trial.

24   There's one in Arizona, one -- there's different parts of the

12:48:54 25   country.

12:48:56  1          I know it's our obligation and I know it's been that

2    way in other MDL's to keep -- even though they aren't federal

3    court cases, it's in the interest of the MDL and certainly the

4    MDL judge for us to keep you apprised of what's going on

12:49:09  5    outside of what's happening here.

6          I want to -- I bring that up because I need you to

7    know there have been a number of cases that are ready to go to

8    trial, the cases have resolved.  Those are confidentiality

9    issues.  It may be something we have to address some day.

12:49:29  10    Maybe soon.  Maybe after this trial.  And how much detail you

11    want about that.  Every judge is different about that, Your

12    Honor, it's been my experience.  Some want to know exactly

13    what's going on in every case with respect to settlements

14    outside of the MDL.

12:49:47  15          THE COURT:  I'm not one of those judges.

16          MR. LOPEZ:  Okay.  I wanted to find that out.

17          THE COURT:  Those aren't my cases; I'm not

18    responsible for them.  As you've been able to tell, I don't

19    believe in wading into your settlement talks in this case.

12:50:07  20          Obviously, if there's a trial's going in another

21    case, going to actually be in front of a jury, I'd be

22    interested in knowing the trial's going and I'd be interested

23    to know what happens because that may affect what we do with

24    bellwether decisions down the road or other issues.  But I

12:50:19  25    don't feel the need to know terms of settlement in those other

12:50:22   1   cases.

2              MR. LOPEZ:  I just wanted to make sure about that.

3              The other issue are these early remands or the mature

4   cases, whatever we've been talking.  I'm getting -- it's not

12:50:33   5   like people are calling everyday but --

6              THE COURT:  Did you see the order on that?

7              Did we get that order out?

8              Oh.  Okay.

9              We've got an order done.  I thought it had gone out

12:50:45  10   in the last day or two.  It will go out in the next day or

11   two.

12             MR. LOPEZ:  Oh.  Okay, Your Honor.

13             THE COURT:  It's 38 pages long.  It takes everything

14   you've submitted and tries to provide enough information for

12:50:55  15   the other judges to know what happened here.  So that order

16   will get out.

17             MR. LOPEZ:  Okay.  Thanks, Your Honor.

18             THE COURT:  Okay.  We'll see you at 8:30 on the 18th.

19             EVERYBODY:  Thank you, Your Honor.

12:51:11  20        (End of transcript.)

21                            *  *  *  *  *

22

23

24

25

1                          **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8      a full, true, and accurate transcript of all of that portion

9      of the proceedings contained herein, had in the above-entitled

10     cause on the date specified therein, and that said transcript

11     was prepared under my direction and control, and to the best

12     of my ability.

13

14             DATED at Phoenix, Arizona, this 8th day of September,

15     2018.

16

17

18

19

20                             s/ Patricia Lyons, RMR, CRR
                               Official Court Reporter
21

22

23

24

25