# Exhibit D

```
 1                (The following is an unedited rough

 2                draft and is not in final form.  Various

 3                corrections and/or changes will be made

 4                before the final version is completed.

 5                This rough draft and/or rough ASCII is

 6                being provided as a special service to be

 7                used for limited purposes; however, the

 8                reporter will not be responsible for the

 9                content of such rough draft and/or any

10                variance thereof from the final

11                transcript.)

12

13                SANTA BARBARA, CALIFORNIA

14                WEDNESDAY, JANUARY 30, 2019, 10:02 A.M.

15

16           THE REPORTER:  Do counsel agree to waive the

17      reporter read on/off required under federal rules?

18           MR. NORTH:  Yes.  That's fine.

19           MR. STOLLER:  Yes.

20           THE VIDEOGRAPHER:  Good morning.  We are on the

21      record at 10:02 a.m. on January 30, 2019.

22           This is media unit number one in today's video-

23      recorded deposition of Robert M. McMeeking, PhD, taken by
```

24  counsel for the defendant in regards to the Bard IVC

25  filters products liability litigation filed in United

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

1

1  States District Court for the district of Arizona.  The

2  case number is MD-15-02641-PHX-DGC.

3      This deposition is being held at 401 Storke Road

4  in Goleta, California, 93117.

5      My name is Michael Currie.  I'm a certified legal

6  video specialist from Veritext Legal Solutions, and the

7  court reporter is Gina Karen also from Veritext Legal

8  Solutions in Los Angeles.

9      Counsel, would you please identify yourselves for

10  the record and whom you represent.

11      MR. STOLLER:  Paul Stoller for the plaintiffs.

12      MR. NORTH:  Richard North for the defendants CR

13  Bard and Bard Peripheral Vascular.

14      THE VIDEOGRAPHER:  This you.

15      MS. Karen, would you please swear in the witness.

16

17      ROBERT M. McMEEKING, PhD, NAE, FREng, FRSE, LFASME,

18       HAVING BEEN FIRST DULY SWORN BY THE REPORTER, WAS

19          EXAMINED AND TESTIFIED AS FOLLOWS:

20

21                        EXAMINATION

22  BY MR. NORTH:

23      Q    This will be the deposition of Dr. McMeeking

24  taken by the defendants in the Bard IVC filter product

25  litigation and more specifically in the case of Debra
            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              2


 1  Tinlin.

 2          It's being taken for purposes of discovery and

 3  all other purposes permitted under the Federal Rules of

 4  Civil Procedure.  And we'll proceed as we have in

 5  countless other depositions as far as preserving

 6  objections except as to the form of the question and

 7  responsiveness of the answer?

 8          Is that acceptable?

 9          MR. STOLLER:  Yes.

10  BY MR. NORTH:

11      Q    And, Dr. McMeeking, what is your preference as to

12  reading and signing?

13      A    I will read and sign.

14      Q    Okay.  Could you state your full name for the

15  record.

16      A    Robert Maxwell McMeeking.

17      Q    Dr. McMeeking, as you know, my name is Richard
                        Page 3

18   North, and I represent the defendants in this particular

19   matter.

20       You and I have met on previous occasions;

21   correct?

22   A   That's correct, yes.

23   Q   And, in fact, I have examined you on previous

24   occasions both in deposition and in the courtroom?

25   A   That's right.  Yes.
       THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                               3


1   Q   And we obviously have all this information, but

2   just so this particular transcript is complete, could you

3   briefly tell us where you're employed and how you're

4   employed?

5   A   I'm employed at the University of California at

6   Santa Barbara, and I'm a Tony Evans professor of

7   structural materials.  And I'm distinguished professor of

8   mechanical engineering at the University of California at

9   Santa Barbara.

10       In addition, I have a part-time appointment at

11   the University of Aberdeen in Scotland, where I'm Sixth

12   Century Professor of Engineering Materials.

13   Q   Do you have a full course load these days?

14   A   This quarter I do not.  I had a full course load

15   in the fall, but right I'm not teaching because I'm

16   associate dean for academic personnel, which means I do

17   the personnel performance reviews for the engineering

18   faculty.  And so that takes up a lot of my time at this

19   time of the year.  And for that reason I'm not teaching

20   right now.  But, otherwise, I would have a full course

21   load.

22          MR. NORTH:  If we could mark as Exhibit 1.

23              (Whereupon Defendants' Exhibit 1 was

24              marked for identification by the court

25              reporter and is attached hereto.)

          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                                    4

 1   BY MR. NORTH:

 2      Q    Dr. McMeeking, you are familiar with Exhibit 1,

 3   aren't you?

 4      A    Yes, I am.  Yes.

 5      Q    And that is a copy of the expert report you have

 6   submitted in the case of Debra Tinlin?

 7      A    That's correct, yes.

 8      Q    And that report is dated December 7 of 2018;

 9   correct?

10      A    Yes.  That's correct.

11      Q    Since the date of that report, have you given any

                          Page 5

12    testimony in a deposition or in a courtroom?

13       A    Yes.

14            I have given courtroom testimony in the case

15    of -- I've forgotten the plaintiff's name already, but

16    it's a Cook IVC filter case.

17       Q    And that is pending in Indianapolis, Indiana?

18       A    That's right.  It's going on right now in

19    Indianapolis in the federal court there.

20       Q    And so you testified, like, a couple weeks ago in

21    early -- or mid January; correct?

22       A    Yes.  It was about a week ago.  Just over a week

23    ago.

24       Q    Is that the only time you have testified since

25    the date of your report?

            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                  5

1       A    Yes.  That's correct.

2       Q    Have you submitted any additional expert reports

3    in any sort of litigation since December 7 of 2018?

4       A    I don't believe so.  No.

5       Q    Have you been designated publicly as an expert

6    witness in any other litigation in the last two years

7    other than filter litigation against Cook or Bard?

8       A    I'm -- I'm not sure if I've been publicly

9    declared.  But I'm involved in legislation associated

10   with Cordis.

11       Q    Legislation.  What do you mean?

12       A    Oh, sorry.  Litigation.  Litigation.  Pardon me.

13       Q    Any other -- well, for the Cordis litigation, I

14   assume, you have been retained on behalf of the

15   plaintiffs?

16       A    That's correct, yes.

17       Q    Have you been retained in any other filter

18   litigation besides Cordis, Cook, or Bard?

19       A    No.  No.

20       Q    You testified previously against Cook in a case

21   that went to trial in Evansville, Indiana; correct?

22       A    That's correct, yes.

23       Q    And there was another case that Cook took to

24   trial in Houston, Texas.  Did you testify live in that

25   case?
                THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                            6


1        A    I did not testify live.

2        Q    Did you testify by videotape?  Or was your

3    deposition just read?  Or do you know?

4        A    I believe the video from my deposition was shown

5    at the trial of Pavlock versus Cook.

6    Q    Since the date of your report about six weeks

7  ago, have you published any other articles or things of

8  that nature?

9    A    Yes.

10         I've had papers that were -- have been submitted

11  since then and papers that have been moved to accepted

12  status of journals.

13    Q    Do any of those papers have anything to do with

14  inferior vena cava filters?

15    A    No.  None of them.

16    Q    Do any of them have anything to do with any sort

17  of medical device?

18    A    Not a medical device, no.

19    Q    Have you done any consulting in the last couple

20  of years with companies regarding medical devices?

21    A    Yes, I have.

22    Q    And could you tell us about that.

23    A    I consult for a company called Edwards

24  Lifesciences.  And I consult for them on the subject of

25  prosthetic hearth valves.  And I'm also consulting for a

       THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                    7

1  company in Italy called Epygone also on the subject of

2  prosthetic heart valves.

3          In addition, I did some consulting work for

4     Edwards concerning a device that goes into the IVC,

5     although it is not an IVC filter.

6     Q    What kind of device goes into the IVC if it's not

7     a filter?

8     A    Well, I'm not at liberty to say.

9     Q    Okay.

10    A    Yeah.  I'm not at liberty to say.

11    Q    When is the last time you did any active

12    consulting with Epygone?

13    A    I was there in the first or the second week of

14    December, and also I worked for them over the holiday

15    break doing some calculations and assessments for them at

16    that time.

17    Q    When is the last time you did any work with

18    Edwards Lifesciences?

19    A    That was more like the summer of 2018.

20    Q    With regard to your work with Epygone or Edwards

21    Lifesciences, have you done any physical testing of

22    products for them?

23    A    No, I have not.

24    Q    Any bench testing?

25    A    No, I have not.
      THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                    8

1     Q     Have you been involved in any interaction with

2  the United States Food and Drug Administration on behalf

3  of or with Edwards or Epygone?

4     A     I was -- I did some interaction with the FDA with

5  Edwards.  Not with Epygone, but with Edwards.

6     Q     And when was that interaction?

7     A     It was many years ago.  Something of the order of

8  a decade ago.

9     Q     Is that the last time you had any interaction

10 with the FDA?

11    A     Other than working through Edwards to provide

12 support for them when they submit things to the FDA.

13 That's the only direct interaction I've had with the FDA

14 over the last period of time.

15    Q     So, around a decade ago since you last actually

16 met with an FDA person?

17    A     Yeah.  It's probably a bit less than a decade

18 ago.  Maybe five years ago.

19          It was actually on behalf of a company called

20 Sorin, which is also an Italian company, and they are a

21 prosthetic heart valve company as well.

22    Q     Is that the last time you did any work for this

23 Sorin company?

Page 10

24     A    Yes.  Yes.

25     Q    And for Sorin you did not do any actual testing
       THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                    9


1    of a product or any bench testing; correct?

2      A    That's correct.

3      Q    Have you published any papers on medical devices

4    in the last five years?

5      A    I have to double-check.  Because I don't remember

6    when the last time I published a paper on prosthetic

7    heart valves was.  But it's been a number of years since

8    I published on medical implants.

9      Q    Have you ever published anything on any medical

10   implant other than a prosthetic heart valve?

11     A    No.

12     Q    Now, the title of your report Exhibit 1 is, and I

13   quote:  "Report on the Bard Inferior Vena Cava Filter

14   Implanted in Mrs. Debra Tinlin."

15          Is that correct?

16     A    That's correct.

17     Q    And that report is intended to be specific to the

18   filter Mrs. Tinlin actually received; correct?

19     A    That's correct.

20     Q    What model filter was that?

21    A    She had a Recovery, a Bard Recovery filter

22  implanted.

23    Q    You had previously provided reports in this

24  litigation regarding your general opinions about Bard

25  filters; correct?
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              10


1    A    That's correct.

2    Q    And the purpose of this particular report was to

3  present opinions specifically tied to the fact of

4  Mrs. Tinlin's case; is that correct?

5    A    That's correct.

6    Q    Does your billing rate remain $400 an hour, or

7  did you increase it effective January 1?

8    A    It remains $400 an hour for consulting, but $800

9  an hour for deposition and court testimony, which is the

10  same as the previous figure that I've been using.

11    Q    Your actual opinions pertaining to Mrs. Tinlin as

12  set forth in your report begin on the first page after

13  the heading "Mrs. Debra Tinlin's filter"; is that

14  correct?

15    A    That's correct, yes.

16        Although it's -- the opinions are half a page

17  beyond that.

18    Q    But that's where they begin?

19    A    That's where they begin, yes.

20    Q    And you have a series of bullet points that

21  continue over to the second page; correct?

22    A    That's correct.

23    Q    And those are reporting or summarizing medical

24  events that occurred with regard to Ms. Tinlin; right?

25    A    That's correct.
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                    11


1    Q    And was the basis of your understanding of those

2  events the medical records and the expert reports of

3  Dr. Hurst and Dr. Muehrcke?

4    A    That's correct.

5    Q    Now, underneath, if we can turn to page 2, the

6  first full paragraph beyond the bullet points states:

7              "Based upon my review of the

8              referenced medical records and expert

9              reports and consistent with my evaluation

10             of the Bard Recovery filter and my

11             opinions regarding failure modes of the

12             Recovery filter, I have determined to a

13             reasonable degree of engineering and

14             scientific certainty that Mrs. Tinlin's

                        Page 13

15            Recovery filter experienced all of the

16            failure modes consistent with the defects

17            inherent in the Recovery filter."

18       Is that correct?

19   A   That's correct.

20   Q   And that is an opinion specific, obviously, to

21  the case of Mrs. Tinlin; correct?

22   A   That's correct.

23   Q   Now, in your report you identify various safety

24  features that you believe were available to Bard prior to

25  the time Mrs. Tinlin received her Recovery filter; is

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                              12


1  that correct?

2   A   That's correct.

3   Q   And if we look at page 3, in the second -- or the

4  first full paragraph, you identify what those safety

5  features are that you believe were available to Bard;

6  correct?

7   A   I would need to look through it.

8   Q   If you would, please, towards the end of that

9  paragraph.

10   A   Towards the end.  Yes, I do.

11   Q   And those features include caudal anchors;

12  correct?

13      A    That's correct.

14      Q    They include penetration limiters?

15      A    That's correct.

16      Q    And they include a two-tiered design; correct?

17      A    That's correct.

18      Q    And they include a better -- and by better I mean

19  smoother or rounder, or rounded -- chamfer,

20  c-h-a-m-f-e-r, on the mouth of the cap of the filter;

21  correct?

22      A    That's correct.

23      Q    Now, if we can turn back to page 2, midway

24  through the middle paragraph, you state:

25              "Bard made a choice to design the

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                            13


1              Recovery filter without caudal anchors or

2              other features that would prevent and/or

3              minimize caudal migration."

4          Is that correct?

5      A    That's correct.

6      Q    And you do not identify anywhere in your report

7  any of what you term there as other features that would

8  prevent or minimize caudal migration, do you?

9     A     Well, I would have to look through the document

10   completely.  Could you ask the question again, please.

11     Q     Let me ask you this.  You do not identify what

12   the other features are beyond caudal anchors themselves

13   that would prevent and/or minimize caudal migration, do

14   you?

15     A     Yeah.  That's my recollection.  Yes.

16     Q     And we can look down at the next paragraph.  And

17   you make a similar statement about Bard making a choice

18   to design the Recovery filter without perforation

19   limiters or other features; correct?

20     A     That's correct.

21     Q     And you do not identify in your report what other

22   features there are that would prevent and/or minimize

23   perforation, do you?

24     A     I believe that's the case, yes.

25     Q     And turning to the next paragraph, you say:

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          14


1               "Bard made a choice to design the

2               Recovery filter without features that

3               would prevent and/or minimize tilt."

4     Correct?

5     A     Correct.

6    Q    And you do not identify in your report what those

7    features are, do you?

8    A    Well, I think I do.

9    Q    In what way?

10   A    Well, I mention caudal anchors, and I mention

11   perforation limiters, which would both contribute to

12   minimizing the tendency for tilt to occur.

13   Q    Beyond caudal anchors and penetration limiters,

14   which we have discussed previously, you do not identify

15   any other features -- quote, features, unquote that would

16   prevent or minimize tilt, do you?

17   A    I think I do.  In the sense that I mention that

18   the shape of a filter is something that can contribute to

19   the tendency to tilt.

20   Q    By the shape of the filter, are you talking about

21   the absence of a two-tiered design?

22   A    That would be one feature, yes.

23   Q    And a two-tiered design feature would

24   appropriately describe the design of the Simon Nitinol

25   filter; correct?
                 THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                        15


1    A    That's correct.

2    Q    So, other than caudal anchors, penetration

3   limiters, or aspects of the size or dimensions of the

4   design, you do not identify any other features that would

5   minimize or prevent tilt, do you?

6   A    That's correct.

7   Q    Would you agree that a specific patient's

8   physical condition could implant the effectiveness of

9   these safety features?

10   A    Well, I'm not a doctor.  So, I'm not sure how to

11   answer that question.

12        Could you ask the question again, please.

13   Q    Let me be more specific.  Would you agree that a

14   patient's inferior vena cava may be too large for caudal

15   anchors to work?

16   A    Yes.  If the -- yes.  I agree.

17   Q    Would you agree that a patient's inferior vena

18   cava filter -- I mean inferior vena cava may have a

19   circumference too big for penetration limiters to work?

20   A    I believe that would be the case too, yes.

21   Q    And do you agree that a patient's inferior vena

22   cava may be too large for a specific two-tiered design

23   that you've identified to work?

24   A    That would be the case too, yes.

25   Q    And would you agree that a person's inferior vena

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

16

1  cava could have too large of a circumference for the

2  rounded cap you have advocated to make any difference?

3     A     No.  I disagree.

4     Q     Explain the basis for that disagreement, please.

5     A     Well, if the filter is able to remain in the vena

6  cava, then the arms may touch the edge of the cap.  And

7  if the arms are touching the edge of the cap, then the

8  chamfer would make a difference to the levels of strain

9  that are generated there and that would have an implant

10  on the likelihood of fatigue fracture occurring at that

11  location.

12     Q     Okay.  I understand that's your opinion.  But

13  have done any testing to verify that opinion?

14     A     No.

15     Q     Would you agree that motion in the inferior vena

16  cava -- of the inferior vena cava could implant the

17  effectiveness of caudal anchors?

18     A     Yes.  I agree.  Yes.

19     Q     And would you agree that caval, c-a-v-a-l, motion

20  could implant the effectiveness of penetration limiters?

21     A     I'm not sure about that.

22     Q     You're not sure one way or the other?

23     A     Yes.  I'm not sure one way or the other.

24     Q     Would you agree that caval motion could implant

25   the efficacy of a two-tiered design?
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          17


1     A     I'm not sure about that as well.

2     Q     Either way?

3     A     Either way, yeah.

4     Q     Would you agree that caval motion could implant

5   the efficacy of a rounded cap?

6     A     I think caval motion would make the efficacy of

7   the rounded chamfer -- it would enhance the effect of it

8   if anything.

9          THE REPORTER:  Would enhance the effect of?

10         THE WITNESS:  Of the rounded chamfer,

11  c-h-a-m-f-e-r.

12  BY MR. NORTH:

13    Q     What is your basis for believing that caval

14  motion would enhance the effectiveness of a rounded cap?

15    A     Well cable motion would include the expansion and

16  contraction of the vena cava width and that is what

17  causes the arms to experience strain.  And the rounded

18  chamfers have the effect of helping to keep the level of

19  strain down in the arms where they exit the cap.

20         And, therefore, that's my reason for saying

21  that -- that caval motion, in the sense of expansion and

22   contraction of the vena cava, would make the chamfer an

23   effective feature of the design.

24        Q    Would you agree that the position of a patient's

25   inferior vena cava with respect to the spine could effect
              THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              18

 1   the effectiveness of caudal anchors?

 2        A    I'm not sure about that.

 3        Q    One way or the other?

 4        A    One way or the other.

 5        Q    Let's back up just a moment to what you just said

 6   about caval motion enhancing the effectiveness of a

 7   rounded cap.  You have not conducted any testing to

 8   verify that opinion, have you?

 9        A    I have not be conducted any bench testing, no, or

10   animal testing.

11        Q    Have you conducting any other type of testing to

12   verify that particular opinion?

13        A    Well, I've done calculations.  But, no.  I would

14   define those as testing.  But it's analysis of the

15   strains which are present in the filter.

16        Q    Would you agree that the position of a patient's

17   inferior vena cava with respect to the spine could

18   implant the effectiveness of penetration limiters?

19     A     I'm not sure about that one way or the other.

20     Q     The same question with regard to a two-tiered

21 design.

22     A     Again, I'm not sure about that one way or the

23 other.

24     Q     Would you agree that the position of a patient's

25 inferior vena cava with respect to the spine could

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                                    19

1 implant the effectiveness of a rounded cap?

2     A     I'm not sure about that one way or the other.

3     Q     Now, this bullet point list that begins on page 1

4 of your report -- what -- where did you obtain those

5 facts, particular facts?

6     A     I am relying on Dr. Hurst's report and

7 Dr. Muehrcke's report for this information.  I also

8 looked at some imaging.  And what I saw in the imaging is

9 consistent with what is reported by Dr. Hurst and

10 Dr. Muehrcke.

11     Q     Do you recall which images you looked at?

12     A     No, I don't recall exactly which images.

13     Q     Do you identify in your report the images that

14 you looked at?

15     A     No.  No.

16     Q     When did you look at those images?

17     A     Um, I don't recall.

18     Q     Did you look at them yourself, or with someone

19     else?

20     A     I believe I looked at them with Dr. Hurst by

21     video conference.

22            I may be mistaken by that.  Because I've looked

23     at other images with him.  So, I may be mistaken about

24     whether it was Mrs. Tinlin's that I looked at.

25     Q     Okay.  If I understand what you just said, you
              THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                    20

1     recall having looked at some images regarding some

2     patient with Dr. Hurst via video conference at some

3     point, but you cannot recall specifically whether that

4     was with regard to Mrs. Tinlin?

5     A     That's correct.

6     Q     Do you recall having a video conference -- when

7     was the last time you had a video conference with

8     Dr. Hurst?

9     A     The one I recall was in September.

10    Q     Of 2018?

11    A     Of 2018, yeah.

12    Q     How long did that video conference last?

13    A    Oh, it was an hour or so.  About an hour.

14    Q    Was Ms. Tinlin the subject of that video

15  conference?

16    A    I don't recall.

17    Q    Did someone else attend that video conference

18  with you and Dr. Hurst?

19    A    One of the attorneys.

20    Q    Do you recall which attorney?

21    A    No.  I don't know.

22    Q    Was it Mr. Stoller?

23    A    Um, I don't think so, no.

24    Q    Have you had any video conferences with

25  Dr. Muehrcke?

            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                    21


1    A    I don't recall.  No.  I don't think so.  No.

2    Q    Did you actually read any medical records

3  yourself other than to possibly, as you indicated, look

4  at images?

5    A    Well, I looked through the medical records of

6  Mrs. Tinlin.

7    Q    But you are not a medical doctor; correct?

8    A    That's correct.

9    Q    Now, these bullet points reflect the medical

10   issues specific to Ms. Tinlin that were important for

11   your opinions in this case; correct?

12      A    That's correct.

13      Q    And you've already testified in three trials in

14   the Bard IVC litigation?

15      A    That's correct.

16      Q    And you understand based on those trials that

17   doctor -- Judge Campbell has a very strict rule that, if

18   you do not disclose facts and opinions in your reports,

19   you cannot testify about those things; correct?

20      A    If you tell me that's the case, I would accept

21   it, yes.

22      Q    Well, you attempted to include all of the

23   important things for the opinions about Mrs. Tinlin that

24   you intend to explain to the jury in this report;

25   correct?
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                22

1      A    That's correct.

2      Q    You told us you're not a medical doctor and you

3   don't hold yourself out as an expert in interpreting

4   medical records; right?

5      A    That's correct.

6      Q    And you're not an expert when it comes to reading

                              Page 25

 7   imaging; correct?

 8   A    That's correct.

 9   Q    And you would defer in this case to all of the

10   medical experts as far as those areas go?

11   A    I would, yes.

12   Q    Let's look at the first bullet point, which

13   reads:

14              "On May 7, 2005, Mrs. Tinlin had a

15              Bard Recovery inferior vena cava filter

16              placed with no significant tilt."

17        Correct?

18   A    Correct.

19   Q    And what was the specific basis of that

20   statement?  Where did you get that information from?

21   A    Dr. Hurst reported that in his -- in his report.

22   Q    Did you do anything to verify the accuracy of

23   that statement?

24   A    No.

25   Q    You used the phrase "significant tilt"; correct?
     THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                       23


 1   A    Yes.

 2   Q    Was that how Dr. Hurst had characterized the

 3   tilt?

4     A     I believe that's the wording he used, yes.

5     Q     What is a significant tilt in your opinion?

6     A     Well, as an engineer, I would say it's more than

7  five degrees.

8     Q     Are you familiar with the guidelines produced by

9  the Society of Interventional Radiology?

10    A     I'm familiar with some aspects of those

11  guidelines.

12    Q     Do you know how they quantify a tilt in those

13  guidelines?

14    A     I'm not absolutely sure, no.

15    Q     Do you agree that not all tilt of a filter is

16  significant?

17    A     I agree, yes.

18    Q     And not all tilt of a filter can have clinical

19  significance; correct?

20    A     I agree.

21          Well --

22          MR. STOLLER:  Foundation.

23          THE WITNESS:  To the extent I'm an engineer and I

24  understand that that would be the point of view of

25  medical people, I agree.

         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                                       24

1  BY MR. NORTH:

2  Q    Well, from that same perspective, it's your

3  understanding that some tilt can occur in some patients

4  yet not cause a physical problem for those patients?

5  A    That's my understanding, yes.

6  Q    Regardless of whether you characterize the tilt

7  in this particular instance as significant, can you

8  quantify what the amount of tilt was in terms of degrees?

9  A    Not specifically in amount of degrees, no.

10  Q    So, do you know whether it was more than five

11  degrees or not?

12  A    I don't know.

13  Q    Are you aware that the Recovery filter is

14  contraindicated in patients with inferior vena cavas

15  measuring greater than 289 millimeters in diameters?

16  A    That is my understanding, yes.

17  Q    Do you know the size of Mrs. Tinlin's inferior

18  vena cava when her Recover filter was implanted on May 7

19  of 2005?

20  A    Well, not on May 7.

21  Q    The way you say that, are you indicating that you

22  know the size of her inferior vena cava at some other

23  point?

24  A    Dr. Hurst reports I think it's three days before

Page 28

25   May the 7th that he measured it at 2.5 centimeters, or 25
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                    25

1   millimeters by 15 millimeters was the size that he

2   reported.

3       Q    And your source of that information is just

4   Dr. Hurst's report?

5       A    Dr. Hurst's report, yes.

6       Q    You did not make any independent assessment of

7   the size of Mrs. Tinlin's inferior vena cava at any

8   juncture; correct?

9       A    That's right.

10      Q    And you do not have any information as you sit

11  here as to the size of her inferior vena cava on the very

12  day the filter was implanted, May 7 of 2005?

13      A    That's correct.

14      Q    Have you seen any medical records beyond

15  Dr. Hurst's report that talk about the size of her

16  inferior vena cava?

17      A    I don't recall, no.

18      Q    Do you know the name of the implanting physician,

19  the doctor who put this filter in her?

20      A    No.  I don't recall his name or her name.

21      Q    Do you have any information whether he or she

22    measured the diameter of Mrs. Tinlin's inferior vena

23    cava?

24        A    I don't have any information about that.

25        Q    Did you review the deposition testimony of any of

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                                              26

1    her treating physicians?

2        A    No.  I have not.

3        Q    Would you agree that, if Ms. Tinlin's inferior

4    vena cava measured between 28 and 29 millimeters at the

5    time of implant, that it would have been -- the filter --

6    this filter, Recovery filter, would have been

7    contraindicated for use in her?

8            MR. STOLLER:  Object to foundation.

9            THE WITNESS:  That's my understanding.

10   BY MR. NORTH:

11       Q    And as we talked about earlier, the size of the

12   inferior vena cava could affect effectiveness -- could

13   affect the effectiveness of penetration limiters or

14   caudal anchors?

15           MR. STOLLER:  Object to foundation.

16           THE WITNESS:  I agree, yes.

17   BY MR. NORTH:

18       Q    Nothing in your report discusses the size of

19  Mrs. Tinlin's inferior vena cava, does it?

20  A    That's correct.

21  Q    And you have no information as to the size of

22  that inferior vena cava on the very day the filter was

23  implanted?

24  A    That's correct.

25  Q    Look at the second bullet point.  You state, and
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          27


1  I quote:

2                "On May 8, 2005, the filter is

3                identified as having 18 degrees of tilt

4                with its tip against the anterior wall of

5                the IVC and with caudal migration of 9

6                millimeters.  All six of its arms and two

7                of its legs are identified as having

8                penetrated the wall of the IVC."

9        Correct?

10  A    That's correct.

11  Q    And that was one day after implant; correct?

12  A    That's correct.

13  Q    And you told us and mentioned in the first bullet

14  point right after implant the filter had no significant

15  tilt?

16     A     That's correct.

17     Q     And would you agree that tilting 18 degrees in 24

18 hours is pretty significant?

19     A     It is, yes.

20     Q     Do you know if that test was performed or that

21 measurement of the tilt was identified a full 24 hours

22 after implant, or some lesser period of time?

23     A     I don't know exactly time --

24            MR. STOLLER:  Object to form.

25            THE WITNESS:  I'm sorry.
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          28

1             I don't know exactly what time of day compared to

2  the implantation that was carried out, the measurement.

3  BY MR. NORTH:

4     Q     Is there anything significant to your opinion

5  that the tilt and perforations occurred in such an

6  temporal proximity to the implant?

7     A     Could you repeat the question, please.

8     Q     Is there anything significant to your opinions in

9  the fact that the tilt and perforation of this filter

10 occurred so soon after the implant?

11     A     Yes.

12     Q     And what is that?

13    A    Well, I've stated the opinion that the Recovery

14    filter is unstable and tilts very easily.  And, so,

15    therefore, it's consistent with my assessment that --

16    that the Recovery filter will tilt readily.

17    Q    Would you agree that tilt and perforation can

18    occur more readily if the Recovery filter is implanted in

19    a patient with an inferior vena cava of greater diameter

20    than the device is indicated for?

21         MR. STOLLER:  Object to the form.

22         THE WITNESS:  Um, yes.

23    BY MR. NORTH:

24    Q    This second bullet point -- did you draw that

25    from Dr. Hurst's report again?

        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                    29


1    A    That's correct.

2    Q    Did you review medical records to independently

3    verify that statement?

4    A    Well, I reviewed medical records.  But I didn't

5    tie it together with this specific -- specific

6    observation.  I didn't tie the medical records together

7    with this specific observation.

8    Q    Did you tie the medical records together with any

9    of these specific observations?

10     A     No.  Not any -- not any specific observation

11   other than a more generic one that there was tilt and

12   perforation and fracture of the filter that took place.

13     Q     The third bullet point states, and I quote again:

14                    "The filter subsequently fractured and

15                    the fractured arm embolized to the right

16                    ventricle.  Therefore, a second arm

17                    fractured and embolized to the right

18                    ventricle."

19          MR. STOLLER:  You said therefore and not

20   thereafter.

21          MR. NORTH:  What?

22          MR. STOLLER:  You said therefore and not

23   thereafter.

24   BY MR. NORTH:

25     Q     Oh.
            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                30


1                    "Thereafter a second arm fractured and

2                    embolized to the right ventricle."

3          Correct?

4     A     Correct.

5     Q     You say that the filter subsequently fractured;

6   correct?

Page 34

7     A     You mean in a lower bullet point?

8     Q     Yeah.  In that same bullet point.

9     A     In the same bullet point?

10    Q     You indicate that the filter subsequently -- and

11   that is the word you used -- subsequently -- fractured;

12   correct?

13    A     Oh, yes, I see that.  Yes, I see that.  Yes.

14    Q     When exactly did it fracture?

15    A     When exactly?

16    Q     Yeah.

17    A     No.

18    Q     Do you know how long after implantation?

19    A     I don't know, no.  Although it was after May the

20   8th, 2005, and before June 11, 2007, is my understanding.

21    Q     Okay.  Let's drop down a couple of bullet points

22   to the fifth bullet point.

23          You state there:

24              "Subsequently a third arm fractured

25              and embolized to the pulmonary artery."
             THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                    31


1         Correct?

2     A     Correct.

3     Q     When did that third arm fracture?

4      A      Sometime between June 11, 2007, and February 3,

5    2012.

6      Q      Do you know when that particular fracture was

7    first observed?

8      A      No.   I don't know the exact date.

9      Q      Do you know whether it embolized?

10     A      I don't know that date.

11     Q      Do you know when the embolization was first

12    discovered?

13     A      No.

14     Q      Do you know how long -- what period of time

15    transpired between the fracture event and the

16    embolization of the fragment to the pulmonary artery?

17     A      No, I don't.

18     Q      Since you are not a doctor, it's not within your

19    expertise to testify as to whether a retained filter

20    strut in the pulmonary artery is a clinically significant

21    event; correct?

22     A      No.  I --

23            Could you repeat the question.  So I can --

24            MR. NORTH:  Could you repeat that, please.

25                        (Record read as follows:

            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                        32

1                    "QUESTION:  Since you are not a

2                    doctor, it's not within your expertise to

3                    testify as to whether a retained filter

4                    strut in the pulmonary artery is a

5                    clinically significant event; correct?")

6            THE WITNESS:  Correct.

7    BY MR. NORTH:

8        Q    Okay.  Let's drop down to the last bullet point

9    on that page, which I believe is the seventh overall.

10   And that one states:

11                   "Subsequently a fifth arm fractured

12                   and embolized to the pulmonary artery."

13           Correct?

14       A    That's correct.

15       Q    And, again, when you say subsequently, can you

16   identify when that fifth arm fractured?

17       A    Well, it was after February 3, 2012, and before

18   July 30, 2012 -- sorry.  It was after February the 3rd,

19   2012, and before July 30th of 2013.

20       Q    Do you know when that fracture event was first

21   observed by a physician?

22       A    No.

23       Q    Are you able to identify when that strut

24   embolized to the pulmonary artery?

25       A    No.

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
33

1    Q    Can you say when the embolization of that strut

2    to the pulmonary artery was first observed?

3    A    No.

4    Q    Now, let's go to the next page, if we could.  And

5    the first bullet point on page 2 says:

6              "On July 30, 2013, Mrs. Tinlin

7              underwent open-heart surgery during which

8              one fractured filter arm was success --

9              was removed successfully but the other

10             fractured filter arm in her heart could

11             not be found."

12         Correct?

13    A    That's correct.

14    Q    What is your basis for saying that the other

15    fractured filter arm in the heart could not be found?  Is

16    that Dr. Hurst?

17    A    That's from Dr. Hurst's report, that's correct.

18    Q    What evidence do you have other than Dr. Hurst's

19    statement in his report that the second fractured filter

20    arm was actually in the heart as opposed to some other

21    location in the body?

22    A    I have no other evidence.

                        Page 38

23    Q    The last bullet point says that Mrs. Tinlin's

24  Recovery filter was used as intended, properly implanted,

25  and there were no other causes of the failures of that
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                           34


1  filter; correct?

2    A    Correct.

3    Q    But you would agree that, if Mrs. Tinlin's

4  inferior vena cava was larger than the Recovery filter

5  was indicated for, that that could have contributed to

6  what you termed the failures of that filter; correct?

7    A    That's correct.

8    Q    How do you know that the filter was properly

9  implanted?

10    A    Because that is what was reported by Dr. Hurst

11  and Dr. Muehrcke.

12    Q    Did you do anything to verify that statement?

13    A    No, I did not.

14    Q    And since you're not a medical doctor, you don't

15  hold yourself out as an expert as to whether or not an

16  inferior vena cava filter is properly implanted, do you?

17    A    That's correct.

18    Q    There is nothing in your report that addresses

19  the effect of -- well, let -- strike that.  Let me start

20  over.

21        There is nothing in your report discussing how

22  caudal anchors or penetration limiters would operate in a

23  situation where the inferior vena cava is larger than

24  indicated for the filter; correct?

25        A    That's correct.
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                35


1        Q    And, in fact, there is nothing in your report

2   discussing how any feature of the filter would perform in

3   an inferior vena cava that's larger than is indicated for

4   the device; right?

5        A    That's correct.

6        Q    You say that the filter was, in that bullet

7   point, "used as intended."  What do you mean by that

8   statement?

9        A    Well, my understanding, as an engineer, is that

10  it was implanted in the inferior vena cava in an attempt

11  to trap clots.

12       Q    And, again, the source of that statement is

13  solely Dr. Hurst's report; correct?

14       A    That's correct.

15            And I guess I should amplify that it was

16  implanted according to -- well, my understanding is that

17   it was implanted according to the instructions for use.

18   Q    And that's based on Dr. Hurst; correct?

19   A    That's correct, yes.

20   Q    Do you know whether any of Mrs. Tinlin's treating

21   doctors recommended that the filter be removed?

22   A    I don't -- I'm not aware of any advice like that.

23   Q    Do you know whether any of Mrs. Tinlin's

24   physicians expected her Recovery filter to be removed

25   after her need for protection had passed?

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                            36


1    A    No.  I don't know that.

2    Q    There is nothing in your report about discussing

3    whether Mrs. Tinlin's filter should have been removed;

4    correct?

5    A    That's correct.

6    Q    And there is nothing in your report discussing

7    whether her doctors advised that it should be removed?

8    A    That's correct.

9    Q    If the filter had been removed from Mrs. Tinlin

10   after her need for the caval protection had passed,

11   you're unable to say whether that would have prevented

12   any fracture or embolization from occurring; correct?

13   A    Could you ask me the question again, please.

14    Q    Yeah.  That's -- agreed.  Confusing.

15    A    Sorry.

16    Q    So, we don't know whether -- or you don't know

17   when Mrs. Tinlin's need for the protection of that filter

18   passed or ended?

19    A    I don't know that.

20    Q    So, you don't know if it ended before the

21   fractures and embolization occurred, or after; correct?

22    A    That's correct.

23    Q    And if her need for protection had ended prior to

24   the fractures occurring and if the filter had been

25   removed prior, then obviously no fractures or
            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                    37


 1   embolization would have occurred?

 2            MR. STOLLER:  Foundation.

 3            THE WITNESS:  That -- no fractures of that filter

 4   within her would have occurred, yeah, that's correct.

 5   BY MR. NORTH:

 6    Q    Other than fatigue, what are the other causes,

 7   potential causes, of fracture in a Nitinol inferior vena

 8   cava filter?

 9    A    Well, it can be overloaded so that the single

10   incidence of load is too great for the material and that

11   can cause it to fracture.

12      Q    What can cause that sort of overload inside the

13   inferior vena cava?

14      A    Extreme motions or extreme compression of the

15   vena cava would be one example of what could cause that.

16      Q    Any other potential causes?

17      A    Well, I -- expansion could cause it as well.

18   Expansion of the filter width, the width between the

19   feet, or the arms, or the hands.

20      Q    And would you agree that those sort of scenarios

21   you're discussing -- the compression or the expansion --

22   could be severe enough that the design alternatives you

23   have proposed would -- could -- may not prevent fracture?

24      A    That -- they would have -- they would -- it would

25   be -- they would have no association with that fracture,
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                    38


1   that's correct, yes.

2      Q    Well, that wasn't quite my question.

3           If the compression or the expansion that you

4   believe could be a potential cause of fracture was severe

5   enough, it's possible that the device design attributes

6   you proposed, such as caudal anchor or penetration

7   limiters, would not be able to prevent the fracture;

8  correct?

9    A    That's correct.

10   Q    Obviously you did not physically examine

11 Mrs. Tinlin; correct?

12   A    No, I did not.

13   Q    Have you ever seen her?

14   A    I've never met her, no.

15   Q    Have you ever spoken with her?

16   A    No, I have not.

17   Q    You have never examined the filter she received;

18 correct?

19   A    That's correct.

20   Q    And you've never examined any component or piece

21 of the filter; correct?

22   A    That's correct.

23   Q    And would you agree that microscopic examination

24 of a fracture filter component can definitively determine

25 whether fatigue was the cause of the fracture?
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                             39


1    A    That's correct.

2    Q    And since you've never seen Mrs. Tinlin's filter

3 or any component of it, you have never examined it under

4 a microscope to determine of the cause of the fracture;

5   right?

6   A    That's correct.

7   Q    If we look at page 6 of your report at the top,

8   you state there, and I quote:

9                "To the extent Mrs. Tinlin's fractured

10               filter body and limbs are removed at some

11               point while this litigation is pending,

12               which is not expected, I reserve the

13               right to examine those fragments and

14               supplement my opinions."

15        Correct?

16   A    Correct.

17   Q    And you believe that microscopic examination

18   might confirm your opinions; correct?

19   A    That's correct.

20   Q    But it's also possible that microscopic

21   examinations could disprove your opinions; correct?

22   A    Could disprove some of my opinions, yes.

23   Q    Now, your report discusses caudal anchors,

24   penetration limiters, a two-tier design, and a smoother

25   cap as features you believe would have improved the

                THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                        40

1   design of the Recovery filter; correct?

2      A      That's correct.

3      Q      Now, there are no actual design drawings in your

4  report for these design attributes you describe; correct?

5      A      Correct.

6      Q      Are you capable of create -- in your expertise of

7  creating design drawings of attributes for the filter

8  like that?

9      A      Yes, I am.

10     Q      Are all caudal anchors the same size?

11     A      No.

12     Q      Are all of the same design?

13     A      No.

14     Q      Are they all equally effective?

15     A      Their effectiveness would vary according to their

16  design.

17     Q      Are all penetration limiters the same design?

18     A      No.

19     Q      Are all equally effective?

20     A      No.

21     Q      Is there more than one variation of a two-tiered

22  design?

23     A      Yes.

24     Q      So, all two-tiered designs are not the same;

25  correct?

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

41

1   A   They are not the same.

2   Q   And all two-tiered designs are not equally

3   effective?

4   A   Yes.  I would accept that.  Yes.

5   Q   And you did not include in your report any design

6   drawing of a two-tiered design; correct?

7   A   Not in this report -- I didn't provide any design

8   drawings.  I provided an image of the Simon Nitinol

9   filter, but no design drawings.

10   Q   So, when you have proposed a two-tiered design as

11   an alternative to the Recovery filter, your proposal is

12   essentially the Simon Nitinol filter?

13   A   That's correct.

14   Q   Your report does not propose any specific

15   dimensions for the caudal anchors you suggest; correct?

16   A   That's correct.

17   Q   It does not propose any specific dimensions for

18   the penetration limiters?

19   A   Correct.

20   Q   And other than to provide an image of the Simon

21   Nitinol filter, you don't provide any dimensions of the

22   two-tiered design; correct?

23     A     That's correct.

24     Q     There is no photograph -- well, no picture or

25     graphic depiction of the alternative filter that you

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

42

1     believe should have been designed?

2     A     No.

3     Q     Your report does not criticize Bard's use of the

4     material Nitinol for the filter, does it?

5     A     No, it does not.

6     Q     And your report does not address what sort of

7     material should be used for a device such as this, does

8     it?

9     A     That's correct.

10     Q     And it does not propose an alternative material

11     to the Nitinol that was used?

12     A     That's correct.

13     Q     Now, let's go beyond this specific report.  Am I

14     correct that in none of the expert reports you have

15     prepared in this litigation have you provided any design

16     drawings of caudal anchors that you believe should have

17     been implemented?

18     A     That's correct.

19     Q     And is it correct that in all of your expert

20   reports in this litigation, you have never prepared -- or

21   proposed any design drawings for the penetration limiters

22   you suggest?

23        A    That's correct.

24        Q    And is it correct that in this litigation you

25   have never in any of your expert reports provided design
              THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              43


 1   drawings or graphic depictions for two-tiered design you

 2   propose other than to provide an image of the Simon

 3   Nitinol filter?

 4        A    That's correct.

 5        Q    And you have not tried to devise any two-tiered

 6   design other than the dimensions of the Simon Nitinol

 7   filter itself as a two-tiered design that would have

 8   improved the performance; correct?

 9        A    That's correct.

10        Q    Now, with regard specifically to the caudal

11   anchors -- well, let me back up.

12             In some of your previous reports you -- to do

13   those reports, you did a number of calculations; correct?

14        A    That's correct.

15        Q    But you have never done any calculations focused

16   specifically on caudal anchors and what effect they would

17   have in improving the performance of the filter; correct?

18      A    That's correct.

19      Q    And, likewise, you have never done any specific

20   calculations regarding the effect that penetration

21   limiters would have on the filter?

22      A    That's correct.

23      Q    And you have never done any specific calculations

24   as to the effect that a two-tiered design would have on

25   the filter?
                THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                       44


1      A    That's correct.

2      Q    And you have never done any specific calculations

3   as to the effect that the rounded chamfer would have on

4   the filter; correct?

5      A    No.  I disagree with that.

6      Q    Okay.  Tell me the basis for that.

7      A    Well, in the MDL report I present calculations

8   for the effect of the rounded chamfer in regard to the

9   levels of strain and stress which are associated with it

10  in the adjacent strut.

11     Q    Would you agree with me that in your view a

12  filter that had the rounded chamfer, like you've

13  discussed, but did not have penetration limiters, caudal

14   anchors, or a two-tiered design could fracture?

15      A    Yes.  It could.

16      Q    In other words, the rounded cap, in the absence

17   of those other design features, would not necessarily

18   prevent a fracture; correct?

19      A    That's correct.

20      Q    Do you know anything about some of the other

21   medical conditions Mrs. Tinlin has had or does have now?

22      A    No, I do not.

23      Q    And you don't have any information concerning the

24   tissue quality firmness or flexibility of her vena cava,

25   do you?
           THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                  45


1      A    I do not, no.

2      Q    Or what her blood flows was or is?

3      A    No.

4      Q    What her respiration rate was --

5      A    No, I do not.

6      Q    -- or is?

7           What her experiences have been with Valsalva?

8      A    No.

9      Q    And neither Dr. Hurst nor Dr. Muehrcke or any

10   other doctor have given you any such information

11  regarding those things, have they?

12      A    That's correct.

13      Q    And as a part of your work in this case, you did

14  not investigate anything specific about Mrs. Tinlin's

15  anatomy; correct?

16      A    Correct.

17      Q    And other than to read the reports of Drs. Hurst

18  and Muehrcke, you did not investigate anything about her

19  medical conditions; correct?

20      A    That's correct.

21      Q    Are you aware that Mrs. Tinlin's physicians

22  recommended and prescribed a retrievable filter for her?

23      A    I'm not aware of their recommendations.

24      Q    Let's turn to page 3 of your report, if we could.

25  At the bottom of the first full paragraph, after you've

        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                    46


1  discussed some of these alternative design features, you

2  state, and I quote:

3                   "Many of these design features existed

4                   in other IVC filter products already on

5                   the market, including the Simon Nitinol

6                   filter, the Cook Guther Tulip filter, the

7                   Greenfield filter, and the Cook Bird's

8          Nest filter."

9          Correct?

10    A    Correct.

11    Q    Do you know whether any of those retrievers --

12 any of those filters you identify are retrievable?

13    A    Yes.  The Gunther Tulip filter is retrievable.

14    Q    Do you know whether the Cook -- well, the others

15 are not?

16    A    Oh, sorry.  Yes, the others are not.

17    Q    Do you know, with regard to the Cook Gunther

18 Tulip filter, whether there was a limitation on the

19 amount of time it could be implanted before retrieval?

20    A    Yes.

21    Q    And what was that limitation?

22    A    It's on the order of seven to ten days.

23    Q    And, by comparison, what was the indwell time

24 that would be permissible or okay for a Recovery filter?

25    A    Recovery filter is optional in that it could be

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                47


1 left in on a permanent basis, according to the

2 instructions for use, is my understanding.

3    Q    Could it be retrieved later than seven to ten

4 days after implant?

5     A     It's my understanding that it can be retrieved

6  beyond seven days.

7          MR. STOLLER:  Object to foundation.

8  BY MR. NORTH:

9     Q     Are you aware of medical studies and reports

10  indicating the successful retrieval of the Recovery

11  filter many months after it was implanted?

12     A     I am.

13     Q     And are you aware of medical reports in the

14  literature of Recovery filters being retrieved more than

15  a year after implant?

16     A     I am.

17     Q     And while you're not a doctor, is it your

18  understanding that there can be a medical benefit to a

19  filter that has a longer permissible indwell time?

20     A     That's my understanding, as an engineer, of what

21  the point of view of the medical people is; yes.

22     Q     So, the fact that the Recovery filter could be

23  implanted months or even a year later might make it more

24  beneficial to a particular patient than a filter that had

25  to be removed within seven to ten days?
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                            48

1     A     You said "implanted" many -- a long time

Page 54

2   afterwards.  I think you meant retrieved a long time

3   afterwards.

4      Q    Yes.  Let me state the question again so it's

5   clear.

6           Therefore, you would agree that a filter that can

7   be retrieved months or even a year after the time of

8   implant might have a superior medical benefit for some

9   patients over a filter that had to be removed in seven to

10  ten days?

11     A    Yes.  I agree.

12     Q    And you don't know whether that was the case with

13  Mrs. Tinlin or not, do you?

14     A    No, I do not.

15     Q    And you do not know whether a filter such as the

16  Cook Gunther Tulip filter that had to be removed within

17  ten days would have been able to be used with

18  Mrs. Tinlin?

19     A    Well, it doesn't have to be removed within ten

20  days.  It can also be left in.  But I don't know whether

21  that would have been a better filter for her or not.

22     Q    Well, you don't know whether her need to have a

23  filter would have resolved itself within ten days;

24  correct?

25     A    Correct.
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                    49

1    Q    Because of what you don't know regarding

2  Mrs. Tinlin's condition, you cannot say that the Simon

3  Nitinol filter would have been a viable option for her;

4  correct?

5    A    Correct.

6         MR. STOLLER:  Object.

7  BY MR. NORTH:

8    Q    And the same is true with the Greenfield?

9    A    Correct.

10   Q    And because you don't know how long she needed

11  the filter and what her doctors wanted with regard to

12  whether she should have a retrievable or permanent

13  filter, you cannot say whether the Tulip was a viable

14  option; correct?

15        MR. STOLLER:  Object to foundation.

16        THE WITNESS:  Correct.

17  BY MR. NORTH:

18   Q    And not say whether the Bird's Nest would have

19  been a viable option; correct?

20        MR. STOLLER:  Foundation.

21        THE WITNESS:  Correct.

22  BY MR. NORTH:

23   Q    And, therefore, you're unable to say whether any

24   retrievable filter available on the market at that time

25   would have been a better option, or a viable option, for

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

50

1   Mrs. Tinlin given her particular medical situation?

2      A    That's correct.

3           MR. STOLLER:  Object.  Foundation.

4   BY MR. NORTH:

5      Q    You have done no analysis to determine what

6   changes you would have to make to the Simon Nitinol to

7   make it retrievable; correct?

8      A    That's correct.

9      Q    And you have done no analysis to determine what

10   changes you would have to make to the Greenfield filter

11   to make it retrievable; correct?

12      A    Correct.

13      Q    Same is true with the Tulip?

14      A    Well, I have, but I'm not at liberty to describe

15   those -- those assessments.

16      Q    So, those do not form a basis of your opinion --

17      A    No.

18      Q    -- in this case?

19      A    They don't form a basis for my opinion in this

20   case, correct.

Page 57

21     Q     And the same is true with Bird's Nest.  You have

22   done no analysis to determine what changes you would have

23   to make to the Bird's Nest to make it retrievable;

24   correct?

25     A     That's correct.

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
51

1     Q     You mentioned two Cook filters by name in your

2   report -- the Tulip and the Bird's Nest -- correct?

3     A     Correct.

4     Q     And as we've discussed, you previously testified

5   that Cook's -- well, as we've discussed in the past, you

6   have previously testified that Cook's filters tilt more

7   than any other filters the marketplace; correct?

8     A     Correct.

9     Q     And as a consequence, you cannot say that --

10   well, let me back up.

11           And Cook filters do fracture on occasion;

12   correct?

13     A     That's correct.

14     Q     And, in fact, in the case you testified in last

15   week involving a Cook filter, that particular filter had

16   fractured; correct?

17     A     That's correct.

18          But it wasn't -- it's not a Tulip filter.

19     Q    Well, what filter is it?

20     A    It's just -- it's a Cook Celect filter.

21     Q    Okay.  But it was one of Cook's filters?

22     A    Correct, yes.

23     Q    Given the propensity that you've testified about

24 for Cook filters to penetrate -- I mean to tilt, you

25 cannot say one way or the other whether Mrs. Tinlin's
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                        52


1 injuries would have been avoided had she received a Tulip

2 or Bird's Nest filter, can you?

3     A    That's correct.

4     Q    And, similarly, you cannot say that Mrs. Tinlin's

5 risk for injuries would have been reduced had she

6 received a Tulip or Bird's Nest filter?

7     A    That's correct.

8     Q    You have performed no calculations in this case

9 to determine whether the Greenfield filter has a lower

10 risk of tilt than the Recovery filter; is that correct?

11     A    That's correct.

12     Q    And the same would be true as to whether the

13 Greenfield filter has a lower risk of migration,

14 perforation, fracture, or embolization?

15     A     That's correct.

16     Q     And you've performed no calculations in this case

17  to determine whether the Tulip filter has a lower risk of

18  tilt than the Recovery filter; correct?

19     A     That's correct.  Not in this case.

20     Q     Have you in this litigation?

21     A     I've made assessment -- on this litigation?

22     Q     Yes.

23     A     No.  No.  No.

24     Q     And any assessments you've made in other

25  litigation are not forming the basis of your opinions
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                        53


1  here?

2     A     That's correct.

3     Q     And in this litigation and as a part of your

4  opinions in this litigation you have performed no

5  calculations to determine whether the Bird's Nest filter

6  has a lower risk of tilt, migration, perforation,

7  fracture, or embolization than the Recovery filter;

8  correct?

9     A     That's correct.

10     Q     It is possible that the addition of caudal

11  anchors to the Recovery filter would not have eliminated
                    Page 60

12      the risk of caudal migration; correct?

13      A    Correct.

14      Q    And it's entirely possible that adding those

15  anchors would not have eliminated the risk of migration,

16  fracture, or embolization?

17      A    That's correct.  Would not have eliminated it,

18  correct.

19      Q    And you have done no calculations as to the

20  extent of which caudal anchors would have reduced the

21  risk of penetration, tilt, migration, fracture, or

22  embolization; correct?

23      A    That's correct.

24      Q    And it's entirely possible that adding

25  penetration limiters to the Recovery filter would not

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              54


1   have eliminated the risk of penetration; correct?

2       A    Would not have eliminated the risk, correct.

3       Q    Right.

4            And it's entirely possible that adding the

5   penetration limiters would not have eliminated the risk

6   of tilt, migration, fracture, or embolization; correct?

7       A    Correct.  Would not have eliminated them.

8   Correct.

9    Q    But you have done no calculations to attempt to

10   quantify the extent to which adding penetration limiters

11   to the Recovery filter would reduce the risk of

12   penetration, tilt, migration, fracture, or embolization;

13   correct?

14   A    That's correct.

15   Q    It's entirely possible that using a two-tiered

16   design would not have prevented Mrs. Tinlin from

17   sustaining any of the injuries she alleges in this case;

18   correct?

19   A    That's correct.

20        Sorry.  Could repeat the question.

21   Q    It's entirely possible that using a two-tiered

22   design would not have prevented Mrs. Tinlin from

23   sustaining any of the injuries she alleges in this case?

24   A    Yes.  I agree.

25   Q    And you have done no calculations in this

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              55

1    litigation as to -- to try to quantify the extent to

2    which a two-tiered design might reduce the risk of

3    Mrs. Tinlin having sustained the injuries she did?

4    A    That's correct.

5    Q    It's entirely possible that improving the shape

6    of the cap, as you suggest, would not have prevented

7    Mrs. Tinlin from sustaining any of the injuries she

8    alleges; correct?

9        A    That's correct.

10       Q    And you have performed no calculations in this

11   litigation to quantify the extent to which a cap would

12   have reduced the risk to Mrs. Tinlin of sustaining the

13   injuries?

14       A    That's correct.

15       Q    And, therefore, it is possible that adding all of

16   the design features you suggest would not have prevented

17   Mrs. Tinlin from sustaining the injuries she alleges;

18   correct?

19       A    That's correct.

20       Q    You are not aware of any single IVC filter that

21   carries no risk of fractures; correct?

22       A    I'm not aware of any, that's correct.

23           MR. NORTH:  Why don't we take a break.  We've

24   been going 75 minutes, I think.

25           MR. STOLLER:  Fine.
             THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                      56

1           THE VIDEOGRAPHER:  The time is 11:15 a.m., and we

2    are off the record.

                            Page 63

3                        (Recess.)

4          THE VIDEOGRAPHER:  The time is 11:26 a.m., and

5    we're back on the record.

6    BY MR. NORTH:

7    Q    Dr. McMeeking, you agree that all IVC filters can

8    tilt; correct?

9    A    I'm not sure I agree with that.  But many of them

10   do tilt, yes, or can tilt.

11   Q    And all IVC filters can penetrate?

12   A    Yes.  I agree with that.

13   Q    At IVC filters can migrate; correct?

14   A    I agree with that, yes.

15   Q    And all IVC filters can fracture?

16   A    I think that's likely the case, yes, I agree.

17   Q    Now, you said -- seemed to apply that not all IVC

18   filters can tilt.  Are there some that you believe cannot

19   tilt?

20   A    I think the ones that are quite cylindrical in

21   shape are perhaps unable to tilt.

22   Q    But many of the filters that are on the market

23   can tilt; correct?

24   A    That's correct.

25   Q    As we sit here today, Doctor, you cannot say to a
     THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                               57

1    reasonable degree of engineering certainty that the

2    design changes you discuss in your report would have

3    prevented Mrs. Tinlin's injuries, can you?

4        A    That's correct.

5        Q    And you cannot say by what percentage the risk

6    would have been reduced with these design changes, can

7    you?

8        A    That's correct.

9        Q    Is there anywhere in your report where you

10   outline the specific health conditions Mrs. Tinlin

11   suffers that might have implanted her filter in and its

12   performance?

13       A    No.

14       Q    Was that significant to you in preparing your

15   report?

16       A    Could you repeat the question.

17       Q    Was that significant to you in preparing her

18   report -- your report?

19       A    You mean leaving it out?

20       Q    Was the fact -- well, were any specific health

21   conditions that she suffers that might have impacted her

22   filter or its performance -- was any of that important to

23   you in coming up with your opinions?

Page 65

24      A     No.  It was not.

25      Q     And you have no idea whether Mrs. Tinlin suffered

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                    58

1    from any particular health condition that could have

2    increased the likelihood that her Recovery filter would

3    have tilted, migrated, perforated, or fractured; correct?

4      A     Correct.

5      Q     You understand that Mrs. Tinlin needed an

6    inferior vena cava filter; correct?

7            MR. STOLLER:  Foundation.

8            THE WITNESS:  Well, I assume, because her doctors

9    prescribed one, that she was considered to need one, yes.

10   BY MR. NORTH:

11     Q     And, therefore, you understand that at least her

12   doctors thought she could have died had she not received

13   a filter; correct?

14           MR. STOLLER:  Objection.  Foundation.

15           THE WITNESS:  I'm not sure if they thought she

16   would have died.  But I believe that they assessed that

17   it would avoid problems that she might face in terms of

18   her health.

19   BY MR. NORTH:

20     Q     You have no reason to dispute whether or not

21  Mrs. Tinlin's Recovery filter might have saved her life;

22  correct?

23    A    I have no reason to dispute that, no.

24    Q    You did no additional testing for your report in

25  this case; correct?

           THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                59

 1    A    That's correct.

 2    Q    And you did no additional calculations for your

 3  report in this case?

 4    A    That's correct.

 5    Q    None of the opinions you provide in this report

 6  regarding design alternatives have been published in any

 7  literature by you, have they?

 8    A    By me, no.  Correct.

 9    Q    Are you aware of any literature regarding

10  penetration limiters or caudal anchors and their efficacy

11  on filters?

12    A    Well, yes.

13    Q    And what is that?

14    A    There are papers that look at clinical experience

15  with filters that have and do not have those features on

16  them.

17    Q    I'm talking about from an engineering standpoint.

18   Are you aware of any publications that analyze from an

19   engineering perspective how caudal anchors or penetration

20   limiters perform?

21      A    Not from an engineering assessment, no.

22      Q    And you haven't published anything from an

23   engineering perspective regarding penetration limiters,

24   caudal anchors, two-tiered design, or a rounded chamfer;

25   correct?

             THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                         60


 1      A    That's correct.

 2      Q    And, therefore, your opinions regarding those

 3   design alternatives have not been peer reviewed, have

 4   they?

 5      A    Not directly, no.

 6      Q    You're not aware of any industry or government

 7   standards that would require any of the design

 8   alternatives that you've proposed; correct?

 9      A    Yes.  I'm aware of some.

10      Q    What would those be?

11      A    In the sense that companies are expected to

12   reduce all risks to the extent practicable.

13      Q    I'm talking about these specific design

14   attributes:  Penetration limiters, caudal anchors,

15  two-tiered design, rounded chamfer.  You're not aware of

16  any industry standards or governmental regulations that

17  require those specific design features; correct?

18     A    That's correct.

19     Q    And you're not aware of any standards or

20  regulations that recommend those specific design

21  features?

22     A    That's correct.

23     Q    And you are aware, of course, that Bard has

24  retained its own engineers in this case; correct?

25     A    You mean as experts?
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                        61


1     Q    Yes.

2     A    Yes.  I am, yes.

3     Q    And you know who Dr. Paul Bryant is; correct?

4     A    That's correct.

5     Q    Have you ever published anything about

6  Dr. Bryant's opinions in this litigation?

7     A    Published in a sense of in public literature?

8     Q    Yes.

9     A    No, I have not.

10    Q    Did you bring any of your other past reports with

11  you today?

12    A    I brought the MDL report.

13    Q    Do you have the March 3, 2017, MDL report?

14    A    That's correct.  Yes, I do.

15    Q    Could we look at that a minute?

16    A    Certainly.

17         MS. NORTH:  Could we put an exhibit sticker on

18    his report, and I'll just substitute one later.

19         THE WITNESS:  Can I give you the one with black-

20    and-white pictures for the exhibit?

21         MR. NORTH:  Yeah.  I couldn't care less.

22    Perfect.  I apologize.  I thought I had that, and it's

23    not here.

24              (Whereupon Defendants' Exhibit 2 was

25              marked for identification by the court

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                                              62


1              reporter and is attached hereto.)

2         MR. NORTH:  I think I have a clip.

3         THE WITNESS:  I'm going to look at the one with

4    color pictures.

5    BY MR. NORTH:

6    Q    That's fine.

7         But I want to look at a diagram on page 47.  And

8    there is a Table 1; correct?

9      A      Yes, correct.

10     Q      I'm sorry.  Not diagram.  A table.

11            Tell me what this table reflects.

12     A      This table reflects calculations that I did for

13   the Recovery filter.

14     Q      Now, the model you employed for that fatigue

15   testing went only up to the elbows of the struts; is that

16   correct?

17     A      Well, it was fatigue tested, per se, but the

18   model went only to the elbow of the upper arm.

19     Q      Just so we're using the same nomenclature, what

20   would you call the testing if not fatigue testing?

21     A      I would call it calculations of strain.

22     Q      Okay.  And so your calculations of strain only

23   went up to the elbow of the strut as opposed to the

24   entire strut; correct?

25            MR. STOLLER:  Object to the form.
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                63


1             THE WITNESS:  Well, I -- I used a model in which

2    I considered the upper arm from the place where it enters

3    the cap to the elbow --

4    BY MR. NORTH:

5      Q      Okay.

6    A    -- in the calculations that I did, and I

7    calculated the strain specifically where the arms enter

8    the cap.  And I did -- did it that way in such a way that

9    the absence of the and forearm makes no difference to the

10   calculation.

11   Q    Now, you made various assumptions in those

12   calculations; correct?

13   A    Correct.

14   Q    And one assumption regard -- was regarding the

15   upper arm angle?

16   A    Correct.

17   Q    And one was regarding the radius of the strut;

18   correct?

19   A    Could you clarify which radius.

20   Q    What radius were you considering when you put

21   that in your table?

22   A    That radius is the radius of the curve of the arm

23   where it comes out of the cap.

24   Q    And you also used different numbers for curvature

25   change; correct?
     THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                   64


1    A    Correct.

2    Q    And explain what that is.

3    A    Well, the curvature will depend on the extent to

4    which the filter has to be squeezed to get it into the

5    IVC.  And, so, when you squeeze the arms of the filter to

6    make it fit in the IVC, that changes the radius of

7    curvature of that curve where it -- that comes out of the

8    cap.

9    Q    And then explain the column for maximum strain.

10    A    The column for maximum strain is the strain that

11    would be experienced in the arm where it comes out of the

12    cap, and it's the strain caused by a one millimeter

13    change of diameter of the IVC perhaps caused by

14    breathing.

15    Q    And you also performed these strain calculations

16    with three different assumptions for the diameter of the

17    vena cava; correct?

18    A    Correct.

19    Q    And those three assumptions were 14 millimeters,

20    18 millimeters and 21 millimeters; correct?

21    A    That's correct.

22    Q    And the larger diameter you assumed for the vena

23    cava, the greater the maximum strain you calculated was;

24    correct?

25    A    That's correct.
THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
65

1    Q    And you did not do any calculations for a vena

2  cava filter with a diameter of 25 millimeters; correct?

3    A    That's correct.

4    Q    And you did not do any calculations for a vena

5  cava filter with a diameter of 25 -- I mean of 28

6  millimeters?

7    A    That's correct.

8    Q    And the same would be true of a vena cava with a

9  diameter of 29 millimeters?

10   A    That's correct.

11   Q    And your calculation showed that, the larger

12  diameter you assumed for the vena cava, the greater the

13  maximum strain would become; correct?

14   A    That's correct.

15   Q    So, therefore, if that is true, if you were to do

16  these calculations assuming a 25 millimeter diameter vena

17  cava, you would expect the maximum strains shown to be

18  even greater; correct?

19   A    That's correct.  Yes, I would.

20   Q    And the same would be true for a 28 millimeter

21  diameter?

22   A    That's correct.

23   Q    So, as you sit here today, you cannot say what

24  the maximum strain would be with a vena cava diameter of

25   28 millimeters?
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                        66


 1          MR. STOLLER:  Object to the form.

 2          THE WITNESS:  I don't have a specific figure, no.

 3   BY MR. NORTH:

 4      Q    And you've made no calculation?

 5      A    Not in -- not in the context of this table, no.

 6      Q    And nowhere in your work in this particular

 7   litigation have you made those calculations of strain

 8   with regard to a filter operating in a 28 millimeter vena

 9   cava, have you?

10          MR. STOLLER:  Object to form.

11          THE WITNESS:  I'd need to review the full report.

12   But I don't believe that that's the case.  I don't

13   believe I did a specific calculation for 28 millimeters.

14   BY MR. NORTH:

15      Q    And therefore, as you sit here today, you cannot

16   say what the strain on the filter would be in a diameter

17   of 28 millimeters; correct?

18      A    That's correct.

19      Q    Let's look at Table 2.  What does that show?

20      A    This shows the results for a Recovery filter.  A

21   similar calculation, except now the arm of the filter has

22    perforated the wall of the vena cava.

23    Q    And, again, you're trying to calculate the

24    maximum strains; correct?

25    A    That's correct.
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                        67

1    Q    And you did that -- those calculations with

2    various assumptions for the diameter of the vena cava;

3    correct?

4    A    That's correct.

5    Q    And those ranged from 14 millimeters to

6    21 millimeters?

7    A    That's correct.

8    Q    And you did not do these calculations with any

9    assumption of a vena cava with 28 millimeters; correct?

10    A    That's correct.

11    Q    And, so, you're not able to say, as you sit here

12    today, what -- you're not able to quantify the strains in

13    this analysis that would be present in a vena cava with

14    28 millimeters in diameter?

15    A    That's correct.

16    Q    You are aware that later generations of Bard

17    filters, such as the Meridian and the Denali came

18    equipped caudal anchors and penetration limiters;

19   correct?

20        A    I'm aware that Meridian has caudal anchors.  The

21   Denali has penetration limiters.  And I believe the

22   Denali has caudal anchors as well, but I don't recall

23   exactly whether that's the case.

24        Q    Are you aware of any single IVC manufacturer who

25   incorporated caudal anchors or penetration limiters in a
           THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                68


1    retrievable filter prior to the time that Bard did?

2         A    Yes.

3         Q    Who is that?

4         A    The Tulip.  The Gunther Tulip.  The Gunther

5    Tulip.

6         Q    And when did they do that?

7         A    The -- it came out in the United States in about

8    2002, 2003.  But it had been available in Europe about

9    ten years prior to that.

10        Q    When you say in -- available in Europe, you mean

11   in the Cook filter?

12        A    Yes.  The Cook Gunther Tulip filter was available

13   in Europe during the 1990s.

14        Q    And you have previously given -- filed a report

15   in the Cook litigation that that Gunther Tulip filter is
                              Page 77

16   defectively designed, haven't you?

17      A    I have, yes.

18      Q    Are you aware of any IVC filter manufacturer

19   other than Cook who incorporated anchors or limiters in a

20   retrievable filter prior to Bard?

21      A    No, I am not.

22      Q    You cannot speak in any detail or any depth about

23   the process by which Bard studied and ultimately

24   implemented anchors and limiters; can you?

25      A    Sorry.  Can I correct my previous answer?
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              69


 1      Q    Yes.

 2      A    Could you ask me the question again.  Because I

 3   think I answered it wrongly.

 4      Q    Are you aware of a single IVC filter manufacturer

 5   other than Cook who incorporated anchors or limiters in a

 6   retrievable filter any earlier than Bard did?

 7      A    Yes, I am.

 8      Q    Ask who is that?

 9      A    It's -- Rex/Argon is the company, and the filter

10   is the Option.  And it had a penetration limiter.  And it

11   was -- it was cleared in 2009, is my recollection.

12      Q    Other than Cook, are you aware of any IVC

13   manufacturer who incorporated anchors or limiters in a

14   retrievable filter prior to 2005 when --

15      A    No.

16      Q    -- Mrs. Tinlin received her filter?

17      A    No.  I am not aware of any.

18      Q    So, the only filter available at the time

19   Mrs. Tinlin had her -- only retrievable filter available

20   at the time she had her implant in 2005 that had limiters

21   or anchors was the Cook filter that you have also opined

22   is defective?

23           MR. STOLLER:  Object to the form.

24           THE WITNESS:  That's correct.

25   BY MR. NORTH:
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                70


1       Q    Have you given any opinions on the design of the

2    Argon filter you just mentioned?

3       A    No.

4       Q    Okay.  You cannot speak in any detail or in any

5    depth about the process by which Bard studied and

6    ultimately implemented anchors and limiters, can you?

7       A    No, I cannot.

8       Q    And as an engineer in understanding product

9    development process, as you do, you would agree it's not

10   just a matter of Bard snapping its fingers and suddenly

11   limiters and anchors appear and work fine; correct?

12      A    That's correct.

13      Q    It requires some development work in the design

14   and testing of those features; correct?

15      A    That's correct.

16      Q    And design and testing to ensure that the

17   addition of those features do not compromise the safety

18   or effectiveness of the device in other ways; correct?

19      A    That's correct.

20      Q    And you are not aware of what Bard did as far as

21   developing or testing initial designs for limiters and

22   anchors that may not have worked ultimately?

23      A    I'm not aware of that work, no.

24      Q    In this litigation you have criticized all

25   generations of Bard filters; correct?
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                           71

1      A    That's correct.

2      Q    And you have also criticized the design of the

3   Denali, which has both anchors and limiters; correct?

4      A    Can I go back and rephrase my answer?

5      Q    Yes.

6      A    I don't think I've criticized the Simon Nitinol

7  filter.  I've identified some features of it that are

8  relevant to what might happen to it.  But I don't believe

9  I've criticized the Simon Nitinol filter.

10    Q    Well, you've criticized the design of every

11  single retrievable filter produced by Bard; correct?

12    A    That's correct.

13    Q    And that includes the Denali filter which has

14  limiters and anchors; correct?

15    A    That's correct.

16    Q    Now, you have done no finite element analyses

17  specific to the Eclipse, Meridian, or Denali filters;

18  correct?

19    A    So, the Eclipse is simply an electro polished

20  version of the G2.  And I did calculations for the G2.

21  So, in that sense I did calculations for the Eclipse.

22    Q    You have done none for the Meridian or Denali;

23  correct?

24    A    None specifically for the Meridian and the

25  Denali.
      THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                72


1    Q    Now, your opinions include a number of criticisms

2  of Bard's testing; correct?

3    A    That's correct.

4    Q    You have made no efforts personally to replicate

5    their testing; correct?

6    A    That's correct.

7    Q    And you have made no efforts to devise

8    alternative test protocols for tests that you believe

9    should be done; correct?

10   A    Not protocols.  I haven't devised protocols, no.

11   Q    And you have not developed any protocols for

12   bench testing that you believe should have been

13   performed; correct?

14   A    That's correct.

15   Q    And do I recall correctly from some of your

16   previous testimony that you have never done any bench

17   testing of a medical device in your career?

18   A    I don't do bench testing.  So, it's not in my

19   professional activities.

20   Q    What is an experimentalist?

21   A    An experimentalist is someone who does

22   experiments in the laboratory, physical experiments.

23   Q    And that's not the sort of work you do; correct?

24   A    That's correct.  I am not an experimentalist.

25   Q    And you don't have a laboratory, in fact, for
     THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              73


                              Page 82

1  testing purposes?

2      A    That's correct.  I do not.

3      Q    And, as a consequence, you do no animal testing;

4  correct?

5      A    I do no animal testing.  That's correct.

6           It's not the kind of thing that mechanical

7  engineers like me would do.

8      Q    You're aware that caudal anchors were first

9  utilized by Bard in the Meridian filter; correct?

10     A    That's correct.

11     Q    And that was first cleared for sale by the FDA in

12  August of 2011?

13     A    I don't recall the exact date.  But I'll accept

14  that if that is what you say.

15     Q    And do you have any evidence as to whether those

16  caudal anchors would have worked without compromising

17  other elements of Bard filters before their

18  implementation in 2011?

19     A    I have no evidence, no.

20     Q    And you have -- do you even know how many

21  prototypes of caudal anchors they went through before

22  they developed that design?

23     A    No.

24     Q    Do you know how many years they worked on that

25  design?
             THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                      74

 1     A     No.

 2     Q     And do you know what testing they did on caudal

 3  anchors?

 4     A     I'd have to review.  But I know they did some

 5  testing of the Meridian filter, yes.

 6     Q     Well, before they actually developed the Meridian

 7  filter, do you know what testing they did of caudal

 8  anchors as a potential design attribute of the filters?

 9     A     No, I do not.

10     Q     Now, you had previously stated the opinion,

11  however, that the caudal anchors on the Meridian were not

12  effective; correct?

13     A     That's correct.

14     Q     And it is your opinion that tilt perforation

15  endothelialization and fracture in the Meridian filter is

16  not significantly better, if any better, than in the

17  Eclipse filter; correct?

18     A     That's correct.

19     Q     And you're aware that the Denali filter was

20  cleared on May 15 of 2013?

21     A     Again, I'm not exactly sure of the date.  But

22    I'll accept that that is it if you're telling me so.

23    Q    And the Denali had penetration limiters for the

24    first time; correct?

25    A    That's correct.
      THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              75


1     Q    Are you aware of any manufacturer that utilized

2     penetration limiters prior to Bard?

3     A    Yes.

4     Q    And who was that?

5     A    That was the Rex/Argon Option filter.

6     Q    But you have criticized the Denali penetration

7     limiters as inadequate; correct?

8     A    That's correct.

9     Q    And it was your -- it is your opinion that the

10    Denali penetration limiters are too small; correct?

11    A    That's correct.

12    Q    But you've made no prototype of what you believe

13    would be the correctly sized penetration limiter;

14    correct?

15    A    That's correct.

16    Q    And, in fact, you've never identified what that

17    size would be?

18    A    That's correct.

19     Q     And you have not done any calculations or testing

20   to determine if limiters can be increased significantly

21   in size and still fit into the sheath used to implant

22   them; correct?

23     A     That's correct.

24     Q     Or what the impact of larger penetration limiters

25   would be on the retrieval of the filter; correct?

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

76

1     A     That's correct.

2     Q     So, while you believe that the Denali penetration

3   limiters are too small to be sufficiently effective, you

4   have done no analysis to determine whether larger

5   penetration limiters would be feasible with this device,

6   have you?

7     A     That's correct.

8     Q     And you have done no analysis of how larger

9   penetration limiters may have compromised the performance

10   or safety of the Denali filter, have you?

11     A     No.  I have not.

12     Q     I believe you previously testified that it is

13   your expectation that the Denali filter will have a

14   comparable number of adverse events as any of the other

15   Bard filters, notwithstanding the use of anchors and

Page 86

16   limiters?

17     A    That's correct.

18     Q    And it's your belief that the Denali filter

19   suffers from the same problems that you believe the

20   earlier generation filters have even with the use of

21   limiters and anchors?

22     A    That's correct.

23     Q    So, therefore, you do not believe it's sufficient

24   for a filter to simply have some sort of anchors or

25   penetration limiters in order to improve safety; correct?
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                77


1     A    That's correct.  They need to be designed to be

2   effective.

3     Q    They have to be the proper size; correct?

4     A    Correct.

5     Q    They have to be a size that does not compromise

6   the performance or the safety in some other way of the

7   device; correct?

8     A    Well, they -- they should be designed in such a

9   way that they reduce the risks to the extent practicable

10   and that -- that that is balanced against the benefits of

11   the filter.

12     Q    And you have made no effort in this litigation to

13   figure out the precise dimensions or size of these design

14   features that would accomplish what you just described?

15       A   That's correct.

16       Q   Nowhere in your reports do you compare the

17   anchors and limiters on the Denali filter to the anchors

18   and limiters on any other type of filter such as the

19   Simon Nitinol, Greenfield, Tulip, Bird's Nest, et cetera?

20       A   That's correct.

21       Q   Nothing in your reports address whether the

22   anchors and limiters on the Meridian and/or Denali differ

23   from those, if any, on the filters -- other filters

24   you've identified in your report; correct?

25       A   I'm sorry.  Could you repeat that question.
             THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                                    78


1        Q   There is nothing in your report that compares the

2    anchors and limiters on the Meridian and Denali filters

3    with any anchors or limiters on the other manufacturers'

4    models?

5        A   Yeah.  I make no comparison.

6        Q   Okay.  Let's look at page 2 of your present

7    report, please, which is Exhibit 1.  If we look down the

8    second full paragraph, that begins with the statement,

9    and I quote:

                          Page 88

10              "Bard made a choice to design the

11              Recovery filter without caudal anchors or

12              other features that would prevent and/or

13              minimize caudal migration."

14         Is that correct?

15     A    That's correct.

16     Q    A choice is a decision.  Would you agree with

17  that?

18     A    Yes, I agree.

19     Q    And to know if a choice was actually made, you

20  have to know what somebody's motivation was; correct?

21         MR. STOLLER:  Object to form.

22         THE WITNESS:  I'm not -- could you repeat the

23  question.  I'm not sure if I understand it.

24  BY MR. NORTH:

25     Q    Well, to know if a choice was consciously made,

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                              79


1  you have to know a person's state of mind; correct?

2     A    I don't think so.

3         MR. STOLLER:  Form.

4  BY MR. NORTH:

5     Q    Why is that?

6     A    Because the fact is that the filter was produced

7    without a caudal anchor.  And, so, therefore, that --

8    that decision was made to produce it that way.  That's

9    the meaning I'm trying to convey in that sentence.

10        Q    Well, you have no evidence one way or the other

11   that Bard actually considered but then rejected caudal

12   anchors as a design feature for the Recovery filter;

13   correct?

14        A    That's correct.

15        Q    And you cannot testify as to Bard's motives in

16   deciding or not deciding to use caudal anchors, can you?

17        A    No, I cannot.

18        Q    Or Bard's intent --

19        A    No.

20        Q    -- in making --

21        A    Sorry.

22        Q    -- that choice as you call it?

23        A    That's correct.

24        Q    Or their state of mind?

25        A    That's correct.
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          80

1    Q    Now, a couple of paragraphs below you say,

2    Bard -- or the next paragraph.  I'm sorry.

3                "Bard made a choice to design the

```
 4              Recovery filter without perforation

 5              limiters or other features that would

 6              prevent and/or minimize perforation of

 7              the filter limbs through the walls of the

 8              IVC."

 9         Correct.

10    A    Correct.

11    Q    And do you have any evidence one way or the other

12  that Bard considered but then rejected perforation

13  limiters for use with the Recovery filter?

14    A    I have none.

15    Q    And, again, with regard to a decision, if one was

16  even made, regarding penetration limiters, you can't

17  testify as to Bard's motives; correct?

18    A    Correct.

19    Q    Or their intent?

20    A    Correct.

21    Q    Or their state of mind?

22    A    Correct.

23    Q    Okay.  Let's go to the next paragraph.  Bard --

24  it begins, and I quote again:

25              "Bard made a choice to design the
```

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

81

1              Recovery filter without features that

2              would prevent and/or minimize tilt or

3              that would limit the negative

4              consequences of tilt."

5         That's what you said; correct?

6    A    That's correct.

7    Q    But you have no evidence that Bard considered

8   features to eliminate or reduce tilt but then rejected

9   them in the design of the Recovery filter, do you?

10   A    That's correct.

11   Q    And, therefore, you can't testify as to Bard's

12  motives, intent, or state of mind with regard to any

13  design features to eliminate or reduce tilt?

14   A    Correct.

15   Q    And you're not aware of any design feature or any

16  IVC filter that totally eliminates the risk of tilt; is

17  that correct?

18   A    That's correct.

19   Q    And you cannot say that any feature, if added to

20  the Recovery filter, would have eliminated tilt in

21  Mrs. Tinlin's case; correct?

22   A    That's correct.

23   Q    And you cannot say by what percentage of risk

24  tilt would have been -- what percentage risk of tilt

25  occurring would have been reduced -- let me try this

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
82

1   again.

2        You can't quantify how much the risk of tilt

3   would be reduced in a filter with any particular safety

4   feature added to the Recovery; correct?

5   A    That's correct.

6   Q    And you cannot say that Mrs. Tinlin's injuries

7   would been avoided all together by the addition of any

8   particular safety feature to eliminate or reduce tilt?

9   A    That's correct.

10  Q    Now, you've given previous testimony and you've

11  talked in your previous reports about Bard's testing and

12  analysis; correct?

13  A    That's correct.

14  Q    But you don't have any evidence one way or the

15  other that Bard considered but then rejected specific

16  tests regarding tilt, penetration limiters, or caudal

17  anchors; correct?

18  A    That's correct.

19  Q    And, therefore, with regard to those decisions or

20  the lack of decision, you cannot testify as to Bard

21  motives, intent, or state of mind?

22  A    That's correct.

23          MR. NORTH:  I have gone much quicker than I

24   thought.  I think I'm about finished.

25          MR. STOLLER:  Let's take a break?
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                83


 1          MR. NORTH:  Want to take a break?

 2          MR. STOLLER:  Yes.

 3          THE VIDEOGRAPHER:  The time is 12:07 p.m., and we

 4   are off the record.

 5                     (Recess.)

 6          THE VIDEOGRAPHER:  The time is 2:12 -- I'm

 7   sorry -- 12:12 p.m., and we're back on the record.

 8   BY MR. NORTH:

 9    Q    Dr. McMeeking, let's look at page 3 of Exhibit 1,

10   your report for this case, the first full paragraph that

11   begins "all of the design features discussed."

12          Do you see that?

13    A    I do, yes.

14    Q    I'd like for you to look at the last sentence of

15   that paragraph.  And could you read that into the record.

16    A    Of this paragraph?

17             "Many of these design feature existed

18             in other IVC filter products already on

19             the market, including the Simon Nitinol

20              filter, the Cook Gunther Tulip filter,

21              the Greenfield filter, and the Cook

22              Bird's Nest filter."

23    Q    I will represent to you, Dr. McMeeking, that we

24 have scanned -- more than scanned.  We have fly spec'd

25 every previous report you've submitted in this litigation
              THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                    84


 1 and found nothing referencing that point in any previous

 2 report.  Do you believe you've actually stated that in a

 3 prior report?

 4          MR. STOLLER:  Object to form.

 5          And to be clear, Richard, you're referencing that

 6 specific sentence he just read?

 7          MR. NORTH:  Yes.  Yes.

 8          THE WITNESS:  I haven't written that particular

 9 sentence in my other reports to my recollection.

10 BY MR. NORTH:

11    Q    Okay.  Let's go to the next page, page 4.  Do you

12 see the paragraph beginning, "The bench test that Bard

13 actually did"?

14    A    Yes.

15    Q    And look back or -- or look down towards the end

16 of the paragraph, the fourth line from the bottom, the

17   sentence beginning, "Indeed."  Can you read that

18   sentence.

19   A     Reading:

20             "Indeed Mr. DeCant, Bard's vice

21             president" -- although it should say

22             president -- "of research and development

23             testified that by approximately April

24             2004 Bard was aware that the Recovery

25             filter was not designed to account for

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

                                    85


1              how the vena cava actually behaved.  23.

2              Due to those failures, Mrs. Tinlin's

3              Recovery filter migrated after

4              implantation."

5    Q    Dr. McMeeking, I would represent to you, again,

6    that we have looked through all your prior reports and

7    seen no reference to Mr. DeCant's previous testimony.  Do

8    you believe that you've ever discussed or recited his

9    testimony in the past?

10   A    I have not, no.

11   Q    Why did you add it here then?

12   A    Because it seemed relevant.

13   Q    Well, that testimony and the way you rely upon it

14   for those opinions would apply to all your opinions in

15   this litigation, not just your opinions specific to

16   Ms. Tinlin; correct?

17       A    That's correct.

18       Q    And, similarly, the opinion you stated -- we

19   talked about right beforehand, comparing Bard's filters

20   to other manufacturers' filters and identifying those

21   other filters by name -- those, likewise, apply to all of

22   your opinions in this litigation and not just your

23   opinion specific to Ms. Tinlin?

24       A    That's correct.

25            MR. NORTH:  Could we mark as Exhibit 3 the
              THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              86


1   following, please.

2            More paper for you to shred.

3                 (Whereupon Defendants' Exhibit 3 was

4                 marked for identification by the court

5                 reporter and is attached hereto.)

6   BY MR. NORTH:

7       Q    You have mentioned, before your testimony today,

8   that you relied in part on the report of Dr. Muehrcke in

9   this case; correct?

10      A    Correct.

11    Q    And is Exhibit 3 a copy of that report?

12    A    Yes.

13         MR. NORTH:  Let's look at Exhibit 4 -- or

14    designate this as 4, please.

15              (Whereupon Defendants' Exhibit 4 was

16              marked for identification by the court

17              reporter and is attached hereto.)

18    BY MR. NORTH:

19    Q    In Exhibit 4 -- well, what is Exhibit 4?  Can you

20    identify that?

21    A    It's expert report Debra Tinlin versus CR Bard,

22    Inc., produced by Darren R. Hurst, M.D.

23    Q    And you have previously testified that you relied

24    heavily on Dr. Hurst's report for certain parts of your

25    report; correct?

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                    87


1    A    Correct.

2    Q    And this is the report that you've relied on;

3    correct?

4    A    That's correct.

5    Q    Dr. McMeeking, have you been told that the

6    defendants have filed a motion to strike portions of your

7    report in this particular case?

8    A    I have been told that, yes.

9    Q    Have you been furnished with a copy of that

10   motion?

11   A    Yes, I have.

12   Q    And you reviewed that motion?

13   A    I did.

14   Q    Do you recall that the motion indicated or argued

15   that your report in Tinlin included some new opinions

16   applicable to all Bard's filters and not specifically to

17   the Tinlin case?

18   A    I'm aware that that's what is in the motion, yes.

19   Q    Okay.  Do you agree with that?

20   A    No.

21   Q    You don't think your report contains any new

22   general opinions about Bard's filters?

23   A    No.  It does not.

24   Q    Dr. McMeeking, you testified in a case involving

25   a Bard filter back in 2012 in a state court in Phoenix,
     THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                      88


1    Arizona; correct?

2    A    I'd have to review my -- can you tell me which

3    case it was?

4    Q    The Rosemary Everett case in Maricopa County?

5     A     Yes.  I recall that case and trial.  I don't

6  remember exactly what year it was.  But, yes.

7     Q     And your expert opinion in that case was that the

8  Bard Recovery filter implanted in Miss Everett was

9  defectively designed; correct?

10    A     Correct.

11    Q     And then in 2018 you testified in three trials in

12  federal court in Phoenix regarding Bard filters; right?

13    A     They were all in the same year, same calendar

14  year.

15    Q     Well, the Bookert trial in March of 2018 you

16  testified; correct?

17    A     Correct.

18    Q     And that involved a G2 filter; correct?

19    A     Correct.

20    Q     And your opinion in that case was the G2 filter

21  was defectively designed?

22    A     That's correct.

23    Q     And then you testified two months later in May of

24  2018 in the Hyde case; correct?

25    A     Correct.
       THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                          89


1     Q     And that involved an Eclipse filter?
                      Page 100

2          MR. STOLLER:  Form.

3   BY MR. NORTH:

4     Q     I'm sorry.  The Jones case.  Correct?

5     A     Correct.

6     Q     And that involved an Eclipse filter?

7     A     That's my recollection, yes.

8     Q     And you testified in that case that in your

9   opinion the Eclipse filter was defectively designed?

10    A     Correct.

11    Q     Then you testified in a third Bard trial in

12  September of 2018 called Hyde; correct?

13    A     Correct.

14    Q     And there was some dispute in that case as to

15  whether it involved a G2X or an Eclipse filter; correct?

16    A     That's what I recall, yes.

17    Q     But it was your testimony and opinion in that

18  case that, regardless which filter it was, it was

19  defectively designed?

20    A     That's correct.

21    Q     So, those are four Bard trials that you've

22  testified in; correct?

23    A     Correct.

24    Q     And in each of those four cases your opinion was

25  that the filter was not defectively designed?  I mean was
             THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                              Page 101

1  defectively designed.  I'm sorry.

2     A    Yes.  That's correct.

3     Q    Then you had testified in two Cook trials

4  regarding filters, one live, and one by videotape;

5  correct?

6     A    Well, I've now testified in two live trials, plus

7  one by videotape.

8     Q    But the third one has not been completed?

9     A    Correct.

10     Q    You have testified in two Cook trials that have

11  been completed?

12     A    Yes.  That's correct.

13     Q    And the first one was in -- a couple of years ago

14  in Evansville, Indiana, where you testified live?

15     A    Correct.

16     Q    And your testimony and opinion in that case was

17  that the Cook filter was defectively designed; correct?

18     A    Correct.

19     Q    And what model of filter was involved in that

20  case?

21     A    That was a Celect filter.

22     Q    A Celect.  Okay.

23          And then you testified by videotape in a case

24  pending in a state court in Houston, I believe last

25  spring of 2018; correct?
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              91

 1      A    Yes.  That's correct.

 2      Q    And that was called Pavlock?

 3      A    Correct.

 4      Q    And what filter did that involve?

 5      A    I don't actually recall.  Because I didn't review

 6  the -- the information to come here today.

 7      Q    But your opinion in that particular case was that

 8  the Cook filter was defectively designed; correct?

 9      A    Correct.

10      Q    So, there have been a total of six completed

11  trials, two against Cook and four against Bard, where you

12  have given the opinion that the fil -- IVC filter was

13  defectively designed; correct?

14      A    That's correct.

15      Q    And, Dr. McMeeking, you're also aware that in all

16  six of those cases the jury decided that the filter was

17  not defectively designed?

18          MR. STOLLER:  Object to form.

19          THE WITNESS:  It's my understanding that on the

Page 103

20   design issue, that the verdict went the way of the

21   defendant, yes.

22   BY MR. NORTH:

23      Q    In all --

24      A    Ones that have been completed, yes.

25      Q    In all six cases?
        THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                    92


1      A    Correct.

2      Q    Dr. McMeeking, does it give you any concern that

3   six separate juries in this country have declined to

4   accept your opinion regarding these devices?

5      A    Could you explain --

6           MR. STOLLER:  Object to form.

7           THE WITNESS:  Sorry.  Could you ask the question

8   again.

9   BY MR. NORTH:

10     Q    Does it give you some concern about your expert

11  opinions in this case that six different juries from

12  different parts of the country have disagreed or failed

13  to adopt your opinion that these devices are defectively

14  designed?

15          MR. STOLLER:  Object to form.

16          THE WITNESS:  Well, it gives me some concern in

17   the sense that I'm not explaining myself well enough to

18   the jury, yes.

19   BY MR. NORTH:

20      Q    Does it ever give you pause to think that they --

21   that -- nothing.

22          That's all I have.

23

24                              EXAMINATION

25   BY MR. STOLLER:
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                           93


1       Q    Dr. McMeeking, I'd like to go over some of the

2    questions that Mr. North asked you earlier today.

3          And I believe he asked you some questions about

4    whether specific patient physical traits could affect the

5    effectiveness of some of the design changes that you have

6    recommended for the Recovery filter.

7          And one of those physical traits Mr. North asked

8    you about was whether the IVC, if it was larger than the

9    indicated upper limits of size, could affect the

10   effectiveness of perforation limiters.

11          Do you recall that testimony?

12      A    I do, yes.

13      Q    And I believe in response to his question you

14   responded that, in fact, a -- an overly -- I'm going to

15   use the term "overly large" -- but an overly large IVC

16   could affect the effectiveness of perforation limiters;

17   is that correct?

18         MR. NORTH:  Objection.  Leading.

19         THE WITNESS:  That's correct.

20   BY MR. STOLLER:

21   Q    Is that -- let me ask the question this way.  Can

22   an overly large IVC affect the effectiveness of

23   perforation limiters as a design feature that you've

24   identified to be included in the Recovery filter?

25   A    No.  They would not.
     THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                       94

1    Q    Why not?

2    A    Because they -- when they are pressed against the

3    wall of the IVC, they are going to reduce the tendency

4    for perforation to take place so that, in that regard --

5    in that sense they are still just as effective whether

6    the IVC is big or small.

7    Q    And you had testified that -- in response to

8    Mr. North's question, that the -- that an overly large

9    IVC could affect the effectiveness of perforation

10   limiters.  What was your intent or meaning when you gave

Page 106

11   that testimony?

12         MR. NORTH:  Objection.  Leading.

13         THE WITNESS:  Well, the meaning of my testimony

14   was that, when the IVC is large, there is less tendency

15   for perforation to take place and therefore less need of

16   a perforation limiter, and therefore the perforation

17   limiter would not be effective in the sense that it's

18   guarding against something that may not be such a big

19   threat -- a big risk.

20   BY MR. STOLLER:

21   Q    Mr. North asked you about that same series of

22   questions with respect to whether things such as an

23   overly large IVC or caval motion could affect -- or

24   impact the effectiveness of some of the design features

25   that you've advocated for with respect to the Recovery
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                95


1   filter and asked you as to those, where you indicated

2   that you thought those might, whether you had done any

3   testing to support those -- those answers.

4         Do you recall that?

5   A    I do, yes.

6   Q    And I think you indicated that you've not done

7   any testing; is that correct?

8     A     That's correct.

9     Q     Have you applied the principles you use in your

10    capacity as a mechanical engineer in coming to those

11    conclusions?

12    A     Yes.

13    Q     And can you give a general explanation of what

14    your -- how you arrived at the conclusion that those

15    designs could or would alleviate some of those issues.

16    A     Well, in -- in any given circumstances where the

17    filter is likely to -- to, for example, tilt, then having

18    features that would inhibit that tilt is going to be

19    beneficial in the sense that it would reduce the degree

20    of tilt.

21          Similarly, with perforation, if there are

22    features that help to reduce the degree of perforation,

23    then they will reduce the extent to which perforation

24    will take place.

25          And similarly if there are features that help to

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          96


1     reduce the risk that the filter faces in terms of the

2     possibility of fatigue fracture, then features that

3     address that will help to reduce that risk.

4     Q     Let me ask a specific question on this point,

5    which is that, I believe Mr. North asked you whether an

6    overly large IVC or IVC greater than the size indicated

7    in the IFU could affect the effectiveness of the chamfer

8    that you produced here.  And I believe your testimony was

9    that you did not think it would.

10          Is that correct?

11          MR. NORTH:  Objection.  Leading.

12          THE WITNESS:  That's correct.

13   BY MR. STOLLER:

14   Q    And in arriving that the conclusion, you didn't

15   perform any tests; correct?

16   A    That's correct.

17   Q    It's not something that's in any of the reports

18   that you've provided in this litigation.  Is that true?

19   A    That's true.  Yes.

20   Q    You were responding to a question by Mr. North in

21   this deposition; correct?

22   A    Correct.

23   Q    But in arriving that the conclusion, did you

24   apply the principles of mechanical engineering that you

25   use in coming to your other opinions in this case?
           THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          97


1    A    Yes, I did.  Yes.

2    Q    So, could you explain that application as to that

3  example.

4    A    Well, the chamfer on the mouth of the cap becomes

5  significant when the struts interfere with the cap.  So,

6  that, if they are riding against the cap, then the

7  strains can be elevated, and the presence of the -- of

8  the chamfer will help to control that effect.

9          And, therefore, the chamfer can be beneficial in

10  circumstances where the strut is interacting with the cap

11  and can help to reduce the danger of fatigue fracture

12  taking place.  And that circumstance becomes significant

13  when the struts are touching the mouth of the cap.

14          If the struts are not touching the mouth of the

15  cap, then it's not so relevant.  And, therefore, it

16  depends on specific circumstances that arise in specific

17  cases.  And that would depend on many things, including

18  the size of the IVC.

19    Q    Is it fair to say that, in arriving at your

20  conclusions here today in response to Mr. North's

21  questions as to whether the particular design features

22  you identified would be affected by an overly large IVC,

23  you applied the same principles that you did in

24  concluding that those were necessary design features?

25    A    That's correct.

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

98

1          MR. NORTH:  Objection.  Leading.

2          THE WITNESS:  That's correct.

3   BY MR. STOLLER:

4     Q    Let me ask you some questions quickly about your

5   report, which has been marked as Exhibit 1 to your

6   deposition.  And, specifically, I'd like to focus first

7   on the facts which are outlined on page 1, 2 in the

8   bullets points of your report.

9          What is the source for the information that's in

10  those bullet points?

11         MR. NORTH:  Objection.  Asked and answered.

12         THE WITNESS:  The source is Dr. Hurst's report,

13  Dr. Muehrcke's report, and my review of the medical

14  records in Mrs. Tinlin's case.

15  BY MR. STOLLER:

16    Q    And I would like you to pull what has been marked

17  as Exhibit 4 to your deposition, which is Mr. Hurst's

18  report.  Real quickly.  And if you wouldn't mind skimming

19  what is on his report from pages 2 through 10 under

20  imaging reviewed.

21    A    Yes.

22    Q    In those, what I just had you look through, are

23  Dr. Hurst' review of the imaging that he did for

24   Mrs. Tinlin; correct?

25   A    Correct.
     THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                      99


1          MR. NORTH:  Objection.  Leading.

2    BY MR. STOLLER:

3     Q    Did you review that -- those portions of

4    Dr. Hurst's report for purpose of preparing your report?

5     A    That's correct.

6     Q    And did you rely on Dr. Hurst's analysis as to

7    what those imaging studies showed with respect to

8    Mrs. Tinlin's filter?

9     A    That's correct.

10    Q    For purposes of your report, did you assume those

11   facts to be true?

12    A    Yes, I did.  Yes.

13    Q    And you're not providing any independent

14   testimony as to the truth of those facts or whether or

15   not Dr. Hurst's analysis of them is correct; is that

16   true?

17    A    That's correct.

18    Q    And is it reasonable for you in your capacity as

19   an expert on issues of mechanical engineering to rely on

20   Dr. Hurst's analysis of the facts to form the basis of

21   your opinions?

22   A    Yes, it is reasonable.

23   Q    Earlier Mr. North asked you some questions about

24   whether, if Mrs. Tinlin's IVC was larger than indicated

25   in the IFU, it could affect the failure mode she

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                    100

1    experienced in this case.

2         Do you recall that testimony?

3    A    I do.

4    Q    And I believe you indicated that whether her IVC

5    was larger than indicated in the IFU could affect the

6    failure mode; is that correct?

7         MR. NORTH:  Objection.  Leading.

8         THE WITNESS:  That's correct.

9    BY MR. STOLLER:

10   Q    Let me ask this question.  Your understanding --

11   is it correct that your understanding is that the IFU

12   indicates for use in IVCs up to 28 millimeters?

13   A    That's correct.

14   Q    And do you have an understanding, based on your

15   review of Bard's records to which you had access or were

16   provided to you in this litigation, with respect to

17   Bard's understanding of the size of an IVC and why that

18  number at 28 was included the IFU?

19       THE REPORTER:  Was?

20       MR. STOLLER:  Included in the IFU.

21       MR. NORTH:  Objection to the form.

22       THE WITNESS:  Well, it's my understanding that

23  they understood that the size of the vena cava is

24  variable due to many circumstances, such as breathing,

25  motion, Valsalva, and so on, and that -- that there

                THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                            101

1  was -- there were also aspects of the behavior of the

2  filter that might be compromised by a large vena cava,

3  such as migration.  And so they put a limit on how big

4  the vena cava should be in terms of the instructions for

5  use in terms of allowing it to be implanted.

6  BY MR. STOLLER:

7       Q    And do you have an understanding, based on your

8  review of the medical literature, of the type or amount

9  of variation that might happen than IVC?

10      A    I do.

11      Q    And what is that?

12      A    Well, my understanding is that the variation can

13  be very significant, such as perhaps as large as

14  43 percent during breathing.  In other words, the width

15   of the IVC can change by as much as 43 during breathing.

16   And during Valsalva it can change by amounts that are as

17   high as 90 percent in terms of the change of width of the

18   IVC.

19        Q    And do you have expertise in terms of identifying

20   what the size -- I use the term size loosely -- of an IVC

21   is in its normal state versus in its expanded or

22   contracted state?

23        A    I'm not sure I understand the question.  Can you

24   repeat the question, please.

25        Q    Sure.
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                             102


1              I think you understood you to say that the IVC

2    can vary in size and normal breathing by as much as

3    43 percent?

4         A    Correct.

5         Q    I'm going to use 50 percent for ease of math.

6    So, if somebody's normal state IVC is 20 millimeters, it

7    could in normal state expand and contract to as much as

8    30 millimeters.

9              Am I understanding that correctly?

10        A    That's correct.

11        Q    So, do you have an understanding of how to

12    determine when you're looking at an IVC whether it is in

13    a normal state, which is 20 millimeter IVC which is

14    expanded to 30, or if it is a 30 millimeter IVC that

15    could expand or contract from there?

16          MR. NORTH:  Objection to the form.

17          THE WITNESS:  Well, with a snapshot measurement,

18    you wouldn't know whether that is as big as it's going to

19    be or as small as it's going to be or how much the change

20    of width might be that the patient would experience.

21    BY MR. STOLLER:

22    Q    And is it -- based on your understanding of the

23    function of the IVC, can a 28 millimeter IVC in its

24    normal state ever be larger than 28 millimeters?

25          MR. NORTH:  Object to the form.  Leading.
      THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                        103


1           THE WITNESS:  Yes.

2     BY MR. STOLLER:

3     Q    And by how much and how big can it get?

4     A    Well, if we use the 50 percent figure that

5     represents breathing, it could be as large as

6     43 millimeters in width as a consequence of that kind of

7     increase in diameter.

8     Q    Now, based on your review of the internal Bard

                         Page 116

9   documents, were they -- did they take that into account

10  in 2004 and 2005 in designing the -- I should take that

11  back -- in 2003 and 2002 in designing their Recovery

12  filter?

13          MR. NORTH:  Objection.  No foundation.

14          THE WITNESS:  No.  They did not.

15  BY MR. STOLLER:

16   Q   Were they aware of the fact that the IVC could

17  expand by that much at that point in time?

18          MR. NORTH:  Objection.  No foundation.

19          THE WITNESS:  They were not.

20  BY MR. STOLLER:

21   Q   And, so, is there any indication in the IFU that

22  warns treating doctors that the filters shouldn't be

23  implanted in an IVC that is 28 millimeters because it

24  might expand to a greater size?

25          MR. NORTH:  Objection to the form.
            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              104


1           THE WITNESS:  Not to my knowledge.

2   BY MR. STOLLER:

3    Q   Are there design aspects of the filter that

4   should have taken those issues into account?

5    A   Yes.

6    Q    And what are they?

7    A    The design aspects, such as making sure that the

8    anchoring of the filter to the wall would be effective

9    even as the vena cava became very large so that it would

10   not be prone to tilting and migration when the vena cava

11   becomes very large and the features that might limit

12   perforation if the vena cava becomes very small, which

13   will tend to make perforation more likely.

14        And since both tilt and perforation contribute to

15   the likelihood of fracture, they would affect the

16   likelihood of fracture by fatigue, and therefore the

17   design should have taken that into consideration in

18   regard to its resistance to fatigue fracture.

19   Q    And if a filter is indicated for use in an IVC up

20   to 28 millimeters, should it be also -- in light of the

21   fact that IVC can expand fairly significantly, should it

22   be designed to be safe and effective for use in IVCs

23   greater than 28 millimeters?

24        MR. NORTH:  Objection to the form.  No

25   foundation.  And leading.
          THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                          105



1         THE WITNESS:  Yes.

2    BY MR. STOLLER:

3    Q    Mr. North asked you some questions about your

4  analysis of other filters in the overall IVC filter

5  litigation against Bard and specifically as to FEA

6  analysis you had conducted as to the various filters.

7  And I believe you testified that you had not conducted

8  FEA specific to the Meridian and Denali.

9         Was that your testimony?

10   A    That's correct.

11   Q    Is that accurate?

12   A    No.  I realized that I misspoke when I said that

13  the calculations are not relevant to the Meridian because

14  the Meridian in its overall shape is identical to the G2,

15  which I did do calculations for, both finite element

16  calculations and --

17        THE REPORTER:  Both?

18        THE WITNESS:  -- finite element calculations and

19  other calculations by algebra and calculus, and so on.

20        So, those calculations all apply to the Meridian.

21  They also apply, in an approximate way, but fairly

22  accurately, render the approximation to the Denali.

23  Because the shape of the Denali is very similar -- is

24  quite similar to the shapes of the Meridian, the Eclipse,

25  and the G2.

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                          106

1  BY MR. STOLLER:

2      Q    Dr. McMeeking, with respect to the report that is

3  Exhibit 1 here today and the other reports that you've

4  provided in the Bard IVC filter litigation, do those

5  reports accurately set forth your opinion and the basis

6  for opinions that you've arrived at to a reasonable

7  degree of engineering probability?

8      A    Yes, they do.

9      Q    And in coming to those conclusions and opinions,

10  did you follow a methodology that is utilized by

11  reasonable engineers in your field to resolve these

12  issues?

13     A    I did, yes.

14     Q    And did you apply the same methods and processes

15  that are used by mechanical engineers in arriving at

16  those opinions?

17     A    Yes, I did.

18     Q    In order to come to your opinions as to the

19  design and testing of the Bard IVC filters, was it

20  necessary for you to carry out bench testing or animal

21  testing?

22     A    No.  It was not.

23     Q    And do mechanical engineers in your role

24   typically carry out bench testing or animal testing?

25       A    Well, many of them carry out bench testing.  But
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                      107

1   animal testing would be an unusual pursuit for a

2   mechanical engineer of my background and professional

3   activities.

4       Q    The purpose of the bench -- what's the purpose of

5   bench testing?

6       A    The purpose of the bench testing is to simulate

7   the environment that the filter will experience as

8   closely as possible and to investigate whether it will

9   suffer failure modes that need to be avoided once it's

10  implanted in a patient, and also to see whether it -- the

11  filter will be -- is likely to be effective in terms of

12  counting out its function.

13      Q    And you've reviewed much of the bench testing

14  that Bard conducted with respect to the IVC filters in

15  this litigation; correct?

16      A    That's correct.

17      Q    And specifically you've done that as to the

18  Recovery; correct?

19      A    That's correct.

20      Q    And do those bench -- does that bench testing

21   conform with the standard you just articulated?

22      A    No.  They do not.

23      Q    Did you follow the methodology that engineers use

24   and should follow when doing the analysis that you've

25   done in this case?
             THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              108


1       A    Yes, I did.

2       Q    And you were asked questions about whether you

3    had inspected Mrs. Tinlin's filter or filter fragments

4    are still in her body.

5            Do you recall that?

6       A    I do.

7       Q    Do you need to inspect those in order to arrive

8    at the conclusions you have in this case?

9       A    No, I do not.

10          MR. STOLLER:  I don't have any further questions.

11          MR. NORTH:  Just a few more, Dr. McMeeking.

12

13                       FURTHER EXAMINATION

14   BY MR. NORTH:

15      Q    Obviously established earlier that you're not a

16   medical doctor?

17      A    Correct.

18     Q     And you would not consider yourself an expert in

19  human anatomy?

20     A     Correct.

21     Q     Or how the inferior vena cava works; correct?

22     A     Depends how you define expert.  I know quite a

23  lot about it.  But whether -- I wouldn't declare myself

24  to be an expert.

25     Q     You have no training in how the inferior vena
           THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                             109


1  cava works, do you?

2     A     Only self-training.  Only self-education.

3     Q     You have no formal education in the anatomical

4  workings of the IVC?

5     A     That's correct.

6     Q     And you have never, before this litigation and

7  your involvement in this litigation, had occasion to deal

8  with the inferior vena cava professionally; correct?

9     A     That's correct.

10     Q     And since you became involved in this litigation,

11  you've had no dealings with the inferior vena cava in any

12  other context other than your litigation consulting?

13     A     That's not quite true.

14           There is the work I've done for Edwards in

15   connection with an IVC implant.  But that's all.

16      Q    Okay.  And you have not set out to do a

17   comprehensive review of the medical literature concerning

18   the workings of the IVC; correct?

19      A    That's correct.

20      Q    And you as you sit here today, could you even

21   name the five -- or five leading authorities in the

22   medical literature on the operation of the IVC?

23      A    No, I could not.

24      Q    How many articles do you think you've even read

25   concerning the operation of the IVC?
         THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                    110


1      A    I would guess about 50.

2      Q    Now, you testified that you believe the -- did I

3   understand you to say that you believe that the FEA you

4   conducted with regard to the G2 would be applicable to

5   the Meridian because the dimensions were identical?

6      A    That's correct.

7      Q    And, so, it's your belief that the physical

8   dimensions of the Meridian are identical to those of the

9   G2?

10           MR. STOLLER:  Object to form.

11           THE WITNESS:  Well, there are features on them

12   that are different; for example, the caudal anchors and

13   the cap may be slightly different in shape.  But

14   otherwise the shapes are close enough that they are --

15   behavior in the context of the calculations that I did

16   would be very much the same.

17   BY MR. NORTH:

18      Q    So, you believe the calculations you did with the

19   G2 are applicable generally to both the Meridian and the

20   Denali; is that correct?

21      A    Applicable to the Meridian quite closely.  And in

22   an approximate manner to the Denali, yes.

23      Q    But you will admit that you've never done an FEA

24   with the precise dimensions of the Meridian, including

25   the anchors and everything, or with the precise

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                                              111

1   dimensions of the Denali?

2      A    That's correct.

3      Q    Now, you were asked a series of leading questions

4   by Mr. Stoller concerning the basis of your opinions in

5   which you stated several times that you have applied

6   principles of engineering; is that correct?

7      A    That's correct.

8      Q    And in particular that you have applied

9    principles of engineering in determining that these

10   design features you have advocated -- the caudal anchors,

11   the penetration limiters, two-tiered design, and the

12   curved or rounded cap -- would reduce the risk of various

13   complications; correct?

14   A    That's correct.

15   Q    And you also said that you've applied the

16   principles of engineering to reach that same conclusion

17   with regard to a reduction in risk in someone with an IVC

18   greater than 28 millimeters in diameter; correct?

19   A    That's correct.

20   Q    But, again, you have not conducted any testing or

21   any calculations to quantify the extent to which those

22   design attributes would reduce the risk of complications

23   in a patient; correct?

24   A    That's correct.

25   Q    And, likewise, you have not conducted any tests

THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM

112

1    or made any calculations to quantify the extent to which

2    those design attributes would reduce the risk of

3    complications in a patient with an IVC greater than 28

4    millimeters in diameter?

5    A    That's correct.

Page 126

6          MR. NORTH:  That's all I have.  We're done.

7          MR. STOLLER:  Thank you.  We're done.

8          THE VIDEOGRAPHER:  This will mark the conclusion

9  of today's deposition of Robert M. McMeeking, PhD.

10          The time is 12:50 p.m., and we are off the

11  record.

12          THE REPORTER:  Counsel, pursuant to Rule 30, if

13  there were any stipulations entered into during the

14  course of the deposition, including regarding custody of

15  the transcript and handling of the exhibits, they must be

16  repeated at the end of the deposition.

17          MR. NORTH:  That must be a California thing.

18          THE REPORTER:  How would you like me to handle

19  the original transcript?

20          MR. NORTH:  Please send the original to me.

21          THE REPORTER:  And will you take custody of the

22  transcript for safekeeping and presentation at any

23  hearings or trial in this matter?

24          MR. NORTH:  Yes.

25          THE REPORTER:  Mr. Stoller, would you like a
            THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                    113


1  certified copy of the transcript?

2          MR. STOLLER:  Sure.  At the end of the day, we'll

3   need a copy.  Just an electronic copy is fine with

4   exhibits.  We have a standing order.

5       MR. NORTH:  Electronic copy for me as well with

6   exhibits.

7           (Whereupon at 12:51 p.m. the deposition

8    of Expert Witness Robert M. McMeeking, PhD was concluded.)

9                      --ooOoo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

    THE FOLLOWING IS AN UNEDITED ROUGH DRAFT AND IS NOT IN FINAL FORM
                                114