Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California  92660
949-812-5771

Mark S. O'Connor (011029) – moconnor@beusgilbert.com
BEUS GILBERT, PLLC
701 N.44th St.
Phoenix AZ 85008
480-429-3019

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| | **PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF CHRISTOPHER S. MORRIS, M.D.** |
| | (Assigned to the Honorable David G. Campbell) |
| | **(Tinlin Bellwether Case)** |
| | Oral Arguments Requested |

<u>**MOTION**</u>

Pursuant to Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiff Debra Tinlin respectfully moves this Court to exclude certain opinions of Bard's expert witness, Christopher S. Morris, M.D.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Dr. Morris is an interventional radiologist who is being offered as an expert by Bard on issues specific to the Tinlin bellwether trial, set for May 2019. Plaintiff challenges two discrete opinions because Dr. Morris is not qualified to offer them and because they are speculative, lack foundation, and would be unhelpful and confusing if

1    presented to the jury.

2          First, Dr. Morris proposes to opine that Mrs. Tinlin underwent a ████████████

3    ████████████████████████ but that:

4          The Interventional Radiology service or the Interventional Cardiology
5          service could have performed ████████████████████████████████████████
          ████████████████████████████ which likely would have been performed more
6          expeditiously, with less morbidity and risk than the surgical procedure, using
7          ████████████████████████████████████████

8    Morris Report, Exhibit A, p. 17, ¶ 6.

9          Second, Dr. Morris proposes to offer the opinion that relative to Mrs. Tinlin's ████

10   ████████████

11         [T]he medical records suggest that no CT scan of the chest was obtained
12         immediately prior to this surgery, to document that the ████████████████████
          ████████████████████████████. This omission was significant, since it was
13         possible that neither arm fragment was still located in the heart, and therefore,
          open heart surgery would have been contraindicated. A high-resolution CT
14         angiogram of the heart, using cardiac gating, could have determined how
          many, if any, ████████████████████████, and whether or not they
15         were amenable to percutaneous (endovascular) retrieval. ████████████████
          ████████████████████████████████████████████████████████████████ In
16         actuality, Dr. Kress performed ████████████████████████████████████████
17         ████████████████████████████████████████████████████████████████████
          ████████████████████████████████████████████████████████████████████
18         ████████████████████████████████████████████████████████████████████
19         ████████████ Dedicated cardiac imaging prior to this operation would have been very
20         informative about the current status of metallic foreign bodies in the heart.
          The ██████████████████████████████████████ potentially
21         could have been removed percutaneously by an Interventional Radiologist
          skilled at retrieving intracardiac foreign bodies, particularly since Dr. Kress
22         did not describe ████████████████████████████ This might have
          precluded ████████████████████████, with all of its attendant risks and morbidity,
23         including ████████████████████████████████████████

24   *Id.* at pp. 17-18, ¶ 7.

25         In both opinions, Dr. Morris implies—but does not state outright—that the

26   procedures performed were improper. But Dr. Morris is not a surgeon, much less a board

27   certified surgeon, and is therefore not qualified to opine as to the standard of care for a

28

surgeon under Wisconsin law.[1] His opinions on that subject are not reliable.

Even if Dr. Morris were qualified to give these opinions, they are inadmissible because they are entirely speculative. Dr. Morris states that ██████████████ ██████ "could have" been performed, but he does not state it should have been given the circumstances, nor does he explain what harm would have been avoided had this procedure been performed instead of the ████████████████████. Dr. Morris also states that it was "possible" that there were no filter fragments in the heart, moments later describing a strut removed from her heart (and citing one imaging report, but ignoring numerous imaging studies that demonstrated one or two struts in Mrs. Tinlin's heart). He says removal of the strut in Mrs. Tinlin's heart "potentially" could have been "attempted" percutaneously had dedicated imaging been done and had the imaging showed it was possible to even attempt. But, he fails to state whether this was more likely than not, or even whether such an attempt was advisable or whether the failure to make an attempt fell below any standard of care. Further speculation by Dr. Morris involves whether ████ ██████████ could have been avoided (it "might have" been, but apparently only if "an Interventional Radiologist skilled at retrieving intercardiac foreign bodies" had made the attempt; no information was provided on the chances of success). Dr. Morris fails to offer any foundation for these speculative opinions, and does not opine that any intervention he now describes with the benefit of hindsight should have been performed, or more likely

---

[1] To the extent Dr. Morris criticizes the treating physicians, he is opining inconsistently with his general report in the MDL, where he stated that only a treating physician can evaluate a patient:

> Only a patient's provider, such as the implanting physician, primary care physician, or specialty consultant seeing and evaluating the patient in follow up, can understand all of the variables and individualized clinical issues of his or her patient before making a decision of whether or not to remove an IVCF. . . . Once a clinical decision for IVCF removal is made, the interventionalist needs to make a decision on a case by case basis regarding further work-up, including imaging, prior to the removal procedure.

Morris MDL Report, Exhibit B, p. 13. Dr. Morris's opinion that clinical decisions are appropriate only with direct patient interaction carries more force in the context of a risky surgical procedure, so it clearly applies to the opinions he seeks to offer here.

1    than not would have avoided any injury that actually occurred, or that any doctor fell

2    below the standard of care for the course of action that was actually taken. His discussion

3    of possibilities and the inuendo that Mrs. Tinlin's doctors breached the standard of care

4    are speculative, lack foundation, and would be unhelpful and confusing to the jury and

5    should be excluded.

6    **I.      APPLICABLE LEGAL STANDARDS**

7          Expert opinion testimony is governed by Federal Rule of Evidence 702, which

8    codified *Daubert,* 509 U.S. 579, and its progeny.

9          Wisconsin law governs the substantive requirements of expert testimony offered

10   against a doctor who provided medical care to a plaintiff. *Wilderness Dev., Ltd. Liab. Co.*

11   *v. Hash*, 606 F. Supp. 2d 1275, 1280 n.1 (D. Mont. 2009) (citing *Hutchinson v. United*

12   *States*, 838 F.2d 390, 392 (9th Cir. 1988)). "[T]he standard of care must be established by

13   reference to the care given in similar circumstances by medical professionals in the area."

14   *Satorius v. Proassurance Wis. Ins. Co.*, 823 N.W.2d 840 ¶ 25 (Wis. App. 2012). In the

15   medical negligence context, "a plaintiff must prove the defendant failed to give him, not

16   the highest degree of care, but merely the reasonable care and skill usually possessed by

17   physicians of the same school." *Trogun v. Fruchtman*, 207 N.W.2d 297, 305 (Wis. 1973);

18   *see also Francois v. Mokrohisky*, 226 N.W.2d 470, 472 (Wis. 1975) ("True, there was

19   evidence that other physicians might have acted differently and that there were alternate

20   procedures available, but no physician testified that what was done did not comport with

21   approved medical practice under the circumstances."). The relevant Wisconsin jury

22   instruction indicates that an opinion about a doctor's care must be given by a doctor with

23   the same specialty:

24          In (treating) . . . (*plaintiff*)'s (injuries) . . . , (*doctor*) was required to use the
            degree of care, skill, and judgment which reasonable (doctors who are in
25          the general practice) [or] (specialists who practice the specialty which
            (*doctor*) practices) would exercise in the same or similar circumstances,
26          having due regard for the state of medical science at the time (*plaintiff*) was
            (treated) . . .
27

28

*Phelps v. Physicians Ins. Co. of Wis., Inc.*, 698 N.W.2d 643, 655 (Wis. 2005) (quoting Wis JI—Civil 1023) (underlining added).

With respect to the proper bases and foundation of an opinion, an expert must provide more than speculation about alternatives and possible outcomes. "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997); *Oglesby v. GMC*, 190 F.3d 244, 251 (4th Cir. 1999) (expert opinion properly excluded where expert "could only speculate as to a possibility which was no more likely than other available possibilities"); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("The expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions."); *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1213 (10th Cir. 2004) (where expert opinion failed to establish underlying factual predicate regarding cause of fire, it "cannot be said to be based on reliable principles and methods. Rather, this opinion [is] based on assumptions and speculation") (internal quotation omitted). *C.f., Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (excluding expert opinion that manganese caused Parkinson's Disease as speculation because expert opined about scientific hypotheses and possibilities, and that plaintiff "may have" predisposing factors for the disease.)

## II.   **ARGUMENT**

### A.   Dr. Morris is not qualified to offer an opinion that a surgeon breached the standard of care under Wisconsin law because he does not have experience as a surgeon.

Dr. Morris does not state that he board-certified in surgery, nor that he has performed the surgical procedures at issue here. In his practice, he does not perform any of the open percutaneous procedures or open surgeries that other interventional radiologists and vascular surgeons use for filter retrievals, nor does he perform open heart

surgeries. Exhibit C, Morris MDL Deposition. 121:2-10.[2]  Based on his report and *curriculum vitae*, Dr. Morris is a top practitioner and expert in his chosen fields of diagnostic and interventional radiology, but he has not been trained in open surgical procedures. Dr. Morris, therefore, does not have the experience necessary to render an opinion about the standard of care regarding the procedures considered and performed on Mrs. Tinlin. *See e.g. Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 182 (E.D.N.Y. 2013) (physician expert precluded from offering opinion "on specialized subjects in which that physician has no training or for which there is no sufficiently reliable basis"); *In re Silicone Breast Implants Litig.*, 318 F.Supp.2d 879, 902 (C.D.Cal. 2004) (expert not qualified to render opinions about reasonableness of failure to conduct biodegredation tests where expert had published papers about medical devices and biomaterials).

If Bard wishes to present evidence that Mrs. Tinlin's doctors did not treat Mrs. Tinlin according to the standard of care applicable to a surgeon performing a surgical sub-xiphoid pericardial window or open heart surgery, then it must present this evidence "by reference to the care given in similar circumstances by medical professionals in the area." *Satorius*, 823 N.W.2d 840 ¶ 25. The standard against which Mrs. Tinlin's doctors must be measured is one not of the best possible outcome, "but merely the reasonable care and skill usually possessed by physicians of the same school." *Trogun*, 207 N.W.2d at 305. Here, Dr. Morris provides an implied criticism without the necessary experience. He also does not indicate that standard to which he is holding the surgeons, and so does not even purport to assist the trier of fact. These opinions should therefore be excluded.

**B.**   The qualifications Dr. Morris placed on his opinions render them speculative and lacking in foundation such that they would be unhelpful and confusing to the jury.

Dr. Morris's opinions should be excluded for the independent reason that that they are too speculative. His opinions are embedded with various qualifications that indicate that he is not offering opinions sufficiently definite to satisfy Rule 702; further, he

---

[2] Dr. Morris has not yet been deposed with respect to his specific opinions in the Tinlin Bellwether case.

1  impliedly relies on underlying facts for which he has provided no basis or support in the
2  record.

3      When an expert fails to indicate that an event is more likely than not, the opinion is
4  not sufficiently certain to satisfy the requirements of Federal Rule of Evidence 702. "The
5  Ninth Circuit has indicated that expert medical causation testimony couched in terms of
6  possibility rather than probability does not satisfy *Daubert. See Chilcote v. Fireman's*
7  *Fund Ins. Co.*, No. CV 06-47-M-DWM-JCL, 2007 U.S. Dist. LEXIS 102570, at *3-4 (D.
8  Mont. Nov. 30, 2007) (citing *Schudel v. General Electric Co.*, 120 F.3d 991, 997 (9th Cir.
9  1997), *abrogated on other grounds, Weisgram v. Marley Co.,* 528 U.S. 440, 120 S. Ct.
10  1011, 145 L. Ed. 2d 958 (2000)).

11      In *Chilcote*, the plaintiff moved to preclude a defense expert from offering an
12  opinion that she had not suffered a brain injury after the expert offered an opinion that she
13  suffered "possible head trauma." *Chilcote*, 2007 U.S. Dist. LEXIS 102570, at *2-4. The
14  court held that the expert's opinion "as to 'possible head trauma' is not sufficiently certain
15  to be admissible under Rule 702." *Id.* at *6. *See also Schulz v. Celotex Corp.*, 942 F.2d
16  204, 208 (3d Cir. 1991) (noting same rule, and referencing cases from the United States
17  Supreme Court, 6th, 7th, and 8th Circuit Courts of Appeal stating similar rules).

18      Dr. Morris's use of qualifiers in the challenged opinions shows that he is merely
19  speculating about possible courses of treatment and potential outcomes of those possible
20  treatments. These opinions are therefore speculative and without foundation and should be
21  excluded. *E.g. Diviero v*, 114 F.3d at 853  (affirming decision to exclude expert testimony
22  as "unsubstantiated speculation"); *Oglesby v. GMC*, 190 F.3d 244, 251 (4th Cir. 1999)
23  (expert opinion properly excluded where expert "could only speculate as to a possibility
24  which was no more likely than other available possibilities"); *McLean v. 988011 Ontario,*
25  *Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("The expert's conclusions regarding causation
26  must have a basis in established fact and cannot be premised on mere suppositions.");
27  *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1213 (10th Cir. 2004) (where expert
28  opinion failed to establish underlying factual predicate regarding cause of fire, it "cannot

be said to be based on reliable principles and methods. Rather, this opinion [is] based on assumptions and speculation") (internal quotation omitted); *Peterson v. Taser Intern., Inc.*, 2009 WL 3789985, at *1 (D. Nev. 2009) (excluding expert testimony that muscle contraction "may have led to" injuries as "a speculative conclusion [that] does not rise to the level of certainty required in this circuit."). Specifically, the following opinions are couched in terms of possibility or lack foundation and should be excluded for the reasons described below:

*First*: "The Interventional Radiology service or the Interventional Cardiology service *could have* performed an ████████████████████████████████ ███████████████ Ex. A, p. 17 ¶ 6 (emphasis supplied). This opinion fails to provide any likelihood of success or indicate under which conditions this procedure could have been performed, or whether an appropriate doctor was available at the time the emergency sub-xiphoid pericardial window was performed.

*Second*: The procedure "likely would have been performed more expeditiously, with less morbidity and risk than the surgical procedure, using ████████████████ ████████████████████ *Id.* This opinion fails to indicate why expeditiousness, lower morbidity risk and avoidance of general anesthesia would have made any difference to Mrs. Tinlin's injuries. Dr. Morris also fails to specify how the opinion is relevant because he does not claim that the length or surgery, risk of morbidity or type of sedation caused any injury.

*Third*: "[T]he medical records suggest that no CT scan of the chest was obtained immediately prior to this surgery, to document that the ████████████████████ ████████████████████ This omission was significant, since it was *possible* that neither arm fragment was still located in the heart, and therefore, open heart surgery would have been contraindicated." *Id.* pp. 17-18 ¶ 7 (emphasis supplied). Dr. Morris again fails to explain why these statements are relevant. Neither Dr. Morris nor Bard dispute the fact that a filter strut was in Mrs. Tinlin's heart during surgery. Bard offers no opinion that the second strut was not also in the heart (even if it was not found), or that it likely had moved

between the time it was imaged in her heart 10 days earlier and the time of the surgery.
The fact that under different facts "open heart surgery would have been contraindicated,"
*id.*, is not relevant and would not be helpful to the jury.

*Fourth*: "A high-resolution CT angiogram of the heart, using cardiac gating, *could have* determined how many, if any, ███████████████████████, and whether or not they were amenable to percutaneous (endovascular) retrieval." *Id.* p. 18 (emphasis supplied). The qualifier "could have" renders this opinion speculative because it does not indicate under which conditions this would have occurred or how likely it would be.

*Fifth*: ████████████████████████████████████ *potentially could have been* removed percutaneously by an Interventional Radiologist skilled at retrieving intracardiac foreign bodies, particularly since Dr. Kress did not describe ████████████████████████ *Id.* (emphasis supplied). Again, the qualifying language "potentially" renders this opinion speculative and unhelpful to the jury. Dr. Morris further fails to opine that "an Interventional Radiologist skilled at retrieving intracardiac foreign bodies" was or should have been available. Nor does the opinion indicate that Dr. Morris considered all of the information he recommends that a treating physician consider before making treatment decisions ("the seeing and evaluating the patient in follow up [to] understand all of the variables and individualized clinical issues of his or her patient before making a decision," Morris MDL Report, Exhibit B, p. 13), nor does he state that, based on all of this information, he recommends the procedure over the procedure he describes over the one Dr. Kress performed. In fact, he is unable to state that the percutaneous procedure should have been attempted because, in the absence of imaging, he has no basis to make that statement. Moreover, Dr. Morris's statement that the relevant operative report "did not describe excising [the fractured strut] from the wall of the heart," Ex. A, p. 18, ¶ 7, is information about a lack of evidence. It does not prove that the fractured strut was not, in fact, embedded—considering that just 10 days earlier, the strut was "anteriorly through the anterior wall of the right ventricle, through the pericardium, and barely into the left anterior chest wall." *Id.*, p. 11. Dr. Morris offered no

opinion that a surgeon would have documented excision, so this part of his opinion is also speculative.

*Finally*: The statement that an alternative course of action "*might have* precluded ████████████ with all of its attendant risks and morbidity, ████████████ ████████████ *id*. p. 18, ¶ 7 (emphasis supplied), is precisely the sort of speculative opinion that has been excluded by numerous courts because it does not meet the standard set forth under Rule 702. *Diviero*, 114 F.3d at 853.  This opinion provides no basis for assessing the likelihood of success and should therefore be excluded.

## III.   <u>CONCLUSION</u>

As set forth above, the opinions of Dr. Morris in paragraphs 6-7 on pages 17-18 should not be permitted at trial because these are opinions offered by an expert without the appropriate qualifications and are speculative and would be unhelpful and confusing to the jury.

RESPECTFULLY SUBMITTED this 1st day of February, 2019.

BEUS GILBERT, PLLC


By:*/s/ Mark O'Connor*
Mark S. O'Connor (011029)
701 N.44th St.
Phoenix AZ 85008

LOPEZ McHUGH LLP
Ramon Rossi Lopez (CA Bar No. 86361)
(admitted *pro hac vice*)
100 Bayview Circle, Suite 5600
Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 1st day of February, 2019, I electronically transmitted

3   the attached document to the Clerk's Office using the CM/ECF System for filing and

4   transmittal of a Notice of Electronic Filing.

5

6                                          */s/ Jessica Gallentine*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28