James R. Condo (#005867)
Kristine L. Gallardo (#033975)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Facsimile: 602.382.6070
jcondo@swlaw.com
kgallardo@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
Taylor Tapley Daly (admitted *pro hac vice*)
Georgia Bar No. 697887
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
Telephone: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com
taylor.daly@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS C. R. BARD, INC. AND BARD PERIPHERAL VASCULAR, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF CHRISTOPHER S. MORRIS, M.D.**<br><br>(Assigned to the Honorable David G. Campbell)<br><br>**(Tinlin Bellwether Case)**<br><br>**(Oral Argument Requested)** |

Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully respond to Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Christopher S. Morris, M.D. ("Motion").

In their Motion, Plaintiffs assert that Dr. Morris is not qualified to give two of his case-specific opinions regarding procedures performed on Mrs. Tinlin's heart, and that these two opinions are unreliable. (*See* Pls.' Mot. at 1.) Plaintiffs' argument is misplaced. Dr. Morris, as a highly qualified interventional radiologist, should be allowed to opine on a minimally-invasive drainage procedure to remove blood that had accumulated around Mrs. Tinlin's heart that could have been performed by an interventional radiologist in lieu of a more invasive cardiothoracic operation performed on June 10, 2015 by a heart surgeon to accomplish that same goal. Similarly, Dr. Morris is qualified and should be allowed to testify about the diagnostic radiological imaging that should have been performed prior to the surgical intervention performed on July 30, 2015 to remove a strut from Mrs. Tinlin's heart, and a minimally-invasive procedure that potentially could have been performed in lieu of that more invasive cardiothoracic operation. Dr. Morris's methodology is sound. His opinions are based on over 27 years of clinical experience as a practicing interventional radiologist, and they are informed and directly supported by the medical literature. Employing the same rigorous, scientific, and intellectual inquiry to the issues in this case as he does in his clinical practice, Dr. Morris reviewed Mrs. Tinlin's medical records and imaging, considered the available medical literature, and reached his conclusions and opinions. Plaintiffs may disagree with those opinions, but that is no basis to exclude them under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert I*"). Accordingly, for the reasons that follow, Plaintiffs' Motion should be denied.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION AND FACTUAL BACKGROUND**

Dr. Morris is a leading, practicing interventional radiologist with over 27 years of clinical experience. (*See* Dr. Morris Tinlin Report, Pls.' Ex. A, at 1.) His clinical practice

-1-

1    includes a large variety of vascular and non-vascular procedures spanning the gamut of
2    interventional radiology, including placement and retrieval of IVC filters. (*See id.* at 1-2.)
3    He estimates that he has implanted more than 800 IVC filters (*see id.*) and that he and his
4    team have retrieved over 300 IVC filters. (*See* Dr. Morris Dep. Tr. (July 25, 2017),
5    attached as Exhibit 1, at 342:15 to 343:16; 109:22 to 110:23.) Dr. Morris also has personal
6    experience performing percutaneous retrievals of foreign bodies from the heart. (*See*
7    Affidavit of Dr. Morris (Feb. 28, 2019), ("Dr. Morris Aff."), attached as Exhibit 2, at ¶ 2.)
8    Dr. Morris was trained by leaders in the field of interventional radiology, including
9    Dr. William Molnar, "a Grandfather of Interventional Radiology who was instrumental in
10   developing the technique of coronary and cardiac angiography…." (*See* Pls.' Ex. A, Tinlin
11   Report at 1.) Dr. Morris and his team have also personally performed image-guided
12   percutaneous placement of pericardial drainage tubes in his clinical practice. (*See* Ex. 2,
13   Dr. Morris Aff. ¶ 3). He estimates that he has placed more than 100 pericardial drainage
14   tubes over his career. (*See id.*) Dr. Morris also has extensive experience performing
15   dedicated cardiac imaging in his clinical practice, including high-resolution, cardiac gated
16   and contrast enhanced CT angiograms of the chest. (*See id.* at ¶ 4.)

17        Dr. Morris is a Professor of Radiology and Surgery at the College of Medicine at
18   the University of Vermont, where he teaches students, residents, and fellows about IVC
19   filters. (*See* Pls.' Ex. A, Tinlin Report at 1.) At the national meeting of the Society of
20   Interventional Radiology ("SIR"), he taught practicing interventional radiology colleagues
21   about IVC filters as a part of SIR's IVC filter workshop series for five years, and he was
22   chair of the workshop for three years. (*See id.* at 2.) Importantly, long before Dr. Morris
23   became involved as an expert in this litigation, Dr. Morris researched, studied, and
24   published regarding IVC filters. (*See* Dr. Morris MDL Report, Pls.' Ex. B, at 2, 27 &
25   Refs. 1-6.)

26        Dr. Morris's full opinions are set forth in his Rule 26 Reports. Plaintiffs explored
27   his generic opinions in detail in his deposition given on July 25, 2017. Dr. Morris holds all
28   of his opinions "to a reasonable degree of medical certainty." (Pls.' Ex. A, Tinlin Report

at 26.) Dr. Morris offers the following case-specific opinions relevant to Plaintiffs' Motion:

***First***, Dr. Morris opines that Plaintiff could have undergone a minimally-invasive, image-guided percutaneous placement of a pericardial drainage tube instead of the more invasive pericardial window operation that she underwent on June 10, 2013 to remove blood that had accumulated around her heart. (*See id.* at 17, ¶ 6.) Dr. Morris opines that this minimally-invasive procedure "likely would have been performed more expeditiously, with less morbidity and risk than the surgical procedure, using moderate sedation rather than general anesthesia." (*Id.*) This might have avoided the cardiothoracic surgical operation, and "could have prevented [post-surgical complications, such as] her tracheomalacia, non-union of her sternotomy, chronic chest pain, chronic cough, abdominal wall and diaphragmatic hernias." (*See id.* at 26.) He bases this opinion on his education, training, and personal experience percutaneously placing pericardial drainage tubes over the years. (*See id.*; *see also* Ex. 2, Dr. Morris Aff. ¶ 3.)

***Second***, Dr. Morris offers opinions regarding imaging that could have been performed prior to the cardiothoracic surgical operation that Plaintiff underwent on July 30, 2015 to remove the fractured filter struts within the right ventricle of her heart. (*See* Pls.' Ex. A, Tinlin Report at 17-18, ¶ 7.) Specifically, Dr. Morris concludes that a "high resolution, cardiac gated and contrast enhanced CT angiogram of the chest should have been performed to determine the feasibility of endovascular removal of the embolized arm strut" immediately prior to the surgical intervention. (*See id.* at 26.) He opines that this dedicated cardiac imaging "would have been very informative about the current status of the [struts] in the heart," as it could have determined whether the struts were still located in the heart and their amenability to percutaneous (as opposed to surgical) retrieval. (*See id.*) Indeed, the most recent imaging of her chest [a plain chest x-ray], taken ***the day before her surgery***, did not demonstrate a strut in the heart. (*See id.* at 6, 18, ¶ 7.) Rather, the last CT scan of the chest that visualized any struts in the heart was on June 10, 2013, ***more than seven weeks before her surgery*** on July 30, 2013. (*See id.* at

-3-

6, 10-11.) Yet, no CT scan of the chest was performed immediately prior to the surgical intervention. (*Id.*)

Furthermore, his opinion, which is supported by the medical literature, is that the single strut that was found during the surgery potentially could have been removed percutaneously by a skilled interventional radiologist given that the medical evidence did not indicate that the strut was completely incorporated into the wall of the heart. (*See id.* at 18, ¶ 7; *see also id.* at 24.) This minimally-invasive technique might have avoided this open heart surgery entirely, and "could have prevented her tracheomalacia, non-union of her sternotomy, chronic chest pain, chronic cough, abdominal wall and diaphragmatic hernias." (*See id.* at 18, ¶ 7; *see also id.* at 26.) He bases this opinion on his education, training, and personal experience percutaneously retrieving IVC filters over the years, his personal experience performing percutaneous retrievals of foreign bodies from the heart, as well as on a review of the medical literature and Mrs. Tinlin's medical records and imaging. (*See id.* at 1-2, 24-26; Ex. 1; Ex. 2, Dr. Morris Aff. ¶ 2.)

## II. ARGUMENT AND CITATION OF AUTHORITY

To be admissible, a qualified expert's opinions must be reliable, be based on sufficient facts or data, and "fit" the case. *See, e.g.*, Fed. R. Evid. 702; *Daubert I*, 509 U.S. at 591. "An expert may be qualified to testify based on his or her 'knowledge, skill, experience, training, or education.'" (Doc. 10230 at 2 (quoting Fed. R. Evid. 702).) Additionally, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010). Plaintiffs question Dr. Morris's qualifications to opine on the percutaneous procedures that Plaintiff could have undergone in lieu of surgical intervention. (*See* Pls.' Mot. at 5-6.) Plaintiffs also challenge Dr. Morris's opinions as unreliable and lacking proper "fit," alleging that they lack foundation, are too speculative, and ultimately will not assist the jury. (*See id.* at 6-10.) For the reasons that follow, Plaintiffs' arguments are misplaced.

### A.     Dr. Morris is Qualified to Give His Opinions

Plaintiffs appear to only challenge Dr. Morris's qualifications to opine on "*the standard of care* regarding the procedures considered and performed on Mrs. Tinlin." (*See, e.g.*, Pls.' Mot. at 6 (emphasis added); *id.* at 2-3 ("Dr. Morris is not a surgeon, much less a board certified surgeon, and is therefore not qualified to opine as to the standard of care for a surgeon under Wisconsin law."); *id.* at 5 ("Dr. Morris is not qualified to offer an opinion that a surgeon breached the standard of care under Wisconsin law.").) To be clear, Bard is not offering Dr. Morris to opine on the standard of care for the two cardiothoracic surgical procedures that Plaintiff underwent, (*see* Pls.' Ex. A, Tinlin Report at 17-18, ¶¶ 6-7), nor is he being offered to opine on any breach of any standard of care for those procedures. Therefore, Wisconsin's competency standards for expert witness testimony on standards of care in medical negligence cases simply do not apply. (*Cf.* Pls.' Mot. at 4-6.)

Plaintiffs argue that Dr. Morris is not qualified to opine generally on the minimally-invasive, percutaneous drainage procedure that could have been performed, the dedicated cardiac imaging that should have been performed, and the minimally-invasive, percutaneous retrieval procedure that potentially could have been performed, because he is not a board-certified surgeon trained in performing the open surgical procedures that Plaintiff did undergo. (*See id.* at 5.) This argument fails.

Dr. Morris's opinions are well within his qualifications as an interventional radiologist with over 27 years of clinical experience. (*See* Pls.' Ex. A, Tinlin Report at 1.) Plaintiffs do not (nor could they) dispute that "[b]ased on his report and *curriculum vitae*, Dr. Morris is a top practitioner and expert in his chosen field of diagnostic and interventional radiology." (Pls.' Mot. at 6.) His clinical practice includes a large variety of vascular and non-vascular procedures spanning the gamut of interventional radiology, including percutaneous retrieval of IVC filters. (*See* Pls.' Ex. A, Tinlin Report at 1-2.) Critically, Dr. Morris has personal experience performing percutaneous retrievals of foreign bodies from the heart, and image-guided percutaneous placement of pericardial drainage tubes. (*See* Ex. 2, Dr. Morris Aff. ¶¶ 2-3.) Additionally, Dr. Morris has extensive

-5-

1  experience, training, and education in performing dedicated cardiac imaging, including
2  the high-resolution, cardiac gated and contrast enhanced CT angiograms that he opines
3  should have been performed immediately prior to surgical intervention in this case. (*See*
4  *id.* at ¶ 4; Pls.' Ex. A, Tinlin Report at 18, ¶ 7). Therefore, Dr. Morris is highly qualified
5  to opine on the topics in these challenged opinions based on his "knowledge, skill,
6  experience, training, or education," Fed. R. Evid. 702, and his opinions should not be
7  excluded in this case.

       **B.**     **Dr. Morris's Opinions are Reliable and Will Assist the Jury.**

            **1. Dr. Morris Appropriately Relies on His Experience and on Medical Literature to Form His Opinions.**

In determining reliability of expert testimony, "[t]he focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Daubert I*, 509 U.S. at 595; *Primiano*, 598 F.3d at 564 (citations omitted) ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."). This Court has recognized that a medical doctor may rely on his or her training and experience to form the basis of reliable opinions under *Daubert*. *See Tavilla v. Cephalon Inc.*, No. CV11-0270 PHX DGC, 2012 WL 1190828, at *4 (D. Ariz. Apr. 10, 2012) (finding that medical doctor's reliance on his "substantial" experience in addiction medicine rendered his opinions reliable). *Cf. Primiano*, 598 F.3d at 565 ("Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to mak[e] a sound judgment." (internal quotation marks omitted) (alteration in original)).[1] Additionally, a doctor may rely on relevant medical literature to inform his or her opinions. *See, e.g.*, *In re Mirena*, 169 F. Supp. 3d at 412 ("[A] review of other studies and

---

[1] *See also In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 420–21 (S.D.N.Y. 2016) ("Dr. Goldberg's experience as a medical doctor specializing in OB/GYN and his familiarity and experience in placing and teaching how to place IUDs . . . are indicative of the reliability of his opinions."); *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 181 (S.D.N.Y. 2009) (doctors' clinical experience is "highly indicative of the reliability of their opinions").

scientific literature can be enough . . . to make that proposed testimony reliable."). And, when a doctor relies on his or her medical experience and—using the backdrop of peer-reviewed literature as a guide—renders an opinion in a case, the opinion is reliable because it "is the ordinary methodology of evidence based medicine." *Primiano*, 598 F.3d at 567; *see also Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 480-81 (E.D.N.Y. 2011) (allowing medical doctors to testify where they based their opinions on their own experiences and review of literature).

In the context of Dr. Morris's general opinions, this Court has already recognized that Dr. Morris's reliance on the relevant medical literature and his "clinical experience is sufficient to satisfy the threshold reliability requirements of Rule 702," including as it related to his opinions concerning the removal of IVC filters based on his clinical "experience removing IVC filters." (Doc. 10231 at 3, 7.) Dr. Morris employed this same methodology in forming his case-specific opinions in this case. His opinions regarding the minimally-invasive, percutaneous procedures that Plaintiff could have undergone—which might have avoided her cardiothoracic surgical operations and subsequent post-surgical complications—are based on his years of experience performing those percutaneous procedures, (*see* Pls.' Ex. A, Tinlin Report at 1-2, 26; Ex. 1; Ex. 2, Dr. Morris Aff. ¶¶ 2-3), as well as on the relevant medical literature. (*See* Pls.' Ex. A, Tinlin Report at 24-25 & Refs. 7-8 (referencing studies regarding successful retrieval of fractured IVC filter struts, including from the heart, and noting that these struts "do not always require an open surgical approach, [they] can be successfully retrieved in a minimally invasive manner"; further noting suggestion that "fractured, embolized fragments that exhibit a mobile free end on venography, or on cross-sectional imaging, be pursued for retrieval by using minimally invasive techniques.").) Similarly, his opinions regarding the dedicated cardiac imaging that "should have been performed" immediately prior to the surgical intervention—which would have provided useful information concerning the status of the struts in the heart and the feasibility of a percutaneous retrieval—are based on his own experience, education, and training performing that imaging. (*See id.* at 1-2, 26; Ex. 2,

Dr. Morris Aff. ¶ 4.)

Thus, it is beyond reasonable dispute that Dr. Morris has employed a sound methodology of reaching his opinions based not on "unsupported speculation," *Daubert I*, 509 U.S. at 590, but rather on his extensive medical experience and analysis of the applicable medical literature. This "is the ordinary methodology of evidence based medicine" that is not grounds for exclusion under *Daubert. Primiano*, 598 F.3d at 567 Therefore, his opinions are sufficiently reliable to satisfy Rule 702. (*Cf.* Doc. 10231 at 3.)

### 2. Dr. Morris's Opinions Do Not Need To be Expressed in Probabilities under Wisconsin Law.

Plaintiffs argue that Dr. Morris's opinions are irrelevant and will not assist the jury because they are not expressed in sufficiently certain terms to satisfy the requirements of Rule 702. (*See* Pls.' Mot. at 7.) Again, Plaintiffs' argument is misplaced.

The admissibility of an expert opinion that is couched in terms of "possibility" rather than "probability" goes to "*Daubert's* relevance requirement." *Schudel v. Gen. Elec. Co.*, 120 F.3d 991, 997 (9th Cir. 1997), *abrogated by Weisgram v. Marley Co.*, 528 U.S. 440 (2000).[2] "A court's determination of relevance must consider the applicable substantive standard." *Id.* (court looked to substantive law of Washington to determine whether expert medical causation testimony had to be expressed to a "probability" as opposed to a "possibility"); *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1320 (9th Cir. 1995) ("*Daubert II*") ("In assessing whether the proffered expert testimony 'will assist the trier of fact' in resolving this issue, we must look to the governing substantive standard, which in this case is supplied by California tort law"; looking to substantive

---

[2] *Cf. Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, 1360 (D. Ariz. 1996) ("The Court concludes that the helpfulness standard incorporated in Rule 702 has not been met by Mr. Forney's proposed expert testimony."), *aff'd*, 114 F.3d 851 (9th Cir. 1997) (emphasis added) ("Under Rule 702, the district judge found that Forney's opinions were speculative and *would not assist the trier of fact*, and we agree."; also finding "his testimony does not meet Rule 702's reliability standard" because of "his inability to dismiss various other possible causes [], his lack of knowledge [] generally, and his inability satisfactorily to explain the reasoning behind his opinions," which rendered them "unsubstantiated and subjective"); *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 251 (4th Cir. 1999) (no abuse of discretion where district court excluded expert testimony under Rule 702 because it "lacked any probative value").

California law to determine whether testimony expressed as "possibility" was sufficient); *Phelps v. Wyeth, Inc.*, 938 F. Supp. 2d 1055, 1069 (D. Or. 2013) (looking to substantive Oregon law to determine degree of medical certainty required of expert testimony); *Luttrell v. Novartis Pharm. Corp.*, 894 F. Supp. 2d 1324, 1340 (E.D. Wash. 2012), *aff'd*, 555 F. App'x 710 (9th Cir. 2014) (looking to substantive Washington law to determine degree of medical certainty required of expert testimony); *Roberts v. Albertson's LLC*, No. 208-CV-00236PMPLRL, 2010 WL 2555082, at *3 (D. Nev. June 22, 2010), *aff'd*, 464 F. App'x 605 (9th Cir. 2011) (same looking to substantive Nevada law); *see also Chilcote v. Fireman's Fund Ins. Co.*, No. CV 06-47-M-DWM-JCL, 2007 U.S. Dist. LEXIS 102570, at *3 n.1 (D. Mont. Nov. 30, 2007) (acknowledging substantive Montana law requirements for degree of certainty of expert medical testimony).[3]

The substantive standard applicable here does not require the level of certainty Plaintiffs demand. "[P]laintiff misstates the law by arguing that an expert opinion cannot be expressed in terms of possibility. In fact, a defense expert is allowed to produce evidence of possibilities" under Wisconsin law. *Roy v. St. Lukes Med. Ctr.*, 741 N.W.2d 256, 264 (Wis. Ct. App. 2007). As the Wisconsin Supreme Court has made clear, "[a]lthough the party with the burden of proof must produce testimony based upon reasonable medical probabilities, the opposing party is not restricted to this requirement

---

[3] To the extent that Plaintiffs' authority cites *Schudel* or *Daubert II* for the general proposition that the Ninth Circuit requires a specific "level of certainty" independent of the substantive state standard, it is misplaced. *See, e.g.*, *Peterson v. Taser Int'l, Inc.*, No. 2:06-CV-145 JCM (RJJ, 2009 WL 3789985, at *1 (D. Nev. Aug. 17, 2009); *Chilcote*, 2007 U.S. Dist. LEXIS 102570, at *3. Plaintiffs' reliance on *Schulz v. Celotex Corp.*, is equally misplaced as that court did not hold any specific degree of certainty was required under Rule 702, and explicitly acknowledged "[w]hether such language [reasonable medical certainty] is required under the federal rules is not clear." 942 F.2d 204, 208 (3d Cir. 1991). *Cf. Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) ("[T]he Federal Rules do not contain any threshold level of certainty requirement. As long as a medical expert's qualifications are proper and the expert relies on appropriate types of information under Rule 703, the district court does not abuse its discretion by admitting the medical expert's testimony."); *LeMaire By & Through LeMaire v. United States*, 826 F.2d 949, 954 (10th Cir. 1987) (applying Colorado law, "the fact that the expert cannot support his opinion with certainty goes only to its weight not to its admissibility."); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (applying Michigan law, "expert's conclusions regarding causation must have a basis in established fact and cannot be premised on mere suppositions").

and may attempt to weaken the claim for injuries with medical proof couched in terms of possibilities." *Felde v. Kohnke*, 184 N.W.2d 433, 441 (Wis. 1971); *Hernke v. N. Ins. Co. of New York*, 122 N.W.2d 395, 399–400 (Wis. 1963) ("We see no inconsistency in requiring that one with the burden of proof produce medical testimony which is based upon reasonable medical probabilities and at the same time in permitting the side which does not have the burden of proof to attempt to upset such proof by showing other relevant possibilities."); *accord Van Vreede v. Mich*, 513 N.W.2d 708 (Wis. Ct. App. 1994) (rejecting the plaintiff's argument that the expert testimony was "speculative," as defendants were permitted to "weaken the claim for injuries with medical proof couched in terms of possibilities"); *Noel v. Wisconsin Health Care Liab. Ins. Plan*, 458 N.W.2d 388 (Wis. Ct. App. 1990) (rejecting plaintiff's argument that defendant's expert opinions were required to be expressed "to a reasonable degree of medical probability," as direct testimony of defendant's experts based on "medical possibilities" was proper under *Kohnke* and *Hernke*).

As a threshold matter, Plaintiffs ignore the fact that Dr. Morris holds all of his opinions "to a reasonable degree of medical certainty." (Pls.' Ex. A, Tinlin Report at 26.) Nevertheless, Dr. Morris is not required to express any of his opinions to any degree of probability under the governing substantive standard because Bard does not bear the burden of proof on the issue. *See, e.g.*, *Roy*, 741 N.W.2d at 264. As discussed above, Bard is not offering Dr. Morris to opine on the standard of care for the two cardiothoracic procedures at issue in his challenged opinions, (*see* Pls.' Ex. A, Tinlin Report at 17-18, ¶¶ 6-7), and, therefore, has assumed no burden of proof. Rather Bard is exercising its right under Wisconsin law to present expert testimony that may "weaken" Plaintiffs' claim of injuries "with medical proof couched in terms of possibilities." *Roy*, 741 N.W.2d at 264*; Hernke*, 122 N.W.2d at 399 ("The burden of proof as to injuries is upon the plaintiff, and h[er] medical testimony in meeting such burden cannot be based on mere possibilities. However, a defendant in resisting such claim of injuries is not required to confine himself to reasonable medical probabilities.").

Furthermore, the Ninth Circuit has recognized that "[l]ack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano*, 598 F.3d at 565. "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable, but it need not be conclusive because 'medical knowledge is often uncertain.'" *Id.* (citation omitted).[4] The law in the Ninth Circuit is clear that a court's task is "to analyze not what the experts say, but what basis they have for saying it." *Daubert II*, 43 F.3d at 1316. "Where the foundation is sufficient, the litigant is 'entitled to have the jury decide upon [the experts'] credibility, rather than the judge." *Primiano*, 598 F.3d at 566. As discussed *supra* at Section A.1, Dr. Morris's opinions are based on a sound, scientific methodology that is employed by other medical professionals, including Plaintiffs' own experts. His opinions are relevant and reliable and should not be excluded in this case.[5]

## III.   CONCLUSION

Dr. Morris is highly qualified to opine on the diagnostic radiological imaging that should have been performed prior to cardiothoracic surgery, and the minimally-invasive treatment techniques that could have been performed instead of surgical intervention. Dr. Morris bases his opinions in this case on his over 27 years of clinical experience as an interventional radiologist. His opinions are buttressed by the available medical literature. Dr. Morris considered the same type of data he considers when making clinical decisions in his medical practice, in reaching his opinions. His opinions are the product of the "ordinary methodology of evidence based medicine." *Primiano*, 598 F.3d at 567.

---

[4] The Ninth Circuit has explicitly recognized that "[d]espite the importance of evidence-based medicine, much of medical decision-making relies on judgment—a process ***that is difficult to quantify*** or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with ***the inevitable uncertainties***" to "mak[e] a sound judgment." *Id.* (citation omitted) (emphasis added).

[5] Plaintiffs' remaining criticisms of Dr. Morris's challenged opinions, (*see, e.g.*, Pls.' Mot at 8-10 (i.e., they allegedly fail to indicate the conditions under which the procedures could have been performed, whether an appropriate doctor was available to perform them, Plaintiffs' disagreement that the strut was not embedded, etc.), are fair game for argument and cross-examination at trial, but do not render his opinions inadmissible under Rule 702. The detail demanded by Plaintiffs is not required in an expert report. *See* Fed. R. Civ. P. 26(a)(2)(B) ("The report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them;").

1   Therefore, his opinions should not be excluded, and Plaintiffs' Motion should be denied.

2   DATED this 1st day of March, 2019.

s/Richard B. North, Jr.
Richard B. North, Jr.
Georgia Bar No. 545599
Matthew B. Lerner
Georgia Bar No. 446986
Taylor Tapley Daly
Georgia Bar No. 697887
NELSON MULLINS RILEY & SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
PH: (404) 322-6000
FX: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com
taylor.daly@nelsonmullins.com

James R. Condo (#005867)
Kristine L. Gallardo (#033975)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204
PH: (602) 382-6000
jcondo@swlaw.com
kgallardo@swlaw.com

**Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**

## **CERTIFICATE OF SERVICE**

I hereby certify that March 1, 2019, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

                                                    s/ Richard B. North, Jr.
                                                  Richard B. North, Jr.

Nelson Mullins Riley & Scarborough L.L.P.
201 17th Street NW, Suite 1700
Atlanta, GA 30363
(404) 322-6000