# Exhibit 4
# (Filed Under Seal)

1          UNITED STATES DISTRICT COURT
2               DISTRICT OF ARIZONA
3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
4

     In Re Bard IVC Filters Products
5    Liability Litigation
6                    No. MD-15-02641-PHX-DGC
7

8

     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
9

10      DO NOT DISCLOSE - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
11

     VIDEOTAPED DEPOSITION OF JOSHUA RIEBE, MD
12

             TAKEN AT: Radisson Hotel
13         LOCATED AT: 2040 Airport Drive
                 Green Bay, WI
14

                 April 4, 2017
15         10:09 a.m. to 2:15 p.m.
16       REPORTED BY ANITA K. FOSS
         REGISTERED PROFESSIONAL REPORTER
17

18

19

     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
20

21

22

23

24

25

Do Not Disclose - Subject to Further Confidentiality Review

1   yes.

2        Q.   For example, have you ever put in any --

3   any Cook products before?

4        A.   I have put in Cook products before.

5        Q.   Have you ever put in any Bard products

6   before?

7        A.   Yes.

8        Q.   Any other types of filters that you

9   recall implementing?

10       A.   Vena Tech.  I don't know the major

11   corporation, but I recall that name as well.

12       Q.   Have you ever been a consultant for any

13   of the IVC filter companies?

14       A.   No.

15       Q.   Have you ever been involved in any type

16   of studies involving IVC filters?

17       A.   No.

18       Q.   When you were in medical school, I assume

19   that you learned risk-benefit profiles for IVC

20   filters; is that correct?

21       A.   Yes.

22            MS. DAVIS:  Object to the form.

23   BY MR. GOLDENBERG:

24       Q.   Okay.  And can you tell me what -- first

25   of all, what is a risk-benefit profile?

Do Not Disclose - Subject to Further Confidentiality Review

1              MS. DAVIS:  Object to the form.

2              THE WITNESS:  Can you repeat that?  I was

3    distracted.

4    BY MR. GOLDENBERG:

5         Q.   Sure.  That's okay.  Would you agree that

6    you need complete and accurate information

7    regarding a filter from the manufacturer to help

8    conduct a risk-benefit analysis?

9         A.   Yes.

10             MS. DAVIS:  Object to the form.

11   BY MR. GOLDENBERG:

12        Q.   And if there are risks that are not

13   disclosed or the true risks are not disclosed, then

14   you cannot conduct a -- conduct a proper

15   risk-benefit analysis for the patient; right?

16        A.   Yes.

17             MS. DAVIS:  Object to the form.

18   BY MR. GOLDENBERG:

19        Q.   Is part of that analysis determining

20   whether a patient should receive a permanent or

21   retrievable filter?

22        A.   Can you be more specific?

23        Q.   Sure.  When you're evaluating a specific

24   patient and implanting a specific device in a

25   patient, would that -- would part of that analysis

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    higher failure rates than other devices?

 2              MS. DAVIS:  Object to the form.

 3              THE WITNESS:  Yes.

 4    BY MR. GOLDENBERG:

 5         Q.   Would you want to know if the rates of

 6    certain adverse events are substantially higher

 7    from one filter versus another?

 8         A.   Yes.

 9              MS. DAVIS:  Object to the form.

10    BY MR. GOLDENBERG:

11         Q.   Would you want to know if the company had

12    concerns about the efficacy of its own filter?

13         A.   Yes.

14              MS. DAVIS:  Object to the form.

15    BY MR. GOLDENBERG:

16         Q.   Would you want to know if a newer, safe

17    filter was available for use?

18         A.   Yes.

19         Q.   And by the way, if there are objections,

20    and there inevitably will be, we just need to make

21    sure we don't talk over each other.  So she's

22    allowed to object, but you can continue to give

23    your answer, okay?

24         A.   Okay.

25         Q.   All right.  Would you want to know if
```

1    Bard itself internally deemed the Recovery filter

2    to have unacceptable risks?

3          A.   Yes.

4               MS. DAVIS:  Object to the form.

5    BY MR. GOLDENBERG:

6          Q.   Would you want to know if Bard, even

7    today, does not understand the root cause of why

8    its filters are migrating?

9               MS. DAVIS:  Object to the form.

10              THE WITNESS:  Yes.

11   BY MR. GOLDENBERG:

12         Q.   Would you want to know if they, even

13   today, did not understand the root cause of why

14   their filters are perforating?

15         A.   Yes.

16              MS. DAVIS:  Object to the form.

17   BY MR. GOLDENBERG:

18         Q.   Or tilting?

19         A.   Yes.

20              MS. DAVIS:  Same objection.

21   BY MR. GOLDENBERG:

22         Q.   Or fracturing?

23         A.   Yes.

24              MS. DAVIS:  Same objection.

25   BY MR. GOLDENBERG:

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.   Would you want to know if a company did

2  not have a good understanding of long-term

3  performance of its retrievable filters?

4      A.   Yes.

5           MS. DAVIS:  Object to the form.

6  BY MR. GOLDENBERG:

7      Q.   Would you want to know if a company's

8  lack of understanding of the dynamics of the vena

9  cava impacted its ability to test the filter?

10     A.   Yes.

11          MS. DAVIS:  Object to form.

12  BY MR. GOLDENBERG:

13     Q.   Would these things we just discussed

14  inform your risk-benefit analysis?

15          MS. DAVIS:  Object to the form.

16          THE WITNESS:  I don't understand the

17  phrasing of that question.

18  BY MR. GOLDENBERG:

19     Q.   Sure.  The things that you mentioned that

20  you would like to know, if you did know those

21  things, would that be helpful for you to discuss a

22  risk-benefit analysis?

23          MS. DAVIS:  Object to the form.

24          THE WITNESS:  Yes.

25  BY MR. GOLDENBERG:

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.   Okay.  And they would be important in

2  terms of looking at patient safety; right?

3      A.   Yes.

4           MS. DAVIS:  Object to the form.

5  BY MR. GOLDENBERG:

6      Q.   Would you expect a filter to be properly

7  tested for safety prior to introduction for the

8  market for use in human beings?

9      A.   Yes.

10     Q.   Do you know what beta testing is?

11     A.   I've heard the term.  I don't know the

12  specifics.

13     Q.   Okay.  What is your understanding of what

14  beta testing is?

15     A.   I know it's a test that exists.

16     Q.   You don't know how it works?

17     A.   I don't know the specifics.  I've heard

18  the term.

19     Q.   I'll just move on.  Okay.  We talked a

20  little bit about sales reps, but I just want to

21  make sure that I've exhausted this, and I'll move

22  on quickly, okay.  The -- I just want to make sure,

23  do you interact with sales reps from companies

24  whose filters you use, even today?

25     A.   I don't understand how you phrased it.

Do Not Disclose - Subject to Further Confidentiality Review

1    centered upon deployment."

2    BY MR. GOLDENBERG:

3        Q.    That's good enough.  And if you could,

4    I'm looking at the top of this exhibit, and this

5    is -- do you see that it's from a Janet Hudnall to

6    a David Rauch?

7        A.    Can you point?

8        Q.    I can.  Right there.

9        A.    Yes.

10       Q.    And the date of this is February 26,

11   2004?

12       A.    Yes.

13       Q.    All right.  You can move on to the next

14   exhibit.  Would you have expected Bard to tell you

15   if they were concerned about migration problems to

16   the point that they were going to actually put that

17   particular filter on hold?  In other words, a

18   silent recall?

19            MS. DAVIS:  Objection to the form.

20            THE WITNESS:  I'm not sure.

21   BY MR. GOLDENBERG:

22       Q.    So if this company was so concerned about

23   migration that it was considering putting it on

24   hold, in other words, recalling it, you wouldn't

25   want to know that as a doctor?

Do Not Disclose - Subject to Further Confidentiality Review

1           MS. DAVIS:  Objection to the form.

2           THE WITNESS:  I would want to know that.

3     BY MR. GOLDENBERG:

4        Q.   Okay.  And would you expect Bard to

5     understand the root cause of why it would be

6     migrating and causing deaths?

7           MS. DAVIS:  Objection to the form.

8           THE WITNESS:  I don't know that.

9        (Exhibit 917 marked for identification.)

10    BY MR. GOLDENBERG:

11       Q.   I'm going to show you Exhibit No. 917.

12    I'll just represent to you that this was a

13    memorandum from a Doug Uelmen, E-U-L-A-N, February

14    13, 2004, regarding a filter meeting of

15    February 12th of 2004.  And if you could, I'd like

16    you to turn to the third page of this exhibit.  And

17    on number eight.

18       A.   Yes.

19       Q.   I'll just represent -- I'll just first

20    represent to you that there was a meeting that this

21    represents.  And if you go down to number eight, if

22    you could just read that out loud, please.

23       A.   Number eight.  "The team discussed a

24    threshold level for migration and agreed that if a

25    migration requiring surgical intervention is

Do Not Disclose - Subject to Further Confidentiality Review

1    confirmed during the course of this investigation,

2    the Recovery filters will be placed on hold pending

3    the outcome of the investigation."

4              MS. DAVIS:  Objection, form and

5    foundation.

6    BY MR. GOLDENBERG:

7        Q.   So if Bard determined that migration was

8    a significant problem, you would want to know that

9    as a doctor, wouldn't you, to know that they were

10   putting this on hold pending an outcome of an

11   investigation?

12             MS. DAVIS:  Objection to the form.

13             THE WITNESS:  Yes.

14   BY MR. GOLDENBERG:

15       Q.   Okay.  If we turn to the next page, we

16   already talked about you indicating that you would

17   want to understand if Bard did not understand the

18   root cause.  Could you read number nine, please?

19       A.   Number nine.  "Coordinate the review of

20   all data to determine root cause/most probable

21   cause using application problem-solving tools.  A

22   meeting will be scheduled to conduct this review,

23   the time and place to be determined during a

24   subsequent team meeting.  Attendees will include

25   the BPV investigation team along with" --

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          Q.   That's okay.  All right.

 2          MS. DAVIS:  Object to form.

 3   BY MR. GOLDENBERG:

 4          Q.   And again, the date of this was

 5   February 12th of 2004; do you see that on the

 6   front?

 7          A.   Yes.

 8          Q.   Okay.  Were you ever notified by anyone

 9   at Bard that as of May -- I'm sorry, as of

10   April 7th of 2005, that they were going to be

11   discontinuing this product?

12          A.   I was not.

13          Q.   Would you have wanted to know that?

14          A.   Yes.

15          Q.   And why?

16          A.   Yes.

17          (Exhibit 918 marked for identification.)

18   BY MR. GOLDENBERG:

19          Q.   I'm showing you Exhibit No. 918.  And

20   I'll just represent to you that this is an e-mail

21   from a Jack Sullivan, who was in sales, to a Janet

22   Hudnall, who was the director of marketing.  And

23   the subject says "FAQ and answers."  Do you see

24   that at the top?

25          A.   Yes.
```

```
 1          Q.   And the date of this is 7/21/2005?

 2          A.   Yes.

 3          Q.   Okay.  I'm just going to come down to the

 4   part where it says "lastly."  And do you see where

 5   it says -- I'm just going to read this.  It says,

 6   "Lastly, it was a little weird being on calls with

 7   Sean today and watching him sell the removability

 8   of Recovery when I know we aren't going to have it

 9   for much longer."  Do you see that?

10          A.   Yes.

11          Q.   Then it says, "Is there anything we can

12   do now to help these guys?  They are out trying to

13   hit a number, and we will be changing the device

14   soon."  Do you see that?

15          A.   Yes.

16          Q.   Move to the next one.  And you were not

17   aware of that; correct?

18          A.   Correct.

19          Q.   I've asked you this before, but I'm going

20   to ask a little different way.  Would you have

21   expected Bard to have done a safety study on the

22   Recovery filter?

23          MS. DAVIS:  Object to the form.

24          THE WITNESS:  Yes.

25   BY MR. GOLDENBERG:
```

Do Not Disclose - Subject to Further Confidentiality Review

1    Q.    And why would that be important to you?

2    A.    We like to use safe equipment on our

3    patients.

4         (Exhibit 919 marked for identification.)

5    BY MR. GOLDENBERG:

6    Q.    Showing you what's been marked 919.  And

7    I'll just represent to you that this is something

8    called internal question and answer.  It says C.R.

9    Bard Recovery vena cava filter, version August,

10   2004.  Do you see that?

11   A.    Yes.

12   Q.    And I'm just going to -- it says on the

13   top, it says, "Internal Q and A to be used,

14   approved by approved corporate spokespeople to

15   respond consistently to inquiries from media.  Not

16   to be handed out externally to any audiences."  Do

17   you see that?

18   A.    Yes.

19   Q.    Did I read that correctly?

20   A.    Yes.

21   Q.    I'm going to turn to page 3 of this.  And

22   if you could read number six for us, please.

23        MS. DAVIS:  Object to the form.

24   BY MR. GOLDENBERG:

25   Q.    The question and the answer.

Do Not Disclose - Subject to Further Confidentiality Review

1  know that the reports of death, filter migration,

2  IVC perforation and filter fracture with Recovery

3  were four and even sometimes five times higher than

4  all other filters on the market?

5           MS. DAVIS:  Objection, form, lack of

6  foundation.

7           THE WITNESS:  Can you rephrase that?

8  BY MR. GOLDENBERG:

9      Q.   Sure.  Would it have been important for

10  Bard to tell you that their filters were

11  fracturing, migrating, and killing people at four

12  to five times greater rates than all other filters

13  on the market?

14           MS. DAVIS:  Objection, form, lack of

15  foundation.

16           THE WITNESS:  Four and five times a small

17  number is still a small number.  However, absolute

18  data and rigorous analysis of the numbers would be

19  important, yes.

20  BY MR. GOLDENBERG:

21      Q.   And so you would expect Bard to analyze

22  those and at least come to a root cause analysis,

23  wouldn't you?

24      A.   Yes.

25           MS. DAVIS:  Object to the form.

Do Not Disclose - Subject to Further Confidentiality Review

1    BY MR. GOLDENBERG:

2        Q.   And you would want to know what the root

3    cause analysis is so you could help make an

4    understanding to the patient of what the safety of

5    this device would be?

6        A.   Yes.

7             MS. DAVIS:  Objection to the form.

8        (Exhibit 921 marked for identification.)

9    BY MR. GOLDENBERG:

10       Q.   I'm showing you Exhibit 921.  And you

11   indicated that you were interested in seeing

12   numbers.  This is a memo on August 3rd of 2005, so

13   within a couple months of the time you actually

14   inserted the filter into my client.  And this is

15   called IVC Recovery Filter Adverse Events Executive

16   Summary; do you see that?

17       A.   Yes.

18       Q.   Okay.  And do you see that actually lists

19   all the different migrations and then what happened

20   from those migrations?

21       A.   Yes.

22       Q.   Okay.  And do you see that there's

23   deaths, and there's also everything from migration

24   of the filter encased in large thrombi, to

25   fatalities?

Do Not Disclose - Subject to Further Confidentiality Review

1       A.   Yes.

2            MS. DAVIS:   Objection to the form and

3       lack of foundation to all these questions regarding

4       this Exhibit 941.

5       BY MR. GOLDENBERG:

6       Q.   If you could, I'd like you to look at the

7       chart where it says "compare MAUDE data for IVC

8       filter fatalities."  Do you see that?

9       A.   Yes.

10      Q.   And do you see that the SNF, which I'll

11      represent to you is the Simon Nitinol filter that

12      was the permanent filter that preceded Recovery by

13      Bard, how many fatalities were there with the SNF?

14           MS. DAVIS:   Same objection.

15           THE WITNESS:   It's reported as

16      zero percent.

17      BY MR. GOLDENBERG:

18      Q.   Okay.   And migration, what is it reported

19      as?

20      A.   0.0027 percent.

21      Q.   So that would be less than one percent;

22      correct?

23      A.   Correct.

24      Q.   All right.   And under Recovery, what's

25      the percentage of fatalities?

Do Not Disclose - Subject to Further Confidentiality Review

1    next page, excuse me, under B.  I'm sorry, so

2    it's -- there's A and B, do you see that at the top

3    there?

4         A.   Yes.

5         Q.   Okay.  Under the small B, if you could

6    read that, please.

7         A.   "The two independent data sets, MAUDE

8    report rates and bench testing results, contain

9    significant signals regarding vena cava filter

10   performance related to migration."

11        Q.   Were you aware of that before you

12   inserted this into my client?

13        A.   No.

14             MS. DAVIS:  Same objections.

15   BY MR. GOLDENBERG:

16        Q.   Under the large B, could you read that

17   for me, please?

18        A.   "The independent consultant's report

19   concluded that the data and his analysis provided

20   two significant signals that further investigation,

21   particularly in relation to migration and fracture,

22   is urgently warranted.  The consultant, however,

23   also cautioned that given the multiple known flaws

24   in the data available, this analysis is

25   insufficient to demonstrate conclusively that any

Do Not Disclose - Subject to Further Confidentiality Review

1    Mrs. Tinlin, had you had any occasion, that you

2    recall, to call Bard for information about this

3    filter before you placed it in Ms. Tinlin?

4         A.   No.

5         Q.   Do you ever recall making any contact

6    with Bard --

7         A.   No.

8         Q.   -- for the purpose of trying to obtain

9    additional information regarding their filters?

10        A.   No.

11        Q.   At the time that you placed the filter in

12   Ms. Tinlin, would you have had any discussions with

13   her about potential retrieval of the filter?

14        A.   I can't remember.

15        Q.   Is that something that you typically

16   discuss?

17        A.   Yes.

18        Q.   And what do you typically tell your

19   patients about potential retrieval of a retrievable

20   filter?

21        A.   In discussing, during the consent time,

22   if we're going to place a retrievable filter, we

23   would -- I would simply say that if we need to take

24   this out and we're able to take it out, in general,

25   it can be removed.

Do Not Disclose - Subject to Further Confidentiality Review

1       Q.   Do you also typically tell your patients

2   that the filter might be left permanently even

3   though it's a retrievable filter?

4       A.   Yes.

5       Q.   And it sounded like you also tell your

6   patients that even though it's a retrievable

7   filter, that there's a probability that it might

8   not be able to be retrieved?

9       A.   Correct.

10      Q.   And do you believe that you would have

11  had such discussions with Mrs. Tinlin?

12      A.   Most likely, yes.

13      Q.   Let's take another look at the consent

14  form, which is in the Exhibit 929.  Do you have

15  that in front of you?

16      A.   Yes.

17      Q.   And I know, in answering questions from

18  counsel for Mrs. Tinlin, you've sort of explained

19  what you normally discuss with patients before you

20  place filters.  I just have a few more questions

21  about this.  Do you recall either Mrs. Tinlin, or

22  anyone else who may have been present, making any

23  questions of you -- or asking any questions of you

24  regarding this filter?

25      A.   No.

Do Not Disclose - Subject to Further Confidentiality Review

1   the cause of any of her pain?

2       A.   I would not have been asked to, nor would

3   I have attempted to.  I should clarify that by

4   saying we're asked to render opinions on images.

5   And the doctors who order the images, they take all

6   that information with the clinical and they make

7   diagnoses with our assistance.  We're a consultant.

8       Q.   So as far as diagnosing what was causing

9   any pain that Mrs. Tinlin was experiencing, am I

10  correct that that is not something that you would

11  do?

12      A.   I assist the doctors who are actually

13  taking care of the patient.  The example would be

14  if someone has a possible appendicitis and they

15  order a CAT scan, I might say I see appendicitis,

16  but that's doesn't mean that's what they have.  I

17  don't have the final word.  They put in clinical

18  data:  does the patient have a fever, are the labs

19  abnormal, and the final say is actually if they

20  undergo operation would be the pathologist, was the

21  appendix inflamed or not.  So we render opinions on

22  images, but that has to go with the clinical

23  information as well.

24      Q.   And as far as any conclusions that you

25  ever came to regarding Mrs. Tinlin, those would be

Do Not Disclose - Subject to Further Confidentiality Review

1    lungs is quite useful.

2         Q.   As you sit here today, do you see any

3    reason that you would not have agreed with

4    Dr. Andrews as far as leaving the Recovery filter

5    in as a permanent filter?

6         A.   No.

7         Q.   Dr. Riebe, I believe there was an exhibit

8    that I failed to ask you some questions about so

9    far.  It's Exhibit 920.  It was one of the Bard

10   documents that you were shown.

11        A.   Yeah, the Wayback Machine.  920.

12        Q.   Yes.  It should say at the top health

13   hazard evaluation.

14        A.   Yes.

15        Q.   Do you know what a health hazard

16   evaluation is?

17        A.   No.

18        Q.   And are you familiar with the assessment

19   processes that a medical device company goes

20   through in looking at complications or issues with

21   their products?

22        A.   No.

23        Q.   In looking at this exhibit that was shown

24   to you, would it appear to you that Bard is

25   actively investigating the events described in this

Do Not Disclose - Subject to Further Confidentiality Review

 1      Q.   Okay.  I have such a protective order

 2  here with me, and I'll -- when we go off the

 3  record, I'll ask you to take a look at it and sign

 4  it.  And then --

 5      A.   I should -- if I have to sign two inches'

 6  worth, then I'm not going to sign.  That's a big

 7  stack.

 8      Q.   No, that's not it.  It's right here, if

 9  you want to look at it.

10          MR. GOLDENBERG:  Can we do this after?

11          MS. DAVIS:  Sure, yeah.  But this is it.

12          THE WITNESS:  Okay.  This is --

13          MS. DAVIS:  But yes, we can do it after

14  the deposition.  Absolutely.  I don't have any more

15  questions at this time.

16          THE WITNESS:  Okay.

17          MS. DAVIS:  Thank you, Doctor.

18                E X A M I N A T I O N

19  BY MR. GOLDENBERG:

20      Q.   I just have a few.

21      A.   Okay.

22      Q.   Doctor, again, Stuart Goldenberg.  I just

23  wanted to ask you, when you are talking with the

24  patient about the risks and benefits of a device

25  like the Bard IVC filter, the Recovery, you can

Do Not Disclose - Subject to Further Confidentiality Review

1    only convey what you know; correct?

2         A.   Correct.

3         Q.   All right.  If a company is hiding

4    important safety information, there's no way for

5    you to know that, is there?

6         A.   Correct.

7              MS. DAVIS:  Object to the form.

8    BY MR. GOLDENBERG:

9         Q.   I think we're all making an assumption

10   here that vena cava filters can prevent blood

11   clots.  Is that your understanding?

12        A.   No, the vena cava filters can prevent

13   clots from moving to places where you don't

14   necessarily want them.

15        Q.   Good -- good point.  And what's the basis

16   for that?

17        A.   It's a mechanical basis.

18        Q.   But what medical studies are you aware of

19   that show that?

20             MS. DAVIS:  Could you let him finish his

21   answer?

22             THE WITNESS:  I'm not -- I'm not -- I

23   don't know specific studies.

24   BY MR. GOLDENBERG:

25        Q.   Are you aware that there has been a great