Ramon Rossi Lopez
rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California  92660
949-812-5771

Mark S. O'Connor (011029)
moconnor@beusgilbert.com
Beus Gilbert PLLC
701 North 44th St.
Phoenix, Arizona  85008
480-429-3000

*Co-Lead/Liaison Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
|---|---|
| | **PLAINTIFFS DEBRA AND JAMES TINLIN'S CONTROVERTING STATEMENT OF FACTS IN OPPOSITION TO BARD'S MOTION FOR SUMMARY JUDGMENT** |
| | (Assigned to the Honorable David G. Campbell) |

Plaintiffs Debra Tinlin and James Tinlin respond as follows to Defendants'

Separate Statement of Facts in Support of Motion for Summary Judgment (ECF No.

15073):

**DEFENDANTS' SEPARATE STATEMENT NO. 1:**

On May 7, 2005, Dr. Joshua Riebe placed a Bard Recovery Filter in Debra Tinlin.

(Ex. A, Medical Records of Mrs. Tinlin, at TINLIND_SMHMC_MDR00077-78.)

**PLAINTIFFS' RESPONSE 1:**

Admit.

1  **DEFENDANTS' SEPARATE STATEMENT NO. 2:**

2      Before receiving a Recovery Filter, Mrs. Tinlin had never heard of IVC filters. (Ex.

3  B, Debra Tinlin Dep. Tr., 88:14-17, Feb. 8, 2017.)

4  **PLAINTIFFS' RESPONSE 2:**

5      **Admit.**

6  **DEFENDANTS' SEPARATE STATEMENT NO. 3:**

7      Mrs. Tinlin was asked during her deposition whether she was provided any written

8  information regarding the filter, and she responded, "Not that I remember." (*Id.* at 90:10-

9  12.)

10  **PLAINTIFFS' RESPONSE 3:**

11      **Admit.**

12  **DEFENDANTS' SEPARATE STATEMENT NO. 4:**

13      Mrs. Tinlin has never spoken with anyone at Bard. (*Id.* at 165:6-8.)

14  **PLAINTIFFS' RESPONSE 4:**

15      **Admit.**

16  **DEFENDANTS' SEPARATE STATEMENT NO. 5:**

17      Dr. Riebe believed that Mrs. Tinlin was an appropriate candidate for a retrievable

18  filter. (Ex. C, Joshua Riebe, M.D., Dep. Tr., 146:19-21, Apr. 4, 2017.)

19  **PLAINTIFFS' RESPONSE 5:**

20      **Admit in part; deny in part. Dr. Riebe also testified that for persons with**

21  **"[v]ery large [vena] cavas, … Where I [Dr. Riebe] trained we, if you had a mega**

22  **cava, most often you would switch to a [Cook Medical] Bird's Nest [a permanent**

23  **filter] at that point." (Ex. 1 (Joshua Riebe, M.D., Dep. Tr., Apr. 4, 2017) ("Riebe**

24  **Tr."), at 95:6-13.)  And because Ms. Tinlin's vena cava was at the upper limits of**

25  **vena cava size for the Recovery (*id.* at 99:9-12), and Ms. Tinlin was obese (*id.* at 69:9-**

26  **22), Dr. Riebe would have liked to have known and been told by Bard that obese**

27  **persons have much larger expansion of their vena cavas than other patients. (*Id.* at**

28

**70:9-14). Had he known this, Dr. Riebe may have selected a different filter because it matters to ensuring the filter stays in place. (*Id.* at 70:17-23.)**

**DEFENDANTS' SEPARATE STATEMENT NO. 6:**

In Dr. Riebe's practice, he thinks that foreign bodies in patients should be removed if possible. (*Id.* at 146:25 to 147:13.)

**PLAINTIFFS' RESPONSE 6:**

**Admit in part; deny in part. Dr. Riebe testified that foreign bodies, like retrievable filters, are only useful insofar as you can "get it out." (*Id.* at 147:13.) And foreign bodies, like IVC filters, are bad if they move to places "where you don't want them." (*Id.* at 43:7-10.)**

**DEFENDANTS' SEPARATE STATEMENT NO. 7:**

For Mrs. Tinlin, Dr. Riebe testified that using a retrievable filter gave him more options for the future. (*Id.* at 147:21-24.)

**PLAINTIFFS' RESPONSE 7:**

**Admit in part; deny in part. Dr. Riebe testified that retrievable filters are only useful insofar as you can "get it out." (*Id.* at 147:13.) And foreign bodies, like IVC filters, are bad if they move to places "where you don't want them." (*Id.* at 43:7-10.)**

**DEFENDANTS' SEPARATE STATEMENT NO. 8:**

Dr. Riebe did not routinely read instructions for use from medical device manufacturers. (*Id.* at 19:9-15.)

**PLAINTIFFS' RESPONSE 8:**

**Admit.**

**DEFENDANTS' SEPARATE STATEMENT NO. 9:**

Dr. Riebe he [*sic*] does not recall ever seeing the Instructions for Use for the Recovery Filter. (*Id.* at 86:4-13.)

**PLAINTIFFS' RESPONSE 9:**

**Admit.**

**DEFENDANTS' SEPARATE STATEMENT NO. 10:**

Dr. Riebe cannot recall whether he ever met with a Bard sales representative generally or between 2004 and 2005 specifically. (*Id.* at 17:2-6, 11-22; 167:15 to 168:5.)

**PLAINTIFFS' RESPONSE 10:**

**Admit in part; deny in part. Dr. Riebe recalled IVC filter companies' representatives calling on him as a customer throughout the entirety of his practice. (*Id.* at 31:1-13.)  Dr. Riebe had sales representatives in the operating room with him when he was implanting a filter in the past, but that never would have been noted in any client's medical records. (*Id.* at 31:15-32:2.)  He also may have seen a Bard sales person years ago. (*Id.* at 7:4-5.)  Ms. Tinlin's implantation was years ago. *See* Response No. 1.**

**DEFENDANTS' SEPARATE STATEMENT NO. 11:**

Dr. Riebe does not recall seeing any marketing material concerning IVC filters generally, or the Recovery Filter brochure specifically. (*Id.* at 32:3-11; 38:22 to 39:3.)

**PLAINTIFFS' RESPONSE 11:**

**Admit in part; deny in part. Dr. Riebe trained with Dr. John McDermott at the University of Wisconsin.  (*Id.* at 71:10-15.)  In a June of 2004 e-mail chain between the medical director for Bard and Dr. Reibe's mentor (prior to Ms. Tinlin's surgery), Bard summarized IVC filter data known to date. (*Id.* at 71:16-73:6.) In that e-mail exchange, Dr. McDermott (and other doctors copied on the same e-mail chain) raised concerns about overweight patients and a large number of migrating filters in such patients due to the possibility of enlarged IVCs; Bard's then-medical director downplayed the risks in obese patients.  (Ex. 2, Exh. 924 to Riebe Tr.) Risk-benefit information that Dr. Riebe learned came from those who trained him: Dr. McDermott.  (Ex. 1 (Riebe Tr.), at 16:19-17:1.)**

**DEFENDANTS' SEPARATE STATEMENT NO. 12:**

Dr. Riebe cannot recall having attended any meetings where doctors spoke on behalf of Bard about IVC filters. (*Id.* at 32:12-20.)

1  **PLAINTIFFS' RESPONSE 12:**

2       **Admit in part; deny in Part. Dr. Riebe trained with Dr. John McDermott at**

3  **the University of Wisconsin.  (*Id.* at 71:10-15.)  In a June of 2004 e-mail chain**

4  **between the medical director for Bard and Dr. Reibe's mentor (prior to Ms. Tinlin's**

5  **surgery), Bard summarized IVC filter data known to date. (*Id.* at 71:16-73:6.) In that**

6  **e-mail exchange, Dr. McDermott (and other doctors copied on the same e-mail**

7  **chain) raised concerns about overweight patients and a large number of migrating**

8  **filters in such patients due to the possibility of enlarged IVCs; Bard's then-medical**

9  **director downplayed the risks in obese patients. (Ex. 2, Exh. 924 to Riebe Tr.) Risk-**

10  **benefit information that Dr. Riebe learned came from those who trained him: Dr.**

11  **McDermott.  (Ex. 1 (Riebe Tr.), at 16:19-17:1.)**

12  **DEFENDANTS' SEPARATE STATEMENT NO. 13:**

13       Dr. Riebe testified that he does not recall ever receiving a dear doctor letter from

14  Bard, that he receives "stacks and stacks" of mail at his facility, and that he generally

15  throws letters from companies in the trash. (*Id.* at 79:17 to 80:10.)

16  **PLAINTIFFS' RESPONSE 13:**

17       **Admit.**

18  **DEFENDANTS' SEPARATE STATEMENT NO. 14:**

19       Dr. Riebe further testified that his regular practice is to not read dear doctor letters

20  from manufacturers, and he has no reason to believe that he ever would have read dear

21  doctor letters from Bard if he received them. (*Id.* at 129:23 to 130:14.)

22  **PLAINTIFFS' RESPONSE 14:**

23       **Admit.**

24  **DEFENDANTS' SEPARATE STATEMENT NO. 15:**

25       There is no evidence in the record that Dr. Riebe had any filter other than the

26  Recovery Filter available for use with Mrs. Tinlin, or that different or additional

27  information would have changed his decision to use the Recovery Filter for Mrs. Tinlin.

28

1    <u>PLAINTIFFS' RESPONSE 15:</u>

2           Denied. *See* Response 5, *supra*.  Additionally, Dr. Riebe testified that there are

3    several pieces of information that he would have liked to have known at the time of

4    Ms. Tinlin's implantation, including:

5                  a.      **Bard itself internally deemed the Recovery filter to have**

6    **unacceptable risks (Ex. 1 (Riebe Tr.), at 27:25-28:3);**

7                  b.      **Bard does not understand the root cause of why its filters**

8    **migrate (*id*. at 28:6-10);**

9                  c.      **Bard does not understand the root cause of why its filters**

10   **perforate (*id*. at 28:12-15);**

11                 d.      **Bard does not understand the root cause of why its filters tilt (*id*.**

12   **at 28:18-19);**

13                 e.      **Bard does not understand the root cause of why its filters**

14   **fracture (*id*. at 28:22-23);**

15                 f.      **Bard did not have a good understanding of the long-term**

16   **performance of its IVCs filters (*id*. at 29:1-4);**

17                 g.      **If any company, including Bard, was concerned about its IVC**

18   **filters' migration (*id*. at 49:22-50:2; 51:7-13);**

19                 h.      **Bard was considering discontinuing the Recovery filter at the**

20   **time of Ms. Tinlin's implantation (*id*. at 52:8-14); and**

21                 i.      **Bard was aware of large data sets that reported issues with**

22   **Recovery migration (*id*. at 78:7-13).**

23

24   **Dr. Riebe would have also expected Bard to have:**

25                 a.      **Completed a safety study on the Recovery filter before it began to**

26   **sell it (*id*. at 53:19-24);**

27                 b.      **Completed root-cause analyses for why filers were fracturing,**

28   **migrating, and killing people (*id*. at 59:21-24); and**

c.   **Disclosed to him that the Recovery filter had a higher fatality rate than numerous other available IVC filters (*id.* 61:24-64:8).**

**Information not known or disclosed to Dr. Riebe could not be relayed to his patients, and he could not consider information unknown to him for his own analysis for a proper risk-benefit decision for patient safety. (*Id*. at 25:5-16; 30:1-3; 54:1-2.) He agreed that if a company fails to disclose safety information to him, he cannot know that information to relay it.  (*Id*. at 171:22-172:6.)  Dr. Riebe would have liked to have known all of this information so both he and the patient could understand the safety of the device. (*Id*. at 60:2-6.)**

**DEFENDANTS' SEPARATE STATEMENT NO. 16:**

Dr. Riebe believes that Mrs. Tinlin needed to have an IVC filter placed. (*Id*. at 146:8-11.)

**PLAINTIFFS' RESPONSE 16:**

**Admit.**

**DEFENDANTS' SEPARATE STATEMENT NO. 17:**

Dr. Riebe was not involved in the decision-making process about which brands of IVC filters his hospital stocked, and he believes that the hospital itself was the purchaser of the filters. (*Id*. at 23:5-22.)

**PLAINTIFFS' RESPONSE 17:**

**Admit in part; deny in part. Dr. Riebe testified that Cook Medical Bird's Nest filters, a permanent filter type, was an option for him as well. (*Id*. at 95:6-13.)**

**DEFENDANTS' SEPARATE STATEMENT NO. 18:**

Dr. Riebe does not know whether anyone in his clinic negotiated with the hospital concerning which products to stock. (*Id*. at 23:23 to 24:4.)

**PLAINTIFFS' RESPONSE 18:**

**Admit.**

**DEFENDANTS' SEPARATE STATEMENT NO. 19:**

The Bard sales representative for Dr. Riebe's hospital in 2004 and 2005, Timothy Fischer, does not remember Dr. Riebe. (Ex. D, Timothy Fischer Dep. Tr., 23:10- 11; 192:23 to 193:9; 257:3-15, Mar. 29, 2017.)

**PLAINTIFFS' RESPONSE 19:**

**Admit.**

**DEFENDANTS' SEPARATE STATEMENT NO. 20:**

Mr. Fischer does not remember ever providing Dr. Riebe with Recovery Filter pamphlets or brochures. (*Id.* at 257:3-15.)

**PLAINTIFFS' RESPONSE 20:**

**Admitted in part; denied in part. Denied as incomplete because Mr. Fischer has no specific recollection one way or another with respect to Dr. Reibe. (Ex. 3, (Timothy A. Fischer., Dep. Tr., March 29, 2017) at 257:3-9.);** *see also* **Response to No. 19.**

**DEFENDANTS' SEPARATE STATEMENT NO. 21:**

Dr. Robert McMeeking has opined that several features should have been incorporated into the Recovery Filter that "would have helped to mitigate or eliminate the failures I have identified that occurred in Mrs. Tinlin's filter. . . : caudal anchors, penetration limiters, two-tier design, and a better (smoother and rounded) chamfer at the mouth of the 'cap' on the filter." (Ex. E, McMeeking Tinlin Rule 26 Rep. at 3.)

**PLAINTIFFS' RESPONSE 21:**

**Admit**.

**DEFENDANTS' SEPARATE STATEMENT NO. 22:**

Dr. McMeeking has also identified several other permanent-only filters as "alternative filters" to the Recovery Filter, including the Simon Nitinol Filter, the Greenfield Filter, the Cook Tulip Filter, and the Bird's Nest Filter. (*Id.*)

**PLAINTIFFS' RESPONSE 22:**

**Disputed.  The cited portion of Dr. McMeeking's report does not identify these filters as "permanent-only," and Bard does not cite anything in the record that indicates that each of the listed filters, including the Cook Tulip Filter, was "permanent-only" at the time of Ms. Tinlin's implantation or otherwise.**

**DEFENDANTS' SEPARATE STATEMENT NO. 23:**

Dr. Derek Muehrcke has opined that Mrs. Tinlin should have an attempt to remove all of her intrapulmonary fragments because of the future risks of bleeding, hemoptysis, pneumothorax, and death. (Ex. F, Muehrcke Tinlin Rep. at 9, 10.)

**PLAINTIFFS' RESPONSE 23:**

**Disputed as incomplete.  Dr. Muehrcke's report includes a discussion of the risks of pulmonary fragments, as well as several "Future Recommendations," which are not limited to "an attempt to remove all of her intrapulmonary fragments."  His recommendations begin with an attempted percutaneous removal of the filter fragments, and include various forms of monitoring if that attempt is unsuccessful. (*See* Ex. F to Bard SOF (Muehrcke Tinlin Rep.), at 9-11.)**

**DEFENDANTS' SEPARATE STATEMENT NO. 24:**

Dr. Muehrcke cannot quantify the future risks of bleeding, hemoptysis, pneumothorax, and death for Mrs. Tinlin. (Ex. G, Muehrcke Dep. Tr., 167:9-21, Jan. 11, 2019.)

**PLAINTIFFS' RESPONSE 24:**

**Disputed as incomplete and immaterial.  Dr. Muehrcke testified that Ms. Tinlin is at risk of complications, including arrhythmia and cardiac failure due to her filter, and explicitly agreed that this was his opinion "to a reasonable degree of medical probability."  (Ex. 4 (Muehrcke Tr.) at 249:15-250:10; *see also id.* at 258:10-259:3 (testifying to a reasonable degree of medical probability that Ms. Tinlin is at a greater risk of future complications). ) Dr. Muehrcke is not required to opine as to precise quantification of risks.**

- 9 -

1  **DEFENDANTS' SEPARATE STATEMENT NO. 25:**

2    Dr. Muehrcke has opined that Mrs. Tinlin should have the Recovery Filter removed

3  because of the risk of future complications with the filter; and if a percutaneous attempt

4  fails, then he would consider open (surgical) removal of the filter. (Ex. F, Muehrcke Rep.

5  at 9, 10.)

6  **PLAINTIFFS' RESPONSE 25:**

7    **Admit in part; deny in part.  Dr. Muehrcke's report states that the Recovery**

8  **Filter should be removed not only because of the risk of future complications, but**

9  **also because "[h]er current IVC filter has essentially no clot stopping ability as a**

10 **result of several of its clot catching struts being missing and is unstable.  Moreover,**

11 **an additional strut can embolize at any time to her heart causing her to suffer**

12 **cardiac tamponade and multi-organ failure again."  (Ex. F to Bard SOF (Muehrcke**

13 **Rep.) at 9.)**

14 **DEFENDANTS' SEPARATE STATEMENT NO. 26:**

15   Dr. Muehrcke thinks that the risk of additional complications related to the filter

16 itself is 40% at 5.5 years, and refused to offer an opinion about whether the filter could be

17 percutaneously retrieved. (Ex. G, Muehrcke Dep. Tr., 168:10-14; 168:21 to 169:25.)

18 **PLAINTIFFS' RESPONSE 26:**

19   **Denied as incomplete, misleading, and immaterial.  Dr. Muehrcke was not**

20 **asked about the risk of additional complications related to the filter "at" 5.5 years.**

21 **He was asked, "[W]hat is the percentage risk or chance that Ms. Tinlin will**

22 **experience any additional complications from her Recovery Filter," and he**

23 **answered, "I'd say 40 percent in five years, or 5.5."  (Ex. 4 (Muehrcke Tr.) at 169:20-**

24 **25.)  He reiterated that, "Based on the medical literature," there is a 40 percent**

25 **chance of Ms. Tinlin experiencing additional complications "in the next five years."**

26 **(*Id.* at 170:5-8.)  Dr. Muehrcke also cited medical literature "which suggests that the**

27 **longer a filter is in place, the more the complications."  (*Id.* at 169:1-3.)  As to the**

28 **percutaneous removal of Ms. Tinlin's filter, Dr. Muehrcke was asked the question,**

1  **"Do you agree that Ms. Tinlin's filter could most likely be retrieved percutaneously**
2  **today?"  His answer was, "I would leave it to – I don't know.  No opinion.  I think it**
3  **should be attempted to be removed, though, without a doubt."  (Ex. G to Bard SOF**
4  **(Muehrcke Tr.), at 168:10-14.)  Finally, the statement is immaterial because Dr.**
5  **Muehrcke is not required to opine as to precise quantification of risks of future**
6  **complications.**
7  **DEFENDANTS' SEPARATE STATEMENT NO. 27:**
8      Dr. Muehrcke has opined that Mrs. Tinlin should have yearly cardiology EKGs and
9  follow up to monitor her heart rhythm and cardiac function because of the risks of
10 arrhythmias, cardiac failure, and endocarditis. (Ex. F, Muehrcke Rep. at 9, 10.)
11 **PLAINTIFFS' RESPONSE 27:**
12 **Admit in part; deny in part.  Dr. Muehrcke's full set of recommendations is**
13 **set out in his report at pages 9-10, and include yearly cardiology EKG's and follow-**
14 **up.  (Ex. 6 (Muehrcke Report) at 9-10.)**
15 **DEFENDANTS' SEPARATE STATEMENT NO. 28:**
16     Dr. Muehrcke cannot quantify the risks of arrhythmias, cardiac failure, and
17 endocarditis for Mrs. Tinlin. (Ex. G, Muehrcke Dep. Tr., 257:1-7; 12-14.)
18 **PLAINTIFFS' RESPONSE 28:**
19 **Disputed as incomplete and immaterial.  Dr. Muehrcke testified that Ms.**
20 **Tinlin is at risk of complications, including arrhythmia and cardiac failure due to**
21 **her filter, and explicitly agreed that this was his opinion "to a reasonable degree of**
22 **medical probability."  (Ex. 4 (Muehrcke Tr.) at 249:15-250:10; *see also id.* at 258:10-**
23 **259:3 (testifying to a reasonable degree of medical probability that Ms. Tinlin is at a**
24 **greater risk of future complications). ) Further, the statement is immaterial because**
25 **Dr. Muehrcke is not required to opine as to precise quantification of risks of future**
26 **complications.**
27
28

1    **DEFENDANTS' SEPARATE STATEMENT NO. 29:**

2        Dr. Muehrcke has opined that Mrs. Tinlin should have yearly follow up with a

3    cardiac surgeon to monitor her diaphragm hernia. (Ex. F, Muehrcke Rep. at 10.)

4    **PLAINTIFFS' RESPONSE 29:**

5        **Admit in part; deny in part.  Dr. Muehrcke's full set of recommendations is**

6    **set out in his report at pages 10-11, and include yearly follow-up with a cardiac**

7    **surgeon to monitor her diaphragm hernia and other injuries. (Ex. 6 (Muehrcke**

8    **Report) at 10-11.)**

9    **DEFENDANTS' SEPARATE STATEMENT NO. 30:**

10        Dr. Muehrcke he thinks [*sic*] that the risk of recurrent or additional hernias for Mrs.

11    Tinlin is about 5%. (Ex. G, Muehrcke Dep. Tr., 157:8-11.)

12    **PLAINTIFFS' RESPONSE 30:**

13        **Disputed.  The cited portion of Dr. Muehrcke's testimony does not address or**

14    **provide support for the fact stated.**

15    **DEFENDANTS' SEPARATE STATEMENT NO. 31:**

16        Dr. Muehrcke has opined that Mrs. Tinlin should have semi-annual surveillance

17    from a pulmonologist to monitor her shortness of breath from tracheomalacia and

18    diaphragm injuries. (Ex. F, Muehrcke Rep. at 9.)

19    **PLAINTIFFS' RESPONSE 31:**

20        **Admit in part; deny in part.  Dr. Muehrcke opines that Ms. Tinlin "will**

21    **require semi-annual surveillance from a pulmonologist to monitor her shortness of**

22    **breath from tracheomalacia and diaphragm injuries."  (Ex. F. to Bard SOF**

23    **(Muehrcke Rep.), at 9.)**

24    **DEFENDANTS' SEPARATE STATEMENT NO. 32:**

25        Dr. Muehrcke did not perform a differential diagnosis concerning Mrs. Tinlin's

26    shortness of breath. (Ex. G, Muehrcke Dep. Tr., 125:7-12.)

27    **PLAINTIFFS' RESPONSE 32:**

28        **Admit.**

1    **DEFENDANTS' SEPARATE STATEMENT NO. 33:**

2         Mrs. Tinlin's morbid obesity could cause shortness of breath. (*See id*. at 162:15-

3    19.)

4    **PLAINTIFFS' RESPONSE 33:**

5         **Admit in part; deny in part.  Dr. Muehrcke testified Ms. Tinlin's**

6    **tracheomalacia is causing her shortness of breath (Ex. 4 (Muehrcke Dep.) at 259:23-**

7    **260:3), and pointed to her hernia repair as a cause.  (*Id.* at 188:12-189:7.)**

8    **DEFENDANTS' SEPARATE STATEMENT NO. 34:**

9         Dr. Darren Hurst has opined that the filter fragments in Mrs. Tinlin's pulmonary

10   arteries can cause complications like pneumothorax/collapse of the lung, abscess, and

11   hemorrhage into the lung; and that Mrs. Tinlin will require lung resection to remove the

12   filter struts if they become symptomatic. (Ex. H, Hurst Tinlin Rep. at 20.)

13   **PLAINTIFFS' RESPONSE 34:**

14        **Admit.**

15   **DEFENDANTS' SEPARATE STATEMENT NO. 35:**

16        Dr. Hurst does not know what the risk is that the events identified in the preceding

17   paragraph will occur for Mrs. Tinlin. (Ex. I, Hurst Dep. Tr., 225:18 to 226:4; 226:18 to

18   229:4, Jan. 7, 2019.)

19   **PLAINTIFFS' RESPONSE 35:**

20        **Admit in part; deny in part.  Dr. Hurst testified that "For all of these potential**

21   **complications, there's no data.  There are only case reports of similar types of**

22   **objects in the lungs that have caused these problems.  No one has done a long-term**

23   **study because it is so new."  (Ex. 5 (Hurst Dep.), at 227:5-10.) As to hemorrhage, he**

24   **testified that it is a "small risk, but it's a risk, nevertheless."  (*Id.* at 227:17-18.)**

25   **DEFENDANTS' SEPARATE STATEMENT NO. 36:**

26        Dr. Hurst has opined that Mrs. Tinlin has experienced chronic cough and

27   exacerbation of her asthma because of treatment with the Recovery Filter. (Ex. H, Hurst

28   Rep. at 20.)

1

**PLAINTIFFS' RESPONSE 36:**

2

  **Disputed.  The chronic cough and exacerbation of Ms. Tinlin's asthma, which**

3

**are listed among other injuries in Dr. Hurst's report, are not "because of treatment**

4

**with the Recovery filter," but instead result from the open surgery that was**

5

**performed to remove an arm of the Recovery filter from Ms. Tinlin's heart; they are**

6

**"related to tracheomalacia from intubation for the procedure."  (Ex. H to Bard SOF**

7

**(Hurst Rep.), at 20.)**

8

**DEFENDANTS' SEPARATE STATEMENT NO. 37:**

9

  Dr. Hurst cannot determine whether Mrs. Tinlin's chronic cough and exacerbation

10

of her asthma are related to the filter or Mrs. Tinlin's preexisting medical conditions. (See

11

Ex. I, Hurst Dep., 220:25 to 221:10.)

12

**PLAINTIFFS' RESPONSE 37:**

13

  **Disputed.  Dr. Hurst testified, directly before the cited portion of his testimony**

14

**in Bard's Statement No. 37, that the chronic cough "is almost certainly related to her**

15

**tracheomalacia."  (Ex. I to Bard SOF (Hurst Tr.), at 220:19-24.)  He then stated that**

16

**her tracheomalacia would make her asthma worse.  (*Id.* at 221:2-4.)**

17

18

  RESPECTFULLY SUBMITTED this 1st day of March, 2019.

19

20

        BEUS GILBERT PLLC

21

      By: */s/*             
         Mark S. O'Connor

22

         701 North 44th St.

23

         Phoenix, Arizona  85008
         480-429-3000

24

      LOPEZ McHUGH LLP

25

         Ramon Rossi Lopez (CA Bar No. 86361)
         (admitted *pro hac vice*)

26

         100 Bayview Circle, Suite 5600
         Newport Beach, California 92660

27

      *Co-Lead/Liaison Counsel for Plaintiffs*

28

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on this 1st day of March 2019, I electronically transmitted the

3   attached document to the Clerk's Office using the CM/ECF System for filing and

4   transmittal of a Notice of Electronic Filing.

5                                  _/s/_ _____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28