# Exhibit 1
# (Filed Under Seal)

Do Not Disclose - Subject to Further Confidentiality Review

1           UNITED STATES DISTRICT COURT

2             DISTRICT OF ARIZONA

3   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

4

   In Re Bard IVC Filters Products

5  Liability Litigation

6                No. MD-15-02641-PHX-DGC

7

8

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

9

10     DO NOT DISCLOSE - SUBJECT TO FURTHER

           CONFIDENTIALITY REVIEW

11

    VIDEOTAPED DEPOSITION OF JOSHUA RIEBE, MD

12

        TAKEN AT: Radisson Hotel

13      LOCATED AT: 2040 Airport Drive

            Green Bay, WI

14

           April 4, 2017

15       10:09 a.m. to 2:15 p.m.

16     REPORTED BY ANITA K. FOSS

      REGISTERED PROFESSIONAL REPORTER

17

18

19

   *  *  *  *  *  *  *  *  *  *  *  *  *  *

20

21

22

23

24

25

Do Not Disclose - Subject to Further Confidentiality Review

1        A.    No.

2        Q.    Have you ever met with anybody from Bard

3    or their representatives?

4        A.    Legal team, no.  I may have saw a Bard

5    salesperson years ago, but nothing recent.

6        Q.    But nothing in preparation for this

7    deposition?

8        A.    No.

9        Q.    Okay.  Have you ever given a deposition

10    before?

11        A.    No.

12        Q.    All right.  Well, let me just talk a

13    little bit about a deposition.  It's just a little

14    different than a conversation.  There's just a

15    couple rules that I think both sides would

16    appreciate if you would follow here, okay?

17                    The first thing is that we have a

18    court reporter obviously taking down everything, so

19    they can't take down shakes of the heads, uh-huhs,

20    uh-uhs.  We need you to answer in the form of a

21    word, okay?

22        A.    Yes.

23        Q.    All right.  Second of all, if there's

24    anything that either lawyer asks you that you don't

25    understand or doesn't seem to make any sense to

1        A.    Anytime we do an intervention on a

2    patient, we want to try to help the patient have a

3    good or a better outcome at minimizing the risk to

4    them from that said procedure.

5        Q.    As a doctor, safety is always paramount

6    for you; correct?

7        A.    Yes.

8             MS. DAVIS:   Object to the form.

9    BY MR. GOLDENBERG:

10       Q.    So when you are -- when you are

11   advising -- when you are going to be inserting an

12   IVC filter into a patient, do you typically have a

13   conversation with the patient about the risks and

14   the benefits?

15       A.    Yes.

16       Q.    Okay.  We'll get into that in just a

17   minute, but I want to talk a little bit about where

18   you learn the information to be able to give that

19   kind of an assessment to a patient.  So where would

20   you get information that would allow you to do a

21   risk-benefit assessment and give the patient that

22   information?

23       A.    From the individuals training me.

24       Q.    I'm sorry?

25       A.    The individuals that train, or were

```
 1            MS. DAVIS:  Object to the form.
 2            THE WITNESS:  Can you repeat that?  I was
 3    distracted.
 4    BY MR. GOLDENBERG:
 5        Q.   Sure.  That's okay.  Would you agree that
 6    you need complete and accurate information
 7    regarding a filter from the manufacturer to help
 8    conduct a risk-benefit analysis?
 9        A.   Yes.
10            MS. DAVIS:  Object to the form.
11    BY MR. GOLDENBERG:
12        Q.   And if there are risks that are not
13    disclosed or the true risks are not disclosed, then
14    you cannot conduct a -- conduct a proper
15    risk-benefit analysis for the patient; right?
16        A.   Yes.
17            MS. DAVIS:  Object to the form.
18    BY MR. GOLDENBERG:
19        Q.   Is part of that analysis determining
20    whether a patient should receive a permanent or
21    retrievable filter?
22        A.   Can you be more specific?
23        Q.   Sure.  When you're evaluating a specific
24    patient and implanting a specific device in a
25    patient, would that -- would part of that analysis
```

Do Not Disclose - Subject to Further Confidentiality Review

1  higher failure rates than other devices?

2          MS. DAVIS:  Object to the form.

3          THE WITNESS:  Yes.

4  BY MR. GOLDENBERG:

5      Q.  Would you want to know if the rates of

6  certain adverse events are substantially higher

7  from one filter versus another?

8      A.  Yes.

9          MS. DAVIS:  Object to the form.

10  BY MR. GOLDENBERG:

11      Q.  Would you want to know if the company had

12  concerns about the efficacy of its own filter?

13      A.  Yes.

14          MS. DAVIS:  Object to the form.

15  BY MR. GOLDENBERG:

16      Q.  Would you want to know if a newer, safe

17  filter was available for use?

18      A.  Yes.

19      Q.  And by the way, if there are objections,

20  and there inevitably will be, we just need to make

21  sure we don't talk over each other.  So she's

22  allowed to object, but you can continue to give

23  your answer, okay?

24      A.  Okay.

25      Q.  All right.  Would you want to know if

Do Not Disclose - Subject to Further Confidentiality Review

1  Bard itself internally deemed the Recovery filter

2  to have unacceptable risks?

3       A.   Yes.

4            MS. DAVIS:  Object to the form.

5  BY MR. GOLDENBERG:

6       Q.   Would you want to know if Bard, even

7  today, does not understand the root cause of why

8  its filters are migrating?

9            MS. DAVIS:  Object to the form.

10            THE WITNESS:  Yes.

11  BY MR. GOLDENBERG:

12       Q.   Would you want to know if they, even

13  today, did not understand the root cause of why

14  their filters are perforating?

15       A.   Yes.

16            MS. DAVIS:  Object to the form.

17  BY MR. GOLDENBERG:

18       Q.   Or tilting?

19       A.   Yes.

20            MS. DAVIS:  Same objection.

21  BY MR. GOLDENBERG:

22       Q.   Or fracturing?

23       A.   Yes.

24            MS. DAVIS:  Same objection.

25  BY MR. GOLDENBERG:

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.   Would you want to know if a company did

2  not have a good understanding of long-term

3  performance of its retrievable filters?

4      A.   Yes.

5           MS. DAVIS:  Object to the form.

6  BY MR. GOLDENBERG:

7      Q.   Would you want to know if a company's

8  lack of understanding of the dynamics of the vena

9  cava impacted its ability to test the filter?

10     A.   Yes.

11          MS. DAVIS:  Object to form.

12 BY MR. GOLDENBERG:

13     Q.   Would these things we just discussed

14 inform your risk-benefit analysis?

15          MS. DAVIS:  Object to the form.

16          THE WITNESS:  I don't understand the

17 phrasing of that question.

18 BY MR. GOLDENBERG:

19     Q.   Sure.  The things that you mentioned that

20 you would like to know, if you did know those

21 things, would that be helpful for you to discuss a

22 risk-benefit analysis?

23          MS. DAVIS:  Object to the form.

24          THE WITNESS:  Yes.

25 BY MR. GOLDENBERG:

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  And they would be important in
 2    terms of looking at patient safety; right?
 3          A.    Yes.
 4                MS. DAVIS:  Object to the form.
 5    BY MR. GOLDENBERG:
 6          Q.    Would you expect a filter to be properly
 7    tested for safety prior to introduction for the
 8    market for use in human beings?
 9          A.    Yes.
10          Q.    Do you know what beta testing is?
11          A.    I've heard the term.  I don't know the
12    specifics.
13          Q.    Okay.  What is your understanding of what
14    beta testing is?
15          A.    I know it's a test that exists.
16          Q.    You don't know how it works?
17          A.    I don't know the specifics.  I've heard
18    the term.
19          Q.    I'll just move on.  Okay.  We talked a
20    little bit about sales reps, but I just want to
21    make sure that I've exhausted this, and I'll move
22    on quickly, okay.  The -- I just want to make sure,
23    do you interact with sales reps from companies
24    whose filters you use, even today?
25          A.    I don't understand how you phrased it.
```

1    Q.   Okay.  I'll re-ask it.  That was kind of

2   an awkward question.  Are any of the IVC filter

3   companies' representatives ever calling on you as a

4   customer?

5    A.   When?

6    Q.   Anytime during the course of your

7   practice.

8    A.   Yes.

9    Q.   Okay.  And what do you remember about

10   those calls?

11        MS. DAVIS:  Object to the form.

12        THE WITNESS:  I remember some salespeople

13   being around in the hospital.

14   BY MR. GOLDENBERG:

15    Q.   Okay.  Have you ever had a sales rep in

16   the operating room with you when you are implanting

17   a filter?

18    A.   Not -- not recently.

19    Q.   Okay.  At any time.

20    A.   I can't remember long ago.

21    Q.   Okay.  Do you know if you ever note

22   that -- if you note that or anybody else notes that

23   in any of the records?

24    A.   I would never note that.

25    Q.   Okay.  So it could have happened, but you

1      A.    Correct.

2      Q.    All right.  And why is that?

3      A.    We're putting a foreign body in the

4   patient.  We try very hard to put it in the correct

5   place.  If it moves from what we feel is not the

6   correct place, we consider that a poor outcome.

7      Q.    And that can have a bad reflection on

8   safety of the patient; correct?

9      A.    Generally, foreign bodies in places

10  that -- where you don't want them is not good.

11     Q.    So if we look at this little Recovery

12  brochure, I want you to see that in the second

13  paragraph, and tell me if I'm reading this

14  correctly, it says, "Recovery.  Recovery filter's

15  unique self-centering design, proven conical shape,

16  and bi-level filtering system create the ideal

17  balance between clot-trapping efficiency and caval

18  patency."  Do you see that?

19     A.    Yes.

20     Q.    So is it your understanding that this was

21  a self-centering design?

22     A.    It's my understanding that this sentence

23  says it's a self-centering design.

24     Q.    Okay.  Then if you turn the page to, and

25  if you could hold this up for the jury, we're now

Do Not Disclose - Subject to Further Confidentiality Review

 1   centered upon deployment."

 2   BY MR. GOLDENBERG:

 3       Q.   That's good enough.  And if you could,

 4   I'm looking at the top of this exhibit, and this

 5   is -- do you see that it's from a Janet Hudnall to

 6   a David Rauch?

 7       A.   Can you point?

 8       Q.   I can.  Right there.

 9       A.   Yes.

10       Q.   And the date of this is February 26,

11   2004?

12       A.   Yes.

13       Q.   All right.  You can move on to the next

14   exhibit.  Would you have expected Bard to tell you

15   if they were concerned about migration problems to

16   the point that they were going to actually put that

17   particular filter on hold?  In other words, a

18   silent recall?

19           MS. DAVIS:  Objection to the form.

20           THE WITNESS:  I'm not sure.

21   BY MR. GOLDENBERG:

22       Q.   So if this company was so concerned about

23   migration that it was considering putting it on

24   hold, in other words, recalling it, you wouldn't

25   want to know that as a doctor?

Do Not Disclose - Subject to Further Confidentiality Review

1             MS. DAVIS:  Objection to the form.

2             THE WITNESS:  I would want to know that.

3    BY MR. GOLDENBERG:

4        Q.   Okay.  And would you expect Bard to

5    understand the root cause of why it would be

6    migrating and causing deaths?

7             MS. DAVIS:  Objection to the form.

8             THE WITNESS:  I don't know that.

9        (Exhibit 917 marked for identification.)

10   BY MR. GOLDENBERG:

11       Q.   I'm going to show you Exhibit No. 917.

12   I'll just represent to you that this was a

13   memorandum from a Doug Uelmen, E-U-L-A-N, February

14   13, 2004, regarding a filter meeting of

15   February 12th of 2004.  And if you could, I'd like

16   you to turn to the third page of this exhibit.  And

17   on number eight.

18       A.   Yes.

19       Q.   I'll just represent -- I'll just first

20   represent to you that there was a meeting that this

21   represents.  And if you go down to number eight, if

22   you could just read that out loud, please.

23       A.   Number eight.  "The team discussed a

24   threshold level for migration and agreed that if a

25   migration requiring surgical intervention is

Do Not Disclose - Subject to Further Confidentiality Review

1    confirmed during the course of this investigation,

2    the Recovery filters will be placed on hold pending

3    the outcome of the investigation."

4         MS. DAVIS:  Objection, form and

5    foundation.

6    BY MR. GOLDENBERG:

7         Q.   So if Bard determined that migration was

8    a significant problem, you would want to know that

9    as a doctor, wouldn't you, to know that they were

10   putting this on hold pending an outcome of an

11   investigation?

12        MS. DAVIS:  Objection to the form.

13        THE WITNESS:  Yes.

14   BY MR. GOLDENBERG:

15        Q.   Okay.  If we turn to the next page, we

16   already talked about you indicating that you would

17   want to understand if Bard did not understand the

18   root cause.  Could you read number nine, please?

19        A.   Number nine.  "Coordinate the review of

20   all data to determine root cause/most probable

21   cause using application problem-solving tools.  A

22   meeting will be scheduled to conduct this review,

23   the time and place to be determined during a

24   subsequent team meeting.  Attendees will include

25   the BPV investigation team along with" --

Do Not Disclose - Subject to Further Confidentiality Review

```
 1        Q.   That's okay.  All right.
 2             MS. DAVIS:  Object to form.
 3   BY MR. GOLDENBERG:
 4        Q.   And again, the date of this was
 5   February 12th of 2004; do you see that on the
 6   front?
 7        A.   Yes.
 8        Q.   Okay.  Were you ever notified by anyone
 9   at Bard that as of May -- I'm sorry, as of
10   April 7th of 2005, that they were going to be
11   discontinuing this product?
12        A.   I was not.
13        Q.   Would you have wanted to know that?
14        A.   Yes.
15        Q.   And why?
16        A.   Yes.
17             (Exhibit 918 marked for identification.)
18   BY MR. GOLDENBERG:
19        Q.   I'm showing you Exhibit No. 918.  And
20   I'll just represent to you that this is an e-mail
21   from a Jack Sullivan, who was in sales, to a Janet
22   Hudnall, who was the director of marketing.  And
23   the subject says "FAQ and answers."  Do you see
24   that at the top?
25        A.   Yes.
```

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.   And the date of this is 7/21/2005?

2      A.   Yes.

3      Q.   Okay.  I'm just going to come down to the

4   part where it says "lastly."  And do you see where

5   it says -- I'm just going to read this.  It says,

6   "Lastly, it was a little weird being on calls with

7   Sean today and watching him sell the removability

8   of Recovery when I know we aren't going to have it

9   for much longer."  Do you see that?

10     A.   Yes.

11     Q.   Then it says, "Is there anything we can

12  do now to help these guys?  They are out trying to

13  hit a number, and we will be changing the device

14  soon."  Do you see that?

15     A.   Yes.

16     Q.   Move to the next one.  And you were not

17  aware of that; correct?

18     A.   Correct.

19     Q.   I've asked you this before, but I'm going

20  to ask a little different way.  Would you have

21  expected Bard to have done a safety study on the

22  Recovery filter?

23          MS. DAVIS:  Object to the form.

24          THE WITNESS:  Yes.

25  BY MR. GOLDENBERG:

Do Not Disclose - Subject to Further Confidentiality Review

1       Q.   And why would that be important to you?

2       A.   We like to use safe equipment on our

3   patients.

4            (Exhibit 919 marked for identification.)

5   BY MR. GOLDENBERG:

6       Q.   Showing you what's been marked 919.  And

7   I'll just represent to you that this is something

8   called internal question and answer.  It says C.R.

9   Bard Recovery vena cava filter, version August,

10  2004.  Do you see that?

11      A.   Yes.

12      Q.   And I'm just going to -- it says on the

13  top, it says, "Internal Q and A to be used,

14  approved by approved corporate spokespeople to

15  respond consistently to inquiries from media.  Not

16  to be handed out externally to any audiences."  Do

17  you see that?

18      A.   Yes.

19      Q.   Did I read that correctly?

20      A.   Yes.

21      Q.   I'm going to turn to page 3 of this.  And

22  if you could read number six for us, please.

23           MS. DAVIS:  Object to the form.

24  BY MR. GOLDENBERG:

25      Q.   The question and the answer.

Do Not Disclose - Subject to Further Confidentiality Review

1    know that the reports of death, filter migration,

2    IVC perforation and filter fracture with Recovery

3    were four and even sometimes five times higher than

4    all other filters on the market?

5              MS. DAVIS:  Objection, form, lack of

6    foundation.

7              THE WITNESS:  Can you rephrase that?

8    BY MR. GOLDENBERG:

9        Q.   Sure.  Would it have been important for

10   Bard to tell you that their filters were

11   fracturing, migrating, and killing people at four

12   to five times greater rates than all other filters

13   on the market?

14             MS. DAVIS:  Objection, form, lack of

15   foundation.

16             THE WITNESS:  Four and five times a small

17   number is still a small number.  However, absolute

18   data and rigorous analysis of the numbers would be

19   important, yes.

20   BY MR. GOLDENBERG:

21       Q.   And so you would expect Bard to analyze

22   those and at least come to a root cause analysis,

23   wouldn't you?

24       A.   Yes.

25             MS. DAVIS:  Object to the form.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   BY MR. GOLDENBERG:

 2       Q.   And you would want to know what the root

 3   cause analysis is so you could help make an

 4   understanding to the patient of what the safety of

 5   this device would be?

 6       A.   Yes.

 7            MS. DAVIS:  Objection to the form.

 8       (Exhibit 921 marked for identification.)

 9   BY MR. GOLDENBERG:

10       Q.   I'm showing you Exhibit 921.  And you

11   indicated that you were interested in seeing

12   numbers.  This is a memo on August 3rd of 2005, so

13   within a couple months of the time you actually

14   inserted the filter into my client.  And this is

15   called IVC Recovery Filter Adverse Events Executive

16   Summary; do you see that?

17       A.   Yes.

18       Q.   Okay.  And do you see that actually lists

19   all the different migrations and then what happened

20   from those migrations?

21       A.   Yes.

22       Q.   Okay.  And do you see that there's

23   deaths, and there's also everything from migration

24   of the filter encased in large thrombi, to

25   fatalities?
```

Do Not Disclose - Subject to Further Confidentiality Review

 1      A.   Yes.

 2           MS. DAVIS:  Objection to the form and

 3      lack of foundation to all these questions regarding

 4      this Exhibit 941.

 5      BY MR. GOLDENBERG:

 6      Q.   If you could, I'd like you to look at the

 7      chart where it says "compare MAUDE data for IVC

 8      filter fatalities."  Do you see that?

 9      A.   Yes.

10      Q.   And do you see that the SNF, which I'll

11      represent to you is the Simon Nitinol filter that

12      was the permanent filter that preceded Recovery by

13      Bard, how many fatalities were there with the SNF?

14           MS. DAVIS:  Same objection.

15           THE WITNESS:  It's reported as

16      zero percent.

17      BY MR. GOLDENBERG:

18      Q.   Okay.  And migration, what is it reported

19      as?

20      A.   0.0027 percent.

21      Q.   So that would be less than one percent;

22      correct?

23      A.   Correct.

24      Q.   All right.  And under Recovery, what's

25      the percentage of fatalities?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    BY MR. GOLDENBERG:

 2         Q.    And how about in terms of tilt, where

 3    would Recovery rank?

 4         A.    The second.

 5         Q.    Okay.

 6               MS. DAVIS:  Object, lack of foundation as

 7    to all questions regarding Exhibit 923.

 8    BY MR. GOLDENBERG:

 9         Q.    I want to switch gears for just a minute

10    and talk about my client just for a second.  I'm

11    going to represent to you that my client, as of the

12    time of her implantation, was 5'11, 278 pounds,

13    okay?

14         A.    Okay.

15         Q.    All right.  And her BMI was about 38.

16         A.    Okay.

17         Q.    Would you agree with me that morbidly

18    obese would be about 40?

19         A.    I don't keep up on those terms.

20         Q.    That's fine.  Okay.  In any regard, she

21    wouldn't be a small lady; correct?

22         A.    Correct.

23         Q.    And respectfully, do you have any

24    opinions as to whether or not a person's weight

25    would make any difference as to what filter you
```

Do Not Disclose - Subject to Further Confidentiality Review

1    would implant in that person as of 2005?

2         A.    I did not consider weight when selecting

3    filters at that time.

4         Q.    Did anyone tell you that weight was a

5    very important consideration?

6         A.    No.

7              MS. DAVIS:  Object to the form.

8    BY MR. GOLDENBERG:

9         Q.    Okay.  If Bard knew that obesity and

10   morbidly obese people have much larger expansion of

11   their vena cavas than other -- than other patients,

12   would you have wanted to know that if they knew

13   that information?

14        A.    Yes.

15             MS. DAVIS:  Object to the form.

16   BY MR. GOLDENBERG:

17        Q.    And why would you want to know that?

18        A.    It would help me select which product I

19   would use.

20        Q.    Okay.  I mean, it could matter keeping

21   the product in place; correct?

22             MS. DAVIS:  Object to the form.

23             THE WITNESS:  Yes.

24   BY MR. GOLDENBERG:

25        Q.    Okay.

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              (Exhibit 924 marked for identification.)

 2    BY MR. GOLDENBERG:

 3         Q.    Showing you what's been marked

 4    Exhibit 924.  And I'll represent to you that this

 5    is a letter or a -- these are e-mails that go back

 6    and forth.  And I'm referring you just to the

 7    middle of the page, where this is from John

 8    McDermott.  Do you see that?

 9         A.    Yes.

10         Q.    You mentioned a person that trained you

11    at the University of Wisconsin.  Am I missing that?

12    What was his name again?  It wasn't McDermott, was

13    it?

14         A.    Yes, I was trained by a person named John

15    McDermott at the University of Wisconsin.

16         Q.    Okay.  I thought that was the case.

17    Okay.  So this is actually from -- a memo from John

18    McDermott; do you see that?

19         A.    Yes.

20         Q.    Okay.  And it's to John Weiland and David

21    Ciavarella.  And I'll just represent to you, again,

22    that David Ciavarella is the medical director for

23    Bard at the time, okay?

24         A.    Yes.

25         Q.    And then Janet Hudnall and others are, in
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   next page, excuse me, under B.  I'm sorry, so

 2   it's -- there's A and B, do you see that at the top

 3   there?

 4        A.   Yes.

 5        Q.   Okay.  Under the small B, if you could

 6   read that, please.

 7        A.   "The two independent data sets, MAUDE

 8   report rates and bench testing results, contain

 9   significant signals regarding vena cava filter

10   performance related to migration."

11        Q.   Were you aware of that before you

12   inserted this into my client?

13        A.   No.

14             MS. DAVIS:  Same objections.

15   BY MR. GOLDENBERG:

16        Q.   Under the large B, could you read that

17   for me, please?

18        A.   "The independent consultant's report

19   concluded that the data and his analysis provided

20   two significant signals that further investigation,

21   particularly in relation to migration and fracture,

22   is urgently warranted.  The consultant, however,

23   also cautioned that given the multiple known flaws

24   in the data available, this analysis is

25   insufficient to demonstrate conclusively that any
```

Do Not Disclose - Subject to Further Confidentiality Review

1      A.   Prior to actually deploying the IVC

2  filter, we generally perform a cavagram, injecting

3  dye into that vein to see the size, see if there's

4  clot in there, and also see where the renal veins

5  are positioned.

6      Q.   And what is the -- what is the reason

7  that you want to make sure that you understand the

8  size?

9      A.   Very large cavas, some people call them

10  mega cavas, often do not hold certain filters well.

11  Where I trained we, if you had a mega cava, most

12  often you would switch to a Bird's Nest at that

13  point.

14      Q.   Okay.  The Recovery filter, is it

15  mentioned at all in any of these records?

16      A.   The name Recovery?

17      Q.   Yes.

18      A.   Yes, if you look slightly above the word

19  Findings, that paragraph that begins "The wire,"

20  about halfway through it said, "The Bard Recovery

21  caval filter was deployed."  Now, Recovery is not

22  capitalized, but that's a transcription issue.

23      Q.   I understand.  So you would transcribe

24  your notes after you do the procedure; is that

25  right?

Do Not Disclose - Subject to Further Confidentiality Review

1    rather prominent in transverse diameter.

2    Calculation was made based off of vertebral body

3    correlation from CT scan chest.  This estimated

4    that the cava was between 28 and 29 millimeters,

5    which was at the upper limits of cava size for

6    Recovery filter.  This was deployed carefully and

7    set well with the filter, demonstrating good

8    position at the conclusion of the procedure."

9         Q.   So clearly this was a cava that was at

10   the edge of the upper limits of cava size for a

11   Recovery; correct?

12        A.   My measurements indicate that, yes.

13        Q.   And again, how did you measure this

14   again?

15        A.   Well, obviously I can't remember exactly

16   what I did on that day in 2005.  However, the

17   documentation suggests that I was having difficulty

18   with the x-ray imaging that we take during the

19   exam, so I had to go to a reference CT scan to get

20   my best estimate of the overall size, and I used

21   that information off of a previous CT scan.

22        Q.   All right.

23        A.   There's a high degree of magnification

24   when you're using an x-ray.  And larger patients,

25   you have to bring the equipment further away from

Do Not Disclose - Subject to Further Confidentiality Review

1   reasons that you typically would consider in

2   whether to place a permanent versus a retrievable

3   filter in a patient?

4        A.   In extremely elderly patients that are

5   probably going to outlive any potential

6   complications, we often put something permanent in.

7   As the patients are younger, it's often nice to put

8   in something retrievable in the event that their

9   current disease state can be treated with

10  whatever's available, and you never know when other

11  treatments become available and are invented.  So

12  we always think if there's a foreign body in the --

13  in the patient, get it out if we can.

14       Q.   And in Ms. Tinlin's case, she was,

15  according to the records, going to undergo

16  additional testing that potentially could have

17  revealed that she did not have a hypercoagulative

18  state?

19       A.   Correct.  And the medical record also

20  says she's 41, I think.

21       Q.   So putting a retrievable filter in

22  someone like Mrs. Tinlin, did that give you more

23  options for the future?

24       A.   Yes.

25       Q.   At the time you placed the Recovery

Do Not Disclose - Subject to Further Confidentiality Review

1        Q.   Okay.  I have such a protective order

2   here with me, and I'll -- when we go off the

3   record, I'll ask you to take a look at it and sign

4   it.  And then --

5        A.   I should -- if I have to sign two inches'

6   worth, then I'm not going to sign.  That's a big

7   stack.

8        Q.   No, that's not it.  It's right here, if

9   you want to look at it.

10            MR. GOLDENBERG:  Can we do this after?

11            MS. DAVIS:  Sure, yeah.  But this is it.

12            THE WITNESS:  Okay.  This is --

13            MS. DAVIS:  But yes, we can do it after

14   the deposition.  Absolutely.  I don't have any more

15   questions at this time.

16            THE WITNESS:  Okay.

17            MS. DAVIS:  Thank you, Doctor.

18                E X A M I N A T I O N

19   BY MR. GOLDENBERG:

20        Q.   I just have a few.

21        A.   Okay.

22        Q.   Doctor, again, Stuart Goldenberg.  I just

23   wanted to ask you, when you are talking with the

24   patient about the risks and benefits of a device

25   like the Bard IVC filter, the Recovery, you can

Do Not Disclose - Subject to Further Confidentiality Review

```
1    only convey what you know; correct?

2         A.   Correct.

3         Q.   All right.  If a company is hiding

4    important safety information, there's no way for

5    you to know that, is there?

6         A.   Correct.

7              MS. DAVIS:  Object to the form.

8    BY MR. GOLDENBERG:

9         Q.   I think we're all making an assumption

10   here that vena cava filters can prevent blood

11   clots.  Is that your understanding?

12        A.   No, the vena cava filters can prevent

13   clots from moving to places where you don't

14   necessarily want them.

15        Q.   Good -- good point.  And what's the basis

16   for that?

17        A.   It's a mechanical basis.

18        Q.   But what medical studies are you aware of

19   that show that?

20             MS. DAVIS:  Could you let him finish his

21   answer?

22             THE WITNESS:  I'm not -- I'm not -- I

23   don't know specific studies.

24   BY MR. GOLDENBERG:

25        Q.   Are you aware that there has been a great
```