# Exhibit C

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3

4

       IN RE BARD IVC FILTERS              CASE NO.

5      PRODUCTS LIABILITY LITIGATION       MD-15-02641-PHX-DGC

6                                          (PAGES 1-118)

7

8

9

10

11          VIDEOTAPED DEPOSITION OF EXPERT WITNESS

12      ROBERT M. McMEEKING, PhD, NAE, FREng, FRSE, LFASME

13          WEDNESDAY, JANUARY 30, 2019, 10:02 A.M.

14

15

16

17

18

19

20

21

22

23

24   OUR JOB NO:  3191492

25   REPORTED BY:  GINA STACY KAREN, CSR 7927

Page 21

1      Q     What is your basis for believing that caval

2   motion would enhance the effectiveness of a rounded cap?

3      A     Well, caval motion would include the expansion

4   and contraction of the vena cava width and that is what

5   causes the arms to experience strain.  And the rounded

6   chamfers have the effect of helping to keep the level of

7   strain down in the arms where they exit the cap.

8            And, therefore, that's my reason for saying

9   that -- that caval motion, in the sense of expansion and

10  contraction of the vena cava, would make the chamfer an

11  effective feature of the design.

12     Q     Would you agree that the position of a patient's

13  inferior vena cava with respect to the spine could affect

14  the effectiveness of caudal anchors?

15     A     I'm not sure about that.

16     Q     One way or the other?

17     A     One way or the other.

18     Q     Let's back up just a moment to what you just said

19  about caval motion enhancing the effectiveness of a

20  rounded cap.  You have not conducted any testing to

21  verify that opinion, have you?

22     A     I have not be conducted any bench testing, no, or

23  animal testing.

24     Q     Have you conducting any other type of testing to

25  verify that particular opinion?

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 22

1      A      Well, I've done calculations.  But, no.  I would

2   define those as testing.  But it's analysis of the

3   strains which are present in the filter.

4      Q      Would you agree that the position of a patient's

5   inferior vena cava with respect to the spine could impact

6   the effectiveness of penetration limiters?

7      A      I'm not sure about that one way or the other.

8      Q      The same question with regard to a two-tiered

9   design.

10     A      Again, I'm not sure about that one way or the

11  other.

12     Q      Would you agree that the position of a patient's

13  inferior vena cava with respect to the spine could impact

14  the effectiveness of a rounded cap?

15     A      I'm not sure about that one way or the other.

16     Q      Now, this bullet point list that begins on page 1

17  of your report -- what -- where did you obtain those

18  facts, particular facts?

19     A      I am relying on Dr. Hurst's report and

20  Dr. Muehrcke's report for this information.  I also

21  looked at some imaging.  And what I saw in the imaging is

22  consistent with what is reported by Dr. Hurst and

23  Dr. Muehrcke.

24     Q      Do you recall which images you looked at?

25     A      No, I don't recall exactly which images.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 23

1    Q    Do you identify in your report the images that

2  you looked at?

3    A    No.  No.

4    Q    When did you look at those images?

5    A    Um, I don't recall.

6    Q    Did you look at them yourself, or with someone

7  else?

8    A    I believe I looked at them with Dr. Hurst by

9  video conference.

10        I may be mistaken by that.  Because I've looked

11  at other images with him.  So, I may be mistaken about

12  whether it was Mrs. Tinlin's that I looked at.

13    Q    Okay.  If I understand what you just said, you

14  recall having looked at some images regarding some

15  patient with Dr. Hurst via video conference at some

16  point, but you cannot recall specifically whether that

17  was with regard to Mrs. Tinlin?

18    A    That's correct.

19    Q    Do you recall having a video conference -- when

20  was the last time you had a video conference with

21  Dr. Hurst?

22    A    The one I recall was in September.

23    Q    Of 2018?

24    A    Of 2018, yeah.

25    Q    How long did that video conference last?

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 24

1      A      Oh, it was an hour or so.  About an hour.

2      Q      Was Ms. Tinlin the subject of that video

3  conference?

4      A      I don't recall.

5      Q      Did someone else attend that video conference

6  with you and Dr. Hurst?

7      A      One of the attorneys.

8      Q      Do you recall which attorney?

9      A      No.  I don't know.

10     Q      Was it Mr. Stoller?

11     A      Um, I don't think so, no.

12     Q      Have you had any video conferences with

13  Dr. Muehrcke?

14     A      I don't recall.  No.  I don't think so.  No.

15     Q      Did you actually read any medical records

16  yourself other than to possibly, as you indicated, look

17  at images?

18     A      Well, I looked through the medical records of

19  Mrs. Tinlin.

20     Q      But you are not a medical doctor; correct?

21     A      That's correct.

22     Q      Now, these bullet points reflect the medical

23  issues specific to Ms. Tinlin that were important for

24  your opinions in this case; correct?

25     A      That's correct.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 25

1      Q     And you've already testified in three trials in

2   the Bard IVC litigation?

3      A     That's correct.

4      Q     And you understand based on those trials that

5   doctor -- Judge Campbell has a very strict rule that, if

6   you do not disclose facts and opinions in your reports,

7   you cannot testify about those things; correct?

8      A     If you tell me that's the case, I would accept

9   it, yes.

10     Q     Well, you attempted to include all of the

11  important things for the opinions about Mrs. Tinlin that

12  you intend to explain to the jury in this report;

13  correct?

14     A     That's correct.

15     Q     You told us you're not a medical doctor and you

16  don't hold yourself out as an expert in interpreting

17  medical records; right?

18     A     That's correct.

19     Q     And you're not an expert when it comes to reading

20  imaging; correct?

21     A     That's correct.

22     Q     And you would defer in this case to all of the

23  medical experts as far as those areas go?

24     A     I would, yes.

25     Q     Let's look at the first bullet point, which

Robert M. McMeeking , PhD, NAE, FRSE     January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 47

1   those reports, you did a number of calculations; correct?

2       A    That's correct.

3       Q    But you have never done any calculations focused

4   specifically on caudal anchors and what effect they would

5   have in improving the performance of the filter; correct?

6       A    That's correct.

7       Q    And, likewise, you have never done any specific

8   calculations regarding the effect that penetration

9   limiters would have on the filter?

10      A    That's correct.

11      Q    And you have never done any specific calculations

12  as to the effect that a two-tiered design would have on

13  the filter?

14      A    That's correct.

15      Q    And you have never done any specific calculations

16  as to the effect that the rounded chamfer would have on

17  the filter; correct?

18      A    No.  I disagree with that.

19      Q    Okay.  Tell me the basis for that.

20      A    Well, in the MDL report I present calculations

21  for the effect of the rounded chamfer in regard to the

22  levels of strain and stress which are associated with it

23  in the adjacent strut.

24      Q    Would you agree with me that in your view a

25  filter that had the rounded chamfer, like you've

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 62

1    a filter; correct?

2              MR. STOLLER:  Objection.  Foundation.

3              THE WITNESS:  I'm not sure if they thought she

4    would have died.  But I believe that they assessed that

5    it would avoid problems that she might face in terms of

6    her health.

7    BY MR. NORTH:

8        Q    You have no reason to dispute whether or not

9    Mrs. Tinlin's Recovery filter might have saved her life;

10   correct?

11       A    I have no reason to dispute that, no.

12       Q    You did no additional testing for your report in

13   this case; correct?

14       A    That's correct.

15       Q    And you did no additional calculations for your

16   report in this case?

17       A    That's correct.

18       Q    None of the opinions you provide in this report

19   regarding design alternatives have been published in any

20   literature by you, have they?

21       A    By me, no.  Correct.

22       Q    Are you aware of any literature regarding

23   penetration limiters or caudal anchors and their efficacy

24   on filters?

25       A    Well, yes.

Robert M. McMeeking , PhD, NAE, FRSE         January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 63

1      Q     And what is that?

2      A     There are papers that look at clinical experience

3   with filters that have and do not have those features on

4   them.

5      Q     I'm talking about from an engineering standpoint.

6   Are you aware of any publications that analyze from an

7   engineering perspective how caudal anchors or penetration

8   limiters perform?

9      A     Not from an engineering assessment, no.

10      Q     And you haven't published anything from an

11   engineering perspective regarding penetration limiters,

12   caudal anchors, two-tiered design, or a rounded chamfer;

13   correct?

14      A     That's correct.

15      Q     And, therefore, your opinions regarding those

16   design alternatives have not been peer reviewed, have

17   they?

18      A     Not directly, no.

19      Q     You're not aware of any industry or government

20   standards that would require any of the design

21   alternatives that you've proposed; correct?

22      A     Yes.  I'm aware of some.

23      Q     What would those be?

24      A     In the sense that companies are expected to

25   reduce all risks to the extent practicable.

Robert M. McMeeking , PhD, NAE, FRSE      January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 64

1      Q     I'm talking about these specific design

2   attributes:   Penetration limiters, caudal anchors,

3   two-tiered design, rounded chamfer.   You're not aware of

4   any industry standards or governmental regulations that

5   require those specific design features; correct?

6      A     That's correct.

7      Q     And you're not aware of any standards or

8   regulations that recommend those specific design

9   features?

10     A     That's correct.

11     Q     And you are aware, of course, that Bard has

12   retained its own engineers in this case; correct?

13     A     You mean as experts?

14     Q     Yes.

15     A     Yes.   I am, yes.

16     Q     And you know who Dr. Paul Bryant is; correct?

17     A     That's correct.

18     Q     Have you ever published anything about

19   Dr. Bryant's opinions in this litigation?

20     A     Published in a sense of in public literature?

21     Q     Yes.

22     A     No, I have not.

23     Q     Did you bring any of your other past reports with

24   you today?

25     A     I brought the MDL report.

Page 65

1    Q    Do you have the March 3, 2017, MDL report?

2    A    That's correct.  Yes, I do.

3    Q    Could we look at that a minute?

4    A    Certainly.

5         MS. NORTH:  Could we put an exhibit sticker on

6    his report, and I'll just substitute one later.

7         THE WITNESS:  Can I give you the one with black-

8    and-white pictures for the exhibit?

9         MR. NORTH:  Yeah.  I couldn't care less.

10   Perfect.  I apologize.  I thought I had that, and it's

11   not here.

12              (Whereupon Defendants' Exhibit 2 was

13              marked for identification by the court

14              reporter and is attached hereto.)

15        MR. NORTH:  I think I have a clip.

16        THE WITNESS:  I'm going to look at the one with

17   color pictures.

18   BY MR. NORTH:

19   Q    That's fine.

20        But I want to look at a diagram on page 47.  And

21   there is a Table 1; correct?

22   A    Yes, correct.

23   Q    I'm sorry.  Not diagram.  A table.

24        Tell me what this table reflects.

25   A    This table reflects calculations that I did for

Robert M. McMeeking , PhD, NAE, FRSE      January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 71

1    this analysis that would be present in a vena cava with

2    28 millimeters in diameter?

3        A    That's correct.

4        Q    You are aware that later generations of Bard

5    filters, such as the Meridian and the Denali came

6    equipped caudal anchors and penetration limiters;

7    correct?

8        A    I'm aware that Meridian has caudal anchors.  The

9    Denali has penetration limiters.  And I believe the

10   Denali has caudal anchors as well, but I don't recall

11   exactly whether that's the case.

12       Q    Are you aware of any single IVC manufacturer who

13   incorporated caudal anchors or penetration limiters in a

14   retrievable filter prior to the time that Bard did?

15       A    Yes.

16       Q    Who is that?

17       A    The Tulip.  The Gunther Tulip.  The Gunther

18   Tulip.

19       Q    And when did they do that?

20       A    The -- it came out in the United States in about

21   2002, 2003.  But it had been available in Europe about

22   ten years prior to that.

23       Q    When you say in -- available in Europe, you mean

24   in the Cook filter?

25       A    Yes.  The Cook Gunther Tulip filter was available

Page 82

1                  minimize caudal migration."

2            Is that correct?

3      A     That's correct.

4      Q     A choice is a decision.  Would you agree with

5      that?

6      A     Yes, I agree.

7      Q     And to know if a choice was actually made, you

8      have to know what somebody's motivation was; correct?

9            MR. STOLLER:  Object to form.

10           THE WITNESS:  I'm not -- could you repeat the

11     question.  I'm not sure if I understand it.

12     BY MR. NORTH:

13     Q     Well, to know if a choice was consciously made,

14     you have to know a person's state of mind; correct?

15     A     I don't think so.

16           MR. STOLLER:  Form.

17     BY MR. NORTH:

18     Q     Why is that?

19     A     Because the fact is that the filter was produced

20     without a caudal anchor.  And, so, therefore, that --

21     that decision was made to produce it that way.  That's

22     the meaning I'm trying to convey in that sentence.

23     Q     Well, you have no evidence one way or the other

24     that Bard actually considered but then rejected caudal

25     anchors as a design feature for the Recovery filter;

Page 98

1         THE WITNESS:  Well, the meaning of my testimony

2    was that, when the IVC is large, there is less tendency

3    for perforation to take place and therefore less need of

4    a perforation limiter, and therefore the perforation

5    limiter would not be effective in the sense that it's

6    guarding against something that may not be such a big

7    threat -- a big risk.

8    BY MR. STOLLER:

9         Q     Mr. North asked you about that same series of

10   questions with respect to whether things such as an

11   overly large IVC or caval motion could affect -- or

12   impact the effectiveness of some of the design features

13   that you've advocated for with respect to the Recovery

14   filter and asked you as to those, where you indicated

15   that you thought those might, whether you had done any

16   testing to support those -- those answers.

17        Do you recall that?

18        A     I do, yes.

19        Q     And I think you indicated that you've not done

20   any testing; is that correct?

21        A     That's correct.

22        Q     Have you applied the principles you use in your

23   capacity as a mechanical engineer in coming to those

24   conclusions?

25        A     Yes.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 99

1      Q    And can you give a general explanation of what

2    your -- how you arrived at the conclusion that those

3    designs could or would alleviate some of those issues.

4      A    Well, in -- in any given circumstances where the

5    filter is likely to -- to, for example, tilt, then having

6    features that would inhibit that tilt is going to be

7    beneficial in the sense that it would reduce the degree

8    of tilt.

9          Similarly, with perforation, if there are

10   features that help to reduce the degree of perforation,

11   then they will reduce the extent to which perforation

12   will take place.

13         And similarly if there are features that help to

14   reduce the risk that the filter faces in terms of the

15   possibility of fatigue fracture, then features that

16   address that will help to reduce that risk.

17     Q    Let me ask a specific question on this point,

18   which is that, I believe Mr. North asked you whether an

19   overly large IVC or IVC greater than the size indicated

20   in the IFU could affect the effectiveness of the chamfer

21   that you produced here.  And I believe your testimony was

22   that you did not think it would.

23         Is that correct?

24         MR. NORTH:  Objection.  Leading.

25         THE WITNESS:  That's correct.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 100

1    BY MR. STOLLER:

2        Q    And in arriving at that conclusion, you didn't

3    perform any tests; correct?

4        A    That's correct.

5        Q    It's not something that's in any of the reports

6    that you've provided in this litigation.  Is that true?

7        A    That's true.  Yes.

8        Q    You were responding to a question by Mr. North in

9    this deposition; correct?

10       A    Correct.

11       Q    But in arriving at that conclusion, did you apply

12   the principles of mechanical engineering that you use in

13   coming to your other opinions in this case?

14       A    Yes, I did.  Yes.

15       Q    So, could you explain that application as to that

16   example.

17       A    Well, the chamfer on the mouth of the cap becomes

18   significant when the struts interfere with the cap.  So,

19   that, if they are riding against the cap, then the

20   strains can be elevated, and the presence of the -- of

21   the chamfer will help to control that effect.

22            And, therefore, the chamfer can be beneficial in

23   circumstances where the strut is interacting with the cap

24   and can help to reduce the danger of fatigue fracture

25   taking place.  And that circumstance becomes significant

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 101

1    when the struts are touching the mouth of the cap.

2          If the struts are not touching the mouth of the

3    cap, then it's not so relevant.  And, therefore, it

4    depends on specific circumstances that arise in specific

5    cases.  And that would depend on many things, including

6    the size of the IVC.

7    Q    Is it fair to say that, in arriving at your

8    conclusions here today in response to Mr. North's

9    questions as to whether the particular design features

10   you identified would be affected by an overly large IVC,

11   you applied the same principles that you did in

12   concluding that those were necessary design features?

13   A    That's correct.

14         MR. NORTH:  Objection.  Leading.

15         THE WITNESS:  That's correct.

16   BY MR. STOLLER:

17   Q    Let me ask you some questions quickly about your

18   report, which has been marked as Exhibit 1 to your

19   deposition.  And, specifically, I'd like to focus first

20   on the facts which are outlined on page 1, 2 in the

21   bullets points of your report.

22         What is the source for the information that's in

23   those bullet points?

24         MR. NORTH:  Objection.  Asked and answered.

25         THE WITNESS:  The source is Dr. Hurst's report,

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 102

1    Dr. Muehrcke's report, and my review of the medical

2    records in Mrs. Tinlin's case.

3    BY MR. STOLLER:

4        Q    And I would like you to pull what has been marked

5    as Exhibit 4 to your deposition, which is Mr. Hurst's

6    report.  Real quickly.  And if you wouldn't mind skimming

7    what is on his report from pages 2 through 10 under

8    imaging reviewed.

9        A    Yes.

10       Q    In those, what I just had you look through, are

11   Dr. Hurst' review of the imaging that he did for

12   Mrs. Tinlin; correct?

13       A    Correct.

14            MR. NORTH:  Objection.  Leading.

15   BY MR. STOLLER:

16       Q    Did you review that -- those portions of

17   Dr. Hurst's report for purposes of preparing your report?

18       A    That's correct.

19       Q    And did you rely on Dr. Hurst's analysis as to

20   what those imaging studies showed with respect to

21   Mrs. Tinlin's filter?

22       A    That's correct.

23       Q    For purposes of your report, did you assume those

24   facts to be true?

25       A    Yes, I did.  Yes.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 103

1      Q      And you're not providing any independent

2    testimony as to the truth of those facts or whether or

3    not Dr. Hurst's analysis of them is correct; is that

4    true?

5      A      That's correct.

6      Q      And is it reasonable for you in your capacity as

7    an expert on issues of mechanical engineering to rely on

8    Dr. Hurst's analysis of the facts to form the basis of

9    your opinions?

10     A      Yes, it is reasonable.

11     Q      Earlier Mr. North asked you some questions about

12   whether, if Mrs. Tinlin's IVC was larger than indicated

13   in the IFU, it could affect the failure mode she

14   experienced in this case.

15            Do you recall that testimony?

16     A      I do.

17     Q      And I believe you indicated that whether her IVC

18   was larger than indicated in the IFU could affect the

19   failure mode; is that correct?

20            MR. NORTH:  Objection.  Leading.

21            THE WITNESS:  That's correct.

22   BY MR. STOLLER:

23     Q      Let me ask this question.  Your understanding --

24   is it correct that your understanding is that the IFU

25   indicates for use in IVCs up to 28 millimeters?

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 104

1     A     That's correct.

2     Q     And do you have an understanding, based on your

3  review of Bard's records to which you had access or were

4  provided to you in this litigation, with respect to

5  Bard's understanding of the size of an IVC and why that

6  number at 28 was included the IFU?

7          THE REPORTER:  Was?

8          MR. STOLLER:  Included in the IFU.

9          MR. NORTH:  Objection to the form.

10         THE WITNESS:  Well, it's my understanding that

11  they understood that the size of the vena cava is

12  variable due to many circumstances, such as breathing,

13  motion, Valsalva, and so on, and that -- that there

14  was -- there were also aspects of the behavior of the

15  filter that might be compromised by a large vena cava,

16  such as migration.  And so they put a limit on how big

17  the vena cava should be in terms of the instructions for

18  use in terms of allowing it to be implanted.

19  BY MR. STOLLER:

20     Q     And do you have an understanding, based on your

21  review of the medical literature, of the type or amount

22  of variation that might happen in an IVC?

23     A     I do.

24     Q     And what is that?

25     A     Well, my understanding is that the variation can

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 105

1    be very significant, such as perhaps as large as

2    43 percent during breathing.  In other words, the width

3    of the IVC can change by as much as 43 percent during

4    breathing.  And during Valsalva it can change by amounts

5    that are as high as 90 percent in terms of the change of

6    width of the IVC.

7        Q    And do you have expertise in terms of identifying

8    what the size -- I use the term size loosely -- of an IVC

9    is in its normal state versus in its expanded or

10   contracted state?

11       A    I'm not sure I understand the question.  Can you

12   repeat the question, please.

13       Q    Sure.

14            I think I understood you to say that the IVC can

15   vary in size and normal breathing by as much as

16   43 percent?

17       A    Correct.

18       Q    I'm going to use 50 percent for ease of math.

19   So, if somebody's normal-state IVC is 20 millimeters, it

20   could in normal state expand and contract to as much as

21   30 millimeters.

22            Am I understanding that correctly?

23       A    That's correct.

24       Q    So, do you have an understanding of how to

25   determine, when you're looking at an IVC, whether it is

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 106

1    in a normal state, which is 20 millimeter IVC which is

2    expanded to 30, or if it is a 30 millimeter IVC that

3    could expand or contract from there?

4          MR. NORTH:  Objection to the form.

5          THE WITNESS:  Well, with a snapshot measurement,

6    you wouldn't know whether that is as big as it's going to

7    be or as small as it's going to be or how much the change

8    of width might be that the patient would experience.

9    BY MR. STOLLER:

10    Q    And is it -- based on your understanding of the

11    function of the IVC, can a 28 millimeter IVC in its

12    normal state ever be larger than 28 millimeters?

13          MR. NORTH:  Object to the form.  Leading.

14          THE WITNESS:  Yes.

15    BY MR. STOLLER:

16    Q    And by how much and how big can it get?

17    A    Well, if we use the 50 percent figure that

18    represents breathing, it could be as large as

19    43 millimeters in width as a consequence of that kind of

20    increase in diameter.

21    Q    Now, based on your review of the internal Bard

22    documents, were they -- did they take that into account

23    in 2004 and 2005 in designing the -- I should take that

24    back -- in 2003 and 2002 in designing their Recovery

25    filter?

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 107

1              MR. NORTH:  Objection.  No foundation.

2              THE WITNESS:  No.  They did not.

3     BY MR. STOLLER:

4        Q    Were they aware of the fact that the IVC could

5     expand by that much at that point in time?

6              MR. NORTH:  Objection.  No foundation.

7              THE WITNESS:  They were not.

8     BY MR. STOLLER:

9        Q    And, so, is there any indication in the IFU that

10    warns treating doctors that the filters shouldn't be

11    implanted in an IVC that is 28 millimeters because it

12    might expand to a greater size?

13             MR. NORTH:  Objection to the form.

14             THE WITNESS:  Not to my knowledge.

15    BY MR. STOLLER:

16       Q    Are there design aspects of the filter that

17    should have taken those issues into account?

18       A    Yes.

19       Q    And what are they?

20       A    The design aspects, such as making sure that the

21    anchoring of the filter to the wall would be effective

22    even as the vena cava became very large so that it would

23    not be prone to tilting and migration when the vena cava

24    becomes very large, and the features that might limit

25    perforation if the vena cava becomes very small, which

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 108

1    will tend to make perforation more likely.

2          And since both tilt and perforation contribute to

3    the likelihood of fracture, they would affect the

4    likelihood of fracture by fatigue, and therefore the

5    design should have taken that into consideration in

6    regard to its resistance to fatigue fracture.

7    Q    And if a filter is indicated for use in an IVC up

8    to 28 millimeters, should it be also -- in light of the

9    fact that IVC can expand fairly significantly, should it

10   be designed to be safe and effective for use in IVCs

11   greater than 28 millimeters?

12         MR. NORTH:  Objection to the form.  No

13   foundation.  And leading.

14         THE WITNESS:  Yes.

15   BY MR. STOLLER:

16   Q    Mr. North asked you some questions about your

17   analysis of other filters in the overall IVC filter

18   litigation against Bard and specifically as to FEA

19   analysis you had conducted as to the various filters.

20   And I believe you testified that you had not conducted

21   FEA specific to the Meridian and Denali.

22         Was that your testimony?

23   A    That's correct.

24   Q    Is that accurate?

25   A    No.  I realized that I misspoke when I said that

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 109

1     the calculations are not relevant to the Meridian because

2     the Meridian in its overall shape is identical to the G2,

3     which I did do calculations for, both finite element

4     calculations and --

5             THE REPORTER:  Both?

6             THE WITNESS:  -- finite element calculations and

7     other calculations by algebra and calculus, and so on.

8             So, those calculations all apply to the Meridian.

9     They also apply in -- approximately, but fairly

10    accurately, render the approximation to the Denali.

11    Because the shape of the Denali is very similar -- is

12    quite similar to the shapes of the Meridian, the Eclipse,

13    and the G2.

14    BY MR. STOLLER:

15    Q     Dr. McMeeking, with respect to the report that is

16    Exhibit 1 here today and the other reports that you've

17    provided in the Bard IVC filter litigation, do those

18    reports accurately set forth your opinion and the basis

19    for opinions that you've arrived at to a reasonable

20    degree of engineering probability?

21    A     Yes, they do.

22    Q     And in coming to those conclusions and opinions,

23    did you follow a methodology that is utilized by

24    reasonable engineers in your field to resolve these

25    issues?

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 110

1      A     I did, yes.

2      Q     And did you apply the same methods and processes

3   that are used by mechanical engineers in arriving at

4   those opinions?

5      A     Yes, I did.

6      Q     In order to come to your opinions as to the

7   design and testing of the Bard IVC filters, was it

8   necessary for you to carry out bench testing or animal

9   testing?

10      A     No.  It was not.

11      Q     And do mechanical engineers in your role

12   typically carry out bench testing or animal testing?

13      A     Well, many of them carry out bench testing.  But

14   animal testing would be an unusual pursuit for a

15   mechanical engineer of my background and professional

16   activities.

17      Q     The purpose of the bench -- what's the purpose of

18   bench testing?

19      A     The purpose of the bench testing is to simulate

20   the environment that the filter will experience as

21   closely as possible and to investigate whether it will

22   suffer failure modes that need to be avoided once it's

23   implanted in a patient, and also to see whether it -- the

24   filter will be -- is likely to be effective in terms of

25   counting out its function.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 111

1     Q     And you've reviewed much of the bench testing

2   that Bard conducted with respect to the IVC filters in

3   this litigation; correct?

4     A     That's correct.

5     Q     And specifically you've done that as to the

6   Recovery; correct?

7     A     That's correct.

8     Q     And do those bench -- does that bench testing

9   conform with the standard you just articulated?

10    A     No.  They do not.

11    Q     Did you follow the methodology that engineers use

12  and should follow when doing the analysis that you've

13  done in this case?

14    A     Yes, I did.

15    Q     And you were asked questions about whether you

16  had inspected Mrs. Tinlin's filter or filter fragments

17  that are still in her body.

18          Do you recall that?

19    A     I do.

20    Q     Do you need to inspect those in order to arrive

21  at the conclusions you have in this case?

22    A     No, I do not.

23          MR. STOLLER:  I don't have any further questions.

24          MR. NORTH:  Just a few more, Dr. McMeeking.

25