# Exhibit G

```
                       UNITED STATES DISTRICT COURT

                       FOR THE DISTRICT OF ARIZONA

                       _____


In Re: Bard IVC Filters               )   MD-15-02641-PHX-DGC
Products Liability Litigation         )
                                      )   Phoenix, Arizona
                                      )   May 15, 2018
_____ )
Doris Jones, an individual,           )
                                      )
                    Plaintiff,        )
                                      )   CV-16-00782-PHX-DGC
        v.                            )
                                      )
C.R. Bard, Inc., a New Jersey         )
corporation; and Bard Peripheral      )
Vascular, Inc., an Arizona            )
corporation,                          )
                                      )
                    Defendants.       )
_____ )
```

**BEFORE: THE HONORABLE DAVID G. CAMPBELL, JUDGE**

REPORTER'S TRANSCRIPT OF PROCEEDINGS

<u>**TRIAL DAY 1 - A.M. SESSION**</u>

(Pages 1 - 124)

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona 85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1  A.  My name is Robert McMeeking.  I'm from Santa Barbara,
2  California.
3  Q.  And you have the title Doctor, but you are not a medical
4  doctor, correct?
5  A.  No.  I'm a Doctor of Philosophy in Engineering.                01:01PM
6  Q.  So you are an engineering doctor?
7  A.  Correct.
8  Q.  What do you do for a living, Dr. McMeeking?
9  A.  I'm a Professor of Mechanical Engineering at the University
10 of California, Santa Barbara.
11 Q.  What is mechanical engineering?
12 A.  Mechanical engineering is the creation, the design, and the
13 analysis of mechanical devices.
14 Q.  Does that include medical devices?
15 A.  Yes, it does.                                                   01:01PM
16 Q.  We'll talk a bit about your background and qualifications.
17 But would you tell the jury why you are here today?
18 A.  I'm here to testify about Bard's design and testing of its
19 IVC filters, particularly the Recovery, the G2, and the Eclipse
20 Filter, and to discuss the problems I found with the design of    01:02PM
21 those filters and to tell you about the impact that the
22 defective design of the filter had on the filter that is in
23 Mrs. Jones.
24 Q.  Have you prepared a summary of your opinions to help
25 illustrate your opinion to the jury?                               01:02PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1  A.  My name is Robert McMeeking.  I'm from Santa Barbara,
2  California.
3  Q.  And you have the title Doctor, but you are not a medical
4  doctor, correct?
5  A.  No.  I'm a Doctor of Philosophy in Engineering.                01:01PM
6  Q.  So you are an engineering doctor?
7  A.  Correct.
8  Q.  What do you do for a living, Dr. McMeeking?
9  A.  I'm a Professor of Mechanical Engineering at the University
10 of California, Santa Barbara.
11 Q.  What is mechanical engineering?
12 A.  Mechanical engineering is the creation, the design, and the
13 analysis of mechanical devices.
14 Q.  Does that include medical devices?
15 A.  Yes, it does.                                                   01:01PM
16 Q.  We'll talk a bit about your background and qualifications.
17 But would you tell the jury why you are here today?
18 A.  I'm here to testify about Bard's design and testing of its
19 IVC filters, particularly the Recovery, the G2, and the Eclipse
20 Filter, and to discuss the problems I found with the design of    01:02PM
21 those filters and to tell you about the impact that the
22 defective design of the filter had on the filter that is in
23 Mrs. Jones.
24 Q.  Have you prepared a summary of your opinions to help
25 illustrate your opinion to the jury?                               01:02PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1  version of the filter, the Recovery.  And as a consequence,
2  they were not -- they were not completely sure of what was
3  causing those failures, and therefore, they were not able to do
4  a redesign of the filter to adequately address the reduction of
5  the incidence of those failures or to be able to eliminate them          01:04PM
6  completely or to reduce them to the greatest extent feasible.
7  Q.  Do you have any opinions with respect to the effect of
8  those designs and testing failures on the filter that Mrs.
9  Jones had?
10 A.  Yes.  It is my opinion that those defects in the design              01:04PM
11 caused the problems that Mrs. Jones suffered from her filter.
12 Q.  Let's talk a bit about your background.  You are a
13 Professor of Mechanical Engineering and Material Science at
14 UCSB, correct?
15 A.  That's correct, yes.                                                 01:04PM
16 Q.  How long have you taught mechanical engineering and
17 material science?
18 A.  I have taught at University level for 45 years, over 45
19 years.  Sorry.
20 Q.  Excuse me.                                                           01:04PM
21      In addition to UCSB, where else have you taught?
22 A.  As a graduate assistant I taught at Brown University and
23 then I was at Stanford University for two years, 1976 to 1978.
24 Then I moved to the University of Illinois at Urbana-Champaign
25 and I was there from 1978 to 1985, at which stage I moved to             01:05PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1        THE COURT: Hold on.

2        MR. STOLLER: Sorry, Your Honor.

3        THE COURT: By curving or chamfering the edge or by
4 eliminating the connection to the cap. Okay. So that's in
5 there. What else do you have in the way of alternative design?   02:51PM
6 Well, let me ask you this. Are you going to elicit alternative
7 design testimony besides that?

8        MR. STOLLER: Yes.

9        THE COURT: What else are you going to elicit?

10       MR. STOLLER: Based on the examination where he was   02:51PM
11 examined by Ms. Daly we're going to elicit testimony that they
12 could have had caudal anchors to elicit caudal movement.

13       THE COURT: Where is that?

14       MR. STOLLER: Page 32. The July 6, 2017: Are there
15 any other changes you think could be made to the filters? He   02:51PM
16 discusses caudal anchors and penetration limiters.

17       THE COURT: All right. I see that on Page 32. What
18 else are you going to elicit?

19       MR. STOLLER: He also testified, Your Honor, at the
20 last trial that the two tier -- the two tier staging of the SNF   02:52PM
21 is a better design to alleviate tilt.

22       THE COURT: What is your response on those three
23 points.

24       MR. NORTH: Your Honor, I think I'm just going to --
25 I'm sorry. He says the opposite in other places. I guess I   02:52PM

1 just need to impeach him with that.

2     THE COURT: So the three areas are where the arms and

3 legs leave the cap; the angle while attaching to the cap,

4 caudal anchors, penetration limiters.

5     MR. STOLLER: Those are two separate things.   02:52PM

6     THE COURT: I know. And the two-staged tiered

7 approach of the Simon Nitinol. That's what you're eliciting?

8     MR. NORTH: Is the two-tiered fair game just because

9 it was mentioned in the last trial?

10     THE COURT: Well, when I said how do you feel about   02:53PM

11 that, you didn't state an objection.

12     MR. NORTH: I'm asking.

13     THE COURT: Are you asking if I would advise you to

14 object?

15     MR. NORTH: Fair enough. We would object because it   02:53PM

16 was not explored in either the deposition or the --

17     THE COURT: Is the two-tiered in the deposition or

18 report?

19     MR. STOLLER: He identified the SNF as all ulterior

20 design in his report.   02:53PM

21     THE COURT: Can you show me where?

22     MR. STOLLER: Your Honor, I will skip that one in the

23 interest of time. I know I'm not going to deal with it.

24     THE COURT: Okay.

25     (In open court.)   02:53PM

5-16-18-MD 15-2641-Jones v Bard-Jury Trial-Day 2-McMeeking-Direct

1    THE COURT: Thanks, Ladies and Gentlemen.
2    BY MR. STOLLER:
3    Q. Dr. McMeeking, I want to talk about some potential
4    alternative design features that you believe may have fixed
5    some of the issues you have identified. Let me talk                02:54PM
6    specifically about the issues you identified about the IVC
7    filter leg coming out of the cap and the concentration of
8    strains there. Do you understand what I'm talking about?
9    A. Yes. Yes, I do.
10   Q. What sort of design changes could Bard have made that would    02:54PM
11   have fixed or reduced the problems with that design issue?
12   A. They could have smoothed the sharp corner to make it
13   gentler.
14   Q. What effect would that have had?
15   A. That would have the effect of avoiding the severe              02:54PM
16   concentration of strain that can occur at that location.
17   Q. And in turn result in less fractures?
18   A. Correct.
19   Q. Okay. With respect to the issue of perforation, what are
20   there -- do you have opinions as to what sort of design changes   02:55PM
21   they could have made to either eliminate or reduce the
22   frequency of that occurrence?
23   A. Yes. They could have added penetration limiters which
24   would be features on the limbs that would help to slow down or
25   even stop the perforation of the limbs through the wall of the   02:55PM

UNITED STATES DISTRICT COURT

1   IVC.

2   Q.  Does that have effect on migration as well?

3   A.  If designed properly, they would have helped to eliminate

4   migration down towards the feet.  The hooks which are on the

5   filter already help to limit the tendency for the filter to                02:55PM

6   move toward your head.  But adding some hook-like features that

7   would point in the opposite direction would help to stop the

8   filter going downwards.

9   Q.  And is there a difference between a design element that you

10  would have added to alleviate the effect of movement down                   02:56PM

11  versus the perforation?

12  A.  Well, they could have been the same device.  But in one

13  case it could have -- hook-like features would have worked.  In

14  the other case of penetration limitation, somewhat blunt

15  features would help to slow down the motion of the limb through            02:56PM

16  the wall of the IVC.

17  Q.  And the migration downward here, what the jury has been

18  told is called caudal?

19  A.  Caudal migration.

20  Q.  You would put on something called caudal anchors?                      02:56PM

21  A.  They are called caudal anchors.

22  Q.  Where would those be placed?

23  A.  They could be placed either at the feet or the hands of the

24  limbs, and they may be placed elsewhere on the limbs as is

25  convenient for the way that the device is hooked into the IVC              02:56PM

1  and the way that it's delivered from the delivery tube.
2  Q.  Let's talk for a moment, Doctor, about your opinions with
3  respect to Bard's design processes and testing for the Eclipse
4  Filter in the prior generation.  And I believe you testified
5  earlier that you have opinions with respect to Bard's actions                02:57PM
6  in testing its filters.  What is your opinion?
7  A.  My opinion is that the testing was inadequate.
8  Q.  And why do you hold that opinion?
9  A.  I hold that opinion because in some of the tests that they
10 did do the conditions that were used were not the worst-case                 02:57PM
11 conditions that were reasonably foreseeable.  And in other
12 cases, there was no test done at all.  For example, there was
13 no test to look at whether the filter would tilt after it had
14 been implanted.  And there was no test to look at whether the
15 limbs would have a tendency to cut through the wall of the IVC               02:57PM
16 and, therefore, puncture and perforate through the wall of the
17 IVC.
18 Q.  Did you review Bard's bench testing?
19 A.  I did.
20 Q.  Did you review its finite element analysis?                              02:58PM
21 A.  I did.
22 Q.  Was its testing reasonable?
23 A.  No.
24 Q.  Was its testing adequate?
25 A.  No.  It wasn't adequate.  No.                                            02:58PM