# EXHIBIT A



Deposition of:

# Robert M. McMeeking , PhD, NAE, FRSE

*January 30, 2019*

In the Matter of:

# In Re: Bard IVC Filters Products Liability

Veritext Legal Solutions

Robert M. McMeeking , PhD, NAE, FRSE      January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 44

1      A      No.

2      Q      Are they all equally effective?

3      A      Their effectiveness would vary according to their

4  design.

5      Q      Are all penetration limiters the same design?

6      A      No.

7      Q      Are all equally effective?

8      A      No.

9      Q      Is there more than one variation of a two-tiered

10  design?

11      A      Yes.

12      Q      So, all two-tiered designs are not the same;

13  correct?

14      A      They are not the same.

15      Q      And all two-tiered designs are not equally

16  effective?

17      A      Yes.  I would accept that.  Yes.

18      Q      And you did not include in your report any design

19  drawing of a two-tiered design; correct?

20      A      Not in this report -- I didn't provide any design

21  drawings.  I provided an image of the Simon Nitinol

22  filter, but no design drawings.

23      Q      So, when you have proposed a two-tiered design as

24  an alternative to the Recovery filter, your proposal is

25  essentially the Simon Nitinol filter?

Robert M. McMeeking , PhD, NAE, FRSE      January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 45

1      A     That's correct.

2      Q     Your report does not propose any specific

3    dimensions for the caudal anchors you suggest; correct?

4      A     That's correct.

5      Q     It does not propose any specific dimensions for

6    the penetration limiters?

7      A     Correct.

8      Q     And other than to provide an image of the Simon

9    Nitinol filter, you don't provide any dimensions of the

10   two-tiered design; correct?

11     A     That's correct.

12     Q     There is no photograph -- well, no picture or

13   graphic depiction of the alternative filter that you

14   believe should have been designed?

15     A     No.

16     Q     Your report does not criticize Bard's use of the

17   material Nitinol for the filter, does it?

18     A     No, it does not.

19     Q     And your report does not address what sort of

20   material should be used for a device such as this, does

21   it?

22     A     That's correct.

23     Q     And it does not propose an alternative material

24   to the Nitinol that was used?

25     A     That's correct.

Robert M. McMeeking , PhD, NAE, FRSE     January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 46

1      Q     Now, let's go beyond this specific report.  Am I

2   correct that in none of the expert reports you have

3   prepared in this litigation have you provided any design

4   drawings of caudal anchors that you believe should have

5   been implemented?

6      A     That's correct.

7      Q     And is it correct that in all of your expert

8   reports in this litigation, you have never prepared -- or

9   proposed any design drawings for the penetration limiters

10   you suggest?

11      A     That's correct.

12      Q     And is it correct that in this litigation you

13   have never in any of your expert reports provided design

14   drawings or graphic depictions for the two-tiered design

15   you propose other than to provide an image of the Simon

16   Nitinol filter?

17      A     That's correct.

18      Q     And you have not tried to devise any two-tiered

19   design other than the dimensions of the Simon Nitinol

20   filter itself as a two-tiered design that would have

21   improved the performance; correct?

22      A     That's correct.

23      Q     Now, with regard specifically to the caudal

24   anchors -- well, let me back up.

25            In some of your previous reports you -- to do

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 47

1   those reports, you did a number of calculations; correct?

2       A     That's correct.

3       Q     But you have never done any calculations focused

4   specifically on caudal anchors and what effect they would

5   have in improving the performance of the filter; correct?

6       A     That's correct.

7       Q     And, likewise, you have never done any specific

8   calculations regarding the effect that penetration

9   limiters would have on the filter?

10      A     That's correct.

11      Q     And you have never done any specific calculations

12  as to the effect that a two-tiered design would have on

13  the filter?

14      A     That's correct.

15      Q     And you have never done any specific calculations

16  as to the effect that the rounded chamfer would have on

17  the filter; correct?

18      A     No.  I disagree with that.

19      Q     Okay.  Tell me the basis for that.

20      A     Well, in the MDL report I present calculations

21  for the effect of the rounded chamfer in regard to the

22  levels of strain and stress which are associated with it

23  in the adjacent strut.

24      Q     Would you agree with me that in your view a

25  filter that had the rounded chamfer, like you've

Robert M. McMeeking , PhD, NAE, FRSE      January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 48

1    discussed, but did not have penetration limiters, caudal

2    anchors, or a two-tiered design could fracture?

3        A    Yes.  It could.

4        Q    In other words, the rounded cap, in the absence

5    of those other design features, would not necessarily

6    prevent a fracture; correct?

7        A    That's correct.

8        Q    Do you know anything about some of the other

9    medical conditions Mrs. Tinlin has had or does have now?

10       A    No, I do not.

11       Q    And you don't have any information concerning the

12   tissue quality firmness or flexibility of her vena cava,

13   do you?

14       A    I do not, no.

15       Q    Or what her blood flows was or is?

16       A    No.

17       Q    What her respiration rate was --

18       A    No, I do not.

19       Q    -- or is?

20            What her experiences have been with Valsalva?

21       A    No.

22       Q    And neither Dr. Hurst nor Dr. Muehrcke or any

23   other doctor have given you any such information

24   regarding those things, have they?

25       A    That's correct.

Page 49

1    Q    And as a part of your work in this case, you did

2    not investigate anything specific about Mrs. Tinlin's

3    anatomy; correct?

4    A    Correct.

5    Q    And other than to read the reports of Drs. Hurst

6    and Muehrcke, you did not investigate anything about her

7    medical conditions; correct?

8    A    That's correct.

9    Q    Are you aware that Mrs. Tinlin's physicians

10   recommended and prescribed a retrievable filter for her?

11   A    I'm not aware of their recommendations.

12   Q    Let's turn to page 3 of your report, if we could.

13   At the bottom of the first full paragraph, after you've

14   discussed some of these alternative design features, you

15   state, and I quote:

16              "Many of these design features existed

17              in other IVC filter products already on

18              the market, including the Simon Nitinol

19              filter, the Cook Guther Tulip filter, the

20              Greenfield filter, and the Cook Bird's

21              Nest filter."

22          Correct?

23   A    Correct.

24   Q    Do you know whether any of those retrievers --

25   any of those filters you identify are retrievable?

Robert M. McMeeking , PhD, NAE, FRSE      January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 50

1      A      Yes.   The Gunther Tulip filter is retrievable.

2      Q      Do you know whether the Cook -- well, the others

3   are not?

4      A      Oh, sorry.   Yes, the others are not.

5      Q      Do you know, with regard to the Cook Gunther

6   Tulip filter, whether there was a limitation on the

7   amount of time it could be implanted before retrieval?

8      A      Yes.

9      Q      And what was that limitation?

10      A      It's on the order of seven to ten days.

11      Q      And, by comparison, what was the indwell time

12   that would be permissible or okay for a Recovery filter?

13      A      Recovery filter is optional in that it could be

14   left in on a permanent basis, according to the

15   instructions for use, is my understanding.

16      Q      Could it be retrieved later than seven to ten

17   days after implant?

18      A      It's my understanding that it can be retrieved

19   beyond seven days.

20           MR. STOLLER:   Object to foundation.

21   BY MR. NORTH:

22      Q      Are you aware of medical studies and reports

23   indicating the successful retrieval of the Recovery

24   filter many months after it was implanted?

25      A      I am.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 58

1    correct?

2        A    That's correct.

3        Q    It's entirely possible that using a two-tiered

4    design would not have prevented Mrs. Tinlin from

5    sustaining any of the injuries she alleges in this case;

6    correct?

7        A    That's correct.

8             Sorry.  Could repeat the question.

9        Q    It's entirely possible that using a two-tiered

10   design would not have prevented Mrs. Tinlin from

11   sustaining any of the injuries she alleges in this case?

12       A    Yes.  I agree.

13       Q    And you have done no calculations in this

14   litigation as to -- to try to quantify the extent to

15   which a two-tiered design might reduce the risk of

16   Mrs. Tinlin having sustained the injuries she did?

17       A    That's correct.

18       Q    It's entirely possible that improving the shape

19   of the cap, as you suggest, would not have prevented

20   Mrs. Tinlin from sustaining any of the injuries she

21   alleges; correct?

22       A    That's correct.

23       Q    And you have performed no calculations in this

24   litigation to quantify the extent to which a cap would

25   have reduced the risk to Mrs. Tinlin of sustaining the

Robert M. McMeeking , PhD, NAE, FRSE     January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 59

1    injuries?

2        A     That's correct.

3        Q     And, therefore, it is possible that adding all of

4    the design features you suggest would not have prevented

5    Mrs. Tinlin from sustaining the injuries she alleges;

6    correct?

7        A     That's correct.

8        Q     You are not aware of any single IVC filter that

9    carries no risk of fractures; correct?

10       A     I'm not aware of any, that's correct.

11            MR. NORTH:  Why don't we take a break.  We've

12   been going 75 minutes, I think.

13            MR. STOLLER:  Fine.

14            THE VIDEOGRAPHER:  The time is 11:15 a.m., and we

15   are off the record.

16                         (Recess.)

17            THE VIDEOGRAPHER:  The time is 11:26 a.m., and

18   we're back on the record.

19   BY MR. NORTH:

20       Q     Dr. McMeeking, you agree that all IVC filters can

21   tilt; correct?

22       A     I'm not sure I agree with that.  But many of them

23   do tilt, yes, or can tilt.

24       Q     And all IVC filters can penetrate?

25       A     Yes.  I agree with that.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 60

1    Q    All IVC filters can migrate; correct?

2    A    I agree with that, yes.

3    Q    And all IVC filters can fracture?

4    A    I think that's likely the case, yes, I agree.

5    Q    Now, you said -- seemed to apply that not all IVC

6    filters can tilt.  Are there some that you believe cannot

7    tilt?

8    A    I think the ones that are quite cylindrical in

9    shape are perhaps unable to tilt.

10   Q    But many of the filters that are on the market

11   can tilt; correct?

12   A    That's correct.

13   Q    As we sit here today, Doctor, you cannot say to a

14   reasonable degree of engineering certainty that the

15   design changes you discuss in your report would have

16   prevented Mrs. Tinlin's injuries, can you?

17   A    That's correct.

18   Q    And you cannot say by what percentage the risk

19   would have been reduced with these design changes, can

20   you?

21   A    That's correct.

22   Q    Is there anywhere in your report where you

23   outline the specific health conditions Mrs. Tinlin

24   suffers that might have impacted her filter in and its

25   performance?

Page 61

1      A     No.

2      Q     Was that significant to you in preparing your

3   report?

4      A     Could you repeat the question.

5      Q     Was that significant to you in preparing her

6   report -- your report?

7      A     You mean leaving it out?

8      Q     Was the fact -- well, were any specific health

9   conditions that she suffers that might have impacted her

10  filter or its performance -- was any of that important to

11  you in coming up with your opinions?

12     A     No.  It was not.

13     Q     And you have no idea whether Mrs. Tinlin suffered

14  from any particular health condition that could have

15  increased the likelihood that her Recovery filter would

16  have tilted, migrated, perforated, or fractured; correct?

17     A     Correct.

18     Q     You understand that Mrs. Tinlin needed an

19  inferior vena cava filter; correct?

20          MR. STOLLER:  Foundation.

21          THE WITNESS:  Well, I assume, because her doctors

22  prescribed one, that she was considered to need one, yes.

23  BY MR. NORTH:

24     Q     And, therefore, you understand that at least her

25  doctors thought she could have died had she not received

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 62

1    a filter; correct?

2            MR. STOLLER:   Objection.   Foundation.

3            THE WITNESS:   I'm not sure if they thought she

4    would have died.   But I believe that they assessed that

5    it would avoid problems that she might face in terms of

6    her health.

7    BY MR. NORTH:

8        Q     You have no reason to dispute whether or not

9    Mrs. Tinlin's Recovery filter might have saved her life;

10   correct?

11       A     I have no reason to dispute that, no.

12       Q     You did no additional testing for your report in

13   this case; correct?

14       A     That's correct.

15       Q     And you did no additional calculations for your

16   report in this case?

17       A     That's correct.

18       Q     None of the opinions you provide in this report

19   regarding design alternatives have been published in any

20   literature by you, have they?

21       A     By me, no.   Correct.

22       Q     Are you aware of any literature regarding

23   penetration limiters or caudal anchors and their efficacy

24   on filters?

25       A     Well, yes.

Robert M. McMeeking , PhD, NAE, FRSE     January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 63

1      Q     And what is that?

2      A     There are papers that look at clinical experience

3   with filters that have and do not have those features on

4   them.

5      Q     I'm talking about from an engineering standpoint.

6   Are you aware of any publications that analyze from an

7   engineering perspective how caudal anchors or penetration

8   limiters perform?

9      A     Not from an engineering assessment, no.

10      Q     And you haven't published anything from an

11   engineering perspective regarding penetration limiters,

12   caudal anchors, two-tiered design, or a rounded chamfer;

13   correct?

14      A     That's correct.

15      Q     And, therefore, your opinions regarding those

16   design alternatives have not been peer reviewed, have

17   they?

18      A     Not directly, no.

19      Q     You're not aware of any industry or government

20   standards that would require any of the design

21   alternatives that you've proposed; correct?

22      A     Yes.  I'm aware of some.

23      Q     What would those be?

24      A     In the sense that companies are expected to

25   reduce all risks to the extent practicable.

Robert M. McMeeking , PhD, NAE, FRSE       January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 70

1    believe I did a specific calculation for 28 millimeters.

2    BY MR. NORTH:

3        Q     And therefore, as you sit here today, you cannot

4    say what the strain on the filter would be in a diameter

5    of 28 millimeters; correct?

6        A     That's correct.

7        Q     Let's look at Table 2.  What does that show?

8        A     This shows the results for a Recovery filter.  A

9    similar calculation, except now the arm of the filter has

10   perforated the wall of the vena cava.

11       Q     And, again, you're trying to calculate the

12   maximum strains; correct?

13       A     That's correct.

14       Q     And you did that -- those calculations with

15   various assumptions for the diameter of the vena cava;

16   correct?

17       A     That's correct.

18       Q     And those ranged from 14 millimeters to

19   21 millimeters?

20       A     That's correct.

21       Q     And you did not do these calculations with any

22   assumption of a vena cava with 28 millimeters; correct?

23       A     That's correct.

24       Q     And, so, you're not able to say, as you sit here

25   today, what -- you're not able to quantify the strains in

Page 71

1    this analysis that would be present in a vena cava with

2    28 millimeters in diameter?

3        A    That's correct.

4        Q    You are aware that later generations of Bard

5    filters, such as the Meridian and the Denali came

6    equipped caudal anchors and penetration limiters;

7    correct?

8        A    I'm aware that Meridian has caudal anchors.  The

9    Denali has penetration limiters.  And I believe the

10   Denali has caudal anchors as well, but I don't recall

11   exactly whether that's the case.

12       Q    Are you aware of any single IVC manufacturer who

13   incorporated caudal anchors or penetration limiters in a

14   retrievable filter prior to the time that Bard did?

15       A    Yes.

16       Q    Who is that?

17       A    The Tulip.  The Gunther Tulip.  The Gunther

18   Tulip.

19       Q    And when did they do that?

20       A    The -- it came out in the United States in about

21   2002, 2003.  But it had been available in Europe about

22   ten years prior to that.

23       Q    When you say in -- available in Europe, you mean

24   in the Cook filter?

25       A    Yes.  The Cook Gunther Tulip filter was available

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 72

1    in Europe during the 1990s.

2        Q    And you have previously given -- filed a report

3    in the Cook litigation that that Gunther Tulip filter is

4    defectively designed, haven't you?

5        A    I have, yes.

6        Q    Are you aware of any IVC filter manufacturer

7    other than Cook who incorporated anchors or limiters in a

8    retrievable filter prior to Bard?

9        A    No, I am not.

10       Q    You cannot speak in any detail or any depth about

11   the process by which Bard studied and ultimately

12   implemented anchors and limiters; can you?

13       A    Sorry.  Can I correct my previous answer?

14       Q    Yes.

15       A    Could you ask me the question again.  Because I

16   think I answered it wrongly.

17       Q    Are you aware of a single IVC filter manufacturer

18   other than Cook who incorporated anchors or limiters in a

19   retrievable filter any earlier than Bard did?

20       A    Yes, I am.

21       Q    Ask who is that?

22       A    It's -- Rex/Argon is the company, and the filter

23   is the Option.  And it had a penetration limiter.  And it

24   was -- it was cleared in 2009, is my recollection.

25       Q    Other than Cook, are you aware of any IVC

Robert M. McMeeking , PhD, NAE, FRSE    January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 73

1    manufacturer who incorporated anchors or limiters in a

2    retrievable filter prior to 2005 when --

3        A    No.

4        Q    -- Mrs. Tinlin received her filter?

5        A    No.  I am not aware of any.

6        Q    So, the only filter available at the time

7    Mrs. Tinlin had her -- only retrievable filter available

8    at the time she had her implant in 2005 that had limiters

9    or anchors was the Cook filter that you have also opined

10   is defective?

11           MR. STOLLER:  Object to the form.

12           THE WITNESS:  That's correct.

13   BY MR. NORTH:

14       Q    Have you given any opinions on the design of the

15   Argon filter you just mentioned?

16       A    No.

17       Q    Okay.  You cannot speak in any detail or in any

18   depth about the process by which Bard studied and

19   ultimately implemented anchors and limiters, can you?

20       A    No, I cannot.

21       Q    And as an engineer in understanding the product

22   development process, as you do, you would agree it's not

23   just a matter of Bard snapping its fingers and suddenly

24   limiters and anchors appear and work fine; correct?

25       A    That's correct.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 74

1    Q    It requires some development work in the design

2    and testing of those features; correct?

3    A    That's correct.

4    Q    And design and testing to ensure that the

5    addition of those features do not compromise the safety

6    or effectiveness of the device in other ways; correct?

7    A    That's correct.

8    Q    And you are not aware of what Bard did as far as

9    developing or testing initial designs for limiters and

10   anchors that may not have worked ultimately?

11   A    I'm not aware of that work, no.

12   Q    In this litigation you have criticized all

13   generations of Bard filters; correct?

14   A    That's correct.

15   Q    And you have also criticized the design of the

16   Denali, which has both anchors and limiters; correct?

17   A    Can I go back and rephrase my answer?

18   Q    Yes.

19   A    I don't think I've criticized the Simon Nitinol

20   filter.  I've identified some features of it that are

21   relevant to what might happen to it.  But I don't believe

22   I've criticized the Simon Nitinol filter.

23   Q    Well, you've criticized the design of every

24   single retrievable filter produced by Bard; correct?

25   A    That's correct.

Robert M. McMeeking , PhD, NAE, FRSE     January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 75

1      Q     And that includes the Denali filter which has

2   limiters and anchors; correct?

3      A     That's correct.

4      Q     Now, you have done no finite element analyses

5   specific to the Eclipse, Meridian, or Denali filters;

6   correct?

7      A     So, the Eclipse is simply an electro polished

8   version of the G2.  And I did calculations for the G2.

9   So, in that sense I did calculations for the Eclipse.

10      Q     You have done none for the Meridian or Denali;

11   correct?

12      A     None specifically for the Meridian and the

13   Denali.

14      Q     Now, your opinions include a number of criticisms

15   of Bard's testing; correct?

16      A     That's correct.

17      Q     You have made no efforts personally to replicate

18   their testing; correct?

19      A     That's correct.

20      Q     And you have made no efforts to devise

21   alternative test protocols for tests that you believe

22   should be done; correct?

23      A     Not protocols.  I haven't devised protocols, no.

24      Q     And you have not developed any protocols for

25   bench testing that you believe should have been

Page 76

1    performed; correct?

2        A    That's correct.

3        Q    And do I recall correctly from some of your

4    previous testimony that you have never done any bench

5    testing of a medical device in your career?

6        A    I don't do bench testing.  So, it's not in my

7    professional activities.

8        Q    What is an experimentalist?

9        A    An experimentalist is someone who does

10   experiments in the laboratory, physical experiments.

11       Q    And that's not the sort of work you do; correct?

12       A    That's correct.  I am not an experimentalist.

13       Q    And you don't have a laboratory, in fact, for

14   testing purposes?

15       A    That's correct.  I do not.

16       Q    And, as a consequence, you do no animal testing;

17   correct?

18       A    I do no animal testing.  That's correct.

19            It's not the kind of thing that mechanical

20   engineers like me would do.

21       Q    You're aware that caudal anchors were first

22   utilized by Bard in the Meridian filter; correct?

23       A    That's correct.

24       Q    And that was first cleared for sale by the FDA in

25   August of 2011?

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 77

1      A    I don't recall the exact date.  But I'll accept

2    that if that is what you say.

3      Q    And do you have any evidence as to whether those

4    caudal anchors would have worked without compromising

5    other elements of Bard filters before their

6    implementation in 2011?

7      A    I have no evidence, no.

8      Q    And you have -- do you even know how many

9    prototypes of caudal anchors they went through before

10   they developed that design?

11     A    No.

12     Q    Do you know how many years they worked on that

13   design?

14     A    No.

15     Q    And do you know what testing they did on caudal

16   anchors?

17     A    I'd have to review.  But I know they did some

18   testing of the Meridian filter, yes.

19     Q    Well, before they actually developed the Meridian

20   filter, do you know what testing they did of caudal

21   anchors as a potential design attribute of the filters?

22     A    No, I do not.

23     Q    Now, you had previously stated the opinion,

24   however, that the caudal anchors on the Meridian were not

25   effective; correct?

Robert M. McMeeking , PhD, NAE, FRSE       January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 78

1      A     That's correct.

2      Q     And it is your opinion that tilt perforation

3    endothelialization and fracture in the Meridian filter is

4    not significantly better, if any better, than in the

5    Eclipse filter; correct?

6      A     That's correct.

7      Q     And you're aware that the Denali filter was

8    cleared on May 15 of 2013?

9      A     Again, I'm not exactly sure of the date.  But

10   I'll accept that that is it if you're telling me so.

11     Q     And the Denali had penetration limiters for the

12   first time; correct?

13     A     That's correct.

14     Q     Are you aware of any manufacturer that utilized

15   penetration limiters prior to Bard?

16     A     Yes.

17     Q     And who was that?

18     A     That was the Rex/Argon Option filter.

19     Q     But you have criticized the Denali penetration

20   limiters as inadequate; correct?

21     A     That's correct.

22     Q     And it was your -- it is your opinion that the

23   Denali penetration limiters are too small; correct?

24     A     That's correct.

25     Q     But you've made no prototype of what you believe

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 79

1    would be the correctly sized penetration limiter;

2    correct?

3        A    That's correct.

4        Q    And, in fact, you've never identified what that

5    size would be?

6        A    That's correct.

7        Q    And you have not done any calculations or testing

8    to determine if limiters can be increased significantly

9    in size and still fit into the sheath used to implant

10   them; correct?

11       A    That's correct.

12       Q    Or what the impact of larger penetration limiters

13   would be on the retrieval of the filter; correct?

14       A    That's correct.

15       Q    So, while you believe that the Denali penetration

16   limiters are too small to be sufficiently effective, you

17   have done no analysis to determine whether larger

18   penetration limiters would be feasible with this device,

19   have you?

20       A    That's correct.

21       Q    And you have done no analysis of how larger

22   penetration limiters may have compromised the performance

23   or safety of the Denali filter, have you?

24       A    No.  I have not.

25       Q    I believe you previously testified that it is

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 80

1    your expectation that the Denali filter will have a

2    comparable number of adverse events as any of the other

3    Bard filters, notwithstanding the use of anchors and

4    limiters?

5       A    That's correct.

6       Q    And it's your belief that the Denali filter

7    suffers from the same problems that you believe the

8    earlier generation filters have even with the use of

9    limiters and anchors?

10      A    That's correct.

11      Q    So, therefore, you do not believe it's sufficient

12   for a filter to simply have some sort of anchors or

13   penetration limiters in order to improve safety; correct?

14      A    That's correct.  They need to be designed to be

15   effective.

16      Q    They have to be the proper size; correct?

17      A    Correct.

18      Q    They have to be a size that does not compromise

19   the performance or the safety in some other way of the

20   device; correct?

21      A    Well, they -- they should be designed in such a

22   way that they reduce the risks to the extent practicable

23   and that -- that that is balanced against the benefits of

24   the filter.

25      Q    And you have made no effort in this litigation to

Robert M. McMeeking , PhD, NAE, FRSE            January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 81

1    figure out the precise dimensions or size of these design

2    features that would accomplish what you just described?

3        A    That's correct.

4        Q    Nowhere in your report do you compare the anchors

5    and limiters on the Denali filter to the anchors and

6    limiters on any other type of filter such as the Simon

7    Nitinol, Greenfield, Tulip, Bird's Nest, et cetera?

8        A    That's correct.

9        Q    Nothing in your reports address whether the

10   anchors and limiters on the Meridian and/or Denali differ

11   from those, if any, on the filters -- other filters

12   you've identified in your report; correct?

13       A    I'm sorry.  Could you repeat that question.

14       Q    There is nothing in your report that compares the

15   anchors and limiters on the Meridian and Denali filters

16   with any anchors or limiters on the other manufacturers'

17   models?

18       A    Yeah.  I make no comparison.

19       Q    Okay.  Let's look at page 2 of your present

20   report, please, which is Exhibit 1.  If we look down the

21   second full paragraph, that begins with the statement,

22   and I quote:

23               "Bard made a choice to design the

24               Recovery filter without caudal anchors or

25               other features that would prevent and/or

                                                        Page 82

 1                minimize caudal migration."

 2          Is that correct?

 3      A    That's correct.

 4      Q    A choice is a decision.  Would you agree with

 5    that?

 6      A    Yes, I agree.

 7      Q    And to know if a choice was actually made, you

 8    have to know what somebody's motivation was; correct?

 9          MR. STOLLER:  Object to form.

10          THE WITNESS:  I'm not -- could you repeat the

11    question.  I'm not sure if I understand it.

12    BY MR. NORTH:

13      Q    Well, to know if a choice was consciously made,

14    you have to know a person's state of mind; correct?

15      A    I don't think so.

16          MR. STOLLER:  Form.

17    BY MR. NORTH:

18      Q    Why is that?

19      A    Because the fact is that the filter was produced

20    without a caudal anchor.  And, so, therefore, that --

21    that decision was made to produce it that way.  That's

22    the meaning I'm trying to convey in that sentence.

23      Q    Well, you have no evidence one way or the other

24    that Bard actually considered but then rejected caudal

25    anchors as a design feature for the Recovery filter;

Page 83

1     correct?

2        A    That's correct.

3        Q    And you cannot testify as to Bard's motives in

4     deciding or not deciding to use caudal anchors, can you?

5        A    No, I cannot.

6        Q    Or Bard's intent --

7        A    No.

8        Q    -- in making --

9        A    Sorry.

10       Q    -- that choice as you call it?

11       A    That's correct.

12       Q    Or their state of mind?

13       A    That's correct.

14       Q    Now, a couple of paragraphs below you say,

15    Bard -- or the next paragraph.  I'm sorry.

16                  "Bard made a choice to design the

17               Recovery filter without perforation

18               limiters or other features that would

19               prevent and/or minimize perforation of

20               the filter limbs through the walls of the

21               IVC."

22            Correct.

23       A    Correct.

24       Q    And do you have any evidence one way or the other

25    that Bard considered but then rejected perforation

Page 84

1    limiters for use with the Recovery filter?

2       A    I have none.

3       Q    And, again, with regard to a decision, if one was

4    even made, regarding penetration limiters, you can't

5    testify as to Bard's motives; correct?

6       A    Correct.

7       Q    Or their intent?

8       A    Correct.

9       Q    Or their state of mind?

10      A    Correct.

11      Q    Okay.  Let's go to the next paragraph.  "Bard" --

12   it begins, and I quote again:

13               "Bard made a choice to design the

14               Recovery filter without features that

15               would prevent and/or minimize tilt or

16               that would limit the negative

17               consequences of tilt."

18           That's what you said; correct?

19      A    That's correct.

20      Q    But you have no evidence that Bard considered

21   features to eliminate or reduce tilt but then rejected

22   them in the design of the Recovery filter, do you?

23      A    That's correct.

24      Q    And, therefore, you can't testify as to Bard's

25   motives, intent, or state of mind with regard to any

Page 85

1   design features to eliminate or reduce tilt?

2       A    Correct.

3       Q    And you're not aware of any design feature or any

4   IVC filter that totally eliminates the risk of tilt; is

5   that correct?

6       A    That's correct.

7       Q    And you cannot say that any feature, if added to

8   the Recovery filter, would have eliminated tilt in

9   Mrs. Tinlin's case; correct?

10      A    That's correct.

11      Q    And you cannot say by what percentage of risk

12  tilt would have been -- what percentage risk of tilt

13  occurring would have been reduced -- let me try this

14  again.

15           You can't quantify how much the risk of tilt

16  would be reduced in a filter with any particular safety

17  feature added to the Recovery; correct?

18      A    That's correct.

19      Q    And you cannot say that Mrs. Tinlin's injuries

20  would been avoided all together by the addition of any

21  particular safety feature to eliminate or reduce tilt?

22      A    That's correct.

23      Q    Now, you've given previous testimony and you've

24  talked in your previous reports about Bard's testing and

25  analysis; correct?

Page 86

1        A     That's correct.

2        Q     But you don't have any evidence one way or the

3    other that Bard considered but then rejected specific

4    tests regarding tilt, penetration limiters, or caudal

5    anchors; correct?

6        A     That's correct.

7        Q     And, therefore, with regard to those decisions or

8    the lack of decision, you cannot testify as to Bard

9    motives, intent, or state of mind?

10        A     That's correct.

11             MR. NORTH:  I have gone much quicker than I

12    thought.  I think I'm about finished.

13             MR. STOLLER:  Let's take a break?

14             MR. NORTH:  Want to take a break?

15             MR. STOLLER:  Yes.

16             THE VIDEOGRAPHER:  The time is 12:07 p.m., and we

17    are off the record.

18                         (Recess.)

19             THE VIDEOGRAPHER:  The time is 2:12 -- I'm

20    sorry -- 12:12 p.m., and we're back on the record.

21    BY MR. NORTH:

22        Q     Dr. McMeeking, let's look at page 3 of Exhibit 1,

23    your report for this case, the first full paragraph that

24    begins "all of the design features discussed."

25             Do you see that?

Robert M. McMeeking , PhD, NAE, FRSE       January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 87

1    A    I do, yes.

2    Q    I'd like for you to look at the last sentence of

3  that paragraph.  And could you read that into the record.

4    A    Of this paragraph?

5              "Many of these design features existed

6              in other IVC filter products already on

7              the market, including the Simon Nitinol

8              filter, the Cook Gunther Tulip filter,

9              the Greenfield filter, and the Cook

10             Bird's Nest filter."

11   Q    I will represent to you, Dr. McMeeking, that we

12 have scanned -- more than scanned.  We have flyspecked

13 every previous report you've submitted in this litigation

14 and found nothing referencing that point in any previous

15 report.  Do you believe you've actually stated that in a

16 prior report?

17             MR. STOLLER:  Object to form.

18             And to be clear, Richard, you're referencing that

19 specific sentence he just read?

20             MR. NORTH:  Yes.  Yes.

21             THE WITNESS:  I haven't written that particular

22 sentence in my other reports to my recollection.

23 BY MR. NORTH:

24   Q    Okay.  Let's go to the next page, page 4.  Do you

25 see the paragraph beginning, "The bench test that Bard

Robert M. McMeeking , PhD, NAE, FRSE    January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 107

1          MR. NORTH:  Objection.  No foundation.

2          THE WITNESS:  No.  They did not.

3    BY MR. STOLLER:

4     Q    Were they aware of the fact that the IVC could

5    expand by that much at that point in time?

6          MR. NORTH:  Objection.  No foundation.

7          THE WITNESS:  They were not.

8    BY MR. STOLLER:

9     Q    And, so, is there any indication in the IFU that

10   warns treating doctors that the filters shouldn't be

11   implanted in an IVC that is 28 millimeters because it

12   might expand to a greater size?

13         MR. NORTH:  Objection to the form.

14         THE WITNESS:  Not to my knowledge.

15   BY MR. STOLLER:

16    Q    Are there design aspects of the filter that

17   should have taken those issues into account?

18    A    Yes.

19    Q    And what are they?

20    A    The design aspects, such as making sure that the

21   anchoring of the filter to the wall would be effective

22   even as the vena cava became very large so that it would

23   not be prone to tilting and migration when the vena cava

24   becomes very large, and the features that might limit

25   perforation if the vena cava becomes very small, which

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 108

1    will tend to make perforation more likely.

2           And since both tilt and perforation contribute to

3    the likelihood of fracture, they would affect the

4    likelihood of fracture by fatigue, and therefore the

5    design should have taken that into consideration in

6    regard to its resistance to fatigue fracture.

7      Q    And if a filter is indicated for use in an IVC up

8    to 28 millimeters, should it be also -- in light of the

9    fact that IVC can expand fairly significantly, should it

10   be designed to be safe and effective for use in IVCs

11   greater than 28 millimeters?

12          MR. NORTH:  Objection to the form.  No

13   foundation.  And leading.

14          THE WITNESS:  Yes.

15   BY MR. STOLLER:

16     Q    Mr. North asked you some questions about your

17   analysis of other filters in the overall IVC filter

18   litigation against Bard and specifically as to FEA

19   analysis you had conducted as to the various filters.

20   And I believe you testified that you had not conducted

21   FEA specific to the Meridian and Denali.

22          Was that your testimony?

23     A    That's correct.

24     Q    Is that accurate?

25     A    No.  I realized that I misspoke when I said that

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 109

1    the calculations are not relevant to the Meridian because

2    the Meridian in its overall shape is identical to the G2,

3    which I did do calculations for, both finite element

4    calculations and --

5           THE REPORTER:  Both?

6           THE WITNESS:  -- finite element calculations and

7    other calculations by algebra and calculus, and so on.

8           So, those calculations all apply to the Meridian.

9    They also apply in -- approximately, but fairly

10   accurately, render the approximation to the Denali.

11   Because the shape of the Denali is very similar -- is

12   quite similar to the shapes of the Meridian, the Eclipse,

13   and the G2.

14   BY MR. STOLLER:

15      Q    Dr. McMeeking, with respect to the report that is

16   Exhibit 1 here today and the other reports that you've

17   provided in the Bard IVC filter litigation, do those

18   reports accurately set forth your opinion and the basis

19   for opinions that you've arrived at to a reasonable

20   degree of engineering probability?

21      A    Yes, they do.

22      Q    And in coming to those conclusions and opinions,

23   did you follow a methodology that is utilized by

24   reasonable engineers in your field to resolve these

25   issues?

Robert M. McMeeking , PhD, NAE, FRSE        January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 110

1      A     I did, yes.

2      Q     And did you apply the same methods and processes

3    that are used by mechanical engineers in arriving at

4    those opinions?

5      A     Yes, I did.

6      Q     In order to come to your opinions as to the

7    design and testing of the Bard IVC filters, was it

8    necessary for you to carry out bench testing or animal

9    testing?

10     A     No.  It was not.

11     Q     And do mechanical engineers in your role

12   typically carry out bench testing or animal testing?

13     A     Well, many of them carry out bench testing.  But

14   animal testing would be an unusual pursuit for a

15   mechanical engineer of my background and professional

16   activities.

17     Q     The purpose of the bench -- what's the purpose of

18   bench testing?

19     A     The purpose of the bench testing is to simulate

20   the environment that the filter will experience as

21   closely as possible and to investigate whether it will

22   suffer failure modes that need to be avoided once it's

23   implanted in a patient, and also to see whether it -- the

24   filter will be -- is likely to be effective in terms of

25   counting out its function.

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 111

1      Q    And you've reviewed much of the bench testing

2    that Bard conducted with respect to the IVC filters in

3    this litigation; correct?

4      A    That's correct.

5      Q    And specifically you've done that as to the

6    Recovery; correct?

7      A    That's correct.

8      Q    And do those bench -- does that bench testing

9    conform with the standard you just articulated?

10     A    No.  They do not.

11     Q    Did you follow the methodology that engineers use

12   and should follow when doing the analysis that you've

13   done in this case?

14     A    Yes, I did.

15     Q    And you were asked questions about whether you

16   had inspected Mrs. Tinlin's filter or filter fragments

17   that are still in her body.

18         Do you recall that?

19     A    I do.

20     Q    Do you need to inspect those in order to arrive

21   at the conclusions you have in this case?

22     A    No, I do not.

23         MR. STOLLER:  I don't have any further questions.

24         MR. NORTH:  Just a few more, Dr. McMeeking.

25

Robert M. McMeeking , PhD, NAE, FRSE       January 30, 2019
In Re: Bard IVC Filters Products Liability

Page 112

1                        FURTHER EXAMINATION

2    BY MR. NORTH:

3        Q    Obviously we established earlier that you're not

4    a medical doctor?

5        A    Correct.

6        Q    And you would not consider yourself an expert in

7    human anatomy?

8        A    Correct.

9        Q    Or how the inferior vena cava works; correct?

10       A    Depends how you define expert.  I know quite a

11   lot about it.  But whether -- I wouldn't declare myself

12   to be an expert.

13       Q    You have no training in how the inferior vena

14   cava works, do you?

15       A    Only self-training.  Only self-education.

16       Q    You have no formal education in the anatomical

17   workings of the IVC?

18       A    That's correct.

19       Q    And you have never, before this litigation and

20   your involvement in this litigation, had occasion to deal

21   with the inferior vena cava professionally; correct?

22       A    That's correct.

23       Q    And since you became involved in this litigation,

24   you've had no dealings with the inferior vena cava in any

25   other context other than your litigation consulting?

Robert M. McMeeking , PhD, NAE, FRSE          January 30, 2019
In Re: Bard IVC Filters Products Liability

                                                    Page 113

1        A     That's not quite true.

2              There is the work I've done for Edwards in

3    connection with an IVC implant.  But that's all.

4        Q     Okay.  And you have not set out to do a

5    comprehensive review of the medical literature concerning

6    the workings of the IVC; correct?

7        A     That's correct.

8        Q     And you -- as you sit here today, could you even

9    name the five -- or five leading authorities in the

10   medical literature on the operation of the IVC?

11       A     No, I could not.

12       Q     How many articles do you think you've even read

13   concerning the operation of the IVC?

14       A     I would guess about 50.

15       Q     Now, you testified that you believe the -- did I

16   understand you to say that you believe that the FEA you

17   conducted with regard to the G2 would be applicable to

18   the Meridian because the dimensions were identical?

19       A     That's correct.

20       Q     And, so, it's your belief that the physical

21   dimensions of the Meridian are identical to those of the

22   G2?

23             MR. STOLLER:  Object to form.

24             THE WITNESS:  Well, there are features on them

25   that are different; for example, the caudal anchors and