# EXHIBIT C

Page 345

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

In Re:  Bard IVC Filters      ) MD-15-02641-PHX-DGC
Products Liability Litigation )
                              ) Phoenix, Arizona
                              ) May 16, 2018
Doris Jones, an individual,   ) 1:00 p.m.
                              )
              Plaintiff,      )
                              ) CV 16-00782-PHX-DGC
        vs.                   )
                              )
C.R. Bard, Inc., a New        )
Jersey corporation; and Bard  )
Peripheral Vascular, Inc., an )
Arizona corporation,          )
                              )
              Defendants.     )
_____ )


BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Jury Trial - Day 2 - P.M. Session)
(Pages 345 through 468, inclusive.)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

Page 403

1    the -- or fatigue of the arms and legs themselves?

2    A.   Well, yeah, the arms and legs are designed so that they are

3    very susceptible to fatigue.  And that's tied up with their

4    shape and orientation and the fact that they can perforate the

5    wall of the IVC.  And that leads to enhanced likelihood of      02:29PM

6    fracture by fatigue.

7           MR. STOLLER:  Gay, would you find Exhibit 4559,

8    please.

9           THE COURT:  We're going to break at this point, Mr.

10   Stoller.  We will take a break until 2:45.  Ladies and         02:30PM

11   Gentlemen, we'll excuse you at this time.

12          MR. STOLLER:  Thank you, Your Honor.

13          (Recess from 2:30 p.m. until 2:47 p.m.)

14          THE COURT:  Go ahead, Mr. Stoller.

15          MR. STOLLER:  Thank you, Your Honor.                     02:47PM

16   BY MR. STOLLER:

17   Q.   Dr. McMeeking, just before we broke we were talking about

18   your opinions with respect to the defective -- the design

19   defects in the Eclipse Filter.  And you identified the conical

20   design, the thin needle-like limbs in the arms and legs that    02:47PM

21   lead to perforation, the design concentration -- the design

22   that concentrates the strain mentioned at the shoulder or the

23   elbow where the filter meets the cap.

24          Are there any alternative design elements that you

25   have identified that would help relieve or ameliorate some of   02:47PM

Page 404

 1   the issues?

 2          MR. NORTH:  Your Honor, objection.  That's outside the

 3   scope of the report.

 4          THE COURT:  Is that in the report, Mr. Stoller?

 5          MR. STOLLER:  It is in the report.                02:47PM

 6          THE COURT:  All right.  Could I have a copy and have

 7   you show that to me?  Why don't you approach, counsel, and we

 8   can talk about that.

 9          Ladies and Gentlemen, if you want to stand up feel

10   free.                                                   02:48PM

11          (Discussion was had at sidebar out of the hearing of

12   the jury:)

13          THE COURT:  By the way, while we're looking for that,

14   the jurors, while they were coming back in, asked Traci if they

15   could hold the filter, if it could be passed around so they   02:48PM

16   could each hold it and look at it.

17          MR. STOLLER:  This is Dr. McMeeking's filter so we

18   will have to ask him.

19          MR. NORTH:  It has to be admitted into evidence,

20   doesn't it?                                             02:48PM

21          MR. STOLLER:  No.

22          THE COURT:  Do they want to pull the leg off?

23          MR. STOLLER:  I'm not sure I mind if they pull the leg

24   off.  I think he might.  It's fine with us.  I will have Dr.

25   McMeeking give it to them and they can pass it around.   02:48PM

Page 405

1          THE COURT:  So where are we?

2          MR. STOLLER:  Question was alternative design

3   elements.  One is, he identified a rounded edge of the cap as

4   fixing the issue at least on Page 62 of his report.

5          THE COURT:  Anybody have a copy?                    02:48PM

6          MR. STOLLER:  I do.  Got 80 something pages.

7          MS. HELM:  The report is 25 pages.

8          MR. STOLLER:  This is the March 3, 2017 report.  You

9   are looking at one of the reports from the Barraza case.  He

10  talks about how you can change it to make it better, sharp     02:49PM

11  corner --

12         THE COURT:  Hold on.  Well, he's saying a sharp corner

13  is bad.

14         MR. STOLLER:  He's saying a rounded corner --

15         THE COURT:  Where does it say that?                  02:49PM

16         MR. STOLLER:  It's this one, Your Honor.  12.

17  Possibility of a strain concentration.

18         THE COURT:  All right.  I see that.  Do you have a

19  response to that?

20         MR. NORTH:  The demonstrative we have been shown that  02:50PM

21  they intend to use goes far beyond those elements.  And in his

22  deposition he twice disclaimed any alternative design.

23         THE COURT:  So what -- so this is simply talking

24  about --

25         MR. STOLLER:  Talking about --                       02:50PM

Page 406

```
 1            THE COURT:  Hold on.

 2            MR. STOLLER:  Sorry, Your Honor.

 3            THE COURT:  By curving or chamfering the edge or by

 4   eliminating the connection to the cap.  Okay.  So that's in

 5   there.  What else do you have in the way of alternative design? 02:51PM

 6   Well, let me ask you this.  Are you going to elicit alternative

 7   design testimony besides that?

 8            MR. STOLLER:  Yes.

 9            THE COURT:  What else are you going to elicit?

10            MR. STOLLER:  Based on the examination where he was    02:51PM

11   examined by Ms. Daly we're going to elicit testimony that they

12   could have had caudal anchors to elicit caudal movement.

13            THE COURT:  Where is that?

14            MR. STOLLER:  Page 32.  The July 6, 2017:  Are there

15   any other changes you think could be made to the filters?  He    02:51PM

16   discusses caudal anchors and penetration limiters.

17            THE COURT:  All right.  I see that on Page 32.  What

18   else are you going to elicit?

19            MR. STOLLER:  He also testified, Your Honor, at the

20   last trial that the two tier -- the two tier staging of the SNF 02:52PM

21   is a better design to alleviate tilt.

22            THE COURT:  What is your response on those three

23   points.

24            MR. NORTH:  Your Honor, I think I'm just going to --

25   I'm sorry.  He says the opposite in other places.  I guess I    02:52PM
```

Page 407

1    just need to impeach him with that.

2            THE COURT:  So the three areas are where the arms and

3    legs leave the cap; the angle while attaching to the cap,

4    caudal anchors, penetration limiters.

5            MR. STOLLER:  Those are two separate things.         02:52PM

6            THE COURT:  I know.  And the two-staged tiered

7    approach of the Simon Nitinol.  That's what you're eliciting?

8            MR. NORTH:  Is the two-tiered fair game just because

9    it was mentioned in the last trial?

10           THE COURT:  Well, when I said how do you feel about    02:53PM

11   that, you didn't state an objection.

12           MR. NORTH:  I'm asking.

13           THE COURT:  Are you asking if I would advise you to

14   object?

15           MR. NORTH:  Fair enough.  We would object because it   02:53PM

16   was not explored in either the deposition or the --

17           THE COURT:  Is the two-tiered in the deposition or

18   report?

19           MR. STOLLER:  He identified the SNF as all ulterior

20   design in his report.                                        02:53PM

21           THE COURT:  Can you show me where?

22           MR. STOLLER:  Your Honor, I will skip that one in the

23   interest of time.  I know I'm not going to deal with it.

24           THE COURT:  Okay.

25           (In open court.)                                     02:53PM

Page 408

1           THE COURT:   Thanks, Ladies and Gentlemen.

2    BY MR. STOLLER:

3    Q.   Dr. McMeeking, I want to talk about some potential

4    alternative design features that you believe may have fixed

5    some of the issues you have identified.  Let me talk        02:54PM

6    specifically about the issues you identified about the IVC

7    filter leg coming out of the cap and the concentration of

8    strains there.  Do you understand what I'm talking about?

9    A.   Yes.  Yes, I do.

10   Q.   What sort of design changes could Bard have made that would 02:54PM

11   have fixed or reduced the problems with that design issue?

12   A.   They could have smoothed the sharp corner to make it

13   gentler.

14   Q.   What effect would that have had?

15   A.   That would have the effect of avoiding the severe        02:54PM

16   concentration of strain that can occur at that location.

17   Q.   And in turn result in less fractures?

18   A.   Correct.

19   Q.   Okay.  With respect to the issue of perforation, what are

20   there -- do you have opinions as to what sort of design changes 02:55PM

21   they could have made to either eliminate or reduce the

22   frequency of that occurrence?

23   A.   Yes.  They could have added penetration limiters which

24   would be features on the limbs that would help to slow down or

25   even stop the perforation of the limbs through the wall of the  02:55PM

Page 409

```
 1    IVC.

 2    Q.   Does that have effect on migration as well?

 3    A.   If designed properly, they would have helped to eliminate

 4    migration down towards the feet.   The hooks which are on the

 5    filter already help to limit the tendency for the filter to     02:55PM

 6    move toward your head.   But adding some hook-like features that

 7    would point in the opposite direction would help to stop the

 8    filter going downwards.

 9    Q.   And is there a difference between a design element that you

10    would have added to alleviate the effect of movement down       02:56PM

11    versus the perforation?

12    A.   Well, they could have been the same device.   But in one

13    case it could have -- hook-like features would have worked.   In

14    the other case of penetration limitation, somewhat blunt

15    features would help to slow down the motion of the limb through 02:56PM

16    the wall of the IVC.

17    Q.   And the migration downward here, what the jury has been

18    told is called caudal?

19    A.   Caudal migration.

20    Q.   You would put on something called caudal anchors?          02:56PM

21    A.   They are called caudal anchors.

22    Q.   Where would those be placed?

23    A.   They could be placed either at the feet or the hands of the

24    limbs, and they may be placed elsewhere on the limbs as is

25    convenient for the way that the device is hooked into the IVC   02:56PM
```

Page 410

1   and the way that it's delivered from the delivery tube.

2   Q.  Let's talk for a moment, Doctor, about your opinions with

3   respect to Bard's design processes and testing for the Eclipse

4   Filter in the prior generation.  And I believe you testified

5   earlier that you have opinions with respect to Bard's actions     02:57PM

6   in testing its filters.  What is your opinion?

7   A.  My opinion is that the testing was inadequate.

8   Q.  And why do you hold that opinion?

9   A.  I hold that opinion because in some of the tests that they

10  did do the conditions that were used were not the worst-case       02:57PM

11  conditions that were reasonably foreseeable.  And in other

12  cases, there was no test done at all.  For example, there was

13  no test to look at whether the filter would tilt after it had

14  been implanted.  And there was no test to look at whether the

15  limbs would have a tendency to cut through the wall of the IVC     02:57PM

16  and, therefore, puncture and perforate through the wall of the

17  IVC.

18  Q.  Did you review Bard's bench testing?

19  A.  I did.

20  Q.  Did you review its finite element analysis?                    02:58PM

21  A.  I did.

22  Q.  Was its testing reasonable?

23  A.  No.

24  Q.  Was its testing adequate?

25  A.  No.  It wasn't adequate.  No.                                  02:58PM