# Exhibit C

Do Not Disclose - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ARIZONA

 3        ---------------------------X

 4        IN RE:  BARD IVC FILTERS     MDL NO.:

 5        PRODUCTS LIABILITY           MD-15-02641-PHX-DGC

 6        LITIGATION

 7        ---------------------------X

 8             DO NOT DISCLOSE - SUBJECT TO FURTHER

 9                    CONFIDENTIALITY REVIEW

10

11          VIDEO DEPOSITION OF HOLLY P. GLASS

12

13                     GRANT NELSON PLC

14             8280 Greensboro Drive, Suite 601

15                   McLean, Virginia 22102

16             September 23, 2016    9:15 a.m.

17

18

19

20

21

22

23

24    Denise D. Vickery, CRR/RMR

25
```

Golkow Technologies, Inc.                                    Page 1

Do Not Disclose - Subject to Further Confidentiality Review

1   up with and develop what you would normally say
2   in an event like that and put it on a piece of
3   paper.
4            I don't believe anything, this or
5   anything else in that plan was ever used, but
6   this could also be used.  Let's say there were 25
7   reporters calling at the same time.  Generally
8   you would release this on a wire, and then
9   everyone would get it at the same time.
10       Q.   Okay.
11       A.   But this was never used.
12       Q.   Okay.  But this was prepared after
13  the reported death of a patient; correct?
14       A.   Yes, because it says "notified of
15  the death of a patient."  Yes.
16       Q.   Okay.  Now, at the time in 2004, was
17  this the first time that you had been involved in
18  your career in the crisis communication relating
19  to a death of a patient related to a medical
20  device?
21       A.   As far as I can recall, yes.
22       Q.   Okay.
23       A.   I don't think anyone died on the
24  other one that I was involved with, with Davol.
25            MR. ORENT:  Okay.  And if we just

Do Not Disclose - Subject to Further Confidentiality Review

 1   negative stories surrounding the Recovery Vena
 2   Cava Filter."
 3           Did I read that correctly?
 4       A.   Yes.
 5       Q.   Now, we talked earlier today about
 6   exposure, the term "exposure."
 7       A.   Uh-huh.
 8       Q.   Do you agree with me that in this
 9   context exposure would be the same as
10   controversial or negative stories surrounding the
11   vena cava filter?
12       A.   Are you asking me if that is their
13   intent in this question -- in this statement?
14       Q.   I'm asking you if you would
15   constitute that as exposure --
16       A.   In this context.
17       Q.   -- definition in this context could
18   mean controversial or negative stories
19   surrounding the Recovery vena cava filter?
20       A.   In this context written by Hill &
21   Knowlton, yes.
22       Q.   Okay.  It goes on to say:
23           "The proliferation of unfavorable
24   press in top-tier media outlets can cause an
25   onslaught of negative activity: a company's

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                 Okay.  And, again, I'm not trying to
 2    paint -- you're asking the appropriate questions
 3    here.  "Did you put a sales hold into effect?"
 4                 And what you're told back is, this
 5    product is on internal hold.  The sales force was
 6    notified via voicemail.
 7                 But my point is, is that -- that a
 8    sales hold isn't the same thing as a recall;
 9    right?
10          A.     Right.
11          Q.     Okay.  And this plan that we looked
12    at as our prior exhibit, it's a very detailed
13    plan; correct?
14          A.     Yeah, it has a lot of template
15    language in it that they would use on any
16    account, but yeah, it's pretty thorough and --
17    and I think pretty well thought out.
18          Q.     And let me just quickly show that
19    you're -- under "Establishing of a Recovery
20    Team," you're number 1?
21          A.     Uh-huh.
22          Q.     That's a yes?
23          A.     Yes.  Well, I'm the first one listed
24    yes.
25          Q.     You're the first one listed?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1     efficacy of the device?
 2          A.    No.
 3                MS. KOWALZYK:  Object to the
 4          form.
 5                THE WITNESS:  No.
 6     BY MR. ORENT:
 7          Q.    Okay.
 8          A.    I have to have time to read it.
 9          Q.    Go ahead.
10          A.    (Reviewing document).
11                And is there a corresponding study
12     in here that goes into detail?
13          Q.    Well, we'll get there when I'm -- in
14     due course.
15          A.    Well, you -- sorry, but you asked me
16     am I aware.
17          Q.    Well, my --
18          A.    I'm not aware.
19          Q.    Well, you're not aware and that's --
20     that's fair enough.
21                In addition, the Recovery filter
22     underwent testing, benchtop or animal studies or
23     a combination of both, according to FDA
24     guidelines to obtain FDA approval."
25                Did I read that correctly?
```

Golkow Technologies, Inc.                                    Page 150

EXHIBIT C, Page 5

Do Not Disclose - Subject to Further Confidentiality Review

```
 1   people use it as 510 -- 510(k) approval.
 2          Q.   Well, isn't it up to -- the terms
 3   "approval" and "clearance" have very particular
 4   meanings to people in the -- in the industry,
 5   which would be medical device sector; right?
 6          A.   I --
 7               MS. KOWALZYK:  Object to the
 8          form.
 9               THE WITNESS:  I think not.  I
10          worked at AdvaMed for five or six years
11          and often we would say 510(k) approval or
12          PMA approval.  I mean, it's -- it's a
13          technicality.  Maybe it's a legal thing,
14          but it's -- it's -- I'm just saying that
15          510 -- 510(k) approval is not unheard of.
16          It's pretty common, actually.  Maybe it's
17          among lay people like myself.
18      BY MR. ORENT:
19          Q.   Okay.  Let's go to step-by-step
20   management of likely scenarios.
21               Likely scenarios -- and these are
22   scenarios that you're preparing for; correct?
23          A.   No, I did not prepare any of this.
24   This was prepared by H&K.
25          Q.   At your request?
```

Golkow Technologies, Inc.                               Page 152

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A.    I didn't say prepare step-by-step
 2    scenarios.  This is part of their template that
 3    they use for all crisis communications plans.
 4          Q.    And you're aware of this when you
 5    retained them; correct?
 6          A.    That they would do step-by-step
 7    scenarios?
 8          Q.    Yes.
 9          A.    I wasn't a hundred percent sure that
10    they had scenarios in their plan.
11          Q.    Well, they did in your prior plan
12    with them?
13          A.    I'm not sure they did.
14          Q.    Okay.  Well, you were aware that
15    they would likely provide scenarios, whether it
16    was step-by-step, but they would provide guidance
17    on likely scenarios; right?
18          A.    Probably, yes.
19          Q.    Okay. Scenario 1.  "Family of the
20    deceased files a suit seeking damages from C.R.
21    Bard and the law firm issues a press release."
22                Right?
23          A.    That's what it says, yes.
24          Q.    Okay.  Scenario 2.  "A reporter
25    calls Bard for comment."
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                   AFTERNOON SESSION
 2                              (1:43 p.m.)
 3                   HOLLY P. GLASS
 4      called for continued examination and, having
 5      been previously duly sworn, was examined and
 6      testified further as follows:
 7                   EXAMINATION (CONTINUED)
 8              THE VIDEOGRAPHER:  With approval
 9         of counsel, back on the record.  The time
10         is approximately 1:43 p.m.  This marks
11         the beginning of recording media 3.
12      BY MR. ORENT:
13         Q.   Okay.  I'm going to hand you what's
14      previously been marked in this litigation as
15      Exhibit No. 285, which is a copy of the October
16      crisis communication plan.
17         A.   Okay.
18         Q.   This plan was ultimately
19      implemented; correct?
20         A.   No, this plan was never implemented.
21         Q.   Bad choice of words.  Let me
22      rephrase it.
23              This plan was ultimately the plan
24      that was approved; correct?
25         A.   No.  There was one later.  In
```

Golkow Technologies, Inc.                                Page 169

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    December, I believe.
 2         Q.   Well, there were several revisions,
 3    but is it your testimony that this exhibit with
 4    the memorandum from October 15th was not
 5    ultimately the iteration that was approved?
 6         A.   No.  I saw something from December.
 7         Q.   Well, there were multiple other
 8    iterations of this that were revised over time
 9    over the years between '05, '06, '07 -- excuse
10    me -- '04, '05, '06.  So --
11         A.   It was my experience that this type
12    of document would go on and on and on until
13    everybody in the corporate -- everybody on the
14    team and then the corporate copy review process
15    was complete and final.  So I would have to say
16    no, this is not the final.
17         Q.   And is that based on your memory?
18         A.   No, just based on how these go and,
19    plus, I saw one dated December, which means it
20    had been updated since then, too.
21         Q.   Well, there's -- there's a
22    December 7, 2005.  There's a January '06.
23         A.   Okay.  I haven't seen those.
24         Q.   You think that there's a December
25    '04?
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A.    No, it's that one, December '05.
 2          Q.    Okay.
 3          A.    Yeah.  I have not seen anything --
 4          Q.    But this -- this document was
 5    approved and then this was a supplement.  It was
 6    a revision; correct?
 7          A.    Can I see it?
 8          Q.    Well --
 9          A.    At first when I saw that, I thought
10    that the date was wrong because I honestly don't
11    remember this going on for years.
12          Q.    Well, let me show you e-mails that
13    might refresh your recollection.
14          A.    Okay.
15          Q.    (Sneeze.)
16          A.    Bless you.
17                See, this one here says "Please
18    review and approve."  So that means we probably
19    got back a bunch of comments on this and there's
20    another version.
21                      (Document marked for
22                identification purposes as Exhibit 482.)
23       BY MR. ORENT:
24          Q.    Well, let me hand you what's been
25    marked as Exhibit 482.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1          A.    October '05.  (Reviewing document).
 2          Q.    And I have a variety of these over
 3    the years.
 4          A.    Okay.  So it went on for how long?
 5    I don't have a recollection.
 6          Q.    My understanding is that this was
 7    continuously updated with new revisions based on
 8    the data as it unfolded between '04 and '06.
 9                Here's another e-mail that may
10    assist your memory.
11          A.    Okay.  So then between '04,
12    October 15, '04 and December whatever that is
13    '05, there were no other versions?
14          Q.    That's my understanding is that this
15    was the final that was approved.
16                And if you look at the -- it says
17    file -- this went to the file, the corporate
18    file.  "File:  Recovery filter."
19          A.    Right.  But just, generally
20    speaking, when I put something out like this from
21    H&K and say, here it is for your comment and
22    review, then there must -- there had to have been
23    stuff that came back marking this up.
24          Q.    Well, there -- there was and there
25    was, as we looked at previously, the April draft.
```

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    There was a May draft.
 2         A.    Do you have something after October?
 3         Q.    Nothing until the next year, which I
 4    see as letters becoming stating that they're for
 5    revision based on new data based on time.
 6               As you sit here today, do you have
 7    any reason to doubt if other testimony in this
 8    case stands for the proposition that this was the
 9    draft that was ultimately approved and adopted
10    and placed in the files?
11         A.    I can't -- I can't say that this is
12    the one that was approved, no, because I'm asking
13    here for comment.
14         Q.    No, I understand that, but you can't
15    -- you don't dispute that other testimony that
16    says that this is the final copy?
17                 MS. KOWALZYK:  Object to the
18           form.
19                 THE WITNESS:  I said earlier
20           today that that was the final copy?
21    BY MR. ORENT:
22         Q.    No, no.
23         A.    No.
24         Q.    Other individuals at Bard.
25                 If there is testimony laying the
```

Golkow Technologies, Inc.                              Page 173

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    foundation that says -- stands for the

 2    proposition that this was the copy that

 3    ultimately was approved and appears in the

 4    corporate files of Bard, you don't dispute that

 5    is what I'm saying.  You don't have an

 6    independent recollection?

 7              A.    No.

 8                    MS. KOWALZYK:  Object to the

 9          form.

10                    THE WITNESS:  I don't have an

11          independent recollection but, again, "For

12          your review and approval."  So review in

13          my experience of 30 years in this job, in

14          a job like this, review means please

15          review and give comment and approve.  So

16          I cannot sit here today and say that this

17          is the final.

18       BY MR. ORENT:

19              Q.    I understand that.  But for purposes

20    of today, I want you to presume that that's the

21    case.

22                    MS. KOWALZYK:  Object to the --

23       BY MR. ORENT:

24              Q.    Fair enough?

25                    MS. KOWALZYK:  Object to the
```