Exhibit B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | ) )  MD 15-02641-PHX-DGC ) |
| _____ | ) ) |
| Lisa Hyde and Mark Hyde, a married couple, | )  Phoenix, Arizona )  September 18, 2018 ) |
| Plaintiffs, | ) ) |
| v. | )  CV 16-00893-PHX-DGC ) |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) ) ) ) |
| Defendants. | ) |
| _____ | ) |

BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 1 - A.M. SESSION

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

1    keeping away from, as part of your design and marketing of the

2    device, the fact that there's a negative clinical experience

3    and you're weighing heavily on marketing, and that just waters

4    down this IFU defense they have.

5            We just got hit with this yesterday with your order

6    and we're concerned that's not giving us a fair opportunity to

7    counter that part of their defense, the fact that they

8    think -- they're going to say their IFU and they've properly

9    advised doctors and they've withdrawn their marketing

10   materials on motion in limine.  It's one of the slides we

11   have.  I don't know whether you're kicking that document out

12   or just Mrs. Hudnall's testimony about it.

13           THE COURT:  Did you say there was a second issue?

14           MR. LOPEZ:  The other issue is that the defense --

15   there's a slide that deals with the Recovery migration to the

16   heart issue.  The slide I think that follows is an HHE, and

17   we've adopted the language in the HHE which calls what was

18   happening at that time catastrophic injuries.  They don't want

19   us to use that.  They want us to use a different word.  But in

20   the HHE, which includes both fractures with migrations to the

21   heart.  Like what happened to Mrs. Hyde, and it also includes

22   the migration or embolization of the entire device into the

23   heart, Dr. Ciavarella uses the term "catastrophic."  And

24   there's an issue about whether or not we can use "catastrophic

25   injuries reported" as it relates to the Recovery filter.

1            THE COURT:  Do you have copies of these slides?

2            MR. LOPEZ:  I do, Your Honor.

3       May I?

4            THE COURT:  All right.  Who from the defense side

5  would like to address these issues?

6            MR. LOPEZ:  Then there's some issues with their

7  slides.  We'll come back after that.

8            THE COURT:  Okay.

9            MR. ROGERS:  Your Honor, we -- as Mr. Lopez informed

10 the Court, we did have objections to three of their slides.

11 And the first thing that he brought up, your docket entry

12 12598, was the docket entry that dealt with Ms. Hudnall's

13 testimony, and the testimony about this document was excluded

14 under Rule 402.  And the objection was that it related to

15 failure to warn, and that objection was sustained.

16            And so, Your Honor, when we saw that this was in

17 their opening slide deck, it appeared to us that the Court was

18 inclined to exclude that evidence, and hence we objected.

19            And do you want me to continue, Your Honor, or do you

20 want to follow up?

21            THE COURT:  Did you want to address the other slide?

22            MR. ROGERS:  Yes, sir, I'll be glad to.

23            Your Honor, you've got these two slides.  The first

24 one, as you can see, up at the top it's got the header

25 "catastrophic injuries reported," and there are two

1   descriptions of two different incidents, both of which are

2   described as catastrophic.  And then the information below

3   them indicates that the entire filter migrated to the right

4   atrium or to the right ventricle.

5           And, Your Honor, even though this particular slide

6   does not mention the word death, we thought that it could

7   easily be discerned from the descriptor that the filter went

8   to the heart and that it was a catastrophic injury that it was

9   a death so we objected to that slide.  I was under the

10  impression with the third slide we had worked that out, but I

11  don't know if that's accurate.

12          MS. REED ZAIC:  It is.  We've withdrawn it.

13          MR. ROGERS:  It is.

14          Okay.  Thank you, Your Honor.

15          THE COURT:  Okay.

16          By my count I've reviewed 34 depositions in the last

17  week and a half.  All of them on weekends or evenings.  So I

18  can't say with confidence that I remember my precise thinking

19  on the Hudnall issue.  But let me explain to you the line I've

20  tried to draw.  And I don't know if we can resolve this this

21  morning or not or if we'll need more argument on it.

22          There is no failure-to-warn claim in the case so the

23  jury cannot find defendant liable for a failure to warn.

24          The jury cannot award punitive damages for a failure

25  to warn because the failure-to-warn claim is gone.

1    a failure to warn that could go to punitive damages, and this

2    is not a failure-to-warn case.  So I tried again on punitive

3    damages evidence to tie it to what is the issue in the case,

4    product defect.  And in drawing a line between what was or was

5    not told to doctors, it seemed to me to be the same line.

6    Namely, when they were told of risks that's relevant to

7    unreasonable dangerousness.  When they were not told of risks,

8    that goes to it as well.  And to punitive damages.

9           And, finally, I was concerned about the law which

10   suggests that the conduct that gives rise to punitive damages

11   should be related to the conduct that gives rise to liability.

12   And so if we've got a wrongful or arguably wrongful marketing

13   technique six years before this defective product was sold,

14   I'm not sure it satisfies that law.

15          I say that so you can address my thinking as we argue

16   this further, but I don't think we have time to work through

17   all of that this morning, so --

18          MR. LOPEZ:  We do have a number --

19          THE COURT:  Let's leave Hudnall out.

20          On the catastrophic injury issue, I didn't understand

21   your point, Mr. Lopez, about the word catastrophic.

22          MR. LOPEZ:  We want to use it --

23          THE COURT:  I know.

24          MR. LOPEZ:  It's in the IFU and it talks about -- I'm

25   sorry, the HHE.

1      THE COURT:  I heard you say that.  I didn't know what

2  you mean by it's in the HHE.

3      MR. LOPEZ:  It's described in the HHE as a

4  catastrophic injury.  Plus -- and it does have the migratory

5  deaths.  But keep in mind there were also deaths from a piece

6  of the metal going into the heart.  That's a catastrophic

7  injury.

8      THE COURT:  Mr. Rogers, do you agree that the HHE

9  uses the phrase "catastrophic injury"?

10      MR. ROGERS:  Yes, Your Honor, I believe it does.

11      THE COURT:  All right.  I'm going to allow you to use

12  that slide.

13      Okay.  Let's go through -- how many -- looks like you

14  have about 15 --

15      MR. LOPEZ:  I don't know how many he's agreed to.

16      THE COURT:  Well, figure that out before you talk to

17  me.

18      (Counsel conferring.)

19      THE COURT:  How many are there, Mr. Lopez?

20      MR. LOPEZ:  I don't know.  Probably a dozen.

21      MR. ROGERS:  Your Honor, I've got objections to over

22  25 slides, so I don't know how many we're talking about this

23  morning.

24      THE COURT:  Well, we've got four minutes.  We don't

25  have time to go through a dozen slides.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | ) ) ) | MD 15-02641-PHX-DGC |
| _____ | ) | |
| Lisa Hyde and Mark Hyde, a married couple, | ) ) ) | Phoenix, Arizona September 18, 2018 |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV 16-00893-PHX-DGC |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 1 - P.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
UNITED STATES DISTRICT COURT

Page 162

1    events.

2          By December of that year, they were already discussing

3    the design review.  Within three months, there were questions

4    about the testing.  I mentioned the 50 -- the millimeters of

5    mercury standard.  The original specification was that the

6    Recovery filter needed to resist 50 millimeters of mercury, and

7    they were questioning that because of the adverse events that

8    were being reported.  There were migrations of this filter

9    indicating the pressure test may not have been accurate, may

10   not have been adequate.

11         Once it was cleared in July 2003 for retrievability,

12   by October, November, and December, they were seeing migrations

13   in both directions, towards the head and towards the feet in a

14   caudal fashion, and fractures.

15         And by the first of the next year, they experienced

16   their first catastrophic injury reported with their first

17   retrievable filter, the Recovery.  By April, they had

18   experienced their second.  It had been reported to them a

19   second catastrophic injury of a filter migrating.

20         And I want you to look at that date, April 14th, 2004.

21   Within 12 days, Bard was redesigning the filter while the first

22   one was still on the market.  They were coming up with their

23   next-generation G2 filter.  Stands for Generation 2.  It was

24   also called the modified Recovery.

25         I make these segues because as you see the evidence
                        UNITED STATES DISTRICT COURT

Page 163

1    come in, it might be called those things.  The modified

2    Recovery, the G2, the G1A.  There's different references to it,

3    but the point being is that based on the limited clinical data

4    that they had, and once it was cleared to the market, the

5    clinical data that was coming in was being experienced by

6    patients who were receiving the filter.

7              They sat down and discussed a redesign while still

8    selling the Recovery.  And internally, they were conducting

9    health hazard evaluations.  So as written by their medical

10   director at the time describing, in the first line, you'll see

11   the catastrophic injuries.

12             They had also reported -- also received reports of 17

13   reports of limb fractures.  It was breaking apart.  A total of

14   20 arm fractures were reported in 14 cases.  20 arm fractures

15   in 14 cases means more than one arm was breaking.  And 11 of

16   the 20 arms remained in the patients, with six patients, and

17   detached arm migrations to the heart or lungs.

18             The MAUDE database contained 25 reports of filter

19   fracture.  And Dr. Ciavarella, their medical director, goes

20   through and looks at the events as they're being reported.  The

21   MAUDE database, I will do a segue and explain later, it's the

22   FDA database of reports that come in to the FDA of adverse

23   events.

24             But the date of this is July 9th.  It was

25   approximately one year.  They're still receiving reports of the

                    UNITED STATES DISTRICT COURT

UNITED  STATES  DISTRICT  COURT

FOR  THE  DISTRICT  OF  ARIZONA

_____

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | ) ) ) | MD 15-02641-PHX-DGC |

_____ )

| | | |
|---|---|---|
| Lisa Hyde and Mark Hyde, a married couple, | ) ) ) | Phoenix, Arizona September 19, 2018 |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV 16-00893-PHX-DGC |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) ) ) ) | |
| Defendants. | ) | |

_____ )

BEFORE:   THE  HONORABLE  DAVID  G.  CAMPBELL,  JUDGE

REPORTER'S  TRANSCRIPT  OF  PROCEEDINGS

TRIAL  DAY  2  -  P.M.  SESSION

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

Page 410

1    correct?

2    A    Yes.

3    Q    And in terms -- you had said on cross-examination, you

4    said that Lisa Hyde experienced a catastrophic event?

5    A    I would consider a filter migration of a fragment to the

6    heart catastrophic, yes.  Or potentially catastrophic.

7    Q    And the reason?

8    A    It's going to require intervention of some sort.  Either

9    surgery or a complex endovascular technique that has high

10   risk.

11   Q    And did Bard ever talk to physicians about its filters

12   that they were aware those filters posed a risk of

13   catastrophic events as opposed to some failure modes?

14   A    No, they never used that language.

15   Q    Would that be something physicians should reasonably

16   expect from medical device company like Bard?

17   A    Yes.

18   Q    And Bard filters were, as we said, the G2, the G2X, were

19   promoted and represented as permanent filters with the option

20   to retrieve.  When they talked about retrieval, what type of

21   procedure were they talking -- Bard talking about?

22   Percutaneous?

23   A    Yes.

24   Q    Meaning what?

25   A    Usually you place a small sheath through the internal

Page 412

1    neither you as the doctors nor the patients ever had any

2    expectation or should have reasonably expected that the filter

3    would break, embolize, land in the ventricle, and then require

4    a procedure, and possibly an open procedure?

5              MR. ROGERS:  Objection, Your Honor, to the portion of

6    the question where he's addressing what patients would have

7    known.

8              THE COURT:  Overruled.

9              THE WITNESS:  So no, that's not what we expected.

10   And, in fact, I was discussing this with someone that when you

11   have that clinic visit, that is a terrible clinic visit when

12   you have to talk to a patient about a device that's failed.

13   And fortunately I have not had one that has failed where the

14   patient has had to have some sort of cardiac procedure to

15   remove it.

16             But, you know, explaining to a patient that their

17   device that you put in has broken and a piece of it has gone

18   into their heart and now they're going to have to have some

19   sort of cardiac procedure is a really big deal.  It's a pretty

20   quiet room when you're having that discussion.

21   Q    Bard, did they ever alert physicians to be on the lookout

22   for catastrophic events?

23   A    No.

24             MR. O'CONNOR:  That's all I have.  Thank you.

25             THE COURT:  Thank you.  You can step down, sir.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | ) ) ) | MD 15-02641-PHX-DGC |
| _____ | ) | |
| Lisa Hyde and Mark Hyde, a married couple, | ) ) ) | Phoenix, Arizona September 21, 2018 |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV 16-00893-PHX-DGC |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 4 - P.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
                    UNITED STATES DISTRICT COURT

Page 924

1    resistance.

2            Do you see that, sir?

3    A.  Yes, I do.  Correct.

4            MR. LOPEZ:  And if we go to the 2.0, the last

5    paragraph, and this -- I'm sorry.  2.0, not the last paragraph.

6    The second to the last paragraph.  "In conjunction with the

7    field activities."

8        If you can just blow that part up.  Thank you.

9    BY MR. LOPEZ:

10   Q.  So this refers back to the design review meeting we talked

11   about earlier in December of 2003; right?

12   A.  That is correct.

13   Q.  And that -- this also confirms that that meeting was to

14   gain a further understanding of the design elements of this

15   product; true?

16   A.  That's what it says, correct.

17   Q.  And in preparation of this design review, the DFMEA for

18   Recovery filter was analyzed for critical elements to be

19   discussed during the review; true?

20   A.  That is what it says, correct.

21   Q.  And migration resistance was one of the critical elements

22   identified for review; true?

23   A.  True.

24   Q.  And now, sir, as of this date, as of the date you had that

25   review, there was already a migration of a Recovery filter in a

UNITED STATES DISTRICT COURT

Page 925

1  patient that caused a catastrophic injury.  Do you recall that?

2  A.  I do not recall the specifics, but I know there was -- I

3  think I recall that there was some type of migration.

4  Q.  And there were some serious migration issues with the

5  Recovery filter that caused your team to get together before

6  market launch and make a decision that maybe we ought to test

7  this device differently than we may have tested it before we

8  got clearance at FDA; true?

9  A.  I would have to defer to Rob on that.

10  Q.  And there had already been, before full market release,

11  when this team got together and now you're trying to -- what

12  did you say -- get a further understanding of the design

13  elements of the product, a fracture like Dr. Asch had

14  experienced in his small study.  But instead, that fracture

15  actually embolized through the vena cava and went into a

16  patient's heart.

17        You knew about that, right, before these tests?

18  A.  I'm not sure if I was made aware of it during these tests

19  or after it, but yes.

20  Q.  You know two lesser events happened in the Asch study.

21  You're aware of that?

22  A.  I don't know the exact details with Dr. Asch 's study.

23  Q.  Okay.  Dr. Asch had a fracture that was able to be removed

24  without causing any injury to the patient.  You know about

25  that; right?
                    UNITED STATES DISTRICT COURT

Page 945

1    A.   Yes.

2    Q.   Did you send them to everybody on that team that we just --

3    we saw earlier, Mr. Uelmen, Ms. Hudnall?

4    A.   So I don't know -- if you go back to the cover letter, it

5    should say everybody I shared it with.

6            So I definitely shared it with those people there, Rob

7    Carr, Brian Hudson.  I'm not sure, this specific test right

8    here, because I'm not -- doesn't say where it's coming from

9    exactly, if it went to the others.

10   Q.   Did you express any personal concern yourself when you saw

11   the results of this test that the Recovery filter was not

12   passing even its bench testing threshold for migration?

13   A.   So I did not exhibit any concern.

14   Q.   Okay.  Was it -- do you know if Mr. Carr or anyone else,

15   when you were discussing these tests, expressed any concern

16   about the findings?

17   A.   I don't recall.  Again, this was -- this testing had no

18   acceptance criteria, so...

19   Q.   Did the performance of the Recovery filter get any better

20   out in the open U.S. market after these tests were performed?

21   A.   Not that I'm aware of.

22   Q.   In fact, it got -- didn't it get progressively worse?

23   A.   Not that I know of.

24   Q.   You don't know about the fact that the Recovery filter was

25   causing some fairly significant injuries, catastrophic

UNITED STATES DISTRICT COURT

Page 946

1  injuries, even after these tests were run?

2  A.   I knew that there were some different complications in the

3  field from past prior -- you know, past testimony.  But in

4  recalling, you know, I wasn't tracking the filter.  My job was

5  to test it and to work on the jugular delivery system, so I'd

6  have to defer to Rob to that.

7  Q.   But what you do know is that while all of this testing was

8  going on and discussions about redesigning the Recovery filter,

9  it was business as usual in the marketing and sales department

10  with this device.   True?

11  A.   As far as I recall.

12  Q.   And were you at all involved in discussing, you know, maybe

13  conceptually how you might improve the design of the Recovery

14  filter to at least minimize if not eliminate some of the

15  serious injury and patient safety problems that were being

16  experienced by the Recovery filter?

17  A.   Again, my job was the jugular delivery system.  I got

18  called into testing.  Andre is the person who is responsible

19  for designing and innovating on the filter.

20  Q.   We're going to go over a couple more tests.

21  A.   Sure.

22  Q.   Probably won't do it right now because we're getting close

23  to the break, but let me ask you --

24          THE COURT:  We're going to go till 2:45.

25          MR. LOPEZ:  Okay.
                UNITED STATES DISTRICT COURT

Page 968

1    Q.   Were your -- the findings that you had on the bench testing

2    we just went through consistent with what was happening in real

3    human beings when it came to migration?

4    A.   I can't answer one way or another because I don't have all

5    the data.

6    Q.   So after they gave you that initial data that led to these

7    tests, they didn't keep you apprised of all the additional

8    catastrophic events that happened when the company chose to

9    leave the Recovery filter on the market?

10             MR. CONDO:   Objection, Your Honor.

11             THE COURT:   Sustained.

12             THE WITNESS:   I do --

13             THE COURT:   I sustained the objection.

14             THE WITNESS:   Oh, okay.

15             MR. LOPEZ:   Pass the witness, Your Honor.

16             THE COURT:   All right.

17             MR. CONDO:   May I proceed?

18             THE COURT:   Yes.

19                      CROSS-EXAMINATION

20   BY MR. CONDO:

21   Q.   Mr. Tessmer, when you left Bard for the first time in 2005,

22   June of 2005, did you go to another company?

23   A.   Yes, I did.

24   Q.   And did your new job have anything to do with IVC filters?

25   A.   No, it did not.
                 UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | ) ) ) | MD 15-02641-PHX-DGC |
| _____ | ) | |
| Lisa Hyde and Mark Hyde, a married couple, | ) ) ) | Phoenix, Arizona September 28, 2018 |
| Plaintiffs, | ) ) | |
| v. | ) ) | CV 16-00893-PHX-DGC |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 9 - P.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
UNITED STATES DISTRICT COURT

Page 2062

1   first several months it was on the market compared to a number

2   of other filters including its predicate device, the Simon

3   Nitinol filter?  Did you know about that?

4   A.  I've seen those analyses.  I was -- did not consider them

5   in my calculations because I didn't think that the statistics

6   and the calculations they were doing were valid and could be

7   relied upon.

8   Q.  Did you see the statistical analysis that it was reported

9   by a Dr. John Lehmann, who is --

10   A.  I don't recall.

11   Q.  Do you know who Dr. Lehmann is?

12   A.  I don't recall.

13   Q.  Do you know that he's an epidemiologist from Harvard?

14   A.  I don't -- I don't recall ever having -- recall who

15   Dr. Lehmann is.

16   Q.  Do you know that Dr. Lehmann concluded, and it was reported

17   in one of their health hazard evaluations, that the Recovery

18   filter was four to five times more likely to cause perforation,

19   migration, fracture, tilt, and catastrophic injuries, more so

20   than any other device on the market at that time?  Did you know

21   that his analysis concluded that?

22   A.  I'm not sure if I ever saw that.  But, again, if it's based

23   on spontaneous reports and comparisons across reports, that's

24   exactly the kind of comparison that FDA themselves says you

25   can't use this information to do that.  It's not reliable.

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | ) ) ) | MD 15-02641-PHX-DGC |
| _____ | ) | |
| Lisa Hyde and Mark Hyde, a married couple, | ) ) | Phoenix, Arizona October 1, 2018 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV 16-00893-PHX-DGC |
| | ) | |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 10 - A.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
                UNITED STATES DISTRICT COURT

Page  2172

 1   BY MR. O'CONNOR:

 2   Q.  And, Mr. Carr, when the Recovery was being used on the

 3   market, it started experiencing events and failures that were

 4   to the level of being catastrophic; correct?

 5   A.  The -- excuse me?

 6   Q.  The Recovery, in patients, patients were experiencing

 7   serious injuries, catastrophic events.  Do you agree with that?

 8   A.  Yes.

 9           MR. O'CONNOR:  And may we publish, Your Honor?

10           THE COURT:  Yes.

11   BY MR. O'CONNOR:

12   Q.  And as you can see, sir, as of June 30, 2004,

13   Dr. Ciavarella had prepared an updated health hazard

14   evaluation.

15           Do you see that?

16   A.  No.

17   Q.  You don't see that Dr. Ciavarella sent that to Doug Uelmen?

18   A.  Yes, I do.  Thank you.

19   Q.  And Dr. Ciavarella was the medical director; correct?

20   A.  He was at one point, yes.

21           MR. O'CONNOR:  And, Felice, if we could highlight that

22   first paragraph.

23   BY MR. O'CONNOR:

24   Q.  And the jury will be able to receive this, but -- to review

25   this themselves, but this talks about, the first sentence:
                 UNITED STATES DISTRICT COURT

Page 2173

1   Migration of thrombus-encased Recovery inferior vena cava

2   filter has been reported in 10 patients.

3           And that's as of June 30, 2004; correct?

4   A.  That's the date of the document, yes.

5   Q.  And go to the Conclusion.

6           And the Conclusion was:  The severity category for the

7   risk of thrombus-associated filter migration is catastrophic.

8           Did I read that correctly?

9   A.  Yes.

10  Q.  All right.  Thank you.

11          A couple questions about the saluting arm test.

12          MR. O'CONNOR:  We can take that down, Felice.

13  BY MR. O'CONNOR:

14  Q.  The saluting arm test is not a general fatigue test.  Do

15  you agree with that?

16  A.  I don't know what that means.

17  Q.  Well, it only measures the situation where the arm is

18  moving up and down; correct?

19  A.  Yes.  That's what it was designed to do.

20  Q.  And is that the situation where the G2 proved to be better

21  than the Recovery?

22  A.  Yes, in that test.

23  Q.  Okay.  But you did not test the G2 in that test against the

24  Simon Nitinol filter?

25  A.  The Simon Nitinol filter can't behave that way.  It can't

                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | ) |
| | ) MD 15-02641-PHX-DGC |
| | ) |
| _____ | ) |
| | ) |
| Lisa Hyde and Mark Hyde, a married couple, | ) Phoenix, Arizona |
| | ) October 1, 2018 |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CV 16-00893-PHX-DGC |
| | ) |
| C.R. Bard, Inc., a New Jersey corporation, and Bard Peripheral Vascular, an Arizona corporation, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 10 - P.M. SESSION

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

Page 2369

1    What year did you come to Bard, sir?

2    A   In 2004.

3    Q   And you do know that the Recovery was responsible for some

4    catastrophic events; correct?

5    A   I'm not sure -- can you rephrase the question, please.

6    Q   You became aware that the Recovery was in fact migrating

7    caudally; correct?  Or, excuse me, in the cranial direction.

8    Upward.

9    A   Yes.  There were some incidents like that, that's correct.

10   Q   And you knew that the Recovery was causing serious

11   injuries and catastrophic events to patients; true?

12   A   There were some cases that there was some association, but

13   I can't -- I don't know if I can say it that the Recovery

14   filter was actually causing the effects.

15   Q   But you started developing the G2 because of issues with

16   the Recovery; right?

17   A   So yes.  The goal was to improve migration resistance was

18   one of the goals.

19   Q   Migration resistance you were trying to improve was

20   migration that went up, cephalad.  Or cranial, excuse me.

21   A   That is correct.

22   Q   You did not test the G2 for caudal or downward migration;

23   correct?

24   A   We did.

25   Q   Pardon me?

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

IN RE:  Bard IVC Filters Products   )     MD 15-02641-PHX-DGC
Liability Litigation,               )
                                    )
_____ )
Lisa Hyde and Mark Hyde, a married  )     Phoenix, Arizona
couple,                             )     October 3, 2018
                                    )
          Plaintiffs,               )
                                    )
          v.                        )     CV 16-00893-PHX-DGC
                                    )
C.R. Bard, Inc., a New Jersey       )
corporation, and Bard Peripheral    )
Vascular, an Arizona corporation,   )
                                    )
          Defendants.               )
_____ )


BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


TRIAL DAY 12 - P.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
                    UNITED STATES DISTRICT COURT

Page 2863

1    maybe we should test this thing not at 104 degrees, because not
2    everyone's going to have a fever that gets these things.  Most
3    people are going to have normal body temperature.  Let's test
4    it at normal body temperature.
5              Well, it failed on the bench three times.  And what
6    did Bard do?  They kept it on the market and allowed
7    catastrophic injuries with the Recovery filter to continue.
8    And you'll see some of that evidence.
9              This is the one that should concern us all.  Do we
10   condone experimenting and testing of potentially dangerous
11   products in human beings without their consent, and the
12   protection each would get if in a monitored and controlled
13   clinical trial?
14             They didn't tell Mrs. Hyde that, we're still trying to
15   figure out what's wrong with this device.  They didn't tell
16   Mrs. Hyde that, by the way, we've been trying to figure it out.
17             Remember the root cause analysis?  You're supposed to
18   figure out what's wrong with this thing.  We still don't know.
19   But we think we might have another product coming on the market
20   that might be better, might keep you safer.  And they don't
21   tell her that.
22             They want to talk about the IFU.  This case is not
23   about an IFU.  This is -- if it is about an IFU, it's about the
24   fact there should have never been one for this device, meaning
25   it should have never been on the market, and they know it.

UNITED STATES DISTRICT COURT

Page  2869

1    don't have the number, but I'll tell you what it is.  It's your

2    first submission to FDA for a retrievable device.

3            And you know what they say in that submission, in the

4    very last part of it, that they know the FDA is going to focus

5    on, because the issue is substantial equivalence?  They say

6    Dr. Asch's study established safety and effectiveness as a

7    permanent device.

8            I mean, that is as big a whopper as you can possibly

9    have when their own expert, their own people before them, have

10   all admitted -- there are other people that have admitted,

11   you've heard the testimony, there's no way that was a long-term

12   clinical trial.  In fact, they told Dr. Asch they were going to

13   do one before they tried to market it.

14           Their long-term clinical trial for the Recovery filter

15   was just putting it out in the open marketplace and having

16   catastrophic injury after catastrophic injury occur.  Then they

17   test it, find out it's not even performing to their performance

18   specifications for foreseeable uses.  They leave it on the

19   market.

20           Now, I know this case gets a little complicated

21   because we start talking about the FDA, you know, substantial

22   equivalence, and that's why you're on the market.  Well, every

23   important witness in this case, both experts, Dr. Parisian and

24   Dr. Tillman; Mr. Ganser, the vice president of regulatory

25   science -- I mean, probably the highest level person who

UNITED STATES DISTRICT COURT

1    anatomy.  In other words, they knew they didn't even understand

2    where this device was being put in.

3            We have historical reactive/evolution design mindset,

4    meaning they wait and see what happens in the open marketplace.

5    Then they'll look at the design and see whether or not it's

6    time to maybe do something about it.

7            Product complications, forcing focus on reactive

8    designing.  There it is again.

9            Limited understanding of user needs.

10           Now, I didn't read the strengths part of it, but they

11   did not include in there marketing safe and effective products.

12           And then G2 -- so here's what -- got it.

13           ==Due to catastrophic injuries reported immediately with==

14   ==the Recovery filter, they started to redesign it to create the==

15   ==G2.  And, again, this is the Recovery.  Catastrophic.  From==

16   ==January 2002 to June 2004, 17 reports of limb fracture.==

17           That's a little misleading, because if you remember

18   the testimony, they didn't really do their full market launch

19   until January of 2004 because they wanted to wait for

20   retrievability.

21           But here's what was different about the Recovery

22   filter.  And by the way, everything I'm saying about the

23   Recovery was true about the G2.

24           A total of 20 arm fragments were reported in 14 cases.

25   Three patients had detached hooks and arms (11 of 20 arms

                  UNITED STATES DISTRICT COURT

Page  2949

 1    Hyde can take on a company like Bard.

 2            And, you know, they had these problems with the G2,

 3    the G2X, following the Recovery which was causing catastrophic

 4    problems.  The G2 was no better.  It just went in a different

 5    direction, but they kept it on the market.  And you saw Janet

 6    Hudnall talk about aggressive marketing.  That's what won.  At

 7    Bard, what won was aggressive marketing.  Aggressive marketing

 8    beat out patient safety, and that's a fact.

 9            And we know that, don't we?  Because we know they

10    continued to sell the G2.  They even brought it back because

11    they realized they weren't going to get the Meridian out there.

12            And the real question for you to ask is, what should

13    an Arizona jury -- what should we in Arizona expect of

14    corporations that we have a right to expect corporate

15    citizenship out of?

16            How about accountability, and if you have a problem

17    and it's dangerous and you have a solution, let the world know,

18    we're working on a solution, but stop.  Don't use our dangerous

19    filter.

20            Now, they talked about Dr. Briant and they talked

21    about Dr. McMeeking, and you can be the judge there.  But, you

22    know, Dr. McMeeking came to this courtroom with real solutions,

23    real tests that showed real predictions that we know had been

24    proven out there in the world why these filters fail.

25            And Bard made a choice.  They brought in Dr. Briant.
                    UNITED STATES DISTRICT COURT