# Exhibit C

Page 445

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| In re:  Bard IVC Filters,<br>Products Liability Litigation | )<br>)<br>)<br>)<br>) MD-15-02641-PHX-DGC<br>) |
| _____ | ) |
| Sherr-Una Booker, an individual,<br><br>           Plaintiff,<br>      v.<br><br>C.R. Bard, Inc., a New Jersey<br>corporation; and Bard Peripheral<br>Vascular, Inc., an Arizona<br>corporation,<br><br>           Defendants.<br>_____ | )<br>) Phoenix, Arizona<br>) March 16, 2018<br>)<br>)<br>)<br>) CV-16-00474-PHX-DGC<br>) 8:59 a.m.<br>)<br>)<br>)<br>) |

BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 3 A.M.

(Pages 445 through 579)

Official Court Reporter:
Elaine Cropper, RDR, CRR, CCP
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

Page 477

1   product; right?                                                      09:13:58

2   A.   Correct.

3   Q.   So in January when Bard launched this device, they had

4   some confusion about the design elements of this device.  They

5   needed to understand it more?                                        09:14:10

6   A.   Well, we're always trying to understand our devices when

7   we launch more and more.  So I was pulled in to do the testing

8   for this specific device; but in regards to, you know, there

9   was a battery of testing that was done which -- with design

10  verification, qualification, that it passed this criteria and I 09:14:28

11  was called in to do this test, to simply look at, hey, if we

12  removed a hook, crossed the legs, what would happen.

13  Q.   Can you think of a worse risk that this device would have

14  than if it got challenged by a clot which the device was

15  supposed to protect from going anywhere and the clot actually  09:14:49

16  dislodged the device and drove it into someone's heart?  Can

17  you imagine a riskier profile than that in a device like this?

18  A.   So when I'm thinking about a massive PE and what this

19  device is protecting against, that's a one of the biggest

20  risks, yeah.                                                         09:15:14

21  Q.   A major failure?

22  A.   Absolutely.  There's a big clot but it moves up.  It does

23  happen.

24  Q.   It didn't perform as intended?

25  A.   For the --                                                      09:15:25

Page 478

```
 1   Q.   Did it perform as it was intended to perform if that      09:15:26

 2   happens?

 3   A.   So I would say, you know, it's trying to prevent those

 4   massive clots but, you know, a lot of filter devices, if you

 5   look at the data --                                            09:15:39

 6   Q.   Sir.

 7   A.   -- they migrate.

 8   Q.   We're just going to be talking about Bard.  Bard Recovery

 9   filter right now.

10   A.   Sure.                                                     09:15:48

11   Q.   Did this device perform as intended or as expected if when

12   challenged by a clot that was supposed to protect the patient

13   from, actually resulted in the device going into a patient's

14   heart and killing them?

15   A.   So, no, it did not.                                       09:16:06

16   Q.   Okay.  Let's go to the test results here.

17        MR. LOPEZ:  Page eight here, please, Greg.  That

18   would be -- could you show Figure 8, below that, please, on the

19   screen.  It says Figure 8 at the bottom of page eight.  That's

20   page nine.                                                     09:17:17

21   BY MR. LOPEZ:

22   Q.   Can you describe or design for the jury what a

23   Box-and-Whisker plot is?

24   A.   Essentially, a Box-and-Whisker plot is just showing the

25   mean standard deviation of the actual devices.  If you have    09:17:38
```

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| In Re: Bard IVC Filters Products Liability Litigation | ) MD-15-02641-PHX-DGC |
| | ) |
| | ) Phoenix, Arizona |
| | ) March 22, 2018 |
| _____) | |
| Sherr-Una Booker, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CV-16-00474-PHX-DGC |
| v. | ) |
| | ) |
| C.R. Bard, Inc., a New Jersey corporation; and Bard Peripheral Vascular, Inc., an Arizona corporation, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) Amended |
| _____) | |

BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S AMENDED TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 6 A.M. SESSION

(Pages 1079 - 1209)

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

Page 1149

1    Q    Did Bard change its specifications, indications for use,

2    for the maximum size of vena cava in which the Recovery filter

3    should be safely implanted to avoid an expansion beyond 28

4    millimeters to put the patient at risk of the device

5    dislodging and going to the heart?  Did they change the IFU,

6    or indications for use?

7    A    No.

8    Q    Did they tell doctors that their device, if it was

9    challenged by a clot and the clot caused the Recovery filter

10   to expand beyond 28 millimeters within the vena cava, that

11   there was a reasonable chance that the filter would become

12   dislodged and not protect the patient and, in fact,

13   potentially cause death because the device went into the heart

14   with the clot?

15   A    Not generally, no.

16   Q    Just kept selling it for the next year and a half; right?

17   A    We did many, many investigations, as I said before.  We

18   convened a panel of experts to learn about bariatric surgery

19   and how filters were used.  We did a tremendous amount of work

20   to understand the situation.

21   Q    I understand.  But my question was you did continue to

22   sell the Recovery filter without any changes to the filter, to

23   the design of the filter.  True?

24   A    Yes.

25   Q    And you continued to sell it for another two years after

Page 1150

1    you had two deaths from the device dislodging when it got

2    challenged by a clot and went into a person's heart.   True?

3    A    I don't know the exact time it was off the market, but

4    around there.

5    Q    And how many more times did that happen, sir, over the

6    next year and a half before Recovery was finally taken off the

7    market?

8    A    How many times did what happen?

9    Q    Did the device dislodge when challenged by a clot and go

10   into a patient's heart and kill the patient.

11   A    I don't know how many times that it was associated with

12   that observation.

13   Q    How many times -- you're the risk and complications person

14   from Bard.   You can't tell this jury how many times it was

15   reported to Bard that the Recovery filter, when challenged by

16   a clot, went into a patient's heart and was associated with

17   that patient's death?

18   A    No, I can't.

19   Q    What if I told you it was 19 times, would you argue with

20   me?

21   A    I'm not going to argue, but I could read it somewhere.

22   Q    Would you dispute -- does 19 sound about right?

23   A    I don't know.

24   Q    It was about 19, wasn't it?

25            MR. NORTH:  Objection, Your Honor.  Cumulative.  And

Page 1151

1    403.

2              THE COURT:  Sustained.

3    BY MR. LOPEZ:

4    Q    But you came to court today not knowing the answer to that

5    question.  True?

6    A    Yes.

7              MR. LOPEZ:  No further questions, Your Honor.

8              THE COURT:  Cross-examination?

9              MR. NORTH:  Your Honor, with the Court's permission,

10   we'd like to reserve our right to present Mr. Carr's testimony

11   as a part of our case in chief.

12             THE COURT:  That's fine.

13             You can step down, sir.

14             THE WITNESS:  Thank you.

15             THE COURT:  All right.  Your next witness, Counsel.

16             MR. O'CONNOR:  Your Honor, at this time we'd call

17   Sheri Booker.

18                        SHERR-UNA BOOKER,

19   called as a witness herein, after having been first duly sworn

20   or affirmed, was examined and testified as follows:

21                  D I R E C T   E X A M I N A T I O N

22   BY MR. O'CONNOR:

23   Q    Good morning.

24   A    Good morning.

25   Q    Would you introduce yourself to the members of the jury,

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| In Re: Bard IVC Filters ) | MD-15-02641-PHX-DGC |
| Products Liability Litigation ) | |
| ) | Phoenix, Arizona |
| ) | March 29, 2018 |
| _____) | |
| Sherr-Una Booker, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CV-16-00474-PHX-DGC |
| v. ) | |
| ) | |
| C.R. Bard, Inc., a New Jersey ) | |
| corporation; and Bard Peripheral ) | |
| Vascular, Inc., an Arizona ) | |
| corporation, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL DAY 11

(Pages 2439 - 2570)

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

Page 2490

1   misleading than that.

2          That's their first communication with FDA.  But now

3   we're supposed to believe they were transparent with FDA.

4          So they put the device on the market anyway.  They

5   know the one and only time it gets challenged by a clot that

6   would have had any clinical significance, it starts to move

7   the device towards the heart.  One time.  The first time.

8   100 percent failure in a clinical trial.  A pilot study.

9          And they tell Dr. Asch, well, we're going to do a

10  long-term clinical study in Europe.  Well, I don't care

11  whether it's in Europe, Australia, Canada, or here in Arizona.

12  They needed to find out what was wrong with that device and

13  they never did.  They just put it out blindly into the world

14  without knowing what was going to happen.  And guess what

15  happened?  19 people died from that Recovery device.  And the

16  only reason why they kept it on the market is because they

17  needed it for their next 510(k) application, the G2, because

18  they didn't want to have to go through the more stringent,

19  more expensive, more lengthy process of doing a PMA, which

20  they would have had to do a clinical trial.

21          We saw that -- remember the slide of Mr. Randall?

22  They wanted to go from a G2 to the next device, quote, without

23  having to do a clinical trial.

24          Slide 4, please.

25          Can I have slide 4, please.

Page 2491

 1          Okay.  Here's the truth in accuracy.  This is what

 2   they signed.  This is how they got clearance.  Note that the

 3   data and information submitted is truthful and accurate.  No

 4   facts material for review of the substantial equivalence of

 5   this device have been knowingly omitted from this submission.

 6          More like a little tidbit like Dr. Asch said, don't

 7   sell this thing until you do a clinical trial because I'm

 8   concerned about the fracture and the migration that happened

 9   in my trial.

10          And a little tidbit like the ethics board in Canada

11   said to stop the study after one fracture and after one

12   migration.

13          Then they put it on the market and what happens?

14          Can I have slide 14, please.

15      (Video clip as follows:)

16          "Users can be swayed by ease of use, low profile and

17   aggressive marketing even in the absence of solid clinical

18   history and in spite of documented negative clinical

19   experiences.

20          "Yes."

21          That's where their attention turned.  Not to doing a

22   clinical trial, but knowing that doctors can be swayed with

23   their 100-plus sales force, with aggressive marketing.  And in

24   spite of negative clinical experience.

25          That's what the evidence in this case showed.

Page 2492

1          Then they go into full market launch.  And remember

2     the testimony of Natalie Wong, a nice lady.  I thought she was

3     a very sweet young lady.  And who was asked to do a test in

4     May of 2004 where she was supposed to do a statistically -- a

5     statistical analysis.  They want to start to talk about

6     statistics, we have to talk about that one where Natalie Wong

7     did a statistical analysis to see, do we have something going

8     wrong really bad with our Recovery filter?

9          And guess what?  She did that study, she did those

10     statistics, and she found that with 95 percent certainty,

11     substantially equivalent, the Recovery filter was causing more

12     deaths than any other device on the market, including their

13     Simon Nitinol filter.

14          Isn't that -- I mean, that is not a stop sign.  I

15     mean, that is a giant wall to stop.

16          Our device is causing more fatalities than the device

17     that allowed us to get it on the market.  But also against our

18     competitors.

19          So what did they do?

20          Slide 8, please.

21          Do they go to ASU and go to the engineering

22     department?  Do they go to the medical center here and find

23     doctors who might be able to help them figure out what they

24     should do or not do and maybe how to redesign this thing and

25     whether or not, you know, these things are too dangerous?  No.

Page 2493

1   What they do is they go to a PR firm.  And they decide to hire

2   Dr. Lehmann.  And they come up with this little quip in case

3   the media -- and they expected the media was going to start

4   coming at them.  Bottom line:  Good filter, severe case, bad

5   out come, deep regret.

6          So sad, too bad, became their mantra.

7          And this is a simple story we should repeat again and

8   again.  Not Natalie Wong's statistical analysis.  Not the fact

9   that they knew this was going to happen from Dr. Asch's

10  clinical trial.  No, let's just find a good story to tell and

11  maybe deflect people away from what's really going on with our

12  device.

13         And you'll see this, this is Trial Exhibit 546, where

14  they try to figure out how do we deal with migration?  I don't

15  have time to go into it, but I urge you to look at Trial

16  Exhibit 546.

17         Slide 9, please.

18         Then they have -- I mean, the mere fact they're

19  having a health hazard evaluation should tell you that

20  something serious is going on.  Just the mere title of that.

21  You almost don't have to read it.

22         This is in July of 2004, after six months of full

23  market launch.  They've had 20 arm fragments in 14 cases,

24  three patients had detached hooks and arms.  11 of the 20

25  arms, 55 percent, remain in the patient.  Like Ms. Booker.

Page 2494

1   And six patients, the arms migrated to the hearts or lungs.

2   Known complication.  That's their excuse.  Keep selling it.

3   Known complication.  We can probably find some statistical way

4   of justifying that.

5             Let's go to the next slide, Greg.

6             Then Dr. Ciavarella says there is no way predict

7   which patients will develop this complication.  Here's what he

8   recommends:  More frequent monitoring of the filter once

9   placed may facilitate discovery of abnormal placement or

10   indeed of a fractured filter.

11             Had they only followed that advice with Ms. Booker

12   and her doctor.

13             Had they only listened to Dr. Ciavarella.

14             Fast-forward to December 2004.  They didn't even tell

15   Dr. Cohen, one of their consultants, who had a death at

16   Temple.  And guess what, Doctor, five patients before yours

17   died of the same consequence.

18             Don't you think they should have told Dr. Cohen so he

19   wouldn't have had statistic number six?  Because I'm sure if

20   they would have told Dr. Cohen, somebody they were paying that

21   was a consultant to them, they didn't have the decency to tell

22   him, then they just allowed two of his patients to die.

23             This is in December --

24             Skip this, Greg.  Go to the next one.

25             So they let another six months go by after that last

Page 2495

1    health hazard evaluation, and they hire a consultant.  And the

2    consultant determines, after looking at all of the data that

3    was available -- remember yesterday I heard Mr. North and

4    Mr. Modra say, that was the best data we had; right?  This

5    adverse event data.

6              Well, here's what the consultant found out:  That

7    reports of death, filter migration, movement -- meaning

8    movement, IVC perforation and filter fracture associated with

9    Recovery filter were seen in the MAUDE database at reporting

10   rates that were 4.6, 4.4, 4.1, and 5.3, higher respectively

11   than the reporting rates of all other filters.  And these

12   differences were statistically significant.

13             What you don't know is compared to the Simon Nitinol

14   filter, they couldn't do a calculation because it was zero for

15   Simon Nitinol filter for migration deaths in the entire

16   history of that device, and by the time this was done they had

17   ten.

18             Can I have 15, please.

19             So before they know how this device is going to

20   perform in a single human being, they go -- they develop this

21   marketing brochure.  And like Mr. Carr said, you heard all the

22   history how things change, this is the message they had out in

23   the open medical community for six or seven years, that the G2

24   filter combines the best design features of Bard's existing

25   vena cava filters to create a brand-new permanent filter

Page 2560

1            And that's what happened.

2            They didn't do a clinical study.  They didn't do one

3    until they absolutely had to.

4            And listen to what they said today.  The failures in

5    the EVEREST study were asymptomatic.  Asymptomatic.

6            Sheri Booker beat cancer.  She is cancer free.  But

7    you know what she's not free of?  She's not free of Bard.

8    Because every day, every minute, Sheri Booker has to think

9    about that Bard strut in her vein.  And you know what?

10   Sheri Booker was asymptomatic at one time too.

11           But Bard made a decision, and they talked and made

12   calculated choices.  They decided rather than doing the right

13   thing and stop the sales, knowing what they knew in January,

14   that they hadn't even tested, much less for caudal migration,

15   knowing that they were testing on patients, they made a

16   choice.  And that choice was to keep selling.  Keep selling

17   because we will deal with the problems later.  And they made a

18   choice that they would rather pay what it takes to come to

19   Arizona for a trial than do the right thing to stop the sale

20   of the G2 filter and stop the injuries, the maiming, and the

21   deaths.  Because they figured somehow if they did it this way,

22   they might not have to face anybody.

23           But now they are.  They have to face Sheri Booker.

24           And look at it the way they have approached this

25   defense.  They have paid experts over $1 million.  What if