Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

Mark S. O'Connor (011029)
mark.oconnor@beusgilbert.com
Beus Gilbert PLLC
701 North 44th St.
Phoenix, Arizona 85008
480-429-3000

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
|---|---|
| This Document Relates to:<br><br>Debra Tinlin, et al. v.<br>C. R. Bard, Inc., et al.<br>CV-16-00263-PHX-DGC | **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* NO. 3 TO EXCLUDE EVIDENCE OF THE CRISIS COMMUNICATIONS PLAN** |

In 2004, Bard retained the public relations firm, Hill & Knowlton ("H&K"), to prepare a "Crisis Communication Plan" to implement "an immediate communications strategy" to address bad press resulting form the internal investigation of a death related to the Recovery filter "and others that may arise." *See* Doc. 16573-1, at 2. It was "intended to prepare for … product withdrawal and or [*sic*] general negative stories surround Recovery Vena Cava Filters." Doc. 16573-1, at 3. H&K and Bard together created additional documents attached to the Plan's Appendix, containing information about Bard's Recovery filter.[1] Numerous Bard employees/consultants reviewed, updated, and commented on the Crisis Communication Plan as it went through Bard's corporate review process.[2] Bard now seeks to exclude all related evidence. The motion should be denied as the evidence is relevant and not unduly prejudicial.

## ARGUMENT AND CITATION OF AUTHORITIES

First, The Crisis Communication Plan is relevant because it outlines Bard's knowledge of the Recovery filter's known risks and Bard's attempt to downplay those risks and associated injuries related to the Recovery filter at the outset of marketing. Bard nevertheless argues the Crisis Communication Plan was a response to a "cephalad migration" not "substantially similar" to Mrs. Tinlin's injury. Def. Mtn at 2. This is not a complete description. This document was intended to prepare for "general negative stories surrounding Recovery Vena Filters." Doc. 16573-1, at 3. The Crisis Communication Plan itself is not "evidence of other accidents" used as "direct proof of negligence, a design defect, or notice of the defect." *See Cooper v. Firestone & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991). Moreover, even if it were, this Court previously held that case law such as *Cooper* is not controlling over alleged substantial

---

[1] See Exhibit A, April 13, 2004 Glass email. Also, key messages used in interviews and "distributed to BPV's sales force, customers, physicians, employees, suppliers and others as needed." Doc. 16573-1, at 5. Q&As were used to "respond to questions from external audiences" and hand "out to media, customers, physicians, suppliers, investors and other Bard audiences." Exhibit B, April 13, 2004 External Q&A at 1.

[2] Included were the head of marketing and the head of global sales. Exhibit C, May 4, 2004 Hudnall email.

similar incidents when, *inter alia,* the evidence Plaintiffs seek to introduce does not involve an unrelated product failure. *See*, Doc. 10258, at 4[3]. In fact, fractures are the exact negative scenarios described in the plan itself associated with the Recovery filter; Bard admitted Recovery fractures were a reason for development of its G2 filter[4]. The Crisis Communication Plan is relevant as it identifies an initial reported failure mode associated with the same product, anticipation of future failures, Bard's testing of the product, and a gestalt of behavioral reactions as "new details arise in this or other incidents." If the "substantial similarity" test were to be applied, it can easily be met. *See Jackson v. Firestone Tire & Rubber Co.,* 788 F.2d 1070, 1083 (5th Cir. 1986). The "substantial similarity" rule is not so rigid as to exclude evidence of similar injuries involving the same device. *See Walton v. Bridgestone/Firestone, Inc.*, 2009 WL 2778441, at *7 (D. Ariz. Jan. 16, 2009). Even adopting Bard's narrow scope of "similarity", the evidence Bard seeks to exclude discusses strut migration,[5] which Mrs. Tinlin experienced—including struts migrating to her heart and lungs. For this reason alone, this evidence is relevant.

      The Crisis Communication Plan and related evidence also supports Plaintiffs' punitive damages claim as it is reflective of Bard's deliberate course of conduct in reacting to its knowledge of the product's burgeoning failure history.[6] The frame of mind of the alleged wrongdoer is a necessary consideration in determining whether punitive damages may be imposed." *Sharp ex rel. Gordon v. Case Corp.*, 595 N.W.2d 380, 390 (Wis. 1999). Punitive damages require looking "to the frame of mind of the wrongdoer."

---

[3] Similar to this Court's ruling in Booker, Plaintiff's experts opine that she also suffers from multiple failure modes: tilt, migration, and fracture with migration and perforation.

[4] "[O]ne of Bard's goals in developing the G2 Filter was to reduce the number of incidents of filter fracture and migration that Bard had observed with the Recovery Filter." Doc. 9862 at 4.

[5] *See*, *e.g.*, Exhibit D, Jan. 10, 2006 Crisis Communication Plan at 52 ("Other potential causes of filter migration include improper implantation technique and fracture or failure of the filter wires.").

[6] Punitive damages are permitted when the "defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043. Bard's actions are not limited to the hiring of the firm, rather its conduct in developing the plan.

*Walter v. Cessna Aircraft Co.*, 358 N.W.2d 816, 819 (Wis. Ct. App. 1984). Here, the Crisis Communication Plan and related evidence shows Bard's knowledge of risks and frame of mind. Rather than take appropriate action, Bard publicly "downplayed" the problem's extent and the plan gives the background of the conduct.[7] Such conduct exemplifies the deliberate acts a jury could interpret as malicious or with intentional disregard for potential harm. *See* Wis. Stat. § 895.043; Wis. JI-Civil 1707.2.

Bard also argues that because H&K helped create the Crisis Communication Plan, it "is not specific to Bard" and thus "lacks probative value." *See* Def. Mtn. at 3. This is incorrect. H&K created the template, Bard filled it with a core team to approve response strategy, draft/review specific messaging, and dispense messaging to the media, sales force, and public. Bard's team was actively involved in writing all content pertaining to the Recovery filter and despite its reliance on case law addressing public relations firms guiding corporate reaction, it has not shown that the Crisis Communication Plan is not relevant or could not be interpreted by a jury as malicious or intentional conduct. Bard's arguments appear to be ripe for cross examination rather than exclusion based on Rules 410, 402, and 403.

Also, Bard relies on a tenuous presentation of testimony from Holly Glass to suggest it would suffer "unfair prejudice" because the Crisis Communication Plan was "not finalized" or "never implemented."[8] Ms. Glass never suggested the Crisis Communication Plan was never used, was unaware of later versions,[9] and could not say which version Bard ultimately approved.[10] The extent the Crisis Communication Plan

---

[7] *See, e.g.*, Exhibit E, Apr. 15, 2004 Lehmann email.

[8] *See* Def. Mtn. at 2-3 n.4. Ms. Glass only testified that the October 2004 version of the Crisis Communication Plan "was never implemented" because she remembered there was a later version of the plan. *See* Doc. 16573-3 at 9-10 (Deposition of Holly Glass at 169:18-170:6).

[9] When asked about versions from late 2005 and early 2006, Ms. Glass responded, "I haven't seen those" and stated she thought the dates were wrong because she did not "remember this going on for years." Doc. 16573-3 at 10-11(Deposition of Holly Glass at 170:21-171:11).

[10] When asked whether she had an independent recollection of whether the Plan was approved and appears in Bard's corporate files, she responded "No." Doc. 16573-3 at 13-14 (Deposition of Holly Glass at 173:24-174:7).

- 3 -

was "implemented" to the public is immaterial to its admissibility. It was formally approved reflecting Bard's corporate process and conduct. Ultimately, it was so important to Bard's strategy that Bard continued to amend it for two years[11]—long after Bard had stopped selling the Recovery filter. Bard also suggests that Plaintiffs would attempt to "sneak in" evidence of other incidents. For reasons stated above, this is not the case. Such evidence is admissible and Bard's Motion to exclude the Crisis Communication Plan should be denied.

RESPECTFULLY SUBMITTED this 12th day of April 2019.

BEUS GILBERT PLLC

By: */s/ Mark S. O'Connor*
　　Mark S. O'Connor
　　701 North 44th St.
　　Phoenix, Arizona 85008

LOPEZ McHUGH LLP
　　Ramon Rossi Lopez (CA Bar No. 86361)
　　(admitted pro hac vice)
　　100 Bayview Circle, Suite 5600
　　Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

---

[11] Bard employees continued to use and revise the Crisis Communication Plan at least through January 2006. *See*, Exhibit D., Jan. 10, 2006 Crisis Communication Plan.

- 4 -

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of April 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

                                                */s/ Jessica Gallentine*