Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California  92660
949-812-5771

Mark S. O'Connor (011029) – moconnor@beusgilbert.com
BEUS GILBERT, PLLC
701 N.44th St.
Phoenix AZ 85008
480-429-3019
*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| | **PLAINTIFFS' TRIAL BRIEF ON THIRD PARTY FAULT** |
| This Document Relates to: | (Assigned to the Honorable David G. Campbell) |
| *Debra Tinlin, et al. v. C. R. Bard, Inc., et al.*<br>CV-16-00263-PHX-DGC | |

1   Plaintiffs respectfully submit this briefing in response to Defendants' Trial Brief on

2   Third Party Fault.

3   **I.    Introduction**

4   This matter involves a Bard Recovery filter implanted into Plaintiff, Debra Tinlin,

5   which fractured and perforated her vital organs.  Prior to implantation, Mrs. Tinlin, a

6   morbidly obese patient, had been diagnosed with a prothrombin gene mutation, bilateral

7   deep vein thrombosis, and pulmonary emboli.   *See* Ex. A, Trial Ex. 15298 at

8   TINLIND_SMHMC_MDR00066-69;  00077-78.   Due to her thrombophilia and

9   hypercoagulability, one of Mrs. Tinlin's physicians recommended that she receive a

10  removable IVC filter.  *Id.* at 00066-69.  On May 7, 2005, Dr. Joshua Riebe implanted a

11  Bard Recovery filter in Mrs. Tinlin.   *Id.* at 00077-78.  In the implantation report, Dr.

12  Riebe noted it was "estimated that the cava was between 28 and 29mm, which was at the

13  upper limits of cava size for recovery filter."  *Id.*  At the time of implantation, Dr. Riebe

14  did not know Bard was already aware that its Recovery filter had a higher rate of risk than

15  other filters on the market or that Bard was planning to soon discontinue selling the

16  Recovery filter.  *See* Ex. B, Dr. Riebe Dep. Tr. at 70:9-23; 52:8-14.  On May 11, 2005,

17  after Dr. Riebe placed Mrs. Tinlin's Recovery filter, Bard issued a "Dear Colleague" letter

18  to the medical community describing the higher risks associated with Recovery filters and

19  morbidly obese patients as well as the difficulties of accurately measuring the IVC in such

20  patients.  *See* Ex. C, Trial Ex. 908, 5/11/2005 Dear Colleague Letter.  After the filter

21  placement, Mrs. Tinlin began suffering from lower back pain as a result of the filter.  *See*

22  Ex. A, Trial Ex. 15298 at TINLIND_SMHMC_MDR00080.  In April 2008, Mrs. Tinlin

23  was recommended by Aurora Baycare Medical Center's respiratory services to get a CT

24  scan performed on her lungs due to asthma and an enlarged thymus.  Dr. Roger Haller, the

25  radiologist who reviewed the CT scans of Mrs. Tinlin's lungs, found a small amount of

26  left basilar atelectasis or scarring. [1]   *See* Ex. D, Trial Ex. 15210 at

27  [1] Bard's expert, Dr. Owens, misstated in his report that Dr. Haller specifically references

28  in the radiology report that the "Heart is normal."  *See* Trial Ex. 4954, Owens Rep. at 2.
    Dr. Haller was reviewing the CT scan specifically for the lungs, not the heart, but he did

TINLIND_ABMC_MDR07248.  On June 10, 2013, Mrs. Tinlin was brought to the emergency room in cardiogenic shock and in the midst of multi-organ failure.  *See* Ex. E, Trial Ex.15201 at TINLIND_ABMC_MDR00533.  It was determined that her Recovery filter had fractured, and two struts had embolized to the right ventricle, causing a massive pericardial effusion around the heart, known as cardiac tamponade, with significant compression of the ventricles.  *Id*.  On July 31, 2013, Ms. Tinlin underwent open heart surgery, and a fractured strut was removed.  *See* Ex. F, Trial Ex. 15259 at TINLIND_ASLMC_MDR00761-63.  Other pieces of her Recovery filter have since been found in her upper and lower lungs.  *See* Ex. G, Trial Ex.15233 at Chest X-Ray Report, TINLIND_ ABMC_RAD00059.

On April 12, 2019, Bard filed its Trial Brief on Third Party Fault.  Although Bard did not ask for specific relief, it sought to "address the legal issues of apportionment of fault and alternative causal possibilities concerning" the medical treatment Mrs. Tinlin received from Dr. Riebe and Dr. Haller.  Plaintiffs recognize that the Court has since issued an Order on Plaintiffs' Motion *in Limine* No. 1 (Dkt. 17285) that touches on some of these issues.  However, Plaintiffs submit this briefing in response to Bard's Trial Brief and request that the Court consider these issues of law as we proceed to trial. .

First, Wisconsin law does not allow a manufacturer to allocate fault to third parties when the claims against the manufacturer are strict products liability claims.  Second, Bard has not established that Mrs. Tinlin's doctors committed malpractice under Wisconsin law, and therefore cannot allocate fault for malpractice to those doctors. Finally, even if Bard could establish Mrs. Tinlin's doctors committed medical malpractice, the *Selleck* rule prevents the allocation of fault for later medical care that allegedly aggravated Mrs. Tinlin's injuries.

## II.    There is No Allocation of Fault to Third Parties for Strict Product Liability Claims.

note during that review that the "Heart size is normal."  *See* Ex. D, Trial Ex. 15210 at TINLIND_ABMC_MDR07248.

Wisconsin law does not permit allocation of fault to third parties for matters involving strict products liability claims.  An action against a manufacturer for products liability is governed by Wisconsin Statute 895.047.  The statute identifies a number of defenses available to the manufacturer, but none of those defenses allow for the manufacturer to reduce its causal responsibility to a third party.  *Id.*  The Wisconsin legislature purposefully left out any defense for the allocation of fault to third parties for strict liability claims.[2]  This is because the focus in a strict liability case is on the product itself.  *See D.L. by Friederichs v. Huebner*, 329 N.W.2d 890, 903 (Wis. 1983) ("The focus in a strict liability case, on the other hand, is on the product itself, not on the manufacturer's conduct. In strict liability actions plaintiffs need not prove specific acts of negligence").  As stated by the Wisconsin Supreme Court, strict product liability theory allows recovery where, although there is no proof of specific acts of negligence on the part of the seller, the "product was in a defective condition at the time it reached the hands of the ultimate consumer."  *Fuchsgruber v. Custom Accessories, Inc.*, 628 N.W.2d 833, 838 (Wis. 2001).  As such, "[t]here is no defendant 'negligence' to be apportioned" in a strict product liability action.  *Id.* at 841.

### III.    There Can Be No Allocation of Fault to Doctors When Medical Malpractice Has Not Been Established.

To the extent allocation of fault would be allowed for remaining negligence claims, Bard's experts would have to show that in this case Mrs. Tinlin's doctors performed medical malpractice that initially caused her injury.  *See Zintek v. Perchik*, 471 N.W.2d 522, 528 (Wis. Ct. App. 1991) ([M]edical negligence *cannot* be established without expert testimony.").  Bard suggests that the "only" question that the court must answer before submitting a negligence question to the jury is whether there is evidence of conduct that

---

[2] The statute only allows the manufacturer to reduce "the percentage of causal responsibility for the claimant's harm attributable to the ***claimant's*** misuse, alteration, or modification of the product."  *Id.* at (3)(d) (emphasis added).  Although Bard is not asserting that Mrs. Tinlin herself is comparatively at fault, it should be noted that the Wisconsin legislature did specifically address actions of third parties for the threshold question of the plaintiff's "right" to recover.  *See* WI ST 894.045.

would constitute negligence.  Def. Trial Br. at 9.  This is incomplete.  The decision of whether the special verdict shall inquire as to the alleged negligence of a non-party raises a question of law, namely, whether evidence exists which warrants submission of the matter to the jury. *See Gierach v. Snap–On Tools Corp*., 255 N.W.2d 465, 468–69 (Wis. 1977).  "Without expert testimony, the jury in a professional negligence case has no standard which enables it to determine whether a defendant failed to exercise the degree of care and skill required of the defendant."  *Zintek*, 471 N.W.2d at 528.  Bard thus has to show that Mrs. Tinlin's doctors breached a standard of care and caused Mrs. Tinlin's initial injuries.  Neither Bard nor its experts have established these elements of a medical malpractice case to allow the question to be put to a jury.  Moreover, there is evidence that Ms. Tinlin's vena cava was not oversized and that it may have in fact been 28mm.  *See* Ex. B, Dr. Riebe Dep. Tr. at 98:24-99:8.

First, Bard's experts have failed to define what the standard of care was for doctors treating patients like Mrs. Tinlin at the appropriate period of time.  *See Carney-Hayes v. NW. Wisconsin Home Care, Inc*., 699 N.W.2d 524, 537 (Wis. 2005) ("Medical malpractice cases require expert testimony to establish the standard of care.").  The standard for determining if a physician failed to exercise due care is "whether the physician used the degree of skill and care that a reasonable physician would use in the same or similar circumstances."  *Graziano v. Allen*, No. 02-2495, 2003 WL 21649499, at *2 (Wis. Ct. App. 2003).  "Without such testimony the jury has no standard which enables it to determine whether the defendant failed to exercise the degree of care and skill required of him."  *Froh v. Milwaukee Medical Clinic, S. C.*, 270 N.W.2d 83, 87 (Wis. Ct. App. 1978).  Bard relies on Dr. Morris's report, suggesting that "Dr. Riebe fell beneath the standard of care when he placed this IVCF into an inferior vena cava that was larger than 28mm in diameter."  *See* Def. Trial Br. at 2; Trial Ex. 4953, Morris Report.  It is insufficient to merely state that someone fell beneath the standard of care by performing a certain action.  Dr. Morris does not outline the practice of reasonable physicians in 2005 with regard to patients like Mrs. Tinlin, a high-risk patient diagnosed with deep vein

thrombosis and multiple bilateral PE, and who had a history of blood clotting.  Nor does Dr. Morris suggest another appropriate action for Dr. Riebe to meet any standard of care. Dr. Riebe's decision to place an IVC filter into Mrs. Tinlin was a decision based on his own medical expertise and what he knew at the time.[3]  He chose among the available IVC filters and weighed the risk of placing a filter in Mrs. Tinlin's vena cava -- which was at the upper limits of a vena cava size for placement of an IVC filter -- against the risk of not placing a filter at all in a high-risk patient.  Given that Bard has not established what other reasonable doctors in the community would have done differently, the jury has no way of determining how much Dr. Riebe deviated from what those doctors would have done.

Moreover, given Bard's failure to specify the standard of care of a doctor in Dr. Riebe's position, any proposed instruction allocating fault to Dr. Riebe necessarily implies that as long as Dr. Riebe did not place an IVC filter in Mrs. Tinlin, he would not have been at fault.  And in turn, the only choice the jury can make is that Dr. Riebe should have done nothing.  However, as the Wisconsin Court of Appeals found just days ago, "[s]imply put, 'doing nothing' is not an alternative method of treatment or diagnosis." *Barney v. State of Wisconsin Dept. of Health and Family Servs.*, No. 2017AP1616, 2019 WL 1612888, at *4 (Wis. Ct. App. April 16, 2019).  An instruction allocating fault to Dr. Riebe would thus be misleading, as it wrongfully implies that Dr. Riebe's only choices were to either negligently fail to take any action or to negligently choose a specific course of action.[4]  *See Miller v. Kim*, 528 N.W.2d 72, 76 n.5 (Wis. Ct. App. 1995).

Bard has also not shown how Dr. Haller breached any standard of care.  Bard relies on the reports of its experts Dr. Sobieszczyk and Dr. Owens, suggesting that Dr. Haller committed medical negligence by failing to identify the fractured struts that allegedly appear in an April 15, 2008 CT scan.  First, it should be noted Dr. Sobieszczyk's report

---

[3] The implantation was prior to Bard informing the medical community that it was aware that the Recovery filter posed especially high risks in large vena cava sizes and in morbidly obese patients. *See* Ex. C, Trial Ex. 908, 5/11/2005 Dear Colleague Letter.

[4] In the event medical malpractice evidence is to be allowed in this case, the Wisconsin standard jury instruction on "alternative methods," WIS JI-CIVIL 2013, should be included for the jury.

makes no mention of Dr. Haller, nor does it specify what the standard of care is for radiologists like Dr. Haller that read films in 2008. *See* Ex. C to Def. Trial Br., Sobieszczyk Rep. Second, although Dr. Owens states in his report that a radiologist has a duty to report all abnormalities they find, Dr. Owens does not specify that all radiologists must be able to find all abnormalities. Dr. Owens does not opine that practicing radiologists of reasonable skill in 2008--who were not analyzing CT scans for IVC filters or broken struts--should necessarily be able to locate abnormalities like fractured IVC filter struts. *Id.* at 2. The subject CT scan was ordered as a review of Mrs. Tinlin's lungs, not her IVC filter. *See* Trial Ex. 4954, Owens Rep. at 1-2. Dr. Haller would not have been looking for abnormalities related to the IVC filter. That Dr. Haller did not see a particular abnormality does not mean that he breached a duty to report all abnormalities he finds. Indeed, whether Dr. Haller should have seen those struts is unknown, as Bard's experts never established that the standard of care for radiologists in Dr. Haller's situation was to always to be able to see fractured struts on films. The jury will be unable to compare Dr. Haller's actions with that of a reasonable practicing radiologist at the time under similar circumstances. The jury will thus cannot make an allocation of fault to Dr. Haller based on those actions.

Additionally, Bard has not met its burden of showing that Mrs. Tinlin's physicians' alleged malpractices were causes of Mrs. Tinlin's injuries. To prove malpractice, one must establish the standard of care, show that the physician failed to conform to the standard of care, and prove that the physician's failure to conform to the standard of care caused the plaintiff's injury. *Carney-Hayes*, 699 N.W.2d at 537; *Olfe v. Gordon*, 286 N.W.2d 573, 576 (Wis. 1980). The breach of care must be shown to be the cause in fact or a substantial factor in causing the eventual injury. *Estate of Hegarty ex rel. Hegarty v. Beauchaine*, 727 N.W.2d 857, 900 (Wis. Ct. App. 2006). The "lack of expert testimony on the question of causation results in an insufficiency of proof." *Id.* Bard relies on Dr. Morris's report to suggest that Dr. Riebe committed malpractice, but Dr. Morris makes no assessment of how any of Dr. Riebe's actions caused Mrs. Tinlin's specific injuries. Trial

Ex. 4953, Morris Report.  Dr. Morris states that Dr. Riebe's filter placement caused Mrs. Tinlin's filter to initially move less than 2 cm, "which is below the standard definition of migration."  Def. Trial Br. at 2.  Dr. Morris further states that in a worst-case scenario, the entire IVC filter can migrate into the heart when placed in a vena cava larger than the indicated size.  *Id.*  However, that worst-case scenario is different from Mrs. Tinlin's scenario.  The allegations in this matter are not that the entire filter migrated into Mrs. Tinlin's heart; rather, Plaintiffs allege that Mrs. Tinlin's filter fractured, with struts migrating and perforating her heart and other organs.[5]  Without the requisite expert opinion explaining how Dr. Riebe breached a specific standard of care, and how that breach caused Mrs. Tinlin's specific injuries, Bard cannot ask the jury allocate any fault to Dr. Riebe.

Bard has also failed to meet the causation requirement with regard to Dr. Haller.  Bard relies on Dr. Owens's report to suggest that "Dr. Haller's negligence prevented Mrs. Tinlin's treating physicians from having information to evaluate her medical condition before she sustained her alleged injuries in this case."  Def. Trial Br. at 4.  At the outset, Bard's argument ignores that Mrs. Tinlin was already injured by the Recovery filter prior to Dr. Haller ever reviewing her CT scans—she had fractured filter struts in her heart.  In any event, Dr. Owens's report makes no reference to any specific injuries that were caused by Dr. Haller's alleged failure to identify and report abnormalities on Mrs. Tinlin's CT scan.  *See* Trial Ex. 4954, Owens Report.   Bard also suggests that Dr. Sobieszczyk's Report addresses the "causal connection" between Dr. Haller and Mrs. Tinlin's injury.  Def. Trial Br. at 4.  Yet Dr. Sobieszczyk's report does not even mention Dr. Haller.  *See* Ex. C to Def. Trial Br., Sobieszczyk Rep.  Dr. Sobieszcysk's report says that the April 2008 scans "should have alerted her clinicians about the loss of filter integrity" and that the "logical next step would have been dedicated CT imaging and evaluation of the filter itself."  But Dr. Sobieszcysk never states that those clinicians, who were not "alerted" at

---

[5] In his deposition testimony, Dr. Morris also could not specify how a large vena cava size could contribute to a fracture and that any relation would only be "conjecture."  Ex. H, Dr. Morris Dep. Tr. at 127:10-128:7.

the time, thereby caused Mrs. Tinlin's injuries.  *Id.*  It is not at all clear which clinicians Dr. Sobieszcysk is referring to.  Dr. Sobieszcysk also does not explain how an "evaluation of the filter" would have prevented any injury that occurred, nor does he state that it would have been advisable and possible to remove the struts before they caused further injury.  To the contrary, Bard has argued in other cases that filter struts lodged in patients' hearts are unlikely to cause any harm.  Ultimately, without the proper expert opinion describing how Dr. Haller's actions caused Mrs. Tinlin's injuries, any instruction allocating fault resulting from a deviation from a standard of care would be improper.

## IV.    The *Selleck* Rule Applies to Aggravating Injuries.

Under the *Selleck* rule, Defendants are liable for "damages for injuries aggravated by subsequent mistaken medical treatment … [a]ssuming that the plaintiff exercised good faith and due care in the selection of [her] treating physician."  *Fouse v. Persons*, 259 N.W.2d 92, 94-95 (Wis. 1977).  Where there are separate injuries, or where an original injury is aggravated, as in the malpractice context, "there [are] separate torts rather than joint liability," and apportionment is improper.  *Johnson v. Heintz*, 243 N.W.2d 815, 826 (Wis. 1976) (specifically distinguishing between two tortfeasors whose "actions concur in time . . . to create an injury-producing situation," and where the actions of others "resulted in distinguishable separate injuries to the same subject.") (citing Prosser, *Law of Torts*, p. 317, sec. 52 (4th ed. 1971)).

First, Bard has not alleged that Mrs. Tinlin failed to exercise good faith and due care in selecting her treating physicians, so any alleged negligence by her doctors--and there is none--that aggravated her injuries is irrelevant, and the jury should not be requested to allocate fault or damages.  Second, any alleged negligence performed by Mrs. Tinlin's physicians occurred at a later time, and did not form a basis for the causes of action relating to the filter failure.  Whether Dr. Riebe was negligent in implanting the filter is arguably irrelevant, as Dr. Riebe would never have had the opportunity to implant a defective IVC filter if Bard had not first placed a defective IVC filter on the market.  Further, whether Dr. Haller was later negligent with regard to finding fractured struts in

| | |
|---|---|
| 1 | CT scans is undoubtedly irrelevant.  Dr. Haller did not have an opportunity to review Mrs. |
| 2 | Tinlin's CT scans until April of 2008, years after the initial implantation of Bard's |
| 3 | Recovery filter.   Although Bard claims that Mrs. Tinlin was not injured until the |
| 4 | pericardial effusion occurred, Mrs. Tinlin was injured when the filter fractured. An injury |
| 5 | in Wisconsin occurs "when the [negligent act or omission] causes a greater harm than |
| 6 | [that which] existed at the time of the [negligent act or omission].  *Estate of Genrich v.* |
| 7 | *OHIC Ins. Co.*, 769 N.W.2d 481, 487-88 (Wis. 2009) (statute of limitations triggered on |
| 8 | date sponge was left in patient; infection caused by sponge and surgery to remove it |
| 9 | "inflicted an additional injury") (alterations in original, citation and internal quotation |
| 10 | omitted).  It defies reason for Bard to acknowledge there were "fractured struts in Mrs. |
| 11 | Tinlin's heart," to state that Dr. Haller failed to identify those fractured struts, to assert |
| 12 | that those fractured struts led to further complications, and then in same breath try to argue |
| 13 | that she was not injured at the time.  Further, it is disingenuous for Bard to propose that |
| 14 | fractured struts in Mrs. Tinlin's heart were "asymptomatic" and imply that she was not |
| 15 | suffering serious injuries.  To the extent that Dr. Haller was negligent in identifying those |
| 16 | fractured struts, any further injuries Mrs. Tinlin experienced would only be aggravations |
| 17 | of those existing injuries.  Pursuant to *Selleck*, Bard would still be responsible for damages |
| 18 | aggravated by any such failure. |
| 19 | RESPECTFULLY SUBMITTED this 25th day of April, 2019. |
| 20 | BEUS GILBERT, PLLC. |
| 21 | By:*/s/ Mark S. O'Connor* |
| 22 | Mark S. O'Connor |
| | BEUS GILBERT, PLLC |
| 23 | 701 N.44th St. |
| | Phoenix AZ 85008 |
| 24 | 480-429-3019 |
| 25 | LOPEZ McHUGH LLP |
| | Ramon Rossi Lopez (CA Bar No. 86361) |
| 26 | (admitted *pro hac vice*) |
| | 100 Bayview Circle, Suite 5600 |
| 27 | Newport Beach, California 92660 |
| 28 | *Co-Lead/Liaison Counsel for Plaintiffs* |

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on this 25th day of April, 2019, I electronically transmitted the

3     attached document to the Clerk's Office using the CM/ECF System for filing and

4     transmittal of a Notice of Electronic Filing.

5                                                    */s/ Jessica Gallentine*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28