James R. Condo (#005867)
Kristine L. Gallardo (#033975)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2202
Telephone: (602) 382.6000
Facsimile: (602) 382.6070
jcondo@swlaw.com
kgallardo@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street, NW / Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
Telephone: (404) 322-6050
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation,<br><br>This Document Relates to All Actions | No. 2:15-MD-02641-DGC<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION SEEKING ESTABLISHMENT OF COMMON BENEFIT FEE AND EXPENSE ACCOUNTS PURSUANT TO CASE MANAGEMENT ORDER NO. 6 AND MODIFICATION OF CASE MANAGEMENT ORDER NO. 6**<br><br>(Assigned to the Honorable David G. Campbell) |

Pursuant to Case Management Order No. 6 (Doc. 372) ("CMO 6"), Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") respectfully submit their response to Plaintiffs' motion seeking establishment of common benefit fee and expense accounts pursuant to CMO 6 and modification of CMO 6. Bard does not object to the establishment of common benefit accounts and the appointment of an escrow agent, but specifically objects to the Plaintiffs Steering Committee's ("PSC") request to increase the common benefit fund assessment percentages set forth in CMO 6 from 8% (6% fees and 2% costs) to 14% (9% fees and 5% costs). The PSC's requested assessment is at the very top-end of all assessments set in medical device and pharmaceutical MDLs, far exceeding the vast majority of assessment percentages in such litigation. Yet the PSC provides no valid justification for nearly doubling the current 8% assessment, an amount that already exceeded the norm. Such an increase could derail ongoing settlement negotiations and chill future resolution of inventories in this MDL. For the reasons discussed below, Bard respectfully requests that the Court deny the PSC's request to increase the assessment percentages in CMO 6.

## ARGUMENT AND CITATION OF AUTHORITY

### I. The PSC's Requested 14% Assessment Far Exceeds the Vast Majority of Medical Device and Pharmaceutical MDLs

The PSC's request to nearly double the current assessment from 8%[1] to 14% would vault this litigation into one of the highest percentages assessed of all medical device and pharmaceutical MDLs. According to a survey of MDL proceedings by Harvard Law School professor William B. Rubenstein, "a typical common benefit assessment is 4% to 6% of the client's gross recovery." William B. Rubenstein, 5 Newberg on Class Actions § 15:115 (5th ed. 2018); Rubenstein, *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 Class Action Att'y Fee Dig. 87, 90 (2009) (noting from 21 cases surveyed,

---

[1] Contrary to their assertions otherwise, (*cf.* Mot. at 3-4), the PSC originally proposed a common fund assessment percentage of 9% (7% fees and 2% costs). (*See* Doc. 264-1 at 10.) This Court denied the PSC's request and instead adopted the current assessment of 8% (6% fees and 2% costs). (*See* Doc. 372 at 10.)

"almost all have common benefit assessment around 4-6%"); Paul D. Rheingold, *Litigating Mass Tort Cases*, at § 7:35 (2015) (citation omitted) ("Percentages awarded for common funds in recent MDLs . . . were in the 4-6% range."); *see also* Rubenstein, 5 Newberg on Class Actions § 15:117 (5th ed. Nov. 2018) (noting from updated survey of 71 MDL proceedings, "the mean total assessment [was] 6.45%" and "the median total assessment [was] 6%").

Attached as Exhibit "A" is a survey Bard made of MDLs that includes all pending medical device and pharmaceutical MDLs since 2010 for which Bard has been able to identify an order setting an assessment percentage for a common benefit fund. The assessment rates ordered in those proceedings had a mean of 7.48% and a median of 6%. Therefore, contrary to the PSC's contention, the current 8% assessment is not "conservative," but rather already exceeds the norm observed in similar medical device and pharmaceutical MDL litigation. Most importantly, out of the 65 MDL proceedings surveyed, only **six** (6) MDL proceedings had an assessment percentage higher than the 14% assessment requested by the PSC here.[2] In other words, the PSC requests that this Court deviate from more than 90% of all medical device and pharmaceutical MDLs surveyed over the last decade. Yet, as demonstrated below, the PSC provides no valid justification for this significant upward deviation. Therefore, the request should be denied.

## II. The PSC Provides No Valid Justification For the Increased Assessment

The PSC claims that the scope, size, duration, and cost of this litigation has exceeded their investment in this MDL,[3] which they claim warrants nearly doubling the assessment percentage. But the PSC should have expected the length and scope of this litigation, including multiple bellwether trials. Moreover, the current size of the MDL actually warrants a reduced (not increased) assessment percentage in this case. Therefore,

---

[2] Not surprisingly, it is these exceedingly rare assessment percentages upon which Plaintiffs rely in their Motion. (*See* Mot. at 4 n.2; *id.* at 5-6.)

[3] The PSC claims to have contributed more than $6 million to fund this litigation, but provides no evidence in support other than their own bald assertions. (*Cf.* Mot. at 5.) The PSC also does not disclose whether that sum included some of the costs of the extensive television advertising that has been undertaken.

1  there is no valid justification for the PSC's requested increase, and it should be denied.

2  The PSC argues that the time and expense preparing for "multiple bellwether
3  trials" exceeded their initial estimates at the time they originally proposed the 9%
4  assessment in November 2015. (Mot. at 4.) But it is undisputed that nearly a month before
5  this submission, the PSC represented to the Court that they expected this MDL would
6  have "3-5" bellwether trials, (Doc. 174 at 25), and were aware that Bard anticipated "a
7  bellwether process" involving a group of "5 to 7" potential bellwether cases. (*Id.* at 9.)
8  Indeed, during the initial case management conference on October 29, 2015, the parties
9  agreed with the Court that "both sides are thinking that we should at some point have
10 bellwether trials. The difference in the parties' proposals really concerns how much
11 discovery should be done between now and when we get to the bellwether phase." (*See*
12 Ex. B, Oct. 29, 2015 Case Mgmt. Conf. Tr. at 58:1-9 (Doc. 277); *see also id.* at 48:13-20
13 (the Court noted "down the road we will make decisions on bellwether trials"); *see also*
14 *id.* at 157:5-6 (acknowledging that "somewhere along the way we would be choosing
15 bellwethers"). Therefore, the PSC's time and expense preparing for and conducting "full
16 trial of three bellwether cases and dispositive motions for four plaintiffs, not including the
17 round of dispositive motions for the *Tinlin* trial," as well as the upcoming full *Tinlin* trial,
18 (Mot. at 5), was or should have been reasonably expected at the time of their proposed
19 assessment based on their own initial estimate of "3-5" bellwether trials. (Doc. 174 at 25).

20 Additionally, the PSC contends that they expected this MDL to have been of a
21 shorter duration, which they also claim warrants nearly doubling the assessment
22 percentage. But the parties completed all common fact discovery by February 2017, all
23 common expert discovery by July 2017, and filed dispositive and *Daubert* motions by late
24 2017. (*See* Doc. 12534 at 2, 8-9.) This schedule concluded less than a year later than the
25 PSC's own estimates prior to their proposed submission of CMO 6. (*Cf.* Doc. 174 at 24-25
26 (common fact discovery by May 2016, expert discovery by October 2016, and dispositive
27 and *Daubert* motions by November 2016).) Moreover, the PSC acknowledged that their
28 estimated schedule did not include dates for an "MDL-sanctioned Bellwether Trial

procedure," which would inevitably extend beyond these dates. (*Id.* at 22-23.) The first two MDL bellwether trials began in March and May 2018, little over a year after the PSC's estimated schedule for the "3-5" bellwether trials. (*Id.* at 25 (February 2017 to April 2017).) The subsequent three MDL bellwethers cases have proceeded expeditiously.

Finally, the PSC asserts that the current size of the MDL exceeded their original estimate of "approximately 1,000 cases," which they claim warrants nearly doubling the assessment percentage. (Mot. at 4.) Setting aside counsel's representation to the Court during the initial conference that, "just in this group of lawyers that are here, the number of cases that are under review go well above a thousand. Maybe closer to 2,000," (Ex. B, Tr. at 35:1-3), the size of the MDL does not warrant an increased assessment percentage. Rather, it warrants the opposite. In the PSC's own words "[w]here there are a large number of plaintiffs, a smaller percentage assessment can provide the same actual amount as a larger percentage assessment applied to a smaller number of plaintiffs." (Doc. 291 at 4-5.) This is because, as the size of the MDL increases, the size of the pool of settlement funds from which the assessments are derived also increases. Therefore, the fact that there are over 6,000 active cases pending in this MDL should warrant a smaller (not larger) assessment percentage to compensate the PSC for their common-benefit work than the Court originally assessed. Furthermore, the PSC has failed to explain how the number of cases in the MDL impacted the amount of common-benefit work conducted in this litigation. Put simply, it had no impact. The same general, expert, and bellwether discovery was conducted regardless of the number of cases in this litigation.

For these reasons, the PSC has provided no valid justification that warrants increasing the assessment percentage. Therefore, PSC's request should be denied.

**III.    The PSC's Requested Assessment Will Impede Ongoing Settlement Efforts**

The PSC's request to nearly double the current assessment percentage will become an immediate impediment to the very settlement efforts the Court has long encouraged. (*See* Doc. 12853 at 6 (ordering good faith settlement talks).) It is beyond dispute that when utilized in an MDL, a common fund assessment on attorneys who do not participate

in the leadership structure functions as an effective "tax" on those attorneys, reducing the fee they contractually agreed upon with their clients. *See* William B. Rubenstein, 5 Newberg on Class Actions § 15:112 (5th ed. 2018) (noting that "the lawyers not involved in undertaking common benefit work—sometimes called the 'primary attorneys'—are effectively taxed a portion of their attorney's fees, with the tax ultimately being distributed to the lawyers who undertook common benefit work"); *see also id.* at § 15:113 (noting that common benefit work "is funded by taxing a portion of the fees of the primary (or non-PSC) lawyers"); *id.* ("taxing the primary attorneys a portion of their contingent fees to help fund the common benefit work undertaken by the PSC."). As happens consistently in MDL settings, those attorneys will inevitably attempt to recoup all or part of that "tax" as a part of the settlement negotiations.

Accordingly, the PSC's request to nearly double the current assessment from 8% to 14% could immediately derail the efforts by Bard and certain plaintiffs' counsel to negotiate fair resolutions of those plaintiffs' claims. Those plaintiffs' counsel, who are not a part of the PSC, had negotiated settlement agreements for their clients in reliance on the current 8% assessment amount set forth in CMO 6, and were entitled to rely on this rate based on the clear language in CMO 6 that "[t]he assessment . . . *shall not be altered.*" (Doc. 372 at 10 (emphasis added).) The Court's Order provided some certainty to plaintiffs' counsel as to the maximum amounts that they and their clients likely would have to pay toward any eventual common benefit assessment. The PSC's request, therefore, risks immediately frustrating the consummation of these agreements that the settling plaintiffs and their counsel determined provided fair compensation for their claims, and will chill any future settlement efforts in this litigation.

The PSC's request also reduces the willingness of other counsel to negotiate with Bard apart from the PSC, because non-leadership counsel cannot be confident that the 14% "holdback" amount will not prove to be the basis for a final common benefit assessment at that rate. (Mot. at 3.) The clear signal from the PSC's request is that all roads to settlement must pass through them. Ironically, this unwarranted request will

ensure that any common benefit fund will be far smaller, by discouraging settlements, while the PSC's fees and costs will be far higher, by dragging this litigation out longer. The PSC's request should be denied.

## CONCLUSION

For the foregoing reasons, Bard respectfully requests that the Court deny Plaintiffs' request to increase the common benefit fund assessment percentages set forth in CMO 6 from 8% (6% fees and 2% costs) to 14% (9% fees and 5% costs).

RESPECTFULLY SUBMITTED this 26th day of April, 2019.

> s/Richard B. North, Jr.
> Richard B. North, Jr.
> Georgia Bar No. 545599
> Matthew B. Lerner
> Georgia Bar No. 446986
> NELSON MULLINS RILEY & SCARBOROUGH, LLP
> Atlantic Station
> 201 17th Street, NW / Suite 1700
> Atlanta, GA 30363
> PH: (404) 322-6000
> FX: (404) 322-6050
> richard.north@nelsonmullins.com
> matthew.lerner@nelsonmullins.com
>
> James R. Condo (#005867)
> Kristine L. Gallardo (#033975)
> SNELL & WILMER L.L.P.
> One Arizona Center
> 400 E. Van Buren
> Phoenix, AZ 85004-2204
> PH: (602) 382-6000
> jcondo@swlaw.com
> kgallardo@swlaw.com
>
> **Attorneys for Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.**