1              UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF ARIZONA

3                 _____

4   In Re: Bard IVC Filters          )  MD-15-02641-PHX-DGC
    Products Liability Litigation     )
5                                     )  Phoenix, Arizona
                                      )  **April 29, 2019**
6   _____)
    **Debra and James Tinlin, a married**  )
7   **couple,**                            )
                                           )
8                    Plaintiffs,           )
                                           )  CV-16-00263-PHX-DGC
9          v.                              )
                                           )
10  **C.R. Bard, Inc., a New Jersey**      )
    **corporation; and Bard Peripheral**  )
11  **Vascular, Inc., an Arizona**         )
    **corporation,**                       )
12                                         )
                     Defendants.           )
13  _____)

14

15

16      BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

17         REPORTER'S TRANSCRIPT OF PROCEEDINGS

18            FINAL PRETRIAL CONFERENCE

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared with Computer-Aided Transcription

1                       **A P P E A R A N C E S**

2     For the Plaintiffs:

3              Lopez McHugh
               By: **RAMON ROSSI LOPEZ**, ESQ.
4              By: **JOSHUA M. MANKOFF**, ESQ.
               100 Bayview Circle, Suite 5600
5              Newport Beach, CA  92660

6              Beus Gilbert, PLLC
               By: **MARK S. O'CONNOR**, ESQ.
7              701 N. 44th St.
               Phoenix, AZ  85008
8

9              Lieff Cabraser Heimann & Bernstein, LLP
               By: **DANIEL SELTZ**, ESQ.
10             By: **WENDY R. FLEISHMAN**, ESQ.
               250 Hudson St., 8th Fl.
11             New York, NY  10013

12

13             Snyder & Wenner, PC
               By: **DAVID A. WENNER**, ESQ.
14             2200 E. Camelback Rd., Ste. 213
               Phoenix, AZ  85016
15

16    For Defendants:

17             Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.**, ESQ.
18             By: **ELIZABETH C. HELM**, ESQ.
               201 17th Street NW, Suite 1700
19             Atlanta, GA  30363

20             Snell & Wilmer
               By: **JAMES R. CONDO**, ESQ.
21             400 East Van Buren
               Phoenix, AZ  85004
22

23

24

25

**A P P E A R A N C E S**   (CONTINUED)

For Vanessa Rose, et al.:

       Garland Samuel & Loeb, PC
       By: **DAVID E. TUSZYNSKI,** ESQ.  (Telephonic)
       3151 Maple Dr. NE
       Atlanta, GA  30305


For SNF cases:

       Baum Hedlund Aristei & Goldman, PC
       By: **NICOLE K. H. MALDONADO,** ESQ.
       10940 Wilshire Blvd., 17th Fl.
       Los Angeles, CA  90024

**P R O C E E D I N G S**

10:01:31  1

2

3          THE COURTROOM DEPUTY:  This is MDL case 15-2641

4    regarding Bard IVC Filters Products Liability Litigation, on

13:01:57  5    for final pretrial conference.

6          Counsel, please announce for the record.

7          MR. O'CONNOR:  Good afternoon, Your Honor.  Mark

8    O'Connor for plaintiffs.

9          MR. LOPEZ:  Good afternoon, Your Honor.  Ramon Lopez

13:02:09 10    for the plaintiffs.

11          MR. SELTZ:  Good afternoon, Your Honor.  Daniel Seltz

12    for the plaintiffs.

13          MS. FLEISHMAN:  Wendy Fleishman for the plaintiffs.

14          MR. O'CONNOR:  Your Honor, also David Wenner --

13:02:19 15          MR. TUSZYNSKI:  David Tuszynski for plaintiffs

16    Vanessa Rose, Elizabeth Rose, et al.

17          MR. WENNER:  Good afternoon, Your Honor.

18          MR. NORTH:  Good afternoon, Your Honor.  Richard

19    North for the defendants, joined by Jim Rogers, Kate Helm, and

13:02:30 20    Matthew Lerner.

21          THE COURT:  All right.  Welcome back, everybody.

22    Nice to see all of you again.

23          That was sincere, you shouldn't be laughing.

24          Okay.  So we've got a number of things we need to do

13:03:12 25    and I think we ought to just dive right in.  Let's deal first

13:03:16  1   with the jurors excused for hardship.

2       You all received a copy of the order I entered at

3   Docket 17- -- well, 17210 that identifies the various jurors

4   that I propose to excuse for hardship.  There were asterisks

13:03:38  5   by some of the numbers because you hadn't received those

6   questionnaires yet, but I think you've since received them.

7       Has both -- have both sides had an opportunity to

8   review that order?

9       MR. O'CONNOR:  Yes, Your Honor, plaintiffs have.

13:03:51  10       MR. NORTH:  Yes, Your Honor.

11       THE COURT:  All right.  Is there any objection to

12   excusing any of those jurors for hardship?

13       MR. O'CONNOR:  None from the plaintiffs.

14       MR. NORTH:  None from the defendant, Your Honor.

13:04:06  15       THE COURT:  Okay.  Then we will excuse all of the

16   jurors in the order at Docket 17210.

17       Are there challenges for cause by Plaintiffs' counsel

18   based on questionnaire answers?

19       MR. O'CONNOR:  Yes, Your Honor, we have a number of

13:04:22  20   them.

21       THE COURT:  Hold on one minute, let me just keep

22   organized here.

23       Mr. O'Connor, are you going to handle those?

24       MR. O'CONNOR:  Yes, Your Honor, and Dave Wenner will

13:04:54  25   assist me.  Where would you like us to be?

13:04:58   1                THE COURT:  Just where you are speaking into the mic.

           2                MR. O'CONNOR:  Is it okay if we stay seated here to

           3       go through the folders?

           4                THE COURT:  Yes.  Pull the mic up a little higher and

13:05:06   5       put it in front of you, if you would.

           6                Let's have you identify the juror by questionnaire

           7       number and just a brief description of why.  I'll look at it

           8       and see if the defendants agree or disagree.  If they

           9       disagree, we'll hear more from you.

13:05:16  10                MR. O'CONNOR:  Sure.  The first one is Juror 2.  I

          11       can draw your attention to the questions we believe show that

          12       this juror cannot be fair and impartial:  44, 49, 64.  Would

          13       you like me to comment on those responses?

          14                THE COURT:  Let me look at this.

13:05:51  15                44, 49, and what was the other one?

          16                MR. O'CONNOR:  64.

          17                THE COURT:  All right.  What is the defendants'

          18       general response?

          19                MR. NORTH:  Your Honor, we believe the only response

13:06:12  20       that is subject to debate is probably Number 64.  We believe

          21       it's a little ambiguous as to what it's saying and that

          22       further voir dire might help clarify that.  I'm not sure that

          23       a belief in informed consent necessarily predisposes the juror

          24       to one party or the other.

13:06:30  25                THE COURT:  What about 49?

13:06:35   1          MR. NORTH:  Your Honor, I believe that a lot of

2    jurors in here express some concern about the tort system and

3    about frivolous lawsuits.  I mean that supposes that -- she

4    says they are frequently frivolous.  I don't think that

13:06:50   5    precludes her from assessing the facts of a particular

6    lawsuit.

7          THE COURT:  Mr. O'Connor, other thoughts?

8          MR. O'CONNOR:  Yes, Your Honor.  In two responses,

9    panel member clearly stated she cannot be fair and impartial.

13:07:04  10    In 44 she said that, and did make it a point of letting us

11    know before she comes down here she cannot be fair and

12    impartial because of her knowledge about informed consent.

13    She is a registered nurse.

14          And she repeated that clearly and unequivocally in

13:07:20  15    64.  She said that she cannot be fair and impartial or

16    unbiased.  She mentioned again informed consent, and she went

17    on to say that risks -- there are risks with anything and that

18    IVC filters save lives.  So clearly she is predisposed to

19    issues in this case and I don't think we can undo that.

13:07:42  20          THE COURT:  I'm going to grant the challenge for

21    cause to Juror Number 2.

22          What's the next one, Mr. O'Connor?

23          MR. O'CONNOR:  Thank you, Your Honor.  Juror

24    Number 7.

13:07:51  25          MR. NORTH:  We concede Number 7.

13:07:58  1          THE COURT:  Let me make sure I do.  What's the basis?

      2          MR. O'CONNOR:  Our basis for this nurse practitioner

      3  are at 36, 39, 64.

      4          THE COURT:  Okay.  Let me look at that.

13:08:23  5          All right.  I'm going to grant the challenge for

      6  cause to Juror 7.

      7          MR. O'CONNOR:  Next is Juror Number 12, Your Honor.

      8  36, 49, and 58.

      9          Excuse me, I do have another one.  Did I say 49?

13:09:25 10  Question Number 49 should be included there, Your Honor.

     11          THE COURT:  You said 36, 49, and 64.

     12          MR. O'CONNOR:  Correct.

     13          THE COURT:  Oh.  58.  That's right.  I was looking at

     14  the earlier one.

13:09:40 15          Response from the defense?

     16          MR. NORTH:  First, Your Honor, on Number 36, this

     17  juror, potential juror, is basically equal opportunity,

     18  sharing the same opinion of personal injury lawyers and

     19  corporations.

13:09:54 20          As far as Number 49 goes, I don't believe that she's

     21  saying, or he's saying, there should never be people resorting

     22  to lawsuits but just suggesting that they should explore

     23  alternative avenues beforehand to resolve the issue.  I think

     24  that's a belief that most people would share.

13:10:10 25          And then on Number 58, a lot of potential jurors give

13:10:15  1   the opinion without explanation that they believe the number

2   of lawsuits are too high, and I think if we use that one

3   answer to disqualify these jurors half this pack would be

4   gone.  I believe that would require further questioning at

13:10:29  5   voir dire.

6          THE COURT:  Anything further on this, Mr. O'Connor?

7          MR. O'CONNOR:  Sure.  To the last point first, a lot

8   of people did not say they feel there's too many lawsuits or

9   that damages are too high.

13:10:44  10         But I would point out, too, Your Honor, if you look

11  at Number 36, and the reason why we think that's important is

12  because these were scaled forced choices for people and they

13  put a 2 for extremely negative feelings for personal injury

14  lawyers and a 4 for medical device companies.  So clearly

13:11:04  15  there's a bias already present and the question isn't feelings

16  about lawsuits, the question is do you have strong negative or

17  positive feelings about people that bring lawsuits and this

18  juror has clearly told us that there are strong negative

19  feelings about people who bring lawsuits.  For that reason we

13:11:26  20  would move for cause.

21         THE COURT:  All right.  I'm going to deny the

22  challenge for cause to Juror 12.

23         She indicates that she has the same negative feelings

24  both for personal injury lawyers and corporations.  She says

13:11:39  25  she doesn't like people who bring lawsuits when there are

13:11:42  1    other alternatives for resolving it.  You can infer from that

       2    that she doesn't mind if they sue when there is no other

       3    alternative.  So I think we should ask her further questions.

       4           MR. O'CONNOR:  Thank you, Your Honor.

13:12:01  5           Your Honor, the next is Number 27.

       6           And I'll tell you the questions that are the basis of

       7    our challenge:  44, 58, 59, 60, and 64.

       8           And, Your Honor, Mr. Wenner also reminded me that

       9    Question 2, she did indicate that she has difficulties with

13:12:50 10    her hearing.

       11           MR. NORTH:  Your Honor, not to short circuit, but we

       12    were going to seek a challenge for cause on her ourselves.

       13           THE COURT:  On what basis?

       14           MR. NORTH:  Your Honor, her son had a pulmonary

13:13:06 15    embolism, Question 39.  Her mother died of pulmonary embolism

       16    Question Number 50.  In 44 and 64 she fears that her nursing

       17    experience and family history of blood clots may hinder her

       18    impartiality.  And Number 55, she fears she might be emotional

       19    rather than objective.

13:13:52 20           THE COURT:  I'm going to grant the challenge for

       21    cause to Juror 27.

       22           MR. O'CONNOR:  Next is Juror 41, Your Honor.

       23           THE COURT:  All right.  The basis?

       24           MR. O'CONNOR:  First of all, this is a U.S. Attorney,

13:14:20 25    I think, who works here.  44, 60, and 64.  And I think if you

13:14:27  1    review those questions this potential juror says that he does

2    not believe in the civil jury system of damages and he clearly

3    states that at 44, clearly restates that at 60, and 64 is

4    clear that he cannot be fair and impartial.

13:15:17  5              THE COURT:  Mr. North.

6              MR. NORTH:  Your Honor, Juror Number 60 -- I mean 41

7    is clearly an attorney, obviously, and as an attorney he has a

8    sworn duty to uphold the law and apply the law as the Court

9    instructs him.  I don't want to accuse anyone of motives, but

13:15:38 10    as an attorney who practices litigation in this court, he

11    would know what would disqualify him and what would not.

12              I think we need to explore this further with

13    additional questioning, because I find it hard to believe that

14    any attorney would not understand and follow his or her duty

13:15:56 15    to follow the law.

16              THE COURT:  I'm going to deny the challenge for cause

17    to Juror 41.  He seems to express concern about the civil jury

18    system.  He doesn't say, or at least that I can see, that he's

19    going to lean one way or the other.  And, frankly, I would

13:17:10 20    like to know why a U.S. Attorney is saying that, so I think we

21    should have him come in.  I'd like to have him answer the

22    questions in front of me.

23              MR. O'CONNOR:  Will you ask him the questions?

24              All right, Your Honor, then the next -- excuse me --

13:17:53 25    Number 63, Your Honor.

13:18:03  1          I think this is one that the defense may agree with.

2    This juror has read about the IVC verdicts.

3              43, 49, 58, 59, and 64.

4          In 64 the question is the ability to be fair and

13:18:22  5    impartial and unbiased and the response is prior lawsuits,

6    doesn't know if she can set these aside.

7              MR. NORTH:  We agree.  She was going to be on our

8    list.

9              THE COURT:  Yeah, I'm going to grant the challenge

13:18:48  10    for cause particularly on her response to Question 43.

11              MR. O'CONNOR:  The next juror, Your Honor, is Number

12    74 and the responses to us were troubling to 44, 51, 54, 55,

13    63, and 64.  And the reason why they were problematic is

14    because this person refused to respond to them and said

13:19:25  15    "private."  Now, these questionnaires were sent to these

16    people where they could complete these, presumably, in the

17    privacy of their homes.  Our concern is that we may not do any

18    better or any more accurate with a juror like her if we have

19    to question this one.  Especially if we have to question about

13:19:42  20    why response to questions such as the ability to be fair and

21    impartial, whether there are ethical or moral, political

22    reasons or beliefs that prevent this juror from applying the

23    law.  Each time this juror responded "private."

24              MR. NORTH:  Your honor, once again this juror was on

13:20:00  25    our list to challenge for cause.  I agree completely with

13:20:03  1    Mr. O'Connor on that.  I'm also concerned that if we tried to

2    seek clarification of these ambiguous answers in front of the

3    entire pool, it could taint them.  And, lastly, Your Honor, I

4    don't know if it's per se disqualifying, but in a very strange

13:20:17  5    coincidence Number 74 is the son-in-law of Juror Number 73.

6    So if we called them both in it would be mother-in-law and

7    son-in-law sitting next to each other.

8         MR. O'CONNOR:  And hence the private responses.

9         THE COURT:  I will grant the challenge for cause to

13:20:36  10   Juror 74.

11        MR. O'CONNOR:  The next is Juror 78.  And the

12   questions are 49, 58, 59, and 65.  But even more troubling is

13   that she is a legal assistant at Fennemore Craig and she said

14   that Bard was a client of Fennemore Craig until 2017.  That

13:21:07  15   coupled with the fact that she has strong feelings against

16   people that bring lawsuits, she thinks the number of PI

17   lawsuits are too high, damages are too high, and she has told

18   us that she believes Bard was a client of Fennemore Craig, we

19   move to excuse this one for cause, Your Honor.

13:21:30  20        MR. NORTH:  Your Honor, I would just note that

21   Fennemore Craig represented Bard in some protracted patent

22   litigation against WL Gore, another company here in Phoenix.

23   It did not involve the same subject matter as this.

24        THE COURT:  What is your response on the challenge

13:21:46  25   for cause?

13:21:47   1          MR. NORTH:  Your Honor, I'm not sure that just the

         2     fact that she works for a law firm that formerly represented

         3     Bard in patent litigation ought to disqualify her, at least

         4     without further questions about her role and knowledge.

13:22:23   5          THE COURT:  I think we need to ask more questions of

         6     Juror 78, so I'm going to deny the challenge for cause at this

         7     time.

         8          MR. O'CONNOR:  Will we be able to ask her who she

         9     works with there?  Because, obviously --

13:22:41  10          THE COURT:  Yeah, absolutely.

        11          MR. O'CONNOR:  -- I've been against that firm as well

        12     as any other --

        13          THE COURT:  Yeah.  I mean, one thing I couldn't tell

        14     from her questionnaire is whether she had any involvement with

13:22:49  15     the Bard representation.  I think we ought to find that out.

        16          MR. O'CONNOR:  If I may respond to just that point.

        17     The problem is, is if she's on the jury and a verdict comes

        18     back in favor of plaintiffs, is she going to struggle with

        19     that just because it was a former client?

13:23:05  20          THE COURT:  I think that's a fair question to ask

        21     her.

        22          MR. O'CONNOR:  All right.  Thank you.

        23          I'm moving down to Number 89, Your Honor, and the

        24     questions are Number 136, disparity between this juror's

13:23:36  25     feelings about personal injury lawyers and medical devices.

13:23:41  1          Number 44, the response there is cannot be fair and

2     impartial, all products have risk, patients should have

3     responsibility.

4          49, has strong negative feelings about people who

13:23:55  5     bring lawsuits and most suits are frivolous.

6          58, the juror went out of his way to say number of

7     suits are, quote, way too high.

8          59, damages are too high.

9          60, believes in legislative reforms.

13:24:10  10          63, went out of his way again to say he does not like

11     frivolous lawsuits.

12          64, again, clearly and unequivocally said he cannot

13     be fair and impartial.

14          And then in 63 or is it 65?  65, gives us some

13:24:31  15     insight into his medical condition and said that he accepted

16     the risk and he did not look for others to blame.

17          I think this juror, the totality of his responses is

18     telling us before he even gets here he has developed opinions

19     and feelings that are strongly against us and we're not going

13:24:49  20     to start on an even playing field with him no matter what

21     questions we ask.

22          MR. NORTH:  Your Honor, I believe that while this

23     potential juror said some of the things Mr. O'Connor stated,

24     he also went out of his way to hedge those responses and make

13:25:06  25     it clear he could be fair.

13:25:07   1          In response to Number 44 he said says using any

           2  product or drug has its risks, unless it's negligence.

           3          Similarly, under Number 49 he did not say all

           4  lawsuits are frivolous, he said most lawsuits are frivolous.

13:25:27   5          But most important, I think, are his responses to 63

           6  and 64.  In 63 he says "I don't like frivolous lawsuits, but,"

           7  and this is an important but, "I think I can follow the letter

           8  of the law and the evidence."

           9          And in 64 he says, "I don't yet have enough

13:25:46  10  information to determine if this is a frivolous lawsuit or

          11  not."

          12          This is a person whose mind is not made up and I

          13  think we need further questioning during voir dire.

          14          THE COURT:  Did you have anything else, Mr. O'Connor?

13:26:03  15          MR. O'CONNOR:  Your Honor, again, I would just

          16  request that you look at the totality of the responses.  I

          17  believe this juror is telling us clearly and unequivocally

          18  that he is predisposed.

          19          And, as Mr. Wenner reminded me, he didn't just say

13:26:28  20  lawsuits, he said most lawsuits are frivolous.  To have to

          21  question this juror what his definition of frivolous is, I

          22  think has a risk of tainting the rest of the panel and could

          23  just send us deep off track with this one juror.

          24          THE COURT:  I'm going to grant the challenge for

13:26:46  25  cause to this juror.  On Question 49 he indicates that he has

13:26:52  1  strong negative, he circled negative, feelings about people

2  who file lawsuits.  On Question 58 he wrote in "way too high"

3  in his description of jury verdicts.  I think the totality of

4  his comments make clear that he would not be fair and

13:27:09  5  impartial.

6         MR. O'CONNOR:  The next is 92, Your Honor.

7         MR. NORTH:  Your Honor, we're not going to oppose

8  that.

9         THE COURT:  What's the basis?

13:27:26  10        MR. O'CONNOR:  Your Honor, I'd ask you to take a look

11  at responses to 36 first of all, extreme disparity between his

12  extreme negative feelings about personal injury lawyers and

13  his positive feelings about medical device companies.

14         He's got opinions about the FDA.

13:27:46  15        49, he has strong negative feelings about people who

16  bring lawsuits.  His quote is "I don't think it should be

17  done."  Excuse me, she.

18         58, too many PI suits.

19         59, damages are too high.

13:28:02  20        60, for legislative reforms.  Doesn't feel people

21  should sue and be awarded millions.

22         62, problems with social media during the trial.

23         And 64, clearly and unequivocally again cannot be

24  fair and impartial or unbiased and impartial, and her quote

13:28:19  25  is, quote, I really don't believe in suing, quote.

13:28:22  1          THE COURT:  I will grant the challenge for cause to

2      Juror 92.

3          MR. O'CONNOR:  That brings us to Number 98, Your

4      Honor, and the questions there are 49, 38, 58, 59, and 60.

13:28:58  5      And if I could just draw your attention to Question 38 for a

6      moment.  I think the defendant may share this with us.

7          In response to 38 this juror talks about her belief

8      of "I feel there is some corruption in the FDA.  I'm not sure

9      they're doing all they can to help the public overall."

13:29:29  10         As you know, Your Honor, the FDA is a major issue in

11     these cases and for that reason we think that our cause for

12     challenge should be sustained.

13         MR. NORTH:  Your Honor, we would oppose that.  She

14     does not give the basis for that opinion.  I think that we

13:29:51  15     need to further explore and see if there is a basis that would

16     actually make her biased and impartial.  Otherwise, she just

17     showed conservative leanings and in no way said she could not

18     be fair.

19         In fact, in response to Number 64 she said she did

13:30:07  20     not know of any reason she could not be fair and impartial.

21         THE COURT:  I'm going to deny the challenge to Juror

22     98.  I think we need to ask her more questions.

23         MR. O'CONNOR:  Next is Number 115, Your Honor, who is

24     a registered nurse.

13:30:43  25         115.

13:30:46  1          And the responses to Questions 36, 49, 59, and 38 are

2     our basis for that.  And, again in 36, a major disparity

3     between negative feelings to PI lawyers and positive feelings

4     for medical device companies.

13:31:08  5          Strong negative feelings, at 49, against people who

6     bring suits.  She said they exaggerate the injury to collect

7     money.  They tend to be on the take.  She thinks damages are

8     too high and she thinks the FDA does a great job.

9          She's an RN.  She's telling us she has opinions.  I

13:31:30 10    don't see that she will be able to set these opinions aside

11    when she comes down here, and I believe that by having to

12    question her about these responses, we're at risk of tainting

13    a panel.

14          MR. NORTH:  Your Honor, I would just note in response

13:31:47 15    to Number 64, she unequivocally says she does not know of any

16    reason she could not be a fair and impartial or unbiased juror

17    in this lawsuit, and I would submit the responses cited by

18    Mr. O'Connor do not provide sufficient basis without further

19    questioning to challenge her statement in that regard.

13:33:04 20          THE COURT:  This is a close one.  I think we ought to

21    err on the side of asking her more questions.  If she confirms

22    what she says here, then I'll grant the challenge for cause,

23    but I think we should hear her explanation about the FDA and

24    other comments that she made.

13:33:21 25          MR. O'CONNOR:  Thank you.

13:33:35  1      Your Honor, the next is Juror Number 125.

2      36, extreme negative feelings against personal injury

3  lawyers, while this juror is right in the middle of the road

4  when it comes to medical device companies.

13:34:01  5      49, strong negative feelings about people bringing

6  suits.  Quote, looking for easy money.  Sue anyone over

7  something small or stupid.  She thinks the number of suits are

8  too high, she thinks damages are too high.

9      Number 59, she wants legislative reforms.

13:34:20  10     And then at Number 64, she tells us that she cannot

11  be fair, impartial, and unbiased.  She says "I believe that is

12  up to the patient to do their own research and possible side

13  effect" --

14     THE COURT:  I'm reading it, so you don't have to read

13:34:42  15  it all.  I'm reading it now.

16     MR. NORTH:  Given the last sentence in that last

17  paragraph you just read, we were likewise going to move to

18  strike.

19     THE COURT:  She seems to spread her criticism around

13:35:27  20  evenly.  She seems to have very strong views given the lengthy

21  answers.  I'm going to grant the challenge for cause to Juror

22  125.

23     MR. O'CONNOR:  The next is Juror 157.

24     49, 59, 60 are the responses but, Your Honor, this

13:36:05  25  individual is a legal secretary at Greenberg Traurig.

13:36:09  1          MR. NORTH:  Your Honor, Greenberg Traurig is

2     representing Bard as settlement counsel, Mr. Gaudreau, who was

3     at the last conference.  So I believe that is probably valid.

4          THE COURT:  All right.  I'll grant the challenge for

13:36:20  5     cause to Juror 157.

6          MR. O'CONNOR:  The next is Number 165, Your Honor.

7          Questions 59 and 60 and 64.

8          THE COURT:  Mr. North.

9          MR. NORTH:  Your Honor, I think her response to

13:37:17  10    Number 64 is extremely equivocal.  She says her personal

11    opinion is, "There are many factors in play well before the

12    manufacturer should be considered as responsible."  She in no

13    way says she cannot listen to the evidence in this case as to

14    whether the manufacturer should be responsible.

13:37:34  15         The other questions that Mr. O'Connor cited are

16    merely those sort of tort reform type questions where she gave

17    conservative responses.

18         MR. O'CONNOR:  May I respond on another point, Your

19    Honor?

13:37:48  20         THE COURT:  You may.  I think it's a he, by the way.

21         MR. O'CONNOR:  It's a he.  There's also in 36 a major

22    disparity between feelings between personal injury lawyers and

23    medical device companies.  And when you couple that with the

24    response to 64, the volunteering of the information that

13:38:10  25    "there are many factors in play before a manufacturer of a

13:38:13   1   device should be considered as responsible," clearly this

2   person is starting out leaning against any plaintiff in this

3   case and is going to hold us to a burden that's not in

4   accordance with the instructions.

13:38:27   5           THE COURT:  I'm going to deny the challenge for cause

6   to Juror Number 165.  He indicates a much lower opinion of

7   corporations than plaintiffs lawyers, and I think we need more

8   information about what his thought is about manufacturers

9   being at play.

13:38:43   10          MR. O'CONNOR:  All right.

11          175.

12          If you would, Your Honor, response to 36, negative

13   feelings against PI attorneys.

14          44 -- 49, strong feelings, negative against people

13:39:13   15   who bring lawsuits.  Quote, "As most are being manipulated by

16   lawyers who want a big commission."

17          59, damages are too high.

18          Then 40 she says that IVC filters are controversial.

19          I see problems having to question this juror in front

13:39:40   20   of everybody else on that, and I think there's a risk that we

21   could get into questions and answers that may well taint a

22   pool.  One way or the other.  Either for or against us or for

23   or against the defense.

24          MR. NORTH:  Your Honor, we were likewise going to

13:40:04   25   move to challenge her for cause based on Questions 40, she's

13:40:08  1    aware of a series of fatal -- filter complications, calling

        2    devices controversial; 43, that it would make it difficult for

        3    her to be fair; and 55, the juror says companies are out to

        4    make money.

13:40:27  5           THE COURT:  I'm going to grant the challenge for

        6    cause.  I'm concerned as well about Question 42.  It sounds

        7    like she's talked in some detail with her daughters, who are

        8    RNs, about IVC filters and has a lot of information on the

        9    subject.  So I will grant the challenge for cause to Juror

13:40:45 10    175.

        11           MR. O'CONNOR:  The next is 177, Your Honor.

        12           Questions -- responses to 36, 43, 49, and 60.  And I

        13    can tell you what we see as problems with that.  She has

        14    strong negative feelings against personal injury attorneys.

13:41:31 15           43, she said people are looking for easy money in

        16    response to questions about advertisements.

        17           49 is the question about strong negative feelings

        18    against people who file lawsuits.  Her quote, "Make a quick

        19    buck.  I'm sick of what I've heard."

13:41:49 20           And 60, tort reform.  She says, "It's ridiculous what

        21    is asked of these companies, in my opinion."

        22           If you look at the totality of that, this juror is

        23    telling us that she cannot be fair and impartial.

        24           MR. NORTH:  Your Honor, we would oppose that.  In

13:42:08 25    response to Number 49 the juror says that a majority of people

13:42:13 1   are looking for any reason.  It's not an unequivocal, absolute

2   statement.

3               MR. O'CONNOR:  Your Honor, may I add a point, too, if

4   I may?

13:42:21 5         Then, after all of that, when we get to 64 where we

6   ask the question "Do you know of any reason you cannot be

7   fair, impartial, or unbiased?"  She doesn't respond to it, she

8   puts a question mark there.

9               THE COURT:  I think we need to ask this juror more

13:42:42 10  questions.  If the questioning bears out strong feelings on

11  these topics, then I'll agree she should be dismissed for

12  cause, but I think we need more information.

13              MR. O'CONNOR:  The next one we have, Your Honor, is

14  185, and I'll let you get situated.

13:43:08 15        This individual's an anesthesiologist.  In 36 he has

16  clear negative feelings against PI lawyers and extremely

17  positive feelings in favor of medical device companies.

18         At 38 he feels the FDA is corrupt.

19         49 about people who file lawsuits, he says it's all

13:43:33 20  about money.

21         58, too many lawsuits.

22         59, damages are too high.

23         And 60, obviously he has relied on news, fake or

24  otherwise, that lawyers drive up the cost of medical care.

13:43:53 25        So based upon that totality, I think this juror

13:43:57  1    clearly is going to be unfair and cannot be impartial to the

       2    plaintiffs in this case.

       3            MR. NORTH:  Your Honor, we would oppose that

       4    challenge.  We believe that, first of all, his responses are

13:44:14  5    pretty short and curt and really don't give much detail or

       6    explanation as to his views, and then he concludes the

       7    questionnaire by giving an unequivocal no to Question 64 where

       8    he says he could be a fair, impartial, unbiased juror.  Based

       9    on these curt responses he has that don't give much

13:44:33 10    explanation or context, I believe we need to have further

      11    questioning of him.

      12            THE COURT:  Hold on.

      13            What is your thought, Mr. North, on asking a

      14    practicing doctor in front of this jury panel why he thinks

13:44:46 15    the FDA is corrupt or why he holds some of these other views?

      16            MR. NORTH:  Your Honor, it may be we want to

      17    challenge him once we question him more.  I think it's

      18    difficult to tell based on what little he says here.

      19            THE COURT:  Mr. O'Connor.

13:45:03 20            MR. O'CONNOR:  Well, clearly he was honest and showed

      21    the disparity of his feelings between us and them.  He's been

      22    sued, if you look at 35.  And he's a physician.

      23            It's clear that this person has clear opinions that

      24    have developed long before he ever answered these questions

13:45:26 25    about people who file lawsuits, about the need for legislative

13:45:29  1    reform.   And he's a physician; he's medically trained.

       2    There's no way we'll be able to change his mind coming in

       3    here.

       4            THE COURT:   I'm going to grant the challenge for

13:45:40  5    cause to Juror 185.

       6            MR. O'CONNOR:   I just have two more.   The only

       7    comment I have on 194 was the 65.   This juror responded "My

       8    nephew is Brett Day, an attorney in your office."   I don't

       9    think we have --

13:46:07 10            THE COURT:   Brett Day is an Assistant United States

      11    Attorney on the criminal side.

      12            MR. O'CONNOR:   Oh.   Okay.   No more on that one.

      13            196, Your Honor.

      14            36, strong negative feelings against PI attorneys;

13:46:53 15    strong positive feelings towards medical device companies.

      16            49, strong negative feelings about lawsuits.   Most,

      17    he says, are frivolous.

      18            54, he's given us an inside look into his feelings

      19    about the doctor who cared for his father.   He wasn't happy.

13:47:12 20            58, he says that the number of lawsuits are too high.

      21            59, the verdict damages are too high.

      22            64, he says he thinks he will be biased because of

      23    the experience with his father.   We're going to be forced to

      24    ask him questions.

13:47:25 25            And 39, relating to his own father, he said, you

13:47:30   1   know, words that he'll hear in this trial, that filters save

2   lives.

3           He is predisposed in a number of different ways and

4   he is telling us he cannot be fair and impartial.

13:47:49   5           Yeah, the IVC filter, he said, in 39 saved his

6   father, so --

7                   THE COURT:  This is a woman, by the way.

8                   MR. O'CONNOR:  Pardon?

9                   THE COURT:  This is a woman.

13:47:58  10                   MR. O'CONNOR:  Oh.  Jennifer.  I apologize.

11                   THE COURT:  What's your thought, Mr. North?

12                   MR. NORTH:  Your Honor, I do think there's some

13   ambiguity particularly in questions 60 and 64, but I find it

14   hard to contest this one.

13:48:17  15                   MR. O'CONNOR:  That's it for us, right?

16                   THE COURT:  Yeah, in 54 she indicates at the end her

17   father bled to death because of what she thought was the

18   doctor's improper care.  She said, "This case will be very

19   difficult for me emotionally."

13:48:37  20           I'm going to grant the challenge for cause to 196.

21                   MR. O'CONNOR:  That concludes our for cause

22   challenges, Your Honor.

23                   THE COURT:  All right.

24           Mr. North.

13:48:45  25                   MR. NORTH:  Your Honor, our first one would be number

13:48:47  1    9.  Let me switch notebooks here.

        2             Looking first to Question Number 35, which she

        3    continues over to the back page.

        4             Your Honor, she's talking obviously about her mother

13:50:00  5    who was involved in a pharmaceutical class action, received a

        6    settlement.  She complains that it was insufficient to cover

        7    her mother's medical costs and she then concludes by saying

        8    she's not sure she could separate her personal feelings and be

        9    objective in this case.

13:50:20 10             THE COURT:  Mr. O'Connor, your thoughts.

       11             MR. O'CONNOR:  When you look at 60, 61, 62, 63, 64,

       12    that's where, if this juror really felt the inability to be

       13    fair and impartial, we would have seen the answers, and in

       14    each time that juror indicates to us that she can be fair and

13:50:48 15    impartial.

       16             THE COURT:  I think --

       17             MR. O'CONNOR:  And this case is not a pharmaceutical

       18    case.

       19             THE COURT:  I think we need to ask her more questions

13:50:57 20    about whether she could set aside her mother's experience, as

       21    we do with many jurors, so I'm going to deny the challenge for

       22    cause to Juror 9.

       23             MR. NORTH:  Next one would be Number 18, Your Honor.

       24    I would refer the Court to Questions Number 43, 44, and 55.

13:51:31 25             Particularly 43 where she says she already has an

13:51:34  1    opinion about medical -- IVC filters or medical devices,

2    although she does not disclose what it is.

3              THE COURT:  Mr. O'Connor.

4              MR. O'CONNOR:  Well, when it comes to comparing us

13:51:57  5    with them, she likes them better at 11.  Number 36.  I don't

6    know what they're complaining about.  I think this juror needs

7    to be questioned.

8              THE COURT:  I think there's some ambiguity here.  She

9    says in Question 39 she doesn't know much about the subject.

13:52:15 10    So I don't know what she then means in Question 43 when she

11    says, "I would already have an opinion."  I think we need to

12    ask her questions.  So I'll deny the challenge for cause to

13    Juror 18.

14              MR. NORTH:  Number 36, Your Honor.

13:52:41 15              I would call the Court's attention to Number 49,

16    which goes on to the back page, Number 55, and Number 64.

17              THE COURT:  All right.

18              Mr. O'Connor.

19              MR. O'CONNOR:  Well, we don't know anything about

13:54:18 20    this person's case, but we do know that when it comes to

21    personal injury lawyers and medical device companies, she has

22    put us both on an even scale.  And she hasn't -- what she says

23    in 64, she's not sure she would be an unbiased juror.  I

24    think, in fairness, we should be able to question and, after

13:54:49 25    this person hears more about the case, find out if that

13:54:51   1    applies to this case and to what extent this case is different

2    or the same as her ongoing case.

3             THE COURT:  Looks to me like her case is probably

4    related to what she says in Question 35.  She fell and had to

13:55:14   5    have implants in her elbow.  Permanent damage to her elbow.

6             I think we do need to get more information about this

7    from the juror, so I'll deny the challenge for cause to Juror

8    36.

9             MR. NORTH:  Number 37, Your Honor.  And I just wanted

13:55:35  10    to draw the Court's attention to her response to Question

11    Number 65.  I don't know if that rises to a level of hardship

12    or not, but she complains she cannot stay awake and that she

13    falls asleep when drinking coffee, as she says.

14             THE COURT:  Mr. O'Connor.

13:56:07  15             MR. O'CONNOR:  She also says she falls asleep when

16    hearing evidence on medical issues, so we better be

17    interesting and have coffee.

18             THE COURT:  She says she falls asleep --

19             MR. O'CONNOR:  I don't think we have any objection to

13:56:18  20    this person with a hardship.

21             THE COURT:  She says she falls asleep when she's

22    drinking coffee.

23             All right, I'll grant the challenge for cause to

24    Juror 37.

13:56:27  25             MR. NORTH:  Your Honor, Number 39.

13:56:42  1              Responses to 36, 42, 63, and 65.

2              In response to 36 she has a very, very low opinion of

3      corporations.  I'm sorry, he does.

4              In 42 he indicates that he has heard of filters and

13:57:06  5      knows that they can cause pain and complications.

6              In response to 63, he declines to commit as to

7      whether he could even apply the law to the evidence in the

8      case saying "I don't know what the evidence is."

9              And then in 65, I don't know that this alone would be

13:57:33 10      disqualifying, he says his spouse works at this court and is

11      in regular contact with the judges.

12              THE COURT:  Yeah, she's a pro se staff attorney here

13      and works on cases for all of us, my cases as well from time

14      to time when we have pro se prison litigation.

13:58:00 15              What is the basis -- is it that he's heard something

16      about filters that you think disqualifies him?

17              MR. NORTH:  Well, he's heard about filters and pain

18      and complications.  I mean, it's not just a neutral hearing

19      about them, he believes they cause pain and complications.

13:58:19 20              THE COURT:  Mr. O'Connor.

21              MR. O'CONNOR:  When you look at 36 he says his

22      opinion on medical device companies is not too far from the

23      way he feels about personal injury attorneys.  And just like

24      one we moved on before that was not excused, he doesn't know

13:58:41 25      what the evidence is.  So I don't think there's anything in

13:58:45  1    there that can be read that he will not be fair and impartial.

2    As a matter of fact, in response to 64, tells us he can be

3    fair and can be impartial.

4              So I think we need to ask more questions of this

13:59:00  5    individual.

6              THE COURT:  I'm going to deny the challenge for cause

7    to Juror 39.

8              MR. NORTH:  Your Honor, the next one is 83.  I would

9    draw the Court's attention to virtually everything this person

13:59:26  10   said, but in particular Number 38, 39, 40, 41, 43, 44, 53, 55,

11   and 64.

12             THE COURT:  All right, I'll read those.

13             Mr. O'Connor.

14             MR. O'CONNOR:  One moment, Your Honor.  For some

14:00:04  15   reason that was not in my group; we're looking at it here.

16             THE COURT:  Look particularly at Question 39.

17             MR. O'CONNOR:  59?

18             THE COURT:  39.

19             MR. O'CONNOR:  In fairness, I think we'll not oppose

14:00:46  20   that motion.

21             THE COURT:  I think when combined with 64, those two

22   answers suggest we should grant the challenge for cause, so I

23   will grant it.

24             MR. NORTH:  Number 124, Your Honor.  Responses to

14:01:16  25   Number 38, 39, 40, 42, 43, and 64.

14:01:55   1          THE COURT:  Mr. O'Connor.

        2          MR. O'CONNOR:  We're not going to oppose that motion

        3   for cause, Your Honor.

        4          THE COURT:  I'll grant the challenge for cause to

14:02:01   5   Juror 124.

        6          MR. NORTH:  Number 133, Your Honor.

        7          I would draw the Court's attention to Number 36, 54

        8   and 55 as far as bias and then Number 65 as a possible

        9   hardship cause because this witness has Tourette's syndrome

14:02:37  10   and is concerned about being prone to outbursts in the

       11   courtroom.

       12          THE COURT:  Mr. O'Connor.

       13          MR. O'CONNOR:  Well, Your Honor, he has indicated he

       14   can be fair and impartial and, if anything, to even the

14:03:19  15   playing field there he tells us at 49 he feels that people

       16   will file lawsuits for anything for money.

       17          THE COURT:  Look, if you would, at question 65 and

       18   what he says on the following page, page 18.

       19          MR. O'CONNOR:  Oh.

14:03:49  20          Depends who his outbursts are against, I guess.

       21          I don't think we will oppose that.

       22          THE COURT:  I'm going to grant the challenge for

       23   cause to Juror 133.

       24          MR. NORTH:  Number 135.

14:04:07  25          Your Honor, I would point questions 38, 39, and 64,

14:04:12  1   and particularly 39 going on to the back page where she

2   wonders whether her mother's IVC filter caused her mother's

3   death.  Then she states in 64 she would try to be fair knowing

4   that.

14:05:01  5                   THE COURT:  Mr. O'Connor.

6                   MR. O'CONNOR:  Well, she likes medical device

7   companies at least one more than she likes personal injury

8   attorneys.

9                   She also is talking about a Greenfield filter.

14:05:17 10                   But if you look at the last page, she says I should

11   point out the filter did, quote, catch a clot at some point

12   following her hip surgery.

13                   I think, on second thought, we will not oppose it.

14                   THE COURT:  I will grant the challenge for cause to

14:05:42 15   Juror 135.

16                   MR. NORTH:  Your Honor, the next one is 139.

17                   Questions 39, 43, and 64.  This person has seen

18   television advertising.  In 64 says as a result, cannot be

19   fair and impartial.

14:06:33 20                   THE COURT:  Mr. O'Connor.

21                   MR. O'CONNOR:  One moment, please, Your Honor.

22                   But when -- in 36, though, she gives the medical

23   device manufacturers a 4 and personal injury attorneys a 2.

24   And then when you look at -- we don't know -- we don't know

14:07:15 25   how she feels about that, Your Honor.  I think we should at

14:07:18   1   least question her even if we have to question her outside.

2   THE COURT:  Her answers are very brief.  All she says

3   is she's seen ads and then checks boxes.  I think we need to

4   ask questions.

14:07:29   5   I'll deny the challenge to Juror 139.

6   MR. NORTH:  Last one, Your Honor, is 169, and I just

7   draw your attention to the response to Number 65 where this

8   potential juror says they do not fully understand English.

9   THE COURT:  I think we need to find out how extensive

14:07:58   10   that is.  I don't know what that means.  They may be very well

11   able to understand what is said at trial.  So I'll deny the

12   challenge for cause to Juror 169.

13   Okay.  Hold on just a second.

14   All right.  We will, in addition to those in the

14:08:37   15   previous order, we will grant the challenge for cause to the

16   various jurors we've just identified.

17   We can double check against the record, Jeff.  Those

18   are the questionnaires for those jurors.

19   For purposes of jury selection, May 13th, we

14:09:03   20   previously indicated that we would seat 9 jurors again, which

21   means we'll have 15 needed after voir dire and you'll each

22   have three peremptories, as before.

23   I stated in my previous order we would have 50 jurors

24   appear.  In the three times we've done this, we've never made

14:09:22   25   it to Juror Number 50.  In fact, in one or two of the trials

14:09:25  1    we didn't question above 40.  I think with these having been

       2    eliminated and hardships having been eliminated, we should be

       3    fine with 50.

       4         One of the things, as you know, that you need to get

14:09:39  5    us is a list of the witnesses from both sides that we can hand

       6    to the jurors when they check in that morning, for them to

       7    look over before they come up to the courtroom.  And I'm going

       8    to ask that you jointly file that witness list by May 8th.

       9    That's a week from Wednesday.  And that way we'll have it in

14:10:05 10    advance and able to get it duplicated before the 13th.

      11         Any questions about that?

      12         I would also appreciate a list from Plaintiffs'

      13    counsel as to who exactly will be at counsel table in the

      14    courtroom so when I introduce you I can identify the right

14:10:25 15    lawyers.

      16         You'll notice in the proposed voir dire that's been

      17    handed out to you it's got the lawyers from the previous

      18    trial.  I just don't know if they're the same.

      19         So we've handed out the proposed voir dire.  They're

14:10:46 20    very brief.  They're just the topics we've talked about in the

      21    last two trials.  We took out the FDA questions that we had in

      22    the voir dire in the first trial because those are included

      23    now in the jury questionnaire.

      24         You've also been given preliminary jury instructions.

14:11:04 25    I took what you submitted and edited it a bit.  So look over

14:11:08  1    that and see if you have any concerns.

       2          I also came up with my own instruction after reading

       3    your two on what to say about Ms. Tinlin's absence from trial,

       4    so please make sure you look at that.  It's the next-to-last

14:11:23  5    paragraph in the preliminary questions that I handed out.

       6          And let's plan, as in last trials, to have you here

       7    at 8:30 on May 13th and we can talk about any concerns over

       8    the voir dire or the preliminary jury instructions.

       9          We'll do the same thing we've done in the past:  I'll

14:11:45 10    ask those initial voir dire questions, then turn it over to

      11    plaintiffs' counsel to ask follow-up questions from the

      12    questionnaires, and then defense counsel, after which I'll

      13    hear your challenges for cause and then we'll exercise

      14    peremptory challenges.

14:12:02 15          Any questions about jury selection?

      16          MR. O'CONNOR:  None from the plaintiff, Your Honor.

      17          Your Honor, we're going to follow the usual what

      18    we've done, question directly from the questionnaires and, if

      19    we think there's something of a private matter, approach you?

14:12:24 20          THE COURT:  Yeah, that would be fine.

      21          Any questions on that?

      22          MR. NORTH:  Nothing, Your Honor.

      23          THE COURT:  Okay.

      24          As you know, the dates we've set aside for the trial

14:12:37 25    are May 13th through the 17th, so we will go Monday through

14:12:44  1    Friday that first week.

2              May 20th through the 24th, so it will be Monday

3        through Friday the second week.

4              The third week Monday is Memorial Day, so we will go

14:12:58  5    May 28 through the 31st in that last week.

6              I've allocated 33 hours to plaintiff and 30 hours to

7        defendants.

8              With that schedule, we should be able, assuming you

9        each reserve an hour for punitive damages, we should be able

14:13:20 10    to get the case to the jury by the afternoon of Wednesday,

11       May 29th.  So they'll have Thursday to deliberate.  And if we

12       need a punitives presentation and deliberation, we should have

13       time for that on Friday.

14             My assumption was that we would handle punitive

14:13:37 15    damages in this trial as we did before.  That is, reserve

16       presentation of evidence on the defendants' worth until after

17       the jury's verdict.  Do you have any disagreement on that

18       approach?

19             MR. O'CONNOR:  We agree with that, Your Honor.

14:13:59 20            MR. NORTH:  Yes, Your Honor.

21             THE COURT:  Okay.  So that will be our plan.

22             We'll do the same thing I've done before:  I'll give

23       you your time at noon and at the end of the day.  We'll go

24       from 9 until 4:30 most days, with a break in the morning,

14:14:12 25    break in the afternoon, and one hour for lunch.

14:14:17  1          Any questions on the trial schedule?

          2          Okay.

          3          I've already talked about the preliminary jury

          4    instructions.  Please, plaintiffs, look at that one I've added

14:14:35  5    about Ms. Tinlin.  I thought it important to tell the jury

          6    that she is not attending the trial on the advice of her

          7    doctors due to medical conditions that are not related to the

          8    issues in this case.  But look at that and see if you have

          9    concerns about how that is phrased.

14:15:00 10          As in the past, we will get you my proposed final

         11    jury instructions during the trial, probably during the first

         12    week of trial since we're really just working off the Hyde

         13    instructions and it's not as big an undertaking as it was

         14    before.

14:15:16 15          With respect to one aspect of the jury instructions,

         16    that is the learned intermediary doctrine, you all have

         17    briefed that issue in your trial memoranda, but I thought I

         18    should tell you now that -- well, first, I have to decide it

         19    in this case.  I didn't have to decide it in Hyde because we

14:15:37 20    granted summary judgment on causation on the failure to warn

         21    claim in Hyde, but the failure to warn claim in this case will

         22    be going to the jury.  So we have to instruct the jury on who

         23    the recipient will be of the failure to warn.

         24          So unlike Hyde, this isn't a case where I can avoid

14:15:54 25    deciding the issue.  And the law is clear, my task is to

14:15:59  1   predict what the Supreme Court of Wisconsin would do with that

2   doctrine.

3            They've never said.

4            I will tell you that I am going to apply the learned

14:16:09  5   intermediary doctrine, and the reason I'm going to is the

6   Seventh Circuit's case in the *Zimmer* matter, the MDL.  Not

7   only do I think that case is well written, but it was also

8   authored by Judge Diane Sykes, a former member of the

9   Wisconsin Supreme Court and, in fact, the justice who had

14:16:26 10   written a number of the cases you all have cited on Wisconsin

11   tort law.  So that decision, to me, carries particular weight

12   in predicting what Wisconsin might do.  So for that reason I

13   intend to apply the learned intermediary doctrine.

14            I got the order out Friday -- go ahead.

14:16:49 15            MR. NORTH:  Your Honor, I just wanted to say one

16   thing in that regard.  Mr. Seltz and us, we have been

17   discussing the -- adding an instruction on the concealment

18   claim because the instructions submitted didn't have one.  We

19   are doing some research and will probably take the position --

14:17:04 20   I know we will, based on what we're seeing in the research,

21   that the learned intermediary doctrine also applies to the

22   concealment claim.  But we may try to file a one- or two-page

23   thing, if we can, just explaining that.

24            THE COURT:  Are you going to be submitting an

14:17:20 25   instruction on that?

14:17:22  1          MR. NORTH:  Yes, we're going to.

2          THE COURT:  Then just set forth your positions on

3     that.  We'll look at that claim with that in mind.

4          MR. NORTH:  Okay.

14:17:28  5          THE COURT:  As I think you saw, I got out the order

6     on Friday on the motions in limine.  Are there any questions,

7     issues, about that order?

8               Okay, not hearing any --

9          MR. O'CONNOR:  Excuse me, Your Honor.  One moment.

14:18:07  10          Your Honor, I think we do have some comments and a

11     position on one of your rulings, if I could turn it over to

12     Mr. Mankoff.

13          THE COURT:  Yeah, that's fine.

14          MR. MANKOFF:  Your Honor, on your order on the Motion

14:18:35  15     in Limine Number 1, Document 17285, we wanted to request the

16     opportunity to respond to the defendants' position that

17     Mrs. Tinlin was not injured before Dr. Haller read the

18     radiology, allegedly negligent read of the radiology scan.

19          THE COURT:  Is this the *Selleck* issue?

14:19:01  20          THE WITNESS:  The *Selleck* issue.  Because if she was

21     already injured at that time, then the *Selleck* rule applies.

22     And you wrote in your order that you took their contention

23     that she wasn't injured at that point, and so then they would

24     be able to allocate fault to Dr. Haller.

14:19:15  25          THE COURT:  Let me give you a comment and see if you

think we need to address it before trial.  When I read the

trial briefs on that issue, it occurred to me that that

decision as to whether or not *Selleck* applies will really have

to be one based on the evidence as it comes out during the

trial.  From the experts and what her condition was.  And that

if you all believe after that evidence that the *Selleck* rule

ought to preclude them from pointing the finger at Dr. Haller

at all, I would make that decision based on the evidence that

has come in.

You seem to have different views of what the evidence

would show.

So I guess what I'm saying is the fact I entered that

order would not preclude you before the case to goes to the

jury from asserting that I should eliminate any apportionment

of fault to Dr. Haller based on the *Selleck* rule, but that

would then be based on the evidence that had come in.

MR. MANKOFF:  Right, I understand that.  Certainly if

there was dispute of fact that would be appropriate.  But our

position is there's no reasonable dispute of fact that her

injury occurred when the filter fractured and the filter had

already fractured when Dr. Haller made that reading, and we

have a case to support that, a Wisconsin Supreme Court case.

THE COURT:  All right.  You can file that, but you

will need to do it quickly because I'm going to have to

address it next week.  So how about by the close of business

14:20:38   1    on Wednesday.   Three-page memo.

           2             MR. MANKOFF:   Okay.

           3             THE COURT:   Response by close of business Friday;

           4    three-page memo.

14:20:48   5             It's only three pages, Ms. Helm.

           6             And I'll look at that in light of the briefing and

           7    see if I think there is a basis for knocking it out before we

           8    start the trial.

           9             MR. MANKOFF:   Thank you, Your Honor.

14:21:09  10             THE COURT:   All right.   Anything else from

          11    Plaintiffs' counsel?

          12             MR. O'CONNOR:   I don't think so.

          13             Do we have anything else?

          14             MR. LOPEZ:   Not at this moment.

14:21:23  15             THE COURT:   Let's talk, then, about the final

          16    pretrial order.

          17             Do you want me to read the stipulations to the jury

          18    as we've done in the past that you've set forth on pages 4 and

          19    5?

14:21:40  20             For your information, that's just the list of

          21    undisputed facts.   It begins with who the defendants are, it

          22    ends with the August 2013 CT scan.   It's paragraphs A through

          23    M that you put forward as undisputed facts.   The question is

          24    do you want me to read those before your openings, as we've

14:22:05  25    done in other trials?

14:22:07  1            MR. LOPEZ:  We have no objection to doing that, Your

       2     Honor.

       3            MR. NORTH:  That's fine, Your Honor.

       4            THE COURT:  Okay.  Let me make a note of that, then.

14:22:49  5            All right.  On those stipulations, in paragraph 1(h),

       6     you have the acronym DVT.  I would intend to say "deep vein

       7     thrombosis" rather than "DVT" since they won't have heard

       8     that.

       9            I also thought that on paragraph 1(k) I should say CT

14:23:19 10     scan of her chest revealed two fractured embolized arms of the

      11     filter in the right ventricle, and add the words "of her

      12     heart" so it's clear, since there are other ventricles in the

      13     body, it's the right ventricle of her heart.  Any objection to

      14     that?

14:23:39 15            MR. LOPEZ:  Not from plaintiffs, Your Honor.

      16            MR. NORTH:  No, Your Honor.

      17            THE COURT:  Okay, that's the way I'll read them,

      18     then.

      19            In the final pretrial order and in the trial brief,

14:23:53 20     you all address the question of whether there is a continuing

      21     duty to warn in the case.  Whether post-sale duty to worn can

      22     contribute to liability.  The defendants argue in the final

      23     pretrial order there is none and I should prevent the

      24     plaintiff from making the argument.  Plaintiffs argue in their

14:24:17 25     trial brief that there is such a duty.

14:24:19   1           It looks like this question turns on the reading of

2      the *Kozlowski*, K-O-Z-L-O-W-S-K-I, and the *Bushmaker* cases.

3           My intent would be to read those cases and get you a

4      ruling before the start of trial so that you know whether or

14:24:41   5      not that's going to be part of what you need to address.

6      There's pretty thorough briefing in the two locations.

7      Defendants put theirs in the final pretrial order, plaintiffs

8      put theirs in the trial memorandum, but you both address it.

9           Any other thought how we ought to deal with that

14:24:59   10     issue?

11          MR. SELTZ:  No, Your Honor.  I would also point you

12     to the *Sharp* case which is actually in the defendants' -- one

13     of their submissions that addresses this issues.

14          THE COURT:  Okay.

14:25:14   15          MR. SELTZ:  But you're right that all of the cases

16     are in various submissions, including the competing jury

17     instructions, or the positions on the jury instructions, on

18     that issue.

19          THE COURT:  Okay.

14:25:28   20          MR. NORTH:  That's fine, Your Honor.

21          THE COURT:  Do you feel like I need to resolve it

22     before the start of trial?  Or can we just resolve it in jury

23     instructions?  What are your thoughts?

24          MR. LOPEZ:  I don't think it's going to change the

14:25:40   25     evidence, Your Honor.  If there's an objection based on that,

14:25:46  1    I guess we'd have to deal with it at the time, but I think the

2    evidence is -- it's not going to influence how the evidence

3    comes in, unless there's an objection to it because that

4    ruling is pending.  I can't foresee that at least on our side.

14:26:03  5         MR. NORTH:  Your Honor, as I stand here I cannot

6    really fathom a reason to have a ruling beforehand.  As

7    Mr. Lopez indicates, I can imagine there may be a scenario

8    where there is objection to particular evidence on that basis,

9    but I'm having a hard time thinking what that would be right

14:26:20 10    now.

11         THE COURT:  Okay.  We'll read the cases and probably

12    deal with that in the jury instructions, then.

13         You did add the fraudulent concealment claim to the

14    amended final pretrial order.  And we need the jury

14:26:41 15    instructions.  Is that what you were referring to a moment

16    ago, Mr. North?  Let's have you get that in, if you can, by a

17    week from today, your proposed jury instruction.

18         Please -- well, let me come back to that in a moment.

19         You raise the issue in the final pretrial order of

14:27:17 20    plaintiffs' use of the defense expert's depositions at trial.

21    Those are defense experts not being called by the defense.

22    This is on pages 48 and 49 of the final pretrial order.

23         In an earlier case my ruling was that the jury

24    shouldn't be told these were experts retained by the defense

14:27:41 25    and that the evidence should be used, because it's an expert

14:27:45   1   opinion evidence, only if it's not addressed by some other

2   expert.

3          I guess the question I have is whether you all think

4   we should follow a different approach in this trial?

14:28:07   5          MR. O'CONNOR:  Your Honor, to be perfectly honest, we

6   haven't thought about that.  In the past trials we took the

7   position that we should announce to the jury that these were

8   the defense experts.  You ruled as you did and that's how we

9   proceeded.

14:28:28  10          THE COURT:  Well, let's do this.  At this point my

11   plan is to follow the same ruling.  But you're free during the

12   trial, if you think it would become appropriate at some point

13   in the trial, to raise with me outside of the hearing of the

14   jury the fact that you want to play part of the defense expert

14:28:48  15   deposition.  And if you think it needs to be disclosed, we can

16   address it at that point.

17          MR. O'CONNOR:  All right.

18          THE COURT:  So you'll have the right to assert it if

19   you decide it becomes relevant.

14:28:58  20          MR. O'CONNOR:  All right.  Thank you.

21          THE COURT:  Otherwise, I'll plan on doing what we've

22   done in the other cases.

23          MR. O'CONNOR:  All right, thank you.  That will be

24   helpful.

14:29:06  25          THE COURT:  Defendants ask in the final pretrial

14:29:07  1   order that plaintiffs indicate whether or not you're using

       2   Kessler or Parisian in this case.

       3           MR. O'CONNOR:  We let them know.  We're just using

       4   Parisian.

14:29:23  5           THE COURT:  Please, also, let's follow the same

       6   practice in this trial that when a party puts an expert on,

       7   give me copies of their reports so that I can deal with any

       8   issues of objections that testimony is beyond the scope of a

       9   report.

14:29:40 10           Defendants also raise the question in the final

      11   pretrial order about whether plaintiffs intend to call

      12   Dr. Kinney as only an expert witness or as a fact witness

      13   also, which was an issue I ruled on earlier.

      14           MR. O'CONNOR:  Well --

14:29:58 15           MR. LOPEZ:  I can address that, Your Honor.  Can I

      16   come up there so I don't have to bend over?

      17           THE COURT:  That's fine, yeah.

      18           MR. LOPEZ:  So currently we're planning to call

      19   Dr. Kinney as an expert witness.  Of course, if we do, we

14:30:17 20   would adhere to the Court's prior ruling that we cannot

      21   reference his prior work for Bard.  In other words, when he

      22   was in the various consulting agreements and things like that.

      23   We understand that ruling.

      24           There is the possibility that Dr. Kinney is also a

14:30:37 25   fact witness independent of his work as a consultant for Bard

14:30:43   1    and we may -- depending how the evidence is coming in and

2    whether or not we even need Dr. Kinney at that point to render

3    the opinions that he has in his report, or any portion of

4    those opinions, that we may want to call Dr. Kinney as a fact

14:31:02   5    witness outside of his role as a consultant with Bard.

6            THE COURT:  To cover what kind of topics?

7            MR. LOPEZ:  Well, his own personal use of the devices

8    and his own questions that he may have had of Bard about those

9    outside of his role as a consultant.  In other words, as a

14:31:20  10    physician who was using the device and had not been properly

11    advised of some of the serious risks and safety issues and

12    efficacy issues involved in the product.

13            THE COURT:  And at this point you don't know whether

14    you're going to want to use him in that way; is that right?

14:31:40  15            MR. LOPEZ:  Exactly.

16            THE COURT:  Let's cross that bridge when we get to

17    it, then.  If you decide you want to use him in that way, lets

18    raise it outside of the jury's hearing and we'll talk through

19    whether it's appropriate.

14:31:51  20            MR. LOPEZ:  I agree with that, Your Honor.  Thank

21    you.

22            THE COURT:  There was also a question in the final

23    pretrial order from the defendants as to which interventional

24    radiologists plaintiffs are going to call.  Have you all

14:32:01  25    communicated about that as well?

14:32:11   1          Paragraph 4 on page 49.

       2          MR. LOPEZ:  Well, I would say that if it's

       3   cumulative, it's cumulative.  Even if we called two

       4   interventional radiologists, they're on different issues.  I

14:32:33   5   think that's another at trial kind of issue, Your Honor, we

       6   can deal with.

       7          I think right now we told them we intend to call

       8   Dr. Hurst and intend to call Dr. Kinney and to call Dr. Kalva,

       9   who is also an interventional radiologist, based on just his

14:32:51  10   facts, based on an article he wrote and some factual testimony

      11   he has about the device.

      12          So there could be three interventional radiologists

      13   that talk about three different things.

      14          THE COURT:  Okay.  Those are the names of the folks

14:33:08  15   they'll call, and you obviously can make a cumulative

      16   objection if you think it's appropriate, and we'll deal with

      17   that during trial.

      18          I do agree we should follow the same practice in this

      19   case that we've followed in the other trials of each side

14:33:20  20   giving the other 48 hours' notice what witnesses will be

      21   called so folks can prepare.

      22          There was a mention on page 73 of the final pretrial

      23   order of impeachment exhibits.  It's paragraph F(2).  And it

      24   says that impeachment exhibits will be provided to the deputy

14:33:47  25   clerk 48 hours in advance.

14:33:49  1        That's fine, but I just want to remind you -- well, I

       2   think I've raised it before but I'm not sure.  My view of

       3   impeachment exhibits is the narrower of the two schools of

       4   thought, and that is, as you know the rule says it refers to

14:34:08  5   documents used solely for impeachment.  I read that to mean

       6   that the only relevancy of the document is impeachment.  And

       7   that if the document otherwise is relevant to the merits of

       8   the case, it's not solely for impeachment and therefore

       9   shouldn't be treated as an impeachment exhibit.

14:34:26 10        But if you have a pure impeachment exhibit, then

      11   getting it to Christine 48 hours beforehand is fine.

      12        MS. HELM:  Excuse me, Your Honor.  Actually, I think

      13   we were addressing the local rule that says 48 hours before

      14   trial and we actually asked for 24 hours before the intended

14:34:44 15   use in F(2).

      16        THE COURT:  Is there a reason it needs to be 24

      17   instead of 48?

      18        MS. HELM:  No, Your Honor.  I was just -- I just

      19   wanted to point out --

14:34:57 20        THE COURT:  Let's say --

      21        MS. HELM:  If 48 is your ruling --

      22        THE COURT:  48 hours before use, let's get them to

      23   Christine.

      24        A question on pages 73 and 74 concerning the sealing

14:35:13 25   of exhibits.  Defendants say you raise this issue to preserve

14:35:18  1    it.  We've been there before.  I just want to make sure

       2    that -- well, you've seen my rulings on the issue up until

       3    now.

       4            MS. HELM:  Yes, Your Honor.  Your rulings are clear.

14:35:29  5    I do not think this will be an issue at the conclusion of this

       6    case because I believe most of the evidence has already been

       7    admitted previously.  But we have to preserve our right to

       8    address it yet again.

       9            May I go back to your 48-hour rule on impeachment?

14:35:45  10           THE COURT:  Yeah.

      11            MS. HELM:  Your Honor, if we don't know who the

      12    witnesses are until 48 hours before they're going to be

      13    called, it's going to be virtually impossible for us to get

      14    the impeachment evidence to the court 48 hours in advance.

14:35:57  15           MR. LOPEZ:  I think we've been using 24 in prior

      16    trials, Judge.

      17            THE COURT:  That's fine.  That's a good point.  24

      18    hours before use.

      19            MS. HELM:  Thank you, Your Honor.

14:36:11  20           THE COURT:  All right.

      21            On page 75 there is a request by defendants, this is

      22    paragraph G(1), for 48 hours' notice of what deposition

      23    designations and exhibits will be used, with a completed

      24    transcript of the video and copies of the exhibits 24 hours

14:36:43  25    before the deposition is played.

14:36:48  1          Plaintiffs disagree with that proposal.

2          What's your thinking on that as to why it's a

3  problem?

4          MR. LOPEZ:  Well, I mean, I know from prior trials

14:37:04  5  when we've altered some of those designations based on

6  evidence that's come in, I just -- we'll do it 48 hours in

7  advance, but I think we ought to have at least some leeway

8  that, for good cause, if we want to amend it or revise it or

9  add something to the testimony, we can deal with it then.  I

14:37:26  10  mean, it's not going to be a huge burden on anybody.

11          But certainly we would tell them 24 hours in advance

12  of us playing the deposition if we had something different

13  that we were going to add or wanted to supplement the

14  designation.

14:37:39  15          THE COURT:  All right.  Let's say 48 hours in advance

16  give notice to each other of deposition excerpts you're going

17  to play with exhibits, but that doesn't preclude you from

18  editing it if you think you need to, you know, the day before

19  trial.  I know you've shortened things as we've gone along and

14:37:56  20  I want to preserve that ability.

21          MR. LOPEZ:  Your Honor, while we're on this paragraph

22  G, there are some rulings you made in the -- even in the

23  Booker case on the Recovery filter evidence that we might want

24  to reurge because this is now a Recovery case and, as we said,

14:38:22  25  this is subject to the Court's rulings.  There may be some

14:38:26  1   supplemental designations we want to make at depositions that

2   were previously submitted to you for ruling where you may have

3   ruled one way or the other or you haven't ruled, but now

4   they've become more relevant because it's a Recovery case.

14:38:40  5         But to put your mind at ease, we've gone through all

6   of these; it's not a large volume.  But it's something I think

7   we might want to get together with counsel and figure out when

8   we can get those to you.  Maybe we can do it three days before

9   we're going to use those depositions.  It's not going to be

14:38:58  10   very much.

11         THE COURT:  So this is not in the 13 depositions

12   you've given me so far?

13         MR. LOPEZ:  Those were depositions you've never seen

14   before.  We've agreed to prior rulings based on your looking

14:39:13  15   at the same evidence and we're basically relying on what we

16   submitted in Booker because we didn't have the Recovery

17   restriction as much as we did in the later trials.  But then

18   again, there were some restrictions that you put on us in

19   Booker on Recovery evidence that we may want to ask you to

14:39:33  20   look at again and -- based on your recent motion in limine,

21   frankly, that we should now be able to get in.  We might even

22   include an exhibit here and there.  It's not going to be large

23   volume of stuff.  We've already gone through it.  For the most

24   part we are cutting stuff out because we have a lot of G2

14:39:52  25   testimony in there and these deposition cuts should be less

14:39:55  1   than they were in the prior trials.

2          THE COURT:  Let's say that my previous rulings on

3   objections in any of those depositions will stand, and if you

4   want me to revisit a ruling or if you want to urge an

14:40:09  5   objection that wasn't previously urged, you can do that.  But

6   don't give me the entire transcript again to go through.

7          MR. LOPEZ:  No.

8          THE COURT:  Just the targeted issues.

9          MR. LOPEZ:  We'll meet and confer on those.  For the

14:40:22 10   most part I think we've agreed to live by your objections --

11   your ruling on objections, and we'll only submit to you those

12   questions and answers and potentially an exhibit here and

13   there that we need you to look at for the first time, or

14   reurge because you denied it or you sustained an objection,

14:40:41 15   but based on your ruling on the motion in limine you might

16   want to change your mind about those objections.

17          THE COURT:  Okay.

18          Were you going to say something, Ms. Helm?

19          MS. HELM:  Yes, Your Honor.  This is the first I'm

14:40:51 20   hearing this.  If plaintiffs are asking to provide additional

21   testimony that hasn't been previously gone through the process

22   of objections and being submitted to the Court, I think we're

23   too late for that.  We've already submitted our depositions to

24   you for ruling.

14:41:08 25          If it's -- and so I'm not really clear what Mr. Lopez

14:41:12  1  is talking about.  If that's what I understood him to say, is

2  that based on your motion in limine allowing for Recovery

3  migration deaths they have testimony they want to add, I would

4  object to that.

14:41:24  5       As far as -- I understand your ruling on reurging

6  objections or addressing prior objections.  But I just would

7  object -- this process is complicated, it takes a long time,

8  thus the reason we ask for the 48 hours.  We're two weeks

9  before trial and have lots of other things to do rather than

14:41:43 10  addressing deposition designations yet again.

11       THE COURT:  All right.  Talk about it.  If you want

12  to make an objection to what they're asking me to do, I'll be

13  happy to hear that.

14       As you all know, it's tough for me to find time to do

14:41:56 15  a lot of work outside of trial during trial because there's

16  other things I have to attend to.  But I'll be happy to look

17  at what you have to submit.

18       We need to take a break for the benefit of the court

19  reporter.  We will break at for 15 minutes and start again at

14:42:13 20  3 o'clock.

21       (Recess taken from 2:42 to 3:00.)

22       THE COURT:  Final pretrial order there's a question

23  raised about the use of Dr. Kalva, K-A-L-V-A.  His deposition.

24  Is that still an issue with the parties?

15:01:08 25       MS. HELM:  Your Honor, I think that's been resolved

15:01:10  1   by the plaintiff stating they didn't intend to call Dr. Kalva

2   as an expert.

3          THE COURT:  Is that correct, Counsel, you're not

4   going to be calling him?

15:01:19  5          MR. LOPEZ:  We've already made that decision.  We're

6   just going to call him as a percipient witness.

7          THE COURT:  Okay.

8          Any other issues we need to address from the final

9   pretrial order?

15:01:33  10          MR. O'CONNOR:  I have an issue but it's outside of

11   the order.

12          THE COURT:  Okay.

13          MR. NORTH:  Nothing with the pretrial order, Your

14   Honor.

15:01:39  15          THE COURT:  Okay.  Then I'm going to approve and

16   adopt the final pretrial order at Docket 17397.

17          As you know, that will mean under Rule 16(e) of the

18   Federal Rules of Civil Procedure that no evidence or issues or

19   objections can be asserted without a showing of manifest

15:01:57  20   injustice if they're not listed in the final pretrial order.

21          There were some more issues that were raised in the

22   trial briefs.  One of them was a discussion of the consumer

23   expectation test and whether it is relevant under Wisconsin

24   law.  There was also the question whether other factors that

15:02:24  25   are identified in the comments to the Restatement are

15:02:28  1    relevant.

2              My plan in this case is to do what I did in Hyde and

3        that is follow the Wisconsin model instructions.

4              If, when I give you my proposed final instructions,

15:02:41  5    you think there's an argument that I ought to include more or

6        less, I'll be happy to hear your arguments at that point.  But

7        in this case, as in Hyde, I'll try to hew fairly closely to

8        those instructions for what the jury should be told about the

9        various claims.

15:03:00  10             And that includes the inherent characteristic

11       defense.  I understand the arguments made on both sides.

12       Because that is expressly part of the Wisconsin product

13       liability statute, it seems to me the defendant is entitled to

14       an instruction on that issue, as occurred in the Hyde case.

15:03:21  15   But, again, you're welcome to raise that issue when you see my

16       proposed final instructions.

17             How do you pronounce the name of Ms. Tinlin's doctor

18       who implanted the filter?  Is it Riebe?

19             MR. LOPEZ:  I asked that question, everyone told me

15:03:38  20   Riebe.

21             MS. HELM:  That's how he says it in his deposition.

22             THE COURT:  How?

23             MS. HELM:  Riebe.

24             THE COURT:  Okay.  Riebe.

15:03:50  25             There is a fair amount of discussion in the trial

15:03:53 1    briefs about Riebe and Haller and just what is the proper

2    issues to be addressed with respect to them.

3            My understanding from what the defendants say is that

4    you intend to make two arguments through your experts.  One is

15:04:08 5    the assertion that I addressed in the motion in limine that

6    other causes were possible and that under Wisconsin law can be

7    asserted in response to a plaintiffs' claim.  And also that

8    you intend to request an instruction and verdict form that

9    would allow the jury to apportion fault to those two

15:04:29 10   individuals.  We've already talked about the motion that can

11   be made on that issue.

12           Am I correct from defendants' perspective that those

13   are the only two ways in which you intend to address those two

14   doctors?

15:04:44 15           MS. HELM:  Yes, Your Honor.

16           THE COURT:  Okay.

17           I already ruled on the question of causation in my

18   view being an element of apportionment.  That was one of the

19   things that was raised in the briefs.

15:04:56 20           The plaintiffs assert in their trial brief that there

21   is no apportionment of fault for a strict liability claim

22   under Wisconsin law, only negligence.  That wasn't addressed,

23   that I could see, in what the defendants filed.

24           What is your thought on that?

15:05:14 25           MS. HELM:  Your Honor, we believe, based on the

15:05:19  1    contributory negligence and the apportionment of fault law and

       2    the statute in Wisconsin, which I will find for you, that it

       3    should apply to strict liability.  It clearly applies to

       4    product liability cases and there's no case law that

15:05:33  5    specifically says it does not apply to strict liability.

       6          And you can, for example, you can have contributory

       7    negligence of a plaintiff, which we are not asserting in this

       8    case.  But you can have contributory negligence in a strict

       9    liability context under Wisconsin law.  So we believe it is

15:05:50 10    applicable to both negligence and strict liability claims.

      11          THE COURT:  Is there any case law that's ever

      12    addressed that question directly?

      13          MS. HELM:  Your Honor, we'll be happy to do a brief

      14    on this.  I will be honest, I have not found a case since 2011

15:06:08 15    when the new statute was enacted in Wisconsin that's directly

      16    on point.  But there are contributory negligence cases in

      17    product liability, in strict liability cases.  But we haven't

      18    found a specific apportionment of fault on strict liability

      19    since the statute was enacted.

15:06:27 20          THE COURT:  Are the contributory negligence cases

      21    before or after 2011?

      22          MS. HELM:  Your Honor, I can't state as I stand here

      23    today.  But we'll be happy to provide a short memo on this.

      24          THE COURT:  Well, look, if you would, at the

15:06:39 25    plaintiffs' brief, page 2, it's at Docket 17357, and file

15:06:48   1   something that responds to that, if you would.  Let's do,

2   again, by Friday, end of the day.  Three pages.  And I'll

3   compare it to the case law.  If it's an issue I think I need

4   to hear more from you on, then we'll address it.

15:07:03   5        My intent with that will be to just craft the jury

6   instructions.  But I'll be happy to have your thoughts on it

7   after you look at those jury instructions.

8        Any other issues that were raised in the trial briefs

9   that you think we ought to talk about?

15:07:31  10        Okay.

11        Let me make mention a couple of other housekeeping

12   type matters.

13        Are we squared away on Ms. Tinlin's remote

14   participation in trial?

15:07:45  15        MR. O'CONNOR:  I believe so, Your Honor.  It appears

16   that my office has contacted the courts in Wisconsin and

17   Joanne gave me a report and it got buried because people went

18   through my stuff.

19        We have to go through the Court in Milwaukee because

15:08:11  20   the Green Bay court just can't accommodate.  We have to decide

21   what date she'll testify.  I think we have the vendors ready

22   to go.  We've been in contact with the person at this court.

23   It's just a matter of deciding when, and we will let everybody

24   know.  It looks like she will be required to go to the federal

15:08:26  25   district court near -- is it Milwaukee or Marquette?

15:08:31  1          Milwaukee.

2          THE COURT:  All right.  And is she only going to do

3     that for her testimony?

4          MR. O'CONNOR:  Well, I think -- as opposed to having

15:08:41  5     the ability to be available during other times?  What we

6     understand is that that would be a fairly difficult task.  So

7     I think, although we don't intend to have her present during

8     the entire trial, if something came up and we could arrange

9     it, we would certainly like the opportunity to give the Court

15:08:59 10     plenty of advanced notice, and defense.  But in terms of

11     testifying remotely, it will be her and her husband because

12     she depends on her husband as a caregiver.  So he is going to

13     stay with her.  And we are planning to have him testify

14     remotely as well.

15:09:16 15          THE COURT:  All right.  Well, our court will need as

16     much advanced notice as you can provide as to the time.  The

17     time of the technicians and equipment is pretty heavily

18     booked, so we need to be able to pin down just when it is.  So

19     if you can get that worked out in the next couple of days and

15:09:35 20     let our folks know, that will be important.

21          If it turns out that the Tinlins want to listen in on

22     other portions of the trial, as I think you heard from the

23     technical folks, that's going to be really hard to do with our

24     video equipment, but they could call in and listen, just like

15:09:54 25     counsel are listening now.  And they could do that from home

15:09:58  1   if they want to listen in on jury selection or arguments or

2   something like that.  And that's a matter of just coordinating

3   with Christine.  That doesn't take any additional technical

4   set, up we just have them call in and we can put them on the

15:10:12  5   audio system.

6        MR. O'CONNOR:  Thank you, that's helpful.

7        MR. NORTH:  Your Honor, I think the Court's last

8   comment is consistent with what we were going to request,

9   which is at least 72 hours' notice as to when she would

15:10:22  10   testify since we have the right, under the Court's order, to

11   have an attorney in the courthouse at that time.

12        THE COURT:  Yeah, let's get that tied down by the

13   middle of this week, if we can.  I'm mostly concerned about

14   the booking of the equipment here.

15:10:36  15        But what that also suggests is that instruction,

16   preliminary instruction that I just gave you, will need to be

17   expanded to include Mr. Tinlin if he's not here.  We'll need

18   to add the idea that he is not present because he is there to

19   assist his wife or something to that effect.

15:10:56  20        So let's address that when you look at those

21   instructions.

22        The other trial matters we're well familiar with.

23        Please be sure during your openings to avoid

24   argument.

15:11:21  25        Is the rule of exclusion going to be invoked?

15:11:25  1          MR. O'CONNOR:  Yes.  Yes, Your Honor.

        2          MR. NORTH:  Yes, Your Honor.

        3          THE COURT:  I've learned through my work on the rules

        4    committee that there's actually a split of authority on

15:11:35  5    whether the rule of exclusion applies outside of the

        6    courtroom, to my surprise.  There have been courts that have

        7    held a witness excluded can't sit in the courtroom, but

        8    somebody can walk out and tell them everything that's said in

        9    the courtroom.  Which makes no sense.  So what I now need to

15:11:50 10    do is be clear that when the rule is invoked in this case,

       11    that means you don't share with the witness anything that goes

       12    on in the courtroom.  So it will apply inside and outside of

       13    the courtroom.  Which I think has been the practice up until

       14    now.

15:12:04 15          MR. O'CONNOR:  I thought we had an exception to

       16    experts.

       17          THE COURT:  We do.  Experts can be in the courtroom.

       18    Or, if they can't get here, you can tell them what the other

       19    expert said.  Yeah, we did have an exclusion for experts.

15:12:21 20          There was a motion filed recently on the common fund

       21    issue in the MDL, and I understand there's been additional

       22    briefing coming in on that.

       23          Let me tell you the logistical issue on that.  I

       24    can't get to that before the trial starts.  After the trial on

15:12:46 25    May 31st, I am booked every day in June and, in fact, just

15:12:54  1   about every day in July.  I might have -- might be able to do

       2   a hearing the first week of July, although that looks doubtful

       3   as well.

       4        The reason I want to mention that is because I don't

15:13:07  5   think there's any way I can get a ruling -- well, I think

       6   we'll need to have a hearing where we hear from both sides but

       7   also from plaintiffs who oppose the common fund issue.  And I

       8   don't think I'm going to be able to get a ruling to you on

       9   that for several months because of my schedule.  But I wanted

15:13:24 10   to raise that because I wanted to find out from you if you see

      11   that as being a serious problem in the case.

      12        MR. SELTZ:  Your Honor, the only issue potentially is

      13   there's a part of that motion that I don't believe there's is

      14   any opposition to which just has to do with getting the escrow

15:13:50 15   agents set up, getting these accounts set up, so that there's

      16   an agreement in place with Citibank.  And those things are

      17   ready to go, pending your approving those modifications to the

      18   ruling.

      19        So there may be an issue waiting into the summer to

15:14:08 20   get those things set up.  I don't believe there's any

      21   opposition to those administrative parts of that.

      22        THE COURT:  That's just the accounts that would be

      23   set up?

      24        MR. SELTZ:  Correct.

15:14:17 25        THE COURT:  I don't think there's an objection to

15:14:18   1    that part.

2              MR. NORTH:  There isn't, Your Honor.  And as far as I

3    can tell in the other responses filed by other plaintiffs

4    Friday.  So maybe the plaintiffs can provide a proposed order

15:14:32   5    and we can look at it that would accomplish that, leaving out

6    the part in dispute.

7              THE COURT:  I think that makes sense.

8              Why don't you all submit a proposed order and we can

9    at least get that taken care of.

15:14:41  10              When it's briefed, we'll try to get the rest of the

11    motion teed up as soon as we can, but it's going to be a bit

12    of time given how my calendar looks right now.

13              There's somebody on the line that doesn't have your

14    phone muted.  Could do you that, please, we're getting a lot

15:14:59  15    of paper shuffling.

16              Thank you.

17              MR. SELTZ:  Your Honor, while we're dealing with the

18    administrative parts of this motion, given that Your Honor

19    won't be able to turn to it for some time, and I haven't

15:15:10  20    discussed this with Mr. North, but if we could have another

21    week to submit that reply, that would be very helpful.

22              THE COURT:  That's fine.

23              MR. SELTZ:  Thank you.

24              THE COURT:  All right.  Let's talk about a few other

15:15:25  25    general issues.

15:15:32   1          I mentioned either in an order or in our last status

2     conference that in my view there has to come a date when this

3     MDL closes.

4          We talked with the judicial panel on multi-district

15:15:45   5     litigation.  They said the procedure will be for me to simply

6     notify them of what that date is and they'll stop transferring

7     cases after that date.

8          And of course what we'd also need to do is enter an

9     order at the same time saying no more direct filing in this

15:16:00  10     court in the MDL.

11          My thought would be to set a date of May 31st for an

12     end to the transfers and to the direct filings.  But I want to

13     find out from you if you see that as a problem?  If there's

14     another date that's better than that?

15:16:24  15          MR. LOPEZ:  I've really not given much thought to

16     that, Your Honor.  I mean, I think you basically concluded

17     that as of that date -- we've concluded our work here except

18     for taking some depositions and preservation depositions.  I

19     mean, I really don't have strong feelings one way or other

15:16:45  20     about that.

21          MR. NORTH:  Your Honor, I think that makes perfect

22     sense.

23          THE COURT:  Okay, then we're going to go ahead and

24     put that in place.  We'll draft an order and enter it that

15:16:57  25     says the last day for any direct filing will be May 31st,

15:17:01  1   we'll notify the judicial panel that that is the last date to

2   transfer any cases, and that way we've got an end date to the

3   growth of the MDL.

4         On that point, I just raise this because I want you

15:17:15  5   to be aware of it, it may be an outlier.  We had a case filed

6   either today or Friday by a law firm in California, against

7   Bard based on one of the filters.  That was filed not in the

8   MDL but separately.  When Nancy called them to say was this a

9   mistake, the lawyer said, no, I don't want this in the MDL.  I

15:17:40 10   want this in front of you, but I don't want it in the MDL.

11         So we said no, that doesn't work.

12         But I don't know if that's going to be another issue

13   or if you've heard anything about it.  I didn't know if he was

14   confused about what all that meant.  We're just going to

15:17:58 15   transfer that case, and if we see any more of that we'll let

16   you know.

17         MR. LOPEZ:  Thank you.

18         THE COURT:  I want to talk about where we are in the

19   settlement talks just to confirm the dates that are coming up,

15:18:35 20   and then I want to talk about the SNF cases.

21         But you had something you wanted to raise,

22   Mr. O'Connor?

23         MR. O'CONNOR:  Yes.  Thank you, Your Honor.

24         And I was reminded by some members on our team, in

15:18:47 25   these trials we have introduced a complaint summary from the

15:18:52  1   complaint files that the defendant has.  I've been told that

2   they're late on supplementing and the last supplement

3   production date was July 1, 2016, and that went through

4   complaint files through December 20, 2015.

15:19:07  5            I raised it with them.

6            We think there's an ongoing duty to supplement.  I've

7   been told that they're going to look at that and get back to

8   us.  But I would ask that they supplement to the extent they

9   can immediately and if there's other issues they'll let us

15:19:22 10  know so, if necessary, we can get in front of you on that.

11            THE COURT:  Mr. North.

12            MR. NORTH:  Your Honor, we have pledged to look at

13  that.  But just so the record is clear, I believe I dispute

14  whether his contention that we were under some sort of duty to

15:19:35 15  supplement constantly these things -- we get new complaint

16  files created every day.  I believe Rule 26 indicates that the

17  duty of supplementation arises when the Court orders it or

18  when the response is incomplete or incorrect when made.  And

19  our response, I believe, was complete when made.

15:19:53 20            We did not update these before the Booker trial,

21  update these before the Jones trial, or update these before

22  the Hyde trial.  They've asked us to do it now.  We're

23  certainly willing to go look at it and we're already talking

24  with our office to see what's involved.  But I just wanted the

15:20:08 25  record clear we don't believe we've violated some duty here.

15:20:11  1        THE COURT:  Well, let's talk about it.  If there's an

        2   issue, you can raise it with me.

        3        MR. O'CONNOR:  Thank you.

        4        MR. NORTH:  Yes.

15:20:18  5        THE COURT:  Are there other matters, Plaintiffs'

        6   counsel, you want to raise?

        7        MR. O'CONNOR:  I'm sorry, Your Honor?

        8        THE COURT:  Do you have other issues you want to

        9   raise?

15:20:25 10        MR. LOPEZ:  No.

       11        MR. O'CONNOR:  None here.

       12        MR. NORTH:  None for the defendants, Your Honor.

       13        THE COURT:  Okay.  Let's talk about those other two

       14   topics I mentioned, then.

15:20:34 15        In Case Management Order 42, I adopted your

       16   recommendation of a procedure for tracking the settlement

       17   cases.  It calls for a joint memo to be submitted on July 1st

       18   that will tell me where the cases are and at that point we

       19   will send home the cases that aren't in one of the two

15:20:54 20   categories that were identified and put the other two on the

       21   schedule that I've laid out.

       22        I wanted to just find out if there's any issues that

       23   have come up, anything I ought to be aware of on that front as

       24   we move forward.

15:21:10 25        MR. LOPEZ:  I have nothing.

15:21:13  1            MR. NORTH:  Nothing for the defendants, Your Honor.

       2    We're proceeding in that fashion.  But I will report, just to

       3    give the Court an update, we have roughly at this point over

       4    1500 cases subject to a settlement agreement that -- intent

15:21:28  5    settlement agreement that's been signed and roughly another

       6    1900 cases that are tentatively resolved approaching a written

       7    agreement.  So we are making progress.

       8            THE COURT:  Okay.

       9            All right.

15:21:42 10            Let's talk, then, for a minute about the SNF cases.

      11            As you know, I had set in Case Management Order 42 a

      12    deadline of May 1st for the SNF cases to be organized into a

      13    steering committee and to designate lead counsel and move

      14    forward.

15:22:06 15            A couple of days ago Nancy exchanged e-mails and then

      16    had a conversation with Nicole Maldonado --

      17            MS. MALDONADO:  Present, Your Honor.

      18            THE COURT:  Ms. Maldonado, thank you for being here.

      19    Do you want to provide an update on where that effort stands.

15:22:27 20            MS. MALDONADO:  I do, Your Honor.  And thank you for

      21    allowing me to be here today.

      22            I actually am here two-fold.  I do have SNF cases in

      23    front of Your Honor.  I do have three.

      24            THE COURT:  Three?

15:22:40 25            MS. MALDONADO:  Three.  One is in the process of

15:22:42   1   being dismissed.  I also have retrievables, but I have 12.  So

2   I'm a very small group.

3        I'm from Los Angeles.  I did receive your CMO 41.

4   I've been conversing with Mr. Lopez, and both Mr. Lopez and I

15:22:58   5   have been trying to rally up the SNF attorneys to try to get

6   them to come forward and form this Plaintiffs' Steering

7   Committee.  And I do apologize, I would have appeared here in

8   March 18th for that hearing, but I guess there was some

9   miscommunication.  I misunderstood.  I thought it was going to

15:23:19  10   be reset.  So that's my apology, Your Honor.  I wasn't trying

11   to avoid the Court at all.

12        But because I do have the Simon Nitinol cases filed

13   in front of Your Honor, I'm very concerned about your CMO 42.

14   I do not want those cases to be dismissed, so I'm stepping

15:23:37  15   forward.  And right now there's actually only one other firm

16   that is willing to step forward with me to form a Plaintiffs'

17   Steering Committee and move these cases forward.

18        So I'm kind of at a loss.  I learned last week that

19   perhaps the reason why individuals are not stepping forward is

15:23:56  20   because they are tying their Simon Nitinol filter cases into

21   the retrievables and getting those settled or potentially

22   getting those settled.

23        So we originally started off with about three or four

24   firms interested.  We held conference calls, both myself and

15:24:15  25   Mr. Lopez.  We talked to -- I tried calling out to different

15:24:20  1   attorneys to see if they were interested, what their plans are

2   if these cases get dismissed.  But in the end, I'm left with

3   myself, which I only have potentially two going forward in

4   front of Your Honor, and then another firm out of Dallas,

15:24:37  5   Texas.

6        So I don't know what to do at this point.

7        I've talked to Mr. North, I said -- last week and I

8   said, you know what, I've heard that some people are trying to

9   settle these.  So originally when the SNF cases were formed

15:24:54  10  into this MDL, there was about 85.  Mr. North found out there

11  was 124 at one point and now it's down to about 52 because of

12  the settlement talks.

13       So I was originally planning to come here, Your

14  Honor, to say, you know what, maybe we should do a wait and

15:25:13  15  see for purposes of efficiency to see if more of the Simon

16  Nitinol cases settle before we start putting time, effort,

17  money, into discovery and forming steering committees and

18  moving forward to see if these cases actually do end up

19  settling over the next 45 to 60 days.

15:25:38  20       And then I know that Mr. North wants to push this

21  forward and go and start the discovery process on the Simon

22  Nitinols.

23       So now I'm at a loss and I'm kind of looking for the

24  Court's guidance.  I don't want the Court to dismiss our

15:25:53  25  cases.  I am appearing here today for all of the cases, as I

15:25:56   1   informed all of the attorneys that I'm coming today to talk

2   about it.  So I'm sort of stuck and asking for the Court's

3   guidance in where I go from here.

4            THE COURT:  Okay.  Thanks for that report.

15:26:10   5            Mr. North.

6            MR. NORTH:  Your Honor, we have been discussing this

7   matter with Ms. Maldonado and she's been very frank and we've

8   been trying to accommodate as we can.

9            I'm not dead set that we need to forge ahead with

15:26:22  10   these cases, but my concern has always been that we have a

11   sizable number of cases, and we still have at least 50-plus

12   cases, by my count, that are not subject to tentative

13   settlement agreements or are part of the cases being discussed

14   right now.  And I know this Court intends to start remanding

15:26:40  15   cases July 1.  My biggest fear is to have several dozen Simon

16   Nitinol cases remanded to transferor courts with no discovery

17   having been done and having to litigate each of those cases

18   from scratch in each jurisdiction.

19            I'm fine to wait.  We are.  But I don't want those

15:26:59  20   cases to be remanded if they're not settled because I think

21   that there needs to be basic discovery done in a consolidated

22   procedure to get the benefit of an MDL.

23            MS. MALDONADO:  Your Honor, I do agree with that.

24   The problem is with one firm, and perhaps two, and actually

15:27:19  25   the second firm that's out of Dallas, Texas, who has been with

15:27:22   1    me all along, they are actually contemplating settling their

2    Simon Nitinol filter cases.  So I have tried and tried and

3    tried.  I've held several conference calls.  I just don't know

4    how to proceed with just me.  And so I'm at a loss.

15:27:41   5        I can advise the Court that I think maybe we can take

6    the next couple of weeks, I can tell the Court that I

7    appeared -- I can tell -- I'm sorry.  I can tell the other

8    attorneys that I've appeared and the judge is mandating either

9    you let us know if you are considering your case for

15:28:01  10    settlement or actually are you going to refer your case to

11    somebody else or do you plan on staying in this litigation,

12    and then come back in front of Your Honor.  I know there's

13    trial set on May 13th, but try to get some more information

14    from these plaintiffs' attorneys on where they are with their

15:28:18  15    Simon Nitinol filter cases.

16        THE COURT:  Mr. North, is it correct that some of

17    these settlements are including SNF cases?

18        MR. NORTH:  Yes, Your Honor.  I'm not sure much money

19    is being paid, to be frank with you, on those cases, but we

15:28:36  20    are settling with some attorneys their entire inventory.  If

21    those include SNF cases, they're bundled up in some fashion in

22    the settlement.

23        THE COURT:  So I take it from that that the number of

24    50 or however many are remaining might decrease further

15:28:51  25    through settlement?

15:28:52  1          MR. NORTH:  Yes, that's quite possible, Your Honor.

2          THE COURT:  Mr. Lopez, do you have thoughts on this

3      issue?

4          MR. LOPEZ:  Well, only that I'm not sure the remand

15:28:59  5      would include the SNFs.  I thought that was kind of a new MDL.

6      I think that that -- I think it makes sense to wait, Your

7      Honor, to see what's left.  It could be that's not enough

8      cases even to have an MDL.  I know the defense are the ones

9      that moved for it, but long before we got here we had more

15:29:21 10      cases than that around the country and we just formed up a

11      private litigation group and we got together on our own, those

12      that were serious about litigating the case.

13          But the case is here.  Unless the defense --

14          (Brief interruption by voice on phone.)

15:29:36 15          MR. LOPEZ:  I think it makes sense to be here even if

16      it's only 30, 35 cases just so people can pool resources.  But

17      I understand Ms. Maldonado's frustration.  She's stepped up

18      early, she's tried to take the reigns, has tried to organize.

19      I've been on some of those calls.  And she's gotten one other

15:29:53 20      attorney to agree to assist her in a leadership role.

21          MS. MALDONADO:  Perhaps, Your Honor, if I may

22      suggest -- I do apologize.

23          THE COURT:  Come up to the mic, would you.

24          MS. MALDONADO:  I'm sorry.  Maybe over the next

15:30:05 25      couple of weeks I can try -- I did send out an e-mail on

15:30:09  1   Friday asking all of the attorneys who have these cases if

        2   they could give me two bullet points of the injuries that are

        3   involved and where they are with their case.  Perhaps I can

        4   follow up on that and try to gather that information for

15:30:26  5   defense, as well as for the Court, and we can actually see why

        6   these people, number one, are not stepping forward, and,

        7   number two, is it because they're not interested in pursuing

        8   this case or are they going to try settle their case.  And try

        9   to get some more information before the Court makes a ruling

15:30:44 10   on what to do at this point.

       11         THE COURT:  Well, I appreciate you being here,

       12   Ms. Maldonado, and your efforts to organize this.

       13         I understand defendants' desire to do discovery once

       14   on the SNF cases, if it happens.

15:31:13 15         On the other hand, if we've got 50 or 40 or 30 cases,

       16   that certainly couldn't be run like a traditional MDL.

       17         I think the fact that the number is perhaps going to

       18   decrease through additional settlements suggests that we

       19   should wait before dismissing the cases, see what happens in

15:31:37 20   the settlement and how many cases remain and then decide do we

       21   keep them here in a sort of second mini MDL?  Do we remand

       22   them?  Recognizing there could be reorganization among counsel

       23   even after they're remanded to limit discovery.  But it's a

       24   moving target right now.

15:32:01 25         So I think what I'm going to do on this,

15:32:04   1    Ms. Maldonado, I won't dismiss the cases at this point.

       2    You've stepped up and it's clear you're paying attention to

       3    them.  I think it would be helpful for you to collect what

       4    information you can, as you suggested, about the nature of the

15:32:17   5    cases.

       6           We're going to have a report filed on July 1st as to

       7    where the rest of the MDL is on settlement.  Maybe what we

       8    should do is get a report at the same time from you,

       9    Ms. Maldonado, on what of the SNF cases remain unsettled as of

15:32:36  10    July 1st, and we can then decide do we -- if it's a really

      11    small number, I assume we can remand them and they can be

      12    taken care of outside of the MDL.  If there's still 30, 40

      13    case, we'll get you back here and talk about whether we keep

      14    it here as an MDL that follows this one to get discovery done

15:32:57  15    or whether there's some other solution.  But I don't think we

      16    will know until July 1st what the size of that final SNF

      17    number is.

      18           So we'll say in the order after today we'll request

      19    another report by then.  We won't dismiss them at this point.

15:33:12  20    If you could gather that additional information so you can

      21    tell me on July 1st what you know about the universe of SNF

      22    cases that remain.  Then we'll have more information to decide

      23    what to do.

      24           MS. MALDONADO:  I will, Your Honor.  Thank you very

15:33:26  25    much.  Appreciate that.

15:33:28   1                THE COURT:  Okay.

           2                Anything else on the SNF cases?

           3                MR. NORTH:  Nothing, Your Honor.

           4                THE COURT:  Okay.

15:33:49   5                What else do we need to discuss today, if anything?

           6           MR. LOPEZ:  Nothing from the plaintiffs at this time,

           7      Your Honor.

           8                MR. NORTH:  Nothing from the defendants, Your Honor.

           9                THE COURT:  Okay.  We will plan to see you, then, at

15:34:03  10      8:30 on Monday, May 13th, and we'll get this trial done.

          11      Thank you all.

          12           (End of transcript.)

          13                                *  *  *  *  *

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                        **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 2nd day of May, 2019.

15

16

17

18

19                         s/ Patricia Lyons, RMR, CRR
                           Official Court Reporter
20

21

22

23

24

25