Ramon Rossi Lopez - rlopez@lopezmchugh.com
(California Bar Number 86361; admitted *pro hac vice*)
Lopez McHugh LLP
100 Bayview Circle, Suite 5600
Newport Beach, California 92660
949-812-5771

Mark S. O'Connor (011029) – mark.oconnor@beusgilbert.com
Beus & Gilbert PLLC
701 N. 44th Street
Phoenix, Arizona 85008
480-429-3019

*Co-Lead/Liaison Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| In Re Bard IVC Filters Products Liability Litigation | No. MD-15-02641-PHX-DGC |
| This Document Relates to All Actions | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO AMEND CASE MANAGEMENT ORDER NO. 6** |
| | (Assigned to the Honorable David G. Campbell) |

The Plaintiffs Steering Committee ("PSC") submits this reply in support of its motion to amend Case Management Order No. 6 to provide for an increase in common benefit fee and assessment percentages (Dkt. No. 10442). Attorneys from three firms, Matthews & Associates and Freese & Goss (Dkt. No. 17367) ("Matthews submission"), and Marc J. Bern & Partners (Dkt. No. 17404) ("Bern submission") (collectively "Objecting Attorneys") submitted objections to the request, and Bard also objected (Dkt. No. 17387). A number of other attorneys filed notices of joinder with the Matthews submission.

**I.      Introduction**

Neither the Objecting Attorneys nor Bard address the issue at the center of the

1720247.2

PSC's request to increase the holdback percentages: whether it is appropriate to adjust those percentages so that the work that numerous attorneys have done to push the MDL to its conclusion will be reasonably compensated.  That work has put the Objecting Attorneys, having done little or no common benefit, in a position to settle large numbers of cases.  Rather than address that question, the objections to the PSC's request are largely based on speculation that increased holdback percentages will hinder settlement of individual cases, because the *lawyers* in those cases may end up receiving a smaller net fee than originally contemplated.  But that speculation is entirely misplaced. Their *clients*, whose interests are barely mentioned in any of the Objecting Attorneys' submissions would still receive their contracted-for share of any recovery.

The submissions from the Objecting Attorneys and Bard obscure the basic and well-established equitable principles that underlie the common benefit doctrine and that guide the Court's determination of the PSC's request.  In recently approving a 19.5 percent total holdback in a recent MDL, Judge Kennelly reiterated the "purpose of a common fund: to ensure that attorneys who perform work that benefits all plaintiffs are compensated and that other attorneys cannot free ride." *In re: Testosterone Replacement Therapy Prods. Liab. Litig.*, 1:14-cv-01748 (N.D. Ill.), Dkt. No. 1478 (Oct. 15, 2018), at 10-11 (attached as Exhibit A).[1]  Neither the Objecting Attorneys nor Bard squarely address the relevant inquiry, as Judge Kennelly correctly frames it: ensuring that the attorneys who have created benefits for all plaintiffs are compensated and that others do not free ride.  That concern is especially acute here, where Bard chose to settle first with attorneys who have done little or no common benefit work or trial preparation, yet have benefited from the work of those lawyers who gave their time and expertise to develop the

---

[1] *See also In re Genetically Modified Rice Litig.*, 835 F.3d 822, 830 (8th Cir. 2016) ("The equitable common-benefit doctrine permits a district court to redistribute costs among plaintiffs when the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.") (internal quotation and citation omitted).

2

1720247.2

work product for all cases subject to the MDL.

II.     **Argument**

    A.     **The Requested Increase Is Reasonable, Necessary, and Made Necessary By the Actions of Bard and the Objecting Attorneys.**

Consistent with Section VI of CMO No. 6, this Court has been receiving reports of the time spent on common benefit work by various plaintiffs' counsel, as well as costs expended on this litigation, and so is aware of those outlays of time and money. Out-of-pocket costs, as the PSC's motion explained, already exceed $6 million,[2] and the collective lodestar reflects tens of thousands of hours of work.[3] If the Court requires a more detailed breakdown of how the PSC has spent its time and money and how it plans to do so in the future (both of which implicate work-product concerns if filed on the public docket), the PSC will be glad to provide it.[4] While PSC members were and are ready for protracted and expensive litigation, including multiple bellwether trials, it eventually became apparent that the initial assessment percentages, which were necessarily based on estimates of future time and costs, would likely not be sufficient to compensate plaintiffs' attorneys for the common benefit work performed to date and to come. The PSC's assessment of that disparity is based not only on time and out-of-pocket costs to date, but also on what the PSC anticipates spending in the future, as the Court prepares to remand a large number of unresolved cases after the final bellwether trial. It is also based on a recently formed settlement landscape that has largely been dictated by

---

[2] Bard speculates, baselessly, that those costs include television advertising. Dkt. No. 17387, at 3 n.3. Not one dollar of any marketing efforts is included in common benefit costs, and if a firm did attempt to submit such costs, predictably they would not be reimbursable according to the Court's Order.

[3] It bears noting that Mr. Matthews, before filing his objection here, signed a brief asking for precisely the same increase in holdback percentages in the Cook IVC Filter MDL, with exactly the same level of detail supporting the request. Indeed, that brief uses verbatim language and case citations from the PSC's motion, indicating a willingness to benefit from the PSC's help not only in this litigation. *See* Exh. B.

[4] This is the procedure recently followed in the Pinnacle Hip Implants MDL, where Judge Kinkeade approved a 25percent total holdback as the defendant began settling substantial numbers of cases at values unknown to the plaintiffs' leadership. *See* Exh. C, at 7.

3

Bard in conjunction with the Objecting Attorneys.

At some point during the MDL, Bard elected to enter into settlement negotiations with the Objecting Attorneys. Those attorneys are at an informational disadvantage, as they are not part of the PSC, have generally not contributed common benefit work, and thus are less familiar with the key issues in the litigation. The PSC does not have visibility into the value of those settlements, and does not know if settlement negotiations have resulted in discounted values to such an extent that they will result in a substantial diminution of common benefit fees available to compensate the attorneys who have prosecuted this litigation and made it possible for the Objecting Attorneys to resolve their cases. As Bard and the Objecting Attorneys drive settlement values down, and as the PSC and other attorneys continue to spend large amounts of time and money on this litigation, increases in holdback percentages become necessary to preserve the possibility that the lawyers doing common benefit work can be compensated, and to prevent shortfalls in the future with later-settling cases or cases tried to verdict.

Contrary to the objectors' contentions, there is nothing unusual about the adjustment that the PSC seeks; it reflects the realities of a constantly changing litigation and settlement landscape. As a 2014 paper from Duke Law School's Center for Judicial Studies, titled "Standards and Best Practices for Large and Mass-Tort MDLs," explained, "Typically, the transferee judge creates the architecture for the [common benefit fund] at the outset of litigation, but it will usually remain unfunded until much later in the litigation process, when cases are resolved through trial or settlement. This means that the court usually will defer setting the precise percentage of settlement proceeds that will fund the [common benefit fund] until the MDL is resolved or settled when the value of the common benefit work is known."[5]

The PSC's request is based on the posture of this MDL now – the work completed

---

[5] https://judicialstudies.duke.edu/wp-content/uploads/2018/03/Common-Benefit-Fund-MDL-Standard-5-from-Standards-and-Best-Practices-for-Large-and-Mass-Tort-MDLs-Dec.-2014.pdf, at 68.

4

1720247.2

to date,[6] anticipated work remaining, and anticipated settlement values that will determine the common benefit funds ultimately available. It is not a request for an immediate award of fees at any particular percentage. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 266 (E.D.N.Y. 2006) ("The common benefit fund set-aside is a holdback, not a levy."). The Court will still assess the amount and value of the claimed common benefit work before approving any distributions; the PSC does not seek to amend the portion of CMO No. 6 that provides that the Court retains ultimate authority to approve common benefit fees. *See* CMO No. 6 (Dkt. No. 372) § V. In the *Testosterone* litigation, Judge Kennelly, in approving the 19.5 percent total holdback, emphasized that a holdback does not guarantee payment to the attorneys who performed the common benefit work: "The Court will carefully review time and expense records before disbursing funds to ensure that any disbursements are consistent with these principles." Exh. A, at 11. The same process will apply here.

### B. The Objecting Attorneys' Reliance Arguments Fail.

In arguing that the PSC's request would harm settlement efforts, the Objecting Attorneys engage in misdirection. Their submissions refer to effects on clients and plaintiffs, when they mean "lawyers."

The PSC's request for increased holdback percentages does nothing to interfere with the contracts between individual attorneys and their clients. It does not change what individual plaintiffs would receive in any settlement they reach with Bard, including what they would pay their attorneys, because the assessments are drawn from fees otherwise owed to individual plaintiffs' attorneys. Despite this, both submissions from the Objecting Attorneys assert that the requested assessments are "unfair when applied" to certain plaintiffs in the middle of the settlement process (Matthews submission, at 2), or that it will "drastically and negatively impact all plaintiffs with cases pending in this

---

[6] Work product being used in this MDL originated as early as 2012, with the first corporate representative testifying on Bard's behalf under Rule 30(b)(6) regarding post-market surveillance in March of 2013 (Chad Modra).

5

1720247.2

MDL," including objecting attorneys' clients. Bern submission, at 2. But the assessments are not applied to any plaintiff directly; they are applied to attorneys' fees. Both submissions from the Objecting Attorneys elide this basic fact.

The Objecting Attorneys assert that they have reliance interests in the original assessment percentages, because they entered into settlement negotiations based on them. But that argument could apply at any time throughout the litigation. Bard could start negotiating with some group of attorneys at any time during the litigation; and indeed, it appears to have started that process long ago, as it is now in a position to settle, according to the Matthews submission, 1,985 cases.

### C. Bard's Objection is Not Well-Taken.

Bard has also submitted an objection to the holdback adjustments, but it is not clear why.

As an initial matter, it should not matter to Bard how attorneys' fees on plaintiffs' recoveries are allocated. *See, e.g., In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 05-md-1708, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008) ("Defense counsel are generally disinterested in how the Settlement Fund is divided up or the manner in which contingency fees affects individual Plaintiff's recoveries."); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 819-20 (3d Cir. 1995) ("[T]his court has recognized that a defendant is interested only in disposing of the total claim asserted against it; ... the allocation between the class payment and the attorneys' fees is of little or no interest to the defense.") (internal quotation and citation omitted).

Like the Objecting Attorneys, Bard's objection is similarly based on speculation that the increase in the holdback percentages will impede ongoing settlement negotiations. But Bard, also like the Objecting Attorneys, does not explain why this should be the case. A case's value is a case's value. Also like the Objecting Attorneys' submission, Bard's objection leaves the impression that the increased assessment percentages will somehow affect *plaintiffs*, rather than (potentially, subject to the Court's approval) their lawyers' net

6

fees. What Bard offers in settlement should not change based on whether the plaintiff's attorney's net fee is slightly less than it otherwise would have been.

Bard concludes its objection by imputing motives to the PSC's request, asserting that "the clear signal" is that settlement efforts must pass through the PSC[7]. Dkt. No. 17387, at 6. This is incorrect, but to the extent that Bard complains of obstacles to settlement, it describes a problem of its own making. It is Bard's prerogative to negotiate with whomever it wishes, and in the order that it wishes, but the non-transparent way it has approached settlement has imposed costs on all parties and increased the length of this MDL. Bard is not required to negotiate with the PSC first (or at all), but by negotiating with the Objecting Attorneys first, Bard has created an information asymmetry, and created a situation in tension not only with CMO No. 6, which recognizes that there is a group of lawyers who are working, within the bounds of the orders entered in this MDL, on behalf of all plaintiffs, and should be reasonably compensated at the appropriate time, but with the structure that this Court put in place at the outset of this MDL. *See Casey v. Denton*, 17-cv-521, 2018 WL 4205153, at *5 (S.D. Ill. Sept. 4, 2018) (holding, after global settlement in an MDL, that while "lead and liaison counsel do not owe a fiduciary duty to each and every MDL plaintiff in the traditional sense… [they] should put the common and collective interests of all plaintiffs first while they carry out their enumerated functions"). The PSC's request is a reasonable response to Bard's decision to negotiate with selected, non-PSC firms.

### III. Conclusion

For these reasons, the PSC respectfully requests that the Court modify CMO No. 6 to reflect the requested increases in holdback percentages.

---

[7] On the contrary, Bard has done nothing to effectuate a settlement through the PSC as a whole or via the smaller management committee, the PEC (Plaintiffs' Executive Committee), with whom Bard has met twice since November 2018.

7

1720247.2

RESPECTFULLY SUBMITTED this 10th day of May, 2019.

BEUS GILBERT PLLC

By: */s/ Mark S. O'Connor*
Mark S. O'Connor
701 N. 44th Street
Phoenix, Arizona 85008

LOPEZ McHUGH LLP
Ramon Rossi Lopez (CA Bar No. 86361)
(admitted *pro hac vice*)
100 Bayview Circle, Suite 5600
Newport Beach, California 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing.

*/s/ Jessica Gallentine*

1720247.2