1          UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF ARIZONA

3          _____

4

5   **In Re: Bard IVC Filters**          ) MD-15-02641-PHX-DGC
    **Products Liability Litigation**    )
6                                        ) Phoenix, Arizona
                                         ) **May 29, 2019**
7   _____)

8

9

10

11      BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                  <u>MOTION HEARING</u>

14

15

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RMR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Ste. 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24

     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared with Computer-Aided Transcription

1                          **A P P E A R A N C E S**

2       For the Plaintiffs:

3               Lopez McHugh
                By: **RAMON ROSSI LOPEZ**, ESQ.
4               100 Bayview Circle, Suite 5600
                Newport Beach, CA  92660
5
                Lieff Cabraser Heimann & Bernstein, LLP
6               By: **DANIEL SELTZ**, ESQ.
                250 Hudson St., 8th Fl.
7               New York, NY  10013

8               Beus Gilbert, PLLC
                By: **MARK S. O'CONNOR**, ESQ. (telephonically)
9               701 N. 44th St.
                Phoenix, AZ  85008
10
                Freese & Goss, PLLC
11              By: **TIM GOSS**, ESQ.  (telephonically)
                3500 Maple Ave., Ste. 1100
12              Dallas, TX  75219

13              Bern Cappelli.
                By:  **JOSEPH J. CAPPELLI**, ESQ.  (telephonically)
14              101 W. Elm St., Ste. 215
                Conshohocken, PA  19428
15
                Marc J. Bern & Associates, LLP
16              By:  **MARC J. BERN**, ESQ.  (telephonically)
                60 E. 42nd St., Ste. 950
17              New York, NY  10165

18              Heaviside Reed Zaic
                By: **JULIA REED ZAIC**, ESQ.  (telephonically)
19              312 Broadway, Ste. 203
                Laguna Beach, CA  92651
20

21      For Defendants:

22              Nelson Mullins Riley & Scarborough
                By: **RICHARD B. NORTH, JR.**, ESQ.
23              By: **MATTHEW B. LERNER**, ESQ.
                201 17th Street NW, Suite 1700
24              Atlanta, GA  30363

25

**P R O C E E D I N G S**

10:01:31  1

2

3        THE COURTROOM DEPUTY:  This is MDL case number

4  15-2641 regarding Bard IVC Filters Products Liability

13:00:38  5  Litigation on for motion hearing.

6        Counsel, please announce for the record.

7        MR. LOPEZ:  Good afternoon.  Ramon Lopez on behalf of

8  the Plaintiffs' Leadership Council.

9        MR. SELTZ:  Good afternoon.  Daniel Seltz --

13:00:52  10        THE COURT:  Pull the mic up, would you, please.

11        MR. SELTZ:  Daniel Seltz from Lieff Cabraser for the

12  plaintiffs.

13        THE COURT:  Good afternoon.

14        MR. NORTH:  Good afternoon.  Richard North and

13:01:02  15  Matthew Lerner for the defendants.

16        THE COURT:  Good afternoon.

17        I know we have some folks on the phone as well.

18  Let's just have people who wish to say something during this

19  hearing who are on the phone identify themselves.

13:01:16  20        MR. GOSS:  Your Honor, Tim Goss for the plaintiffs.

21        MR. CAPPELLI:  Your Honor, Joseph Cappelli for the

22  plaintiffs.

23        MR. BERN:  Your Honor, Marc Bern for the plaintiffs.

24        MR. O'CONNOR:  Your Honor, Mark O'Connor.  I'm

13:01:34  25  appearing telephonically today.

13:01:36  1           THE COURT:  Okay.

2           All right.  We have a motion that was filed by the

3    Plaintiffs' Steering Committee back on April 12th which

4    sought to establish the two funds called for in Case

13:01:55  5    Management Order Number 6 and also sought an increase in the

6    amount of the assessment to be made when settlements occur in

7    this case.  The request is to increase the assessment from

8    8 percent to a total of 14 percent.  What that would comprise

9    would be an increase from 6 percent to 9 percent as an

13:02:21 10    assessment for common benefit attorneys' fees and an increase

11    from 2 percent to 5 percent for common benefit costs.

12           I've reviewed the motion, the responses filed by

13    Bard, by the Bern firm, by the Freese and Matthews firms.

14    There's been lots of joinders as well.  And then the reply

13:02:56 15    filed by the plaintiffs.  And I went back and reread Case

16    Management Order Number 6.

17           I think what we ought to do now that this briefing

18    is done is give Plaintiffs' Steering Committee an opportunity

19    to address any additional matters they would like.  I'll then

13:03:10 20    be happy to hear comments from Bard if they wish to make

21    them, but also from the folks on the phone who wish to say

22    something about this issue, particularly it looks like

23    Mr. Goss, Mr. Cappelli, and Mr. Bern would like to do that.

24           Mr. Lopez, let's start with you, please.

13:03:31 25           And if you would, pull both mics in so the folks on

13:03:35  1    the phone can hear you.

       2           MR. LOPEZ:  So just so the Court -- I've been on all

       3    different sides of this issue.  I understand it's one where,

       4    depending on where your perspective is, you look at it

13:03:49  5    differently.  I mean, I've been objected, I've been in the

       6    middle, and I've been on committees where we thought the

       7    original assessment was not high enough.  So --

       8           So the Court knows the genesis of this, part of our

       9    duties as lead counsel or co-lead counsel in this case as an

13:04:10  10   executive committee, if the Court will recall we had an

      11    executive committee that was formed about a year and a half

      12    ago or so, and those members and I discussed frequently

      13    various administrative things, including things like this.

      14           And it's obviously part of our function is to look

13:04:35  15   at issues like this type of benefit holdback.  And, again,

      16    we're not asking the Court to make an assessment today.

      17           THE COURT:  Hold on just a minute, Mr. Lopez.

      18           Somebody on the phone is making a fair bit of noise.

      19    If you all could either mute your phones until you want to

13:04:53  20   speak or just be a little quieter, that would help us.  We're

      21    hearing that in the courtroom.

      22           Go ahead, Mr. Lopez.

      23           MR. LOPEZ:  So when we looked at where we were about

      24    two or three months ago and we -- since that time we've -- and

13:05:08  25   before we filed this, we kind of looked at where we thought

13:05:12   1   this case might be going and whether or not we had more work

2   ahead of us and we -- and looking at the lodestar hours to

3   date and whether or not based on all of that we -- whether or

4   not -- what was currently the holdback was equitable and fair

13:05:31   5   for not only the work that had been done, but for the work

6   that we kind of foresee into the future.

7            And I'll go through those in a bit.

8            This is not about, you know, unjustly enriching

9   anybody.  This is looking at what a good number of us have

13:05:49   10   done over the last three and a half, going on four years.  In

11   some instances some of us were two or three years before this

12   MDL to get to us where we are now.  And we just feel that in

13   looking at what some of the recent upward assessments -- not

14   assessments, but holdbacks in simpler cases, that it was

13:06:15   15   appropriate for us to make that request of the Court at this

16   time.

17            The first thing I want to address, and I'll get

18   into -- I know there's a lot of things about what's happened

19   in other cases.  Of course, we cited cases we think are more

13:06:32   20   similar to this one, where the assessment or holdback was

21   actually significantly higher than what we're asking for

22   here.  But it's fairly consistent when you read cases, when

23   you read best practices, law review articles, and things like

24   that, that whatever the holdback ultimately is, or even the

13:06:54   25   assessment, should be tailored to the realities of the

13:06:58   1    particular case as being superior to any other means of

2    determining a reasonable fee for common benefit counsel.  And

3    that's why we're here, I think, is to show the Court what

4    some of those realities are in this case.

13:07:13   5          I'm a bit taken aback about the fact that the

6    defendants think that they have standing to even file an

7    objection.  I'm going to object to the fact that they

8    shouldn't have standing to file an objection to our request

9    because none of what they state in their papers has anything

13:07:31 10    to do with what would be a fair and equitable common benefit

11    fee or holdback in this case.

12          I mean, certainly I wouldn't be in here suggesting

13    to the Court that because of the fees that defense counsel

14    are making in defending these cases that somehow that is a

13:07:55 15    detriment to settlement.  I wouldn't make that accusation.  I

16    don't think that is true and I have no basis of doing so.

17    But that's essentially what they're doing in opposing what

18    we're trying to have the Court do for us today.

19          For them to suggest that somehow or other applying

13:08:13 20    these equitable principles will somehow get in the way of

21    settlement, I've seen no proof of that.  I mean, I know

22    objecting counsel have suggested that.

23          Again, I don't know that that's even one of the

24    principles, the equitable principles that should be applied

13:08:29 25    in determining what the holdback should be in this case.

13:08:32   1          It could be, Your Honor, two years from now those

2   lawyers that may have settled cases, now they come in and

3   say, You know, Judge, all this stuff that happened

4   afterwards, we didn't benefit from this increase, it did not

13:08:46   5   benefit our clients in any way and -- paying the extra

6   3 percent that we're asking to you hold back.

7          It could be that when we get here you say, you know

8   what, I was right the first time when I said 6 percent.  But

9   don't know.  There are too many unknowns right now about all

13:09:06  10   that.  You haven't had an opportunity to really look at the

11   work that's been done as far as the contribution by the

12   various lawyers and what we have ahead of us.

13          One of the things that you'll see in some of the

14   papers we filed, Judge Kincaid and Judge Kennelly both

13:09:26  15   mentioned the fact they don't know anything about the

16   settlements that have happened in those cases to determine

17   whether or not the current holdback would be sufficient based

18   on the settlements that have happened to have time to

19   sufficiently compensate the lawyers that have done the common

13:09:46  20   benefit work.

21          Likewise, we didn't know.  The Plaintiffs' Executive

22   Committee and no one that I know of on the Plaintiffs'

23   Leadership Committee other than I think two or three of the

24   firms that have objected, have any idea what the settlement

13:10:01  25   program is with Mr. Goss' firm, Mr. Matthews' firm, and the

13:10:07  1   defendants.  No idea.

2          I don't know whether or not -- I'm hearing things,

3   and based on probably things that I'm hearing, I -- we better

4   be well prepared to deal with a large number of remands is

13:10:22  5   basically where I think we are.  And if that happens, the

6   work that our PLC, the PEC, and others who decide to continue

7   to do this work is fairly vast, and I'll get into those

8   details in a minute.

9          But I think as Judge Kincaid and Judge Kennelly

13:10:43  10  rightfully pointed out, how can the Court determine whether

11  or not the assessment on settlements would adequately

12  compensate the lawyers for the work they've done even thus

13  far?  We don't know.  We don't know whether or not the amount

14  of the settlements that have -- and by the way, those

13:10:59  15  settlements were entered into by lawyers who are not part of

16  our common benefit group, not part of the Leadership Council

17  that's authorized to do work in this case.

18         And it's worth pointing out one of the lawyers in

19  the settlement group, Mr. Matthews, is one of the lead

13:11:18  20  counsel in the Cook litigation, who the same day that we

21  filed our papers to increase our percentage of holdback from

22  6 to 9 percent and our costs from 2 to 5 percent, basically

23  filed our papers in the Cook MDL for the same type of

24  increase in the assessment or in the holdback.

13:11:39  25         There's a lot of similarities there, there are a lot

13:11:42   1    of common things there.  There's one thing that we got

2    engaged in in this case that I'm not sure that they -- I'm

3    not even sure but I -- but the Court will recall that the

4    preemption part of this case, the briefing, the extra

13:11:57   5    hearings we had, the depositions that were taken, the access

6    and supplementation of expert reports were not something we

7    anticipated at the beginning.  I don't know how many hours

8    that was but I know that that is something that is going to

9    continue.

13:12:14  10            I know that the defendants are bent on seeing this

11    thing through the Ninth Circuit.  We've hired

12    David Frederick's firm in Texas, who is probably the best

13    known appellate lawyer and appellate firm that handles

14    preemption cases on behalf of plaintiffs in these cases, and

13:12:37  15    he doesn't come at a cheap expense, his hourly rate we're

16    paying, and that's being funded by our PLC and we've got

17    members of our PLC that are working with that firm on that

18    appeal, as well as others.

19            That is headed to the Supreme Court.

13:12:54  20            That's something that we didn't anticipate in the

21    beginning.

22            We didn't -- nor did we anticipate that a non-PLC

23    firm a year ago would start the process of developing a

24    settlement program that we knew nothing about, that that

13:13:12  25    firm -- those firms are now going around the country bringing

13:13:16  1    other law firms into whatever this settlement program is.

2         Again, I have no idea what that program is.  I don't

3    know whether or not we're going to be dealing with -- I'm

4    hearing there could be a number of opt-outs from those

13:13:30  5    settlements.  I'm hearing the settlements could go on for

6    another one to three years before they're finalized.

7         In the meantime, what happens to the cases where

8    releases aren't presented or where the cases aren't

9    dismissed?  Those are going to become part of your remand

13:13:47 10    order and those are going to be out in the system, and even

11    those lawyers that are part of that settlement, I assume

12    they're going to continue to represent those individuals and

13    individual cases that have to be tried in the transferor

14    courts.

13:14:05 15         Again, I think that the focus -- and when you read

16    the manual, you read cases, you read law review articles and

17    some best practices articles, your decision should be based

18    on the posture of this MDL now.  And if we were at a point

19    where we knew what the settlements were, if we knew that

13:14:29 20    there weren't going to be hundreds, if not thousands, of

21    remands, which there may be, or we knew what values were

22    being paid to 2,000, 3,000 -- there may be 4,000 involved in

23    that other settlement that added up to a certain number at

24    the current assessment, and that that would sufficiently

13:14:54 25    provide equitable and fair compensation to those of us that

13:14:59   1    have not only done common benefit work but will continue to

           2    do so, then we'll be able to address that.  But we can't do

           3    that here.

           4         I think that's what struck Judge Kincaid and

13:15:09   5    Judge Kennelly in their increases in the holdback, because

           6    they really didn't know.  In both instances, there were

           7    settlements in cases where that wasn't shared.

           8         Interestingly, one of the objectors, I can't

           9    remember whether it was the testosterone case or the DePuy

13:15:28  10    hip case, was objecting because he or she didn't know what

          11    the PLC in that case had settled cases for, what kind of PLC

          12    program was in place, so that they can determine as an

          13    objector to the increase whether or not the settlements were

          14    at a certain level where a certain percentage would, you

13:15:48  15    know, justly and fairly compensate the common benefit

          16    lawyers.

          17         We have just the opposite here, we have -- which is

          18    highly unusual.  We have non-PLC lawyers that have

          19    established a settlement program and apparently some kind of

13:16:04  20    a matrix or something -- I have no details, literally none --

          21    whether or not if that is the program that gets applied

          22    across every case or every firm's group of cases to be

          23    settled, whether or not that percentage is going to equal a

          24    lodestar that is fine for fair and equitable or whether or

13:16:33  25    not it's a lodestar that is woefully inadequate.

13:16:36   1            But that is something you can determine, Your Honor,

           2   a year or two from now when we know what is in that fund and

           3   what's been assessed.

           4            Again, the number of remands, I think -- I don't

13:16:46   5   know.  I can just tell you that it appears that there could

           6   be thousands of remands.  And -- I'll get to that in a

           7   second -- and what that means insofar as the continuing work

           8   that we may have to do as a Leadership Council or a PEC or a

           9   PSC, whatever you want to call us.

13:17:11  10            I will add that in many of these cases, like the

          11   DePuy case, we're talking about one product.

          12            Here, we have seven different devices.

          13            I just had a meeting yesterday with lawyers who are

          14   getting a case prepared in this litigation because they

13:17:29  15   wanted to know, you know, what was our trial package, what

          16   was -- what our advice was for that case.  If it -- it

          17   involved a product that -- the way that case should be

          18   prepared and tried is unique to -- not only to that device,

          19   but to when that person got the device, when that client,

13:17:52  20   when that plaintiff got that device.

          21            So a lot of this -- you know, it's not a

          22   one-size-fits-all trial package they're putting together.

          23   There are going to be, you know, various buckets of different

          24   types of evidence that are going to come in.  Even in the G2

13:18:08  25   case that's been on the market for six years, you know, the

13:18:11   1   way the warnings have changed, the way the literature

2   changed, the way the FDA's involvement changed.  Those all

3   changed.

4          So these trial packages are going to be something

13:18:21   5   that -- we've made a lot of progress but we know that that's

6   going to require ongoing work by our PLC.

7          We've already talked, Your Honor, last time we were

8   here, I think, about the expert preservation depositions that

9   have to be taken.  That -- I mean, even if there are only

13:18:41  10   hundreds of remands, that's something I think both sides

11   agree we'd have to do.

12          I also think that there are going to be a number of

13   corporate witness preservation depositions.  These cases are

14   not going to be, for the most part, tried in Arizona.  A lot

13:18:57  15   of the people we saw live here are not going to appear live

16   in other jurisdictions, other states.

17          Some of these depositions that have been played are

18   stale.  Some of them are dated 2010, '11, '12, '13, '14.  Key

19   deposition been played in every trial.  And there's been a

13:19:19  20   lot of things that have changed with respect to -- I mean,

21   just the evidence in the case, the FDA's involvement in the

22   case, the 510(k) process, the medical literature, the amount

23   of complaints that have come out, and frankly, the market.

24   There are some of these devices that are no longer even being

13:19:35  25   marketed in other countries, they've been disallowed to be

13:19:38  1    marketed.   Those types of things.

2             There's probably good cause for some litigant to go

3        to his or her judge in a federal court to say, Judge, this

4        deposition was taken in 2013 of the medical director and

13:19:49  5    there's been a number of things that have changed between now

6        and then, and we think that we should be able to take at

7        least an updated deposition of that individual.

8             THE COURT:  Let me ask you a question on that,

9        Mr. Lopez.  Assuming that happens by some litigant in some

13:20:05 10    court somewhere, why does the taking of that deposition become

11       a common-benefit expense?

12            MR. LOPEZ:  Well, because the issue is whether or

13       not -- I mean, that's a whole 'nother -- one of the things I

14       read in preparing for today is your ongoing communication with

13:20:29 15    transferor courts when they're faced with things like that.

16       And maybe you're faced with it from four or five different

17       judges where they're getting the same requests for the

18       deposition.

19            And the question is whether or not, as part of this

13:20:45 20    process, this MDL process that's supposed to resolve those

21       sorts of things and not really -- and just get sent back to a

22       court and things don't change.

23            The chances of that happening here -- I've already

24       talked with -- I mean, even the people I met with yesterday

13:21:05 25    want to take updated depositions of some of these corporate

13:21:08  1   witnesses and certainly want to take the depositions of the

          2   people that appeared live in trial because they don't have

          3   the video depositions of the testimony that was given here in

          4   trial.

13:21:18  5           So that becomes an issue whether or not you do that

          6   as an ongoing part of being the MDL judge, whether or not

          7   three judges who are faced with the same request coordinate.

          8   There's a lot.  In one of the articles I read, a best

          9   practices article from Duke, they talked about being a

13:21:46 10   coordination within a court.

         11           And you're right, maybe that's not something that

         12   you have to address, and that's a deposition that gets taken

         13   in that case and gets applied to all other cases.  I mean,

         14   that's possible.  But I don't know.  I don't know what the

13:22:03 15   transferor courts might ask you to do if they get hit with a

         16   number of these requests.

         17           I know that's not something that is unexpected,

         18   especially if you're talking about every court in America

         19   potentially getting any number of these cases, maybe even

13:22:26 20   some hundreds of them.

         21           But, again, I'm anticipating that that's something

         22   that I would prefer not to have to personally be involved in,

         23   but whether or not I'm going to be -- I or others are going

         24   to be consulted about that, or maybe even ask us to bring

13:22:50 25   that to your attention, I mean, I don't know.  That's some of

13:22:55    1    the unknown that we're dealing with here and why we think

2    just the holdback, not an assessment, but preparing for -- I

3    frankly think the holdback should be greater based on what

4    I'm anticipating is going to happen.  Potentially could

13:23:11    5    happen in the future.  I think we're being a lot more

6    reasonable than they were being in the testosterone and the

7    DePuy case.  Under the circumstances, I think are more

8    supportive of us being at their level.  So we came to a

9    number where we thought was a fair and reasonable holdback

13:23:34   10    under these circumstances.

11         There are people that are asking for access to

12    our -- to the common benefit, you know, the MDL PLC experts.

13    Some of them don't want to use a deposition.  And we're going

14    to have to continue to monitor that and make sure that we're

13:23:57   15    the people that are kind of monitoring that and making sure

16    that these -- that these experts are protected from not

17    getting involved in a case that maybe they shouldn't get

18    involved in.

19         We already talked about the organization of trial

13:24:11   20    packages.

21         Depending on whether there is 100 remands or 2,000

22    remands, we feel that we're obligated to have multiple trial

23    package presentation seminars.  You know, maybe various --

24    maybe two or three of those.

13:24:27   25         We talked about the coordination and consolidation

13:24:30  1    of cases in transferor courts.  That's something that may or

2    may not -- I mean, it could be the transferor court says I

3    want Mr. O'Connor or I want someone that was involved with

4    Judge Campbell to come here and tell me what -- what he

13:24:44  5    thinks about that or what she thinks about that.

6        Of course, we have to maintain the depository, we

7    have to update discovery, these complaint files continue to

8    come in.  There could be good reason for there to be a

9    nationally coordinated deposition of some of these what I

13:25:02 10    would call older depositions, something we already talked

11    about.

12        The bottom line, Judge, here, is I think that -- I

13    can't foretell the future but I can just kind of -- I'm

14    getting a glimpse of it, that unlike maybe the overwhelming

13:25:33 15    majority of cases, MDL cases -- and I've got to be careful

16    what I say because I don't -- some of this involves strategy

17    some of it involves ongoing settlement discussions -- but I

18    foresee a reasonable chance that Bard is going to be happy

19    allowing a number of these cases to be remanded and just deal

13:25:58 20    with them one at a time as they come up, which would have

21    accomplished nothing by way of this MDL, and I think we still

22    have to be in a position to make sure that doesn't happen.

23        I mean, you even said, I think at the end of one of

24    our bellwether trials, that you wonder what might happen with

13:26:20 25    different rulings in front of a different jury and different

13:26:23  1   state laws.

2   I think while you wouldn't call that officially a

3   bellwether process, it is going to be.  I mean, they're going

4   to be the first four, five, or six cases that get tried in

13:26:36  5   different jurisdictions where they don't have an FDA defense

6   or where -- or different 403 rulings come in based on

7   different evidence.  Or who knows.  We saw a glimpse of three

8   cases that -- we almost saw one in the Recovery case that got

9   resolved.

13:27:03  10   But there are some things that we as a leadership

11   group have to understand that the bellwether process here was

12   an important one.  But personally -- I'm just saying

13   personally I'm not seeing that it had much of an effect on

14   the full and final and global resolution of this litigation.

13:27:24  15   Again, I wish I could go into more detail about

16   that, but I can't because of confidentiality issues and other

17   issues that I think might affect ongoing discussions about

18   that.  But I can just tell you, I don't know what the risks

19   are, what the chances are, we're all kind of playing chicken

13:27:45  20   here between now and July 1st whether or not cases are going

21   to settle or cases are not going to settle and they're going

22   to be put on your remand list for July 15.

23   I don't know whether that number is going to be only

24   my cases or whether or not it's going to be my cases plus a

13:28:00  25   number of other firms that I've been in communication with

13:28:04  1   that seem to be in that -- are planning for that potential.

2        So, again, Your Honor, I can just tell you that this

3   was not -- this is something that we did after much

4   deliberation and we knew there was going to probably be

13:28:32  5   objections to this, especially by those that are involved in

6   some settlement program that we know nothing about, whether

7   or not -- I haven't seen any dismissals be filed yet.  I

8   don't know whether releases -- I don't know whether there is

9   an opt-out provision in that settlement program, which, if

13:28:52  10   there are, I don't know how many that would be, what that

11   would do as far as the type of remands that you would have to

12   deal with.

13       But we feel that in fairness and in equity to not

14   only the work that's been done thus far, but to what we

13:29:11  15   anticipate the work will be -- there is no one in this world

16   other than the person standing in front of Your Honor who

17   wishes he didn't have any more obligations or duties to do

18   common benefit work in this case.  I mean, there are a lot of

19   other projects in my firm or others that I could be looking

13:29:31  20   at right now that are going to certainly be more lucrative

21   than the potential of a 6 percent or a 9 percent assessment

22   of what my firm's ultimate lodestar or my firm's ultimate

23   common benefit award might be.

24       So I'm here on behalf of not just myself, but I

13:29:50  25   think a number of -- certainly on behalf of the entire PEC,

13:29:54  1    which are six member firms that I won't say did all the work

2    but certainly did a good majority of the common benefit work,

3    as well as a number of others that are not on our executive

4    committee that support this.

13:30:10  5         I mean, interesting that only two of -- I think only

6    two of our PLC members objected.  I'm told one may be

7    withdrawing their objection.  I've heard that.  But I know

8    there is one that is involved in this other settlement who

9    has objected to this, but that's the only firm that has.

13:30:34 10         There are others on the phone.

11         Mr. O'Connor, Ms. Fleishman, or Daniel, if there is

12    anything that I failed to present to the Court you think I

13    should have or you think we should bring to his attention.

14         May they speak, Your Honor, if they do?

13:30:53 15         THE COURT:  Yes, they may.

16         Thank you, Mr. Lopez.

17         MR. LOPEZ:  Thank you, Your Honor.

18         THE COURT:  Do any other members of the Plaintiffs'

19    Steering Committee wish to speak?

13:30:59 20         All right.

21         Let's hear from Bard next, and then we'll hear from

22    the plaintiffs' attorneys who are on the phone.

23         MR. NORTH:  Thank you, Your Honor.

24         As the Court is aware, Bard opposes any increase at

13:31:14 25    this point in the assessment percentage for the common

13:31:16   1   benefit fund.  We believe that the present assessment at

2   8 percent is reasonable and that the plaintiffs have not

3   offered a persuasive justification under the law or prior MDL

4   practice for the increase they're seeking, and we therefore

13:31:30   5   ask that the motion be denied.

6        But let me address, if I could, at the outset, the

7   plaintiffs' suggestion that Bard has no standing to oppose

8   this request.

9        Candidly, we admit we do not have standing of the

13:31:43  10   same enormity that some of the plaintiffs' attorneys do who

11   have expressed their opposition, but we still have a concrete

12   interest in what the percentage for the common benefit fund

13   assessment is.  And that's for a couple of reasons.

14        We believe it's axiomatic that any increase, and

13:32:04  15   particularly the 75 percent increase from 8 percent to

16   14 percent that they're seeking will be a disincentive or at

17   least a hindrance to settlement discussions.

18        The plaintiffs originally said, well, it won't

19   affect settlement discussions because it will have no impact

13:32:23  20   on the clients, individual plaintiffs themselves.  As they

21   later conceded in the supplemental filing, that's not true.

22   They're asking just for the cost assessment alone to be

23   increased from 2 to 5 percent, which will come directly out

24   of an individual plaintiff's pocket.

13:32:41  25        And I also think it is too simplistic to say it will

13:32:45 1  have no effect, an increase, on future settlements as far as

2  the attorneys are concerned.  The individual attorneys.

3  Because they say it's not their concern.  Their client is

4  still going to get the same amount.

13:33:01 5  But the fact of the matter is, as a practical

6  matter, clients, the vast majority of them make the decision

7  whether to settle based upon the recommendation of their

8  attorneys.  And the higher the assessment percentage goes,

9  the less individual plaintiffs' attorneys will want to settle

13:33:21 10  for rates or values that are acceptable to Bard.

11  THE COURT:  Aren't you suggesting with that last

12  comment, Mr. North, that plaintiffs' lawyers would act

13  unethically and would advise their clients not to settle

14  because the lawyer isn't getting enough personally out of the

13:33:38 15  case?

16  MR. NORTH:  Your Honor, I would hope not.

17  Professionally, I would hope not.

18  THE COURT:  I would think not.  And if not, then

19  that's not a concern, is it?

13:33:47 20  MR. NORTH:  But I think with advising, Your Honor,

21  people would have that in mind.  It's a concern.  I'll just

22  say that.  It is a concern.

23  I understand what the Court is saying.  I agree it

24  should not be a factor, but we do have a concern that it

13:33:59 25  might be.

13:34:01  1          But more important -- or equally important,

2    Your Honor, what we're facing here is the fact that a great

3    number of plaintiffs and plaintiffs' attorneys who have

4    either settled cases or tentatively settled cases with Bard

13:34:15  5    have relied upon the existing 8 percent assessment.  The CMO

6    Number 6, which set the 8 percent, said that that amount or

7    that percentage shall not be altered.

8          We have a firm settlement agreement for

9    approximately 1900 cases with the Freese and Goss and

13:34:35 10    Matthews firms, of which I think about 15- or 1600 are in

11    this court that we discussed at a previous hearing I think in

12    February.

13          Since that time, we have reached tentative

14    settlements or are approaching what we believe momentarily

13:34:51 15    will be settlements with as many as 22- or 2300 individual

16    plaintiffs, if not more.

17          I believe the specter of the mass remands that

18    Mr. Lopez paints is not necessarily correct.  But that's as

19    an aside.

13:35:06 20          The fact of the matter is we probably have either

21    settled or on the brink of settlement half of the cases in

22    this -- at least in this MDL.  And those settlements or near

23    settlements have been reached based upon plaintiffs' reliance

24    upon the 6 percent.  I mean the 8 percent.  And we are

13:35:28 25    concerned as to what effect that's going to have,

13:35:31  1   particularly on those settlements that are just about

2   finalized but not inked in a settlement agreement yet.

3           I would note, Your Honor, that we believe that the

4   amount they're seeking is abnormally high.  We pointed out a

13:35:45  5   lot of statistics in our filings.  We pointed out the fact

6   that we -- well, we surveyed as best we could all MDLs in

7   comparable MDLs since 2010.  We were able to compute that the

8   mean assessment rate for common benefit funds for those MDLs

9   was 7.4 percent and the median was 6 percent.

13:36:09 10           All -- the median and the mean of all of those prior

11   percentages is less than the 8 percent that's already in

12   effect in this MDL.

13           Interestingly, of the several dozen MDLs we have on

14   that chart, we were only able to only identify six MDLs that

13:36:28 15   have a rate as high as the 14 percent they are now seeking.

16           And as we noted, most commentators say that

17   historically between 4 -- I mean, the assessment rate for the

18   common benefit fund has been between 4 and 6 percent.

19           Your Honor, I would also note that the plaintiffs,

13:36:47 20   we believe, have not presented a persuasive justification for

21   the increase they seek.

22           Mr. Lopez focused primarily on post MDL activities

23   after remand and what would be necessary, in his view, for

24   counsel -- or leadership council.

13:37:06 25           We submit that that's not the appropriate work to be

13:37:10   1   reimbursed or compensated by the common benefit fund.  As

2   this Court has pointed out many times to us, the purpose of

3   an MDL is for pretrial coordinated discovery.  This Court

4   went one step further and conducted three bellwether trials.

13:37:28   5         But the purpose of the MDL is discovery.

6   Coordinated discovery.  They had performed those duties and

7   that's what the common benefit fund is established to

8   compensate them for.  Not for all of the work that will be

9   done in cases or may be done in cases, and that is

13:37:45   10   speculative at this point, throughout the country.  That, by

11   definition, Your Honor, is not common benefit, and it's

12   certainly not common benefit for the purpose of this MDL.

13         Some of the other justifications they offer in their

14   briefs we believe are equally unpersuasive.  They claim this

13:38:04   15   MDL has been unduly prolonged.  But the fact of the matter is

16   the overall schedule of this MDL has lasted for less than a

17   year more than what the parties and the Court originally

18   planned.

19         It has been run efficiently.  And virtually all

13:38:21   20   discovery in this MDL was completed by 2017.  And the last

21   two years have not been extensive work other than the

22   bellwether trials.

23         They also suggested, oh, we've tried so many cases.

24   The fact of the matter is in October, I think it was in 2015,

13:38:41   25   at this Court's initial status conference or case management

13:38:44 1    conference, the plaintiffs specifically talked about

2    envisioning three to five bellwether trials, and we've had

3    three.  So at the time they sought the original assessment

4    and the sought 9 percent and the Court awarded them

13:38:56 5    8 percent, they knew or anticipated at least three bellwether

6    trials, exactly what's occurred.

7              Perhaps most confusingly, they suggest that things

8    have changed because they didn't envision this many cases.

9              They envisioned, they said, about a thousand cases

13:39:13 10   when they sought the original assessment and that now that we

11   have 7,000-plus.

12             Well, when they sought the initial assessment, they

13   justified the fact that it was above the mean because there

14   wouldn't be as many cases.  And they needed to have a higher

13:39:30 15   percentage than the mean.

16             Well, by their own logic, the fact that we have

17   seven times more cases whose settlements they will get the

18   assessment from, by definition means they should not have an

19   increase; if anything, they should have a decrease.  But

13:39:50 20   we're not asking for that, of course, but by their own logic,

21   no justification -- or no increase would be justified there.

22             Your Honor, lastly, I would suggest and respectfully

23   dispute Mr. Lopez's characterization that the Plaintiffs'

24   Leadership is in the dark and something is going on

13:40:10 25   clandestine behind their back.

13:40:13    1        The fact of the matter is in these settlements that

            2   have been reached, or tentative settlements, at least six and

            3   I think maybe seven members -- or firms who are represented

            4   on the Plaintiffs' Steering Committee are involved and have

13:40:27    5   tentatively committed to settlements.

            6        Discussions are ongoing with all the members of the

            7   Plaintiffs' Executive Committee.  Records are being reviewed

            8   of their cases.  Discussions are ongoing.  There may not be

            9   final resolutions with the members of the Executive

13:40:44   10   Committee, but they are not in the dark and have not been

           11   excluded from this process.

           12        Your Honor, in conclusion, we believe CMO Number 6

           13   has a generous assessment, 8 percent, above the mean and

           14   median in all MDLs overall.  It is an assessment that this

13:41:05   15   court originally stated shall not be altered, and settlements

           16   have been reached in reliance on that.  And we believe, as

           17   I've said earlier, that the increase they're seeking will

           18   simply hinder our efforts to completely resolve the cases in

           19   this MDL.  And for that reason we would ask that the motion

13:41:23   20   be denied.

           21             THE COURT:  Thanks, Mr. North.

           22             Let's hear comments by Mr. Goss on the phone.

           23             MR. GOSS:  Thank you, Your Honor.  My flight was

           24   canceled for weather and I appreciate the opportunity to

13:41:41   25   appear telephonically.

13:41:42   1            I'd like to make two comments at the beginning.

       2            The first one is we've worked with Mr. Lopez and his

       3    firm and members of the Leadership Committee for quite some

       4    time in this litigation and other litigation.  And by no

13:41:58   5    means is our objection or opposition to this any comment on

       6    their work.  They're good lawyers and they've done good work.

       7            But what we do have a problem with is we're simply

       8    saying that the increase in the assessment over 8 percent is

       9    just not warranted in this situation.

13:42:16  10            Secondly, Your Honor, I'd like to address a

      11    statement that the Leadership made in the reply brief

      12    regarding our firms.  Essentially they made a statement that

      13    we weren't familiar with the key issues in this litigation.

      14            Your Honor, that's just not so.  My firm has had --

13:42:33  15    early on on the Bard PSC.  We've submitted thousands of hours

      16    in this MDL and in other MDLs.  We've prepared state court

      17    Bard cases for trial.  We've obviously done settlement --

      18    incidentally, Your Honor, I think it's important that we

      19    haven't billed a single hour to this MDL for any of the

13:42:54  20    settlement work we've done.

      21            We've expended a lot of money on this case and on

      22    IVC cases in general.  Mr. Matthews handled depositions for

      23    the *Booker* bellwether case.  Mr. Chavez, with Mr. Matthews'

      24    firm, was on the team for the *Hyde* bellwether trial.

13:43:14  25            Importantly, Your Honor, we're total lead counsel

13:43:18  1   with Mr. Lopez's firm in the *Cordis* IVC litigation, we're

2   total lead counsel in the *Cook* IVC litigation.  And,

3   importantly, in the six cases that have been tried to jury

4   verdicts, Mr. Matthews and I tried two of those.  One of the

13:43:32  5   cases is actually being appealed in the Houston Court of

6   Appeals.

7           So the notion that our opposition is somehow without

8   merit because we're not familiar with the litigation is

9   simply incorrect, Your Honor.

13:43:43  10          With respect to our specific objections regarding

11  assessment, and I won't step on the arguments that have

12  already been made, but our first basis is that the 8 percent

13  is a sufficient assessment, Your Honor.

14          If you'll recall, the Leadership asked for a

13:44:03  15  9 percent assessment at the beginning.  They -- they knew

16  less then than they know now, and they asked for 9 percent

17  back then.

18          The fact of the matter is, Your Honor, the only

19  cases they rely upon are quite different than the ones in

13:44:23  20  this situation.

21          They rely on the *Pinnacle* hip litigation MDL case.

22  *Pinnacle* was different, Your Honor.  *Pinnacle* had been

23  ongoing for eight years, remains ongoing, and has had five

24  bellwether trials.  They had judgments appealed to the Fifth

13:44:36  25  Circuit that have gone back -- remanded back from the Fifth

13:44:40  1   Circuit.  So that case is not at all similar to this

2   situation.

3          They cite the testosterone litigation MDL.  In the

4   testosterone MDL they've conducted eight bellwether trials in

13:44:52  5   a four-year period.  And that court, Your Honor, specifically

6   found that the PSC could not have anticipated that despite

7   having thirty PSC firms involved in the case that it would

8   still need to go outside and get non-PSC firms to come handle

9   another three waves of bellwether trials.  So that case

13:45:14  10  really doesn't support the position for an increase in our

11  situation.

12         Our second basis, Your Honor, is that they -- that

13  this has failed to show anything that was unanticipated from

14  the outset.

13:45:30  15         They said they originally predicted there would be a

16  thousand or 2,000 cases.  There's now I think close to 7600

17  cases.  That would suggest that there should be a decrease in

18  the assessment, not an increase.

19         And interestingly about that, Your Honor, you may

13:45:49  20  recall back when we announced our settlement in February,

21  there was some discussion about how Bard is requiring cases

22  to be filed.  So almost 1500, 1600 cases, if the Court will

23  recall, were immediately filed.

24         So those are cases that were added just recently

13:46:06  25  that didn't increase any work that the PSC had to do, the

13:46:14  1    mere fact case numbers had gone up.  Those cases were added

2    because of Bard's requirement when they were settled.

3          I think I have seen recently a flurry of filings as

4    well, and I think -- my suspicion is that it relates to the

13:46:26  5    fact that the direct filing order is about to conclude so a

6    lot of cases are being filed.  Those cases haven't had --

7    have not added to any work that the steering committee's had

8    to do over the past four years.  So the fact that there's

9    more cases actually benefits the leadership in this situation

13:46:45 10   and doesn't suggest that an increase would be appropriate.

11          The PSC argues they didn't anticipate a preemption

12   motion.  Your Honor, I think it would be malpractice in

13   today's times for a defense firm not to allege a preemption

14   motion in a case involving the FDA.  I've yet to see one

13:47:04 15   where it wasn't brought.  I think it was actually pled by

16   Bard in this case before CMO 6 was even entered.  So I don't

17   think the fact that -- I think it's unpersuasive to state

18   that a preemption motion couldn't have been anticipated.

19          I think, as Mr. North noted, three bellwether

13:47:26 20   trials, those were anticipated early on.  I think that the

21   PSC representative anticipated three to five bellwether

22   cases.

23          Lastly, with respect to this additional work and the

24   ongoing work to do for post remand, obviously the 28 USC 1407

13:47:46 25   mandate is for consolidation for pretrial.

13:47:50  1        And this Court is about to fulfill that mandate.

2    The PSC is about to fulfill that mandate.  I'm aware of no

3    authority to continue to submit time for common benefit work

4    once cases are remanded.

13:48:08  5        I'm hearing -- I've heard arguments anywhere from a

6    hundred to a thousand new cases could possibly be remanded to

7    transferor courts around the country.  I'm not sure whose

8    cases those are.  I'm not sure if they're leadership's cases.

9    I'm not sure how long that's going to go on.  But there has

13:48:28 10   to be some finality to this, and I don't think 1407 ever

11   anticipated that there would continue to be assessments or --

12   I'm sorry, submission of time and common benefit work for

13   cases after the MDL's been concluded.

14        And, Your Honor, I think that you hit on the

13:48:44 15   question when you asked Mr. Lopez about this with respect to

16   who makes those rulings.

17        Well, Your Honor, when the cases get transferred to

18   these transferor courts, presumably that judge and the

19   attorneys in that case are going to be handling that.  I

13:49:03 20   can't imagine a situation where they're going to be -- even

21   if they could, come to Your Honor and to the PSC lawyers to

22   have discovery issues decided in the MDL court.  I don't

23   think that's appropriate.

24        Likewise, I don't think that the submission of time

13:49:20 25   for that work is appropriate.

13:49:22  1          There has to be finality.  If there's truly going to

2      be thousands of cases going on, this could go on forever.

3          And Mr. Lopez discusses holdbacks.  Well, right

4      there's a problem with a holdback.  The holdback could be

13:49:40  5      held back for years.  Even in a situation where the common

6      benefit submissions are cut off, like Judge Goodwin has done

7      in the pelvic mesh litigation, he cut off common benefit

8      submissions a long time before any cases were remanded.

9          But even in a situation like that, it would take

13:50:06 10      years.  The mesh assessment is being appealed still to the

11      Fourth Circuit.  So it will be three, four years down the

12      road.  And I think Mr. Lopez admits that.  Even under his

13      scenario it could be even longer.

14          So -- and the reason that's a problem, Your Honor,

13:50:27 15      is that these clients, they have a lot more expenses than

16      just what's being assessed against them.  They have -- each

17      of them typically has had a CT, an expert read that CT,

18      medical records, filing fees, and related subpoenas and so

19      forth.  So they typically have 2- to $3,000 worth of expenses

13:50:52 20      that are outside of the assessment that they think -- that

21      their non-PSC lawyer has incurred.

22          So if they get funds from a settlement, what will

23      happen is attorney fees are taken out, the non-MDL

24      assessments are taken out, a holdback is taken out, and --

13:51:15 25      Your Honor, these are people that many of them are -- not to

13:51:19  1  mention, Your Honor, they had medical liens.  Some of them

2  are substantial.  Medical liens are taken out.

3       So to say that, well, you know, it might -- we might

4  not take their money, there might be a refund four, five

13:51:32  5  years down the road, yeah, that doesn't offer a lot of solace

6  to these people.

7       So -- and I think that's a real problem, Your Honor.

8       Another basis for opposition, Your Honor, is it's

9  extremely unfair to change this assessment here at the

13:51:50  10  eleventh hour.  Thousands of cases were settled, cases have

11  been negotiated over the last six or seven months with the

12  understanding that there's an 8 percent assessment.

13       The PSC's, the substantial part of the rely brief is

14  arguing that, well, this is just lawyers worrying about

13:52:11  15  lawyers' money.  Ultimately, they had to back off of that

16  after we called them on it because it's not lawyers worried

17  about lawyers' money, it's, you know, lawyers worried about

18  clients' money.  Clients don't like to have their money held

19  back for years when it's unnecessary.  That's why the -- you

13:52:24  20  can't just pick a number out of the air and say, well, let's

21  just say 14 percent, they did it in a couple of other MDLs.

22  You can't just pick a number out of the air because this is

23  real money to these people and it's going to be held for a

24  long time.  A long time.

13:52:39  25       Like anything else, my experience is that if you had

13:52:42  1    money held back, somebody is going to find a way to spend it.

       2    And, yeah, to -- to say, well, they'll get a refund down the

       3    road, that doesn't help out much, Your Honor.

       4         And another thing, the reason it takes so long for

13:53:01  5    there to ever be a refund is because before there can ever be

       6    an award, Your Honor, a lot of things still have to happen.

       7    Fee committees have to be appointed, applications have to be

       8    made for the award, applications have to be made for the

       9    allocations to the particular law firms.  Then there has to

13:53:19 10    be an award and an allocation.  There has to be an objection

      11    process.  That objection process has to be completed and

      12    there has to be an appeal process.  And it goes on for a

      13    long, long time.

      14         So it really doesn't help much to say, well, maybe

13:53:33 15    we'll take 14 percent and, who knows, maybe you'll get some

      16    of it back four or five years from now.  That's not very

      17    meaningful, Your Honor.  That's why it needs to be tied to

      18    something.

      19         And I have heard nothing about any estimates of how

13:53:48 20    much time that is believed will be expended over the next six

      21    months or year.  I've heard no estimates about here's how

      22    much money -- they have a history.  Here's how much money we

      23    think we might need to spend.  I've heard no estimates on

      24    that.

13:54:04 25         The one thing I have heard that I found very

13:54:08   1   disturbing, and it's in their brief, is that they state

           2   that -- let me get this right -- that they expect there will

           3   be common benefits -- okay, here it is.  That the PSC will

           4   continue to fund cases post remand using common benefit funds

13:54:27   5   and assessments.

           6          To me that means the PSC's going to take this money

           7   and they're going to continue to fund cases post remand.  I

           8   don't know whose.  I don't know if it's going to be these

           9   thousands of cases that everybody's talking about or hundreds

13:54:42  10   of cases.

          11          You know, everything -- every MDL I've ever been

          12   involved in, when the cases get remanded, the lawyers that

          13   get the cases on remand, that's their issue.  They deal with

          14   it.  They get a trial package, they deal with it.  They want

13:54:56  15   to talk to experts, they pay the experts for their time.

          16          So I don't know what that means.  If it's just an

          17   unlimited amount of money out there to be spent, it shouldn't

          18   be that.

          19          THE COURT:  All right.  Mr. Goss, make your last

13:55:17  20   comment, if you would.

          21          MR. GOSS:  Okay.  Yeah.

          22          Lastly -- well, two points, Your Honor.  Just a few

          23   minutes here.

          24          There seems to be some fear by the PSC that there's

13:55:32  25   not going to be enough dollars at the end of the day to pay

13:55:36   1   the fee that they expected from the outset.  And I understand

          2   that.  But, Your Honor, the PSC's not insulated from the

          3   highs and lows of litigation.  The PSC needs to take the same

          4   risk that we do.  Some work out better than others, just like

13:55:51   5   some cases work out better than others.

          6       Finally, Your Honor, I'll say that there's been 16

          7   joinders in our objection.  Some from PSC members.  The Bard

          8   firm has also filed its own objection.  And for four years

          9   the PSC didn't need an increase in the assessment.  They

13:56:08  10   didn't need an increase in the assessment when they're

         11   negotiating their individual cases and settling individual

         12   cases and paid at 8 percent.  They didn't need an increase in

         13   2017 when they were making a global demand.  And they haven't

         14   shown that one's due now.  They didn't even request one until

13:56:21  15   after we had announced a settlement last February.

         16       So for all those reasons, Your Honor, we'd request

         17   the motion be denied.

         18       THE COURT:  All right.  Thank you, Mr. Goss.

         19       Mr. Cappelli.

13:56:32  20       MR. CAPPELLI:  Yes, Your Honor.  For the Bern

         21   plaintiffs, and I'll be very brief.

         22       Mr. Goss covered expenses and an amount of issues

         23   that I also would have touched on.  But I just want to touch

         24   on really one main point, Your Honor, and that is I have yet

13:56:51  25   to hear Mr. Lopez, through their papers or through his

13:56:53   1   argument today, articulate a reason, a specific reason for a

           2   necessary increase.  Something that was unanticipated.  And I

           3   say that because Mr. Lopez is a well-experienced attorney, a

           4   good attorney, an attorney who is well-versed in mass torts.

13:57:12   5        And I find it -- I get taken back somewhat when I

           6   hear that it was -- we couldn't expect bellwethers or we

           7   couldn't expect preemption or we couldn't expect all the

           8   motions.

           9        And I take that, and I think the Court has to take

13:57:31  10   that, with a grain of salt because all of these things are

          11   normal practice when it comes to mass torts.  And they should

          12   not be something that is not anticipated by someone in

          13   leadership, especially with the leaders that are involved in

          14   this litigation with their vast experience.

13:57:50  15        Nobody's questioning the work product that these

          16   firms did.  What we're questioning here is necessity of an

          17   additional common benefit fee that they themselves can't

          18   articulate why they need it or what the point is.

          19        They talk about a whole bunch of things that may or

13:58:08  20   may not happen in the future, people dropping out.  And

          21   Mr. Goss touched on why those things aren't even relevant to

          22   the discussion.

          23        But one other issue that I want to touch on and very

          24   briefly is the fact that -- and Mr. Goss touched on this a

13:58:26  25   little bit -- which is the addition of these cases where the

13:58:29    1    litigation and the MDL has grown.  The work product for those

            2    additional plaintiffs hasn't been there or hasn't been

            3    necessitated by the additional plaintiffs.

            4            Therefore, you're not necessarily by sheer numbers

13:58:46    5    seeing additional work.  What you're seeing addition to is

            6    additional pot of money that is going to come out of the

            7    regular common benefit fund without the necessary -- without

            8    additional work product having to go to that.

            9            So I would agree with Mr. Goss and Bard's attorney

13:59:05   10    when the number of plaintiffs goes up, the need for the

           11    common benefit fund traditionally should actually be going

           12    down.  And we're seeing the opposite here.  Once again, going

           13    back to the whole point with no real articulated reason for

           14    it.

13:59:23   15            All other points really were covered by Mr. Goss and

           16    Bard's attorney, Your Honor.  And with that, I'll let the

           17    Court go.

           18            THE COURT:  Okay.  Thank you.

           19            Mr. Bern.

13:59:37   20            MR. BERN:  Your Honor, Mr. Cappelli covered it for

           21    me.  Thank you.

           22            THE COURT:  All right.  Thanks.

           23            Does anybody else on the phone wish to make any

           24    comment?

13:59:47   25            All right.

13:59:47  1          Mr. Lopez, do you want to respond to any of this?

2          MR. LOPEZ:  Your Honor, I'm aware of three of the 22

3     or 23 PLC firms that are involved in the Freese/Goss/Matthews

4     settlement who -- I've only talked to two, but both have made

14:00:11  5     it clear they cannot share with me the details of that

6     settlement.  So I still don't know the details.  It's a fact

7     that two of them do.  And neither one of them are objecting,

8     by the way, to this, at least the two I spoke to, objecting to

9     this petition that we're making today.

14:00:30 10          Couple things to note is -- and I think the

11     reasoning in the *Pinnacle* and testosterone cases for the

12     increase, again in the holdback, not in what we're asking

13     Your Honor to award, are fairly parallel to what -- the

14     points that I've made today.

14:00:49 15          The most important thing, however, is to note that

16     in the *Pinnacle* case, Judge Kincaid increased the holdback to

17     18.5 percent in fees and 6.5 percent in costs.  And

18     Judge Kennelly, in the testosterone case, increased the

19     holdback to 14.5 percent in fees and 5 percent in costs.

14:01:16 20          We are asking the Court to hold back 9 percent,

21     again, under a case in an MDL that has, maybe arguably, more

22     complexities about it and maybe more things that we're going

23     to have to deal with in the future.

24          Let's talk about that, Mr. Goss' point about this

14:01:36 25     going on and on and on.  I don't want it to go on and on and

14:01:40   1    on.  I think our work as a PLC and the work that we need to

           2    do to make sure folks are adequately prepared and armed to

           3    try their own cases is something that will probably end by

           4    this calendar year.  I'm hoping it does.  I'm thinking that

14:01:58   5    by the time we do these preservation depositions and deal

           6    with some of the other issues that we still need to do

           7    despite the fact there's no longer going to be cases here,

           8    but I think things that I think the transferor courts would

           9    prefer and appreciate were done here so they don't have to

14:02:18  10    address them.

          11         Again, if there's an issue with a deposition -- like,

          12    for example, we come to and you say we need to take a

          13    preservation deposition or an updated deposition of

          14    Dr. Ciavarella and you deny that request, fine.  Then it

14:02:32  15    becomes an issue for a transferor court or a group of

          16    transferor courts to get together and decide what they're

          17    going to do about that.

          18         So that's up to you.

          19         In other words, I'm hoping you tell me, but for some

14:02:44  20    administrative things that maybe just have to do with this

          21    issue, and that is getting with a special master and putting

          22    together a fee committee, then my work's done.  And not only

          23    my work, but the work of those that want to continue to do

          24    this work for folks that might have to try cases.

14:03:05  25         Yes, our PEC and others have committed to whatever

14:03:10  1   the first handful of cases that might be going to trial on

        2   remand that we would continue to treat those as bellwether

        3   cases because we think that's for the good of all litigants

        4   that might get transferred or remanded.

14:03:25  5        You know, a lot of this has to do that us offering

        6   not only you, but maybe these transferor courts from having to

        7   deal with what could be an enormous amount of chaos if there's

        8   not some type of continued coordination and common generic

        9   work done.  Like I said, we anticipate that being done by --

14:03:49 10   including the appeals.  The Ninth Circuit appeal is done, I

       11   think, and Ms. Zaic can probably talk to you about that, but I

       12   think there may be reply briefs.  But eventually that will be

       13   heard and that will go up to the Supreme Court.  I mean, we

       14   can probably give you a -- some kind of a forecast of what

14:04:07 15   that cost might be --

       16        I agree that the concern should be the plaintiffs

       17   here in the cost assessment.  We chose 5 percent because we

       18   looked at what was done in testosterone and *Pinnacle* and it

       19   was 5 and -- plus 6.5.  I think we would be able to give the

14:04:27 20   Court a more -- once we find out what cases are settling for,

       21   we might be able to give the Court a better idea of what that

       22   number, what the more realistic number should be and that --

       23   the cost part of this can be something that we can resolve in

       24   a short period of time so that if there is an extra 1 percent

14:04:49 25   that was held back that the plaintiffs shouldn't have had to

14:04:51 1  pay, they can be reimbursed.  And that is something that can

2  be administered through a third party.

3          But, you know, I'm also taken aback by the fact that

4  these clients have 2- to $3,000 in expenses and they might get

14:05:07 5  hit with another 5 percent.  I mean, none of them are getting

6  hit -- that's the expense in any one of those cases, whether

7  it be a small case or a large settlement of retaining one

8  expert, just retaining the expert in the case that they have

9  the benefit of.  So the cost of that, spread out among however

14:05:27 10  many litigants, are paying 5 percent of your settlement.  So

11  in a $100,000 settlement, you're paying $5,000.  That's

12  assuming that's what you agree should be a reasonable cost

13  assessment, is something that's -- that would cause a

14  plaintiff who has only spent 2- to $3,000 thus far to get a

14:05:53 15  settlement who had to do nothing really more than to have a CT

16  scan and submit their settlement to a settlement program.

17          So I don't think that argument is a viable one and I

18  don't think it's something that a plaintiff would say, well,

19  you know, I got to pay 7- to $8,000 in a $100,000 settlement.

14:06:11 20  I mean, alls you need to do is do what I'm doing with my

21  clients and saying, by the way, that is saving you hundreds of

22  thousands of dollars if you were litigating this case alone.

23  So it's still on a fairness and equitable basis.  I don't

24  think that is going to be a deterrent to any plaintiff

14:06:31 25  agreeing to a settlement.

14:06:33   1          Again, this additional -- we don't plan to create
       2   work.  It could be that you tell us, no, Mr. Lopez, these are
       3   issues that I'm not going to deal with here.  I think we've
       4   already agreed that we should be doing trial preservation
14:06:48   5   depositions of experts and I think that's something we have to
       6   do.  But I think there are other things that -- and if you say
       7   no, then it's no.
       8          But, again, we're not asking -- I'm just telling you
       9   from the position that I'm in and the position that our PEC is
14:07:03  10   in, and looking at the work that's been done in this case, the
      11   additional work we anticipate doing over the next six months,
      12   the quality of the work that's been done, the potential
      13   success of this litigation, we feel that in order to protect
      14   those that have done this work and maybe to encourage those to
14:07:26  15   continue to do the work that needs to be done, that we would
      16   urge the Court to increase the holdback, not the assessment
      17   but the holdback, on attorneys' fees -- originally we asked
      18   for 7 percent and you said 6, and I'm going to ask you to
      19   increase the fee assessment to 9 percent, not the 14.5 or 18.5
14:07:49  20   that Judge Kennelly and Judge Kincaid respectively did in very
      21   recent similar litigations, and to increase the costs, at
      22   least at this point, to 5 percent.
      23          And if you want a better estimate of that,
      24   Your Honor, because I know that involves clients where -- in
14:08:11  25   fact, I called Mr. Goss and we had a conversation with him and

14:08:14  1    his partner, Mr. Freese, so I wanted to talk to him about that

       2    part of the assessment.  I wanted to talk to them about

       3    whether or not that is something that -- if he can give me

       4    some information about his settlement, whether or not that's

14:08:26  5    something where we might be able to reach some kind of a

       6    compromise.  And they said no.

       7         I didn't have authority to reduce it, but I had

       8    authority to, through the PEC, to have that discussion.  And

       9    I'm still willing to have that discussion.  I don't want that

14:08:45  10   to be a deterrent, and I don't think it is, but I think we

       11   need to be fair to the plaintiffs.  But I even think

       12   5 percent -- and even if it was a million-dollar settlement,

       13   a $50,000 assessment compared to what we've paid to try these

       14   cases is a small fraction of what that plaintiff might

14:09:03  15   otherwise have to play.

       16        So If you have any other questions, Your Honor, I'm

       17   here to answer them and -- but that's all I have to say at

       18   this time.

       19        THE COURT:  I do have a couple of questions for you,

14:09:12  20   Mr. Lopez.

       21        And I have a question or two for Mr. North as well.

       22        I take it, Mr. Lopez, that you agree with the

       23   assertion that if I were to increase the holdback for costs

       24   in the case, that that would be borne by the clients, not the

14:09:43  25   lawyers.  Do you agree with --

14:09:44  1          MR. LOPEZ:  Yes, Your Honor.

2          THE COURT:  Okay.

3          In your papers, you indicate in your motion that

4  there has been an assessment, I think you describe it as, or

14:10:06  5  maybe it's a contribution, from folks on the Plaintiffs'

6  Steering Committee of $6 million for costs.

7          MR. LOPEZ:  Right.  Closer to 7 now, but yeah.

8          THE COURT:  I understand that to be money that people

9  have put into a pot to be used to pay costs that were incurred

14:10:24  10  in the litigation.

11          That's a different number than what's actually been

12  spent for costs and expenses in litigation.  Now, I have the

13  most recent report from Judge Corodemus about what's been

14  spent, and that's not public, that's not something that's

14:10:47  15  shared with everybody, but it's less than $6 million.

16          And I assume that -- and it also includes all

17  expenses incurred through the fourth quarter -- no, I'm

18  sorry, through the third quarter of 2018, which would include

19  the last bellwether trial.

14:11:27  20          MR. LOPEZ:  Well, for the most part.  I mean, some of

21  those bills probably filtered in after.

22          THE COURT:  But it seems to me that the bulk of

23  expenses were in discovery and all of the travel that had to

24  be done there and deposition costs and the expert fees in the

14:11:41  25  bellwether trials, and most of that was submitted in this most

14:11:46   1   recent report from Judge Corodemus through the third quarter

           2   of 2018.  I think I'll get the next one pretty soon for the

           3   rest.

           4          MR. LOPEZ:  Right.  She's working on it now.

14:11:56   5          THE COURT:  And it's less than $6 million.  So I

           6   assume it's that number that I ought to have in mind when I'm

           7   assessing the costs incurred in the case rather than the

           8   $6 million that have been assessed of the --

           9          MR. LOPEZ:  Yeah, I mean, there's money still in that

14:12:09  10   account.  So, yeah.  I know there's been a contribution that

          11   has exceeded $6 million.  I know there are expenses that have

          12   been paid since then.  Again, I rely on Judge Corodemus.  We

          13   give her our complete accounting on everything that we spend,

          14   so she would know.

14:12:27  15          THE COURT:  Well, I'm going to do something unusual

          16   and I'm going to have you come up to sidebar so I can ask you

          17   a question about a report that's not public, just to make sure

          18   I'm not misreading it, if you would.

          19          (Sidebar discussion reported but not transcribed herein.)

14:19:35  20          THE COURT:  Thanks for your patience, Counsel.

          21          The entire purpose of that sidebar was so that I

          22   understand the report that I have received, or reports I

          23   should say, from the special master in this case who is

          24   submitting numbers to me about costs incurred and hours

14:19:54  25   billed, and that is Judge Corodemus.  There wasn't any

14:19:57  1   argument on any of the issues that we had talked about at

2   sidebar.

3            A second -- well, let me -- let me ask you one other

4   question.  Actually, two other questions.

14:20:12  5           The Case Management Order Number 6 does include the

6   statement which says -- and I'm now looking at Docket 372,

7   page 10.  It says, "The assessment amount is 8 percent, which

8   includes 6 percent for attorneys' fees and 2 percent for

9   expenses.  The assessment represents a holdback," and then

14:20:51 10   there's a citation to the *Zyprexa* case, "and shall not be

11   altered."

12           That is the language in the Case Management Order.

13           I had Jeff go back and check, Mr. Lopez, and that

14   language "shall not be ordered" was in the Case Management

14:21:08 15   Order you proposed.  It came from you.

16           So I guess the question I have is what did you

17   intend, if you remember, when this case management order was

18   submitted to say that the assessment shall not be altered?

19           MR. LOPEZ:  Well, we also submitted with that -- I'll

14:21:31 20   be honest, I don't remember the genesis of that and why that

21   was put in.  And of course wherever you see the word

22   "shall" --

23           THE COURT:  I know that other phrase in the joint

24   prosecution agreement --

14:21:46 25           MR. LOPEZ:  Okay.

14:21:47  1          THE COURT:  -- that says -- the way I read it is you

2    won't seek an increase unless you think it's necessary.

3          MR. LOPEZ:  Right.

4          THE COURT:  But I got -- I adopted the "shall not be

14:21:57  5    altered" language from you and didn't know if you had some

6    memory of what was intended at the time.

7          MR. LOPEZ:  No.  Obviously it's an unfortunate

8    statement to have to deal with right now, but other than to

9    say that I think it still remains within the equitable powers

14:22:11 10    of the Court under the principles that really deal with these

11    kinds of issues to provide the kind of relief that we're

12    requesting.

13          I think -- I don't want to go through the panoply of

14    issues that I think were something we didn't anticipate,

14:22:33 15    but -- and I think that -- again, I -- in looking at

16    Judge Kennelly and Judge Kincaid's rationales --

17          THE COURT:  Excuse me.

18          Folks, somebody on the line has failed to mute your

19    phone and we're hearing your activities.  If you could mute

14:22:53 20    it, please.

21          Go ahead, Mr. Lopez.

22          MR. LOPEZ:  Again, Your Honor, I understand that.

23    And, again, I think I'm just doing my job.  I'm just thinking

24    I'm doing the job that I was appointed to do.  Not just me,

14:23:03 25    but I'm doing it as the point person for not only our

14:23:08  1    executive committee but a number of other firms that have

2    contributed significant work and -- you know, just kind of

3    a -- a fairly significant change of circumstances.

4        I mean, I think that settlement that's happened that

14:23:23  5    we know nothing about, it's usually the PLC or leadership

6    that knows what's going on with settlement, and here it's

7    just the opposite.  And some of the things I think we still

8    need to do in anticipation of remands.

9        And, again, Your Honor, it could be in the end, when

14:23:43 10    you look at this these issues, you're going to decide that

11    9 percent -- you're not going to award 9 percent in

12    attorneys' fees but, again, that's something -- I don't think

13    it's going to take years and years for us to get there.  I

14    think -- again, I want an opportunity to see if we can

14:24:03 15    propose to you maybe a different type of cost assessment.

16    I've got some ideas about that that may, in fact, help

17    decrease that percentage so the clients don't to have bear

18    more than double, I think, what the original cost assessment

19    was.

14:24:26 20        But I think the -- as far as the fee part of this

21    thing, I think that -- I mean, it's no secret that the work

22    that's been done in this case started before this MDL by

23    people that are now part of the leadership committee,

24    Plaintiffs' Leadership Committee, and have been done by a

14:24:45 25    number of folks since that time.  And that's been used for

14:24:50   1   the benefit of whatever settlement discussions are going on

         2   now and will be used for the benefit of cases that might have

         3   to get tried in transferor courts.

         4        THE COURT:  All right.  Let me ask you one other

14:25:03   5   question.  I understand the argument on your side that the

         6   whole purpose of a common benefit fund is to fairly compensate

         7   those who have really created the value in the case by the

         8   work of preparing cases for trial and trying some.

         9        I think the other side has a pretty strong argument

14:25:26  10   as well of unfair reliance or justifiable reliance that there

        11   were by I think February almost 2,000 cases where a term

        12   sheet was signed on the understanding that the assessment was

        13   8 percent.

        14        Here's -- here's the concern that I'd appreciate you

14:25:50  15   addressing.  I went back and looked at the previous reports

        16   from Judge Corodemus, and as of May last year the report

        17   included 89 percent of all of the hours, at least in the most

        18   recent report are included, and 86 percent of all expenses.

        19        So if the concern in the case is that this case was

14:26:15  20   getting more expensive than the 8 percent would really

        21   properly reimburse, it seems to me that was pretty clear a

        22   year ago, and I'm concerned that the request to increase the

        23   holdback wasn't made until after I had ordered you to have

        24   settlement discussions, which were by November 20th of last

14:26:36  25   year, and then even after a number of the cases had reached a

14:26:40  1    settlement in principle and reliance on the lower number,

       2    when it looks to me as though, projecting out what the

       3    expenses and hours would be, if the concern is that the

       4    8 percent won't reimburse what this case has cost, that could

14:26:54  5    have been foreseen.

       6         Would you give me your thoughts on that.

       7         MR. LOPEZ:  Yeah.  I can say this.  That, you know,

       8    obviously I think during that period of time we weren't really

       9    focused on this kind of an issue and when we started talking

14:27:13 10    discussing settlement, I -- we had no idea at the time that

      11    there was actually this other -- we actually thought when we

      12    started these discussions last fall that the PLC, through the

      13    PEC, would come up with some kind of a program to settle cases

      14    on behalf of everyone in the MDL.

14:27:35 15         We had no idea that ongoing for almost a year

      16    already was this other settlement program that was announced

      17    to us shortly before it was announced to you.  So we didn't

      18    know anything about that.

      19         That might have prompted us to take a look at what

14:27:55 20    the common benefit situation was, what our lodestar was, some

      21    of the work we anticipated going forward.

      22         Could we have made that sooner?  We could have.  But

      23    we wanted to kind of see -- play out -- see this how this

      24    whole settlement process was going to play out so we maybe

14:28:15 25    wouldn't have to.

14:28:17  1        But now we're sitting here, I don't know, we're

2    about a month and three days, three or four days away from

3    you getting a list of the cases that have to be remanded.

4    And -- you know, I'm not saying there's no hope that this

14:28:32  5    case can't settle between now and July 1 as to everybody

6    but -- I don't know.  I think what we're dealing with, we're

7    dealing with a lot of unknowns about that.

8        And, again, I think the lawyers that were involved

9    in those discussions, you know, in many ways, they benefited

14:28:50 10    from the fact that while they were doing that and maybe even

11    collecting a lot more cases, I wasn't doing that.  I was

12    actually -- you know, me and many others were continuing to

13    litigate this case so that this opportunity for them to

14    settle the case happened.

14:29:06 15        And if -- I don't think there should be an issue on

16    whether or not the work that we did benefited them from

17    reaching those settlements and what that benefit is, whether

18    it's 6 percent or 9 percent is a decision you can -- I mean,

19    it could be that when they come in, you know, here a year or

14:29:35 20    so from now and they may make a really good argument as to

21    why they should only pay 6 percent in assessments as opposed

22    to 9, or whatever it is we may be asking you to do at that

23    time.

24        But I don't -- I mean, I -- it doesn't change the

14:29:52 25    equitable principles that should apply to the work product

14:29:57  1    and the work that we did.

        2          You know, getting back to when they started these, I

        3    think they -- I've heard that these discussions actually

        4    started before the *Booker* trial and they continued until

14:30:08  5    what -- and, again, I don't know.  I'm speculating.  I've

        6    heard things.  You know.

        7          There's a song I hear all the time that reminds

        8    me -- I mean, I just think it probably hits everybody.  It

        9    says, I wish I knew what I know now when I was younger, you

14:30:26 10    know, because what happens is you just -- you realize that as

       11    you gain more knowledge, as you move forward through

       12    processes like this, and you're doing it to the extent that

       13    you've done it and others have done it, you know, you wish

       14    you could have -- you knew back then what we know now about

14:30:46 15    where we would be in this litigation and the quality of the

       16    work and -- and, frankly, the amount of work that needs to be

       17    done going forward.  I anticipate there's going to be more

       18    trials.

       19          But, anyway, I'm getting -- I'm digressing from the

14:31:01 20    issue.

       21          The issue is still going to be what's fair under the

       22    circumstances.  You know, is assessing the plaintiffs an

       23    additional whatever percentage fair if, in fact, the money

       24    that was spent gave them that opportunity?  I know they said

14:31:20 25    they relied on it, but I don't see any evidence of that

14:31:24  1  having influenced that settlement at all.  I mean, I've heard

2  people say it did but I don't -- I mean, other than people

3  saying, well, geez, we wouldn't have entered this settlement

4  had we known that we would have had to pay -- and even

14:31:38  5  address it.  They can't do what's in the best interest of a

6  client to settle a case based upon whether or not their fee

7  is going to be assessed an additional 2 or 3 percent.

8      The same with costs.  I mean, if the clients' costs

9  are the clients' cost, and that cost is but a fraction of

14:31:58  10  what that client might have been assessed had they

11  individually been litigating that case, in fairness, should

12  the clients still have to pay that additional cost?

13      I just don't -- I mean, I've heard a lot about that

14  influencing settlement, about there being reliance on that,

14:32:14  15  but I just -- I think that is a lot more speculative and

16  there's really no evidence of that.  But what's not

17  speculative is the reports you've been given by

18  Judge Corodemus about the number of hours that have been

19  spent on this case and the number -- and I think we've

14:32:35  20  clarified the cost issue at sidebar, and the amount of work

21  that might be ahead of us.

22      It could be -- Your Honor, if all these cases settle

23  July 1, I mean, if you entered a holdback order between now

24  and then, and we could address the fact that, you know, all

14:32:51  25  those things that we were anticipating happening in the

14:32:56  1    future didn't happen and we can -- you know, we can talk to

2    others in our group and the PEC and others that have settled

3    the case and we'll come back to you and say, you know, we

4    don't need that holdback anymore.

14:33:09  5         The reason for the holdback, I think Judge -- I keep

6    quoting Judge Kennelly and Judge Kincaid because I think they

7    were faced with the same issue, is it's the uncertainty and

8    the unknown that we need to protect, and I think the people

9    that are going to be potentially putting in more time and

14:33:23 10   more money into this litigation for the common benefit, and

11   who have done that, you know, need to be able to be protected

12   in the event we come back to you and can show you that maybe

13   6 percent was not an appropriate assessment at the time.

14         THE COURT:  All right.  Thanks, Mr. Lopez.

14:33:38 15         MR. LOPEZ:  Thank you, Your Honor.

16         THE COURT:  Mr. North --

17         MS. ZAIC:  Your Honor.

18         THE COURT:  Yes.

19         MS. ZAIC:  I apologize.  Julie Reed Zaic on behalf of

14:33:46 20   the Plaintiffs' Steering Committee.

21         May I make an additional comment on behalf of

22   plaintiffs?

23         THE COURT:  Yes.

24         MS. ZAIC:  Again, I apologize.  I will make it very

14:33:53 25   short.

14:33:53    1        I just want to clarify something that was mentioned

2    earlier by Mr. Goss, and I apologize I didn't catch counsel's

3    name, an additional objector who spoke.  But with regard to

4    the preemption filing, I agree that preemption filings are

14:34:06    5    common, they're anticipated in MDLs.

6        But the preemption motion filed by Bard in this

7    matter was not of the kind that is normally seen in an MDL.

8    It was, to my knowledge, unprecedented in the MDL with regard

9    to the legal theory that they brought forward.

14:34:22   10        There were probably two to three individual district

11    court cases with published opinions prior to Bard filing that

12    motion, whereas a preemption motion is usually filed at the

13    outset of litigation or at the end during the dispositive

14    phase.

14:34:38   15        If you recall, Your Honor, Bard actually asked for

16    leave from the Court to file their papers at the time that

17    they did, which was March of 2017.  The legal theory

18    encompassed how individual the issue was to Bard, and it was

19    treated differently than preemption motions that are normally

14:34:56   20    anticipated are usually treated in a court.

21        If you recall, Your Honor, we actually took on a

22    separate discovery track.  We incurred additional expenses

23    and time with preparing expert reports and additional

24    discovery on those reports specific to this individual

14:35:16   25    preemption issue.  The papers were filed in March 2017, and

14:35:21  1    the time that it took for several PSC firms who stepped aside

2    to handle that matter culminated in an oral argument that did

3    not take place until a week before Thanksgiving, 2017.  It

4    was ten months.

14:35:37  5         I'm sure Your Honor recalls the voluminous filings,

6    Your Honor's clerks certainly remember the voluminous

7    filings.

8         But I just wanted to make that clarification with

9    regard to preemption in this matter and a legal theory that

14:35:48 10   was used.  I especially wanted to clarify the record -- I

11   apologize, but when the word malpractice was actually placed

12   on the record, I feel compelled to make the clarification.

13        Thank you.

14        THE COURT:  All right.  Thanks, Ms. Zaic.

14:36:01 15        I do think the malpractice comment was directed at

16   defense counsel, not plaintiffs, but I understand your point.

17        Mr. North, the question I had was, from Bard's

18   perspective, what do you anticipate in the way of trial

19   preservation depositions of experts or corporate witnesses

14:36:22 20   that need to be done in this MDL?

21        MR. NORTH:  We actually were having a discussion

22   about that yesterday, Your Honor.  Right now we are

23   anticipating probably three to five at most.

24        THE COURT:  Of whom?  Generally.  What categories?

14:36:39 25        MR. NORTH:  Not experts.  A couple of corporate

14:36:42  1   witnesses.  Probably Ms. O'Quinn, the regulatory person who no

          2   longer works at Bard.  Probably a couple of other employees

          3   that have moved on and therefore it's difficult to bring them

          4   live.  So my best estimate is three to five at most.

14:37:04  5          THE COURT:  So you're not inclined to take expert

          6   preservation depositions?

          7          MR. NORTH:  Not right now, Your Honor, no.

          8          THE COURT:  If the cases go back and there's going to

          9   be ten trials, then your view is that those experts should

14:37:15 10   appear in all ten cases as opposed to being subject to a trial

         11   deposition that could be played in all ten cases?

         12          MR. NORTH:  I believe so, Your Honor, but I believe

         13   the odds of that happening are not particularly great.  I

         14   believe we're going to see a lot of these cases resolve before

14:37:31 15   they're ever remanded.  And I also believe there are not going

         16   to be that many trials once they are remanded in that the

         17   remand itself will spur settlement on a lot of these.  If it

         18   doesn't before the remand.

         19          It is possible we might do -- we talked about one

14:37:50 20   expert, but he's a very limited issue expert and not one of

         21   the major ones.  We do not plan to do at this point major

         22   preservation depos of all of the experts.

         23          If I change our thinking I will let the Court know

         24   that, but that is our preliminary sort of decision in our

14:38:08 25   initial discussions.

14:38:09 1          THE COURT:  Okay.  Thanks.

2          Mr. Lopez, did you want to comment on that issue

3     specifically?

4          MR. LOPEZ:  Yeah.  I think that -- you know, maybe

14:38:16 5     we're different positions with respect to experts.  I think we

6     need to probably preserve every generic expert on the

7     plaintiff side for preservation.

8          Defense counsel has maybe different ideas about that

9     or different access or different resources.  But I think --

14:38:38 10    you know, I mean, in fairness to the lawyer and our country

11    courthouse who has limited resources to somebody who has

12    unlimited resources, I think we have to make that expert

13    available to him or her.  And the only sure way of doing that

14    is to do preservation depositions of our experts.

14:38:59 15         THE COURT:  All right.

16         Thank you all for your arguments.  I'll take this

17    under advisement and I think get a decision out within the

18    next few days.  It won't take long.

19         Thank you all.

14:39:11 20        MR. LOPEZ:  Thank you, Your Honor.

21         MR. NORTH:  Thank you.

22       (End of transcript.)

23                         *  *  *  *  *

24

25

1                      **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion

9   of the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control, and to the best

12  of my ability.

13

14         DATED at Phoenix, Arizona, this 6th day of June,

15  2019.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter

21

22

23

24

25