1  Mark S. O'Connor (011029)
   BEUS GILBERT PLLC
2  701 North 44th St.
   Phoenix, AZ 85008
3  Telephone: (480) 429-3000
   moconnor@beusgilbert.com
4
   Ramon Rossi Lopez (admitted *pro hac vice*)
5  (CA Bar No. 86361)
   LOPEZ MCHUGH LLP
6  100 Bayview Circle, Suite 5600
   Newport Beach, CA 92660
7  rlopez@lopezmchugh.com

8  *Attorneys for Plaintiffs*

9  James R. Condo (#005867)
   Kristine L. Gallardo (#033975)
10 SNELL & WILMER L.L.P.
   One Arizona Center
11 400 E. Van Buren, Suite 1900
   Phoenix, AZ 85004-2204
12 Telephone:  (602) 382-6000
   jcondo@swlaw.com
13 kgallardo@swlaw.com

14 Richard B. North, Jr. (admitted *pro hac vice*)
   Georgia Bar No. 545599
15 Matthew B. Lerner (admitted *pro hac vice*)
   Georgia Bar No. 446986
16 NELSON MULLINS RILEY & SCARBOROUGH LLP
   Atlantic Station
17 201 17th Street, NW, Suite 1700
   Atlanta, GA 30363
18 Telephone: (404) 322-6000
   richard.north@nelsonmullins.com
19 matthew.lerner@nelsonmullins.com

20 *Attorneys for Defendants*
   *C. R. Bard, Inc. and*
21 *Bard Peripheral Vascular, Inc.*

22       **IN THE UNITED STATES DISTRICT COURT**

23          **FOR THE DISTRICT OF ARIZONA**

24 IN RE:  Bard IVC Filters Products          No. 2:15-MD-02641-DGC
   Liability Litigation
25                                            **JOINT PROPOSED REPORT FOR
                                              PURPOSES OF SUGGESTION OF
26                                            REMAND OR TRANSFER OF
                                              CERTAIN CASES**
27
                                              (Assigned to the Honorable David G.
28                                            Campbell)

Pursuant to Case Management Order No. 42 (Doc. 16343 at 7), and the Court's Order dated June 27, 2019 (Doc. 18877), the parties submit the following joint proposed report to be sent to the United States Judicial Panel for Multidistrict Litigation with cases recommended for remand and to districts receiving transfers under § 1404(a) for all cases in this MDL that are not in Track 1 or Track 2. *See* Doc. 16343 at 6.

## I.    Introduction.

This multidistrict litigation proceeding ("MDL") involves thousands of personal injury cases brought against Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard"). Bard manufactures and markets medical devices, including inferior vena cava ("IVC") filters. The MDL Plaintiffs have received implants of Bard IVC filters and claim that they are defective and have caused Plaintiffs to suffer serious injury or death.

The MDL was transferred to this Court in August 2015 when 22 cases had been filed. Doc. 1. To date, more than 7,000 cases have been filed. The Court has completed all consolidated pretrial proceedings and is satisfied that the MDL has matured sufficiently to warrant closing. The Court set May 31, 2019, as the closing date for new cases to be transferred to or directly filed in this MDL. Doc. 17494 at 2. Many of the cases pending in this MDL have settled, and the parties have indicated to the Court that many others appear to be nearing a settlement agreement. The Court has concluded that the cases listed on Schedule A, which have not been identified as nearing settlement, will no longer benefit from centralized proceedings and should be remanded to the transferor courts. The Court therefore provides this Suggestion of Remand to the United States Judicial Panel for Multidistrict Litigation (the "Panel"). The Court has also concluded that the cases listed on Schedule B, which also have not been identified as nearing settlement, should be transferred under 28 U.S.C. § 1404(a).

To assist the transferor courts on remand, if ordered by the Panel, or the transferor courts receiving transfers under § 1404(a), this order describes events that have taken place in these cases and the MDL as a whole. A copy of this order, along with the case files and materials, will be available to the transferor courts after remand or transfer.

**II.    Background.**

The IVC is a large vein that returns blood to the heart from the lower body. An IVC filter is a small device implanted in the IVC to catch blood clots before they reach the heart and lungs. This MDL involves multiple versions of Bard's IVC filters – the Recovery, G2, G2X, Eclipse, Meridian, and Denali. These are umbrella-shaped devices that have multiple limbs fanning out from a cone-shaped head. The limbs consist of legs with hooks that attach to the IVC wall and curved arms to catch or break up blood clots. Each of these filters is a variation of its predecessor.[1]

The MDL Plaintiffs allege that Bard filters are more dangerous than other IVC filters because they have higher risks of tilting, perforating the IVC, or fracturing and migrating to vital organs. Plaintiffs further allege that Bard failed to warn patients and physicians about these higher risks. Defendants dispute these allegations, contending that Bard filters are safe and effective, that their complication rates are low and comparable to those of other IVC filters, and that the medical community is aware of the risks associated with IVC filters.

As noted, more than 7,000 cases have been filed in this MDL since its inception in 2015. By late 2017, the parties completed all common discovery and filed dispositive and *Daubert* motions. The Court has ruled on Defendants' motion for summary judgment on preemption grounds, decided more than a dozen *Daubert* motions, and resolved summary judgment motions in five bellwether cases. Three bellwether cases were tried in 2018. The Defendants prevailed in two of those trials, and the Plaintiff obtained a verdict (solely on the negligent failure to warn claim) in the third. The Court granted summary judgment in favor of Defendants in a fourth bellwether case, and removed a fifth case from the bellwether trial schedule. The final bellwether case settled before trial earlier this year.

**III.    Suggestion of Remand.**

**A.    Remand Standard.**

The power to remand MDL cases rests solely with the Panel. 28 U.S.C. § 1407(a);

---

[1]    For further discussion of IVC filters and their uses, see the Court's order addressing Defendants' summary judgment motion on preemption. Doc. 8872 at 1-2.

1    *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 28 (1998). The

2    Panel typically relies on the transferee court to suggest when it should order remand.

3    J.P.M.L. Rule 10.1(b)(i); *see In re Motor Fuel Temperature Sales Practices Litig.*, No. 07-

4    MD-1840-KHV, 2012 WL 1963350, at *1 (D. Kan. May 30, 2012). Indeed, the Panel "is

5    reluctant to order a remand absent the suggestion of the transferee judge[.]" J.P.M.L. Rule

6    10.3(a); *see In re Regions Morgan Keegan Sec., Derivative & ERISA Litig.*, No. 2:09-md-

7    2009-SHM, 2013 WL 5614285, at *2 (W.D. Tenn. Feb. 28, 2013). The transferee court may

8    suggest to the Panel that cases be remanded where they are "ready for trial, or . . . would no

9    longer benefit from inclusion in the coordinated or consolidated pretrial proceedings." *In re

10   Multi-Piece Rim Prods. Liab. Litig.*, 464 F. Supp. 969, 975 (J.P.M.L. 1979); *see In re TMJ

11   Implants Prods. Liab. Litig.*, 872 F. Supp. 1019, 1038 (D. Minn. 1995).

12          **B.      The MDL Cases Should Be Remanded.**

13          The Court has completed all consolidated pretrial proceedings in this MDL. All

14   common fact and expert discovery in this MDL have been completed, and the Court has

15   ruled on *Daubert* motions and Defendants' summary judgment motion on preemption. The

16   Court, as requested by the parties, has also completed bellwether proceedings to provide

17   insight into how their claims and defenses would be received by juries, with the hope that a

18   global settlement could be achieved before the cases were remanded. Doc. 13329 at 2. The

19   Court is satisfied that the MDL has matured sufficiently to warrant closing and set a closing

20   date of May 31, 2019. Doc. 17494 at 2. The MDL cases listed on Schedule A, which have

21   not been identified as nearing a settlement agreement, would no longer benefit from

22   centralized proceedings. The remaining case-specific issues in these cases are best left to

23   the transferor courts to resolve. The Court therefore suggests that the Panel remand the cases

24   listed on Schedule A to the transferor courts for further proceedings. *See In re TMJ

25   Implants*, 872 F. Supp. at 1038 (suggesting remand of cases that no longer benefited from

26   inclusion in consolidated pretrial proceedings).

27

28

**IV.     Transfer Under § 1404(a).**

    **A.     Transfer Standard.**

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

    **B.     The MDL Cases Should Be Transferred.**

Not all of the civil actions in this MDL were transferred to this Court by the Panel. Many cases were directly filed in this MDL but did not originate in Arizona. CMO No. 4, entered on December 17, 2015, permitted any plaintiff whose case would be subject to transfer to the MDL to file his or her case directly in this Court by using a short form complaint. Doc. 363 at 3 (as amended by Docs. 1108, 1485). Plaintiffs were required to identify in the pleading the district court and division in which venue would be proper absent direct filing. *Id.* at 7. CMO No. 4 further provided that, upon completion of the pretrial proceedings related to a civil action as determined by this Court, the case shall be transferred pursuant to 28 U.S.C. § 1404(a) to the district court identified in the short form complaint. *Id.* at 3-4.

As noted, the Court has completed all consolidated pretrial proceedings in this MDL. The cases listed on Schedule B, which also have not been identified as nearing a settlement agreement, would no longer benefit from centralized proceedings. The remaining case-specific issues in these cases are best left to the proper district courts to resolve. The Court therefore concludes that, "for the convenience of parties and witnesses, in the interest of justice," the cases listed on Schedule B should be transferred under § 1404(a) to the proper district courts identified on Schedule B for further proceedings. Prior to transfer, Defendants may object to the district specified in the short form complaint, and listed on Schedule B, based on venue or jurisdiction (including a lack of personal jurisdiction based on *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014)), and propose an alternative jurisdiction for the Court's consideration. Doc. 363 at 4.

**V.     The MDL Proceedings.**

A summary of the MDL proceedings to date is provided below to assist the transferor courts on remand, if ordered by the Panel, or the district courts receiving transfers under § 1404(a). Case management orders, discovery orders, and other significant rulings are listed in Exhibit 1. The status of the remaining case-specific discovery and other pretrial issues for these cases, and the estimated time needed to resolve such issues and make the cases ready for trial, will be determined by the parties and reported to the district courts on remand or transfer.

**A.     Case Management Orders.**

The primary orders governing pretrial management of this MDL are a series of case management orders ("CMOs"), along with certain amendments. To date, the Court has issued 43 CMOs. These orders are discussed below and can be found on the Court's website at http://www.azd.uscourts.gov/case-info/bard.

**B.     Lead and Liaison Counsel.**

CMO No. 1, entered on October 30, 2015, appointed Co-Lead/Liaison Counsel for Plaintiffs ("Lead Counsel") to manage the litigation on behalf of Plaintiffs, and set out the responsibilities of Lead Counsel. Doc. 248. Plaintiffs' Lead Counsel has changed since the inception of the MDL. Mr. Ramon Lopez, of Lopez McHugh, LLP, in Newport Beach, California, and Mr. Mark O'Connor, of Beus Gilbert PLLC, in Phoenix, Arizona, are now Lead Counsel for Plaintiffs. Doc. 5285. Mr. Richard North of Nelson Mullins Riley & Scarborough, LLP, in Atlanta, Georgia, is Defendants' Lead Counsel.

**C.     Plaintiffs' Steering Committee and Common Benefits Fund.**

CMO No. 1 directed the selection and appointment of a Plaintiffs' Steering Committee ("PSC") to assist in the coordination of pretrial activities and trial planning. Plaintiffs' Lead Counsel and the PSC together form the Plaintiffs' Leadership Counsel ("PLC"). The PSC acts on behalf of, or in consultation with, Plaintiffs' Lead Counsel in the management of the litigation. The PLC assists all Plaintiffs in the MDL by overseeing discovery, appearing in court, attending status conferences, and preparing motions and

responses regarding case-wide discovery matters. CMO No. 1 has been amended to select and appoint a Plaintiffs' Executive Committee ("PEC") to assist the Lead Counsel in the administration, organization, and strategic decisions of the PLC. Doc. 4016. The configuration of the PSC has changed during the course of the litigation. *See* Docs. 248, 4016, 5285.

CMO No. 6, entered December 18, 2015, set forth rules, policies, procedures, and guidelines for fees and expenses incurred by attorneys acting for the common benefit of all MDL Plaintiffs. Doc. 372

**D.      Master and Short-Form Pleadings.**

CMO No. 2, entered October 30, 2015, required the creation of a master complaint, a master answer, and templates of short-form complaints and answers. Doc. 249 at 6. The master complaint and answer were filed December 12, 2015. Docs. 364, 366. They are the operative pleadings for most of the cases in this MDL. The master complaint serves as a long-form complaint giving notice, pursuant to Rule 8, of the allegations that the MDL Plaintiffs assert generally. Doc. 364. The master complaint asserts 17 claims and seeks both compensatory and punitive damages. *Id.* ¶¶ 166-349.

Plaintiff-specific allegations are contained in individual short-form complaints (Doc. 303-2) or certain complaints served on Defendants before the filing of the master complaint. Plaintiffs also provide Defendants with profile forms and fact sheets that describe their individual conditions and claims. Doc. 365 (CMO No. 5, as amended by Doc. 927).

**E.      Status Conferences.**

Since the inception of the MDL, the Court has held regular status conferences with Lead Counsel for the parties to discuss issues related to the litigation. The initial case management conference was held in October 2015. Doc. 246. Deadlines were set for, among other things, the filing of master and short-form pleadings, profile forms, a proposed protective order (including Rule 502 provisions), a proposed protocol governing the production of electronically stored information ("ESI"), as well as deadlines to complete first-phase MDL discovery and address privilege log issues. Doc. 249 (CMO No. 2).

1   Thereafter, the Court held periodic status conferences to ensure that the parties were on task
2   and to address routine discovery issues and disputes. In addition to the status conferences,
3   the Court conducted telephonic hearings to address time-sensitive issues, as well as
4   numerous additional conferences to consider various matters such as hearings on dispositive
5   motions and general case management issues.

6         **F.**     **Discovery.**

7             **1.**     **General Fact Discovery.**

8        Prior to the establishment of this MDL, Plaintiffs had conducted substantial common
9   discovery against Bard concerning all aspects of Bard IVC filters, including the design,
10  testing, manufacturing, marketing, labeling, and post-market surveillance of these devices.
11  Bard produced numerous documents and ESI, responded to thousands of written discovery
12  requests, and more than 80 corporate witness depositions were taken. The pre-MDL general
13  fact discovery was made available by Bard to all Plaintiffs in the MDL.

14       This MDL was formed to centralize all pretrial proceedings and complete all
15  common fact and expert discovery concerning Bard IVC filters. Doc. 1. CMO No. 8
16  established a procedure concerning re-deposing witnesses in the MDL. Doc. 519. CMO No.
17  14 established deposition protocols generally. Doc. 2239. The Court allowed additional
18  depositions of a handful of corporate witnesses that had been previously deposed, as well
19  as numerous depositions of other Bard corporate witnesses, including several Rule 30(b)(6)
20  depositions. Docs. 3685, 4311. CMO No. 9 governed the production of ESI and hard-copy
21  documents. Doc. 1259.

22       Discovery in the MDL was separated into multiple phases. The parties completed
23  the first phase of MDL discovery in early 2016. Doc. 519. First-phase MDL discovery
24  included production of documents related to an FDA inspection and warning letter to Bard,
25  an updated production of complaint and adverse event files, and an updated version of
26  Bard's complaint database relating to IVC filters. Doc. 249. Plaintiffs also conducted a Rule
27  30(b)(6) deposition concerning the FDA inspection and warning letter, and a deposition of
28  corporate witness Kay Fuller.

The parties completed the second phase of MDL fact discovery in February 2017. CMO No. 8 set deadlines for the second phase, which included all common fact and expert issues in the MDL, but not case-specific issues to be resolved after remand. Docs. 249, 519. Second-phase discovery included extensive additional discovery related to Bard's system architecture for ESI, Bard's ESI collection efforts, ESI relating to Bard's IVC filters, and Bard's national and regional sales and marketing practices. Plaintiffs also deposed two corporate witnesses in connection with Kay Fuller's allegations that a submission to the FDA regarding the Recovery Filter did not bear her original signature. Doc. 1319 (CMO No. 10). Plaintiffs deposed additional corporate witnesses concerning the FDA inspections and warning letter. *Id.*

Bard also produced discovery regarding the sales and marketing materials related to the Simon Nitinol filter ("SNF"), documents comparing filter performance and failure rates to the SNF, and internal and regulatory communications relating to the SNF. Docs. 1319, 10489. The Court denied Plaintiffs' request to obtain ESI discovery from Bard's overseas operations. Doc. 3398. The Court denied Defendants' request to obtain discovery of communications between Plaintiffs' counsel and NBC related to NBC news stories about the products at issue in this litigation, and third-party financing that may be in place with respect to Plaintiffs in this MDL. Docs. 3313, 3314. Plaintiffs were required to produce communications between Plaintiffs and the FDA related to the FDA warning letter, but the Court denied Defendants' request to depose Plaintiffs' Counsel regarding these communications. Docs. 3312, 4339. Bard also produced punitive damages discovery, and Plaintiffs conducted a Rule 30(b)(6) deposition related to Bard's net worth.

All common fact discovery in these cases has now been completed except for preservation depositions for certain expert witnesses and corporate witnesses who will not be traveling to testify live at the trials of remanded cases. The parties are engaged in the meet and confer process as to these depositions. Thus, transferor courts need not be concerned with facilitating general fact discovery on remand or following transfer under § 1404(a).

### 2.   Case-Specific Discovery.

CMO No. 5 governed initial case-specific discovery and required the parties to exchange abbreviated profile forms. Doc. 365 (as amended by Doc. 927). Plaintiffs were required to provide Defendants with a Plaintiff Profile Form ("PPF") that described their individual conditions and claims. *Id.* at 5-9. Upon receipt of a substantially complete PPF, Defendants were required to provide the individual plaintiff with a Defendants' Profile Form ("DPF") that disclosed information and documents concerning Defendants' contacts and relationship with the plaintiff's physicians, tracking and reporting of the plaintiff's claims, and certain manufacturing related information for the plaintiff's filter. *Id.* at 12-14. Completed profile forms were considered interrogatory answers under Fed. R. Civ. P. 33, or responses to requests for production under Fed. R. Civ. P. 34, and were governed by the standards applicable to written discovery under Federal Rules 26 through 37. *Id.* at 2-3. CMO No. 5 also set deadlines and procedures for resolving any purported deficiencies with the parties' profile forms, and for dismissal of cases that did not provide substantially completed profile forms. *Id.* at 2.

Further discovery was conducted in a group of forty-eight cases ("PFS/DFS Group 1") selected for consideration in the bellwether trial process from the pool of cases filed and properly served upon Defendants in the MDL as of April 1, 2016 ("Initial Plaintiff Pool"). Docs. 1662, 3214, 4311 (CMO Nos. 11, 15, 19). Plaintiffs in PFS/DFS Group 1 were required to provide Defendants with a Plaintiff Fact Sheet ("PFS") that described their individual conditions and claims in greater detail, and provided detailed disclosures concerning their individual background, medical history, insurance, fact witnesses, prior claims, and relevant documents and records authorizations. Docs. 1662 at 3, 1153-1 (PFS).

Upon receipt of a PFS, Defendants were required to provide the individual plaintiff with a Defendants Fact Sheet ("DFS") that disclosed in greater detail information concerning Defendants' contacts and relationship with the plaintiff, plaintiff's physicians, or anyone on behalf of the plaintiff, Defendants' tracking and reporting of the plaintiff's claims, sales and marketing related information for the implanting facility, manufacturing

related information for the plaintiff's filter, and other relevant documents. Docs. 1662 at 3, 1153-2 (DFS). Completed fact sheets were considered interrogatory answers under Fed. R. Civ. P. 33, or responses to requests for production under Fed. R. Civ. P. 34, and were governed by the standards applicable to written discovery under Federal Rules 26 through 37. *Id.* at 3. CMO No. 11 also set deadlines and procedures for resolving any purported deficiencies with the parties' fact sheets. *Id.* at 2, 4-5. CMO No. 12 governed records discovery for PFS/DFS Group 1. Doc. 1663. The parties agreed to use The Marker Group to collect medical, insurance, Medicare, Medicaid, prescription, Social Security, workers' compensation, and employment records for individual plaintiffs from third-parties designated as custodians for such records in the PFS. *Id.* at 1.

From PFS/DFS Group 1, twelve cases were selected for further consideration as a bellwether case ("Discovery Group 1"). Docs. 1662, 3685, 4311 (CMO Nos. 11, 18, 19). CMO No. 20 set deadlines for additional, preliminary case-specific discovery in that group. Doc. 4335. Pursuant to the protocols set in CMO Nos. 14 (Doc. 2239) and 21 (Doc. 4866), the parties were permitted to depose Plaintiffs, the spouse or significant family member of Plaintiffs, the implanting physician, an additional treating physician, and either a Bard sales representative or supervisor. Doc. 4866 at 1-2. From Discovery Group 1, six Plaintiffs were selected for bellwether trials and further case-specific discovery ("Bellwether Group 1"). Docs. 1662, 3685, 4311, 5770, 11659 (CMO Nos. 11, 18, 19, 23, and 34).

Except for the forty-eight cases in PFS/DFS Group 1, the parties did not conduct case-specific fact discovery for the cases listed on Schedules A and B during the MDL proceedings, other than exchanging abbreviated profile forms. The Court has concluded that any additional case-specific discovery in these cases should await their remand or transfer.

### 3.    Expert Discovery.

CMO No. 8 governed expert disclosures and discovery. Doc. 519. The parties designated general experts in all MDL cases, and case-specific experts in individual bellwether cases. General expert discovery closed on July 14, 2017. Doc. 3685. The parties

did not conduct case-specific expert discovery for the cases listed on Schedules A and B during the MDL proceedings. The Court has concluded that case-specific expert discovery in these cases should await their remand or transfer.

### 4.    Privileged Materials.

CMO No. 2 required Defendants to provide to Plaintiffs all privilege logs in compliance with the Federal Rules of Civil Procedure. Doc. 249. The parties were then required to engage in an informal privilege log meet and confer process to resolve any privilege disputes. Defendants produced several privilege logs identifying documents withheld pursuant to the attorney-client privilege, the work-product doctrine, and other privileges. The parties regularly met and conferred regarding the privilege logs and engaged in negotiations regarding certain entries identified by Plaintiffs. As part of that meet and confer process, Defendants provided Plaintiffs with a small number of these identified items for inspection and, in some cases, withdrew certain claims of attorney-client privilege and produced the previously withheld items.

CMO No. 3 governed the non-waiver of any privilege or work-product protection in this MDL, pursuant to Federal Rule of Evidence 502(d), from Defendants' disclosure or production of documents on its privilege logs as part of the meet and confer process. Doc. 314.

In late 2015, Plaintiffs challenged a substantial number of documents on Defendants' privilege log. The parties engaged in an extensive meet and confer process, and Defendants produced certain documents pursuant to the Rule 502(d) order. Doc. 314. Plaintiffs moved to compel production of 133 disputed documents. The Court granted the motion in part. Doc. 2813. The parties identified several categories of disputed documents and provided sample documents to the Court for *in camera* review. The Court denied Plaintiffs' motion with respect to seven out of the eight categories of documents and found only one of the sample documents in one of the categories to contain unprivileged portions that should be produced. The Court found all other documents protected by the attorney-client privilege

or work product doctrine. The Court directed the parties to use this ruling as a guide to resolve remaining privilege disputes.

Since this ruling, there have been no further challenges to Defendants' privilege logs. Defendants continued to provide updated privilege logs throughout the discovery process, and the parties met and conferred to resolve privilege disputes. Privilege issues should not be a concern for any transferor court on remand.

### 5.    Protective Order and Confidentiality.

A stipulated protective order governing the designation, handling, use, and disclosure of confidential discovery materials was entered in November 2015. Doc. 269. CMO No. 7, entered January 5, 2016, governed redactions of material from additional adverse event reports, complaint files, and related documents in accordance with the Health Insurance Portability Act of 1996 ("HIPAA") and under 21 C.F.R. § 20.63(f). Doc. 401.

In September 2016, to expedite production of ESI, the parties agreed to a primarily "no-eyes-on" document production as to relevancy while still performing a privilege review for this expedited ESI document production. CMO No. 17 (Doc. 3372) modified the protections and requirements in the stipulated protective order (Doc. 269) and CMO No. 7 (Doc. 401) for ESI produced pursuant to this process. CMO No. 17 was amended in November 2016. Doc. 4015.

Defendants filed a Motion to Seal Certain Trial Exhibits at the conclusion of the first bellwether trial. Doc. 11010. The Court denied this motion and Defendants' subsequent Motion for Reconsideration. Docs. 11642, 11766, 12069. Defendants also filed a Motion to Enforce the Protective Order for the second and third bellwether trials collectively. Doc. 13126. This motion was denied. Doc. 14446. A list of exhibits admitted at the bellwether trials (excluding case-specific medical records) and documents deemed no longer subject to the Protective Order are attached as Exhibit 2.

### G.    Bellwether Cases and Trials.

CMO No. 11, entered May 5, 2016, provided for the selection of individual Plaintiffs who would be subject to case-specific discovery and eligible to be part of the bellwether

trial process. Doc. 1662. From that group, six Plaintiffs were selected for bellwether trials. Docs. 5770 (CMO No. 23), 11659 (CMO No. 34). To date, the Court has presided over three bellwether trials: *Booker v. C. R. Bard, Inc.*, No. CV-16-00474-PHX-DGC, *Jones v. C. R. Bard, Inc.*, No. CV-16-00782-PHX-DGC, and *Hyde v. C. R. Bard, Inc.*, No. CV-16-00893. The Court granted summary judgment in one of the bellwether cases (Doc. 12202), and removed another from the bellwether trial schedule. Doc. 13329 (CMO No. 40). The final bellwether case settled before trial in May 2019. The Court determined that a sixth bellwether trial would not be necessary. Docs. 12853, 13329 (CMO Nos. 38, 40).

### 1.   *Booker v. C. R. Bard, Inc.*, No. CV-16-00474.

The first bellwether trial concerned Plaintiff Sherr-Una Booker and involved a Bard G2 filter. The filter had tilted, migrated, and fractured. Plaintiff required open heart surgery to remove the fractured limbs and repair heart damage caused by a percutaneous removal attempt. The Court granted in part Defendants' motion for summary judgment. Docs. 8873, 8874. The claims for failure to warn, design defect, and punitive damages were tried to a jury over a three-week period in March 2018.

The jury found for Plaintiff Booker on her negligent failure-to-warn claim, and in favor of Defendants on the design defect and strict liability failure-to-warn claims. Doc. 10595. The jury returned a verdict of $2 million on compensatory damages (of which $1.6 million was attributed to Defendants) and $2 million in punitive damages. *Id.*; Doc. 10596. The Court denied Defendants' motion for judgment as a matter of law and motion for a new-trial. Docs. 10879, 11598. Defendants have appealed to the Ninth Circuit. Docs. 11934, 11953. Plaintiff had filed and later dismissed with prejudice a cross-appeal. Docs. 12070, 17916.

### 2.   *Jones v. C. R. Bard, Inc.,* No. CV-16-00782.

The second bellwether trial concerned Plaintiff Doris Jones and involved a Bard Eclipse filter. The Court granted in part Defendants' summary judgment motion. Doc. 10404. The claims for failure to warn, design defect, and punitive damages were tried to a jury over a three-week period in May 2018. The jury returned a defense verdict. Doc. 11350.

1   Plaintiff filed a motion to contact the jurors, Doc. 11663, which was denied. Doc. 12068.

2   Plaintiff's appeal of the court's rulings excluding cephalad migration death evidence is

3   pending. Docs. 12057, 12071.

4         **3.**    ***Kruse v. C. R. Bard, Inc.*, No. CV-15-01634.**

5       Plaintiff Carol Kruse's case was set for trial in September 2018. The Court granted

6   Defendants' summary judgment motion on statute of limitations grounds. Doc. 12202.

7         **4.**    ***Hyde v. C. R. Bard, Inc.*, No. CV-16-00893.**

8       The third bellwether trial concerned Plaintiff Lisa Hyde and involved either a Bard

9   G2X or Eclipse filter (the exact model was in dispute). Ms. Hyde's case was moved to the

10   September 2018 bellwether slot in lieu of Ms. Kruse's case. Doc. 11867. The Court granted

11   Defendants' summary judgment motion on Ms. Hyde's claims for breach of implied

12   warranty, failure to warn, failure to recall, misrepresentation, concealment, and fraud. Doc.

13   12007. Plaintiffs withdrew their claims for manufacturing defect and breach of express

14   warranty before Defendants moved for summary judgment. The Court also entered

15   judgment in favor of Defendants on Ms. Hyde's claim for negligence per se after concluding

16   that it was impliedly preempted under 21 U.S.C. § 337(a). Doc. 12589. The remaining

17   claims for design defect, loss of consortium, and punitive damages were tried to a jury over

18   a three-week period in September 2018. After the close of Plaintiffs' evidence at trial, the

19   Court granted in part Defendants' motion for judgment as a matter of law with respect to

20   future damages for any cardiac arrhythmia Ms. Hyde may experience, but denied as to the

21   remaining claims. Doc. 12805. The jury returned a defense verdict. Doc. 12891. Plaintiff

22   has appealed. Docs. 13465, 13480.

23         **5.**    ***Mulkey v. C. R. Bard, Inc.*, No. CV-16-00853.**

24       Plaintiff Debra Mulkey's case was set for trial in February 2019. Before trial,

25   Plaintiffs moved to remove Mulkey from the bellwether trial schedule. Doc. 12990.

26   Defendants opposed the motion. Doc. 13117. The Court granted the motion. Doc. 13329.

27   The Court "d[id] not agree with Defendants' assertion that Mulkey 'is close to a non-injury

28   case.' … And if another Eclipse defense verdict resulted from a Mulkey trial, as appears

1   likely, the parties would learn nothing about the valuation of limited injuries in filter cases."

2   For this reason and because Mulkey would have been the third trial potentially involving a

3   Bard Eclipse filter, the Court concluded that the time and expense of trying Mulkey

4   significantly outweighed any benefits to be derived from the trial. *Id.* at 4.

5   **6.    *Tinlin v. C. R. Bard, Inc.*, No. CV-16-00263.**

6   The final bellwether trial concerned Plaintiff Debra Tinlin and involved a Bard

7   Recovery filter. The Court granted Defendants' summary judgment motion on Ms. Tinlin's

8   claims for misrepresentation and deceptive trade practices, as well as future damages for a

9   lung resection, but denied as to the remaining claims. Doc. 17008. Plaintiffs withdrew their

10  claims for manufacturing defect, failure to recall, negligence per se, and breach of warranty.

11  The remaining claims for failure to warn, design defect, concealment, loss of consortium,

12  and punitive damages, as well as future damages for CT scans, chronic cough, and asthma,

13  were scheduled to be tried to a jury over a three-week period in May 2019. The case settled

14  before trial.

15  **H.    Key Legal and Evidentiary Rulings.**

16  The Court has made many significant rulings in this MDL, some of which affect the

17  remanded or transferred cases. The Court provides the following summary of key legal and

18  evidentiary rulings to assist the transferor courts on remand or transfer.

19  **1.    Medical Monitoring Class Action Ruling.**

20  In May 2016, Plaintiffs' counsel filed a medical monitoring class action that was

21  consolidated with the MDL. *See Barraza v. C. R. Bard, Inc.*, No. CV-16-01374. The

22  *Barraza* Plaintiffs moved for class certification for medical monitoring relief on behalf of

23  themselves and classes of individuals who have been implanted with a Bard IVC filter, have

24  not had that filter removed, and have not filed a claim or lawsuit for personal injury related

25  to the filter. *Id.*, Doc. 54. The Court denied the motion. *Id.*, Doc. 95.

26  The class certification motion recognized that only 16 states permit claims for

27  medical monitoring. The Court concluded that the classes could not be certified under

28  Federal Rule of Civil Procedure 23(b)(3) because individual issues would predominate. *Id.*

at 20-21.[2] The Court further concluded that the class could not be certified under Rule 23(b)(2) because the medical monitoring relief primarily constituted monetary rather than injunctive relief, and the class claims were not sufficiently cohesive to permit binding class-wide relief. *Id.* at 21-32. Finally, the Court concluded that typicality under Rule 23(a)(3) had not been established. *Id.* at 32-34. The *Barazza* Plaintiffs ultimately dismissed their claims without prejudice. Docs. 106, 107. No appeal has been filed.

## 2. Federal Preemption Ruling.

Defendants moved for summary judgment on the grounds that Plaintiffs' state claims are expressly preempted by the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360 et seq., and impliedly preempted by the MDA under the Supreme Court's conflict preemption principles. Doc. 5396. The Court denied Defendants' motion. Doc. 8872. Defendants have appealed this ruling. Docs. 11934, 11953.

The MDA curtails state regulation of medical devices through a provision that preempts state requirements that differ from or add to federal requirements. 21 U.S.C. § 360k. The Bard IVC filters at issue in this litigation were cleared for market by the FDA through section "510k" review, which focuses primarily on equivalence rather than safety and effectiveness. *See* § 360c(f)(1)(A).

The Supreme Court in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), held that § 360k does not preempt state law claims directed at medical devices cleared through the 510(k) process because substantial equivalence review places no federal requirements on a device. *Id.* at 492-94. *Lohr* also noted that the "510(k) process is focused on *equivalence*, not safety." *Id.* at 493 (emphasis original). Although the Safe Medical Devices Act of 1990

---

[2] These individual issues would arise from several key elements of the *Barazza* Plaintiffs' claims: (1) whether Bard was negligent in the design of various generations of filters; (2) whether Bard was negligent in failing to disclose risks for various kinds of filters at various points in time; (3) whether the learned intermediary defense applies; (4) whether assumption of risk or contributory or comparative negligence applies; (5) whether the proposed medical monitoring is necessary and distinct from the ordinary course of treatment the class member is receiving; and (6) what state law should apply to each class member's claim. *Id.*

("SMDA"), Pub. L. 101-629, introduced safety and effectiveness considerations into 510(k) review, it did so only comparatively. The Court found that *Lohr* remains good law, and that clearance of a product under 510(k) generally does not preempt state common law claims. Doc. 8872 at 12-14.

The Court found that Defendants failed to show that the 510(k) reviews for Bard IVC filters imposed device-specific requirements as needed for preemption under § 360k. *Id.* at 14-20. Even if device-specific federal requirements could be ascertained, Defendants made no showing that any particular state law claim is expressly preempted by federal requirements. *Id.* at 21-22.

The Court further found that Plaintiffs' state law claims are not impliedly preempted because Defendants failed to show that it is impossible to do under federal law what the state laws require. *Id.* at 22-24.

### 3.    The Lehmann Report Privilege and Work Product Rulings.

The Court granted Defendants' motion for a protective order to prevent Plaintiffs from using the December 15, 2004 report of Dr. John Lehmann. Doc. 699. Dr. Lehmann provided various consulting services to Bard at different times. Following Bard's receipt of potential product liability claims involving the Recovery Filter, Bard's legal department retained Dr. Lehmann in November 2004 to provide an assessment of the risks associated with the Recovery filter and the extent of Bard's legal exposure. Dr. Lehmann prepared a written report of his findings at the request of the legal department and in anticipation of litigation. The Court found the report to be protected from disclosure by the work product doctrine. *Id.* at 4-12. The Court further found that Plaintiffs had not shown a substantial need for the report or undue hardship if the report were not disclosed. *Id.* at 13-15. The Court agreed with the parties that this ruling does not alter any prior rulings by transferor judges in specific cases. *Id.* at 22.

### 4.    *Daubert* Rulings.

The Court has ruled on the parties' *Daubert* motions and refers the transferor courts to the following orders:

- 18 -

| ***Daubert* Order** | **Doc. No(s).** |
|---|---|
| Order on Motion to Disqualify Plaintiffs' Expert Dr. Thomas Kinney | 9428, 10323 |
| Order on Motion to Disqualify Plaintiffs' Experts Drs. Scott Resnick, Robert Vogelzang, Kush Desai, and Robert Lewandowski | 9432 |
| Order on Motions to Exclude Opinions of Plaintiffs' Experts Drs. David Kessler and Suzanne Parisian | 9433 |
| Order on Motion to Exclude Opinions of Plaintiffs' Experts Drs. Thomas Kinney, Anne Christine Roberts, and Sanjeeva Kalva | 9434 |
| Order on Motion to Exclude Opinions of Plaintiffs' Expert Dr. Mark Eisenberg | 9770 |
| Order on Motion to Exclude Opinions of Plaintiffs' Expert Dr. Derek Muehrcke | 9771 |
| Order on Motion to Exclude Opinions of Plaintiffs' Expert Dr. Darren Hurst | 9772 |
| Order on Motion to Exclude Opinions of Plaintiffs' Expert Dr. Rebecca Betensky | 9773 |
| Order on Motion to Exclude Opinions of Defendants' Expert Dr. Clement Grassi | 9991, 10230 |
| Orders on Motions to Exclude Opinions of Plaintiffs' Expert Dr. Robert McMeeking | 10051, 16992 |
| Order on Motion to Exclude Opinions of Plaintiffs' Expert Dr. Robert Ritchie | 10052 |
| Order on Motion to Exclude Opinions of Plaintiffs' Experts Drs. David Garcia and Michael Streiff | 10072 |

| Orders on Motions to Exclude Opinions of Defendants' Expert Dr. Christopher Morris | 10230, 10231, 17285 |

### 5. Motion in Limine Rulings.

#### a. FDA Evidence (*Cisson* Motion).

In the Booker bellwether trial, Plaintiffs sought to exclude, under Federal Rules of Evidence 402 and 403, evidence of FDA 510(k) clearance of Bard IVC filters and the lack of FDA enforcement action against Bard. Doc. 9529. The Court denied the motion. Docs. 9881, 10323.

The Court found that under Georgia law, which applied in both the Booker and Jones bellwether cases, compliance with federal regulations may not render a manufacturer's design choice immune from liability, but evidence of Bard's compliance with the 510(k) process was nonetheless relevant to the design defect and punitive damages claims under Georgia law. Doc. 9881 at 3-4. The Court acknowledged concerns that FDA evidence might mislead the jury or result in a mini-trial. *Id.* at 5-6 (citing *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig. (Cisson)*, No. 2:10-CV-01224, 2013 WL 3282926, at *2 (S.D.W. Va. June 27, 2013)). But the Court concluded that such concerns could be adequately addressed by efficient management of the evidence and adherence to the Court's time limits for trial, and, if necessary, by a limiting instruction regarding the nature of the 510(k) process. *Id.* at 6-7.[3]

The Court noted that the absence of any evidence regarding the 510(k) process would run the risk of confusing the jury, as many of the relevant events in this litigation occurred in the context of FDA 510(k) review and are best understood in that context. Doc. 9881 at

---

[3] The Court did not find a limiting instruction necessary at the close of either the Booker or Jones bellwether trials. *See* Trial Tr. Day 11, at 2447:18-19, *Booker v. C. R. Bard, Inc.* (D. Ariz. Mar. 29, 2018).

7. Nor was the Court convinced that all FDA-references could adequately be removed from the evidence. *Id.*

The Court further concluded that it would not exclude evidence and arguments by Defendants that the FDA took no enforcement action against Bard with respect to the G2 or Eclipse filters, or evidence regarding information Bard provided to the FDA in connection with the 510(k) process. Docs. 10323 at 2-3 (Booker), 11011 at 4-5 (Jones). The Court found that the evidence was relevant to the negligent design and punitive damages claims under Georgia law. *Id.* The Court determined at trial that it had no basis to conclude that the FDA's lack of enforcement was intended by the FDA as an assertion, and thus should not be barred as hearsay. *See* Trial Tr. Day 8, at 1681:1-6, *Booker v. C. R. Bard, Inc.* (D. Ariz. Mar. 26, 2018).

### b.    FDA Warning Letter.

Defendants moved to exclude, under Federal Rules of Evidence 402 and 403, evidence of the July 13, 2015 FDA warning letter issued to Bard. Doc. 9864 at 2-3. The Court granted the motion in part, excluding as irrelevant topics 1, 2, 4(a), 4(b), 5, 6, 7, and 8 of the warning letter. Doc. 10258 at 6-8 (Booker), 10805 at 1 (Jones), 12736 (Hyde), 17401 at 10 (Tinlin). Topics 1 and 2 concern the Recovery Cone retrieval system; Topic 4(a) concerns the filter cleaning process; and Topics 4(b), 5, 6, 7, and 8 concern the Denali Filter. The Court concluded that none of these topics was relevant to the issues in the bellwether cases involving a G2 filter (Booker), an Eclipse filter (Jones), either a G2X or Eclipse filter (Hyde), and a Recovery filter (Tinlin). *Id.*

The Court deferred ruling on the relevance of topic 3 until trial in all bellwether cases. The Court found that topic 3, concerning Bard's complaint handling and reporting of adverse events with respect to the G2 and Eclipse filters, as well as the adequacy of Bard's evaluation for the root cause of the violations, was relevant to rebut the implication at trial that the FDA took no action with respect to Bard IVC filters. *See* Trial Tr. Day 9, at 1888:21 to 1892:25, *Booker v. C. R. Bard, Inc.* (D. Ariz. Mar. 27, 2018); Doc. 11256. The Court concluded that the warning letter was admissible under Federal Rule of Evidence 803(8),

and thus should not be barred as hearsay. Doc. 10258 at 7. The Court further concluded that the probative value of topic 3 was not substantially outweighed by the danger of unfair prejudice to Bard under Rule 403. The Court admitted the warning letter in redacted form during the first three bellwether trials. *See* Docs. 10565, 11256, 12736. The Court noted that topic 3 included reference to the G2, the filter at issue in Booker, and reached similar conclusions in Jones and Hyde. Doc. 17401 at 11. The parties disputed the relevance of topic 3 in Tinlin because it did not include reference to the Recovery, the filter at issue in Tinlin. *Id.* The Court deferred decision on this issue until trial. *Id.* However, the Tinlin case settled before trial.

### c.     Recovery Cephalad Migration Death Evidence.

Defendants moved to exclude, under Federal Rules of Evidence 402 and 403, evidence of cephalad migration (i.e., migration of the filter toward the patient's heart) by a Recovery filter resulting in patient death. The Court denied the motion for the Booker bellwether trial, which involved a G2 filter. Docs. 10258 at 4-5, 10323 at 4. Defendants have appealed this ruling. Docs. 11934, 11953.

The Court granted the motion for the Jones bellwether trial, which involved an Eclipse filter, and denied Plaintiff's requests for reconsideration of the ruling before and during the trial. *See* Docs. 10819, 10920, 11041, 11113, 11256, 11302; *see also* Trial Tr. Day 10, at 2224:3 to 2226:24, *Jones v. C. R. Bard, Inc.* (D. Ariz. May 30, 2018). Plaintiff Jones has appealed those rulings. Docs. 12057, 12071.

The Court granted the motion for the Hyde bellwether trial, which involved either a G2X or Eclipse filter. Doc. 12533 at 6-7. Plaintiff Hyde has appealed this ruling. Docs. 13465, 13480.

The Court denied the motion for the Tinlin bellwether trial, which involved a Recovery filter. Doc. 17401 at 7-10. The Tinlin bellwether case settled before trial.

The Court concluded for purposes of the Booker bellwether trial that evidence of cephalad migrations by a Recovery filter resulting in patient death was necessary for the jury to understand the issues that prompted creation and design of the G2 filter, and thus

was relevant to Plaintiff's design defect claims. Doc. 10323 at 4. In addition, because the Recovery filter was the predicate device for the G2 filter in Defendants' 510(k) submission to the FDA, and Defendants asserted to the FDA that the G2 was as safe and effective as the Recovery, the Court concluded that the safety and effectiveness of the Recovery filter was at issue. *Id.* The Court was concerned, however, that too heavy an emphasis on deaths caused by cephalad migration of the Recovery filter – a kind of migration which did not occur in the G2 filter generally or the Booker case specifically – would result in unfair prejudice to Defendants that substantially outweighed the probative value of the evidence. *Id.* The Court monitored this issue during trial, but found that the death evidence was not over-emphasized by Plaintiffs.

The Court initially concluded for purposes of the Jones bellwether trial, which involved an Eclipse filter, that evidence of cephalad migration deaths by the Recovery filter was inadmissible because it was only marginally relevant to Plaintiff's claims. *See* Docs. 10819, 10920, 11041, 11113, 11256, 11302. This is because cephalad migration did not continue in any significant degree beyond the Recovery; cephalad migration deaths all occurred before the Recovery was taken off the market in late 2005; Ms. Jones did not receive her filter until 2010; the deaths said nothing about three of Ms. Jones' four claims (strict liability design defect and the failure to warn claims); and instances of cephalad migration deaths were not substantially similar to complications experienced by Ms. Jones and therefore did not meet the Georgia standard for evidence on punitive damages. Docs. 10819, 11041.

The Court also found that deaths caused by a non-predicate device (the Recovery was not the predicate device for the Eclipse in Defendants' 510(k) submission), and by a form of migration that was eliminated years earlier, were of sufficiently limited probative value that their relevancy was substantially outweighed by the danger of unfair prejudice because the death evidence may prompt a jury decision based on emotion. *Id.* The Court further concluded that Plaintiff Jones would not be seriously hampered in her ability to prove Recovery filter complications, testing, and design when references to cephalad

1    migration deaths are removed. Doc. 11041. As a result, the Court held that such references

2    should be redacted from evidence to be presented during the Jones bellwether trial.

3         The Court made sure to balance this concern with the competing concern that it

4    would be unfair for Defendants to present statistics about the Recovery filter and not allow

5    Plaintiffs to present competing evidence that included Recovery deaths. *See, e.g.*, Trial Tr.

6    Day 2, at 242:18 to 242:23, *Jones v. C. R. Bard, Inc.* (D. Ariz. May 16, 2018). Based on

7    this concern, Plaintiffs argued at various points during the trial that Defendants had opened

8    the door to presenting evidence about Recovery cephalad migration deaths. The Court

9    repeatedly made fact-specific determinations on this point, and held that even though

10   Defendants presented some evidence that made the Recovery evidence more relevant, the

11   danger of unfair prejudice continued to substantially outweigh the probative value of the

12   evidence. *See* Docs. 11113, 11302; Trial Tr. Day 10, at 2224:3 to 2226:24, *Jones v. C. R.*

13   *Bard, Inc.* (D. Ariz. May 30, 2018).

14        The Court concluded for purposes of the Hyde bellwether trial, which involved either

15   a G2X or Eclipse filter, that evidence of Recovery filter cephalad migration deaths should

16   be excluded under Rule 403, for the reasons it excluded the same evidence in the Jones

17   bellwether trial. Doc. 12533 at 6-7. The Court concluded that this evidence had marginal

18   relevance to Plaintiff's claims because Ms. Hyde received either a G2X or Eclipse filter,

19   two or three generations after the Recovery filter; Ms. Hyde did not receive her filter until

20   2011, more than five years after cephalad migration deaths stopped when the Recovery was

21   taken off the market in 2005; the deaths did not show that G2X or Eclipse filters – which

22   did not cause cephalad migration deaths – had design defects when they left Defendants'

23   control several years later; nor did the cephalad migration deaths, which were eliminated

24   by design changes to the G2, shed light on Defendants' state of mind when designing and

25   marketing the G2X and Eclipse filters. *Id.* at 7.

26        The Court concluded for purposes of the Tinlin bellwether trial, which involved a

27   Recovery filter, that Recovery filter patient deaths and Defendants' knowledge of those

28   deaths were relevant to Plaintiffs' design defect claim under Wisconsin law because they

went directly to the Recovery's foreseeable risks of harm and whether it was unreasonably dangerous. Doc. 17401 at 7-8. The Court also concluded that the Recovery death evidence was relevant to Plaintiffs' failure to warn and concealment claims because it was probative on the causation issue – that is, whether her treating physician would have selected a different filter for Ms. Tinlin had he been warned about the Recovery's true risks, as Plaintiffs describe them. *Id.* at 8. In addition, because this evidence would be used to impeach expert testimony from Defendants that the Recovery filter was safe and effective, the Court concluded that substantial similarity was not required. *Id.* at 8-9. The Court further concluded that the death evidence was relevant to Bard's state of mind and to show the reprehensibility of its conduct for purposes of punitive damages. *Id.* at 9-10. The Court reached a different conclusion in Jones and Hyde because cephalad migration deaths stopped when the Recovery was taken off the market in 2005, and the deaths shed little light on Defendants' state of mind when marketing different filters with different complications, years later. *Id.* at 9 n.4.

The Court had the same concern in Tinlin that it expressed in Booker – that too heavy an emphasis on deaths could result in unfair prejudice that substantially outweighs the probative value of the cephalad migration evidence. *Id.* at 9. The Court invited Defendants to object during trial if they believed Plaintiffs were overemphasizing the cephalad migration deaths. *Id.* The Tinlin case settled before trial.

### d.    Simon Nitinol Filter Evidence.

Plaintiffs sought to exclude evidence of complications associated with the SNF on the grounds that Plaintiffs were barred from conducting relevant discovery into the design and testing of the SNF under CMO No. 10 (Doc. 1319). The Court denied Plaintiffs' request. Doc. 10489. The Court did not agree that Plaintiffs were foreclosed from obtaining relevant evidence for rebuttal. The Court foreclosed this discovery because Plaintiffs do not contend that the SNF is defective. *Id.* at 2. Nor did Plaintiffs explain how discovery into the design and testing of the SNF would have produced any information on failure rates the SNF experienced after it was on the market. *Id.* at 2-3. Plaintiffs also had rebuttal evidence

showing that reported failure rates for SNF were lower than Recovery and G2 failure rates. *Id.* The Court ultimately concluded it would not preclude Defendants from presenting its SNF evidence on the basis of a discovery ruling and invited Plaintiffs to make appropriate evidentiary objections at trial. *Id.* at 3.

### e.    Use of Testimony of Withdrawn Experts.

Defendants sought to preclude, under Federal Rules of Evidence 804 and 403, Plaintiffs' use at trial of the depositions of three defense expert witnesses, Drs. Moritz, Rogers, and Stein, who originally were retained by Bard but had since been withdrawn in some or all cases. Doc. 10255 at 2. The Court denied the request in part. Doc. 10382. The Court found that Defendants failed to show that the depositions of these experts are inadmissible on hearsay grounds, but agreed that it would be unfairly prejudicial under Rule 403 to disclose to the jury that the experts originally were retained by Bard. *Id.* at 2-3. The Court therefore concluded that Plaintiffs could use portions of the experts' depositions that support Plaintiffs' claims, but could not disclose to the jury that the experts originally were retained by Bard. *Id.* at 3. The Court was concerned about the presentation of cumulative evidence, and therefore required Plaintiffs to show that no other expert of similar qualifications is available or that the unavailable expert has some unique testimony to contribute, before the deposition of any withdrawn expert may be used at trial. *Id.* at 3-4.

### f.    Other Motion in Limine Rulings.

The Court's other motion in limine rulings (Docs. 10075, 10235, 10258, 10947) may be useful in other jurisdictions. The Court refers the transferor courts to the following motions and orders to assist in preparing for trial:[4]

- **Parties' Joint Stipulation on Motions in Limine in Booker:** The Court, on stipulation of the parties, excluded evidence, argument, and testimony

---

[4] The Court also ruled on the parties' motions in limine concerning several case-specific issues. *See* Docs. 10075 (Plaintiff's MIL No. 12 in Booker), 10258 (Plaintiff's MIL Nos. 6 and 13 in Booker), 10947 (Defendants' MIL No. 1 and Plaintiff's MIL Nos. 1-4 and 7 in Jones), 12533 (Plaintiff's MIL No. 3 in Hyde), 17285 (Plaintiff's MIL No. 1 in Tinlin), 17401 (Plaintiff's MIL Nos. 2, 3, and 6 in Tinlin).

concerning several case-specific issues in the Booker bellwether trial, as well as a few general issues, including: Bard's 1994 criminal conviction; other lawsuits or claims against Bard; advertising by Plaintiff's counsel; Plaintiff's counsel specializing in personal injury or products liability litigation; contingency fee agreements; and advertising by any counsel nationally for any IVC filter cases. Doc. 10235.

- **Defendants MIL No. 1 in Booker:** The Court permitted evidence and testimony concerning Recovery Filter complications. Doc. 10258 at 1-5; *see* Doc. 10819 (Jones). As noted above, the Court permitted evidence and testimony concerning Recovery Filter cephalad migrations resulting in patient death in the Booker bellwether trial involving a G2 Filter (Doc. 10323 at 4), but excluded such evidence in the Jones bellwether trial involving an Eclipse Filter. (Docs. 10819, 10920, 11041).

- **Defendants' MIL No. 2 in Booker:** The Court permitted evidence and testimony relating to the development of the Recovery Filter. Doc. 10258 at 5-6; *see* Doc. 10819 at 2-3 (Jones).

- **Defendants' MIL No. 4 in Booker:** The Court excluded evidence and testimony concerning a photograph of Bard employee Michael Randall making an offensive gesture to a camera. Doc. 10075 at 1-2.

- **Defendants' MIL No. 5 in Booker:** The Court permitted Plaintiff's expert Dr. Thomas Kinney to be called as a fact witness, but prohibited him from testifying regarding his prior work for Bard as an expert witness in two prior IVC filter cases or as a paid consultant to Bard. Docs. 10075 at 2-3, 10323 at 4.

- **Plaintiff's MIL No. 2 in Booker:** The Court reserved ruling until trial on evidence and testimony regarding the nature of Bard's business, including the nature, quality, and usefulness of its products, the conscientiousness of its employees, and references to its mission statement. Doc. 10075 at 3-4.

- **Plaintiff's MIL No. 3 in Booker:** The Court permitted evidence and testimony concerning the benefits of IVC filters, including testimony describing Bard filters as "lifesaving" devices. Doc. 10258 at 8.

- **Plaintiff's MIL No. 4 in Booker:** The Court permitted evidence and testimony that IVC filters, including Bard's filters, are within the standard of care for the medical treatment of pulmonary embolism. Doc. 10258 at 8-9. Defendants agreed to not characterize IVC filters as the "gold standard" for the treatment of pulmonary embolisms. *Id.* at 8.

- **Plaintiff's MIL No. 5 in Booker:** The Court denied as moot the motion to exclude evidence and argument relating to failure rates, complication rates, percentages, or comparative analysis of any injuries that were not produced to Plaintiffs during discovery, as all such information was produced. Doc. 10075 at 4.

- **Plaintiff's MIL No. 7 in Booker:** The Court excluded evidence and argument relating to prior judicial opinions about Plaintiffs' experts, including the number of times their testimony has been precluded in other cases. *Id.*

- **Plaintiff's MIL No. 8 in Booker:** The Court excluded evidence and argument that a verdict against Defendants will have an adverse impact on the medical

community, future medical device research or costs, and the availability of medical care. *Id.* at 4-5.

- **Plaintiff's MIL No. 9 in Booker:** The Court deferred ruling on the relevance of statements or lack of statements from medical societies, including the Society of Interventional Radiologists ("SIR"), until trial. Doc. 10258 at 14-18. The Court ultimately admitted this evidence in both the Booker and Jones bellwether trials.

- **Plaintiff's MIL No. 10 in Booker:** The Court excluded evidence and testimony that Bard needed FDA consent to add warning to its labels, send warning letters to physicians and patients, or recall its filters. *Id.* at 18-19. The Court permitted evidence and argument explaining the reasons why Bard filters were not recalled, FDA's potential involvement in any recall effort, and the fact that warnings about failure rates and increased risks could not be based on MDR and MAUDE data alone. *Id.*

- **Plaintiff's MIL No. 11 in Booker:** The Court permitted evidence and argument relating to the informed consent form signed by Plaintiff prior to insertion of the IVC filter, even though the form is not specific to IVC filters or Bard filters. Doc. 10075 at 5-6.

- **Plaintiff's MIL No. 14 in Booker:** The Court reserved ruling until trial on evidence and argument relating to background information and personal traits of Bard employees and witnesses. *Id.* at 7.

- **Plaintiff's MIL No. 6 in Jones:** The Court permitted evidence and testimony concerning whether a party's expert had been retained by the same attorneys in other litigation. Doc. 10947 at 8-9.

- **Plaintiff's MIL No. 5 in Jones:** The Court excluded evidence and testimony that Bard employees or their relatives have received Bard IVC filter implants. *Id.* at 9-10.

- **Defendants' MIL No. 2 in Jones:** The Court excluded evidence and testimony of other lawsuits against Bard. *Id.* at 11.

- **Plaintiff's MIL Nos. 4 and 5 in Hyde:** The Court permitted evidence and testimony concerning Bard's Instructions for Use ("IFU") and the Society of Interventional Radiology ("SIR") Guidelines. Doc. 12507.

- **Plaintiff's MIL No. 2 in Hyde:** The Court permitted evidence and testimony concerning "The Surgeon General's Call to Action to Prevent Deep Vein Thrombosis and Pulmonary Embolism." Doc. 12533 at 4-6.

- **Defendants' MIL No. 3 in Hyde:** The Court permitted evidence and testimony that Bard's SNF is a reasonable alternative design. *Id.* at 7.

- **Defendants' MIL No. 4 in Hyde:** The Court excluded testimony from Dr. Muehrcke about his personal feelings of betrayal and his moral and ethical issues with Bard's conduct. *Id.* at 7-8.

- **Defendants' MIL No. 6 in Hyde:** The Court permitted evidence and testimony regarding informed consent. *Id.* at 8-9.

- **Plaintiff's MIL No. 4 in Tinlin:** The Court reserved ruling until trial on evidence and argument relating to a chart created by Defendants from their internal TrackWise database regarding reporting rates of IVC filter complications. Doc. 17401 at 5.

- **Plaintiff's MIL No. 5 in Tinlin:** The Court permitted evidence and testimony concerning a chart comparing the sales of the permanent SNF with those of retrievable filters between 2002 and 2016. *Id.* at 5-6.

- **Defendants' MIL No. 3 in Tinlin:** The Court permitted evidence and testimony concerning the Recovery Filter Crisis Communications Plan that Bard had prepared in 2004 to help manage damaging media coverage about a Recovery migration death. *Id.* at 11-12.

- **Defendants' MIL No. 4 in Tinlin:** The Court excluded evidence and testimony concerning Dr. Muehrcke's untimely disclosed opinion that one of his patients died from cardiac tamponade caused by a fractured strut that had embolized to her heart. *Id.* at 12-13.

### 6.      Deposition Designation Rulings.

The Court has ruled on numerous objections to deposition designations for trial and refers the transferor courts to the following orders:[5]

| Deponent | Depo. Date(s) | Doc. No(s). |
|---|---|---|
| Bill Altonaga | 10/22/2013 | 10497, 10922, 12598 |
| Murray Asch | 05/02/2016 | 12508 |
| Brian Barry | 01/31/2014 | 17513 |
| Christine Brauer | 05/23/2014 08/02/2017 | 10922, 10922, 12590 |
| David Ciavarella | 11/12/2013 | 10403, 12508, 12590 |
| Gary Cohen | 01/25/2017 | 10438 |
| Robert Cortelezzi | 11/11/2016 | 10438, 11064, 12590 |
| Len DeCant | 05/24/2016 | 10438, 11080, 12590 |
| John DeFord | 06/02/2016 | 10524, 11080, 12595 |

---

[5] In addition to the depositions identified in the table above, the Court ruled on numerous objections to case-specific deposition designations for trial.

| Deponent | Depo. Date(s) | Doc. No(s). |
|---|---|---|
| Joseph DeJohn | 06/17/2016 | 12357 |
| Mary Edwards | 01/20/2014 | 10438, 12598 |
| Thomas Ferari | 10/20/2010 | 12357, 17386 |
| Matthew Fermanich | 03/27/2017 | 12508 |
| Robert Ferrara | 04/17/2017 | 10438, 12590 |
| Timothy Fischer | 03/29/2017 | 17513 |
| Chris Ganser | 10/11/2016 | 10438, 11073, 12595 |
| Brooke Gillette | 07/11/2014 | 17386 |
| Holly Glass | 09/23/2016 | 17513 |
| Jason Greer | 08/11/2014 | 10438, 10922, 12590 |
| Janet Hudnall | 11/01/2013 | 10403, 12598 |
| Brian Hudson | 01/17/2014 | 10403, 12590 |
| Sanjeeva Kalva | 07/11/2017 | 17582 |
| Krishna Kandarpa | 07/19/2018 | 12590 |
| William Kuo | 03/23/2017 | 12357 |
| John Lehmann | 08/07/2014 | 10922, 12357 |
| William "Bill" Little | 07/27/2016 | 10438, 11064, 12598 |
| Hugh Magee | 10/17/2017 | 17513 |
| John McDermott | 02/05/2014 | 10438, 12590 |
| Patrick McDonald | 07/29/2016 | 10486, 11064, 12590 |
| Mark Moritz | 07/18/2017 | 10922, 12590 |
| Daniel Orms | 08/16/2016 | 10403, 11073, 12595 |
| Abithal Raji-Kubba | 07/18/2016 | 11064 |
| Gin Schulz | 01/30/2014 | 10403, 12598 |
| Christopher Smith | 08/03/2017 | 11073 |

| Deponent | Depo. Date(s) | Doc. No(s). |
|---|---|---|
| William Stavropoulos | 02/01/2017 | 10524 |
| Jack Sullivan | 11/03/2016<br>09/16/2016 | 10486, 11080, 12590<br>11080, 12590 |
| Melanie Sussman | 04/07/2017 | 11073 |
| Mehdi Syed | 03/02/2018 | 11313 |
| Scott Trerotola | 01/20/2017 | 10524, 12590 |
| Douglas Uelmen | 10/04/2013 | 10403, 11080, 12590 |
| Carol Vierling | 05/11/2016 | 10486, 11073 |
| Allison Walsh | 01/23/2014 | 17386 |
| Mark Wilson | 01/31/2017 | 10922 |
| Natalie Wong | 10/18/2016 | 10403, 12590 |
| John Worland | 03/16/2011 | 17582 |

**I.      Further Proceedings in Remanded or Transferred Cases.**

**1.      General Discovery.**

Because all general fact and expert discovery has been completed in this MDL, the transferor courts need not be concerned with facilitating general expert, corporate, and third-party discovery on remand or transfer. This is not meant to restrict the power of transferor courts for good cause or in the interest of justice to address issues that may be unique and relevant in remanded or transferred cases.

**2.      Case-Specific Discovery and Trial Preparation.**

According to the parties, the status of the remaining discovery and other pretrial issues for the cases being remanded or transferred, and the estimated time needed to resolve such issues and make the cases ready for trial, will be determined on remand or transfer. Final trial preparation in the bellwether trials was governed by certain Court orders. *See* Docs. 8871, 10323, 10587, 11011, 11320, 11321, 11659, 11871, 12061, 12853, 12971.

1

**J.      Documents to Be Sent to Transferor Courts.**

2      If the Panel agrees with the Court's suggestion of remand of the cases listed on

3 Schedule A and issues a final remand order ("FRO"), the Clerk of the Court for this District

4 will issue a letter to the transferor courts, via email, setting out the process for transferring

5 the individual cases listed in the FRO. The letter and certified copy of the FRO will be sent

6 to each transferor court's email address.

7      Upon receipt of the FRO, the parties shall furnish to the Clerk for this District a

8 stipulation or designation of the contents of the record or part thereof to be remanded. *See*

9 J.P.M.L Rule 10.4(a). The Clerk shall transmit to the respective transferor court the

10 following concerning each remanded action: (1) a copy of the individual docket sheet for

11 each action remanded, (2) a copy of the master docket sheet in this MDL, (3) the entire file

12 for each action remanded, as originally received from the transferor district, (4) a copy of

13 any final pretrial order entered in the remanded action (if applicable), and (5) a "record on

14 remand" as designated by the parties. *See* J.P.M.L Rule 10.4(b).

15      The Court has concluded that the cases listed on Schedule B should be transferred to

16 their proper districts pursuant to 28 U.S.C. § 1404(a). The Court will issue a final transfer

17 order ("FTO"). Upon receipt of the FTO, the Clerk of the Court for this District and the

18 parties shall follow the same procedures prescribed above for the individual cases listed in

19 the FTO.

20      If a party believes that the docket sheet for a particular case being remanded or

21 transferred under § 1404(a) is not correct, a party to that case may, with notice to all other

22 parties in the case, file with the transferor court a designation amending the record. Upon

23 receiving such designation, the transferor court may make any needed changes to the

24 docket. If the docket is revised to include additional documents, the parties should provide

25 those documents to the transferor court.

26

**K.      Conclusion.**

27      Pursuant to J.P.M.L. Rule 10.1(b)(i), the Court suggests that the Panel remand the

28 cases listed on Schedule A to their transferor districts for further proceedings. The Clerk

1  shall forward a certified copy of this order to the Panel.

2       Pursuant to 28 U.S.C. § 1404(a), the Court concludes that the cases listed on

3  Schedule B should be transferred to their proper districts for further proceedings.

4       RESPECTFULLY SUBMITTED this 10th day of July, 2019.

5  BEUS GILBERT PLLC                          NELSON MULLINS RILEY &
                                              SCARBOROUGH, LLP
6

7  By: /s/ *Mark O'Connor* (with permission)  By: /s/ *Richard B. North, Jr.*
      Mark S. O'Connor (011029)                  Richard B. North, Jr. (*pro hac vice*)
8     701 North 44th St.                          Georgia Bar No. 545599
      Phoenix, AZ 85008                           Matthew B. Lerner (*pro hac vice*)
9                                                 Georgia Bar No. 446986
      Ramon Rossi Lopez                           Atlantic Station
10    (admitted *pro hac vice*)                   201 17th Street, NW / Suite 1700
      CA Bar No. 86361                            Atlanta, GA 30363
11    LOPEZ MCHUGH LLP
      100 Bayview Circle, Suite 5600             James R. Condo (005867)
12    Newport Beach, CA 92660                    Kristine L. Gallardo (033975)
                                                 SNELL & WILMER L.L.P.
13    *Co-Lead/Liaison Counsel for*              One Arizona Center
      *Plaintiffs*                               400 E. Van Buren
14                                               Phoenix, AZ 85004-2204

15                                               *Attorneys for C. R. Bard, Inc. and Bard*
                                                 *Peripheral Vascular, Inc.*
16

17

18

19

20

21

22

23

24

25

26

27

28