**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

——————————————

| | |
|---|---|
| **In Re: Bard IVC Filters** | ) MD-15-02641-PHX-DGC |
| Products Liability Litigation | ) |
| | ) Phoenix, Arizona |
| | ) **February 1, 2019** |
| ———————————————————————— | ) 10:28 a.m. |

**BEFORE:   THE HONORABLE DAVID G. CAMPBELL, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**STATUS CONFERENCE**

Official Court Reporter:
Patricia Lyons, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Ste. 312
401 West Washington Street, SPC 41
Phoenix, Arizona  85003-2150
(602) 322-7257

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared with Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2    For Plaintiffs:

3              Lopez McHugh
               By: **RAMON ROSSI LOPEZ,** ESQ.
4              100 Bayview Circle, Suite 5600
               Newport Beach, CA  92660
5
               Beus Gilbert McGroder PLLC
6              By: **MARK S. O'CONNOR,** ESQ.
               701 N 44th St.
7              Phoenix, AZ 85008

8              Freese & Goss PLLC
               By: **TIM K. GOSS,** ESQ.
9              3500 Maple Ave., Ste. 1100
               Dallas, TX 75219
10
               Matthews & Associates
11             By: **DAVID P. MATTHEWS,** ESQ.
               2905 Sackett St.
12             Houston, TX 77098

13

14   For Defendants:

15             Nelson Mullins Riley & Scarborough
               By: **RICHARD B. NORTH, JR.,** ESQ.
16             By: **MATTHEW B. LERNER,** ESQ.
               By: **ELIZABETH HELM,** ESQ.
17             201 17th Street NW, Suite 1700
               Atlanta, GA   30363
18

19             Snell & Wilmer
               By: **JAMES R. CONDO,** ESQ.
20             400 East Van Buren
               Phoenix, AZ   85004
21

22

23

24

25

**P R O C E E D I N G S**

10:01:31  1

2

3          THE COURT:  Thank you, please be seated.

4          THE COURTROOM DEPUTY:  MDL case 15-2641, Bard IVC

10:29:18  5   Filters Products Liability Litigation in regards to plaintiff

6   Debra Tinlin.

7          Counsel, please announce for the record.

8          MR. O'CONNOR:  Good morning.  Mark O'Connor for the

9   plaintiffs.

10:29:29  10         MR. LOPEZ:  Morning, Your Honor.  Ramon Lopez for the

11   plaintiffs.

12         THE COURT:  Good morning.

13         MR. NORTH:  Good morning, Your Honor.  Richard North

14   on behalf of the defendants.  And I'm joined by James Condo;

10:29:38  15   Elizabeth Helm; and, Your Honor, I'd like to introduce Russell

16   Gaudreau who is our settlement counsel in the litigation; and

17   then Matthew Lerner.

18         THE COURT:  All right.  Good morning.

19         MR. MATTHEWS:  David Matthews for the plaintiffs,

10:29:50  20   Your Honor, we've not been in front of the Court, and Tim

21   Goss.

22         MR. GOSS:  Tim Goss for the plaintiffs, Your Honor.

23         THE COURT:  All right.  Good morning.

24         Our apologies to everybody on the line.  We had a bit

10:30:01  25   of a fire drill going on here trying to figure out what was

10:30:04   1   wrong with our phone.  We're sorry it was a hassle for you

2   all.

3           Okay.  Let's talk about the issues that you outlined

4   in your joint report starting with the Tinlin trial.

10:30:18   5           Mr. Lopez or Mr. O'Connor, could you give me an

6   update on her condition.  We talked last time we were together

7   about the question of whether or not she'll be able to come to

8   trial.

9           MR. O'CONNOR:  Right, Your Honor.  We talked to the

10:30:32  10   defense.  My understanding is, is that we're going to be

11   trying to get ahold of a doctor to get an update on her within

12   the next two weeks and we'll provide a report to both the

13   Court and counsel about her ability to travel in view of her

14   conditions.

10:30:49  15           THE COURT:  Okay.  So you don't have any information

16   since we were together last?

17           MR. LOPEZ:  No.  I mean, I can tell you in speaking

18   with her, she says that she still cannot travel.  I doubt

19   there's going to be a change in that situation or condition.

10:31:04  20           THE COURT:  Remind me where she's located.

21           MR. LOPEZ:  She's in Wisconsin.  I think it's

22   Madison.

23           THE COURT:  Can she -- can she travel to the federal

24   courthouse in Madison?

10:31:16  25           MR. LOPEZ:  She can.  She just cannot get on an

10:31:18   1   airplane, Your Honor.

2          THE COURT:  Okay.  All right.  Well, provide that

3   update in a couple of weeks.

4          If we end up having her participate remotely, we

10:31:27   5   really need to have her at the courthouse.  We can link very

6   effectively by video to the courthouse and have her on a

7   screen here in the courtroom so she can see what's happening

8   and we can see her.  If she testifies, she can testify

9   remotely if I decide 43(a) requirements are satisfied.  But if

10:31:50  10   she's not in a courthouse, that's much more difficult to make

11   happen effectively.

12          We'll need some advanced notice on that so we can

13   work with the folks at the courthouse in Madison to get it all

14   set up, get a room set aside where she can have the video

10:32:06  15   equipment.  So let's keep our eye on that as we approach the

16   trial.

17          MR. LOPEZ:  All right, Your Honor.

18          MR. O'CONNOR:  Yes, Your Honor.

19          THE COURT:  The schedule for Tinlin is set out in

10:32:19  20   Case Management Order Number 39, which was modified a little

21   bit by a minute entry on December 6th.  So the schedule to

22   date has been for plaintiffs' experts to be disclosed on

23   December 7th, defense experts -- these are case-specific

24   experts -- to be disclosed January 7th, depositions to be done

10:32:43  25   by today, although I know from your joint report that

10:32:45  1    Dr. Morris still needs to be deposed.

        2            Otherwise, has that schedule been met?

        3            MR. O'CONNOR:  Yes, Your Honor, I think everything's

        4    going as planned.

10:32:57  5            MR. NORTH:  Yes, Your Honor.  We took the final

        6    deposition earlier this week, I did, of one of their experts

        7    and we're filing our dispositive motions and *Daubert* motions

        8    today as called for.

        9            THE COURT:  Okay.

10:33:09 10            That was going to be my next question.  Going

       11    forward, we've got those motions due today.  Responses will be

       12    due on March 1st, replies on March 15th.  And I understand

       13    there's a plaintiffs' *Daubert* motion as well being filed

       14    today; is that right?  Or maybe it's already been filed?

10:33:27 15            MR. O'CONNOR:  That's correct.  As I understand it,

       16    it's getting prepared to be filed right now.  I think there's

       17    going to be a few documents that contain health care

       18    information that will be filed under seal, but it is in the

       19    preparation to be filed.

10:33:44 20            THE COURT:  Okay.  All right.

       21            The jury questionnaire modifications will be

       22    submitted on March 1st.  We're planning to get those out, the

       23    questionnaires out, to 200 jurors on March 8th with a return

       24    date of April 5th.  This is all in Case Management Order 39.

10:34:05 25            We will then get you the completed questionnaires on

10:34:09  1   a thumb drive by April 12th, or make it available for you by

2   April 12th.

3        I'll give you my list of people to be excused for

4   hardship on April 19th.

10:34:21  5        And we have the final pretrial conference on

6   April 30th.

7        Other relevant dates are motions in limine by

8   March 29th with responses by April 12th.

9        Deposition designations by March 29th.

10:34:44  10       Proposed final pretrial order by April 12th as well.

11       The trial dates that we're holding for this case are

12  May 13th through 17th, 20th through the 24th, and 28 through

13  the 31st.  And we're holding those.  We're not scheduling

14  anything over them.  We've managed to schedule before and

10:35:11  15  after, so it's sort of boxed in again as you've experienced in

16  the past, but those days are all available.  And that will

17  include 33 hours of trial time for plaintiff and 30 hours for

18  defense.

19       Are there other matters that we need to discuss with

10:35:34  20  respect to the Tinlin trial?

21            MR. LOPEZ:  I don't think so, Your Honor.

22            THE COURT:  How about from the defense?

23            MR. NORTH:  Nothing further, Your Honor.

24            THE COURT:  Okay.

10:35:46  25            All right, let's talk about the Simon Nitinol cases.

10:35:51  1        I read the MDL panel's order the same way defendants

2    did, I assume plaintiffs did as well, that when they denied it

3    as moot, they were stating a view that the SNF cases are

4    already a part of this MDL.  And we've got a number of them

10:36:10  5    here.  So my assumption is that we should proceed with getting

6    those cases resolved.

7        And that does raise questions that you all flagged in

8    the joint status report, which is do we need to designate a

9    different plaintiffs' leadership structure for the SNF cases.

10:36:35 10        I'm interested in whether you think these cases are

11    going to grow in number, whether we're going to get more or

12    whether, given the age of this filter, we're looking at about

13    the extent that we'll have.  And then there's some issues

14    you've identified that we need to talk about.

10:36:50 15        So why don't we start with plaintiffs and get your

16    thoughts on those matters.

17        MR. LOPEZ:  About the question of whether or not it

18    grows, that would be speculation on my part unless something

19    happens through discovery and the case develops into something

10:37:08 20    that maybe many of us don't think was worthy of bringing these

21    cases in the first place.

22        As far as leadership, I think we talked about this

23    once before.  From the standpoint of just keeping people

24    organized and being a liaison with the court, I think

10:37:25 25    Mr. O'Connor and I are happy to do that.  We just won't take

10:37:29   1    lead role in any additional discovery, things of that nature.

           2            The best I could suggest at this point, Your Honor,

           3    now that we've identified the people who have these cases, is

           4    to find time quickly, I know that you're going to want us to

10:37:44   5    get back to you on this quickly, to hold a meeting, a

           6    conference call, some kind of -- whether it be a go-to meeting

           7    or in-person meeting with the people who are litigating these

           8    cases and present to them the idea that if you're really going

           9    to pursue these cases you need to confer amongst yourselves as

10:38:05  10    to who's going to be the person in charge of discovery, in

          11    charge of whatever happens with those cases from the

          12    standpoint of either continuing to litigate them, whether or

          13    not they get remanded, whether or not they get settled.

          14            I think there's still less than 100 cases, I'm not

10:38:23  15    sure.

          16            Still less than 100?

          17            MR. NORTH:  Either 87 or 88 by our count.

          18            MR. LOPEZ:  Yeah.  It hasn't grown, Your Honor, since

          19    we've been talking about it and it's been, I don't know,

10:38:35  20    probably going on six months now.  So -- in fact, I think the

          21    number was actually higher than that at one point.  We

          22    actually got people who dismissed those cases when we first

          23    started to audit them.

          24            So I don't anticipate that number growing much, if at

10:38:51  25    all.  At this point it's just a matter of who are these people

10:38:57  1   who have these cases.  And I think they are -- we've been

2   talking with some of them; they're serious about litigating

3   them.  So whether or not that happens here or whether or not

4   they get remanded, that's going to be, I guess, a conference

10:39:11  5   we're going to have to have with you after we meet with these

6   folks and someone steps up and says I'm the point person on

7   the Simon Nitinol filters.

8           THE COURT:  Well, I think you volunteered to continue

9   acting as lead counsel, I assume until we get different lead

10:39:24  10  counsel designated.

11          MR. LOPEZ:  Yes.

12          THE COURT:  Because it seems to me lead counsel ought

13  to be the people who are going to take the depositions and

14  find the experts and try the case.

10:39:35  15          MR. LOPEZ:  Right.  That offer was more of an

16  accommodation to the Court than it was to the cases.

17          THE COURT:  Right.  Okay.

18          I'm assuming from that that you all don't have Simon

19  Nitinol filter cases in this MDL.

10:39:49  20          MR. LOPEZ:  No, we don't.  Mr. O'Connor and I don't.

21  I don't think most of us on the PEC and PLC do.  I think one

22  or two.  Mr. North would probably know that better than me.

23          THE COURT:  All right.  Well, it does seem to me we

24  need to identify the lawyers who have those cases and I need

10:40:09  25  to set a hearing where they're required to come forward with a

10:40:12   1   proposal for who the plaintiffs' steering committee will be

2   and proposal for the litigation schedule, not unlike what we

3   did at the beginning of this case, although I think on a

4   faster track so that we can get those cases going if they're,

10:40:30   5   in fact, going to be litigated.

6         So my thought would be to give you 30 days or

7   something like that to contact them, to -- I'll get an order

8   out saying what they need to do, but getting them to either

9   fish or cut bait.  And if they're going to step up, we'll have

10:40:50  10   a conference and get those cases moving.

11         MR. LOPEZ:  I would suggest that maybe you actually

12   set a date for that because that will expedite the process.

13         THE COURT:  Right.  Yeah.  That's my thought.  I'll

14   set it about 30 days out.

10:41:02  15         MR. LOPEZ:  Okay.  I gotcha.

16         THE COURT:  I'm kind of backed up with trials, but

17   I'll -- actually, it will probably be the second half of March

18   before I can do it.  But I'll get a date set so that we can

19   have that conference.

10:41:20  20         Defense counsel, do you have any different thoughts

21   on those issues?

22         MR. NORTH:  No, Your Honor.  We will try to assist

23   Mr. Lopez.  We have a database that can give him a list of the

24   Simon Nitinol cases and the attorneys that we believe

10:41:33  25   represent them.

10:41:33  1          As far as that expanding, Your Honor, I don't believe

       2     it will be significantly, but there will probably be a few

       3     additional cases.  For example, we were just served this

       4     morning with a Simon Nitinol filter case in the Georgia state

10:41:46  5     court, which we will be removing and tagging.  So there will

       6     be some growth, but I wouldn't expect much.

       7          THE COURT:  Okay.

       8          And I agree that the list of issues identified on

       9     page 3 of your joint report is a pretty good list of what

10:42:01 10     ought to be addressed at that conference when we get together.

      11     So I'll incorporate that into the order that I send out.

      12          Since you've mentioned it, speaking of cases being

      13     filed, I was told that two or three days ago we got 130 new

      14     cases in one day in the MDL.  That sort of broke records.  Is

10:42:30 15     there something out there happening to make that happen?

      16          MR. NORTH:  Yes, Your Honor.  There's some settlement

      17     discussions and some tentative settlements that have been

      18     reached, and I'll report on those in a few minutes.  But it

      19     has been Bard's policy, and we have stated this throughout the

10:42:46 20     litigation, that we're not going to settle a case unless it

      21     has been filed.

      22          Some plaintiffs' attorneys maintain these large

      23     unfiled case inventories and it causes real problems for the

      24     company in trying to settle and set reserves and things of

10:43:01 25     that nature.  So that's been the company's policy all the

10:43:04    1   time.  Now that it's coming to the fore, settlement

        2   discussions, I think it's prompting a lot of plaintiffs'

        3   attorneys to suddenly file some of their cases.

        4        THE COURT:  I may say in an order that when they do

10:43:19    5   that they have to send roses to the woman in the clerk's

        6   office --

        7        (Laughter)

        8        THE COURT:  She has just been buried this week.

        9        Okay.

10:43:28   10        Let's talk about the record on remand, which really

       11   relates to the mature cases.

       12        Let me tell you what happened after you submitted

       13   your stipulated order in late October that the woman I

       14   mentioned, who's our go-to person on this case in our clerk's

10:43:44   15   office, contacted the districts to which these cases will be

       16   remanded and asked them what they want to receive and she got

       17   a different answer back from every one of them.

       18        And it quickly dawned on us, we don't want to have

       19   tailored packets for every district this goes back to because

10:44:05   20   that would just bury us when we get to the larger remands.

       21        Some of the districts didn't want to get any

       22   documents from the case, all they wanted was the docket from

       23   the MDL, the docket from the individual case being remanded,

       24   and the parties' stipulation of record on remand, and then

10:44:26   25   they would request documents as they thought they needed them.

10:44:31   1          In fact, I just got a remand of a case from an MDL

           2   and that's what they sent me, just the docket list.  They

           3   didn't send any documents.

           4          We were talking this morning.  I don't think that's

10:44:43   5   consistent with MDL Rule 10.4 that actually says we're

           6   supposed to send the record on remand.  So that's the view we

           7   took.

           8          And so what we did, as you saw, probably, a couple of

           9   days ago, was enter the order and we have sent a zip drive to

10:45:00  10   all of those districts that has everything in it that was in

          11   your stipulated list of record on remand.  So the districts

          12   now have those documents.

          13          I don't know whether or not they'll put them on a

          14   docket or just hold the zip drive until they talk to you, but

10:45:18  15   the districts who said they didn't want to get any documents

          16   said before we do that we hold a status conference with the

          17   parties.  So I assume you'll be talking to those judges.  And

          18   if they want them, they can get them right off the zip drive.

          19   They'll already have that.

10:45:35  20          But that was the delay in figuring out what we ought

          21   to do on remand.  But that's happened and the zip drives have

          22   gone, so I assume you'll be hearing from those courts, if you

          23   haven't already.

          24          Any questions on that issue?

10:45:52  25          MR. LOPEZ:  Nothing from plaintiffs.

10:45:53  1          MR. NORTH:  None, Your Honor.

        2          THE COURT:  We also hit some delay on that by the

        3   government shutdown and the holidays, but that's been done

        4   now.

10:46:03  5          All right.  Mr. North, you said a moment ago you

        6   would give a report on settlement talks.  If you would,

        7   please.

        8          MR. NORTH:  If I could step up here.

        9          THE COURT:  Yeah.

10:46:12 10          MR. NORTH:  Your Honor, if the Court would permit, we

       11   would prefer to do that off the record, but of course we defer

       12   to the Court.

       13          THE COURT:  Well, why do you want it off the record?

       14          MR. NORTH:  We just don't want a lot of publicity

10:46:33 15   beyond the parties and the attorneys.  The press is following

       16   these MDLs and things like this get reported sometimes.

       17   Again, I defer to the Court.

       18          THE COURT:  I -- I don't do anything off the record,

       19   Mr. North.  Even when I have -- you know, when I have

10:46:53 20   discovery conference calls I've got that on the record.

       21          I guess the question in my mind is whether there's a

       22   justification for sealing the record.  That's a pretty high

       23   threshold as well.

       24          Do Plaintiffs' counsel have any thoughts on this

10:47:10 25   issue?

10:47:12 1        MR. LOPEZ:  I really don't, Your Honor.  We're not

2    going to object to sealing this if that's what the Court's

3    only option is.

4        MR. NORTH:  Perhaps we could have it recorded and

10:47:23 5    then decide afterwards, again after talking to my team,

6    whether we feel like we need to file a motion to seal for some

7    reason.

8        THE COURT:  That's fine.

9        Tricia, let me ask you a question off the record.

10:47:34 10        (The Court and the court reporter confer.)

11        THE COURT:  It will be easier for her if we save this

12    for the very last item and then she'll start a new file, which

13    would be a separate transcript, and it's easier to seal that

14    than to seal the middle portion of a transcript.  So we'll

10:48:00 15    come back to that issue.

16        And we'll then have you present it, we'll hold it,

17    and you can talk about whether you want it sealed and, if so,

18    file something.  It will be easier to seal if we decide to do

19    that.

10:48:15 20        Actually, there's not that much more on my list to

21    cover, but there may be on yours.

22        I received the memorandum filed by you, Mr. Lopez and

23    Mr. O'Connor, on the steering committee and Plaintiffs'

24    counsel issue.  We all lost track of that with the press of

10:48:34 25    business we were engaged in.

10:48:36   1        The proposed order looks fine, so we will enter that

           2   order.  In fact, I don't think we made any changes to it.  No

           3   substantive changes.  We did a little formatting change.  So

           4   that order will get entered.  That steering committee will be

10:48:58   5   back in place under a current order.

           6        Any questions on that?

           7        MR. LOPEZ:  No, Your Honor.  Just our apologies for

           8   letting that slip off the calendar.

           9        THE COURT:  I did, too.  We were fairly busy.

10:49:10  10        Okay, so we'll take care of that.

          11        Those are the only issues I have.

          12        Plaintiffs' counsel, do you have matters that you

          13   would like to raise?

          14        MR. LOPEZ:  Nothing at this time, Your Honor.

10:49:32  15        MR. O'CONNOR:  Nothing from us, Your Honor.  Thank

          16   you.

          17        MR. NORTH:  Nothing further other than the report,

          18   Your Honor.

          19        THE COURT:  Okay.

10:49:37  20        So I'll give Tricia a minute to start a new file and

          21   then we have you give that report.

          22     (The Court and courtroom deputy confer.)

          23        THE COURT:  We're going to have folks on the phone

          24   listening, Mr. North.

10:49:49  25        MR. NORTH:  I understand.

10:50:55  1          (Brief pause in proceedings.)

        2          THE COURT:  So for purposes of this new transcript,

        3     we've been in a status conference this morning.  Mr. North is

        4     going to provide an update on settlement discussions.  We've

10:51:12  5     decided to put this in a separate transcript file and allow

        6     defendants to think about whether you want to ask that it be

        7     sealed and, if so, provide reasons and it will be easier to

        8     seal because it's a separate transcript.

        9          Go ahead, Mr. North.

10:51:26 10          MR. NORTH:  Thank you, Your Honor.

       11          As I introduced at the beginning of the hearing, I'm

       12     accompanied by Mr. Russell Gaudreau from Greenberg Traurig in

       13     New York.  Mr. Gaudreau is serving as Bard's settlement

       14     counsel in this litigation.  He has past experience

10:51:42 15     representing Bard and other companies in the settlement of

       16     mass tort litigation.  He's been working parallel while we've

       17     been litigating the cases in an effort to try to start

       18     implementing some resolution here.

       19          We're very pleased to report we have reached a

10:51:57 20     tentative settlement with the two law firms that have the

       21     largest number of cases in this MDL.  That's the firm of

       22     Freese and Goss and Matthews and Associates.  And they're

       23     represented here today by Mr. Matthews and Mr. Goss.

       24          We assigned a term sheet and memorandum of

10:52:15 25     understanding with them and we're in the process of processing

10:52:19  1   that settlement.

2          That accounts for approximately 1500 cases, which,

3   according to my estimation or calculation, is between 20 and

4   25 percent of the present MDL.

10:52:32  5          As a part of this effort and in the discussions with

6   Mr. Goss and Mr. Matthews, we have established, or

7   Mr. Gaudreau, more specifically, has established a framework

8   that we believe can work very successfully in reviewing and

9   analyzing cases for settlement purposes.  And it's our hope

10:52:50 10   that we can apply the same framework with negotiations with

11   other folks.

12          Parallel with Mr. Gaudreau's discussions with these

13   two firms, as well as many others, he and I have met with the

14   plaintiffs' steering -- executive committee on two separate

10:53:07 15   occasions.  One we reported to the Court last fall and then

16   just last Thursday we met with the executive committee,

17   including Mr. Lopez and Mr. O'Connor in Irvine, California, to

18   discuss these issues and to try to discuss this framework and

19   the ability to use this framework to settle with other

10:53:28 20   parties.

21          Your Honor, we completely understand and I have

22   instructed my client and they understand this Court's

23   intention to remand cases following the Tinlin trial, at some

24   point thereafter.

10:53:41 25          However, we are hopeful that the Court will consider

10:53:44   1   an alternative mechanism for those cases that are either

           2   settled or they look like they're headed towards settlement.

           3   We're hoping that the Court will allow those cases where the

           4   plaintiffs' attorneys are willing, because they've reached a

10:53:59   5   tentative settlement with us or negotiations are ongoing and

           6   fruitful and they believe there's a possibility that we are

           7   going to reach settlement, that the Court will allow those to

           8   stay in the MDL, perhaps go on some sort of inactive docket

           9   mechanism as some courts have used while we attempt to

10:54:19  10   finally -- finalize and negotiate settlements with those

          11   parties, with the understanding that if parties are not

          12   wanting to do that, plaintiffs are not wanting to do that,

          13   they can have their cases remanded at that juncture, as this

          14   court has intended to do.

10:54:36  15           The reason we hope the Court would consider something

          16   like this is that finalizing these settlements, even when we

          17   reach a memorandum of understanding like we have with Mr. Goss

          18   and Mr. Matthews, takes time.  We're having -- they're having

          19   to bundle together records for us.  We're reviewing the

10:54:53  20   records and categorizing the cases.  At some point we're going

          21   to have to obtain releases and then just the process of

          22   clearing medical liens before payments can be made takes a

          23   period of time.

          24           And that's why we are hopeful that at least for those

10:55:08  25   cases that have settled tentatively or that negotiations are

10:55:12   1   promising, that once the Tinlin case is over, the Court will

2   consider some sort of framework to allow us to keep the cases

3   here for a period of time while we get the finality of the

4   settlement resolved so all the parties that want that can

10:55:29   5   avoid further cost and expenses on remand and individual

6   courts.

7        That's sort of the report.  I'm here to answer any

8   questions, Your Honor, as are Mr. Goss and Mr. Matthews and

9   Mr. Gaudreau.

10:55:51  10        THE COURT:  Walk me through, if you would, what

11   happens when we get to June 1st and you have a memorandum of

12   understanding with a plaintiffs' firm that has several hundred

13   cases.  What are the exact steps that you then follow and how

14   long do you think that takes?  And if you want Mr. Gaudreau to

10:56:18  15   respond or plaintiffs' counsel, I'm happy to do that.

16        MR. GAUDREAU:  Thank you, Your Honor.

17        THE COURT:  Let's have you find a mic to talk into.

18        MR. GAUDREAU:  Sure thing.

19        THE COURT:  Why don't you come up to the lectern,

10:56:28  20   we'll hear you better.

21        MR. GAUDREAU:  Thank you, Your Honor.

22        Generally speaking, it can take six to eight months

23   to process the releases and get the liens cleared.  Once

24   you've got -- we have a term sheet signed, but once you have a

10:56:45  25   master settlement agreement signed typically the dismissals of

10:56:49 1    the cases don't occur until each individual plaintiff is paid

2    and, as I said, it can take months to push that process

3    through.  And we have to set up a qualified settlement fund to

4    hold the money, the plaintiff lawyers have to basically round

10:57:04 5    up the claimants, they've got to get them to sign releases.

6    Those releases are prenegotiated, so that shouldn't take that

7    much time.  Sometimes additional records are needed to kind of

8    make sure we have the right plaintiffs.  We also have to make

9    sure that certain thresholds are met in the deal so that --

10:57:20 10   you know, there's certain types of cases that have to be

11   settled for the settlement to finalize.

12        So generally six to eight months from the date you

13   sign an agreement.

14        THE COURT:  Who signs an agreement?

10:57:37 15        MR. GAUDREAU:  The company will sign with the

16   individual plaintiff's lawyers.

17        THE COURT:  And has that agreement been signed?

18        MR. GAUDREAU:  We have a term sheet that outlines a

19   number of cases and outlines what the master settlement

10:57:45 20   agreement will look like, and right now we're just negotiating

21   the terms of that.  It's a larger document and has mechanisms

22   for, as I said, when the money will be paid, how long they

23   have to get us releases.  Because we're talking -- I know

24   there's about 1500 cases here, but this deal's about 1800

10:58:01 25   total because there's some state court cases involved in it.

10:58:05  1    It's their entire inventory of cases.

2            THE COURT:  When do you think that agreement will be

3    signed with these --

4            MR. GAUDREAU:  My client is still going through the

10:58:14  5    terms of this agreement.  I'm hopeful it's going to happen

6    this quarter.

7            THE COURT:  Meaning before the end of March?

8            MR. GAUDREAU:  Yes.  Basically what happens, they

9    have board level management meetings and they have to get

10:58:27 10    approved at that level.

11            THE COURT:  You said a moment ago that there are

12    certain cases that have to be settled for the deal to go

13    through.  Explain that, please.

14            MR. GAUDREAU:  Sure.  Basically, we have a system to

10:58:48 15    rate the cases and to -- in terms of how -- essentially we

16    have categories of cases, so we think certain cases are more

17    valuable than others, and they have to get a certain number of

18    the most valuable cases in the deal for it to close.

19            THE COURT:  As a percentage?

10:59:07 20            MR. GAUDREAU:  Exactly, Your Honor.

21            THE COURT:  In your experience, in a deal like this

22    where there's, say, 1500 cases, how many of those actually

23    settle under that deal?

24            MR. GAUDREAU:  I would say 90, 95 percent of them.

10:59:25 25    And we have a substitution mechanism in the deal to put in so

10:59:27   1   they can backfill in cases to the extent thresholds aren't

2   met.  These things generally close.

3            THE COURT:  What do you mean backfill?

4            MR. GAUDREAU:  Essentially if -- if they're unable to

10:59:38   5   get certain levels of, say, tilt cases, for instance, or

6   they're able to get other claimants into their deal.  Settle

7   other cases so they can hit their thresholds.  They have that

8   ability.

9            THE COURT:  And is it your anticipation that there

10:59:53  10   will be a set time by me within which that has to happen so

11   that when we reach that date, if there's 95 percent you've got

12   a deal but I remand everything else?  Is that anticipated?  Or

13   how do you deal with cleaning up the end of this process?

14            MR. GAUDREAU:  Within the specific deal --

11:00:15  15            THE COURT:  Yeah, within a specific deal.

16            MR. GAUDREAU:  Well, Your Honor, I guess what would

17   happen in this -- in this setting was to the extent any cases

18   don't end up getting resolved, they would get remanded because

19   you wouldn't have a dismissal on file.  So you may want to

11:00:29  20   have a deadline for setting dismissals in the cases.  I'm not

21   sure how you want to handle this.  Or time frame for them to

22   sit in this docket if this is ever created.  But at the end of

23   the day, those cases would get remanded.

24            THE COURT:  Another question, which was, I think, the

11:01:11  25   one you thought I might be asking.  I assume you've got a

11:01:15  1   certain number of firms that have large inventories and then

2   you've got a whole bunch of additional firms.  Tell me the

3   process by which you intend to attack that and work through

4   those.

11:01:28  5            MR. GAUDREAU:  At this point in time we're in

6   discussions with or hopefully going to go into discussions

7   with some of the firms with the larger inventories.  And to

8   the extent we're able to reach an agreement with them, we will

9   do this -- we will use this same process, put in place an

11:01:43  10  agreement and we'll process the releases and pay out the

11  claimants and get the dismissals filed.

12            It's easier when you have the larger deals, larger

13  firms, because they can control large blocks of cases.

14            For the firms that have smaller numbers of cases,

11:01:58  15  there are various ways to approach those.  Either individually

16  just making phone calls with them, that's -- they usually call

17  that the tail of the litigation.  I've been involved in other

18  litigations, MDLs, where we had a different process, mediation

19  process, set up by the court.

11:02:15  20            It depends what the Court would want to do with those

21  cases.  To the extent they just want to remand them, they can

22  remand them.  But you can also set up ADR processes and things

23  that are beneficial that get so many cases looked at.

24            Basically we would set up these things called

11:02:32  25  intensive settlement process meetings, so you'd have basically

11:02:35  1   claimants coming from across the country to one location and

2   have meetings back to back to back, doing 20 or 30 a month, I

3   guess, in the hernia litigation, and we resolved about

4   95 percent of the one off -- kind of the smaller groups of

11:02:48  5   cases that were left over after the larger inventories were

6   settled.

7         THE COURT:  Mr. North suggested -- well, as you know,

8   I've been telling the parties that when we're done with the

9   bellwether trials I think I've discharged my responsibility

11:03:04  10  and I'm not one who feels like I will fail if the cases don't

11  settle.  And, therefore, my intent has been to remand.

12        I think Mr. North addressing that a moment ago said

13  that, if I understood what you were requesting, Mr. North, is

14  that when we get to the end of the Tinlin trial, you come to

11:03:22  15  me and say here are the cases where we've reached a tentative

16  settlement or where we think we're close.  And I understood

17  that we'd take those cases and if I agree with your approach,

18  we would put them on some sort of settlement schedule, but

19  everything else would get remanded at that point.

11:03:42  20        Is that the way you've been approaching this,

21  Mr. Gaudreau?

22        MR. GAUDREAU:  Yes, Your Honor.

23        THE COURT:  So I'm assuming these meetings of the

24  kind you just described need to be happening in the next few

11:03:54  25  months?

```
11:03:55   1          MR. GAUDREAU:  Yes, Your Honor, absolutely.

           2          THE COURT:  So we'll know when we get to the end of

           3    Tinlin -- well, you will have attempted to talk with at least

           4    everybody and we'll know who is either on board with the deal

11:04:03   5    or likely to be so that if I accept your proposal we can do

           6    something differently with those than the remand of everything

           7    else; is that right?

           8          MR. GAUDREAU:  That's right, Your Honor.

           9          THE COURT:  Okay.  I think those are my questions for

11:04:24  10    you.

          11          I'm sorry, gentlemen, but my short term memory's not

          12    great and I've forgotten your names.

          13          MR. MATTHEWS:  David Matthews, Tim Goss.

          14          THE COURT:  Did you want to add anything to this?

11:04:35  15    You don't need to, I just want to make sure I'm not

          16    overlooking you.

          17          MR. MATTHEWS:  No, we're just here to answer

          18    questions, Your Honor.  They've pretty much been answered.

          19          THE COURT:  Okay.

11:04:46  20          For the people on the phone who couldn't hear that,

          21    Mr. Goss and Mr. Matthews said they think the questions have

          22    pretty much been answered.

          23          Is there a possibility that this process is going to

          24    resolve the Tinlin trial before we get to the Tinlin trial?

11:05:12  25          Mr. North:  I do not believes so, Your Honor.  I
```

think the parties are fairly intent on trying Tinlin.  Part of the problem, of course, in trying to settle these cases are agreeing on values, and there is quite a schism, I think, between the parties of how much a case should be worth just because it's a Recovery filter case.  So right now I don't have any expectation that the case will be wrapped up in the settlement.

MR. LOPEZ:  Well, first of all, I hope Mr. North wasn't speaking for me because he said the parties -- I mean, we've never discussed the prospect of settling the Tinlin case.  I don't know where that came from.

I have every intention of not -- of entering into any process that has a reasonable chance of my clients' cases settling, including Mrs. Tinlin's.  I've been involved in a number of other cases that have settled and I've not gotten in the way of those cases settling for what they settle for because of some crazy number that they think I have for the value of these cases.  So I don't know where that came from.

If anyone's intent on trying the case, maybe it's the defense.  We're -- we'll be ready to try it, but I don't want you to have the impression that we somehow have engaged in some kind of negotiation that involved the Tinlin case and that our numbers are wildly outrageously high and therefore there's not a chance it's going to settle.  That's the impression I think Mr. North gave --

11:06:45  1        THE COURT:  I didn't -- I didn't hear it that way.

2    But I'm not asking it in the hopes Tinlin settles.  I'm

3    concerned if Tinlin does settle that we've eliminated the last

4    of the bellwethers.  And my view is if that happens, we've

11:06:58  5    eliminated the last of the bellwethers and we settle the case

6    then or, if not, we remand.

7        I mean, that's what I've said earlier in the case, I

8    think, that once we pick these bellwethers, if they resolved

9    for one reason or another, I think we've done the job.  We're

11:07:15 10    not going to be looking for another round of bellwether

11    trials.  And I continue to hold that view.

12        So if you all don't reach a settlement that resolves

13    Tinlin, that's fine with me, we'll try the case in May.

14        If you reach one that does settle Tinlin, then we'll

11:07:32 15    address this issue of when remand occurs and whether we put

16    likely-to-settle cases on some other schedule or not.  That's

17    really why I was asking.

18        MR. LOPEZ:  I just don't want the record to reflect

19    somehow or other we've been engaged in discussions about

11:07:52 20    Tinlin and the plaintiffs --

21        THE COURT:  I didn't understand Mr. North to be

22    referring to Tinlin.  I did understand him to say there's a

23    different of -- difference of view on what a Recovery case is

24    worth.

11:08:04 25        MR. LOPEZ:  Again --

11:08:05  1          THE COURT:  Which might be true.

2          MR. LOPEZ:  -- we've settled two Recovery cases so

3     far.  So -- and those are the only two that we've discussed so

4     far.  So I don't even know where that came from.

11:08:15  5          THE COURT:  Okay.  I understand.  I believe you're

6     all negotiating in good faith.

7          MR. LOPEZ:  And the only two Recovery cases that have

8     been discussed have been settled.

9          THE COURT:  What I think I would like to do is have

11:08:44 10     you jointly propose a method for treating what we'll call the

11     settled or likely-to-settle cases.  I will tell you, this will

12     come as no surprise, but what will really matter to me is that

13     I retain control of that process; that we not just sort of

14     commit it to an open-ended period.

11:09:11 15          So if I were to go to down that road, I would want to

16     have dates by which things would happen, and if they didn't

17     happen we would settle -- we would remand the cases.  And I

18     would want those dates to be fairly aggressive to really force

19     the parties to get to the table and talk.  And if they can't

11:09:27 20     resolve it, then we send them home.

21          So I'm happy to consider a proposal that would allow

22     for that.  I want to look at it before I make a decision on

23     whether that's the right thing, as opposed to just having a

24     remand date.

11:09:44 25          So if you would submit that to me after you've had a

11:09:47    1   chance to talk, say, by -- let's say by March 1st.

            2           Mr. North:  Okay.

            3           THE COURT:  Then I will look at that, and if I agree

            4   with it we'll put that in place so that you know there's a

11:10:09    5   structure for dealing with those cases.

            6           But as part of that, what I would like you to do is

            7   articulate the basis upon which I can identify a case that's

            8   to go into that process.  Do I just let you pick them because

            9   you think they're likely to settle or do we have to have some

11:10:33   10   other indication that they're likely to settle?  Or maybe a

           11   memorandum of understanding needs to be signed.  I don't know

           12   what it is, but I really want to distinguish between the cases

           13   that appear to be on a track to settle and those that aren't,

           14   and the rest I want to get back to their home districts to be

11:10:50   15   dealt with by those judges.

           16           Any questions on that?

           17           Mr. North:  None, Your Honor.

           18           MR. LOPEZ:  My only question, so defense counsel,

           19   Your Honor, will draft something --

11:11:03   20           THE COURT:  Yeah --

           21           MR. LOPEZ:  -- send it to us --

           22           THE COURT:  Yeah.

           23           Mr. North:  Yes.

           24           THE COURT:  But I want your input on it so that I

11:11:12   25   know I'm hearing from both sides.  And if you have

11:11:14   1   disagreements on it, put your disagreements on it and I'll be

          2   happy to consider the competing views.

          3           All right.  Anything else we need to take up?

          4           MR. O'CONNOR:  Nothing from our side, Your Honor.

11:11:29   5           Mr. North:  Nothing for the defendant, Your Honor.

          6           THE COURT:  Jeff, have I missed anything?

          7           We're good?  Okay.

          8           Nice to see you all.

          9           MR. LOPEZ:  Same here, Your Honor.

11:11:39  10           THE COURT:  Thank you.

         11       (End of transcript.)

         12                         *  *  *  *  *

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                       **C E R T I F I C A T E**

2

3              I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7              I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14             DATED at Phoenix, Arizona, this 3rd day of July,

15   2020.

16

17

18

19

20                             s/ Patricia Lyons, RMR, CRR
                               Official Court Reporter
21

22

23

24

25