Exhibit C

Mark S. O'Connor (011029)
BEUS GILBERT MCGRODER PLLC
701 North 44th St.
Phoenix, AZ 85008
Telephone: (480) 429-3000
moconnor@beusgilbert.com

Ramon Rossi Lopez (admitted *pro hac vice*)
(CA Bar No. 86361)
LOPEZ MCHUGH LLP
100 Bayview Circle, Suite 5600
Newport Beach, CA 92660
rlopez@lopezmchugh.com

*Attorneys for Plaintiffs*

James R. Condo (#005867)
Kristine L. Gallardo (#033975)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, AZ 85004-2204
Telephone:  (602) 382-6000
jcondo@swlaw.com
kgallardo@swlaw.com

Richard B. North, Jr. (admitted *pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (admitted *pro hac vice*)
Georgia Bar No. 446986
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street, NW, Suite 1700
Atlanta, GA 30363
Telephone: (404) 322-6000
richard.north@nelsonmullins.com
matthew.lerner@nelsonmullins.com

*Attorneys for Defendants*
*C. R. Bard, Inc. and*
*Bard Peripheral Vascular, Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation | No. 2:15-MD-02641-DGC |
| | **JOINT PROPOSED REPORT FOR PURPOSES OF SUGGESTION OF REMAND OR TRANSFER OF CERTAIN CASES** |
| | (Assigned to the Honorable David G. Campbell) |

Pursuant to Case Management Order No. 47, the parties submit the following joint proposed report to be sent to districts receiving transfers under § 1404(a) for all cases in this MDL that are in Track 2 that are ready for transfer. *See* Doc. 21540 at 4.

This multidistrict litigation proceeding ("MDL") involves personal injury cases brought against Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard"). Bard manufactures and markets medical devices, including inferior vena cava ("IVC") filters. The MDL Plaintiffs have received implants of Bard IVC filters and claim that they are defective and have caused Plaintiffs to suffer serious injury or death.

The MDL was transferred to this Court in August 2015 when 22 cases had been filed. Doc. 1. To date, more than 8,000 cases have been filed when the MDL closed on May 31, 2019. Docs. 18079, 18128. Thousands of cases pending in the MDL have settled or are near settlement. *See* Docs. 16343, 19445, 19798, 21167, 21410. The remaining cases no longer benefit from centralized proceedings.

On August 20, 2019, the Court suggested the remand of 35 cases that were transferred to this MDL by the United States Judicial Panel for Multidistrict Litigation (the "Panel"), and transferred more than 500 cases that were directly filed in the MDL to appropriate districts. Doc. 19899 at 2-6, 34-59. The Court suggested the remand of another case and transferred nearly 400 cases on October 17, 2019. Doc. 20672 at 2-4, 32-48. The Court suggested the remand of 30 cases and transferred nearly 1500 cases on March 5, 2020. Docs. 21462 at 2-4, 33-77; 21463 at 2-4, 33-76; 21472 at 2-4, 33-76.

In updated reports on the settlement status of cases, the parties identify approximately 119 pending cases that are not likely to settle. Doc. 21552-2. These cases are now subject to transfer.

The cases listed on Schedule A, which were directly filed in this MDL, will be transferred to appropriate districts pursuant to 28 U.S.C. § 1404(a). *See* Doc. 21552-2 (Ex. B). To assist the courts that receive these cases, this order will describe events that have taken place in these cases and the MDL. A copy of this order, along with the case files and materials, will be available to the courts after transfer. The cases listed on Schedule B

1    will be unconsolidated from the MDL, will remain in the District of Arizona, and will be

2    assigned to the undersigned judge. *See* Docs. 21552-2 (Ex. B); 21426 at 3-4.

3    **I.      Transfer Under 28 U.S.C. § 1404(a).**

4          **A.      Transfer Standard.**

5          Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the

6    interest of justice, a district court may transfer any civil action to any other district or

7    division where it might have been brought or to any district or division to which all parties

8    have consented."

9          **B.      The Direct-Filed Cases Listed on Schedule B Will Be Transferred.**

10          Not all MDL cases were transferred to the Court by the Panel. Pursuant to Case

11   Management Order No. 4 ("CMO 4"), many cases were filed directly in the MDL through

12   use of a short form complaint. Doc. 363 at 3 (as amended by Docs. 1108, 1485). Plaintiffs

13   were required to identify in the short form complaint the district where venue would be

14   proper absent direct filing in the MDL. *See id.* at 7. CMO 4 provides that, upon the MDL's

15   closure, each pending direct-filed case shall be transferred to the district identified in the

16   short form complaint. *Id.* at 3.

17          Pursuant to § 1404(a), the Court will transfer the cases listed on Schedule A to the

18   districts identified in the short form complaints or to the districts where the filters were

19   implanted based on information provided in plaintiff profile forms. *See* Doc. 21552-2

20   (Ex. B); *see also In re Biomet M2a Magnum Hip Implant Prods. Liab. Litig.,* No. 3:12-MD-

21   2391, 2018 WL 7683307, at *1 (N.D. Ind. Sept. 6, 2018) (transferring cases under § 1404(a)

22   where they would "no longer benefit from centralized proceedings[] and the remaining

23   case-specific issues are best left to decision by the courts that will try the cases"). 

24   Defendants' right to challenge venue and personal jurisdiction upon transfer is preserved.

25   *See* Docs. 19899 at 4-6, 20672 at 4, 21426 at 4.

26   **II.     The MDL Proceedings.**

27          A summary of the MDL proceedings is provided below to assist courts receiving

28   transfers under § 1404(a). CMOs, discovery orders, and other significant rulings are listed

1  in Exhibit 1. The status of the remaining case-specific discovery and other pretrial issues in

2  individual cases should be addressed by the courts receiving the cases on transfer.

3     **A.   Plaintiffs' Claims and the Pleadings.**

4     The IVC is a large vein that returns blood to the heart from the lower body. An IVC

5  filter is a small device implanted in the IVC to catch blood clots before they reach the heart

6  and lungs. This MDL involves multiple versions of Bard's retrievable IVC filters – the

7  Recovery, G2, G2X, Eclipse, Meridian, and Denali. These filters are umbrella-shaped

8  devices that have multiple limbs fanning out from a cone-shaped head. The limbs consist

9  of legs with hooks that attach to the IVC wall and curved arms to catch or break up blood

10  clots. Each of these filters is a variation of its predecessor.[1]

11     The MDL Plaintiffs allege that Bard filters are more dangerous than other IVC filters

12  because they have higher risks of tilting, perforating the IVC, or fracturing and migrating

13  to vital organs. Plaintiffs further allege that Bard failed to warn patients and physicians

14  about these higher risks. Defendants dispute these allegations, contending that Bard filters

15  are safe and effective, that their complication rates are low and comparable to those of other

16  IVC filters, and that the medical community is aware of the risks associated with IVC filters.

17     CMO 2, entered October 30, 2015, required the creation of a master complaint, a

18  master answer, and templates of short-form complaints and answers. Doc. 249 at 6. The

19  master complaint and answer were filed December 12, 2015. Docs. 364, 366. They are the

20  operative pleadings for most of the cases in this MDL.

21     The master complaint gives notice, pursuant to Rule 8, of the allegations that

22  Plaintiffs assert generally. The master complaint contains seventeen state law claims:

23  manufacturing defect (Counts I and V); failure to warn (Counts II and VII); design defect

24  (Counts III and IV); failure to recall (Count VI); misrepresentation (Counts VIII and XII);

25  negligence per se (Count IX); breach of warranty (Counts X and XI); concealment (Count

26

27     [1] In early 2019, Defendants moved to expand the scope of the MDL to include cases concerning Bard's Simon Nitinol Filter ("SNF"), a permanent device that predated the other filters in this litigation. The Panel denied the motion as moot because more than 80 SNF

28  cases already had been filed in the MDL. None of the SNF cases are subject to this order.

XIII); consumer fraud and deceptive trade practices (Count XIV); loss of consortium (Count XV); and wrongful death and survival (Counts XVI and XVII). Doc. 364 at 34-63. Plaintiffs seek both compensatory and punitive damages. *Id.* at 63.

Plaintiff-specific allegations are contained in individual short-form complaints or certain complaints served on Defendants before the filing of the master complaint. *See* Docs. 249, 363, 365. Plaintiffs also provided Defendants with profile forms and fact sheets that describe their individual claims and conditions. *See* Doc. 365.

## B.     Case Management Orders.

The primary orders governing pretrial management of this MDL are a series of CMOs, along with certain amendments. To date, the Court has issued 47 CMOs. These orders are discussed below and can be found on the Court's website at http://www.azd.uscourts.gov/case-info/bard.

## C.     Lead Counsel.

CMO 1, entered October 30, 2015, appointed Co-Lead/Liaison Counsel for Plaintiffs ("Lead Counsel") to manage the litigation on behalf of Plaintiffs, and set out the responsibilities of Lead Counsel. Doc. 248. Plaintiffs' Lead Counsel has changed since the inception of the MDL. Mr. Ramon Lopez, of Lopez McHugh, LLP, in Newport Beach, California, and Mr. Mark O'Connor, of Beus Gilbert McGroder PLLC, in Phoenix, Arizona, are now Lead Counsel for Plaintiffs. Doc. 5285. Mr. Richard North of Nelson Mullins Riley & Scarborough, LLP, in Atlanta, Georgia, is Defendants' Lead Counsel.

## D.     Plaintiffs' Steering Committee and Common Benefits Fund.

CMO 1 directed the selection and appointment of a Plaintiffs' Steering Committee ("PSC") to assist in the coordination of pretrial activities and trial planning. Plaintiffs' Lead Counsel and the PSC together form the Plaintiffs' Leadership Counsel ("PLC"). The PLC assists all Plaintiffs in the MDL by overseeing discovery, appearing in court, attending status conferences, and preparing motions and responses regarding case-wide discovery matters. CMO 1 has been amended to select and appoint a Plaintiffs' Executive Committee ("PEC") to assist Lead Counsel in the administration, organization, and strategic decisions

of the PLC. Doc. 4016. The configuration of the PSC has changed during the course of the litigation. *See* Docs. 248, 4016, 5285.

CMO 6, entered December 18, 2015, set forth rules, policies, procedures, and guidelines for fees and expenses incurred by attorneys acting for the common benefit of all MDL Plaintiffs. Doc. 372. In May 2019, the Court increased the common benefit attorneys' fees assessment from 6% to 8%, but declined to increase the 3% assessment for costs. Doc. 18038.

Upon transfer, individual Plaintiffs likely will be represented by their own counsel – the attorney or attorneys who filed their original complaint. Plaintiffs' Lead Counsel, the PSC, the PLC, and the PEC were tasked with managing the MDL for Plaintiffs, not the individual cases on transfer.

**E.   Status Conferences.**

Since the inception of the MDL, the Court has held regular status conferences with Lead Counsel for the parties to discuss issues related to the litigation. The initial case management conference was held in October 2015. Doc. 246. Deadlines were set for, among other things, the filing of master and short-form pleadings, profile forms, a proposed protective order (including Rule 502 provisions), a proposed protocol governing the production of electronically stored information ("ESI"), as well as deadlines to complete first-phase MDL discovery and address privilege log issues. Doc. 249. Thereafter, the Court held periodic status conferences to ensure that the parties were on task and to address routine discovery issues and disputes. In addition to the status conferences, the Court conducted telephone hearings to address time-sensitive issues, as well as numerous additional conferences to consider various matters such as dispositive motions and general case management issues.

**F.   Discovery.**

**1.   General Fact Discovery.**

Prior to the establishment of this MDL, Plaintiffs' counsel had conducted substantial discovery against Bard concerning all aspects of Bard IVC filters, including the design,

testing, manufacturing, marketing, labeling, and post-market surveillance of the devices. Bard produced numerous documents and ESI and responded to thousands of written discovery requests, and more than 80 corporate witness depositions were taken. The pre-MDL fact discovery was made available by Bard to all Plaintiffs in the MDL.

CMO 8 established a procedure concerning re-deposing witnesses in the MDL. Doc. 519. CMO 14 established deposition protocols generally. Doc. 2239. The Court allowed additional depositions of a handful of corporate witnesses that had been previously deposed, as well as numerous depositions of other Bard corporate witnesses, including several Rule 30(b)(6) depositions. Docs. 3685, 4311. CMO 9 governed the production of ESI and hard-copy documents. Doc. 1259.

Discovery in the MDL was separated into phases. The parties completed the first phase of MDL discovery in early 2016. Doc. 519. The first phase included production of documents related to an FDA inspection and warning letter to Bard, an updated production of complaint and adverse event files, and an updated version of Bard's complaint database relating to IVC filters. Doc. 249. Plaintiffs also conducted a Rule 30(b)(6) deposition concerning the FDA inspection and warning letter, and a deposition of corporate witness Kay Fuller.

The parties completed the second phase of fact discovery in February 2017. CMO 8 set deadlines for the second phase, which included all common fact and expert issues in the MDL, but not case-specific issues to be resolved after transfer. Docs. 249, 519. Second-phase discovery included extensive additional discovery related to Bard's system architecture for ESI, Bard's ESI collection efforts, ESI relating to Bard's IVC filters, and Bard's national and regional sales and marketing practices. Plaintiffs also deposed two corporate witnesses in connection with Kay Fuller's allegations that a submission to the FDA regarding the Recovery filter did not bear her original signature. Doc. 1319 (CMO 10). Plaintiffs deposed additional corporate witnesses concerning the FDA inspections and warning letter. *Id.*

Bard also produced discovery regarding the sales and marketing materials related to the SNF, documents comparing filter performance and failure rates to the SNF, and internal and regulatory communications relating to the SNF. Docs. 1319, 10489. The Court denied Plaintiffs' request to obtain ESI discovery from Bard's overseas operations. Doc. 3398. The Court also denied Defendants' request to discover communications between Plaintiffs' counsel and NBC news related to stories about the products at issue in this litigation, and third-party financing that may be in place with respect to MDL Plaintiffs. Docs. 3313, 3314. Plaintiffs were required to produce communications between Plaintiffs and the FDA related to the FDA warning letter, but the Court denied Defendants' request to depose Plaintiffs' counsel regarding these communications. Docs. 3312, 4339. Defendants also produced punitive damages discovery, and Plaintiffs conducted a Rule 30(b)(6) deposition related to Bard's net worth.

All common fact discovery has now been completed except for preservation depositions for certain witnesses who will not be traveling to testify live at the trials of remanded and transferred cases. The parties are engaged in a meet and confer process as to these depositions and shall complete them by March 16, 2020.[2] *See* Docs. 16343, 19959, 21063. Thus, courts receiving these cases need not be concerned with facilitating general fact discovery on transfer.

## 2. Case-Specific Discovery.

CMO 5 governed initial case-specific discovery and required the parties to exchange abbreviated profile forms. Doc. 365 (as amended by Doc. 927). Plaintiffs were required to provide Defendants with a Plaintiff profile form ("PPF") that described individual conditions and claims. *Id.* at 5-9. Upon receipt of a substantially complete PPF, Defendants were required to provide the individual Plaintiff with a Defendants' profile form ("DPF") that disclosed information and documents concerning Defendants' contacts and relationship

---

[2] Because of the ongoing COVID-19 pandemic, the parties have delayed taking a small number of preservation depositions that will be rescheduled as soon as reasonably feasible under the exigent circumstances.

with Plaintiff's physicians, tracking and reporting of Plaintiff's claims, and certain manufacturing related information for Plaintiff's filter. *Id.* at 12-14. Completed profile forms were considered interrogatory answers under Rule 33 or responses to requests for production under Rule 34, and were governed by the standards applicable to written discovery under Rules 26 through 37. *Id.* at 2-3. CMO 5 also set deadlines and procedures for resolving any purported deficiencies with the parties' profile forms, and for dismissal of cases that did not provide substantially completed profile forms. *Id.* at 2.[3]

Further discovery was conducted in a group of 48 cases ("Group 1") selected for consideration in the bellwether trial process from the pool of cases filed and properly served on Defendants in the MDL as of April 1, 2016 ("Initial Plaintiff Pool"). Docs. 1662, 3214, 4311 (CMOs 11, 15, 19). Plaintiffs in Group 1 were required to provide Defendants with a Plaintiff fact sheet ("PFS") that described their individual conditions and claims in greater detail, and provided detailed disclosures concerning their individual background, medical history, insurance, fact witnesses, prior claims, and relevant documents and records authorizations. Docs. 1153-1, 1662 at 3.

Upon receipt of a PFS, Defendants were required to provide the individual Plaintiff with a Defendants fact sheet ("DFS") that disclosed in greater detail information concerning Defendants' contacts and relationship with Plaintiff, Plaintiff's physicians, or anyone on behalf of Plaintiff, Defendants' tracking and reporting of Plaintiff's claims, sales and marketing information for the implanting facility, manufacturing information for Plaintiff's filter, and other relevant documents. Docs. 1153-2, 1662 at 3. Completed fact sheets were considered interrogatory answers under Rule 33 or responses to requests for production under Rule 34, and were governed by the standards applicable to written discovery under Rules 26 through 37. Doc. 1662 at 3. CMO 11 set deadlines and procedures for resolving any purported deficiencies with the parties' fact sheets. *Id.* at 2, 4-5. CMO 12 governed

---

[3] The Court has dismissed certain cases where Plaintiffs failed to provide complete PPFs. *See* Docs. 19874, 20667.

records discovery for Group 1. Doc. 1663. The parties agreed to use The Marker Group to collect medical, insurance, Medicare, Medicaid, prescription, Social Security, workers' compensation, and employment records for individual plaintiffs from third-parties designated as custodians for such records in the PFS. *Id.* at 1.

From Group 1, twelve cases were selected for further consideration as bellwether cases ("Discovery Group 1"). Docs. 1662, 3685, 4311 (CMOs 11, 18, 19). CMO 20 set deadlines for preliminary case-specific discovery in that group. Doc. 4335. Pursuant to the protocols set in CMOs 14 and 21, the parties were permitted to depose each Plaintiff, his or her spouse or a significant family member, the implanting physician, an additional treating physician, and either a Bard sales representative or supervisor. Docs. 2239, 4866 at 1-2. From Discovery Group 1, six Plaintiffs were selected for potential bellwether trials and further case-specific discovery ("Bellwether Group 1"). Docs. 1662, 3685, 4311, 5770, 11659 (CMOs 11, 18, 19, 23, and 34).

Except for the 48 cases in Group 1, the parties did not conduct case-specific fact discovery for the cases listed on Schedules A and B during the MDL proceedings, other than exchanging abbreviated profile forms. The Court concluded that any additional case-specific discovery in these cases should await their transfer. Thus, courts receiving these cases should set a schedule for the completion of case-specific discovery.

### 3. Expert Discovery.

CMO 8 governed expert disclosures and discovery. Doc. 519. The parties designated general experts in all MDL cases and case-specific experts in individual bellwether cases. General expert discovery closed July 14, 2017. Doc. 3685 (CMO 18). The parties did not conduct case-specific expert discovery for the cases listed on Schedules A and B during the MDL proceedings. The Court concluded that case-specific expert discovery in these cases should await their transfer. Thus, courts receiving these cases should set a schedule for the completion of case-specific expert discovery.

### 4.    Privileged Materials.

CMO 2 required Defendants to produce privilege logs in compliance with the Federal Rules of Civil Procedure. Doc. 249. The parties were then required to engage in an informal privilege log meet and confer process to resolve any privilege disputes. Defendants produced several privilege logs identifying documents withheld pursuant to the attorney-client privilege, the work-product doctrine, and other privileges. The parties regularly met and conferred regarding the privilege logs and engaged in negotiations regarding certain entries identified by Plaintiffs. As part of that meet and confer process, Defendants provided Plaintiffs with a small number of these identified items for inspection and, in some cases, withdrew certain claims of attorney-client privilege and produced the previously withheld items.

CMO 3 governed the non-waiver of any privilege or work-product protection in this MDL, pursuant to Federal Rule of Evidence 502(d), by Defendants' disclosure or production of documents on its privilege logs as part of the meet and confer process. Doc. 314.

In late 2015, Plaintiffs challenged a substantial number of documents on Defendants' privilege log. The parties engaged in an extensive meet and confer process, and Defendants produced certain documents pursuant to the Rule 502(d) order. *See id.* Plaintiffs moved to compel production of 133 disputed documents. The Court granted the motion in part. Doc. 2813. The parties identified several categories of disputed documents and provided sample documents for in camera review. The Court denied Plaintiffs' motion with respect to seven of eight categories of documents and found only one of the sample documents in one of the categories to contain unprivileged portions that should be produced. The Court found all other documents protected by the attorney-client privilege or work product doctrine. The Court directed the parties to use this ruling as a guide to resolve remaining privilege disputes.

Since this ruling, there have been no further challenges to Defendants' privilege logs. Defendants continued to provide updated privilege logs throughout the discovery process,

and the parties met and conferred to resolve privilege disputes. Privilege issues should not be a concern for courts that receive these cases.

### 5.      Protective Order and Confidentiality.

A stipulated protective order governing the designation, handling, use, and disclosure of confidential discovery materials was entered in November 2015. Doc. 269. CMO 7, entered January 5, 2016, governed redactions of material from additional adverse event reports, complaint files, and related documents in accordance with the Health Insurance Portability Act of 1996 ("HIPAA") and under 21 C.F.R. § 20.63(f). Doc. 401.

In September 2016, to expedite production of ESI, the parties agreed to a primarily "no-eyes-on" document production as to relevancy while still performing a privilege review for this expedited ESI document production. CMO 17 (Doc. 3372) modified the protections and requirements in the stipulated protective order (Doc. 269) and CMO 7 (Doc. 401) for ESI produced pursuant to this process. CMO 17 was amended in November 2016. Doc. 4015.

Defendants filed a motion to seal certain trial exhibits at the conclusion of the first bellwether trial. Doc. 11010. The Court denied this motion and Defendants' subsequent motion for reconsideration. Docs. 11642, 11766, 12069. Defendants also filed a motion to enforce the protective order for the second and third bellwether trials collectively. Doc. 13126. This motion was denied. Doc. 14446. A list of exhibits admitted at the bellwether trials (excluding case-specific medical records) and documents deemed no longer subject to the protective order are attached as Exhibit 2.

### G.      Bellwether Cases and Trials.

Six Plaintiffs were selected for potential bellwether trials. Docs. 5770, 11659 (CMOs 23, 34). The Court held three bellwether trials: *Booker,* No. CV-16-00474, *Jones,* No. CV-16-00782, and *Hyde,* No. CV-16-00893. The Court granted summary judgment in one of the bellwether cases, *Kruse,* No. CV-15-01634, and removed another from the bellwether trial schedule at the request of Plaintiffs, *Mulkey,* No. CV-16-00853. Docs. 12202, 13329. The final bellwether case, *Tinlin,* No. CV-16-00263, settled shortly before trial in May 2019.

The Court determined that further bellwether trials were not necessary. Docs. 12853, 13329 (CMOs 38, 40).

### 1.   *Booker*, No. CV-16-00474.

The first bellwether trial concerned Plaintiff Sherr-Una Booker and involved a Bard G2 filter. The filter had tilted, migrated, and fractured. Plaintiff required open heart surgery to remove the fractured limbs and repair heart damage caused by a percutaneous removal attempt. Plaintiff withdrew her breach of warranty claims before Defendants moved for summary judgment. The Court granted Defendants' motion for summary judgment on the claims for manufacturing defects, failure to recall, misrepresentation, negligence per se, and breach of warranty. Docs. 8873, 8874. The remaining claims for failure to warn, design defect, and punitive damages were tried to a jury over a three-week period in March 2018.

The jury found for Plaintiff Booker on her negligent failure-to-warn claim, and in favor of Defendants on the design defect and strict liability failure-to-warn claims. Doc. 10595. The jury returned a verdict of $2 million in compensatory damages (of which $1.6 million was attributed to Defendants after apportionment of fault) and $2 million in punitive damages. *Id.;* Doc. 10596. The Court denied Defendants' motions for judgment as a matter of law and a new-trial. Docs. 10879, 11598. Defendants have appealed. Docs. 11934, 11953. Plaintiff filed and later dismissed with prejudice a cross-appeal. Docs. 12070, 17916.

### 2.   *Jones,* No. CV-16-00782.

The second bellwether trial concerned Plaintiff Doris Jones and involved a Bard Eclipse filter. Plaintiffs withdrew the manufacturing defect, failure to recall, and breach of warranty claims. The Court granted summary judgment on the misrepresentation, negligence per se, and unfair trade practices claims. Doc. 10404. The remaining claims for failure to warn, design defect, and punitive damages were tried to a jury over a three-week period in May 2018. The jury returned a defense verdict. Doc. 11350. Plaintiff filed a motion to contact the jurors, which was denied. Docs. 11663, 12068. Plaintiff's appeal of the court's rulings excluding cephalad migration death evidence is pending. Docs. 12057, 12071.

3.    *Kruse*, No. CV-15-01634.

Plaintiff Carol Kruse's case was set for trial in September 2018. The Court granted Defendants' summary judgment motion on statute of limitations grounds. Doc. 12202.

4.    *Hyde*, No. CV-16-00893.

The third bellwether trial concerned Plaintiff Lisa Hyde and involved either a Bard G2X or Eclipse filter (the exact model was in dispute). Ms. Hyde's case was moved to the September 2018 bellwether slot in lieu of Ms. Kruse's case. Doc. 11867. Plaintiffs withdrew their claims for manufacturing defect and breach of express warranty. The Court granted summary judgment on the claims for breach of implied warranty, failure to warn, failure to recall, misrepresentation, concealment, and fraud. Doc. 12007. The Court also entered judgment in favor of Defendants on the negligence per se claim after concluding that it was impliedly preempted under 21 U.S.C. § 337(a). Doc. 12589. The remaining claims for design defect, loss of consortium, and punitive damages were tried to a jury over three weeks in September 2018. After the close of Plaintiffs' evidence, the Court granted in part Defendants' motion for judgment as a matter of law with respect to future damages for any cardiac arrhythmia Ms. Hyde may experience, but denied the motion as to the remaining claims. Doc. 12805. The jury returned a defense verdict. Doc. 12891. Plaintiff has appealed. Docs. 13465, 13480.

5.    *Mulkey*, No. CV-16-00853.

Plaintiff Debra Mulkey's case involved an Eclipse filter and was set for trial in February 2019. Before trial, Plaintiffs asked the Court to remove the Mulkey case from the bellwether trial schedule because it was similar to the Jones and Hyde cases and would not provide meaningful information to the parties. Doc. 12990. The Court granted the motion. Doc. 13329.

6.    *Tinlin*, No. CV-16-00263.

The final bellwether trial concerned Plaintiff Debra Tinlin and involved a Bard Recovery filter. Plaintiffs withdrew their claims for manufacturing defect, failure to recall, negligence per se, and breach of warranty. The Court granted summary judgment on the

misrepresentation and deceptive trade practices claims. Doc. 17008. The remaining claims for failure to warn, design defect, concealment, loss of consortium, and punitive damages were scheduled for trial in May 2019, but the case settled.

### H.    Key Legal and Evidentiary Rulings.

The Court has made many rulings in this MDL that could affect the remanded or transferred cases. The Court provides the following summary of key legal and evidentiary rulings to assist the courts that receive these cases.

### 1.    Medical Monitoring Class Action Ruling.

In May 2016, Plaintiffs' counsel filed a medical monitoring class action that was consolidated with the MDL. *See Barraza v. C. R. Bard, Inc.,* No. CV-16-01374-PHX-DCG (D. Ariz. May 5, 2015). The *Barraza* Plaintiffs moved for class certification for medical monitoring relief on behalf of themselves and classes of individuals who have been implanted with a Bard IVC filter, have not had that filter removed, and have not filed a claim or lawsuit for personal injury related to the filter. *Id.,* Doc. 54. The Court declined to certify the class. *Id.,* Doc. 95.

The class certification motion recognized that only 16 states permit claims for medical monitoring. The Court concluded that the classes could not be certified under Rule 23(b)(3) because individual issues would predominate. *Id.* at 20-21. The Court further concluded that the class could not be certified under Rule 23(b)(2) because the medical monitoring relief primarily constituted monetary rather than injunctive relief, and the class claims were not sufficiently cohesive to permit binding class-wide relief. *Id.* at 21-32. Finally, the Court concluded that typicality under Rule 23(a)(3) had not been established. *Id.* at 32-34. The *Barazza* Plaintiffs dismissed their claims without prejudice. Docs. 106, 107. No appeal has been filed.

### 2.    Federal Preemption Ruling.

Defendants moved for summary judgment on the grounds that Plaintiffs' state law claims are expressly preempted by the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 360 et seq., and impliedly preempted by the MDA under the Supreme Court's

1  conflict preemption principles. Doc. 5396. The Court denied the motion. Doc. 8872.
2  Defendants have appealed this ruling. Docs. 11934, 11953.

3      The MDA curtails state regulation of medical devices through a provision that
4  preempts state requirements that differ from or add to federal requirements. 21 U.S.C. §
5  360k. The Bard IVC filters at issue in this litigation were cleared for market by the FDA
6  through section "510k" review, which focuses primarily on equivalence rather than safety
7  and effectiveness. *See* § 360c(f)(1)(A).

8      The Supreme Court in *Medtronic, Inc. v. Lohr,* 518 U.S. 470 (1996), held that § 360k
9  does not preempt state law claims directed at medical devices cleared through the 510(k)
10  process because substantial equivalence review places no federal requirements on a device.
11  *Id.* at 492-94. *Lohr* also noted that the "510(k) process is focused on *equivalence,* not
12  safety." *Id.* at 493 (emphasis in original). Although the Safe Medical Devices Act of 1990
13  ("SMDA"), Pub. L. 101-629, injected safety and effectiveness considerations into 510(k)
14  review, it did so only comparatively. The Court found that *Lohr* remains good law and that
15  clearance of a product under 510(k) generally does not preempt state common law claims.
16  Doc. 8872 at 12-14.

17      The Court further found that Defendants failed to show that the 510(k) reviews for
18  Bard IVC filters imposed device-specific requirements as needed for preemption under §
19  360k. *Id.* at 14-20. Even if device-specific federal requirements could be ascertained,
20  Defendants made no showing that any particular state law claim is expressly preempted by
21  federal requirements. *Id.* at 21-22.

22      The Court concluded that Plaintiffs' state law claims are not impliedly preempted
23  because Defendants failed to show that it is impossible to do under federal law what the
24  state laws require. *Id.* at 22-24. Defendants are pursuing their preemption arguments in the
25  Booker appeal.

26          **3.     The Lehmann Report Privilege and Work Product Rulings.**

27      The Court granted Defendants' motion for a protective order to prevent Plaintiffs
28  from using a December 15, 2004 report of Dr. John Lehmann. Doc. 699. Dr. Lehmann

provided various consulting services to Bard at different times. Following Bard's receipt of potential product liability claims involving the Recovery filter, Bard's legal department retained Dr. Lehmann in November 2004 to provide an assessment of the risks associated with the Recovery filter and the extent of Bard's legal exposure. Dr. Lehmann prepared a written report of his findings at the request of the legal department and in anticipation of litigation. The Court found the report to be protected from disclosure by the work product doctrine. *Id.* at 4-12. The Court further found that Plaintiffs had not shown a substantial need for the report or undue hardship if the report was not disclosed. *Id.* at 13-15. The Court agreed with the parties that this ruling does not alter any prior rulings by transferor judges in specific cases. *Id.* at 22.

### 4.   *Daubert* Rulings.

The Court has ruled on *Daubert* motions directed at general experts, and refers the transfer courts to the following orders:

| *Daubert* Order | Doc. Nos. |
|---|---|
| Plaintiffs' Expert Dr. Thomas Kinney | 9428, 10323 |
| Plaintiffs' Experts Drs. Scott Resnick, Robert Vogelzang, Kush Desai, and Robert Lewandowski | 9432 |
| Plaintiffs' Experts Drs. David Kessler and Suzanne Parisian | 9433 |
| Plaintiffs' Experts Drs. Thomas Kinney, Anne Christine Roberts, and Sanjeeva Kalva | 9434 |
| Plaintiffs' Expert Dr. Mark Eisenberg | 9770 |
| Plaintiffs' Expert Dr. Derek Muehrcke | 9771 |
| Plaintiffs' Expert Dr. Darren Hurst | 9772 |

| Plaintiffs' Expert Dr. Rebecca Betensky | 9773 |
|---|---|
| Defendants' Expert Dr. Clement Grassi | 9991, 10230 |
| Plaintiffs' Expert Dr. Robert McMeeking | 10051, 16992 |
| Plaintiffs' Expert Dr. Robert Ritchie | 10052 |
| Plaintiffs' Experts Drs. David Garcia and Michael Streiff | 10072 |
| Defendants' Expert Dr. Christopher Morris | 10230, 10231, 17285 |

### 5.    Motion in Limine Rulings.

#### a.    FDA Evidence (*Cisson* Motion).

In the Booker bellwether trial, Plaintiffs sought to exclude, under Federal Rules of Evidence 402 and 403, evidence of the FDA's 510(k) clearance of Bard IVC filters and the lack of FDA enforcement action against Bard. Doc. 9529. The Court denied the motion. Docs. 9881, 10323.

The Court found that under Georgia law, which applied in both the Booker and Jones bellwether cases, compliance with federal regulations may not render a manufacturer's design choice immune from liability, but evidence of Bard's compliance with the 510(k) process was nonetheless relevant to the design defect and punitive damages claims. Doc. 9881 at 3-4. The Court acknowledged concerns that FDA evidence might mislead the jury or result in a mini-trial. *Id.* at 5-6 (citing *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig. (Cisson),* No. 2:10-CV-01224, 2013 WL 3282926, at *2 (S.D.W. Va. June 27, 2013)). But the Court concluded that such concerns could adequately be addressed by efficient management of the evidence and adherence to the Court's time limits for trial, and,

1   if necessary, by a limiting instruction regarding the nature of the 510(k) process. *Id.* at 6-7.[4]

2   The Court noted that the absence of any evidence regarding the 510(k) process would

3   run the risk of confusing the jury, as many of the relevant events in this litigation occurred

4   in the context of the FDA's 510(k) review of the Bard filters and are best understood in that

5   context. Doc. 9881 at 7. Nor was the Court convinced that all FDA references could

6   adequately be removed from the evidence. *Id.*

7   The Court further concluded that it would not exclude evidence and arguments by

8   Defendants that the FDA took no enforcement action against Bard with respect to the G2

9   or Eclipse filters, or evidence regarding information Bard provided to the FDA in

10  connection with the 510(k) process. Docs. 10323 at 2-3 (Booker), 11011 at 4-5 (Jones). The

11  Court found that the evidence was relevant to the negligent design and punitive damages

12  claims under Georgia law. *Id.* The Court determined at trial that it had no basis to conclude

13  that the FDA's lack of enforcement was intended by the FDA as an assertion, and therefore

14  declined to exclude the evidence as hearsay. Doc. 10568 at 87.

15  **b.     FDA Warning Letter.**

16  Defendants moved to exclude evidence of the July 13, 2015 FDA warning letter

17  issued to Bard. Doc. 9864 at 2-3. The Court granted the motion in part, excluding as

18  irrelevant topics 1, 2, 4(a), 4(b), 5, 6, 7, and 8 of the warning letter. Docs. 10258 at 6-8

19  (Booker), 10805 at 1 (Jones), 12736 (Hyde), 17401 at 10 (Tinlin). Topics 1 and 2 concern

20  the Recovery Cone retrieval system; Topic 4(a) concerns the filter cleaning process; and

21  Topics 4(b), 5, 6, 7, and 8 concern the Denali Filter. The Court concluded that none of these

22  topics was relevant to the issues in the bellwether cases involving a G2 filter (Booker), an

23  Eclipse filter (Jones), either a G2X or Eclipse filter (Hyde), and a Recovery filter (Tinlin).

24  *Id.*

25  The Court deferred ruling on the relevance of topic 3 until trial in all bellwether

26  cases. The Court found that topic 3, concerning Bard's complaint handling and reporting of

27  ――――――――――――――――

28  [4] The Court did not find a limiting instruction necessary at the close of either the
    Booker or Jones trials. *See* Doc. 10694 at 9.

1   adverse events with respect to the G2 and Eclipse filters, as well as the adequacy of Bard's

2   evaluation of the root cause of the violations, was relevant to rebut the implication at trial

3   that the FDA took no action with respect to Bard IVC filters. *See* Doc. 10693 at 13-15; Doc.

4   11256. The Court concluded that the warning letter was admissible under Federal Rule of

5   Evidence 803(8), and was not barred as hearsay. Doc. 10258 at 7. The Court further

6   concluded that the probative value of topic 3 was not substantially outweighed by the danger

7   of unfair prejudice to Bard under Rule 403. *Id.* The Court admitted the warning letter in

8   redacted form during the three bellwether trials. *See* Docs. 10565, 11256, 12736. The Court

9   noted that topic 3 included reference to the G2, the filter at issue in Booker, and reached

10  similar conclusions in Jones and Hyde. Doc. 17401 at 11. The parties disputed the relevance

11  of topic 3 in Tinlin because it did not include reference to the Recovery, the filter at issue

12  in Tinlin. *Id.* The Court did not decide this issue because the Tinlin case settled.

13                      **c.      Recovery Cephalad Migration Death Evidence.**

14          Defendants moved to exclude evidence of cephalad migration (i.e., migration of the

15  filter toward the patient's heart) by a Recovery filter resulting in patient death. The Court

16  denied the motion for the Booker bellwether trial, which involved a G2 filter. Docs. 10258

17  at 4-5, 10323 at 4. Defendants have appealed this ruling. Docs. 11934, 11953.

18          The Court granted the motion for the Jones bellwether trial, which involved an

19  Eclipse filter, and denied Plaintiff's requests for reconsideration of the ruling before and

20  during the trial. *See* Docs. 10819, 10920, 11041, 11113, 11256, 11302; *see also* Doc. 11409

21  at 94-96. Plaintiff Jones has appealed those rulings. Docs. 12057, 12071.

22          The Court granted the motion for the Hyde bellwether trial, which involved either a

23  G2X or Eclipse filter. Doc. 12533 at 6-7. Plaintiff Hyde has appealed this ruling. Docs.

24  13465, 13480.

25          The Court denied Defendants' motion for the Tinlin bellwether trial, which involved

26  a Recovery filter. Doc. 17401 at 7-10. The Tinlin case settled before trial.

27          The Court concluded for purposes of the Booker bellwether trial that evidence of

28  cephalad migrations by a Recovery filter resulting in patient death was necessary for the

1    jury to understand the issues that prompted creation and design of the next-generation G2

2    filter, and thus was relevant to Plaintiff's design defect claims. Doc. 10323 at 4. In addition,

3    because the Recovery filter was the predicate device for the G2 filter in Defendants' 510(k)

4    submission to the FDA, and Defendants asserted to the FDA that the G2 was as safe and

5    effective as the Recovery, the Court concluded that the safety and effectiveness of the

6    Recovery filter was at issue. *Id.* The Court was concerned, however, that too heavy an

7    emphasis on deaths caused by cephalad migration of the Recovery filter – a kind of

8    migration which did not occur in the G2 filter generally or the Booker case specifically –

9    would result in unfair prejudice to Defendants that substantially outweighed the probative

10   value of the evidence. *Id.* Defendants did not object during trial that Plaintiffs were over-

11   emphasizing the death evidence.

12        The Court initially concluded for purposes of the Jones bellwether trial, which

13   involved an Eclipse filter, that evidence of cephalad migration deaths by the Recovery filter

14   was inadmissible because it was only marginally relevant to Plaintiff's claims and its

15   marginal relevancy was substantially outweighed by the risk of unfair prejudice. *See* Docs.

16   10819, 10920, 11041, 11113, 11256, 11302. This is because cephalad migration did not

17   continue in any significant degree beyond the Recovery filter; cephalad migration deaths

18   all occurred before the Recovery was taken off the market in late 2005; Ms. Jones did not

19   receive her Eclipse filter until 2010; the Recovery-related deaths said nothing about three

20   of Ms. Jones' four claims (strict liability design defect and the failure to warn claims); and

21   instances of cephalad migration deaths were not substantially similar to complications

22   experienced by Ms. Jones and therefore did not meet the Georgia standard for evidence on

23   punitive damages. Docs. 10819, 11041.

24        The Court also found that deaths caused by a non-predicate device (the Recovery

25   was not the predicate device for the Eclipse in Defendants' 510(k) submission), and by a

26   form of migration that was eliminated years earlier, were of sufficiently limited probative

27   value that their relevancy was substantially outweighed by the danger of unfair prejudice

28   because the death evidence may prompt a jury decision based on emotion. *Id.* The Court

1   further concluded that Plaintiff Jones would not be seriously hampered in her ability to
2   prove Recovery filter complications, testing, and design when references to cephalad
3   migration deaths are removed. Doc. 11041. As a result, the Court held that such references
4   should be redacted from evidence presented during the Jones trial.

5        The Court balanced this concern with the competing concern that it would be unfair
6   for Defendants to present statistics about the Recovery filter and not allow Plaintiffs to
7   present competing evidence that included Recovery deaths. *See, e.g.,* Doc. 11391 at 12.
8   Based on this concern, Plaintiffs argued at various points during the trial that Defendants
9   had opened the door to presenting evidence about Recovery cephalad migration deaths. The
10  Court repeatedly made fact-specific determinations on this point, holding that even though
11  Defendants presented some evidence that made the Recovery evidence more relevant, the
12  danger of unfair prejudice continued to substantially outweigh the probative value of the
13  cephalad migration death evidence. *See* Docs. 11113, 11302; *see also* Doc. 11409 at 94-96.

14       The Court concluded for purposes of the Hyde bellwether trial, which involved either
15  a G2X or Eclipse filter, that evidence of Recovery filter cephalad migration deaths should
16  be excluded under Rule 403 for the reasons identified in the Jones bellwether trial. Doc.
17  12533 at 6-7. The Court concluded that this evidence had marginal relevance to Plaintiff's
18  claims because Ms. Hyde received either a G2X or Eclipse filter, two or three generations
19  after the Recovery filter; Ms. Hyde did not receive her filter until 2011, more than five years
20  after cephalad migration deaths stopped when the Recovery was taken off the market; the
21  deaths did not show that G2X or Eclipse filters – which did not cause cephalad migration
22  deaths – had design defects when they left Defendants' control; nor did the cephalad
23  migration deaths, which were eliminated by design changes in the G2, shed light on
24  Defendants' state of mind when designing and marketing the G2X and Eclipse filters. *Id.* at
25  7.

26       The Court concluded for purposes of the Tinlin bellwether trial, which involved a
27  Recovery filter, that Recovery deaths and Defendants' knowledge of those deaths were
28  relevant to Plaintiffs' design defect claim under Wisconsin law because they went directly

to the Recovery's foreseeable risks of harm and whether it was unreasonably dangerous. Doc. 17401 at 7-8. The Court also concluded that the Recovery death evidence was relevant to Plaintiffs' failure to warn and concealment claims because it was probative on the causation issue – that is, whether her treating physician would have selected a different filter for Ms. Tinlin had he been warned about the Recovery's true risks, as Plaintiffs describe them. *Id.* at 8. In addition, because this evidence would be used to impeach expert testimony from Defendants that the Recovery filter was safe and effective, the Court concluded that substantial similarity was not required. *Id.* at 8-9. The Court further concluded that the death evidence was relevant to Bard's state of mind and to show the reprehensibility of its alleged conduct for purposes of punitive damages. *Id.* at 9-10. The Court reached a different conclusion in the Jones and Hyde cases because cephalad migration deaths stopped when the Recovery was taken off the market in 2005, and the deaths shed little light on Defendants' state of mind when marketing different, improved filters years later. *Id.* at 9 n.4. As noted, the Tinlin case settled before trial.

### d.      SNF Evidence.

Plaintiffs sought to exclude evidence of complications associated with the SNF, claiming that they were barred from conducting relevant discovery into the design and testing of the SNF under CMO 10. Doc. 10487; *see* Doc. 1319. The Court denied Plaintiffs' request. Doc. 10489. The Court did not agree that Plaintiffs were foreclosed from obtaining relevant evidence for rebuttal. The Court foreclosed this discovery because Plaintiffs did not contend that the SNF was defective. *Id.* at 2. Plaintiffs also had rebuttal evidence showing that reported failure rates for SNF were lower than Recovery and G2 failure rates. *Id.* The Court ultimately concluded it would not preclude Defendants from presenting its SNF evidence on the basis of a discovery ruling and permitted Plaintiffs to make appropriate evidentiary objections at trial. *Id.* at 3.

### e.      Use of Testimony of Withdrawn Experts.

Defendants sought to preclude Plaintiffs' use at trial of the depositions of three defense experts – Drs. Moritz, Rogers, and Stein – who originally were retained by Bard

but were later withdrawn in some or all cases. Doc. 10255 at 2. The Court denied the request

in part. Doc. 10382. The Court found that Defendants failed to show that the depositions of

these experts were inadmissible on hearsay grounds, but agreed that it would be unfairly

prejudicial under Rule 403 to disclose to the jury that the experts originally were retained

by Bard. *Id.* at 2-3. The Court therefore concluded that Plaintiffs could use portions of the

experts' depositions that support Plaintiffs' claims, but could not disclose to the jury that

the experts originally were retained by Bard. *Id.* at 3. The Court was concerned about the

presentation of cumulative evidence, and therefore required Plaintiffs to show that no other

expert of similar qualifications was available or that the unavailable expert had some unique

testimony to contribute, before the deposition of any withdrawn expert could be used at

trial. *Id.* at 3-4.

### f.      Other Motion in Limine Rulings.

Other motion in limine ("MIL") rulings may be useful to the receiving courts. See

Docs. 10075, 10235, 10258, 10947. The courts are referred to the following motions and

orders to assist in preparing for trial:[5]

- **Parties' Joint Stipulation on MILs in Booker:** The Court, on stipulation of the parties, excluded evidence concerning several case-specific issues in the Booker bellwether trial, as well as a few general issues, including: Bard's 1994 criminal conviction; other lawsuits or claims against Bard; advertising by Plaintiff's counsel; Plaintiff's counsel specializing in personal injury or products liability litigation; contingency fee agreements; and advertising by any counsel nationally for IVC filter cases. Doc. 10235.

- **Defendants MIL 1 in Booker:** The Court permitted evidence and testimony concerning Recovery complications. Doc. 10258 at 1-5; *see* Doc. 10819 (Jones). As noted above, the Court permitted evidence and testimony concerning Recovery filter cephalad migration deaths in the Booker bellwether trial involving a G2 filter (Doc. 10323 at 4), but excluded such evidence in the trials involving a G2X or Eclipse filter (Docs. 10819, 10920, 11041).

---

[5] The Court also ruled on the parties' MILs concerning several case-specific issues. *See* Docs. 10075 (Plaintiff's MIL 12 in Booker), 10258 (Plaintiff's' MILs 6 and 13 in Booker), 10947 (Defendants' MIL 1 and Plaintiff's MILs 1-4 and 7 in Jones), 12533 (Plaintiff's MIL 3 in Hyde), 17285 (Plaintiff's MIL 1 in Tinlin), 17401 (Plaintiff's MILs 2, 3, and 6 in Tinlin).

- **Defendants' MIL 2 in Booker:** The Court permitted evidence and testimony relating to the development of the Recovery filter. Doc. 10258 at 5-6; *see* Doc. 10819 at 2-3 (Jones).

- **Defendants' MIL 4 in Booker:** The Court excluded evidence and testimony concerning a photograph of Bard employee Michael Randall making an offensive gesture. Doc. 10075 at 1-2.

- **Defendants' MIL 5 in Booker:** The Court permitted Plaintiff's expert Dr. Thomas Kinney to be called as a fact witness, but prohibited him from testifying regarding his prior work for Bard as an expert witness in two prior IVC filter cases or as a paid consultant to Bard. Docs. 10075 at 2-3, 10323 at 4.

- **Plaintiff's MIL 2 in Booker:** The Court reserved ruling until trial on evidence and testimony regarding the nature of Bard's business, including the nature, quality, and usefulness of its products, the conscientiousness of its employees, and references to its mission statement. Doc. 10075 at 3-4.

- **Plaintiff's MIL 3 in Booker:** The Court permitted evidence and testimony concerning the benefits of IVC filters, including testimony describing Bard filters as "lifesaving" devices. Doc. 10258 at 8.

- **Plaintiff's MIL 4 in Booker:** The Court permitted evidence and testimony that IVC filters, including Bard's filters, are within the standard of care for the medical treatment of pulmonary embolism. Doc. 10258 at 8-9. Defendants agreed to not characterize IVC filters as the "gold standard" for the treatment of pulmonary embolisms. *Id.* at 8.

- **Plaintiff's MIL 5 in Booker:** The Court denied as moot the motion to exclude evidence and argument relating to failure rates, complication rates, percentages, or comparative analysis of any injuries that were not produced to Plaintiffs during discovery, as all such information was produced. Doc. 10075 at 4.

- **Plaintiff's MIL 7 in Booker:** The Court excluded evidence and argument relating to prior judicial opinions about Plaintiffs' experts, including the number of times their testimony has been precluded in other cases. *Id.*

- **Plaintiff's MIL 8 in Booker:** The Court excluded evidence and argument that a verdict against Defendants will have an adverse impact on the medical community, future medical device research or costs, and the availability of medical care. *Id.* at 4-5.

- **Plaintiff's MIL 9 in Booker:** The Court deferred ruling on the relevance of statements or lack of statements from medical societies, including the Society of Interventional Radiologists ("SIR"), until trial. Doc. 10258 at 14-18. The Court ultimately admitted this evidence in both the Booker and Jones bellwether trials.

- **Plaintiff's MIL 10 in Booker:** The Court excluded evidence and testimony that Bard needed FDA consent to add warnings to its labels, send warning letters to physicians and patients, or recall its filters. *Id.* at 18-19. The Court permitted evidence and argument explaining the reasons why Bard filters were not recalled, FDA's potential involvement in any recall effort, and the fact that warnings about failure rates and increased risks could not be based on MDR and MAUDE data alone. *Id.*

- **Plaintiff's MIL 11 in Booker:** The Court permitted evidence and argument relating to the informed consent form signed by Plaintiff prior to insertion of the IVC filter, even though the form is not specific to IVC filters or Bard filters. Doc. 10075 at 5-6.

- **Plaintiff's MIL 14 in Booker:** The Court reserved ruling until trial on evidence and argument relating to background information and personal traits of Bard employees and witnesses. *Id.* at 7.

- **Plaintiff's MIL 6 in Jones:** The Court permitted evidence and testimony concerning whether a party's expert had been retained by the same attorneys in other litigation. Doc. 10947 at 8-9.

- **Plaintiff's MIL 5 in Jones:** The Court excluded evidence and testimony that Bard employees or their relatives have received Bard IVC filter implants. *Id.* at 9-10.

- **Defendants' MIL 2 in Jones:** The Court excluded evidence and testimony of other lawsuits against Bard. *Id.* at 11.

- **Plaintiff's MILs 4 and 5 in Hyde:** The Court permitted evidence and testimony concerning Bard's Instructions for Use ("IFU") and SIR Guidelines. Doc. 12507.

- **Plaintiff's MIL 2 in Hyde:** The Court permitted evidence and testimony concerning "The Surgeon General's Call to Action to Prevent Deep Vein Thrombosis and Pulmonary Embolism." Doc. 12533 at 4-6.

- **Defendants' MIL 3 in Hyde:** The Court permitted evidence and testimony that Bard's SNF is a reasonable alternative design. *Id.* at 7.

- **Defendants' MIL 4 in Hyde:** The Court excluded testimony from Dr. Muehrcke about his personal feelings of betrayal and his moral and ethical issues with Bard's conduct. *Id.* at 7-8.

- **Defendants' MIL 6 in Hyde:** The Court permitted evidence and testimony regarding informed consent. *Id.* at 8-9.

- **Plaintiff's MIL 4 in Tinlin:** The Court reserved ruling until trial on evidence and argument relating to a chart created by Defendants from their internal TrackWise database regarding reporting rates of IVC filter complications. Doc. 17401 at 5.

- **Plaintiff's MIL 5 in Tinlin:** The Court permitted evidence and testimony concerning a chart comparing the sales of the permanent SNF with those of retrievable filters between 2002 and 2016. *Id.* at 5-6.

- **Defendants' MIL 3 in Tinlin:** The Court permitted evidence and testimony concerning the Recovery Filter Crisis Communications Plan that Bard had prepared in 2004 to help manage damaging media coverage about a Recovery migration death. *Id.* at 11-12.

- **Defendants' MIL 4 in Tinlin:** The Court excluded evidence and testimony concerning Dr. Muehrcke's untimely disclosed opinion that one of his patients died from cardiac tamponade caused by a fractured strut that had embolized to her heart. *Id.* at 12-13.

1    **6.    Deposition Designation Rulings.**

2        The Court has ruled on numerous objections to deposition designations for trial and

3    refers the transferor courts to the following orders:[6]

| Deponent | Depo. Date | Doc. No(s). |
|---|---|---|
| Bill Altonaga | 10/22/2013 | 10497, 10922, 12598 |
| Murray Asch | 05/02/2016 | 12508 |
| Brian Barry | 01/31/2014 | 17513 |
| Christine Brauer | 05/23/2014<br>08/02/2017 | 10922,<br>10922, 12590 |
| David Ciavarella | 11/12/2013 | 10403, 12508, 12590 |
| Gary Cohen | 01/25/2017 | 10438 |
| Robert Cortelezzi | 11/11/2016 | 10438, 11064, 12590 |
| Len DeCant | 05/24/2016 | 10438, 11080, 12590 |
| John DeFord | 06/02/2016 | 10524, 11080, 12595 |
| Joseph DeJohn | 06/17/2016 | 12357 |
| Mary Edwards | 01/20/2014 | 10438, 12598 |
| Thomas Ferari | 10/20/2010 | 12357, 17386 |
| Matthew Fermanich | 03/27/2017 | 12508 |
| Robert Ferrara | 04/17/2017 | 10438, 12590 |
| Timothy Fischer | 03/29/2017 | 17513 |
| Chris Ganser | 10/11/2016 | 10438, 11073, 12595 |
| Brooke Gillette | 07/11/2014 | 17386 |
| Holly Glass | 09/23/2016 | 17513 |
| Jason Greer | 08/11/2014 | 10438, 10922, 12590 |

---

[6] In addition to the depositions identified in the table above, the Court ruled on numerous objections to case-specific deposition designations for trial.

- 27 -

| Deponent | Depo. Date | Doc. No(s). |
|---|---|---|
| Janet Hudnall | 11/01/2013 | 10403, 12598 |
| Brian Hudson | 01/17/2014 | 10403, 12590 |
| Sanjeeva Kalva | 07/11/2017 | 17582 |
| Krishna Kandarpa | 07/19/2018 | 12590 |
| William Kuo | 03/23/2017 | 12357 |
| John Lehmann | 08/07/2014 | 10922, 12357 |
| William Little | 07/27/2016 | 10438, 11064, 12598 |
| Hugh Magee | 10/17/2017 | 17513 |
| John McDermott | 02/05/2014 | 10438, 12590 |
| Patrick McDonald | 07/29/2016 | 10486, 11064, 12590 |
| Mark Moritz | 07/18/2017 | 10922, 12590 |
| Daniel Orms | 08/16/2016 | 10403, 11073, 12595 |
| Abithal Raji-Kubba | 07/18/2016 | 11064 |
| Gin Schulz | 01/30/2014 | 10403, 12598 |
| Christopher Smith | 08/03/2017 | 11073 |
| William Stavropoulos | 02/01/2017 | 10524 |
| Jack Sullivan | 11/03/2016 09/16/2016 | 10486, 11080, 12590 11080, 12590 |
| Melanie Sussman | 04/07/2017 | 11073 |
| Mehdi Syed | 03/02/2018 | 11313 |
| Scott Trerotola | 01/20/2017 | 10524, 12590 |
| Douglas Uelmen | 10/04/2013 | 10403, 11080, 12590 |
| Carol Vierling | 05/11/2016 | 10486, 11073 |
| Allison Walsh | 01/23/2014 | 17386 |
| Mark Wilson | 01/31/2017 | 10922 |
| Natalie Wong | 10/18/2016 | 10403, 12590 |

| Deponent | Depo. Date | Doc. No(s). |
|---|---|---|
| John Worland | 03/16/2011 | 17582 |

### 7.    Subject Matter Jurisdiction Ruling.

The parties identified cases in the MDL for which federal subject matter jurisdiction does not exist. Doc. 20210; *see also* Doc. 21410-7. No federal question jurisdiction exists under 28 U.S.C. § 1331 because the master complaint asserts no federal claim and the state law claims alleged in the complaint do not depend on the resolution of a federal law question. Doc. 364 ¶¶ 166-349. For purposes of diversity jurisdiction under 28 U.S.C. § 1332, Defendant C. R. Bard, Inc. is a citizen of New Jersey and Defendant Bard Peripheral Vascular, Inc. is a citizen of Arizona. *See id.* ¶¶ 11-12. Thus, complete diversity between the parties does not exist in any case where each Defendant is a named party and Plaintiff is a resident of either Arizona or New Jersey. *See* Doc. 20210-1.

Plaintiffs in most of the cases without subject matter jurisdiction agreed to a dismissal without prejudice. *See id.* Plaintiffs in other cases opposed dismissal, but provided no reason why the cases should not be dismissed. *See id.* The Court dismissed without prejudice multiple cases for lack of subject matter jurisdiction. *See* Docs. 20667, 21461. Some of these cases may be refiled in state court. *See* Doc. 20210-1.

### I.    Further Proceedings in Transferred Cases.

#### 1.    General Discovery.

Because all general fact and expert discovery has been completed in this MDL, the courts receiving these cases need not be concerned with facilitating general expert, corporate, and third-party discovery.[7] This observation is not meant to restrict the power of

---

[7] In cases that have been unconsolidated from the MDL and retained in the District of Arizona, this Court has ruled that discovery will be limited to Plaintiff-specific issues, and that the Court will not reopen general fact or expert discovery, with two narrow exceptions: (a) Defendants shall timely supplement their disclosures of adverse event data; and (b) any new medical literature published since 2017 may be added to the reliance lists of general experts, and the general experts may expand their trial testimony from the MDL to include a discussion of such new literature.

receiving courts for good cause or in the interest of justice to address issues that may be unique and relevant in a transferred case.

### 2.     Case-Specific Discovery and Trial Preparation.

According to the parties, the status of the remaining discovery and other pretrial issues for the cases being transferred, and the estimated time needed to resolve such issues and make the cases ready for trial, will be determined on transfer. Final trial preparation in the bellwether trials was governed by certain Court orders. *See* Docs. 8871, 10323, 10587, 11011, 11320, 11321, 11659, 11871, 12061, 12853, 12971.

### J.     Documents to Be Sent to Receiving Courts.

The Court has concluded that the cases listed on Schedule A should be transferred to appropriate districts pursuant to 28 U.S.C. § 1404(a). Upon receipt of this transfer order, the Clerk for this District shall issue a letter to the transferor courts, via email, setting out the process for transferring the case. The letter and certified copy of this transfer order will be sent to the transferor courts' email addresses.

The parties have submitted a stipulated designation of record for remanded cases. Doc. 19444-1; *see* J.P.M.L Rule 10.4(a). Upon receipt of this transfer order, the Clerk of this District shall transmit to the transferor court the following: (1) a copy of the individual docket sheet for the remanded action, (2) a copy of the master docket sheet in this MDL, (3) the entire file for the remanded action, as originally received from the transferor district, and (4) the record on remand designated by the parties. *See* Doc. 19444-1; J.P.M.L Rule 10.4(b)..

If a party believes that the docket sheet for a particular case being remanded or transferred is not correct, a party to that case may, with notice to all other parties in the case, file with the receiving court a designation amending the record. Upon receiving such designation, the receiving court may make any needed changes to the docket. If the docket is revised to include additional documents, the parties should provide those documents to the receiving court.

**III.    Conclusion.**

Pursuant to 28 U.S.C. § 1404(a), the Clerk of this District is directed to transfer the cases listed on Schedule A to appropriate districts for further proceedings.

The Clerk of this District is directed to unconsolidate from the MDL the cases listed on Schedule B. These cases will remain in the District of Arizona and be assigned to the undersigned judge.

RESPECTFULLY SUBMITTED this 6th day of August, 2020.

BEUS GILBERT MCGRODER PLLC

NELSON MULLINS RILEY & SCARBOROUGH, LLP

By: /s/ *Mark O'Connor* (with permission)
Mark S. O'Connor (011029)
701 North 44th St.
Phoenix, AZ 85008

Ramon Rossi Lopez
(admitted *pro hac vice*)
CA Bar No. 86361
LOPEZ MCHUGH LLP
100 Bayview Circle, Suite 5600
Newport Beach, CA 92660

*Co-Lead/Liaison Counsel for Plaintiffs*

By: /s/ *Richard B. North, Jr.*
Richard B. North, Jr. (*pro hac vice*)
Georgia Bar No. 545599
Matthew B. Lerner (*pro hac vice*)
Georgia Bar No. 446986
Atlantic Station
201 17th Street, NW / Suite 1700
Atlanta, GA 30363

James R. Condo (005867)
Kristine L. Gallardo (033975)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2204

*Attorneys for C. R. Bard, Inc. and Bard Peripheral Vascular, Inc.*