Mark S. O'Connor (011029) – mark.oconnor@beusgilbert.com
Beus Gilbert McGroder PLLC
701 N. 44th Street
Phoenix, Arizona  85008
480-429-3019
*Co-Lead and Liaison Counsel to Common Benefit Fee and Cost Committee*

Howard Nations – nations@howardnations.com
(TX 14823000; admitted *pro hac vice*)
The Nations Law Firm
9703 Richmond, Suite 200
Houston, Texas 77042
713-807-8400
*Co-Chair Common Benefit Fee and Cost Committee*

Wendy Fleishman – wfleishman@lhcb.com
(NY 2500429; admitted *pro hac vice*)
Lieff Cabraser Heimann & Bernstein
250 Hudson Street, 8th Floor
New York, NY 10013
212-355-9500
*Co-Chair Common Benefit Fee and Cost Committee*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation | No. MDL 15-02641-PHX-DGC<br><br>**RESPONSE IN OPPOSITION TO LAW OFFICES OF BEN C. MARTIN AND MARTIN\|BAUGHMAN'S MOTION TO REDUCE AND EXEMPT CLIENT RECOVERIES FROM COMMON BENEFIT FEE AND EXPENSE ASSESSMENT AND MEMORANDUM OF LAW IN SUPPORT**<br><br>**(Sealed; Ex Parte)** |

The *In re Bard IVC Filters Products Liability Litigation* Common Benefit Fees and Costs Committee ("Committee") responds in opposition to the Motion of Law Offices of Ben C. Martin and Martin|Baughman (collectively referred to as "BCM") to Reduce and Exempt Client Recoveries from Common Benefit Fee and Expense Assessment and Memorandum of Law in Support [Doc. 22144].  As explained below, BCM has an enforceable private agreement to pay Court-ordered assessments for *all* its cases and voluntarily submitted to the jurisdiction of this Court for the purpose of assessments. The

common benefit work done by the PLC benefitted *all* BCM Bard IVC filter clients and neither fairness nor equity require reduction of the common benefit assessments.

**I.     BACKGROUND**

At the outset of this MDL, the Court appointed a Plaintiffs' Leadership Counsel ("PLC") which later became the Plaintiff Steering Committee ("PSC") to, in coordination with lead counsel, perform pretrial discovery and bellwether trial work to discover and prepare for trial various cases and issues in the Bard IVC filter litigation. *See* CMO1 [Doc. 248], Amended CMO1 [Doc. 4016] and Second Amended CMO1 [Doc. 5285]. Ben Martin applied to the Court for a position on the PSC. Doc 176-2 at 47. At all relevant times, Ben Martin was, and still is, a member of the PSC.[1] As a member of the PLC/PSC, BCM was automatically designated and included as "Participating Counsel" under CMO6. CMO6 defined the rights and responsibilities of lawyers appointed to leadership and set forth parameters for common benefit work to be performed in this matter, requirements for authorization of work, timekeeping standards, requirements for reimbursement (current and future) of common benefit expenses, etc. Doc. 372. CMO6 also established an assessment amount of 8 percent, which was allocated 6 percent for attorneys' fees and 2 percent for expenses. CMO6 at 10.

As Participating Counsel, BCM agreed to the terms of the Common Benefit Participation Agreement (Exhibit A to CMO6). This agreement was defined as a voluntary, private "agreement between and among plaintiffs' attorneys who have cases pending in the MDL and/or in state court." *Id.* at 2. Under the Participation Agreement, an attorney "is entitled to receive the Common Benefit Work Product created by those attorneys who have also executed, or have been deemed to have executed[2] the Participation Agreement and

---

[1] As with other members of the PSC, Mr. Martin's firm name and partners changed during the pendency of the MDL. While Mr. Martin's current partner, Laura Bauman, was not a member of the PSC, she has at all times during this MDL worked for PSC firms (Martin|Baughman and Baron & Budd) and, therefore, the arguments made throughout this response apply with equal weight to her interest in BCM's cases.

[2] The Committee was unable to find Mr. Martin's signature on the Participation Agreement, but his signature (or lack thereof) is irrelevant since Mr. Martin is deemed to have signed it

2

1    Joint Prosecution Agreement, *regardless of the venue in which the attorney's cases are
2    pending.*" *Id.*, Exhibit A at 2 (emphasis added).  In return for being appointed to leadership
3    (and, therefore becoming eligible for common benefit fees payment and expenses
4    reimbursement) and securing access to MDL work product created by leadership, BCM and
5    other Participating Counsel agreed to pay the Court-ordered assessments from the gross
6    recovery on funds obtained for cases benefitting from MDL work product. *Id.* at 3.  This
7    assessment specifically applied to "all cases now pending or later filed in, transferred to, or
8    removed to this Court and treated as part of the coordinated proceeding known as *In re:
9    Bard IVC Filters Products Liability Litigation,* MDL 2641." *Id.* at 4. In addition, for
10   signatories to the Participation Agreement (actual signers or those deemed to have signed,
11   such as BCM), the assessments also "apply to all un-filed cases, tolled cases, and/or cases
12   filed in state court in which they have a fee interest, regardless of the size of that fee
13   interest." *Id.* Thus, the Court's order and the Participation Agreement made clear that
14   assessments applied to all MDL and federal actions but not un-filed or state court cases
15   *unless* attorneys for clients in un-filed or state court cases were Participating Counsel.  BCM
16   has been Participating Counsel from the outset of the MDL.  At no time did BCM object to
17   CMO1 (or its amendments) or CMO6 (or its amendments).

18        The issue of assessments came before the Court again after the MDL neared
19   completion and leadership was better able to assess the Common Benefit expenses incurred
20   and work performed by leadership (including BCM).  In reviewing leadership's motion to

---

in exchange for his appointment to leadership. CMO6 at 2-3 ("Participating Counsel shall automatically include all present and future members of the "Plaintiff's Leadership Counsel" (as designated in CMO No. 1) by virtue of their appointment by the Court as Plaintiff's Co-Lead/Liaison Counsel and State/Federal Liaison Counsel ("Plaintiffs' Co-Lead Counsel"), the Plaintiff's Steering Committee (the "PSC"), State-Federal Liaisons, and any other plaintiff's attorneys who execute the Participation Agreement (Exhibit A hereto)").  Mr. Martin also personally attended strategy meetings before the Court's initial Case Management Conference (as well as the initial Case Management Conference itself) in this matter and participated in several matters leading up to his appointment to leadership. Finally, because common benefit reimbursement was limited to Participating Counsel, and BCM requested and was awarded common benefit funds, BCM cannot now claim it was not Participating Counsel.

3

increase expense assessments from 2 to 5 percent and fees assessments from 6 to 9 percent, the Court ultimately determined that expenses should remain at 2 percent but that an increase in the fees assessment from 6 percent to 8 percent was appropriate. *See* CMO 6 as amended by May 31, 2019, Order (Doc. 18038). BCM did not object to the proposed increase in assessments or Amended CMO6.

All told, approved common benefit work in the MDL was the result of efforts of 202 attorneys and staff who dedicated in excess of 110,000 hours[3] to create the very MDL common benefit work and Bard IVC Filter Litigation trial package that BCM utilized in resolving all 507 of his cases. *See* CMO 52 (approving common benefit work and Special Master's Recommendations for Common Benefit fees and expenses reimbursement).

Anticipating that many attorneys may need to litigate their cases upon remand from the MDL, towards the end of bellwether process, the PEC created a trial package for all remanded cases. It exists in the form of a vendor's advanced business online electronic repository. It contains almost all work product developed in the MDL and from qualifying pre-MDL cases, amounting to tens of thousands of documents, motions, transcripts, exhibit lists, exhibits, corporate documents and memos. Access is controlled by one PEC law firm and granted only if the requestor is a member of PSC firm, or signs the Joint Prosecution Agreement on behalf of his/her firm. *See* Declaration of Laura Smith, Exhibit A at ¶¶ 3-4. BCM attorneys and staff have accessed the trial package over *5000* times since January 2020. *See id.* at ¶¶ 6-7.

**II.     ARGUMENT**

BCM makes a twofold argument. First, it claims it cannot be required to honor its agreement to pay assessments on all its Bard IVC Filter cases or follow this Court's orders memorializing those agreements as they relate to un-filed cases, cases filed in state court or cases filed after the close of the MDL. Second, it argues that fairness and equity require a

---

[3] BCM performed approved common benefit work during the active stages of the MDL as well as pre-MDL work deemed compensable and currently receives fee and expense distributions from assessments collected from all other resolved cases, including certain state court cases.

reduction of assessments for BCM cases filed in the MDL because BCM did additional work to settle those cases after the MDL closed. Each argument is addressed in turn, and each argument should be rejected.

**A.    The Court has authority to assess BCM's un-filed and state court cases.**

Courts throughout the country have recognized that MDL common benefit work is entitled to compensation and that the attorneys doing work for the common benefit should be compensated for their efforts. *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *In re Air Crash Disaster at Florida Everglades on December 29, 1972,* 549 F.2d 1006, 1019-21 (5th Cir. 1977); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Products Liab. Litig.*, 914 F.3d 623, 637 (9th Cir. 2019); *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 772 (9th Cir. 1977); *In re MGM Grand Hotel Fire Litigation,* 660 F.Supp. 522, 525-29 (D. Nev. 1987); *In re Vioxx Products Liab. Litig.*, 760 F. Supp. 2d 640, 648 (E.D. La. 2010); *In re Cook Med., Inc., Pelvic Repair Sys. Products Liab. Litig.*, 365 F. Supp. 3d 685, 706 (S.D.W. Va. 2019); Manual for Complex Litigation § 14.121 (4th ed. 2004).

Here, the Court has determined that, in light of the work performed by MDL leadership and the expenses they have incurred, assessments of ten percent of the gross recovery (8 percent fees/2 percent expenses) is reasonable. These assessments apply to all MDL cases, as well as any other case handled by Participating Counsel regardless of where or whether such cases are filed. *See* CMO6, Exhibit A. BCM, by virtue of its role in MDL leadership (which also entitled it to ongoing common benefit compensation and reimbursement of substantial expenses) is Participating Counsel and therefore all BCM cases are subject to assessment.

BCM's motion rests entirely on District Court Judge Chhabria's June 22, 2021, order in *In re Roundup*, ___ F. Supp. 3d ___, 2021 WL 3161590 (N.D. Cal. 2021). That order, however, addressed whether that court could and should assess broadly and indiscriminately all cases in which a party receives payment from Monsanto relating to a claim arising from

5

Roundup exposure. These would include any case "regardless of whether their lawyer was involved in the MDL or used MDL work product." *Id.* at *5.

Here, unlike what was sought in Roundup, assessments do not apply to un-filed cases or state court cases unless attorneys in those cases are Participating Counsel. Thus, unlike the situation the court addressed in *Roundup* where assessments were sought without regard to whether a claimant benefitted from MDL work product, here assessments are limited to Participating Counsel, and only Participating Counsel are allowed to use MDL work product. Thus, the problem of claimants paying for work that did not benefit them is not implicated by BCM's Motion. BCM was Participating Counsel and availed itself handsomely and regularly of MDL work product.

To the extent that BCM relies upon *In re Roundup* for a blanket rule that federal courts lack jurisdiction in all circumstances to assess non-federal claimants, that is a minority viewpoint. *See In re Xarelto Products Liability Litigation*, 2020 WL 1433923 (E.D. La. 2020) at *2-*3.[4] This fact was recognized by the *In re Roundup* court itself: "It's true that district courts often adopt orders requiring holdbacks from recoveries of plaintiffs outside the MDL—and in particular from recoveries of plaintiffs who hired an attorney with an MDL case." 2021 WL 3161590 at *13. Even counsel opposing the proposed assessments in Roundup acknowledged that "[t]he situation might well be different if (1) we had voluntarily entered into a participation agreement with Co-Lead Counsel and (2) that agreement was incorporated into an order of this Court."[5]

---

[4] BCM's reliance on *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977), and *Hartland v. Alaskan Airlines*, 544 F.2d 992 (9th Cir. 1976), are equally misplaced. *Vincent* merely found that a single claimant who had *not hired an attorney or used the judicial process* to obtain a settlement could not be required to pay an assessment, and that claimants who settled *before* lead counsel were appointed likewise could not be required to pay assessments. 557 F.2d at 765-767. *Hartland* involved taxing of a state court settlement achieved by lawyers who did not file in federal court, were not in leadership of the consolidated matters and had not signed a participation agreement. 544 F.2d at 996. Neither case has application here, where BCM was Participating Counsel and extensively used common benefit work product.

[5] U.S. District Court, California Northern District (San Francisco), Civil Docket for Case 3:16-md-02741-VC, *In re: Roundup Products Liability Litigation*, ECF No. 12517, at 2.

6

At the end of the day, however, the extent and scope of *In Re Roundup* is neither binding on the Court nor relevant here because BCM *has* voluntarily submitted to the jurisdiction of the Court by virtue of the Participation Agreement.  As the Agreement itself declares and CMO6 recognizes, Participating Counsel reached a private agreement where they (and their clients) agree to pay assessments on *all* their cases in exchange for receiving MDL work product and, in the case of leadership members like BCM, becoming eligible to be paid for common benefit work and be reimbursed for common benefit expenses.  Failure to pay the fee and cost assessments would be not only a breach of contract but also a violation of CMO6.  "When a district court incorporates the terms of an agreement into a court order, 'a breach of the agreement would be a violation of the order.'" *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 617 Fed. Appx. 136, 142 (3d Cir. 2015) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)).  It is also well-settled that a lawyer can bind his or her clients to an agreement. *George Nicolais & Associates, Inc. v. Acquvest, Inc.*, 322 Fed. Appx. 519, 520 (9th Cir. 2009); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978).

And there is no viable challenge to the Court's jurisdiction here because BCM submitted to the Court's jurisdiction and parties can (and regularly do) agree to submit to a court's jurisdiction through private agreement.  *Custom Polymers PET, LLC v. Gamma Meccanica SpA*, 185 F. Supp. 3d 741, 760 (D.S.C. 2016) ("Through this provision, Custom submitted to the jurisdiction of this Court"); *In re Avandia Mktg.*, 617 Fed. Appx. at 142 (participation agreement and court's responsibility to supervise and appoint leadership/coordinating counsel was sufficient for a court to exercise jurisdiction); *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 187 (S.D.N.Y. 2020); *In re Cook Med., Inc., Pelvic Repair Sys. Products Liab. Litig.*, 365 F. Supp. 3d at 695 ("The source of the court's authority is in its discretion to manage the litigation in combination with the voluntarily entered into agreement.").

7

Thus, this is a matter of contract, and this Court was expressly given the authority to enforce the terms of the parties' agreement.[6] The PLC/PSC agreed that BCM would be paid common benefit fees and expenses and provided access to MDL work product. In return, BCM agreed to pay the Court-ordered assessments on its entire inventory of cases. A deal is a deal, even if one side later believes it was not a particularly good deal.

There are also policy reasons not to countenance BCM's argument that its un-filed and later-filed cases should be exempt from assessments. First, MDLs are designed in large part to facilitate the orderly administration of a massive number of cases. And part of examining what is reasonable both in terms of discovery, proportionality and eventually settlement is influenced by the number of cases that exist. Yet BCM's position, if adopted, would allow a Participating Counsel access to the full complement of MDL work product but limit recovery of assessments to only those of the Participating Counsel's MDL-filed cases. Thus, there would be incentive for attorneys to seek tolling agreements or otherwise minimize the number of cases filed in an MDL so as to minimize the number of cases subject to an assessment. Under BCM's argument, the firm could simply have filed a single, low value, placeholder case in the MDL and, through forum shopping or tolling agreements, avoided assessments on hundreds or thousands of cases that all benefited from the MDL work product. Such a system would not only deprive MDL leadership of deserved and Court-approved compensation, but would also create the "free rider" problem that the Common Fund Doctrine was created to solve.

Finally, BCM waived its right to contest CMO6 in any form since it did not timely object to those orders.[7] *See Baker v. Chevron USA, Inc.*, 105-CV-227, 2007 WL 315346,

---

[6] BCM's argument to exempt his state court cases is particularly offensive. BCM submitted and was awarded common benefit time for work on state court cases such as *Grossman* and *Austin*. To receive direct compensation from the MDL common benefit fund for work on state court cases but at the same time seek to avoid payment of assessments for other state court cases does not smack of fairness or equity.

[7] The Committee expressly does *not* argue that BCM waived its right to dispute assessments by withdrawing its opposition to the CBFCC's common benefit recommendation before the Special Master. Rather, it is in failing to object to the applicable court orders within a

8

at *4 (S.D. Ohio Jan. 30, 2007) (failure to comply with the case management order and subsequent failure to object to the Report and Recommendation operated as a waiver of claims); *United States v. Clack*, 957 F.2d 659, 661 (9th Cir. 1992) (failure to object at sentencing to restitution order waived the objection).

### B. "Fairness and Equity" Require BCM to pay assessments in the MDL filed cases.

The Court has already determined that an 8/2 percent assessment is appropriate for work performed in this MDL. *See* CMO 6 as amended by May 31, 2019, Order (Doc. 18038) (rejecting request to increase expense assessments from 2 percent to 5 percent but authorizing an adjustment of fees from 6 percent to 8 percent).

Indeed, courts have routinely rejected efforts to exempt attorneys and cases from assessments when attorneys and their clients have benefited from work done by MDL leadership. *In re Avandia Mktg.*, 617 Fed. Appx. at 138 (affirming district court's order declining to permit an exemption to the common fund fee assessment as a credit for a party, despite the party alleging that it spent $14,000,000 in attorneys' fees, because movant did not show its work was to the common benefit of all plaintiffs or otherwise entitled by court order); *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d at 183 (rejecting challenge to fee assessment for settled cases because there was evidence common benefit work product was used in at least one of its cases and the plain terms of the case management order required the fee assessment); *In re Diet Drugs Products Liab. Litig.*, 553 F. Supp. 2d 442, 497 (E.D. Pa. 2008) (denying motions for exemption from assessments because the court will not "wade into the morass of determining which of the hundreds of lawyers used, did not use, or used only to a limited extent, the materials and services available through the work of the common benefit attorneys. Such a process would undermine one of the key purposes of an MDL—effecting the efficient litigation of tens of thousands of related cases."); *see also In re Air Crash Disaster at Florida Everglades on*

---

reasonable period of time before or after they were entered that BCM waived its right to challenge the scope or percentage holdback of assessments.

*December 29, 1972*, 549 F.2d 1006, 1020 (5th Cir. 1977) ("That it is fair and just that those who are deriving benefits from efforts of counsel inuring to the benefit of all claimants . . . should bear their fair share of repayment of the costs and payment for counsel's skill and time and effort which have been devoted to the common question of establishing liability.").

BCM's argument for an unspecified reduction of assessments on the 202 cases that were filed in the MDL based on fairness and equity does not withstand serious scrutiny or make logical sense. BCM used MDL work product. Extensively. *See* Exhibit A at ¶¶ 6-7 (describing BCM attorneys and staff accessing the trial package in excess of 5000 times). BCM regularly consulted MDL attorneys concerning the trial package, expert witnesses, exhibits and related matters. Two preservation/*de bene esse* depositions were taken of common benefit expert witnesses David Garcia and Rebecca Betensky specifically at BCM's request given his decision to further litigate his inventory of cases. These depositions were funded by the MDL and compensated as common benefit time (which BCM now seeks to avoid contributing to). Also, BCM describes the work and resources it committed to at least two trials (*Conn* and *Couturier*), yet a review of the docket in those cases demonstrates that the litigation was hugely based on the MDL work product BCM accessed over 4000 times. *See id.* at ¶¶ 8-16 (describing large percentage of motions, responses and exhibits derived directly from MDL work product).[8]

BCM points to his development of a supplemental expert report relating to the prothrombogenic nature of IVC filters as evidence of the alleged incomplete and inadequate workup done by leadership. This point is wrong on multiple levels. First, clotting due to filter placement was not a signature injury that leadership was charged with developing. *See* Transfer Order at 1, MDL No. 2641 (J.P.M.L. Aug. 17, 2015), ECF No. 31. Second, despite that fact, this issue *was* developed in the MDL. Indeed, in the *Jones* bellwether trial, plaintiff called Dr. Garcia to testify. That testimony included:

---

[8] It should be noted that the examination of the docket in the two cases cited by BCM was simply a snapshot. The Committee is confident that a deep study of work performed in any BCM litigated case would demonstrate substantial use of MDL work product.

10

Q Based upon your understanding of hematology, do you believe that Mrs. Jones is in any danger from the filter fragment that is in her pulmonary artery?

A Yes.

Q What are the dangers?

A Well, we never want to have a foreign object in the flowing blood because foreign objects, through a variety of mechanisms, *can cause clots to form where we don't want them to*.

Q What are some of those mechanisms?
A For one thing, in a case like this, *the presence of this filter fragment is creating local turbulence, and turbulent blood flow is a well-known cause of, or potential cause of blood clotting*.

Another issue is that when *we expose a foreign material, whether it's a catheter, a stent, a filter fragment, to the flowing blood, it can trigger a biochemical reaction that just occurs naturally in the body that promotes the formation of clots.*

Q So is that the risk that she is exposed to with the fragment of the filter in her pulmonary artery?

A That is the principal risk that I'm concerned about is that this fragment sitting in her pulmonary artery could induce the formation of a blood clot.

Q And if it were to induce the formation of a blood clot, what could happen?

A Well, one possibility is that the artery where the fragment is sitting could become occluded, thereby preventing that portion of her lung from reoxygenating her blood, which could lead to low oxygen levels and be dangerous.

Another possibility is that the -- if a clot begins to form, clot can beget clot, and it could enlarge in either direction. But if it enlarges proximally, that is toward the heart, toward the larger caliber blood vessels, it could actually put stress on the heart, leading to either low blood pressure or potentially even an arrhythmia, like the heart suddenly stopping.

Combined Trial Transcript, *Jones v. Bard*, 515:7-516:18 (emphasis added). To say that the MDL did not develop opinions from Dr. Garcia relating to the dangers of filters causing clots is flat wrong.

Similarly, that BCM undertook additional discovery concerning alternative designs from Dr. McMeeking is of no moment. Whatever additional work Dr. McMeeking did benefited from the foundation that his experience in the MDL provided him. BCM did not have to "reinvent the wheel" with Dr. McMeeking, who was called as a design engineer in each of the bellwether trials and testified numerous times, all on the MDL dime.[9]

BCM seems to be under the impression that the purpose of the MDL is to achieve a global resolution of all cases. That impression is wrong. While MDL work can have a salutary effect on settlement efforts—and in this case undoubtedly did—the primary objective of an MDL is to conduct consolidated and coordinated discovery that avoids parties having to do the same discovery in thousands of cases. Nor is it unusual for firms to litigate their cases after they are remanded from and MDL. BCM was not alone in litigating his cases (several PSC firms are participating in litigating remanded/transferred cases), though it is alone in asking to be exempted from paying assessments because it had to put work into its inventory of cases.

**C.     Discovery Regarding Confidential Settlements Is Unnecessary and Inappropriate.**

---

[9] Also, any after-the-fact criticisms BCM has regarding the MDL's strategy is would be directed at BCM itself. Two partners at BCM were either appointed to the PSC or participated in the MDL as a member of another PSC firm. This relevant as one BCM partner began working with Dr. McMeeking before the MDL was in full swing on a state court case called *Austin*. That partner thus was party to (and was compensated in common benefit funds for) creating the "deficits" BCM now identifies with respect to Dr. McMeeking's opinions. And, for what it's worth, the Court will recall that a prominent trial theme in these cases was that Bard had a perfectly good permanent filter and rushed the retrievable line to market for business reasons. Thus, having Bard's own, proven filter as the alternative design was fully consistent with these themes.

12

The Committee objects to discovery into the relative (and highly confidential) "values" or amounts of settlements between BCM's clients and other firms who settled their cases with less effort. While BCM believes that its post-remand efforts enhanced the value of its settlements, that is not a basis for avoiding or reducing the assessments BCM owes for the work that was done in the MDL. Moreover, there is no realistic way to reliably trace what factors lead to Bard's decision to settle with BCM for whatever it settled for. Perhaps Bard valued BCM's inventory lower based on BCM's lack of work on any bellwether trial team (the BCM bellwether case—*Kruse*—was dismissed after the Court granted summary judgment to Bard on the statute of limitations, *see* Doc. 12202). Perhaps Bard's risk appetite changed. Or perhaps BCM would have achieved the same or greater settlement had its inventory remained as part of larger group settlement discussions much earlier. There is no way to know, and the Committee does not endorse BCM's efforts to discover or reveal in any other way the merits of their argument involving confidential settlements. And, as Bard points out, these settlements are confidential and discovery into them would be inappropriate. *See* Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc.'s Brief Regarding the Motion Filed by Law Offices of Ben C. Martin and Martin Baughman to Reduce and Exempt Client Recoveries from Common Benefit Fee and Expense Assessment, Doc. 22148.

The reality is that the size and quality of the BCM settlements compared to other firms' are irrelevant. The Court has already determined that an 8/2 assessment is reasonable and fair in light of the work MDL attorneys (including BCM) performed. That BCM may have enhanced his settlement by doing work in addition to the MDL work has no bearing on the reasonableness of the assessment amounts. If the amounts of assessments varied on a case-by-case basis, then the Court would have to examine whether the assessments should be higher for firms that signed the participation agreement but did not have their cases remanded (meaning the MDL work was the only work done in those cases). And where would it end? If an attorney happened to get a massive verdict, would that, in itself, justify a reduction in assessments? And if so, would it be for all cases or just the case in which he

or she obtained the verdict? And how could the Court ensure that it was making a true "apples to apples" comparison between settlements when settlements are a function of the severity of the injury, the venues in which the cases are tried and the lawyers trying them? Lawyers with experience and a proven track record tend to get better results at trial and therefore better settlements. So if BCM gained experience and obtained jury verdicts in some Bard cases, it is not surprising that BCM's settlement values were enhanced (if they were).

BCM did not argue that the 8/2 assessment was unfair or unreasonable when the Court was examining that issue. Only after BCM litigated some of its cases on remand did it seek to get out from under assessments for more than half of its cases and have the assessments reduced on its others. If BCM did not wish to be eligible for common benefit reimbursement and use MDL work product, it had the option to opt out of participation under CMO6 by excusing itself from leadership. Instead, BCM opted in. BCM used MDL work product and obtained settlement of (presumably) all its cases. And if those settlements were enhanced by additional effort expended by BCM, that resulted in higher reimbursement to common benefit attorneys *as well as BCM*. A rising tide floats all boats.[10]

### III.  CONCLUSION

BCM made a deal. It now thinks it wasn't a very good deal, but it was nonetheless a deal, incorporated into a Court order. BCM also gave this Court the power to enforce that deal. BCM must be held to the deal it made, regardless of how much or how little it believes it benefitted from the deal.

RESPECTFULLY SUBMITTED this 8th day of February, 2022.

---

[10] BCM also argues that the entire assessment amount should be sequestered until the Court's order on its Motion becomes final. The Committee does not object to this request *provided* BCM sequesters and places in an escrow account *all* of its attorneys' fees on its settled cases so that there is a de facto bond sufficient to cover the CBFCC's attorneys' fees and costs incurred in adjudication of this issue, as well as interest on the disputed amounts. Nothing in this Response should be construed as a waiver of the Committee's rights to seek separate enforcement of the parties' agreement or make claims against BCM for unjust enrichment.

|   |   |
|---|---|
| 1 | BEUS GILBERT MCGRODER PLLC |
| 2 |   |
| 3 | By:*/s/ Mark S. O'Connor* |
| 4 |     Mark S. O'Connor |
|   |     701 N. 44th Street |
| 5 |     Phoenix, Arizona 85008 |
| 6 | *Co-Lead Counsel for Plaintiffs/Liaison Counsel to the Common Benefit Fee and Cost Committee* |
| 7 |   |
|   | THE NATIONS LAW FIRM |
| 8 |     Howard Nations (TX Bar No. 14823000) |
|   |     (admitted *pro hac vice*) |
| 9 |     9703 Richmond, Suite 200 |
|   |     Houston, Texas 77042 |
| 10 |     713-807-8400 |
|   | *Co-Chair, Common Benefit Fee and Cost* |
| 11 | *Committee* |
| 12 |   |
|   | LIEFF CABRASER HEIMANN & |
| 13 | BERNSTIEN |
|   |     Wendy Fleishman (NY Bar No. 2500429) |
| 14 |     (admitted *pro hac vice*) |
|   |     250 Hudson Street, 8th Floor |
| 15 |     New York, NY 10013 |
| 16 |     212-355-9500 |
|   | *Co-Chair, Common Benefit Fee and Cost* |
| 17 | *Committee* |

## **CERTIFICATE OF SERVICE**

     I hereby certify that on February 8, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing and provided a copy via email to the following:

Ben C. Martin, Esq.
Martin Baughman
3141 Hood Street, Level 6
Dallas, Texas  75219

                                                     */s/ Jessica Gallentine*

8812316v1/26997-0001