**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. MDL 15-02641-PHX-DGC **ORDER** |

The Law Offices of Ben C. Martin and the law firm Martin|Baughman (collectively, "BCM") have filed a motion to reduce and exempt their clients' recoveries from common benefit fee and expense assessments.  Doc. 22144.  The motion is fully briefed, and no party has requested oral argument.  Docs. 22148, 22149, 22151, 22160.  For reasons stated below, the Court will deny the motion.

**I.  Background.**

This multidistrict litigation ("MDL") involves personal injury cases brought against Defendants C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, "Bard").  Bard manufactures and markets medical devices, including blood clot filters.  The MDL Plaintiffs each received implants of Bard filters and claim they were defective and caused serious injury or death.

The MDL was transferred to this Court in August 2015 when 22 cases had been filed.  Doc. 1.  More than 8,000 cases were filed before the MDL closed in May 2019.  Docs. 18079, 18128.  Thousands of the cases have settled.  Many others have been

1   remanded or transferred to appropriate districts because they no longer benefit from

2   centralized pretrial proceedings.  *See*, *e.g.*, Doc. 22042 (final remand and transfer order).

3          At the outset of the MDL, the Court entered Case Management Order ("CMO") 1,

4   which directed counsel to select and appoint a Plaintiffs' Steering Committee ("PSC") to

5   coordinate pretrial activities and trial planning.  Doc. 248.[1]  While the configuration of the

6   PSC changed during the course of the litigation (*see* Docs. 248, 4016, 5285), Ben Martin

7   has been a member since its inception (*see* Docs. 176 at 8, 248 at 2).[2]

8          CMO 6 was issued early in the MDL to provide for the fair and equitable sharing

9   among plaintiffs and their counsel of the burden of litigating this complex case.  Doc. 372

10  at 1.  A common benefit fund was established to ensure that attorneys who performed work

11  that benefited all plaintiffs and their counsel would be reasonably compensated.  *Id.* at 1-2;

12  *see also* Doc. 18038 at 4.  Compensable common benefit work included meetings and

13  conference calls, discovery, document review, expert retention and discovery, motion

14  practice, court appearances, plaintiff-specific discovery and motion practice on bellwether

15  cases, bellwether trials, and settlement efforts.  Doc. 372 at 1-2, 7-8.

16         CMO 6 further provided for the establishment of two interest-bearing accounts to

17  receive and disburse common benefit funds – the Bard IVC Filters Fee Fund and the Bard

18  IVC Filters Expense Fund.  *Id.* at 9.  The Court granted the PSC's request to establish these

19  accounts and appointed Citibank as escrow agent.  *See* Docs. 16932, 17777.  The accounts

20  are funded through assessments on the gross monetary recoveries received by plaintiffs

21  and their counsel.  *See* Doc. 372 at 9-10.

22         CMO 6 established a total common benefit assessment amount of 8%, which

23  included 6% for attorneys' fees and 2% for expenses.  *Id.* at 10.  In May 2019, the Court

24  found that significant unanticipated common benefit work justified an increase in the

---

25

26  [1] CMO 1 was later amended to establish a Plaintiffs' Executive Committee ("PEC") to assist in the administration, organization, and strategic decisions of the PSC.  *See* Doc. 4016.

27

28  [2] Mr. Martin's current partner, Laura Baughman, is not a member of the PSC, but has at all times during the MDL worked for PSC firms (Martin|Baughman and Baron & Budd).  *See id.*; Doc. 22149 at 2 n.1.

attorneys' fees assessment percentage to 8%, but declined to increase the 2% assessment for expenses. Doc. 18038 at 3-5.[3]

As a member of the PSC, BCM was included as "Participating Counsel" under CMO 6. Doc. 372 at 2-3. As Participating Counsel, BCM agreed to the terms of the "Participation Agreement" which were incorporated into CMO 6. *Id.* at 14-27. The Participation Agreement is a voluntary agreement between plaintiffs' attorneys to share common benefit work. *Id.* at 15-16. Under the agreement, an attorney is entitled to receive and use common benefit work "created by those attorneys who have also executed, or have been deemed to have executed, the Participation Agreement[,] . . . regardless of the venue in which the attorney's cases are pending." *Id.* at 15. In return, Participating Counsel agreed to pay common benefit assessments from the gross recoveries obtained in all cases benefitting from common benefit work, including MDL cases and "all un-filed cases, tolled cases, and/or cases filed in state court in which [Participating Counsel] have a fee interest[.]" *Id.* at 17. This commitment was repeated several times in the Participation Agreement.[4] The agreement further provided that "Non-Participating Counsel are not required to pay an assessment on state court cases or on un-filed cases[,]" but they are not entitled to receive common benefit work or common benefit payments for any work performed or expenses incurred. *Id.* at 17.

BCM moves to exempt and reduce client recoveries from common benefit assessments. Doc. 22144. BCM contends that no assessment should be paid by BCM clients whose cases were filed in federal court after the MDL closed, were filed in state court, or were never filed in any court. *Id.* at 11. BCM further contends that assessments for its cases that were at one time part of the MDL should "be capped at the average fee

---

[3] BCM did not object to the proposed increase in assessments. *See id.* at 1; Doc. 22149 at 4.

[4] *See id.* at 10 ("The assessment shall apply to all of the cases of the plaintiffs' attorneys who are subject to this Order, whether as sole counsel or co-counsel, including cases pending in the MDL, pending in state court, unfiled, or tolled."); *id.* at 15 ("Participating Counsel agrees that all cases in which Participating Counsel has a fee interest, including unfiled cases, tolled cases, and/or cases filed in state and/or federal court, are subject to the terms of this Participation Agreement.").

1    and costs amount paid on those cases that settled solely as the result of common fund

2    work."  *Id.*  The Common Benefit Fee and Cost Committee opposes the motion.

3    Doc. 22149.[5]  Bard has filed a brief urging BCM to be mindful of its confidentiality

4    obligations under the various settlement agreements and asking the Court to deny BCM's

5    request to conduct discovery regarding the value of other settlements.  Doc. 22148.

6        BCM primarily relies on Judge Chhabria's decision *In re Roundup Products*

7    *Liability Litigation*, 544 F. Supp. 3d 950 (N.D. Cal. 2021), in urging the Court to exempt

8    BCM's unfiled cases, state court cases, and post-MDL federal court cases from common

9    benefit assessments.  Doc. 22144 at 1-2, 7-9.  The Court will address the decision in

10   *Roundup*, showing that it faced a very different set of facts than this case, and then will

11   address the basis for the Court's authority to hold BCM and its clients to the terms of

12   CMO 6 and the Participation Agreement.

13   **II.    The *Roundup* Decision.**

14       Plaintiffs' lead counsel in *Roundup* requested an order requiring that "whenever

15   anyone in the country recovers money from Monsanto based on allegations that its

16   Roundup product caused their cancer, 8.25% of their recovery be held back and placed into

17   a [common benefit] fund to compensate lawyers who took the lead in litigating against

18   Monsanto."  544 F. Supp. 3d at 952.  The proposed order would apply to any person who

19   recovers money from Monsanto, "regardless of whether their lawyer was involved in the

20   MDL or used MDL work product."  *Id.* at 957.

21       Judge Chhabria understandably found this request "far-reaching" and "breathtaking

22   [in] nature," and largely denied it.  *Id.* at 952-53, 957; *see also id.* at 968 (noting "how

23   badly lead counsel overreached when they asked the Court to tax every Roundup-related

24   recovery by anyone in the country, regardless of any connection to the MDL").  With

---

26   [5] The Committee was formed to provide recommendations to the Court (in
     conjunction with the Special Master, the Honorable Marina Corodemus) for distributions
27   of fee and expense reimbursements to Participating Counsel who have performed common
     benefit work.  *See* Docs. 372 at 12, 21480 at 1.  The Committee consists of twelve
28   Plaintiffs' attorneys, including Co-Chairs Howard Nations and Wendy Fleishman, and
     Plaintiffs' Co-Lead Counsel Mark O'Connor, who filed the response on the Committee's
     behalf.  *See* Docs. 21480 at 2, 22149 at 15.

respect to recoveries by people who were not plaintiffs in the MDL but who hired a lawyer with a client in the MDL, Judge Chhabria found that he could not "exert authority over the recovery of a person with so tenuous a connection to the MDL." *Id.* at 963.  He concluded that "[n]either the common fund doctrine nor the district court's inherent power to control its docket justifies an order affecting the recovery of a nonparty merely because they happened to hire a lawyer with a client in the MDL." *Id.*  And he found that the "same logic applies to disputes where the claimant has not filed a lawsuit in any court." *Id.* at 964.

Judge Chhabria did not address the question presented here.  Although he found it "questionable whether a district court has authority . . . over the recovery of someone whose lawyer signs a participation agreement," 544 F. Supp. 3d at 967, he ultimately took no position on this issue because he decided not to exercise any such authority he did have, *id.* at 968.[6]

Judge Chhabria's decision was influenced by several factors that are not present here.

First, in contrast to the very broad fee requests at issue in *Roundup*, the common benefit assessments in this case apply only to unfiled or state court cases whose attorneys elected to become Participating Counsel in this MDL.  *See* Docs. 372 at 17, 22149 at 3, 6.  BCM could have avoided paying assessments on recoveries from its unfiled and state court cases by declining to become Participating Counsel and forgoing the opportunity to receive and use common benefit work.  *See* Doc. 22149 at 14.  BCM instead joined the PSC, became Participating Counsel subject to the terms of the Participation Agreement, accessed common benefit work frequently while pursuing its unfiled and state court cases, and received common benefit payments for work it did in the MDL and in its state court cases.  *See* Doc. 22149 at 2-8, 14.  BCM expressly agreed in the Participation Agreement that

---

[6] The Committee notes that even counsel opposing the proposed assessments in *Roundup* acknowledged that "[t]he situation might well be different if" — as is the case here — "(1) we had voluntarily entered into a participation agreement with Co-Lead Counsel and (2) that agreement was incorporated into an order of this Court."  Doc. 22149 at 6 & n.5 (citation omitted).

common benefit assessments would "apply to all" of its "un-filed cases, tolled cases, and/or cases filed in state court[.]"  Doc. 372 at 17; *see also id.* at 10, 15 (same).

Second, the *Roundup* court noted that much of the common benefit work in that case had been placed on the public docket and was available to any member of the public for free.  The court found "[i]t would not be appropriate to take money from anyone's recovery based on access to that information."  *Id.* at 972.  This MDL is different.  The common benefit work in this case includes millions of pages of reviewed documents, substantial ESI discovery, scores of depositions (including trial preservation depositions after the MDL closed), and numerous experts retained and developed by the MDL's lead counsel.  *See* Docs. 18038 at 2-3, 22036 at 7-31.  Although some of this work product can be found in the public docket (albeit with considerable difficulty as the docket itself now includes more than 22,000 separate entries), much of it is not public and would not be accessible to lawyers who are not Participating Counsel.

What is more, even for materials that have been made public, lead counsel fought expensive battles that later-settling lawyers do not have to fight, including numerous *Daubert* challenges, multiple summary judgment motions (including one that would have defeated all plaintiffs' claims on the basis of preemption), numerous motions in limine, three multi-week bellwether trials, post-trial motions and appeals, and substantial settlement efforts.  *See* Doc. 22036 at 4-31.  The common benefit work also includes scores of depositions of general causation experts and Bard witnesses that do not have to be repeated in individual cases.  *See id.* at 19-20, 29-30.  BCM notes that it had to produce experts and take or defend a number of depositions, but the vast majority of these undoubtedly were plaintiff-specific witnesses that were not addressed in the MDL and that would have been required in every individual case.  *See* Doc. 22144 at 5-6 (noting that depositions were taken of plaintiffs, treating physicians, and sales representatives).

Anticipating that some attorneys would need to try cases on remand from the MDL, the PEC created a trial package and made it available to Participating Counsel.  *See* Doc. 22149 at 2.  The trial package is designed to assist counsel on remand in presenting

their clients' cases at trial.  It contains almost all the work product developed in the MDL and qualifying pre-MDL cases, including tens of thousands of documents, motions, transcripts, exhibits, corporate documents, legal memos, and post-bellwether preservation depositions that can be played at trial in lieu of live testimony.  *See id.*  The trial package is maintained in a secure online business repository (Dropbox), with access strictly controlled by one PEC law firm (Heaviside Reed Zaic).  *See* Docs. 22149 at 4, 22149-1 ¶¶ 1-4.  The trial package and other common benefit work represent the efforts of more than 200 attorneys and staff who spent more than 100,000 hours creating MDL work product.  *See* Doc. 22149 at 4.  The Court cannot conclude, as did the *Roundup* court, that the common benefit work in this case conferred little benefit on BCM and other Participating Counsel.

Third, Judge Chhabria found no correlation between the lawyers who signed the participation agreement in his case and those who were granted access to common benefit work.  This was because lead counsel "did not take the time to ensure . . . that attorneys who requested access to MDL work product signed the agreement."  544 F. Supp. 3d at 972.  As a result, Judge Chhabria found "it would not be reasonable to require a holdback from the recoveries of non-parties whose attorneys happened to sign the participation agreement[.]"  *Id.*  The same is not true here.  The PEC took reasonable measures to ensure that only Participating Counsel receive access to common benefit work.  *See* Docs. 22149 at 4, 22149-1 ¶¶ 1-4; *see also* Doc. 372 at 15 ("Upon execution of this Participation Agreement[,] . . . the [PEC] will provide Participating Counsel access to the Common Benefit Work Product, including . . . full access and availability of work product within the private, secure and confidential plaintiffs-only website.").  More will be said about this below.

Fourth, to the extent lawyers for nonparties actually received access to confidential common benefit work, the *Roundup* court doubted "that access to that work product is what truly advanced the ball for those attorneys and their clients."  *Id.*  In this case, the Court has no doubt that BCM's use of the trial package advanced the ball for its clients.  BCM

reached a settlement with Bard that includes more than 500 clients, and accessed the trial package more than 5,000 times while representing those clients between January 2020 and the present.  Docs. 22144 at 2, 22149 at 4 (citing Doc. 22149-1 ¶¶ 6-7).  BCM claims that this fact "proves nothing, as BCM clearly was entitled to access that material an unlimited number of times[.]"  Doc. 22151 at 3.  But BCM enjoyed unlimited access only because it signed on as Participating Counsel and agreed that common benefit assessments would "apply to all un-filed cases, tolled cases, and/or cases filed in state court in which [BCM has] a fee interest[.]"  Doc. 372 at 17.  BCM argues that had it "simply downloaded the materials to its own internal database, [it] could have made exactly the same use of those materials while accessing them via the Dropbox site fewer than a dozen times."  Doc. 22151 at 3-4.  True, but the point is that BCM enjoyed access to the MDL work product – whether online or by downloading it – only because it entered into the Participation Agreement and agreed to pay common benefit assessments.  *Roundup*'s concern about claimants paying for work that did not benefit them simply is not present here.

Fifth, because of the very large verdicts returned in three *Roundup* trials ($289 million, reduced to $20.5 million; $80 million, reduced to $25 million; and $2.55 billion, reduced to $87 million), the *Roundup* court expressed doubt about whether lead counsel needed any more compensation for their work.  544 F. Supp. 3d at 969 ("Yes, the lead lawyers invested a great deal of time and money in these cases, but now they're likely making so much from settling their own 'inventories' that they can each afford to buy their own island.").  The same is not true here.  The three bellwether trials in this MDL resulted in a plaintiff's verdict of $3.6 million and two defense verdicts.  Lead counsel will not be buying islands from their earnings, and whether they will receive full compensation for the time and resources they devoted to the MDL remains an open question.[7]

---

[7] In a similar vein, the *Roundup* court suggested that lead counsel in an MDL possesses more bargaining power and therefore likely will obtain larger settlements.  *Id.* at 962 ("After all, once you've been appointed lead counsel and have taken control of the MDL, you and your clients will typically have much greater bargaining power compared to other plaintiffs.").  Not so here.  Co-lead counsel for Plaintiffs in this MDL complained in court more than once that Bard was willing to negotiate and reach settlements with other Plaintiffs' counsel, but not with him.

Sixth, the *Roundup* court noted that much of the settlement leverage acquired by plaintiffs suing Monsanto came from two verdicts in state court trials, rather than from work done in the MDL.  *Id.* at 969 ("[W]hat really opened the floodgates for settlement were the three jury verdicts, two of which took place in state court, not the MDL.").  Again, this case is different.  Although BCM suggests that the seven cases it took to trial after the MDL resulted in larger confidential settlements for its clients than settlements reached in the MDL (a fact Bard disputes (Doc. 22148 at 2)), the results in BCM's seven trials were not better than the bellwether trial results.  BCM's trials resulted in four plaintiffs' verdicts totaling $7.1 million, and three defense verdicts.  The average recovery per trial for BCM was $1.01 million ($7.1M/7), while the average result from the three bellwether trials was $1.2 million ($3.6M/3).

Seventh, the *Roundup* court did not set a common benefit assessment amount at the beginning of the *Roundup* MDL and had not set an amount at the time it addressed these issues.  544 F. Supp. 3d at 956 ("[A] holdback percentage for the common benefit fund has yet to be set.").  In contrast, this Court set the original 8% holdback percentage less than five months after the MDL started.  Doc. 372.  As a result, BCM has known since 2016 that this assessment would be required of it and its clients, and has been able to take this fact into account not only in the fee agreements it reached with its clients but also in its settlement negotiations with Bard.  The same certainty was not available to counsel in *Roundup*.  *See* 544 F. Supp. 3d at 970 n.6 ("[I]t would have been advisable for the Court to revisit the holdback issue, setting both the scope and the percentage of the holdback, to ensure that the parties could conduct settlement discussions against a more predictable backdrop.").

In short, the *Roundup* court faced very different circumstances than this case.  Those circumstances surely influenced Judge Chhabria's evaluation of his power to make common benefit assessments against plaintiffs who did not participate in the MDL.  This Court reaches different conclusions about its power to hold BCM and its clients to the agreements and orders entered from the beginning of this case.

1    **III.    The Court Has Authority to Impose the Common Benefit Assessments.**

2          *Roundup* and other cases have addressed three possible sources of authority for an

3    MDL court's power to impose common benefit assessments on plaintiffs in and out of the

4    MDL: (1) the federal MDL statute, (2) inherent judicial power, and (3) the common fund

5    doctrine.   The Court will address each of these possible sources and relevant reliance

6    interests.

7          **A.    MDL Statute.**

8          The Court agrees with *Roundup* and other cases that the MDL statute is procedural

9    in nature and does not clearly confer on federal courts the power to create a common benefit

10   fund or make assessments for that fund.   *See Roundup*, 544 F. Supp. 3d at 958; *In re*

11   *Genetically Modified Rice Litig.*, 764 F.3d 864 (8th Cir. 2014) (citing *In re Showa Denko*

12   *K.K. L-Tryptophan Prods. Liab. Litigation-II*, 953 F.2d 162, 165 (4th Cir. 1992)).   But the

13   statute is not entirely irrelevant.   It provides that the Judicial Panel on Multidistrict

14   Litigation will transfer cases – potentially a very large number of cases – to MDL judges

15   for "coordinated or consolidated pretrial proceedings[.]"   28 U.S.C. § 1407(b).   MDL

16   judges clearly may exercise such inherent powers as are necessary to manage and complete

17   those pretrial proceedings.   And in an MDL like this one, with more than 8,000 cases, the

18   appointment and oversight of lead plaintiffs' counsel is essential.   That appointment and

19   oversight necessarily requires the MDL court to address how lead counsel will be paid for

20   their extensive MDL work on behalf of all plaintiffs.   Thus, although the MDL procedural

21   statute is not itself a source of power for a court to establish and oversee a common benefit

22   fund, it creates a complex and consolidated litigation process that makes the exercise of the

23   court's inherent power uniquely necessary.   *See In re Nat'l Opiate Prescription Litig.*, No.

24   1:17-md-2804, at *2 (N.D. Ohio May 9, 2022) ("[The] common benefit work must and

25   will continue in this MDL in order to fulfill the purposes of 28 U.S.C. §1407, as well as

26   the expectations of the Judicial Panel on Multi-District Litigation.");   Doc. 22160-1 (copy

27   of the *Nat'l Opiate Prescription* order).

28

1    The Court adds one observation here.  In *Roundup*, Judge Chhabria quoted Judge

2    Furman's observation in *In re General Motors LLC Ignition Switch Litigation*, 477 F. Supp.

3    3d 170 (S.D.N.Y. 2020), that "[a] subset of plaintiffs' lawyers do the lion's share of the

4    work, but that work accrues to the benefit of all plaintiffs.  If those other plaintiffs were not

5    required to pay any costs of that work, high-quality legal work would be under-incentivized

6    and, ultimately, under-produced."  *Id*. at 174; *see Roundup*, 544 F. Supp. 3d at 962.  This

7    Court would go even further.  Without a common benefit fund mechanism, MDL courts

8    would not only be unable to attract good counsel for leadership roles, they would be unable

9    to attract any counsel.  Lead MDL counsel invest thousands of hours in attorney time and

10   millions of dollars in costs.  No counsel would be willing to do so without some assurance

11   that their time and costs would be repaid if the MDL ultimately were successful, and not

12   every MDL will have the lucrative recoveries seen in *Roundup*, where lead counsel's

13   contingent fees from their own clients are sufficient to cover their substantial investment

14   in common benefit work.  An MDL court's ability to perform the task assigned to it by the

15   MDL statute necessarily requires the power to assure reasonable compensation for the

16   efforts of lead counsel.

17       **B.     Inherent Power.**

18       "[I]t is well established that federal courts . . . possess certain inherent powers,

19   'governed not by rule or statute but by the control necessarily vested in courts to manage

20   their own affairs so as to achieve the orderly and expeditious disposition of cases[.]"  *Gen.*

21   *Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d at 189 (quoting *Link v. Wabash R.R.*

22   *Co.*, 370 U.S. 626, 630-31 (1962)); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)

23   ("It has long been understood that certain implied powers must necessarily result to our

24   Courts of justice from the nature of their institution, powers which cannot be dispensed

25   with in a Court, because they are necessary to the exercise of all others.") (citing *United*

26   *States v. Hudson*, 7 Cranch 32, 34, 11 U.S. 32 (1812)); *see also In re Air Crash Disaster*

27   *at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977) (noting that

28   "[t]he trial court's managerial power is especially strong and flexible in matters of

consolidation"); *Showa Denko*, 953 F.2d at 165 (recognizing a district court's "broad discretion in coordinating and administering multi-district litigation"); Fed. Jud. Ctr., *Manual for Complex Litigation, Fourth* § 10.1 (2004) (explaining that once cases are consolidated under the umbrella of an MDL court's pretrial jurisdiction, "the court's express and inherent powers enable the judge to exercise extensive supervision and control [over the] litigation").

While a district court's inherent managerial power is particularly important in a large MDL like this one, the power is not unlimited.  As Judge Furman explained in *General Motors*, "'the outer boundaries of a district court's inherent powers' have never been 'precisely delineated,' but courts have articulated certain limiting principles." 477 F. Supp. 3d at 189 (quoting *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016)).  First, "the exercise of an inherent power must be a reasonable response to the problems and needs confronting the court's fair administration of justice." *Id.*  Second, it "cannot be contrary to any express grant of or limitation on the district court's power contained in a rule or statute." *Id.*  Third, "federal courts may not enforce their orders – particularly those regulating conduct outside of the courtroom – against 'the entire universe of potential violators.'"  *Id.* (quoting *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010)).

CMO 6 falls within these limits.  "It is beyond dispute that the Court may 'establish fee structures designed to compensate [lead counsel] for their work on behalf of all plaintiffs involved in [this MDL]." *Id.* at 189-90 (quoting *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992)).  CMO 6's common benefit assessments "ensure that [lead counsel are] appropriately 'compensated for their work not only by their own clients, but also by those other parties on whose behalf the work is performed and on whom a benefit has been conferred.'"  *Id.* at 190 (quoting *In re Worldcom, Inc. Sec. Litig.*, No. 02-CV-3288 (DLC), 2004 WL 2549682, at *2 (S.D.N.Y. Nov. 10, 2004)).  And as explained above, "the expectation of such payments is critical to incentivize counsel to do such work in the first place."  *Id.*  Imposing assessments in this MDL "is thus 'a reasonable response to the problems and needs confronting the [C]ourt's fair administration of justice.'"  *Id.* (quoting

*Dietz*, 579 U.S. at 45); *see also In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. CV 09-2047, 2018 WL 2095729, at *6 (E.D. La. May 7, 2018) ("It is well-settled that 'an MDL court's authority to order contributions to compensate leadership counsel derives from its 'managerial' power over the consolidated litigation, and, to some extent, from its inherent equitable power.'") (citation and alteration omitted); *In re Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.*, No. MDL 2326, 2019 WL 385420, at *5 (S.D. W. Va. Jan. 30, 2019) ("A separate source of authority for MDL courts to assess attorneys' fees in common benefit fund cases comes from the inherent managerial power over the consolidated litigation.") (citation and quotation marks omitted).  And while CMO 6 "may not be authorized by any rule or statute, nor is it 'contrary to any express grant of, or limitation on, the [C]ourt's power contained in a rule or statute." *Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d at 190.

The Court's exercise of its inherent power to impose common benefit assessments on BCM's unfiled and state court cases is bolstered by the fact that BCM knowingly entered into the Participation Agreement incorporated into CMO 6.  The Third Circuit addressed a similar situation in *In re Avandia Marketing, Sales Practices & Products Liability Litigation*, 617 Fed. App'x 136 (3d Cir. 2015).  In that case, a law firm entered into a participation agreement with the plaintiffs' steering committee, pursuant to which it agreed to pay 7% of the recovery on its clients' claims into a common benefit fund in exchange for use of the steering committee's work product.  *Id.* at 138.  The district court incorporated the agreement into a common benefit fund order, which mandated an assessment on "all Avandia claims, regardless of whether those claims are subject to the jurisdiction of the MDL, tolled, unfiled, or filed in another jurisdiction if, among other things, the attorney signed on to the Participation Agreement[.]" *Id.* at 138-39 (quotation marks and brackets omitted).  When a global settlement was reached, the firm argued that its state court cases should not be subject to any assessment.  *See id.*  The district court disagreed, reasoning both that the firm had "used MDL work product" in its state court

cases and that the "Participation Agreement covered all claims for which [the firm] served as counsel at the time of resolution." *Id.* at 140.

The Third Circuit affirmed on the ground that the firm was bound by the district court's common benefit order. "A district court that supervises a multidistrict litigation," the Circuit explained, "has – and is expected to exercise – the ability to craft a plaintiffs' leadership organization to assist with case management. Included in that ability is the power to fashion some way of compensating the attorneys who provide class-wide services." *Id.* at 141 (citation and quotation marks omitted). The district court "permitted the Steering Committee to, essentially, trade work product for a share in the recovery in cases *not* before the MDL." *Id.* at 141 (emphasis in original). Because the district court incorporated the Steering Committee's agreement with the firm into its own order, and the breach of an agreement incorporated into a court order is a violation of the order itself, the district court "had jurisdiction to determine whether [the law firm] breached [its] agreement and, if so, to remedy that breach." *Id.* at 142 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)); *see Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978) (noting that an attorney has the power to bind clients to an agreement); *George Nicolais & Assocs., Inc. v. Acquvest, Inc.*, 322 Fed. App'x 519, 520 (9th Cir. 2009) (same); *see also Nat'l Opiate Prescription Litig.*, No. 1:17-md-2804, at *11 ("[T]here is also no question that a common benefit assessment upon a Plaintiff's attorney is appropriate when the attorney agrees to it.").

The same reasoning applies here. As Participating Counsel, BCM knowingly assented to the terms of the Participation Agreement which were incorporated into CMO 6. *See* Doc. 372 at 14-27. BCM took advantage of those terms when it repeatedly accessed common benefit work for the good of its clients, and when it applied for and received payments of common benefit funds for its own common benefit work, including its state court work. *See* Doc. 22149 at 8 n.6; *see also Nat'l Opiate Prescription Litig.*, No. 1:17-md-2804, at *13 ("MDL courts appear virtually unanimous on their authority to subject a recovery in a non-MDL forum to an appropriate assessment if the plaintiffs or their counsel

*actually used* common benefit work product.") (citing *Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d at 184-85) (emphasis in original).

Although BCM does not address what it told its clients about the common benefit assessments that would apply to their claims in light of the Participation Agreement and CMO 6, it surely informed them of those obligations and obtained their agreement.  Ethical rules required BCM to advise their clients of the terms of their fee arrangements – which would include the common benefit fund assessments established by the Court and to which BCM had agreed – and to include those terms in their written agreements.  *See*, *e.g.*, Ariz. Sup. Ct. R. 42, ER 1.5(b) ("The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client in writing, before or within a reasonable time after commencing the representation[.]"); ER 1.5(c) ("A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery[.]"); Tex. Disciplinary Rs. of Prof'l Conduct, ER 1.04(c) ("When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."); ER 104(d) ("A contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined.  If there is to be a differentiation in the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, the percentage for each shall be stated.  The agreement shall state the litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated."); Am. Bar. Assoc. Model Rs. of Prof'l Conduct, ER 1.5(b)-(c) (same).

What is more, BCM and its clients clearly benefitted from the MDL work product.  BCM not only received the trial package containing a vast amount common benefit work ready for use in trials, but BCM also was not required in its unfiled and state court cases to take scores of depositions of Bard witnesses and general causation experts that were taken

1    in the MDL.  Nor was BCM required to obtain and review the numerous documents and

2    ESI produced during consolidated pretrial discovery in the MDL.  And it was lead MDL

3    counsel, not BCM, who successfully opposed Bard's numerous motions in limine on

4    general causation experts and its motion for summary judgment on preemption grounds.

5    *See* Docs. 5396, 7369, 8872, 21632; *see also In re Bard IVC Filters Prods. Liab. Litig.*,

6    No. MDL 15-02641-PHX-DGC, 2017 WL 5625547 (D. Ariz. Nov. 22, 2017), *aff'd*, 969

7    F.3d 1067 (9th Cir. 2020).

8    In addition, the Court made many key legal and evidentiary rulings in the MDL that

9    would affect remanded and transferred cases, including rulings on discovery matters,

10   privilege and work product issues, *Daubert* challenges, the admissibility of evidence

11   regarding the FDA clearance process, Bard's Simon Nitinol Filter, and scores of deposition

12   designations for trial.  *See* Doc. 22036 at 16-30, 48-59.  As explained to other courts in the

13   Court's final remand and transfer order, "[b]ecause all general fact and expert discovery

14   has been completed in this MDL, the courts receiving cases need not be concerned with

15   facilitating general expert, corporate, and third-party discovery." *Id.* at 31.  The receiving

16   courts also were provided a stipulated designation of record that included all significant

17   rulings made in the MDL.  *See id.* at 2, 32.

18   BCM does not state how closely the courts in its seven trials followed these MDL

19   rulings, but the four trials it identifies all occurred in federal court (Doc. 22144-1 at 3 n.1),

20   and those courts were specifically advised of key MDL rulings and encouraged by this

21   Court to follow them (Doc. 22036 at 16-31).  Thus, although BCM notes that it had to take

22   a number of depositions and produce experts, the vast majority of these undoubtedly were

23   plaintiff-specific matters that were not addressed in the MDL.  *See* Doc. 22036 at 31

24   (discussing case-specific discovery and trial preparation for remanded and transferred

25   cases).  BCM's cases for its clients were built on the foundation of the MDL work.  It is

26   simply incorrect to assert that they did not benefit from that work.

27   For all these reasons, the Court concludes that it has the inherent power to enforce

28   the terms of CMO 6 and the Participation Agreement, to hold BCM to its promise to pay

the Court-ordered common benefit assessments on recoveries obtained in its unfiled and state court cases, and to hold BCM's clients to the agreement made by their counsel and surely included in their fee agreements with BCM.   Judge Furman reached the same conclusion: "[T]he Court concludes that it had both jurisdiction and authority to mandate assessments on the settlements of . . . unfiled claims.   It follows that the Court may, and will, enforce Order No. 42 as written."   *Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d at 192; *see also In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 648 (E.D. La. 2010) ("In addition to judicial precedent the Court also finds authority to assess common benefit attorneys' fees in its inherent managerial authority, particularly in light of the complex nature of this MDL."); *Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 WL 385420, at *5 ("The source of the court's authority is in its discretion to manage the litigation in combination with the voluntarily entered into agreement. . . .   Because this court is empowered to 'govern how to compensate the Steering Committee for its work and because the Participation Agreement was incorporated into that order,' this court has the jurisdiction to adjudicate fund claims by attorneys participating in the common benefit fund process in the seven MDLs.") (quoting *Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 617 Fed. Appx. at 143) (alterations omitted).[8]

## C.   Common Fund Doctrine.

"[U]nder the 'American Rule,' the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser."   *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 561 (1986).   Likewise, the attorney for the prevailing litigant generally must look to his or her own client for payment of attorneys' fees.   "Since the nineteenth century, however, the Supreme Court has recognized an equitable exception to this rule, known as the common fund or common benefit doctrine, that permits the

---

[8] Judge Chhabria found it "strange to exercise power over a nonparty's recovery from a state court judgment or settlement when the same purpose could be achieved . . . [by] authorizing lead counsel to directly charge a lawyer who wishes to use confidential MDL work product, and then allowing that lawyer to decide, with their client and without involvement of a federal court, who should shoulder that cost."   544 F. Supp. 3d at 967-68. Such an alternative approach might indeed be reasonable, but the existence of an alternative strategy for managing an MDL does not deprive the Court of its inherent power.

creation of a common fund in order to pay reasonable attorneys' fees for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries." *In re Vioxx Prods. Liab. Litig.*, No. 09-2861, 2013 WL 1856035, at *3 (E.D. La. Apr. 30, 2013) (citing *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (Kaplan, J., concurring)); *see also In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, No. CV MDL 2592, 2020 WL 1433923, at *3 (E.D. La. Mar. 24, 2020) (explaining that the common benefit doctrine "serves to encourage attorneys to accept the considerable risks associated with prosecuting complex, multi-plaintiff matters for the benefit and protection of all plaintiffs' rights").

The common fund doctrine typically has been used to award attorneys' fees in class actions. *See Vioxx Prods. Liab. Litig.*, 2013 WL 1856035, at *3 (citing 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 13:76 (4th ed. 2002); Fed. R. Civ. P. 23(h)). "But the common fund doctrine is not limited solely to class actions." *Id.* (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 59 (1939) (employing common benefit doctrine to award fees and costs to a litigant whose success benefitted unrelated parties by establishing their legal rights)). "As class actions morph into multidistrict litigation, as is the modern trend, the common benefit concept has migrated into the latter area. The theoretical bases for the application of this concept to MDLs are the same as for class actions, namely equity and her blood brother, quantum meruit." *Manual for Complex Litigation* (Fourth) § 14.121; *see also Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 WL 385420, at *4 (discussing the history of the common fund doctrine and its modern use in MDLs); *In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*, No. 3:05-MD-527 RM, 2011 WL 611883, at *4 (N.D. Ind. Feb. 11, 2011) (explaining that "the roots of the common fund doctrine . . . provide[] that plaintiffs and their counsel contribute to lead counsel's compensation in exchange for the benefit of lead counsel's work") (citing *Sprague*, 307 U.S. at 161; *Trustees v. Greenough*, 105 U.S. 527 (1881); *Cent. R.R. & Banking Co. of Ga. v. Pettus*, 113 U.S. 116 (1885); *Boeing Co. v. Van Gemert*, 444 U.S.

472 (1980)); Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 374-79 (2014).

In light of the equitable principles underlying the common fund doctrine, "MDL courts have consistently cited the . . . doctrine as a basis for assessing common benefit fees in favor of attorneys who render legal services beneficial to all MDL plaintiffs." *Vioxx Prods. Liab. Litig.*, 2013 WL 1856035, at \*3 (citing *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708, 2008 WL 682174, at \*4 (D. Minn. Mar. 7, 2008)); *see also Bos. Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 WL 385420, at \*4 ("Although originally used in the context of class actions, MDL courts commonly cite the common fund doctrine as a basis for assessing common benefit fees. . . . This is because, even though individual plaintiffs are usually represented by individual counsel in MDLs, there are substantial similarities to class actions that warrant compensating benefits conferred by plaintiffs' counsel for the common good.") (citations and alterations omitted); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-01570 (GBD) (SN), 2020 WL 5848990, at \*3 (S.D.N.Y. Sept. 30, 2020) (noting that the Third Circuit "has similarly found that under the common benefit doctrine, which is distinct from the common fund doctrine but which derives from the latter, an award of attorney's fees is appropriate [in an MDL] where the plaintiff's successful litigation confers a substantial benefit on the members of an ascertainable class") (quoting *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 546 (3d Cir. 2009)) (quotation marks omitted); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 655 (E.D. Pa. 2003) ("Several multidistrict cases have followed *In re Air Crash* in providing fees for lead and liaison counsel and management committees for common benefit work.") (citing *In re Protegen Sling & Vesica Sys. Prods. Liab. Litig.*, MDL No. 1387, 2002 WL 31834446 (D. Md. Apr. 12, 2003); *In re Rezulin Prods Liab. Litig.*, MDL No. 1348, 2002 WL 441342 (S.D.N.Y. Mar. 20, 2002); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1998 WL 118060 (E.D. Pa. Jan.12, 1998)); *Nat'l Opiate Prescription Litig.*, No. 1:17-md-2804, at \*2 (noting that the court's common benefit order was entirely appropriate, "as authorized and established by

1    the United States Supreme Court in its common benefit doctrine, and as reaffirmed

2    in  the extensive jurisprudence thereunder") (citations omitted).

3            The *Roundup* court interpreted the common fund doctrine narrowly, noting that the

4    doctrine "stems from cases holding that district courts may, in rare circumstances, invoke

5    their equitable power to award attorneys' fees to successful plaintiffs."  544 F. Supp. 3d at

6    958.  The court found that "despite the superficial similarity based on the name of the

7    doctrine, the common fund cases are a questionable source of support for creating and

8    requiring contributions to a fund in [an MDL]."  *Id.*  The court noted that "[t]he common

9    fund line of cases typically involve a plaintiff recovering or preserving some money or

10   property – for example, a trust – which can be loosely understood as a 'fund.'"  *Id.*  Because

11   a "similarly situated group of people typically has an interest in that fund," the court

12   explained, "the Supreme Court has held that the prevailing plaintiff may seek, and the

13   district court may order, reimbursement of attorneys' fees and litigation costs from the fund

14   produced by the plaintiff's litigation."  *Id.*  Judge Chhabria deemed it "a stretch, however,

15   to apply the common fund doctrine to the type of arrangement contemplated in [the

16   *Roundup*] case (and in many other MDLs)" because lead counsel did not ask the court "to

17   reimburse them from some fund or property interest that was preserved or established as a

18   result of a victory against, or settlement with, Monsanto.  Rather, lead counsel asked the

19   [c]ourt to create a fund at the outset – before any judgment was entered and before liability

20   was established – and to require contributions from individual recoveries down the line,

21   whenever they were reached."  *Id.* at 959.

22           The Court cannot conclude, as did the *Roundup* court, that the common fund

23   doctrine is limited solely to cases where a lawyer's work creates a *res* that resides in the

24   court and from which others seek to recover.  The doctrine has been applied repeatedly to

25   MDL cases.  *See*, *e.g.*, *Vioxx Prods. Liab. Litig.*, 2013 WL 1856035, at *3; *Bos. Sci. Corp.,*

26   *Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 WL 385420, at *4; *In re Terrorist Attacks on*

27   *Sept. 11, 2001*, 2020 WL 5848990, at *3; *In re Linerboard Antitrust Litig.*, 292 F. Supp.

28   2d at 655; *Nat'l Opiate Prescription Litig.*, No. 1:17-md-2804, at *12; *see also Van Gemert*

*v. Boeing Co.*, 590 F.2d 433, 437 (2d Cir. 1978) (noting that "the common fund doctrine has not been restricted to equitable actions in which the court exercised control over a 'res'").

Nor does the Court find the historical beginnings of the common fund doctrine to be meaningfully different from its applications in MDLs. Although it is true that MDLs generally do not produce an actual fund paid into court on which all plaintiffs can draw, the advantage conferred on all plaintiffs by a successful MDL prosecution is no less real. The equitable reality underlying the common fund doctrine – that substantial work and expense by few has conferred a significant financial benefit on many – is the same. And it certainly is true in this case. BCM and its clients, in and out of the MDL, stood on the foundation created by the MDL common benefit work, freely and frequently accessed that work, and secured substantial financial benefits from it. The compelling equities of the common benefit doctrine apply fully here. *See Nat'l Opiate Prescription Litig.*, No. 1:17-md-2804, at *12 ("MDL courts, using their equity powers when applying the common benefit doctrine, regularly extend that authority over counsel's other, non-MDL cases in order to 'preempt . . . the free-rider problem[.]'") (quoting *Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d at 181)).[9]

BCM's reliance on *Hartland v. Alaskan Airlines*, 544 F.2d 992 (9th Cir. 1976), and *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977), is not convincing. *See* Doc. 22144 at 7. *Hartland* addressed significantly different facts – fee assessments on settlements achieved by lawyers who were not in leadership of the consolidated matters, had not signed a participation agreement, and had not used common benefit work. 544 F.2d at 995 (explaining that the common discovery stipulation "bears the signatures of a number of people, but not . . . [claimants] Golub or Sampson"); *id.* at 996 ("Counsel for

_____

[9] It is worth noting that the common benefit work that lead counsel undertook in this MDL "serves the interests of not only the litigants but also the Court and the nation. 'By making manageable litigation that otherwise would run out of control, [lead counsel] serve interests of the court, the litigants, the other counsel, and the bar, and the public at large, who are entitled to their chance at access to unimpacted courts.'" *Id.* at *1 (quoting *Air Crash Disaster*, 549 F.2d at 1017).

1    Miss Sampson's estate did not sign the Stipulation regarding discovery, and has not

2    received any benefit of any kind from the efforts of the discovery committee").  *Vincent*

3    merely found that a single claimant who had not filed suit or otherwise used the judicial

4    process to obtain a settlement could not be required to pay an assessment, and that

5    claimants who settled before lead counsel were appointed likewise could not be required

6    to pay assessments.  557 F.2d at 765-67.[10]  Neither *Hartland* nor *Vincent* applies here,

7    where BCM voluntarily signed on as Participating Counsel and has used common benefit

8    work extensively.  *See* Doc. 22149 at 4 n.6.[11]

9         **D.    Reliance Interests.**

10        Reliance interests are also relevant.  *See* Doc. 18038 at 4; *Roundup*, 544 F. Supp. 3d

11   at 970.  The common benefit fund was established early in this MDL to ensure that

12   attorneys who performed work for all plaintiffs and their counsel would be reasonably

13   compensated.  *See* Docs. 372, 18038 at 4 (concluding that "simple fairness requires that

14   [settling] firms – which will benefit financially from the work of the PSC – pay reasonable

15   compensation to the lawyers who secured the benefit").  In reliance on that arrangement,

16   in which BCM was a full and knowing participant, the PSC managed and litigated this

17   complex MDL to a conclusion, tried three bellwether cases, withstood Bard's preemption

18   challenge, and amassed evidence and experts useable by all plaintiffs and their counsel.

19   *See* Doc. 18038 at 4.  The PSC and other attorneys who performed compensable common

20   benefit work justifiably relied on Participating Counsel's agreement to pay common benefit

21

22   _____

23        [10] The Ninth Circuit noted that Vincent's position was "unique" because "[s]oon
     after receiving word of her husband's death in the air crash, she determined, first, that
24   because liability was (to her) clear, she had no need to and would not file a lawsuit against
     any person in any court but rather would use nonjudicial means to secure recovery, and,
25   second, that no outsider would 'profit' from her husband's death." *Id.* at 765. Accordingly,
     "she directed the law firm that previously had assisted her and her husband in their business
26   activities to commence [settlement] negotiations . . . without filing suit[,]" and "her
     attorneys undertook this task on a per hour, rather than on a contingent fee, basis." *Id.*

27        [11] BCM's reliance on *Showa Denko* fares no better.  *See* Doc. 22151 at 7.  That case
     did not involve voluntary participation agreements, and the non-MDL claimants instead
28   were required to "obtain a waiver of assessments by petitioning the district court."  953
     F.2d at 166.

assessments on all cases in which Participating Counsel have a fee interest.[12]  Now, more than six years after BCM agreed to pay assessments on all its cases in return for access to common benefit work, and after obtaining and utilizing that work, BCM seeks to avoid paying assessments on its non-MDL cases.  Doc. 22144 at 1-2, 11.  Simple fairness requires that its request be denied.[13]

## IV.   BCM's MDL Cases.

BCM contends that its post-remand litigation efforts have "significantly increased the average settlement value for clients of BCM far above and beyond the average settlement value that would have been achieved relying solely on the common fund work[.]"  Doc. 22144 at 3.  BCM claims that any fee amount above the fee for the average settlement value achieved by members of the Committee and other attorneys who chose not to litigate cases post-remand "was earned 100% due to the additional time, effort and money that BCM invested since September 2019, rather than as the result of common fund work."  *Id.* at 4.  BCM requests, "for the sake of equity and fairness," that the Court reduce the common benefit assessment amounts applied to BCM's remanded cases "to the average assessment paid on cases that settled based on the MDL proceeding's efforts."  *Id.* at 2.

The Court will deny this request.  BCM agreed at the outset of this MDL that the fixed percentage assessments to be applied for common benefit work would apply to all cases, including those that did not settle in the MDL.  Surely Participating Counsel knew at the beginning that some cases would not be resolved in the MDL and would require additional work by counsel, and yet they uniformly agreed on a fixed percentage

---

[12] *See* Doc. 372 at 10 ("The assessment [on gross monetary recoveries] shall apply to all of the cases of the plaintiffs' attorneys who are subject to this Order, whether as sole counsel or co-counsel, including cases pending in the MDL, pending in state court, unfiled, or tolled."); *id.* at 15 ("Participating Counsel agrees that all cases in which Participating Counsel has a fee interest, including unfiled cases, tolled cases, and/or cases filed in state and/or federal court, are subject to the terms of this Participation Agreement."); *id.* at 17 ("Counsel who sign this Participation Agreement further agree that the assessment shall apply to all un-filed cases, tolled cases, and/or cases filed in state court in which they have a fee interest, regardless of the size of that fee interest.").

[13] Further, as the Committee correctly notes, BCM's argument to exempt its state court cases "does not smack of fairness or equity" given that BCM itself has been awarded common benefit funds for its work on state-court cases.  Doc. 22149 at 8 n.6.

assessment.  It would be manifestly unfair at the end of the process – after reliance by all Participating Counsel – to renegotiate this agreement.  It would also be impossible to evaluate thousands of settlements to determine what factors affected each settlement negotiated by each group of plaintiffs' counsel.  BCM does not propose such an evaluation, but it would not be fair to do so for BCM and not for others.

The Court determined that an 8% assessment for attorneys' fees and a 2% assessment for expenses would be appropriate for the extensive common benefit work to be done in this MDL.  *See* Docs. 372, 18038.  BCM cites no legal authority suggesting that established assessment percentages should be changed merely because participating counsel obtained recoveries in remanded cases without relying entirely on common benefit work.  *See* Doc. 22144 at 9-11, 22151 at 7-8.  And the Committee notes that other courts have rejected requests to exempt attorneys and cases from assessments when attorneys and their clients have benefited from MDL work product.  Doc. 22149 at 9-10 (citing *Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. at 183 (rejecting participating counsel's challenge to the fee assessment because there was evidence that common benefit work had been used in at least one state court case and the plain terms of the case management order required the fee assessment)); *In re Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 496-97 (E.D. Pa. 2008) (denying motions to exempt and reduce assessment amounts)).

BCM seeks to have the assessments applied only to the portion of the recoveries "fairly traceable" to the use of common benefit work.  Doc. 22151 at 2.  But BCM does not explain how this approach would be feasible, even if appropriate.  Other courts have rightly found such a proposal impractical.  *See Diet Drugs Prods. Liab. Litig.*, 553 F. Supp. at 497 (explaining that "a case by case analysis was untenable" as the court would need to "wade into the morass" of determining which of the materials and services available through the work of the common benefit attorneys were actually used in particular cases).  Also untenable is BCM's proposal that assessments for its remanded cases "be capped at the average fee and costs amount paid on those cases that settled solely as the result of common fund work."  Doc. 22144 at 11.  As the Committee notes, there is no realistic way

to reliably trace what factors led to Bard's decision to settle with BCM or other plaintiffs' lawyers.  Doc. 22149 at 13.[14]  If BCM's post-remand efforts enhanced the value of its settlements, BCM and its clients will benefit financially from that increased value.  The overall results were, however, due at least in part to the work done in the MDL, and the Court will not attempt to parse the value between the common benefit work and BCM's work.  *See* Doc. 22149 at 13.[15]

BCM's request to conduct discovery on confidential settlement amounts received by non-BCM clients is denied.  *See* Doc. 22144 at 10 n.14; *see also* Doc. 22148 (opposing discovery regarding other settlements because it would "decimate Bard's interests in confidentiality [and] unnecessarily complicate the final proceedings of this MDL").  The Court also denies BCM's related request that the entire fee assessment at issue be set aside and held in escrow.  *See* Doc. 22144 at 10.

**IT IS ORDERED** that BCM's motion to reduce and exempt client recoveries from common benefit fee and expense assessments (Doc. 22144) is **denied**.

Dated this 20th day of May, 2022.

David G. Campbell
Senior United States District Judge

---

[14] As already noted, Bard disputes BCM's description of the value of their settlements and the value of BCM's litigation efforts since cases were remanded from the MDL.  Doc. 22148 at 2.

[15] This conclusion would not change even if, as BCM alleges, thrombosis injuries were not adequately addressed in the MDL.  *See* Doc. 22144 at 5, 10; Doc. 22151 at 8. Individual cases litigated outside of the MDL naturally would focus on factors unique to those cases – factors that may not have received primary attention in the MDL.  This does not change the fact that each case benefitted substantially from the foundation built by the MDL common benefit work.